# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## JOINT MOTION OF THE CITY OF DETROIT AND THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN FOR THE ENTRY OF AN ORDER ENFORCING THE PLAN OF ADJUSTMENT AND CONFIRMATION ORDER AGAINST DANIEL J. SALKOWSKI, JEFFREY HAMM, AND RICHARD MAKULSKI

The City of Detroit, Michigan ("City") and the Police and Fire Retirement System of the City of Detroit, Michigan ("PFRS" and together with the City, the "Movants") file this *Joint Motion of the City of Detroit and the Police and Fire Retirement System of the City of Detroit, Michigan for the Entry of an Order Enforcing the Plan of Adjustment and Confirmation Order Against Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski* ("Motion"). In support of this Motion, the Movants respectfully state as follows:

## I. Introduction

1. On July 25, 2019, Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski (collectively, the "Plaintiffs") commenced a state court action against the City that is barred by the City's confirmed plan of adjustment. In their state court action, the Plaintiffs completely ignore the heavily-negotiated and binding pension

settlement codified in the plan - a settlement that was "[t]he final component of the Grand Bargain" and "border[ed] on the miraculous." Supplemental Opinion Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing (the "Confirmation Opinion," Doc. No. 8993), pp. 35-36 (citations omitted).

2.     Plaintiffs and their counsel have known about the matter at issue here for many months – if not years.  But, without notice to the City or any of the other defendants in the state court action, and in disregard of the due process protections in the Michigan Court Rules that govern such actions, the Plaintiffs, alleging "emergency," improperly sought and obtained an *ex parte* temporary restraining order ("TRO").  The TRO compelled the City and the PFRS to violate the terms of the confirmed plan of adjustment and the pension settlement embodied therein. The City informed the Plaintiffs of these violations and asked them to voluntarily dismiss their state court action.  This request was ignored.  As a result, the City is left with no choice but to move this Court for an order (i) barring and permanently enjoining the Plaintiffs from asserting and prosecuting the claims described in the state court action, (ii) requiring the Plaintiffs to dismiss the state court action with prejudice, and (iii) assessing against Plaintiffs damages incurred by the City as a direct result of Plaintiffs' wrongful conduct.

## II. Jurisdiction

3.     The Court has subject matter jurisdiction over this Chapter 9 bankruptcy case and this contested matter under 28 U.S.C. § 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(O), because it is a proceeding "affecting…the adjustment of the debtor-creditor…relationship."  This is also a core proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). As this Motion seeks to enforce the confirmed Chapter 9 plan of adjustment, it is a proceeding "arising in" a case under title 11, because it is a proceeding that "by its very nature, could arise only in bankruptcy cases."  *Allard v. Coenen (In re Trans-Indus., Inc.)*, 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009).  The Court also retained jurisdiction under the Plan to enforce the Plan injunction and to resolve any suits that may arise in connection with the consummation, interpretation or enforcement of the Plan. Plan, Art. VII. F, G, I, at p. 72.

## III. Factual Background

### A.     The Plaintiff's State Court Lawsuit

4.     On July 25, 2019, the Plaintiffs filed a Complaint in the Wayne County Circuit Court against the City, the PFRS and the Detroit Fire Fighters Association Local 344 ("DFFA", and together with the City and the PFRS, the "Defendants").  The Complaint is attached as **Exhibit 6A**.

13-53846-tjt    Doc 13090    Filed 08/09/19    Entered 08/09/19 10:13:05    Page 3 of 226

5.     Plaintiff Salkowski and Makulski allege that in July 2014 they submitted applications for participation in the deferred retirement option program ("DROP").  Complaint ¶ 17.  Plaintiff Hamm alleges that he submitted his application in June 2014.  Complaint ¶ 18.

6.     The DROP program provides members of the PFRS who are eligible to retire with a pension, the option to continue working subject to certain pension modifications.  **Exhibit 6I,** New PFRS Active Pension Plan, pp. 48-50.  Generally speaking, under DROP, the electing member (a) continues to work for the City beyond the eligible age for her retirement for her full salary and (b) receives a portion of the pension benefit that otherwise would have been paid to the member during the DROP period had the member elected to retire and not participated in DROP.  *Id.*

7.     The Plaintiffs allege that when they submitted their applications to participate in DROP in June and July 2014, the terms of DROP would have permitted them to work for an unlimited number of years after their acceptance into the program.  Complaint ¶ 9.

8.     The Plaintiffs assert that their applications to participate in DROP were accepted after the City and the DFFA ratified the 2014-2019 collective bargaining agreement on November 6, 2014.  Complaint ¶ 23. At that point, the Plaintiffs allege that the time period had changed from an unlimited number of

years to five years and that they were not made aware of the change or that some or all of the Defendants misrepresented the applicable time period. Complaint ¶¶ 21-22.

9. The Plaintiffs further allege that they were not notified of these changes because of a "gag order issued within the bankruptcy proceeding." Complaint ¶ 14-15.

10. Furthermore, the Plaintiffs allege that they were informed in **August 2015** that DROP only permitted them to work for five years after their acceptance into the program. Complaint ¶¶ 25-26. As a result, the Plaintiffs were told that they must retire in August 2019. Complaint ¶ 38-39.

11. The Complaint requested that the state court enter an injunction prohibiting the Defendants from forcing the Plaintiffs to retire in August 2019 and to allow the Plaintiffs to continue in their roles with the Detroit Fire Department pending resolution of the state court action.

12. Although the Plaintiffs did not attach their applications to participate in DROP to the Complaint, the Movants attach them as exhibits to this Motion. **Exhibit 6B**. As set forth in "Step 2 – DROP Election Date", each of the Plaintiffs selected a DROP Election Date of either August 8 or 9, 2014. These are the earliest possible dates that the Plaintiffs could participate in DROP because they are the dates on which the respective member first attained the requisite 20 years or

25 years (as applicable) of service to qualify.[1]  As was the case here, members often submit their applications to participate in DROP months before the date on which they are first eligible to participate in the program.  Exhibit 5-B, Declaration of Kelly Tapper ("PFRS Declaration").  However, the application date is not controlling.  *Id.*  Instead, the controlling date and the date on which DROP benefits are calculated is the DROP Election Date provided that the application has been accepted on or before such date.  *Id.*  The DROP Election Date may not be any earlier than the date on which the respective member attained 20 years or 25 years (as applicable) of service, which in the case of the Plaintiffs was August 8 or 9, 2014. *Id.*

13.    As set forth in the "Member Acknowledgement" section of the application to participate in DROP, each Plaintiff irrevocably elected "the above DROP election date for participation in the Deferred Retirement Option Plan."

14.    Along with the Complaint, the Plaintiffs also filed a *Motion for a Temporary Restraining Order, Show Cause Order, and Preliminary Injunction* ("TRO Motion").  The TRO Motion is attached as **Exhibit 6C**.  Prior to serving the TRO Motion on the City or the PFRS and in violation of the Michigan Court

---

[1] The text under the DROP election date on the DROP program application provides "I am eligible for a 25 year service retirement (or such other DROP eligible service retirement requirement as provided in the applicable collective bargaining agreement) from the Police and Fire Retirement System of the City of Detroit ("System") at the time of my election."

- 6 -

34130634.7\022765-00213

Rules, including MCR 3.310(B)(2)(b),[2] on August 1, 2019, the Plaintiffs obtained a *Temporary Restraining Order and Order to Show Cause* ("TRO") with no prior notice to the Defendants. The TRO is attached as **Exhibit 6D**. The TRO provides in pertinent part that the "Defendants are restrained from completing the process of retiring Plaintiffs from their positions as Detroit Fire Fighters." TRO ¶1. The state court ordered the Defendants to appear before the court on August 12, 2019, at 9:30 a.m. "to show cause why the restraining order should not be made a preliminary injunction." TRO ¶ 4. The Court subsequently rescheduled the hearing for August 15, 2019 at 9:30 a.m.[3]

15. On June 3, 2019, months before the Plaintiffs filed the Complaint and the TRO Motion, the Plaintiffs were notified in writing that their employment must cease in August 2019. Termination Letters, **Exhibit 6E**. The Plaintiffs also admit that in August 2015, they were aware that their retirement dates were in August 2019. Complaint ¶ 25. Plaintiffs, however, choose to wait until two weeks before their retirement dates to file the Complaint and the TRO Motion and seek expedited relief in the form of the TRO without any prior notice to Defendants.

---

[2] This Court rule provides that an ex parte temporary restraining order without notice must state why the order was granted without notice. The TRO does not.

[3] The fact that Plaintiffs' counsel gave no notice to the City is inexcusable. The City's law department is in the same building as the Judge from whom Plaintiffs secured the *ex parte* TRO. In a hearing held in 2014 in the City's bankruptcy case, Judge Rhodes excoriated another attorney for similar conduct.

**B.      The City's Disclosure Statement and Bankruptcy Plan**

16.      On July 18, 2013 ("Petition Date"), the City filed this chapter 9 case.

17.      On May 5, 2014, the City filed its *Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Doc. No. 4391] ("Disclosure Statement").  This was the version of the Disclosure Statement approved by the Court.  Relevant excerpts from the Disclosure Statement are attached as **Exhibit 6F**.

18.      Throughout the Disclosure Statement and the *Fourth Amended Plan of the Adjustment of Debts of the City of Detroit* ("Fourth Amended Plan") that was attached as exhibit to the Disclosure Statement, the City states that the old pension plan will be frozen and that there will be a new plan which will govern the accrual of pension benefits by active employees on or after July 1, 2014.  **Exhibit 6F.**  For example, the Disclosure Statement provides:

> The Plan provides that, on the Effective Date, the City will assume the obligations related to the already accrued benefits under the GRS pension plan and the PFRS pension plan as those benefits will have been modified in the Plan. This means that the City will not seek to terminate the GRS or the PFRS, although their respective pension plans will be closed to new participants, and vested active employees will not continue to accrue additional pension benefits under the terms and conditions of the current plans, i.e., the two plans will be "frozen." For a discussion of the City's proposal regarding the accrual of pension benefits by active employees on or after July 1, 2014, see Section II.B of this Disclosure Statement and Sections I.A.191 and I.A.189 of the Plan, regarding the New PFRS Active Pension Plan Formula and the New GRS Active Pension Plan Formula.

- 8 -

Disclosure Statement, Doc. No. 4391, p. 26.

> If you are an active employee who is not currently collecting pension payments but you have earned a monthly pension based on employment with the City and you are currently vested in such monthly pension or you work enough years with the City before and after June 30, 2014 to become vested in such monthly pension, you will receive upon your future retirement a monthly pension equal to the sum of (a) your PFRS Adjusted Pension Amount, which will be the same starting monthly pension amount you earned as of June 30, 2014 under the current pension program, but your annual COLAs will be reduced or eliminated, plus (b) your "New Accrued Pension." Your "New Accrued Pension" is the part of your pension that will be earned under a new "hybrid" pension plan based upon service from and after July 1, 2014. This is called the "New PFRS Active Pension Plan" in the Plan.

Disclosure Statement, Doc. No. 4391, p. 3. There are further examples on pp. 51, 52, 65 of the Disclosure Statement filed as docket number 4391. The New PFRS Active Pension Plan is also discussed in several places in the Fourth Amended Plan and the material terms were attached as an exhibit to the Fourth Amended Plan. *See* Doc. No. 4391-1, pp. 7, 24, 40, 41, 221-225 of 302.

19.     Most importantly, the Disclosure Statement also states that the future participation in the DROP program would be limited to *five years*:

> If you are an active employee and you continue to work for the City after July 1, 2014, you will also earn a new monthly pension under the New PFRS Active Pension Plan that will be paid at retirement along with your PFRS Adjusted Pension Amount. The monthly pension amount that you earn after July 1, 2014 is called your "New Accrued Pension." The pension formula for years of service after July 1, 2014 will be less generous than the formula that currently applies to your pension. For purposes of determining whether you are vested in your New Accrued Pension, your service with the City before and after

- 9 -

July 1, 2014 will be taken into account. If the terms of the bargaining agreement between the City and your union so provide, you will be entitled to elect into a deferred retirement option plan ("DROP") for your frozen benefit and for your New Accrued Pension. **If you are not currently participating in the DROP program, your participation in DROP will be limited to 5 years. If you previously irrevocably elected into a DROP, you will continue to participate in the DROP in accordance with the terms of the bargaining agreement between the City and your union.**

Disclosure Statement, Doc. No. 4391, p. 33.

20.     Each of the Plaintiffs was served with the *Notice of Hearing to Consider Approval of Disclosure Statement with respect to Plan for the Adjustment of Debts of the City of Detroit*. Certificate of Service, Doc. No. 2823-2, p. 19 of 171 and Doc. No. 2823-11, p. 129 of 171 (Daniel J. Salkowski), Doc. No. 2823-2, p. 165 of 171 (Jeffrey R. Hamm) and Doc. No. 2823-4, p. 6 of 171 and Doc. No. 2823-11, p. 98 of 171 (Richard S. Makulski).   The above excerpts from the certificate of service are attached as **Exhibit 6G**.

21.     On May 5, 2014, this Court entered an order approving the Disclosure Statement.   [Doc. No. 4401]. The order provides, among other things, that the Disclosure Statement contains "adequate information" under the Bankruptcy Code.

22.     On October 22, 2014, the City filed its *Eighth Amended Plan of the Adjustment of Debts of the City of Detroit* ("Plan"), which this Court confirmed on November 12, 2014.   [Doc. Nos. 8045 & 8272].   On December 10, 2014 ("Effective Date"), the Plan became effective.  [Doc. No. 8649.]

- 10 -

23.     Each of the Plaintiffs was served with *Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit and (II) Occurrence of Effective Date* [Doc. No. 9000].   Certificate of Service, Doc. No. 9000-1, p. 268 of 569 and Doc. No. 9000-4, p. 259 of 569 (Daniel J. Salkowski), Doc. No. 9000-1, p. 474 of 569 (Jeffrey R. Hamm) and Doc. No. 9000-2, p. 162 of 569 and Doc. No. 9000-4, p. 216 of 569 (Richard S. Makulski). The above excerpts from the certificate of service are attached as **Exhibit 6H**.

### C.     The PFRS Settlement and the New PFRS Active Pension Plan

24.     Class 10 of the Plan provides for treatment of pension claims of the PFRS.   Plan, Article II.B.q, p. 38.   These pension claims were allowed in the aggregate amount of approximately $1,250,000,000.  *Id.*

25.     The Plan also provided for a new plan for the pension system, which is called the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (Amendment and Restatement Effective July 1, 2014) ("Plan Document").   The Plan Document was attached to the Plan as an exhibit.  Plan, pp. 38-39; Exhibits I.A.254.a, Exhibit I.A.281.

26.     The Plan Document has two components: Component I of the Plan Document applies to benefits accrued by members of the PFRS on or after July 1, 2014, and to the operation of the PFRS on or after July 1, 2014 (i.e., to active

- 11 -

employees).  The Plan identifies Component I as the "<u>New PFRS Active Pension Plan</u>."  *See* Exhibit I.A.254.a to the Plan, Doc. No. 8045-1, page 448, 456 of 809.

27.     Under the Plan, the New PFRS Active Pension Plan governs pension benefits for service on or after July 1, 2014:

> Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

Plan, Article II.B.q.E, p. 39.

28.     Component II of the Plan Document generally applies to benefits accrued by members of the PFRS prior to July 1, 2014.  The Plan identifies Component II as the "<u>Prior PFRS Pension Plan</u>."  *See* Exhibit I.A.281, Doc. No. 8045-1, page 590, 599 of 809.

29.     The final version of the Plan Document (i.e. the New PFRS Active Pension Plan and the Prior PFRS Pension Plan) was attached as Exhibit E to Emergency Manager Order 44.  Emergency Manager Order 44 and Exhibit E are attached as **Exhibit 6I**.

30.     Pursuant to the New PFRS Active Pension Plan, members of the PFRS who elect the DROP program can work for only five years after making the DROP election.  *See* New PFRS Active Pension Plan, § 12.1(2), p. 48.  Five years is the maximum.

### D.     The Plan and the PFRS Settlement

31.     In its opinion confirming the Plan, the Court discussed the PFRS

settlement as part of the Pension Global Settlement, calling it "[t]he final

component of the Grand Bargain."

> The GRS, the PFRS and the retiree committee, on one hand, and the
> City, on the other hand, aggressively disputed the pension plans'
> UAAL.[4]   The GRS and PFRS reported that as of June 30, 2013, the
> GRS was 70% funded and the PFRS was 89.3% funded with a
> combined total UAAL for both retirement systems of only $1.5
> billion.  The City claimed that the UAAL is actually $2 billion for the
> GRS and $1.4 billion for the PFRS, for a total of $3.4 billion.

Confirmation Opinion, pp. 35-36 (citations omitted) [Doc. No. 8272].  The Court

went on to note that

> For PFRS pension claims, the accrued pension amount will not be
> reduced.  However, the annual cost of living adjustment ("COLA")
> will be reduced to 45% of the amount provided in pre-petition
> collective bargaining agreements.

> For GRS pension claims, the accrued pension amount will be reduced
> by 4.5% and COLAs will be eliminated. Some GRS retirees will also
> be subject to the terms of an annuity savings fund ("ASF")
> recoupment.  [. . .]

> Because of the outside money committed as part of the Grand
> Bargain, the City will have little responsibility for funding the GRS
> and the PFRS through June 2023.  During that time period, the PFRS
> will be funded exclusively from contributions from the DIA, the DIA
> Funders, the Foundation Funders and the State under the Grand
> Bargain, as described previously.

---

[4] Unfunded Actuarial Accrued Liabilities.

34130634.7\022765-00213

Through 2023, GRS funding will come from: (a) the DWSD; (b) a portion of the contributions from the State, the DIA, the DIA Funders, and the Foundation Funders as part of the Grand Bargain, (c) the proceeds from the Stub UTGO Bonds as part of the UTGO settlement, described in part III.K. below, and (d) certain revenues from City departments, (e) the Detroit Public Library and (f) the Detroit Regional Convention Facility Authority.

In addition, the parties agree that the pension plans in effect on the petition date will be frozen as of July 1, 2014. Active employees continuing to work for the City after July 1, 2014, will have benefits accrue under new hybrid pension plans. The pension formulas contained in the new hybrid plans are less generous than those in the prior plans.

*Id.*, pp. 36-37 (citations omitted). After discussing other aspects of the Pension Global Settlement, the Court considered whether the settlement was fair and equitable. The Court noted that, although "the pension classes voted to accept the plan by 82% in class 10 (PFRS) and 73% in class 11 (GRS)[,] the treatment of pension claims in the City's plan has been a significant issue in this case." *Id.*, pp. 38-39. The Court observed that a significant number of pension creditors objected to any impairment of pension claims. *Id.*, p. 39. Nonetheless, the Court approved the pension settlement as fair and reasonable. *Id.*, p. 40. Indeed, the Court wrote

It is therefore a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. Without the outside funding from the Grand Bargain, the City anticipated having to reduce pensions by as much as 27%. The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

[. . .]

- 14 -

As noted, a substantial majority of both classes 10 and 11 voted in favor of the City's plan and accepted the necessity of shared sacrifice for the common good of the City. That collective judgment is entitled to substantial consideration here.

Accordingly, the Court finds that the pension settlement is reasonable and approves it.

*Id.*, pp. 40-41. The Court thus approved the PFRS Settlement. *Id.*, Plan, Art II.B.3.q; Confirmation Order, pp. 33-34, ¶ N.6; *see also* p. 70, ¶ C.5. The PFRS Settlement, and its contribution to the overall Grand Bargain, was thus an integral part of the City's Plan and a linchpin in the successful restructuring of the City's finances.

### E. The Injunction and Exculpation Provisions in the Plan

32. To protect the pension settlement and the Grand Bargain, the Plan contained an injunction, which provides that:

> **Injunction**
>
> **On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**
>
> **a. all Entities that have been, are or may be holders of Claims against the City…shall be permanently enjoined from taking any of the following actions against or affecting the City or its property…**
>
> **1. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affect the City of its property…**
>
> **5. proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

- 15 -

**6.** **taking any actions to interfere with the implementation or consummation of the Plan.**

Plan, Article III.D.5, at pp.50-51 (emphasis added).

33. The Plan also contains an exculpation provision to protect those parties that negotiated and implemented the Plan, the pension settlement and the Grand Bargain:

> From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City….

Plan, p. 51.

34. The PFRS is included within the definition of Exculpated Parties. Plan, pp. 14-15.

34130634.7\022765-00213

**F.     Harm to the City and the PFRS Caused by the TRO and the Lawsuit**

35.     As emphasized in the attached Affidavit of Robert Distelrath, Chief of Fire Operations for the City of Detroit's Fire Department, the TRO is causing the City harm. *See* Declaration of Robert Distelraff, Exhibit 5-A. Based on the Plaintiffs' impending retirement, the City Fire Department planned to promote other fire fighters in the department. Those promotions are now on hold. *Id.* The TRO harms the members scheduled to be promoted as to salary, average final calculations for retirement and DROP options. *Id.* This TRO also harms the department by disrupting the deployment of manpower, and lowering the morale within the department. *Id.*

36.     Further, as set forth in the declaration of Kelly Tapper, the Assistant Executive Director at the PFRS, the TRO is causing or will cause the following additional harms to the City:

(a)     By restraining the City from completing Plaintiffs' retirement process, the TRO forces the City to violate its Plan. *See* Plan, Art. II.B.3.q.ii (discussing Class 10 – PFRS Pension Claims) *and* Plan, attachment I.A.254.a (*Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan*), Art. 12, Section 12.1 (Doc. No. 8045-1, p. 502 of 809) (limiting DROP participation to five years).

(b)     This Plan violation is a default under the DIA settlement agreement which must be reported to the DIA settlement "Funders" and which, in principle, threatens continued funding of the DIA settlement. *See* Plan, attachment I.A.126 (*Principal*

- 17 -

*Terms of DIA Settlement*), Conditions to Future Funding Obligations (Doc. No. 8045-1, p. 71 of 809).

(c)    Allowing Plaintiffs to postpone retirement also violates the Memorandum of Understanding between the City and the Detroit Fire Fighters Association. *See* Exhibit 6-J, p. 3, DROP ACCOUNTS ("No more than 5 years of DROP participation for employees not already in DROP as of June 30, 2014.")

(d)    The TRO encourages other members affected by the five-year DROP limitation to seek similar, if still improper, relief.

(e)    IRS regulations mean that the TRO, if upheld, would have tax implications for the retirement system, including a possible adverse qualification determination which would affect all members of the system.

PFRS Declaration, Exhibit 5-B.

37.    Finally, the TRO has harmed the City by forcing it to file this Motion to protect itself.

## IV. Argument

38.    The Plaintiffs' claims in the state court action seek to undermine the plain terms of the Plan and the New PFRS Active Pension Plan. This pension settlement was "[t]he final component of the Grand Bargain" and "border[ed] on the miraculous." Confirmation Opinion, pp. 35-36.

39.    Under section 944(a) of the Bankruptcy Code, the Plaintiffs are bound by this settlement and all of the other terms of the Plan.

40.    Pursuant to the Plan, the New PFRS Active Pension Plan governs pension benefits for service on or after July 1, 2014:

34130634.7\022765-00213

> Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

Plan, Article II.B.q.E, p. 39.

41.    And, the New PFRS Acive Pension Plan unequivocally provides that "A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years. At the end of such five year period of participation in the DROP program, the Member shall be retired from employment." New PFRS Active Pension Plan, p. 48.

42.    Plaintiffs Salkowski and Makulski did not submit their DROP applications until after July 1, 2014. And, even though Plaintiff Hamm submitted his application before July 1, 2014, that is irrelevant because Hamm was not eligible to participate in the program until August 2014 (as he admits in his application). Consequently, under the plain terms of the Plan and the New PFRS Active Pension Plan, the Plaintiffs participation in the DROP program is limited to five years.  Thus, the claims in the Complaint that they are entitled to participate for an unlimited period of time are wrong and violate the confirmed Plan by which Plaintiffs are bound.

- 19 -

43.     Further, any claims against the City or the PFRS for misrepresentation or withholding of information are not only false, but also violate the exculpation provisions in the Plan.  As set forth above, at least one month before the Plaintiffs filed their applications, the Disclosure Statement provided that participation in the DROP program would be limited to five years.  And, notice of the Disclosure Statement was served on Plaintiffs and approved by the Court.  Thus, all of the Plaintiffs' claims that this information was withheld, misrepresented or otherwise not available are unequivocally and demonstrably false and untrue.  Further, any claims against the City or PFRS for misrepresentation or withholding of information are barred under the exculpation provisions in the Plan.

44.     The Court may award compensatory damages, including attorneys' fees and costs, when a creditor violates a discharge injunction despite having knowledge of it.  *Holley v. Oliver, PLLC*, 473 B.R. 212, 215-16 (Bankr. E.D. Mich. 2012).

45.     For a court to impose compensatory sanctions, it must be shown by clear and convincing evidence that the creditor had knowledge of a definite and specific order yet still violated it.  *Id.* at 215.  Once a knowing violation of an order by a creditor has been shown, to avoid the imposition of sanctions, the creditor must show that it "took all reasonable steps within [its] power to comply with the court's order."  *Id.* (citation and internal quotation marks omitted)).

- 20 -

46.     Here, Plaintiffs clearly knew about the City's confirmed Plan and its terms; they cite it in their Complaint.  Complaint, ¶ 41.  They chose to file their Complaint anyway.  There is no way that Plaintiffs can show that they "took all reasonable steps within their power to comply with [this C]ourt's order" when they knowingly filed their Complaint despite the Plan injunction.  *Holley*, 473 B.R. at 215.  The City thus asks the Court to award the City its costs and attorneys' fees in responding to the Complaint and in drafting and filing this Motion and the accompanying *ex parte* motion to expedite the hearing on this Motion.

## V.     Conclusion

47.     The Movants respectfully request that the Court enter an order in substantially the same form as the form attached as Exhibit 1, (1) requiring the Plaintiffs to dismiss the Complaint with prejudice, (2) ordering the Plaintiffs to refund any pay to the City that they obtained on or after August 8, 2019 for Plaintiffs Makulski and Hamm and on or after August 9, 2019 for Plaintiff Salkowski, and (3) awarding the City its costs and attorneys' fees incurred in connection with the Complaint and the TRO.  With respect to pay made by the City after August 9, 2019, a date that had been the set retirement date for months, because of the improper *ex parte* TRO the City was forced to continue paying the Plaintiffs after the retirement date.  The City seeks recovery of their wrongfully

compelled payments. The City sought, but did not obtain, concurrence to the relief requested in this Motion.

Dated: August 9, 2019

Respectfully submitted,

By: /s/ Marc N. Swanson
Jonathan S. Green (P33140)
Marc N. Swanson (P71149)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
green@millercanfield.com
swansonm@millercanfield.com

Charles N. Raimi (P29746)
Deputy Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Coleman A. Young Municipal Center
Detroit, Michigan 48226
Telephone: (313) 237-5037
Facsimile: (313) 224-5505
raimic@detroitmi.gov

Attorneys for the City of Detroit

- and –

By: /s/  Jennifer K. Green

Jennifer K. Green (P69019)
Ronald A. King (45088)
Shannon L. Deeby (P60242)
Clark Hill PLC
151 S. Old Woodward Ave., Suite 200
Birmingham, MI  48009
(248) 988-2315
jgreen@clarkhill.com

Attorneys for Police and Fire Retirement System
for the City of Detroit

- 23 -

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## **EXHIBIT LIST**

| | |
|---|---|
| Exhibit 1 | Proposed Order |
| Exhibit 2 | Notice of Opportunity to Object |
| Exhibit 3 | None |
| Exhibit 4 | Certificate of Service |
| Exhibit 5A | Affidavit of Robert Distelrath |
| Exhibit 5B | PFRS Declaration |
| Exhibit 6A | Complaint |
| Exhibit 6B | DROP Program Applications |
| Exhibit 6C | TRO Motion |
| Exhibit 6D | Temporary Restraining Order |
| Exhibit 6E | Termination Letters |
| Exhibit 6F | Excerpts from Disclosure Statement |
| Exhibit 6G | Excerpts from Certificate of Service (Notice of Hearing) |
| Exhibit 6H | Excerpts from Certificate of Service (Notice of Plan Confirmation) |
| Exhibit 6I | Emergency Manager Order 44 and Exhibit E |
| Exhibit 6J | MOU between the City and the DFFA |

# EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## ORDER GRANTING JOINT MOTION OF THE CITY OF DETROIT AND THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN FOR THE ENTRY OF AN ORDER ENFORCING THE PLAN OF ADJUSTMENT AND CONFIRMATION ORDER AGAINST DANIEL J. SALKOWSKI, JEFFREY HAMM, AND RICHARD MAKULSKI

This matter, having come before the Court on the *Joint Motion of the City of Detroit and the Police and Fire Retirement System of the City of Detroit, Michigan for the Entry of an Order Enforcing the Plan of Adjustment and Confirmation Order Against Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski* ("Motion"),[1] upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.    The Motion is granted.

---

[1] Capitalized terms used but not otherwise defined in this Order shall have the meanings given to them in the Motion.

2.     Within five days of the entry of this Order, Plaintiffs Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski shall each dismiss, or cause to be dismissed, with prejudice the lawsuit captioned as *Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski, Plaintiffs v. City of Detroit, the Detroit Police and Fire Pension Board, Detroit Firefighters Association Local 344, Defendants*, filed in the Third Circuit Court for Wayne County, State of Michigan, case number 2019-009993-CL ("Lawsuit").

3.     Within five days after the entry of this Order, Daniel J. Salkowski must pay to the City the amount of any wages or other compensation provided to him by the City on or after August 8, 2019.

4.     Within five days after the entry of this Order, Jeffrey Hamm must pay to the City the amount of any wages or other compensation provided to him by the City on or after August 7, 2019.

5.     Within five days after the entry of this Order, Richard Makulski must pay to the City the amount of any wages or other compensation provided to him by the City on or after August 7, 2019.

6.     The City may submit a bill of attorneys' fees and costs it incurred in responding to the Lawsuit.  The Court will set a hearing on proper notice to consider ordering any or all of Daniel J. Salkowski, Jeffrey Hamm, Richard Makulski, and their attorney to reimburse the City for these costs.

34130634.7\022765-00213

7.     The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

## EXHIBIT 2 – NOTICE

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## NOTICE OF OPPORTUNITY TO OBJECT TO JOINT MOTION OF THE CITY OF DETROIT AND THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN FOR THE ENTRY OF AN ORDER ENFORCING THE PLAN OF ADJUSTMENT AND CONFIRMATION ORDER AGAINST DANIEL J. SALKOWSKI, JEFFREY HAMM, AND RICHARD MAKULSKI

The City of Detroit has filed papers with the Court requesting the Court to enforce the Confirmation Order Against Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski.

**Your rights may be affected.** **You should read these papers carefully and discuss them with your attorney.**

If you do not want the Court to enter an Order granting the *City of Detroit's and the Detroit Police and Fire PFRS's Joint Motion For the Entry of an Order Enforcing the Plan of Adjustment and Confirmation Order Against Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski,* within 14 days, you or your attorney must:

1.    File with the court a written response or an answer, explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above.  You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2.    If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
     Marc N. Swanson (P71149)
     150 West Jefferson, Suite 2500
     Detroit, Michigan 48226
     Telephone: (313) 496-7591
     Facsimile: (313) 496-8451
     swansonm@millercanfield.com

Dated:  August 9, 2019

34130634.7\022765-00213

## **EXHIBIT 3 – NONE**

34130634.7\022765-00213

## EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 9, 2019, he served a copy of the foregoing **JOINT MOTION OF THE CITY OF DETROIT AND THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN FOR THE ENTRY OF AN ORDER ENFORCING THE PLAN OF ADJUSTMENT AND CONFIRMATION ORDER AGAINST DANIEL J. SALKOWSKI, JEFFREY HAMM, AND RICHARD MAKULSKI** upon counsel for Daniel J. Salkowski, Jeffrey Hamm and Richard Makulski, in the manner described below:

Via first class mail and email:

Elizabeth A. Ferguson
Law Offices of Elizabeth A. Ferguson, PLLC
55 Southbound Gratiot
Mount Clemens, MI 48043
lizferguson@lawofficeseaferguson.com

DATED:  August 9, 2019

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

# EXHIBIT 5A – DECLARATION OF ROBERT DISTELRAFF

34130634.7\022765-00213

## STATE OF MICHIGAN
## IN THE THIRD CIRCUIT COURT FOR WAYNE COUNTY

DANIEL J. SALKOWSKI  
JEFFRREY HAMM  
RICHARD MAKULSKI

Case No. 2019-009993-CL  
Hon. John A. Murphy

       Plaintiffs

V

CITY OF DETROIT,  
DETROIT POLICE & FIRE PENSION BOARD  
DETROIT FIRE FIGHTERS ASSOCIATION, LOCAL 344

       Defendants

---

ELIZABETH A. FERGUSON (P53645)  
Law Ofcs of Elizabeth A Ferguson, PLLC  
Attorney for Plaintiffs  
55 S Gratiot  
Mount Clemens, MI 48043  
586-206-0157  
lizferguson@lawofficeseaferfuson.com

LETITIA C. JONES (P52136)  
City of Detroit Law Department  
2 Woodward, #500  
Detroit, MI 48226  
(313) 237-3002  
jonelc@detroitmi.gov

---

### AFFIDAVIT – ROBERT DISTELRATH

I, Robert Distelrath, being first duly sworn, hereby state the following in the above captioned matter:

1) I am employed with the City of Detroit in the Fire Department as the Chief of Fire Operations.

2) Plaintiffs elected the option of retiring under the DROP program, which provides for retirement in five years.

3) Letters were sent to the Plaintiffs giving notice of the retirement dates.

4) Based on Plaintiff's expected retirements, the department issued promotions to other members of the department.

5) The recent TRO filed by Plaintiffs prevents the implementation of the promotions that have been in the works causing irreparable harm to the promoted members and the Department;

6) The TRO harms the members scheduled to be promoted as to salary, average final calculations for retirement, and DROP options.

7) The TRO harms the department by disrupting the deployment of manpower, and lowering the morale within the department,

8) The TRO affects the negotiated contract by causing uncertainty of the DROP process moving forward and causes further litigation on an issue negotiated by the City and the Union.

9) If called to testify on this matter, I can competently testify to the facts as stated in this affidavit.

Date: August 5, 2019                    By: _____

**Robert Distelrath**, *Affiant*

*Subscribed and sworn before me*
*On 5ᵗʰ day of August, 2019*

_____
Myria Ross, Notary Public
Wayne County, MI
My Commission expires 9-3-2024

MYRIA ROSS
Notary Public, State of Michigan
County of Wayne
My Commission Expires Sep. 03, 2024
Acting in the County of Wayne

# EXHIBIT 5B – PRFS DECLARATION

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## DECLARATION OF KELLY TAPPER IN SUPPORT OF THE CITY OF DETROIT'S AND THE DETROIT POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT'S JOINT MOTION FOR THE ENTRY OF AN ORDER ENFORCING CONFIRMATION ORDER AGAINST DANIEL J. SALKOWSKI, JEFFREY HAMM, AND RICHARD MAKULSKI

I, Kelly Tapper, submit this declaration in support of the *Joint Motion of the City of Detroit and the Police and Fire Retirement System of the City of Detroit for the Entry of an Order Enforcing the Plan of Adjustment and Confirmation Order Against Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski* ("Motion").

1.      I am the Assistant Executive Director of the Police and Fire Retirement System of the City of Detroit, Michigan ("PFRS").

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge or are based upon information provided to me by PFRS employees or its legal counsel.  If I am called to testify, I can and will testify to the facts set forth in this declaration.

3.      I have reviewed the *Temporary Restraining Order and Order to Show Cause* ("TRO") entered by Honorable John A. Murphy, Judge in the Third Circuit

34151423.4\022765-00213

Court for Wayne County, Michigan, in Case Number 2019-009993-CL ("State Court Case") on August 1, 2019. I have also reviewed the complaint in the State Court Case.

4.    I understand the TRO as enjoining the City and PFRS from completing the retirement process for the Plaintiffs in the State Court Case.

5.    I also understand that the Plaintiffs were required to retire on August 7 or 8, 2019 ("Effective Date").

6.    On October 22, 2014, the City filed its *Eighth Amended Plan of the Adjustment of Debts of the City of Detroit* ("Plan"), which this Court confirmed on November 12, 2014.  [Doc. Nos. 8045 & 8272].

7.    The Plan provides for a new plan for the pension system, which is called the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (Amendment and Restatement Effective July 1, 2014) ("Plan Document").  The Plan Document was attached to the Plan as an exhibit.  Plan, pp. 38-39; Exhibits I.A.254.a, Exhibit I.A.281.

8.    The PFRS, among other things, administers the Plan in conformance with the Plan Document.

9.    The Plan Document has two components: Component I of the Plan Document applies to benefits accrued by members of the PFRS on or after July 1, 2014, and to the operation of the PFRS on or after July 1, 2014 (i.e., to active

employees). The Plan identifies Component I as the "New PFRS Active Pension Plan." *See* Exhibit I.A.254.a to the Plan, Doc. No. 8045-1, page 448, 456 of 809.

10. Under the Plan, the New PFRS Active Pension Plan governs pension benefits for service on or after July 1, 2014:

> Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

Plan, Article II.B.q.E, p. 39.

11. Component II of the Plan Document generally applies to benefits accrued by members of the PFRS prior to July 1, 2014. The Plan identifies Component II as the "Prior PFRS Pension Plan." *See* Exhibit I.A.281, Doc. No. 8045-1, page 590, 599 of 809.

12. The final version of the Plan Document (i.e. the New PFRS Active Pension Plan and the Prior PFRS Pension Plan) was attached as Exhibit E to Emergency Manager Order 44.

13. The New PFRS Active Pension Plan provides a retirement benefit referred to as the "Deferred Retirement Option Program" ("DROP").

14. Based on my review of the records of the PFRS, the earliest date on which any of the Plaintiffs attained 20 years of service was August 8 or August 9,

2014, making it the first date that any of the Plaintiffs were eligible to retire and thus begin participation in DROP.

15. The New PFRS Active Pension Plan limits DROP participation to a maximum of five years. PFRS Plan, ¶ 12.1(2).

16. Each plaintiff executed a DROP application in advance of attaining 20 years of service which set the DROP effective date on the date each attained 20 years of service.

17. In each case, the effective date occurred after July 1, 2014.

18. The DROP applications clearly state that the election to DROP is irrevocable, a requirement consistent with IRS regulations.

19. PFRS cannot legally permit any plan participant with a DROP effective date after July 1, 2014 to remain in DROP more than five years.

20. Compliance with the TRO after the Effective Date will cause PFRS to violate New PFRS Active Pension Plan, which includes the DROP terms. *Id.*

21. The City's compliance with the TRO after the Effective Date will thus cause the PFRS to violate the Confirmation Order.

22. Under the Plan, PFRS is required to certify to the City Treasurer and to the Foundation for Detroit's Future that it is in compliance with the Plan and Plan Documents as a condition of receipt of continued "Grand Bargain" funding.

- 4 -

23.     Violation of the Plan Documents will constitute a default under the operative documents and require reporting and remedial measures.

24.     Compliance with the TRO after the Effective Date will also violate provisions of the *Memorandum of Understanding between the City and the Detroit Fire Fighters Association*, a true copy of which is attached as Exhibit A, exposing PFRS to liability to other Detroit Fire Fighters Association members.

25.     PFRS is aware of other potentially impacted members who will likely seek a similar remedy if the Plaintiffs are allowed to postpone retirement beyond the five years provided by the DROP program in the New PFRS Active Pension Plan.

26.     IRS regulations require that if a mistake was made for one participant of the DROP program, (*i.e.*, by processing a DROP application incorrectly as the Plaintiffs allege in their Complaint), PFRS will have to correct the mistake by taking all impacted members (in addition to the Plaintiffs) out of DROP, even participants who entered DROP knowing full well that there was a five-year limitation.

27.     Compliance with the IRS regulations discussed above would also subject the New PFRS Active Pension Plan to a possible adverse qualification determination which would affect all members of the New PFRS Active Pension Plan.

34151423.4\022765-00213

28.     The accounting and crediting and debiting of various DROP and New PFRS Active Pension Plan accounts to comply with the TRO will be an extraordinary administrative undertaking which may have negative unintended consequences on other New PFRS Active Pension Plan members participating in DROP other than the Plaintiffs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

By: _____
    Kelly Tapper

Executed on August 8, 2019

34151423.4\022765-00213

# EXHIBIT 1

## Memorandum of Understanding between the City and the Detroit Fire Fighters Association

# MEMORANDUM OF UNDERSTANDING
## REGARDING THE POLICE AND FIRE RETIREMENT SYSTEM
### BETWEEN
### THE CITY OF DETROIT
### AND
### THE DETROIT FIRE FIGHTERS ASSOCIATION

This Memorandum of Understanding is made and entered into this $6$ day of November, 2014, by and between the City of Detroit ("City") and the Detroit Fire Fighters Association ("DFFA" or the "Association").

WHEREAS, on July 18, 2013, the City filed for protection under Chapter 9 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1550; and

WHEREAS, on December 5, 2013, the U.S. Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court") ruled that the City is eligible to be a debtor under Chapter 9 of the U.S. Bankruptcy Code; and

WHEREAS, the City's duty to bargain with the Association over changes to terms and conditions of employment has been suspended pursuant to Public Act 436, MCL § 141.1541 *et seq.*; and

WHEREAS, on August 16, 2013 the Bankruptcy Court ordered the City and the Association to participate in Court-supervised mediation regarding the terms of a successor collective bargaining agreement, including retirement benefits for current employees; and

WHEREAS, the City and the Association agree that it is in the best interests of the City and its employees for the City to provide fiscally responsible but high quality retirement benefits to its future retirees; and

WHEREAS, in connection with the mediation, the City and the Association have discussed ways to address the unfunded liabilities of the Police and Fire Retirement System ("PFRS") and to reach an agreement to provide sustainable retirement benefits to future retirees of the City; and

WHEREAS, benefit accruals under the PFRS ceased effective June 30, 2014, pursuant to Ordinance No. 12-14; and

WHEREAS, effective July 1, 2014, employees represented by certain City unions, including the DFFA, became eligible to participate in the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Combined Plan"), which consists of provisions relating to benefits accrued by members under PFRS prior to July 1, 2014 ("Old PFRS") and provisions relating to benefits accrued by members under PFRS on and after July 1, 2014 ("New PFRS"); and

1

WHEREAS, this Memorandum of Understanding supplements any collective bargaining agreements entered into between the City and the Association and/or any Act 312 Arbitration Award pertaining to the Association and the City until the expiration of this Memorandum of Understanding;

NOW, THEREFORE, it is agreed that the City and the Association have entered into this Memorandum of Understanding, and any proposals or counter-proposals made during related discussions by either the City or the Association, but not included in this Memorandum of Understanding, are hereby withdrawn. The City and the Association further agree as follows:

A.  The Police and Fire Retirement System.  During the term of this Memorandum of Understanding, pension benefits for eligible employees represented by the DFFA shall be in accordance with this Memorandum of Understanding, as follows:

1.  City Contribution.  The City shall contribute to New PFRS, on an annual basis, an amount equal to twelve and one-quarter percent (12.25%) of each eligible employee's base compensation.  A portion of such contribution will be credited to a rate stabilization fund.

2.  Employee Contribution.  Eligible employees hired by the City on or before June 30, 2014 shall make pre-tax contributions equal to six percent (6%) of their base compensation to New PFRS (pre-risk shifting).  Eligible employees hired or rehired by the City on and after July 1, 2014 shall make pre-tax contributions equal to eight percent (8%) of their base compensation to New PFRS (pre-risk shifting).

3.  Plan Terms.  Except as set forth herein, the following key terms relating to New PFRS shall apply to benefits accrued by eligible employees on and after July 1, 2014 and prior to January 1, 2024:

| BENEFIT FORMULA | Final Average Compensation (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014 x 2.0%.  Average base compensation does not include overtime, unused sick leave, longevity payments, or any other form of bonus or additional compensation – just the employee's base salary. |
| --- | --- |
| | Actual time for benefit accrual is actual time served. For vesting service, an eligible employee must work 1,000 hours in a 12-month period to accrue a year of service. |

2

| | |
|---|---|
| **NORMAL RETIREMENT AGE** | Age 50 with 25 years of service, with the following 7 year transition period for New PFRS benefits only:<br><br>Fiscal Year            Age and Service<br>2015                   Age 43 and 20 years<br>2016                   Age 43 and 20 years<br>2017                   Age 44 and 21 years<br>2018                   Age 45 and 22 years<br>2019                   Age 46 and 23 years<br>2020                   Age 47 and 24 years<br>2021 and thereafter       Age 50 and 25 years<br><br>Unreduced frozen Old PFRS benefits are payable in accordance with the requirements of PFRS as in effect on June 30, 2014 (that is, when an employee reaches 20 or 25 years of credited service, whichever applied to the employee as of June 30, 2014 under Old PFRS). |
| | 10 Years of Service for vesting. |
| | Deferred vested pension -- 10 years of service and age 55. |
| | Duty Disability - consistent with Old PFRS. |
| | Non-Duty Disability – consistent with Old PFRS. |
| | Non-Duty Death Benefit for Surviving Spouse – consistent with Old PFRS. |
| | Duty Death Benefit for Surviving Spouse – consistent with Old PFRS. |
| **COLA** | 1% compounded, variable. |
| **DROP ACCOUNTS** | Available for frozen Old PFRS benefits and future accrued benefits under New PFRS for employees who are eligible to retire under concurrent eligibility requirements. No more than 5 years of DROP participation for employees not already in DROP as of June 30, 2014. DROP accounts will be managed by PFRS instead of ING, if administratively and legally feasible. If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%. |
| **ANNUITY SAVINGS** | Voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted. |
| | Investment Return/Discount rate – 6.75%. |

3

| | |
|---|---|
| **RISK SHIFTING** | If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable).<br><br>If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until the PFRS actuaries can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:<br><br>1. eliminate COLAs (if applicable);<br>2. use amounts credited to the rate stabilization fund to fund accrued benefits;<br>3. increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees in year 1) for up to 5 years;<br>4. increase employee contributions (active and new employees) by an additional 1% per year;<br>5. increase employee contributions (active and new employees) by an additional 1% per year;<br>6. implement a 1 year COLA fallback;<br>7. implement a second 1 year COLA fallback;<br>8. increase employee contributions by an additional 1% per year; and<br>9. increase City contributions consistent with applicable actuarial principles and PERSIA. |

a) In accordance with the 2014-2019 collective bargaining agreement between the City and the DFFA ("CBA"), the ten percent (10%) cap on annual contributions to the Annuity Savings Account will not apply to payments of accrued sick leave into an Annuity Savings Account made pursuant to Article 24, Section I.8.c of the CBA.

b) Employees in the DFFA bargaining unit will have the option to participate in a one-time irrevocable "roll-in election" with respect to calculation of their frozen accrued benefits under Old PFRS. The purpose of this roll-in election is to give each eligible employee the option to allocate a portion of his or her unused sick pay bank to the employee's Average Final Compensation, which in turn will be used to determine the employee's frozen accrued benefits under Old PFRS as of June 30, 2014. If the employee elects to roll-in a portion of his or her unused sick pay, the employee's Average Final Compensation will include the portion of the employee's sick pay bank determined as of June 30, 2014 that would have been included in the member's Average Final Compensation in accordance with the terms of Old PFRS, as though the employee had retired on June 30, 2014 with 20 or 25 years of service (whichever applied to the employee as of June 30, 2014 under Old PFRS). In the event an employee terminates employment with the City prior to attaining 20 or 25

4

years of service (whichever applied to the employee as of June 30, 2014 under Old PFRS), the employee's roll-in election will be nullified. If an employee makes a roll-in election, the employee's unused sick leave bank will be reduced by the number of hours included in the employee's Average Final Compensation calculation and the employee may not use those hours for sick leave or receive the value in cash when the employee retires. The form for making a roll-in election will be available to employees on-line, and paper copies of the form will also be made available. An eligible employee wishing to roll-in a portion of his or her unused sick pay must sign the form in the presence of a witness and return the form to the PFRS office no later than November 15, 2014. The one-time roll-in election will have no impact on benefits accrued under New PFRS.

c)    For avoidance of doubt, 'eligible to retire under concurrent eligibility requirements' of the Combined Plan means that an Association member with accrued benefits under Old PFRS may retire upon attaining 20 or 25 years of service (whichever requirement applied to the employee as of June 30, 2014 under Old PFRS), regardless of age. This member would immediately receive a frozen pension under Old PFRS. If the member does not meet the age and years of service requirements of the New PFRS, he or she will begin receiving an additional payment (actuarially reduced to reflect early commencement) based on his or her accrued benefit under New PFRS when he or she turns 55. He or she can begin receiving an unreduced normal retirement benefit under New PFRS when he/she reaches age 62.

The age 50 and 25 years of service requirements of New PFRS apply only to New PFRS and are subject to the 7 year transition period set forth above. The transition applies to New PFRS benefits as set forth below:

> 1.    Under the transition, after July 1, 2014, an Association member who reaches 20 years of service and age 43 on or before June 30, 2015 can retire anytime after reaching 20 years of service and age 43, and he or she will immediately receive an unreduced accrued New PFRS benefit.

> 2.    Beginning on July 1, 2015, an Association member who reaches 20 years of service and age 43 on or before June 30, 2016 can retire anytime after reaching 20 years of service and age 43, and he or she will immediately receive an unreduced accrued New PFRS benefit.

> 3.    After June 30, 2020, an Association member must be at least 50 years old with 25 years of service to retire and immediately receive his or her unreduced accrued New PFRS benefit.

5

An Association member who does not meet these New PFRS requirements will not begin receiving his or her unreduced accrued New PFRS benefit until the Association member reaches age 62 and has been credited with 10 years of service. An Association member with 10 years of service may elect to retire at age 55 with an actuarially reduced benefit.

d) Section 1.4 (Board of Trustees – Membership; Appointment) of the New PFRS and Article III, Section 2 of the Old PFRS (Membership of Board) shall not be modified during the term of the CBA.

e) The City will remit to the New PFRS all contributions withheld from employees' pay checks.

The City shall promptly transfer these employees' contributions to the new PFRS, but in no event shall such City transfers be made later than the 15th day of the month following the month of the pay dates when the employees' contributions are withheld by the City (hereinafter "Contribution Due Date"). (By way of illustration and example only, the City must transfer to the New PFRS by no later than February 15 all of the employees' contributions withheld on the pay dates of the immediately preceding January.)

If the City does not transfer the employees' withheld contributions to the New PFRS by the Contribution Due Date, these contributions shall be deemed delinquent contributions (hereinafter "Delinquent Contributions"). The City shall be liable to the New PFRS in the amount of the Delinquent Contributions and any Lost Earnings ("Lost Earnings") on the Delinquent Contributions, which would have been earned on the employees' contributions, had the City timely made the transfer of these employees' contributions.

Notwithstanding the above, the City shall be liable for Lost Earnings in an amount not less than the applicable corporate underpayment rate(s), effective during the delinquency, established under Section 6621(a)(2) of the Internal Revenue Code.

B. Reservation of Rights by City. This Memorandum of Understanding shall in no way be construed to interfere with, or add additional requirements with respect to, the City's rights to modify the terms of any pension plan document currently in effect, or that may be in effect during the term of this Memorandum of Understanding, including but not limited to the Combined Plan; provided, however, that the City shall not modify the terms of the applicable pension plan(s), in any manner that conflicts with those terms set forth in Section A above, unless the City is ordered to do so by the Bankruptcy Court in the plan of adjustment dated August 20, 2014 (as it may be amended, modified or supplemented, "Plan of Adjustment") in the case *In re: City of Detroit*, Case No. 13-53846 or as set forth in Section D below.

6

C.    Compliance with Plan of Adjustment. The terms of this Memorandum of Understanding are subject to confirmation of the Plan of Adjustment and may be modified therein to achieve confirmation of the Plan of Adjustment. Any proposed modification to the Plan of Adjustment is subject to the rights of the DFFA to object to same. During the term of this Memorandum of Understanding, the City shall not make any modifications to the terms of the Combined Plan that are contrary to the terms of the Plan of Adjustment as confirmed by the Bankruptcy Court.

D.    Compliance with Public Act 183. Notwithstanding any provision of this Memorandum of Understanding that can be construed to the contrary, this Memorandum of Understanding will not be construed to require the City to fall out of compliance with the requirements of Public Act 183, House Bill 5568 ("PA 183"). In the event that the City determines that it has fallen out of compliance with, or is reasonably likely to fall out of compliance with PA 183, the City will provide written notice to the Association, and offer to meet and confer with the Association for a period not longer than thirty (30) days to discuss potential modifications to the terms of the Memorandum of Understanding in order to comply with the requirements of PA 183. To the extent that the City and the Association are unable to reach an agreement within thirty (30) days, the City may make any necessary modifications to ensure compliance with PA 183.

E.    Duration. This Memorandum of Understanding will become effective upon approval by the Mayor of the City of Detroit and the Treasurer of the State of Michigan and shall remain in effect until December 31, 2023. The City and the Association hereby agree to waive any and all collective bargaining rights with respect to pension benefits, including but not limited to benefits provided under, and any other issues relating to, the Combined Plan (the "Waived Issues") from the date that this Memorandum of Understanding is executed through December 31, 2023. The parties acknowledge that they are enjoined from collective bargaining regarding the Waived Issues through June 30, 2023 and further agree to waive any right to raise any of the Waived Issues in any Act 312 arbitration proceeding. The City and the Association agree that they may engage in collective bargaining regarding the Waived Issues beginning June 30, 2023, but that no modifications may be made with respect to any Waived Issue until after December 31, 2023.

F.    Grievance and Arbitration: Any dispute pertaining to the provision of benefits pursuant to this Memorandum of Understanding shall be subject to the grievance and arbitration procedures set forth in Articles 8 and 9 of the CBA or any comparable provision set forth in a successor collective bargaining agreement entered into between the City and the DFFA.

G.    In resolving any dispute pertaining to provision of benefits pursuant to this Memorandum of Understanding, the Arbitrator shall be bound by the terms of this Memorandum of Understanding, the Combined Plan, and the Plan of Adjustment, and shall have no authority to issue any award or order that is contrary to the terms of these documents.

7

IN WITNESS WHEREOF, the parties hereto have affixed their signatures below:

Dated this 6 day of November 2014.

DETROIT FIRE FIGHTERS ASSOCIATION:     CITY OF DETROIT:

_____
Jeffrey Pegg, President

_____
Teresa Singleton, Vice President

_____
Martin McClung, Secretary

_____
Robert Shinske, Treasurer

_____
Michael E. Duggan, Mayor

_____
Michael A. Hall, Director of Labor Relations

_____
Edsel Jenkins, Executive Fire Commissioner

_____
Office of the State Treasurer, Michigan

_____
Kevyn Orr, Emergency Manager

8

# EXHIBIT 6A – COMPLAINT

STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR WAYNE COUNTY


DANIEL J. SALKOWSKI,

JEFFREY HAMM,

RICHARD MAKULSKI

     Plaintiffs

v.                                                                  Case No.  2019-                -CL

                                                Hon.


CITY OF DETROIT, THE DETROIT POLICE AND

FIRE PENSION BOARD, DETROIT FIRE

FIGHTERS ASSOCIATION LOCAL 344,

     Defendants,

_____/

ELIZABETH A. FERGUSON (P53645)
Law Offices of Elizabeth A. Ferguson, PLLC
Attorney for Plaintiffs
55 Southbound Gratiot
Mount Clemens, MI 48043
586-206-0157  586-261-4835 (fax)
_____/


There is no other pending or resolved civil action arising out of the same
transaction or occurrence as alleged in the complaint.


VERIFIED COMPLAINT AND REQUEST FOR INJUNCTION


JURISDICTION AND VENUE

1.  All Plaintiffs are active members of the Detroit Fire Department and presently work

within Wayne County.

Document received by the MI Wayne 3rd Circuit Court.

2.  The City of Detroit is an incorporated city within Wayne County.

3.  The Detroit Police and Fire Pension Board operates as the pension board responsible for the pensions of the members of the Detroit Fire Department, including Plaintiffs.

4.  Detroit Fire Fighters Association (DFFA) Local 344 is the local union representing Plaintiffs in all collective bargaining matters involving the Detroit Fire Department and the City of Detroit.

5.  The actions underlying this complaint occurred within Wayne County.

6.  Plaintiffs are seeking equitable relief regarding mishandling of Deferred Retirement Option Plan (DROP) applications that resulted in Plaintiffs receiving benefits different than what they were promised.

## BACKGROUND FACTS

7.  On March 26, 2013, Kevyn D. Orr became the Emergency Manager (EM) for the City. Mr. Orr was responsible for issuing orders to rectify the financial emergencies facing the City.

8.  On or about July 18, 2013, the City of Detroit (City) filed for Chapter 9 bankruptcy protection in the Bankruptcy Court in the Eastern District of Michigan.

9.  At the time the City filed for bankruptcy protection, the collective bargaining agreement between the Detroit Fire Department and the DFFA Local 344 provided for a Deferred Retirement Option Plan (DROP) that allowed members of the DFFA an unlimited time to participate in the retirement program after declaring their intention to retire.

10. Effective July 1, 2014, the DROP program was closed to, and no longer a distribution option with respect to the frozen accrued benefit of, members represented by the DFFA.

Document received by the MI Wayne 3rd Circuit Court.

The Plaintiffs were not notified that the DROP program was closed and no longer accepting applications.

11. At the time the DROP program was closed, terms of a new DROP program had not yet been determined.

12. Plaintiffs all submitted DROP applications just before or shortly after the DROP program was closed. The DROP applications for the Plaintiffs, including those who submitted applications after the DROP program was closed, were processed by the City of Detroit and/or the Detroit Police and Fire Pension Board.

13. There is a three-part process for filing and completing the DROP process:

   a.  Plaintiffs each had to apply with Human Resources at the City/County Building, giving notice of their intent to retire and participate in the DROP program;

   b.  Plaintiffs then were given an appointment with a Police and Fire Pension System representative to go over the pension amount, DROP calculations, benefits, and complete and sign off on each issue;

   c.  The final step occurs when the Detroit Police and Fire Pension Board votes on whether to accept the application.

14. Neither the City of Detroit nor the Detroit Police and Fire Pension Board notified the Plaintiffs at the time they submitted their DROP paperwork that the DROP program was closed, nor were they informed as their paperwork was processed that the DROP program had been closed.

15. Plaintiffs began hearing rumors around August 2014 that the DROP program was changing but were unable to get specific information due to a gag order issued within the bankruptcy proceeding.

Document received by the MI Wayne 3rd Circuit Court.

16. In November 2014 a collective bargaining agreement between the City and DFFA was reached reopening the DROP program and changing the time of the DROP program from unlimited to five years.

## COUNT 1

17. Plaintiff Salkowski submitted his DROP application on or about July 14 or July 15, 2014, after the DROP program was closed and applications were no longer being accepted.  On July 22, 2014 he participated in a DROP interview with a Ms. Carter from the City's Human Resource Department.  At the time of his DROP application, the DROP program was still recognized as unlimited, and Ms. Carter informed him it was an unlimited DROP plan on August 13, 2014.

18. Plaintiff Hamm submitted his DROP application on June 9, 2014, prior to the DROP program's closure.  At the time his application was submitted, the DROP program was unlimited.

19. Plaintiff Makulski submitted his DROP application on July 7, 2014, after the DROP program was closed and no longer accepting applications.  At the time he submitted his application, the DROP program was still recognized as unlimited.

20. Under the terms of the DROP, once a member decides to participate in the DROP program, the election becomes irrevocable and cannot be changed.

21. The City and/or Pension Board did not notify Plaintiffs that the DROP program was closed prior to accepting their applications, nor did the City and/or Pension Board notify the Plaintiffs while the applications were pending that the unlimited DROP program they were led to believe they had signed up for was changing to a five year program.  At least

Document received by the MI Wayne 3rd Circuit Court.

two of the Plaintiffs were told while continuing the DROP paperwork process that the DROP program was still unlimited.

22. Plaintiffs did not find out until around August 2014 that the DROP program was suspended and no longer accepting applications. Plaintiff Baumann was informed by other firefighters who had filed applications for the DROP program that they had been notified that the program was suspended, and their applications were not being processed. None of the Plaintiffs were notified their applications were suspended and the City and Pension Board continued to process their applications without regard for the fact that Plaintiffs were being treated differently than other Firefighters who had filed for the DROP program and had their applications suspended.

23. The City of Detroit and the DFFA ratified the 2014-2019 collective bargaining agreement on November 6, 2014. Immediately after the collective bargaining agreement was ratified, the Pension Board voted to accept the DROP applications from the Plaintiffs.

24. Plaintiffs were not notified prior to the collective bargaining ratification that the DROP program had been changed.

25. On or about August 10, 2015, the DFFA distributed an informational bulletin to union members informing them of the new DROP dates.

26. Plaintiff Salkowski immediately contacted the Pension Board and was told that he was in the five-year program and that his concerns about the change from unlimited to a five-year program was a union issue.

27. Plaintiff Salkowski contacted the DFFA and the DFFA admitted to Plaintiff Salkowski that the Pension Board made a mistake by allowing members to file applications after the DROP program was closed but stated Plaintiff Salkowski was still in the five-year DROP program.

Document received by the MI Wayne 3rd Circuit Court.

28. Plaintiff Hamm submitted his DROP application while the program was unlimited, but he is being forced to retire under the five-year DROP plan even though that is not the plan in place when he submitted his paperwork.

29. The Defendants mishandled the Plaintiffs' DROP application paperwork when it accepted DROP applications from Plaintiffs Salkowski and Makulski after the DROP program was closed, and continued to process those applications without notifying Plaintiffs that the program was changing or that the Plaintiffs would be placed in a five-year DROP. The Defendants mishandled Plaintiff Hamm's DROP application when they accepted his application prior to the suspension of the DROP program, while it was an unlimited program, and then unilaterally processed it as a five-year drop without notice to Plaintiff Hamm.

30. The Defendants misrepresented the terms of the DROP program to Plaintiffs when Plaintiffs were not told that the program was limited to five years, and when Defendants informed Plaintiff Salkowski and Plaintiff Hamm that the program was still unlimited.

31. As a result of the Defendants' misrepresentations and decision to accept and process the Plaintiffs' DROP applications when the DROP program had been suspended, Plaintiffs are not getting the benefits they were entitled to when they submitted their applications for the DROP program.

32. As a result of the Pension Board's decision to vote and accept the applications immediately after the collective bargaining agreement was ratified, without informing Plaintiffs that the benefits had changed, Plaintiffs are not receiving the benefits they were entitled to when they submitted their DROP applications.

33. As a result of Defendants' actions, all of the Plaintiffs are being forced into retirement sooner than they expected when they submitted their DROP applications.

Document received by the MI Wayne 3rd Circuit Court.

Wherefore, Plaintiffs respectfully request that this Court grant Plaintiffs equitable relief and order that they be included in the unlimited DROP program that Plaintiffs were told was in place when they filed their DROP applications.

COUNT II

34. Plaintiffs individual and collectively incorporate by reference all statements made in Paragraphs 7 through 33.

35. The DFFA has admitted to Plaintiffs that the DROP program had been suspended and the Pension Board made a mistake in allowing Plaintiffs to submit DROP applications, but the DFFA has refused and/or failed to file a grievance or take other action to address the Plaintiffs' issues.

36. It is not clear that the City of Detroit leadership is aware of this situation involving the Plaintiffs, but it does appear that the City's Human Resources department was operating on the belief that the DROP program was unlimited when the Plaintiffs applied.

37. The DFFA and the Pension Board appear to be blaming each other for the situation, but neither is taking any action to fix the problems they created when the Plaintiffs' applications were accepted after the Emergency Manager ordered the DROP program closed to new applications and when they failed to notify the Plaintiffs of the changes to the DROP program or allow the Plaintiffs to rescind their applications after discovering they had been misled by the City's Human Resources office, the DFFA, and the Pension Board.

38. All of the Plaintiffs have been notified that they are scheduled to retire in August 2019 and are facing imminent threat of losing their positions.

Document received by the MI Wayne 3rd Circuit Court.

39. All of the Plaintiffs have been told they are required to complete their final paperwork and exit procedures to retire, and if they do not complete that process, they will be terminated by the Detroit Fire Department.

40. Plaintiffs have been diligently attempting to resolve this issue, but while they have received sympathy and acknowledgements that their applications should not have been accepted and they were not informed of the changes to the program, no one is taking action to stop the retirement process.

41. The Eighth Amended Plan for the Adjustment of Debts of the City of Detroit, dated October 22, 2014, gives the Retirement Board discretionary authority to determine the rights and status of members, retirees, beneficiaries, and other persons under the retirement system. In this case, the Board has the ability to determine that the Plaintiffs were misled throughout the DROP process and to take action to correct the situation, but the Board has instead decided to pass the blame to others and continue to enforce actions the Board took when it allowed the DROP applications to be processed and approved, knowing that the DROP program had been suspended.

42. Plaintiffs will be irreparably harmed if the Defendants are allowed to force Plaintiffs to retire rather than correct the problems that Defendants created by misrepresenting the DROP program at the time Plaintiffs applied.

43. Defendants will not be harmed by requiring Defendants to maintain Plaintiffs as active employees while this matter is pending. Plaintiffs Salkowski and Makulski appear to be the only members of the DFFA that were mislead as to the terms of their DROP program and whose applications were processed while the DROP program was suspended. Plaintiff Hamm appears to be the only member who applied prior to the closing of the

Document received by the MI Wayne 3rd Circuit Court.

DROP program and while the program was truly still unlimited, but who is being forced into the 5-year program with the rest of the Plaintiffs.

44. An injunction is proper in this matter because of the irreparable harm the Plaintiffs are facing with their imminent forced retirement.

45. There is no harm to the public interest if an injunction is issued in this case.

Wherefore, Plaintiffs respectfully request that this Court exercise its equitable powers and issue an injunction prohibiting Defendants City of Detroit and the Detroit Police and Fire Pension Board from forcing Plaintiffs to retire in August 2019 and allowing Plaintiffs to continue in their roles with the Detroit Fire Department pending resolution of this matter.

I swear that the above statements are true to the best of my information, knowledge, and belief.

  /s/ Daniel Salkowski                              /s/ Richard Makulski
Daniel Salkowski                                  Richard Makulski


  /s/ Jeffrey Hamm
Jeffrey Hamm


  /s/ Elizabeth A. Ferguson
Elizabeth A. Ferguson (P53645)
Law Offices of Elizabeth A. Ferguson, PLLC
Attorney for Plaintiffs
55 Southbound Gratiot
Mount Clemens, MI 48043
(586) 206-0157  (586) 261-4835 (fax)

Document received by the MI Wayne 3rd Circuit Court.

# EXHIBIT 6B – DROP PROGRAM APPLICATIONS

34130634.7\022765-00213

**DEFERRED RETIREMENT OPTION PLAN ("DROP")**
**OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**
**DROP ELECTION**

| STEP 1 – MEMBER INFORMATION |
|---|

| Social Security Number | Pension Number | Bargaining Unit (e.g., DPOA) |
|---|---|---|
| ▮ | 233232 | Detroit Fire - DFFA |

**Name of Member (first, middle initial, last)**
Daniel J. Salkowski

**Address (number and street, city, state and zip code)**
▮ Clinton Twp. Mi 48035

| Home telephone number | Other telephone number | E-mail address |
|---|---|---|
| (586) 294- ▮ | (586) 925- ▮ (cell) | ▮ @yahoo.com |

| STEP 2 – DROP ELECTION DATE |
|---|

**DROP election date (month, day, year)**  8 / 9 / 2014

My DROP election date cannot be earlier than the day I deliver my DROP election form to the System, and it <u>will be the last day I will accrue any service credit or change in compensation for AFC purposes towards my System pension benefit</u>.

I am eligible for a 25 year service retirement (or such other DROP eligible service retirement requirement as provided in the applicable collective bargaining agreement) from the Police and Fire Retirement System of the City of Detroit ("System") at the time of my election.

| STEP 3 – SYSTEM RETIREMENT FORMS |
|---|

In connection with my DROP election I agree to provide the System, as soon as possible, applicable signed and completed System form(s) providing that my DROP election date will be my retirement date for System purposes, and as soon as possible and in accordance with standard System procedures complete System forms necessary to elect how my System benefit will be paid when I retire (and which election will determine how my DROP calculations will be based before retirement and after DROP election), and take any other action the System deems necessary.

| MEMBER ACKNOWLEDGEMENT |
|---|

I irrevocably elect the above DROP election date for participation in the Deferred Retirement Option Plan (DROP) of the Police and Fire Retirement System of the City of Detroit. I have read and understand the "*Guidelines for Making the DROP Decision*". I have had an opportunity to consult with my own personal financial advisor. I understand that I cannot change my DROP election after this form is received by the System. I also understand and acknowledge that due to the time necessary to properly establish and record keep my DROP, there may be an administrative delay between my DROP election and when funds are first allocated to my DROP account. By signing below, I acknowledge that I have read and understand this statement.

| Signature of member | Date (month, day, year) |
|---|---|
| Daniel J Salkowski | 7 - 1 - 2014 |

**Printed name of member**
Daniel J. Salkowski

| Signature of witness | Date (month, day, year) |
|---|---|
| Debra Fer... | 7.1.2014 |

**Printed name of witness**
DEBra Ferguson

**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**
**2 Woodward Avenue**
**Suite 908 CAYMC**
**Detroit, Michigan 48226**

(06/2009)

**DEFERRED RETIREMENT OPTION PLAN ("DROP")**
**OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**
**DROP ELECTION**

| STEP 1 – MEMBER INFORMATION | | |
|---|---|---|
| Social Security Number | Pension Number *233295* | Bargaining Unit (e.g., DPOA) *DFFA* |
| Name of Member (first, middle initial, last) *Jeffrey R. Hamm* | | |
| Address (number and street, city, state and zip code) *Sterling Heights MI. 48313* | | |
| Home telephone number (586) 323 – | Other telephone number (586) 218 – | E-mail address *@GMail* |

**STEP 2 – DROP ELECTION DATE**

DROP election date (month, day, year) _8_ / _8_ / _2014_

My DROP election date cannot be earlier than the day I deliver my DROP election form to the System, and it will be the last day I will accrue any service credit or change in compensation for AFC purposes towards my System pension benefit.

I am eligible for a 25 year service retirement (or such other DROP eligible service retirement requirement as provided in the applicable collective bargaining agreement) from the Police and Fire Retirement System of the City of Detroit ("System") at the time of my election.

**STEP 3 – SYSTEM RETIREMENT FORMS**

In connection with my DROP election I agree to provide the System, as soon as possible, applicable signed and completed System form(s) providing that my DROP election date will be my retirement date for System purposes, and as soon as possible and in accordance with standard System procedures complete System forms necessary to elect how my System benefit will be paid when I retire (and which election will determine how my DROP calculations will be based before retirement and after DROP election), and take any other action the System deems necessary.

**MEMBER ACKNOWLEDGEMENT**

I irrevocably elect the above DROP election date for participation in the Deferred Retirement Option Plan (DROP) of the Police and Fire Retirement System of the City of Detroit. I have read and understand the "*Guidelines for Making the DROP Decision*". I have had an opportunity to consult with my own personal financial advisor. I understand that I cannot change my DROP election after this form is received by the System. I also understand and acknowledge that due to the time necessary to properly establish and record keep my DROP, there may be an administrative delay between my DROP election and when funds are first allocated to my DROP account. By signing below, I acknowledge that I have read and understand this statement.

| Signature of member | Date (month, day, year) *6-9-2014* |
|---|---|
| Printed name of member *Jeffrey R. Hamm* | |
| Signature of witness | Date (month, day, year) *6-9-14* |
| Printed name of witness *Debra Ferguson* | |

**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**
**2 Woodward Avenue**
**Suite 908 CAYMC**
**Detroit, Michigan 48226**

(06/2009)

# DEFERRED RETIREMENT OPTION PLAN ("DROP")
## OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT
### DROP ELECTION

| STEP 1 – MEMBER INFORMATION |
|---|

| Social Security Number | Pension Number | Bargaining Unit (e.g., DPOA) |
|---|---|---|
| ████████ | 233-290 | DFFA |

**Name of Member (first, middle initial, last)**
RICHARD SCOTT MAKULSKI

**Address (number and street, city, state and zip code)**
████████ STERLING HEIGHTS, MI 48312

| Home telephone number | Other telephone number | E-mail address |
|---|---|---|
| (586) 979-████ | (586) 822-████ | ████@hotMAIL.com |

| STEP 2 – DROP ELECTION DATE |
|---|

**DROP election date (month, day, year)** 08 / 08 / 2014

My DROP election date cannot be earlier than the day I deliver my DROP election form to the System, and it will be the last day I will accrue any service credit or change in compensation for AFC purposes towards my System pension benefit.

I am eligible for a 25 year service retirement (or such other DROP eligible service retirement requirement as provided in the applicable collective bargaining agreement) from the Police and Fire Retirement System of the City of Detroit ("System") at the time of my election.

| STEP 3 – SYSTEM RETIREMENT FORMS |
|---|

In connection with my DROP election I agree to provide the System, as soon as possible, applicable signed and completed System form(s) providing that my DROP election date will be my retirement date for System purposes, and as soon as possible and in accordance with standard System procedures complete System forms necessary to elect how my System benefit will be paid when I retire (and which election will determine how my DROP calculations will be based before retirement and after DROP election), and take any other action the System deems necessary.

| MEMBER ACKNOWLEDGEMENT |
|---|

I irrevocably elect the above DROP election date for participation in the Deferred Retirement Option Plan (DROP) of the Police and Fire Retirement System of the City of Detroit. I have read and understand the *Guidelines for Making the DROP Decision*. I have had an opportunity to consult with my own personal financial advisor. I understand that I cannot change my DROP election after this form is received by the System. I also understand and acknowledge that due to the time necessary to properly establish and record keep my DROP, there may be an administrative delay between my DROP election and when funds are first allocated to my DROP account. By signing below, I acknowledge that I have read and understand this statement.

| Signature of member | Date (month, day, year) |
|---|---|
| *[signature]* | 7-7-2014 |

**Printed name of member**
RICHARD S. MAKULSKI

| Signature of witness | Date (month, day, year) |
|---|---|
| *[signature]* | 7/7/2014 |

**Printed name of witness**
*[signature] L. Canvas*

---

**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**
**2 Woodward Avenue**
**Suite 908 CAYMC**
**Detroit, Michigan 48226**

*[barcode]*

(06/2009)

# EXHIBIT 6C – TRO MOTION

STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR WAYNE COUNTY


DANIEL J. SALKOWSKI,

JEFFREY HAMM,

RICHARD MAKULSKI

     Plaintiffs

v.                                 Case No.  2019-     -CL

                                           Hon.

CITY OF DETROIT, THE DETROIT POLICE AND

FIRE PENSION BOARD, DETROIT FIRE

FIGHTERS ASSOCIATION LOCAL 344,

     Defendants,

_____/

ELIZABETH A. FERGUSON (P53645)
Law Offices of Elizabeth A. Ferguson, PLLC
Attorney for Plaintiffs
55 Southbound Gratiot
Mount Clemens, MI 48043
586-206-0157  586-261-4835 (fax)
_____/

MOTION FOR A TEMPORARY RESTRAINING ORDER,

SHOW CAUSE ORDER, AND PRELIMINARY INJUNCTION


     Now come the Plaintiffs who state in support of this Motion:


     1. An action has been instituted between Plaintiffs and the Defendants, and it is necessary

that a restraining order on ex parte application be issued on behalf of Plaintiffs restraining

Defendants from forcing the Plaintiffs to retire from the Detroit Fire Department under the DROP program currently in effect.

2. Plaintiffs all applied for the DROP program when it had an unlimited time frame, and without their knowledge, their applications were processed after the DROP program was suspended. Plaintiffs were never told that the DROP program was suspended or that the terms of the DROP program were being changed.

3. Plaintiffs attempted to resolve this issue with the Defendants Detroit Police and Fire Pension Board and the Detroit Fire Fighters Association Local 344 to no avail.

4. Plaintiffs have all received notice that they will be terminated as Detroit Fire Fighters effective August 8, 2019, with their last date of work on August 7, 2019.

5. If Plaintiffs are terminated, Plaintiffs will suffer immediate injury because they will lose their positions, wages, and benefits. If Plaintiffs are forced to retire, they face irreparable harm in that it will be difficult and potentially very costly, if even possible, to reverse their retirement and return them to their positions.

6. The Ex Parte Temporary Restraining Order is necessary because Plaintiffs face an imminent loss of their positions, wages, and benefits, if Defendants are allowed to required Plaintiffs to retire before the parties have an opportunity to litigate this matter. Undoing the retirements at a later date would be difficult, if not impossible.

7. Defendants will not be prejudiced by being temporarily restrained from terminating Plaintiffs' employment; Defendants will be able to continue using Plaintiffs' services as veteran fire fighters and the retirement process can be completed in the future if necessary.

8. This motion is supported by the attached affidavits from the Plaintiffs.

Plaintiffs request the court to:

A. Enter an order restraining Defendants from forcing Plaintiffs to retire on August 8, 2019.

B. Issue an order to show cause to be heard on _____, at _____, showing why this restraining order should not be made into a preliminary injunction.


Respectfully submitted.


_/s/ Elizabeth A. Ferguson_____
Elizabeth A. Ferguson (P53645)
Law Offices of Elizabeth A. Ferguson, PLLC
Attorney for Plaintiffs
55 Southbound Gratiot
Mount Clemens, MI 48043
(586) 206-0157  (586) 261-4835 (fax)

STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR WAYNE COUNTY

DANIEL J. SALKOWSKI,

JEFFREY HAMM,

RICHARD MAKULSKI

      Plaintiffs

v.                                            Case No.  2019-       -CL

                                                 Hon.

CITY OF DETROIT, THE DETROIT POLICE AND

FIRE PENSION BOARD, DETROIT FIRE

FIGHTERS ASSOCIATION LOCAL 344,

      Defendants,

_____/

ELIZABETH A. FERGUSON (P53645)
Law Offices of Elizabeth A. Ferguson, PLLC
Attorney for Plaintiffs
55 Southbound Gratiot
Mount Clemens, MI 48043
586-206-0157  586-261-4835 (fax)
_____/


AFFIDAVIT IN SUPPORT OF TEMPORARY RESTRAINING ORDER


      Now comes Affiant, JEFFREY HAMM, and after being duly sworn, states for my

Affidavit as follows:

1. I am a Plaintiff in the above action.

2. I have personal knowledge of the facts set forth in this affidavit, and if sworn as a

    witness, can testify competently to these facts.

3. I seek a temporary restraining order for the following reasons:

   a. I am currently a Detroit Fire Fighter.

   b. I applied to the DROP program on June 9, 2014 and at that time the program was unlimited, meaning I did not have a specific timeframe in which I had to retire.

   c. At the time I applied for the unlimited DROP program, the DROP program had not yet been suspended or changed.

   d. I was not told that the DROP program would be suspended nor was I told that the DROP program's terms were being changed from unlimited to five years.

   e. I was told several times while I was going through the application process and final retirement choice interview, that I was in the unlimited DROP program.

   f. After the DROP program was changed, I was only officially notified by certified mail on 6/24/19 that I was no longer in the unlimited DROP program but instead was in a five-year DROP program.

   g. I have attempted to resolve this situation and was repeatedly told that I am in the five-year DROP program and cannot change my designation to unlimited, even though I was assured I was in the unlimited DROP program throughout the processing of my application.

   h. I am being forced to retire effective August 8, 2019; my last day of employment will be August 7, 2019.

   i. The Temporary Ex Parte Restraining Order is necessary to prohibit the Defendants from terminating my employment through retirement while this matter is being litigated.

j.  If I am terminated while this action is pending, I will lose my position, my pay, and my benefits.

k.  I was misled by the Defendants and they denied me an opportunity to make an informed decision on my retirement by repeatedly telling me I was in the unlimited DROP program and processing my application while the program was suspended.


 7-23-19                               /s/ Jeffrey R. Hamm
Date                                  Jeffrey Hamm, Plaintiff


STATE OF MICHIGAN     )

WAYNE COUNTY          )

Subscribed to and sworn before me in  Wayne      County, Michigan on  07/23/2019
by Jeffrey Hamm.


   /s/ MD Hisham Liddin Chowdhury
MD-Hisham Chowdhury
Notary Public, State of Michigan, County of  Wayne
My commission expires  10/16/2025
Acting in the County of _____

STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR WAYNE COUNTY


DANIEL J. SALKOWSKI,

JEFFREY HAMM,

RICHARD MAKULSKI

      Plaintiffs

v.                                               Case No.  2019-        -CL

                                                  Hon.

CITY OF DETROIT, THE DETROIT POLICE AND

FIRE PENSION BOARD, DETROIT FIRE

FIGHTERS ASSOCIATION LOCAL 344,

      Defendants,

_____/

ELIZABETH A. FERGUSON (P53645)
Law Offices of Elizabeth A. Ferguson, PLLC
Attorney for Plaintiffs
55 Southbound Gratiot
Mount Clemens, MI 48043
586-206-0157  586-261-4835 (fax)
_____/


AFFIDAVIT IN SUPPORT OF TEMPORARY RESTRAINING ORDER


      Now comes Affiant, RICHARD MAKULSKI, and after being duly sworn, states for my

Affidavit as follows:

1. I am a Plaintiff in the above action.

2. I have personal knowledge of the facts set forth in this affidavit, and if sworn as a

   witness, can testify competently to these facts.

3. I seek a temporary restraining order for the following reasons:

   a. I am currently a Detroit Fire Fighter.

   b. I applied to the DROP program on or about July 7, 2014 and at that time the program was unlimited, meaning I did not have a specific timeframe in which I had to retire.

   c. I was not told that the DROP program had been suspended on July 1, 2014 and was not supposed to accept or process applications, nor was I told that the DROP program's terms were being changed from unlimited to five years.

   d. After the DROP program was changed, I was notified that I was no longer in the unlimited DROP program but instead was in a five-year DROP program.

   e. I have attempted to resolve this situation and was repeatedly told that I am in the five-year DROP program and cannot change my designation to unlimited, even though I was assured I was in the unlimited DROP program throughout the processing of my application.

   f. I am being forced to retire effective August 8, 2019; my last day of employment will be August 7, 2019.

   g. The Temporary Ex Parte Restraining Order is necessary to prohibit the Defendants from terminating my employment through retirement while this matter is being litigated.

   h. If I am terminated while this action is pending, I will lose my position, my pay, and my benefits.

   i. I was misled by the Defendants and they denied me an opportunity to make an informed decision on my retirement by repeatedly telling me I was in the

unlimited DROP program and processing my application while the program was suspended.


__7-23-19_____          _/s/ Richard Makulski_____
Date                             Richard Makulski, Plaintiff

 STATE OF MICHIGAN     )

 MACOMB COUNTY         )

Subscribed to and sworn before me in _Macomb_____ County, Michigan on _7-23-19_____ by

Richard Makulski.


   _/s/ John C. Rodriquez II_____
John C. Rodriquez II
Notary Public, State of Michigan, County of _Macomb____
My commission expires _9-6-20_____
Acting in the County of _Macomb_____

STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR WAYNE COUNTY


DANIEL J. SALKOWSKI,

JEFFREY HAMM,

RICHARD MAKULSKI

      Plaintiffs

v.                                  Case No.  2019-     -CL

                                     Hon.

CITY OF DETROIT, THE DETROIT POLICE AND

FIRE PENSION BOARD, DETROIT FIRE

FIGHTERS ASSOCIATION LOCAL 344,

      Defendants,

_____/

ELIZABETH A. FERGUSON (P53645)
Law Offices of Elizabeth A. Ferguson, PLLC
Attorney for Plaintiffs
55 Southbound Gratiot
Mount Clemens, MI 48043
586-206-0157  586-261-4835 (fax)
_____/


AFFIDAVIT IN SUPPORT OF TEMPORARY RESTRAINING ORDER


      Now comes Affiant, Daniel Salkowski, and after being duly sworn, states for my

Affidavit as follows:

1. I am a Plaintiff in the above action.

2. I have personal knowledge of the facts set forth in this affidavit, and if sworn as a

    witness, can testify competently to these facts.

3. I seek a temporary restraining order for the following reasons:

    a. I am currently a Detroit Fire Fighter.

    b. I applied to the DROP program on or about July 14 or July 15, 2014 and at that time the program was unlimited, meaning I did not have a specific timeframe in which I had to retire.

    c. I was not told that the DROP program had been suspended on July 1, 2014 and was not supposed to accept or process applications, nor was I told that the DROP program's terms were being changed from unlimited to five years.

    d. I was told by a Human Resources representative at least twice while I was going through the process that I was in the unlimited DROP program.

    e. After the DROP program was changed, I was notified that I was no longer in the unlimited DROP program but instead was in a five-year DROP program.

    f. I have attempted to resolve this situation and was repeatedly told that I am in the five-year DROP program and cannot change my designation to unlimited, even though I was assured I was in the unlimited DROP program throughout the processing of my application.

    g. I am being forced to retire effective August 8, 2019; my last day of employment will be August 7, 2019.

    h. The Temporary Ex Parte Restraining Order is necessary to prohibit the Defendants from terminating my employment through retirement while this matter is being litigated.

    i. If I am terminated while this action is pending, I will lose my position, my pay, and my benefits.

j. I was misled by the Defendants and they denied me an opportunity to make an informed decision on my retirement by repeatedly telling me I was in the unlimited DROP program and processing my application while the program was suspended.


___7-24-19_____          _/s/ Daniel J. Salkowski_____
Date                               Daniel Salkowski, Plaintiff


STATE OF MICHIGAN     )

MACOMB COUNTY         )

Subscribed to and sworn before me in __Macomb__ County, Michigan on __7-24-19_____ by Daniel Salkowski.


____/s/ Joseph M. Palm_____
Joseph M. Palm
Notary Public, State of Michigan, County of Macomb
My commission expires __04/07/2024_____
Acting in the County of _____

# EXHIBIT 6D – TEMPORARY RESTRAINING ORDER

STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR WAYNE COUNTY

DANIEL J. SALKOWSKI,

JEFFREY HAMM,

RICHARD MAKULSKI

      Plaintiffs

v.                                Case No.  2019-009993-CL

                                        Hon. John A. Murphy

CITY OF DETROIT, THE DETROIT POLICE AND

FIRE PENSION BOARD, DETROIT FIRE

FIGHTERS ASSOCIATION LOCAL 344,

      Defendants,

_____/

ELIZABETH A. FERGUSON (P53645)
Law Offices of Elizabeth A. Ferguson, PLLC
Attorney for Plaintiffs
55 Southbound Gratiot
Mount Clemens, MI 48043
586-206-0157  586-261-4835 (fax)
_____/

**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**

                    At a session of court held in the courthouse in
                    Detroit, Michigan, on __8/1/2019_____.
                    Present: Honorable John A. Murphy
                        Wayne County Court Judge

Plaintiffs have filed a complaint, motion, and supporting affidavits. The court has reviewed these documents. It appears that unless the court restrains Defendants from forcing Plaintiffs to retire on August 8, 2019, Plaintiffs may suffer irreparable harm because Plaintiffs will lose their

positions, wages, and benefits, and it would be difficult if not impossible to undo the retirements once they have been processed.

IT IS ORDERED:

1. Defendants are restrained from completing the process of retiring Plaintiffs from their positions as Detroit Fire Fighters.

2. The injunctive relief against Defendants is binding, in accordance with MCR 3.310(C)(4), on Defendant's officers, agents, servants, employees, and attorneys and on all persons in active concert or participation with them who receive notice of this order by personal service or otherwise.

3. Security is not required for issuing this restraining order because the complaint in this matter only seeks equitable relief. There are no known costs or damages that Defendants would suffer as a result of the issuance of this order.

4. Defendant will appear before this court on August 12, 2019, at 9:30 am, to show cause why the restraining order should not be made a preliminary injunction.

5. A copy of the summons, complaint, motion, affidavit, and this order will be served on Defendants on or before August 2, 2019. Plaintiffs will file a proof of service.

This order is issued on __8/1/2019_____, at _____.

Dated: _____     /s/ _/s/ John A. Murphy   8/1/2019____
                                        John A. Murphy
                                        Wayne County Circuit Court Judge

# EXHIBIT 6E – TERMINATION LETTERS

34130634.7\022765-00213

POLICE AND FIRE
RETIREMENT SYSTEM
OF THE
CITY OF DETROIT

233290

500 WOODWARD AVE STE 3000
DETROIT, MICHIGAN 48226
PHONE 313•224•3362
TOLL FREE 800•339•8344
FAX 313•224•3522

June 3, 2019

Richard Makulski
███████████
Sterling Heights, MI 48312

RE: DROP Participation Termination

Dear Mr. Makulski,

This letter is to notify you of a change in your DROP participation. Per the terms of the Plan of Adjustment (POA) as of July 1, 2014 and the Memorandum of Understanding (MOU) signed by the Detroit Fire Fighters Association (DFFA) November 6, 2014.

> "A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years. At the end of such five year period of participation in the DROP program, the Member shall be retired from employment."

Your employment must end and participation in DROP **must cease by August 7, 2019,** please call our office, 313-224-3362, and schedule an appointment to finalize the remaining paperwork needed for your retirement. Failure to schedule an appointment will result in us holding your retirement check until the paperwork has been completed; no further DROP payments will be made. Please also make retirement arrangements with your HR department to finalize any paperwork required by them.

Thank you,

Kelly Tapper
Assistant Executive Director
Police and Fire Retirement System

cc: City of Detroit HR- Denise Starr
    City of Detroit- Kemia Crosson

**POLICE AND FIRE
RETIREMENT SYSTEM
OF THE
CITY OF DETROIT**

233232

500 WOODWARD AVE STE 3000
DETROIT, MICHIGAN 48226
PHONE 313 • 224 • 3362
TOLL FREE 800 • 339 • 8344
FAX 313 • 224 • 3522

June 3, 2019

Daniel Salkowski

Clinton Township, MI 48035

RE: DROP Participation Termination

Dear Mr. Salkowski,

This letter is to notify you of a change in your DROP participation. Per the terms of the Plan of Adjustment (POA) as of July 1, 2014 and the Memorandum of Understanding (MOU) signed by the Detroit Fire Fighters Association (DFFA) November 6, 2014.

> "A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years. At the end of such five year period of participation in the DROP program, the Member shall be retired from employment."

Your employment must end and participation in DROP **must cease by August 8, 2019,** please call our office, 313-224-3362, and schedule an appointment to finalize the remaining paperwork needed for your retirement. Failure to schedule an appointment will result in us holding your retirement check until the paperwork has been completed; no further DROP payments will be made. Please also make retirement arrangements with your HR department to finalize any paperwork required by them.

Thank you,

Kelly Tapper
Assistant Executive Director
Police and Fire Retirement System

cc: City of Detroit HR- Denise Starr
   City of Detroit- Kemia Crosson

**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**

233295

500 WOODWARD AVE STE 3000
DETROIT, MICHIGAN 48226
PHONE 313 • 224 • 3362
TOLL FREE 800 • 339 • 8344
FAX 313 • 224 • 3522

June 3, 2019

Jeffrey Hamm

▉▉▉▉▉▉▉

Sterling Heights, MI 48313

RE: DROP Participation Termination

Dear Mr. Hamm

This letter is to notify you of a change in your DROP participation. Per the terms of the Plan of Adjustment (POA) as of July 1, 2014 and the Memorandum of Understanding (MOU) signed by the Detroit Fire Fighters Association (DFFA) November 6, 2014.

> "A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years. At the end of such five year period of participation in the DROP program, the Member shall be retired from employment."

Your employment must end and participation in DROP **must cease by August 7, 2019,** please call our office, 313-224-3362, and schedule an appointment to finalize the remaining paperwork needed for your retirement. Failure to schedule an appointment will result in us holding your retirement check until the paperwork has been completed; no further DROP payments will be made. Please also make retirement arrangements with your HR department to finalize any paperwork required by them.

Thank you,

Kelly Tapper
Assistant Executive Director
Police and Fire Retirement System

cc: City of Detroit HR- Denise Starr
    City of Detroit- Kemia Crosson

# **EXHIBIT 6F – EXCERPTS FROM DISCLOSURE STATEMENT**

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------x

In re                                                    :  Chapter 9
                                                         :
CITY OF DETROIT, MICHIGAN,                               :  Case No. 13-53846
                                                         :
                              Debtor.                    :  Hon. Steven W. Rhodes
                                                         :
-------------------------------------------------------------x

## FOURTH AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**FOURTH AMENDED DISCLOSURE STATEMENT, DATED MAY 5, 2014**
**SOLICITATION OF VOTES WITH RESPECT TO FOURTH**
**AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT, MICHIGAN**

———————————

**Preamble**

The City of Detroit ("<u>Detroit</u>" or the "<u>City</u>") believes that the Plan for the Adjustment of Debts of the City of Detroit (the "<u>Plan</u>") attached as <u>Exhibit A</u> to this Disclosure Statement (this "<u>Disclosure Statement</u>") is in the best interests of creditors. All creditors entitled to vote thereon are urged to vote in favor of the Plan. A summary of the voting instructions is set forth beginning on page 1 of this Disclosure Statement. Additional instructions are contained on the ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be duly completed, executed and <u>received</u> by the City at or before 5:00 p.m., Eastern Time, on July 11, 2014 (the "<u>Voting Deadline</u>"), unless the Voting Deadline is extended.

———————————

The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied. <u>See</u> Section III.D.1 of this Disclosure Statement. There is no assurance that these conditions will be satisfied or waived.

———————————

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan.

——————

This Disclosure Statement is the only document that the Bankruptcy Court has approved for use in connection with the solicitation of votes on the Plan. No entity is authorized by the City to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein in connection with the Plan or the solicitation of acceptances of the Plan. Information or representations derived from any other source may not be relied upon as having been authorized by the City.

———————————

ALL CREDITORS (INCLUDING RETIREES) ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED AS EXHIBIT A AND THE RISK FACTORS DESCRIBED UNDER SECTION VI, PRIOR TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.

RETIREES ARE FURTHER ENCOURAGED TO READ AND CAREFULLY CONSIDER THE "NOTICE REGARDING PROPOSED CHANGES TO PENSIONS IN THE CITY'S PLAN OF ADJUSTMENT AND/OR YOUR RIGHT TO VOTE ON THE PLAN" AND THE "NOTICE REGARDING PROPOSED CHANGES TO POST-EMPLOYMENT HEALTHCARE BENEFITS IN THE CITY'S PLAN OF ADJUSTMENT AND YOUR RIGHT TO VOTE ON THE PLAN" ENCLOSED WITH THIS DISCLOSURE STATEMENT PRIOR TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.

———————————

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits and supplemental documents thereto (collectively, the "<u>Plan Supplement Documents</u>") and documents described therein as Filed prior to approval of this Disclosure Statement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Except as otherwise indicated, the City will File all Plan Supplement Documents with the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>") and make them available for review on the Document Website (*www.kccllc.net/detroit*) prior to the Confirmation Hearing. A Plan Supplement or Plan Supplements containing Exhibits 189.a, 191.a, 220, 221 and II.D.6 to the Plan will be Filed no later than five Business Days prior to the Voting Deadline. All other Plan Supplements will be Filed no later than ten days before the Confirmation Hearing.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. The City reserves the right to modify the Plan consistent with section 942 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and other applicable law.

The statements contained in this Disclosure Statement are made as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including the information regarding the history and operations of the City and any financial information regarding the City, is included for the purpose of soliciting acceptances of the Plan. As to contested matters, adversary proceedings or any other litigation, the statements made in this Disclosure Statement are not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations as part of the City's attempt to settle and resolve its Liabilities pursuant to the Plan. This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding, nor shall it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to any party, including any Holder of a Claim against the City. Except where specifically noted, the financial information contained in this Disclosure Statement and in its Exhibits has not been audited by a certified public accountant and may not have been prepared in accordance with standards promulgated by the Government Accounting Standards Board or generally accepted accounting principles in the United States.

---

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the City and projections about future events and financial trends affecting the financial condition of the City and its assets. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section VI. In light of these risks and uncertainties, the forward-looking events and trends discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The City does not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

---

## II.

## SUMMARY OF CLASSIFICATION
## AND TREATMENT OF CLAIMS UNDER THE PLAN

*The following Plan summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement and the Plan.*

### A.     Overview

#### 1.     Introduction to the Plan

The Plan provides for the resolution of a variety of complex financial and operational issues faced by the City. The City believes that adjustment of the City's debts pursuant to the Plan will provide the greatest recovery for creditors of the City, while simultaneously allowing for meaningful and necessary investment in the City.  The Plan contemplates the City's emergence from chapter 9 this year and represents a crucial step toward the City's rehabilitation and recovery from a decades-long downward spiral.

The Plan includes settlements that the City believes will inure to the benefit of the City's creditors and its residents. The City settled controversial and sensitive issues relating to the Detroit Institute of Arts (the "DIA"), which settlement is expected to yield at least $466 million to provide a source of recovery for the approximately 33,000 individuals who participate in the City's retirement systems – the General Retirement System and the Police and Fire Retirement System (together, the "Retirement Systems") and which will free up other funds for distribution to other creditors – and negotiated a settlement with the State of Michigan (the "State") for the benefit of Holders of Pension Claims.

Except in the case of Subordinated Claims, the Plan provides a recovery to all classes of Claims.  The Plan also allows for investment in the City of approximately $1.4 billion over ten years, which the City believes is critical and meaningful, in order to, among other things:  (a) provide basic, essential services to City residents; (b) attract new residents and businesses to foster growth and redevelopment; (c) reduce crime; (d) demolish blighted and dangerous properties; (e) provide functional streetlights that are aligned with the current population footprint; (f) improve information technology systems, thereby increasing efficiency and decreasing costs; and (g) otherwise set the City on a path toward a better future.

The City believes that the Plan gives the City the best chance of effectively adjusting its debts and reestablishing itself as a prosperous and productive American city.  All creditors entitled to vote are encouraged to vote in favor of the Plan.

#### 2.     Special Information Regarding Pension and OPEB Claims

UNDER THE PLAN, THE TREATMENT OF ALLOWED PENSION CLAIMS DEPENDS UPON WHETHER OR NOT THE HOLDERS OF CLAIMS IN CLASSES 10 AND 11 VOTE TO ACCEPT THE PLAN.  REDUCTIONS IN ACCRUED PENSION BENEFITS WILL BE GREATER IF THE PLAN IS NOT ACCEPTED BY CLASSES 10 AND 11.  IF CLASSES 10 AND 11 VOTE TO ACCEPT THE PLAN, THE TREATMENT OF ALLOWED PENSION CLAIMS UNDER THE PLAN ASSUMES THE IMPLEMENTATION OF THE DIA SETTLEMENT AND THE RECEIPT OF THE FULL AMOUNT OF THE STATE CONTRIBUTION.  IF THE DIA SETTLEMENT DOES NOT, IN FACT, OCCUR, OR IF THE STATE CONTRIBUTION IS NOT RECEIVED BECAUSE CLASS 10 OR CLASS 11 VOTES TO REJECT THE PLAN, THEN THE TREATMENT OF ALLOWED PENSION CLAIMS IN CLASSES 10 AND 11 WILL REFLECT LARGER CUTS TO BENEFITS.  THE TREATMENT OF ALLOWED CLAIMS IN CLASSES 10 AND 11, AND THE SOURCES OF FUNDING FOR SUCH TREATMENT, ARE ILLUSTRATED AND DISCUSSED BELOW.

In connection with the requirement that the Bankruptcy Court make a determination that the City is eligible to be a debtor under chapter 9 of the Bankruptcy Code, numerous City retirees, employees, their representatives (including the Retiree Committee, the Retirement Systems, and certain labor unions – such as AFSCME and the International Union, UAW (the "UAW") – and retiree organizations) and other parties (including the Attorney General of the State of Michigan) advanced the argument that the Bankruptcy Court may not impair accrued pension benefits because they are protected under Article IX, Section 24 (the "Pensions Clause") of Michigan's State Constitution of 1963 (the "Michigan Constitution") and that the City's intention to impair accrued pensions in bankruptcy was a bar to its eligibility for chapter 9 relief. As more fully described in Section VIII.D of this Disclosure Statement, the Bankruptcy Court ruled that the City was

eligible to be a debtor under chapter 9 of the Bankruptcy Code, which ruling was memorialized in the Opinion Regarding Eligibility (Docket No. 1945) (the "Eligibility Order"). In the Eligibility Order, dated December 5, 2013, the Bankruptcy Court ruled that the pension obligations are subject to impairment in a federal bankruptcy case notwithstanding the Pensions Clause. Several parties, including the Retiree Committee, the Retirement Systems and several labor organizations and retiree associations, have requested and obtained permission to appeal the Bankruptcy Court's eligibility ruling directly to the United States Court of Appeals for the Sixth Circuit (the "Sixth Circuit Court of Appeals"). The effect of a reversal or modification of the Eligibility Order is uncertain. In that event, the range of potential outcomes might include dismissal of City's chapter 9 case or a determination that the chapter 9 case may not impose reductions in accrued vested pension benefits for retirees or active employees even if the City did not have assets sufficient to pay vested benefits in full.

The Plan provides that, on the Effective Date, the City will assume the obligations related to the already accrued benefits under the GRS pension plan and the PFRS pension plan *as those benefits will have been modified in the Plan*. This means that the City will not seek to terminate the GRS or the PFRS, although their respective pension plans will be closed to new participants, and vested active employees will not continue to accrue additional pension benefits under the terms and conditions of the current plans, *i.e.*, the two plans will be "frozen." For a discussion of the City's proposal regarding the accrual of pension benefits by active employees on or after July 1, 2014, see Section II.B of this Disclosure Statement and Sections I.A.191 and I.A.189 of the Plan, regarding the New PFRS Active Pension Plan Formula and the New GRS Active Pension Plan Formula. The City will continue to retain the responsibility to fund all amounts necessary to provide the adjusted (reduced) pension benefits to its employees and retirees who will have accrued benefits in either of the GRS or PFRS pension plans as of the Effective Date, although the City's contributions will be fixed during the period ending June 30, 2023. *It is not contemplated that the City will make contributions to GRS or PFRS through June 30, 2023 other than the contributions from DWSD to GRS.* Thereafter, the City will be required to contribute all amounts necessary to fund the modified accrued pensions regardless of the actual future investment performance of the pension plan assets. Although, pursuant to the Plan, the City will provide necessary funding to support the reduced pension benefit levels after 2023, the level of funding necessary to support those reduced pension benefits will depend upon, among other things, future actuarial assumptions, changes in retiree mortality and investment returns. Using the assumptions adopted by the City in proposing the Plan, between 2024 and 2053 the City will contribute approximately $2.816 billion, the present value of which is approximately $1.038 billion.

Based on reports prepared by the Retirement Systems' independent auditors, as of June 30, 2013, there were approximately 32,427 individuals who are entitled to benefits under the GRS and PFRS. As of June 30, 2013, in the PFRS pension plan there were 3,272 active employee members, 9,054 retiree members receiving benefits, and 111 members who are neither working for the City nor yet receiving benefits. As of June 30, 2013, in the GRS pension plan, there were 5,658 active employee members, 12,118 retiree members receiving benefits and 2,214 terminated plan members who are entitled to but not yet receiving benefits. The total number of current retirees is approximately 21,172. As of June 30, 2012, there were approximately 7,200 retirees in both systems over age 75. There were approximately 6,500 retirees who are age 65 or younger, with a higher percentage of PFRS retirees in this group. According to the most recent annual reports published by the Retirement Systems, the average annual pension for a GRS retiree or beneficiary as of June 30, 2012 was $19,213, and the average annual pension for a PFRS retiree or beneficiary as of June 30, 2012 was $30,607.

In the past, the Retirement Systems engaged in a variety of practices that contributed considerably to the underfunding of the pension plans, particularly with respect to the GRS pension plan. As more fully discussed in Section VII.B.5.b, these practices included: (a) consuming pension fund assets to pay promised returns under the separate "annuity savings plan," whether or not such returns actually were realized; (b) dissipating pension fund assets during the years when returns on investment exceeded expectations through the so-called "13th check" program and (c) deferring required pension fund contributions from the City each year and financing the deferred amounts at a rate of 8%. Serious allegations also have been made that former officials of the Retirement Systems accepted bribes and misappropriated assets of the Retirement Systems for their own personal gain. In addition, the Retirement Systems have made many poor investments that have reduced the funded status of the two pension plans. Finally, it appears that a large portion of the assets of the respective Retirement Systems is invested in alternative investments for which no recognized market exists, requiring valuation methodologies that generate estimates of value rather than prices drawn from active markets. As of June 30, 2013, approximately 24% of PFRS assets and 33% of GRS assets had estimated, rather than readily ascertainable, market values. The Retirement Systems maintain that the past investment practices of the pension plans were consistent with the guidelines set forth in the Michigan Public Employee Retirement System Investment Act. The Retirement Systems also maintain that the current investment practices of the pension plans are consistent with the guidelines set forth in the Michigan Public Employee Retirement System Investment Act.

In 2009, two separate (albeit related) class actions were filed against trustees of the Retirement Systems, which addressed allegations of malfeasance against GRS and PFRS officials and advisors. See Estes *et al.* v. Clark *et al.*, Wayne County Circuit Court, Case No. 09-010080-NZ; Foy *et al.* v. Bandemer *et al.*, Wayne County Circuit Court, Case No. 09-024103-NZ. The member plaintiffs in the two class actions included all active employees and retirees from both Retirement Systems. There was an "opt-out" period prior to class certification through which any potential class member could "opt-out" and not be bound by the outcome of the class actions. No one opted out. The *Estes* and *Foy* cases included claims against trustees of the Retirement Systems as well as against certain independent fiduciaries (such as financial advisors). The class members alleged, among other things, that certain current and former trustees of the Retirement Systems and certain advisors to the Retirement Systems made various investment recommendations and/or decisions that were grossly negligent and that violated Defendants' duties to the Retirement Systems, causing a loss of money to the Retirement Systems. On February 28, 2014, these class actions were settled for approximately $8 million. The settlement funds (minus certain fees) were paid into the two Retirement Systems. Under the terms of the relevant settlement orders, all claims that were asserted or that could have been asserted by the plaintiffs and class members were dismissed with prejudice. The Retiree Committee has asserted its interest in investigating, and taking discovery with respect to, any claims or causes of action that may exist on behalf of the City or pension beneficiaries in respect of past activities, events, conduct or management of or related to the pension systems or the assets thereof, or any advice provided to or on behalf of the pension systems. The Retiree Committee may seek to take action to preserve or otherwise prosecute any such claims or causes of action.

As a result of, among other things, the past practices described above, both the GRS and the PFRS are underfunded. Each of the Retirement Systems has reported unfunded actuarial accrued liabilities ("UAAL") that are substantially lower than the amounts disclosed by the City in the List of Creditors. In particular, as of June 30, 2013, the GRS reported that it was 70.0% funded with a UAAL of $1.084 billion out of $3.609 billion in accrued liabilities. As of June 30, 2013, the PFRS reported that it was 89.3% funded with a UAAL of $415.6 million out of $3.890 billion in accrued liabilities. Thus, based on actuarial assumptions and methods employed by the Retirement Systems prior to the commencement of the City's chapter 9 case, the estimated UAAL as of the end of Fiscal Year 2013 for both Retirement Systems combined was $1.5 billion.

The City believes that the UAAL figures reported by the Retirement Systems were substantially understated because they were based upon various actuarial assumptions and methods that substantially understate the Retirement Systems' UAAL. The assumptions and methods included: (a) annual net rates of return on investments (GRS – 7.9%; PFRS – 8.0%) that were and are unrealistic in light of the Retirement Systems' demographics and the average of actual returns realized by both pension plans over the past 10-15 years, the targeted mix of the Retirement Systems' assets and the inability of the City to budget for and fund pension investment loss in the event the sought-after returns were not achieved; (b) the "smoothing" (reallocation over several years) of asset gains and losses over a seven year period, which masks the funding shortfall; and (c) the use of 29-year (PFRS) and 30-year (GRS) amortization periods for funding UAAL – which is applied anew each year to the full amount of unfunded liability – that allows unfunded liabilities to continue to grow rapidly as a result of compounding. The Retirement Systems believe that the actuarial assumptions and methods upon which the UAAL figures were calculated were sound and entirely consistent with the practices commonly used by public pension funds.

In the List of Creditors, the City set forth what it believes is a more realistic total UAAL for the Retirement Systems of $3.474 billion, consisting of $2.037 billion in UAAL owed to the GRS and $1.437 billion in UAAL owed to the PFRS. The City's actuary, Milliman Inc., calculated this UAAL figure merely by substituting the estimated market value of the Retirement Systems' assets for their actuarial value and using a more achievable assumed rate of return of 7.0% instead of the rates of return of 7.9% or 8.0% assumed by the Retirement Systems.

To reduce the risk that the City has experienced from the past investment and discretionary benefit allowance practices of the GRS and PFRS pension funds, which contributed to the current underfunding in each of the pension funds, and to ensure that pension funding obligations do not impair the crucial Plan objective of assuring that the City will have sufficient funds to operate and to improve infrastructure and public safety, the City has developed the following pension restructuring approach: (a) the City has set a goal of achieving a 70% and 75% funded status for GRS and PFRS, respectively, based upon an assumed investment rate of return of 6.75%, by June 30, 2023 and based further on the market value of assets, not a smoothed value of assets; and (b) the City has determined the cash contributions it can reasonably afford to make to each pension plan during the period ending June 30, 2023. Based on these parameters, which were chosen to achieve predictable pension contributions over the long term and sufficient pension funding to provide benefits as modified, and to align the City's required future cash contributions to the plans with its reasonably projected revenues, the City has determined what pension benefit cuts are necessary from the participants in each pension plan.

Specifically, the calculation of the aggregate amounts of the Allowed PFRS Claims in Class 10 and the Allowed GRS Claims in Class 11 utilizes, among other assumptions, a 6.75% discount rate to value liabilities and a 6.75% investment return rate for future growth of assets. This investment return rate is less than (a) the net 8% investment return rate historically utilized by PFRS in calculating the actuarial underfunding of the PFRS pension plan and (b) the net 7.9% investment return rate historically utilized by GRS in calculating the actuarial underfunding of the GRS pension plan. In both cases, the City has utilized the lower rate as a measure to ensure that both GRS and PFRS utilize prudent and conservative investment policies going forward to protect the assets in both pension plans from unnecessary and imprudent risk of depletion to the detriment of the plan beneficiaries and also to insulate the City – given its extremely limited cash resources – from unforeseen and unbudgeted increases in required future contributions to the pension plans that could cause the City to experience budget deficits in the future. The City believes that its use of these revised investment return assumptions is consistent with the trend by governmental entities to reduce pension investment return assumptions. In 2012, for example, the California Public Employees' Retirement System (known as CalPERS) – the nation's second-largest public pension fund – reduced its assumed rate of return from 7.75% to 7.5%. The particular rates used in the Plan – although lower than most jurisdictions – nonetheless align with the unique financial inability of the City to weather unanticipated pension investment loss. Certain other pension funds utilize assumed rates of return that are equal to, or lower than, those utilized by the City. For example, Washington D.C.'s Teachers' Retirement System and Police Officers' and Fire Fighters' Retirement System both use an assumed rate of return of 6.5%, and the Indiana Public Retirement System uses a 6.75% rate of return. The City believes that these conservative assumptions are particularly appropriate given the large percentage of investments held by the pension funds that do not have a readily determinable market value and the uncertainty to actual asset values held by the pension plans as a result.

## Classification of Pension and OPEB Claims in the Plan

**Under the Plan, claims against the City are divided into different classes. Claims related to PFRS pensions are in Class 10. Claims related to GRS pensions are in Class 11. Claims related to retiree healthcare and death benefits – OPEB Claims – are in Class 12.**

### *Pensions*

- **If you participate in PFRS, your Pension Claim is what the Plan calls a "<u>PFRS Pension Claim</u>." Your PFRS Pension Claim is included in Class 10 of the Plan.**

  - The amount of all PFRS Pension Claims that has been <u>estimated</u> for purposes of voting on the Plan is $1,284,000,000. This amount is equal to the estimated amount of the "underfunding" for PFRS as of June 30, 2013. That is, it is equal to the difference between the market value of the assets in PFRS as of June 30, 2013 and the present value of the liabilities of PFRS as of June 30, 2013 (in other words, the total amount of all PFRS pension benefits accrued by all City employees, former employees, retirees and survivors). If you are the holder of a PFRS Pension Claim, the value of your PFRS Pension Claim is equal to your share of this $1,284,000,000 and is stated on the Ballot that you received with this Disclosure Statement. The amount stated on your Ballot is the estimated amount of your PFRS Pension Claim **only for purposes of counting votes for the Plan**. It is not a promise by the City to pay that amount under the Plan. It is also not an estimate of your future pension checks.

  - If you are an active or former employee who was not receiving a PFRS pension as of March 1, 2014, the actual value of your pension will not be calculated until you retire. Your claim and your pension are different things. For purposes of counting votes for the Plan, your Ballot contains a rough estimate of your portion of the total PFRS Pension Claim based on your age and years of service. It is not a promise by the City to pay that amount under the Plan. It is also not an estimate of your future pension checks.

  - If you also worked for other City departments (or you are a surviving beneficiary of someone who worked in another City department), you may also have a right to a pension from the GRS. If so, you will receive a separate Plain Language Supplement and Ballot for voting your GRS Pension Claim in Class 11 of the Plan.

  - If you are currently retired or are a surviving beneficiary, you also have a separate OPEB Claim. You will receive a separate Plain Language Supplement and Ballot for voting your OPEB Claim in Class 12 of the Plan.

-13-

13-53846-tjt  Doc 2390  Filed 08/08/19  Entered 08/08/19 11:53:05  Page 93 of 226
13-53846-swr  Doc 3090  Filed 08/08/19  Entered 08/08/19 11:53:12  Page 93 of 226

- **If you participate in GRS, your Pension Claim is what the Plan calls a "<u>GRS Pension Claim</u>." Your GRS Pension Claim is included in Class 11 of the Plan.**

  - The amount of all GRS Pension Claims that has been <u>estimated</u> for purposes of voting on the Plan is $1,976,000,000. This amount is equal to the estimated amount of the "underfunding" for GRS as of June 30, 2013. That is, it is equal to the difference between the market value of the assets in GRS as of June 30, 2013 and the present value of the liabilities of GRS (in other words, the total amount of all GRS pension benefits accrued by all City employees, former employees, retirees and survivors) as of June 30, 2013. If you are the holder of a GRS Pension Claim, the value of your GRS Pension Claim is equal to your share of this $1,976,000,000 and, for voting purposes only, any estimated amount of the Annuity Savings Fund Recoupment (defined below). This amount is stated on the Ballot that you received with this Disclosure Statement. The amount stated on your Ballot is the estimated amount of your GRS Pension Claim **only for purposes of counting votes for the Plan**. It is not a promise by the City to pay that amount under the Plan. It is also not an estimate of your future pension checks.

  - If you are an active or former employee who was not receiving a GRS pension as of March 1, 2014, the actual value of your pension will not be calculated until you retire. Your claim and your pension are different things. For purposes of counting votes for the Plan, your Ballot contains a rough estimate of your portion of the total GRS Pension Claim based on your age and years of service. It is not a promise by the City to pay that amount under the Plan. It is also not an estimate of your future pension checks.

  - If you worked for the Police or Fire Department of the City of Detroit (or you are a surviving beneficiary of someone who worked for the Police or Fire Department of the City), you may also have a right to a pension from the PFRS. If so, you will receive a separate Plain Language Supplement and Ballot for voting your PFRS Pension Claim in Class 10 of the Plan.

  - If you are currently retired or are a surviving beneficiary, you also have a separate OPEB Claim. You will receive a separate Plain Language Supplement and Ballot for voting your OPEB Claim in Class 12 of the Plan.

  - <u>Employees and Retirees of the Detroit Public Library.</u> To any extent the City has any obligations to the current or former employees of the Detroit Public Library (the "<u>Library</u>") by virtue of their participation in the GRS pension plan, the City believes that the City's obligations may be modified in the City's bankruptcy case. The City, therefore, has provided Plain Language Supplements and Ballots to current and former Library employees. The Library's obligations to current and former employees for pension benefits are separate from any obligation the City may have, however. Any vote on the City's Plan affects only any obligation the City may have and does not change the Library's obligations for pension benefits.

### *OPEB (Retiree Health (Including Vision and Dental) and Death Benefits)*

**If you are a retiree or a surviving beneficiary and are receiving retiree health benefits, or are entitled to retiree death benefits from the City, you are a holder of what the Plan calls an "<u>OPEB Claim</u>" and your OPEB Claim is included in Class 12 of the Plan.**

The <u>estimated</u> amount of all OPEB Claims for purposes of voting on the Plan is $4,095,000,000. This amount represents the estimated present value of the cost of the City's future obligations, as of June 30, 2013, for the City to continue to provide retiree health benefits (including dental and vision) and death benefits into the future under the programs that were in effect at the time the City filed its chapter 9 petition. If you are the holder of an OPEB Claim, the estimated value of your OPEB Claim is equal to your share of this $4,095,000,000 and is stated on the Ballot that you received with this Disclosure Statement. Your share is calculated based in part on your age and life expectancy, and also the projected cost of future health care. The claim amount stated on your Ballot is the estimated amount of your OPEB Claim **only for purposes of voting** on the Plan. It is not the value of your OPEB benefits, and it is not a promise by the City to pay that amount under the Plan. The estimated claim for voting purposes is different than the allowed amount of the Class 12 OPEB Claim that was reached as part of a settlement between the City and the Retiree Committee.

<u>Employees and Retirees of the Detroit Public Library.</u> To any extent the City has any obligations to the Library's current or former employees by virtue of their participation in the City's OPEB plans or programs, the City believes that the City's obligations may be modified in the City's bankruptcy case. The City, therefore, has provided Plain Language

Supplements and Ballots to current and former Library employees. The Library's obligations to current and former employees for pension and OPEB benefits are separate from any obligation the City may have, however. Any vote on the City's Plan affects only any obligation the City may have and does not change the Library's obligations for OPEB benefits.

**How The Plan To Adjust Detroit's Debts Affects Future Pension Benefits**

### Class 10 – PFRS

The Plan provides for two alternatives for your pension benefits. The Plan will not reduce your monthly pension payments, but it will reduce your future annual cost-of-living adjustments ("COLAs"), or "escalators," either by 55% (Alternative A) or eliminate them entirely (Alternative B). Alternatives A and B are described in the chart on page 17 and in the following pages. There are two alternatives because the amount of the pension reductions depends upon whether you and others in Class 10 and those in Class 11 (those holding GRS Claims) vote to accept the Plan and the Outside Funding is received.

### Class 11 – GRS

The Plan provides for two alternatives for your pension benefits. Alternative A has lower pension reductions. Alternative B has higher pension reductions. Alternatives A and B are described in the chart on page 17 and in the following pages. There are two alternatives because the amount of the pension reductions depends upon whether you and others in Class 11 and those in Class 10 (those holding PFRS Claims) vote to accept the Plan and the Outside Funding is received.

### The Outside Funding

The Plan contemplates that $816 million in funding from outside sources as a settlement of certain issues affecting the City and its retirees will be contributed to GRS and PFRS over 20 years *if and only if both Classes 10 and 11 vote to accept the Plan*. These outside sources are: (a) funders of the non-profit corporation that operates the Detroit Institute of Arts, (b) 12 charitable foundations and (c) the State of Michigan. Their collective contributions are called the **"Outside Funding."**

*If one Class of pension claims votes to accept the Plan and the other Class of pension claims votes to reject the Plan, the Outside Funding for the pensions will not be available. If both Classes of pension claims vote to reject the Plan, this additional Outside Funding for the pensions will not be available.*

*IN OTHER WORDS, BOTH CLASS 10 AND CLASS 11 MUST VOTE TO ACCEPT THE PLAN IN ORDER FOR THE OUTSIDE FUNDING TO BE CONTRIBUTED TO FUND PENSIONS.*

*For a Class to vote to accept the Plan, more than two-thirds in amount of claims and one-half in number of Class members who actually vote must vote "YES" to accept the Plan.*

*There are other conditions to the receipt of the Outside Funding that must also be met for the money to be contributed. These conditions are described in the Plan. See Plan, §§ IV.E.3, IV.F.3. Therefore, even if Classes 10 and 11 both vote to accept the Plan, there is a risk that the payments from the Outside Funding may not be made as promised. The Plan does not require the City to make up for any missed payments.*

-15-

13-53846-tjt   Doc 3091   Filed 08/08/19   Entered 08/08/19 11:53:05   Page 95 of 226
13-53846-swr   Doc 3090   Filed 03/03/14   Entered 03/03/14 10:13:12   Page 95 of 126

---

**NOTICE REGARDING EFFECT OF VOTING ON RELEASES**

**If you vote to accept the Plan:** **You may be giving up any right you may have to sue the State of Michigan, the City or other entities specifically protected by the Plan releases to try to recover the full amount of your pension,** only if the necessary conditions (the "Initial Funding Conditions") for the funding from the State and the other Outside Funding parties that can be satisfied before the Confirmation Hearing are satisfied or waived. These preconditions include adoption of relevant legislation and appropriations by the State and completion of necessary agreements and documents by the State and the other Outside Funding parties, among other things.

**If you vote to accept the Plan and the Initial Funding Conditions are not satisfied or waived:** Your vote will be treated as a vote to reject the Plan because, in this circumstance, the Outside Funding would not be received.

**If you vote to reject the Plan:** If you vote to reject the Plan, it will be less likely that the Outside Funding will be available because acceptance by Classes 10 and 11 is a condition for receipt of the Outside Funding. Nevertheless, if Classes 10 and 11 vote to accept the Plan so that the Outside Funding will be received despite your vote to reject the Plan, you will benefit from the Outside Funding that is received, but you will not have any right to sue the State of Michigan, State officials, the City or other entities specifically protected by the Plan releases to try to recover the full amount of your pension. This is because the releases are also conditions of the Outside Funding.

---

A summary chart showing the difference in estimated adjustments to pension benefits if Outside Funding is, or is not, received for both GRS and PFRS appears below.

-16-

13-53846-tjr   Doc 3090   Filed 06/06/19   Entered 06/06/19 10:53:05   Page 96 of 226
13-53846-swr   Doc 4391   Filed 05/05/14   Entered 05/05/14 11:50:12   Page 96 of 226

| Alternative A |  |
|---|---|
| **Estimated Adjustments to Pension Benefits if Classes 10 and 11 Vote Yes on the Plan and Outside Funding Is Received and the Court Approves the Plan[1]** |  |
| **PFRS** | **GRS** |
| <ul><li>You will receive 100% of your current pension and 45% of your annual "escalators" or COLAs over your lifetime.<ul><li>No reduction in current and future monthly pension payments.</li><li>Elimination of 55% of your annual "escalators" or COLA.</li></ul></li><li>COLAs are approximately 18% of the total value of PFRS liabilities; 55% of COLAs equate to a reduction of about 9.9%.</li><li>The value of the COLA to you depends largely upon your age and the size of your current pension; yours could be more or less.</li><li>The PFRS plan will be "frozen." The impact of this is to reduce liabilities by about $55 million – or roughly 7.5% of the active employee liabilities, or 1% of the total PFRS liabilities.</li></ul> | <ul><li>You will receive 95.5% of your current pension and no "escalators" or COLAs over your lifetime and you will be subject to Annuity Savings Fund Recoupment.</li><li>Three reductions apply: a 4.5% reduction in current and future monthly pension payments and elimination of COLAs and Annuity Savings Fund Recoupment.</li><li>COLAs are approximately 14.5% of the total GRS liabilities; the value of the COLAs to you depends largely upon your age and the size of your current pension.</li><li>Annuity Savings Fund Recoupment is expected to be about 8.8% of the total GRS liabilities after COLA; your portion could be more or less.</li></ul> |
| Alternative B |  |
| **Estimated Adjustments to Pension Benefits if Either Class 10 or Class 11 Votes No on the Plan, No Outside Funding Is Received and the Court Approves the Plan** |  |
| **PFRS** | **GRS** |
| <ul><li>You will receive 100% of your current pension but no COLAs over your lifetime.<ul><li>No reduction in current and future monthly pension payments.</li><li>Elimination of 100% of COLAs.</li></ul></li><li>COLAs are approximately 18% of the total value of PFRS liabilities; the value of the COLA to you depends largely upon your age and the size of your current pension; your total reduction could be more or less.</li><li>The PFRS plan will be "frozen." The impact of this is to reduce liabilities by about $55 million – or roughly 7.5% of the active employee liabilities, or 1% of the total PFRS liabilities.</li></ul> | <ul><li>You will receive 73% of your current pension and no COLAs over your lifetime and you will be subject to Annuity Savings Fund Recoupment.</li><li>Three reductions apply: a 27% reduction in current and future monthly pension payments and elimination of COLAs and Annuity Savings Fund Recoupment.</li><li>COLAs are approximately 14.5% of the total GRS liabilities; the value of the COLA to you depends largely upon your age and the size of your current pension.</li><li>Annuity Savings Fund Recoupment is expected to be about 8.8% of the total GRS liabilities after COLA; your portion could be more or less.</li></ul> |

**Your PFRS Adjusted Pension Amount (Class 10)**

Your already-accrued pension benefit amount, as it will be adjusted/reduced by the Plan as shown in the chart above, is called your "PFRS Adjusted Pension Amount." Your monthly pension amount will not change under the Plan, but the annual "escalators" or COLAs that you were entitled to will either be reduced or eliminated.

---

[1] Under the Plan, benefits may be reduced by more than COLA + 4.5% + ASF Recoupment for GRS and 55% of COLA for PFRS if one of the Foundations or the DIA Corp. does not make its promised contribution. It cannot be predicted with any certainty at this time how much of a reduction may occur if such a funding default were to happen.

If you are currently a retiree or a surviving beneficiary drawing a pension, you will continue to receive the same monthly pension amount if the Plan is approved, but your annual "escalators" (or COLAs) will change. The City cannot ensure collection of the Outside Funding, and a failure to collect the Outside Funding may cause a further reduction in your PFRS Adjusted Pension Amounts.

If you are a former employee who has earned a pension but has not yet retired and begun to receive your pension, your starting monthly pension amount upon your future retirement will be your earned pension at the time of your termination, but your annual "escalators" (or COLAs) will be reduced or eliminated. If you are an active employee who is not currently collecting pension payments but you have earned a monthly pension based on employment with the City and you are currently vested in such monthly pension or you work enough years with the City before and after June 30, 2014 to become vested in such monthly pension, you will receive upon your future retirement a monthly pension equal to the sum of (a) your PFRS Adjusted Pension Amount, which will be the same starting monthly pension amount you earned as of June 30, 2014 under the current pension program, but your annual COLAs will be reduced or eliminated, plus (b) your "New Accrued Pension." Your "New Accrued Pension" is the part of your pension that will be earned under a new "hybrid" pension plan based upon service from and after July 1, 2014. This is called the "New PFRS Active Pension Plan" in the Plan.

### *PFRS Pension Reductions & the PFRS Adjusted Pension Amount*

1.      **If you are a current retiree or a surviving beneficiary who currently receives a monthly pension,** your monthly pension amount will not change under the Plan. However, your annual "escalators" or COLAs will either be reduced by 55% or eliminated completely, depending on whether all of the Outside Funding is available. Over time, the loss of COLAs will affect younger retirees (or active employees with a vested pension benefit) more than it will affect older retirees because younger people generally can expect to receive more years of annual COLAs.

2.      **If you are a former employee who earned a vested pension before separation from employment with the City**, the starting monthly pension amount that you will be paid upon your future retirement will not change. However, your future annual "escalators" or COLAs will either be reduced by 55% or eliminated completely depending on whether all of the Outside Funding is available. Over time, the loss of COLAs will affect younger terminated employees with vested benefits more than it will affect older retirees because younger people generally can expect to receive more years of annual COLAs.

3.      **If you are an active employee who has earned a monthly pension to be paid upon your future retirement**, you will continue to grow your pension under the current pension formula through June 30, 2014. At that point, your pension benefits will be frozen (meaning that you will not earn any more benefits under the current pension plan formula), and you will not be able to earn any additional pension amounts under the current PFRS pension formula. If the Plan is approved, your frozen monthly pension amount will be the same as your current pension earned as of June 30, 2014, but your future annual "escalators" or COLAs will either be reduced by 55% or eliminated entirely, depending on whether all of the Outside Funding is available. If you work long enough (both before and after June 30, 2014) to become vested in your reduced frozen pension benefit, you will be able to receive your reduced frozen pension payment upon attaining a sufficient number of years of service as provided for under the current pension formula. As noted above, your reduced pension amount is called your "PFRS Adjusted Pension Amount." Over time, the loss of COLAs will affect younger retirees (or active employees with vested pension benefits) more than it will affect older retirees because younger people generally can expect to receive more years of annual COLAs.

4.      **If you are an active employee and you continue to work for the City after July 1, 2014**, you will also earn a new monthly pension under the New PFRS Active Pension Plan that will be paid at retirement along with your PFRS Adjusted Pension Amount. The monthly pension amount that you earn after July 1, 2014 is called your **"New Accrued Pension."** The pension formula for years of service after July 1, 2014 will be less generous than the formula that currently applies to your pension. For purposes of determining whether you are vested in your New Accrued Pension, your service with the City before and after July 1, 2014 will be taken into account. If the terms of the bargaining agreement between the City and your union so provide, you will be entitled to elect into a deferred retirement option plan ("DROP") for your frozen benefit and for your New Accrued Pension. If you are not currently participating in the DROP program, your participation in DROP will be limited to 5 years. If you previously irrevocably elected into a DROP, you will continue to participate in the DROP in accordance with the terms of the bargaining agreement between the City and your union.

*PFRS Pension Funding*

5.      **In the event that all of the Outside Funding is made available and that Classes 10 and 11 both have accepted the Plan,** during the period through June 30, 2023, contributions in the amount of approximately $260 million will be made to PFRS. Other than the Income Stabilization funds discussed below, these are the only amounts that are contemplated to be contributed to PFRS during this period. These contributions will be paid only from the Outside Funding. During this period, the City will not pay any money for PFRS pensions. If the Outside Funding is not paid as promised, the Plan does not require the City to make up these amounts.

6.      Beginning on and after July 1, 2023, approximately $68 million in Outside Funding will be available for PFRS. The City will be responsible for contributing all other amounts annually determined by PFRS to be necessary to fund the PFRS pension trust and to enable PFRS to pay your PFRS Adjusted Pension Amount (and your New Accrued Pension, if you are an active employee). The City will make the necessary contributions from its future tax revenues and available cash.

*PFRS Pension Restoration*

7.      The pension benefits reductions that are discussed in Paragraphs 1, 2 and 3 above may be restored, in whole or in part, if the funding level[2] of PFRS significantly improves and the PFRS trustees have complied with certain requirements described in the State Contribution Agreement. This restoration may occur if (a) the investment returns on PFRS assets are greater than certain specified thresholds or (b) other actuarially-determined factors contribute to improve the funding level of PFRS. In other words, if PFRS pension funding levels improve, your PFRS Adjusted Pension Amount may be increased, and some or all of your future COLA payments could be restored.

        This is a summary of how restoration of your COLA may happen. If the investments do well and the funding level of the PFRS exceeds the target, money will be set aside in a "restoration reserve account" to pay COLA restoration payments. Investment returns will increase (up to a cap) or decrease the assets in the restoration reserve account. When the restoration reserve account can fully fund (for people's lifetimes) at least 10% of future COLA payments, restoration payments will begin the next year. If more money is available, restoration payments will increase. If the funding level of the PFRS drops, money in the restoration reserve account may no longer be sufficient to provide increased COLA benefits and COLA restoration payments may be suspended. A summary of the relevant funding level targets is in the table below.

The year in which you begin to receive COLA restoration payments depends on when you began receiving your pension and when restoration begins. The order is: (1) Pensions that began before June 30, 2014 will have COLA restored first (up to 66%). (2) Pensions that began after June 30, 2014 but before the year when restoration begins will have COLA restored second (up to 66%). (3) Pensions for all PFRS participants (including those whose COLAs were restored to 66%) will have their remaining COLA restored last.

---

2       "Funding level" means the market value of PFRS' assets as a percentage of PFRS' liabilities to all participants for PFRS Adjusted Pension Amounts projected forward to 2023 and later. For example, if (a) the market value of PFRS' assets were $100 and (b) the amount of its liabilities to all participants for PFRS Adjusted Pension Amounts were also $100, the "funding level" for PFRS would be 100%. If, however, (a) the market value of PFRS' assets were $80 and (b) the amount of its liabilities were $100, the "funding level" for PFRS would be 80%.

| Summary of PFRS Funding Level Targets | | | | |
|---|---|---|---|---|
| | To set aside money for restoration, the funding level has to be at least this amount: | Investment return of restoration reserve account assets will be capped at: | No money set aside when the funding level falls below this amount: | COLA restoration payments may be suspended when funding level is: |
| Until 6/30/23 | 78% | 6.75% | 76% | Below 75% |
| Between 7/1/23 and 6/30/33 | [88]% | Assumed PFRS investment return (currently 6.75%, but it could change) | [86]% | Below [85]% |
| Between 7/1/33 and 6/30/43 | [95]% | | [93]% | Below [92]% |
| If funding level is greater than [78]% on 6/30/23, existing COLA restoration payments can no longer be suspended unless there are insufficient assets in the restoration reserve account. | | | | |

Finally, if the City completes a transaction with a third party involving the majority of assets in the Detroit Water and Sewerage Department ("DWSD") within seven years of the Plan's effective date, 50% of the funds that would be received by the City from that transaction may be used to help fund pension restoration, but the GRS will have a priority on receipt of that 50% share.

**Restoration of COLA benefits, particularly until 2023, cannot be assured. After 2023, restoration of certain benefits may be possible, but it cannot be predicted at this time whether or when any restoration will occur.**

**Your GRS Adjusted Pension Amount (Class 11)**

Your already-accrued pension benefit amount, as it will be adjusted by the Plan as shown in the chart on page 17, is called your "GRS Adjusted Pension Amount" in the Plan.

If you are currently a retiree or a surviving beneficiary drawing a pension, you will receive a revised monthly pension equal to your GRS Adjusted Pension Amount.

If you are a former employee who has earned a pension but has not yet retired and begun to receive your pension, you, too, will receive a revised monthly pension equal to your GRS Adjusted Pension Amount upon your retirement.

If you are an active employee who is not currently collecting pension payments but you have earned a monthly pension based on your employment with the City and you are currently vested in such monthly pension or you work enough years with the City before and after June 30, 2014 to become vested in such monthly pension, you will receive upon your future retirement a monthly pension equal to the sum of (a) your GRS Adjusted Pension Amount plus (b) your "New Accrued Pension." Your "New Accrued Pension" is the part of your pension that will be earned under a new "hybrid" pension plan based upon service from and after July 1, 2014. This new plan is called the "New GRS Active Pension Plan" in the Plan.

**For all Alternative A estimates, keep in mind that the City cannot ensure collection of the Outside Funding, and a failure to collect Outside Funding may cause a further reduction in your GRS Adjusted Pension Amount.**

**In addition, for Alternative A estimates, the Plan provides for DWSD to pay for its portion of the GRS underfunding over nine years. There is a risk that these payments may not be permitted.**

If you maintained an Annuity Savings Fund account at any time during the period July 1, 2003 through June 30, 2013, your GRS Adjusted Pension Amount will include an adjustment to your Annuity Savings Fund account (if you are an

-20-
13-53846-tjt   Doc 4391   Filed 09/09/14   Entered 09/09/14 15:03:25   Page 100 of 226
13-53846-swr   Doc 4391   Filed 09/09/14   Entered 09/09/14 15:03:12   Page 35 of 97
226

active employee or a terminated employee with an Annuity Savings Fund account) or in your monthly pension check (if you are a retiree who has received a total distribution from the Annuity Savings Fund) in an effort to recover certain excess interest that was credited to your Annuity Savings Fund account during this 10-year period. More information on these adjustments is set forth below under the heading "GRS Annuity Savings Fund Recoupment."

### *GRS Pension Reductions & the GRS Adjusted Pension Amount*

1.      **If you are a current retiree or a surviving beneficiary who currently receives a monthly pension,** then as soon as practical following the effective date of the Plan, your monthly pension will be reduced by either 4.5% or 27% (depending on whether the Outside Funding is available), and if you are a current retiree who maintained an Annuity Savings Fund account between July 1, 2003 and June 30, 2013, you will be subject to the Annuity Savings Fund Recoupment described in paragraph 8 below. The reduction in total GRS liabilities represented by the Annuity Savings Fund Recoupment is estimated to be an average 8.8% reduction of total GRS liabilities; your individual percentage reduction could be more or less. In addition, you will not receive any future COLAs to your pension payments. For GRS, these COLAs represent about 14.5% of total GRS liabilities. Over time, the loss of COLAs will affect younger retirees (or active employees with a vested pension benefit) more than it will affect older retirees because younger people can generally expect to receive more years of annual COLAs. Finally, if you participated in and received a distribution from the Annuity Savings Fund between July 1, 2003 and June 30, 2013, the reduction in your monthly pension will be greater than if you had not participated at all.

2.      **If you are a former employee who voluntarily or involuntarily terminated employment with the City but earned a vested pension before separation**, the monthly pension amount that you will be paid upon your future retirement will be reduced by either 4.5% or 27% (depending on whether the Outside Funding is available), and you will be subject to the Annuity Savings Fund Recoupment described in paragraph 8 below. The reduction in GRS liabilities represented by the Annuity Savings Fund Recoupment is estimated to be an average 8.8% reduction of total GRS liabilities; your individual percentage reduction could be more or less. In addition, you will not receive any future COLAs to your pension payments. For GRS, COLAs represent about 14.5% of total GRS liabilities. Over time, the loss of COLAs will affect younger terminated employees with vested benefits more than it will affect older retirees, because younger people generally can expect to receive more years of annual COLAs ("escalators"). Finally, if you participated in and received a distribution from the Annuity Savings Fund between July 1, 2003 and June 30, 2013, the reduction in your future monthly pension will be greater than if you had not participated at all.

3.      **If you are an active employee who has earned a monthly pension to be paid upon your future retirement**, you will continue to grow your pension under the current pension formula through June 30, 2014. At that point, your pension benefits will be frozen (meaning that you will not earn any more benefits under the current GRS pension plan formula. If the Plan is approved, your frozen monthly pension amount will be reduced by either 4.5% or 27% (depending on whether the Outside Funding is available), and you will be subject to the Annuity Savings Fund Recoupment described in paragraph 8 below. You will be able to receive your reduced frozen pension payment upon attaining a sufficient number of years of service as provided for under the current pension formula. As noted above, your reduced pension amount is called your "GRS Adjusted Pension Amount." In addition, you will not receive any future COLAs ("escalators") to your pension payments. For GRS, COLAs represent about 14.5% of total GRS liabilities. Over time, the loss of COLAs will affect younger retirees (or active employees with vested pension benefits) more than it will affect older retirees because younger people generally can expect to receive more years of annual COLAs.

In addition, if you participate or previously participated in the Annuity Savings Fund and continue to maintain an Annuity Savings Fund account, your Annuity Savings Fund account will be reduced by an amount equal to a portion of the excess investment earnings that were credited to that account during the years 2003 through 2013. If you are an active employee who participated in the Annuity Savings Account and already received a total distribution from the Annuity Savings Fund, then the reduction in your frozen monthly pension amount upon your future retirement will be greater than if you had not participated. The reduction in GRS liabilities represented by the Annuity Savings Fund Recoupment is estimated to be an average 8.8% of total GRS liabilities; your individual percentage reduction could be more or less. More information on Annuity Savings Fund Recoupment is described in paragraph 8 below.

4.      **If you are an active employee and you continue to work for the City after July 1, 2014**, you will also earn a new monthly pension under the New GRS Active Pension Plan that will be paid at retirement along with your GRS Adjusted Pension Amount. The monthly pension amount that you earn after July 1, 2014 is called your "**New Accrued Pension**." The pension formula for years of service after July 1, 2014 will be less generous than the formula that currently applies to your pension.

-21-
13-53846-twt   Doc 43090   Filed 08/09/19   Entered 08/09/19 10:50:15   Page 364 of 167
13-53846-swr   Doc 4391   Filed 09/09/19   Entered 09/09/19 15:03:25   Page 36 of 107
226

5.      In the event that all of the Outside Funding is made available and that Classes 10 and 11 both have accepted the Plan, during the period through June 30, 2023, contributions of over $700 million will be made to GRS.  Other than the Income Stabilization funds discussed below, these are the only amounts that will be contributed to GRS during this period.  These contributions will be paid only from contributions from DWSD, from other City sources and from the Outside Funding.  If the Outside Funding is not paid as promised, the Plan does not require the City to make up these amounts.  Importantly, the Plan assumes that during the period through June 30, 2023, DWSD will make payments on account of its full allocable share of the GRS UAAL, as explained in the following two paragraphs, which set forth the City's position with respect to such funding.

As employees and retirees of a City department, DWSD employees and retirees participate in the GRS with other non-uniform City employees and retirees.  Applicable state law permits DWSD to be charged, and pay directly to the GRS, its allocable share of the periodic contributions required to be made to the GRS as a cost and expense of operating the City's water and sewer systems.  The share of GRS contributions allocated to DWSD represents the cost of providing pensions to employees and retirees of DWSD.  Under the Plan, during the period through June 30, 2023, DWSD will make payments to GRS on account of all of its full allocable share of the GRS UAAL remaining *after the pension modifications contemplated by the Plan.*  That is, the total accrued liabilities of GRS *as modified by the Plan* will be determined first, and *then* the amount of such reduced, accrued liabilities allocable to DWSD will be determined, which amount will be paid to GRS over the 9-year period ending June 30, 2023.  The amount to be paid by DWSD has been determined as the amount necessary to fully fund, by June 30, 2023, all underfunded GRS liabilities allocable to DWSD that will have accrued as of June 30, 2014.  The amount to be paid by DWSD has been calculated based on an assumed investment rate of return of 6.75% and further assumes that the GRS pension plan will be frozen as of June 30, 2014.

Such funding is consonant with applicable state law.  As a general matter, DWSD is permitted to, and historically has, paid its contributions to GRS from the water system's and sewage disposal system's respective "Operation and Maintenance Fund," which, pursuant to City ordinance, are to "be used to pay the expenses of administration and operation" of the systems.  In addition, State law permits an enterprise system, such as DWSD, to charge fees for services conferred on the ratepayers/users of the system that are proportionate to the necessary costs of the service.  The contributions from DWSD to GRS contemplated by the Plan – which will be derived from rates that DWSD will charge to users of its water and sewage disposal systems during the period through June 30, 2023 – are on account of *accrued liabilities* attributable to DWSD.  DWSD historically has been expected to account for approximately 30-33% of the contributions to GRS.  The required funding represents a substantial reduction in the DWSD funding contribution.  Although DWSD will be funding its allocable share of this accrued liability over 9 years instead of a longer period, it will not be paying any more than its actual, full, allocable share of the GRS UAAL.  If DWSD did not fund its allocable share to the GRS pension fund in this manner, the cuts to GRS pension beneficiaries would have to be higher than those contemplated in the Plan.  After the initial 9-year period through June 30, 2023 is completed and the unused Outside Funding is received by GRS, DWSD will remain responsible for its allocable share of GRS UAAL but is expected to have very small contributions, if any, to make to the GRS on account of this liability.

6.      Except as described above with respect to DWSD, beginning on and after July 1, 2023, the City will be responsible for contributing all amounts annually determined by GRS to be necessary to fund the GRS pension trust and enable GRS to pay your GRS Adjusted Pension Amount (and your New Accrued Pension, if you are an active employee).  The City will make the contributions from its available cash and from approximately $188 million from the Outside Funding during the ten-year period from July 1, 2023 through June 30, 2033.  The City estimates that it will be required to contribute approximately $442 million from its available cash during that period.

### *GRS Pension Restoration*

7.      The pension benefits reductions that are discussed in Paragraphs 1, 2 and 3 above may be restored, in whole or in part, if the funding level[3] of GRS significantly improves.  This restoration may occur if (a) the investment returns on GRS assets are greater than certain specified thresholds or (b) other actuarially-determined factors contribute to improve the funding level of GRS.

---

[3]      "Funding level" means the market value of GRS' assets as a percentage of GRS' liabilities to all participants for GRS Adjusted Pension Amounts projected forward to 2023 and later.  For example, if (a) the market value of GRS' assets were $100 and (b) the amount of its liabilities to all participants for GRS Adjusted Pension Amounts were also $100, the "funding level" for GRS would be 100%.  If, however, (a) the market value of GRS' assets were $80 and (b) the amount of its liabilities were $100, the "funding level" for GRS would be 80%.

This is a summary of how restoration of your pension benefits may happen. If the investments do well and the funding level of the GRS exceeds the target, money will be set aside in a "restoration reserve account" to pay pension restoration payments. Investment returns will increase (up to a cap) or decrease the assets in the restoration reserve account. When the restoration reserve account can fund at least a restoration of 0.5% of the 4.5% pension reduction (*i.e.*, 1/9th of the 4.5% reduction), restoration payments will begin the next year. If more money is available, more pension reductions will be restored. First, the restoration payments will be used to restore the 4.5% pension reduction. Then, payments will be made to restore COLA reductions. Third, payments will be made to restore pension benefits of non-retirees subject to ASF recoupment until they are on equal footing with retirees subject to ASF recoupment. And, finally, payments will be made to restore all other pension benefits reduced due to ASF recoupment. If the funding level of the GRS drops, money in the restoration reserve account may no longer be sufficient to provide pension restoration payments and pension restoration payments may be suspended. A summary of the relevant funding level targets is in the table below.

The order in which you will receive pension restoration payments depends on when you began receiving your pension and when restoration begins. There are three classes. Class 1: Pensions that began before June 30, 2014. Class 2: Pensions that began after June 30, 2014 but before the year when restoration begins. Class 3: All other individuals. Each class will receive full restoration payments of each pension restoration type before the next class in line. The order of pension restoration types is as follows. First, the 4.5% pension reduction will be restored (first to Class 1, then to Class 2, then to Class 3). Second, 50% of the COLA reduction will be restored (in the same class order). Third, the remaining 50% of the COLA reduction will be restored (in the same class order). Fourth, pension benefit reductions due to ASF recoupment that occurred for Class 2 and Class 3 will be restored (first to Class 2, then to Class 3) until those classes are on equal footing with the ASF-related pension reductions to Class 1. Finally, all other pension benefit reductions due to ASF recoupment will be restored (first to Class 1, then to Class 2, then to Class 3).

| Summary of GRS Funding Level Targets | | | | |
|---|---|---|---|---|
| | To set aside money for restoration, the funding level has to be at least this amount: | Investment return of restoration reserve account assets will be capped at: | No money set aside when the funding level falls below this amount: | Restoration payments may be suspended when funding level is: |
| Until 6/30/23 | 75% | 6.75% | 73% | Below 70% |
| Between 7/1/23 and 6/30/33 | [85]% | Assumed GRS investment return (currently 6.75%, but it could change) | [83]% | Below [82]% |
| Between 7/1/33 and 6/30/43 | [93]% | | [91]% | Below [90]% |
| If funding level is greater than [75]% on 6/30/28, existing restoration payments can no longer be suspended unless there are insufficient assets in the restoration reserve account. | | | | |

Finally, if the City completes a transaction with a third party involving the majority of assets in the DWSD within seven years of the Plan's effective date, 50% of the funds that would be received by the City from that transaction may be used to help fund pension restoration, but the GRS will have a priority on receipt of that 50% share.

**Restoration of benefits, particularly until 2023, cannot be assured. After 2023, restoration of certain benefits may be possible, but it cannot be predicted at this time whether or when any restoration will occur.**

### *GRS Annuity Savings Fund Recoupment*

8. *What is the Annuity Savings Fund?* The Annuity Savings Fund (**"ASF"**) is a voluntary, individual account pension program that operates within the GRS pension plan. If an employee chooses to participate in the ASF, a pension account is established for the employee, and he or she may voluntarily contribute 3%, 5% or 7% of gross pay, on an after-tax basis, to that account. The GRS trustees invest these contributions with other GRS assets. The GRS trustees

are granted discretion to determine the annual interest to be credited on the employee contributions to the ASF accounts, and each employee's ASF account increases in value based upon the interest amounts that the GRS trustees credit to the ASF accounts. After 25 years of service, an active employee may elect to withdraw from his or her ASF account some or all of the accumulated contributions plus the investment earnings credited to that individual account. An active employee may borrow up to 50% of his or her ASF account. Upon retirement, an employee may elect to receive a lump sum distribution, or to annuitize some or all of his or her ASF account balance, which is added to his or her monthly pension payment and is separately identified on a retiree's pension check. Any portion of the ASF balance that is not annuitized upon retirement is paid to the retiree in a partial or total lump sum distribution at the retiree's request. Many GRS participants contributed a part of their salaries to an ASF account for decades.

*"Excess Interest" to be Recovered.* During the period from 2003 through 2013, the GRS trustees credited to employee ASF accounts annual interest of no less than 7.9%, and in some years more than 7.9%, based upon actuarial computations. Retirees had no say in the computations or the crediting of interest to their ASF accounts. The ASF accounts essentially were treated as a guaranteed investment program, where, each year, ASF account holders would be credited with interest of at least 7.9%, regardless of the actual market investment returns on the assets in GRS. For example, in fiscal year 2009, the value of the assets that supported the Annuity Savings Fund accounts actually lost 19.67% percent of their value, but the GRS trustees credited the ASF account with 7.9% in interest. So, even though an ASF account holder who might have had $10,000 in his or her ASF account in 2009 actually lost 19.67% in market value and should have had only a balance of $8,033 in his or her account, instead his or her account was credited as having $10,790.

The City believes that, as a result of these practices, there was too much, or "excess," interest credited to the ASF accounts, and that assets were diverted from the money available to fund GRS participants' monthly defined benefit pensions. The City estimates that, using actual market returns between 0% and 7.9% for crediting purposes,[4] **over $387 million of excess interest was credited to the ASF accounts collectively during the period from July 1, 2003 through June 30, 2013.** It is the City's belief that the $387 million represents money that was diverted from the general GRS asset pool during this period, and that should have been used to fund all GRS participants' monthly defined benefit pensions.

In designing the Plan, the City addressed whether the Plan should: (a) contain higher across-the-board pension cuts for all GRS participants and not try to recover a portion of the excess ASF interest credits or (b) recover a portion of the excess ASF interest credits, which would result in lower across-the-board pension cuts for all GRS participants. The City decided on the second choice and, therefore, there will be both across-the-board pension cuts and a recovery of excess ASF interest credits. **As a result, the across-the-board cuts will be lower.**

Specifically, as part of the Plan, some, but not all, of these **"excess"** amounts related to the over-crediting of interest to ASF accounts will be recovered by (a) offsetting current ASF accounts of active or terminated employees and/or (b) reducing monthly pension checks of current or future retirees and their survivors under annuities that provide survivor benefits. Persons participating in the ASF during the period from July 1, 2003 through June 30, 2013 will be affected. This recovery will be in addition to the other reductions to your accrued pension described in this Disclosure Statement.

**There will be a cap on what is recovered.** Specifically, for any active or former employee or retiree, the recovery will be limited to **20%** of the highest value of such participant's ASF account balance between July 1, 2003 and June 30, 2013 (including any unpaid loans taken by the participant from his or her ASF account as of such date). The 20% cap described above is not the average amount of the reduction from your pension as a result of the Annuity Savings Fund Recoupment. **Using a 20% cap, the City believes that approximately $230 million of excess interest was credited to the ASF accounts during the period from July 1, 2003 through June 30, 2013.** The City believes that the Annuity Savings Fund Recoupment process, subject to the 20% cap, will permit the City to recover approximately $230 million of such excess interest.

In addition, for a person who is a retiree as of June 30, 2014, if the Outside Funding is received, the total reduction to your pension will not exceed 20% of your current annual pension, including both the Annuity Savings Fund Recoupment and the 4.5% reduction. Under Alternative B, the ASF recoupment can vary from 0.01% to, for a very few select individuals, 100% of a retiree's pension, depending on the excess amount of the pension.

Under the Plan, the recovery – called **"recoupment"** in the Plan – will work as follows using the 20% cap:

---

[4]      This range is consistent with the range approved by a City Council ordinance in 2011.

a.    _Active or Terminated Employee Recoupment._    For each active employee, or terminated employee, who continues to maintain an ASF account in GRS, the City will recalculate that employee's ASF account value by applying the "Actual Return."  The **"Actual Return"** means the <u>actual</u> net return percentage on invested GRS assets for each year from July 1, 2003 through June 30, 2013 <u>unless</u> the return is greater than 7.9% (in which case 7.9% will be used) or less than 0% (in which case 0% will be used).  The difference between the value of your re-calculated ASF account using the Actual Return and the actual value of your ASF account as of June 30, 2013 is your **"Annuity Savings Fund Excess Amount."**  For an active or terminated employee who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the period beginning July 1, 2003 and ending June 30, 2013 and (ii) the sum of (A) the value of your Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of your distribution calculated as of the date of distribution using the Actual Return through such date will be your Annuity Savings Fund Excess Amount.

Your Annuity Savings Fund Excess Amount, *subject to the 20% cap described above*, will then be deducted from your ASF account and irrevocably contributed to the pool of all GRS assets.  The pool of all GRS assets can be used to fund all GRS participants' Adjusted Pensions.  For those who took partial distributions, some of the recovery may also be deducted from your future pension checks.  Your Class 11 GRS Ballot will show your Annuity Savings Fund Excess Amount as calculated by the City.  **Even with the recovered amount, your Annuity Savings Fund account value after recoupment <u>will be greater than</u> the amounts you actually contributed into the Annuity Savings Fund and will reflect all interest credited by the GRS trustees to your Annuity Savings Fund account for the plan years prior to June 30, 2003.**

b.    _Recoupment from Persons who Previously Took Total Annuity Savings Fund Account Distributions._  For each GRS participant who participated in the ASF at any time during the period from July 1, 2003 through June 30, 2013, but who has already received a total distribution from the ASF, the City will re-calculate that participant's ASF account value by applying the "Actual Return."  **"Actual Return"** means the <u>actual</u> net return percentage on invested GRS assets for each year from July 1, 2003 through June 30, 2013 <u>unless</u> the return is greater than 7.9% (in which case 7.9% will be used) or less than 0% (in which case 0% will be used).  Your **"Actual Return"** shall be the difference between (i) the value of your ASF account as of the date of distribution from the Annuity Savings Fund, provided such date falls between July 1, 2003 and June 30, 2013, and (ii) the value of your ASF account as of such date, using the Actual Return.  Your Annuity Savings Fund Excess Amount will be capped at 20% of your highest ASF account balance during the period July 1, 2003 through June 30, 2013 and that amount will then be converted into monthly annuity amounts based on your life expectancy and other factors.  The monthly Annuity Savings Fund Excess Amount will be deducted from your monthly pension check (and the pension check of your survivor, if you receive an annuity that provides a survivor benefit).  Your Class 11 GRS Ballot will show (i) the Annuity Savings Fund Excess Amount and (ii) the monthly amount that will be deducted from your monthly GRS pension payments.

**Further, for a retiree who is receiving a pension as of June 30, 2014,** if the Outside Funding is received, the total combined reduction to your current annual pension (*i.e.*, your reduction from the 4.5% cut and your Annuity Savings Fund Recoupment) will not exceed 20% of your current annual pension.  Under Alternative B, the ASF recoupment can vary from 0.01% to, for a very few select individuals, 100% of a retiree's pension, depending on the excess amount of the pension.  ASF recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014.

**Fund for Income Stabilization**

The purpose of this program is twofold:  (i) to make sure that pensioners who have a low household income today can count on a stable income; and (ii) to help protect Eligible Pensioners (defined below) from falling into poverty as a result of inflation.  Individuals will have to apply for the program in the first year and provide household income documentation to participate in the program.

PFRS and GRS will be amended to provide a supplemental pension income stabilization benefit (an **"Income Stabilization Benefit"**) to each Eligible Pensioner.  There are two parts to this benefit.

The Income Stabilization Benefit will be calculated in the first year and will not increase.  It is equal to the <u>lesser</u> of either (i) the amount needed to restore 100% of an Eligible Pensioner's reduced pension benefit to the amount of the pension benefit that the Eligible Pensioner received from PFRS or GRS, as applicable, in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

In addition, to the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined below) in any calendar year after the first year of the program is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit – the **"Income Stabilization Benefit Plus."** The Income Stabilization Benefit Plus for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's pension benefit, including COLAs or "escalators;" or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

An Eligible Pensioner's **"Estimated Adjusted Annual Household Income"** for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his (or in the case of minor children, their legal guardian's) 2013 income tax return or equivalent documentation), less the pension benefit paid to the Eligible Pensioner in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the reduced pension benefit that PFRS or GRS, as applicable, will pay the Eligible Pensioner for that year; (iii) any PFRS or GRS pension restoration payment to the Eligible Pensioner due to an improved PFRS or GRS funding level; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

Notwithstanding the foregoing, Income Stabilization Payments under both GRS and PFRS will not exceed $20 million in the aggregate.

The Income Stabilization Benefit and Income Stabilization Benefit Plus will be paid from the Income Stabilization Funds of PFRS and GRS. The Income Stabilization Funds of PFRS and GRS will be funded with certain proceeds of a settlement with certain bond creditors, up to an aggregate amount of $20 million to be divided between the Income Stabilization Fund of GRS and the Income Stabilization Fund of PFRS.

Under the Plan, PFRS and GRS each will establish an **"Investment Committee"** for the purpose of making recommendations to the boards of trustees of PFRS and GRS with respect to certain matters, and for purposes of making some determinations. Each Investment Committee will consist of five independent members and two or more non-independent members, which non-independent members may include employees of the City or members or retirees of PFRS or GRS, as applicable, provided that at all times during the 20-year period following disbursement of the State Contribution, the independent members shall have at least 70% of the voting power. Each independent Investment Committee member shall possess, by reason of training or experience or both, a minimum level of expertise in managing or advising pension systems, all as agreed to by the City, the State and PFRS or GRS, as applicable, after consultation with the Foundations.

In the event that, in 2022 (provided that the State has not issued a certificate of default with respect to PFRS or GRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the respective Investment Committee that the Income Stabilization Fund of PFRS or GRS, as applicable, has more assets than it needs to provide Income Stabilization Benefits and Income Stabilization Benefits Plus, such Investment Committee may recommend to the board of trustees that the excess assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by PFRS or GRS, as applicable. In the event that any funds remain in the relevant Income Stabilization Fund on the date upon which no Eligible Pensioners under PFRS or GRS, as applicable, remain, such funds shall be used to fund the Adjusted Pension Amounts payable by PFRS or GRS, as applicable.

**"Eligible Pensioners"** are those retirees, surviving spouses or surviving minors who hold a Pension Claim and who are eligible to receive Income Stabilization Benefits because such Holder (i) is, as of the effective date of the Plan, at least 60 years of age or a minor child receiving survivor benefits from PFRS or GRS, and (ii) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation). No new persons will be eligible to receive Income Stabilization Benefits or Income Stabilization Benefits Plus at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

**How The Plan Affects OPEB Claims (Retiree Health, Dental, Vision & Death Benefits)**

Under the Plan, the City will no longer sponsor and maintain retiree health or death benefits programs for existing retirees, surviving beneficiaries and their dependents. Instead, the City will establish two voluntary employees' beneficiary association trusts (known as a **"VEBA"**) – one for PFRS-related retirees and one for GRS-related retirees. The two VEBAs will be responsible for providing retiree health benefits beginning January 1, 2015 to existing retirees, surviving beneficiaries and their eligible dependents. The VEBAs will be funded with a portion of a note (the "New B Note") that will be issued to satisfied the OPEB claims and other unsecured claims. It is not likely that the funding will be sufficient to

provide benefits at the same level of benefits provided to retirees and their beneficiaries during the period beginning March 2014.

### Detroit General VEBA for General City Retirees

Under the Plan, the City will establish the Detroit General VEBA to provide health benefits to Detroit's non-police and non-fire retirees, surviving beneficiaries and their eligible dependents. The Detroit General VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA beneficiaries. The board will be comprised of retiree representatives and independent professionals, and the composition of the initial board will be approved by the Bankruptcy Court. The board members will be appointed by the City, or by other entities based upon further discussion with union representatives, retiree associations and the Retiree Committee. The board will have the authority to determine who is eligible to receive retiree health or other welfare benefits, including death benefits, from the Detroit General VEBA, and the annual level, design and cost of such benefits.

Under the Plan, the City will provide the Detroit General VEBA with $218 million in principal amount of a note to be issued to non-pension unsecured creditors. For purposes of determining the Detroit General VEBA's pro rata share of this note, the City has calculated the general retiree OPEB Claim at $2,095,000,000. If the City does not make the payments under the note, the persons who operate and manage the Detroit General VEBA will have the right to sue the City for payment. The Detroit General VEBA trustees may also, in their discretion, seek to "sell" or monetize the note in the market to generate more up-front cash for the Detroit General VEBA. Further, in addition to the note received by the Detroit General VEBA, the City will request that the trustees who control the health insurance rate stabilization fund trust release an amount of no less than $5.5 million, of which at least 60% will be used to pay start-up costs for the Detroit General VEBA; furthermore, and to the extent approved by the Detroit General VEBA trustees, a portion will be used to establish a catastrophic illness fund within the Detroit General VEBA to be used to provide limited assistance to those retirees who participate in the Detroit General VEBA and who are otherwise unable to afford the cost of necessary and immediate life-threatening health care costs (pursuant to the criteria established by the DRCEA and approved by the Detroit General VEBA trustees). The remainder of the $5.5 million sum released by the trustees who control the health insurance rate stabilization fund trust will be used to pay start-up costs for the Detroit Police and Fire VEBA.

How much the Detroit General VEBA trustees may spend on retiree health benefits in any particular year is unknown at this time. It is also unknown how long the money in the Detroit General VEBA trust will last because that will depend upon the benefits to be provided. It is likely, however, that the amount of the note to be provided to the Detroit General VEBA by the City under the Plan in satisfaction of the OPEB Claim will not be enough to provide the same level of benefits over the long term as the City began providing to retirees and surviving beneficiaries in March 2014.

Further, the value of the healthcare that may be provided to retirees by the Detroit General VEBA or (any other trust that may be created) is subject to various factors, including but not limited to: whether or not a retiree is eligible for Medicare (generally 65 or older) or Medicaid (depending on income level and state residency); costs of future premiums, co-pays and deductibles; whether the Affordable Care Act continues in effect, and, if so, in what form; and whether tax credits that currently exist to reduce healthcare costs to low-to-middle income persons continue.

If the Plan is approved by the Bankruptcy Court, regardless of your vote on the Plan, the new Detroit General VEBA board of trustees will make the determination of what level and form of health benefits will be provided to current retirees based on the amount of money available to the Detroit General VEBA trust under the Plan and the exercise of their reasonable discretion.

### Detroit Police and Fire VEBA

Under the Plan, the City will establish the Detroit Police and Fire VEBA to provide health benefits to retired employees of the Detroit Police Department and Detroit Fire Department who do not participate in (or have the right to participate in) the GRS and their surviving beneficiaries and eligible dependents. The Detroit Police and Fire VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA beneficiaries. The board will be comprised of retiree representatives and independent professionals, and the composition of the initial board will be approved by the Bankruptcy Court. The board members will be appointed by the City, the Retiree Committee and the Retired Detroit Police and Fire Fighters Association. The board will have the authority to determine who is eligible to receive retiree health or other

welfare benefits, including death benefits, from the Detroit Police and Fire VEBA, and the annual level, design and cost of such benefits.

Under the Plan, the City will provide the Detroit Police and Fire VEBA with $232 million in principal amount of a note to be issued to non-pension unsecured creditors. For purposes of determining the Detroit Police and Fire VEBA's pro rata share of this note, the City has calculated the PFRS-related retiree OPEB Claim at $2,208,000,000; the size of this claim reflects the benefits that the RDPFFA negotiated on behalf of the PFRS retirees in the settlement of Weiler *et al.* v. City of Detroit, Case No. 06-619737-CK (Wayne County Circuit Court). The Retiree Committee believes that the claim number should be higher. If the City does not make the payments under the note, the persons who operate and manage the Detroit Police and Fire VEBA will have the right to sue the City for payment. The Detroit Police and Fire VEBA trustees may also, in their discretion, seek to "sell" or monetize the note in the market to generate more up-front cash for the Detroit Police and Fire VEBA.

How much the Detroit Police and Fire VEBA trustees may spend on retiree health benefits in any particular year is unknown at this time. It is also unknown how long the money in the Detroit Police and Fire VEBA trust will last because that will depend upon the benefits to be provided. It is likely, however, that the amount of the note to be provided to the Detroit Police and Fire VEBA by the City under the Plan in satisfaction of the OPEB Claim will not be enough to provide the same level of benefits over the long term as the City began providing to retirees and surviving beneficiaries in March 2014.

Further, the value of the healthcare that may be provided to retirees by the Detroit Police and Fire VEBA or (any other trust that may be created) is subject to various factors, including but not limited to: whether or not a retiree is eligible for Medicare (generally 65 or older) or Medicaid (depending on income level and state residency); costs of future premiums, co-pays and deductibles; whether the Affordable Care Act continues in effect, and, if so, in what form; and whether tax credits that currently exist to reduce healthcare costs to low-to-middle income persons continue.

If the Plan is approved by the Bankruptcy Court, regardless of your vote on the Plan, the new Detroit Police and Fire VEBA board of trustees will make the determination of what level and form of health benefits will be provided to current retirees based on the amount of money available to the Detroit Police and Fire VEBA under the Plan and the exercise of their reasonable discretion.

**Death Benefits**

The City provides the death benefit program through a separate trust fund. The death benefit trust fund will not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. Instead, the death benefit trust will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the trust for any participant or beneficiary. The trust will be self-liquidating, and existing retirees who participate in the trust will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the trust funding. The trustees of the death benefit trust fund will continue to manage the trust assets and employ the staff of the Retirement Systems to administer the timely disbursement of benefits. The costs of administration will be borne by the assets of the trust.

Active employees as of March 1, 2014 do not have an OPEB Claim. Future OPEB benefits, if any, for active employees will be subject to the terms of future contracts between the City and its active employees.

**Plan Releases**

**If the Plan is confirmed, it will be binding on you whether or not you vote. You will have no right to demand that the City pay you the full original amounts it owed for your pension or your OPEB benefits. You will only have the right to your reduced pension benefits or the treatment for OPEB Claims under the Plan.**

### *Comprehensive State Release*

In addition to protection from further claims against the City that is a standard part of any plan of adjustment, the Plan also proposes to grant to the State of Michigan, its officials and certain other related parties a comprehensive release of any obligation they might have with respect to your pension claim and other claims against the City. This is called the **"Comprehensive State Release."** The Bankruptcy Court will have to approve this Comprehensive State Release, and it may not do so. If the Comprehensive State Release is approved, **you will not be allowed to sue the State, the City or any State officials to restore pension benefits or argue that the City did not have the power to reduce pensions, even if**

**you vote to reject the Plan**. Specifically, this release would release all claims and liabilities arising from or related to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan and exhibits thereto, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution. **If you are an active employee, the Comprehensive State Release does not release or discharge rights you have to your New Accrued Pension.**

**If the Bankruptcy Court confirms the Plan but does not approve the Comprehensive State Release (or if the other conditions to Outside Funding are not met), the State does not have to contribute its $350 million State Contribution to GRS and PFRS.** If the State's money is not contributed, then none of the other sources of Outside Funding will make their payments, either. In that case, none of the $816 million in contributions will be made to the pension plans, Alternative B will take effect and your pension benefit cuts will be at the higher levels set forth in the chart on page 17 of this Disclosure Statement.

### _Release by Claim Holders in Classes 10 or 11 Accepting the Plan_

The Plan also provides for an **"Accepting Holders Release."** The Accepting Holders Release would be granted by individual creditors by their accepting the Plan. This means that if you individually vote to accept the Plan, you will be personally releasing the City and its related entities, the State and its related entities, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee professionals, the Foundations and other organizations who are providing Outside Funding and their related entities **except for** such parties' gross negligence or willful misconduct, but only if the Initial Funding Conditions (which include adoption of relevant legislation and appropriations by the State and completion of necessary agreements and documents by the State and the other Outside Funding parties, among other things) that can be satisfied before the Confirmation Hearing are satisfied or waived.

**In other words, if you hold a claim in Class 10 or Class 11 and you vote to accept the Plan, you may not be allowed to sue the State, the City or any State individuals or entities to restore pension benefits or argue that the City did not have the power to reduce pensions.** **However,** if Classes 10 and 11 vote to accept the Plan, **but the Initial Funding Conditions are not satisfied or waived before the Confirmation Hearing, then your vote to accept the Plan will be treated as a vote to <u>reject</u> the Plan, and the voluntary Accepting Holders Release will <u>not</u> apply to you.**

For the avoidance of doubt, the Plan (including the Comprehensive State Release and the Accepting Holders Release) does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees and/or their respective collective bargaining representatives to the extent permitted by applicable non-bankruptcy law and/or the Plan.

## B.     Classification and Treatment of Claims Under the Plan

Except for Administrative Claims, which are not required to be classified, all Claims that existed on July 18, 2013 (the "Petition Date") are divided into classes under the Plan.  The following summarizes the treatment of the classified Claims under the Plan.  The amount that a creditor may actually recover could vary from the estimates in the chart below.

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 1A - DWSD Bond Claims (one Class for each CUSIP of DWSD Bonds)**:  Consists of all Claims arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.<br><br>Estimated Aggregate Allowed Amount: $5,272,240,054 | Impaired or unimpaired, as set forth on Exhibit I.A.110 to the Plan.<br><br>Unimpaired Classes:  Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as unimpaired on Exhibit I.A.110 to the Plan shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim.  Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.<br><br>Impaired Classes:  Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as impaired on Exhibit I.A.110 to the Plan shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (1) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (2) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees to a different treatment of such Claim.  Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.<br><br>Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (1) paid in Cash on the first Distribution Date following the date on which such DWSD Bond Claim is Allowed or (2) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.<br><br>Independent of whether a Holder votes to accept or reject the Plan, each Holder of an Allowed DWSD Class 1A Claim is also entitled to elect, by CUSIP, one of the following two options:<br><br>*Option 1:*     New Existing Rate Water/Sewer Bonds having (1) an interest rate equal to the interest rate on the DWSD Class 1A Bonds held by such Holder in the applicable CUSIP and (2) a principal amount equal to the outstanding amount of principal of the DWSD Class 1A Bonds held by such Holder in the applicable CUSIP (plus, at the City's option, additional principal in the amount of accrued but unpaid interest on such Bonds as of the Distribution Date, to the extent such interest is not paid in cash).  To receive New Existing Rate Water/Sewer Bonds, (1) the Holder must affirmatively make the election to receive New Existing Rate Water/Sewer Bonds and (2) the applicable Class of DWSD Class 1A Claims must accept the Plan.  **In addition, the applicable securities of all Holders who elect to receive New Existing Rate Water/Sewer Bonds will be tendered into an election account established at the DTC.  Such securities may not be withdrawn from the election account after the applicable nominee has tendered them to the election account.  Once such securities have been tendered, no further trading will be permitted in the securities held in the election account.  If the Plan is revoked or withdrawn, or if a Class of Impaired Class 1A Claims rejects the Plan, then any securities in affected Classes of Allowed Impaired Class 1A Claims that were tendered into an election account will be returned by the DTC, in accordance with its customary practices and procedures to the applicable nominee for credit to such Holder's account, and the securities will no longer be restricted from trading.  If such Holder does not elect to receive New Existing Rate DWSD Bonds, then such Holder's securities will not be restricted from trading.**<br><br>[CONTINUED ON FOLLOWING PAGE] |

-30-

13-53846-swr   Doc 4391   Filed 08/09/19   Entered 08/09/19 15:03:25   Page 110 of 107
13-53846-swr   Doc 4391   Filed 08/09/19   Entered 08/09/19 15:03:12   Page 110 of 107
226

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 1A – DWSD Bond Claims** (continued) | *Option 2*: New Water/Sewer Bonds having (1) a principal amount equal to the outstanding amount of principal of the DWSD Class 1A Bonds held by such Holder in the applicable CUSIP (plus, at the City's option, additional principal in the amount of accrued but unpaid interest on such Bonds as of the Distribution Date, to the extent such interest is not paid in cash) and (2) an interest rate equal to the interest rate set forth on the Interest Rate Reset Chart (Exhibit I.A.168) to the Plan) for the DWSD Class 1A Bonds held by such Holder in the applicable CUSIP. The New Water/Sewer Bonds will not be callable by the City for the shorter of five years after the date such New DWSD Bonds are issued or the date upon which the DWSD Bonds for which such New DWSD Bonds were exchanged pursuant to the Plan would have matured. |
| | If a Holder elects both Option 1 and 2, fails to elect either Option 1 or 2 or attempts to split the election within a single CUSIP, the Holder will be deemed to have elected Option 2. Likewise, if a Class of DWSD Class 1A Claims does not accept the Plan and the Plan is confirmed, all Holders within such non-accepting Class will receive the treatment set forth in Option 2. |
| | Estimated Percentage Recovery for unimpaired Classes: 100% |
| | Estimated Percentage Recovery for impaired Classes: 100% of principal and interest |
| **Class 1B - DWSD Revolving Sewer Bond Claims (one Class for each DWSD Series of DWSD Revolving Sewer Bonds)**: Consists of all Claims arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds. | Unimpaired. Notwithstanding any other provision of the Plan, on the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim. |
| Estimated Aggregate Allowed Amount: $486,047,364 | Estimated Percentage Recovery: 100% |
| **Class 1C - DWSD Revolving Water Bond Claims (one Class for each DWSD Series of DWSD Revolving Water Bond)**: Consists of all Claims arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds. | Unimpaired. Notwithstanding any other provision of the Plan, on the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim. |
| Estimated Aggregate Allowed Amount: $21,589,986 | Estimated Percentage Recovery: 100% |
| **Class 2A - Secured GO Series 2010 Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds. | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim. |
| Estimated Aggregate Allowed Amount: $252,475,366 | Estimated Percentage Recovery: 100% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 2B - Secured GO Series 2010(A) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.<br><br>Estimated Aggregate Allowed Amount: $101,707,848 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2C - Secured GO Series 2012(A)(2) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.<br><br>Estimated Aggregate Allowed Amount: $39,254,171 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2D - Secured GO Series 2012(A2-B) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.<br><br>Estimated Aggregate Allowed Amount: $54,055,927 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2E - Secured GO Series 2012(B) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.<br><br>Estimated Aggregate Allowed Amount: $6,469,135 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2F - Secured GO Series 2012(B2) Claims**: Consists of all Claims arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.<br><br>Estimated Aggregate Allowed Amount: $31,037,724 | Unimpaired. On the Effective Date, each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 3 - Other Secured Claims**: Consists of all Secured Claims, other than COP Swap Claims, DWSD Bond Claims, DWSD Revolving Bond Claims, HUD Installment Note Claims, Parking Bonds Claims or Secured GO Bond Claims.<br><br>Estimated Aggregate Allowed Amount: $8,855,456 | Unimpaired. On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 4 - HUD Installment Note Claims**: Consists of all Claims arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.<br><br>Estimated Aggregate Allowed Amount: $90,075,004 | Unimpaired. On the Effective Date, each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class 5 - COP Swap Claims**: Consists of all Claims by the Swap Counterparties arising under the COP Swap Documents.<br><br>Estimated Aggregate Allowed Amount: $85,000,000, less quarterly amounts paid after January 1, 2014, plus interest if applicable | Impaired. The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount. Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either: (1) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (2) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (a) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (i) supported by the full faith and credit of the City or (ii) payable from the general fund of the City, will be used to pay the Net Amount, (b) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (c) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (d) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property, and (e) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.<br><br>Estimated Percentage Recovery: 30% of the Swap Termination Payment |
| **Class 6 – Parking Bonds Claims**: Consists of all Claims arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.<br><br>Estimated Aggregate Allowed Amount: $8,099,287 | Unimpaired. On the Effective Date, each Holder of an Allowed Parking Bonds Claim shall have its Allowed Parking Bonds Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 100% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 7 – Limited Tax General Obligation Bond Claims**:  Consists of all Claims arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.<br><br>Estimated Aggregate Allowed Amount: $163,543,187 | Impaired.  Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.<br><br>Estimated Percentage Recovery:  10-13%[5] |
| **Class 8 – Unlimited Tax General Obligation Bond Claims**:  Consists of all Claims arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.<br><br>Estimated Aggregate Allowed Amount: $388,000,000 | Impaired.  Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds.  Such Holders shall retain ownership of the Reinstated Stub UTGO Bonds, subject to Sections I.A.23 and IV.D of the Plan.<br><br>Estimated Percentage Recovery:  74% |

---

[5]     Estimated percentage recovery ranges for Classes receiving Unsecured Pro Rata Shares of New B Notes have been calculated using an assumed 5% discount rate based upon anticipated cash flows.  The Unsecured Pro Rata Shares for such Classes (*i.e.*, Classes 7, 9, 12, 13 and 14) reflect estimated aggregate allowed amounts of $163,543,187 for Class 7 Claims, $0 to $1,473,000,000 for Class 9 Claims, $4,303,000,000 for Class 12 Claims, $33,600,000 for Class 13 Claims and $150,000,000 for Class 14 Claims (totaling $4,650,143,187 to $6,123,143,187).  By agreement with the Retiree Committee, the agreed-upon OPEB liability as of the Petition Date of $4.446 billion has been reduced by $143 million (the amount of post-petition payments that the City expects to make on account of OPEB liabilities through December 31, 2014) to arrive at the estimated aggregate allowed claim amount of $4.303 billion.  Realization of the estimated percentage recoveries set forth herein is subject to certain risks and contingencies.  See "Risk Factors," Section VI of this Disclosure Statement.

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 9 - COP Claims**: Consists of all Claims under or evidenced by the COP Service Contracts.<br><br>Estimated Range of Aggregate Allowed Amounts:<br>$0 to $1,473,000,000 | *The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (1) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (2) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative. If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement. The treatment set forth below in respect of the COP Claims is afforded only if and to the extent that such Claims ultimately become Allowed Claims.*<br><br>Impaired. Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.<br><br>Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.<br><br>Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:<br><br>On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (1) an Unsecured Pro Rata Share of New B Notes, calculated as if such Disputed COP Claims were Allowed (a) in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement or (b) in such lesser amount as may be required by an order of the Bankruptcy Court, and (2) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.<br><br>If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (1) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (2) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (1) an amount of New B Notes and/or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred from and after the Effective Date shall be distributed to the City; (2) following such distribution, 65% of the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B of the Plan; and (3) following such distribution, New B Notes and distributions thereon shall revert to the City, provided that the City, in its sole discretion, may choose to distribute such remaining property among holders of Allowed Claims in Classes 7, 13 and/or 14.<br><br>Estimated Percentage Recovery: 0-10% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 10 - PFRS Pension Claims**: Consists of all Claims (other than OPEB Claims), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (1) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (2) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.<br><br>Estimated Aggregate Allowed Amount: $1,250,000,000 | Impaired.  During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A to the Plan.  The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution.  After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan.  Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.<br><br>During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.<br><br>During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, <u>provided</u> that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.<br><br>Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C to the Plan.  For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions other than those set forth on Exhibit II.B.3.q.ii.A to the Plan or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement.  In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F.1 of the Plan prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.<br><br>The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G of the Plan.<br><br>Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified by the Plan, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.<br><br>PFRS shall establish an Investment Committee for the purpose of making recommendations to the board of trustees of PFRS with respect to certain matters, and for purposes of making some determinations.  The Investment Committee will consist of five independent members and two or more non-independent members, which non-independent members may include employees of the City or members or retirees of PFRS; <u>provided</u> that at all times during the 20-year period following disbursement of the State Contribution, the independent members shall have at least 70% of the voting power.  Each independent Investment Committee member shall possess, by reason of training or experience or both, a minimum level of expertise in managing or advising pension systems, all as agreed to by the City, the State and PFRS, after consultation with the Foundations.<br><br>[CONTINUED ON FOLLOWING PAGE] |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 10 – PFRS Pension Claims** (continued) | **Except as may be required to maintain the tax-qualified status of the PFRS, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B of the Plan, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.** |
| | The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11 and legislative action, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b of the Plan. |
| | *If the release set forth at Section III.D.7.b of the Plan is approved by the Bankruptcy Court, each Holder of a PFRS Pension Claim shall release the State from all Liabilities related to PFRS Pension Claims, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b of the Plan.* |
| | Estimated Recovery Percentage with Outside Funding: 59% |
| | Estimated Recovery Percentage without Outside Funding: 39% |

| Description and<br>Amount of Claims | Treatment |
|---|---|
| **Class 11 – GRS Pension Claims**: Consists of all Claims (other than OPEB Claims), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (1) any pension, disability or other post retirement payment or distribution in respect of the employment of current or former employees or (2) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.<br><br>Estimated Aggregate Allowed Amount: $1,879,000,000 | Impaired. During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A to the Plan. The exclusive sources for such contributions shall be certain City sources, pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution and certain DIA Proceeds. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.<br><br>During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.<br><br>During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.<br><br>Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C to the Plan. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.r.ii.A to the Plan or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F.1 of the Plan prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.<br><br>On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.<br><br>The Annuity Savings Fund Excess Amount will be calculated for each ASF Distribution Recipient, will then be converted into monthly annuity amounts based on each ASF Distribution Recipient's life expectancy and other factors and will be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.<br><br>The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G of the Plan.<br><br>[CONTINUED ON FOLLOWING PAGE] |

-38-

13-53846-swr   Doc 4391   Filed 09/09/19   Entered 09/09/19 15:03:25   Page 118 of 157
13-53846-swr   Doc 4391   Filed 09/09/19   Entered 09/09/19 15:03:25   Page 118 of
226

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 11 – GRS Pension Claims** (continued) | Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified by the Plan, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan. |
| | GRS shall establish an Investment Committee for the purpose of making recommendations to the board of trustees of GRS with respect to certain matters, and for purposes of making some determinations. The Investment Committee will consist of five independent members and two or more non-independent members, which non-independent members may include employees of the City or members or retirees of GRS; <u>provided</u> that at all times during the 20-year period following disbursement of the State Contribution, the independent members shall have at least 70% of the voting power. Each independent Investment Committee member shall possess, by reason of training or experience or both, a minimum level of expertise in managing or advising pension systems, all as agreed to by the City, the State and GRS, after consultation with the Foundations. |
| | **Except as may be required to maintain the tax-qualified status of the GRS, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B of the Plan, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.** |
| | The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11 and legislative action, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b of the Plan. |
| | *If the release set forth at Section III.D.7.b of the Plan is approved by the Bankruptcy Court, each Holder of a GRS Pension Claim shall release the State from all Liabilities related to GRS Pension Claims, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b of the Plan.* |
| | Estimated Recovery Percentage with Outside Funding: 60% <br> Estimated Recovery Percentage without Outside Funding: 48% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 12 – OPEB Claims**: Consists of all Claims against the City held by retirees who retired on or before December 31, 2014 and who otherwise are eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retirees, for post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and the Employees Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et al. v. City of Detroit*, Case No. 06 619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009. The City believes that under applicable law, active employees of the City do not have allowable OPEB Claims.<br><br>Estimated Aggregate Allowed Amount: $4,303,000,000 (PFRS: $2,208,000,000; GRS: $2,095,000,000) | Impaired. As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.<br><br>Establishment of Detroit General VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents. The Detroit General VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries. The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.78 to the Plan, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees. The DRCEA and the Retiree Committee will each be able to appoint board members in equal numbers, and such appointees will constitute a majority of the initial Detroit General VEBA board; the City will appoint the remaining members. Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.<br><br>Distributions to Detroit General VEBA: On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries. The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2 of the Plan.<br><br>Establishment of Detroit Police and Fire VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents. The Detroit Police and Fire VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.82 to the Plan, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees. The initial board members will be appointed by the City, the Retiree Committee and the RDPFFA. Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.<br><br>Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2 of the Plan.<br><br>[CONTINUED ON FOLLOWING PAGE] |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 12 – OPEB Claims** (continued) | From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan. Estimated Percentage Recovery: 10-13% |
| **Class 13 - Downtown Development Authority Claims**: Consists of all Claims in respect of the Downtown Development Authority Loans. Estimated Aggregate Allowed Amount: $33,600,000 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes. Estimated Percentage Recovery: 10-13% |
| **Class 14 - Other Unsecured Claims**: Consists of all Claims that are unpaid as of the Effective Date and that are not Administrative Claims, Convenience Claims, COP Claims, Downtown Development Authority Claims, General Obligation Bond Claims, GRS Pension Claims, GRS Pension/ASF Claims, OPEB Claims, PFRS Pension Claims, Secured Claims or Subordinated Claims. For the avoidance of doubt, Section 1983 Claims, Indirect Employee Indemnity Claims and Indirect 36th District Court Claims are included within the definition of Other Unsecured Claims. Estimated Aggregate Allowed Amount: $150,000,000 | Impaired. Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes. Estimated Percentage Recovery: 10-13% |

| Description and Amount of Claims | Treatment |
|---|---|
| **Class 15 - Convenience Claims**: Consists of all Claims that would otherwise be Other Unsecured Claims that are (1) Allowed Claims in an amount less than or equal to $25,000; or (2) in an amount that has been reduced to $25,000 pursuant to an election made by the Holder of such Claim; *provided* that, where any portion(s) of a single Claim has been transferred, (a) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (b) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.<br><br>Estimated Aggregate Allowed Amount: *Unknown* | Impaired. Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.55 of the Plan) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.<br><br>Estimated Percentage Recovery: 25% |
| **Class 16 - Subordinated Claims**: Consists of all Claims of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.<br><br>Estimated Aggregate Allowed Amount: *Unknown* | Impaired. On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.<br><br>Estimated Percentage Recovery: 0% |

# III.

# THE PLAN

## A.     General

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.   THE CITY URGES ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

Section 1123 of the Bankruptcy Code provides that, except for administrative claims, a plan of adjustment must categorize claims against a debtor into individual classes.   Although the Bankruptcy Code gives a chapter 9 debtor significant flexibility in classifying claims, section 1122 of the Bankruptcy Code dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The Plan identifies 384 Classes of Claims (certain of which encompass numerous separate classes comprised of individual series of the relevant debt, as set forth on the Exhibits to the Plan).   These Classes take into account the differing nature and priority of Claims against the City.   Administrative Claims are not classified for purposes of voting or receiving distributions under the Plan (as is permitted by section 1123(a)(1) of the Bankruptcy Code) but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims.   Only certain Holders of Claims that are impaired under the Plan are entitled to vote and receive Distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim.   Upon Confirmation, the Plan will be binding on all Holders of a Claim regardless of whether such Holders voted to accept the Plan.

The following discussion sets forth the classification and treatment of all Claims against the City.   It is qualified in its entirety by the terms of the Plan, which is attached hereto as Exhibit A, and which should be read carefully by you in considering whether to vote to accept or reject the Plan.

## B.     Classification and Treatment of Claims

If the Plan is confirmed by the Bankruptcy Court, each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the Holder of such Claim voted to accept the Plan.

### 1.     Unclassified Claims

An Administrative Claim is a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the City's chapter 9 case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(a)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code and/or section 2-702 of the Uniform Commercial Code; <u>provided</u> that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof shall be considered an Administrative Claim.   Administrative Claims thus may include:   (a) the actual and necessary costs and expenses incurred by the City in the ordinary course of its operations after the Petition Date (*e.g.*, wages, salaries, payments for services and lease payments); (b) Claims under any Postpetition Financing Agreement; (c) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code and/or section 2-702 of the Uniform Commercial Code; and (d) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of its operations.   In addition, section 503(b) of the Bankruptcy Code provides for payment of compensation or reimbursement of expenses to creditors and other entities making a "substantial contribution" to a chapter 9 case and to attorneys for, and other professional advisors to, such entities.   The amounts, if any, that such Entities may seek for such compensation or reimbursement are not known by the City at this time.   Requests for such compensation or

reimbursement must be approved by the Bankruptcy Court after notice and a hearing at which the City and other parties in interest may participate and, if appropriate, object to the allowance of any such compensation or reimbursement.

Except as specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (a) on the Effective Date or as soon as reasonably practicable thereafter; or (b) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim.

Unless otherwise agreed by Barclays Capital, Inc., pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Purchaser Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

Except as otherwise provided in Section II.A.2 of the Plan or in the Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (a) 150 days after the Effective Date, (b) 60 days after the Filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

Holders of Administrative Claims that are Postpetition Purchaser Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b of the Plan.

Allowed Administrative Claims based on liabilities incurred by the City in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the City's business and Administrative Claims arising from those contracts and leases of the kind described in Section II.D of the Plan, will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

The Plan does not modify any Bar Date Order already in place, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

The City estimates that, as of the Effective Date, the total amount of Allowed Administrative Claims will be $124,925,691.

2.     **Classified Claims**

*Class 1: Secured DWSD-Related Claims*, subclassified as follows:

*Class 1A: DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.110 to the Plan).*

Unimpaired Classes: Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as unimpaired on Exhibit I.A.110 to the Plan shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

Impaired Classes: Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as impaired on Exhibit I.A.110 to the Plan shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (a) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (b) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (a) paid in Cash on the first Distribution Date following the date on which such DWSD Bond Claim is Allowed or (b) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.

Independent of whether a Holder votes to accept or reject the Plan, each Holder of an Allowed DWSD Class 1A Claim is also entitled to elect, by CUSIP, one of the following two options:

*Option 1*:  New Existing Rate Water/Sewer Bonds having (a) an interest rate equal to the interest rate on the DWSD Class 1A Bonds held by such Holder in the applicable CUSIP and (b) a principal amount equal to the outstanding amount of principal of the DWSD Class 1A Bonds held by such Holder in the applicable CUSIP (plus, at the City's option, additional principal in the amount of accrued but unpaid interest on such Bonds as of the Distribution Date, to the extent such interest is not paid in cash). To receive New Existing Rate Water/Sewer Bonds, (a) the Holder must affirmatively make the election to receive New Existing Rate Water/Sewer Bonds and (b) the applicable Class of DWSD Class 1A Claims must accept the Plan. **In addition, the applicable securities of all Holders who elect to receive New Existing Rate Water/Sewer Bonds will be tendered into an election account established at the DTC. Such securities may not be withdrawn from the election account after the applicable nominee has tendered them to the election account. Once such securities have been tendered, no further trading will be permitted in the securities held in the election account. If the Plan is revoked or withdrawn, or if a Class of Impaired Class 1A Claims rejects the Plan, then any securities in affected Classes of Allowed Impaired Class 1A Claims that were tendered into an election account will be returned by the DTC, in accordance with its customary practices and procedures to the applicable nominee for credit to such Holder's account, and the securities will no longer be restricted from trading. If such Holder does not elect to receive New Existing Rate DWSD Bonds, then such Holder's securities will not be restricted from trading.**

*Option 2*:  New Water/Sewer Bonds having (a) a principal amount equal to the outstanding amount of principal of the DWSD Class 1A Bonds held by such Holder in the applicable CUSIP (plus, at the City's option, additional principal in the amount of accrued but unpaid interest on such Bonds as of the Distribution Date, to the extent such interest is not paid in cash) and (b) an interest rate equal to the interest rate set forth on the Interest Rate Reset Chart (Exhibit I.A.**168**) to the Plan) for the DWSD Class 1A Bonds held by such Holder in the applicable CUSIP. The New Water/Sewer Bonds will not be callable by the City for the shorter of five years after the date such New DWSD Bonds are issued or the date upon which the DWSD Bonds for which such New DWSD Bonds were exchanged pursuant to the Plan would have matured.

If a Holder elects both Option 1 and 2, fails to elect either Option 1 or 2 or attempts to split the election within a single CUSIP, the Holder will be deemed to have elected Option 2. Likewise, if a Class of DWSD Class 1A Claims does not accept the Plan and the Plan is confirmed, all Holders within such non-accepting Class will receive the treatment set forth in Option 2.

Class 1A Claims are impaired or unimpaired, as set forth on Exhibit I.A.110 to the Plan.

*Class 1B: DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.117 to the Plan).*

Notwithstanding any other provision of the Plan, on the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 1B Claims are unimpaired.

*Class 1C: DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.120 to the Plan).*

Notwithstanding any other provision of the Plan, on the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 1C Claims are unimpaired.

*Class 2: Secured GO Debt Claims*, subclassified as follows:

*Class 2A: Secured GO Series 2010 Claims.*

On the Effective Date, (a) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (b) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2A Claims are unimpaired.

*Class 2B: Secured GO Series 2010(A) Claims.*

On the Effective Date, (a) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (b) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2B Claims are unimpaired.

*Class 2C: Secured GO Series 2012(A)(2) Claims.*

On the Effective Date, (a) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (b) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2C Claims are unimpaired.

*Class 2D: Secured GO Series 2012(A2-B) Claims.*

On the Effective Date, (a) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (b) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2D Claims are unimpaired.

*Class 2E:  Secured GO Series 2012(B) Claims*.

On the Effective Date, (a) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (b) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2E Claims are unimpaired.

*Class 2F:  Secured GO Series 2012(B2) Claims*.

On the Effective Date, (a) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (b) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 2F Claims are unimpaired.

<u>Class 3:  Other Secured Claims</u>

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 3 Claims are unimpaired.

<u>Class 4:  HUD Installment Note Claims</u>

On the Effective Date, (a) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (b) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 4 Claims are unimpaired.

<u>Class 5:  COP Swap Claims</u>

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (a) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (b) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (i) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (A) supported by the full faith and credit of the City or (B) payable from the general fund of the City, will be used to pay the Net Amount, (ii) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (iii) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (iv) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property, and (v) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

Class 5 Claims are impaired.

-47-

13-53846-twr   Doc 4391   Filed 09/09/19   Entered 09/09/19 15:03:25   Page 127 of 226
13-53846-swr   Doc 4391-0   Filed 08/08/14   Entered 08/08/14 11:50:12   Page 247 of 357
226

_Class 6:  Parking Bonds Claims_

On the Effective Date, (a) the Parking Bonds Claims shall be deemed Allowed in the amount of $8,099,287 and (b) each Holder of an Allowed Parking Bonds Claim shall have its Allowed Parking Bonds Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

Class 6 Claims are unimpaired.

_Class 7:  Limited Tax General Obligation Bond Claims_

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

Class 7 Claims are impaired.

_Class 8:  Unlimited Tax General Obligation Bond Claims_

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds. Such Holders shall retain ownership of the Reinstated Stub UTGO Bonds, subject to Sections I.A.23 and IV.D of the Plan.

Class 8 Claims are impaired.

_Class 9:  COP Claims_

_The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (a) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (b) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative.  If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.  The treatment set forth below in respect of the COP Claims is afforded only if and to the extent that such Claims ultimately become Allowed Claims._

Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs.  Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.

Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan.  Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (a) an Unsecured Pro Rata Share of New B Notes, calculated as if such Disputed COP Claims were Allowed (i) in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement or (ii) in such lesser amount as may be required by an order of the Bankruptcy Court, and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (a) an amount of New B Notes and/or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred from and after the Effective Date shall be distributed to the City; (b) following such distribution, 65% of the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B of the Plan; and (c) following such distribution, the remaining New B Notes and distributions thereon shall revert to the City, provided that the City, in its sole discretion, may choose to distribute such remaining property among holders of Allowed Claims in Classes 7, 13 and/or 14.

Class 9 Claims are impaired.

_Class 10: PFRS Pension Claims_

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A to the Plan. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (a) PFRS will receive certain additional DIA Proceeds and (b) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, _provided_ that such PFRS Adjusted Pension Amount shall be (a) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (b) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C to the Plan. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.q.ii.A to the Plan or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F.1 of the Plan prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G of the Plan.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified by the Plan, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

PFRS shall establish an Investment Committee for the purpose of making recommendations to the board of trustees of PFRS with respect to certain matters, and for purposes of making some determinations. The Investment Committee will consist of five independent members and two or more non-independent members, which non-independent members may include employees of the City or members or retirees of PFRS; provided that at all times during the 20-year period following disbursement of the State Contribution, the independent members shall have at least 70% of the voting power. Each independent Investment Committee member shall possess, by reason of training or experience or both, a minimum level of expertise in managing or advising pension systems, all as agreed to by the City, the State and PFRS, after consultation with the Foundations.

**Except as may be required to maintain the tax-qualified status of the PFRS, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B of the Plan, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11 and legislative action, shall include the following principal terms: (a) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (b) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b of the Plan. The Bankruptcy Court may not approve the release referenced in (b) in the preceding sentence; if it does not, the State will not be required to make the State Contribution.

Class 10 Claims are impaired.

*Class 11: GRS Pension Claims*

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A to the Plan. The exclusive sources for such contributions shall be certain City sources, pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution and certain DIA Proceeds. After June 30, 2023, (a) certain DIA Proceeds shall be contributed to the GRS and (b) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (a) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (b) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C to the Plan. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.r.ii.A to the Plan or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F.1 of the Plan prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

The Annuity Savings Fund Excess Amount will be calculated for each ASF Distribution Recipient, will then be converted into monthly annuity amounts based on each ASF Distribution Recipient's life expectancy and other factors and will be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G of the Plan.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified by the Plan, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

GRS shall establish an Investment Committee for the purpose of making recommendations to the board of trustees of GRS with respect to certain matters, and for purposes of making some determinations. The Investment Committee will consist of five independent members and two or more non-independent members, which non-independent members may include employees of the City or members or retirees of GRS; provided that at all times during the 20-year period following disbursement of the State Contribution, the independent members shall have at least 70% of the voting power. Each independent Investment Committee member shall possess, by reason of training or experience or both, a minimum level of expertise in managing or advising pension systems, all as agreed to by the City, the State and GRS, after consultation with the Foundations.

**Except as may be required to maintain the tax-qualified status of the GRS, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the**

**GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B of the Plan, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11 and legislative action, shall include the following principal terms: (a) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (b) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b of the Plan. The Bankruptcy Court may not approve the release referenced in (b) in the preceding sentence; if it does not, the State will not be required to make the State Contribution.

Class 11 Claims are impaired.

*Class 12: OPEB Claims*

As set forth in Section VIII.L.3.d, the City and the Retiree Committee have agreed to settle their differences with respect to the Allowed amount of the OPEB Claim and with respect to whether any Postpetition OPEB Payments should be set off against the claim amount or the Class 12 distribution under the Plan. The parties have agreed that, as part of their settlement, the Postpetition OPEB Payments will be deducted from the gross amount of the OPEB Claim. As a result, the parties have agreed that the Allowed OPEB Claim shall be $4,303,000,000. On the Effective Date, the two VEBAs discussed below will receive their Pro Rata share of the New B Notes in full satisfaction of the Allowed OPEB Claim.

Establishment of Detroit General VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents. The Detroit General VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries. The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.78 to the Plan, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees. The DRCEA and the Retiree Committee will each be able to appoint board members in equal numbers, and such appointees will constitute a majority of the initial Detroit General VEBA board; the City will appoint the remaining members. Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA: On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries. The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2 of the Plan.

Establishment of Detroit Police and Fire VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents. The Detroit Police and Fire VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially

in the form set forth on Exhibit I.A.82 to the Plan, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees. The initial board members will be appointed by the City, the Retiree Committee and the RDPFFA. Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2 of the Plan.

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

Class 12 Claims are impaired.

*Class 13: Downtown Development Authority Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

Class 13 Claims are impaired.

*Class 14: Other Unsecured Claims*

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

Class 14 Claims are impaired.

*Class 15: Convenience Claims*

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.55 of the Plan) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

Class 15 Claims are impaired.

*Class 16: Subordinated Claims*

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to

-53-
13-53846-tjt Doc 13090 Filed 08/09/19 Entered 08/09/19 10:50:12 Page 133 of 207
13-53846-swr Doc 4391 Filed 08/09/19 Entered 08/09/19 10:50:12 Page 133 of 207
226

## EXHIBIT A

PLAN OF ADJUSTMENT

THE BANKRUPTCY COURT HAS NOT APPROVED THE PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY THIS PLAN. THE DISTRIBUTION OF THIS PLAN AND THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE CITY OF DETROIT, MICHIGAN RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------------- x
                                            :
In re                                       :        Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                   :        Case No. 13-53846
                                            :
              Debtor.                        :        Hon. Steven W. Rhodes
                                            :
                                            :
------------------------------------------------------------- x
```

---

**FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**
**(May 5, 2014)**

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................. 1

    A.    Defined Terms. ........................................................................................................... 1

    B.    Rules of Interpretation and Computation of Time. ....................................................... 24

        1.    Rules of Interpretation. ................................................................................... 24

        2.    Computation of Time. ..................................................................................... 24

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................................................... 24

    A.    Unclassified Claims. ..................................................................................................... 25

        1.    Payment of Administrative Claims. ................................................................. 25

        2.    Bar Dates for Administrative Claims. .............................................................. 25

    B.    Classified Claims. ......................................................................................................... 26

        1.    Designation of Classes. ................................................................................... 26

        2.    Subordination; Reservation of Rights to Reclassify Claims. ............................. 27

        3.    Treatment of Claims. ...................................................................................... 27

    C.    Confirmation Without Acceptance by All Impaired Classes ........................................ 37

    D.    Treatment of Executory Contracts and Unexpired Leases ........................................... 37

        1.    Assumption. .................................................................................................... 37

        2.    Assumption of Ancillary Agreements. ............................................................ 37

        3.    Approval of Assumptions and Assignments. .................................................... 37

        4.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases ............................................................................................................ 38

        5.    Contracts and Leases Entered Into After the Petition Date. ............................. 38

        6.    Rejection of Executory Contracts and Unexpired Leases. ................................ 38

        7.    Rejection Damages Bar Date. .......................................................................... 38

        8.    Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. .......................................................................................... 39

        9.    Insurance Policies. .......................................................................................... 39

ARTICLE III CONFIRMATION OF THE PLAN ........................................................................... 39

    A.    Conditions Precedent to the Effective Date. ................................................................ 39

    B.    Waiver of Conditions to the Effective Date. ................................................................ 40

    C.    Effect of Nonoccurrence of Conditions to the Effective Date. ..................................... 40

    D.    Effect of Confirmation of the Plan. .............................................................................. 40

        1.    Dissolution of Retiree Committee. .................................................................. 40

        2.    Preservation of Rights of Action by the City. .................................................. 40

        3.    Comprehensive Settlement of Claims and Controversies. ................................ 41

        4.    Discharge of Claims. ...................................................................................... 41

| | 5. | Injunction. | 41 |
| | 6. | Exculpation. | 42 |
| | 7. | Releases | 43 |
| E. | | No Diminution of State Power | 43 |
| F. | | Effectiveness of the Plan. | 44 |
| G. | | Binding Effect of Plan. | 44 |

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ........... 44

| A. | | DWSD. | 44 |
| | 1. | Rates and Revenues. | 44 |
| | 2. | DWSD CBAs. | 44 |
| | 3. | The New DWSD Bonds and New Existing Rate DWSD Bonds. | 44 |
| B. | | The New B Notes. | 44 |
| C. | | The Plan COP Settlement. | 45 |
| D. | | The UTGO Settlement. | 45 |
| E. | | The State Contribution Agreement. | 45 |
| | 1. | State Contribution. | 45 |
| | 2. | Income Stabilization Payments. | 45 |
| | 3. | Conditions to State's Participation. | 46 |
| | 4. | Release of Claims Against the State and State Related Entities. | 46 |
| F. | | The DIA Settlement. | 46 |
| | 1. | Funding Contributions. | 46 |
| | 2. | Transfer of DIA Assets. | 47 |
| | 3. | Conditions to the Foundations' Participation. | 47 |
| G. | | Contingent Payment Rights | 47 |
| | 1. | Special Restoration | 47 |
| | 2. | General Restoration | 48 |
| H. | | The OPEB Settlement | 48 |
| I. | | Issuance of the New Securities. | 48 |
| J. | | Cancellation of Existing Bonds and Bond Documents. | 48 |
| K. | | Release of Liens. | 49 |
| L. | | Professional Fee Reserve | 49 |
| M. | | Assumption of Indemnification Obligations. | 49 |
| N. | | Incorporation of Retiree Health Care Settlement Agreement. | 49 |
| O. | | Payment of Workers' Compensation Claims. | 49 |
| P. | | Payment of Certain Claims Relating to the Operation of City Motor Vehicles | 50 |
| Q. | | Payment of Tax Refund Claims. | 50 |
| R. | | Utility Deposits. | 50 |

13-53846-swr    Doc 4391    Filed 05/05/14    Entered 05/05/14 11:53:15    Page 137 of 302
13-53846-tjt    Doc 8045    Filed 08/08/14    Entered 08/08/14 10:50:12    Page 137 of
226
-iii-

S.      Pass-Through Obligations .................................................................................. 50

T.      Exit Facility ........................................................................................................ 50

U.     Post-Effective Date Governance ....................................................................... 51

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN ....................... 51

A.     Appointment of Disbursing Agent. .................................................................. 51

B.     Distributions on Account of Allowed Claims. .................................................. 51

C.     Certain Claims to Be Expunged. ...................................................................... 51

D.     Record Date for Distributions; Exception for Bond Claims. ........................... 51

E.     Means of Cash Payments. ................................................................................. 52

F.     Selection of Distribution Dates for Allowed Claims ........................................ 52

G.     Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. ............................................................................................ 52

H.     City's Rights of Setoff Preserved. .................................................................... 52

I.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...... 52

     1.     Delivery of Distributions Generally ..................................................... 52

     2.     Delivery of Distributions on Account of Bond Claims ......................... 52

     3.     De Minimis Distributions / No Fractional New Securities. ................... 53

     4.     Undeliverable or Unclaimed Distributions. .......................................... 53

     5.     Time Bar to Cash Payment Rights. ....................................................... 53

J.      Other Provisions Applicable to Distributions in All Classes ........................... 53

     1.     No Postpetition Interest. ........................................................................ 53

     2.     Compliance with Tax Requirements. ..................................................... 54

     3.     Allocation of Distributions. ................................................................... 54

     4.     Surrender of Instruments. ...................................................................... 54

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ......................................... 55

A.     Treatment of Disputed Claims. ........................................................................ 55

     1.     General. .................................................................................................. 55

     2.     ADR Procedures. ................................................................................... 55

     3.     Tort Claims. ........................................................................................... 55

B.     Disputed Claims Reserve. ................................................................................ 56

C.     Objections to Claims. ....................................................................................... 56

     1.     Authority to Prosecute, Settle and Compromise. .................................. 56

     2.     Application of Bankruptcy Rules. .......................................................... 56

     3.     Expungement or Adjustment of Claims Without Objection. .................. 56

     4.     Extension of Claims Objection Bar Date. .............................................. 56

     5.     Authority to Amend List of Creditors. .................................................. 56

ARTICLE VII RETENTION OF JURISDICTION ............................................................................. 57

ARTICLE VIII MISCELLANEOUS PROVISIONS ................................................................ 58

    A.     Modification of the Plan. ................................................................................. 58

    B.     Revocation of the Plan. ................................................................................... 58

    C.     Disclosure of Amounts to Be Paid for Chapter 9 Case Services. ................... 58

    D.     Severability of Plan Provisions. ..................................................................... 58

    E.     Effectuating Documents and Transactions. ..................................................... 59

    F.     Successors and Assigns. .................................................................................. 59

    G.     Plan Controls. .................................................................................................. 59

    H.     Notice of the Effective Date. ........................................................................... 59

    I.     Governing Law. ............................................................................................... 59

    J.     Request for Waiver of Automatic Stay of Confirmation Order. ..................... 59

    K.     Term of Existing Injunctions and Stays. ......................................................... 59

    L.     Service of Documents ...................................................................................... 60

        1.     The City ............................................................................................... 60

        2.     The Retiree Committee ........................................................................ 60

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit I.A.61 | Schedule of COP Swap Agreements |
| Exhibit I.A.78 | Form of Detroit General VEBA Trust Agreement |
| Exhibit I.A.82 | Form of Detroit Police and Fire VEBA Trust Agreement |
| Exhibit I.A.91 | Principal Terms of DIA Settlement |
| Exhibit I.A.92 | Form of DIA Settlement Documents |
| Exhibit I.A.110 | Schedule of DWSD Bond Documents & Related DWSD Bonds |
| Exhibit I.A.117 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.120 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.135 | Principal Terms of Exit Facility |
| Exhibit I.A.159 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.168 | Interest Rate Reset Chart |
| Exhibit I.A.173 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.183 | Principal Terms of New B Notes |
| Exhibit I.A.184 | Form of New B Notes Documents |
| Exhibit I.A.186 | Principal Terms of New DWSD Bonds |
| Exhibit I.A.188 | Principal Terms of New Existing Rate DWSD Bonds |
| Exhibit I.A.189.a | Form of New GRS Active Pension Plan |
| Exhibit I.A.189.b | Principal Terms of New GRS Active Pension Plan |
| Exhibit I.A.191.a | Form of New PFRS Active Pension Plan |
| Exhibit I.A.191.b | Principal Terms of New PFRS Active Pension Plan |
| Exhibit I.A.214 | Form of Plan COP Settlement Documents |
| Exhibit I.A.220 | Prior GRS Pension Plan |
| Exhibit I.A.221 | Prior PFRS Pension Plan |
| Exhibit I.A.236 | Retiree Health Care Settlement Agreement |
| Exhibit I.A.244 | Schedule of Secured GO Bond Documents |

| Exhibit I.A.268 | State Contribution Agreement |
| Exhibit I.A.279 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit I.A.285 | Principal Terms of UTGO Settlement |
| Exhibit II.B.3.q.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.q.ii.C | Terms of PFRS Pension Restoration |
| Exhibit II.B.3.r.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.r.ii.C | Terms of GRS Pension Restoration |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit III.D.2 | Retained Causes of Action |

## INTRODUCTION

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A.     Defined Terms.

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.      "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.      "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.      "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.      "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.      "36th District Court" means the district court for the thirty-sixth judicial district of the State.

6.      "Active Employee" means an active employee of the City on and after the Confirmation Date.

7.      "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual

13-53846-tjt    Doc 4391-1    Filed 08/08/14    Entered 08/08/14 11:53:05    Page 142 of
226
13-53846-swr    Doc 4391-1    Filed 05/05/14    Entered 05/05/14 11:50:12    Page 143 of 302

Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

8.  "Adjusted Pension Amount" means the GRS Adjusted Pension Amount and/or the PFRS Adjusted Pension Amount, as applicable.

9.  "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code and/or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof shall be considered an Administrative Claim.

10.  "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

11.  "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

12.  "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

13.  "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

14.  "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City. "Allow" and "Allowing" shall have correlative meanings.

15.  "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

16.  "Annuity Savings Fund Excess Amount" means: (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual

Return through such date; and (c) for an ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

17.     "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.154, plus the ASF Recoupment.

18.     "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

19.     "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

20.     "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

21.     "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

22.     "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

23.     "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Reinstated Stub UTGO Bonds, which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement, substantially on the terms set forth on Exhibit I.A.285.

24.     "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

25.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

26.     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

27.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

28.     "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

29.     "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

30.     "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

31.     "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

32.     "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

33.     "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds and/or the Secured GO Bonds.

34.     "Bondholder" means any beneficial or record holder of a Bond.

35.     "Bond Insurance Policies" means those policies, surety policies and/or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

36.     "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

37.     "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

38.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

39.     "Cash" means legal tender of the United States of America and equivalents thereof.

40.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

41.     "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

42.     "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

43.     "City" means the City of Detroit, Michigan.

-4-

13-53846-tjt   Doc 13000   Filed 08/09/14   Entered 08/09/14 11:30:12   Page 145 of 302
13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 13:05:12   Page 145 of 226

44.     "City Council" means the duly-elected City Council of the City.

45.     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

46.     "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

47.     "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) one year after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

48.     "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

49.     "Class" means a class of Claims, as described in Section II.B.

50.     "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements.

51.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

52.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

53.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

54.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

55.     "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

56.     "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

57.     "COP Claim" means a Claim under or evidenced by the COP Service Contracts.

58.     "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

59.     "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006,

dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

60.     "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

61.     "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.61, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

62.     "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

63.     "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

64.     "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

65.     "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

66.     "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

67.     "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

68.     "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

69.     "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

70.     "Creditor Representative" means (a) if all Retiree Classes accept the Plan and the Retiree Committee supports the Plan, the Retiree Committee, (b) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 accepts the Plan, a person or committee of persons appointed by the five largest beneficial holders of Class 7 Claims other than the LTGO Insurer and (c) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 rejects the Plan, a person or committee of persons appointed by the Emergency Manager.

71.     "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

72.     "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue

pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

73.     "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension of a person who was a current retiree as of June 30, 2014.

74.     "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

75.     "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OBEB Claim.

76.     "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

77.     "Detroit General VEBA Beneficiary" means a Holder of an Allowed OPEB Claim who is a Detroit General Retiree.

78.     "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.78.

79.     "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

80.     "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

81.     "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

82.     "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.82.

83.     "DIA" means The Detroit Institute of Arts, a museum and cultural facility located at 5200 Woodward Avenue, Detroit, Michigan 48202.

84.     "DIA Assets" means the assets identified on Exhibit A to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, to the extent that the City holds title to any such assets as of the Effective Date.

85.     "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

86.     "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations listed on Exhibit C to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, and all additional persons, businesses, business-affiliated foundations and any other foundations from which DIA Corp. secures commitments to contribute monies in furtherance of the DIA Settlement.

87. "DIA Funding Parties" means the Foundations, the DIA Funders and DIA Corp.

88. "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.F.1.

89. "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

90. "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

91. "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.F and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.91.

92. "DIA Settlement Documents" means the definitive documentation, including grant award letters, to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.92, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.91.

93. "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

94. "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, supplemented or otherwise modified.

95. "Disclosure Statement Order" means the [_____] (Docket No. [___]), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on [_____], 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

96. "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

97. "Disputed Claim" means any Claim that is not Allowed.

98. "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.B.1.

99. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

100. "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

101. "Distribution Date" means any date on which a Distribution is made.

102. "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

103.    "District Court" means the United States District Court for the Eastern District of Michigan.

104.    "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

105.    "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

106.    "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

107.    "DRCEA" means the Detroit Retired City Employees Association.

108.    "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

109.    "DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

110.    "DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.110, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

111.    "DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.110.

112.    "DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

113.    "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

114.    "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

115.    "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

116.    "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

117.    "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.117, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

118.    "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.117.

119.    "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

120.    "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.120, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

121.    "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.120.

122.    "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

123.    "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

124.    "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

125.    "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

126.    "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continued to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

127.    "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

128.    "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

129.    "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

130.    "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

131.    "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

132.     "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors and (g) Gabriel, Roeder, Smith & Company.

133.     "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

134.     "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed.  The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.  For the avoidance of doubt, Exhibits I.A.92 and I.A.135 will be Filed only if the transactions related to and/or underlying such Exhibits are to be consummated by the City.

135.     "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.135.

136.     "Exit Facility Agent" means the agent under the Exit Facility.

137.     "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

138.     "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

139.     "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

140.     "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

141.     "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

142.     "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified.

143.     "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order and (b) the Fee Examiner Parties.  For the avoidance of doubt, any professionals retained by any

official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

144. "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

145. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

146. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

147. "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year. A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

148. "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, solely in their capacity as participants in the DIA Settlement.

149. "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

150. "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

151. "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

152. "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

153. "GRS" means the General Retirement System for the City of Detroit.

154. "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

-12-

13-53846-tjt Doc 13990-1 Filed 08/09/24 Entered 08/09/24 11:50:12 Page 158 of
302
13-53846-swr Doc 4391-1 Filed 05/05/14 Entered 05/05/14 11:50:12 Page 158 of
302

(b) If Classes 10 and 11 do **not** vote to accept the Plan and/or funding is **not** received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

155. "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

156. "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

157. "Holder" means an Entity holding a Claim.

158. "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

159. "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.159, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

160. "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.159.

161. "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

162. "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

163. "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

164. "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

165.     "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners.  The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

166.     "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the treatment accorded to any Allowed Other Unsecured Claims held by the 36th District Court pursuant to Section II.B.3.u.

167.     "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification and/or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

168.     "Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, attached as Exhibit I.A.168.

169.     "Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees and/or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

170.     "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

171.     "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

172.     "Limited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

173.     "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.173, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

174.     "Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.173.

175.     "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries and/or schedules may be amended, restated, supplemented or otherwise modified.

176.     "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date, and failing that, as soon thereafter as possible, but, notwithstanding such compliance, is unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

177.  "LTGO Insurer" means Ambac Assurance Corp., solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

178.  "Macomb County" means the County of Macomb, Michigan.

179.  "Mayor" means the duly-elected mayor of the City.

180.  "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the Michigan Finance Authority in accordance with the UTGO Settlement and applicable law.

181.  "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

182.  "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction.  In applying this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

183.  "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.183.

184.  "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.184.

185.  "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New DWSD Bonds.

186.  "New DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.186.

187.  "New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed to be executed with respect to the New Existing Rate DWSD Bonds.

188.  "New Existing Rate DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.188.

189.  "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.189.a and the material terms of which are attached hereto as Exhibit I.A.189.b.

190.  "New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such

employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

191.    "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.191.a and the material terms of which are set forth at Exhibit I.A.191.b.

192.    "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

193.    "New Securities" means, collectively, the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New B Notes and the Municipal Obligation.

194.    "Oakland County" means the County of Oakland, Michigan.

195.    "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and the Employees Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

196.    "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

197.    "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

198.    "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim or a Subordinated Claim.  For the avoidance of doubt, Section 1983 Claims, Indirect Employee Indemnity Claims and Indirect 36th District Court Claims are included within the definition of Other Unsecured Claim.

199.    "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

200.    "Parking Bond Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

201.    "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may be subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

-16-
13-53846-tjt   Doc 13990-1   Filed 08/09/14   Entered 08/09/14 01:13:05   Page 157 of
13-53846-swr   Doc 4991-1   Filed 09/05/14   Entered 09/05/14 11:30:12   Page 54 of
302

202. "Parking Bonds" means the secured $27,000,000 City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents in the outstanding principal amount of $8,080,000 as of the Petition Date.

203. "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

204. "Pass-Through Recipients" means, collectively, the (a) City of Detroit Downtown Development Authority, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

205. "Patient Protection and Affordable Care Act" means Public Law 111-148, 111th Congress, 42 U.S.C. §§ 18001, *et seq.*

206. "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

207. "Petition Date" means July 18, 2013.

208. "PFRS" means the Police and Fire Retirement System for the City of Detroit.

209. "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b) If Classes 10 and 11 do **not** vote to accept the Plan and/or funding is **not** received from the DIA Settlement and the State Contribution Agreement: (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

210. "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

211. "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

212. "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

213. "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.p.iii.A and more definitively set forth in the Plan COP Settlement Documents.

214. "Plan COP Settlement Documents" means the definitive documentation to be executed in connection with the Plan COP Settlement, in substantially the form attached hereto as Exhibit I.A.214.

215. "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order. A Plan Supplement or Plan Supplements containing Exhibits 189.a, 191.a, 220, 221 and II.D.6 will be Filed no later than five Business Days prior to the Voting Deadline. All other Plan Supplements will be Filed no later than ten days before the Confirmation Hearing.

216. "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement and/or Ordinance No. 05-09 of the City.

217. "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

218. "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

219. "Postpetition Purchaser Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

220. "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.220.

221. "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.221.

222. "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

223. "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.L.

224. "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water and/or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

225. "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

226. "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder. "Reinstate" and "Reinstatement" shall have correlative meanings.

227. "Reinstated Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,410,000 that, from and after the Effective Date, will remain outstanding and will be payable from the UTGO Bond Tax Levy, as more particularly described on Exhibit I.A.285.

228. "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

229. "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the DIA Funding Parties and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

230. "Restoration Trust" means a trust to be established (a) to hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

231. "Restructured UTGO Bonds" means the bonds to be issued by the Michigan Finance Authority to the current Holders of Unlimited Tax General Obligation Bonds in the amount of $287,500,000 pursuant to the UTGO Settlement, which bonds shall be limited obligations of the Michigan Finance Authority and shall be secured as more particularly described on Exhibit I.A.285.

232. "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

233. "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

234. "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of

-19-

13-53846-swr  Doc 13000-1  Filed 08/09/15  Entered 08/09/15 10:13:05  Page 160 of
302
13-53846-tjt  Doc 4391-1  Filed 05/05/14  Entered 05/05/14 11:30:12  Page 167 of
202

expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

235.    "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

236.    "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.236.

237.    "Retiree Health Plan" means the City of Detroit Retiree Health Plan, a welfare benefit plan sponsored and administered by the City, which, effective for the period beginning March 1, 2014 and ending December 31, 2014, provides health, dental and vision care benefits to retired officers and employees of the City who enrolled in the plan as of March 1, 2014.

238.    "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS and/or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

239.    "Retirement Systems" means, collectively, the GRS and the PFRS.

240.    "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

241.    "Section 1983 Claim" means any claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

242.    "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

243.    "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

244.    "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

245.    "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

246.    "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.244, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

-20-
13-53846-tjt   Doc 13990-1   Filed 08/09/24   Entered 08/09/24 11:35:12   Page 161 of
302
13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 10:35:12   Page 163 of
302

247. "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

248. "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

249. "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.244, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

250. "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

251. "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

252. "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.244, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

253. "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

254. "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

255. "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.244, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

256. "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

257. "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

258. "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.244, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

259. "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

260.     "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

261.     "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.244, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

262.     "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

263.     "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

264.     "Settling COP Claimant" means a beneficial holder of a COP Claim that elects to participate in the Plan COP Settlement as to some or all COP Claims held by or assigned to it and its Affiliates by so indicating on a timely-returned Ballot.

265.     "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.G.

266.     "State" means the state of Michigan.

267.     "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement.  References to the "disbursement of the State Contribution" in the Plan shall be construed to refer to either the distribution of the discrete lump sum payments to GRS and PFRS or the payment of the first installment of the State Contribution to GRS and PFRS, as the case may be.

268.     "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.E, in substantially the form attached hereto as Exhibit I.A.268.

269.     "State Related Entities" means, collectively:  (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

270.     "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

271.     "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

272.     "Swap Insurance Policies" means those policies and/or other instruments insuring the COP Swap Agreements and obligations related thereto.

273.     "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

274.     "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

275.     "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

276.     "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

277.     "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

278.     "Unlimited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

279.     "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.279, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all instruments and agreements related thereto.

280.     "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.279.

281.     "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

282.     "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 7, 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

283.     "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

284.     "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

285.     "UTGO Settlement" means the comprehensive settlement regarding Unlimited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, the principal terms of which are attached hereto as Exhibit I.A.285 and described in Section IV.D.

-23-
13-53846-swr   Doc 4391-1   Filed 08/09/14   Entered 08/09/14 11:30:12   Page 164 of
13-53846-swr   Doc 4391-1   Filed 08/09/14   Entered 08/09/14 11:30:12   Page 164 of
202

286. "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

287. "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

288. "Voting Record Date" means the record date fixed by the Bankruptcy Court in the Disclosure Statement Order establishing the Holders of Claims entitled to vote to accept or reject the Plan.

289. "Wayne County" means the Charter County of Wayne, Michigan.

**B.      Rules of Interpretation and Computation of Time.**

**1.      Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

**2.      Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS; CRAMDOWN;**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

A.     **Unclassified Claims.**

1.     **Payment of Administrative Claims.**

a.     **Administrative Claims in General.**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.  No Claim of any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim.

b.     **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Purchaser Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

2.     **Bar Dates for Administrative Claims.**

a.     **General Bar Date Provisions**

Except as otherwise provided in Section II.A.2.b or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

b.     **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition Purchaser Claims will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

c.     **No Modification of Bar Date Order.**

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

13-53846-tjt   Doc 13990-1   Filed 08/09/14   Entered 08/09/14 10:30:12   Page 166 of
13-53846-swr   Doc 4391-1    Filed 08/09/14   Entered 08/09/14 11:30:12   Page 68 of
202

**B.** **Classified Claims.**

    **1.** **Designation of Classes.**

        The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| | *Secured Claims* | |
| 1A | All Classes of DWSD Bond Claims<br>(One Class for each CUSIP of DWSD Bonds,<br>as set forth on Exhibit I.A.110) | Unimpaired/Nonvoting or<br>Impaired/Voting, as set forth<br>on Exhibit I.A.110 |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims<br>(One Class for each DWSD Series of DWSD Revolving Sewer Bonds,<br>as set forth on Exhibit I.A.117) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims<br>(One Class for each DWSD Series of DWSD Revolving Water Bonds,<br>as set forth on Exhibit I.A.120) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |
| | *Unsecured Claims* | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |

-26-

13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 11:30:12   Page 167 of
13-53846-tjt   Doc 13990-1   Filed 08/09/19   Entered 08/09/19 10:35:02   Page 167 of
202
226

2. **Subordination; Reservation of Rights to Reclassify Claims.**

Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

3. **Treatment of Claims.**

a. **Class 1A – DWSD Bond Claims.**

i. **Classification and Allowance.**

DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.110, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.110.

ii. **Treatment.**

A. **Unimpaired Classes.**

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as unimpaired on Exhibit I.A.110 shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

B. **Impaired Classes.**

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as impaired on Exhibit I.A.110 shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (1) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (2) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

Treatment Option for Classes that Accept the Plan: Each Holder of an Allowed DWSD Bond Claim in an impaired Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder in lieu of New DWSD Bonds.

Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (1) paid in Cash on the first Distribution Date following the date on which such DWSD Bond Claim is Allowed or (2) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.

-27-

13-53846-swr Doc 4391 Filed 05/05/14 Entered 05/05/14 11:30:12 Page 168 of
13-53846-tjt Doc 13001 Filed 08/08/16 Entered 08/08/16 21:10:51 Page 168 of
302

b.    **Class 1B – DWSD Revolving Sewer Bond Claims**

i.    **Classification and Allowance.**

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.117, with each Class receiving the treatment set forth below.  On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.117.

ii.    **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

c.    **Class 1C – DWSD Revolving Water Bond Claims**

i.    **Classification and Allowance.**

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.120, with each Class receiving the treatment set forth below.  On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.120.

ii.    **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

d.    **Class 2A – Secured GO Series 2010 Claims.**

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

e.    **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

f.    **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

g.    **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim

shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### h. Class 2E - Secured GO Series 2012(B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### i. Class 2F – Secured GO Series 2012(B2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### j. Class 3 – Other Secured Claims.

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### k. Class 4 – HUD Installment Note Claims.

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### l. Class 5 – COP Swap Claims.

#### i. Allowance.

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

#### ii. Treatment.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (A) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

m.    **Class 6 – Parking Bond Claims.**

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

n.    **Class 7 – Limited Tax General Obligation Bond Claims.**

i.    **Allowance.**

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,543,187.86.

ii.    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Limited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

o.    **Class 8 – Unlimited Tax General Obligation Bond Claims.**

i.    **Allowance.**

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

ii.    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds. Such Holders shall retain ownership of the Reinstated Stub UTGO Bonds, subject to Sections I.A.23 and IV.D.

p.    **Class 9 – COP Claims.**

i.    **Disputed.**

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative. If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.

ii.    **Assignment.**

Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.

-30-

13-53846-tjt   Doc 13991-1   Filed 08/09/15   Entered 08/09/15 10:13:05   Page 173 of 226
13-53846-swr   Doc 4991-1   Filed 09/05/14   Entered 09/05/14 11:50:12   Page 73 of 202

### iii. Treatment.

### A. Plan COP Settlement Option.

Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely-returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### B. Non-Settling Holders.

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

### 1. Disputed COP Claims Reserve.

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain no less than (a) an Unsecured Pro Rata Share of New B Notes, calculated as if such Disputed COP Claims were Allowed (i) in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs not subject to the Plan COP Settlement or (ii) in such lesser amount as may be required by an order of the Bankruptcy Court, and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.

### 2. Distributions From The Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (a) an amount of New B Notes and/or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred from and after the Effective Date shall be distributed to the City; (b) following such distribution, 65% of the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; and (c) following such distribution, the remaining New B Notes and distributions thereon shall revert to the City, provided that the City, in its sole discretion, may choose to distribute such remaining property among holders of Allowed Claims in Classes 7, 13 and/or 14.

### q. Class 10 – PFRS Pension Claims.

### i. Allowance.

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

-31-

13-53846-swr    Doc 4391-1    Filed 05/05/14    Entered 05/05/14 11:50:12    Page 172 of
13-53846-swr    Doc 4391-1    Filed 05/05/14    Entered 05/05/14 11:50:12    Page 179 of
226

### ii.     Treatment.

#### A.     Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A.  The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution.  After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan.  Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

#### B.     Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

#### C.     Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C.  For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement.  In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

#### D.     Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G.

#### E.     Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

#### F.     Governance.

On or as soon as reasonably practicable after the Effective Date, PFRS shall establish an Investment Committee in accordance with the State Contribution Agreement.  The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### G. No Changes in Terms for Ten Years.

Except as may be required to maintain the tax-qualified status of the PFRS, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### H. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r. Class 11 – GRS Pension Claims.

#### i. Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

#### ii. Treatment.

##### A. Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain City sources, pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution and certain DIA Proceeds. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

##### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

##### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that

such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D. Annuity Savings Fund Recoupment.

#### 1. ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

#### 2. ASF Distribution Recipients.

The Annuity Savings Fund Excess Amount will be calculated for each ASF Distribution Recipient, will then be converted into monthly annuity amounts based on each ASF Distribution Recipient's life expectancy and other factors and will be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

### E. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G.

### F. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, GRS shall establish an Investment Committee in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that**

govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

## I.  State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms:  (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s.  Class 12 – OPEB Claims.

#### i.  Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii.  Treatment.

##### A.  Detroit General VEBA.

Establishment of Detroit General VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.  The Detroit General VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries.  The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.78, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees.  The DRCEA and the Retiree Committee will each be able to appoint board members in equal numbers, and such appointees will constitute a majority of the initial Detroit General VEBA board; the City will appoint the remaining members.  Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA:  On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries.  The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2.

##### B.  Detroit Police and Fire VEBA.

Establishment of Detroit Police and Fire VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.  The Detroit Police and Fire VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit

Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.82, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees. The initial board members will be appointed by the City, the Retiree Committee and the RDPFFA. Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2.

### C. No Further Responsibility.

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

### t. Class 13 – Downtown Development Authority Claims.

#### i. Allowance.

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### u. Class 14 – Other Unsecured Claims.

#### i. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

i. Treatment.

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.55) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

w. Class 16 – Subordinated Claims.

i. Treatment.

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

C. Confirmation Without Acceptance by All Impaired Classes

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan shall constitute a motion for such relief.

D. Treatment of Executory Contracts and Unexpired Leases

1. Assumption.

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.

2. Assumption of Ancillary Agreements.

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

3. Approval of Assumptions and Assignments.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure

Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

### 4.     Payments Related to the Assumption of Executory Contracts and Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

### 5.     Contracts and Leases Entered Into After the Petition Date

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 6.     Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

### 7.     Rejection Damages Bar Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 30 days after the Effective Date; or (b) 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

-38-

13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 01:35:12   Page 176 of 302
13-53846-tjt   Doc 13090-1   Filed 08/09/19   Entered 08/09/19 10:13:05   Page 179 of 302

8.      **Preexisting Obligations to the City Under**
        **Rejected Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the City under such contract or lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

9.      **Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

# ARTICLE III
# CONFIRMATION OF THE PLAN

A.      **Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2.      The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.      The Confirmation Order shall not be stayed in any respect.

4.      All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

5.      All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement.

6.      Any legislation that must be passed by the Michigan Legislature to effect any term of the Plan shall have been enacted.

7.      The Michigan Finance Authority board shall have approved the issuance of the Restructured UTGO Bonds.

8.       The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.A.

9.       If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

10.      The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B.       Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion.

**C.       Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then upon motion by the City made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

**D.       Effect of Confirmation of the Plan.**

**1.       Dissolution of Retiree Committee.**

Following the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case, provided, however, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.3.p.i.  If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown.  All fees and expenses of the Creditor Representative shall be subject to the approval of the City.  All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court.  No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.

**2.       Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans and/or assets), to the extent not expressly released under the Plan or

pursuant to any Final Order of the Bankruptcy Court. A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2. The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

### 3. Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable. For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

### 4. Discharge of Claims.

#### a. Complete Satisfaction, Discharge and Release.

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

#### b. Discharge.

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and Liabilities against the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged Claim; provided that such discharge will not apply to (i) Claims specifically exempted from discharge under the Plan; and (ii) Claims held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

### 5. Injunction.

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

**a. all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

**1. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property**

**(including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims, and (C) Indirect Employee Indemnity Claims);**

**2.       enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

**3.       creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

**4.       asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;**

**5.       proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

**6.       taking any actions to interfere with the implementation or consummation of the Plan.**

**b.       All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

6.       **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan.

7.      Releases

        Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

        a.      each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, the Exhibits or the Disclosure Statement that such entity has, had or may have against the City, its Related Entities, the State, the State Related Entities and the Released Parties (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code), provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; provided further that this Section III.D.7.a shall not apply to any Exculpated Party; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; and

        b.      if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.  For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations.  Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees and/or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law and/or the Plan.

E.      No Diminution of State Power

        No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to

-43-

13-53846-tjt   Doc 13990-1   Filed 08/09/14   Entered 08/09/14 11:50:12   Page 184 of
13-53846-swr   Doc 4391   Filed 05/05/14   Entered 05/05/14 10:13:05   Page 81 of
202

it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

**F.      Effectiveness of the Plan.**

The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**G.      Binding Effect of Plan.**

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan.  Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.      DWSD.**

**1.      Rates and Revenues.**

DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

**2.      DWSD CBAs.**

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

**3.      The New DWSD Bonds and New Existing Rate DWSD Bonds.**

DWSD shall, as necessary:  (a) execute the New DWSD Bond Documents, issue the New DWSD Bonds substantially on the terms set forth on Exhibit I.A.186, and distribute the New DWSD Bonds as set forth in the Plan; and (b) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds substantially on the terms set forth on Exhibit I.A.188, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan.

**B.      The New B Notes.**

On the Effective Date, the City shall execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.183, and distribute the New B Notes as set forth in the Plan.

-44-

13-53846-tjt   Doc 13990   Filed 08/09/19   Entered 08/09/19 10:13:05   Page 185 of
13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 11:50:12   Page 52 of
302
302

## C.     The Plan COP Settlement.

The City shall consummate the Plan COP Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.214.  Settling COP Claimants shall receive the treatment described in Section II.B.3.p.iii.A.

## D.     The UTGO Settlement.

The City shall consummate the UTGO Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.285.  The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement, among other things:  (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the Municipal Finance Authority, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of Restructured UTGO Bonds; and (4) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

## E.     The State Contribution Agreement.

On the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.268.

### 1.     State Contribution.

The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

### 2.     Income Stabilization Payments.

The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State.  Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus.  The Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner.  In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.  In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible

-45-

13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 11:30:12   Page 188 of 202
13-53846-tjt   Doc 13000   Filed 09/06/24   Entered 09/06/24 11:50:12   Page 186 of 226

Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

3.      **Conditions to State's Participation.**

The State's payment of the State Contribution is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following: (a) the Confirmation Order becoming a Final Order no later than September 30, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement; (b) the occurrence of the Effective Date no later than December 31, 2014; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, (i) challenging PA 436 or any actions taken pursuant to PA 436 as it relates to the City or (ii) to enforce Article IX, Section 24 of the Michigan Constitution, or equivalent assurances of finality of such litigation; (g) a firm commitment by the Foundations to contribute an aggregate amount of not less than $366 million to fund the DIA Settlement; (h) a firm commitment by DIA Corp. to raise at least $100 million from its donors to fund the DIA Settlement; (i) assurances that the State Contribution may only be used to fund payments to Holders of Pension Claims in accordance with the terms of the State Contribution Agreement; (j) assurances that the Retirement Systems must at all times during the 20 years following the Effective Date maintain an Investment Committee for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees and/or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement; (k) assurances that an income stabilization program will be operated; (l) assurances that the provisions of the State Contribution Agreement regarding governance of the Retirement Systems will be approved; (m) the execution of the State Contribution Agreement acceptable in form and substance to the City and the State; and (n) the passage of legislation prior to Confirmation authorizing the State Contribution.

4.      **Release of Claims Against the State and State Related Entities.**

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

F.      **The DIA Settlement.**

On the Effective Date, the City, the Foundations and DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA Assets to remain in the City in perpetuity and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State.  The DIA Settlement Documents attached hereto as Exhibit I.A.92 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.91.

1.      **Funding Contributions.**

The DIA Settlement will be funded as follows:  (a) an irrevocable commitment of at least $366 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors (subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed

by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to an "Agreed Required Minimum Schedule" and "Present Value Discount," as set forth in Exhibit I.A.91. Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

## 2. Transfer of DIA Assets.

On the Effective Date, the City shall irrevocably transfer the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

## 3. Conditions to the Foundations' Participation.

The DIA Funding Parties participation in the DIA Settlement is conditioned upon, among other things, the following: (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.F.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.F.2; (e) the existence of appropriate governance and oversight structures at DIA Corp. that include representation of the City, the DIA Funding Parties and other stakeholders; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the existence of appropriate prospective governance and financial oversight mechanisms for the Retirement Systems; (h) the affirmation by County authorities of certain existing funding obligations with respect to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution in an aggregate amount of $350 million; (k) the occurrence of the Effective Date no later than December 31, 2014; and (l) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

## G. Contingent Payment Rights

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust. The City shall issue the DWSD CVR to the Restoration Trust. If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire. The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities: (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS. If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made. The DWSD CVR may not be transferred.

## 1. Special Restoration

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration. In such case, the City will perform a Value Determination and arrive at the Discounted Value. The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable. In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C. In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored. In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate. In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction. Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

## 2. General Restoration

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

## H. The OPEB Settlement

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims. The Plan reflects the terms of that settlement, and the Confirmation Order shall constitute an order approving such settlement pursuant to Bankruptcy Rule 9019.

## I. Issuance of the New Securities.

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

## J. Cancellation of Existing Bonds and Bond Documents.

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bonds and Bond Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent or similar entity under the Bond Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and (iii) as may be necessary to preserve any claim by a Bondholder and/or Bond Agent under a Bond Insurance Policy or against any Bond Insurer. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such Bonds and/or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders and/or Bond Agents with respect to claims under applicable Bond

Insurance Policies and/or against the Bond Insurers or (b) Holders of COP Claims with respect to claims under applicable policies and/or other instruments insuring the COPs and obligations related thereto.

**K.      Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City.  As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.K.

**L.      Professional Fee Reserve**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve.  The Professional Fee Reserve shall be funded in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date.  The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties.  Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund.

**M.      Assumption of Indemnification Obligations.**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; <u>provided</u> that this Section IV.M shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.M.

**N.      Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.236, are incorporated herein by reference and shall be binding upon the parties thereto.

**O.      Payment of Workers' Compensation Claims.**

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers'

compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law. The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

**P.      Payment of Certain Claims Relating to the Operation of City Motor Vehicles**

If the City determines to maintain self-insurance with respect to the operation of its motor vehicles in a notice Filed not less than ten days before the Confirmation Hearing, this Section IV.P will apply. Subject to the foregoing, from and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows: (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable). If this Section IV.P becomes effective, nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1). The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.P, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**Q.      Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures. The City expressly reserves the right to challenge the validity of any claim for an income tax refund and/or property tax refund.

**R.      Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**S.      Pass-Through Obligations**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**T.      Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

U.      **Post-Effective Date Governance**

        Prior to or on the Effective Date, a financial oversight board shall be established pursuant to and in accordance with State law now in effect or hereafter enacted to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that should result in more efficient and effective delivery of services to City residents. The financial oversight board shall be composed of individuals with recognized financial competence and experience and shall have the authority to, among other things, impose limits on City borrowing and expenditures and require the use of financial best practices.

# ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

A.      **Appointment of Disbursing Agent.**

        The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

B.      **Distributions on Account of Allowed Claims.**

        Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

C.      **Certain Claims to Be Expunged.**

        Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

D.      **Record Date for Distributions; Exception for Bond Claims.**

        With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

E.    **Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

F.    **Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process.  Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

G.    **Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage.  To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court.  Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City.  For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

H.    **City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

I.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

1.    **Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

2.    **Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed

-52-

13-53846-tjt   Doc 13991-1   Filed 08/09/14   Entered 08/09/14 11:50:12   Page 193 of
13-53846-swr   Doc 4999-1   Filed 08/09/14   Entered 08/09/14 11:50:12   Page 193 of
202

completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

### 3. De Minimis Distributions / No Fractional New Securities.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

### 4. Undeliverable or Unclaimed Distributions.

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 5. Time Bar to Cash Payment Rights.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

## J. Other Provisions Applicable to Distributions in All Classes

### 1. No Postpetition Interest.

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

2.      **Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 and/or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

3.      **Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

4.      **Surrender of Instruments.**

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any applicable policies and/or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds and/or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

**ARTICLE VI**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

A.    **Treatment of Disputed Claims.**

    1.    **General.**

        No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

    2.    **ADR Procedures.**

        At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

    3.    **Tort Claims.**

        At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction selected by the City that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim.

        Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

**B. Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.

**C. Objections to Claims.**

**1. Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

**2. Application of Bankruptcy Rules.**

To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(c).

**3. Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

**4. Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

**5. Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such

-56-

13-53846-swr   Doc 4391   Filed 08/09/08   Entered 08/09/05 14:13:05   Page 197 of 302
13-53846-tjt   Doc 13000-1   Filed 08/09/14   Entered 08/09/14 11:50:12   Page 194 of 302

amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A. Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B. Enforce the term (maturity) of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, notwithstanding any state law to the contrary;

C. Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D. Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E. Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H. Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I. Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

K.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.     Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

M.     Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

N.     Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.     Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**B.     Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be: (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**C.     Disclosure of Amounts to Be Paid for Chapter 9 Case Services.**

No later than five days before the Confirmation Hearing, (1) the City shall File a statement of all amounts to be paid by it for services or expenses in the Chapter 9 Case or incident to the Plan; and (2) as applicable, all other persons shall File statements of all amounts to be paid by them for services or expenses in the Chapter 9 Case or incident to the Plan. Pursuant to section 943(b)(3) of the Bankruptcy Code, the Bankruptcy Court must approve such amounts as reasonable as a condition to Confirmation.

**D.     Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

E.      **Effectuating Documents and Transactions.**

        The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City. On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

F.      **Successors and Assigns.**

        Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

G.      **Plan Controls.**

        In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

H.      **Notice of the Effective Date.**

        On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

I.      **Governing Law.**

        Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

J.      **Request for Waiver of Automatic Stay of Confirmation Order.**

        The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

K.      **Term of Existing Injunctions and Stays.**

        **All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

-59-

13-53846-tjt   Doc 4391   Filed 05/05/14   Entered 05/05/14 11:35:12   Page 200 of 302
13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 11:30:12   Page 207 of 302

**L.     Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

**1.     The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

(Counsel to the City)

**2.     The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone:  (202) 408-6400
Facsimile:  (202) 408-6399

-60-

13-53846-swr   Doc 13090-1   Filed 08/09/19   Entered 08/09/19 10:13:05   Page 201 of
13-53846-swr   Doc 4391-1   Filed 09/05/14   Entered 09/05/14 11:30:12   Page 201 of
322
202

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone:  (248) 971-1711
Facsimile:  (248) 971-1801

(Counsel to the Retiree Committee)


Dated:  May 5, 2014                    Respectfully submitted,

                                       The City of Detroit, Michigan


                                       By:    _/s/  Kevyn D. Orr_____
                                       Name:  Kevyn D. Orr
                                       Title: Emergency Manager for the City of Detroit, Michigan

**EXHIBIT I.A.191.b**

PRINCIPAL TERMS OF NEW PFRS ACTIVE PENSION PLAN

## NEW PFRS ACTIVE PENSION PLAN -- MATERIAL TERMS

1.      Benefit Formula:

      a.   Detroit Fire Fighters Association Employees
          i.   FAC (average base compensation over last 10 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

      b.   Detroit Police Command Officers Association Employees
          i.   FAC (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

      c.   Detroit Police Officers Association Employees
          i.   FAC (average base compensation over last 10 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

      d.   Detroit Police Lieutenants and Sergeants Association Employees
          i.   FAC (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

2.      Actual time for benefit accrual is actual time served.  For vesting service,  1,000 hours in a 12 month period to earn a  year of service.

3.      Normal Retirement Age

      a.   Detroit Fire Fighters Association Employees
          i.   age 52 with 25 years of service

      b.   Detroit Police Command Officers Association Employees
          i.   age 50 with 25 years of service, with 5 year transition period to be determined by the City

      c.   Detroit Police Officers Association Employees
          i.   age 52 with 25 years of service

      d.   Detroit Police Lieutenants and Sergeants Association Employees
          i.   age 50 with 25 years of service, with the following 5 year transition period:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 43 and 20 years |

| | |
|---|---|
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

4.     10 Years of Service for vesting.

5.     Deferred vested  pension -- 10 years of service and age 55.

6.     Duty Disability  - consistent with current PFRS

7.     Non-Duty Disability – consistent with current PFRS

8.     Non-Duty Death Benefit for Surviving Spouse – consistent with current PFRS

9.     Duty Death Benefit for Surviving Spouse – consistent with current PFRS

10.    COLA

    a.  Detroit Fire Fighters Association Employees
        i.  no COLA

    b.  Detroit Police Command Officers Association Employees
        i.  1% compounded, variable

    c.  Detroit Police Officers Association Employees
        i.  no COLA

    d.  Detroit Police Lieutenants and Sergeants Association Employees
        i.  1% compounded, variable

11.    DROP Accounts

    a.  Detroit Fire Fighters Association Employees
        i.   no future payments into DROP.

    b.  Detroit Police Command Officers Association Employees
        i.  available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements.  No more than 5 years of DROP participation for employees not already in DROP. DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible.  If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.

    c.  Detroit Police Officers Association Employees
        i.  no future payments into DROP.

    d.  Detroit Police Lieutenants and Sergeants Association Employees
        i.  available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements.  No more than 5 years of DROP participation for employees not already in DROP. DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible.  If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.

12.    Annuity Savings Fund

    a.  Detroit Fire Fighters Association Employees
        i.  no future Annuity Savings Fund contributions.

    b.  Detroit Police Command Officers Association Employees
        i.  voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%.  No in-service withdrawals permitted.

    c.  Detroit Police Officers Association Employees
        i.  no future Annuity Savings Fund contributions.

    d.  Detroit Police Lieutenants and Sergeants Association Employees
        i.  voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%.  No in-service withdrawals permitted.

13.    Investment Return/Discount rate – 6.75%

14.    City Contributions

    a.  Detroit Fire Fighters Association Employees
        i.  11.2% of the base compensation of eligible employees.  A portion of such contribution (not less than 1% of base compensation) will be credited to a rate stabilization fund.

    b.  Detroit Police Command Officers Association Employees
        i.  12.25% of the base compensation of eligible employees.  A portion of such contribution will be credited to a rate stabilization fund.

c. Detroit Police Officers Association Employees
   i. 11.2% of the base compensation of eligible employees. A portion of such contribution (not less than 1% of base compensation) will be credited to a rate stabilization fund.

d. Detroit Police Lieutenants and Sergeants Association Employees
   i. 12.25% of the base compensation of eligible employees. A portion of such contribution will be credited to a rate stabilization fund.

15. Employee Contributions – Employees hired before July 1, 2014 (current actives) will contribute 6% of base compensation (pre-risk shifting); employees hired on or after July 1, 2014 (new employees) will contribute 8% of base compensation (pre-risk shifting). Maximum employee contributions of 10% (current actives) and 12% (new employees).

16. Risk Shifting:

a. If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable).

b. If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until the actuary can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:

   i. eliminate COLAs (if applicable);
   ii. use amounts credited to the rate stabilization fund to fund accrued benefits;
   iii. increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees) for up to 5 years;
   iv. increase employee contributions (active and new employees) by an additional 1% per year;
   v. increase employee contributions (active and new employees) by an additional 1% per year;
   vi. implement a 1 year COLA fallback;
   vii. implement a second 1 year COLA fallback;
   viii. increase employee contributions by an additional 1% per year; and
   ix. increase City contributions consistent with applicable actuarial principles and PERSIA.

# EXHIBIT 6G – EXCERPTS FROM CERTIFICATE OF SERVICE (NOTICE OF HEARING)

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

In re:                                              Chapter 9

City of Detroit, Michigan,                          Case No. 13-53846

            Debtor.                                 Hon. Steve W. Rhodes

_____/

## CERTIFICATE OF SERVICE

I, Lydia Pastor Nino, certify and say that I am employed by Kurtzman Carson Consultants LLC (KCC), the claims and noticing agent for the Debtor in the above-captioned case.

On February 28, 2014, at my direction and under my supervision, employees of KCC caused to be served the following documents via Overnight mail on the service list attached hereto as **Exhibit A**, for subsequent distribution to beneficial holders of the securities listed on **Exhibit B**; and via First Class mail to the parties on the service lists attached hereto as **Exhibit C**, **Exhibit D**, **Exhibit E**, and **Exhibit F**:

- **Notice of Hearing to Consider Approval of Disclosure Statement with Respect to Plan for Adjustment of Debts of the City of Detroit** [attached hereto as **Exhibit G**]

- **First Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment** [Docket No. 2755]

Dated: March 4, 2014

                                        /s/ Lydia Pastor Nino
                                        Lydia Pastor Nino
                                        KCC
                                        2335 Alaska Ave
                                        El Segundo, CA 90245
                                        Tel 310.776.7386

1353846140305000000000011

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Damond Jackson | | P.O. Box 380231 | | | Clinton Twp | MI | 48038 | |
| Dampier, Johnnie B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Damron , Reginald | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Damuth, Randall M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Damuth, Randall M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Damuth, Richard M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Damuth, Stephanie A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dan Guyer | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dan Harris Iii | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dan Pincheck | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dana Robinson, Sr. | Robert A. Canner, P.C. | 24423 Southfield Rd., Ste. 200 | | | Southfield | MI | 48075 | |
| Danclovic, John T | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dancy, Ethel | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dancy, Jazmine N | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dancy-walker, Kimb | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dancy-Walker, Kimberlee R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dandridge, Horace | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dandridge, Iola J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dandridge, Maurice | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dandridge, Patricia D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Danels, Frederick | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daney, George R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Danforth, Albert | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Danforth, Paul A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Danforth, Sylvia E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Danforth-Brown, Tara | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DAngelo, Joseph J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dangelo, Lauretta | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Dangelo, Todd | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Danich, Christine | | 8095 Rathbone St | | | Detroit | MI | 48209-1924 | |
| Daniel B Hoard Md PLLC | Attn Accounts Payable | 27211 Lahser Rd Ste 101 | | | Southfield | MI | 48034 | |
| Daniel Beels | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel C Nunnery | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Dupuis | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel E Manville Atty | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel E. Gold | | 191 Presidental Blvd., #304 | | | Bala Cynwyd | PA | 19004 | |
| Daniel Familant | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel G Romano PLLC | Attn Accounts Payable | 26555 Evergreen Ste 1500 | | | Soutfield | MI | 48076 | |
| Daniel Hubbard | | 23110 Ranch Hilldre | | | Southfield | MI | 48033 | |
| Daniel J Blank | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Chapp | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Clapp | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Reid | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Salkowski | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Watson | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Jr., Clifford | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Jr., Joseph S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Jr., Ralph | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Lin Md | Attn Accounts Payable | 27450 Schoenherr Ste 500 | | | Warren | MI | 48088 | |
| Daniel Lin Md | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Mapps | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Plocharczyk | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel R. Irvin | | 27 Paine Avenue | PO Box 252 | | Prides Crossing | MA | 01965 | |
| Daniel T Schaecher | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Thomas Ray | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Torres | Andreapoulos and Hill, PLLC | 28900 Woodward Ave | | | Royal Oak | MI | 48067 | |
| Daniel V Padilla PLLC | Attn Accounts Payable | 1821 W Maple Rd | | | Birmingham | MI | 48009 | |
| Daniel Woitulewicz | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Zegrofus | Law offices of Jeffrey Appel | 26000 West Twelve Mile Rd | | | Southfield | MI | 48034 | |
| Daniel, Andrea | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Andrea N | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Salathea Jackson | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salathiel, Jeanne | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salavaggio, Gusssie | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salazar Jr., David | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salazar, David | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salazar, David | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salazar, Mark A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salcedo, Roger M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salcido, Eduardo | | 9123 Lafayette Blvd | | | Detroit | MI | 48209-1748 | |
| Saldana, Danny M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saldivar, Ruth S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saleem, Virginia B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saleh, Basma | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saleh, Basma R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saleh, Saleh | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salem | Law Department | PO Box 75002 | | | Salem | MI | 48175 | |
| Salem A Salamey | Canzano, Roger | Court House Services | 2595 Lapeer Rd, Auburn Hills | | Auburn Hills | MI | 48033 | |
| Salem, Steve | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salene S. Stewart | | 2526 Harding | | | Detroit | MI | 48214 | |
| Salene S. Stewart | City of Detroit Law Department | 2 Woodward Ave., Ste. 500 | | | Detroit | MI | 48226 | |
| Salene S. Stewart | Salene S. Stewart | City of Detroit Law Department | 2 Woodward Ave., Ste. 500 | | Detroit | MI | 48226 | |
| Salerno, Constance | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sales, Loraine | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salha, Hatem | | 8050 W Vernon | | | Detroit | MI | 48209 | |
| Saliim, Khalil | | PO Box 44542 | | | Detroit | MI | 48244-0542 | |
| Salim, Jessie K | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salim, Kumbi K A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saline | Law Department | 100 North Harris Street | | | Saline | MI | 48176 | |
| Salisbury, Cedric | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salisbury, Christophe | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salisbury, Lawanda | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salisbury, Shannon M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salisbury, William M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salkowski, Daniel J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sall, James F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sall, Kelly | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sallador, Eddie S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sallee, Calvin | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sallee, Muriel G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sallie M Jones | | 4413 W Philadelphia St | | | Detroit | MI | 48204 | |
| Sally C Spain | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sally, Betty J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sally, Carolyn J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salo, Danial A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salo, Keith A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salo, Norman A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salomone, Joseph V | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salon Hott Topiq | | 19520 James Couzens Fwy | | | Detroit | MI | 48235-1934 | |
| Salt Mine Church | | 13432 E Mcnichols Rd | | | Detroit | MI | 48205-3424 | |
| Salt, Morton | | 123 Wacker Drive | | | Chicago | IL | 60606 | |
| Salter, Louise | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salter, Nachona | | 16815 Stout St | | | Detroit | MI | 48219-3323 | |
| Salter, Virginia J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salters, Joann | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saltzman, Marshall | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salvaterra, Robert E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sam Bernstein Law Firm | Attn Accounts Payable | 31731 Northwestern Hwy., Ste 333 | | | Farmington Hills | MI | 48334 | |
| Sam Bernstein Law Firm | Attn Accounts Payable | 31731 Northwestern Hwy., Ste 333 | | | Farmington Hls | MI | 48334 | |
| Sam Lentine | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sam, Branson M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sam, Susan M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Hamilton, William | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, William P | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Yolanda Et Al | Mitchell, Karri | Law Office of Karri Mitchell | 21900 Greenfield Rd | | Oak Park | MI | 48237 | |
| Hamilton, Yolanda Y | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton-jackson, Angela | | 18230 Ashton Ave | | | Detroit | MI | 48219-2957 | |
| Hamilton-Smith, Sue | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamlet, James | | 19729 Gallagher St | | | Detroit | MI | 48234-1611 | |
| Hamlin, Jerry F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamlin, Jessica | | 14567 Indiana St | | | Detroit | MI | 48238-1742 | |
| Hamm, Jeffrey R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamm, Jeffrey R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamm, Lakenya L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamm, Raymond G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammell, John C | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammell, John D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammell, Stephen | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammer, Kent R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammerick, Geraldine F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammerick, Ralph | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammerly, Marieta B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammerly, Michael | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Antonio D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Betty J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Deidrea | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Delores | | 14313 Faust Ave | | | Detroit | MI | 48223-3543 | |
| Hammond, Detra F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Jacquelyn | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Ladell | | 7232 Bramell St | | | Detroit | MI | 48239-1053 | |
| Hammond, Margaret A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Marian | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Reginald | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Richard | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Rickey L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond, Sandra | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammond-mac Investments Llc | Nadis, Ronn S. | Couzens Lansky Fealk Ellis Roeder & Lazar PC | 39395 W 12 Mile Rd Ste 200 | | Farmington Hills | MI | 48331 | |
| Hammons, Mary | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammou, Azmi | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammoud, Sue | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamon, James W | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamood, Jamal J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamp Marzett | Attn Accounts Payable | 17740 Chandler Park Drive | | | Detroit | MI | 48224 | |
| Hampton , Carolyn | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hampton Jr., Henry B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hampton, Angela | | 17301 Livernois Ste#258 | | | Detroit | MI | 48221 | |
| Hampton, Carolyn | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hampton, Crystal | | 25657 Southfield Rd | | | Southfield | MI | 48075 | |
| Hampton, Crystal | James A. Lane | Michael J. Morse, P.C. | 24901 Northwestern Hwy, Ste 700 | | Southfield | MI | 48075 | |
| Hampton, Crystal | Mendelson, Marc J. | Michael J. Morse PC | 24901 Northwestern Hwy Ste 700 | | Southfield | MI | 48075 | |
| Hampton, Crystal | Morse, Michael J. | Michael J. Morse PC | 24901 Northwestern Hwy Ste 700 | | Southfield | MI | 48075 | |
| Hampton, D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hampton, Dwayne F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hampton, Gilbert | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hampton, Glenda | | 20100 Murray Hill | | | Detroit | MI | 48235 | |
| Hampton, Gordon | | | | | | | | |
| Hampton, Gordon | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hampton, Hurley S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hampton, Kahaila | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

In re: City of Detroit, Michigan
Case No. 13-53846
Page 336 of 2054
13-53846-swr Doc 13292 Filed 08/05/14 Entered 08/05/14 01:53 Page 215 of 226

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Majer, Maria Helen | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majeske, Arthur M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majeski Jr., Steve | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majeski, Sophie | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majewski, David | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majewski, Phillip B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majkowski, Sylvia | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major City Chiefs | Attn Accounts Payable | C/O Sergeant Larry Thorum | 315 East 200 South | | Salt Lake City | UT | 84111 | |
| Major City Chiefs | Attn Accounts Payable | C/O Sergeant Larry Thorum | Salt Lake City Police Department | | Salt Lake City | UT | 84111 | |
| Major L. Russell | | 15358 Rutherford | | | Detroit | MI | 48227 | |
| Major Taul | Attn Accounts Payable | 13652 Saratoga | | | Detroit | MI | 48205 | |
| Major, Garry | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Garry | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Isadore | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Latawnya | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Latawnya | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Latawnya J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Mattie | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Renetta | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majors, Virgil B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majur, Terrence J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makar, Marquerite | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makarewicz, Gregory J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makeba Simmons | | 22913 Cleveland | | | Dearborn | MI | 48124 | |
| Makee, Lois S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makela, James | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maki, Amy | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maki, Amy L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maki, Angela | | 16503 Avon Ave | | | Detroit | MI | 48219-4118 | |
| Maki, Raymond | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maki, Raymond A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makki, Al (recovery) | | 4510 Westland | | | Dearbon, | MI | 48126 | |
| Makowski, Claudia | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, Dennis | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, Dennis | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, Dennis J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, Raymond | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, William E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makulski, Richard S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malachi Graves | Grant & Busch | 26555 Evergreen Rd., Ste 860 | | | Southfield | MI | 48076 | |
| Malachowski, Chester G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malachowski, Daniel | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malachowski, Eugen | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malachowski, Eugene J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malallah, Mazin | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malas-Grover, Patrici | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malas-Grover, Patricia | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malcolmcarr, Joycelyn A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malcom, Dennis D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malden Express Llc | Attn Accounts Payable | 2021 E 52nd St Ste 101 | | | Indianapolis | IN | 46236 | |
| Malden Express LLC | Attn Accounts Payable | P.O.Box 361341 | | | Indianapolis | IN | 46236 | |
| Maldonado, Maria C | | 7330 Cahalan St | | | Detroit | MI | 48209-1829 | |
| Maldonado, Roberto A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maldonado, Silvano | | 8046 Vanderbilt | | | Detroit | MI | 48209 | |
| Malek, Tarek | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malfante, Elves | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malhalab, David | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malhalab, David L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malhoit, Dolores L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malie, Robert J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Richard A Seidel | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard Arthur Bullard | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard B Decker | | 1351 McCormicks Cir | | | Danville | IN | 46122 | |
| Richard Cadoura | Elias Muawad, Esq | Law Offices of Elias Muawad, PC | 36700 Woodward Ave, Ste 209 | | Bloomfield Hills | MI | 48304 | |
| Richard Davis | | 22578 East River Road | | | Grosse Ile | MI | 48138 | |
| Richard Feldstein Md Pc | Attn Accounts Payable | 214 E Park Ave | | | Savannah | GA | 31401 | |
| Richard Greenbaum | Attn Accounts Payable | Greenbaum, Richard | 1175 Ne 125th Ste | | North Miami | FL | 66161 | |
| Richard Hall | | 3752 Eastern Place | | | Detroit | MI | 48208 | |
| Richard Hall | | 7727 Bryden Street | | | Detroit | MI | 48210 | |
| Richard Hall | Richard Hall | | 7727 Bryden Street | | Detroit | MI | 48210 | |
| Richard J Gainer | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard J Janes | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard J Ruffini Dc Pc | Attn Accounts Payable | 24725 W 12 Mile Rd Ste 260 | Franklin Bank Business Ctr | | Southfield | MI | 48034 | |
| Richard J Ruffini Dc Pc | Attn Accounts Payable | 24725 W 12 Mile Rd Ste 260 | | | Southfield | MI | 48034 | |
| Richard J. Ehrlich, Attorney at Law | Zamler, Mellen, and Shiffman, P.C. | 23077 Greenfield Road, Suite 557 | | | Southfield | MI | 48075 | |
| Richard J. Ehrlich, Attorney at Law | | 23077 Greenfield Road, Suite 557 | | | Southfield | MI | 48075 | |
| Richard J. Surmont | | 1713 Hampton | | | Grosse Pointe Woods | MI | 48236 | |
| Richard Johnson El-Bey | | 10339 Curtis | | | Detroit | MI | 48221 | |
| Richard Johnson El-Bey | | 10339 Curtis Street | | | Detroit | MI | 48221 | |
| Richard Joseph Bratto | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard Jr, Arnett | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard L Warsh | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard Lee Muntz | | 201 N Squirrel Rd Apt 213 | | | Auburn Hills | MI | 48326 | |
| Richard Mack | Wolfgang Mueller, Esq. | 2684 West Eleven Mile Rd. | | | Berkley | MI | 48072 | |
| Richard Nichols | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard P Hathaway | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard R Sopha Ii | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard Randall | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard S Makulski | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard S Nichols Living Trust | Attn Accounts Payable | Trustee Craig Nichols | 6879 Chimeny Hill Drive #102 | | Bloomfield | MI | 48322 | |
| Richard T Rybak Jr | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard T. Shaw | | 62 Oakmont Lane | | | Jackson | NJ | 08527-4019 | |
| Richard T. Weatherly | Richard Weatherly | | 535 Meadowbrook St. | | Detroit | MI | 48214 | |
| Richard W. Van Saun | | 15812 75th Pl. W. | | | Edmonds | WA | 98026 | |
| Richard Weatherly | | 535 Meadowbrook | | | Detroit | MI | 48124 | |
| Richard Weatherly | | 535 Meadowbrook St. | | | Detroit | MI | 48214 | |
| Richard Weiss | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Brandon | | 25899 W. 12 Mile Rd. | Suite 220 | | Southfield | MI | 48034 | |
| Richard, Ethel | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Herbert O | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Herbert O | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Kevin C | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Lashawn | | 18400 Ashton Ave | | | Detroit | MI | 48219-2956 | |
| Richard, Mckenzie | | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| RiChard, Michael S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Michael Stephen | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Nevon T | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Paula Elaine | | 18633 -35 Schaefer Hwy | | | Detroit | MI | 48235-1755 | |
| Richard, Shalawna | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richardo Leslie | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richards , Ronald W | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richards, Barbara J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richards, Carl G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richards, Curtis A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richards, Curtis A | Zamler, Mellen & Shiffman, PC | Attn Paul Rosen | 23077 Greenfield Road | Suite 557 | Southfield | MI | 48075 | |
| Richards, Earl | | 18250 Plymouth Rd | | | Detroit | MI | 48228-1105 | |
| Richards, Edward A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richards, Elroy A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richards, Eric A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richards, Gayle E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

# **EXHIBIT G**

13-53846-swr   Doc 13290   Filed 08/09/19   Entered 08/09/19 10:13:05   Page 215 of
226
13-53846-tjt   Doc 2823-14   Filed 03/05/14   Entered 03/05/14 01:26:03   Page 1 of 5

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
------------------------------------------------------x
                                                      :
In re                                                 : Chapter 9
                                                      :
CITY OF DETROIT, MICHIGAN,                            : Case No. 13-53846
                                                      :
                                  Debtor.             : Hon. Steven W. Rhodes
                                                      :
                                                      :
------------------------------------------------------x
```

## NOTICE OF HEARING TO CONSIDER APPROVAL OF
## DISCLOSURE STATEMENT WITH RESPECT TO PLAN
## <u>FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT</u>

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On February 21, 2014 the City of Detroit, Michigan (the "<u>City</u>") filed the *Plan for the Adjustment of Debts of the City of Detroit* (Docket No. 2708) (the "<u>Plan</u>") and the *Disclosure Statement with Respect to Plan for the Adjustment of Debts of the City of Detroit* (Docket No. 2709) (the "<u>Disclosure Statement</u>") with the Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "<u>Bankruptcy Court</u>").

2.     On February 21, 2014, the City filed the *Motion of the City of Detroit for Approval of the Proposed Disclosure Statement* (Docket No. 2713) (the "<u>Disclosure Statement Approval Motion</u>").

3.      On April 14, 2014, the Bankruptcy Court will hold a hearing to consider whether the City's proposed Disclosure Statement contains adequate information.  The hearing will be at 9:00 a.m. Eastern time at 231 W. Lafayette Blvd., Detroit, Michigan 48226.  The hearing will take place before the Honorable Steven W. Rhodes, United States Bankruptcy Judge.

4.      The Bankruptcy Court may continue the hearing after this time and date without prior notice to the parties.  The City may modify the Disclosure Statement prior to the hearing, during the hearing or as a result of the hearing without further notice to the parties.

5.      IF YOU WISH TO OBJECT TO THE APPROVAL OF THE DISCLOSURE STATEMENT AND DO NOT STRICTLY FOLLOW THESE PROCEDURES, YOU MAY BE BARRED FROM OBJECTING TO THE DISCLOSURE STATEMENT AND YOU MAY NOT BE HEARD AT THE DISCLOSURE STATEMENT HEARING.

6.      Any objection or response to approval of the Disclosure Statement must be filed with the Bankruptcy Court on or before April 1, 2014.

7.      The City shall file and serve a consolidated reply to all objections or responses to approval of the Disclosure Statement on or before April 4, 2014.

8.      Copies of the Disclosure Statement Approval Motion; the Disclosure Statement, Plan and all amendments thereto; and related documents are available

on the internet, free of charge, at http://www.kccllc.net/Detroit and

http://www.detroitmi.gov/EmergencyManager.aspx.

9.      In addition, copies of the Disclosure Statement Approval Motion; the

Disclosure Statement, Plan and all amendments thereto; and related documents are

available upon request by contacting Kurtzman Carson Consultants at City of

Detroit Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska

Avenue, El Segundo, CA 90245 or by telephone at (877) 298-6236.

LAI-3209398v2

13-53846-swr    Doc 13230   Filed 08/09/19   Entered 08/09/19 10:13:05   Page 218 of
226
13-53846-swr    Doc 2823-14   Filed 03/05/14   Entered 03/05/14 01:26:03   Page 4 of 5

Dated:  February 28, 2014

Respectfully,

 /s/  Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT 6H – EXCERPTS FROM CERTIFICATE OF SERVICE
## (NOTICE OF PLAN CONFIRMATION)

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 9 |
| City of Detroit, Michigan, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

_____/

## AMENDED CERTIFICATE OF SERVICE

I, Lydia Pastor Nino, certify and say that I am employed by Kurtzman Carson Consultants LLC (KCC), the claims and noticing agent for the Debtor in the above-captioned case.

On or before December 16, 2014, at my direction and under my supervision, employees of KCC caused to be served the following document via First Class mail on the service lists attached hereto as **Exhibit A** and **Exhibit B**:

- Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit and (II) Occurrence of Effective Date [Docket No. 8649]

Furthermore, on December 22, 2014, at my direction and under my supervision, employees of KCC caused the following documents to be served via Overnight mail on the service list attached hereto as **Exhibit C**, for subsequent distribution to beneficial holders of the securities listed on **Exhibit D**; via First Class mail to the parties on the service list attached hereto as **Exhibit E**; and via Email on the service list attached hereto as **Exhibit F**:

- Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit and (II) Occurrence of Effective Date [Docket No. 8649]

Dated: January 5, 2015

/s/ Lydia Pastor Nino
Lydia Pastor Nino
KCC
2335 Alaska Ave
El Segundo, CA 90245

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| DANGERFIELD, CLAUDE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Danich, Christine | | 8095 Rathbone St | | | Detroit | MI | 48209-1924 | |
| Daniel B Hoard Md PLLC | Attn Accounts Payable | 27211 Lahser Rd Ste 101 | | | Southfield | MI | 48034 | |
| Daniel Beels | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel C Nunnery | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel C Nunnery | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Dupuis | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel E Manville Atty | | 1715 Whitegate Ln | | | East Lansing | MI | 48823-2278 | |
| Daniel E. Gold | | 191 Presidental Blvd., #304 | | | Bala Cynwyd | PA | 19004 | |
| Daniel Familant | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel G Romano PLLC | Attn Accounts Payable | 23880 Woodward Ave | | | Pleasant Rdg | MI | 48069-1133 | |
| Daniel Hubbard | | 23110 Ranch Hill Dr E | | | Southfield | MI | 48033 | |
| Daniel J Blank | C/O Steven Doughrity | 30150 Telegraph Rd, Ste 444 | | | Bingham Farms | MI | 48025 | |
| Daniel J Chapp | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Clapp | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Reid | | 821 Milwaukee St | | | Detroit | MI | 48202 | |
| Daniel J Salkowski | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Salkowski | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel J Watson | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Jr., Clifford | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Jr., Joseph S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Jr., Ralph | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Lin Md | | 27450 Schoenherr Ste 500 | | | Warren | MI | 48088 | |
| Daniel Lin Md | Attn Accounts Payable | 27450 Schoenherr Ste 500 | | | Warren | MI | 48088 | |
| Daniel Lin Md | Michele Smyt | Billing & Collections | MI Neuro (Ophthalmology) | 27450 Schoenherr Rd, Ste 500 | Warren | MI | 48288 | |
| Daniel Mapps | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Plocharczyk | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel R. Irvin | | 27 Paine Avenue | PO Box 252 | | Prides Crossing | MA | 01965 | |
| Daniel T Schaecher | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel T Schaecher | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Thomas Ray | | 15717 E Cherry Pk Dr | | | Northport | MI | 49670-0462 | |
| Daniel Torres | Andreopoulos and Hill, PLLC | 28900 Woodward Ave | | | Royal Oak | MI | 48067 | |
| Daniel V Padilla PLLC | Attn Accounts Payable | 1821 W Maple Rd | | | Birmingham | MI | 48009 | |
| Daniel Woitulewicz | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel Woitulewicz | | 15600 Carlisle | | | Detroit | MI | 48205 | |
| Daniel Zegrofus | Law offices of Jeffrey Appel | 26000 West Twelve Mile Rd | | | Southfield | MI | 48034 | |
| Daniel, Andrea | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Andrea N | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Asia M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, CARL | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Cheryl D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, CHERYL D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, CLIFFORD JR. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Eric M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, ERIC M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Joseph | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, JOSEPH | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, JOSEPH S JR. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Joyce R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Joyce R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, JOYCE R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Lamont | | 2155 Eastlawn St | | | Detroit | MI | 48215-2650 | |
| Daniel, Linda | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Linda | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Maiysha N | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, MAIYSHA N | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Malkia | | 7240 Mettetal St | | | Detroit | MI | 48228-3646 | |
| Daniel, Marlene J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Marlene J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, MARLENE J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Michaline | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, MICHALINE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, RALPH JR. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Reneathia | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Reneathia | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, RENEATHIA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, SCOTT | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Scott R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Sharon | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| DANIEL, SHARON | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Daniel, Sheila E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Sain, Phillip | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saine, Kevin | | 12136 Abington Ave | | | Detroit | MI | 48227-1116 | |
| Saint Clair | Law Department | 547 N Carney Drive | | | St Clair | MI | 48079 | |
| Saint Eward, Beverly | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SAINT EWARD, BEVERLY | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saiyad, Ashifali M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saiyad, Ashifali Numi | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SAIYAD, ASHIFALI NUMIRALI | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sajewski Jr, Richard | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SAJEWSKI, RICHARD J JR. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sajit, George | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saka, Tim T | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SAKA, TIM T | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sakinah Hanifa | | 23705 Walden Ct. | | | Southfield | MI | 48033 | |
| Salaam, Askia | | 25660 Catalina | | | Southfield | MI | 48075-1058 | |
| Salach, Robert F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALACH, ROBERT F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salad Bomb Dalite & Emporium | Attn Accounts Payable | 1411 Washington Blvd | | | Detroit | MI | 48226 | |
| Salathea Jackson | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salathiel, Jeanne | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALATHIEL, JEANNE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salavaggio, Gusssie | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALAVAGGIO, GUSSSIE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salazar Jr, David | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salazar, David | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salazar, David | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALAZAR, DAVID | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALAZAR, DAVID JR. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALAZAR, JENNIFER A. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALAZAR, JOSE R. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salazar, Mark A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALAZAR, MARK A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salcedo, Roger M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALCEDO, ROGER M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salcido, Eduardo | | 9123 Lafayette Blvd | | | Detroit | MI | 48209-1748 | |
| Saldana, Danny M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALDANA, DANNY M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saldivar, Ruth S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saleem, Virginia B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALEEM, VIRGINIA B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saleh, Basma | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saleh, Basma R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALEH, BASMA R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saleh, Saleh | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salem | Law Department | PO Box 75002 | | | Salem | MI | 48175 | |
| Salem A Salamey | Canzano, Roger | Court House Services | 2595 Lapeer Rd, Auburn Hills | | Auburn Hills | MI | 48033 | |
| Salem, Steve | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALEM, STEVE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salene S. Stewart | | 2526 Harding | | | Detroit | MI | 48214 | |
| Salene S. Stewart | City of Detroit Law Department | 2 Woodward Ave., Ste. 500 | | | Detroit | MI | 48226 | |
| Salene S. Stewart | Salene S. Stewart | City of Detroit Law Department | 2 Woodward Ave., Ste. 500 | | Detroit | MI | 48226 | |
| Salerno, Constance | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALERNO, CONSTANCE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sales, Loraine | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salha, Hatem | | 8050 W Vernon | | | Detroit | MI | 48209 | |
| Saliim, Khalil | | PO Box 44542 | | | Detroit | MI | 48244-0542 | |
| Salim, Jessie K | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALIM, JESSIE K | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salim, Kumbi K A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALIM, KUMBI K A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Saline | Law Department | 100 North Harris Street | | | Saline | MI | 48176 | |
| Salisbury, Cedric | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALISBURY, CEDRIC | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salisbury, Christophe | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALISBURY, CHRISTOPHER A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salisbury, Lawanda | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salisbury, Shannon M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salisbury, William M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALISBURY, WILLIAM M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Salkowski, Daniel J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| SALKOWSKI, DANIEL J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Sall, James F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Hamilton, Keith M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Keith M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, KEITH M | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Kirk | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, KIRK | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Levon R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, LEVON R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Lucius T | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, LUCIUS T | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Lydia | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, LYDIA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Marion | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, MARION | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Mary E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, MARY E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, MENYETTA D. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Michael | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Michael | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Michael A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, MICHAEL A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, PATRICIA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Rena | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, RENA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, RENEE D. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Robert L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, ROBERT L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Rogelio | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Rogelio R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, ROGELIO R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Rogelio R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Ronald G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Ronald G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, RONALD G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Ronald W | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, RONALD W | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Ronnie | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Shanita | | 21669 Thatcher St | | | Detroit | MI | 48219-2550 | |
| Hamilton, Sherwin A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Shiwanda | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Susanna | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, SUSANNA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Tanisha | | 15410 Wabash St | | | Detroit | MI | 48238-1532 | |
| Hamilton, Tracey L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, TRACEY L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Trevour | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, TREVOUR L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, William | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, WILLIAM | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, William P | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, WILLIAM P | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, WILLIE J JR. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON, YOLANDA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton, Yolanda Et Al | Mitchell, Karri | Law Office of Karri Mitchell | 21900 Greenfield Rd | | Oak Park | MI | 48237 | |
| Hamilton, Yolanda Y | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamilton-jackson, Angela | | 18230 Ashton Ave | | | Detroit | MI | 48219-2957 | |
| Hamilton-Smith, Sue | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMILTON-SMITH, SUE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamlet, James | | 19729 Gallagher St | | | Detroit | MI | 48234-1611 | |
| HAMLIN, ALVA N | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamlin, Jerry F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMLIN, JERRY F | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamlin, Jessica | | 14567 Indiana St | | | Detroit | MI | 48238-1742 | |
| Hamm, Jeffrey R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamm, Jeffrey R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMM, JEFFREY R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamm, Lakenya L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamm, Lakenya L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hamm, Raymond G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMM, RAYMOND G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMM, RECHELLE E. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| HAMMELL, JOHN | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Hammell, John C | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Major Taul | Attn Accounts Payable | 13652 Saratoga | | | Detroit | MI | 48205 | |
| Major, Garry | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Garry | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAJOR, GARRY | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Isadore | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAJOR, ISADORE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Latawnya | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Latawnya | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Latawnya J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAJOR, LATAWNYA J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Mattie | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAJOR, MATTIE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Major, Renetta | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAJOR, RENETTA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAJORS, VIRGIL | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majors, Virgil B | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Majur, Terrence J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAJUR, TERRENCE J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makar, Marquerite | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKAR, MARQUERITE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makarewicz, Gregory J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKAREWICZ, GREGORY J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makeba Simmons | | 22913 Cleveland | | | Dearborn | MI | 48124 | |
| Makee, Lois S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKEE, LOIS S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makela, James | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKELA, JAMES | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maki, Amy | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maki, Amy L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKI, AMY L | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maki, Angela | | 16503 Avon Ave | | | Detroit | MI | 48219-4118 | |
| Maki, Raymond | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKI, RAYMOND | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maki, Raymond A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKI, RAYMOND A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makki, Al (recovery) | | 4510 Westland | | | Dearbon, | MI | 48126 | |
| Makowski, Claudia | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKOWSKI, CLAUDIA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, Dennis | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, Dennis | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKOWSKI, DENNIS | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, Dennis J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKOWSKI, DENNIS J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, Raymond | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makowski, William E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKOWSKI, WILLIAM E | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Makulski, Richard S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MAKULSKI, RICHARD S | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malachi Graves | Grant & Busch | 26555 Evergreen Rd., Ste 860 | | | Southfield | MI | 48076 | |
| Malachowski, Chester G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MALACHOWSKI, CHESTER G | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malachowski, Daniel | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MALACHOWSKI, DANIEL | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malachowski, Eugen | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malachowski, Eugene J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MALACHOWSKI, EUGENE J | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malallah, Mazin | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MALALLAH, MAZIN | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malas-Grover, Patrici | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malas-Grover, Patricia | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MALAS-GROVER, PATRICIA | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malcolmcarr, Joycelyn A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malcom, Dennis D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MALCOM, DENNIS D | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Malden Express LLC | Attn Accounts Payable | P.O.Box 361341 | | | Indianapolis | IN | 46236 | |
| Malden Express Llc | Attn Accounts Payable | 2021 E 52nd St Ste 101 | | | Indianapolis | IN | 46236 | |
| Malden, Lance M | REDACTED | REDACTED | REDACTED | | | REDACTED | REDACTED | REDACTED | |
| Maldonado, Maria C | | 7330 Cahalan St | | | Detroit | MI | 48209-1829 | |
| Maldonado, Roberto A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| MALDONADO, ROBERTO A | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Maldonado, Silvano | | 8046 Vanderbilt | | | Detroit | MI | 48209 | |
| Malek, Tarek | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Rice, Ruth | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| RICE, RUTH | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Rice, Susan | | 5717 Hillcrest St | | | Detroit | MI | 48236-2105 | |
| Rice, Sydette | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| RICE, SYDETTE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Rice, William R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| RICE, WILLIAM R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| RICE, WILLIAM R JR. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Rice, Yvette Michelle | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| RICE, YVETTE MICHELLE | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Rice-Parker, Vickie R | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Rich, Clarence | | 5044 Lannoo St | | | Detroit | MI | 48236-2157 | |
| Rich, Donna | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Rich, Donna | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Rich, Jewel | | 16801 Washburn St | | | Detroit | MI | 48221-2844 | |
| Rich, Michelle | | 23855 Northwestern Highway | | | Southfield | MI | 48075 | |
| Rich, Wynter | | 5044 Lannoo St | | | Detroit | MI | 48236-2157 | |
| Richard A Hartsfield | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard A Keintz | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard A Seidel | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard A Seidel | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard Arthur Bullard | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard B Decker | | 1351 McCormicks Cir | | | Danville | IN | 46122 | |
| Richard Cadoura | Elias Muawad, Esq | Law Offices of Elias Muawad, PC | 36700 Woodward Ave, Ste 209 | | Bloomfield Hills | MI | 48304 | |
| Richard Davis | | 22578 East River Road | | | Grosse Ile | MI | 48138 | |
| Richard Drumb | | 5900 Lannoo | | | Detroit | MI | 48236 | |
| Richard Feldstein Md Pc | Attn Accounts Payable | 214 E Park Ave | | | Savannah | GA | 31401 | |
| Richard Greenbaum | Attn Accounts Payable | Greenbaum, Richard | 1175 Ne 125th Ste | | North Miami | FL | 66161 | |
| Richard Hall | | 8110 Wyoming Street | | | Detroit | MI | 48204 | |
| Richard Hall | Richard Hall | | 8110 Wyoming Street | | Detroit | MI | 48204 | |
| Richard Humphrey | | 1151 E. Grand Blvd. | | | Detroit | MI | 48207 | |
| Richard J Gainer | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard J Janes | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard J Ruffini Dc Pc | Attn Accounts Payable | 24725 W 12 Mile Rd Ste 260 | Franklin Bank Business Ctr | | Southfield | MI | 48034 | |
| Richard J Ruffini Dc Pc | Attn Accounts Payable | 24725 W 12 Mile Rd Ste 260 | | | Southfield | MI | 48034 | |
| Richard J. Ehrlich, Attorney at Law | | 23077 Greenfield Road, Suite 557 | | | Southfield | MI | 48075 | |
| Richard J. Ehrlich, Attorney at Law | Zamler, Mellen, and Shiffman, P.C. | 23077 Greenfield Road, Suite 557 | | | Southfield | MI | 48075 | |
| Richard J. Fhrlich, Attorney at Law | | 23077 Greenfield Road, Suite 557 | | | Southfield | MI | 48075 | |
| Richard J. Surmont | | 1713 Hampton | | | Grosse Pointe Woods | MI | 48236 | |
| Richard James Bowers Jr | | 19301 Burlington Dr | | | Detroit | MI | 48203 | |
| Richard Johnson El-Bey | | 10339 Curtis | | | Detroit | MI | 48221 | |
| Richard Johnson El-Bey | | 10339 Curtis Street | | | Detroit | MI | 48221 | |
| Richard Joseph Bratto | | 31 Oakdale Blvd. | | | Pleasant Ridge | MI | 48069 | |
| Richard Jr, Arnett | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard L Warsh | | 29566 Northwestern Highway Ste 120 | | | Southfield | MI | 48034 | |
| Richard L. Weiss, PhD | | 37899 W. 12 Mile, Ste. 250 | | | Farmington Hills | MI | 48331 | |
| Richard Lee Hairston | | 1996 Calvert St | | | Detroit | MI | 48206 | |
| Richard Lee Muntz | | 201 N Squirrel Rd Apt 213 | | | Auburn Hills | MI | 48326 | |
| Richard Mack | Wolfgang Mueller, Esq. | 2684 West Eleven Mile Rd. | | | Berkley | MI | 48072 | |
| Richard Nichols | | 4518 Elizabeth | | | Wayne | MI | 48185 | |
| Richard P Hathaway | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard R Sopha Ii | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard Randall | | 16217 Muirland | | | Detroit | MI | 48221 | |
| Richard S Makulski | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard S Nichols Living Trust | Attn Accounts Payable | Trustee Craig Nichols | 6879 Chimeny Hill Drive #102 | | Bloomfield | MI | 48322 | |
| Richard T Rybak Jr | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard T Rybak Jr | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard T. Shaw | | 62 Oakmont Lane | | | Jackson | NJ | 08527-4019 | |
| Richard T. Weatherly | H. Nathan Resnick | Resnick & Moss, P.C. | 40900 Woodward Avenue | Suite 111 | Bloomfield | MI | 48304 | |
| Richard T. Weatherly | Richard Weatherly | | 535 Meadowbrook St. | | Detroit | MI | 48214 | |
| Richard W. Van Saun | | 15812 75th Pl. W. | | | Edmonds | WA | 98026 | |
| Richard Weatherly | | 535 Meadowbrook | | | Detroit | MI | 48124 | |
| Richard Weatherly | | 535 Meadowbrook St. | | | Detroit | MI | 48214 | |
| Richard Weiss | | 37899 W 12 Mile Rd Ste 310 | | | Farmington Hills | MI | 48331 | |
| Richard Weiss | Richard L. Weiss, PhD | | 37899 W. 12 Mile, Ste. 250 | | Farmington Hills | MI | 48331 | |
| RICHARD, ARNETT JR. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Brandon | | 25899 W. 12 Mile Rd. | Suite 220 | | Southfield | MI | 48034 | |
| RICHARD, CLABON J. | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Ethel | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Herbert O | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Richard, Herbert O | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| RICHARD, HERBERT O | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |