# EXHIBIT 5: ROUMELL AWARD

STATE OF MICHIGAN
DEPARTMENT OF LABOR & ECONOMIC GROWTH
MICHIGAN EMPLOYMENT RELATIONS COMMISSION
ACT 312, PUBLIC ACTS OF 1969 AS AMENDED

*In the Matter of:*

CITY OF DETROIT

-and-                                                    MERC Case No. D12 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

## PANEL'S FINDINGS, OPINION AND ORDERS

**George T. Roumell, Jr., Chairman**
**Craig Schwartz, Esq., Employer (City) Designee**
**Theodore Iorio, Esq., Union (DPOA) Designee**

APPEARANCES:

FOR THE CITY OF DETROIT:           FOR DETROIT POLICE OFFICERS
                                   ASSOCIATION:

Malcolm D. Brown, Attorney         Donato Iorio, Attorney

### Prologue

This Act 312 proceeding between the Detroit Police Officers Association (DPOA), who

represents approximately 2,000 Police Officers in the City of Detroit, and the City of Detroit

(City), began with the filing of an Act 312 Petition by the DPOA on June 22, 2012. After legal

and political issues concerning P.A. 4 and the duty to bargain were resolved, the Chairman was

appointed as the Arbitrator in this matter on August 23, 2012. After numerous meetings with the

Chairman, Last Best Offers were exchanged by the parties on October 3, 2012. Opening

statements were made by the parties on November 5, 2012 and hearings were held on November

16, 19 and 29, 2012, December 12, 13, 18, 2012 and on January 8, 11 and 12, 2013.

13-53846-swr   Doc 512-2   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 2 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 2 of
147

Following the City's presentation on financial ability, the DPOA presented John Bibish, along with comments of its attorney, Donato Iorio, concerning the City's financial ability at the January 12, 2013 hearing. In order to expedite the proceedings, the Chairman, with the consent of the Panel Members, in lieu of scheduling a subsequent hearing date, stated that the City should file a written response to the DPOA's January 12, 2013 financial ability presentation, which the City did on February 1, 2013, and amplified its response in its post-hearing brief.

The Chairman, pursuant to the request of the DPOA, made an Interim Award on most aspects of the health care issues and the parties filed briefs on the remaining issues on January 25, 2013. A decision on the remaining health care issues is still pending before the Chairman. After the Chairman makes a ruling on the remaining health care issues, the parties are to submit their final health care contract language to the Chairman and a meeting or telephone conference will be held regarding the contract language.

Post-hearing briefs were filed by the parties on all non-health care issues with the last brief being filed February 15, 2013.

Between the issues presented by the City and the DPOA, there are 146 issues in dispute. The issues will be listed when discussed by the Panel rather than separately at this point.

This is the Findings, Opinion and Award pursuant to Act 312 of Public Acts of 1969, as amended, based on the Petition filed by the Detroit Police Officers Association. Subsequent to the June 30, 2012 expiration of the Master Agreement between the City of Detroit and the Detroit Police Officers Association, on July 18, 2012 the City instituted the City Employment Terms (CET) with the Detroit Police Officers Association essentially stripping the previous terms of the expired Master Agreement, which represented 40 years of negotiations.

In doing so, even though apparently the City was acting pursuant to Public Act 4 of

2

13-53846-swr   Doc 512-2   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 3 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 3 of
147

Public Acts of 2011 and the Consent Agreement with the State, no attempt was made after March 2012 to negotiate even though the City had previously negotiated a Tentative Agreement with the DPOA dated February 9, 2012 which had the goal of saving approximately $6 million annually. The CET, for example, paid attention unnecessarily to such minor details as stripping funeral leaves to two days whereas universally, throughout Southeast Michigan, police contracts provided for three days which is reasonable when a Police Officer under the stress of daily dealing with crime loses a spouse or a child. And, in the big picture, attacking funeral leave is not where the savings are. But, in the Tentative Agreement of February 2012, the DPOA was willing voluntarily to address a suspension of a wage differential worth $332,000 per year as one example and an overtime issue worth $598,000 per year.

At the same time, the CET in the view of this Chairman, ignored a very fundamental cost issue.

Even in this Act 312 arbitration the DPOA, to some extent, recognized the City's financial crisis by a Last Best Offer for essentially the first four and one-half months of a 10% wage cut and then continuing of a previous no wage increase from 2008 levels, as the DPOA members have not received a wage increase since 2008.

The CET has been devastating on crime fighting in Detroit. The CET with its 10% wage cut from a previous no wage increase since 2008 brought about by any other name a demoralized Police force. The morale of the Detroit Police Officers by any standard is at an all-time low. As Gertrude Stein wrote in *Sacred Emily*, "A rose is a rose is a rose". The record reveals that ticket writing is at an all-time low. Arrests are at an all-time low. The Department is completely demoralized. This has all occurred since the CET. And this is taking place in a major American urban area where reputedly the homicide rate per capita is among the highest in the country,

3

where Police response times are lacking.

The reduced arrest and ticket writing has had a cascading effect on crime prevention as established by the enlightened successor to O.W. Wilson, namely, Chief Bracton of New York City and Los Angeles fame who pioneered the concept that more ticket writing and mundane misdemeanor enforcement creates an atmosphere of law abiding citizens. But Police morale in Detroit is at an all-time low impacting effecting law enforcement. And as this Chairman observes, the CET missed a major economic point while emasculating contract language without at least negotiating.

In addition, 146 issues have now been presented to the Act 312 Panel as there has now been a struggle between the City and the DPOA with the DPOA attempting to regain some of the provisions of the previous Master Agreement, with the City concerned about cost savings. The existence of 146 issues presented to the Act 312 Panel was most unusual, some 43 years after the enactment of Act 312 when arguably, even in Detroit's financial crisis, the critical issues, if there had been negotiations and this would apply to both sides, could have been narrowed down.

The Chairman recognizes that the financial crisis of Detroit will require reorganization, even within the Detroit Police Department, as has been the case in other major city police departments.

It is also true that the general employees have taken some big hits with furlough days. The Chairman is aware of this. But, during the hearings, a number of which were conducted in the offices of the DPOA, on the wall there were pictures of approximately 42 Officers since 1974 who were killed in the line of duty, two of which have been killed in the last three years. This does not include those who have been injured while on duty. Thus, being a Police Officer in Detroit, a large urban area with a substantial homicide rate and citizen concern about this rate and

4

crime in general, demands personal sacrifice.

In addition to the City's financial ability, an essential issue with the Detroit Police Department is that in the marketplace the Detroit Police Officers, with the CET wages, are paid below the marketplace. The DPOA attempts to use higher paid suburban departments and of course the higher paid Michigan State Police to compare. But, even if one compares Flint and perhaps Saginaw, financially distressed cities with Flint having an Emergency Financial Manager, the Detroit Police are underpaid.

Try as hard as the DPOA has done through its counsel to shift the financial ability focus, the City is running out of cash. The City is in financial crisis. There is no question about it.

On the other hand, the City needs Police Officers to survive and grow.

An effective Detroit Police force is essential to Southeast Michigan. Southeast Michigan is critical to the growth of the great State of Michigan. A Detroit Police force consisting of demoralized Officers not paid the marketplace will have trouble, as is evident today, serving effectively. It is just that simple. But the realities of the financial situation must be faced.

Throughout the hearings, the DPOA in particular, and at some times the Chairman, asked questions about the efforts being made by the City concerning efforts in collecting taxes that were made in the past and even currently. Yet, as Jan Lazar pointed out, the past is the past. The question that might be asked is what is going to be done currently and in the future? But, again, currently, the City is in financial crisis. The Chairman and Panel majority will prepare Findings, Opinions and Orders on this basis while recognizing that a demoralized Detroit Police Department, being paid substantially under the marketplace of even financially distressed cities in the area, does not serve the interests of the public as these are Detroit Police Officers that are necessary, even at the risk of their own lives, to protect the public interest of Detroit.

5

The aim of the Chairman, joined by one member or the other of the Panel to form a majority, is to frame Orders that will withstand challenge, help the City, Department and the Officers get back on track, deal with the current financial crisis, and set the foundation for more fruitful (for both the City and the Officers) negotiations in the near future.

It should also be noted that the Chairman, joined by the DPOA Delegate, crafts the Orders based on the proposition that the Master Agreement that expired on June 30, 2012 except as otherwise modified by the Orders herein is effective the date of these Findings, Opinion and Orders; and that the CET no longer applies.

## The History

The brief submitted by the current labor counsel of the City, though the Chairman and certainly the Union Designee do not agree with some of the editorial or advocacy statements therein, essentially gives the basic facts as leading to this Act 312 proceedings and are worth quoting in total and are as follows:

| | |
|---|---|
| September 18, 2009 | The City institutes a 10% pay reduction in the form of budget required furlough days for all employees, except uniform employees. These are implemented for non-union employees immediately. For union-represented employees, the furlough days are implemented when the union labor contracts expired if a mid-term modification could not be negotiated. ATU had an 8% pay reduction effective October 1, 2010 because furlough days would not work operationally for DDOT bus drivers. The City is seeking the additional 2% and is now in Fact-Finding required by Section 13(c) of the Federal Transit Act. See Exhibit 695 at xix. |
| 2010 | City of Detroit borrows $250M through issuance of Fiscal Stabilization Bonds. City grants second lien on State revenue sharing to secure the bonds. Ex. 451 at 8. |

6

| | |
|---|---|
| March 2011 | Passage of P.A. 4 |
| December 2, 2011 | State Treasurer Andy Dillon requests that Governor Snyder undertake a preliminary review of the financial condition of the City of Detroit pursuant to P.A. 4. See Ex. 404. |
| Mid-December 2011 | City begins negotiations with its labor unions for concessions to avoid upcoming cash crisis and possible appointment of an Emergency Manager under P.A 4. |
| December 21, 2011 | State Treasurer Andy Dillon issues a preliminary review of the City's financial condition, finding probable financial stress exists in the City of Detroit and recommends the appointment of a Financial Review Team by Governor Snyder pursuant to P.A. 4. See Ex. 405. |
| December 27, 2011 | Governor Snyder appoints a Financial Review Team. Ex. 406 at 7. |
| January 2012 | Furlough days are converted to an actual 10% wage reduction for non-union employees. Ex. 695 at xix. |
| January 2012 | Financial Review Team begins reviewing City financial condition. Ex. 406 at 1, 7. |
| February 2012 | City concludes discussions with DPOA, DPCOA, DPLSA, DFFA and other unions for concessions which are placed in separate documents for each union titled "Tentative Agreement". The Tentative Agreements are subject to and require approval by State Treasurer Andy Dillon. See Tentative Agreement between DPOA and City, Ex. 771 at page 1 (introductory paragraph). The Tentative Agreements would extend the labor contracts until June 30, 2015. |
| March 2012 | City of Detroit enters into a financing transaction (referred to as the Refunding Transaction) through the Michigan Fiscal Authority under which it will borrow $137M. This transaction will take several months (Summer, 2012) to actually close. See disc |

7

containing Refunding Transaction documents provided on February 6, 2013.

As part of the transaction, the City grants to bondholders a third lien on its State revenue sharing.

Part of the transaction documents provide that no loan proceeds can be advanced to the City of Detroit without the approval of the State.

Since the City is in desperate need of cash, the City, with State approval, enters into a short term bridge loan arrangement with Bank of America under which the City borrows $80M which is placed in an escrow account to be released only upon State approval. This loan will be repaid when the Refunding Transaction closes. See disc containing Refunding Transaction documents.

| | |
|---|---|
| March 26, 2012 | Report from Detroit Financial Review Team to Governor Snyder finding that Detroit is in a condition of severe financial distress as provided under P.A. 4 and that a consent agreement pursuant to P.A. 4 needs to be entered into between the City and the State. See Ex. 406 at 11-12. |
| Late March 2012 | State declines to approve Tentative Agreements entered into between the City and its various unions, including DPOA, because, according Brom Stibitz, Senior Policy Advisory to State Treasurer Andy Dillon, there was insufficient concessions to meet the needs of the City of Detroit and because the City's severe financial condition requires flexibility and the State refused to be bound by labor contracts that would not expire until June 30, 2015. Vol. 9, pp. 172-173. |
| April 4, 2012 | City of Detroit and State of Michigan enter into Financial Stability Agreement. Ex. 407. |
| | The Financial Stability Agreement ("FSA") provides for the establishment of the Financial Advisory Board ("FAB") which is to plan, implement and complete financial restructuring |

8

with the City of Detroit. Ex. 407 at 5.

The FSA provides for a Chief Financial Officer
and a Project Management Director. Ex. 407 at
16, 18.

Annex D of the FSA sets forth requirements for
labor contracts which includes:

- Uniformity
- Outsourcing
- Consolidation of operations
- Changes to support financial
  restructuring
- Maintaining the favorable concessions
  from the tentative agreements (note the
  testimony of Brom Stibitz at Vol. 9 at
  257 that the concessions in the
  Tentative Agreements were
  insufficient).

Pursuant to P.A. 4, upon execution of the
Financial Stability Agreement the duty to
bargain under PERA is suspended. However,
existing labor contracts continue in force until
their expiration. The FAB has no power under
the FSA and P.A. 4 to terminate existing labor
contracts.

| | |
|---|---|
| April 2012 | State approves the transfer of $30M of bridge loan proceeds from the Bank of America to the City so that the City can meet payroll, debt and other obligations. Ex. 451 at 19. |
| May 25, 2012 | Jack Martin hired as Chief Financial Officer. Vol. 9, pp. 257-258. |
| June 2012 | State approves transfer of an additional $20M from the Bank of America bridge loan proceeds so that Detroit can meet payroll, debt service and other obligations. Ex. 451 at 19. |
| June 22, 2012 | DPOA files Petition for Act 312 arbitration. Petition is stayed pursuant to P.A. 4 and the suspension of the duty to bargain under P.A. 4. |
| June 30, 2012 | DPOA labor contract and most other City labor contracts expire, except for DPLSA, DFFA, and |

9

13-53846-swr   Doc 512-2   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 10 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 10 of
147

the Emergency Service Operators ("ESO") in the Fire Department (expiration dates June 30, 2013). Note: DDOT and its labor contracts with the ATU and other unions are subject to Federal Transit Act Section 13(c) requirements. The Water and Sewerage Department and its labor contracts are subject to federal court control although payroll, benefits, and other related matters are administered by the City of Detroit.

June 30, 2012     City ends FY2012 with $1.9M in cash. See CAFR and see Ex. 451 at 19.

City is in violation of Act 51 by using $38.1M from the Street Fund for General Fund purposes. The City is required to repay this money to the Street Fund. Vol. 10, pp. 5-6, 15 and CAFR at 80.

July 9, 2012     Kriss Andrews hired as Program Management Director. Vol. 9, p. 105.

July 17, 2012     City implements City Employment Terms ("CET") for DPOA and separate CETs for each union that had a labor contract that expired on or before June 30, 2012. See CET applicable to DPOA, Ex. 401.

Furlough days for non-uniform union-represented employees are converted to an actual 10% wage reduction. See Ex. 695 at xx.

July 27, 2012     PFRS enters a judgment against City in Wayne County Circuit Court in the amount of $47M for past due pension plan contributions. Judgment payable with interest in 12 monthly installments. Ex. 455.

August 3, 2012     Michigan Supreme Court approves placement of ballot petition seeking repeal of P.A. 4 on the ballot for the November 6, 2012 election.

August 9, 2012     Board of State Canvassers enters ballot proposal on ballot.

Entry of ballot proposal for November 6, 2012 election suspends P.A. 4. However, actions

10

taken under P.A. 4 remain valid.

| | |
|---|---|
| August 2012 | City Refunding Transaction through State Fiscal Authority closes. |
| | $80M of bridge loan proceeds is repaid to Bank of America. |
| | At this time, City has actually received $50M of loan proceeds leaving $87M of loan proceeds available but subject to approval of State of Michigan before disbursement to the City of Detroit. |
| August 15, 2012 | MERC formally begins processing DPOA Act 312 Petition. |
| August 23, 2012 | George Roumell appointed as Act 312 Arbitrator. |
| October 3, 2012 | Parties exchange Last Best Offers. |
| November 6, 2012 | Voters repeal P.A. 4. |
| | PA 72 is revived. |
| | All actions taken under or pursuant to P.A. 4 prior to its suspension on or about August 9, 2012 remain valid. |
| December, 2012 | State approves transfer of an additional $10M of loan proceeds to the City of Detroit for payroll and other purposes. Ex. 451 at 20 and at fn. 1. |
| December 2012 | Governor appoints a Financial Review Team under P.A. 72n. Ex. 464, Attachment B. |
| December 2012 | City begins negotiations with non-uniform unions for additional 10% pay reduction in the form of furlough days. See Ex. 750. |
| December 21, 2012 | Interim Award on health care made by Arbitrator Roumell. A number of issues remained which were briefed on January 25, 2013. Once a ruling is made on the remaining issues, the parties will submit final healthcare contract language to the Arbitrator and oral |

11

|                   |                                                                                                                                                                                                                      |
|-------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                   | presentations will be made by telephone or in person regarding the contract language.                                                                                                                                |
| December 27, 2012 | Passage of Act 436 (new EFM law) effective March 28, 2013.                                                                                                                                                           |
| February 5, 2013  | City Council passes Resolution and Mayor Bing issues Executive Order for an additional 10% pay reduction in the form of furlough days for non-union employees to be effective February 11, 2013. Exs. 757 and 758. |
|                   | Bargaining continues with non-uniform union-represented employees for the furlough days.                                                                                                                             |
| February 8, 2013  | City seeks approval for an additional $20M of loan proceeds from the Refunding Transaction.                                                                                                                          |
|                   | If approved this will leave approximately $57M of loan proceeds. The State has indicated it will hold in reserve at least $57M of the loan proceeds in the event the State needs funds to assist an Emergency Financial Manager or for other purposes. |
| February 11, 2013 | Furlough days equivalent to a 10% pay reduction begin for non-union employees.                                                                                                                                       |

The DPOA through its attorneys filed lawsuits seeking, based upon the provisions of Act 312, to maintain the *status quo*, namely, the terms of the Master Agreement while the Act 312 was pending, but thus far the Courts have refused to maintain the *status quo* and the CET is currently in effect.

<u>The Criteria</u>

Act 312 of Public Acts of 1969, as amended, in Section 9 thereof sets forth the criteria to be followed by an arbitration panel. Act 116 of Public Acts of 2011 amended Section 9, which Section 9 as amended by Act 116 providing as follows:

> Sec. 9. (1) If the parties have no collective bargaining agreement or the parties have an agreement and have begun negotiations or

12

discussions looking to a new agreement or amendment of the existing agreement and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions, and order upon the following factors:

(a) The financial ability of the unit of government to pay. All of the following shall apply to the arbitration panel's determination of the ability of the unit of government to pay:

(i) The financial impact on the community of any award made by the arbitration panel.

(ii) The interests and welfare of the public.

(iii) All liabilities, whether or not they appear on the balance sheet of the unit of government.

(iv) Any law of this state or any directive issued under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, that places limitations on a unit of government's expenditures or revenue collection.

(b) The lawful authority of the employer.

(c) Stipulations of the parties.

(d) Comparison of the wages, hours, and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours, and conditions of employment of other employees performing similar services and with other employees generally in both of the following:

(i) Public employment in comparable communities.

(ii) Private employment in comparable communities.

(e) Comparison of the wages, hours, and conditions of employment of other employees of the unit of government outside of the bargaining unit in question.

(f) The average consumer prices for goods and services, commonly known as the cost of living.

(g) The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays, and other excused time, insurance and pensions, medical and

13

hospitalization benefits, the continuity and stability of employment, and all other benefits received.

(h) Changes in any of the foregoing circumstances while the arbitration proceedings are pending.

(i) Other factors that are normally or traditionally taken into consideration in the determination of wages, hours, and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration, or otherwise between the parties, in the public service, or in private employment.

(2) The arbitration panel shall give the financial ability of the unit of government to pay the most significance, if the determination is supported by competent, material, and substantial evidence.

Though the Act 116 amendment does require the Panel to give financial ability the most significance, the Legislature recognized that the Panel could consider other factors. The amendment also included the 9(1)(e) comparison with other employees of the unit of government outside of the bargaining unit in question. Obviously, the City wishes the Panel to consider the fact that other employees of the City, including union employees, have taken wage cuts in the 10-20% category.

There is the a(ii) interest and welfare of the public. In this case, this is an important consideration, namely, the fact that public safety is involved; that Detroit Police Officers are not writing tickets and arrests are not being made, which affects safety issues and therefore the interest and welfare of the public. Then there is 9(1)(h)(i), other factors. There is the so-called demoralized criteria and what this Chairman has many times referred to as the art of the possible criteria, namely, what is needed to avoid a demoralized Police force in a high crime area and what is the art of the possible? In this case, as pointed out, the approach of the CET and the failure to attempt to negotiate after March 2012 demoralized the Department, affecting the delivery of Police service. Then there is the art of the possible. What is possible to resolve this

14

dispute short of further disruption in the Department? These factors, when combined with the ability to pay, which is dominant in this situation, must be considered by the Panel in considering the proposals.

It must be recognized that the internal comparisons cannot be overlooked. The unionized general employees as well as union employees have taken a pay reduction by way of furlough days due to the financial emergency in Detroit. Another 24/7 operation in the City, the ATU, namely, the bus drivers, have taken an 8% reduction and are in fact finding for a remaining 2% reduction. These facts cannot be overlooked by the Panel in balancing the economic proposals. On the other hand, as already pointed out by the Chairman, Police work is inherently dangerous, suggesting that some recognition must be placed on this factor and the comparison of the marketplace for well trained Police Officers capable of dealing with crime prevention and intervention by reviewing the marketplace for Police Officers in Southeast Michigan by making comparisons with Police employment in comparable financially distressed communities while considering the financial emergency in Detroit and the financial sacrifices of other Detroit employees.

As already alluded to, the DPOA counsel attempts as a good advocate to have the Panel look to such communities as Birmingham, Livonia, Grosse Pointe, Sterling Heights, all communities with substantial fund balances, rather high pay, as well as the Michigan State Police whose top pay is in the $67,000 range. The City of Detroit, under financial stress, cannot afford those ranges because of financial problems. But, as the Chairman addresses wages, it is very difficult to suggest that the job of a Detroit Police Officer is not as difficult as a State Trooper or Police in the surrounding communities if not more so because of the nature of criminal activity in Detroit, only emphasizing that Detroit Officers are underpaid. Yet, there are two distressed

15

communities nearby whose wages, as will be pointed out, are above what the CET is suggesting that Detroit Officers should be paid, namely, Flint and Saginaw, which make the point.

Then the issue becomes one of priorities and the question of the interest and welfare of the public in Detroit that has one of the highest homicide rates per capita in the country. The Chairman, when turning to the issues, recognizing that the financial ability is "the most significant", also considered other criteria including the marketplace and the welfare of the public and the nature of Police employment including, as compared to other Detroit City employees as representative in the Southeast, the significant number of Detroit Police Officers who have been killed on duty as compared to Michigan State Troopers and other municipal police departments in Michigan.

Yet, the Panel must recognize that the civilian employees of the City of Detroit during Detroit's financial emergency have taken up to a 20% pay cut which, in evaluating the situation with the Police, the Panel cannot overlook.

Section 8 of Act 312 provides:

> **423.238 Identification of economic issues in dispute; submission and adoption of settlement offers; findings, opinion, and order.**
>
> Sec. 8. The arbitration panel shall identify the economic issues in dispute and direct each of the parties to submit to the arbitration panel and to each other its last offer of settlement on each economic issue before the beginning of the hearing. The determination of the arbitration panel as to the issues in dispute and as to which of these issues are economic is conclusive. The arbitration panel, within 30 days after the conclusion of the hearing, or within up to 60 additional days at the discretion of the chair, shall make written findings of fact and promulgate a written opinion and order. As to each economic issue, the arbitration panel shall adopt the last offer of settlement which, in the opinion of the arbitration panel, more nearly complies with the applicable factors prescribed in section 9. The findings, opinions and order as to all other issues shall be based upon the applicable factors prescribed in section 9.

16

Pursuant to this provision, certain of the issues presented by the parties have been determined to be economic issues requiring the Panel to adopt the Last Best Offer of one party or the other. Other issues have been determined not to be economic and as to those the Panel may formulate an order based upon the applicable factors prescribed in Section 9. As to each issue that follows, there will be a majority vote.

## City's Financial Ability

Detroit's poor financial health can be attributed to a number of factors. With hindsight, a careful observer could point to a number of things that the City's leadership should have been done differently. Today, however, the fact remains that the City is dangerously low on cash. Unfortunately, this situation is unlikely to change in the near term. While many drastic reform measures have been implemented, true reform does not happen overnight.

Over the past several decades, Detroit suffered from declining population and high unemployment. For these reasons, tax revenue has substantially declined. Since 1990, the City's population has declined by approximately 30%. In addition, unemployment has increased by roughly 200%. When the associated loss of income tax revenue is combined with recent decreases in state revenue sharing, it is not surprising that the City has experienced debilitating cash flow problems. Between property taxes, municipal income taxes, and wagering taxes, only wagering taxes have remained somewhat steady over the past six years. Since 2008, property tax revenue has decreased approximately 12% due to declining taxable property valuations and increasing charge-backs due to delinquency rates. Income tax revenues have declined due to lower taxable income of both residents and non-residents. While wagering tax revenues have remained steady, they are projected to decrease beginning in 2013 due to a loss of market share caused by a new casino in Toledo.

17

Declining population has also affected state revenue sharing. Since 2008, revenue sharing has decreased by approximately 30%. Between 2011 and 2012, revenue sharing declined from $239 million to $173 million. This startling decrease is primarily due to the population decline illustrated by the 2010 census. If Detroit continues to lose population, this amount will decline even further.

While Mayor Bing and his team can be applauded for effectuating large cost cutting measures, revenue has continued to decline faster than expenses. Because the City has issued debt to cover the significant shortfalls between revenue and expenditures, debt service costs have increased substantially. For example, debt service and POC expenditures are expected to increase from $126 million in 2008 to $151 million in 2013. Additionally, due to the growing number of retiree and legacy costs, the benefit and pension costs per active employee have jumped from $18,000 in 2000 to $28,000 in 2012. While reductions to the active workforce have occurred, the number of retirees and their associated costs are rising. These costs do not decline when headcount of active employees is reduced.

The City's cumulative unrestricted deficit indicates that the City is insolvent. Over the past five years, the City has run an average annual operating deficit of nearly $100 million. These large financial shortfalls have been addressed with long term debt issuances and drastic cost-cutting actions. Despite the receipt of loan proceeds from the issuance of new debt, cash balances have declined since 2008 due to large operating deficits. Even with the current cost saving measures, the city will have an estimated $110 million shortfall at the end of FY2013. Remaining proceeds from the August 2012 issuance of the "Refunding Bonds," together with remaining short term borrowings, are currently held in escrow and can only be used with State approval. The state has mandated that the city reduce cash outflow by between $30 million and

18

$45 million. In addition, the State may release some of the escrow funds; however, it is unlikely that the State will release more than $20 million by the end of FY2013. Even if the City fully reduces cash outflow by the stipulated amount and the State releases a portion of the escrow account, the city is still left with a $50 million to $60 million cash shortfall at the end of FY2013. Quite simply, the city could be out of cash.

In the past, the city has issued debt to cover such shortfalls, but due to recent debt downgrades, this is no longer possible. The City's credit ratings have been deteriorating rapidly and are at all-time lows. Currently, Detroit's credit ratings are below investment grade (junk status) and are lower than any other major US city. Since the beginning of 2012, Moody's has downgraded the City's credit rating from B2 to Caa1. Similarly, Fitch has downgraded the City's rating from B to CCC. According to Moody's November 2012 report, "[t]hese downgrades reflect the City's ongoing precariously narrow cash position and a weakened State oversight framework following the repeal of Public Act 4. ... The negative outlook ... is based on the rising possibility that the city could file for bankruptcy or default on an obligation over the next 12 to 24 months, the general uncertainty of the State oversight as challenges to Public Act 72 persist following the repeal of Public Act 4, and the City's ongoing inability to implement reforms necessary to regain financial stability." Furthermore, the City has nearly reached its legal debt limit. It is currently leveraged to 93% of its general obligation borrowing capacity. This illustrates that the City is no longer able to cover cash shortfalls with debt.

According to the McKenzie Group, there exists a $183 million income tax opportunity for the City. According to another, more conservative estimate created by DPOA witness John Bibish, approximately $54 million of income taxes are left on the table every year. Thus, the DPOA questions the City's performance of collecting income taxes over the years. In fact, the

19

income tax staff positions were reduced from 49 in 2009 to 32 currently. Of all the departments from which employees can be cut, the DPOA asks why make cuts from the group that collects the revenue?

Then, too, as the McKenzie Group and Bibish estimates are just that, a realistic income tax figure is not known.

According to Cheryl Johnson, the current computer system used in the Department of Finance has not been updated since 1998. However, the city has worked with Compuware to build an application that will allow the City to identify non-filer residents (those city residents who file with the IRS but failed to file with the City). The DPOA has indicated that uncollected income taxes could bolster the city's cash. To this effect, letters are currently being sent to resident non-filers. While the City has started the process to collect income taxes from resident non-filers, the success of such an initiative is uncertain.

According to Janet Lazar, an expert in city income taxes, collecting from non-filers will probably not be overly successful. This prediction is based on her observations of other Michigan cities, such as Highland Park. According to Lazar, the City's population is aging. Many of the City's residents receive pension benefits, Social Security, and other governmental assistance that are not taxable by the city. In addition, due to the low income status of many of the city's residents, the cost of collection could often exceed the amount owed. Furthermore, the collection of unpaid income taxes takes time, often in excess of one year. Unfortunately, the City is running out of cash and does not have the luxury of time.

According to Mr. Bibish, it does not need to take over a year to improve tax collections. To improve collections, the City should create work groups that are responsible for collection. For example, light duty police officers could be assigned to work with collection investigators.

20

13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 21 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 21 of
147

However, this suggestion is unlikely to work. The employees in the Income Tax Division belong to one of three unions in the treasury Department, the AFSCME, the Association of Professional and Technical Employees, or the Detroit Income Tax Investigators Association. Each union has a labor contract. The use of non-unit personal to perform bargaining unit work could be problematic.

The City should also devise a way to more effectively collect income tax from non-residents. According to Cheryl Johnson, letters are not being sent to non-resident non-filers because the city does not have data on non-resident non-filers. However, even if the City increased its efforts in this regard, there was testimony questioning the results because the tax rate of a non-resident is lower than that of a resident.

In order to increase income tax collections, Lazar has suggested that local income taxes be collected along with State income tax. This has worked in other states. It has worked in Michigan, too. When a pilot program was attempted in Albion, compliance increased significantly. In Albion, revenue increased 18% in the first year. An 18% income tax revenue increase in Detroit could be substantial. Despite its success in Albion, other cities refused to participate due to territorial disputes. The local tax divisions incorrectly claimed that the state would keep the revenue. They improperly compared the initiative to state revenue sharing. Just as state revenue sharing was cut, they claimed that the state would also keep the local tax revenue. However, this is a weak argument. By law, the local revenue must be given to the locality. Unfortunately, the argument was enough to scare many mayors.

While the City's financial information may appear to indicate that cash is available to pay police officers, certain restrictions often disallow such funds to be used for such purposes. For example, Mr. Bibish claims that there is approximately $68.1 million available in the Capital

21

Improvement Project Fund. This amount represents the Revised Free Balance from outstanding project balances. However, all the monies listed under Capital Projects Funds are special project funds raised from voter approved bond issues. The money can only be used for the specific purpose set forth in the bond issue. The City cannot transfer capital project funding to pay debt service for anything other than the project for which the debt was incurred. Therefore, the suggestion that the old capital projects should be closed out and the unused bond funds transferred to pay debt service for other projects is not possible.

Mr. Bibish has also suggested that too much has been budgeted for the 2013 Claims Fund. The official red-book budget for 2013 included a $100 million provision for the Claims Fund. In 2010 and 2011 respectively, only $70 million and $68 million were needed for claims. This indicates that there is approximately $31 million budgeted in excess over the amount needed in 2010 and 2011. If the administration originally thought $80 million was enough (the 2013 Executive Legal Budget only listed $80 million), why was the amount increased to $100 million? It may appear that $100 million may be excessive.

Nevertheless, had the State not released $10 million from escrow in December 2012, the city would have run out of cash. In addition, the only reason the City did not run out of cash in mid-2012 was because the City borrowed more money. Now, the City has borrowed all it can. Its credit rating has decreased to such a low level that additional borrowing is no longer possible.

In his brief, counsel for the DPOA questioned the priorities in the 2012-2013 budget. The Chairman will not go there, so to speak, for those are financial decisions. The City is obligated to provide fire fighting services, emergency medical services, street and sidewalk maintenance, recreation services, garbage pickup, waste disposal, legal defense and the list goes on. Hopefully, those who make the City's financial decisions will recognize the obvious – that

22

public safety is a major concern to the citizens of Detroit; that the issue is whether the Detroit

Police Officers are being compensated comparable with other distressed cities, given the hazards

of serving in a municipality such as Detroit and the responsibilities in controlling mounting crime

concerns in the community.

A State Financial Review Team consisting of financial experts following a review of the

City's finances concluded that the City's finances were in a crisis situation and so reported to the

Governor in the following letter dated February 19, 2013:

DATE:          February 19, 2013[1]

TO:            Governor Snyder

FROM:          Detroit Financial Review Team:
               Andy Dillon
               Darrell Burks
               Ronald E. Goldsberry
               Frederick Headen
               Thomas H. McTavish
               Kenneth Whipple

SUBJECT:       Report of the Detroit Financial Review Team

The Detroit Financial Review Team met on December 19th and 20th
2012, and January 3rd, 7th, 9th, 16th, 25th, and February 1st, 14th, and
15th 2013, to review information relevant to the financial condition of
the City of Detroit. Based upon those reviews, the Review Team
concludes, in accordance with Section 14(3)(c) of Public Act 72 of
1990, the Local Government Fiscal Responsibility Act, that a local
government financial emergency exists within the City of Detroit
because no satisfactory plan exists to resolve a serious financial
problem. Accompanying this report is supplemental documentation in
support of our conclusion.

Our conclusion is based primarily upon the following considerations:

1.    Cash Crisis. The City continues to experience a significant
      depletion of its cash. Projections have estimated a cumulative
      cash deficit in excess of $100.0 million by June 30, 2013,
      absent implementation of financial countermeasures. While the
      Mayor and City Council deserve credit for considering and, in
      some instances, adopting difficult financial reforms, those

23

**13-53846-swr**    **Doc 512-2**    **Filed 08/19/13**    **Entered 08/19/13 19:38:38**    **Page 24 of 46**
**13-53846-tjt**    **Doc 13152-2**    **Filed 10/29/19**    **Entered 10/29/19 09:55:40**    **Page 24 of**
147

reforms are too heavily weighted toward one-time savings and apply only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

2.   General Fund Deficits. The City's General Fund has not experienced a positive year-end fund balance since fiscal year 2004. Since that time, the General Fund has had cumulative deficits ranging from $155.4 million in fiscal year 2005, to $331.9 million in fiscal year 2009. The General Fund deficit was $326.6 million in fiscal year 2012. The primary methods by which City officials have sought to address these deficits has been by issuing long-term debt. While such an approach reduces the deficit in the year in which the debt is issued, it also reduces fund balance over time as debt service payments increase. Had City officials not issued debt, the City's accumulated General Fund deficit would have been $936.8 million in fiscal year 2012.

3.   Long-Term Liabilities. As of June 30, 2012, the City's long-term liabilities, including unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $14 billion. City officials have projected that over the next five years, the expenditures needed to fund certain long-term liabilities will total approximately $1.9 billion. However, City officials have not yet devised a satisfactory plan to address the long-term liability issue.

4.   Bureaucratic Structure. The City Charter contains numerous restrictions and structural details which make it extremely difficult for City officials to restructure the City's operations in any meaningful and timely manner. These restrictions include numerous steps and time periods which must be observed before certain proposed changes may be implemented and provisions which make it all but impossible to restructure municipal services.

Based upon the foregoing, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Section 14(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.

cc:   Dave Bing, Mayor
       Detroit City Councilmembers
       James Bolger, Speaker of the House of Representatives

24

---

[1] Pursuant to Section 14(3) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, a Review Team is required to report its findings to the Governor within 60 days of its appointment, unless the Governor specifies an earlier date or grants a one-time 30-day extension. This Review Team was appointed on December 18, 2012, and in accordance with statutory convention, 60 days thereafter was February 16, 2013, a Saturday.

However, Section 6 of the Revised Statutes of 1846, which applies to statutes and administrative rules, provides that "[i]n computing a period of days, the first day is excluded and the last day is included. If the last day of any period or a fixed or final day is a Saturday, Sunday or legal holiday, the period or day is extended to include the next day which is not a Saturday, Sunday or legal holiday." Therefore, this Review Team report is due on February 19, 2013.

Though counsel for the DPOA questioned the conclusions of the report, the Chairman and the City Delegate, based upon the record made before the Panel, including comments of the rating agencies and the financial information furnished, is in agreement with the Review Team's conclusions in that Detroit is in a financial crisis, having limited ability to pay.

There are ways to raise revenue from both residents who can afford to pay as well as non-residents. Here are the ideas because, without interfering with the political process, this Chairman believes that a Chairman in this situation must take some responsibilities and make some revenue raising suggestions:

1.  Instead of laying off or furloughing people in the Finance Section, the City should add to the Finance Section to aid in collecting taxes and in particular income taxes so that it can have agents that can go into the field and monitor the non-residents and particularly the following types of individuals:

    A.  All the lawyers advertising on the billboards on the freeways of Detroit because many of them, if not all, are earning income in Detroit, even though having offices out of Detroit. Whether they are trial lawyers or probate lawyers in the Circuit and Federal Courts, 36th District Courts or Probate Courts, they earn portions of their fees in Detroit;

    B.  There are lawyers that advertise that they are Social Security specialists who have offices outside of Detroit but earn their income in Detroit at the Social Security Administrative Tribunals;

    C.  There are labor lawyers who appear before the National Labor Relations Board in the McNamara Building and before MERC at Cadillac Place;

25

D.   There are lawyers that appear before State agencies in the Cadillac Place Building;

E.   There are doctors who have offices in Macomb County and in Grosse Pointe who are operating at St. John's Hospital whose operating rooms, on information and belief, are in Detroit, thereby earning substantial income in Detroit. There are doctors who operate at Sinai, Ford and the DMC.

F.   There are lawyers from New York, Philadelphia and Washington, D.C. that try cases in the Federal Court in Detroit. There are bankruptcy lawyers that come to Detroit. There are visiting athletic teams in three major sports who come to Detroit and earn income in Detroit. There are entertainers that come to Detroit and earn income in Detroit. One does not collect by just writing letters. One needs agents "out there".

2.   The City should contact Louisville, Kentucky and ask how Louisville collects income tax from non-residents who come to Louisville. It so happens that at a regional meeting of the National Academy of Arbitrators, two arbitrators, including Richard Block, told this Chairman of their experience of going to Louisville, Kentucky and arbitrating for a non-municipality and being contacted by the city and asked to pay city income tax for their efforts in the city of Louisville. One of them was arbitrating for General Electric. One told that he was "hit" for $33.00. The question is, how does Louisville get the information? This Chairman was hit by Big Rapids, Michigan for a day he spent in Big Rapids arbitrating.

Detroit, with the cooperation of the State, can prevail on the State legislature to enact two statutes requiring all businesses outside of the city limits, as well as within the city limits, to withhold City of Detroit income tax and also a non-discrimination act so that the employer will not discriminate against hiring City of Detroit residents because some employers might avoid hiring a Detroit resident to avoid the withholding requirement.

Another idea is to pass at least for a limited time (three or four years, if not longer) a sports ticket tax for hockey, baseball and football of $1.00 to $2.00. This would bring in upwards to $10 million annually. The events do receive Police protection at their athletic events. Detroit is in a financial crisis. People go to the Lions, Tigers and the Red Wings games. Particularly at the Tigers and Lions games, there is substantial Police presence. This modest

26

amount will not keep people away. And Detroit is in a crisis. This will help pay for needed Police services. Any resistance should be overcome. These are dire financial times. The Officers must be brought up to the marketplace.

Furthermore, the general employees cannot be expected to continue to sacrifice as they have been.

Jan Lazar is correct. The State should be collecting the City of Detroit income tax at least as to residents and to non-residents who are already identified as consistent filers. And when other non-residents are identified in a comprehensive investigation, the State should add them to the State collecting efforts. The Chairman recognizes that this may not be done until 2014, but it should be part of the long range effort.

Many of the above suggestions may not be able to be implemented immediately to address the current cash crisis. In this regard, the Chairman, concerned with restoring the Detroit Police Officers to a reasonable competitive pay rate and some long established benefits necessary to keep the Detroit Police Officers competitive and benefits used to control absences, the orders will provide for civilianization permitting the Department to employ Police Officers in jobs that require MCOLES certification and that other jobs now performed by Police Officers can be performed by civilians. This will permit the Department to serve citizens with fewer sworn Officers at the same level of Police services as now with Officers being paid at the market rate. Furthermore, if necessary, as was the case in Flint, some Officers may be laid off or the force can be reduced as a result of attrition due to retirements. With civilianization, this could impact the number of Officers available for street duty. Yet, there would be, if need be, less current costs to the City while restoring some benefits and paying Officers at least a competitive wage with the distressed cities.

27

In addition, in addressing the Issues, the Chairman has voted with the City Delegate to control some overtime costs. This approach gives significance to the financial ability in Detroit's situation while recognizing other Section 9 criteria, both in the short run and in the long run.

The Issues

Preliminary Comment

To repeat a refrain, the parties have submitted 146 issues for the Panel to decide. The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings. Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.*, the need for an efficient, effective Detroit Police Department. This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan. It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

28

Furthermore, if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced. Even so, both the counsel for the City and the DPOA are to be complimented for the fact that they were able to complete the hearings in record time despite the number of issues and to present their briefs in an extraordinarily accelerated time. Those who read this Opinion, if there ever is a Hall of Fame for Lawyers, should make these two counsel the first candidates because both have put in extraordinary efforts as had the two Panel Members. Nevertheless, in a 2013 Act 312, the Chairman will repeat there should not have been 146 issues nor should there have been a CET without an opportunity to bargain for, as the Chairman, as pointed out, it has bred a demoralized Police force.

Counsel mutually numbered the Issues. The Panel will follow the parties' numbering of the Issues, but the Issues will not be discussed in numerical order. In some cases, the Issues will be discussed in interest groups for convenience.

**The reference on each Issue to "*status quo*" is a reference to the language in the Master Agreement that expired on June 30, 2012. In addition, the references to the current contract are to the Master Agreement that expired on June 30, 2012.**

Issue No. 97 -        *Article 48 - Contract Duration*

It is appropriate to begin the discussion of the Issues with the length of the contract. Issue No. 97 addresses duration. The City maintains that this is an economic issue. The DPOA maintains that this is a non-economic issue. As a non-economic issue, the Panel can formulate a provision without accepting the Last Best Offer of either party. The Chairman, joined by the DPOA Delegate, accepts the DPOA's position that duration is a non-economic issue.

The City proposes that the Agreement run from July 1, 2012 to June 30, 2013. The

29

DPOA proposes that the Agreement run from July 1, 2012 to June 30, 2014. The Chairman appreciates that the parties have spent a great deal of time, effort and money in presenting this case.

Yet, by any standard, the City is in a dire financial crisis. The City is in need of a serious reorganization. This is a given. The Department is in the need of reorganization as part of the City's reorganization. On the other hand, by any definition, the CET as applied to the Police brought about a demoralized Police Department that affected the productivity of the Police and the public welfare, causing this Panel to have to deal unnecessarily with 146 issues, starting with resurrecting a Collective Bargaining Agreement that was a product of 40 years or more of negotiations and interest arbitration. It would seem, therefore, to the Chairman that to bring stability to the situation that there be a two year contract beginning on July 1, 2012 with an automatic re-opener on health care insurance and pension issues, with the automatic re-opener taking place on June 30, 2013 which is not too far away. This way, all of the other issues are established, including wages, longevity, transfer rights, seniority rights and the other issues that came before the Panel, including sick leave accumulation.

Health care and pensions are major issues that the parties will be obliged without the pressure of so many issues to review beginning June 30, 2013. The re-opener is automatic as to these two issues, though it is recognized that the health care insurance, because of the enrollment, continues until January 2014. Nevertheless, health care will be re-opened for discussion beyond the open enrollment ending January 2014. To repeat, the re-opener on June 30, 2013 for all pension issues and health issues will be re-opened automatically on June 30, 2013.

The Chairman has been joined by the DPOA Delegate in voting for a two year contract except that the DPOA Delegate dissents from a re-opener. The City Delegate dissents from a

30

13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 31 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 31 of
147

two year contract but would agree that if there is a two year contract he will vote for a re-opener as to pensions and health care.

| | |
|---|---|
| **Issue No. 1 - Economic -** | *Union Security - 2% Dues Collection Charge* |
| **Issue No. 5 - Economic -** | *Article 4 - Basis of Representation, Pay for Full-Time Union Officers* |
| **Issue No. 8 - Non-Economic -** | *Article 4.O - Basis of Representation, Pay for Grievance Committee* |

The Chairman, for discussion purposes, has grouped Issue Nos. 1, 5 and 8 together as the underlying principle applies. The City proposes to add a Section L to Article 3 whereby the DPOA would reimburse the City "an amount equal to 2% for all Union dues and service fees amounts remitted to the Union" which the DPOA opposes, as there is no such provision in the Master Agreement nor has there ever been such a provision in the parties' numerous past agreements.

As to Issue No. 5, presently the City pays the wages for the full-time release of the President, Vice President, Sergeant at Arms and Financial Secretary of the DPOA. Similarly, as to Issue No. 8, the City has been paying the salary and benefits for three Grievance Committee Members to be off two working days per week. The City proposes that the DPOA reimburse the City for the salary and benefits of the full-time DPOA Officers and the two working days off that the three Grievance Committee Members are off. The DPOA proposes the *status quo*.

The rationale of the City is that the 2% dues collection fee has been imposed on all City unions and that granting this provision would achieve uniformity consistent with the requirements of the Financial Stability Agreement.

In regard to reimbursement for Union Officers and the Grievance Committee Members, the City notes that it has ceased paying the wages and benefits of union officers for every union in the City that has expired labor contracts; that the cost per year for three Grievance Committee

31

Members is $296,000 per year; that the cost for four full-time Union Officers and three Grievance Committee Members is $691,096; that the cost to the City for all full-time Union representatives City-wide is $2,797,747; and that when the cost for part-time as well as full-time Union representatives City-wide is added, the grand total is $3,125,806.

The Chairman recognizes that this is a considerable amount of savings that cannot be overlooked in a financially distressed City of Detroit and the DPOA's $691,096 cannot be overlooked. However, there is a failure to recognize the unique circumstances of Police representation. Because of the nature of Police work, including physical contact with certain members of the public, Police Officers are sometimes charged with abuse of force requiring Police representation, including representation of Union Officers as well as legal counsel. This involves *Garrity* hearings where Officers are represented by both counsel and Union Officers as well as discipline hearings. There are other discipline proceedings in a quasi-military organization, putting an undue burden on the DPOA which is not as common in a civilian union.

Furthermore, though the ranks of the DPOA have been reduced, the representation needs continue. In addition, there is no showing that the 2% charge would save any appreciable sum of money for the City. There is no showing that the City has charged for deducting for charitable contributions. There is no showing that the City's payroll system is not already keyed to providing such deductions without additional appreciable costs. This has been a method of dealing between the parties for many years. Though the DPOA has approximately 2,000 individuals either paying dues or a service fee, with the cost of representation because of the nature of Police work and discipline issues in a quasi-military organization, its dues structure will have difficulty supporting the representation that the DPOA must provide.

Having said the above, however, in applying the art of the possible and recognizing the

32

13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 33 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 33 of
147

City's financial situation, the Chairman will agree with the City on Issue No. 8 and provide that if the DPOA wishes to have Grievance Committee Members receive two working days off per week, on any days off those days shall be at the expense of the DPOA, namely, their salaries and benefits for those days off shall be paid by the DPOA. This will amount to a savings of $296,000 per annum by the City and can be afforded by the DPOA. This represents a compromise, recognizes the City's financial situation, and it is up to the DPOA to adjust, if it so desires, its method of delivering services to its members. The DPOA must recognize that it is somewhat being treated differently than other unions in the City. But this is because of the nature of the members it represents and the cost associated with doing so, as explained by the Chairman.

As to Issue No. 5, the Chairman believes that the Order is unique to the Detroit Police Officers Association for the reason discussed in this portion of the Opinion. For this reason, the Chairman cautions that the Order as to Issue No. 5 or the Opinion that has been written by the Chairman as to Issue No. 5 should not be taken as a precedent as to the other uniform groups as their numbers and their situations are different and may or may not support the claim for full-time Union Officers as was made by the DPOA based on the numbers of Officers represented by the DPOA that were made to this Panel and the type of representation that was required to be made on a day to day basis.

The Union Delegate concurs with the Chairman as to Issue Nos. 1 and 5, but dissents as to Issue No. 8. The City Delegate dissents as to issue Nos. 1 and 5, but concurs with the Chairman as to Issue No. 8.

Issue No. 27 - Economic - *Article 12.A - Modify Funeral Leave*

Issue 27 pertains to the funeral leave provisions of Article 12. This is an economic issue. The City proposes that the number of leave days for funeral of immediate family members be

33

13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 34 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 34 of
147

reduced from three (3) to two (2). Additionally, the City proposes that leave days for funerals of immediate family members exceeding two (2) days only be extended to "a total of five (5) days to be charged against current sick leave..." Conversely, the DPOA proposes that the *status quo* be maintained, which would provide three (3) days of leave for the funerals of immediate family members. The language affording three (3) days of funeral leave has been in the contract between the City and the DPOA for a number of years. The City has put forth no convincing justification for a reduction in leave days for the funerals of immediate family members. Although legitimate, the cost savings associated with the City's proposal do not justify a reduction in leave days for funerals of immediate family members in light of added stress to officers. Indeed, reducing the historical funeral leave that the officers have had would add to the stress of an already highly stressful job at times of personal crisis. Furthermore, comparables to other cities indicate that the City's proposal, frankly, is below any of the listed police jurisdictions. Accordingly, considering the lack of significant, consistent cost savings and the comparables presented, the Chairman denies the City's requested changes to Article 12. The DPOA Delegate joins the Chairman in adopting the *status quo*. The City Delegate dissents.

| | |
|---|---|
| Issue No. 79 - Economic - | *Article 37 - Bonus Vacation Days - Eliminate* |
| Issue No. 40 - Economic - | *Article 14.D.4 - Overtime-Bonus Vacation Days - Did Not Work Roster* |
| Issue No. 47 - Economic - | *Article 22.A - Furlough Selection-Delete-Attach Bonus Vacation Days to Furlough Days* |
| Issue No. 49 - Economic - | *Article 25 - Emergency/Excused Leave Days-Relation to Sick and Bonus Vacation Days* |
| Issue No. 58 - Economic - | *Article 31.E.6 - Holidays-Bonus Vacation Days* |
| Issue No. 59 - Economic - | *Article 31.F.2 - Holidays-Bonus Vacation Days* |
| Issue No. 135 - Economic - Union Proposal - | *Article 22-Furlough Selection and Cancellation-Sell Furlough Time-Continue to Attach Leave Days and Bonus Vacation Days to Furlough* |
| Issue No. 142 - Economic - Union Proposal - | *Article 37-Bank and Pay Bonus Vacation Days* |

34

**Issue No. 116** - Economic - Union Proposal -    *Article 37-Bonus Vacation-Bonus Vacation Days Not Used to Excused Time or Comp Bank*

The above issues deal with bonus vacation days which are set forth in Article 37 of the

Master Agreement which in its entirety reads:

### 37. BONUS VACATION DAYS

Bonus vacation days are granted for unused current sick time. Officers who have accumulated a minimum of fifty (50) sick days including both current and seniority days and have a minimum of six (6) years of service on July 1st of each year will be credited with one-half (1/2) of the unused current sick time from the previous fiscal year up to six (6) days. An officer may request to take his bonus vacation days in any sequence (except when attached to a furlough as stated below) by submitting a request in writing to his commanding officer. This request will be reviewed for the availability of personnel by his commanding officer. Seniority will be a prime consideration when several officers request the same period of time off.

An officer shall be allowed to use up to three (3) bonus vacation days in conjunction with a furlough. The request to utilize bonus vacation days in this manner must be included in the leave day request. Bonus vacation days, when connected to a furlough, shall not be canceled unless the accompanying furlough is canceled. This article does not affect or limit the right of the Department to determine the number of employees assigned to work. Consequently, there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

The Department must insure that bonus vacation days are expended proportionately throughout the year and are not carried until the last months of the fiscal year; therefore, on April 1st, the commanding officer shall assign the remaining bon us vacation days at his discretion. Any request to utilize unused bonus vacation days in conjunction with a furlough scheduled during the months of April, May or June must be submitted to the commanding officer by April 1st or those bonus vacation days will be assigned.

Bonus vacation time shall be deducted from the member's bonus vacation bank before compensatory time shall be taken.

As the first sentence of Article 37 clearly indicates, bonus vacation days are linked to

"unused current sick time". In other words, bonus vacation days are granted as an incentive to

35

**13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 36 of 46**
**13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 36 of**
**147**

encourage an Officer's attendance.

The Department continues to be concerned with Officers who have absentee issues. This is the reason that the parties have negotiated an attendance program set forth in Article 36, namely, the D.P.D. 350 program. Absenteeism causes the Department overtime costs in that the Department on occasion finds it necessary to backfill for absent Officers on an overtime basis. Thus, when the City proposes in Issue No. 79 to eliminate bonus vacation days and suggests that it would save $1.2 million per year in the Police Department alone, the proposal ignores the cost of absenteeism.

The DPOA objects to eliminating Article 37, the bonus vacation days, and proposes that the *status quo* be maintained. This is an economic issue requiring the Panel to elect one of the parties' proposals. In the view of the Chairman, for the reasons already suggested, namely, absences add to the cost of the Department's operations, any savings resulting from the elimination of the Bonus Vacation Days program would be outweighed by the cost of backfilling because of absenteeism. Furthermore, the Bonus Vacation Day program has been a part of the Collective Bargaining Agreement between the DPOA and the City for a number of years. Considering the City has show no convincing reason justifying the elimination of the Bonus Vacation Days program, the Chairman decides to maintain the *status quo*. The DPOA Delegate joins the Chairman. The City Delegate dissents.

As to Issue No. 40, since a majority of the Panel is not eliminating bonus vacation days, bonus vacation days will be part of the Did Not Work Roster. Therefore, the City's Issue No. 40 will no longer be necessary and will be rejected with the DPOA Delegate voting with the Chairman on this rejection as the proposal would remove bonus vacation days from the Did Not Work Roster. The City Delegate dissents.

36

As to Issue **47**, the City's Last Best Offer proposes the elimination of language contained in Article 22.A regarding Bonus Vacation Days granted in connection with furlough days. The DPOA objects to the elimination of this language and supports maintaining the *status quo*. This is an economic issue with the Panel obliged to select one or the other Last Best Offer. Since a majority of the Panel, in addressing Issue No. **79**, opted not to eliminate bonus days, it follows that as to Issue No. 47 that the Chairman, joined by the DPOA Delegate, will opt to maintain the *status quo* as to Article 22.A since bonus vacation days shall remain in the Master Agreement. The City Delegate dissents.

Issue 49 makes reference to Article 25, "Emergency/Excused Leave Days". The last sentence of that Article in the first paragraph reads: "All excused days will be deducted from the member's accumulated sick bank and will consequently affect the accumulation of bonus vacation days." The City proposes to remove the phrase "and will consequently affect the accumulation of bonus vacation days". The DPOA proposes the *status quo*. The City's proposal was on the assumption that bonus vacation days will be eliminated. Since a majority of the Panel rejected the proposal to eliminate bonus vacation days, a majority of the Panel, namely, the Chairman and the DPOA Delegate, will vote to reject the elimination of the bonus vacation language from Article 25. The City Delegate dissents.

Issue No. 58 addresses Article 31.E.6 and the preparation and maintenance of holiday rosters and the elimination of the phrase "and up to three (3) bonus vacation days" as proposed by the City. The DPOA proposes the *status quo*. Since a majority, namely, the Chairman and the DPOA Delegate, have voted to maintain the bonus vacation days, the same majority rejects the elimination of the preparation and maintenance of holiday rosters, the language "and up to three (3) bonus vacation days", and will vote to maintain the *status quo* and keep the reference to

13-53846-swr   Doc 512-2   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 38 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 38 of
147

the three bonus vacation days in Article 31.E.6.d. The City Delegate dissents.

Issue No. 59 is similar to issue No. 58 in that Article 31.F.2 addresses Special Rules Affecting Rotation. The City proposes to delete from Article 31.F.2 the following language:

F.    Special Rules Affecting Rotation.

* * *

2.    **Employees on Furlough.** For purposes of this Article, a furlough period includes the customary five (5) attached leave days ~~and up to three (3) bonus vacation days~~. The furlough includes the holiday even if it should fall on the first day of the regularly scheduled furlough.

* * *

The language that the City proposed to delete is the strikeout language. The DPOA proposes the *status quo* and to keep the deleted language. Since the deletion assumes the elimination of the bonus vacation days and a majority of the Panel has opted to maintain the bonus vacation days, a majority of the Panel, namely, the Chairman and the DPOA Delegate, will vote to deny the request to delete the above language with the City Delegate dissenting.

As to Issue Nos. 135, 142 and 116, which are DPOA proposals, the DPOA has made the following proposals:

**DPOA**
**PROPOSAL NO. 116**
**Article 37 - Bonus Vacation Days**

**ARTICLE 37 (NON-ECONOMIC)**

Paragraph 3 of the current collective bargaining agreement shall be amended by addition the following proposed new language:

"**Effective July 1, 2012 any bonus vacation days not used by June 30 of each year, shall be automatically credited with an equivalent amount of "excused time" which will be placed in the officers compensatory bank.**"

38

## ARTICLE 22 (NON-ECONOMIC)

Paragraph G – Shall be amended as follows: "Effective with the first furlough draw after August 28, 2011, members may elect to sell up to one (1) week of furlough time (5 consecutive days) per furlough period. This shall not diminish the election to attach five leave days and up to three (3) Bonus Vacation Days in connection with the furlough. An election to sell furlough time shall be at the time of the furlough draw. Payment shall be made within thirty (30) days after the furlough draw.

## ARTICLE 37 - BONUS VACATION DAYS

Article 37, "Bonus Vacation Days," shall be modified upon issuance of this Award to provide that bonus vacation days that are not utilized during the fiscal year will be banked and paid at the rate of pay and rank at time of banking.

In regard to these proposals, the City's Advocate at pages 87 and 88 of his post-hearing brief writes:

3. **Union Issue No. 135 - Right To Attach Bonus Vacation Days To Furlough Days Even If Furlough Days Are Sold**

The City agreed to allow Officers to sell one week of furlough time. With this agreement Officers gave up their right to schedule time off using furlough time and agreed to be at work. It is inconsistent to allow that an Officer to then schedule leave days and bonus vacation days for the same time period.

Further, to allow the Officer to schedule up to eight consecutive days off even though he has sold his furlough time is unfair to others who want furlough time and maybe prevented from taking it because the employee continues to schedule leave time and bonus vacation time during that period. It is hard enough to schedule furlough time when an Officer has sold furlough days to take available vacation time for Bonus Vacation Days and leave days.

39

13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 40 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 40 of
147

4.  **The DPOA Wants The Right To Bank And Sell Any Bonus Vacation Days Not Utilized Within The Fiscal Year**

    This request should be denied for the following reasons:

    - Bonus Vacation Days were agreed upon because they had to be used and could not be paid out costing the City much needed cash. This is the premise upon which Bonus Vacation Days were agreed upon and placed in the Labor Contract. To now allow them to be paid out would violate the principle underlying this contract provision.

    - If police officers are allowed to bank and sell unused Bonus Vacation Days it will be costly to the City. It will cost the City $985,000 to payoff Bonus Vacation Days if all eligible officers bank and sell them. See Ex. 663.

    - In the Ability To Pay portion of this Brief the City made it clear it has no cash. To allow Police Officers to convert Bonus Vacation Days into paid days negatively affects the City's cash, cash which the City does not have.

5.  **Conversion of Bonus Vacation Time To Excuse Days To Be Placed In Officer's Compensatory Time Bank**

    The DPOA wants to convert any unused bonus vacation days to excuse time to placed in Officers' compensatory time bank. The City opposes this request for the following reasons.

    - At the present time bonus vacation days must be used or lost. It was negotiated as time off to be utilized during the fiscal year so that the problems of carryover would not exist. Further, they were negotiated such that they would be used and not cash out as compensatory time at retirement.

    - Allowing the conversion of bonus vacation days to compensatory time would allow the officer to have these days paid out as compensatory time bank at retirement. The City is trying to decrease the retirement leave bank payments it must make not increase them.

    - See cost implications set forth in the prior section. Ex. 663.

These proposals will add approximately $1 million annually in cost. Based upon the

City's fiscal condition, this is not the contract to add costs. The only reason the Chairman opted

with the DPOA Delegate to maintain the bonus vacation days is because the bonus vacation days

40

was an incentive to encourage good attendance and, for this reason, had the potential of not only being cost neutral but cost effective, *i.e.*, discouraging absences and, therefore, controlling overtime. Thus, the Chairman, with the concurrence of the City Delegate, will vote to reject Union Issue Nos. 135, 142 and 116. The DPOA Delegate dissents.

**Issue 50** - **Economic** -        *Article 27 - Police Reserves*

Issue 50 addresses Article 27 of the Collective Bargaining Agreement dealing with police reserves. The DPOA proposes to maintain the current language of Article 27 and keep the status quo. Conversely, the City, in its Last Best Offer, proposes the following modified language:

> The City may deploy Police Reserve Officers to assist on-duty police officers or to assist the Department by performing tasks that do not require MCOLES certification. These tasks shall be limited to traffic duty, crowd control, riding with a Police Officer if the Police Officer consents, school patrol, handling and assisting in handling abandoned vehicle, helping with special events and central events, issuing parking tickets, and taking police reports.

Since at least 1998, the current Article 27 language has been in the contract. The question of police reserves is always a difficult one for the Police unions and municipalities to negotiate to their mutual satisfaction. In Detroit, under the current contract language, which either was negotiated or awarded in a 312 arbitration, the parties have developed certain practices as to the use of police reserves. In the absence of any current negotiations on the issue, the City wishes to impose an employment term that the City may hire and deploy police reserve officers in a manner deemed appropriate by the Chief of Police. There is no evidence that the parties were negotiating to an impasse on this subject. Nor were they making any concrete proposals prior to this 312 arbitration proceeding to modify the existing practices. Based upon the lack of bargaining history, which suggests no need to change the current practice, the Chairman, joined by the DPOA Delegate, decides to adopt the *status quo*. Article 27 will continue to read:

41

13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 42 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 42 of
147

ARTICLE 27

In continuing its policy on police reserves, the City will in no event use police reserves to perform the essential core duties of bargaining unit members or to circumvent the holiday overtime and/or any other provisions of this agreement. Should a dispute over the deployment of reserves arise, the burden of proceeding and the burden of proof in any grievance/arbitration matter shall be on the Employer to establish by probative, objective evidence, that its use of reserves did not circumvent any provision of the collective bargaining agreement, and, but for the deployment of reserves, bargaining unit members would not have been used to participate in the particular event, duty, function, activity, etc.

Reserves cannot be assigned to ride with employees unless the employee consents. Reserves shall not ride with employees assigned to one person cars except in such situations that arise under Article 6.E.4.f. of this Agreement.

The City Delegate dissents.

**Issue No. 70 - Economic -** *Article 33 - Pension Provisions - City Right to Modify DB Plans*

In Issue 70, the City proposes the addition of new language to Article 33. The language of the City's proposed Article 33.X reads as follows:

The City reserves the right to modify, amend, and/or eliminate any and all aspects of its pension/retirement plan(s), unless prohibited by law.

The DPOA objects to the insertion of the City's proposed Article 33.X. This is an economic issue. The City's proposed Article 33.X is too open ended. When parties enter into a contract, they agree to be bound by the agreed upon terms. The proposed Article 33.X could serve to deny the DPOA of the agreed upon terms contained in the contract. Once orders are issued, they should be final and binding. Accordingly, the Chairman, joined by the DPOA Delegate, declines to adopt Article 33.X. The City Delegate dissents.

**Issue No. 85 - Non-Economic -** *Article 40.F - Miscellaneous-Service Weapon*

The City wishes to amend Article 40, Miscellaneous, Section F, as follows, represented by the strikeouts, suggesting that a weapon costs in excess of $600 and can be recycled:

42

13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 43 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 43 of
147

F.C.    Service Weapon.  All employees shall be provided at no charge
with their department-issued service weapon upon full service
retirement; provided, however, that no employee who retires
before July 1, 1995 shall be entitled to receive their Department
issued Glock semi-automatic weapon unless the employee has
been qualified with the Glock semi-automatic weapon for one
year as of the date of retirement.

            Effective July 1, 1989, this provision shall apply to employees
who take a 40 & 8 vested pension.

The Department may refuse to give employees their weapon for
good cause shown.

This has been designated as a non-economic issue by the parties.

The City is correct that the proviso should be eliminated because there are no Officers

now employed who would be subject to the proviso.  Except for eliminating the proviso, there is

no reason to change the language.  It has been in the parties' Master Agreement for some time,

including the provision for employees who can retire at 40 and 8.  For this reason, the Chairman,

joined by the DPOA Delegate, will vote to maintain the current language minus the proviso.  The

City Delegate dissents.  The language will now read:

F.      Service Weapon.  All employees shall be provided at no charge
with their department-issued service weapon upon full service
retirement.

Effective July 1, 1989, this provision shall apply to employees
who take a 40 & 8 vested pension.

The Department may refuse to give employees their weapon for
good cause shown.

**Issue No. 88** - Economic -    *Article 40.I - Miscellaneous-Correction of Overpayments and*
*Underpayments*

Issue No. 88 addresses Article 40.I of the Master Agreement which is entitled "Correction

of Overpayments and Underpayments."  The City wishes to delete the current language and

replace it with the following language:

43

13-53846-swr    Doc 512-2    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 44 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 44 of
147

> When by payroll error an employee is underpaid or overpaid, the City is
> expressly authorized to correct the underpayment or overpayment by
> payroll adjustment pursuant to applicable law. The City reserves the
> right to seek immediate recovery through appropriate legal proceedings.

Here, again, the Chairman is faced with no current history of bargaining. But the Chairman is faced with a contract provision that has survived at least two 312 arbitration proceedings, if not before. The whole idea of PERA is to bargain. When this Chairman remanded these proceedings back to bargaining, as permitted by Act 312, he was hoping that he would not be faced with provisions such as this to be decided as this is a provision that should have been resolved by the parties. As it is, this provision has obviously been resolved by the parties long ago, since it has been, there is no reason, in the view of this Chairman, to modify the contract language. Therefore, the Chairman, with the DPOA Delegate concurring, will reject the City's position and continue the language of Article 40.I in the Master Agreement. The City Delegate dissents.

**Issue No. 91** - Economic -  *Article 41.A - Wages-Additional Classification Payments*

As to Issue No. 91, which references Article 41.B of the Master Agreement, the City proposes the following language with the addition of "unless modified" and the strikeout "Beginning July 1, 200~~4~~8 through June 30, 2009":

> <u>Unless modified</u>, salaries for the following classifications will be
> maintained at the dollar differentials indicated for the term of this
> Agreement ~~beginning July 1, 20048 through June 30, 2009~~.

> 1.  **Communications Officer - Police Officer (Class Code 33-12-11)**
>
> | | |
> |---|---|
> | Start | $450 over starting salary of Police Officer |
> | After one year | $450 over starting salary of one-year Police Officer |
> | After two years | $450 over starting salary of two-year Police Officer |
> | After three years | $450 over starting salary of three- year Police |

44

|                 | Officer                                                  |
|-----------------|----------------------------------------------------------|
| After four years | $450 over starting salary of four-year Police Officer |
| After five years | $450 over starting salary of five-year Police Officer |

2. **Band Director - Police Officer (Class Code 33-12-14)**
   $821 over maximum of salary of Police Officer

3. **Assistant Supervisor of Motor Vehicles - Police Officer (Class Code 33-12-15)**
   $862 over maximum salary of Police Officer

4. **Police Data Processing Programmer - Police Officer (Class Code 33-12-26)**
   Minimum: $589 over maximum salary of Police Officer
   Maximum: $1,738 over maximum salary of a Police Officer

5. **Radio Maintenance Officer - Police Officer (Class Code 33-12-12)**
   $862 over maximum salary of a Police Officer

6. **Radio Systems and Planning Officer - Police Officer (Class Code 33-12-13)**
   $1,567 over maximum salary of a Police Officer

7. **Senior Police Data Processing Programmer - Police Officer (Class Code 33- 12-36)**
   Police Lieutenant salary

The DPOA agrees with this language which is in the Master Agreement except the DPOA does not agree with the addition of "unless modified" and the DPOA referenced *status quo* without mentioning striking the "beginning July 1, 2008" language. The Chairman, along with the DPOA Delegate would agree with striking the "unless modified" language because once an agreement is consummated it is the parties' agreement. If the parties want to modify it, that is up to the parties. As a housekeeping matter, the "beginning" language should be struck and the DPOA Delegate agrees that the language "beginning July 1, 2008 through June 30, 2009" should be struck because it is redundant and obsolete. On this assumption, in striking the words "unless modified", the Chairman and the DPOA Delegate adopts the DPOA's *status quo* language. The

45

# EXHIBIT A-1 (Part 2)

13-53846-swr   Doc 512-3   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 1 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 47 of
147

City Delegate dissents as he would include the "unless modified" language.

**Issue No. 106** - **Economic** - *Article 33 - Sick Leave-Restricted Duty Assignments in Discretion of City: Restricted Limited to One Year*

Issue No. 106 is a proposal by the City to limit limited duty for Officers who are not injured on duty or have illnesses not connected to injuries on duty, as contrasted to injuries obtained while on duty to serving in a limited duty capacity for one year. This Chairman is familiar with such a provision whereby the Department would be distinguishing as to limited duty between Officers injured on duty and non-injured on duty Officers as this Chairman was called upon by the Chicago Police Department and the Fraternal Order of Police Chicago Lodge No. 7 to issue an opinion dated February 18, 2013 on the same subject against a background of numerous opinions issued by arbitrators in Chicago on the subject.

The Opinion gives the history of the matter in Chicago. Here, in Detroit, the record reveals that there are upwards to 60 non-IOD limited duty Officers serving in a Department of 2,000 Officers. In contrast, in Chicago, in a Department of 10,000 Officers, there are approximately 220 such Officers. This does make the point. Time lines do encourage Officers to get well and get back to full duty. This is particularly important in economically difficult times when the services of all Officers are needed on full duty.

There are provisions for disability retirements. This proposal only applies to non-IOD Officers. It does not apply to injury on duty Officers. The DPOA proposed the *status quo*, namely, no limitation, and the City proposed the one year limitation. As the Chairman understands the City's offer, the one year limitation would begin effective the date of the Order. Furthermore, the Panel must choose one or the other offer. Recognizing that the City needs full-time duty Officers and there are provisions for disability retirement and it seems that one year is a

46

reasonable time to recover from a disability, the Chairman, along with the City Delegate, will accept the one year limitation. The DPOA Delegate dissented, maintaining that there should be no limitation. Thus, the Order of the majority would be a one year limitation for non-IOD injuries or illnesses. There is no limitation for IOD injuries or illnesses.

**Issue No. 45** - Economic - *Article 20 - Eliminate Educational Reimbursement*

The City has proposed that the educational stipend set forth in Article 20 under the conditions set forth therein, namely, that Officers can receive a maximum of $850 per fiscal year applied toward tuition in seeking a graduate degree from an accredited university, a maximum of $700 per fiscal year seeking an undergraduate degree, and $600 per fiscal year to be applied toward payment for participating in an employment development program be eliminated. The DPOA proposes to keep the *status quo.*

This provision has been in the parties' contract since 2000. It is similar to the provision that has been in union contracts throughout the City. The City in the current financial crisis in imposed contracts has eliminated the tuition reimbursement program throughout the City. In the Tentative Agreement the DPOA agreed to suspend the educational reimbursement until July 1, 2015.

In the overall scheme of economic benefits, this benefit has not been a major factor between the parties. In fiscal year 2011-2012, there were 43 requests of an average amount of $621 for a total of $26,716. In fiscal year 2009-2010, there were 97 requests of an average of $591 for a total of $57,365. This is an economic issue. The Panel is obliged to select one or the other Last Best Offer. It is a minuscule amount. Nevertheless, it is a saving and the DPOA at one time, in view of the current history of usage, was willing to suspend the payment for three years. The Chairman is aware of the circumstances of the Tentative Agreement which was

47

eventually rejected by the State. Nevertheless, this was the Tentative Agreement and gives some indication of what the parties would bargain on this issue, all other things being equal.

If this was the Last Best Offer of the DPOA, the Chairman would embrace it. But it was not.

Under the circumstances and with little usage and given the City history city-wide, the Chairman will join with the City Delegate and eliminate Article 20. The DPOA Delegate dissents.

<u>Issue No. 81</u> - Non-Economic -    *Article 40.A - Miscellaneous-Maintenance of Conditions-Eliminate*

The City proposes to eliminate Article 40.A, the Maintenance of Conditions clause, which reads:

> Wages, hours and conditions of employment legally in effect at the execution of this Agreement shall, except as improved herein, be maintained during the term of this Agreement. No employee shall suffer a reduction in such benefits as a consequence of the execution of this Agreement.

The DPOA proposes the *status quo.*

Under normal circumstances, to the Chairman, this would be a "no brainer" and the Chairman would opt to maintain such a clause. But, because of the City's financial crisis, there will be changes in the parties' Master Agreement as a result of this Act 312. In fact, as a result of the Tentative Agreement of February 2012, there were major changes. Thus, the Maintenance of Conditions clause under such conditions is not appropriate. Hopefully, this clause can return in the future. However, under current conditions, the Chairman reluctantly must vote to at least temporarily eliminate the clause and save it for future negotiations. The City Delegate joins with the Chairman in so voting. The DPOA Delegate dissents.

48

<u>Issue No. 84</u> - **Economic** -    *Article 40.E - Miscellaneous-Execution of Agreement Without Prejudice to Any Grievances, etc.*

Article 40.E in the Master Agreement reads:

> The execution of this collective bargaining agreement shall be without prejudice to any pending grievances, arbitration or other litigation except where the subject matter in dispute may be resolved herein.

The City proposes to eliminate this provision. The DPOA proposes the *status quo*.

This provision has been in the parties' Master Agreement for a number of years. To the Chairman, it is an end run to avoid pending disputes which the parties have chosen to resolve other than through negotiations or Act 312. If the parties had wished to resolve the grievances in negotiations or Act 312, they should have done so.

Having chosen not to do so, then the parties, as they have in the past, should rely on other procedures. It is for these reasons that the Chairman, joined by the DPOA Delegate, votes to keep the present language. The City Delegate dissents.

<u>Issue No. 83</u> - Economic -    *Article 40 - Miscellaneous-Savings Clause*

Article 40.D of the Master Agreement reads:

> **Savings Clause.** If any article or section of this Agreement or any supplement thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal, the remainder of this Agreement and supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section.

The City proposes to remove the clause "the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually" and replace it with the clause "the City shall in its discretion determine". The DPOA proposes the *status quo*.

The Chairman, along with the DPOA Delegate, agrees to keep the *status quo*. This is a

49

mutual contract. If a provision of the Agreement is held invalid, then the parties should mutually agree on a replacement. It is just that simple. The City Delegate dissents.

| | |
|---|---|
| Issue **No. 140** - Economic - **Union** Proposal - | *Article __ - Award of 20% of Savings from Reduction in Certain Benefits* |
| Issue **No. 114** - Economic - Union Proposal - | *Article 18-Leave Days-Pay 1 ½x for All Time on Restricted Weekends* |
| Issue **No. 136** - **Economic** - Union Proposal - | *New Rank of Corporal to be Established; Any Officer With 15 Years of Service Automatically Promoted to Corporal; 2% Increase* |
| Issue **No. 119** - Economic - Union Proposal - | *$500 Per Year For Cell Phone Use* |
| Issue **No. 125** - Economic - Union Proposal - | *$1,000 Bonus for All Officers* |
| Issue **No. 134** - Economic - Union Proposal - | *Field Training Officers 5% Increase in Wages* |
| **Issue No. 121** - **Economic** - Union Proposal | *Bank or Sell Furlough Time* |

The Chairman has grouped Issue Nos. 140 (Union Proposal), which is different than City Issue No. 140; Union Issue No. 114; Union Issue No. 136; Union Issue No. 119; Union Issue No. 125; Union Issue No. 134 and Union Issue No. 121 as a group. The reason that the Chairman has done so is that these proposals represent economic enhancement over the expired Master Agreement. The Chairman has already discussed the City's ability to pay. As this Opinion and Award is being written, a State Financial Review Team on February 19, 2013 issued a report confirming the Chairman's conclusion, along with the financial private agencies' conclusions, that the City of Detroit is in a financial crisis, to say the least. Thus, when the Chairman reviews Union Issue No. 140 and Issue Nos. 114, 136, 119, 126, 134 and 121, these are all issues that seek economic improvements of one sort or another that would be proffered in a situation where there was some semblance of an ability to pay.

The Chairman appreciates that as to Union Issue No. 140, an award of 20% of savings from reduction in certain benefits had its genesis in the Tentative Agreement of February 2012 and was no doubt the result of the give and take of bargaining. But that Agreement was rejected

50

by the State. The savings were necessary in order to arrive at an agreement in a critical financial situation. Seeking a Corporal rank is an attempt to get a pay raise where general employees are taking a pay reduction and the City is virtually, if not, insolvent. The Chairman acknowledges that this is an attempt to mirror what occurred with the Wayne County Deputies. But it is not in the cards at this time in Detroit because of the financial crisis which is the proposal represented by Issue No. 132 to provide a 2% increase for Officers with 15 years of service to be automatically promoted to Corporal.

Issue No. 119 provides for $500 per year for cell phone use. Again, this is a cost that the City cannot at this time afford.

Issue No. 125 represents a $1,000 bonus for all Officers – another cost that the City does not have the financial ability to provide.

As to a 5% increase for Field Training Officers, there are some departments that do provide a stipend for Field Training Officers such as, for example, Chicago. But, again, this Chairman with these financial difficult times in Detroit, with the amendments to Act 312 brought about by Act 116 emphasizing financial ability, if there was ever a case where financial improvements, absent compelling circumstances, can be made, this is the case. The proposals listed above, including one and one-half time pay for restricted weekends, fall in this category. This does not mean, in the Chairman's view, that there might be a situation where the marketplace might compel an economic improvement. But the cost associated with these proposals would impede the ability to maintain a competitive wage in these difficult financial times. For instance, the $500 per year cell phone payment and the $1,000 per year bonus just for the Police Officers is estimated to be $3 million. This is no small change.

If 50% of the Officers sold one week of furlough time, this would cost the Department

51

approximately $900,000.

There would be an additional cost for the time and one-half on the restricted leave day. In addition, this provision had been rejected by three Act 312 Arbitrators, including this Chairman. this Chairman in the mid 1990's in *Case No. D92 C-0554*, noted that the issues concerning restricted days should be resolved through the grievance procedure.

Second, in his August 2003 Act 312 Award, Arbitrator William E. Long rejected an identical proposal for three reasons:

- First, Arbitrator Long stated the language in the DPOA's LBO stating that if the Department restricts leave days for any command district, precinct or part thereof, no matter how small, that this counts toward one of the six restricted days for the entire Department was unreasonable. See Ex. 674, second exhibit, at 84. The Panel also noted that "there is concern with the fiscal impact of the provision in the last sentence, which in the view of the Panel majority, unnecessarily restricts management in managing its personnel needs and adds unnecessary costs." *Id.* at Ex. 674, second exhibit, at 87.

- Second, Arbitrator Long credited the City's analysis of the cost of this provision should they need to exceed the number of restricted days at between $154,000 and $218,000 each day. This is obviously an astronomical cost that the City cannot afford if it is required to restrict leave days for any kind of an emergency. See Ex. 674, second exhibit, at 86.

- Third, Arbitrator Long noted that there was no record evidence to support how a six day limit on the City's ability to restrict weekend days would be enough or appropriate. Ex. 674, second exhibit, at 86·87.

Arbitrator Richard Block rejected the proposal in his March 2007 Act 312 Award. See Ex. 674, first exhibit. Arbitrator Block found that the provision would be too costly, that the City needed flexibility concerning restricted days in the event of an emergency and that there was no need shown.

Like the Long and Block Awards, this provision continues to be too costly and there has been no need shown for a change, particularly in a financially distressed city.

It is for these reasons in the economic climate in Detroit that the Chairman must vote

52

13-53846-swr   Doc 512-3   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 8 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 54 of 147

along with the City Delegate to deny the DPOA's request as to Union Issue No. 140 and to deny the DPOA's request as to Issue Nos. 114, 136, 119, 125, 134 and 121. The DPOA Delegate dissents.

**Issue No. 124** - Economic - Union Proposal -    *Economic Promotion to Sergeant Based on Seniority Only*

The DPOA as to Issue No. 124 has proposed to add a provision that promotion to and through the rank of Sergeant shall be based on length of service therein and as defined length of service. The rationale for this proposal is that promotions in the Detroit Fire Department are by seniority only rather than examination as in the Police Department. The DPOA has not pointed to any comparable police department in Southeast Michigan or anywhere in the State of Michigan where Police Officers are not promoted by examination.

Furthermore, the matter of promotion in the Detroit Police Department has been in existence since the time the parties have been negotiating. There is no basis to change.

For this reason, the Chairman, along with the City Delegate will vote to deny this request. The DPOA Delegate dissents.

**Issue No. 115** - Economic - Union Proposal -    *Article - Legal Representation-Increase Amount to $300,000 for Legal Fees*

Article 28 is entitled "Legal Representation and Identification". Paragraph 5 of Article 28 provides:

> Effective July 2004 and each fiscal year thereafter, the City shall either defend or reimburse the DPOA and/or member for all legal expenses and fees incurred by the DPOA or member if the member is criminally charged and/or prosecuted for conduct that arises out of/or involved with the good faith performance of the official duties of the employee and the member is either exonerated or the criminal charges are dismissed. The City's obligation to defend or reimburse shall be capped at an amount of one hundred thousand dollars ($100,000) each fiscal year. The DPOA shall upon request provide documentation supporting a

53

claim for reimbursement.

The DPOA proposes that the amount be increased to $300,000. The City proposes the *status quo*. This is a cost item. As in this round of contract 312, the City opposes any increase in cost and is seeking reductions. This proposal would be costly.

In his brief, the City's Advocate notes, "With no demonstration that the $100,000 allotted per year has either been exceeded was ever close to being exceeded, there is no justification for a change in this provision." Furthermore, the City can elect to defend with its own counsel and, indeed, $100,000 can buy substantial services. Without a proven need for an increased amount, this Chairman, along with the City Delegate, will deny this request. The DPOA Delegate dissents.

**Issue No. 117 - Economic -Union Proposal -**      *Article 40-Miscellaneous - City shall provide DPOA members with all greater benefits provided to others*

The Union proposes a new Section L to Article 40 to read:

> The City shall propose DPOA bargaining unit members with all greater economic benefits awarded and/or provided to DPCOA, DPLSA and/or DFFA.

There is presently no such provision in the Master Agreement. This is sometimes known in labor parlance as a "favorite nation" clause.

The argument being made by the City is there should be no such provision. There has not been such a provision in the past. The City proposes that the *status quo* remain.

The Panel has put together a contract based upon the unique circumstances of Police work in Detroit and more specifically the work of the Detroit Police Officers – not the Command, not the Supervisors, not the Commanders, and not the Detroit Fire Department. Each of these units have different factors and in a reorganized and reconstituted City government may

54

be expected in each case to be reconstituted in order to respond to the economic realities of what will become a new Detroit. In the meantime, this Panel must address the needs and limitations involved with the Detroit Police Officers Association. This Panel is addressing the City's financial ability in conjunction with the public welfare of having Police protection. The marketplace for Police Officers, which is different than the marketplace, for example, of the DPLSA or the DPCOA and the art of the possible as to Detroit Police Officers when comparing with similarly situated police officers doing police work.

It is for these reasons that the Chairman, along with the City Delegate, will deny the requested addition of Section L to Article 40. The DPOA Delegate dissents.

**Issue No. 52** - **Economic** - *Article 30 - Modify Shift Differential*

Article 30 of the Master Agreement provides for shift differential, namely, if the tour of duty begins between 11:00 a.m. and 6:59 p.m., the rate of shift premium is 50¢ per hour. If the tour of duty begins between 7:00 p.m. and 3:59 a.m., the rate of shift premium is 60¢ per hour.

The City proposes to reduce the shift premium for the 11:00 a.m. to 6:59 p.m. period to 25¢ per hour and from 7:00 p.m. to 3:59 a.m. to 50¢ per hour, maintaining that this is an attempt to obtain uniformity with all bargaining units throughout the City; that this has been obtained with all the non-uniform units. The DPOA seeks to maintain the *status quo*.

There is no question that this reduction would result in a savings. But it fails to recognize that Police work does not lend itself to uniformity as might be suggested by the fiscal agreement. Here is why.

In his travels among police departments over the years, particularly in large municipalities, the Chairman has been led to believe that there are two major periods in a 24-hour period of high Police activities, namely, between 4:00-8:00 p.m. and at the time that bars

55

close which the Chairman is led to believe in Michigan is 2:00 a.m. And it is also recognized that criminal activity has a tendency to occur during hours of darkness. This is not always true, of course, but there is the tendency.

In addition, as a Police force grows older and is on permanent shifts as compared to rotating shifts, older Officers tend to use seniority to obtain positions on the day shift. The value of shift premiums, which usually are not available when there are rotating shifts, is to encourage some senior Officers to take the night shifts. Thus, there is a reason for shift differentials in Police work that does not apply to general employees in both the public and the private sectors.

In other words, the work of Police Officers on the afternoon and midnight shifts, by the nature of criminal activity, can be more demanding and the Department may wish to encourage a more experienced, older Officer to seek employment on the night shift by a reasonable shift differential that is not necessary to make available to employees in other types of work. Though there may be a cost savings in halfing the afternoon shift differential and in docking the night shift differential by 10¢, the nature of Police work and the need for experienced Officers in times of heavy Police activity, coupled with the fact that these shift differentials have been negotiated over a long period of time, even in a fiscal crisis, causes this Chairman to vote with the DPOA Delegate to maintain the current shift differential, namely, the *status quo*. The City Delegate dissents.

| | |
|---|---|
| **Issue No. 108** - Economic - Union Proposal - | *Article 33-Pension Benefits-2.2% Multiplier* |
| **Issue No. 109** - Economic - Union Proposal - | *Article 33.D.H-Pension-Include Banked Vacation and Sick Time in Pension Calculation* |
| **Issue No. 110** - Economic - Union Proposal - | *Article 33-Pension-Best 3 of 5 Years* |
| **Issue No. 111** - Economic - Union Proposal - | *Article 33-Pension-1.5% Escalator and Same for DROP Plan* |

The Chairman has grouped together Union Proposals represented by Issue Nos. 108, 109,

56

110 and 111. The DPOA and the City of Detroit entered into a Stipulated Act 312 Award in September 2011 concerning a pension multiplier and the loss of an escalator. What the DPOA proposes to introduce in Issue No. 111 is an escalator of 1.5%, to increase the multiplier from 2.1% to 2.2% (Issue No. 108), and by changing the years to be utilized in the final average compensation (Issue No. 110) from the last 60 months prior to retirement to the best three of the last five years, and to include banked vacation and sick time in average final compensation (Issue No. 109), which the City argues is contrary to the Stipulated Act 312 Award in September 2011 and is designed to alter that Award. The City introduced a report dated January 8, 2013 from actuary Joseph Esuchanko as Exhibit 741 that set forth the cost of these proposals as follows:

Increase multiplier from 2.1% to 2.2%: $8.5M

Include longevity again, plus all banked vacation and sick leave time in AFC: $103M

Change the definition of Average Final Compensation from last 60 months to highest three years of the last of five years: $8.6M

Reinstitution of longevity, inclusion of banked vacation and sick time and change in years of Average Final Compensation if all were granted: $19.5M

Add 1.5% per annum pension escalator: $40.4M

Cost to increase multiplier, change Average Final Compensation to highest three of five years, include vacation and sick banks and add 1.5% annum pension escalator: $73.2M. See Report, Ex. 741 at 11.

After setting forth this cost analysis, the City's Advocate at page 70 of his brief concludes:

In view of the stipulated Act 312 Award in September 2011 and the City's current financial condition, awarding the DPOA any of its proposed pension proposals is totally and completely unwarranted. Furthermore, considering that the City has already borrowed $1.5B (the POCs) to fund the pension, any more liability is simply unwarranted.

The Chairman agrees that with the City's financial situation and the fact that only a year

57

previously the DPOA stipulated to the changes referenced in the Stipulated Act 312 Award of September 2011, this is not the time to make the changes sought . For this reason, the Chairman, concurred in by the City Delegate, will vote to reject the DPOA's proposals as to Issue Nos. 108, 109, 110 and 111. The DPOA Delegate dissents.

**Issue Nos. 95 and 96 - Economic -** *Article 46-Pension Board to Provide Information to City;*
*City Right to Change Board*
Issue No. **120** - **Economic - Union Proposal -**      *Article 46-Pension Board-Add Two DPOA*
*Representatives*

The parties have two competing issues as to the Pension Board. The DPOA proposes to have the right to add two Trustees elected to the Police and Fire Pension Board. Presently, the Pension Board's composition has a 50/50 representation as a result of an Act 312 decision by Arbitrator William Long and then confirmed by Arbitrator Ken Frankland as a result of the September 2011 Stipulated Award. Although there was testimony by DPOA President Diaz suggesting that the Commander representative favored management, with the Long and Frankland Awards favoring the current composition and the method in the contract for breaking ties, there is no persuasive reason to overrule previous arbitrators on this issue.

For this reason, the Chairman, along with the City Delegate, will vote for the *status quo.* The DPOA Delegate dissents.

As to Issue No. 95, this issue is the opposite of Issue No. 121 and is an attempt to change the composition of the Board proposed by the City by eliminating the deadlock mechanism implemented by Arbitrator Long in *Case No. D01 D-0568* and to provide in Paragraph L language "The City reserves the right to change the composition structure and decision making procedures of the Pension Board". The Chairman, joined by the DPOA Delegate, will vote for the *status quo.* The City Delegate dissents.

58

13-53846-swr    Doc 512-3    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 14 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 60 of
147

As to Issue No. 96, except with the elimination of the reference to the CET and replacing it with the word "order", which is housekeeping language, the Chairman, joined by the City Delegate, will adopt Issue No. 96 which provides as follows:

> M. Within fifteen (15) days of the effective date of this CET, the Pension Board shall provide to the Mayor and City Council all pension plan documents, including but not limited to: Plan Documents, Plan Amendments, Favorable Determination Letters (Pension Only), Summary Plan Descriptions, All Summaries of Material Modification, Model Enrollment Forms, Insurance Contracts, All Funding/Actuarial Reports, All Explanations provided to Participants/Employees such as "Benefits at a Glance" and/or other summaries. The Pension Board shall provide to the Mayor and City Council all future amendments to any such documents within five (5) days of the amendment.

This seems to be a reasonable provision as, since the City is supplying funds for financing the pension obligations, the City is entitled to the pension documents as set forth in the above provision and Paragraph M should be incorporated into Article 96 of the Master Agreement.

Issue No. 123 - Economic - Union Proposal -        *Article 40-Miscellaneous-Canine*

Article 40.K of the Master Agreement provides:

> K. Canine. With respect to any assignment made to Canine (K-9) on or after July 1, 2007, the City may, at its discretion, direct the member on said assignment to return all departmental dogs under the age of five and all departmental equipment to the department at such time as that member is no longer assigned to Canine.

The DPOA proposes to replace Section K as follows:

> Paragraph K - Deleted to reflect the fact that DPOA bargaining unit members retiring from and/or leaving the canine unit will be permitted to keep their canine.

There is no evidence that there was bargaining over this provision. The City proposes to keep the *status quo*, making the return of equipment optional at the discretion of the Department

59

for dogs under the age of five. This provision was in the Master Agreement as a result of negotiations. There is a cost, although minor, in the scheme of things. But, with the lack of negotiations, even on the remand, the Chairman will not vote to modify the Master Agreement. This is a matter that should be negotiated between the parties. For this reason, the Chairman will vote with the City Delegate to maintain the *status quo*. The DPOA Delegate dissents.

**Issue No. 28** - **Economic** -   *Article 13.A and B - Off-Duty Court Appearance-2x Straight Time*
**Issue No. 29** - **Economic** -   *Article 13.D - Off-Duty Court Appearance First 60 Hours as Comp Time*
**Issue No. 30** - **Economic** -   *Article 13.G - Off-Duty Court Appearance - Holiday Court Appearance 1 ½x*

The City proposes to modify four Sections of Article 13 addressing off-duty court appearances. The City as to Article 13.A proposes to change the minimum time for off-duty court appearances from three hours at time and one-half to two hours at straight time (Issue No. 28) and to delete the sentence, "Off-duty court appearances for a period of less than 45 minutes which abut a prescheduled shift may be treated as either overtime or court time at the option of the Department".

As part of Issue No. 28, the City proposes to amend Article 13.B so that the second paragraph shall read, "If the actual amount of time spent in court is less than two hours, the member shall be credited with two hours worked at straight time" and to amend the third paragraph of Article 13.B to read, "If the court appearance is for two hours or more, the member shall be carried working for the actual amount of time worked".

Issue No. 29 addresses Article 13.D and provides, as proposed by the City, "Each fiscal year, the first sixty (60) hours of off-duty court time for any member shall be compensated through credited compensatory leave time placed in the member's leave bank and not cash payment. After the sixty hours of off-duty court time are worked in the fiscal year, the member

60

shall have the option of being paid in cash or being credited with compensatory time. Furthermore, such off-duty court time shall be paid in cash rather than granting compensatory time when necessary to comply with F.L.S.A. requirements". In the Master Agreement, the member has the option to be credited with compensatory time or being paid in cash, subject to FLSA requirements.

Issue No. 30 is a proposal that "a member who is required to appear in court on a holiday will receive credit either for an off-duty court appearance at the two hours straight time minimum or holiday premium pay (1x) for the actual time spent on the court appearance whichever is greater". The Master Agreement had provided in Section 13.G, "...at three hour minimum or holiday premium pay (2x) for the actual time spent on the court appearance, whichever is greater".

The DPOA proposes the *status quo*, namely, the language in the Master Agreement.

The City notes, as in Exhibit 646, overtime costs for the Department for 2011-2012 were $24 million; that changing court time for two hours straight time from three hours at time and one-half would save the Department $1.5 million annually; that requiring the first 60 hours of court time as banked as compensatory time would save the Department $700,000 per year.

The fact is that in the Tentative Agreement of February 2012, the DPOA, as an attempt to assist the City to save money, did agree to these proposals as to off-duty court appearances, namely, "Article 13 'Off-Duty Court Appearances' of the collective bargaining agreement shall be modified through August 13, 2015 to provide as follows ...". As the Chairman interprets the Agreement, the DPOA was willing to agree to these modifications for a period of three years on the condition that the savings represented by the modifications, along with other savings, would first sunset and, in the Tentative Agreement, would provide that the DPOA members would

61

13-53846-swr   Doc 512-3   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 17 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 63 of
147

receive 20% of the savings represented by the Tentative Agreement. Then, too, there was to be no reduction in salary and longevity. Nevertheless, the State rejected the Tentative Agreement because allegedly there was not sufficient economic savings.

The matter has come before an Act 312 Panel. This Panel will recommend a two year contract under certain conditions. The Panel will provide for certain additional savings that were not in the Tentative Agreement, including certain provisions for structural changes that will aid in reorganizing the Department to be economically more efficient and yet provide the Officers with a pathway for a more competitive wage.

As the Chairman sees the proposal of the City, it is in three parts, namely, the court appearance being two times straight time, the first 60 hours as comp time, and holiday court appearance as time and one-half. The City noted at page 59 of its advocate's brief that "The City requests these changes for the following reasons". The fourth reason that the City gives is:

> The DPOA agreed to this provision as part of the Tentative Agreement. See Ex. 771, p. 1. Although the Tentative Agreement was rejected by the State of Michigan because it did not provide sufficient overall savings and because the Labor Contract would be extended to June 30, 2015, there is support for this concept from the DPOA.

As to Issue No. 29, the bank of compensatory time would save the Department $700,000 per year and for this reason this Chairman, along with the City Delegate, will opt for this proposal with the DPOA Delegate dissenting. However, as to changing Article 13.A and B as proposed and Article 13.G as to holiday court appearances as proposed, the Chairman, along with the DPOA Delegate, will opt for the *status quo*. Though the changes would represent a savings in overtime, depriving the Officers of a long time benefit is not the way to obtain the savings. What needs to be done is to encourage the Officers to write tickets. If the Department wishes to control overtime as to court appearances and holiday court appearances, then the Department

62

should consider adopting the technique that is prevalent in other Michigan municipal police departments, namely, to have a supervisor negotiate with the citizens who are ticketed and only have the court Officers come to court in the event there are contested tickets. This works well, particularly in suburban departments and controls overtime. There was no showing that the Department has utilized this technique to control overtime justifying eliminating a long-standing contractual benefit.

Based upon this analysis, a majority of the Panel will continue the *status quo* as to Article 38.A and B and Article 13.G with the City Delegate dissenting. As to Issue No. 29, the Chairman, concurred in by the City Delegate, will agree to adopt the City's proposal as to off-duty court appearances for 60 hours at comp time. The DPOA Delegate dissents.

| | |
|---|---|
| **Issue Nos. 71 and 72 - Economic -** | *Article 35.A.2 - Sick Leave-Freeze Sick Leave Banks; Limit Future Accrual of Sick Leave; Elimination of Seniority Sick Leave* |
| **Issue No. 73 - Economic -** | *Article 35.B - Sick Leave-Use of Sick Time for Family and Relatives Discretionary* |
| **Issue No. 74 - Non-Economic -** | *Article 35.F - Sick Leave-Call in Sick Daily Until Doctor Note* |
| **Issue No. 75 - Economic -** | *Eliminate Pay-Out of Sick Leave Accrued After July 17, 2012* |
| **Issue No. 76 -** | *Interest Payments* |
| **Issue No. 77 -** | *Drop Plan Participants-Receipt of Payouts* |
| **Issue No. 78 -** | *Reservation of Right to Cap Accumulation of Sick Leave and Compensatory Time* |

The City has proposed the above four listed Issues. Issue Nos. 71, 72, 73, 76, 77 and 78 are proposed amendments to Article 35 addressing sick leave. Issue No. 75 addresses an overall elimination of payout of sick leave accrued after July 17, 2012. All of the Issues are deemed economic except Issue No. 74, which is deemed non-economic.

There are two types of sick leave in the Master Agreement. The current sick leave provides that an Officer earns one sick day per month which is placed in a sick leave bank,

63

namely, the current sick leave bank. In addition, after one year, an Officer is credited with five seniority sick days in his or her sick bank. Both banks, current and seniority sick time bank, can accumulate without limitation.

Issue No. 71 is a City proposal that the current sick leave bank be frozen as of July 17, 2012 and that further accumulation of current sick leave banks will be capped at 300 hours.

Issue No. 72 eliminates seniority sick days and freezes existing seniority sick banks.

Though the City maintains, based on Exhibit 659, that the value of seniority sick banks in the Police Department is approximately $2 million every year and that this is an ongoing liability, the fact is that seniority sick banks have been part of the parties' Master Agreement for a number of years. This provision is in the parties' contract as a guarantee against catastrophic injury or illnesses. With no evidence of negotiations to limit the effect of this provision, the Chairman, joined by the DPOA Delegate, will vote to maintain the *status quo*, namely, the present provision in the Master Agreement as to seniority sick bank and the unlimited accumulation of seniority sick leave with the City Delegate dissenting.

As to Issue No. 71, the Chairman recognized that the payout of sick time at retirement is a cost. The DPOA proposes as to Issue No. 71 that the *status quo* be maintained, noting that the unlimited accumulation of current sick time has been in the parties' Master Agreement for some time. The Chairman appreciates that this creates a substantial economic obligation on the part of the City. Yet, the Department is concerned about absenteeism and its effect on the Department's 24/7 operation and the need to have Police on the streets; that absenteeism interferes with the Department's operation. If Officers in effect have no incentive not to use sick days despite the possibility of discipline, the incentive to accumulate sick days as insurance against catastrophic illnesses or the award in accumulation could very well impact on the efforts of the Department to

64

avoid absenteeism and the overtime caused by absences.

There are creative ways that the Chairman has seen in other departments to address the so-called legacy costs created by the payouts at retirement or leaving the Department of accumulated sick time. But the proposal of capping, particularly at the low number of 300 hours, would not fit in to the concept of the art of the possible and would not, in the opinion of the Chairman, shared by the DPOA Delegate, have been reached at the bargaining table.

For this reason, as to Issue No. 71, the Chairman, joined by the DPOA Delegate, will opt to remain the *status quo* and reject the City's proposal. The City Delegate dissents.

As to Issue No. 75, the City proposes that a member shall receive full pay for 100% of the unused accumulated sick bank accumulated as of the date of July 17, 2012. Payment shall be made after permanent retirement/separation within 90 days if the amount is less than $10,000 and if in excess of $10,000 the amount shall be paid in semi-annual installments for a period of three years on September 1st and August 1st with no interest due.

The DPOA proposes the *status quo* as to Article 35.M which gives the Officer the option to take a payment of the accumulated sick time or choose to receive the three year average of 25% of the unused accrued sick leave bank in one (1) ... and have the sum included in the final average compensation used to compute the member's service pension of the retirement allowance. ... The lump sum payment the member will receive will be the remaining value of the unused accrued sick leave as provided ... above.

The Panel must choose one or the other option. Issue No. 75 assumes a cap on sick leave and, as explained on Issue No. 73, a majority of the Panel has rejected the cap on sick leave because such a cap could well encourage absenteeism which the Department wishes to avoid. For this reason, the Chairman, along with the DPOA Delegate, votes to maintain the *status quo*

65

as to issue No. 75 and maintain Article 35.M. The City Delegate dissents.

As to Issue No. 76, the City in the event, which was the case, that a majority of the Panel rejected the City's Issue No. 75, nevertheless proposed that payments made on sick leave accumulations, if the amount is less than $10,000, be paid within 90 days after permanent retirement/separation and if in excess of $10,000 the amount shall be paid in semi-annual installments for a period of three years on February 1st and August 1st with no interest due. The Chairman interprets this to mean that if the payments are not made when due, then interest would be paid. On this basis, the Chairman will vote with the City Delegate to accept this proposal as to issue No. 76. The DPOA Delegate dissents. This ruling is subject to the ruling on Issue No. 77.

As to Issue No. 77, the City proposes that DROP Plan participants may only receive payout of sick time when they permanently retire, not when they enter the DROP Plan. Under the expired Master Agreement, DROP Plan participants receive sick leave payout when they enter the DROP Plan and continue to work as Police Officers. This proposal could save money to the City. However, it has an unintentional consequence. For this reason, the City would ask to amend the proposal to permit Drop Plan participants at the time they enter the Drop Plan to exercise the option, if desired, set forth in Article 35.M.2 and defer after collecting the three year average of 25% of the unused accrued sick leave bank available at the time of entering the Drop Plan would be received at the time the participant permanently retires. The City agrees to amend the proposal accordingly with the concurrence of the DPOA. Though the DPOA objects to the proposal, the Chairman and the City Delegate concur in the proposal with this amendment, namely, that the Drop Plan participant may exercise the 35.M.2 option at the time of entering the Drop Plan with the understanding that the remaining value of the unused accrued sick leave bank

66

shall not be paid to the Drop Plan participant until the Drop Plan participant permanently retires.

As to Issue No. 78, the City proposes, "The City reserves the right for purposes of retirement payout to cap the number of hours a member may accumulate in their sick leave and compensatory time banks or to the extent allowed by law, cap the amount of payouts from such banks upon retirement." The DPOA objects to such language.

The Chairman has been asked in these proceedings to rule on provisions, including proposals as to caps on payouts. The Chairman, with one or the other Delegate, has made rulings. Once making these rulings, this becomes part of the contract. If the rulings do not modify the Master Agreement, the language or the practices developed under the Master Agreement remain. What Issue No. 78 does is to ignore negotiations, ignore the provisions of the contract that have been crafted between the parties over the years, and these Act 312 proceedings which were carefully developed by the parties through testimony and extensive briefs. There is no place in these proceedings or in the Master Agreement for such language. It fails to recognize that there are two parties to the Agreement. For this reason, the Chairman, joined by the DPOA Delegate, will reject the City's proposal on Issue No. 78. The City Delegate dissents.

In Issue No. 73, the City seeks to amend Article 35.B by amending the last sentence of the first paragraph entitled "Sick Time Credit" as follows:

> The granting of sick time for attendance upon these relatives is <u>at the discretion of the City</u> ~~and not limited to any given number of days per fiscal year~~. However, no more than three (3) days will be granted in one instance.

The City is adding the language "at the discretion of the City" and striking out "and not limited to any given number of days per fiscal year".

67

The City's Advocate correctly recognizes in his brief the possible impact of the Family and Medical Leave Act on this language, as does the Chairman. Furthermore, the current language has been in Master Agreement for some time. The DPOA objects to this language change.

For these reasons, the Chairman, joined by the DPOA Delegate, will opt for the *status quo* as proposed by the DPOA. The City Delegate dissents.

Issue No. 74 is non-economic. The issue deals with Article 35.E which is entitled "Reporting Illness or Disability". The City proposes one change, namely, notification on a daily basis. The City tells the story of an Officer who when asked to notify the Officer's Command, actually sought a protective order. The Chairman finds this incredible. Though the Chairman appreciates that the DPOA objects, the Chairman finds that this proposal is reasonable to a point. The language should be further refined to clarify that if an Officer is hospitalized that the Officer does not have to call in daily or if the Officer is recuperating from a hospital stay at home that the Officer, if producing a medical statement that indicates when the Officer may return, that this would not require the Officer to call in daily.

In other words, the language should be refined so that it is clear when the daily requirement is to be met.

The Chairman, along with the City Delegate, will approve of the concept once the City clarifies exactly when the daily requirement is to be met. In other words, if an Officer is out, presumably the daily requirement will be met until the Officer produces a doctor's statement indicating the times of illness and return date or when the Command knows that the Officer is recuperating under a direction of a doctor and has documentation to that effect or is in the hospital. The language should be refined. If there is a dispute between the parties as to the

68

refinement, then it should be returned to the Panel for refinement. Otherwise, the concept is sound.

Therefore, the Chairman will join with the City Delegate, recognizing that the DPOA objects to this change but, in the interest of completing this contract immediately, will adopt this language subject to the comments of the Chairman here. If there is a dispute in any given case as to any discipline over the failure to call in because it fell into one of the categories discussed by this Chairman, that dispute should be attached either to an expedited arbitration at the next expedited arbitration date if the discipline is meted out or to a regular arbitration with these comments so that the umpire will understand the intent behind the change approved by a majority of this Panel. The DPOA Delegate dissents.

Issue No. 80 - Economic - *Jury Duty*

The City proposes to replace Article 35, "Jury Duty" with entirely new language. The new language proposes that "An employee shall be allowed to attend jury duty without pay. An employee may elect to use paid leave for any day he/she serves on jury duty. Jury duty time shall not be counted as time worked for the purposes of computing overtime." This is Section A of the new Article 35. There is also Sections B and C. In Section B there is a provision that provides, "that the Department shall have the discretion in seeking to have the employee excused when his services are essential".

The DPOA proposes to maintain the *status quo* which provides that jury time is paid time and that the jury fees are to be returned to the City.

The City's rationale for the change as set forth in its counsel's brief is, "One of the goals of the Annex D of the Financial Stability Agreement was that there be uniformity in contract provisions." The brief goes on to point out that, except with unexpired labor contracts, the City's

69

expired contracts now have the proposed language.

The Chairman appreciates the desire for uniformity. But there are two reasons why the Chairman will vote with the DPOA Delegate to maintain the *status quo*. First, there is only so much that can be accomplished in an Act 312 and one negotiations. The provisions for jury duty would not be the main focus of negotiations between the parties because there is no showing that it represents a financial savings. Second, the provision as to seeking to have the employee excused is always the Department prerogative. The Department could issue a Special Order without any contract provision asking that all Officers notify the Department as to pending jury duty notification and then exercise the right to seek to have the Officer excused.

Finally, in many cases, an Officer will no doubt be excused as compared to the general employee population. It is doubtful that a Police Officer would be permitted to sit on a jury involving a criminal matter. It is doubtful that a Police Officer would be permitted to sit on a jury involving litigation against another Police Officer or the City. Thus, there was no persuasive reason in the grand scheme of things, particularly when there were no negotiations, to change this provision. For these reasons, the Chairman will vote with the DPOA Delegate and reject the City's proposal and maintain the *status quo*. The City Delegate dissents.

| | |
|---|---|
| Issue No. 26 - Economic - | *Article 10.C. - Seniority-Assign to Avoid OT* |
| Issue No. 31 - Economic - | *Article 14.A - Overtime-Dept. Has Right To Limit OT by Reassigning, etc.* |
| Issue No. 36 - Economic - | *Article 14.D - Overtime-Assign OT Without Regard to Preschedule OT* |
| Issue No. 43 - Economic - | *Article 14.E.9.F - Overtime-Assign From Straight time From Any Entity* |
| | |
| Issue No. 32 - Economic - | *Article 14.B.1 - Overtime-Eliminate Daily Overtime* |
| Issue No. 34 - Economic - | *Article 14.C - Overtime-Work 80 Hours for OT* |
| Issue No. 33 - Economic - | *Article 14.B.4 - Overtime-Not Include Sick Time For OT* |
| Issue No. 35 - Economic - | *Article 14.C - Overtime-Calculation* |

70

**Issue Nos. 37 and 38** - Economic - *Article 14.D.2 - Overtime-Notice of OT*
**Issue No. 39** - Economic - *Article 14.D.3 - Overtime-Union Verify OT Lists*
**Issue No. 42** - Economic - *Article 14.D.9 - Overtime-Not Call More than 10 For OT*
**Issue No. 129** - Economic - Union Proposal - *Article 14 - Overtime-Eligible to Work*
*Overtime on a Furlough Day*

Overtime is an important issue to both the DPOA and the City. For a financially strapped City in fiscal year 2011-2012, the overtime cost for the Police Department was $24.9 million. In fiscal year 2010-2011, it was $24.3 million. Not all of this was attributable to the Police Officers. Some was attributable to the Lieutenants and Sergeants as well as the Command. Yet, this is a substantial cost. On the other hand, Police Officers do rely on overtime.

Issue No. 33 is a proposal to amend Article 14.B.4 as follows: "Time off due to furlough, liquidation of compensatory time, and other paid absences (<u>not including sick leave</u>) shall be considered as time worked when applying overtime rules."

The Chairman begins with the discussion that in the Tentative Agreement of February 2011 the DPOA did agree to a modification besides court time as to overtime costs for, in Paragraph 6 of the Tentative Agreement, the following was provided:

> <u>Overtime</u>. Article 14, "Overtime," shall be modified to provide that unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours. Sick time shall not be considered as time worked in meeting the 80 hour work requirement, but time off due to furlough, liquidation of compensatory time, and other paid absences shall continue to be considered as time worked.

The DPOA rejected the City's proposal despite the Tentative Agreement. There is a logical reason for accepting the City's proposal. It discourages the casual taking of sick time on a daily basis for an Officer can still be called in to work overtime without any penalty for taking off sick. The taking of casual sick time will be discouraged, thereby aiding in the control of sick

71

time.

Based upon this analysis and the fact that the DPOA was agreeable to this provision at one time, the Chairman, along with the City Delegate, will agree with the City's proposal as to Issue No. 33. The DPOA Delegate dissents.

As to Issue No. 34, the City proposes that overtime shall be calculated on the following basis: "... unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours". In the City's brief, it is stated that the purpose of this provision is "elimination of sick leave as time worked for purposes of calculating the 80 work hour requirement before overtime begins. Time off for furlough, compensatory time and other leave time (except sick time) will be considered time worked". The provision provides elimination of daily overtime (i.e., overtime after eight hours in a day) and payment of overtime only after 80 hours worked in a pay period.

The Chairman, along with the City Delegate, will vote to include this clause with the DPOA Delegate dissenting, with the clear understanding that the clause should have language consistent with the post-hearing brief that "time off for furlough, compensatory time and other leave time (except sick time) will still be considered time worked". This is the intent of the language and it should be in the contract. This is not an amendment. This is the intent and it is consistent with Issue No. 33. The whole idea of the language is to eliminate time and one-half for time after eight hours.

As to Issue No. 26, the City proposes to add to Article 10.C.4, "The Department may transfer, assign members to different entities on a day to day or week to week basis to limit, avoid or eliminate overtime or for other staffing or manpower purposes." The DPOA objects.

72

This came from the CET.

As to Issue No. 31, the City proposes to add in Article 14.A, "The Department retains the right to limit overtime in determining the deployment, assignment of personnel and resources, including transferring/reassigning employees to different entities on a day to day or week to week basis to limit, avoid or eliminate overtime."

There are difficulties with these two proposals, causing the DPOA to object to these additions. Until very recently, the Department had a Tactical Unit – one on the east side and one on the west side – where the Officers in that Unit were familiar with the entire City and could fill in where there was a need in any District or Precinct. The Chairman appreciates that that Unit has been disbanded. Based upon the proposed Issue Nos. 26 and 31, the proposals ignore seniority and could be causing seniority Officers being transferred while junior Officers are not being transferred. In the case of Issue No. 26, there appears to be an end run around seniority provisions as the last phrase, "or for any other staffing or manpower purposes", does not seem to have anything to do with overtime provisions. Then there is the safety problem in that an Officer could be transferred to an area where the Officer is unfamiliar. An Officer could be transferred to a so-called delta zone and be unaware that the Officer is in a delta zone. The Chairman understands a delta zone is a zone known as being an area where there is a tendency of hostility toward Police Officers. Officers who work such an area are familiar with such dangerous parts, whereas Officers unfamiliar with the area, coming from other areas in the City, would not be.

It is all these factors that cause this Chairman to join with the DPOA Delegate in rejecting the proposals of the City in adding in the contract proposals represented by Issue Nos. 26 and 31. The City Delegate dissents.

As to Issue No. 39, the City proposes to add to Article 14.E.3.a.c which reads, "The

73

Union shall verify and notify the City of any discrepancies in the overtime roster and indemnify the City if its failure to notify the City results in a grievance for overtime". The DPOA objects to this provision. In the absence of negotiations over this provision, the Chairman will opt not to honor this request. This is a matter for the bargaining table, not Act 312, particularly when there were so many other issues presented. The DPOA Delegate agrees with the Chairman. The City Delegate dissents.

Issue Nos. 36, 37 and 38 address changes as to the procedures in addressing prescheduled overtime. Presently, the Department is operating in patrol on a 12 hour schedule.

Issue No. 42 addresses a limitation on the number of calls that are to be made before on-duty personnel are offered the opportunity to accept overtime and does provide by mandatory overtime by inverse seniority when the daily on-duty roster in the event a sufficient number do not accept the overtime assignment. With 12 hour shifts there is a problem with such a provision if the junior Officer or any Officer on duty has already worked 12 hours, namely, a problem with fatigue.

A majority of the Panel will address the 12 hour schedule on patrol elsewhere. It seems that even if, based upon the majority opinion, the Department and Patrol goes back to eight hours, there is no showing of a need for the changes proposed by the City as to Issue Nos. 36, 37, 38 and 42; that without negotiation there is no indication that the parties would have reached some accommodation. Thus, the Panel has not been given any guidance of what would have occurred at the bargaining table. Since the present language on these subjects has been in the contract for some time, the Chairman, along with the DPOA Delegate, will opt to make no changes to the Master Agreement as to Issue Nos. 36, 37, 38 and 42. The City Delegate dissents as to Issue Nos. 36, 37, 38 and 42.

74

As to Issue No. 43, the City proposes to add an Article 14.E.9.f which would read, "The Department reserves the right to assign Officers on straight time from any entity in the City to avoid utilization of any overtime." The DPOA objects. The Chairman appreciates the sentiment behind the City's Last Best Offer as to Issue No. 43. There is, however, a limit to the quest to control overtime. There are the seniority provisions in the contract. There are the bid rights to certain entities which are to be followed. There is the limitation on assigning out rights. This language, to the Chairman, seems too broad and ignores other provisions of the contract that the parties over the years have negotiated. There are provisions sustained by this Chairman, with the concurrence of the City Delegate, in this Opinion that will assist the City in controlling overtime costs and yet protect basic contract rights that have been negotiated over the years between the City and the DPOA. This language as written would not pass muster at the bargaining table. This is another situation where the Chairman is limited to the parties' Last Best Offers. Without protective language giving recognition to other provisions in the contract, this Chairman cannot adopt this language.

It is based upon this analysis that the Chairman is joined by the DPOA Delegate in rejecting the City's proposal as to Issue No. 43. The City Delegate dissents.

Issue No. 129 seeks to amend Article 14.D.5, Overtime, by adding furloughs to the times that employees "are entitled to participate in pre-scheduled overtime opportunities". Reviewing Article 14.5, the symmetry of the provision and its meaning would suggest that furloughs should be included if in fact there is pre-scheduled overtime. Therefore, the Chairman, along with the DPOA Delegate, will vote to add furlough to Article 14.5 as proposed by the DPOA. The City Delegate dissents.

Finally, as to Issue No. 35, Overtime Calculation, because longevity will be restored the

75

second year of the contract by a majority vote, the calculation in Article 14.C shall remain as in the Master Agreement with the Chairman voting with the DPOA Delegate to maintain the Article 14.C overtime calculation without changes. The City Delegate dissents.

Arbitration:

| | |
|---|---|
| **Issue No. 14** - Non-Economic - | *Article 8.A - Arbitration-2 Umpires, Not 4* |
| **Issue No. 128** - Economic - Union Proposal - | *Article 4 - Basis of Rep - Special Conferences Held Within 5 Days)* |
| **Issue No. 130** - Non-Economic - Union Proposal - | *Article 14-Overtime-Prescheduled O.T. Grievance Heard by Arbitrator Within 30 Days* |
| **Issue No. 131** - Non-Economic - Union Proposal - | *Article 17-Arbitration on Performance Review Within 30 Days* |
| **Issue No. 132** - Non-Economic - Union Proposal - | *Article 36 - Regularity in Sick Leave Benefits - Arbitration on Attendance Issues Within 30 Days* |
| **Union Proposal No. 146** - Economic - | *Article 7 - Non-Economic: Payment of Umpire for cancellation days by party cancelling hearing)* |
| **Issue No. 16** - Non-Economic - | *Article 8.F - Arbitration-Back Wages* |

There are seven issues dealing with arbitration or related to dispute resolution in the parties' Master Agreement. The Chairman has grouped these issues together for the purposes of convenience.

The Master Agreement provides for four Umpires. Currently, the parties are operating with three Umpires with one vacancy. This is Issue No. 14. The City proposes to reduce the number of four Umpires to two. The City's rationale is threefold. First, the number of Officers assigned to the Labor Relations Law Unit has decreased since 2008 from a high of six Officers in the unit plus an Inspector to three Officers in the unit plus an Inspector, although recently a fourth Officer has been added to the unit.

In addition, the Law Department in most cases has not been furnishing counsel as it has in the past, adding further strain to the Labor Relations Law Unit. Though this Chairman, who also

13-53846-swr   Doc 512-3   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 32 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 78 of
147

serves as an Umpire for the parties, is aware of the situation, and also the argument that the parties have been able, nevertheless, to dispose of a number of cases under these circumstances as the parties have embarked on an ambitious mediation process, the Chairman is not persuaded that at this juncture there is a need to reduce the number of Umpires. This may be an issue in the future or by negotiations between the parties. But, this is not a matter that at this time should be addressed in Act 312. For this reason, the Chairman, joined by the DPOA Delegate, will opt to vote to decline the City's proposal to reduce the number of Umpires. The City Delegate dissents.

Issue No. 128 addresses Article 4, Section 2, the provision for Special Conferences, which provides that "arrangements for such special conferences shall be made five (5) calendar days in advance whenever possible." The DPOA proposes to amend Section 2 to read, "Arrangements for such special conferences shall be made and take place within five (5) calendar days of the request". The argument was made that there have been delays in scheduling Special Conferences. The response of the Department was that it takes time to gather information needed to be presented for Special Conferences and whether the Chief or other high ranking Officers are needed to be present. Particularly in this time of reorganization in the City and within the Department itself, there will be substantial time demands on the Chief and other high ranking Department Officers that could very well make it not possible to meet the five day deadline and the fact that the present "wherever possible" language has been in the contract for some time, causing the Chairman, along with the City Delegate, to vote to decline to adopt the DPOA proposal and adopt the City's proposal to keep the *status quo*.

Issue No. 130 is a proposal by the DPOA to add a sentence to Section D.10 concerning overtime grievances to reflect "the grievance shall be heard by an arbitrator within thirty (30) days from the date of the submission of the grievance as an extra day on an expedited basis."

77

Issue No. 131 is a proposal by the DPOA amending Article 17.D to read, "The Personnel Bureau shall convene the Performance Evaluation Board to hear the matter within forty-five (45) days of the date of the written request to appeal. If the appeal is not heard within forty-five (45) days, the Performance Evaluation shall be increased to its prior rating." The City points out that there may be reasons that the Evaluation Board may not be able to be convened within 45 days and that the result could well be that an underperforming Officer could, by a technicality, not have his or her true rating recorded.

Issue No. 132 is a proposal to add an extra arbitration date under Article 36.H addressing disputes concerning the Attendance Control procedures. The City objects to these proposals. The DPOA argues that such disputes need expedited resolution. The City argues that with its limited staff which also have other duties it will not be able to keep such deadlines.

The Chairman, in reviewing these proposals, would vote to deny same. The current expediting process has been resolving a number of the attendance issues promptly. In fact, there is time on the regular one-day process per month to resolve additional cases. The parties need more time to develop the current procedures. If they are not working, then the parties can sit down and refine the process. Until this is done, within the parties' respective current resources, there is no reason to memorialize any changes. This may be necessary in the future, but not until there has been further experience both in the Performance Evaluation Board and in the expedited process. It is for this reason that the Chairman, along with the City Delegate, votes to reject the DPOA's proposals as to Issue Nos. 130, 131 and 132. The DPOA Delegate dissents.

In this arbitration section, the Chairman appreciates that he has voted in most cases to reject the DPOA's proposals along with one City proposal. But these proposals, including the City proposal, should have been addressed at the bargaining table. They are proposals that in a

78

13-53846-swr    Doc 512-3    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 34 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 80 of
147

true impasse situation would have not reached impasse. The Chairman's approach was to address the larger issues that these circumstances have brought to the Panel and to recognize that the issues brought forth that the Chairman has dubbed the "arbitration issues" need time to be worked out between the parties based upon further experience. This explains the Chairman's approach.

As to Issue No. 16, the City proposes an overhaul of Article 8. F regarding arbitration of back wages claims of DPOA members. Specifically, the City Proposes that Article 8.F read:

ARTICLE 8.F

All claims for back wages shall be limited to the amount of wages that the employee would have earned, less any compensation for *temporary employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, Welfare, Family Independence Agency, City-Funded Long-Term Disability Insurance, Sickness and Accident Insurance or Automobile Accident Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employee's equity therein; and* when an employee is suspended pending disposition of charges against him, there shall be no offset of interim earnings provided he is exonerated and restored to duty. In consideration for the above, the Union agrees to process cases of officers under suspension in a prompt manner.

The City's proposed changes to Article 8.F would significantly alter a contractual provision that has been included in the agreement between the City and DPOA for many years. Conversely, the DPOA argues for maintaining the *status quo*. Under the current circumstances, there is no reason for a change to the current language of Article 8.F. As an economic issue, the Chairman adopts the proposal of the DPOA. The DPOA Delegate joins the Chairman. The City Delegate dissents. Therefore, Article 8.F will continue to read:

ARTICLE 8.F

All claims for back wages shall be limited to the amount of wages that the employee otherwise would have earned less any compensation for

79

personal services he may have received from any source during the
period in question excluding documented overtime and Department
authorized income earned outside his regularly scheduled work period.

When an employee is suspended pending disposition of charges against
him, there shall be no offset of interim earnings provided he is
exonerated and restored to duty. In consideration for the above, the
Union agrees to process cases of officers under suspension in a prompt
manner.

**Issue No. 146** -      *Article 7 - Non-Economic: Payment of Umpire for cancellation days by
party cancelling hearing*

The DPOA proposes to place in the contract a provision that the party who cancels an

arbitration hearing shall be responsible for paying the Umpire's cancellation fee.

This is one of the items that should never be in an Act 312. This is an item that should

have been negotiated if the parties had been negotiating. Furthermore, this Chairman, who has

had the privilege of serving as an Umpire with the parties for some time, never realized that the

Umpires were charging cancellation fees because this Chairman was under the impression that

under the contract with the parties the Umpires were not to charge cancellation fees. This came

as a revelation to this Chairman. Because this Chairman believes this matter should be at the

bargaining table and not at Act 312, and because this is a matter that should be resolved by the

parties at the time the issue arises, noting that at the last cancellation with this Umpire, due to

unexpected illness of one of the attorneys, this Umpire never thought of charging a cancellation

fee and this Umpire did not. For these reasons, joined by the City Delegate, this Chairman

rejects this proposal. The DPOA Delegate dissents.

**Union Representation:**

| | |
|---|---|
| **Issue No. 2** - **Non-Economic** - | *Article 4.A - Basis of Representation-One Steward/One Alternate* |
| **Issue No. 4** - **Non-Economic** - | *Article 4.D - Basis of Representation-Seniority of Chief Steward and Steward* |

80

13-53846-swr   Doc 512-3   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 36 of 46
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 82 of
147

Article 4.A of the Master Agreement provides that "Employees shall be represented by one (1) steward for each shift" in each represented district. Maintaining that this provision has not been followed in all cases, the City has proposed to add the following sentence to Article 4.A, "Any current practice inconsistent with this representation provision shall be discontinued". The DPOA opposes the addition of this sentence and seeks the *status quo*. This is a matter for the parties to negotiate in the view of this Chairman and not a matter that should be brought to Act 312 with so many other issues. For this reason, the Chairman will vote with the DPOA Delegate and maintain the *status quo*. The City Delegate dissents.

As to Issue No. 4, the City proposes the following changes as underlined, namely, to amend Article 4.D as follows:

> D.     Except as otherwise provided, only one (1) chief steward and one (1) steward from each shift shall enjoy top seniority ·insofar as remaining with their district, precinct, section, unit, or platoon during their term of office, and they shall not be transferred out of or reassigned from their district, section, unit or platoon, except for justifiable cause or reduction in force, or when a district, precinct, section, unit or platoon is discontinued or otherwise inactivated or consolidated.

The City has agreed to remove the phrase "except as otherwise provided". Thus, the Panel is considering this proposal with the "except as" phrase removed. The DPOA apparently objects to the proposal. But there is, in the view of the Chairman, no reason to object because, frankly, the language is cleanup language. This is a simply adjustment and one that the DPOA should have agreed to long ago. For this reason, the Chairman, joined by the City Delegate, will accept the proposed language as amended with the "except as otherwise provided" removed as proposed by the City. The DPOA Delegate dissents.

**Transfer and Assignments:**

81

| | |
|---|---|
| **Issue No. 21** - Non-Economic - | *Article 10.C.1.a - Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |
| Issue No. 24 - Non-Economic - | *Article 10.C.2.a-Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |
| Issue No. 22 - Economic - | *Article 10.C.1.A - Seniority -Assignments and Transfers-Additional Entities Exempt* |
| **Issue No. 23** - Non-Economic - | *Article 10.C.1.c-Seniority-Assignments and Transfers Additional Entities Exempt* |
| Issue No. 104 - **Economic - City Proposal -** | *Article 10C.1.d. -Seniority-Transfer From Assigned Duty After 5 years* |
| Issue No. 126 - **Economic - Union** Proposal - | *Article 10 - Seniority - 50 Day Duration on Temporary Assignments* |
| Issue No. 21 - Non-Economic - | *Art. 10.C.1.a, Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |

In Issue 21, the City's Last Best Offer proposes an overhaul to Article 10.C.1.a, which deals with assignments and transfers based upon seniority. Under the current agreement, "[a]ll assignments and transfers except those excluded herein, shall be based upon seniority provided the employee is qualified." Essentially, the City proposes that assignments and transfers be based upon a number of factors, including seniority, attendance, and the employee's disciplinary record. With respect to attendance, the City proposes that "the employee cannot have been on initial counseling regarding attendance or on the attendance control program – D.P.D. 350 program – within six (6) months." Regarding the employee's disciplinary record, the City proposes that the employee's record, the preceding six (6) months, shall be considered. The DPOA asserts that the *status quo* should be maintained. This is a non-economic issue.

Accordingly, the Chairman, joined by the DPOA Delegate, declines to adopt the City's Last Best Offer with the City Delegate dissenting. The current language of Article 10.C.1 has been a part of the agreement between the City and the DPOA for some time and the City has put forth no cogent reason, in the view of the Chairman, for changing the current provision. Indeed, the City has D.P.D. 350 for controlling attendance and Bonus Vacation Days for incentivizing

82

attendance. In addition, attendance misconduct can be addressed through disciplinary procedures. It would seem that the parties would not have chosen to modify the current techniques for absence control and disciplinary procedures contained in the Collective Bargaining Agreement if faced with a strike. Therefore, Article 10.C.1 a will continue to read:

ARTICLE 10.C.1.a

All assignments and transfers except those excluded herein, shall be based on seniority provided the employee is qualified.

1.    Transfers;

        a.    The present practice of individual officers filing requests (Police Manuel Vol. IV, Chapter 1, Sec. 4) for transfers between various districts, and entities shall be continued. The requests shall be valid for a period until October 1st each year. Continuation requests may be submitted on or after August 15th. Whenever openings occur in districts, or entities, the most senior employee on the list shall be transferred provided the employee is qualified. Any time there are common seniority dates on the transfer list, the transfer shall be given to the member who was first recorded as approved by the Personnel Section. In the event members with common seniority dates also have a common recording date, the selection shall be by blind draw. An association representative shall be present at the tie-breaking procedure. The following entities shall be excluded from this procedure...

**Issue No. 24** - **Non-Economic** -     *Article 10.C.2.a - Seniority-Assignments and Transfers-Additional Entities Exempt*

Regarding Issue 24, the City proposes the addition of substantive language to Article 10.C.2.a. Specifically, the City's Last Best Offer proposes the following addition:

An assignment list shall be maintained. Placement on the assignment list shall be based on the following factors: seniority, attendance, (the employee cannot have been on initial counseling regarding attendance or on the attendance control program – D.P.D. 350 program – within six (6) months) and the employee's disciplinary record, excluding written reprimands, over the preceding six (6) months (such discipline shall be utilized only after all administrative remedies have been exhausted).

83

> Employees who have been placed on the assignment list shall be
> removed from the assignment list if the member receives an initial
> counseling regarding attendance, is placed on the attendance control
> program, or receives written disciplinary action, excluding written
> reprimands (such discipline shall be utilized only after all administrative
> remedies have been exhausted).

This is a non-economic issue, with the DPOA asserting that the *status quo* of Article 24.C.2.a should remain. The provisions of Article 24.C.2.a have been included in the contractual arrangement between the City and the DPOA for some time and there has been no showing of problem with the current provisions. Furthermore, the City has other effective methods of controlling and rewarding attendance, including Bonus Vacation Days. Additionally, the City may exact discipline upon those who maintain poor attendance records. Accordingly, with respect to Article 10.C.2.a, the Chairman decides that the *status quo* should be maintained. The Chairman, joined by the DPOA Delegate, adopts the *status quo*. The City Delegate dissents. Article 10.C.2.a will continue to read:

> A request for assignments within a district, or entity once an employee is
> assigned there, can be made by submitting DPD Form #31 (referred to as
> a Blue Slip) to the Commanding Officer. The request shall be valid for a
> period until October 1st each year. An employee may have only one
> assignment request on file at any time; the most recent request will
> replace earlier requests. Whenever openings occur within districts, or
> entities, the most senior employee on the list shall be assigned provided
> the employee is qualified. Any time there are common seniority dates
> on a job assignment list the job assignment shall be given to the member
> whose request was first received by supervision...

As to Issue No. 104, the City proposes to add the following provision to Article 10.C.1.d, Transfers: "Notwithstanding anything set forth in this Article, the Department may transfer any member from any non-patrol entity to a patrol entity after the completion of five (5) years in the non-patrol entity." The DPOA objects and proposes the *status quo*, namely, objects to any such provision in the contract. The Chairman understands the Department's desirability to have such

84

**13-53846-swr** Doc 512-3 Filed 08/19/13 Entered 08/19/13 19:38:38 Page 40 of 46
**13-53846-tjt** Doc 13152-2 Filed 10/29/19 Entered 10/29/19 09:55:40 Page 86 of
147

a provision. But, presumably, with the reorganization of the Department, a number of entities will be eliminated. First, there is no need for such a provision and second, if there are some non-patrol entities, Officers who have seniority will have the opportunity to bid into those positions and their seniority rights should be honored. It is for these reasons that the Chairman, along with the DPOA Delegate, will vote not to include such language in this contract round. The City Delegate dissents.

Issue No. 126 is the Union proposal to amend Article 10.C.2.c to modify the parties' longstanding provision that temporary assignments will not exceed 84 days to 60 days. The City opposes such a change. The Chairman, along with the City Delegate, will vote to maintain the *status quo* which is the City's Last Best Offer, with the DPOA Delegate dissenting. The reason for this is that the 84 day provision has been in the contract for some time. There is no persuasive reason to change. This is the way the parties have operated for some time. In this era of reorganization in the Department, this is not the time for such a change.

In regard to Issue No. 22, Article 10.C.1.a addresses transfers and particularly exempts from seniority transfers 29 entities in the Department. The City proposes to add to this exemption list the following additional entities: Bomb Squad, City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Technical Support, Tactical Operations and Task Force Administration. The DPOA objects to adding these additional entities. This is a one-third increase. The DPOA argues that there is "no demonstrated need" for the change.

As the Chairman views the situation, in reviewing the arguments and Exhibit 639, there is an argument as to the Bomb Squad because of the expense of six weeks of military bomb disposal training in Alabama and one year of probation training with the Unit plus the six written

85

examinations and six practical examination application testing. There is a need to choose an applicant with the aptitude for this type of work. It is also understandable that in terms of Technical Support that there may be special aptitudes in this day and age of computers and advanced technology that may not necessarily involve the most senior Officers.

But, beyond these two entities, when compared to the type of entities that the parties over the years have excluded, the Chairman believes that the Department has not made its case for the other eight proposed entities. The City Delegate would concur as to the Bomb Squad and the Technical Support, but would dissent as to the exclusion of the City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Tactical Operations and Task Force Administration. The DPOA Delegate would dissent as to the Bomb Squad and the Technical Support inclusion, but would concur with the Chairman as to the exclusion of City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Tactical Operations and Task Force Administration.

<u>Issue No. 86</u> - **Economic** - *Article 40.G - Miscellaneous-Deferred comp Selected by City and Direct Deposit*

The City has proposed to amend Article 40.G "Miscellaneous" as follows, represented by the strikeouts, with the DPOA objecting, proposing the *status quo*, namely, objecting to the strikeouts:

> GD. **Deferred Compensation and Direct Deposit**. Members of the bargaining unit may participate in the deferred compensation and direct deposit programs offered by the City. ~~The Association shall be entitled to arrange for the establishment of a deferred compensation program by a company of its choosing, which shall be included in the deferred compensation programs offered by the City.~~

The City notes that it pays for the administrative costs of the deferred compensation

86

program. Therefore, its counsel writes, "Accordingly, the City wants this provision changed such that the City will select the deferred compensation company and program. The City operates a number a number of benefit plans and there are cost savings to the City in combining the various benefit plans available to employees. ... If the City is going to pare the cost, it should choose the carrier to limit that cost".

The difficulty with this argument is there has been no negotiation between the parties; that the present language has been in the contract for some time. It is possible that the DPOA selected carrier could match the City's cost or even below the City's cost. In other words, the blanket statement, without a history of negotiations and the possibility that the DPOA could meet or even with its chosen carrier be able to save the City money in this area, suggests that this provision has not been well thought out by the City. For this reason, the Chairman will vote with the DPOA Delegate and reject the City's proposal and maintain the *status quo*. The City Delegate dissents. There just was not a history of negotiations addressing the potential cost savings either way.

**Issue No. 87** - Economic - *Article 40.H - Miscellaneous-Payment of Banked Time*

The City proposes to amend Article 40.H as follows:

> **Lump Sum for Banked Time.** Whenever an employee leaves employment with the City, such employee will be paid for all banked time, other than sick time, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. <u>DROP plan participants shall only receive payout for banked time when they permanently retire, not when they enter the DROP plan.</u>
>
> ~~Payment shall be made pursuant to the City's schedule for that specific payment.~~ <u>Payment shall be paid within 90 days if the amount is less than Ten Thousand ($10,000.00) Dollars, and if in excess of Ten Thousand ($10,000.00) Dollars, the amount shall be made in semi-annual installments over a three-year period with the installments due on February 1 and August 1 with no interest due.</u>

87

The underscoring represents the City's proposed additional language. The strikeouts represent the deletions. The DPOA proposes the *status quo.*

The Chairman reviewed the language as proposed as two proposals – one addressing DROP Plan participants; the second dealing with the payout. The proposed amendment of the City, objected to by the DPOA, proposes that the DROP Plan participants receive the payout for bank time other than sick time when they permanently retire. To the Chairman, this is a reasonable proposition for it prevents the participant from being in a higher tax bracket and it preserves cash funds for the City during a time when the City is in financial crisis. For this reason, the Chairman, joined by the City Delegate, will vote to adopt this amendment. The DPOA Delegate dissents.

As to the provision for a payout, the Chairman interprets the no interest language which in Issue No. 144 the DPOA in effect proposed, except the Chairman interprets the City's proposal to include that if the installments are not made when due then interest would be paid. On this basis, the Chairman would accept the City's payout proposal with the City Delegate agreeing and the DPOA Delegate dissenting.

**Issue No. 144 - Economic - Union Proposal -**     *Article 33 - Separation Payments*

The DPOA has proposed the following new language to Article 33:

> X.    All provisions of the collective bargaining agreement relating to separation payments shall be modified to provide that effective January 1, 2013, for future separation payments to members who were already eligible to retire as of the effective date of the Award, a member will have the option of receiving (a) lump sum payment ninety (90) days after separation, or (b) semiannual installments for a period of three (3) years after separation, with no interest unless payment is not made on the date it is due. This option shall not be available to members in the ERIP established as part of the Award.

With the exception of the last sentence, this option shall not be available to members in

88

the ERIP established as part of this Award which, as will be explained elsewhere, there will be

no ERIP. The Chairman does not believe this language is appropriate, as this is contrary to other

issues that the Panel has ruled upon and, therefore, the Chairman, joined by the City Delegate,

will opt to deny the proposal. The DPOA Delegate dissents.

**Issue No. 145** - Non-Economic - Union Proposal -        *Article 33 - Payment of Accumulated*

This is another proposal by the DPOA which reads:

### ARTICLE 33 - PAYMENT OF ACCUMULATED BANKED TIME UPON ELECTION TO PARTICIPATE IN THE D.R.O.P.

Upon issuance of this Award, the provisions of Article 133, "Pension Provisions," pertaining to 'DROP' payments shall be modified in accordance with the Memorandum of Understanding attached hereto as Exhibit B.

The City objects. There is a Memorandum signed by the parties dated February 9, 2011.

It is reasonable and it dovetails with the other Orders in regard to payouts and the limits of when

payouts are made for those participating under the DROP Plan as issues under the Orders herein.

By agreeing to this proposal, the Chairman would be acting in contradiction to other proposals

that the Chairman has agreed to and for this reason rejects the DPOA proposal as to Issue No.

145, joined by the City Delegate. The DPOA Delegate dissents.

**Issue No. 143** - Economic - Union Proposal -        *Article 33 - Early Retirement*

The DPOA has proposed in Article 33, "Early Retirement", which reads:

### ARTICLE 33 - EARLY RETIREMENT

New language: ¶W

W.        An Early Retirement Incentive Program ("ERIP") will be offered to a limited number of officers in the Department and the participation will be based on seniority upon the issuance of this Award. The total maximum number of early retirements will be 150, to be allocated to members of the DPOA (76%), the DPLSA (23%) and the DPCOA (1%).

89

13-53846-swr    Doc 512-3    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 45 of 46
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 91 of
147

Employees will be eligible to participate in ERIP if they (a) are three (3) years or less away from completing either 20 or 25 years of service, and (b) have sufficient banked time to purchase the remaining service time. Officers participating in the program will retire immediately using their years of service and banked time to get to 20 years of service and their pension will be calculated based on 20 years of service. All banked time will be relinquished in exchange for retirement service credit.

The City will offer members with between 17 and 20 years of service the ability to early retire as follows, as well as between 22 and 25 years: The City will offer such members the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have more than [1,000] hours of banked time (i.e. sick time, furlough, vacation or compensatory), and who relinquish all of their banked time. The City will offer members to retire two (2) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have at least [500] or more hours of banked time, and who relinquish all of their banked time. The City will offer members to retire one (1) year earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have less than [500] hours of banked time, and who relinquish all of their banked time. The utilization of banked time, for purposes of the calculation, begins with sick time.

DROP participants with 22 years of service who have not received their lump sum payout from their banks may use such banked time to participate in the ERIP in accordance with the above.

Any language not expressly modified remains current language (i.e. CBA *status quo*).

The City opposes adding this provision.

This language was in the Tentative Agreement signed on February 9, 2012 which at that time the City had agreed to it. In his post-hearing brief at page 71, the City's counsel writes in part:

The Tentative Agreement contained an early retirement plan under which 100 DPOA members would be able to retire three years early by forfeiting certain accrued banks or by purchasing time. This proposal was agreed to because the City believed it was in a position to allow 100 DPOA Officers to retire early and leave the force. The underlying concept was that these Officers would not need to be replaced and there would be substantial savings.

90

# EXHIBIT A-1 (Part 3)

This is no longer the case. Since January/February 2012, the
Department has had more than 100 DPOA members retire. See Ex.
742, January 31, 2012 headcount showing 2,091 DPOA members, and
Ex. 743 November 30, 2012 headcount showing 2,001 DPOPA. Since
November 30, 2012 there has also been an additional 20 retirements. ...

Furthermore, during the hearing, counsel for the DPOA suggested there would be more

retirements. It is problematical whether any of these retirees will be replaced in the economic

environment in Detroit. Thus, there is no room to encourage any Officers to retire. For this

reason, the Chairman, joined by the City Delegate, as the City opposes the early retirement plan

at this point, rejects the early retirement proposal. The DPOA Delegate dissents.

| | | |
|---|---|---|
| **Issue No. 53** - Economic - | *Article 31.A - Holidays- Eliminate Holidays-Election Day and 8th and 9th Holidays* | |
| **Issue No. 54** - Economic - | *Article 31.B - Holidays- Excuse Day and Holiday* | |
| **Issue No. 55** - Economic - | *Article 31.C.1 - Holidays- 1 ½x on Holidays if Scheduled and Not Appear to Holiday Pay* | |
| **Issue No. 141** - Economic - Union Proposal - | *Article 31 - Holiday Pay* | |
| **Issue No. 56** - Economic - | *Article 31.C.2 - Holidays-Holiday Rosters Employer Discretion* | |

The above five issues all deal with holidays.

Article 31.A of the Master Agreement provides for a schedule of holidays. The City's

Last Best Offer with strikeouts is as follows:

A.    **Schedule of Holidays**

Each employee shall be entitled to the following holidays in accordance
with this schedule.

| | |
|---|---|
| Independence Day | July 4th |
| Labor Day | First Monday in September |
| Veteran's Day | November 11th |
| Thanksgiving Day | Fourth Thursday in November |
| Christmas Day | December 25th |
| New Year's Day | January 1st |
| Memorial Day | Last Monday in May |

~~In addition, each employee shall be entitled to a holiday on one Election
Day in each year or an eighth holiday if an election is not scheduled.
(Notification will be made by Special Order.) A ninth holiday shall be~~

91

13-53846-swr   Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 2 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 94 of
147

~~granted to employees who have been employed ninety (90) days or more~~
~~and who are entitled to regular holidays under existing ordinances.~~
~~This holiday shall be taken at any time during the fiscal year which is~~
~~mutually acceptable to the employee and the Department. To insure that~~
~~the ninth holidays are expended proportionately throughout the year and~~
~~not carried until the last months of the fiscal year, on May 1st, the~~
~~commanding officer shall assign the remaining ninth holidays at his~~
~~discretion. Ninth holidays which are not used prior to the end of the~~
~~fiscal year will be lost.~~

Thus, the City proposes to eliminate the so-called 8th and 9th holiday. The DPOA

proposes to maintain the *status quo*. In support of its position, the City Advocate in his post-

hearing brief writes:

### Elimination of Election Day and Eighth and Ninth Holidays

While there are three holidays involved, in reality the City seeks
to eliminate only two holidays per year. In years in which there is an
election for which Officers have the day off they day off they have an
eighth and ninth holiday. These holidays should be eliminated for two
reasons:

- First, pursuant to the Financial Stability Agreement and
  Annex D it will conform the DPOA contact and the
  labor contracts of all other City employees whose
  contract has expired. As noted above, uniformity and
  thus ease of administration are one of the goals set forth
  in the Financial Stability Agreement.

- City will receive cost savings in the amount of
  approximately $390,000 per holiday, and with DFFA
  parity and approximately the City will save $500,000
  per holiday and $1M for both holidays. Ex. 654.
  approximately $500,000 per holiday or $1M for both
  holidays.

The Chairman acknowledges that the City makes a point. The problem, however, is that

though the City is in serious financial stress the Chairman must consider the nature of Police

work and the marketplace. No one can doubt the stress of Police who are working the street and

the need, when available, for holiday time off. Furthermore, even when compared with

distressed cities such as Flint and Saginaw, the holiday made available by the so-called 8th and 9th

92

13-53846-swr    Doc 512-4    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 3 of 49
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 95 of
147

holiday in Detroit, which has been available for numerous years, is competitive. There is a difference between the Police and general employees and the need to have the time off, if available, to relieve the stress of Police work. And, as indicated, the number of holidays is competitive even with the distressed cities such as Flint and Saginaw. It is for these reasons that the Chairman concludes, along with the DPOA Delegate, that the deletion of the 8th and 9th holidays, particularly in the absence of negotiations, is not the area for savings and therefore would opt with the DPOA Delegate to maintain the *status quo.* The City Delegate dissents.

However, for the period from July 1, 2012 through June 30, 2013, there shall not be an 8th or 9th holiday. The 8th and 9th holiday will commence the second year of the contract, July 1, 2013. On this point, the DPOA Delegate would dissent as he would opt to have an 8th and 9th holiday begin in the first year of the contract. The City Delegate, though objecting to the 8th and 9th holiday, would nevertheless join with the Chairman in agreeing that in any event there would not be an 8th and 9th holiday in the first year of the contract.

Issue No. 54 addresses a proposed change by the City in Article 31.B.3 as follows:

> 3. Should the holiday fall on Sunday and the Monday leave day begins the next 28 day work cycle, the leave day will be the Friday prior to the holiday or a day mutually agreed upon between the employee and the Department. ~~Should that Friday already be used in conjunction with article 32~~ [Excuse Time] ~~then the leave day will be Thursday or a day mutually agreed upon.~~

The DPOA proposes the *status quo.* The City's reason for the change is set forth in the following statement in its counsel's post-hearing brief:

> Under the Labor Contract, if a holiday falls on a weekend and Friday is an excuse day for the Officer, then the Officer has Thursday off. This sometimes creates scheduling issues for the Department. The Department wants to eliminate the requirement that if Friday is an excuse day that the Officer has Thursday off and wants to replace it with a day to be mutually agreed upon. In this way, the Officer receives his

93

day off and the Department can better schedule for the holiday week.

Therefore, the City requests that its Last Best Offer, Issue No. 54, be granted.

This statement, as the Chairman views it, is a perfect example of the failure to bargain.

If the parties had bargained rather than take this issue to Act 312, the parties would have been able to resolve the matter. The matter should have been resolved on the remand. It was not. Yet, the parties have had language on the issue in the Master Agreement for some time. This is a signal to the Chairman that the language should not be changed. If the language is to be changed, it is to be changed at the bargaining table. This is not an issue for Act 312. For this reason, the Chairman, joined by the DPOA Delegate, will vote for the *status quo* on this issue. The City Delegate dissents.

Issue No. 55 seeks to change the rate of pay for those Officers required to work from double time to time and one-half the regular rate of pay for all hours actually worked in addition to their regular day's pay of eight hours and a provision that employees who are scheduled to work on any holiday, but fail to report to work, shall not be eligible for holiday pay.

Issue No. 56 is a proposal concerning flexibility in assigning employees to various holiday rosters at the discretion of the Department by eliminating the following language in 31.C.2 under "example": "In those cases where an employee works four (4) or more hours into a holiday as a result of overtime, he is not entitled to holiday premium rate for that shift; the overtime hours shall be compensated at the regular time and one-half rate".

Issue No. 141 is a Union proposal that Officers be able to take part of their holiday pay in compensatory time. As to the DPOA's proposal, the City favors the *status quo*. Holiday pay from double time to time and one-half, though the City has suggested that there is no City

94

comparable to Detroit, the City did offer the comparables of St. Louis, Pittsburgh, Cleveland, Philadelphia, Baltimore and Chicago in terms of holiday pay. Only one (Pittsburgh) paid more than Detroit at 2.5 times. One (Philadelphia) paid straight time. Three (Cleveland, Baltimore and Chicago) paid time and one-half. St. Louis paid straight time plus four hours comp time. Yet, it seems with the long bargaining history of double time plus eight hours it is difficult, despite the fiscal crisis, to reduce this benefit. For this reason, the Chairman will vote with the DPOA Delegate and continue the double time for holiday work with the City Delegate dissenting as to Issue No. 55.

On Issue No. 55, there was a second Issue concerning employees who are scheduled to work on any holiday and fail to report. The Chairman believes this is a fair provision and would vote with the City Delegate and agree that such employees who fail to report will lose their holiday pay. The DPOA Delegate dissents.

As to Issue No. 56, the holiday roster issue, this seems reasonable to the Chairman and the Chairman, along with the City Delegate, will vote to accept the City's proposal. The DPOA Delegate dissents.

As to the DPOA's proposal on Issue No. 141, if the City wants to pay cash, the Chairman will go along with the City and vote with the City Delegate to reject the DPOA's proposal. The DPOA Delegate dissents.

**Issue No. 139** - Economic - City Proposal - *Eliminate 2% Promotional Increase*

The annual cost of the 2% increase on Officers who pass the promotional test and are on a promotional list waiting promotion is approximately $270,000 per year. During the time period July 1, 2012 to October 12, 2012, a period of three and one-half months, the 2% promotional increase cost to the city was $73,000. The 2% promotional increase has cost as much as

95

13-53846-swr    Doc 512-4    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 6 of 49
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 98 of
147

$340,000 annually to the City. *See* Exhibit 691. To the City, in financial crisis, this is no small amount.

Recognizing that the DPOA itself agreed to suspend the educational reimbursement, albeit on a sunset basis until July 1, 2015, the Chairman will agree to the elimination of the 2% promotional increase, recognizing that the parties at the end of this two year agreement can again revisit the issue. The City Delegate will join with the Chairman in adopting the City's proposal. The DPOA Delegate dissents.

**Issue No. 127** - **Economic - Union Proposal -**      *Article 11 - No Requirement to Perform*

The DPOA has proposed amending Article 11, Section B, as follows:

> Employees shall not be assigned duties normally performed by a person of higher rank, except in emergency situations, and shall receive the wages of the first year sergeant for all time/hours worked.

As the parties know, this matter is in arbitrating, awaiting an opinion. That opinion will be forthcoming when this Act 312 assignment is completed. That opinion will answer the issue raised. For this reason, the Chairman, joined by the City Delegate, will reject this proposal. The DPOA Delegate dissents.

**Issue No. 133** - **Economic - Union Proposal -**      *Field Training Officers*

The DPOA had proposed that once an Officer is certified FTO, namely, Field Training Officer, the Officer shall receive a 5% adjusted gross wage annually. The Chairman appreciates that in other large city departments there is a precedent for such a proposal. However, the City is in a financial crisis. This is not the time, unfortunately, for such an economic improvement. The Chairman notes that, though there are arguments for such a benefit, the parties over the years, when the City was perhaps able to afford such a benefit, have not negotiated or obtained such a benefit in previous Act 312.

13-53846-swr   Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 7 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 99 of
147

Thus, considering the financial circumstances and the previous bargaining history, the Chairman, joined by the City Delegate, will vote not to include a stipend at this time for a Field Training Officer. The DPOA Delegate dissents.

**Issue No. 133** - Union Proposal - Economic -    *Article 40 - Miscellaneous - Include Sick Time in Lump Sum Payments*

The DPOA has proposed to amend Article 40.H as follows:

> **H.** **Lump Sum for Banked Time.** Whenever an employee leaves employment with the City, such employee will be paid for all banked time, ~~other than~~ including sick time, in a lump sum payment within thirty (30) calendar days of the separation, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability.

The City objects.

The Chairman, along with the City Delegate, agrees with the City that Article 40.H should not be amended as proposed by the DPOA. As the City points out in the transcript at Vol. 6, pg. 93, some payments involve several hundred thousand dollars and there are concerns as to sick leave that sometimes it takes anywhere from 30 days to six months to reconcile sick leave banks. This explains that the parties over the years have negotiated the language "other than sick time". It is for this reason that the Chairman was not persuaded to adopt the proposed amendment and opted with the City Delegate to continue the present Article 40.H language. The DPOA Delegate dissents.

**Issue No. 48** - Economic -    *Article 22-Furlough Selection City Can Change*
**Issue No. 51** - Economic -    *Article 29-Eliminate Longevity*
**Issue No. 89 A and B** - Economic - *Article 41.A - Wages-10% Reduction*
**Issue No. 90** - Economic -    *Article 41.A - Wages-City Right to Institute Furlough Days*

As to Issue No. 48, the City proposes to add a subparagraph I to Article 22, "Furlough

97

Selection and Cancellation", which reads: "The City reserves the right to make changes to any aspect of furloughs, including but not limited to, the number of furlough days and selection process". The Master Agreement has been negotiated between the parties, including Act 312 proceedings. This is an Act 312 proceeding where proposals have been made, testimony has been taken and arguments have been made, including arguments concerning furloughs. Once Orders have been issued and agreements have been made, this is the parties' contract. What the City is proposing is inconsistent with a binding contract to be honored by both parties. For this reason, the Chairman, joined by the DPOA Delegate, will reject the City's proposal. The City Delegate dissents.

Issue No. 89 A and B deals with wages. Issue No. 51 deals with longevity. Issue No. 90 addresses furloughs. These issues represent the core money issues with the exception of issue No. 90, which is basically a layoff issue, between the parties in this Act 312 proceedings.

As to Issue No. 89 A and B, the Last Best Offer of the City is as follows:

(CORRECTED - UPDATED)
ISSUE NO. 89 A and B - ECONOMIC

CBA Article 41.A - Wages
CET Article 38.A - Wages
CET Provision and City Last Best Offer on Issue 89 A

WAGE DECREASE: All classifications and positions shall receive a 10% wage reduction effective 7-17-12.

July 17, 2012 - June 30, 2013

| CLASS CODE | TITLE | Min | Max |
|---|---|---|---|
| 33-10-11 | Police Officer | $36,274 | $47,914 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $29,352 | $47,914 |
| 33-10-13 | Police Officer 2-20-95 1st Step | $29,352 | $33,065 |

98

| 33-10-14 | Police Officer - Promotion List | $47,914 | $47,914 |
|---|---|---|---|
| 33-12-11 | Communications Officer - Police Officer | $36,724 | $48,364 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $48,776 | $48,776 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $49,481 | $49,481 |
| 33-12-14 | Communications Officer - Police Officer - Promotion List | $48,364 | $48,364 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles - Police Officer | $48,776 | $48,776 |
| 33-12-26 | Police Data Processing Programmer - Police Officer | $48,503 | $49,652 |
| 33-12-36 | Senior Police Data Processing Programmer - Governed by wage rate for a Police Lieutenant contained in the Lts. And Sgts. Labor Contract | $74,028 | $76,220 |

IF THE ARBITRATOR AWARDS THE UNION A 2-YEAR DURATION FOR THE LABOR CONTRACT, THE CITY'S LAST BEST OFFER FOR THE TIME PERIOD JULY 1, 2013 TO JUNE 30, 2014 (ISSUE 89b) IS:

July 1, 2013 - June 30, 2014

| CLASS CODE | TITLE | Min | Max |
|---|---|---|---|
| 33-10-11 | Police Officer | $36,274 | $47,914 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $29,352 | $47,914 |
| 33-10-13 | Police Officer 2-20-95 1st Step | $29,352 | $33,065 |
| 33-10-14 | Police Officer - Promotion List | $47,914 | $47,914 |
| 33-12-11 | Communications Officer - Police Officer | $36,724 | $48,364 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $48,776 | $48,776 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $49,481 | $49,481 |
| 33-12-14 | Communications Officer - Police Officer - Promotion List | $48,364 | $48,364 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles - Police Officer | $48,776 | $48,776 |

| | | | |
|---|---|---|---|
| 33-12-26 | Police Data Processing Programmer - Police Officer | $48,503 | $49,652 |
| 33-12-36 | Senior Police Data Processing Programmer - Governed by wage rate for a Police Lieutenant contained in the Lts. And Sgts. Labor Contract | $74,028 | $76,220 |

As to Issue No. 51, the City proposes to eliminate Article 29, "Longevity". As to issue

No. 90, the City proposes to add to Article 41.A the following language:

BUDGET REQUIRED FURLOUGHS: The City reserves the right to reinstitute future furloughs as a means of cost containment.

The DPOA's proposal as to Issue No. 89 (wages) as well as Issue No. 51 (longevity) and

Issue No. 90 concerning budget furloughs is as follows:

DPOA
PROPOSAL NO. 89
Article 41 - Wages/Longevity

Article 41.A of the current Collective Bargaining Agreement shall be applied/enforced as follows:

### 41. WAGES

Employees hired prior to February 20, 1995, in this title shall proceed from minimum to maximum on the basis of five equal steps.

Employees hired on or after February 20, 1995 in this title shall receive wage increases and step increments in accordance with Exhibit II. B. Effective July 1, 2000, employees in this title shall proceed from minimum to maximum on the basis of five equal steps.

Employees who have already completed the Police Academy prior to July 1, 2000, but have not yet reached the 1st pay step shall have $1,000 of the 1st pay step applied to their annual salary, effective July 1, 2000. Employees who complete the Police Academy on or after July 1, 2000, will have $1,000 of the 1st pay step applied to their annual salary upon completion of the Police Academy. This increase will be considered an early entitlement to part of the first annual step increase.

Employees in the classification of Police Officer shall receive the following wage adjustment effective January 1, 2013 for the duration of this agreement.

Compensation Schedule

100

January 1, 2013

| Class Code | Title | Min. | Max. |
|---|---|---|---|
| 33-10-11 | Police Officer | $40,304 | $53,237 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $32,613 | $53,237 |
| 33-12-11 | Communications Officer - Police Officer | $40,754 | $53,687 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $54,099 | $54,099 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $54,804 | $54,804 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles – Police Officer | $54,099 | $54,099 |
| 33-12-26 | Police Data Processing Programmer - Police Officer | $53,826 | $54,975 |
| 33-12-36 | Senior Police Data Processing Programmer - Police Lieutenant | $71,870 | $74,000 |

Essentially, effective January 1, 2013, the DPOA proposed restoring the 10% wage cut in all classifications and proposing a two year agreement from July 1, 2012. The DPOA rejects the budget required furloughs and restores the longevity payments that were eliminated by the CET. The DPOA is seeking payment of longevity pay pursuant to Paragraph 29 of the Master Agreement according to the schedule thereof and according to the terms thereof.

According to Exhibit 2 of the Master Agreement Schedule, Officers who are employed after February 20, 1995 are hired in under the City's proposal at $29,352. There are five steps beginning after one year until reaching top pay which under the City's proposal would be $47,914 on an annual base wage. Under the DPOA proposal, the top pay after five years would be the rate that existed on July 1, 2008, namely, $53,237 annualized as there had been no pay raise at the base rate since July 1, 2008.

101

Succinctly put, in advocating for a one year contract, the City was proposing to maintain a 10% pay cut. In advocating for a two year contract, if the Panel was so disposed, the City was advocating for a 10% pay cut for two years. Initially, the DPOA was advocating a three year contract and advocating that it maintain the same level of pay, no pay cut, for three years. The Chairman urged the DPOA to back off to a two year contract, recognizing the situation that the parties were facing which the DPOA accepted in making an offer of a two year contract. Then the Chairman urged, based upon his belief that he would not find the financial situation in Detroit as critical as it turned out to be, that the DPOA offer to accept the 10% pay cut for the first six months and then a restoration of the 10% for the last 18 months. The DPOA accepted this suggestion from the Chairman and made this its offer, namely, to accept the 10% pay cut that had prevailed until January 1, 2013 and then a restoration of the 10% beginning January 1, 2013.

In an attempt to convince the Chairman of their respective positions, the parties offered competing comparables with the City suggesting internal comparables and suggesting that there were no external comparables. The DPOA ignored the internal comparables, suggested certain national Police comparables, and referenced 15 Southeastern Michigan Police comparables as well as Saginaw and Flint. The City suggested that there were no external Police comparables comparable to Detroit. Though the City's internal comparables do reference general employees who have taken pay cuts that were imposed, none of the internal comparables have the same working conditions as Detroit Police Officers who, as pointed out in the prologue, are faced with the same hazards of employment that have unfortunately in some cases resulted in the death of some Officers. In other words, the Police marketplace is what is being paid by other nearby communities for police services.

Nevertheless, the general employees in Detroit in recent years have taken pay cuts so that

102

13-53846-swr    Doc 512-4    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 13 of 49
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 105 of
147

in 2013 their pay cuts have averaged a 20% pay cut for both unionized and non-union employees – both supervisors/executives and general employees whereas, up to July 2012, the uniform employees have not taken a pay cut. The financial situation in Detroit is at an emergency stage. Regardless of the Police marketplace, this fact cannot be overlooked by the Chairman, regardless of the equities and the Police marketplace. Yet, the marketplace for Police work is there to behold.

The Midwest national comparables ranging from $55,000 to $80,000 annually are not particularly helpful because the taxing authority of the other national Midwest cities varies and are not comparable with Detroit. Nor are the economic conditions in the other national Midwest cities comparable with Detroit.

Likewise, the 15 suburban cities in Southeast Michigan used by the DPOA are not comparable with Detroit. Detroit is not, for example, Livonia, Birmingham, Troy, the Grosse Pointes (Public Safety Departments) or Royal Oak – cities that are financially well off and are not in financial distress. Nor can the Michigan State Police be considered a comparable because Michigan is not in financial distress as Detroit finds itself. Nevertheless, the comparables were used to point out that, for instance, Michigan in base wages on an annual basis at a five year level, exclusive of longevity, pays a State Trooper $59,988. The top pay for a Michigan State Trooper at 10 years is $64,143.36 and after 20 years, $65,730.24. The suburban districts are paying anywhere between $55,000 and $60,000 annually.

One of the criteria under Section 9 of Act 312, besides financial ability, is external comparables. A proper comparable in this situation would be, as pointed out at the beginning of this Opinion in the open letter to Emergency Manager Orr, Flint, Michigan, 60 miles away from Detroit, which is under an Emergency Financial Manager, and Saginaw, Michigan,

103

13-53846-swr   Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 14 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 106 of
147

approximately 85 miles away from Detroit, which is also a financially distressed city, having a deficit in excess of $3 million. Yet, in each of those cities, the police officers are paid more than Detroit's current $47,914 based on an annual base wage at 2,080 straight time hours for a five year Officer, the top pay in Detroit.

Below is a chart comparing the base wage and total compensation between Detroit at the current $47,916 top rate, Flint and Saginaw, noting that Flint is also under an Emergency Financial Manager under Act 72:

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

As the above chart indicates, in terms of base salary Flint, under an Emergency Financial Manager, is approximately at the five year level $4,000 more than Detroit Officers. As the Officer has more years on the job, the spread, even with Flint, is more. When total compensation is compared, even at five years, the spread between Detroit and Flint is dramatic, namely, $9,000, and almost $12,000 between Saginaw and Detroit.

104

These facts are devastating. These are not comparisons with the high paid State Police nor with Livonia, Birmingham, the Grosse Pointes (Public Safety Departments). The Chairman has chosen to compare primarily with another nearby community that is under an Emergency Financial Manager, namely, Flint. And look what the facts reveal. Compared with the marketplace, Detroit Police Officers, faced with the Police working conditions of a large urban area, are by any definition underpaid even in a distressed community faced with a financial emergency.

To put it another way, there can be no doubt that the job of a Detroit Police Officer is certainly as difficult as any in Southeast Michigan or, for that matter, the State Police because of the nature of Police work in a large urban American city. Furthermore, the Chairman is informed that the Flint figure was imposed by the Emergency Financial Manager, further emphasizing that the Detroit Police Officers, in comparison with a nearby distressed Michigan city, namely, Flint, Michigan's third largest city, are vastly underpaid.

As to Issue No. 51, longevity, the City proposes to eliminate longevity, arguing that the City has eliminated longevity with its other unions by virtue of the City Employment Terms as well as its non-union personnel. Yet, in order to reach some semblance in the marketplace, the DPOA argues that it needs longevity and proposes that longevity pay be restored.

The external comparable of Flint and Saginaw clearly establishes that the Detroit Police Officers at $47,416 at the five year rate are grossly underpaid, even in a city that is under an Emergency Financial Manager where there is a serious question of the ability to pay.

Even though the Chairman made the suggestion of what he believes should be the Union's Last Best Offer because it was evident that Detroit Police Officers were clearly underpaid in the comparable workplace in comparable police work, the Chairman, applying the

105

312 criteria and the emphasis required to be put on financial ability, hit a roadblock of Detroit's financial crisis, causing the Chairman to reconsider his initial reaction because of his obligation to follow the statute and the criteria set forth therein as there is a question of ability to pay, though the Chairman will point out that a careful analysis suggests that the Orders that will follow will indicate that if Detroit wishes to have a viable Police force in the interest of the citizens' public welfare, there is a way to have some semblance of the ability to pay. In this regard, what a majority of the Panel has done is for the first year continue no pay raises, even though Flint during the same year is making a base wage of $4,000 more. There was recognized that those Officers who are 12 hour shifts, and that is not all of the Detroit Police Officers, are being paid if they work a full year on 12 hour shifts an extra 104 hours at 84 hours every two weeks. But this does not apply to all Detroit Police Officers. The Panel majority, the Chairman and the DPOA Delegate, although the DPOA Delegate is reluctant, believing that the Panel should have awarded a pay restoration in the first year of the contract or at least by July 1, 2013, would award a 5% restoration effective January 1, 2014. This gives the Emergency Manager and Mayor nine months to reorganize the Department, if he so chooses, in conjunction with the City and the Department. This will bring the five year Officer up to $50,311.80, based upon a 2,080 hour year, still below Flint. However, if the Department continues 12 hour shifts 84 hours in a two week cycle and makes the 84 hour cycle available, Officers will be able to earn additional monies, at least those on patrol, as they have in the past year.

The reason for not restoring the longevity is there is the claimed ability to pay proposition and the fact that longevity was eliminated with the Lieutenants and Sergeants in an Act 312 proceeding, has been eliminated throughout the City, although imposed, and is not available in Flint. What the majority of the Panel has done is illustrated by the following chart:

106

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

The Emergency Manager, the Mayor and the Treasurer of the State of Michigan should consider, with the blessings of the Governor, moving the date of the 5% restoration to July 1, 2013 when considering the above comparisons.

In regard to the longevity, again recognize what the longevity payments were in the Master Agreement that expired on June 30, 2012 that had been in the Master Agreement for some time. After five years, an Officer received 1% of base wage; after 11 years, 2% of base wage; after 16 years, 3% of base wage; and after 21 years, 4% of base wage. Using these figures, if the Emergency Manager and the Mayor should consider, recognizing that longevity is being eliminated in Detroit, to bake in as part of the base wage the previous longevity into the Police Officer's base wage. If this is done, look at the figures in comparison with Flint and Saginaw:

| Five (5) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$50,814.92** |
| Flint | $51,336 |
| Saginaw | $53,700 |

107

| Eleven (11) Year Officer | Annual Base |
|---|---|
| Detroit | **$51,318.04** |
| Flint | $51,336 |
| Saginaw | $53,700 |

| Sixteen (16) Year Officer | Annual Base |
|---|---|
| Detroit | **$51,821.15** |
| Flint | $52,176 |
| Saginaw | $53,700 |

| Twenty-One (21) Year Officer | Annual Base |
|---|---|
| Detroit | **$52,324.27** |
| Flint | $53,148 |
| Saginaw | $53,700 |

If the longevity is baked in, it should be done by the Emergency Manager and Mayor. The Panel has not done this although the DPOA Delegate would do it as he believes longevity should have been included in the Order. It should be noted that the City Delegate dissents on any pay increases or any consideration of longevity. The City Delegate agrees with the Chairman that the Chairman has no authority to include longevity. The DPOA Delegate would have included longevity in any event.

Now, where is this money coming from, given the City's ability to pay? First, the Emergency Manager has nine months to reorganize the Department to bring efficiencies to the Department, including controlling overtime. And, in this regard:

(1) there are provisions to work out, including 12 hour shifts and perhaps an arrangement of a dual eight hour/12 hour program which can eliminate, according to the Department, substantial overtime;

(2) in regard to going to court on tickets and ordinance violations, the Detroit Police Department, in conjunction with the 36th District Court, can adopt the techniques used in the suburban courts and departments where a supervisor can conduct pre-trials and arrange for pleas

108

from citizens to avoid having Officers appear in court, thereby saving overtime. This is a well-known technique in suburban departments and apparently has not been used in Detroit and can save overtime;

(3) working with the Chief Judge of the 36th District Court, address the question of Judges who do not appear timely in court which contributes to the overtime that Officers spend in court;

(4) move a number of Officers who are not doing police work out of their positions and into field work. The importance of this is that when these proceedings began there were over 2,000 Police Officers. The latest count is there are under 2,000 Officers either as a result of resignations or retirements. It is anticipated that there will be more retirements before the proposed raises take effect. In the opinion of the Chairman, it is unnecessary to replace the retiring Officers as probably the same or even more police service can be performed for the citizens of Detroit with less Officers if Police Officers are put out on the street.

One example suffices. In Central District, when one walks into that District, there is an Officer assigned to the screening device. Right behind that Officer there are two or three civilian employees at a security desk. If one turns right and walks down the hall, there are three counters where fully uniformed Officers are serving the public for some type of licenses. Every time the Chairman has gone by there, there have been rarely one or two citizens being served. Exactly why there are three full service Officers behind those counters when that work could be done by civilians or whether one Officer rather than three Officers could be doing the work. In other words, a careful survey throughout the Department might reveal a substantial number of Police Officers who could be doing police work rather than civilian work or their jobs could be combined. The significance of this is, rather than replacing Officers who are resigning or

109

13-53846-swr    Doc 512-4    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 20 of 49
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 112 of
147

retiring, Officers could be performing work out in the field with no increased cost. It is estimated that assuming the overhead cost of a $51,000 or $53,000 Officer is one-third, these Officers not replaced represents an $80,000 reduction in the budget. If 100 Officers are not replaced, but instead 100 Officers are moved out of counters or out of Precincts where they are not doing police work, this provides the financing to give these Police Officers a wage comparable with Flint and Saginaw. The Emergency Manager and the City government has nine months to accomplish this consistent with the City's ability to pay.

Detroit is in a serious financial crisis. There is a need to have more Police Officers on the street. But the Orders here limit the number of non-IOD limited duty Officers. The Orders provide for civilianization. The Chairman has illustrated the one example where there are Officers who seemingly are wearing full uniforms and are not doing police work, answering calls of citizens and who could replace retiring Officers without adding to the force and still serve the citizens and not strain the City's finances. It may be that, with retirements and resignations and utilizing available person power that could be put out on the street without hiring any other personnel, the Department could operate with between 1,800 to 1,900 Officers and provide the same current service and even increased service to the citizens of Detroit and pay the comparable wages ordered by the majority of the Panel and be cost neutral, in other words without adding costs to the Department. This comment goes hand in hand with the recognition in the Orders of attempts at the need to save overtime costs. The Panel has clearly recognized the City's dire financial crisis.

There is the Section 9(h) criteria that fact finding and arbitrators consider, namely, the art of the possible. The Chairman appreciates that the civilian employees have taken pay cuts. This is unfortunate. But, police work is different. It is dangerous. It has resulted in Police Officers

110

losing their lives. And, as one can see, all the majority of this Panel has done is made a comparison with another city, Flint, that has an Emergency Financial Manager, and the comparison has been with wages that were imposed by that Emergency Financial Manager. Any court that might be called upon to review this Opinion should recognize that the art of the possible means that a strike should be avoided. That is the purpose of Act 312. And it would seem that it is possible by applying careful management techniques to get Police Officers out on the street; that it means a smaller Department in terms of numbers, a more effective Department that can do it with less money with Officers who are paid at least a reasonable rate with a comparable community, then this should be done.

Incidentally, this is what is happening in other communities, even to the effect, based upon this Chairman's experience in Chicago, that even Command Officers are now out on the street as a matter of course. Thus, the Chairman realizes there are a number of things that could be done in the Department based on his own observations that can be tightened up consistent with protecting the integrity of the contract and the integrity of the Department, consistent with the City's limited ability to pay.

If the observations of the Chairman are followed, the Order may even be cost neutral. If the Emergency Manager with the Mayor bake in the longevity payments, it is suggested that it still could be in the $5 million to $6 million range as the longevity payments would not have been due until December 2013. And, then, as pointed, it still would be cost neutral. In other words, the ruling of the majority of the Panel, although the DPOA Delegate reluctantly signed the Order only to get a majority ruling, gives the Emergency Manager the opportunity to accelerate the restoration of 5% as early as July 2013. And, even then, the Chairman is of the view that it could be cost neutral if the resignations and retirements are not replaced. But, certainly, the

111

13-53846-swr    Doc 512-4    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 22 of 49
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 114 of
147

baking in of the longevity payments at a minimum should be voluntarily done by the Emergency Manager and the Mayor because these are, in the view of the Chairman, cost neutral.

The DPOA Delegate very reluctantly concurs with the Chairman, but if the DPOA Delegate had his druthers would have restored the complete amount of the cut on January 1, 2013. The City Delegate dissents. The City Delegate agrees with the Chairman that longevity should not be restored. The DPOA Delegate voted to restore longevity.

Concerning Issue No. 90, the City proposes to add to Article 41.A the following provision: "Budget Required Furloughs. The City reserves the right to reinstitute future furloughs as a means of cost containment." The DPOA objects to such a provision. Hopefully, such a provision will not during the life of this Agreement be instituted. But the financial crisis in Detroit is such that this is a possibility. Furthermore, this is consistent with management rights. For this reason, the Chairman, joined by the City Delegate, will vote to include such a provision. The DPOA Delegate dissents.

**Issue No. 103** - **Economic - City Proposal -**      *12-Hour Shifts*
**Issue No. 122** - **Non-Economic - Union Proposal -***10-Hour Shifts*

Issue No. 103 is a City issue which the City has dubbed as an economic proposal dealing with 12 hour shifts. The DPOA has proposed Issue No. 122 dealing with work schedules which the DPOA has dubbed as non-economic. Both offers deal with work schedules. The dilemma that the parties have presented is that if an economic issue, then the Panel must select one or the other Offer. If a non-economic issue, the Panel can fashion an award. The two Issues involve work schedules. Work schedules represent a condition of employment which is not necessarily an economic issue. Therefore, the Chairman concludes that since the two Issues are schedules that both Issue No. 103 (12 Hour Shifts) and the proposed 4/10 work schedule is also a work

112

13-53846-swr   Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 23 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 115 of
147

schedule; that the two issues are non-economic. The DPOA Delegate agrees with the Chairman. The City Delegate dissents. This means that the Panel can fashion its own Orders as to scheduling.

As to the 4/10 work schedule, this was a proposal in the Tentative Agreement if 10 hours shifts are utilized as a development of a pilot program. Commander Benson testified that he did a study on a 10 hour shift model and concluded that it would increase the cost to the Department in instituting such a schedule. Commander Benson explained that two 10-hour shifts would cover 20 hours per day which he believed would mean the need to have more equipment and Officers to cover the additional four hours per day which the Department does not have the equipment or the personnel available to accommodate the additional needed squad cars. The Chairman was persuaded by this testimony and for this reason will join with the City Delegate in rejecting Issue No. 122, as mandating a 10 hour shift. On this point, the City Delegate joins with the Chairman in agreeing that this is a management right. The DPOA Delegate believes, again, that the Panel should have issued an Order mandating a 10 hour shift. However, the Department retains the management right to determine whether the Department wishes to initiate a 10 hour shift. The DPOA Delegate dissents.

As to the 12-hour shifts, the Department maintains that the 12-hour shifts project a savings annually in overtime of approximately $3 million per year; that in the Second Precinct, comparing January 2012 before 12-hour shifts with November 2012, there was an increase of Officers on the street from 52% to 76%; that in the Eighth Precinct there was an increase from 75% to 86%. Inspector Rivers testified that there were examples of Officers working on the eight hour shift basis on double shifts. She gave an example in Exhibit 710 in the period between June 27, 2011 through August 7, 2011 in the Southwestern District there were 63 double

113

13-53846-swr    Doc 512-4    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 24 of 49
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 116 of
147

shifts, meaning Officers worked 63 double shifts or 16 straight hours. The proposed schedule in one scenario provides for a five day week, followed by a two day week, with one three day weekend.

The Chairman appreciates that there are consistent runs in Detroit; that the schedule does provide all Officers with every other weekend off. It does provide a savings in overtime and allegedly provides for more cars on the street.

On the other hand, there has been a ground squall from Officers indicating that there is a fatigue factor that Officers, because of the consistent runs in a large urban area, are having difficulty adjusting to 12 hour days. Yet, other Officers welcome the 12 hour shift. Under such circumstances, this is a matter that should have been developed with more care on the part of the Department with input from Union representatives, recognizing that the Department does have the management right to institute a 12 hour shift. The Chairman, joined by the City Delegate with the Union Delegate dissenting, recognizes the Department's management right to institute a 12 hour shift. However, the Order will also provide, with the City Delegate dissenting, with the Chairman and the DPOA Delegate concurring, that there be established a committee consisting of one member of the Department and one Officer of the DPOA to meet within one week of this Order to explore the possibility of providing an opportunity to operate 12 hour shifts with volunteers and allowing other Officers to work eight hour shifts and to report their findings to the Chief within two weeks of this Order. If the Chief accepts the recommendations of the committee and in doing so implements a volunteer 12 hour program, this ends the matter. If the Chief does not accept a voluntary program by May 1, 2013, then within one month of May 1, 2013 the matter may be submitted to the Chairman of this Panel as the senior Umpire under the Umpire System, to determine whether the Chief has been arbitrary in exercising his management

114

13-53846-swr  Doc 512-4  Filed 08/19/13  Entered 08/19/13 19:38:38  Page 25 of 49
13-53846-tjt  Doc 13152-2  Filed 10/29/19  Entered 10/29/19 09:55:40  Page 117 of
147

discretion in determining not to accept a voluntary program, with the standard being to curtail overtime and to have more patrol cars on the street.

The City Delegate agrees with the Chairman that the decision to have 12 hour shifts is a management right, but disagrees with the committee approach as spelled out in the Order. The DPOA Delegate dissents on the issue of 12 hour shifts, maintaining that it is a condition of employment to be negotiated, but would concur with the Chairman as to the committee approach and the opportunity to grieve in the event that the Chief does not accept the committee recommendation or implements, in any event, a volunteer program in establishing 12 hour shifts.

One final point which is a point made by the Chairman. The Chairman, in writing this portion of the Opinion as to 12 hour shifts, does so on the proposition that the schedule that will be adopted will be an 84 hour schedule on a two week cycle as this has been the schedule that the Department has used since implementing the 12 hour schedule. The Department's testimony on this point has been that a 10 hour day is not as effective as a 12 hour day in having cars on the road and in eliminating overtime.

**Issue No. 102 - Non-Economic - City Proposal - *Emergency Manager***

The City proposes the following language as to an Emergency Manager:

> An Emergency Manager appointed under the Local Financial Statutory and Choice Act may reject, modify or terminate this collective bargaining agreement as provided within the Local Financial Stability and Choice Act 436 P.A. 2012.

> Inclusion of the foregoing language does not constitute an agreement by the DPOA to the substantive or procedural content of the language. In addition, inclusion of the language does not constitute a waiver of the DPOA's right to raise Constitutional and/or other legal challenges (including contractual or administrative challenges) to: (1) the validity of the Local Financial Stability and Choice 436 P.A. 2012; (2) appointment of an Emergency Manager; or (3) any action of an Emergency Manager which acts to reject, modify or terminate the collective bargaining agreement.

115

The difficulty with this proposal is the failure to recognize that it is not a mandatory subject of bargaining. Act 312 is designed to resolve disputes between public employers and police and fire unions when the parties have reached impasse over mandatory subjects of bargaining. An Act 312 Panel's jurisdiction is limited to resolving mandatory subjects of bargaining.

Section 15(7) of the Public Employment Relations Act provides:

> (7) Each collective bargaining agreement entered into between a public employer and public employees under this act after March 16, 2011 shall include a provision that allows an emergency manager appointed under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, to reject, modify, or terminate the collective bargaining agreement as provided in the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531. Provisions required by this subsection are prohibited subjects of bargaining under this act.

Subsequent to the rejection of Public Act 4, the Legislature enacted Act 436 of Public Acts of 2012. Pursuant to Section 30 of Act 436 and Act 212 30(1) as well as 30(2), it seems that the references to Act 4 of Public Acts of 2011 contained in 15(7) of PERA would also apply to Act 436 of 2012. The point is "provisions required by this subjection are prohibited subjects of bargaining under this Act". This means, in the view of this Chairman, that placing the proposed provision is not a mandatory subject of bargaining, but is required by PERA; that the refusal by the DPOA to agree to such a provision in their contract may well be an unfair labor practice. But that would be a matter before the Michigan Employment Relations Commission and is not a matter to be resolved by this Act 312 Panel, whose jurisdiction is to address mandatory subjects of bargaining. For this reason, the Chairman declines to join either party in issuing an Order including the City's offer on this subject for lack of jurisdiction. Having received no majority, the proposal fails for lack of a majority vote, with the City Delegate

116

dissenting as the City Delegate would vote to include the City's Last Best Offer. The DPOA Delegate takes the position that it would not be an unfair labor practice to resist including such language in the contract.

**Issue No. 60 - Economic -**   *Article 33.J - Pension Provisions-Longevity Delete from AFC*

In Issue No. 60, the City proposes to delete longevity from the average final compensation of the pension plan. Though a majority of the Panel has not included longevity in this contract, longevity has been in previous contracts and it is hoped that the City and the Emergency Manager may in their wisdom reinstate longevity and for this reason the Chairman, joined by the DPOA Delegate, will reject the City's Issue No. 60 which the DPOA obviously objects to. The City Delegate dissents.

**Issue No. 66 - Economic -**   *Article 33 - Pension Provisions-Right to Create/Amend/Eliminate DC Plan*
**Issue No. 67 - Economic -**   *Article 31.U.10 - Pension Provisions-City May Create Loan Program from DC Plan*

The City proposes in issue No. 67 to modify Article 31.U as follows:

U.   **Defined Contribution Plan.**

*       *       *

10.   Participant Loan Program. ~~There shall be a~~ The City may create a participant loan program which will conform with the requirements of Section 72(p) of the Internal Revenue Code and shall be limited to "hardship" circumstances, as defined by the Plan Administrator and will only be available if no other loans from the Plan are outstanding. A participant who satisfies applicable rules and procedures as established by the Administrator may borrow from the participant's accounts an amount which does not exceed the lesser of fifty (50%) percent of the participant's vested accumulated balance or Fifty Thousand and 00/100 ($50,000.00) Dollars. Loans must be for a minimum of One Thousand and 00/100 ($1,000.00) Dollars. Repayment shall be done through payroll deduction. However, any outstanding balance shall be due upon termination of employment.

117

* * *

Thus, the City proposes to amend Section U.10 by making the Participant Loan Program permissive rather than mandatory, and not only to new hires but to all Officers without negotiating with the DPOA.

Article 31 - Pension Provisions

U. **Defined Contribution Plan for Current and New Hires - The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan and related duty disability retirement provisions for current employees and new hires, which may include a Defined Contribution Retirement Health Care Plan.**

This Plan shall be effective for all bargaining unit members hired into the Department on or after June 30, 2012 and when employee contributions may be made on a pre-tax basis.

Bargaining unit members hired into the Department at or after that time, other than as provided herein in regard to duty-disability beneficiaries, will not accrue benefits under the old plan. Rather, those bargaining unit members hired into the Department on or after the effective date shall accrue benefits exclusively under this Section.

* * *

10.   See Issue 67.

* * *

The issue of the type of pension plan is usually an issue of negotiation between the parties. Likewise, the parties did agree that the loan program would be mandatory. There has been no showing after the parties previously agreed that it would be mandatory; that there is any persuasive reason that now the program should be permissive. For both of these reasons, the Chairman, joined by the DPOA Delegate, will vote to deny the request of the City to adopt the proposal represented by Issue No. 66 and 67 which the DPOA objects. The City Delegate dissents.

118

13-53846-swr   Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 29 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 121 of
147

**Issue No. 68 - Economic -** *Article 33.V.1 - Pension Provisions-City Right to Amend Disability Retirement*

In Article 33.V.1, the City proposed the following amendment represented by the underscoring:

     V.      Duty Disability Retirement Provisions

          1.      Subject to the City's reserved authority to amend and modify the following and subject to c, below, applicable to all bargaining unit members who file application for disability retirement benefits, the definition of "total disability" and "total incapacity" for the duty disability retirement provisions is as follows:

* * *

There was no showing of a need for this provision. The duty disability retirement provisions have been in the contract for some. They are a result of negotiations or an Act 312 between the parties. Subsections a, b and c under Section V.1 were carefully drafted. If there are changes, the changes should be mutually negotiated between the parties or mutually contested in an Act 312. For these reasons, the Chairman, concurred in by the DPOA Delegate, will vote to deny the issue No. 68 proposal by the City. The City Delegate dissents.

**Issue No. 69 -**     *Article 33 - New Pension provision. Eliminate vision and dental care*

The City proposes to add to Article 33 a new section on pensions reading:

        Upon the effective date of this Agreement, all vision and dental pensions shall no longer be provided for any future retirees after January 1, 2013.

The DPOA opposes.

The rationale that the City presents is that this is a cost item to the City as the City is required to fund this benefit; that its consultants suggest that this benefit is not prevalent in other pension plans. The DPOA questions this fact. Though the Chairman appreciates that the City is

119

in financial difficulty, there are disputes between the parties as to the financial condition of the pension plan plus the need to make reforms. The problem that the Chairman sees is that with no history of bargaining and an attempt to resolve such issues as this, given the City's financial plight, more needs to be done at the bargaining table before submitting the issue to the Panel. It is for this reason that the Chairman, joined by the DPOA Delegate, will at this time reject this proposal. Though the DPOA Delegate did not agree with the Chairman's position on a re-opener as to pensions, and therefore expressed concern as to the re-opener, in order to obtain a majority vote at this time, agrees to vote to reject the City's proposal on Issue No. 69. The City Delegate dissents, believing that the issue should be addressed at this time.

**Issue No. 62** - **Economic** -    *Article 33.R.1 - Pension Provisions-Full Time to Stay in DROP*
**Issue No. 63** - **Economic** -    *Article 33.R.2 - Pension Provisions-DROP Limited to 5 Years*

Issue Nos. 62 and 63 are proposals by the City as to the DROP Plan. These are proposals to amend the DROP Plan which the DPOA opposes. Issue No. 62 is a proposal by the City to amend Article 33.R.1 to add the following language:

> Members entering the DROP Plan after the effective date of this Agreement must remain in a full duty status for the duration of their participation in the DROP Plan. If a member is not able to return to full duty status within six months, their participation in the DROP Plan shall terminate and he/she shall revert to a regular pension.

The proposal also proposes to delete the reference to the 2.25 escalator in Section R.5 and in R.9. Likewise, in R.2, the proposal proposes to incorporate the City's proposal as to Issue No. 63, the five year limitation on participation in the DROP Plan.

The Chairman would agree with the elimination of the reference to the 2.25% escalator because this is a housekeeping matter related to the stipulation in the 2011 Act 312 arbitration before Chairman Frankland. Thus, this would take care of subsections 5 and 9. As to subsection

120

2, this will be discussed in the discussion on Issue No. 63.

The Chairman appreciates the proposal put forth by the City. But the difficulty is that the language is drafted as an internal inconsistency and it does not distinguish between IOD and non-IOD injuries or address the overall issue of limited duty. For this reason, the Chairman, concurred with by the DPOA Delegate, will deny the City's proposal except as to Sections R.5 and 9. The City Delegate dissents as to Section s R.1 and 2, but will concur with the Chairman as to Sections R.5 and 9, and as to Sections R.5 and 9, the DPOA Delegate dissents.

As to issue No. 63, the City seeks to limit the participation in the DROP Plan to five years. When the DROP Plan was adopted by the parties, there was no limitation. There would have to be a further record developed to establish a cost factor that would strain the already fragile financial condition of the City to convince this Chairman that this provision is needed. At this point, the Chairman is not convinced. For this reason, the Chairman will join with the DPOA Delegate and deny this proposal but, as the Chairman did with Issue No. 63, he again repeats that as to Sections R.5 and 9, he will agree with the City Delegate that the reference to the 2.25 multiplier will be deleted. On this point, the DPOA Delegate dissents. On the point of denying the limitation, the City Delegate dissents, but does agree with the Chairman as to Sections R.5 and 9 in deleting the 2.25 references to the multiplier.

**Issue No. 61** - Economic - *Article 35.K - Pension Provisions-Delete Reference to 2.25% Escalator-No Escalator for Future*

**Issue No. 64** - Economic - *Article 33.R.5- Pension Provisions-Delete Reference to 2.25% Escalator*

**Issue No. 65** - Economic - *Article 31.R.8 - Pension Provisions-Delete Reference to 2.25% Escalator*

Issue Nos. 61, 64 and 65 are what the City proposes are cleanup provisions representing the stipulated award of 2011 concerning eliminating the 2.25% escalator for service credits

121

earned after September 1, 2011. As to Article 33.K, the City proposes as follows:

K.    On or after July 1,1992, and the first of July each year thereafter, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in Article IV, Section 1 (d) of the plan provisions, and Article 31, K of this Agreement (to include those members who opt to retire under the new plan provisions) shall be increased at the rate of 2.25% per annum computed on the basis of the amount of the pension received at the time of retirement by all new plan members who are currently retired or who retire on or after July 1, 1992.

~~For persons retiring on or after July 1, 2001, under the new plan provisions, the 2.25% per annum escalation amount shall be re-computed each fiscal year on the basis of the amount of pension received in the previous fiscal year (i.e., the 2.25% per annum escalation amount shall be compounded).~~

The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined in Article IV, Section 1 (d) of the plan provisions, and Article 31 (K) of this Agreement (to include those members who opt to retire under the new plan provisions) earned on or after September 1, 2011, shall not be increased whatsoever, per annum or otherwise. The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined herein, accrued prior to September 1, 2011, shall still be increased as provided herein. Hence pension benefits earned based on service rendered on or after September 1, 2011 will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to pension benefits earned based on service rendered before September 1, 2011.

Pension benefits based on service rendered after the effective date of this Agreement shall continue to not be subject to any escalation amounts.

The City proposes to delete one full paragraph as struck out and add a sentence as underscored, plus a reference to Article 31.K of this Agreement.

As to Issue No. 64, the City proposed to amend Article 33.R.5 as represented by the following underscoring and strikeout:

122

R.     DROP Plan:

    1.     See Issue No. 62.

    2.     See Issue No. 63.

* * *

    5.     The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the annual escalator <u>applicable to the credited service years</u> ~~of 2.25% times that portion of any retirement allowance earned prior to September 1, 2011~~.

* * *

    8.     See Issue 65.

* * *

Likewise, as to Issue No. 65, the City proposes to amend Article 31.R.8 with the following strikeouts and underscoring:

R.     DROP Plan:

    1.     See Issue 62.

    2.     See Issue 63.

* * *

    5.     See Issue 64.

* * *

    8.     When the member permanently retires, the member will receive a regular retirement allowance calculated **as if** the member retired on the day the DROP account started. <u>The member's retirement allowance shall include all annual escalator amounts</u> ~~2.25%~~ <u>subject to Article 31(K)</u> that would have been added while the member was participating in the DROP plan.

* * *

The history behind this language goes back to correspondence between the then counsel of the City, Kenneth Wilson, and the current counsel of the DPOA, Donato Iorio, when in a letter dated July 14, 2011 Mr. Wilson wrote Mr. Iorio as follows:

    I am writing to confirm that the City of Detroit and the Detroit

123

13-53846-tjtswDoc 13132-2   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 34 of 49
13-53846-tjtswDoc 13132-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 126 of
147

Police Officers Association (DPOA) have negotiated the agreement
summarized below subject to ratification. This agreement would resolve
changes to the collective bargaining agreement that would otherwise
have been determined by a majority of a panel pursuant to Public Act
312 of 1969, as amended. Subject to ratification, this agreement is as
follows:

\* \* \*

iv.   **Elimination of Escalator.** Pension benefits earned based on
      service rendered **after September 1, 2011** would no longer
      receive a 2.25% per annum escalation. Pension benefits earned
      pursuant to service rendered prior to that date would still be
      subject to the escalator. (Identical to LSA award other than the
      effective date.)

This language then became part of a Stipulated 312 Award before Chairman Kenneth P.

Frankland signed on September 22, 2011 in MERC Case No. D09 F-0731 wherein the Stipulated

Award provided:

iv.   **Elimination of Escalator.** Pension benefits earned based on
      service rendered **after September 1, 2011** would no longer
      receive a 2.25% per annum escalation. Pension benefits earned
      pursuant to service rendered prior to that date would still be
      subject to the escalator.

Based upon this history, the Chairman concludes that the language proposed by the City in Issue

Nos. 61, 64 and 65 reflects this stipulation. It is clarifying language. And, by placing this history

in this Opinion, confirming the history, all will understand the meaning of the language. For this

reason, the Chairman, voting with the City Delegate, accepts the City's proposal as to Issue Nos.

61, 64 and 65. The DPOA objected, arguing for the *status quo*. Based on the history, the

Chairman cast his vote as indicated with the City Delegate. The DPOA Delegate dissents.

| | |
|---|---|
| **Issue No. 9 - Non-Economic -** | *Article 6.A - Management Rights-Add Law and FSA* |
| **Issue No. 10 - Non-Economic -** | *Article 6.D, E and F - New Management Rights Provision* |
| **Issue No. 11 - Economic -** | *Article 6.G - Management Rights-Delete Confusing Section G about CBA Supplementing Charter* |
| **Issue No. 12 - Economic -** | *Article 6 - Management Rights-Reserve all Rights* |

124

13-53846-swr   Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 35 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 127 of
147

These Issues proposed by the City address management rights and are amendments to
Article 6 of the Master Agreement. All of the amendments proposed are opposed by the DPOA,
who propose that the *status quo* remain.

The amendments essentially mirror the City Employment Terms. The fact of the matter
is the management rights and responsibilities provisions in the Master Agreement have been
negotiated over a long period of time and, in the opinion of the Chairman, gives the Department
broad rights only subject to any negotiated "provisions of this Agreement".

The management rights in the Master Agreement are two pages long. They have been
tested in the umpire system and the Department has fared quite well among the umpires. All the
proposals do is represent a stylistic change. There is no need to reinvent the wheel. The present
management rights language gives the Department broad rights which the Department has in the
past and will continue to exercise. For these reasons, the Chairman, joined by the DPOA
Delegate, declines to adopt the City's proposals as to Issue Nos. 9, 10, 11 and 12 and votes to
continue the *status quo*. The City Delegate dissents.

**Issue No. 17** - **Non-Economic** -       *Article 9 - Discipline-Department Can Implement
                                             Disciplinary Policies, etc.*

The City has proposed to amend the introduction to Article 9, "Discipline", as follows:

> All alleged charges and specifications against employees will indicate
> the specific violation of Departmental rules and regulations including
> the date, time and location of such alleged violations and a statement in
> simple concise language of the facts constituting the allegations. The
> Department reserves the right to implement and/or modify disciplinary
> policies, rules and penalties, including but not limited to policies
> relating to use of alcohol and marijuana and other controlled substances
> with at least thirty (30) days prior notice to the Union.

This, again, is a non-economic issue. Under its management rights, it would seem that the
Department has the right to amend policies. But this is asking to confirm this right in the

125

13-53846-swr  Doc 512-4  Filed 08/19/13  Entered 08/19/13 19:38:38  Page 36 of 49
13-53846-tjt  Doc 13152-2  Filed 10/29/19  Entered 10/29/19 09:55:40  Page 128 of
147

contract. Likewise, the DPOA has the right to challenge the reasonableness of the rule. Therefore, the Chairman would add the language to the Union's right to challenge the reasonableness of the rule in the grievance procedure. With this added provision, the Chairman would adopt the City's Last Best Offer. The City Delegate reluctantly would agree. The DPOA Delegate dissents with amending the provision.

## Uniforms

The parties had proposals on uniforms but, during these proceedings, there was a representation that the parties were reaching an agreement on the issue of uniforms. Based upon this representation, the Panel will not issue an award on uniforms. If the Chairman is mistaken, then the Chairman shall be so advised within five days of the issuance of this Opinion and Award and the Panel will meet to address the issue of uniforms.

**Issue No. 94** - City Issue - *Eliminate Adoption by Reference*

Issue No. 94 is a proposal by the City to delete Article 45 of the Master Agreement which is entitled "Adoption by Reference or Relevant Charter Provisions, Ordinances and Resolutions" and reads:

> ~~Except as otherwise provided in this Agreement, the parties further agree that all provisions of the City Charter, Ordinances and Resolutions of the City Council relating to the working conditions and compensation of employees are incorporated herein by reference and made a part hereof to the same extent as if they were specifically set forth. These charter provisions, ordinances and resolutions include, but are not necessarily limited to, the following subject matter:~~
>
> ~~A.     Hours of work and method of compensation~~
> ~~B.     Overtime payments~~
> ~~C.     Premium payments~~
> ~~D.     Uniforms and equipment~~
> ~~E.     Vacations (furlough and leave days)~~
> ~~F.     Holidays~~
> ~~G.     Non-duty connected illness or disability (sick leave)~~
> ~~H.     Duty connected illness or disability~~

126

I.       ~~Retirement System (pension)~~
J.      ~~Longevity pay~~

The Chairman agrees that there is no reason to reference the Charter Provisions,

Ordinances and Resolutions; that the contract involved here should stand by itself. For this

reason, the Chairman, joined by the City Delegate, will agree to the elimination with the DPOA

Delegate dissenting as the DPOA objects to the elimination of Article 45.

**Issue No. 93 - Economic -** *Article 43 - Civilianization*

The City proposes to amend Article 43, "Civilianization", as follows:

> The Department shall have the right to use civilians <u>in any
> function/classification not requiring MCOLES certification, including in
> any of the functions/classifications listed below. Any police officer in a
> function/classification that is civilianized shall be reassigned.</u> ~~as it
> deems appropriate so long as it does not reduce the force or erode the
> membership of the bargaining unit as a result of the use of civilians in
> the following commands and district assignments~~ <u>including of the</u>
> ~~following s/classifications~~<u>:</u>

> Commands
> <u>1.</u> Fleet Management
> <u>2.</u> Equipment Property Control Section
> <u>3.</u> Communication Systems Section
> 4. Communications Operations
> 5. Uniform Store
> 6. Auto Pound
> 7. Records/Identification Section
> 8. Print Shop
> 9. Graphic Arts
> 10. Crime Analysis
> 11. Technology Liaison Office
> <u>12. Technical Support</u>
> <u>13. Any administrative function or classification</u>

> District Assignments
> <u>1.</u> Vehicle Maintenance Officer
> <u>2.</u> Property Officer
> <u>3. Any administrative function or classification</u>

> ~~To the extent civilians are employed to replace sworn officers it shall be
> done on the basis of either adding civilian staff, or by attrition when an
> officer voluntarily leaves the positions he/she currently holds.~~

127

13-53846-swr  Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 38 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 130 of
147

Should the Department decide to utilize officers in any of the above
mentioned positions, those positions shall be made available for officers
to submit DPD 568 Inter Office Memorandums for the transfer requests
for the commands. Unless a position is abolished, the Department must
fill all vacancies as soon as practicable if not with civilian than with
sworn officers.

Effective September 1, 2011, the Department may, at its discretion,
reassign bargaining unit members from the 36th District Court in order
that they may be replaced with civilian staff or civilian security
personnel.

The provisions of Article 10 shall not apply to this provision.

The strikeouts in the text represent deletions. There is also an added addition, namely, "The

provisions of Article 10 shall not apply to this provision". There is also some additional

language in the text concerning MCOLES certification. The City has also added under

"Commands" three additional entities, namely, Communications Operations, Technical Support

and "Any administrative function or classification". Under "District Assignments", the City has

added "Any administrative function or classification".

The DPOA proposes the *status quo*.

Although the City maintains there are 90 Officers affected, some of the City's count

includes present entities that can be civilianized, including Fleet Management, which the City

claims involves 14 Officers. The present Article 43 already provides for civilianization of Fleet

Management. The largest group in the City's proposal is Communications Operations involving

approximately 42 Officers.

The City does make a point. In their presentations, the parties did refer to the contract

between the City of Chicago and the Fraternal Order of Police Chicago Lodge No. 7 which

represents the Chicago Police Officers. Section 23.12 of that contract recognizes civilianization

of the functions that the city is seeking to civilianize and the amendment proposed to Article 43.

128

13-53846-swr Doc 512-4 Filed 08/19/13 Entered 08/19/13 19:38:38 Page 39 of 49
13-53846-tjt Doc 13152-2 Filed 10/29/19 Entered 10/29/19 09:55:40 Page 131 of
147

The City is seeking with less certified Officers in the Department to put more Officers on the street performing Police work. The City is seeking what other major departments are doing as evidenced by the Chicago contract. This civilianization process will take some time. Based upon the record, the City, even with its present language, has not always been able to civilianize. Yet, the City should have the opportunity to do so as part of the reorganization of the Department and the well being of the citizens served by the Department.

For these reasons, the Chairman, with the concurrence of the City Delegate, will vote to accept the proposal of the City to amend Article 43. The DPOA Delegate dissents.

| | |
|---|---|
| **Issue No. 99** - City Proposal - Economic - | *Article 33 - Pension-Lump Sum-Actuarial Reduction* |
| **Issue No. 100** - City Proposal - Economic - | *Article 33 - Pension-Gaines and Losses on Annuity Accounts* |

These are two issues dealing with pensions. As to Issue No. 99, the City proposes an amendment to Article 33 that reads: "Bargaining unit members may not receive a lump sum cashout of all or part of their accrued financial benefits from the Police and Fire Retirement System without actuarial reduction of benefits fully equivalent to and otherwise of equal value to such payment." As to Issue No. 100, the City proposes to add the following language:

> Bargaining unit members having participant accounts with the Police and Fire Retirement System which may be distributed to participant's beneficiaries in one or more installments rather than as an annuity, sometimes referred to as annuity accounts, shall have such accounts ratably adjusted, not less frequently than once per year, based on actual returns, positive or negative, experienced by the Trust during the fiscal year preceding the crediting date. Final distribution of the account balance due a participant or beneficiary shall be delayed until the final adjustment has been made.

The DPOA objects to these proposals.

The provisions for employee pension contributions and annuity funds have been in the

129

parties' Master Agreement since January 1, 1987. There was no evidence that there was any

negotiation on these proposals by the City. Given the length of time that the concept at issue has

been in the contract and the lack of negotiation between the parties, the Chairman will vote to

maintain the *status quo*. This is the type of proposal, given its longevity, whereby there should

be a history of negotiation. Therefore, the Chairman, along with the DPOA Delegate, will vote

to maintain the *status quo* as to Issue Nos. 99 and 100. The City Delegate dissents.

**Issue No. 107 - Economic - Union Proposal -**   *Article 34 - Regularity in Use of Sick Leave-*
*Discipline*

Issue No. 107 addresses regularity in the use of sick leave benefits and proposes to amend

Article 34.A as follows:

> **A.    General:**
>
> The Detroit Police Department is responsible for providing efficient law
> enforcement services. Maximum attendance is required from all
> members if this responsibility is to be fulfilled.
>
> The Department shall provide a guideline (copy attached) for
> determining excessive/improper use of sick usage. It is, therefore,
> necessary to identify and correct members who have developed a pattern
> or regularity in the use of their sick leave benefits.
>
> **CITY LAST BEST OFFER**
>
> **A.    General:**
>
> The Detroit Police Department is responsible for providing efficient law
> enforcement services. Maximum attendance is required from all
> members if this responsibility is to be fulfilled.
>
> The Department shall provide a guideline (copy attached) for
> determining excessive/improper use of sick usage. It is, therefore,
> necessary to identify and correct members who have developed a pattern
> or regularity in the use of their sick leave benefits.

Attached to the Offer is an extensive Guideline. The actual proposal refers to Article 34.

However, the proposal would best fit into Article 36 which is the Article in the Master

130

13-53846-swr   Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 41 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 133 of
147

Agreement referring to regularity in the use of sick leave benefits.

The DPOA opposes the addition of this language and, therefore, opts for the *status quo*. The Chairman, concurred in by the DPOA Delegate, believes that this is a non-economic issue and that the Panel, therefore, is not bound by one Offer or the other of the parties.

There was little bargaining on this issue, even though the Chairman is aware that the question of the use of sick leave benefits has generated grievances between the parties. Therefore, the Chairman believes that the matter requires more discussion and negotiations between the parties than was discussed in these proceedings. For this reason, the Chairman, joined by the DPOA Delegate, will opt for a Letter of Understanding to be attached to the contract whereby the parties are to form a regularity in the use of sick leave benefits committee with two members from the Police administration and two members from the DPOA selected by the President. The committee shall meet within one month of the issuance of these Orders. The committee shall attempt to reach agreement on the guidelines for determining excessive and improper sick leave usage. If the committee is not able to reach agreement by October 1st, the matter shall be referred to the Panel of existing Umpires who shall render a final and binding opinion by January 15, 2014. The referenced referral should be done no later than October 15, 2013. A majority opinion of the Panel shall be binding on the parties. This shall be in reference to the amendment to Article 36.A. Otherwise, all the provisions of Article 36.A as well as the remaining provisions of Article 36.A shall remain in place.

The DPOA Delegate will join with the Chairman in accepting the Chairman's proposal. The City Delegate would have agreed with the City's proposal as to the amendment to Section A, but would agree with the Chairman and the DPOA Delegate that all the other provisions of Article 36.B through H and the portions of Article 36.A that were not proposed to be amendment

131

would stay.

**Issue No. 82** - *Article 40.C - Miscellaneous- Extent of Agreement*

The City proposes to eliminate Article 40.C, "Miscellaneous", which both parties agree is

non-economic, and reads:

> **Extent of Agreement.** The parties acknowledge that during the
> negotiations which resulted in this Agreement, each had the unlimited
> right and opportunity to make demands and proposals with respect to
> any subject or matter not removed by law from the area of collective
> bargaining and that the understandings and agreements arrived at by the
> parties after the exercise of that right and opportunity are set forth in this
> Agreement. Therefore, the City and the Union, for the life of this
> Agreement, each voluntarily and unqualifiedly waives the right, and
> agrees that the other shall not be obliged to bargain collectively with
> respect to any subject or matter referred to or covered in this Agreement
> or with respect to any subject or matter not specifically referred to or
> covered in this Agreement, even though such subject matter may not
> have been within the knowledge or contemplation of either or both
> parties at the time that they negotiated or signed this Agreement, unless
> otherwise provided for herein.

The DPOA objects, noting that this language has been in the parties' contract for a

number of years. The Chairman sees no reason why this language should not be in the parties'

contract. With the number of issues involved in this Act 312, certainly the parties have the

opportunity to present the issues they wish put forward. Therefore, it would seem that Article

40.C is an appropriate provision. For this reason, the Chairman, joined with the DPOA Delegate,

will vote to retain Article 40.C as it was in the expired Master Agreement expiring on June 30,

2012, with the City Delegate objecting.

**Retroactivity**

The provisions of the Orders are prospective if involving economic matters from the date

of the Opinion and Orders, with the City Delegate agreeing with the Chairman on this point and

the DPOA Delegate dissenting.

132

13-53846-swr  Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 43 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 135 of
147

<u>Issue No. 57</u> - **Economic** - *Article 31.E.5 - Holidays*

The City has proposed to amend Article 31.E.5, "Holidays", as follows:

    E.    **Preparation and Maintenance of Holiday Rosters.**

                          * * *

    5.    **District Rosters.** <u>At the discretion of the Employer,</u> all district personnel shall be included on one of the following rosters with the exception as noted in 31.E.5.e.:

        a.    **Platoon One.** All employees who start work between 12:00 a.m. and 3:59 a.m.

        b.    **Platoon Two.** All employees who start work between 4:00 a.m. and 10:59 a.m. (including staff personnel).

        c.    **Platoon Three.** All employees who start work between 11:00 a.m. and 4:00 p.m.

        d.    **Platoon Four.** An employees who start work between 4:01 p.m. and 11:59 p.m.

        e.    The exception to the above is personnel assigned to <u>Central Events</u> ~~Special Operations (formerly Special Events Section) of the First Precinct. Only First Precinct Special Operations shall maintain their own rosters.~~

    **NOTE:** These start times shall not include roll call time, nor desk personnel who start earlier than normal hours.

In other words, the City proposes to add the words "At the discretion of the Employer" and add to E.5.e "Central Events" and to delete the remaining language as indicated. The DPOA objects to the changes.

The Chairman believes that this language, namely, the change to "Central Events" represents the current organization in the Department. The Chairman also believes that the reference to the addition of "At the discretion of the Employer" is a reasonable addition, consistent with management rights. For this reason, the Chairman, along with the City Delegate, will vote to accept the City's proposal. The DPOA Delegate dissents.

133

**Issue No. 112** - **Economic** - *Article 33 - Pension Provisions*

The Union has proposed to add the following Paragraph P to Article 33:

> Paragraph P – New 13  "Effective July 1, 2009, all members that elect
> DROP, with the immediate payout option shall be paid for all bank time,
> including sick time, within thirty (30) days. Should any member not
> receive their lump sum payments within thirty (30) days, they shall
> receive Michigan judgment interest."

The City opposed this proposal and has made Last Best Offers set forth in Issue Nos. 75, 87 and

145.

The Chairman, joined by the City Delegate, rejects the Union's proposal for the reasons

discussed under Issue Nos. 75, 87 and 145. The DPOA Delegate dissents.

**Issue No. 102** - **Economic** - **City Issue**    *Health Care Coverage For All Spouses of*
                                                      *Employees Hired on or after January 1, 2003*

The City is proposing that there be no health care coverage for all spouses of employees

hired on or after January 1, 2003. The DPOA opposes such a provision. This would affect

Officers who have been on the force for 10 years. It would obviously affect the City's ability to

recruit qualified candidates because retiree health care for one's spouse is a plus for recruitment.

It is doubtful that in negotiations the City would prevail in this request without a major

concession on the part of the City. For this reason, the Chairman, joined by the DPOA Delegate,

will vote to deny this request. The City Delegate dissents.

**Issue No. 113** - **Economic**    *DPOA Shall Have The Authority to Name an Alternate Health*
                                     *Care Provider*

The DPOA proposes to add to Article 21 a new Section H, namely, "The DPOA shall

have the authority to name an alternate health care provider consistent with the terms enumerated

in Article 21." The DPOA has not been able to prevail in such a provision in the past.

Furthermore, in the view of the Chairman, it is the responsibility of the City to present insurance

134

13-53846-swr   Doc 512-4   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 45 of 49
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 137 of
147

plans and proposals. If the DPOA has an insurance carrier that it wishes to propose to the City, it may at the bargaining table. Furthermore, as the City points out, it is the City that administers various health plans in many bargaining units. For this reason, the Chairman, joined by the City Delegate, chooses not to adopt the DPOA's proposal as to a new Section H as proposed. The DPOA Delegate dissents.

**Issue No. 137 - Non-Economic - DPOA Proposal**

The DPOA has proposed to add a new Section R to Article 21 requesting that the City provide the DPOA certain information from Blue Cross Blue Shield each May 1st. This provision has not been in the parties' contract for some time, if ever. In the view of the Chairman, there is no reason to have such a provision in the contract. This is a matter for discussion between the parties during their day-to-day relationship. Therefore, the Chairman, joined by the City Delegate, will vote to deny this request. The DPOA Delegate dissents.

**Issue No. 92 A and B - Economic - City Issue**     *Permanent Shift Program*

Article 42 of the Master Agreement provides for the permanent shift program. In 42.A, the City proposes to add the following sentences: "The City reserves the right to modify, amend, terminate or suspend the permanent shift program in its sole discretion. In the event that the City exercises this right, the City may give prior notice to the Union." As the parties well know, this Chairman in a previous Act 312 at the request of the parties initiated the permanent shift program. The program has been successful and there is no reason to abandon the program. It was a joint initiated program and if it is abandoned, in the view of the Chairman, its elimination should be jointly negotiated as was its creation. For this reason, the Chairman, along with the DPOA Delegate, will vote to deny the addition of the proposed language. The City Delegate dissents.

135

As to Issue 92B, which is a proposal to eliminate the Joint Labor Management Permanent Shift Committee set forth in Sections D and E, this language is now obsolete as it was necessary when the permanent shift program was in its infancy and as a result the City has proposed to eliminate this language, which apparently the DPOA objects to the elimination. There is no reason after permanent shifts have been in place in excess of 10 years to have such language. Therefore, voting with the City, the Chairman agrees to eliminate Sections D and E of the current language. The DPOA Delegate dissents.

## O R D E R S

The Orders and the votes of the Delegates are as set forth in the body of the Opinion. The views expressed in the Opinion are the views of the Chairman and those voting with the Chairman do not necessarily represent the views of the Delegate voting with the Chairman. But the vote of the Delegate with the Chairman was necessary to obtain a majority vote on the Issue involved. For convenience, these Orders have been signed by the Delegates on separate pages, but have the same effect as if signed on the same pages with the Chairman.

March 25, 2013

GEORGE T. ROUMELL, JR., Chairman

136

March 25, 2013

CRAIG S. SCHWARTZ, City Delegate, concurring
and dissenting where indicated

137

13-53846-swr    Doc 512-4    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 48 of 49
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 140 of
147

March 25, 2013

*Theodore M. Iorio*

THEODORE M. IORIO, DPOA Delegate,
concurring and dissenting where indicated

138

13-53846-swr    Doc 512-4    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 49 of 49
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 141 of
147

# EXHIBIT A-2

13-53846-swr    Doc 512-5    Filed 08/19/13    Entered 08/19/13 19:38:38    Page 1 of 15
13-53846-tjt    Doc 13152-2    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 142 of
147

STATE OF MICHIGAN
DEPARTMENT OF LABOR & ECONOMIC GROWTH
MICHIGAN EMPLOYMENT RELATIONS COMMISSION
ACT 312, PUBLIC ACTS OF 1969 AS AMENDED

*In the Matter of:*

CITY OF DETROIT

-and-                                        MERC Case No. D12 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

## CHAIRMAN'S PARTIAL AWARD ON HEALTH INSURANCE

George T. Roumell, Jr., Chairman
Craig Schwartz, Esq., Employer Designee
Theodore Iorio, Esq., Union Designee

## APPEARANCES:

FOR THE CITY OF DETROIT:             FOR DETROIT POLICE OFFICERS
                                     ASSOCIATION:

Malcolm D. Brown, Attorney           Donato Iorio, Attorney

## OPINION AND FINDINGS

The hearings involving this Act 312 have occurred after numerous pre-conference and

pre-trial conferences with the Chairman on November 5, 16, 19, 29, 30, December 12 and 18,

2012. On December 18, 2012, there was a hearing on the issue of health care. Because there

was an ongoing open enrollment on health care that affected the choices that members of the

Detroit Police Officers Association could make which was scheduled to end on December 27,

2012, it was imperative that this Chairman issue an Opinion and Award dealing with the issue of

health care, dealing with health insurance as it affected current employees in order to give said

Officers the opportunity to make informed choices.

13-53846-swr   Doc 512-5   Filed 08/19/13   Entered 08/19/13 19:38:38   Page 2 of 15
13-53846-tjt   Doc 13152-2   Filed 10/29/19   Entered 10/29/19 09:55:40   Page 143 of
147

With the concurrence of the parties and the members of the Panel, the Chairman, with the splendid work of the reporter to issue a transcript of the hearing within 12 hours of the hearing, issues an Interim Award on most aspects of the health care issue so that the members of the Detroit Police Officers Association can make their choices.

The genesis of the dispute stems from the fact that at one point the City entered into a tentative agreement with the DPOA on February 9, 2012 addressing the health care plans offered to Officers, namely, a PPO Plan, HAP, Blue Care Network Plans and the THC Plan, whereby the City's maximum contribution for any health plan was to be 80% of the Option I Plan offered by BCBSM1/CVS Caremark and the employee was to contribute 20% of the premium. This tentative agreement was not ratified by the City. Following a Consent Agreement between the State and the City, there were City Employment Terms imposed by the City of Detroit on the Detroit Police Officers Association. This Act 312 was instituted.

The DPOA presented Last Best Offers essentially as to COPS Trust mirroring the tentative agreement of February 9, 2012. The City presented a Last Best Offer modifying the benchmark to the BCBSM Community Blue PPO Modified Option III Plan offered by BCBSM/CVS Caremark. The City's Last Best Offer also provided, "Participants in COPS Trust must pay 20% of the BCBSM Community Blue PPO Modified Option III Plan offered by BCBSM/CVS Caremark plus any additional premium cost, if any, between COPS Trust and Community Blue PPO BCBSM/CVS Caremark". The City's Last Best Offer also provided that the COPS Trust could keep its plan design. The difficulty with the City's proposal was for Officers seeking COPS Trust and there were 400 Officers using COPS Trust is that those Officers would be paying substantially more toward premiums than the 80/20.

What then occurred is, as the record reveals, for a period of about three to four hours the

2

13-53846-swr  Doc 512-5  Filed 08/19/13  Entered 08/19/13 19:38:38  Page 3 of 15
13-53846-tjt  Doc 13152-2  Filed 10/29/19  Entered 10/29/19 09:55:40  Page 144 of
147

parties engaged in off-record negotiations where the parties did modify their positions, but then the negotiations broke down over one issue to be discussed by the Chairman, namely, the issue of working spouse coverage. As the Chairman views it, the working spouse coverage is not economic as it is a language part of the plan which permitted the Chairman to make a choice. Furthermore, the Chairman views the parties' positions as modifying their offers as permitted by the Commission's proposed rules for Last Best Offers.

What now follows is the Award of the Panel on health care, health insurance for current employees, joined by the City Delegate. The Chairman does state that the Union Delegate was active in the negotiations but will dissent because of the issue of the spouse. The representative of COPS Trust, Daniel Gorczyca, testified that COPS Trust on January 1, 2013 through December 31, 2013 will guarantee the following health care insurance rates:

|  | Monthly Premium Amounts |
|---|---|
| One Person | $ 485.25 |
| Two Persons | $1,016.65 |
| Family | $1,151.53 |

Based upon these rates, the Award shall be that the City shall pay 80% of the premium and the employee shall pay 20% based upon this calculation of the above premiums, the City shall pay no more than the following amounts:

|  | City Pays These Amounts Monthly |
|---|---|
| One Person | $388.20 |
| Two Persons | $813.32 |
| Family | $921.22 |

The employees' contribution shall be monthly as follows:

|  |  |
|---|---|
| One Person | $ 97.05 |
| Two Persons | $203.33 |
| Family | $230.31 |

The City's obligation to pay 80% shall not be any higher than 80% of the highest

3

premium that it pays for any plan and the City's benchmark shall be as proposed the BCBSM Community Blues PPO Modified Option III Plan offered by BCBSM/CVS Caremark. The Chairman notes that the City pays a premium higher than COPS Trust for HAP.

The Hospitalization Plan Design Changes attached to the tentative agreement of February 9, 2012 and reattached to this Award as Exhibit A shall apply to all plans including COPS Plan and that the parties are to draft appropriate language to be included in the contract. The COPS Plan as designed as well as the design of the other plans attached as Exhibit B to the tentative agreement shall apply except as modified by this Award.

This Award also intends that Paragraph H of Article 20 of the 2004-2011 Agreement be removed as the parties did indicate to the Chairman that a committee is no longer needed. It is the intention of the Award that language be drafted by the parties to comply with this Award.

There were other changes proposed by the City that this Award does not address which will have to be addressed at the January 8, 2013 hearing so that the language changes are clear to the Chairman, namely, proposals as to 20.E and F. Furthermore, this Award does address proposal 20.F as the Award addressed this issue. The language as to Article 21.A is reserved for further discussion. Likewise, the issue of dental and optical care for retirees is reserved and not covered by this Award for further discussion, namely, the proposed Article 21.CC language.

The issues represented by the proposed Article 21.Y, BB and DD are rejected.

The issues represented by the proposed language in Paragraphs O and Z are reserved.

The reservation of issues means that this Award has not addressed those issues or that language and will do so after further discussion with the parties in January 2013.

The final issue was raised by the DPOA and that is spousal coverage, particularly under the COPS Trust. The issue involves the working spouse who works for an employer other than

4

the City who has health care insurance coverage. The City's position is that if the other employer furnishes the working spouse's health care insurance, then the City should not be obligated to furnish health care coverage for that spouse. The City, with the other carriers and Blue Cross Plans, furnished the DPOA members and other City employees except groups in which there are still existing collective bargaining agreements have this provision. It does have a cost saving feature. This particular provision became an area of contention between the parties. As it is, the City has provided that COPS Trust can have its own plan design with modifications. It only seems fair in the area just discussed that all plans have the same features, namely, as long as a spouse has health care coverage by another employer, then the City should not provide spousal coverage, since this will be a universal feature, should be a feature in the COPS Trust provision and for this reason the Chairman will accept this as his position on this issue based on the representation that it is in all other plans offered by the City to the Officers and for that matter to a large number of City employees.

As to the open enrollment, the open enrollment will be extended until January 15, 2013 so that Officers will have the opportunity to make choices. Member Theodore Iorio dissents from this Interim Award. Member Craig Schwartz concurs.

<u>A W A R D</u>

The Award incorporates as the Award the statements made above and does not include the reservations stated above.

_GEORGE T. ROUMELL, JR., Chairman_

December 19, 2012

5