Sick Leave Benefits, D.P.D. 350, and forward the necessary copies as outlined on the form. The supervisor shall inform the member of the requirement to obtain documentation of the illness or of the illness of a family member which necessitates the member's absence from work. This documentation shall consist of a statement from a physician concerning the illness for each sick day taken during the next three month period. This requirement must be strictly adhered to during said period of time, except where the commanding officer is convinced that a reasonable basis exists for not requiring a physician's note in conjunction with a particular absence. The member will also be advised that said physician's documentation shall be submitted on D.P.D. 350-A, or an equally detailed doctor's note, and shall be presented to the member's section commanding officer within three days after returning to duty. This documentation is subject to the review of the department physician. Commanding officers shall ensure that the copy of D.P.D. 350-A which is submitted by the member is forwarded to the Medical forthwith for retention.

A member who has been served with a Notice of Regularity in the Use of Sick Leave Benefits, D.P.D. 350, and is being carried sick due to personal illness or injury or for attendance upon a sick family member, must secure permission from the officer in charge of the member's entity or, if the entity is closed, from the officer in charge of the precinct in which the member resides before the member may leave the member's place of confinement. This restriction does not apply on leave days or non-duty hours.

"Improved attendance" as used herein shall mean that the member has consistently and reliably demonstrated the capacity to provide proper and sustained attendance within the meaning of this article. For purposes of interpreting the preceding sentence, the word "sustained" shall be construed to mean an improvement which demonstrates that the abuse has been eliminated.

The supervisor shall further advise the member that failure to satisfactorily comply with the regulation will result in the designation of each working day taken as "Sick" to "Absent No Pay." The supervisor shall also advise the member that unless attendance improves, additional disciplinary action may be imposed.

D.     Improved Attendance. A member placed on a D.P.D. 350 will have his attendance reviewed on a quarterly basis and will be removed from the restrictions of that provision upon a showing of improved attendance within the meaning of the above definition.

E.     Extended Medical Treatment. Members who document that their illness requires treatment on a regular basis may submit D.P.D. 350-A for that ailment on a semi-annual basis. The physician designated by the department, however, may want further verification concerning said ailment, and accordingly the member may be required to see the physician.

F.     Failure to Present Documentation by a Physician. If failure to comply with the regulation set forth on D.P.D. 350 occurs, the section commanding officer shall personally serve the member with a Notice of Failure to Present Documentation by a Physician, D.P.D. 350-B, and shall forward the necessary copies as outlined on the form. A designation of "Absent No Pay" will be entered in timekeeping records.

13-53846-tjt    Doc 13152-5    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 1 of 70

G.    Appeals. Any member may file a grievance regarding the imposition of a Notice of Regularity in the Use of Sick Leave Benefits, D.P.D. 350. If the grievance is granted, the arbitrator shall be empowered to provide an appropriate remedy, including reimbursement of expenses for medical visits ordered by the Department.

## 36. BONUS VACATION DAYS

Bonus vacation days are granted for unused current sick time. Officers who have accumulated a minimum of thirty-five (35) sick days including both current and seniority days and have a minimum of six (6) years of service on July 1st of each year will be credited with one-half (1/2) of the unused current sick time from the previous fiscal year up to six (6) days. An officer may request to take his bonus vacation days in any sequence (except when attached to a furlough as stated below) by submitting a request in writing to his commanding officer. This request will be reviewed for the availability of personnel by his commanding officer. Seniority will be a prime consideration when several officers request the same period of time off.

An officer shall be allowed to use up to three (3) bonus vacation days in conjunction with a furlough. The request to utilize bonus vacation days in this manner must be included in the leave day request. Bonus vacation days, when connected to a furlough, shall not be canceled unless the accompanying furlough is canceled. This article does not affect or limit the right of the Department to determine the number of employees assigned to work. Consequently, there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

The Department must insure that bonus vacation days are expended proportionately throughout the year and are not carried until the last months of the fiscal year; therefore, on April 1st, the commanding officer shall assign the remaining bonus vacation days at his discretion. Any request to utilize unused bonus vacation days in conjunction with a furlough scheduled during the months of April, May or June must be submitted to the commanding officer by April 1st or those bonus vacation days will be assigned.

Bonus vacation time shall be deducted from the member's bonus vacation bank before compensatory time shall be taken.

## 37. JURY DUTY

A.    All Employees who serve on jury duty on regularly scheduled work days exclusive of leave days, furlough days and holidays will be paid the difference between their pay for jury duty and their regular straight time pay for all days they are required to serve on jury duty.

B.    In the event that an Employee reports for jury duty but does not actually serve on jury, he will be paid the difference between the jury pay received and his regular day's pay and be excused for the day.

C.    In order to receive payment for jury duty supplementation, an Employee must have been regularly scheduled to work on a non-overtime basis, must give reasonably prompt prior

notice to his supervisor that he has been summoned for jury duty, and must furnish satisfactory evidence that he reported for or performed jury duty on the days for which he claims such payment, provided that the commanding officer shall have discretion in seeking to have the Employee excused when his services are essential.

D.     Employees shall have the option when called to jury duty to use vacation, bonus vacation or compensatory time for such service. In that event, the Employee will not be required to turn in his jury pay. However, the Employee must notify the Department of his desire to exercise this option prior to the first date of jury service.

If the date for jury duty falls upon a day when the Employee is scheduled to work other than Platoon 2, the Department, upon request of the Employee, will rearrange the Employee's working schedule so that he will be carried working Platoon 2 on that date(s). If the date for jury duty falls upon a holiday an Employee is scheduled to work, the Employee shall be allowed to attend jury duty without loss of the Employee's holiday work opportunity.

E.     For payroll purposes, jury duty shall be considered as time worked.

F.     An Employee on jury duty will be continued on the payroll and be paid at his straight time hourly rate of his normally scheduled hours of work. Upon return from jury duty, the Employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an Employee fails to turn in his jury duty payment, the City will hold subsequent payments due to the Employee until the City is reimbursed for all time lost due to the alleged jury duty service.

G.     Where Employees once impaneled are excused for days or parts of days, reimbursement shall be made only for time served. Employees should otherwise be expected to report for work.

## 38.  DEATH BENEFITS AND LIFE INSURANCE

A.     Death Benefits. Section 13-8-8 of the Municipal Code of the City of Detroit currently provides a death benefit of ten thousand dollars ($10,000).

    1.     Membership shall be mandatory for regular Employees.

    2.     Contribution

By the City - $13.30 per year per Employee.

By the Employee - $.20 per week or $10.40 per year.

B.     Payment for employees killed or permanently disabled in line of duty:

    1.     A lump sum duty death benefit of ten thousand dollars ($10,000) shall be paid to the beneficiaries or estate of Employees who are killed or who die as a result of

injuries sustained in the actual performance of their duties in accordance with the City Council resolution of August 23, 1977, p. 1683, March 26, 1974, p. 627, and March 2, 1954, p. 509.

2. A lump sum payment of ten thousand dollars ($10,000) shall be made to any Employee who is totally and permanently disabled from illness or injury arising solely out of the actual performance of his duties. "Totally and permanently disabled" shall be defined exclusively as follows:

   a. Total and permanent loss of sight of both eyes.

   b. Loss of both legs or both feet at/or above the ankle.

   c. Loss of both arms or both hands at/or above the wrist.

   d. Loss of any two of the members of facilities enumerated in a., b., c.

   e. Permanent and complete paralysis of both legs or both arms or one leg and one arm.

   f. Incurable insanity or imbecility. Claims for this payment shall be made in accordance with the City Council resolution of March 26, 1974, p. 627.

3. Employees who receive a permanent disability under this Article shall be ineligible for the $10,000 Duty Death Benefit described in Section B.1. above. Denial of the $10,000 Duty Death Benefit may be appealed directly to arbitration in accordance with Article 8 (Arbitration) of this Agreement.

C. Group Life Insurance:

A group life insurance program for the Employee and his family is available for all members of the Employees Benefit Plan on an optional basis, under the provisions of the City Code, Chapter 13, Article 9.

1. Membership

   Optional for members of the Employees Benefit Plan.

2. Contributions

   The City shall pay one hundred percent (100%) of the premium for insurance up to and including thirty-five thousand dollars ($35,000) for each member plus five thousand dollars ($5,000) for each dependent.

   Additional life insurance may be purchased through this plan at the Employee's expense.

   Employees and their dependents who are on a duty disability retirement shall be covered by this program.

# 39. MISCELLANEOUS

A. <u>Relation to Regulations, etc.</u> This Agreement shall supersede any rules, regulations, ordinances or resolutions inconsistent herewith.

B. <u>Savings Clause.</u> If any article or section of this Agreement or any supplement thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal, the remainder of this Agreement and supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section.

C. <u>Service Weapon.</u> All Employees shall be provided at no charge with their department-issued service weapon upon full service retirement. An Employee will have no more than thirty (30) days after separation to make such request to the Chief of Police. The Department may refuse to give Employees their weapon for good cause shown. Good cause will be established where an Employee has pending criminal charges or has been convicted of a crime, is subject to departmental investigations, or psychological restrictions. Employees who are involuntarily discharged will not receive a service weapon.

D. <u>Longevity Pay.</u> There will be no longevity payments during the term of this Agreement.

E. <u>Direct Deposit.</u> Members of the bargaining unit may participate in the direct deposit programs offered by the City.

F. <u>Lump Sum for Banked Time.</u> Whenever an Employee leaves employment with the Department, such Employee will be paid for all banked time, other than sick time, at the prevailing rate of pay in effect at the time of separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. DROP plan participants will only receive payout for banked time when they permanently retire, not when they enter the DROP plan. Payments will be paid within ninety (90) days if the amount is less than ten thousand dollars ($10,000), and if in excess of ten thousand dollars ($10,000), the amount will be made in semi-annual installments over a three (3) year period with the installments due on February 1 and August 1 with no interest due.

G. <u>Correction of Overpayments and Underpayments.</u> Where by payroll error an Employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment. The City shall notify an Employee in writing fourteen (14) calendar days prior to making any payroll recovery. Each deduction by the City shall be substantiated in the records of the City and shall be identified as to the individual Employee.

H. <u>Civilianization.</u> Positions within the Department that do not require Michigan Commission on Law Enforcement Standards (M.C.O.L.E.S.) certification are subject to civilianization at any time. Any reductions in force (lay-offs) resulting from civilianization will comply with Article 10.I. (Seniority – Lay-off and Recall).

13-53846-tjt    Doc 13152-5    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 5 of 70

I.   Ammunition. All members shall be provided with limited penetration, full expansion rounds to be carried on or off duty. Members shall also be allowed to purchase (at their own expense) and carry other Department approved limited penetration, full expansion rounds.

J.   Canine. With respect to any assignment made to Canine (K-9), the City may, at its discretion, direct the member on said assignment to return all departmental dogs under the age of five (5) and all departmental equipment to the department at such time as that member is no longer assigned to Canine.

K.   Care of Departmental Dogs. Employees will be paid at a rate of time and one-half for the actual off-duty time spent caring for Department dogs, provided such work is authorized. Employees may expend a maximum of forty (40) minutes per day caring for Department dogs; provided, however, that Employees may expend additional time per day with the prior approval of their supervisor. Employees caring for more than one Department dog shall receive an additional fifteen (15) minutes per day, per dog. The Department retains the discretion to determine whether time spent in excess of the above is necessary and whether it shall be performed while the member is on duty or off duty. Employees shall maintain a record, on a form to be established by the Department, of the time spent in the performance of these duties, and submit the form to the Administrative Sergeant on a bi-weekly basis. This time shall be reported on the bi-weekly Time and Attendance Report as kind-of-time 66.

# 40. WAGES

A.   Wages – September __, 2014 through June 30, 2019 – Base Salary:

   o   8% wage increase effective first payroll period after the ratification of this Agreement.

   o   2.5% wage increase effective July 1, 2016.

   o   2.5% wage increase effective July 1, 2017.

   o   2.5% wage increase effective July 1, 2018.

   In addition to the foregoing, DPOA members shall receive their pro rata share of the lump sum payments described in Section 5 of the July 8, 2014 Term Sheet between the DPOA and the City of Detroit. In all other respects, this wage provision supersedes any prior agreement or term sheet between the parties.

B.   Wage Scale. Employees' wages during the term of this Agreement are set forth in the attached Official Compensation Schedule.

C.   Differential. Salaries for the following classifications will be maintained at the dollar differentials indicated for the term of this Agreement.

   1.   Communications Officer - Police Officer (Class Code 33-12-11)

| | |
|---|---|
| Start | $450 over starting salary of Police Officer |
| After one year | $450 over salary of one-year Police Officer |
| After two years | $450 over salary of two-year Police Officer |
| After three years | $450 over salary of three-year Police Officer |
| After four years | $450 over salary of four-year Police Officer |
| After five years | $450 over salary of five-year Police Officer |

2.  Band Director - Police Officer (Class Code 33-12-14)

$821 over maximum of salary of Police Officer

3.  Assistant Supervisor of Motor Vehicles - Police Officer (Class Code 33-12-15)

$862 over maximum salary of Police Officer

4.  Police Data Processing Programmer - Police Officer (Class Code 33-12-26)

Minimum: $589 over maximum salary of Police Officer
Maximum: $1,738 over maximum salary of a Police Officer

5.  Radio Maintenance Officer - Police Officer (Class Code 33-12-12)

$862 over maximum salary of a Police Officer

6.  Radio Systems and Planning Officer - Police Officer (Class Code 33-12-13)

$1,567 over maximum salary of a Police Officer

7.  Senior Police Data Processing Programmer - Police Officer (Class Code 33-12-36)

Police Lieutenant salary

8.  Neighborhood Police Officer (Class Code __-__-__)

$1,198 over maximum salary of a Police Officer

9.  Police Detective Trainee (Class Code __-__-__)

$1,198 over maximum salary of a Police Officer

10.  Police Corporal (Class Code __-__-__)

| | |
|---|---|
| Start | $1,198 over maximum salary of a Police Officer |
| When engaged in field training operations | $2,396 over maximum salary of a Police Officer |

# 41. PERMANENT SHIFT PROGRAM

A.  The permanent shift program shall only apply to precinct job assignments on the day, afternoon and midnight shifts that historically rotated among all three (3) shifts. In addition, the permanent shift program shall apply to the Harbormaster which for purposes of the program shall be treated as an entity distinct from the Northeastern Precinct and to the Tactical Response Unit (TRU), Canine and the Public Housing Section. All assignments shall be based on seniority provided the Employee is qualified.

B.  There shall be no periodic re-bidding procedure and vacancies will be filled, if and when the Department decides to fill them, in accordance with the following procedures:

1.  A vacancy exists when an officer performing the assignment is permanently transferred, permanently reassigned, resigns, retires, dies, is separated, or when the Department increases the number of officers on a shift.

2.  Employees having less than two (2) years of service may be assigned to shifts and assignments within the discretion of management. At the end of two (2) years of service, their positions shall be considered vacancies and shall be subject to the procedures of this Article except where an officer has obtained a permanent job reassignment through the blue slip procedure in accordance with the provisions of Subsection 4 of this Section B.

3.  Whenever the Department chooses to fill vacancies created as a result of officers completing two (2) years of service, the positions to be filled shall be posted at least ten (10) days before they are permanently filled.

4.  Employees with less than eighteen (18) months service shall not be entitled to use the blue slip procedure to bid on a permanent job assignment. Employees with at least eighteen (18) months and less than twenty-four (24) months service shall be entitled to use the blue slip procedure to bid on a permanent job assignment other than a scout car.

5.  In addition to the existing procedure for filling job assignments, Employees may also submit a blue slip indicating their preference for a shift change. In accordance with present practice, a blue slip that is accepted shall be reviewed promptly to determine if the Employee is qualified. When vacancies occur the most senior qualified Employee will have his blue slip request honored. All blue slips will expire on October 1 of each year. The blue slip procedure is for the filling of vacancies and no Employee may be bumped. The blue slip of an officer requesting a particular assignment on a shift shall be honored before the blue slip of an officer requesting the shift only.

6.  In the event of an involuntary reassignment from one shift to another, the officer having the least Department seniority shall be reassigned. This provision shall not affect the Department's right to reassign members in accordance with B.2.

13-53846-tjt    Doc 13152-5    Filed 10/29/19    Entered 10/29/19 09:55:40    Page 8 of 70

7.      Employees transferring into an entity participating in the permanent shift plan, may be initially assigned to shifts and assignments within the discretion of management, provided there are no blue slips on file for the requested shift or assignment. Thereafter, except as limited by the provisions of Subsections 2 and 4 of this Section B., Employees may utilize the blue slip procedure in Article 10, Section G.1. While Employees shall be entitled to submit a blue slip for a shift or assignment they shall not be eligible to exercise seniority for shifts for a period of six (6) months or assignments for one (1) year. When Employees are involuntarily transferred to an entity participating in the permanent shift program they shall not be eligible to exercise seniority for shifts for a period of three (3) months or assignments for six (6) months.

C.      A Joint Labor Management Permanent Shift Committee, consisting of not more than five (5) representatives from the Association and five (5) representatives of the Department shall meet within five (5) working days of the request by either party. The Committee shall meet to discuss issues related to the transition from rotating to permanent shifts and to the implementation and continuation of the permanent shifts concept. The Committee will attempt to resolve any such issues without the filing of a formal grievance with due regard to the fact that in negotiating permanent shifts the parties may not have considered all of the effects of such change and that flexibility is necessary and desirable to ensure that an orderly transition from rotating shifts to permanent shifts is effectuated.

D.      The Panel shall retain jurisdiction over the permanent shift award and, upon the request of either party, for a period of one (1) year after permanent shifts are implemented, shall convene, with substitute delegates if a party so designates, to resolve any dispute concerning permanent shifts which has not been resolved by the Committee.

E.      In the case of a bona fide hardship, reviewed and approved by the Chief of Police or the appropriate Deputy Chief, management may change an Employee's shift for a period not to exceed thirty (30) days. No other Employee shall be displaced from his shift or assignment as the result of such a reassignment. The Association will be notified of any approved request. This provision shall be applicable not only to those entities participating in the permanent shift plan, but to all assignments on a Department-wide basis.

## 42. OUTSIDE EMPLOYMENT

An Employee may engage in outside business activity or outside employment provided it is not inconsistent or incompatible with or does not interfere with the proper discharge of the Employee's duties and responsibilities as a police officer.

Approval for outside business activity or outside employment must be obtained from the Chief of Police, and shall be for a period of one (1) year. The Employee may request it be renewed after one (1) year. If an Employee is on the Attendance Control Program (DPD 350), that Employee cannot be approved for outside employment, and prior approval can be revoked at the discretion of the Chief of Police.

Approval will not be granted for an outside business activity or outside employment which would involve more than thirty (30) hours per week of work, or for work in businesses that are regulated by the Detroit Police Department (e.g., bars, adult movies or adult bookstores, etc.)

Officers may not be in uniform when engaged in any outside employment. Officers may not carry or use any equipment or accessories issued by the Department when engaged in any outside business activity or outside employment in private or personal security.

Approval to engage in outside business activity or outside employment shall not be unreasonably withheld.

## 43. WORK AREAS

The City will provide and maintain safe, clean, sanitary and healthful work premises, facilities and equipment. The City shall have the responsibility and authority first to determine what constitutes safe, clean, sanitary and healthful work premises, facilities and equipment. Grievances alleging a violation, that is, whether or not the City has provided and maintained safe, clean, sanitary and healthful work premises, facilities and equipment, shall be entered at the last step of the grievance procedure and shall be subject to arbitration.

## 44. DURATION

This Agreement shall be effective and binding on the Union and the City as of October __, 2014, and shall continue in full force and effect through June 30, 2019 (the "Term"). This Agreement, including the Term, shall be incorporated into and become a part of both the plan of adjustment and order confirming the plan of adjustment, and the Agreement shall be subject to the post-confirmation ongoing jurisdiction of the Bankruptcy Court for the full Term, including without limitation, whatever jurisdiction the Bankruptcy Court's retains to enforce the Term. This Agreement, including specifically, the Term, shall be duly authorized and approved by and consented to by the Governor, the Treasurer and the Emergency Manager, with these consents reflected by duly authorized signatures.

If either party desires to modify this Agreement, it may give written notice to the other party during the month of March 2019.

In the event that the Department and the Association fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2019, this Agreement will remain in effect on a day-to-day basis. Either party may terminate this Agreement by giving the other party a ten (10) day written notice on or after June 30, 2019.

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement on this __ day of October, 2014.

DETROIT POLICE OFFICERS                      CITY OF DETROIT:
ASSOCIATION:

Mark Diaz, President                         Michael E. Duggan, Mayor

Bernard Cybulski, Vice President             James Craig, Chief of Police

Donna Latouf, Secretary-Treasurer            Office of the State Treasurer, Michigan

Linda Broden, Sergeant at Arms               Michael A. Hall, Labor Relations

**SCHEDULE A**

| District | Work Location & Platoon | Stewards | Alternates |
|---|---|---|---|
| 1 | 1st Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 3rd Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | Downtown SVS / Gaming<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 2 | 2nd Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 4th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 3 | 6th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 8th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 4 | 10th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 12th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |

| District | Work Location & Platoon | Stewards | Alternates |
|---|---|---|---|
| 5 | 5th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 9th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 6 | 7th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 11th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3<br>HMS | 3 | 3 |
| | Mound Rd. / Detention Center<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 7 | Communications Ctr. / Tech Support/ Fleet<br>Communications Systems<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 8 | Narcotics / Firearms Inventory | 2 | 2 |
| | Forfeiture / Auction Detail / Magnet | 1 | 1 |
| 9 | DPSH 1301 Third Floors 1-7 | 4 | 4 |
| | Police Personnel / Recruiting / IA / Medical | | |
| | Sex Crimes / Homicide | | |
| | Domestic Violence / Child Abuse | | |
| | Evidence Tech. Unit | | |

| District | Work Location & Platoon | Stewards | Alternates |
|---|---|---|---|
| 10 | Law Dept. / OCI / EPU / Disciplinary CRIB / Ident. / Records / Liquor License | 1 | 1 |
| | DMPA / Range | 1 | 1 |
| | Commercial Auto Theft | 1 | 1 |
| 11 | Canine / Support Svc. | 1 | 1 |
| | Tac Response Unit | 1 | 1 |
| | SRT / Bomb Squad | 1 | 1 |
| | Special Crimes | 1 | 1 |
| | TEU / TSU | 1 | 1 |
| | Totals | 60 | 60 |

# EXHIBIT I
## Official Compensation Schedule

CHI-1939680v4

**MEMORANDUM OF UNDERSTANDING**
**REGARDING THE POLICE AND FIRE RETIREMENT SYSTEM**
**BETWEEN**
**THE CITY OF DETROIT**
**AND**
**THE DETROIT POLICE OFFICERS ASSOCIATION**

This Memorandum of Understanding is made and entered into this 1st day of October, 2014, by and between the City of Detroit ("City") and the Detroit Police Officers Association ("DPOA" or the "Association").

WHEREAS, on July 18, 2013, the City filed for protection under Chapter 9 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1550; and

WHEREAS, on December 5, 2013, the U.S. Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court") ruled that the City is eligible to be a debtor under Chapter 9 of the U.S. Bankruptcy Code; and

WHEREAS, the City's duty to bargain with the Association over changes to terms and conditions of employment has been suspended pursuant to Public Act 436, MCL § 141.1541 *et seq.*; and

WHEREAS, on August 16, 2013 the Bankruptcy Court ordered the City and the Association to participate in Court-supervised mediation regarding the terms of a successor collective bargaining agreement, including retirement benefits for current employees; and

WHEREAS, the City and the Association agree that it is in the best interests of the City and its employees for the City to provide fiscally responsible but high quality retirement benefits to its future retirees; and

WHEREAS, in connection with the mediation, the City and the Association have discussed ways to address the unfunded liabilities of the Police and Fire Retirement System ("PFRS") and to reach an agreement to provide sustainable retirement benefits to future retirees of the City; and

WHEREAS, benefit accruals under the PFRS ceased effective June 30, 2014, pursuant to Ordinance No. 12-14; and

WHEREAS, effective July 1, 2014, employees represented by certain City unions, including the DPOA, became eligible to participate in the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Combined Plan"), which consists of provisions relating to benefits accrued by members under PFRS prior to July 1, 2014 ("Old PFRS") and provisions relating to benefits accrued by members under PFRS on and after July 1, 2014 ("New PFRS"); and

1

WHEREAS, this Memorandum of Understanding supplements any collective bargaining agreements entered into between the City and the Association and/or any Act 312 Arbitration Award pertaining to the Association and the City until the expiration of this Memorandum of Understanding;

NOW, THEREFORE, it is agreed that the City and the Association have entered into this Memorandum of Understanding, and any proposals or counter-proposals made during related discussions by either the City or the Association, but not included in this Memorandum of Understanding, are hereby withdrawn. The City and the Association further agree as follows:

A.    The Police and Fire Retirement System. During the term of this Memorandum of Understanding, pension benefits for eligible employees (which, in all cases, shall exclude Police Assistants) represented by the DPOA shall be in accordance with this Memorandum of Understanding, as follows:

1.    City Contribution. The City shall contribute to New PFRS, on an annual basis, an amount equal to twelve and one-quarter percent (12.25%) of each eligible employee's base compensation. A portion of such contribution will be credited to a rate stabilization fund.

2.    Employee Contribution. Eligible employees hired by the City on or before June 30, 2014 shall make pre-tax contributions equal to six percent (6%) of their base compensation to New PFRS (pre-risk shifting). Eligible employees hired or rehired by the City on and after July 1, 2014 shall make pre-tax contributions equal to eight percent (8%) of their base compensation to New PFRS (pre-risk shifting).

3.    Plan Terms. Except as set forth herein, the following key terms relating to New PFRS shall apply to benefits accrued by eligible employees on and after July 1, 2014 and prior to January 1, 2024:

| BENEFIT FORMULA | Final Average Compensation (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014 x 2.0%. Average base compensation does not include overtime, unused sick leave, longevity payments, or any other form of bonus or additional compensation – just the employee's base salary. |
| | Actual time for benefit accrual is actual time served. For vesting service, an eligible employee must work 1,000 hours in a 12-month period to accrue a year of service. |

2

| | |
|---|---|
| **NORMAL RETIREMENT AGE** | Age 50 with 25 years of service, with the following 7 year transition period:<br><br>Fiscal Year        Age and Service<br>2015                Age 43 and 20 years<br>2016                Age 43 and 20 years<br>2017                Age 44 and 21 years<br>2018                Age 45 and 22 years<br>2019                Age 46 and 23 years<br>2020                Age 47 and 24 years<br>2021 and thereafter    Age 50 and 25 years |
| | 10 Years of Service for vesting. |
| | Deferred vested pension -- 10 years of service and age 55. |
| | Duty Disability - consistent with Old PFRS. |
| | Non-Duty Disability – consistent with Old PFRS. |
| | Non-Duty Death Benefit for Surviving Spouse – consistent with Old PFRS. |
| | Duty Death Benefit for Surviving Spouse – consistent with Old PFRS. |
| **COLA** | 1% compounded, variable. |
| **DROP ACCOUNTS** | Available for frozen Old PFRS benefits and future accrued benefits under New PFRS for employees who are eligible to retire under concurrent eligibility requirements. No more than 5 years of DROP participation for employees not already in DROP as of June 30, 2014. DROP accounts will be managed by PFRS instead of ING, if administratively and legally feasible. If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%. |
| **ANNUITY SAVINGS** | Voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted. |
| | Investment Return/Discount rate – 6.75%. |

3

| | |
|---|---|
| **RISK SHIFTING** | If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable).<br><br>If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until the PFRS actuaries can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:<br><br>1. eliminate COLAs (if applicable);<br>use amounts credited to the rate stabilization fund to fund accrued benefits;<br>2. increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees in year 1) for up to 5 years;<br>3. increase employee contributions (active and new employees) by an additional 1% per year;<br>4. increase employee contributions (active and new employees) by an additional 1% per year;<br>5. implement a 1 year COLA fallback;<br>6. implement a second 1 year COLA fallback;<br>7. increase employee contributions by an additional 1% per year; and<br>8. increase City contributions consistent with applicable actuarial principles and PERSIA. |

a)     In accordance with the 2014-2019 collective bargaining agreement between the City and the DPOA ("CBA"), the ten percent (10%) cap on annual contributions to the Annuity Savings Account will not apply to payments of accrued sick leave into an Annuity Savings Account made pursuant to Article 34, Section A.2.c. of the CBA.

b)     Employees in the DPOA bargaining unit will have the option to participate in a one-time irrevocable "roll-in election" with respect to calculation of their frozen accrued benefits under Old PFRS. The purpose of this roll-in election is to give each eligible employee the option to allocate a portion of his or her unused sick pay bank to the employee's Average Final Compensation, which in turn will be used to determine the employee's frozen accrued benefits under Old PFRS as of June 30, 2014. If the employee elects to roll-in a portion of his or her unused sick pay, the employee's Average Final Compensation will include the portion of the employee's sick pay bank determined as of June 30, 2014 that would have been included in the member's Average Final Compensation in accordance with the terms of Old PFRS, as though the employee had retired on June 30, 2014 with 20 years of service. In the event an employee terminates employment with the City prior to attaining 20 years of service, the employee's roll-in election will be nullified. If an employee makes a roll-in election, the employee's unused sick leave bank

4

will be reduced by the number of hours included in the employee's Average Final Compensation calculation and the employee may not use those hours for sick leave or receive the value in cash when the employee retires. The form for making a roll-in election will be available to employees on-line, and paper copies of the form will also be made available. An eligible employee wishing to roll-in a portion of his or her unused sick pay must sign the form in the presence of a witness and return the form to the PFRS office no later than October 15, 2014. The one-time roll-in election will have no impact on benefits accrued under New PFRS.

c)     For avoidance of doubt, 'eligible to retire under concurrent eligibility requirements' of the Combined Plan means that an Association member with accrued benefits under Old PFRS may retire upon attaining 20 years of service, regardless of age. This member would immediately receive a frozen pension under Old PFRS. If the member does not meet the age and years of service requirements of the New PFRS, he or she will begin receiving an additional payment (actuarially reduced to reflect early commencement) based on his or her accrued benefit under New PFRS when he or she turns 55. He or she can begin receiving an unreduced normal retirement benefit under New PFRS when he/she reaches age 62.

The age 50 and 25 years of service requirements of New PFRS apply only to New PFRS and are subject to the 7 year transition period set forth above. The transition applies as set forth below:

1.     Under the transition, after July 1, 2014, an Association member who reaches 20 years of service and age 43 on or before June 30, 2015 can retire anytime after reaching 20 years of service and age 43, and he or she will immediately receive an unreduced accrued New PFRS benefit.

2.     Beginning on July 1, 2015, an Association member who reaches 20 years of service and age 43 on or before June 30, 2016 can retire anytime after reaching 20 years of service and age 43, and he or she will immediately receive an unreduced accrued New PFRS benefit.

3.     After June 30, 2020, an Association member must be at least 50 years old with 25 years of service to retire and immediately receive his or her unreduced accrued New PFRS benefit.

An Association member who does not meet these New PFRS requirements will not begin receiving his or her unreduced accrued New PFRS benefit until the Association member reaches age 62 and has been credited with 10 years of service. An Association member with 10 years of service may elect to retire at age 55 with an actuarially reduced benefit.

5

d)    Section 1.4 (Board of Trustees – Membership; Appointment) of the New PFRS and Article III, Section 2 of the Old PFRS (Membership of Board) shall not be modified during the term of the CBA.

e)    The City will remit to the New PFRS all contributions withheld from employees' pay checks.

The City shall promptly transfer these employees' contributions to the new PFRS, but in no event shall such City transfers be made later than the 15th day of the month following the month of the pay dates when the employees' contributions are withheld by the City (hereinafter "Contribution Due Date"). (By way of illustration and example only, the City must transfer to the New PFRS by no later than February 15 all of the employees' contributions withheld on the pay dates of the immediately preceding January.)

If the City does not transfer the employees' withheld contributions to the New PFRS by the Contribution Due Date, these contributions shall be deemed delinquent contributions (hereinafter "Delinquent Contributions"). The City shall be liable to the New PFRS in the amount of the Delinquent Contributions and any Lost Earnings ("Lost Earnings") on the Delinquent Contributions, which would have been earned on the employees' contributions, had the City timely made the transfer of these employees' contributions.

Notwithstanding the above, the City shall be liable for Lost Earnings in an amount not less than the applicable corporate underpayment rate(s), effective during the delinquency, established under Section 6621(a)(2) of the Internal Revenue Code.

B.    Reservation of Rights by City.  This Memorandum of Understanding shall in no way be construed to interfere with, or add additional requirements with respect to, the City's rights to modify the terms of any pension plan document currently in effect, or that may be in effect during the term of this Memorandum of Understanding, including but not limited to the Combined Plan; provided, however, that the City shall not modify the terms of the applicable pension plan(s), in any manner that conflicts with those terms set forth in Section A above, unless the City is ordered to do so by the Bankruptcy Court in the plan of adjustment dated August 20, 2014 (as it may be amended, modified or supplemented, "Plan of Adjustment") in the case *In re: City of Detroit*, Case No. 13-53846 or as set forth in Section D below.

C.    Compliance with Plan of Adjustment.  The terms of this Memorandum of Understanding are subject to confirmation of the Plan of Adjustment and may be modified therein to achieve confirmation of the Plan of Adjustment. Any proposed modification to the Plan of Adjustment is subject to the rights of the DPOA to object to same. During the term of this Memorandum of Understanding, the City shall not make any modifications to the terms of the Combined Plan that are contrary to the terms of the

6

Plan of Adjustment as confirmed by the Bankruptcy Court.

D.     Compliance with Public Act 183.     Notwithstanding any provision of this Memorandum of Understanding that can be construed to the contrary, this Memorandum of Understanding will not be construed to require the City to fall out of compliance with the requirements of Public Act 183, House Bill 5568 ("PA 183"). In the event that the City determines that it has fallen out of compliance with, or is reasonably likely to fall out of compliance with PA 183, the City will provide written notice to the Association, and offer to meet and confer with the Association for a period not longer than thirty (30) days to discuss potential modifications to the terms of the Memorandum of Understanding in order to comply with the requirements of PA 183. To the extent that the City and the Association are unable to reach an agreement within thirty (30) days, the City may make any necessary modifications to ensure compliance with PA 183.

E.     Duration.     This Memorandum of Understanding will become effective upon approval by the Emergency Manager and the Treasurer of the State of Michigan and shall remain in effect until December 31, 2023. The City and the Association hereby agree to waive any and all collective bargaining rights with respect to pension benefits, including but not limited to benefits provided under, and any other issues relating to, the Combined Plan (the "Waived Issues") from the date that this Memorandum of Understanding is executed through December 31, 2023. The parties acknowledge that they are enjoined from collective bargaining regarding the Waived Issues through June 30, 2023 and further agree to waive any right to raise any of the Waived Issues in any Act 312 arbitration proceeding. The City and the Association agree that they may engage in collective bargaining regarding the Waived Issues beginning June 30, 2023, but that no modifications may be made with respect to any Waived Issue until after December 31, 2023.

F.     Grievance and Arbitration:  Any dispute pertaining to the provision of benefits pursuant to this Memorandum of Understanding shall be subject to the grievance and arbitration procedures set forth in Articles 7 and 8 of the CBA or any comparable provision set forth in a successor collective bargaining agreement entered into between the City and the DPOA. In resolving any dispute pertaining to provision of benefits pursuant to this Memorandum of Understanding, the Arbitrator shall be bound by the terms of this Memorandum of Understanding, the Combined Plan, and the Plan of Adjustment, and shall have no authority to issue any award or order that is contrary to the terms of these documents.

IN WITNESS WHEREOF, the parties hereto have affixed their signatures below:

Dated this 1st day of October 2014.

DETROIT POLICE OFFICERS                         CITY OF DETROIT:
ASSOCIATION:

_____                 _____
Mark Diaz, President                             Michael E. Duggan, Mayor

_____                 _____
Bernard Cybulski, Vice President                 Michael A. Hall, Director of Labor Relations

_____                 _____
Donna Latouf, Secretary-Treasurer                James E. Craig, Chief of Police

_____                 _____
Linda Broden, Sergeant at Arms                   Office of the State Treasurer, Michigan

8

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE CITY OF DETROIT
## AND
## DETROIT POLICE OFFICERS ASSOCIATION

The Detroit Police Officers Association ("Association") and the City of Detroit ("Detroit") discussed the application of Article 20, Section J.2 and Article 40, Section A of the 2014-2019 Collective Bargaining Agreement. In connection with those discussions, the parties have agreed to the following:

1. The 8% wage increase listed in Article 40, Section A shall become effective the second pay period following the effective date of the Collective Bargaining Agreement.

2. Each Employee who was on the City's payroll as of October 1, 2014 shall receive a one-time signing bonus equal to $620.00.

3. With respect to Article 20, Section J.2, the DPOA shall have 10 business days to identify an existing VEBA to which the City may make the contributions set forth in that provision and confirm that such VEBA is willing to accept said contributions. If the DPOA identifies such a VEBA within the applicable time frame, the parties shall meet and confer with respect to necessary changes to the Collective Bargaining Agreement. If the Association does not identify such a VEBA, the provisions of Article 20, Section J.2 shall remain unchanged.

IN WITNESS WHEREOF, the parties have affixed their signatures below:

Dated this 1st day of October, 2014.

DETROIT POLICE OFFICERS ASSOCIATION

CITY OF DETROIT

_____
Mark Diaz, President

_____
Michael E. Duggan, Mayor

_____
Bernard Cybulski, Vice President

_____
Michael A. Hall, Director of Labor Relations

_____
Donna Latouf, Secretary-Treasurer

_____
James E. Craig, Chief of Police

_____
Linda Broden, Sergeant-at-Arms

_____
Office of the State Treasurer, Michigan

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave.
Detroit, MI 48207

Re:     Prescheduled Overtime (2014-2019 Collective Bargaining Agreement)

Dear Mr. Diaz:

During negotiations with respect to the parties' 2014-2019 collective bargaining agreement, the Detroit Police Department (the "Department") and the Detroit Police Officers Association ("DPOA") discussed the methods by which the Department may shift personnel from one assignment to another pursuant to Article 14, Section E.1.  The Department shall utilize Employees in the DPOA bargaining unit and, absent exigent circumstances, shall follow the following process:

1.      The Department shall first attempt to address the personnel shortage by shifting Employees within the Command.

2.      To the extent the Department cannot address the personnel shortage by shifting Employees within the Command, the Department shall next attempt to shift Employees from adjacent Precincts.

3.      If the Department cannot fill the vacancy by shifting personnel within the Command or by shifting Employees from an adjacent Precinct, the Department may assign DPOA Employees without restriction.

Sincerely,

James Craig
Chief of Police

Acknowledged and Agreed:

Mark Diaz
President, DPOA

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave
Detroit, MI 48207

Re:   Funeral Leave (2014-2019 Collective Bargaining Agreement)

Dear Mr. Diaz:

During negotiations with respect to the parties' 2014-2019 collective bargaining agreement, the Detroit Police Department ("Department") and the Detroit Police Officers Association ("DPOA") discussed the application of Article 12 of the collective bargaining agreement. In connection with those discussions, the parties have agreed that an Employee's Legal Guardian, or an individual over whom the Employee serves as Legal Guardian, shall be treated as an immediate family member for purposes of eligibility for funeral leave. The Department may require the Employee to furnish proof of legal guardianship.

Sincerely,

James Craig
Chief of Police

Acknowledged and Agreed:

Mark Diaz
President, DPOA

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave.
Detroit, MI 48207

Re: <u>Letter of Agreement – Group Health Care</u>

Dear Mr. Diaz:

In connection with the negotiations regarding the 2014-2019 collective bargaining agreement (the "CBA") between the City of Detroit (the "City") and the Detroit Police Officers Association (the "DPOA") (collectively, the "Parties"), the Parties discussed the administration and application of the language contained in Article 20 of the CBA pertaining to Hospitalization, Medical, Dental and Optical Care (the "Group Health Care Provisions"). In particular, the Parties discussed the interpretation and application of Group Health Care Provisions pertaining to compliance with Michigan Public Act 152, Michigan Combined Laws ("MCL"), §§ 15.561 *et seq.* ("PA 152"), in connection with the administration of the City's group health care program provided to DPOA bargaining unit employees. With respect to the interpretation and application of Article 20.H of the CBA, the Parties agree as follows:

1.     In the event that the annual "Medical Benefit Plan Costs" (as defined in MCL § 15.562(F)) exceed the maximum public employer payment set forth in MCL § 15.563 (the "Hard Cap"), the City agrees to present a resolution to the City Council requesting that, for each applicable year, the City elect to comply with the provisions of MCL § 15.564 (the "80/20 Cost Allocation"), in order to maintain the current Medical Plan Design and premium allocations set forth in Articles 20.A and 20.B of the CBA.

2.     In the event that the City Council does not approve the 80/20 Cost Allocation by majority vote in any year, the City agrees to meet and confer with the Union for a period not longer than thirty (30) days, as outlined in Article 20.H of the CBA, in order to discuss potential modifications to the terms of the Medical Plan Designs (as defined in Article 20.A of the CBA) to maintain compliance with PA 152.

3. In the event that the Parties are unable to reach an agreement after thirty (30) days, as outlined in Article 20.H of the CBA, the City may make necessary modifications to the Medical Plan Designs to ensure compliance with PA 152 but will not modify the 80/20 monthly contribution allocation set forth in Article 20.B of the CBA without the agreement of the DPOA. However, the Parties agree that, in the event that the City is required to modify the Medical Plan Designs in order to ensure compliance with PA 152, the City shall be relieved of any obligation under Article 20.G of the CBA to provide "Gold"-level coverage.

4. In the event that any other bargaining unit reaches a different resolution of these issues, the DPOA may elect to adopt that agreement.

Very truly yours,

Michael E. Duggan
Mayor, City of Detroit

2

# MEMORANDUM OF UNDERSTANDING
## POLICE CORPORAL

The Detroit Police Department and the Detroit Police Officers Association (D.P.O.A.) have entered into the following Memorandum of Understanding to summarize the appointment to Police Corporal, which will be an appointed position, represented by and for DPOA collective bargaining unit active members.

The primary purpose of a Corporal is to provide training in the basic police-training curriculum and to transition newly appointed officers from classroom instruction into a structured practical application environment as a patrol response unit. The Corporal rank is an integral part of the probationary period because it provides close examination of Probationary Police Officers to ensure their emotional, physical and intellectual performances meet the required levels for law enforcement officers as defined by the Michigan Commission on Law Enforcement Standards.

## OBJECTIVES

1. Produce a highly trained and motivated police officer capable of meeting or exceeding the performance standards required by the department.

2. Provide proficient and professional academy and field training to direct Probationary Police Officers with the practical application of Academy knowledge.

3. Maintain an appraisal system with related job tasks and a standardized evaluation system for documenting performance skills of probationary officers. Identify, document and remediate skill levels of probationary officers, which reflect the lack of progress.

1

4. Modify the selection and recertification process for Corporals as needed. Maintain an appraisal process for reviewing the training techniques of Corporals.

## PROGRAM GUIDELINES

The Corporal is designed to be an extension of the recruitment and selection process from the date of hire until successful completion of the probationary period has been attained. Therefore, upon completion of Academy training, the recruits will transition to the level of Probationary Police Officer; to continue training in a patrol environment to ensure a well-rounded police experience is obtained.

## RESPONSIBILITIES:

## COMMANDING OFFICER OF TRAINING

As an executive officer in charge of basic and field training, the commanding officer of Training will ensure that the training curriculum for the Corporal rank is consistent and in compliance with the department policies. The commanding officer of Training will report program-training issues to the Deputy Chief of Support Services and the Assistant Chief of the Administrative Portfolio. The Chief of Police has the final determination for the appointment and de-appointment to the rank of Corporal.

## FIELD TRAINING ADMINISTRATOR

The Field Training Administration (F.T.A), reports directly to the Commanding Officer of Training.

2

The Field Training Administrator has direct management of the Field Training program. Specific guidelines listing the program procedures are defined in the Standard Operating Procedures Manual. The F.T.A. has the following responsibilities:

- Submit reports and training concerns to the Commanding Officer of Training and revisions to the program when necessary.
- Review Daily Observation Reports received to chart the progress of probationary officers during their training process.
- Participate with Group Evaluation meetings to ascertain the progress of probationary officers.
- Monitor activities of the Corporal while engaged in field training operations to ensure that probationary officers receive proper training. Make field visits/communicate with precincts/districts to ensure program objectives and procedures are being accomplished.

## PRECINCT TRAINING COORDINATOR

A supervisor selected by the Commanding Officer of each command has been designated as the Training Coordinator, to oversee the in-service and field-training program at the command level. The Training Coordinators' responsibilities are:

- Ensure all department members assigned to their commands attend all mandated training and receive additional training as necessary to perform their duties both proficiently and professionally.
- Collect and review completed Daily Observation Reports to chart the progress of probationary officers.
- Create a file for the probationary officer's completed Daily Observation Reports for review by supervisors completing the monthly probation reports and evaluation meetings to discuss the probationary officer's progress.

3

- Ensure monthly probationary reports are processed by the PPO's shift supervisor and forward the original Daily Observation Reports to the F.T.A.U. on a weekly basis.
- Report training concerns to their Commanding Officer and the Field Training Administrator and ensure the Corporal engaged in field training operations documents are completed and forwarded to the Field Training Administrator.


## CORPORALS

Corporals employed in field operations are responsible for coaching, instructing, and demonstrating proper patrol tasks to be performed by PPOs. Corporals employed in field operations will identify skills of PPOs that require remediation due to poor performance levels and low evaluation ratings. The Corporal, as a trainer, will also have the following responsibilities:

- Assist the training coordinator supervisor by coordinating and/or providing training to department members at their command. Corporals may also be called upon to provide training to members at other commands throughout the department on an as needed basis.
- Complete Daily Observation Reports when training PPOs.
- Evaluate performance skills of PPOs in accordance with the Standard Evaluation Guidelines.
- Develop techniques to help the PPO meet all training objectives.
- Apprise their FTO Coordinator and Commanding Officer regarding poor performance that is continually demonstrated by his/her assigned PPO.
- Attend an annual recertification course to maintain the Corporal position.
- Ensure training given to PPOs is consistent with standards for the State of Michigan, the Detroit Police Department and the guidelines of the program.

4

## PROBATIONARY POLICE OFFICERS

The probationary period shall be eighteen (18) months from the date of hire, or one year from graduation, whichever comes first. Upon graduating from the Academy, the PPO will be assigned to a command. Training will maintain an oversight of the continuation of basic police training until the successful completion of the Field Training Program.

PPOs must work with a Corporal who is certified in Field Training during the program as much as possible. If circumstances interfere with this procedure, the PPO, whenever practical, shall be given a desk assignment for a minimum of three (3) days per phase. The desk supervisor shall complete a Daily Observation Report on the PPO in accordance with the existing guidelines. A supervisor can assign a PPO to work with them in a patrol capacity and must process a Daily Observation Report.

PPOs are evaluated every day when training with a Corporal. The Field Training Program consists of three (3) phases in which the PPO has a Corporal partner. Each phase requires the completion of fifteen (15) Daily Observation Reports by a minimum of two different Corporals. This allows the PPO exposure to different activities and fair evaluation of performance skills. Failure of the PPO to reach the training standards required by the department and the Michigan Commission on Law Enforcement Standards shall be referred to the Probationary Evaluation Board (PEB) attaining all applicable appellate rights under the collective bargaining agreement. All supporting documentation, along with a written recommendation from the affected Commanding Officer, is to be forwarded to the Commanding Officer of Training.

A PEB or Chiefs hearing, as determined by the Chief of Police or his/her designee, will be empanelled to extend the probation of an

unconfirmed employee up to six (6) months. Consideration to terminate, extend, or otherwise affect a PPO's probation period, shall be conducted in accordance with established department and contractual procedures.

## FIELD TRAINING PROGRAM PERFORMANCE CATEGORIES

The Daily Observation Report (DOR) is the evaluation form utilized to record performed skill levels of PPOs in the following categories:

- Officer Safety
- Uniform Appearance
- Attitude
- Knowledge of Traffic/City Ordinance Violations
- Knowledge of Criminal Procedures
- Prisoner Processing
- Report Writing
- Patrol Forms
- Department Vehicle Procedures
- Telephone/Radio Communications
- Orientation/Response Time to Calls
- Crime Scene Procedures
- Ethics and Professional Conduct

## STANDARD EVALUATION GUIDELINES

Guidelines were established from Department Directives, policies, training directives and compiled laws from the State of Michigan as a reference source to compile fair rating scores. The performance categories are consistent with those listed above under the DOR.

The rating scores are 1 = unacceptable, 4 = acceptable, 7 = excels above average, N.O. = performance not observed, and N.R.T.T. = not

responding to training. Daily Training Time is also noted on the DOR when corrective information is provided when the PPO demonstrates improper techniques.

## CORPORAL SELECTION PROCESS

The Commanding Officers of each command within the Detroit Police Department shall:

- By seniority (starting with the most senior), ascertain each Police Officers desire to be appointed to the rank of Corporal, and accordingly prepare a list of Corporal Candidates in said order. This list shall include members who are currently Field Training Officers.
- Evaluate disciplinary records and sick time records of each Police Officer on said list, going back two (2) years from the date of the evaluation.
- Conduct a meeting (within ten (10) days of creating the list of Corporal Candidates) to discuss potential disqualifiers with the respective Police Officer, their immediate supervisor and an elected representative of the Detroit Police Officers Association.
- Should it be determined by the Commanding Officer of said Police Officer's command that their disciplinary and/or attendance over the past two (2) years is unsatisfactory, the Police Officer shall be disqualified from that commands list of Corporal Candidates until the Commanding Officer determines the disqualifying factor has been corrected, or two years from the date the disqualifying factor was committed.
- Should the Commanding Officer of a Police Officer determine their disciplinary record would not interfere with their ability to perform as a Corporal; the Commanding Officer shall prepare a written statement to the Chief of Police detailing their reason(s) for believing so. It shall be the Chief of Police (or his/her designee) who determines whether to uphold the decision of the

7

Commanding Officer to allow the Police Officer onto the list of Corporal Candidates.

- Upon final completion of the list of Corporal Candidates, each Commanding Officer shall forward said list to the Deputy Chief of Support Services.
- The lists of Corporal Candidates from ALL commands shall be combined by department seniority (starting with the most senior).
- Corporal Candidates having certifications and training specific to necessary departmental training needs (including that of the FTO) shall be appointed to the rank of Corporal if they are currently in an instructor capacity. Accordingly, said individual shall retain their position at their respective command only if they are to continue as an instructor.
- The Deputy Chief of Support Services shall make a list of ALL commands and number of positions where Corporals will be stationed available to all Corporal Candidates.
- Prior to the initial Corporal Training, Corporal Candidates shall bid for ALL available commands and platoons. This process shall be completed either in person or by way of a 568 from the Corporal Candidate to the Deputy Chief of Support Services (Direct). Accordingly, this process shall be done by department seniority (starting with the most senior).
- Corporal positions at commands shall first be filled by Corporal Candidates currently at that command and from their respective shifts.
- Upon completion of the command and platoon bidding process, Corporal Candidates shall be given two (2) days to withdraw their candidacy for the rank of Corporal. Should the Corporal Candidate decline appointment to the rank at this phase of the process they shall be removed from the Corporal Candidacy list for a period of one year from the date they declined the appointment.
- Should a Corporal Candidate withdraw from the candidacy list, the Corporal candidates with less seniority than the withdrawing candidate (most senior being first) shall be notified within twenty four (24) hours of vacancy and given an opportunity to fill the

8

vacancy. Accordingly, should a Corporal Candidate already on the list elect to fill the vacated position of the withdrawing Corporal Candidate, their vacated position shall be filled in the same manner until all available Corporal positions are filled.

- Upon filling all Corporal positions from the aforementioned Corporal Candidate list, Training will conduct Corporal Candidacy Training, to include an additional ten (10) Corporal Candidates (Corporals in Waiting) from the remaining list of candidates on the Corporal Candidates list.
- These ten (10) Corporals in Waiting shall remain at their respective commands as Police Officers. Should a Corporal position become available, the Corporal Candidates transfer list shall first be used to fill a vacated position. If there are no existing transfers to that vacancy, the vacancy filled by the next Corporal in Waiting (most senior having first refusal).
- Upon completion of the Corporal Candidacy Training, the Field Training Administrator shall prepare and forward an evaluation of each Corporal Candidate to the Chief of Police giving a positive or negative recommendation for the Corporal Candidates. Should the Field Training Administrator give a negative recommendation for any Corporal Candidate, a hearing with the Chief of Police (or his/her designee), Field Training Administrator, Corporal Candidate in question, and elected Detroit Police Officers Association representative shall be conducted. Should the Chief of Police (or his/her designee), adopt the recommendation of the Field Training Administrator, the Corporal Candidate shall be removed from the list of Corporal Candidates for a period of one (1) year before being eligible to be considered for Corporal Candidacy.

Additional Criteria:

- Corporal Candidates must have a minimum of five (5) years of street patrol experience.
- Successful completion of the Corporal Candidacy 40-Hour Certification Course

9

- Corporal Candidates must demonstrate the following in the Corporal Candidacy 40-Hour Certification Course

- Clean, neat appearance
- Knowledge level of Federal, State, City Ordinances, Department Policies and Patrol
- Communication Skills
- Positive Attitude.
- Adaptability
- Emotional Maturity
- Motivation
- Leadership
- Ability to document and evaluate.

## EXCLUSIONS

The following are reasons a Police Officer may be excluded from the Corporal Candidacy list:

- Disciplinary History
- Suspension as a result of final disposition in disciplinary case within the past two years.
- Current status on DPD350 after all appellate options has been exhausted.
- Pending Criminal Charges

The Chief of Police has the final determination for the appointment and de-appointment to the rank of Corporal and reserves the right to deny a candidate at his discretion with cause.

10

## APPEAL PROCESS

Any Police Officer who has articulable facts that demonstrate bias in their exclusion from the Corporal Candidacy process may appeal their exclusion, in writing, through the Detroit Police Officers Association Grievance Committee, to the Chief of Police (or his/her designee), to be heard and resolved within thirty (30) days of the appeal.

Any Corporal Candidate who is excluded from the Corporal Candidacy list may appeal their exclusion, in writing, through the Detroit Police Officers Association Grievance Committee, to the Chief of Police (or his/her designee), to be heard and resolved within thirty (30) days of the appeal.

## RECOGNITION

To recognize their importance in the training and evaluation of PPOs, an insignia has been awarded to identify Corporals. The Corporal shall wear two (2) stripes on their uniform sleeve.

## COMPENSATION

A Corporal, upon successfully completing Corporal Candidacy Training, shall receive a 2.5% wage increase. When A Corporal is engaged in training duties, the Corporal shall receive an additional 2.5% wage increase for all time spent training, including off duty court appearances with PPOs for a total of 5%. When calculating off duty court appearances, the additional 2.5% shall be added to the end of the normal off duty court appearance calculation as agreed upon in the DPOA City of Detroit State of Michigan collective bargaining agreement 2014-1019.

## CORPORAL RESIGNATION

Notice of resignation for Corporals shall be submitted through channels to the Chief of Police on a DPD 568. The Chief of Police reserves the authority to appoint a police officer to the rank of Corporal and de-appoint a Corporal to the rank of Police Officer.

Upon de-appointment by resignation or at the discretion of the Chief of Police, a member shall be returned to the rank of Police Officer. They shall be returned to the command they were assigned to prior to being appointed to the rank of Corporal with no loss of seniority (rights or privileges). Previous Corporals returning to their previous commands shall not displace another police officer from their assignment until that position becomes available (i.e. shift or job assignments.)

## ADDITIONAL PROVISIONS

- Corporals shall draw furloughs and leave days with the Police Officers on their respective shifts.
- PPOs shall have the same leave days as the Corporal they are assigned to.
- Members reinstated or reappointed pursuant to Article 10.F, Section 1 and 2 of the parties' collective bargaining agreement, shall not be considered PPOs for purposes of participation in the Field Training Program.
- Corporals shall receive the additional 2.5% increase when training reinstated or reappointed Police Officers.
- The rank of Corporal is not considered an assignment within the meaning of the parties' collective bargaining agreement and a member selected for a Corporal position shall retain his or her job assignment for all purposes set forth in the contract and this memorandum of understanding.

12

- Nothing in this agreement is intended nor should it be interpreted to confer on Corporals authority to exercise effective personnel action concerning probationary officers.
- The Chief of Police may exercise his or her authority to appoint a member to the rank of Corporal who is directly responsible for the training of both probationary members and confirmed members, i.e., members assigned to Training and Firearms Training.
- An Umpire in an expedited arbitration proceeding shall resolve disputes concerning the interpretation or application of this Memorandum of Understanding.
- Corporal Candidates refusing transfers by reverse seniority shall be suspended from the Corporal Candidate list for a period of one (1) year
- Training will host Corporal Candidate Training no less than once (1) a year to maintain at least ten (10) Corporals in waiting.
- Training will host Corporal Professional Development Training no less than once (1) a calendar year, or as needed for each Corporal to receive this training annually
- The rank of Corporal has been established for the reasons set forth in this Memorandum of Understanding. No other rank shall act in the capacity of Corporal.

## TRANSFERS

Corporals shall be eligible for two (2) transfer lists;

*Corporal Transfer List*

- Corporals may request to transfer to another command as a Corporal.
- Should a position become available within a command, Corporals at that command shall have first refusal for the open position.
- The most senior Corporal on the Corporal Transfer List requesting to transfer to the command shall immediately be made aware of the

13

open position and work hours. That Corporal shall immediately decide whether they accept the transfer or not.
- Should a Corporal decline the transfer, the opportunity to transfer to the command in question shall continue down the transfer list in this manner (most senior being first).
- Should the open position not be filled, the position shall be offered to the next Corporal Candidate on the Corporal Candidate List. (Most senior of the ten (10) Corporal Candidates in waiting).

*Police Officer Transfer List*

Corporals wishing to transfer to another command may do so in accordance with department policies and procedures on transfers. Should a Corporal be transferred to a Police Officer position, their position as a Corporal shall be forfeited and they shall be placed on the Corporal Candidate List in order of seniority. However, the Corporal position vacated shall first be offered to the Corporal Candidates in waiting by seniority.

**James E. Craig**
Chief of Police
Detroit Police Department

**Mark Diaz**
President
Detroit Police Officer's
Association

14

# MEMORANDUM OF UNDERSTANDING
## DETECTIVE TRAINEE

The Detroit Police Department and the Detroit Police Officers Association (D.P.O.A.) have entered into the following Memorandum of Understanding to summarize the appointment to the rank of Detective Trainee which will be a DPOA rank.

## RESPONSIBILITIES:

Job Description: Detective Trainee

A Detective Trainee is directly accountable to a sergeant and shall be responsible for the following:

- Responding and directing activities at crime scenes (both preliminary and on-going investigations)
- Conducting and directing of investigations along with the gathering of evidence (including witness statements)
- Follow-up investigations
- Complete and thorough case notes documented in the ascribed records management system
- Accountability for case notes and investigatory progress during case reviews with supervision
- Periodic communication with complainants regarding the status of investigations
- Awareness of crime patterns, changes and trends affecting an assigned area
- Keeping supervisors apprised of significant issues of importance;
- Recovering and processing of evidence/property;
- Conducting live or photo show-ups;
- Apprehending wanted persons;
- Typing of Search Warrants and participation in the execution of same;
- Interrogating and processing of detainees;
- Preparing cases for presentation to the prosecutor;
- Assisting the prosecutor through each step of the judicial process;
- Court case preparation and presentation;
- Testifying in court;
- Establishing and fostering shared communication with department personnel, entities and other law enforcement agencies;

A Detective Trainee shall assume all details, duties and responsibilities, which may be delegated by a superior officer or an entity with authority within the department.

A Detective Trainee is directly accountable to a sergeant and shall be responsible for the following:

The Detective Trainee rank is an integral part of the Detroit Police Department's criminal investigation and crime reduction strategy.

Applicants for an appointment to a Detective Trainee position are selected based on their ability to effectively perform independently, their enthusiasm towards the philosophy of policing and their level of commitment to the department's organizational values. Detective Trainees are not empowered to perform supervisory duties

## OBJECTIVES

1. Produce a highly trained and motivated Detective capable of meeting or exceeding the performance standards required by the department.

2. Provide proficient and professional police service to the community.

## DETECTIVE TRAINEE SELECTION PROCESS

The Commanding Officers of Investigative Operations are to be involved with the selection of Detective Trainees.

Applicants for the Detective Trainee position are restricted to sworn personnel. Officers applying for the position must be confirmed in the rank of police officer.

The following requirements are necessary in order to be considered for an appointment to the Detective Trainee Position.

- Confirmation in the rank of Police Officer
- Positive review from personnel and Internal Affairs records
- Positive clearance from Disciplinary Administration
- Successful completion of the Oral Interview Process

An interview appraisal is conducted on applicants who meet the minimum qualifications as defined in the announcement of the open positions to determine their qualifications. Selection to move forward in the process will be based on the needs of the department and those candidates that are selected for additional consideration based on past performance will be interviewed. During the interview process, the candidates for appointment will be assessed based on criteria including, but not limited to, disciplinary history, sick time usage, at fault accidents, performance evaluation ratings and their responses to the interview

questions. The candidate's must demonstrate experience in the following categories which shall be assigned a score and documented on the candidate's interview form:

1. Appearance
2. Investigative knowledge, skills and abilities
3. Knowledge level on Federal, State, City Laws, Department Policies and Patrol
4. Communication Skills
5. Attitude
6. Adaptability
7. Emotional Maturity
8. Motivation
9. Leadership
10. Ability to document and evaluate
11. Supervision

## APPEAL PROCESS

A candidate who has articulable facts that demonstrate bias in the rating of their interview may make written appeal directly to the Director of Personnel within seventy-two hours of their oral interview. The Chief of Police shall have the final determination as to the appointment to the rank of Detective Trainee.

## RECOGNITION

To recognize their importance in the training and evaluation of probationary officers an insignia has been awarded to identify Detective Trainees. Upon successful completion of the Detective Trainee program the Detective will wear two stripes and one diamond on their uniform sleeve.

## DETECTIVE TRAINEE COMPENSATION

A Detective Trainee upon appointment will receive a 2.5% pay increase.

## DETECTIVE TRAINEE RESIGNATION

A written resignation request on a DPD 568 must be submitted through channels to the Chief of Police.

The Chief of Police reserves the authority to appoint a police officer to the rank of Detective Trainee and de-appoint a Detective Trainee to the rank of police officer.

Upon de-appointment either by resignation or at the chief's discretion, a member shall be returned to the rank of police officer and retain their former assignment and retain all seniority rights.

## ADDITIONAL PROVISIONS

A.  Members reinstated or reappointed pursuant to Article 10.F. Section 1 and 2 of the parties' collective bargaining agreement, shall not be considered to be probationary officers for purposes of participation in the Detective Trainee program.

B.  The rank of Detective Trainee is not considered an assignment within the meaning of the parties' collective bargaining agreement and a member selected for a Detective Trainee position shall retain his or her job assignment for all purposes set forth in the contract.

C.  Nothing in this agreement is intended nor should it be interpreted to confer on Detective Trainees the authority to exercise effective personnel action concerning probationary officers.

D.  The Chief of Police may exercise his or her authority to appoint a member to the rank of Detective Trainee.

E.  Questions concerning the interpretation or application of this Memorandum of Understanding shall be resolved by an Umpire in an expedited arbitration proceeding.

F.  It is understood that final acceptance of this proposal is subject to approval of necessary city officials.

_____  3/18/201_  _____  3/18/14
DEPARTMENT        DATE        ASSOCIATION       DATE

## MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
## CITY OF DETROIT POLICE DEPARTMENT
### AND
## DETROIT POLICE OFFICERS ASSOCIATION

---

**RE: RULES AND PROCEDURES FOR BINDING MEDIATION PROCESS**

Article 7.I of the 2014 – 2019 Collective Bargaining Agreement between the Detroit Police Department and the Detroit Police Officers Association permits the parties to engage in binding mediation to settle contract grievances and disciplinary matters in lieu of arbitration.

Both parties understand that the 2014 -2019 Collective Bargaining Agreement provides a basic framework of the mediation process. It is agreed by the parties that this document provides more detail to the mediation process. Thus, the Detroit Police Department and the Detroit Police Officers Association agree to the following mediation process:

1. The parties select George Roumell as the Primary Mediator/Arbitrator. If the Parties agree that an additional Mediator is needed, The Parties agree to select one additional Mediator/Arbitrator from the permanent panel identified in Article 8 of the 2014-2019 CBA. The additional Mediator/Arbitrator shall be used if the parties agree to hold additional mediation sessions.

2. Mediation sessions shall be scheduled mutually no less than thirty (30) days before the hearing date.

3. Prior to each scheduled hearing date, each party may submit up to five (5) unresolved grievances and five (5) disciplinary matters for a binding recommendation by the Mediator/Arbitrator.

4. For each mediation hearing date, the City of Detroit Police Department shall bring forth up to five (5) Discipline cases prior to the Trial Board, Board of Police Commissioners hearing or any other administrative hearing.

5. Department cases presented shall involve discipline matters with a penalty imposed at the previous level not to exceed 30 days or 3 or more disciplinary sustained charges for the same or similar alleged offenses.

6. For each mediation hearing date, the Detroit Police Officers Association shall bring forth up to five (5) unresolved grievances.

7. Association cases presented shall involve grievances relating only to the interpretation, application or enforcement of a specific article and section of the collective bargaining agreement.

8. No more than ten (10) cases shall be presented at one mediation hearing.

## MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
## CITY OF DETROIT POLICE DEPARTMENT
### AND
## DETROIT POLICE OFFICERS ASSOCIATION

---

9. At least twenty (20) calendar days in advance of the hearing date, the parties shall meet and mutually set the agenda of cases to be considered on the designated mediation date.

10. Either party may decline to have a particular cases placed on the mediation agenda without explanation or justification.

11. At least fifteen (15) days prior to the mediation date, both parties shall exchange copies of all documents to be used for cases placed on the agenda. No additional records may be introduced at the hearing unless by consent of the opposing party. However, either party may request the Mediator to allow the introduction of additional documents/records, not produced within the 15 day time period, if good cause can be demonstrated for the delay.

12. A complete agenda, all documents, exhibits and files shall be provide to the Mediator/Arbitrator at the same time the parties exchange, fifteen (15) days prior.

13. Failure to adhere to document exchange timeframes may result in the party's case being removed from the agenda.

14. The mediation hearing shall be confidential and informal, therefore, no recording, court reporting, or recorded transcripts will be generated.

15. The DPOA may be represented by Counsel and/or an Association Advocate; and, up to two Association representatives.

16. The grievant is not required to be present at the hearing; however the grievant may attend as an observer. Grievant(s) will not be allowed to testify either by narrative or direct questions or be subject to cross examination by Counsel and/or Advocates as it relates to the merits of the case. However, the Mediator will be allowed to asked questions of the grievant for clarity purposes only.

17. The Department may be represented by Counsel and/or a Department Advocate and up to two Department Representatives.

18. No witnesses will be allowed in this mediation process. .

19. In cases which require the testimony of the grievant and/or witnesses, the matter shall be removed from the mediation agenda and set for regular umpire arbitration.

20. Each party's representative/advocate shall be authorized to resolve each grievance and/or enter into a settlement agreement to serve the best interest of their represented party.

21. Either party after the mediation hearing, but before the Umpire renders the decision, may, upon oral motion to the Mediator, have the matter moved to regular umpire arbitration.

22. Any matter removed from the mediation process to regular arbitration shall not be reconsidered for any future mediation proceeding.

23. Mediation cases scheduled but not heard on the designated date for reasons other than removal by either party, shall be scheduled for the next mediation date.

24. Cases that are resolved by mediation shall result in a written statement from the Mediator/Arbitrator given within 72 hours. The settlement award shall provide the rationale for the settlement which shall be binding on the parties.

25. If the Mediator, selected by the parties, fails to adhere to the terms of this agreement the parties may consider removing the Mediator from the mediation process.

26. Any settlement reached at mediation shall be binding with respect to the particular grievance or disciplinary matter, but shall have no precedential value with respect to any other grievance or disciplinary matter nor may be used or referred to in any subsequent proceeding between the parties unless both parties agree in writing.

27. The location of the mediation sessions shall alternate between the DPOA Office and the Office of the Department's Labor Affairs Relations or a location mutually agreed to by the parties. Frequency of the alternation shall be mutually agreed upon as it proves beneficial by the parties. If no agreement can be achieved, all mediation during even months will be held at Labor Relations, odd months will be held at the DPOA.

28. All fees and expenses of the Mediator and this process shall be split equally between the Detroit Police Department and the Detroit Police Officers Association.

29. The parties may from time to time in writing mutually agree to amendments to these ground rules

# MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
## CITY OF DETROIT POLICE DEPARTMENT
### AND
## DETROIT POLICE OFFICERS ASSOCIATION

Both parties acknowledge their shared interest in streamlining the grievance arbitration and disciplinary appeal process as well as the desire to protect the fiscal interest of the party's respective entities. To that end, both parties agree to the terms of this agreement and commit to its successful implementation through good faith discussions and the ultimate goal of operating through harmonious labor relations.

_____
FOR THE ASSOCIATION

_____
FOR THE DEPARTMENT

7-15-15
_____
DATE

7/15/15
_____
DATE

## MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
## CITY OF DETROIT
### AND
## DETROIT POLICE OFFICERS ASSOCIATION

**RE: NEIGHBORHOOD POLICE OFFICERS (NPO) AND DETECTIVE TRAINEES**

The Department being desirous of promoting harmonious labor relations by acting in good faith on previously discussed terms, recognizes a discrepancy in the Collective Bargaining Agreement between the Detroit Police Officers Association and the City of Detroit as it relates to pay rates for Neighborhood Police Officers and Detective Trainees.

Understanding that the 2014 -2019 CBA, which has been signed by both parties, reflects a dollar amount pay rate of $1,198 over maximum salary of a police officer for both Neighborhood Police Officers and Detective Trainees; the Department recognizes this rate does not reflect the rates discussed between the parties. Therefore, the Detroit Police Department and the Detroit Police Officers Association stipulate to the following:

1. Neighborhood Police Officers, upon appointment, shall be compensated at a pay rate of 3.5% above maximum standard police officer pay rate.

2. Detective Trainee, upon appointment, shall be compensated at a pay rate of 2.5% above maximum standard police officer pay rate.

3. It is clearly understood and agreed upon by the parties through previous Memorandums of Understanding that both Neighborhood Police Officer and Detective Trainee are appointments at the discretion of the Chief of Police.

4. Further, the Chief of Police reserves the right to unappoint members from Neighborhood Police Officer and/or Detective Trainee.

5. As such, in the event a member is un-appointed from Neighborhood Police Officer and/or Detective Trainee, said member's pay rate shall revert to the rate of pay step according to their time-in-grade step rate at the time of un-appointment.

The Association acknowledges this issue was brought forth by the Department without any employee rights violations or contractual obligations to adjust the NPO and Detective Trainee rates accordingly, insomuch that these rates will be adjusted as soon as possible without any retroactive pay applied at any time.

FOR THE ASSOCIATION

FOR THE CITY

4/7/15
DATE

4/17/15
DATE

# MEMORANDUM OF UNDERSTANDING

BETWEEN THE

## CITY OF DETROIT POLICE DEPARTMENT

AND

## DETROIT POLICE OFFICERS ASSOCIATION

The parties have engaged in discussions concerning Article 16.J of the 2014 — 2019 DPOA Collective Bargaining Agreement and have reached the following understanding.

1. A member who has been notified to appear for the purpose of questioning where the purpose of the questioning is not to charge the member with any criminal conduct or to discipline the member and the member is only being called as a witness, shall be entitled to a Union representative or legal counsel, if the member makes a request for such representation.

2. Questioning the member shall not begin until after the member has been advised of his/her right to legal counsel and/or a Union representative.

CITY OF DETROIT POLICE DEPARTMENT        DETROIT POLICE OFFICERS ASSOCIATION

James E. Craig, Chief of Police                        Mark Diaz, President

Date: 7 — 16 — 2015                                        Date: July 16, 2015

# MEMORANDUM OF UNDERSTANDING

## DETROIT POLICE DEPARTMENT –DETROIT POLICE OFFICERS ASSOCIATION

## ARTICLE 9. DISCIPLINE

The parties have engaged in discussions concerning Article 9 Discipline, 2014-2019 DPOA (Detroit Police Officers Association) Collective Bargaining Agreement (CBA), and have reached an understanding regarding a written reprimand appeal process procedure for all employees covered by this Agreement:

Under the current C.B.A. Article 9. Discipline (H) Written Reprimand reads: All written reprimands will be issued and implemented as soon as practicable following an investigation. Written reprimands will remain in employees' files for a period of time not to exceed two (2) years from the date of issuance of the reprimand

Under this M.O.U., the parties agree to have the language modified to read as follows:

"All written reprimands will be issued and implemented as soon as practicable following an investigation or decision from a Chief's Hearing. However, members will not be issued a written reprimand more than 366 calendar days from the date of the occurrence. Written reprimands will remain in employees' files for a period of time not to exceed two (2) years from the date of incident".

If the written reprimand is appealed the following appeal procedural guidelines must be followed by all employees covered by Article 9(C) of this Agreement:

**"Appeal to Chief's Hearing**: Within two (2) days of the receipt of the Notice of Discipline or, in its absence, an Employee may appeal the discipline to a Chief's Hearing (which will be presided over by the Chief or his/her designee) for review. The Chief of Police or his

designated representative shall conduct a hearing in a timely manner.

The Chief or his/her designee presiding over the Chief's Hearing will have the authority to rescind the written reprimand, affirm the written reprimand, or lower the level of discipline, but may not increase the disciplinary penalty from what was stated in the Notice of Discipline.

The Chief of Police or his designated representative shall give a written decision and that decision shall be final and binding with no right of appeal".

_____
CITY OFDETROIT
(POLICE DEPARTMENT)

_____
DETROIT POLICE OFFICERS
ASSOCIATION

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN**
**THE CITY OF DETROIT**
**AND**
**THE DETROIT POLICE OFFICERS ASSOCIATION**

The Detroit Police Officers Association ("Association") and the City of Detroit ("City") discussed various articles pertaining to wages and conditions of employment. Based on mutual consideration, the 2014-2019 Collective Bargaining Agreement ("CBA") has been amended. The parties have agreed to amend the following Contractual Articles:

1. Article 33. Recall Pay
   (Exhibit 1)

2. Article 34. Sick Leave
   (Exhibit 2)

3. Article 39. Miscellaneous
   (Exhibit 3)

4. Article 40. Wages
   (Exhibit 4)

5. Article 44. Duration
   The remaining articles and provisions of the DPOA Master Agreement remain as is without change or modification.
   (Exhibit 5)

IN WITNESS WHEREOF, the parties have affixed their signatures below:

Dated this 15th day of December, 2015

DETROIT POLICE OFFICERS ASSOCIATION

Mark Diaz, President

Bernard Cybulski, Vice President

Donna Lalouf, Secretary-Treasurer

Linda Broden, Sergeant-at-Arms

CITY OF DETROIT

Michael E. Duggan, Mayor

Michael A. Hall, Director of Labor Relations

James E. Craig, Chief of Police

Detroit Police Officer's Association (DPOA)

EXHIBIT 1

## 33. RECALL PAY AND STANDBY TIME COMPENSATION

A. Recall Pay: Employees are entitled to recall pay at time and one-half (1.5) rate if recalled to duty after reporting off duty and before their next tour of duty. A minimum of two (2) hours will be granted to a recalled member. Travel time, not to exceed one-half (1/2) hour each way shall be granted for travel to and from the duty station when the total time worked exceeds one (1) hour.

The recall rate shall not be paid when a member works continuously beyond his normal tour without first being relieved. The recall rate shall terminate as of the time that his next regular tour was scheduled to begin and he will not receive any travel time back to his residence.

Recall pay shall not be granted when:

1.   A mobilization has been ordered;

2.   Leave, furlough, bonus vacation days or compensatory time days have been canceled;

3.   A member has been directed to appear in court;

4.   A member is given notice of a change in shift starting time prior to his going off duty.


**B.   Standby Time Compensation: Standby time is defined as that time a member is scheduled to be available to work in case of emergency. The member is compensated for being required to be available to provide emergency services during a specified period of time.**

**Scheduling is determined by departmental procedures. If scheduled, a member can pursue personal activities, but when called must be able to promptly and effectively carry out their duties while designated to be on standby time.**

**All members scheduled pursuant to departmental standby procedures will be compensated at the following rate: one (1) hour of straight time earned for every eight (8) hours of standby time. For the one (1) hour of straight time the member shall have the option of pay or compensatory time.**

**The Standby Provision is effective January 1, 2016.**

FLSA time not Kot 81

1



Detroit Police Officers Association (DPOA)
EXHIBIT 2

## 34. SICK LEAVE

A.   <u>Sick Banks.</u>

    1.   Current sick bank is designated as that sick time accumulated at the rate of one (1) day for every calendar month in which a member has been credited for not less than eighteen (18) paid time days, excluding overtime.

    2.   Current sick time bank shall accumulate without limitation, provided that, for Employees who on July 1st of any year have accumulated more than 400 hours of sick time (including both unused current sick time and unused seniority sick bank time), the Department at its discretion may pay out all or any portion of the Employees' accumulated sick time in excess of 400 hours. Such payments shall be in accordance with the following terms:

        a.   The Department will announce whether it has elected to pay out sick time under the terms of this Agreement up to one year in advance. For example, as soon as practicable after the effective date of this Agreement, the Department will announce whether it will elect to pay out sick time accrued as of July 1, 2015. As soon as practical after July 1, 2015, the Department will announce wither it will elect to pay out sick time accrued as of July 1, 2016, and so on.

        b.   At the time it makes such announcements, the Department will also announce the amount of sick time that it may buy out.

        c.   Any payments under this Section shall be made at 85% of the Employee's base rate of pay during the previous fiscal year. If the Department elects to make a payment under this provision, the payment shall be made on the first pay date after December 1, or earlier if agreed upon by both parties. For example, any payment made based upon sick time accrued as of July 1, 2015 shall be made on the first pay date after December 1, 2015, unless otherwise mutually agreed. Notwithstanding any other provision of this Agreement, an Employee may elect to have a payment made pursuant to this Section contributed into the Employee's Annuity Savings Account in lieu of a cash payment.

    3.   Employees shall no longer accumulate additional seniority sick bank time.

B.   <u>Sick Time Credit.</u> The term "sick time" shall be defined as absence due to illness or injury of the member, to exposure to a contagious disease and to the attendance upon immediate members of the family of the member of the Department living within his household, including husband, wife, children, father, mother, sister, brother and relatives living in the same household regardless of degree of relationship. The granting of sick time for attendance upon these relatives is not limited to any given number of days per fiscal

1



year; however, no more than three (3) days will be granted in one instance.

This sick time is granted to permit the member to make arrangements for care of the ill person so that he may return to duty. When it comes to the attention of the Department that a member is abusing sick leave, the Chief of Police may cause an investigation to be initiated. Such investigation may result in disciplinary action, consistent with this Agreement.

C.   Deductions from the Sick Bank.  Sick banks, both current and seniority, are designed to provide for non-duty connected illness or disability. No deduction from either current or the seniority sick banks shall be made for any sick time resulting from a service connected illness or disability which is certified by a physician designated by the Department.

Sick time shall be charged first to the current sick bank and secondly, to the seniority sick bank, in periods of not less than half-days.

No more than once per quarter, when a member starts his/her shift but is unable to finish the shift because of sickness, sick time will be deducted in the following manner. (i) If less than four (4) hours has been worked, the Employee will be charged half a sick day and credited with half a work day; or (ii) If four (4) or more hours have been worked from the beginning of the shift, the Employee will be credited with a full work day.

During a period of illness, only that time which would be actual working time will be deducted from the sick bank. Illness or injury during furlough time may be changed to sick time in lieu of the member's furlough, provided such illness or injury during the furlough shall be reported forthwith to the member's commanding officer and to a physician designated by the Department. Such illness or injury will be verified by the physician designated by the Department. The unused portion of the member's furlough will be rescheduled and used immediately following recovery from the illness or injury which made the change necessary.

D.   Reporting Illness or Disability.  When any member becomes sick, the officer in charge must be notified without delay and informed where the member is confined. If a member is hospitalized, the officer in charge shall be notified and will cause a physician designated by the Department to be notified, during the next regular office hours, of the nature of the illness and the hospital to which the member was admitted. Members unable to report for duty because of sickness shall have their duty station notified not less than one (1) hour before roll call daily, in order to remain in a sick status. An Employee calling in sick in accordance with this provision will not be allowed to work until his next scheduled tour of duty. Under normal circumstances, a physician designated by the Department will not make visits to an individual member's home. When attending a sick Officer, a physician designated by the Department shall issue him a notice stating the nature of the illness and whether or not the officer shall remain off duty. The notice must be turned in to the commanding officer when the member returns to duty.

Employees on extended sick leave (more than three (3) work days) are required to keep their commands informed of their incapacity and expected date of return. In this instance, the Employee shall not be required to call in daily as specified above. Employees on sick leave

2

of thirty (30) days or more may be ordered to obtain verification by a physician designated by the Department.

E.   **Limited Duty.**   Officers placed on limited duty by a physician designated by the Department shall report immediately with their limited duty authorization slip to an appropriate command designated by the Chief of Police. Said command will determine an appropriate limited duty assignment and notify the member's commanding officer. Limited duty assignments are made by the Chief of Police under the authority granted by Article VII, Chapter VIII, Section VI, paragraph (4) of the City Charter and are subject to the limitations thereof.

An officer on limited duty normally shall not wear a uniform except under emergency conditions when ordered by his commanding officer. In such cases, however, the officer shall not leave the building or travel to and from work in uniform.

The number, location, and duration of restricted duty assignments, as well as whether a restricted duty assignment vacancy exists, shall be within the discretion of the Department.

The Department may give preference for restricted duty assignments to those Employees whose injury or illness is determined to have occurred in the line of duty over Employees whose injury or illness is determined to have occurred not in the line of duty. When the Department determines that the number of restricted duty Employees exceeds the available number of restricted duty assignments, in accordance with the limitations enumerated below, Employees having or seeking a restricted duty position for a non-duty related medical condition may be required to utilize sick time benefits. An Employee who is required to utilize sick time benefits by operation of this paragraph but who has no accumulated sick time will be allowed to use other accumulated time to cover the absence.

When an Employee having a non-duty related injury or illness is displaced from a restricted duty position, or when no restricted duty position is currently available, the Employee shall be placed on a waiting list for assignment to an available restricted duty position. Placement on this waiting list shall be by departmental seniority and placement in restricted duty positions shall be made in seniority order provided the Employee is able to perform the duties of the particular restricted duty position.

Notwithstanding the provisions of this Article, Employees on restricted duty for a non- duty related injury or illness and who are able to perform the duties of their regularly assigned job shall not be subject to being displaced by either an employee having a duty related injury or illness or by a more senior employee having a non-duty related injury or illness.

The Department shall maintain a continuous listing of those Employees who are restricted duty which shall indicate their duty assignment, seniority date, whether the status is for a duty or non-duty related reason, and other relevant data the parties may from time to time agree upon. The Department shall provide the Association with a copy of the list on any day that a change has been made.

Nothing in this Article shall affect the right of the Department under the Charter of the City of Detroit to refer Employees for duty or non-duty disability pensions.

F.   **Determination of Sick or Disability Status.**   It is the responsibility of a physician

3

designated by the Department to determine whether the illness or injury of a member is duty incurred. When a member sustains an original injury in the performance of duty during his regular duty hours, and is unable to complete his tour of duty, he shall be carried disabled. At all other times, he shall be carried sick until a final determination is made by a physician designated by the Department. Under no circumstances shall the status of a member being carried sick or disabled be changed in the time book or other Department records without the written authorization of a physician designated by the Department. A physician designated by the Department shall authorize such change by preparing an inter-office memorandum. Employees are automatically assigned to Platoon Two while disabled.

G.   Report for Duty When Ordered. Any member reported fit for duty by a physician designated by the Department who does not report at the roll call indicated by the physician shall be considered absent without leave.

H.   Return to Duty. To insure proper health safeguards for Department personnel, members who are ordered off duty by a physician designated by the Department due to illness or injury, whether service connected or not, shall not be returned to active or limited duty assignments without being certified for such assignment by a physician designated by the Department.

I.   Illness or Injury Services. In non and/or post emergency cases, police personnel who have incurred a service connected illness or injury must obtain approval from a physician designated by the Department before securing any type of medical attention or treatment for the illness or injury, including x-rays and dental care. The Department will not be liable for costs so incurred unless prior approval is obtained.

Officers who are duty disabled or on limited duty shall report for physical examinations when directed by a physician designated by the Department. Furthermore as a condition for continuing disabled or limited duty status and the benefits thereof, the officers must submit to all reasonable examinations ordered by the Department. Failure to do so will lead to immediate termination of such status and benefits.

J.   Depletion of Sick Banks. If a member is unable to perform police duties when all his sick banks are exhausted, he shall be dropped from the payroll unless he is eligible for non-duty connected retirement benefits. A member exhausting his sick banks who has completed five (5) or more years of service and who is otherwise eligible for non-duty connected disability retirement, may be retired at his own request or at the request of the Chief of Police subject to the approval of the Retirement Board.

A member may apply for reinstatement within two (2) years of being removed from the payroll if he recovers sufficiently from his illness or injury to return to duty. He/She may be reinstated in the same status as when he/she left upon proper certification by a physician designated by the Department and appointment by the Chief of Police.

K.   Retirement and Death Sick Leave Payment. Immediately preceding the effective day of a member's retirement, exclusive of duty and non-duty disability retirement, or at the time of a member's death, he or his estate shall be entitled to pay for his unused accumulated

4

**Detroit Police Officers Association (DPOA)**
**EXHIBIT 2**

sick banks as follows:

An Employee shall receive full pay for eighty-five percent (85%) of the unused accumulated sick bank amounts.

If a member is granted a duty or non-duty disability retirement, he shall be entitled to a reimbursement of unused sick time according to the preceding formula, upon attaining his normal full duty retirement date and petitioning the Chief of Police for such reimbursement.

5

# 39. MISCELLANEOUS

A.   Relation to Regulations, etc. This Agreement shall supersede any rules, regulations, ordinances or resolutions inconsistent herewith.

B.   Savings Clause. If any article or section of this Agreement or any supplement thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal, the remainder of this Agreement and supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section.

C.   Service Weapon. All Employees shall be provided at no charge with their department-issued service weapon upon full service retirement. An Employee will have no more than thirty (30) days after separation to make such request to the Chief of Police. The Department may refuse to give Employees their weapon for good cause shown. Good cause will be established where an Employee has pending criminal charges or has been convicted of a crime, is subject to departmental investigations, or psychological restrictions. Employees who are involuntarily discharged will not receive a service weapon.

D.   Longevity Pay. There will be no longevity payments during the term of this Agreement.

E.   Direct Deposit. Members of the bargaining unit may participate in the direct deposit programs offered by the City.

F.   Lump Sum for Banked Time. Whenever an Employee leaves employment with the Department, such Employee will be paid for all banked time, other than sick time, at the prevailing rate of pay in effect at the time of separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. DROP plan participants will only receive payout for banked time when they permanently retire, not when they enter the DROP plan. Payments will be paid within ninety (90) days if the amount is less than ten thousand dollars ($10,000), and if in excess of ten thousand dollars ($10,000), the amount will be made in semi-annual installments over a three (3) year period with the installments due on February 1 and August 1 with no interest due.

G.   Correction of Overpayments and Underpayments. Where by payroll error an Employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment. The City shall notify an Employee in writing fourteen (14) calendar days prior to making any payroll recovery. Each deduction by the City shall be substantiated in the records of the City and shall be identified as to the individual Employee.

H.   Civilianization. Positions within the Department that do not require Michigan Commission on Law Enforcement Standards (M.C.O.L.E.S.) certification are subject to civilianization at any time. Any reductions in force (lay-offs) resulting from civilianization will comply with Article 10.I. (Seniority – Lay-off and Recall).

1

**Detroit Police Officers Association (DPOA)**
EXHIBIT 3

I.      <u>Ammunition</u>. All members shall be provided with limited penetration, full expansion rounds to be carried on or off duty. Members shall also be allowed to purchase (at their own expense) and carry other Department approved limited penetration, full expansion rounds.

J.      <u>Canine</u>. With respect to any assignment made to Canine (K-9), the City may, at its discretion, direct the member on said assignment to return all departmental dogs under the age of five (5) and all departmental equipment to the department at such time as that member is no longer assigned to Canine.

K.      <u>Care of Departmental Dogs</u>. Employees will be paid at a rate of time and one-half for the actual off-duty time spent caring for Department dogs, provided such work is authorized. Employees may expend a maximum of forty (40) minutes per day caring for Department dogs; provided, however, that Employees may expend additional time per day with the prior approval of their supervisor. Employees caring for more than one Department dog shall receive an additional fifteen (15) minutes per day, per dog. The Department retains the discretion to determine whether time spent in excess of the above is necessary and whether it shall be performed while the member is on duty or off duty. Employees shall maintain a record, on a form to be established by the Department, of the time spent in the performance of these duties, and submit the form to the Administrative Sergeant on a bi-weekly basis. This time shall be reported on the bi-weekly Time and Attendance Report as kind-of-time 66.

L.      <u>**Tuition Reimbursement:** **The City agrees to provide tuition reimbursement up to a maximum of $2,000 per fiscal year to cover classes necessary in securing an Associate's, Bachelor's, Master's, Law or Doctorate Degree. The following criteria must be met to be eligible for reimbursement:**</u>

    1. <u>**Member must have successfully completed one (1) year of continuous service after successful completion of the Police Academy.**</u>

    2. <u>**Each course must be taken through an accredited college or university.**</u>

    3. <u>**Each course must grant college level credits.**</u>

    4. <u>**Each member must receive at least a "C" grade in the course or in "pass/fail" courses a member must receive a "pass" grade.**</u>

    5. <u>**Proof of enrollment, tuition payment and course completion is required to receive tuition reimbursement.**</u>

    6. <u>**Tuition will be reimbursed for course work that is directly job-related or expands the member's overall job skills.**</u>

2

**Detroit Police Officers Association (DPOA)**
EXHIBIT 3

M.    **Employee Referral Incentive: A member shall receive $250 for every individual referred and hired into uniformed and essential DPD positions as identified by the Director of Police Personnel, in conjunction with the Chief of Police.**

3

## 40. WAGES

A.    Wages   September   , 2014 through June 30, 2020  Base Salary:

- **Starting salary for Police Officers will increase to $36,000 effective January 1, 2016.**

- **Five year Police Officer 4% wage increase effective January 1, 2016.**

- **Incremental steps increased accordingly to reflect new starting salary and five year Police Officer effective January 1, 2016.**

- 2.5% wage increase effective July 1, 2016.

- 2.5% wage increase effective July 1, 2017.

- 2.5% wage increase effective July 1, 2018.

- **3% wage increase effective July 1, 2019.**

**B**    **Wage Scale.**  Employees' wages during the term of this Agreement are set forth in the attached Official Compensation Schedule. **The Official Compensation Schedule will be revised to reflect the adjusted wage increases as referenced in this article.**

**C.**    **Education Salary Incentive: Beginning January 2016, any members covered by this Agreement who has attained at least two (2) years of college credit from an accredited college or university shall receive a 2% wage increase of their base salary upon submission of certified transcripts. The 2% education incentive will be calculated after the January 2016 wage increase is implemented.**

**D.**    **Differential.** Salaries for the following classifications will be maintained at the dollar differentials indicated for the term of this Agreement.

    1.    Communications Officer - Police Officer (Class Code 33-12-1 1)

| | |
|---|---|
| Start | $450 over starting salary of Police Officer |
| After one year | $450 over salary of one-year Police Officer |
| After two years | $450 over salary of two-year Police Officer |
| After three years | $450 over salary of three-year Police Officer |
| After four years | $450 over salary of four-year Police Officer |
| After five years | $450 over salary of five-year Police Officer |

    2.    Band Director - Police Officer (Class Code 33-12-14)

       $821 over maximum of salary of Police Officer

1

3. Assistant Supervisor of Motor Vehicles – Police Officer (Class Code 33-12-15)

   $862 over maximum salary of Police Officer

4. Police Data Processing Programmer – Police Officer (Class Code 33-2-26)

   Minimum:   $589 over maximum salary of Police Officer
   Maximum:   $1,738 over maximum salary of a Police Officer

5. Radio Maintenance Officer – Police Officer (Class Code 33-12-12)

   $862 over maximum salary of a Police Officer

6. Radio Systems and Planning Officer – Police Officer (Class Code 33-12-13)

   $1,567 over maximum salary of a Police Officer

7. Senior Police Data Processing Programmer – Police Officer (Class Code 33-12-36)
   Police Lieutenant Salary

8. Neighborhood Police Officer (Class Code _ - _ - _ )

   $1,198 over maximum salary of a Police Officer

9. Police Detective Trainee (Class Code _ - _ - _ )

   $1,198 over maximum salary of a Police Officer

10. Police Corporal (Class Code _ - _ - _ )
    Start                    $1,198 over maximum salary of a Police Officer
    When engaged in field    $2,396 over maximum salary of a Police Officer
    Training operations

**Qualifications incentives:** Notwithstanding anything to the contrary herein, qualifications incentives are not included in the wage differential language.

2



**Detroit Police Officers Association (DPOA)**
EXHIBIT 5

### 44. DURATION

This Agreement shall be effective and binding on the Union and the City as of October ‗,
2014, and shall continue in full force and effect through June 30, <u>2020</u> (the "Term"). This
Agreement, including the Term, shall be incorporated into and become a part of both the
plan of adjustment and order confirming the plan of adjustment, and the Agreement shall
be subject to the post‑confirmation ongoing jurisdiction of the Bankruptcy Court for the
full Term, including without limitation, whatever jurisdiction the Bankruptcy Court's
retains to enforce the Term. This Agreement, including specifically, the Term, shall be
duly authorized and approved by and consented to by the Governor, the Treasurer and
the Emergency Manager, with these consents reflected by duly authorized signatures.

If either party desires to modify this Agreement, it may give written notice to the other
party during the month of March <u>2020</u>.

In the event that the Department and the Association fail to arrive at an agreement on
wages, fringe benefits, other monetary matters, and non-economic items by June 30,
<u>2020</u>, this Agreement will remain in effect on a day-to-day basis. Either party may
terminate this Agreement by giving the other party a ten (10) day written notice on or after
June 30, <u>2020</u>.

1