UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE: | Chapter 9 |
| CITY OF DETROIT | Case No. 13-53846 |
| Debtor. | Hon. Thomas J. Tucker |

## MOTION TO ENFORCE DEVELOPMENT AGREEMENT

Pike Pointe Holdings, LLC ("Pike Pointe"), a wholly owned subsidiary of

Syncora Guarantee Inc. ("Syncora"), through its counsel Dykema Gossett PLLC,

moves this Court for an order enforcing certain terms of a Development Agreement

dated as of December 10, 2014 (the "Agreement") between Pike Pointe and the City

of Detroit (the "City") with regards to two properties[1] on Detroit's east riverfront.

Specifically, Pike Pointe seeks an order (1) granting a two-year extension of the

current December 10, 2019 Option Period (as defined in the Agreement) for Pike

Pointe to acquire the Jefferson Property; (2) requiring the City to terminate

contractual arrangements that authorize the operator of the Aretha Franklin

---

[1] There are two undeveloped properties at issue: parcels located at 2290 East Jefferson, 2310 East Jefferson and 301 Chene (collectively, the "Jefferson Property") and parcels located at 2200 Franklin Street, 2263 East Atwater Street and 281 Chene (the "Chene Property"). A map of these properties is attached as **Exhibit A**. The Jefferson Property and Chene Property are sometimes collectively referred to as the "Subject Properties."

Amphitheater (the "Amphitheatre") to use the Jefferson Property for parking; and (3) such other relief as requested herein.

## SUMMARY OF ARGUMENT

Under the terms of the Agreement, the City is not permitted to unreasonably withhold, condition, or delay its consent to Pike Pointe's request for an extension of the Option Period for the Jefferson Property. The Agreement specifically states that the City's consent to this extension request shall not be unreasonably withheld, conditioned, or delayed and provides two examples when withholding, delaying, or conditioning such consent is unreasonable: (i) if development in the vicinity of the property has decreased, or (ii) if the contemplated development is complex. Both apply here. Moreover, the City's withholding of consent is unreasonable because (a) Pike Pointe has undertaken enormous efforts to work with the City in good faith to develop the Subject Properties over the last five years while the City's evolving plans for the neighborhood and other actions have caused delays, (b) the City has indicated multiple times, and as recently as September 11, 2019, that *it wanted to extend the Option Period for the Jefferson Property*, but has now suddenly reversed course, taking Pike Pointe by surprise, and (c) the extension would make the Option Period for the Jefferson Property coincide with the Option Period for the Chene Property and thereby allow these adjacent properties to be developed together in a coordinated fashion (rather than piecemeal under separate timelines), which will

benefit all parties and the East Rivertown neighborhood. That is the most reasonable and responsible way to move forward.[2]

Pike Pointe also requests that this Court enforce the Agreement by requiring the City to terminate certain contractual arrangements permitting a City vendor to use the Jefferson Property for parking. Under the Agreement, the City is obligated to terminate the current contractual arrangements between the City and the operator of the Amphitheater to use the Jefferson Property for parking. However, if the Option Period for the Jefferson Property is extended as requested, Pike Pointe could suspend or withdraw its objection to the parking arrangements currently encumbering the Jefferson Property until such time the Option is exercised or circumstances otherwise require.

## JURISDICTION

The Court has jurisdiction over this matter and this Chapter 9 proceeding under 28 U.S.C. § 1334 and the general order of reference in this District. Further, the Court retained jurisdiction over disputes related to the Agreement in the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (the "Plan," Doc

---

[2] Under similar, but far less compelling circumstances, the City recently granted a comparable extension to exercise option rights on Detroit's west riverfront to Gotham Motown Recovery, LLC ("Gotham"), as assignee of rights given to the Financial Guaranty Insurance Company ("FGIC") under development agreements similar to the Agreement at issue here.

8045) and the Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit ("Order Confirming Plan", Doc 8272).

Paragraph 92 of the Order Confirming Plan states that "the Court shall retain such jurisdiction over the Chapter 9 Case to the fullest extent permitted by law, including, among other things, jurisdiction over those matters and issues described in Article VII of the Plan". (Doc 8272 at p. 126). Paragraph 95 of the Order Confirming Plan states that "[p]ursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over any matters, cases, controversies, suits or disputes that may arise in connection with . . . the Syncora Development Agreement." (*Id*. at p. 127). Further, Article VII of the Plan (Doc 8045) provides as follows:

> Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code . . . the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to: …. resolve any matters, cases, controversies, suits, or disputes that may arise in connection with the Syncora Development Agreement. (Doc 8045 at p. 69-70).[3]

---

[3] "Syncora Development Agreement" is defined in the Plan as "that certain development agreement by and between the City and Pike Point Holdings, LLC, a wholly owned indirect subsidiary of Syncora, in substantially the form attached hereto as Exhibit I.A.340, including all exhibits thereto, and in any case in form and substance reasonably acceptable to the City and Syncora." (Plan, Doc 8045 at p. 28).

Pursuant to LBR 9014-1(h), Pike Pointe sought the City's concurrence in the relief sought by this motion on November 8, 2019 and that concurrence has not been obtained. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).

## BACKGROUND

### A. The Agreement Was an Integral Part of Resolving Syncora's Claims in this Bankruptcy Case.

Syncora, a financial guaranty insurance company and large creditor in this case, resolved its substantial claims against the City (more than $333 million) by entering into certain transactions, collectively referred to as the Syncora Development Transactions, a term defined in the Order Confirming Plan (Doc 8272 at p. 56). As part of the Syncora Development Transactions, the City and Pike Pointe entered into the Agreement as of December 10, 2014, a copy of which is attached as **Exhibit B**. The City agreed that the Agreement "will provide the City with benefits that the City otherwise would be unable to realize, including by laying the groundwork for a decades-long partnership between the City and Syncora that promises to provide substantial investment in, and rehabilitation of, City assets on a mutually beneficial basis." (Order Confirming Plan, Doc 8272, at p. 57).

The Agreement granted to Pike Pointe the Option (as defined in the Agreement) to acquire, *at no cost*, four assembled parcels of property. (Agreement, Exhibit B at § 1(A)). The ability to obtain title to these parcels at no cost was an

integral and important part of the consideration received to resolve the claims in the bankruptcy proceeding and to allow the City to emerge from that proceeding.

The four parcels subject to the Agreement were (1) the former police headquarters at 1300 Beaubien Street ("1300 Beaubien"); (2) the properties commonly described as 1303 East Atwater, 1325 East Atwater, 1365 East Atwater, 1399 East Atwater, 1364 Franklin, 1340 Franklin, 1310 Franklin, and 1370 Guoin. (collectively, the "Atwater Property"); (3) the Jefferson Property; and (4) the Chene Property.  Together, these four properties are sometimes referred to below as the "Four Development Properties."  Subject to extension, the Option Period for the Jefferson Property ends on December 10, 2019.  The corresponding Option Period for the Chene Property ends two years later, i.e. December 10, 2021.

**B.  Since 2014, Pike Pointe Has Worked Diligently to Develop the Four Development Properties.**

Since the execution of the Agreement, Pike Pointe has been in close and ongoing contact with representatives of the City and the Detroit Economic Growth Corporation ("DEGC"), as well as a variety of other local stakeholders, in an effort to coordinate and align possible developments and potential joint venture partners with the goals of the City.  These contacts regarding the Four Development Properties involved staff and leadership of the City's Planning and Development Department; representatives of the Mayor's Office; and representatives of the

DEGC. (*See* **Exhibit 5**, Affidavit of Thomas Waters at ¶ 5). These efforts have been entirely voluntary and were not required under terms of the Agreement.

These interactions resulted in successful and collaborative closings and joint venture agreements on the Options with respect to 1300 Beaubien (in February 2018) and the Atwater Property (in November 2018). They also resulted in significant coordination on efforts to identify the projects and appropriate joint venture partners for the Jefferson Property and the Chene Property. (Waters Aff. at ¶ 6).

Pike Pointe has spent a tremendous amount of time, effort and expense in performing planning and due diligence for all of the Four Development Properties, particularly the Jefferson Property and the Chene Property. These efforts included not only frequent and ongoing coordination with the City, the DEGC, and other local stakeholders, but also comprehensive title reviews; commissioning surveys; Phase One environmental reports; Phase Two environmental reports; market studies; interviews with developers, architects, engineers, contractors, planners and other consultants; and two massing (development) studies of the Subject Properties—one done by Hamilton Anderson (a prominent local architectural firm) and the second by Gensler[4] (a prominent national architectural and planning firm). Pike Pointe also

---

[4] The depiction of a potential project on the Subject Properties as a result of the Gensler study is attached as **Exhibit C**, which underscores the scope, impact and complexity of projects which Pike Pointe has been aspiring to accomplish.

collaborated with the City and its consultants in a district planning effort for the east riverfront initiated by the City after the Agreement was signed. All of these efforts have informed the ongoing dialogue between the City and Pike Pointe regarding how and when the Subject Properties should be developed, what meaningful or aspirational projects would be viewed more favorably by the City, and which joint venture partners the City preferred or disfavored. (Waters Aff. at ¶ 8).

Pike Pointe has consulted with various potential joint venture partners throughout the foregoing process and has been receptive to offers on the Subject Properties since 2015. In 2016, Pike Pointe entered into a purchase agreement for the Subject Properties with a prominent local developer, but that developer terminated the agreement during the due diligence period. Perhaps not coincidentally, the termination occurred shortly after the City released a proposed master plan that showed the Chene Property as being part of a public park. (Waters Aff. at ¶ 9).

The City's Director of Planning and Development encouraged Pike Pointe to sequence its development of the Atwater Property and the Subject Properties, focusing first on the Atwater Property and then on the Subject Properties. Pike Pointe closed on the Atwater Property in November 2018. Pike Pointe then accelerated efforts to market the Subject Properties per the City's recommendation. After consultation with various developers, the City, and others, it was quickly

concluded that the Subject Properties would result in a more significant project if developed together than if marketed separately. By late 2018, Pike Pointe was in serious discussions with two potential joint venture partners. One potential partner wanted to develop the Subject Properties as soon as possible (and therefore was not in a position to allow the Subject Properties to be used for parking for an extended period of time).[5] The other potential partner preferred not to develop the Subject Properties immediately (thereby giving the City more time within which to implement alternative parking arrangements for the Amphitheatre). A City representative indicated that more time within which to implement alternative parking arrangements was the City's preferred option. (Waters Aff. at ¶ 11). Accordingly, Pike Pointe refrained from providing an Objection Notice[6] under the Agreement for more than six months while the City considered its alternatives and ultimate recommendations were made to the Mayor. *In fact, as recently as September 11, 2019, the City itself suggested that it would extend the Option*

---

[5] This fact was alarming to City representatives due to how it would disrupt operations of the Amphitheatre, as noted below. However, this developer's plan, when completed, intended to provide parking sufficient to support the Amphitheatre.

[6] As explained below, under the terms of the Agreement, Pike Pointe has a right to provide an Objection Notice that would obligate the City to terminate the parking arrangement in support of the Amphitheatre.

***Period for the Jefferson Property to accommodate its preferred plan of preserving***
***the status quo parking arrangement for the Amphitheatre***.  (Waters Aff. at ¶ 12).

Shortly thereafter, the Mayor apparently decided that the City would grant no extensions of the Option Period or any other timing requirement for either the Subject Properties.  At the same time, the City and/or DEGC advised Pike Pointe's potential joint venture partners that any proposed development of property in this area would take about 24 months to start construction, given the City's new Community Benefits Agreement Ordinances, the fluctuating state of the City's master planning efforts for this area, and the intricacies of the City's planning and approval processes. (Waters Aff. at ¶ 13).  This timing was important because there is a right of reverter in the Agreement that provides title to a Property (as defined in the Agreement) would revert to the City if Commencement of Construction (as defined in the Agreement) is not achieved within 15 months after the Closing on a Property.  This statement represented an implicit threat that the City would seek to "time out" any developer from developing one or both of the Subject Properties if the developer could not obtain City approvals in time to comply with the 15-month deadline (which the City considered unrealistic).  Neither potential joint venture partner is willing to proceed unless extensions are granted.  (Waters Aff. at ¶¶ 14-15).

**C.     The City has Caused Delay by Changing its Plans for the East
        Riverfront.**

Although the City's Chapter 9 filing gave the City the fresh start it needed to jumpstart its revitalization, the City's post-bankruptcy actions with Pike Pointe have repeatedly called into question the City's commitment to work reasonably with Pike Pointe to move forward in compliance with the Agreement.

Development and planning efforts for the Subject Properties have been considerably complicated by the City's own actions. The complications include that the City implemented an East Riverfront Framework Plan[7] process that has gone through a number of iterations and is still not complete; significant changes in both planning and development officials; the adoption by the City of a Community Benefits Agreement Ordinance that could substantially extend the timeframe for planning and development of projects in this area; and (for reasons explained below) the designation of Chene Park by the Mayor of Detroit as the Aretha Franklin Amphitheatre.

Until the Mayor's unexpected announcement to rename Chene Park as the "Aretha Franklin Amphitheatre", community partners and planning officials openly discussed a plan to eliminate the concerts held at Chene Park and to consolidate all

_____

[7] The City's Planning and Development Department website notes that the City is working on developing a "visionary comprehensive neighborhood frame work plan for Detroit's East Riverfront" and includes a link to a Detroit Easter Riverfront Report, which outlines in broad terms an East Riverfront Framework Plan (see https://detroitmi.gov/departments/planning-and-development-department/central-design-region/east-riverfront).

concerts at a different location (e.g., Hart Plaza). Once the Mayor designated Chene Park as the Aretha Franklin Amphitheatre, development of the Subject Properties became far more complex. This occurred after Pike Pointe had studied and marketed the site, so its potential development partners were now negotiating in a new and considerably more challenging context. (Waters Aff. at ¶¶ 7, 16).

For some years, the primary parking for events at Chene Park (now the Aretha Franklin Amphitheatre) has been on the Subject Properties. The Subject Properties have been made available to The Right Productions ("TRP"), the City's vendor who operates and manages Chene Park, pursuant to a Professional Services Contract dated March 23, 2010, as amended by Contract Amendment No. 1 (approved by the City Council as of March 26, 2013), and as further amended by Contract Amendment No. 2 (approved by City Council January 20, 2015) (as amended, the "TRP Agreement").

Under the TRP Agreement, TRP has been using (or allowing an affiliate to use) the Subject Properties as parking lots to support the Amphitheatre, particularly when concerts and events are being conducted. The parking in the area of the Amphitheatre already is insufficient, and if one or both of the Subject Properties are no longer available for parking because they are under development, the operations of the Amphitheatre would be negatively impacted. For this reason, Pike Pointe opened a dialogue with the City to determine how this problem could be resolved.

Under the TRP Agreement, the City has the right to terminate the TRP Agreement, in whole or in part, upon advance notice to TRP. This right notwithstanding, the impact of even a partial termination of the right to use the Chene Property and the Jefferson Property for parking, and its consequent impact on the public's ability to access and enjoy the Amphitheatre, would be considerable. The requested extension would provide the City with more time to address this issue.

## D. The Current Development Plan of Pike Pointe's Potential Joint Venture Partner is Complex.

The current development plan of the preferred joint venture partner contemplates development of both the Chene Property and the Jefferson Property as one unitary project. The development plan contemplates a 3,500 Car Automated Parking system[8], 300 luxury apartments, 100 furnished condominiums, a hotel with 256 rooms, 60,000 - 100,000 square feet of office space and 60,000 square feet of retail space for restaurants and cafes. (Waters Aff. ¶ 17). This development will only be possible if the Option Period on the Jefferson Property is extended.

## E. The City Refuses to Consent to Pike Pointe's Request to Extend the Option Period.

---

[8] The automated parking system being considered doubles the number of cars parked in the same volume of traditional parking and provides approximately the same cost as a conventional approach. It also is designed to be more sustainable, faster to build, less expensive to operate, and safer for the community.

On October 9, 2019, Pike Pointe requested that the City consent to a two-year extension, from December 10, 2019 to December 10, 2021, of the Option Period for the Jefferson Property. A copy of the October 9, 2019 letter making this request is attached as **Exhibit C**. The extension would make the Option Period for the Jefferson Property coincide with the Option Period for the Chene Property, which would allow the contemplated comprehensive development involving both parcels to move forward. However, the City orally advised that it will not consent to *any* extension.

**F.    The City is Obligated Under the Agreement to Terminate Parking Rights on the Jefferson Property.**

As noted in more detail below, Pike Pointe has the right under the Agreement to object to title matters that it finds unacceptable. It further has the right to provide the City with an Objection Notice and, as to matters within the control of the City, the City must eliminate the title matter within 60 days of the City's receipt of an Objection Notice. Since continued use of the Subject Properties as parking lots for the Amphitheatre would substantially limit the value of the Subject Properties, Pike Pointe advised the City last year that it intended to object to the TRP Agreement, and the use of the Subject Properties by TRP or its affiliate for parking, in connection with its exercise of the Options for one or both Subject Properties.

In consideration of the potential impact on the City and the Amphitheatre if Pike Pointe provided an Objection Notice that triggered a termination of the parking

rights under the TRP Agreement, many months ago Pike Pointe began discussions

with the City to provide it with a "heads up" about the impact of an Objection Notice

and to confirm whether the City had alternate arrangements for meeting the parking

needs of the Amphitheatre if the Subject Properties were no longer available to

provide such parking. Pike Pointe was thanked on several occasions for this

courtesy. (Waters Aff. at ¶ 18). After several months, it became abundantly clear

that the City had no alternative arrangements in place to provide convenient parking

for the Amphitheatre if the Subject Properties were no longer available.

On October 9, 2019, Pike Pointe provided an Objection Notice (as defined in

Section 1(C)(5) of the Agreement) to the grant of these rights and the continued use

of the Jefferson Property for parking and demanded that the City terminate such

rights of record, including the rights of TRP to use the Jefferson Property.[9] The City

is obligated to cure this Defect pursuant to the Agreement. Pike Pointe has reserved

the right to provide an Objection Notice with respect to the Chene Property.

## ARGUMENT

The Court retained jurisdiction over disputes related to the Agreement in the

Plan (Doc 8045) and the Order Confirming Plan (Doc 8272). "[T]he provisions of a

confirmed plan bind the debtor[.]" 11 U.S.C. 1141(a). And, the Court may direct the

---

[9] Pike Pointe has reserved the right to suspend or withdraw the Objection Notice if
its request to extend the Option Period on the Jefferson Property is granted.

debtor to perform any act necessary for the consummation of the plan. 11 U.S.C. 1142(b). Further, this Court has the equitable power to enforce agreements. *Bowater N. Am. Corp. v. Murray Mach., Inc.*, 773 F.2d 71, 76 (6th Cir. 1985); *In re Dow Corning Corp.*, 255 B.R. 445, 478 (E.D. Mich. 2000) (citing 11 USC § 105(a)). "Courts are empowered to summarily enforce settlement agreements in order to promote the policy of speedy and reasonable resolution to disputes." *Bobonik v. Medina Gen. Hosp.*, 126 F. App'x 270, 273 (6th Cir. 2005). A bankruptcy plan "is essentially a new and binding contract, sanctioned by the Court, between the debtor and his preconfirmation creditors." *In re XOFOX Indus., Ltd.*, 241 B.R. 541, 543 (Bankr. E.D. Mich. 1999) (internal cites omitted).

In interpreting a contract, a court's obligation is to determine the intent of the contracting parties. *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375, 666 N.W.2d 251, 259 (2003) (citing *Sobczak v. Kotwicki*, 347 Mich. 242, 249; 79 N.W.2d 471 (1956)). If the language of the contract is unambiguous, a court should construe and enforce the contract as written. *Id.* (citing *Farm Bureau Mut Ins Co of Michigan v Nikkel*, 460 Mich. 558, 570; 596 N.W.2d 915 (1999)). "Thus, an unambiguous contractual provision is reflective of the parties' intent as a matter of law. Once discerned, the intent of the parties will be enforced unless it is contrary to public policy." *Id.*

Here, the unambiguous language of the Agreement should be enforced in two ways to carry out the Plan and the Order Confirming Plan, and to give Pike Pointe the benefit of its bargain in settling Syncora's claim in bankruptcy. *First*, Pike Pointe's request for a two-year extension of the Option Period for the Jefferson Property should be granted. The City's refusal to consent to this extension is unreasonable (and thus not permitted by the Agreement) given (a) the complexity of the contemplated development, (b) economic conditions and lack of development in the vicinity of the Subject Properties, and (c) the totality of the circumstances set forth in this motion. *Second*, the TRP Agreement should be terminated as to the Jefferson Property. The City has the right to terminate the TRP Agreement to accomplish this and must do so to convey good title as required by the Agreement. (Agreement, § 1(C)).

## I.    THE OPTION PERIOD MUST BE EXTENDED.

The Agreement should be enforced to extend the Option Period for the Jefferson Property from the current deadline of December 10, 2019 to December 10, 2021. The Agreement contemplates this two-year extension and states that if Pike Pointe requests an extension the City's "consent [to such request] shall not be unreasonably withheld, conditioned or delayed." (Agreement, § 1(A)). The Agreement specifically describes two non-exclusive examples when the City cannot withhold consent:

> [I]t shall be unreasonable for the City to withhold consent [to an extension request] to the extent that, (i) on the date of [Pike Pointe's] request therefor, <u>development in the immediate vicinity of the Property has materially decreased</u> or the general economic condition of the City or geographic region in which the Property is located has deteriorated . . . and/<u>or</u> (ii) <u>the Option Extension is reasonable given the complexity of the development contemplated by [Pike Pointe]</u>.

(*Id*., emphasis added). Both of these circumstances apply here, yet the City has refused to consent to the extension. The City's withholding of consent is also unreasonable given Pike Pointe's cooperation with the City over the last five years and the fact that the City *itself and very recently* was asking Pike Pointe to extend the Option Period but has now abruptly reversed course. An extension of the Option Period to December 10, 2021 would make it coincide with the current Option Period for the Chene Property (which also is December 10, 2021). This would permit these two adjacent properties to be developed together and in coordinated fashion, which would enhance the overall project and benefit the community as a whole.

## A. The Contemplated Development is Complex.

Pike Pointe and its preferred developer want to achieve a complex development of the Jefferson Property and the adjacent Chene Property. As communicated to the City long ago, the assemblage of these adjacent parcels would be more impactful than if the individual parcels were sold or developed separately, and a developer currently interested in the Subject Properties desires the Option Period for the Jefferson Property and Chene Property to be coterminous, as it

envisions an integrated development on them. As noted above, the extension to December 10, 2021 of the Option Period for the Jefferson Property would make it coincide with the current Option Period for the Chene Property and thereby facilitate a large-scale project on a combined assemblage.

The (a) ongoing planning process for the east riverfront, (b) the renaming of Chene Park, (c) the explicit commitment to the Amphitheatre as a concert venue, (d) the City's adoption of a Community Benefits Agreement Ordinance, and (e) the City's current arrangement for parking on the Jefferson Property have added layers of complexity onto this already difficult development process. Even a developer the Mayor's office itself recommended as a potential joint venture development partner for Pike Pointe recently acknowledged complexities associated with developing in East Rivertown.

Moreover, the development plan currently being contemplated is itself complex. Pike Pointe has a joint venture partner with a specific, complex, and multifaceted development plan in mind that contemplates a project that takes into account the surrounding parcels and is consistent with the City's broader vision for the entire neighborhood, rather than a forced, piecemeal development of individual parcels. As noted above, that development plan includes a 3,500 Car Automated Parking system, 300 luxury apartments, 100 furnished condominiums, 256 Keys of Extended Stay Hospitality, 60,000 - 100,000 square feet of office and 60,000 square

feet of retail. This development plan will only be possible if the Option Period on the Jefferson Property is extended. Given the complexity of the development plan, the City's withholding of consent to Pike Pointe's request for an extension of the Option Period for the Jefferson Property was unreasonable.

**B.     Development in the Vicinity of the Jefferson Property has Decreased and The Economic Condition Has Deteriorated.**

There has been no significant development in the vicinity of the Jefferson Property over the last several years. Construction costs have skyrocketed across the City and are contributing to the lack of development in the neighborhood surrounding the Jefferson Property.[10] The delayed Meijer and Stone Soap projects are two examples of the lack of development in this neighborhood:

- *10 more Detroit projects that were announced — but haven't happened*, DETROIT FREE PRESS, (Oct. 4, 2019), https://www.freep.com/story/money/business/2019/10/04/10-detroit-development-projects/3843199002/ ("The mini-Meijer was supposed to open [on Jefferson Ave.] in fall 2019. So far, there has yet to even be a groundbreaking.")

- *Detroit works to kick-start stalled development projects*, CRAIN'S (Jan. 13, 2019), https://www.crainsdetroit.com/real-estate/detroit-works-kick-start-stalled-development-projects (noting that "[o]f 19 major development RFPs, 14 have been awarded, with just three under way" including the "$27 million Stone Soap Building redevelopment on the east Detroit riverfront by Detroit-based Banyan Investments, which is a year behind.")

_____

[10] *Detroit's downtown building boom slowing as costs, rents soar*, DETROIT FREE PRESS (June 27, 2019), https://www.freep.com/story/money/2019/06/27/detroit-downtown-building-rents/1557346001/ ("[T]here are increasing signs that rising construction costs, a shortage of skilled-trades workers and resistance to sharply higher rents are slowing things down.")

Additionally, the City itself has not proceeded with requests for proposals or development on real estate it owns in East Rivertown between Atwater and Franklin and St. Aubin and Orleans. (Waters Aff. at ¶ 20). In short, there has been no significant development in the vicinity of the Jefferson Property over the last several years, so the second independent criterion for the extension request is satisfied.

### C. Extending the Option Period is Otherwise Reasonable.

The complexity of the contemplated development and the decrease in development in the vicinity of the Jefferson Property are specifically enumerated grounds in the Agreement that make the City's withholding of consent to an extension of the Option Period for the Jefferson Property unreasonable and therefore improper. Moreover, the City's withholding of consent at the eleventh hour also is unreasonable given (a) the history of Pike Pointe's cooperation with the City with regard to the Agreement, and (b) the efficiencies and benefit to the City and the East Riverfront community that will be gained from a project that develops both the Chene Property and the adjacent Jefferson Property together.

Pike Pointe has spent countless hours working with the City toward a plan for the development of properties under the Agreement. Indeed, it has already exercised Options and acquired two of the Four Development Properties. The only responsible and reasonable way to move forward is to extend the Option Period for the Jefferson Property so that it coincides with the December 21, 2021 Option Period for the

adjacent Chene Property. This will allow the Subject Properties to be part of a larger and more impactful development project that will provide greater benefit to the City and the East Rivertown neighborhood in particular.

Under similar, but far less compelling circumstances, the City granted a comparable extension to exercise option rights on Detroit's west riverfront to Gotham, as assignee of rights given to FGIC pursuant to a similar development agreement (the "FGIC Agreement").[11] The same result should follow here.

The FGIC Agreement was also entered into on December 10, 2014 between the City and FGIC. Like Syncora, FGIC is a financial guaranty insurance company and was a large creditor in this Chapter 9 case. The FGIC Agreement, like the Agreement at issue here, contained a provision requiring that the City consent to reasonable requests for extensions of up to two years. However, the City initially refused to consent to the two-year extension requested by Gotham.

On February 26, 2018, Gotham filed an adversary proceeding in this Court to enforce its right to a two-year extension given the complexity of the contemplated development on the west riverfront. Section 1(A) of the FGIC Agreement at issue

_____

[11] *See Gotham Motown Recovery, LLC v. City of Detroit*, E.D. Mich. Case No. 18-04088-tjt; see also *Bankruptcy creditor subsidiary gets more time to submit Joe Louis Arena redevelopment plan*, CRAIN'S (July 24, 2018), https://www.crainsdetroit.com/article/20180724/news/666846/bankruptcy-creditor-subsidiary-gets-more-time-to-submit-joe-louis-arena

in that case contained the same provision as the Agreement here, which stated that it was unreasonable to withhold consent if the contemplated development was complex: "The City agrees that it would be unreasonable to withhold its approval of such extension if . . . (ii) it is reasonable given the complexity of the development contemplated by [Gotham] for the Property." (See Adversary Case No. 18-04088, Doc 1).  After Gotham moved to compel mediation and mediation was finally conducted, the City agreed to an extension.  Pike Pointe's requests are likewise reasonable.  For all of these reasons, the Option Period for the Jefferson Property must be extended to December 10, 2021.[12]

## II.    THE TRP AGREEMENT MUST BE TERMINATED IF THE OPTION PERIOD IS NOT EXTENDED.

The TRP Agreement is a defect on title to the Jefferson Property, and the City is obligated to eliminate this Defect. (Agreement, § 1(C)(5)). Indeed, the Agreement provides that "the City *shall be required* to cure any liens or encumbrances (collectively, a 'Mandatory Cure') (x) in favor of the City or any agency or

_____

[12] The City, through the DEGC, has advised Pike Pointe's potential joint venture partners that any proposed development of any property in this area would take about 24 months to start construction (i.e., more than the 15 months allotted in the Agreement). Therefore, the Commencement of Construction (as defined in the Agreement) should also be extended by nine months (from 15 to 24 months). This extended timeframe, if accurate, is the result of development hurdles created by the City after the execution of the Agreement.

department of the City or (y) result from a violation of Section 5(G) of this Agreement."[13] (*Id.*) Further, a separate provision in the Agreement states as follows:

> Notwithstanding any provision herein to the contrary, **the City agrees to (1) cooperate with the Developer in clearing title to the Property to the extent that the title related Defects described in the Objection Notice are within the reasonable control of the City to address or eliminate and (2) cure all Mandatory Cure Defects**. In the event that the expiration of the City Cure Period for a particular Property occurs (or would occur) after the expiration of the Option Period, the Option Period shall be extended for such Property until the date that is fifteen (15) days after the expiration of the applicable City Cure Period. (*Id.*, emphasis added).

The TRP Agreement is an encumbrance on the Jefferson Property, to which Pike Pointe has properly objected, and therefore the City is *required* to cure it by cancelling the TRP Agreement insofar as it pertains to the Jefferson Property.

## CONCLUSION

For the foregoing reasons, Pike Pointe respectfully requests that the Court enter an order (a) extending the period for Pike Pointe to exercise its Option under the Agreement to acquire the Jefferson Property from December 10, 2019 to December 10, 2021; (b) requiring the City to terminate the TRP Agreement; and (c)

---

[13] Section 5(G) of the Agreement provides in part that "[d]uring the Option Period and prior to a Closing with respect each Property, the City shall . . . not execute or grant any lease, contract, agreement, lien, security interest, encumbrance, easement, or restriction with respect to such Property, or amend, modify, renew, extend or terminate any of the foregoing, without prior written consent of the Developer[.]" (Agreement at § 5(G)(iv).

since the City through the DEGC, advised Pike Pointe's potential joint venture partners that any proposed development of the Subject Property would take 24 months to start construction (i.e., more than the 15 months allotted in the Agreement), extending this period by nine months (from 15 to 24 months).

Alternatively, if the Option Period for the Jefferson Property is extended as requested, Pike Pointe could withdraw its objection to the parking arrangement currently encumbering the Jefferson Property until the end of the extended option period.

Dated: November 13, 2019

Respectfully submitted,

DYKEMA GOSSETT PLLC

By: /s/ John F. Rhoades
    Brian M. Moore (P58584)
    bmoore@dykema.com
    John F. Rhoades (P75575)
    jrhoades@dykema.com
    400 Renaissance Center
    Detroit, Michigan 48243
    (313) 568-6800
    *Attorneys for Pike Pointe Holdings, LLC*

**EXHIBIT 1**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE:<br><br>CITY OF DETROIT<br><br>                     Debtor. | Chapter 9<br><br>Case No. 13-53846<br><br>Hon. Thomas J. Tucker |

## <u>ORDER GRANTING MOTION TO ENFORCE DEVELOPMENT AGREEMENT</u>

This cause coming to be heard on the Motion to Enforce Development Agreement (the "Motion") filed by Pike Pointe Holdings, LLC ("Pike Pointe"), the Court having reviewed the Motion, and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, IT IS HEREBY ORDERED THAT:

1. Pike Pointe's Motion is granted.

2. The City shall terminate the professional services contract for parking at the parking lots near the Aretha Franklin Amphitheater, i.e., at the parcels located at 2290 East Jefferson, 2310 East Jefferson and 301 Chene (collectively, the "Jefferson Property").

3. The period for Pike Pointe to exercise its Option under the Development Agreement to acquire the Jefferson Property is extended from December 10, 2019 to December 10, 2021.

4. The Commencement of Construction, as defined in the Development Agreement, is extended from 15 months to 24 months.

**5.**     Pike Pointe is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

**6.**     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

**7.**     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**EXHIBIT 2**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE:<br><br>CITY OF DETROIT<br><br>Debtor. | Chapter 9<br><br>Case No. 13-53846<br><br>Hon. Thomas J. Tucker |

**NOTICE OF OPPORTUNITY TO RESPOND TO MOTION TO ENFORCE
DEVELOPMENT AGREEMENT**

Pike Pointe Holdings, LLC has filed papers with the court to ENFORCE DEVELOPMENT AGREEMENT.

**<u>Your rights may be affected.</u>  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to ENFORCE DEVELOPMENT AGREEMENT, or if you want the court to consider your views on the MOTION TO ENFORCE DEVELOPMENT AGREEMENT, within 14 days, or a shorter period of time as the Court may allow, you or your attorney must:

1.      File with the court a written response or an answer, explaining your position at:[1]

**United States Bankruptcy Court**
211 West Fort Street
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or

---

1  Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e)

before the date stated above.  All attorneys are required to
file pleadings electronically.

You must also send a copy to:

DYKEMA GOSSETT PLLC
Brian M. Moore, bmoore@dykema.com
John F. Rhoades, jrhoades@dykema.com
400 Renaissance Center
Detroit, Michigan 48243
(313) 568-6800
*Attorneys for Pike Pointe Holdings, LLC*

2.        If a response or answer is timely filed and served, the clerk may
          schedule a hearing on the motion and you will be served with a notice
          of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that
you do not oppose the relief sought in the motion or objection and may enter an
order granting that relief.**

Dated: November 13, 2019                    Respectfully submitted,

                                            DYKEMA GOSSETT PLLC

                                       By: /s/ John F. Rhoades
                                            Brian M. Moore
                                            bmoore@dykema.com
                                            John F. Rhoades
                                            jrhoades@dykema.com
                                            400 Renaissance Center
                                            Detroit, Michigan 48243
                                            (313) 568-6800
                                            *Attorneys for Pike Pointe
                                            Holdings, LLC*

**EXHIBIT 4**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE:<br><br>CITY OF DETROIT<br><br>      Debtor. | Chapter 9<br><br>Case No. 13-53846<br><br>Hon. Thomas J. Tucker |

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on November 13, 2019, I electronically filed a copy of Pike Pointe Holdings, LLC's Motion to Enforce Development Agreement, Notice of Opportunity to Respond and this Certificate of Service with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys and parties of record registered electronically and by serving a copy of the papers on counsel for the City via regular mail as follows:

   Marc Nicholas Swanson, Esq.
   Miller Canfield Paddock and Stone
   150 W. Jefferson Avenue, Ste. 2500
   Detroit, MI  48226 - 4415

   Charles N. Raimi
   Deputy Corporation Counsel
   City of Detroit Law Department
   2 Woodward Avenue, Suite 500
   CAYMC
   Detroit, MI  48226-3437
   .

DATED:  November 13, 2019         Respectfully submitted,

**DYKEMA GOSSETT PLLC**


By: */s/ John F. Rhoades* _____
      Brian Moore (P58584)
      John F. Rhoades (P75575)

      400 Renaissance Center
      Detroit, Michigan 48243
      (313) 568-6800
      (855) 252-8003 - Fax
      bmoore@dykema.com
      jrhoades@dykema.com

112975.000002  4825-3835-3324.1

EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE:<br><br>CITY OF DETROIT<br><br>Debtor. | Chapter 9<br><br>Case No. 13-53846<br><br>Hon. Thomas J. Tucker |

## AFFIDAVIT OF THOMAS WATERS

Thomas Waters, first being duly sworn on oath, states and affirms the following facts in support of the Motion to Enforce Development Agreement filed by Pike Pointe Holdings, LLC ("Pike Pointe"), a subsidiary of Syncora Guarantee, Inc. ("Syncora").

1.  I am a Vice President of Real Estate Projects for Syncora and Pike Pointe. Since March of 2017, I have been a lead representative for Syncora and Pike Pointe regarding Pike Pointe's real estate interests in Detroit.

2.  I make this affidavit based upon my own personal knowledge and, if called as a witness, I am competent to testify to the facts set forth herein.

3.  I am familiar with the four properties that are subject to the Development Agreement dated as of December 10, 2014 (the "Agreement") between Pike Pointe and the City of Detroit (the "City"). These properties are: (1) the former police headquarters at 1300 Beaubien Street ("1300 Beaubien"); (2) the properties commonly described as 1303 East Atwater Street, 1365 East Atwater Street, 1364 Franklin Street, and 1340 Franklin Street (collectively, the "Atwater Property"); (3) parcels located at 2290 East Jefferson, 2310 East Jefferson and 301 Chene (collectively, the "Jefferson Property"); and (4) parcels located at 2200 Franklin Street, 2263 East Atwater Street and 281 Chene Street (the "Chene Property"). Together, these four properties are referred to as the "Four Development Properties." The Chene Property and Jefferson Property are sometimes collectively referred to as the "Subject Properties."

4.  Since the execution of the Agreement, Pike Pointe has been in close and ongoing contact with representatives of the City and the Detroit Economic

Growth Corporation ("DEGC"), as well as a variety of other stakeholders, in an effort to coordinate and align possible developments and potential joint venture partners with the goals of the City.

5.    These contacts regarding the Four Development Properties involved staff and leadership of the City's Planning and Development Department, representatives of the Mayor's Office, and representatives of the DEGC.

6.    These interactions resulted in successful and collaborative closings and joint venture agreements on the Options (as defined in the Agreement) with respect to 1300 Beaubien (in February 2018) and the Atwater Property (in November 2018). They also resulted in significant coordination on efforts to identify the projects and appropriate joint venture partners for the Jefferson Property and the Chene Property.

7.    Pike Pointe has spent a tremendous amount of time, effort and expense in planning and performing due diligence for all of the Four Development Parcels, particularly the Jefferson Property and the Chene Property. These efforts included not only frequent and ongoing coordination with the City, the DEGC, and other stakeholders, but also comprehensive title reviews, surveys, Phase One environmental reports, Phase Two environmental reports, market studies, interviews with developers, architects, planners and other consultants, and two massing (development) studies of the Subject Properties—one done by Hamilton Anderson and the second by Gensler (an architectural and planning firm).

8.    Pike Pointe also collaborated with the City and its consultants in a district planning effort initiated by the City after the Agreement was signed. These efforts have informed the ongoing dialogue between the City and Pike Pointe regarding how and when the Subject Properties should be developed, what meaningful or aspirational projects would be viewed more favorably by the City, and which joint venture partners the City preferred or disfavored.

9.    Pike Pointe consulted with various potential joint venture partners throughout the foregoing process and has been receptive to offers since 2015. In 2016, Pike Pointe entered into a purchase agreement for the Subject Properties with a local developer, but that developer terminated the agreement during the due diligence period. At approximately the same time the City promulgated an early iteration of a district master plan which depicted the Chene Property and Jefferson Property as part of a public park.

2

10. The City's Director of Planning and Development encouraged Pike Pointe to sequence its development of the Atwater Property and the Subject Properties, focusing first on the Atwater Property and then on the Subject Properties. In 2018, Pike Pointe continued to market the Subject Properties. After consultation with various developers, the City, and others, Pike Pointe concluded that it would benefit all parties and the East Rivertown neighborhood to develop the Subject Properties together in a coordinated fashion.

11. By late 2018, Pike Pointe was in discussions with two potential joint venture partners. One potential partner wanted to develop the Subject Properties as soon as possible (and therefore was not in a position to allow the Subject Properties to be used for parking for an extended period of time). However, this developer's plan, when completed, intended to provide parking sufficient to support the Amphitheatre. The other potential partner preferred not to develop the Subject Properties immediately. A City representative indicated that more time within which to implement alternative parking arrangements was its preferred option.

12. As late as September 11, 2019 and previously, the City asked if Pike Pointe would consider extending the Option Period for the Jefferson Property to accommodate the City.

13. On or about September 30th, 2019, Pike Pointe's potential joint venture partners informed Pike Pointe that the DEGC advised them that any proposed development of the Jefferson Property or the Chene Property would take close to 24 months to start construction.

14. On October 16th, 2019, Pike Pointe met with Pike Pointe's potential joint venture partner and the DEGC. That meeting was held at the DEGC offices, 500 Griswold St #2200, Detroit, MI. During that meeting the DEGC again stated that it would take close to 24 months to start construction for either the Jefferson Property or the Chene Property. The DEGC recognized that this exceeded the 15 month period provided by the Agreement.

15. Pike Pointe's potential joint venture partners are not willing to proceed unless additional extensions are granted. Both potential joint venture partners seek an extension of the Commencement Date (as defined in the Agreement) and one also is requesting that the Option Period be extended for the Jefferson Property.

3

16. The following actions taken by the City have complicated the development of the Subject Properties: (1) an East Riverfront Master Planning process that has gone through a number of iterations; (2) significant changes in both planning and development officials; (3) the adoption by the City of a Community Benefits Agreement Ordinance that could substantially extend the timeframe for planning and developing projects in this area; and (4) the designation of Chene Park by the Mayor of Detroit as the Aretha Franklin Amphitheatre.

17. The current development plan of the preferred joint venture partner contemplates development of both the Chene Property and Jefferson Property. The development plan contemplates a 3,500 Car Automated Parking system, 300 luxury apartments, 100 furnished condominiums, a hotel with 256 rooms, 60,000 - 100,000 square feet of office space and 60,000 feet of retail space for restaurants and cafes.

18. In February of 2019, Pike Pointe began discussions with the City to provide it with a "heads up" about the impact of an Objection Notice and to confirm whether the City had alternate arrangements for meeting the parking needs of the Amphitheatre if the Subject Properties were no longer available to provide such parking. Pike Pointe was thanked on several occasions for this courtesy.

19. The Mayor's office encouraged Pike Pointe to consider a possible joint venture partner that the city identified. The Mayor's office considered that entity a good potential joint venture partner because it had a large adjoining property under contract and the Mayor's office thought the adjacent parcels could be used to resolve parking issues for the Amphitheatre. A representative for the development joint venture then contacted Pike Pointe and acknowledged the development complexities in East Rivertown.

20. Upon information and belief, the City has not proceeded with requests for proposals or development on real estate it owns between Atwater and Franklin and St. Aubin and Orleans St.

Further Affiant Sayeth Not.

Subscribed and sworn to before me this 13th day of November 2019.

Notary Public

Signature: _____ *VP OF REAL ESTATE Project SYNCORA GUARANTEE*

Printed Name: Thomas Water

Title: VP of Real Estate Projects

KIMBERLY A. GINGO
NOTARY PUBLIC, STATE OF MI
COUNTY OF WASHTENAW
MY COMMISSION EXPIRES Aug 7, 2026
ACTING IN COUNTY OF Washtenaw

4

EXHIBIT 6

# **EXHIBIT INDEX**

A.      Map of Subject Properties

B.      Development Agreement

C.      Gensler Images

D.      October 9, 2019 Letter

# EXHIBIT A



Google Maps satellite image of Subject Properties

# EXHIBIT B

## DEVELOPMENT AGREEMENT

### OPTION TO PURCHASE AND DEVELOP LAND
### BY AND BETWEEN
### CITY OF DETROIT
### AND
### PIKE POINTE HOLDINGS, LLC

 **THIS AGREEMENT** (referred to herein as the "Agreement") is entered into as of the 10th day of December, 2014 (the "Effective Date"), by and between the City of Detroit, a Michigan public body corporate (the "City"), acting through its Planning & Development Department ("PDD"), whose address is 2300 Cadillac Tower, Detroit, Michigan 48226, and Pike Pointe Holdings, LLC, a Delaware limited liability company ("Developer"), whose address is 135 West 50th Street, 20th Floor, New York, NY 10020. The City and Developer are sometimes referred to in this Agreement as a "Party" and, collectively, as the "Parties."

### Recitals:

 A. In consideration of the Parties' various contractual arrangements entered into contemporaneously herewith, including without limitation, extension of the lease of the Windsor Tunnel between the City and affiliates of Developer, and the mutual desire of the Parties to promote economic growth in the City (the "Arrangement"), the City has agreed to grant an option to Developer to acquire various parcels of land located in the City of Detroit as described in the attached **Exhibit A** (each a "Property" and, collectively, the "Properties"). Unless otherwise set forth herein, references in this Agreement to a Property shall apply only to the applicable Property and not the other Properties.

B.     If Developer exercises its option with respect to one or more of parcels of the Property as set forth herein, Developer shall develop such Property in accordance with the terms and provisions of this Agreement.

Accordingly, the Parties agree as follows:

## Section 1.     TERMS OF OPTION

(A)     <u>Grant of Option</u>. The City hereby grants to Developer an option (the "<u>Option</u>") to, from time to time, acquire any or all of the Properties from the City upon the terms and conditions set forth in this Agreement.  The Option shall be effective for five (5) years from the Effective Date, except with respect to (i) those certain Properties located at 2200 Franklin, 2263 E. Atwater and 281 Chene for which the Option shall be effective for seven (7) years from the Effective Date and (ii) those certain Properties located at 1365 E Atwater St, 1325 E Atwater St, 1399 E Atwater St, 1370 Guoin St, 1310 Franklin St, 1340 Franklin St and 1364 Franklin St, (the "<u>Western Contiguous Parcel</u>"), for which the Option shall be effective for four (4) years from the Effective Date (the "<u>Option Period</u>").  For the sake of clarity, the Western Contiguous Parcel excludes 1303 E. Atwater.  The Parties agree and acknowledge that the sole and exclusive consideration for the Option and any subsequent acquisition of any Property hereunder is deemed to be the Arrangement, the sufficiency of which is hereby acknowledged.  The City shall cause to be recorded and maintained of record against the Properties in the appropriate land records for the duration of the Option Period the memorandum of option attached hereto as **Exhibit B**. Notwithstanding the foregoing, the Option Period may be extended for a period not to exceed two (2) years for any of the Properties except for the Western Contiguous Parcel upon written consent of the City, which consent shall not be unreasonably withheld, conditioned or delayed (the "<u>Option Extension</u>").   For purposes of the Option Extension, it shall be unreasonable for the City to withhold consent thereto to the extent that, (i) on the date of Developer's request therefor, development in the immediate vicinity of the Property has materially decreased or the general economic condition of the City or geographic region in which the Property is located has deteriorated, in either instance from and after the Effective Date to such a level that it would not be economically feasible for the Developer to pursue development of the Property and/or (ii) the Option Extension is reasonable given the complexity of the development contemplated by the Developer. Any dispute between the Parties with regard to a request for Option Extension which cannot be resolved by the Parties within sixty (60) days following the Developer's request therefor shall be brought in the Bankruptcy Court for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided, that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan; provided, further, by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

2

(B)     Diligence Notice.  If the Developer desires (in its sole discretion) to undertake Due Diligence Activities (as hereinafter defined) with respect to one or more of the Properties, the Developer shall, from time to time, give prior written notice of its intent thereof to the City not less than sixty (60) days prior to the expiration of the Option Period (each, a "Diligence Notice").  The Developer shall be entitled to deliver any number of Diligence Notices with respect to the various Properties during the Option Period; provided, however, that any such Diligence Notice shall indicate reference to the Property the Developer intends to subject to the Due Diligence Activities hereunder.

(C)     Condition of Property.

(1)     Due Diligence Activities. Subject to the requirements of Section 2 below, upon delivery of the Diligence Notice to the City with respect to any Property, Developer shall have a period commencing on the date of the Diligence Notice and continuing through and including the date that is sixty (60) days prior to the expiration of the Option Period (the "Due Diligence Period") to conduct its due diligence activities on any Property that is the subject of a Diligence Notice.   For purposes of this Agreement, "Due Diligence Activities" include but are not limited to the following:

(a)     such physical inspections, surveys, soil borings and bearing tests, possible relocation of utilities, and such environmental due diligence on or for the Property as Developer deems appropriate, all of which shall be completed at Developer's expense;

(b)     investigations, environmental site assessments, including Phase I and Phase II site assessments, sampling and testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint), and/or a Baseline Environmental Assessment, ("BEA"), as defined in Part 201 of the Natural Resources and Environmental Protection Act ("NREPA"), being MCL 324.20101 *et seq.*, and such other investigations and assessments as Developer may deem needed in its sole discretion to determine the condition of the Property and the Property's compliance with Environmental Law and any other federal, state and local laws, rules, regulations and orders relating in any way to protection of human health, the environment and natural resources, all of which shall be completed at Developer's expense; and

(c)     a review of the title evidence, survey, entitlements, and payment of taxes and assessments, all of which shall be completed at Developer's expense.

(d)     a review of financing sources related to Developer's proposed development and use of the Property, or any other matter that in Developer's sole discretion is relevant to Developer's acquisition of the Property.

(e)     a review of all City Information and all publicly-available information with respect to the Property.

(f)     a review of available public and private utilities and public accesses necessary for the proposed development of the Property.

3

(f)     application and procurement of any zoning, site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required or appropriate for the proposed development of the Property. The City hereby authorizes the Developer to submit and apply for all such approvals, permits, and variances upon the commencement of the Due Diligence Period.

(2)    <u>City Information</u>. The City shall use reasonable efforts to make available to Developer all information in the City's (or the City's agencies' or departments') possession or control related to the applicable Property within thirty (30) days following delivery to the City of a Diligence Notice for the applicable Property, including but not limited to existing leases, licenses, permits, approvals, contracts, warranties, title searches and policies, surveys, appraisals, environmental audits, Phase I environmental site assessments, Phase II reports or other testing or sampling data, asbestos surveys, reports, specifications, from the Planning, Building, Assessing, Environmental Affairs and Fire Departments, notices of violations of applicable laws, regulations and ordinances or other documents in the City's possession or control related to the applicable Property (collectively, the "<u>City Information</u>"). The City shall cooperate with the Developer and use reasonable efforts to facilitate the Developer's Due Diligence Activities, all at no material incremental cost to the City, including providing information, coordinating with tenants or other third party users of the Property as applicable, and executing such documentation as may be reasonable and necessary for Developer's access to the site and completion of the Due Diligence Activities including the preparation of a BEA.

(3)    <u>Insurance</u>. Prior to entering onto any Property for any Due Diligence Activities, Developer or its contractors shall maintain the insurance coverage and comply with the insurance requirements specified in the City's Right-of-Entry, a form of which is attached as **Exhibit C** (the "<u>Right-of-Entry</u>").

(4)    <u>Indemnity</u>. Developer shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Developer's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Due Diligence Activities; provided, however, that (i) in the event Developer provides an Objection Notice or otherwise elects not to proceed to Closing, the Developer shall in no circumstance have any obligation or liability with respect to any conditions pre-existing at the Property including without limitation any environmental condition, soil or groundwater contamination or other environmental conditions that may discovered in the course of the Developer's Due Diligence Activities and thereafter disclosed to the City as required hereunder, except to the extent such conditions are materially exacerbated due to the negligence or willful acts of Developer or any of its duly authorized employees, agents, engineers or other representatives, and (ii) the Developer shall not be responsible for any loss, liability, cost, or expense resulting from the discovery of any adverse information or condition regarding the applicable Property or from the City's (or the City's agencies' or departments') negligence or misconduct.

(5)    <u>Results of Due Diligence Activities</u>. If Developer concludes, in Developer's sole discretion, that a particular Property is satisfactory, then Developer shall so

4

notify the City in writing on or before the last day of the Due Diligence Period, by sending an "Election Notice," and the parties shall proceed to closing the applicable Property subject to other terms and conditions of this Agreement. If Developer concludes, in Developer's sole discretion, that, for any reason or for no reason, a particular Property is not satisfactory, then Developer shall so notify the City in writing on or before the last day of the Due Diligence Period, by sending a "Rejection Notice," and the parties shall not proceed to Closing with respect to the applicable Property at such time. In the event the Developer issues a Rejection Notice with respect to any Property, Developer may not later elect to re-commence Due Diligence Activities with respect to the same Property and the Option granted hereunder with respect to such Property will be thereafter deemed released and of no further force or effect. If Developer concludes, in Developer's sole discretion, as a result of the Due Diligence Activities that the condition of the Property is not satisfactory but Developer wants the City to cure such unsatisfactory conditions, then Developer shall notify the City in writing on or before the last day of the Due Diligence Period, by sending an "Objection Notice" setting forth with reasonable specificity the particular condition of the applicable Property which is unacceptable to Developer (each such condition referred to as a "Defect"). The City shall have the right, but not the obligation, within sixty (60) days of the Objection Notice (the "City Cure Period"), to cure such Defects; provided, however, that the City shall be required to cure any liens or encumbrances (collectively, a "Mandatory Cure") (x) in favor of the City or any agency or department of the City or (y) result from a violation of Section 5(G) of this Agreement. If the City is unable or unwilling to cause any or all of the Defects (other than Mandatory Cures which the City shall be obligated to cure) during such City Cure Period, Developer shall have the right to either (i) elect not to exercise the Option with respect to the applicable Property by sending written notice to City of such election within two (2) days after the expiration of the City Cure Period, in which event the Developer may later elect to commence Due Diligence Activities with respect to the same Property by delivery of a Diligence Notice pursuant to the terms of Section 1(B) above; or (ii) waive its objection to such Defects and accept the Property subject to those Defects (Developer being deemed to have elected this option (ii) if it fails to make the election in the preceding option (i)). If Developer fails to provide an Election Notice or an Objection Notice within the Due Diligence Period, then Developer shall be deemed to have delivered a Rejection Notice with respect to the applicable Property. Notwithstanding any provision herein to the contrary, the City agrees to (1) cooperate with the Developer in clearing title to the Property to the extent that the title related Defects described in the Objection Notice are within the reasonable control of the City to address or eliminate and (2) cure all Mandatory Cure Defects. In the event that the expiration of the City Cure Period for a particular Property occurs (or would occur) after the expiration of the Option Period, the Option Period shall be extended for such Property until the date that is fifteen (15) days after the expiration of the applicable City Cure Period.

(6)     As Is Condition of Property; City Cooperation. From time to time with respect to each Property, subject to the earliest to occur of (i) delivery by Developer of an Election Notice, (ii) written notice to Developer that the City has cured all Defects set forth in an Objection Notice provided prior to the expiration of the City Cured Period, or (iii) waiver by Developer of any Defects, each pursuant to Section 1(C)(5) above, closing of the transactions contemplated hereby with respect to a particular Property (each, a "Closing") shall be on an "as-is, where-is" basis and the Developer shall take the applicable Property as it finds it at Closing

5

CHI-1941899v12

other than a matter resulting from a violation of the covenant set forth in Section 5(G) of this Agreement. The City makes no implied or express representations or warranties of any kind as to its condition, including its environmental condition and any other condition that may adversely affect the development, or its fitness for absolutely any purpose whatsoever. By proceeding to Closing after completion of its Due Diligence Activities, Developer will acknowledge that it is satisfied with the condition of the applicable Property, except as otherwise provided in this Agreement. By accepting title to the applicable Property at Closing, Developer shall be deemed to have waived any right to object to the status of title or to the condition of the applicable Property, regardless of the result of any Due Diligence Activities, and shall be deemed to have declared its full satisfaction with the status of title to and condition of the applicable Property, except as otherwise provided in this Agreement.

(7)     Release of City from Liability. Upon Closing on any particular Property, Developer shall release the City and its officials, employees, and agents (but not any third party) from any and all claims or causes of action the Developer may have against the City for any liability, injury or loss as a result of any physical defects in or physical conditions of the applicable Property, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party, including but not limited to environmental condition, other than a matter resulting from a violation of the City's covenant set forth in Section 5(G)(ii) of this Agreement.

(8) Security of Properties. In the event that a Property is vacant or otherwise not being utilized by the City, without imposing any liability or obligation with respect thereto, commencing on the commencement of Due Diligence Activities with respect to such Property, Developer shall have the right, but not the obligation, it is sole and absolute discretion, at Developer's cost and expense, to undertake any actions it deems reasonably necessary to secure the Property and prevent damage or unauthorized access to the applicable Property, including, without limitation, installing and maintaining fencing and/or signage on the applicable Property. As a condition to Developer exercising its right hereunder to secure any Property, the Developer must first obtain a general liability policy of insurance in connection with such activities in form and amount reasonably satisfactory to the City, with the City named as an additional insured thereto.   In addition, Developer shall not be deemed to be in control of or operating the applicable Property as a result of Developer's undertaking of any security measures with respect to this section. Notwithstanding the foregoing, in exercising its right to secure the Property provided for herein, Developer shall not be deemed to have warranted to the City the effectiveness of the security measures so implemented.

(D)     Manner of Conveyance. At the Closing, the applicable Property shall be conveyed to Developer (or its designee) by one or more quit claim deeds substantially in the form of the deed set forth in **Exhibit D** (the "Deeds") using legal descriptions approved by Developer and the City.

(E)     Brokerage and Finder's Fees and Commission. Developer will defend and indemnify the City and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under Developer incident to this Agreement and the transaction contemplated hereby or any litigation

6

or similar proceeding arising therefrom unless the City has a written agreement with a broker, finder or agent providing for such payment in which case the City shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses. To the maximum extent permitted by applicable law, the City will defend and indemnify the Developer and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under the City incident to this Agreement and the transaction contemplated hereby or any litigation or similar proceeding arising therefrom unless the Developer has a written agreement with a broker, finder or agent providing for such payment in which case the Developer shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses.

    (F)    <u>Taxes And Assessments</u>.

    (1)  <u>Property on Tax Rolls at Closing</u>. All taxes and assessments which (i) have become a lien upon the Property or part thereof prior to the date of Closing, and (ii) have been discovered and specifically identified by Developer prior to the applicable Closing, shall be paid by the City and shall be a Mandatory Cure; provided, however, that all current property taxes shall be prorated and adjusted to the date of Closing on a due date basis. From and after each Closing, Developer shall be solely responsible for all taxes, liens, and assessments that become due and payable for the period after the applicable Closing against the applicable Property it acquires hereunder or any part thereof, whenever assessed, levied, or due, and shall have no claim against the City on account thereof.

    (2) <u>Approval of Requests for Economic Incentives/Entitlements and Land Use Approvals</u>.

    (i)    The City agrees to consider any requests by Developer or its designee for any development or economic inducements (including tax abatements, tax credits, tax increment financing, grants, loans, cost reimbursements and like development incentives) for which any of the Properties are eligible, whether or not such requests are made as part of Developer's Due Diligence Activities or thereafter. The City also agrees to cooperate with and support Developer or its designee in any request to procure such development or economic inducements from other governmental authorities (whether or not related to or controlled by City).

    (ii)    The City agrees to consider requests or applications by Developer or its designee for approvals relating to zoning, site plans, special use permits, uses, variances or other municipal approvals that are necessary or appropriate to develop the Properties, provided that if the requests pertain to any of the Properties other than 1300 Beaubien, such requests are for uses that are consistent with the SD4 zoning classification as of the Effective Date or otherwise are consistent with residential, parking, retail or commercial uses permitted within the SD4 zoning classification as currently in effect or other uses suitable for the location.

    (iii)    The following shall apply to any consideration or cooperation by the City with respect to any formal requests made by Developer or its designee to the City, described in subsections (i) or (ii) of this Section: (a) the City agrees to process such requests pursuant

7

to its ordinary processes for the applicable requests, (b) the City shall not unreasonably withhold, condition or delay approvals of the applicable requests, and shall not unreasonably impede or interfere with development activities consistent with this Agreement, (c) the City shall not discriminate against Developer or its designee in the consideration or approval of such requests on account of the Arrangement, the events leading up to the Arrangement or this Agreement, and (d) the City shall use reasonable efforts to facilitate such requests, taking into consideration other similar requests for approvals or inducements, as applicable, of third parties granted by the City for similarly situated developments and uses as those contemplated by Developer for the Property; provided, however, the City shall process such requests pursuant to all then applicable rules, regulations, statutes and similar requirements.

     (G)  <u>Inability to Convey</u>. Subject to the Developer's rights under Section 6(D) below, if, for any reason, the City is unable to convey title to a particular Property to the Developer upon exercise of the Option and Developer's election to proceed to Closing with respect to the applicable Property pursuant to the terms of this Agreement, which shall include (i) if the City (or an agency or department of the City) does not own title to such Property, (ii) there is a Defect that is not cured or removed as of the Closing and such Defect materially hinders Developer's ability to develop the applicable Property in an economically viable manner, (iii) there are any uncured Mandatory Cure items, or (iv) if Developer determines that the scope or expense of any environmental remediation necessary to develop the applicable Property would make the development thereof, as contemplated by the Developer, economically unfeasible, the Developer and the City shall mutually agree upon alternate consideration commensurate to the undeveloped, fair-market value of the applicable Property (the "<u>Alternate Consideration</u>"); provided, however, that such value shall assume that any applicable Defects have been removed; provided, further, that, with respect to the applicable Property, the reasonable, actual and out-of-pocket acquisition and development costs incurred by Developer or its designee after the Effective Date and prior to the date upon which Developer or its designee obtains actual knowledge of the existence of the particular Defect or condition of such Property giving rise to Alternate Consideration, including, without limitation, costs associated with Due Diligence Activities, remediation activities, and architect, engineering, and design activities, shall be included in the amount of Alternate Consideration to the extent Alternate Consideration is required pursuant to Section 1(G)(i) or 1(G)(iii) above.

     To the extent the Parties do not agree on the Alternate Consideration within sixty (60) days of establishing that Alternative Consideration is required, then, within thirty (30) days thereafter, the Developer and the City shall deliver to each other Developer's or City's, as the case may be, determination of the Alternate Consideration (which shall be in the form of an alternate parcel of real property or cash payment amount). Within ten (10) days after each Party delivers to the other party such Party's determination of the Alternate Consideration, the Developer and the City shall each appoint one disinterested appraiser having the qualifications set forth herein. Each such appraiser must be a Member of the Appraisal Institute (MAI) and have at least ten (10) years of experience appraising commercial or industrial property in the Detroit metropolitan area as a MAI appraiser. If either the Developer or the City fails to appoint an appraiser within such ten (10) day period, the appraiser appointed by the Developer or the City, as the case may be, shall appoint an appraiser having the qualifications set forth herein. As promptly as possible, but in no event later than thirty (30) days after the appointment of both

8

appraisers, the appraisers shall notify the Developer and the City in writing of their determination of which of the Developer's or the City's determination more closely approximates Alternate Consideration (all as valued as of the determination date). The Alternate Consideration so selected by the two appraisers will constitute the Alternate Consideration for purposes of this section, and will be binding upon the Developer and the City. If the two appraisers are unable to agree as to the Alternate Consideration, then the two appraisers shall promptly agree upon and appoint a third appraiser having the qualifications set forth herein. The third appraiser shall, within thirty (30) days of appointment, determine which of the two determinations of the Developer or the City more closely approximates Alternate Consideration, and shall notify the Developer and the City thereof. The Alternate Consideration selected by the third appraiser will constitute the Alternate Consideration for purposes of this section, and will be binding upon the Developer and the City. To the extent the Alternate Consideration selected by the appraisers hereunder is real property, (i) such real property shall be reasonably acceptable to Developer, and (ii) the City may elect in its sole discretion to satisfy such Alternate Consideration in the form of a cash payment to the Developer in an amount equal to the appraisers' determination of the cash value of the Alternate Consideration selected. To the extent the Alternate Consideration to be given to the Developer hereunder is real property, the City shall be deemed to be have granted Developer an option with respect to such Alternative Consideration property pursuant to the same terms as this Agreement; provided, however, that the time periods with respect to such option, including without limitation, the Option Period, shall commence upon the date that such new option with respect to the Alternative Consideration is granted to Developer and not as of the Effective Date.

(H)    Use of the Properties During the Due Diligence Period.    Commencing on the commencement of the Due Diligence Period, Developer shall have the right (but not the obligation), in its sole discretion, to elect to utilize all or a portion of the Properties identified on Schedule 1(H) prior to acquiring title of the Use Property for the operations of a surface lot parking facility and ancillary uses (collectively, the "Parking Use") by providing thirty (30) days' prior written notice thereof to City (a "Use Notice"). The Use Notice shall identify the Properties that will be used by Developer for the Parking Use (collectively, the "Use Property"). Developer's right to utilize the Use Property for the Parking Use shall commence as a license from the City upon the expiration of thirty (30) days following the delivery of the Use Notice to the City. Developer shall have the right to enter into an agreement with a third party to operate the Parking Use on the Use Property. Developer shall pay all costs associated with the Parking Use of the Use Property (including all federal, state and local taxes and charges as may be applicable thereto; however, Developer shall not be responsible for ad valorem property taxes during the Use Period) and shall receive all revenue with respect thereto. In the event that Developer delivers a Use Notice, Developer shall be required to deliver an Election Notice with respect to the Use Property; provided however, Developer shall have the right to elect at what point during the Due Diligence Period such Election Notice is given by providing written notice of such election prior to the expiration of the Due Diligence Period. The period between a Use Notice and Closing shall be referred to herein as the "Use Period." If Developer fails to deliver such election prior to the expiration of the Due Diligence Period, Developer shall be deemed to have delivered an Election Notice with respect to the Use Property on the last day of the Due Diligence Period. Developer shall maintain such commercially reasonable insurance as is customary for operations similar to the Parking Use on the Use Property and shall defend,

9

indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from the Parking Use; provided, however, that the Developer shall not be responsible for any loss, liability, cost, or expense resulting from the City's (or of the City's agencies' or departments') negligence or misconduct. Developer shall at all times keep the Use Property clean and free of debris and shall not permit any area of the Use Property to be littered with refuse during the Use Period. The City disclaims all representations and warranties as to the condition of the Use Property, including, but not limited to, any implied or express warranty of fitness of the Use Property for the Parking Use. Developer covenants and agrees that it shall not use the Use Property during the Use Period in any manner which violates the laws of the United States of America, the laws of the State of Michigan or any ordinances or other regulations of any governing municipality or other political subdivision. Developer's use of the Use Property and any activities or actions of Developer or its designee in connection therewith shall not be deemed a violation of the City's covenants under Section 5(G) below.

**Section 2.      ENVIRONMENTAL MATTERS**

(A)    <u>Definitions</u>. The following words and expressions shall, wherever they appear in this document, be construed as follows:

(1)    "Asbestos" shall have the meanings provided under the Environmental Laws and shall include, but not be limited to, asbestos fibers and friable asbestos as such terms are defined under the Environmental Laws.

(2)    "Environmental Claims" shall mean all claims, demands, suits, proceedings, actions, whether pending or threatened, contingent or non-contingent, known or unknown, including but not limited to investigations and notices by any governmental authority, brought under common law and/or under any of the Environmental Laws which can or do relate to the Property.

(3)    "Environmental Laws" shall mean all applicable federal, state, and local laws, rules, regulations, orders, judicial determinations and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, whether in the past, present or future, with respect to:

(i)    the installation, existence, or removal of, or exposure to, Asbestos on the Property;

(ii)    the existence on, or discharge from, or removal from the Property of Hazardous Materials; and

(iii)    the effects on the environment of the Property or any activity conducted now, previously or hereafter conducted on the Property.

Environmental Laws shall include, but are not limited to, the following: (i) the Michigan Natural Resources and Environmental Protection Act, 1994 Public Act 451, as amended ("<u>NREPA</u>"); the Comprehensive Environmental Response,

10

Compensation, and Liability Act, 42 USC Sections 9601, et seq. ("CERCLA"); the Superfund Amendments and Reauthorization Act, Public Law 99-499, 100 Stat. 1613; the Resource Conservation and Recovery Act, 42 USC Sections 6901, et seq.; the National Environmental Policy Act, 42 USC Section 4321; the Toxic Substances Control Act, 15 USC Section 2601; the Hazardous Materials Transportation Act, 49 USC Section 1801; the Clean Air Act, 42 USC Sections 7401, et seq.; and the regulations promulgated in connection therewith; (ii) Environmental Protection Agency regulations pertaining to Asbestos (including 40 CFR Part 61, Subpart M); Occupational Safety and Health Administration Regulations pertaining to Asbestos (including CFR Sections 1901.1001 and 1926.58) as each may now or hereafter be amended; and (iii) any Michigan state and local laws and regulations pertaining to any Hazardous Materials.

(4)  "Hazardous Materials" shall mean any of the following as defined by the Environmental Laws:  Asbestos; hazardous wastes; solid wastes; toxic or hazardous substances, wastes or contaminants (including but not limited to polychlorinated biphenyls (PCBs), paint containing lead and urea formaldehyde foam insulation), and sewage.

(B)  The City and Developer acknowledge and agree that some of the parcels to be transferred may be "facilities" pursuant to Part 201 of NREPA, whether or not as yet discovered to be such, and that given the number of parcels being transferred, the 100-year period over which the parcels were developed, numerous changes in uses, and the City's lack of knowledge about the condition or history of most of the parcels, it may not be practicable or possible to identify all pre-existing contamination or conditions on the parcels which may strictly violate Environmental Laws.  Further, the City and Developer acknowledge that although the Developer can give its general undertaking to comply with Environmental Laws with regard to its conduct of future activities on the parcels, at the time of Closing, neither City nor Developer will be able to estimate exactly what such compliance may involve with regard to existing contamination and other existing conditions on the parcels that may violate Environmental Laws.  The City acknowledges that the Developer may conduct a BEA and CERCLA "All Appropriate Inquiry" assessment activities respecting the Property, the results of which assessments may be reported to federal and state authorities at such time as Developer issues an Election Notice to proceed to Closing with respect to such Property, in order to seek the associated protections from liability with respect to pre-existing environmental conditions at the Property ("Liability Protection"), or such earlier date as required pursuant to Environmental Laws or in order to preserve Liability Protection.

(C) The City shall authorize the Developer, through a fully executed Right-of-Entry (in the form attached), to enter upon the applicable Property during the Due Diligence Period to, subject to the conditions set forth herein, undertake environmental remediation activities approved by the City hereunder, and make soil boring and bearing tests, undertake such surveying and environmental due diligence activities as Developer deems appropriate, including without limitation sampling and testing of soil, soil vapor, surface water, groundwater, indoor air, and the installation of groundwater wells, provided such do not materially and permanently interfere with demolition or site improvement activities of the City or the rightful use of the

11

Property by a tenant in possession or other third party, if any. All such testing and remediation shall be done at Developer's expense. Developer shall at all times during the Due Diligence Period comply with the terms and provisions of the Right-of-Entry, and Developer's right to enter upon the applicable Property is subject to execution of such Right-of-Entry. To the extent any provision of such Right-of-Entry conflicts with the terms set forth herein, the terms of this Agreement shall govern. Developer shall upon request submit to the City a copy of each final survey or environmental testing report generated as a result of such activities. Developer shall give prior written notice to the City to inspect, investigate and/or remediate the condition of the Property during the Due Diligence Period, including any investigation of the environmental condition (each such notice referred to herein as an "Investigation Notice"). To the extent the Investigation Notice includes a request to perform any environmental remediation activities upon the applicable Property, prior to undertaking such remediation, the Developer shall submit to the City in writing (i) the scope of remediation activities contemplated by the Developer, (ii) evidence of commercially reasonable insurance appropriate for the scope of remediation contemplated by the Developer, and (iii) evidence that the Developer has the financial resources to complete the scope of remediation contemplated, each of which shall be subject to the prior written approval of the City, which approval shall not be unreasonably withheld, conditioned or delayed. Upon written request of Developer, the City shall provide an electronic mail address for delivery of any Investigation Notice; provided, Developer shall mail a copy of any Investigation Notice sent via electronic mail to the City pursuant to the provisions of Section 4 below. Developer shall use all commercially reasonable efforts to minimize damage to the Property in connection with such entry and shall restore the Property to substantially the condition existing prior to such entry, provided that the City acknowledges that soil borings and groundwater well sampling may be conducted, and it may not be practicable to fully restore the Property to the exact same condition. Developer shall indemnify, defend and hold the City harmless from and against any and all loss, cost, liability and expense, including reasonable attorney fees and litigation costs, suffered or incurred by the City as a result of the Developer's (including any of its duly authorized employees, agents, engineers or other representatives) negligent acts or omissions or willful misconduct occurring in connection with the activities conducted in accordance with the Right-of-Entry; provided however that (A) in the event Developer provides an Objection Notice or otherwise elects not to proceed to Closing, the Developer shall in no circumstance have any indemnity obligation or other liability with respect to any environmental conditions pre-existing at the Property including without limitation any soil or groundwater contamination or other environmental conditions that may discovered in the course of the Developer's Due Diligence Activities and thereafter disclosed to the City as required hereunder, except to the extent such environmental conditions are materially exacerbated due to the negligence or willful misconduct of Developer or any of its duly authorized employees, agents, engineers or other representatives, and (B) in no event shall Developer have any indemnity obligation or other liability with respect to any loss, cost, liability or expense incurred by the City as the result of the gross negligence or willful misconduct of the City or its agents.

(D)     In the event Developer elects to proceed to take title to any Property, upon the Closing, Developer takes such Property as it finds it, "AS IS", and the City makes no express or implied representations or warranties as to its fitness for absolutely any purpose whatsoever, including but not limited to any warranty that the Property is fit for the Developer's purpose or

12

regarding the presence or absence of Hazardous Materials at, on, in, under, about, or from the Property and compliance with the Property with Environmental Laws. Developer acknowledges that neither the City nor any agent or employee of the City has made any representation, warranty or agreement, either express or implied, and Developer has not relied on any representation, warranty or agreement of any kind made by the City or any agent or employee of the City, concerning (a) the physical or environmental condition of the Property, or (b) the presence or absence of any condition, substance or material, including but not limited to any waste material, equipment or device at, on, in, under, about, or from the Property. Developer agrees that the disclosures of the City concerning the Property and its condition are intended to satisfy any duties the City may have under the law, including but not limited to the statutes, Environmental Laws, and common law. Developer shall rely solely on its own due diligence with respect to such inquiries, investigations and assessments. By executing this Agreement, Developer acknowledges that it is satisfied with the condition of the Property, subject only to its Due Diligence Activities, including but not limited to inspection of the Property, review of title, and the results of the tests, investigations and surveys permitted under this Agreement. If, prior to Closing, Developer fails to undertake such investigations and/or obtain such test results and surveys, or fails to object to the condition of the Property based on the results of its Due Diligence Activities, and Developer thereafter elects to proceed to Closing, Developer shall thereupon be deemed to have waived any right to object to the condition of the Property and shall be deemed to have declared its full satisfaction therewith.

(E)    Upon Closing on any particular Property, subject to the City's covenant set forth in Section 5(G)(ii) below, Developer, for itself and its successors and assigns, expressly waives and releases all Environmental Claims (whether for personal injury, property damage or otherwise) that Developer may have against the City and its officials, employees and agents in connection with or related to such Property or any aspect thereof except for Environmental Claims arising out of actions by the City of its employees or agents that caused the release or threatened release of hazardous substances on the parcels being transferred. Upon Closing on any particular Property, Developer releases and discharges the City from all Environmental Claims that Developer may have against the City in connection with or arising out of the present condition of the Property.

(F)    Intentionally omitted.

(G)    Subject to the City's covenant set forth in Section 5(G)(ii) below, after the Closing with respect to a Property, the City shall have no obligation or liability to Developer whatsoever to undertake any cleanup or other remedial action that may be required in connection with the Property under any Environmental Law, or to comply with any other federal, state or local requirement to attend to the physical condition of the Property.

(H)    At its sole cost and expense, with respect to an applicable Property for the period commencing on the applicable Closing and ending on the applicable Commencement of Construction, Developer shall: (a) comply with all Environmental Laws; (b) pay when due the cost of Developer's compliance with the Environmental Laws resulting directly or indirectly out of environmental conditions caused or permitted by Developer during its period of ownership, use, possession or development of the Property; and (c) keep the Property free of any lien

13

imposed pursuant to the Environmental Laws resulting out of Developer's ownership, use, possession, or development of the Property.

(I)     During the earliest of the date that Developer (a) receives title to the Property, (b) receives possession of the Property or (c) performs any removal or remedial activities on the Property, Developer shall comply with all Environmental Laws and will undertake to complete any further investigation and remediation of the environmental conditions, if any, necessary to permit the intended use of the Property in accordance with the Environmental Laws. As between the City and Developer but not as to third parties, Developer assumes the risk of liability for any and all Hazardous Materials, whether known or unknown, which may have been or may be present in, at, on, under about or from the Property except for hazardous materials released by the City or its agents, employees, or contractors.

(J)     Notwithstanding anything to the contrary which may be contained in this Agreement, Developer represents and warrants and covenants to the City for the period after Developer's commencement of ownership, use, possession or development of the Property and terminating upon the Commencement of Construction at an applicable Property, as follows:

(i)     Developer shall not directly or indirectly use or allow the use of the Property for the purpose of storing any Hazardous Materials Developer brings into the Property, nor shall Developer directly or indirectly use the Property in a manner which will cause or increase the likelihood of causing the release of such Hazardous Materials onto or from the Property, other than those Hazardous Materials which are necessary and commercially reasonable for the conduct of Developer's development activities or the business operated on the Property and which Hazardous Materials shall be, handled and disposed of in compliance with all Environmental Laws and industry standards and in a commercially reasonable manner.

(ii)     Developer shall promptly notify the City of any claims or litigation against the Developer by any person (including any governmental authority), concerning the presence or possible presence of Hazardous Materials contamination at the Property or concerning any violation or alleged violation of the Environmental Laws by the Developer respecting the Property, and shall furnish the City with a copy of any such communication received by Developer.

(iii)     Developer shall notify the City promptly and in reasonable detail in the event that Developer becomes aware of or suspects the presence of Hazardous Materials contamination or a violation of the Environmental Laws at the Property.

(iv)     If Developer's operations at the Property violate the Environmental Laws so as to subject Developer or the City to a formal notice of violation by a governmental agency alleging a violation of the Environmental Laws, Developer shall promptly investigate the underlying circumstances and notify the City within fourteen (14) days of the results of its investigation. If Developer determines that an ongoing violation by Developer is occurring or did occur,  Developer shall, to

14

the extent required by Environmental Laws, cease or cause a cessation of or take other actions to address those aspects of the use or operations causing the violation and shall remedy and cure in compliance with the Environmental Laws any conditions arising therefrom to the extent required by Environmental Laws at its own cost and expense. If Developer disputes that its activities are violating Environmental Laws, it shall expeditiously appeal and prosecute an appeal of the notice of violation or take other commercially reasonable actions to dispute such notice.

**Section 3.    CLOSING**

(A)    <u>Time and Place of Closing</u>. The closing with respect to a particular Property shall take place at the office of the PDD, or such other location designated by the City and acceptable to Developer. Each Closing will take place within fifteen (15) days following the earliest to occur of (i) delivery by Developer of a Election Notice with respect to a particular Property, (ii) written notice to Developer that the City has cured all Defects set forth in an Objection Notice provided prior to the expiration of the City Cured Period with respect to a particular Property, or (iii) waiver by Developer of any Defects with respect to a particular Property, each pursuant to Section 1(C)(5) above. For the avoidance of doubt, no additional consideration shall be due from the Developer to the City at any Closing.

(B)    <u>Conditions to Closing</u>. The City's obligation to proceed with a Closing is conditioned on the fulfillment by Developer of each of the following conditions precedent:

a.    <u>Resolution of Developer's Authority</u>. Developer shall furnish to the City a certified copy of a resolution in form and substance as set forth on **Exhibit E**, duly authorizing the execution, delivery and performance of this Agreement and all other documents and actions contemplated hereunder with respect to a particular Property.

b.    <u>Intentionally Omitted</u>.

c.    <u>Payment of Closing Costs</u>. Developer shall have tendered payment of the closing costs payable by Developer, which shall include all title charges, escrow, closing and recording fees associated with any conveyance hereunder. For avoidance of doubt, the City shall not be responsible for any closing charges or transaction fees in connection with any Closing hereunder other than the payment of its own legal fees and expenses.

(C)    <u>Delivery of Deeds and Possession</u>. The City will deliver to Developer at each Closing the Deeds with respect to the particular Property that is subject of such Closing to and possession of the applicable Property.

(D)    <u>Recording</u>. Provided that Developer has complied with all conditions precedent as specified herein, the Deeds with respect to a particular Property shall be delivered at the applicable Closing for prompt recordation with the Register of Deeds of Wayne County, Michigan. Developer shall pay at each Closing all costs for recording the Deeds. Possession of the applicable Property shall be delivered to Developer at the applicable Closing.

**Section 4:    NOTICES**

CHI-1941899v12

A notice, demand or other communication under this Agreement by either Party to the other shall be sufficiently given if it is dispatched by certified or registered mail, postage prepaid, return receipt requested, or sent by recognized overnight delivery service, or hand delivered, with receipt obtained, and addressed as follows:

If to Developer:       Pike Pointe Holdings, LLC
135 West 50th Street, 20th Floor
New York, NY 10020
Attn: Legal Department

If to the City:       Director
Planning & Development Department
65 Cadillac Square, Suite 2300
Detroit, Michigan 48226

With a copy to (which copy shall not constitute notice):

Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue
Suite 500
Detroit, MI 48226

All notices shall be deemed given on the day of mailing. Either Party to this Agreement may change its address for the receipt of notices at any time by giving notice thereof to the other as provided in this section. Any notice given by a Party hereunder must be signed by an authorized representative of such Party.

**Section 5:    COVENANTS**

(A)    Developer covenants for itself and its successors and assigns and every successor in interest to any Property constituting a part of the Properties, that from and after Closing on such Property, Developer and its successors and assigns shall develop such Property only to and in accordance with the uses specified in this Agreement, unless otherwise agreed in writing by the City. The uses specified in this Agreement are for development and use of such Property into parking facilities, residential housing, commercial, retail space or any other use suitable for the location, consistent with the City's urban planning policies and the City's comprehensive development plan in effect as of the date the Developer seeks zoning and land use approval for such development. Subject to force majeure delays, within fifteen (15) months following Closing (the "Commencement Deadline") on any Property, the Developer shall achieve Commencement of Construction (as defined below) with respect to such Property. Following Commencement of Construction, the Developer shall diligently prosecute such development on the Property to substantial completion (which shall mean substantial completion of such development and all material improvements related thereto, exclusive of landscaping, punch list

16

CHI-1941899v12

items and any tenant work for commercial or other space for which there are no tenants or for which the work is to be done by a tenant and any onsite or offsite work that is not commercially necessary for occupancy) (the date upon which such substantial completion occurs referred to herein as the "Completion Date"). Subject to force majeure delays, the Completion Date shall occur within thirty nine (39) months following Closing for the applicable Property, or such longer period of time as may be reasonably necessary for Developer or its designee to actually achieve substantial completion of the applicable development or improvements, provided Developer is diligently pursuing such completion (the "Completion Deadline"). For purposes hereof, "force majeure delays" shall mean acts of God, terrorism, flooding, strikes, lockouts or other labor trouble, materially adverse weather conditions, fire or other casualty, governmental preemption in connection with an emergency, any rule, order or regulation of any governmental authority or any department or subdivision thereof and any other cause or event beyond the reasonable control of Developer (other than failure of Developer to secure necessary land use or zoning approvals from any governmental authority), or inability to secure materials, labor or access to the Property because of any such emergency, rule, order, regulation, war, civil disturbance, terrorist act or other emergency, or inability to secure materials, labor or access to the Property because of any other cause or event beyond the reasonable control of Developer (other than shortage of funds). In the event that the Developer elects to undertake environmental remediation of the Property after the Closing, "force majeure delays" also shall include the time reasonably necessary for the proper completion of all applicable remediation activities. In the event that Developer ceases, delays, or slows its development activities for a particular Property as a result of any claim or cause of action filed, threatened or asserted by the City (or any of its agencies or departments) and, (1) a court of competent jurisdiction dismisses such action or rules in favor of Developer with respect thereto or (2) the City withdraws its claims or causes of actions, the delay associated with such reduction or cessation in the development shall be deemed a "force majeure delay." The Commencement Deadline and Completion Deadline shall be extended for a period of time equal to the number of days during which Developer is prevented from proceeding with the construction of the development at the Property by reason of force majeure, provided that (i) Developer is otherwise in material compliance with the terms and provisions of this Agreement, and (ii) Developer notifies the City of the events constituting such force majeure upon the later of (i) Closing with respect to the applicable Property and (ii) sixty (60) days after Developer has actual knowledge of their occurrence.

(B)     For purposes of this Agreement, "Commencement of Construction" on a Property shall be deemed to have occurred when the Developer shall have commenced foundation or other equivalent site preparation work on the Property, which site preparation work may include renovation or demolition of existing buildings located on the Property, as applicable.

(C)     If the development plan for a Property calls for development of improvements on the Property in two or more discrete phases, the requirements set forth in this Agreement relative to the Completion of Construction, as well as the remedies of the City applicable thereto, shall be satisfied upon Completion of Construction of the initial phase.

(D)     Developer covenants and agrees that from and after Closing it will: (i) comply with all zoning requirements, and all other applicable state and federal statutes and regulations and local laws and ordinances applicable to the ownership, use and/or occupancy of the Property;

17

and (ii) pay and discharge when due without penalty, and in all events before penalty for nonpayment attaches thereto, all taxes, assessments and governmental charges, including but not limited to real estate taxes or assessments on the Property or any part thereof, except where the same may be contested in good faith.

(E) <u>Certificate of Completion</u>. The Developer shall give the City prompt written notice of the Completion Date. The City agrees that the PDD shall inspect the Property for purposes of issuance of the Certificate of Completion promptly following the Completion Date, and shall provide Developer with notice of any deficiencies in compliance with this Agreement, and an opportunity for cure and re-inspection. If, as of the Completion Deadline, PDD determines that Developer is in compliance with all provisions and requirements of this Agreement, PDD shall issue a "<u>Certificate of Completion</u>." The Certificate of Completion shall be a conclusive acknowledgment by PDD of satisfaction by Developer of its obligations under this Agreement for the applicable Property or portion of the applicable Property addressed by the Certificate of Completion. The Certificate of Completion shall not, however, constitute evidence of compliance with or satisfaction of the requirements of any department, agency or entity with respect to any building, occupancy, or other permits, to the extent such departments are exercising their regulatory authority. The Certificate of Completion shall be in such form as can be recorded against the Property, or portion thereof, and shall release the Property, or portion thereof, from the City's rights under this Agreement. The cost of recording the Certificate of Completion shall be the responsibility of Developer.

(F) <u>Estate Conveyed</u>. Notwithstanding anything contained in this Agreement to the contrary, the estate conveyed hereby shall be deemed to be a determinable fee and only upon the Commencement of Construction on the Property will the possibility of reverter retained by the City automatically expire as to that part of the applicable Property.

(G) <u>City Covenants</u>. During the Option Period and prior to a Closing with respect each Property, the City shall (i) maintain such Property in at least the same condition and repair (except for environmental condition and repair thereof, which is addressed in sub-clause (ii) below) as of the Effective Date, (ii) not, through its own action (or the action of any agency, department, employee, agent, or contractor), alter the environmental condition of the Property, as such exists as of the Effective Date, in a material and adverse manner, (iii) not "down zone" the Property or take zoning or land use action on the Property that would materially and adversely affect Developer's ability to develop the Property for the uses otherwise permitted in this Agreement, (iv) not execute or grant any lease, contract, agreement, lien, security interest, encumbrance, easement, or restriction with respect to such Property, or amend, modify, renew, extend or terminate any of the foregoing, without prior written consent of the Developer, which consent shall not be unreasonably withheld, conditioned or delayed and (v) cause the Economic Development Corporation to subordinate any prior conflicting options on the Western Contiguous Parcel to the Developer's Options on the Western Contiguous Parcel.

**Section 6:      REMEDIES**

(A) <u>City's Remedies Prior to Conveyance</u>. Except with respect to assignment to a Permitted Entity (as defined below), in the event that, prior to the conveyance of the Property, Developer assigns this Agreement or any right therein or in a Property without the prior written

CHI-1941899v12

approval of the City, this Agreement and any rights of Developer in this Agreement, may, at the option of the City, be terminated by the City after thirty (30) days written notice and opportunity to cure provided by the City to Developer. Notwithstanding the foregoing, the Developer's rights and obligations under this Agreement may be assigned: (i) to a wholly owned subsidiary of Developer, or (ii) to a joint venture, limited liability company, partnership, limited partnership or other entity formed to develop or finance a Property or the Properties, provided that the Developer retains a direct or indirect interest in such entity (any such assignee being referred to as a "Permitted Entity"). In any case, the Developer shall provide written notice to the City of such assignment.

      (B)    City's Remedies Subsequent to Conveyance.

      (1) Event of Default. If, prior to the issuance of a Certificate of Completion on a Property, Developer breaches any covenant set forth in Sections 5(A) or (D) hereof applicable to such Property and fails to cure such breach within ninety (90) days after written demand by the City, such an event shall be deemed to constitute an **Event of Default**, provided, however, that if the nature of Developer's default is such that more than the cure period provided is reasonably required for its cure, then Developer shall not be deemed to be in default and an Event of Default shall not have occurred if Developer commences such cure within said period and thereafter diligently pursues such cure to completion within two hundred seventy (270) days of City's initial written demand hereunder. Notwithstanding the foregoing, Developer shall have the right to dispute that an Event of Default has occurred or that an Event of Default has not been timely cured by written notice of dispute sent to the City ("Notice of Dispute"). In the event a Notice of Dispute is sent, the parties shall meet and in good faith work to resolve their differences. In the event the City and Developer cannot resolve their differences as to whether an Event of Default has occurred or has been cured, then the City shall not record a notice of an uncured and undisputed Event of Default as described in Section 6(B)(2) below without first bringing an action in a court of competent jurisdiction for a final judicial determination that an Event of Default occurred and was uncured. To the extent a court of competent jurisdiction deems that an Event of Default occurred prior to the Commencement of Construction and such cause of action was filed with the court of competent jurisdiction prior to the Commencement of Construction, irrespective of the date the court makes such determination, the City shall have all rights and remedies available to it hereunder as if such Event of Default was undisputed prior to the Commencement of Construction in the first instance. The City may, in its sole discretion, waive in writing any Default or Event of Default by Developer. Notwithstanding any provision contained herein to the contrary, any lender of Developer that has a security interest in a Property, shall have an additional notice and cure right that should provide such lender with a reasonable period of time after the expiration of any cure periods available to Developer in which to cure any Event of Default prior to the City enforcing its remedies hereunder.

      (2)    Right of Reverter. It is expressly understood and agreed between the Parties hereto that until the Commencement of Construction on a particular Property, the conveyance of such Property to Developer shall be construed and interpreted as the conveyance of a fee simple determinable, and that such conveyance shall endure only so long as subsequent to the conveyance and prior to the Commencement of Construction there has been no uncured or undisputed Event of Default with respect to such Property and such Event of Default results from a failure of the Commencement of Construction to have occurred prior to the Commencement

19

Deadline (a "Reverter Event of Default"). In the event of an uncured and undisputed Reverter Event of Default and the City's recording of a notice thereof, after a judicial determination as required by Section 6(B)(1) above and written notice from the City to Developer of the City's election to enforce the reverter set forth in this Section, title to the applicable Property (and only the applicable Property) shall revest in the City, except for parcels of Property previously conveyed where Commencement of Construction has already been achieved. Upon such revesting of title, the City shall have the right to re-enter and take immediate possession of the applicable Property. Upon an uncured and undisputed Reverter Event of Default as to a Property occurring prior to the Commencement of Construction and expiration of the cure period, this Agreement and any rights of Developer arising hereunder with respect to the Property subject to the reverter, may, at the option of the City, be terminated by the City by the City providing written notice of such termination to the Developer prior to the cure of such Reverter Event of Default, and the Developer shall thereafter have no further interest in the reverted Property. In such case Developer agrees to promptly execute and deliver a quit claim deed for any such portion of reverted Property to the City. While the right of reversion as to a Property automatically terminates upon Commencement of Construction on such Property, the City agrees to provide Developer with a written acknowledgement, in recordable form, that the Commencement of Construction has occurred and the City's right of reversion has terminated as to such Property.

        (3)    <u>Intentionally Omitted</u>.

    (C)    <u>Rights and Remedies Cumulative</u>. The rights and remedies of the City, whether provided by law or by this Agreement, shall be cumulative, and the exercise by the City of any one or more remedies shall not preclude the exercise by it, at the same or different times, of any other remedy for the same default or breach or any other default or breach by the Developer. No waiver made by either Party shall apply to obligations beyond those expressly waived in writing.

    (D)    <u>Developer's Remedies</u>. If the City breaches its obligations under this Agreement after reasonable notice and opportunity to cure, Developer shall have the right to seek injunctive relief, specific performance or other equitable remedies for the City's breach of this Agreement. In no event shall the Developer be entitled to monetary damages as a result of the City's breach of this Agreement, except to the extent such damages arise out of the City's uncured breach of the covenant set forth in Section 5(G) above.

    (E)    <u>City's Representatives Not Individually Liable</u>. No official or employee of the City shall be personally liable to Developer or any successor in interest, in the event of any default or breach by the City or for any amount which may become due to Developer or successor or on any obligations under the terms of this Agreement.

20

**Section 7:     PROVISIONS NOT MERGED WITH DEEDS**

No provision of this Agreement is intended to or shall be merged into the Deeds transferring title to each Property from the City to Developer or any successor in interest, and any such Deeds shall not be deemed to affect or impair the provisions and covenants of this Agreement.

**Section 8:     ENTIRE AGREEMENT; AMENDMENT**

This Agreement (including all exhibits, schedules or other attachments hereto) constitutes the complete and exclusive statement of the terms of the agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, promises, and arrangements, oral or written, between the Parties with respect to the subject matter hereof. This Agreement may be amended or modified only by an instrument in writing signed by both of the Parties.

**Section 9:     GOVERNING LAW**

This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without regard to conflicts-of-law principles that would require the application of any other law.

**Section 10:    COUNTERPARTS**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but together such counterparts shall constitute one and the same instrument.

**Section 11:    <u>AUTHORITY OF CITY.</u>**

**Notwithstanding anything in this Agreement, in law or in equity, or otherwise to the contrary, this Agreement shall be of no force or effect and may not in any way be enforced against the City unless or until this Agreement and the transaction contemplated hereby have been: (i) approved in writing by the Emergency Manager for the City of Detroit, in accordance with Emergency Manager Order No. 5, (ii) either included in the Emergency Manager's financial and operating plan or approved in writing by the Governor of the State of Michigan or his or her designee, in accordance with Section 12(1)(k) of Public Act 436 of 2012; and (iii) either included in the Emergency Manager's financial and operating plan or approved in writing by the State Treasurer, in accordance with Section 15(1) of Public Act 436 of 2012.**

**Section 12: CITY AGENCIES AND DEPARTMENTS.**  Whenever this Agreement requires an action or creates an obligation on behalf of the City, the City shall also be required, as applicable, to cause all of its agencies and departments to undertake such obligations.

(signatures on following pages)

21

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

WITNESSES:                                    DEVELOPER

                                              PIKE   POINTE   HOLDINGS,   LLC,   a
                                              Delaware limited liability company

_____            By: _____
Print:   James. W. Lundy Jr.                  Print:  Claude LeBlanc
                                              Its:    Senior Managing Director and
                                                      Chief Financial Officer


STATE OF ____New York____ )
                          ) ss.
COUNTY OF ___New York____ )

    The foregoing instrument was acknowledged before me on November 20th, 2014 by
___Claude LeBlanc_____ the  SMD and CFO _____ of Pike Pointe
Holdings, LLC, a Delaware limited liability company, on behalf of said company.


                                              _____
                                              Notary Public, R. Sharon Smith
                                              Acting in New York County
                                              My commission expires: 6/6/15

        [signatures continue on following page]

                                              SHARON R. SMITH
                                        Notary Public, State of New York
                                              No. _02SM6091329
                                         Qualified in New York County
                                        Commission Expires June 6, 2015



                        [Signature Page – Detroit-Syncora Dev Agreement]
CHI-1941899

WITNESSES:                                    CITY OF DETROIT,
                                              a Michigan public body corporate

_Daniel 7 m_____           By: _Kevin D. Orr_____
Print: _Daniel T Moss_____           Print: _KEVIN D. ORR_____
                                         Its: _EMERGENCY MANAGER_

_District of Columbia_
STATE OF MICHIGAN     )
                      ) ss.
COUNTY OF WAYNE       )

                                                           _November 21_
The foregoing instrument was acknowledged before me on September 21 2014 by
_Kevin Orr_____, the _Emergency Manager_ of the City of
Detroit, a Michigan public body corporate, on behalf of the City.

                                    _Marcia A. Giroux_____
                                    Notary Public, Wayne County, Michigan
                                    Acting in Wayne County, Michigan
                                    My commission expires: _March 31, 2016_

Pursuant to § 18-5-12 of the Detroit City Code,    Approved by the City Law Department
I hereby certify that proper and fair              pursuant to Sec. 7.5-206 of the Charter of the
consideration has been received by the City        City of Detroit.
pursuant to this contract.
                                                           Corporation Counsel
          Finance Director
                                                   City Council Approval Date:

**Drafted by and when recorded return to:**

Bruce N. Goldman
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226

[Signature Page - Detroit-Syncora Dev Agreement]

CHI-1941899

## EXHIBIT A

## LEGAL DESCRIPTION

1. The contiguous parcels of (2.721 acres):

   1303 E Atwater  (.908 acres)

   1365 E Atwater  (.220 acres)

   1364 Franklin  (.337 acres)

   1340 Franklin (.020 acres)

   1310 Franklin  (.145 acres)

   1399 E Atwater  (.287 acres)

   1325 E Atwater (.707 acres)

   1370 Guoin St (.097 acres)

2. The contiguous parcels of (6.787 acres):

   2200 Franklin (3.545 acres)

   2263 E Atwater (2.812 acres)

   281 Chene St (.430 acres)

3. The contiguous parcels of (2.108 acres) :

   2290 E Jefferson (1.199 acres)

   2310 E Jefferson (.730 acres)

   301 Chene  (.179 acres)

4. 1300 Beaubein (Former Police HQ)

[legal descriptions of the above parcels to be attached based on mutual agreement by the parties
hereto following the Effective Date]

CHI-1941899v12

## EXHIBIT B

## MEMORANDUM OF OPTION

Please see attached.

CHI-1941899v12

## MEMORANDUM OF OPTION

THIS MEMORANDUM OF OPTION (this "Memorandum") is made as of the ___ day of _____, 2014, by _____, a _____, whose address is _____, Detroit, MI 48226 ("Owner").

## W I T N E S S E T H:

WHEREAS, the City of Detroit (the "City") and _____ (the "Developer") entered into that certain Development Agreement dated as of _____, 2014 (the "Development Agreement");

WHEREAS, pursuant to the Development Agreement, the City has agreed to grant an option to Developer (the "Option") to acquire certain real property and improvements located in the City of Detroit, County of Wayne, State of Michigan and described on attached Exhibit A, (collectively, the "Property");

WHEREAS, the City has further agreed in the Development Agreement to either record or cause to be recorded against the Property a memorandum evidencing the Option; and

WHEREAS, Owner desires to evidence the Option in the Official Records of Wayne County by the recitations contained in this Memorandum.

NOW, THEREFORE, in consideration of the foregoing and TEN DOLLARS ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Owner does hereby evidence the Option by recordation of this Memorandum against the Property upon the following terms:

1.      The Option Term shall be for a ____(__) year period, commencing on the date of execution of this Memorandum.

2.      The Development Agreement contains a right of Developer to acquire the Property.

3.      The Option shall (a) run with the land described on Exhibit A and be binding on any successor owners of such land, and (b) inure to the benefit of the Developer and its successors and assigns.

4. This Memorandum and the Option herein are subject to all conditions, terms and provisions of the Development Agreement. Reference should be made to the Development Agreement for a more detailed description of all matters contained in this Memorandum.

[signature page follows]

IN WITNESS WHEREOF, Owner has executed this Memorandum effective as of the date first written above.

OWNER

_____, a _____

By:_____

Name:_____

Its:_____

STATE OF _____ )
                        )
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this ____ day of _____, 2014, by _____, the _____ of _____., a _____ corporation, on behalf of the company.

    IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.

                           _____

                         Notary Public:_____
                         My Commission Expires: _____
                         Acting in _____ County

Drafted by and when recorded return to:

**Exhibit A**

**Legal Description**

## EXHIBIT C

## RIGHT OF ENTRY

Please see attached.

CHI-1941899v12



**CITY OF DETROIT**
Buildings, Safety Engineering and Environmental Department
Coleman A. Young Municipal Center
2 Woodward Ave., Suite 401
Detroit, Michigan 48226
(313) 471-5108
www.detroitmi.gov

**RIGHT OF ENTRY ("ROE") PERMIT APPLICATION**
A detailed scope of work, site maps, drawings and certificate of insurance in accordance with City of Detroit requirements are required in order to process the permit.

PROPERTY ADDRESS: _____ DATE: _____

CROSS STREETS/BOUNDARIES: _____

_____

**TYPE OF ROE REQUEST** (check one):  ☐ Parcel of Land          ☐ Right-Of-Way (R-O-W)

☐ Extension/Modification for Parcel      ☐ Extension/Modification for R-O-W

## APPLICANT CONTACT INFORMATION

| Contact Person: | Telephone Number: | | |
|---|---|---|---|
| Company Name: | Email Address: | | |
| Address: | City: | State: | Zip: |

## PROPERTY INFORMATION

| Requested Site City Owned/Controlled: | ☐ Yes | ☐ No |
|---|---|---|
| Structure's on Property: | ☐ Yes | ☐ No |
| If Yes, # and type:_____ | | |

## PERMIT INFORMATION

Timeline for access (dd/mm/yyyy):  Start date_____      End date_____

Insurance Policy Expiration Date:_____

Are monitoring wells being installed in the R-O-W?      ☐ Yes          ☐ No

If Yes: ☐ Less (<) than 30 days (Temporary)    ☐ More (>) than 30 days (Permanent - Requires City Council approval)

Type of Activities:  ☐ Soil Excavations    ☐ Temporary Staging    ☐ Soil Borings: # of Borings_____

☐ Well Installation: # of Wells _____    ☐ Other:_____

Is a site inspection being requested:      ☐ Yes          ☐ No

Are additional copies of the permit being requested:    ☐Yes, # of copies_____      ☐ No

APPLICANT'S SIGNATURE: _____ DATE_____

| Make checks payable to "Treasurer, City of Detroit" **Total Fee:** *Include Permit # on check.* | ROE Permit #: |
|---|---|

*Applications must be completed in full or will be denied.*

# City of Detroit
# ENVIRONMENTAL AFFAIRS

## Right of Entry Fee Schedule

Effective March 1, 2013 the Buildings, Safety Engineering & Environmental Department, Environmental Affairs (EA) Division is implementing a new Fee Schedule for Right-Of-Entry (ROE) permits.

The EA coordinates the City of Detroit's ROE permit process for persons, developers and environmental consultants desiring to enter and conduct work on City-owned property or right-of-ways. Our responsibilities include reviewing permit requests, scope of work documents, figures/diagrams and insurance certificates. As necessary, EA conducts site inspections, contacts federal & state agencies and responds to emergencies.

EA works closely with the Law Department to ensure insurance certificates meet the City's requirements and to identify the property owner for the requested properties. The division also coordinates with various city departments that own property to acquire sign off on the ROE permit.

The fees for ROE permits are based on the following considerations.

**ECONOMICS** — Accounting for staff time to process ROE permits, cost of materials to issue the permit such as printing, copying and mailing, and costs associated with researching deed records for ownership information.

**ACCURACY** — Ensuring that required documents and technical data are submitted to EA once site activities are completed, and to account for additional staff time during emergency response activities or negligence of the applicant.

**EFFICIENCY** — Reducing the number of ROE permits that are requested, issued and subsequently not used or are cancelled by the requester after the process has been completed, and limiting extensions to encourage that work is conducted during the applicants requested time.



City of Detroit
**Buildings,
Safety Engineering &
Environmental Department**

For further information about the Right-of-Entry Fee Schedule and process, please contact Environmental Affairs Division at 313.471.5108

**Buildings, Safety Engineering & Environmental Department
2 Woodward Avenue #401, Detroit MI 48226**

# CITY OF DETROIT
## BUILDINGS, SAFETY ENGINEERING AND ENVIRONMENTAL DEPARTMENT

FEE SCHEDULE
MARCH 2013

## ENVIRONMENTAL RIGHT OF ENTRY

### A. RIGHT OF ENTRY("ROE") PERMIT
The following ROE Fees are based on requests and/or Scope of Work received for access onto City owned property:

BASE FEE applied to each permit……………………………………..…$ 200.00

Draft/Final Report Retainer……………………………………….…..$ 150.00
(Returned after final documents are submitted)

Site Inspection (Requested by applicant or required)………………….…..$ 75.00

Failure to obtain permit……………………………………………..……$ 500.00

### B. RIGHT OF WAY ("ROW") PERMIT
The following ROW Fees are based on requests and/or Scope of Work received for access onto the City owned Right of Way:

BASE FEE applied to each permit……………………………….……...$ 150.00

Draft/Final Report Retainer……………………………………….…..$ 150.00
(Returned after final documents are submitted)

Site Inspection (Requested by applicant or required)………………….…..$ 75.00

Failure to obtain permit……………………………………… ……..…. $ 500.00

### C. PERMIT EXTENSION & MODIFICATION
Permit Extension……………………………………………………… $ 50.00
Permit Modification……………………………………………….....…$ 50.00

### D. PHOTOCOPY
Each Copy……………………………………………………...……$ 5.00
Each Page over 8……………………………………………..……$ 1.00

- 1 -

02/2013

### E. **REFUNDS**
There are no refunds for Permit Fees

**Service fee for returned checks**                                    **$35.00**

Any returned checks not reimbursed with additional returned check fee within fourteen days of our receipt of Non Sufficient Funds Notice shall be subject to collection action and may result in the imposition of more fees and collection costs as authorized by law.

- 2 -

02/2013

**Buildings, Safety Engineering & Environmental Department**
# RIGHT OF ENTRY

**Do I need a Right-Of-Entry (ROE) permit from the City for private, county, state or federally owned property?**

No. We only issue ROE permits for City owned/controlled property (parcels & Right-Of-Way (ROW)). If the property is not owned or controlled by the City, you will need to contact the owner of the property to gain access.

**I am working on a project and have a large group of City owned parcels for which I need a ROE permit. Do I have to pay a fee for each parcel?**

No. There is a flat fee for the first 10 parcels per ROE for those parcels within the Project Boundaries.

**What are Project Boundaries?**

Project Boundaries define the area of your project. Project Boundaries will be determined by the reviewer, but usually include contiguous, adjacent and/or nearby parcels within a defined limited radius.

**Can I email my application package to get the process started and provide my payment at a later date?**

No. The entire package must be submitted at the same time in order to be processed, otherwise it will not be accepted. Your package should include your ROE application, detailed scope of work, timeline, figures/soil boring location map, insurance certificate (including all corresponding additional insured endorsements as required) and a check made payable to "Treasurer, City of Detroit" in the appropriate amount.

**How do I submit my ROE package?**

You can either mail or hand-deliver your complete package to 2 Woodward Ave., Suite 401, Detroit, MI 48226 to the attention of Mr. Raymond Scott. If your package is received by mail, your receipt of payment will be mailed or emailed to you. Time permitting, if you hand deliver your package, you may be able to receive your invoice and process your payment with the cashier in Suite 402; otherwise your receipt will be mailed/emailed to you.

**How can I prevent delays in getting my ROE package approved?**

Prior to submitting your package you can confirm the following:

1) Your package is complete with all the required submittals. It is recommended that you include 2 copies of your figure/soil boring location map.
2) Make sure you provide a clear and detailed scope of work, providing an overview of the project and detailed site activities including site restoration.

3) Your Certificate of Insurance (COI) meets all of the City's Requirements. Your COI shall read "THE CITY OF DETROIT IS A NAMED ADDITIONAL INSURED WITH RESPECTS TO COMMERCIAL, AUTO AND POLLUTION LIABILITY" in the Description of Operations box. Make sure to include all corresponding additional insured endorsements.
4) Confirm that the property or ROW is owned and/or controlled by the City of Detroit prior to submitting your ROE package. The City cannot give access to property or public ROW's that are not city owned.

## How long does it take to process my ROE?

If your ROE package is complete and meets all of the City of Detroit requirements it usually takes approximately 1-2 weeks for you to receive your ROE.

## What is the difference between a ROE for a parcel versus a ROE for the Public ROW?

A parcel of land is identified by an address and parcel number. A ROE for a parcel would be requested if you are performing activities on the actual parcel (within the property line).

The Public ROW is generally the area that includes the sidewalk, berm (area between sidewalk and curb), curb, street and alley. A ROE for a ROW would be requested if you are performing activities within these areas or an area that is not considered a parcel.

## How do I obtain a refund for my report retainer fee?

Once your work activities are complete, you are required by your ROE permit to submit plans, technical reports (e.g., environmental data) manifest and any other documents relating in any way or arising out of the activities performed at the Site under your ROE. Once you submit the documents to the Environmental Affairs of BSEED, you will need to submit an Application for Refund of Permit, License & Certificate Fees. If you are not in the City's system as a Supplier, a Non PO Supplier form will need to be processed and approved prior to a refund being issued to add you to the system. This form will be completed internally.

Once all documents are received you will be eligible to receive a refund for the report retainer fee you paid in the amount of $150.00. The ROE fee is non-refundable.

## Is a ROE permit for the ROW the same as a ROW permit from City Engineering?

No. A ROE permit from BSEED is required to grant you access to enter onto City owned property (parcel & ROW) to perform site activities and confirms that you are complying with all City requirements. A permit from City Engineering is required to perform work in the public ROW. This work includes curb cuts, excavations, utility cuts, sidewalk & driveway approach construction/reconstruction or street and alley construction/reconstruction. Although the ROE permit is one of the requirements to receive a ROW permit from City Engineering, the approval of the ROE does not relieve you from securing a City Engineering ROW permit for performing work/activities in the public ROW, including but not limited to open cuts, backfills, and barricades. ROW permits must be obtained prior to the commencement of site work/activities from the Department of Public Works, City Engineering Division, 65 Cadillac Square, Suite 900, (313) 224-3935.

[DATE]

Mr. John Smith, Project Manager
[Name of Environmental Consultant]
[Address]

RE:    **Request for Right-of-Entry:**
       **[Address/Location] (Ward #/Item #)**
       **Detroit, Michigan 48226**

Dear Mr. Smith:

You have requested a right-of-entry to conduct **[general description of requested activities]** at the above-referenced address (hereinafter, the "Site").

Please be advised that the City of Detroit grants permission to **[Environmental Consultant]**, including its contractors, subcontractors, representatives, agents, and employees (collectively, "User") to enter the above-referenced Site for the sole purpose of conducting certain environmental activities, within the confines of the Scope of Work contained in **Exhibit A.**

This Right-of-Entry is subject in all respects to the following conditions:

1.      Subject to satisfaction of the terms and conditions contained herein, this Right-of- Entry shall commence on **[start date]**, and shall automatically terminate upon the completion of the work described herein, or on **[end date]**, whichever occurs first.

2. See Addendum  User shall hold the City of Detroit harmless and shall defend and indemnify the City of Detroit from and against any and all damages, claims, obligations, penalties, costs, charges, losses, demands, liabilities, and expenses (including, without limitation, fees and expenses for attorneys, expert witnesses and other consultants) that may be imposed upon, incurred by, or asserted against the City of Detroit or its departments, officers, employees, or agents arising from and related to User and its contractors', subcontractors', representatives', agents', and employees' use of the Site and this Right-of-Entry (including but not limited to, any release or threatened release of hazardous and non-hazardous substances, contaminants, exacerbation, evacuation, on-site and/or off-site property damage, or bodily injury).

3.      **[Environmental Consultant]** shall continue to maintain, and shall cause its contractors, subcontractors, representatives, and agents to continue to maintain, at their sole expense, during the time this Right-of-Entry is in effect, the following separate insurance policies:

     •    Commercial General Liability Insurance (Broad Form Comprehensive) written on an occurrence-based coverage, with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage, and $2,000,000.00 in the aggregate, with the general aggregate limit applying per location.

     •    Automobile Liability Insurance covering all owned, hired, and non-owned vehicles with Michigan No-Fault Coverage plus residual liability coverage with a

minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage.

- Worker's Compensation Insurance for employees which meets Michigan's Statutory minimum requirements and Employer's Liability Insurance with the minimum limits of $500,000.00 for each disease, person, and accident.

- Contractor Pollution Liability Insurance with minimum limits of $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate.

Said insurance policies shall name the User as the insured. The City of Detroit shall be named as an additional insured on the certificates of insurance, without limitation, for all preceding coverage, excluding workers' compensation and employers' liability insurance. Each policy shall be accompanied by a commitment from the insurer that such policies shall not be canceled, modified, or coverage reduced without at least thirty (30) days prior notice to the City of Detroit. Certificates of Insurance evidencing such coverage and endorsements shall be submitted to the City of Detroit prior to the commencement of performance under this Right-of-Entry, and at least fifteen (15) days prior to the expiration dates of expiring policies.

4. User shall not impair any part of the Site, except as customarily incident to the activities described in Exhibit A and in accordance with all applicable laws. User shall repair any damage caused to the Site and/or properties affected by the activities at the Site, and restore the Site and/or properties affected by the activities at the Site to its/their original condition. Initial access to the Site shall be coordinated through the Planning and Development Department, Property Management Section at (313) 224-1187.

5. User shall contact the Department of Public Works, City Engineering Division at (313) 224-3935 upon the discovery of any damage caused by User's activities to the curb, sidewalk, street, or any portion of the right of way and/or infrastructure in order to provide notice and obtain the proper City of Detroit permits for repair.

6. User will not bring any soils or other materials onto the Site, except in strict accordance with the Department of Public Works, City Engineering Division Standard Specifications for the above-referenced Site and only with prior written verification for compliance by the City of Detroit's Buildings, Safety Engineering, and Environmental Department – Environmental Affairs of the User's fill material analytical data. User shall be responsible for the removal of any and all materials, tools and equipment brought onto the Site required for the authorized activities, and User shall assume the risk of loss or damage to any materials, tools and equipment.

7. User is entering upon and using the Site at its own risk, and accepts the Site "As Is". The City of Detroit makes no representation or warranty as to the status of title or the physical or environmental condition of the Site, or its fitness for any particular use.

8. User shall take all reasonable measures and precautions to mitigate any noise, vibrations, dust, and odors emanating from the activities on the Site.

9. User shall immediately notify the City's Buildings, Safety Engineering, and Environmental Department – Environmental Affairs at (313) 471-5108 upon the

13-53846-tjt    Doc 13170    Filed 11/13/19    Entered 11/13/19 16:51:44    Page 78 of 96

discovery of a suspected release of hazardous substances, hazardous materials, contaminants, or property damage as a result of User's activity at the Site.

10.      User shall provide to the City of Detroit, without charge, copies of any and all draft and final work plans, reports, health and safety plans, and other environmental, analytical, or engineering documents relating in any way or arising out of its activities at the Site.

Upon the preparation of the documents, three copies of each document shall be provided to:

      Raymond A. Scott, General Manager
      City of Detroit
      Buildings, Safety Engineering, and Environmental Department
      2 Woodward Avenue, Suite 401
      Detroit, Michigan 48226

11.      This instrument and the rights granted hereunder may not be assigned by User.

12.      User shall take all precautions necessary to make the Site safe for the authorized activities, including, where appropriate, preparation and adherence to a site-specific health and safety plan.

13.      User shall be responsible for ensuring compliance with all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders. Any violation of the applicable laws, rules, regulations, standards, plans, and orders; or breach of the terms contained within this document may be considered grounds for termination of the Right-of-Entry.

14.      This instrument constitutes the entire Right-of-Entry agreement between the City of Detroit and the User with respect to its subject matter. This agreement may not be modified, amended, changed, or altered in any respect unless done so in a writing acknowledged by both the City of Detroit and User.

15.      No activities other than the activities authorized in Exhibit A may be performed on the Site.

This Right-of-Entry will be effective only upon execution of the acknowledgment and agreement noted herein by an authorized representative of User and upon delivery of same to Mr. Raymond Scott, Buildings, Safety Engineering, and Environmental Department, at the address listed above.

Sincerely,

_____

*** [Authorized City of Detroit Department Signature]

**[Environmental Consultant]**, by its duly authorized representative, hereby acknowledges receipt of the original copy of this letter, and agrees to be bound by the terms and conditions stated therein.

**[ENVIRONMENTAL CONSULTANT]**

BY: _____
(Signature)

PRINT NAME: _____

ITS: _____
(Duly Authorized Representative)

DATE _____

TELEPHONE NUMBER: _____

EXHIBIT A

# SCOPE OF WORK

The following is the Scope of Work that [**Environmental Consultant**], its contractors, subcontractors, representatives, agents and employees (collectively, "User"), is authorized to perform at the Site. User shall be responsible for ensuring compliance in all respects with the Scope of Work, and all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders.

User is only authorized to undertake the following activities at the Site:

**[LIST OF AUTHORIZED ACTIVITIES]**

\*\*\*

## Addendum to the "Sample Environmental Right of Entry Document"

Paragraph 2 of the attached "Sample Environmental Right of Entry Document" is deleted and replaced with the following:

> 2.    User shall indemnify, defend and hold the City harmless from and against any and all loss, cost, liability and expense, including reasonable attorney fees and litigation costs, suffered or incurred by the City as a result of the User's (including any of its duly authorized employees, agents, engineers or other representatives) negligent acts or omissions or willful misconduct occurring in connection with the activities conducted in accordance with the Right-of-Entry; provided however that (A) in the event User provides an Objection Notice or otherwise elects not to proceed to Closing, the User shall in no circumstance have any indemnity obligation or other liability with respect to any environmental conditions pre-existing at the Property including without limitation any soil or groundwater contamination or other environmental conditions that may discovered in the course of the User's Due Diligence Activities and thereafter disclosed to the City as required hereunder, except to the extent such environmental conditions are materially exacerbated due to the negligence or willful misconduct of User or any of its duly authorized employees, agents, engineers or other representatives, and (B) in no event shall User have any indemnity obligation or other liability with respect to any loss, cost, liability or expense incurred by the City as the result of the gross negligence or willful misconduct of the City or its agents.

Terms capitalized but not otherwise defined in the "Sample Environmental Right of Entry Document" shall have the meaning given to such term in the Development Agreement dated November __, 2014 between the City and Pike Pointe Holdings, LLC.

CHI-181948754v1

# LEARN ABOUT RIGHT OF ENTRY INSURANCE REQUIREMENTS

CONSULTANT shall continue to maintain, and shall cause its contractors, subcontractors, representatives, and agents (collectively, "User") to continue to maintain, at their sole expense, during the time this Right-of-Entry is in effect, the following separate insurance policies:

- Commercial General Liability Insurance (Broad Form Comprehensive) written on an occurrence based coverage, with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage, and $2,000,000.00 in the aggregate, with the general aggregate limit applying per location.

- Automobile Liability Insurance covering all owned, hired, and non-owned vehicles with Michigan No-Fault Coverage plus residual liability coverage with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage.

- Workers Compensation Insurance for employees which meets Michigan's Statutory minimum requirements and Employer's Liability Insurance with the minimum limits of $500,000.00 for each disease, person, and accident.

- Contractor Pollution Liability Insurance with minimum limits of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate.

Said insurance policies shall name the User as the insured. The City of Detroit shall be named as an additional insured on the certificate of insurance, without limitation, for all preceding coverage, excluding worker's compensation and employer's liability insurance. Each policy shall be accompanied by a commitment from the insurer that such policies shall not be canceled, modified, or coverage reduced without at least thirty (30) days prior notice to the City of Detroit. Certificates of Insurance evidencing such coverage and endorsements shall be submitted to the City of Detroit prior to the commencement of performance under this Right-of-Entry, and at least fifteen (15) days prior to the expiration dates of expiring policies. The certificate of insurance should be forwarded to:

City of Detroit Building, Safety Engineering, and Environment Department
2 Woodward Avenue, Suite 401
Detroit, Michigan 48226

## Addendum to the "Sample Environmental Right of Entry Document"

Paragraph 2 of the attached "Sample Environmental Right of Entry Document" is deleted and replaced with the following:

2.      User shall indemnify, defend and hold the City harmless from and against any and all loss, cost, liability and expense, including reasonable attorney fees and litigation costs, suffered or incurred by the City as a result of the User's (including any of its duly authorized employees, agents, engineers or other representatives) negligent acts or omissions or willful misconduct occurring in connection with the activities conducted in accordance with the Right-of-Entry; provided however that (A) in the event User provides an Objection Notice or otherwise elects not to proceed to Closing, the User shall in no circumstance have any indemnity obligation or other liability with respect to any environmental conditions pre-existing at the Property including without limitation any soil or groundwater contamination or other environmental conditions that may discovered in the course of the User's Due Diligence Activities and thereafter disclosed to the City as required hereunder, except to the extent such environmental conditions are materially exacerbated due to the negligence or willful misconduct of User or any of its duly authorized employees, agents, engineers or other representatives, and (B) in no event shall User have any indemnity obligation or other liability with respect to any loss, cost, liability or expense incurred by the City as the result of the gross negligence or willful misconduct of the City or its agents.

Terms capitalized but not otherwise defined in the "Sample Environmental Right of Entry Document" shall have the meaning given to such term in the Development Agreement dated December __, 2014 between the City and Pike Pointe Holdings, LLC.

CHI-181948754v1

**EXHIBIT D**

**QUIT CLAIM DEED**

  The City of Detroit, a Michigan public body corporate whose address is 2 Woodward Avenue, Detroit, MI 48226 ("Grantor"), quit claims to _____, a Michigan _____ ("Grantee"), whose address is _____, the premises located in the City of Detroit, Wayne County, Michigan, described as:

  A/K/A _____    Ward: _____ Item(s):

(the "Property"), for the sum of _____ ($_____), subject to and reserving to the City of Detroit its rights under public easements and rights of way, easements of record, applicable zoning ordinances, development plans pursuant to Act 344 of 1945 as amended (if any), and restrictions of record.

  This Deed is given subject to the terms, covenants and conditions of a Development Agreement - Option to Purchase and Develop Land dated _____, 20___ entered into by the parties hereto and which is incorporated herein by reference and a memorandum of which was recorded on _____, 20___ in the Office of the Register of Deeds for the County of Wayne in Liber _____ on Pages _____ through _____ inclusive, none of the terms, covenants and conditions of which shall be deemed merged in this Deed. The covenants therein recited to be covenants running with the land are hereby declared to be covenants running with the land enforceable by the City as therein set forth until issuance of a Certificate of Completion.

  The Grantor grants to the Grantee the right to make all divisions under Section 108 of the land division act, Act No. 288 of the Public Acts of 1967, as amended. This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan right to farm act.

  This deed is dated as of _____.

      CITY OF DETROIT,
      a Michigan public body corporate


      By: _____

      Print: _____

      Its: _____


    *[acknowledgement on following page]*

CHI-1941899v12

STATE OF MICHIGAN )
) ss.
COUNTY OF WAYNE )

The foregoing instrument was acknowledged before me on _____
20__, by _____, the _____ of
the City of Detroit, a Michigan public body corporate, on behalf of the City.

_____

Print: _____
Notary Public, Wayne County, Michigan
Acting in Wayne County, Michigan
My commission expires:

---

| | |
|---|---|
| Pursuant to § 18-5-12 of the Detroit City Code, I hereby certify that proper and fair consideration has been received by the City pursuant to this contract. | Approved by the City Council on.<br><br>JCC pp _____ or Detroit Legal News,<br><br>_____, on file in my office. |
| Finance Director | |
| Approved by the City Law Department pursuant to Sec. 7.5-206 of the Charter of the City of Detroit. | Approved by Mayor on |
| Corporation Counsel | City Clerk |

---

**This Instrument Drafted by:**               **When recorded, return to:**

Bruce N. Goldman                              Grantee
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, MI 48226

Exempt from transfer taxes pursuant to MCL § 207.505(h)(i) and MCL § 207.526(h)(i).

2

## EXHIBIT E

## CERTIFICATE OF AUTHORITY FOR LIMITED LIABILITY COMPANY

I, _____, Manager of
_____, a _____ limited liability company
(the "Company")

DO HEREBY CERTIFY that the following is a true and correct excerpt from *[check appropriate box]*

☐  the minutes of a meeting of the Members of the Company duly called and held on

☐  a consent in lieu of a meeting, with signed consents received from all of the [Members] of the Company on

and that the same is now in full force and effect:

"RESOLVED, that any [Manager of the Company], is hereby authorized to execute and deliver, in the name and on behalf of the Company, any agreement or other instrument or document in connection with any matter or transaction with the City of Detroit that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such [Managers] to be conclusive evidence of such approval."

I FURTHER CERTIFY that the following persons are [Managers]:

I FURTHER CERTIFY that any of the aforementioned managers of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in the attached Agreement, and that all necessary approvals have been obtained in relationship thereto.

IN WITNESS WHEREOF, I have set my hand this _____ day of _____, 20__.

_____
Print: _____
Its: Manager

CHI-1941899v12

*Schedule 1(H)*

1365 E Atwater St, 48207

1325 E Atwater St, 48207

1399 E Atwater, 48207

1370 Guoin St, 48207

1310 Franklin St, 48207

1364 Franklin St, 48207

1340 Franklin St, 48207

CHI-1941899v12

# EXHIBIT C



RIVERTOWN WAREHOUSE DISTRICT

Gensler 45

1



RIVERTOWN
**WAREHOUSE DISTRICT**

Gensler  48

2



RIVERTOWN
**WAREHOUSE DISTRICT**

Gensler 46

3

# EXHIBIT D

# Pike Pointe Holdings, LLC

<u>Option Extension Request, Objection Notice and Election Notice</u>
<u>(collectively, the "Notice")</u>

October 9, 2019                                   <u>Via Federal Express and Hand Delivery</u>

Director                                          Corporation Counsel
Planning & Development Department                 City of Detroit Law Department
65 Cadillac Square, Suite 2300                    2 Woodward Avenue, Suite 500
Detroit, Michigan 48226                           Detroit, Michigan 48226

and Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 808
Detroit, Michigan 48226

Re:   Development Agreement dated as of December 10, 2014
      (the "<u>Development Agreement</u>") By and Between City of Detroit (the "<u>City</u>")
      and Pike Pointe Holdings, LLC ("<u>Pike Pointe</u>")

Ladies and Gentlemen:

As you know, the Development Agreement provided an Option to Pike Pointe to acquire various parcels of property owned or under the control of the City. These parcels include the property described in numbered paragraph 3 of Exhibit A to the Development Agreement, such property being commonly known as 2290 East Jefferson, 2310 East Jefferson and 301 Chene (collectively, the "<u>Jefferson Parcels</u>").

Reference is made herein to the Development Agreement. Capitalized terms used in this Notice but not otherwise defined herein shall have the meanings ascribed to them in the Development Agreement.

<u>Option Extension Request</u>

Pursuant to Section 1(A) of the Development Agreement, Pike Pointe hereby requests an Option Extension extending the Option Period for the Jefferson Parcels for a period of two (2) years (to expire on December 10, 2021), with a corollary extension of the Due Diligence Period for the Jefferson Parcels. Pike Pointe hereby further requests that the City provide its written consent to the Option Extension pursuant to Section 1(A) of the Development Agreement.

Pike Pointe believes that this request is consistent with the provisions of Section 1(A) of the Development Agreement, and that it would be unreasonable for the City to withhold, condition or delay its consent. An exercise of the Option before December 10, 2019 would be impractical and detrimental to the development of the Jefferson Parcels. The reasons for this include that

development in the immediate vicinity of the Jefferson Parcels has materially decreased and the general economic conditions of the geographical area in which the Jefferson Parcels are located have deteriorated from the Effective Date of the Development Agreement to such a level that it is not economically feasible for Pike Pointe to pursue development of the Jefferson Parcels. Furthermore, the extension is reasonable given the complexity of the developments being contemplated by Pike Pointe. We would be happy to discuss this further if the City has any additional questions.

We also note that this extension would make the Option Period for the Jefferson Parcels coincide with the Option Period applicable to the remaining parcels subject to the Option granted in the Development Agreement, which are commonly known as 2200 Franklin Street, 2263 East Atwater Street and 281 Chene Street (the "Chene Parcels"). This would facilitate the development of a larger, more impactful project on a combined assemblage containing the Jefferson Parcels and the Chene Parcels – the sort of development that will be a credit to all and a milestone in fulfilling the City's vision for this area.

We ask that the City respond to this request for an Option Extension by Wednesday, October 16, 2019. For more than two (2) years, Pike Pointe has worked with the City regarding the appropriate planning, scheduling and sequencing of meaningful development on the Jefferson Parcels and the Chene Parcels, as well as regarding the potential impact of any development on the Aretha Franklin Amphitheatre.

The alternative accorded to Pike Pointe under the Development Agreement is to seek relief from the United States Bankruptcy Court. We don't believe that a return to the Bankruptcy Court to adjudicate these issues, and the inevitable public airing of the issues, would serve the best interests of the parties involved.

Objection Notice

We also note that pursuant to Pike Pointe's Due Diligence Activities, it has come to our attention that the City appears to have granted certain rights to the Jefferson Parcels to The Right Productions, a Michigan for profit corporation, pursuant to the Professional Services Contract dated as of March 23, 2010, by and between The Right Productions and the City, as amended by Contract Amendment No. 1 approved by the City Council as of March 26, 2013, and as further amended by Contract Amendment No. 2 approved by the City Council as of January 20, 2015 (as so amended, and as it may have been further amended, "Contract No. 2815275"). Pursuant to Contract No. 2815275 The Right Productions or an affiliate has been using the Jefferson Parcels (and other adjacent property) for parking in connection with the management of events at the Aretha Franklin Amphitheatre.

Pike Pointe hereby provides an Objection Notice (as defined in Section 1(C)(5) of the Development Agreement) to the grant of these rights and the continued use of the Jefferson Parcels for parking, and hereby demands that the City take any and all actions that are necessary to terminate such rights of record, including, without limitation, terminating any rights of The Right Productions to use the Jefferson Parcels. We note that Contract No. 2815275 constitutes a Defect in the City's title to the Jefferson Parcels that represents an item of Mandatory Cure. The City also is obligated to cure this Defect pursuant to the provisions of Section 1(C)(5) of the

Development Agreement.  Pike Pointe is willing to consider an extension of the City Cure Period or suspend this Objection Notice if the City grants the Option Extension requested above.

Election Notice

Finally, please consider this letter as an Election Notice (as defined in Section 1(C)(5) of the Development Agreement), although Pike Pointe reserves the right to withdraw this unless the City timely terminates the Defect referred to above.

Pike Pointe reserves all other rights and remedies under the Development Agreement, including the right to withdraw or suspend this Objection Notice and Election Notice and the right to provide an Option Extension request, an Objection Notice and/or an Extension Notice with respect to the Chene Parcels, whether based on Contract No. 2815275 or any other Defects applicable to the Chene Parcels.

As noted, facing conditions beyond Pike Pointe's control, Pike Pointe has delayed taking the foregoing actions and worked with the City for many months in the hope of finding a less formal and mutually beneficial path to the successful development of the Jefferson Parcels and the Chene Parcels.  Pike Pointe remains optimistic that a constructive dialogue can continue, and that the City will work collaboratively with Pike Pointe to extend the Option Period to enable proper development of the sites.

Respectfully submitted,

**PIKE POINTE HOLDINGS, LLC,**
a Delaware limited liability company

By: _____

Its: _____