# EXHIBIT A

EMERGENCY MANAGER
CITY OF DETROIT

ORDER No. 44

FINAL EMERGENCY MANAGER ORDER

By the Authority Vested in the Emergency Manager
For the City of Detroit
Pursuant to Michigan's Public Act 436 of 2012,
Kevyn D. Orr, the Emergency Manager,
Issues the Following Order:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager (the "EM") for the City of Detroit (the "City") with all of the authority, powers and duties provided under PA 436; and

Pursuant to Section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the City's Mayor (the "Mayor") and the Detroit City Council (the "Council"); and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Section 10(1) of PA 436 provides, in part, that "[a]n emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act, including, but not limited to, orders for the timely implementation of a financial and operating plan..., or to take actions or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan. An order issued under this section is binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued. Local elected and appointed officials and employees, agents, and contractors of the local government shall take and direct those actions that are necessary and advisable to maintain compliance with the financial and operating plan;" and

1

The EM has developed and implemented a written financial and operating plan for the City consistent with the requirements of Section 11 of PA 436, the objective of which has been to enable City officials to provide, or cause to be provided, governmental services essential to the public health, safety and welfare of residents of the City, and assure the fiscal accountability of the City; and

Section 12 of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to exercise certain rights and powers, along with the other rights, duties and powers set forth in PA 436; and

Section 21 of PA 436 states, "[b]efore the termination of receivership and the completion of the emergency manager's term, or if a transition advisory board is appointed under section 23, then before the transition advisory board is appointed, the emergency manager shall adopt and implement a 2-year budget, including all contractual and employment agreements, for the local government commencing with the termination of receivership;" and

On July 18, 2013, consistent with the authorization of the Governor of the State of Michigan (the "Governor") provided under Section 18(1) of PA 436, the City filed a petition for relief pursuant to chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as it may be amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

By an order dated December 5, 2013 (Docket No. 1945) (the "Eligibility Order"), the Bankruptcy Court determined that the City is eligible for relief under chapter 9 of the Bankruptcy Code; and

On October 22, 2014, the City filed the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit in the Bankruptcy Court (Docket No. 8045) (as it may be further amended, modified or supplemented, the "Plan of Adjustment");[1] and

By an order dated November 12, 2014 (the "Confirmation Order") (Docket No. 8272), the Bankruptcy Court confirmed the Plan of Adjustment pursuant to the Bankruptcy Code; and

In connection with the Plan of Adjustment, the City, Title Source, Inc. (the "Title Company"), The Detroit Institute of Arts (the "DIA") and the Foundation for Detroit's Future ("FDF") have entered into that certain Deposit Escrow Agreement dated September 19, 2014 (the "Deposit Escrow Agreement"), whereby the parties thereto have agreed to deposit certain agreements relating to the conveyance of the assets of the Detroit Institute of Arts to the DIA to be held in perpetual charitable trust, including, but not limited to, the Omnibus Transaction Agreement by and among the City, the DIA and the FDF (the "Omnibus Agreement"); the Settlement Conveyance and Charitable Trust Agreement by and between the City and the DIA (the "Conveyance Agreement"); the Quit Claim Deed from the City to the DIA granting the DIA the City's interest in the cultural center garage (the "Garage Deed"); the Quit Claim Deed from the City to the DIA granting the DIA the City's interest in the real property of the Detroit

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Plan of Adjustment.

Institute of Arts (the "DIA Deed"); the Bill of Sale by and between the City and the DIA (the "Bill of Sale"); and the Intellectual Property Transfer Agreement by and between the City and the DIA (together with the Omnibus Agreement, the Conveyance Agreement, the Garage Deed, the DIA Deed, the Bill of Sale and any other document referenced in Schedule 1 of the Deposit Escrow Agreement, the "DIA Transfer Documents"); and

The City also is entering into various settlement agreements and other resolutions as set forth in the Plan of Adjustment and the exhibits thereto (collectively, the "Plan Settlements"), which will be effective upon effective date of the Plan of Adjustment (the "Effective Date"), including, without limitation, the following (as further defined or described in the Plan of Adjustment): (a) the UTGO Settlement Agreement, in substantially the form as Exhibit I.A.360 to the Plan of Adjustment, (b) the LTGO Settlement Agreement, in substantially the form as Exhibit I.A.237 of the Plan of Adjustment, (c) the 36th District Court Settlement, as outlined in Exhibit I.A.9 to the Plan of Adjustment; (d) the settlement of OPEB Benefits, as set forth in Section IV.G of the Plan of Adjustment and the Retiree Health Care Settlement Agreement attached as Exhibit I.A.298 to the Plan of Adjustment; (e) the DIA Settlement, as outlined in Exhibit I.A.126 of the Plan of Adjustment and pursuant to the DIA Settlement Documents substantially in the form as Exhibit I.A.127 of the Plan of Adjustment; (f) the State Contribution Agreement in substantially the form as Exhibit I.A.332 of the Plan of Adjustment (the "State Contribution Agreement"); (g) matters relating to the DWSD Authority; (h) the Syncora Settlement, including the Syncora Development Agreement in substantially the form as Exhibit I.A.340 of the Plan of Adjustment and the other Syncora Settlement Documents in substantially the forms as Exhibit I.A.344 of the Plan of Adjustment; (i) the FGIC/COP Settlement, including the FGIC Development Agreement in substantially the form as Exhibit I.A.198 to the Plan of Adjustment and the other FGIC/COP Settlement Documents in substantially the forms as Exhibit I.A.197; and (j) all other compromises and settlements included in, incorporated into or related to the Plan of Adjustment; and

On September 25, 2014, in accordance with Section 9(6)(c) of PA 436, the Council voted unanimously to remove the EM as of the Effective Date (the period from the appointment of the EM through such removal, the "EM Tenure"). By a letter to the Governor, the Mayor approved of the Council's vote on the same day; and

On September 25, 2014, in connection with the vote of Council to, and the Mayor's approval of, the removal of the EM as of the Effective Date, the EM adopted and issued his Order No. 42. By Order No. 42, the EM, among other things, (a) restored the authority of the Mayor and the Council over day-to-day operations and activities effective immediately as permitted by PA 436, (b) agreed not to exercise his powers under PA 436 to interfere with the powers restored to the Mayor and the Council and (c) agreed that he will exercise his powers through the conclusion of the EM Tenure only with respect to any action (or the prevention of any action) that is necessary or convenient for (i) the management of the case captioned "*In re City of Detroit, Michigan*, Case No 1353846" (the "Bankruptcy Case") and related bankruptcy proceedings and (ii) the implementation of the Plan of Adjustment; and

3

The EM has concluded that, as of and conditioned on the occurrence of the Effective Date, the financial conditions of the City will have been corrected in a sustainable fashion consistent with the requirements of Section 9(7) of PA 436; and

Section 22(1) of PA 436 provides that "[i]f an emergency manager determines that the financial emergency that he or she was appointed to manage has been rectified, the emergency manager shall inform the governor and the state treasurer;" and

By letter dated December 8, 2014, the EM will notify the Governor and the Treasurer of the State of Michigan (the "State Treasurer") of the EM's determination that the financial emergency he was appointed to manage within the City will have been rectified as of, and conditioned on the occurrence of, the Effective Date; and

As the EM Tenure approaches its conclusion and in anticipation of the Effective Date, the EM has determined that this Order is appropriate to: (a) promote the successful conclusion of the City's restructuring efforts and its capacity to provide or cause to be provided necessary governmental services essential to the public health, safety and welfare; and (b) otherwise fulfill the intents and purposes of PA 436 and chapter 9 of the Bankruptcy Code; and

As part of this Order, the EM has determined, among other things, that the terms hereof are appropriate to provide for a smooth transition at the conclusion of the EM Tenure and to promote the long-term financial recovery of the City and the health, safety and welfare of the public; and

Pursuant to Order No. 42, the EM has consulted with the Mayor and the Council regarding the terms of this Order.

**It is hereby ordered that:**

*Restoration of City Governance*

1. To the extent not already restored pursuant to the EM's Order No. 42, and except as provided by this Order or other or applicable Michigan or Federal statute, the powers and authority of the Mayor and the Council previously exercised by the EM shall be restored as of, and conditioned upon the occurrence of, the Effective Date.

*Cooperation and Compliance by City Officials*

2. The Mayor, Council members, department heads and other employees, agents and contractors of the City shall promptly and fully do all of the following:

   a. Cooperate with the EM through the end of the EM Tenure to the extent necessary to effectuate the implementation of a Plan of Adjustment, the Confirmation Order or other orders entered or that may be entered in connection therewith by

4

the Bankruptcy Court in the Bankruptcy Case or in any related proceeding or appeal from any order entered or that may be entered by the Bankruptcy Court.

b. Comply with requests from the Michigan Financial Review Commission (the "Commission") created by Michigan Public Act 181 of 2014 ("PA 181"), known as the Michigan Financial Review Commission Act, to the extent necessary or appropriate to effectuate the purposes of PA 181. Such compliance shall include, at a minimum and without limitation, all of the following:

   i. Providing to the Commission any documents, records or other information requested of City officials by the Commission or its staff, including any documents, records or other information specifically required by PA 181.

   ii. Appearing before the Commission to provide testimony, documents, records or other information as and when requested by the Commission or its staff.

   iii. Providing to the Commission upon its request verification of compliance by the City with all of the following consistent with the requirements of Section 6(3) of PA 181:

      A. Section 8 of Michigan Public Act 152 of 2011, the Publicly Funded Health Insurance Contribution Act;

      B. Sections 4i, 4p, 4s and 4t of Michigan Public Act 279 of 1909, the Home Rule City Act;

      C. Michigan Public Act 34 of 2001, the Revised Municipal Finance Act; and

      D. Michigan Public Act 2 of 1968, the Uniform Budgeting and Accounting Act;

   *provided that* nothing herein shall limit, modify or excuse the City's obligation to comply with the applicable law, whether or not listed herein.

*Plan of Adjustment Matters*

3. Without limiting the terms of paragraph 2 above, the Mayor, the Council and all City officers, department heads and other employees, agents and contractors shall take such steps as are necessary or appropriate from and after the Effective Date to pursue the prompt implementation of the Plan of Adjustment, the Confirmation Order and all agreements necessary thereto, including the Plan Settlements. For the avoidance of doubt, such steps include, without limitation, the following:

5

a. The City shall defend any appeals of the Confirmation Order and any appeals of the Eligibility Order or other orders of the Bankruptcy Court necessary for the success of the Plan of Adjustment.

b. On or promptly after the Effective Date and provided that the conditions set forth in the Deposit Escrow Agreement and the DIA Transfer Documents have been otherwise satisfied, the City shall provide the certification described in Schedule 2 of the Deposit Escrow Agreement to the Title Company, and, upon release of the DIA Transfer Documents in accordance with the Deposit Escrow Agreement, the City shall cause the transfer of the assets of the Detroit Institute of Art described in the DIA Transfer Documents and the governance thereof to The Detroit Institute of Arts in accordance with the DIA Transfer Documents.

c. The City shall comply with all covenants set forth in Sections 5.2 and 5.3 of the Omnibus Agreement.

d. Without limiting any other provision hereof, the City shall make such distributions and take such actions as are contemplated in the Plan of Adjustment for the establishment of and distribution to the Detroit General VEBA and Detroit Police and Fire VEBA (as such terms are defined in the Plan of Adjustment), in substantially the form provided in the Plan of Adjustment, and consistent with the measures set forth in the letter agreement filed at Docket No. 8183, all of which are hereby specifically adopted, approved and ratified in all respects.

e. Upon the negotiation of documentation mutually acceptable to the parties, the City shall be authorized and is directed to take such actions and sign such documents as are necessary or appropriate to establish the DWSD Authority (i.e., the Great Lakes Water Authority) and implement the DWSD Authority Transaction consistent with the Memorandum of Understanding (as defined in the Confirmation Order).

f. The City is authorized to enter into and implement, and the EM hereby approves, the *Memorandum of Understanding Between the City of Detroit and Wayne County Community College* in the form approved by the Council on December 8, 2014.

4. All Plan Settlements and related agreements (including, without limitation, the DIA Transfer Documents), to the extent not previously approved by an order of the EM, are hereby expressly adopted, approved and ratified in all respects.


*Restructuring Advisors*

5. The Mayor or his designee may determine whether to retain the restructuring advisors listed on the attached Exhibit A (collectively, the "Restructuring Advisors") for such period as is necessary or appropriate to complete their work to implement the Plan of Adjustment and defend the appeals thereof (the "Restructuring Period"), subject to the terms of the Restructuring Advisors' contracts with the City, *provided that* the Mayor shall consult with the Commission with respect to any decision not to retain a Restructuring Advisor through the conclusion of the Restructuring Period.

6

6. The Emergency Manager, on behalf of the City, hereby restates and ratifies his approval of all fees and expenses for the City's restructuring professionals that have been subject to the Fee Examiner review process in the City's bankruptcy case (including the Restructuring Advisors) for services rendered through the Effective Date, subject to the Bankruptcy Court's independent review of reasonableness. The City is directed to continue to process and pay invoices of the City's restructuring professionals (including the Restructuring Advisors) for their work through the Effective Date based on the invoices presented, subject only to the Bankruptcy Court's independent review of reasonableness. For the avoidance of doubt, the City also shall pay any creditor advisors or court-appointed professionals and experts consistent with orders of the Bankruptcy Court. The City's Chief Financial Officer ("CFO") shall be responsible for the foregoing on behalf of the City, under the supervision of the Mayor.

7. Consistent with the foregoing, the City shall: (a) set aside a reserve account solely for the payment of restructuring fees consistent with full funding of the amounts identified for "Restructuring Professional Fees" in the City of Detroit Ten-Year Financial Projections; and (b) otherwise implement the fee provisions of the Plan of Adjustment, the Confirmation Order and any further orders of the Bankruptcy Court. The CFO shall be responsible for the foregoing on behalf of the City, under the supervision of the Mayor.


*Two-Year Budget*

8. Attached hereto as Exhibit B is the City's two-year budget consistent with the requirements of Section 21(1) of PA 436 (the "Two-Year Budget").

9. Consistent with the requirements of Section 21(2) of PA 436, the City shall not amend the Two-Year Budget without the written approval of the State Treasurer. In addition to approval by the State Treasurer, an amendment by the City to the Two-Year Budget shall not take effect unless approved by the Commission consistent with Section 7(c) of PA 181.


*Labor Matters*

10. All Collective Bargaining Agreements ("CBAs") set forth on Exhibit II.D.5 of the Plan of Adjustment and all CBAs identified on the attached Exhibit C (including CBAs relating to the Detroit Water and Sewerage Department), and any addenda, exhibits, schedules, appendices, supplements or related agreements though the date of this Order, are hereby adopted, approved and ratified in all respects. In addition to the foregoing, all City Employment Terms ("CETs") and other labor-related agreements approved or authorized by the EM are hereby adopted, ratified and approved in all respects, including, without limitation, the CETs and other agreements identified on the attached Exhibit C. The EM also ratifies and approves the CETs that were implemented prior to the EM Tenure and that remain in effect as of the date of this Order, including the CETs identified on the attached Exhibit C.

7

*Pension Plan Matters*

11. For the avoidance of doubt, and without limiting anything herein, the EM hereby expressly reaffirms his Order Nos. 25, 26, 29, 30 and 43 with respect to the changes to the City's pension plans and related ordinances, subject to the additional provisions below.

12. Pursuant to Section 16.4 of Component I of the Combined Plan for the General Retirement System of the City of Detroit, Michigan (the "Combined GRS Plan"), the EM, on behalf of the City, adopts the Combined GRS Plan, as amended and restated, in the form attached hereto as Exhibit D, which document (a) conforms the Combined GRS Plan to the terms of the confirmed Plan of Adjustment and (b) makes other clarifying modifications.

13. Pursuant to Section 17.5 of Component I of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Combined PFRS Plan"), the EM, on behalf of the City, adopts the Combined PFRS Plan, as amended and restated, in the form attached hereto as Exhibit E, which document: (a) reflects changes in the terms and conditions of retirement benefits as provided in the CBAs and memoranda of understanding negotiated with certain of the employee representatives; (b) conforms the Combined PFRS Plan to the terms of the confirmed Plan of Adjustment; and (c) makes other clarifying modifications.

14. Copies of the Combined GRS Plan, as amended and restated, and the Combined PFRS Plan, as amended and restated, will be kept in the Office of the City Clerk for the City of Detroit and shall be available for public inspection.

15. The appropriate City officers, department heads and other employees shall cause the Boards of Trustees of the General Retirement System of the City of Detroit ("GRS") and the Police and Fire Retirement System of the City of Detroit ("PFRS") to timely file or cause to be filed on behalf of GRS and PFRS applications for Favorable Determination Letters with the Internal Revenue Service pursuant to Revenue Procedure 2014-6 (or any successor procedure) to obtain rulings that the Combined GRS Plan and the Combined PFRS Plan satisfy the requirements for favorable tax treatment under Sections 401(a) and 501(a) of the Internal Revenue Code. City officers, department heads and other employees, agents and contractors shall cooperate with and provide such information as the Boards of Trustees and their legal counsel may require in connection with such Favorable Determination Letter applications.

16. The Mayor, Council members and appropriate City officers, department heads and other employees shall cause the Boards of Trustees of the GRS and the PFRS to: (a) comply with the governance requirements set forth in Section 2 of the State Contribution Agreement (including, with respect to the GRS, the requirements of Exhibit A and, with respect to the PFRS, the requirements of Exhibit B) at all times during the 20-year period

8

following the disbursement to the GRS and the PFRS of the State Contribution (as defined in the State Contribution Agreement); and (b) establish and implement an income stabilization program that complies in all respects with Section 3 of the State Contribution Agreement.

*Other EM Orders and Bond Orders*

17. All prior Orders of the EM, to the extent that they are not otherwise inconsistent with this Order and have not previously been modified or rescinded (the "Prior Orders"), shall be incorporated by reference into this Order.

18. The reaffirmation herein of specific Orders of the EM shall not render the Orders not explicitly mentioned herein revoked, rescinded or altered in any way unless such Orders are otherwise inconsistent with this Order.

19. The bond orders issued by the EM, including the bond orders identified on the attached Exhibit F (collectively, the "Bond Orders"), are hereby ratified and affirmed.

*Administrative Matters*

20. The City shall maintain access to the EM page via the City's website for a period of at least one year following the end of the EM Tenure.

21. Nothing in this Order shall be construed as contrary to applicable law.

22. Nothing in this Order shall be construed to restrict or impair the authority of the Governor, in the Governor's sole discretion, to determine that the financial conditions of the City have not been corrected in a sustainable fashion as required by Section 9(7) of PA 436 and appoint a new emergency manager pursuant to Section 24 of PA 436.

23. If any provision of this Order is declared by a court of competent jurisdiction to be illegal, unenforceable or ineffective, such provision shall be deemed severable to the extent necessary so that all other provisions contained in this Order shall remain valid, enforceable and effective.

24. The City shall, and is directed to, maintain all insurance called for by Article 8 of the EM's Contract for Emergency Manager Services dated March 27, 2013 between Mr. Orr and the State of Michigan (the "EM Contract"), including, without limitation, any general liability, professional liability or errors and omissions policy under Sections 8.1 and 8.3 of the EM Contract, and any tail coverage for such insurance.

25. The City shall, and is directed to, fulfill its obligations under Section 8.2 of the EM Contract after the end of the EM Tenure, including, without limitation, by paying the costs of any judgment, settlement or attorneys' fees relating to any uninsured claim,

9

demand or lawsuit against the EM or any employee, agent, appointee or contractor of the EM for actions taken during the EM Tenure. If Mr. Orr is sued personally for any action performed within the scope of his official capacity as the EM, Mr. Orr shall have the right to direct the defense of any such action, and the Mayor, the Council, the Corporation Counsel and the other employees, officers, department heads and agents of the City shall not take any action contrary to, or to interfere with, Mr. Orr's right to direct such defense.

26. Prior to the Effective Date, and pursuant to Section 5.1 of the Financial Stability Agreement, as Amended and Restated on November 7, 2013 (the "FSA"), the EM hereby consents, with the mutual consent of the State Treasurer, to amend Section 6.1(c) of the FSA for the purpose of terminating the FSA as of the Effective Date. To that end, the *Addendum to the Financial Stability Agreement* in the form attached hereto as Exhibit G (the "FSA Amendment") is approved and ratified in all respects. For the avoidance of doubt, the mutual execution of the FSA Amendment by the EM and the State Treasurer shall not preclude the Council from voting to ratify execution of the FSA Amendment prior to the Effective Date.

27. This Order shall be distributed to the Governor, the State Treasurer, the Mayor, Council members, the CFO and all department heads.

28. This Order is effective immediately.

*Modification of This Order and Prior EM Orders*

29. Prior to the Effective Date, the EM may modify, amend, rescind, replace, supplement or otherwise revise this Order at any time. Further, nothing herein shall preclude the EM from issuing any other appropriate Orders, consistent with EM Order No. 42, prior to the Effective Date.

30. Pursuant to Section 21(2) of PA 436, the Council shall not revise this Order or any other Orders or ordinances implemented by the EM during his term, and that remain in effect, prior to one year after the termination of receivership. In addition, after the Effective Date, this Order, or any other Order issued by the EM that remains in effect, may be amended, modified or rescinded only by the following methods:

    a. By a subsequent Order issued by an emergency manager appointed by the Governor under Section 9 of PA 436, including:

        i. After a selection by the Council pursuant to Section 7(1)(b) of PA 436; or

        ii. Pursuant to Section 24 of PA 436; or

    b. By the City by resolution of the Council, approved by the Mayor and ratified by the Commission pursuant to Section 7(n) or 7(o) of PA 181.

10

Dated: December 8, 2014

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc: Governor of the State of Michigan
State Treasurer
Mayor Michael Duggan
Members of Detroit City Council
Chief Financial Officer
City Department Heads

EXHIBIT E

Combined PFRS Plan

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

Amendment and Restatement Effective July 1, 2014

# TABLE OF CONTENTS

Page

COMPONENT 1 .................................................................................................................... 1

ARTICLE 1.          GENERAL PROVISIONS .................................................................... 1

Sec 1.1.            Police and Fire Retirement System Established; Adoption of 2014
                    Plan Document ....................................................................................... 1

Sec 1.2.            Retirement System Intended to be Tax-Qualified; Governmental
                    Plan .......................................................................................................... 1

Sec 1.3.            Compliance With Plan of Adjustment ................................................. 1

Sec 1.4.            Board of Trustees .................................................................................... 2

Sec 1.5.            Board of Trustees -- Membership; Appointment ............................. 2

Sec 1.6.            Board of Trustees; Scheduling of Elections for Active and Retiree
                    Trustees ................................................................................................... 3

Sec 1.7.            Procedures for election of Retiree Trustees ..................................... 3

Sec 1.8.            Board of Trustees; Oath; Term; Vacancies ....................................... 4

Sec 1.9.            Board of Trustees; Officers and Employees ...................................... 4

Sec 1.10.           Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum ........... 4

Sec 1.11.           Board of Trustees; Compensation; Expenses .................................... 5

Sec 1.12.           Rules for Administration of Funds ..................................................... 5

Sec 1.13.           Board of Trustees; Certain Data to be Kept ..................................... 5

Sec 1.14.           Board of Trustees; Annual Audit Report ........................................... 5

Sec 1.15.           Board of Trustees; Legal Advisors ..................................................... 5

Sec 1.16.           Board of Trustees; Medical Director ................................................. 6

Sec 1.17.           Designation of Actuary; Authority to Engage Additional Actuaries ........ 6

Sec 1.18.           Board of Trustees; Adoption of Mortality and Other Tables of
                    Experience and Rates of Interest; Limitations on Payments by the
                    Retirement System ................................................................................. 7

Sec 1.19.           Board of Trustees; Annual Actuarial Valuation of Assets and
                    Liabilities ................................................................................................ 7

Sec 1.20.           Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary
                    Duties ....................................................................................................... 7

Sec 1.21.           Investment Committee; Establishment; Purpose; Fiduciary Status;
                    Fiduciary Duties .................................................................................... 8

Sec 1.22.           Investment Committee; Membership; Appointment ........................ 8

-i-

Sec 1.23.   Investment Committee; Term; Resignation and Removal;
            Vacancies.................................................................................9

Sec 1.24.   Investment Committee; Operation; Meetings; Quorum; Voting.............10

Sec 1.25.   Investment Committee; Compensation; Expenses; Employment of
            Advisors.................................................................................11

Sec 1.26.   Investment Committee; Special Reporting Obligation ...........................11

ARTICLE 2.  DEFINITIONS ........................................................................14

Sec 2.1.    Definitions ..............................................................................14

ARTICLE 3.  MEMBERSHIP .......................................................................22

Sec 3.1.    Eligible Employees....................................................................22

Sec 3.2.    Cessation of Membership; Re-Employment ......................................22

Sec 3.3.    Report From City.......................................................................23

ARTICLE 4.  SERVICE CREDIT...................................................................24

Sec 4.1.    Credited Service .......................................................................24

Sec 4.2.    Vesting Service.........................................................................24

Sec 4.3.    Service Credit; Military Service.....................................................24

Sec 4.4.    Service Credit; Qualified Military Service.........................................25

ARTICLE 5.  ELIGIBILITY FOR RETIREMENT ...............................................26

Sec 5.1.    Eligibility for Unreduced Normal Retirement Benefit............................26

Sec 5.2.    Eligibility for Deferred Vested Retirement Benefit ..............................26

Sec 5.3.    Eligibility for Disability Retirement Benefit – Duty Disability ................26

Sec 5.4.    Eligibility for Disability Retirement Benefit – Non-Duty Disability.......28

Sec 5.5.    Disability Retirees; Reexamination.................................................29

Sec 5.6.    Disability Benefits; Procedures for Determination of Disability .............30

Sec 5.7.    Return of Accumulated Mandatory Contributions to Non-Vested
            Member ..................................................................................32

Sec 5.8.    Benefits Offset by Workers' Compensation and Benefits;
            Subrogation .............................................................................32

ARTICLE 6.  RETIREMENT ALLOWANCE; VARIABLE PENSION
            IMPROVEMENT FACTOR (ESCALATOR)...................................33

Sec 6.1.    Retirement Allowance .................................................................33

Sec 6.2.    Variable Pension Improvement Factor (Escalator) ..............................33

-ii-

# TABLE OF CONTENTS
### (continued)

ARTICLE 7. DEATH BENEFITS ....................................................................34

    Sec 7.1. Accidental Death Benefit; Performance of Duty .....................34

    Sec 7.2. Non-Duty Death Benefits ...........................................................35

    Sec 7.3. Refund of Accumulated Mandatory Contributions Upon Death of Member ....................................................................................................35

ARTICLE 8. FORMS OF PAYMENT ............................................................36

    Sec 8.1. Retirement Allowance Options ...................................................36

    Sec 8.2. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ...............................................................................................37

ARTICLE 9. FUNDING AND RESERVES .....................................................38

    Sec 9.1. Funding Objective of the Retirement System .............................38

    Sec 9.2. Funds .........................................................................................38

    Sec 9.3. Method of Financing Retirement System Benefits .....................39

    Sec 9.4. Member Contributions Picked-Up ..............................................40

    Sec 9.5. Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations ...............................................................................................40

ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS .......................43

    Sec 10.1. Voluntary Employee Contributions; Amount; Vesting ..............43

    Sec 10.2. Changing an Election to Contribute .........................................43

    Sec 10.3. Individual Member Accounting; Crediting of Earnings ..............43

    Sec 10.4. Distribution of Accumulated Voluntary Employee Contributions ..........43

ARTICLE 11. LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS ...................................................................45

    Sec 11.1. The Loan Program ...................................................................45

    Sec 11.2. Eligibility for Loan ....................................................................45

    Sec 11.3. Amount of Loan ........................................................................45

    Sec 11.4. Terms and Conditions .............................................................45

    Sec 11.5. Loan Balance ...........................................................................46

    Sec 11.6. Default .....................................................................................46

    Sec 11.7. Distribution ..............................................................................47

    Sec 11.8. Annual Report ..........................................................................47

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE 12.   DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM .......48
   Sec 12.1.   General Provisions ..................................................................................48
   Sec 12.2.   Conversion to Retirement Allowance ......................................................48
   Sec 12.3.   Investment of DROP Assets ....................................................................48
   Sec 12.4.   Distribution of Amounts Credited to DROP Account..............................49
   Sec 12.5.   Death of Member While Participating in the DROP Program.................49
   Sec 12.6.   Disability of Member While Participating in the DROP Program...........50
   Sec 12.7.   Cost Neutrality .......................................................................................50
ARTICLE 13.   LIMITATION ON BENEFITS AND CONTRIBUTIONS ...........................51
   Sec 13.1.   Compliance With Code Section 415(b) And Regulations.........................51
   Sec 13.2.   Compliance with Code Section 415(c) and Regulations..........................54
ARTICLE 14.   RETIREMENT SYSTEM ADMINISTRATION ......................................55
   Sec 14.1.   Board of Trustees as Retirement System Administrator..........................55
   Sec 14.2.   Powers and Duties of Board.....................................................................55
   Sec 14.3.   Executive Director; Employees.................................................................57
   Sec 14.4.   Discretionary Authority...........................................................................57
   Sec 14.5.   Administrator's Decision Binding.............................................................58
ARTICLE 15.   MANAGEMENT OF FUNDS.......................................................................59
   Sec 15.1.   Board as Trustee of Retirement System Assets........................................59
   Sec 15.2.   Maintenance of Segregated Funds ...........................................................59
   Sec 15.3.   Custodian of Funds...................................................................................59
   Sec 15.4.   Exclusive Purpose ....................................................................................59
   Sec 15.5.   Prohibited Conduct...................................................................................59
ARTICLE 16.   INVESTMENT OF RETIREMENT SYSTEM ASSETS................................61
   Sec 16.1.   Investment Powers of the Board and the Investment Committee ............61
   Sec 16.2.   Investment Management ..........................................................................62
   Sec 16.3.   Best Practices ...........................................................................................63
   Sec 16.4.   Chief Investment Officer..........................................................................63
   Sec 16.5.   Investment Consultants ...........................................................................64
ARTICLE 17.   RETIREE MEDICAL ACCOUNT ................................................................66

-iv-

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| Sec 17.1. | Establishment of Account | 66 |
| Sec 17.2. | Effective Date | 66 |
| Sec 17.3. | Funding of Benefits | 66 |
| Sec 17.4. | Limitation on Contributions | 66 |
| Sec 17.5. | Impossibility of Diversion | 67 |
| Sec 17.6. | Administration | 67 |
| Sec 17.7. | Right to Amend or Terminate Medical Plans | 67 |
| Sec 17.8. | Reversion | 67 |
| Sec 17.9. | Limitation of Rights | 67 |
| ARTICLE 18. | MISCELLANEOUS | 68 |
| Sec 18.1. | Nonduplication of Benefits | 68 |
| Sec 18.2. | Assignments Prohibited | 68 |
| Sec 18.3. | Protection Against Fraud | 68 |
| Sec 18.4. | Errors | 68 |
| Sec 18.5. | Conviction of Felony; Forfeiture of Rights | 68 |
| Sec 18.6. | Amendment; Termination; Exclusive Benefit | 69 |
| Sec 18.7. | Expenses of Administration; Forfeitures Not to Increase Benefits | 69 |
| Sec 18.8. | Required Distributions - Compliance with Code Section 401(a)(9) and Regulations | 69 |
| Sec 18.9. | Direct Rollovers | 70 |
| Sec 18.10. | Construction | 71 |
| Sec 18.11. | Severability | 71 |
| COMPONENT II | | 72 |
| ARTICLE A. | COMMON PROVISIONS OF THE POLICE AND FIRE RETIREMENT SYSTEM | 73 |
| Sec. A-1. | Common Provisions | 73 |
| ARTICLE B. | FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM AS OF JUNE 30, 2014 | 75 |
| Sec. B-1. | Freeze of Police and Fire Retirement System as of June 30, 2014 | 75 |
| ARTICLE C. | DEFINITIONS | 78 |
| Sec. C-1. | Definitions | 78 |

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| ARTICLE D. | MEMBERSHIP | 85 |
| Sec. D-1. | Generally | 85 |
| Sec. D-2. | Membership election option prior to July 1, 2014 | 86 |
| Sec. D-3. | Cessation of membership | 87 |
| ARTICLE E. | SERVICE CREDITABLE | 88 |
| Sec. E-1. | Members to file statement of service, etc. | 88 |
| Sec. E-2. | Credit for service | 88 |
| Sec. E-3. | Employees in military service commencing prior to July 1, 2014 | 88 |
| Sec. E-4. | Verification of service claimed | 91 |
| Sec. E-5. | Prior Service certificates | 91 |
| Sec. E-6. | Creditable service at retirement | 91 |
| ARTICLE F. | BENEFITS PROVIDED TO MEMBERS | 92 |
| Sec. F-1. | Petition for retirement, mandatory age | 92 |
| Sec. F-2. | Old Plan/New Plan | 94 |
| Sec. F-3. | Pension Multiplier | 95 |
| Sec. F-4. | Disposition of surplus benefits upon death of retired member | 96 |
| Sec. F-5. | Retirement allowance for certain persons leaving City employment after eight years service (40 & 8) | 96 |
| Sec. F-6. | Reduced Early Pension Benefits (40 & 8 Vesting Retirees) | 97 |
| Sec. F-7. | Duty disability | 98 |
| Sec. F-8. | Duty disability benefits; Members in service on or after July 1, 1941 but prior to January 1, 1969 | 98 |
| Sec. F-9. | Duty disability benefits; Members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10 | 100 |
| Sec. F-10. | Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below | 101 |
| Sec. F-11. | Non-duty disability | 103 |
| Sec. F-12. | Disability retirement procedures | 105 |
| Sec. F-13. | Generally | 107 |
| Sec. F-14. | Increase of Benefits; Pension Improvement Factor (Escalator) | 107 |

-vi-

| | | |
|---|---|---|
| Sec. F-15. | Payment | 108 |
| Sec. F-16. | Generally | 108 |
| Sec. F-17. | Payment of Accumulated Contributions | 110 |
| Sec. F-18. | Allowances to surviving spouses | 110 |
| Sec. F-19. | Payment of benefits to employees who became Members before January 1, 1969 | 112 |
| Sec. F-20. | Payment of benefits to employees who became Members on or after January 1, 1969 | 113 |
| Sec. F-21. | Deferred vested benefits | 113 |
| Sec. F-22. | Forfeiture of rights | 113 |
| Sec. F-23. | Generally | 114 |
| Sec. F-24. | Disposition of surplus benefits upon death of Member and Beneficiary | 116 |
| Sec. F-25. | Generally | 116 |
| Sec. F-26. | Generally | 116 |
| Sec. F-27. | Authority of Board | 116 |
| Sec. F-28. | Member With Twenty or Twenty-Five Years of Service | 117 |
| Sec. F-29. | Disabled Member | 118 |
| Sec. F-30. | Optional Annuity Withdrawal | 118 |
| ARTICLE G. | METHOD OF FINANCING | 121 |
| Sec. G-1. | General | 121 |
| Sec. G-2. | Annuity Savings Fund | 121 |
| Sec. G-3. | Annuity Reserve Fund | 122 |
| Sec. G-4. | Alternative Financing Method | 122 |
| Sec. G-5. | Contributions to and payments from Pension Accumulation Fund | 123 |
| Sec. G-6. | Retiree payments from Pension Reserve Fund; reinstatement of disability Retirees to active service | 124 |
| Sec. G-7. | Expense Fund | 124 |
| Sec. G-8. | Deferred Retirement Option Plan Fund | 124 |
| Sec. G-9. | Appropriations prior to July 1, 2014 and after June 30, 2023 | 124 |
| Sec. G-10. | Maintenance of reserves | 124 |

Sec. G-11.  Survivors Benefit Fund ................................................................... 125

Sec. G-12.  Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries................................................... 126

Sec. G-13.  Determination of City's annual contribution — Disability Pension liabilities ............................................................................................. 129

Sec. G-14.  Determination of City's annual contribution — Death Pension liabilities ............................................................................................. 129

Sec. G-15.  Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities............................ 130

Sec. G-16.  Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014 and after June 30, 2023 ......................................................................... 130

Sec. G-17.  Board of trustees to compute City's annual contribution...................... 130

Sec. G-18.  Employer Contribution....................................................................... 131

ARTICLE H.  MISCELLANEOUS............................................................................ 132

Sec. H-1.  Recall of Retirees during emergencies ................................................ 132

ARTICLE I.  DEFERRED RETIREMENT OPTION PLAN .......................................... 133

Sec. I-1.  General provisions............................................................................ 133

Sec. I-2.  Conversion to Retirement Allowance ................................................. 133

Sec. I-3.  Investment of DROP assets ............................................................... 133

Sec. I-4.  Distribution of amounts credited to DROP Account ............................ 134

Sec. I-5.  Death of Member while participating in the DROP program ................ 134

Sec. I-6.  Disability of Member While Participating in the DROP Program.......... 135

Sec. I-7.  Cost Neutrality ................................................................................. 135

ARTICLE J.  PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM.......... 137

Sec. J-1.  Participant Annuity Savings Fund Loan Program................................. 137

ARTICLE K.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS .............................. 140

Sec. K-1.  Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment...................................................................... 140

Sec. K-2.  Income Stabilization Benefits ........................................................... 140

Sec. K-3.  Restoration of Pension Benefits ........................................................ 143

APPENDIX A  ................................................................................................... 152

TABLE OF CONTENTS
(continued)

ARTICLE IX, SECTION 24 OF STATE OF MICHIGAN CONSTITUTION.........................152

CITY OF DETROIT CHARTER....................................................................................153

DETROIT CITY CODE................................................................................................154

COLLECTIVE BARGAINING AGREEMENTS...........................................................155

-ix-

# COMPONENT I

## ARTICLE 1. GENERAL PROVISIONS

**Sec 1.1. Police and Fire Retirement System Established; Adoption of 2014 Plan Document**

Effective July 1, 1941, a Pension System for Policemen and Firemen of the City of Detroit was established for the purpose of providing retirement allowances and death benefits for Policemen and Firemen and their beneficiaries by amendment to the Charter of the City of Detroit. That Pension System was amended on numerous occasions after July 1, 1941, including an amendment renaming the Retirement System as the "Police and Fire Retirement System of the City of Detroit." The provisions of the Police and Fire Retirement System of the City of Detroit, as in effect July 1, 2014, were set forth in a Combined Plan Document (including Appendix A attached thereto). As provided in Ordinance 15-14 and Ordinance 16-14 and Section 47-1-2 of the Detroit City Code, the Combined Plan Document replaced the provisions of the Police and Fire Retirement System of the City of Detroit as set forth in the City of Detroit Charter, the Detroit City Code and any conflicting provisions in any collective bargaining agreements, rulings or opinions covering Members (including, without limitation, City Employment Terms). All resolutions and policies of the Board previously enacted which were inconsistent with the provisions of the Combined Plan Document were also repealed to the extent of such inconsistency.

This Combined Plan Document is hereby amended and restated effective July 1, 2014, in the form of this instrument. Component I of the Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Police and Fire Retirement System of the City of Detroit on and after July 1, 2014. Component II of the Plan Document generally applies to benefits accrued by Members prior to July 1, 2014. Except as specifically provided in Component II, benefits provided under Component II of the Plan Document are frozen effective June 30, 2014.

**Sec 1.2. Retirement System Intended to be Tax-Qualified; Governmental Plan**

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code. The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

**Sec 1.3. Compliance With Plan of Adjustment**

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment"). Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment. To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the

Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

## Sec 1.4.    Board of Trustees

Effective July 1, 1941, a Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created. The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document.

## Sec 1.5.    Board of Trustees -- Membership; Appointment

The Board of Trustees of the Police and Fire Retirement System of the City of Detroit shall consist of seventeen Trustees, as follows:

(1)    The Mayor, *ex-officio*, or the Mayor's designee;

(2)    The President of City Council or a member thereof elected by the City Council, *ex-officio*;

(3)    The City Treasurer or Deputy City Treasurer, *ex-officio*;

(4)    The City Finance Director, or a designated representative, *ex-officio*;

(5)    The City Budget Director, or a designated representative, *ex-officio*;

(6)    The Corporation Counsel of the City, or a designated representative, *ex-officio*;

(7)    Three Fire Members of the Retirement System to be elected by the Fire Members under such rules and regulations as may be established by the Board of Fire Commissioners to govern such elections, as follows:

    (a)    Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)    One to be elected by and from Members holding ranks above the rank of lieutenant (or its equivalent);

(8)    Three Police Members of the Retirement System to be elected by the Police Members under the rules and regulations as may be established by the Commissioner of Police to govern such elections, as follows:

    (a)    Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks: and

    (b)    One to be elected by and from Members holding a rank above lieutenant (or its equivalent); and

- 2 -

(9) One individual who neither is a Member of the Retirement System nor an employee of the City in any capacity to be selected by the Board;

(10) Two Retirees receiving benefits under the Retirement System, one of whom shall be elected by Retired Police Members and one of whom will be elected by Retired Fire Members pursuant to Sections 1.6 and 1.7 below;

(11) One Trustee appointed by the Mayor upon election of a Retiree Police Trustee; and

(12) One Trustee appointed by the Mayor upon election of a Retiree Fire Trustee.

**Sec 1.6. Board of Trustees; Scheduling of Elections for Active and Retiree Trustees**

(1) Annual elections for active Police Officers and Fire Fighters shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(2) Elections to fill vacancies created by the expiration of a term for a Retiree Trustee shall be held every three years during the month of May.

(3) A special election for Retiree Trustees shall be held as soon as practicable after the Plan of Adjustment is confirmed. Unless a Retiree Trustee elected by reason of this special election resigns or is removed from the position of Trustee in accordance with the terms of the Combined Plan Document, a Retiree elected to the office of Trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the last day of June that follows the third anniversary of the special election, at which time an election for Retiree Trustees shall be held in accordance with Section 1.7.

**Sec 1.7. Procedures for election of Retiree Trustees**

The procedures for the election of the Retiree Trustees shall be as follows:

(1) *Notice.* Notice of a primary election shall be sent to each Retiree by United States Mail.

(2) *Notice of Candidacy.* A proposed candidate shall submit a notarized letter to the executive director notifying the Retirement System of his or her candidacy.

(3) *Ballot.* Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position the Retiree held at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4) *Voting.* Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes

- 3 -

shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5) *Procedures.* Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6) *Board Rules.* Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.7 shall be handled in accordance with such rules and regulations as the Board may adopt and Michigan law.

### Sec 1.8. Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the City Clerk.

The term of office for each elected Trustee under Sections 1.5(7), (8) and (10) shall be three years. The term of office for the Trustee who is selected by the Board under Section 1.5(9) shall be two years. The term of office for the Trustees appointed by the Mayor under Sections 1.5(11) and (12) shall be three years. Except as provided in Section 1.6(3), elected Trustees holding office on June 30, 2014 shall serve the remainder of their terms.

If a Trustee resigns or is removed by the other Trustees for cause, or if an elected or appointed Trustee fails to attend three consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board. If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled. No vacancy shall result by reason of a change in the rank or grade of a Trustee during the term of office.

### Sec 1.9. Board of Trustees; Officers and Employees

The Board shall elect from its membership a chairman and a vice chairman. The executive director of the Retirement System or his or her representative shall serve as secretary of the Board. The Board may employ such special actuarial, medical and other contractors and employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec 1.10. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1) The Board shall hold regular meetings, at least one in each month, and shall hold special meetings as necessary. The Board shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings. All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Board meetings shall be held within the City of Detroit.

- 4 -

(2)     Each Trustee shall be entitled to one vote on each question before the Board. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Eight members of the Board, four of whom must be elected members, shall constitute a quorum.

### Sec 1.11.  Board of Trustees; Compensation; Expenses

All members of the Board of Trustees shall serve without additional compensation from the City or the Retirement System; however Retiree Trustees shall receive a hourly stipend from the Retirement System equal to the lowest rate of pay received by an active employee Trustee for attending Board meetings, educational time and travel out of the City on official business of the Retirement System. All Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec 1.12.  Rules for Administration of Funds.

Subject to the limitations contained in this Combined Plan Document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Combined Plan Document and for the transaction of its business.

### Sec 1.13.  Board of Trustees; Certain Data to be Kept

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the Retirement System and for checking and compiling the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec 1.14.  Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec 1.15.  Board of Trustees; Legal Advisors

(1)     The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

- 5 -

(2)  Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)  Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec 1.16. Board of Trustees; Medical Director

(1)  The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in a retirement system maintained by the City. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(2)  The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of the Combined Plan, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred to it.

### Sec 1.17. Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board. In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary. The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Board and the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Board and the Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the term sheet regarding Investment Committee Governance for Police and Fire Retirement System, attached to that certain agreement by and between the Michigan Settlement Administration Authority, a Michigan body public corporation (the "Authority"), the Retirement System, the General Retirement system for the City of Detroit, Michigan ("GRS"), and the City (the "State Contribution Agreement") as Exhibit B (the "Governance Term Sheet"), and the Plan of Adjustment. Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

- 6 -

**Sec 1.18. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System**

(1)     Subject to Section 16.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this Section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this Section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System. This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

**Sec 1.19. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities**

Subject to Section 16.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.18, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

**Sec 1.20. Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties**

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee. To the extent the Board exercises discretion with respect to investment of Retirement System assets, each member of the Board of Trustees shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*, and shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

- 7 -

**Sec 1.21. Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties**

As of the effective date of the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees and taking action under and with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment Committee is controlled by the Governance Term Sheet. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6).* The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

**Sec 1.22. Investment Committee; Membership; Appointment**

The Investment Committee shall consist of nine (9) members, determined as follows:

(1) Five independent members, at least two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee

- 8 -

members as necessary to bring the number of independent Investment Committee members to five (5);

(2)    Two Retirees who shall be appointed by the Board consisting of one elected retired Police Member and one elected retired Fire Member who are serving on the Board and who are receiving benefit payments under the Retirement System; and

(3)    Two Employee members who shall be appointed by the Board consisting of one Fire Department Employee and one Police Department Employee who are active members of the Board.

**Sec 1.23.  Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|---|---|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or Employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees. Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier. Notwithstanding any provision of this Combined Plan Document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee. An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in accordance with the voting procedure set forth in Section 1.24; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government. A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings. In the event of any

- 9 -

removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("State Treasurer"), in consultation with the Foundation, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the State Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

### Sec 1.24. Investment Committee; Operation; Meetings; Quorum; Voting

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq*. All Investment Committee meetings shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Each independent Investment Committee member shall be entitled to one vote on each question before the Investment Committee. Each Retiree and Employee member shall be entitled to one-half vote on each question before the Investment Committee. Except as otherwise provided in the Governance Term Sheet, at least four concurring votes shall be necessary for a decision by the

- 10 -

Investment Committee and each Investment Committee member shall be entitled to one vote on each question before the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a state or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

### Sec 1.25.  Investment Committee; Compensation; Expenses; Employment of Advisors

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System. The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions, and such parties or persons may be reasonably compensated from the assets of the Retirement System. Such engagements shall not be subject to approval of the Board.

### Sec 1.26.  Investment Committee; Special Reporting Obligation

(1)    Beginning in calendar year 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the State Treasurer on a semi-annual basis and at such other times as the State Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)    In the event the Retirement System receives a written notice from the State Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the State Treasurer a written certification that (i) the default has been cured, and (ii) no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)    Beginning in calendar year 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)    Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

- 11 -

(a)     a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b)     a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to the Foundation that, as of the date of the annual report required to be provided by the City to the Foundation under the Omnibus Transaction Agreement by and among the City, The Detroit Institute of Arts and Foundation For Detroit's Future ("Annual Report"):

     (i)     the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

     (ii)     the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan Document; and

     (iii)     the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)     a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the State Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the State Treasurer; and (iv) in the event that the State Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee. Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d)     any additional information that may be reasonably requested by the Foundation from time to time.

(e)     Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City

- 12 -

confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

- 13 -

# ARTICLE 2. DEFINITIONS

## Sec 2.1.  Definitions

Unless a different definition is contained within this Combined Plan Document, or a different meaning is plainly required by context, for purposes of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1)  *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the Compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)  *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System representing after-tax amounts deducted from the Compensation of the Member, together with earnings on such contributions.

(3)  *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.

(4)  *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee. The rates of interest, tables and factors adopted by the Board from time to time to determine Actuarial Equivalence shall not violate the terms of the Plan of Adjustment.

(5)  *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)  *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)  *Average Final Compensation* means the average Compensation received by a Member during the five consecutive years of Credited Service which immediately precede the date of the Member's last termination of City employment as an employee of the Police Department or the Fire Department. If a Member has less than five years of Credited Service, the Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.

(8)  *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(9)  *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Police and Fire Retirement System of the City of Detroit.

- 14 -

(10)  *City* means the City of Detroit, Michigan, a municipal corporation.

(11)  *City Council or Council* means the legislative body of the City.

(12)  *Combined Plan* means the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan, effective July 1, 2014, and as amended thereafter.

(13)  *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the taxable income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which is contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, solely for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the City.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14)  *Component 1* means the portion of the Retirement System described in this Combined Plan and which consists of:

- 15 -

    (a)    the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (b)    the 2014 Defined Contribution Plan which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15)    *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

    (a)    the Frozen Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (b)    the Frozen Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16)    *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(17)    *Disability or Disabled:* see Total Disability or Totally Disabled.

(18)    *DFFA* means the Detroit Fire Fighters Association.

(19)    *DPCOA* means the Detroit Police Command Officers Association.

(20)    *DPLSA* means the Detroit Police Lieutenants and Sergeants Association.

(21)    *DPOA* means the Detroit Police Officers Association.

(22)    *DROP Account* means the account established by the Board for a Member who is eligible for and who elects to participate in the DROP Program.

(23)    *DROP Program* means a program established for eligible Members pursuant to Article 12.

(24)    *Employee* means an employee of the City's Police Department who has taken an oath of office or a Fire Fighter providing services to the City, but does not include:

    (a)    individuals whose City services are compensated on a contractual or fee basis;

    (b)    any person during any period when such person is classified by the City as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the City;

    (c)    the Medical Director of the Retirement System.

- 16 -

If a person described in (b) above is reclassified by the City as a common-law employee of the City and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(25)  *Employer* means the City.

(26)  *Final Compensation* means the annual compensation of a Member at the time of his or her termination of employment.

(27)  *Fire Fighter* means the rank in the Fire Department currently or formerly classified by the civil service commission as Fire Fighter.

(28)  *Fire Member* means an employee of the Fire Department of the City of Detroit who is a participant in the Retirement System.

(29)  *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(30)  *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the City for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the City for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(31)  *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(32)  *Investment Committee* means the committee established pursuant to Section 1.22 which shall have the powers and duties described herein.

(33)  *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(34)  *Medical Beneficiary* means a Member who has retired from employment with the City and the Spouses and dependents of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by the City.

(35)  *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(36)  *Medical Benefits Account* means the bookkeeping account established under Section 17.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(37)  *Medical Director* means the physician appointed by the Board pursuant to Section 1.16.

- 17 -

(38) *Member* means any Police Member or Fire Member who has not retired or died.

(39) *Normal Retirement Age* means for any Member Age fifty with twenty-five years of Credited Service, with the following transition period for a Member who is an active employee on June 30, 2014 regarding payment of Component I benefits only:

| Fiscal Year | Age and Credited Service |
|---|---|
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his or her accrued benefit under the Retirement System upon Attainment of Normal Retirement Age while in Service.

(40) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(41) *Patrolman* means the rank in the Police Department currently or formerly known as patrolman.

(42) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance payable under Component I of the Combined Plan. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience, and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(43) *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.17 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Investment Committee or the Board may direct.

(44) *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(45) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan,* Case No. 13-53846.

(46) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(47) *Police and Fire Retirement System of the City of Detroit or Retirement System* means the Police and Fire Retirement System of the City of Detroit created and, prior to July 1, 2014, memorialized in Title IX, Chapter VI, of the 1918 Detroit City Charter, as

- 18 -

amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code, Article 54 of the Detroit City Code of 1964, and collective bargaining agreements and, on and after July 1, 2014, pursuant to Section 47-1-2 of the Detroit City Code, memorialized in this Combined Plan Document, as amended from time to time.

The Retirement System consists of:

(a)    The 2014 Defined Benefit Plan, which is described in Component I hereof;

(b)    the 2014 Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, which is described in Component I hereof;

(c)    the Frozen Defined Benefit Plan, which is described in Component II hereof; and

(d)    the Frozen Defined Contribution Plan, which is described in Component II hereof.

References to the words Retirement System in Component I of the Plan Document shall mean the provisions of the 2014 Defined Benefit Plan and/or the 2014 Defined Contribution Plan described in Component I, unless a different meaning is plainly required by context.

(48)    *Police Member* means a Police Officer who has taken the oath of office as prescribed in the Detroit City Charter, excluding patrolmen of other City departments, privately employed patrolmen and special patrolmen, who is a participant in the Retirement System.

(49)    *Police Officer* means the rank in the Police Department currently or formerly known as Police Officer.

(50)    *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(51)    *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(52)    *Retirement* means a Member's withdrawal from the employ of the City with a Retirement Allowance paid by the Retirement System.

(53)    *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(54)    *Service* means personal services rendered to the City by an employee of the Police Department or Fire Department, provided such person is compensated by the City for such personal services.

(55) *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

(56) *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(57) *Total Disability or Totally Disabled* means:

    (a)  during the first twenty-four (24) months that a Member receives benefits from the Retirement System due to injury, illness or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of the Member's occupation; and

    (b)  during all subsequent months that a Member receives benefits from the Retirement System due to illness, injury or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the Member is suited, based on education, training and experience.

(58) *Vesting Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(59) *Voluntary Employee Contributions* mean the after-tax contributions made by a Member to the Retirement System pursuant to Section 10.1.

(60) *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for a Member who elects to make Voluntary Employee Contributions.

    The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 13.2(1) |
| Annual Report | Section 1.26(4)(b) |
| Authority | Section 1.17 |
| cash refund annuity | Section 5.4(1)(a) |
| compensation | Section 13.1(12) |
| Compliance Report | Section 1.26(1) |
| Cure Certification | Section 1.26(2) |
| current active | Section 9.3(3) |
| Default Notice | Section 1.26(2) |
| Deferred Retirement Option Plan Fund | Section 9.2(5) |
| Deferred Retirement Option Plan Program (DROP) | Section 12.1 |
| Differential Wage Payment | Section 4.4 |
| Direct rollover | Section 18.9(1)(b) |
| Distributee | Section 18.9(1)(c) |
| Dollar Limit | Section 13.1(3)(b) |
| Disability Retirement Review Board/DRRB | Section 5.6(2) |

- 20 -

| | |
|---|---|
| Eligible retirement plan | Section 18.9(1)(d) |
| Eligible rollover distribution | Section 18.9(1)(e) |
| Expense Fund | Section 9.2(7) |
| Foundation | Section 1.22(1) |
| funding level | Section 9.5(3) |
| Governance Term Sheet | Section 1.17 |
| Income Fund | Section 9.2(8) |
| ING | Section 12.3(1) |
| investment management decisions/investment management matters | Section 16.2 |
| limitation year | Section 13.1(2) |
| Medical Benefits Account Fund | Section 9.2(6) |
| Medical Plans | Section 17.1 |
| new employee | Section 9.3(3) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One. Modified Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(3) |
| Pension Certificate | Section 1.26(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| Plan of Adjustment | Section 1.3 |
| Police and Fire Retirement System of the City of Detroit | Section 1.1 |
| Pop-up Form | Section 8.1(2)(b) |
| Rate Stabilization Fund | Section 9.2(4) |
| Standard Form | Section 8.1(2)(a) |
| State Contribution Agreement | Section 1.17 |
| State Treasurer | Section 1.23 |
| Straight Life Retirement Allowance | Section 8.1(1) |

# ARTICLE 3. MEMBERSHIP

## Sec 3.1.    Eligible Employees

(1)    Except as provided in Section 3.2, the membership of the Retirement System shall consist of all persons who are employed with the Police and Fire Departments of the City and who are employed as Police Officers or Fire Fighters according to the rules and regulations of the respective Departments.  An eligible Employee's membership in the Retirement System shall be automatic; no eligible Employee shall have the option to elect to become a Member of the Retirement System.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member, paying contributions and entitled to benefits as though he or she had remained in the rank, grade or position held at the date of his or her appointment.

(3)    Any Police Officer or Fire Fighter who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member as of his or her date of death.

(4)    Any Member who shall be transferred to a civilian position in his or her Department shall continue as a Member, subject to all the obligations of a Member.

## Sec 3.2.    Cessation of Membership; Re-Employment

(1)    If a Member dies, or is separated from service with the City by resignation, dismissal, retirement or Disability, he or she shall cease to be a Member.  A Member who elects to participate in the DROP Program under Component I, Component II or both shall be considered to have separated from service with the City by reason of retirement and shall not accrue a benefit under the Retirement System, be required to make Mandatory Employee Contributions to the Retirement System pursuant to Section 9.3(3) or 9.5, or be permitted to make Voluntary Employee Contributions pursuant to Section 10.1.

(2)    If a vested Member ceases to be a Member under paragraph (1) other than by reason of participation in the DROP Program and later becomes a Police Officer or Fire Fighter other than in the position of Police Assistant, he or she shall again become a Member, subject to the obligations of a Member.  The benefit payable to the Member upon a subsequent termination shall be based upon his or her total Credited Service earned on and after July 1, 2014, provided that, if the Member received a distribution of his or her Accumulated Mandatory Contributions following termination, the Member recontributes the Accumulated Mandatory Contributions to the Retirement System within two years of his or her re-employment date.  If a Member who receives a distribution of his or her Accumulated Mandatory Contributions fails to recontribute such amount to the Retirement System within two years of re-employment, only the Credited Service earned on and after the Member's re-employment date shall be taken into consideration in determining his or her Retirement Allowance.

- 22 -

(3)     If a Member ceases to be a Member under paragraph (1) and later becomes employed as a Police Assistant, such Member shall not become a Member upon re-employment. If such Member was receiving a Retirement Allowance from the Retirement System prior to his or her date of rehire, such Retirement Allowance shall not be suspended during the period of the Member's reemployment as a Police Assistant.

(4)     Retirement benefits for a Retiree who returns to active full time employment other than as a Police Assistant shall be subject to the following:

    (a)     A Retiree who returns to work will have his or her Retirement Allowance suspended upon re-employment. The variable Pension Improvement Factor (Escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

    (b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his or her re-employment period.

    (c)     A Retiree's Average Final Compensation and Credited Service for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation and Credited Service earned by the Retiree after he or she returns to work.

    (d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his or her second Retirement Allowance.

## Sec 3.3.     Report From City

It shall be the duty of the City to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

- 23 -

## ARTICLE 4. SERVICE CREDIT

### Sec 4.1.   Credited Service

(1)   The Board shall keep an accurate record of each Member's accumulated Credited Service from the date of commencement of employment with the City to the date of termination of employment with the City.

(2)   A Member shall be credited with one month of Credited Service for each calendar month during which he or she performs one hundred forty (140) or more Hours of Service for the City as a Member beginning on the later of (i) July 1, 2014 or (ii) his or her date of hire with the City as a Police Officer or Fire Fighter and ending on the date his or her employment with the City as a Police Officer or Fire Fighter is terminated.  Service shall be credited in years and twelfths $(1/12^{th})$ of a year.  Not more than one-twelfth $(1/12^{th})$ of a year of Credited Service shall be credited to a Member on account of all service rendered to the City in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all service rendered to the City in any period of 12 consecutive months.

(3)   Not more than one month of Credited Service shall be granted for any period of more than one month during which the Member is absent without pay; notwithstanding the foregoing, any Member who shall be suspended from duty and subsequently reinstated to duty without further disciplinary action shall receive credit for the time of such period of suspension.

(4)   Solely for purposes of determining eligibility for a retirement benefit under Sections 5.1 and 5.4, a Member shall be credited with the sum of his or her Prior Service as determined by the Board and his or her Credited Service on and after July 1, 2014 determined under Section 4.1(2).  The period of time during which a Member is on layoff from the service of the City shall be included in the Member's Credited Service solely for the purposes of determining whether the Member has attained his or her Normal Retirement Age for purposes of Section 5.1.

### Sec 4.2.   Vesting Service

(1)   A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the City.

(2)   A Member's total Vesting Service shall be the sum of his or her Prior Service and his or her Vesting Service determined under Section 4.2(1).

### Sec 4.3.   Service Credit; Military Service

A Member who enters the military service of the United States while employed with the City shall have the period of such military service credited as Credited Service and Vesting Service in the same manner as if the Member had served the City without interruption, provided that (1) the Member's entry into such military service and re-employment thereafter shall be in

- 24 -

accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, (2) he or she is re-employed by the City upon completion of such military service, and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service. The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder. During the period of military service and until return to City employment, the Member's Mandatory Employee Contributions to the Retirement System shall be suspended.

### Sec 4.4.    Service Credit; Qualified Military Service

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u). Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than thirty days, such Differential Wage Payment will be treated as compensation under the Code Section 415(c)(3) limits, but not for purposes of benefit accruals under the Retirement System. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the City to an individual who is performing service in the uniformed services while on active duty for a period of more than thirty days.