UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Case No. 13-53846

CITY OF DETROIT, MICHIGAN,                      Chapter 9

            Debtor.                             Judge Thomas J. Tucker
_____ /

**OPINION REGARDING THE JOINT MOTION BY THE CITY OF DETROIT AND THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN FOR THE ENTRY OF AN ORDER ENFORCING THE PLAN OF ADJUSTMENT AND CONFIRMATION ORDER AGAINST DANIEL J. SALKOWSKI, JEFFREY HAMM, AND RICHARD MAKULSKI**

## I. Introduction

This case is before the Court on a civil contempt matter.

In July 2019, three fire fighters employed by the City of Detroit (the "City") filed a lawsuit in the Third Judicial Circuit Court of Michigan (the "State Court"). They sought equitable relief that would prevent them from being deemed retired in August 2019, and thereby terminated from their employment with the City. And they obtained a temporary restraining order, which was later dissolved when the State Court lawsuit was dismissed, with prejudice.

While the State Court lawsuit was still pending, the City and the Police and Fire Retirement System of the City of Detroit, Michigan (the "PFRS") filed a joint motion in this Court, claiming that the filing and prosecution of the State Court lawsuit was a violation of the City's confirmed plan of adjustment, and the injunction contained in that plan. They ask the Court to find the three fire fighters in civil contempt, and for related relief.

For the reasons stated in this Opinion, the Court concludes that the State Court lawsuit was indeed a violation of the injunction contained in the City's confirmed plan. And the Court

finds the three fire fighters in civil contempt, because all the elements for a contempt finding have been established. But the Court declines to award any relief for the contempt. This is because (1) the City and PFRS no longer seek any injunctive relief; (2) PFRS seeks no monetary relief; (3) the City no longer seeks part of the monetary relief it originally sought in the motion; and (4) in the exercise of its discretion in contempt matters, the Court concludes that no other monetary relief should be granted.

## II. Background

This case is before the Court on the motion filed on August 9, 2019 (Docket # 13090, sometimes referred to below as the "Motion"), entitled "Joint Motion by the City of Detroit and the Police and Fire Retirement System of the City of Detroit, Michigan for the Entry of an Order Enforcing the Plan of Adjustment and Confirmation Order Against Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski." The joint movants are the City and PFRS. The Motion seeks relief against three individuals, Daniel J. Salkowski, Jeffrey Hamm, and Richard Makulski (collectively, the "Respondents"). Until recently, at least, each of the Respondents was a fire fighter employed by the City, and was a member of the Detroit Fire Fighters Association Local 344 (the "DFFA").

On July 25, 2019 the Respondents jointly filed, and then briefly prosecuted, a lawsuit in the State Court, against the City, PFRS, and the DFFA.[1] On August 1, 2019, the Respondents sought and obtained a temporary restraining order, without notice, that restrained the City, PFRS, and the DFFA "from completing the process of retiring Plaintiffs from their positions as Detroit

---

[1] *See* Mot. Ex. 6A (Docket # 13090) at pdf p. 53 (State Court complaint).

Fire Fighters."[2]

On August 15, 2019, six days after the present Motion was filed in this Court, the State Court held a hearing, and on August 21, 2019, the State Court entered an order dissolving the temporary restraining order and dismissing the State Court lawsuit, with prejudice.[3]

The City and PFRS contend that the Respondents' filing and prosecution of the State Court lawsuit was a violation of an injunction contained in the City's confirmed plan of adjustment, and ask this Court to find the Respondents in civil contempt for that violation. The City asks this Court to award it compensatory relief for the contempt, for the attorney fees and expenses incurred by the City.[4] PFRS has not requested any monetary relief, as its counsel confirmed during the hearing on the Motion.

Originally, the City and PFRS also sought an order requiring the Respondents to dismiss the State Court lawsuit, and the City sought reimbursement for any compensation the City paid to Respondents after their retirement dates (August 8, 2019 for Hamm and Makulski and August 9, 2019 for Salkowski), due to the temporary restraining order. But the City and PFRS later withdrew these requests, as moot, because the State Court lawsuit was dismissed, and because, as stated by the City's counsel during the hearing on the Motion, the Respondents did not actually receive any compensation after their retirement dates.

The Respondents filed a timely response objecting to the Motion, and the Court held a

---

[2] Mot. Ex. 6D (Docket # 13090) at pdf p. 80.

[3] [Movants'] Joint Reply Ex. 2 (Docket # 13120) at pdf p. 12.

[4] In this Opinion, the Court will refer to the joint movants, the City and PFRS, as the "City" when discussing the contentions of the joint movants, unless otherwise noted.

3

hearing on September 18, 2019.[5]  For the reasons stated in this Opinion, the Court finds each of

the Respondents in civil contempt, but the Court will deny any other relief.

## III.  Facts

Except as otherwise indicated, the following facts are undisputed.

### A.  The City's confirmed plan of adjustment

The plan of adjustment in this Chapter 9 bankruptcy case was confirmed on November

12, 2014.  It consists of the "Eighth Amended Plan for the Adjustment of Debts for the City of

Detroit," and all of its exhibits, filed October 22, 2014 (the "Plan"),[6] and the "Order Confirming

Eighth Amended Plan for the Adjustment of Debts for the City of Detroit," filed November 12,

2014 (the "Confirmation Order").[7]  (The Plan and the Confirmation Order are collectively

referred to as the "POA.").  The POA became effective on December 10, 2014.[8]

### B.  The amendment of the PFRS Plan under the POA

One of the many effects of the POA was to change the City's pension plan applicable to

its fire fighters.  That pension plan is called the "Combined Plan for the Police and Fire

Retirement System of the City of Detroit, Michigan" (the "PFRS Plan").  As part of the POA, the

PFRS Plan that was in effect before confirmation of the City's POA (the "Old PFRS Plan") was

amended and restated, effective July 1, 2014.  Although the amended and restated PFRS Plan

---

[5]  The DFFA also filed a response to the City's Motion, which did not object to the Motion. (Docket # 13122).  The DFFA's response disputed certain contentions made in the Respondents' response to the Motion.

[6]  Docket # 8045.

[7]  Docket # 8272.

[8]  *See* Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit and (II) Occurrence of Effective Date, filed December 10, 2014 (Docket # 8649).

4

(the "New PFRS Plan") was stated to be effective July 1, 2014, it did not actually come into

effect until the Effective Date of the City's POA — *i.e.*, December 10, 2014. As the City points

out, the New PFRS Plan was actually defined to be part of the City's proposed Plan, which was

later confirmed and became part of the POA.[9]

The New PFRS Plan came into being, after confirmation of the City's POA, by virtue of

Order No. 44 issued by the City's Emergency Manager, Kevin D. Orr. That Emergency Manager

Order was entitled "Emergency Manager[,] City of Detroit, Order No. 44[,] Final Emergency

Manager Order" ("EM Order No. 44"), and it was signed by the Emergency Manager on

December 8, 2014, in contemplation of the upcoming Effective Date of the confirmed POA.[10] In

a section of EM Order No. 44 entitled "Plan of Adjustment Matters," the Emergency Manager

ordered as follows:

> [T]he Mayor, the Council, and all City officers, department heads
> and other employees, agents and contractors shall take such steps
> as are necessary or appropriate from and after the Effective Date
> to pursue the prompt implementation of the Plan of Adjustment, the
> Confirmation Order, and all agreements necessary thereto,
> including the Plan Settlements. For the avoidance of doubt, such
> steps include, without limitation, the following:
> . . . .
>
> Pursuant to Section 17.5 of Component I of the [New PFRS Plan],
> the [Emergency Manager], on behalf of the City, adopts the [New
> PFRS Plan], in the form attached hereto as Exhibit E, which
> document: (a) reflects changes in the terms and conditions of
> retirement benefits as provided in the [Collective Bargaining
> Agreements] and memoranda of understanding negotiated with
> certain of the employee representatives; (b) conforms the [PFRS
> Plan] to the terms of the confirmed Plan of Adjustment; and (c)

---

[9] *See* discussion in Part V.B.1 of this Opinion.

[10] A copy of EM Order No. 44 is Exhibit 6I to the Motion (Docket # 13090-1).

5

makes other clarifying modifications.[11]

The City's adoption of the New PFRS Plan took effect on December 10, 2014, when the confirmed POA became effective.[12]  Until that date, the Old PFRS Plan was in effect.

## C.  The amendment of the "DROP Program" in the PFRS Plan

One feature of both the Old PFRS Plan and the New PFRS Plan is known as the "Deferred Retirement Option Plan ("DROP") Program" (the "DROP Program").  In the Motion, the City and PFRS describe the DROP Program, in general terms, in this way:

> The DROP [P]rogram provides members of the PFRS who are eligible to retire with a pension, the option to continue working subject to certain pension modifications.  Generally speaking, under DROP, the electing member (a) continues to work for the City beyond the eligible age for her retirement for her full salary and (b) receives a portion of the pension benefit that otherwise would have been paid to the member during the DROP period had the member elected to retire and not participated in DROP.[13]

More specifically, an employee electing to participate in the DROP Program begins to receive monthly payments credited into a DROP Account established on behalf of the employee equal to 75% of the employee's monthly "Retirement Allowance," while he continues to work for the City and receive his normal pay.  The amounts credited to the employee's DROP Account while the employee continues to work for the City are invested, and ultimately are distributed to the employee, in the form of a lump sum payment or an annuity, beginning when the employee

---

[11]  EM Order No. 44 at 5, 8.

[12]  As noted in EM Order No. 44 just quoted, the New PFRS Plan was attached as Exhibit E to EM Order No. 44.  It was also attached as exhibits to the Plan, filed October 22, 2014 (Docket # 8045), at Exs. I.A.254.a and I.A.281.

[13]  Mot. (Docket # 13090) at 4, ¶ 6 (record citations omitted).

6

ultimately retires from employment with the City. At that time of retirement, the employee also begins to receive 100% of his monthly Retirement Allowance.[14]

Under the Old PFRS Plan, a fire fighter electing to participate in the DROP Program could continue his employment with the City for an unlimited number of years after he elected and began participating in the DROP Program. But under the New PFRS Plan, for an employee who elected to participate in the DROP Program "after June 30, 2014," participation in the DROP Program is limited to five years, and that employee could continue to work for the City for a maximum of five years.[15] This means that "[a]t the end of such five year period of participation in the DROP Program, the [employee] shall be retired from employment."[16]

The dispute in this case centers around this new five-year limitation that was added to the DROP Program when the New PFRS Plan was adopted after, and as a result of, confirmation of the City's POA.

**D. The Respondent fire fighters' election to participate in the DROP Program**

Each of the three Respondents was a fire fighter employed by the City, who was eligible to begin participating in the DROP Program in August 2014. Each of the Respondents elected to begin participating in the DROP Program beginning on his eligibility date, by applying in writing for the DROP Program in June or July 2014. Specifically, Jeffrey R. Hamm applied to participate in, and elected, the DROP Program in a written application dated and submitted on

---

[14] *See* New PFRS Plan, Component I at Article I, Sections 1.1 and 12.1 - 12.4 (Docket # 13090-1) at pdf pp. 25, 72-73.

[15] New PFRS Plan Component I at Article I, Section 12.1(2) (Docket # 13090-1) at pdf p. 72; Component II at Article B, Section B-1(h) (Docket # 13090-1) at pdf pp. 99, 100.

[16] New PFRS Plan Component I at Article I, Section 12.1(2) (Docket # 13090-1) at pdf p. 72.

7

June 9, 2014, with a DROP election date of August 8, 2014. Richard Makulski applied to participate in, and elected, the DROP Program in a written application dated July 7, 2014 and submitted on July 14, 2014, with a DROP election date of August 8, 2014. Daniel Salkowski applied to participate in, and elected, the DROP Program in a written application dated and submitted on July 1, 2014, with a DROP election date of August 9, 2014.[17] Printed language on each of the application forms stated that the DROP election date was "irrevocabl[e]," and that the applicant "cannot change [his] DROP election after this form is received by the [PFRS]."[18]

Thus, both at the time each of the Respondents submitted his "irrevocable" written application electing to participate in the DROP Program, and at the time each of the Respondents first became eligible to begin participating in the DROP Program, the version of the DROP Program that was then in effect, as part of the Old PFRS Plan, did ***not*** contain the five-year limitation. That is, the DROP Program did not then include the requirement that no later than five years after the employee begins participating in the DROP Program, his employment with the City must terminate in a retirement.

Each of the Respondents alleges that when he elected to participate in the DROP Program, he thought there was no time limit on that participation. And each Respondent alleges that representatives of the City and PFRS told him that he was applying for, and would be in, the unlimited DROP Program. The City and PFRS do not admit these allegations, but argue that even if true, these allegations are not relevant.

---

[17] A copy of the Respondents' written applications are in Ex. 6B to the Motion.

[18] *See* the "Member Acknowledgement" section on each Respondent's application. (Ex. 6B to the Motion).

## IV. Jurisdiction

This Court has subject matter jurisdiction over this Chapter 9 bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(O), because it is a proceeding "affecting . . . the adjustment of the debtor-creditor . . . relationship." This is also a core proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within this category are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Indus., Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009) (citing *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1144 (6th Cir. 1991)). As a proceeding that seeks to enforce the confirmed POA, this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

This dispute is a type over which this Court retained jurisdiction under the confirmed Plan. Article VII, Sections G and I of the confirmed Plan state:

> Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things jurisdiction to:
> . . . .
>
> G. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

. . . .

I. Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order[.][19]

## V. Discussion

## A. Applicable law — general principles

Initially, the Court will discuss certain basic points of law about civil contempt and the relief available for the violation of an injunction. The cases cited below all concern civil contempt for violation of a specific form of injunction — the discharge injunction under 11 U.S.C. § 524(a)(2) — but all of the principles discussed apply to other types of injunctions, including the Plan injunction involved in this case.

The discussion can be divided between the law as it existed before the United States Supreme Court's decision in *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019), and the refinement of the law made by the *Taggart* case. This Court discussed the pre-*Taggart* law in the case of *Schubiner v. Zolman* (*In re Schubiner*), 590 B.R. 362, 398-99 (Bankr. E.D. Mich. 2018):

Bankruptcy courts have authority, under their civil contempt powers, to order appropriate monetary and injunctive relief for a violation of the § 524(a)(2) discharge injunction. But as discussed below, bankruptcy courts have discretion in deciding whether to order such relief.

This Court discussed the law applicable to a violation of the discharge injunction in the case of *Holley v. Kresch Oliver, PLLC*

---

[19] Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket # 8045) at 69-70; *see also* Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket # 8272) at 125-26.

(*In re Holley*), 473 B.R. 212 (Bankr. E.D. Mich. 2012):

> Plaintiff seeks relief for Defendants' violations of the discharge injunction contained in Bankruptcy Code § 524(a)(2). That section states:

> > (a) A discharge in a case under this title—
> > . . .

> > (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [debt discharged under section 727] as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

11 U.S.C. § 524(a)(2). The Sixth Circuit has held that no private right of action exists under 11 U.S.C. § 524 for a violation of the discharge injunction. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 422–23 (6th Cir.2000). Rather, bankruptcy courts enforce § 524 through civil contempt proceedings. *See id.* at 422; *see also Gunter v. Kevin O'Brien & Assocs. Co. LPA (In re Gunter)*, 389 B.R. 67, 71 (Bankr. S.D. Ohio 2008)(citing *Pertuso*, 233 F.3d at 421)("[A] debtor's only recourse for violation of the discharge injunction is to request that the offending party be held in contempt of court.").

Bankruptcy courts have civil contempt powers. Those powers "flow from Bankruptcy Code § 105(a) and the inherent power of a court to enforce compliance with its lawful orders." *In re Walker*, 257 B.R. 493, 496 (Bankr. N.D. Ohio 2001) (citations omitted). The United States Court of Appeals for the Sixth Circuit has held that:

> In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order.

> A litigant may be held in contempt if his adversary shows by clear and convincing evidence that "he violate(d) a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's

11

order."

It is the petitioner's burden . . . to make a prima facie
showing of a violation, and it is then the responding party's
burden to prove an inability to comply. . . .

[T]he test is not whether [respondents] made a good
faith effort at compliance but whether "the defendants
took all reasonable steps within their power to comply
with the court's order."

[G]ood faith is not a defense to civil contempt.
Conversely, impossibility would be a defense to
contempt, but the [respondent] had the burden of
proving impossibility, and that burden is difficult to
meet.

*Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998)(citations
omitted); *see also Liberte Capital Grp., LLC v. Capwill*, 462 F.3d
543, 550 (6th Cir. 2006); *Elec. Workers Pension Trust Fund of
Local Union # 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373,
379 (6th Cir. 2003).

In the context of a violation of the discharge injunction, this
means that the act must have been willful. The question of
whether the violation is willful is based on whether the
creditor intended the acts that constituted the violation. The
standard does not require proof that the creditor deliberately
violated the injunction. Thus, a debtor who alleges a
violation of § 524(a)(2) must establish by clear and
convincing evidence (1) the creditor violated the discharge
injunction and (2) the creditor did so with actual knowledge
of the injunction.

*In re Frambes*, No. 08-22398, 2012 WL 400735, at *5 (Bankr.
E.D. Ky. Feb. 7, 2012)(citations omitted).

If a bankruptcy court finds a creditor in civil contempt for
violating the discharge injunction, the court may award the debtor
*compensatory* damages, including attorney fees and costs. *In re
Johnson*, 439 B.R. 416, 428 (Bankr. E.D. Mich. 2010), *aff'd on
other grounds*, No. 10-14292, 2011 WL 1983339 (E.D. Mich. May
23, 2011); *Gunter*, 389 B.R. at 71-72; *In re Perviz*, 302 B.R. 357,

12

370 (Bankr. N.D. Ohio 2003).

473 B.R. at 214-15 (italics in original).

This Court has discretion in deciding whether to award relief, including monetary relief, for a violation of the discharge injunction. *See, e.g.*, *Badovick v. Greenspan* (*In re Greenspan*), 464 B.R. 61, No. 10-8019, 2011 WL 310703, at *5 (B.A.P. 6th Cir. 2011) (internal quotation marks and citation omitted) (the court has "broad discretion . . . in selecting an appropriate sanction" for a violation of the discharge injunction); *In re Perviz*, 302 B.R. 357, 370, 370 n. 4 (Bankr. N.D. Ohio 2003) (sanctions and monetary relief for violations of the discharge injunction are discretionary); *Mitchell v. Anderson* (*In re Mitchell*), 545 B.R. 209, 227-28 (Bankr. N.D. Ohio 2016) (damages for violation of the discharge injunction are "within the Court's discretion;" and holding that even if the defendant violated the discharge injunction, the court would not award any damages to the debtor under the circumstances of that case).

*See also In re Kalabat*, 592 B.R. 134, 141-42 (Bankr. E.D. Mich. 2018) (same).

Under the case law in the Sixth Circuit, as quoted above, and before *Taggart*, at least, it was sufficient to find a party in civil contempt if the moving party proved "by clear and convincing evidence that '[the respondent] violate(d) a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *Schubiner*, 590 B.R. at 398 (quoting *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998)).

But after the Supreme Court's 2019 decision in *Taggart*, more is required. As a recent decision of the Sixth Circuit Bankruptcy Appellate Panel accurately described it,

[I]n *Taggart v. Lorenzen*, —— U.S. ——, 139 S. Ct. 1795, 204 L.Ed.2d 129 (2019), the United States Supreme Court . . . clarified the standard that applies when a violation of the discharge injunction is alleged. The Court held that a creditor may only be held in civil contempt for violation of the discharge order "if there

13

> is *no fair ground of doubt* as to whether the order barred the
> creditor's conduct." 139 S. Ct. at 1799. "[C]ivil contempt may be
> appropriate if there is no objectively reasonable basis for
> concluding that the creditor's conduct might be lawful." *Id.* In
> other words, there is no fair ground of doubt when the creditor
> violates a discharge injunction "based on an objectively
> unreasonable understanding of the discharge order or the statutes
> that govern its scope." *Id.* at 1802. A "creditor's good faith belief"
> that the discharge injunction does not apply to the creditor's act
> that violated the discharge injunction does not by itself preclude a
> civil contempt sanction. *Id.* Conversely, it is not sufficient to hold
> a creditor in civil contempt [merely] by finding that "the creditor
> was aware of the discharge order and intended the actions that
> violated the order." *Id.* at 1803.

*Orlandi v. Leavitt Family Ltd. P'ship* (*In re Orlandi*), 612 B.R. 372, 382 (B.A.P. 6th Cir. 2020)

(italics in original).

To summarize, after *Taggart*, the elements that must be proven for a court to find a party

in civil contempt are that (1) the party violated a definite and specific order of the court requiring

him to perform or refrain from performing a particular act or acts; (2) the party did so with

knowledge of the court's order; and (3) there is no fair ground of doubt as to whether the order

barred the party's conduct — *i.e.*, no objectively reasonable basis for concluding that the party's

conduct might be lawful. And at least as to the first two of these elements, the moving party

must prove them by clear and convincing evidence.

If these elements are proven, the accused party may still avoid a contempt finding, by

proving that his/her compliance with the order in question was impossible.

**B. Whether the civil contempt elements are established in this case**

**1. The Respondents violated a definite and specific order of this Court, namely, the
POA injunction.**

The injunction in the POA, which the City says the Respondents violated, is very broad.

14

It states, in pertinent part:

> 5. Injunction.
>
> On the Effective Date, except as otherwise provided herein or in the Confirmation Order,
>
> a. **all Entities that have been, are or may be holders of Claims against the City,** Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, **shall be permanently enjoined from taking any of the following actions against or affecting the City or its property,** DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):
>
> 1. **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property** (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims);
>
> . . . .
>
> 5. **proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan** or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and
>
> 6. **taking any actions to interfere with the implementation or consummation of the Plan.**[20]

The City's argument for holding the Respondents in contempt has several steps, including

the following. First, the City contends that the amendment and restatement of the PFRS Plan,

---

[20] "Eighth Amended Plan for the Adjustment of Debtors of the City of Detroit (October 22, 2014)" (Docket # 8045), Article III.D.5, at 50-51 (pdf pp. 57-58) (emphasis added).

which included the change at issue in the DROP Program, was defined to be part of the POA. Second, the City contends that the change to the DROP Program, which limited participation to five years, applies to each of the Respondents, because the change was effective as of July 1, 2014, and each of the Respondents elected to participate in the DROP Program effective in August 2014. Third, the City contends that the Respondents' State Court lawsuit filed in August 2019 was an effort to avoid the five-year limitation in the DROP Program, and therefore was inconsistent with the POA, and violated the injunction in the POA.

The City is correct in each of these contentions. The first contention is proven by the following. The Plan defined the "Plan" to mean "this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented, or otherwise modified."[21] The word "Exhibits," in turn, is defined to mean "the documents listed on the 'Table of Exhibits' included herein . . .,"[22] and that Table of Exhibits includes Exhibit I.A.254.a, entitled "Form of New PFRS Active Pension Plan" and Exhibit I.A.254.b, entitled "Principal Terms of New PFRS Active Pension Plan."[23] These two exhibits were attached to the Plan when it was filed on October 22, 2014.[24] The first of these exhibits, Exhibit I.A.254.a, is entitled "Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan[,] Amendment and Restatement Effective July 1, 2014."[25] That exhibit is in substance

---

[21] *Id.* at Article I.A, Definition no. 273, at 23 (pdf p. 30).

[22] *Id.* at Article I.A., Definition no. 182, at 15 (pdf p. 22).

[23] *Id.* at vi, vii (pdf pp. 6-7), Table of Exhibits.

[24] *Id.* at pdf pp. 448-525, 526-29.

[25] *Id.* at pdf p. 449.

the same as the New PFRS Plan discussed in Parts III.B and III.C of this Opinion, with the new five-year limitation for participation in the DROP Program.[26]

The Confirmation Order expressly confirmed the "Plan," as that term is defined in the Plan.[27]

Based on the foregoing, it is clear that the City's POA includes the provisions of the New PFRS Plan and its change to the DROP Program, limiting participation in that program to five years. Thus, the City's first contention is correct.

The City's second contention, that the change to the DROP Program under the POA applies to each of the Respondents, also is correct. As explained in Part III.C of this Opinion, under the New PFRS Plan, for an employee who elected to participate in the DROP Program "after June 30, 2014," participation in the DROP Program is limited to five years, and an employee electing into the DROP Program could continue to work for the City for a maximum of five years.[28] This means that "[a]t the end of such five year period of participation in the DROP Program, the [employee] shall be retired from employment."[29]

As detailed in Part III.D of this Opinion, each of the Respondents first became eligible to participate in the DROP Program in August 2014. And in their written applications to elect the DROP Program, each Respondent elected to begin his participation on his first eligible date in

---

[26] *See*, e.g., *id.* at Exhibit I.A.254.a, Section 12.1(2), pdf p. 502.

[27] *See* "Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit" (Docket # 8272) at pdf p. 5 & n.1, and pdf p. 72, Order ¶ A.1.

[28] New PFRS Plan Component I at Article I, Section 12.1(2) (Docket # 13090-1 at pdf p. 72); Component II at Article B, Section B-1(h) (Docket # 13090-1 at pdf pp. 99, 100).

[29] New PFRS Plan Component I at Article I, Section 12.1(2) (Docket # 13090-1 at pdf p. 72).

17

August 2014.  And two of them (Makulski and Salkowski) actually submitted their applications to elect the DROP Program in July 2014.  Although the other Respondent (Hamm) submitted his application in June 2014, he was not eligible to participate in the DROP Program until August 9, 2014.

Because each of the Respondents elected to participate in the DROP Program after June 30, 2014, the new five-year limitation in the DROP Program, which was part of the New PFRS Plan under the POA, applies to each of them.  Thus, under the POA, each of the Respondents is subject to the DROP Program's five-year limitation.

This is so even though the POA was not confirmed until November 12, 2014 and did not become effective until December 10, 2014.  While it is true that the POA did not became effective until a few months after the Respondents made their elections to participate in the DROP Program, that does not mean that the POA's change to that program does not apply to the Respondents.  Rather, it simply means that the Respondents' rights under the PFRS Plan and its DROP Program were altered by the POA when the POA was confirmed and became effective. This is simply one example of the many ways in which the POA altered the previously-existing pension-related rights and other rights of many of the City's active and retired employees.  But any issue about whether the POA's alteration of Respondents' rights was fair or just is not properly before the Court in this contempt proceeding.[30]  The issue is whether Respondents

---

[30]  As noted in Part III above, the Respondents allege that when they applied for the DROP Program, several months before confirmation of the POA, they were misled by City of Detroit and/or PFRS representatives into believing that they were electing into an unlimited DROP Program.  The Court does not need to resolve any factual dispute about these allegations, in deciding the present Motion. Even if Respondents' allegations are true, any rights Respondents might have had, based on their allegations, were altered by the confirmation of the POA.  As described in Part III and this Part IV.B.1 of this Opinion, the confirmed POA altered Respondents' rights by limiting their participation in the DROP

18

violated the POA and its injunction.

Finally, the City is correct in its third contention, that the Respondents' State Court lawsuit filed in August 2019 was an effort to avoid the five-year limitation in the DROP Program, and therefore was inconsistent with the POA, and violated the injunction in the POA. Under the five-year limitation, the employment of each of the Respondents was due to end, in a retirement, in August 2019. As discussed in Part II of this Opinion, the State Court lawsuit, filed by the Respondents on July 25, 2019, sought an injunction "prohibiting [the City, and the PFRS Board] from forcing [Respondents] to retire in August 2019, . . .."[31] And on August 1, 2019, the Respondents sought and obtained a temporary restraining order, without notice, that restrained the City, PFRS, and the DFFA "from completing the process of retiring Plaintiffs from their positions as Detroit Fire Fighters."[32]

These actions by Respondents clearly violated the POA injunction, quoted above. Respondents each violated the parts of the injunction that enjoined them[33] from "commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property;" from "proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan;" and from "taking any actions to interfere with the implementation or consummation of the

_____

Program to five years. And Respondents have failed to demonstrate that there is any valid legal basis now for the Court to relieve them of this consequence under the confirmed POA.

[31] Mot. Ex. 6A (Docket # 13090) at pdf p. 61.

[32] Mot. Ex. 6D (Docket # 13090) at pdf p. 80.

[33] As quoted above, the POA injunction applies to "all Entities that have been, are or may be holders of Claims against the City." Each of the Respondents clearly falls into this category, and none of them has argued otherwise.

19

Plan."

**2. Before filing their State Court lawsuit, the Respondents had knowledge of the POA and of the DROP Program changes, and had knowledge of the POA injunction.**

Well before they filed their State Court lawsuit on July 25, 2019, each of the Respondents and their attorney had knowledge of the POA. And they also had knowledge that the POA included the change in the DROP Program that limited Respondents' participation to five years.

The Respondents' knowledge of these things is shown by the following, among other things. First, the State Court complaint that the Respondents filed, which was signed by their attorney and which each of the Respondents verified under oath, specifically referred to the POA.[34] Second, the PFRS sent a letter to each of the Respondents dated June 3, 2019, reminding each of them of the end of their participation in the DROP Program and their specific retirement dates in August 2019. Respondents' attorney admitted during the hearing that the Respondents received these letters, and that Respondents' attorney was aware of these letters, before the State Court lawsuit was filed. Each letter stated that the August 2019 ending of the DROP Program participation was "**[p]er the terms of the Plan of Adjustment (POA) as of July 1, 2014**," as well as "the Memorandum of Understanding (MOU) signed by the [DFFA] November 6, 2014."[35] Third, the Respondents admitted, in their written response to the Motion, that they were aware of the POA, although they argue that they did not understand that filing the State Court

---

[34] *See* Mot. Ex. 6A (Docket # 13090) at pdf p. 60, ¶ 41, pdf p. 61 (signature of Respondents' attorney and verifications by Respondents).

[35] Mot. Ex. 6E (Docket # 13090) at pdf pp. 83-85 (emphasis added).

20

lawsuit would violate any injunction in the POA.[36]

Finally, as discussed below, the Respondents and their attorney knew of the injunction contained in the POA, quoted above, before they filed the State Court lawsuit.

If Respondents or their attorney ever received the POA, or if they ever reviewed the POA, at any time before filing the State Court lawsuit on July 25, 2019, then they could be deemed to have had knowledge of the contents of the POA, including the injunction in the POA.  Until the hearing on the Motion, at least, the City had presented evidence of these things, but it was not conclusive.  It consisted of three main facts: (1) that on February 28, 2014 the Respondents were each mailed a notice (the "February 28, 2014 Notice") of the April 14, 2014 hearing in this Court, regarding whether to approve the City's proposed disclosure statement, which notice contained two internet links by which the recipients could obtain and read the then-existing disclosure statement and the City's then-proposed Plan;[37] (2) that on May 12, 2014, Respondents were each sent the solicitation package (the "Solicitation Package") used by the City to give notice of the then-proposed plan of adjustment and solicit votes on that plan;[38] and (3) that in December 2014,  Respondents were each sent notice of the entry of the Confirmation Order.

As to the first of these things, the February 28, 2014 Notice, Respondents deny receiving

---

[36] Respondents' Response and Objections . . . (Docket #13103) at 2 (Respondents "were aware of the Plan"); 3 ("It is accurate that [Respondents] and counsel were aware of the issues with the DROP [P]rogram"); 5 ("[Respondents] admit that they received an informational bulletin from the DFFA in August 2015 informing them that the DROP rules had changed . . . ."); 16 ("[Respondents] were aware of the Confirmation Plan, but . . . had no specific knowledge that seeking to resolve these issues would violate any injunction issued by the Court.").

[37] Mot. Ex. 6G (Docket # 13090) at pdf pp. 208-26; Docket ## 2823, 2823-14.

[38] City's Reply Ex. 3 (Docket # 13120) at pdf pp. 15-31.

this notice,[39] and there is no evidence presented yet to show that any of the Respondents actually reviewed the then-proposed plan or the then-existing disclosure statement for which this notice contained links. Moreover, the February 28, 2014 Notice gave notice of the City's filing of the City's first plan and first disclosure statement, each of which were filed on February 21, 2014.[40] Those documents were later amended several times, before the Eighth Amended Plan was confirmed. And it is the City's *Fourth* Amended Disclosure Statement, rather than the first disclosure statement, that the City points to as having first given notice to the Respondents of the proposed changes to the DROP Program.[41] That Fourth Amended Disclosure Statement was not filed until May 5, 2014.[42] The City has not pointed to any specific notice that was given to Respondents of the Fourth Amended Disclosure Statement, except the Solicitation Package, discussed below.

In any event, even if the Respondents had become specifically aware of what the City's Fourth Amended Disclosure Statement said about proposed changes to the DROP Program, that does not prove that the Respondents knew of the actual POA — *i.e.*, the Eighth Amended Plan, the Order confirming that Plan, and the Exhibits that were filed with and made part of the Eighth Amended Plan.[43] All of those things were filed many months after the Fourth Amended Disclosure Statement.

---

[39] Respondents' Response and Objection (Docket # 13103) at 7, ¶ 20.

[40] *See* February 14, 2014 Notice (Docket # 2823) at ¶ 1 (giving notice of the plan and disclosure statement at Docket ## 2708, 2709).

[41] *See* Mot. (Docket # 13090) at 8-10, ¶¶ 17-20, and Mot. Ex. 6F.

[42] Docket # 4391.

[43] Docket ## 8045, 8272.

As to the second form of notice cited by the City, the Solicitation Package, which the City says was mailed to each of the Respondents, the package contained a CD-ROM that included the City's proposed Fourth Amended Plan and the Fourth Amended Disclosure statement, and a ballot for voting on the Plan.[44]  And that Fourth Amended Disclosure Statement contained a clear statement that effective July 1, 2014, the DROP Program would be limited to five years.  The City's evidence shows that of the three Respondents, only Richard Makulski actually submitted a ballot, voting to reject that Plan, dated July 1, 2014.[45]  He also filed an objection to that Plan, on July 8, 2014.[46]  This tends to show that Mr. Makulski, at least, actually received the Solicitation Package, including the CD-ROM that contained the Fourth Amended Plan and the Fourth Amended Disclosure statement.  There is no evidence yet presented to show that Respondents Daniel Salkowski and Jeffrey Hamm actually received the Solicitation Package that was mailed to them.  Under the common law rule sometimes referred to as the "mailbox rule," all of the Respondents are presumed to have actually received the Solicitation Package mailed to them, but that is a rebuttable presumption.  It may be rebutted with evidence of non-receipt, including a mere denial by the alleged recipient of actual receipt.  *See Bratton v. The Yoder Co.* (*In re The Yoder Co.*)*,* 758 F.2d 1114, 1118 (6th Cir. 1985).[47]

---

[44]  *See* City's Reply Ex. 3 (Docket # 13120), especially at pdf p. 29 (certificate of service at ¶ 5(a) and 5(g) (describing the contents of the solicitation package sent to members of Classes 10, 11, and 12 of the Plan); and pdf pp. 30-31, ¶¶ 6, 10-12.

[45]  *See* City's Reply Ex. 1 (Docket # 13120) at pdf pp. 9-10.

[46]  Docket # 5993.  Makulski's objection did not mention the proposed changes to the DROP Program.

[47]  As stated in *Yoder*:

The common law has long recognized a presumption that an item

As to the third notice cited by the City, the City's evidence shows that no later than December 16, 2014, each of the Respondents was mailed a notice of the entry of the Confirmation Order (the "Confirmation Notice").[48] That Confirmation Notice was 8 pages long, single spaced and with its text in a very small font. It stated, among many other things, that the Court had entered an order on November 12, 2014 confirming the Eighth Amended Plan; and that the Effective Date of the Plan occurred on December 10, 2014.[49] It further stated in detail the POA injunction quoted in Part V.B.1 of this Opinion, including all of the provisions highlighted in bold in this Opinion, which the Court now has found Respondents to have violated.[50] And while this Confirmation Notice itself said nothing about any changes to the DROP Program, it did state that copies of the Plan and all related documents could be obtained for free from a specified website or by calling a specified toll-free telephone number.[51]

Under the mailbox rule, discussed above, there is a rebuttable presumption that each of

---

properly mailed was received by the addressee. *Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932). The presumption arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail. *Simpson v. Jefferson Standard Life Insurance Co.*, 465 F.2d 1320, 1323 (6th Cir.1972).

758 F.2d at 1118. "[U]nless same-day delivery [is] in fact the norm, receipt by the addressee [is] not deemed to have occurred on the same day as the mailing. The presumption seems to [be] that the addressee would receive the material after a normal interval—two or three days, *e.g.*, under current Postal Service norms." *Carroll v. Comm'r*, 71 F.3d 1228, 1230 (6th Cir. 1995). "Testimony of non-receipt, standing alone, would be sufficient to support a finding of non-receipt; such testimony is therefore sufficient to rebut the presumption of receipt." *Yoder*, 758 F.2d at 1118.

[48] *See* Mot. Ex. 6H (Docket # 13090 at pdf pp. 219-26) (copy of the Amended Certificate of Service filed at Docket # 9000).

[49] *See* Confirmation Notice (Docket # 8649) at 1, ¶ 1.

[50] *Id.* at 3-4, ¶ 4.

[51] *See id.* at 8, ¶ 9.

the Respondents received the Confirmation Notice within days after it was mailed to them.  But the Respondents deny that they actually received this notice.[52]

At the hearing on the Motion, however, the Respondents' attorney admitted that after Respondents received the June 3, 2019 letters referred to above, and before the State Court lawsuit was filed, the Respondents' attorney reviewed the POA to see what it said about the DROP Program issue, and that she was aware of the POA injunction.  But Respondents' attorney stated  that she did not interpret the POA to apply the changes to the DROP Program "retroactively" to the Respondents, who had applied to participate in the DROP Program before the POA was confirmed.

The Respondents have not made any persuasive or objectively reasonable argument in support of this interpretation of the POA.  And the Court disagrees with this interpretation of the POA, as explained above.  But the admission by Respondents' attorney, that she reviewed the POA, the POA's provisions regarding the DROP Program, and the POA injunction, all before filing the State Court lawsuit, shows that Respondents knew of the POA and its injunction before taking the actions that violated the injunction.  Respondents are deemed to have known what their attorney knew about these subjects.  *See, e.g.*, *Link v. Wabash R. Co.*, 370 U.S. 626, 633–34 (1962) (stating that in "our system of representative litigation, . . . each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'") (quoting *Smith v. Ayer,* 101 U.S. 320, 326 (1880)).

Thus, the Court finds that the Respondents' violation of the POA injunction was done after the Respondents had knowledge of that injunction.

---

[52]  *See* Response and Objection (Docket # 13103) at 7, ¶ 23.

**3. There is no fair ground of doubt as to whether the POA injunction barred the Respondents' conduct in filing and prosecuting the State Court lawsuit — *i.e.*, there is no objectively reasonable basis for concluding that their conduct might be lawful.**

In Part V.B.1 of this Opinion, the Court explained why it concludes that the Respondents' actions in filing and prosecuting their State Court lawsuit were violations of the POA injunction. Based on that discussion, it is clear that the requirement of *Taggart* is satisfied. Namely, there is no fair ground of doubt as to whether the POA injunction barred the Respondents' conduct. There is no objectively reasonable basis for concluding that the Respondents' conduct "might be lawful" as not barred by the POA injunction. If and to the extent Respondents or their attorney interpreted the POA and its injunction otherwise, that was based on "an objectively unreasonable understanding of" the POA. *See Orlandi*, 612 B.R. at 382 (quoting *Taggart*, 139 S. Ct. at 1802).

**4. Respondents are in civil contempt.**

For the foregoing reasons, the Court finds that each of the elements of civil contempt has been established, by clear and convincing evidence, as to each of the Respondents. And Respondents have not alleged, or presented any support for, the affirmative defense that their compliance with the POA injunction was impossible.

For these reasons, the Court finds each of the Respondents in civil contempt, for having violated the POA injunction.

**C. The Court's discretion to deny monetary relief for Respondents' alleged civil contempt**

As noted in Part II of this Opinion, the only relief the City now seeks for the Respondents' civil contempt is compensatory relief, for the attorney fees incurred by the City because of the Respondents' filing and prosecution of their State Court lawsuit. This consists of

26

the reasonable attorney fees incurred by the City in defending the State Court lawsuit and in

prosecuting their contempt motion in this Court. The City does not claim to have suffered any

other cost or monetary loss. And the City no longer asks for any injunctive relief. It is not

necessary for this Court to award any injunctive relief, because the Respondents' State Court

lawsuit was dismissed with prejudice on August 21, 2019.

As this Court pointed out in its opinion in the *Schubiner* case, quoted in Part V.A of this

Opinion, if the Court finds a party in civil contempt, the Court has discretion to award

compensatory monetary relief, but the Court also has discretion ***not*** to award such relief. The

Court made this point in *Schubiner* when discussing the specific form of contempt consisting of a

violation of the discharge injunction under 11 U.S.C. § 524(a)(2). But the point applies to civil

contempt generally, and to relief for violation of injunctions generally. The Court now reiterates

the point. As stated in *Schubiner*:

> This Court has discretion in deciding whether to award relief,
> including monetary relief, for a violation of the discharge
> injunction. *See, e.g.*, *Badovick v. Greenspan* (*In re Greenspan*),
> 464 B.R. 61, No. 10-8019, 2011 WL 310703, at *5 (B.A.P. 6th Cir.
> 2011) (internal quotation marks and citation omitted) (the court has
> "broad discretion . . . in selecting an appropriate sanction" for a
> violation of the discharge injunction); *In re Perviz*, 302 B.R. 357,
> 370, 370 n. 4 (Bankr. N.D. Ohio 2003) (sanctions and monetary
> relief for violations of the discharge injunction are discretionary);
> *Mitchell v. Anderson* (*In re Mitchell*), 545 B.R. 209, 227-28
> (Bankr. N.D. Ohio 2016) (damages for violation of the discharge
> injunction are "within the Court's discretion;" and holding that
> even if the defendant violated the discharge injunction, the court
> would not award any damages to the debtor under the
> circumstances of that case).

*Schubiner*, 590 B.R. at 399. In the *Schubiner* case itself, for example, this Court exercised its

discretion to decline to award any monetary relief for the defendant's alleged violation of the

discharge injunction. *See* 590 B.R. at 399-400.

The Court will take the same approach in this case. In its discretion, the Court will decline to order any monetary relief against the Respondents, even though they are in civil contempt. The Court makes this decision based on the following considerations.

While the Court has found that the Respondents' actions in filing and briefly prosecuting the State Court lawsuit violated the POA injunction, this becomes clear only after one reviews a number of specific terms of the POA and its exhibits, in several steps, as the Court has done in Part V.B.1 of this Opinion. Getting to the ultimate conclusion is far from an easy task, and this certainly is so for anyone who is not an attorney intimately familiar with the POA and its exhibits. Needless to say, the POA and its exhibits in a Chapter 9 case of this magnitude are very voluminous and complicated. During the hearing on the present Motion, the undersigned judge had to ask for a detailed explanation from the City's attorney to get to the ultimate conclusion that the Respondents violated the POA injunction. The City's attorney had to walk through the POA and its pertinent exhibits, step by step, in order for the Court to understand exactly how the change in the DROP Program was actually part of the POA; how that change in the DROP Program actually applied to the Respondents; and how the Respondents' filing of the State Court lawsuit violated the POA injunction.

There is no evidence presented showing that the Respondents or their attorney had the benefit of such a detailed explanation before they filed the State Court lawsuit. And apparently the Respondents' attorney did not have much or any prior involvement in, or familiarity with, this bankruptcy case, and appears to have lacked much familiarity with the detailed POA and its exhibits.

In short, determining that the Respondents violated the POA injunction is complicated. And the Court also is mindful of the following factors. The duration of the State Court lawsuit was less than a month; the City's reasonable cost of defending that lawsuit necessarily could not have been very substantial; and in the end the State Court lawsuit caused the City no actual harm whatsoever, other than its attorney fees.

None of these considerations can justify Respondents' taking action that violated the POA or its injunction. But these are significant mitigating factors in this case, when the Court considers whether to impose monetary relief against the Respondents.

If the issue now was whether to order injunctive relief, that would be a relatively easy call. If necessary, the Court certainly would enjoin the Respondents from any further pursuit of their State Court lawsuit, and order them to dismiss that lawsuit. But that injunctive relief is not necessary; the lawsuit was dismissed with prejudice less than a month after it was filed.

Given all of the above considerations, the Court is very reluctant to require Respondents, who are now retired City fire fighters, to personally pay the City's attorney fees. In its discretion, the Court declines to do this. For these reasons, the Court will grant no monetary relief to the City on its contempt motion.

## VI. Conclusion

For the reasons stated in this Opinion, the Court will enter an order finding each of the Respondents in civil contempt, but denying any other relief.

**Signed on April 6, 2020**



/s/ **Thomas J. Tucker**

**Thomas J. Tucker**
**United States Bankruptcy Judge**

29