# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**TRUSTEES OF THE SHEET METAL WORKERS' LOCAL UNION NO. 80 PENSION TRUST FUND AND TRUSTEES OF THE ELECTRIC WORKERS' PENSION TRUST FUND OF LOCAL UNION #58, I.B.E.W., DETROIT, MICHIGAN'S RESPONSE IN OPPOSITION TO CITY OF DETROIT'S MOTION TO ENFORCE CONFIRMATION ORDER AGAINST THE SHEET METAL WORKERS' LOCAL UNION NO. 80 PENSION TRUST FUND AND ELECTRICAL WORKERS' PENSION TRUST FUND OF LOCAL UNION #58, I.B.E.W., DETROIT, MICHIGAN**

The Trustees of the Sheet Metal Workers' Local Union No. 80 Pension Fund ("SMW 80 Pension Fund") and the Trustees of the Electrical Workers' Pension Trust Fund of Local Union #58, I.B.E.W., Detroit, Michigan ( "IBEW 58 Pension Fund") (collectively "Pension Funds"), through their undersigned counsel, Law Office of Barbara A. Patek, P.L.C., file this response in opposition to the City of Detroit's Motion to Enforce the Confirmation Order Against the Sheet Metal Workers' Local Union No. 80 Pension Trust Fund and Electrical Workers' Pension Trust Fund of Local Union #58, I.B.E.W., Detroit, Michigan ("Motion to Enforce") [Doc. No. 13308] ( "Response"). In support of their Response, the Pension Funds state:

## INTRODUCTION

1.    The City, through its Motion to Enforce, improperly seeks to use the Plan[1] injunction to prevent the Pension Funds from enforcing a post-Effective Date obligation assumed under the Plan and which did not arise and could not have arisen until January of 2016—more than a year after the Effective Date. The Motion to Enforce must be denied in its entirety.

2.    The SMW 80 Pension Fund and the IBEW 58 Pension Fund are each multiemployer pension funds under ERISA, 29 U.S.C. §1301(a)(3). As further detailed herein and substantiated by **Exhibit A**, Declaration of Danette Sears, and **Exhibit B**, Declaration of Craig Young, the City had an ongoing obligation to contribute to the SMW 80 Pension Fund dating back until at least June 2001 **(Exhibit A, Attachment A1)** and to the IBEW 58 Pension Fund dating back until at least January 2005 **(Exhibit B, Attachment B1)** and continuing through at least December 31, 2015. The City withdrew from each of the Pension Funds in January of 2016, thereby incurring withdrawal liability under ERISA, 29 U.S.C. §1383.

3.    The Motion, without evidence, incorrectly asserts that (a) the assessed withdrawal liability might be a pre-petition or pre-Effective Date obligation; (b) the collective bargaining agreements under which the liability arose do not exist or were rejected by the City in these bankruptcy proceedings; or (c) the liability

---

[1] Unless otherwise indicated, capitalized terms are as defined by the City's Motion.

sought to be enforced against the City was actually assumed by the Great Lakes Water Authority (the "Authority").

4.      Attached to the Response is the collective bargaining agreement that gave rise to the City's obligation to contribute to each of the Pension Funds, **Exhibit C,** and a Declaration from each of the Pension Fund's administrative offices attaching the histories of the City's fringe benefit contributions to the Pension Fund, **Exhibit A, Attachment A1, and Exhibit B, Attachment B1**, which establish the date of the City's withdrawal from each of the Pension Funds. The City has previously been provided with the collective bargaining agreement and contribution histories.

5.      When this Court confirmed the Plan, it turned the City's governance, legal and democratic processes, including the rights and remedies granted its employees and unions, back to the City, to be performed in the ordinary course. See Supplemental Opinion Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing [Docket No. 8993, pp. 218-219]. The Confirmation Order explicitly provides that, "[c]ontracts, leases and other agreements entered into after the Petition Date by the City, including ... the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course of its business. ***Accordingly, such contracts ... will survive***

*and remain unaffected by this Order.*" See Confirmation Order [Docket No. 8272, pp. 105-06] (emphasis added).

6.    The City, based on unsubstantiated speculation, now seeks to use the Plan injunction to prevent the Pension Funds from enforcing their post-Effective Date right to assess withdrawal liability under ERISA. As set forth herein, those rights are ordinary course, post-Effective date obligations that arose when the City withdrew from the Pension Funds in January of 2016,[2] and the City is obliged to satisfy those obligations in the ordinary course. The Plan injunction cannot be used to avoid these obligations. As further detailed herein, the Motion to Enforce must be denied in its entirety. In addition, under ERISA, 29 U.S.C. §1132(g), the Pension Funds reserve their rights to seek costs and attorney's fees incurred as the result of the need to defend against the Motion to Enforce.

## STATEMENT OF FACTS

### Pension Fund Contribution Obligations

7.    The SMW 80 Pension Fund and the IBEW 58 Pension Fund are multiemployer defined benefit pension plans established through collective bargaining and maintained and administered pursuant to Section 302 of the Labor-Management Relations Act of 1947, as amended, ("LMRA") 29 U.S.C. §186, *et.*

---

[2] *Parmac, Inc. v. IAM Nat'l Pension Fund Benefit Plan A,* 872 F.2d 1069, 10 EB Cases 2670 (D.C. Cir. 1989)

*seq.* and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, *et seq*.

8. The City and the Greater Detroit Building and Construction Trades Council ("BCTC") entered into a collective bargaining agreement covering Special Service Employees ("Special Service Agreement"). See **Exhibit C**. Upon information and belief, the BCTC acted as the exclusive bargaining representative of the Special Service journeymen, including sheet metal workers and electrical workers. The Special Services Agreement sets forth the terms and conditions of employment of all employees of the City holding Special Service journeymen building trades' classifications as established by the City's Human Resources Department. **Exhibit C**, Recognition, page 1. The Special Service Agreement remained in effect through midnight June 30, 2005 and thereafter on a day-to-day basis unless the City or the BCTC terminated the Special Service Agreement by giving the other party a ten calendar day written notice on or after June 20, 2005. **Exhibit C**, Agreement, Effective Date, Recognition, page 1.

9. The Special Service Agreement required the City to pay employees working under that agreement the wages and fringe benefits set forth in the BCTC's Official Wage and Benefit List, which "wages and fringe benefits will be changed to reflect any subsequent changes made to the Local Agreements." **Exhibit C**, Section 16, Wages and Fringe Benefits, page 4. See also **Exhibit A,**

**Attachment A2**, fringe benefit contribution rates for SMW 80 building trades journeymen and **Exhibit B, Attachment B2**, fringe benefit contribution rates for IBEW 58 building trades journeymen. These wage and fringe benefit obligations included the obligation to make pension contributions to the SMW 80 Pension Fund and the IBEW 58 Pension Fund. See **Exhibit A, Attachment A2 and Exhibit B, Attachment B2**.

### Special Services Agreement and Bankruptcy Proceedings

10.    The City continued to abide by the requirements of the Special Service Agreement during the City's bankruptcy proceedings. Throughout that time, including through and after the Effective Date, the City continued to make its required pension contributions to each of the Pension Funds. See **Exhibit A, Attachment A1 and Exhibit B, Attachment B1 (contribution history).** The Special Services Agreement was not rejected during the course of the bankruptcy proceedings.[3] See Plan, Ex. II.D.6, Executory Contracts and Unexpired Leases to be Rejected, Doc. 8045-10, pp. 31-78.

---

[3]  The Special Services Agreement refers to the Local Agreements, which, in this case, are the Sheet Metal Workers Local Union No. 80 Construction Agreement negotiated by Sheet Metal Workers' Local 80 ("SMW 80 Local Agreement") and Inside Agreement negotiated by the International Brotherhood of Electrical Workers Local 58 ("IBEW 58 Local Agreement"), which were likewise not rejected during the course of the bankruptcy proceeding. See Plan, Ex. II.D.6, Executory Contracts and Unexpired Leases to be Rejected, Doc. 8045-10, pp. 31-78.

11.     Throughout the bankruptcy proceedings, including until and after the Effective Date, the Special Services Agreement remained in effect; the City continued to be obliged to make pension contributions to each of the Pension Funds; and the City continued to make its required contributions.

**Continuing Pension Fund Contributions Under Special Services Agreement**

12.     At no time before the City stopped contributing to the Pension Funds, did the Pension Funds receive notice that the City would be terminating the Special Services Agreement. See **Exhibit A,** paragraph 3, and **Exhibit B**, paragraph 3.

13.     The Pension Funds are now aware that, approximately six months after the Effective Date, in June of 2015, the City apparently contacted BCTC's business manager to indicate that it was <u>considering</u> terminating the Special Services Agreement. See **Exhibit D,** June 15, 2015 Correspondence and Draft MOU.

14.     But, just as it had since at least 2005, the City continued to make pension contributions to the SMW 80 Pension Fund at the fringe benefit rates, as was required by the Special Services Agreement and as set forth in the SMW 80 Local Agreement on behalf of journeyman sheet metal workers for the work months of June 2001 through December 2015. See **Exhibit A, Attachment A1,** SMW 80 employee contribution history.

15.     Similarly, as also required by the Special Services Agreement, the City continued to make pension contributions to the Local 58 Pension Fund on behalf of journeymen electricians at the fringe benefit rates set forth in the IBEW 58 Local Agreement for the work months of January 2005 through December 2015. See **Exhibit B, Attachment B1**, IBEW Local 58 employee contribution history.

**The City's Withdrawal and Employer Withdrawal Liability Assessments**

16.     December of 2015 was the last month that work was performed that required the City to make pension contributions under the Special Services Agreement. As of January of 2016, the City ceased contributing to the IBEW 58 Pension Fund and the SMW 80 Pension Fund, which effectuated the City's withdrawal from the SMW 80 Pension Fund and the IBEW 58 Pension Fund pursuant to Section 4203(a) of ERISA, 29 USC §1383(a).[4]

17.     Under applicable non-bankruptcy law, the City's withdrawal from the IBEW 58 Pension Fund and the SMW 80 Pension Fund triggered the City's withdrawal liability pursuant to Section 4201(a) of ERISA, 29 USC §1381(a).

18.     When the SMW80 Pension Fund initially sought information as to why the City stopped making contributions through a July 12, 2018 questionnaire

---

[4] In as much as City claims the Authority assumed any obligation to contribute to the Pension Funds, the record is clear that no contributions were ever made by the Authority. See Issue III, *infra.*

and more than a half-dozen follow up phone calls and e-mails, the City did not respond. **Exhibit E**, Declaration of Joseph Uhl. The Pension Funds then ultimately proceeded with their assessments.

19.     The actuary for the SMW 80 Pension Fund calculated the City's withdrawal liability to be $123,614 and established a quarterly payment schedule. On March 31, 2020, the SMW 80 Pension Fund forwarded to the City a Notice of Assessment of Employer Withdrawal Liability in accordance with Sections 4202 and 4219(b)(1)(A) and (B) of ERISA, 29 USC §§1382 and 1399(b)(1)(A) and (B). The Notice recited a total liability of $123,614 and provided for 13 quarterly installment payments of $9,737 and a final installment payment of $8,565 with the first installment due on May 1, 2020. See **Exhibit A**, **Attachment A3**, Notice Dated March 25, 2020.

20.     The actuary for the IBEW 58 Pension Fund calculated the City's withdrawal liability to be $167,555 and established a quarterly payment schedule. On March 31, 2020, the IBEW 58 Pension Fund forwarded to the City a Notice of Assessment of Employer Withdrawal Liability in accordance with Sections 4202 and 4219(b)(1)(A) and (B) of ERISA, 29 USC §§1382 and 1399(b)(1)(A) and (B). The Notice recited a total liability of $167,555 and provided for five quarterly installment payments of $29,232.50 and a final installment payment of $25,189.50

with the first installment due on June 1, 2020. See **Exhibit B, Attachment B3**, Notice dated March 30, 2020.

### City's Responses to Employer Withdrawal Liability Assessments

21.     On April 23, 2020, Assistant Corporate Counsel Jason McFarlane requested, on behalf of the City "all relevant documents regarding the notice of assessment, including but not limited to: Pension Plan documents, any documents related to the determining the amount of the determined withdrawal liability, the names of the employees that were in the respective IBEW Locals[5] above and all other relevant documents." **Exhibit F**.

22.     On May 21, 2020, the Pension Funds produced copies of their ERISA plan documents, the withdrawal liability payment schedules, the allocation of unfunded vested benefits, and the summaries of the respective actuarial assumptions. See **Exhibit G**, May 21, 2020 response on behalf of SMW 80 Pension Fund, and **Exhibit H**, May 21, 2020 response on behalf of IBEW 58 Pension Fund**.**

23.     Less than a week later, on May 27, 2020, the Deputy Corporation Counsel Charles Raimi requested that the Fund "produce all available files and documents (including electronic documents or emails), in the custody or control of

---

[5] Mr. McFarlane apparently and erroneously understood that Local 80 and Local 58 were both locals of the International Brotherhood of Electrical Workers ("IBEW").

[the Fund], or other third party agents, relating in any way to (i) these unions/pension funds/employees past or current relationships to or dealing with the City, or (ii) the claims now being asserted against the City." (**Exhibit I**, May 27, 2020 request.)

24.     On June 22, 2020, the Pension Fund's legal counsel responded by reminding the City that the Pension Funds produced the names of the applicable union(s), pension fund(s), and the past and current employees for which the City of Detroit paid contributions and that the Funds were (and are) under no obligation to produce additional documents. (**Exhibit J**, June 22, 2020 reply to May 27, 2020 request).

25.     On June 25, 2020, the City, through outside counsel, submitted a Request for Review to the SMW 80 Pension Fund and to the IBEW 58 Pension Fund pursuant to ERISA §4219(b)(2)(A), 29 U.S.C. §1399(b)(2)(A). **Exhibit K**, Request for Review to the SMW 80 Pension Fund, and **Exhibit L**, Request for Review to the IBEW 58 Pension Fund.

26.     After 3:00 p.m. on Friday, August 21, 2020, the City notified the Pension Funds of its intent to file the Motion to Enforce and provided the Pension Funds with a draft of the Motion to Enforce with a request that the Pension Funds consent to the motion by noon on Monday, August 24, 2020. Although the Pension Funds, through counsel, indicated a willingness to provide the City with additional

information related to their withdrawal liability claims and why those claims were not subject to the Plan injunction, on Friday, August 28, 2020, the City filed its Motion to Enforce.

27.     The Pension Funds subsequently identified the controlling Special Service Agreement and provided a copy of that agreement as well as wage sheets, a sample SMW 80 Local Agreement, a sample IBEW 58 Local Agreement, the fringe benefit contribution rates for SMW 80 building trades journeymen, **Exhibit A, Attachment A2,** and the fringe benefit contribution rates for IBEW 58 building trades journeymen, **Exhibit B, Attachment B2,** to counsel for the City on September 8, 2020.

28.     To date, the City has paid under protest two quarterly withdrawal liability installment payments to the SMW 80 Pension Fund and two quarterly withdrawal liability installment payments to the IBEW 58 Pension Fund, although each payment was made after its respective due date. See **Exhibit A,** paragraphs 6 and 7, and **Exhibit B**, paragraphs 6 and 7.

29.     The City has declined to withdraw the Motion to Enforce. This is the Pension Funds' Response opposing the Motion to Enforce.

## ARGUMENT

**I.    The City's withdrawal liability is an enforceable obligation, based on a valid, post-Effective date collective bargaining agreement, that the Plan requires the City to perform in the ordinary course.**

As set forth above, the City paid contributions to the IBEW 58 Pension Fund from the work month of January 2005 through the work month of December 2015; the City paid contributions to the SMW 80 Pension Fund from the work month of June 2001 to the work month of December 2015. Those contributions were paid at the rates set forth in the Local Agreements negotiated by IBEW 58 and SMW 80, as required by the Special Service Agreement, **Exhibit C**, which explicitly stated that it was to continue from day-to-day unless and until the parties agreed otherwise.

The day-to-day Special Service Agreement was in effect when the City filed its chapter 9 petition on July 18, 2020; the City continued to perform under the contract after the Petition Date; and the City did not reject the Special Services Agreement in the bankruptcy proceedings. See Plan, Ex. II.D.6, Doc. 8045-10, pp. 31-78.  As such, as of the Effective Date, the Special Services Agreement (and the City's obligations thereunder), "*. . . survive[d] and remain[ed] unaffected by [the Confirmation] Order,*"    Confirmation Order [Docket No. 8272, pp. 105-06] (emphasis added), and the City was required to perform its obligations thereunder in the ordinary course of its business. *Id.*

## II.    There is no claim here that can plausibly be considered to have been discharged under the Plan.

As set forth in Issue I, the City's obligations under the Special Services Agreement survived and were unaffected by the bankruptcy. Indeed, the City continued to perform its obligations under the day-to-day Special Service Agreement until December 31, 2015. After the City's contributions to the Pension Funds ceased, the Pension Funds each ultimately determined that a withdrawal had occurred.

For the Pension Funds' withdrawal liability claims to be subject to the Plan injunction, they must be claims, within the meaning of the Bankruptcy Code, that were discharged by the Plan. *See In re City of Detroit,* 548 B.R. 748 (E.D. Mich. Bankr. 2018).

Under ERISA, when the City ceased acting on the obligations set forth in the Special Service Agreement, it withdrew from the Pension Funds and triggered its statutory obligations to pay its employer withdraw liability. 29 U.S.C. §1383 (providing that "for purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan).

The IBEW 58 Pension Fund and the SMW 80 Pension Fund are governed by ERISA, which imposes withdrawal liability on an employer when it partially or

completely withdrawals from a multiemployer plan. See Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§1301-1485; Pub. L. No. 96-364, 94 Stat. 1208 (Sept. 26, 1980).

Employer withdrawal liability occurs when an employer (1) permanently ceases to have an obligation to contribute under the plan or (2) permanently ceases all covered operations under the plan. 29 U.S.C. §1383. In other words, a claim for withdrawal liability emerges when, and only when, an actual withdrawal occurs. In *CPT Holdings v. Industrial & Allied Emps. Union Pension Plan*, 162 F.3d 405, 409 (6th Cir. 1998), the Sixth Circuit directly addressed the question of when a claim for withdrawal liability is discharged by a confirmed plan in the context of a chapter 11 reorganization. The *CPT Holdings* Court held that, "[a] multiemployer pension plan has no enforceable right to payment for withdrawal liability until an employer actually withdraws from a plan, leaving the plan underfunded. Since this may never occur, it cannot be said that a legal right to payment exists prior to withdrawal." *Id. at* 409.

*CPT Holdings* relied on *In re United Merchants and Manufacturers,* 166 B.R. 234, 235–36 (Bkrtcy.D.Del.1994). In that case, the bankruptcy court sustained a chapter 11 debtor's objection to an ERISA plan's claim for withdrawal liability.

As here, in *United Merchants* and *CPT Holdings*:

The relevant non-bankruptcy law in the instant case is ERISA, as amended by MPPAA. That law defines withdrawal liability as imposed when a plan has unfunded vested benefits, and an employer withdraws from the plan. 29 U.S.C. §§ 1381–1391. Using the logic of *Remington,* the court in *United Merchants & Manufacturers* held that a multiemployer pension plan does not have a claim for withdrawal liability until actual withdrawal. *United Merchants & Manufacturers,* 166 B.R. at 239. In *United Merchants & Manufacturers,* the commonly controlled employers filed Chapter 11 petitions. *Id.* at 236. A plan of reorganization was confirmed nine months later, and the debtors became UM & M. *Id.* UM & M assumed the collective bargaining agreements that had existed between each employer and a labor union prior to reorganization. *Id.* After reorganization was complete, UM & M objected to a proof of claim filed by the plan, asserted the plan in fact had a claim for withdrawal liability prior to confirmation, and that claim had been discharged through bankruptcy. *Id.* The court held that because no relevant violation of ERISA and MPPAA occurred prior to both withdrawal *and* the existence of an underfunded plan, no right to payment, and thus no "claim," existed at that time. *Id.* at 239.

*CPT Holdings* at 409.

Here, the City, through its Plan, assumed the obligations under the Special Services Agreement, was obliged to perform those obligations in the ordinary course, and, until the January 2016 withdrawals, continued to perform them.

Under *CPT Holdings* and, "[t]he logic employed by the UM & M court," the Pension Funds had, "... no enforceable right to payment for withdrawal liability until ... [the City] ... actually withdr[ew] from [the] plan[s], leaving the plan[s] underfunded." *CPT Holdings* continued, "Since this may never occur, it cannot be said that a legal right to payment exists prior to withdrawal," *Id.* at 409. As such, because there was no legal right to payment until January of 2016, the City cannot

plausibly use the Plan injunction to prevent the enforcement of this post-Effective Date obligation.

The Sixth Circuit, in finding that, "withdrawal liability is not a 'claim' prior to confirmation," found this result consistent with both, "a sense of fairness, as well as to an understanding of ERISA. ***The court basically told employers that if they want their withdrawal liability discharged, they must completely withdraw from the [ERISA pension] plan prior to confirmation. They cannot remain a part of the plan and simultaneously have their withdrawal liability forgiven should they ever decide to withdraw.***" *Id.* at 409 (emphasis added).

*CPT Holdings* requires this Court to reject the City's effort to use the Plan injunction to block the Pension Funds' enforcement of their right to collect withdrawal liability that did not exist until more than a year after the Effective Date. Under that case, if a debtor emerges from bankruptcy without having withdrawn from an ERISA pension plan, as is the case here, there is no claim within the meaning of the Bankruptcy Code to be discharged. Therefore, a debtor cannot argue (as the City apparently is attempting here) that such a non-existent claim was discharged. *CPT Holdings, supra.*

This result is also consistent with the "fair contemplation" test applied by this Court in determining whether to enforce the Plan injunction to enjoin certain claims sought to be enforced as post-petition matters. *In re City of Detroit, supra.*

In that case, the Court rejected the City's efforts to use the Plan injunction to block a wrongful termination claim brought by City employee, Cedric Cook. The Court rejected the City's argument that Cook's claim was a pre-petition claim because the City did not begin the termination procedures until after the Petition Date.[6]

Applying that test, this Court found, consistent with *CPT Holdings*, that the City's failure to institute disciplinary proceedings until after the petition was filed made Cedric Cook's claim a post-petition matter he could not have "fairly contemplated" before the petition was filed. *In re City of Detroit*, 548 B.R. at 763, 770. Specifically, the Court ruled that (a) a post-petition no fault claim arising out of a pre-petition accident was a pre-petition claim, as the claimant could have fairly contemplated the need for future benefits; (b) a post-petition wrongful termination action arising out of a pre-petition effort by the City to terminate the claimant was a pre-petition claim, as it could have been fairly contemplated before the petition was filed; but (c) even where some of the conduct giving rise to the City's efforts to terminate an employee occurred pre-petition, a pre-petition claim

---

[6] With regard to Cedric Cook's claim, the City withdrew its argument that the Plan injunction could be enforced against claims that arose prior to the Effective Date. In this case, the City appears to seek a broader application of the Plan injunction to include pre-Effective Date claims. Where, as here, there is no mechanism under the Plan to enforce such post-petition, pre-Effective date claims, there are serious due process concerns with such a position. However, given established Sixth Circuit precedent under *CPT Holdings* and the undisputed fact that the City did not withdraw until more than a year after the Effective Date, this distinction is immaterial.

could not be "fairly contemplated" where the City did not seek to terminate the employee until more than a week after the petition was filed. *Id. at* 770.

In this case, pursuant to the Plan, the City assumed its obligations under the Special Services Agreement, continued to perform under that agreement, and last paid contributions for the work month of December 2015, more than a year after the Effective Date. As with the claims asserted in Cedric Cook's case, in *CPT Holdings*, and in *United Merchants & Manufacturers*, the Pension Funds' withdrawal liability claims could not have been "fairly contemplated" and could not have been discharged in the City's bankruptcy proceedings, such that the Plan injunction barred their enforcement. Therefore, the Motion to Enforce must be denied.

### III. The City has provided no evidence that the Great Lakes Water Authority assumed its liability under the relevant collective bargaining agreements, and, in fact, the evidence is directly to the contrary.

The City also apparently wants to offload its obligations on the Great Lakes Water Authority. The City argues that in 2014, the City entered in a Memorandum of Understanding Regarding the Formation of the Great Lakes Water Authority ("MOU"); that, apparently because of that MOU, by January 1, 2016 "neither the City nor DWSD retained any liability with respect to the employees who transferred to the Authority, including liability in respect to pension contributions for those employees," and that the leases ultimately negotiated pursuant to the

MOU designated Authority as the City's successor employer. *See* Motion to Enforce, Doc. Nos. 13308-10 and 13308-11; **Exhibits 6J and 6K.** First, Schedule F (the schedule which lists the collective bargaining agreements being assumed) does not include the Special Services Agreement, nor does it include any collective bargaining agreement with SMW 80 or IBEW 58. Second, regardless of whether the Authority assumed the obligations under the Special Services Agreement, it never made any contributions to either of the Pension Funds. Third, the City cites no authority for the proposition that, if the Authority were a successor employer, that would eliminate or abate the City's withdrawal liability.

This argument implicitly admits that the Pension Funds were correct in assessing the City of Detroit employer withdrawal liability because it explicitly admits that as of January 1, 2016, the City of Detroit ceased having obligations to both of the Pension Funds. See, 29 U.S.C. §1392(a) (defining "obligation to contribute" as arising "under one or more collective bargaining (or related) agreements) and 29 U.S.C. §1383.

Further, whether another entity, such as the Great Lakes Water Authority, continued the City's pension contribution obligations (which it did not) is irrelevant to whether the City is ultimately obligated to pay its employer withdrawal liability. For,

the pension arrangements an employer may make for its employees
following a withdrawal from a multiemployer plan do not mitigate the

harm to the plan caused by the withdrawal. Therefore, absent the type of situation described in section 4235(c) and section 4211(e), i.e., where the multiemployer plan transfers some of its unfunded vested benefits to a plan to be maintained by the withdrawing employer, the employer's establishment of a new plan for its employees does not affect the employer's withdrawal liability to the multiemployer plan.

PBGC Op Letter No. 86-7.

This conclusion is likewise consistent with *CPT Holdings*. Furthermore, even if the City were to establish that the Authority assumed the obligation to continue to make pension contributions, whether that would vitiate the City's obligation for withdrawal liability is, as set forth in Issue IV, below, a question for the arbitrator, not for this Court, since that would be a post-petition matter, unaffected by the Plan injunction.

## IV. This Court lacks jurisdiction to consider the merits of the Pension Funds' withdrawal liability claims.

As discussed in Issue II, above, this Court has the jurisdiction to determine whether or not the Pension Funds' post-petition, post-Effective Date assessment of withdrawal liability constitutes a claim that was discharged by the Plan and enjoined by the Plan injunction. However, to the extent the Motion to Enforce seeks a determination on the merits of the City's obligation for withdrawal liability, that determination must be made pursuant to the procedures set forth in the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), which

include a mandatory arbitration provision. ERISA Section 4221(a)(1), 29 USC §1401(a).

In short, "The MPPAA requires employers who withdraw, completely or partially, from a multiemployer pension plan to contribute to the plan a proportionate share of the unfunded, vested benefits." *Mason Dixon Tank Lines v. Central States, Southeast and Southwest Areas Pension Fund*, 852 F.2d 156, 158 (6th Cir. 1988) (citing *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 81 L. Ed. 2d 601, 104 S. Ct. 2709 (1984)).

The MPPAA includes provisions for notice of employer withdrawal liability and the out-of-court resolution of disputes related to the assessment of employer withdrawal liability. The plan's trustees must first determine whether withdrawal has occurred. ERISA Section 4203(b)(2), 29 USC §1383(b)(2). The trustees must then notify the employer of the amount of liability and demand payment in accordance with a schedule. ERISA Section 4219(b)(1)(A),(B), 29 USC §§1399(b)(1)(A),(B).

An employer that objects to an employer withdrawal assessment is statutorily required to initiate a review process. An employer does so by "(i) ... ask[ing] the plan sponsor to review a specific matter relating to the determination of the employer's liability and the schedule of payments, (ii) ... identif[ying] any inaccuracy in the determination of the amount of the unfunded vested benefits

allocable to the employer, and (iii) ... furnish[ing] any additional relevant information to the plan sponsor." ERISA Section 4219(b)(2)(A)(i)-(iii), 29 USC §1399(b)(2)(A)(i)-(iii). That request must be made within 90 days of the demand. ERISA Section 4219(b)(2), 29 USC §1399(b)(2).

The City separately asked the Trustees of the IBEW 58 Pension Fund and the Trustees SMW 80 Pension Fund for a review of the liability within the statutory time frame.[7] **Exhibit K**, Request for Review to the SMW 80 Pension Fund, and **Exhibit L**, Request for Review to the IBEW 58 Pension Fund. Those requests are pending with each respective Fund.

Where, as here, the employer has timely initiated the informal review process, the employer must request arbitration the within 60 days of the earlier of the Trustees' response to the request for review or 120 days after the employer requested review. ERISA Section 4221(a)(1), 29 USC §1401(a)(1).

The arbitration proceeding "shall be conducted in accordance with fair and equitable procedures to be promulgated by the [Pension Benefit Guaranty Corporation ("PBGC")]." ERISA Section 4221(a)(2), 29 USC §1401(a)(2). The

---

[7] Employers are required to remit the installment payments notwithstanding any request for review or appeal of determinations of the amount of such liability. *Marvin Hayes Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, 814 F.2d 297, 299 (6th Cir. 1987). The City has made payments. See Statement of Facts, paragraph 25.

PBGC approved the use of the Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes (revised effective January 1, 2020) ("Arbitration Rules"), administered by the American Arbitration Association, pursuant to 29 C.F.R. §4221.14(c). See 84 Federal Register 67484 (December 10, 2019).

The City of Detroit, by filing its Motion to Enforce in Federal Bankruptcy Court, seeks to circumvent ERISA's mandatory arbitration provision which provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 4201 through 4219 of this title shall be resolved through arbitration." 29 U.S.C. §1401(a)(1) (Emphasis added).

Therefore, to the extent the Motion to Enforce seeks relief beyond asking the Court to determine whether the City's post-Effective Date withdrawals are claims barred by the Plan injunction, because the Pension Funds' employer withdrawal liability assessment were made under sections 4201 through 4219, this Court should dismiss the City's Motion to Enforce and rightfully require the City to submit a demand for arbitration, if it believes that it is not liable for employer withdrawal liability.

## V. The Pension Funds are entitled to recover reasonable costs and attorney's fees under ERISA, 29 U.S.C. §1132(g).

ERISA, 29 U.S.C. §1132(g) authorizes the Court, in its discretion, Sec. 1132(g)(1) or, mandatorily, Sec. 1132(g)(2), to award reasonable attorney fees and

costs. In the event the Court rejects the City's efforts to use the Plan injunction to block the Pension Funds' efforts to enforce their post-Effective date rights under ERISA, the Pension Funds reserve their right to seek costs and attorney fees under this provision.

## <u>RELIEF REQUESTED</u>

WHEREFORE, for all the reasons stated herein, the Pension Funds respectfully request that the Court deny the City's Motion in its entirety.

Respectfully submitted,

LAW OFFICE OF

BARBARA A. PATEK, PLC


By: _/s/ Barbara A. Patek_
Barbara A. Patek (P34666)
Counsel for the Pension Funds


Dated: October 1, 2020

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## <u>EXHIBIT LIST</u>

Exhibit A – SMW 80 Pension Fund Declaration – Danette Sears

Exhibit B – IBEW 58 Pension Fund Declaration – Craig Young

Exhibit C – Special Services Agreement

Exhibit D – June 15, 2015 correspondence

Exhibit E – Uhl Declaration

Exhibit F – City's April 23, 2015 request for information

Exhibit G - SMW 80 Pension Fund's May 21, 2020 response to City

Exhibit H – IBEW 58 Pension Fund's May 21, 2020 response to City

Exhibit I – City's May 27, 2020 request for information

Exhibit J – Funds' June 22, 2020 response to May 27, 2020 request

Exhibit K – Request for Review to SMW 80 Pension Fund

Exhibit L – Request for Review to IBEW 58 Pension Fund

- 1 -