# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF MICHIGAN

### SOUTHERN DIVISION

In Re:                                                  Chapter 9

CITY OF DETROIT, MICHIGAN                     Case No. 13-53846

     Debtor.                                         Hon. Thomas J. Tucker

_____/

## NOTICE OF HEARING

PLEASE TAKE NOTICE that Claimants Abraham Greer, and Abraham Greer as Personal Representative for the Estate of Sandra Greer's Motion for Relief from Order is hereby scheduled for a time and date to be set by this Honorable Court, or as soon as counsel may be heard.

Dated: May 21, 2021

Respectfully Submitted,

/s/ *Jan Jeffrey Rubinstein*

Jan Jeffrey Rubinstein (P57937)

In Re:                                          Chapter 9

CITY OF DETROIT, MICHIGAN                        Case No. 13-53846

    Debtor.                                  Hon. Thomas J. Tucker

_____/

### CLASS 14 CLAIMANTS' MOTION FOR RELIEF FROM ORDER

NOW COME Class 14 Claimants, ABRAHAM GREER, and ABRAHAM GREER AS REPRESENTATIVE OF THE ESTATE OF SANDRA GREER, by and through their attorneys, THE RUBINSTEIN LAW FIRM, and for their Motion for Relief From Order, respectfully states as follows:

1. Counsel, Jan Jeffrey Rubinstein, brings this Motion on behalf of his clients and particular Claimants, Abraham Greer, and Abraham Greer as Personal Representative of the Estate of Sandra Greer.

2. By way of brief background, Claimants, at all times relevant, resided at the address of 15739 Manor Street in the City of Detroit. Claimants brought an underlying action in the Wayne County Circuit Court against Debtor, CITY OF DETROIT – WATER AND SEWERAGE DEPARTMENT ("DWSD"), based upon theories of inverse condemnation and Gross Negligence in their lack of responses, selective remediation, and willful disregard for DWSD systems.

1

3. As a result of the acts of Debtor, Claimants were subject to consistent sewage in their home which ultimately caused severe damages to Appellees' home and **resulted in the death of Sandra Greer[1]**.

4. Without attempting to argue its case in front of this Court, Debtor has clearly done *everything in its power to escape liability.* The current Order Debtor is trying to use to oust Claimants is *horrific, unethical, and outright discriminatory.*

5. Procedurally, Debtor has tried, and failed, at a Motion for Summary Disposition at the trial court level.

6. Thereafter, Debtor attempted to Appeal the Order Denying Summary Disposition to the Michigan Court of Appeals, where they also were without merit. That opinion is attached hereto as Exhibit "B".

7. Now, Claimants' case has been affirmed and is set for trial in the Wayne County Circuit Court. *However, due to the COVID-19 Pandemic, Claimants' case has been indefinitely on hold, while civil jury trials are suspended until July 19, 2021[2] - as such, Claimants have **not yet** achieved a liquidated monetary judgment and do not have monies to put into a brokerage account.*

8. On May 11, 2021, debtors counsel tendered a Letter in Re: **Final Notice Account Form and W-9 Form, and Notice Regarding Distributions to Class 14 Claimants.** See Exhibit "A".

---

[1] Notably, the Order Attached hereto as Exhibit "A" erroneously names Sandra Greer as an individual currently alive.
[2] Per the 3rd Circuit Court's Website.

9. In the attached letter from counsel for Debtor, Marc Swanson, it is indicated that the City was preparing to make initial distributions and that **Claimants will not receive a distribution unless they comply with the distribution order.**

10. Conveniently, despite the Claimants here not yet having a liquidated judgment, Mr. Swanson attempts to lump them into the same category as Claimants that do, by stating:

> **If a Class 14 Claimant fails to return a properly completed and valid Tax Form and Brokerage Account Form** to KCC at the address set forth on the Notice on or before 180 days after the date on which the Brokerage Account Form and the Tax Form are served (a) **all Distributions of Related Income now owing or which may hereafter come due to such Class 14 Claimant will irrevocably revert to the City <u>and any Claim in respect of such Distribution or Distributions will be released and forever barred</u> from assertion against the City and its property;** (b) the City is authorized and directed to cancel any B notes held for distribution to a Class 14 Claimant, and those B Notes will be of no further force or effect and (c) the proof of claim(s) filed by such Class 14 Claimant will be disallowed and expunged. (see Exhibit "A p. 6)

11. Mr. Swanson also attempts to lay out what he believes to be his authority under this Order; specifically:

> **Please do not submit responses other than properly completed forms as any other response will not preserve your claim. <u>*Numerous other claimants*</u> have complied with the Distribution Order without the extensions that have been afforded to you; the City will not entertain objections at this late date that you are unable to open a brokerage account, whether due to COVID-19 or any other Reason.**
> (See Exhibit "A" – P. 7 – emphasis added).

3

12. Mr. Swanson has overlooked a key point in his letter – ***the other Claimants that he is referencing have liquidated judgments against the city, and therefore can begin collecting on these claims, <u>immediately</u>.*** *This begs the question; how can the City begin making distributions to Abraham Greer and the Estate of Sandra Greer when there is no judgment, and no definite number or schedule in place for payments, either through a judgment or settlement agreement?*

13. Further, the letter attached hereto as Exhibit "A" takes the tone that the three (3) attorneys listed have spent the last year *not working towards setting up a brokerage account for clients pending trial.* In reality, this is a brazenly false and frivolous allegation. All named attorneys have spent several months attempting to find a brokerage pursuant to the Order referenced in Exhibit "A" – however, this has been met with several issues:

   a. Undersigned Counsel for Claimants called all named brokerages on the list. **A majority of them did not even know that they were on this list and further stated they could not facilitate, or were not interested in providing the requested account[3];**

   b. On one occasion, a broker identified by debtors' list, Charles Sprinkle, was no longer employed with the brokerage;

   c. Some of the brokerages would assist, however they incurred significant fees, and ***would not allow the Claimants to maintain a zero balance.*** Being that Mr. Greer[4] does not have

---

[3] Claimants have attempted to work with Fidelity, Huntington, Comerica, TCF, Chemical Bank, JP Morgan Chase, PNC, and Flagstar banks.

[4] This also begs the query, *how can a new brokerage account be set up for a deceased person, such as Sandra Greer?* None of the named brokerages were capable of assisting with that, and the Order Referenced in Exhibit "A" **erroneously names Mrs. Greer as alive.**

4

a great deal of means at this time, he would be expected to furnish a brokerage account with the required minimum balance, and routinely pay fees *indefinitely until he has a trial on his case and reaches a judgment.*

    d.  Jan Jeffrey Rubinstein, counsel for Mr. Greer and Mrs. Greer, attempted to set up a brokerage account in his own name on their behalf, which was rejected by several brokerage firms.

14. Remarkably, Mr. Swanson has given Claimants until *May 25, 2021* to get these brokerage accounts set up, **despite it being physically impossible to do.** However, when Mr. Swanson was alerted to this issue **earlier in 2020**, he would take *anywhere from weeks to four months to respond.* It is evident that on behalf of his client, he is doing whatever he can to avoid payment to judgment creditors.

15. Mr. Swanson has also been informed of the *numerous ethical violations* all named Counsel in Exhibit "A" is expected to commit in compliance with this Order, specifically:

    Rule 1.15(b)) A lawyer shall:

    (1) promptly notify the client or third person when funds or property in which a client or third person has an interest is received;

    (2) preserve complete records of such account funds and other property for a period of five years after termination of the representation; and

    (3) promptly pay or deliver any funds or other property that the client or third.

5

16. As this Court is well-aware, MRPC 1.15 is the rule which governs the co-mingling of client funds. The State Bar of Michigan has given written opinions regarding this rule:

> MRPC 1.15(d) requires that **"[a]ll client or third person funds" be deposited into an IOLTA or non-IOLTA account.** "Client or third person funds" include unearned legal fees and unincurred expenses that have been paid in advance, funds in which a third person has an interest, and funds in which two or more persons (one of whom may be the lawyer) claim an undivided interest. When the funds received are unearned fees and unincurred costs or expenses, they must be held in trust until earned or expended.
>
> […]
>
> *A lawyer is not permitted to commingle the lawyer's funds with client or third person funds.* When funds are received from a client or third person in a "lump sum" that represents a combination of earned funds or incurred expenses along with unearned funds or unincurred expenses, the entire sum must be placed in trust and then any earned funds or incurred expenses must be promptly withdrawn.
>
> *Upon receipt of client or third person funds, lawyers are obligated to determine whether the funds should be deposited into an IOLTA or a non-IOLTA account.* [5]

17. Notably, all of these obligations *are on the attorney, not the client.* Attorneys clearly have a duty to their clients to safeguard funds, a duty to get their clients paid, and a right to get paid themselves.

---

[5] See https://www.michbar.org/opinions/ethics/numbered_opinions/r-021; See Also **MRPC 1.2; 1.5(a); 1.8(e); 1.15(a), (b), (c), (d), (e), (g), (h) and (j); 1.15A(a); 1.16(d);** R-7; RI-10; RI-69; RI-92; RI-93; RI-107; RI-189; RI-330; *Grievance Administrator v. Cooper*, **482 Mich 1079; 757 NW2d 867 (2008)** rev'g *Grievance Administrator v. Cooper*, **Case No. 06-36-GA (Sep 17, 2007).**

6

18. Clearly, there is no way any of the remaining attorneys can pay fees unrelated to litigation on behalf of a client, and the clients do not have the means to set these brokerage accounts up with the minimum balance, as well as paying monthly maintenance fees *indefinitely until their case goes to trial.* Essentially, the Order in place amounts to discrimination against lower income Claimants and puts undue burden on them that they cannot fulfill.

WHEREFORE, Class 14 Claimants, ABRAHAM GREER, and ABRAHAM GREER AS REPRESENTATIVE OF THE ESTATE OF SANDRA GREER, respectfully request that this Honorable Court grant their Motion for Relief from Order, and enter an Order permitting an alternative method for setting up accounts pertaining to the City of Detroit Bankruptcy proceedings, *which does __not__ violate the Michigan Rules of Professional Conduct.*

                                        Respectfully submitted,
                                        THE RUBINSTEIN LAW FIRM

Dated: May 21, 2021

                                        BY:/s/ *Jan Jeffrey Rubinstein*
                                        Jan Jeffrey Rubinstein (P57937)
                                        Attorney for Claimants

7

# EXHIBIT "A"

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 9 |
| City of Detroit, Michigan, | Case No. 13-53846 |
| Debtor. | Hon. Thomas J. Tucker |

_____/

## CERTIFICATE OF SERVICE

I, Lydia Do, certify and say that I am employed by Kurtzman Carson Consultants LLC (KCC), the claims and noticing agent for the Debtor in the above-captioned case.

On May 11, 2021, at my direction and under my supervision, employees of KCC caused to be served the following documents via First Class Mail on the service list attached hereto as **Exhibit A**:

- **Letter re Final Notice Account Form and W-9 Form [attached hereto as Exhibit B]**

- **Notice Regarding Distributions to Class 14 Claimants** (includes the Brokerage Account Form, the Tax Form, the Set Up Your Brokerage Account Form) [attached as Exhibit 6-1 to Docket No. 13126]

- **Return Envelope**

Dated:  May 18, 2021

/s/ Lydia Do
Lydia Do
KCC
222 N. Pacific Coast Highway,
Suite 300
El Segundo, CA 90245

# **EXHIBIT A**

| CreditorName | CreditorNoticeName | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Abraham Greer and Sandra Greer | c/o Atty the Rubinstein Law Firm | Jan Jeffrey Rubinstein (P57937) | 30150 Telegraph Rd., Ste 444 | Bingham Farms | MI | 48025 |
| Bell, Shelton (estate Of) P/r, Tammy Howard | Romano, Daniel G. | Romano Law PLLC | 23880 Woodward Ave | Pleasant Ridge | MI | 48069 |
| Bell, Shelton Jr, Est. Of Bhpr Tammy Howard | Romano, Daniel G. | Romano Law PLLC | 23880 Woodward Ave | Pleasant Ridge | MI | 48069 |
| Brazel, Gregory | | 25657 Southfield Rd | | Southfield | MI | 48075 |
| Brazell, Gregory | Romano, Daniel G | Romano Law PLLC | 23880 Woodward | Pleasant Ridge | MI | 48069 |
| Curtis Morris | Romano Law PLLC | 23880 Woodward Ave | | Pleasant Ridge | MI | 48069 |
| Davistion, Frank | Bachteal, Robert | Law Offices of Kelman & Fantich | 30833 Northwestern Hwy Ste 206 | Farmington Hills | MI | 48334 |
| Davistion, Frank | Fantich, Brian L. | Law Office of Kelman & Fantich | 30833 Northwestern Hwy Ste 206 | Farmington Hills | MI | 48334 |
| Davistion, Frank | Law office of Kelman & Fantich | 30903 Northwestern Hwy Ste 270 | | Farmington Hills | MI | 48334 |
| Denson, Velma | Romano, Daniel G. | Romano Law PLLC | 23880 Woodward Ave | Pleasant Ridge | MI | 48069 |
| Denson, Velma | | 326555 Evergreen Rd. | Suite 1500 | Southfield | MI | 48076 |
| Gilstrap, Jenniger | Law Offices of Kelman & Fantich | 30903 Northwestern Hwy Ste 270 | | Farmington Hills | MI | 48334 |
| Guest, Shuntina | Bachteal, Robert | Law Offices of Kelman & Fantich | 30833 Northwestern Hwy Ste 206 | Farmington Hills | MI | 48334 |
| Guest, Shuntina | Fantich, Brian L. | Law Office of Kelman & Fantich | 30833 Northwestern Hwy Ste 206 | Farmington Hills | MI | 48334 |
| Guest, Shuntina | Guest, Shuntina / Law Office of Kelman & Fantich | 30903 Northwestern Hwy Ste 270 | | Farmington Hills | MI | 48334 |
| Law Offices of Kelman & Fantich | | 30903 Northwestern Hwy #270 | | Farmington Hills | MI | 48334 |
| Mckay, Michael | Romano, Daniel G. | Romano Law PLLC | 23880 Woodward Ave | Pleasant Ridge | MI | 48069 |
| Parnell, Taesean a minor by his next friend Corliss Thomas | Romano Law, PLLC | 23880 Woodward Ave | | Pleasant Ridge | MI | 48069 |
| Raymond Thompson | Daniel Romano | Romano Law PLLC | 23880 Woodward Ave | Pleasant Ridge | MI | 48069 |
| Roman Law | | 23800-23880 Woodward Ave | | Pleasant Ridge | MI | 48069 |
| The Rubinstein Law Firm | | 30150 Telegraph Road, Suite 444 | | Bingham Farms | MI | 48025 |
| Thompson, Jr., Raymond | Romano, Daniel G. | Romano Law PLLC | 23880 Woodward Ave | Pleasant Ridge | MI | 48069 |
| Williams, La-sheryl, | Bachteal, Robert | Law Offices of Kelman & Fantich | 30833 Northwestern Hwy Ste 206 | Farmington Hills | MI | 48334 |
| Williams, La-sheryl, | Fantich, Brian L. | Law Office of Kelman & Fantich | 30833 Northwestern Hwy Ste 206 | Farmington Hills | MI | 48334 |
| Williams, La-sheryl, | | 30903 Northwestern Hwy, Ste 270 | | Farmington Hills | MI | 48334 |

# EXHIBIT B

Founded in 1852
by Sidney Davy Miller

MARC N. SWANSON
TEL (313) 496-7591
FAX (313) 496-8451
E-MAIL swansonm@millercanfield.com

# MILLER CANFIELD

**Miller, Canfield, Paddock and Stone, P.L.C.**
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
TEL (313) 963-6420
FAX (313) 496-7500
www.millercanfield.com

MICHIGAN
ILLINOIS
NEW YORK
OHIO
WASHINGTON, D.C.
CANADA
CHINA
MEXICO
POLAND
QATAR

May 11, 2021

Re:     City of Detroit Bankruptcy – FINAL NOTICE Brokerage Account Form and W-9
         Form

**PLEASE TAKE NOTICE that you have not returned properly completed Brokerage Account and/or W-9 Forms by the specified deadline. Under the terms of the Distribution Order, the City has no obligation to consider your claim further and may treat your claim as waived. Nonetheless, by this letter the City is providing you with a final opportunity to comply with the Distribution Order. Your properly completed forms must be actually received by KCC no later than May 25, 2021, or your claim will be expunged from the claims register and you will not receive distributions or further correspondence regarding your claim.**

Dear Claimant:

We represent the City of Detroit ("City") in bankruptcy case number 13-53846 in the Bankruptcy Court for the Eastern District of Michigan ("Court"). In September of 2019, the City filed its *Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims under the City's Confirmed Plan of Adjustment* ("Motion") with the Court, seeking Court permission to begin making distributions to creditors holding Class 14 claims under the City's confirmed bankruptcy plan. The Motion was approved by the Bankruptcy Court by order entered on November 13, 2019, at docket number 13173 in the City's bankruptcy case ("Distribution Order").

In the Motion, the City committed to providing all "Class 14 Claimants"[1] who will or may receive distributions under the plan with notice and instructions to complete and return (1) a Brokerage Account Form, and (2) W-9 Form. The Court ordered that these forms be returned by no later than June 24, 2020.

---

[1] This term is defined in the Motion and in the City's confirmed plan and generally refers to creditors in the City's bankruptcy case with claims against the City in excess of $25,000. For additional details, please refer to these documents which may be found on the City's bankruptcy website (http://www.kccllc.net/detroit), or consult with your counsel.

**You are receiving this letter because the City is preparing to make initial distributions. This is a final notice that you will not receive a distribution unless you take immediate action to comply with the Distribution Order.**

You have either failed to submit a Brokerage Account Form or W-9 Form, or one or both of these forms that you previously submitted were improperly filled out. Further, you were granted an extension to submit properly completed forms to comply with the Distribution Order, but as of the date of this letter, you have not done so. Your failure to return properly completed Brokerage Account and W-9 Forms means that you have not complied with the Distribution Order and, under its terms, have waived your right to receive Class 14 distributions under the plan.

Brokerage Account Form Requirements:

The Motion requires, among other things, that each claimant entitled to receive a distribution of B Notes must establish an individual brokerage account. As explained in the Motion, the B Notes were issued "in registered book entry" form through The Depository Trust Company ("DTC")." (*See* Motion at ¶ 14). Consequently, distributions of B Notes **must** be executed through a broker/dealer that maintains a relationship with the DTC. *Id.*

W-9 Form Requirements:

As stated in the Distribution Order, "the name of the creditor on the Brokerage Account Form and the name on the [W-9] Form must match the name of the creditor on the proof of claim form and the Distribution will be made in the name of the creditor on the proof of claim form." (*See* Distribution Order at ¶ 3). Only one name is permitted on the W-9 form.

A copy of the Motion was served on you and your attorney, either via email or via first-class mail as evidenced by the certificates of service filed with the Court on September 19 and September 27, 2019. Neither you nor your attorney objected to the Motion and the time allowed for challenging the Motion has passed, which led to the Court entering its Distribution Order.

Paragraph 6 of the Distribution Order states, in pertinent part:

> **If a Class 14 Claimant fails to return a properly completed and valid Tax Form and Brokerage Account Form** to KCC at the address set forth on the Notice on or before 180 days after the date on which the Brokerage Account Form and the Tax Form are served (a) **all Distributions of Related Income now owing or which may hereafter come due to such Class 14 Claimant will irrevocably revert to the City <u>and any Claim in respect of such Distribution or Distributions will be released and forever barred</u> from assertion against the City and its property**; (b) the City is authorized and directed to cancel any B Notes held for Distribution

to a Class 14 Claimant, and those B Notes will be of no further force
or effect and (c) the proof of claim(s) filed by such Class 14
Claimant will be disallowed and expunged.

(*See* Distribution Order at ¶ 6) (emphasis added).

Please do not submit responses other than properly completed forms as any other response
will not preserve your claim. Numerous other claimants have complied with the Distribution Order
without the extensions that have been afforded to you; the City will not entertain objections at this
late date that you are unable to open a brokerage account, whether due to COVID-19 or any other
reason.

Please return a properly completed Brokerage Account Form and W-9 Form so that it is
actually received by KCC by no later than **May 25, 2021**. You may use the prepaid, preaddressed
envelope included with this Notice to return the forms. You may also mail them to KCC at the
following address.

City of Detroit Claims Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

Please be advised that you should contact your own attorney or tax advisor if you have any
questions.

Very truly yours,

Miller, Canfield, Paddock and Stone, P.L.C.

By: /s/ Marc N. Swanson
      Marc N. Swanson

MNS

# EXHIBIT "B"

**Burton, Kevin 7/6/2020**
**For Educational Use Only**

Greer v. Detroit Water and Sewerage Department, Not Reported in N.W. Rptr. (2020)

2020 WL 815133
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Abraham GREER, individually and as
personal representative of the Estate
of Sandra Greer, Plaintiff-Appellee,
v.
DETROIT WATER AND SEWERAGE
DEPARTMENT, Defendant-Appellant,
and
James G. Fausone and Michael
Einheuser, Defendants.

No. 345698
|
February 18, 2020

Wayne Circuit Court, LC No. 16-102832-02

Before: Murray, C.J., and Swartzle and Cameron, JJ.

**Opinion**

Per Curiam.

 **\*1** This action involves claims of negligence and inverse
condemnation against defendant, the City of Detroit Water
and Sewerage Department (DWSD), for property damage
and physical injury allegedly resulting from repeated sewer
backups into the home of Abraham and Sandra Greer. The
DWSD appeals as of right the trial-court order denying its
motion for summary disposition, which was brought under
MCR 2.116(C)(7) (governmental immunity and statute of
limitations) and MCR 2.116(C)(10) (no genuine issue of
material fact). We affirm.

I. BACKGROUND

This case arose from alleged backups from the DWSD's
sewage-disposal system into the Greers' basement at
15739 Manor in Detroit, Michigan. The Greers allegedly
experienced these backups for over 20 years, resulting
in water damage to their home, as well as severe mold
infiltration, which they allege caused Sandra's death.
Beginning in 2000, the Greers made numerous complaints to
the DWSD regarding the backups. The DWSD investigated
the complaints, but repeatedly indicated that there were no
failed or blocked sections in the main-sewer line servicing the
home. The DWSD maintained that the water intrusion was
related to the Greers' private-sewer connection, not the main-
sewer line owned and operated by the DWSD.

Over many years, Sandra suffered from chronic health issues,
including type-II diabetes, hypertension, obesity, chronic-
sleep apnea, stage-IV chronic-renal failure, and congestive-
heart failure. The record indicates that she suffered from
various medical conditions before she was allegedly exposed
to toxic mold in her home. In 2016, Sandra died from "severe
hypertension due to a pulmonary edema as a consequence
of end-stage renal disease." After her death, Abraham Greer,
individually and as personal representative of Sandra's estate,
filed this action asserting a claim of negligence and a claim
of inverse condemnation. Broadly speaking, the negligence
claim consisted of two separate claims, one for injuries related
to the property damage and one for injuries related to Sandra's
medical conditions and eventual death.

The DWSD brought a motion for summary disposition
asserting that it was immune from liability under the
Governmental Immunity Act ("the Act"), MCL 691.1401
et seq. The DWSD argued that plaintiff could not establish
the requisite elements of the sewage-disposal-system-event
exception to governmental immunity, MCL 691.1417(2).
The DWSD also maintained that plaintiff's claim relating to
Sandra's personal injury was time-barred and that plaintiff
could not establish a claim of inverse condemnation.

In support of their respective positions, both parties relied on
video inspections and reports of the main-sewer line servicing
the Greers' home, which revealed heavy root infiltration in
the sewer downstream of the Greers. In addition, both parties
relied on a proposal by Inland Waters Pollution Control, Inc.
(IWPC) to reconstruct several of the sewer pipes. The IWPC
proposal indicated that there was "severe root infestation
through the joints and services" of various sewer pipes.
Plaintiff relied on the IWPC proposal to show that the sewage-

13-53846-tjt Doc 13369 Filed 05/21/21 Entered 05/21/21 14:04:31 Page 18 of 24

**Burton, Kevin 7/6/2020**
**For Educational Use Only**

disposal system maintained by the DWSD had a "defect" that caused the backups onto the Greers' property. The DWSD relied on the same proposal to show that the root infiltration was located in the private-service connections, not in the main-sewer line owned and operated by the DWSD.

**\*2** This distinction is pertinent because, under the sewage-disposal-system-event exception to governmental immunity, a governmental agency is not liable for a backup onto a plaintiff's property if an obstruction in a service lead that was not caused by a governmental agency was a "substantial proximate cause" of the overflow or backup. MCL 691.1416(k)(*i*); MCL 691.1417. A "service lead" is statutorily defined as "an instrumentality that connects an affected property ... to the sewage disposal system and that is neither owned nor maintained by a governmental agency." MCL 691.1416(i). Thus, to the extent the backups onto the Greers' property resulted from an obstruction in their private-service connection to the main-sewer line, or in other property owners' private-service connections to the main-sewer line, the DWSD would not be liable under the Act.

The DWSD investigated the Greers' complaints of backups on multiple occasions over the years, and consistently claimed that there was nothing wrong with the main-sewer line. In 2000, a video taken by closed-circuit camera revealed that "there were no failed or blocked sections found" in the main-sewer line and the DWSD advised plaintiff to have the private-service line "rodded." In 2004, the DWSD determined that the damage alleged by the Greers "was not caused by any defect in the sewage disposal system owned or operated by the City of Detroit." In 2006, the DWSD "cleaned and televised the public line," found "no failed or blocked sections," and concluded that "the sewage problem at your home is the property owner's responsibility." In 2011, the DWSD investigated and identified no "defects in its sewer system that caused flooding of basements" and concluded that "the cause of your backup on your property was not a result of a blockage or any defect in the sewer system." Yet, the DWSD's inspections of its own sewer system is not the only evidence in this case.

Plaintiff's claim is premised on the alleged existence of severe root infiltration in the sewer system. Plaintiff alleged in the complaint and asserted in the response to the DWSD's motion for summary disposition that it was "indisputable that

there existed substantial defects within the sewage disposal system" as set forth by the IWPC in a 2012 proposal provided to the DWSD. This proposal stated, in relevant part:

> Pursuant to your departmental request, made ... on 02/21/2012, we are pleased to provide the following proposal for CIPP reconstruction of three 12-inch, one 15-inch, one 18-inch and one 20-inch sewer pipes on ER-217W. These sewers have been cleaned and televised previously. ER-217W is located at 15739 Manor. Accordingly, the work for this ER release is identified within the proposal below. **This ER was called in to investigate the customer complaint of water in basement. From video inspection, it was observed that all sewers have severe root infestation problem through joints and services. It is recommended that the sewers be lined using CIPP to permanently curb the root growth in main sewer**.
> [Emphasis in original.]

Thus, even though the main-sewer line had been "cleaned and televised previously," the IWPC nonetheless discovered a "severe root infestation problem." In 2012, the IWPC performed the repair work on the sewer line; a preprinted-utilities notice dated April 10, 2012 indicated that IWPC was working in the area "to reconstruct certain troubled sewer lines."

To illustrate the severity of the root problem in the sewer line servicing the Greers' home, plaintiff also relied on pictures that were apparently from a video inspection performed in 2012 of two service connections at addresses located 195.92 and 204.08 feet downstream of their home. These pictures showed those service connections with heavy roots (90% and 95% blockages, respectively) within 8 inches of the joint. Plaintiff argued at the motion hearing that these pictures were egregious and clearly showed that the city's sewer lines in this

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    2

**Burton, Kevin 7/6/2020**
**For Educational Use Only**

Greer v. Detroit Water and Sewerage Department, Not Reported in N.W. Rptr. (2020)

area were completely "clogged by roots and infestation that had grown and really all this is ... is a failure to maintain."

**\*3** The DWSD argued that the video footage referenced in the 2012 proposal did not show any defects or obstructions restricting the flow of water in the main sewer, but only showed roots in service connections. The 2012 video footage, however, is not included as part of the trial court record (with the exception of the pictures noted above).

In addition to the 2012 proposal, plaintiff also relied on an earlier, July 2006 video-inspection by IWPC of the main-sewer line at 15739 Manor. The inspection started at the manhole 19.80 feet upstream showing heavy root infiltration (90% to 100% blockages) in several service connections at addresses located 117.50, 158.60, 182.80, 275.70, and 316.30 feet downstream from the Greers' home. The proposal did not, however, specifically identify any heavy roots at the service connection of the Greers' property.

Plaintiff also directed the trial court to evidence provided by one of their neighboring property owners, Joseph Ensley, who owned the home just south or downstream of the Greers' home. Ensley stated that he also experienced backups over many years, from 1971 to 2012. Ensley had his service connection "snaked" and there were no obstructions found. Ensley's flooding issues apparently dissipated in 2012, the same year that the DWSD had repair work performed on the main-sewer line.

Yet, as the DWSD pointed out, Ensley's problems were less extensive than those of the Greers. Unlike Ensley, the Greers continued to experience backups into their basement, even after the 2012 repairs to the main-sewer line, which suggests that something other than an issue in the main-sewer line may have caused or contributed to the backups experienced by the Greers. Plaintiff also repeatedly asserted that the backups occurred in all types of weather conditions, including heavy rain, light rain, snow, changes of season, or even on perfectly sunny, dry days, which would be consistent with an obstruction blocking the flow in their own private-service line, while Ensley indicated that he experienced backups "after a heavy rain," which would tend to be more consistent with a blockage in the main-sewer line. There is no evidence that the Greers, unlike Ensley, ever had their service connection inspected or "snaked" to rule out any issue in their own private-service line that might have obstructed the water

flow from their home into the main sewer. There is also no evidence that the DWSD televised the Greers' private-service line to prove that it was, in fact, obstructed.

Finally, plaintiff relied on evidence showing that the Greers' home suffered property damage because of a severe mold infestation allegedly caused by the repeated instances of sewer backups. This evidence included an environmental report identifying the serious mold issue in the home, pictures showing the home's property damage, and quotes from repair companies to remediate the mold and repair the water damage. Notably, environmental testing revealed a serious mold issue because of the flooding in the basement, noting "extensive water damage and subsequent bacteria/ fungal (mold) growth" and "severely elevated Aspergillus/ Penicillium candida (almost 13 times higher)" when compared to the outdoor sample." The inspection recommended the use of face respirators and protective suits when working in the basement and concluded that the issue should be addressed immediately with proper remediation.

**\*4** The trial court denied the DWSD's motion for summary disposition, generally concluding that questions of fact existed regarding plaintiff's claims. This appeal followed.

## II. ANALYSIS

### A. STANDARD OF REVIEW

Summary disposition is appropriate under MCR 2.116(C)(7) if a plaintiff's claims are barred by governmental immunity. *Cannon Twp. v. Rockford Public Schools*, 311 Mich. App. 403, 414; 875 N.W.2d 242 (2015). We review de novo a trial court's decision on a motion for summary disposition. *Id.* The application of governmental immunity is a question of law that we also review de novo. *Pierce v. Lansing*, 265 Mich. App. 174, 176; 694 N.W.2d 65 (2005).

### B. SEWAGE-DISPOSAL-SYSTEM-EVENT EXCEPTION TO GOVERNMENTAL IMMUNITY

Under MCL 691.1401 *et seq.*, governmental agencies enjoy "broad immunity from tort liability ... whenever they

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    3

**Burton, Kevin 7/6/2020**
**For Educational Use Only**

Greer v. Detroit Water and Sewerage Department, Not Reported in N.W. Rptr. (2020)

are engaged in the exercise or discharge of a governmental function." *Plunkett v. Dep't of Transp.*, 286 Mich. App. 168, 181; 779 N.W.2d 263 (2009) (cleaned up); see also MCL 691.1401(a), (d), (e); 691.1407(1). The Legislature enacted several exceptions to governmental immunity, and those exceptions are the only means by which an individual may bring a tort claim against a governmental agency. *Lash v. Traverse City*, 479 Mich. 180, 195; 735 N.W.2d 628 (2007).

At issue in this case is the so-called sewage-disposal-system-event exception, set forth at MCL 691.1417(2). This exception "abrogate[s] common law exceptions, if any, to immunity for the overflow or backup of a sewage disposal system and provide[s] the sole remedy for obtaining any form of relief for damages or physical injuries caused by a sewage disposal system event regardless of the legal theory." *Willett v. Waterford Charter Twp.*, 271 Mich. App. 38, 46; 718 N.W.2d 386 (2006) (cleaned up). Under this exception, "[a] governmental agency is immune from tort liability for the overflow or backup of a sewage disposal system unless the overflow or backup is a sewage disposal system event and the governmental agency is an appropriate governmental agency." MCL 691.1417(2).

There is no question on appeal that the DWSD is an "appropriate governmental agency." MCL 691.1416(b). "A 'sewage disposal system event' is defined, in pertinent part, as 'the overflow or backup of a sewage disposal system onto real property.' " *Willett*, 271 Mich. App. at 48, quoting MCL 691.1416(k). Meanwhile, the term "sewage disposal system" means "all interceptor sewers, storm sewers, sanitary sewers, combined sanitary and storm sewers, sewage treatment plants, and all other plants, works, instrumentalities, and properties used or useful in connection with collection, treatment, and disposal of sewage and industrial wastes, and includes a storm water drain system under the jurisdiction of a governmental agency." MCL 691.1416(j).

To bring a claim under the sewage-disposal-system-event exception, a claimant must prove all of the following elements:

(1) that the claimant suffered property damage or physical injuries caused by a sewage disposal system event;

(2) that the governmental agency against which the claim is made is an appropriate governmental agency;

(3) that the sewage disposal system had a defect;

(4) that the governmental agency knew, or in the exercise of reasonable diligence should have known, about the defect;

**\*5** (5) that the governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect;

(6) that the defect was a substantial proximate cause of the event and the property damage or physical injury;

(7) reasonable proof of ownership and the value of any damaged personal property; and

(8) that the claimant provided notice to the governmental agency of the claim as set forth in MCL 691.1419. [*Cannon Twp.*, 311 Mich. App. at 415-416 (cleaned up).]

"A plaintiff must satisfy all of these elements to survive a motion for summary disposition based on governmental immunity." *Id.* at 416, citing *Willett*, 271 Mich. App. at 50.

With respect to plaintiff's negligence claims, the DWSD argues that there is no issue of fact on whether (1) its sewer system had a defect; (2) it knew, or should have known about any defect; (3) it failed to take reasonable steps in a reasonable amount of time to repair any defect; and (4) any defect was a substantial proximate cause of the backups and the resulting property damage or personal injury. As we explain, there are issues of fact on all of these matters with the exception of whether any defect was a substantial proximate cause of Sandra's medical conditions and death.

## C. PROPERTY-DAMAGE NEGLIGENCE CLAIM

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

4

**Burton, Kevin 7/6/2020**
**For Educational Use Only**

Greer v. Detroit Water and Sewerage Department, Not Reported in N.W. Rptr. (2020)

## 1. DEFECT

The DWSD first argues that plaintiff failed to establish an issue of fact on whether the sewer system had a defect. The Legislature defined "defect" as "a construction, design, maintenance, operation, or repair defect." MCL 691.1416(e). The DWSD argues that it repeatedly told the Greers that the backups that occurred at their home were caused by "significant growth of roots" in their own private-service lead, not any defect in the main-sewer line. Noting that the maintenance of private-service leads is the responsibility of the property owner, the DWSD argues that plaintiff is not entitled to proceed under the sewage-disposal-system-event exception to governmental immunity.

As outlined above, plaintiff provided evidence regarding the condition of the main-sewer line in 2006 and 2012. Considering the heavy roots that IWPC observed in the main-sewer line at several service connections immediately downstream from the Greers' home, it can be reasonably inferred that root growth had infiltrated the main-sewer line by 2012 and could have potentially obstructed flow in the line so as to cause the contents of the main-sewer line to back up and flood the private-service connections upstream.

And, from IWPC's 2012 proposal to reconstruct the sewer lines, indicating that "all sewers have severe root infestation problem through joints and services" and recommending using a CIPP lining "to permanently curb the root growth in main sewer," it could be reasonably inferred that the root growth did, in fact, worsen from 2006 to 2012. Moreover, the fact that the DWSD responded to the root-infiltration problem identified in the video inspection by performing the repairs in 2012 could be considered circumstantial evidence that the DWSD viewed the root infiltration as a fault, shortcoming, or imperfection in its sewer line, i.e., a defect requiring maintenance. See *Willett*, 271 Mich. App. at 51-52 ("Defendant's response to the obstruction indicates that it viewed the obstruction as a fault or a defect requiring immediate maintenance.").

**\*6** On this record, including the severity and location of the root infiltration problem in 2012 (in the main line or in the service connections) and the remedial measures that the DWSD apparently took to "permanently curb the root

growth in [the] main sewer," we conclude that reasonable minds could differ regarding whether the root infiltration constituted a maintenance defect under MCL 691.1417(3)(b) for which the DWSD could be liable. *Id.* at 52.

Relatedly, the DWSD argues that roots are "foreign objects" that could not constitute a defect under the Act because they have no relation to the construction, design, maintenance, operation, or repair of the sewage disposal system. In support, the DWSD refers this Court to *Willett*. The portion of the opinion cited by the DWSD, however, is the description of the trial court's decision in that case. *Id.* at 44. The issue in *Willett* was "whether a foreign object believed to be concrete or asphalt introduced into the sewer system by an unknown third party creating an obstruction in the sewer constitutes a maintenance defect." *Id.* at 51. This Court concluded that "the obstruction of the sewer constituted a defect," regardless of fault. *Id.* at 52. Thus, as this Court specifically held, "[T]he trial court erred in finding, as a matter of law, that the obstruction by a foreign object did not constitute a defect." *Id.* Similarly, the existence of root infiltration, even if not the DWSD's fault, could constitute a "defect" under the Act. Accordingly, the DWSD was not entitled to summary disposition on this basis.

## 2. REASONABLE STEPS IN REASONABLE TIME

The DWSD next argues that plaintiff failed to establish that it failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the root infiltration. Plaintiff presented evidence that the DWSD was aware that the service connections immediately downstream of the Greers' home had a root-infiltration problem as early as 2006, as evidenced by the IWPC inspection report. In early 2012, IWPC characterized the root-infiltration problem as "severe" in "all sewers" and "through joints and services," prompting the company's recommendation to reconstruct several sewers using CIPP lining to "permanently curb the root growth in [the] main sewer." In April 2012, IWPC performed the work. Accordingly, as the DWSD asserts, it did take action to remedy the root-infiltration problem in 2012.

Yet, given the video inspection revealing service connections with heavy roots as early as 2006, reasonable minds could differ regarding whether the DWSD failed to take reasonable

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   5

**Burton, Kevin 7/6/2020**
**For Educational Use Only**

Greer v. Detroit Water and Sewerage Department, Not Reported in N.W. Rptr. (2020)

steps in a reasonable amount of time (over six years) to curb the root infiltration, in light of the location and severity of the root growth. Moreover, plaintiff contends that problems continued after the IWPC work in 2012. As there is a factual question on whether root infiltration was a defect in the DWSD line, there is similarly a factual question on whether the DWSD "failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect."

📄 MCL 691.1417(3)(d).

### 3. SUBSTANTIAL PROXIMATE CAUSE

With respect to causation, the DWSD argues that there is no evidence that its line was a substantial proximate cause of the property damage at the Greers' home or Sandra's medical conditions and death. Taking the property damage first, the DWSD argues that such damage resulted from the Greers' private-service line. In support, the DWSD cites its numerous responses to the Greers' complaints made over the years. The DWSD claims that each time it investigated, it did not find a blockage or other problem in its system. Additionally, the DWSD points to IWPC's 2006 video inspection, which did not indicate any obstructions or defects restricting the flow in the main-sewer line maintained by the DWSD, but showed several service connections at addresses downstream with roots, some "heavy" (90% to 100% blockages). Yet, pictures from IWPC's 2012 inspection of the sewer line show heavy roots infiltrating the service connections downstream of the Greers' home and noted heavy roots within eight inches of the joints, which at least suggests that the heavy root infiltration was located in the connections to the main-sewer line.

*7 The fact that a close neighbor also experienced severe water problems caused not by his own service line, but purportedly by the main-service line, is also some circumstantial evidence that plaintiff's problems were similarly caused. The circumstantial inference is not crystal clear, however, given that the neighbor's problems cleared up after the DWSD had work performed in 2012, but plaintiff's problems allegedly continued. But, this is a matter for a fact-finder to resolve, not one for an appellate court.

While "[c]ircumstantial evidence may be sufficient to establish a case," *Karbel v. Comerica Bank*, 247 Mich. App. 90, 97; 635 N.W.2d 69 (2001) (cleaned up), "[t]o be adequate,

a plaintiff's circumstantial proof must facilitate reasonable inferences ... not mere speculation," *Yoost v. Caspari*, 295 Mich. App. 209, 228; 813 N.W.2d 783 (2012) (cleaned up). Viewed in the light most favorable to plaintiff, there are questions of fact as to the existence of significant root infiltration in the service connections downstream from the Greers' property in 2006, and significant infiltration "through joints and services" in 2012. Read in that same light, the DWSD's actions in 2012, intended to "permanently curb the root growth in [the] main sewer," further suggests that there was significant root growth in the main-sewer line.

In sum, the facts of this case could support various conclusions regarding the cause of the Greers' repeated backups. A reasonable trier of fact could conclude that severe root infiltration in the main-sewer line was a proximate cause of the Greers' repeated backups. A reasonable trier of fact could conversely conclude that root infiltration or some other obstruction or defect in the Greers' own private-service line was a proximate cause of the backups. A reasonable trier of fact could even conclude that defects in both the main-sewer line and the Greers' own private-sewer line contributed in various measures to the backups. The term "substantial proximate cause" means at least 50% of the cause, 📄 MCL 691.1416(l), and it is not for this Court to make factual findings regarding what percentage of fault lies with which party. Viewing the evidence in the light most favorable to plaintiff, an issue of fact exists on whether root infiltration in the DWSD's main-sewer line was a substantial proximate cause of the Greers' repeated sewer backups. Therefore, the trial court properly denied the DWSD's motion for summary disposition on plaintiff's negligence claim related to property damage.

### D. PERSONAL-INJURY NEGLIGENCE CLAIM

On appeal, the DWSD argues that plaintiff provided insufficient evidence linking Sandra's health conditions and death to any "defect" in its sewer line. The DWSD therefore argues that this Court should conclude that the trial court erred by not granting summary disposition to the DWSD on plaintiff's personal-injury negligence claim. Although the DWSD raises this argument on appeal, it did not raise this argument in the trial court in any substantive way, and the trial court did not consider or rule on any issue related to

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Burton, Kevin 7/6/2020**
**For Educational Use Only**

Greer v. Detroit Water and Sewerage Department, Not Reported in N.W. Rptr. (2020)

the personal-injury claim. Generally, an issue is not properly preserved if it is not raised before the trial court. *Walters v. Nadell*, 481 Mich. 377, 387; 751 N.W.2d 431 (2008). Appellate consideration of unpreserved claims of error is disfavored. *People v. Frazier*, 478 Mich. 231, 241; 733 N.W.2d 713 (2007). Because this issue is not preserved for appeal, we decline to address it.

### E. INVERSE-CONDEMNATION AND STATUTE-OF-LIMITATIONS CLAIMS

 **\*8** Lastly, the DWSD asks us to review the denial of its dispositive motion on plaintiff's inverse-condemnation claim and the denial of its motion on grounds of the statute of limitations. We decline to do so. The DWSD filed this appeal as of right under MCR 7.202(6)(a)(*v*). Under that rule, a "final order" includes "an order denying a motion for summary disposition under MCR 2.116(C)(10) based on a claim of governmental immunity." A governmental entity does not enjoy immunity from a constitutional claim, like one for inverse-condemnation. See *Electro-Tech, Inc. v. H.F. Campbell Co.*, 433 Mich. 57, 91 n. 38; 445 N.W.2d 61 (1989); *Wiggins v. Burton*, 291 Mich. App. 532, 574 n. 9; 805 N.W.2d 517 (2011). Plaintiff's claim for inverse-condemnation and the DWSD's defense under the statute of limitations are outside the scope of this appeal as of right, and therefore we will not review these issues. *Pierce*, 265 Mich. App. at 182-183.

Affirmed.

### All Citations

Not Reported in N.W. Rptr., 2020 WL 815133

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.