# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**THE CITY OF DETROIT'S RESPONSE TO MOTION TO COMPEL CITY TO WAIVE B-NOTE AND BROKERAGE ACCOUNT REQUIREMENTS OF ORDER GRANTING THE CITY OF DETROIT'S MOTION TO IMPLEMENT DISTRIBUTIONS OF B NOTES TO HOLDERS OF ALLOWED CLASS 14 CLAIMS UNDER THE CITY'S CONFIRMED PLAN OF ADJUSTMENT (DOC # 13173 — ENTERED 11-13-19), AND/OR TO SET ASIDE THE REQUIREMENTS OF THE ORDER, AND TO COMPEL THE CITY TO MAKE DISTRIBUTIONS TO <u>ATTORNEYS FOR CLASS 14 CLAIMANTS, INSTEAD</u>**

The City of Detroit ("<u>City</u>") files this Response to the *Motion to Compel City to Waive B-Note and Brokerage Account Requirements of Order Granting the City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment (Doc # 13173 — Entered 11-13-19), and/or to Set Aside the Requirements of the Order, and to Compel the City to Make Distributions to Attorneys for Class 14 Claimants, Instead* ("<u>Motion</u>," Doc, No. 13372), filed by Class 14 Claimants Jennifer Gilstrap, Frank Daviston, Shuntina Guest, and La-Sheryl Williams, represented by the law Offices of Kelman & Fantich, as well as Tammy Howard as personal representative of the

- 1 -

Estate of Shelton Bell, Gregory Brazel a/k/a Gregory Brazell,[1] Curtis Morris, Velma Denson, Michael McKay, Taesan Parnell, a minor by his next Friend Corliss Thomas, and Raymond Thompson, Jr (collectively, the "Claimholders") represented by Romano Law, PLLC (and, together with Kelman and Fantich, the "Attorneys"). In support of this Response, the City respectfully states as follows:

## I. <u>INTRODUCTION</u>

The Attorneys ask the Court to rewrite the City's Plan to make the City distribute cash instead of New B Notes to the Claimholders and then to divert this cash from these Claimholders to the Attorneys.

The Motion suffers from numerous errors. First, the Motion seeks relief from the *Order Granting the City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment* ("<u>Brokerage Order</u>," Doc. No. 13173) but does not discuss the requirements for such relief or demonstrate that the Attorneys meet them.

Second, the Attorneys incorrectly conclude that the requirement for a brokerage account stems from the Brokerage Order alone. It does not. That

---

[1] Mr. Brazell's claims numbered 1608 and 1618 were resolved by the City in April of 2017. *See* **Exhibit 1**. The City's resolution of these claims was not reflected on the claims register at the time the Brokerage Motion (defined below) was filed; however, it was later updated to reflect the settlement. Because Mr. Brazel's claims were resolved and paid, he will not receive a distribution of New B Notes and the Motion is moot in regard to him.

- 2 -

provision comes from the Plan,[2] which requires the City to distribute New B Notes[3] to Holders of Allowed Class 14 Claims.  Thus, even if the Attorneys could show that they were entitled to relief from any of the terms of the Brokerage Order (they are not), it would not yield the results the Attorneys seek.

Third, the Plan provides that the Claimholders (and not the Attorneys) will receive New B Notes.  The Claimholders are not entitled to any relief from the Plan, which was confirmed over six years ago, substantially consummated, and upheld on appeal.  *Ochadleus v. City of Detroit (In re City of Detroit, Mich.)*, 838 F.3d 792 (6th Cir. 2016).  Nor can the Court order the City to distribute cash instead of distributing New B Notes to the Claimholders.  Bankruptcy Code section 904 prevents this Court from issuing such an order to the City unless (a) the relief is required by the City's Plan (it is not) or (b) the City consents (it does not).  In addition, it is illogical to suggest that the form of the consideration, and its inherent value, can be altered or changed by alleged creditors more than six years after the Effective Date of the Plan.

---

[2] *Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (October 22, 2014)* ("Plan"), filed at Docket Number 8045 and confirmed as modified by order entered at Docket Number 8272.

[3] Capitalized terms not otherwise defined in this Response have the meanings ascribed to them in the Plan.

37709813.12/022765.00213

Finally, the Attorneys incorrectly assert that the City would be liable to them if the City follows the terms of the confirmed Plan and the directives of the Brokerage Order.  The Motion should be denied.

## II.    BACKGROUND

### A.    The Requirement to Distribute New B Notes to Class 14 Claimants

The treatment for Holders of Allowed Class 14 Claims is provided for in Article II, Section B.3.u of the Plan.

#### u.  Class 14 – Other Unsecured Claims.

#### i. Treatment.

> Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive (A) on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of approximately $16.48 million in New B Notes and (B) distributions in accordance with Section II.B.3.p.i.A.

Plan, Art. II.B.3.u.  The Plan contains no provisions that would allow or require the City to substitute other property for these New B Notes.

The Plan provides that Distributions on Claims are to be made to Holders of Allowed Claims.  Plan, Art. V.B ("Except as otherwise provided in the Plan, [. . .] each Holder of an Allowed Claim shall receive [. . .] the Distributions that the Plan provides for Allowed Claims in the applicable Class.").  A "Distribution" is "any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan."  Plan, Art. I.A.135.  A "Holder" is simply "an

- 4 -

Entity holding a Claim." Plan, Art. I.A.214. And Claims needed to be filed by February 21, 2014 ("Bar Date"). ("Bar Date Order," Doc. No. 1782), ¶ 4.

Thus, the Plan directs the City to provide each Holder of an Allowed Class 14 Claim with a *pro rata* share of New B Notes; it does not provide the City with the obligation to substitute cash for the New B Notes or to make Distributions to entities other than the Holder of Class 14 Claims.

Article V.D of the Plan states that the Holders of Claims became fixed as of the Distribution Record Date.

> With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date.

Plan, Art. V.D. In the Plan, the "Distribution Record Date" is the "Confirmation Date," defined as the date the Court entered the Order confirming the Plan. Plan, Art. I.A.70, 138. That was November 12, 2014. Doc. No. 8272. Thus, the owners of Claims became fixed as of November 12, 2014, and the City need not recognize

- 5 -

attempts to sell or transfer claims after that date, nor is it obligated to entertain or consider Claims not timely filed by the Bar Date under the Bar Date Order.

The order confirming the Plan reaffirms that Distributions are to be "effectuated pursuant to Section II.B and Article V of the Plan." Doc. No. 8272, ¶ 49. The Plan's treatment is consistent with the requirements of the Bankruptcy Rules. *See* Fed. R. Bankr. P. 3021 ("[A]fter a plan is confirmed, distribution shall be made to creditors whose claims have been allowed.").

## B. The Brokerage Motion and Brokerage Order

To receive a share of the New B Notes, a Holder of an Allowed Claim must have a brokerage account. Over a year and a half ago, on September 17, 2019, the City proposed a process by which it would notify any potential Holder of a Class 14 Claim of the necessity of opening a brokerage account and provide what assistance it could in the process. *See generally City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment* ("Brokerage Motion," Doc. No. 13126), pp. 1-2. The City submitted forms that it proposed to use to inform Class 14 Claimants of the Distribution process and to collect the information necessary to make the Distributions (e.g., the number of the account into which the claimant wished to have the New B Notes placed, tax information, and so forth). One such form, the *Notice Regarding Distributions to Class 14 Claimants* ("Notice," attached as Exhibit 6-1 to

- 6 -

the Brokerage Motion), explained that the Plan required distribution of New B Notes and "Related Income"[4] in satisfaction of Allowed Class 14 Claims. Exhibit D to the Notice explained how to find a broker, and provided a sample list of brokers, although the Exhibit cautioned that the list was "***provided for informational purposes only***" (emphasis in original) and that the City made no representation or recommendation as to any broker listed.

Each Claimholder was served with the Brokerage Motion and had the opportunity to object.[5] None filed an objection or other response. The Court reviewed and approved the City's proposed form and process. *See* Brokerage Order.

The City noted in the Brokerage Motion that the Plan allows it to request proper tax and disbursement information and that, if a claimant does not timely

---

[4] Defined in the Notice as "related interest payments and investment income" concerning the New B Notes.

[5] *See* Certificate of Service filed at Docket Number 13129, Ex. C (pp. 14-18, showing first class mail service). For the Kelman & Fantich Claimholders, Daviston is listed on page 1, fourth from bottom; Gilstrap and Guest are listed on page 2, twelve lines and seventeen lines from top, respectively; and Williams is listed on page 5, fourth from top. For the Romano Law Claimholders, Tammy Howard (for the estate of Shelton Bell) is listed on page 1, sixteen lines down with Gregory Brazel listed three lines below that; Curtis Morris is also listed on page 1, eight lines up from the bottom, with Velma Denson listed five lines below that; Corliss Thomas (for minor Taesan Parnell) is listed on page 3, thirteen lines from the bottom, with Raymond Thompson, Jr. listed seven lines below that. Michael McKay's attorney was served by email. *Id.*, Ex. A (pp. 3-9, showing email service), top of page 6. Many of the Claimholders served by first class mail were also served by email. Ex. A, top of page 6. All Claimholders were served at the offices of their Attorneys.

37709813.12/022765.00213

provide this information, the claimant waives the right to any Distributions under the Plan. Brokerage Motion, ¶ 22-26; *see also*, Plan, Art. V.I.4 and V.J.2. The Court's Brokerage Order reaffirmed these provisions. Brokerage Order, ¶ 6.

The City identified and served Holders of 132 Class 14 Claims who might receive a Distribution with a "Brokerage Package" containing (a) a copy of the Brokerage Order; (b) the Notice; and (c) a self-addressed, postage paid return envelope to KCC (the City's Claims Agent). Declaration of Lydia Do, ¶ 10, attached as **Exhibit 2**. Over the next year, eleven of these Claims were either expunged or withdrawn by the Holders of the Claims.[6]

Eighty claimants thus far have returned the brokerage forms. Decl. of Lydia Do, ¶ 11. Sixty-eight of these were properly completed, although a few were returned by claimants whose Claims were expunged. All but one of the improperly filled out forms were returned by the Claimholders.[7] (The other improperly filled out form was returned by the Greers, who filed a separate motion similar to the Motion.) The City has not received responses from approximately 43 eligible New B Note recipients. As a result, their Distributions have been forfeited under the Brokerage Order and the Plan.

---

[6] Mr. Brazell's claim number 1618 was one of the expunged claims.

[7] Of note, Taesean Parnell, a minor by his next friend, Corliss Thomas, is a Romano Law client and included in the Motion. However, he recently submitted properly completed forms. The Motion is thus moot as to Mr. Parnell as well.

- 8 -

## C.    The Claimholders

The Claimholders refused to establish brokerage accounts and have thus waived any right they may have had to receive a Distribution under the Plan.  The Claimholders represented by Kelman & Fantich returned tax forms that impermissibly included the names of both the claimant and the Kelman & Fantich law firm on line 1.  Each Brokerage Account and Direction Form listed the Kelman & Fantich law firm's IOLTA information instead of a brokerage account in the name of the claimant.  The Brokerage Account and Direction Forms submitted by these Claimholders included hand-written notes alleging that requiring claimants to establish a brokerage account violated the Michigan Rules of Professional Conduct ("MRPC").  Additionally, the notes alleged that COVID-19 complications prevented the opening of brokerage accounts.  As an example only, the Brokerage Account form from claimant Frank Daviston (redacted for privacy) is attached as **Exhibit 3**.

The Claimholders represented by Romano Law made substantially similar allegations and submitted forms with similar issues.

The Brokerage Order states that "the name of the creditor on the Brokerage Account Form and the name on the Tax Form must match the name of the creditor on the proof of claim . . . ."  *See* Brokerage Order, ¶ 3.  The Attorneys are not creditors in this case as they did not file a proof of claim (by the Bar Date or

37709813.12/022765.00213

13-53846-tjt    Doc 13388    Filed 06/07/21    Entered 06/07/21 16:41:30    Page 9 of 42

otherwise) and are not listed as Holders on any of the claims filed by any of the Claimholders.

On July 13, 2020, the City sent letters to the Claimholders identifying the errors and rejecting the allegations that the Claimholders could not establish brokerage accounts. (Doc. No. 13304.) The City provided the Claimholders until August 13, 2020, to submit properly completed forms. Claimholders represented by Kelman & Fantich did not submit new forms. Those represented by Romano Law submitted properly completed W-9 Forms but did not submit new brokerage account forms. Instead, Romano Law included a cover letter that stated in pertinent part, "Due to recent changes for brokerage accounts the SEC now requires financial plans for each individual client to assist them in determining if a brokerage account is reasonable." Further, Romano Law stated that it intended to "follow up with the next steps" as soon as the brokerage accounts had been opened but no additional forms were submitted.

On May 11, 2021, in a final attempt to resolve these issues, the City sent a notice to each Claimholder ("Final Notice") informing each that, under the terms of the Brokerage Order, he or she is no longer entitled to a distribution because of failure to comply with the Brokerage Order. *See* Brokerage Order, ¶ 6. (Doc. No. 13366.) Despite the Final Notice and as one last attempt to solicit cooperation, the Final Notice provided one last extension, until May 25, 2021, for each Claimholder

37709813.12/022765.00213

to submit properly completed forms or be forever barred from receiving a distribution and asserting a claim against the City. *See* Brokerage Order, ¶¶ 4, 7. This Final Notice prompted the Motion on May 24.

Prior to filing the Motion, none of the Attorneys objected to the Brokerage Motion, sought relief from the Brokerage Order, sought to modify the Plan's treatment of Class 14 Claims or, as far as the City is aware, take any action other than submitting hand-written complaints and emails to the City.

### D.    The Motion

On May 24, 2021, the Attorneys filed the Motion. Ostensibly, they filed the Motion on behalf of their Claimholders, although the Motion is filed in support of rights asserted by the Attorneys, not the Claimholders.

The Motion asks the Court "to compel the City of Detroit [. . .] to waive the B Note and brokerage account requirement set forth" in the Brokerage Order and "to compel the City to instead make distributions to the Attorneys [. . .]" (Motion, p. 2) and to compel the City to make these disbursements "in U.S. Currency" (Motion, p. 16, in Conclusion of Brief section); *see also* proposed Order attached to Motion.

For the first request, it is not clear how "waiving" any portion of the Brokerage Order would help the Attorneys or their Claimholders as this would not change either the Plan's requirement that Class 14 Claimants receive New B Notes or the forfeiture of those New B Notes if a Claimholder refuses to cooperate to claim them. *See* Plan

- 11 -

Art. II.B.3.u, V.B, V.I.4., and V.J.2.  For the second and third requests, the Attorneys do not set forth any legal authority that they believe would allow the Court to order the City to deviate from the terms of the City's confirmed Plan.

Additionally, the Attorneys have neither briefed the appropriate standard for relief from an order (*see* Fed. R. Bankr. P. 9024 *and* Fed. R. Civ. P. 60(b)) nor offered an explanation as to how the Motion meets that standard.  At best, the Attorneys offer a variety of reasons and excuses as to why they seek this relief. Although the Attorneys claim they have attempted to set up accounts and cannot open them in two weeks, it remains unclear why so many other claimants have succeeded in opening accounts where these Attorneys have failed.[8]  *See* Motion, ¶¶ 5-7; Decl. of Lydia Do, ¶ 11.  The Attorneys blame the City's attorneys for their delay, without explaining what they think the City should have done to help them open these brokerage accounts.  Motion, ¶ 8.  Or, for that matter, any obligation they think the City has or had to do so.

---

[8] The Attorneys stress that they may not commingle client and lawyer funds, suggesting that they have contingency fee arrangements with their clients and believe that this is an excuse for not complying with the Brokerage Order.  Brief attached to Motion, pp. 14-15.  The Plan requires the City to Distribute New B Notes to Claimholders, though, so the Attorneys will not directly receive client property and thus commingling is not an issue.  *See* Part II.A of this Response, *supra*; *see also* Part III.D, *infra*.  In any event, the City has received brokerage forms from other Holders of Claims who likely have contingency fee arrangements (*e.g.*, for personal injury claims), showing that this is not a valid excuse for noncompliance.  *See*, *e.g.*, Claim numbers 1375, 1438, 1440, 1489, 1544, 1646, 1649, 1910, 2032, 2274, 2277.

- 12 -

## III. ARGUMENT

### A. The Attorneys have neither outlined the proper legal test for relief from an order, nor shown that they qualify for such relief.

The first decretal paragraph of the proposed order the Attorneys supplied with their Motion begins with "**IT IS HEREBY ORDERED** that the City of Detroit shall waive the B Note/Brokerage account requirements of the Order Granting [. . .]." (Motion, unnumbered exhibit at Doc No. 13372-2, page 1 of 2.) The Attorneys seek relief from the order confirming the Plan and the Brokerage Order.[9]

A motion for relief from an order is made under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9024, which applies Federal Rule of Civil Procedure ("Civil Rule") 60 to cases under the Bankruptcy Code. As set forth in Civil Rule 60(b), the grounds for relief from a final order include

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has

---

[9] There is no rule of procedure for asking a court to force an opposing party to grant relief that is expressly subject to the opposing party's discretion.

37709813.12/022765.00213

been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Civil Rule 60. The Motion does not mention or cite to Civil Rule 60. Based on the arguments made in the Motion, it does not seem the Attorneys are arguing that they have made some mistake or neglect; they attribute all fault to the City's actions. Likewise, the Motion does not refer to new evidence or fraud, nor does it claim that the Brokerage Order is void or "satisfied" in some manner. That leaves Civil Rule 60(b)(6), which only applies where (b)(1) through (b)(5) do not. *See Liljeberg v. Health Servs. Acquisition Corp*., 486 U.S. 847, 863 (1988) (relief cannot be had under subsection (b)(6) if it would have been available under the earlier subsections).

The Sixth Circuit

> has stated that Rule 60(b)(6) provides relief "only in exceptional and extraordinary circumstances," which are defined as those "unusual and extreme situations where principles of equity mandate relief." *Jinks v. AlliedSignal, Inc.*, 250 F.3d 381, 387 (6th Cir.2001) (citations and emphases omitted). In addition to the requirement of exceptional circumstances, a Rule 60(b)(6) movant must also satisfy the three equitable factors required for Rule 55 relief: (1) lack of prejudice to the plaintiff; (2) a meritorious defense; and (3) whether the defendant's culpable conduct led to the judgment. *Thompson v. Am. Home Assur. Co.*, 95 F.3d 429, 433 (6th Cir.1996).

*Exp.-Imp. Bank of U.S. v. Advanced Polymer Scis., Inc.*, 604 F.3d 242, 247 (6th Cir. 2010). Here, the Attorneys argue that (1) they cannot open brokerage accounts for

- 14 -

their clients at some of the firms the City named as a courtesy,[10] (2) they can open accounts at other firms, but there might be unspecified charges that the Attorneys or their clients are unwilling to incur, and (3) the Attorneys could not set up brokerage accounts in their clients' names over which the Attorneys could maintain control. Motion, p. 3; Brief attached to Motion (Motion, p. 8). This hardly qualifies as "exceptional and extraordinary circumstances," especially when (a) the need for a brokerage account to receive New B Notes has been known since the notices approved by the Brokerage Order were served over a year and a half ago[11] and (b) the Attorneys admit they can open accounts, albeit possibly subject to unspecified fees.

Because the Attorneys do not meet the standard for seeking relief from the Brokerage Order, the Motion should be denied.

---

[10] The Attorneys state on page 7 of their Motion that they "confirmed that a total of none of them will permit Attorneys or Claimants to open a Brokerage account sufficient to allow the City to make distributions of B Notes to Claimants." Although the City made clear in Exhibit D to the Notice that it could not guaranty that the brokerages listed would work with or be suitable for working with claimants, the City notes that a number of them have. *See* Decl. of Lydia Do, ¶ 12(i), (l), (t). Also, a number of brokerages that the Attorneys listed in a footnote in their Motion as being unwilling to work with them have been able to assist other claimants. *Compare* Motion, p. 8, n.2 *with* Decl. of Lydia Do, ¶ 12(b), (c), (e), (w), (x), (bb).

[11] In fact, in 2014, the City's Disclosure Statement explained that Class 14 Claimants would be receiving New B Notes in exchange for their claims. *See* Disclosure Statement, p. 41 (Doc. No. 4391) *and* Certificate of Service (Doc. No. 6177). The fact that claimants will be getting New B Notes has been known for seven years.

- 15 -

**B.    Even if the Attorneys were granted full relief from the Brokerage Order, the Attorneys would still not get the relief they seek.**

The Attorneys' belief that the requirement to open a brokerage account stems from the Brokerage Order is mistaken.  As discussed previously, that requirement comes from the Plan itself.  *See* Plan, Art. II.B.3.u.  Likewise, the Plan, the order confirming it, and the Bankruptcy Rules require the City to Distribute New B Notes to Holders of Allowed Class 14 Claims.  Plan, Art. V.B; Doc. No. 8272, ¶ 49; Bankruptcy Rule 3021.  All the Brokerage Order does is (1) approve the forms used to provide notice and to collect the necessary brokerage account and tax information to make the Distributions (Brokerage Order, ¶ 2); (2) approve the process to serve these forms and affirm the entities to whom Distributions are to be made (*Id.*, ¶¶ 3, 5); (3) grant the City some leeway in order to help parties who are making good-faith attempts to comply with the Brokerage Order (*Id.*, ¶¶ 4, 7); and (4) affirm the consequences set forth in the Plan for failure to comply with its requirements (*Id.*, ¶ 6).  The Brokerage Order does not modify the Plan or the order confirming it.  (*Id.*, ¶ 9).

Assuming *arguendo* that this Court entered an order stating that the Attorneys and Claimholders did not have to comply with the terms of the Brokerage Order, they would be no better off than they are now.  Granting relief from the Brokerage Order would not provide the City with the ability to transfer the New B Notes to the Claimholders because the City still would lack the necessary tax or brokerage

- 16 -

account information to do so. Relief from the Brokerage Order would not rewrite the Plan; thus, the City still would have no ability to transform the New B Notes into cash or to substitute the Attorneys as recipients for the Claimholders. Indeed, if the Claimholders receive relief from the Brokerage Order and thus do not provide the City with proper documentation, the Claims held by the Claimholders simply would be undeliverable. In that instance, the Plan makes clear that each such Claimholder "**shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.**" Plan, Art. V.I.4 (boldface in Plan).

Thus, even if the Attorneys succeed in getting relief from the Brokerage Order, the only relief they would be getting would be to "free" themselves and their clients from the sole mechanism to recover on the Claims held by the Claimholders.

Thus, to the extent that the Motion seeks relief from the Brokerage Order, it should be denied because relief from the Brokerage Order would change nothing; the Claimholders would still have forfeited their Claims.

### C. The Attorneys Cannot Ask the Court to Order the City to Deviate from the Terms of the Plan.

As noted earlier, the Attorneys want the Court to compel the City to (1) "waive the B Note and brokerage account requirement set forth" in the Brokerage Order and (2) make distributions (x) to the Attorneys and (y) in cash instead of New B Notes. Motion, pp. 2, 16. As just discussed, the City can only Distribute the New

- 17 -

B Notes promised under the Plan to a Class 14 Claimant if that claimant has a brokerage account to receive them. And, the promise to Distribute New B Notes is set forth in the Plan, not the Brokerage Order, so "waiving" the brokerage account requirement only has significance if the Court can also order the City to substitute cash for the New B Notes. There are multiple problems with this request.

First and foremost, the Attorneys would need relief from the Plan which has been substantially consummated and upheld on appeal by the District Court and the Sixth Circuit. The Plan provides for Distributions to Holders of Allowed Claims, not to those who assert interests in those claims, such as the Attorneys. As noted previously, the Holders of Claims became fixed as of November 12, 2014. Plan, Art. I.A.70, 138; Plan, Art. V.D, Doc. No. 8272. If the Attorneys wanted the City to recognize their asserted interests in the Claimholders' Claims, they needed to have the Claimholders include them as Holders on the filed proofs of claim. Alternately, the Attorneys might have filed claim transfers under Federal Rule of Bankruptcy Procedure 3001(e)(2) or (4), so long as the transfers were completed by 5:00 p.m. on November 12, 2014. At this late date, however, this option no longer exists. Plan, Art. V.D.

Additionally, these Distributions are to be of New B Notes, not cash, as the Attorneys request. Plan, Art. II.B.3.u.

Second, the request runs afoul of 11 U.S.C. § 904, which states

37709813.12/022765.00213

> Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with--
>
> (1) any of the political or governmental powers of the debtor;
>
> (2) any of the property or revenues of the debtor; or
>
> (3) the debtor's use or enjoyment of any income-producing property.

11 U.S.C. § 904. The Sixth Circuit has held, in an appeal from this very bankruptcy case, that this section "limits the bankruptcy court's authority over the municipal debtor." *In re City of Detroit, Mich.*, 841 F.3d 684, 695 (6th Cir. 2016) (quoting *In re City of Stockton*, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013)).

> In the overall construct, § 904 performs the role of the clean-up hitter in baseball. Its preambular language "[n]otwithstanding any power of the court, . . . the court may not, by any stay, order, or decree, in the case or otherwise . . ." is so comprehensive that it can only mean that a federal court can use no tool in its toolkit—no inherent authority power, no implied equitable power, no Bankruptcy Code § 105 power, no writ, no stay, no order—to interfere with a municipality regarding political or governmental powers, property or revenues, or use or enjoyment of income-producing property. *As a practical matter, the § 904 restriction functions as an anti-injunction statute—and more.*

*Id.* at 695-96 (quoting *Ass'n of Retired Emps. of the City of Stockton v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012)) (emphasis added by Sixth Circuit to *Stockton* opinion language).

- 19 -

Unless the City consents (it does not), or the Attorneys point to Plan language requiring the City to pay cash on behalf of Allowed Class 14 Claims, and pay it to a Claimant's attorney instead of the Claim Holder (there is no such provision), section 904 prevents the Court from issuing an order telling the City what to do with its property.

The Attorneys cannot ask the Court to modify the Plan so that it provides for the relief the Attorneys prefer, either. "No party other than the debtor may propose a plan, section 941, or modification of a plan, section 942." *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991).

Thus, the Attorneys cannot ask this Court to modify the City's Plan or to order the City to act in a manner inconsistent with the Plan. This is yet another reason why the Attorneys' request cannot be granted. The Motion should be denied.

### D. The Attorneys failed to timely assert any alleged liens.

The Attorneys also assert that the City is "fully aware" that it has liens on its clients' proofs of claim and that the City must aid the Attorneys in enforcing these liens. In doing so, they cite *Miller v. Detroit Auto. Inter-Ins. Exch.*, 139 Mich. App. 565, 572 (1984) and *Nichols v. Waters*, 201 Mich. 27, 34 (1918). Putting aside for the moment that, in each of these cases, the state court ruled *against* the attorneys seeking to enforce their liens, the cited cases do not apply here to the extent that they conflict with the distribution provisions of the Bankruptcy Code. *See In re Kyle*,

- 20 -

510 B.R. 804, 815 (Bankr. S.D. Ohio 2014) ("Inconsistent state laws are preempted by conflicting Bankruptcy Code provisions."). As just discussed in the previous section, the Plan only provides for Distributions to Holders of Allowed Claims as of the record date of November 12, 2014. The Attorneys are not Holders of any Claims against the City as of that date. To assert their liens in compliance with the terms of the Plan, the Attorneys needed to ensure that they became Holders (or co-Holders) of Claims by then. To the extent that the Attorneys seek to use state law to achieve results that conflict with these provisions of the City's confirmed plan, though, that state law is in conflict and preempted.

### E. The Attorneys' misrepresentation of the purpose of Michigan Rule of Professional Conduct 1.15 does not avail them.

The Attorneys claim that requiring the Claimholders to open brokerage accounts violates Michigan Rule of Professional Conduct 1.15, but this is neither true nor would it excuse the Claimants' failure to open brokerage accounts if it were.

As the Attorneys must realize, MRPC 1.15 is a directive to *attorneys*, not third parties. Here, MRPC 1.15 governs what the Attorneys must do if and when they receive proceeds on behalf of their clients. MRPC 1.15 (beginning "A *lawyer* shall . . . ." and listing duties) (emphasis added); *see also* MRPC Preamble: A Lawyer's Responsibilities (noting that "Some of the rules are imperatives, cast in terms of 'shall' or 'shall not'" and that "[t]hese define proper conduct for purposes of

- 21 -

professional discipline."). Directives governing how the Attorneys are to act vis-à-vis their clients do not bind anyone other than the Attorneys themselves.

Further, MRPC 1.15 is solely for client protection, not attorney collection. The Attorneys observe in their brief that the rule requires the Attorneys to notify their clients if they receive property on their clients' behalf, preserve records of this property, and promptly pay or deliver the property to the clients. Brief attached to Motion (quoting MRPC 1.15). The Attorneys also say that the ethics rules prevent them from commingling client property with property of their own or of others. *Id.* These directives protect clients, not attorneys. They do not apply when a client receives its own funds directly, and cannot be interpreted as a tool for *preventing* a client from directly receiving funds.

Indeed, because of MRPC 1.15, if the City were able to Distribute the New B Notes to the Attorneys directly (it can't), the Attorneys would not necessarily be entitled to simply claim their fees if there is any dispute at all over the amount of the fees or the ownership of the proceeds. *Kasben v. Hoffman*, 278 Mich. App. 466, 472-73 (2008) ("Further, even if an attorney has a claim against funds held for a client, the attorney may not unilaterally seize the funds. Rather, the attorney must hold the funds separately until the dispute is resolved.") (citing MRPC 1.15). Thus, the Attorneys' argument (*i.e.*, because the Attorneys must safeguard any client funds they receive, the City must ignore the Plan's terms and hand over Class 14 claim

- 22 -

proceeds directly to the Attorneys) is a non sequitur and logical fallacy; the conclusion does not follow from the premise.

In any event, even if being required to open brokerage accounts *would* violate the Michigan Rules of Professional Conduct in some way (it doesn't), the Attorneys' refusal to comply with the terms of the Plan and the Brokerage Order is not the proper way to raise and address that issue. "If [the Attorneys] did not agree with this Court's decision, the[ir] proper avenue for recourse was to appeal the Order." *Yoppolo v. Walter (In re Walter)*, 265 B.R. 753, 759 (Bankr. N.D. Ohio 2001); *see also Brown v. City of Upper Arlington*, 637 F.3d 668, 671 (6th Cir. 2011) (citing *United States v. United Mine Workers of Am.,* 330 U.S. 258, 294 (1947)). The Claimholders and their Attorneys are bound by the Brokerage Order until and unless they convince this Court to modify that Order. They also are bound by the terms of the confirmed Plan. Even if this Plan requirement were confirmed in error (it wasn't), the terms of the Plan remain binding. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) (holding that a confirmed plan is binding even if provisions are confirmed in error). These terms will not be set aside unless the City (and only the City) requests a major modification of the Plan at this late date (it won't) and the Court approves (which the City believes would be unlikely). *Richmond Unified Sch. Dist.*, 133 B.R. at 225 (holding that only a debtor can propose modifications to a chapter 9 plan).

- 23 -

Thus, the Attorneys' attempt to convert client protections into attorney collection tools does not provide grounds for granting the Motion.

## **CONCLUSION**

For all of these reasons, the Motion should be denied. The City also respectfully submits that under 28 U.S.C. § 1927 this Court should sanction the Claimholders and their Attorneys for unreasonably and vexatiously multiplying the proceedings through the filing of the Motion for the reasons set forth above. The City may also provide the Attorneys with notice under Federal Rule of Bankruptcy Procedure 9011(c).

CITY OF DETROIT LAW DEPARTMENT

By: */s/ Charles N. Raimi*
Charles N. Raimi (P29746)
Attorneys for the City of Detroit
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
Phone - (313) 237-5037/(313)
Email - raimic@detroitmi.gov


MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

37709813.12/022765.00213

By: /s/ *Marc N. Swanson*
Jonathan S. Green (P33140)
Marc N. Swanson (P71149)
Ronald A. Spinner (P73198)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

Counsel for the City of Detroit, Michigan

Dated:  June 7, 2021

37709813.12/022765.00213

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE OF THE CITY OF DETROIT'S RESPONSE TO MOTION TO COMPEL CITY TO WAIVE B-NOTE AND BROKERAGE ACCOUNT REQUIREMENTS OF ORDER GRANTING THE CITY OF DETROIT'S MOTION TO IMPLEMENT DISTRIBUTIONS OF B NOTES TO HOLDERS OF ALLOWED CLASS 14 CLAIMS UNDER THE CITY'S CONFIRMED PLAN OF ADJUSTMENT (DOC # 13173 — ENTERED 11-13-19), AND/OR TO SET ASIDE THE REQUIREMENTS OF THE ORDER, AND TO COMPEL THE CITY TO MAKE DISTRIBUTIONS TO ATTORNEYS FOR CLASS 14 CLAIMANTS, INSTEAD

The undersigned hereby certifies that on June 7, 2021, he caused a copy of

*The City of Detroit's Response to Motion to Compel City to Waive B-Note and Brokerage Account Requirements of Order Granting the City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment (Doc # 13173 — Entered 11-13-19), and/or to Set Aside the Requirements of the Order, and to Compel the City to Make Distributions to Attorneys for Class 14 Claimants, Instead* to be served upon counsel for the Movants via ECF, first class mail, and email as listed below.

Law Offices of Kelman & Fantich
Attn: Brian L. Fantich, Carra J. Stoller, Adam J. Gantz
30903 Northwestern Hwy., Ste. 270
Farmington Hills, MI 48334
agantz@gantzassociates.com
kelmanandassociates@yahoo.com

Romano Law PLLC
Attn: Daniel G. Romano
23880 Woodward Ave
Pleasant Ridge, MI 48069
dromano@romanolawpllc.com

By: /s/ Marc N. Swanson
     Marc N. Swanson
     150 West Jefferson, Suite 2500
     Detroit, Michigan 48226
     Telephone: (313) 496-7591
     Facsimile: (313) 496-8451
     swansonm@millercanfield.com

Dated: June 7, 2021

# EXHIBIT 1

## Settlement Agreement with Gregory Brazell

RECEIVED

NOV 22 2017

CITY OF DETROIT
LAW DEPARTMENT
LITIGATION DIVISION

```
------------------------------------------------------------x
                                      :
In re                                 :      Chapter 9
                                      :
CITY OF DETROIT, MICHIGAN,            :      Case No. 13-53846
                                      :
                    Debtor.           :      Hon. Thomas J. Tucker
                                      :
------------------------------------------------------------x
```

## AGREEMENT RESOLVING CLAIMS OF GREGORY BRAZELL

## THIS FORM IS FOR MOTOR VEHICLE CLAIMS ONLY

The City of Detroit (the "City") and the claimant identified in paragraph 3 below (the "Claimant" and, together with the City, the "Parties"), by and through their respective authorized representatives, do hereby agree as follows:

### RECITALS

A.      On July 18, 2013, the City commenced the above-captioned case (the "Chapter 9 Case") by filing a petition for relief under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). On December 5, 2013, following its determination that the City met all of the applicable requirements and is eligible to be a debtor under chapter 9 of the Bankruptcy Code, the Bankruptcy Court entered the Order for Relief Under Chapter 9 of the Bankruptcy Code (Docket No. 1946) with respect to the City.

B.      Pursuant to section 904 of the Bankruptcy Code, the City may continue to exercise its political and governmental powers, manage its property and revenues and use and enjoy its income-producing property without interference from the Bankruptcy Court.

C. On December 24, 2013, the Bankruptcy Court entered the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302) (the "ADR Order") establishing certain alternative dispute resolution procedures (collectively, the "ADR Procedures") to promote the resolution of certain claims designated by the City.

D. The Claimant is the current record holder of the proof[s] of claim identified under the heading "Filed Claim Number" in the table in paragraph 3 below (the "Filed Claim[s]").

E. The City (i) reviewed the Filed Claim[s] and the facts and circumstances of the alleged liabilities asserted therein and (ii) designated the Filed Claim[s] for potential resolution through the ADR Procedures.

F. The City believes that the resolution of the Filed Claim[s] as set forth in this Agreement is fair, reasonable and appropriate and will allow the Parties to avoid the cost, delay and burden of litigating potential disputes related to the Filed Claim[s]. In accordance with the ADR Order, the resolution of the Filed Claim[s] set forth in this Agreement terminates the ADR Procedures with respect to the Filed Claim[s] pursuant to section II.A.7 of the ADR Procedures.

G. Pursuant to section 904 of the Bankruptcy Code, the City is authorized to propose and enter into this Agreement without further order of the Bankruptcy Court.

H. The undersigned is authorized to enter into this Agreement on behalf of the City pursuant to a confidential memorandum dated March 25, 2014 that was issued to the City of Detroit Corporation Counsel by Kevyn Orr, Emergency Manager for the City of Detroit, entitled Litigation Claim Settlement Authority.

I. The Parties have agreed to the terms set forth in this Agreement, as indicated by the signatures of their respective authorized representatives below.

-2-

## AGREEMENT

1. The Claimant represents and warrants to the City that it has not sold, assigned, factored or otherwise transferred any portion of or interest in the Filed Claim[s] and is the sole holder of the Filed Claim[s], with full authority to enter into this Agreement. The Claimant further agrees to indemnify and hold the City harmless for any damages, including without limitation actual and reasonable out of pocket costs, resulting from a breach of its representations and warranties set forth in this paragraph.

2. The current version of the City's proposed Plan of Adjustment provides different payment provisions for each of the three following category of claims arising from operation of City motor vehicles: (1) claims for personal protection benefits as provided by MCL 500.3107 and MCL 500.3108, for which insurance coverage is required by MCL 500.3101(1), ("PPI Claims"); (2) tort claims permitted by MCL 500.3135, for which residual liability insurance coverage is required by MCL 500.3101(1) and MCL 500.3135, ("Tort Claims"); and (3) claims for property protection benefits under MCL 500.3121 and MCL 500.3123 ("Property Claims"). Accordingly, it is necessary that this Settlement Agreement properly identify each type of claim.

3. Each of the Filed Claim[s] is deemed amended, modified and allowed, and to be paid as a PPI Claim, a Tort Claim or a Property Claim, as the case may be, in accordance with, and subject to the treatment provided for claims of that type under, any chapter 9 plan for the adjustment of debts confirmed by the Bankruptcy Court (a "Plan"), (any such claim, a "Settled MVA Claim"), in the corresponding amount set forth in the table below under the heading "Settled MVA Claim Amount. " **NOTE – if any bankruptcy claim combines two or more types of claims, the claims must be separated in the chart below:**

-3-

| Claimant | Filed Claim Number | Filed Claim Amount | Filed MVA Claim Type – identify as a PPI, Tort or Property Claim | Settled MVA Claim Amount | Settled MVA Claim Type– identify as a PPI, Tort or Property Claim |
|---|---|---|---|---|---|
| **Brazell, Gregory** | **1608** | **$300,000.00** | **PPI** | **$15,000.00** | **PPI** |
| **Brazell, Gregory** | **1618** | **$800,000.00** | **Tort** | **$0.00** | **Tort** |

For any Tort Claims listed, identify all other bankruptcy claims that arise out of the same motor vehicle accident: _____

_____ .

4. The Parties agree that any Filed Claim identified in paragraph 3 above for which there is no corresponding Settled Claim (or such amount is listed as $0.00) is hereby withdrawn and deemed disallowed and expunged, pursuant to section 502 of the Bankruptcy Code.

5. The Claimant will not further amend the Filed Claim[s] (or the Settled MVA Claim[s]) or file any additional proofs of claim with respect to the liabilities asserted in the Filed Claim[s]. Any further amendments to the Filed Claim[s] (or the Settled MVA Claim[s]) or any additional claims filed by the Claimant or their successors or assigns with respect to the liabilities asserted in the Filed Claim[s] shall be null, void and of no effect.

6. The Parties agree that any Settled MVA Claim shall be paid in accordance with, and subject to the treatment provided for claims of that type under, any chapter 9 plan for the adjustment of debts confirmed by the Bankruptcy Court (a "Plan").

7. Any distribution made to the Claimant pursuant to a Plan is referred to herein as a "Plan Distribution." If the Claimant or its successors or assigns receive payment of any portion of the Settled Claims from any source, including from the City, other than through the Plan (a "Non-Plan

-4-

Payment"), the portion of the Settled MVA Claim[s] equal to the amount of the Non-Plan Payments shall be deemed fully satisfied, and the Claimant, for itself and any successors or assigns, hereby prospectively waives and disclaims the right to receive Plan Distributions on account of the portion of the Settled MVA Claim[s] satisfied by any Non-Plan Payments.

8. Nothing in this Agreement will have any impact on any proof(s) of claim that the Claimant has filed or holds other than the Filed Claim[s]. The Parties retain all of their respective claims, defenses, objections, counterclaims and any and all rights in respect of any proofs of claim that the Claimant has filed or holds other than the Filed Claim[s].

9. As to the Filed Claims and Settled MVA Claims described herein, the Claimant releases the City from any and all liability, actions, damages and claims (including claims for attorney fees, expert fees or court costs), known and unknown, arising or accruing at any time prior to and after the date of this Agreement, that the Claimant has or may have against the City, including but not limited to all claims under MCL 500.3101, *et seq,* for past, present and future benefits. The Claimant acknowledges that this Agreement represents the compromise of a disputed claim and is not to be construed as an admission of liability on the part of the City. As used in this Agreement, the Claimant and the City include each of their respective servants, agents, contractors, attorneys, employees, representatives, family members, heirs, elected officials, appointed officials, related corporations, subsidiaries, divisions, affiliates, directors and officers, if any. Where required by the City, the Claimant has executed the Medicare Reporting and Indemnification Affidavit[s], if any, attached as Exhibit A.

10. The Claimant stipulates to the entry of an order dismissing with prejudice, and without costs or fees, any civil action[s] related to the Filed Claim[s] or Settled Claim[s].

-5-

11. This Agreement may be executed in identical counterparts, and/or by facsimile or e-mail scan, each of which when so executed and delivered will constitute an original, but all of which taken together will constitute one and the same instrument. This Agreement constitutes the entire agreement between the Parties with respect to the matters addressed herein and may not be modified except in a writing signed by the Parties.

WHEREFORE, the undersigned have executed this Agreement on behalf of the parties hereto.

**City of Detroit**

By: _____

Name: _____
      (printed)

Title: _____

Date: _____

**Gregory Brazell**

_____
Claimant

Date: 3/2/17

Claimant(s) counsel

Signature _____
P- 78340

Name: Ardiola Vosha
      (printed)

Date: 3/2/17

-6-

**EXHIBIT 2**

**<u>Declaration of Lydia Do</u>**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

**DECLARATION OF LYDIA DO IN SUPPORT OF THE
CITY OF DETROIT'S RESPONSE TO MOTION TO
COMPEL CITY TO WAIVE B-NOTE AND BROKERAGE ACCOUNT
REQUIREMENTS OF ORDER GRANTING THE CITY OF DETROIT'S
MOTION TO IMPLEMENT DISTRIBUTIONS OF B NOTES TO
HOLDERS OF ALLOWED CLASS 14 CLAIMS UNDER THE CITY'S
CONFIRMED PLAN OF ADJUSTMENT (DOC # 13173 — ENTERED 11-
13-19), AND/OR TO SET ASIDE THE REQUIREMENTS OF THE ORDER,
AND TO COMPEL THE CITY TO MAKE DISTRIBUTIONS TO
ATTORNEYS FOR CLASS 14 CLAIMANTS, INSTEAD**

1.      I am Lydia Do, Senior Consultant for Kurtzman Carson Consultants ("KCC").

2.      I am over the age of 18 years old, have personal knowledge of the facts contained in this declaration, and if called as a witness, can competently testify to the facts it contains.

3.      KCC was engaged by the City of Detroit to provide services to the City in connection with its bankruptcy case, including providing service of certain documents filed in the City's bankruptcy case.

4.      On September 17, 2019, the City filed the *City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under*

*the City's Confirmed Plan of Adjustment* ("Brokerage Motion") in order to establish procedures for the pro rata distribution of New B Notes to holders of Allowed Class 14 Claims. [Doc. No. 13126].

5.     The City asked KCC to serve claimants with the Brokerage Motion.

6.     On September 17, 2019, KCC served the Brokerage Motion via First-Class Mail and via email to the members of Class 14. Lydia Do, Senior Consultant of Corporate Restructuring Services for KCC, filed a certificate of service on September 19, 2019 to this effect. [Doc. No. 13129, Certificate of Service (discussing service of the Brokerage Motion on a list of class 14 claim holders attached as Exhibits A, B and C to the Certificate of Service)].

7.     On November 13, 2019, the Court approved the Brokerage Motion, entering its *Order Granting the City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment* ("Brokerage Order"). [Doc. No. 13173].

8.     The City asked KCC to serve "Brokerage Packages" to Class 14 claim holders. Each Brokerage Package contained

   (a)     A copy of the *Order Granting the City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment*;

   (b)     *Notice Regarding Distributions to Class 14 Claimants* (including the Brokerage Account Form, the Tax Form, the Set Up Your Brokerage Account Form) [attached as Exhibit 6-1 to Brokerage Motion]; and

2

(c)     a self-addressed, postage paid return envelope to KCC.

*See* Certificate of Service Brokerage Package, (defined below).

9.     On December 27, 2019, KCC served the Brokerage Package via First-Class Mail to the members of Class 14.  I filed a certificate of service on January 6, 2020, to this effect. [Doc. No. 13215, Certificate of Service Brokerage Package (discussing service of the Brokerage Package on a list of class 14 claim holders attached as Exhibit A to the Certificate of Service Brokerage Package].

10.     Exhibit A to the Certificate of Service Brokerage Package indicates 132 claimants were served, including the Claimholders.[1]

11.     Since the Brokerage Packages were served, 80 claimants have returned Brokerage Account and Direction Forms (collectively, "Distribution Forms") either directly to KCC or to KCC via attorneys at Miller Canfield.

12.     As of the date of this declaration, KCC has received Distribution Forms that include information for brokerage accounts at the following financial institutions:

(a)     TD Ameritrade;

(b)     Comerica Securities;

(c)     Fidelity Investments;

(d)     ETrade Securities LLC;

---

[1] Defined terms not otherwise defined have the meaning ascribed to them in the Response.

37732821.2/022765.00213

(e)     JP Morgan Securities, LLC;

(f)     PFS Investments;

(g)     UBS Financial Services Inc.;

(h)     Edward Jones;

(i)     Merrill Lynch;

(j)     JPM Securities;

(k)     James Haddon Ramirez Asset Management;

(l)     Oppenheimer & Co., Inc.;

(m)     Wells Fargo Bank;

(n)     Bank of NY Mellon;

(o)     Woodbury Financial;

(p)     Interactive Brokers;

(q)     Merril Edge;

(r)     RBC Capital Markets;

(s)     Samuel A. Ramirez & Co.;

(t)     Morgan Stanley;

(u)     Baird;

(v)     Fifth Third;

(w)     Huntington National Bank;

(x)     Huntington Securities, Inc.

(y)     American Enterprise Investments;

4

(z)  Charles Schwab;

(aa)  Concorde Investment Services, LLC;

(bb)  JP Morgan Chase Bank, NA;

(cc)  Manufacturers & Traders Trust Company; and

(dd)  Wells Fargo Clearing Services

13.  KCC maintains records of this type in the ordinary course of its business.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By: _____
    Lydia Do
    Senior Consultant
    Kurtzman Carson Consultants

Executed on June 4, 2021.

5

37732821.2/022765.00213

**EXHIBIT 3**

**<u>Brokerage Account Form Returned by Claimant Frank Daviston (Redacted)</u>**

37709813.12/022765.00213

As an Attorney, under the Michigan/Federal Rules of professional conduct and ethics I am providing our firms client trust account # and bank information as a lien exists in the firm name on all payments for costs/attorney fees and must not be violated. Moreover, due to Covid 19 complications brokerage accounts are unable to be opened and violate professional conduct rules

**EXHIBIT B**

## BROKERAGE ACCOUNT AND DIRECTION FORM

Name of Creditor as set forth on proof of claim form:

Davistion, Frank / LAW OFFICE OF HELMAN & FANTICH

The above-named Creditor hereby designates the broker-dealer named below to receive the Creditor's Distribution of B-Notes in accordance with the *Notice Regarding Status of New B Notes to be Distributed to the Holders of Allowed Class 14 Claims* dated December 27, 2019 (the "Notice"). The Creditor acknowledges that neither the City nor the Disbursing Agent is obligated to confirm the accuracy of the information provided in this Brokerage Account and Direction Form, and that any Distribution of New B Notes is subject in all respects to the terms and conditions of the Notice, Plan and Order of the Bankruptcy Court.

| **Broker-Dealer Information** (to be provided by broker/dealer) | |
|---|---|
| DTC Participant/Broker Name | J. P. Morgan Chase Bank, N.A. |
| DTC Participant Broker # | Client Trust Account to CTA |
| DTC Participant Contact Information (Name, Phone #) | Chase Bank ... West Bloomfield, MI 48322 |
| For Further Credit To | Law office of Helman & Fantich for Frank Davison |
| FFC A/C # | See Above |

Signature of Creditor: _____ Attorney of Frank on Behalf Davison

Date: 6/19/2020

By **no later than June 24, 2020**, you must mail this notice to the City of Detroit at the following address:

City of Detroit Claims Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

**RECEIVED**

JUN 2 3 2020

**KURTZMAN CARSON CONSULTANTS**

- B-1 -