# EXHIBIT 6A

CHRISTOPHER MCGHEE, NORMAN BROWN,
CRAIG BROWN, JAMES WASHINGTON,
SHANNON FERGUSON, JUNIUS PERRY,
and ORLANDO POTTS
                    Plaintiffs,

v.

Case No. 20-006272-CD
Judge: Sheila Gibson

CITY OF DETROIT,
ERIC JONES - EXECUTIVE FIRE COMMISSIONER,
REGINALD JENKINS – 2ND DEPUTY COMMISSIONER,
ROBERT DISTELRATH - CHIEF OF DEPARTMENT
FIRE FIGHTING DIVISION,
KEMIA CROSSON – EMPLOYEE SERVICES CONSULTANT,
DETROIT FIRE FIGHTERS ASSOCIATION LOCAL 344,
MICHAEL NEVIN – FORMER PRESIDENT
THOMAS GEHART – PRESIDENT,
WILLIAM HARP – VICE PRESIDENT,
JOHN A. CANGIALOSI – SECRETARY
CHRISTOPHER A. SMITH - TREASURER
*In their Individual and Official Capacities,*
*Jointly & Severally,*
                    Defendants.

_____/

**Herbert A. Sanders (P43031)**
**The Sanders Law Firm, P.C.**
Attorney for Plaintiffs
The Ford Building
615 Griswold, Suite 913
Detroit, Michigan 48226
(313) 962-0099 (Phone)
(313) 962-0044 (Fax)
haslawpc@gmail.com

_____/

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge, nor do I know of any other civil action, not between these parties, arising out of the same transaction or occurrence as alleged in this complaint that is either pending or was previously filed and dismissed, transferred or otherwise disposed of after having been assigned to a judge in this court.

# PLAINTIFFS' FIRST AMENDED COMPLAINT

Document received by the MI Wayne 3rd Circuit Court.

NOW COME the Plaintiffs, by and through their Attorney, Herbert A. Sanders of THE SANDERS LAW FIRM, P.C., and for their First Amended Complaint they state as follows:

1. This is an action to enforce civil rights and contractual rights arising out of the Plaintiffs' relationship with their Union, and their Employer.

## PARTIES

2. Plaintiff Christopher McGhee is a resident of the City of Detroit, County of Wayne, State of Michigan.

3. Plaintiff Norman Brown is a resident of the City of Southfield, County of Oakland, State of Michigan.

4. Plaintiff Craig Brown is a resident of the City of Sterling Heights, County of Macomb, State of Michigan.

5. Plaintiff James Washington is a resident of the City of Warren, County of Macomb, State of Michigan.

6. Plaintiff Shannon Ferguson is a resident of the City of Detroit, County of Wayne, State of Michigan.

7. Plaintiff Junius Perry is a resident of the City of Warren, County of Macomb, State of Michigan.

8. Plaintiff Orlando Potts is a resident of the City of Romulus, County of Wayne, State of Michigan.

9. At all times relevant hereto, Plaintiffs were employed by the Defendant City of Detroit, in the County of Wayne, City of Detroit, State of Michigan.

Document received by the MI Wayne 3rd Circuit Court.

10. At all times relevant hereto, Plaintiffs were members of the Detroit Fire Fighters Association, Local 344.

11. At all times relevant hereto, Defendant City of Detroit (also referred to herein as the City) was and is a municipal corporation located in Wayne County, Michigan operating under, and subject to, the Constitution and laws of the State of Michigan and the United States.

12. Defendant Eric Jones, Executive Fire Commissioner, at all times relevant hereto was an employee and agent of the City of Detroit, and the City of Detroit is therefore vicariously liable for his actions.

13. Defendant Reginald Jenkins – 2nd Deputy Commissioner, at all times relevant hereto was an employee and agent of the City of Detroit, and the City of Detroit is therefore vicariously liable for his actions.

14. Defendant Robert Distelrath, Chief of Department Fire Fighting Division, at all times relevant hereto was an employee and agent of the City of Detroit, and the City of Detroit is therefore vicariously liable for his actions.

15. Defendant Kemia Crosson, Employee Services Consultant, at all times relevant hereto was an employee and agent of the City of Detroit, and the City of Detroit is therefore vicariously liable for her actions.

16. Defendant City of Detroit had a Respondent Superior relationship with all of the named Defendant City employees.

17. At all times relevant hereto, Defendant Detroit Fire Fighters Association, Local 344 (also referred to herein as DFFA and/or the Union) was chartered with the

Document received by the MI Wayne 3rd Circuit Court.

International Association of Fire Fighters (IAFF), and is the union representative of fire fighters that are employed by the City of Detroit.

18. Defendant Michael Nevin, Former President, at all times relevant hereto was an employee and agent of the Detroit Fire Fighters Association, and the Detroit Fire Fighters Association is therefore vicariously liable for his actions.

19. Defendant Thomas Gehart, President, at all times relevant hereto was an employee and agent of the Detroit Fire Fighters Association, and the Detroit Fire Fighters Association is therefore vicariously liable for his actions.

20. Defendant William Harp, Vice President, at all times relevant hereto was an employee and agent of the Detroit Fire Fighters Association, and the Detroit Fire Fighters Association is therefore vicariously liable for his actions.

21. Defendant John A. Cangialosi, Secretary, at all times relevant hereto was an employee and agent of the Detroit Fire Fighters Association, and the Detroit Fire Fighters Association is therefore vicariously liable for his actions.

22. Defendant Christopher A. Smith, Treasurer, at all times relevant hereto was an employee and agent of the Detroit Fire Fighters Association, and the Detroit Fire Fighters Association is therefore vicariously liable for his actions.

23. Defendant DFFA had a Respondent Superior relationship with the named Defendant Union officers.

## JURISDICTION

24. The amount in controversy is in excess of $10,000,000.00 exclusive of interest, costs, and attorney fees.

Document received by the MI Wayne 3rd Circuit Court.

25. This Court has jurisdiction of this matter pursuant to the Elliot-Larsen Civil Rights Act and the Public Employment Relations Act 336 of 1947. See *Demings v. City of Ecorse, 423 Mich. 49 (Mich. 1985).*

## GENERAL ALLIGATIONS

26. The events giving rise to this cause of action occurred in the City of Detroit, County of Wayne, State of Michigan.

27. Prior to 2014, the Collective Bargaining Agreement (CBA) had between the City and DFFA allowed a fire fighter that had retired as a result of a duty disability to maintain his/her accumulated seniority if they returned to the employ of the City of Detroit as a fire fighter.

28. Additionally, the CBA allowed an employee that returned to work after a duty disability retirement to achieve and assume the rank of his/her class on an accelerated basis.

29. Specifically, the 2001-2008 CBA had between DFFA and the City stated in part:

> **Section 9. Seniority - C. Forfeitures 8 (a)-(b)**
>
> *(a) Seniority credit for promotions to any position in the Department shall be frozen and cease to accumulate for any member on a disability retirement for three (3) years or more. In the event such person is returned to active service, he/she shall be reinstated with his/her frozen seniority.*
>
> *(b) Persons who return to active service from duty disability retirement after one (1) or more years of absence must attend and successfully complete a re-entry training program including a performance physical evaluation that is conducted by the Fire Training Division and approved by the Chief of Fire Operations and Executive Fire Commissioner.*
>
> \*\*\*

Document received by the MI Wayne 3rd Circuit Court.

***Section 9. Seniority - E. Promotions and Transfers - Fire Fighting Division***

*1. General: Promotions in the Fire Department shall be based on length of service therein. The officers or employee thereof having served the longest period in any position shall be advanced to fill any vacancy in the next higher position, if he/she shall have the qualifications therefore.*

> *a. Promotions shall be based solely upon seniority provided the senior employee shall satisfy qualifications for the position for which he/she is to be promoted[1].   See Exhibit 1[2].*

30.     Prior to 2014, in reliance upon the longstanding disability retirement policy, a litany of fire fighters, including the Plaintiffs, retired with a duty disability injury, and sometime thereafter returned to the employ of the City of Detroit as a fire fighter.

31.     Those individuals were allowed to return as fire fighters, maintain their seniority, and advance to the rank of their entry class.

32.     On November 6, 2014, the City and the DFFA entered into a new CBA 2014-2019. See Exhibit 2.

33.     **Article 12 Seniority - D (2) of the 2014-2019 CBA**, states that employees who retire from service as a result of a duty disability, shall lose their seniority.

34.     Pursuant to the new CBA provision, they shall no longer be allowed to return to the employ of the City and maintain their accumulate seniority, or advance to the rank of their original class.

---

[1] Based upon information and belief, the 2001-2008 CBA was mutually extended through 2013.
[2] The Exhibits referenced in Plaintiffs' First Amended Complaint are identical to the Exhibits referenced in Plaintiffs' initial Complaint and are already a part of the Court record.  Consequently, Plaintiffs have not reattached the Exhibits to the First Amended Complaint.

Document received by the MI Wayne 3rd Circuit Court.

35.	However, after implementation of the new CBA provision in 2014, no duty disability retired fire fighter was ever notified by the City or the Union that they would lose all of their seniority if they returned to work for the City.

36.	To the contrary, after negotiation of the 2014-2019 CBA, the City continued to return many fire fighters to duty with their previous seniority in tack, without objection from the Union; and officers were allowed to assume the rank that their original class had achieved.

37.	The Defendants had conspired to selectively enforce the new provision of the 2014-2019 CBA.

38.	In fact, after 2014 the City and the Union agreed to allow some fire fighters to return from duty disability retirement, maintain their previous seniority, be promoted in accordance with their class ranking, and retire after receiving the promotion with a pension based upon the ranking that they had achieved with their original class.

39.	Thereafter, in continuation of the conspiracy to selectively enforce the new provision of the 2014 CBA, in May 2019, the Union filled a grievance maintaining that the City had violated the CBA by returning fire fighters to duty with their seniority after a disability retirement.

40.	The grievance was filed in violation of the CBA years after the Union first became aware that fire fighters were returning from a duty disability and being allowed to maintain their previous seniority.

41.	In accordance with the 2014-2019  CBA*; "Any grievance not filed within ten (10) calendar days of the occurrence of the alleged violation or within ten (10) calendar*

Document received by the MI Wayne 3rd Circuit Court.

*days of an Employee or the Association becoming aware of an alleged violation will be considered untimely and will not be processed".*

42. However, in furtherance of their conspiracy, the Defendants conspired to ignore the CBA statute of limitations, and the grievance was recognized and acknowledged by the City.

43. Thereafter, without cause, the Defendants agreed to take disciplinary action against the Plaintiffs.

44. The Defendants put in place an alleged blanket demotion of all disability retirement returnees that had returned to work for the City after 2014.

45. As a result, the Plaintiffs were stripped of the seniority they had accumulated prior to their retirement, and in many instances demoted.

46. The Plaintiffs were not afforded any type of hearing prior to the disciplinary actions taken against them.

47. The Defendants' goal was to strip the Plaintiffs of their seniority, and take away any promotion which was the result of the systematic seniority promotion.

48. The disparate treatment and lack of due process in which the stripping of seniority and promotions occurred was presented to the Union on numerous occasions by those victimized, however they refused to assist the Plaintiffs, or provide them with representation.

49. The Plaintiffs filed grievances and wrote letters to both the Union and the City in an effort to address the disparate treatment; however, their efforts fell on deaf ears.

50. The City nor the Union made any effort to address the injustice that was being done to the Plaintiffs.

Document received by the MI Wayne 3rd Circuit Court.

51. Defendants intentionally deprived the Plaintiffs of the opportunity to collect a larger pension.

52. All of the Plaintiffs affected by the conspiracy of the Defendants, which deprived them of their seniority and promotions (or promotional opportunities) were over the age of 40.

53. All of the Plaintiffs affected by the conspiracy of the Defendants, which deprived them of their seniority and promotions (or promotional opportunities) were formerly disabled.

54. In accordance with the CBA discipline and demotions shall only occur when there is just cause.

55. The Defendants did not have just cause to discipline and/or demote the Plaintiffs.

### Allegations as to Plaintiff Christopher McGhee

56. Plaintiff McGhee's date of birth is June 24, 1963.

57. McGhee became employed with the Detroit Fire Department on or about March 9, 1992.

58. McGhee underwent a disability retirement on or about December 26, 1999.

59. After undergoing surgery and therapy as a result of his injury, McGhee was rehired by the City of Detroit, and returned to work on or about June 21, 2016.

60. After returning to work, he was promoted through the seniority system, achieved the rank of Lieutenant on October 10, 2019, in accordance with his class ranking, and was earning a salary of $72,000/year.

Document received by the MI Wayne 3rd Circuit Court.

61. McGhee was stripped of the seniority he had earned prior to his disability retirement, and demoted on or about January 27, 2020 to the position of Fire Fighter at a pay rate of $59,417.00/year.

62. The disciplinary action taken against McGhee was without just cause.

63. McGhee requested through Defendant Harp that a grievance be pursued on his behalf.

64. However, Defendant Harp and the Union refused to pursue the grievance.

**Allegations as to Plaintiff Norman Brown**

65. Plaintiff Norman Brown's date of birth is January 26, 1969.

66. N. Brown underwent a disability retirement in 2003.

67. After rehabilitation, he returned to work in January 2018 as a fire fighter.

68. Thereafter he was promoted through testing (as opposed to the seniority system) to the rank of Lieutenant on July 30, 2018 and was earning approximately $71,000/year.

69. On or about October 10, 2019, N. Brown wrote a letter to the DFFA expressing his concern that he had been informed by the City of Detroit that his seniority would be reduced and he would be demoted as a result of a grievance filed by the DFFA concerning promotions received by him and other fire fighters.

70. N. Brown further expressed that the grievance was not filed in a timely manner.

71. N. Brown requested that a grievance be filed on his behalf, and he further requested an opportunity to meet with a Union representative.

72. On December 20, 2019, N. Brown wrote a letter to Defendant Harp in which he expressed:

Document received by the MI Wayne 3rd Circuit Court.

*I am writing today in the hopes of clearing up any confusion as it pertains to my potential demotion resulting from your May 2019 Grievance. The Grievance stated the City was in violation of (seniority) Article 12 Section 7 found on Pages 17 & 18 of the CBA which states:*

> *An employee shall lose his seniority due to absence from work for any reason in excess of two (2) years.*

*As you know, my position with Fire Prevention is not the result of seniority. Bulletin #4/18 gives clear requirements for the position to Fire Prevention which state:*

> *\*Are you a current Detroit Fire Employee*
> *\* Do you have 5 years experience in the Fire Fighting Division on Active Duty*

*I met all requirements and was selected in June 2018. There were no grievances from members nor rejections from the Union. (See Application & Selection, Page 25) Since we are not using the promotional provisions found on pages 19-24 of the CBA, seniority has no bearing on my position and, as a dues-paying member in good standing, I will need assistance with this matter before any adverse action is taken against me.*

73. N. Brown's inquiry was ignored.

74. He was demoted January 27, 2020 to the position of Fire Fighter, at a pay rate of approximately $59,000/yr.

75. The disciplinary action taken against N. Brown was without just cause.

76. On or about February 3, 2020, N. Brown filed a grievance concerning his demotion.

77. On or about March 11, 2020, N. Brown wrote to Defendant Gehart.

78. At that time, he reiterated his concern that he believed he and others had been discriminated against on the basis of their prior disability.

79. N. Brown expressed concern that the Union had not followed the CBA when processing the Union grievance.

Document received by the MI Wayne 3rd Circuit Court.

80. N. Brown expressed concern that there are other areas of the CBA that the City has not complied with, and the Union has failed to seek consistent universal enforcement.

81. His inquiries were ignored, and he was informed by the Union that they would not pursue the grievance that he had filed concerning his demotion.

82. Once again on March 16, 2020, N. Brown wrote a letter to Defendant Gehart in which he stated in part:

> …my promotion to Fire Prevention was based on the administered examination results and the oral interview.
>
> Another situation that I found to be disturbing is my demotion from FFD to Fire Fighter. Prior to my duty disability status, I met the department's requirements to apply for and become a Fire Fighter Driver applicant. I was later promoted to the classification of FFD after satisfactorily meeting the departments mandatory standards. When I returned to duty, my classification according to the department was FFD and, during my retraining period at the RTC, Chief Green ordered Pump Apparatus Operator and Qualified Driver's Training classes which I completed and was certified.
>
> Over the past few months, during my inquiries I found that I am not "similarly situated" as the City suggests. For example, several members were returned to the Fire Fighting Division, systemically promoted, and later retired.

83. His inquires to the Union were ignored.

**Allegations as to Plaintiff Craig Brown**

84. Plaintiff Craig Brown's date of birth is April 29, 1973.

85. C. Brown became employed with the Detroit Fire Department on or about January 25, 1999.

86. C. Brown underwent a disability retirement on or about May 6, 2013.

Document received by the MI Wayne 3rd Circuit Court.

87. C. Brown underwent treatment for his injury, and was returned to work on or about May 8, 2017.

88. After returning to work, on or about January 27, 2020, C. Brown was stripped of his prior 11 years of seniority and given a new seniority date with 2 years and 8 months of seniority.

89. The disciplinary action taken against C. Brown was without just cause

90. On or about February 6, 2020, C. Brown filed a grievance challenging the loss of his seniority.

91. However, the Union refused to pursue the grievance.

92. C. Brown sent a letter to Defendant Harp requesting an explanation as to why the Union was refusing to pursue his grievance, however, he did not receive a response to his inquiry.

93. Further, on or about March 21, 2020, C. Brown complained to the Union Executive Board and Defendant Crosson that his Return to Duty Seniority Adjustment had been miscalculated.

94. He indicated that his duty disability date was incorrect, as well as his indicated previous service time.

95. However, he never received any response from the Union or Ms. Crosson as it relates to the concerns he expressed.

### Allegations as to Plaintiff James Washington

96. Plaintiff James Washington's date of birth is November 30, 1961.

97. Washington became employed with the Detroit Fire Department on or about August 10, 1992.

Document received by the MI Wayne 3rd Circuit Court.

98. Washington underwent a disability retirement on or about March 15, 2013.

99. Washington underwent treatment for his injury and was rehired by the City of Detroit on or about September 26, 2016.

100. After returning to work, he was promoted through the seniority system, achieved the rank of Fire Sergeant, and was earning $68,547.00/year.

101. Washington was demoted on or about January 27, 2020 to the position of Fire Fighter at a pay rate of $59,417.00/year.

102. The disciplinary action taken against Washington was without just cause

103. Washington filed a grievance concerning his loss of seniority and demotion on or about January 27, 2020.

104. On or about February 11, 2020, Washington sent separate letters to Defendant Gehart, Defendant Harp, Defendant Cangialosi, and Defendant Smith seeking that the Union represent him concerning his loss of seniority and demotion.

105. The Union refused to honor his request.

**Allegations as to Plaintiff Shannon Ferguson**

106. Plaintiff Shannon Ferguson's date of birth is December 19, 1967.

107. Ferguson became employed with the Detroit Fire Department on or about August 1994.

108. Ferguson underwent a disability retirement in 2003.

109. Ferguson submitted a request to return to work letter February 2018.

110. Ferguson received a letter from the City in September 2018 clearing him to return to duty.

Document received by the MI Wayne 3rd Circuit Court.

111. Ferguson spoke with Defendant Crosson, and she told him she would contact him after she scheduled his return to work.

112. He had several conversations with Defendant Crosson in 2018 and 2019 in which she stated that she was working on his return to work.

113. On March 10, 2020, Ferguson received a certified letter from the City.

114. The letter was dated February 27 2020, and postmarked March 5, 2020.

115. The letter informed him that he must return to work by March 3, 2020 or be considered a voluntary quit.

116. Ferguson spoke with Defendant Crosson, however, she was unaware how to direct him to return to work.

117. She advised Ferguson that there was a new CBA that would prevent him from retaining his seniority status upon return to work.

118. She indicated that Ferguson would return as a new hire, with no seniority.

119. Defendant Crosson also stated that she was unclear if the new CBA would affect Ferguson's ability to return to work, and that she would seek clarification and contact him.

120. Defendant Crosson never gave Ferguson further instructions on how to complete the return to work process.

121. Ferguson made additional attempts to contact Crosson for instructions on how to return to work, however, Defendant Crosson never responded to his inquires.

122. On or about March 20, 2020 Ferguson received a call from Kelly Tapper concerning his return to work.

Document received by the MI Wayne 3rd Circuit Court.

123. She stated that because Ferguson had reached the 25th anniversary of his seniority date on August 8, 2019, he was no longer eligible to be considered to return to work.

124. If Ferguson had been allowed to return to work, he should have been promoted through the seniority system, achieved the rank of Fire Sergeant, and been earning $68,547.00/year.

125. The denial of his right to return to work was disciplinary action, and it was without just cause.

**Allegations as to Plaintiff Junius Perry**

126. Plaintiff Perry's date of birth is December 19, 1976.

127. Perry became employed with the Detroit Fire Department on or about January, 1999.

128. Perry underwent a disability retirement in 2010.

129. Perry underwent treatment as a result of his injury.

130. Perry sent a letter to the City of Detroit seeking to return to work on or about June 2019.

131. Perry was found to be fit to return to work by the City on or about July 18, 2019.

132. Perry was finally allowed to return to work in March 2020.

133. Perry was denied the opportunity to maintain the seniority he had accumulated prior to his disability, and he was returned to work in the position of Fire Fighter at a pay rate of $59,417.00/year.

Document received by the MI Wayne 3rd Circuit Court.

134. Perry should have been promoted through the seniority system and achieved the rank of Fire Sergeant upon his returned to work, at a rate of pay of $68,547.00/year.

135. The disciplinary action taken against Perry was without just cause.

### Allegations as to Plaintiff Orlando Potts

136. Plaintiff Orlando Pott's date of birth is April 23, 1971.

137. Potts became employed with the Detroit Fire Department on or about March 11,1991.

138. Potts underwent a disability retirement in June 2005.

139. Potts was approved to return to work on or about June 21, 2018.

140. Potts made several attempts to speak to Ms. Crosson about arranging to return to work.

141. He finally spoke to her on July 23, 2018, at which time Ms. Crosson responded and indicated that she would get back to him about the process of returning to work.

142. He continued to call and left several voice messages in hopes of expediting the process of reinstatement .

143. On or about August 27, 2018 he received a voicemail from Ms. Crosson stating that she was waiting to hear from another department.

144. Mr. Potts began to email Ms. Crosson inquiring as to when he could return to work.

145. His initial email was on September 19, 2018 and several emails followed.

146. However, he continued to receive no direction from Ms Crosson.

Document received by the MI Wayne 3rd Circuit Court.

147. On or about May 23, 2019, Potts emailed Ms. Crosson , and she replied and stated that the Department was addressing a grievance regarding the matter, and when the grievance process was completed, she would be in touch with him.

148. On or about March 4, 2020 Potts received a letter stating to return to work no later than Monday, March 3, 2020.

149. Potts attempted to call Ms. Crosson to gain clarity concerning the letter he had received.

150. Several days thereafter, Potts was contacted by Ms. Crosson, and she informed him that he had to return to work, and start his career over.

151. She stated he would lose all of his seniority; and if he didn't return, his pension checks would stop, and would be considered a Voluntary Quit .

152. Thereafter, Potts converted his disability retirement to a general retirement.

153. At the time Potts went out on a disability retirement, he was a lieutenant in the Fire Marshall Division earning $63,251.00/year.

154. Potts should have been allowed to return to work with his accumulated seniority.

155. If he had been allowed to return to work with his accumulated seniority, he would have achieved the rank of Captain, and been earning over $80,000/year.

### COUNT I
### VIOLATION OF DUTY OF FAIR REPRESENTATION
### BY THE UNION AND THE DEFENDANT UNION OFFICERS,
### PAST AND PRESENT

156. Plaintiffs hereby incorporate by reference each allegation in each of the previous paragraphs as if fully restated herein.

Document received by the MI Wayne 3rd Circuit Court.

157. The acts of Defendants as described herein violated the Public Employment Relations Act (PERA), MCL 423.201 et seq.; MSA 17.455(1) et seq.

158. The Union (through the representation of the named Defendant Union Officers) had a duty of fair representation to the Plaintiffs who were members of the bargaining unit it represented and/or beneficiaries of the Union's representation of its members.

159. The exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

160. The Union was obligated to refrain from engaging in conduct that was arbitrary, discriminatory or in bad faith.

161. As the exclusive bargaining agent, the Union had a duty to fairly represent both members and non-members who were within the bargaining unit.

162. The duty of fair representation included the Union's responsibility to bargain for and to enforce the collective bargaining agreement, as well as process meritorious grievances filed by the employees within the bargaining unit in a manner that was not arbitrary, discriminatory, or in bad faith.

163. The Union breached each obligation owed to the Plaintiffs as delineated pursuant to the above facts.

164. As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained

Document received by the MI Wayne 3rd Circuit Court.

mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice all of which damages continue into the future.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**BY THE UNION AND THE DEFENDANT UNION OFFICERS,**
**PAST AND PRESENT**

165.   Plaintiffs hereby incorporate by reference each allegation in each of the previous paragraphs as if fully restated herein.

166.   There was a fiduciary relationship had between the Union (as represented by its officers, who are named Defendants) and the Plaintiffs.

167.   A fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another.

168.   The Union as fiduciary owed the Plaintiffs duties of loyalty, honesty, due care, good faith, and fair dealing.

169.   The Plaintiffs relied upon the judgment, advice and actions of the Union to their detriment.

170.   The Union breached the fiduciary duty it owed to the Plaintiffs.

171.   As a result of the breach by the Defendant Union, the Plaintiffs were caused to suffer damages.

172.   Relief is warranted wherein the Union's position of influence was abused and/or confidences have been reposed and/or betrayed.

Document received by the MI Wayne 3rd Circuit Court.

173. The Union as the fiduciary had a duty to act for the benefit of the Plaintiffs regarding matters within the scope of the relationship.

174. The violation of the fiduciary duty was a proximate cause of the damages the Plaintiffs have suffered.

175. As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice all of which damages continue into the future.

## COUNT III
## BREACH OF CONTRACT
## VIOLATION BY ALL DEFENDANTS

176. Plaintiffs hereby incorporate by reference each allegation in each of the previous paragraphs as if fully restated herein.

177. The Plaintiffs were parties to, and/or beneficiaries of a valid, enforceable contract/collective bargaining agreement had between the Union, and the City of Detroit.

178. As delineated above, the Defendants breached the contract by either refusal to perform and/or performance that does not conform to the contract's requirements.

179. As a result of the breach of the contract/collective bargaining agreement, the Plaintiffs suffered damages.

Document received by the MI Wayne 3rd Circuit Court.

180. As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice all of which damages continue into the future.

**COUNT IV**
**VIOLATION BY ALL DEFENDANTS OF**
**JUST CAUSE EMPLOYMENT AGREEMENT**

181. Plaintiffs hereby incorporate by reference each allegation in each of the previous paragraphs as if fully restated herein.

182. Plaintiffs were disciplined without just without cause.

183. Pursuant to the City of Detroit Corrective Disciplinary Action Guidelines, all disciplinary actions shall be for just cause.

184. Pursuant to the CBA had between the Union and the City all disciplinary actions shall be for just cause.

185. There was a contractual promise for just cause discipline only; and/or the employer's policies, words, or actions instilled a legitimate expectation of just-cause employment within the Plaintiffs.

186. Yet, as delineated above, the Plaintiffs were disciplined without just cause.

187. As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained

Document received by the MI Wayne 3rd Circuit Court.

mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice all of which damages continue into the future.

**COUNT V**
**PROMISSORY ESTOPPEL**
**VIOLATION BY ALL DEFENDANTS**

188. Plaintiffs hereby incorporate by reference each allegation in each of the previous paragraphs as if fully restated herein.

189. Defendants promised the Plaintiffs who all retired as a result of a duty disability, that they would maintain their accumulated seniority if they returned to the employ of the City of Detroit as a fire fighter.

190. Additionally, Defendants promised the Plaintiffs that upon return to work after a duty disability retirement that they would assume the rank of their hiring date class on an accelerated basis in accordance with the CBA under which they assumed a disability retirement.

191. Defendants' promises were clear, definite, and unequivocal and were specifically made to induce Plaintiffs to render the contemplated services and actions for the stated period for Defendants' benefit.

192. In reliance on the promise, and to their substantial detriment, Plaintiffs performed all that was expected of them in their various capacities.

193. Plaintiffs faithfully rendered these services to Defendants in reliance upon the promises made within their contract/collective bargaining agreement.

Document received by the MI Wayne 3rd Circuit Court.

194. To avoid injustice, this court must specifically enforce Defendants' promises to Plaintiffs.

195. At the time of making the promise and inducing the action on Plaintiffs' part, Defendants could reasonably foresee that their failure to perform pursuant to the promises made to the Plaintiffs would cause the damages Plaintiffs have suffered.

196. Plaintiffs are entitled to a judgment of this court compelling specific performance by Defendants to grant Plaintiff's their loss seniority, positions, and financial damages.

197. As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice, all of which damages continue into the future.

**COUNT VI**
**VIOLATION BY ALL DEFENDANTS OF MICHIGAN'S**
**PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**
**Act 220 of 1976**

198. Plaintiffs hereby incorporate by reference each allegation in each of the previous paragraphs as if fully restated herein.

199. At all relevant times, Plaintiffs were individuals with a *disability (or former disability)* within the meaning of *MCL 37.1101 et. seq., Michigan's Persons with Disabilities Civil Rights Act.*

Document received by the MI Wayne 3rd Circuit Court.

200. Under said statute, Defendants had a duty not to fail or refuse to hire, recruit, or promote an individual because of a disability they have or had that is unrelated to the individual's ability to perform the duties of a particular job or position; not to discharge, retaliate against or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position; not to limit, segregate, or classify an employee or applicant for employment in a way which deprives or tends to deprive an individual of employment opportunities or otherwise adversely affects the status of an employee because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position; not to fail or refuse to hire, recruit, or promote an individual on the basis of a disability, former disability, physical or mental examinations that are not directly related to the requirements of the specific job; not to discharge, retaliate against or take other discriminatory action against an individual on the basis of a disability, former disability, physical or mental examinations that are not directly related to the requirements of the specific job; not to fail or refuse to hire, recruit, or promote an individual when adaptive devices or aids may be utilized thereby enabling that individual to perform the specific requirements of the job; not to discharge or take other discriminatory action against an individual when adaptive devices or aids may be utilized thereby enabling that individual to perform the specific requirements of the job.

201. Defendants breached each and every duty owed to the Plaintiffs as delineated above.

Document received by the MI Wayne 3rd Circuit Court.

202. Notwithstanding said duties and in willful violation thereof, Defendants discriminated against Plaintiffs and harassed them, by subjecting them to humiliation, and discrimination to which other workers were not subject, all because of their disabilities, or former disabilities as delineated above.

203. Plaintiffs had a physical impairment that substantially limited one or more major life activities, had a record of the impairment, and were regarded by Defendants as having the impairment.

204. Upon return to duty or seeking to return to duty after their disability retirement, the Plaintiffs could perform the essential functions of their jobs with or without accommodation.

205. Defendants harassed Plaintiffs because of their disability.

206. Defendants disciplined the Plaintiffs because of their disability.

207. Defendants breached each and every duty owed to the Plaintiffs as delineated herein, by denying Plaintiffs the benefits of the services, programs, or activities of the City of Detroit, and/or by subjecting them to discrimination.

208. As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice, all of which damages continue into the future.

Document received by the MI Wayne 3rd Circuit Court.

**COUNT VII**
**AGE DISCRIMINATION**
**AS TO THE CITY OF DETROIT**
**AND THE NAMED CITY OF DETROIT DEFENDANT EMPLOYEES**
**IN VIOLATION OF THE MICHIGAN CIVIL RIGHTS ACT**

209. Plaintiffs hereby incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

210. At all times relevant hereto, Plaintiffs were employees and Defendants were an employer within the meaning of *MSA 3.548 (101) et. seq., MCLA 37.2101 et. seq., the Michigan Civil Rights Act.*

211. Under said statute, Defendants had a duty to Plaintiffs not to discriminate against them or to harass them with respect to their employment, compensation, terms, conditions or privileges of employment because of their age, or to limit, segregate or classify Plaintiffs in a way which deprived or tended to deprive them of employment opportunities, or otherwise to adversely affect the employment status of Plaintiffs because of their age.

212. Notwithstanding said duties and in willful violation thereof, Defendants discriminated against the Plaintiffs and harassed them, by subjecting them to humiliation, and discrimination to which other workers were not subject, all because of their age, as delineated above.

213. As a direct and proximate result of the Defendants' violations as described above, Plaintiffs have suffered loss of earnings, and other benefits of employment; loss of earning capacity; embarrassment and humiliation, mental and emotional distress with physical manifestations; expenses for medical care and treatment; loss of fringe and pension benefits; loss of career opportunities; and loss of the ordinary

Document received by the MI Wayne 3rd Circuit Court.

pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice; all of which damages continue into the future.

**COUNT VIII**
**AGE DISCRIMINATION**
**AS TO THE DFFA**
**AND THE NAMED DFFA DEFENDANT EMPLOYEES**
**IN VIOLATION OF THE MICHIGAN CIVIL RIGHTS ACT**

214. Plaintiffs hereby incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

215. At all times relevant hereto, Plaintiffs were employee labor union members and Defendants, were a labor union within the meaning of *MCLA 37.2204 et. seq., the Michigan Civil Rights Act.*

216. Under said statute, Defendants had a duty to Plaintiffs not to exclude or expel from membership, or otherwise discriminate against, a member or applicant for membership because of their age, or to limit, segregate, or classify membership or applicants for membership, or classify or fail or refuse to refer for employment an individual in a way which would deprive or tend to deprive that individual of an employment opportunity, or which would limit an employment opportunity, or which would adversely affect wages, hours, or employment conditions, or otherwise adversely affect the status of an employee or an applicant for employment, because of their age, or cause or attempt to cause an employer to violate the Michigan Civil Rights Act, or fail to fairly and adequately represent a member in a grievance process because of their age.

217. Notwithstanding said duties and in willful violation thereof, Defendants discriminated against the Plaintiffs and harassed them, by subjecting them to

Document received by the MI Wayne 3rd Circuit Court.

28

humiliation, and discrimination to which other workers were not subject, all because of their age, as delineated above.

218. As a direct and proximate result of the Defendants' violations as described above, Plaintiffs have suffered loss of earnings, and other benefits of employment; loss of earning capacity; embarrassment and humiliation, mental and emotional distress with physical manifestations; expenses for medical care and treatment; loss of fringe and pension benefits; loss of career opportunities; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice; all of which damages continue into the future.

**COUNT IX**
**TORTIOUS INTERFERENCE**
**WITH A BUSINESS RELATIONSHIP OR EXPECTANCY**
**AS TO THE DFFA AND THE NAMED DFFA DEFENDANT EMPLOYEES**

219. Plaintiffs hereby incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

220. The Plaintiffs had a business relationship and expectancy with the City of Detroit.

221. The Union Defendants had knowledge of the business relationship or expectancy that the Plaintiffs had with the City of Detroit.

222. The Defendants intentional and improperly interfered with the business relationship and expectancy the Plaintiffs had with the City of Detroit.

223. The Defendants committed per se wrongful acts and/or lawful acts with malice and without justification for the purpose of invading the business relationship of the Plaintiffs, inducing or causing a breach, disruption, or termination of the business relationship or expectancy.

Document received by the MI Wayne 3rd Circuit Court.

224. As a direct and proximate result of the Defendants' violations as described above, Plaintiffs have suffered loss of seniority, loss of earnings, and other benefits of employment; loss of earning capacity; embarrassment and humiliation, mental and emotional distress with physical manifestations; expenses for medical care and treatment; loss of fringe and pension benefits; loss of career opportunities; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice; all of which damages continue into the future.

**COUNT X**
**VIOLATION OF THE FOURTENTH AMENDMENT**
**TO THE U.S. CONSTITUTION BY DISCRIMINATION AND RETALIATION**
**AS TO ALL DEFENDANTS**
**ACTIONABLE PURSUANT TO 42 USC §1983**

225. Plaintiffs hereby incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

226. Pursuant to the Fourteenth Amendment:

*All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

227. Pursuant to 42 USC § 1983:

*Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law*

Document received by the MI Wayne 3rd Circuit Court.

*shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress…*

228. Defendants, through their own actions and/or policies, practices, procedures and supervision, or lack thereof, violated clearly established law and no reasonable official would believe the actions described herein were lawful.

229. At all times relevant to this Complaint, Defendants, had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct as delineated above.

230. Defendants violated Plaintiffs' federal constitutional rights secured by the 14th amendment to be free from discrimination and retaliation as a result of their illness/disability.

231. Defendants are liable for the violation of Plaintiff's federal constitutional rights pursuant to 42 U.S.C. § 1983 in failing to provide proper supervision and training to prevent this type of unlawful, discriminatory abuse.

232. As a direct and proximate result of the violation of Plaintiff's rights as alleged, Plaintiffs have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits, mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice, all of which damages continue into the future.

233. As a result of the willful violation of the Plaintiffs' constitutional rights, they are entitled to punitive damages.

*Document received by the MI Wayne 3rd Circuit Court.*

## COUNT XI
## VIOLATION OF THE FOURTEENTH AMENDMENT
## TO THE U.S. CONSTITUTION BY DEPRIVATION OF A PROPERTY INTEREST
## WITHOUT DUE PROCESS OF LAW
## AS TO ALL DEFENDANTS
## ACTIONABLE PURSUANT TO 42 USC §1983

234. Plaintiffs hereby incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

235. The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that certain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures.

236. As public employees, Plaintiffs had a property interest in their employment, which was entitled to due process protection.

237. As public employees, prior to being disciplined and denied and/or deprived of seniority and/or promotional opportunities, the Plaintiffs should have received notice of the charges against them, an explanation of the employer's evidence, and an opportunity to present their side of the story.

238. The Plaintiffs were required to be given the opportunity for a hearing by the decision makers before being deprived of any significant property interest.

239. Further, the Plaintiffs were entitled to a full post denial/deprivation hearing.

240. At a minimum, the Plaintiffs should have been permitted to attend a hearing, to have the assistance of counsel, to call witnesses and produce evidence on their own behalf, and to know and have an opportunity to challenge the evidence against them.

241. The Plaintiffs were denied each and every right which should have been afforded to them, as delineated above.

Document received by the MI Wayne 3rd Circuit Court.

242.   As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice, all of which damages continue into the future.

243.   As a result of the willful violation of the Plaintiffs' constitutional rights, they are entitled to punitive damages.

**COUNT XII**
**MUNICIPAL LIABILITY FOR CONSTITUTIONAL VIOLATIONS**

244.   Plaintiffs hereby incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

245.   Defendant City of Detroit established, promulgated, and implemented the customs, usages, practices, policies and procedures which resulted in the deprivation of Plaintiffs' Constitutional rights.

246.   At all times relevant to this Complaint, Defendant City of Detroit, acting through its Fire Department, Human Resources Department and the named City of Detroit Defendants had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of all the individual Defendants, and were a direct and proximate cause of the damages and injuries complained of herein.

247.   Those practices, polices, and/or procedures were inclusive of, but not limited to denying and/or depriving fire fighters who had been disabled of previously guaranteed seniority and promotional opportunities without due process of law.

Document received by the MI Wayne 3rd Circuit Court.

248. As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained mental and emotional distress, embarrassment, humiliation, anxiety about the future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice, all of which damages continue into the future.

249. As a result of the willful violation of the Plaintiffs' constitutional rights, they are entitled to punitive damages.

## COUNT XIII
## CIVIL CONSPIRACY

250. Plaintiffs hereby incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

251. The Defendants engaged in a civil conspiracy.

252. The facts as delineated above reveal that there was a concerted action by the Defendants to accomplish a criminal or unlawful purpose or a lawful purpose by criminal or unlawful means.

253. As a result of the civil conspiracy engaged in by the Defendants, the Plaintiffs suffered damages.

254. As a direct and proximate result of the violation of Plaintiffs' rights as alleged, they have suffered loss of seniority, loss of earnings and earning capacity, past and future lost earnings, the value of fringe and pension benefits; they have sustained mental and emotional distress, embarrassment, humiliation, anxiety about the

Document received by the MI Wayne 3rd Circuit Court.

future, damage to their good name and reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful occupation of their choice, all of which damages continue into the future.

PLAINTIFFS REQUEST that this Court enter judgment against Defendants as follows:

1. Legal Relief

    a.    A judgment for lost wages and benefits, past and future, in whatever amount they are found to be entitled;

    b.    Compensatory damages in whatever amount they are found to be entitled;

    c.    Damages for emotional distress and mental anguish;

    d.    Punitive and exemplary damages commensurate with the wrong and Defendants' ability to pay, and award of interest, and costs;

    e.    An award of interest, costs, and reasonable attorney fees.

2. Equitable Relief

    a.    An injunction prohibiting any further acts of discrimination or retaliation;

    b.    An order directed to the Union for it to cease and desist its breach of the duty of fair representation;

    c.    An order compelling the Union to proceed on grievances which it had wrongfully refused to handle;

    d.    An order reestablishing the seniority level that the Plaintiffs are rightly entitled to;

    e.    An order placing each of the Plaintiffs in their rightful and lawful position at their appropriate rank;

Document received by the MI Wayne 3rd Circuit Court.

d.  Back pay and or lost earnings to which the Plaintiffs are entitled;

e.  An order compelling the Union to post a notice on its breach of the duty of fair representation in conspicuous places;

f.  An award of interest, costs, and reasonable attorney fees;

g.  Whatever other equitable relief appears appropriate at the time of trial.

WHEREFORE, Plaintiffs requests the Court to enter a judgment against Defendants in an amount exceeding $10,000,000.00, exclusive of costs and interest, and also award to Plaintiffs such other relief as may be applicable under statutory and common law, including interest, costs and attorney fees associated with this action.

## JURY DEMAND

Plaintiffs, through their Attorney, Herbert A. Sanders of The Sanders Law Firm, P.C., hereby requests a trial by jury.

Respectfully submitted,

Dated:  July 8, 2020

/s/ Herbert A. Sanders
Herbert A. Sanders (P43031)
The Sanders Law Firm, P.C.
615 Griswold, Suite 913
Detroit, MI  48226
Phone:  313-962-0099
Fax:  313-962-0044
haslawpc@gmail.com

Document received by the MI Wayne 3rd Circuit Court.

# EXHIBIT 6B

**EMERGENCY MANAGER**
**CITY OF DETROIT**

**ORDER No. 44**

**FINAL EMERGENCY MANAGER ORDER**

_____

**BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER**
**FOR THE CITY OF DETROIT**
**PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,**
**KEVYN D. ORR, THE EMERGENCY MANAGER,**
**ISSUES THE FOLLOWING ORDER:**

_____

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager (the "EM") for the City of Detroit (the "City") with all of the authority, powers and duties provided under PA 436; and

Pursuant to Section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the City's Mayor (the "Mayor") and the Detroit City Council (the "Council"); and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Section 10(1) of PA 436 provides, in part, that "[a]n emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act, including, but not limited to, orders for the timely implementation of a financial and operating plan…, or to take actions or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan. An order issued under this section is binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued. Local elected and appointed officials and employees, agents, and contractors of the local government shall take and direct those actions that are necessary and advisable to maintain compliance with the financial and operating plan;" and

1

The EM has developed and implemented a written financial and operating plan for the City consistent with the requirements of Section 11 of PA 436, the objective of which has been to enable City officials to provide, or cause to be provided, governmental services essential to the public health, safety and welfare of residents of the City, and assure the fiscal accountability of the City; and

Section 12 of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to exercise certain rights and powers, along with the other rights, duties and powers set forth in PA 436; and

Section 21 of PA 436 states, "[b]efore the termination of receivership and the completion of the emergency manager's term, or if a transition advisory board is appointed under section 23, then before the transition advisory board is appointed, the emergency manager shall adopt and implement a 2-year budget, including all contractual and employment agreements, for the local government commencing with the termination of receivership;" and

On July 18, 2013, consistent with the authorization of the Governor of the State of Michigan (the "Governor") provided under Section 18(1) of PA 436, the City filed a petition for relief pursuant to chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as it may be amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

By an order dated December 5, 2013 (Docket No. 1945) (the "Eligibility Order"), the Bankruptcy Court determined that the City is eligible for relief under chapter 9 of the Bankruptcy Code; and

On October 22, 2014, the City filed the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit in the Bankruptcy Court (Docket No. 8045) (as it may be further amended, modified or supplemented, the "Plan of Adjustment");[1] and

By an order dated November 12, 2014 (the "Confirmation Order") (Docket No. 8272), the Bankruptcy Court confirmed the Plan of Adjustment pursuant to the Bankruptcy Code; and

In connection with the Plan of Adjustment, the City, Title Source, Inc. (the "Title Company"), The Detroit Institute of Arts (the "DIA") and the Foundation for Detroit's Future ("FDF") have entered into that certain Deposit Escrow Agreement dated September 19, 2014 (the "Deposit Escrow Agreement"), whereby the parties thereto have agreed to deposit certain agreements relating to the conveyance of the assets of the Detroit Institute of Arts to the DIA to be held in perpetual charitable trust, including, but not limited to, the Omnibus Transaction Agreement by and among the City, the DIA and the FDF (the "Omnibus Agreement"); the Settlement Conveyance and Charitable Trust Agreement by and between the City and the DIA (the "Conveyance Agreement"); the Quit Claim Deed from the City to the DIA granting the DIA the City's interest in the cultural center garage (the "Garage Deed"); the Quit Claim Deed from the City to the DIA granting the DIA the City's interest in the real property of the Detroit

---

[1]     Capitalized terms not otherwise defined herein have the meanings given to them in the Plan of Adjustment.

2

Institute of Arts (the "DIA Deed"); the Bill of Sale by and between the City and the DIA (the "Bill of Sale"); and the Intellectual Property Transfer Agreement by and between the City and the DIA (together with the Omnibus Agreement, the Conveyance Agreement, the Garage Deed, the DIA Deed, the Bill of Sale and any other document referenced in Schedule 1 of the Deposit Escrow Agreement, the "DIA Transfer Documents"); and

The City also is entering into various settlement agreements and other resolutions as set forth in the Plan of Adjustment and the exhibits thereto (collectively, the "Plan Settlements"), which will be effective upon effective date of the Plan of Adjustment (the "Effective Date"), including, without limitation, the following (as further defined or described in the Plan of Adjustment): (a) the UTGO Settlement Agreement, in substantially the form as Exhibit I.A.360 to the Plan of Adjustment, (b) the LTGO Settlement Agreement, in substantially the form as Exhibit I.A.237 of the Plan of Adjustment, (c) the 36th District Court Settlement, as outlined in Exhibit I.A.9 to the Plan of Adjustment; (d) the settlement of OPEB Benefits, as set forth in Section IV.G of the Plan of Adjustment and the Retiree Health Care Settlement Agreement attached as Exhibit I.A.298 to the Plan of Adjustment; (e) the DIA Settlement, as outlined in Exhibit I.A.126 of the Plan of Adjustment and pursuant to the DIA Settlement Documents substantially in the form as Exhibit I.A.127 of the Plan of Adjustment; (f) the State Contribution Agreement in substantially the form as Exhibit I.A.332 of the Plan of Adjustment (the "State Contribution Agreement"); (g) matters relating to the DWSD Authority; (h) the Syncora Settlement, including the Syncora Development Agreement in substantially the form as Exhibit I.A.340 of the Plan of Adjustment and the other Syncora Settlement Documents in substantially the forms as Exhibit I.A.344 of the Plan of Adjustment; (i) the FGIC/COP Settlement, including the FGIC Development Agreement in substantially the form as Exhibit I.A.198 to the Plan of Adjustment and the other FGIC/COP Settlement Documents in substantially the forms as Exhibit I.A.197; and (j) all other compromises and settlements included in, incorporated into or related to the Plan of Adjustment; and

On September 25, 2014, in accordance with Section 9(6)(c) of PA 436, the Council voted unanimously to remove the EM as of the Effective Date (the period from the appointment of the EM through such removal, the "EM Tenure"). By a letter to the Governor, the Mayor approved of the Council's vote on the same day; and

On September 25, 2014, in connection with the vote of Council to, and the Mayor's approval of, the removal of the EM as of the Effective Date, the EM adopted and issued his Order No. 42. By Order No. 42, the EM, among other things, (a) restored the authority of the Mayor and the Council over day-to-day operations and activities effective immediately as permitted by PA 436, (b) agreed not to exercise his powers under PA 436 to interfere with the powers restored to the Mayor and the Council and (c) agreed that he will exercise his powers through the conclusion of the EM Tenure only with respect to any action (or the prevention of any action) that is necessary or convenient for (i) the management of the case captioned "*In re City of Detroit, Michigan*, Case No 1353846" (the "Bankruptcy Case") and related bankruptcy proceedings and (ii) the implementation of the Plan of Adjustment; and

The EM has concluded that, as of and conditioned on the occurrence of the Effective Date, the financial conditions of the City will have been corrected in a sustainable fashion consistent with the requirements of Section 9(7) of PA 436; and

Section 22(1) of PA 436 provides that "[i]f an emergency manager determines that the financial emergency that he or she was appointed to manage has been rectified, the emergency manager shall inform the governor and the state treasurer;" and

By letter dated December 8, 2014, the EM will notify the Governor and the Treasurer of the State of Michigan (the "State Treasurer") of the EM's determination that the financial emergency he was appointed to manage within the City will have been rectified as of, and conditioned on the occurrence of, the Effective Date; and

As the EM Tenure approaches its conclusion and in anticipation of the Effective Date, the EM has determined that this Order is appropriate to: (a) promote the successful conclusion of the City's restructuring efforts and its capacity to provide or cause to be provided necessary governmental services essential to the public health, safety and welfare; and (b) otherwise fulfill the intents and purposes of PA 436 and chapter 9 of the Bankruptcy Code; and

As part of this Order, the EM has determined, among other things, that the terms hereof are appropriate to provide for a smooth transition at the conclusion of the EM Tenure and to promote the long-term financial recovery of the City and the health, safety and welfare of the public; and

Pursuant to Order No. 42, the EM has consulted with the Mayor and the Council regarding the terms of this Order.

**It is hereby ordered that:**

*Restoration of City Governance*

1. To the extent not already restored pursuant to the EM's Order No. 42, and except as provided by this Order or other or applicable Michigan or Federal statute, the powers and authority of the Mayor and the Council previously exercised by the EM shall be restored as of, and conditioned upon the occurrence of, the Effective Date.

*Cooperation and Compliance by City Officials*

2. The Mayor, Council members, department heads and other employees, agents and contractors of the City shall promptly and fully do all of the following:

   a. Cooperate with the EM through the end of the EM Tenure to the extent necessary to effectuate the implementation of a Plan of Adjustment, the Confirmation Order or other orders entered or that may be entered in connection therewith by

4

the Bankruptcy Court in the Bankruptcy Case or in any related proceeding or appeal from any order entered or that may be entered by the Bankruptcy Court.

b. Comply with requests from the Michigan Financial Review Commission (the "Commission") created by Michigan Public Act 181 of 2014 ("PA 181"), known as the Michigan Financial Review Commission Act, to the extent necessary or appropriate to effectuate the purposes of PA 181. Such compliance shall include, at a minimum and without limitation, all of the following:

   i. Providing to the Commission any documents, records or other information requested of City officials by the Commission or its staff, including any documents, records or other information specifically required by PA 181.

   ii. Appearing before the Commission to provide testimony, documents, records or other information as and when requested by the Commission or its staff.

   iii. Providing to the Commission upon its request verification of compliance by the City with all of the following consistent with the requirements of Section 6(3) of PA 181:

      A. Section 8 of Michigan Public Act 152 of 2011, the Publicly Funded Health Insurance Contribution Act;

      B. Sections 4i, 4p, 4s and 4t of Michigan Public Act 279 of 1909, the Home Rule City Act;

      C. Michigan Public Act 34 of 2001, the Revised Municipal Finance Act; and

      D. Michigan Public Act 2 of 1968, the Uniform Budgeting and Accounting Act;

   *provided that* nothing herein shall limit, modify or excuse the City's obligation to comply with the applicable law, whether or not listed herein.

*Plan of Adjustment Matters*

3. Without limiting the terms of paragraph 2 above, the Mayor, the Council and all City officers, department heads and other employees, agents and contractors shall take such steps as are necessary or appropriate from and after the Effective Date to pursue the prompt implementation of the Plan of Adjustment, the Confirmation Order and all agreements necessary thereto, including the Plan Settlements. For the avoidance of doubt, such steps include, without limitation, the following:

5

a. The City shall defend any appeals of the Confirmation Order and any appeals of the Eligibility Order or other orders of the Bankruptcy Court necessary for the success of the Plan of Adjustment.

b. On or promptly after the Effective Date and provided that the conditions set forth in the Deposit Escrow Agreement and the DIA Transfer Documents have been otherwise satisfied, the City shall provide the certification described in Schedule 2 of the Deposit Escrow Agreement to the Title Company, and, upon release of the DIA Transfer Documents in accordance with the Deposit Escrow Agreement, the City shall cause the transfer of the assets of the Detroit Institute of Art described in the DIA Transfer Documents and the governance thereof to The Detroit Institute of Arts in accordance with the DIA Transfer Documents.

c. The City shall comply with all covenants set forth in Sections 5.2 and 5.3 of the Omnibus Agreement.

d. Without limiting any other provision hereof, the City shall make such distributions and take such actions as are contemplated in the Plan of Adjustment for the establishment of and distribution to the Detroit General VEBA and Detroit Police and Fire VEBA (as such terms are defined in the Plan of Adjustment), in substantially the form provided in the Plan of Adjustment, and consistent with the measures set forth in the letter agreement filed at Docket No. 8183, all of which are hereby specifically adopted, approved and ratified in all respects.

e. Upon the negotiation of documentation mutually acceptable to the parties, the City shall be authorized and is directed to take such actions and sign such documents as are necessary or appropriate to establish the DWSD Authority (i.e., the Great Lakes Water Authority) and implement the DWSD Authority Transaction consistent with the Memorandum of Understanding (as defined in the Confirmation Order).

f. The City is authorized to enter into and implement, and the EM hereby approves, the *Memorandum of Understanding Between the City of Detroit and Wayne County Community College* in the form approved by the Council on December 8, 2014.

4. All Plan Settlements and related agreements (including, without limitation, the DIA Transfer Documents), to the extent not previously approved by an order of the EM, are hereby expressly adopted, approved and ratified in all respects.

*Restructuring Advisors*

5. The Mayor or his designee may determine whether to retain the restructuring advisors listed on the attached Exhibit A (collectively, the "Restructuring Advisors") for such period as is necessary or appropriate to complete their work to implement the Plan of Adjustment and defend the appeals thereof (the "Restructuring Period"), subject to the terms of the Restructuring Advisors' contracts with the City, *provided that* the Mayor shall consult with the Commission with respect to any decision not to retain a Restructuring Advisor through the conclusion of the Restructuring Period.

6

6. The Emergency Manager, on behalf of the City, hereby restates and ratifies his approval of all fees and expenses for the City's restructuring professionals that have been subject to the Fee Examiner review process in the City's bankruptcy case (including the Restructuring Advisors) for services rendered through the Effective Date, subject to the Bankruptcy Court's independent review of reasonableness. The City is directed to continue to process and pay invoices of the City's restructuring professionals (including the Restructuring Advisors) for their work through the Effective Date based on the invoices presented, subject only to the Bankruptcy Court's independent review of reasonableness. For the avoidance of doubt, the City also shall pay any creditor advisors or court-appointed professionals and experts consistent with orders of the Bankruptcy Court. The City's Chief Financial Officer ("CFO") shall be responsible for the foregoing on behalf of the City, under the supervision of the Mayor.

7. Consistent with the foregoing, the City shall: (a) set aside a reserve account solely for the payment of restructuring fees consistent with full funding of the amounts identified for "Restructuring Professional Fees" in the City of Detroit Ten-Year Financial Projections; and (b) otherwise implement the fee provisions of the Plan of Adjustment, the Confirmation Order and any further orders of the Bankruptcy Court. The CFO shall be responsible for the foregoing on behalf of the City, under the supervision of the Mayor.

*Two-Year Budget*

8. Attached hereto as Exhibit B is the City's two-year budget consistent with the requirements of Section 21(1) of PA 436 (the "Two-Year Budget").

9. Consistent with the requirements of Section 21(2) of PA 436, the City shall not amend the Two-Year Budget without the written approval of the State Treasurer. In addition to approval by the State Treasurer, an amendment by the City to the Two-Year Budget shall not take effect unless approved by the Commission consistent with Section 7(c) of PA 181.

*Labor Matters*

10. All Collective Bargaining Agreements ("CBAs") set forth on Exhibit II.D.5 of the Plan of Adjustment and all CBAs identified on the attached Exhibit C (including CBAs relating to the Detroit Water and Sewerage Department), and any addenda, exhibits, schedules, appendices, supplements or related agreements though the date of this Order, are hereby adopted, approved and ratified in all respects. In addition to the foregoing, all City Employment Terms ("CETs") and other labor-related agreements approved or authorized by the EM are hereby adopted, ratified and approved in all respects, including, without limitation, the CETs and other agreements identified on the attached Exhibit C. The EM also ratifies and approves the CETs that were implemented prior to the EM Tenure and that remain in effect as of the date of this Order, including the CETs identified on the attached Exhibit C.

7

*Pension Plan Matters*

11. For the avoidance of doubt, and without limiting anything herein, the EM hereby expressly reaffirms his Order Nos. 25, 26, 29, 30 and 43 with respect to the changes to the City's pension plans and related ordinances, subject to the additional provisions below.

12. Pursuant to Section 16.4 of Component I of the Combined Plan for the General Retirement System of the City of Detroit, Michigan (the "Combined GRS Plan"), the EM, on behalf of the City, adopts the Combined GRS Plan, as amended and restated, in the form attached hereto as Exhibit D, which document (a) conforms the Combined GRS Plan to the terms of the confirmed Plan of Adjustment and (b) makes other clarifying modifications.

13. Pursuant to Section 17.5 of Component I of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Combined PFRS Plan"), the EM, on behalf of the City, adopts the Combined PFRS Plan, as amended and restated, in the form attached hereto as Exhibit E, which document:  (a) reflects changes in the terms and conditions of retirement benefits as provided in the CBAs and memoranda of understanding negotiated with certain of the employee representatives; (b) conforms the Combined PFRS Plan to the terms of the confirmed Plan of Adjustment; and (c) makes other clarifying modifications.

14. Copies of the Combined GRS Plan, as amended and restated, and the Combined PFRS Plan, as amended and restated, will be kept in the Office of the City Clerk for the City of Detroit and shall be available for public inspection.

15. The appropriate City officers, department heads and other employees shall cause the Boards of Trustees of the General Retirement System of the City of Detroit ("GRS") and the Police and Fire Retirement System of the City of Detroit ("PFRS") to timely file or cause to be filed on behalf of GRS and PFRS applications for Favorable Determination Letters with the Internal Revenue Service pursuant to Revenue Procedure 2014-6 (or any successor procedure) to obtain rulings that the Combined GRS Plan and the Combined PFRS Plan satisfy the requirements for favorable tax treatment under Sections 401(a) and 501(a) of the Internal Revenue Code.  City officers, department heads and other employees, agents and contractors shall cooperate with and provide such information as the Boards of Trustees and their legal counsel may require in connection with such Favorable Determination Letter applications.

16. The Mayor, Council members and appropriate City officers, department heads and other employees shall cause the Boards of Trustees of the GRS and the PFRS to:  (a) comply with the governance requirements set forth in Section 2 of the State Contribution Agreement (including, with respect to the GRS, the requirements of Exhibit A and, with respect to the PFRS, the requirements of Exhibit B) at all times during the 20-year period

8

following the disbursement to the GRS and the PFRS of the State Contribution (as defined in the State Contribution Agreement); and (b) establish and implement an income stabilization program that complies in all respects with Section 3 of the State Contribution Agreement.

*Other EM Orders and Bond Orders*

17. All prior Orders of the EM, to the extent that they are not otherwise inconsistent with this Order and have not previously been modified or rescinded (the "Prior Orders"), shall be incorporated by reference into this Order.

18. The reaffirmation herein of specific Orders of the EM shall not render the Orders not explicitly mentioned herein revoked, rescinded or altered in any way unless such Orders are otherwise inconsistent with this Order.

19. The bond orders issued by the EM, including the bond orders identified on the attached Exhibit F (collectively, the "Bond Orders"), are hereby ratified and affirmed.

*Administrative Matters*

20. The City shall maintain access to the EM page via the City's website for a period of at least one year following the end of the EM Tenure.

21. Nothing in this Order shall be construed as contrary to applicable law.

22. Nothing in this Order shall be construed to restrict or impair the authority of the Governor, in the Governor's sole discretion, to determine that the financial conditions of the City have not been corrected in a sustainable fashion as required by Section 9(7) of PA 436 and appoint a new emergency manager pursuant to Section 24 of PA 436.

23. If any provision of this Order is declared by a court of competent jurisdiction to be illegal, unenforceable or ineffective, such provision shall be deemed severable to the extent necessary so that all other provisions contained in this Order shall remain valid, enforceable and effective.

24. The City shall, and is directed to, maintain all insurance called for by Article 8 of the EM's Contract for Emergency Manager Services dated March 27, 2013 between Mr. Orr and the State of Michigan (the "EM Contract"), including, without limitation, any general liability, professional liability or errors and omissions policy under Sections 8.1 and 8.3 of the EM Contract, and any tail coverage for such insurance.

25. The City shall, and is directed to, fulfill its obligations under Section 8.2 of the EM Contract after the end of the EM Tenure, including, without limitation, by paying the costs of any judgment, settlement or attorneys' fees relating to any uninsured claim,

9

demand or lawsuit against the EM or any employee, agent, appointee or contractor of the EM for actions taken during the EM Tenure. If Mr. Orr is sued personally for any action performed within the scope of his official capacity as the EM, Mr. Orr shall have the right to direct the defense of any such action, and the Mayor, the Council, the Corporation Counsel and the other employees, officers, department heads and agents of the City shall not take any action contrary to, or to interfere with, Mr. Orr's right to direct such defense.

26. Prior to the Effective Date, and pursuant to Section 5.1 of the Financial Stability Agreement, as Amended and Restated on November 7, 2013 (the "FSA"), the EM hereby consents, with the mutual consent of the State Treasurer, to amend Section 6.1(c) of the FSA for the purpose of terminating the FSA as of the Effective Date. To that end, the *Addendum to the Financial Stability Agreement* in the form attached hereto as Exhibit G (the "FSA Amendment") is approved and ratified in all respects. For the avoidance of doubt, the mutual execution of the FSA Amendment by the EM and the State Treasurer shall not preclude the Council from voting to ratify execution of the FSA Amendment prior to the Effective Date.

27. This Order shall be distributed to the Governor, the State Treasurer, the Mayor, Council members, the CFO and all department heads.

28. This Order is effective immediately.

*Modification of This Order and Prior EM Orders*

29. Prior to the Effective Date, the EM may modify, amend, rescind, replace, supplement or otherwise revise this Order at any time. Further, nothing herein shall preclude the EM from issuing any other appropriate Orders, consistent with EM Order No. 42, prior to the Effective Date.

30. Pursuant to Section 21(2) of PA 436, the Council shall not revise this Order or any other Orders or ordinances implemented by the EM during his term, and that remain in effect, prior to one year after the termination of receivership. In addition, after the Effective Date, this Order, or any other Order issued by the EM that remains in effect, may be amended, modified or rescinded only by the following methods:

a. By a subsequent Order issued by an emergency manager appointed by the Governor under Section 9 of PA 436, including:

i. After a selection by the Council pursuant to Section 7(1)(b) of PA 436; or

ii. Pursuant to Section 24 of PA 436; or

b. By the City by resolution of the Council, approved by the Mayor and ratified by the Commission pursuant to Section 7(n) or 7(o) of PA 181.

Dated: December 8, 2014

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc: Governor of the State of Michigan
    State Treasurer
    Mayor Michael Duggan
    Members of Detroit City Council
    Chief Financial Officer
    City Department Heads

# EXHIBIT C

## NONEXCLUSIVE SCHEDULE OF POSTPETITION
## COLLECTIVE BARGAINING AGREEMENTS AND CITY EMPLOYMENT TERMS

### I. FULLY APPROVED AGREEMENTS[2]

#### A. City of Detroit Collective Bargaining Agreements

1) Master Agreement Between the City of Detroit and the Police Officers Association of Michigan (POAM), 2013-2018, dated November 12, 2013.

2) Master Agreement Between the City of Detroit and the International Brotherhood of Teamsters Local 214 2013-2018, dated December 18, 2013.

    a. Supplemental Agreement Between the City of Detroit Police Department and Teamsters State, County and Municipal Workers, Local 214 2013-2018, dated December 18, 2013.

    b. Supplemental Agreement Between the Department of Public Works and Teamsters Local 214 2013-2018, dated December 18, 2013.

    c. Supplemental Agreement Between the General Services Department and Teamsters Local 214 2013-2018, dated December 18, 2013.

    d. Supplemental Agreement between the City of Detroit Municipal Parking Department and Local 214 Teamsters State, County and Municipal Workers, 2013-2018, dated December 18, 2013.

3) Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 2013-2018, dated December 18, 2013.

4) Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 (Park Management) 2013-2018, dated December 18, 2013.

5) Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 (Principal Clerks) 2013-2018, dated December 18, 2013.

6) Master Agreement Between the Assistant Supervisors of Street Maintenance and Construction and the City of Detroit 2014-2018.

---

[2] "Fully Approved Agreements" means those collective bargaining agreements that have been (i) ratified by the applicable bargaining unit or units, as necessary (ii) approved by the applicable City or DWSD bargaining representatives, (iii) approved by the Emergency Manager and (iv) approved by the Office of the Treasurer of the State of Michigan.

1

7) Master Agreement Between the City of Detroit and the Michigan Building and Construction Trades Council 2014-2018, dated May 1, 2014.

8) Master Agreement Between the City of Detroit and the Emergency Medical Service Officers Association 2014-2019, dated June 11, 2014.

9) Master Agreement Between the City of Detroit and Local 1863 of the American Federation of State County and Municipal Employees, AFL-CIO (Detroit Civilian Crossing Guards) 2014-2018, dated June 27, 2014.

10) Master Agreement Between the City of Detroit and Local 542 of the American Federation of State County and Municipal Employees, AFL-CIO (Motor City Seasonals) 2014-2018, dated June 27, 2014.

11) Master Agreement Between the City of Detroit and Local 1206 of the American Federation of State County and Municipal Employees, AFL-CIO (Detroit Forestry and Landscape Foreman's Union) 2014-2018, dated June 27, 2014.

12) Master Agreement Between the City of Detroit and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

   a. Supplemental Agreement Between the City of Detroit Elections Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018.

   b. Supplemental Agreement Between the City of Detroit Municipal Parking Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018.

   c. Supplemental Agreement Between the City of Detroit Police Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018.

   d. Supplemental Agreement Between the City of Detroit Recreation Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018.

13) Master Agreement Between the City of Detroit and Local 6087 of the American Federation of State County and Municipal Employees, AFL-CIO (Paving Forepersons) 2014-2018, dated June 27, 2014.

14) Master Agreement Between the City of Detroit and the Detroit Police Command Officers Association 2014-2019, dated June 18, 2014.

2

15) Master Agreement Between the City of Detroit and the Detroit Income Tax Investigators Association 2014-2018.

16) Master Agreement Between the City of Detroit and the Association of Municipal Inspectors 2014-2018, dated June 27, 2014.

17) Master Agreement Between the City of Detroit and the Service Employees International Union Local 517-M (Supervisory Unit) 2014-2018, dated June 25, 2014.

18) Master Agreement Between the City of Detroit and the Service Employees International Union Local 517-M (Non-Supervisory Unit) 2014-2018, dated June 25, 2014.

19) Master Agreement Between the City of Detroit and the Service Employees International Union Local 517-M (Professional and Technical Unit) 2014-2018, dated June 25, 2014.

20) Master Agreement Between the City of Detroit and the Association of City of Detroit Supervisors 2014-2018, dated June 27, 2014.

21) Master Agreement Between the City of Detroit and the Association of Professional and Technical Employees 2014-2018, dated July 22, 2014.

22) Master Agreement Between the City of Detroit and the Senior Accountants, Analysts and Appraisers Association 2014-2018, dated May 27, 2014.

23) Master Agreement Between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO (Non-Supervisory Bargaining Unit) 2014-2018.

   a. Supplemental Agreement Between the City of Detroit Planning and Development Department and Local 23 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

   b. Supplemental Agreement Between the City of Detroit Building and Safety Department and Local 62 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

   c. Supplemental Agreement Between the City of Detroit Department of Public Works and Local 62 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

   d. Supplemental Agreement Between the City of Detroit General Services Department and Local 62 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

3

e.      Supplemental Agreement Between the City of Detroit Human Resources Department and Local 62 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

f.      Supplemental Agreement Between the City of Detroit Information Technology Department and Local 62 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

g.      Supplemental Agreement Between the City of Detroit Municipal Parking Department and Local 62 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

h.      Supplemental Agreement Between the City of Detroit Department of Public Works and Local 229 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

i.      Supplemental Agreement Between the City of Detroit General Services Department and Local 229 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

j.      Supplemental Agreement Between the City of Detroit General Services Department and Local 542 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

k.      Supplemental Agreement Between the City of Detroit Fire Department and Local 542 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

l.      Supplemental Agreement Between the City of Detroit Recreation Department and Local 542 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

m.      Supplemental Agreement Between the City of Detroit Recreation Department and Local 836 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

n.      Supplemental Agreement Between the City of Detroit Public Lighting Department and Local 2920 of the American Federation of State County and Municipal Employees, AFL-CIO 2014-2018.

24)    Master Agreement Between the City of Detroit and the Detroit Police Officers Association, dated October 1, 2014.

25)    Master Agreement Between the City of Detroit and the Association of Professional Construction Inspectors 2014-2018.

4

26) Master Agreement Between the City of Detroit and the United Automobile, Aerospace and Agricultural Implement Workers of America Local 212 – Police Commission Investigators 2014-2018, dated October 20, 2014.

27) Master Agreement Between the City of Detroit and the United Automobile, Aerospace and Agricultural Implement Workers of America Local 412 – Legal Assistants 2014-2018, dated October 20, 2014.

28) Master Agreement Between the City of Detroit and the Association of Detroit Engineers 2014-2018.

29) Master Agreement Between the City of Detroit, Local 1227 of the American Federation of State, County and Municipal Employees, AFL-CIO and the Michigan Building and Construction Trades Council 2014-2018.

30) Master Agreement Between the City of Detroit and the Detroit Fire Fighters Association 2014-2019.

31) Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association 2014-2019.

32) Master Agreement Between the City of Detroit and the Association of Municipal Engineers 2014-2018.

**B. Detroit Water and Sewerage Department Collective Bargaining Agreements**

1) 2012-2018 Master Agreement Between the Detroit Water & Sewerage Department and AFSCME, Michigan Council 25 Local 2920.

2) Master Agreement Between the City of Detroit and the Michigan Building and Construction Trades Council 2013-2016, dated June 26, 2013.

   a. Memorandum of Agreement between the Detroit Water and Sewerage Department and the Michigan Building & Construction Trades Council to amend their June 26, 2013 - June 30, 2016 collective bargaining agreement.

3) 2013-2016 Master Agreement Between the Detroit Water & Sewerage Department and the Building Trades Foremen, dated June 26, 2013.

4) 2014-2016 Master Agreement Between the Detroit Water & Sewerage Department and the Detroit Senior Water Systems Chemists Association.

5) 2014-2019 Master Agreement Between the DWSD and Teamsters State, County and Municipal Workers, Local 214.

5

6)  Memorandum of Agreement between the Detroit Water and Sewerage Department and the International Union of Operating Engineers, Local 324 to amend their March 25, 2013 - June 30, 2022 collective bargaining agreement.

7)  Memorandum of Agreement between the Detroit Water and Sewerage Department and the Association of Professional Construction Inspectors to amend their March 26, 2013 - June 30, 2020 collective bargaining agreement.

## II.  CITY EMPLOYMENT TERMS

### A.  City of Detroit City Employment Terms

1)  City Employment Terms implemented by the City of Detroit on the American Federation of State, County and Municipal Employees, AFL-CIO Local 1023 – Emergency Services Operators, dated August 23, 2013, December 26, 2013 and December 8, 2014.

2)  Restructuring changes implemented by the City of Detroit impacting employees in the Law Department, dated May 5, 2014.

3)  City Employment Terms implemented by the City of Detroit on the United Automobile, Aerospace and Agricultural Implement Workers of America Local 2211 – Public Attorneys Association, dated September 17, 2014.

4)  City Employment Terms implemented by the City of Detroit on the Police Officers Labor Council – Detention Facility Officers, dated July 18, 2012, December 26, 2013 and December 4, 2014.

### B.  Detroit Water and Sewerage Department City Employment Terms

5)  City Employment Terms implemented by the City of Detroit on United Automobile, Aerospace and Agricultural Implement Workers of America Local 2200 – Waste Water Treatment Plant Supervisors, dated July 18, 2012, December 26, 2013, and September 25, 2014.

6)  City Employment Terms implemented by the City of Detroit on the American Federation of State, County and Municipal Employees Local 2394 – Detroit Water and Sewerage Department Supervisors, dated July 18, 2012, December 26, 2013, and September 25, 2014.

7)  City Employment Terms implemented by the City of Detroit on the American Federation of State, County and Municipal Employees Local 207 – Detroit Water and Sewerage Department Employees, dated July 18, 2012, December 26, 2013, and September 25, 2014.

6

8)   City Employment Terms implemented by the City of Detroit on the Association of Professional and Technical Employees – Detroit Water and Sewerage Department Employees, dated July 18, 2012, December 26, 2013, and September 25, 2014.

9)   City Employment Terms implemented by the City of Detroit on the Association of Detroit Engineers – Detroit Water and Sewerage Department Employees, dated July 18, 2012, December 26, 2013, and September 25, 2014.

10)  City Employment Terms implemented by the City of Detroit on the Senior Accountants, Analysts, and Appraisers Association – Detroit Water and Sewerage Department Employees, dated July 18, 2012, December 26, 2013, and September 25, 2014.

11)  City Employment Terms implemented by the City of Detroit on the Sanitary Chemists and Technicians Association, dated July 18, 2012, December 26, 2013, and September 25, 2014.

12)  Letter from Emergency Manager Kevyn D. Orr, Esq. to Detroit Water and Sewerage Department Director Sue McCormick regarding the Detroit Water and Sewerage Department, dated December 30, 2013.