# EXHIBIT 6C

STUART M. ISRAEL
CHRISTOPHER P. LEGGHIO
KEVIN P. KALES
JOHN G. ADAM
MEGAN B. BOELSTLER
LAUREN E. CRUMMEL
CARLA T. BLAKEY

306 SOUTH WASHINGTON AVENUE, SUITE 600
ROYAL OAK, MI 48067-3837
248.398.5900
FAX 248.398.2662
WWW.LEGGHIOISRAEL.COM

DOWNRIVER OFFICE
WWW.KEVINKALES.COM
3133 VAN HORN ROAD
TRENTON, MI 48183-4070
313.381.0806

April 23, 2021

**Via Email**

Herbert A. Sanders
The Sanders Law Firm, P. C.
The Ford Building
615 Griswold, Suite 913
Detroit, MI 48226
haslawpc@gmail.com

RE:     *Christopher McGhee, et al v. City of Detroit, et al*
Wayne County Circuit Court 20-006272-CD
**Pension Credited Service -** *Combined Plan for the Police and Fire Retirement System of the City of Detroit ("Plan")*

Dear Mr. Sanders:

This letter also confirms our telephone conversations on April 21, 2021. Earlier -- on April 21, 2021 by a 2:34 p.m. email -- I confirmed Plaintiffs' intention to withdraw their Motion to Compel with regard to the DFFA, which was scheduled for April 23 hearing.

As we discussed on April 21, the DFFA believes your clients earned Credited Service with the Plan *while on duty disability*. All members may do so until they accrue up to twenty-five (25) years of Credited Service. This is so *even when* a member's seniority is terminated after more than two (2) years off the job on duty disability.

For your convenience, I have attached a pertinent highlighted excerpt from the Plan document. The City provided Plaintiffs with the entire Plan document in discovery.

Herbert A. Sanders
*Christopher McGhee, et al v. City of Detroit, et al*
*Pension Credited Service*
April 23, 2021
Page 2

The DFFA urges Plaintiffs to review this language and, more specifically, to review their individual Credited Service "received" while they were/are duty disabled.

During our April 21, 2021 call, I also noted that the DFFA believes that Plaintiffs' claims raise issues within the exclusive jurisdiction of the Bankruptcy Court, *i.e.*, that they are contrary to the Bankruptcy Court's approved Plan of Adjustment ("POA").

Finally, this letter also confirms that the DFFA will depose, pursuant to MCR 2.306(B)(3), the Police and Fire Retirement System.   And, as we agreed, I will contact you early next week regarding additional dates for discovery.

Sincerely,

Christopher P. Legghio

Enclosure

cc:   Megan B. Boelstler (mbb@legghioisrael.com)
Shawndrica N. Simmons (simmonslegal@lawchic.com)
Jason McFarlane (mcfaj@detroitmi.gov)

# EXHIBIT 6D

VOLUNTARY LABOR ARBITRATION TRIBUNAL
Before George T. Roumell, Jr., Arbitrator

*In the Matter of the*
*Arbitration Between:*

CITY OF DETROIT (FIRE
DEPARTMENT)

                                  Gr. No. 20-20
                                    Stephen Henderson

-and-
                                    Christopher J. Smith

DETROIT FIRE FIGHTERS
ASSOCIATION

_____

## **ARBITRATOR'S OPINION AND AWARD**

<u>APPEARANCES</u>:

FOR THE CITY OF DETROIT:           FOR THE DETROIT FIRE FIGHTERS
                                        ASSOCIATION:

Jason McFarlane, Asst. Corporation Counsel     Megan Boelstler, Attorney

## **The Grievance and Answers**

On June 23, 2020, Detroit Fire Fighters Association Vice President William M. Harp

filed the following grievance on behalf of Stephen Henderson:

> **Statement of Grievance:**
> The DFFA grieves the loss of seniority for Stephen Henderson. He
> made application to the Pension Board prior to his 2nd anniversary of
> being on a Duty Disability. The Pension Board returned him to work on
> or about June 1, 2020. The department's HR representative Kemia
> Crosson failed to process his return timely. Demoted him without due
> process. Upon his return Ms. Crosson deemed him a new hire this being
> a violation of Article 1 A, B, C, D – Article 12 D 7 along with other
> applicable provisions of the CBA.

By letter dated June 30, 2020 to the President of the Association, Thomas Gehart, Robert

Distelrath, Chief of Department-Fire Fighting Division, denied the grievance writing:

* * *

The Department <u>denies</u> this grievance as Stephen Henderson was properly returned to duty per 12 D(2).  Article 12 D(2) calls for the loss of seniority upon retirement.  Article D states: <u>Loss of Seniority</u>: An employee loses seniority for the following reasons only: Sec. 2 Retirement.  This is the sole Article and section of the CBA controlling Stephen Henderson's seniority.  The Police and Fire Retirement System of the City of Detroit recognizes four types of retirement: Normal Retirement, Deferred Retirement (Vested Benefits), Duty Disability Retirement, and Non-Duty Disability Retirement.  Stephen Henderson separated from the Department on a Duty Disability Retirement, therefore, he must be returned with no seniority.

At Step 2, Reginald T. Jenkins, Second Deputy Commissioner, denied the grievance, writing:

Stephen Henderson was properly returned to work, from a Duty Disability Retirement, in accordance with the CBA, Article 12(D)(2). The Retirement Systems did release Mr. Henderson from a Duty Disability Retirement status and notified the Fire Department's Human Resources Office of such, on or about June 1, 2020.

The date of notification to the Department is not a return to work date. Upon release by the Retirement Systems, there is a process that is followed when returning to work. Part of that process is going to the City's doctor for an examination and release to return to work.  The return to work date is the actual date that the employee is returned to work.  Stephen Henderson's actual return to work date was June 15, 2020.

Stephen Henderson was returned to work timely by H.R. and he was not demoted without due process.  HR followed the provisions of the CBA, Article 12(D)(2); therefore, there is no violation of the CBA in this case. This grievance is denied.

By letter dated July 7, 2020 to Eric Jones, Executive Fire Commissioner, Vice President

Harp announced an intent to arbitrate.  Subsequently, by letter dated October 29, 2020 to

Commissioner Jones, Vice President Harp wrote:

This letter serves as an amendment and clarification to Grievance #20-20, as this is an ongoing matter.

Grievance #20-20 is on behalf of Stephen Henderson and all other DFFA I employees similarly situated under DFFA I CBA,

2

> including but not limited to Christopher J. Smith. All employees who applied to the Pension Board prior to their second anniversary of being on a duty disability, but were improperly denied seniority, are included in Grievance #20-20.

This arbitration followed.

## Background

The Detroit Fire Fighters Association represents employees in various classifications employed by the Detroit Fire Department, including employees assigned to the Fire Fighting Division. An employee who is injured on the job and is unable to perform the full duties of the employee's position may be put off active duty and put on what was described as J Status – injury on duty status and be treated for the injury. While on duty status, the employee could receive full pay. J Status can last up to a one year period at a time. (Tr. 21, 120).[1] Employees whose J time is approaching beyond the six month period are encouraged by the Association to seek a duty disability pension. (Tr. 22).

Employees who are approved for a duty disability pension by the Retirement System are paid 62 2/3 of their normal pay and receive treatment for their injuries. (Tr. 23, 24). Catastrophically injured employees receive additional health care benefits. (Tr. 60).

The duty disability pension is administered by the Board of Trustees of the Police and Fire Retirement System. An employee can continue to receive duty disability benefits until the employee's 25th anniversary, at which time the employee receives a duty disability benefit of 50% of pay until age 65 or can convert to service retirement. (Tr. 23). Employees can return to work either by applying to return to work or being eligible to return to work by the Pension Board's Medical Director who causes an annual re-examination to determine whether the employee is

---

[1] "Tr." is a reference to the transcript of the arbitration hearing.

3

able to return to work.  (Tr. 34).

**The Seniority Issue**

Robert Shinske began as a Fire Fighter with the Department in 1986 and has served in various ranks including Deputy Chief and Chief of the Fire Division.  From 2001 to 2009 Chief Shinske was the Union 7th Battalion Director.  He was Treasurer of the Association from 2009 to 2015.

According to Chief Shinske, beginning in 1981 the parties' CBA, based upon a one-page document signed between the then President of the Association and the Mayor of the City of Detroit, anyone that went off on duty disability who returned to work even after 19 and 20 years would return to work based upon seniority accumulated while they were off work.  (Tr. 113-114). This agreement was continued in the July 1, 1998 - June 30, 2001 Agreement between the parties.

It was explained that this benefit could mean that an employee who had worked for three years, gone on duty disability for 20 years, and then returned, based upon 23 years of seniority, as a Fire Officer as if the employee had never left, resulting in the benefits of higher rank, higher pay and increased pension upon retirement.  (Tr. 114).  According to Chief Shinske, some members believed this was a good benefit while others believed it was unfair, including Chief Shinske.  As a result, according to Chief Shinske, he agitated at a Union meeting for a narrow seniority window for returning from duty disability; that he moved at a membership meeting for a three year seniority freeze window, which motion passed.  (Tr. 114, 123).

This three year freeze represented by the motion whereby an employee on duty disability could continue to accrue seniority for three years at which point the employee's seniority is

4

frozen until return to active duty was set forth in the 2001-2008 CBA as follows:

## 9. SENIORITY
* * *

C.    **Forfeitures:** An employee shall forfeit his seniority only for the following reasons:

* * *

6.    he/she retires on a regular service retirement or a reduced disability retirement, or if on a duty disability, reaches what would have been his twenty-fifth (25th) anniversary.

* * *

8.    (a)   Seniority credit for promotions to any position in the Department shall be frozen and cease to accumulate for any member on a disability retirement for three (3) years or more.  In the event such person is returned to active service, he/she shall be reinstated with his/her frozen seniority.

* * *

Jeffery Pegg has served as Association Vice President (2012-2013) and President (2014-2015) during the time of the City's bankruptcy.  Jeffery Pegg since 2005 has been elected a Pension Board Trustee of the Police and Fire Pension System.  (Tr. 19-20).  William Harp is the current Vice President and Grievance Chairperson of the Association.  He previously served as Vice President.  (Tr. 69, 79).

Harp, Pegg and Shinske all agreed that seniority is a top issue for Fire Fighters and is a "very closely watched issue with all membership" and has "been a strong point of contention among the membership".  (Tr. 84, 113).  Vice President Harp testified that seniority is a top issue for Fire Fighters in CBA negotiations.  (Tr. 78).

## Bankruptcy and the Retirement System

On July 18, 2013, the City of Detroit filed for bankruptcy protection under Chapter 9 of the United States Bankruptcy Code in the Eastern District of Michigan.  Among the results was the approval of the Court of a combined plan for the Police and Fire Retirement System of the

5

City of Detroit effective July 1, 2014.  In the Collective Bargaining Agreement that was negotiated between the City and the Association for 2014-2019, there was attached to the Agreement a Memorandum of Understanding dated November 6, 2014 adopting the combined plan on behalf of the Detroit Fire Fighters Association.

Pension Board member Pegg correctly described the options under the Pension Plan.  (Tr. 24-26).  Article 5 of the combined plan is entitled "Eligibility for Retirement".  Consistent with Pegg's testimony, Section 5.1, "Eligibility for Unreduced Normal Retirement Benefits", refers to "any member who obtains his normal retirement age while employed by the City may retire ...".  Section 5.2, "Eligibility for Deferred Vested Retirement Benefits" begins with "any employee whose terminates employment with the City prior to satisfying the requirement for receipt of a retirement benefit under Section 5.1 ...".  Reading 5.1 and 5.2, it is clear that these types of retirements contemplate a permanent separation of employment from the Fire Department.

Section 5.3 is entitled "Eligibility for Disability Retirement Benefit – Duty Disability".  What follows is a detailed explanation referring to "totally disabled for duty by reason of injury, illness or disease resulting from the performance of duty".  Unlike the reference to normal retirements or vested retirements, the provisions for duty disability retirement in Section 5.3(5) provides that a person on duty disability benefits "shall continue to be credited with credited services until the member accrues 25 years of credited service", suggesting that duty disability retirement is treated differently in the plan.

In Section 5.3(4), there is a reference to a member "on duty disability returns to active duty with the City".  This language recognizes that a person on duty disability pension, as contrasted to a normal retirement or vested retirement, is not necessarily considered having a

6

permanent separation from employment, but could return to employment. There is also in Section 5.3(4) a reference to a non-duty disability. In Section 5.5 there is a reference to disability retirement re-examinations. The point is in the combined plan a duty disability pension as explained by Pension Board member Pegg and as observed by this Arbitrator is formulated differently than a normal retirement or vested retirement in that there is a recognition of an employee returning to employment with the Fire Department after being on a duty disability retirement benefit.

### The Issue and Contract Language

There is no dispute that employees Henderson and Smith were injured on the job and applied for and received a duty disability retirement benefit and then, after doing so, returned to the Department for full duty. The issue becomes whether their respective returns were without any previous seniority credits or whether, if they return to employment by two years after receiving retirement benefits, they were entitled to receive all seniority up until the time of their return.

The issue to be resolved by this Arbitrator is not the benefits to be received pursuant to the combined plan for a duty disability retirement for, pursuant to Article G of the Memorandum of Understanding attached to the 2014-2019 contract as extended, this Arbitrator has no authority to issue an award or order contrary to the provisions of the benefits of the Retirement Plan. What this Arbitrator has authority to do is interpret the parties' agreement under their Collective Bargaining Agreement 2014-2019 as extended in terms of seniority rights as set forth in the CBA.

The 2014-2019 CBA was negotiated during the bankruptcy era. The resulting Article 12,

7

"Seniority", in Section D provided:

> Loss of Seniority.   An Employee shall lose his/her seniority for the following reasons only:

> 1. Resignation.

> 2. Retirement.

> 3. Discharge.

> 4. If an Employee working 8- or 10-hour shifts fails to report to work for five (5) consecutive calendar days, an employee working 12-hour shifts fails to report to work for four (4) consecutive tours of duty, or an Employee working 24-hour shifts fails to report to work for two (2) consecutive tours of duty, without providing proper notice to the Department, unless the Employee, in the judgment of the Department, is completely incapacitated through no fault of his/her own or subject to some other emergency situation that, through no fault of his/her own, makes him/her unable to report said absence and is able to supply sufficient proof thereof.

> 5. If an Employee working 8- or 10-hour shifts fails to report within three (3) consecutive calendar days, or an Employee working 12- or 24-hour shifts fails to report to work within two (2) consecutive tours of duty, after leave of absence, vacation, or suspension.

> 6. Failure of a laid-off Employee to notify the Department of his/her intent to return to work within seven (7) days after notice has been sent by the Department to the laid-off Employee at his/her last address on the Department's records at time of layoff.

> 7. Absence from work for any reason (including lay-off) in excess of two (2) years, except as set forth in Section B.1 of this Article.

The focus of the dispute between the parties in this grievance is that the City relies on 12.D.2, "Retirement", whereas the Association relies on 12.D.7,"absence from work for any reason (including lay-off) in excess of two (2) years ...".

The factual background of the dispute is that Stephen Henderson and Christopher Smith

8

were both injured while on duty and placed on a duty disability retirement. Henderson was approved for duty disability retirement on October 1, 2018. On April 28, 2020, Henderson petitioned the Pension Board to return to work and was so returned on June 15, 2020. Smith was approved for a duty disability retirement on April 14, 2018. The Pension Board approved Smith's return to work on April 16, 2020. Smith entered the Academy on July 13, 2020.

Both Henderson and Smith had significant seniority at the time each was placed on duty disability retirement. Relying on Article 12.D.2 and the definition of "retirement", both Henderson and Smith were returned by the Department without any prior seniority. The Association, relying on Article 12.D.7, maintains that both Henderson and Smith were not absent from work in excess of two years and are entitled to all their previous accumulated seniority including the time they were off on duty disability.

There are several basic principles of contract interpretation applicable to this dispute, two of which were long ago established by one of Michigan's great arbitrators of the past, Harry Platt. A contract must be read as a whole and not based upon a single word or phrase. *Riley Stoker Corp.*, 7 LA 764, 767 (Platt, 1947). Collective bargaining history can be used as a guide in interpreting contract language. *National Cash Register Co.*, 57 LA 341 (Platt, 1971).

It is also fundamental that an arbitrator, when interpreting the agreement, must attempt to glean from the contract and language used the parties' intent. *See, e.g., Philadelphia Orchestra Assn.*, 46 LA 513 (Gill, 1966).

There is also the recognition that there can be a latent ambiguity where the language of the contract appears clear on its face, but becomes unclear when an effort is made to apply the language to a given situation. *See, Midwest Reclaiming Co.*, 69 LA 198, 199 (Bernstein, 1977).

The reference to retirement in 12.D.2 when read in conjunction with 12.D.7 in the situation now faced by this Arbitrator has created a latent ambiguity requiring the application of the principles of contract interpretation just discussed.

As this Arbitrator pointed out, Article 5 of the combined plan for the Police and Fire Retirement System in Section 5.1, "Unreduced Normal Retirement", and in Section 5.2, "Deferred Vested Retirement", contemplates a permanent severance of employment from the Detroit Fire Department. Thus, the reference to 12.D.2, "Retirement", is referencing a permanent separation from the Department voluntarily by the employee.

On the other hand, as noted, Section 5.3, "Duty Disability Retirement Benefits", contemplates a possible return to work in the employment of the Detroit Fire Department bringing into play the concept of Article 12.D.7, "absent from work for any reason".

The concept that a duty disability retirement benefit do not necessarily represent a permanent separation from employment is buttressed by several provisions of the 2014-2019 Collective Bargaining Agreement as extended. Employees on duty disability are not paid out for unused sick leave until normal full-duty retirement. Article 24(I)(7)(a)-(b). Employees on duty disability unlike retirees are covered by group life insurance policy. Article 24(C). Article 16.B of the CBA further emphasizes that employees on duty disability retirement are considered more of an absence rather than a permanent separation for the language reads: "Employees returning from leaves of absence lasting longer than one (1) year, including employees returning from duty disability, must pass the Physical Abilities Tests prior to returning to work".

Reading the contract as a whole, considering the language that the parties have used in 12.D.2, "Retirement", and 12.D.7, "Absent from work for any reason", it becomes clear that an

10

employee does not lose seniority who is placed on duty disability retirement and then returns, consistent with the two year window noted in 12.D.7.

To check this conclusion, all one needs to do is to consider the context and historical negotiations involving seniority as previously discussed and as a continuing concern during the negotiations for the 2014-2019 CBA.

The negotiations for the 2014-2019 CBA were during the bankruptcy proceedings, the existence of emergency powers by the Emergency Manager resulting in the then City Counsel presenting an entirely new contract that was described as being "very large drastic changes to the contract ...", being "a completely new contract". (Tr. 62, 122-123). As noted, the City had powers under the Emergency Management law to impose terms.

The Union's bargaining team included Robert Shinske, John Berlin, Theresa Singleton and Marty McClung as well as Jeffery Pegg. (Tr. 49-50).

The City initially proposed that an employee going on duty disability retirement would lose all previous seniority if the employee returned to duty. The Union rejected this proposal. (Tr. 62, 63). As Jeffery Pegg testified, "So we couldn't accept a loss of total seniority for being off one day on a duty disability". (Tr. 64).

The Union responded with the three year frozen language set forth in the 2001-2008 language which, according to then Vice President Pegg, referring to the City, "they came back with members would not have any seniority after being off on a duty disability". (Tr. 39). The Union responded that "we are sticking to our three years". (Tr. 39). This position ended up with the City proposing the 12.D.7 language which Pegg described as "you would lose your seniority after two years". (Tr. 39). In regard to the 12.D language, Vice President Pegg, in discussing the

11

D.7 language that was proposed by the City, testified:

* * *

Then we said we are sticking to our three years, and then they
came back with after two years that members' seniority – you would
accumulate seniority after two years. Then after that, you would lose
your seniority after two years.

We discussed that on our side of the table. Then I made it clear,
I said, "So this provision in the contract allows a member to be off for
two hears and then after that, they would lose seniority?" Then they
said, "That's correct." Then we decided, okay, we would agree to that.
(Tr. 39).

In this regard, Jeffery Pegg also testified, "Nothing was said that said we accept, you

know, at the table one day of being off you lose all seniority. That was never discussed at the

table that we agreed to that." (Tr. 64).

President Pegg, after testifying as to the evolution leading to the adoption of the Article

12.D.7 language and the clarification he believed was obtained from the City attorneys, testified

that the bargaining team accepted this explanation from the City, recognizing that there was now

a two year limitation and not the three year frozen language, believing that the modification was

from three to two years. In explaining the understanding and the acceptance of the bargaining

team of the 12.D.7 language, President Pegg testified:

Q       No one said to you, "Jeff, we have got to really think about this,
        I don't think we're on the same page"?

A       No. It was a hard decision to make. This issue was a very
        tenuous issue going to back when we first got it into the
        contract. The membership was very torn about including
        language about frozen seniority on a duty disability. I remember
        it was a very passionate discussion at union meetings prior to the
        bankruptcy a long time ago.

        Once we did decide on doing it, it was a tough decision. So
        that's why we wanted to keep that provision in there to say it
        was a frozen. When they came back with what they decided to
        do, because of the bankruptcy, because we knew they could just

12

wipe it away entirely, we decided we're not going to fight this one as hard as we want and accepted the city's proposal.

Q    And when you are talking about the city could wipe it away, you are referring to the city's powers under the emergency manager law to impose terms?

A    Correct.

Q    So after the negotiations, the contract was ultimately TA'd, right?

A    Yes. The contract was TA'd by both parties and we ratified it at two membership meeting.

(Tr. 41-42).

Robert Shinske, who was on the Association's bargaining team and has since served as

Chief of the Department, testified on behalf of the City as to the bargaining history. Chief

Shinske was asked and answered:

Q    And what is your understanding of 12-D-2?

A    Well, 12-D-2 says that you lose your seniority when you retire.

I heard Jeff's testimony. I'll agree with a lot of what he said. I don't remember it the way he does. We took that language from the 2001 to 2008 contract that stated there would be a – you would– you would accrue seniority on a duty disability for three years and then be frozen.

We took that language and we put it on the table for Kevin Orr, just like we did it with a lot of the language when we were negotiating the blank pages of the contract that were put in front of us. They rejected it. They rejected it wholeheartedly then.

They didn't want anything to do with any kind of an accumulation of seniority when you are on duty disability. Okay. I don't remember how many days we talked about it. I know we had some discussion with them.

Then when we moved past it. We moved onto something else. Honestly, we talked about it and we had bigger fish to fry than that. We moved onto something else.

At some point I remember we were getting ready to sign the contract and we were going over certain pages of the contract

13

and our attorney pointed it out to us, you see that, right, you see what they're doing there? It's going to mean – you understand that that means you are going to – everybody is going to lose seniority. We all said we agree. We know. We had conversations amongst ourselves, are we okay with this? We were. Again, we had bigger fish to fry.

We weren't going to throw the contract away for that. We tried to get that language back in the contract. They wouldn't do it. They would not go there. So we got what we got.

Q     So it was your understanding that when 12-D-2 referenced retirement, that was all types of retirement?

A     Every type of retirement there is.

Q     If there had been an exception for duty disability retirement, would that have been carved out?

A     Yeah. I mean, listen, I wish we would have won that. I wish I could sit here and tell you we won that. We put the language for three years in there. If they were going to give us the two years, they had the opportunity to use the language we had on the table and change that three to a two. They refused to do it. They didn't want to go there.

(Tr. 116-118).

Later in his testimony, Chief Shinske continued to stress that employees returning from disability benefits lost all previous seniority even if returning within two years.

A careful analysis of the Shinske testimony dovetails with the Pegg testimony. The negotiations were difficult because of the City's insistence of substantially new contract language along with the dynamics of bankruptcy and the emergency management powers. Both Shinske and Pegg recognized this. Both agreed that the Association did not get the "frozen" language. Both agreed that the Association accepted the D-7 language. President Pegg asked for an explanation as to whether the language in effect would cover return from disability and received a positive answer. Though Chief Shinske mentions discussing the matter with the Association's attorney, it is far from clear from his testimony exactly what the attorney pointed out as to the

14

application of "absence from work for any reason" to returning from a duty disability pension. Pegg as the senior Union officer at the bargaining table was satisfied that the seniority rights of officers on disability benefits were protected for two years based on the responses of the City attorneys to his questions, agreed to accept the "for any reason" language in lieu of the "frozen" language, given the totality of the circumstances.

Based upon this analysis, this Arbitrator believes that the testimony of Vice President Pegg and Chief Shinske can be reconciled.

Furthermore, in the quote that this Arbitrator has set forth when Chief Shinske was asked about 12.D.2, his response was "every type of retirement there is". Yet, as this Arbitrator has pointed out, as contrasted to a full retirement or a vested retirement contemplating a permanent severance of employment, a duty disability retirement by its nature, as outlined, contemplates a possible temporary absence. A return to duty from a duty disability retirement is a distinct possibility and has been a fact.

In the end, for the reasons outlined in this Opinion, an employee returning to duty with the Fire Department following a duty disability pension is, when the language is viewed in context, returning from an "absence from work for any reason".

This conclusion as to the Pegg belief that was expressed across the table is buttressed by the fact that at the ratification meetings the Association membership was advised of the change from three years to two years and there was no discussion suggesting losing seniority on day one of a duty disability pension. (Tr. 74-75; 100). There was an extension of the 2014-2019 CBA in 2016 extending the contract to 2020. There were no negotiations or discussions regarding duty disability at that time highlighting that the negotiation history is limited on this subject to what

15

occurred during the negotiations for the 2014-2019 CBA.

Having concluded that an employee who went on a duty disability pension who then returns to full duty within two years of going on duty disability retirement is entitled to full seniority to be reinstated without loss of any seniority, including the time the employee was on duty disability retirement, the issue remains as to whether Grievants Henderson and Smith met the two year threshold.

In the case of Stephen Henderson, this is not by any calculation an issue. Henderson went on duty disability retirement on October 1, 2018. After petitioning the Pension Board to return to work on April 28, 2020 and the Pension Board advising the City on June 3, 2020 that Henderson was eligible for a return to full duty, Henderson was admitted to the Academy on June 15, 2020. By any definition, Stephen Henderson was not absent from work in excess of two years.

The City has raised the two year threshold issue as to Christopher Smith, noting that he went on duty disability on April 14, 2018 and did not re-enter the Academy until July 13, 2020, more than two years after going on duty disability retirement.

There are several reasons as to why the City's position as to Christopher Smith is not persuasive.

Review the nature of a duty disability retirement. As pointed out, a duty disability retirement contemplates re-examining the employee medically in an attempt to determine whether the employee can return to full, active duty. According to Pension Plan Board Member Pegg, the Medical Director of the Pension Board performs annual evaluations of employees on duty disability retirement. (Tr. 34).

If the Medical Director concludes that an individual can return to full duty, the Board of

16

Trustees approves the recommendation, advising the employee of the approval, and directing the employee to contact HR at the Detroit Fire Department to be processed for the return to duty. This is the process. The employee's ability to return to duty depends on this process which is controlled by the Pension Board and the City's Fire Department as to when the employee is returned to the Academy for training to return to assigned duties. It is the City's processes, whether it be the Pension Board or the Department's Human Resources, that determine, once the employee initiates the efforts to return to work, when the employee arrives at the Academy.

Dr. Vosburgh is the Pension Board's Medical Director who previously examined Christopher Smith and did write, "I consider him duty disabled and would recommend that we repeat his examination in one year as I do feel he will continue to improve". This is exactly what occurred.

In early March 2020, Christopher Smith received a letter advising him to schedule an appointment with Dr. Vosburgh for a re-evaluation. Christopher Smith testified that within 24 hours of receiving the letter in early March 2020, he scheduled an appointment with Dr. Vosburgh's office. The appointment was scheduled for March 19, 2020. The appointment was cancelled because Dr.Vosburgh was on the City's Covid-19 task force and was unavailable. (Tr. 109). As a result, Dr. Vosburgh sent Christopher Smith to a physical therapy evaluation and adopted the report of the evaluation and on March 25, 2020 advised the Board that Smith was capable of being returned to full duty. The Board on April 16, 2020 advised Mr. Smith that the Board had approved his return to work and directed that he contact Detroit Fire Department HR for processing.

This Arbitrator notes that Michigan's stay at home, stay safe lockdown order was

17

announced on March 23, 2020. Mr. Smith testified that as soon as he received the letter from the Pension Board and the telephone number set forth in that letter for HR, he began calling the phone number to process his return. Mr. Smith testified that he made numerous calls to HR but only received voicemail notices that his call would be returned and he could not make immediate contact, although he made the effort numerous times according to his testimony to do so, suggesting that HR was on lockdown. (Tr. 110). There was no rebuttal to this testimony of Mr. Smith.

This Arbitrator recognizes that the Pension Board's approval for a return to work was not until April 16, 2020, which is two days beyond two years from the date that Mr. Smith went on duty disability retirement on April 14, 2018. There are two points to be observed. There was at least a six day delay in obtaining the Medical Director's approval caused by Dr. Vosburgh's office cancelling the initial appointment due to Dr. Vosburgh's Covid-19 duties. There was a further delay at the Pension Board of approximately 23 days which the record does not reflect whether part of this delay was attributable to the Covid-19 lockdown. Certainly, the inability to contact HR was attributable to Covid-19.

Mr. Smith presumably would have been approved medically to return to work consistent with the procedures outlined in the duty disability retirement benefits on or about March 19, 2020, the date of the first scheduled appointment with Dr. Vosburgh, within two years of the date Smith originally went on duty disability. What remained was the processing within the structures set forth by the Pension Board and the City. In the view of this Arbitrator, Mr. Smith on these facts was returning to work within two years, consistent with the City's procedures. Then, too, if there was any delay, the evidence suggests that some of the delay could be attributable to the

Covid-19 lockdown.

The bottom line is that Christopher Smith, following City procedures, which would include the procedures of the Pension Board, established by law, promptly responded to take the required steps to return to work by promptly scheduling a medical re-evaluation all within two years. It was the City's procedures, along with Covid-19 issues, that resulted in Mr. Smith entering the Academy on July 13, 2020. The fact is Dr. Vosburgh, the Pension Board's Medical Director, approved medically the return of Mr. Smith on March 25, 2020 within two years. Any delay thereafter was by the nature of the procedure that is followed by the City in returning employees from duty disability retirement, coupled with Covid-19 delays.

There is no evidence on this record that Christopher Smith did not timely respond to the request for re-evaluation and did not promptly arrange for an appointment with Dr. Vosburgh. Mr. Smith on this record did everything within his power to comply with the two year threshold. Absent any evidence of any delay on his part, there is only one conclusion and that is by reporting for the evaluation on a timely basis and actually receiving medical approval by the Pension Board's Medical Director for a return to work prior to the two year period pursuant to the procedures that have been established by the City, this Arbitrator concludes for all the reasons discussed that Mr. Smith met the two year threshold as it was intended to apply.

Several days before the arbitration hearing, the Union presented to the City two comparables, namely, employees Koehn and Wright, as examples where employees who were returned from duty disability retirement benefits were granted their full seniority even though the physical return was past the applicable deadline. The City objected to these exhibits, Exhibits 11and 12, based upon Article 9(C)(3) which reads: "The arbitrator will not consider any evidence

19

submitted by either party, which was not produced in the grievance procedure, unless such evidence was not then known to the party submitting the same."

It is unfortunate that the parties were confronted with this procedural issue. Though the City has not raised this issue in previous Fire Fighter grievances, although the City has successfully argued this in other contracts. An argument can be made that presenting Exhibits 11 and 12 several days before the arbitration was still a production within the grievance procedure. Nevertheless, this Arbitrator chose not to rely on the Koehn and Wright examples for he believed that his analysis of the intent of 12.D.7 would in any event avoid a nonsensical result, namely, where an employee presents him or herself for re-evaluation within two years based on the structure of a duty disability retirement pension pursuant to the procedures implemented by the City, namely, a Pension Board, and is approved medically by the examining Pension Board physician to be able to return to full duty, then the employee has met the requirements of returning to work by two years as contemplated by the contract language used.

It is based upon the above analysis that this Arbitrator issues the following Award.

## A W A R D

1.     The grievance of Stephen Henderson is granted and his seniority is hereby directed to be restored to the date of his first employment by the Detroit Fire Department, including the time he was off on duty disability retirement and he shall be made whole for any lost wages as a result of not being previously restored to duty with full seniority.

2.     The grievance of Christopher Smith is hereby granted and his seniority is hereby directed to be restored to the date of his first employment by the Detroit Fire Department,

including the time he was off on duty disability retirement and he shall be made whole for any

lost wages as a result of not being previously restored to duty with full seniority.

   3.  This Arbitrator will keep jurisdiction for a period of one hundred twenty (120)

days from the date of this Opinion and Award to resolve any disputes concerning the

implementation of the Award, including calculation of back seniority and wages.


          *George T. Roumell, Jr.*
          GEORGE T. ROUMELL, JR.
          Arbitrator

May 12, 2021