# EXHIBIT 6G

## Page 8

1  A   No.
2  Q   Have didn't have any conversations at any time with Mike
3      Nevin, for example?
4  A   No.
5  Q   Have you ever had any conversations with Mike Nevin since
6      you filed this lawsuit?
7  A   No.
8  Q   To your knowledge, has your attorney spoke with Mike
9      Nevin since you filed this lawsuit?
10          MR. SANDERS: Objection to the extent that
11     would be attorney-client privileged information if I
12     communicated something to him concerning our
13     investigation and preparation for this case. It would
14     also be attorney work product, so I would direct him not
15     to answer any question as it relates to any conversation
16     I have had with him as it relates to this litigation.
17          MR. LEGGHIO: Okay. Fair enough. I am
18     not asking about conversations. I am asking him does he
19     know whether there's been any conversations between his
20     attorney and Mike Nevin. I'm asking for anything that
21     was said to him, any communication you made.
22 Q   (By Mr. Legghio) Do you have any knowledge, other than
23     from your attorney about any discussion between your
24     attorney and Mike Nevin?
25          MR. SANDERS: You can answer.

## Page 9

1           THE WITNESS: I'm unaware. I'm not
2      certain of any conversations that they had.
3  Q   (By Mr. Legghio) Any communications of any type?
4  A   I remember that they were supposed to dialogue or get
5      together, but I don't know what the outcome, I haven't
6      heard anything about that.
7  Q   And has that happened, did you understand that to have
8      happened since you filed the lawsuit?
9  A   Correct. I think Nevin wanted to, yeah. I'm kind of
10     sketchy on that. I really don't know too much about
11     that.
12 Q   Did Mike Nevin reach out to you since you filed this
13     lawsuit, you personally?
14 A   No, sir.
15 Q   Do you know whether he's reached out to any other
16     Plaintiffs in the lawsuit personally, not to your
17     attorney?
18 A   No.
19 Q   Okay. I want to go over your employment history with the
20     City to make sure we have a clear record. When was your
21     first day of work with the Detroit Fire Department?
22 A   September of '96.
23 Q   Did you have any City employment prior to September of
24     '96 with the City of Detroit?
25 A   No.

## Page 10

1  Q   So your first day of employment with the City, you didn't
2      work in the Parks and Recs Department or anything like
3      that? You first start at the Fire Department with the
4      City and that's in September of 1996?
5  A   That's correct.
6  Q   And your position when you joined the City Fire
7      Department was what?
8  A   Fire Fighter.
9  Q   Okay, and you worked for the City until about 2003?
10 A   Correct.
11 Q   In 2003 you became disabled, duty disabled?
12 A   Correct.
13 Q   Between 1996 and 2003, did you have any disabilities or
14     were you off any time at all for disability for work?
15 A   Can you repeat that?
16 Q   Sure. Between 1996 when you had your first day of work
17     to 2003 when you became duty disabled, were you off of
18     work for any extended period of time related to
19     disability?
20 A   No.
21 Q   Okay, so you just basically between '96 and 2003, you
22     were just generally working every day?
23 A   Your questions are a little bit vague, but I was employed
24     and receiving a paycheck from the Fire Department during
25     that whole time, so I had an injury, but your information

## Page 11

1      is vague. Your question is —
2  Q   My job today is to take all the vagueness out of it.
3      Were you off work between '96 and 2003 for any injury
4      related to your work?
5  A   Yes.
6  Q   How long were you off?
7  A   I am uncertain. That was a long time ago. Back
8      injuries.
9           REPORTER: Excuse me. You're speaking
10     over each other.
11          THE WITNESS: It was a long time ago.
12     There have been injuries. Nothing serious during that
13     period until I became disabled in 2003.
14 Q   (By Mr. Legghio) Okay, well, right now as I say, I want
15     to make this deposition, take all the vagueness out of
16     it. I'm still focusing on the period '96 to 2003. It
17     sounds like that you were off work at least for some
18     period of time during that timeframe for a back injury.
19     Is that a fair statement?
20 A   I'll go with that.
21 Q   Okay.
22          MR. SANDERS: I don't want you to guess,
23     Norman. If you know, you know. If not, you don't.
24          THE WITNESS: Off work is an unfair
25     statement. If you're still on the payroll, you're not

5 (Pages 8 to 11)

TAMARA A. O'CONNOR
248.882.1331    toconnorptg@aol.com
13-53846-tjt    Doc 13430-7    Filed 08/30/21    Entered 08/30/21 15:58:02    Page 2 of 8

8484fa36-a6a1-4d3b-bc91-cec1e3f03331

Page 32

1 Complaint that's Exhibit 1, DFFA 0008. You said you read
2 it. You said you read the Collective Bargaining
3 Agreement and you concluded it didn't apply to you. What
4 about that, if anything, made you conclude that losing
5 your seniority was not an issue for you?
6     MR. SANDERS: Object to the form and
7 foundation. I think he gave a litany of reasons as to
8 why he felt that way, but you're free to answer the
9 question.
10 Q  (By Mr. Legghio) I'm focusing on the language now. The
11    language. What about the language that made you think
12    that?
13 A  Well, I went off under a different contract and other
14    fire fighters in the past have been allowed to use that
15    same past practice, so these things that were promised to
16    me before I came back, I understood that these were
17    things that would apply to me. The contract that I read
18    was the contract that was in place after I returned, so I
19    assumed that I would be promised or I would receive what
20    I was promised.
21        The language in that contract that you're
22    explaining to me happened way after me coming back,
23    almost four months after me coming back, three and a half
24    months which would have been the first time that I even
25    knew that that language had changed.

Page 33

1        So, of course, there may have been more
2    information in the contract, but I didn't assume that it
3    would affect me because I would have thought that
4    anything that would affect me would have been explained
5    to me.
6 Q  Okay. I'm going to deal with some factual issues and
7    make sure we're clear. You returned to work four years
8    after the Collective Bargaining Agreement that began in
9    2014. We're in agreement on that. Am I correct?
10 A  That's correct.
11 Q  And if I understand your testimony what you're suggesting
12    and I want you to tell me if I'm wrong, is that whatever
13    the language in the 2014 Collective Bargaining Agreement
14    was with regard to returning to work after a duty
15    disability, you believed that your return to work when
16    returning from a duty disability would be governed by the
17    Collective Bargaining Agreement that was in place when
18    you went on duty disability. Is that fair?
19 A  That's fair simply because no one told me of any changes,
20    not the Retirement Board, not the City, so yes. It's
21    fair to assume that the only information that I had is
22    the information that I relied on.
23 Q  Okay. I'm not interested in all of that, I just want to
24    know, it sounds like what you're saying is I had this
25    contract I went out on duty disability on, and I believe

Page 34

1    those provisions would apply to me, not the provisions of
2    the 2014-2019 CBA. Is that fair?
3        MR. SANDERS: Asked and answered. You can
4    answer again.
5        THE WITNESS: I had no knowledge of the
6    2014-2019 content until I was already back working.
7    Since I was back working, the fact that no one told me
8    that the changes had occurred and people were still
9    promoting, my assumption was that they were honoring the
10   contract or the promises that they made to us.
11 Q  (By Mr. Legghio) Okay. You're complicating my question.
12    There's no trap doors here. I just want to make sure
13    I've got your concept. Your concept is that —
14        MR. SANDERS: You're complicating your
15    question and he's answering your question, Chris. You
16    might not like the answer, but let's move on.
17        MR. LEGGHIO: I'm not emotionally invested
18    in his answer one way or the other. I just want to make
19    sure I understand it.
20 Q  (By Mr. Legghio) I'm not asking you about who said
21    anything to you or didn't. I'm just asking that am I
22    correct in understanding you that you believed the terms
23    of your return to work and the terms of any loss of
24    seniority would be governed by the Collective Bargaining
25    Agreement under which you went out on duty disability?

Page 35

1    How you got there, I'm not asking but that's what you're
2    suggesting. Am I right?
3        MR. SANDERS: Objection. Asked and
4    answered. He's going to answer that question one more
5    time. Then we're going to move on or we're going to
6    discontinue the deposition.
7        Mr. Brown, give your answer for the fourth
8    time.
9        THE WITNESS: I believe that the contract
10   that I went off under was the information or was the
11   content that applied to me.
12 Q  (By Mr. Legghio) Okay. All right. Now, I want you to
13    look at Paragraph 36. This is on Exhibit 1. This is
14    Bate stamped number DFFA 0008 and if you could read
15    Paragraph 36 to yourself and let me know when you have
16    completed that.
17 A  I'm done.
18 Q  Now, I am going to read it into the record. It says:
19        "To the contrary, after negotiation of the
20        2014-2019 CBA, the City continued to return
21        many fire fighters to duty with their previous
22        seniority in tack, without objection from the
23        Union, and officers were allowed to assume the
24        rank that their original class had achieved."
25    Now, other than Mark Green, is there anyone else that

11 (Pages 32 to 35)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13430-7    Filed 08/30/21    Entered 08/30/21 15:58:02    Page 3 of 8

8484fa36-a6a1-4d3b-bc91-cec1e3f03331

Page 40

1  A   Yes.
2  Q   Now, in Paragraph 39 of Exhibit 1, this is Bates stamped
3      0008. Will you take a look at that?
4          MR. SANDERS: I'm sorry. Can you repeat
5      where you're looking at?
6  Q   (By Mr. Legghio) Paragraph 39, Exhibit 1, page 0008.
7          MR. SANDERS: I got you.
8  Q   (By Mr. Legghio) Have you read that, Mr. Brown?
9  A   I did.
10 Q   Can you put the witness on the screen? Now, Mr. Brown,
11     you say in this paragraph:
12         ". . in continuation of the conspiracy to
13         selectively enforce the new provisions of the
14         2014 CBA, in May 2019, the Union filed a
15         grievance maintaining that the City had
16         violated the CBA by returning fire fighters to
17         duty with their seniority after a disability
18         retirement."
19     Okay. Did anyone tell you that the Union would have
20     filed a grievance, this grievance that you reference in
21     Paragraph 39, that this was done to conspire, to
22     selectively enforce the new provisions of the Collective
23     Bargaining Agreement?
24 A   I was not told that.
25 Q   Okay. Do you have any facts other than the fact that

Page 41

1      they actually filed this grievance that you rely upon for
2      the allegation that this grievance was in continuation of
3      this conspiracy that you allege? Do you have any other
4      facts?
5  A   Just the email, the letter between, I think it was an
6      email that was published in the fire fighter magazine
7      between the previous President Nevin and the, I think, I
8      don't remember his position, Hakim Berry.
9  Q   Okay. By the way, if I told you that Mark Green returned
10     to work in 2011, do you have any facts to dispute that?
11 A   No, I don't.
12 Q   So you don't know if he returned to work before the 2014
13     contract?
14 A   I don't have the contract in front of me.
15 Q   It's not the contract I'm asking about. I'm not asking
16     about the contract.
17 A   I understand. I don't have the list in front of me, so I
18     don't know the date that he returned.
19 Q   Okay, so you say there was an email or a correspondence
20     from the prior President. This is Mike Nevin?
21 A   Correct.
22 Q   And this was an email or a letter that he sent to whom?
23 A   I don't know if he sent it to Hakim Berry or Hakim Berry
24     sent it to him, but it was posted in the magazine.
25 Q   Let me take a second.

Page 42

1          MR. LEGGHIO: Mr. Sanders, I would like to
2      take a second. I think we have that and I want to see if
3      I can pull it up.
4          MR. SANDERS: Not a problem.
5          MR. ADAM: It's Bates stamped 5455.
6          MR. MCFARLANE: Do you want me to pull it
7      up for you?
8          MR. LEGGHIO: Yes, if you could pull it
9      up. It's a February 27, 2019 letter.
10         THE WITNESS: I'm sorry. That's not the
11     letter. Oh, I'm sorry. Wait a minute.
12         UNIDENTIFIED: Go to the next page also.
13 Q   (By Mr. Legghio) Have you read that, Mr. Brown?
14 A   I did.
15 Q   Now, is this the document that you're referencing in
16     Paragraph 39 and Bates stamped number 0008 in which you
17     say:
18         "In continuation of the conspiracy to
19         selectively enforce the new provisions of the
20         CBA, the Union filed a grievance."
21 A   That's correct.
22 Q   Now, this is February 27, 2019. You returned to work in
23     July of 2018?
24 A   January.
25 Q   January of 2018. Between January of 2018 and February of

Page 43

1      2019, did you have any discussion with any Union officer
2      regarding whether you would be able to keep your
3      seniority, the seniority that predated your duty
4      disability in 2003?
5  A   Negative. No, I did not.
6  Q   You did not. When you received this, when you saw this
7      document, was this in a Fire Fighters Association
8      magazine?
9  A   That's correct.
10 Q   Did you have any discussions with any Union officer after
11     you saw this?
12 A   No.
13 Q   Did this document, Exhibit 1, DFFA 0055, did it raise
14     concerns for you that your seniority would be affected?
15 A   I guess it did. It did to a degree.
16 Q   Okay. Well, given the fact that you thought it might
17     affect your seniority to a degree, did it prompt you to
18     have a discussion with anybody from the Union?
19 A   No, sir. It didn't apply to my promotion. I wasn't
20     promoted based on the seniority system, so it didn't have
21     any bearing on me.
22 Q   Okay. You raise a good question here. You say in your
23     Complaint you weren't promoted based on the seniority
24     system and I am going to refer you to Exhibit 1, Bates
25     stamped number 0012, and in particular, Paragraph 72. If

13 (Pages 40 to 43)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13430-7   Filed 08/30/21   Entered 08/30/21 15:58:02   Page 4 of 8

8484fa36-a6a1-4d3b-bc91-cec1e3f03331

Page 108

1  A   In Novi.
2  Q   Novi, Michigan?
3  A   That's correct.
4  Q   Since 2001 until the present, have you ever been
5      hospitalized for your wrist injury?
6  A   Not hospitalized. No, sir.
7  Q   How many surgeries have you had on your left wrist?
8  A   No surgeries.
9  Q   Can you show me your left wrist so I could just see it?
10 A   (Witness complied)
11 Q   Can you move your wrist? Can you move your hand?
12 A   Sure. Are you asking me to --
13         MR. SANDERS: He's not asking you
14     anything.
15 Q   (By Mr. Adam) I just want to see your left wrist.
16         MR. SANDERS: Can you move it?
17 Q   (By Mr. Adam) And how old are you right now, Mr. Brown,
18     your age?
19 A   Fifty-two
20 Q   Now, you were asked a few questions about your complaint
21     of age discrimination in the lawsuit. What is the nature
22     of the age discrimination?
23 A   That sounds a little vague? What's the nature of it?
24 Q   Right. Were you discriminated against are you saying
25     because you're too old or you're too young or what?

Page 109

1  A   No. I believe that the returnees who have all been over
2      a certain age, they were specifically targeted. I was
3      specifically targeted because of that and the disability.
4  Q   And is it because you're older or younger?
5  A   Older.
6  Q   For example, tell me how Mr. Nevin discriminated against
7      you because of your age. Give me specific facts?
8  A   I can't answer that right now.
9  Q   Tell me how the Fire Commissioner discriminated against
10     you because of your age. Give me specific facts as to
11     how he did it?
12 A   The administration and the Commissioner, Kemia Crosson,
13     they seemed to have targeted those who were previously
14     disabled and the people that it appears to be disabled
15     were over a certain age, 42, for instance.
16 Q   So what about Mr. Harp? Give me specific facts as to how
17     you can show that he discriminated against you because
18     you were what, 50 years old at the time?
19 A   I would have to go back to the original answer which is
20     Mr. Harp knew all of the details of my current situation
21     and he refused to do anything on my behalf.
22 Q   I'm asking specifically, I want a specific fact as to age
23     discrimination what Mr. Harp specifically did that shows
24     age discrimination?
25         MR. SANDERS: Objection. Asked and

Page 110

1      answered. You can answer again.
2          THE WITNESS: That is it specifically.
3      All of the Union E-Board members including Harp, they
4      knew of all of the returning members. They knew their
5      ages. They knew their disabilities and under with my
6      situation, he knows exactly my age and my disability and
7      I just believe that he specifically discriminated against
8      me.
9  Q   (By Mr. Adam) Mr. Brown, you testified that Nevin wrote a
10     letter in February of 2019 and you saw that letter.
11     Right?
12 A   That's correct.
13 Q   And he complained that the City was not causing employees
14     when they came back from duty disability, that they were
15     given prior seniority and he said that should stop.
16     Right?
17 A   Repeat it one more time.
18 Q   You're aware that Mr. Nevin wrote the letter in February
19     of 2019 complaining that the City was not properly
20     applying Article XII of the contract. Right?
21 A   I remember a letter, yes.
22 Q   And in fact the Union filed a grievance in May of 2019
23     complaining that the City was not applying Article XII,
24     the Seniority provision of the contract, correctly.
25     Correct? You're aware of that?

Page 111

1  A   I am aware of that.
2  Q   And that the City and the DFFA eventually agreed that
3      individuals who came back from a duty disability who've
4      been absent in your case for more than 15 years, that you
5      should not have been given your seniority when you came
6      back in January of 2018. Correct?
7  A   I apologize, Attorney Adam. I'm struggling. I can hear
8      you, but your questions seem a little bit -- they're a
9      little bit off, but please one more time for me.
10 Q   So you're aware that the DFFA and the City of Detroit
11     agreed that you should not have been given your previous
12     seniority when you came back to work in January of 2018.
13     Correct?
14 A   Correct.
15 Q   And so the Union, the City agreed and therefore caused
16     you to lose some of the prior seniority that you had.
17     Correct?
18 A   Correct.
19 Q   And the City did that to other individual DFFA members.
20     Right?
21 A   I believe that's correct.
22 Q   Well, in fact, this lawsuit involves other Plaintiffs,
23     does it not?
24 A   Correct.
25 Q   And all of these individuals or at least some of the

30 (Pages 108 to 111)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13430-7    Filed 08/30/21    Entered 08/30/21 15:58:02    Page 5 of 8

8484fa36-a6a1-4d3b-bc91-cec1e3f03331

CHRISTOPHER McGHEE, et al vs. CITY OF DETROIT, DFFA, et al
Deposition of Norman Brown

## Page 124

1  to your seniority?
2  A  My seniority, no. We didn't discuss my seniority. We
3  never discussed my seniority.
4  Q  I'm referring to did you ever talk to him about what the
5  City did with respect to taking away your prior
6  seniority?
7  A  That's the same question. I never talked to him about my
8  seniority.
9  Q  What did you talk to him about, about anything about what
10  the City did?
11  A  I don't know because to me or to him or what are you
12  asking, sir?
13  Q  Have you spoken to Mr. McGhee about what happened to you
14  and what happened to him with respect to the City
15  changing your seniority?
16  A  No. We didn't talk about what the City did to me as it
17  pertains to seniority. Seniority wasn't a factor for me.
18  Q  Now, Mr. Brown, I want to show you Exhibit – oh, I just
19  lost the page number on it. Sorry. Do you see it's
20  January 22, 2020 letter to you from the City?
21     MR. SANDERS:  Would you state the number
22  for the record?
23  Q  (By Mr. Adam)  Bates stamp 81.
24  A  Okay.
25  Q  So you saw this letter. Correct?

## Page 125

1  A  I did receive that.
2  Q  And at the time you received this letter, you were not
3  actively working. You were on a, what do you call it, an
4  absence of some sort. Correct?
5  A  I was on J's.
6  Q  And what does J stand for?
7  A  Injured.
8  Q  Mr. Brown, are you claiming that the 2014 contract is
9  illegal?
10 A  No, sir, I'm not saying that it's illegal. I'm saying no
11  one told me that it applied to me.
12 Q  And because no one told you it applied to you, why don't
13  you think it applied to you because?
14 A  Because promises that were made to me prior to going off.
15  The City informed me under the contract that the Union
16  and the City agreed to, that at a certain point if I came
17  back to work, I would be promised these things. They
18  never told me that that promise was broken. They never
19  told me that there would be a new promise.
20     They just simply waited for a couple, I
21  don't know, a year or so after I was back, almost two,
22  and then they changed it and told me that, you know,
23  basically this is it. This is what we're doing.
24 Q  So you're not claiming that the 2014 contract is illegal?
25  You're just claiming it shouldn't apply to you. Correct?

## Page 126

1     MR. SANDERS:  I'd object to the form of
2  the question. I don't know if this witness is competent
3  to determine whether the contract is legal or illegal,
4  but with that stated, he's free to answer.
5     THE WITNESS:  You know, I apologize for
6  repeating what Attorney Sanders said, but if it comes
7  down to it being a legal or not, I really don't know if I
8  could judge it either way.
9  Q  (By Mr. Adam)  So, now you're saying after hearing your
10  Counsel's objection you're not sure whether the 2014
11  contract is illegal or not. Is that what you're saying?
12 A  No, sir. No, sir. You're fashioning that question in
13  the form of a lie again. I never said that the contract
14  was illegal. I don't remember ever saying that the
15  contract was illegal and currently I'm saying that I
16  can't say that it is illegal or it isn't illegal and the
17  only way that I would know which of the two it is, is to
18  confer with my attorney.
19     He would let me know if he believes it's
20  illegal, but that wasn't the basis of anything that I've
21  said.
22 Q  I'm asking you if you are claiming that the 2014 CBA is
23  illegal?
24     MR. SANDERS:  Same objection.
25     THE WITNESS:  I don't know, sir. I don't

## Page 127

1  know.
2  Q  (By Mr. Adam)  Are you claiming that the 2014 CBA should
3  not have applied to you? You're claiming that?
4  A  I am claiming that based on promises made to me.
5  Q  I'm now showing you Bates stamped 491.
6  A  Okay.
7  Q  And the first sentence says, it's from a doctor:
8     "Mr. Norman Brown is requesting return to
9     work as a Fire Fighter. He was granted a Duty
10    Disability Retirement in 2003 following injury
11    of the left thumb with rupture of the volar
12    plate of the thumb. He reported being seen by
13    Dr. Dietz who recommended surgical repair,
14    which he declined."
15 A  At that time.
16 Q  Did you decline surgery for your wrist injury?
17    MR. SANDERS:  Objection. Asked and
18  answered. You can answer again.
19    THE WITNESS:  I don't remember. No, I
20  don't remember.
21 Q  (By Mr. Adam) Has your wrist injury prevented you from
22  doing any sports? Let me ask you, do you do any sports?
23 A  No, sir.
24 Q  What physical activity do you do?
25    MR. SANDERS:  Objection. Form and

34 (Pages 124 to 127)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13430-7    Filed 08/30/21    Entered 08/30/21 15:58:02    Page 6 of 8

8484fa36-a6a1-4d3b-bc91-cec1e3f03331

Page 128

1  vagueness, but you can answer.
2           THE WITNESS:  My activity is extremely
3  limited.
4  Q  (By Mr. Adam) You don't play any sports at all?
5  A  Unfortunately, no.
6  Q  Do you work out at all?
7  A  No, sir.
8  Q  And this all relates, it's all because you're claiming
9     your left wrist injury.  Right?  Is that why?
10 A  In part.  For the most part, I don't do it because I
11    don't want to reinjure it.
12 Q  And how many times a week or months do you go to physical
13    therapy let's say for the last two years?
14 A  In the last two years, approximately four days a week.
15 Q  Four days a week for your wrist?
16 A  That's correct.
17 Q  Every week?
18 A  Whenever it was applied or whenever it was approved, yes,
19    I made physical therapy.
20 Q  And what is the form of the physical therapy?  What do
21    they do for your wrist four days a week?
22 A  Strengthening to determine if a surgical procedure may be
23    needed, but mostly strengthening, stretching and learning
24    how to use it safely.
25 Q  Do you have any movement of your hand at all?  Can you

Page 129

1     show me, you can move your hand?
2  A  (Witness complied)
3  Q  Make a fist?
4  A  (Witness complied)
5  Q  Move your wrist.  Can you move your wrist?
6  A  (Witness complied)
7  Q  And who are your treating doctors now for your wrist
8     injury?
9  A  Dr. Bohm from Mendelson and Kornbloom.  I believe it's B-
10    o-h-m and Dr. King from Henry Ford Hospital.
11 Q  And were these the people that treated you during your
12    15-year absence from 2002 to 2018?
13 A  No.
14 Q  And who were those doctors that treated you during that
15    15 years absence from working for the City?
16 A  There was a Dr. Dietz and there was a Dr. McGill.
17 Q  And during those 15 years, did you undergo physical
18    therapy every week?
19 A  No, sir.  No, sir.
20 Q  Did you undergo any physical therapy during those 15
21    years?
22 A  No.
23 Q  So when you went off on the first duty disability in
24    2002, you would have been what, 33 years old?
25 A  That sounds about right.

Page 130

1  Q  And other than working for the City of Detroit for about
2     18 months from January 2018 to July of 2019, you've not
3     done any other work for anybody else in a business,
4     etcetera.  Right?
5  A  That's correct.
6  Q  Now, when you said you reinjured your wrist in 2019 in a
7     car accident, were you hospitalized at all for that
8     accident?
9  A  I was only seen through Emergency the day that it
10    happened and the following day.
11 Q  And you were taken there by ambulance?
12 A  That's correct.
13 Q  And your injury there was the wrist was injured?  That's
14    why you were taken to the hospital?
15 A  The scaphoid and there was nerve damage.  Yes, sir.
16    Wrist, hand, pretty much wrist hand and aggravation to
17    the original volar plate.
18 Q  Do you have any surgery planned, scheduled now for the
19    wrist?
20 A  No, sir.  Not as of now.
21 Q  And you've been approved as I understand it for duty
22    disability a second time.  Right?
23 A  That's correct.
24 Q  And how much will your payments be approximately?
25 A  Monthly payment?

Page 131

1  Q  Yes.
2  A  I have no idea.
3  Q  What was your monthly payment when you were off let's say
4     up until 2018?
5  A  Thirty-three hundred a month.
6  Q  Mr. Brown, I have in front of you Bates stamp 495.  It's
7     called a Retirement Application Checklist.  This is a
8     document you filled out.  Right?
9  A  That is my signature.
10 Q  And I'm showing you just as an example, Bates stamp 506.
11    This is an example of something you would submit to the
12    Pension Board about income.  Right?
13 A  That is correct.
14 Q  And you reported this NA means non-applicable.  Right,
15    meaning you didn't get anything.  Correct?
16 A  Correct.
17 Q  Sorry.  I'm trying to get back to this page.  Hold on.  I
18    have in front of you Bates stamp 0031, Count X, Violation
19    of the Fourteenth Amendment.  Do you see that?
20 A  Yes, I can see it.
21 Q  Of your Complaint?
22 A  Okay.
23 Q  And that goes on for a couple of pages.  Why are you
24    suing DFFA and the DFFA officers for violation of the
25    Fourteenth Amendment?

35 (Pages 128 to 131)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13430-7    Filed 08/30/21    Entered 08/30/21 15:58:02    Page 7 of 8

8484fa36-a6a1-4d3b-bc91-cec1e3f03331

### Page 148

1  Q  So is this the first time you went to the psychologist?
2  A  Yes.
3  Q  And it talks about complaints of anxiety, stress and
4     worry.  Two months ago, a new supervisor took over who
5     has much more of a military style.  Who is that
6     supervisor?
7  A  Calvin Harris.  He had a – Calvin Harris.
8  Q  Did you provide this psychologist report to the City?
9  A  I don't remember.  I can't recall.
10 Q  Did you use this psychologist report as a basis for
11    stopping work in July of 2019?
12 A  No.
13 Q  Since July 2019, have you treated with a psychologist?
14 A  No.
15 Q  How many times did you see the psychologist, Edith
16    Montgomery?
17 A  That was the first time.
18 Q  So how many times did you see her?
19 A  That was the one time.
20 Q  For one time how long was the meeting?
21 A  I don't remember.
22 Q  I mean, an hour, a half an hour?
23 A  I don't remember.
24 Q  Did you meet with her eight hours?
25 A  I don't remember.  It wasn't this long.

### Page 149

1  Q  So you met her one time on one day then.  Right?
2  A  That's correct.
3  Q  And you have not been back to her since.  Correct?
4  A  That's correct.
5  Q  Have you been to another psychologist?
6  A  No, sir.
7  Q  Have you been to a psychiatrist?
8  A  No.
9  Q  How did you end up going to Ms. Montgomery?
10 A  I don't remember if it was a referral or how I found her,
11    so I don't have an answer for that.
12 Q  Well, did you have a treating doctor that might have
13    recommended the person?
14 A  No.
15 Q  So you have no idea how you ended up getting a meeting
16    with the psychologist?  You have no idea how you got her
17    name?
18 A  I don't remember.
19 Q  And you don't remember whether you gave this to the City
20    of Detroit.  Right?
21 A  No, sir.  I don't recall.
22 Q  Mr. Brown, I asked you some questions about whether you
23    viewed the contract, the 2014 contract as illegal and I
24    want to direct you now to Bates stamp 114, your Response
25    to Request for Admissions, and take you to the part I'm

### Page 150

1  highlighting right there.  It says:
2      "The referenced CBA was not collectively
3      bargaining for wherein there was a lack of duty
4      of fair representation.  Consequently, an
5      illegal document was created pursuant to a
6      conspiracy, with the intent and purpose of
7      violating my and the other Plaintiffs' civil
8      rights."
9  So, explain to me how the contract was illegal?
10 A  I've got to read it again.  Let me see where it says that
11    the contract wasn't legal.
12 Q  I am just asking you why are you saying the contract is
13    illegal.
14 A  No.  Are you suggesting that I'm saying that the CBA is
15    illegal?  I am reading it.  It says:
16      "The referenced CBA was not collectively
17      bargaining for wherein there was a lack of duty
18      of fair representation.  Consequently, an
19      illegal document was created pursuant to a
20      conspiracy."
21 Originally when I spoke to – I've probably answered this
22 a lot of times now, but if the grievance was put in place
23 that did not affect me and I explained to my Union that
24 that action, that grievance that was put in place and
25 it's harming me, I expected them to do something to

### Page 151

1  represent me or to assist me.  They did nothing.
2      They did nothing to assist me, so when I
3  speak of the CBA, I speak of the Collective Bargaining
4  Agreement that they told me would protect me when I went
5  off.  No one told me that there would be any changes or
6  had been any changes.  No one said anything.
7  Q  Well, Mr. Brown, did you ever ask for a copy of the CBA?
8  A  From who?
9  Q  Anybody, co-workers, anybody?
10 A  Well, that's how I got it in May or April of 2018.
11 Q  So you got it in May of 2018?
12 A  It may have been April.
13 Q  Well, how did you get it?
14 A  I got it from one of the previous Union representatives.
15 Q  So you had a copy of the 2014 contract before you went
16    back to work?
17 A  Negative.  I got that contract in 2018 about four months
18    after I had returned.
19 Q  Oh.  Got it.  All right, so my question is you say the
20    CBA was not collectively bargained.  Do you see that
21    sentence right there?
22 A  I see it.
23 Q  What do you mean "not collectively bargained?"
24 A  The contract that you're speaking of that you
25    consistently speak of, the 2014-2019 contract, that's the

40 (Pages 148 to 151)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13430-7    Filed 08/30/21    Entered 08/30/21 15:58:02    Page 8 of 8

8484fa36-a6a1-4d3b-bc91-cec1e3f03331