**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**CITY OF DETROIT'S AUGUST 2021 MOTION FOR AUTHORITY TO
MODIFY THE CONFIRMED PLAN OF ADJUSTMENT TO REVISE
THE "DROP" PROGRAM FOR CERTAIN POLICE OFFICERS**

The City of Detroit, Michigan ("City"), by its undersigned counsel, files its

*City of Detroit's August 2021 Motion for Authority to Modify the Confirmed Plan of*

*Adjustment to Revise the "DROP" Program for Certain Police Officers* ("Motion").

In support, the City respectfully states as follows:

I.    **Introduction**

On September 13, 2018, the City filed its *City of Detroit's Motion for*

*Authority to Modify the Confirmed Plan of Adjustment to Revise the "DROP"*

*Program for Police Officers* [Doc. No. 12896] ("First Motion"). The First Motion

generally sought to extend the time during which members of the Detroit Police

Command Officers Association ("DPCOA") and the Detroit Police Lieutenants and

Sergeants Association ("DPLSA") could participate in the Deferred Retirement

Option Plan ("DROP") program from five to ten years. This Court granted the First

Motion [Doc. No. 12935] ("First Order").

38008557.7/022765.00213

On April 19, 2019, the City filed its *City of Detroit's Second Motion for Authority to Modify the Confirmed Plan of Adjustment to Revise the "DROP" Program for Police Officers* [Doc. No. 13048] ("Second Motion"). The Second Motion sought substantially the same relief as the First Motion–an increase in the participation time in the DROP program from five to ten years–albeit only for the Detroit Police Officers Association ("DPOA"). This Court approved the Second Motion [Doc. No. 13053] ("Second Order").

This Motion seeks substantially the same relief as the First Motion and Second Motion. It seeks an increase in the participation time in the DROP program for the DPLSA but from ten to fifteen years.

As explained in the First and Second Motion, in recent years, the Detroit Police Department ("DPD") has faced significant challenges retaining experienced officers. More police officers are resigning from the force for jobs elsewhere instead of remaining with the DPD until retirement. Nearly one-third of those officers who resign have fewer than five years' seniority. This imposes significant costs on the City and its police force because it means that a higher percentage of the police force is relatively inexperienced. The constant churn also means that DPD must spend more time and money to recruit and train newer officers.

These challenges are exacerbated by the fact that many of Detroit's most senior officers in the DPLSA can only continue working in the police force for up

38008557.7/022765.00213

13-53846-tjt    Doc 13433    Filed 08/31/21    Entered 08/31/21 11:39:35    Page 2 of 210

to ten years after they choose to participate in the DROP program. This election to participate in the DROP program is made by the officer on an individual, officer-by-officer basis. No one can force a police officer to elect to participate in the DROP program. A police officer in the DPLSA can elect to retire and receive full retirement benefits commencing immediately upon retirement or can elect to continue working beyond retirement age for up to ten additional years under the DROP program.

Under the DROP program, the electing police officer (a) continues to work as a police officer beyond the eligible age for her retirement for her full salary; and (b) receives 75% of the pension benefit that otherwise would have been paid to the officer during the DROP period had the officer elected to retire and not participate in DROP. The 75% benefit is invested in an individual savings account for the exclusive benefit of that officer. However, additional pension benefits no longer accrue during the DROP period for the electing officer and the remaining 25% of the pension benefit not otherwise invested in the individual savings account during the DROP period is forgiven. This is an economic benefit to the City.

From a member's perspective, the DROP program allows her to continue working (and earn a salary) while realizing some benefits from the pension she would have been eligible to receive had she retired and not participated in DROP.

Unfortunately, the current ten-year limit for the DPLSA forces out of the door some of Detroit's most prized and experienced veteran officers at the end of the ten years.

To help remedy this problem, the City proposes to further modify one of the exhibits to its bankruptcy plan. The proposed modification would lengthen the time police officers in the DPLSA can continue to work after they elect to participate in the DROP program from ten to fifteen years. A new actuarial study projects that this change will provide cost savings to the City because the number of DROP participants would increase and those participants would work longer as police officers of the City. This would result in a reduction in the outflow of retirement benefits and a corresponding cost savings to the City.

Finally, nothing in the City's bankruptcy plan prohibits the proposed modification. Indeed, this Court retained jurisdiction to enter orders modifying the plan if needed and has approved two modifications that are substantially similar to the one sought here. As the proposed modification is justified, fair, and does not affect any distribution to, or treatment of, any claim or creditor in any Class under the Plan except those police officers in class 10 who on an individual basis *voluntarily* elect to take advantage of the proposed fifteen-year DROP period, the City respectfully requests that the Court enter an order authorizing and approving the modification.

38008557.7/022765.00213

## II.    **Background**

### A.    **Relevant background from the City's bankruptcy case.**

On July 18, 2013 ("Petition Date"), the City commenced this chapter 9 case ("Bankruptcy Case"). After a number of iterations, the City filed its *Eighth Amended Plan of the Adjustment of Debts of the City of Detroit (October 22, 2014)* ["Plan," Doc. No. 8045]. The Court confirmed the City's Plan ["Confirmation Order," Doc. No. 8272] and on December 10, 2014 ("Effective Date"), it became effective. [Doc. No. 8649.]

Class 10 of the Plan provides for treatment of pension claims of the Police and Fire Retirement System of the City ("PFRS"). Plan, Art. II.B.3.q, p. 38. These pension claims were allowed in the aggregate amount of approximately $1,250,000,000. *Id.* The Plan provides that the pension plan for the PFRS in effect on the Petition Date would be frozen as of July 1, 2014. [*Supplemental Opinion Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing*, p. 43 of 219, Doc. No. 8993.] This change and others are set forth in the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (Amendment and Restatement Effective July 1, 2014) ("Plan Document"). The Plan Document has two components. Component I of the Plan Document applies to benefits accrued by members of the PFRS on or after July 1, 2014, and to the operation of the PFRS on or after July 1, 2014 (i.e., to active employees). The

Plan identifies Component I as the "New PFRS Active Pension Plan." *See* Exhibit I.A.254.a to the Plan, Doc. No. 8045-1, p. 448, 456 of 809; **Exhibit 6A** to this Motion. Component II of the Plan Document generally applies to benefits accrued by members of the PFRS prior to July 1, 2014. The Plan identifies Component II as the "Prior PFRS Pension Plan." *See* Exhibit I.A.281, Doc. No. 8045-1, p. 590, 599 of 809; **Exhibit 6B** to this Motion.

More specifically, with respect to the accrual of future benefits for active employees, Class 10 provides that

> Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

Plan, Art. II.B.3.q.E, p. 39. Article 12 of the New PFRS Active Pension Plan sets forth the requirements for the DROP program that are available to members of the PFRS. New PFRS Active Pension Plan, p. 502 of 809.

## B. The DROP program.

As originally set forth in the New PFRS Active Pension Plan, the DROP program provided polices officers who are eligible to retire with a pension with the option to continue working for an additional five years. New PFRS Active Pension Plan, ¶¶ 12.1, 12.2, 12.3. This five-year period was extended to 10 years as set forth

6

in the First Order and the Second Order for certain police officers. This election is made by the officer on an individual, officer-by-officer basis. No one can force a police officer to elect to participate in the DROP program. A police officer can elect to retire and receive full retirement benefits commencing immediately upon retirement. Certain police officers can elect to continue working beyond her eligibility for retirement for up to an additional ten years under the DROP program. Under the DROP program, the electing police officer (a) continues to work as a police officer beyond her retirement for her full salary; and (b) receives 75% of the pension benefit that otherwise would have been paid to the officer during the DROP period had the officer elected to retire and not participate in DROP. The 75% benefit is invested in an individual savings account for the exclusive benefit (and risk) of that officer. However, additional pension benefits no longer accrue during the DROP period for the electing officer and the remaining 25% of the pension benefit not invested in the individual savings account during the DROP period is forgiven. This is of economic benefit to the City.

The City also benefits through the continued service of experienced police officers because it avoids the cost of training and replacing officers. The officer benefits by continuing to work as a police officer and earn a full salary beyond retirement age, while receiving 75% of the pension benefit the officer would have

7

received if she had retired, with that benefit invested in her individual retirement savings account. City residents benefit by having more experienced police officers.

Under the version of the New PFRS Active Pension Plan (as modified by the First Order and Second Order), DPLSA members who elect the DROP program generally can work for only ten years after making a DROP election. New PFRS Active Pension Plan, § 12.1; First Order; Second Order. That restricts the degree to which both the City and DPLSA members can benefit from the DROP program.

### C. The City's significant challenge in retaining officers.

The ten-year period is problematic because the DPD, in recent years, has faced significant challenges in retaining officers. Exhibit 5, Declaration of James White, Chief of the DPD ("Decl."), ¶ 3; *see also* Declaration of James Craig attached as Ex. 5 to First Motion, pp. 33-37 of 224 *and* Ex. 5 to Second Motion, pp. 33-37 of 224.

Simply put, it is critical to the operations of DPD that the City have the option of allowing qualified and productive members of DPLSA to remain in the DROP program for an additional five years. Decl., ¶ 4. Otherwise, these individuals must leave after ten years in the DROP program, forcing out invaluable officers. *Id.*

There is a real need—both operationally and fiscally—to modify the DROP program to ensure that participants are able to work longer. Decl., ¶ 5.

8

**D.  The proposed modification to the New PFRS Active Pension Plan.**

Accordingly, under a memorandum of understanding recently reached with the DPLSA ("MOU"), the City agreed to use reasonable efforts to obtain this Court's approval to modify the New PFRS Active Pension Plan.  Decl., ¶ 6.  Specifically, the City agreed to seek this Court's approval to amend paragraph (3) of § 12.1 of the New PFRS Active Pension Plan as follows ("Proposed Modification"):

> (3) Notwithstanding paragraph 2 of this section or any other provision of this Plan, a member of the Detroit Police Lieutenants and Sergeants Association shall be entitled to participate in the DROP program under the Component I for the maximum of ten (10) years.  At the end of such ten (10) year period of participation in the DROP program, the member shall be retired and separated from employment. **If, however, at the time of the scheduled DROP retirement date, the Chief of Police determines that the skill set or value of the member who is retiring would result in a hardship on department needs or operations, the Chief of Police after mutual agreement with the member may grant an extension of the retirement date in one year increments not to exceed an additional five (5) years for a total of fifteen (15) total years in the DROP.  A member granted this extension shall continue to be subject to the below listed criteria.**
>
> A member who is participating in the DROP program pursuant to this paragraph §12.1(3) or pursuant to Component II of the Police and Fire Retirement System must be able to perform the essential functions of a police officer, assigned for the duration of his or her participation in the DROP program.  Provided, however, that  if a member, while participating in the DROP program pursuant to this paragraph §12.1(3) or Component II of the Police and Fire Retirement System requires and is granted

9

restricted duty for 365 consecutive days or more, that member may be retired and separated from employment after the end of such granted time period if the member is unable to perform the essential functions of a police officer.

While participating in the DROP program pursuant to paragraph §12.1(3) or pursuant to Component II of the Police and Fire Retirement System, a member of the Detroit Police Lieutenants and Sergeants Association must receive bi-annual satisfactory performance evaluations according to the performance evaluation standards then in place for sworn officers. Any such member who receives an unstatisfactory performance evaluation shall be entitled to the appeals process then in place, as well as final review by the Chief of Police. If a member receives a second unsatisfactory evaluation, that member may be retired and separated from employment. Additionally, if a participating member receives consecutive adjudicated findings of misconduct, that member may be retired and separated from employment subject to an appeal and final review of the Chief of Police.

MOU, ¶ 4.

The MOU further provides that any motion filed in this Court seeking to amend the Plan Document shall reiterate that the proposed amendment to the DROP as set forth in the MOU shall not affect those members who are currently grandfathered into the unlimited DROP program.

### E. The Proposed Modification will be cost beneficial.

Projections show that the City will benefit financially from lengthening the amount of time, from ten years to fifteen years, that certain officers may participate in the DROP program. *See* **Exhibit 6C,** Supplemental Actuarial Report.

10

Based on an August 9, 2021, actuarial study completed by Gabriel Roeder Smith & Company for the PFRS, extending the DROP period to fifteen years would reduce the unfunded actuarial accrued liability[1] of the Prior PFRS Pension Plan and the New PFRS Active Pension Plan. *Id.* It would also reduce the employer normal cost[2] for new service credit in the New PFRS Active Pension Plan. *Id.* These costs savings are projected because it is expected that the number of DROP participants would increase and that DROP participants would work longer. *Id.* The result is an overall delay in actual retirement from service for PFRS members, thus reducing the outflow of retirement benefits and the need to hire, train, and retain new officers. *Id.*

## III. **Argument**

### A. **The Plan and Confirmation Order permit the modification.**

The Plan anticipates the possibility that modifications might become necessary at some point after confirmation.

> Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or

---

[1] Unfunded actuarial accrued liability is a term that generally refers to the difference between the actuarial value of assets and the actuarial accrued liabilities of a plan.

[2] The "normal cost" is the cost of benefits earned in the current year; the "employer normal cost" equals the total normal cost of the plan reduced by any employee contributions.

38008557.7/022765.00213

> modification does not materially and adversely change the treatment of the Claim of such Holder.

Plan, Art. VIII.B., p. 71.

> The City is hereby authorized to make non-material modifications or amendments to the Plan at any time prior to the substantial consummation of the Plan, without further order of the Court. In addition, without the need for a further order or authorization of this Court, but subject to the express provisions of this Order, the City shall be, and hereby is, authorized and empowered to make non-material modifications to the documents filed with the Court, including Exhibits or documents forming part of the evidentiary record at the Confirmation Hearing, in its reasonable business judgment as may be necessary or appropriate.

Confirmation Order, ¶ 73, p. 117; *see also id.*, ¶ 74 (noting that modifications to the Plan may not impair Class 9 treatment or adversely affect FGIC without FGIC's written consent). Thus, prior to substantial consummation of the Plan, the City could modify its Plan without Court approval. After substantial consummation, however, a Court order is required. The Court retains jurisdiction to enter such an order.

> Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to [. . .]

> Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document

12

created in connection with the Plan or the Confirmation
Order, or remedy any defect or omission or reconcile any
inconsistency in any order, the Plan, the Confirmation
Order or any contract, instrument, release or other
agreement or document created in connection with the
Plan or the Confirmation Order, or enter any order in aid
of confirmation pursuant to sections 945 and 1142(b) of
the Bankruptcy Code, in such manner as may be necessary
or appropriate to consummate the Plan [. . . .]

Plan, Art. VII.H, p. 70; *see also* Confirmation Order, ¶ 92, pp. 125-26

("Notwithstanding the entry of this Order, from and after the Effective Date, the

Court shall retain such jurisdiction over the Chapter 9 Case to the fullest extent

permitted by law, including, among other things, jurisdiction over those matters and

issues described in Article VII of the Plan . . . ."); 11 U.S.C. § 945(a) ("The court

may retain jurisdiction over the case for such period of time as is necessary for the

successful implementation of the plan.").

>   **B.    A confirmed and substantially consummated chapter 9 plan may
>   be modified when no creditor will be treated less favorably by the
>   modification.**

The Plan has been confirmed and substantially consummated. *In re City of

Detroit, Mich.*, 838 F.3d 792, 799 (6th Cir. 2016), *cert. denied sub nom. Ochadleus

v. City of Detroit, Mich.*, 137 S. Ct. 1584, 197 L. Ed. 2d 707 (2017), and *cert. denied

sub nom. Quinn v. City of Detroit, Mich.*, 137 S. Ct. 2270, 198 L. Ed. 2d 714 (2017).

However, it may still be modified to authorize the revision of the DROP program

proposed in this Motion.

38008557.7/022765.00213

"The Bankruptcy Code does not explicitly provide for modification of a plan after confirmation. Neither did the Bankruptcy Act. However, two cases have held that such modification is permissible." 6 COLLIER ON BANKRUPTCY ¶ 942.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citing *Am. United Life Ins. Co. v. Haines City, Fla.*, 117 F.2d 574 (5th Cir. 1941) and *Wells Fargo Bank & Union Trust Co. v. Imperial Irrigation Dist.*, 136 F.2d 539 (9th Cir. 1943)).

The *American United Life Insurance Company* case considered whether Congress's failure to include any provision in the Bankruptcy Act for post-confirmation modification of a Chapter IX plan meant that such modifications were impermissible. 117 F.2d at 576. The Fifth Circuit considered an argument "against the possible modification of a confirmed plan [] based on the words of the statute [. . .] 'Before a plan is confirmed, changes and modifications may be made therein, with the approval of the judge after hearing,' etc. The implication is urged that afterwards changes cannot be made." *Id.* The court rejected that argument, stating that it was "unwilling to put a plan into such a strait jacket" and that "[t]here ought to be some leeway for such adjustments." *Id.* The main requirement is that the modification sought must be justified and fair. *Id.*

The *Wells Fargo Bank & Union Trust Company* court faced a slightly different question. In that case, the debtor sought to confirm a plan that contained provisions allowing for post-confirmation modification without court approval, so

long as certain conditions were met. 136 F.2d at 548-50. The Ninth Circuit found these provisions permissible. *Id.* at 550. The fact that the Bankruptcy Act did not expressly provide for them did not make them unlawful. *Id.*

More recent cases agree. For example, in *Ault v. Emblem Corporation (In re Wolf Creek Valley Metropolitan District Number IV)*, one creditor wanted to buy property from another, but the second creditor would not sell to the first. 138 B.R. 610, 613 (D. Colo. 1992). In retaliation, the first creditor pressured the municipal debtor to amend its plan on the day of confirmation to the detriment of the second creditor and apparently without notice to him. *Id.* The amended plan was confirmed and the confirmation order became final before the second creditor was able to object. *Id.* The second creditor moved the bankruptcy court to amend the plan to "cure defects" in it, but the bankruptcy court denied the motion, in part because the court felt that it could not authorize any amendments to the plan because the plan had been consummated. *Id.* at 613-14, 619.

The district court reversed, focusing on the fact that the sought-after plan modification affected only the two creditors. *Id.* at 620. Because of this, it was possible to amend the plan without disrupting the legitimate expectations of others. *Id.* The court felt this made modification of the confirmed plan possible. *Id.*

Just a few years ago, another court reviewed the case law and concluded that post-confirmation modifications of chapter 9 plans are permissible. *In re Barnwell*

38008557.7/022765.00213

*Cnty. Hosp.*, 491 B.R. 408, 414-16 (Bankr. D.S.C. 2013). That court found only one case that held to the contrary, *In re East Shoshone Hospital District*, No. 98-20934-9, 2000 WL 33712301 (Bankr. D. Idaho Apr. 27, 2000). *Id*. at 415, 416.

The *Barnwell* court distinguished *East Shoshone* on the basis that the proposed modification in *East Shoshone* "would dramatically alter the treatment of a creditor who objected to the modification,"[3] whereas the change under consideration in *Barnwell* would not. *Id.* at 416. The *Barnwell County Hospital* court also afforded more weight to the two published appellate court decisions, *Wolf Creek Valley Metropolitan District Number IV* and *American United Life Insurance Company*, than it did to *East Shoshone*, an unpublished bankruptcy court opinion. *Id.* Finally, the *Barnwell* court noted that the plan at issue in its case expressly provided for modifications. *Id.* For these reasons, the court concluded it had the ability to approve a proposed modification to the confirmed chapter 9 plan. *Id.*

For these reasons, Colliers concludes that

> Given the Bankruptcy Code's silence on postconfirmation modifications, there is no basis to impose a *per se* rule prohibiting such modifications. Whether based on the reasoning that: (i) a chapter 9 plan should not be confined to a "straightjacket" as a matter of equity; (ii) a plan of reorganization is a contract subject to modification for

---

[3] "Here the proposed modification changes dramatically the treatment of the Trust under the plan. It does not simply correct some overlooked matter nor does it address something which has arisen to the mutual surprise of the parties after confirmation." *E. Shoshone Hosp. Dist.*, 2000 WL 33712301 at *4.

16

surprise or mistake; (iii) a plan itself can provide for postconfirmation modifications; (iv) a plan has not been consummated; or (v) the bankruptcy court has continuing jurisdiction over a chapter 9 plan under the terms of the plan and section 945(a), a bankruptcy court has sufficient authority to consider, after such notice and a hearing as is appropriate under the circumstances, postconfirmation modifications and authorize such modifications that are necessary for the successful adjustment of the chapter 9 debtor's debts.

6 COLLIER ON BANKRUPTCY ¶ 942.03 (footnotes and citations omitted).

Here, the Plan and Confirmation Order provide the City with the ability to make changes to the Plan prior to substantial confirmation *without a Court order*. Plan, Art. VIII.B, p. 71; Confirmation Order, ¶ 73, p. 117. They do not speak to changes after substantial consummation, the implication being that such changes at that time may require a Court order. In fact, the Court retained jurisdiction to enter orders modifying the Plan if needed for that purpose. Plan, Art. VII.H, p.70; Confirmation Order, ¶ 92, pp. 125-26.[4]

---

[4] The Proposed Modification is not prohibited by subsection G of Class 10 of the Plan because it does not amend or change the calculation of pension benefits. Class 10, subsection G provides: "G. No Changes in Terms for Ten Years. Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, **that govern the calculation of pension benefits** (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in

38008557.7/022765.00213

13-53846-tjt   Doc 13433   Filed 08/31/21   Entered 08/31/21 11:39:35   Page 17 of 210

The modification sought affects only the City and members of the DPLSA—no other creditor is helped or harmed in any way—so the modification sought is permissible under the Plan and case law. *Wolf Creek Valley Metro. Dist. No. IV*, 138 B.R. at 620; *see also Am. United Life Ins.*, 117 F.2d at 576. Moreover, DPLSA members affected by the proposed modification are only affected if they choose to be on an individual, officer-by-officer basis. The takeaway is simple: the proposed modification affects no one that does not want to be affected by it.[5]

Although the proposed modification has no negative effect on the claims of City creditors, the change is expected to have a significant positive affect on the City's ability to retain police officers and thus provide sufficient police coverage to its citizens. It is also projected to provide the City with cost savings. As the proposed modification is justified, fair, and does not affect any distribution to, or treatment of, any claim or creditor in any Class under the Plan except those police officers in class 10 who on an individual basis *voluntarily* elect to take advantage of

---

Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law." Plan, Art. II.B.3.q.G, p. 39. (boldfacing removed and emphasis added).

[5] Consequently, prior Court approval of the modification may be unnecessary. However, the City seeks such approval by filing this Motion upon prior notice, as it did with the First Motion and Second Motion.

38008557.7/022765.00213

the proposed fifteen-year DROP period, the City respectfully requests that the Court enter an order authorizing and approving the modification.

## IV. <u>Conclusion</u>

The City has been working to rectify its difficulty in retaining experienced police officers. It had hoped the First Motion and Second Motion would suffice, but now concludes that a further small change to the New PFRS Active Pension Plan is required. Although the change involved is minor and may not require Court approval at all,[6] the City nonetheless believes that it is prudent to provide notice and seek the approval of this Court before implementing it.[7]

No creditor will be harmed. No creditor will receive a windfall. Instead, if granted, the City's finances are projected to improve significantly. The change will also aid the City in keeping more qualified and experienced police officers on the street to protect the public.

---

[6] The City files this Motion without prejudice to or waiver of its rights under section 904 of the Bankruptcy Code. Nothing herein is intended to constitute, will constitute, or may be deemed as constituting the City's consent under section 904 of the Bankruptcy Code to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

[7] The City has provided notice of this Motion to all entities that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure and the presidents of the DPCOA, the DPLSA, and the DPOA. Given the nature of the relief requested, the City respectfully submits that no other or further notice of this Motion need be given.

19

The DPLSA concurs in the relief requested in this Motion.

WHEREFORE, the City respectfully requests that this Court enter an order, substantially in the form attached as Exhibit 1, granting the relief requested in this Motion and granting the City such other and further relief as the Court may deem just and proper.

August 31, 2021

Respectfully submitted,

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

    -and-

    Charles N. Raimi (P29746)
    Deputy Corporation Counsel
    City of Detroit Law Department
    2 Woodward Avenue, Suite 500
    Coleman A. Young Municipal Center
    Detroit, Michigan 48226
    Telephone: (313) 237-5037
    Facsimile: (313) 224-5505
    raimic@detroitmi.gov

ATTORNEYS FOR THE CITY OF DETROIT

# EXHIBIT LIST

Exhibit 1    Proposed Order

Exhibit 2    Notice

Exhibit 3    None

Exhibit 4    Certificate of Service

Exhibit 5    Declaration in Support of the City of Detroit's August 2021 Motion for Authority to Modify the Confirmed Plan of Adjustment to Revise the "DROP" Program for Certain Police Officers

Exhibit 6A   New PFRS Active Pension Plan

Exhibit 6B   Prior PFRS Pension Plan

Exhibit 6C   Supplemental Actuarial Report

# EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### [PROPOSED] ORDER GRANTING CITY OF DETROIT'S AUGUST 2021 MOTION FOR AUTHORITY TO MODIFY THE CONFIRMED PLAN OF ADJUSTMENT TO REVISE THE "DROP" PROGRAM FOR CERTAIN POLICE OFFICERS

This matter, having come before the court on the *City of Detroit's August 2021 Motion for Authority to Modify the Confirmed Plan of Adjustment to Revise the "DROP" Program for Certain Police Officers* ("Motion"); and the Court having jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Article VII of the Plan; and due and proper notice of the Motion having been given as provided in the Motion; and it appearing that no other or further notice of the Motion need be given; and a hearing on the Motion having been held before the Court; and any objections or other responses to the Motion having been overruled or withdrawn; and the Court finding that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted; and the Court being fully advised in the premises; and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.      The Motion is granted as set forth herein.

2.      The City may amend paragraph (3) of section 12.1 of the New PFRS

Active Pension Plan with language that is substantially similar to the following:

> (3) Notwithstanding paragraph 2 of this section or any other provision of this Plan, a member of the Detroit Police Lieutenants and Sergeants Association shall be entitled to participate in the DROP program under the Component I for the maximum of ten (10) years. At the end of such ten (10) year period of participation in the DROP program, the member shall be retired and separated from employment. **If, however, at the time of the scheduled DROP retirement date, the Chief of Police determines that the skill set or value of the member who is retiring would result in a hardship on department needs or operations, the Chief of Police after mutual agreement with the member may grant an extension of the retirement date in one year increments not to exceed an additional five (5) years for a total of fifteen (15) total years in the DROP. A member granted this extension shall continue to be subject to the below listed criteria.**
>
> A member who is participating in the DROP program pursuant to this paragraph §12.1(3) or pursuant to Component II of the Police and Fire Retirement System must be able to perform the essential functions of a police officer, assigned for the duration of his or her participation in the DROP program. Provided, however, that if a member, while participating in the DROP program pursuant to this paragraph §12.1(3) or Component II of the Police and Fire Retirement System requires and is granted restricted duty for 365 consecutive days or more, that member may be retired and separated from employment after the end of such granted time period if the member is

2

unable to perform the essential functions of a police officer.

While participating in the DROP program pursuant to paragraph §12.1(3) or pursuant to Component II of the Police and Fire Retirement System, a member of the Detroit Police Lieutenants and Sergeants Association must receive bi-annual satisfactory performance evaluations according to the performance evaluation standards then in place for sworn officers. Any such member who receives an unstatisfactory performance evaluation shall be entitled to the appeals process then in place, as well as final review by the Chief of Police. If a member receives a second unsatisfactory evaluation, that member may be retired and separated from employment. Additionally, if a participating member receives consecutive adjudicated findings of misconduct, that member may be retired and separated from employment subject to an appeal and final review of the Chief of Police.

3.     Nothing in this Order is intended to constitute, will constitute, or may be deemed as constituting the City's consent under section 904 of the Bankruptcy Code to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

4.     The Court retains jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

38008557.6/022765.00213

## EXHIBIT 2 – NOTICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## NOTICE OF OPPORTUNITY TO RESPOND TO
## CITY OF DETROIT'S AUGUST 2021 MOTION FOR AUTHORITY TO
## MODIFY THE CONFIRMED PLAN OF ADJUSTMENT TO REVISE
## THE "DROP" PROGRAM FOR CERTAIN POLICE OFFICERS

The City has filed its *City of Detroit's August 2021 Motion for Authority to Modify the Confirmed Plan of Adjustment to Revise the "DROP" Program for Certain Police Officers* (the "Motion"). **Your rights may be affected. You should read these papers carefully and discuss them with your attorney.** If you do not want the Court to enter an Order granting the Motion, within 14 days, you or your attorney must:

1. File with the court a written response or an answer explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

4

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above. You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2. If a response or answer is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
      Marc N. Swanson (P71149)
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      Telephone: (313) 496-7591
      Facsimile: (313) 496-8451
      swansonm@millercanfield.com

Dated: August 31, 2021

5

**EXHIBIT 3 – NONE**

38008557.6/022765.00213

# EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 31, 2021 he electronically filed the *City of Detroit's August 2021 Motion for Authority to Modify the Confirmed Plan of Adjustment to Revise the "DROP" Program for Certain Police Officers* (the "Motion") with the Clerk of the Court which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case. The City has engaged a Noticing Agent, which will serve the Motion on all parties identified on the Special Service List; the General Service List maintained by the Noticing Agent; and the presidents of the Detroit Police Command Officers Association, the Detroit Police and Lieutenant and Sergeants Association, and the Detroit Police Officers Association, and will file a subsequent Proof of Service after it has performed the service.

DATED:  August 31, 2021

By: /s/ Marc N. Swanson
    Marc N. Swanson
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

38008557.6/022765.00213

**EXHIBIT 5**

**DECLARATION IN SUPPORT OF THE CITY OF DETROIT'S
AUGUST 2021 MOTION FOR AUTHORITY TO
MODIFY THE CONFIRMED PLAN OF ADJUSTMENT TO REVISE
THE "DROP" PROGRAM FOR CERTAIN POLICE OFFICERS**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### DECLARATION IN SUPPORT OF THE CITY OF DETROIT'S AUGUST 2021 MOTION FOR AUTHORITY TO MODIFY THE CONFIRMED PLAN OF ADJUSTMENT TO REVISE THE "DROP" PROGRAM FOR CERTAIN POLICE OFFICERS

1.     My name is James White.   I am the Chief of the Detroit Police Department ("DPD").

2.     This declaration is filed in support of the *City of Detroit's August 2021 Motion for Authority to Modify the Confirmed Plan of Adjustment to Revise the "DROP" Program for Police Officers* ("Motion").[1]

3.     This Court has granted two previous motions which are similar to the Motion.   One of those motions modified the deferred retirement option plan ("DROP") program for Detroit Police Department ("DPD") officers who were members of the union known as the Detroit Police Lieutenants and Sergeants Association ("DPLSA").   The Court approved an extension in the program from 5 to 10 years.   For the same reasons, the City now requests an extension of the program

---

[1] Capitalized terms not otherwise defined in this declaration shall have the meanings ascribed to them in the Motion.

38008547.2/022765.00213

from 10 to 15 years. Namely, DPD in recent years, has faced significant challenges in retaining experienced and qualified officers.

4.     Simply put, it is critical to the operations of DPD that the City have the option of allowing qualified and production members of DPLSA continue in the Drop program for an additional five years. The alternative would be that these individuals would be forced to resign after 10 years in the DROP program.  That would force out some invaluable officers.

5.     There is a real need—both operationally and fiscally—to modify the DROP program to ensure that participants are able to work longer.  I am aware that an actuarial study has been conducted which confirms this change will not adversely impact the Police and Fire Retirement System ("PFRS").

6.     Accordingly, pursuant to a memorandum of understanding recently reached with DPLSA, the City agreed to seek Bankruptcy Court approval to modify the New PFRS Active Pension Plan to lengthen the amount of time from ten to fifteen years that DPLSA members can work post-DROP.

7.     Specifically, the City agreed to seek bankruptcy court approval to amend §12.1 of the New PFRS Active Pension Plan to add a new paragraph (3), which is substantially similar to the following language:

> (3) Notwithstanding paragraph 2 of this section or any other provision of this Plan, a member of the Detroit Police Lieutenants and Sergeants Association shall be entitled to participate in the DROP program under

38008547.2/022765.00213

the Component I for the maximum of ten (10) years. At the end of such ten (10) year period of participation in the DROP program, the member shall be retired and separated from employment. **If, however, at the time of the scheduled DROP retirement date, the Chief of Police determines that the skill set or value of the member who is retiring would result in a hardship on department needs or operations, the Chief of Police after mutual agreement with the member may grant an extension of the retirement date in one year increments not to exceed an additional five (5) years for a total of fifteen (15) total years in the DROP. A member granted this extension shall continue to be subject to the below listed criteria.**

A member who is participating in the DROP program pursuant to this paragraph §12.1(3) or pursuant to Component II of the Police and Fire Retirement System must be able to perform the essential functions of a police officer, assigned for the duration of his or her participation in the DROP program. Provided, however, that if a member, while participating in the DROP program pursuant to this paragraph § 12.1(3) or Component II of the Police and Fire Retirement System requires and is granted restricted duty for 365 consecutive days or more, that member may be retired and separated from employment after the end of such granted time period if the member is unable to perform the essential functions of a police officer.

While participating in the DROP program pursuant to paragraph §12.1(3) or pursuant to Component II of the Police and Fire Retirement System, a member of the Detroit Police Lieutenants and Sergeants Association must receive bi-annual satisfactory performance evaluations according to the performance evaluation standards then in place for sworn officers. Any such member who receives an unsatisfactory performance evaluation shall be entitled to the appeals process then in place, as well as final review by the Chief of Police. If a member receives a second unsatisfactory evaluation, that member may be retired and separated from employment. Additionally, if a participating member receives consecutive adjudicated findings of misconduct, that member may be retired and separated from employment subject to an appeal and final review of the Chief of Police.

38008547.2/022765.00213

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

By: _____

James White
Chief of the Detroit Police Department

Dated: August 24, 2021

38008547.2/022765.00213

# Exhibit 6A – New PFRS Active Pension Plan

**EXHIBIT I.A.254.a**

FORM OF NEW PFRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT I ............................................................................................... 1

ARTICLE 1.        GENERAL PROVISIONS ................................................................. 1

Sec 1.1.        Police and Fire Retirement System Established; Adoption of 2014
                Plan Document.......................................................................... 1

Sec 1.2.        Retirement System Intended to be Tax-Qualified; Governmental
                Plan ......................................................................................... 1

Sec 1.3.        Compliance With Plan of Adjustment ...................................... 1

Sec 1.4.        Board of Trustees ..................................................................... 2

Sec 1.5.        Board of Trustees – Membership; Appointment ...................... 2

Sec 1.6.        Board of Trustees; Scheduling of Elections for Active and Retiree
                Trustees ................................................................................... 3

Sec 1.7.        Procedures for election of Retiree Trustees ............................. 3

Sec 1.8.        Board of Trustees; Oath; Term; Vacancies .............................. 4

Sec 1.9.        Board of Trustees; Officers and Employees ............................ 4

Sec 1.10.       Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 4

Sec 1.11.       Board of Trustees; Compensation; Expenses ........................... 5

Sec 1.12.       Rules for Administration of Funds ........................................... 5

Sec 1.13.       Board of Trustees; Certain Data to be Kept............................. 5

Sec 1.14.       Board of Trustees; Annual Audit Report.................................. 5

Sec 1.15.       Board of Trustees; Legal Advisors .......................................... 5

Sec 1.16.       Board of Trustees; Medical Director ....................................... 6

Sec 1.17.       Designation of Actuary; Authority to Engage Additional Actuaries......... 6

Sec 1.18.       Board of Trustees; Adoption of Mortality and Other Tables of
                Experience and Rates of Interest; Limitations on Payments by the
                Retirement System ................................................................... 6

Sec 1.19.       Board of Trustees; Annual Actuarial Valuation of Assets and
                Liabilities ................................................................................ 7

Sec 1.20.       Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary
                Duties ...................................................................................... 7

Sec 1.21.       Investment Committee; Establishment; Purpose; Fiduciary Status;
                Fiduciary Duties...................................................................... 7

Sec 1.22.       Investment Committee; Membership; Appointment ................. 8

-i-

13-53846-tjt   Doc 13168-1   Filed 08/30/19   Entered 08/30/19 14:38:05   Page 38 of 224
13-53846-swr   Doc 13066-5   Filed 06/20/14   Entered 06/20/14 14:39:05   Page 46 of 224
809

Sec 1.23. Investment Committee; Term; Resignation and Removal; Vacancies ..................................................................... 9

Sec 1.24. Investment Committee; Operation; Meetings; Quorum; Voting ............ 10

Sec 1.25. Investment Committee; Compensation; Expenses; Employment of Advisors ..................................................................... 12

Sec 1.26. Investment Committee; Special Reporting Obligation .......................... 12

ARTICLE 2. DEFINITIONS ................................................................. 14

Sec 2.1. Definitions ................................................................... 14

ARTICLE 3. MEMBERSHIP ............................................................... 22

Sec 3.1. Eligible Employees ......................................................... 22

Sec 3.2. Cessation of Membership; Re-Employment ................................. 22

Sec 3.3. Report From City ........................................................... 23

ARTICLE 4. SERVICE CREDIT ........................................................... 24

Sec 4.1. Credited Service ............................................................ 24

Sec 4.2. Vesting Service ............................................................. 24

Sec 4.3. Service Credit; Military Service ............................................ 24

Sec 4.4. Service Credit; Qualified Military Service .................................. 25

ARTICLE 5. ELIGIBILITY FOR RETIREMENT ........................................ 26

Sec 5.1. Eligibility for Unreduced Normal Retirement Benefit ...................... 26

Sec 5.2. Eligibility for Deferred Vested Retirement Benefit .......................... 26

Sec 5.3. Eligibility for Disability Retirement Benefit – Duty Disability ............... 26

Sec 5.4. Eligibility for Disability Retirement Benefit – Non-Duty Disability ...... 28

Sec 5.5. Disability Retirees; Reexamination ......................................... 28

Sec 5.6. Disability Benefits; Procedures for Determination of Disability ............. 29

Sec 5.7. Return of Accumulated Mandatory Contributions to Non-Vested Member ..................................................................... 31

Sec 5.8. Benefits Offset by Compensation Benefits; Subrogation ..................... 31

ARTICLE 6. RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) ............................. 33

Sec 6.1. Retirement Allowance ...................................................... 33

Sec 6.2. Variable Pension Improvement Factor (Escalator) ........................... 33

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 7.    DEATH BENEFITS ............................................................................ 34

    Sec 7.1.    Accidental Death Benefit; Performance of Duty ..................................... 34

    Sec 7.2.    Non-Duty Death Benefits ................................................................... 35

    Sec 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of
             Member ......................................................................................... 35

ARTICLE 8.    FORMS OF PAYMENT ...................................................................... 36

    Sec 8.1.    Retirement Allowance Options ............................................................ 36

    Sec 8.2.    Disposition of Surplus Benefits upon Death of Retiree and
             Beneficiary .................................................................................... 37

ARTICLE 9.    FUNDING AND RESERVES ............................................................... 38

    Sec 9.1.    Funding Objective of the Retirement System ......................................... 38

    Sec 9.2.    Funds ........................................................................................... 38

    Sec 9.3.    Method of Financing Retirement System Benefits ................................... 39

    Sec 9.4.    Member Contributions Picked-Up ....................................................... 40

    Sec 9.5.    Fiscal Responsibility: Benefit Reductions and Increased Funding
             Obligations .................................................................................... 40

ARTICLE 10.    VOLUNTARY EMPLOYEE CONTRIBUTIONS ..................................... 42

    Sec 10.1.    Voluntary Employee Contributions; Amount; Vesting ........................... 42

    Sec 10.2.    Changing an Election to Contribute ................................................... 42

    Sec 10.3.    Individual Member Accounting; Crediting of Earnings ......................... 42

    Sec 10.4.    Distribution of Accumulated Voluntary Employee Contributions .......... 42

ARTICLE 11.    LOAN PROGRAM FOR VOLUNTARY EMPLOYEE
             CONTRIBUTIONS .......................................................................... 44

    Sec 11.1.    The Loan Program ........................................................................ 44

    Sec 11.2.    Eligibility for Loan ....................................................................... 44

    Sec 11.3.    Amount of Loan ............................................................................ 44

    Sec 11.4.    Terms and Conditions .................................................................... 44

    Sec 11.5.    Loan Balance ............................................................................... 45

    Sec 11.6.    Default ........................................................................................ 45

    Sec 11.7.    Distribution ................................................................................. 46

ARTICLE 12.    DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM ....... 47

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| Sec 12.1. | General Provisions | 47 |
| Sec 12.2. | Conversion to Retirement Allowance | 47 |
| Sec 12.3. | Investment of DROP Assets | 47 |
| Sec 12.4. | Distribution of Amounts Credited to DROP Account | 48 |
| Sec 12.5. | Death of Member While Participating in the DROP Program | 48 |
| Sec 12.6. | Disability of Member While Participating in the DROP Program | 48 |
| Sec 12.7. | Cost Neutrality | 49 |
| ARTICLE 13. | LIMITATION ON BENEFITS AND CONTRIBUTIONS | 50 |
| Sec 13.1. | Compliance With Code Section 415(b) And Regulations | 50 |
| Sec 13.2. | Compliance with Code Section 415(c) and Regulations | 53 |
| ARTICLE 14. | RETIREMENT SYSTEM ADMINISTRATION | 54 |
| Sec 14.1. | Board of Trustees as Retirement System Administrator | 54 |
| Sec 14.2. | Powers and Duties of Board | 54 |
| Sec 14.3. | Executive Director; Employees | 56 |
| Sec 14.4. | Discretionary Authority | 56 |
| Sec 14.5. | Administrator's Decision Binding | 57 |
| ARTICLE 15. | MANAGEMENT OF FUNDS | 58 |
| Sec 15.1. | Board as Trustee of Retirement System Assets | 58 |
| Sec 15.2. | Maintenance of Segregated Funds | 58 |
| Sec 15.3. | Custodian of Funds | 58 |
| Sec 15.4. | Exclusive Purpose | 58 |
| Sec 15.5. | Prohibited Conduct | 58 |
| ARTICLE 16. | INVESTMENT OF RETIREMENT SYSTEM ASSETS | 60 |
| Sec 16.1. | Investment Powers of the Board and the Investment Committee | 60 |
| Sec 16.2. | Investment Management | 61 |
| Sec 16.3. | Best Practices | 62 |
| Sec 16.4. | Chief Investment Officer | 62 |
| Sec 16.5. | Investment Consultants | 63 |
| Sec 16.6. | Consistency With Plan of Adjustment | 64 |
| ARTICLE 17. | RETIREE MEDICAL ACCOUNT | 65 |

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| Sec 17.1. | Establishment of Account | 65 |
| Sec 17.2. | Effective Date | 65 |
| Sec 17.3. | Funding of Benefits | 65 |
| Sec 17.4. | Limitation on Contributions | 65 |
| Sec 17.5. | Impossibility of Diversion | 65 |
| Sec 17.6. | Administration | 66 |
| Sec 17.7. | Right to Amend or Terminate Medical Plans | 66 |
| Sec 17.8. | Reversion | 66 |
| Sec 17.9. | Limitation of Rights | 66 |
| ARTICLE 18. | MISCELLANEOUS | 67 |
| Sec 18.1. | Nonduplication of Benefits | 67 |
| Sec 18.2. | Assignments Prohibited | 67 |
| Sec 18.3. | Protection Against Fraud | 67 |
| Sec 18.4. | Conviction of Felony; Forfeiture of Rights | 67 |
| Sec 18.5. | Amendment; Termination; Exclusive Benefit | 67 |
| Sec 18.6. | Forfeitures Not to Increase Benefits | 68 |
| Sec 18.7. | Required Distributions - Compliance with Code Section 401(a)(9) and Regulations | 68 |
| Sec 18.8. | Direct Rollovers | 68 |
| Sec 18.9. | Construction | 70 |
| Sec 18.10. | Severability | 70 |

# COMPONENT I

# ARTICLE 1.  GENERAL PROVISIONS

## Sec 1.1.    Police and Fire Retirement System Established; Adoption of 2014 Plan Document

Effective July 1, 1941, a Pension System for Policemen and Firemen of the City of Detroit was established for the purpose of providing retirement allowances and death benefits for Policemen and Firemen and their beneficiaries by amendment to the Charter of the City of Detroit.  That Pension System was amended on numerous occasions after July 1, 1941, including an amendment renaming the Retirement System as the "Police and Fire Retirement System of the City of Detroit." The provisions of the Police and Fire Retirement System of the City of Detroit, as in effect July 1, 2014, are set forth in this Plan Document (including Appendix A attached hereto).  Component I of the Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Police and Fire Retirement System of the City of Detroit on and after July 1, 2014.  Component II of the Plan Document generally applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Plan Document are frozen effective June 30, 2014.

Pursuant to Section 47-1-2 of the Detroit City Code, this Combined Plan Document shall replace the provisions of the Police and Fire Retirement System of the City of Detroit as set forth in the City of Detroit Charter, the Detroit City Code and any conflicting provisions in any collective bargaining agreements, rulings or opinions covering Members (including, without limitation, City Employment Terms).  All resolutions and policies of the Board previously enacted which are inconsistent with the provisions of this Plan Document are also hereby repealed to the extent of such inconsistency.

## Sec 1.2.    Retirement System Intended to be Tax-Qualified; Governmental Plan

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.  The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

## Sec 1.3.    Compliance With Plan of Adjustment

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment").  Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment.  To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

### Sec 1.4.    Board of Trustees

Effective July 1, 1941, a Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created. The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document.

### Sec 1.5.    Board of Trustees – Membership; Appointment

The Board of Trustees of the Police and Fire Retirement System of the City of Detroit shall consist of seventeen Trustees, as follows:

(1)    The Mayor, *ex-officio*, or the Mayor's designee;

(2)    The President of City Council or a member thereof elected by the City Council, *ex-officio*;

(3)    The City Treasurer or Deputy City Treasurer, *ex-officio*;

(4)    The City Finance Director, or a designated representative, *ex-officio*;

(5)    The City Budget Director, or a designated representative, *ex-officio*;

(6)    The Corporation Counsel of the City, or a designated representative, *ex-officio*;

(7)    Three Fire Members of the Retirement System to be elected by the Fire Members under such rules and regulations as may be established by the Board of Fire Commissioners to govern such elections, as follows:

    (a)    Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)    One to be elected by and from Members holding ranks above the rank of lieutenant (or its equivalent);

(8)    Three Police Members of the Retirement System to be elected by the Police Members under the rules and regulations as may be established by the Commissioner of Police to govern such elections, as follows:

    (a)    Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)    One to be elected by and from Members holding a rank above lieutenant (or its equivalent); and

(9)    One individual who neither is a Member of the Retirement System nor an employee of the City in any capacity to be selected by the Board;

(10) Two Retirees receiving benefits under the Retirement System, one of whom shall be elected by Retired Police Members and one of whom will be elected by Retired Fire Members pursuant to Sections 1.6 and 1.7 below;

(11) One Trustee appointed by the Mayor upon election of a Retiree Police Trustee; and

(12) One Trustee appointed by the Mayor upon election of a Retiree Fire Trustee.

### Sec 1.6. Board of Trustees; Scheduling of Elections for Active and Retiree Trustees

(1) Annual elections for active Police Officers and Fire Fighters shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(2) Elections to fill vacancies created by the expiration of a term for a Retiree Trustee shall be held every three years during the month of May.

(3) A special election for Retiree Trustees shall be held as soon as practicable after the Plan of Adjustment is confirmed. Unless a Retiree Trustee elected by reason of this special election resigns or is removed from the position of Trustee in accordance with the terms of the Combined Plan Document, a Retiree elected to the office of Trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the last day of June that follows the third anniversary of the special election, at which time an election for Retiree Trustees shall be held in accordance with Section 1.7.

### Sec 1.7. Procedures for election of Retiree Trustees

The procedures for the election of the Retiree Trustees shall be as follows:

(1) *Notice*. Notice of a primary election shall be sent to each Retiree by United States Mail.

(2) *Notice of Candidacy*. A proposed candidate shall submit a notarized letter to the executive director notifying the Retirement System of his or her candidacy.

(3) *Ballot*. Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position the Retiree held at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4) *Voting*. Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.7 shall be handled in accordance with such rules and regulations as the Board may adopt and Michigan law.

## Sec 1.8.     Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the City Clerk.

The term of office for each elected Trustee under Sections 1.5(7), (8) and (10) shall be three years.  The term of office for the Trustee who is selected by the Board under Section 1.5(9) shall be two years.  The term of office for the Trustees appointed by the Mayor under Sections 1.5(11) and (12) shall be three years.  Except as provided in Section 1.6(3), elected Trustees holding office on June 30, 2014 shall serve the remainder of their terms.

If a Trustee resigns or is removed by the other Trustees for cause, or if an elected or appointed Trustee fails to attend three consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled.  No vacancy shall result by reason of a change in the rank or grade of a Trustee during the term of office.

## Sec 1.9.     Board of Trustees; Officers and Employees

The Board of Trustees shall elect from its membership a chairman and a vice chairman. The executive director of the Retirement System or his or her representative shall serve as secretary of the Board of Trustees.  The Board may employ such special actuarial, medical and other employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

## Sec 1.10.   Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)     The Board shall hold regular meetings, at least one in each month, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.*  All Board meetings shall be held within the City of Detroit.

(2)     Each Trustee shall be entitled to one vote on each question before the Board. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Eight members of the Board, four of whom must be elected members, shall constitute a quorum.

## Sec 1.11.    Board of Trustees; Compensation; Expenses

All members of the Board of Trustees shall serve without additional compensation from the City or the Retirement System; however Retiree Trustees shall receive a hourly stipend from the Retirement System equal to the lowest rate of pay received by an active employee Trustee for attending Board meetings, educational time and travel out of the City on official business of the Retirement System. All Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

## Sec 1.12.    Rules for Administration of Funds.

Subject to the limitations contained in this Combined Plan document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Combined Plan document and for the transaction of its business.

## Sec 1.13.    Board of Trustees; Certain Data to be Kept

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the Retirement System and for checking and compiling the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

## Sec 1.14.    Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

## Sec 1.15.    Board of Trustees; Legal Advisors

(1)     The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)     Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)     Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec 1.16.   Board of Trustees; Medical Director

(1)     The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in a retirement system maintained by the City. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(2)     The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of the Combined Plan, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred to it.

### Sec 1.17.   Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board.  In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary.  The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the governance terms attached to the that certain Agreement by and between the Michigan Settlement Administration Authority, the Retirement System, the General Retirement system for the City of Detroit, Michigan ("GRS"), and the City (the "State Contribution Agreement") as Exhibit B (the "Governance Term Sheet"), and the Plan of Adjustment.  Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

### Sec 1.18.   Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this Section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this Section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

## Sec 1.19.   Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.18, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

## Sec 1.20.   Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee.  To the extent the Board exercises discretion with respect to investment of Retirement System assets, the Board shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*., and a Board member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose.  Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

## Sec 1.21.   Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties

As of the effective date the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to, and approving certain actions by, the Board of Trustees and/or making determinations and taking action under and with respect to certain investment management matters relating to the Retirement System.  The creation and operation of the Investment

Committee is controlled by the Governance Term Sheet. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*. The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

## Sec 1.22.  Investment Committee; Membership; Appointment

The Investment Committee shall consist of nine (9) members, determined as follows:

(1)     Five independent members, at least two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as necessary to bring the number of independent Investment Committee members to five (5);

(2)     Two Retirees who shall be appointed by the Board consisting of one elected retired Police Member and one elected retired Fire Member who are serving on the Board and who are receiving benefit payments under the Retirement System;  and

13-53846-tjt  Doc 13498-1  Filed 08/30/24  Entered 08/30/24 14:39:05  Page 51 of 210
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 19:05:29  Page 54 of 224
809

(3)     Two Employee members who shall be appointed by the Board consisting of one Fire Department Employee and one Police Department Employee who are active members of the Board.


## Sec 1.23.   Investment Committee; Term; Resignation and Removal; Vacancies

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|---|---|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or Employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees.  Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier.  Notwithstanding any provision of this Combined Plan document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee.  An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in accordance with the voting procedure set forth in Section 1.24; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government.  A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings.  In the event of any removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

13-53846-tjt  Doc 13498-1  Filed 08/20/21  Entered 08/20/21 14:39:05  Page 52 of 210
13-53846-swr  Doc 1388-1  Filed 08/30/21  Entered 08/30/21 14:39:05  Page 46 of 224
809

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("Treasurer"), in consultation with the Foundation, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

## Sec 1.24. Investment Committee; Operation; Meetings; Quorum; Voting

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Investment Committee meetings shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Each independent Investment Committee member shall be entitled to one vote on each question before the Investment Committee. Each Retiree and Employee member shall be entitled to one-half vote on each question before the Investment Committee. Except as otherwise provided in the Governance Term Sheet, at least four concurring votes shall be necessary for a decision by the Investment Committee and each Investment Committee member shall be entitled to one vote on each question before the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a state or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

13-53846-tjt Doc 13498-1 Filed 08/30/21 Entered 08/30/21 14:30:05 Page 54 of 210
13-53846-tjt Doc 13498-1 Filed 08/30/21 Entered 08/30/21 14:30:05 Page 46 of 224

809

**Sec 1.25.   Investment Committee; Compensation; Expenses; Employment of Advisors**

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System. The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions, and such parties or persons may be reasonably compensated from the assets of the Retirement System. Such engagements shall not be subject to approval of the Board.

**Sec 1.26.   Investment Committee; Special Reporting Obligation**

(1)   Beginning in calendar year 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)   In the event the Retirement System receives a written notice from the Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the Treasurer a written certification that (i) the default has been cured, and (ii) no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)   Beginning in calendar year 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)   Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)   a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b)   a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to

13-53846-tjt   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:39:35   Page 55 of 210
13-53846-swr   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:39:35   Page 46 of 224
809

the Foundation that, as of the date of the annual report ("Annual Report") required to be provided by the City to the Foundation:

(i) the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

(ii) the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan document; and

(iii) the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c) a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the Treasurer; and (iv) in the event that the Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee. Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d) any additional information that may be reasonably requested by the Foundation from time to time.

(e) Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

13-53846-tjt Doc 13498-1 Filed 08/20/21 Entered 08/20/21 14:39:05 Page 56 of 210
13-53846-swr Doc 13498-1 Filed 08/20/21 Entered 08/20/21 14:39:05 Page 56 of 210
809

# ARTICLE 2.  DEFINITIONS

## Sec 2.1.    Definitions

Unless a different definition is contained within this Combined Plan Document, or a different meaning is plainly required by context, for purposes of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1)     *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the Compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)     *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System.

(3)     *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.  The rates of interest adopted by the Board from time to time shall not violate the terms of the Plan of Adjustment.

(4)     *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5)     *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)     *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)     *Average Final Compensation* means the average Compensation received by a Member during the five consecutive years of Credited Service which immediately precede the date of the Member's last termination of City employment as an employee of the Police Department or the Fire Department.  If a Member has less than five years of Credited Service, the Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.

(8)     *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(9)     *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Police and Fire Retirement System of the City of Detroit.

(10)    *City* means the City of Detroit, Michigan, a municipal corporation.

(11)   *City Council or Council* means the legislative body of the City.

(12)   *Combined Plan* means the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan, effective July 1, 2014, and as amended thereafter.

(13)   *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which is contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the City.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14)   *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)   the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)     the 2014 Defined Contribution Plan which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15)    *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)     the Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)     the Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16)    *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(17)    *Disability or Disabled*: see Total Disability or Totally Disabled.

(18)    *DFFA* means the Detroit Fire Fighters Association.

(19)    *DPCOA* means the Detroit Police Command Officers Association.

(20)    *DPLSA* means the Detroit Police Lieutenants and Sergeants Association.

(21)    *DPOA* means the Detroit Police Officers Association.

(22)    *DROP Account* means the account established by the Board for a Member who is eligible for and who elects to participate in the DROP Program.

(23)    *DROP Program* means a program established for eligible Members pursuant to Article 12.

(24)    *Employee* means an employee of the City's Police Department who has taken an oath of office or a Fire Fighter providing services to the City, but does not include:

(a)     individuals whose City services are compensated on a contractual or fee basis;

(b)     any person during any period when such person is classified by the City as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the City;

(c)     the Medical Director of the Retirement System.

If a person described in (b) above is reclassified by the City as a common-law employee of the City and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such

13-53846-tjt   Doc 13166-1   Filed 08/30/21   Entered 08/30/21 14:30:35   Page 59 of 210
13-53846-swr   Doc 13066-1   Filed 08/30/21   Entered 08/30/21 14:30:35   Page 59 of 210

809

reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(25)    *Employer* means the City.

(26)    *Final Compensation* means the annual compensation of a Member at the time of his or her termination of employment.

(27)    *Fire Fighter* means the rank in the Fire Department currently or formerly classified by the civil service commission as Fire Fighter.

(28)    *Fire Member* means an employee of the Fire Department of the City of Detroit who is a participant in the Retirement System.

(29)    *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(30)    *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the City for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the City for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(31)    *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(32)    *Investment Committee* means the committee established pursuant to Section 1.22 which shall have the powers and duties described herein.

(33)    *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(34)    *Medical Beneficiary* means a Member who has retired from employment with the Employers and the spouses and dependents of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(35)    *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(36)    *Medical Benefits Account* means the bookkeeping account established under Section 17.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(37)    *Medical Director* means the physician appointed by the Board pursuant to Section 1.16.

(38)    *Member* means any Police Member or Fire Member who has not retired or died.

13-53846-tjt   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:39:05   Page 60 of 210
13-53846-swr   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:39:05   Page 60 of 210
809

(39) *Normal Retirement Age* means for any Member Age fifty with twenty-five years of Credited Service, with the following transition period regarding payment of Component I benefits only:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon Attainment of Normal Retirement Age while in Service.

(40) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(41) *Patrolman* means the rank in the Police Department currently or formerly known as patrolman.

(42) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience, and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(43) *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.17 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Investment Committee or the Board may direct.

(44) *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(45) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan,* Case No. 13-53846.

(46) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(47) *Police and Fire Retirement System of the City of Detroit or Retirement System* means the Police and Fire Retirement System of the City of Detroit created and, prior to July 1, 2014, memorialized in Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code, Article 54 of the Detroit City Code of 1964, and

13-53846-tjt Doc 13498-1 Filed 08/10/21 Entered 08/10/21 14:39:05 Page 61 of 210
13-53846-swr Doc 13498-1 Filed 08/10/21 Entered 08/10/21 14:39:05 Page 64 of 224
809

collective bargaining agreements and, on and after July 1, 2014, pursuant to Section 47-1-2 of the Detroit City Code, memorialized in this Combined Plan Document, as amended from time to time.

The Retirement System consists of:

(a)    The 2014 Defined Benefit Plan, which is described in Component I hereof;

(b)    the Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, which are described in Component I hereof;

(c)    the Frozen Defined Benefit Plan, which is described in Component II hereof; and

(d)    the Frozen Defined Contribution Plan, which is described in Component II hereof.

References to the words Retirement System in Component I of the Plan Document shall mean the provisions of the Defined Benefit Plan and Defined Contribution Plan described in Component I, unless a different meaning is plainly required by context.

(48)    *Police Member* means a Police Officer who has taken the oath of office as prescribed in the Detroit City Charter, excluding patrolmen of other City departments, privately employed patrolmen and special patrolmen, who is a participant in the Retirement System.

(49)    *Police Officer* means the rank in the Police Department currently or formerly known as Police Officer.

(50)    *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(51)    *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(52)    *Retirement* means a Member's withdrawal from the employ of the City with a Retirement Allowance paid by the Retirement System.

(53)    *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(54)    *Service* means personal services rendered to the City by an employee of the Police Department or Fire Department, provided such person is compensated by the City for such personal services.

(55)    *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

(56)  *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(57)  *Total Disability or Totally Disabled* means:

(a)  during the first twenty-four (24) months that a Member receives benefits from the Retirement System due to injury, illness or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of the Member's occupation; and

(b)  during all subsequent months that a Member receives benefits from the Retirement System due to illness, injury or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the Member is suited, based on education, training and experience.

(58)  *Vesting Service* means service credited to a Member to the extent provided in Section 4 of Component I of this Combined Plan Document.

(59)  *Voluntary Employee Contributions* mean the after-tax contributions made by an eligible Member to the Retirement System pursuant to Section 10.1.

(60)  *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for an eligible Member who elects to make Voluntary Employee Contributions.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 13.2(2) |
| Annual Report | Section 1.26(4)(b) |
| Authority | Section 1.26(1) |
| compensation | Section 13.1(12) |
| Compliance Report | Section 1.26(1) |
| Cure Certification | Section 1.26(2) |
| current active | Section 9.3(3) |
| Default Notice | Section 1.26(2) |
| Deferred Retirement Option Plan Fund | Section 9.2(3) |
| Deferred Retirement Option Plan Program (DROP) | Section 12.1 |
| Differential Wage Payment | Section 4.4 |
| Direct rollover | Section 18.8(1)(b) |
| Distributee | Section 18.8(1)(c) |
| Dollar Limit | Section 13.1(3)(b) |
| DRRB | Section 5.6 |
| Eligible retirement plan | Section 18.8(1)(d) |
| Eligible rollover distribution | Section 18.8(1)(e) |
| Expense Fund | Section 9.2(7) |

| | |
|---|---|
| Foundation | Section 1.22 |
| funding level | Section 9.5(3) |
| Governance Term Sheet | Section 1.17 |
| Income Fund | Section 9.2(8) |
| ING | Section 12.3(1) |
| investment management decision or investment management matter | Section 16.2 |
| limitation year | Section 13.1(2) |
| Medical Benefits Account Fund | Section 9.2(4) |
| Medical Plans | Section 17.1 |
| new employee | Section 9.3(3) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One. Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(5) |
| Pension Certificate | Section 1.26(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| Plan of Adjustment | Section 1.3 |
| Police and Fire Retirement System of the City of Detroit | Section 1.1 |
| Pop-up Form | Section 8.1(2)(b) |
| Rate Stabilization Fund | Section 9.2(6) |
| Standard Form | Section 8.1(2)(a) |
| State Contribution Agreement | Section 1.17 |
| Straight Life Retirement Allowance | Section 8.1(1) |
| Treasurer | Section 1.23 |

13-53846-tjt  Doc 13498-1  Filed 08/30/21  Entered 08/30/21 14:39:05  Page 64 of 210
13-53846-swr  Doc 13498-1  Filed 08/30/21  Entered 08/30/21 14:39:05  Page 4 of 224
809

# ARTICLE 3. MEMBERSHIP

## Sec 3.1.    Eligible Employees

(1)    Except as provided in Section 3.2, the membership of the Retirement System shall consist of all persons who are employed with the Police and Fire Departments of the City and who are employed as Police Officers or Fire Fighters according to the rules and regulations of the respective Departments.  An eligible Employee's membership in the Retirement System shall be automatic; no eligible Employee shall have the option to elect to become a Member of the Retirement System.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)    Any Police Officer or Fire Fighter who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member as of his or her date of death.

(4)    Any Member who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

## Sec 3.2.    Cessation of Membership; Re-Employment

(1)    If a Member dies, or is separated from service with the City by resignation, dismissal, retirement or disability, he shall cease to be a Member.  A Member who elects to participate in the DROP Program under Component I, Component II or both shall be considered to have separated from service with the City by reason of retirement and shall neither accrue a benefit under the Retirement System nor be required to make Mandatory Employee Contributions to the Retirement System pursuant to Section 9.3(3) or 9.5 or permitted to make Voluntary Employee Contributions pursuant to Section 10.1.

(2)    If a Member ceases to be a Member under paragraph (1) other than by reason of participation in the DROP Program and later becomes a Police Officer or Fire Fighter other than in the position of Police Assistant, he shall again become a Member, subject to the obligations of a Member.

(3)    If a Member ceases to be a Member under paragraph (1) and later becomes employed as a Police Assistant, such Member shall not become a Member upon reemployment.  If such Member was receiving a Retirement Allowance from the Retirement System prior to his or her date of rehire, such Retirement Allowance shall not be suspended during the period of the Member's reemployment as a Police Assistant.

(4)    Retirement benefits for a Retiree who returns to active full time employment other than as a Police Assistant shall be subject to the following:

(a)     A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment.  The variable Pension Improvement Factor (Escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)     A Retiree's Average Final Compensation and Credited Service for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation and Credited Service earned by the Retiree after he returns to work.

(d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance.  However, the individual may select a separate payment option with respect to his second Retirement Allowance.

## Sec 3.3.    Report From City

It shall be the duty of the City to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

13-53846-tjt   Doc 13498-1   Filed 08/10/21   Entered 08/10/21 14:39:35   Page 66 of 210
13-53846-swr   Doc 13498-1   Filed 08/10/21   Entered 08/10/21 14:39:35   Page 66 of 210
809

# ARTICLE 4. SERVICE CREDIT

## Sec 4.1.    Credited Service

(1)    The Board shall keep an accurate record of each Member's accumulated Service credit from the date of commencement of employment with the City to the date of termination of employment with the City.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the City as a Police Officer or Fire Fighter beginning on the later of (i) July 1, 2014 or (ii) his date of hire with the City as a Police Officer or Fire Fighter and ending on the date his employment with the City as a Police Officer or Fire Fighter is terminated.  Service shall be credited in years and twelfths $(1/12^{th})$ of a year.  Not more than one-twelfth $(1/12^{th})$ of a year of Credited Service shall be credited to a Member on account of all Service rendered to the City in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the City in any period of 12 consecutive months.

(3)    Not more than one month of Credited Service shall be granted for any period of more than one month during which the Member is absent without pay; notwithstanding the foregoing, any Member who shall  be suspended from duty and subsequently reinstated to duty without further disciplinary action shall receive credit for the time of such period of suspension.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Sections 5.1 and 5.4, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).  The period of time during which a Member is on layoff from the service of the City shall be included in the Member's Credited Service solely for the purposes of determining whether the Member has attained his Normal Retirement Age for purposes of Section 5.1.

## Sec 4.2.    Vesting Service

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the City.

(2)    A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec 4.3.    Service Credit; Military Service

A Member who enters the military service of the United States while employed with the City shall have the period of such military service credited as City Service in the same manner as if the Member had served the City without interruption, provided that (1) the Member's entry into such military service and re-employment thereafter shall be in accordance with applicable

13-53846-tjt  Doc 13498-1  Filed 08/30/21  Entered 08/30/21 14:33:05  Page 67 of 224
13-53846-swr  Doc 13498-1  Filed 08/30/21  Entered 08/30/21 14:33:05  Page 67 of 224
809

laws, ordinances, and regulations of the State of Michigan and the City, (2) he or she is re-employed by the City upon completion of such military service, and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service. The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder. During the period of military service and until return to City employment, the Member's Mandatory Employee Contributions to the Retirement System shall be suspended.

## Sec 4.4.    Service Credit; Qualified Military Service

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u). Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than thirty days, such Differential Wage Payment will be treated as compensation under the Code Section 415(c)(3) limits, but not for purposes of benefit accruals under the Retirement System. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the City to an individual who is performing service in the uniformed services while on active duty for a period of more than thirty days.

# ARTICLE 5. ELIGIBILITY FOR RETIREMENT

## Sec 5.1.    Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Age while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

## Sec 5.2.    Eligibility for Deferred Vested Retirement Benefit

Any Member who terminates employment with the City prior to satisfying the requirements for receipt of a retirement benefit under Section 5.1 and who is credited with ten (10) or more years of Vesting Service upon his or her termination of employment (regardless of Age) shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his Attainment of Age sixty-two.  At a Member's election, the Member may begin receiving a Retirement Allowance following his Attainment of Age fifty-five, actuarially reduced for early commencement, in lieu of an unreduced Retirement Allowance beginning at age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec 5.3.    Eligibility for Disability Retirement Benefit – Duty Disability

(1)    If, prior to attainment of his Normal Retirement Date, a Member shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if, pursuant to Section 5.6, the Board shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board by or on behalf of such Member or by the head of his Department such Member shall be retired; notwithstanding that during such period of notification he or she may have separated from service and provided further that the Medical Director, after examination of such Member shall certify to the Board the Member's Total Disability.  A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

(a)    a basic benefit equal to fifty percent (50%) of his Final Compensation at the time his duty disability retirement begins, and

(b)    a supplemental benefit equal to sixteen and two-thirds percent (16-2/3%) of his Final Compensation at the time his duty disability retirement begins.

Subject to Section 9.5, on the first day of each Plan Year, a Member's duty disability benefit will be increased as provided in Section 6.2.

(2)    After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation.  If the

Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (1)(a) and (1)(b) until such time as the Member would have attained twenty-five years of Credited Service had he continued in active Service with the City.  At that time, the Member shall continue to receive the benefit described in paragraph 1(a) above; however, benefits described in paragraph (1)(b) above will cease. If the Member is not disabled from any occupation, he shall continue to receive the benefit described in paragraph (1)(a) above; benefits described in paragraph 1(b) will cease.

(3)     In the event a Member receiving duty disability benefits has attained twenty-five years of Credited Service, duty disability benefits shall continue to be paid to the Member until the earlier of (i) the Member's Attainment of Age sixty-five, or (ii) the date the Member ceases to be Totally Disabled as determined by the Board.  Upon termination of disability or Attainment of Age sixty-five, a Member with twenty-five years of Credited Service shall be eligible to receive a Retirement Allowance as provided in Section 6.1.  The amount of such Retirement Allowance shall be equal to the amount which would have been payable to the Member if the Member's conversion from duty disability retirement to a Retirement Allowance had occurred on the date the Member attained twenty-five years of Credited Service.

(4)     If a Member on duty disability retirement returns to active Service with the City and shall re-qualify for duty disability retirement for the same or related reasons within twenty-four months of his return to active Service, then the disability shall be deemed a continuation of the prior Total Disability and the period of the Member's active Service following the return to work will not qualify the Member to be entitled to a new initial determination of disability for purposes of determining the benefit payable to the Member.  Instead, such Member will return to duty disability retirement benefits based on the number of months of disability with which the Member was credited at the time of his return to active Service, as if there had not been a break in his period of duty disability retirement.

(5)     During the period a Member is eligible to receive duty disability benefits under this Section 5.3, the Member shall continue to be credited with Credited Service until the Member accrues twenty-five years of Credited Service, at which time accrual of Credited Service shall cease.

(6)     In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Plan Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of duty disability, increased by the variable Pension Improvement Factor (Escalator) (if any) applicable to such benefit pursuant to Section 6.2 multiplied by the number of full Plan Years from the date of the Member's duty disability to the year in which the earnings offset is applied, and (ii) the amount of the Member's remuneration from gainful employment during the prior calendar year.  The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources.  Furnishing such information to the Board at such

13-53846-tjt   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:30:05   Page 70 of 210
13-53846-swr   Doc 13405   Filed 08/19/21   Entered 08/19/21 14:39:52   Page 78 of 224
809

times as the Board shall require shall be a condition for the Member's continued eligibility for duty disability benefits.

## Sec 5.4. Eligibility for Disability Retirement Benefit – Non-Duty Disability

(1)     Upon the application of a Member or the Member's Department head, a Member who becomes totally and permanently disabled prior to his or her Normal Retirement Date in the employ of the City not resulting from the performance of duty shall be retired by the Board; provided that the Medical Director shall certify to the Board after a medical examination, that such Member is mentally or physically totally and permanently disabled for the further performance of duty to the City.  Such a Member shall receive the following applicable benefits:

(a)     If such Member has less than five years of Credited Service at the time of his disability retirement, his Accumulated Mandatory Employee Contributions standing to his credit in the Accumulated Mandatory Employee Contributions Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his Accumulated Mandatory Employee Contributions.

(b)     If such Member has five or more years of Credited Service at the time of his disability retirement, he shall receive a disability Retirement Allowance computed in accordance with the provisions of Section 6.1 payable in any of the optional forms provided in Section 8.1 hereof.  His annual Straight Life Retirement Allowance shall not be less than twenty per cent (20%) of his Average Final Compensation.

(2)     If a Member receiving non-duty disability retirement benefits is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the disabled Member's Retirement Allowance and Average Final Compensation, the Member's Retirement Allowance shall be reduced by the amount of such difference.  If the amount of the Retiree's earnings changes, the Retirement Allowance may be adjusted accordingly.  The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources.  Furnishing such information to the Board at such times as the Board shall require shall be a condition for the Member's continued eligibility for non-duty disability benefits.

## Sec 5.5. Disability Retirees; Reexamination

(1)     At least once each year during each year following the retirement of a Member under Section 5.3 or Section 5.4, the Board shall require that such disability Retiree who has not attained his Normal Retirement Age undergo a medical examination, to be made by, or under the direction of the Medical Director; provided, however, that medical examinations shall not be required if the Medical Director determines that the Retiree's condition is permanent and there is no need for further reexamination.  Retirees shall be reimbursed for reasonable costs actually incurred by the Retirees in connection with such

13-53846-tjt  Doc 13498-1  Filed 08/30/21  Entered 08/30/21 14:39:05  Page 71 of 210
13-53846-swr  Doc 13498-1  Filed 08/30/21  Entered 08/30/21 14:39:05  Page 74 of 224
809

examinations. Should any such Retiree who has not attained Normal Retirement Age fail to submit to a required medical examination, the Retiree's Retirement Allowance may be suspended by the Board until the examination is completed. Should such failure continue for one year, all of the disability Retiree's rights in and to the duty or non-duty disability Retirement Allowance may be revoked by the Board. If upon such examination of a Retiree, the examiner reports that the Retiree is no longer Totally Disabled, and such report is concurred in by the Board, the Retiree shall be restored to active service with the City and the Retirement Allowance paid pursuant to Section 5.3 or Section 5.4 shall be suspended until the Retiree terminates active Service with the City.

(2)     A disabled Retiree who has been, or shall be, reinstated to active Service in the employ of the City shall again become a Member. All Credited Service at the time of the disability retirement shall be restored to the Member.

### Sec 5.6.     Disability Benefits; Procedures for Determination of Disability

(1)     The Board shall establish procedures for determining whether a Member is Totally Disabled. Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(2)     If a Member is determined to be Totally Disabled under Section 5.3(1) or 5.4(1), the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan. If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits. If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility. If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board. The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members. The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in accordance with the agreements between the City and the unions representing Members.

(3)     The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

(a)     The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

(b)     A court reporter will be present and make a stenographic record of the proceedings;

(c)     The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

(d)     The witnesses will be sequestered;

(e)     The witnesses will be sworn by the court reporter and testify under oath;

(f)     The Member may not be called by the City as an adverse witness;

(g)     The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

(h)     If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department executive for the release of the employee for the purpose of so testifying;

(i)     The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

(j)     The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

(k)     The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan. The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan: and

(l)     The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(4)     If a disability Retiree is determined by the Board to no longer be Totally Disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination. The Board shall promptly arrange for such re-examination. The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer Totally Disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

13-53846-tjt   Doc 13408-1   Filed 08/20/21   Entered 08/20/21 14:39:05   Page 73 of 210
13-53846-swr   Doc 13408-1   Filed 08/20/21   Entered 08/20/21 14:39:05   Page 46 of 224
809

(5)     The Board shall not act upon or grant the application filed by a Member who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

(a)     regularly assigned to a position, the full duties of which he or she is capable of performing; or

(b)     assigned to a restricted duty position, unless the Member's Department advises that it intends to seek a disability retirement for the Member in the foreseeable future.

(6)     The provisions in paragraph (5) above are not intended to and will not:

(a)     affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

(b)     restrict in any way the existing authority of the Chief of Police or the Fire Commissioner to seek a duty or non-duty disability retirement for a Member for that Member at that time to request a duty or non-duty disability retirement.

### Sec 5.7.     Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases employment with the City before becoming eligible for a Retirement Allowance under Section 5.1 or 5.2 or a disability Retirement Allowance pursuant to Section 5.3 or 5.4, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

### Sec 5.8.     Benefits Offset by Compensation Benefits; Subrogation

(1)     Any amounts which may be paid or payable to a Member, Retiree, or Beneficiary on account of disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be an offset against any amounts payable from funds of the Retirement System (Component I and Component II combined) on account of the same disability or death.  If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance payable by the Retirement System (under both Component I and Component II), the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System (under both Component I and Component II), and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2) In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

13-53846-tjt Doc 13498-1 Filed 08/30/21 Entered 08/30/21 14:39:05 Page 75 of 210
13-53846-tjt Doc 13498-1 Filed 08/30/21 Entered 08/30/21 14:39:05 Page 76 of 210
809

# ARTICLE 6.  RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

## Sec 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Age or his actual retirement from employment with the City in the form of a Straight Life Retirement Allowance shall be equal to two percent (2%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth $(1/12^{th})$ year) of Credited Service earned after June 30, 2014.

## Sec 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2015 and effective the first day of each Plan Year thereafter, the Board may determine that the annual Retirement Allowance of a Member shall be increased by a factor of one percent (1.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement ("Pension Improvement Factor (Escalator)"); provided, that the recipient of said Retirement Allowance shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.  The Pension Improvement Factor (Escalator) shall be compounded.

# ARTICLE 7.  DEATH BENEFITS

## Sec 7.1.    Accidental Death Benefit; Performance of Duty

(1)    If a Member is killed in the performance of duty in the service of the City, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the City, and such death, illness, or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the City, the following benefits shall be paid:

    (a)    the Accumulated Mandatory Employee Contributions standing to his or her credit in the Accumulated Mandatory Employee Contributions Fund at the time of his or her death shall be paid to such person or persons as the Member shall have nominated by written designation duly executed and filed with the Board.  If no such designated person survives the Member, the said Accumulated Mandatory Employee Contributions shall be paid to the Member's legal representative, subject to paragraph (e) of this Section 7.1(1).

    (b)    the surviving spouse shall receive a pension of five-elevenths of the Member's Final Compensation payable for the spouse's lifetime.  If the Member's child or children under age eighteen years also survive the deceased Member, each such child shall receive a pension of one-tenth of such Final Compensation; provided, that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of seven thirty-thirds of such Final Compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution of the benefit by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of the Member's Final Compensation.  In no case shall the total of the benefits provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the Member's Final Compensation.

    (c)    if no surviving spouse survives the deceased Member or if the Member's surviving spouse dies before his youngest unmarried surviving child attains Age eighteen years, his unmarried child or children under Age eighteen years shall each receive a pension of one-fourth of the Member's Final Compensation; provided that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of one-half of such Final Compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the Member's Final Compensation.

    (d)    if the Member has no surviving spouse or surviving children under Age eighteen years and if the Member leaves surviving either a father or mother or both, whom the Board shall find to be actually dependent upon such Member for financial

support, such dependent father and mother shall each receive a pension of one-sixth of the Member's Final Compensation.

(e)     If a Member dies intestate, without having designated a person or persons, as provided in paragraph (a) of this Section 7.1(1), and without heirs, the amount of his Accumulated Mandatory Employee Contributions in the Accumulated Mandatory Employee Contribution Fund, not to exceed a reasonable sum, to be determined by the Board, shall be used to pay his burial expenses, provided the Member leaves no other estate sufficient for such purpose.  Any balance credited to such Member in the Accumulated Mandatory Employee Contribution Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

## Sec 7.2.    Non-Duty Death Benefits

The surviving spouse of any Member who dies while in the employ of the City (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, shall receive a Retirement Allowance computed in the same manner in all respects as if said Member had (i) retired effective on the day preceding the Member's death, notwithstanding that the Member had not attained Normal Retirement Age, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving spouse as Beneficiary.

## Sec 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member who is not covered by Section 7.1 dies while employed by the City or following termination of employment but prior to commencement of a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member  who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 8.  FORMS OF PAYMENT

## Sec 8.1.    Retirement Allowance Options

(1)    Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary, in accordance with the options set forth below:

(a)    *Option One.  Cash Refund Annuity*.  A Retiree will receive a reduced Retirement Allowance for as long as he or she lives, provided that if the Retiree dies before payment of the Accumulated Mandatory Employee Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

(b)    *Option Two.  Joint and One Hundred Percent Survivor Allowance*.  Upon the death of a Retiree  who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the Member's reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(c)    *Option "A".  Joint and Seventy-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(d)    *Option Three.  Joint and Fifty Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(e)    *Option "B".  Joint and Twenty-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the Member's reduced Retirement Allowance shall be

continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2)     *Joint and Survivor Optional Forms of Payment*.  The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

    (a)     *Standard Form*.  Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

    (b)     *Pop-up Form*.  Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary.  In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance payable to the Retiree shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

### Sec 8.2.     Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1, both a Retiree and Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions (and if the Retiree makes an election pursuant to Section 10.4(2), his Accumulated Voluntary Employee Contributions) at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions (and Accumulated Voluntary Employee Contributions, if applicable) and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board.  If there is no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the Retiree or the Beneficiary, whichever is the last to die.

# ARTICLE 9.  FUNDING AND RESERVES

## Sec 9.1.    Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive City and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of the Retirement System).

## Sec 9.2.    Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Contribution Fund, the Deferred Retirement Option Program Fund (if applicable), the Medical Benefits Account Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Expense Fund and the Income Fund, as follows:

(1)    The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the retirement, termination, disability or death of a Member with a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's or Beneficiary's Retirement Allowance.

(2)    The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members, together with earnings thereon.

(3)    The Deferred Retirement Option Plan Fund shall be the fund in which shall be accumulated the amounts credited to the DROP Accounts of Members who have elected to participate in the DROP Program pursuant to Article 12, together with earnings thereon, provided that the DROP Accounts are held and invested within the Retirement System.

(4)    The Medical Benefits Account Fund shall be the fund in which shall be accumulated the amounts contributed to the Retirement System for the purposes of paying Medical Benefits.

(5)    The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the City's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II and from which shall be paid Retirement Allowances and other benefits on account of Members.

(6)     The Rate Stabilization Fund shall be the Fund to which shall be credited City contributions in excess of the amount of the City's contribution which is credited to the Pension Accumulation Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II.

(7)     The Expense Fund shall be the fund to which shall be credited any money provided by the City, if any, to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(8)     The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the assets of Component I of the Retirement System, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9. There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document. Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

### Sec 9.3.    Method of Financing Retirement System Benefits

(1)     The pension liabilities for Members under this Component I shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)     The City's annual contribution to finance the prospective pension liabilities during the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be (a) eleven and two-tenths percent (11.2%) of the base Compensation of active employees who are members of the DFFA (for pay periods ending on or before the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA) and members of DPOA (for pay periods ending on or before October 3, 2014) and (b) twelve and one-quarter percent (12.25%) of the base Compensation of active employees who are members of the DPCOA, the DPLSA, the DPOA (for pay periods beginning on or after October 3, 2014) and the DFFA (for pay periods beginning on or after the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA). A portion of the City's annual contribution for each Plan Year shall be credited to the Rate Stabilization Fund. The remainder of the City's annual contribution shall be allocated to the Pension Accumulation Fund.

(3)     Except as provided in Section 9.5, for each Plan Year, a Member who was an active employee as of June 30, 2014 ("current active") shall contribute to the Retirement System an amount equal to six percent (6%) of his or her base Compensation for such Plan Year and a Member who is hired or rehired by the City on or after July 1, 2014 ("new employee") shall contribute to the Retirement System an amount equal to eight percent

13-53846-tjt   Doc 13036-1   Filed 08/30/21   Entered 08/30/21 14:39:05   Page 83 of 224
13-53846-swr   Doc 13046-5   Filed 08/30/21   Entered 08/30/21 14:39:05   Page 85 of 224
809

(8%) of his or her base Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014. The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014 and (ii) the Member's date of hire, to the date he ceases to be a Member. The contribution shall be deducted from the Members' Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

## Sec 9.4. Member Contributions Picked-Up

(1)     The City shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)     The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code. The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)     The City shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both. The City shall designate the Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

## Sec 9.5. Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations

(1)     To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below ninety percent (90%), the Trustee may not award the variable Pension Improvement Factor (Escalator) described in Section 6.2 to any individual beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than ninety percent (90%).

(2)     In the event the funding level of the Retirement System projected over a five year period falls below ninety percent (90%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which

such determination is made and continuing until the funding level is projected to be one hundred percent (100%) on a market value basis within the next five years:

(a) the remedial action required in Section 9.5(1) shall be implemented or continued;

(b) all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under the Retirement System;

(c) Mandatory Employee Contributions for active and new employees shall be increased by one percent (1%) for up to the next following five Plan Years;

(d) Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(e) Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(f) the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently paid to the Retiree on the date the funding level is projected to fall below ninety percent (90%);

(g) the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently added to the Member's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (f) above;

(h) Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year; and

(i) contributions made to the Retirement System by the City shall be increased, consistent with applicable actuarial principles and the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

(3) For purposes of this Section 9.5, the "funding level" shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System. The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee. The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

13-53846-tjt Doc 13486-1 Filed 08/30/24 Entered 08/30/24 14:39:05 Page 84 of 210
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 13:39:32 Page 40 of 24
809

# ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec 10.1.   Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member who is covered by a collective bargaining agreement with the City that permits the Member to make Voluntary Employee Contributions to Component I of the Retirement System may elect to reduce his Compensation for any Plan Year by a whole percentage not less than one percent (1%) nor more than ten percent (10%) and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  A Member represented by the DPOA may elect to reduce the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours by a whole percentage not less than one percent (1%) nor more than one hundred percent (100%) of such amount and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

## Sec 10.2.   Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

## Sec 10.3.   Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second Fiscal Year immediately preceding the Fiscal Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

## Sec 10.4.   Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases employment with the City other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the Actuarial Equivalent

13-53846-tjt   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:39:05   Page 85 of 210
13-53846-swr   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:39:05   Page 85 of 210

809

Value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)     If a Member dies while employed by the City or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Voluntary Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate.  If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose.  Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 11.  LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec 11.1.  The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

## Sec 11.2.  Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve (12) months or more.  Former Members, spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

## Sec 11.3.  Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount, which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Fifteen Thousand Dollars ($15,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

## Sec 11.4.  Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)     Each loan application shall be made in writing.

(b)     All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)     Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a

13-53846-tjt   Doc 13498-1   Filed 08/20/21   Entered 08/20/21 14:39:05   Page 87 of 210
13-53846-swr   Doc 13498-1   Filed 08/20/21   Entered 08/20/21 14:39:05   Page 96 of 219
809

principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)    An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)    Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the City's costs with respect to the Retirement System or the investment return allocated to Members.

(f)    Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec 11.5.  Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec 11.6.  Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

13-53846-tjt  Doc 13108-1  Filed 08/10/21  Entered 08/10/21 14:29:05  Page 88 of 210
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 14:00:29  Page 93 of 224
809

**Sec 11.7.   Distribution**

No distribution shall be made to a Member, former Member, spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the Member from the Retirement System.

13-53846-tjt   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:39:05   Page 89 of 210
13-53846-tjt   Doc 13498-1   Filed 08/30/21   Entered 08/30/21 14:39:05   Page 89 of 210
809

# ARTICLE 12. DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM

## Sec 12.1. General Provisions

The following provisions are hereby established as the Deferred Retirement Option Plan ("DROP") Program under Component I, which shall be available to Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and those non-union executives of the Police Department and the Fire Department.

(1)  In lieu of terminating employment and accepting a Retirement Allowance under the Component I, any Member of the Retirement System who is eligible for the DROP program and who is eligible to immediately retire and receive an unreduced Retirement Allowance under Section 5.1 may elect to participate in the DROP program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article 12. Any such election shall be irrevocable.

(2)  A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years. At the end of such five year period of participation in the DROP program, the Member shall be retired from employment.

## Sec 12.2. Conversion to Retirement Allowance

Upon the effective date of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance pursuant to Section 6.1 and shall elect a form of payment for his Retirement Allowance pursuant to Section 8.1. Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable Pension Improvement Factor (Escalator) increases) that would have been payable, had the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

## Sec 12.3. Investment of DROP Assets

(1)  ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program. ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (4) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(2)  As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts invested under the Retirement System. If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(3)     If amounts credited to a DROP Account are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees.  A Member's DROP Account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP Account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(4)     The Board of Trustees entered into an administrative services agreement with ING.  Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(5)     The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(6)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from their DROP Accounts.

## Sec 12.4.   Distribution of Amounts Credited to DROP Account

A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City.  Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account.  In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program. Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec 12.5.   Death of Member While Participating in the DROP Program

If a Member dies while participating in the DROP program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate.  In addition, one hundred percent (100%) of the Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP program will be restored.  Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased Member at the time the Member elected to participate in the DROP program.

## Sec 12.6.   Disability of Member While Participating in the DROP Program

13-53846-tjt wr Doc 13182-1 Filed 08/20/14 Entered 08/20/14 14:39:05 Page 91 of 210
13-53846-swr Doc 1348-5 Filed 08/20/14 Entered 08/20/14 14:39:05 Page 94 of 224
809

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section 12.1(2), and (b) shall be entitled to receive payment of the funds in his DROP Account (in the form of a lump sum or other form of payment described in Section 8.1). Such Member shall not be entitled to disability retirement benefits under Section 5.3 or Section 5.4 hereof.

### Sec 12.7.  Cost Neutrality

(1)    The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(2)    If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect, the Board and the City, along with the Plan Actuary as well as an actuary appointed by the City (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost.  If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan Actuary and the City's actuary.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program cost-neutral.  Upon the implementation of changes necessary to make the DROP program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw from the DROP program and resume active participation in Component I of the Retirement System.  The Board shall notify DROP participants of these changes prior to implementation.  Those DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP program (under either Component I or Component II).  Those not making either election shall remain participants in the DROP program.

(3)    In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire or (ii) continue active employment with the City and resume active participation in Component I of the Retirement System.  DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

# ARTICLE 13. LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec 13.1.   Compliance With Code Section 415(b) And Regulations

(1)    Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)    The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)    Notwithstanding the foregoing:

    (a)    if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 13.1(2) has been satisfied shall be made, in   accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 13.1(9) or (10);

    (b)    if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 13.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two (adjusted for participation for fewer than 10 years, if applicable); provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System,  commencing at Age sixty-two; and

    (c)    if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an

annual benefit payable in the form of a straight life annuity, commencing when the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     The adjustments in Sections 13.1(3)(b) shall not apply to a Member with at least 15 years of Credited Service as a Police Member or a Fire Member within the meaning of Code Section 415(b)(2)(H).  In addition, the adjustments in Sections 13.1(3)(b) and 13.1(6) shall not apply to benefits payable on account of the disability or the death of a Member.

(5)     Notwithstanding the foregoing provisions of this Section 13.1, except as provided in Section 13.1(6), the maximum annual benefit specified in Section 13.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by the City, does not exceed $10,000 for the Plan Year or any prior Plan Year, and (b) the Member was not at any time a participant in a Defined Contribution Plan maintained by the City.

(6)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 13.1(2) shall be such limitation (without regard to this Section 13.1(6)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten.  In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 13.1(2) and in Section 13.1(5) shall be such limitations (determined without regard to this Section 13.1(6)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.  The adjustment in this Section 13.1(6) shall not apply to benefits paid on account of the disability or death of a Member.

(7)     Notwithstanding anything in this Section 13.1 to the contrary, if the annual benefit of a Member who has terminated employment with the City is limited pursuant to the limitations set forth in Section 13.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(8)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 13.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(9)     The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 13.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 13.1(8).

(10)    The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 13.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(11)    For purposes of applying the limitations set forth in this Section 13.1, all qualified defined benefit plans (whether or not terminated) ever maintained by the City shall be treated as one defined benefit plan.

(12)    For purposes of this Section 13.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year. The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with the City or (b) the end of the limitation year that includes the date of the Member's severance from employment with the City, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the City and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(13)    This Section 13.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to those interpreting Section 415(b)(2)(H), and any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

### Sec 13.2.  Compliance with Code Section 415(c) and Regulations

(1)     The "Annual Addition" with respect to a Member for a limitation year shall in no event exceed the lesser of:

    (a)     $40,000 (adjusted as provided in Code Section 415(d)); or

    (b)     One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)     The Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions made to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified Defined Contribution Plan (whether or not terminated) maintained by the City, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)     In the event the Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 13.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

## ARTICLE 14.  RETIREMENT SYSTEM ADMINISTRATION

### Sec 14.1.  Board of Trustees as Retirement System Administrator

(1)     The Retirement Board shall have the power and authority to manage and administer  the Retirement System in accordance with the provisions of this Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 14.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document.  This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

### Sec 14.2.  Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

(a)     exclusive authority regarding the  administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Retirement System required of the City and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g) except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h) to prepare an annual report for the Retirement System for each Fiscal Year in compliance with generally accepted accounting principles. The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the Fiscal Year. The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and the Investment Committee. The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i) to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and contributions of each Member who has made contributions to the Retirement System;

(j) to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the City or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System. In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k) to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System. The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)     except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec 14.3.   Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)     manage and administer the Retirement System under the supervision and direction of the Board;

(b)     annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following Fiscal Year; and

(c)     perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may but need not be an employee of the City.

## Sec 14.4.   Discretionary Authority

The Board shall have sole and absolute discretion to:

(a)     interpret the provisions of the Retirement System;

(b)     make factual findings with respect to any and all issues arising under the Retirement System;

(c)     determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)     decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)     make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

## Sec 14.5.  Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

# ARTICLE 15.  MANAGEMENT OF FUNDS

## Sec 15.1.  Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City, and subject to the terms of Article 16, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.

## Sec 15.2.  Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan document.  Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan document may be commingled for investment purposes and transferred as provided in Section G-2(f) of Component II.

## Sec 15.3.  Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.  The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

## Sec 15.4.  Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

## Sec 15.5.  Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)     Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)     Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

# ARTICLE 16.  INVESTMENT OF RETIREMENT SYSTEM ASSETS

## Sec 16.1.   Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 16, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 16.

All investment management decisions made by the Board, as more fully described in Section 16.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has responsibility and authority, including the investment management matters described in Section 16.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If (a) the Board fails to approve or disapprove an investment management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an investment management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee and the chief investment officer are authorized to implement the decision.

If the Board disapproves an investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not less than five business days, of the request by the Investment Committee to discuss the disapproval by the Board described in the written response.  Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended investment management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended investment management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision.  Any action taken by the Board or the Investment Committee in violation of the terms of this Article 16 shall constitute an *ultra vires* act and the Investment Committee or the Board is

granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

### Sec 16.2.  Investment Management

(1)     For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

     (a)     development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

     (b)     within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

     (c)     evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

     (d)     review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

     (e)     in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

     (f)     communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

     (g)     determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

     (h)     the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(i)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment or other financial determination that could affect funding or benefit levels;

(j)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(k)     determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l)     causing an asset/liability valuation study to be performed for the Retirement System every three years or, more often, as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314* and *Plan Investment Guidelines*.

### Sec 16.3.   Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

### Sec 16.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.  The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board.  The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall

provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

## Sec 16.5.  Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Investment Committee and the Board with oversight of the Retirement System's investment portfolio.  Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.  Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.  The duties of an investment consultant may include, but shall not be limited to:

(a)    providing an asset/liability valuation study for the Retirement System;

(b)    reviewing the Retirement System's asset allocation based on current market assumptions;

(c)    identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)    implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)    monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)    recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations in the event of a deviation from expectations;

(g)    communicating the investment policies of the Retirement System to the investment managers;

(h)    reviewing the investment policies with the appropriate employees of the Retirement System;

(i)    aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)        attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)        meeting with the Investment Committee to provide detailed quarterly performance reports and executive summaries of performance;

(l)        meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)       meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manager selections.

## Sec 16.6.  Consistency With Plan of Adjustment

Nothing herein shall be interpreted as permitting the Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment.

# ARTICLE 17.  RETIREE MEDICAL ACCOUNT

## Sec 17.1.   Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board of Trustees shall pay the cost, which would otherwise be borne by the City, for certain medical and related benefits provided under the plans or programs maintained by the City to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 17 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec 17.2.   Effective Date

Medical Benefits shall be paid from the Medical Benefits Account beginning October __, 2014 or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec 17.3.   Funding of Benefits

Subject to the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Combined Plan document under Section 18.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time the City makes a contribution to the Trustee, the City shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec 17.4.   Limitation on Contributions

At all times the aggregate of the contributions made by the City to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the City to the Plan under Sections 9.3 and 9.5, other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 17.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

## Sec 17.5.   Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the City.

### Sec 17.6.   Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  Notwithstanding, the interpretation and administration of the terms of this Article 17 shall be pursuant to the provisions of the Combined Plan document.

### Sec 17.7.   Right to Amend or Terminate Medical Plans

The City expressly reserves the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by the City that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible spouses and dependents to pay all or any portion of the cost of such medical benefits.

### Sec 17.8.   Reversion

At any time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, no part of the Medical Benefits Account may be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the City to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the City.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the City's contributions.

### Sec 17.9.   Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

# ARTICLE 18. MISCELLANEOUS

## Sec 18.1.  Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by the City (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec 18.2.  Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of benefit, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec 18.3.  Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec 18.4.  Conviction of Felony; Forfeiture of Rights

If a Member or Beneficiary shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active Service, the Board shall have the power to order the forfeiture of all rights of the Member or Beneficiary to benefits hereunder, except the return of the Member's Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.

## Sec 18.5.  Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments permitted under the terms of the Plan of Adjustment (including amendments contemplated in Section K-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Combined Plan or any successors plan or trust that govern the calculation of pension benefits, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in the

Plan of Adjustment.  Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code.  The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law.  Any amendment of the Retirement System by the City must be approved by the Council or a person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

### Sec 18.6.   Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

### Sec 18.7.   Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan document to the contrary.   Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year that he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires.  Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9.  The provisions of this Section 18.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

### Sec 18.8.   Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

     (a)     For purposes of this Section 18.8, the following terms shall have the following meanings:

     (b)     *"Direct rollover"* means a payment by the Retirement System to an eligible retirement plan specified by a distributee.

(c)     *"Distributee"* means a Member or former Member.  It also includes the Member's or former Member's surviving spouse, a spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E).  However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

(d)     *"Eligible retirement plan"* means any of the following that accepts a distributee's eligible rollover distribution:

(i)     a qualified trust described in Code Section 401(a);

(ii)    an annuity plan described in Code Section 403(a);

(iii)   an annuity contract described in Code Section 403(b);

(iv)    an individual retirement account described in Code Section 408(a);

(v)     an individual retirement annuity described in Code Section 408(b);

(vi)    a Roth IRA described in Code Section 408A; or

(vii)   a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the Retirement System.

(e)     *"Eligible rollover distribution"* means any distribution of all or any portion of the balance to the credit of a distributee under the Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year.  Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the Retirement System.  However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion

of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec 18.9.   Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate.  The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I of this Combined Plan document and not to any particular provision or section thereof.  The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan document or the Retirement System created hereunder.

## Sec 18.10. Severability

If any section or part of a section of this Combined Plan document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan document or Retirement System or of the Combined Plan document or Retirement System in its entirety.

# Exhibit 6B – Prior PFRS Pension Plan

**EXHIBIT I.A.281**

PRIOR PFRS PENSION PLAN

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT II ................................................................................................................ 1

ARTICLE A.     COMMON PROVISIONS OF THE POLICE AND FIRE
               RETIREMENT SYSTEM ..................................................................... 2

    Sec. A-1.     Common Provisions................................................................... 2

ARTICLE B.     FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM AS OF
               JUNE 30, 2014 ..................................................................................... 4

    Sec. B-1.     Freeze of Police and Fire Retirement System as of June 30, 2014 ........... 4

ARTICLE C.     DEFINITIONS...................................................................................... 6

    Sec. C-1.     Definitions................................................................................ 6

ARTICLE D.     MEMBERSHIP..................................................................................... 13

    Sec. D-1.     Generally.................................................................................. 13

    Sec. D-2.     Membership election option prior to July 1, 2014 ................................... 14

    Sec. D-3.     Cessation of membership ............................................................. 15

ARTICLE E.     SERVICE CREDITABLE ................................................................... 16

    Sec. E-1.     Members to file statement of service, etc .............................................. 16

    Sec. E-2.     Credit for service........................................................................ 16

    Sec. E-3.     Employees in military service commencing prior to July 1, 2014 ......... 16

    Sec. E-4.     Verification of service claimed ...................................................... 19

    Sec. E-5.     Prior Service certificates ............................................................. 19

    Sec. E-6.     Creditable service at retirement ................................................... 19

ARTICLE F.     BENEFITS PROVIDED TO MEMBERS ................................................... 20

    Sec. F-1.     Petition for retirement, mandatory age .................................................. 20

    Sec. F-2.     Old Plan/New Plan...................................................................... 22

    Sec. F-3.     Pension Multiplier....................................................................... 23

    Sec. F-4.     Disposition of surplus benefits upon death of retired member ................ 24

    Sec. F-5.     Retirement allowance for certain persons leaving City employment
               after eight years service (40 & 8)................................................... 24

    Sec. F-6.     Reduced Early Pension Benefits (40 & 8 Vesting Retirees).................... 25

    Sec. F-7.     Duty disability........................................................................... 26

    Sec. F-8.     Duty disability benefits; members in service on or after July 1,
               1941 but prior to January 1, 1969 ................................................. 26

Sec. F-9.     Duty disability benefits; members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10 .......................................................................... 28

Sec. F-10.    Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below ........................................... 29

Sec. F-11.    Non-duty disability ................................................................. 31

Sec. F-12.    Disability retirement procedures ............................................ 32

Sec. F-13.    Generally ................................................................................ 34

Sec. F-14.    Increase of Benefits; Pension Improvement Factor (Escalator) .............. 35

Sec. F-15.    Payment ................................................................................. 36

Sec. F-16.    Generally ................................................................................ 36

Sec. F-17.    Payment of Accumulated Contributions .................................. 38

Sec. F-18.    Allowances to surviving spouses ........................................... 38

Sec. F-19.    Payment of benefits ............................................................... 40

Sec. F-20.    Payment of benefits ............................................................... 40

Sec. F-21.    Deferred vested benefits ........................................................ 40

Sec. F-22.    Forfeiture of rights ................................................................ 41

Sec. F-23.    Generally ................................................................................ 41

Sec. F-24.    Disposition of surplus benefits upon death of Member and Beneficiary ........................................................................... 43

Sec. F-25.    Generally ................................................................................ 43

Sec. F-26.    Generally ................................................................................ 43

Sec. F-27.    Authority of Board ................................................................. 44

Sec. F-28.    Member With Twenty or Twenty-Five Years of Service .......... 45

Sec. F-29.    Disabled Member ................................................................... 45

Sec. F-30.    Optional Annuity Withdrawal ................................................ 45

ARTICLE G.     METHOD OF FINANCING ..................................................... 48

Sec. G-1.     General ................................................................................... 48

Sec. G-2.     Annuity Savings Fund ........................................................... 48

Sec. G-3.     Annuity Reserve Fund ........................................................... 49

Sec. G-4.     Alternative Financing Method ............................................... 49

# TABLE OF CONTENTS
## (continued)

Sec. G-5.  Contributions to and payments from Pension Accumulation Fund ......... 50

Sec. G-6.  Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service .......................................................... 51

Sec. G-7.  Expense Fund ...................................................................................... 51

Sec. G-8.  Appropriations prior to July 1, 2014 ..................................................... 51

Sec. G-9.  Maintenance of reserves ..................................................................... 51

Sec. G-10.  Survivors Benefit Fund ........................................................................ 51

Sec. G-11.  Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries ..................................................... 53

Sec. G-12.  Determination of City's annual contribution — Disability Pension liabilities .............................................................................................. 56

Sec. G-13.  Determination of City's annual contribution — Death Pension liabilities .............................................................................................. 56

Sec. G-14.  Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities ............................ 57

Sec. G-15.  Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014 ................. 57

Sec. G-16.  Board of trustees to compute City's annual contribution ....................... 57

Sec. G-17.  Refunds for certain Members.................................................................. 58

Sec. G-18.  Employer Contribution ......................................................................... 58

ARTICLE H.  MISCELLANEOUS .............................................................................. 59

Sec. H-1.  Recall of Retirees during emergencies .................................................. 59

ARTICLE I.  DEFERRED RETIREMENT OPTION PLAN ............................................. 60

Sec. I-1.  General provisions ................................................................................ 60

Sec. I-2.  Conversion to Retirement Allowance ...................................................... 60

Sec. I-3.  Investment of DROP assets ................................................................... 60

Sec. I-4.  Distribution of amounts credited to DROP Account ................................ 61

Sec. I-5.  Death of Member while participating in the DROP program .................... 61

Sec. I-6.  Disability of Member While Participating in the DROP Program .......... 62

Sec. I-7.  Cost Neutrality ...................................................................................... 62

ARTICLE J.  PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM ........... 64

Sec. J-1.  Participant Annuity Savings Fund Loan Program ................................... 64

ARTICLE K.    SPECIAL PLAN OF ADJUSTMENT PROVISIONS ................................... 67

    Sec. K-1.    Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment..................................................................................... 67

    Sec. K-2.    Income Stabilization Benefits ................................................................. 67

    Sec. K-3.    Restoration of Pension Benefits ............................................................. 70

APPENDIX A    ......................................................................................................... 79

ARTICLE IX, SECTION 24 OF STATE OF MICHIGAN CONSTITUTION ......................... 79

CITY OF DETROIT CHARTER ............................................................................... 80

DETROIT CITY CODE ......................................................................................... 81

# COMPONENT II

# ARTICLE A. COMMON PROVISIONS OF THE POLICE AND FIRE RETIREMENT SYSTEM

## Sec. A-1. Common Provisions

Certain provisions of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014. Those provisions are set forth in the following Sections of Component I:

(a)     Article I (General Provisions);

(b)     Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Board of Trustees

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

DFFA

DPLSA

DPCOA

DPOA

Detroit Police and Fire Retirement System or Retirement System

Fiscal Year

Internal Revenue Code or Code

Investment Committee

Medical Director

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse;

Straight Life Retirement Allowance; and

Total Disability or Totally Disabled;

(c)     Article 13 (Limitation on Benefits and Contributions);

(d)     Article 14 (Retirement System Administration);

(e)     Article 15 (Management of Funds);

(f)     Article 16 (Investment of Retirement System Assets); and

(g)     Article 18 (Miscellaneous).

# ARTICLE B. FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM
## AS OF JUNE 30, 2014

**Sec. B-1.        Freeze of Police and Fire Retirement System as of June 30, 2014.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code, or in Chapter 54, Article II of the 1964 Detroit City Code, or any ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

(a)     No new employee hired by the City on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date;

(b)     No employee who is rehired by the City on or after July 1, 2014 and who received a distribution of his accumulated employee contributions prior to July 1, 2014, shall become a Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date; provided, however, that if a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (d) of this Section B-1 and who is rehired by the City on or after July 1, 2014 repays to the Police and Fire Retirement System in accordance with a payment schedule approved by the Board of Trustees the amount of accumulated employee contributions that he withdrew, then such Member shall be eligible to accrue service credit under this Component II following rehire solely for the purpose of determining the Member's eligibility for payment of his Frozen Accrued Benefit;

(c)     No Member shall make contributions to the Annuity Savings Fund under the Police and Fire Retirement System in effect as of June 30, 2014 with respect to payroll dates occurring on or after August 1, 2014 and all Member contributions made with respect to payroll dates occurring on or after August 1, 2014 shall be made to and in accordance with the terms of Component I of the Combined Plan;

(d)     Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service and Average Final Compensation and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(e)     Except as otherwise provided in this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit. No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the Police and Fire Retirement System;

(f)     Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of the unused accrued sick leave that he could have received in cash upon retirement ("Cashable Sick Leave") to increase his Average Final Compensation if the Member had been eligible to retire and had elected to retire as of June 30, 2014,

shall have a one-time election to have the value of twenty-five percent (25%) of the Member's Cashable Sick Leave as of June 30, 2014 included in the computation of the Member's Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit ("Sick Leave Election"); provided, however, that the amount of the member's Cashable Sick Leave at the time the completed election form is received by the Retirement System is at least equal to the value of twenty-five percent (25%) of the Member's Cashable Sick Leave as of June 30, 2014 and, provided further that the completed election form is received by the Retirement System no later than the dates established by the City. A Member's Sick Leave Election shall be made in the manner set forth by the Board of Trustees and the Police and Fire Retirement System. Notwithstanding anything in this subsection (f) to the contrary, a Member's Sick Leave Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's Cashable Sick Leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement benefit if he retired as of June 30, 2014, and (ii) the electing Member's employment with the City is terminated before the electing Member becomes eligible for an immediate service retirement benefit under the Police and Fire Retirement System;

(g)    Service earned after the Freeze Date shall be credited to a Member under this Component II solely for purposes of determining a Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit and to a rehired Member solely for purposes of determining the Member's eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the Police and Fire Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the Police and Fire Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(h)    The Deferred Retirement Option Plan ("DROP") shall remain in effect for all Members who have either enrolled in or elected to participate in the DROP as of June 30, 2014. Members also may elect to participate in the DROP after June 30, 2014 with respect to their Frozen Accrued Benefits; however, participation in DROP with respect to such Frozen Accrued Benefits shall be limited to five years.

The foregoing terms of Section B-1 shall be referred to as the "Freeze" of the provisions of the Police and Fire Retirement System as in effect on the Freeze Date and the provisions of Component II of the Police and Fire Retirement System shall be interpreted and construed by the Board of Trustees and the Police and Fire Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1 and the provisions of Chapter 54 of the 1964 Detroit City Code, or any Charter, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other document governing terms of employment of an employee, the Board of Trustees and the Police and Fire Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

# ARTICLE C.  DEFINITIONS

## Sec. C-1.     Definitions.

Unless a different meaning is plainly required by context, for purposes of this Component II the following words and phrases have the meanings respectively ascribed to them by this Section C-1:

(1)     *Accrued Service* shall mean a Member's credited service for employment rendered before the date of an actuarial valuation of the Retirement System and before July 1, 2014.

(2)     *Accumulated Contributions* shall mean the sum of all amounts deducted from the compensation of a Member and credited to his individual account in the Annuity Savings Fund, together with Regular Interest, as provided in this Component II of the Combined Plan.

(3)     *Annuity* shall mean payments derived from the Accumulated Contributions of a Member.

(4)     *Annuity Reserve* shall mean the present value of all payments to be made on account of any Annuity, or benefits in lieu of any Annuity, computed on the basis of such mortality tables and Regular Interest as shall be adopted by the Board of Trustees.

(5)     *Average Final Compensation* shall mean:

a.      With respect to an "Old Plan Member" (an employee described in Section F-2(a)) the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the sixty (60) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.   The salary shall be obtained from the official compensation schedule for the Fiscal Year of the earlier of the dates described in (i) or (ii) and an average shall be determined.   A Member who retires on or after July 1, 2000 (for DPCOA and DFFA members) or July 1, 1998 (for all other Members) shall have the Member's most recent full longevity payment included in his Average Final Compensation.

b.      With respect to a "New Plan Member" (an employee described in Section F-2(b)) the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the sixty (60) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.   The salary shall be obtained from the official compensation schedule for the Fiscal Year of the earlier of the dates described in (i) or (ii) and an average shall be determined.   If more than one (1) rank, grade or position has been held over the sixty (60) month period, a weighted average is determined based on time spent in each rank, grade or position during this sixty (60) month period.

(i)     A Member who retires on or after July 1, 2000 (for DPCOA and fire equivalents) or July 1, 1998 (for all other Members) shall have the Member's most recent full longevity payment included in his Average Final Compensation.

(ii)    Effective July 1, 2000, Average Final Compensation shall be calculated for members of the DPCOA, Executive members and their fire equivalents by using the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the thirty-six (36) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.

c.      With respect to reduced duty disability retirements occurring on or after July 1, 1992, notwithstanding the provisions of Article F, Part B, Section F-8, for those Members who receive benefits under Article F, Part B, Section F-9(a), the Average Final Compensation used in the computation of the reduced duty disability allowance shall mean the maximum salary at the date of conversion to reduced duty disability retirement for the rank(s), grade(s), or positions(s) which were held by the Member over the sixty (60) months prior to his or her duty disability retirement.

d.      Subject to Section B-1(f), for purposes of computing the Average Final Compensation received by a Member who retires on or after July 1, 2008 and prior to July 1, 2014, the Member shall have the option of adding the value of the three year average of twenty-five percent (25%) of the Member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation.

e.      The Average Final Compensation for "Old Plan" and "New Plan" Members represented by DFFA retiring on or after July 1, 1992 or on or after July 1, 2000 for Members represented by DPOA is calculated pursuant to paragraph (b) above.  The salary is obtained from the Official Compensation Schedule for the Fiscal Year prior to the Member's elective date of retirement and an average shall be determined.

f.      Effective July 1, 2000, for Members represented by DFFA with a parity relationship with the DPCOA Inspector, Average Final Compensation shall be calculated pursuant to paragraph (b)(ii) above.  The salary is obtained from the Official Compensation Schedule for the Fiscal Year prior to the Member's elective date of retirement and an average shall be determined.

g.      For Members represented by DFFA who have a parity relationship with the DPLSA and the DPCOA Inspector, who retire on or after July 1, 1998 and for those having a parity relationship with the DPOA who retire on or after July 1, 2000 and prior to July 1, 2014, the amount of the Member's

most recent full longevity payment shall be included in the definition of Average Final Compensation.

h.    Subject to Section B-1(f), all Members represented by DFFA who retire on or after July 1, 2008 and prior to July 1, 2014, may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank and have that sum included in the average compensation used to compute the Members' service Pension of their Retirement Allowance.

i.    Subject to Section B-1(f), non-union uniformed Police and Fire executives represented by DPCOA who retire on or after January 15, 2010 and prior to July 1, 2014 may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank, and have that sum included in the Average Final Compensation used to compute the Member's service Pension of their Retirement Allowance.

j.    Subject to Section B-1(f), a Member represented by DPLSA who retires on or after July 1, 2008 and prior to July 1, 2014 may choose to receive the 3-year average of twenty-five percent (25%) of eighty-five percent (85%) of his or her unused accrued sick leave bank, and have that sum included in the Average Final Compensation used to compute the Member's service Pension of their Retirement Allowance.

(6)    *Beneficiary* shall mean any person or persons (designated by a Member pursuant to procedures established by the Board) who are in receipt of a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(7)    *Decrement Probabilities* shall mean the probabilities of a Member's withdrawal from City employment, death while in the employ of the City, retirement from City employment with a Pension payable from funds of the Retirement System, and death after retirement.

(8)    *Final Compensation* shall mean the annual rate of earnable compensation of a Member at the earlier of (i) the time of termination of employment or (ii) June 30, 2014. Effective July 1, 1992 and prior to July 1, 2014, compensation shall also include the value of the percentage reduction in compensation for non-union employees, pursuant to ordinance, resolution or executive order. In cases of any doubt regarding these values, the decisions of the Board of Trustees shall be controlling to implement the intention that no non-union employee will suffer a diminution of Pension benefits computation due to reduction in compensation because of fiscal emergency and that Pension benefits with respect to Fiscal Years beginning July 1, 1992 and ending June 30, 2014 should always be computed as if no reduction in compensation occurred due to ordinance, resolution or executive order or directive.

(9)  *Fire Employees* (formerly referred to as "Firemen") shall mean all employees of the Fire Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter employed therein prior to November 10, 1937, and who shall be in the employ of the Fire Department of the City of Detroit prior to the effective date of this amendment and restatement and, where the context requires, all persons who shall take the said oath of office and become members of the Fire Department thereafter.

(10)  *Fire Fighter* shall mean the rank in the Fire Department currently or previously classified by the civil service commission as Fire Fighter.

(11)  *Member* shall mean any member of the Retirement System who has not retired.

(12)  *Membership Service* shall mean the total service rendered as a Police Employee or Fire Employee prior to July 1, 2014.

(13)  *New Plan* shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(D) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect through June 30, 2014 by Article 11, Section 102 of the City of Detroit Charter.

(14)  *Old Plan* shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(A) and (B) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect through June 30, 2014 by Article 11, Section 102 of the City of Detroit Charter.

(15)  *Patrolman* shall mean the rank in the Police Department currently or previously known as patrolman.

(16)  *Pension* shall mean the portion of a Retirement Allowance which is paid for by appropriations made by the City.

(17)  *Pension Reserve* shall mean the present value of all payments to be made on account of any Pension, or benefit in lieu of any Pension, computed upon the basis of such mortality tables and Regular Interest as shall be adopted by the Board of Trustees.

(18)  *Police Employees* (formerly referred to as "Policemen") shall mean all employees of the Police Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter, and who shall be in the employ of the Police Department of the City of Detroit prior to the effective date of this amendment and restatement and, where the context requires, all persons who shall take the said oath of office and become members of the Police Department thereafter.

(19)  *Prior Service* shall mean service in the military rendered prior to July 1, 2014 as provided in Section E-3.

(20) *Regular Interest* shall mean, for a period of five years from the effective date of the Retirement System interest at four per centum per annum, compounded annually. For the subsequent five year period, and each five year period beginning thereafter but prior to July 1, 2013, Regular Interest shall be such rate of interest as the Board of Trustees, in its discretion, may determine and adopt. For Fiscal Years beginning on and after July 1, 2013:

  a.   the annual rate of return for purposes of determining the Regular Interest to be credited to a Member's account in the Annuity Savings Fund shall not be less than zero and shall not be greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Fiscal Year immediately preceding the Fiscal Year in which the Regular Interest is credited; and

  b.   the rate(s) of Regular Interest adopted by the Board from time to time as necessary for the operation of the Retirement System on an actuarial basis shall not violate the Plan of Adjustment.

(21) *Retiree* shall mean any Member who has retired with a Pension payable from funds of the Retirement System.

(22) *Retirement* shall mean for any Member that such Member has retired, with a Pension payable from the funds of the Retirement System.

(23) *Retirement Allowance* shall mean the sum of the Annuity and the Pension.

(24) *Retirement System or System* shall mean the Police and Fire Retirement System of the City of Detroit created and established by Title IX, Chapter VII of the 1918 Charter of the City as amended through June 30, 1974 and continued in effect by the provisions of the July 1, 1974 City Charter, and as set forth in the Combined Plan effective as of July 1, 2014 and this amendment and restatement of the Combined Plan.

(25) *Salary Factors* shall mean the ratio between a Member's rate of compensation as of the date of an actuarial valuation of the Retirement System and his rate of compensation as of the earlier of (i) the date of his Retirement and (ii) June 30, 2014.

(26) *Service* shall mean service with the City as a Police Employee or Fire Employee.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accrued Liability Fund | Section G-4(a) |
| additional years | Section F-9(a)(3) |
| Adjusted Pension Benefit | Section K-1(1) |
| Annuity Reserve Fund | Section G-3 |
| Annuity Savings Fund | Section G-2(a) |

ASF Excess Return                                       Section G-2(f)
Authority                                               Section K-2(1)
Cashable Sick Leave                                     Section B-1(f)
COLA                                                    Section K-3
Deferred Retirement Option Plan (DROP)                  Section B-1(h), Article I
Determination Date                                      Section G-4(a)
Disability Retirement Review Board                      Section F-12(b)
Eligible Pensioner                                      Section K-2(5)
Estimated Adjusted Annual Household Income              Section K-2(3)b
Expense Fund                                            Section G-7
Federal Poverty Level                                   Section K-2(6)
Freeze                                                  Section B-1
Freeze Date                                             Section B-1
Frozen Accrued Benefit                                  Section B-1(d)
Funding Conditions                                      Section K-1(1)
Funding Proceeds                                        Section G-4(a)
Funding Target                                          Section K-3(2)(a)
GRS                                                     Section K-2(1)
Income Stabilization Benefit                            Section K-2(2)
Income Stabilization Benefit Plus                       Section K-2(3)
Income Stabilization Fund                               Section K-2(4)
New Plan Member                                         Section F-2(b)
Old Plan Member                                         Section F-2(a)
Optional Forms                                          Section F-23
Option 1. Cash Refund Annuity                           Section F-23(a)(1)
Option 2. Joint and Last Survivorship Retirement        Section F-23(a)(2)
Allowance
Option 3. Joint and Seventy-Five Percent Survivor       Section F-23(a)(3)
Allowance
Option 3(A). Modified Joint and Last Survivorship       Section F-23(a)(4)
Allowance
Option 3(B). Joint and Twenty-Five Percent Survivor     Section F-23(a)(5)
Allowance
Participant Loan Program                                Section J-1
Pension Accumulation Fund                               Section G-5
Pension Funding Transaction                             Section G-4(a)
Pension Improvement Factor (Escalator)                  Section F-14
Pension Reserve Fund                                    Section G-6
Pop-up Form                                             Section F-23(b)(ii)
Sick Leave Election                                     Section B-1(f)
Standard Form                                           Section F-23(b)(i)
State Treasurer                                          Section K-2(1)
Straight Life Retirement Allowance                      Section F-23
Survivors Benefit Fund                                  Section G-10
Transition Cost                                         Section G-2(f)
UAAL                                                    Section G-4(a)

Waterfall Classes                                    Section K-3(1)

## ARTICLE D.  MEMBERSHIP

**Sec. D-1.**     **Generally.**

Subject to Section B-1, the membership of Component II of the Retirement System shall consist of the following:

(a)     All Police Employees and Fire Employees who were in Service on or after July 1, 1941, but prior to January 1, 1969; provided, however, that any Police Employee or Fire Employee who, on or before July 1, 1941, shall have been in the employ of the Police or Fire Department for a period of twenty years, or who shall have a total of twenty years of creditable Service, shall be excluded from the provisions hereof and shall retain for himself or herself, his or her wife, children, dependent mother and dependent sister all rights and privileges provided by Chapters XV and XXI of title IV of the 1918 Detroit City Charter, unless any such Police Employee or Fire Employee, on or before June 1, 1941, shall file with the City Controller his or her written election to become a Member of the Retirement System, in which event he or she shall be a Member; such excluded Police Employee not electing to become a Member, from and after July 1, 1941, while he or she remains an active member of the Police Department, shall pay five per cent of each salary payment into the fund for retired Police Employees, and any such excluded Fire Employee not electing to become a Member, from and after July 1, 1941, while he or she remains an active member of the Fire Department, shall pay five per cent of each salary payment into the Fire Department Pension and Retirement Fund, and such salary contributions shall hereafter be used toward the payments of Retirement Allowances provided for under Chapter XV, Section 14, subsections (1), (2), and (3) thereof.  On retirement, the contributions of such excluded members shall cease.

(b)     All persons who became Police Employees or Fire Employees on or after July 1, 1941, but prior to January 1, 1969, and who are confirmed as Police Employees or Fire Employees according to the rules and regulations of the respective Departments shall thereupon become Members of the Retirement System, subject, however, to the following provisions:

(i)     Any person who shall become a Police Employee or Fire Employee at an attained age of thirty-one years or more may become a Member of the Retirement System only by vote of the Board of Trustees who shall fix the rate of contribution of such Member on a basis recommended by the Actuary for the attained age of such Member.

(ii)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member of the Retirement System, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(iii) Any Police Employee or Fire Employee who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member of the Retirement System.

(c) Any Member as defined in paragraph (a) or (b) of this Section D-1 who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

(d) All persons who became Police Employees or Fire Employees on or after January 1, 1969 and prior to July 1, 2014 and who are not individuals re-employed with the Police and Fire Departments on or after January 1, 1969 and prior to July 1, 2014, and who are confirmed as Police Employees or Fire Employees according to the rules and regulations of the respective Departments shall thereupon become Members of the Retirement System subject, however, to the following provisions:

(i) Any person who shall become a Police Employee or Fire Employee at an attained age of thirty-one years or more may become a Member of the Retirement System only by vote of the Board of Trustees who shall fix the rate of contribution of such Member on a basis recommended by the actuary for the attained Age of such Member.

(ii) Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member of the Retirement System, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(iii) Any Police Employee or Fire Employee who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member of the Retirement System.

(iv) Any Member as defined in Section D-1(a), (b), or (c) who was separated from Service by resignation or dismissal or discharge who subsequently again becomes a Member shall be considered a Member for all purposes under this Component II under Section D-1(a), (b), or (c) and shall not be considered a Member under Section D-1(d).

(v) Any Member as defined in Section D-1(d) who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

## Sec. D-2.    Membership election option prior to July 1, 2014.

Any person who is a Member as defined in Section D-1(a), (b), or (c) who was in active service on January 1, 1969, shall have had the option to elect to become a Member of the Retirement System as defined in Section D-1(d) by filing his written election with the Board of Trustees on or before January 31, 1969, or any Retiree who retired on or before December 31, 1968, under the provisions of Article F, Part B, Section F-8, who returns to active service prior to July 1, 2014 shall have the option to elect to become a Member of this Retirement System as

defined in Section D-1(d), by filing his written election with the Board of Trustees on or before the earlier of (i) thirty days after his return to active service and (ii) June 30, 2014. The election shall be effective on the date that it is filed with the Board of Trustees.

### Sec. D-3. Cessation of membership.

(a)  Should a Member die or become a Retiree or be separated from service by resignation, dismissal, or disability, he shall thereupon cease to be a Member.

(b)  Any person who became a Member under Section D-1(a), (b), or (c) and ceases to be a Member, as provided in Section D-3(a), and who becomes a Police Employee or Fire Employee prior to July 1, 2014, shall again become a Member of Component II of the Retirement System, under section D-1(a), (b), or (c) subject to the provisions of Article G, Section G-2(d).

(c)  Any person who became a Member under Section D-1(d) and ceases to be a Member, as provided in Section D-3(a), and who becomes a Police Employee or Fire Employee prior to July 1, 2014, shall again become a Member of Component II of the Retirement System under Section D-1(d), subject to the provisions of Article G, Section G-2(d).

(d)  Any Member of the Retirement System from the Fire Department who retires as a Member of the Retirement System and who is rehired prior to July 1, 2014 as a civilian Member of the Fire Department may elect on or before June 30, 2014 to again become a Member of Component II of the Retirement System.

# ARTICLE E.  SERVICE CREDITABLE.

## Sec. E-1.      Members to file statement of service, etc.

Under such rules and regulations as the Board of Trustees shall adopt, each Police Employee and Fire Employee who shall become a Member prior to July 1, 2014 shall file a detailed statement of all prior service rendered by him as an employee of the Police Department or Fire Department, for which he claims credit, and of such other facts as the Board of Trustees may require, for the proper operation of the Retirement System.

## Sec. E-2.      Credit for service.

The Board of Trustees shall fix and determine by appropriate rules and regulations how much service in any year is equivalent to a year of service, but in no case shall less than six months' service constitute one year, nor shall more than one year of service be creditable for all service in one calendar year.  The Board of Trustees shall not allow credit as service for any period of more than one month during which the Member was or shall be absent without pay provided that if a Member shall be transferred from his Department payroll to the payroll of any city, county or state government or the federal government, by his Department head, during peace times, then such Member shall continue to be a Member of the System and shall he required to make regular contributions into the Annuity Savings Fund; and provided further, that if a Member, so transferred, shall fail to make such contributions for three consecutive months, he shall cease to be a Member of the System four months (of 31 days each) after the due date of his first defaulted Annuity contribution; and provided further, that any Member who was or shall be suspended from duty and subsequently reinstated to duty without further disciplinary action, shall receive total credit for the time of such period or periods of suspension.

## Sec. E-3.      Employees in military service commencing prior to July 1, 2014.

(a)    If a Member of the Retirement System was or shall be drafted, or enlisted or shall enlist into military, naval, marine, or other service of the United States government during time of war, or if a Member shall be drafted into such service during time of peace, and prior to the earlier of (i) ninety days from the date of his separation from such government service or from the date peace was or shall be established by treaty, whichever date was or shall be earlier, and (ii) June 30, 2014 resumed or shall resume employment as a Police Employee or Fire Employee, then such government service rendered prior to July 1, 2014 shall be credited to him as a Member of the Retirement System.   During the period of such government service of a Member, his contributions to the Annuity Savings Fund shall be suspended and the balance in the Annuity Savings Fund, standing to his credit as of the last payroll date preceding his leave of absence from the service of his Department shall be accumulated at Regular Interest.  Prior to July 1, 2014, even though the applicant may have been unable to satisfy all the foregoing requirements, the Board of Trustees had the power to grant the privileges provided for by this section in exceptional or extraordinary cases.

(b)    A Member on the City payroll on or after January 1, 1979 and prior to July 1, 2014 who, prior to employment in the City service, was called to or entered or is called to

or enters any full time military service of the United States during time of war, period of compulsory military service, or period of unusual emergency as defined in this ordinance, shall have the required period of active duty credited him as Membership Service, subject to the following conditions and limitations:

(1) The Member files a written election with the Board of Trustees, before the earlier of (i) 180 days following the effective date of this provision or 180 days from the date of his first employment in the City service, whichever is most recent, and (ii) June 30, 2014, to claim military service credit under the provisions of this section. A Member who is included in a collective bargaining unit shall file a written election to claim military service credit with the Board of Trustees within 180 days following the date of a negotiated approval and acceptance of this section by his duly authorized bargaining agent as transmitted to the Board of Trustees by the Labor Relations Director or, in the case of Members hired subsequent to the transmittal of approval and acceptance by his duly authorized bargaining agent, within 180 days from the date of his first employment in the City service; provided that any such election is required to be filed prior to July 1, 2014.

(2) The Member furnishes the Board of Trustees such information as the Board of Trustees determines necessary to verify the amount of military service claimed.

(3) The Member pays to the Pension Accumulation Fund of the Retirement System an amount of five (5) percent of the Member's annual rate of compensation at the time of payment multiplied by the years or parts of years of military service claimed.

(4) The required payment shall be made under one of the following options:

    a. Payment in full within 30 days of the election to claim military service.

    b. Payment in equal bi-weekly installments by payroll deduction over a 36 month period starting 30 days following the election to claim military service. Interest shall accrue during the period of installment payments at the compound rate of 5 percent per annum. Payments must be completed prior to application for retirement.

    c. If a Member has sufficient funds in the principal portion of his Annuity, he may authorize the Board to transfer such funds to the Pension Accumulation Fund to meet the required payment.

(5) In the event a Member, who has filed the required election of this benefit, and who would be eligible for a Pension in all respects except for paying the full amount, dies prior to completion of the payment required in paragraph (4) preceding, the person otherwise entitled to a Retirement Allowance may pay the full amount due within 30 days of the Member's death to become eligible for an additional Pension credit under this section.

(6) Military service credited under the provisions of Section 54-30-3(c) of the 1964 Detroit City Code shall not be claimed or credited under the provisions of this section.

(7) Military service which is or will be the basis of service credit under any other public employee retirement program shall not be claimed or credited under the provisions of this section.

(8) In no case shall more than 3 years of pre-employment military service be credited a Member on account of military service. For the purpose of this limitation, military service credited pursuant to Section 54-30-3(a) of the 1964 Detroit City Code shall be combined with military service created pursuant to this section.

(9) The required payments made to the Pension Accumulation Fund for military service credit pursuant to this section shall, upon application by the Member or his estate, be returned without interest to any Member who dies or leaves City employment prior to being eligible for a Pension.

(10) Only honorable military service during the following periods shall be covered by this Section E-3(b):

World War II — December 8, 1941 to July 1, 1946.

Korean Conflict — June 27, 1950 to December 31, 1953.

Vietnam Conflict — August 5, 1964 to May 7, 1975.

(11) The military service credit pursuant to this section shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability Pension or for a service Pension. Such service credit may be used in meeting the minimum time needed for an automatic Option Two Pension in case of death of a Member.

(12) In no case shall benefits be based on the military service credit provided by this section unless the Member shall have been credited a minimum of eight years of service credit not including military service credit.

(13) Special service, contractual, part time, seasonal and summer camp employees are not eligible for the military service credit.

(14) In cases of doubt, the Board of Trustees will determine whether a Member is entitled to the benefits of this section consistent with the requirements and limitations herein.

(15) Any member of DFFA, DPCOA or DPLSA who performed military service prior to employment by the City and membership in the Retirement System

may, prior to July 1 2014, claim service credit as a Member of the Retirement System for time spent in the military service.

(16) Effective December 15, 2008, any member of DFFA, DPCOA or DPLSA who has performed any honorable military service may, prior to July 1, 2014, claim up to thirty-six (36) months service in the Pension time for time spent in the military. However, the Member will be required to purchase this military service credit as provided above.

(17) Effective March 8, 2007, all DPOA bargaining unit members who have served in the military may, prior to July 1, 2014, purchase a maximum of three (3) years Pension time.

## Sec. E-4. Verification of service claimed.

Subject to the above restrictions and to such other rules and regulations as the Board of Trustees may adopt, the Board of Trustees shall verify, as soon as practicable after the filing of such statements of service, the service therein claimed.

## Sec. E-5. Prior Service certificates.

Upon verification of the statements of service, the Board of Trustees shall issue Prior Service certificates, certifying to each Member the length of Prior Service rendered, with which he is credited. A Prior Service certificate shall be final and conclusive for retirement purposes as to such service; provided, however, that within one year from the date of issuance or modification of such certificate the Board of Trustees on its own motion or on the request of a Member may modify or correct the Prior Service certificate.

## Sec. E-6. Creditable service at retirement.

Creditable service at retirement, on which the Retirement Allowance of a Member shall consist of the Membership Service rendered by him prior to July 1, 2014 and, if he has a Prior Service certificate in full force and effect as of July 1, 2014, the amount of service certified thereon.

## ARTICLE F.  BENEFITS PROVIDED TO MEMBERS

### Part A - Service Retirement Allowance

**Sec. F-1.  Petition for retirement, mandatory age.**

(a)  Any Member as defined in Article D, Section D-1 (a), (b), or (c) in service may file with the Board of Trustees his written application for retirement setting forth the date not less than fifteen days nor more than ninety days subsequent to the filing thereof, on which he or she desires to be retired; and provided the Board of Trustees shall determine that the Member, at the date so specified for his retirement will have a total of twenty-five years or more of creditable service he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that in the case of any Fire Fighter as defined in Article D, section D-1 (a), (b) or (c) having served twenty-five years or more of creditable service, upon recommendation of the Board of Fire Commissioners, the Fire Fighter shall be retired forthwith, by the Board of Trustees.

(b)  Any Members as defined in Article D, Section D-1 (d) in service may file with the Board of Trustees his written application for retirement setting forth the date not less than fifteen days nor more than ninety days subsequent to the filing thereof, on which he or she desires to be retired; and provided the Board of Trustees shall determine that the Member, at the date so specified for his retirement, will have a total of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service and has attained Age fifty-five, he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that, effective July 1, 1983 for members of DPOA and fire equivalents and June 30, 1986 for DPLSA and fire equivalents and new Members, a Member described in Article D, Section D-1(d) shall be eligible to retire upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service, regardless of Age.  Effective July 1, 1998 (June 30, 2001 for DPOA members and their fire equivalents), the time a Member is on layoff from service of the City shall be included in actual service rendered to the City for purposes of determining whether a Member has twenty-five years or twenty years of creditable service.  The Pension benefit to which such Member is entitled shall be based only on his actual years of creditable service.  Effective July 1, 1989, the minimum Age requirement for deferred Pensions payable for post 1969 Members represented by DPOA and hired before June 30, 1985 shall be eliminated.

Notwithstanding the foregoing provisions, effective October 15, 2014, a DPLSA member shall be eligible to terminate employment with the City and commence

receipt of a Retirement Allowance (or make a DROP election as provided in Article I) under this Component II provided the Member satisfies the following requirements:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 45 and 24 years |
| 2016 | Age 46 and 23 years |
| 2017 | Age 47 and 23 years |
| 2018 | Age 48 and 22 years |
| 2019 | Age 49 and 23 years |
| 2020 and thereafter | 25 years of service |

(c)    Effective June 30, 2001, any Member represented by DPOA and fire equivalents who has been laid off shall be eligible to retire at what would have been the Member's 25th anniversary. To determine eligibility for retirement, the Member's actual service time and time on lay off shall be combined. To calculate the Member's Retirement Allowance for members of DFFA, however, only actual service time shall be used. For DFFA members having a parity relationship with the DPLSA and the DPCOA Inspector, only lay off time which occurred between July 1, 1973 and July 1, 1998 will be credited. Effective in accordance with the specific date and terms of the DPLSA award in Act 312 No. D98 F-0944, Members represented by DPCOA shall have the right to retire on their 25th anniversary date, notwithstanding any service time they may have lost due to any layoffs, as provided in such award.

(d)    Any Member represented by DPOA who was hired on or after July 1, 1985 and who leaves City employment after being vested shall not be eligible for Pension benefits until said individual reaches his or her sixty-second birthday.

(e)    Any Member of the Retirement System as defined in Article D, Section D-1(a), (b), (c), and (d) who shall reach the Age of sixty years shall be retired forthwith, or on the first day of the calendar month next succeeding that in which the Member shall have reached Age sixty. On the written request of the Member and of the Commissioner of Police or the Board of Fire Commissioners, as the case may be, the Board of Trustees may continue such Member in active service for a period of two years beyond his sixtieth birthday, and on the expiration of such period, on like request, may continue such Member for a further period of two years.

(f)    Any Member of the Retirement System who satisfies the requirements for a Pension as defined in Article F, Section F-5 shall be eligible upon ninety days notice to make an irrevocable election to receive an immediate Retirement Allowance, actuarially reduced for early commencement, in lieu of a deferred Retirement Allowance.

(g)    Any Member of the Retirement System who was in the service of the City on or after July 1, 1941 but prior to January 1, 1969 and who was still an active Member on July 1, 1983 for DPLSA and fire equivalents and July 1, 1986 for DPOA members and fire equivalents shall have the option of retiring under the Old Plan or the New Plan.

(h)    Pursuant to IRC 411(e), as in effect in 1974, an employee shall be 100 percent vested in his or her Retirement System accrued benefit upon attaining normal retirement hereunder while in service.

## Sec. F-2.    Old Plan/New Plan

Effective July 1, 1986, Members of the Retirement System as defined under the terms of the Retirement System in effect on July 1, 1977, who were in service on or after July 1, 1941 but prior to January 1, 1969, and are active Members on July 1, 1986 shall have the option of retiring under the Old Plan or the New Plan.

(a)    *Amount of allowance – Old Plan Members*.  Upon his or her retirement from service, a Member as defined in Article D, Section D-1(a), (b), or (c) ("Old Plan Member") shall receive a straight life Retirement Allowance which shall consist of the benefits provided in paragraphs (1) and (2) below; and he or she shall have the right to elect an option provided for in Part H of this Article F:

(1)    An Annuity which shall be the Actuarial Equivalent of the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement; and

(2)    A Pension which, when added to the Member's Annuity, will provide a straight life Retirement Allowance equal to two percent (2.0%) of his or her Average Final Compensation, multiplied by the number of years, and fraction of a year, of his or her creditable service, not to exceed twenty-five years; provided, that the Retirement Allowance of a Police Employee shall in no case exceed fifteen twenty-seconds of the maximum earnable compensation of a Patrolman and the Retirement Allowance of a Fire Fighter shall not exceed fifteen twenty-seconds of the maximum earnable compensation of a Fire Fighter (and if either or both of the said ranks shall be hereafter abolished, the equivalent thereof).  The foregoing Pension limitation shall not apply to any Police Employee or Fire Employee who on July 1, 1941, shall be entitled to a certificate for twenty years or more of prior service and who remains under the provisions of Chapter XV or Chapter XXI of Title IV of the 1918 Detroit City Charter.

(b)    *Amount of allowance – New Plan Members*.  Upon his retirement from service, a Member as defined in Article D, Section D-1(d) ("New Plan Member") shall receive a straight life Retirement Allowance which shall consist of the benefits provided in paragraphs (1) and (2) below; and he shall have the right to elect an option provided for in Part H of this Article F:

(1)    An Annuity which shall be the Actuarial Equivalent of the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his retirement; and

(2)    A Pension which, when added to his or her Annuity, will provide a straight life Retirement Allowance equal to:

a. two and one-half percent (2.5%) of the Member's Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service, for the first twenty-five (25) years of such service; and

b. two and one-tenths percent (2.1%) of the Member's Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service in excess of twenty-five (25) years, subject to a maximum of thirty-five (35) years.

## Sec. F-3.    Pension Multiplier

(a)    Notwithstanding Section F-2(a)(2) and F-2(b)(2), effective July 1, 1992 each Member who retires on or after that date shall be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation, multiplied by the number of years and fraction of a year, of his or her creditable service, not to exceed thirty-five (35) years of service for New Plan Members and twenty-five (25) years of service for Old Plan Members.

(b)    Effective July 1, 1997 or for DPCOA members the effective date of the CET-DPCOA, each Member who retires shall be entitled to a Pension which when added to the Annuity will provide a straight life Retirement Allowance equal to 2.5% (or 2.1% for DPCOA members) of his or her Average Final Compensation multiplied by the number of years and fraction of year of his or her creditable service for the first twenty-five (25) years or, in the case of a DPCOA member of his or her creditable service earned or accrued on or after the effective date of the CET-DPCOA.  For Members represented by DFFA, DPCOA and DPLSA, the multiplier shall be 2.1% for each year of service over twenty-five (25) years.  Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.

(c)    Effective September 1, 2011, each Member represented by DPOA who retires shall only be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service earned or accrued on or after September 1, 2011.  Hence, for the first twenty-five (25) years of service accrued on or after September 1, 2011, the multiplier shall no longer be 2.5%; rather, 2.1%.  Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.  Service credit accrued prior to September 1, 2011 will be unaffected by this Section F-3(c).

(d)    Each DPLSA member who retires shall only be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service earned or accrued following the date of the Act 312 Award in D09 G-0786.  Hence, for the first twenty-five (25) years of

service accrued after the date of the Act 312 Award, the multiplier shall no longer be 2.5% as stated in paragraph (b) above. Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.

**Sec. F-4.  Disposition of surplus benefits upon death of retired member.**

In the event a retired Member dies before he or she has received in straight life Retirement Allowance payments an aggregate amount equal to his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement, the difference between his or her said Accumulated Contributions and the said aggregate amount of straight life Retirement Allowance payments received by him or her shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees. If there is no such designated person or persons surviving the said deceased Retiree such difference, if any, shall be paid to his or her legal representative. No benefits shall be paid under this Section F-4 on account of the death of such a retired Member if he or she had elected Option 1, 2, 3, 3A or 3B provided for in Part H of this Article F.

**Sec. F-5.  Retirement allowance for certain persons leaving City employment after eight years service (40 & 8).**

(a)  Should any DPLSA member or any fire equivalent who (1) has attained age forty years of Age, and (2) has acquired eight or more years of credited service, or any Member who terminates employment with the City on or after August 29, 2003 with ten or more years of credited service leave the employ of the Police Department or Fire Department prior to the date he or she would have first become eligible to retire as provided in this Part A, for any reason except his or her retirement or death, he or she shall be entitled to a Retirement Allowance computed according to Section F-2 (a) or (b) of this Article F, whichever is applicable, as said Section was in force as of the earlier of (i) the date his or her employment with the City last terminated or (ii) June 30, 2014; provided, that he or she does not withdraw his or her Accumulated Contributions from the Annuity Savings Fund. The Member's Retirement Allowance shall begin the first day of the calendar month next following the month in which his or her application for same is filed with the Board of Trustees, on or after the date he or she would have been eligible to retire had he or she continued in City employment. Notwithstanding the foregoing, prior to March 3, 2008 the Retirement Allowance of a DPOA member or a fire equivalent hired on or after July 1, 1985 shall not begin prior to the date on which the Member reaches his or her sixty-second birthday. Unless otherwise provided in this Component II, such person shall not receive service credit for the period of his or her absence from the City Police Department and/or Fire Department employ, nor shall his or her Beneficiary be entitled to any other benefit afforded in this Component II, except the benefits provided in Part A, Section F-2(a) or (b) or Part F of this Article F, whichever is applicable, subject to the above provisions, notwithstanding, his or her membership has terminated.

(b) Effective August 28, 2003, for DPOA members and fire equivalents who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to 40 & 8 Retirees.

## Sec. F-6. Reduced Early Pension Benefits (40 & 8 Vesting Retirees)

(a) Members who terminate employment and who are eligible for a Pension pursuant to Article F, Part A, Section F-5 of Component II (40 & 8) shall have the option of receiving an immediate, but reduced early Pension benefit in lieu of a deferred Pension.

(b) This reduced early Pension benefit shall not result in an increase in employer contribution rates; therefore, the value of the Reduced Early Pension Benefit shall be the Actuarial Equivalent of the 40 & 8 Pension.

(c) For employees represented by DFFA in ranks or classifications with a parity relationship to employees represented by the DPLSA and employees in higher ranks or classifications, upon termination, a vested employee must within 90 calendar days make an irrevocable election as to whether or not to take this option.

(d) Individuals represented by DFFA, DPOA or DPLSA, who terminated employment prior to July 1, 1986, are not eligible for this option.

(e) An employee who receives a lump sum payment for accumulated time upon termination is not allowed to have that time count towards his retirement service.

(f) Since Members (other than DPOA and fire equivalents) are eligible to begin collecting their vested Pension as soon as they would have been eligible to retire had they continued their City employment, minimum retirement age (i.e., Age 55) shall not be a factor in computing the actuarially reduced Pension benefit.

(g) All DFFA members, except those members in ranks or classifications with a parity relationship to employees represented by the DPOA, electing to receive the reduced early Pension benefits shall receive upon separation full pay for fifty percent (50%) of the unused sick bank amounts. This provision shall have no effect on a Member electing to receive the deferred 40 & 8 vested Pension who shall continue to be reimbursed for unused sick time in accordance with an applicable collective bargaining agreement.

(h) Effective August 28, 2003, DPOA members and fire equivalents who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to 40 & 8 retirees.

## Part B — Total Disability Pension and Retirement Allowances

**Sec. F-7.     Duty disability.**

If a Member shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if the Board of Trustees shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board of Trustees by or on behalf of such Member or by the head of his Department such Member shall be retired; notwithstanding that during such period of notification he or she may have separated from service; provided, the Medical Director, after examination of such Member shall certify to the Board of Trustees his or her Total Disability.  If said Member was separated from service after filing of the written application, and he or she had attained twenty-five years or more of service prior to the date of separation, the Board of Trustees, shall retire said Member, under this Part B.

**Sec. F-8.     Duty disability benefits; members in service on or after July 1, 1941 but prior to January 1, 1969.**

(a)     A Member, as defined under Article D, Section D-1(a), (b), or (c), shall receive the following benefits:

(1)     Each such Member shall receive a disability Pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation at the time of disability retirement. On the date that a Member, who retired under Section F-7 and who receives benefits under this Section F-8, would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches age sixty, whichever comes first, the Member shall be eligible for optional benefits as provided Part H of this Article F.

(2)     In addition to the disability Pension provided for in Section F-8(a)(1), any Member who receives a disability Pension pursuant to Section F-8(a)(1) and has not accrued a total of twenty-five (25) years of creditable service as of the date of the Member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the Member's Average Final Compensation at the earlier of (i) the time of disability retirement or (ii) June 30, 2014.  This supplemental payment shall terminate upon the expiration of the period when a Member who retired under Section F-7 of this Part B and who receives benefits under Section F-8(a)(1) would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches Age sixty, whichever comes first.

Effective July 1, 1992 for DPLSA members, the Average Final Compensation used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the Member over the sixty months prior to the earlier of (i) the date of retirement (reduced disability/service retirement when the Member would have attained a total of twenty-five years of

credited service) had he or she continued working in that classification which he or she held at the time of his or her disability or (ii) June 30, 2014. For Members who begin receiving such benefits on or after July 1, 1998 and before July 1, 2014, the amount of the Member's most recent full longevity payment shall be included in the definition of Average Final Compensation.

Effective July 1, 1992 for DFFA and DPOA members, the Average Final Compensation used in this computation shall be the highest average annual compensation that would have been received by such a Member had he or she continued working in the classification he or she held at the time of his or her disability, during any period of five consecutive years, selected by the Member, contained within the last ten years immediately preceding the earlier of (i) expiration of the period when the Member would have attained a total twenty-five years of creditable service and (ii) June 30, 2014.

Effective July 1, 2000, the Average Final Compensation used in this computation shall mean the current maximum salary, including the annual longevity payment provided above, for the rank(s), grade(s) or position(s) which would have been held by the Member over the thirty-six (36) months prior to the earlier of (i) retirement or (ii) June 30, 2014.

(3)     In the case of a Member retired under Section F-8 who receives benefits under F-8(a)(1) and F-8(a)(2), the Accumulated Contributions standing to the Member's credit at the date of retirement shall continue to be held in the Annuity Savings Fund and Regular Interest shall be credited thereto. If such Member dies before the date upon which the Member would have achieved a total of twenty-five years of creditable service had the Member continued in active service and before such Member reaches Age sixty, the balance of the member's Annuity Savings Account including interest thereon shall be paid as provided in Part D and Part E of this Article F.

(b)     This Section shall be applicable to those Members receiving benefits on the date of adoption of this Section who are not covered by the arbitration decision regarding the DPOA which became effective July 1, 1995, or the arbitration decision regarding the DPLSA which became effective June 30, 1998.

(c)     This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from the DPLSA who retired prior to the June 30, 1998 arbitration award.

(d)     This Section does not amend any computations used to determine disability benefits payable under this Section F-8, or result in an increase or decrease in such disability benefits.

**Sec. F-9.**     **Duty disability benefits; members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10.**

(a)     A Member, as defined under Article D, Section D-1(d), who retired under Section F-7, shall receive the following benefits:

(1)     Each such Member shall receive a disability Pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation at the earlier of (i) the time of disability retirement or (ii) June 30, 2014. On the date that a Member who retired under Section F-7 of this Part B and who receives benefits under this Section would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches Age sixty, whichever comes first, the Member shall be eligible for optional benefits as provided Part H of this Article F.

(2)     In addition to the disability Pension provided for in Section F-8(a)(1) of this Part B, any Member who receives a disability Pension pursuant to Section F-8(a)(1) of this Part B and who has not accrued a total of twenty-five years or more of creditable service as of the date of the Member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the Member's Average Final Compensation at the earlier of (i) the time of the Member's disability retirement and (ii) June 30, 2014. This supplemental payment shall terminate when a Member who retires under Section F-7 and who receives benefits under Section F-8(a)(1) would have accrued twenty-five years of creditable service had he or she continued in active service or on the date that the Member reaches Age sixty, whichever comes first.

(3)     In addition to the disability Pension provided for in Section F-8, any Member who receives a disability Pension pursuant to Section F-8(a)(1) and who has accrued more than twenty-five years ("additional years") of creditable service as of the earlier of (i) the date of the Member's disability retirement and (ii) June 30, 2014 shall receive another supplemental disability payment equal to two percent (2%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation as of the earlier of such dates, multiplied by the number of additional years of creditable service the Member has accrued; provided, however, that such supplemental disability payment shall not exceed twenty percent (20%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation.

(4)     In the case of a Member who retires under Section F-7 and who receives benefits described under Section F-8(a)(1) through (3), the Accumulated Contributions standing to the Member's credit at the date of disability retirement shall continue to be held in a separate fund in the Annuity Savings Fund and Regular Interest shall be credited thereto. If such Member dies prior

to the time when the Member would have achieved a total of twenty-five years of creditable service had the Member continued in active service and before such Member reaches Age sixty, the amount of the Member's Accumulated Contributions so set aside and interest thereon shall be paid as provided in Part D and Part E of this Article. F

(5)     The amendment of Section F-8(a)(1) shall not result in an increase or decrease in the amount of disability benefits payable to Members.

(b)     This Section shall be applicable to those Members receiving benefits on the effective date of this Section F who are not covered by the arbitration decision regarding the DPOA which became effective July 1, 1995, or the arbitration decision regarding the DPLSA which became effective June 30, 1998.  This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from DPLSA who retired prior to the June 30, 1998 arbitration award.

(c)     This Section does not amend any computations used to determine benefits under Section F-8 of this Part, or result in an increase or decrease in such benefits.

### Sec. F-10.     Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below.

(a)     This Section F-10 shall be applicable to:

(1)     DFFA employees who file applications for disability retirement on or after July 1, 1995 and who have a parity relationship with the DPOA and on or after June 30, 1998, for DFFA employees with a parity relationship with the DPLSA and the DPCOA Inspector;

(2)     all DPLSA employees who file applications for disability retirement on or after June 30, 1998; and

(3)     all DPOA members who file applications for disability retirement on or after July 1, 1995.

(b)     A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

(i)     a basic benefit equal to 50% of the Member's Final Compensation at the earlier of (i) the time his or her duty disability retirement begins or (ii) June 30, 2014; and

(ii)     a supplemental benefit equal to 16-2/3% of the Member's Final Compensation at the earlier of (i) the time his or her duty disability retirement begins or (ii) June 30, 2014.

On July 1st of each year, the benefits determined under paragraphs (i) and (ii) above then payable will each be increased by adding to said amounts the product of the initial amount of said benefit which was computed at the time the duty disability retirement began and the applicable Pension Improvement Factor (Escalator).

(c)     After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation. If the Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (b)(i) and (b)(ii) until such time as the Member would have attained twenty-five years of creditable service had he continued in active Service with the City. At that time, the Member shall continue to receive the benefit described in paragraph (b)(i) above; however, benefits described in paragraph (b)(ii) above will cease. If the Member is not disabled from any occupation, he shall continue to receive the benefit described in paragraph (b)(i) above; benefits described in paragraph (b)(ii) will cease.

(d)     Duty disability retirement benefits shall continue to be paid to a Member on duty disability retirement after the Member has attained twenty-five years of creditable service, to the earlier of (i) the Member's attainment of Age sixty-five, or (ii) termination of disability as determined by the Board. Upon termination of disability or attainment of Age sixty-five, a Member with twenty-five years of creditable service shall be eligible to receive a service retirement benefit. The amount of such service retirement benefit shall be the same amount which would have been payable if the conversion from duty disability retirement to service retirement had occurred at the date of attaining twenty-five years of creditable service. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a DPOA Member is not qualified for reappointment as a Police Employee, for medical reasons, disability benefits will be continued.

(e)     If a Member on duty disability retirement returns to active service and within a twenty-four month period re-qualifies for duty disability retirement for the same or related reasons he or she had been retired, then the disability shall be deemed a continuation of the prior disabling condition and the period of the return to work will not have caused the Member to be entitled to a new initial determination of benefit amounts as set forth in paragraph (b) above. Instead, such Member will return to retirement at the point he or she had reached in sub-paragraphs (b), (c) or (d) above as if there had not been a break in his or her period of placement on duty disability retirement.

(f)     Disability retirement benefits shall continue to be considered benefits provided by the City pursuant to the 1918 Detroit City Charter, as amended, which are paid instead of and not in addition to any benefits under the State Workers' Disability Compensation Act.

(g)     Survivor benefit coverage applicable to active Members shall be continued during the period a Member is eligible for a duty disability benefit. Upon conversion to a service retirement benefit as provided in paragraph (d), automatic survivor benefit

coverage shall terminate. At that time, the Member shall have the right to elect an optional form of payment in the same manner as if he or she had retired from active membership on the conversion date.

(h)  Pension Credit While on Duty Disability Status

  (1)  While eligible to receive duty disability benefits, Pension service credit shall continue to accrue, but not beyond June 30, 2014.

  (2)  The accrual of Pension service credit will cease on the earlier of (i) the date the Member has twenty-five years of creditable service, or (ii) June 30, 2014.

(i)  Earnings Offset

  (1)  In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Fiscal Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of disability, increased by 2.25% times the number of full years from the date of disability to the year in which the earnings offset is applied, and (ii) the amount of remuneration from gainful employment during the prior calendar year.

  (2)  The earnings test shall be based on information the Board may periodically require from a duty disability benefit recipient or has secured from other reliable sources. Furnishing such information shall be a condition for a Member's continued eligibility for a duty disability benefit.

(j)  The withdrawal provision of the Retirement System will continue to apply to Members on duty disability. If a duty disability recipient elects annuity withdrawal after attaining twenty-five years of creditable service, the applicable benefit reduction will offset the duty disability benefit until the conversion date, after which it will offset the converted service retirement benefit.

## Sec. F-11.    Non-duty disability.

(a)  On written application to the Board by or on behalf of a Member or by the head of his Department, a Member, who becomes Totally Disabled for duty by reason of injury, illness or disease not resulting from the performance of duty as determined by the Board of Trustees, shall be retired by the Board of Trustees. If said Member was separated from service after the filing of the written application and had attained twenty-five years or more of creditable service prior to the date of separation, the Board shall retire said Member, under this Part B.

(b)  A Member retired under paragraph (a) above shall receive the following applicable benefits:

(1)     If such Member has less than five years of creditable service at the time of his or her disability retirement, his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund shall be returned to the Member, or at his or her option, he or she shall receive a cash refund annuity which shall be the Actuarial Equivalent of his or her Accumulated Contributions.

(2)     If such Member has five or more years of creditable service at the time of his or her disability retirement, he or she shall receive a disability Retirement Allowance computed in accordance with the provisions of this Article F, Part A, Section F-2(a) or (b), whichever is applicable, and he or she shall have the right to elect an Option provided for in Part H of this Article F.   The Member's Straight Life Retirement Allowance shall not be less than twenty per cent of his or her Average Final Compensation.   Such Retirement Allowance shall be subject to Parts I and K of this Article F.

(3)     If a Member receiving non-duty disability benefits has any Accumulated Contributions standing to his or her credit in the Annuity Savings Fund when the Member would have attained twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service, such Member may withdraw the balance of such contributions at that time.

### Sec. F-12.     Disability retirement procedures.

(a)     The Board shall establish procedures for determining whether a Member is disabled. Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(b)     If a Member is determined to be disabled, the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan.   If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits.   If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility.   If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board.   The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members.   The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in

accordance with the agreements between the City and the unions representing Members.

(c)    The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

    (1)    The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

    (2)    A court reporter will be present and make a stenographic record of the proceedings;

    (3)    The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

    (4)    The witnesses will be sequestered;

    (5)    The witnesses will be sworn by the court reporter and testify under oath;

    (6)    The Member may not be called by the City as an adverse witness;

    (7)    The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

    (8)    If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department for the release of the employee for the purpose of so testifying;

    (9)    The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

    (10)    The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

    (11)    The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan. The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan; and

    (12)    The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(d)     If a disability retiree is determined by the Board or its delegate to no longer be disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination. The Board or its delegate shall promptly arrange for such re-examination. The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

(e)     The Board of Trustees shall not act upon or grant the application filed by a Police Employee or Fire Employee who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

(1)     regularly assigned to a position, the full duties of which he or she is capable of performing; or

(2)     assigned to a restricted duty position, unless the Police Department or Fire Department advises that it intends to seek a disability retirement for the Police Employee or Fire Employee in the foreseeable future.

(f)     The provisions in paragraph (e) above are not intended to and will not:

(1)     affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

(2)     restrict in any way the existing authority of the Chief of Police or the Fire Commissioners to seek a duty or non-duty disability retirement for a Member or for that Member at that time to request a duty or non-duty disability retirement.

(g)     DPCOA and DPLSA members who are retired on disability Pensions pursuant to this Part B shall be entitled to lump sum payments of all accumulated time from the date that the Board of Trustees determines that they are entitled to such a Pension. These members shall not be required to utilize such time delaying their retirement dates.

## Part C — Escalation and Change in Compensation, Rank

### Sec. F-13.     Generally.

Subject to the Plan of Adjustment, if hereafter the rate of compensation of the rank, grade or position on which the service Retirement Allowance, disability Pension or disability Retirement Allowance of a Member who was hired prior to July 1, 1969 or is a Beneficiary of such a Member as defined in Article D, Section D-1(a), (b), or (c) is based shall be changed, his

or her service Retirement Allowance, disability Pension, or disability Retirement Allowance shall be changed proportionately, and if such rank, grade, or position shall have been abolished, his or her service Retirement Allowance, disability Pension, or disability Retirement Allowance shall be changed in proportion to the change made in the compensation of the existing rank, grade, or position most nearly approximating the rank, grade, or position so abolished.

### Sec. F-14. Increase of Benefits; Pension Improvement Factor (Escalator).

On and after July 1, 1969, and the first of July of each year thereafter until July 1, 1992, the Pension portion of any Retirement Allowance or death benefit of a Member or Beneficiary of a Member as defined in Article D, Section D-1(d), which is paid or payable under this Component II shall be increased at the rate of two per cent (2.0%) per annum computed on the basis of the amount of the Pension received at the time of retirement.

On or after July 1, 1992 and the first of July each year thereafter until July 1, 2014, the Pension portion of any Retirement Allowance or death benefit of a Member or Beneficiary of a Member as defined in Article D, Section D-1(d), (including those Members who opt to retire under the New Plan provisions) shall be increased at the rate of two and twenty-five one-hundredths per cent (2.25%) per annum computed on the basis of the amount of the Pension received at the time of retirement.

Effective for Members who retire on or after July 1, 1997 (July 1, 1998 for DPCOA members, DPLSA members and DFFA members with a parity relationship with DPCOA and July 1, 2001 for DPOA members and their fire equivalents), the Pension Improvement Factor (Escalator) described in this Section shall be re-computed each Fiscal Year ending before July 1, 2014 on the basis of the amount of Pension received in the previous Fiscal Year (i.e., the 2.25% per annum escalation amount shall be compounded).

Pension benefits for DPCOA members under Component II based on service rendered after November 30, 2012 shall not be subject to any escalation amounts.

The Pension portion of any Retirement Allowance or death benefit of a Member, or Beneficiary of a Member as defined in Article D, Section D-1(d) of the Combined Plan provisions, and Article 51.G. of the DPLSA collective bargaining agreement or Article 3.K. of the DPOA collective bargaining agreement (to include those Members who opt out to retire under the New Plan provisions) earned after April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members), shall not be increased whatsoever, per annum or otherwise. The Pension portion of any Retirement Allowance or death benefit of a Member, or Beneficiary of a Member as defined herein, accrued prior to April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members), shall still be increased as provided herein. Hence, Pension benefits earned based on service rendered after April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members) will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to Pension benefits earned based on service rendered before April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members).

## Sec. F-15.　　Payment.

Except as provided in the Plan of Adjustment, the escalation factor contained in Section F-14 above shall be payable to the Member or Beneficiary of a Member as defined in Article D, Section D-1(d), notwithstanding any Retirement Allowance or Pension amount limitation provisions in this Component II to the contrary.

**Part D — Death Benefits.**

## Sec. F-16.　　Generally.

If a Member, or a Retiree who was a Member, is killed in the performance of his or her duty or dies as the result of illness contracted or injuries received while in the performance of his or her duty and such death, illness or injuries resulting in death, is found by the Board of Trustees to have resulted from the performance of his or her duty, the following applicable benefits shall be paid, subject to Part I, Section F-25, of this Article F.

(a)　　The Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her death shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees. If there is no such designated person surviving, his or her said Accumulated Contributions shall be paid to his or her legal representative, subject to paragraph (e) of this Section F-16.

(b)　　A Member's surviving spouse shall receive a Pension of five-elevenths of the maximum earnable compensation for the rank of Patrolman or Fire Fighter as the case may be determined as of the earlier of (i) the date of death or (ii) June 30, 2014. If his or her child or children under Age eighteen years also survive the deceased Member each such child shall receive a Pension of one-tenth of such maximum earnable compensation as of the earlier of (i) the date of death or (ii) June 30, 2014; provided, that if there are more than two such surviving children under Age eighteen years, each such child's Pension shall be an equal share of seven thirty-thirds of such maximum earnable compensation. Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child his or her Pension shall terminate and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's Pension exceed one-tenth of such maximum earnable compensation. In no case shall the total of the Pensions, provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, determined as of the earlier of (i) the date of the Member's death or (ii) June 30, 2014.

Effective July 1, 1986, widows of Police Department or Fire Department employees who have been receiving a flat monthly benefit of $300.00 should receive an increase of $500.00 per month thereby making the flat monthly benefit $800.00.

(c)　　If no spouse survives the deceased Member or if his or her surviving spouse dies or remarries before his or her youngest unmarried surviving child attains Age eighteen

years, his or her unmarried child or children under age eighteen years shall each receive a Pension of one-fourth of the maximum earnable compensation for the rank of Police Employee or Fire Employee, as the case may be as of the earlier of (i) the date of the Member's death or (ii) June 30, 2014; provided that if there are more than two such surviving children under Age eighteen years, each such child's Pension shall be an equal share of one-half of such maximum earnable compensation. Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child his or her Pension shall terminate and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's Pension exceed one-fourth of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

(d)     If there is no surviving spouse and if there are no children under Age eighteen years surviving such deceased Member and if he or she leaves surviving either a father or mother or both, whom the Board of Trustees shall find to be actually dependent upon such Member for financial support, such dependent father and mother shall each receive a Pension of one-sixth of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

(e)     If a Member dies intestate, without having designated a person or persons, as provided in sub-section (a) of this section, and without heirs, the amount of his or her Accumulated Contributions in the Annuity Savings Fund, not to exceed a reasonable sum, to be determined by the Board of Trustees, shall be used to pay his or her burial expenses, provided he or she leave no other estate sufficient for such purpose; any balance credited to such Member in the Annuity Savings Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be credited to the Pension Accumulation Fund.

(f)     If the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, is subsequently changed, the Pensions provided in this Section F-16 for beneficiaries of Members as defined in Article D, Section D-1(a), (b), or (c) shall be proportionately changed; provided, however, that no increases shall be made after June 30, 2014.

(g)     The maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, to be used in computing the Pensions provided in this Section for beneficiaries of Members as defined in Article D, Section D-1(d) shall be the maximum earnable compensation of the rank of Patrolman or Fire Fighter as established by the City's budget for the Fiscal Year in which occurs the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

## Part E — Nonduty Death.

### Sec. F-17.    Payment of Accumulated Contributions.

If a Member, or a Member who retires after June 30, 1965, under Part B, Section F-7 of this Article F, dies and no Pension or Pensions become payable under this Component II on account of his or her death, the Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of death shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees. If there is no such designated person or persons surviving the said Member, his or her said Accumulated Contributions shall be paid to his or her legal representative.  If such Member dies intestate, without having designated a person as above provided, and without heirs, his or her said Accumulated Contributions not to exceed a reasonable sum to be determined by the Board of Trustees, shall be used to pay his or her burial expenses, provided he or she leaves no other estate sufficient for such purpose; and any balance credited to such Member in the Annuity Savings Fund not so used for burial expenses shall be transferred to the Survivors Benefit Fund.

### Sec. F-18.    Allowances to surviving spouses.

Upon the death of a Member, or a Member who retires after June 30, 1965, under Part B, Section F-7 of this Article F, and such death is found by the Board of Trustees not to have resulted from the performance of his or her duty, the applicable Retirement Allowances provided in paragraphs (a), (b), (c) and (d) of Section F-1 shall be paid from the Survivors Benefit Fund, to the extent of available funding, and shall be subject to paragraphs (e), (f) and (g) of Section F-1.

(a)    His or her surviving spouse shall receive a Retirement Allowance computed in the same manner in all respects as if the said Member had (1) regularly retired on the earlier of (i) the day preceding the date of his or her death, or (ii) June 30, 2014, notwithstanding that he or she might not have acquired twenty-five years of creditable service, in the case of a Member as defined in Article D, Section D-1(a), (b), or (c), or notwithstanding that he or she might not have acquired twenty-five years of service or more and had not attained age fifty-five, in the case of a Member as defined in Article D, Section D-1(d); (2) elected Option 2 provided for in Part H of this Article F; and (3) nominated his or her surviving spouse as joint Beneficiary; provided, that in no case shall the Retirement Allowance payable to such joint Beneficiary be less than twenty per cent of said Member's Average Final Compensation as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014.  If a Member who had less than twenty-five years of creditable service dies prior to July 1, 2001, the Retirement Allowance payable to the surviving spouse shall be terminated in the event the surviving spouse remarries.

(b)    His or her unmarried child or children under Age eighteen years shall each receive a Retirement Allowance of one-seventh of the annual maximum earnable compensation of the rank of a Patrolman or a Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014; provided, that if there are more than two such children, each child shall receive a Retirement

Allowance of an equal share of two-sevenths of said annual maximum earnable compensation. Upon any such child's adoption, marriage, death or Attainment of Age eighteen years, whichever occurs first, his or her Retirement Allowance shall terminate, and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children under Age eighteen years; provided, that in no case shall the Retirement Allowance payable to any such child exceed one-seventh of the said annual maximum earnable compensation.

(c) If, at the time of the said Member's death, there shall be neither a surviving spouse nor children eligible for a Retirement Allowance provided for in this Section F-18, each of his or her parents shall receive a Retirement Allowance of one-seventh of the annual maximum earnable compensation of a Patrolman, or a Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014; provided, that the Board of Trustees finds that such parent was dependent upon the said Member for at least fifty per cent of his or her financial support. Upon the remarriage of any such parent, his or her Retirement Allowance shall thereupon terminate.

(d) In the event all the Retirement Allowances, provided for in this Section F-18, payable on account of the death of a Member, terminate before there has been paid an aggregate amount equal to the said Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of death, the difference between his or her said Accumulated Contributions and the said aggregate amount of Retirement Allowances shall be paid to such persons as the said Member shall have nominated by written designation duly executed and filed with the Board of Trustees. If there are no such designated person or persons surviving the said Member such difference, if any, shall be paid to his or her legal representative.

(e) In no case shall any Retirement Allowance be paid under this Section F-18 on account of the death of a Member if any benefits are paid under Part D of this Article F on account of his or her death. The Retirement Allowance provided for in this Section F-18 shall be subject to Part I of this Article F.

(f) All benefits provided in this Part E for Beneficiaries of Members as defined in Article D, Section D-1(a), (b), or (c) shall be based on the maximum earnable compensation of the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, or (ii) June 30, 2014. If a Member died before July 1, 2014 and the compensation of such rank shall be changed prior to July 1, 2014, the benefits provided shall be changed proportionately. All benefits provided in this Part E for Beneficiaries of Members as defined in Article D, Section D-1(d) shall be based on the maximum earnable compensation of the rank of Patrolman or Fire Fighter as established in the City's budget for the year of the earlier of (i) the Member's death or (ii) June 30, 2014.

(g) In the event a Member has withdrawn his or her Accumulated Contributions from the Annuity Savings Fund and has not returned in full all amounts due the fund by him or her, the survivors benefits provided in paragraphs (a), (b), (c) and (d) of this Section

shall be reduced to the proportion that the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund, at the time of his or her death bears to the amount his Accumulated Contributions would have been had he or she not made a withdrawal from the Annuity Savings Fund.

## Part F — Termination of Membership Otherwise than by Retirement, Death or Becoming a Beneficiary.

### Sec. F-19.      Payment of benefits.

If the membership of a Member as defined in Article D, Section D-1(a), (b), or (c) shall terminate for any reason other than retirement, his or her becoming a Beneficiary, or death, the Member shall be paid the Accumulated Contributions standing to the credit of his or her individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a Member eligible for retirement shall resign or be dismissed from service, the Board of Trustees, on the written petition of such Member filed within one year from his or her separation from service and prior to the withdrawal of his or her Accumulated Contributions in the Annuity Savings Fund, shall grant such Member service retirement benefits computed in accordance with Article F, Part A, Section F-2(a), subject to the provisions of Part G of this Article F.

### Sec. F-20.      Payment of benefits.

If the membership of a Member as defined in Article D, Section D-1(d) shall terminate for any reason other than retirement, his or her becoming a Beneficiary or death, he or she shall be paid the Accumulated Contributions standing to the credit of his or her individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a Member having twenty-five or more years of service and having attained age fifty-five shall resign or be dismissed from service, the Board of Trustees, on the written petition of such Member filed within one year from his or her separation from service and prior to the withdrawal of his Accumulated Contributions in the Annuity Savings Fund, shall grant such Member service retirement benefits computed in accordance with Article F, Part A, Section F-2(b), subject to the provisions of Part G of this Article F.

### Sec. F-21.      Deferred vested benefits.

A Member (i) whose employment is terminated before August 28, 2003 and who is credited with eight or more years of creditable service and has attained Age forty, or (ii) whose employment is terminated after August 27, 2008 and who is credited with ten or more years of creditable service, but in each case less than twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service shall be eligible to receive a full Retirement Allowance under Component II beginning on the date upon which the Member would have been eligible to commence a full Retirement Allowance had he or she continued in the service of the City until such date.  Alternatively, such Member may elect to receive an actuarially reduced early Retirement Allowance at any time following his or her termination of employment with the City.

## Part G — Conviction of Felony.

**Sec. F-22.        Forfeiture of rights.**

If a Member or retiree as defined in Article D, Section D-1(a), (b), (c) or (d) shall be convicted of by a court of competent jurisdiction or enters a nolo contendere plea accepted by a court for a felony against the City arising out of his or her service as an employee of the City and while a Member of the Retirement System, the court may order the forfeiture of all or a portion of the rights of the Member to benefits hereunder, except the return of his or her Accumulated Contributions, as provided in the *Public Employee Retirement Benefits Forfeiture Act, MCL 38.2701, et. seq.*  In such case, the Retirement System shall pay to an individual, if any, who would otherwise be a Beneficiary of the Member or retiree whose retirement benefit is being forfeited under this Section F-22 an Actuarially Equivalent monthly retirement allowance at the Age that the Member or Retiree would have become eligible for unreduced retirement benefits under the Retirement System.

### Part H — Option Elections.

**Sec. F-23.        Generally.**

(a)        Prior to the first payment of any Retirement Allowance normally due, except a disability Pension payable under Part B, Sections F-8 and F-11 of this article, a Member may elect to receive his or her Retirement Allowance as a Straight Life Retirement Allowance payable throughout the Member's life; or the Member may elect to receive the Actuarial Equivalent, as of the date of the Member's retirement, of his or her Straight Life Retirement Allowance in a reduced Retirement Allowance payable throughout the Member's life and nominate a joint Beneficiary, in accordance with the provisions of Options 1, 2, 3, 3(A) or 3(B) as follows:

(1)        OPTION 1.  *Cash Refund Annuity.*  Under Option 1, a Member will receive a reduced Retirement Allowance.  If a Member who selected Option 1 dies before full payment of the Annuity has been received, the person or persons nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees shall receive in a single payment the difference between the present value of the Member's Annuity on the date the Member retired, minus the amount of Annuity payments already paid to the Member.  If there is no such designated person(s) surviving the retired deceased Member, such difference, if any, shall be paid to the Member's legal representative.

(2)        OPTION 2.  *Joint and Last Survivorship Retirement Allowance.*  Under Option 2, upon a Member's death, payment of a reduced Retirement Allowance shall be continued through the life of and paid the person having an insurable interest in the Member's life and nominated by written designation duly executed by the Member and filed with the Board of Trustees prior to the first payment of the Member's Retirement Allowance is due.

(3)        OPTION 3.  *Joint and Seventy-Five Percent Survivor Allowance.*  Under Option 3, upon a Member's death, payment of seventy-five percent (75%) of

the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(4)     OPTION 3(A).  *Modified Joint and Last Survivorship Allowance*.  Under Option 3(A), upon a Member's death, payment of one-half (50%) of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(5)     OPTION 3(B). *Joint and Twenty-Five Percent Survivor Allowance*. Under Option 3(B), upon a Member's death, payment of twenty-five percent (25%) of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(b)     The Joint and Survivor Optional Forms of Payment provided under Options 2, 3, 3(A) and 3(B) shall be made available in either the standard form or the pop-up form, as follows:

(i)     *Standard Form*. Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

(ii)    *Pop-up Form*. Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the allowance shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Form of Payment.  The actuarial cost of the change in benefit shall be borne by the Member who seeks change in his or her election.

In addition, a Member may elect to have all or part of his Accumulated Contributions paid to the Member in a single sum or used to purchase an annuity contract from an insurance company of his or her choice in which case, any annuity payments attributable to such amount under the Retirement System shall not be payable from the Annuity Reserve fund but shall be the responsibility of the insurance company.  A Member's Retirement Allowance shall be reduced by the actuarial equivalent of the amount so paid or used.

(c)     This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the arbitration decision regarding DPOA

members that became effective on July 1, 1995, or the arbitration decision regarding DPLSA members that became effective on June 30, 1998.

(d)    This Section does not amend any computations used to determine benefits under Part B, Sections F-8 and F-11 of this Component II, or result in an increase or decrease in such benefits.

(e)    Retirees of the Retirement System shall be entitled to change their Pension option from either Option 2, Option 3, Option 3(A) or Option 3(B) to a Straight Life Retirement Allowance after they have commenced collection of the Pension if the Member's Beneficiary predeceases the Member. The actuarial cost of the change in benefit shall be borne by the Member who seeks change in his option election. The pop-up option shall be based upon the investment return assumption as recommended by the Plan Actuary and adopted by the Board of Trustees.

## Sec. F-24.    Disposition of surplus benefits upon death of Member and Beneficiary.

In the event a Member elected Option 2, 3, 3(A) or 3(B) provided for in Section F-23 of this Part H and both the Member and his or her designated joint Beneficiary die before there has been paid in Retirement Allowances an aggregate amount equal to his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement, the difference between his or her said Accumulated Contributions and the said aggregate amount of Retirement Allowances paid shall be paid to the said retired Member's legal representative.

## Part I — Pension Offset by Compensation Benefits.

## Sec. F-25.    Generally.

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a Member, or to the dependents of a Member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the Retirement System on account of the same disability or death. In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the Pension Reserve or benefits otherwise payable from the funds provided by the City under this Retirement System, then the present value of the commuted payments shall be deducted from the Pension Reserve, and such benefits as may be provided by the Pension Reserve, so reduced, shall be payable under the provisions of the Retirement System.

## Part J — Monthly Payments.

## Sec. F-26.    Generally.

Unless otherwise herein provided, all benefits payable under this Retirement System shall be paid in equal monthly installments.

## Part K — Re-Examination of Beneficiaries.

### Sec. F-27.     Authority of Board.

(a)     Once each year during the retirement of a Member on a disability Pension or a disability Retirement Allowance and at least once in every three year period thereafter the Board of Trustees shall require any disability retiree, if he or she would not then be eligible for a service Retirement Allowance had he or she remained in active service, to undergo a medical examination at a place to be fixed by the Board of Trustees.  If the retiree shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his or her reasonable traveling expenses.  Should such disability retiree refuse to submit to such examination, his or her disability Pension or disability Retirement Allowance may be discontinued until he or she shall submit to such examination and should such refusal continue for one year, all of the Member's rights in and to a Pension may be revoked by the Board of Trustees.  If, on medical examination of a Beneficiary, the Board of Trustees determines that the retiree is physically able and capable of resuming active duty, he or she shall be restored to such duty and his or her other disability Pension or disability Retirement Allowance shall cease.  Such Member so restored to active duty shall be returned to duty in a rank or grade equivalent to or higher than the rank or grade in which he or she was serving at the time of his or her last retirement and his or her compensation shall be that provided for the rank or grade in which he or she is restored to service.  It shall be the duty of the Commissioner of Police or the Board of Fire Commissioners to restore such Member to duty forthwith.

(b)     If the Board of Trustees determines that a disabled Old Plan Member is engaged in a gainful occupation, paying more than the difference between his or her Final Compensation as of the earlier of (i) the date of disability or (ii) June 30, 2014 and his or her disability Pension, or disability Retirement Allowance, the amount of his or her Pension shall be reduced to an amount, which together with the amount earned by the Member, shall equal the amount of such Final Compensation.  If the Board of Trustees determines that a disabled New Plan Member is engaged in a gainful occupation, paying more than the difference between his or her base salary at the earlier of (i) the time of disability or (ii) June 30, 2014, increased by two and twenty-five one hundredths percent (2.25%) for each full year from the date of disability and his or her disability Pension, or disability Retirement Allowance, the amount of his or her Pension shall be reduced to an amount, which together with the amount earned by him or her, shall equal the amount of such final compensation.  Should his or her earnings be later changed, the amount of his or her Pension may be further modified in like manner.

(c)     A disability retiree who shall be reinstated to active service prior to July 1, 2014 as provided in this Section, shall from the date of such restoration again become a Member of the Retirement System, and he or she shall contribute to the Retirement System thereafter in the same manner and at the same rate as he or she paid prior to his or her disability retirement.  A disability retiree who shall be reinstated to active service after June 30, 2014, shall from the date of such restoration become an active

Member of the Retirement System and shall accrue future benefits pursuant to Component I. He or she shall contribute to the Retirement System at the rate required of active Members pursuant to Component I. Any Prior Service and Membership Service on the basis of which his or her service was computed at the time of his or her disability retirement shall be restored to full force and effect, and he or she shall be given service credit under Component I or Component II, as applicable, for the period of time he or she was in retirement due to such disability, except in the case of nonservice connected disability.

## Part L — Withdrawal of Accumulated Contributions

### Sec. F-28.     Member With Twenty or Twenty-Five Years of Service.

Effective July 1, 1982, a Member with twenty-five years or more of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) shall be allowed to withdraw either a portion or the full amount of his or her Accumulated Contributions, one time only, whether or not the Member retires. A Member shall make such election prior to the receipt of his or her first retirement benefit check.

### Sec. F-29.     Disabled Member

A Member who is receiving disability benefits (duty or non-duty) from the Retirement System and who has twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) or more of creditable service shall have the right to withdraw the full amount of his or her Accumulated Contributions. If such Member withdraws his or her Accumulated Contributions, his or her retirement benefit shall be actuarially reduced to reflect such withdrawal.

### Sec. F-30.     Optional Annuity Withdrawal

(a)     A Member shall have the right to elect to receive on the effective date of his or her service retirement a partial or total refund of his or her Accumulated Contributions. If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionally. If the total Accumulated Contributions are withdrawn, no Annuity shall be payable.

The limitation of fifteen twenty-seconds of the maximum earnable compensation of a Police Employee and Fire Employee continues in effect. For purposes of determining the fifteen twenty-seconds limitation, a computation based on the Annuity which is an Actuarial Equivalent of the Accumulated Contributions standing to a Member's credit in the Annuity Savings Fund prior to any partial or total refund will be used.

On or after July 1, 1974, Members or former Members who are entitled to begin to receive the 40 & 8 benefit provided under Section F-6 will be entitled to the annuity refund withdrawal option.

On or after July 1, 1974, non-duty disability retirees represented by DFFA, DPCOA and DPLSA who retired pursuant to Article D, Section D-1(a), (b) or (c) prior to

having twenty-five years of service credit, shall be entitled to the annuity refund withdrawal option on the date he or she would have had twenty-five years of service credit had he or she continued as an active employee. Said option shall only apply to the balance of Accumulated Contributions, if any, remaining to such retiree's credit in accordance with the existing annuity refund provisions.

Survivor benefit beneficiaries as defined in Title IX, Chapter VII, Article VI, Part E, Section 2, parts (a), (b) and (c) of the 1918 City Charter in effect as of June 30, 1974, and continued in effect by Section 11-102 of the City Charter shall be entitled to the annuity withdrawal refund option subject to the same rules that would have been applicable to the deceased Member or Members had he or she not died. Said option shall only apply to the balance of Accumulated Contributions, if any, remaining to the applicable former Member's credit.

In any case of doubt, the Board of Trustees shall decide whether a Member or Beneficiary is entitled to an annuity refund withdrawal option.

(b)     A Member shall have the right on or after the effective date of his becoming eligible for a full service Retirement Allowance (Members who have either twenty or twenty-five years of creditable service depending upon the applicable bargaining unit) to elect to receive a partial or total refund of his or her Accumulated Contributions to the Annuity Savings Fund. If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionally. If the total Accumulated Contributions are withdrawn, no Annuity shall be payable.

If a Member makes such an election, the Retirement Allowance shall be reduced to reflect the value of the Annuity withdrawn. The amount of the Annuity at the time of such election shall be the amount used at the time of retirement for purposes of computing the Retirement Allowance.

All members (except DPOA members retiring prior to July 1, 1982) who complete their required years of service, shall have the right to withdraw all or part of their Accumulated Contributions whether they choose to retire or not.

Effective July 21, 2000 for DFFA members having a parity relationship with the DPOA and for the DPCOA Inspector, and effective July 1, 2003 for DPLSA members, and effective July 21, 2000 for DPOA members, a Member who has elected to retire and elected to withdraw his or her Annuity for the purposes of calculating his or her Retirement Allowance (thereby lowering the Retirement Allowance), may nevertheless choose to leave the Annuity in the Retirement System collecting regular annuity interest with the option of a one-time withdrawal of the Annuity funds at a later date.

For a DPCOA, DPLSA or DFFA member or an employee with a parity relationship with the DPLSA and for the DPCOA Inspector who retires on or after July 1, 1990, and who has made or makes an election to receive a total or partial refund of his or

her accumulated contribution to the Annuity Savings Fund, there shall be no reduction of Retirement Allowances due to the portion of withdrawal representing interest credits. For members of DFFA and DPLSA, this Subsection shall be controlled by the requirements of the Act 312 arbitration award issued June 25, 1990 (MERC Case No. B89 C-0622, page numbers 22 and 23).

Effective January 15, 2010 for members of DPCOA and fire equivalents, or December 15, 2008 for DPLSA and fire equivalents, or March 8, 2007 for DPOA members and fire equivalents, a Member who retires and elects to leave a balance in the Annuity Savings Fund shall have the option of receiving a quarterly payment of interest earnings only or to take periodic withdrawals of principal, in addition to a one time complete withdrawal. Members of DPCOA and DPLSA and their fire equivalents must make their elections a minimum of thirty days before the beginning of a quarter; quarter defined as beginning March 1, June 1, September 1, and December 1.

An employee represented by DFFA, DPCOA or DPLSA who is entitled to a Retirement Allowance under Article F, Part A, Section F-5 of the Retirement System and who leaves the employ of the Police or Fire Department of the City on or after July 1, 1982 shall have the right to elect to receive on the effective date of termination a partial or total refund of his Accumulated Contributions. The Pension portion of his Retirement Allowance shall be computed as if the Member had not withdrawn his or her Accumulated Contributions from the Annuity Savings Fund until the date he or she was eligible to retire had he or she continued in City employment.

(c)   Effective in accordance with the specific date and terms of the DPOA award in Act 312 No. D98 E-0840 (Chairman Donald F. Sugerman, dated July 21, 2000), a DPOA member shall have the right to leave his or her withdrawn Annuity in the Pension system and accumulating interest, as provided therein.

# ARTICLE G.  METHOD OF FINANCING.

## Sec. G-1.    General.

The funds of the Retirement System shall be the Annuity Savings Fund, Annuity Reserve Fund, Pension Accumulation Fund, Pension Reserve Fund, Expense Fund and the Survivors Benefit Fund.

## Sec. G-2.    Annuity Savings Fund.

(a)    The Annuity Savings Fund shall be the fund in which shall be accumulated at Regular Interest, the contributions deducted from the compensation of Members to provide for their Annuities.  Subject to Section B-1(c), the contributions of a Member as defined in Article D, Section D-1(a), (b) or (c) shall be five percent of a Member's compensation until the Member has acquired twenty-five years of creditable service. Subject to Section B-1(c), the contribution of a Member as defined in Article D, Section D-1(d) shall be five percent of his or her compensation until he or she has acquired at least twenty-five years of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) and attained age fifty-five.  No Member shall have the option of choosing to receive the compensation required to be contributed hereunder directly instead of having such amounts paid by the City to the Annuity Savings Fund.

(b)    The City shall cause the contributions provided for in paragraph (a) above to be deducted from the compensation of each Member on each and every payroll, for each and every payroll period, from the date of his or her entrance in the System to the earlier of (i) the date he or she ceases to be a Member or (ii) the last payroll date occurring in July 2014.

(c)    The deductions provided for herein shall be made notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby.  Every Member shall be deemed to consent and agree to the deductions made and provided for herein, and payment of his or her salary or compensation, less said deduction, shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payments, except as to the benefits provided under this Retirement System.  The amounts to be deducted shall be deducted by the City Treasurer and when deducted shall be paid into the Annuity Savings Fund and shall be credited to the individual account of the Member from whose compensation said deduction was made.

(d)    If, under the provisions of this Component II, any person shall withdraw or be paid any part or all of his Accumulated Contributions and shall thereafter again become a Member on or before June 30, 2014, he or she shall, in addition to the contributions provided for in paragraph (a) above, redeposit in the Annuity Savings Fund, by an increased rate of contribution to be determined by the Board of Trustees, or by a single payment, such amount that his or her Accumulated Contributions at the date of

his or her eligibility for retirement will be the same amount it would have been had no withdrawal or payment been made therefrom.

(e)    Except as is otherwise provided in this Component II, upon the death or retirement of a Member, his or her Accumulated Contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund.

(f)    In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (a) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I  The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary.  In the event there is an ASF Return Excess for a Plan Year following the Plan Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I.  "Transition Cost" shall be determined by the Plan Actuary.

## Sec. G-3.    Annuity Reserve Fund.

The Annuity Reserve Fund shall be the fund from which shall be paid all Annuities payable as provided in this Component II, except Annuities which are payable from the Survivors Benefit Fund.  Should a disability retiree be restored to active service, his or her Annuity Reserve at the time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or her individual account therein.

## Sec. G-4.    Alternative Financing Method.

Except as provided regarding the Survivors Benefit Fund, the Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Pensions and other benefits payable from contributions made by the City, and from which transfers shall be made as provided in this section.

(a)    *Accrued Liability Fund*. Pursuant to *Ordinance No. 05-05*, which authorized the creation of the Detroit Police and Fire Retirement System Service Corporation, the City entered into a transaction ("the Pension Funding Transaction") to obtain funds as

an alternative to those available through the traditional funding mechanism described in Section G-5. The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transaction, as described below) that were deposited into the Retirement System will be termed the "Funding Proceeds." The Funding Proceeds were deposited into a new Fund in the Retirement System called the Accrued Liability Fund. The purpose of the Funding Proceeds is to fund all or part of the heretofore unfunded accrued liabilities ("UAAL") of the Retirement System. The Funding Proceeds are the assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay accrued benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of the Pension Funding Transaction, and any earnings thereon. Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund to the Pension Accumulation Fund as provided in the documents governing the Retirement System, including *Ordinance No. 5-05*.

(b)    As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

### Sec. G-5.    Contributions to and payments from Pension Accumulation Fund.

Contributions to and payments from the Pension Accumulation Fund shall be made as follows:

(a)    For Fiscal Years commencing prior to July 1, 2014, upon the basis of such assumptions as to future financial experiences as the Board of Trustees shall from time to time adopt, the Actuary annually computed the City's contribution, expressed as a percent of active Member contributions, to provide the Pension Reserves covering the Pensions or other City-financed benefits to which Members might be entitled or which might be payable at the time of their discontinuances of City employment; provided, such contribution percents shall not be less than amounts which, expressed as percents of active Member compensation will remain level from generation to generation of Detroit citizens. Upon the retirement or death of a Member, the Pension Reserve for any benefits payable on his or her behalf shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund, to the extent of there being assets in the Pension Accumulation Fund.

(b)    For Fiscal Years commencing prior to July 1, 2014, the Board of Trustees annually ascertained and reported to the Mayor and the Council the amount of contributions due the Retirement System by the City, and the Council may have appropriated and the City may have paid such contributions to the Retirement System during the ensuing Fiscal Year. When paid, such contributions were credited to the Pension Accumulation Fund.

(c)     For Fiscal Years commencing after June 30, 2014, he City shall make contributions to the Pension Accumulation Fund only as provided in the Plan of Adjustment.

## Sec. G-6.     Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service.

Except as to the Survivor's Benefit Fund, the Pension Reserve Fund shall be the fund from which shall be paid Pensions on account of Members.  Should a disability retiree be reinstated to active service, the Member's Pension Reserve, at that time, shall be transferred from the Pension Reserve Fund to the Pension Accumulation Fund.

## Sec. G-7.     Expense Fund.

The Expense Fund shall be the fund to which shall be credited all money provided by the City, if any, to pay the administration expenses of Component II, and from which shall be paid all the expenses necessary in connection with the administration and operation of Component II.

## Sec. G-8.     Appropriations prior to July 1, 2014.

(a)     The Board of Trustees shall certify the amount of the appropriation necessary to pay to the various funds of Component II of the Retirement System the amounts payable by the City as enumerated in this Component II, according to legal budget procedure.

(b)     To cover the requirements of Component II prior to July 1, 2014, such amounts as shall have been necessary to cover the needs of Component II prior to July 1, 2014 shall be paid into the Pension Accumulation Fund and the Expense Fund by special appropriations or transfers to the Retirement System; provided, however that no transfers can be made from the Accrued Liability Fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to Section G-4 (as in effect prior to July 1, 2014).

## Sec. G-9.     Maintenance of reserves.

The maintenance of the Annuity Reserves in the Annuity Reserve Fund and the Pension Reserves in the Pension Reserve Fund are hereby made obligations of the Pension Accumulation Fund. All income, interest, and dividends derived from deposits and investments authorized by this Component II, which are not required for the allowance of interest to the funds of the Retirement System as provided herein, shall be credited to the Pension Accumulation Fund. Prior to July 1, 2014, the moneys credited to the Accrued Liability Fund were credited to the Pension Accumulation Fund only to the extent authorized pursuant to the terms of the Retirement System as in effect prior to July 1, 2014.  Any contributions by the City to the System from any fund impressed by law with a certain and definite purpose shall be accounted for separately.

## Sec. G-10.     Survivors Benefit Fund.

(a)     The Survivors Benefit Fund shall be the fund in which shall be accumulated, at Regular Interest, the reserves for survivors benefits provided for in Article F, Part E, Section F-18, hereof, and from which such benefits shall be paid, but only to the

extent sufficient assets are credited to the fund at the time a claim for benefits is made. In the event there are insufficient assets credited to the Survivor's Benefit Fund to pay the benefits provided under this Section G-10, such benefits thereafter shall be payable from the Pension Reserve Fund.

(b)     After June 30, 1965 and prior to July 1, 1986, each Member shall contribute to the Survivors Benefit Fund one per cent of his or her compensation paid by the City until he or she has acquired twenty-five years of creditable service. The City shall cause the said contributions to be deducted from the Member's compensation, on each and every payroll, for each and every payroll period so long as he or she remains a Member and has not acquired twenty-five years of creditable service. Each and every Member shall be deemed to consent and agree to the said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of the said Member's Accumulated Contributions, nor be subject to refund.

(c)     Each Member who retires after June 30, 1965, under Part B, Section F-7 of Article F shall, prior to July 1, 1986, contribute to the Survivors Benefit Fund one per cent of his or her final compensation as defined until he or she would have had a total of twenty-five years of creditable service had he or she continued in active service. The Retirement System shall cause the said contribution to be deducted from the Pension of each such retired Member on each and every retirement roll, for each and every retirement roll period, so long as he or she is receiving a Pension under Part B, Section F-8(a) of Article F. Each and every such retired Member who is receiving a Pension under Part B, Section F-8(a) of Article F shall be deemed to consent and agree to said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of said Member's Accumulated Contributions, nor be subject to refund.

(d)     Effective July 1, 1986, the contributions, required by Article G, Section G-10(b) and G-10(c), to the Survivors Benefit Fund were eliminated for union members. For Fiscal Years ending prior to July 1, 2014, the City shall make the contributions necessary to maintain the benefit level by contributing that amount necessary to replace the contributions of members of DFFA and DPOA to the Survivor's Benefit Fund.

(e)     For Fiscal Years ending prior to July 1, 2014, upon the basis of such mortality and other tables of experience, and Regular Interest, as the Board of Trustees shall from time to time adopt, the Actuary shall annually compute the liabilities for benefits being paid from the Survivors Benefit Fund. The Board of Trustees shall report to the Mayor and the Council the amount of contributions to be made by the City to the Survivors Benefit Fund, and the Council shall appropriate and the City shall pay such amount to the Retirement System during the ensuing Fiscal Year. When paid, such appropriations shall be credited to the Survivors Benefit Fund. For Fiscal Years commencing prior to July 1, 2014, if the balance in the fund is not sufficient to fully cover the liabilities so computed, the City shall appropriate and pay, in the ensuing Fiscal Year, the amount of such insufficiency. For Fiscal Years commencing on and

after July 1, 2014, the City shall not make any contributions to the Survivor's Benefit Fund.

(f)    Upon the death of a Member, on whose account survivors benefits become payable as provided in Article F, Part B, Section F-8, hereof, his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her death shall be transferred from the Annuity Savings Fund to, and shall become a part of, the Survivors Benefit Fund, notwithstanding any provisions in this Component II to the contrary.

## Sec. G-11. Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries.

In computing the Annuity and Pension Reserve liabilities for Members, retirees and beneficiaries, the Board of Trustees shall cause the following annual Decrement Probabilities, Salary Factors and interest assumption to be used.

(a)    The annual Decrement Probabilities and Salary Factors to be used in evaluating the Annuity and Pension liabilities for Members shall be as shown in Tables 1 and 2 hereinafter set forth.

(b)    The total of active Member annual compensation shall be assumed to increase three percent per annum, compounded annually.

(c)    The mortality assumption for retirees and beneficiaries shall be the mortality rates contained in the 1971 group annuity male mortality table, without setback for men and set back five years for women.

(d)    The investment return assumption shall be five percent per annum, compounded annually, for Fiscal Years commencing prior to July 1, 2014.

(e)    For Fiscal Years commencing on or after July 1, 2014, the Annuity and Pension Reserve liabilities shall be calculated in a manner which is consistent with the Plan of Adjustment.

# TABLE 1.

## City of Detroit Policemen and Firemen
## Retirement System
## Active Member Annual

## Probabilities
## and Salary Factors

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 18 | .04120 | .00098 | .10561 |
| 19 | .04090 | .04099 | .11327 |
| 20 | .04030 | .00100 | .12126 |
| 21 | .04000 | .00101 | .12988 |
| 22 | .03960 | .00102 | .13913 |
| 23 | .03910 | .00103 | .14913 |
| 24 | .03890 | .00104 | .15971 |
| 25 | .03840 | .00105 | .17068 |
| 26 | .03800 | .00107 | .18204 |
| 27 | .03700 | .00108 | .19347 |
| 28 | .03600 | .00111 | .20527 |
| 29 | .03480 | .00113 | .21712 |
| 30 | .03340 | .00117 | .22916 |
| 31 | .03200 | .00121 | .24124 |
| 32 | .03000 | .00126 | .25321 |
| 33 | .02730 | .00133 | .26522 |
| 34 | .02370 | .00143 | .27753 |
| 35 | .01990 | .00154 | .29015 |
| 36 | .01500 | .00168 | .30306 |
| 37 | .01160 | .00184 | .31637 |
| 38 | .00850 | .00204 | .32995 |
| 39 | .00600 | .00227 | .34405 |
| 40 | .00390 | .00252 | .35851 |
| 41 | .00210 | .00281 | .37333 |
| 42 | .00090 | .00313 | .38861 |
| 43 | .00000 | .00348 | .40435 |
| 44 | .00000 | .00387 | .42051 |
| 45 | .00000 | .00429 | .43709 |
| 46 | .00000 | .00475 | .45395 |
| 47 | .00000 | .00526 | .47144 |
| 48 | .00000 | .00582 | .48929 |
| 49 | .00000 | .00643 | .50750 |
| 50 | .00000 | .00710 | .52639 |
| 51 | .00000 | .00783 | .54560 |
| 52 | .00000 | .00864 | .56535 |

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|-----|-----|-----|-----|
| 53 | .00000 | .00953 | .58548 |
| 54 | .00000 | .01051 | .60612 |
| 55 | .00000 | .01157 | .62711 |
| 56 | .00000 | .01270 | .64867 |
| 57 | .00000 | .01392 | .67066 |
| 58 | .00000 | .01520 | .69319 |
| 59 | .00000 | .01656 | .71610 |
| 60 | .00000 | .01802 | .73939 |
| 61 | .00000 | .01959 | .76316 |
| 62 | .00000 | .02133 | .78747 |
| 63 | .00000 | .02322 | .81211 |
| 64 | .00000 | .02526 | .83715 |
| 65 | .00000 | .02750 | .86258 |
| 66 | .00000 | .03000 | .88848 |
| 67 | .00000 | .03277 | .91514 |
| 68 | .00000 | .03584 | .94264 |
| 69 | .00000 | .03919 | .97094 |
| 70 | .00000 | .04278 | 1.00000 |

**TABLE 2.**

**City of Detroit Policemen and Firemen
Retirement System
Annual Probabilities of Age and Service
Retirement Applicable to Members
Who Are Eligible to Retire**

| Age | Probabilities of Retirement |
|---|---|
| 45 | 25% |
| 46 | 25 |
| 47 | 25 |
| 48 | 25 |
| 49 | 25 |
| 50 | 25 |
| 51 | 25 |
| 52 | 25 |
| 53 | 25 |
| 54 | 20 |
| 55 | 20 |
| 56 | 15 |
| 57 | 10 |
| 58 | 15 |
| 59 | 30 |
| 60 | 100 |

**Sec. G-12.      Determination of City's annual contribution — Disability Pension liabilities.**

For Fiscal Years commencing prior to July 1, 2014, the City's annual contribution, expressed as a percent of active Member compensation, to finance disability Pensions shall be determined by dividing the average of the Pension Reserve liabilities for disability retirements incurred, during the three Fiscal Years ending with the date of the valuation by one percent of the active Members' annual compensation used in the valuation.

**Sec. G-13.      Determination of City's annual contribution — Death Pension liabilities.**

For Fiscal Years commencing prior to July 1, 2014, the City's annual contribution, expressed as a percent of active Member compensations, to finance death-in-service Pensions shall be determined by dividing the average of the Pension reserve liabilities for death-in-service claims incurred during the three Fiscal Years ending with the date of the valuation by one percent of the active Member's annual compensations used in the valuation.

**Sec. G-14.** **Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities.**

The Annuity and Pension Reserve liabilities for Members, retirees and beneficiaries shall be actuarially evaluated as set forth in this Article G and the Plan of Adjustment.

**Sec. G-15.** **Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014.**

(a)  The service Pension liabilities for Members shall be determined using the entry age-normal cost method of actuarial valuation.

(b)  The City's annual contribution, expressed as a percent of active Member compensations, to finance the prospective service Pension liabilities shall be determined by dividing the total of the individual annual normal costs of the active Members by one percent (1%) of the active Members' annual compensation used in the valuation.

(c)  The City's annual contribution, expressed as a percent of active Member compensation, to finance any unfunded Accrued Service Pension liabilities, including instances in which assets exceed liabilities, shall be determined by dividing such unfunded Accrued Service Pension liabilities by one percent (1%) of the present value of future compensation payable during a period of future years. Such period of future years shall be thirty years for the actuarial valuation as of June 30, 1974, decreasing one (1) year at each subsequent June 30th until a twenty year period is reached, which twenty year period shall be used in each subsequent actuarial valuation until June 30th, 2004 when the period shall again be thirty years.

**Sec. G-16.** **Board of trustees to compute City's annual contribution.**

Based upon the provisions of this Article, including any amendments, the Board of Trustees shall compute the City's annual contributions for Fiscal Years commencing prior to July 1, 2014, expressed as a percent of active Member compensation, to the Retirement System for the Fiscal Year beginning July 1, 1975, using actuarial valuation data as of June 30, 1974, and for each subsequent Fiscal Year prior to July 1, 2014 using actuarial valuation data as of the June 30th date which date is a year and a day before the first day of such Fiscal Year. The Board shall report to the Mayor and to the City Council the contribution percents so computed, and such contribution percents shall be used in determining the contribution dollars to be appropriated by the City Council and paid to the Retirement System. For each Fiscal Year beginning July 1, 1975 and each Fiscal Year thereafter and prior to July 1, 2014, such contribution dollars shall be determined by multiplying the applicable contribution percent for such Fiscal Year by the Member compensation paid for such Fiscal Year; provided that for the one Fiscal Year beginning July 1, 1975 and ending June 30, 1976, such Member compensation so used shall not exceed 106.09 percent of the active Members' annual compensation used in the actuarial valuation determining such contribution percent.

### Sec. G-17.    Refunds for certain Members.

Effective July 1, 1974, a Member who holds the rank of police inspector and above and who is not covered by a collective bargaining agreement shall, notwithstanding any other provisions of Component II to the contrary, have the right to elect to receive on the effective date of his or her service retirement a partial or total refund of his or her Accumulated Contributions. Effective as of March 8, 2007, a DPOA and fire equivalent retiree who elects not to withdraw his or her Accumulated Contributions as of the effective date of his or her service retirement shall have the option of receiving a quarterly payment of interest credited to his or her Accumulated Contributions or to receive periodic withdrawals of the contributions such Retiree made to Component II of the Retirement System.    If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionately.    If the total Accumulated Contributions are withdrawn no Annuity shall be payable with respect to such withdrawn amounts.

### Sec. G-18.    Employer Contribution

Effective January 1, 1987 for members of DFFA and DPLSA or upon issuance of the 1986-89 Act 312 Award for members of DPOA, the employee contributions to the Annuity Fund, although designated as employee contributions, shall be paid by the City in lieu of contributions by the Employee.    The Employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the City to the Annuity Fund. There shall be no additional contribution expense to the City, and the amounts so contributed by the City on behalf of the Employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the Employee until these amounts are distributed or made available to the Employee.

This provision shall not affect the amount or benefit level of the Retirement Allowance, or the City's obligation with respect thereto.

# ARTICLE H.  MISCELLANEOUS.

## Sec. H-1.        Recall of Retirees during emergencies.

During an emergency declared by the Commissioner of Police or the Board of Fire Commissioners, the Commissioner or the Board of Fire Commissioners, as the case may be, shall have power, with the consent of a Retiree, to recall to active duty a Retiree for such period of service as the commissioner or the Board of Fire Commissioners shall deem advisable; provided, however, that the foregoing power shall not apply in the case of a Retiree who has reached the age of sixty-four years, and provided further, that any Retiree so recalled may, at any time, separate from active duty on his or her own application or by order of the Commissioner or the Board of Fire Commissioners.  A Retiree so recalled shall serve in the rank at which he or she retired, or a higher rank, and shall receive the pay of such rank without deduction.  On subsequent separation from active duty, such Retiree shall resume the Retiree status held by him prior to such recall.

# ARTICLE I.  DEFERRED RETIREMENT OPTION PLAN.

**Sec. I-1.        General provisions.**

For periods on and after July 1, 2014, the Deferred Retirement Option Plan ("DROP") Program under Component II shall be available to Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and non-union executives of the Police Department and the Fire Department.

(a)        In lieu of terminating employment and accepting a Retirement Allowance under the Component II, any Member of the Retirement System who is eligible for the DROP program and who is eligible to immediately receive a twenty-five year (or twenty year) Retirement Allowance may elect to participate in the DROP program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article I.  Any such election shall be irrevocable.

(b)        Participation in the DROP program for Members for who elected to participate in the DROP program prior to July 1, 2014 shall be limited to ten years.  Participation for Members who elect to participate in DROP program after June 30, 2014 shall be limited to five years.  At the end of such five (or ten) year period of participation in the DROP program, the Member shall be retired from employment.

**Sec. I-2.        Conversion to Retirement Allowance**

Upon the effective date of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance under Component I and shall elect a form of payment for his Retirement Allowance pursuant to Part H of Article F.  Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable Pension Improvement Factor (Escalator) increases) that would have been payable, had the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

**Sec. I-3.        Investment of DROP assets**

(a)        ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program.  ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (d) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(b)        As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts to be invested under the Retirement System. If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(c)     If amounts credited to DROP accounts are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees. A Member's DROP account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(d)     The Board of Trustees entered into an administrative services agreement with ING. Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(e)     The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(f)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from their DROP Accounts.

## Sec. I-4.     Distribution of amounts credited to DROP Account

A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City. Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account. In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program. Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec. I-5.     Death of Member while participating in the DROP program

If a Member dies while participating in the DROP program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate; provided, notwithstanding anything to the contrary herein, the Member's adjusted DROP Account balance under Component II upon the Member's death while participating in the DROP program shall not be less than total system DROP payments into his or her account (not including earnings and losses). In addition, one hundred percent (100%) of the Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP

program will be restored.  Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased Member at the time the Member elected to participate in the DROP program.

## Sec. I-6.        Disability of Member While Participating in the DROP Program

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section I-2, and (b) shall be entitled to receive payment of the funds in his DROP Account (in the form of a lump sum or other form of payment described in Part H of Article F). Such Member shall not be entitled to disability retirement benefits under Article F hereof.

## Sec. I-7.        Cost Neutrality

(a)     The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(b)     If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect, the Board and the City, along with the Plan Actuary as well as an actuary appointed by the City (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost.  If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan Actuary and the City's actuary.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program cost-neutral.  Upon the implementation of changes necessary to make the DROP program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw from the DROP program and resume active participation in Component I of the Retirement System.  The Board shall notify DROP participants of these changes prior to implementation.  Those DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP program (under either Component I or Component II).  Those not making either election shall remain participants in the DROP program.

(c)     In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire or (ii) continue active employment with the City

and resume active participation in Component I of the Retirement System. DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

# ARTICLE J.  PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM

### Sec. J-1.        Participant Annuity Savings Fund Loan Program

A Participant Annuity Savings Fund Loan Program (Participant Loan Program) will be established and available to bargaining unit Members.  Its terms will be as follows:

(a)     Any loans granted or renewed shall conform to the requirements of Section 72(p) of the Internal Revenue Code.  Such loan program shall be established in writing by the Board of Trustees in conformity with the terms of the Combined Plan document and applicable collective bargaining agreements, and must include, but need not be limited to the following:

   (1)     The identity of the administrator of the Participant Loan Program;

   (2)     A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

   (3)     The procedure under the program for determining a reasonable rate of interest;

   (4)     The events constituting default and the steps that will be taken to preserve plan assets.

(b)     The Participant Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the Retirement System for Members.  The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program.  Copies of the rules shall also be made available to prospective participating Members of the Retirement System in the offices of the Retirement System.

(c)     Subject to the rules and procedures established by the Board, loans may be made to Members from such Member's contributions to the Annuity Savings Fund.  Former Members, spouses of Members, and Beneficiaries are not eligible to receive any loans from the Retirement System.  Subject to rules and procedures established by the Board, a Member who has been in the Retirement System for twelve (12) months or more is eligible to apply for a loan.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

(d)     A Member who has satisfied applicable rules and procedures may borrow from his or her Annuity Savings Fund account an amount, which does not exceed fifty percent (50%) of the Member's vested accumulated balance, up to fifteen thousand dollars ($15,000.00) reduced by the excess, if any, of: (1) the highest outstanding balance of loans from the Retirement System during the one (1) year period ending on the day before the date on which the loan is made (under both Component I and Component II), or (2) the outstanding balance of loans from the Retirement System on the date on

which the loan is made (under both Component I and Component II), whichever is less.  The minimum loan amount shall be one thousand dollars ($1,000.00).

(e)     In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

  (1)     Loan applications shall be in writing.

  (2)     All loans shall be memorialized by a promissory note made to the Retirement System and properly executed by the Member.

  (3)     Loan shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period.

  (4)     Each loan granted under Component II shall be made against the assignment of the Member's entire right, title, and interest in and to the Annuity Savings Fund supported by the Member's collateral promissory note for the amount of the loan, including interest payable to the order of the Board of Trustees.

  (5)     Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the Retirement System.  The loan interest rate shall be calculated in a manner that will not negatively affect the City's costs relating to the Retirement System or the return to Members.

  (6)     Loan repayments shall be suspended under this Retirement System as permitted by Section 414(u)(4) of the Internal Revenue Code.  A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

(f)     Any loans granted or renewed shall be made and administered pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

(g)     A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's account balance (provided that the interest credited shall be reduced appropriately to cover the

administrative cost of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of net investment income or part of the Member's account balance for the purpose of allocation of net investment income under Article G.

(h)     No distributions shall be made to a Member, former Member, or Beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been repaid or offset against the distributable Annuity Savings Fund account balance.

(i)     The Retirement System shall include, in its annual report to all Members, an accounting of the loan program established by this section, which contains the number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the Fiscal Year covered the costs of administering the program.

# ARTICLE K.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS

**Sec. K-1.**  **Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment**

Notwithstanding anything in Articles A, C, D or E to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following changes in benefits provided under Component II of the Combined Plan shall be implemented:

(1) <u>Elimination or Reduction in Pension Improvement Factor (Escalator)</u>.  With respect to all Pension benefits payable on or after the effective date of the Plan of Adjustment, the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be equal to 1.0125%; provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be reduced in proportion to the funding which is not received by the Retirement System ("Adjusted Pension Benefit").

For purposes of this Section K-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2) <u>Effect of Payment Default</u>.  In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall proportionately reduce the Pension Improvement Factor (Escalator) to be applied to the monthly Pension benefit of any retirees, surviving beneficiaries, employees and former employees to the extent of such default.

**Sec. K-2.**  **Income Stabilization Benefits**

(1) The provisions of this Section K-2 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in writing executed by the Authority and the Treasurer.

(2)	Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section K-2, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i) the amount needed to restore an Eligible Pensioner's reduced annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013. The Income Stabilization Benefit as determined under this Section K-2(2) will not increase after the date on which the Income Stabilization Benefit is determined. The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3)	To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section K-2) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section K-2 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

a.	The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's Pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

b.	An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the Pension benefit paid to the Eligible Pensioner by the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Pension Benefit that is payable to the Eligible Pensioner for that year as determined under Section K-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section K-3; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4)	A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be

credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section K-2(6).

(5)     For purposes of this Section K-2, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section K-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

   a.     An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

   b.     The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board. The Board, with the assistance of the Investment Committee shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

   c.     After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

   d.     An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6)     For purposes of this Section K-2, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7)    In the event that, in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Benefits payable by the Retirement System. The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)    In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Benefits payable by the Retirement System.

## Sec. K-3.    Restoration of Pension Benefits

The following rules shall govern how Pension Improvement Factor (Escalator) ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re City of Detroit, Michigan,* Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)    *Waterfall Classes.*

There will be three Waterfall Classes:

a.    Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and Beneficiaries.

b.    Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and Beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

c.    Waterfall Class 3 – All retirees, surviving spouses, and beneficiaries in pay status and all other Members who as of June 30, 2014 are not in retirement benefit pay status.

(2)     *Restoration of Benefits Through June 30, 2023.*

a.      Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (administrative and investment), future employer contributions as set forth in the Plan of Adjustment (subject to conditions in the Plan of Adjustment), and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 75% funded ratio, and the Restoration Target will be a 78% funded ratio, both projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Plan Actuary projects that the Funded Level as of 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest in an amount equal to the net return on Retirement System investments but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the PFRS Pension Reserve Fund as provided herein.

b.      Actual restoration payments and restoration credits will work as follows: each year, in conjunction with the preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore COLA benefits in a minimum incremental amount of 10% or more. For example: if a retiree's then current COLA benefit is a 1.0% annual compounded COLA, the minimum incremental restoration would increase the COLA benefit to 1.225%. COLA restoration only will occur if the funding level in the Restoration Reserve Account can fund 100% of the COLA increase over the actuarially-projected lives of the eligible recipient Waterfall Class. If the Plan Actuary certifies that the Restoration Reserve Account as of the end of the prior Fiscal Year satisfies the required funding level for one or more increments of restoration, then in the next immediate Fiscal Year actual COLA restoration payments will be made to PFRS Waterfall Class 1 members in such increments until an amount sufficient to fund 66% of the value of their future COLA payments (e.g., a 1.5% compound COLA, or as otherwise applicable) has been funded. At that juncture, and to the

extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 2 members will receive COLA restoration, until an amount sufficient to fund 66% of the value of their future COLA payments has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 3 members will receive COLA restoration on a pro-rata basis. For Waterfall Class 3 members who are in pay status at that time of restoration, they will receive COLA payments; for active employees at the time of restoration, they will receive credits granting them a right upon retirement to receive COLA restoration equal to the 10% increments that are fully funded to Waterfall Class 3 members. For example: assume there are sufficient assets credited to the Restoration Reserve Account as of the end of a Fiscal Year to fully fund 66% of the value of the COLA for all Waterfall Class 1 and Class 2 members for their actuarially projected lives. To the extent additional assets remain in the Restoration Reserve Account to fully fund at least a 10% COLA increment for Waterfall Class 3 members for their actuarially projected lives, then (i) all retirees would receive a restoration payment of 76% of the value of their COLAs (their having already received by virtue of their membership in Waterfall Classes 1 and 2 an increase to 66% of the value of their COLAs) and also a 10% COLA increment would be credited to eligible active employees which would be included in their benefit payments upon retirement (thus causing their COLAs to increase in value from 45% to 55%). Restoration amounts actually paid from the Restoration Reserve Account will be debited from such account. Restoration payments will be calculated and paid on a prospective basis only.

c.     Once restoration payments and credits begin, as long as the Restoration Reserve Account continues to have assets to fund 100% of an incremental COLA restoration amount for such Waterfall Class for their actuarially projected lives, the restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments, falls below 100% for the second or greater increment, the annual amounts to pay such second or greater increment can continue until the Restoration Reserve Account lacks any assets to fund such additional increment. For example, assume a 10% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019. Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second

increment would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid). For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

d.      If the Funded Level (excluding Restoration Reserve Assets) projected to 2023 falls below 76% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 76% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net Retirement System investment returns for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 75%) then restoration payments to retirees and credits to active employees in the following year will be modified in the following manner: (1) funds previously credited to the Restoration Reserve Account will be notionally transferred and credited to the Pension Reserve Fund in sufficient amounts to restore the projected Funded Level in 2023 to 75%; (2) following such transfer, the remaining assets in the Restoration Reserve Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph c.

e.      In connection with preparation of the actuarial report for Fiscal Year 2023, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target, which shall be 78%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers, the Funded Level as of June 30, 2023 has satisfied the Permanent Restoration Target (i.e., 78%), then the residual amounts, if any, in the Restoration Reserve Account (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes for their actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.      Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of the Retirement System as of 2023 is less than 76%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average

annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 76%.

(3)  *Restoration of Benefits from July 1, 2023 to June 30, 2033.*

    a.  If and to the extent that all COLA payments have not been restored as of June 30, 2023 pursuant to Section (2)(e), then during this period and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2033:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 78% | 81%/84% |
| 77% | 80%/83% |
| 76% | 79%/82% |
| 75% | 78%/81% |
| 74% or lower | 3% >than 2023 Funded Level %/81% |

2033 Permanent Restoration Target - Same as 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger – 1% higher than the projected Funding Target for all time periods

    b.  The same rules for restoration payments that applied during the period ending June 30, 2023 shall apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 using the then current investment return assumption which is assumed to be net of expenses (administrative and investment), and the then applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that

the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL (using the market value of assets) over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contributions would achieve the applicable Funding Target (pursuant to paragraph b) as of 2033. Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

c.      To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (i.e., the year ending June 20, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected Funded Level for purposes of determining whether the Retirement System has attained the Restoration Target or the Permanent Restoration Target. To the extent that the City's actual contributions in any of the Fiscal Years 2024 through 2033 are less than the City's projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

d.      Each year, in addition to the notional credit of amounts that exceed the amount necessary to satisfy the Restoration Target, existing notional Restoration Account assets will be credited with interest equal to the net return on Retirement System investments; however, such interest shall not exceed the then investment return assumption. In the event of net losses on the Retirement System's investments, the notional assets credited to the Restoration Reserve Account will be reduced to reflect such losses.

e.      In connection with preparation of the actuarial report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target (i.e., the 2033 Restoration Target). Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the funding level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and

which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.     Following receipt of the actuarial report for 2028, and in the event that the projected Funded Level as of 2033 is less than 79%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 79%.

(4)     *Restoration of Benefits from July 1, 2033 to June 30, 2043.*

a.     If and to the extent that all COLA payments have not been restored pursuant to Section (3)(f) as of June 30, 2033, then during the period ending June 30, 2043 and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2043.

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|---|---|
| 78% | 84%/87% |
| 77% | 83%/86% |
| 76% | 82%/85% |
| 75% | 81%/84% |
| 74% or lower | 3% > than 2023 Funded Level %/84% |

2043 Permanent Restoration Target - Same as 2043 Restoration Target

b.     The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and the making of notional asset transfers from the Restoration Reserve Account to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target) and shall be rolled forward. For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

c.     In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a above. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

(5)    *Modification of the Pension Restoration Program.*

If at any time after July 1, 2026, the Investment Committee by vote of five of its seven Members, or the Board of Trustees by a greater than 66% vote, determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement attached to and made a part of the Plan of Adjustment, such that the continued operation of the Pension Restoration Agreement and this Section K-3 without amendment will: (a) materially harm the long-term economic interests of the City or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the Restoration Program, if as of that juncture (and for purposes of applying this subsection K-3(5)(a)) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet

without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section K-3 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, *inter alia*, whether or in what manner to amend the Pension Restoration Agreement and this Section K-3.

# APPENDIX A

The following provisions shall also have general applicability to the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan:

## MCLS Const. Art. IX, § 24 (2003)

### § 24.  Public pension plans and retirement systems, obligation.

Sec. 24.  The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

## ARTICLE 11.
## RETIREMENT PLANS

### Sec. 11-101. City's Duties.

1. The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2. Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3. The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

### Sec. 11-102. Continuation of Existing Plans.

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

**Relevant Provisions of the
Detroit City Code**

## Sec. 47-1-2. Detroit Police and Fire Retirement System.

Notwithstanding any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of July 1, 2014, the Detroit Police and Fire Retirement System shall hereinafter be memorialized in a separate written document entitled "Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan," which shall comprise the exclusive terms of the Detroit Police and Fire Retirement System and be kept in the Office of the City Clerk for the City of Detroit.

## Collective Bargaining Agreements.

Except to the extent otherwise provided in the Plan of Adjustment, under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement.

(b)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association.

(c)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association.

(d)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association.

# Exhibit 6C – Supplemental Actuarial Report

38008557.6/022765.00213



August 9, 2021


<u>CONFIDENTIAL</u>

The Police and Fire Retirement System
   of the City of Detroit
One Detroit Center
500 Woodward Ave., Suite 3000
Detroit, Michigan 48226

Attention: Mr. David Cetlinski, Executive Director

**Re:  Police and Fire Retirement System of the City of Detroit – Supplemental
        Actuarial Valuation of Proposed Changes in DROP Provisions**

Dear Mr. Cetlinski:

Enclosed is a supplemental actuarial valuation report for the Police and Fire Retirement System of the City of Detroit (PFRS) regarding the financial effects of using a 15-year maximum DROP period for Police Officers. This report contains results for both the Component I (Hybrid) and Component II (Legacy) plans.

Please do not hesitate to contact us if you have any questions.

Sincerely,

*Jamal Adora*

Jamal Adora, ASA, EA, MAAA

JJA:ah
Enclosure


cc:  Kelly Tapper
      Gail Oxendine
      Judith A. Kermans, GRS
      David T. Kausch, GRS

# Police and Fire Retirement System of the City of Detroit
# Supplemental Actuarial Report as of June 30, 2020

Requested By:     Police and Fire Retirement System of the City of Detroit
Date:             August 9, 2021
Submitted By:     Jamal Adora, ASA, EA, MAAA
                  Judith A. Kermans, EA, FCA, MAAA
                  David T. Kausch, FSA, EA, FCA, MAAA
                  Gabriel, Roeder, Smith & Company

This report contains an actuarial valuation of a proposed change in benefits for members of the City of Detroit Police and Fire Retirement System (DPFRS). The Proposed change is to extend the maximum DROP participation period for Police Officers from 10 to 15 years. The purpose of this report is to estimate the financial effect of the proposed change on the DPFRS.

Jamal Adora, Judith A. Kermans, and David T. Kausch are Members of the American Academy of Actuaries and meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

This report may be shared with other parties, but only in its entirety and only with the permission of the DPFRS. Gabriel, Roeder, Smith & Company is not responsible for unauthorized use of this report. This report should not be used for any purpose other than the purpose stated above. The individuals issuing this report are independent of the plan and the plan sponsor.

The date of the valuation was June 30, 2020. This means that the results of the supplemental valuations indicate what the June 30, 2020 valuations would have shown if the proposed benefit changes had been in effect on that date. Supplemental valuations do not predict the result of future actuarial valuations. Rather, supplemental valuations give an indication of the probable long-term cost of the benefit change only without comment on the complete end result of the future valuations.

Actuarial assumptions and methods were consistent with those used in the regular actuarial valuation of the Retirement System on the valuation date, unless otherwise noted. For additional information, please see the June 30, 2020 actuarial valuation of Component II issued June 8, 2021 and the June 30, 2020 actuarial valuation of Component I issued May 18, 2021. Actuarial assumptions are adopted by the Retirement Board of Trustees and the Investment Committee. In particular:

- The assumed rate of interest was 6.75%;
- The assumed VPIF (COLA) rate for Component I (Hybrid) was 0.5%;
- Wage inflation as of June 30, 2014 assumed to be 2.00% for five years, 2.50% for the next five years after that and 3.00% thereafter;
- Component II benefits were frozen as of June 30, 2014;
- Employer contributions through 2023 are fixed by plan and/or the POA approved by the Bankruptcy Court. The Board has adopted a funding policy for contributions beginning with the 2024 Fiscal Year. Please see the June 30, 2020 actuarial valuations for more information.

It is our understanding that benefits for current inactive, retired members, and active Firefighters would not be affected by the proposed benefit changes. They were excluded from this study.

A brief summary of the data, as of June 30, 2020, used in this valuation is presented below.

**Component I (Hybrid):**

|  | DPOA | DPLSA | DPCOA | Total Police |
|---|---|---|---|---|
| **Active** | | | | |
| Count | 1,498 | 370 | 29 | 1,897 |
| Annual Pay | 83,159,528 | 28,650,345 | 3,469,556 | 115,279,429 |
| Average Age | 33.3 | 46.5 | 47.2 | 36.1 |
| Average Service | 7.3 | 20.0 | 22.7 | 10.0 |
| **DROP** | | | | |
| Count | 19 | 60 | 5 | 84 |
| Average Age | 53.4 | 54 | 59 | 54.2 |

**Component II (Legacy):**

|  | DPOA | DPLSA | DPCOA | Total Police |
|---|---|---|---|---|
| Active | | | | |
| Count | 531 | 360 | 28 | 919 |
| Annual Pay | 26,299,501 | 20,594,663 | 2,067,812 | 48,961,976 |
| Average Age | 43.3 | 46.3 | 46.8 | 44.6 |
| Average Service | 16.1 | 19.7 | 22.3 | 17.7 |
| **DROP** | | | | |
| Count | 399 | 199 | 10 | 608 |
| Average Age | 52.8 | 55.6 | 57.8 | 53.8 |

**Present Provisions:**

**Component I (Hybrid):** Police Officers shall be entitled to participate in the DROP program under Component I **for a maximum of ten years.**

**Component II (Legacy):** Police Officers shall be entitled to participate in the DROP program under Component I **for a maximum of ten years.**

**Proposed Provisions:**

**Component I (Hybrid):** Police Officers shall be entitled to participate in the DROP program under Component I **for a maximum of 15 years.**

**Component II (Legacy):** Police Officers shall be entitled to participate in the DROP program under Component I **for a maximum of 15 years.**

**Discussion**

We understand that the mandatory retirement age is currently not enforced for Police members. Recent membership data indicates that very few Police members stay in employment past age 65 and, in the valuation, we assume employment will end at age 65 for Police members regardless of the length of their DROP participation at that age.

We understand that the members and the employer expect that increasing the maximum DROP period will 1) increase participation in the DROP program, and 2) lengthen the members overall careers (for members who utilize the DROP provision). Since we have no specific data upon which to estimate the increase in members utilizing the DROP provisions or the increase in the length of DROP participation (and potential deferral of retirement) as a result of the proposed change, we have attempted to show a range of possible results by assuming two different levels of changes in behavior as a result of the proposed provision change. Our current valuation assumptions for Police include a 65% DROP participation rate and a 7-year DROP duration period subject to an age 65 maximum. The levels are described as follows:

- Level 1: Increase DROP participation from 65% to 70% and increase the average expected length of participation from 7 years to 9 years but not beyond age 65 (Police); and
- Level 2: Increase DROP participation from 65% to 75% and increase the average expected length of participation from 7 years to 11 years but not beyond age 65 (Police).

These changes in assumed behavior effectively measure the financial impact of an overall delay in actual retirement from service for members. Delaying retirement is expected to result in a lower estimate of System costs (normal costs and accrued liabilities), all other things (pay increases in particular) being unchanged.

This valuation assumes Component I employer and member contributions as a percentage of payroll cease when a member enters the DROP.

The financial effect of the proposal is shown below:

| | June 30, 2020 AAL (Millions) | 2024 Employer Normal Cost | Illustrative 2024 UAAL Contribution* |
|---|---|---|---|
| **Component I (Hybrid)** | | | |
| Current (65% DROP for 7 Years) | $ 178.8 | 10.50% | (1.09)% |
| | | | |
| Increase For Level 1 Changes (70% DROP for 9 Years) | | | |
| For Fire | $ - | 0.00% | 0.00% |
| For DPOA | (0.8) | (0.11)% | (0.08)% |
| For DPLSA | (0.6) | (0.03)% | (0.05)% |
| For DPCOA | (0.1) | (0.00)% | (0.01)% |
| Total Increase | $ (1.5) | (0.14)% | (0.14)% |
| | | | |
| Increase For Level 2 Changes (75% DROP for 11 Years) | | | |
| For Fire | $ - | 0.00% | 0.00% |
| For DPOA | (1.6) | (0.21)% | (0.16)% |
| For DPLSA | (1.1) | (0.06)% | (0.09)% |
| For DPCOA | (0.1) | (0.01)% | (0.01)% |
| Total Increase | $ (2.8) | (0.28)% | (0.27)% |
| | | | |
| **Component II (Legacy)** | | | |
| Current (65% DROP for 7 Years) | $ 3,725.3 | N/A | $ 127.8 |
| | | | |
| Increase For Level 1 Changes (70% DROP for 9 Years) | | | |
| For Fire | $ - | N/A | $ - |
| For DPOA | (4.0) | N/A | (0.5) |
| For DPLSA | (2.7) | N/A | (0.3) |
| For DPCOA | (0.2) | N/A | (0.0) |
| Total Increase | $ (7.0) | N/A | $ (0.8) |
| | | | |
| Increase For Level 2 Changes (75% DROP for 11 Years) | | | |
| For Fire | $ - | N/A | $ - |
| For DPOA | (8.6) | N/A | (1.0) |
| For DPLSA | (6.0) | N/A | (0.7) |
| For DPCOA | (0.5) | N/A | (0.1) |
| Total Increase | $ (15.1) | N/A | $ (1.7) |

*The Fiscal Year 2024 UAAL contribution is based on the Board adopted policy but without consideration that the policy disallows a UAAL contribution below 0.0% for the Hybrid. The Board adopted policy uses an amortization of 15-year level percent of pay for Hybrid and 20-year level dollar for Legacy and Funding Policy Assets.

The figures shown above are based on the June 30, 2020 actuarial valuation. Please remember that these changes would be first reflected in the valuation whose issuance follows the adoption of this change. Reflecting plan changes for GASB purposes may differ depending on the timing of implementation.

### Comments

**Comment 1** — We have been provided with a Memorandum of Understanding (MOU) that describes the proposed change. Within that MOU, there is language which states that the Chief of Police must grant DROP extensions past 10-years. We have not considered that requirement in our analysis and have assumed all individuals in the study were eligible for the proposed provision.

**Comment 2** — The financial effects of the proposal represent potential long-term cost savings if more members enter the DROP and work longer than under the current provision. A range of likely results is shown, based on the assumed level of change in member behavior. However, the range is not exhaustive. If actual experience is outside of the range modeled, the change in cost may be outside of the range shown as well. In fact, if members accelerate the time at which they leave active status (to DROP or retire) as a result of the proposed change, costs could potentially increase as a result of the proposed provision rather than decrease.

**Comment 3** — At the time of this supplementals publication, an Experience Study is underway. The Experience Study may result in a new DROP entry and/or duration assumption which may impact the estimated cost/saving related to this proposal. We are not recommending a change to the DROP entry and/or duration assumption in advance of the Experience Study even if this proposal is adopted.

**Comment 4** — Section 12.7 (1) and (2) of the Combined PFRS Plan reads as follows:

> Sec 12.7. Cost Neutrality
> (1) The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.
> (2) If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect…

Please note that we have not been asked to evaluate whether the current DROP program is cost-neutral to the City. Plus, there are many possible interpretations of "cost neutral." However, based on our analysis within the parameters described in this report (only), we believe that the change under consideration should not make the City's annual contribution to the Retirement System higher, all other things being unchanged.

**Comment 5** — Component I wage inflation as of June 30, 2014 is assumed to be 2.00% for five years, 2.50% for the next five years after that and 3.00% thereafter. Component I also has an assumption that the non-DROP active headcount remains constant. To the extent that member behavior changes the length of time spent in the DROP, the actual non-DROP headcount and payroll growth may differ from assumed. That potential impact was not evaluated in this analysis.

## Comments (Concluded)

**Comment 6** — This report does not reflect the potential impact on restoration benefits of Component II or fiscal responsibility provisions of Component I. Any change in member behavior regarding entry into DROP will likely affect the short-term growth of non-DROP payroll and therefore contributions received, since members in DROP do not make contributions. These changes will be reflected in valuations as they occur.

**Comment 7** — This report was prepared using our proprietary valuation model and related software which, in our professional judgment, has the capability to provide results that are consistent with the purposes of the tool. We performed tests to ensure that the model reasonably represents that which is intended to be modeled. We are relying on the GRS actuaries and Internal Software, Training, and Processes Team who developed and maintain the model.

**Comment 8** — The calculations are based upon assumptions regarding future events, which may or may not materialize. They are also based upon present and proposed plan provisions that are outlined in the report. If you have reason to believe that the assumptions that were used are unreasonable, that the plan provisions are incorrectly described, that important plan provisions relevant to this proposal are not described, or that conditions have changed since the calculations were made, you should contact the authors of this report prior to relying on information in the report.

**Comment 9** — If you have reason to believe that the information provided in this report is inaccurate, or is in any way incomplete, or if you need further information in order to make an informed decision on the subject matter of this report, please contact the authors of the report prior to making such decision.

**Comment 10** — No statement in this report is intended to be interpreted as a recommendation in favor of the changes, or in opposition to them.

**Comment 11** — In the event that more than one plan change is being considered, it is very important to remember that the results of separate actuarial valuations cannot generally be added together to produce a correct estimate of the combined effect of all of the changes. The total can be considerably greater than the sum of the parts due to the interaction of various plan provisions with each other, and with the assumptions that must be used.

**Comment 12** — This report is intended to describe the financial effect of the proposed plan changes on the Retirement System. Except as otherwise noted, potential effects on other benefit plans were not considered.

**Comment 13** — The reader of this report should keep in mind that actuarial calculations are mathematical estimates based on current data and assumptions about future events (which may or may not materialize). Please note that actuarial calculations can and do vary from one valuation year to the next, sometimes significantly if the group valued is very small (less than 30 lives). As a result, the cost impact of a benefit change may fluctuate over time, as the demographics of the group changes.

**Comment 14** — A determination of the Plan sponsor's ability to make contributions when due (before and/or after the proposed changes) was outside our scope of expertise and was not performed.