EXHIBIT 14

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHRISTOPHER MCGHEE, NORMAN BROWN
CRAIG BROWN, JAMES WASHINGTON
SHANNON FERGUSON, JUNIUS PERRY
And ORLANDO POTTS,

Plaintiff,

vs.

Case No.: 20-006272-CD
Hon. Shelia Gibson

CITY OF DETROIT, et al
In their Individual and
Official Capacities,
Jointly & Severally,

Defendants.

_______________________________/

DEPOSITION OF REGINALD JENKINS,

Taken by the Plaintiff Via Zoom on Wednesday, March 10, 2021, at 11:00 a.m.

APPEARANCES:

For the Plaintiffs: HERBERT A SANDERS (P43031)
615 Griswold, Suite 913
Detroit, MI 48226
(313) 962-0099

For the Defendant Fire Department: CHRISTOPHER P. LEGGHIO (P37205)
306 S. Washington, Ste. 600
Royal Oak, MI 48067
(248) 398-5900

For Defendant City of Detroit: JASON T. MCFARLANE (P73105)
2 Woodward Ave., Ste. 500
Detroit, MI 48226
(313) 224-4550

TABLE OF CONTENTS

| WITNESS: | PAGE |
|---|---|
| RALPH JENKINS | |
| Direct Examination by Mr. Sanders | 3 |
| Cross-Examination by Mr. Leggiho | 69 |
| Cross-Examination by Mr. McFarlane | 83 |
| Redirect Examination by Mr. Sanders | 85 |

| EXHIBITS: | IDENTIFIED |
|---|---|
| Exhibit Number One | 16 |
| Exhibit Number Two | 23 |
| Exhibit Number Three | 28 |
| Exhibit Number Four | 34 |
| Exhibit Number Five | 35 |
| Exhibit Number Thirteen | 86 |

Wednesday, March 10, 2021
Via Zoom

\- - -

PROCEEDINGS

\- - -

THE COURT REPORTER: Witness, can you raise your right hand for me, please? Do you solemnly swear or affirm that the testimony you are about to give in this matter will be the truth?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

REGINALD JENKINS,

WAS DULY SWORN BY THE COURT REPORTER, TESTIFIED UNDER OATH AS FOLLOWS:

DIRECT EXAMINATION

BY MR. SANDERS:

Q Good morning, Mr. Jenkins.

A Good morning Mr. Sanders.

Q Would you state your full name for the record, please?

A Reginald Terrence Jenkins.

MR. SANDERS: Let the record reflect that this is the Deposition of Reginald Jenkins, taken pursuant to Notice, to be used for all intent and purposes in the Wayne County Circuit Court

Case, 20-006272-CD, Christopher McGhee, et al versus the City of Detroit, et al.

BY MR. SANDERS, CONTINUING:

Q Mr. Jenkins, I'm going to ask you a series of questions as it relates to the Lawsuit that I just referenced. If at any time you do not understand my question, please let me know; I will be happy to repeat the question or rephrase it for you.

If you give a response, I will assume that you did understand the question. If at any time you need to take a break, please let me know and I will be happy to accommodate you. I would ask that if there is a question pending, that you answer the question before we break, okay?

A Okay.

Q All right. Mr. Jenkins what is your date of birth?

A August 31, 1973.

Q And are you a High School Grad?

A Yes, I am.

Q When did you graduate from High School?

A June 12, 1991.

Q What High School was that?

A Cass Technical High School in Detroit.

Q Do you have any formal education after your completion of High School?

EXHIBIT # 14

A I do.

Q And what is that?

A I have a Bachelor of Science degree in business management from Alabama A & M University. I have a Master of Arts in Human Resource Administration from Central Michigan University, and I have a master's of science in Industrial and Labor Relations from Wayne State University.

Q And when did you complete your studies at Alabama A & M?

A May. I don't remember the date. May of 1996. I don't remember the exact date.

Q What year did you graduate from Central?

A 2009, I believe May of 2009, somewhere in there.

Q And what year did you graduate from Wayne State?

A That was May of 2011. No, hold on. I'm sorry, Wayne State of 2009, so Central Michigan would have been May of 2007 maybe. Sorry about that.

Q Now I saw you looking at something to refresh your memory, what was that?

A I'm in my Office. I have my Wayne State Degree on the wall.

Q Okay.

A So that indicates Wayne State was May of 2011. I mean 2009.

Q This is a Video Deposition, or excuse me, a Zoom Deposition, so is there anyone else present in the room with you?

A No, there's not. My office door is closed.

Q Okay. I would ask that during the course of the Deposition that you keep it private and not have anyone else in your Office. If there is a need for someone to come in your Office, let us know so that we can take a pause. I'd also ask that you refrain from communicating with anyone via text message telephone or on your computer during the course of the Deposition, okay?

A I understand.

Q When did you first become employed with the City of Detroit?

A The very first time was August of 1996.

Q And what capacity were you employed in?

A Junior Typist at the Department of Elections.

Q How long did you hold that position?

A About thirteen months.

Q And why did you leave?

A I moved back to Alabama for a few months to seek some other activities.

Q When was the next time you became employed with the City of Detroit?

A September of 1998.

Q In what capacity?

A Technical Aide-Human Resources, and I was assigned to the Labor Relations Division.

MR. LEGGHIO: Mr. Sanders, just procedurally, on my screen it's showing two Chris McGhee's as a participate in this Deposition, is that just something with the technology or is there another person in the spot for Mr. McGhee?

MR. SANDERS: Chris, can you hear me? Do you know why there are two, you have two log ins?

MR. MCGHEE: Yes, one is my phone, and one is my tablet. I am about to switch the devices in about five minutes. I am about to leave the house. So in a minute the tablet will be off.

MR. SANDERS: All right. Thank you.

MR. MCGHEE: Yes, sir.

MR. LEGGHIO: And Mr. Sanders, one other thing. In terms of your follow up on your questions procedurally, is there anyone else listening into this Deposition other than those names that appear on the screens? Is there anybody but Mr.

McGhee or any other Plaintiff in the case that's in attendance in this Deposition?

MR. SANDERS: I'd assume by their silence, there is not.

MR. LEGGHIO: Well, I don't want to make that assumption. They are your clients. Can you tell me whether -- can they tell us that there is no one else in the room with them?

MR. WASHINGTON: This is James Washington, I am alone.

MR. PERRY: This is Junius Perry, I am alone.

MR. LEGGHIO: Okay. Mr. McGhee is alone also?

MR. MCGHEE: This is Christopher McGhee, I am alone.

MR. BROWN: Craig Brown, I'm alone.

MR. BROWN: Norman Brown, and I'm alone.

MR. LEGGHIO: Okay.

MR. SANDERS: We might as well go through the whole list. Tom Gerhart, do you got anybody in the room with you?

MR. GEHART: I'm alone, sir.

MR. SANDERS: Okay.

MR. LEGGHIO: Tamea, how about you?

MS. TAMEA: I'm alone as well.

MR. SANDERS: All right. Are we ready?

MR. LEGGHIO: Thank you Mr. Sanders. Thank you.

MR. SANDERS: Okay.

MR. GERHART: Mr. Sanders, this is Tom. I have, William Hart just came into my office because he is unable to sign on.

MR. SANDERS: Okay. I appreciate that.

BY MR. SANDERS, CONTINUING:

Q I believe, Mr. Jenkins, when we left off you indicated you had commenced working as a Technical Aide/Human Resources, Labor Relations on or about September 1998 --

A Yes.

Q -- how long did you hold that position?

A Tech Aide was about six months.

Q When was the next position you had?

A I was promoted to the Junior Labor Relations

Specialist.

Q And that was approximately when?

A Approximately March of 1999.

Q How long did you hold that position?

A Approximately six months, six to eight months, something like that.

Q And what was the next position you assumed?

A Intermediate Labor Relations Specialist.

Q How long did you hold that position?

A Six to eight months.

Q And you assumed that position approximately when?

A Approximately September to November of 1999.

Q What was the next position that you held?

A Senior Labor Relations Specialist.

Q And when did you assume that position?

A That would have been in the Spring of 2000. I can't remember exactly when. Again, and that was about six to eight months.

Q What was the next position that you held?

A Human Resource Consultant at the Department of Transportation.

Q And you assumed that position approximately when?

A That was approximately October of 2001.

Q And the next position?

A Labor Relations Specialist II, no, no, I'm sorry,

Labor Relations Specialist I.

Q You assumed that position approximately when?

A July of 2003.

Q And the next position?

A Labor Relations Manager One.

Q And when did you assume that position?

A It was in 2007. I can't say -- I want to say August, but it was in 2007. It was in the late Summer 2007.

Q What was the next position?

A I resigned from the City in October of 2012. So my next position was with the State of Michigan.

Q And why did you resign from the City in 2012?

A It was a family decision because my wife and I both worked for the City. The City was headed into bankruptcy and one of us needed to leave for stability purposes.

Q Did you retire or resign?

A I resigned.

Q And you returned to the City when?

A March 17 of 2014.

Q And in what capacity?

A Human Resources Analyst II, I believe. Yes, II. Oh, and I was assigned to Central Services at that time in CAYMC.

Q And the next position you held?

A Administration of Labor Relations III.

Q And you assumed that position approximately when?

A In the Fall of 2015. I can't remember exactly when, in the Fall of 2015.

Q And the next position?

A Administrator of Labor Relations IV.

Q And you assumed that position when? Approximately?

A It was either late 2018, early 2019. It was 2019.

Q Since assuming the position of Administrator of Labor Relations IV, have you had any other positions?

A Yes, my current position.

Q What is that?

A Second Deputy Fire Commissioner.

Q And when did you assume that position?

A December 3, of 2019.

Q As an Administrator Labor Relations IV what were your responsibilities?

A Negotiate Collective Bargaining Agreements and administer Collective Bargaining Agreements, including processing grievances at the third step of the grievance procedure; advising the Departments that were assigned to me on labor and employee relations matters.

Q As and Administrator of Labor Relations IV, were there particular City Collective Bargaining

Agreements you were assigned to or did you deal with any and all Collective Bargaining Agreements?

A I was assigned to particular Agreements, but I dealt with questions about any Agreement, because over my career I worked on all labor contracts accept Police Department Contracts.

Q Okay

A But I was assigned to particular.

Q And what Collective Bargaining Agreements were you assigned to at that time? Let me ask you this. Scratch that question. Were you assigned to the Collective Bargaining Agreement of the Detroit Fire Fighters?

A Yes, I was.

Q Did you participate in the Negotiation of any of the Detroit Fire Fighter Collective Bargaining Agreements?

A Over my career?

Q Yes.

A Yes.

Q Do you recall which ones?

A I started out with the 9801 Agreement. The year -- when I started, they were in negotiations, so that was the first one, 1998 to 2001. I can't remember. I would have to have some --

MR. MCFARLANE: He froze. We lost him. If he is not back on in a few minutes I will call him.

(Whereupon a brief recess was taken)

BY MR. SANDERS, CONTINUING:

Q I think when we left off I had inquired about the contracts that you had participated in negotiating as it related to the Detroit Fire Fighters, and you indicated, you believe you participated in the 9801 negotiations. Do you know if you participated in the Agreement following 9801?

A I believe so. I can't remember, because that was in the transition when I -- I was gone for that, so a certain period of time for that one. So the only thing I can say was, once I returned, I once again began to get involved with negotiating.

Q Okay.

A But without knowing the dates in front of me, I can't say for certain.

Q Now you resigned in 2012 and returned March 2014. If I am not mistaken, there's a Detroit Fire Fighter's Association Agreement that was negotiated or came into effect in 2014, is that accurate?

A That's accurate, yes.

Q Did you participate in negation of that Agreement?

A No, I was not in Labor Relations at the time.

Q When you resigned in 2012, and then returned in March of 2014, have you maintained your seniority?

A No, my new seniority date, new seniority date is March 14 or 17. The day I returned in 2014, that's my new seniority date.

Q Did you review anything in preparation for your Deposition today?

A I reviewed the grievances that were related to this case, but that's all I reviewed.

Q Other than the grievances themselves, were there any other documents that you reviewed associated with those grievances?

A The entire grievance chain, the grievance responses also.

Q Can you tell me what are your responsibilities as Second Deputy Fire Commissioner?

A To assist the Executive and Fire Commissioner and administrative functions; for example, grievances, I act as his designee for the second step of the grievance process. I advise them of grievance issues -- labor issues, labor relation issues. I assist in advising him on some HR issues, along with our HR Administrator. I oversee the Executive

Administrative Staff. I oversee the Medical Case Manager.

Q I'd like to show you what's been marked as Deposition Exhibit One.

MR. SANDERS: Sharon, Shawndrica Simmons is going to assist me by sharing the Deps on the screen. Can you make her an Administrator so she can assist?

THE COURT REPORTER: I sure will. There you go.

BY MR. SANDERS, CONTINUING:

Q Now before we talk about Exhibit One, you shared your resume with me with the City of Detroit. Were any of those positions' demotions?

A No, none. Well, when I returned from the State of Michigan, I returned to a lower position, yes, but it wasn't a demotion. I mean I was coming back. I didn't come back as a Labor Relations Manager of course.

Q Okay.

A I came back as a Human Resource Analysist.

Q Understood.

A Within the City, no, I was never demoted.

Q Were all of those positions that you assumed promotions or were any of them lateral moves?

A In 2001 when I went to HR to DDOT, on the hierarchy scale it was a lateral moved, but it was -- the position paid more money.

MR. SANDERS: Shawndrica, can you share Exhibit One Exhibit One on the screen, please?

BY MR. SANDERS, CONTINUING:

Q I'm showing you what's been marked as Plaintiff's Deposition Exhibit Number One. It is the Notice of Deposition as it relates to this matter. Have you seen that before?

A Yes.

Q Okay. Line two in the notice says that Plaintiff requested the City of Detroit produce the City Representative person or persons most knowledge concerning the attached grievances and their resolutions. And did you review the grievances that are attached?

A Yes.

Q The City has produced you as the person most knowledgeable concerning those grievances; do you understand that to be the case?

A Yes.

Q What makes you the most knowledgeable person as it relates to those grievances?

A I was involved with some of those grievances from

either the -- from Labor Relations standpoint or my current position. The only other person, the person that had my position prior to me is no longer with the City.

Q And who are you referring to?

A Sydney Pertreli.

Q And do I understand your testimony to be that Sydney Pertreli was involved in the grievances that are attached as Exhibit One also?

A From the onset, yes.

Q Okay.

A I am sorry, can you hold on for a second?

Q Yes.

(Whereupon a brief recess was taken)

BY MR. SANDERS, CONTINUING:

A Sorry about that.

Q Not a problem.

MR. SANDERS: Now if you can Shawdrica scroll to page three of Deposition Exhibit One, and it's entitled grievance number 12-19. There we go.

BY MR. SANDERS, CONTINUING:

Q Do you see that, Mr. Jenkins?

A Yes, I do.

Q And I believe your previous testimony indicated that you had reviewed the grievance chain as it relates to this grievance, is that accurate?

A That is accurate.

Q What specific documents did you review as it relates to grievance 12-19?

A From what I can remember, the grievance itself and the responses, pretty much responses.

Q And who authored the response or responses?

A I know for Step II I believe it was Sydney Pertreli. Step I, it would have been either Chief Distelrath or Chief Deputy Shinske, Deputy Chief at the time, Shinske.

Q Okay. I'm sorry, can you repeat those names for Step I?

A Step I, it would probably would have been Chief Distelrath.

Q Can you spell that name?

A D-i-s-t-e-l-r-a-t-h.

Q D-i-s-t --

A E-l-r-a-t-h.

Q Or alternatively who?

A At the time he was Deputy Chief Shinske.

Q Spell that name.

A S-h-i-n-s-k-e.

Q So Distelrath or Shinske would have responded at Step I. Step II would have been Sydney Pertreli. Were there any other documents you recall reviewing as it relates to that grievance chain?

A No, not that I recall.

Q All right.

MR. SANDERS: I thought I carefully reviewed the documents that were produced by the City and I don't recall seeing the Step I Answer or the Step II Answer that you've mentioned, perhaps I've missed it in my review.

But if it isn't there, I would ask that it be produced, additionally or alternatively if it is there if you can at a later date identify what page numbers those Step responses are in the documents that were produced by the City, I would appreciate, because I think we've gotten maybe a couple thousand pages of documents.

MR. MCFARLANE: Yes, something like that.

MR. SANDERS: I thought I read them all, but maybe I missed those two pages.

BY MR. SANDERS, CONTINUING:

Q So let me ask you, Mr. Jenkins, what was the Step I answer to this grievance, and I don't know if you --

I'm not asking you to cite it for me via memory to the best of your recollection, what was the Step I answer?

A I would have to review it. I can't -- I don't want to speculate.

Q Well you reviewed it in preparation for your Deposition, is that accurate?

A Yes.

Q And when did you do that?

A Probably I don't know. I don't know if it was last week or the week before last.

Q And you have no recollection whatsoever as to what the Step I Answer was to this grievance?

MR. MCFARLANE: Objection, asked and answered. He indicated he would have to review it to talk about it.

MR. SANDERS: I understand. I'm just probing.

BY MR. SANDERS, CONTINUING:

Q I am not asking you again to cite verbatim, but what was the gist of the Step I Answer?

A Again I would have to review it to make a --

Q Okay. Let me ask you this. In the Step I answer was the grievance denied?

A Again, I would have to review it.

Q You have no recollection as to whether the grievance was denied at Step I?

A No, I would have to review it.

Q What about at Step II, was the grievance denied?

A I would have to review it.

Q You have no recollection as to whether the grievance was denied at Step II?

A Correct.

Q In any of the documents that you reviewed, did the City indicate that the grievance was untimely?

A This particular grievance?

Q Yes.

A I cannot remember. I would have to review the response.

Q Okay. And I don't want you to share with me any communication you've had with your Attorney as it relates to this matter, okay? So I am preferencing my question by that statement. My question now is, who provided you with the grievance chain, was it something that was in possession by your Office or someone else in Labor Relations or was it on a computer? How did you get the grievance chain?

A It was in possession with me coming from Labor Relations. I was the Labor Relations Administrator assigned to DFFA at this time. So I would have had a

copy of this particular file.

Q Now I want to refer you to what's been marked as Deposition Exhibit Number Two. Are you familiar with this document?

A I have seen it before, yes.

Q Was that document part of the grievance chain that you reviewed?

A No.

Q All right. Now the grievance was filed on or about May of 2019, is that accurate?

A That's accurate.

Q Other than the Step I and Step II Answer that you've testified to and the document that's marked as Exhibit two on the screen now was there any correspondence between the City and the Detroit Fire Fighters Association as it relates to the grievance?

A From me?

Q Well first rom you?

A From me, no.

Q Are you familiar with any other correspondence from anyone from the date in which the grievance was filed through February 26, 2019 other than the first and second step answers?

A I'm not familiar with it. I'm not saying that it could have been. This meeting -- these were meeting

between the Director at the time Hakim Berry and the President at the time, Mike Nevin. So before I even became involved, they were communicating. To my knowledge, no, to the answer to your question.

Q Wouldn't Labor Relations have maintained a file or a folder as it relates to each of the grievance that we are discussing today?

A Yes.

Q Would that file include correspondence associated with the grievances other than the official responses?

A It could, yes.

Q Who maintains that file?

A Currently or when I was there?

Q Well first when you were there?

A I did.

Q Who maintains it now?

A That would be Valerie Colbert, also known as the Deputy Director of Labor Relations.

Q Now eventually the grievance, the 12-19 grievance was resolved, would that be accurate?

A Yes.

Q And how was the grievance resolved?

A Employees that were retired on Duty Disability from the start of the contract had their seniority

adjusted to the date of their return to the Department.

Q When you say from the start of the contract, what contract are you referring to?

A The current contract, the one that is in existence now.

Q The one that's in existence now? Was that contract implemented on or about 2014?

A Correct.

Q Okay. And would it be accurate that since that time that contract has been extended and is currently in existence?

A Yes, that is correct.

Q Now referring to what has been marked as Exhibit Number Two in the middle of the letter, this is a letter from Michael Nevin to Hakim Berry, first of all let me ask you, who is Hakim Berry?

A He is currently the City's Chief Operating Officer, and he still acts as the Director of Labor Relations.

Q Okay. And at the time of this correspondence, he was Director of Labor Relations, is that accurate?

A That's accurate.

Q Near the middle of the page it says that this confirms that as discussed, the DFFA would not grieve or otherwise litigate the City's failure to restore

seniority to these employees upon their reinstatement from Duty Disability. What do you understand that sentence to mean?

MR. LEGGHIO: Objection as to foundation.

MR. SANDERS: You can answer.

THE WITNESS: That the employees returning from Duty Disability will come back with seniority dates based upon the date of their return to the Department --

MR. SANDERS: Okay.

THE WITNESS: -- the DFFA would not grieve that.

BY MR. SANDERS, CONTINUING:

Q All right. And was that Agreement for the DFFA not to grieve that, a condition of resolving the grievance?

MR. LEGGHIO: Objection as to foundation.

MR. SANDERS: You can answer.

THE WITNESS: I can't answer that. Again, this was correspondence between Mr. Nevin and Mr. Berry. I was not involved with that discussion.

BY MR. SANDERS, CONTINUING:

Q But you are the person most knowledgeable as it relates to the grievance and its resolution; is that not correct? That was your earlier testimony.

A Yes.

Q All right. And do you have an understanding that a condition of resolution to this grievance was that the DFFA would not grieve those employees who lost their seniority?

MR. LEGGHIO: Same objection.

MR. SANDERS: You can answer.

THE WITNESS: I'm sorry. Repeat that one more time.

BY MR. SANDERS, CONTINUING:

Q Sure. Was it a condition of resolving the grievance, that the DFFA would not grieve the loss of seniority of those employees affected by the resolution of the grievance?

MR. LEGGHIO: Same objection.

THE WITNESS: I don't know if it was a condition. I can't speak to that. Again, with those discussions, I don't know.

BY MR. SANDERS, CONTINUING:

Q You don't know?

A No.

Q Okay. So you have no facts that would contradict or unaware of no facts that would contradict that it was a condition of resolution?

MR. LEGGHIO: Objection, mischaracterizes the testimony.

MR. SANDERS: I'm asking him a question.

MR. LEGGHIO: I placed my objection on the record. That's all.

BY MR. SANDERS, CONTINUING:

Q And I believe your answer is you don't know. Is that accurate?

A That's accurate, yes.

Q I'd like to show you what's been marked as Deposition Exhibit Number Three. Excuse me. Hold on please before we go on from there. I want you to look at page two of Exhibit Three -- excuse me, Exhibit Number Two, page two of Exhibit Number Two, my mistake. Are you familiar with that document?

MR. LEGGHIO: I'm sorry, were we looking at a different document?

MR. SANDERS: Yes, it is. It is page two of Exhibit Number Two.

MR. LEGGHIO: I only got the

first page of it on the screen. The February 27, 2019 letter?

MR. SANDERS: That is correct.

MR. LEGGHIO: Yes, I just got the first page of it. Is there another page? This is --

MR. SANDERS: Page one was the February 26, 2019 letter, he said he has no idea whether or not --

MR. LEGGHIO: Okay.

BY MR. SANDERS, CONTINUING:

Q Have you had a chance to look at this February 27, letter, Mr. Jenkins?

A Yes.

Q Are you familiar with it?

A I've seen it before.

Q And was this the letter that was sent in confirmation of the resolution of the 12/19 grievance?

MR. LEGGHIO: Objection as to foundation.

MR. SANDERS: You can answer.

THE WITNESS: Again, that wasn't said to me, but that's what it says.

BY MR. SANDERS, CONTINUING:

Q Now I would like to refer you to Deposition Exhibit Number Three. Can you take a look at the first page

of that Exhibit, and when you are done we will scroll to page two.

A Okay.

MR. SANDERS: All right. Can you scroll to page two, please?

BY MR. SANDERS, CONTINUING:

Q Have you had an opportunity to read that?

A Almost done. Yes.

Q Okay. Now are you familiar with that document?

A Yes.

Q How so?

A I prepared the document.

Q And that document was prepared in response to the grievances that were filed on behalf of some of the employees who had been affected by the 12-19 resolution, the 12-19 grievance resolution; is that accurate?

A That's accurate.

Q And the letter that we are looking at dated February 11, this one is prepared and sent to Norman Brown, but you sent the exact same letter to the other Grievants, would that be accurate?

A That is accurate.

Q If we can go back to --

A Just to correct, it was sent to the Union, but it was

I do not send grievance, but you said it was sent to Norman. I do not send grievance responses to individuals. I was sent to the Union President.

Q I understand.

A Just for clarification.

Q And a similar letter was sent to the Union as it relates to each of the grievances that had been filed as a result of the resolution of the 12-9 grievance, is that right?

A That's correct.

Q Now referring to page one of that February 11 letter --

MR. SANDERS: You can go to the first page Shawndrica, right there, up some, up, up, up. There we go.

BY MR. SANDERS, CONTINUING:

Q The last paragraph on the first page says the Department subsequently identified a number of individuals who had indeed returned to work under the realm of the 2014/2019 CBA between the parties, and should have returned to work without any previous department seniority, do you see that?

A Yes.

Q All right. How many individuals were you referring to?

A I didn't have a specific number. I know there was a few. I don't have the exact number.

Q Was it more than ten?

A Again I don't remember. I don't remember the number.

Q So you don't know if it was more than ten or less than ten, correct?

A Correct.

Q How is it that these individuals returned to work and were able to maintain their seniority, how did that happen?

A Again, when they were returned, the contractual information, I was in Labor Relations at the time, but my understanding the contractual language was not adhered to because they returned under the old process, and --

Q And why did --- I'm sorry, go ahead.

A Which did not have any change of seniority ramifications.

Q And why were they returned under the old process?

A I don't know, because I was not responsible for that.

Q Who was responsible for it?

A That would have been Ms. Crosson, Kenia Crosson.

Q Now the next sentence says that the DFD Human Resources Office made contact with the affected

individuals and explained the situation; do you have any personal knowledge as to who from Human Resources made contact with the affected individuals?

A Yes, Ms. Crosson.

Q And do you know how Ms. Crosson made contact with the affected individuals?

A I do not, no.

Q And then it says which resulted in a meeting being scheduled between the Department, the Union and the affected individuals. What personal knowledge do you have that the meeting was scheduled with the affected individuals as it relates to this subject matter?

A When I was investigating this grievance, I talked to Ms. Crosson, and that's information I received from her.

Q So Ms. Crosson told you that a meeting had been scheduled?

A Yes.

Q Did you see anything in writing relating to informing the affected individuals that there was a meeting scheduled?

A You're talking about in connection with this grievance?

Q What I'm referring to is, this sentence says that a meeting was scheduled between the Department, Union

and affected individuals, do you see that?

A Yes.

Q Did you receive anything in writing notifying the affected individuals that a meeting had been scheduled?

A No.

Q So your reliance, you are relying upon what Ms. Crosson told you in your drafting of that sentence, is that accurate?

A That's accurate.

MR. SANDERS: Can you put Exhibit Four on the screen, Shawndrica?

BY MR. SANDERS, CONTINUING:

Q Can you read Exhibit Four to yourself, Mr. Jenkins and when you are done, let me know.

A Okay. I am done.

Q Are you familiar with this document?

A I've seen it before, yes.

Q Can you explain to me what it means when it says the Department is in the process of implementing the terms of Article 12H2 of the parties 2014/2019 Collective Bargaining Agreement, what does that mean?

A I'm not sure. I didn't draft this document.

Q The second sentence says once completely implemented, all nine designated classification promotions in the

Fire Fighting Division shall be in accordance with Article 12H2, however, the process will begin with the promotions to Battalion Chief, do you see that?

A Yes.

Q Do you know what that means?

MR. LEGGHIO: Objection as to foundation.

THE WITNESS: No, no I don't.

BY MR. SANDERS, CONTINUING:

Q Now this letter was drafted on December of 2019, and it's referring to a provision in the 2014 contract, is that accurate?

A Yes.

MR. LEGGHIO: Objection as to foundation assumes a fact not in evidence.

MR. SANDERS: You can answer.

THE WITNESS: It appears to be.

BY MR. SANDERS, CONTINUING:

Q To your knowledge, prior to December 17, 2019 had the Department implemented the terms of Article 12H2 of the 2014 contract?

A I don't know.

Q All right.

MR. SANDERS: Shawndrica, can you put Exhibit Five on the screen, please?

BY MR. SANDERS, CONTINUING:

Q This is the Complaint or the First Amended Complaint that was filed as it relates to this matter. Are you familiar with that document?

A I've seen it before.

Q I want to refer you to page five, line twenty-seven. Can you read line twenty-seven aloud please?

A Prior to 2014 the Collective Bargaining Agreement, CBA had between the City and DFFA allowed a Fire Fighter that had retired as a result of a Duty Disability to maintain his or her accumulated seniority that they returned the employee of the City of Detroit as a Fire Fighter.

Q Are you aware of any facts that would contradict that statement?

A I'm not aware of any facts that would contradict that, no.

Q Can you read aloud, line number twenty-eight please?

A The CBA allowed an employee that returned to work after a Duty Disability Retirement to achieve and assume the rank of his or her Class or -- on an accelerated basis.

Q Are you aware of any facts that would contradict the allegations in line twenty-eight?

MR. LEGGHIO: Objection as to

foundation.

THE WITNESS: I can't -- I'm not sure. I don't know what CBA you are talking about.

MR. SANDERS: Line twenty-eight.

THE WITNESS: Right.

BY MR. SANDERS, CONTINUING:

Q I'm referring to the CBA prior to 2014 in line twenty-eight.

MR. LEGGHIO: Same objections. Mr. Sanders, I just want to be clear. Are you referring to one Collective Bargaining Agreement prior to 2014 or any other Collective Bargaining Agreement?

MR. SANDERS: I'm referring to the one immediately prior to 2014.

MR. LEGGHIO: Same objection as to foundation.

THE WITNESS: I would have to review that CBA.

BY MR. SANDERS, continuing:

Q So without reviewing it, you're not aware of any facts that would contradict that statement? Without reviewing it, you are not aware of any facts that would contradict that statement?

A Without reviewing it, no.

Q I would like to refer you to line number thirty.

MR. SANDERS: Shawndrica, page six please, line thirty.

BY MR. SANDERS, CONTINUING:

Q Can you read that line aloud, please?

A Prior to 2014, in reliance upon the longstanding disability retirement policy, a litany of Fire Fighters, including the Plaintiffs retired with a Duty Disability Injury, and sometime thereafter returned to the employ of the City of Detroit as a Fire Fighter.

Q Are you aware of any facts that would contradict the allegations in line thirty?

MR. LEGGHIO: Objection as to foundation and object to -- assumes facts not in evidence.

MR. MCFARLANE: Same objection. There's nothing in this question that identifies any -- it's a compound question. You've lumped it all into one question.

MR. LEGGHIO: Let me just, Mr. Sanders, let me just embellish this. The question suggests that Fire Fighters took a Duty Disability Injury and then returned to the employ of the City, based on their --

MR. SANDERS: -- not testifying, I'm just asking him a question. You can put your objection on the record.

MR. LEGGHIO: Okay. My objection is, is that it assumes that people went on disability because of a promise of reinstatement --

MR. SANDERS: I know what the question says. He read it. I'm asking him question --

MR. LEGGHIO: -- foundation, and assumes facts not in evidence.

MR. SANDERS: I got you.

BY MR. SANDERS, CONTINUING:

Q Aare you aware of any facts that would contradict the allegations in line thirty, yes or no?

A I can't answer that. I am not sure how employees returned, if it was a Fire Fighter or higher rank, I'm not sure, so I can't answer that.

Q You would agree that employees returned to work under the 2014 contract, and they were allowed to maintain their seniority after being on a Duty Disability, is that correct?

MR. LEGGHIO: Objection as to foundation. It assumes facts not in evidence.

MR. MCFARLANE: Same.

MR. SANDERS: You can answer.

THE WITNESS: Well can you better clarify your question?

MR. SANDERS: Sure.

BY MR. SANDERS, CONTINUING:

Q We can do this another way.

MR. SANDERS: Shawndrica can you put Exhibit One on the screen please? Can you scroll to the grievance number 320, James Washington. Keep scrolling please. Stop.

BY MR. SANDERS, CONTINUING:

Q Can you read that grievance, please?

MR. SANDERS: Can you make it larger?

THE WITNESS: Read the statement agreements?

MR. SANDERS: Yes.

BY MR. SANDERS, CONTINUING:

A The Master Agreement states that any grievance not filed within ten days of the occurrence of the alleged violation or within ten days of the employee or association fee coming aware of alleged violation will be considered untimely and will not be heard, Grievance 12-19 improper seniority placement was filed in an untimely manner.

I was returned into the system on September 26, 2015 with Department number 574.

Q All right. Are you aware that Mr. Washington went out on a disability retirement prior to 2014, is that correct?

A I'm not aware of when he went out, no.

Q You are not aware of when he went out? So you have no facts in which to dispute that, correct?

A Correct.

Q You are aware that he returned into the seniority system on September 26, 2016, correct?

A I am not aware of the exact date, no. I don't have that in front of me.

Q You are not aware of any facts that would dispute that, correct?

A Correct.

Q And if Mr. Washington maintains that when he returned, he was eventually denied his seniority, do you have any facts in which to dispute that?

A I do not.

Q And you agree that there were some employees who returned to their employment after being on a Duty Disability who were allowed to maintain the accumulated seniority that they had, correct?

MR. LEGGHIO: Objection. What's

the time frame? Are you saying at any time or are you restricting it to the period of 2014 forward?

MR. SANDERS: I'm saying that there were employees who left off on a Duty Disability prior to 2014 and returned after 2014 who were allowed to maintain their accumulated disability, correct?

THE WITNESS: Accumulated disability?

BY MR. SANDERS, CONTINUING:

Q Or accumulated seniority, excuse me.

MR. LEGGHIO: I'm going to object as to foundation and I'm going to object also to the form of the question.

MR. SANDERS: You can answer.

THE WITNESS: I'm not sure.

BY MR. SANDERS, CONTINUING:

Q You're not sure?

A I don't know.

Q Let's go back to grievance 12-19. Can you read that, please?

A DFFA grieves the City of Detroit's application of Article 12B7, several members were returned to active service and placed within the seniority system, not in compliance with Section 12 and or other applicable

portions of the Collective Bargaining Agreement.

Q So what do you understand the basis of that grievance to be?

A The Members returned to work and they not have their seniority reset.

Q Okay. And some of them returned to work, didn't have their seniority reset and worked for many months, correct?

A Some, yes.

Q Some worked for many years, correct?

A I'm not sure about that.

Q And then those individuals, some had their seniority reset, correct?

A Yes, correct.

Q After working in a position for many months and their seniority not being reset, correct?

A Correct.

Q All right. And some of those individuals who returned were allowed to not only maintain their seniority but advance to the rank of their entry class correct?

A I'm not -- I don't know.

Q You don't know if some of those people with who I reference in grievance 12-19 assumed higher ranking positions after they returned?

A I don't know, no.

Q And you're the person most knowledgeable as it relates to grievance 12-19, correct?

A Correct.

MR. SANDERS: Can we go back to the Complaint please Shawndrica, which is Exhibit Five, a separate document to itself.

BY MR. SANDERS, CONTINUING:

Q Now that I've refreshed your recollection with Exhibit 12-19, I am going to ask you to read line thirty again.

A Prior to 2014, in reliance upon the longstanding disability retirement policy, a litany of Fire Fighters, including the Plaintiffs, retired with a Duty Disability injury and sometime thereafter returned to the employ of the City of Detroit as a Fire Fighter.

Q Are you aware of any facts that would contradict that statement?

MR. LEGGHIO: Objection as to foundation and form. It asks him to testify about what the intensions were of those who retired.

MR. MCFARLANE: Same objection. It assumes facts not in evidence, including the policy, the names of these Fire Fighters and

everything else --

MR. SANDERS: Noted.

BY MR. SANDERS, CONTINUING:

Q Are you aware of any facts that would contradict that statement?

A I don't know.

Q Line thirty-one, can you read that please?

A Those individuals were allowed to return as Fire Fighters, maintain their seniority and advance to rank of their entry class.

Q Are you aware of any facts that would contradict that statement.

A I do not know.

MR. MCFARLANE: Objection. Assumes facts -- the same objection as to the previous question.

BY MR. SANDERS, CONTINUING

Q Can you read line thirty-two, thirty-three and thirty-four of the Complaint to yourself?

A Okay.

Q Are you aware of any facts that would contradict the allegations in line thirty-two through thirty-four?

MR. MCFARLANE: Objection as it's compound and again assumes facts not in evidence.

MR. LEGGHIO: Same objection.

BY MR. SANDERS, CONTINUING:

MR. SANDERS: You can answer.

THE WITNESS: Can you repeat your question?

BY MR. SANDERS, CONTINUING:

Q Are you aware of any facts that would contradict the allegations in lines thirty-two through thirty-four?

A No, I am not aware.

Q I'd like to refer you to line number thirty-five of the Complaint.

MR. SANDERS: Next page please, Shawndrica.

BY MR. SANDERS, CONTINUING:

Q Can you read line thirty-five aloud please?

A However, after implementation of the new CBA provision in 2014, no Duty Disability Retired Fire Fighter was ever notified by the City or the Union that they would lose all of their seniority if they returned to work for the City.

MR. LEGGHIO: Objection as to foundation. Assumes facts not in evidence.

BY MR. SANDERS, CONTINUING:

Q Are you aware of any facts that would contradict the allegations in line thirty-five?

MR. MCFARLANE: Objection to

foundation and assumers facts not in evidence.

MR. SANDERS: You can answer.

THE WITNESS: I don't know.

BY MR. SANDERS, CONTINUING:

Q Can you read line thirty-six aloud please?

A To the contrary, after negotiation of the 2014 to 2019 CBA, the City continued to return many Fire Fighters to duty with their previous seniority intact without objection from the Union, and Officers were allowed to assume the rank that their original class had achieved.

Q Are you aware of any facts that would contradict the allegations in line thirty-six?

MR. LEGGIO: Objection, assumes facts not in evidence.

MR. MCFARLANE: Same objection.

THE WITNESS: I don't know.

BY MR. SANDERS, CONTINUING:

Q Line thirty-seven, can you read that aloud please?

A The Defendants had (inaudible) to selectively enforce the new provision of the 2014 to 2019 CBA.

Q Are you aware of facts that contradict that statement?

MR. LEGGHIO: Objection as to foundation and form.

MR. MCFARLANE: Same objection.

MR. LEGGHIO: Assumes facts not in evidence.

MR. SANDERS: You can answer.

THE WITNESS: I have no knowledge of that, no.

BY MR. SANDERS, CONTINUING:

Q My question is, do you have any facts or are you aware of any facts that would contradict that statement?

A I do not, no.

Q Can you read line thirty-eight aloud, please?

A In fact, after 2014, the City and the Union agreed to allow some Fire Fighters to return from Duty Disability to Retirement, maintain their previous seniority, be promoted in accordance with their class ranking and retire after receiving a promotion with a pension based upon the ranking that they had achieved with their original class.

Q Are you aware of any facts that would contradict that statement?

MR. LEGGHIO: Objection as to foundation and form; assumes facts not in evidence.

MR. MCFARLANE: Same objection.

THE WITNESS: I do not, no.

BY MR. SANDERS, CONTINUING:

Q Line thirty-nine, can you read that aloud please?

A Thereafter and continuation of the conspiracy to selectively enforce the new provision of the 2014 CBA, in May 2019 the Union filed a grievance maintaining that the City had violated the CBA by returning Fire Fighters to duty with their seniority after a disability retirement.

Are you aware of any facts that would contradict that allegation?

MR. LEGGHIO: Objection as to foundation, form and assumes facts not in evidence.

MR. MCFAR: Same objection.

THE WITNESS: I do no know.

BY MR. SANDERS, CONTINUING:

Q Read line forty, please.

A Can you scroll up a little?

MR. SANDERS: Can you scroll up please, Shawndrica?

THE WITNESS: The grievance was filed in violation of the CBA years after the Union first became aware that Fire Fighters were returning from a Duty Disability and being allowed to maintain their previous seniority.

BY MR. SANDERS, CONTINUING:

Q Are you aware of any facts that would contradict that statement?

MR. LEGGHIO: Objection as to form, foundation and assumes facts not in evidence.

MR. MAC: Same objection.

THE WITNESS: I do not know.

BY MR. SANDERS, CONTINUING:

Q When a Fire Fighter returns from Duty Disability, how -- is that return communicated by the City to the Detroit Fire Fighter's Association?

MR. LEGGFHIO: Same objection.

THE WITNESS: I do not know.

BY MR. SANDERS, CONTINUING:

Q Well let me ask you a different way. You do not know as it relates to now or you do not know as it relates to what went on in 2014 and 2015?

MR. LEGGFHIO: Same objection.

THE WITNESS: I do not know as it relates to prior to me coming on board.

BY MR. SANDERS, CONTINJUING:

Q Since you came on board, what is the procedure?

A I'm not sure of the procedure. I don't know the procedure.

Q So you don't know whether or not the City of Detroit

communicates to DFFA upon the return of a Fire Fighter from Duty Disability, would that be accurate?

A I know that they do now.

Q And when you say now, do you know when that became affective?

A I do not know the exact date, no.

Q How is that communication made?

A By HR.

Q When I say how, I mean is there a letter sent to them, an email, or do you know

A I do not know.

Q I would like you to read line forty-one, can you read that aloud please?

A In accordance with the 2014 to 2019 CBA, any grievance not filed within the ten calendar days of the occurrence of the alleged violation or within ten calendar days of an employee or the Association becoming aware of an alleged violation will be considered untimely and will not be processed.

Q Are you aware of any facts that would contradict the allegations in line forty-one?

MR. LEGGHIO: Objection document speaks for itself.

MR. MCFARLANE: Same objection.

THE WITNESS: I'm not aware.

BY MR. SANDERS, CONTINUING:

As it relates to grievance 12-19, are you aware of the DFFA asking for an extension in which to file the grievance?

MR. LEGGHIO: Objection as to foundation.

MR. SANDERS: You can answer.

THE WITNESS: I don't know.

BY MR. SANDERS, CONTINUING:

Q Are you aware of the City of Detroit granting the DFFA an extension which to file the grievance?

A I don't know.

Q Can you read line forty-two, please?

A Can you scroll up some?

MR. SANDERS: Can you scroll up please, Shawndrica?

THE WITNESS: However, in furtherance of their conspiracy, the Defendants conspired to ignore the CBA Statute of Limitations, and the grievance was recognized and acknowledged by the City.

BY MR. SANDERS, CONTINUING:

Q Are you aware of any facts that would contradict the allegations in line forty-two?

MR. LEGGFHIO: Objection form and

foundation, and assumes facts not in evidence.

MR. MCFAR: Same objection.

THE WITNESS: I do not know.

BY MR. SANDERS, CONTINUING:

Q I'd like you to read line forty-three aloud please.

A Thereafter, without cause, the Defendants agreed to take disciplinary action against the Plaintiffs.

Q Are you aware that the Plaintiffs in this cause of action loss seniority?

A I'm aware that the seniority was adjusted.

Q Okay. You're aware that it was adjusted. And when you say adjusted, would you agree with me that many of them had received their seniority -- had received seniority and worked in a capacity with higher seniority for several months and potentially years, and then it was adjusted to a lower seniority; is that accurate?

A I can't say that sir. I don't know how long they worked in the higher position.

Q When you say their seniority was adjusted, what do what do you mean by that?

A It was adjusted to the date they returned form Duty Disability.

And it had previously been the seniority that they had accumulated during their entire stint of service

as a Detroit Fire Fighter, would that be accurate?

MR. MCFARLANE: Objection as it assumes facts not in evidence.

THE WITNESS: I can't say what their seniority was. It was a different seniority date, but I can't say it was through their entire --

BY MR. SANDERS, CONTINUING:

Q It was a higher seniority, would that be accurate?

A It was a higher seniority, correct.

Q Now some of the Plaintiff's after their seniority was adjusted were placed in a lower rank, would that be accurate or do you know?

A I don't know. I don't know.

Q That didn't go into your -- you didn't consider that when you decided to resolve the grievance, whether or not some of the Plaintiffs would be placed in a lower rank?

A Which grievance?

Q 12-19.

A You said when I decided to resolve the grievance?

Q Or when the City of Detroit decided to resolve the grievance, they didn't take into consideration that some of the Plaintiffs in this case and others might be in a lower rank, is that accurate?

A If adjusting their seniority caused them to go to a

lower rank, yes that was taken into consideration.

Q The Plaintiffs maintain that when their seniority was adjusted, that was disciplinary action; do you agree with that or disagree?

A Disagree.

Q And why do you disagree?

A Disciplinary action comes about when you break a rule or regulation or policy with the Department.

Q They had not broken any rule or regulation or policy with the Department, would that be accurate?

A That's accurate.

Q Okay. I want to refer you to line forty-six.

A Okay.

Q Can you read that aloud please?

A The Plaintiffs were not afforded any type of Hearing prior to the disciplinary actions taken against them.

Q Now I know you stated you disagree that they were disciplined; my question to you is, prior to the Plaintiffs having their seniority quote unquote, adjusted as you have described it, were they afforded any type of Hearing?

MR. MCFARLANE: I'm going to object. That's a mischaracterization of his testimony.

MR. LEGGHIO: Same objection. I

join with that objection, and also object as to foundation and form and assumes facts not in evidence.

THE WITNESS: I don't know.

BY MR. SANDERS, CONITNUING:

Q Were You ever involved in the planning or the scheduling of any type of Hearing?

A Hearing for what?

Q A Hearing for the Plaintiffs as it relates to taking away their seniority?

A For a grievance Hearing, yes.

Q Explain to me what you mean,

A For Step II we have a grievance meeting.

Q So you are saying --

MR. LEGGHIO: Let me object for a moment. Are you asking him in the abstract, Mr. Sanders, or are you talking about specifically these Plaintiffs?

BY MR. SANDERS, CONITNUING:

Q My question is, are you maintaining there was a Step II Grievance Hearing in which the Plaintiffs in this cause of action appeared?

MR. LEGGPHIO: I think he was talking about it in the abstract.

THE WITNESS: I would just say--

MR. SANDERS: I'm sorry, go ahead.

THE WITNESS: The City had, we have grievance meetings at the Step Two, is that what you are referring to as a Hearing? I'm trying to get what you are referring to.

BY MR. SANDERS, CONTINING:

Q My question to you is, as part of Exhibit One you saw where several of the Plaintiffs had filed grievances, correct?

A Yes.

Q Was there ever a step II Hearing in which they appeared concerning those grievances?

A No.

Q Was there any other kind of Hearing where the Plaintiffs appeared, and they had an opportunity to be heard as it relates to losing their seniority?

A I do not know.

Q Can you read line forty-seven aloud, please?

A The Defendants goal was to strip the Plaintiffs of their seniority and take away any promotion which was a result of the systematic seniority promotion.

Q Are you aware of any facts that would contradict that allegation?

MR. LEGGHIO: Objection as to the

form, foundation and assumes facts not in evidence.

MR. MCFARLANE: Same objection.

MR. SANDERS: You can answer.

THE WITNESS: I do not know.

MR. SANDERS: Can you, Shawndrica turn to page nine please, line fifty-one.

BY MR. SANDERS, CONTINUING:

Q I would like you to read line fifty-one aloud please.

A Defendants intentionally deprived the Plaintiffs of the opportunity to collect a larger pension.

Q Are you aware of any facts that would contradict the allegations in line fifty-one?

MR. LEGGHIO: Same objections, form, foundation and assumes facts not in evidence.

MR. MCFARLANE: Same objection

THE WITNESS: I do not know.

BY MR. SANDERS, CONTINUING:

Q Line fifty-four, can you read that aloud please?

A In accordance with the CBA discipline and demotions shall only occur when there is just cause.

Q Are you aware of any facts that would contradict that allegation?

MR LEGGHIO: Objection as to form and foundation, assumes facts not in evidence.

MR. MCFARLANE: Same objection.

THE WITNESS: I do not know.

BY MR. SANDERS, CONTINUING:

Q Now I would like to refer you to page ten of the Complaint, line sixty-eight.

A Can we take a break after this question or --

Q Absolutely we can. Can you read line sixty-eight aloud please?

A Thereafter he was promoted through testing as opposed to the seniority system to the rank of Lieutenant from July 30, 2018 I was earning approximately seventy-one thousand dollars a year.

Q Now this is an allegation made by Plaintiff Norman Brown. Are you aware whether or not there is a difference between being promoted through testing as opposed to the seniority system?

A What do you mean? Can you explain that a little more?

MR. LEGGHIO: Objection as to form.

MR. SANDERS: Sure.

MR. LEGGHIO: And assumes facts not in evidence.

BY MR. SANDERS, CONTINUING:

Q Do you know whether or not Fire Fighters can be promoted for some positions by taking a test?

A Some positions require a test, yes.

Q Do you know whether or not there are some positions that Fire Fighters are promoted based upon their seniority?

A Yes.

Q Okay. Do you have any familiarity with the difference between the two and what positions require taking of a test?

A No, not all of the positions. No, I know positions within the Divisions require an exam. I can't tell you all of which ones.

Q So if Mr. Brown was promoted by the taking of an exam, should he have been demoted as a result grievance 12-19?

MR. MCFARLAND: Objections, it assumes facts not in evidence.

MR. LEGGHIO: Same objection, and foundation and object to the form of the question.

MR. SANDERS: You can answer.

THE WITNESS: I don't know.

BY MR. SANDERS, CONTINUING:

Q And you are the person most knowledgeable as it relates to grievance 12-19 and the resolution thereof, correct?

A Correct.

Q All right sir. I know you want to take a break. I can probably use one too. You guys want to say ten minutes.

MR. LEGGHIO: Do you have a plan to break for lunch at a certain time, Mr. Sanders?

MR. SANDERS: I anticipate when I am done with this witness, we can then break for lunch. I don't have a lot more for this witness, okay?

MR. LEGGHIO: Sounds fair.

MR. SANDERS: Unless someone just wants to break for lunch now, we can do it. We will do ten minutes and come back.

MR. LEGGHIO: Okay.

(Whereupon a brief recess was taken at or about 11:47 a.m.)

BY MR. SANDERS, CONTINUING:

Q Mr. Jenkins, earlier we discussed, and you testified about the grievance file, and you indicated that, I believe you indicated that the file as it relates to grievance 12-19 would be maintained in Labor Relations and Valerie Colbert would be the person in charge of that right now. I'm paraphrasing your testimony, but would that be accurate?

A Yes.

Q Okay. Now my question is, does the Detroit Fire Department maintain a separate grievance file?

A Yes.

Q Okay. And who would be over that file?

A Me.

Q And do you know whether you have the same documents in your file that Valerie has in her file?

A For this particular case?

Q Yes.

A I'm pretty sure they are the same because I basically you know, handled the grievance in both positions.

Q Is it the norm that Fire Department would maintain its own grievance file and Labor Relations would have its own grievance file? Would that be the norm as it relates to Fire Fighter grievances?

A That's the norm, yes.

MR. SANDERS: Now if we can, Shawndrica, can you put Exhibit One back on the screen. And I would like you to go to the 12-19 grievance.

BY MR. SANDERS, CONTINUING:

Q Now the 12-19 grievance was filed in May of 2019 is that accurate?

A Yes.

Q All right.

MR. SANDERS: Shawndrica, can you go again to Exhibit Two? Second page, please.

BY MR. SANDERS, CONTINUING:

Q Now previously you testified that this was confirmation of the grievance, is that correct?

MR. LEGGFHIO: Objection, mischaracterizes the testimony, and foundation.

MR. MACFARLANE: Same objection.

MR. SANDERS: You can answer.

THE WITNESS: No.

BY MR. SANDERS, CONTINUING:

Q Well, this correspondence is confirmation as to how the issues delineated in the grievance would be resolved, is it not?

MR. LEGGHIO: Objection as to foundation, mischaracterizes the testimony and argumentative. The document speaks for itself.

MR. SANDERS: You can answer.

THE WITNESS: Can you scroll up some more. Can you repeat the question?

BY MR. SANDERS, CONTINUING:

Q Can you read paragraph two of this letter aloud?

A To clarify, we understand that the City will retroactively adjust the seniority of the employees

who returned to work after being on retirement for Duty Disability for more than two yes. We understand that the City will now count these employees' seniority from their reinstatement dates.

Further, we understand for the upcoming reinstatement of several employees from Duty Disability who have been in retirement for more than two years that the City will count these employees seniority from their reinstatement dates.

Q Was that how grievance 12-19 was resolved?

MR LEGGHIO: Objection, foundation and as to form.

MR. SANDERS: Let the record reflect a long pause on behalf of the witness.

THE WITNESS: I'm reading. I'm reading.

MR. LEGGHIO: Let the record reflect that that has no significance to the answer.

MR. MCFARLANE: And let the record reflect that he's reading the paragraph you just asked him to read regarding the question.

THE WITNESS: The answer is the way we treated everyone that retired was that upon return that their seniority was reset.

BY MR. SANDERS, CONITNUING:

Q My question is the paragraph that you read aloud, is that a summary as to how grievance 12-19 was resolved?

MR. LEGGHIO: Same objection --

MR. MCFARLANE: Objection, asked and answered.

MR. LEGGHIO: -- foundation, form, assumes facts not in evidence.

THE WITNESS: No, that's not my understanding of it, no.

BY MR. SANDERS, CONTINUING:

Q Okay. What is the difference in the resolution from this paragraph?

A This talks about someone returning for two years or with a two year -- that's been out for more than two years. My training of the resolution is that everyone who has returned has had their seniority reset.

Q Everyone who returned had their seniority reset?

A Yes.

Q And had everyone been off for more than two years?

A I'm not sure. I would have to look at it.

Q Let's assume that everyone was off for two years; the resolution of the grievance is consistent with what's in this letter, is it not?

65

MR. LEGGHIO: Objection as to foundation and form. Argumentative.

MR. MACFARLANE: Objection. He's already testified, and it is further speculative. You are asking him to speculate on something that assumes facts not in evidence.

THE WITNESS: Yes, I can't speculate on --

BY MR. SANDERS, CONTINUING:

Q I am not asking you to speculate. My question is -- well let me ask a different question. Is there anything other than Exhibit Two that delineates how the grievance was resolved?

MR. LEGGHIO: Objection as to foundation.

THE WITNESS: I don't know.

BY MR. SANDERS, CONTINUING:

Q And you're the person most knowledgeable as to the grievance and how it was resolved, correct?

MR. LEGGHIO: Objection, that mischaracterizes what his testimony is.

BY MR. SANDERS, CONTINUING:

Q Correct?

MR. MCFARLANE: Same objection.

THE WITNESS: Correct.

66

BY MR. SANDERS, CONTINUING:

Q So there was a resolution of the grievance in February of 2019 before it was ever filed in May of 2019, correct?

MR. LEGGHIO: Objection, assumes facts not in evidence.

BY MR. SANDERS, COTNINUING:

Q Is that accurate?

A I have no knowledge of a resolution before the grievance was filed.

Q You have knowledge of Exhibit Two, the letter dated February 27, 2019, correct?

A Correct.

Q And you have no knowledge of any other written documents that would delineate the resolution of the grievance, correct?

MR. LEGHGIO: Same objection.

MR. SANDERS: You can answer.

THE WITNESS: Correct.

BY MR. SANDERS, CONTINUING:

Q I may only have a few questions. Give me a second here. You would agree with me that grievance 12-19 addresses Duty Disability and what should happen under the Collected Bargaining Agreement, correct?

MR. LEGGIO: Objection, the

67

document speaks for themselves.

MR. SANDERS: You can answer.

MR. MCFARLANE: Foundation.

MR. SANDERS: What was your answer, sir?

THE WITNESS: Yes.

BY MR. SANDERS, CONITNUING:

Q And the letter that you are looking at now, February 27, also addresses Duty Disability and what should happen upon returning under the Collected Bargaining Agreement, correct?

MR. LEGGHIO: Same objection.

THE WITNESS: That's what it discusses, yes.

MR. SANDERS: Give me one second, please. I don't think I have any further questions.

MR. LEGGHIO: Jason, do you mind if I go first?

MR. MCFARLANE: No, that's fine. But for the record, I just want to -- there was an information request earlier regarding Step I and Step II response to a grievance. At the very least I know it's been produced by the DFFA based on 000356, is where it begins. I'm not sure where the City's production on it at this time, but it already has

68

been produced.

MR. LEGGHI: What's the number, 5?

MR. MCFARLANE: 000356 is where it begins in the DFFA's production of documents.

MR. SANDERS: All right. Before we conclude, I'd like to pull that up and take a look at it, but go ahead. Go ahead, Chris.

CROSS-EXAMINATION

BY M.R LEGGHIO:

Q Mr. Jenkins, good afternoon. I have some questions. Mr. Jenkins, you understand you are a Defendant in this Lawsuit that's been filed by Plaintiffs?

A Yes.

Q And I am not going to go through your Curriculum Vitae, Mr. Sanders has done that this morning. Is it fair enough to say that you worked in Labor Relations, you now work as Second Deputy Fire Commissioner, correct?

A Correct.

Q I want to ask you some general questions, and then I'm going to direct you to some specific provisions of the Complaint, some of which were referred to by Mr. Sanders. First of all do you have -- did you ever conspire with anybody from the Union to deprive the Plaintiffs in this case of their appropriate seniority?

A No, I never did.

Q Were you ever present when you witnessed somebody conspiring or hatching a plot to deprive the Plaintiffs in this case of their appropriate seniority?

A No.

Q And when I say appropriate seniority I mean seniority that's appropriate under the Collective Bargaining Agreement that applies. You were never present for such a thing?

A Correct, I was not.

Q Have you ever conspired with any of the Union Officers in this case or anyone else to discriminate against the Plaintiffs in this case based on an alleged disability?

A I have not.

Q Have you ever been present when anybody was hatching a plot to discriminate the Plaintiffs in this case, based on their alleged disability?

A I have not.

Q Did you ever conspire with anybody, any other Defendants in this case or anyone else to discriminate against the Plaintiffs in this case with regard to their seniority, appropriate, based on their age?

A No, I have not.

Q Were you ever present when you witnessed somebody else, any other Defendant in this case hatching to plot, to discriminate against the Plaintiffs in this case with regard to their seniority, based on their age?

A No, I have not.

Q You were asked some questions, and I want to make sure you understand my concern about the question. The questions were asked, do you have any facts to contradict the allegations, and I want to reformulate those questions, because for the record, those questions are questions that ask you to prove a negative, and I am asking you to give me assertive facts. Let's start with paragraph thirty of the Complaint, and I am going to, do you have access to that?

A I do not.

MR. MCFARLANE: If somebody can give me screen share, I can share it.

BY MR. LEGGHIO, CONTINUING:

Q Mr. Jenkins, in your experience with the City, in the Departments that you've served in, isn't it true that a person takes a Duty Disability Retirement because they are Duty Disabled, and unable to perform their work, isn't that true?

A That is true.

Q In your experience, it isn't an option to take a Duty Disability injury based on your reliance of policy; isn't it in fact true that one is either Duty Disabled and cannot perform the functions or you can actually continue working; isn't that true?

MR. SANDERS: I will just make a continuing objection to the leading nature of the inquiries. You can answer.

THE WITNESS: That is true.

BY MR. LEGGHIO, CONTINUING:

Q Just to shorten it up, in your experience, people take Duty Disability Retirements because they cannot perform the job and they are Duty Disabled, isn't that so?

A That's correct.

Q If you can turn to paragraph thirty-seven of the Complaint, and read that to yourself.

A Okay.

Q Did you ever conspire with the Union or any Union Official to selectively enforce the provisions of the 2014, 2019 CBA?

A No, I never did.

Q Were you ever present when anyone else, any other Defendant in this case conspired to selectively enforce the provision, the new provision of the CBA 2019 that is the provisions that address the seniority and the return from Duty Disability?

A No, I was never present for such.

Q Do you have any facts to suggest there was any such conspiracy?

A No, I never heard of a conspiracy, no facts.

Q If you would look down to paragraph thirty-nine, actually thirty-eight.

A Okay.

Q And read that to yourself.

A Okay.

Q Now in your experience with the City do you have any facts to support the allegation that the City and the Union conspired or agreed to allow some Fire Fighters to come back from Duty Disability Retirement post 2014, maintain their seniority, be promoted and then retire after receiving their promotions, being treated differently than the Plaintiffs in this case? Do you have any facts to support such an agreement or conspiracy?

A I do not.

Q Did you ever do such a thing? Were you ever a party to such an agreement or conspiracy?

A No, I was not. Never heard of it.

Q Paragraph thirty-nine, can you read that to yourself?

A Okay.

Q First of all, I want to make clear, it's true, is it, the Union never consulted with you before it filed any grievances related to this seniority issue, did it?

MR. SANDERS: Objection, form, foundation, mischaracterization of the record.

BY MR. LEGGHIO, CONTINUING:

Q Did the Union ever consult with you before it filed any grievances related to this saga?

A They did not, no.

Q In your experience with the City, let's take it out of this situation. In anything, has the Union ever consulted with you about whether they would agree or not agree? I mean, is that your experience?

A No, no Unions have ever talked to me prior to filing a grievance.

Q They don't consult with you about whether they are going to grieve or not?

A Correct, they do not.

Q In this paragraph it indicates that in continuation

of a conspiracy to selectively enforce the new provisions of the CBA, and I'm going to insert in there, provisions related to seniority, did you ever -- do you have any facts to support that claim that the Union filed the grievance in May of 2019 because it was conspiring to select (inaudible) new seniority provisions of the 2014 CBA?

A No, I do not.

Q Did you participate in any conspiracy either with the City and the Union or within the City itself to selectively enforce the new provisions of the Collective Bargaining Agreement with regard to seniority after a Duty Disability Return?

A No, I did not.

Q Now paragraph forty-one if you could read that to yourself for a moment.

A Okay.

Q You would, in your position now and in your position in Labor Relations before, you understand that there are deadlines in any Collective Bargaining Agreement, and I'm not talking about any Collective Bargaining Agreement, with the City and the Fire Fighters, to file a grievance, you are familiar with that?

A Yes.

Q And you are familiar with the 2014, 2019 provision

about filing a grievance within ten days of the occurrence of the violation, alleged violation or within ten days of when the Association becomes aware of the violation; you're aware of that.

A Yes.

Q Are you aware of things that are called continuing violations, have you ever heard that term?

A Yes, I have.

Q What is a continuing contract violation?

A It's when some potential violation occurs and then the same violation occurs on a continuing basis.

And at that point is it your experience that -- well let me strike that. If you look at paragraph forty-two of the Complaint and read that paragraph to yourself, it begins with however and furtherance.

A Okay.

Q Now did you ever conspire with the Union or any Union Official to recognize the May 2019 grievance regarding seniority and those returning from Duty Disability, did you participate in any such conspiracy?

A No, I did not.

Q Were you ever a witness to any such a conspiracy? Were you ever in a room where people were talking about conspiring to ignore the CBA Statute of

Limitations and recognize this grievance, the May 2019 grievance by the Union regarding seniority and Duty Disability?

A No, I was not.

Q Do you have any facts to support this assertion that there was a conspiracy between -- within the City and the Union or between the City and the Union to ignore the Statute of Limitations with regard to the May 19, the May 2019 grievance regarding Seniority and Duty Disability?

A No, I do not have any knowledge of that.

Q Now let me move on to paragraph forty-three, read that to yourself then I have some questions for you.

A I am ready.

Q First of all, in your experience with the City in any of your positions, can you cite any example when the Union or Union Official disciplines employees of the City?

A When Union Officials discipline?

Q Yes. Discipline employees?

A No. No.

Q You would agree that discipline City employees is a function exclusively within the management rights of the City am I correct?

Q That's correct.

A Now in terms of the demotion that occurred that's at the core of this litigation, let me ask you this question, is seniority adjustment, does that occur, has that ever occurred in your experience with the City in a way that's unconnected in to this case, Have you ever seen individuals have their seniority adjusted because there were calculation errors or Department errors or issues regarding whether you use City-wide seniority or Department-wise seniority?

Do you have any experience with seniority adjustments?

A Yes, I do. There have been.

Q In your experience with seniority adjustments, in some occasions have individuals had their seniority adjusted downward, reduced?

A They have.

Q Is that simply a function of, well let me rephrase it. Is all seniority adjustments always a disciplinary action, if they involve a reduction in seniority?

A No, it sometimes just a correct the record.

Q Okay. If you can -- if you look at paragraph forty-four and look at it yourself.

A Okay.

Q Now your understanding, in a Collective Bargaining

Agreement and I am going to ask you if this is your understanding, does one who goes out on Duty Disability lose all of their seniority if they return to work before two years?

A Say that one more time.

Q Well let me rephrase it. If I go out on Duty Disability, and this is a post 2014 event, and I am off for ten months, when I return to work, do I maintain my seniority?

A If you are off for ten months?

Q Yes.

A On Duty Disability?

Q Yes. In other words, I'm not off for more than two years?

A Yes, you should.

Q Well this paragraph alleges that the Defendants put in place an alleged blanket demotion of all disability retirement -- retires that returned to work after 2014. You as a Defendant, did you put in place such a blanket demotion of all Disability Retirement returnees?

A No.

Q Were you ever present when anyone else put in place such a blanket demotion of all Disability Retiree returnees at all?

A No.

Q Paragraph forty-seven of the Complaint, would you read that to yourself.

A Okay.

Q As a Defendant did you ever intend to strip Plaintiffs of their seniority in any improper way?

A No.

Q Did you have any -- did you conspire with any of the Plaintiffs in this case -- or with the Defendants in this case, whether Union or other City Officials to strip Plaintiffs of their seniority in a way that was not consistent with the Collective Bargaining Agreement?

A No.

Q If you could turn to Page fifty-one of the Complaint. Before we go to fifty-one, let me ask you this question, Mr. Jenkins. Seniority is something that's earned and correct me if I am wrong. Seniority is something that is earned through time and through work right, right? I mean you go to work, you do your job and you earn your seniority, that's your experience, isn't it?

A That's correct.

Q Can you think of any occasion where they have not either been working or on Duty Disability within the

context of the Collective Bargaining Agreement? Has anybody been, to your knowledge, to your experience, does anyone get seniority unless they are performing their job and they are off for only an appropriate time under the Collective Bargaining Agreement?

A Only if there is a discharge and thy are returned to work, normally Arbitrators will, if they won their grievance, the Arbitrators will return them to work with full seniority so they wouldn't lose it.

Q But that is based on the notion that they were discharged, and had they not been discharged improperly, they would have been working?

A Correct, yes.

Q Now paragraph fifty-one of the Complaint, can you read that to yourself?

A Okay.

Q Now first of all did you, is there anything that you did that you did to intentionally deprive the Plaintiffs in this case, of an opportunity to collect a larger pension?

A No.

Q Were you ever present when anyone from the City articulated or suggested or gestured toward the notion that they were taking actions to intentionally deprive the Plaintiffs of an opportunity to collect a

larger pension?

A No.

Q Were you ever present when anyone from the Union indicated to you or to anyone in your presence, that the Union was grieving in May of 2019 about seniority in an effort to intentionally deprive Plaintiffs of a larger pension?

A No.

Q Now as I said, I wasn't going to go through your Curriculum Vitae, but I want to just clarify one thing, you were off, I just want to kind a bookend this. You were off just prior to the time that the City went into bankruptcy, is that when you left City employment?

A That's correct.

Q Then you returned when exactly?

A March of 2014, but they were still going through their bankruptcy process but on the way out.

Q So they went into bankruptcy July 2013, is that your recollection?

A Yes, somewhere in there, yes.

Q Are you aware in all of your work at the City of any occasion where an employee who returns from Duty Disability to his employment with the City, comes back to work under the terms of the contract under

which he took disability, and let me be specific. For example, as you know in this case some Plaintiffs took Duty Disability and were off for fourteen or fifteen years, you understand that, don't you?

A I do.

Q Are you aware of any employee who returns to work from Duty Disability after fourteen or fifteen years and is paid at the pay rate that was in place when they took Duty Disability fifteen years earlier?

A No, employees are returned under the contractual plan.

Q Okay. I would like a moment if I could, I would like to talk to my clients. Just five minutes

MR. SANDERS: Sure, why not.

(Whereupon a brief recess was taken at or about 12:37 p.m.)

CROSS EXAMINATION

BY MR. MCFARLANE:

Q Can you tell me, is there a current process for disciplining employees of the Detroit Fire Department?

A Yes.

Q And what's the first step of that process?

A The first step of discipline?

Q When the Department issues discipline, what step does

it take?

A Conduct an investigation.

Q And after an investigation, if it's found warranted, then what happens?

A It goes to-- employees are charged through a charge Hearing. Then after the charge Hearing then it would go to, if appealed it could go to a Preliminary Hearing, and if it appealed further then It could be a grievance, it could go to grievance form.

Q And at the Charge Hearing, do they receive notice of charges?

A Yes, they do.

Q And that Notice of Charge just indicates what the discipline is for?

A Yes, what the discipline is for and what specific general order they are being charged with.

Q And you were asked a question about the seniority provisions in a current contract. Are you aware if there is a dispute between the City and the Union over which language applies to the return for Duty Disability retirement?

A Yes.

MR. SANDERS: Objection, form, foundation.

MR. SANDERS: I'm sorry, I didn't

hear his answer.

BY MR. MCFARLANE, CONTINUING:

Q What was your answer, sir?

A Yes.

Q And that dispute is the subject of the current grievance, is that correct?

A Correct.

Q And that grievance has been arbitrated?

A No.

Q You don't know, okay?

A No, I said it has not. It has been appealed to Arbitration.

Q Do you know if the Arbitration has occurred?

A Yes.

Q But a decision has not come back?

A Correct.

MR. MCFARLANE: I have nothing further.

REDIRECT EXAMINATION

BY MR. SANDERS:

Q I've got a couple questions. Was the 2014 CBA collectively bargained for?

A I was not at the table.

A MR. LEGGHIO: Objection as to foundation.

BY MR. SANDERS, CONTINUING:

Q Do you know whether or not it was implemented by the Bankruptcy Court?

MR. LEGGHIO: Objection as to foundation. It calls for a Legal conclusion.

THE WITNESS: I do not know.

MR. SANDERS: Shawndrica can you put up 00356 please?

BY MR. SANDERS, CONTINUING:

Q Can you take a look at that correspondence, please Mr. Jenkins?

A Yes.

Q And when you need to scroll, please let us know.

A Okay. Next page. Okay.

Q Are you familiar with that document?

A Yes, I am.

Q What is it?

A It's the Step I response to grievance, DFFA grievance 12-19/

Q I am going to ask that that be marked as Exhibit Number 13 to our Exhibits to our Exhibit.

(Whereupon Exhibit Thirteen was marked for identification)

BY MR. SANDERS, CONTINUING:

Q Other than grievance 12-19, are you familiar with any

other dispute concerning reinstatement from Duty Disability that the City had with the DFFA in 2019?

A No, I can't think of anything else.

Q I have nothing further.

MR. LEGGHIO: I have nothing further.

MR. MCFARLANE: The City doesn't either.

(Whereupon proceedings concluded at or about 12:45 p.m.)

CERTIFICATION

STATE OF MICHIGAN )
 )
COUNTY OF OAKLAND )

I HEREBY CERTIFY that the foregoing testimony and proceedings, consisting of eighty-eight (88) typewritten pages were mechanically recorded at the time and place hereinbefore set forth; was thereafter reduced to typewritten form; and that the foregoing is a full, true and correct transcript of the recording so taken.

Sharon Dillon, CER 3192
Certified Electronic Reporter
P.O. Box 214552
Auburn Hills, MI 48321-4864
(248)342-7229

May 7, 2021