# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN,

     Debtor.

_____/

Case No. 13-53846-tjt
Chapter 9
Hon. Thomas J. Tucker

**RESPONSE TO MOTION OF DETROIT FIRE FIGHTERS ASSOCIATION (DFFA) FOR THE ENTRY OF AN ORDER ENFORCING THE PLAN OF ADJUSTMENT AGAINST: CHRISTOPHER MCGHEE, NORMAN BROWN, CRAIG BROWN, JAMES WASHINGTON, SHANNON FERGUSON, JUNIUS PERRY AND ORLANDO POTTS**

Lower court Plaintiffs Christopher McGhee, Norman Brown, Craig Brown, James Washington, Shannon Ferguson, Junius Perry, and Orlando Potts, by and through their undersigned counsels and request that Defendant Detroit Firefighters Association (DFFA) motion for entry of an order to enforce the plan adjustment against lower court Plaintiffs be denied. In support of their response, Plaintiffs state:

1.  Plaintiffs filed the lower court case on July 8, 2020 in Wayne County Circuit Court.

2. The parties have completed the discovery process and the matter is slated for trial given the parties have not reached a settlement and was most recently stayed until January 2022 pending the outcome in this Court.

3. Defendants DFFA are attempting to achieve in this court what it believes it will not achieve in the lower court.

4. The lower court matter is one of enforcing civil rights and contractual rights arising out of Plaintiffs' relationship with their Union (DFFA) and their Employer (City of Detroit).

5. DFFA's motion for entry of an order to enforce the plan adjustment against lower court Plaintiffs should be denied for the reasons set forth in the foregoing brief.

Dated: September 24, 2021

Respectfully Submitted,

*/s/ Shawndrica N. Simmons*
SIMMONS LEGAL dba THE LAWCHIC
Attorney for Plaintiffs
77 Bagley St.
Pontiac MI 48341
(248) 732-7559 (o)
SimmonsLegal@LawChic.com

**[BRIEF IN SUPPORT FOLLOWS]**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………3

TABLE OF AUTHORITIES……………………………………………………4

I.      Plaintiffs' Introduction …………………………………………………5

II.     Issue Presented………………………………………………………………5

III.    Facts………………………………………………………………………………6

      a.  Allegations as to Plaintiff Christopher McGhee……………………12

      b.  Allegations as to Plaintiff Norman Brown…………………………..13

      c.  Allegations as to Plaintiff Craig Brown……………………………..16

      d.  Allegations as to Plaintiff James Washington………………………18

      e.  Allegations as to Plaintiff Shannon Ferguson………………………18

      f.  Allegations as to Plaintiff Junius Perry……………………………...20

IV.     The Witnesses..……………………………………………………………23

      a.  Reginald Jenkins…………………………………………………23

      b.  Kemia Crosson……………………………………………………28

      c.  Michael Nevin……………………………………………………32

V.      Plaintiffs' Cause of Action……………………………………………32

VI.     Standard of Review…………………………………………………………..33

VII.    Argument…...……………………………………………………………33

A. THE PLAINTIFFS COULD NOT HAVE ASCERTAINED THROUGH THE EXERCISE OF REASONABLE DUE DILIGENCE THAT THEY HAD A CLAIM AT THE TIME THE PETITION FOR BANKRUPTCY WAS FILED, AND ARE THUS NOT PREEMPTED FROM PURSUING THEIR CAUSE OF ACTION. ……………………………………………34

VIII.   Conclusion……………………………………………………………36

CERTIFICATE OF SERVICE..………………………………………………..38

EXHIBIT LIST……………………………………………………………39

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

## TABLE OF AUTHORITIES

*In re Senczyszyn, 426 B.R. 250 (Bankr. E.D.Mich.2010), aff'd, 444 B.R. 750 (E.D.Mich.2011)*                    [Page 32, 34]

*In re Cleveland, 349 B.R. 522, 532 (Bankr.E.D.Tenn.2006).*    [Page 32]


*O'loghlin v. County of Orange, 229 F. 3d 871 - Court of Appeals, 9th Circuit 2000*                    [Page 35]

*United States v. Sotelo, 436 U.S. 268, 280, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978)*                    [Page 36]

*Kokoszka v. Belford, 417 U.S. 642, 645-646, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974)*                    [Page 36]

*Lines v. Frederick, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970)*                    [Page 36]

**Other**

*11 U.S.C. § 101(5)*                    [Page 32]

Federal Rule of Civil Procedure 12(b)(6)                    [Page 35]

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

## I.    INTRODUCTION

Plaintiffs filed the lower court cause of action in the Wayne County Circuit Court in July 2020.  This is a case in which the Defendants failed to consistently apply the provisions of the Detroit Fire Fighters Association (DFFA) Collective Bargaining Agreement (CBA) after the Plan of Adjustment concerning the City of Detroit Bankruptcy was confirmed on November 12, 2014.  The Defendants conspired to deprive the Plaintiffs of their seniority, promotional opportunities, and pensions in violation of their civil rights.  The Plaintiffs do not seek damages against the Pension Fund in this cause of action.  The Pension Fund has not been sued.  Nor do the Plaintiffs seek damages for any occurrences prior to confirmation of the Plan of Adjustment on November 12, 2014.  Rather the Plaintiffs seek damages from the named Defendants for the inconsistent application of the 2014 CBA after November 12, 2014, and the resulting injuries suffered by the Plaintiffs.

## II.    ISSUE PRESENTED

A. WHETHER THE PLAINTIFFS COULD HAVE ASCERTAINED THROUGH THE EXERCISE OF REASONABLE DUE DILIGENCE THAT THEY HAD A CLAIM AT THE TIME THE PETITION FOR BANKRUPTCY WAS FILED, AND ARE THUS PREEMPTED FROM PURSUING THEIR CAUSE OF ACTION?

Plaintiffs answer:          No.

Defendants answer:          Yes.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

## III.   FACTS

1.   The lower court action was brought to enforce civil rights and contractual rights arising out of the Plaintiffs' relationship with their Union, and their Employer.

2.   At all times relevant hereto, Plaintiffs were employed by the Defendant City of Detroit, as firemen, and they were members of the Detroit Fire Fighters Association, Local 344.

3.   The Plan of Adjustment concerning the City of Detroit Bankruptcy was confirmed on November 12, 2014.

4.   Prior to 2014, the Collective Bargaining Agreement (CBA) had between the City and DFFA allowed a fire fighter that had retired as a result of a duty disability to maintain his/her accumulated seniority if they returned to the employ of the City of Detroit as a fire fighter.

5.   Additionally, the CBA allowed an employee that returned to work after a duty disability retirement to achieve and assume the rank of his/her class on an accelerated basis.

6.   Specifically, the 2001-2008 CBA had between DFFA and the City stated in part:

   *Section 9. Seniority -  C. Forfeitures 8 (a)-(b)*

*(a)Seniority credit for promotions to any position in the Department shall be frozen and cease to accumulate for any member on a disability retirement for three (3) years or more. <u>In the event such person is returned to active service, he/she shall be reinstated with his/her frozen seniority.</u>*

*(b) Persons who return to active service from duty disability retirement after one (1) or more years of absence must attend and successfully complete a re-entry training program including a performance physical evaluation that is conducted by the Fire Training Division and approved by the Chief of Fire Operations and Executive Fire Commissioner.*

\*\*\*

**Section 9. Seniority -  E. Promotions and Transfers - Fire Fighting Division**

*1. General: Promotions in the Fire Department shall be based on length of service therein. The officers or employee thereof having served the longest period in any position shall be advanced to fill any vacancy in the next higher position, if he/she shall have the qualifications therefore.*

*a. Promotions shall be based solely upon seniority provided the senior employee shall satisfy qualifications for the position for which he/she is to be promoted[1].*  See Exhibit 1.

7.     Prior to 2014, and after, in reliance upon the longstanding disability retirement policy, a litany of fire fighters, including the Plaintiffs, retired with a duty disability injury, and sometime thereafter returned to the employ of the City of Detroit as a fire fighter.

---

[1] The 2001-2008 CBA was mutually extended through 2013.

8. Those individuals were allowed to return as fire fighters, maintain their seniority, and advance to the rank of their entry class.

9. On November 6, 2014, the City and the DFFA entered into a new CBA 2014-2019. See Exhibit 2.

10. **Article 12 Seniority - D (2) of the 2014-2019 CBA**, states that employees who retire from service as a result of a duty disability, shall lose their seniority. See Exhibit 2.

11. Pursuant to the new CBA provision, they shall no longer be allowed to return to the employ of the City and maintain their accumulate seniority, or advance to the rank of their original class.

12. However, after implementation of the new CBA provision in 2014, no duty disability retired fire fighter was ever notified by the City or the Union that they would lose all of their seniority if they returned to work for the City.

13. To the contrary, after negotiation of the 2014-2019 CBA, the City continued to return many fire fighters to duty with their previous seniority in tack, without objection from the Union; and officers were allowed to assume the rank that their original class had achieved for up to 5 years after implementation of the 2014 CBA.

14. In fact, after 2014 the City and the Union agreed to allow some fire fighters to return from duty disability retirement, maintain their previous seniority, be promoted in accordance with their class ranking, and retire after receiving the promotion with a pension based upon the ranking that they had achieved with their original class. See Exhibit 16.

15. Thereafter, in continuation of the conspiracy to selectively enforce the new provision of the 2014 CBA, in May 2019 (**five years later**), the Union filed a grievance maintaining that the City had violated the CBA by returning fire fighters to duty with their seniority after a disability retirement. See Exhibit 3 & 4.

16. The grievance was filed in violation of the CBA years after the Union first became aware that fire fighters were returning from a duty disability and being allowed to maintain their previous seniority.

17. In accordance with the 2014-2019 CBA*; "Any grievance not filed within ten (10) calendar days of the occurrence of the alleged violation or within ten (10) calendar days of an Employee or the Association becoming aware of an alleged violation will be considered untimely and will not be processed".* See Exhibit 2.

18. The Defendants conspired to ignore the CBA statute of limitations, and the grievance was recognized and acknowledged by the City. Particularly, even prior to the filing of the Union's grievance, the Defendant City and DFFA had already agreed to the resolution of the grievance. See Exhibit 5.

19. Thereafter, without cause, the Defendants agreed to take disciplinary action against the Plaintiffs, in accordance with their prior agreement as articulated in Exhibit 5.

20. The Defendants put in place a blanket demotion of all disability retirement returnees that had returned to work for the City after 2014. See Exhibit 5.

21. As a result, the Plaintiffs were stripped of the seniority they had accumulated prior to their retirement, and in many instances demoted. See Exhibits 6, 7, 8, 9 & 10.

22. Some of the Plaintiffs were denied the opportunity to return to work during the pendency of the Union's grievance, and they were ultimately striped of their seniority, and denied placement with their class. Subsequently, after implementation of the new seniority stripping policy, they were ordered to return to work. See Exhibits 11, 12, 13.

23. The Plaintiffs were not afforded any type of hearing prior to the disciplinary actions taken against them.

24.     The Defendants' goal was to strip the Plaintiffs of their seniority, and take away any promotion which was the result of the systematic seniority promotion.

25.     The disparate treatment and lack of due process in which the stripping of seniority and promotions occurred was presented to the Union on numerous occasions by those victimized, however they refused to assist the Plaintiffs.

26.     The Plaintiffs requested that grievances be filed, and wrote letters to both the Union and the City in an effort to address the disparate treatment; however, their efforts fell on deaf ears.

27.     Long after the Union had cut a deal with the City to deprive the Plaintiffs of their seniority and promotions, the Union filed token grievances on behalf of the Plaintiffs.  See Exhibit 1.

28.     The grievances were denied by the City, and the Union refused to pursue arbitration as it relates to the grievances.

29.     The City nor the Union made any effort to address the injustice that was being done to the Plaintiffs.

30.     All of the Plaintiffs affected by the conspiracy of the Defendants, which deprived them of their seniority and promotions (or promotional opportunities) were over the age of 40.

31.     All of the Plaintiffs affected by the conspiracy of the Defendants, which deprived them of their seniority and promotions (or promotional opportunities) were formerly disabled.

32.     In accordance with the CBA discipline and demotions shall only occur when there is just cause.  See Exhibit 2.

33.     The Defendants did not have just cause to discipline and/or demote the Plaintiffs.

34.     ***The actions taken against the Plaintiffs were taken 5 years after the Plan of Adjustment concerning the City of Detroit Bankruptcy was confirmed on November 12, 2014, and therefore the Plaintiffs could not have ascertained through the exercise of reasonable due diligence that they had a claim at the time the petition for bankruptcy was filed.***

### Allegations as to Plaintiff Christopher McGhee

35.     Plaintiff McGhee's date of birth is June 24, 1963.

36.     McGhee became employed with the Detroit Fire Department on or about March 9, 1992.

37.     McGhee underwent a disability retirement on or about December 26, 1999.

38. After undergoing surgery and therapy as a result of his injury, McGhee was rehired by the City of Detroit, and returned to work on or about June 21, 2016.

39. After returning to work, he was promoted through the seniority system, achieved the rank of Lieutenant on October 10, 2019, in accordance with his class ranking, and was earning a salary of $72,000/year.

40. McGhee was stripped of the seniority he had earned prior to his disability retirement, and demoted on or about January 27, 2020 to the position of Fire Fighter at a pay rate of $59,417.00/year.

41. The disciplinary action taken against McGhee was without just cause.

## Allegations as to Plaintiff Norman Brown

42. Plaintiff Norman Brown's date of birth is January 26, 1969.

43. N. Brown underwent a disability retirement in 2003.

44. After rehabilitation, he returned to work in January 2018 as a fire fighter.

45. Thereafter he was promoted through testing (as opposed to the seniority system) to the rank of Lieutenant on July 30, 2018 and was earning approximately $71,000/year.

46. On or about October 10, 2019, N. Brown wrote a letter to the DFFA expressing his concern that he had been informed by the City of Detroit that

his seniority would be reduced and he would be demoted as a result of a grievance filed by the DFFA concerning promotions received by him and other fire fighters.

47. N. Brown further expressed that the grievance was not filed in a timely manner.

48. N. Brown requested that a grievance be filed on his behalf, and he further requested an opportunity to meet with a Union representative.

49. On December 20, 2019, N. Brown wrote a letter to Defendant Harp in which he expressed:

> *I am writing today in the hopes of clearing up any confusion as it pertains to my potential demotion resulting from your May 2019 Grievance. The Grievance stated the City was in violation of (seniority) Article 12 Section 7 found on Pages 17 & 18 of the CBA which states:*
>
>> *An employee shall lose his seniority due to absence from work for any reason in excess of two (2) years.*
>
> *As you know, my position with Fire Prevention is <u>not</u> the result of seniority. Bulletin #4/18 gives clear requirements for the position to Fire Prevention which state:*
>
>> *\*Are you a current Detroit Fire Employee*
>> *\* Do you have 5 years' experience in the Fire Fighting Division on Active Duty*

> *I met all requirements and was selected in June 2018. There were no grievances from members nor rejections from the Union. (See Application & Selection, Page 25) Since we are not using the promotional provisions found on pages 19-24 of the CBA, seniority has no bearing on my position and, as a dues-paying member in good standing, I will need assistance with this matter before any adverse action is taken against me.*

50.    N. Brown's inquiry was ignored.

51.    He was demoted January 27, 2020 to the position of Fire Fighter, at a pay rate of approximately $59,000/yr.

52.    The disciplinary action taken against N. Brown was without just cause.

53.    On or about February 3, 2020, N. Brown filed a grievance concerning his demotion.

54.    On or about March 11, 2020, N. Brown wrote to Defendant Gehart.

55.    At that time, he reiterated his concern that he believed he and others had been discriminated against on the basis of their prior disability.

56.    N. Brown expressed concern that the Union had not followed the CBA when processing the Union grievance.

57.    N. Brown expressed concern that there are other areas of the CBA that the City has not complied with, and the Union has failed to seek consistent universal enforcement.

58. His inquiries were ignored, and he was informed by the Union that they would not pursue the grievance that he had filed concerning his demotion.

59. Once again on March 16, 2020, N. Brown wrote a letter to Defendant Gehart in which he stated in part:

> *...my promotion to Fire Prevention was based on the administered examination results and the oral interview.*
>
> *Another situation that I found to be disturbing is my demotion from FFD to Fire Fighter. Prior to my duty disability status, I met the department's requirements to apply for and become a Fire Fighter Driver applicant. I was later promoted to the classification of FFD after satisfactorily meeting the departments mandatory standards. When I returned to duty, my classification according to the department was FFD and, during my retraining period at the RTC, Chief Green ordered Pump Apparatus Operator and Qualified Driver's Training classes which I completed and was certified.*
>
> *Over the past few months, during my inquiries I found that I am not "similarly situated" as the City suggests. For example, several members were returned to the Fire Fighting Division, systemically promoted, and later retired.*

60. His inquires to the Union were ignored.

### Allegations as to Plaintiff Craig Brown

61. Plaintiff Craig Brown's date of birth is April 29, 1973.

62. C. Brown became employed with the Detroit Fire Department on or about January 25, 1999.

63. C. Brown underwent a disability retirement on or about May 6, 2013.

64. C. Brown underwent treatment for his injury, and was returned to work on or about May 8, 2017.

65. After returning to work, on or about January 27, 2020, C. Brown was stripped of his prior 11 years of seniority and given a new seniority date with 2 years and 8 months of seniority.

66. The disciplinary action taken against C. Brown was without just cause

67. On or about February 6, 2020, C. Brown filed a grievance challenging the loss of his seniority.

68. However, the Union refused to pursue the grievance.

69. C. Brown sent a letter to Defendant Harp requesting an explanation as to why the Union was refusing to pursue his grievance, however, he did not receive a response to his inquiry.

70. Further, on or about March 21, 2020, C. Brown complained to the Union Executive Board and Defendant Crosson that his Return to Duty Seniority Adjustment had been miscalculated.

71. He indicated that his duty disability date was incorrect, as well as his indicated previous service time.

72. However, he never received any response from the Union or Ms. Crosson as it relates to the concerns he expressed.

73.  C. Brown would have been promoted to Sargent if he had not been demoted.

**Allegations as to Plaintiff James Washington**

74.  Plaintiff James Washington's date of birth is November 30, 1961.

75.  Washington became employed with the Detroit Fire Department on or about August 10, 1992.

76.  Washington underwent a disability retirement on or about March 15, 2013.

77.  Washington underwent treatment for his injury and was rehired by the City of Detroit on or about September 26, 2016.

78.  After returning to work, he was promoted through the seniority system, achieved the rank of Fire Sergeant, and was earning $68,547.00/year.

79.  Washington was demoted on or about January 27, 2020 to the position of Fire Fighter at a pay rate of $59,417.00/year.  See Exhibit 15, pg. 60.

**Allegations as to Plaintiff Shannon Ferguson**

80.  Plaintiff Shannon Ferguson's date of birth is December 19, 1967.

81.  Ferguson became employed with the Detroit Fire Department on or about August 1994.

82.  Ferguson underwent a disability retirement in 2003.

83.  Ferguson submitted a request to return to work letter February 2018.

84. Ferguson received a letter from the City in September 2018 clearing him to return to duty.

85. Ferguson spoke with Defendant Crosson, and she told him she would contact him after she scheduled his return to work.

86. He had several conversations with Defendant Crosson in 2018 and 2019 in which she stated that she was working on his return to work.

87. On March 10, 2020, Ferguson received a certified letter from the City.

88. The letter was dated February 27 2020, and postmarked March 5, 2020.

89. The letter informed him that he must return to work by March 3, 2020 or be considered a voluntary quit.

90. Ferguson spoke with Defendant Crosson; however, she was unaware how to direct him to return to work.

91. She advised Ferguson that there was a new CBA that would prevent him from retaining his seniority status upon return to work.

92. She indicated that Ferguson would return as a new hire, with no seniority.

93. Defendant Crosson also stated that she was unclear if the new CBA would affect Ferguson's ability to return to work, and that she would seek clarification and contact him.

94. Defendant Crosson never gave Ferguson further instructions on how to complete the return to work process.

95. Ferguson made additional attempts to contact Crosson for instructions on how to return to work, however, Defendant Crosson never responded to his inquires.

96. On or about March 20, 2020 Ferguson received a call from Kelly Tapper concerning his return to work.

97. She stated that because Ferguson had reached the 25th anniversary of his seniority date on August 8, 2019, he was no longer eligible to be considered to return to work.

98. If Ferguson had been allowed to return to work, he should have been promoted through the seniority system, achieved the rank of Fire Sergeant, and been earning $68,547.00/year.

**Allegations as to Plaintiff Junius Perry**

99. Plaintiff Perry's date of birth is December 19, 1976.

100. Perry became employed with the Detroit Fire Department on or about January, 1999.

101. Perry underwent a disability retirement in 2010.

102. Perry underwent treatment as a result of his injury.

103. Perry sent a letter to the City of Detroit seeking to return to work on or about June 2019.

104. Perry was found to be fit to return to work by the City on or about July 18, 2019.

105. Perry was finally allowed to return to work in March 2020.

106. Perry was denied the opportunity to maintain the seniority he had accumulated prior to his disability, and he was returned to work in the position of Fire Fighter at a pay rate of $59,417.00/year.

107. Perry should have been promoted through the seniority system and achieved the rank of Fire Sergeant upon his returned to work, at a rate of pay of $68,547.00/year.

### Allegations as to Plaintiff Orlando Potts

108. Plaintiff Orlando Pott's date of birth is April 23, 1971.

109. Potts became employed with the Detroit Fire Department on or about March 11,1991.

110. Potts underwent a disability retirement in June 2005.

111. Potts was approved to return to work on or about June 21, 2018.

112. Potts made several attempts to speak to Ms. Crosson about arranging to return to work.

113.  He finally spoke to her on July 23, 2018, at which time Ms. Crosson responded and indicated that she would get back to him about the process of returning to work.

114.  He continued to call and left several voice messages in hopes of expediting the process of reinstatement .

115.  On or about August 27, 2018 he received a voicemail from Ms. Crosson stating that she was waiting to hear from another department.

116.  Mr. Potts began to email Ms. Crosson inquiring as to when he could return to work.

117.  His initial email was on September 19, 2018 and several emails followed.

118.  However, he continued to receive no direction from Ms. Crosson.

119.  On or about May 23, 2019, Potts emailed Ms. Crosson , and she replied and stated that the Department was addressing a grievance regarding the matter, and when the grievance process was completed, she would be in touch with him.

120.  On or about March 4, 2020 Potts received a letter stating to return to work no later than Monday, March 3, 2020.

121.  Potts attempted to call Ms. Crosson to gain clarity concerning the letter he had received.

122. Several days thereafter, Potts was contacted by Ms. Crosson, and she informed him that he had to return to work, and start his career over.

123. She stated he would lose all of his seniority; and if he didn't return, his pension checks would stop, and would be considered a Voluntary Quit .

124. Thereafter, Potts converted his disability retirement to a general retirement.

125. At the time Potts went out on a disability retirement, he was a lieutenant in the Fire Marshall Division earning $63,251.00/year.

126. Potts should have been allowed to return to work with his accumulated seniority.

127. If he had been allowed to return to work with his accumulated seniority, he would have achieved the rank of Captain, and been earning over $80,000/year.

128. Potts loss all of his seniority and was returned to the rank of Fireman.

129. Potts will have a reduced income over 16 years in the approximate amount of $328,800.

## IV. THE WITNESSES

### Reginald Jenkins

130. Reginald Jenkins is the Second Deputy Fire Commissioner for the City of Detroit. See Exhibit 14, pg. 12.

131. Mr. Jenkins was produced by the City of Detroit as <u>the person most</u>
     <u>knowledgeable as it relates to the grievances that were filed by the DFFA and</u>
     <u>the Plaintiff's</u> concerning the herein matter. See Exhibit 1 & 14, pgs. 17, 60
     & 66.

132. Mr. Jenkins testified that Grievance 12-19 (filed by the DFFA) was resolved
     as follows: *"Employees that were retired on Duty Disability from the start of*
     *the [2014] contract had their seniority adjusted to the date of their return to*
     *the Department".* See Exhibit 14, pg. 25.

133. Mr. Jenkins acknowledged **that prior to the filing of Grievance 12-19,**
     Hakim Berry, Chief Operating Officer for the **City of Detroit/Director of**
     **Labor relations entered into an agreement with the DFFA President**
     **Michael Nevin** which stated: *<u>"That the employees returning from Duty</u>*
     *<u>Disability will come back with seniority dates based upon the date of their</u>*
     *<u>return to the Department –</u> **<u>[and] the DFFA would not grieve</u>** <u>that [action as</u>*
     *<u>it relates to negatively affected Plaintiffs].</u>* See Exhibit 2 & 14, pg. 26.

134. Concerning the Plaintiffs and others that were allowed to return to work after
     2014, maintain their seniority, be promoted, and work for several years, Mr.
     Jenkins was asked:

     Q      *How is it that these individuals returned to work and were*
            *able to maintain their seniority, how did that happen?*

A    *... the contractual language was not adhered to because they returned under the old process, and -- Which did not have any change of seniority ramifications.*

Q    *And <u>why were they returned under the old process</u>?*

A    *<u>I don't know</u>, because I was not responsible for that.*

Q    *Who was responsible for it?*

A    *That would have been Ms. Crosson, Kemia Crosson.*

135.    Mr. Jenkins is not aware of the affected individuals ever being notified in writing concerning a meeting to discuss the loss of their seniority and/or demotions.

136.    Mr. Jenkins was asked if he was aware of any facts that would contradict the allegations in line 35 of the Plaintiffs' Complaint which states; *"However, after implementation of the new CBA provision in 2014, no duty disability retired fire fighter was ever notified by the City of the Union that they would lose all of their seniority if they returned to work for the City".* See Exhibit 14, pg. 46. Mr. Jenkins responded: *"I don't know".* See Exhibit 14, pg. 47.

137.    Mr. Jenkins was asked if he was aware of any facts that would contradict the allegations in line 36 of the Plaintiffs' Complaint which states; *"To the contrary, after negotiation of the 2014-2019 CBA, the City continued to return many fire fighters to duty with their previous seniority in tack, without*

*objection from the Union; and officers were allowed to assume the rank that their original class had achieved".* Mr. Jenkins responded: *"I don't know".*

138. Mr. Jenkins was asked if he was aware of any facts that would contradict the allegations in line 37 of the Plaintiffs' Complaint which states; *"The Defendants had conspired to selectively enforce the new provision of the 2014-2019 CBA".* See Exhibit 14, pg. 47. Mr. Jenkins responded: *"I don't know".* See Exhibit 14, pg. 48.

139. Mr. Jenkins was asked if he was aware of any facts that would contradict the allegations in line 38 of the Plaintiffs' Complaint which states*; "In fact, after 2014 the City and the Union agreed to allow some fire fighters to return from duty disability retirement, maintain their previous seniority, be promoted in accordance with their class ranking, and retire after receiving the promotion with a pension based upon the ranking that they had achieved with their original class".* See Exhibit 14, pg. 48. Mr. Jenkins responded: *"I don't know".* See Exhibit 14, pg. 49.

140. Mr. Jenkins was asked if he was aware of any facts that would contradict the allegations in line 38 of the Plaintiffs' Complaint which states*; "The grievance was filed in violation of the CBA years after the Union first became aware that Fire Fighters were returning from a Duty Disability and being*

*allowed to maintain their previous seniority"*. See Exhibit 14, pg. 49. Mr. Jenkins responded: *"I don't know"*. See Exhibit 14, pg. 50.

141. Though Grievance 12-19 was filed untimely, Mr. Jenkins testified that he is not aware of the Union requesting an extension to file the grievance; nor is he aware of the City granting the Union an extension in which to file the grievance. See Exhibit 14, pg. 52.

142. When asked whether the City of Detroit and the Union had conspired to ignore the statute of limitations for the filing of Grievance 12-19 (which is 10 calendar days), Mr. Jenkins stated*: "I don't know"*. See Exhibit 14, pgs. 51, 52, & 53.

143. Mr. Jenkins testified that he is unaware as to whether the Plaintiffs were afforded a hearing prior to having their seniority taken away from them and/or being demoted. See Exhibit 14, pgs. 55-56.

144. Mr. Jenkins testified that he was unaware of any facts that would contradict the Plaintiffs' allegation in line 51 of their Complaint, that the Defendants intentionally deprived the Plaintiffs of the opportunity to collect a larger pension. See Exhibit 14, pg. 58.

145. Mr. Jenkins does not dispute that discipline and demotions can only occur for just cause. See Exhibit 14, pgs. 58-59.

146. As it relates to Norman Brown's promotion; Mr. Jenkins acknowledged that some firefighters are promoted via seniority, and that for some positions, fire promotions occur via testing. See Exhibit 14, pg. 60.

147. However, when asked; *"So, if Mr. Brown was promoted by the taking of an exam, should he have been demoted as a result of Grievance 12-19?"* Mr. Jenkins responded; *"I don't know"*.

**Kemia Crosson**

148. Ms. Crosson is an Employee Services Consultant. See Exhibit 15, pg. 5.

149. In that capacity, she serves as the HR consultant to the Fire Department and the Health Department. See Exhibit 15, pg. 6.

150. It is Ms. Crosson's responsibility to begin the employee return to work process, once an employee has completed a duty disability. See Exhibit 15, pg. 9.

151. It was Ms. Crosson's responsibility to assure that employees returning from a duty disability have the appropriate seniority documented within their files. See Exhibit 15, pg. 7.

152. Ms. Crosson was asked; _You said it was your responsibility to assure that the seniority was appropriate, and my question to you is, the contract language that you reference in paragraph one, was it your opinion that that language_

*was not to be applied retroactive, and is that why you allowed him to come*

*back and maintain all of his seniority?  Her response was:* ***"I don't recall"***.

See Exhibit 15, pg. 19 & 20.

153. However, Ms. Crosson acknowledged that she made the decision to return the
Plaintiffs back to work after their duty disability retirement with their original
seniority in place, and at the rank of their entry class, in accordance with the
past practice of the Fire Department.  See Exhibit 15, pg. 17.

154. Ms. Crosson acknowledged that Norman Brown had received his promotion
via testing, and not seniority; yet he was demoted even though the grievance
filed by the DFFA dealt with promotions pursuant to seniority only.  See
Exhibit 15, pgs. 23-24.

155. Ms. Crosson acknowledged that Norman Brown had met all of the
qualifications to maintain his position, and not be demoted.  See Exhibit 15,
pg. 28-29.

156. Ms. Crosson acknowledged that the City of Detroit never notified the
Defendants that there would be any change to their retirement benefits as a
result of the 2014 contract.  See Exhibit 15, pg. 34.

157.  Ms. Crosson acknowledged that she does not have any documentation that would support her claim that she had authorized Mr. Perry to return to work prior to March 2020:

> Q    *So there was nothing in writing telling him to report to the Chief for assignment –-*
>
> A    *No.*
>
> Q    *There was nothing in writing telling him to report to Training Camp for Training, correct?*
>
> A    *No.*

158.  Ms. Crosson acknowledged that even though Mr. Ferguson had been cleared by the Pension Board to return to work, she held up his return because she was unclear if the new [2014-2019] CBA would affect Ferguson's ability to return to work.  See Exhibit 15, pg. 46.  She did not schedule him for a physical, or take any of the other customary procedures that would allow him to return to work.  See Exhibit 15, pg. 47.

159.  Ms. Crosson acknowledged that though the Pension Board authorized Mr. Potts to return to work, she held up his return to work while waiting for direction concerning same from Labor Relations.  **She testified that she lacked any understanding as to what his seniority should be, or the**

**position he should have assumed upon his return**. See Exhibit 15, pgs. 51 & 52.

160. Further, when Mr. Potts requested something in writing concerning his return to work status, Ms. Crosson indicated that she had nothing to give him. See Exhibit 15, pg. 55.

161. On May 23, 2019 she informed Mr. Potts that he could not return to work until the grievance that had been filed concerning duty disability retirement had been resolved. See Exhibit 15, pgs. 56-57.

162. Once again, Ms. Crosson acknowledged that she had no idea what Mr. Potts seniority rate/level should have been. See Exhibit 15, pg. 57.

163. Ms. Crosson acknowledged that the City of Detroit never met with the Plaintiffs to discuss the loss of their seniority or their demotions. See Exhibit 15, pgs. 66-67 & 81.

164. Ms. Crosson acknowledged that the adjustment of the Plaintiffs' seniority caused them damage by affecting their pensions, pay, title, and resulted in demotions. See Exhibit 15, pg. 83.

**Michael Nevin**

165. Mr. Nevin was President of the DFFA from December 2015 – December 2019. See Exhibit 16.

166. Mr. Nevin testified that the language concerning loss of seniority was written during the bankruptcy by people who were not knowledgeable about the City or the Fire Department. See Exhibit 16.

167. He indicated that the language regarding loss of seniority was never explained to the membership, because no one took it seriously once the CBA was ratified. See Exhibit 16.

168. <u>He indicated that the Plaintiffs should not have lost their seniority, and that there was an agreement with the City of Detroit to that extent.</u> See Exhibit 16.

169. **<u>This statement by Mr. Nevin contradicts the letters that he exchanged with the City of Detroit prior to the filing of the DFFA grievance. See Exhibit 4.</u>**

## V.    PLAINTIFFS' CAUSE OF ACTION

170. Plaintiffs filed their First Amended Complaint on July 8, 2020 alleging (1) Breach of Duty of Fair Representation, (2) Breach of Fiduciary Duty, (3), Breach of Contract, (4) Breach of Just Cause Employment Agreement, (5) Promissory Estoppel, (6) Violation of the Persons With Disabilities Civil Rights Act, (7) Age Discrimination, (8) Tortious Interference with a Business Relationship or Expectancy, (9) Violation of the 14th Amendment, by Discrimination and Retaliation, (10) Violation of the 14th Amendment Due

Process, (11) Municipal Liability for Constitutional Violations, and (12) Civil Conspiracy.

171.   The Defendants DFFA (with Defendant City of Detroit concurring now bring the herein Motion over 1-year latter alleging violation of the Bankruptcy Plan of Adjustment.

## VI.   STANDARD OF REVIEW

As explained in *In re Senczyszyn, 426 B.R. 250 (Bankr. E.D.Mich.2010), aff'd, 444 B.R. 750 (E.D.Mich.2011)*, the most widely adopted test, has been alternately termed the "fair contemplation," "foreseeability," "pre-petition relationship," or "narrow conduct" test. Under this test, <u>a claim is considered to have arisen pre-petition if the creditor "could have ascertained through the exercise of reasonable due diligence that it had a claim" at the time the petition is filed.</u>  The Bankruptcy Code defines "claim" as a "right to payment, *11 U.S.C. § 101(5)*. A "matured claim" is one that is "`unconditionally due and owing,'" while an "unmatured claim," is "one which is not yet due and owing*." In re Cleveland, 349 B.R. 522, 532 (Bankr.E.D.Tenn.2006).*

## VII.   ARGUMENT

## A. THE PLAINTIFFS COULD NOT HAVE ASCERTAINED THROUGH THE EXERCISE OF REASONABLE DUE DILIGENCE THAT THEY HAD A CLAIM AT THE TIME THE PETITION FOR BANKRUPTCY

**WAS FILED, AND ARE THUS NOT PREEMPTED FROM PURSUING THEIR CAUSE OF ACTION.**

It is clear pursuant to the above facts <u>the Plaintiffs could not have ascertained through the exercise of reasonable due diligence that they had a claim at the time the petition for bankruptcy was filed</u>.  See *In re Senczyszyn, 426 B.R. 250 (Bankr. E.D.Mich.2010), aff'd, 444 B.R. 750 (E.D.Mich.2011).*  <u>The Plaintiffs did not have a "matured claim"</u> until in January 2020 (**five plus years later**), the Union and the City agreed to demote fire fighters who had returned from a duty disability retirement, and strip them of all of their seniority.  See *In re Cleveland, 349 B.R. 522, 532 (Bankr.E.D.Tenn.2006).*

Moreover, even to the extent some of the Plaintiffs claims were found to predate the Plan of Adjustment, the Plaintiffs should be allowed to proceed with their cause of action as it relates to those claims that do not predate the Plan of Adjustment.

In the case of *O'loghlin v. County of Orange, 229 F. 3d 871 - Court of Appeals, 9th Circuit 2000,* the district court dismissed O'Loghlin's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), holding that her claim, in its entirety, was discharged in the County's bankruptcy proceeding. **O'Loghlin alleged violations of the ADA both before and after the date of discharge**. <u>The Court of Appeals held that the district court's dismissal of O'Loghlin's claim was proper insofar as it pertained to the County's alleged pre-</u>

<u>discharge violations.</u> However, **the dismissal of her claim was improper insofar as it pertained to an alleged post-discharge violation, even though the post-discharge violation was a continuation of the County's allegedly illegal pre-discharge behavior.** The Court of Appeals stated:

> *In this case of first impression, we hold that the County is liable for post-discharge conduct that violated the ADA.*
>
> \*\*\*
>
> *The district court's holding would allow a defendant to use pre-discharge violations of the ADA to insulate itself from liability for post-discharge violations, so long as the pre- and post-discharge violations were part of the same course of conduct. Under this holding, the County would be advantaged by its own earlier violation of the ADA, for if the County had not violated the ADA during the pre-discharge period it would clearly be liable for a violation in the post- discharge period. To put it another way, this holding would disadvantage- indeed, doubly disadvantage-O'Loghlin. Not only would O'Loghlin be unable to recover damages for the County's pre-discharge violations of her rights under the ADA; she would also be unable to recover damages for the County's post- discharge violation of those same rights.*
>
> *The bankruptcy laws provide no justification for such a result. Their purpose is to provide a "fresh start" to a discharged debtor. United States v. Sotelo, 436 U.S. 268, 280, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978); Kokoszka v. Belford, 417 U.S. 642, 645-646, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974); Lines v. Frederick, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). <u>A suit for illegal conduct occurring after discharge threatens neither the letter nor the spirit of the bankruptcy laws</u>. A "fresh start" means only that; it does not mean a continuing license to violate the law.* See Exhibit 17.

Further, Page 85 of the order confirming the Plan of Adjustment clearly states that the confirmation does not apply to things that take place after the date of confirmation of the plan:

> *For the avoidance of doubt, <u>the foregoing sentence does not provide for a release, waiver or discharge of obligations of the City that are established in the Plan or that arise from and after the Effective Date</u> with respect to (a) pensions as modified by the Plan or (b) <u>labor-related obligations, which post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives</u> to the extent permitted by applicable non-bankruptcy law....* See Exhibit 18.

Clearly, in the case at bar, there is no violation of the Bankruptcy Plan of Adjustment, and the Plaintiffs should be allowed to proceed with their civil cause of action.

## VIII. CONCLUSION

WHEREFORE, Plaintiffs request that Defendant's motion be denied and that Plaintiffs be granted cost and attorney fees for having to defend this Motion.

Plaintiffs do not consent to entry of final orders or judgment by the bankruptcy court.

Respectfully submitted,

Dated: September 24, 2021

/s/ Herbert A. Sanders
Herbert A. Sanders (P43031)
The Sanders Law Firm, P.C.
Attorney for Plaintiffs
615 Griswold, Suite 913

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Detroit, MI  48226
Phone:  313-962-0099
Fax:  313-962-0044
haslawpc@gmail.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2021, I electronically filed Plaintiffs'

Response to Defendant Motion Entry of an Order Enforcing the Plan of Adjustment

against lower court Plaintiffs with the Clerk of the Court using the ECF system

which will send notification of such filing to all lower court Defendants.

Dated: September 27, 2021        Respectfully Submitted,
                                          */s/ Shawndrica N. Simmons*
                                          Shawndrica N. Simmons
                                          P70608 (Michigan)
                                          SIMMONS LEGAL dba the LawChic
                                          Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

## EXHIBIT LIST

1. Exhibit 1 – 2001-2008 CBA – Pg. 1

2. Exhibit 2 – 2014-2019 CBA – Pg. 4

3. Exhibit 3 – Notice of Depositions and Grievances – Pg. 9

4. Exhibit 4 – May 14, 2019 Denial of DFFA Grievance – Pg. 23

5. Exhibit 5 – February 26, 2019 Agreement Re DFFA Grievance – Pg. 25

6. Exhibit 6 – Norman Brown Communications – Pg. 27

7. Exhibit 7 – Norman Brown Communications – Pg. 32

8. Exhibit 8 – Craig Brown Communications – Pg. 33

9. Exhibit 9 – Christopher McGhee Communications – Pg. 35

10. Exhibit 10 – James Washington Communications – Pg. 37

11. Exhibit 11 – Orlando Potts Communications – Pg. 42

12. Exhibit 12 – Shannon Ferguson Communications – Pg. 50

13. Exhibit 13 – Junius Perry – Communications – Pg. 53

14. Exhibit 14 – Jenkins Deposition – Pg. 56

15. Exhibit 15 – Crosson Deposition – Pg. 78

16. Exhibit 16 – Nevin Affidavit – Pg. 100

17. *O'loghlin v. County of Orange, 229 F. 3d 871 - Court of Appeals, 9th Circuit 2000*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

18. Order, Plan of Adjustment