EXHIBIT

14

## Page 1

```
STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHRISTOPHER MCGHEE, NORMAN BROWN
CRAIG BROWN, JAMES WASHINGTON
SHANNON FERGUSON, JUNIUS PERRY
And ORLANDO POTTS,

                    Plaintiff,

    vs.                        Case No.: 20-006272-CD
                               Hon. Shelia Gibson
CITY OF DETROIT, et al
In their Individual and
Official Capacities,
Jointly & Severally,

                    Defendants.        /

            DEPOSITION OF REGINALD JENKINS,

        Taken by the Plaintiff Via Zoom on Wednesday, March

    10, 2021, at 11:00 a.m.

APPEARANCES:

For the Plaintiffs:      HERBERT A SANDERS (P43031)
                         615 Griswold, Suite 913
                         Detroit, MI  48226
                         (313) 962-0099

For the Defendant        CHRISTOPHER P. LEGGHIO (P37205)
Fire Department          306 S. Washington, Ste. 600
                         Royal Oak, MI  48067
                         (248) 398-5900

For Defendant            JASON T. MCFARLANE (P73105)
City of Detroit          2 Woodward Ave., Ste. 500
                         Detroit, MI  48226
                         (313) 224-4550
```

## Page 2

TABLE OF CONTENTS

WITNESS:                                        PAGE

RALPH JENKINS

    Direct Examination by Mr. Sanders            3
    Cross-Examination by Mr. Leggiho            69
    Cross-Examination by Mr. Mcfarlane          83
    Redirect Examination by Mr. Sanders         85


EXHIBITS:                               IDENTIFIED

    Exhibit Number One                      16

    Exhibit Number Two                      23

    Exhibit Number Three                    28

    Exhibit Number Four                     34

    Exhibit Number Five                     35

    Exhibit Number Thirteen                 86

## Page 3

```
Wednesday, March 10, 2021

Via Zoom

                - - -

            PROCEEDINGS

                - - -

            THE COURT REPORTER:  Witness, can
    you raise your right hand for me, please?  Do you
    solemnly swear or affirm that the testimony you are
    about to give in this matter will be the truth?
            THE WITNESS:  I do.
            THE COURT REPORTER:  Thank you.
            REGINALD JENKINS,
    WAS DULY SWORN BY THE COURT REPORTER, TESTIFIED UNDER
    OATH AS FOLLOWS:
            DIRECT EXAMINATION
BY MR. SANDERS:
Q   Good morning, Mr. Jenkins.
A   Good morning Mr. Sanders.
Q   Would you state your full name for the record,
    please?
A   Reginald Terrence Jenkins.
            MR. SANDERS:  Let the record
    reflect that this is the Deposition of Reginald
    Jenkins, taken pursuant to Notice, to be used for all
    intent and purposes in the Wayne County Circuit Court
```

## Page 4

```
    Case, 20-006272-CD, Christopher McGhee, et al versus
    the City of Detroit, et al.
BY MR. SANDERS, CONTINUING:
Q   Mr. Jenkins, I'm going to ask you a series of
    questions as it relates to the Lawsuit that I just
    referenced.  If at any time you do not understand my
    question, please let me know; I will be happy to
    repeat the question or rephrase it for you.
            If you give a response, I will
    assume that you did understand the question.  If at
    any time you need to take a break, please let me know
    and I will be happy to accommodate you.  I would ask
    that if there is a question pending, that you answer
    the question before we break, okay?
A   Okay.
Q   All right.  Mr. Jenkins what is your date of birth?
A   August 31, 1973.
Q   And are you a High School Grad?
A   Yes, I am.
Q   When did you graduate from High School?
A   June 12, 1991.
Q   What High School was that?
A   Cass Technical High School in Detroit.
Q   Do you have any formal education after your
    completion of High School?
```

EXHIBIT # . 14

**Page 5**

```
 1  A   I do.
 2  Q   And what is that?
 3  A   I have a Bachelor of Science degree in business
 4      management from Alabama A & M University.  I have a
 5      Master of Arts in Human Resource Administration from
 6      Central Michigan University, and I have a master's of
 7      science in Industrial and Labor Relations from Wayne
 8      State University.
 9  Q   And when did you complete your studies at Alabama A &
10      M?
11  A   May.  I don't remember the date.  May of 1996.  I
12      don't remember the exact date.
13  Q   What year did you graduate from Central?
14  A   2009, I believe May of 2009, somewhere in there.
15  Q   And what year did you graduate from Wayne State?
16  A   That was May of 2011.  No, hold on.  I'm sorry, Wayne
17      State of 2009, so Central Michigan would have been
18      May of 2007 maybe.  Sorry about that.
19  Q   Now I saw you looking at something to refresh your
20      memory, what was that?
21  A   I'm in my office.  I have my Wayne State Degree on
22      the wall.
23  Q   Okay.
24  A   So that indicates Wayne State was May of 2011.  I
25      mean 2009.
```

5

**Page 6**

```
 1  Q   This is a Video Deposition, or excuse me, a Zoom
 2      Deposition, so is there anyone else present in the
 3      room with you?
 4  A   No, there's not.  My office door is closed.
 5  Q   Okay.  I would ask that during the course of the
 6      Deposition that you keep it private and not have
 7      anyone else in your office.  If there is a need for
 8      someone to come in your office, let us know so that
 9      we can take a pause.  I'd also ask that you refrain
10      from communicating with anyone via text message
11      telephone or on your computer during the course of
12      the Deposition, okay?
13  A   I understand.
14  Q   When did you first become employed with the City of
15      Detroit?
16  A   The very first time was August of 1996.
17  Q   And what capacity were you employed in?
18  A   Junior Typist at the Department of Elections.
19  Q   How long did you hold that position?
20  A   About thirteen months.
21  Q   And why did you leave?
22  A   I moved back to Alabama for a few months to seek some
23      other activities.
24  Q   When was the next time you became employed with the
25      City of Detroit?
```

6

**Page 7**

```
 1  A   September of 1998.
 2  Q   In what capacity?
 3  A   Technical Aide-Human Resources, and I was assigned to
 4      the Labor Relations Division.
 5                  MR. LEGGHIO:  Mr. Sanders,
 6      just procedurally, on my screen it's showing two
 7      Chris McGhee's as a participate in this Deposition,
 8      is that just something with the technology or is
 9      there another person in the spot for Mr. McGhee?
10                  MR. SANDERS:  Chris, can you hear
11      me?  Do you know why there are two, you have two log
12      ins?
13                  MR. MCGHEE:  Yes, one is my
14      phone, and one is my tablet.  I am about to switch
15      the devices in about five minutes.  I am about to
16      leave the house.  So in a minute the tablet will be
17      off.
18                  MR. SANDERS:  All right.  Thank
19      you.
20                  MR. MCGHEE:  Yes, sir.
21                  MR. LEGGHIO:  And Mr. Sanders, one
22      other thing.  In terms of your follow up on your
23      questions procedurally, is there anyone else
24      listening into this Deposition other than those names
25      that appear on the screens?  Is there anybody but Mr.
```

7

**Page 8**

```
 1      McGhee or any other Plaintiff in the case that's in
 2      attendance in this Deposition?
 3                  MR. SANDERS:  I'd assume by their
 4      silence, there is not.
 5                  MR. LEGGHIO:  Well, I don't want
 6      to make that assumption.  They are your clients.  Can
 7      you tell me whether -- can they tell us that there
 8      is no one else in the room with them?
 9                  MR. WASHINGTON:  This is James
10      Washington, I am alone.
11                  MR. PERRY:  This is Junius Perry,
12      I am alone.
13                  MR. LEGGHIO:  Okay.  Mr. McGhee
14      is alone also?
15                  MR. MCGHEE:  This is Christopher
16      McGhee, I am alone.
17                  MR. BROWN:  Craig Brown, I'm
18      alone.
19                  MR. BROWN:  Norman Brown, and I'm
20      alone.
21                  MR. LEGGHIO:  Okay.
22                  MR. SANDERS:  We might as well go
23      through the whole list.  Tom Gerhart, do you got
24      anybody in the room with you?
25                  MR. GEHART:  I'm alone, sir.
```

8

MR. SANDERS: Okay.

MR. LEGGHIO: Tamea, how about you?

MS. TAMEA: I'm alone as well.

MR. SANDERS: All right. Are we ready?

MR. LEGGHIO: Thank you Mr. Sanders. Thank you.

MR. SANDERS: Okay.

MR. GERHART: Mr. Sanders, this is Tom. I have, William Hart just came into my office because he is unable to sign on.

MR. SANDERS: Okay. I appreciate that.

BY MR. SANDERS, CONTINUING:

Q I believe, Mr. Jenkins, when we left off you indicated you had commenced working as a Technical Aide/Human Resources, Labor Relations on or about September 1998 --

A Yes.

Q -- how long did you hold that position?

A Tech Aide was about six months.

Q When was the next position you had?

A I was promoted to the Junior Labor Relations

9

Specialist.

Q And that was approximately when?

A Approximately March of 1999.

Q How long did you hold that position?

A Approximately six months, six to eight months, something like that.

Q And what was the next position you assumed?

A Intermediate Labor Relations Specialist.

Q How long did you hold that position?

A Six to eight months.

Q And you assumed that position approximately when?

A Approximately September to November of 1999.

Q What was the next position that you held?

A Senior Labor Relations Specialist.

Q And when did you assume that position?

A That would have been in the Spring of 2000. I can't remember exactly when. Again, and that was about six to eight months.

Q What was the next position that you held?

A Human Resource Consultant at the Department of Transportation.

Q And you assumed that position approximately when?

A That was approximately October of 2001.

Q And the next position?

A Labor Relations Specialist II, no, no, I'm sorry,

10

Labor Relations Specialist I.

Q You assumed that position approximately when?

A July of 2003.

Q And the next position?

A Labor Relations Manager One.

Q And when did you assume that position?

A It was in 2007. I can't say -- I want to say August, but it was in 2007. It was in the late Summer 2007.

Q What was the next position?

A I resigned from the City in October of 2012. So my next position was with the State of Michigan.

Q And why did you resign from the City in 2012?

A It was a family decision because my wife and I both worked for the City. The City was headed into bankruptcy and one of us needed to leave for stability purposes.

Q Did you retire or resign?

A I resigned.

Q And you returned to the City when?

A March 13 of 2014.

Q And in what capacity?

A Human Resources Analyst II, I believe. Yes, II. Oh, and I was assigned to Central Services at that time in CAYMC.

Q And the next position you held?

11

A Administration of Labor Relations III.

Q And you assumed that position approximately when?

A In the Fall of 2015. I can't remember exactly when, in the Fall of 2015.

Q And the next position?

A Administrator of Labor Relations IV.

Q And you assumed that position when? Approximately?

A It was either late 2018, early 2019. It was 2019.

Q Since assuming the position of Administrator of Labor Relations IV, have you had any other positions?

A Yes, my current position.

Q What is that?

A Second Deputy Fire Commissioner.

Q And when did you assume that position?

A December 3, of 2019.

Q As an Administrator Labor Relations IV what were your responsibilities?

A Negotiate Collective Bargaining Agreements and administer Collective Bargaining Agreements, including processing grievances at the third step of the grievance procedure; advising the Departments that were assigned to me on labor and employee relations matters.

Q As and Administrator of Labor Relations IV, were there particular City Collective Bargaining

12

Page 13:

```
 1   Agreements you were assigned to or did you deal with
 2   any and all Collective Bargaining Agreements?
 3  A  I was assigned to particular Agreements, but I dealt
 4   with questions about any Agreement, because over my
 5   career I worked on all labor contracts accept Police
 6   Department Contracts.
 7  Q  Okay
 8  A  But I was assigned to particular.
 9  Q  And what Collective Bargaining Agreements were you
10   assigned to at that time? Let me ask you this.
11   Scratch that question.  Were you assigned to the
12   Collective Bargaining Agreement of the Detroit Fire
13   Fighters?
14  A  Yes, I was.
15  Q  Did you participate in the Negotiation of any of the
16   Detroit Fire Fighter Collective Bargaining
17   Agreements?
18  A  Over my career?
19  Q  Yes.
20  A  Yes.
21  Q  Do you recall which ones?
22  A  I started out with the 9801 Agreement.  The year --
23   when I started, they were in negotiations, so that
24   was the first one, 1998 to 2001.  I can't remember.  I
25   would have to have some --
                                                      13
```

Page 14:

```
 1                 MR. MCFARLANE:  He froze.  We
 2   lost him.  If he is not back on in a few minutes I
 3   will call him.
 4                 (Whereupon a brief recess was
 5   taken)
 6  BY MR. SANDERS, CONTINUING:
 7  Q  I think when we left off I had inquired about the
 8   contracts that you had participated in negotiating as
 9   it related to the Detroit Fire Fighters, and you
10   indicated, you believe you participated in the 9801
11   negotiations.  Do you know if you participated in the
12   Agreement following 9801?
13  A  I believe so.  I can't remember, because that was in
14   the transition when I -- I was gone for that, so a
15   certain period of time for that one.  So the only
16   thing I can say was, once I returned, I once again
17   began to get involved with negotiating.
18  Q  Okay.
19  A  But without knowing the dates in front of me, I can't
20   say for certain.
21  Q  Now you resigned in 2012 and returned March 2014.  If
22   I am not mistaken, there's a Detroit Fire Fighter's
23   Association Agreement that was negotiated or came
24   into effect in 2014, is that accurate?
25  A  That's accurate, yes.
                                                      14
```

Page 15:

```
 1  Q  Did you participate in negation of that Agreement?
 2  A  No, I was not in Labor Relations at the time.
 3  Q  When you resigned in 2012, and then returned in March
 4   of 2014, have you maintained your seniority?
 5  A  No, my new seniority date, new seniority date is
 6   March 14 or 17.  The day I returned in 2014, that's
 7   my new seniority date.
 8  Q  Did you review anything in preparation for your
 9   Deposition today?
10  A  I reviewed the grievances that were related to this
11   case, but that's all I reviewed.
12  Q  Other than the grievances themselves, were there any
13   other documents that you reviewed associated with
14   those grievances?
15  A  The entire grievance chain, the grievance responses
16   also.
17  Q  Can you tell me what are your responsibilities as
18   Second Deputy Fire Commissioner?
19  A  To assist the Executive and Fire Commissioner and
20   administrative functions; for example, grievances, I
21   act as his designee for the second step of the
22   grievance process.  I advise them of grievance issues
23   -- labor issues, labor relation issues.  I assist in
24   advising him on some HR issues, along with our HR
25   Administrator.  I oversee the Executive
                                                      15
```

Page 16:

```
 1   Administrative Staff.  I oversee the Medical Case
 2   Manager.
 3  Q  I'd like to show you what's been marked as Deposition
 4   Exhibit One.
 5                 MR. SANDERS:  Sharon, Shawndrica
 6   Simmons is going to assist me by sharing the Deps on
 7   the screen.  Can you make her an Administrator so she
 8   can assist?
 9                 THE COURT REPORTER:  I sure will.
10   There you go.
11  BY MR. SANDERS, CONTINUING:
12  Q  Now before we talk about Exhibit One, you shared your
13   resume with me with the City of Detroit.  Were any of
14   those positions' demotions?
15  A  No, none.  Well, when I returned from the State of
16   Michigan, I returned to a lower position, yes, but it
17   wasn't a demotion.  I mean I was coming back.  I
18   didn't come back as a Labor Relations Manager of
19   course.
20  Q  Okay.
21  A  I came back as a Human Resource Analyst.
22  Q  Understood.
23  A  Within the City, no, I was never demoted.
24  Q  Were all of those positions that you assumed
25   promotions or were any of them lateral moves?
                                                      16
```

**Page 17**

```
1   A   In 2001 when I went to HR to DDOT, on the hierarchy
2       scale it was a lateral moved, but it was -- the
3       position paid more money.
4               MR. SANDERS:  Shawndrica, can you
5       share Exhibit One Exhibit One on the screen, please?
6   BY MR. SANDERS, CONTINUING:
7   Q   I'm showing you what's been marked as Plaintiff's
8       Deposition Exhibit Number One. It is the Notice of
9       Deposition as it relates to this matter. Have you
10      seen that before?
11  A   Yes.
12  Q   Okay. Line two in the notice says that Plaintiff
13      requested the City of Detroit produce the City
14      Representative person or persons most knowledge
15      concerning the attached grievances and their
16      resolutions. And did you review the grievances that
17      are attached?
18  A   Yes.
19  Q   The City has produced you as the person most
20      knowledgeable concerning those grievances; do you
21      understand that to be the case?
22  A   Yes.
23  Q   What makes you the most knowledgeable person as it
24      relates to those grievances?
25  A   I was involved with some of those grievances from
```

**Page 18**

```
1       either the -- from Labor Relations standpoint or my
2       current position. The only other person, the person
3       that had my position prior to me is no longer with
4       the City.
5   Q   And who are you referring to?
6   A   Sydney Pertreli.
7   Q   And do I understand your testimony to be that Sydney
8       Pertreli was involved in the grievances that are
9       attached as Exhibit One also?
10  A   From the onset, yes.
11  Q   Okay.
12  A   I am sorry, can you hold on for a second?
13  Q   Yes.
14              (Whereupon a brief recess was
15      taken)
16  BY MR. SANDERS, CONTINUING:
17  A   Sorry about that.
18  Q   Not a problem.
19              MR. SANDERS:  Now if you can
20      Shawdrica scroll to page three of Deposition Exhibit
21      One, and it's entitled grievance number 12-19. There
22      we go.
23  BY MR. SANDERS, CONTINUING:
24  Q   Do you see that, Mr. Jenkins?
25  A   Yes, I do.
```

**Page 19**

```
1   Q   And I believe your previous testimony indicated that
2       you had reviewed the grievance chain as it relates to
3       this grievance, is that accurate?
4   A   That is accurate.
5   Q   What specific documents did you review as it relates
6       to grievance 12-19?
7   A   From what I can remember, the grievance itself and
8       the responses, pretty much responses.
9   Q   And who authored the response or responses?
10  A   I know for Step II I believe it was Sydney Pertreli.
11      Step I, it would have been either Chief Distelrath or
12      Chief Deputy Shinske, Deputy Chief at the time,
13      Shinske.
14  Q   Okay. I'm sorry, can you repeat those names for Step
15      I?
16  A   Step I, it would probably would have been Chief
17      Distelrath.
18  Q   Can you spell that name?
19  A   D-i-s-t-e-l-r-a-t-h.
20  Q   D-i-s-t --
21  A   E-l-r-a-t-h.
22  Q   Or alternatively who?
23  A   At the time he was Deputy Chief Shinske.
24  Q   Spell that name.
25  A   S-h-i-n-s-k-e.
```

**Page 20**

```
1   Q   So Distelrath or Shinske would have responded at Step
2       I. Step II would have been Sydney Pertreli. Were
3       there any other documents you recall reviewing as it
4       relates to that grievance chain?
5   A   No, not that I recall.
6   Q   All right.
7               MR. SANDERS:  I thought I
8       carefully reviewed the documents that were produced
9       by the City and I don't recall seeing the Step I
10      Answer or the Step II Answer that you've mentioned,
11      perhaps I've missed it in my review.
12              But if it isn't there, I would
13      ask that it be produced, additionally or
14      alternatively if it is there if you can at a later
15      date identify what page numbers those Step responses
16      are in the documents that were produced by the City,
17      I would appreciate, because I think we've gotten
18      maybe a couple thousand pages of documents.
19              MR. MCFARLANE:  Yes, something
20      like that.
21              MR. SANDERS:  I thought I read
22      them all, but maybe I missed two pages.
23  BY MR. SANDERS, CONTINUING:
24  Q   So let me ask you, Mr. Jenkins, what was the Step I
25      answer to this grievance, and I don't know if you --
```

I'm not asking you to cite it for me via memory to
the best of your recollection, what was the Step I
answer?

A   I would have to review it. I can't -- I don't want
to speculate.

Q   Well you reviewed it in preparation for your
Deposition, is that accurate?

A   Yes.

Q   And when did you do that?

A   Probably I don't know. I don't know if it was last
week or the week before last.

Q   And you have no recollection whatsoever as to what
the Step I Answer was to this grievance?

          MR. MCFARLANE: Objection, asked
and answered. He indicated he would have to review
it to talk about it.

          MR. SANDERS: I understand. I'm
just probing.

BY MR. SANDERS, CONTINUING:

Q   I am not asking you again to cite verbatim, but what
was the gist of the Step I Answer?

A   Again I would have to review it to make a --

Q   Okay. Let me ask you this. In the Step I answer was
the grievance denied?

A   Again, I would have to review it.

Q   You have no recollection as to whether the grievance
was denied at Step I?

A   No, I would have to review it.

Q   What about at Step II, was the grievance denied?

A   I would have to review it.

Q   You have no recollection as to whether the grievance
was denied at Step II?

A   Correct.

Q   In any of the documents that you reviewed, did the
City indicate that the grievance was untimely?

A   This particular grievance?

Q   Yes.

A   I cannot remember. I would have to review the
response.

Q   Okay. And I don't want to share with me any
communication you've had with your Attorney as it
relates to this matter, okay? So I am prefencing
my question by that statement. My question now is,
who provided you with the grievance chain, was it
something that was in possession by your Office or
someone else in Labor Relations or was it on a
computer? How did you get the grievance chain?

A   It was in possession with me coming from Labor
Relations. I was the Labor Relations Administrator
assigned to DFFA at this time. So I would have had a

copy of this particular file.

Q   Now I want to refer you to what's been marked as
Deposition Exhibit Number Two. Are you familiar
with this document?

A   I have seen it before, yes.

Q   Was that document part of the grievance chain that
you reviewed?

A   No.

Q   All right. Now the grievance was filed on or about
May of 2019, is that accurate?

A   That's accurate.

Q   Other than the Step I and Step II Answer that you've
testified to and the document that's marked as
Exhibit two on the screen now was there any
correspondence between the City and the Detroit Fire
Fighters Association as it relates to the grievance?

A   From me?

Q   Well first rom you?

A   From me, no.

Q   Are you familiar with any other correspondence from
anyone from the date in which the grievance was filed
through February 26, 2019 other than the first and
second step answers?

A   I'm not familiar with it. I'm not saying that it
could have been. This meeting -- these were meeting

between the Director at the time Hakim Berry and the
President at the time, Mike Nevin. So before I even
became involved, they were communicating. To my
knowledge, no, to the answer to your question.

Q   Wouldn't Labor Relations have maintained a file or a
folder as it relates to each of the grievance that we
are discussing today?

A   Yes.

Q   Would that file include correspondence associated
with the grievances other than the official
responses?

A   It could, yes.

Q   Who maintains that file?

A   Currently or when I was there?

Q   Well first when you were there?

A   I did.

Q   Who maintains it now?

A   That would be Valerie Colbert, also known as the
Deputy Director of Labor Relations.

Q   Now eventually the grievance, the 12-19 grievance was
resolved, would that be accurate?

A   Yes.

Q   And how was the grievance resolved?

A   Employees that were retired on Duty Disability from
the start of the contract had their seniority

## Page 25

```
 1   adjusted to the date of their return to the
 2   Department.
 3   Q   When you say from the start of the contract, what
 4       contract are you referring to?
 5   A   The current contract, the one that is in existence
 6       now.
 7   Q   The one that's in existence now?  Was that contract
 8       implemented on or about 2014?
 9   A   Correct.
10   Q   Okay.  And would it be accurate that since that time
11       that contract has been extended and is currently in
12       existence?
13   A   Yes, that is correct.
14   Q   Now referring to what has been marked as Exhibit
15       Number Two in the middle of the letter, this is a
16       letter from Michael Nevin to Hakim Berry, first of
17       all let me ask you, who is Hakim Berry?
18   A   He is currently the City's Chief Operating Officer,
19       and he still acts as the Director of Labor Relations.
20   Q   Okay.  And at the time of this correspondence, he was
21       Director of Labor Relations, is that accurate?
22   A   That's accurate.
23   Q   Near the middle of the page it says that this
24       confirms that as discussed, the DFFA would not grieve
25       or otherwise litigate the City's failure to restore
```
25

## Page 26

```
 1   seniority to these employees upon their reinstatement
 2   from Duty Disability.  What do you understand that
 3   sentence to mean?
 4           MR. LEGGHIO:  Objection as to
 5   foundation.
 6           MR. SANDERS:  You can answer.
 7           THE WITNESS:  That the employees
 8   returning from Duty Disability will come back with
 9   seniority dates based upon the date of their return
10   to the Department --
11           MR. SANDERS:  Okay.
12           THE WITNESS:  -- the DFFA would
13   not grieve that.
14   BY MR. SANDERS, CONTINUING:
15   Q   All right.  And was that Agreement for the DFFA not
16       to grieve that, a condition of resolving the
17       grievance?
18           MR. LEGGHIO:  Objection as to
19   foundation.
20           MR. SANDERS:  You can answer.
21           THE WITNESS:  I can't answer
22   that.  Again, this was correspondence between Mr.
23   Nevin and Mr. Berry.  I was not involved with that
24   discussion.
25   BY MR. SANDERS, CONTINUING:
```
26

## Page 27

```
 1   But you are the person most knowledgeable as it
 2   relates to the grievance and its resolution; is that
 3   not correct?  That was your earlier testimony.
 4   A   Yes.
 5   Q   All right.  And do you have an understanding that a
 6       condition of resolution to this grievance was that
 7       the DFFA would not grieve those employees who lost
 8       their seniority?
 9           MR. LEGGHIO:  Same
10   objection.
11           MR. SANDERS:  You can
12   answer.
13           THE WITNESS:  I'm sorry.
14   Repeat that one more time.
15   BY MR. SANDERS, CONTINUING:
16   Q   Sure.  Was it a condition of resolving the grievance,
17       that the DFFA would not grieve the loss of seniority
18       of those employees affected by the resolution of the
19       grievance?
20           MR. LEGGHIO:  Same objection.
21           THE WITNESS:  I don't know if it
22   was a condition.  I can't speak to that.  Again, with
23   these discussions, I don't know.
24   BY MR. SANDERS, CONTINUING:
25   Q   You don't know?
```
27

## Page 28

```
 1   A   No.
 2   Q   Okay.  So you have no facts that would contradict or
 3       unaware of no facts that would contradict that it was
 4       a condition of resolution?
 5           MR. LEGGHIO:  Objection,
 6   mischaracterizes the testimony.
 7           MR. SANDERS:  I'm asking him a
 8   question.
 9           MR. LEGGHIO:  I placed my
10   objection on the record.  That's all.
11   BY MR. SANDERS, CONTINUING:
12   Q   And I believe your answer is you don't know.  Is that
13       accurate?
14   A   That's accurate, yes.
15   Q   I'd like to show you what's been marked as Deposition
16       Exhibit Number Three.  Excuse me.  Hold on please
17       before we go on from there.  I want you to look at
18       page two of Exhibit Three -- excuse me, Exhibit
19       Number Two, page two of Exhibit Number Two, my
20       mistake.  Are you familiar with that document?
21           MR. LEGGHIO:  I'm sorry, were we
22   looking at a different document?
23           MR. SANDERS:  Yes, it is.  It is
24   page two of Exhibit Number Two.
25           MR. LEGGHIO:  I only got the
```
28

13-53846-tjt    Doc 13451-5    Filed 09/28/21    Entered 09/28/21 10:54:45    Page 8 of 22

**Page 29**

1  first page of it on the screen.  The February 27,
2  2019 letter?
3              MR. SANDERS:  That is correct.
4              MR. LEGGHIO:  Yes, I just got the
5  first page of it.  Is there another page?  This is --
6              MR. SANDERS:  Page one was the
7  February 26, 2019 letter, he said he has no idea
8  whether or not --
9              MR. LEGGHIO:  Okay.
10 BY MR. SANDERS, CONTINUING:
11 Q  Have you had a chance to look at this February 27,
12    letter, Mr. Jenkins?
13 A  Yes.
14 Q  Are you familiar with it?
15 A  I've seen it before.
16 Q  And was this the letter that was sent in confirmation
17    of the resolution of the 12/19 grievance?
18              MR. LEGGHIO:  Objection as to
19 foundation.
20              MR. SANDERS:  You can answer.
21              THE WITNESS:  Again, that wasn't
22 said to me, but that's what it says.
23 BY MR. SANDERS, CONTINUING:
24 Q  Now I would like to refer you to Deposition Exhibit
25    Number Three.  Can you take a look at the first page

**Page 30**

1  of that Exhibit, and when you are done we will scroll
2  to page two.
3  A  Okay.
4              MR. SANDERS:  All right.  Can you
5  scroll to page two, please?
6  BY MR. SANDERS, CONTINUING:
7  Q  Have you had an opportunity to read that?
8  A  Almost done.  Yes.
9  Q  Okay.  Now are you familiar with that document?
10 A  Yes.
11 Q  How so?
12 A  I prepared the document.
13 Q  And that document was prepared in response to the
14    grievances that were filed on behalf of some of the
15    employees who had been affected by the 12-19
16    resolution, the 12-19 grievance resolution; is that
17    accurate?
18 A  That's accurate.
19 Q  And the letter that we are looking at dated February
20    11, this one is prepared and sent to Norman Brown,
21    but you sent the exact same letter to the other
22    Grievants, would that be accurate?
23 A  That is accurate.
24 Q  If we can go back to --
25 A  Just to correct, it was sent to the Union, but it was

**Page 31**

1  I do not send grievance, but you said it was sent to
2  Norman.  I do not send grievance responses to
3  individuals.  I was sent to the Union President.
4  Q  I understand.
5  A  Just for clarification.
6  Q  And a similar letter was sent to the Union as it
7     relates to each of the grievances that had been filed
8     as a result of the resolution of the 12-9 grievance,
9     is that right?
10 A  That's correct.
11 Q  Now referring to page one of that February 11
12    letter --
13              MR. SANDERS:  You can go to the
14 first page Shawndrica, right there, up some, up, up,
15 up.  There we go.
16 BY MR. SANDERS, CONTINUING:
17 Q  The last paragraph on the first page says the
18    Department subsequently identified a number of
19    individuals who had indeed returned to work under the
20    realm of the 2014/2019 CBA between the parties, and
21    should have returned to work without any previous
22    department seniority, do you see that?
23 A  Yes.
24 Q  All right.  How many individuals were you referring
25    to?

**Page 32**

1  I didn't have a specific number.  I know there was a
2  few.  I don't have the exact number.
3  Q  Was it more than ten?
4  A  Again I don't remember.  I don't remember the
5  number.
6  Q  So you don't know if it was more than ten or less
7     than ten, correct?
8  A  Correct.
9  Q  How is it that these individuals returned to work and
10    were able to maintain their seniority, how did that
11    happen?
12 A  Again, when they were returned, the contractual
13    information, I was in Labor Relations at the time,
14    but my understanding the contractual language was not
15    adhered to because they returned under the old
16    process, and --
17 Q  And why did --- I'm sorry, go ahead.
18 A  Which did not have any change of seniority
19    ramifications.
20 Q  And why were they returned under the old process?
21 A  I don't know, because I was not responsible for that.
22 Q  Who was responsible for it?
23 A  That would have been Ms. Crosson, Kemia Crosson.
24 Q  Now the next sentence says that the DFD Human
25    Resources Office made contact with the affected

**[Page 33]**

```
 1    individuals and explained the situation; do you have
 2    any personal knowledge as to who from Human Resources
 3    made contact with the affected individuals?
 4  A  Yes, Ms. Crosson.
 5  Q  And do you know how Ms. Crosson made contact with the
 6    affected individuals?
 7  A  I do not, no.
 8  Q  And then it says which resulted in a meeting being
 9    scheduled between the Department, the Union and the
10    affected individuals.  What personal knowledge do you
11    have that the meeting was scheduled with the affected
12    individuals as it relates to this subject matter?
13  A  When I was investigating this grievance, I talked to
14    Ms. Crosson, and that's information I received from
15    her.
16  Q  So Ms. Crosson told you that a meeting had been
17    scheduled?
18  A  Yes.
19  Q  Did you see anything in writing relating to informing
20    the affected individuals that there was a meeting
21    scheduled?
22  A  You're talking about in connection with this
23    grievance?
24  Q  What I'm referring to is, this sentence says that a
25    meeting was scheduled between the Department, Union
```

**[Page 34]**

```
 1    and affected individuals, do you see that?
 2  A  Yes.
 3  Q  Did you receive anything in writing notifying the
 4    affected individuals that a meeting had been
 5    scheduled?
 6  A  No.
 7  Q  So your reliance, you are relying upon what Ms.
 8    Crosson told you in your drafting of that sentence,
 9    is that accurate?
10  A  That's accurate.
11        MR. SANDERS:  Can you put Exhibit
12    Four on the screen, Shawndrica?
13  BY MR. SANDERS, CONTINUING:
14  Q  Can you read Exhibit Four to yourself, Mr. Jenkins
15    and when you are done, let me know.
16  A  Okay.  I am done.
17  Q  Are you familiar with this document?
18  A  I've seen it before, yes.
19  Q  Can you explain to me what it means when it says the
20    Department is in the process of implementing the
21    terms of Article 12H2 of the parties 2014/2019
22    Collective Bargaining Agreement, what does that mean?
23  A  I'm not sure.  I didn't draft this document.
24  Q  The second sentence says once completely implemented,
25    all nine designated classification promotions in the
```

**[Page 35]**

```
 1    Fire Fighting Division shall be in accordance with
 2    Article 12H2, however, the process will begin with
 3    the promotions to Battalion Chief, do you see that?
 4  A  Yes.
 5  Q  Do you know what that means?
 6        MR. LEGGHIO:  Objection as to
 7    foundation.
 8        THE WITNESS:  No, no I don't.
 9  BY MR. SANDERS, CONTINUING:
10  Q  Now this letter was drafted on December of 2019, and
11    it's referring to a provision in the 2014 contract,
12    is that accurate?
13  A  Yes.
14        MR. LEGGHIO:  Objection as to
15    foundation assumes a fact not in evidence.
16        MR. SANDERS:  You can answer.
17        THE WITNESS:  It appears to be.
18  BY MR. SANDERS, CONTINUING:
19  Q  To your knowledge, prior to December 17, 2019 had the
20    Department implemented the terms of Article 12H2 of
21    the 2014 contract?
22  A  I don't know.
23  Q  All right.
24        MR. SANDERS:  Shawndrica, can you
25    put Exhibit Five on the screen, please?
```

**[Page 36]**

```
 1  BY MR. SANDERS, CONTINUING:
 2  Q  This is the Complaint or the First Amended Complaint
 3    that was filed as it relates to this matter.  Are you
 4    familiar with that document?
 5  A  I've seen it before.
 6  Q  I want to refer you to page five, line twenty-seven.
 7    Can you read line twenty-seven aloud please?
 8  A  Prior to 2014 the Collective Bargaining Agreement,
 9    CBA had between the City and DFFA allowed a Fire
10    Fighter that had retired as a result of a Duty
11    Disability to maintain his or her accumulated
12    seniority that they returned the employee of the City
13    of Detroit as a Fire Fighter.
14  Q  Are you aware of any facts that would contradict that
15    statement?
16  A  I'm not aware of any facts that would contradict
17    that, no.
18  Q  Can you read aloud, line number twenty-eight please?
19  A  The CBA allowed an employee that returned to duty
20    after a Duty Disability Retirement to achieve and
21    assume the rank of his or her Class or — on an
22    accelerated basis.
23  Q  Are you aware of any facts that would contradict the
24    allegations in line twenty-eight?
25        MR. LEGGHIO:  Objection as to
```

**Page 37**

1  foundation.
2         THE WITNESS:  I can't -- I'm not
3  sure.  I don't know what CBA you are talking about.
4         MR. SANDERS:  Line twenty-eight.
5         THE WITNESS:  Right.
6  BY MR. SANDERS, CONTINUING:
7  Q    I'm referring to the CBA prior to 2014 in line
8       twenty-eight.
9         MR. LEGGHIO:  Same objections.
10  Mr. Sanders, I just want to be clear.  Are you
11  referring to one Collective Bargaining Agreement
12  prior to 2014 or any other Collective Bargaining
13  Agreement?
14         MR. SANDERS:  I'm referring to
15  the one immediately prior to 2014.
16         MR. LEGGHIO:  Same objection as
17  to foundation.
18         THE WITNESS:  I would have to
19  review that CBA.
20  BY MR. SANDERS, continuing:
21  Q    So without reviewing it, you're not aware of any
22       facts that would contradict that statement?
23       Without reviewing it, you are not aware of any facts
24       that would contradict that statement?
25  A    Without reviewing it, no.

                                                    37

**Page 38**

1  Q    I would like to refer you to line number thirty.
2         MR. SANDERS:  Shawndrica, page
3  six please, line thirty.
4  BY MR. SANDERS, CONTINUING:
5  Q    Can you read that line aloud, please?
6  A    Prior to 2014, in reliance upon the longstanding
7       disability retirement policy, a litany of Fire
8       Fighters, including the Plaintiffs retired with a
9       Duty Disability Injury, and sometime thereafter
10      returned to the employ of the City of Detroit as a
11      Fire Fighter.
12  Q    Are you aware of any facts that would contradict the
13      allegations in line thirty?
14         MR. LEGGHIO:  Objection as to
15  foundation and object to -- assumes facts not in
16  evidence.
17         MR. MCFARLANE:  Same objection.
18  There's nothing in this question that identifies any
19  -- it's a compound question.  You've lumped it all
20  into one question.
21         MR. LEGGHIO:  Let me just, Mr.
22  Sanders, let me just embellish this.  The question
23  suggests that Fire Fighters took a Duty Disability
24  Injury and then returned to the employ of the City,
25  based on their --

                                                    38

**Page 39**

1         MR. SANDERS:  -- not testifying,
2  I'm just asking him a question.  You can put your
3  objection on the record.
4         MR. LEGGHIO:  Okay.  My objection
5  is, is that it assumes that people went on disability
6  because of a promise of reinstatement --
7         MR. SANDERS:  I know what the
8  question says.  He read it.  I'm asking him question
9  --
10         MR. LEGGHIO:  -- foundation, and
11  assumes facts not in evidence.
12         MR. SANDERS:  I got you.
13  BY MR. SANDERS, CONTINUING:
14  Q    Aare you aware of any facts that would contradict
15       the allegations in line thirty, yes or no?
16  A    I can't answer that.  I am not sure how employees
17       returned, if it was a Fire Fighter or higher rank,
18       I'm not sure, so I can't answer that.
19  Q    You would agree that employees returned to work under
20       the 2014 contract, and they were allowed to maintain
21       their seniority after being on a Duty Disability, is
22       that correct?
23         MR. LEGGHIO:  Objection as to
24  foundation.  It assumes facts not in evidence.
25         MR. MCFARLANE:  Same.

                                                    39

**Page 40**

1         MR. SANDERS:  You can answer.
2         THE WITNESS:  Well can you better
3  clarify your question?
4         MR. SANDERS:  Sure.
5  BY MR. SANDERS, CONTINUING:
6  Q    We can do this another way.
7         MR. SANDERS:  Shawndrica can you
8  put Exhibit One on the screen please?  Can you scroll
9  to the grievance number 320, James Washington.  Keep
10  scrolling please.  Stop.
11  BY MR. SANDERS, CONTINUING:
12  Q    Can you read that grievance, please?
13         MR. SANDERS:  Can you make it
14  larger?
15         THE WITNESS:  Read the statement
16  agreements?
17         MR. SANDERS:  Yes.
18  BY MR. SANDERS, CONTINUING:
19  A    The Master Agreement states that any grievance not
20       filed within ten days of the occurrence of the
21       alleged violation or within ten days of the employee
22       or association fee coming aware of alleged violation
23       will be considered untimely and will not be heard,
24       Grievance 12-19 improper seniority placement was
25       filed in an untimely manner.

                                                    40

1    I was returned into the system on
2  September 26, 2015 with Department number 574.
3  Q   All right.  Are you aware that Mr. Washington went
4      out on a disability retirement prior to 2014, is that
5      correct?
6  A   I'm not aware of when he went out, no.
7  Q   You are not aware of when he went out?  So you have
8      no facts in which to dispute that, correct?
9  A   Correct.
10 Q   You are aware that he returned into the seniority
11     system on September 26, 2016, correct?
12 A   I am not aware of the exact date, no.  I don't have
13     that in front of me.
14 Q   You are not aware of any facts that would dispute
15     that, correct?
16 A   Correct.
17 Q   And if Mr. Washington maintains that when he
18     returned, he was eventually denied his seniority, do
19     you have any facts in which to dispute that?
20 A   I do not.
21 Q   And you agree that there were some employees who
22     returned to their employment after being on a Duty
23     Disability who were allowed to maintain the
24     accumulated seniority that they had, correct?
25          MR. LEOGHIO:  Objection.  What's

                                                      41

1      the time frame?  Are you saying at any time or are
2      you restricting it to the period of 2014 forward?
3          MR. SANDERS:  I'm saying that
4      there were employees who left off on a Duty
5      Disability prior to 2014 and returned after 2014 who
6      were allowed to maintain their accumulated
7      disability, correct?
8          THE WITNESS:  Accumulated
9      disability?
10 BY MR. SANDERS, CONTINUING:
11 Q   Or accumulated seniority, excuse me.
12          MR. LEOGHIO:  I'm going to object
13     as to foundation and I'm going to object also to the
14     form of the question.
15          MR. SANDERS:  You can answer.
16          THE WITNESS:  I'm not sure.
17 BY MR. SANDERS, CONTINUING:
18 Q   You're not sure?
19 A   I don't know.
20 Q   Let's go back to grievance 12-19.  Can you read that,
21     please?
22 A   DFFA grieves the City of Detroit's application of
23     Article 1287, several members were returned to active
24     service and placed within the seniority system, not
25     in compliance with Section 12 and or other applicable

                                                      42

1      portions of the Collective Bargaining Agreement.
2  Q   So what do you understand the basis of that grievance
3      to be?
4  A   The Members returned to work and they not have their
5      seniority reset.
6  Q   Okay.  And some of them returned to work, didn't have
7      their seniority reset and worked for many months,
8      correct?
9  A   Some, yes.
10 Q   Some worked for many years, correct?
11 A   I'm not sure about that.
12 Q   And then those individuals, some had their seniority
13     reset, correct?
14 A   Yes, correct.
15 Q   After working in a position for many months and their
16     seniority not being reset, correct?
17 A   Correct.
18 Q   All right.  And some of those individuals who
19     returned were allowed to not only maintain their
20     seniority but advance to the rank of their entry
21     class correct?
22 A   I'm not -- I don't know.
23 Q   You don't know if some of those people with who I
24     reference in grievance 12-19 assumed higher ranking
25     positions after they returned?

                                                      43

1  A   I don't know, no.
2  Q   And you're the person most knowledgeable as it
3      relates to grievance 12-19, correct?
4  A   Correct.
5          MR. SANDERS:  Can we go back to
6      the Complaint please Shawndrica, which is Exhibit
7      Five, a separate document to itself.
8  BY MR. SANDERS, CONTINUING:
9  Q   Now that I've refreshed your recollection with
10     Exhibit 12-19, I am going to ask you to read line
11     thirty again.
12 A   Prior to 2014, in reliance upon the longstanding
13     disability retirement policy, a litany of Fire
14     Fighters, including the Plaintiffs, retired with a
15     Duty Disability injury and sometime thereafter
16     returned to the employ of the City of Detroit as a
17     Fire Fighter.
18 Q   Are you aware of any facts that would contradict that
19     statement?
20          MR. LEOGHIO:  Objection as to
21     foundation and form.  It asks him to testify about
22     what the intensions were of those who retired.
23          MR. MCFARLANE:  Same objection.
24     It assumes facts not in evidence, including the
25     policy, the names of these Fire Fighters and

                                                      44

**Page 45**

```
 1          everything else --
 2                    MR. SANDERS:  Noted.
 3   BY MR. SANDERS, CONTINUING:
 4   Q    Are you aware of any facts that would contradict that
 5        statement?
 6   A    I don't know.
 7   Q    Line thirty-one, can you read that please?
 8   A    Those individuals were allowed to return as Fire
 9        Fighters, maintain their seniority and advance to
10        rank of their entry class.
11   Q    Are you aware of any facts that would contradict that
12        statement.
13   A    I do not know.
14                    MR. MCFARLANE:  Objection.
15        Assumes facts -- the same objection as to the
16        previous question.
17   BY MR. SANDERS, CONTINUING:
18   Q    Can you read line thirty-two, thirty-three and
19        thirty-four of the Complaint to yourself?
20   A    Okay.
21   Q    Are you aware of any facts that would contradict the
22        allegations in line thirty-two through thirty-four?
23                    MR. MCFARLANE:  Objection as it's
24        compound and again assumes facts not in evidence.
25                    MR. LEGGHIO:  Same objection.
```

**Page 46**

```
 1   BY MR. SANDERS, CONTINUING:
 2                    MR. SANDERS:  You can answer.
 3                    THE WITNESS:  Can you repeat your
 4        question?
 5   BY MR. SANDERS, CONTINUING:
 6   Q    Are you aware of any facts that would contradict the
 7        allegations in lines thirty-two through thirty-four?
 8   A    No, I am not aware.
 9   Q    I'd like to refer you to line number thirty-five of
10        the Complaint.
11                    MR. SANDERS:  Next page please,
12        Shawndrica.
13   BY MR. SANDERS, CONTINUING:
14   Q    Can you read line thirty-five aloud please?
15   A    However, after implementation of the new CBA
16        provision in 2014, no Duty Disability Retired Fire
17        Fighter was ever notified by the City or the Union
18        that they would lose all of their seniority if they
19        returned to work for the City.
20                    MR. LEGGHIO:  Objection as to
21        foundation.  Assumes facts not in evidence.
22   BY MR. SANDERS, CONTINUING:
23   Q    Are you aware of any facts that would contradict the
24        allegations in line thirty-five?
25                    MR. MCFARLANE:  Objection to
```

**Page 47**

```
 1        foundation and assumers facts not in evidence.
 2                    MR. SANDERS:  You can answer.
 3                    THE WITNESS:  I don't know.
 4   BY MR. SANDERS, CONTINUING:
 5   Q    Can you read line thirty-six aloud please?
 6   A    To the contrary, after negotiation of the 2014 to
 7        2019 CBA, the City continued to return many Fire
 8        Fighters to duty with their previous seniority intact
 9        without objection from the Union, and officers were
10        allowed to assume the rank that their original class
11        had achieved.
12   Q    Are you aware of any facts that would contradict the
13        allegations in line thirty-six?
14                    MR. LEGGHIO:  Objection, assumes
15        facts not in evidence.
16                    MR. MCFARLANE:  Same objection.
17                    THE WITNESS:  I don't know.
18   BY MR. SANDERS, CONTINUING:
19   Q    Line thirty-seven, can you read that aloud please?
20   A    The Defendants had [inaudible] to selectively enforce
21        the new provision of the 2014 to 2019 CBA.
22   Q    Are you aware of facts that contradict that
23        statement?
24                    MR. LEGGHIO:  Objection as
25        to foundation and form.
```

**Page 48**

```
 1                    MR. MCFARLANE:  Same
 2        objection.
 3                    MR. LEGGHIO:  Assumes facts not
 4        in evidence.
 5                    MR. SANDERS:  You can answer.
 6                    THE WITNESS:  I have no knowledge
 7        of that, no.
 8   BY MR. SANDERS, CONTINUING:
 9   Q    My question is, do you have any facts or are you
10        aware of any facts that would contradict that
11        statement?
12   A    I do not, no.
13   Q    Can you read line thirty-eight aloud, please?
14   A    In fact, after 2014, the City and the Union agreed to
15        allow some Fire Fighters to return from Duty
16        Disability to Retirement, maintain their previous
17        seniority, be promoted in accordance with their class
18        ranking and retire after receiving a promotion with a
19        pension based upon the ranking that they had achieved
20        with their original class.
21   Q    Are you aware of any facts that would contradict that
22        statement?
23                    MR. LEGGHIO:  Objection as to
24        foundation and form; assumes facts not in evidence.
25                    MR. MCFARLANE:  Same objection.
```

THE WITNESS: I do not, no.

BY MR. SANDERS, CONTINUING:

Q Line thirty-nine, can you read that aloud please?

A Thereafter and continuation of the conspiracy to selectively enforce the new provision of the 2014 CBA, in May 2019 the Union filed a grievance maintaining that the City had violated the CBA by returning Fire Fighters to duty with their seniority after a disability retirement.

Are you aware of any facts that would contradict that allegation?

MR. LEGGHIO: Objection as to foundation, form and assumes facts not in evidence.

MR. MCFAR: Same objection.

THE WITNESS: I do no know.

BY MR. SANDERS, CONTINUING:

Q Read line forty, please.

A Can you scroll up a little?

MR. SANDERS: Can you scroll up please, Shawndrica?

THE WITNESS: The grievance was filed in violation of the CBA years after the Union first became aware that Fire Fighters were returning from a Duty Disability and being allowed to maintain their previous seniority.

49

---

BY MR. SANDERS, CONTINUING:

Q Are you aware of any facts that would contradict that statement?

MR. LEGGHIO: Objection as to form, foundation and assumes facts not in evidence.

MR. MAC: Same objection.

THE WITNESS: I do not know.

BY MR. SANDERS, CONTINUING:

Q When a Fire Fighter returns from Duty Disability, how -- is that return communicated by the City to the Detroit Fire Fighter's Association?

MR. LEGGHIO: same objection.

THE WITNESS: I do not know.

BY MR. SANDERS, CONTINUING:

Q Well let me ask you a different way. You do not know as it relates to now or you do not know as it relates to what went on in 2014 and 2015?

MR. LEGGHIO: Same objection.

THE WITNESS: I do not know as it relates to prior to me coming on board.

BY MR. SANDERS, CONTINUING:

Q Since you came on board, what is the procedure?

A I'm not sure of the procedure. I don't know the procedure.

Q So you don't know whether or not the City of Detroit

50

---

communicates to DFFA upon the return of a Fire Fighter from Duty Disability, would that be accurate?

A I know that they do now.

Q And when you say now, do you know when that became affective?

A I do not know the exact date, no.

Q How is that communication made?

A By MR.

When I say how, I mean is there a letter sent to them, an email, or do you know

A I do not know.

Q I would like you to read line forty-one, can you read that aloud please?

A In accordance with the 2014 to 2019 CBA, any grievance not filed within the ten calendar days of the occurrence of the alleged violation or within ten calendar days of an employee or the Association becoming aware of an alleged violation will be considered untimely and will not be processed.

Q Are you aware of any facts that would contradict the allegations in line forty-one?

MR. LEGGHIO: Objection document speaks for itself.

MR. MCFARLANE: Same objection.

THE WITNESS: I'm not aware.

51

---

BY MR. SANDERS, CONTINUING:

Q As it relates to grievance 12-19, are you aware of the DFFA asking for an extension in which to file the grievance?

MR. LEGGHIO: Objection as to foundation.

MR. SANDERS: You can answer.

THE WITNESS: I don't know.

BY MR. SANDERS, CONTINUING:

Q Are you aware of the City of Detroit granting the DFFA an extension which to file the grievance?

A I don't know.

Q Can you read line forty-two, please?

A Can you scroll up some?

MR. SANDERS: Can you scroll up please, Shawndrica?

THE WITNESS: However, in furtherance of their conspiracy, the Defendants conspired to ignore the CBA Statute of Limitations, and the grievance was recognized and acknowledged by the City.

BY MR. SANDERS, CONTINUING:

Q Are you aware of any facts that would contradict the allegations in line forty-two?

MR. LEGGHIO: Objection form and

52

---

1 foundation, and assumes facts not in evidence.
2 MR. MCFAR: Same objection.
3 THE WITNESS: I do not know.
4 BY MR. SANDERS, CONTINUING:
5 Q I'd like you to read line forty-three aloud please.
6 A Thereafter, without cause, the Defendants agreed to
7 take disciplinary action against the Plaintiffs.
8 Q Are you aware that the Plaintiffs in this cause of
9 action loss seniority?
10 A I'm aware that the seniority was adjusted.
11 Q Okay. You're aware that it was adjusted. And when
12 you say adjusted, would you agree with me that many
13 of them had received their seniority -- had received
14 seniority and worked in a capacity with higher
15 seniority for several months and potentially years,
16 and then it was adjusted to a lower seniority; is
17 that accurate?
18 A I can't say that sir. I don't know how long they
19 worked in the higher position.
20 Q When you say their seniority was adjusted, what do
21 what do you mean by that?
22 A It was adjusted to the date they returned form Duty
23 Disability.
24 And it had previously been the seniority that they
25 had accumulated during their entire stint of service

1 as a Detroit Fire Fighter, would that be accurate?
2 MR. MCFARLANE: Objection as it
3 assumes facts not in evidence.
4 THE WITNESS: I can't say what
5 their seniority was. It was a different seniority
6 date, but I can't say it was through their entire --
7 BY MR. SANDERS, CONTINUING:
8 Q It was a higher seniority, would that be accurate?
9 A It was a higher seniority, correct.
10 Q Now some of the Plaintiff's after their seniority was
11 adjusted were placed in a lower rank, would that be
12 accurate or do you know?
13 A I don't know. I don't know.
14 Q That didn't go into your -- you didn't consider that
15 when you decided to resolve the grievance, whether or
16 not some of the Plaintiffs would be placed in a lower
17 rank?
18 A Which grievance?
19 Q 12-19.
20 A You said when I decided to resolve the grievance?
21 Q Or when the City of Detroit decided to resolve the
22 grievance, they didn't take into consideration that
23 some of the Plaintiffs in this case and others might
24 be in a lower rank, is that accurate?
25 A If adjusting their seniority caused them to go to a

1 lower rank, yes that was taken into consideration.
2 Q The Plaintiffs maintain that when their seniority was
3 adjusted, that was disciplinary action; do you agree
4 with that or disagree?
5 A Disagree.
6 Q And why do you disagree?
7 A Disciplinary action comes about when you break a rule
8 or regulation or policy with the Department.
9 Q They had not broken any rule or regulation or policy
10 with the Department, would that be accurate?
11 A That's accurate.
12 Q Okay. I want to refer you to line forty-six.
13 A Okay.
14 Q Can you read that aloud please?
15 The Plaintiffs were not afforded any type of Hearing
16 prior to the disciplinary actions taken against them.
17 Q Now I know you stated you disagree that they were
18 disciplined; my question to you is, prior to the
19 Plaintiffs having their seniority quote unquote,
20 adjusted as you have described it, were they afforded
21 any type of Hearing?
22 MR. MCFARLANE: I'm going to
23 object. That's a mischaracterization of his
24 testimony.
25 MR. LEGGHIO: Same objection. I

1 join with that objection, and also object as to
2 foundation and form and assumes facts not in
3 evidence.
4 THE WITNESS: I don't know.
5 BY MR. SANDERS, CONTINUING:
6 Q Were you ever involved in the planning or the
7 scheduling of any type of Hearing?
8 A Hearing for what?
9 Q A Hearing for the Plaintiffs as it relates to taking
10 away their seniority?
11 A For a grievance Hearing, yes.
12 Q Explain to me what you mean.
13 A For Step II we have a grievance meeting.
14 Q So you are saying --
15 MR. LEGGHIO: Let me object for a
16 moment. Are you asking him in the abstract, Mr.
17 Sanders, or are you talking about specifically these
18 Plaintiffs?
19 BY MR. SANDERS, CONTINUING:
20 Q My question is, are you maintaining there was a Step
21 II Grievance Hearing in which the Plaintiffs in this
22 cause of action appeared?
23 MR. LEGGHIO: I think he was
24 talking about it in the abstract.
25 THE WITNESS: I would just say--

**Column 1 (Page 57)**

```
1              MR. SANDERS:  I'm sorry, go
2   ahead.
3              THE WITNESS:  The City had, we
4   have grievance meetings at the Step Two, is that what
5   you are referring to as a Hearing?  I'm trying to get
6   what you are referring to.
7   BY MR. SANDERS, CONTINUING:
8   Q   My question to you is, as part of Exhibit One you saw
9       where several of the Plaintiffs had filed grievances,
10      correct?
11  A   Yes.
12  Q   Was there ever a step II Hearing in which they
13      appeared concerning those grievances?
14  A   No.
15  Q   Was there any other kind of Hearing where the
16      Plaintiffs appeared, and they had an opportunity to
17      be heard as it relates to losing their seniority?
18  A   I do not know.
19  Q   Can you read line forty-seven aloud, please?
20  A   The Defendants goal was to strip the Plaintiffs of
21      their seniority and take away any promotion which was
22      a result of the systematic seniority promotion.
23  Q   Are you aware of any facts that would contradict that
24      allegation?
25              MR. LEGGHIO:  Objection as to the
                                                       57
```

**Column 2 (Page 58)**

```
1   form, foundation and assumes facts not in evidence.
2              MR. MCFARLANE:  Same objection.
3              MR. SANDERS:  You can answer.
4              THE WITNESS:  I do not know.
5              MR. SANDERS:  Can you, Shawndrica
6   turn to page nine please, line fifty-one.
7   BY MR. SANDERS, CONTINUING:
8   Q   I would like you to read line fifty-one aloud please.
9   A   Defendants intentionally deprived the Plaintiffs of
10      the opportunity to collect a larger pension.
11  Q   Are you aware of any facts that would contradict the
12      allegations in line fifty-one?
13              MR. LEGGHIO:  Same objections,
14      form, foundation and assumes facts not in evidence.
15              MR. MCFARLANE:  Same objection
16              THE WITNESS:  I do not know.
17  BY MR. SANDERS, CONTINUING:
18  Q   Line fifty-four, can you read that aloud please?
19  A   In accordance with the CBA discipline and demotions
20      shall only occur when there is just cause.
21  Q   Are you aware of any facts that would contradict that
22      allegation?
23              MR. LEGGHIO:  Objection as to form
24      and foundation, assumes facts not in evidence.
25              MR. MCFARLANE:  Same objection.
                                                       58
```

**Column 3 (Page 59)**

```
1              THE WITNESS:  I do not know.
2   BY MR. SANDERS, CONTINUING:
3   Q   Now I would like to refer you to page ten of the
4       Complaint, line sixty-eight.
5   A   Can we take a break after this question or --
6   Q   Absolutely we can.  Can you read line sixty-eight
7       aloud please?
8   A   Thereafter he was promoted through testing as opposed
9       to the seniority system to the rank of Lieutenant
10      from July 30, 2018 I was earning approximately
11      seventy-one thousand dollars a year.
12  Q   Now this is an allegation made by Plaintiff Norman
13      Brown.  Are you aware whether or not there is a
14      difference between being promoted through testing as
15      opposed to the seniority system?
16  A   What do you mean?  Can you explain that a little
17      more?
18              MR. LEGGHIO:  Objection as to
19      form.
20              MR. SANDERS:  Sure.
21              MR. LEGGHIO:  And assumes facts
22      not in evidence.
23  BY MR. SANDERS, CONTINUING:
24  Q   Do you know whether or not Fire Fighters can be
25      promoted for some positions by taking a test?
                                                       59
```

**Column 4 (Page 60)**

```
1   A   Some positions require a test, yes.
2   Q   Do you know whether or not there are some positions
3       that Fire Fighters are promoted based upon their
4       seniority?
5   A   Yes.
6   Q   Okay.  Do you have any familiarity with the
7       difference between the two and what positions require
8       taking of a test?
9   A   No, not all of the positions.  No, I know positions
10      within the Divisions require an exam.  I can't tell
11      you all of which ones.
12  Q   So if Mr. Brown was promoted by the taking of an
13      exam, should he have been demoted as a result
14      grievance 12-19?
15              MR. MCFARLAND:  Objections, it
16      assumes facts not in evidence.
17              MR. LEGGHIO:  Same objection, and
18      foundation and object to the form of the question.
19              MR. SANDERS:  You can answer.
20              THE WITNESS:  I don't know.
21  BY MR. SANDERS, CONTINUING:
22  Q   And are you the person most knowledgeable as it
23      relates to grievance 12-19 and the resolution
24      thereof, correct?
25  A   Correct.
                                                       60
```

1 Q All right sir. I know you want to take a break. I
2 can probably use one too. You guys want to say ten
3 minutes.
4         MR. LEGGHIO: Do you have a
5 plan to break for lunch at a certain time, Mr.
6 Sanders?
7         MR. SANDERS: I anticipate
8 when I am done with this witness, we can then break
9 for lunch. I don't have a lot more for this witness,
10 okay?
11         MR. LEGGHIO: Sounds fair.
12         MR. SANDERS: Unless someone
13 just wants to break for lunch now, we can do it. We
14 will do ten minutes and come back.
15         MR. LEGGHIO: Okay.
16         (Whereupon a brief recess
17 was taken at or about 11:47 a.m.)
18 BY MR. SANDERS, CONTINUING:
19 Q Mr. Jenkins, earlier we discussed, and you testified
20 about the grievance file, and you indicated that, I
21 believe you indicated that the file as it relates to
22 grievance 12-19 would be maintained in Labor
23 Relations and Valerie Colbert would be the person in
24 charge of that right now. I'm paraphrasing your
25 testimony, but would that be accurate?

61

1 A Yes.
2 Q Okay. Now my question is, does the Detroit Fire
3 Department maintain a separate grievance file?
4 A Yes.
5 Q Okay. And who would be over that file?
6 A Me.
7 Q And do you know whether you have the same documents
8 in your file that Valerie has in her file?
9 A For this particular case?
10 Q Yes.
11 A I'm pretty sure they are the same because I basically
12 you know, handled the grievance in both positions.
13 Q Is it the norm that Fire Department would maintain
14 its own grievance file and Labor Relations would have
15 its own grievance file? Would that be the norm as it
16 relates to Fire Fighter grievances?
17 A That's the norm, yes.
18         MR. SANDERS: Now if we can,
19 Shawndrica, can you put Exhibit One back on the
20 screen. And I would like you to go to the 12-19
21 grievance.
22 BY MR. SANDERS, CONTINUING:
23 Q Now the 12-19 grievance was filed in May of 2019 is
24 that accurate?
25 A Yes.

62

1 Q All right.
2         MR. SANDERS: Shawndrica, can you
3 go again to Exhibit Two? Second page, please.
4 BY MR. SANDERS, CONTINUING:
5 Q Now previously you testified that this was
6 confirmation of the grievance, is that correct?
7         MR. LEGGHIO: Objection,
8 mischaracterizes the testimony, and foundation.
9         MR. MCFARLANE: Same objection.
10         MR. SANDERS: You can answer.
11         THE WITNESS: No.
12 BY MR. SANDERS, CONTINUING:
13 Q Well, this correspondence is confirmation as to how
14 the issues delineated in the grievance would be
15 resolved, is it not?
16         MR. LEGGHIO: Objection as to
17 foundation, mischaracterizes the testimony and
18 argumentative. The document speaks for itself.
19         MR. SANDERS: You can answer.
20         THE WITNESS: Can you scroll up
21 some more. Can you repeat the question?
22 BY MR. SANDERS, CONTINUING:
23 Q Can you read paragraph two of this letter aloud?
24 A To clarify, we understand that the City will
25 retroactively adjust the seniority of the employees

63

1 who returned to work after being on retirement for
2 Duty Disability for more than two yes. We understand
3 that the City will now count these employees'
4 seniority from their reinstatement dates.
5         Further, we understand for the
6 upcoming reinstatement of several employees from Duty
7 Disability who have been in retirement for more than
8 two years that the City will count these employees
9 seniority from their reinstatement dates.
10 Q Was that how grievance 12-19 was resolved?
11         MR. LEGGHIO: Objection,
12 foundation and as to form.
13         MR. SANDERS: Let the record
14 reflect a long pause on behalf of the witness.
15         THE WITNESS: I'm reading. I'm
16 reading.
17         MR. LEGGHIO: Let the record
18 reflect that that has no significance to the answer.
19         MR. MCFARLANE: And let the
20 record reflect that he's reading the paragraph you
21 just asked him to read regarding the question.
22         THE WITNESS: The answer is the
23 way we treated everyone that retired was that upon
24 return that their seniority was reset.
25 BY MR. SANDERS, CONTINUING:

64

1  Q    My question is the paragraph that you read aloud, is

2       that a summary as to how grievance 12-19 was

3       resolved?

4                      MR. LEGGHIO:  Same objection --

5                      MR. MCFARLANE:  Objection, asked

6       and answered.

7                      MR. LEGGHIO:  -- foundation,

8       form, assumes facts not in evidence.

9                      THE WITNESS:  No, that's not my

10      understanding of it, no.

11 BY MR. SANDERS, CONTINUING:

12 Q    Okay.  What is the difference in the resolution from

13      this paragraph?

14 A    This talks about someone returning for two years or

15      with a two year -- that's been out for more than two

16      years.  My training of the resolution is that

17      everyone who has returned has their seniority

18      reset.

19 Q    Everyone who returned had their seniority reset?

20 A    Yes.

21 Q    And had everyone been off for more than two years?

22 A    I'm not sure.  I would have to look at it.

23 Q    Let's assume that everyone was off for two years; the

24      resolution of the grievance is consistent with what's

25      in this letter, is it not?

                                                    65

---

1                      MR. LEGGHIO:  Objection as to

2       foundation and form.  Argumentative.

3                      MR. MCFARLANE:   Objection.

4       He's already testified, and it is further

5       speculative.  You are asking him to speculate on

6       something that assumes facts not in evidence.

7                      THE WITNESS:  Yes, I can't

8       speculate on --

9  BY MR. SANDERS, CONTINUING:

10 Q    I am not asking you to speculate.  My question is --

11      well let me ask a different question.  Is there

12      anything other than Exhibit Two that delineates how

13      the grievance was resolved?

14                     MR. LEGGHIO:  Objection as to

15      foundation.

16                     THE WITNESS:  I don't know.

17 BY MR. SANDERS, CONTINUING:

18 Q    And you're the person most knowledgeable as to the

19      grievance and how it was resolved, correct?

20                     MR. LEGGHIO:  Objection, that

21      mischaracterizes what his testimony is.

22 BY MR. SANDERS, CONTINUING:

23 Q    Correct?

24                     MR. MCFARLANE:  Same objection.

25                     THE WITNESS:  Correct.

                                                    66

---

1  BY MR. SANDERS, CONTINUING:

2  Q    So there was a resolution of the grievance in

3       February of 2019 before it was ever filed in May of

4       2019, correct?

5                      MR. LEGGHIO:  Objection, assumes

6       facts not in evidence.

7  BY MR. SANDERS, CONTINUING:

8  Q    Is that accurate?

9  A    I have no knowledge of a resolution before the

10      grievance was filed.

11 Q    You have knowledge of Exhibit Two, the letter dated

12      February 27, 2019, correct?

13 A    Correct,

14 Q    And you have no knowledge of any other written

15      documents that would delineate the resolution of the

16      grievance, correct?

17                     MR. LEGGHIO:  Same objection.

18                     MR. SANDERS:  You can answer.

19                     THE WITNESS:  Correct.

20 BY MR. SANDERS, CONTINUING:

21 Q    I may only have a few questions.  Give me a second

22      here.  You would agree with me that grievance 12-19

23      addresses Duty Disability and what should happen

24      under the Collected Bargaining Agreement, correct?

25                     MR. LEGGHIO:  Objection, the

                                                    67

---

1       document speaks for themselves.

2                      MR. SANDERS:  You can answer.

3                      MR. MCFARLANE:  Foundation.

4                      MR. SANDERS:  What was your

5       answer, sir?

6                      THE WITNESS:  Yes.

7  BY MR. SANDERS, CONTINUING:

8  Q    And the letter that you are looking at now, February

9       27, also addresses Duty Disability and what should

10      happen upon returning under the Collected Bargaining

11      Agreement, correct?

12                     MR. LEGGHIO:  Same objection.

13                     THE WITNESS:  That's what it

14      discusses, yes.

15                     MR. SANDERS:  Give me one second,

16      please.  I don't think I have any further questions.

17                     MR. LEGGHIO:  Jason, do you mind

18      if I go first?

19                     MR. MCFARLANE:  No, that's fine.

20      But for the record, I just want to -- there was an

21      information request earlier regarding Step I and Step

22      II response to a grievance.  At the very least I know

23      it's been produced by the DFFA based on 000356, is

24      where it begins.  I'm not sure where the City's

25      production on it at this time, but it already has

                                                    68

1  been produced.
2              MR. LEGGHI:  What's the number,
3  5?
4              MR. MCFARLANE:  000356 is where it
5  begins in the DFFA's production of documents.
6              MR. SANDERS:  All right.  Before
7  we conclude, I'd like to pull that up and take a look
8  at it, but go ahead.  Go ahead, Chris.
9              CROSS-EXAMINATION
10 BY M.R LEGGHIO:
11 Q   Mr. Jenkins, good afternoon.  I have some questions.
12     Mr. Jenkins, you understand you are a Defendant in
13     this Lawsuit that's been filed by Plaintiffs?
14 A   Yes.
15 Q   And I am not going to go through your Curriculum
16     Vitae, Mr. Sanders has done that this morning.  Is it
17     fair enough to say that you worked in Labor
18     Relations, you now work as Second Deputy Fire
19     Commissioner, correct?
20 A   Correct.
21 Q   I want to ask you some general questions, and then
22     I'm going to direct you to some specific provisions
23     of the Complaint, some of which were referred to by
24     Mr. Sanders.  First of all do you have -- did you
25     ever conspire with anybody from the Union to deprive

69

1  the Plaintiffs in this case of their appropriate
2  seniority?
3  A   No, I never did.
4  Q   Were you ever present when you witnessed somebody
5      conspiring or hatching a plot to deprive the
6      Plaintiffs in this case of their appropriate
7      seniority?
8  A   No.
9  Q   And when I say appropriate seniority I mean seniority
10     that's appropriate under the Collective Bargaining
11     Agreement that applies.  You were never present for
12     such a thing?
13 A   Correct, I was not.
14 Q   Have you ever conspired with any of the Union
15     Officers in this case or anyone else to discriminate
16     against the Plaintiffs in this case based on an
17     alleged disability?
18 A   I have not.
19 Q   Have you ever been present when anybody was hatching
20     a plot to discriminate the Plaintiffs in this case,
21     based on their alleged disability?
22 A   I have not.
23 Q   Did you ever conspire with anybody, any other
24     Defendants in this case or anyone else to
25     discriminate against the Plaintiffs in this case with

70

1  regard to their seniority, appropriate, based on
2  their age?
3  A   No, I have not.
4  Q   Were you ever present when you witnessed somebody
5      else, any other Defendant in this case hatching a
6      plot, to discriminate against the Plaintiffs in this
7      case with regard to their seniority, based on their
8      age?
9  A   No, I have not.
10 Q   You were asked some questions, and I want to make
11     sure you understand my concern about the question.
12     The questions were asked, do you have any facts to
13     contradict the allegations, and I want to reformulate
14     those questions, because for the record, those
15     questions are questions that ask you to prove a
16     negative, and I am asking you to give me assertive
17     facts.  Let's start with paragraph thirty of the
18     Complaint, and I am going to, do you have access to
19     that?
20 A   I do not.
21              MR. MCFARLANE:  If somebody can
22     give me screen share, I can share it.
23 BY MR. LEGGHIO, CONTINUING:
24 Q   Mr. Jenkins, in your experience with the City, in the
25     Departments that you've served in, isn't it true that

71

1  a person takes a Duty Disability Retirement because
2  they are Duty Disabled, and unable to perform their
3  work, isn't that true?
4  A   That is true.
5  Q   In your experience, it isn't an option to take a Duty
6      Disability injury based on your reliance of policy;
7      isn't it in fact true that one is either Duty
8      Disabled and cannot perform the functions or you can
9      actually continue working; isn't that true?
10              MR. SANDERS:  I will just make a
11     continuing objection to the leading nature of the
12     inquiries.  You can answer.
13              THE WITNESS:  That is true.
14 BY MR. LEGGHIO, CONTINUING:
15 Q   Just to shorten it up, in your experience, people
16     take Duty Disability Retirements because they cannot
17     perform the job and they are Duty Disabled, isn't
18     that so?
19 A   That's correct.
20 Q   If you can turn to paragraph thirty-seven of the
21     Complaint, and read that to yourself.
22 A   Okay.
23 Q   Did you ever conspire with the Union or any Union
24     Official to selectively enforce the provisions of the
25     2014, 2019 CBA?

72

1 A No, I never did.

2 Q Were you ever present when anyone else, any other

3 Defendant in this case conspired to selectively

4 enforce the provision, the new provision of the CBA

5 2019 that is the provisions that address the

6 seniority and the return from Duty Disability?

7 A No, I was never present for such.

8 Q Do you have any facts to suggest there was any such

9 conspiracy?

10 A No, I never heard of a conspiracy, no facts.

11 Q If you would look down to paragraph thirty-nine,

12 actually thirty-eight.

13 A Okay.

14 Q And read that to yourself.

15 A Okay.

16 Q Now in your experience with the City do you have any

17 facts to support the allegation that the City and the

18 Union conspired or agreed to allow some Fire Fighters

19 to come back from Duty Disability Retirement post

20 2014, maintain their seniority, be promoted and then

21 retire after receiving their promotions, being

22 treated differently than the Plaintiffs in this case?

23 Do you have any facts to support such an agreement or

24 conspiracy?

25 A I do not.

73

1 Q Did you ever do such a thing?  Were you ever a party

2 to such an agreement or conspiracy?

3 A No, I was not.  Never heard of it.

4 Q Paragraph thirty-nine, can you read that to yourself?

5 A Okay.

6 Q First of all, I want to make clear, it's true, is it,

7 the Union never consulted with you before it filed

8 any grievances related to this seniority issue, did

9 it?

10 MR. SANDERS:  Objection, form,

11 foundation, mischaracterization of the record.

12 BY MR. LEGGHIO, CONTINUING:

13 Q Did the Union ever consult with you before it filed

14 any grievances related to this saga?

15 A They did not, no.

16 Q In your experience with the City, let's take it out

17 of this situation.  In anything, has the Union ever

18 consulted with you about whether they would agree or

19 not agree?  I mean, is that your experience?

20 A No, no Unions have ever talked to me prior to filing

21 a grievance.

22 Q They don't consult with you about whether they are

23 going to grieve or not?

24 A Correct, they do not.

25 Q In this paragraph it indicates that in continuation

74

1 of a conspiracy to selectively enforce the new

2 provisions of the CBA, and I'm going to insert in

3 there, provisions related to seniority, did you ever

4 -- do you have any facts to support that claim that

5 the Union filed the grievance in May of 2019 because

6 it was conspiring to select (inaudible) new seniority

7 provisions of the 2014 CBA?

8 A No, I do not.

9 Q Did you participate in any conspiracy either with the

10 City and the Union or within the City itself to

11 selectively enforce the new provisions of the

12 Collective Bargaining Agreement with regard to

13 seniority after a Duty Disability Return?

14 A No, I did not.

15 Q Now paragraph forty-one if you could read that to

16 yourself for a moment.

17 A Okay.

18 Q You would, in your position now and in your position

19 in Labor Relations before, you understand that there

20 are deadlines in any Collective Bargaining Agreement,

21 and I'm not talking about any Collective Bargaining

22 Agreement, with the City and the Fire Fighters, to

23 file a grievance, you are familiar with that?

24 A Yes.

25 Q And you are familiar with the 2014, 2019 provision

75

1 about filing a grievance within ten days of the

2 occurrence of the violation, alleged violation or

3 within ten days of when the Association becomes aware

4 of the violation; you're aware of that.

5 A Yes.

6 Q Are you aware of things that are called continuing

7 violations, have you ever heard that term?

8 A Yes, I have.

9 Q What is a continuing contract violation?

10 A It's when some potential violation occurs and then

11 the same violation occurs on a continuing basis.

12 And at that point is it your experience that -- well

13 let me strike that.  If you look at paragraph forty-

14 two of the Complaint and read that paragraph to

15 yourself, it begins with however and furtherance.

16 A Okay.

17 Q Now did you ever conspire with the Union or any Union

18 official to recognize the May 2019 grievance

19 regarding seniority and those returning from Duty

20 Disability, did you participate in any such

21 conspiracy?

22 A No, I did not.

23 Q Were you ever a witness to any such a conspiracy?

24 Were you ever in a room where people were talking

25 about conspiring to ignore the CBA Statute of

76

1 Limitations and recognize this grievance, the May
2 2019 grievance by the Union regarding seniority and
3 Duty Disability?
4 A No, I was not.
5 Q Do you have any facts to support this assertion that
6 there was a conspiracy between -- within the City and
7 the Union or between the City and the Union to ignore
8 the Statute of Limitations with regard to the May 19,
9 the May 2019 grievance regarding Seniority and Duty
10 Disability?
11 A No, I do not have any knowledge of that.
12 Q Now let me move on to paragraph forty-three, read
13 that to yourself then I have some questions for you.
14 A I am ready.
15 Q First of all, in your experience with the City in any
16 of your positions, can you cite any example when the
17 Union or Union Official disciplines employees of the
18 City?
19 A When Union Officials discipline?
20 Q Yes. Discipline employees?
21 A No. No.
22 Q You would agree that discipline City employees is a
23 function exclusively within the management rights of
24 the City am I correct?
25 Q That's correct.

77

1 A Now in terms of the demotion that occurred that's at
2 the core of this litigation, let me ask you this
3 question, is seniority adjustment, does that occur,
4 has that ever occurred in your experience with the
5 City in a way that's unconnected in to this case,
6 Have you ever seen individuals have their seniority
7 adjusted because there were calculation errors or
8 Department errors or issues regarding whether you use
9 City-wide seniority or Department-wise seniority?
10 Do you have any experience with
11 seniority adjustments?
12 A Yes, I do. There have been.
13 Q In your experience with seniority adjustments, in
14 some occasions have individuals had their seniority
15 adjusted downward, reduced?
16 A They have.
17 Q Is that simply a function of, well let me rephrase
18 it. Is all seniority adjustments always a
19 disciplinary action, if they involve a reduction in
20 seniority?
21 A No, it sometimes just a correct the record.
22 Q Okay. If you can -- if you look at paragraph forty-
23 four and look at it yourself.
24 Okay.
25 Q Now your understanding, in a Collective Bargaining

78

1 Agreement and I am going to ask you if this is your
2 understanding, does one who goes out on Duty
3 Disability lose all of their seniority if they return
4 to work before two years?
5 A Say that one more time.
6 Q Well let me rephrase it. If I go out on Duty
7 Disability, and this is a post 2014 event, and I am
8 off for ten months, when I return to work, do I
9 maintain my seniority?
10 A If you are off for ten months?
11 Q Yes.
12 A On Duty Disability?
13 Q Yes. In other words, I'm not off for more than two
14 years?
15 A Yes, you should.
16 Q Well this paragraph alleges that the Defendants put
17 in place an alleged blanket demotion of all
18 disability retirement -- retires that returned to
19 work after 2014. You as a Defendant, did you put in
20 place such a blanket demotion of all Disability
21 Retirement returnees?
22 A No.
23 Q Were you ever present when anyone else put in place
24 such a blanket demotion of all Disability Retiree
25 returnees at all?

79

1 A No.
2 Q Paragraph forty-seven of the Complaint, would you
3 read that to yourself.
4 A Okay.
5 Q As a Defendant did you ever intend to strip
6 Plaintiffs of their seniority in any Improper way?
7 A No.
8 Q Did you have any -- did you conspire with any of the
9 Plaintiffs in this case -- or with the Defendants in
10 this case, whether Union or other City Officials to
11 strip Plaintiffs of their seniority in a way that was
12 not consistent with the Collective Bargaining
13 Agreement?
14 A No.
15 Q If you could turn to Page fifty-one of the Complaint.
16 Before we go to fifty-one, let me ask you this
17 question, Mr. Jenkins. Seniority is something that's
18 earned and correct me if I am wrong. Seniority is
19 something that is earned through time and through
20 work right, right? I mean you go to work, you do
21 your job and you earn your seniority, that's your
22 experience, isn't it?
23 A That's correct.
24 Q Can you think of any occasion where they have not
25 either been working or on Duty Disability within the

80

1 context of the Collective Bargaining Agreement? Has

2 anybody been, to your knowledge, to your experience,

3 does anyone get seniority unless they are performing

4 their job and they are off for only an appropriate

5 time under the Collective Bargaining Agreement?

6 A Only if there is a discharge and thy are returned to

7 work, normally Arbitrators will, if they won their

8 grievance, the Arbitrators will return them to work

9 with full seniority so they wouldn't lose it.

10 Q But that is based on the notion that they were

11 discharged, and had they not been discharged

12 improperly, they would have been working?

13 A Correct, yes.

14 Q Now paragraph fifty-one of the Complaint, can you

15 read that to yourself?

16 A Okay.

17 Q Now first of all did you, is there anything that you

18 did that you did to intentionally deprive the

19 Plaintiffs in this case, of an opportunity to collect

20 a larger pension?

21 A No.

22 Q Were you ever present when anyone from the City

23 articulated or suggested or gestured toward the

24 notion that they were taking actions to intentionally

25 deprive the Plaintiffs of an opportunity to collect a

81

---

1 larger pension?

2 A No.

3 Q Were you ever present when anyone from the Union

4 indicated to you or to anyone in your presence, that

5 the Union was grieving in May of 2019 about seniority

6 in an effort to intentionally deprive Plaintiffs of a

7 larger pension?

8 A No.

9 Q Now as I said, I wasn't going to go through your

10 Curriculum Vitae, but I want to just clarify one

11 thing, you were off, I just want to kind a bookend

12 this. You were off just prior to the time that the

13 city went into bankruptcy, is that when you left city

14 employment?

15 A That's correct.

16 Q Then you returned when exactly?

17 A March of 2014, but they were still going through

18 their bankruptcy process but on the way out.

19 Q So they went into bankruptcy July 2013, is that your

20 recollection?

21 A Yes, somewhere in there, yes.

22 Q Are you aware in all of your work at the City of any

23 occasion where an employee who returns from Duty

24 Disability to his employment with the City, comes

25 back to work under the terms of the contract under

82

---

1 which he took disability, and let me be specific.

2 For example, as you know in this case some Plaintiffs

3 took Duty Disability and were off for fourteen or

4 fifteen years, you understand that, don't you?

5 A I do.

6 Q Are you aware of any employee who returns to work

7 from Duty Disability after fourteen or fifteen years

8 and is paid at the pay rate that was in place when

9 they took Duty Disability fifteen years earlier?

10 A No, employees are returned under the contractual

11 plan.

12 Q Okay. I would like a moment if I could, I would like

13 to talk to my clients. Just five minutes

14        MR. SANDERS: Sure, why not.

15        (Whereupon a brief recess was

16 taken at or about 12:37 p.m.)

17        CROSS EXAMINATION

18 BY MR. MCFARLANE:

19 Q Can you tell me, is there a current process for

20 disciplining employees of the Detroit Fire

21 Department?

22 A Yes.

23 Q And what's the first step of that process?

24 A The first step of discipline?

25 Q When the Department issues discipline, what step does

83

---

1 it take?

2 A Conduct an investigation.

3 Q And after an investigation, if it's found warranted,

4 then what happens?

5 A It goes to-- employees are charged through a charge

6 Hearing. Then after the charge Hearing then it would

7 go to, if appealed it could go to a Preliminary

8 Hearing, and if it appealed further then It could be

9 a grievance, it could go to grievance form.

10 Q And at the Charge Hearing, do they receive notice of

11 charges?

12 A Yes, they do.

13 Q And that Notice of Charge just indicates what the

14 discipline is for?

15 A Yes, what the discipline is for and what specific

16 general order they are being charged with.

17 Q And you were asked a question about the seniority

18 provisions in a current contract. Are you aware if

19 there is a dispute between the City and the Union

20 over which language applies to the return for Duty

21 Disability retirement?

22 A Yes.

23        MR. SANDERS: Objection, form,

24 foundation.

25        MR. SANDERS: I'm sorry, I didn't

84

1     hear his answer.
2 BY MR. MCFARLANE, CONTINUING:
3 Q   What was your answer, sir?
4 A   Yes.
5 Q   And that dispute is the subject of the current
6     grievance, is that correct?
7 A   Correct.
8 Q   And that grievance has been arbitrated?
9 A   No.
10 Q   You don't know, okay?
11 A   No, I said it has not. It has been appealed to
12     Arbitration.
13 Q   Do you know if the Arbitration has occurred?
14 A   Yes.
15 Q   But a decision has not come back?
16 A   Correct.
17         MR. MCFARLANE: I have nothing
18     further.
19         REDIRECT EXAMINATION
20 BY MR. SANDERS:
21 Q   I've got a couple questions. Was the 2014 CBA
22     collectively bargained for?
23 A   I was not at the table.
24         MR. LEGGHIO: Objection as to
25     foundation.

85

---

1 BY MR. SANDERS, CONTINUING:
2 Q   Do you know whether or not it was implemented by the
3     Bankruptcy Court?
4         MR. LEGGHIO: Objection as to
5     foundation. It calls for a Legal conclusion.
6         THE WITNESS: I do not know.
7         MR. SANDERS: Shawndrica can you
8     put up 00356 please?
9 BY MR. SANDERS, CONTINUING:
10 Q   Can you take a look at that correspondence, please
11     Mr. Jenkins?
12 A   Yes.
13 Q   And when you need to scroll, please let us know.
14 A   Okay. Next page. Okay.
15 Q   Are you familiar with that document?
16 A   Yes, I am.
17 Q   What is it?
18 A   It's the Step I response to grievance, DFFA grievance
19     12-19/
20 Q   I am going to ask that that be marked as Exhibit
21     Number 13 to our Exhibits to our Exhibit.
22         (Whereupon Exhibit Thirteen was
23     marked for identification)
24 BY MR. SANDERS, CONTINUING:
25 Q   Other than grievance 12-19, are you familiar with any

86

---

1     other dispute concerning reinstatement from Duty
2     Disability that the City had with the DFFA in 2019?
3 A   No, I can't think of anything else.
4 Q   I have nothing further.
5         MR. LEGGHIO: I have nothing
6     further.
7         MR. MCFARLANE: The City doesn't
8     either.
9         (Whereupon proceedings concluded
10     at or about 12:45 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

87

---

1             CERTIFICATION
2
3 STATE OF MICHIGAN  )
                  )
4 COUNTY OF OAKLAND  )
5     I HEREBY CERTIFY that the foregoing testimony and
6     proceedings, consisting of eighty-eight (88)
7     typewritten pages were mechanically recorded at the
8     time and place hereinbefore set forth; was thereafter
9     reduced to typewritten form; and that the foregoing
10     is a full, true and correct transcript of the
11     recording so taken.
12
13
14
15
16
17         Sharon Dillon, CER 3192
           Certified Electronic Reporter
18         P.O. Box 214552
           Auburn Hills, MI 48321-4064
19         (248)342-7229
20 May 7, 2021
21
22
23
24
25

88