EXHIBIT 15

## Page 1

```
 1                    STATE OF MICHIGAN

 2        IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

 3   CHRISTOPHER MCGHEE, NORMAN BROWN
     CRAIG BROWN, JAMES WASHINGTON
 4   SHANNON FERGUSON, UNIUS PERRY
     And ORLANDO POTTS,
 5
              Plaintiff,
 6
          vs.                  Case No.: 20-006272-CD
 7                             Hon. Shelia Gibson

 8   CITY OF DETROIT, et al
     In their Individual and
 9   Official Capacities,
     Jointly & Severally,
10
              Defendants.
11   _____/

12           DEPOSITION OF KEMIA CROSSON,

13     Taken by the Plaintiff Via Zoom on Wednesday, March

14   10, 2021, at 11:00 a.m.

15

16   APPEARANCES:

17   For the Plaintiffs:    HERBERT A SANDERS (P43031)
                            615 Griswold, Suite 913
18                          Detroit, MI 48226
                            (313) 962-0099
19

20   For the Defendant      CHRISTOPHER P. LEGGHIO (P37205)
     Fire Department        306 S. Washington, Ste. 600
21                          Royal Oak, MI 48067
                            (248) 398-5900
22
     For Defendant          JASON T. MCFARLANE (P73105)
23   City of Detroit        2 Woodward Ave., Ste. 500
     Insurance Company      Detroit, MI 48226
24                          (313) 224-4550

25
                                                    1
```

## Page 2

```
 1                   TABLE OF CONTENTS

 2   WITNESS:                                    PAGE

 3

 4   KEMIA CROSSON

 5     Direct Examination by Mr. Sanders           3
       Cross-Examination by Mr. Legghio           68
 6     Cross-Examination by Mr. McFarlane         79
       Redirect Examination by Mr. Sanders        80
 7
```

```
 8

 9

10

11

12

13

14

15

16

17   EXHIBITS:                                IDENTIFIED

18

19

20

21

22

23

24

25
                                                    2
```

## Page 3

```
 1   Wednesday, March 10, 2021

 2   Via Zoom

 3         -   -   -

 4                PROCEEDINGS

 5         -   -   -

 6              THE COURT REPORTER:  Witness, can

 7   you raise your right hand for me, please?  Do you

 8   solemnly swear or affirm that the testimony you are

 9   about to give in this matter will be the truth?

10              THE WITNESS:  I do.

11              THE COURT REPORTER:  Thank you.

12              KEMIA CROSSON,

13   WAS DULY SWORN BY THE COURT REPORTER, TESTIFIED UNDER

14   OATH AS FOLLOWS:

15              DIRECT EXAMINATION

16   BY MR. SANDERS:

17   Q   Can you state your full name for the record, please?

18   A   Kemia Danielle Crosson.

19        MR. SANDERS:  Let the record

20   reflect that this is the Deposition of Kemia Crosson

21   taken pursuant to Notice in the Wayne County Circuit

22   Court Case, Christopher McGhee, et al versus the City

23   of Detroit, et al.  Case Number 20-006272-CD to be

24   used for all intent and purposes in accordance with

25   the Michigan Court Rules.
                                                    3
```

## Page 4

```
 1   BY MR. SANDERS, CONTINUING:

 2   Q   Good afternoon, Ms. Crosson, how are you?

 3   A   I'm doing fine, thank you.

 4   Q   I'm going to ask you a series of questions as it

 5   relates to the Lawsuit that I just referenced.  If at

 6   any time you do not understand my question, please

 7   ask me to repeat it or rephrase it, I will be happy

 8   to do so.

 9              If you give a response or an

10   answer, I will assume that you did understand the

11   question.  If you need to take a break at any time, I

12   would be happy to accommodate you.  I would ask that

13   if there's a question pending, that you answer the

14   question before we break, okay?

15   A   Okay.

16   Q   Ms. Crossman, what is your date of birth?

17   A   May 7,1972.

18   Q   And are you a High School Grad?

19   A   Ys.

20   Q   What High School did you attend?

21   A   Denby High School.

22   Q   What year did you graduate?

23   A   1990.

24   Q   Do you have any formal education after High School?

25   A   Yes, I do.
```

EXHIBIT # 15

| | |
|---|---|
| 1 | Q   And what is that? |
| 2 | A   I have a Master of Science in Administration with a |
| 3 | concentration, Human Resources.  I also have a |
| 4 | Bachelor of Science in Education. |
| 5 | Q   When did you receive your BA in Education? |
| 6 | A   I received my BS in education I May of 2003. |
| 7 | Q   And when did you receive your Master of Science in |
| 8 | Administration and Human Resources? |
| 9 | A   May of 2009 --  sorry about that.  My Bachelor of |
| 10 | Science was May 2006 and then the master's degree was |
| 11 | May of 2009. |
| 12 | Q   When did you first become employed with the City of |
| 13 | Detroit? |
| 14 | A   I became employed with the City of Detroit October of |
| 15 | 2013. |
| 16 | Q   And in what capacity? |
| 17 | Human Resources Analyst. |
| 18 | Q   Human Resource what? |
| 19 | Human Resources Analyst, HRA |
| 20 | Q   And what was the next position you held with the City |
| 21 | of Detroit? |
| 22 | A   Employee Services Consultant.  The title was just |
| 23 | changed, however, I am still at the same capacity. |
| 24 | Q   Can you repeat the title, employee -- |
| 25 | A   Employee Services Consultant. |

5

| | |
|---|---|
| 1 | Q   And you assumed that title when? |
| 2 | A   What's this, maybe three years ago. |
| 3 | Q   So approximately -- |
| 4 | A   Approximately three years ago. |
| 5 | Q   2017? |
| 6 | A   That sounds about right. |
| 7 | Q   Is that your title today or do you have another |
| 8 | title? |
| 9 | A   That is my title today. |
| 10 | Q   And what are your current job responsibilities? |
| 11 | A   My current responsibilities are, I'm the Consultant |
| 12 | for the Fire Department as well as the Health |
| 13 | Department.  Those are the two Departments that I |
| 14 | service.  I handle employee relation issues, employee |
| 15 | Department movements; I'm the Liaison of both |
| 16 | Departments. |
| 17 | Q   Okay.  Can you slow down a bit? |
| 18 | A   Oh sure.  Sorry about that. |
| 19 | Q   I believe you said you consult for Fire; you're the |
| 20 | Employee Liaison? |
| 21 | A   Yes, for Human Resources, for the Health Department |
| 22 | and the Fire Department. |
| 23 | Q   And what else? |
| 24 | A   Just those two Departments, and I currently assist |
| 25 | with the movements throughout the Department. |

6

| | |
|---|---|
| 1 | Promotions, any type of promotions, demotions.  I |
| 2 | assist with insuring that the employees get paid. |
| 3 | That's the most important part.  I also help |
| 4 | interpret different Rules and Polices and |
| 5 | Regulations, if needed. |
| 6 | Q   Now those responsibilities that you've described, how |
| 7 | long have you had those particular responsibilities? |
| 8 | A   Since 2013. |
| 9 | Q   Now referring to employees returning from a Duty |
| 10 | Disability, a Retirement, would it be your |
| 11 | responsibility to see that those employees, upon |
| 12 | return have the appropriate seniority or given the |
| 13 | appropriate seniority? |
| 14 | A   Would it be my responsibility? So I would say yes. |
| 15 | Q   Okay.  And after 2014, was there a process in place |
| 16 | to assure that employees returning from a Duty |
| 17 | Disability Retirement would receive the appropriate |
| 18 | seniority? |
| 19 | A   Yes. |
| 20 | Q   Can you tell me what that process was? |
| 21 | A   2014 the process would be the employee would receive |
| 22 | notification from pension, if they are able to return |
| 23 | to work from a Duty Disability Retire, that |
| 24 | information is being sent to Human Resources.  The |
| 25 | employee is then scheduled for a return-to-work |

7

| | |
|---|---|
| 1 | fitness, return to work physical, I'm sorry, |
| 2 | physical.  And upon completion of a return to work |
| 3 | physical, with a cleared UDG they are then return |
| 4 | back to work. |
| 5 | Q   Okay.  Now you said the employee will receive |
| 6 | notification from pension? |
| 7 | A   Yes |
| 8 | Q   They would receive notification from pension of what? |
| 9 | A   If they had been cleared to return to work of Duty |
| 10 | Disability with or without restriction; the letter |
| 11 | would come from them first. |
| 12 | Q   And would that letter also be sent to the City of |
| 13 | Detroit? |
| 14 | A   Yes, that letter would be sent to Human Resources. |
| 15 | Q   Do you have any knowledge as to whether that letter |
| 16 | is sent to the Detroit Fire Fighter's Association as |
| 17 | it relates to Fire Fighters? |
| 18 | A   I have no knowledge of that, sir. |
| 19 | Q   Now do you know whether or not prior to pension |
| 20 | sending out the letter we have discussed, pension |
| 21 | requires that the employee have a physical |
| 22 | examination? |
| 23 | A   I have no knowledge of what happens before they |
| 24 | return to Human Resources. |
| 25 | Q   Do you know what the basis would be for pension |

8

saying that someone is eligible to return?

A  I have no knowledge.

Q  Once the information is sent to City of Detroit Human Resources from Pension, what does Human Resources do with that information?

A  Human resources would then reach out to the employee and begin the return-to-work process.

Q  Who in Human Resource would reach out and begin the return-to-work process?

A  That would be me, sir.

Q  Now I believe you indicated the employee would be scheduled for a physical, is that part of the return-to-work process?

A  Yes, it is.

Q  And are you the one that would schedule that physical?

A  I would refer them to -- I would refer the information to our Medical Case Manager, and our Medical Case Manager would then schedule the physical for the employee.

Q  What would happen next?

A  Once the results are in then the person would be notified that they have been cleared to return to work and then they will start the new hire or rehire paperwork to complete the documents to be entered

into the payroll system.

Q  Now what is the rehire paperwork?

A  The rehire paperwork will consist of the Federal, City exemption forms, things of that nature, the demographics form, in the event their address has changed, that information is entered into the system, so that we can make sure that they receive their paycheck. Any medical information that needs to be included, whether they accept the medical, vision and dental benefits again, information as such.

Q  Okay. And after they fill out that paperwork, what happens next?

A  Once they fill that paperwork out, then they will report to the I want to say Senior Chief's Office to be assigned their Fire schedule. Once they go to the, so when I say the Chief' Office, when they are retuning back to work, they return back to the Training Academy for retraining, if they have been out for so long.

Q  Do they return to the Training Academy before or after they report to the Senior Chief's office?

A  So instead of the Senior Chief's Office they report to the Training Academy. They go to the Training Academy, because that's where they are going for retraining. That's what I corrected myself saying

that, yes.

Q  They go to the Training Academy?

A  Un-huh.

Q  For how long?

A  I want to say it's more forty-five to ninety days, but I don't want to misspeak.

Q  Okay.

A  I'm not certain of the actual time frame.

Q  I understand that is an approximation.

A  Yes.

Q  What happens after they complete Training?

A  After they complete Training, that's when they would go back to the field, or back to the Senior Chief -- once they leave Training, I'm no longer tracking their movements basically, so they pretty much go to the field. They are placed in Fire Operations.

Q  I'm sorry, I interrupted you. You said they go to the field and then what?

A  They are placed in Fire Operations. So once they complete training, they go over to Fire Operations, and I am no longer tracking where they are at, sir.

Q  Who determines where they are placed in the field or placed in Fire Operations?

A  Who determines that? I would say the Chief, the Chief of the Department or the Senior Chief. I'm not

certain as to who makes that determination as to where they would go.

Q  Do you have any idea what information the Chief or Senior Chief takes into consideration when they determine where they would go?

A  No, I don't.

Q  And at what point during the process you have described, is it determined what seniority a person will have upon their return?

A  At what point? Currently once they return, a letter is given to the employee to let them know that their seniority dates have been adjusted. So they will receive a letter to let them know the different dates, in particular the date they started with the City, their return to work date as well as their seniority date with the City of Detroit.

Q  Now you qualified your answer by stating currently. When did that practice come into place?

A  That practice came into play well over a year or so. I want to say well over a year, just to provide clarification, once the employee returned, but within the last year and a half.

Q  And prior to the current practice that you've described, let's say beginning in 2014, what was the practice in terms of assuring that Fire Fighters had

**Page 13**

1  appropriate seniority?
2  A  They would return -- once they completed their
3  physical, they would return back to work.  As far as
4  placement, in 2014 --
5  Q  Yes.
6  A  -- I was not participating in that movement; that
7  information went to payroll.
8  Q  Now I hear you say that, well let me just as this, in
9  2014 up to around a year and a half ago you were not
10  participating in placement; would that be accurate?
11  A  Yes.
12  Q  Okay.  But I think I have a somewhat different
13  question and that is, in 2014 until the new policy
14  you talked about that begin about a year and a half
15  ago, whose responsibility was it to insure the Fire
16  Fighters had the appropriate seniority upon their
17  return?
18  A  Before now?  I was not -- that was not my role.  So
19  I am not certain.  I would say payroll, but I am not
20  certain who entered the information and who is
21  responsible for doing it.  I don't have an answer for
22  that.
23  Q  Would you agree with me that there were some Fire
24  Fighters who returned to employment from Duty
25  Disability who later had their seniority adjusted and

13

**Page 14**

1  reduced?
2          MR. LEGGHIO:  Objection as to
3  foundation.
4  BY MR.
5  Q  Are you aware of that?
6  A  Can you repeat that question again, sir?
7          MR. SANDERS: Can you read it back
8  again, Court Reporter?
9          (Whereupon the Court Reporter
10  read back the last question)
11          THE WITNESS:  It's kind of
12  scrambled, so I can't really hear it very clear.
13  BY MR. SANDERS, CONTINUING:
14  Q  So let me try to repeat the question.  Would you
15  agree with me that there were some Fire Fighters who
16  returned from Duty Disability, who later had their
17  seniority adjusted and reduced?
18          MR. LEGGHIO: Objection, as to
19  form.  There is no time limits placed on that
20  question.
21          MR. SANDERS:  Okay.  You can
22  answer.
23          THE WITNESS:  I agree.
24  BY MR. SANDERS, CONTINUING:
25  Q  So prior to approximately a year and a half ago, you

14

**Page 15**

1  have no idea whose responsibility it was to assure
2  that Fire Fighters had the appropriate seniority when
3  they returned, is that accurate?
4          MR. LEGGHIO: Objection, asked and
5  answered.
6          MR. MCFARLAND:  You can answer.
7          THE WITNESS:  I have no idea.  I
8  have no idea who put that information in the system,
9  no I don't because it wasn't me.
10          MR. SANDERS:  Maybe this is a
11  good time to take a few minutes, so get back on at
12  2:10.
13          MR. LEGGHIO:  Okay.
14          MR. SANDERS:  Okay.  Thank you. I
15  will make it short.
16          (Whereupon a brief recess was
17  taken)
18  BY MR. SANDERS, CONTINUING:
19  Q  Ms. Crosson, I'd like to show you what has been
20  marked as Deposition Exhibit Number Six.
21          MR. SANDERS:  Can you put that on
22  the screen, Shawndrica, Exhibit Six?
23  BY MR. SANDERS, CONTINUING:
24  Q  Can you see that document, Ms. Crosson?
25  A  Yes.

15

**Page 16**

1  Q  Are you familiar with the document?
2  A  Yes.
3  Q  How is it that you're familiar with that document?
4  A  That was the document that I sent to Norman Brown.
5  Q  And you sent that document to Mr. Brown on October 3,
6  2019; is that accurate?
7  A  That would be accurate, sir.
8  Q  And what was the basis for you sending this document
9  to Mr. Brown?
10  A  Informing him that his return to work date would be I
11  want to say adjusted.
12  Q  Why was his return work date being adjusted?
13  A  Basically as it's highlighted on the letter that DFAA
14  -- it was brought to the attention by way of
15  conversations and ultimately filing a grievance, that
16  the City was in violation of a Master Agreement.  So
17  returning him back to his previous -- I am trying
18  to read this; it's kind of blurry, I'm just looking
19  at it.  It's hard to kind of read it.
20  Q  Why don't you take your time and read it and then I
21  can question you.
22  A  Can she blow it up so I can see it because it's a
23  little small?
24  Q  Sure.
25          MR. SANDERS:  Can you make it a

16

Page 17:

1   little larger, please?
2   BY MR. SANDERS, CONTINUING:
3   Q   Is that better?
4   A   Yes, that's much better. Yes. The letter is
5       informing him that his seniority would be adjusted to
6       reflect the date that he return back to work --
7   Q   I'm sorry, go ahead.
8   A   I said is informing him that his seniority would be
9       adjusted to reflect the dates that he returned back
10      to duty with the Fire Department.
11  Q   Okay.
12  A   It resulted in a demotion from his current
13      classification.
14  Q   Prior to his seniority being adjusted, what was his-
15      well scratch that. Scratch that question. Second
16      paragraph says at the point when you returned to work
17      from a Duty Disability Retirement, the City did not
18      take into account the above referenced contractual
19      language and return you to a duty -- return you to
20      duty with your previous seniority, do you see that?
21  A   Yes, I do.
22  Q   Who specifically did not take into account the
23      previous contractual language or the contractual
24      language? Whose job was that?
25  A   I would say the City when he returned back.

17

Page 18:

1   Q   Who within the City?
2   A   That would be -- could you scroll down a little bit?
3   Q   I'm sorry?
4   A   The City didn't take that into account when they
5       returned him back to work. So that would be me, when
6       he returned back to work in his previous position.
7   Q   Okay. So was it your impression that that language
8       was not to be applied retroactively?
9               MR. MCFARLANE: Objection to the
10      form of the question. Which language are you
11      referencing?
12              MR. SANDERS: The language that
13      she references in the letter as it relates to the
14      Collective Bargaining Agreement that she said
15      resulted in his seniority being adjusted.
16              MR. LEGGHIO: I'm going to
17      object, that calls for a Legal conclusion.
18              MR. SANDERS: No it doesn't. It
19      calls for what her state of mind was. I'm asking --
20              MR. LEGGHIO: I'm not stopping
21      her from testifying, Mr. Sanders, it's a legal
22      conclusion. Proceed.
23  BY MR. SANDERS, CONTINUING:
24  Q   Do you understand my question?
25  A   Can you repeat it again?

18

Page 19:

1   Q   Sure. You said it was your responsibility to assure
2       that the seniority was appropriate, and my question
3       to you is, the contract language that you reference
4       in paragraph one, was it your opinion that that
5       language was not to be applied retroactive, and is
6       that why you allowed him to come back and maintain
7       all of his seniority?
8   A   I don't recall because that was a while ago.
9   Q   Alternatively, did you simply overlook it and make a
10      mistake?
11  A   As indicated, I don't recall.
12  Q   Did anyone ever tell you that that language was not
13      to be applied retroactively?
14  A   Can you repeat that again?
15              MR. LEGGHIO: Mr. Sanders, I
16      would like to object to the form of the question. I
17      don't want to interfere, but I want to object to the
18      form of the question. I think it's a little
19      misleading when you say applied retroactively. With
20      that, my objection is on the record.
21  BY MR. SANDERS, CONTINUING:
22  Q   You referenced contractual language in paragraph
23      one --
24  A   Uh-huh.
25  Q   -- okay?

19

Page 20:

1   A   Yes.
2   Q   My question is, was Norman Brown allowed to return to
3       work and maintain his seniority because someone had
4       told you that contractual language should not apply
5       to Norman Brown?
6   A   No one told me. We just didn't apply it.
7   Q   Did you believe that it shouldn't apply to Norman
8       Brown for some reason?
9   A   I believe that didn't apply to him?
10  Q   Why did you believe that didn't apply to him?
11  A   I'm sorry, I'm actually repeating the question just
12      so I can understand when he was brought back, we
13      brought him back to the City without taking this into
14      consideration, and I don't know why; that's how he
15      was returned back. So I'm trying to not be confused
16      in answering the question, that's all.
17  Q   So you answer is you don't know why; is that
18      accurate?
19  A   Yes, I would say that. I don't know why.
20  Q   If you recall during the course of this Deposition
21      will you let me know?
22  A   Sure.
23  Q   Now the next paragraph says the Detroit Fire
24      Fighter's Association bought this matter to the
25      City's attention and indicated by way of numerous

20

## Page 21

1  conversations, and ultimately the filing of a
2  grievance, do you see that?
3  A  Yes, I do.
4  Q  Were you in participation with conversations with the
5  Detroit Fire Fighters concerning this issue?
6  A  No, I was not.
7  Q  How do you know that to be the case?
8  A  I was not involved in the conversation.
9  Q  Right.  So how do you know there were numerous
10  conversations?
11  A  I would say maybe via email; I got information from
12  DFRA.  They provided me with a list of names, so the
13  information came to me.  I wasn't involved in the
14  conversation up front.
15  Q  All right.  So you exchanged emails with the Detroit
16  Fire Fighters Association --
17  A  Yes, I did.
18  Q  -- as it relates to this issue?
19  A  Yes.
20  Q  Can you look at the next page of this Exhibit Six?
21  Can you read that over to yourself, please?
22  A  Okay.  I'm done.
23  Q  Are you familiar with that document?
24  A  Yes.
25  Q  How so?

21

## Page 22

1  A  I sent the letter to Norman Brown.
2  Q  And why did you send this letter to Norman Brown?
3  A  This letter was basically describing the seniority
4  adjustment, it was the change that was made as a
5  result of that grievance being filed.
6  Q  Okay.  So prior to the seniority adjustment, what
7  date was being utilized to calculate Norman Brown's
8  seniority?
9  A  His original hire date with the Fire Department.
10  Q  And do you know what that is?
11  A  Original seniority date, as indicated 9-23-1996.
12  Q  And what new seniority date did you adjust his time
13  to be?
14  A  January 29, 2018.
15  Q  Other than the two documents that you looked at ask
16  as it relates to Norman Brown, are you aware of any
17  other correspondence that you had with Norman Brown
18  as it relates to his return to duty and his seniority
19  date?
20  A  Correspondence, maybe phone calls.  I don't recall
21  documenting anything that I have here on my notes.
22  We may have had a phone conversation.
23  Q  All right.  But you don't recall?
24  A  Yes, I don't recall.
25  Q  Let me finish my question.  You don't recall seeing

22

## Page 23

1  any other correspondence between you and Norman
2  Brown, other than what's indicated in Exhibit Six, is
3  that correct?
4  A  I don't recall.
5  Q  Okay.  So Norman Brown returned to work on 1-29-2018,
6  is it correct?
7  A  Yes.
8  Q  And he worked until approximately January 22, 2020
9  before his seniority was adjusted, is that accurate?
10  A  Yes, I would say that's accurate.
11  Q  And did the adjustment -- was he demoted or do you
12  know?
13  A  Yes, he was demoted.
14        MR. SANDERS:  Shawndrica, can you
15  put up Exhibit Five, please?
16  BY MR. SANDERS, CONTINUING:
17  Q  Let me ask you this question, Ms. Brown or excuse me,
18  Ms. Crosson.  Is it true that some Fire Fighters are
19  promoted pursuant to seniority, and others might be
20  promoted pursuant to testing?
21  A  Yes, that's true.
22  Q  All right.  The position from which Norman Brown was
23  demoted from, do you know whether or not that was
24  pursuant to testing for seniority that he had
25  obtained that position?

23

## Page 24

1  A  Through testing.
2  Q  All right.  If he obtained the position through
3  testing, and not through seniority, why was he
4  demoted?
5  A  He was demoted based on the grievance filed to place
6  him back in his property seniority, from when he
7  returned back from duty disability.
8  Q  But he had received his promotion via testing and not
9  seniority, right?
10  A  Yes.
11        MR. LEGGHIO:  Objection as to
12  form and foundation.  It assumes facts not in
13  evidence.  You can answer.
14  BY MR. SANDERS, CONTINUING:
15  Q  I believe you answered yes, is that correct?
16  A  He received the promotion via testing, that's what
17  you asked, right?
18  Q  Yes.
19  A  Yes, he did.
20  Q  So if he received the promotion via testing what was
21  the basis for his demotion?
22        MR. LEGGHIO:  Same objection.
23        THE WITNESS:  The basis -- can I
24  continue to answer?
25        MR. SANDERS:  Yes.

24

**Page 25**

```
 1                    THE WITNESS:  Okay.  The basis
 2      for the demotion was based on his seniority being
 3      adjusted with the City.  He returned back to a Fire
 4      Fighter's position.
 5   BY MR. SANDERS, CONTINUING:
 6   Q    So you took away a position that he had tested for?
 7   A    Un-huh.
 8                    MR. LEGGHIO:  Objection, form and
 9      foundation.  Hang on.  Objection as to form and
10      foundation and it mischaracterizes the testimony,
11                    MR. SANDERS:  Well she said yes.
12   BY MR. SANDERS, CONTINUING:
13   Q    So are you maintaining that he had to have a certain
14      seniority in order to assume that position for which
15      he had tested for?
16   A    Can I clarify?  With the position that he tested for,
17      based on his seniority, he wouldn't have been in that
18      position, if we had of utilized the seniority based
19      on the grievance that was filed, he would not have
20      been there and got promoted, because there were
21      people in front of him.
22   Q    My question is, is it your contention that he had to
23      have a certain seniority to assume the promotional
24      position he was placed in after testing?
25   A    You have to have a certain seniority, yes.
```

**Page 26**

```
 1   Q    Do you know that that seniority was?
 2   A    To place for that position, you had to be within Fire
 3      Fighting for at least five years.
 4   Q    Okay.
 5   A    Okay?
 6   Q    I'd like to refer you to page eleven of the
 7      Complaint.  I'm looking at the middle of the page
 8      and this is a letter that Norman had written to one
 9      of the DFFA Representatives, and he says in part, as
10      you know my position with Fire Prevention is not the
11      result of seniority; do you see where I am reading?
12   A    I see that.
13   Q    Bulletin Number 4/18 gives clear requirements for the
14      position to Fire Prevention which states are you a
15      current Detroit Fire Employee; do you have five years
16      experience in the Fire Fighting Division on active
17      duty, do you see that?
18   A    Yes, I see that.
19   Q    Is there anything there that I read that you disagree
20      with?
21                    MR. LEGGHIO:  Objection, calls
22      for a legal conclusion.  The document speaks for
23      itself.
24   BY MR. SANDERS, CONTINUING:
25   Q    You can answer.
```

**Page 27**

```
 1   A    Did I disagree with it?
 2   Q    Yes.
 3   A    I don't disagree with that.
 4                    MR. LEGGHIO:  If she disagrees
 5      with the way you read it?
 6                    MR. SANDERS:  She said she didn't
 7      disagree with anything I read.
 8                    MR. LEGGHIO:  Well meaning --
 9                    MR. SANDERS:  No, that's not what
10      it means.  If you have an objection, make the
11      objection.
12                    MR. LEGGHIO:  Let me put the
13      objection on the record, Mr. Sanders.
14                    MR. SANDERS:  You did.  You don't
15      need to give a speaking objection.
16                    MR. LEGGHIO:  I'm asking you a
17      question, sir.
18                    MR. SANDERS:  You can't ask me
19      any questions.  What is your objection?
20                    MR. LEGGHIO:  Is your question --
21                    MR. SANDERS:  You don't get to
22      ask any questions.  You get to make objections.  You
23      can cross examine the witness.
24                    MR. LEGGHIO:  All right.  I'm
25      going to move to strike what you --
```

**Page 28**

```
 1                    MR. SANDERS:  Well you can --
 2                    MR. LEGGHIO:  Let me finish.  Now
 3      it's my turn to talk.  It's my turn to talk.  I
 4      object to form, foundation and it assumes facts not
 5      in evidence, and the question that's been asked of
 6      the witness is not clear.  And with that said I will
 7      get it on redirect or recross.
 8   BY MR. SANDERS, CONTINUING:
 9   Q    Let me see if I can clear it up.  Do you see where he
10      indicates that in order to have assumed his
11      promotional position, it asks are you a current
12      Detroit Fire Employee, do you see that.
13   A    I see that.
14   Q    Do you disagree with that?
15   A    No, I don't.
16   Q    Do you see where it says in order to have assumed the
17      position he had, it asks do you have five years
18      experience in the Fire Fighting Division on active
19      duty, do you see that?
20   A    Yes, I see that.
21   Q    Do you disagree with that?
22   A    No, I don't disagree.
23   Q    Now would you agree with me that Norman Brown had
24      five years experience in the Fire Fighting Division
25      on active duty when he --
```

**Page 29 (top-left)**

```
 1                    MR. LEGGHIO:  Objection as to
 2      form.
 3   BY MR. SANDERS, CONTINUING:
 4   Q   -- or do you know?
 5   A   Can you repeat that again?
 6   Q   Sure.  Did Norman Brown have five years experience in
 7       the Fire Fighting Division on active duty at the time
 8       he loss his seniority?
 9                    MR. LEGGHIO:  Same objection as
10       to form and foundation.
11                    THE WITNESS:  He had five years
12       experience in Fire Fighting.
13   BY MR. SANDERS, CONTINUING:
14   Q   In the Fire Fighting Division on active duty?
15                    MR. LEGGHIO:  Same objection.  It
16       also calls for a legal conclusion.
17   BY MR. SANDERS, CONTINUING:
18   Q   And if you don't mind, can you adjust your screen?  I
19       can only see the top of your head.  Thank you.
20   A   You are welcome.  So I do agree that he had five
21       years experience in the Fire Fighting Division is
22       what I stated.
23   Q   On active duty?
24   A   On active duty.
25   Q   You agree with that?
                                                          29
```

**Page 30 (top-right)**

```
 1   A   Yes.
 2   Q   I'd like to refer you to Deposition Exhibit Number
 3       Seven, I think it's -- there we go.  Can you take a
 4       look at that document, please?
 5                    MR. LEGGHIO:  What's the Bates
 6       Stamp Number on that?
 7                    THE WITNESS:  DFPA0066.
 8                    MR. LEGGHIO:  Thank you.
 9   BY MR. SANDERS, CONTINUING:
10   Q   Are you familiar with that document?
11   A   Yes.
12   Q   How so?
13   A   I sent that document to Craig Brown.
14   Q   And what was the basis for sending it?
15   A   Advising him that his seniority would be -- a
16       seniority audit would be taking place.
17   Q   Can we look at the next page of that document.  The
18       next page is a letter from you to Craig Brown dated
19       January 22, 2020, do you see that?
20   A   Yes.
21   Q   Are you familiar with the document?
22   A   Yes.
23   Q   How so?
24   A   I sent that letter to Craig Brown.
25   Q   And what was the basis for sending it?
                                                          30
```

**Page 31 (bottom-left)**

```
 1   A   Advising him of his adjusted seniority date.
 2   Q   And was the basis for adjusting his seniority date as
 3       you had previously testified concerning the similar
 4       letter regarding Norman Brown?
 5   A   Yes.
 6   Q   What was his new seniority date pursuant to this
 7       correspondence?
 8   A   May 8, 2017.
 9   Q   What had previously been his seniority date?
10   A   January 25, 1999.
11   Q   And he returned to work from Duty Disability on May
12       8, 2017; is that accurate?
13   A   Yes.
14   Q   And he continued to work until on or about January
15       22, 2020 when his seniority was adjusted, is that
16       accurate?
17   A   Yes, that's accurate.
18   Q   Other than these two documents are you aware of any
19       other correspondence that you had with Craig Brown as
20       it relates to return to duty or adjustment of his
21       seniority?
22   A   Vaguely.  I want to say maybe telephone conversations
23       regarding seniority dates, but I don't recall the
24       specifics.
25   Q   Are you aware of any documents, correspondence,
                                                          31
```

**Page 32 (bottom-right)**

```
 1       emails?
 2   A   I don't recall any off the top of my head.
 3   Q   Give me one second, please.  Can we look at Exhibit
 4       Eight, please?
 5                    MR. SANDERS:  Shawndrica can we
 6       look at Exhibit Eight, please?  Can we see the top
 7       with the date?
 8   BY MR. SANDERS, CONTINUING:
 9   Q   Are you familiar with that document?
10   A   Yes.
11   Q   And how so?
12   A   I sent that letter the Christopher McGhee.
13   Q   And what was the purpose of sending it?
14   A   Informing him that an audit was going to be conducted
15       regarding his seniority.
16   Q   Can you take a look at the next page of Exhibit
17       Eight? Are you familiar with this document, January
18       22, 2020, a letter to you from Christopher McGhee?
19   A   Yes.
20   Q   How so?
21   A   It's the letter I sent to Christopher McGhee.
22   Q   And what was the purpose of you sending it to him?
23   A   Informing him of his seniority adjustment that was
24       made.
25   Q   And would it be accurate for Craig Brown as well as
                                                          32
```

**Column 1 (page 33)**

1  Christopher McGhee, it's your position that you don't
2  know who was responsible for assuring that their
3  seniority was accurate when they return to work, is
4  that accurate?
5  A  Back in 2016?
6  Q  Yes.
7  A  Yes, that would be accurate? That would be accurate.
8  Q  Would that have been you?
9  A  It wouldn't have been me. I wasn't in that role at
10  the time. So that would be accurate as I stated
11  before.
12  Q  Now Mr. McGhee returned to work from a Duty
13  disability on 6-21-2016; is that accurate?
14  A  Yes.
15  Q  And he worked until approximately January 22, 2020
16  when his seniority was reduced, is that correct?
17  A  Yes, that is correct.
18  Q  What had his seniority date been prior to it being
19  reduced or adjusted?
20  A  March 9, 1992.
21  Q  And it was adjusted to what?
22  A  June 21, 2016.
23  Q  And was he demoted?
24  A  Yes.
25  Q  And is it accurate that you are not aware of any

                                                    33

**Column 2 (page 34)**

1  other documents where you communicated with
2  Christopher McGhee as it relates to his return to
3  duty or seniority adjustment, other than what's in
4  Exhibit Eight?
5  A  I don't recall anything that I sent out other than
6  here regarding his seniority. I don't recall that
7  they --
8  Q  Let me ask you this. I believe on the first page of
9  Exhibit 8, if we can go back there, you refer to
10  Collective Bargaining Agreement language in the 2014
11  Collective Bargaining Agreement, do you see that?
12  A  Yes.
13  Q  While Mr. McGhee was off on Duty Disability, did you
14  or anyone else form the City notify him of any
15  language in the 2014 Collective Bargaining Agreement?
16  A  I did not notify him.
17  Q  And would that be accurate for all of the other
18  Plaintiffs?
19  A  I did not notify any of the other ones.
20  Q  Can we turn to Exhibit Nine please? I am showing you
21  a letter dated July 18, 2019 to Erin Jones from Kelly
22  Tapper, can you take a look at that please?
23  A  Yes.
24  Q  Are you familiar with this document?
25  A  Yes.

                                                    34

**Column 3 (page 35)**

1  Q  How so?
2  A  This information was sent to the Detroit Fire
3  Department via mail.
4  Q  And what is the information?
5  A  This letter that I am reading?
6  Q  Yes.
7  Q  You said what is the information?
8  Q  Yes, what is it that is being relayed to the Detroit
9  Fire Department?
10  A  That Junius Perry is capable of returning to work
11  with unrestricted duty as of July 18, 2019.
12  Q  And who is Kelly Tapper?
13  A  Kelly Tapper is -- she works at the Pension
14  Department. I am not sure of her exact title.
15  Q  Now I'd like to refer you to the next page of Exhibit
16  Nine.
17        MR. SANDERS: Shawndrica can we
18  go to the next page?
19  BY MR. SANDERS, CONTINUING:
20  Q  Are you familiar with this document?
21  A  Yes.
22  Q  What is it?
23  A  This is a letter that was sent to Junius Perry
24  regarding voluntary Quit if he did not report back to
25  me for his return to work.

                                                    35

**Column 4 (page 36)**

1  Q  Now it indicates that he must return to work by
2  Monday, March 3, 2020, is that accurate?
3  A  Yes.
4  Q  And this letter is dated February 27, 2020, correct?
5  A  Yes.
6        MR. SANDERS: Can we go to the
7  next page, Shawndrica? Scroll up lease. You were on
8  the page with the envelop. There we go. Can we move
9  up?
10  BY MR. SANDERS, CONTINUING:
11  Q  Mr. Perry indicates that that correspondence was
12  post marked 3-2-2020, do you have any basis in which
13  to dispute that?
14  A  It was posted marked that date. I am looking at it
15  as you are. I can't dispute what the Post Master
16  said.
17  Q  Other than this correspondence dated February 27,
18  2020, do you recall sending Mr. Perry any other
19  correspondence concerning his return to work or his
20  seniority?
21  A  What was the dates? I believe he received letters as
22  well. I don't recall off the top of my head, but he
23  should have received the seniority letter as well.
24  Q  Okay. But you don't recall, is that accurate?
25  A  He should have received one, because it's around the

                                                    36

**Page 37**

1  same time. He should have got the letter.

2  Q  All right. I'd like to refer you to Exhibit Five,

3  page sixteen. Can you take a look at lines one

4  thirty-one and one thirty-two, please, and read them

5  aloud if you would?

6  A  You said one thirty-one and one thirty-two?

7  Q  Yes.

8  A  Perry was found to be fit to return to work by the

9  City on or about July 18, 2019. Perry was finally

10  allowed to return to work in March 2020.

11  Q  All right. Are you aware of any facts that would

12  dispute the allegations in line one thirty-one?

13  A  I have -- when you say dispute, one thirty-two --

14          MR. LEGGHIO: Objection,

15  foundation.

16          MR. SANDERS: I'm just talking

17  about line one thirty-one now.

18          MR. LEGGHIO: Same objection.

19  BY MR. SANDERS, CONTINUING:

20  Q  Do you dispute what that statement is in one thirty-

21  one? Do you agree with it or disagree with it?

22  A  I agree, he was found to be fit to return on or about

23  July, 2019, I agree with that.

24  Q  Now line one thirty-two, Perry was finally allowed to

25  return to work in March 2020. Do you have any --

37

**Page 38**

1  are you aware of any facts that would dispute that?

2  A  Yes.

3  Q  Can you tell me what those are?

4  A  So when you say allowed to return to work, I would

5  dispute that we allowed him to return, however,

6  Junius Perry came to the Fire Department, and we

7  discussed the seniority, and after we discussed it,

8  when he came to Headquarters, I didn't talk to him

9  for several weeks after that. So he was aware and

10  could have returned well before March 20. That's why

11  I don't agree with that; that we allowed him to

12  return to work.

13  Q  Do you recall when he came and you and he had a

14  conversation?

15  A  I don't have the specific dates, but I can recall him

16  coming to Headquarters, and we spoke on the third

17  floor, and I advised him of the seniority

18  adjustments, and he had some uncertainties about

19  that, and --

20  Q  Do you maintain that was before March 2020; is that

21  correct?

22  A  Yes, well before March 2020.

23  Q  That was going to be my next question. Approximately

24  when was that?

25  A  I don't have the specific date.

38

**Page 39**

1  Q  Is there anything that would refresh your

2  recollection; any notes or any letter confirming the

3  conversation or anything like that?

4  A  I don't have any notes in front of me, but there

5  would probably have been -- when you come in

6  Headquarters, you have to write it down. I'm not

7  certain if it was documented when he came to

8  Headquarters, but we saw each other.

9  Q  So let me probe what you just said. You said you

10  don't have any notes in front of you. Are there any

11  notes that would refresh your recollection, whether

12  they are in front of you or not?

13  A  No, I don't have any notes in particular that I can

14  refer back to.

15  Q  Now you said in particular. What do you mean by in

16  particular?

17  A  So on his visit, when he came to Headquarters, I

18  don't recall documenting that anywhere. So those are

19  the notes I am referring to. I don't recall

20  documenting that.

21  Q  Okay. So you earlier testified about a process that

22  happens when the City receives notice that a person

23  is able to return from Duty Disability, when the City

24  receives their Notice from the Pension Board; do you

25  remember that testimony?

39

**Page 40**

1  A  Yes.

2  Q  Do you have anything that would tell us when you

3  completed your process for him to be able to return

4  to work?

5  A  Meaning return to work UDS, something of that nature,

6  drug screen? When you say do I have anything in

7  particular, can you clarify that?

8  Q  Yes, that is what I was hoping you would do for me.

9  What I'm saying is, I believe it's your testimony

10  that Mr. Perry could have returned to work long

11  before March 2020; was that not your testimony?

12  A  Yes, that is my testimony.

13  Q  My question is, what evidence do you have to support

14  that testimony? Is there some documentation that you

15  created that would support that testimony?

16  A  No, I don't have any document that I created?

17  Q  How would Mr. Perry be aware that it was your

18  position that he could return to work?

19  A  We had conversations. We had conversations. Once I

20  advised Mr. Perry of the seniority conversations, we

21  we had played phone tag back and forth. So he was

22  aware that he could return back to work.

23  Q  So there was nothing in writing telling him to report

24  to the Chief for assignment --

25  A  No.

40

**[Page 41]**

```
1   Q   -- correct?
2   A   No.
3   Q   There was nothing in writing telling him to report to
4       Training Camp for Training, correct?
5   A   No.
6   Q   All right. Can we take a look at Exhibit Number Ten,
7       please? I don't know what I did, but somehow I am
8       unable to see the Exhibit and so I clicked on
9       something inappropriately. Let me just start
10      clicking away and see what I did.
11          MR. MCFARLANE:  On your tool bar
12      you should have a zoom meeting, it looks like a blue
13      kind of square with a camcorder in the middle. Click
14      on that and your screen should come back up. If not,
15      I don't know what you did.
16          MR. SANDERS:  Let me work through
17      this, because I can see you, Ms. Crosson, but I
18      cannot see the Exhibit. So
19          (Whereupon a brief recess was
20      taken)
21  BY MR. SANDERS, CONTINUING:
22  Q   I am showing you what's been marked as Deposition
23      Exhibit Number Ten, are you familiar with that
24      document?
25  A   Yes.

                                                        41
```

**[Page 42]**

```
1   Q   How so?
2   A   This letter was sent to the, it looks like it was
3       sent to the Fire Department.
4   Q   Okay. And what is the purpose of the letter?
5   A   Returning the employee back to work from a Duty
6       Disability.
7   Q   Can we look at the next page? I'm showing you a
8       document dated February 27, 2020, a letter from you
9       to Mr. Ferguson regarding voluntary quit employment
10      notifications; are you familiar with that document?
11  A   Yes.
12  Q   How so?
13  A   That document was sent out via certified mail, from
14      me.
15  Q   And why did you send that document?
16  A   Because Shannon Ferguson, at that point had not
17      returned back to work, and we tried to get in touch
18      with him to return back to work.
19  Q   Okay. When you say we tried to get in touch with
20      him, what did you do personally to try to get in
21      touch with him to try to get him to come back to
22      work?
23  A   Typically make phone calls to try to get, you know,
24      reach out to him via phone. So reach out to Shannon
25      Ferguson via phone to return back to work.

                                                        42
```

**[Page 43]**

```
1   Q   You said typically. I'm asking, do you have any
2       specific recollection as it relates to Shannon
3       Ferguson as to what you did to try to get him
4       back to work?
5   A   Reached out to him via phone to return back to work.
6   Q   Do you have any -- I'm sorry, go ahead.
7   A   To start the return-to-work process.
8   Q   All right. Do you have any personal knowledge as to
9       whether anyone else other than you did something to
10      get him to come back to work?
11  A   I have no knowledge of anyone's other's actions.
12  Q   Can we look at the next page, please? This is the
13      letter in which Mr. Ferguson indicates it was the
14      letter dated February 27 was postmarked 3-2-2020. Do
15      you dispute that?
16  A   I don't dispute what the Postmaster had on file.
17  Q   Other than the two documents in Exhibit Ten, or the
18      one document in Exhibit Ten dated February 27, 2020,
19      did you correspond with Mr. Shannon Ferguson
20      concerning his return to work and/or his seniority?
21  A   We may had had phone conversations, I don't recall
22      the specifics or specific days that we talked.
23  Q   Did you send him anything, email or letter?
24  A   I may have sent an email. I don't recall. It's been
25      a while.

                                                        43
```

**[Page 44]**

```
1   Q   So you have no recollection, all right.
2   A   No.
3           MR. SANDERS:  Can we go to
4       Exhibit Five please, the Complaint? Can we go to
5       page fifteen, please?
6   BY MR. SANDERS, CONTINUING:
7   Q   How these are part of the allegations that Mr.
8       Ferguson made in his Complaint. Can you read aloud
9       line one eleven?
10  A   Ferguson spoke with Defendant Crosson, and she told
11      him she would contact him after she scheduled his
12      return to work.
13  Q   Do you dispute the allegations in paragraph one
14      eleven?
15  A   No, I don't.
16  Q   Can you read one twelve, please?
17  A   He had several conversations with Defendant in 2018,
18      2019 which she stated she was working on his
19      return to work.
20  Q   Do you dispute the allegations in line one twelve?
21  A   No, I don't.
22  Q   Can you read one thirteen, please?
23  A   On March 10, Ferguson received a certified letter
24      from the City.
25  Q   March 10, 2020. And we've looked at, well I don't

                                                        44
```

**[Top Left — Page 45]**

1  know if we have; do you dispute that?
2  A  Well the Postmaster just said March 3; this says
3     March 16, so I'm not --
4  Q  Well it said it was mailed?
5  A  It was mailed, so --
6  Q  All right.  So you potentially dispute that date, is
7     that accurate?
8  A  Yes, I would.
9  Q  Line one fifteen, can you read that.
10 A  The letter informed him that he must return to work
11    by March 3, 2020 or be considered a voluntary quit.
12 Q  Do you dispute that?
13 A  No, I don't.
14 Q  Line one sixteen, can you look at that?
15 A  Ferguson spoke with Defendant Crosson, however, she
16    was unaware of how to direct him to return to work?
17 Q  Do you dispute that?
18 A  Yes, I do.
19 Q  So you never had a conversation with him in which you
20    informed him that you were unaware as to how he
21    should return to work?
22 A  I dispute that.  It was not that I was unaware of how
23    he would return to work.  No.  I dispute that.
24 Q  What was the substance of the conversation that you
25    recall.

45

**[Top Right — Page 46]**

1  A  The substance of the conversation was him returning
2     back to work and his seniority being adjusted.  At
3     that time, I didn't know how that was going to work,
4     but that was the conversation.
5  Q  I would like you to look at line one nineteen, can
6     you read that?
7  A  Yes.  Defendant Crosson also stated that she was
8     unclear if the new CVA would affect Ferguson's
9     ability to return to work, and that she would see
10    clarification and contact him.
11 Q  Do you dispute that?
12 A  I don't dispute that.
13 Q  All right.  So after telling him that, when is it
14    that you maintain that you contacted him, or did you?
15 A  I'm telling him that --  I contacted him on several
16    occasions, you know, whether I left a voicemail to
17    contact him to begin the return to work process.
18 Q  Can you read line one twenty, please?
19 A  Never gave --  Defendant Crosson never gave Ferguson
20    further instructions on how to complete the return
21    process.  Go ahead.
22 Q  Do you dispute that?
23 A  Yes, I do.
24 Q  What specifically did you instruct him on how to
25    complete the return-to-work process?

46

**[Bottom Left — Page 47]**

1  A  I instructed him, once he come in, I advised him on
2     how to return back to work, that he will be sent for
3     a return to work, UDS/physical; upon completion of
4     the results, he would then be going to the Training
5     Academy.  So that's what I instructed him on the
6     return-to-work process.
7  Q  Did you schedule him for a physical?
8  A  No, I didn't schedule him for a physical, no, I did
9     not.
10 Q  Why not?
11 A  When I reached out to him, there was no -- we played
12    phone tag.  By the time he -- we actually made
13    contact, he was advised that he was going to retire.
14 Q  Can you read line one twenty-one please?
15 A  Ferguson made additional attempts to contact Crosson
16    for instructions on how to return to work, however,
17    Defendant Crosson never responded to his inquires.
18 Q  Do you dispute that?
19 A  Yes, I dispute that.
20 Q  Can you read lines one twenty-two and one twenty-
21    three?
22 A  I can't see one twenty-three.
23 Q  Okay.
24 A  On or about March 20, Ferguson receive a call from
25    Kelly Tapper concerning his return to work.

47

**[Bottom Right — Page 48]**

1  Q  All right.  Read one twenty-two and then when you are
2     ready to go to one twenty-three, let us know.
3  A  On or about March 20, Ferguson received a call from
4     Kelly Tapper concerning his return to work.
5  Q  Can you read one twenty-three?
6  A  She stated that because Ferguson had reached his
7     twenty-five years, his twenty-fifth anniversary of
8     his seniority date on August 8, 2019 he was no longer
9     eligible to be considered to return to work.
10 Q  Do you know whether or not the allegations in one
11    twenty-two and one twenty-three are accurate or
12    inaccurate?
13                 MR. MCFARLANE:  I'm going to
14    objection as it calls for speculation.  Lack of
15    foundation.  There is no indication she was aware of
16    this call or on this call.
17                 MR. SANDERS:  I'm asking her does
18    she know.
19                 THE WITNESS:  I was not aware.
20 BY MR. SANDERS, CONTINUING:
21 Q  As it relates to line one twenty-three, had Ferguson
22    reached his twenty-fifth anniversary on August 8,
23    2019, do you know?
24 A  I don't have his dates in front of me, so I wouldn't
25    know that.

48

**Column 1 (page 49)**

1  Q  Do you know whether he was no longer eligible to be
2     considered to return to work as of that date?
3  A  After you've reached your twenty-fifth year, you are
4     no longer eligible to return to work.
5  Q  Did you ever have a conversation with Mr. Ferguson in
6     that regard?
7  A  No.  I didn't have a conversation with him about
8     that.
9         MR. SANDERS:  Can we go to
10    Exhibit Eleven, please?
11 BY MR. SANDERS, CONTINUING:
12  Q  Are you familiar with that document?
13  A  Yes.
14  Q  How so?
15  A  This document comes from the Pension Board to return
16     a person back to work.
17  Q  And that person being Orlando Potts?
18  A  Yes.
19  Q  And it indicates that he was eligible to return to
20     work on June 21, 2018?
21  A  Yes.
22  Q  And that correspondence was sent to him; but would it
23     be accurate that the Fire Department also received
24     that information?
25  A  Yes.

49

**Column 2 (page 50)**

1         MR. SANDERS:  Can we go to the
2    next page please, Shawndrica?  Can you move it up?
3 BY MR. SANDERS, CONTINUING:
4  Q  Can you take a look at that email, and when you are
5     done reading it, let me know.
6  A  Okay.
7  Q  Are you familiar with that document?
8  A  Yes.
9  Q  And did you receive that correspondence from Mr.
10    Potts on or about September 19,2018?
11  A  Yes.
12  Q  Okay.
13         MR. SANDERS:  Can we go to the
14    next page, please?
15 BY MR. SANDERS, CONTINUING:
16  Q  I'd like you to look at this email on the next page
17     of Exhibit Eleven, dated October 26, 2018, and I
18     believe, excuse me the -- yes, October 26, 2018 from
19     Orlando Potts to you, do you see that?
20  A  Yes.
21  Q  Do you see that?
22  A  Yes.
23  Q  So Mr. Potts had been authorized to return to work by
24     June 21, 2018.  As of October 26, 2018 he had not
25     returned to work, is that accurate?

50

**Column 3 (page 51)**

1  A  Yes.
2  Q  Why not?
3  A  It appears that we played phone tag for him to come
4     back to return to work.  As I look here, looking at
5     this email, at 3:07 he sent me an email; I sent him
6     for me to call him, then we never that contact in
7     between.  So it looks like it was another case of
8     playing phone tag to come back.
9  Q  Now he says in this email the last time he spoke with
10    you, you said you were waiting to hear from Labor
11    Relations, quote unquote, do you see that?
12  A  Yes, I do.
13  Q  Do you recall waiting to hear from Labor Relations as
14     it related to him returning to work?
15  A  As it relates, yes, I do recall that.  I do recall
16     that.
17  Q  What were you waiting to hear from Labor Relations?
18  A  Labor Relations, I want to say direction on how to
19     return him back to work as far as it relates to
20     seniority.
21  Q  All right.  So you did not know as of October 26,
22     2018 how he should return back to work, would that be
23     accurate?  And you were waiting for some instruction
24     on that?
25  A  No, he could have returned back to work.  The

51

**Column 4 (page 52)**

1     clarification would have been at what position would
2     he had been returning back to work.  So he could
3     return back to work, as I advised him.
4  Q  Well if you had no understanding as to what position
5     he should return to, how was he going to return back
6     to work?
7  A  Because once you tell a person that you are not going
8     to come back in your previous position, that -- a
9     lot of people are hesitant, should I stay where I'm
10    at or should I return, as we had the conversation
11    sitting in my office, once he did come to my office.
12    So that was the hesitation there.
13  Q  What I understood you to say is that you were waiting
14     to hear from Labor Relations to gain clarity as to
15     where he should return to work; is that accurate or
16     inaccurate?
17  A  That would be accurate.
18  Q  So you didn't know where he was going to be placed;
19     is that correct?
20  A  That would be correct.
21  Q  So if you didn't know where he was going to be
22     placed, you could not complete what you needed to
23     complete to return him to work, is that correct?
24  A  That would be incorrect.  I can return him back to
25     work, however --

52

**Page 53**

1  Q  Okay.  So --

2  A  I will say incorrect.  I will leave it at that.  I

3     will say incorrect.

4     I am confused as to how you can return him to work if

5     you are waiting to hear from Labor Relations as to

6     where he should be returned.

7                    MR. LEGGHIO:  Is that a question?

8                    MR. SANDERS:  Yes.

9

10 BY MR. SANDERS, CONTINUING:

11 Q  Do you understand it or do you want me to repeat it?

12                   MR. LEGGHIO:  The question that

13    you're confused --

14 BY MR. SANDERS, CONTINUING:

15 Q  Do you understand it or do you want me to rephrase

16    it?

17 A  Rephrase it.

18 Q  Now is it you're saying he couldn't return to work,

19    but in the same breath you're saying I didn't know

20    where to return him to work?

21                   MR. MCFARLAND:  Objection, asked

22    and answered.

23                   THE WITNESS:  That's two

24    different things.  That's two different things.  I've

25    answered that already.  He could return to work,

---

**Page 54**

1     however, if you are going to be returned back to Fire

2     Fighter or would you be returned back to where you

3     are?  You can return back, right?  You can return

4     back to work.  I specified that.  If you are going to

5     come back at a different capacity, then that was the

6     clause in between it.

7  BY MR. SANDERS, CONTINUING:

8  Q  As of October 26, 2018 what was your understanding as

9     to where Mr. Potts was to be placed?

10                   MR. MCFARLALND:  I'm going to

11    object as to asked and answered.

12 BY MR. SANDERS, CONTINUING:

13 Q  What position?

14 A  I don't have that in front of me right now, what

15    position he would have been going back to.

16 Q  You don't know?

17 A  I don't have that information right now to tell you

18    what title he would have been going back to.  I don't

19    have that information.

20 Q  Where would that be contained?

21 A  In his employee history file; it's in the position

22    that he left from.

23 Q  So it was your contention that he should be going

24    back to the position he left from?

25 A  Now you are trying to make me --  so if he was going

---

**Page 55**

1     to return, the clarification would have been whether

2     he is going to return back to work as a Fire Fighter

3     or was he going to return back to work in his old

4     spot.  Once I advised him of those two things, he

5     went away.  So because there would have been a

6     possibility he would have been demoted or moved back

7     to a Fire Fighter.  So we loss contact.

8                    MR. SANDERS:  Can we go to the

9     next page of this Exhibit?

10 BY MR. SANDERS, CONTINUING:

11 Q  There is an email here dated November 19, 2018 from

12    Mr. Potts to you, can you read that?

13 A  Good morning Ms. Crosson --

14 Q  You can read it to yourself.

15 A  Okay.

16 Q  Have you read it?

17 A  Yes, I've read it.

18 Q  Now Mr. Potts is asking you for something in writing

19    concerning his returning to work; is that accurate?

20 A  Yes.

21 Q  And you respond on November 21, 2018 per our

22    conversation, I do not have new information in

23    writing, however, see the attached document.  Please

24    refer to page seventeen, Section twelve, Seniority

25    Article D., loss of seniority.

---

**Page 56**

1  A  Yes.

2  Q  So you sent him, in response to this email, the

3     contractual provision; would that be accurate?

4  A  Yes.

5  Q  Prior to sending him a contractual provision, had you

6     sent him anything in writing concerning his return to

7     work and where he would be placed in his seniority?

8  A  No, I did not.

9  Q  Why is that?

10 A  As indicated in my email I did not have new

11    information in writing.  So verbally through our

12    conversations, he was made aware that his seniority

13    would be loss.  In this email, I referred him to that

14    to help assist him where the information came

15    from.  However, I did not have a formal letter, in

16    writing to provide to him at that time.

17                   MR. SANDERS:  Can we move to the

18    net page please?  One more page, please?

19 BY MR. SANDERS, CONTINUING:

20 Q  Can you read that email please, Ms. Crosson?

21 A  Good morning Orlando, the Department is currently

22    addressing the grievance regarding this matter.  When

23    the grievance process is completed, the Department

24    will respond to your request.

25 Q  All right.  And that was dated May 23, 2019, correct?

---

**Page 57**

1 A Correct.

2 Q What requests were you going to respond to once the

3 grievance was completed?

4 A He wanted some information in writing as it relates

5 to his seniority. Once that process was completed, I

6 would send him that information.

7 Q It was your position that as of that time you didn't

8 know what his seniority rate or level would be?

9 A Correct.

10 MR. SANDERS: And can we go to

11 the last page of this document? You went too far.

12 I'm sorry, the last page of Exhibit Eleven, it's a

13 letter dated February 27. Next page. Okay.

14 BY MR. SANDERS, CONTINUING:

15 Q Take a look at that, please.

16 A Un-huh.

17 Q Are you familiar with that document?

18 A Yes, I am.

19 Q What is it?

20 A A certified letter of employment notification to

21 Orlando Potts.

22 Q Dated February 27, 2020?

23 A Yes.

24 Q And signed by you?

25 A Yes.

57

**Page 58**

1 It says Human Resource has made several attempts to

2 contact you via phone to avail, I assume that's to no

3 avail. To date you have still not reported to work

4 at the Detroit Fire Department; do you see that?

5 A Yes.

6 Q Who were you referring to in Human Resources that

7 made several attempts to contact Mr. Potts?

8 A That would be me.

9 Q But you had been speaking to Mr. Potts and

10 corresponding with him, correct?

11 A Right. Un-huh.

12 Q So your efforts were not to no avail, correct?

13 A After our last conversation, via email, and I had the

14 information to return him back to work, I made

15 several attempts as we were communicating. I called,

16 left messages back and forth.

17 Q And when would that have been?

18 A In between that time, I don't have the specific

19 dates, but it would be in between that time that I

20 was reaching out to him and calling. However, when

21 he got this letter, he showed up at my office.

22 Q Okay.

23 A Un-huh.

24 MR. SANDERS: Can we go to

25 Exhibit Twelve, please?

58

**Page 59**

1 BY MR. SANDERS, CONTINUING:

2 Q Before we talk about Exhibit Twelve, Exhibit Eleven

3 regarding Mr. Potts, are you aware of any other

4 written communications had between you and Mr. Potts

5 that we do not have?

6 A I don't recall anything that's not on record.

7 Q Can you take a look at Exhibit Twelve; are you

8 familiar with that document?

9 A I don't -- is this Exhibit Twelve? I don't see the

10 number on the bottom.

11 Q Yes, this is Exhibit Twelve.

12 A Yes, I'm familiar with this document as well.

13 Q What is it?

14 A This is a letter that was sent to Mr. James

15 Washington regarding his seniority; that there was

16 going to be an audit.

17 Q Okay. And can we take a look at the next page?

18 MR. SANDERS: Can you go up

19 further, please?

20 BY MR. SANDERS, CONTINUING:

21 Q Are you familiar with this document?

22 A Yes, I am.

23 Q What is it?

24 A Return to work duty seniority adjustment letter that

25 I sent to Mr. James Washington.

59

**Page 60**

1 Q And his seniority was being adjusted from what to

2 what?

3 A His original seniority date was August 10, 1992. His

4 new seniority date was being readjusted to 9-26-2016.

5 Q So Mr. Washington had worked in his position of a

6 Fire Sergeant, is that accurate, upon return to work

7 in September of 2016 until January 22, 2020; is that

8 right?

9 A Yes.

10 Q And pursuant to this correspondence, he was demoted,

11 is that accurate?

12 A Yes.

13 Q And he was given a new seniority date of 9-26-2016,

14 correct?

15 A Yes.

16 Q Other than the two documents that we just looked at

17 concerning Mr. Washington, do you have any

18 recollection of sending him any other correspondence

19 as it relates to his return to duty or his seniority?

20 A I don't recall anything else outside of what's here.

21 MR. SANDERS: Can we scroll to

22 the next page and then scroll again, I think that's a

23 duplicate.

24 BY MR. SANDERS, CONTINUING:

25 Q Can you take a look at what looks like an email chain

60

**[Page 61 - top left]**

```
 1    in Exhibit Twelve?  Do you see that?
 2  A  Yes.
 3  Q  You can read it over?
 4  A  Ms. Cross --
 5  Q  You can read it to yourself if you would like.
 6  A  We will have to reschedule our meeting until January
 7     29 or 30 or 31.  Please contact me to set up a new
 8     date.  Thank you.  James Washington.
 9  Q  Are you familiar with that document?
10  A  It was sent to me via email.  It came through email.
11  Q  Yes, I'm saying do you recall seeing that document?
12  A  Reading it now, but off the top of my head, I don't
13     recall something that came in January 2020.
14  Q  Do you know what the meeting was that you were
15     attempting to reschedule?
16              MR. MACFARLAND:  I would object
17     because it is mischaracterizing the document.
18              MR. SANDERS:  It does.  Let me
19     rephrase the question.
20  BY MR. SANDERS, CONTINUING:
21  Q  Mr. Washington was asking you to reschedule a
22     meeting, correct?
23  A  Yes.
24  Q  Do you know what the basis was for the meeting that
25     he was asking you to reschedule?

                                              61
```

**[Page 62 - top right]**

```
 1  A  Yes.
 2  Q  What was the meeting?
 3  A  To discuss the seniority adjustments.
 4  Q  And was that meeting scheduled for Mr. Washington
 5     only or for all of the Plaintiffs?
 6  A  It would have been scheduled for every -- for all of
 7     the Plaintiffs that were affected by the seniority
 8     adjustments.
 9  Q  And did that meeting ever take place?
10  A  We had a meeting, yes it did.
11  Q  And when did you meet with all of the Plaintiffs
12     concerning the seniority adjustment?
13  A  The Plaintiffs never showed up.  The meeting was with
14     the Union, DFFA as well as the Chief of Department
15     and the Second Deputy Commissioner.
16  Q  And that meeting took place when?
17  A  We had a meeting.  Yes, it did.
18  Q  And when did you meet with all of the Plaintiffs
19     concerning the seniority adjustment?
20  A  The Plaintiffs never showed.  The meeting was with
21     the Union, DFFA, as well as the Chief of Department
22     and the Second Deputy Commissioner.
23  Q  And that meeting took place when?
24  A  I don't recall the exact date.  But we met with the
25     Union.

                                              62
```

**[Page 63 - bottom left]**

```
 1  Q  Did you send anything in writing to the Plaintiffs
 2     informing them of the meeting?
 3  A  I don't recall anything formally being sent.  But all
 4     the Plaintiffs were contacted.  Everyone was aware
 5     that we were having a meeting.
 6  Q  And the Plaintiffs were contacted by whom?
 7  A  By me.
 8  Q  And how did you contact the Plaintiffs?
 9  A  Via phone.
10  Q  Do you know if you spoke with them all personally, or
11     you left messages?
12  A  I left messages --  I want to say I left messages and
13     I spoke with them personally.
14  Q  Do you recall who you spoke with personally?
15  A  Off the top of my head I don't recall all names.
16  Q  Were those phone calls made before you received this
17     email from Mr. Washington?
18  A  Yes.
19  Q  All right.  And did you oblige Mr. Washington in
20     rescheduling the meeting on one of the proposed dates
21     that he indicates in this correspondence?
22  A  I don't recall the specific conversation or if
23     something went out via email.  I don't recall that.
24  Q  So you don't recall whether or not the date was
25     rescheduled after receiving this correspondence from

                                              63
```

**[Page 64 - bottom right]**

```
 1     Mr. Washington, is that accurate
 2  A  No, the date was rescheduled.  I mean the date was --
 3     I'm not certain if the date was rescheduled based on
 4     his request.  So the meeting was not built around one
 5     person.  The meeting was built around the
 6     availability of the entire team, staff, right?  So
 7     I'm not certain.
 8              MR. SANDERS:  And can we go to
 9     the next page.
10  BY MR. SANDERS, CONTINUING:
11  Q  Can you read that, please?
12  A  I'm still in the process of rescheduling these
13     meetings.  The date was on -- the date was one of
14     the dates on hold and I need to ensure the dates and
15     times works well for all parties involved.
16  Q  Now it says -- it doesn't say rescheduling, it says
17     scheduling, correct?  I am still in the process of
18     scheduling --
19  A  Scheduling these meetings, yes.
20  Q  -- the date was one of the dates on hold as I need to
21     ensure the date/times works well for all parties
22     involved.
23  A  Right.
24  Q  Okay.  And do you recall whether or not you scheduled
25     a date and time that worked for the Plaintiffs?

                                              64
```

## Column 1 (top left)

1  A  Once the date was scheduled, the date -- I don't
2     recall if they were all based on what they wanted the
3     dates to be, however, I don't recall exactly. The
4     dates were scheduled. It's hard trying to get
5     everybody dates that they want.
6              So I am not certain. I don't
7     recall. But I know dates were scheduled.
8  Q  And again what was the purpose of this meeting?
9  A  The purpose of this meeting was to discuss the
10    seniority adjustments for these individuals that were
11    affected by their seniority and titles being changed?
12 Q  What do you mean discuss, because --
13 A  The purpose --
14 Q  -- go ahead. I cut you off.
15 A  The purpose of the meeting was to discuss the
16    information regarding their seniority adjustments.
17 Q  So you were going to inform them what their seniority
18    adjustments were going to be, correct?
19 A  Yes.
20 Q  And at that time a decision had been made to in fact
21    adjust their seniority, correct?
22 A  Yes.
23 Q  The calls that you reference that you made to inform
24    the Plaintiffs of meeting date or dates, were those
25    calls made from a City of Detroit phone?

65

## Column 2 (top right)

1  A  Yes.
2  Q  Are you accustomed to keeping a phone log?
3  A  No.
4  Q  Give me one second. Now I think you said ultimately
5     a meeting was held without the Plaintiffs being
6     present; is that accurate?
7  A  Yes, that's accurate.
8  Q  Where was it held?
9  A  It was held at the Detroit -- I'm sorry, Public
10    Safety Headquarters, 1301 Third Street.
11 Q  Who was present?
12 A  I know the Union was present, the Chief of Department
13    was present, Second Deputy Sydney Peritreli was
14    present, I believe. I don't recall the other dates.
15    It could have been Chris Smith. But I know the Union
16    was present as well.
17 Q  Who from the Union was present?
18 A  I want to say it was Bill Harp. Bill Harp.
19 Q  Anyone else?
20 A  I don't recall all the names. I don't recall
21    everyone in that room.
22 Q  And what was said in the meeting?
23 A  I don't recall verbatim, word for word, but the Union
24    was advised of the seniority dates and adjustments
25    for those individuals that were affected by the

66

## Column 3 (bottom left)

1     seniority that had to be readjusted.
2  Q  Are there any minutes from the meeting?
3  A  No, I don't have any minutes from the meeting.
4  Q  Any written correspondence confirming the meeting?
5  A  I don't have any written correspondence. I must say
6     Sydney Peritreli would have been taking, she usually
7     takes notes on that. She's no longer with the City.
8  Q  How were the other participants informed of the
9     meeting, those folks who were there?
10 A  How were they notified?
11 Q  Yes.
12 A  Possibly via email, but I don't recall the exact
13    notification.
14 Q  And when you sent an email possibly to the Union and
15    to the chief do you know if you sent an email to the
16    Plaintiffs?
17 A  I don't recall sending an email to the Plaintiff --
18    Plaintiffs. I do recall having a conversations with
19    the Plaintiffs, I don't recall sending an email as a
20    follow up.
21 Q  All right. I don't think I have any further
22    questions at this time. Can we take a break.
23             MR MCFARLAND: About five minutes
24    or so?
25             MR. SANDERS: Yes, we can come

67

## Column 4 (bottom right)

1     back in five minutes.
2             (Whereupon a brief recess was
3     taken at or about 3:32 p.m.)
4             CROSS-EXAMINYTION
5  BY MR. LEGGHIO:
6  Q  Good afternoon, Ms. Crosson, my name is Chris
7     Legghio, and I'm the Attorney for the Detroit Fire
8     Fighters Association, and the current officers who
9     are also Defendants in this Lawsuit, do you
10    understand that?
11 A  Yes.
12 Q  I am going to be asking you some questions; you are
13    still under oath. I am going to try and move briskly
14    through this, and before we get into looking at any
15    documents, I want to ask you a couple questions.
16    First of all, you are aware that you are a Defendant
17    in this Lawsuit also?
18 A  Yes.
19 Q  And are you aware that the Union and several current
20    Union Officers are also Defendants?
21 A  Yes.
22 Q  And you know the Lawsuit is bought by seven
23    individuals who were on Duty Disability at some point
24    or another, you're aware of that?
25 A  Yes.

68

**[Column 1 — Page 69]**

1 Q   Before we drill down to more specific details, there
2      is something I want to get cleared up because I
3      thought it was a little confusing on your examination
4      earlier. Some of these Plaintiffs, and you can
5      identify them for me if you know by name. Some of
6      these Plaintiffs were clear to return to work by the
7      Pension Board, but did not return to work
8      immediately, isn't that true?
9 A   Yes, that's true.
10 Q   And this discussion about why were they cleared to
11      work and then they didn't get return to work --
12      didn't come back to work right away, did in any of
13      those cases, did that have anything to do with the
14      fact that the Plaintiffs were not sure they wanted to
15      return to work, even though they were cleared to
16      return to work, because they didn't like the prospect
17      that they were going to come back without their
18      earlier seniority?
19          MR. SANDERS: Objection, calls
20      for speculation.
21          THE WITNESS: Can you repeat that
22      again, I'm sorry.
23          MR. LEGGHIO: Sure.
24 BY MR. LEGGHIO, CONTINUING:
25 Q   Some of these Plaintiffs were cleared to return to

                                                        69

**[Column 2 — Page 70]**

1      work, but did not come back to work right away. You
2      had discussions with some of them, correct?
3 A   Yes.
4 Q   Did any of the Plaintiffs ever indicate to you that
5      they were not sure they wanted to return to work
6      immediately though they were cleared to return to
7      work, because they thought they were going to come
8      back to work with less seniority than they had?
9 A   Yes.
10          MR. SANDERS: Objection
11      speculation.
12 BY MR. LEGGHIO, CONTINUING:
13 Q   Well basically what they said; did they say that to
14      you.
15          MR. SANDERS: Objection --
16          THE WITNESS: Yes, a few of them
17      did.
18          MR. SANDERS: -- foundation.
19 BY MR. LEGGHIO, CONTINUING:
20 Q   Do you recall who of these Plaintiffs said to you
21      that even though I'm cleared to return to work, I'm
22      having some trepidation about coming back because it
23      looks like I'm losing seniority? Can you identify
24      which of the Plaintiffs said that to you?
25 A   I know for certain I know Potts mentioned, we talked

                                                        70

**[Column 3 — Page 71]**

1      about his seniority, and him having -- being
2      hesitate. Ferguson was also hesitant. Junius Perry,
3      when he showed up and I explained, and he was pretty
4      much hesitant. They were like how they were going to
5      be affected by it. So I recall those three in
6      particular.
7 Q   Did these things that these three Plaintiffs, these
8      things that these three Plaintiffs that you've just
9      identified said to you, did that play a role in the
10      gap between the time they were clear to return to
11      work and the time that they were going to return to
12      work?
13 A   Yes, it did.
14          MR. SANDERS: Objection,
15      foundation.
16 BY MR. LEGGHIO, CONTINUING:
17 Q   You can answer.
18 A   Yes.
19 Q   Okay. Now in your position, I'm not going to go over
20      your Curriculum Vitae with you; Mr. Sanders asked you
21      those questions. But in your job with the City, am I
22      correct that your job from the City is not to
23      interpret the Collective Bargaining Agreement?
24 A   That is not my job, sir.
25 Q   And in terms of the issue of what seniority is going

                                                        71

**[Column 4 — Page 72]**

1      to attach to all Plaintiffs, when they came back to
2      work from Duty Disability, you would look to other
3      City Departments for authority on what seniority
4      would attach, am I correct?
5 A   Yes, you are correct, sir.
6 Q   Now if you could turn to page, I am going to have you
7      read some paragraphs to yourself. I am now on page
8      00007, page six, this is paragraph thirty of the
9      Complaint. If you can just read that to yourself.
10 A   Yes.
11 Q   Is it, in your position with the City, isn't it true
12      that individuals go on Duty Disability Retirement
13      because they are Duty Disabled, not because they are
14      relying on some policy that would be in place when
15      they return to work?
16          MR. SANDERS: Objection,
17      foundation.
18 BY MR. LEGGHIO, CONTINUING:
19 Q   That's your experience?
20 A   Yes.
21 Q   In other words, stated another way, I can't go out on
22      Duty Disability Retirement if I was a Fire Fighter if
23      I am not Duty Disabled, correct?
24 A   Correct.
25 Q   If you could turn to paragraph thirty-seven of the

                                                        72

**[Page 73]**

1 Complaint and read that to yourself.
2 A Okay.
3 Q Now did, and I am asking about you personally, did
4 you ever conspire with anybody from the Union or any
5 other City Official to selectively enforce the
6 provisions of 2014/2019 CBA --
7 A No.
8 Q -- Collective Bargaining Agreement?
9 A No, I did not.
10 Q Were you ever present when anybody said that the
11 Union is looking to selectively enforce the new --
12 A You are fading out
13 Q Were you present when anybody said to you that the
14 Union is looking to selectively enforce the
15 provisions -- the Duty Disability Provisions of the
16 Collective Bargaining Agreement?
17 A You said was I present?
18 Q Were you ever present? Were you in attendance?
19 A No.
20 Q Did anybody say to you that the Union is trying to do
21 this in a selective way?
22 A No, I was not in attendance.
23 Q If you could turn to paragraph forty-two and read
24 that to yourself.
25 A Okay.

73

**[Page 74]**

1 Q Did you conspire, you yourself, did you ever conspire
2 with anybody to ignore the contracts, the Collective
3 Bargaining Agreement Statute of Limitations
4 regarding the grievance?
5 A No.
6 Q Were you ever present when anybody said that there
7 was a conspiracy to do that?
8 A No.
9 Q The next paragraph, would you read that to yourself,
10 forty-three.
11 A Okay.
12 Q Are you involved in any way in the passing out of
13 discipline to employees?
14 A I am involved, yes.
15 Q In this case did you agree to take disciplinary
16 action with the Union against the Plaintiffs in this
17 case?
18 A No.
19 Q Did you understand that this adjustment and the Duty
20 Disability Seniority was a disciplinary action, or
21 did you understand it to be an interpretation of the
22 contract?
23 A I understand it as being an adjustment based on
24 making a correction to their records.
25 Q So you didn't understand it to be a discipline?

74

**[Page 75]**

1 A No.
2 Q If you turn to paragraph forty-seven on this same
3 page, if you could red that to yourself.
4 A Okay.
5 Q Did you have any goal to strip the Plaintiffs of
6 their seniority?
7 A No.
8 Q Did you ever conspire with anybody to strip the
9 Plaintiffs of their seniority?
10 A No.
11 Q Can you turn to paragraph fifty-one, 0010 and read
12 paragraph fifty-one to yourself?
13 A Okay.
14 Q I'm speaking about you again. Did you ever intend to
15 deprive the Plaintiffs of a larger pension?
16 A No.
17 Q In terms of your, the discharge of your duties
18 related to their seniority and their pensions and
19 their return to work, you were discharging your
20 duties as you understood them to be and as others
21 told you; am I correct?
22 A Correct.
23 Q Now I want you to look at paragraph seventy-two and
24 in particular it's on page eleven of the Complaint.
25 Now before we get into that and I have you read

75

**[Page 76]**

1 anything, let me ask you something. Fire Fighters
2 can be promoted in the Department, you're aware oof
3 that, correct?
4 A Yes.
5 Q They can be promoted from Fire Fighter, to Sergeants,
6 to Lieutenants to Captains, et cetera, right?
7 A Yes.
8 Q Do you know all of the qualifications that are
9 required for individuals to be promoted up the chain?
10 A No, I don't know all of the qualifications.
11 Q And in terms of -- but you are aware that some
12 promotions involved seniority, some promotions
13 involve seniority and testing; am I correct?
14 A Yes.
15 Q Now if you look at paragraph seventy-two of the
16 Complaint, and Mr. Sanders read to you the provision
17 that says, as you know, my position with the Fire
18 Prevention is not the result of seniority and then he
19 says, he points out, do you have five years
20 experience in Fire Fighting Division on active duty,
21 do you see that?
22 A Yes.
23 Q Now when Mr. Brown's seniority was adjusted, pursuant
24 to the arguments of the Collective Bargaining
25 Agreement, he no longer had the five years experience

76

1  in the Fire Fight Division; am I correct?
2          MR. SANDERS: Objection, leading,
3  mischaracterization of the witness' prior testimony.
4          THE WITNESS: Once the seniority
5  was adjusted, that changed his place within the
6  position that he held.
7  BY MR. LEGGHIO, CONTINUING:
8  Q   He was losing seniority because the seniority was
9      adjusted, didn't he?
10 A   Yes.
11         MR. SANDERS: Objection, leading.
12 BY MR. LEGGHIO, CONTINUING:
13 Q   Now in your job, as I say I am not going to go
14     through all of your credentials, is part of your job
15     dealing with the assigning appropriate seniority
16     dates to employees in the Fire Fighting Department?
17 A   Assigning seniority dates?
18 Q   Or determining appropriate seniority dates, is that
19     part of your job?
20 A   Yes.
21 Q   And in that job, it's not unusual for you to have to
22     adjust seniority dates for any of a number of
23     reasons, correct?
24 A   Correct.
25         MR. SANDERS: Objection, leading.

77

1  BY MR. LEGGHIO, CONTINUING:
2  Q   In other words, have you ever had to adjust seniority
3      dates for something other than people returning from
4      Duty Disability?
5  Q   And when you adjust seniority dates, for something
6      other than returning Duty Disability, has it ever
7      happened in your experience that people have their
8      seniority diminished or reduced?
9  A   Yes.
10 Q   And when you are doing this, is this merely getting
11     the seniority roster corrected to reflect the reality
12     of the workplace?
13 A   Yes.
14 Q   Did you ever conspire with the Union or the City or
15     anyone else to discriminate against the Plaintiffs in
16     this case based on their disability?
17 A   No.
18 Q   Did you ever discriminate or conspire with the
19     Defendants in this case, the Union, any Union
20     Officer, any City or City Official to discriminate
21     against the Plaintiffs in this case based on their
22     age?
23 A   No.
24         MR. LEGGHIO: I don't have
25     anything further.

78

1          CROSS-EXAMINATION
2  BY MR. MCFARLANE:
3  Q   I have got a couple quick questions. You testify
4      regarding a meeting between the Union and the City
5      where you discussed adjusted seniority dates, do you
6      remember that?
7  A   Yes.
8  Q   Did that occur in 2019 or 2020?
9  A   You said 2019 of 2020?
10 Q   Was it 2019 or 2020?
11 A   It had to be -- I don't recall the date.
12 Q   Do you recall sending letters adjusting seniority to
13     the Plaintiffs, correct?
14 A   Yes.
15 Q   Those were sent January of 2020, correct?
16 A   Right.
17 Q   Would that meeting have occurred that same year?
18 A   Yes, I believe it would have occurred. I don't have
19     the dates. I don't recall the date exactly.
20 Q   I am going to share with you something really quick.
21     You were shown this email chain between yourself and
22     Mr. Washington, correct?
23 A   Right.
24 Q   And in this email chain you are talking about
25     rescheduling this meeting?

79

1  A   Un-huh.
2  Q   Now if this meeting occurred in January of 2019,
3      would you have waited until January of 2020 to send
4      out those letters notifying them of the seniority
5      adjustment?
6  A   No, I would not.
7  Q   And so would you agree that it's more likely that
8      that meeting occurred in January of 2020?
9  A   Yes.
10 Q   Now in January of 2020 do you know if Sydney
11     Pericheli was still with the City of Detroit?
12 A   Yes, January 2020, yes.
13 Q   So if I told you that Mr. Jenkins testified that he
14     took over the Second Deputy Chief position in
15     December of 2019 would you have any reason to dispute
16     that?
17 A   No, I don't.
18 Q   So if Mr. Jenkins was Second Deputy Chief in 2019, he
19     would have been the Deputy Chief in early 2020; is
20     that correct?
21 A   Yes, that's correct.
22 Q   Okay. I have nothing further.
23         REDIRECT EXAMINATION
24 BY MR. SANDERS:
25 Q   I do have a couple follow ups. You just discussed a

80

Column 1 (page 81):

```
 1   meeting date as it relates to the meeting you
 2   described where the Union met with the employer and
 3   the Plaintiffs were not present, correct?
 4  A  Yes.
 5  Q  You really don't have any recollection as to what
 6   date that meeting took place, isn't that accurate?
 7  A  I don't have the specific date.  No, I don't have a
 8   specific date.
 9  Q  Okay.
10  A  But it can be approximately.  If I got the email
11   saying he wanted to adjust the dates, then it would
12   have been around that time that we had the meeting,
13   but I don't have a specific date.
14  Q  You are not really sure of the year, are you?
15  A  I don't have the date.
16  Q  You're not sure of the year, correct?
17  A  Within a specific date, the year would be behind it.
18   So I'm not sure of the date of the meeting.
19  Q  Okay.
20  A  Thank you.
21  Q  So you are not certain of the specific date nor are
22   you certain of the specific year?
23  A  I would say 2020.
24  Q  And what are you basing that on?
25  A  That we need to -- I am basing that on the email
                                                        81
```

Column 2 (page 82):

```
 1   from Mr. Washington specifying that we need to --
 2   I'm basing that on Mr. Washington sending me the
 3   email saying he want to change his date for these
 4   different dates for me to meet with him.
 5   So that's what I'm basing it on.
 6   I know we had the meeting, but I don't know what the
 7   specific date it was.
 8  Q  All right.  Is it possible for a Fire Fighter to have
 9   fifteen years of experience and a seniority date of
10   two years seniority?
11   Is it possible for fifteen years of experience, would
12   that be with the City of Detroit or just --
13  Q  Yes, could you have fifteen years of experience with
14   the City of Detroit and have a seniority date that
15   gives you two years of seniority?
16  A  Yes.
17  Q  And why is that?  How is that possible?
18  A  Based on a person returning back from a Duty
19   Disability Retirement and coming back with a new
20   seniority date.  You can be out for seventeen years,
21   return back, your date has been adjusted.
22  Q  So you would agree with me that experience is
23   different than seniority?
24  A  Yes.
25  Q  Now you were asked the question, when you adjust
                                                        82
```

Column 3 (page 83):

```
 1   seniority, are you merely getting the roster
 2   corrected and the books corrected as to the
 3   appropriate seniority date; do you recall being asked
 4   that question?
 5  A  Yes.
 6  Q  And I'm paraphrasing, I believe your answer was yes,
 7   that's correct; do you recall that?
 8  A  Yes.
 9  Q  But isn't it more to that when you adjust seniority,
10   aren't you one, potentially affecting an individual's
11   pension?
12  A  It can affect a variety of things once the date is
13   adjusted.  So my goal is to adjust the date --
14  Q  I understand.  One of the things it could affect is a
15   person's pension, correct?
16  A  Possible.
17  Q  It could also affect their pay, correct?
18  A  Correct.
19  Q  It could also affect their title, correct?
20  A  Correct.
21  Q  It could also require them to be demoted, correct?
22  A  Correct.
23  Q  You would agree with me the adjustment of someone's
24   seniority after they've worked in a position for a
25   significant period of time, could be a very emotional
                                                        83
```

Column 4 (page 84):

```
 1   experience for them --
 2          MR. LEGGHIO:  Objection as to
 3   foundation.  Calls for speculation.
 4          MR. MCFARLAN:  Same objection.
 5  BY MR. SANDERS, CONTINUING:
 6  Q  You can answer.
 7          MR. LEGGHIO:  The witness can't
 8   testify to what somebody's emotional experience is.
 9  BY MR. SANDERS, CONTINUING:
10  Q  You don't know?
11          THE WITNESS:  I can't testify how
12   someone else feels.  They can act like they are sad
13   and be happy.  They could want to retire or want to
14   stay.  I can't say that.
15  BY MR. SANDERS, CONTINUING:
16  Q  So that sounds like a very insensitive answer to me.
17          MR. LEGGHIO:  Objection --
18  BY MR. SANDERS, CONTINUING:
19  Q  -- demote someone, take away their pay --
20          MR. LEGGHIO:  Argumentative.
21  BY MR. SANDERS, CONTINUING:
22  Q  -- affect their pension.
23          MR. LEGGHIO:  You are badgering
24   the witness.
25  BY MR. SANDERS, CONTINUING:
                                                        84
```

1   Q   -- emotional experience to them --

2              MR. MCFARLAND: Herb --

3              MR. LEGGHIO: You are badgering

4   the witness.

5              MR. SANDERS: No, I'm just asking

6   a questions --

7              MR. LEGGHIO: That's not a

8   question. The witness is not qualified to testify

9   about someone's emotional state or their reaction to

10   anything done with regard to their seniority.

11             MR. MCFARLAND: And she gave you

12   her answer, and you are just badgering her.

13             MR. SANDERS: I'm not badgering

14   her.

15             MR. LEGGHIO: Well you called her

16   insensitive, that is pretty close to --

17             MR. LEGGHIO: That is absolutely

18   what you are doing.

19   BY MR. SANDERS, CONTINUING:

20   Q   Do you agree with me that could be emotional for

21   someone?

22             MR. MCFARLAND: Asked and

23   answered.

24             MR. LEGGHIO: Same objection.

25   BY MR. SANDERS, CONTINUING:

85

---

1   Q   You can answer.

2   A   I can't answer how someone else feels.

3   Q   I have no further questions.

4             MR. MCFARLAND: Chris you got

5   anything?

6             MR. SANDERS: I'm sorry?

7             MR. MCFARLAND: I said Chris, you

8   got anything?

9             MR. LEGGHIO: No, I don't have

10   anything more.

11             MR. MCFARLAND: I don't have any

12   questions.

13             (Whereupon proceedings concluded)

14

15

16

17

18

19

20

21

22

23

24

25

86

---

1                   CERTIFICATION

2

3   STATE OF MICHIGAN   )
                    )
  COUNTY OF OAKLAND   )

4

5     I HEREBY CERTIFY that the foregoing testimony and

6   proceedings, consisting of eighty-seven (87)

7   typewritten pages were mechanically recorded at the

8   time and place hereinbefore set forth; was thereafter

9   reduced to typewritten form; and that the foregoing

10   is a full, true and correct transcript of the

11   recording so taken.

12

13

14

15

16

17              Sharon Dillon, CER 3192
              Certified Electronic Reporter

18              P.O. Box 214552
              Auburn Hills, MI 48321-4864

19              (248)342-7229

20   May 6, 2021

21

22

23

24

25

87



EXHIBIT
16

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHRISTOPHER MCGHEE, NORMAN BROWN,
CRAIG BROWN, JAMES WASHINGTON,
SHANNON FERGUSON, JUNIUS PERRY,
and ORLANDO POTTS

            Plaintiffs,

v.

CITY OF DETROIT,
ERIC JONES - EXECUTIVE FIRE COMMISSIONER,
REGINALD JENKINS – 2ND DEPUTY COMMISSIONER,
ROBERT DISTELRATH - CHIEF OF DEPARTMENT
FIRE FIGHTING DIVISION,
KEMIA CROSSON – EMPLOYEE SERVICES CONSULTANT,
DETROIT FIRE FIGHTERS ASSOCIATION LOCAL 344,
MICHAEL NEVIN – FORMER PRESIDENT
THOMAS GEHART – PRESIDENT,
WILLIAM HARP – VICE PRESIDENT,
JOHN A. CANGIALOSI – SECRETARY
CHRISTOPHER A. SMITH - TREASURER
*In their Individual and Official Capacities,*
*Jointly & Severally,*

            Defendants.

Case No. 20-006272-CD
Judge: Sheila Gibson

Herbert A. Sanders (P43031)
The Sanders Law Firm, P.C.
Attorney for Plaintiffs
The Ford Building
615 Griswold, Suite 913
Detroit, Michigan 48226
(313) 962-0099 (Phone)
(313) 962-0044 (Fax)
haslawpc@gmail.com

Christopher P. Legghio (P27378)
John G. Adam (P37205)
Legghio & Israel, P.C.
Attys for Fire Dept Defendants
306 S. Washington, Suite 600
Royal Oak, MI 48067-3837
(248) 398-5900
cpl@legghioisrael.com
jga@legghioisrael.com

Jason T. McFarlane (P73105)
Tiffany Boyd (P71481)
City of Detroit, Law Department
2 Woodward Avenue, Suite 500
Detroit, MI 48226
(313) 224-4550
mcfaj@detroitmi.gov
boydti@detroitmi.gov

## AFFIDAVIT OF MICHAEL V. NEVIN

EXHIBIT # 16



NOW COMES, the affiant, Michael V. Nevin, deposes and states as follows:

1. I am over the age of 18 and I am otherwise able to testify accurately and truthfully.

2. I am a former Union President of the Detroit Firefighter Association (DFFA).

3. I was DFFA President from December 2015 – December 2019.

4. Prior to my presidency I held DFFA Executive Office from 1995-1999 (3rd Battalion Director/Treasurer).

5. I have at least 10 full years of union experience in direct collective bargaining with the City of Detroit.

6. I am currently employed as a captain of squad 3 with the City of Detroit Fire Department, but act as a battalion chief every day in the field.

7. I have reviewed the amended complaint in case #2020-006272-CD. (attached)
   a. Page 5 #27 of the complaint is an accurate statement.
   b. Page 5 #28 of the complaint is an accurate statement.
   c. Page 6 #30 of the complaint is an accurate statement.
   d. Page 6 #31 of the complaint is an accurate statement.
   e. Page 6 #33 of the complaint is an accurate statement.
   f. Page 6 #34 of the complaint is an accurate statement.
   g. Page 9 #54 of the complaint is an accurate statement.

8. It is my understanding that the 2001-2008 Collective Bargaining Agreement was extended due to the City of Detroit bankruptcy.

9. It is my understanding that the 2001-2008 Collective Bargaining Agreement was ratified by the DFFA union membership after the bankruptcy.

10. The language in the bankruptcy contract was not written by people knowledgeable about the City of Detroit or the fire department.

11. The language regarding loss of seniority was never explained to the membership nor was it taken seriously once the CBA was ratified.

12. The issue of retroactively adjusting a firefighter's seniority who returned to work after being on retirement due to duty disability for more than two years was not initially grieved by the union because it just slipped through the cracks.

13. I had other grievances that I was working on and was attempting to get all of them wrapped up.

14. The Plaintiffs should not have lost their seniority.

15. Anyone on duty disability prior to the bankruptcy should have retained their negotiated seniority

16. Sydney Zack, Reginal Jenkins and Hakeem Berry and I were all in agreement that the issue of losing seniority was wrong and I made sure that no member was harmed under that language while I was President.

17. That bankruptcy contract had a lot of bad language that I was attempting to address while I was President and the City was working with me to get it done.

18. I could have settled the dispute as it relates to this issue, and all of this litigation could have been avoided.

19. It was a benefit to some in the union not to file the grievance because it allowed others not on disability to jump the list.

20. I know of at least one person on duty disability who returned after 2014, went through 6 months, received a promotion and retired at a higher rank.

21. Although we didn't have any formal offers from the City, we had verbal conversations and a few emails about changing the language so members were not harmed and the City was hot to settle.

22. If the officers were demoted as a result of the language, there has to be just cause for the demotion.

23. The language about losing seniority was clearly miswritten, just like the CT time.

24. The bankruptcy contract was full of mistakes.

25. Neither the union nor the City gave notice to the members returning to work from duty disability of the bankruptcy contract language changing seniority.

26. It just doesn't make any sense. They should have had a meeting with the commissioner's office. The Union should have been there they should have brought these members in individually and gone over this with these people.

27. They are demoting these people they're taking them out of their rank, and they're moving into the beginning of the, the seniority list, without explanation.

28. I don't think that even happens in McDonald's when they take a guy off a quarter-pounders and put them back on fries.

29. I don't know how they could just put these guys back at the beginning of the seniority list and go well, that's that.

30. If called upon to do so at trial, I will testify to the aforementioned affirmations based upon my personal knowledge.

I DECLARE THAT THE STATEMENTS ABOVE ARE TRUE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

Date: 7-29-2021

_____

Michael Nevin

STATE OF Arizona

COUNTY OF Yuma

The foregoing instrument was acknowledged before me this ___ day of ___ 20 21

By **Michael Nevin**