**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

IN RE:

|  |  |
|---|---|
| CITY OF DETROIT, MICHIGAN, | Case No.13-53846 |
|  | Hon. Thomas J. Tucker |
| Debtor. | Chapter 9 |

## COVERSHEET FOR EXHIBIT 14

EXHIBIT 14

**Panel 1 (page 1)**

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHRISTOPHER MCGHEE, NORMAN BROWN
CRAIG BROWN, JAMES WASHINGTON
SHANNON FERGUSON, JUNIUS PERRY
And ORLANDO POTTS,

    Plaintiff,

vs.        Case No.: 20-006272-CD
          Hon. Shelia Gibson

CITY OF DETROIT, et al
In their Individual and
Official Capacities,
Jointly & Severally,

    Defendants.    /

DEPOSITION OF REGINALD JENKINS,

Taken by the Plaintiff Via Zoom on Wednesday, March

10, 2021, at 11:00 a.m.

APPEARANCES:

For the Plaintiffs:    HERBERT A SANDERS (P43031)
      615 Griswold, Suite 913
      Detroit, MI 48226
      (313) 962-0099

For the Defendant    CHRISTOPHER P. LEGGHIO (P37205)
Fire Department    306 S. Washington, Ste. 600
      Royal Oak, MI 48067
      (248) 398-5900

For Defendant    JASON T. MCFARLANE (P73105)
City of Detroit    2 Woodward Ave., Ste. 500
      Detroit, MI 48226
      (313) 224-4550

1

**Panel 2 (page 2)**

TABLE OF CONTENTS

WITNESS:          PAGE

RALPH JENKINS

  Direct Examination by Mr. Sanders    3
  Cross-Examination by Mr. Legglho    69
  Cross-Examination by Mr. McFarlane    83
  Redirect Examination by Mr. Sanders    85

EXHIBITS:          IDENTIFIED

  Exhibit Number One    16
  Exhibit Number Two    23
  Exhibit Number Three    28
  Exhibit Number Four    34
  Exhibit Number Five    35
  Exhibit Number Thirteen    86

2

**Panel 3 (page 3)**

Wednesday, March 10, 2021

Via Zoom

- - -

PROCEEDINGS

- - -

THE COURT REPORTER: Witness, can you raise your right hand for me, please? Do you solemnly swear or affirm that the testimony you are about to give in this matter will be the truth?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

REGINALD JENKINS,

WAS DULY SWORN BY THE COURT REPORTER, TESTIFIED UNDER OATH AS FOLLOWS:

DIRECT EXAMINATION

BY MR. SANDERS:

Q  Good morning, Mr. Jenkins.

A  Good morning Mr. Sanders.

Q  Would you state your full name for the record, please.

A  Reginald Terrence Jenkins.

MR. SANDERS: Let the record reflect that this is the Deposition of Reginald Jenkins, taken pursuant to Notice, to be used for all intent and purposes in the Wayne County Circuit Court

3

**Panel 4 (page 4)**

Case, 20-006272-CD, Christopher McGhee, et al versus the City of Detroit, et al.

BY MR. SANDERS, CONTINUING:

Q  Mr. Jenkins, I'm going to ask you a series of questions as it relates to the Lawsuit that I just referenced. If at any time you do not understand my question, please let me know; I will be happy to repeat the question or rephrase it for you.

If you give a response, I will assume that you did understand the question. If at any time you need to take a break, please let me know and I will be happy to accommodate you. I would ask that if there is a question pending, that you answer the question before we break, okay?

A  Okay.

Q  All right. Mr. Jenkins what is your date of birth?

A  August 31, 1973.

Q  And are you a High School Grad?

A  Yes, I am.

Q  When did you graduate from High School?

A  June 12, 1991.

Q  What High School was that?

A  Cass Technical High School in Detroit.

Q  Do you have any formal education after your completion of High School?

EXHIBIT # . 14

**Page 5 (top-left)**

1  A   I do.
2  Q   And what is that?
3  A   I have a Bachelor of Science degree in business
4      management from Alabama A & M University. I have a
5      Master of Arts in Human Resource Administration from
6      Central Michigan University, and I have a master's of
7      science in Industrial and Labor Relations from Wayne
8      State University.
9  Q   And when did you complete your studies at Alabama A &
10     M?
11 A   May. I don't remember the date. May of 1996. I
12     don't remember the exact date.
13 Q   What year did you graduate from Central?
14 A   2009, I believe May of 2009, somewhere in there.
15 Q   And what year did you graduate from Wayne State?
16 A   That was May of 2011. No, hold on. I'm sorry, Wayne
17     State of 2009, so Central Michigan would have been
18     May of 2007 maybe. Sorry about that.
19 Q   Now I saw you looking at something to refresh your
20     memory, what was that?
21 A   I'm in my office. I have my Wayne State Degree on
22     the wall.
23 Q   Okay.
24 A   So that indicates Wayne State was May of 2011. I
25     mean 2009.

5

**Page 6 (top-right)**

1  Q   This is a Video Deposition, or excuse me, a Zoom
2      Deposition, so is there anyone else present in the
3      room with you?
4  A   No, there's not. My office door is closed.
5  Q   Okay. I would ask that during the course of the
6      Deposition that you keep it private and not have
7      anyone else in your office. If there is a need for
8      someone to come in your office, let us know so that
9      we can take a pause. I'd also ask that you refrain
10     from communicating with anyone via text message
11     telephone or on your computer during the course of
12     the Deposition, okay?
13 A   I understand.
14 Q   When did you first become employed with the City of
15     Detroit?
16 A   The very first time was August of 1996.
17 Q   And what capacity were you employed in?
18 A   Junior Typist at the Department of Elections.
19 Q   How long did you hold that position?
20 A   About thirteen months.
21 Q   And why did you leave?
22 A   I moved back to Alabama for a few months to seek some
23     other activities.
24 Q   When was the next time you became employed with the
25     City of Detroit?

6

**Page 7 (bottom-left)**

1  A   September of 1998.
2  Q   In what capacity?
3  A   Technical Aide-Human Resources, and I was assigned to
4      the Labor Relations Division.
5              MR. LEGGHIO: Mr. Sanders,
6      just procedurally, on my screen it's showing two
7      Chris McGhee's as a participate in this Deposition,
8      is that just something with the technology or is
9      there another person in the spot for Mr. McGhee?
10             MR. SANDERS: Chris, can you hear
11     me? Do you know why there are two, you have two log
12     ins?
13             MR. MCGHEE: Yes, one is my
14     phone, and one is my tablet. I am about to switch
15     the devices in about five minutes. I am about to
16     leave the house. So in a minute the tablet will be
17     off.
18             MR. SANDERS: All right. Thank
19     you.
20             MR. MCGHEE: Yes, sir.
21             MR. LEGGHIO: And Mr. Sanders, one
22     other thing. In terms of your follow up on your
23     questions procedurally, is there anyone else
24     listening into this Deposition other than those names
25     that appear on the screens? Is there anybody but Mr.

7

**Page 8 (bottom-right)**

1      McGhee or any other Plaintiff in the case that's in
2      attendance in this Deposition?
3              MR. SANDERS: I'd assume by their
4      silence, there is not.
5              MR. LEGGHIO: Well, I don't want
6      to make that assumption. They are your clients. Can
7      you tell me whether -- can they tell us that there
8      is no one else in the room with them?
9              MR. WASHINGTON: This is James
10     Washington, I am alone.
11             MR. PERRY: This is Junius Perry,
12     I am alone.
13             MR. LEGGHIO: Okay. Mr. McGhee
14     is alone also?
15             MR. MCGHEE: This is Christopher
16     McGhee, I am alone.
17             MR. BROWN: Craig Brown, I'm
18     alone.
19             MR. BROWN: Norman Brown, and I'm
20     alone.
21             MR. LEGGHIO: Okay.
22             MR. SANDERS: We might as well go
23     through the whole list. Tom Gerhart, do you got
24     anybody in the room with you?
25             MR. GERHART: I'm alone, sir.

8

**Column 1 (page 9):**

```
 1                    MR. SANDERS:  Okay.
 2                    MR. LEGGHIO:  Tamea, how
 3    about you?
 4                    MS. TAMEA:  I'm alone as
 5    well.
 6                    MR. SANDERS:  All right.
 7    Are we ready?
 8                    MR. LEGGHIO:  Thank you Mr.
 9    Sanders.  Thank you.
10                    MR. SANDERS:  Okay.
11                    MR. GERHART:  Mr. Sanders,
12    this is Tom.  I have, William Bart just came into my
13    office because he is unable to sign on.
14                    MR. SANDERS:  Okay.  I
15    appreciate that.
16  BY MR. SANDERS, CONTINUING:
17  Q    I believe, Mr. Jenkins, when we left off you
18       indicated you had commenced working as a Technical
19       Aide/Human Resources, Labor Relations on or about
20       September 1998 --
21  A    Yes.
22  Q    -- how long did you hold that position?
23  A    Tech Aide was about six months.
24  Q    When was the next position you had?
25  A    I was promoted to the Junior Labor Relations
```
9

**Column 2 (page 10):**

```
 1       Specialist.
 2  Q    And that was approximately when?
 3  A    Approximately March of 1999.
 4  Q    How long did you hold that position?
 5  A    Approximately six months, six to eight months,
 6       something like that.
 7  Q    And what was the next position you assumed?
 8  A    Intermediate Labor Relations Specialist.
 9  Q    How long did you hold that position?
10  A    Six to eight months.
11  Q    And you assumed that position approximately when?
12  A    Approximately September to November of 1999.
13  Q    What was the next position that you held?
14  A    Senior Labor Relations Specialist.
15  Q    And when did you assume that position?
16  A    That would have been in the Spring of 2000.  I can't
17       remember exactly when.  Again, and that was about six
18       to eight months.
19  Q    What was the next position that you held?
20  A    Human Resource Consultant at the Department of
21       Transportation.
22  Q    And you assumed that position approximately when?
23  A    That was approximately October of 2001.
24  Q    And the next position?
25  A    Labor Relations Specialist II, no, no, I'm sorry,
```
10

**Column 3 (page 11):**

```
 1       Labor Relations Specialist I.
 2  Q    You assumed that position approximately when?
 3  A    July of 2003.
 4  Q    And the next position?
 5  A    Labor Relations Manager One.
 6  Q    And when did you assume that position?
 7  A    It was in 2007.  I can't say -- I want to say August,
 8       but it was in 2007.  It was in the late Summer 2007.
 9  Q    What was the next position?
10  A    I resigned from the City in October of 2012.  So my
11       next position was with the State of Michigan.
12  Q    And why did you resign from the City in 2012?
13  A    It was a family decision because my wife and I both
14       worked for the City.  The City was headed into
15       bankruptcy and one of us needed to leave for
16       stability purposes.
17  Q    Did you retire or resign?
18  A    I resigned.
19  Q    And you returned to the City when?
20  A    March 13 of 2014.
21  Q    And in what capacity?
22  A    Human Resources Analyst II, I believe.  Yes, II.  Oh,
23       and I was assigned to Central Services at that time
24       in CAYMC.
25  Q    And the next position you held?
```
11

**Column 4 (page 12):**

```
 1  A    Administration of Labor Relations III.
 2  Q    And you assumed that position approximately when?
 3  A    In the Fall of 2015.  I can't remember exactly when,
 4       in the Fall of 2015.
 5  Q    And the next position?
 6  A    Administrator of Labor Relations IV.
 7  Q    And you assumed that position when?  Approximately?
 8  A    It was either late 2018, early 2019.  It was 2019.
 9  Q    Since assuming the position of Administrator of Labor
10       Relations IV, have you had any other positions?
11  A    Yes, my current position.
12  Q    What is that?
13  A    Second Deputy Fire Commissioner.
14  Q    And when did you assume that position?
15  A    December 3, of 2019.
16  Q    As an Administrator Labor Relations IV what were your
17       responsibilities?
18  A    Negotiate Collective Bargaining Agreements and
19       administer Collective Bargaining Agreements,
20       including processing grievances at the third step
21       of the grievance procedure; advising the Departments
22       that were assigned to me on labor and employee
23       relations matters.
24  Q    As and Administrator of Labor Relations IV, were
25       there particular City Collective Bargaining
```
12

## Page 13

```
 1    Agreements you were assigned to or did you deal with
 2    any and all Collective Bargaining Agreements?
 3  A I was assigned to particular Agreements, but I dealt
 4    with questions about any Agreement, because over my
 5    career I worked on all labor contracts accept Police
 6    Department Contracts.
 7  Q Okay
 8  A But I was assigned to particular.
 9  Q And what Collective Bargaining Agreements were you
10    assigned to at that time? Let me ask you this.
11    Scratch that question. Were you assigned to the
12    Collective Bargaining Agreement of the Detroit Fire
13    Fighters?
14  A Yes, I was.
15  Q Did you participate in the Negotiation of any of the
16    Detroit Fire Fighter Collective Bargaining
17    Agreements?
18  A Over my career?
19  Q Yes.
20  A Yes.
21  Q Do you recall which ones?
22  A I started out with the 9801 Agreement. The year --
23    when I started, they were in negotiations, so that
24    was the first one, 1998 to 2001. I can't remember. I
25    would have to have some --
                                                        13
```

## Page 14

```
 1                    MR. MCFARLANE: He froze. We
 2    lost him. If he is not back on in a few minutes I
 3    will call him.
 4                    (Whereupon a brief recess was
 5    taken)
 6  BY MR. SANDERS, CONTINUING:
 7  Q I think when we left off I had inquired about the
 8    contracts that you had participated in negotiating as
 9    it related to the Detroit Fire Fighters, and you
10    indicated, you believe you participated in the 9801
11    negotiations. Do you know if you participated in the
12    Agreement following 9801?
13  A I believe so. I can't remember, because that was in
14    the transition when I -- I was gone for that, so a
15    certain period of time for that one. So the only
16    thing I can say was, once I returned, I once again
17    began to get involved with negotiating.
18  Q Okay.
19  A But without knowing the dates in front of me, I can't
20    say for certain.
21  Q Now you resigned in 2012 and returned March 2014. If
22    I am not mistaken, there's a Detroit Fire Fighter's
23    Association Agreement that was negotiated or came
24    into effect in 2014, is that accurate?
25  A That's accurate, yes.
                                                        14
```

## Page 15

```
 1  Q Did you participate in negation of that Agreement?
 2  A No, I was not in Labor Relations at the time.
 3  Q When you resigned in 2012, and then returned in March
 4    of 2014, have you maintained your seniority?
 5  A No, my new seniority date, new seniority date is
 6    March 14 or 17. The day I returned in 2014, that's
 7    my new seniority date.
 8  Q Did you review anything in preparation for your
 9    Deposition today?
10  A I reviewed the grievances that were related to this
11    case, but that's all I reviewed.
12  Q Other than the grievances themselves, were there any
13    other documents that you reviewed associated with
14    those grievances?
15  A The entire grievance chain, the grievance responses
16    also.
17  Q Can you tell me what are your responsibilities as
18    Second Deputy Fire Commissioner?
19  A To assist the Executive and Fire Commissioner and
20    administrative functions; for example, grievances, I
21    act as his designee for the second step of the
22    grievance process. I advise them of grievance issues
23    -- labor issues, labor relation issues. I assist in
24    advising him on some HR issues, along with our HR
25    Administrator. I oversee the Executive
                                                        15
```

## Page 16

```
 1    Administrative Staff. I oversee the Medical Case
 2    Manager.
 3  Q I'd like to show you what's been marked as Deposition
 4    Exhibit One.
 5                    MR. SANDERS: Sharon, Shawndrica
 6    Simmons is going to assist me by sharing the Deps on
 7    the screen. Can you make her an Administrator so she
 8    can assist?
 9                    THE COURT REPORTER: I sure will.
10    There you go.
11  BY MR. SANDERS, CONTINUING:
12  Q Now before we talk about Exhibit One, you shared your
13    resume with me with the City of Detroit. Were any of
14    those positions' demotions?
15  A No, none. Well, when I returned from the State of
16    Michigan, I returned to a lower position, yes, but it
17    wasn't a demotion. I mean I was coming back. I
18    didn't come back as a Labor Relations Manager of
19    course.
20  Q Okay.
21  A I came back as a Human Resource Analyst.
22  Q Understood.
23  A Within the City, no, I was never demoted.
24  Q Were all of those positions that you assumed
25    promotions or were any of them lateral moves?
                                                        16
```

**[Page 17]**

1  A  In 2001 when I went to HR to DDOT, on the hierarchy
2     scale it was a lateral moved, but it was -- the
3     position paid more money.
4          MR. SANDERS:  Shawndrica, can you
5     share Exhibit One Exhibit One on the screen, please?
6  BY MR. SANDERS, CONTINUING:
7  Q  I'm showing you what's been marked as Plaintiff's
8     Deposition Exhibit Number One.  It is the Notice of
9     Deposition as it relates to this matter.  Have you
10    seen that before?
11  A  Yes.
12  Q  Okay.  Line two in the notice says that Plaintiff
13    requested the City of Detroit produce the City
14    Representative person or persons most knowledge
15    concerning the attached grievances and their
16    resolutions.  And did you review the grievances that
17    are attached?
18  A  Yes.
19  Q  The City has produced you as the person most
20    knowledgeable concerning those grievances; do you
21    understand that to be the case?
22  A  Yes.
23  Q  What makes you the most knowledgeable person as it
24    relates to those grievances?
25  A  I was involved with some of those grievances from

**[Page 18]**

1    either the -- from Labor Relations standpoint or my
2    current position.  The only other person, the person
3    that had my position prior to me is no longer with
4    the City.
5  Q  And who are you referring to?
6  A  Sydney Pertreli.
7  Q  And do I understand your testimony to be that Sydney
8    Pertreli was involved in the grievances that are
9    attached as Exhibit One also?
10  A  From the onset, yes.
11  Q  Okay.
12  A  I am sorry, can you hold on for a second?
13  Q  Yes.
14          (Whereupon a brief recess was
15    taken)
16  BY MR. SANDERS, CONTINUING:
17  A  Sorry about that.
18  Q  Not a problem.
19          MR. SANDERS:  Now if you can
20    Shawdrica scroll to page three of Deposition Exhibit
21    One, and it's entitled grievance number 12-19.  There
22    we go.
23  BY MR. SANDERS, CONTINUING:
24  Q  Do you see that, Mr. Jenkins?
25  A  Yes, I do.

**[Page 19]**

1  Q  And I believe your previous testimony indicated that
2    you had reviewed the grievance chain as it relates to
3    this grievance, is that accurate?
4  A  That is accurate.
5  Q  What specific documents did you review as it relates
6    to grievance 12-19?
7  A  From what I can remember, the grievance itself and
8    the responses, pretty much responses.
9  Q  And who authored the response or responses?
10  A  I know for Step II I believe it was Sydney Pertreli.
11    Step I, it would have been either Chief Distelrath or
12    Chief Deputy Shinske, Deputy Chief at the time,
13    Shinske.
14  Q  Okay.  I'm sorry, can you repeat those names for Step
15    I?
16  A  Step I, it would probably would have been Chief
17    Distelrath.
18  Q  Can you spell that name?
19  A  D-i-s-t-e-l-r-a-t-h.
20  Q  D-i-s-t --
21  A  E-l-r-a-t-h.
22  Q  Or alternatively who?
23  A  At the time he was Deputy Chief Shinske.
24  Q  Spell that name.
25  A  S-h-i-n-s-k-e.

**[Page 20]**

1  Q  So Distelrath or Shinske would have responded at Step
2    I.  Step II would have been Sydney Pertreli.  Were
3    there any other documents you recall reviewing as it
4    relates to that grievance chain?
5  A  No, not that I recall.
6  Q  All right.
7          MR. SANDERS:  I thought I
8    carefully reviewed the documents that were produced
9    by the City and I don't recall seeing the Step I
10    Answer or the Step II Answer that you've mentioned,
11    perhaps I've missed it in my review.
12          But if it isn't there, I would
13    ask that it be produced, additionally or
14    alternatively if it is there if you can at a later
15    date identify what page numbers those Step responses
16    are in the documents that were produced by the City,
17    I would appreciate, because I think we've gotten
18    maybe a couple thousand pages of documents.
19          MR. MCFARLANE:  Yes, something
20    like that.
21          MR. SANDERS:  I thought I read
22    them all, but maybe I missed those two pages.
23  BY MR. SANDERS, CONTINUING:
24  Q  So let me ask you, Mr. Jenkins, what was the Step I
25    answer to this grievance, and I don't know if you --

**[Page 21]**

1    I'm not asking you to cite it for me via memory to
2    the best of your recollection, what was the Step I
3    answer?
4    A  I would have to review it.  I can't --  I don't want
5    to speculate.
6    Q  Well you reviewed it in preparation for your
7    Deposition, is that accurate?
8    A  Yes.
9    Q  And when did you do that?
10   A  Probably I don't know.  I don't know if it was last
11   week or the week before last.
12   Q  And you have no recollection whatsoever as to what
13   the Step I Answer was to this grievance?
14                   MR. MCFARLANE:  Objection, asked
15   and answered.  He indicated he would have to review
16   it to talk about it.
17                   MR. SANDERS:  I understand.  I'm
18   just probing.
19   BY MR. SANDERS, CONTINUING:
20   Q  I am not asking you again to cite verbatim, but what
21   was the gist of the Step I Answer?
22   A  Again I would have to review it to make a --
23   Q  Okay.  Let me ask you this.  In the Step I answer was
24   the grievance denied?
25   A  Again, I would have to review it.

21

**[Page 22]**

1    Q  You have no recollection as to whether the grievance
2    was denied at Step I?
3    A  No, I would have to review it.
4    Q  What about at Step II, was the grievance denied?
5    A  I would have to review it.
6    Q  You have no recollection as to whether the grievance
7    was denied at Step II?
8    A  Correct.
9    Q  In any of the documents that you reviewed, did the
10   City indicate that the grievance was untimely?
11   A  This particular grievance?
12   Q  Yes.
13   A  I cannot remember.  I would have to review the
14   response.
15   Q  Okay.  And I don't want to share with me any
16   communication you've had with your Attorney as it
17   relates to this matter, okay?  So I am preferencing
18   my question by that statement.  My question now is,
19   who provided you with the grievance chain, was it
20   something that was in possession by your Office or
21   someone else in Labor Relations or was it on a
22   computer?  How did you get the grievance chain?
23   A  It was in possession with me coming from Labor
24   Relations.  I was the Labor Relations Administrator
25   assigned to DFFA at this time.  So I would have had a

22

**[Page 23]**

1    copy of this particular file.
2    Q  Now I want to refer you to what's been marked as
3    Deposition Exhibit Number Two.  Are you familiar
4    with this document?
5    A  I have seen it before, yes.
6    Q  Was that document part of the grievance chain that
7    you reviewed?
8    A  No.
9    Q  All right.  Now the grievance was filed on or about
10   May of 2019, is that accurate?
11   A  That's accurate.
12   Q  Other than the Step I and Step II Answer that you've
13   testified to and the document that's marked as
14   Exhibit two on the screen now was there any
15   correspondence between the City and the Detroit Fire
16   Fighters Association as it relates to the grievance?
17   A  From me?
18   Q  Well first rom you?
19   A  From me, no.
20   Q  Are you familiar with any other correspondence from
21   anyone from the date in which the grievance was filed
22   through February 26, 2019 other than the first and
23   second step answers?
24   A  I'm not familiar with it.  I'm not saying that it
25   could have been.  This meeting --  these were meeting

23

**[Page 24]**

1    between the Director at the time Hakim Berry and the
2    President at the time, Mike Nevin.  So before I even
3    became involved, they were communicating.  To my
4    knowledge, no, to the answer to your question.
5    Q  Wouldn't Labor Relations have maintained a file or a
6    folder as it relates to each of the grievance that we
7    are discussing today?
8    A  Yes.
9    Q  Would that file include correspondence associated
10   with the grievances other than the official
11   responses?
12   A  It could, yes.
13   Q  Who maintains that file?
14   A  Currently or when I was there?
15   Q  Well first when you were there?
16   A  I did.
17   Q  Who maintains it now?
18   A  That would be Valerie Colbert, also known as the
19   Deputy Director of Labor Relations.
20   Q  Now eventually the grievance, the 12-19 grievance was
21   resolved, would that be accurate?
22   A  Yes.
23   Q  And how was the grievance resolved?
24   A  Employees that were retired on Duty Disability from
25   the start of the contract had their seniority

24

**Page 25**

1  adjusted to the date of their return to the
2  Department.
3  Q   When you say from the start of the contract, what
4      contract are you referring to?
5  A   The current contract, the one that is in existence
6      now.
7  Q   The one that's in existence now? Was that contract
8      implemented on or about 2014?
9  A   Correct.
10 Q   Okay. And would it be accurate that since that time
11     that contract has been extended and is currently in
12     existence?
13 A   Yes, that is correct.
14 Q   Now referring to what has been marked as Exhibit
15     Number Two in the middle of the letter, this is a
16     letter from Michael Nevin to Hakim Berry, first of
17     all let me ask you, who is Hakim Berry?
18 A   He is currently the City's Chief Operating Officer,
19     and he still acts as the Director of Labor Relations.
20 Q   Okay. And at the time of this correspondence, he was
21     Director of Labor Relations, is that accurate?
22 A   That's accurate.
23 Q   Near the middle of the page it says that this
24     confirms that as discussed, the DFFA would not grieve
25     or otherwise litigate the City's failure to restore

**Page 26**

1  seniority to these employees upon their reinstatement
2  from Duty Disability. What do you understand that
3  sentence to mean?
4           MR. LEGGHIO:   Objection as to
5  foundation.
6           MR. SANDERS:   You can answer.
7           THE WITNESS:   That the employees
8  returning from Duty Disability will come back with
9  seniority dates based upon the date of their return
10 to the Department --
11          MR. SANDERS:   Okay.
12          THE WITNESS:   -- the DFFA would
13 not grieve that.
14 BY MR. SANDERS, CONTINUING:
15 Q   All right. And was that Agreement for the DFFA not
16     to grieve that, a condition of resolving the
17     grievance?
18          MR. LEGGHIO:   Objection as to
19 foundation.
20          MR. SANDERS:   You can answer.
21          THE WITNESS:   I can't answer
22 that. Again, this was correspondence between Mr.
23 Nevin and Mr. Berry. I was not involved with that
24 discussion.
25 BY MR. SANDERS, CONTINUING:

**Page 27**

1  But you are the person most knowledgeable as it
2  relates to the grievance and its resolution; is that
3  not correct? That was your earlier testimony.
4  A   Yes.
5  Q   All right. And do you have an understanding that a
6      condition of resolution to this grievance was that
7      the DFFA would not grieve those employees who lost
8      their seniority?
9           MR. LEGGHIO:   Same
10 objection.
11          MR. SANDERS:   You can
12 answer.
13          THE WITNESS:   I'm sorry.
14 Repeat that one more time.
15 BY MR. SANDERS, CONTINUING:
16 Q   Sure. Was it a condition of resolving the grievance,
17     that the DFFA would not grieve the loss of seniority
18     of those employees affected by the resolution of the
19     grievance?
20          MR. LEGGHIO:   Same objection.
21          THE WITNESS:   I don't know if it
22 was a condition. I can't speak to that. Again, with
23 these discussions, I don't know.
24 BY MR. SANDERS, CONTINUING:
25 Q   You don't know?

**Page 28**

1  A   No.
2  Q   Okay. So you have no facts that would contradict or
3      unaware of no facts that would contradict that it was
4      a condition of resolution?
5           MR. LEGGHIO:   Objection,
6  mischaracterizes the testimony.
7           MR. SANDERS:   I'm asking him a
8  question.
9           MR. LEGGHIO:   I placed my
10 objection on the record. That's all.
11 BY MR. SANDERS, CONTINUING:
12 Q   And I believe your answer is you don't know. Is that
13     accurate?
14 A   That's accurate, yes.
15 Q   I'd like to show you what's been marked as Deposition
16     Exhibit Number Three. Excuse me. Hold on please
17     before we go on from there. I want you to look at
18     page two of Exhibit Three -- excuse me, Exhibit
19     Number Two, page two of Exhibit Number Two, my
20     mistake. Are you familiar with that document?
21          MR. LEGGHIO:   I'm sorry, were we
22 looking at a different document?
23          MR. SANDERS:   Yes, it is. It is
24 page two of Exhibit Number Two.
25          MR. LEGGHIO:   I only got the

**Page 29**

1    first page of it on the screen.  The February 27,
2    2019 letter?
3                      MR. SANDERS:  That is correct.
4                      MR. LEGGHIO:  Yes, I just got the
5    first page of it.  Is there another page?  This is --
6                      MR. SANDERS:  Page one was the
7    February 26, 2019 letter, he said he has no idea
8    whether or not --
9                      MR. LEGGHIO:  Okay.
10   BY MR. SANDERS, CONTINUING:
11   Q   Have you had a chance to look at this February 27,
12       letter, Mr. Jenkins?
13   A   Yes.
14   Q   Are you familiar with it?
15   A   I've seen it before.
16   Q   And was this the letter that was sent in confirmation
17       of the resolution of the 12/19 grievance?
18                      MR. LEGGHIO:  Objection as to
19   foundation.
20                      MR. SANDERS:  You can answer.
21                      THE WITNESS:  Again, that wasn't
22   said to me, but that's what it says.
23   BY MR. SANDERS, CONTINUING:
24   Q   Now I would like to refer you to Deposition Exhibit
25       Number Three.  Can you take a look at the first page

                                                            29

**Page 30**

1    of that Exhibit, and when you are done we will scroll
2    to page two.
3    A   Okay.
4                      MR. SANDERS:  All right.  Can you
5    scroll to page two, please?
6    BY MR. SANDERS, CONTINUING:
7    Q   Have you had an opportunity to read that?
8    A   Almost done.  Yes.
9    Q   Okay.  Now are you familiar with that document?
10   A   Yes.
11   Q   How so?
12   A   I prepared the document.
13       And that document was prepared in response to the
14       grievances that were filed on behalf of some of the
15       employees who had been affected by the 12-19
16       resolution, the 12-19 grievance resolution; is that
17       accurate?
18   A   That's accurate.
19   Q   And the letter that we are looking at dated February
20       11, this one is prepared and sent to Norman Brown,
21       but you sent the exact same letter to the other
22       Grievants, would that be accurate?
23   A   That is accurate.
24   Q   If we can go back to --
25   A   Just to correct, it was sent to the Union, but it was

                                                            30

**Page 31**

1    I do not send grievance, but you said it was sent to
2    Norman.  I do not send grievance responses to
3    individuals.  I was sent to the Union President.
4    Q   I understand.
5    A   Just for clarification.
6    Q   And a similar letter was sent to the Union as it
7        relates to each of the grievances that had been filed
8        as a result of the resolution of the 12-9 grievance,
9        is that right?
10   A   That's correct.
11   Q   Now referring to page one of that February 11
12       letter --
13                      MR. SANDERS:  You can go to the
14   first page Shawndrica, right there, up some, up, up,
15   up.  There we go.
16   BY MR. SANDERS, CONTINUING:
17   Q   The last paragraph on the first page says the
18       Department subsequently identified a number of
19       individuals who had indeed returned to work under the
20       realm of the 2014/2019 CBA between the parties, and
21       should have returned to work without any previous
22       department seniority, do you see that?
23   A   Yes.
24   Q   All right.  How many individuals were you referring
25       to?

                                                            31

**Page 32**

1    I didn't have a specific number.  I know there was a
2    few.  I don't have the exact number.
3    Q   Was it more than ten?
4    A   Again I don't remember.  I don't remember the
5    number.
6    Q   So you don't know if it was more than ten or less
7        than ten, correct?
8    A   Correct.
9    Q   Now is it that these individuals returned to work and
10       were able to maintain their seniority, how did that
11       happen?
12   A   Again, when they were returned, the contractual
13       information, I was in Labor Relations at the time,
14       but my understanding the contractual language was not
15       adhered to because they returned under the old
16       process, and --
17   Q   And why did --- I'm sorry, go ahead.
18   A   Which did not have any change of seniority
19       ramifications.
20   Q   And why were they returned under the old process?
21   A   I don't know, because I was not responsible for that.
22   Q   Who was responsible for it?
23   A   That would have been Ms. Crosson, Kemia Crosson.
24   Q   Now the next sentence says that the DFD Human
25       Resources Office made contact with the affected

                                                            32

**[Top-left panel — page 33]**

1  individuals and explained the situation; do you have

2  any personal knowledge as to who from Human Resources

3  made contact with the affected individuals?

4  A   Yes, Ms. Crosson.

5  Q   And do you know how Ms. Crosson made contact with the

6      affected individuals?

7  A   I do not, no.

8  Q   And then it says which resulted in a meeting being

9      scheduled between the Department, the Union and the

10     affected individuals.  What personal knowledge do you

11     have that the meeting was scheduled with the affected

12     individuals as it relates to this subject matter?

13 A   When I was investigating this grievance, I talked to

14     Ms. Crosson, and that's information I received from

15     her.

16 Q   So Ms. Crosson told you that a meeting had been

17     scheduled?

18 A   Yes.

19 Q   Did you see anything in writing relating to informing

20     the affected individuals that there was a meeting

21     scheduled?

22 A   You're talking about in connection with this

23     grievance?

24 Q   What I'm referring to is, this sentence says that a

25     meeting was scheduled between the Department, Union

                                                    33

**[Top-right panel — page 34]**

1      and affected individuals, do you see that?

2  A   Yes.

3  Q   Did you receive anything in writing notifying the

4      affected individuals that a meeting had been

5      scheduled?

6  A   No.

7  Q   So your reliance, you are relying upon what Ms.

8      Crosson told you in your drafting of that sentence,

9      is that accurate?

10 A   That's accurate.

11     MR. SANDERS:  Can you put Exhibit

12     Four on the screen, Shawndrica?

13 BY MR. SANDERS, CONTINUING:

14 Q   Can you read Exhibit Four to yourself, Mr. Jenkins

15     and when you are done, let me know.

16 A   Okay.  I am done.

17 Q   Are you familiar with this document?

18 A   I've seen it before, yes.

19 Q   Can you explain to me what it means when it says the

20     Department is in the process of implementing the

21     terms of Article 12H2 of the parties 2014/2019

22     Collective Bargaining Agreement, what does that mean?

23 A   I'm not sure.  I didn't draft this document.

24 Q   The second sentence says once completely implemented,

25     all nine designated classification promotions in the

                                                    34

**[Bottom-left panel — page 35]**

1      Fire Fighting Division shall be in accordance with

2      Article 12H2, however, the process will begin with

3      the promotions to Battalion Chief, do you see that?

4  A   Yes.

5  Q   Do you know what that means?

6              MR. LEGGHIO:  Objection as to

7      foundation.

8              THE WITNESS:  No, no I don't.

9  BY MR. SANDERS, CONTINUING:

10 Q   Now this letter was drafted on December of 2019, and

11     it's referring to a provision in the 2014 contract,

12     is that accurate?

13 A   Yes.

14             MR. LEGGHIO:  Objection assumes

15     foundation assumes a fact not in evidence.

16             MR. SANDERS:  You can answer.

17             THE WITNESS:  It appears to be.

18 BY MR. SANDERS, CONTINUING:

19 Q   To your knowledge, prior to December 17, 2019 had the

20     Department implemented the terms of Article 12H2 of

21     the 2014 contract?

22 A   I don't know.

23 Q   All right.

24             MR. SANDERS:  Shawndrica, can you

25     put Exhibit Five on the screen, please?

                                                    35

**[Bottom-right panel — page 36]**

1  BY MR. SANDERS, CONTINUING:

2  Q   This is the Complaint or the First Amended Complaint

3      that was filed as it relates to this matter.  Are you

4      familiar with that document?

5  A   I've seen it before.

6  Q   I want to refer you to page five, line twenty-seven.

7      Can you read line twenty-seven aloud please?

8  A   Prior to 2014 the Collective Bargaining Agreement,

9      CBA had between the City and DFFA allowed a Fire

10     Fighter that had retired as a result of a Duty

11     Disability to maintain his or her accumulated

12     seniority that they returned the employee of the City

13     of Detroit as a Fire Fighter.

14 Q   Are you aware of any facts that would contradict that

15     statement?

16 A   I'm not aware of any facts that would contradict

17     that, no.

18 Q   Can you read aloud, line number twenty-eight please?

19 A   The CBA allowed an employee that returned to work

20     after a Duty Disability Retirement to achieve and

21     assume the rank of his or her Class or -- on an

22     accelerated basis.

23 Q   Are you aware of any facts that would contradict the

24     allegations in line twenty-eight?

25             MR. LEGGHIO:  Objection as to

                                                    36

13-53846-tjt  Doc 13455-5  Filed 09/29/21  Entered 09/29/21 17:17:52  Page 11 of 23

**[Top-left panel]**

```
 1   foundation.
 2               THE WITNESS:  I can't -- I'm not
 3   sure.  I don't know what CBA you are talking about.
 4               MR. SANDERS:  Line twenty-eight.
 5               THE WITNESS:  Right.
 6   BY MR. SANDERS, CONTINUING:
 7   Q   I'm referring to the CBA prior to 2014 in line
 8       twenty-eight.
 9               MR. LEGGHIO:  Same objections.
10       Mr. Sanders, I just want to be clear.  Are you
11       referring to one Collective Bargaining Agreement
12       prior to 2014 or any other Collective Bargaining
13       Agreement?
14               MR. SANDERS:  I'm referring to
15       the one immediately prior to 2014.
16               MR. LEGGHIO:  Same objection as
17       to foundation.
18               THE WITNESS:  I would have to
19       review that CBA.
20   BY MR. SANDERS, continuing:
21   Q   So without reviewing it, you're not aware of any
22       facts that would contradict that statement?
23       Without reviewing it, you are not aware of any facts
24       that would contradict that statement?
25   A   Without reviewing it, no.
                                                         37
```

**[Top-right panel]**

```
 1   Q   I would like to refer you to line number thirty.
 2               MR. SANDERS:  Shawndrica, page
 3       six please, line thirty.
 4   BY MR. SANDERS, CONTINUING:
 5   Q   Can you read that line aloud, please?
 6   A   Prior to 2014, in reliance upon the longstanding
 7       disability retirement policy, a litany of Fire
 8       Fighters, including the Plaintiffs retired with a
 9       Duty Disability Injury, and sometime thereafter
10       returned to the employ of the City of Detroit as a
11       Fire Fighter.
12   Q   Are you aware of any facts that would contradict the
13       allegations in line thirty?
14               MR. LEGGHIO:  Objection as to
15       foundation and object to -- assumes facts not in
16       evidence.
17               MR. MCFARLANE:  Same objection.
18       There's nothing in this question that identifies any
19       -- it's a compound question.  You've lumped it all
20       into one question.
21               MR. LEGGHIO:  Let me just, Mr.
22       Sanders, let me just embellish this.  The question
23       suggests that Fire Fighters took a Duty Disability
24       Injury and then returned to the employ of the City,
25       based on their --
                                                         38
```

**[Bottom-left panel]**

```
 1               MR. SANDERS:  -- not testifying,
 2       I'm just asking him a question.  You can put your
 3       objection on the record.
 4               MR. LEGGHIO:  Okay.  My objection
 5       is, is that it assumes that people went on disability
 6       because of a promise of reinstatement --
 7               MR. SANDERS:  I know what the
 8       question says.  He read it.  I'm asking him question
 9       --
10               MR. LEGGHIO:  -- foundation, and
11       assumes facts not in evidence.
12               MR. SANDERS:  I got you.
13   BY MR. SANDERS, CONTINUING:
14   Q   Aare you aware of any facts that would contradict the
15       allegations in line thirty, yes or no?
16   A   I can't answer that.  I am not sure how employees
17       returned, if it was a Fire Fighter or higher rank,
18       I'm not sure, so I can't answer that.
19   Q   You would agree that employees returned to work under
20       the 2014 contract, and they were allowed to maintain
21       their seniority after being on a Duty Disability, is
22       that correct?
23               MR. LEGGHIO:  Objection as to
24       foundation.  It assumes facts not in evidence.
25               MR. MCFARLANE:  Same.
                                                         39
```

**[Bottom-right panel]**

```
 1               MR. SANDERS:  You can answer.
 2               THE WITNESS:  Well can you better
 3       clarify your question?
 4               MR. SANDERS:  Sure.
 5   BY MR. SANDERS, CONTINUING:
 6   Q   We can do this another way.
 7               MR. SANDERS:  Shawndrica can you
 8       put Exhibit One on the screen please?  Can you scroll
 9       to the grievance number 320, James Washington.  Keep
10       scrolling please.  Stop.
11   BY MR. SANDERS, CONTINUING:
12   Q   Can you read that grievance, please?
13               MR. SANDERS:  Can you make it
14       larger?
15               THE WITNESS:  Read the statement
16       agreements?
17               MR. SANDERS:  Yes.
18   BY MR. SANDERS, CONTINUING:
19   A   The Master Agreement states that any grievance not
20       filed within ten days of the occurrence of the
21       alleged violation or within ten days of the employee
22       or association fee coming aware of alleged violation
23       will be considered untimely and will not be heard,
24       Grievance 12-19 improper seniority placement was
25       filed in an untimely manner.
                                                         40
```

Column 1 (top-left):

```
 1            I was returned into the system on
 2   September 26, 2015 with Department number 574.
 3 Q All right.  Are you aware that Mr. Washington went
 4   out on a disability retirement prior to 2014, is that
 5   correct?
 6 A I'm not aware of when he went out, no.
 7 Q You are not aware of when he went out?  So you have
 8   no facts in which to dispute that, correct?
 9 A Correct.
10 Q You are aware that he returned into the seniority
11   system on September 26, 2016, correct?
12 A I am not aware of the exact date, no.  I don't have
13   that in front of me.
14 Q You are not aware of any facts that would dispute
15   that, correct?
16 A Correct.
17 Q And if Mr. Washington maintains that when he
18   returned, he was eventually denied his seniority, do
19   you have any facts in which to dispute that?
20 A I do not.
21 Q And you agree that there were some employees who
22   returned to their employment after being on a Duty
23   Disability who were allowed to maintain the
24   accumulated seniority that they had, correct?
25            MR. LEGGHIO:  Objection.  What's
                                                    41
```

Column 2 (top-right):

```
 1   the time frame?  Are you saying at any time or are
 2   you restricting it to the period of 2014 forward?
 3            MR. SANDERS:  I'm saying that
 4   there were employees who left off on a Duty
 5   Disability prior to 2014 and returned after 2014 who
 6   were allowed to maintain their accumulated
 7   disability, correct?
 8            THE WITNESS:  Accumulated
 9   disability?
10 BY MR. SANDERS, CONTINUING:
11 Q Or accumulated seniority, excuse me.
12            MR. LEGGHIO:  I'm going to object
13   as to foundation and I'm going to object also to the
14   form of the question.
15            MR. SANDERS:  You can answer.
16            THE WITNESS:  I'm not sure.
17 BY MR. SANDERS, CONTINUING:
18 Q You're not sure?
19 A I don't know.
20 Q Let's go back to grievance 12-19.  Can you read that,
21   please?
22 A DFFA grieves the City of Detroit's application of
23   Article 1267, several members were returned to active
24   service and placed within the seniority system, not
25   in compliance with Section 12 and or other applicable
                                                    42
```

Column 3 (bottom-left):

```
 1   portions of the Collective Bargaining Agreement.
 2 Q So what do you understand the basis of that grievance
 3   to be?
 4 A The Members returned to work and they not have their
 5   seniority reset.
 6 Q Okay.  And some of them returned to work, didn't have
 7   their seniority reset and worked for many months,
 8   correct?
 9 A Some, yes.
10 Q Some worked for many years, correct?
11 A I'm not sure about that.
12 Q And then those individuals, some had their seniority
13   reset, correct?
14 A Yes, correct.
15 Q After working in a position for many months and their
16   seniority not being reset, correct?
17 A Correct.
18 Q All right.  And some of those individuals who
19   returned were allowed to not only maintain their
20   seniority but advance to the rank of their entry
21   class correct?
22 A I'm not -- I don't know.
23 Q You don't know if some of those people with who I
24   reference in grievance 12-19 assumed higher ranking
25   positions after they returned?
                                                    43
```

Column 4 (bottom-right):

```
 1 A I don't know, no.
 2 Q And you're the person most knowledgeable as it
 3   relates to grievance 12-19, correct?
 4 A Correct.
 5            MR. SANDERS:  Can we go back to
 6   the Complaint please Shawndrica, which is Exhibit
 7   Five, a separate document to itself.
 8 BY MR. SANDERS, CONTINUING:
 9 Q Now that I've refreshed your recollection with
10   Exhibit 12-19, I am going to ask you to read line
11   thirty again.
12 A Prior to 2014, in reliance upon the longstanding
13   disability retirement policy, a litany of Fire
14   Fighters, including the Plaintiffs, retired with a
15   Duty Disability injury and sometime thereafter
16   returned to the employ of the City of Detroit as a
17   Fire Fighter.
18 Q Are you aware of any facts that would contradict that
19   statement?
20            MR. LEGGHIO:  Objection as to
21   foundation and form.  It asks him to testify about
22   what the intensions were of those who retired.
23            MR. MCFARLANE:  Same objection.
24   It assumes facts not in evidence, including the
25   policy, the names of these Fire Fighters and
                                                    44
```

13-53846-tjt   Doc 13455-5   Filed 09/29/21   Entered 09/29/21 17:17:52   Page 12 of 23

**[Page 45]**

```
 1        everything else --
 2                    MR. SANDERS:  Noted.
 3   BY MR. SANDERS, CONTINUING:
 4   Q    Are you aware of any facts that would contradict that
 5        statement?
 6   A    I don't know.
 7   Q    Line thirty-one, can you read that please?
 8   A    Those individuals were allowed to return as Fire
 9        Fighters, maintain their seniority and advance to
10        rank of their entry class.
11   Q    Are you aware of any facts that would contradict that
12        statement.
13   A    I do not know.
14                    MR. MCFARLANE:  Objection.
15        Assumes facts -- the same objection as to the
16        previous question.
17   BY MR. SANDERS, CONTINUING:
18   Q    Can you read line thirty-two, thirty-three and
19        thirty-four of the Complaint to yourself?
20   A    Okay.
21   Q    Are you aware of any facts that would contradict the
22        allegations in line thirty-two through thirty-four?
23                    MR. MCFARLANE:  Objection as it's
24        compound and again assumes facts not in evidence.
25                    MR. LEGGHIO:  Same objection.
```
45

**[Page 46]**

```
 1   BY MR. SANDERS, CONTINUING:
 2                    MR. SANDERS:  You can answer.
 3                    THE WITNESS:  Can you repeat your
 4        question?
 5   BY MR. SANDERS, CONTINUING:
 6   Q    Are you aware of any facts that would contradict the
 7        allegations in lines thirty-two through thirty-four?
 8   A    No, I am not aware.
 9   Q    I'd like to refer you to line number thirty-five of
10        the Complaint.
11                    MR. SANDERS:  Next page please,
12        Shawndrica.
13   BY MR. SANDERS, CONTINUING:
14   Q    Can you read line thirty-five aloud please?
15   A    However, after implementation of the new CBA
16        provision in 2014, no Duty Disability Retired Fire
17        Fighter was ever notified by the City or the Union
18        that they would lose all of their seniority if they
19        returned to work for the City.
20                    MR. LEGGHIO:  Objection as to
21        foundation.  Assumes facts not in evidence.
22   BY MR. SANDERS, CONTINUING:
23   Q    Are you aware of any facts that would contradict the
24        allegations in line thirty-five?
25                    MR. MCFARLANE:  Objection to
```
46

**[Page 47]**

```
 1        foundation and assumers facts not in evidence.
 2                    MR. SANDERS:  You can answer.
 3                    THE WITNESS:  I don't know.
 4   BY MR. SANDERS, CONTINUING:
 5   Q    Can you read line thirty-six aloud please?
 6   A    To the contrary, after negotiation of the 2014 to
 7        2019 CBA, the City continued to return many Fire
 8        Fighters to duty with their previous seniority intact
 9        without objection from the Union, and officers were
10        allowed to assume the rank that their original class
11        had achieved.
12   Q    Are you aware of any facts that would contradict the
13        allegations in line thirty-six?
14                    MR. LEGGHIO:  Objection, assumes
15        facts not in evidence.
16                    MR. MCFARLANE:  Same objection.
17                    THE WITNESS:  I don't know.
18   BY MR. SANDERS, CONTINUING:
19   Q    Line thirty-seven, can you read that aloud please?
20   A    The Defendants had [inaudible] to selectively enforce
21        the new provision of the 2014 to 2019 CBA.
22   Q    Are you aware of facts that contradict that
23        statement?
24                    MR. LEGGHIO:  Objection as
25        to foundation and form.
```
47

**[Page 48]**

```
 1                    MR. MCFARLANE:  Same
 2        objection.
 3                    MR. LEGGHIO:  Assumes facts not
 4        in evidence.
 5                    MR. SANDERS:  You can answer.
 6                    THE WITNESS:  I have no knowledge
 7        of that, no.
 8   BY MR. SANDERS, CONTINUING:
 9   Q    My question is, do you have any facts or are you
10        aware of any facts that would contradict that
11        statement?
12   A    I do not, no.
13   Q    Can you read line thirty-eight aloud, please?
14   A    In fact, after 2014, the City and the Union agreed to
15        allow some Fire Fighters to return from Duty
16        Disability to Retirement, maintain their previous
17        seniority, be promoted in accordance with their class
18        ranking and retire after receiving a promotion with a
19        pension based upon the ranking that they had achieved
20        with their original class.
21   Q    Are you aware of any facts that would contradict that
22        statement?
23                    MR. LEGGHIO:  Objection as to
24        foundation and form; assumes facts not in evidence.
25                    MR. MCFARLANE:  Same objection.
```
48

Highlighted portions are marked in the original.

**[Top Left]**

```
 1              THE WITNESS:  I do not, no.
 2  BY MR. SANDERS, CONTINUING:
 3  Q    Line thirty-nine, can you read that aloud please?
 4  A    Thereafter and continuation of the conspiracy to
 5       selectively enforce the new provision of the 2014
 6       CBA, in May 2019 the Union filed a grievance
 7       maintaining that the City had violated the CBA by
 8       returning Fire Fighters to duty with their seniority
 9       after a disability retirement.
10       Are you aware of any facts that would contradict that
11       allegation?
12              MR. LEGGHIO:  Objection as to
13       foundation, form and assumes facts not in evidence.
14              MR. MCFAR:  Same objection.
15              THE WITNESS:  I do no know.
16  BY MR. SANDERS, CONTINUING:
17  Q    Read line forty, please.
18  A    Can you scroll up a little?
19              MR. SANDERS:  Can you scroll up
20       please, Shawndrica?
21              THE WITNESS:  The grievance was
22       filed in violation of the CBA years after the Union
23       first became aware that Fire Fighters were returning
24       from a Duty Disability and being allowed to maintain
25       their previous seniority.
                                                          49
```

**[Top Right]**

```
 1  BY MR. SANDERS, CONTINUING:
 2  Q    Are you aware of any facts that would contradict that
 3       statement?
 4              MR. LEGGHIO:  Objection as to
 5       form, foundation and assumes facts not in evidence.
 6              MR. MAC:  Same objection.
 7              THE WITNESS:  I do not know.
 8  BY MR. SANDERS, CONTINUING:
 9  Q    When a Fire Fighter returns from Duty Disability, how
10       -- is that return communicated by the City to the
11       Detroit Fire Fighter's Association?
12              MR. LEGGHIO:  same objection.
13              THE WITNESS:  I do not know.
14  BY MR. SANDERS, CONTINUING:
15  Q    Well let me ask you a different way.  You do not know
16       as it relates to now or you do not know as it relates
17       to what went on in 2014 and 2015?
18              MR. LEGGHIO:  Same objection.
19              THE WITNESS:  I do not know as it
20       relates to prior to me coming on board.
21  BY MR. SANDERS, CONTINUING:
22  Q    Since you came on board, what is the procedure?
23  A    I'm not sure of the procedure.  I don't know the
24       procedure.
25  Q    So you don't know whether or not the City of Detroit
                                                          50
```

**[Bottom Left]**

```
 1       communicates to DFFA upon the return of a Fire
 2       Fighter from Duty Disability, would that be accurate?
 3  A    I know that they do now.
 4  Q    And when you say now, do you know when that became
 5       affective?
 6  A    I do not know the exact date, no.
 7  Q    How is that communication made?
 8  A    By MR.
 9       When I say how, I mean is there a letter sent to
10       them, an email, or do you know
11  A    I do not know.
12  Q    I would like you to read line forty-one, can you read
13       that aloud please?
14  A    In accordance with the 2014 to 2019 CBA, any
15       grievance not filed within the ten calendar days of
16       the occurrence of the alleged violation or within ten
17       calendar days of an employee or the Association
18       becoming aware of an alleged violation will be
19       considered untimely and will not be processed.
20  Q    Are you aware of any facts that would contradict the
21       allegations in line forty-one?
22              MR. LEGGHIO:  Objection document
23       speaks for itself.
24              MR. MCFARLANE:  Same objection.
25              THE WITNESS:  I'm not aware.
                                                          51
```

**[Bottom Right]**

```
 1  BY MR. SANDERS, CONTINUING:
 2  Q    As it relates to grievance 12-19, are you aware of
 3       the DFFA asking for an extension in which to file the
 4       grievance?
 5              MR. LEGGHIO:  Objection as to
 6       foundation.
 7              MR. SANDERS:  You can answer.
 8              THE WITNESS:  I don't know.
 9  BY MR. SANDERS, CONTINUING:
10  Q    Are you aware of the City of Detroit granting the
11       DFFA an extension which to file the grievance?
12  A    I don't know.
13  Q    Can you read line forty-two, please?
14  A    Can you scroll up some?
15              MR. SANDERS:  Can you scroll up
16       please, Shawndrica?
17              THE WITNESS:  However, in
18       furtherance of their conspiracy, the Defendants
19       conspired to ignore the CBA Statute of Limitations,
20       and the grievance was recognized and acknowledged by
21       the City.
22  BY MR. SANDERS, CONTINUING:
23  Q    Are you aware of any facts that would contradict the
24       allegations in line forty-two?
25              MR. LEGGHIO:  Objection form and
                                                          52
```

## Page 53

1 foundation, and assumes facts not in evidence.
2     MR. MCFAR: Same objection.
3     THE WITNESS: I do not know.
4 BY MR. SANDERS, CONTINUING:
5 Q  I'd like you to read line forty-three aloud please.
6 A  Thereafter, without cause, the Defendants agreed to
7 take disciplinary action against the Plaintiffs.
8 Q  Are you aware that the Plaintiffs in this cause of
9 action loss seniority?
10 A  I'm aware that the seniority was adjusted.
11 Q  Okay. You're aware that it was adjusted. And when
12 you say adjusted, would you agree with me that many
13 of them had received their seniority -- had received
14 seniority and worked in a capacity with higher
15 seniority for several months and potentially years,
16 and then it was adjusted to a lower seniority; is
17 that accurate?
18 A  I can't say that sir. I don't know how long they
19 worked in the higher position.
20 Q  When you say their seniority was adjusted, what do
21 what do you mean by that?
22 A  It was adjusted to the date they returned form Duty
23 Disability.
24 And it had previously been the seniority that they
25 had accumulated during their entire stint of service

## Page 54

1 as a Detroit Fire Fighter, would that be accurate?
2     MR. MCFARLANE: Objection as it
3 assumes facts not in evidence.
4     THE WITNESS: I can't say what
5 their seniority was. It was a different seniority
6 date, but I can't say it was through their entire --
7 BY MR. SANDERS, CONTINUING:
8 Q  It was a higher seniority, would that be accurate?
9 A  It was a higher seniority, correct.
10 Q  Now some of the Plaintiff's after their seniority was
11 adjusted were placed in a lower rank, would that be
12 accurate or do you know?
13 A  I don't know. I don't know.
14 Q  That didn't go into your -- you didn't consider that
15 when you decided to resolve the grievance, whether or
16 not some of the Plaintiffs would be placed in a lower
17 rank?
18 A  Which grievance?
19 Q  12-19.
20 A  You said when I decided to resolve the grievance?
21 Q  Or when the City of Detroit decided to resolve the
22 grievance, they didn't take into consideration that
23 some of the Plaintiffs in this case and others might
24 be in a lower rank, is that accurate?
25 A  If adjusting their seniority caused them to go to a

## Page 55

1 lower rank, yes that was taken into consideration.
2 Q  The Plaintiffs maintain that when their seniority was
3 adjusted, that was disciplinary action; do you agree
4 with that or disagree?
5 A  Disagree.
6 Q  And why do you disagree?
7 A  Disciplinary action comes about when you break a rule
8 or regulation or policy with the Department.
9 Q  They had not broken any rule or regulation or policy
10 with the Department, would that be accurate?
11 A  That's accurate.
12 Q  Okay. I want to refer you to line forty-six.
13 A  Okay.
14 Q  Can you read that aloud please?
15 A  The Plaintiffs were not afforded any type of Hearing
16 prior to the disciplinary actions taken against them.
17 Q  Now I know you stated you disagree that they were
18 disciplined; my question to you is, prior to the
19 Plaintiffs having their seniority quote unquote,
20 adjusted as you have described it, were they afforded
21 any type of Hearing?
22     MR. MCFARLANE: I'm going to
23 object. That's a mischaracterization of his
24 testimony.
25     MR. LEGGHIO: Same objection. I

## Page 56

1 join with that objection, and also object as to
2 foundation and form and assumes facts not in
3 evidence.
4     THE WITNESS: I don't know.
5 BY MR. SANDERS, CONITNUING:
6 Q  Were You ever involved in the planning or the
7 scheduling of any type of Hearing?
8 A  Hearing for what?
9 Q  A Hearing for the Plaintiffs as it relates to taking
10 away their seniority?
11 A  For a grievance Hearing, yes.
12 Q  Explain to me what you mean,
13 A  For Step II we have a grievance meeting.
14 Q  So you are saying --
15     MR. LEGGHIO: Let me object for a
16 moment. Are you asking him in the abstract, Mr.
17 Sanders, or are you talking about specifically these
18 Plaintiffs?
19 BY MR. SANDERS, CONITNUING:
20 Q  My question is, are you maintaining there was a Step
21 II Grievance Hearing in which the Plaintiffs in this
22 cause of action appeared?
23     MR. LEGGHIO: I think he was
24 talking about it in the abstract.
25     THE WITNESS: I would just say--

## Page 57

```
 1                 MR. SANDERS:  I'm sorry, go
 2     ahead.
 3                 THE WITNESS:  The City had, we
 4     have grievance meetings at the Step Two, is that what
 5     you are referring to as a Hearing?  I'm trying to get
 6     what you are referring to.
 7   BY MR. SANDERS, CONTINUING:
 8   Q     My question to you is, as part of Exhibit One you saw
 9     where several of the Plaintiffs had filed grievances,
10     correct?
11   A     Yes.
12   Q     Was there ever a step II Hearing in which they
13     appeared concerning those grievances?
14   A     No.
15   Q     Was there any other kind of Hearing where the
16     Plaintiffs appeared, and they had an opportunity to
17     be heard as it relates to losing their seniority?
18   A     I do not know.
19   Q     Can you read line forty-seven aloud, please?
20   A     The Defendants goal was to strip the Plaintiffs of
21     their seniority and take away any promotion which was
22     a result of the systematic seniority promotion.
23   Q     Are you aware of any facts that would contradict that
24     allegation?
25                 MR. LEGGHIO:  Objection as to the
                                                        57
```

## Page 58

```
 1     form, foundation and assumes facts not in evidence.
 2                 MR. MCFARLANE:  Same objection.
 3                 MR. SANDERS:  You can answer.
 4                 THE WITNESS:  I do not know.
 5                 MR. SANDERS:  Can you, Shawndrica
 6     turn to page nine please, line fifty-one.
 7   BY MR. SANDERS, CONTINUING:
 8   Q     I would like you to read line fifty-one aloud please.
 9   A     Defendants intentionally deprived the Plaintiffs of
10     the opportunity to collect a larger pension.
11   Q     Are you aware of any facts that would contradict the
12     allegations in line fifty-one?
13                 MR. LEGGHIO:  Same objections,
14     form, foundation and assumes facts not in evidence.
15                 MR. MCFARLANE:  Same objection
16                 THE WITNESS:  I do not know.
17   BY MR. SANDERS, CONTINUING:
18   Q     Line fifty-four, can you read that aloud please?
19   A     In accordance with the CBA discipline and demotions
20     shall only occur when there is just cause.
21   Q     Are you aware of any facts that would contradict that
22     allegation?
23                 MR. LEGGHIO:  Objection as to form
24     and foundation, assumes facts not in evidence.
25                 MR. MCFARLANE:  Same objection.
                                                        58
```

## Page 59

```
 1                 THE WITNESS:  I do not know.
 2   BY MR. SANDERS, CONTINUING:
 3   Q     Now I would like to refer you to page ten of the
 4     Complaint, line sixty-eight.
 5   A     Can we take a break after this question or --
 6   Q     Absolutely we can.  Can you read line sixty-eight
 7     aloud please?
 8   A     Thereafter he was promoted through testing as opposed
 9     to the seniority system to the rank of Lieutenant
10     from July 30, 2018 I was earning approximately
11     seventy-one thousand dollars a year.
12   Q     Now this is an allegation made by Plaintiff Norman
13     Brown.  Are you aware whether or not there is a
14     difference between being promoted through testing as
15     opposed to the seniority system?
16   A     What do you mean?  Can you explain that a little
17     more?
18                 MR. LEGGHIO:  Objection as to
19     form.
20                 MR. SANDERS:  Sure.
21                 MR. LEGGHIO:  And assumes facts
22     not in evidence.
23   BY MR. SANDERS, CONTINUING:
24   Q     Do you know whether or not Fire Fighters can be
25     promoted for some positions by taking a test?
                                                        59
```

## Page 60

```
 1   A     Some positions require a test, yes.
 2   Q     Do you know whether or not there are some positions
 3     that Fire Fighters are promoted based upon their
 4     seniority?
 5   A     Yes.
 6   Q     Okay.  Do you have any familiarity with the
 7     difference between the two and what positions require
 8     taking of a test?
 9   A     No, not all of the positions.  No, I know positions
10     within the Divisions require an exam.  I can't tell
11     you all of which ones.
12   Q     So if Mr. Brown was promoted by the taking of an
13     exam, should he have been demoted as a result
14     grievance 12-19?
15                 MR. MCFARLAND:  Objections, it
16     assumes facts not in evidence.
17                 MR. LEGGHIO:  Same objection, and
18     foundation and object to the form of the question.
19                 MR. SANDERS:  You can answer.
20                 THE WITNESS:  I don't know.
21   BY MR. SANDERS, CONTINUING:
22   Q     And you are the person most knowledgeable as it
23     relates to grievance 12-19 and the resolution
24     thereof, correct?
25   A     Correct.
                                                        60
```

## Page 61

1  Q   All right sir. I know you want to take a break. I
2      can probably use one too. You guys want to say ten
3      minutes.
4              MR. LEGGHIO: Do you have a
5      plan to break for lunch at a certain time, Mr.
6      Sanders?
7              MR. SANDERS: I anticipate
8      when I am done with this witness, we can then break
9      for lunch. I don't have a lot more for this witness,
10     okay?
11             MR. LEGGHIO: Sounds fair.
12             MR. SANDERS: Unless someone
13     just wants to break for lunch now, we can do it. We
14     will do ten minutes and come back.
15             MR. LEGGHIO: Okay.
16             (Whereupon a brief recess
17     was taken at or about 11:47 a.m.)
18 BY MR. SANDERS, CONTINUING:
19 Q   Mr. Jenkins, earlier we discussed, and you testified
20     about the grievance file, and you indicated that, I
21     believe you indicated that the file as it relates to
22     grievance 12-19 would be maintained in Labor
23     Relations and Valerie Colbert would be the person in
24     charge of that right now. I'm paraphrasing your
25     testimony, but would that be accurate?

                                                    61

## Page 62

1  A   Yes.
2  Q   Okay. Now my question is, does the Detroit Fire
3      Department maintain a separate grievance file?
4  A   Yes.
5  Q   Okay. And who would be over that file?
6  A   Me.
7  Q   And do you know whether you have the same documents
8      in your file that Valerie has in her file?
9  A   For this particular case?
10 Q   Yes.
11 A   I'm pretty sure they are the same because I basically
12     handled the grievance in both positions.
13 Q   Is it the norm that Fire Department would maintain
14     its own grievance file and Labor Relations would have
15     its own grievance file? Would that be the norm as it
16     relates to Fire Fighter grievances?
17 A   That's the norm, yes.
18             MR. SANDERS: Now if we can,
19     Shawndrica, can you put Exhibit One back on the
20     screen. And I would like you to go to the 12-19
21     grievance.
22 BY MR. SANDERS, CONTINUING:
23 Q   Now the 12-19 grievance was filed in May of 2019 is
24     that accurate?
25 A   Yes.

                                                    62

## Page 63

1  Q   All right.
2              MR. SANDERS: Shawndrica, can you
3      go again to Exhibit Two? Second page, please.
4  BY MR. SANDERS, CONTINUING:
5  Q   Now previously you testified that this was
6      confirmation of the grievance, is that correct?
7              MR. LEGGHIO: Objection,
8      mischaracterizes the testimony, and foundation.
9              MR. MCFARLANE: Same objection.
10             MR. SANDERS: You can answer.
11             THE WITNESS: No.
12 BY MR. SANDERS, CONTINUING:
13 Q   Well, this correspondence is confirmation as to how
14     the issues delineated in the grievance would be
15     resolved, is it not?
16             MR. LEGGHIO: Objection as to
17     foundation, mischaracterizes the testimony and
18     argumentative. The document speaks for itself.
19             MR. SANDERS: You can answer.
20             THE WITNESS: Can you scroll up
21     some more. Can you repeat the question?
22 BY MR. SANDERS, CONTINUING:
23 Q   Can you read paragraph two of this letter aloud?
24 A   To clarify, we understand that the City will
25     retroactively adjust the seniority of the employees

                                                    63

## Page 64

1      who returned to work after being on retirement for
2      Duty Disability for more than two yes. We understand
3      that the City will now count these employees'
4      seniority from their reinstatement dates.
5              Further, we understand for the
6      upcoming reinstatement of several employees from Duty
7      Disability who have been in retirement for more than
8      two years that the City will count these employees
9      seniority from their reinstatement dates.
10 Q   Was that how grievance 12-19 was resolved?
11             MR. LEGGHIO: Objection,
12     foundation and as to form.
13             MR. SANDERS: Let the record
14     reflect a long pause on behalf of the witness.
15             THE WITNESS: I'm reading. I'm
16     reading.
17             MR. LEGGHIO: Let the record
18     reflect that that has no significance to the answer.
19             MR. MCFARLANE: And let the
20     record reflect that he's reading the paragraph you
21     just asked him to read regarding the question.
22             THE WITNESS: The answer is the
23     way we treated everyone that retired was that upon
24     return that their seniority was reset.
25 BY MR. SANDERS, CONTINUING:

                                                    64

1 Q My question is the paragraph that you read aloud, is

2 that a summary as to how grievance 12-19 was

3 resolved?

4 MR. LEGGHIO: Same objection --

5 MR. MCFARLANE: Objection, asked

6 and answered.

7 MR. LEGGHIO: -- foundation,

8 form, assumes facts not in evidence.

9 THE WITNESS: No, that's not my

10 understanding of it, no.

11 BY MR. SANDERS, CONTINUING:

12 Q Okay. What is the difference in the resolution from

13 this paragraph?

14 A This talks about someone returning for two years or

15 with a two year -- that's been out for more than two

16 years. My training of the resolution is that

17 everyone who has returned has had their seniority

18 reset.

19 Q Everyone who returned had their seniority reset?

20 A Yes.

21 Q And had everyone been off for more than two years?

22 A I'm not sure. I would have to look at it.

23 Q Let's assume that everyone was off for two years; the

24 resolution of the grievance is consistent with what's

25 in this letter, is it not?

65

---

1 MR. LEGGHIO: Objection as to

2 foundation and form. Argumentative.

3 MR. MCFARLANE: Objection.

4 He's already testified, and it is further

5 speculative. You are asking him to speculate on

6 something that assumes facts not in evidence.

7 THE WITNESS: Yes, I can't

8 speculate on --

9 BY MR. SANDERS, CONTINUING:

10 Q I am not asking you to speculate. My question is --

11 well let me ask a different question. Is there

12 anything other than Exhibit Two that delineates how

13 the grievance was resolved?

14 MR. LEGGHIO: Objection as to

15 foundation.

16 THE WITNESS: I don't know.

17 BY MR. SANDERS, CONTINUING:

18 Q And you're the person most knowledgeable as to the

19 grievance and how it was resolved, correct?

20 MR. LEGGHIO: Objection, that

21 mischaracterizes what his testimony is.

22 BY MR. SANDERS, CONTINUING:

23 Q Correct?

24 MR. MCFARLANE: Same objection.

25 THE WITNESS: Correct.

66

---

1 BY MR. SANDERS, CONTINUING:

2 Q So there was a resolution of the grievance in

3 February of 2019 before it was ever filed in May of

4 2019, correct?

5 MR. LEGGHIO: Objection, assumes

6 facts not in evidence.

7 BY MR. SANDERS, CONTINUING:

8 Q Is that accurate?

9 A I have no knowledge of a resolution before the

10 grievance was filed.

11 Q You have knowledge of Exhibit Two, the letter dated

12 February 27, 2019, correct?

13 A Correct,

14 Q And you have no knowledge of any other written

15 documents that would delineate the resolution of the

16 grievance, correct?

17 MR. LEGGHIO: Same objection.

18 MR. SANDERS: You can answer.

19 THE WITNESS: Correct.

20 BY MR. SANDERS, CONTINUING:

21 Q I may only have a few questions. Give me a second

22 here. You would agree with me that grievance 12-19

23 addresses Duty Disability and what should happen

24 under the Collected Bargaining Agreement, correct?

25 MR. LEGGHIO: Objection, the

67

---

1 document speaks for themselves.

2 MR. SANDERS: You can answer.

3 MR. MCFARLANE: Foundation.

4 MR. SANDERS: What was your

5 answer, sir?

6 THE WITNESS: Yes.

7 BY MR. SANDERS, CONTINUING:

8 Q And the letter that you are looking at now, February

9 27, also addresses Duty Disability and what should

10 happen upon returning under the Collected Bargaining

11 Agreement, correct?

12 MR. LEGGHIO: Same objection.

13 THE WITNESS: That's what it

14 discusses, yes.

15 MR. SANDERS: Give me one second,

16 please. I don't think I have any further questions.

17 MR. LEGGHIO: Jason, do you mind

18 if I go first?

19 MR. MCFARLANE: No, that's fine.

20 But for the record, I just want to -- there was an

21 information request earlier regarding Step I and Step

22 II response to a grievance. At the very least I know

23 it's been produced by the DFFA based on 000356, is

24 where it begins. I'm not sure where the City's

25 production on it at this time, but it already has

68

**[Page 69 - top left]**

1  been produced.

2  MR. LEGGHI: What's the number,

3  5?

4  MR. MCFARLANE: 000356 is where it

5  begins in the DFFA's production of documents.

6  MR. SANDERS: All right. Before

7  we conclude, I'd like to pull that up and take a look

8  at it, but go ahead. Go ahead, Chris.

9  CROSS-EXAMINATION

10  BY M.R LEGGHIO:

11  Q  Mr. Jenkins, good afternoon. I have some questions.

12  Mr. Jenkins, you understand you are a Defendant in

13  this Lawsuit that's been filed by Plaintiffs?

14  A  Yes.

15  Q  And I am not going to go through your Curriculum

16  Vitae, Mr. Sanders has done that this morning. Is it

17  fair enough to say that you worked in Labor

18  Relations, you now work as Second Deputy Fire

19  Commissioner, correct?

20  A  Correct.

21  Q  I want to ask you some general questions, and then

22  I'm going to direct you to some specific provisions

23  of the Complaint, some of which were referred to by

24  Mr. Sanders. First of all do you have -- did you

25  ever conspire with anybody from the Union to deprive

69

**[Page 70 - top right]**

1  the Plaintiffs in this case of their appropriate

2  seniority?

3  A  No, I never did.

4  Q  Were you ever present when you witnessed somebody

5  conspiring or hatching a plot to deprive the

6  Plaintiffs in this case of their appropriate

7  seniority?

8  A  No.

9  Q  And when I say appropriate seniority I mean seniority

10  that's appropriate under the Collective Bargaining

11  Agreement that applies. You were never present for

12  such a thing?

13  A  Correct, I was not.

14  Q  Have you ever conspired with any of the Union

15  Officers in this case or anyone else to discriminate

16  against the Plaintiffs in this case based on an

17  alleged disability?

18  A  I have not.

19  Q  Have you ever been present when anybody was hatching

20  a plot to discriminate the Plaintiffs in this case,

21  based on their alleged disability?

22  A  I have not.

23  Q  Did you ever conspire with anybody, any other

24  Defendants in this case or anyone else to

25  discriminate against the Plaintiffs in this case with

70

**[Page 71 - bottom left]**

1  regard to their seniority, appropriate, based on

2  their age?

3  A  No, I have not.

4  Q  Were you ever present when you witnessed somebody

5  else, any other Defendant in this case hatching to

6  plot, to discriminate against the Plaintiffs in this

7  case with regard to their seniority, based on their

8  age?

9  A  No, I have not.

10  Q  You were asked some questions, and I want to make

11  sure you understand my concern about the question.

12  The questions were asked, do you have any facts to

13  contradict the allegations, and I want to reformulate

14  those questions, because for the record, those

15  questions are questions that ask you to prove a

16  negative, and I am asking you to give me assertive

17  facts. Let's start with paragraph thirty of the

18  Complaint, and I am going to, do you have access to

19  that?

20  A  I do not.

21  MR. MCFARLANE: If somebody can

22  give me screen share, I can share it.

23  BY MR. LEGGHIO, CONTINUING:

24  Q  Mr. Jenkins, in your experience with the City, in the

25  Departments that you've served in, isn't it true that

71

**[Page 72 - bottom right]**

1  a person takes a Duty Disability Retirement because

2  they are Duty Disabled, and unable to perform their

3  work, isn't that true?

4  A  That is true.

5  Q  In your experience, it isn't an option to take a Duty

6  Disability injury based on your reliance of policy;

7  isn't it in fact true that one is either Duty

8  Disabled and cannot perform the functions or you can

9  actually continue working; isn't that true?

10  MR. SANDERS: I will just make a

11  continuing objection to the leading nature of the

12  inquiries. You can answer.

13  THE WITNESS: That is true.

14  BY MR. LEGGHIO, CONTINUING:

15  Q  Just to shorten it up, in your experience, people

16  take Duty Disability Retirements because they cannot

17  perform the job and they are Duty Disabled, isn't

18  that so?

19  A  That's correct.

20  Q  If you can turn to paragraph thirty-seven of the

21  Complaint, and read that to yourself.

22  A  Okay.

23  Q  Did you ever conspire with the Union or any Union

24  Official to selectively enforce the provisions of the

25  2014, 2019 CBA?

72

**[Page 73]**

```
 1  A   No, I never did.
 2  Q   Were you ever present when anyone else, any other
 3      Defendant in this case conspired to selectively
 4      enforce the provision, the new provision of the CBA
 5      2019 that is the provisions that address the
 6      seniority and the return from Duty Disability?
 7  A   No, I was never present for such.
 8  Q   Do you have any facts to suggest there was any such
 9      conspiracy?
10  A   No, I never heard of a conspiracy, no facts.
11  Q   If you would look down to paragraph thirty-nine,
12      actually thirty-eight.
13  A   Okay.
14  Q   And read that to yourself.
15  A   Okay.
16  Q   Now in your experience with the City do you have any
17      facts to support the allegation that the City and the
18      Union conspired or agreed to allow some Fire Fighters
19      to come back from Duty Disability Retirement post
20      2014, maintain their seniority, be promoted and then
21      retire after receiving their promotions, being
22      treated differently than the Plaintiffs in this case?
23      Do you have any facts to support such an agreement or
24      conspiracy?
25  A   I do not.
                                                      73
```

**[Page 74]**

```
 1  Q   Did you ever do such a thing?  Were you ever a party
 2      to such an agreement or conspiracy?
 3  A   No, I was not.  Never heard of it.
 4  Q   Paragraph thirty-nine, can you read that to yourself?
 5  A   Okay.
 6  Q   First of all, I want to make clear, it's true, is it,
 7      the Union never consulted with you before it filed
 8      any grievances related to this seniority issue, did
 9      it?
10              MR. SANDERS:  Objection, form,
11      foundation, mischaracterization of the record.
12  BY MR. LEGGHIO, CONTINUING:
13  Q   Did the Union ever consult with you before it filed
14      any grievances related to this saga?
15  A   They did not, no.
16  Q   In your experience with the City, let's take it out
17      of this situation.  In anything, has the Union ever
18      consulted with you about whether they would agree or
19      not agree?  I mean, is that your experience?
20  A   No, no Unions have ever talked to me prior to filing
21      a grievance.
22  Q   They don't consult with you about whether they are
23      going to grieve or not?
24  A   Correct, they do not.
25  Q   In this paragraph it indicates that in continuation
                                                      74
```

**[Page 75]**

```
 1      of a conspiracy to selectively enforce the new
 2      provisions of the CBA, and I'm going to insert in
 3      there, provisions related to seniority, did you ever
 4      -- do you have any facts to support that claim that
 5      the Union filed the grievance in May of 2019 because
 6      it was conspiring to select (inaudible) new seniority
 7      provisions of the 2014 CBA?
 8  A   No, I do not.
 9  Q   Did you participate in any conspiracy either with the
10      City and the Union or within the City itself to
11      selectively enforce the new provisions of the
12      Collective Bargaining Agreement with regard to
13      seniority after a Duty Disability Return?
14  A   No, I did not.
15  Q   Now paragraph forty-one if you could read that to
16      yourself for a moment.
17  A   Okay.
18  Q   You would, in your position now and in your position
19      in Labor Relations before, you understand that there
20      are deadlines in any Collective Bargaining Agreement,
21      and I'm not talking about any Collective Bargaining
22      Agreement, with the City and the Fire Fighters, to
23      file a grievance, you are familiar with that?
24  A   Yes.
25  Q   And you are familiar with the 2014, 2019 provision
                                                      75
```

**[Page 76]**

```
 1      about filing a grievance within ten days of the
 2      occurrence of the violation, alleged violation or
 3      within ten days of when the Association becomes aware
 4      of the violation; you're aware of that.
 5  A   Yes.
 6  Q   Are you aware of things that are called continuing
 7      violations, have you ever heard that term?
 8  A   Yes, I have.
 9  Q   What is a continuing contract violation?
10  A   It's when some potential violation occurs and then
11      the same violation occurs on a continuing basis.
12      And at that point is it your experience that -- well
13      let me strike that.  If you look at paragraph forty-
14      two of the Complaint and read that paragraph to
15      yourself, it begins with however and furtherance.
16  A   Okay.
17  Q   Now did you ever conspire with the Union or any Union
18      Official to recognize the May 2019 grievance
19      regarding seniority and those returning from Duty
20      Disability, did you participate in any such
21      conspiracy?
22  A   No, I did not.
23  Q   Were you ever a witness to any such a conspiracy?
24      Were you ever in a room where people were talking
25      about conspiring to ignore the CBA Statute of
                                                      76
```

**Page 77**

1  Limitations and recognize this grievance, the May
2  2019 grievance by the Union regarding seniority and
3  Duty Disability?
4  A  No, I was not.
5  Q  Do you have any facts to support this assertion that
6  there was a conspiracy between -- within the City and
7  the Union or between the City and the Union to ignore
8  the Statute of Limitations with regard to the May 19,
9  the May 2019 grievance regarding Seniority and Duty
10  Disability?
11  A  No, I do not have any knowledge of that.
12  Q  Now let me move on to paragraph forty-three, read
13  that to yourself then I have some questions for you.
14  A  I am ready.
15  Q  First of all, in your experience with the City in any
16  of your positions, can you cite any example when the
17  Union or Union Official disciplines employees of the
18  City?
19  A  When Union Officials discipline?
20  Q  Yes.  Discipline employees?
21  A  No.  No.
22  Q  You would agree that discipline City employees is a
23  function exclusively within the management rights of
24  the City am I correct?
25  Q  That's correct.

77

**Page 78**

1  A  Now in terms of the demotion that occurred that's at
2  the core of this litigation, let me ask you this
3  question, is seniority adjustment, does that occur,
4  has that ever occurred in your experience with the
5  City in a way that's unconnected in to this case,
6  Have you ever seen individuals have their seniority
7  adjusted because there were calculation errors or
8  Department errors or issues regarding whether you use
9  City-wide seniority or Department-wise seniority?
10       Do you have any experience with
11  seniority adjustments?
12  A  Yes, I do.  There have been.
13  Q  In your experience with seniority adjustments, in
14  some occasions have individuals had their seniority
15  adjusted downward, reduced?
16  A  They have.
17  Q  Is that simply a function of, well let me rephrase
18  it.  Is all seniority adjustments always a
19  disciplinary action, if they involve a reduction in
20  seniority?
21  A  No, it sometimes just a correct the record.
22  Q  Okay.  If you can -- if you look at paragraph forty-
23  four and look at it yourself.
24  A  Okay.
25  Q  Now your understanding, in a Collective Bargaining

78

**Page 79**

1  Agreement and I am going to ask you if this is your
2  understanding, does one who goes out on Duty
3  Disability lose all of their seniority if they return
4  to work before two years?
5  A  Say that one more time.
6  Q  Well let me rephrase it.  If I go out on Duty
7  Disability, and this is a post 2014 event, and I am
8  off for ten months, when I return to work, do I
9  maintain my seniority?
10  A  If you are off for ten months?
11  Q  Yes.
12  A  On Duty Disability?
13  Q  Yes.  In other words, I'm not off for more than two
14  years?
15  A  Yes, you should.
16  Q  Well this paragraph alleges that the Defendants put
17  in place an alleged blanket demotion of all
18  disability retirement -- retires that returned to
19  work after 2014.  You as a Defendant, did you put in
20  place such a blanket demotion of all Disability
21  Retirement returnees?
22  A  No.
23  Q  Were you ever present when anyone else put in place
24  such a blanket demotion of all Disability Retiree
25  returnees at all?

79

**Page 80**

1  A  No.
2  Q  Paragraph forty-seven of the Complaint, would you
3  read that to yourself.
4  A  Okay.
5  Q  As a Defendant did you ever intend to strip
6  Plaintiffs of their seniority in any improper way?
7  A  No.
8  Q  Did you have any -- did you conspire with any of the
9  Plaintiffs in this case -- or with the Defendants in
10  this case, whether Union or other City Officials to
11  strip Plaintiffs of their seniority in a way that was
12  not consistent with the Collective Bargaining
13  Agreement?
14  A  No.
15  Q  If you could turn to Page fifty-one of the Complaint.
16  Before we go to fifty-one, let me ask you this
17  question, Mr. Jenkins.  Seniority is something that's
18  earned and correct me if I am wrong.  Seniority is
19  something that is earned through time and through
20  work right, right?  I mean you go to work, you do
21  your job and you earn your seniority, that's your
22  experience, isn't it?
23  A  That's correct.
24  Q  Can you think of any occasion where they have not
25  either been working or on Duty Disability within the

80

1 context of the Collective Bargaining Agreement? Has
2 anybody been, to your knowledge, to your experience,
3 does anyone get seniority unless they are performing
4 their job and they are off for only an appropriate
5 time under the Collective Bargaining Agreement?
6 A Only if there is a discharge and thy are returned to
7 work, normally Arbitrators will, if they won their
8 grievance, the Arbitrators will return them to work
9 with full seniority so they wouldn't lose it.
10 Q But that is based on the notion that they were
11 discharged, and had they not been discharged
12 improperly, they would have been working?
13 A Correct, yes.
14 Q Now paragraph fifty-one of the Complaint, can you
15 read that to yourself?
16 A Okay.
17 Q Now first of all did you, is there anything that you
18 did that you did to intentionally deprive the
19 Plaintiffs in this case, of an opportunity to collect
20 a larger pension?
21 A No.
22 Q Were you ever present when anyone from the City
23 articulated or suggested or gestured toward the
24 notion that they were taking actions to intentionally
25 deprive the Plaintiffs of an opportunity to collect a

81

1 larger pension?
2 A No.
3 Q Were you ever present when anyone from the Union
4 indicated to you or to anyone in your presence, that
5 the Union was grieving in May of 2019 about seniority
6 in an effort to intentionally deprive Plaintiffs of a
7 larger pension?
8 A No.
9 Q Now as I said, I wasn't going to go through your
10 Curriculum Vitae, but I want to just clarify one
11 thing, you were off, I just want to kind a bookend
12 this. You were off just prior to the time that the
13 city went into bankruptcy, is that when you left city
14 employment?
15 A That's correct.
16 Q Then you returned when exactly?
17 A March of 2014, but they were still going through
18 their bankruptcy process but on the way out.
19 Q So they went into bankruptcy July 2013, is that your
20 recollection?
21 A Yes, somewhere in there, yes.
22 Q Are you aware in all of your work at the City of any
23 occasion where an employee who returns from Duty
24 Disability to his employment with the City, comes
25 back to work under the terms of the contract under

82

1 which he took disability, and let me be specific.
2 For example, as you know in this case some Plaintiffs
3 took Duty Disability and were off for fourteen or
4 fifteen years, you understand that, don't you?
5 A I do.
6 Q Are you aware of any employee who returns to work
7 from Duty Disability after fourteen or fifteen years
8 and is paid at the pay rate that was in place when
9 they took Duty Disability fifteen years earlier?
10 A No, employees are returned under the contractual
11 plan.
12 Q Okay. I would like a moment if I could, I would like
13 to talk to my clients. Just five minutes
14 MR. SANDERS: Sure, why not.
15 (Whereupon a brief recess was
16 taken at or about 12:37 p.m.)
17 CROSS EXAMINATION
18 BY MR. MCFARLANE:
19 Q Can you tell me, is there a current process for
20 disciplining employees of the Detroit Fire
21 Department?
22 A Yes.
23 Q And what's the first step of that process?
24 A The first step of discipline.
25 Q When the Department issues discipline, what step does

83

1 it take?
2 A Conduct an investigation.
3 Q And after an investigation, if it's found warranted,
4 then what happens?
5 A It goes to-- employees are charged through a charge
6 Hearing. Then after the charge Hearing then it would
7 go to, if appealed it could go to a Preliminary
8 Hearing, and if it appealed further then It could be
9 a grievance, it could go to grievance form.
10 Q And at the Charge Hearing, do they receive notice of
11 charges?
12 A Yes, they do.
13 Q And that Notice of Charge just indicates what the
14 discipline is for?
15 A Yes, what the discipline is for and what specific
16 general order they are being charged with.
17 Q And you were asked a question about the seniority
18 provisions in a current contract. Are you aware if
19 there is a dispute between the City and the Union
20 over which language applies to the return for Duty
21 Disability retirement?
22 A Yes.
23 MR. SANDERS: Objection, form,
24 foundation.
25 MR. SANDERS: I'm sorry, I didn't

84

## Column 1 (page 85)

1    hear his answer.
2  BY MR. MCFARLANE, CONTINUING:
3  Q  What was your answer, sir?
4  A  Yes.
5  Q  And that dispute is the subject of the current
6    grievance, is that correct?
7  A  Correct.
8  Q  And that grievance has been arbitrated?
9  A  No.
10  Q  You don't know, okay?
11  A  No, I said it has not. It has been appealed to
12    Arbitration.
13  Q  Do you know if the Arbitration has occurred?
14  A  Yes.
15  Q  But a decision has not come back?
16  A  Correct.
17          MR. MCFARLANE: I have nothing
18    further.
19          REDIRECT EXAMINATION
20  BY MR. SANDERS:
21  Q  I've got a couple questions. Was the 2014 CBA
22    collectively bargained for?
23  A  I was not at the table.
24  A        MR. LEGGHIO: Objection as to
25    foundation.

85

## Column 2 (page 86)

1  BY MR. SANDERS, CONTINUING:
2  Q  Do you know whether or not it was implemented by the
3    Bankruptcy Court?
4          MR. LEGGHIO: Objection as to
5    foundation. It calls for a Legal conclusion.
6          THE WITNESS: I do not know.
7          MR. SANDERS: Shawndrica can you
8    put up 00356 please?
9  BY MR. SANDERS, CONTINUING:
10  Q  Can you take a look at that correspondence, please
11    Mr. Jenkins?
12  A  Yes.
13  Q  And when you need to scroll, please let us know.
14  A  Okay. Next page. Okay.
15  Q  Are you familiar with that document?
16  A  Yes, I am.
17  Q  What is it?
18  A  It's the Step I response to grievance, DFFA grievance
19    12-19/
20  Q  I am going to ask that that be marked as Exhibit
21    Number 13 to our Exhibits to our Exhibit.
22          [Whereupon Exhibit Thirteen was
23    marked for identification]
24  BY MR. SANDERS, CONTINUING:
25  Q  Other than grievance 12-19, are you familiar with any

86

## Column 3 (page 87)

1    other dispute concerning reinstatement from Duty
2    Disability that the City had with the DFFA in 2019?
3  A  No, I can't think of anything else.
4  Q  I have nothing further.
5          MR. LEGGHIO: I have nothing
6    further.
7          MR. MCFARLANE: The City doesn't
8    either.
9          [Whereupon proceedings concluded
10    at or about 12:45 p.m.]

87

## Column 4 (page 88)

            CERTIFICATION

STATE OF MICHIGAN  )
             )
COUNTY OF OAKLAND  )

    I HEREBY CERTIFY that the foregoing testimony and
proceedings, consisting of eighty-eight (88)
typewritten pages were mechanically recorded at the
time and place hereinbefore set forth; was thereafter
reduced to typewritten form; and that the foregoing
is a full, true and correct transcript of the
recording so taken.

                Sharon Dillon, CER 3192
                Certified Electronic Reporter
                P.O. Box 214552
                Auburn Hills, MI 48321-4064
                (248)342-7229

May 7, 2021

88