**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S STATUS REPORT ON BANKRUPTCY CASE

On June 7, 2021, the Court entered its *Order Requiring the City to File a Status Report* ("Order," Doc. No. 13386).  The Order provided that the City of Detroit ("City") must file a further status report, updating the June 4, 2021 status report ("Previous Status Report"), and "discussing whether the Chapter 9 bankruptcy case should then be closed, and if not, why not, and if not, when the City contends that the case will be ready to be closed." Order, p. 1. The City of Detroit ("City") files this Report in accordance with that directive, respectfully stating as follows:

## I.     INTRODUCTION

The bankruptcy case may be closed when case administration is complete, subject to the retained jurisdiction of the Court over the case for as long as necessary for the successful implementation of the Plan. 11 U.S.C. § 945.  Although the City has made significant progress since the filing of the Previous Status Report, there are still a few critical matters remaining before case administration can be considered complete, including one issue that directly threatens the successful implementation

- 1 -

38406260.3/022765.00213

of the Plan. This Report summarizes those known and reasonably foreseeable matters.

*__First__*, the City must distribute the New B Notes[1] to the Holders of Allowed Class 14 Other Unsecured Claims. The City has resolved all Class 14 claims and recently filed a motion to establish procedures with respect to the distribution of the New B Notes.[2] Assuming the motion is granted, the City believes that it will soon be in a position to makes its first and final distribution to Holders of Allowed Class 14 Other Unsecured Claims that have complied with this Court's orders.

*__Second__*, in November 2021, the City's police and fire retirement system ("PFRS") officially adopted a drastic acceleration of the amortization of the unfunded actuarial accrued liability ("UAAL") of the PFRS Component II (legacy) plan. This action violates the Plan of Adjustment and threatens the City's ability to fully and successfully implement the Plan of Adjustment. In the near future, the City intends to file a motion with this Court to enforce the Plan of Adjustment against the PFRS. This issue was discussed in the Previous Status Report at pages 20-28 and is also summarized here.

---

[1] Terms that are capitalized but not defined in this Report have the meanings ascribed to them in the City's *Eighth Amended Plan for the Adjustment of Debts of the City of Detroit* ("Plan of Adjustment"), as filed as Docket Number 8045 and confirmed by this Court's order filed at Docket Number 8272.

[2] *City of Detroit's Motion to Establish Procedures for Distribution of New B Notes to Holders of Allowed Class 14 Claims Under the City's Plan of Adjustment*, filed at Docket Number 13476.

- 2 -

Under the Plan of Adjustment, the City was supposed to enjoy—under the Grand Bargain—a 10 year pension contribution "holiday" until June 2023, during which time the City would be required to make only nominal contributions to its frozen (legacy) pension plans. Then, the UAAL was to be amortized over a thirty-year period. Prior to the filing of the Previous Status Report, the PFRS Board voted to accelerate the amortization period from 30 years to 20 years. Recently, this vote was approved by the investment committee for the PFRS.

The approval accelerated hundreds of millions of dollars of payments by the City, contrary to the Plan of Adjustment and sound actuarial principles for a closed plan like the PFRS plan. The acceleration would starve the City of funding necessary for public safety, other critical services and its obligations under the Plan of Adjustment. The City believes that it is supremely important for this Court to keep the case open for an additional limited period to exercise its jurisdiction to protect the progress that has been made by the City and its ability to fully and successfully implement the Plan of Adjustment.

***Third,*** the DFFA has filed a motion to enforce the Plan of Adjustment against seven current or former firefighters that filed a lawsuit in violation of the Plan of Adjustment. The City concurred in this motion and it is set for hearing on January 12, 2022.

38406260.3/022765.00213

Consequently, the City requests that this Court not close this bankruptcy case now or at any time in the near future. Instead, the City requests that the Court require the City to file another status report in six months so that the City and the Court can reevaluate the status of the case then. The City is available and willing to address any questions the Court may have regarding this Report or the continuing administration of this case.

## II.    THIS CASE MAY BE CLOSED WHEN "FULLY ADMINISTERED"

1.    In the City's confirmed Plan of Adjustment, the Court retained jurisdiction to "Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code[.]"  Plan, Art. VII.P (Doc. No. 8045, p. 78 of 82; Doc. No 8272, p. 211 of 225).

2.    Section 945(b) states that "Except as provided in subsection (a) of this section, the court shall close the case when administration of the case has been completed."  11 U.S.C. § 945(b).  Subsection (a) states that a bankruptcy court may retain jurisdiction for whatever time is necessary for successful plan implementation. 11 U.S.C. § 945(a).

3.    The Bankruptcy Code does not explain when administration of a chapter 9 case is complete and, to the City's knowledge, only one reported decision has addressed the question.  *In re Lake Lotawana Cmty. Improvement Dist.*, Case No. 10-44629-can9; 2017 WL 1968282 (Bankr. W.D. Mo. May 11, 2017).

- 4 -

4. The *Lake Lotawana Community Improvement District* court noted that neither the Bankruptcy Code nor the Bankruptcy Rules offer guidance as to when a chapter 9 case has been administered. *Id.* at *2. The court then observed

> Returning to § 945(b) then, cannons of statutory construction require that when Congress does not define a term, courts must give it its ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Black's Law Dictionary defines "administration" as the "judicial action in which a court undertakes the management and distribution of property." Black's Law Dictionary 49 (9th ed. 2009).

*Id.* at *3.

5. Thus, the court determined that a case is administered when there is no longer anything for the court to manage in the case. *Id.*

**A.    The One Remaining Claim**

6. As of the filing of the Previous Status Report, two claims remained to be liquidated. The City has resolved one of those claims. *See* Docket No. 13473.

7. The other unresolved claim – claim number 799 of Daryl Cain ("Cain Claim") – is being liquidated in the District Court for the Eastern District of Michigan ("District Court"), Case Number 13-10525 ("Cain Case") under this Court's *Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims* ("ADR Order," Doc. No. 230) and this Court's order at docket number 13269. (Doc. No. 13269, ¶ 2.).

- 5 -

8.     Even though the Cain Claim is not fully resolved, the City confirmed that it is a Class 15 Claim.  (Doc. Nos. 13246, 13249, 13258, 13269, 13278, 13281, 13285, 13286.)

9.     The District Court originally granted the City summary judgment in the Cain Case in September of 2016.  Cain Case, Doc. Nos. 44, 45.

10.     In October of 2017, after appeal, the Sixth Circuit reversed the District Court's grant of summary judgment to the City, directing the District Court to hold further proceedings in the matter.  Cain Case, Doc. Nos. 52, 53.

11.     Since then, the District Court has granted Cain's motion for trial by jury and reopened discovery.  Cain Case, Doc. No. 70.

12.     At one point, Cain was assigned counsel.  Cain Case, Doc. No. 55.  Counsel later moved to withdraw, and the District Court granted the request.[3]  *Id.*, Doc. Nos. 62, 64.  Cain moved again for counsel to be appointed, but his request was denied.  Doc. Nos. 71, 73, 74.

13.     On or about November 22, 2021, Magistrate Judge Patricia T. Morris conducted a status and settlement conference but a settlement was not reached.  Cain had made an offer to settle, then withdrew it, and demands a jury trial.

---

[3] Cain apparently approved of counsel's withdrawal.  The District Court referred to a letter from Cain where he accused counsel of violating his constitutional rights and made other complaints.  "Clearly, there has been a breakdown in the attorney-client relationship."  Cain Case, Doc. No. 64.

- 6 -

14. There are no scheduling orders currently on the Cain Case docket.

15. As a claim subject to treatment of Class 15 of the Plan of Adjustment, any distribution on the Cain Claim will be paid by the City directly in cash (albeit with the cash payout capped at $6,250). This amount can be reserved for and later resolved without keeping the City's bankruptcy case open.

16. Consequently, the City does not believe it is required to wait for final liquidation of the Cain Claim before making a distribution of New B Notes or closing this bankruptcy case.

### B. The Distribution Process

17. On September 17, 2019, the City filed the *City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment* ("Brokerage Motion," Doc. No. 13126) in order to establish procedures for the *pro rata* distribution of New B Notes to Holders of Allowed Class 14 Claims.

18. The Court approved the Brokerage Motion, entering its *Order Granting the City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment* ("Brokerage Order," Doc. No. 13173).

19. The Brokerage Order approved both the form of the notice of the obligations imposed by the Brokerage Order ("Notice") and the forms of the

- 7 -

Brokerage Account Form and Tax Form (collectively, the "Distribution Forms") to be served on and used by Holders of Class 14 Claims as described in and attached to the Brokerage Motion to be served on Class 14 Claimants. Brokerage Order, ¶ 2.

20. Under the Brokerage Order, if a Class 14 Claimant fails to return properly filled out Distribution Forms within 180 days of being initially served with the Distribution Forms, the Class 14 Claimant releases any right to distributions that otherwise would be due to the Class 14 Claimant and the claimant's claim will be disallowed and expunged from the claims register. Brokerage Order, ¶ 6.

21. Ultimately, 122 Class 14 Claims were Allowed for Distribution.

22. As of the of this Status Report, approximately 75 Holders of Allowed Class 14 Claims ("Claimholders") have returned tax and Brokerage Account Forms that appear to be filled out correctly so that Distributions can be attempted to those Claimholders.[4]

23. On November 24, 2021, the City filed its *Motion to Establish Procedures for Distribution of New B Notes to Holders of Allowed Class 14 Claims Under the City's Plan of Adjustment* ("Distribution Motion," Doc. No. 13476). The Distribution Motion was filed to establish procedures if a distribution to a

---

[4] The Detroit Police Officers Association ("DPOA") has not yet returned a Brokerage Account Form for its Allowed Claim Number 1862. It does not need to do so until the final B Note Distribution is to be made. *See* Doc. No. 13346, ¶ 3. As this Distribution likely will be the final one, the DPOA is working to get this information now.

- 8 -

Claimholder failed. No objections have been filed to the Distribution Motion but the objection deadline has not run.

24.     As all Class 14 claims have been resolved, the City intends to make one distribution of New B Notes to Claimholders. Before it can do so, a "Distribution Date" must be chosen for the B Notes. Once chosen, a notice must be filed "that provides information regarding the Distribution to be made." Plan, Art. V.F., p. 65. The City will file this notice ("<u>Distribution Notice</u>"), providing the date on which the Disbursing Agent will begin distributing New B Notes and the amount of New B Notes to be distributed. The Distribution Notice will also list those claimants who did not comply with the Brokerage Order and thus will not receive a Distribution under the Plan.

25.     The City will file the Distribution Notice at least ten business days prior to initiating the Distribution with the Disbursing Agent.

26.     When the Distribution Notice is filed, the City will also file an updated calculation of the amount (if any) of the Disputed Unsecured Claims Reserve.[5]

---

[5] The Plan requires the City to establish a reserve for disputed unsecured claims. Plan, Art. VI.B. To initially set up the Disputed Unsecured Claims Reserve, the City filed a motion with the Court ("<u>Reserve Motion</u>," Doc. No. 9351) which it later refined ("<u>Reserve Reply</u>," Doc. No. 9652). The Court approved the Reserve Motion as modified by the Reserve Reply. (Doc. No. 9701.) The Reserve Motion included certain rules ("<u>Reserve Rules</u>," Reserve Motion, ¶ 26) for managing the Disputed Unsecured Claims Reserve. The Disputed Unsecured Claims Reserve was initially set at $1.035 billion but currently stands at $98 million. (Doc. No. 13127.)

- 9 -

Reserve Rule (f), approved as part of the Reserve Motion that set up the Disputed Unsecured Claims Reserve requires the City "to file with the Court a notice of the calculation of the then-current Disputed Unsecured Claims Reserve" at least ten business days prior to making a Distribution to Claimholders.

27.     After the New B Note distribution is complete, the City will file a Distribution Notice with respect to accrued interest on the New B Notes.  The Disbursing Agent will then issue checks with accrued interest to Claimholders.

28.     Future interest payments on distributed B Notes will occur through the brokerage system as the City makes interest payments on the B Notes.

## III.    ISSUES THAT THREATEN THE SUCCESSFUL IMPLEMENTATION AND VIABILITY OF THE PLAN

### A.    Accelerated amortization of the unfunded actuarial accrued liability ("UAAL") for the Police and Fire Retirement System.

29.     The City has two frozen pension plans, also known as Component II plans, for employees who worked for or retired from the City prior to the Plan of Adjustment.  One is for public safety officers–the Police and Fire Retirement System ("PFRS").  The other is for all other City employees–the General Retirement System ("GRS").

30.     As discussed below, the Plan of Adjustment expressly provided a 30-year period for amortizing the UAAL for both plans–such period beginning after the 10-year pension contribution "holiday" ends.  Those provisions were supported in

- 10 -

the Plan of Adjustment by carefully developed 40-year financial projections of the anticipated payments and City revenues available to support the payments. *See* **Exhibit 1,** Plan of Adjustment–40-year projections, at POA00706604 and POA00706607, POA00706608.

31. Prior to the filing of the Previous Status Report, the PFRS Board voted to accelerate the amortization period from 30 years to 20 years of its Component II plan. In November 2021, the acceleration was approved by the PFRS Investment Committee.

32. The apparent impetus for this action is that the public safety representatives on the board want the funding accelerated to further ensure the safety of their pensions. But any such concerns were fully vetted, considered and weighed against the feasibility concerns when the Court approved the 30-year amortization in the Plan of Adjustment. And, the draconian reduction of the amortization period threatens the implementation of the Plan of Adjustment and undermines the City's ability to provide necessary public services critical to the City's continued growth and revitalization and the safety of its residents. This move is devastating because the extremely modest police and fire pension cuts in the Plan of Adjustment were based on the express assumption that, with the money from the "Grand Bargain," the City would be fully able to afford the 30 year expected amortization payments. Those assumptions proved to be terribly wrong and the City is now facing (even

- 11 -

**without** the accelerated amortization) amortization payments that are hundreds of millions of dollars more than were anticipated by, and that formed the basis of, the Plan of Adjustment.  Attached as **Exhibit 2** is a presentation made by the City to the Board of the PFRS.

### 1.    GRS and PFRS plan treatment under the Plan.

33.    The Plan provided that the City would essentially enjoy a 10-year pension contribution "holiday" that would largely relieve it from making payments to the frozen pension plans.  At the end of the "holiday," based on estimates made in the Plan of Adjustment, the City would need to make an estimated $111 million contribution.  On December 31, 2014, Bankruptcy Judge Steven Rhodes issued a supplemental opinion approving the Plan of Adjustment.  *In re City of Detroit*, 524 B.R. 147 (2014), ("Supp Op"). It states, *inter alia*:

> Because of the outside money committed as part of the Grand Bargain, the City will have little responsibility for funding the GRS and the PFRS through June 2023. During that time period, the PFRS will be funded exclusively from contributions from the DIA, the DIA Funders, the Foundation Funders and the State under the Grand Bargain, as described previously.
>
> Through 2023, GRS funding will come from: (a) the DWSD; (b) a portion of the contributions from the State, the DIA, the DIA Funders, and the Foundation Funders as part of the Grand Bargain, (c) the proceeds from the Stub UTGO Bonds as part of the UTGO settlement, described in part III.K. below, and (d) certain revenues from City departments, (e) the Detroit Public Library and (f) the Detroit Regional Convention Facility Authority.

- 12 -

Supp Op, at 179-80.

Judge Rhodes concluded that the pension settlement was "fair and equitable" and stated as follows:

> It is therefore a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. Without the outside funding from the Grand Bargain, the City anticipated having to reduce pensions by as much as 27%. The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

Supp Op, at 181 (citation omitted).

> **2.    The Bankruptcy Court found the Plan was feasible, but barely, even with the assumption that the City would not need to make material pension contributions until 2024.**

34.    The Court was not nearly as bullish when it came to the subject of the feasibility of the Plan of Adjustment. There was significant concern about the feasibility of the Plan of Adjustment:

> In this case, examining the feasibility of the plan is difficult for a number of reasons. The City's debt is enormous and the City proposes to pay most of its creditors over a long period of time. As the Court discusses below, the City"s revenue and expense projections extend forty years into the future.
>
> Second, the feasibility of the plan depends upon the City's ability to fix and maintain its broken governmental operations. This is significant because the chapter 9 feasibility inquiry requires an analysis of whether the City

- 13 -

can reasonably provide sustainable municipal services, as the court found in *In re Mount Carbon.* It is also significant because the City's ability to repay its creditors pursuant to the plan depends upon the City's ability to increase its revenues from taxes and fees by improving the efficiency of City operations and by identifying and accessing untapped sources of revenue.

The feasibility analysis is yet more complex because several key parts of the plan depend upon performance by parties who are completely beyond the City's control. **For example, because the City's contributions to the retirement systems are fixed through FY2023, a risk remains that the pension plans will be significantly more underfunded than anticipated if one of the many organizations participating in the Grand Bargain fails to perform in the time or manner promised.**

As the City itself succinctly states in its pretrial brief in support of plan confirmation, "[T]he City was—and remains today—enmeshed in a financial crisis of unsurpassed proportions and complexity." Despite efforts from both the City and the State of Michigan, "the City is trapped in a vicious circle of cash crises, general fund deficits, crushing long-term liabilities and tumbling credit ratings exacerbated by the City's bureaucratic structure and frequent deviations from established budgets.

Supp Op, at 220-21 (emphasis added and citations omitted).

35.    Martha Kopacz, the Court's appointed feasibility expert, explained that

the Plan of Adjustment left "little space of the continuum of feasibility":

I want to emphasize, however, that there is little space remaining on the continuum of [feasibility]. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they have imposed

- 14 -

additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern.

Supp Op, at p. 219 (Court's quotation of expert, alterations in original).

36. In its discussion on feasibility, the Court stated as follows regarding the pension liabilities:

> However, at the end of FY2023, the GRS and PFRS will remain significantly underfunded. Using the assumptions from the global pension settlement, including the 6.75% discount rate, **the City projects that the PFRS will only achieve 78% funding, leaving a UAAL of $681 million.** Ex. 793 at 2. **For the GRS, the City projects a 70% funded status by the end of FY2023, leaving a UAAL of $695 million.** *Id.* **The City will then amortize the remaining UAAL for both plans <u>over the next thirty years</u> at an interest rate of 6.75%.** *Id.* Between FY2024 and FY2033, the City will receive an additional $68 million in Grand Bargain proceeds to pay toward the UAAL amortization for PFRS, and $188 million for GRS. The balance of the amortized UAAL will come from the City. *Id.* at 5.
>
> The plan greatly reduces the City's pension obligations, thanks to the State Contribution Agreement, the Grand Bargain funding, and the modification of the City's obligations to its current retirees."

Supp Op, at 231-32 (emphasis added).

38406260.3/022765.00213

### 3. The ugly truth emerges almost immediately after the Plan is confirmed.

37.     The bolded language quoted above indicates that under actuarial analyses done at the time of the Plan of Adjustment, at the end of FY 2023, the total UAAL for both plans would be approximately $1.4 billion. *See* **Exhibit 1** at POA00706604 (estimating the PFRS UAAL to be approximately ~$681 million as of June 30, 2023 and the GRS UAAL to be approximately ~$695 million as of June 30, 2023).  Although it is not possible to estimate with precision the total amount of the UAAL as of June 30, 2023, the City estimates that the UAAL likely will be approximately double the estimate in the Plan of Adjustment.  In other words, rather than a "pension cliff" of roughly $1.4 billion estimate in the Plan, the deficit amount will likely be approximately **$2.8 billion**.

38.     The report issued almost immediately after the bankruptcy, which advised of the materially flawed assumptions, was issued by PFRS' actuarial firm, Gabriel Roeder.   That firm, together with several other actuarial firms, was intimately involved with developing the actuarial assumptions relied on in the Plan. The increase of hundreds of millions of dollars was due in significant part to actuaries' use of outdated mortality tables in preparing the estimates used in the Plan. The outdated mortality tables were relied on to avoid **any** cuts to police and fire post-retirement pensions; the only reduction was a 55% reduction to the previous scheduled cost of living increases.

- 16 -

39.     In response to this development, the City, while having no obligation to do so under the Plan of Adjustment, has created and is funding out of its general fund, a supplemental pension fund that is expected to have several hundred million dollars by 2023.  But, as shown in the presentation appended as **Exhibit 2**, the City faces a monumental funding task that will crowd out monies critical to public safety and other public services.

40.     The reduction in the amortization period from 30 to 20 years sharply accelerates hundreds of millions of dollars of payments that would come directly out of the City's general fund that funds all City services, including public safety.  That acceleration is contrary to the carefully constructed Plan of Adjustment, which determined that a 30-year amortization period was proper to ensure the City also had sufficient funding to operate and grow the City.

41.     In the near future, the City intends to seek relief from this Court on this issue.

**B.     DFFA Motion**

42.     On August 30, 2021, the DFFA filed its *Motion for the Entry of An Order Enforcing the Plan of Adjustment Against: Christopher McGhee, Norman Brown, Craig Brown, James Washington, Shannon Ferguson, Junius Perry, and Orlando Potts* ("DFFA Motion," Doc. No. 13430).  As set forth in the DFFA Motion, seven current or former firefighters filed an action in Wayne County Circuit

- 17 -

Court to avoid the limitations on duty disability seniority that are contained in the Master Agreement between the City of Detroit and the Detroit Fire Fighters Association 2014-2019 ("Master Agreement") and the amended and restated Combined Plan for the Police and Fire Retirement System of the City of Detroit ("New PFRS Plan"). Both the Master Agreement and the New PFRS Plan were incorporated into the Plan of Adjustment and thus the Plaintiffs are enjoined from pursuing their lawsuit pursuant to the injunction in the Plan of Adjustment.

43.    The DFFA Motion is set for hearing before this Court on January 12, 2021. *See* Docket No. 13477.

## IV.    CONCLUSION

44.    Thus, due to the issues described above, the City respectfully requests that the Court not close this bankruptcy case now or in the near future. Instead, the City requests that the Court require the City to file another status report in six months so that the City and this Court can reevaluate the status of the case then. The City is available and willing to address any questions the Court may have regarding this Report or the continuing administration of this case.

38406260.3/022765.00213

Dated: December 2, 2021

CITY OF DETROIT LAW DEPARTMENT

By: */s/ Charles N. Raimi*
Charles N. Raimi (P29746)
Attorneys for the City of Detroit
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
Phone - (313) 237-5037/(313)
Email - raimic@detroitmi.gov

MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.

By: */s/ Marc N. Swanson*
Jonathan S. Green (P33140)
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

Counsel for the City of Detroit,
Michigan

- 19 -

**Exhibit List**

**Exhibit 1 – Plan of Adjustment – 40 Year Projections**

**Exhibit 2 – Presentation made by the City to the Board of the PFRS**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 2, 2021, I electronically filed the *City of Detroit's Status Report on Bankruptcy Case* with the Clerk of the Court via the Court's ECF electronic filing system which will serve notice to all ECF participants.


/s/ Marc N. Swanson
Marc N. Swanson

Dated:  December 2, 2021

**Exhibit 1 – Plan of Adjustment – 40 Year Projections**

# City of Detroit

Plan of Adjustment - 40 year projections

The attached Plan of Adjustment preliminary forecast (the "POA Financial Projections"), its assumptions and underlying data are the product of the Client and its management ("Management") and consist of information obtained solely from the Client. With respect to prospective financial information relative to the Client, Ernst & Young LLP ("EY") did not examine, compile or apply agreed upon procedures to such information in accordance with attestation standards established by the AICPA and EY expresses no assurance of any kind on the information presented. It is the Client's responsibility to make its own decision based on the information available to it. Management has the knowledge, experience and ability to form its own conclusions related to the Client's POA Financial Projections. There will usually be differences between forecasted and actual results because events and circumstances frequently do not occur as expected and those differences may be material. EY takes no responsibility for the achievement of forecasted results. Accordingly, reliance on this report is prohibited by any third party as the projected financial information contained herein is subject to material change and may not reflect actual results.

POA00706603

**Plan of Adjustment - 40 year projections**

**Assumptions**

*($ in millions)*

| Plan of Adjustment - 40 year projections | | |
|---|---|---|
| **General Fund Cash Flows** | GF 40yr cash flows | $4.3b funds available for unsecured claims |
| | DIP financing | Quality of Life ($129m @ 3.5% assumed to be refinanced as part of exit facility) |
| | Exit financing | $300m note @ 6.0% maturing in FY26 |
| | Swap treatment | $85m settlement |
| | Contingency | Reflects 1.0% of total revenues |
| **Revenue stream from DWSD** | Pension | $429m for pension in the first 10 years |
| | OPEB | 12.1% of OPEB - current retirees payments |
| | POC | 11.5% of total POC payments |
| **Reimbursement from other funds** | Reimbursements from Parking (non-GF) and Library | |
| **Hypothetical art proceeds (a)** | Foundations | $366m over 20 years |
| | DIA | $100m over 20 years |
| **Hypothetical State settlement (a)** | Contributions to pension | $195m in FY15 |
| **Hypothetical claims treatment** | | |
| PFRS | | |
| Pension | Contributions (years 1-10) | Estimated to be $261m from foundations / State settlement |
| | Contributions (years 11-40) | UAAL as of June 30, 2023 estimated to be ~$681m (b) amortized over |
| | | 30yr, including contributions in second decade from DIA and foundations |
| | Discount rate | 6.75% |
| | Targeted funded status as of 2023 | 78% |
| GRS | | |
| Pension | Contributions (years 1-10) | Estimated to be $99m from State settlement; $429m from DWSD; $46m from DIA; $146m from GF & other funds |
| | Contributions (years 11-40) | UAAL as of June 30, 2023 estimated to be ~$695m (b) amortized over |
| | | 30yr, including contributions in second decade from DIA and foundations |
| | Discount rate | 6.75% |
| | Targeted funded status as of 2023 | 70% |
| UTGO | Hypothetical Note A1 | $287.5m note funded with pass-through UTGO millage |
| LTGO | Hypothetical Note A2 | $55m settlement note |
| Other unsecured | Hypothetical Notes B | $632m note paid over 30 years - $450m OPEB, $162m POC, $4m notes/loans and $16m other |

*Footnotes:*

(a)  Hypothetical art and State settlement proceeds are subject to a consensual agreement with respect to the treatment of pension-related claims.

(b)  Estimated pension contributions to retirement systems and unfunded pension liabilities as of June 30, 2023 are subject to change.

POA00706604

**Plan of Adjustment - 40 year projections**
**Recovery summary**
*($ in millions)*

## 10 Years

| Creditor | Claim | State settlement | Art proceeds | Cash | Notes A1 (UTGO) | A2 (LTGO) | B | 10 year $ |
|---|---|---|---|---|---|---|---|---|
| PFRS pension | $1,250 | $96 | $165 | | | | | $261 |
| GRS pension | $1,879 | $99 | $45 | $575 | | | | $719 |
| PFRS OPEB | $2,208 | | | $9 | | | $79 | $88 |
| GRS OPEB | $2,095 | | | $11 | | | $74 | $85 |
| UTGO | $388 | | | | $328 | | | $328 |
| LTGO | $164 | | | | | $55 | | $55 |
| POC | $1,473 | | | | | | $55 | $55 |
| Notes/loans payable | $34 | | | | | | $1 | $1 |
| Other unsecured items | $150 | | | | | | $6 | $6 |
| | $9,640 | $195 | $210 | $595 | $328 | $55 | $215 | $1,597 |

## 40 Years

| Creditor | Claim | State settlement | Art proceeds | Cash | Notes A1 (UTGO) | A2 (LTGO) | B | Illustrative Recoveries $ | NPV (a) | % | Adjusted % | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PFRS pension | $1,250 | $96 | $233 | $1,325 | | | | $1,654 | $735 | 59% | 39% | Excludes State, Foundation, and DIA proceeds |
| GRS pension | $1,879 | $99 | $233 | $1,809 | | | | $2,141 | $1,118 | 60% | 48% | |
| PFRS OPEB | $2,208 | | | $9 | | | $443 | $452 | $212 | 10% | | |
| GRS OPEB | $2,095 | | | $11 | | | $415 | $426 | $201 | 10% | | |
| UTGO | $388 | | | | $368 | | | $368 | $288 | 74% | | |
| LTGO | $164 | | | | | $55 | | $55 | $52 | 32% | | |
| POC | $1,473 | | | | | | $308 | $308 | $141 | 10% | | |
| Notes/loans payable | $34 | | | | | | $7 | $7 | $3 | 10% | | |
| Other unsecured items | $150 | | | | | | $31 | $31 | $14 | 10% | | |
| | $9,640 | $195 | $466 | $3,154 | $368 | $55 | $1,205 | $5,443 | $2,767 | 29% | | |

### Description of Hypothetical notes

| Note | Face value | Interest rate | Recipients | Term | Comments |
|---|---|---|---|---|---|
| Note A1 | $287.5 | n/a | UTGO | 14 years | Represents ~87% of UTGO scheduled debt service |
| Note A2 | $55.0 | n/a | UTGO | n/a | Paid in full with proceeds from exit financing |
| Note B | $632.0 | 4%, 4%, 6% | OPEB, POC, Notes & Other unsec. | 30 years | 10 yrs interest only, and straight-line amortization thereafter |

*Footnotes*
(a) Present value amounts calculated assuming 5% discount rate

3 of 9

POA00706605

**Plan of Adjustment - 40 year projections**
**Preliminary forecast and distributions**
*($ in millions)*

| | Growth after FY21 | 2014-2023 | 2024-2033 | 2034-2043 | 2044-2053 | 40-year total |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Municipal income tax | 2.4% - 2.8% | $ 2,770.2 | $ 3,510.0 | $ 4,590.6 | $ 6,059.3 | $ 16,930.1 |
| State revenue sharing | 0.1% - 1.7% | 2,000.5 | 2,121.0 | 2,307.1 | 2,533.2 | 8,961.8 |
| Wagering taxes | 1.0% | 1,732.6 | 1,905.6 | 2,105.0 | 2,325.2 | 8,068.4 |
| Property taxes | 1.5% - 2.2% | 1,074.0 | 1,369.6 | 1,640.0 | 1,903.2 | 5,986.8 |
| Utility users' taxes | 1.5% - 1.7% | 257.2 | 304.3 | 353.2 | 409.9 | 1,324.6 |
| Sales and charges for services | 2.0% | 1,118.0 | 1,161.2 | 1,415.5 | 1,725.5 | 5,420.2 |
| Other revenue | 2.0% | 712.8 | 753.5 | 918.5 | 1,119.7 | 3,504.5 |
| General Fund reimbursements | 2.0% | 264.1 | 238.8 | 291.1 | 354.9 | 1,149.0 |
| Transfers in for UTGO | n/a | 532.8 | 147.6 | 22.1 | - | 702.4 |
| Restructuring: | | | | | | |
|   Department revenue initiatives | 2.0% | 482.9 | 586.2 | 714.6 | 871.1 | 2,654.8 |
|   QOL / exit financing proceeds (net) | n/a | 292.7 | - | - | - | 292.7 |
|     Total revenues | | 11,237.8 | 12,097.9 | 14,357.6 | 17,301.9 | 54,995.2 |
| **Expenditures** | | | | | | |
| Salaries/overtime/fringe - Public Safety (a) | 2.0% - 2.25% | (2,864.3) | (3,524.5) | (4,356.5) | (5,442.1) | (16,187.4) |
| Salaries/overtime/fringe - Non-Public Safety | 2.0% - 2.25% | (903.8) | (1,087.2) | (1,343.9) | (1,678.8) | (5,013.7) |
| Health benefits (b) | ~4% inflation cap beg. FY20 | (752.6) | (928.2) | (1,373.9) | (2,033.7) | (5,088.4) |
| OPEB payments - future retirees (a) | $1 m per year uniform / 2% of wages non-uniform | (32.2) | (37.0) | (43.2) | (51.1) | (163.4) |
| Active pension plan (a) | 12.25% uniform / 3.75% non-uniform | (347.9) | (443.6) | (547.8) | (683.4) | (2,022.6) |
| Other operating expenses (c) | 2.0% | (3,073.2) | (3,437.4) | (4,190.1) | (5,107.7) | (15,808.5) |
| Restructuring: | | | | | | |
|   Additional operating expenditures | 2.0% | (357.5) | (359.1) | (437.7) | (533.5) | (1,687.7) |
|   Working capital | n/a | (24.8) | - | - | - | (24.8) |
|   Secured debt service | n/a | (390.5) | (391.0) | (67.2) | - | (848.6) |
|   Contributions to income stabilization fund | n/a | (17.8) | (2.2) | - | - | (20.0) |
|   Swap interest set-aside | n/a | (103.7) | - | - | - | (103.7) |
|   QOL / exit financing principal/interest payments | n/a | (335.8) | (110.3) | - | - | (446.1) |
|   Reorganization (Capital investments) | 2.0% | (582.2) | (442.7) | (501.4) | (605.3) | (2,131.5) |
|   Restructuring professional fees (d) | n/a | (130.0) | - | - | - | (130.0) |
|   Blight (excludes heavy commercial) | n/a | (420.0) | - | - | - | (420.0) |
|   PLD decommission | n/a | (75.0) | - | - | - | (75.0) |
|   Contingency | n/a | (101.3) | (121.0) | (143.6) | (173.0) | (538.8) |
|   Reinvestment deferrals | n/a | 29.8 | 222.9 | 10.9 | (241.8) | - |
|     Total expenditures | | (10,482.8) | (10,661.1) | (13,016.1) | (16,550.4) | (50,710.3) |
| **Funds available for unsecured claims** | | $ 755.0 | $ 1,436.8 | $ 1,341.6 | $ 751.5 | $ 4,284.9 |

*Footnotes:*
(a) Assumes DPOA & DFFA deals are consistent with that of DPLSA.
(b) Health benefits include $142.8m of OPEB payments for current retirees in FY 2014 ($123.8m) and FY 2015 ($19m).
(c) The impact of the first decade increase in DDOT subsidy is assumed to be offset by operational savings beyond 2023.
(d) Any incremental professional fees are assumed to be funded by escrow account subject to State approval.

POA00706606

**Plan of Adjustment - 40 year projections**
Preliminary forecast and distributions
*($ in millions)*

| | 2014-2023 | 2024-2033 | 2034-2043 | 2044-2053 | 40-year total |
|---|---|---|---|---|---|
| **Sources** | | | | | |
| **Funds available for unsecured claims** | $ 755.0 | $ 1,436.8 | $ 1,341.6 | $ 751.5 | $ 4,284.9 |
| **Revenue stream from DWSD - no transaction** | | | | | |
| Pension | 478.5 | - | - | - | 478.5 |
| OPEB (based on 12.1% of OPEB - current retirees payments) | 19.9 | 40.4 | 38.7 | 5.9 | 105.0 |
| POC (based on 11.5% of total POC payments) | 6.4 | 13.9 | 13.3 | 2.0 | 35.6 |
| **Sub-total: Revenue stream from DWSD** | 504.8 | 54.3 | 52.1 | 8.0 | 569.1 |
| **Reimbursement from other funds** | 27.6 | 32.8 | 25.2 | 15.5 | 101.2 |
| **Hypothetical art proceeds** | | | | | |
| Foundation fundraising | 164.7 | 201.3 | - | - | 366.0 |
| DIA contributions | 45.0 | 55.0 | - | - | 100.0 |
| **State settlement** | 194.8 | - | - | - | 194.8 |
| **Total hypothetical sources** | $ 1,641.9 | $ 1,780.2 | $ 1,418.9 | $ 775.0 | $ 5,616.0 |
| | | | | | |
| **Uses** | | | | | |
| **Hypothetical retiree payments** | | | | | |
| PFRS pension payments | (260.7) | (617.7) | (464.5) | (311.3) | (1,654.2) |
| GRS pension payments | (718.6) | (630.4) | (474.0) | (317.7) | (2,140.7) |
| PFRS OPEB payments - current retirees | (9.1) | - | - | - | (9.1) |
| GRS OPEB payments - current retirees | (10.9) | - | - | - | (10.9) |
| **Subtotal: hypothetical retiree distributions** | (999.3) | (1,248.1) | (938.5) | (628.9) | (3,814.9) |
| **Hypothetical notes** | | | | | |
| Note A1 (UTGO) | (327.5) | (40.8) | - | - | (368.4) |
| Note A2 (UTGO) | (55.0) | - | - | - | (55.0) |
| Note B ($632m - 10yr interest only) | (214.9) | (470.7) | (450.6) | (68.9) | (1,204.6) |
| **Subtotal: hypothetical notes** | (597.4) | (511.1) | (450.6) | (68.9) | (1,628.0) |
| **Total hypothetical distributions / total uses** | $ (1,596.7) | $ (1,759.2) | $ (1,389.2) | $ (697.8) | $ (5,442.9) |
| | | | | | |
| **Surplus / (deficit)** | $ 45.2 | $ 21.0 | $ 29.7 | $ 77.2 | $ 173.1 |
| **Ending cash balance** | $ 81.2 | $ 102.2 | $ 131.9 | $ 209.1 | $ 209.1 |

POA00706607

**Plan of Adjustment - 40 year projections**
**Preliminary forecast and distributions**
*($ in millions)*

| | 2014-2023 | 2024-2033 | 2034-2043 | 2044-2053 | 40-year total |
|---|---|---|---|---|---|
| **Total distributions to creditors** | | | | | |
| PFRS pension (c) | $ (260.7) | $ (617.7) | $ (464.5) | $ (311.3) | $ (1,654.2) |
| GRS pension (c) | (718.6) | (630.4) | (474.0) | (317.7) | (2,140.7) |
| PFRS OPEB | (9.1) | - | - | - | (9.1) |
| GRS OPEB | (10.9) | - | - | - | (10.9) |
| UTGO (Note A1) | (327.5) | (40.8) | - | - | (368.4) |
| LTGO (Note A2) | (55.0) | - | - | - | (55.0) |
| Note B | | | | | |
| PFRS OPEB | (78.9) | (172.7) | (165.5) | (25.3) | (442.5) |
| GRS OPEB | (74.1) | (162.1) | (155.3) | (23.7) | (415.2) |
| POC | (55.0) | (120.4) | (115.4) | (17.6) | (308.5) |
| Notes/loans payable | (1.3) | (2.7) | (2.6) | (0.4) | (7.0) |
| Other unsecured items | (5.6) | (12.3) | (11.8) | (1.8) | (31.4) |
| **Total hypothetical distributions to unsecured creditors** | **(1,596.7)** | **(1,759.2)** | **(1,389.2)** | **(697.8)** | **(5,442.9)** |
| **Total secured debt service (including QOL/Exit financing)** | (726.3) | (501.3) | (67.2) | - | (1,294.7) |
| **Total distributions to creditors** | **$ (2,323.0)** | **$ (2,260.5)** | **$ (1,456.3)** | **$ (697.8)** | **$ (6,737.7)** |
| Percentage of total revenues (including other sources) | 19.2% | 18.2% | 10.1% | 4.0% | 12.0% |

| | Claims (a) | | 40 years | | | |
|---|---|---|---|---|---|---|
| | $ in millions | % | Nominal (b) | % | PV @ 5.0% (b) | % |
| PFRS pension (c) | 1,250.0 | 13% | 1,325.2 | 108% | 481.8 | 39% |
| GRS pension (c) | 1,879.0 | 19% | 1,808.9 | 96% | 895.5 | 48% |
| PFRS OPEB | 2,207.8 | 23% | 451.7 | 20% | 212.1 | 10% |
| GRS OPEB | 2,095.2 | 22% | 426.0 | 20% | 201.3 | 10% |
| Sub-total: Pension and OPEB | 7,432.1 | 77% | 4,011.8 | 54% | 1,790.6 | 24% |
| UTGO (Note A1) | 387.9 | 4% | 368.4 | 95% | 288.4 | 74% |
| LTGO (Note A2) | 163.5 | 2% | 55.0 | 34% | 52.4 | 32% |
| Notes B (excl. OPEB) | | | | | | |
| POC | 1,472.9 | 15% | 308.5 | 21% | 141.5 | 10% |
| Notes/loans payable | 33.6 | 0% | 7.0 | 21% | 3.2 | 10% |
| Other unsecured items | 150.0 | 2% | 31.4 | 21% | 14.4 | 10% |
| Sub-total: Note B (excl. OPEB) | 1,656.5 | 17% | 346.9 | 21% | 159.1 | 10% |
| Total | $ 9,640.0 | 100% | $ 4,782.1 | 50% | $ 2,290.5 | 24% |

**Footnotes:**

(a) Subject to ongoing legal review/negotiation. Final allowed claim amounts under these categories may be materially different.

(b) Nominal pension system payments have each been adjusted by $661m for PFRS and GRS combined (State settlement & art proceeds) for the calculation of recoveries.

(c) Retirement system pension claims based on actuarial valuation as of June 30, 2013.

**Plan of Adjustment - 40 year projections**
**Preliminary forecast and distributions**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2014-2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $ 247.9 | $ 256.2 | $ 262.3 | $ 268.3 | $ 274.0 | $ 279.9 | $ 286.0 | $ 292.2 | $ 298.5 | $ 304.9 | $ 2,770.2 |
| State revenue sharing | 191.2 | 196.6 | 198.7 | 200.3 | 202.0 | 203.8 | 205.6 | 199.1 | 200.8 | 202.5 | 2,000.5 |
| Wagering taxes | 169.9 | 168.2 | 169.0 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.6 | 180.3 | 1,732.6 |
| Property taxes | 114.9 | 102.6 | 100.8 | 102.4 | 102.6 | 103.9 | 106.8 | 109.7 | 113.3 | 117.0 | 1,074.0 |
| Utility users' taxes | 20.1 | 24.5 | 24.9 | 25.5 | 26.0 | 26.4 | 26.8 | 27.2 | 27.6 | 28.0 | 257.2 |
| Sales and charges for services | 131.5 | 118.0 | 115.8 | 113.6 | 111.4 | 109.2 | 107.0 | 104.4 | 103.3 | 104.0 | 1,118.0 |
| Other revenue | 79.8 | 86.6 | 78.7 | 67.3 | 66.0 | 66.3 | 66.6 | 66.9 | 67.2 | 67.5 | 712.8 |
| General Fund reimbursements | 29.8 | 42.9 | 41.7 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 264.1 |
| Transfers in for UTGO | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | 532.8 |
| Restructuring: | | | | | | | | | | | |
|    Department revenue initiatives | 7.2 | 88.0 | 45.1 | 49.7 | 52.9 | 42.5 | 46.9 | 44.8 | 51.3 | 52.5 | 482.9 |
|    QOL / exit financing proceeds (net) | 52.5 | 199.4 | 40.8 | - | - | - | - | - | - | - | 292.7 |
|      Total revenues | 1,111.3 | 1,345.6 | 1,135.6 | 1,075.9 | 1,084.4 | 1,080.8 | 1,095.5 | 1,097.1 | 1,099.6 | 1,112.0 | 11,237.8 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe - Public Safety (a) | (245.2) | (263.3) | (276.7) | (277.5) | (284.4) | (291.5) | (297.4) | (303.3) | (309.4) | (315.6) | (2,864.3) |
| Salaries/overtime/fringe - Non-Public Safety | (85.7) | (86.9) | (88.1) | (86.1) | (88.0) | (90.2) | (92.0) | (93.8) | (95.4) | (97.3) | (903.8) |
| Health benefits (b) | (173.0) | (67.1) | (52.4) | (55.9) | (60.0) | (63.6) | (66.1) | (68.7) | (71.5) | (74.3) | (752.6) |
| OPEB payments - future retirees (a) | (3.0) | (3.1) | (3.1) | (3.1) | (3.2) | (3.2) | (3.3) | (3.3) | (3.4) | (3.4) | (32.2) |
| Active pension plan (a) | (18.8) | (34.1) | (34.1) | (34.9) | (35.8) | (36.7) | (37.4) | (38.2) | (38.9) | (39.7) | (347.9) |
| Other operating expenses (c) | (291.3) | (320.1) | (326.5) | (303.5) | (304.8) | (302.0) | (302.2) | (303.3) | (309.4) | (310.3) | (3,073.2) |
| Restructuring: | | | | | | | | | | | |
|    Additional operating expenditures | (8.0) | (64.6) | (45.3) | (39.9) | (35.6) | (33.0) | (33.0) | (33.3) | (32.5) | (32.1) | (357.5) |
|    Working capital | (39.8) | 15.0 | - | - | - | - | - | - | - | - | (24.8) |
|    Secured debt service | (35.4) | (39.4) | (39.4) | (39.4) | (39.4) | (39.4) | (39.5) | (39.5) | (39.5) | (39.6) | (390.5) |
|    Contributions to income stabilization fund | - | (2.5) | (2.3) | (2.3) | (2.2) | (2.1) | (2.1) | (2.0) | (1.3) | (1.1) | (17.8) |
|    Swap interest set-aside | (45.9) | (57.8) | - | - | - | - | - | - | - | - | (103.7) |
|    QOL / exit financing principal/interest payments | (0.7) | (13.4) | (18.0) | (18.0) | (18.0) | (46.6) | (59.1) | (56.6) | (54.0) | (51.4) | (335.8) |
|    Reorganization (Capital investments) | (20.4) | (118.9) | (106.4) | (65.6) | (50.2) | (43.6) | (51.9) | (46.0) | (40.4) | (38.6) | (582.2) |
|    Restructuring professional fees (d) | (82.2) | (47.8) | - | - | - | - | - | - | - | - | (130.0) |
|    Blight (excludes heavy commercial) | (2.0) | (100.0) | (45.0) | (40.0) | (43.0) | (48.0) | (52.0) | (45.0) | (25.0) | (19.0) | (420.0) |
|    PLD decommission | - | (2.5) | (5.0) | (15.0) | (10.0) | (10.0) | (10.0) | (12.5) | (10.0) | - | (75.0) |
|    Contingency | - | (13.5) | (11.4) | (10.8) | (10.8) | (10.8) | (11.0) | (11.0) | (11.0) | (11.1) | (101.3) |
|    Reinvestment deferrals | - | - | 6.4 | 3.4 | (9.8) | 23.8 | 24.7 | 22.0 | (8.9) | (31.8) | 29.8 |
|      Total expenditures | (1,051.7) | (1,219.1) | (1,048.3) | (988.6) | (995.2) | (997.0) | (1,032.3) | (1,034.6) | (1,050.5) | (1,065.5) | (10,482.8) |
| **Funds available for unsecured claims** | $ 59.6 | $ 126.5 | $ 87.3 | $ 87.2 | $ 89.2 | $ 83.8 | $ 63.3 | $ 62.6 | $ 49.0 | $ 46.5 | $ 755.0 |

*Footnotes:*
(a) Assumes DPOA & DFFA deals are consistent with that of DPLSA.
(b) Health benefits include $142.8m of OPEB payments for current retirees in FY 2014 ($123.8m) and FY 2015 ($19m).
(c) The impact of the first decade increase in DDOT subsidy is assumed to be offset by operational savings beyond 2023.
(d) Any incremental professional fees are assumed to be funded by escrow account subject to State approval.

13-53846-tjt    Doc 13498    Filed 02/04/21    Entered 02/04/21 18:04:33    Page 29 of 77

POA00706609

City of Detroit                                                                                                                Exhibit 3b

**Plan of Adjustment - 40 year projections**
**Preliminary forecast and distributions**
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2014-2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | |
| **Sources** | | | | | | | | | | | |
| **Funds available for unsecured claims** | $ 59.6 | $ 126.5 | $ 87.3 | $ 87.2 | $ 89.2 | $ 83.8 | $ 63.3 | $ 62.6 | $ 49.0 | $ 46.5 | $ 755.0 |
| **Revenue stream from DWSD - no transaction** | | | | | | | | | | | |
|   Pension | - | 65.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 478.5 |
|   OPEB (based on 12.1% of OPEB - current retirees payments) | - | 2.5 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 19.9 |
|   POC (based on 11.5% of total POC payments) | - | 0.4 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 6.4 |
| **Sub-total: Revenue stream from DWSD** | - | 68.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 454.8 |
| **Reimbursement from other funds** | - | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.0 | 3.0 | 3.0 | 3.0 | 27.6 |
| **Hypothetical art proceeds** | | | | | | | | | | | |
|   Foundation fundraising | - | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 164.7 |
|   DIA contributions | - | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 45.0 |
| **State settlement** | - | 194.8 | - | - | - | - | - | - | - | - | 194.8 |
| **Total hypothetical sources** | $ 59.6 | $ 416.0 | $ 162.0 | $ 162.0 | $ 164.0 | $ 158.6 | $ 137.9 | $ 137.2 | $ 123.6 | $ 121.1 | $ 1,641.9 |
| | | | | | | | | | | | |
| **Uses** | | | | | | | | | | | |
| **Hypothetical retiree payments** | | | | | | | | | | | |
|   PFRS pension payments | - | (114.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (260.7) |
|   GRS pension payments | - | (188.2) | (76.9) | (76.9) | (76.8) | (76.6) | (56.5) | (56.5) | (55.2) | (54.9) | (718.6) |
|   PFRS OPEB payments - current retirees | (9.1) | - | - | - | - | - | - | - | - | - | (9.1) |
|   GRS OPEB payments - current retirees | (10.9) | - | - | - | - | - | - | - | - | - | (10.9) |
| **Subtotal: hypothetical retiree distributions** | (20.0) | (302.5) | (95.2) | (95.2) | (95.1) | (94.9) | (74.8) | (74.8) | (73.5) | (73.2) | (999.3) |
| **Hypothetical notes** | | | | | | | | | | | |
|   Note A1 (UTGO) | - | (45.8) | (41.5) | (41.5) | (40.5) | (38.4) | (37.8) | (37.1) | (24.1) | (20.8) | (327.5) |
|   Note A2 (UTGO) | - | (55.0) | - | - | - | - | - | - | - | - | (55.0) |
|   Note B ($632m - 10yr interest only) | - | (12.6) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (214.9) |
| **Subtotal: hypothetical notes** | - | (113.4) | (66.8) | (66.8) | (65.8) | (63.7) | (63.0) | (62.4) | (49.4) | (46.1) | (597.4) |
| **Total hypothetical distributions / total uses** | $ (20.0) | $ (416.0) | $ (162.0) | $ (162.0) | $ (160.9) | $ (158.6) | $ (137.9) | $ (137.2) | $ (122.9) | $ (119.3) | $ (1,596.7) |
| | | | | | | | | | | | |
| **Surplus / (deficit)** | $ 39.6 | $ 0.0 | $ - | $ - | $ 3.1 | $ - | $ - | $ - | $ 0.7 | $ 1.8 | $ 45.2 |
| **Ending cash balance** | $ 75.6 | $ 75.6 | $ 75.6 | $ 75.6 | $ 78.7 | $ 78.7 | $ 78.7 | $ 78.7 | $ 79.4 | $ 81.2 | $ 81.2 |

POA00706610

This page intentionally left blank

POA00706611

**Exhibit 2 – Presentation made by the City to the Board of the PFRS**



# Legacy Pension Obligations

## Funding Policy Recommendation
## Police and Fire Retirement System

**Office of the Chief Financial Officer | Office of Budget**

August 19, 2020

# Overview

- Introduction
- Background
- Process
- Risks
- Options
- Recommendation

# Introduction

- Presenters:
  - David Massaron, Chief Financial Officer, City of Detroit
  - Tanya Stoudemire, Deputy CFO/Budget Director, City of Detroit

- The City's legacy pension plans have not yet adopted funding policies
- Plan experience plus funding policy will have a substantial impact on the City budget
- We have analyzed those fiscal impacts and are presenting our recommended framework for funding our legacy pension plans

# Background

**Legacy Pension Obligations**

**OCFO – Office of Budget**                    4

# Stakeholders agreed to the POA terms

Bankruptcy Court confirmed the POA in November 2014, finding it feasible based on a mediated solution, to which the City, Retirees, Pension Boards and their Actuaries agreed:

- Legacy pension benefits were reduced and frozen, and the plans were closed
- Grand Bargain contributions prevented even larger pension benefit reductions
- 10-year "pension holiday" for City to address service insolvency and rebuild tax base by investing in operations, capital improvements, and blight removal
- 30-year amortization beginning FY 2024 that assumed annual contributions increase from $0 to $111M in FY 2024 (the "pension cliff")
  - Even with the pension reductions, the City still faces a substantial financial burden

# But the POA understated the pension liabilities

- Outdated mortality tables used in 2014 understated pension liabilities
- Pension benefit reductions would have otherwise been larger
- Within one year, mortality tables used for the new valuations increased unfunded liabilities over $490M (34%)
- **City had a bigger financial challenge to address one year out of bankruptcy**



**Combined UAAL of Legacy Plans after Bankruptcy**
($ in millions)

POA (Oct 2014): **$1.45 B**
FY 2014 Valuation: **$1.94 B**

# Led to another $55M (and still growing) annual budget burden starting in FY24

**Projected FY 2024 Contribution to Legacy Plans
General Fund**
($ in millions)



In her October 2014 report on the POA's feasibility, the Bankruptcy Court's expert Martha Kopacz said:

"I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment...**It is not realistic or prudent to believe that the City could take on any additional Plan obligations and remain within the continuum of reasonableness necessary to establish feasibility**."

\* Excludes annual Foundation/DIA contributions through FY34. After that, General Fund must bear that additional $18.7M. Excludes DWSD and Library contributions.

# How did the City respond?

The City has gone beyond the POA requirements to address the now larger pension cliff:

- City is not required to make pension contributions until FY2024 but began setting aside surplus funds in 2016 otherwise available for reinvestment
- The Mayor and City Council agreed in 2017 to provide $335M in additional pension funding through FY2023
- Established the Retiree Protection Fund (RPF) to conservatively invest the $335M in an irrevocable trust that can only be used for pension funding
- RPF assets will partially offset annual pension contributions starting FY2024
- The plan gradually builds up the City's budget capacity to make pension contributions
  - The "pension cliff" instead becomes a ramp

# FY 2021 RPF Approved Budget (with City's March 2020 Projections)



* Excludes "Grand Bargain" contributions from State of Michigan, Foundation for Detroit's Future (FDF), and Detroit Institute of Arts (DIA). DWSD and Library liabilities and contributions are separate.

**Legacy Pension Obligations**

**OCFO – Office of Budget**    9

# But City Budget not sustainable with current RPF Plan



**FY20-29 Long-Term Forecast (July 2020)**
($ in millions)

Resource gap will be supported by fund balance in FY20 and FY21.

Assumes 30-year level dollar amortization

Expenditures continue to exceed revenues in FY22 without action

Revenues ——  Expenditures ——

* Includes recurring RPF deposits as expenditures through FY 2023

13-53846-tjt    Doc 13868    Filed 09/04/21    Entered 09/04/21 18:04:35    Page 42 of 77

# The Problem: Our FY2024 "Pension Cliff" keeps growing...



General Fund
($ in millions)

**$111 M** FY24 Contribution from Plan of Adjustment

10% of Budget

# The Problem: Our FY2024 "Pension Cliff" keeps growing...



General Fund
($ in millions)

**$140 M** FY24 Contribution with Mortality Table Impacts

10% of Budget

# The Problem: Our FY2024 "Pension Cliff" keeps growing...

**$166 M** FY24 Contribution in FY2021 Budget due to 2 years of missed investment target



# The Problem: Our FY2024 "Pension Cliff" keeps growing...



**$178 M** FY24 Contribution Now projected due to new valuations released in April

The City needs greater contribution **certainty** to plan ahead and fund retiree benefits

General Fund
($ in millions)

10% of Budget

# And with a shorter amortization? FY2024 "Pension Cliff" at 25-Year Policy



**$191 M** FY24 Contribution if City takes on **25-year level dollar**

Shorter amortization periods increase the annual cost and volatility

General Fund
($ in millions)

10% of Budget

# And with a shorter amortization?
# FY2024 "Pension Cliff" at 20-Year Policy



**$213 M** FY24 Contribution if City takes on **20-year level dollar**

General Fund
($ in millions)

**20% of Budget**

**10% of Budget**

Pension spending would crowd out the City's ability to fund essential services.

# Pension Plans Failing to Meet Returns

- Until FY 2024, the Plans rely on investment returns to fund retiree payments
- Not hitting the 6.75% investment return is the biggest cost driver for pensions
- Unfunded liability is $2.2B, **just one bad year** (0% return) can increase it to $2.6B

  - That **one bad year** increases the annual contribution by $22M

## $22M = Recreation Budget

  - Even with a strong recovery the following year (10% return), annual contribution still grows by $13M

## $13M = Human Resources Budget

# Funding Policy Process

# Process for Detroit's funding policy

- The Pension Plans must adopt funding policies and provide actuarially determined contributions prior to the City developing its budget for FY2024 (by fall 2022)
  - Contribution projections based on an approved funding policy this year will help the City plan ahead using the RPF
- The Investment Committees (ICs) of each Plan have responsibility over actuarial matters, including funding policy
- The City, as the plan sponsor, must have substantial input on funding policy
  - The City would have recourse in the Bankruptcy Court if the funding policy threatens the City's implementation of the Plan of Adjustment (POA)

# Funding Policy Objectives and Goals

- The main objective is to fund the long-term costs of the promised benefits to retirees
- The principal goal is that future contributions and current plan assets are sufficient to pay all benefits to our 28,000 retirees and their beneficiaries when due

How does a funding policy successfully do that?

1. It ensures adequate plan solvency to pay benefits
2. It provides predictable and affordable contributions for the plan sponsor
3. It manages and controls future contribution volatility
4. It complies with all provisions in State law (PERSIA, Home Rule City Act)

# How can we fund retiree benefits?

1. **Pre-funding** retiree benefits over an established time period so that eventually investment earnings alone can fund them
2. **Direct funding** retiree benefits directly from the City budget

- Ideally, the Plans would be 100% pre-funded with risk-free investments, but that would require an impossible level of City contributions
- Direct funding is infeasible today because annual retiree payments are over $540M
- Pre-funding with investment risk is typical for plans that continue to grow
- Direct funding can work for frozen plans like ours that continue to shrink, once annual retiree payments decrease to a level the City budget can bear (est. mid-2040s)

# Projected Retiree Payments: GRS and PFRS Combined



**Combined GRS and PFRS Annual Retiree Payments for Legacy Pension Plans**
($ in millions)

# Projected Retiree Payments: PFRS Only



**PFRS Only Annual Retiree Payments for Legacy Pension Plans**
($ in millions)

# Funding Policy Risks

# Risks

1. **Solvency Risk**: The Plans run out of assets before the City budget can afford to directly fund benefits
   - Managed with City contributions and Plan assets to cover retiree payments
   - Benefits are frozen, so mortality drives liabilities changes
   - Greatest risk is poor investment performance
2. **Budget Risk**: The Plans demand contributions City cannot afford, risking deep personnel and service cuts, or even another service insolvency
   - Managed with contributions the City budget can afford with limited volatility

- In the City's bankruptcy, retirees lost benefits because the City could not afford them
- To ensure that does not happen again, funding policy must manage both of these risks

# What does poor investment performance look like?

What happens to the contribution when the Plans do not hit 6.75%?

**$178 M** FY24 Contribution now projected due to new valuations released in April



General Fund
($ in millions)

10% of Budget

# What does poor investment performance look like?

Pension Plans have returned 3% for the past 5 years through March 2020

**$222M** Contribution under 30-year level dollar if Plans only return 3% for the next 5 years



General Fund
($ in millions)

20% of Budget

10% of Budget

# ...and under a 25-year amortization?

**$239M** Contribution if City takes on **25-year level dollar** at **3% return** for next 5 years



General Fund
($ in millions)

20% of Budget

10% of Budget

# ...20-year amortization?

**$265M** Contribution if City takes on **20-year level dollar** at **3% return** for next 5 years

Shorter amortizations create even more budget risk due to investment risk

Unaffordable annual contributions ultimately undermine the solvency risk that shorter amortizations try to solve



General Fund
($ in millions)

25% of Budget

20% of Budget

10% of Budget

# Funding Policy Options

# Funding Policy Amortizations

- Per state law, the required employer contribution "shall not be determined using an amortization period greater than 30 years" (MCL 38.1140m)
  - That includes an open rolling 30 years restarted every year
- Focus so far has been **Level Dollar Amortization** spread over 30, 25, or 20 years
- Another is a **Predefined 30-year rolling method:**
  - Uses fixed annual contributions and Plan assets over a period of time
  - Transitions to Direct Funding once annual retiree payments decrease to a level the City budget can bear (est. $108M for GRS in FY 2045)
  - Gives the City greater certainty in planning for its contributions

# Predefined 30-Year Rolling Method

- Contributions are defined by a starting amount in FY 2024 plus an annual growth factor
  - Grows contributions over time in line with revenue growth
- Example: $178M in FY24 for GRS & PFRS (same as 30-Year Level Dollar) + 1% per year
  - More than FY 2021 Budget Plan and more than 30-Year Level Dollar
- Pension Plans pay benefits from a combination of City contributions, plan assets, and investment returns for several years
- Since the plans are closed and frozen, benefit payments will decline over time
- When City contributions equal benefit payments, City contributions will cover all benefits and continue declining each year

# Predefined 30-year rolling vs. 30-Year Level Dollar: GRS and PFRS Combined



General Fund
($ in millions)

General Fund picks up $18.7M FDF/DIA share in FY35

■ 30-Year Level Dollar  ■ Predefined

\* Excludes "Grand Bargain" contributions from State of Michigan, Foundation for Detroit's Future (FDF), and Detroit Institute of Arts (DIA). DWSD and Library liabilities and contributions are separate.

# Predefined 30-year rolling vs. 30-Year Level Dollar: PFRS Only



General Fund
($ in millions)

**DIA and General Fund pick up $18.3M FDF share in FY25**

**General Fund picks up $0.4M DIA share in FY35**

* Excludes "Grand Bargain" contributions from State of Michigan, Foundation for Detroit's Future (FDF), and Detroit Institute of Arts (DIA). DWSD and Library liabilities and contributions are separate.

# Level Dollar Amortization: GRS and PFRS Combined



**Combined Annual Retiree Payments for Legacy Pension Plans and Funding Sources**
($ in millions)

After 30 years, Plan Assets and Investment Returns expected to fund retiree payments

Legend: Level Dollar Contributions · Plan Assets/Investment Returns · Retiree Payments

* Includes contributions from General Fund, Foundation for Detroit's Future (FDF), Detroit Institute of Arts (DIA), DWSD, and Library.

# Level Dollar Amortization: PFRS Only



**PFRS Only Annual Retiree Payments for Legacy Pension Plans and Funding Sources**
($ in millions)

**After 30 years, Plan Assets and Investment Returns expected to fund retiree payments**

Level Dollar Contributions ■ Plan Assets/Investment Returns ■ Retiree Payments —

\* Includes contributions from General Fund, Foundation for Detroit's Future (FDF), Detroit Institute of Arts (DIA), DWSD, and Library.

# Predefined 30-year rolling with 1% growth: GRS and PFRS Combined



**Combined Annual Retiree Payments for Legacy Pension Plans and Funding Sources**
($ in millions)

After 23 years, City budget can directly fund retiree payments

Predefined Contributions   Plan Assets/Investment Returns   Retiree Payments

\* Includes contributions from General Fund, Foundation for Detroit's Future (FDF), Detroit Institute of Arts (DIA), DWSD, and Library.

# Predefined 30-year rolling with 1% growth: PFRS Only



**PFRS Only Annual Retiree Payments for Legacy Pension Plans and Funding Sources**
($ in millions)

**After 25 years, City budget can directly fund retiree payments**

Legend: Predefined Contributions · Plan Assets/Investment Returns · Retiree Payments

\* Includes contributions from General Fund, Foundation for Detroit's Future (FDF), Detroit Institute of Arts (DIA), DWSD, and Library.

# Pre-Funding creates both Budget Risk and Solvency Risk

- Front-loading contributions is not the most efficient use of limited City budget funds
  - Larger plan assets in the near term will increase investment risk
  - Shorter amortizations will increase budget risk and volatility
  - We cannot crowd out 20%-30% of the City budget for the next 20-30 years
  - It requires service reductions that would erode the tax base and ultimately impair the City's ability to pay retiree benefits (service insolvency)

- The City just closed a $348M revenue shortfall due to COVID-19.
  - It required painful reductions in employee compensation and layoffs that saved **only $50M (5% of the budget)**

# Solvency Risk: GRS & PFRS Combined

- While 20- and 25-Year amortizations may seem less risky, they are instead the riskiest because the City cannot afford them (risks a default and another service insolvency)
- Predefined 30-year rolling bears some solvency risk, but it can be mitigated by ongoing evaluation, adjustment to the contributions, and RPF reserves
  - As possibility of asset depletion grows, retiree payments are declining
  - Risk peaks FY34-FY44 when City budget alone cannot yet afford retiree payments

| Fiscal Year | Retiree Payments | City Contributions | Difference Covered by Pension Fund |
|---|---|---|---|
| 2024 | $537M | $205M | $332M |
| 2034 | $452M | $227M | $225M |
| 2044 | $301M | $251M | $50M |
| 2047 | $251M | $251M | $0 |

13-53846-tjt    Doc 13478    Filed 02/04/21    Entered 02/04/21 18:03:35    Page 72 of 77

# Funding Policy Recommendation

# Predefined 30-year rolling contributions manages both Budget and Solvency Risks

- We need greater contribution certainty to plan ahead and fund retiree benefits
- We need to pair contribution growth with revenue growth
- We need to manage our Plans until we can afford to pay benefits directly

- We do not face the same challenges as open plans that must match growing assets with growing liabilities
- Our closed legacy plans have frozen liabilities that decrease over time

- We have an opportunity to set our plan today and start taking actions now to meet those targets with predictable and affordable contributions and less risk to the City and its stakeholders

# But what about solvency risk with a Predefined 30-year rolling policy?

- Managing our Plans until we can afford to pay retiree benefits directly means ensuring plan assets are sufficient to cover retiree payments that exceed our annual contributions

- We can manage Solvency Risk by shaping our funding policy with these principles:

    1. Set our Predefined 30-year rolling contributions above the bare minimum to build in a cushion in the Pension Plans

    2. Do not reduce contributions in response to investment gains

    3. Increase contributions if possibility of asset depletion > 15% within 10 years and before we switch to Direct Funding

    4. Build up additional reserves in the RPF as a safeguard for the peak risk period of 2034-2044 before we switch to Direct Funding

# Recommendation

1.  Work with the Pension Plans and their actuaries to establish a Predefined 30-year rolling contributions funding policy consistent with the framework presented today
    o   Given expected investment performance in FY 2020, the Predefined 30-year rolling contributions shown here will need to be adjusted before we lock in a plan

2.  Identify and provide both new one-time and ongoing funding to the RPF to rebuild a workable budget ramp and to shore up reserves for 2034-2044 period

3.  Maintain a constant dialog with the Pension Plans to successfully monitor and manage the new funding policy

# Current RPF with Predefined 30-year rolling contributions



General Fund
($ in millions)

FDF/DIA
Support Ends

More RPF Funding will be needed

RPF Deposits Total $335M

Legend: Pension Contribution (General Fund) • Pension Contribution (RPF) • RPF Deposit (recurring) • RPF Deposit (one-time)

\* Excludes "Grand Bargain" contributions from State of Michigan, Foundation for Detroit's Future (FDF), and Detroit Institute of Arts (DIA). DWSD and Library liabilities and contributions are separate.

13-53846-tjt   Doc 13478   Filed 02/04/21   Entered 02/04/21 18:04:35   Page 77 of 77