# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RICHARD WERSHE, JR,

Case No.  21-cv-11686

*Plaintiff,*

*v.*

Hon.  Laurie J Michelson
Mag. Elizabeth A Stafford

THE CITY OF DETROIT; WILLIAM
JASPER, former Detroit Police
Officer, individually; KEVIN GREEN,
former Detroit Police Officer,
individually; JAMES DIXON, former
Federal Bureau of Investigations agent,
individually; HERMAN GROMAN,
former Federal Bureau of
Investigations agent, individually;
LYNN HELLEND, former Assistant
United States Attorney; and JAMES
KING former Assistant United States
Attorney; and UNKNOWN
ASSISTANT UNITED STATES
ATTORNEY; jointly and severally,

*Defendants*

| | |
|---|---|
| AYAD LAW, PLLC | CITY OF DETROIT LAW DEPT. |
| Nabih H. Ayad (P59518) | Gregory B. Paddison (P75963) |
| William D. Savage (P82146) | Attorney for City of Detroit |
| Attorney for Plaintiff | Coleman A. Young Municipal Center |
| 645 Griswold St., Ste 2202 | 2 Woodward Ave., Ste. 500 |
| Detroit, MI 48226 | Detroit, MI 48226 |
| P: 313.983.4600 | (313) 237-0435 |
| F: 313.983.4665 | paddisong@detroitmi.gov |
| ayadlaw@hotmail.com | |

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF DETROIT'S**
**MOTION TO DISMISS *IN LIEU* OF AN ANSWER**</u>

Plaintiff, Richard Wershe, Jr., ("Plaintiff") by and through his attorneys at

Ayad Law, PLLC, hereby responds to Defendant City of Detroit's ("Defendant")

Motion to Dismiss in Lieu of Answer, stating the following:

<div align="center">

**TABLE OF CONTENTS**

</div>

**TABLE OF AUTHORITY**     **iii**

**ISSUES PRESENTED**     **1**

**FACTUAL BACKGROUND**     **1**

**LAW AND ARGUMENT**     **10**

<u>***SECTION I: REGARDING THE LAW OF EQUITABLE***</u>
<u>***TOLLING***</u>     **10**

***Standard of review:***     **10**

***a. Defendant's four unpublished district court cases, litigated pro se, are***     **11**
***not controlling and do not speak to the important constitutional issues at***
***play here, namely, equitable tolling based on a fear of retaliation.***

***b. Federal law requires the Court to perform an equitable tolling analysis***     **13**
***of Plaintiff's case because Michigan's lack of equitable tolling is***
***"inconsistent with the Constitution and laws of the United States" and***
***federal "courts modify state tolling rules in these situations because §***
***1983 is a remedial statute that seeks to deter violations of individual***
***constitutional rights and compensate individuals who have suffered such***
***violations whereas state statutes of limitations serve different goals, such***
***as finality and repose."***

***c. Even if this Court were to determine that Michigan's tolling provisions***     **18**
***apply to Plaintiff's case, he would still be entitled to tolling of his claims***
***pursuant to Michigan's "judicial tolling" doctrine which allows for tolling***
***when the state of the law itself has caused confusion***

<div style="writing-mode: vertical">

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

</div>

*SECTION II: REGARDING THE APPLICATION OF*    **20**
*EQUITABLE TOLLING STANDARDS TO PLAINTIFF'S CASE.*

*Standard of review:*    **20**

*a. Like the Second Circuit's test utilized in Davis v Jackson, the Sixth*    **21**
*Circuit uses the Supreme Court's two-factor test, in addition to the Sixth*
*Circuit's traditional five-factor analysis.*

*1. Plaintiff's fear of retaliation based on specific actions and threats,*    **25**
*including his placement into the prisoner's witness protection program for*
*which he went by a false identity for 15 years for working against corrupt*
*members of the Detroit law enforcement community, is absolutely an*
*extraordinary circumstance requiring equitable tolling.*

*2. Not only do the above facts more than meet the standard for fear of*    **34**
*retaliation based on articulable facts of implied threats, but all of*
*Plaintiff's articulated fears are also validate by expert medical diagnosis.*

*3. Plaintiff pursued his rights diligently, especially considering his great*    **35**
*trauma and valid fear of physical and legal retaliation, in working to*
*summon the courage to file this lawsuit within one year of the ending of*
*his parole period.*

**CONCLUSION AND RELIEF REQUESTED**    **38**

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

# TABLE OF AUTHORITY

**Most controlling:**

*Davis v. Jackson*, No. 15 Civ. 5359 (KMK), 2016 WL 5720811,   Passim
(S.D.N.Y. Sept. 30, 2016)

*Hardin v Straub*, 490 US 536, 538; 109 S Ct 1998, 2000; 104 L Ed 2d   Passim
582 (1989).

*Holland v Florida*, 560 US 631, 655; 130 S Ct 2549, 2566; 177 L Ed 2d   Passim
130 (2010)

**Caselaw:**

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868   10
(2009)

*Ari v. Cohen*, 107 A.D.3d 516, 517, 968 N.Y.S.2d 31 [1st Dept.2013]   16

*Andrews v Orr*, 851 F2d 146, 151 (CA 6, 1988)   21-2

*Baldayaque v. United States*, 338 F.3d 145, 152–153 (C.A.2 2003)   22

*Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003)   20

*Battle v Ledford*, 912 F3d 708, 715 (CA 4, 2019)   18

*Bd of Regents of Univ of State of N Y v Tomanio*, 446 US 478, 479; 100   15
S Ct 1790, 1792; 64 L Ed 2d 440 (1980)

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167   10
L.Ed.2d 929 (2007)).

*Brown v. Morgan*, 209 F.3d 595, 596-97 (6th Cir. 2000).   11

*Central States, Southeast & Southwest Areas Pension Fund v. Slotky*, 956   18
F.2d 1369, 1376 (7th Cir.1992)

*Chavez v. Carranza*, 559 F.3d 486, 493 (6th Cir. 2009)   20

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

*Chung v US Dept of Justice*, 333 F3d 273, 279; 357 US App DC 152, 158 (2003).    38

*Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007)    26

*Crump v Lafler*, 657 F3d 393, 405 (CA 6, 2011)    12

*DeGrave, v State of Wisconsin*, No. 21-CV-256-WMC, 2021 WL 5371393, at *3 (WD Wis, November 18, 2021)    25

*EPlaintiffson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).    10

*Estate of Miller ex rel Miller v Hudson*, 528 Fed Appx 238, 240 (CA 3, 2013)    17

*Gabbidon v Wilson*, No. CV 1:19-00828, 2021 WL 625232, at *10 (SDW Va, February 17, 2021)    25

*Geiss v Weinstein Co Holdings LLC*, 383 F Supp 3d 156, 173 (SDNY, 2019), app dis (Oct. 1, 2021)    25

*Guy v. Lexington–Fayette Urban County Government*, 488 Fed. Appx. 9, 18 (6th Cir.2012)    13-4

*Heck v Humphrey*, 997 F2d 355, 358 (CA 7, 1993), aff'd 512 US 477; 114 S Ct 2364; 129 L Ed 2d 383 (1994)    14,17-8

*Herman v. Ford Motor Co*. (1982) 326 N.W.2d 590, 119 Mich.App. 639    19

*Jang Ho Choi v Beautri Realty Corp*, 135 AD3d 451, 452; 22 NYS3d 431, 432 (2016)    16

*Johnson v Garrison*, 805 Fed Appx 589, 594 (CA 10, 2020)    18

*Jones v. Schmaker*, 2019 WL 2949964 (W.D. Mich. July 9, 2019)    12

*Kirschke v. Schooley*, 2020 WL 3036389 (E.D. Mich. June 4, 2020)    12

*Lake v Arnold*, 232 F3d 360, 366 (CA 3, 2000)    17

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

iv | P a g e

*Massey v Frank*, No. 1:19-CV-115, 2019 WL 1109756, at *1 (WD Mich, March 11, 2019)    11

*Moses v Westchester Co Dept of Corr*, 951 F Supp 2d 448, 454 (SDNY, 2013)    16

*Nicoloudakis v Bocchini*, No. CV 13-2009 (MAS), 2016 WL 3617959, at *3 (DNJ, July 1, 2016)    29

*Parnell v Lashbrook*, No. 16-CV-1144-NJR, 2017 WL 2876526, at *6 (SD Ill, July 6, 2017)    25

*Peterson v. Ostrander*, 2016 WL 2956360 (W.D. Mich. May 23, 2016)    11

*Peterson v. Ostrander*, 17-2160, 2018 WL 4739692, at *2 (6th Cir., Apr. 6, 2018)    5,26

*Rentsch v Herbert*, No. 18-12491, 2019 WL 8750358, at *3 (ED Mich, October 16, 2019), report and recommendation adopted No. 18-12491, 2020 WL 1283787 (ED Mich, March 18, 2020)    19

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).    10

*Rosenblum v. Yates*, No. 09-CV-3302, 2011 WL 590750, at *3 (E.D. Cal. Feb. 10, 2011)    29

*Ross v Blake*, 578 US 632, 644; 136 S Ct 1850, 1859; 195 L Ed 2d 117 (2016)    27

*Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)    26

*Shared Communications Servs. of ESR, Inc. v. Goldman, Sachs & Co.*, 38 A.D.3d 325, 832 N.Y.S.2d 32 [1st Dept.2007]    16

*Solman v Corl*, No. 3:15-CV-1610 (JCH), 2018 WL 2337129, at *8 (D Conn, May 23, 2018)    25

*Swann v Charlotte-Mecklenburg Bd of Ed*, 402 US 1, 15; 91 S Ct 1267, 1276; 28 L Ed 2d 554 (1971)    13

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

*Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378, 448; 738 NW2d 664, 702 (2007)     19

*Truitt v Co of Wayne*, 148 F3d 644, 648 (CA 6, 1998)     39

*Wallace v. Kato*, 549 U.S. 384, 387-88 (2007)     15,26

*Wysocki v Intl Bus Mach Corp*, 607 F3d 1102, 1105 (CA 6, 2010); Fed. R. Civ. P. 56.     21

*Zappone v United States*, 870 F3d 551, 556 (CA 6, 2017)     16,20-1

**Rules and Statutes:**

42 US Code § 1983 ("§ 1983")     Passim

MCL 600.5851     19

MCL 600.5869     19

MCL 333.7401     6

Fed. R. Civ. P. 12(b)(6)     10

**Expert Publications:**

Craig Haney, *Psychology and the Limits to Prison Pain Confronting the Coming Crisis in Eighth Amendment Law*, 3 Psychol. Pub. Pol'y & L. 499, 499 (1997)     27

Jason J. Ben, *America's Need to Explore Alternatives to Incarceration: Can America Purport to Be the "Land of the Free" When It Currently Is the World's Leading Incarcerator?*, 30 S.U. L. Rev. 349, 356 (2003)     28

Vincent M. Nathan, *Evaluation of the Inmate Grievance System Ohio*, Ohio Dep't of Rehab. & Corr. 28 (Feb. 13, 2001), *https://www.law.umich.edu/facultyhome/margoschlanger/Documents/Resources/Prison_and_Jail_Grievance_Policies/Ohio_Nathan_Evaluation_Grievance_System.pdf*.     28

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Zieva Dauber Konvisser, *Psychological Consequences of Wrongful*       28
*Conviction in Women and the Possibility of Positive Change*, 5 DePaul J.
for Soc. Just. 221, 241 (2012)

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## ISSUES PRESENTED

1. Does Michigan's no-tolling rule, as applied to prisoners seeking to bring § 1983 claims, frustrate the goals of § 1983 and is thus clearly "inconsistent" with settled federal policy and requiring application of federal equitable tolling law? *Hardin v Straub*, 490 US 536, 538; 109 S Ct 1998, 2000; 104 L Ed 2d 582 (1989).

   Plaintiff answers: "Yes."

   Defendant answers: "No."

2. Given Plaintiff's validated fear of retaliation based on actual threats and instances of retaliation, does Plaintiff's situation constitute an extraordinary circumstance which stood in his way in filing suit and entitles him to equitable tolling? *Holland v Florida*, 560 US 631, 655; 130 S Ct 2549, 2566; 177 L Ed 2d 130 (2010); *Davis v. Jackson*, No. 15 Civ. 5359 (KMK), 2016 WL 5720811, (S.D.N.Y. Sept. 30, 2016).

   Plaintiff answers: "Yes."

   Defendant answers: "No."

## FACTUAL BACKGROUND

**Plaintiff Mr. Richard Wershe, Jr. ("Plaintiff") spent 32 years and 7 months in prison, which makes him the longest serving person convicted as a minor for a nonviolent offense in the history of the State of Michigan**. **Pltf's Complaint, ECF No. 4, PageID.84, ¶ 1.** He was arrested in 1987 and released last year on July 20, 2020. Effectively, Plaintiff spent his entire adult life in prison.

In 1984, FBI Agents began using Plaintiff as an informant **when he was just 14 years of age**; making him the youngest FBI informant ever known. **Pltf's Complaint, ECF No. 4, PageID.87, ¶ 15-18.** Plaintiff was, even at that age, instilled

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

with the fear of law enforcement common to East-side Detroiter's at that time and felt compelled to do as he was told by these literal authority figures. **Pltf's Aff'd, ECF No. 4-1, PageID 130., ¶ 6-7.** At this tender young age, the FBI gave Plaintiff hard drugs, money, a fake ID.

These FBI Agents' would accost Plaintiff at random, unannounced, times. This could be while he walked to or from school, or even at his home. **Pltf's Complaint, ECF No. 4, PageID.88, ¶ 20.**

In August of 1984, different FBI agents began using Plaintiff in more dangerous undercover operations such as drug buys. The law enforcement acted with impunity. **<u>Plaintiff through the law enforcements meddling, rose in the ranks of an infamous Detroit drug gang amidst the height of Detroit's gangland turf war and the government's war on drugs.</u>**

**<u>In November of 1984, there was an attempted assassination of Plaintiff whereby he was shot at point blank range with a .357 magnum, cutting his large intestine in half, with Plaintiff only surviving by the grace of God.</u>** See Ex. E "White Boy" Documentary at 00:26:17,327 to 00:29:28,601, Ex. D Transcript ¶ 1.** In what can only be described as child abuse, law enforcement (including Detroit Police) went to see Plaintiff in the hospital for the sole purpose of coercing him into not "snitching" on his would-be assassin, to increase Plaintiff's 'street cred' and his value to law enforcement. **See Ex. E "White Boy" Documentary at 00:28:31,001 to 00:29:28,601, Ex. D Transcript ¶ 2.; Pltf's Aff'd, ECF No. 4-1, PageID 131.,**

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**2 |** Page

**¶ 12-13.** Instead of pulling him out, they further endangered him by coercing him to stay a confidential informant. They gave him money, and sent him to Las Vegas alone, at age 15, to mingle with drug kingpins.

As Plaintiff became more and more notorious as the 'white boy' drug dealer, the racial tension between blacks and whites in Detroit, and the country, was at a highpoint. Coleman A. Young was the first black mayor of Detroit and finding dirt on him or his family that led to a conviction would bring glory to any law enforcement officer or team who did it. As it was a known fact that Mayor Young's niece was married to Johnny Curry, the leader of the dangerous Curry Gang, law enforcement pushed Plaintiff in that direction, until Plaintiff was close to Johnny Curry's inner circle.

**When the Curry Gang was implicated in a shooting that killed a 13-year-old Detroiter, the killing made national news. Detroiters were furious. If Johnny Curry went down for such a crime, so would Mayor Young, *via* his connection to the crime: his niece. Accordingly, Plaintiff believes he learned that Mayor Young called in a favor with then head of Detroit homicide investigations, Gil Hill (of Beverly Hills Cop fame). The favor was to frame and ensure the conviction of a decoy; a fall guy, for the shooting of the 13-year-old Detroiter, so that Johnny Curry and, by extension, his uncle-in-law Coleman A. Young, would remain unimplicated and be saved from ruination.**

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**It was after Plaintiff expressed his belief that he had learned that Gil Hill had done the above, that two more assassination attempts were made on him**.

First, a drive-by shooting in which his father nearly died when bullets whizzed past his head. Second, was an attempted shooting by hit-man Nate Boon Craft, in which a van pulled up alongside Plaintiff, opened its sliding door, and Craft attempted to fire on Plaintiff but, fortunately, his gun jammed and Plaintiff's car sped off and escaped. **See Ex. E "White Boy" Documentary at 00:38:56,501 to 00:42:06,649, Ex. D Transcript ¶ 3.; 00:51:01,977 to 00:51:01,977, Ex. D Transcript ¶ 6; Ex. A Second Aff'd of Richard Wershe ¶ 5.**

Nate Boon Craft is on camera admitting that he was paid by Gil Hill to assassinate Plaintiff. Plaintiff was aware of this while he was imprisoned. **See Ex. E "White Boy" Documentary at 00:38:56,501 to 00:42:06,649, Ex. D Transcript ¶ 3.; 00:51:01,977 to 00:51:01,977, Ex. D Transcript ¶ 6; Ex. A Second Aff'd of Richard Wershe ¶ 5.**

However, law enforcement without a personal motivation were also after Plaintiff, and he was eventually arrested and charged. Plaintiff was set up by police. **See Ex. E "White Boy" Documentary at 00:46:48,765 to 00:47:03,780, Ex. D Transcript ¶ 5; Pltf's Comlpaint, ECF No. 4, PageID.13, ¶ 94-95.**

When Plaintiff was arrested, he had no drugs on him, in his vehicle, etc. **He fled on foot empty handed and upon being caught the Detroit police beat him**

**4 |** Page

A Y A D   L A W,  P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**so badly that he had to be hospitalized.** See Ex. E "White Boy" Documentary at 00:46:39,172 to 00:47:03,780, Ex. D Transcript ¶ 4 ;Pltf's Compaint, ECF No. 4, PageID.94, ¶ 59.; Ex. A Second Aff'd of Richard Wershe ¶ 7. **After Plaintiff was charged, he learned that he was accused of possessing a large box of cocaine that had supposedly been found under a porch near where he had fled police, and police were supposedly alerted to the box by a 9-1-1 call, which was somehow never recorded (the prosecutor told the Court that the call had occurred just as the 9-1-1 operator was changing tapes). Plaintiff maintains this was all a set-up by law enforcement and that he did not possess such a box.** See Ex. E "White Boy" Documentary at 00:46:48,765 to 00:47:03,780, Ex. D Transcript ¶ 5; Pltf's Comlpaint, ECF No. 4, PageID.94-95, ¶ 60-61.

**Prior to his trial, Plaintiff and his family were approached by two high-profile Detroit attorneys, initials: E.G. and E.B. Attorneys E.G. and E.B were black, and convinced Plaintiff and his family that it would be better for him to have black attorneys than his then white attorney. Accordingly, Plaintiff accepted those two attorneys, who withdrew pending pretrial motions to suppress evidence and to allow evidence of Plaintiff's having been a law enforcement informant prior to trial. No law enforcement made a single statement on behalf of Plaintiff during his trial. It was not until after his conviction that Plaintiff learned of his attorneys close connection to Gil Hill**.

In 1978, Michigan passed what became known as the 650-lifer law (MCL 333.7401) which, before its revision, mandated that anyone convicted of possessing 650 grams of cocaine or more be sentenced to life without the possibility of parole. At his trial, Plaintiff was alleged to have possessed more than 650 grams of cocaine with an intent to distribute it. In 1987, while still a minor, **Plaintiff was convicted and sentenced to life without parole and he very much felt that that was because he was set-up and taken down by members of law enforcement, especially Gil Hill, whose career would have been ruined if Plaintiff was able to show that he had worked to cover up the Curry Gang members' murder of a 13-year-old boy (something also later admitted by Johnny Curry)**. **See Ex. E "White Boy" Documentary at 00:58:36,472 to 00:58:43,520, Ex. D Transcript ¶ 9.**

On his first day in prison, while on the phone with his mother, Plaintiff witnessed an attempted retaliatory assassination, as one prisoner stabbed another in the neck. After which, a guard said to him, approximately: 'get ready, Wershe, that happens every day in here.' **See Pltf's Aff'd, ECF No. 4-1, PageID.132, ¶ 19-21.; Pltf's Ex. A Second Aff'd ¶ 13.**

While he was in prison, fully knowing that Detroit law enforcement and political figures had set him up and were keeping him there, federal law enforcement and Assistant United States Attorneys (including the former AUSA defendants in this case) approached Plaintiff for help. Plaintiff agreed on the condition that they help him if he ever became eligible for parole. They agreed. **Yet they also moved**

A Y A D  L A W, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**6 |** P a g e

**Plaintiff to a higher security federal prison and gave him a false identity for fifteen (15) years, because, as they stated, they were afraid that members of Detroit law enforcement or politics would try and have him killed if they found out he was working against them**. See Ex. E "White Boy" Documentary at 00:56:11,077 to 00:56:30,346, Ex. D Transcript ¶ 8; Pltf's Ex. A Second Aff'd, ¶ 12. During that difficult time, Plaintiff was estranged from his family. His father died and he was not allowed to attend the funeral. He saw his mother only twice.

After having to be relocated into the witness protection program Plaintiff has stated that his attorney **William Bufalino's advice to not attempt legal action against any of the law enforcement (for fear of retaliation in the form of losing any chance at release or being killed) that had caused his imprisonment made sense in an entirely more serious way. Pltf's Aff'd, ECF No. 4-1, PageID 132, 136, ¶ 18, 41-43. Plaintiff was terrified of his captors. And the hopelessness inevitably instilled by his sentence of life without parole sapped the 'fight' out of him the entire time he was incarcerated.**

Plaintiff successfully helped law enforcement with their operations, leading to the conviction of 12 high-ranking members of Detroit law enforcement. **See Ex. E "White Boy" Documentary at 00:56:11,077 to 00:56:30,346, Ex. D Transcript ¶ 8.** Then, the federal law enforcement came to Plaintiff again for help. They asked him to testify against dangerous criminals that he had interacted with while on the outside. Plaintiff was resistant but they assured him that his testimony would remain

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

sealed forever (as, if his testimony ever got out, it would both expose Plaintiff to retaliatory killing by one of the gangs he was testifying against and portray him in a very negative light by making it appear as if Plaintiff was associated in largescale drug sales/buys). Plaintiff's important testimony ultimately led to the breaking up of the dangerous Best Friends gang by law enforcement. **Accordingly, Plaintiff truly believed that Defendants would help him with his parole when the time came**.

**When Plaintiff finally became eligible for parole in approximately 2003, instead of helping him, the federal law enforcement he worked with refused and, in violation of the law actually leaked the "sealed" testimony that he had agreed to give to a grand jury, to his parole board and the Wayne County Prosecutor's Office, which caused a letter to be sent to from the Wayne County Prosecutor's office to his parole board, stating emphatically that Plaintiff was a dangerous criminal who should never be free again. Incredibly, that letter was signed by E.G., one of Plaintiff's former attorneys in his criminal case who had since become employed at the Wayne County Prosecutors office**. See Ex. E "White Boy" Documentary at 00:59:30,025 to 01:03:11,788, Ex. D Transcript **¶ 10.** This multi-layered betrayal only reinforced Plaintiff's fear of retaliation by the Detroit law enforcement community (city and federal). As stated above, Plaintiff was now aware of his former attorneys E.G.'s and E.B.'s close association with Gil Hill and Mayor Young. Plaintiff has stated a very clear and realistic vision of why

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

he believes that powerful people in Detroit law enforcement worked successfully to keep him in prison.

In the mid-2000's, Plaintiff was, unbelievably, charged with running a car theft ring in Florida from a federal prison. He was extradited to Florida and members of the Detroit law enforcement community contacted the Florida prosecutors and told them to do whatever they had to do to convict Plaintiff. **See Ex. E "White Boy" Documentary at 01:05:13,034 to 01:06:19,685, Ex. D Transcript ¶ 11.; Pltf's Complaint, ECF No. 4, PageID.104, ¶ 106; Ex. A Second Aff'd of Richard Wershe, ¶ 9-10.**

**Plaintiff was put in "the hole," or solitary confinement, for 16 months straight, which itself is illegal in Florida as the maximum number of days one is allowed to be in the hole is 30. See Pltf's Ex. A Second Aff'd, ¶ 11. This was to coerce a confession out of him, as there was apparently not enough to convict him on the trumped-up charges. Plaintiff only took a plea when they told him that they were going to arrest his mother and sister if he did not**.

**On February 29, 2016, Gil Hill passed away. Soon thereafter, in August of 2016, without prompting by Plaintiff or anyone he knew, the Wayne County Prosecutors office inexplicably officially released a letter stating that they were reversing their position on Plaintiff Wershe, and that they now supported his release from prison**. **See Ex. E "White Boy" Documentary at 01:12:22,964 to 01:12:38,939, Ex. D Transcript Par 15.** The timing of this is strong evidence that

**9 |** P a g e

A Y A D  L A W,  P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Gil Hill or his friends had a strong, undue, influence over Plaintiff's circumstances, and an untoward interest in them.

In 2017, Plaintiff was finally paroled by the Michigan Parole Board. He never left government custody, however. Instead, Plaintiff was transferred immediately to a Florida prison, where he served five years. Plaintiff was finally released from prison on July 20, 2020. Plaintiff had spent 32 and 7 months years in prison, effectively, his entire adult life.

## LAW AND ARGUMENT

### SECTION I: REGARDING THE LAW OF EQUITABLE TOLLING.

**Standard of review:** A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp*., 78 F.3d 1125, 1134 (6th Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *EPlaintiffson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668, 129 S.Ct. 1937.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

### a. *Defendant's four unpublished district court cases, litigated pro se, are not controlling and do not speak to the important constitutional issues at play here, namely, equitable tolling based on a fear of retaliation.*

As a civil rights attorney practicing for over 20 years, this counsel knows the great difference in quality between a case litigated *pro se* and a case litigated by a constitutional attorney. In a sense, a *pro se* litigant is forced to fight unarmed against the fully armed and armored defendants of the government. As a general thing, the resulting opinions tend to be of poorer legal quality than those litigated by attorneys equipped with the knowledge to bring all relevant issues to bear. **<u>Each of Defendant's four cases were litigated *pro se*.</u>** The Judge in Defendant's *Massey v Frank*, No. 1:19-CV-115, 2019 WL 1109756, at *1 (WD Mich, March 11, 2019) noted: "Plaintiff asserts eight claims, none of which contain any intelligible supporting facts. For instance, in claim one he alleges, 'Contract plea agreement of guilt perjurous regarding stipulated facts within the borders thereof and therefore nullified/void by default being in breach of truth and accuracy upon offering and submission to district court.' " *Id*.

Defendant's *Peterson v. Ostrander*, 2016 WL 2956360 (W.D. Mich. May 23, 2016) case actually did apply federal equitable tolling to the plaintiff's case: "The statute of limitations [for plaintiff's § 1983 claim] is tolled for the period during which a plaintiff's available state remedies were being exhausted." *Id*. at *2. Citing *Brown v. Morgan*, 209 F.3d 595, 596-97 (6th Cir. 2000).

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

*Jones v. Schmaker*, 2019 WL 2949964 (W.D. Mich. July 9, 2019) is perhaps the farthest thing from a fear of retaliation case, as that plaintiff alleged an injury occurring in 1998, filed suit against the same defendants in 2000, a second time 2018, and finally in 2019; Clearly Jones was not afraid to sue his defendants.

The *Kirschke v. Schooley*, 2020 WL 3036389 (E.D. Mich. June 4, 2020) is hardly comparable to the case at bar as, that plaintiff alleged such trifling abuses as his keepers failing to provide him with enough envelopes for mailing as many letters as he would have liked and that the they allowed him to be transferred to another prison which, the plaintiff felt, had unacceptable levels of lead in its water.

Each of Defendant's cases' opinions are exceedingly short, clearly not intended by its author for publication, and therefore not as precedent. "**Unpublished decisions in the Sixth Circuit are, *of course*, not binding precedent…**" *Crump v Lafler*, 657 F3d 393, 405 (CA 6, 2011) (emphasis added). **Accordingly, none of Defendant's four cases bind this Court in any way**.

Although all of Defendant's four cases mention that Michigan does not allow for any tolling of a prisoner's causes of action, in the § 1983 context, these four cases fail to address the overriding issue of federal tolling allowed pursuant to federal judges' inherent equitable powers, as applied to prisoner's § 1983 when appropriate. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are

inherent in equitable remedies." *Swann v Charlotte-Mecklenburg Bd of Ed*, 402 US 1, 15; 91 S Ct 1267, 1276; 28 L Ed 2d 554 (1971).

   ***b. Federal law requires the Court to perform an equitable tolling analysis of Plaintiff's case because Michigan's lack of equitable tolling is "inconsistent with the Constitution and laws of the United States" and federal "courts modify state tolling rules in these situations because § 1983 is a remedial statute that seeks to deter violations of individual constitutional rights and compensate individuals who have suffered such violations whereas state statutes of limitations serve different goals, such as finality and repose."***

   Defendant's argument, that the doctrine of equitable tolling is precluded in Plaintiff's case, fails to fully review the status of the law. In fact, Defendant cites to only a single case for that direct proposition (and four unpublished cases which Defendant feels are illustrative). Defendant's sole authoritative case is highly distinguishable from the case at bar.

   Specifically, Defendant argues that because federal causes of action that do not have their own statutes of limitations use analogous state statutes and doctrines, and because Michigan does not have an equitable tolling doctrine, that this Court cannot apply equitable tolling to rescue Plaintiff's causes of action. Defendant cites only *Guy v. Lexington–Fayette Urban County Government*, 488 Fed. Appx. 9, 18 (6th Cir.2012): "A federal court must borrow state statutes of limitations and tolling rules in a § 1983 action." Def. Brf. ECF No. 8-1, PageID 160. However, the *Guy* opinion does not actually analyze the applicability of equitable tolling in § 1983 cases as in that case "any error the district court may have committed in refusing to apply equitable tolling… was harmless." *Guy*, 488 Fed Appx 9, 18 (CA 6, 2012). In

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**13** | P a g e

truth, *Guy* merely mentions equitable tolling in passing regarding a stipulation of the parties as its "parties agree[d] that a federal court must borrow state statutes of limitations and tolling rules in a § 1983 action." Further still, the *Guy* case arose out of "Kentucky[, which] has a relevant tolling statute." *Id.* **Here, Defendant's argue that equitable tolling cannot apply to Plaintiff's case because "Michigan law does not permit equitable tolling."[1]** Def. Brf. ECF No 8-1, PageID 162. **Yet, for purposes of § 1983, "a body of state tolling law that lacks a provision for equitable tolling is inconsistent with the provision of a complete federal remedy under section 1983 and therefore is overridden by the federal [tolling] doctrine."** *Heck v Humphrey*, 997 F2d 355, 358 (CA 7, 1993), aff'd 512 US 477; 114 S Ct 2364; 129 L Ed 2d 383 (1994) (emphasis added) (**affirmed on appeal by Supreme Court of the United States**).

Finally, the very sentence cited by Defendant in the *Guy* opinion itself in turn cites to a Supreme Court of the United States case which contradicts Defendant's position and is cited by several circuit court opinions holding that the federal doctrine of equitable tolling is to be applied in prisoner § 1983 cases arising in states which do not provide such equitable tolling.

> Under 42 U.S.C. § 1988, federal courts are instructed to refer to state statutes when federal law provides no rule of decision for actions brought under § 1983, and **§ 1988 authorizes federal courts to**

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

---

[1] See Defendant's unpublished case, *Jones v Schmaker*, No. 1:19-CV-195, 2019 WL 2949964, at *2 (WD Mich, July 9, 2019), at footnote 3: "In fact, Michigan does not permit equitable tolling on any basis."

**14 |** P a g e

**disregard an otherwise applicable state rule of law only if the state law is "inconsistent with the Constitution and laws of the United States."** Since Congress did not establish a statute of limitations or a body of tolling rules applicable to federal-court actions under § 1983, the analogous state statute of limitations and the coordinate tolling rules are binding rules of law **in most cases**. This "borrowing" of the state statute of limitations includes rules of tolling **unless they are "inconsistent" with federal law**.

*Bd of Regents of Univ of State of N Y v Tomanio*, 446 US 478, 479; 100 S Ct 1790, 1792; 64 L Ed 2d 440 (1980) (emphasis added).

Although, as far as Plaintiff's counsel can discern from a diligent caselaw review, the Sixth Circuit has not directly addressed the issue of the fear of retaliation doctrine as applied to prisoners § 1983 causes of action, as Plaintiff states in his verified complaint, the trend among the circuits is to apply the federal tolling doctrine to § 1983 arising in states that have no equitable tolling law or have insufficient equitable tolling laws, such as Michigan.

**The circuits that have addressed this have all ruled against Defendant's position, and for Plaintiff's position that where a state lacks equitable tolling, federal equitable tolling fills the gap**.[2]

*The Second Circuit:*

Federal courts deciding section 1983 actions generally apply the tolling provisions of the state in which the action is brought, see *Wallace v.*

---

[2] It must be noted that not every Circuit has had cause to address this issue, as many states allow for equitable tolling. For instance, the Ninth Circuit need not address § 1983 tolling where its states all allow equitable tolling anyway. *E.g.*, "Where applicable, the doctrine will 'suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness." *McDonald v Antelope Valley Cmty Coll Dist*, 45 Cal 4th 88, 99; 194 P3d 1026, 1031 (2008).

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

*Kato*, 549 U.S. 384, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007), **unless doing so would be contrary to the federal policy goals of "compensation of persons injured by a deprivation of federal rights and the prevention of abuses of power by those acting under color of state law" underlying section 1983**. *Singleton v. City of New York*, 632 F.2d 185, 189–91 (2d Cir.1980). **In order to enforce these goals, courts in this Circuit deciding section 1983 claims have applied the federal equitable tolling standard, which allows tolling where "extraordinary circumstances prevented a party from timely performing a required act."** *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir.2005).

*Moses v Westchester Co Dept of Corr*, 951 F Supp 2d 448, 454 (SDNY, 2013).

Notably, the Second Circuit's equitable tolling 'test' is essentially the same as that passed down by the Supreme Court in prisoner's *habeas corpus* petition cases *Holland v Florida*, 560 US 631, 655; 130 S Ct 2549, 2566; 177 L Ed 2d 130 (2010) and recently incorporated into the Sixth Circuit's equitable tolling test *via Zappone v United States*, 870 F3d 551, 556 (CA 6, 2017).

The *Davis v Jackson* case which holds that a prisoner-plaintiff's valid fear of retaliation warrants equitable tolling, is factually and logically directly on-point here. **Like Michigan, New York does not allow for equitable tolling of a wrongful death claim (wrongful death statutes being the state claim from which § 1983 'borrows' its limitations and tolling law)**. "[T]he doctrine of equitable tolling is not available in state causes of action in New York." *Jang Ho Choi v Beautri Realty Corp*, 135 AD3d 451, 452; 22 NYS3d 431, 432 (2016) citing: *Ari v. Cohen*, 107 A.D.3d 516, 517, 968 N.Y.S.2d 31 [1st Dept.2013]; *Shared Communications Servs.*

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

*of ESR, Inc. v. Goldman, Sachs & Co.*, 38 A.D.3d 325, 832 N.Y.S.2d 32 [1st Dept.2007].

### The Third Circuit:

**[Federal c]ourts modify state tolling rules in these situations [where state tolling laws are insufficient] because § 1983 is a remedial statute that seeks to deter violations of individual constitutional rights and compensate individuals who have suffered such violations whereas state statutes of limitations serve different goals, such as finality and repose.**

*Estate of Miller ex rel Miller v Hudson*, 528 Fed Appx 238, 240 (CA 3, 2013) (emphasis added).

[W]e do not agree with the District Court's determination that the federal claims are also time-barred. Although the Pennsylvania statute of limitations is applied to the federal claims, federal tolling doctrine may be applicable to determine whether Elizabeth's federal claims are timely… *Heck v. Humphrey*, 997 F.2d 355, 357–58 (7th Cir.1993). **As we discuss below, application of the federal tolling doctrine leads us to conclude that the federal claims may not be barred.**

*Lake v Arnold*, 232 F3d 360, 366 (CA 3, 2000).

### The Fourth Circuit:

The Supreme Court has directed that we apply a state's "statute of limitations governing general personal injury actions" when considering § 1983 claims. *Owens v. Okure*, 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). A state's limitations and tolling rules are to be followed unless doing so "defeat[s] either § 1983's chief goals of compensation and deterrence or its subsidiary goals of uniformity and federalism." *Hardin*, 490 U.S. at 539, 109 S.Ct. 1998 (footnote omitted).

\*\*\*

**Given this structure, Virginia's no-tolling rule, as applied to prisoners seeking to bring § 1983 claims, frustrates the goals of § 1983 and is thus clearly "inconsistent" with settled federal policy**. *Hardin*, 490 U.S. at 538, 109 S.Ct. 1998.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**17 |** P a g e

*Battle v Ledford*, 912 F3d 708, 715 (CA 4, 2019) (emphasis added).

**The Seventh Circuit**:

"The doctrine is straightforward: 'a person is not required to sue within the statutory period if he cannot in the circumstances reasonably be expected to do so.' *Central States, Southeast & Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1376 (7th Cir.1992). It has been applied to a prisoner's civil rights case." *Heck v Humphrey*, 997 F2d 355, 357 (CA 7, 1993), aff'd 512 US 477; 114 S Ct 2364; 129 L Ed 2d 383 (1994).

**The Tenth Circuit**:

"**[W]e conclude that Oklahoma's lack of a tolling provision to allow for the exhaustion of mandatory prison grievances is contrary to § 1983's goals. In so holding, we join several other circuits**." *Johnson v Garrison*, 805 Fed Appx 589, 594 (CA 10, 2020) (emphasis added).

   c. *Even if this Court were to determine that Michigan's tolling provisions apply to Plaintiff's case, he would still be entitled to tolling of his claims pursuant to Michigan's "judicial tolling" doctrine which allows for tolling when the state of the law itself has caused confusion.*

Michigan courts recognize the principle of judicial tolling to relieve a party of the effect of a statute of limitations when the cause of their confusion was related to a confusion in the law itself; That is, inconsistent caselaw.

Michigan recognizes the doctrine of [judicial] tolling, and that a plaintiff may obtain relief from a statute of limitations thereunder if the delay in filing is the product of **an understandable confusion about**

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**the legal nature of her claim, that confusion is created by the courts themselves, and the delay does not result simply from the plaintiff's lack of diligence**.

Rentsch v Herbert, No. 18-12491, 2019 WL 8750358, at *3 (ED Mich, October 16, 2019), report and recommendation adopted No. 18-12491, 2020 WL 1283787 (ED Mich, March 18, 2020).

Up until April 1 of 1994, Michigan law held: "If the person first entitled to ... bring an action is ... imprisoned at the time his claim accrues, he ... shall have one year after his [legal] disability is removed through death or otherwise, to ... bring the action although the period of limitations has run." M.C.L.A. § 600.5851(1). Since 1994, that statute has read, in pertinent part: "If a person was serving a term of imprisonment on the effective date of the 1993 amendatory act that added this subsection, … [their] action may be brought … within 1 year after the effective date of the 1993 amendatory act that added this subsection, or within any other applicable period of limitation provided by law." MCL 600.5851(9).

Michigan's ancient '**conflict of laws**' statute, MCL 600.5869, states: "All actions and rights shall be governed and determined according to the law under which the right accrued, in respect to the limitations of such actions or right of entry." As one Michigan Supreme Court justice recently stated regarding a statute of limitations question: "**MCL 600.5869 states that all actions shall be governed by the law as it existed when the claim accrued.**" *Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378, 448; 738 NW2d 664, 702 (2007); see also *Herman v. Ford Motor Co.* (1982) 326 N.W.2d 590, 119 Mich.App. 639.

**19** | P a g e

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Accordingly, even now it is not quite clear that Plaintiff's is not entitled to have brought his case within one year of his release, based on Michigan statute. Considering that the state of the law is confused in this regard, Plaintiff should also be entitled to bring his claims based on Michigan's doctrine of judicial tolling, which is distinct from a doctrine of equitable tolling. Wherefore, even pursuant to Michigan law, Plaintiff's causes of action should be allowed to proceed and Defendant's motion be denied.

### *SECTION II: REGARDING THE APPLICATION OF EQUITABLE TOLLING STANDARDS TO PLAINTIFF'S CASE.*

***Standard of review:*** The Court of Appeals reviews *de novo* a district court's determination that the applicable statutes of limitations barres a plaintiff's state-law and constitutional claims. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (citing *Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934, 938 (6th Cir. 1999)). The Circuit Court also reviews *de novo* the district court's "decision on the application of equitable tolling where the facts underlying the equitable tolling are undisputed." *Chavez v. Carranza*, 559 F.3d 486, 493 (6th Cir. 2009) (citation omitted). "When the facts are in dispute, we apply an abuse of discretion standard." *Id.* (citation omitted). See also *Zappone v United States*, 870 F3d 551, 555 (CA 6, 2017).

Further, a federal court has discretion in deciding whether a "motion to dismiss might be converted into a motion for summary judgment" by reviewing

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

evidence outside of the pleadings. *Wysocki v Intl Bus Mach Corp*, 607 F3d 1102, 1105 (CA 6, 2010); Fed. R. Civ. P. 56.

a.   ***Like the Second Circuit's test utilized in Davis v Jackson, the Sixth Circuit uses the Supreme Court's two-factor test, in addition to the Sixth Circuit's traditional five-factor analysis.***

The United States Supreme Court has held that "[g]enerally, a litigant seeking equitable tolling bears the burden of establishing two elements: **(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."** *Holland v Florida*, 560 US 631, 655; 130 S Ct 2549, 2566; 177 L Ed 2d 130 (2010) (emphasis added). The Sixth Circuit has adopted this test. *Zappone v United States*, 870 F3d 551, 556 (CA 6, 2017).[3] Of great significance here, the Supreme Court in *Holland v Florida* specifically referenced the Second

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

---

[3] The Sixth Circuit's law requires that both the two-factor test of *Holland v Florida* and the five-factor test of *Andrews v Orr*, 851 F2d 146, 151 (CA 6, 1988) be considered. However, the 'writing is on the wall' as to the abrogation of the obsolete Andrews factors. *Patterson v Lafler*, 455 Fed Appx 606, 609 (CA 6, 2012). [The five factors historically used in the Sixth Circuit to analyze equitable-tolling claims were "(1) lack of actual notice… [etc.] However, over time we decided that these factors are neither comprehensive nor always relevant; and that each case had to be examined on its own facts. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir.2002). Even more recently, we held both that *Holland* [*v Florida*]'s two-part test replaced the *Andrews* test, and that meeting all five factors of the *Andrews* test does not necessarily demonstrate the "extraordinary circumstance" that *Holland* requires. *Hall v. Warden, Lebanon Corr. Inst*., 662 F.3d 745, 749–50 (6th Cir.2011). Thus, we do not find it necessary to discuss the *Andrews* factors; *Holland* is the relevant test.] *Zappone v United States*, 870 F3d 551, 556–57 (CA 6, 2017) [The government urges us to adopt the two-part *Holland* test to assess the timeliness of the … state-law claims, asserting that it is more streamlined and avoids the drawbacks of the five-factor approach this court has identified in previous cases. Although these observations are persuasive, our hands are mostly tied. Because … this court has previously applied the five-factor approach…, the law-of-the-circuit doctrine precludes us from supplanting that approach to embrace a new equitable-tolling standard… ("Under the law-of-the-circuit doctrine, only the Court sitting *en banc* may overrule published circuit precedent, absent an intervening Supreme Court decision or a change in the applicable law.")]

**21** | P a g e

Circuit, which uses an equitable tolling doctrine nearly identical to the one adopted by the Supreme Court, in overturning the Eleventh Circuit's "too rigid" and unforgiving tolling doctrine. "Because the Court of Appeals' application of the equitable tolling doctrine… conflicts with the approach taken by other Circuits, we granted [certiorari]. Compare [this case] with, *e.g., Baldayaque v. United States*, 338 F.3d 145, 152–153 (**C.A.2 2003) (applying a less categorical approach**)." *Holland*, 560 US 631, 644–45; 130 S Ct 2549, 2560; 177 L Ed 2d 130 (2010) (emphasis added).

The Sixth Circuit also counsels the consideration of its five 'historic' factors in the equitable tolling context. Those five factors are: "(1) the plaintiff's lack of notice of the filing requirement; (2) the plaintiff's lack of constructive knowledge of the filing requirement; (3) the plaintiff's diligence in pursuing her rights; (4) an absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement." *Andrews v Orr*, 851 F2d 146, 151 (CA 6, 1988).

**Factors (1), (2), and (5):** Here, Plaintiff's 'notice' or lack of notice of his filing deadline is a tangential issue at best as it was Plaintiff's great fear of retaliation which prevented him from bringing suit years earlier, when he would have liked to. Yet Plaintiff's causes of action are, independently, entitled to equitable tolling based solely on his two former attorneys counseling that he would have one year from the date of his release from custody to file any suit. Significantly, *Holland v Florida*,

**22 |** P a g e

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

560 US 631, 655; 130 S Ct 2549, 2566; 177 L Ed 2d 130 (2010) which gives us the two-factor equitable tolling test was a case in which the Supreme Court specifically overturned the Eleventh Circuits rule **that attorney negligence alone could not be grounds for equitable tolling**. Here, both of Plaintiff's two prior attorneys warned him that 'going after' Defendants could both ruing his chances of ever being a free man, and get him killed and, assured Plaintiff that he could consider the matter later as they incorrectly stated that he would have one year after his release from prison to bring any lawsuit, **when that was untrue and had been so for years at the time of their counsel**. See **Affidavit of Plaintiff's former attorney's wife, Lynne Hoover, ECF No. 4-3, PageID 143**. The Supreme Court's holding in *Holland v. Florida* reaffirms the elemental wisdom that, if anyone, a plaintiff can be expected to trust their own attorney. Afterall, if one cannot be expected to trust their own attorney, whom are they supposed to trust for guidance in their cases?

        **Factor (3)**: See Section II(a)(3), below.

        **Factor (4)**: Defendant's will likely claim that they have been prejudiced by the passage of time since Plaintiff's claim accrued. Yet any alleged prejudice due to the passing of time would doubly effect Plaintiff, who was incarcerated (unable to keep records, communicate freely, maintain relationships with potential witnesses, etc.) and so it is Plaintiff and not Defendant, that is unfairly prejudiced by the time elapsed. Accordingly, Defendant the City of Detroit (and others) will suffer no

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

discernable prejudice from the tolling of the limitations period; Only Plaintiff is prejudiced by the passage of time.

More significant than any of the five-factors is the Supreme Court's factor which asks did "some extraordinary circumstance st[and] in [Plaintiff's] way[?]" *Holland, supra.* Several did, as Plaintiff was prevented from bringing his claims much earlier by a very real fear of legal, physical, and/or psychological retaliation by the Detroit law enforcement community. The granting of equitable tolling to cases in which a prisoner had a fear of retaliation is the future of federal common law. The case *Davis v. Jackson*, No. 15 Civ. 5359 (KMK), 2016 WL 5720811, (S.D.N.Y. Sept. 30, 2016), which Plaintiff discussed in the preliminary statement of his complaint, illustrates this point as it is already a highly regarded opinion amongst the federal judiciary, having been cited approvingly and as authority in over 20 cases, from different circuits. [4, 5]

---

[4] ***Davis v Jackson* has been cited as authority since its issuing and up until the present**. *Stone #1 v Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *12 (SDNY, September 28, 2021); *Philips v Smith*, No. 19-CV-2019 (CS), 2021 WL 4224957, at *6 (SDNY, September 15, 2021); *Junior v Erie Co Med Ctr Corp*, No. 18-CV-01014-LJV-JJM, 2019 WL 4279949, at *10 (WDNY, August 19, 2019), report and recommendation adopted No. 18-CV-1014, 2019 WL 4276613 (WDNY, September 9, 2019); *Funk v Belneftekhim*, No. 14-CV-0376 (BMC), 2019 WL 3035124, at *2 (EDNY, July 11, 2019); *Wheeler v Slanovec*, No. 16-CV-9065 (KMK), 2018 WL 2768651, at *6 (SDNY, June 8, 2018); *Brown v Smithem*, No. 15-CV-1458 (BKS/CFH), 2017 WL 1155825, at *7 (NDNY, February 28, 2017), report and recommendation adopted No. 915CV01458BKSCFH, 2017 WL 1155827 (NDNY, March 27, 2017).

[5] ***Davis v Jackson* is also highly cited as authority for its holdings on law unrelated to equitable tolling**: *Morrow v Bauersfeld*, No. 919CV1628DNHCFH, 2020 WL 3118520, at *4 (NDNY, June 12, 2020); *Fowler v City of New York*, No. 19 CIV. 4703 (LGS), 2020 WL 1151297, at *2 (SDNY, March 10, 2020); *Hamilton v Edwards*, No. 14-CV-6308 CJS, 2019 WL 1862828, at *4 (WDNY, April 25, 2019); *Fabricio v Griffin*, No. 16 CV 8731 (VB), 2019 WL 1059999, at *8 (SDNY, March 6, 2019); *Marhone v Cassel*, No. 16-CV-4733 (NSR), 2018 WL 4189518, at *5 (SDNY,

---

**24 |** P a g e

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

In this circuit, fear of retaliation has been recognized as a basis for equitable estoppel in at least one context: litigation by prison inmates under 42 U.S.C. § 1983. See *Davis v. Jackson*, No. 15 Civ. 5359 (KMK), 2016 WL 5720811, at *9 (S.D.N.Y. Sept. 30, 2016) (holding that, given the "unique context and the substantial control that correction officers exert over inmates," an inmate's "reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling").

*Geiss v Weinstein Co Holdings LLC*, 383 F Supp 3d 156, 173 (SDNY, 2019), app dis (Oct. 1, 2021).

**Many federal courts in other circuits have cited the case as authority**:

*Gabbidon v Wilson*, No. CV 1:19-00828, 2021 WL 625232, at *10 (SDW Va, February 17, 2021). [Distinguishing the defendant's caselaw because "the plaintiff there was not incarcerated, which, for the well-articulated reasons in *Davis* (discussed above), makes a big difference."] *Solman v Corl*, No. 3:15-CV-1610 (JCH), 2018 WL 2337129, at *8 (D Conn, May 23, 2018). [Regarding exhaustion.] *Parnell v Lashbrook*, No. 16-CV-1144-NJR, 2017 WL 2876526, at *6 (SD Ill, July 6, 2017). *DeGrave, v State of Wisconsin*, No. 21-CV-256-WMC, 2021 WL 5371393, at *3 (WD Wis, November 18, 2021).

1. *Plaintiff's fear of retaliation based on specific actions and threats, including his placement into the prisoner's witness protection program for which he went by a false identity for 15 years for working against corrupt members*

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

---

August 31, 2018); *Abujayyab v City of New York*, No. 15 CIV. 10080 (NRB), 2018 WL 3978122, at *3 (SDNY, August 20, 2018); *Ennis v New York Dept of Parole*, No. 518CV00501GTSTWD, 2018 WL 3869151, at *4 (NDNY, June 12, 2018), report and recommendation adopted No. 518CV0501GTSTWD, 2018 WL 3862683 (NDNY, August 14, 2018); *Wallace v Warden of MDC*, No. 14CIV6522PACHBP, 2016 WL 6901315, at *4 (SDNY, November 23, 2016); *Lehal v Cent Falls Det Facility Corp*, No. 13CV3923 (DF), 2016 WL 7377238, at *10 (SDNY, November 21, 2016).

*of the Detroit law enforcement community, is absolutely an extraordinary circumstance requiring equitable tolling.*

As a preliminary matter, Plaintiff's valid fear of retaliation for taking action against Defendants existed when his claims accrued, which means his statute of limitations was immediately tolled until he was no longer suffered from such fear. Although state law governs the length of the statute of limitations, federal law governs the accrual date. *Wallace v. Kato*, 549 U.S. 384, 387-88 (2007). Under § 1983, "the statute of limitations begins to run when the plaintiff knows or has reason to know that the act providing the basis of ... [the] injury has occurred." *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007). In other words, courts "look to the event that should have alerted the typical lay person to protect his or her rights." Id. (internal quotations omitted); see also, *Peterson v. Ostrander*, 17-2160, 2018 WL 4739692, at *2 (6th Cir., Apr. 6, 2018). "A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). In applying this standard, courts seek to determine "what event should have alerted the typical lay person to protect his or her rights. In *Wallace v. Kato*, the Supreme Court stated that **a § 1983 claim accrues when the plaintiff has "a complete and present cause of action."** *Wallace*, 549 U.S. at 388.

Here, Plaintiff's case accrued only after he turned eighteen and, by that time, he was already imprisoned as a result of the Defendants' wrongdoing. Then, his case

**26 |** P a g e

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

would have been statutorily tolled until 1994, when Michigan's prisoner-tolling statute ceased being effective. **By that time, Plaintiff was already well-aware of the retaliation against him as the federal government had placed him in the witness protection program, in prison, giving him a fake name and life's story and transferring him to a different prison. It defies logic to expect that someone in the federal witness protection program for concern of retaliation by corrupt Detroit law enforcement should be expected to blow their cover by bringing suit against the law enforcement responsible for his imprisonment in the first place**.

The extraordinary nature of Plaintiff's circumstances cannot genuinely be disputed. His circumstances are in fact so extraordinary that a famous documentary, "White Boy" and a Hollywood movie starring Matthew McConaughey have been made depicting his extraordinary circumstances. The Supreme Court has already settled that fear of retaliation can excuse an inmate's failure to exhaust administrative remedies. See *Ross v Blake*, 578 US 632, 644; 136 S Ct 1850, 1859; 195 L Ed 2d 117 (2016) (holding that administrative exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation") **For the exact same reasons, it can and has caused Plaintiff to fear suing his true captors, the Defendant's of this case, until now**.

"Nowhere in our society is more forceful and sustained control over persons exercised than in its prisons ...." Craig Haney, *Psychology and the Limits to Prison*

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**27 |** P a g e

*Pain Confronting the Coming Crisis in Eighth Amendment Law*, 3 Psychol. Pub. Pol'y & L. 499, 499 (1997). Such sustained control tends to result in "adverse psychological effects" that invariably have "behavioral consequences." Jason J. Ben, *America's Need to Explore Alternatives to Incarceration: Can America Purport to Be the "Land of the Free" When It Currently Is the World's Leading Incarcerator?*, 30 S.U. L. Rev. 349, 356 (2003). When these "negative psychological effects of imprisonment" become "chronic and deeply internalized," inmates experience:

> [D]ependence on the external constraints of institutional structure and contingencies; hypervigilance, interpersonal distrust and suspicion of threat or personal risk; emotional over-control, alienation and psychological distancing as a defense against exploitation and awareness of the riskiness and unpredictability of emotional investments in relationships; social withdrawal and isolation; incorporation of exploitative informal rules and norms of prison culture; diminished sense of self-worth and personal value; and posttraumatic stress reactions to the pains of imprisonment.
>
> Zieva Dauber Konvisser, *Psychological Consequences of Wrongful Conviction in Women and the Possibility of Positive Change*, 5 DePaul J. for Soc. Just. 221, 241 (2012) (internal quotation marks omitted).

Plaintiff has been imprisoned his entire adult life until recently. Retaliation and fear of retaliation are natural consequences of an inmate's unique psychological environment. And that fear of retaliation is not merely speculative or conjectural, as "**it is clear that the level of actual retaliation, as well as the perception of likely retaliation among ... inmates ... constitutes the single most important and difficult obstacle to inmates' use of the system [to protect their rights]**." Vincent M. Nathan, *Evaluation of the Inmate Grievance System Ohio*, Ohio Dep't of Rehab.

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**28 |** P a g e

& Corr. 28 (Feb. 13, 2001), *https://www.law.umich.edu/facultyhome/margoschlanger/Documents/Resources/Prison_and_Jail_Grievance_Policies/Ohio_Nathan_Evaluation_Grievance_System.pdf*.

"[T]he specter of retaliation, a real and ever-present force in an inmate's life, can reasonably be said to be outside of an inmate-plaintiff's control. Thus, the Court concludes that in the prison context, reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling, particularly if the person threatening retaliation is a defendant or another official who could be or was influenced by a defendant." Davis v Jackson, No. 15-CV-5359 (KMK), 2016 WL 5720811, at *11 (SDNY, September 30, 2016).

Generalized allegations of fear of retaliation are not sufficient to establish "extraordinary circumstances" warranting application of equitable tolling. See *Nicoloudakis v Bocchini*, No. CV 13-2009 (MAS), 2016 WL 3617959, at *3 (DNJ, July 1, 2016) ("Generalized fear of reprisal is not enough to warrant equitable tolling ...."); *Rosenblum v. Yates*, No. 09-CV-3302, 2011 WL 590750, at *3 (E.D. Cal. Feb. 10, 2011) (finding that the plaintiff's "generalized allegation ... [of] fear of retaliation" was "insufficient to meet his high burden"). **Here, however, Plaintiff has pled specific instances of actual retaliation against him from the Defendant's or those acting on behalf of the Defendants, especially Defendant the City of Detroit**.

**1) As a 15 year old working for Detroit and federal law enforcement, Plaintiff was shot and nearly killed an agent of then Mayor Coleman A. Young's nephew-in-law, John Curry, and law enforcement acted with impunity to keep Plaintiff in their control.** See Ex. E "White Boy" Documentary at 00:26:17,327 to 00:29:28,601, Ex. D Transcript ¶ 1-2; Pltf's Aff'd, ECF No. 4-1, PageID.131, ¶ 12-15.

**2) Convicted Detroit hit-man Nate Boon Craft admitted to accepting a payment from top Detroit law enforcement Gil Hill to kill Plaintiff and, indeed, Plaintiff narrowly escaped his own murder when Boon pulled up alongside his friends car and attempted to shoot him, with Plaintiff being saved by his friend speeding away.** See Ex. E "White Boy" Documentary at 00:38:56,501 to 00:42:06,649, Ex. D Transcript ¶ 3.; Ex. A Second Aff'd of Richard Wershe ¶ 5.

**3) Plaintiff's conviction was the result of falsified evidence planted under a porch and attributed to him.** See Ex. E "White Boy" Documentary at 00:46:48,765 to 00:47:03,780, Ex. D Transcript ¶ 5; Pltf's Comlpaint, ECF No. 4, PageID.94-95, ¶ 60-61.

**4) Upon his arrest, Plaintiff was beaten so brutally by law enforcement that he had to be hospitalized.** See Ex. E "White Boy" Documentary at 00:46:39,172 to 00:47:03,780, Ex. D Transcript ¶ 4; Pltf's Compaint, ECF No. 4, PageID.94, ¶ 59.; Ex. A Second Aff'd of Richard Wershe ¶ 7.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**5) Plaintiff's first day in prison, he witnessed a fellow inmate get 'hit,' _i.e_, an attempted retaliatory murder, by being stabbed in the neck, to which the prison guard made the threatening comment: "Get ready, Wershe, that happens every day in here".** See Pltf's Aff'd, ECF No. 4-1, PageID.132, ¶ 19-21.

**6) After Plaintiff was approached by the FBI to use him for information and connections as part of Operation Backbone to discover police corruption, former Detroit mayor Coleman Young endangered Plaintiff's life by calling him a "stool-pigeon" an archaic term for a police informant.** See Ex. E "White Boy" Documentary at 00:55:52,474 to 00:56:11,035, Ex. D Transcript ¶ 7.

**7) in approximately 1991, federal law enforcement had already made Plaintiff aware that, based on what he knew about the law enforcement he had worked with could endanger his life, and required his being placed in the prisoner witness protection program, relocated, and given a fake identification for fifteen (15) years.** See Pltf's Complaint, ECF No. 4, PageID.96, ¶ 69-70; Pltf's Aff'd ECF No. 4-1, PageID 133., ¶ 24.

**8) Plaintiff's former attorneys each instructed Plaintiff to not sue Defendants for the stated reason that it could get him killed or ruin his chances of ever being released from prison.** Pltf's Aff'd ECF No. 4-1, PageID 133., ¶ 24; Aff'd ECF No. 4-3, PageID 143., ¶ 24.

**9) When Plaintiff was finally eligible for parole, the powers Plaintiff feared took direct action against him by releasing to Plaintiff's parole board**

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

<u>Plaintiff's sealed grand jury testimony (used in the conviction of multiple murderous Detroit gangsters), which Plaintiff had only given based on law enforcement's promises that it would always remain sealed so as never to endanger his life</u>. See Pltf's Complaint, ECF No. 4, PageID.86, ¶ 9; Pltf's Aff'd, ECF No. 4-1, PageID 134., ¶ 33.

<u>10) Former head of Detroit Police's homicide unit, William Rice, testified that he was ordered by his superiors in the City of Detroit to falsely testify against Plaintiff at his parole hearing</u>. See Ex. E "White Boy" Documentary at 01:01:50,625 to 01:03:11,788, Ex. D Transcript ¶ 10.; Pltf's Complaint, ECF No. 4, PageID.100-101, ¶ 95-98.

<u>11) Plaintiff's former attorney at his criminal trial, Edward Gardner, drafted and signed a letter from the Wayne County Prosecutor's office emphatically arguing that Plaintiff must never be released</u>. See Ex. E "White Boy" Documentary at 00:59:30,025 to 01:01:24,348, Ex. D Transcript ¶ 10.; Pltf's Aff'd, ECF No. 1-1, PageID 53., ¶ 34-36.; Pltf's Complaint, ECF No. 4, PageID.117-118, ¶ 172.

<u>12) Defendant Lynn Helland explicitly told Plaintiff that he was reneging on his agreement with Plaintiff because his superiors had intervened and wanted Plaintiff to remain incarcerated</u>. Pltf's Complaint, ECF No. 4, PageID.99, ¶ 86-87; Pltf's Aff'd, ECF No. 4-1, PageID 134-135., ¶ 32-34.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**13) Plaintiff was indicted on trumped-up charges in Florida of running an auto-theft ring from prison, and members of the Detroit law enforcement community contacted prosecutors in Florida to request that they do everything in their power to convict Plaintiff.** See Ex. E "White Boy" Documentary at 01:05:13,034 to 01:06:19,685, Ex. D Transcript ¶ 11.; Pltf's Complaint, ECF No. 4, PageID.104, ¶ 106; Ex. A Second Aff'd of Richard Wershe, ¶ 9-10.

**14) Plaintiff was unconstitutionally and horrifically placed in solitary confinement for fifteen (15) months to elicit a confession regarding the Florida charges and, in the end, Plaintiff took a plea deal when Florida prosecutors threatened to charge his mother and sister.** See Ex. E "White Boy" Documentary at 01:05:13,034 to 01:06:19,685, Ex. D Transcript ¶ 11.; Pltf's Complaint, ECF No. 4, PageID.104, ¶ 107-110; Ex. A Second Aff'd of Richard Wershe, ¶ 10-11.

**15) Plaintiff's former attorneys each instructed Plaintiff to not sue Defendants for the stated reason that it could get him killed or ruin his chances of ever being released from prison.** Pltf's Aff'd, ECF No. 4-1, PageID 132, 136., ¶ 18, 41-43.

Each of the above 15 facts exceeds what is required under federal tolling doctrine to toll a statute of limitations period for fear of retaliation. "[I]nmates may show extraordinary circumstances for purposes of equitable tolling where they allege specific facts showing that a reasonable fear of retaliation." *Davis*, No. 15-CV-5359

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

(KMK), 2016 WL 5720811, at *11 (SDNY, September 30, 2016). Whereas the federal law on the issue merely requires that one have a specific reason for the fear, such as a questionable remark from a prisoner guard, etc, Plaintiff has related over a dozen actual instances of abuse and/or retaliation at the hands of Defendants or their agents.

> **2. *Not only do the above facts more than meet the standard for fear of retaliation based on articulable facts of implied threats, but all of Plaintiff's articulated fears are also validate by expert medical diagnosis.***

Plaintiff has already been diagnosed with Post Traumatic Stress Syndrome based on the above experiences by an expert **who for years performed psychological evaluations of Detroit Police for Defendant the City of Detroit**, renowned expert Dr. Larry Friedberg, PhD. See **Exhibit B, November 17, 2021 Report of Dr. Friedberg, PhD** and **Exhibit C, Curriculum Vitae of Dr. Larry Friedberg, PhD**. Dr. Friedberg's extensive testing and diagnosis of Plaintiff has revealed that his fear of retaliation is real. "**Richard Wershe Jr. was frightened to file a lawsuit until August of this year.**" **Ex. B at ¶ 1**.

> Psychological Testing yields the following conclusions, **which are relevant to the anxiety which led Mr. Wershe to delay filing his lawsuit**:
>
> ***
>
> Per his valid Trauma Symptoms Inventory- Second Edition (TSI-2) Mr. Wershe displays significant Intrusive Experiences (T=72) and Posttraumatic Stress (T=60). Intrusive Experiences refer to post-traumatic reactions and symptoms including flashbacks, upsetting

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

memories easily triggered by current events, and repetitive thoughts of an unpleasant previous experience which intrude into awareness.

**These scores validate his reports of suffering from Post-Traumatic Stress Disorder (PTSD) and are consistent with his reported fears of retaliation, fears which he reported were present throughout his incarceration from age 18 through his release in 2020 and his period of probation**.

**All of this test data is consistent with my conclusion that Mr. Wershe's reason for not filing a lawsuit sooner was due to fear of negative consequences (re-imprisonment, violence, or other retaliation) which might have occurred after filing a lawsuit sooner**.

**Ex. B at ¶ 6(g)-(h) and page 3**.

Accordingly, Plaintiff has not only alleged specific facts adequate for a finding of a fear of retaliation, but has actually shown that 1) he suffered from real retaliation, not just a fear of retaliation, 2) federal agents shared his fears that me may be retaliated against while in prison for taking action against the Detroit law enforcement community, and 3) Defendant the City of Detroit's own police psychologist has validated that Plaintiff's fears were real and are the cause of the delay in his filing suit to vindicate his constitutional rights.

3. ***Plaintiff pursued his rights diligently, especially considering his great trauma and valid fear of physical and legal retaliation, in working to summon the courage to file this lawsuit within one year of the ending of his parole period.***

As stated above, Plaintiff remained afraid of retaliation for some time after his incarceration, as he remained technically in custody by way of his parole from prison in Florida, for an additional year. As Plaintiff told Dr. Friedberg, and as Dr.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**35 |** P a g e

Friedberg validates, Plaintiff was afraid that he could be "reimprisoned" at any time after his release, on falsified charges. **Ex. B at page 3**. Further, Plaintiff's intense fear of retaliation lingered (and lingers) for many months after his parole ended, in part from the massively traumatic and unconstitutional putting of Plaintiff into solitary confinement or 'the hole' for sixteen (16) months in 2015-16.

c. He was placed in solitary confinement ("the hole") for 1[6] consecutive months while in a Florida prison. He said he found this "traumatizing":

1) Published research indicates that isolation/segregation/solitary confinement, the worst punishment shy of a death sentence, is itself harmful to inmates. Both psychologically healthy inmates and mentally ill inmates suffer to a substantial degree while in segregation (Scharrf Smith, 2006; Metzler and Fellner, 2013; Kupers, 2008; Grassian, 2006) and afterwards.

2) Solitary confinement can cause severe psychiatric harm, per Kupers (2008). Grassian (2006), who evaluated inmates in solitary confinement in a series of studies, summarized this harm in his paper, *Psychiatric Effects of Solitary Confinement*:

Per Grassian, common features of the harm caused by solitary confinement include: 1) Perceptual distortions, illusions, and hallucinations; 2) Panic attacks; 3) Difficulties with thinking, concentration, and memory- including, for some, acute psychotic, confusional states; 4) Intrusive obsessional thoughts- including aggressive fantasies of retaliation; 5) Paranoia, including persecutory fears; and 6) Problems with impulse control, including violence.

3) Scharff Smith (2006) reviewed the literature on the effects of solitary confinement: "for many prisoners, the effects are substantial…"

i. He cited international studies, in addition to North American research, all of which led him to conclusions similar to Grassian. He cited short-term effects similar to Grassian, with the addition of somatization symptoms, depression, massive, free-floating anxiety, and panic attacks.

ii. Panic, paranoia, and lethargy are common reactions to solitary confinement. Preexisting paranoid symptoms can deteriorate in

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**36 |** P a g e

isolation into "overt psychosis." Lethargy, he observed, based on his review of research, is part of a "complete breakdown or disintegration of the identity of the isolated individual..." This breakdown, caused by prolonged isolation, includes somatic problems, hallucinations, anxiety, and loss of control (crying, lethargy, fits of rage); this condition reaches a state that resembles, or is, psychosis. Physical and social isolation is also strongly related to suicide, thoughts of suicide, and self-mutilation.

iii. "Solitary confinement harmed prisoners who were not mentally ill on admission to prison and worsens the mental health of those who were (Scharff Smith, 2006)." The most dramatic effects are hallucinations, major depression, and psychoses.

iv. The duration of segregation is directly related to its detrimental effects: For nearly all prisoners, being held in extended isolated confinement (longer than 3 months) "causes lasting emotional damage if not full-blown psychosis and functional disability (Kupers, 2008)."

4) Anxiety, self-isolation, and mistrust are key components of the expected result of solitary confinement, which are likely to amplify the anxiety and mistrust already likely present in Mr. Wershe.

**Ex. B at page 2**.

Therefore, Plaintiff undeniably suffered from a very real fear of reincarceration at the hands of the Detroit law enforcement community, or worse, that he would simply be assassinated upon bringing suit. It is accordingly a near miracle that Plaintiff has, through the encouragement and counseling of those closest to him, had the absolute courage to bring this lawsuit for a shred of justice for the destruction of his life. **Despite all of the fear, Plaintiff still brought this action within the year of his parole ending**.

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## CONCLUSION AND RELIEF REQUESTED

It cannot genuinely be argued that Plaintiff did not have reason to fear retaliation while in prison. Our own federal government feared for Plaintiff's life from agents of Defendant The City of Detroit and placed him in the prisoner's witness protection program for 15 years after he brought down at least 12 of their high-ranking officers and agents. Federal tolling common law merely requires that a plaintiff "allege specific facts showing [] a reasonable fear of retaliation." *Davis v Jackson*, No. 15-CV-5359 (KMK), 2016 WL 5720811, at *11 (SDNY, September 30, 2016). Those facts need not be instances of actual retaliation, but may be simply insinuated threats or, as implied by the DC Court of Appeals, even just a simple request for leniency.

> We believe, however, that Chung may be entitled to relief pursuant to the doctrine of equitable tolling if fear that his lawsuit would jeopardize his request for leniency — a fear that seems objectively reasonable in light of the plea agreement and the surrounding circumstances — in fact prevented him from filing suit...
>
> *Chung v US Dept of Justice*, 333 F3d 273, 279; 357 US App DC 152, 158 (2003).

Accordingly, if federal equitable tolling applies to Plaintiff's case, then he is entitled to its application here. Because Michigan's inadequate tolling law does not allow for a prisoner's claims to be equitably tolled, it frustrates the goals of § 1983 and is thus clearly "inconsistent" with settled federal policy, requiring application of

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

federal equitable tolling law. *Hardin v Straub*, 490 US 536, 538; 109 S Ct 1998, 2000; 104 L Ed 2d 582 (1989).

On a final note, Plaintiff is not asking for a sea change in the law, but only that this Court rule in accordance with modern constitutional jurisprudence. Just as the above-holdings have not 'opened the flood gates' of prison litigation in their respective circuits, no such thing will happen in this district. That is because the requirement of alleging actual facts showing a reasonable fear is too high and '[t]he propriety of equitable tolling must necessarily be determined on a case-by-case basis." *Truitt v Co of Wayne*, 148 F3d 644, 648 (CA 6, 1998); *Holland v Florida*, 560 US 631, 650; 130 S Ct 2549, 2563; 177 L Ed 2d 130 (2010).

WHEREFORE, Plaintiff humbly prays that this Honorable Court enter an order containing the following relief:

a) Fully DENYING Defendant the City of Detroit's motion in lieu of answer; and/or, in the alternative;

b) Allowing Plaintiff to conduct limited discovery for a 90-day period to show his entitlement to the relief of his complaint; and/or, in the alternative;

c) Granting Plaintiff leave to amend his complaint to cure any perceived inadequacies; and

d) Any other relief which this Court deems equitable and just.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Respectfully submitted;

AYAD LAW, PLLC

*/s/Nabih H Ayad*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
*Attorneys for Plaintiff*
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
Dated: November 22, 2021            ayadlaw@hotmail.com

**40** | P a g e

## CERTIFICATE OF SERVICE

I hereby certify that on this date I filed the foregoing paper and any attachments with the Clerk of Courts using the ECF electronic filing system, which will constitute service on all parties of record.

Respectfully submitted;

AYAD LAW, PLLC

*/s/William D Savage*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
*Attorneys for Plaintiff*
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
ayadlaw@hotmail.com

Dated: November 22, 2021

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

RICHARD WERSHE, JR,

Case No.  21-cv-11686

*Plaintiff,*

*v.*

Hon.  Laurie J Michelson
Mag. Elizabeth A Stafford

THE CITY OF DETROIT; WILLIAM
JASPER, former Detroit Police
Officer, individually; KEVIN GREEN,
former Detroit Police Officer,
individually; JAMES DIXON, former
Federal Bureau of Investigations agent,
individually; HERMAN GROMAN,
former Federal Bureau of
Investigations agent, individually;
LYNN HELLEND, former Assistant
United States Attorney; and JAMES
KING former Assistant United States
Attorney; and UNKNOWN
ASSISTANT UNITED STATES
ATTORNEY; jointly and severally,

*Defendants*

| | |
|---|---|
| AYAD LAW, PLLC | CITY OF DETROIT LAW DEPT. |
| Nabih H. Ayad (P59518) | Gregory B. Paddison (P75963) |
| William D. Savage (P82146) | Attorney for City of Detroit |
| Attorney for Plaintiff | Coleman A. Young Municipal Center |
| 645 Griswold St., Ste 2202 | 2 Woodward Ave., Ste. 500 |
| Detroit, MI 48226 | Detroit, MI 48226 |
| P: 313.983.4600 | (313) 237-0435 |
| F: 313.983.4665 | paddisong@detroitmi.gov |
| ayadlaw@hotmail.com | |

*Side text:* AYAD LAW, P.L.L.C. 645 Griswold St., Ste. 2202 DETROIT, MICHIGAN 48226 P: (313) 983-4600 | F: (313) 983-4665

### <u>INDEX OF EXHIBITS TO PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF DETROIT'S MOTION TO DISMISS *IN LIEU* OF AN ANSWER</u>

| | |
|---|---|
| <u>**Exhibit A**</u> | **Second Affidavit of Richard Wershe, Jr** |
| <u>**Exhibit B**</u> | **November 17, 2021 Report of Dr. Friedberg, PhD** |
| <u>**Exhibit C**</u> | **Curriculum Vitae of Dr. Larry Friedberg, PhD** |
| <u>**Exhibit D**</u> | **Excerpts of Transcript from White Boy Documentary** |
| <u>**Exhibit E**</u> | **White Boy Documentary DVD (Filed in the Traditional Manner by leave of Court)** |

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## SECOND AFFIDAVIT OF RICHARD J. WERSHE, Jr.

I, RICHARD J. WERSHE, Jr, do depose and state the following under penalty of perjury:

1. I have personal knowledge of the facts alleged herein.

2. I am competent and able to testify if called to do so.

3. I make this affidavit of my own free will.

4. I have survived multiple assassination attempts.

5. During one of these assassination attempts, Nate Boone Craft, a notorious hitman, was paid and ordered to kill me by former Detroit Police Official Gill Hill.

6. I narrowly escaped this assassination attempt, when the car I was in was shot in a drive-by shooting.

7. When I was first arrested by Detroit Police, I was savagely beaten and pistol whipped by law enforcement.

8. Because of the brutal beating I received from Detroit Police, I had to have my injuries treated at the hospital.

9. I was indicted on trumped-up charges in Florida of running an auto-theft ring from prison, and I believe members of the Detroit law enforcement community contacted prosecutors in Florida to request that they do everything in their power to convict me.

10. To coerce a guilty plea, prosecutor's threatened to indict my sister and mother if I did not plead guilty.

11. I also was forced to spend 16 months in solitary confinement.

12. Because of the testimony I provided in Operation Backbone, and threat of retaliation to my life, I was placed in Witness Protection for 15 years.

13. I have reviewed Plaintiff's Response to Defendant City of Detroit's Motion to Dismiss and I certify that its contents are true and accurate.

**Further Affiant say not.**

**I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)**

Dated this ___22___ day of ___November___ 20_21_.

_Richard J. Wershe Jr._
(Signature of Affiant)

_Richard J. Wershe JR._
(Printed name of Affiant)

Subscribed and sworn to before me this

_22_ day of _November_, 2021.

_[signature]_
NOTARY PUBLIC

My Commission Expires:

_07/02/2025_

MYLES J. BAKER
Notary Public, State of Michigan
County of Oakland
Acting in _Macomb_ County
My Commission Expires: 07/02/2025

# Larry M. Friedberg, Ph.D.  L.L.C.
## *Clinical and Forensic Psychology*

November 17, 2021

Nabih Ayad, Esq.
Ayad Law
645 Griswold Street, Ste. 2202
Detroit MI 48226

RE: Richard Wershe, Jr.

Dear Mr. Ayad:

I interviewed your client, Richard Wershe Jr. on November 10, 2021, for 1.5 hours. On that date I also administered one psychological test, the Minnesota Multiphasic Personality Inventory, Third Edition (MMPI-3). I have subsequently administered the following two tests: the Personality Assessment Inventory (PAI), and the Trauma Symptoms Inventory- Second Edition (TSI-2).

I was asked by you to assess the reasons Mr. Wershe waited until this year to file a lawsuit against the FBI, Detroit Police, and certain individuals.

Here are my conclusions:

1. Richard Wershe Jr. was frightened to file a lawsuit until August of this year.

    a. Mr. Wershe is a person whom the government (Detroit Police officers, FBI) allegedly recruited to get involved in drugs, with violent criminals, and with criminal officials in positions of authority. His trust of law enforcement and even the courts is not strong.

    b. Even as a 14-year-old, he was afraid of the law enforcement authorities who accosted and intimidated him, while enlisting him to become an informant to be used in dangerous undercover operations, promising him protection.

    c. Mr. Wershe was advised/warned by multiple individuals, including his own attorneys (Mr. Moselli, Mr. Buffalino) not to file such a lawsuit while he was still incarcerated.  He told me he felt vulnerable to being killed in prison if such a lawsuit was filed.

    His first day in prison he saw someone being stabbed in the neck. He continued to feel afraid of being murdered throughout his incarceration. He was labelled as an informant and received numerous threats and was placed in a witness protection program while in prison.  He still fears that his life is in danger.

    He was very familiar, while in prison, with persons assassinated on the orders of others. He cannot forget seeing people cut, stabbed, or beaten with rocks in prison.

    In his role as informant, he said, Richard became familiar with corrupt officials and informed on people in law enforcement who were involved in the cover-up of murders.

    d. Mr. Wershe reports that he has received numerous death threats and had been shot at three times prior to his incarceration, by persons he believes had ties to the Detroit Police. At age 15 he was seriously injured in one assassination attempt; and he was coerced into not informing on his would-be assassin.  He asserts that the individual who tried twice to kill him before he was imprisoned (Nate Boon Craft), has linked the murder attempts to a Detroit Police Department official.

    e. Mr. Wershe was released and placed on parole in 2020. He was on parole until August of this year.

    f. He told me he was very afraid and was warned that his parole would be violated and he likely would be returned to prison as a result of filing a lawsuit against city and/or law

Facsimile: (248) 671-3203 | Email: dr.larry.friedberg@gmail.com | Web: drlarryfriedberg.net

enforcement authorities.

2. Mr. Wershe's background is one of repeated traumatic experiences, which have created an intense vulnerability to fear:

    a. As a child, he was exposed to repeated physical fights between his parents, and domestic violence perpetrated against his mother by her husband after his parents' divorce.

    b. He constantly felt in grave danger while an informant for the government, from the criminals with whom he worked, from corrupt law enforcement officers, and from assassins who made several attempts on his life. Rich was asked to risk his life, given drugs, a gun, and a bullet-proof vest by law-enforcement.

    c. He was placed in solitary confinement ("the hole") for 15 consecutive months while in a Florida prison. He said he found this "traumatizing":

        1) Published research indicates that isolation/segregation/solitary confinement, the worst punishment shy of a death sentence, is itself harmful to inmates. Both psychologically healthy inmates and mentally ill inmates suffer to a substantial degree while in segregation (Scharrf Smith, 2006; Metzler and Fellner, 2013; Kupers, 2008; Grassian, 2006) and afterwards.

        2) Solitary confinement can cause severe psychiatric harm, per Kupers (2008). Grassian (2006), who evaluated inmates in solitary confinement in a series of studies, summarized this harm in his paper, *Psychiatric Effects of Solitary Confinement:*

          Per Grassian, common features of the harm caused by solitary confinement include: 1) Perceptual distortions, illusions, and hallucinations; 2) Panic attacks; 3) Difficulties with thinking, concentration, and memory- including, for some, acute psychotic, confusional states; 4) Intrusive obsessional thoughts- including aggressive fantasies of retaliation; 5) Paranoia, including persecutory fears; and 6) Problems with impulse control, including violence.

        3) Scharff Smith (2006) reviewed the literature on the effects of solitary confinement: "for many prisoners, the effects are substantial..."

          i. He cited international studies, in addition to North American research, all of which led him to conclusions similar to Grassian. He cited short-term effects similar to Grassian, with the addition of somatization symptoms, depression, massive, free-floating anxiety, and panic attacks.

          ii. Panic, paranoia, and lethargy are common reactions to solitary confinement. Preexisting paranoid symptoms can deteriorate in isolation into "overt psychosis." Lethargy, he observed, based on his review of research, is part of a "complete breakdown or disintegration of the identity of the isolated individual..." This breakdown, caused by prolonged isolation, includes somatic problems, hallucinations, anxiety, and loss of control (crying, lethargy, fits of rage); this condition reaches a state that resembles, or is, psychosis. Physical and social isolation is also strongly related to suicide, thoughts of suicide, and self-mutilation.

          iii. "Solitary confinement harmed prisoners who were not mentally ill on admission to prison and worsens the mental health of those who were (Scharff Smith, 2006)." The most dramatic effects are hallucinations, major depression, and psychoses.

          iv. The duration of segregation is directly related to its detrimental effects:

            For nearly all prisoners, being held in extended isolated confinement (longer than 3 months) "causes lasting emotional damage if not full-blown psychosis and functional disability (Kupers, 2008)."

        4) Anxiety, self-isolation, and mistrust are key components of the expected result of solitary confinement, which are likely to amplify the anxiety and mistrust already likely present in Mr. Wershe.

3.  Mr. Wershe reported continuing moderate anxiety, ranging from a 5 (moderate) to 10 (severe) on a scale of 10.

    a.  He reports frequent nightmares

    b.  He wakes, hears noises, and must go to find the source of the noise.

    c.  He says he is "hyper-vigilant"; i.e., he continually scans his environment for sources of threat.  He pays "very good attention to my surroundings."

    d.  He never sits with his back to a door in restaurants

    e.  He fears he is being followed, sometimes getting off and back on the freeway to make sure no one is following him.

4.  He also reports moderate depression, with good and bad days.

5.  He says he can not forget the sounds, the sights of what he has gone through, he said.

6.  Psychological Testing yields the following conclusions, which are relevant to the anxiety which led Mr. Wershe to delay filing his lawsuit:

    a.  Substantial anxiety, consistent with Post-Traumatic Stress Disorder (PTSD), per his valid MMPI-3 (Scale ARX, T=70), and the PAI Traumatic Stress Subscale (ARD-T, T=70).

    b.  Rumination and worry

    c.  Moodiness (relatively mild but persistent depression)

    d.  Feelings of helplessness

    e.  Suspiciousness (wariness and sensitivity, skepticism) in interpersonal relationships.

    f.  In response to test items he reports: 1) that he "keeps reliving" one or more "horrible" experiences he has endured; 2) He often thinks about "painful memories of a past event…;" 3) is often frightened in the middle of the night; and 4) his anxiety "sometimes gets out of control…"

    g.  Per his valid Trauma Symptoms Inventory- Second Edition (TSI-2) Mr. Wershe displays significant Intrusive Experiences (T=72) and Posttraumatic Stress (T=60). Intrusive Experiences refer to post-traumatic reactions and symptoms including flashbacks, upsetting memories easily triggered by current events, and repetitive thoughts of an unpleasant previous experience which intrude into awareness.

    h.  These scores validate his reports of suffering from Post-Traumatic Stress Disorder (PTSD) and are consistent with his reported fears of retaliation, fears which he reported were present throughout his incarceration from age 18 through his release in 2020 and his period of probation.

All of this test data is consistent with my conclusion that Mr. Wershe's reason for not filing a lawsuit sooner was due to fear of negative consequences (re-imprisonment, violence, or other retaliation) which might have occurred after filing a lawsuit sooner.

Sincerely,

Larry M. Friedberg, Ph.D.
Michigan License No. 6301005034

Larry M. Friedberg, Ph.D., LLC



**Larry M. Friedberg, Ph.D.**
Clinical and Forensic Psychology

# CURRICULUM VITAE

## Clinical and Forensic Psychologist

Michigan Board of Psychology License No. 6301005034, 1987-present.

## Professional Experience:

**Larry M. Friedberg, Ph.D., L.L.C.**, 2017 to present.
- Psychotherapy: individuals (children, adolescents, and adults), couples, and families.
- Psychological evaluation and testing.
  - Cognitive and personality assessment.
  - Collaborative and therapeutic assessment.
- Forensic psychology.
  - Independent Evaluation for civil and criminal litigation.
  - Family law: mediation, therapeutic parenting time, reunification therapy.
- Clinical supervision.

**Psychological Institutes of Michigan, P.C.**, 1998 to 2017.
- Psychotherapy, psychological evaluation, clinical supervision, forensic psychology.

**Madonna University, Adjunct Professor.** 2009-2018.
- Graduate Level Courses Taught: Clinical Theory I, Child Psychopathology, Assessment I, Practicum II and III, Advanced Clinical Methods.
- Clinical supervision.

**Larry M. Friedberg, Ph.D.**, Huntington Woods, Michigan. 1989 to 1998.
- Psychotherapy, psychological evaluation, clinical supervision, forensic psychology.

**Renaissance Psychological Services**, Detroit, Michigan. 1993 to 1997.
- Evaluation of candidates for employment as Detroit Police officers.

**Mercy Hospitals,** Detroit, Michigan. 1989 to 1993.
- Clinical Psychologist, Department of Behavioral Medicine.

**South Woodward Clinic**, Birmingham, Michigan. 1982 to 1989.
- Psychotherapy, psychological evaluation, forensic psychology.

**Value Health, Inc.**, Southfield, Michigan. 1993 to 1995.
- Senior Clinical Consultant, mental health managed-care corporation.

**Orchard Hills Psychiatric Center**, Farmington Hills, Michigan. 1981 to 1983.
- Psychotherapy, psychological evaluation.

## Education and Training:

*Degrees Earned:*

**Ph.D.**, Clinical and Developmental Psychology, 1984, The University of Michigan, Ann Arbor.
**M.A.**, Clinical and Developmental Psychology, 1979, The University of Michigan, Ann Arbor.
**B.Sc.**, Psychology, 1973, Michigan State University, East Lansing.

*Clinical Internships* (American Psychological Association approved):

Children's Psychiatric Hospital, The University of Michigan, Ann Arbor. 1977 to 1978.
The Psychological Clinic, The University of Michigan, Ann Arbor. 1979 to 1981.

26640 Woodward Ave., Suite 214, Huntington Woods, Michigan 48070-1365 · Phone: (248) 671-3203
Facsimile: (248) 671-3203 | Email: dr.larry.friedberg@gmail.com | www.drlarryfriedberg.net

*Curriculum Vitae*: Larry M. Friedberg, Ph.D.
Page 2 of 2

## Professional Affiliations:

**American Psychological Association,** *Member*, *1984-present. Council of Representatives*, *APA Representative for Michigan* (2003-2004).

**Michigan Psychological Association,** *Member*, 1984-present. **President**, 2001. Communications Committee: Member, 2005-2015, Chair, 2007-2009. Ethics Committee: Member, 2005 - 2015. Insurance committee: Member 1994-1998, Chair, 1996-1998. MPA Foundation: President, 2001, Vice President- 2014. MPA Representative: PPPCAC, Blue Cross/Blue Shield of Michigan, 1996-2007.

**Michigan Inter-Professional Association on Marriage, Divorce and the Family**, **President**, 2007-2010. *Member*, 1995-present. *Board of Trustees*, 2005-2014.

**Association of Family and Conciliation Courts**, *Member*, 2001-present.

**Society for Personality Assessment**, *Member*, 1997-present. Website editor: 2010-2012.

**Therapeutic Assessment Institute**, *Member, 2019-present*.

## Honors Received:

*Phi Beta Kappa, Phi Eta Sigma.*
United States Public Health Service: *Fellow*, 1974-1975.
Michigan Psychological Association: *Fellow*, 1994-present.
                                                       *Distinguished Psychologist*, 1999.
                                                       *Beth Clark Service Award*, 2007.

## Presentations:

Sanctuary, Common Ground, "Attention Deficit Disorder," 1989, 1990.
State Bar of Michigan, Family Law Section, "Child Custody Evaluation," 1990.
Michigan Psychological Association, "Managed Care: Both Sides," 1994.
Michigan Inter-Professional Association on Marriage, Divorce and the Family (M.I.P.A.), "Parental Alienation Syndrome," 1996.
American Psychological Association, and Michigan Psychological Association, "Personality Disorder and Adolescent Suicide," 1996, 1997.
American Bar Association, Family Law Section. "The Fault with Fault," 1996.
American Academy of Matrimonial Lawyers, Michigan Chapter. "Abuse Allegations and Parental Alienation Syndrome," 1997.
Oakland County Friend of the Court, "Renegotiating Family Relationships," 1998.
Wayne County Circuit Court, Family Division, "High Conflict Divorce," 1998.
Oakland County Circuit Court, Family Division, "Interventions in High Conflict Divorce," 1999.
State Bar of Michigan, Family Law Section, "The Court Appointed Expert and the GAL," 2000.
American Academy of Matrimonial Lawyers, Michigan Chapter. "Child Custody/Parenting Time," 2000.
Michigan Trial Lawyers Association, "Parenting Time Coordinators," 2000.
M.I.P.A., "Parenting Coordinators," 2000.
Waterford Schools, "Adolescent Suicide Prevention and Early Intervention," 2001.
Society for Personality Assessment (S.P.A.), "Walter Mitty v. Saladin: Personality Assessment in a Complex Child Custody Evaluation," 2002.
M.I.P.A., "Blame and Moral Disengagement in High Conflict Divorce." February & April 2003.
S.P.A., "Nomothetic and Idiographic Approaches to Forensic Assessment," 2003.
Oakland County Bar Association, ADR Committee, "The Evolution of the Role of Parenting Coordinator in High Conflict Divorce," 2004.
S.P.A., "Personality Assessment with Normal Individuals in High-Conflict Divorce," 2005.
Wayne County Bar Association, Family Law Section, "Child Custody Evaluations and Facilitations: What a Forensic Psychologist Can Do," 2008.
M.I.P.A., "Restricted Parenting Time," 2008.
National Business Institutes, Panel Participant, "Handling Complex Custody Matters," 2009.
Michigan Psychological Association. "The Court-Involved Therapist: Ethical Dilemmas and Pitfalls" (Full-day workshop and four-part webinar), 2011.
S.P.A., Ethics Consultation, Annual Meeting, 2011.
M.I.P.A., Cleveland Bar Association. "The Court-Involved Therapist: Ethical Dilemmas and Pitfalls," 2011.
The Divorce Expo, "The Emotional Divorce," 2012.
S.P.A., "Helping a Client Who Lies Arrive at His Own Truth." Annual Meeting, March 2015.
S.P.A., "Inquiring Into Shattered Worlds: The Rorschach, Trauma, and the Dysregulated Self." Annual Meeting, March 2015.
Center for Forensic Psychiatry, "Therapeutic assessment: Introductory workshop." May, 2015.
Michigan Psychological Association. "The WISC-5: Some thoughts and concerns." May, 2015.
S.P.A., "Therapeutic Assessment and Child Custody Evaluations." Annual Meeting, March 2017.
Michigan Council for Psychoanalysis and Psychotherapy. "Therapeutic Assessment of an Adolescent with a Developing Personality Disorder." May, 2019.

## Transcribed Excerpts from "White Boy" Netflix Documentary

1. <u>First Assassination Attempt of Rick Wershe in 1984</u>
   **1050-1068**
   **00:26:17,327 --> 00:26:42,601**
   **[Scott, Reporter]** At some point, as the fall progressed in 1984, Johnny Curry was given information that Rick Wershe was an informant. Rick Wershe was giving the Feds information and people were getting busted. So they knew somebody was leaking information, and they would have meetings, talking about who the informant might be. There were a lot of people on the street that believed that Johnny Curry ordered  Rick Wershe's murder.

   **1086-1089**
   **00:27:02,705 --> 00:27:07,960**
   **[Interviewer]** Rick was with another Curry lieutenant who was a couple years older than him.

   **1090-1102**
   **00:27:08,002 --> 00:27:23,934**
   **[Wershe]** We were in the house< approximately five minutes. We were both skipping school that day. He went upstairs. And after a couple of minutes, says, "Hey, Rick. Come over here. Come to the stairs." As soon as I hit the top of the stairs, he comes out of the bedroom, shoots me in the stomach.

   **1103 -1107**
   **00:27:23,976 --> 00:27:32,193**
   **[Dawn Wershe]**<i> He was shot at close range with a .357 magnum. Went in the front, out the back, blew his large intestine in half.

   **1108-1130**
   **00:27:32,235 --> 00:28:03,891**
   **[Wershe]** I believe I rolled down the stairs. I was asking them to call 911, he wouldn't call 911. He was in a panic. By the grace of God, his girlfriend walked in the house. And she's the one that called 911. The guy that shot me, his older brother and a friend of his were putting me in their car. I don't know if they were going to take me to a hospital or take me somewhere and dump me. Finally an ambulance showed up and blocked them off and told them to give me to them, and basically that ambulance ride saved my life.

2. <u>Coverup by FBI</u>
   **1149-1158**
   **00:28:31,001 --> 00:28:46,892**
   **[Interviewer]** The task force were kind of huddled by the snack machines. They had realized that if he died, the fact that they had been using a 14-year-old kid to infiltrate drug gangs was gonna come to the surface and it would be a scandal of all scandals.

**1180-1183**
**00:29:15,045 --> 00:29:19,717**
[Interviewer] Members of that task force came to the conclusion that this would increase his credibility.

**1184-1191**
**00:29:19,758 --> 00:29:28,601**
[Wershe] The police told me to say the shooting was an accident because it was the best way to sweep it under the rug and I could continue to work for them if I said it was an accident.</i>

3. <u>Second Assassination Attempt of Rick Wershe in Drive-By Shooting</u>
   **1556-1564**
   **00:38:56,501 --> 00:39:13,560**
   [Nate Boone Craft, Hitman] "He (Gil Hill) said that basically, he wanted us to make sure that we kill White Boy Rick. Make sure that boy is dead. But we gotta make sure that it don't lead back to no one. I said, "'Well, you know me. All my hits don't lead back to no one.'"

   **1651-1659**
   **00:41:20,020 --> 00:41:35,077**
   [Wershe] "Me and Roy were sitting at a stoplight in a car, and I happened to look over my shoulder and I seen a van pulling up. And I saw this door sliding, it was like cracked open. And I told Roy, I said, 'Roy, run the light.'"

   **1660-1669**
   **00:41:35,118-00:41:55,138**
   [Craft] "We stopped. That side door pulled open. Who's sitting in the chair? [imitates gun firing, jamming] '"Man, hand me another gun,"' I said. I said "I think we better reach up in the..." By that time, they had speeded off.  That's the only reason why he was still alive. That MAC jammed on us."

   **1670-1683**
   **00:41:47,214 --> 00:42:06,649**
   [Wershe] "I mean, they got shots off, the car was hit. I had friends that were murdered. To be honest, you're a kid and you don't realize every day that you were playing with fire, that you could walk out your door one day and your life would be over."

4. <u>Plaintiff's Brutalization at the Hands of Arresting DPD Officers</u>
   **1865-1886**
   **00:46:39,172 --> 00:47:03,780**
   [Chris Hansen, Reporter] Investigators say that Wershe took off running. About 25 minutes,
   To a half-hour later, the police find him and they roughed him up pretty good.

To the point where he had to go to the hospital.  00:47:03,780

**1891-1895**
**00:47:09,411--> 00:47:14,541**
[Kevin] Rick believes that it was a setup, that they were watching him and they knew he would have drugs or money.

5. <u>Illegal Planting of Evidence by DPD Officers</u>
   **1873-1886**
   **00:46:48,765 -->00:47:03,780**
   [Chris Hansen, Reporter] So, the next three or four hours, the police are combing the neighborhood, looking for drugs. They got an anonymous tip. Later, more police arrived and eventually they found a box containing eight kilos of cocaine under this back porch, a block away from the traffic stop.

6. <u>Third Assassination Attempt of Rick Wershe Outside Courthouse</u>
   **2060-2063**
   **00:51:01,977 --> 00:51:08,357**
   [Wershe] "Nate was showing up down there which we saw Nate there to try and do some harm to me."

   **2064-2076**
   **00:51:08,399 --> 00:51:24,582**
   [Craft] "I was trying to shoot him out at the courthouse. We had the van already parked up on Gratiot. I already had the scope and everything scoped in, but, at that point, they walked him underneath into the courthouse. "What do you mean he in the courtroom?" They said, "Yeah, he in the courtroom.""

   **2077-2083**
   **00:51:24,624 --> 00:51:34,133**
   [Wershe] "Of course we were a little more careful and when we left the courthouse  or when we parked the car, or whatever. He wasn't there to wish me well at trial."

   **2084-2085**
   **00:51:34,175 --> 00:51:38,262**
   [Craft] "And he was convicted and, after that, it was easy."

7. <u>Former Mayor of Detroit Coleman Young Endangering Plaintiff's Life by Identifying him as an Informant as Part of Operation Backbone</u>
   **2274-2283**
   **00:55:52,474 --> 00:56:05,321**
   [Wershe] "Any other mayor would have been glad to have corruption out of their police department. Unless your brother-in-law is the head of the corruption. And then this guy (Coleman Young) goes on to call me a 'stool pigeon.' That's like an old gangster term for a rat."

**2284-2287**
**00:56:05,362 --> 00:56:09,075**
[**Interviewer**] "Did that put your life in danger, having Coleman Young call you a 'stool pigeon?'"

**2288-2289**
**00:56:09,117 --> 00:56:11,035**
[**Wershe**] "Oh, there's no doubt about it."

8. <u>Rick's Law Enforcement Contributions to Operation Backbone</u>
**2290-2302**
**00:56:11,077 ---> 00:56:30,346**
[**Herm Groman, FBI**] "18 corrupt police officers and politicians, as a result of Wershe's direct involvement in this thing (Operation Backbone) went to prison. And without White Boy Rick or Richard Wershe, Jr. it's I think he'd prefer to be called at this point, that never would have happened. And they haven't even scratched the surface. The corruption runs so deep."

9. <u>Vendetta by City of Detroit Police Official Gill Hill Against Rick Wershe</u>
**2392-2395**
**00:58:36,472 --> 00:58:43,520**
[**Scott Burnstein, Reporter**] "Gil Hill ran for mayor and lost, but Gil Hill blames Rick for him not becoming the mayor."

**2396-2408**
**00:58:43,562 --> 00:59:01,038**
[**Wershe**] "I think helping the FBI with Operation Backbone was the biggest mistake of my life because it created enemies that I couldn't even imagine. I was a kid. I didn't think of the political aspects of it. There's still a lot of angry people in the city of Detroit in positions of power."

10. <u>Wayne County Prosecutor's Office Colluding to Keep Plaintiff Imprisoned</u>
**2420-2481**
**00:59:30,025 --> 01:01:02,659**
[**Ralph Musilli, Wershe's prior attorney**] "When you're up for parole, what the parole board does is they send letters out to the original trial judge. In Rick's case, it was a judge by the name of Thomas Jackson who recently retired. And Judge Jackson wrote back and he said, "I have no problem with this young man getting out. He's served a long time in jail." They then send the letter at the same time to the prosecuting attorney's office. The chief prosecutor was a fellow by the name of Michael Duggan. And Michael Duggan is now the mayor of the city of Detroit. The first response from that office was, "We have no problem with him getting out. "Two weeks later, another letter comes from that office saying, "Disregard the first letter. We don't want him out." In the letter, which was a multipage letter, they were saying that Richard Wershe, Jr. was responsible for the downfall of the city of Detroit. Rick Wershe was involved in cases as a juvenile where the witnesses just disappeared. That this kid is so dangerous that he should never be let out of

prison. And it was signed by Michael Duggan.  If you ask him today, he'll tell you he doesn't remember that letter and he didn't remember signing it. If you look at the letter, the name right underneath Michael Duggan is that of his chief assistant, Samuel Gardner. Rick's two defense attorneys at the time he was convicted was Samuel Gardner and Ed Bell, who were law partners.

**2482-2497**
**01:01:02,701 --> 01:01:24,348**
[Wershe] "He (Sam Gardner) wanted to keep me in prison as long as he could. I mean, here's a guy that was my lawyer and was the number two prosecutor told me I had nothing to worry about. And then this letter that was so outlandish and crazy gets sent to the parole board. I think it proves that they threw the case from the beginning and that their ultimate goal was to keep me in prison."

**2518-2569**
**01:01:50,625 --> 01:03:11,788**
[Bill Rice, former DPD homicide detective] I was approached by Deputy Chief Dennis Richardson, and was told that I was gonna go to the parole hearing. The goal of the hearing was to make sure that he was not released. That Richard Wershe was considered to be dangerous. They characterized him as, uh, Al Capone.
And then I talked about, in generalities, the damage that drugs had did to the city of Detroit. The story of all of the homicides, and all of the drugs, and all of the murders. That was the extent of my contact with the parole board. But the other members of the police department and, and law enforcement that was there went into generalities also. It's fair that you could have implied that they knew about Richard Wershe. Because they slanted it to whereas he was to be considered dangerous when they didn't know anything at all about him. In order to prepare for the parole hearing, I was given information to review and look at so that I can familiarize myself with Richard Wershe.

11. <u>Florida Prosecutor's Efforts to Coerce Plaintiff into Guilty Plea for Fabricated Auto-Theft Charges</u>
**2655-2682**
**01:05:13,034 -> 01:06:04,712**
[Herm Groman FBI ] So, uh, a couple of years after the parole hearing,<i>uh, probably around 2005, Wershe, Jr., uh, was of course in, uh, federal, uh, protective custody, <i>uh, witness protection program doing his life sentence. I became aware that he was involved, in a very minor way, in an auto theft ring. He became aware of the ability to obtain a car for his mother. Consisted of him making some phone calls on behalf of the people. that were actually involved in the auto theft ring. When the Wayne County Prosecutor's Office found out, they made phone calls to the United States Attorney's Office down in Miami saying, "You make sure he's indicted and the full extent of the law comes down on him."

**2683-2688**
**01:06:04,753 --> 01:06:11,927**
[Wershe] I was told, "You take a plea bargain, or I am going to arrest your mom and your sister." So what do I do? I took a plea bargain.

2691
**01:06:16,181 --> 01:06:19,685**
**[Scott]**
In 99.9% of all other cases, the five years will run concurrently with the life sentence that he's under in Michigan. But because Rick's Rick, the sentence was ruled to run consecutively. If and when he's released here,
which I pray is soon, he has to go to Florida and finish out time. And if you look at the guy's prison record, with the exception of that one incident, he is someone that is a model prisoner.

12. Judge Dana Hathaway on Wayne County Prosecutor's Decision to Deny Re-sentencing
**01:09:40,969 --> 01:10:08,080**
**[Dana]** When Prosecutor Worthy objected to my resentencing, I was disappointed. I didn't think that there was a legitimate basis for it. And then when the Court of Appeals sided with the prosecutor I was disappointed again. I thought that, uh, my opinion had strong legal footing given the fact that his sentence was ultimately an Eighth Amendment violation and I thought that the remedy should have been resentencing.

13. Wayne County Prosecutor Kym Worth's Connection to former Homicide Inspector Gill Hill
**2896-2909**
**01:11:26,658 --> 01:11:47,929**
**[Herm Groman, former FBI Agent]** There is a relationship between <i>the current Wayne County prosecutor and Gil Hill.  Uh, she and Gil Hill worked together especially when he was, um, city council, so they have a long history. So I think that's where the issue is.
**[Joe Swickard, reporter]**  From what I saw,  Kym Worthy and Gil Hill had a professional and political relationship.

14. Former Hitman Threatens to Reveal Identities of Detroit Police Officials/Politicians Responsible for Keeping Plaintiff Incarcerated
**2935-2939**
**01:12:38,980 --> 01:12:47,072**
**[Craft]** "Maybe they need to step down and let the boy out before I start really naming names, and they know who they are."

**DVD of "White Boy" Documentary**

**filed in the traditional manner.**