```
              UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF MICHIGAN
                    SOUTHERN DIVISION


IN RE:                      .    Case No. 13-53846
                            .    (tjt)
CITY OF DETROIT, MICHIGAN,  .
                            .    Detroit, Michigan
              Debtor.       .    January 12, 2022
. . . . . . . . . . . . . . .


         IN RE: MOTION TO ENFORCE PLAN OF ADJUSTMENT
                    HELD TELEPHONICALLY
            BEFORE THE HONORABLE THOMAS J. TUCKER
           TRANSCRIPT ORDERED BY:  HON. THOMAS J. TUCKER

APPEARANCES:

For Detroit Fire       Legghio & Israel PC
Fighters Association:  By: CHRISTOPHER P. LEGGHIO
                           MEGAN BOELSTER
                       306 South Washington Avenue
                       Suite 600
                       Royal Oak, Michigan  48067-3837
                       (248) 398-5900
                       cpl@legghioisrael.com
                       mbb@legghioisrael.com


For                    The Sanders Law Firm, PC
Christopher McGhee:    By: HERBERT A. SANDERS
                       333 West Fort Street
                       Suite 1260
                       Detroit, Michigan  48226
                       (313) 961-7770
                       haslawpc@gmail.com


                       Simmons Legal Services
                       By: SHAWNDRICA SIMMONS
                       77 Bagley Street
                       Pontiac, Michigan  48341
                       (248) 734-7559
                       simmonslegal@LawChic.com
```

(Appearances continued)

For the                    Miller Canfield Paddock and Stone,
City of Detroit:           PLC
                           By: MARC N. SWANSON
                           150 West Jefferson
                           Suite 2500
                           Detroit, Michigan  48226
                           (313) 496-7591
                           swansonm@millercanfield.com

                           City of Detroit Law Department
                           By: JASON MCFARLANE
                           2 Woodward Avenue
                           Suite 500
                           Detroit, Michigan  48226-5431
                           (313) 237-0548
                           mcfaj@detroitmi.gov

For General Retirement     Clark Hill, PLC
System of the City         By: WILLIAM C. PRICE
of Detroit:                One Oxford Centre
                           301 Grant Street, 14th Floor
                           Pittsburgh, Pennsylvania  15219
                           (412) 394-7776
                           wprice@clarkhill.com

Court Recorder:            MS. LASHONDA MOSS


Transcribed By:            MS. KRISTEN SHANKLETON

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service

```
 1              (Proceedings commenced at 1:33 p.m.)

 2              THE CLERK:  We'll call the matter of the City of

 3    Detroit, Michigan, case number 13-53846.

 4              THE COURT:  All right.  Good afternoon again.

 5    This is a hearing as everyone knows, I assume, on the

 6    motion that was filed by the Detroit Fire Fighters

 7    Association to enforce plan of adjustment.  It is Docket

 8    Number 13430.  Actually it's the Detroit Fire Fighters

 9    Association Local 344.

10              Let's begin by having entries of appearance put on

11    the record, for the record.  So I'll call on people to do

12    that first of all.

13              First of all, counsel for the Detroit Fire

14    Fighters Association?

15              MR. LEGGHIO:  Your Honor, it's Christopher Legghio

16    and Megan Boelster.

17              THE COURT:  All right.  One moment.

18              All right, thank you.

19              By the way, somebody's shuffling around their

20    phone or something and making a lot of noise.  As asked by

21    my courtroom deputy before this hearing, keep your phone on

22    mute at all times unless you are actually speaking, please.

23              All right, next let me ask for entry of appearance

24    for counsel for the Respondents, the seven Plaintiffs in

25    the state court lawsuit, Christopher McGhee, et al?
```

```
 1              MR. SANDERS:  Good afternoon, Your Honor.  This is
 2    Herbert Sanders, and I believe Shawndrica Simmons is also
 3    present who is co-counsel.
 4              THE COURT:  All right.  Mr. Sanders, are you on a
 5    speakerphone?
 6              MR. SANDERS:  Yes, Your Honor.
 7              THE COURT:  I need you to get off the
 8    speakerphone.  That creates a problem for our hearings for
 9    audio.
10              MR. SANDERS:  Is that better?
11              THE COURT:  Speak again?
12              MR. SANDERS:  Is that better?
13              THE COURT:  It doesn't sound any better, but if
14    you're off the speakerphone that's the best we can do I
15    guess.
16              MR. SANDERS:  Okay.
17              THE COURT:  Okay, let me ask, is Ms. Simmons going
18    to enter an appearance herself?
19              MS. SIMMONS:  This is attorney Shawndrica Simmons,
20    Your Honor.  I am present.
21              THE COURT:  All right.  Good afternoon to you
22    also.
23              Anyone who is on a speakerphone, get off the
24    speakerphone for this hearing.
25              All right, next, counsel for the City of Detroit?
```

```
 1            MR. SWANSON:  Good afternoon, Your Honor.  Marc
 2  Swanson from Miller, Canfield, Paddock & Stone on behalf of
 3  the City of Detroit.  And I believe Mr. Jason McFarlane,
 4  who is in-house counsel to the City of Detroit, is also
 5  present.
 6            THE COURT:  Mr. McFarlane, do you want to enter an
 7  appearance?
 8            MR. MCFARLANE:  Jason McFarlane on behalf of the
 9  City of Detroit is also present.
10            THE COURT:  All right.  Good afternoon to all of
11  you.
12            Then counsel for the Pension -- the PFRS for
13  short, who also in addition to the City of Detroit entered
14  a joinder for this motion.
15            MR. PRICE:  Good afternoon, Your Honor.  William
16  Price, Clark Hill, on behalf of the Detroit Fire Fighter,
17  Police and Fire Retirement System.
18            THE COURT:  All right, good afternoon to you.
19            Now let me ask whether there's anyone who has not
20  yet entered an appearance for this hearing who wants to do
21  so?
22            (No response.)
23            THE COURT:  I'm hearing nothing.  So anyone else?
24            (No response.)
25            THE COURT:  All right, so thank you and good
```

afternoon to everyone again.  This motion that's before me
today for hearing of course is a motion that I have
reviewed, along with all the key exhibits, not only for the
motion, but the response filed by the seven Respondents,
the reply brief filed by the moving party, the DFFA I'll
call 'em for shorthand if that's all right, and the joinder
notice essentially filed each by the City of Detroit and
the Police and Fire Retirement System, which I'll call PFRS
for shorthand during this hearing.

So, let me hear argument first by counsel for the
moving party, the DFFA.

MR. LEGGHIO:  Yes, Your Honor.  This is Chris
Legghio.  Your Honor, before I begin, a housekeeping
matter, I think the Defendants in the civil case, the
officers of the Union, some of them may be on the call.  I
do not know.  I wanted to make sure that the record is
clear if they're on the call

THE COURT:  Well, anyone -- anyone who wants to,
any member of the public, including those individuals, can
dial into this hearing using this AT&T number and listen to
the hearing.  They're not required to enter an appearance
if they're not going to speak, and if they don't want to.
So, it's like, essentially like someone sitting in the back
of the courtroom if we were live in the courtroom.

So if there is any other person, however, who has

1   not yet entered an appearance in this case or in this

2   hearing who wants to do that, you may do that now.  Anyone

3   else?

4               (No response.)

5               THE COURT:  I'm hearing nothing.

6               So, all right, back to you, Mr. Legghio.

7               MR. LEGGHIO:  Okay.

8               THE COURT:  Did I say your name right?

9               MR. LEGGHIO:  Yeah, Your Honor.  Thank you very

10  much.

11              THE COURT:  Okay, so go ahead.

12              MR. LEGGHIO:  Okay.  Your Honor, let me, if I can

13  just get the Court's indulgence, I'm going to address some

14  housekeeping issues to kind of start us off here.  I know

15  this has been briefed, but I think it will be helpful as

16  this argument is developed.

17              This is a case filed by seven Plaintiffs against

18  eleven Defendants.  All the Plaintiffs are fire fighters or

19  were fire fighters.  All of the Plaintiffs were on duty

20  disability prior to the City's bankruptcy.  All of them

21  returned to City employment except for one I believe, after

22  the bankruptcy, after the plan of adjustment was adopted,

23  and after the 2014 DFFA collective bargaining agreement

24  with the City was approved.

25              Four of the seven Plaintiffs had their seniority

```
 1   and rank adjusted after the City and the Union agreed that
 2   the City had misapplied seniority, in re, inconsistent with
 3   the collective bargaining agreement, the 2014 collective
 4   bargaining agreement, and the PFS -- PRFS (sic) and the
 5   plan of adjustment.
 6          Now, all of the Plaintiffs received the same
 7   notice of the bankruptcy and the plan of adjustment as
 8   those Plaintiffs in *Salkowski* did, and which this Court
 9   chronicled on page 21 of the *Salkowski* decision.  And I'm
10   not going to belabor what those are, but you -- this Court
11   listed what those notices were, and these, all these
12   Plaintiffs as current -- currently receiving pensioneers at
13   the time of the bankruptcy received notice.
14          THE COURT:  And are -- they are listed are they in
15   the various certificates of service?  Is that what you're
16   saying?
17          MR. LEGGHIO:  Yes, Your Honor.  On the three items
18   you identify on page 21 of the *Salkowski* decision, they are
19   listed.
20          THE COURT:  All right.  Hold on a minute.  The,
21   just for the record and for clarity, the *Salkowski* decision
22   that you're referring to is no doubt the opinion that I
23   wrote and filed in this bankruptcy on April 6th, 2020 at
24   Docket Number 13274.  That is cited in the, by parties in
25   the papers filed in connection with this motion.  I want to
```

say also for the record that that opinion is also
published, and I'll give you the citation for it.  For the
record it's *In Re City of Detroit, Michigan.*  It's roped at
614 B.R. 255.  Again, that's a decision of the Court, this
Court from 4/6/2020.

Now, you've cited to the unpublished version of it
that's on file at page 21.  Let me grab that real quickly.
I've been looking at the Bankruptcy Reporter version of it,
but they are the same in substance and terms, the language.
All right, so I'm looking at page 21.  Let's see, what
citations there are you talking about?

MR. LEGGHIO:  You talk about the February 28, 2014
where the Respondents were mailed a notice.  The May 12th
solicitation package.  And the December 2014 notice of the
entry of the order, confirmation order.

THE COURT:  Okay.  Those things -- those three
things are referred to I see in the second full paragraph
on page 21 of the *Salkowski* opinion, Docket Number 13274,
right?

MR. LEGGHIO:  Yes, Your Honor.

THE COURT:  Okay.  So go ahead.  You were saying
then?

MR. LEGGHIO:  So each of the Plaintiffs received
this, these notices, and despite that they filed suit in
Wayne County Circuit Court in July of 2020.  Now, the suit

condensed to its essence, it's a pretty ponderous suit.
It's, as I say, against 11 Defendants.  It has over 240
paragraphs.  I believe it's 13 counts.  But reduced to its
essence, and this reduction is a function of the testimony
of the Plaintiffs.  What they really are grieving in their
litigation is how the 2014 DFFA, CBA was negotiated;
secondly, how the 2014 CBA, the substance of the terms of
the CBA, i.e., that the CBA reduced those, the terms during
which a person on duty disability pension could return to
City service and restart their seniority.  The 2014
contract capped that at a two-year period.  That is, if one
was off on duty disability for longer than two years, you
came back to work, you would start at zero, and the lawsuit
challenges that.

          The lawsuit also challenges the City and the
DFFA's observance of current retroactive -- its observance
of currently, retroactively, and prospectively of the terms
of the 2014 CBA, including these terms related to capping
their ability to recover seniority when you're on duty
disability.  And they challenge the City's and DFFA's
observance of the terms of the PFRS and the plan of
adjustment.  The PFRS is required to honor the terms of the
collective bargaining agreement and the PFRS, as you have
indicated in the *Salkowski* case, is to determine the plan
of adjustment.  They challenge the operation of the plan of

```
 1  adjustment.

 2          Now, the Union, the DFFA, the City, the PFRS
 3  believe that the suit violates the plan of adjustment; it
 4  violates the statute, the bankruptcy statutory prohibitions
 5  against attacking discharges in bankruptcy.  It also
 6  attacks the broad POA injunctions against suits and pension
 7  changes.  In *Salkowski*, you chronicled the pertinent dates
 8  and the fact that the PFRS both, or the new plans are part
 9  of the plan of adjustment, and those, and the PFRS is
10  obligated to honor and implement the PFRS consistent with
11  the terms of the 2014 collective bargaining agreement.

12          THE COURT:  Well, I was wondering, because you
13  don't really cite chapter and verse and nail it down in
14  your motion papers, I don't think, exactly where and how
15  the confirmed plan of adjustment incorporates the 2014
16  collective bargaining agreement.

17          MR. LEGGHIO:  Let me -- let address that.

18          THE COURT:  Do you want to walk through that for
19  me?

20          MR. LEGGHIO:  Yes, Your Honor.  Well, first of
21  all, I will start with the fact that the Court acknowledged
22  that the PFRS is incorporated into plan of adjustment, and
23  the PFRS language specifically requires it to honor the
24  terms of the collective bargaining agreement.  That's --

25          THE COURT:  Where does it do that?
```

```
 1            MR. LEGGHIO:  Hang on for a second, Your Honor.

 2            (Pause.)

 3            THE COURT:  What I'm looking for is specific

 4    record citations here that I can go look at because I don't

 5    think you cited those in your papers.  The first part I get

 6    your point.  You're citing the *Salkowski* opinion and what I

 7    said and what I cited in that opinion.  Obviously I can see

 8    that.  But this last point, where is that established in

 9    the record?

10            MR. LEGGHIO:  I'm reading from -- I don't -- let's

11    see.  This is Appendix A to the new PFSR (sic) plan.  I'm

12    quoting this in a Docket Number 13090-1, page 179.  And the

13    quote is that:

14            "The Board of Trustees shall administer

15        the retirement system consistent with the

16        pension provisions of the 2014/2019 collective

17        bargaining agreement between the City of

18        Detroit and the Detroit Fire Fighters

19        Association."

20            THE COURT:  All right.  Thank you.

21            MR. LEGGHIO:  Now, so, but there are other

22    indicators, Your Honor, also that the collective bargaining

23    agreement of the Union itself, and I -- I don't -- the

24    collective bargaining agreement of the Union itself, I

25    don't have the exhibit number right in front of me, but I
```

```
 1  will -- it's under Article 30.  Let me read that to you.
 2  Article 30 says in the --
 3            THE COURT:  Article 30 of what?
 4            MR. LEGGHIO:  Of the collective bargaining
 5  agreement between the parties, City of Detroit and the
 6  DFFA.
 7            THE COURT:  All right, so that's not in the record
 8  in connection with exhibits that anybody filed regarding
 9  this motion I don't think.  It may be elsewhere in the
10  record in this very voluminous Chapter 9 case.  I wouldn't
11  be surprised if it's somewhere, but I don't think anyone
12  has filed a complete copy of that 2014 collective
13  bargaining agreement in connection with this motion, have
14  they?
15            MR. LEGGHIO:  Uhm.
16            THE COURT:  There are only excerpts filed.
17            MR. LEGGHIO:  Well, yes, we have filed excerpts,
18  Your Honor.  I don't -- do you want me to proceed on
19  addressing part of the duration that speaks to the
20  incorporation?
21            THE COURT:  Well, you can -- hold on a minute.
22            MR. SWANSON:  If I may, Marc Swanson on behalf of
23  the City of Detroit --
24            THE COURT:  Oh, no.  Not yet.  Not yet, Mr.
25  Swanson.  You're later.
```

1          Hold on, Mr. Legghio.  I'm pulling up something
 2    real quick.  Okay, Exhibit 6E to the motion, actually
 3    that's Section 30, Duration.  That's what you're citing
 4    now, isn't it?
 5          MR. LEGGHIO:  Correct, Your Honor.
 6          THE COURT:  Okay.  I get it.  So that is, that
 7    page at least is in the record, your Exhibit 6E to your
 8    motion.  Docket 13430-3.  So go ahead.  What were you going
 9    to say about that?
10          MR. LEGGHIO:  Well, this makes reference to the
11    incorporation of the collective bargaining agreement into
12    the plan of adjustment.  So it's not just derivatively
13    through the PRSF (sic) language, but also language of the
14    contract itself addresses that.
15          THE COURT:  Well, I see -- okay.  So Article 30,
16    the contract, the CBA says it becomes, it will be
17    incorporated into and part of a plan of adjustment and
18    order confirming the plan of adjustment.  Of course the
19    actual plan of adjustment is a separate document, a very
20    lengthy document, and the order confirming the plan is a
21    very lengthy order.  And I -- I'm wondering, I did see some
22    excerpts having to do with this, with, generally with, in
23    the order confirming plan and the plan concerning post-
24    petition collective bargaining agreement, but I'm wondering
25    if there's something in the order confirming plan, which

```
 1   was entered on November 12th, 2014 at Docket 8272, or the
 2   plan that it confirmed, the 8th amended plan, Docket Number
 3   8045 I believe that is, and its copy is also attached at
 4   Docket 8272, that specifically incorporates, or even
 5   generally but clearly incorporates as part of the confirmed
 6   plan of adjustment the 2014 collective bargaining
 7   agreement?
 8            Do you see what I'm asking?
 9            MR. LEGGHIO:  I do know what you're asking, Your
10   Honor, and I don't have that document.  I would say to you
11   though that the schedule of post-petition collective
12   bargaining agreement, which is Exhibit 2D5 of the plan of
13   adjustment, it lists a number -- well, if I can get the
14   number here, it looks like 27 collective bargaining
15   agreements between the City of Detroit and the unions with
16   which it negotiated.  Now, the DFFA's contract is not
17   listed, but we believe that's a scrivener's error, and the
18   support for that is this, that on page 2 of that exhibit it
19   refers to the master agreement between the City of Detroit
20   and the Detroit Police Command Officers Association, 2014
21   to 2019, dated, it's 2014.  And then it repeats that, I
22   think it repeats it.  I'll -- so I think that it's a
23   scrivener's error that the DFFA's contract wasn't included.
24   Every other collective bargaining agreement was included.
25            And, and let me add to that.  As the Court
```

certainly knows, the DFFA 2014 contract was mediated under
a federal guidance with Victoria Roberts, and it was
approved by the emergency manager.  So the notion that it's
omitted from this list is we think evidence that it was
nothing more than a scrivener's error.

       But we -- but for purposes of your questions, we
believe this, the circumstances that we've just given you
supports that it is incorporated by reference into the plan
of adjustment.

              THE COURT:  All right, one second.

       All right, anything else you want to add on this
point, this incorporation or adoption point?  In other
words, does the CBA, the 2014 CBA as part of the confirmed
plan of adjustment?

              MR. LEGGHIO:  Well, I guess the other point is is
that there -- if you don't -- if the Court -- it leads to
kind of an intellectual dead end if all collective
bargaining agreement that were negotiated when the City was
in bankruptcy and had federal, or had court supervision and
mediation of their negotiations, the whole injunction, the
10 year injunction on the pension plan, it creates a
problem.  I suppose it means that if it's not incorporated,
does that mean that the DFFA have a carve out on the
injunction, and they can negotiate changes in the
collective -- or in the pension plan, when all of the other

```
 1    collective bargaining agreement had that 10 year
 2    injunction, or at least some of the public service
 3    contracts had a 10 year injunction?
 4            So I think both with the specifics we gave you,
 5    whether the PFRS is incorporated by derivation, it includes
 6    the DFFA CBA.  The DFFA CBA specific language, it's
 7    acknowledgement that it is assumed to be incorporated in
 8    what appears to be contextually that it should have been
 9    included in that list but wasn't.  And finally, the
10    context, it doesn't make sense for it to be the only CBA to
11    be excluded, and creates interpretation issues.  That's my
12    response to why it is that the DFFA CBA is part and parcel
13    of the POA.
14            THE COURT:  Well, I think another point that might
15    be relevant to this is, I'm just looking quickly at the
16    order confirming plan, paragraph 47, that's Docket 8272,
17    the order confirming plan, it's at, it's BF page 105 to
18    106, numbered page 101 to 102 of that order says that:
19            "Contracts, leases, and other agreements
20        entered into after the petition date by the
21        City, including any executory contracts or
22        unexpired leases assumed by the City, and the
23        collective bargaining agreements identified on
24        Exhibit 2D5 to the plan, will be performed by
25        the City in the ordinary course of its
```

```
 1         business.  Accordingly, such contracts and
 2         leases including any assumed executory
 3         contracts and unexpired leases will survive
 4         and remain unaffected by entry of this order."
 5              Now, you've talked about how the, you're saying
 6    that the 2014 CBA at issue here was not listed on Exhibit
 7    2D5 to the plan, which you say was a scrivener's error, but
 8    even if -- even if it's not included in that exhibit, it
 9    would seem to me that that collective bargaining agreement
10    would be covered by the broader language of paragraph 47
11    that I just read from.  That is as a contract, lease, or
12    other agreement entered into after this petition date by
13    the City.  You know, the including language after that
14    doesn't limit the broader reach of that first phrase, and
15    so basically any contract, lease, or other agreement
16    entered into after the petition date by the City, unless
17    there's some other provision in the order confirming plan
18    or the plan that says otherwise under this language will be
19    performed by the City in the ordinary course of its
20    business, and will survive and remain unaffected by entry
21    of the order confirming plan.  Is that language that says
22    that it will be performed by the City in the ordinary
23    course of business, is that sufficient to make it
24    essentially part of the confirmed plan of adjustment, or at
25    least the City's obligation to perform under the terms of
```

1  the 2014 CBA here, part of the City's obligation under the
2  confirmed plan of adjustment?

3           Do you see what I'm asking?

4           MR. LEGGHIO:  Yes.  I would agree.  I think so.

5           THE COURT:  Well, that, of course that question if

6  answered in the affirmative favor's your position of

7  course, but.

8           Okay, so anything else you want to say about why

9  you contend or how you contend the 2014 CBA at issue here

10 is somehow part of or the City's obligation to perform

11 under its terms as part of the City's obligations under the

12 confirmed plan of adjustment?

13          MR. LEGGHIO:  No, I've listed the items, Your

14 Honor.

15          THE COURT:  Okay.  So I think you were moving on,

16 then.  Go ahead.

17          MR. LEGGHIO:  In *Salkowski*, this Court reviewed

18 the elements for contempt for violations of the POA, both

19 under pre- and post-*Taggart*, and I'm not going to go

20 through those in any detail, but you articulated the issue

21 of clear and convincing evidence in the violation, whether

22 the lawsuit for example in *Salkowski*, which was a lawsuit

23 also by fire fighters as you know, challenging drop

24 provisions that were changed by the plan of adjustment,

25 whether the suit was willful, and then the post-*Taggart*

1   element, which is no fair grounds about that the suit is,
2   that it is enjoined by the TOA.
3          Here we believe the elements are established.
4   Excuse me.  We think the suit is a clear violation of
5   statutory injunctions and the plan of adjustment
6   injunctions.  Both the injunctions about, that, that
7   restrain any change in the collective bargaining agreement
8   for 10 years and the injunctions against bringing suit
9   against the City and those who, I forget the phrase that
10  was used in that provision, but those who were affiliated
11  with the City.
12         The reason we say this is clear is for this
13  purpose: the suit simply seeks to retain the pre-bankruptcy
14  CBA pension rights that the Plaintiffs claim they had.
15  They won't -- do not want to be held to the two-year cap on
16  duty disability, and they specifically cite to the fact
17  that they should be entitled to have their disability
18  pension interpreted under the collective bargaining
19  agreements which were in place either when they were hired,
20  which include contracts that date back to 1999, or under
21  contracts under which they weren't out on duty disability.
22         Now, as we pointed out, these are, Plaintiffs are
23  individuals who were gone from City employment from between
24  three and seventeen years, and this is a classic case where
25  we say that they just want the -- they want the advantages

of the old contracts, and they are entitled to those, and
the unfairness of this for them is simply that others were
able to enjoy the benefits of the contracts under which
they either were hired or went out on duty disability, and
therefore they are entitled to do that. And this is simply
in complete disregard of the winching process of bankruptcy
that you've alluded to and Judge Rhodes alluded to in the
(unintelligible), to both healthcare benefits and pension
benefits; that is why we believe it's a clear violation of
the injunctions.

        We also think Plaintiffs -- Plaintiffs certainly
had knowledge that the pension changes were in play and
were going to be compromised, both formally and
anecdotally. I mean everyone who lived through that, every
fire fighter, every police officer, ever City employee knew
that there were changes, adverse changes to their pension,
health, and welfare benefits as a result of the pension
plan. So they had that, they had knowledge of it at the
time that this was happening.

        Now, they also had knowledge, Your Honor, and this
bears on other elements of this case, after their suit was
filed. We've provided you with at least one letter and
informed them, the Plaintiffs, that their suit had
threshold jurisdictional issues, and that it was in
violation of the plan of adjustment. There are other

1    exhibits that are not attached in this case which include
2    both letters to the -- Plaintiffs' attorney and the, and as
3    well as the filings with the case evaluation.  It was
4    specifically laid out for them, warned them that your
5    lawsuit had fatal problems with it in terms of the plan of
6    adjustment, and that it was simply seeking to undo what the
7    Bankruptcy Court was able to finally do.  As I say, the
8    really difficult process of trimming pension benefits.  So
9    --
10         THE COURT:  Let me -- excuse me.  Let me ask you
11   about these letters.  I see as one of your exhibits, this
12   is Exhibit 6C to your motion, Docket 13430-2, you included
13   a copy of a letter from you to Herbert Sanders, who is the
14   attorney for the seven Respondents in the state court
15   lawsuit at issue of course, dated April 23, 2021.  Is that
16   one of the letters that you are saying by which the DFFA
17   informed the Respondents' attorney that the state court
18   action was violating the City's plan and plan injunction?
19         MR. LEGGHIO:  Yes.
20         THE COURT:  And how does it -- where and how does
21   it do that?  It's not -- it's a little hard --
22         MR. LEGGHIO:  It's in the last paragraph of that
23   letter.
24         THE COURT:  The last paragraph.  Okay.
25         MR. LEGGHIO:  Let me see.

```
 1              THE COURT:  Yeah.  All right.  So.

 2              MR. LEGGHIO:  Yeah, not the last, but second to

 3   last paragraph.

 4              THE COURT:  Yeah, so where it says:

 5              "During our April 21, '21 call, I also

 6         noted that the DFFA believes that Plaintiffs'

 7         claims raise issues within the exclusive

 8         jurisdiction of the Bankruptcy Court, i.e.,

 9         that they are contrary to the Bankruptcy

10         Court's approved plan of adjustment (POA)."

11              Unquote.  That's what you're referring to?

12              MR. LEGGHIO:  Yes, Your Honor.  On a different

13   letter that -- which would be in fact duplicative of what I

14   said in that letter, and when the parties submitted case

15   evaluation, the lead argument that we submitted to the case

16   evaluator was that there was threshold jurisdictional

17   questions that in fact that the case was in violation with

18   plan of adjustment and was barred.

19              THE COURT:  Well, those, that additional letter,

20   those lead arguments in the case evaluation, those are not

21   in the record, is that correct?

22              MR. LEGGHIO:  That's correct.  I didn't add those

23   to the record, but we can, with the Court's permission we

24   can supplement the record.

25              THE COURT:  Well, the, what is the additional
```

```
 1    letter, the date of that?  What's the date of that letter?
 2              MR. LEGGHIO:  That's May, May of 2021.
 3              THE COURT:  What does that say?
 4              MR. LEGGHIO:  I'm -- I think it -- no -- I guess
 5    it's -- let's see.  May is the letter.  May is the case
 6    evaluation.  June is the second letter.  Of 2021.
 7              THE COURT:  One second, please.  Okay, June is the
 8    letter?  June what?
 9              MR. LEGGHIO:  Yes.  Yes.
10              THE COURT:  June what?
11              MR. LEGGHIO:  Hang on, Your Honor.  I'll give it
12    to you.  It's June 17.
13              THE COURT:  Okay, that's not attached to your
14    motion.  Is that in the exhibits filed by the Respondents
15    by chance?  I can look quickly through those, but.
16              MR. LEGGHIO:  It's not filed by anybody, Your
17    Honor.  I'll -- I can start with the Court.
18              THE COURT:  And what does that say in substance
19    about this issue again?
20              MR. LEGGHIO:  Let me -- I've cited -- this is what
21    I've cited briefly, I say:
22              "...stated simply, Plaintiffs' lawsuit
23         seeks to avoid the claims less generous 2014
24         CBA language related to duty disability
25         retirement and seniority limits.  And as
```

```
 1          Plaintiffs have said and testified, Plaintiffs
 2          seek increased pension benefits.  As such, it
 3          creates legally impermissible pension
 4          liabilities for the City pension plan, and
 5          violates the Bankruptcy Court approved plan of
 6          adjustment, and the POA's ten year injunction
 7          against any changes for the pension plan."
 8               And I say:
 9               "The 2014 CBA is incorporated into the
10          POA."
11               I also say:
12               "In a recent similar Wayne County case
13          involving fire fighters who also sought
14          increased benefits under the pension plan, the
15          Bankruptcy Court found that Plaintiffs' Wayne
16          County suit was an improper attempt to change
17          POA terms in violation of the POA ten year
18          injunction."
19               And that is referring to the *Salkowski* case and --
20               THE COURT:  All right, but that letter -- that
21     letter is much more explicit in detail.
22               MR. LEGGHIO:  Yes.
23               THE COURT:  Explaining or trying to tell the
24     opposing counsel, Respondents' counsel, that their state
25     court lawsuit violated the plan, right?
```

```
 1            MR. LEGGHIO:  Yes.  And the case evaluation gets
 2   even in a little more detail than that, but it's the same
 3   thing, Your Honor.
 4            THE COURT:  What is the case evaluation you're
 5   referring to?  Is that like a, basically a mediation
 6   summary, or what is it?
 7            MR. LEGGHIO:  Yes, it's a case evaluation summary
 8   that each party submits to the Court -- to the case
 9   evaluators.
10            THE COURT:  Is there anything confidential or
11   privileged about that that would under state law prevent
12   you from filing that in this case?
13            MR. LEGGHIO:  No, in fact I reference it in a
14   footnote, Your Honor, and I spent some time researching
15   that issue because there are prohibitions against using
16   case evaluation matters in some types of litigation,
17   obviously with a fact finder, but in this case this Court's
18   not the fact finder, so there's nothing from my perspective
19   that precludes use from filing the brief that we filed with
20   the case evaluators.
21            THE COURT:  And when will --
22            MR. LEGGHIO:  It lays out in a little more detail
23   our claim.
24            THE COURT:  When were those filed?
25            MR. LEGGHIO:  Those were filed in May I believe.
```

```
 1              THE COURT:  All right, now getting back to the
 2    state court lawsuit as you started out your argument and
 3    this is in your papers as well, this lawsuit in state court
 4    at issue was filed in July of 2020.  What's been put in the
 5    record so far is the First Amended Complaint, that's
 6    Exhibit 6A to your motion I believe.  The Plaintiffs' First
 7    Amended Complaint which was filed at a later date?
 8              MR. LEGGHIO:  Correct.
 9              THE COURT:  When was that filed in the state
10    court?
11              MR. LEGGHIO:  I don't -- you have me at a
12    disadvantage, Your Honor.  I have to get that date.
13              THE COURT:  All right.  Well, the initial
14    Complaint was filed obviously in July of 2020 sometime.
15    Did that -- is it -- the DFFA really hasn't argued about
16    what that said or whether that specifically violated the
17    plan injunction or anything, but is it your view that that
18    did as well?
19              MR. LEGGHIO:  Yes.
20              THE COURT:  All right, so was the First Amended
21    Complaint, had that been filed by the time of your June 17,
22    2021 letter and the May 2021 case evaluation briefs?
23              MR. LEGGHIO:  Your Honor, that correction is --
24    that is the chronology, yes.
25              THE COURT:  And how many Complaints do we have in
```

```
 1   the state court?  The initial one and First Amended?  Is
 2   that it?
 3              MR. LEGGHIO:  I believe that's correct, Your
 4   Honor.
 5              THE COURT:  All right.  So -- all right.
 6              So I think I've interrupted you with a bunch of
 7   things, but I am going to require that, and I'll put this
 8   in an order that I'll prepare and enter after this hearing
 9   today, but I'm going to require that you file as a
10   supplement in support of your motion the June 17, 2021
11   letter and the case evaluation brief that you have referred
12   to, as well as a copy of the initial Complaint filed in the
13   state court action, and that you say in that supplement the
14   dates on which these Complaints, the initial Complaint and
15   the First Amended Complaint, were filed.
16              Now, assuming that that's the only stuff that I'm
17   going to require you to file, how much time do you want me
18   to give you to file that?  I'm going to set a deadline for
19   this.  Is seven days --
20              MR. LEGGHIO:  I can file -- pardon?
21              THE COURT:  Is seven days enough?
22              MR. LEGGHIO:  Oh, certainly, yes.
23              THE COURT:  All right.  I'll make that August 19 -
24   - or January 19.  I wish it was August; it'd be warmer.
25   January 18, 2022 will be the deadline for that.  Now,
```

1  unless I, you know, during the course of this hearing
2  something happens and I change that, or the details of
3  that, so.

4          All right, so I've interrupted you with all these
5  questions; why don't you continue with your argument.

6          MR. LEGGHIO:  Okay.  Your Honor, I left off on the
7  issue of no fair ground of doubt that the suit violates the
8  POA and the injunctions and the terms of the PFRS as well
9  as the terms of the 2014 CBA.  Now, let me -- as I said,
10 and I'm going to get a little granular here, but not too
11 much.  You know, what they want is simply they want to
12 restore the status quo ante, as it exists with the time
13 they either were hired or the time they were not on duty
14 disability, and they want that despite the fact that the
15 City went through this bankruptcy that made all sorts of
16 adjustments in City obligations.

17         Now, let me get to the point about the granular
18 point.  This is what their proposal -- this is what their
19 lawsuit seeks.  They want to -- they want to work for the
20 City of Detroit for a few years, and I'm broad stroking one
21 part of this, they worked for the City for a few years,
22 they go out on duty disability, they want to have an
23 unlimited time in which they can earn credited service as
24 well as increases in their rank and wages, and then when
25 they return their pension benefit is calculated on using a

factor of the final average compensation at the promoted
rate that they are now at after being absent from the City
for 15 years or 17 years.  I called it in my brief
sensibility offending, and really a sort of kind of horror
story that predated the bankruptcy.  That's what they want.
And the problem with that is that it's a significant
expense to the pension plan to do that.  The way the
current CBA reads is that after two years if you're on duty
disability you lose your seniority when you come -- if you
come back later, and you start at zero, and you're not
promoted over the last 17 years when you were absent.  And
so there's no fair grounds that -- what they're doing flies
in the face of the real, the mission of the bankruptcy, the
mission of the plan of adjustment to get the pension debt
under control, and to kind of eliminate these extravagant
payments that were made prior to the bankruptcy.

            THE COURT:  All right, now, excuse me, the
provision about the absence from work for any reason in
excess of two years that's in the CBA, just for the record,
that it looks like the excerpts from the 2014 CBA that you
put in with you motion did not include this; it only
included Section 30 of the Section 12D of that collective
bargaining agreement is in the record as part of the
excerpts of that CBA that were a exhibit filed by the
Respondents.  And just for the record, this is Exhibit 2 at

```
 1  Docket Number 13455-2.  And I'm looking at Section 12,
 2  Seniority, and subpart (D), Loss of Seniority.  And you go
 3  down to subpart 7 of the next page, that's the -- that's
 4  the provision that in your view has to be applied to these
 5  Respondents, and was applied correctly to these Respondents
 6  essentially, that they lost their seniority and basically
 7  started over in terms of seniority and all the consequences
 8  of that because they were absent from work for more than
 9  two years.  Is that correct?
10           MR. LEGGHIO:  Correct.
11           THE COURT:  You put into the record as one of your
12  exhibits, and it's Exhibit 6D, Docket 13430-2, this
13  Arbitrator's opinion and award from George Roumell that was
14  dated May 12th, 2021, and I have had a chance to quickly
15  read through that, but he interprets the CBA, the 2014 CBA
16  in the same way that I think you do with respect to this
17  Section 12D(7).  And, but he disagreed with the DFFA's then
18  position that, about Section 12D(2), Retirement.  And it
19  just -- just so I'm clear now, is it your client's position
20  now in this court with respect to to this motion that it is
21  12D(7) only, and not 12D(2) that requires the loss of
22  seniority for the Respondents, the seven Respondents that
23  we have in front of the Court now?
24           Do you see what I'm saying?
25           MR. LEGGHIO:  I don't understand your question,
```

1  Your Honor.

2          THE COURT:  Well, Arbitrator Roumell disagreed

3  with the interpretation of the collective bargaining

4  agreement, the 2014 collective bargaining agreement, with

5  respect to Section 12D(2), that is, you lose seniority if

6  you retire, and the argument I think was made by DFFA that

7  the Respondents in front of -- or the arbitration parties

8  in front of the Arbitrator, I think there were a couple of

9  'em, who it looks like had gone out on disability

10 retirement well after the 2014 collective bargaining

11 agreement was adopted, and then argued that they had, had

12 come back within two years and that therefore they

13 shouldn't lose their seniority.  And the DFFA it looks like

14 argued that, well, no, they retired and so under Section

15 12D(2) retirement means they lost their seniority.  He

16 rejected that and interpreted the contract not to mean

17 that, and to instead -- instead applied 12D(7).  Am I --

18         MR. LEGGHIO:  I don't know that (unintelligible)

19 Your Honor.

20         THE COURT:  Am I misreading that Arbitrator's

21 opinion?

22         MR. LEGGHIO:  I -- I don't know that I can say I

23 agree with your read of it, and I not sure that I recall

24 when I read the opinion that I would, thought he was in

25 counterpoint to the DFFA's position.  I think the City was

```
 1   arguing the 12D(2) provision, but in any event what --

 2           THE COURT:  Okay, but in any event it's 12D(7)

 3   that you're relying on now, isn't it?

 4           MR. LEGGHIO:  Precisely.

 5           THE COURT:  Okay.  All right.  Perhaps that's a

 6   sufficient answer for present purposes.  Why don't you

 7   continue; you were saying?

 8           MR. LEGGHIO:  And so, Your Honor, this is where we

 9   think that the law says what's fair -- fair ground about

10   and what the suit is trying to do is to increase pension

11   benefits to the Plaintiff, contrary to what the plan of

12   adjustment provided, what the collective bargaining

13   agreement provided, what the PRFS must do, and to that

14   extent we believe we've met that element of

15   (unintelligible) give the Court grounds to find that they

16   are in violation of the plan of adjustment and in contempt.

17           THE COURT:  Mr. Legghio, do you know where in the

18   record in this voluminous Chapter 9 case I can find the

19   full copy of the 2014 collective bargaining agreement, if

20   anywhere?

21           MR. LEGGHIO:  I have my -- can I ask my associate

22   --

23           THE COURT:  Sure.

24           MR. LEGGHIO:  -- my colleague?

25           Megan, do you have that number?
```

1    I don't, but we can find the entire collective
2  bargaining agreement for you, Your Honor.
3    THE COURT:  Well, unless somebody later in the
4  hearing tells me where I can find it already in the record
5  in this bankruptcy case, and, you know, I'd kind of be
6  surprised if it isn't somewhere, and perhaps Mr. Swanson
7  will tell me, but, when he gets a chance to talk, but
8  unless that happens, I'll add that to the list of what you
9  are to file a copy of as a supplement by January 18, so.
10    MR. LEGGHIO:  Okay.
11    THE COURT:  Put that on your list.
12    So, these seven Respondents, the Plaintiffs in the
13  state court action at issue here, they all went on a
14  disability, and forgive me if I don't use the precise,
15  accurate term for it, but they went out on disability well
16  before, most of the time, most of 'em well before, but all
17  of them before the effective date of the 2014 collective
18  bargaining agreement, the date it was adopted, or the date
19  the City's plan of adjustment was confirmed, right?
20    MR. LEGGHIO:  Correct.
21    THE COURT:  Okay.
22    MR. LEGGHIO:  And it was duty disability, Your
23  Honor.
24    THE COURT:  Okay, duty disability.  At the time
25  these Respondents went out on duty disability, the

1 | collective bargaining agreement that was then in effect

2 | wouldn't deprive them of their seniority if they stayed out

3 | for more than two years, right?  I mean that was changed

4 | and tightened up by the 2014 collective bargaining

5 | agreement, right?

6 | MR. LEGGHIO:  That answer's a little more

7 | complicated.  Let me say this: yes, in principle you're

8 | right.  What I've -- the prior CBAs to 2014 and the

9 | bankruptcy was more generous in committing a duty disabled

10 | person to earn seniority, and, when they came back.

11 | Now, the most generous contract going back to the

12 | 1990s had no cap on how much seniority you could earn while

13 | you were on duty disability.  So one could be off for,

14 | theoretically could be off for 20 some years or 20 years

15 | and come back and say now, I come back as a 20 year, 25

16 | year employee, five years on active duty, and 20 years on

17 | the bench, and now I want to retire as a captain of

18 | whatever higher rank.

19 | Later -- later on contracts started to trim that a

20 | little bit, but, so some of the Plaintiffs went on duty

21 | disability, which I believe during the period of time of

22 | the collective bargaining agreement was the most generous

23 | grant of earning seniority while on duty disability and

24 | some of them I believe went out on duty disability when the

25 | City had already, and the Union had negotiated some

1  restrictions on how much you could earn while on duty
2  disability.  So it's not -- it's not monolithic.
3          THE COURT:  Well, for example, the 2001 to 2008
4  collective bargaining agreement, which excerpts of which
5  are in the record as one of the exhibits filed by the
6  Respondents, it's Exhibit 1 to their motion, or their
7  response, Docket 13455-2, has this 25 year cap at Section
8  9B --
9          MR. LEGGHIO:  Yes.
10         THE COURT:  -- of that.  That's the 25 year cap
11  that you're talking about.  That was in effect in that CBA
12  for 2001 to 2008, which I think somebody said the papers
13  was extended by mutual agreement through 2013 'til the 2014
14  collective bargaining agreement came in, right?
15         MR. LEGGHIO:  I believe that's correct.
16         THE COURT:  Okay.  So that the 25 year cap.  So
17  some of the Respondents went out even before that and
18  argued --
19         (At 2:23 p.m., background speaking occurs)
20         THE COURT:  -- that they have (unintelligible).
21         I don't know what that background noise is, but
22  whoever has got that, get your phone on mute.
23         All right, so Mr. Legghio, this is a sort of a
24  lead into the question I have, and that is is there any
25  dispute there that the provision, the new provision in the

1   2014 CBA applies retroactively in effect; that is, it
2   applies to fire fighters who went on duty disability before
3   the 2014 CBA became effective?

4         Do you see what I'm asking?

5         MR. LEGGHIO:  Yes.  There's no dispute from our
6   position, Your Honor, and we believe no dispute under the
7   terms of the POA or the PFRS, the term retroactive kind of
8   plays into Plaintiffs' argument, but yes, what you're
9   pointing to is yes, you're correct.

10        THE COURT:  Well, retroactive could be a loaded
11  term.  It can mean a lot --

12        MR. LEGGHIO:  Yes.

13        THE COURT:  -- in a lot of different contexts; I
14  understand that.  And so I don't mean to use that word with
15  any sort of precision here; just to convey the general idea
16  that that is, you don't have, for example, you don't have a
17  vested right forever, doesn't last forever under say the
18  2001/2008 CBA, as a fire fighter, if that CBA provision
19  regarding seniority is later changed in the 2014 CBA as it
20  was, then you're going to be governed by that new one, even
21  if you went out on duty disability before that later CBA
22  became effective?  That's your view of it, right?

23        MR. LEGGHIO:  Yes, Your Honor, and I would submit
24  that that has been articulated both by this Court when it -
25  - it indicated that in the *Salkowski* case that pension

1  benefits can be compromised or were compromised in
2  bankruptcy, and I think Judge Rhodes identified that
3  specifically that promised pension benefits were going to
4  be compromised if they were a contractual promise that were
5  going to be compromised within the ambit of the bankruptcy.
6  So yes.
7          THE COURT:  But what I'm asking really is more a
8  matter of contract question, that is, in other words what
9  the contract right is.  If there is, I mean is there
10 anything, you know, the 2014 CBA for example is not, the
11 entire document is not in the record where I can find it at
12 the moment at least anyway, and the same is true for the
13 2001 to 2008 CBA.  But I'm wondering if there's any
14 language in either of those agreements that essentially
15 says that the rights to retain seniority essentially are
16 vested, and here's another loaded word, "vested," but
17 essentially they're vested with respect to fire fighters
18 who take duty disability during the term of say the
19 previous CBA, the 2001 to 2008 one?
20          Do you see what I'm asking there?
21          MR. LEGGHIO:  Yes.  And Your Honor, I, you know, I
22 was involved in the litigation for the fire fighters in the
23 bankruptcy, and as you may know, the fire fighters as well
24 as other Unions trotted out the arguments of vested rights
25 and it did not go very well.

1          So, no, we -- the Union is of the position that
2    there were no vested rights that were immunized from the
3    difficult changes that the bankruptcy and the plan of
4    adjustment imposed on people, both those who were in pay
5    status, as well as those who had inchoate pension benefits
6    not yet utilized and not yet in pay status.  So there was
7    no vesting.  I think the Court's made very clear and the
8    parties made very clear that there was no vesting of
9    pension benefits after that bankruptcy.  And the two that
10   were made were made to vested benefits.
11         THE COURT:  Well, is there anything in the
12   language of the 2014 CBA that has any bearing on this
13   question I'm asking?  One way or the other?
14         MR. LEGGHIO:  You know, Your Honor, I would have
15   to fly spec that.  I doubt there's any language that
16   acknowledges that pension, the pension is vested, and
17   there's no language as far as I can recall, vesting
18   language that is apropos of seniority.
19         THE COURT:  Well, let's not get hung up on the
20   word "vesting," just like with "retroactivity," okay?
21         The concept, that is, is there anything that
22   addresses or has any bearing on the concept, or on the
23   bearing on way or the other on your argument, for example,
24   that the new seniority provisions in the 2014 CBA,
25   including the one, the two year cap that you're relying on

1  now, that that does or does not apply to fire fighters who

2  went out on disability before the effective date of the

3  2014 CBA?

4           MR. LEGGHIO:  I don't believe there's anything

5  language that carves that out, Your Honor.

6           THE COURT:  On way or the other?

7           MR. LEGGHIO:  Yes, I don't believe there's

8  anything that's reserved or anything that -- anything that

9  reasserts it or carves it out.

10          THE COURT:  Or that bears on the question that I'm

11  asking?

12          MR. LEGGHIO:  The question -- the question being

13  that, that these fire fighters preserved their rights under

14  prior collective bargaining agreement?

15          THE COURT:  Well, that's not how I asked the

16  question.  Do you remember the question I asked?  I mean

17  I'll tear my hair out if I have to repeat it because it's,

18  you know, it's like, it's like, all I could muster at this

19  hour of the day to get that question out.

20          MR. LEGGHIO:  I hate to try the Court's patience,

21  but I'm not sure that I --

22          THE COURT:  All right.  All right.  Okay.  So,

23  again, I've interrupted you.  Go ahead with your argument,

24  where you were going.

25          MR. LEGGHIO:  Your Honor, so I -- I think I -- I

```
 1  think the case is -- this is -- I want to just kind of wrap
 2  up here.  I think the cases that are cited by the
 3  Plaintiffs in the reply brief are really inapplicable.
 4  This is not a case, they cited a *O'Loghlin* I believe it is?
 5  This is not a case where the City or the Union engaged in
 6  post-bankruptcy conduct that was violative of a statute, or
 7  that would be actionable standing in and of itself, and
 8  that we're now trying to assert that the bankruptcy or the
 9  plan of adjustment somehow immunizes that.  That -- that --
10  the facts on their face are clear that that's now what
11  we're doing.
12          Their references to the case, and let me spell it
13  into the record, S-e-n-c-z-y-s-z-y-n, in which they suggest
14  that the issue over which their suing really didn't mature
15  until after, you know, until sometime after, and they, so
16  they couldn't react in a timely fashion.  That too is, we
17  believe is, the facts don't support.  They were prepetition
18  contractual parties with the City and they received notices
19  as such, and so they admit that they -- it wasn't
20  foreseeable that they had a claim or that they had to
21  challenge it lets them off the hook.
22          Now, I want to add something to this point.  They
23  don't really argue this point, and I referenced this in our
24  reply brief, but it's important -- I don't -- I do not
25  conclude my arguments without acknowledging this.  Four of
```

1   the seven Plaintiffs came back to work post-bankruptcy, and
2   the City applied the seniority provision of prior
3   collective bargaining agreements, that is, contracts prior
4   to 2014, and that is where the rub began for the Union.
5   This was a -- the Union took issue with this and then as a
6   result the City in effect reduced the pension of these four
7   individuals back to the position should be consistent with
8   the terms of the 2014 collective bargaining agreement, and,
9   and as a result there was a reduction in rank.

10          Now, during this period of time that the City was
11  operating outside the lines of the collective bargaining
12  agreement, these individuals were paid at higher ranks.
13  The City did not seek reimbursement for that.  But it was
14  just an inadvertent application of the collective
15  bargaining agreement, and we believe, as it's laid out in
16  our briefs, this doesn't create any rights, it doesn't
17  justify any claims, it doesn't permit the Plaintiffs to now
18  claim that they somehow are permitted to operate outside
19  the more strict or severe terms of the plan of adjustment
20  and the 2014 collective bargaining agreement.

21          And finally, Your Honor, I would say that, and I'm
22  not going to spend a lot of time on this, but you know, the
23  Union's position is is that it tried mightily to educate
24  the Plaintiffs and their counsel that their lawsuit was
25  just an effort to avoid the harsh changes that the

1  bankruptcy imposed on everybody, and that the Union was
2  spending, you know, buckets of money defending itself, and
3  that we believe that conduct entitles the DFFA to their
4  costs and attorney fees in defending that action.
5         THE COURT:  Why did the, since that's part of the
6  relief you're seeking, why did the DFFA wait so long to
7  file this motion?  They waited more than a year after the
8  state court action was filed before you filed the motion in
9  this Court for contempt.
10        MR. LEGGHIO:  Yeah, I -- I anticipated your
11 question, Your Honor, and I have a very good answer.
12             First of all, when the suit was filed --
13        THE COURT:  It's nice of you to say so, but go
14 ahead.
15        MR. LEGGHIO:  First of all, when the suit was
16 filed, Your Honor, and amended, discovery in Wayne County
17 Circuit Court was, you know, (unintelligible), so it was
18 really, it was very difficult, and we weren't really sure
19 how things, you know, what was -- what was happening.  So
20 discovery went much slower than we anticipated.  And
21 discovery in this case, as it is in all cases is important,
22 but in this case even more so for this reason: if you read
23 Plaintiffs' First Amended Complaint, now it's 250-some
24 paragraphs which are really, looked like they were pulled
25 out of a Hornbook in which the Plaintiff simply recite the

1  elements of each of their 13 claims.  And there's no

2  marrying up of their claims with factual assertion.  So it

3  wasn't --

4           THE COURT:  Are you talking about -- are you

5  talking about the Plaintiffs' First Amended Complaint,

6  Exhibit 6A to your motion?

7           MR. LEGGHIO:  Yes.

8           THE COURT:  Well, I -- I might take a different

9  view of -- of what you just said about that.  But go ahead.

10          MR. LEGGHIO:  Well, then if not the First Amended

11 Complaint, certainly the first Complaint that was filed.

12          THE COURT:  Okay, so that's not in the record --

13          MR. LEGGHIO:  So that --

14          THE COURT:  -- but you're going to file that.

15          MR. LEGGHIO:  Yes.

16          THE COURT:  I'm going to require you to.  All

17 right.

18          MR. LEGGHIO:  But --

19          THE COURT:  I assume that if you don't get, as a

20 contempt relief if you don't get attorney fees for

21 defending the state court action the entire time it was

22 pending, you at least want them for the cost and expense of

23 bringing and prosecuting your contempt motion?

24          MR. LEGGHIO:  Yes, Your Honor.

25          THE COURT:  Yeah.  Well, I --

```
 1              MR. LEGGHIO:  And --

 2              THE COURT:  I might have cut -- I cut off your --

 3   I cut you off when you were trying to answer my earlier

 4   question.  I don't want -- let me be fair and -- go ahead

 5   and finish what you were saying about the discovery going

 6   slow and, you know, those, go ahead.

 7              MR. LEGGHIO:  Well, Your Honor, it wasn't until we

 8   got into the depositions of the Plaintiffs that we could

 9   get them to articulate that they were really challenging,

10   the lawsuit was really an effort to preserve what they

11   believed were their vested contractual rights.  And as I

12   said, and it's in our brief, they were challenging the way

13   the contract was negotiated, the substance of the contract,

14   and the City and the Union's observance of the contractual

15   terms, as well as the terms of the plan of adjustment.  It

16   wasn't 'til we got into discovery that we got that.

17              Now, I know this Court is not adjudicating the

18   merits of the claim, but we made references in our briefs,

19   Your Honor, that when asked questions pointedly, "What's

20   your evidence of conspiracy, and what's your evidence of

21   19(a)(3) violations?"  That the answers are just a flat

22   "No."  So it took us some time through the seven Plaintiffs

23   to frame up what they were really saying, and that is the

24   answer for the delay.

25              THE COURT:  Well, a different question I wanted to
```

1  ask you about, you're talking about how the City applied
2  the provisions of the prior collective bargaining
3  agreement, pre-2014 one initially for four of the seven
4  Plaintiffs here in this case, they're involved in this
5  matter, and then later changed that application to them, if
6  there -- apparently there were other fire fighters, not
7  just the, some of the seven that are present in this, but
8  other fire fighters besides them after the 2014 collective
9  bargaining agreement became effective who were treated in
10 terms of seniority under the prior agreement.  Is that
11 correct?
12         MR. LEGGHIO:  No, Your Honor.  We are not aware of
13 anyone else that was treated that way.
14         THE COURT:  Okay.  All right.  All right.  I
15 thought I saw something indicating otherwise, but.  All
16 right.  So it's the four of the seven.  Which four is it of
17 the seven?
18         MR. LEGGHIO:  Let me see.  Your Honor, if you give
19 me a moment, I'll give you the list of the four.
20         THE COURT:  Sure.
21         MR. LEGGHIO:  Your Honor, if you want, I will get
22 it, I'll gather the names for you while you take argument
23 from others and I will give it to you.
24         THE COURT:  Okay.  That'll be fine.
25         So let's talk for a second about this concept of

selective enforcement of the CBA, the 2014 CBA, and what

under your view of the world it would also be selective

enforcement of the terms of the confirmed plan of

adjustment by the City, for a time at least, at least with

respect to these four that you're going to name in applying

the prior CBA, not the 2014 one.  That selective, that

alleged selective enforcement of course it did occur after

the effective date of the 2014 CBA, and after the effective

date of the confirmed plan of adjustment, which happened in

December of 2014.  The, is there a claim, potential claim,

some sort of potential claim of discrimination or -- well,

let's focus on discrimination for a minute.  There are

claims of age discrimination and disability discrimination

in the First Amended Complaint in the state court here.

And is there, is there a potential claim, post-confirmation

claim of discrimination based on the selective, so-called

their alleged selective enforcement of the CBA and the

plan?  That is one that -- that can be prosecuted and

pursued and is not barred by the confirmed plan of

adjustment?

      Do you see what I'm asking?

      MR. LEGGHIO:  I think I do but -- I think I do,

but let me -- let probe it a little bit.  Let me clarify a

little bit.

      First of all, you're going to -- when you say

```
1   selective enforcement, this was the concept that the
2   Plaintiffs are advancing --
3             THE COURT:  Yeah.
4             MR. LEGGHIO:  -- that the Union selectively
5   enforced this?
6             THE COURT:  Yes.
7             MR. LEGGHIO:  Well, we, at the threshold, the
8   Union challenges that.  The Union is saying that when it's
9   understood that the City had inadvertently returned people
10  to work with seniority after being gone more than two
11  years, that all the seniority while the time they were
12  gone, the Union did not selectively enforce that provision,
13  and there's no evidence in the record to support such a
14  claim.  And so there's nothing like that in this case.
15  There weren't ten people that the City inadvertently gave
16  seniority to beyond the two years and the Union only
17  challenged five.  There's just no evidence to support such
18  a notion.
19            THE COURT:  Well, there were four here.
20            MR. LEGGHIO:  Well, those -- what I'm saying to
21  you is four of the seven, the other three, Your Honor, when
22  they came back, the City was already operating
23  appropriately respecting the two year limit.
24            THE COURT:  All right, so the four, with respect
25  to the four, what about them?  Do they have a claim?  Don't
```

1  even need to focus on the Union, let's say against the
2  City, for discrimination, disability related discrimination
3  based on the -- based on the -- well, I guess part of your
4  point seems to be these four don't have a claim that they
5  were adversely discriminated against by the fact that the
6  City inadvertently in your view for a short time gave them
7  more than they were entitled to and then took it away?
8  That's part of your argument, right?

9          MR. LEGGHIO:  Correct.  I'm saying to you that the
10 City's inadvertent -- the City's inadvertent honoring of
11 old contracts and old practices did not immunize these four
12 from the effect of the new collective bargaining agreement
13 and the terms of the plan of adjustment.  So it didn't give
14 them some special dispensation from the severe cuts that
15 everyone was experiencing.  And that, and what I want to
16 make sure I do not end this discussion without the Court
17 understanding, when I said the four of the seven, what I'm
18 saying is the seven individuals, some of them got the
19 advantage of the City's inadvertent award of seniority.
20 The others, when they came back, the City had already --
21 the City was already in agreement with the Union that yes
22 they should honor the two year provision.  That's what I
23 mean by saying -- so some of, some were defrocked of
24 seniority and rank and some weren't, simply depending on
25 when they returned to work.

1          THE COURT:  But part of your argument I gather is

2    that all seven were treated, ultimately were treated the

3    same way?  There was no --

4          MR. LEGGHIO:  Yes.

5          THE COURT:  -- discrimination treatment or

6    different treatment as disparate treatment as between or

7    among them, either within that group of seven or compared

8    to the rest of the world of fire fighters who were subject

9    to the, who came back from duty disability -- duty

10   disability, right?

11         MR. LEGGHIO:  Correct, Your Honor.

12         THE COURT:  And I didn't -- there's no allegations

13   in the First Amended Complaint, Exhibit 6A to your motion

14   that I saw anyway that were specific enough to allege that

15   any of these -- any of these Plaintiffs who came back to

16   duty, to employment, to working after being on duty

17   disability somehow were damaged by relying on what you say

18   is a misimpression about how the seniority, what seniority

19   rules would apply.  Do you understand my question?

20         MR. LEGGHIO:  Yes.  And it's correct, Your Honor,

21   and let me point out something that's even more obvious

22   here.  There can't be any detrimental reliance in this

23   case.  If you're off on duty disability, it's because

24   you're disabled; it's not because you want to be off.  So,

25   you know, they didn't, ostensibly I mean they had to

```
 1   certify they were disabled.  I mean, nobody was, you know,
 2   saying, "Now I'm affected and I would have returned earlier
 3   had I known this happened."  So there can't be any
 4   detrimental reliance, and to the extent that Plaintiffs
 5   kind of gesture toward that, it's just, you know, it's a
 6   non-started.
 7            THE COURT:  All right, so anything else you'd like
 8   to say then before I finally give others a chance to speak?
 9            MR. LEGGHIO:  No, Your Honor.  I think I've spoke
10   enough.
11            THE COURT:  All right, well, thank you, Mr.
12   Legghio.
13            Let me hear next from counsel for the -- I going
14   to go ahead and hear from counsel for the parties who
15   joined the motion before I give the seven Respondents'
16   counsel an opportunity to argue, because he can then apply
17   whatever replies he sees fit to the arguments of all the
18   parties on the other side of this motion.
19            So let me hear next from Mr. Swanson on behalf of
20   the City.
21            MR. SWANSON:  Thank you, Your Honor.  Marc Swanson
22   on behalf of the City of Detroit.  I wanted to address a
23   few points raised by the Court previously when Mr. Legghio
24   was providing his presentation.
25            One, the combined PFRS plan as Mr. Legghio said at
```

1  Docket 13090-1, page 179 of 179, you know, provides in
2  subparagraph (D) of that page that the Board of Trustees
3  have to administer the retirement system consistent with
4  the terms of the 2014 CBA between the City of Detroit and
5  the DFFA, and as this Court found in the *Salkowski* opinion,
6  the PFRS was clearly incorporated into the plan, and thus
7  the injunction applied and prohibited *Salkowski* and the
8  other Plaintiffs there from violating the PFRS, and they
9  were enjoined from doing so by the plan.  This provision in
10  the PFRS which says that, you know, it needs to be applied
11  consistently with the CBA, would certainly be violated if
12  it wasn't applied consistently with the CBA, which is what
13  we believe the Plaintiffs are attempting to do so here.  So
14  that's one way I believe that we get to the plan
15  injunction.
16          The second way, and I think the Court made a good
17  point --
18          THE COURT:  Okay, Mr. Swanson, let me interrupt
19  with a question about that.
20          MR. SWANSON:  Sure.
21          THE COURT:  How so?  How is it that the -- if the
22  -- if the Plaintiffs here were in fact awarded seniority
23  based on the old CBA, how, and pay accordingly and
24  everything else, how would -- how would the Board of
25  Trustees of the PFRS be violating the 2014 CBA in

```
 1   administering the pension plan?
 2            MR. SWANSON:  Well, Your Honor, one, if we look at
 3   Article 6 of the combined PFRS plan, which is on page 57 of
 4   179, of Docket 13090-1, it -- it -- that provision talks
 5   about how you calculate pensions, and one factor in
 6   calculating pensions is a member's average final
 7   compensation.  That's in Section 6.1 there.  One effect of
 8   granting the Plaintiffs the relief that they would seek in
 9   the state court lawsuit in granting them seniority for the
10   entire time there on duty disability, is that their average
11   final compensation will of course be much higher than it
12   would be if the CBA, the 2014 CBA were applied pursuant to
13   its terms.  And I think the Court can also look at the
14   Plaintiffs' Complaint and the Plaintiffs' response which
15   both state that their pensions are being adversely affected
16   and lowered because the City is applying the 2014 CBA.  So
17   we can look at the actual document and then we can look at
18   the admissions and the Complaint and the response that
19   their pensions are being lowered because the City is
20   applying the 2014 CBA pursuant to its terms.
21            THE COURT:  Well, Mr. Swanson, I think I get what
22   you're saying, but I, my follow-up question there is this,
23   the average final compensation of any given fire fighter
24   for purposes of calculating their pension under the PFRS
25   provisions is not determined by the PFRS.  That is, it is -
```

1   - their pay is established by something else, presumably
2   the CBA and other provisions.
3            In other words, if they're actually paid more than
4   they should have gotten, it's actually paid more because
5   you ignore the 2014 CBA, but they get that pay and that
6   seemed to be their average final compensation, then it's
7   consistent with the amended or new PFRS for the Board of
8   Trustees to use that actual average final compensation not
9   contrary to it, isn't it?
10           Do you see what I'm asking?
11           MR. SWANSON:  I guess I -- so I think what the
12  Court's saying is if the average final compensation under
13  the 2014 CBA was determined to be a higher amount, would
14  the PFRS then be acting consistently with the 2014 CBA, and
15  I agree with that.
16           What I don't agree with though is that, and what
17  the Plaintiffs are seeking is to ignore the terms of the
18  2014 CBA and instead apply the terms of the previous CBA,
19  so when the PFRS document says you have to apply the terms
20  of the 2014 CBA, and the Plaintiffs say, "No, we don't want
21  that document to be applied; we want the old document to be
22  applied," I don't see how the PFRS could be acting pursuant
23  to the 2014 CBA, when instead what they're doing would be
24  applying the terms of the old CBA.
25           THE COURT:  Well, is the Board under the new PFRS

1    provision required to look behind the numbers they are

2    given by the City for, in terms of what an employee's

3    average final compensation or compensation was for the

4    years necessary to calculate average compensation?

5            MR. SWANSON:  You know, I don't know the answer to

6    that question.  I think it does in part when it says that

7    you, that the PFRS has to apply to 2014 CBA to the

8    calculation of pension.  So I -- I think it does.  I think

9    it has to apply the agreement that it says that it must

10   apply.

11           THE COURT:  All right, well, go ahead.  You were

12   saying then?  What else do you want to say?

13           MR. SWANSON:  Sure.  And then the Court raised

14   another point here with respect to the confirm order,

15   paragraph 47 of the confirm order on page 101 at Docket

16   8272 discusses contracts, leases, and other agreements

17   entered as to the petition date including, and including

18   means including but not limited to, as defined by the

19   Bankruptcy Code, the collective bargaining agreements

20   identified on Exhibit 2D5 and any other, you know,

21   contracts that were entered into after the petition date,

22   and it says that the City will perform those contracts in

23   accordance -- in the ordinary course of business.

24           Now, I think that's important because again the

25   focus on the plan in *Salkowski* was to tie the injunction

1    language and to find that *Salkowski* violated the
2    injunction, and of course to do that we had to find that
3    *Salkowski* violated the plan.  And so in *Salkowski* we were
4    very focused on trying to demonstrate to the Court that the
5    PFRS was the plan because that was the term used in the
6    injunction language in the plan, that people are prohibited
7    from acting contrary to the plan.

8              And as we were discussing in here today, I took a
9    look at the injunction language in the confirm order.  So
10   we can turn to Docket 8272, paragraph 32, pages 89 and 90.
11   And I believe it's slightly different than the language in
12   the plan, subparagraph (e) there on page 90 of Docket 8272.
13   Subparagraph (e) provides that essentially all these
14   parties are enjoined from proceeding in any manner, any
15   place whatsoever that does not conform to or comply with
16   the provisions of this order.  And I think that's
17   significant because that's broader than the injunctive
18   language in the plan.  The plan only mentioned the plan,
19   the confirmation order again says that people are
20   prohibited from acting contrary to the order.

21             And then if you look at paragraph 47, which the
22   Court mentioned earlier, it says that, you know, the City
23   needs to perform these contracts in the ordinary course of
24   business, and even though that contract, be it scrivener's
25   error or not, was not included on Exhibit 2D5, the broader

1   language in the confirmation order brought under the plan
         2   would also enjoin parties from acting contrary to the CBA
         3   which was of course entered into after the petition date,
         4   and would fall within the ambit of paragraph 47 of the
         5   confirmation order.
         6            THE COURT:  All right, hold on.  Hold on one
         7   second.  I'm looking at -- I'm looking at paragraph 32 of
         8   the order confirming plan.  Give me a second.  It's a very
         9   long one.  Let me look at it.
        10            (Pause.)
        11            THE COURT:  Okay, I think I see it.  You cited a
        12   subparagraph (e), and I think I see where that is on page
        13   90 of the order confirming plan.  I think I see the
        14   language you're talking about, an injunction against
        15   proceeding in any manner and any place whatsoever that does
        16   not confirm to or comply with the provisions of this order.
        17            Right?
        18            MR. SWANSON:  Yes, Your Honor.
        19            THE COURT:  Okay.  And by the way, and I should
        20   have asked Mr. Legghio this question, too, that if you
        21   follow on a little bit later in that same paragraph over on
        22   pages 90 to 91, of course there's that exception that's
        23   well known that there's no release of prepetition claims
        24   under, against officers of, or employees of the City in
        25   their individual capacity under 42 U.S.C. Section 1983.  I

```
 1   assume your view would be that, that does not apply, would
 2   not create an exception to apply here to permit the state
 3   court lawsuit that's at issue here?
 4            MR. SWANSON:  Correct, Your Honor.  I think we'd
 5   be talking about apples and oranges; two different
 6   circumstances.
 7            THE COURT:  And partly I assume you argue, you
 8   would argue that because the Section 1983 exception is for
 9   essentially prepetition claims that might otherwise be
10   discharged?
11            MR. SWANSON:  Exactly.
12            THE COURT:  Confirmed plan, right?
13            MR. SWANSON:  Exactly.
14            THE COURT:  Okay, so go ahead.  I interrupted you
15   with questions.  Go ahead.
16            MR. SWANSON:  Thank you, Your Honor.
17            The CBA, I'm scrambling and looking while we were
18   -- nowhere -- I don't believe it was actually, has been
19   filed with the Court.  Perhaps it has, but I couldn't find
20   it.  And I didn't file it in connection with the response
21   here because I, frankly I didn't read the Plaintiffs'
22   Complaint or their response as arguing that -- that -- that
23   the actual language of the CBA if applied, you know,
24   wouldn't bar their claims.  What I read their response as
25   arguing was that perhaps there was a lack of communication
```

1    and that the new language in the CBA wasn't communicated to
2    them properly, even though Mr. Legghio accurately and
3    correctly cited that they received notice as pensioners of
4    the plan and the other related documents, that there was an
5    inconsistent application was another argument I read in the
6    Plaintiffs' Complaint and response, or that there was some
7    sort of conspiracy.

8           So what I didn't read was that if you actually
9    apply the language in the 2014 CBA, that they can still
10   prevail on their claims.  I didn't see that argument.
11   Although as Mr. Legghio said, we would certainly be happy
12   to file the CBA with the Court.

13          So I do want to address the last two arguments
14   that I brought up because I think Mr. Legghio properly
15   addressed the notice argument, first, that there was an
16   inconsistent application.  We did address this in our reply
17   at Docket 13467 on page 10.  And essentially after the DFFA
18   brought the improper application, the seniority provisions
19   to the City's attention, the City agreed to adjust the
20   seniority so that it would be applied in accordance with
21   the CBA.  And although the Plaintiffs continue to claim
22   that there has been an uniform application, they haven't --
23   and have conducted discovery, they have not pointed out any
24   specific examples or individuals, and thus there hasn't
25   been an inconsistent application.  When the issue was

1  brought to the City's attention, the City promptly took
2  action to correct it, and to act in accordance with the
3  CBA.

4         The other point about there being some conspiracy
5  about ignoring the statute of limitations, again, Your
6  Honor, that's false.  It was the City's view that that sort
7  of defense would not have survived in this instance in
8  front of the Arbitrator, mainly because the Plaintiffs
9  never have shown that the DFFA was aware of this improper
10  application prior to the point when the DFFA actually
11  initiated discussions with this issue on the City.  So once
12  the DFFA found out about the issue, to the City's knowledge
13  the DFFA brought the issue to the City, and the City then
14  corrected the improper application.

15         Finally, Your Honor, I'd like to address the
16  argument in the Plaintiffs' response regarding the
17  bankruptcy argument that they make, essentially that they
18  could not have ascertained these claims until after the
19  petition date, and thus somehow they survive.  And I said
20  apples and oranges earlier, and I think, you know, we're
21  back to, that analogy is apt here as well, because what the
22  Plaintiffs are arguing is essentially a discharge question.
23  They're arguing that because their claims, and just
24  assuming this is true, I wouldn't concede it's true, but,
25  you know, that their claims arose after the effective date,

```
 1  that they are not discharged by the City's bankruptcy plan.

 2          Fortunately, again, the Court doesn't even need to

 3  go there because that's not the issue that we're talking

 4  about.  We're not talking about the discharge provision;

 5  we're talking about the injunction provision in the plan,

 6  and thus their arguments regarding fair contemplation or

 7  whatever test they might posit applies here are

 8  inapplicable.  We're talking about the injunction provision

 9  and the plan, and that's far different than the discharge

10  provision in the plan.

11          And that concludes the City's presentation unless

12  the Court has any questions for the City.

13          THE COURT:  I do.  One second.

14          Mr. Swanson, during your argument earlier you

15  mentioned the City, I think you mentioned something about

16  the City's reply.  And I'm not sure I know what you're

17  talking about there or that I've seen that.  Where is that

18  and when was that filed?

19          MR. SWANSON:  Your Honor, it's filed at Docket

20  13467.

21          THE COURT:  Okay, hold on.  Okay.  October 28,

22  2021.  Okay.  Same day as the reply was filed by the DFFA,

23  right?  Yeah.  All right, one -- give me a second.

24          You know, I'm sorry, I confess I have not -- I did

25  not see that, and I have not read that, but I certainly
```

1  will before making a decision on this motion.  Hold on.

2         Yeah, I'm sorry, I didn't -- I missed that and so

3  I didn't read it, but I certainly will do so.

4         All right.  Is there anything further you want to

5  say in light of the fact that I did not read your reply?

6         MR. SWANSON:  Nothing further, Your Honor.  I

7  think it -- it -- I've covered everything, and if I haven't

8  covered it, Mr. Legghio covered it.  But thank you.

9         THE COURT:  All right.  Thank you.

10        All right, so then it's an opportunity now for

11  counsel for the PFRS, Mr. Price, if you want to say

12  anything regarding this motion?

13        MR. PRICE:  Good afternoon, Your Honor.  William

14  Price, Clark Hill, on behalf of the Retirement Systems.

15        We have nothing to add to the record, Your Honor.

16  The Association and the City covered all the positions that

17  have been set forth in their papers, and we really don't

18  have anything to add to the discussion.

19        THE COURT:  All right.  Thank you.

20        Now it's, next will be a turn for counsel for the

21  seven Respondents, the seven Plaintiffs in the state court

22  action to argue.  Hold on a second.

23        I -- I, for one, need a short break before we

24  continue with this hearing.  So, and I appreciate

25  everyone's patience in putting up with that, but I need to

```
 1   take a ten minute break.  So let's do that.  It's 3:08.
 2   I'll say we'll reconvene at 3:20 and recall this case, and
 3   at that time I will -- I will call on counsel for the seven
 4   Respondents to make his argument.
 5           So thank you, and we'll be back on at 3:20.
 6   Thanks.
 7           THE CLERK:  Please be advised that this court is
 8   in recess.
 9           (Off the record from 3:08 to 3:20 p.m.)
10           THE CLERK:  Please be advised that this court is
11   back in session.
12           THE COURT:  All right, good afternoon again to
13   everyone.  We're back on the record in the City of Detroit
14   case hearing the motion to enforce the plan of adjustment
15   filed by the Detroit Fire Fighters Association, Local 344.
16           As I mentioned before we took a break, it's time
17   now for the Court to get a chance to hear from counsel for
18   the seven responding parties, Christopher McGhee, et al.
19   So go ahead.  Mr. Sanders, are you going to argue for this
20   party?
21           MR. SANDERS:  That is correct, Your Honor.
22           THE COURT:  Okay, go ahead, sir.
23           MR. SANDERS:  Thank you, Your Honor.
24           Your Honor, first I would like to say and make
25   clear that Plaintiffs do not seek relief that would change
```

the plan of adjustment as has been alleged.  Plaintiffs do
not seek to change how pension benefits are calculated as
has been alleged.  Plaintiffs are not seeking to increase
their pension benefits through the pension system.
Contrary to the Defendants' assertions, Plaintiffs do not
seek to compel the Defendants to violate the plan of
adjustment.

The Defendants clearly chose to selectively
enforce the 2014 collective bargaining agreement for a
period of five years.  It is the Plaintiffs' contention
that they should be compensated as a result of the
Defendants' choosing to selectively enforce the CBA, and
that the damages the Plaintiffs sustained as a result of
that selective enforcement they should be compensated for.

We maintain, Your Honor, that a claim is
considered to have arisen prepetition, that the Creditor
could have ascertained through the exercise of reasonable
due diligence that it had a claim at the time the petition
was filed.  I believe we cite, and forgive my
pronunciation, *Senczyszyn*, S-e-n-c-z-y-s-z-y-n, clearly
indicates the bar of the Defendants had no claim until on
or about January 20th.  That's when the City began to take
certain actions against the Respondents or the Plaintiffs.

McGhee, rehired in 2016, two years after the
bankruptcy and the CBA, promoted in 2019 in accordance with

the pre-2014 CBA past practice, and then demoted and
stripped of all seniority in January 2020.

Norm Brown, rehired in January 2018, promoted via
testing in July 2018, and then demoted and stripped of all
seniority in January 2020.

C. Brown, rehired in May 2017; demoted and
stripped of all seniority in January 2020.

Washington, rehired in 2016, promoted to sergeant
in accordance with the pre-2014 CBA past practice; demoted
and stripped of all seniority in January 2020.

Yet, it delineated in the testimony by the
Defendant witnesses they had no explanation as to why some
employees were allowed to maintain their seniority and
receive the benefit of same through retirement or other
means, while the provisions of the 24th (phonetic) CBA were
enforced against the Plaintiffs years after they were
promoted in accordance with the past practice that the City
and the Union had agreed upon. As the former DFFA Union
president Mr. Nevins testified, no one ever took seriously
the loss of seniority provision.

The *Salkowski* case relied upon by the Defendants,
and I believe an opinion drafted by Your Honor, is
distinguishable from the case at bar. The Plaintiffs in
the *Salkowski* case sought to continue the pre-2014 drop
provisions after the signing of the POA. Their

1  applications were submitted and they were denied.  However,
2  in the case at bar, the Defendants, the City of Detroit and
3  the DFA (sic), agreed to continue with the pre-twenty-four
4  2014 (phonetic) disability retirement return process for
5  five years after implementation of the POA and five years
6  after negotiation of the 2014 CBA.
7          The attorney for DFFA have said during his
8  argument on numerous occasions that there was an
9  inadvertent application of the CBA provisions prior to
10 2014.  There's nothing in the record that has been cited or
11 that they can point to to show that the application was
12 inadvertent.  As I'm sure Your Honor's aware because Your
13 Honor's very -- obviously read the briefs, the Union --
14 excuse me -- the City witnesses, one of which who indicated
15 he was the most knowledgeable person as it relates to this
16 issue, both indicated they didn't know why these
17 individuals were promoted in the way that they were.  They
18 never testified that it was inadvertent.  They never
19 testified that it was accident.  Allegedly they claimed
20 they didn't know why it happened over a five year period.
21 They clearly wanted some employees to fully benefit from
22 the past practice, while years lately -- later ultimately
23 enforcing it against others.  The Plaintiffs did not have a
24 mature claim until they were demoted, and in some instances
25 completely denied employment in January 2020.

The O'*Loghlin* case is paramount.  A suit for
illegal conduct occurring after discharge threatens neither
the letter or the spirit of the bankruptcy laws.  Your
Honor asked the attorney for the DFA (sic) a couple of
questions that I would like to respond to.  One Your Honor
asked was whether or not there was a claim as it relates to
reliance or reliance damages.  I believe we have a current
promissory estoppel, Count 5 of our Complaint, on page 23
of the Amended Complaint.  And what we've maintained is
that those Plaintiffs who were given promotional
opportunities and allowed to assume those promotional
opportunities and allowed to maintain their seniority for
years after the 2014 agreement, relied upon that added
income that they did receive, thought they would continue
to receive, and the promise implicit that they would
receive a higher pension as a result of the promotional
opportunity.  We believe that there clearly is a promissory
estoppel claim.

        The Court also inquired with the DFA as it relates
to whether or not there's a viable disability or age
discrimination claim.  As we have alleged and the Court is
aware, all of the Plaintiffs were at one point disabled.
All of them were over the age of 40 when action was taken
against it.  It is our contention that pursuant to Michigan
Elliott-Larsen Civil Rights Act, the Plaintiffs were

qualified for the positions they had assumed, that they
were removed from those positions, and the evidence will
show that they were replaced by individuals who were either
never disabled or younger individuals.  We believe we make
out a prima facie case as it relates to disability
discrimination and age discrimination.

One of the other issues that the Court raised was
whether or not there was anything to suggest that the 2014
provisions were to be applied retroactively.  And we
specifically asked Ms. Clawson, the person who reinstated
the Plaintiffs, whether or not she did it in the manner she
did because she believed that those provisions should be
applied retroactively.  I believe we indicate her response
on line 152 of our pleadings in which she said,
quote/unquote, "I don't recall."

As it relates to the City's effort to seek civil
contempt against the Plaintiff, it's our position, Your
Honor, that we were simply and are simply seeking to
enforce what the City and the DFFA gave the Plaintiffs for
five years.  Surely if the Plaintiffs are in civil
contempt, then the City was also in civil contempt because
obviously they interpreted the provisions of the contract
and the past practice in the same manner that the
Plaintiffs did for a period of five years.  So it's our
position as it relates to civil contempt as delineated in

1 | the *Taggart* case, that a creditor may only be held in civil
2 | contempt for violation of a discharge order if there is no
3 | fair ground of doubt as to whether the order barred the
4 | creditor's conduct.

5 | We believe that there is doubt as to whether or
6 | not our cause of action violated the Court's order. We
7 | acted in reliance upon what the City and the DFFA did for a
8 | period of five years, and clearly they have been damaged as
9 | a result of that reliance.

10 | I don't have anything further unless the Court has
11 | questions.

12 | THE COURT: I do have some questions, Mr. Sanders,
13 | and I chose not to interrupt you, but I do have some
14 | questions as it occurred to me at various points in your
15 | argument here. So let me go over that.

16 | First of all, and I meant to ask this of the
17 | others earlier too, but what is the status of the state
18 | court action currently? Has the state court basically put
19 | that case on hold while this motion gets resolved in this
20 | Court?

21 | MR. SANDERS: Sure, Your Honor, by stipulation of
22 | the parties, the case in the state court has been stayed.

23 | Your Honor, there's another point that comes to
24 | mind. I believe you inquired as to when the Amended
25 | Complaint was filed. If I'm not mistaken, Your Honor, the

1    First Amended Complaint was filed prior to any of the
2    Defendants being served.  It was amended, the Complaint was
3    amended and the Defendants were then served.  So it was at
4    the initiation of the cause of action.
5            THE COURT:  So very early in time, close to July
6    of 2020?
7            MR. SANDERS:  That is correct.
8            THE COURT:  All right.  But getting back to the
9    question I had asked, you said the state court, what, has
10   ordered that the pending lawsuit be stayed?  Is there a
11   time limit or deadline for that to end?
12           MR. SANDERS:  We informed the Court that we had
13   this hearing pending, and we adjourn a status conference
14   which was scheduled I believe last week, understanding that
15   this matter was pending before Your Honor.  So I anticipate
16   that the state court will adjourn the matter until Your
17   Honor makes a ruling.
18           THE COURT:  All right, thank you for that
19   information.
20           The -- but in any case your clients, you and your
21   clients have no intention of trying to push forward with
22   that state court litigation until this Court makes a ruling
23   on the present motion, is that right?
24           MR. SANDERS:  That was the stipulation between the
25   parties; that is correct.

1          THE COURT:  But that's -- that's your -- your

 2  intention is what I just said.  Is that right?

 3          MR. SANDERS:  My intention is to wait on the

 4  ruling of this Court before we proceed in Wayne County

 5  Circuit.

 6          THE COURT:  Okay, thank you.  That's what I was

 7  asking there.

 8          MR. SANDERS:  Yes.

 9          THE COURT:  All right, so going back to an early,

10  sort of the early part of your argument, and you alluded to

11  it later, you said that -- that the Plaintiffs suffered

12  damages as a result of the, what you allege is the

13  selective enforcement of the 2014 CBA's provisions on

14  seniority.  And application of the prior seniority rules

15  essentially for I think you said, you said it was for five

16  years.  How so?  How were the, any of the Plaintiffs

17  damaged, injured or damaged by that?

18          MR. SANDERS:  Sure, Your Honor.  First, as it

19  relates to those Plaintiffs, which I believe there are four

20  who were promoted, received raises, and then ultimately

21  were demoted and stripped of their seniority, it's our

22  position that they were damaged by the fact that one, they

23  lost income from the position that they held.  Two, they

24  lost status.  It's -- one of the Plaintiffs consistently

25  has discussed the fact that though he has what would have

1  been considered significant seniority and he would have
2  been a ranking individual, he's now doing the work of a
3  fire fighter with significantly younger guys supervising
4  him, and that's been emotionally damaging to him.

5          So the loss of status, the loss of their position,
6  the loss of their income and, you know, unfortunately we
7  live in a society where the more you make, the more you
8  rely upon that income and the more you spend and you have
9  expenses that you anticipate having at one salary, you're
10 effectively doing your job and you're demoted and your pay
11 is cut, and you can't make ends meet.  So we believe that
12 the damages have been significant.

13         I believe Mr. Ferguson however, for example, he
14 attempted to return to work.  He was told that, by Ms.
15 Clawson, that she didn't know where to return him or how to
16 return him to work because of the pendency of the grievance
17 that had been filed five years later by the DFFA.  And he
18 continued to inquire and continued to inquire, and
19 eventually she told him, "Well, you can't return to work
20 now because you're beyond the two year provision of
21 12D(7)," when he attempted to come back to work prior to
22 the two year provision, but she wouldn't allow him to.  She
23 wouldn't allow him to come back in any position, fire
24 fighter, promoted position, nothing, pending the outcome of
25 the grievance.  Now he's beyond the two year provision and

```
 1  hasn't been allowed to come back at all.  So I think those
 2  are just examples of the damages that the Plaintiffs have
 3  suffered.
 4         THE COURT:  Well, what I was -- let me ask it in a
 5  little different way than I did before.  If -- putting
 6  aside Mr. Ferguson's situation for a minute, but as to the
 7  others, if they had, when they came back before, in the
 8  years before 2020 when they came back in employment, if
 9  they had been given seniority -- lost their seniority based
10  on enforcement of the 2014 collective bargaining agreement,
11  and continued working, would they have been any worse off
12  financially than they are -- then they are now?
13         MR. SANDERS:  Yes, absolutely.  And the reason --
14         THE COURT:  How so?
15         MR. SANDERS:  Pardon me?
16         THE COURT:  How so?
17         MR. SANDERS:  Unfortunately, when you make more,
18  you spend more.  You buy a bigger house, you buy a better
19  car.  You incur obligations that you may not have incurred
20  if you were at a different salary.  So, yeah.  I believe
21  that they, those are the damages.
22         THE COURT:  All right, let me move to another
23  question.  By the way, on this, this argument you've made
24  about the Senczyszyn case and arguing that the Plaintiffs,
25  your clients, have claims that arose after the bankruptcy
```

1  petition in this case, and after confirm of the plan even,
2  let me just say for the benefit of everyone that I -- I did
3  adopt the *Senczyszyn* case's fair contemplation test in a
4  prior opinion that I wrote and has been published in this
5  City of Detroit case, and I want to just make everyone
6  aware of that for their benefit because, you know, to the
7  extent that's an issue that I need to deal with in this,
8  with respect to this motion, you're going to see me cite
9  that case really more than *Senczyszyn*. So I just wanted to
10 make everyone aware of it. I think it's consistent with
11 *Senczyszyn* however. The case is *In re City of Detroit,*
12 *Michigan*, 548 B.R. 748. It's a decision of mine in this
13 case from 2016. Specifically at page 763 of that opinion,
14 548 B.R. at 763 I talk about the fair contemplation test
15 and *Senczyszyn*, I do adopt it, for purposes in that case of
16 determining whether any given claims arose before or after
17 the bankruptcy petition in the City of Detroit case.
18         So anyway, I wanted to note that. Now, the next
19 question I have I think for you, Mr. Sanders, is it
20 correct, I think other have argued, Mr. Legghio for example
21 argued that in terms of this concept of, this allegation of
22 selective enforcement, is it correct that other than the
23 four of the seven Plaintiffs that you represent here, other
24 than those individuals, no one else was given the benefit,
25 after the 2014 collective bargaining agreement came into

1  effect, no one else was given the benefit of the seniority
2  rules from the prior collective bargaining agreement after
3  that, is that correct?
4        MR. SANDERS:  Well, Your Honor, I know that's what
5  Mr. Legghio argued; however, I think that there is some
6  dispute of that within the record.  Particularly in our
7  brief, line 139, we asked Mr. Jenkins whether or not, he's
8  the person they produced is most knowledgeable concerning
9  this issue, whether or not individuals returned and retired
10 after receiving a promotion with a pension based upon the
11 rank that they had achieved with their original class.  And
12 his testimony was, "I don't know."
13       If you look at the affidavit of Mr. Nevin, line
14 20, Exhibit 16, he said in his affidavit, "I know of at
15 least one person on duty disability who returned after
16 2014, went through six months, received a promotion, and
17 retired at a higher rank."
18       So I think there's minimally a question of fact as
19 to whether or not there were some others who received the
20 benefit of the selective enforcement prior to the
21 Plaintiffs having it enforced to their detriment.
22       THE COURT:  Did Nevin name the person?
23       MR. SANDERS:  He did not.
24       THE COURT:  All right, so the next question I had
25 for you, with respect to reliance by your clients who

```
 1   received the benefit of the greater seniority for a period
 2   of time before being demoted and so forth, how did they
 3   rely upon, to their detriment on the better treatment
 4   rather than being treated as the seniority provisions of
 5   the 2014 collective bargaining agreement, other than I
 6   assume you would argue this notion that the more you make
 7   the more you spend and you get higher expenses, other than
 8   that is there any way in which they relied on that to their
 9   detriment on that?
10         MR. SANDERS:  No, that would be my argument, Your
11   Honor.  Contrary to Mr. Legghio's position, we're not
12   arguing that they were on disability and relied upon being,
13   you know, able to come back at a certain period of time or
14   something.  They were disabled as he had mentioned.  But
15   once they get into the position, that given the position
16   they assumed the position for years.  And then you have Mr.
17   Norman Brown who assumed his position by testing, not by
18   promotion, which I believe the record shows there's a
19   distinction, and that even to the extent the Court were to
20   accept the Defendants' argument that the Plaintiff should
21   have lost their position pursuant to the 2014 collective
22   bargaining agreement, that would apply to Plaintiffs who
23   received promotions through seniority, not testing.  Norman
24   Brown received his promotion through testing, yet he was
25   still demoted without explanation.
```

```
 1              THE COURT:  All right.  One moment, please.
 2              All right, Mr. Sanders, I believe that's -- those
 3   are the questions I had for you.  Let me just give you a
 4   chance, if there's anything further you want to say before
 5   I give the counsel for the moving parties an opportunity to
 6   reply briefly, go ahead.
 7              MR. SANDERS:  I don't believe I have anything
 8   else, Your Honor.  I appreciate your indulgence.
 9              THE COURT:  All right, thank you, Mr. Sanders.
10              I will give the moving parties a brief reply
11   opportunity here, and so counsel for DFFA, Mr. Legghio, go
12   ahead.
13              MR. LEGGHIO:  Yes, Your Honor.  Before I do that,
14   can I give you the names of the four individuals who --
15              THE COURT:  Yes.
16              MR. LEGGHIO:  -- came back?  I'm on my text.  Let
17   me pull it up.
18              (Pause.)
19              MR. LEGGHIO:  The names are, Your Honor, Mr.
20   McGhee, Mr. Norm Brown, Mr. Washington, and I believe the
21   other Mr. Brown.
22              THE COURT:  That'd be Craig Brown, right?
23              MR. LEGGHIO:  Yes, Your Honor.
24              THE COURT:  All right, thank you.  Anything else
25   you want to say in reply, Mr. Legghio?
```

1          MR. LEGGHIO:  Yes.  A couple items -- Your Honor,
2    the -- first of all, let me, I do want to address a couple
3    things.  Mr. Sanders referred the Court to Paragraph 139 of
4    their reply and cites that to support his claim of
5    selective enforcement.  But if you read the quote, the
6    question doesn't asks (sic) if he's aware whether the City
7    and the Union agree to allow some fire fighters to return
8    from duty disability retirement, and paying their previous
9    seniority and be promoted in accordance with their class,
10   the answer is, "No, I don't know."  It's not a question
11   that goes to some fire fighters were off for more than two
12   years, you know, which is the claim that Plaintiffs are
13   trying to suggest.
14          This same absence of inquiry, if you look at 137
15   of their reply, same question, Mr. Jenkins was asked if
16   he's aware of any facts that would contradict paragraph 36
17   of the Complaint, that after the negotiations the City
18   continued to return many fire fighters to duty with their
19   previous seniority intact without objection from the Union
20   and also were allowed to resume the rank that their
21   original class had achieved.  He said, "I don't know."
22          Those, both of those citations are of utterly no
23   probative value.  They don't refer to two year
24   restrictions, and the fact that Mr. Jenkins said "I don't
25   know," it's undoubtedly he wouldn't know that.  It's --

```
 1   it's highly probable that people did return from duty
 2   disability with less than two years and came back with
 3   their rank and were promoted and were able to continue
 4   along the way consistent with the CBA.
 5          The issue of -- of -- of promissory estoppel, and
 6   Mr. Sanders refers to those who were promoted and relied on
 7   the higher wages and what they anticipated will be higher
 8   pension benefits, the flaw with that argument, Your Honor,
 9   is that it's inconceivable that a Debtor could act
10   inconsistent with the terms of the plan of adjustment and
11   the restrictions placed on a Debtor in that situation, and
12   create rights for parties that operated at the, adverse to
13   the interest of other Creditors.  And so, for example, let
14   me reformulate it.
15          Could a Debtor pay a Creditor more money than
16   permitted under a plan of adjustment and do so over a
17   period of time, and then the Creditor could take a position
18   that they were entitled to this incorrect pay, and it
19   created some rights for them, and then now that they could
20   invoke equity principles of promissory estoppel, that is to
21   compel the Court to disregard the specifics of the plan of
22   adjustment, and instead recognize the so-called right
23   created by the City's plan of adjustment inconsistent
24   action.  So that argument doesn't really work from our
25   perspective.
```

1          I also want to pick up on a point, Your Honor,
2    that was raised by counsel for the City and it's, it was
3    alluded to by the Plaintiffs in their briefs, but not
4    discussed here, but I want to make sure we're addressing
5    the record.  This is this issue that -- there was a statute
6    of limitations issue that in effect that the City and the
7    Union disregarded the statute of limitations for grading
8    these inappropriately assigned seniorities, and that is
9    evidence of something sinister and nefarious, that sort of
10   thing.  Let me -- let me put that to rest for a moment.

11         Your Honor, challenges to seniority are rarely
12   untimely.  In fact, there is case law and I can cite the
13   Court to the case law.  Inappropriately assigned seniority
14   are normally considered ongoing contract violations.  And
15   for -- and there's an obvious logic to this.  If there's
16   100 employees, and the employer has assigned inappropriate
17   seniority to two or three employees, and every day those
18   employees work it's a new violation because to the extent
19   that anything pivots off of seniority, overtime rights,
20   vacation rights, that sort of thing, it's an ongoing
21   violation of the contract.  So there was no -- this
22   inappropriate, inadvertent assignment of seniority was a
23   continuing violation.

24         The other thing I would point out to you is that,
25   you know, seniority is the ultimate zero-sum game.  You

```
 1   know, if you're assigned more seniority than you're
 2   entitled to, and I'm assigned my seniority, I do -- you do
 3   so at my expense or at the expense of other employees.  So
 4   this argument that this is evidence of something sinister
 5   or a conspiracy just doesn't wash.
 6          And finally, Your Honor, the notion that the City
 7   and the Union acting to honor the terms of the POA and the
 8   collective bargaining agreement somehow creates causes of
 9   action to the extent that Plaintiff has alleged, is just --
10   I just -- it's hard to put your arms around this.  I mean,
11   this is as we have demonstrated with our quotes from
12   Plaintiffs, is simply an attempt to restore what they
13   thought they had under prior collective bargaining
14   agreements.  It's nothing short of that.  And to that
15   extent, Your Honor, we think that it violates the POA and
16   it's -- the parties are in contempt.
17          THE COURT:  All right.  Thank you, Mr. Legghio.
18          Mr. Swanson, you can briefly reply if you want to.
19          MR. SWANSON:  Thank you, Your Honor.  I echo what
20   Mr. Legghio said.  The City and the DFFA are simply trying
21   to comply with this Court's order, and I don't see how
22   complying with this Court's order could create any sort of
23   cause of action.
24          With respect to the inconsistent application, the
25   City in its reply on October 28th said, you know, although
```

1  the Plaintiffs continue to claim that the City has not

2  uniformly applied the seniority duty disability provisions

3  in the master agreement, and a new PFRS plan, and have

4  conducted discovery in the state court lawsuit on this

5  point, they have not identified any specific examples or

6  individuals. And we're now more than two months later with

7  that being filed, and we're in the same place. There's not

8  any specific examples or individuals. I agree with Mr.

9  Legghio, the answers of "I don't know" referenced in

10 paragraph 135 through 139 of the response that the

11 Plaintiffs filed have no probative value and certainly does

12 not constitute any sort of proof to back their assertion.

13         Thank you, Your Honor.

14         THE COURT: All right, thank you, Mr. Swanson.

15         Mr. Price, did you want to say anything in reply

16 at this point?

17         MR. PRICE: No, Your Honor. Thank you.

18         THE COURT: All right, thank you. I -- that'll

19 conclude the argument, the oral argument today on this

20 motion, and I thank everyone for your patience and sitting

21 through and participating in this long hearing, and doing

22 it by telephone. And I want to thank all of you, all the

23 attorneys for your efforts in presenting oral argument

24 today. That is very helpful to me, the Court, in sorting

25 through the arguments relevant to this motion and

1  ultimately making a decision on it.  I'm not prepared at

2  this moment to announce or give a decision on this motion.

3  I want to take a bit of time to think about it, think about

4  the oral and written arguments and the other exhibits that

5  are in the record, and to consider the parties' arguments

6  and relevant authorities and other relevant parts of the

7  record in this bankruptcy case before making a ruling on

8  this motion.

9        And also I'm going to, as I mentioned in Mr.

10 Legghio's opening argument, I'm going to enter and order,

11 prepare and enter an order that requires him to file a

12 supplement in support of the motion.  Just to recap that,

13 what Mr. Legghio is to file on behalf of the DFFA as a

14 supplement to the motion no later than January 18, 2022 is

15 following:

16       The June 17, 2021 letter that he sent to opposing

17 counsel;

18       The mediation brief or briefs that he referred to

19 in his opening oral argument regarding, relating to case

20 evaluation;

21       The copy of the initial Complaint that was filed

22 by the seven Respondents in the state court action.  The

23 First Amended Complaint of course is already in the record,

24 it's an Exhibit already, it's Exhibit 6A to the motion of

25 the initial Complaint;

```
 1              A statement and the supplement of the dates on
 2  which these initial Complaint and the Amended Complaint
 3  were held -- were filed;
 4              A full copy of the 2014 collective bargaining
 5  agreement at issue.  The entire document, that is;
 6              And I'm also going to add to this list, and I -- I
 7  don't think I've said this before, but I also want a full
 8  copy of the 2001 to 2008 collective bargaining agreement to
 9  be filed.
10              Mr. Legghio, any reason you can't include that in
11  what you file?
12              MR. LEGGHIO:  No.  We will include it, Your Honor.
13              THE COURT:  All right.  So those things need to be
14  filed no later than January 18, a week from today.  I of
15  course will review those things, and I'll review the reply
16  filed by the City that I had missed and did not review.
17  I'll certainly review that.  And of course I'll consider
18  and review all the arguments and briefs and other papers
19  filed by the parties before making a decision.
20              I want to schedule a hearing, further hearing for
21  purposes of giving a bench opinion, ruling on this motion,
22  giving the ruling and explaining the reasons for my ruling.
23  I may yet decide to rule on this motion in writing in the
24  form of a written opinion rather than an oral bench opinion
25  given only orally and followed by an order, but I do, in
```

```
 1   case I decide to stick with the plan of oral bench opinion
 2   rather than a written one, I want to set a date for that
 3   now and make sure you're available for it who wants to be.
 4            One moment.
 5            I have in mind a date of February, Wednesday,
 6   February 9, 2022 at 2:00 p.m. for that bench opinion
 7   hearing.  That will be conducted by telephone just as this
 8   one was.  And that would not involve any argument; simply
 9   parties have an opportunity to listen to my oral bench
10   opinion.  So let me ask whether each of the attorneys
11   involved here is available on that date and time for that
12   purpose after you consider your calendars.
13            Mr. Legghio?
14            MR. LEGGHIO:  I think that day works, Your Honor.
15            THE COURT:  Mr. Sanders?
16            MR. SANDERS:  That day works, Your Honor.  Can you
17   repeat the time?
18            THE COURT:  2:00 p.m.
19            MR. SANDERS:  2:00 p.m.  Thank you.
20            THE COURT:  And I'll put this in the order I'm
21   going to prepare and enter.  You'll see the order that will
22   have that date and time also.
23            Mr. Swanson?
24            MR. SWANSON:  Yes, Your Honor.
25            THE COURT:  Mr. Price?
```

```
 1              MR. PRICE:  Yes, Your Honor

 2              THE COURT:  All right.

 3              Well, thank you all.  I'll prepare and enter this

 4    order that I have described.  That should be entered today

 5    or at the latest tomorrow, and we'll proceed from there,

 6    and thank you again, all of you, for your patience and

 7    efforts in this, not only the written papers filed, but

 8    also in the, in today's oral argument hearing.

 9              So, thank you all.

10              (At 4:04 p.m., proceedings concluded; off the

11              record)

12
```

```
 1
 2
 3
 4
 5
 6   I certify that the foregoing is a correct transcript from
 7   the electronic sound recording of the proceedings in the
 8   above-entitled matter.
 9
10   /s/Kristen Shankleton, CER-6785      Dated: 04/27/22
11
12
13
```