# EXHIBIT I

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MICHIGAN
2               SOUTHERN DIVISION

3
   UNITED STATES OF AMERICA,
4
                    Plaintiff,
5  vs.                              Case No. 15-20217
                                    Hon. Stephen J. Murphy, III
6  D-1 DAVID HANSBERRY
   D-2 BRYAN WATSON
7  D-3 KEVLIN OMAR BROWN,

8                   Defendants.
   _____/
9
                **JURY TRIAL: VOLUME 14**
10
          BEFORE THE HONORABLE STEPHEN J. MURPHY, III
11             United States District Judge
           Theodore Levin United States Courthouse
12             231 West Lafayette Boulevard
                Detroit, Michigan  48226
13              Tuesday, June 28, 2016

14 APPEARANCES:

15 For the Plaintiff            J. MICHAEL BUCKLEY
   United States of America:    SHELDON N. LIGHT
16                              U.S. Attorney's Office
                                211 W. Fort Street
17                              Suite 2001
                                Detroit, Michigan  48226
18                              313-226-9732

19 For the Defendant           MICHAEL J. HARRISON
   David Hansberry:            Harrison Law PLC
20                             240 Daines Street
                               Birmingham, Michigan  48009
21                             248-430-6421

22 For the Defendant           STEVEN F. FISHMAN
   Bryan Watson:               615 Griswold
23                             Suite 1125
                               Detroit, Michigan  48226
24                             313-962-4090

25

```
 1    APPEARANCES:  Continued

 2    For the Defendant          KENNETH SASSE
      Kevlin Omar Brown:         27 E. Flint Street
 3                               2nd Floor
                                 Lake Orion, Michigan  48362
 4                               248-821-7325

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24         To obtain a copy of this official transcript, contact:
                 Linda M. Cavanagh, Official Court Reporter
25           (248) 884-0327 • linda_cavanagh@mied.uscourts.gov
```

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5544   Page 3 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

3

```
1                          TABLE OF CONTENTS

2    Government Witnesses Continued:                     Page

3    ARTHUR LEAVELLS

4        Direct Examination Continued by Mr. Light        5
         Cross-Examination by Mr. Harrison               15
5        Cross-Examination by Mr. Fishman                71
         Redirect Examination by Mr. Light              147
6        Recross-Examination by Mr. Harrison            149
         Recross-Examination by Mr. Fishman             150
7

8

9

10

11

12

13

14

15
                              EXHIBITS
16
     Identification                      Offered   Received
17
     NONE
18

19

20

21

22

23

24

25
```

```
1              Detroit, Michigan
2              Tuesday, June 28, 2016
3                         −  −  −
4              (Proceedings commenced at 8:36 a.m., all parties
5              present)
6              (Whereupon the jury entered the courtroom at
7              8:36 a.m.)
8              THE LAW CLERK:  United States District Court for the
9   Eastern District of Michigan is now in session, the Honorable
10  Stephen J. Murphy presiding.
11             The Court calls Case No. 15-20217, United States of
12  America versus David Hansberry and others.
13             THE COURT:  Okay.  Everybody's in place and let's all
14  be seated please.  Morning to everybody.
15             THE JURORS:  Good morning.
16             THE COURT:  We're going to get back to work here in
17  just a few seconds.  I -- at the end of the day yesterday, you
18  know, your mind is in a number of different places, but we're
19  going to go from now until 1:30, and what I'd like to do, if
20  possible, is, you know, stretch out the morning session.  If we
21  don't have to take a break, we won't, and we'll go from now til
22  about 10:45 or 11:00, take our usual 25 or 30-minute break,
23  come back and then go from 11:30 roughly til 1:30.  So that's
24  my idea.  If it doesn't work out that way, it's fine.  If any
25  of the parties or lawyers or the jury, of course, needs a break
```

1      prior to 11:00, just get Mr. Lepola's attention or whatever the

2      case may be and we'll take -- we'll take a quick comfort break.

3              But my idea that I didn't put very artfully yesterday

4      was that if we compress our -- our time, even though we're

5      knocking off a little early today, we might be able to get in

6      just as much testimony.  Regardless of whether we do, we're

7      making very good progress, as I mentioned yesterday, and I

8      think we are -- we are right on schedule.

9              So continue to pay good attention.  Thank you for

10     being on time.  Keep your minds open.

11             And if you're ready to go, Mr. Light --

12             MR. LIGHT:  Thank you, Your Honor.

13             THE COURT:  -- we're ready to go as well.  Yes, sir.

14                       DIRECT EXAMINATION CONTINUED

15     BY MR. LIGHT:

16     Q.   Good morning, Mr. Leavells.

17     A.   Good morning.

18     Q.   When we finished yesterday, we had listened to a recording

19     that you made of your conversations with David Hansberry on

20     September 7, 2014, correct?

21     A.   Correct.

22     Q.   And in those conversations you talked about a number of

23     different topics, including your mutual interest in growing

24     marijuana?

25     A.   Correct.

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5547   Page 6 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

6

1   Q.   Including the plan that purportedly came from Gary Jackson

2   to stage another rip-off like the ones that had occurred

3   before?

4   A.   Correct.

5   Q.   Including Mr. Watson's idea --

6          MR. HARRISON:   Your Honor, I'm going to object --

7   Q.   -- about how to manipulate that?

8          MR. HARRISON:   -- I'm going to object again, Your

9   Honor, to the continued leading.

10          THE COURT:   I think we're setting the stage for

11   further testimony, so I'll hold the objection in abeyance and

12   ask you to, when we're back into the testimony, go ahead and --

13          MR. LIGHT:   I just have a couple more along those

14   lines.

15          THE COURT:   Yeah.   Sum -- sum up where we were and

16   then get out of the leading questions and we'll move forward.

17          Go right ahead.

18   BY MR. LIGHT:

19   Q.   Did your discussions also include what Mr. Watson and you

20   had talked about about how to implement what Gary Jackson had

21   been talking about?

22   A.   Yes.

23   Q.   And finally, did you talk some about contacts between Mr.

24   Hansberry and the person he called "my man" in Kentucky?

25   A.   Yes.

Case 2:15-cr-20217-SJM-APP  ECF No. 229  filed 05/02/17  PageID.5548  Page 7 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

7

1  Q.  Now, four days later did you meet again with Officer Bryan
2  Watson on September 11, 2014?
3  A.  Yes.
4  Q.  And did you record that conversation as well?
5  A.  Yes.
6      MR. LIGHT:  I'm going to ask the Court if we may play
7  and publish to the jury Government Exhibit 808.
8      THE COURT:  Yes, sir.  Go right ahead.
9      (Audio clip being played at 8:41 a.m.)
10     MR. LIGHT:  Stop there.
11 BY MR. LIGHT:
12 Q.  Where's this conversation taking place?
13 A.  At his house.
14 Q.  Where?
15 A.  At his house.
16 Q.  And where is that located?
17 A.  In Novi.
18 Q.  And you're outside?
19 A.  Yes.
20 Q.  Looking at a hornets nest or something like that?
21 A.  Yes.
22     MR. LIGHT:  Go ahead.
23     (Audio clip being played at 8:41 a.m.)
24     MR. LIGHT:  Would you stop there?
25 BY MR. LIGHT:

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5581   Page 40 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

40

1   Hansberry, you tell him the truck's en route, they take the
2   truck down, correct?
3   A.   Correct.
4   Q.   And lots of notification are made, correct?
5   A.   Yes.
6   Q.   Federal agents you told us were notified, right?
7   A.   Correct.
8   Q.   A Border Patrol agent with a dog was called, correct?
9   A.   Correct.
10  Q.   Other federal agents arrive, correct?
11  A.   Correct.
12  Q.   Your supervisors arrived, correct?
13  A.   Yeah.
14  Q.   In all, would it be fair to say that there were at least
15  20 or 30 law enforcement officers at that scene?
16  A.   It was a lot.
17  Q.   And you tell us that when you arrived on the scene, that
18  the semi was stopped, correct?
19  A.   Correct.
20  Q.   And that there were officers inside the cab, correct?
21  A.   Correct.
22  Q.   And that there was money that appeared to already be out
23  on the -- on the ground in duffle bags, correct?
24  A.   It didn't appear to be but it was, laying right there on
25  the ground next to the car.

USA v David Hansberry, et al • 15-20217

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5582    Page 41 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

41

1    Q.    Okay.  And the officers -- what month was this?

2    A.    This was in July.

3    Q.    July 2010, right?

4          Officers are wearing their summer plainclothes

5    uniforms, correct?

6    A.    Summer plainclothes uniforms?

7    Q.    The officers on your crew are wearing polo shirts, right?

8    A.    Officers on my crew?  No.

9    Q.    No?

10   A.    Just two officers that had the raid gear on.  The rest of

11   us was in plainclothes.

12   Q.    And who were the officers in the raid gear?

13   A.    Tourville and Napier.

14   Q.    Tourville and Napier.

15         And explain to us what the raid gear is.

16   A.    At that time it was polo shirts with "Police" on it,

17   narcotic patches on the side and BDU pants.

18   Q.    So the raid gear would be polo shirts that say "Police"

19   and BDU -- like 511 BDU pants, right?

20   A.    Correct.

21   Q.    Okay.  And you say that when Officer Napier exited the

22   truck cab, you tried to hug him, right?

23   A.    Correct.

24   Q.    And he kept you away, correct?

25   A.    Pushed me away.

```
 1    Q.   Pushed you away.
 2             And now in retrospect, you're inferring to the jury
 3    that you believe that Officer Napier had stolen money and
 4    didn't want to hug you because then you would have noticed the
 5    money that he had on him, correct?
 6    A.   I say -- you could say that.
 7    Q.   That's your inference, right?
 8    A.   Mm-hmm.
 9    Q.   All right.  And Gary Jackson told you and you believed
10    that there was $3 million in that truck when it was stopped,
11    correct?
12    A.   He said it before and he said it after and stayed to it.
13    Q.   And what you all found was $2.1 million, correct?
14    A.   2.1197.
15    Q.   Okay.  And so approximately $900,000 was missing, right?
16    A.   Correct.
17             MR. HARRISON:  And can we take a look at 724-F?
18    BY MR. HARRISON:
19    Q.   What do we see there?
20    A.   What part?
21    Q.   How much of the money do we see there?
22    A.   That's the 2.1197.
23    Q.   That's all of it, right?
24    A.   Correct.
25             MR. HARRISON:  Can we see G?
```

1   BY MR. HARRISON:

2   Q.   Do these numbers mean anything to you, sir?

3   A.   Yes.

4   Q.   What do they mean?

5   A.   The numbers to the left is the itemized number and then to

6   the right is how much is in that pack.

7   Q.   Okay.  And so the 20 would mean $20,000, right?

8   A.   Correct.

9   Q.   So one of those packets that is labeled 20 would have --

10  would be $20,000, right?

11  A.   Correct.

12  Q.   Okay.  And, sir, would you agree with me that those

13  packets are approximately eight to ten inches long and

14  approximately six to eight inches across, does that sound about

15  accurate?

16  A.   I don't -- I don't know.

17  Q.   About the size of a legal pad, that'd be a fair estimate?

18  A.   I don't know.

19  Q.   You don't know.

20       And would you agree with me, sir, that they're about

21  four to five inches thick?

22  A.   I don't know the dimensions of it.

23  Q.   Okay.  So what we see there is $2.1 million, right?

24  A.   2.1197.

25  Q.   Right.  So you would agree with me that half of that would

1    be a little more than a million, right?

2    A.   Somewhere around there.

3    Q.   And you believe or you surmise that Officers Tourville and

4    Officers Napier were able to take half of that money and hide

5    it under their polo shirts and in their pants, and they were

6    able to do that before any of the other officers arrived,

7    that's what you're suggesting to us, correct?

8    A.   That's not what I'm suggesting.  I didn't say a million

9    dollars.

10   Q.   $900,000, right?

11   A.   2.1197, so that's more like seven to eight thousand,

12   800,000.

13   Q.   Okay.  Fair enough.  I want to move you on to some of the

14   specific incidents that you talked about, other ones.  You

15   talked -- you told us about an incident in South -- Southfield

16   involving a raid that you did with Sergeant Hansberry's crew

17   where a woman was in the bathroom asking you to shoot her,

18   right?

19   A.   Asking officers to shoot her, yes.

20   Q.   Asking officers to shoot her.

21        And you remember specifically her saying that, right,

22   "Please shoot me," something like that?

23   A.   Something around -- like that.

24   Q.   Okay.  And you remember that there were officers from

25   another department there as well, correct?

1    A.    Southfield.

2    Q.    And you told us that your recollection was that somewhere

3    around $40,000 was found, right?

4    A.    It was on the table.

5    Q.    It was on the table?

6    A.    Correct.

7    Q.    What was your role in that entry, that raid?

8    A.    I didn't really have a role in that one.  I was just in

9    the -- in the entry crew.

10   Q.    So you were part of the entry crew?

11   A.    Correct.

12   Q.    Part of the crew that went in after the door was -- was --

13   was taken down, right?

14   A.    Correct.

15   Q.    Part of the crew that went around and searched and

16   secured, right?

17   A.    Correct.

18   Q.    And you don't remember specifically what you did, what

19   your role was?

20   A.    No.  I was just on the stack that I can remember.

21   Q.    On the stack.

22         Can you explain to the jury what that means, to be on

23   the stack?

24   A.    Just stacked up in the -- in the line.

25   Q.    Okay.  And you recall that after the money was secured,

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5611   Page 70 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

70

```
1              THE COURT:  Five minutes?
2              MR. BUCKLEY:  Judge, I would agree with Mr. Fishman
3    as well.
4              THE COURT:  All right.  Let's take five minutes,
5    ladies and gentlemen.  It's 10:25 and let's get back at 10:30.
6    Let's all rise for our jurors please.
7              (Whereupon the jury was excused at 10:25 a.m.)
8              THE COURT:  Okay.  Five-minute recess.  You can step
9    down.
10             (Court in recess at 10:26 a.m.)
11             (Proceedings resumed at 10:36 a.m., all parties
12             present)
13             (Whereupon the jury entered the courtroom at
14             10:36 a.m.)
15             THE COURT:  Okay.
16             MR. FISHMAN:  We all feel a lot better now, Judge.
17             THE COURT:  I know.  Always ready to help.
18             MR. FISHMAN:  Especially those of us who are a little
19   up in years, you know.
20             THE COURT:  I was ready myself.
21             All right.  Let's all be seated.  Our jury's back.
22             Now, listen, Mr. Fishman, we -- maybe, you know,
23   when -- 35, 40 minutes, 11:00, 11:15, when you think it's a
24   good time for our break, you let us know --
25             MR. FISHMAN:  I will.
```

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5612   Page 71 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

71

```
 1              THE COURT:  -- and we'll take -- okay.  Go right
 2   ahead.
 3                       CROSS-EXAMINATION
 4   BY MR. FISHMAN:
 5   Q.   Okay.  So Mr. Levels [sic], you started -- or Leavells,
 6   you started as a police officer in 1999, correct?
 7   A.   Correct.
 8   Q.   When you were asked at the grand jury why you wanted to
 9   become a police officer, you said as follows, page 5:  Answer,
10   "Well, I thought I could make a difference, you know, and
11   wanted to support my family."  Do you remember that answer?
12   A.   Correct.
13   Q.   All right.  So that was part of your intention, when you
14   said "make a difference," you meant do something good out for
15   the community, correct?
16   A.   Correct.
17   Q.   And then you told Mr. Harrison about an incident that
18   happened where you were trying to help Benny Doughrity, it's
19   D-O-U-G-H-R-I-T-Y, because he was some type of kin to Mr.
20   Jackson, am I right?
21   A.   Correct.
22   Q.   And Gary Jackson approached you and he asked you if you
23   could do something to help his kin, whatever he was to him,
24   right?
25   A.   Correct.
```

1   Q.   And you said you'd see what you could do, something like

2   that, correct?

3   A.   Yes.

4   Q.   And what you decided to do, according to what you were

5   telling us before the break, was you typed up a search warrant

6   affidavit, am I right?

7   A.   Correct.

8   Q.   And I'm not going to read through the same things that Mr.

9   Harrison read through, but you'd agree with me that it

10  contained all kinds of lies, right?

11  A.   Some.

12  Q.   Well, I don't want to go through all of them, but the ones

13  you agreed with Mr. Harrison were lies, you still agree those

14  were lies, right?

15  A.   Correct.

16  Q.   And you knew from your experience that you can't just type

17  up a search warrant affidavit, you have to actually swear to it

18  and sign it, am I right?

19  A.   Correct.

20  Q.   And you knew then as a police officer that swearing to an

21  affidavit was exactly the same as what you did yesterday when

22  Judge Murphy asked you if you're telling the truth, correct?

23  A.   Correct.

24  Q.   It's an oath, isn't it?

25  A.   Correct.

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5614    Page 73 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

73

1   Q.   And what you did was you swore to something that you knew

2   contained a number of lies, am I right?

3   A.   Correct.

4   Q.   Can you tell us, sir, how did you decide which lies to

5   stick in there, for instance, the surveillances that you

6   claimed you observed narcotics transactions, how -- how did you

7   decide what lie you should stick in there?

8   A.   It's just wording.

9   Q.   Well, it's word -- how did you pick a black male,

10  heavyset, wearing a tan jacket, did you just pick that out of

11  the sky?

12  A.   Yeah.  It's not hard to do.

13  Q.   It's not hard to do.

14          Had -- had you done that before?

15  A.   Yeah, I've done it before.

16  Q.   You've submitted false affidavits both to the Prosecutor's

17  Office and to judges before this?

18  A.   Correct, just like your client did.

19  Q.   Okay.  Mr. Levels [sic], we're going to -- Leavells --

20  we're going to have a real -- I'm going to ask you questions

21  and you answer my question.  If you want to make a speech, you

22  tell the Judge.  If he lets you do it, you can speech, okay?

23  You got it?  You got it?

24  A.   I understand what you're saying.

25  Q.   All right.  So my question is are you telling the jury

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5615   Page 74 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

74

1    that in addition to this false affidavit, you've submitted

2    other false affidavits, true?

3    A.    I made others.

4    Q.    And on each occasion you did the same thing in terms of

5    typing it up, swearing to it, eventually talking to a

6    prosecutor and then seeing a judge about it, am I right?

7    A.    Correct.

8    Q.    And in this instance, the one that we have here, was March

9    the 14th of 2013, correct?

10   A.    Correct.

11   Q.    And based on your testimony, you said you went to the FBI

12   task force in October of 12, am I right?

13   A.    Yeah, late October, 12.

14   Q.    Halloween I think you said, true?

15   A.    During Halloween.

16   Q.    And then you stayed about six or seven months, correct?

17   A.    Up until May, June -- I mean April, May.

18   Q.    April, May of 2013, right?

19   A.    Correct.

20   Q.    Which means that on March the 14th of 2013 when you

21   submitted this false affidavit, you were working for the FBI?

22   A.    I was working for Detroit Police Department.

23   Q.    Okay.  Let me use a different preposition.  You were

24   working with the FBI at the time you did this?

25   A.    I was on the joint task force, yes.

1   Q.  And did you tell any of your superiors, either Sergeant

2   Weathers or maybe one of the FBI agents, say, "Guess what,

3   fellas?  I've got to help this guy out so I'm going to go

4   submit a false affidavit to a prosecutor and a judge."  Did you

5   tell anybody that?

6   A.  No.

7   Q.  Because you knew if you told them, number one, you'd be

8   booted off the task force in 15 minutes, right?

9   A.  I don't know that.

10  Q.  You don't.

11       Well, you figure they would say, "Hey, we're going to

12  give you one of those commendations for doing this."  Is that

13  what you figured would happen?

14  A.  Never thought of it.

15  Q.  Okay.  You -- you certainly thought of the notion if you

16  told the FBI or other officers that you were about to submit a

17  false affidavit, you knew something bad would happen to you,

18  didn't you?  I'm sorry?

19  A.  Well, you didn't give me a chance to answer.

20  Q.  Go ahead.  Somebody coughed.  I thought you did.

21  A.  Oh.  I didn't -- can you repeat the question now?

22  Q.  Yeah.  My question is you knew, did you not, that if you

23  told the FBI or anybody on your task force, "I'm about to

24  submit a false affidavit to a judge and to a prosecutor," that

25  something bad would happen to you, right?

1    A.    I don't know what will happen.

2    Q.    How well did you know Assistant Prosecutor Sarah DeYoung

3    as of March 24th of 2013?

4    A.    I knew her.

5    Q.    And you knew she was a narcotics prosecutor over there,

6    correct?

7    A.    Correct.

8    Q.    And from what you saw, first she appeared to be a good

9    lawyer, true?

10    A.    True.

11    Q.    And she appeared to be a straightforward,

12    straight-shooting, honest person, true?

13    A.    True.

14    Q.    Did it bother you in the least when you were reading this

15    affidavit over the phone to her that you were telling her a

16    bunch of lies, did that bother you?

17    A.    I was reading what was on there.

18    Q.    I know that, but my question is, sir, did it bother your

19    conscience, did it bother your mind, did it bother you at all

20    to be reading a pack of lies to somebody like Sarah DeYoung

21    who's a narcotics prosecutor at the Wayne County Prosecutor's

22    Office?

23    A.    I didn't know my state of mind at that time so I can't

24    tell you something from not -- from back then.

25    Q.    What you do know though about your state of mind was you

USA v David Hansberry, et al., 15-20217

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5618    Page 77 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

77

1    were certainly trying to help Gary Jackson, that's for sure?

2    A.    Correct.

3    Q.    And if it required you to lie on the phone to the

4    prosecutor, whatever your state of mind was, it wasn't enough

5    to keep you from doing it, agreed?

6    A.    I did what I did.

7    Q.    All right.  And after you lied to Sarah DeYoung, you had

8    to go in front of some judge or magistrate with your affidavit

9    and have a brief conversation with that judge or magistrate,

10   true?

11   A.    True.

12   Q.    And you've done that countless occasions, true?

13   A.    Correct.

14   Q.    And the judge or magistrate, whether they happen to be

15   sitting on the bench at the time or they're in chambers or

16   they're somewhere, they do the same thing that Judge Murphy did

17   that we talked about earlier:  You put your hand in the air,

18   you tell that judge or that magistrate everything in here is

19   true, right?

20   A.    Correct.

21   Q.    So when you stuck your hand in the air on March

22   the 24th -- I'm sorry, March the 14th of 2013 and you were

23   asked is everything true, did it bother you to lie outright to

24   the judge or magistrate, did it bother you?

25   A.    I don't know my state of mind at that time so I don't

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5619   Page 78 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

78

 1   know.

 2   Q.   Okay.  You told Mr. Harrison that you know nothing of

 3   whether or not -- strike that.  Let me start over.

 4        Whether it was in person, on the phone, on e-mail or

 5   by carrier pigeon, did you ever say to Sarah DeYoung after this

 6   raid where you got the phony stuff, did you inform Sarah

 7   DeYoung that you wanted her to give a break to Benny Doughrity?

 8   A.   After?

 9   Q.   After you had the phony raid with the phony warrant and

10   whatever the phony stuff you found in there, did you

11   communicate in any way with Sarah DeYoung that you wanted her

12   to give a break to Benny Doughrity on his case?

13   A.   After?

14   Q.   At any time.

15   A.   I asked her what was needed to make that case go away.

16   Q.   And you asked her that before the phony affidavit?

17   A.   I asked her what was needed.

18   Q.   Right.  My question is did you ask her that before you

19   read that phony affidavit to her or after?

20   A.   I had to ask her before.

21   Q.   All right.  So you talked to her before and you asked her

22   what was needed, and her answer was?

23   A.   Some drugs and a gun.

24   Q.   So that gave you the brilliant idea to look -- to create a

25   search warrant affidavit looking for drugs and a gun, right?

USA v David Hansberry, et al., 15-20217

1    A.   Correct.

2    Q.   And after you found whatever you found, did you then

3    contact Sarah DeYoung and say, "Hey, we went in, he was my

4    source and we found drugs and guns, what are you going to do

5    for him?" or something like that?

6    A.   No.  I just let her know what we got and that was it.

7    Q.   You never then -- I'm asking you this for the last time.

8    This is your last chance.  You never said to Sarah DeYoung,

9    "Look, we found this stuff and I want you to do something, I'm

10   asking you to do something for Doughrity on his criminal case."

11   A.   Once again, I called her and let her know what we got.

12   Q.   Okay.  The whole purpose of the exercise, including the

13   phony affidavit, was to try to help Mr. Jackson's kin, Benny

14   Doughrity, correct?

15   A.   Correct.

16   Q.   Do you know, sir, where Mr. Doughrity is today?

17   A.   No.

18   Q.   Do you know, do you have any information whatsoever that

19   tells you that he's sitting in the penitentiary today on that

20   case?

21          MR. LIGHT:  Objection, Your Honor.  He's already said

22   he doesn't know.

23          THE COURT:  I'll overrule.  You can answer that.

24          Go ahead.

25   BY MR. FISHMAN:

```
 1   Q.  Do you know that he's in the penitentiary today on the

 2   case you were supposedly trying to help him on?

 3   A.  No, I don't know.

 4   Q.  Okay.  Did Sarah DeYoung ever say to you at any time,

 5   either before or after, did she ever say to you, "Hey, don't

 6   worry about it, I'll take care of that case, nothing will

 7   happen to him"?

 8   A.  I don't recall.

 9   Q.  Okay.  All right.  You started your police career at the

10   Third Precinct, correct?

11   A.  Correct.

12   Q.  You worked Special Operations, correct?

13   A.  Correct.

14   Q.  You went to Narcotics, correct?

15   A.  Correct.

16   Q.  And then you went to the FBI task force around 2012,

17   around Halloween as you've told us, right?

18   A.  Correct.

19   Q.  When you got to the FBI task force, did you tell anybody

20   there, "Hey, there's a lot of crookery going on in Detroit

21   Police Narcotics; in fact, I'm one of them."  Did you tell them

22   that?

23   A.  No.

24   Q.  But by then, according to you, there was all kinds of

25   crookery going on in the Detroit Police Narcotics Section,
```

1    right?

2    A.   It was things going on.

3    Q.   Right.  Including money seizure and some of the other

4    things you've told us about, correct?

5    A.   Correct.

6    Q.   But just so we're clear, you never said to anybody at the

7    FBI or anybody at the task force, you know, "You don't want me,

8    I've been a crook, and I know some other guys and I can tell on

9    them."  You didn't do that, did you?

10   A.   Nope.

11   Q.   So by January of 2014 you were in Narcotics again and you

12   were working on Sergeant Geelhood's crew, is that correct?

13   A.   In January, yes.

14   Q.   And did you have some suspicions about Sergeant Geelhood?

15   A.   What do you mean?

16   Q.   Well, I mean did you think Sergeant Geelhood was a crook?

17   A.   I don't know if he was a crook.

18   Q.   Did you have any suspicions about him at all?

19   A.   That's a wide open question.  I mean --

20   Q.   You're right.

21   A.   -- be specific.

22   Q.   No, that's my question.  The answer is easy, yes or no?

23   A.   I can't answer that question.

24   Q.   Okay.  Did Sergeant Geelhood before he was a sergeant work

25   on Sergeant Hansberry's crew with you, Hansberry, Watson and

1    the other people you've named?

2    A.    I wasn't on there when he was there.

3    Q.    Did you know him to have worked on Sergeant Hansberry's

4    crew?

5    A.    Yes.

6    Q.    And your answer is, when I asked you were you -- did you

7    have any suspicions, you don't know?  Is that your answer?

8    A.    You have to specify what you're talking about.  Other than

9    that, I can't answer the question.

10   Q.    Okay.  When you were on Sergeant Geelhood's crew in

11   January of 2014, were you still selling marijuana to Calvin

12   Turner?

13   A.    Yes.

14   Q.    And tell the jury again how -- how many times you figure

15   you gave weed to Calvin Turner.

16   A.    Several.

17   Q.    Well, does several mean four or five, 10 or 12, what does

18   that mean?

19   A.    I don't know, sir.

20   Q.    More than 10?

21   A.    Several.

22   Q.    Okay.  And what kind of quantities were you giving him?

23   A.    Pounds.

24   Q.    And how were you dividing up the money, splitting it?

25   A.    Yes.

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5624    Page 83 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

83

1    Q.   And that was while you were -- continued while you were

2    working on Geelhood's crew, correct?

3    A.   Correct.

4    Q.   You were also running a grow house, right, or being

5    involved in a grow house, correct?

6    A.   Correct.

7    Q.   And was the marijuana that was being grown in the house

8    being sold?

9    A.   It still hadn't been sold.

10   Q.   I'm sorry?

11   A.   It wasn't sold.

12   Q.   It was just in the process of being grown?

13   A.   Yeah.

14   Q.   Did you tell Sergeant Geelhood, "Hey, I hope you don't

15   mind, but I've got a grow house and I'm giving weed to Calvin

16   Turner.  Is it okay if I stay on the crew?"  Did you have a

17   conversation like that with him?

18   A.   No.

19   Q.   Were you guys also ripping off marijuana when you'd go for

20   raids while you were working with Sergeant Geelhood's crew?

21   A.   Sometimes.

22   Q.   And was the sergeant in the middle of that, was he either

23   taking it himself or watching you guys?

24   A.   He pretty much knew.

25   Q.   He pretty much knew.  Okay.

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5625    Page 84 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

84

1    And the crew was what, five, six, seven, eight

2    people?

3    A.    It all depends.

4    Q.    Were Beasley and Bray still on the crew?

5    A.    Yes.

6    Q.    And you've testified on numerous occasions Beasley and

7    Bray were not crooks, correct?

8    A.    Correct.

9    Q.    And you're saying they knew and looked the other way, or

10   are you saying they didn't know and they got nothing out of it?

11   A.    You have to ask them.

12   Q.    No, I'm asking you, sir, from what you observed and what

13   you heard.

14   A.    I mean I don't know if they knew anything.

15   Q.    Okay.  You'd -- you'd agree with me that -- that in most

16   raids, at some point in time, everybody is inside the location

17   at some point in time, true?

18   A.    Pretty much.

19   Q.    And you'd agree with me the evidence has to be catalogued

20   and listed, correct?

21   A.    Correct.

22   Q.    And you'd agree with me that oftentimes that evidence

23   includes controlled substances, it may also include personal

24   property like jewelry and it may also include cash, correct?

25   A.    Rarely jewelry, but...

```
 1    Q.   Okay.  Let's say cash and drugs.  Yes?

 2    A.   And guns, yeah.

 3    Q.   And guns, right?  Okay.

 4         The incident occurs where you have the raid and

 5    there's some equipment that's taken, the one that you've been

 6    talking about to both the government and Mr. Harrison, correct?

 7    A.   Correct.

 8    Q.   You didn't think ahead of time that maybe this crook who's

 9    growing marijuana is slick enough that he might have some

10    surveillance inside, did you?

11    A.   I don't know.

12    Q.   Well, did it cross your mind, hey, maybe we shouldn't

13    steal this stuff because maybe the guy's got surveillance

14    equipment?

15    A.   A lot of places have surveillance.

16    Q.   That's not my question though.  I'm talking about this

17    incident, did it occur to you that it might not be a good idea

18    to participate in stealing because he might have surveillance

19    equipment?

20    A.   I don't know.

21    Q.   Did anybody say while the stealing was going on or before

22    the stealing or after the stealing, "Hey, fellas, we could get

23    caught, maybe the guy's got surveillance equipment."  Anybody

24    say that?

25    A.   Not that I remember.
```

Case 2:15-cr-20217-SJM-APP  ECF No. 229  filed 05/02/17  PageID.5627  Page 86 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

86

1    Q.  But you -- you'd agree, as you've just said, these days a

2    lot of people do have surveillance equipment; houses,

3    buildings, parking lots, right?

4    A.  Courtrooms.

5    Q.  Courtrooms.

6    A.  Mm-hmm.

7    Q.  Okay.  So when you got suspended, tell us again what's the

8    month and year?

9    A.  It was 2014 in July.

10   Q.  July.

11       That meant when you were suspended, there's two ways

12   of being suspended in the police department, with pay and

13   without pay.  Which way were you suspended?

14   A.  With pay.

15   Q.  All right.  So you were still getting your pay, correct?

16   A.  Correct.

17   Q.  And your understanding was that the -- there'd be an

18   investigation generally by Internal Affairs, is that true?

19   A.  Correct.

20   Q.  And at some point in time there'd be some recommendation

21   and maybe you'd have a trial board or maybe not and you'd get

22   some kind of a punishment or not, correct?

23   A.  I don't know what would happen.

24   Q.  You were not concerned then, though, that you were going

25   to get fired as a result of the stealing from the weed house,

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5628   Page 87 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

87

1    were you?

2    A.   I didn't get fired.

3    Q.   Sir, I'm asking you, were you concerned at the time when

4    you were suspended and you were still getting paid, were you

5    concerned that you were going to be fired or did you figure

6    you'll get 30 days off or something?

7    A.   I knew I wasn't going to get fired.

8    Q.   Okay.  So you were still getting a check from the police

9    department every two weeks, correct?

10   A.   Correct.

11   Q.   And in April of 2014 you started having a marijuana

12   connection with this fellow Timothy Davis, am I right?

13   A.   Correct.

14   Q.   Did I hear you correctly, did you tell Mr. Harrison you

15   didn't know Timothy Davis was working with the government until

16   he mentioned it to you today?

17   A.   No, that isn't what he said.

18   Q.   All right.  You -- you -- you've -- you've learned that he

19   was -- he was an informant for the government, right, you knew

20   that before you came in here today, didn't you?

21   A.   Right.

22   Q.   You knew that those deliveries you were making of weed and

23   hash and cannabis oil and whatever the other stuff was, you

24   knew that he was working for the government when you gave those

25   things to him, right?

```
 1   A.   No.

 2   Q.   You -- you -- you know that now though, don't you?

 3   A.   Yeah, now, afterwards.

 4   Q.   And you learned afterwards, you learned that the money

 5   that you got came from the FBI?

 6   A.   Correct.

 7   Q.   Okay.  So now you didn't learn that until after you were

 8   busted in the phony rip set up by Gary Jackson correct?

 9   A.   Correct.

10   Q.   All right.  So nobody, the FBI or the government, for

11   whatever reasons, they didn't grab you when you took the money

12   from Timothy Davis, right?

13   A.   Correct.

14   Q.   They didn't grab you when you provided them with whatever

15   you provided them, right?

16   A.   Yes.

17   Q.   They left you out there, right?

18   A.   I guess.

19   Q.   Under suspension from the police department, true?

20   A.   No.

21   Q.   Working as a police officer?

22   A.   Which time?

23   Q.   Timothy Davis.  We're talking about April of 2014.

24   A.   I was off, sir.

25   Q.   All right.  And then the suspension came what -- when
```

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5630    Page 89 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

89

```
 1   again?
 2   A.   In July.
 3   Q.   And was it early July?
 4   A.   It was in July.
 5   Q.   All right.  And again, you were still getting paid, right?
 6   A.   Correct.
 7   Q.   So when Gary Jackson came to you and proposed this robbery
 8   where y'all could split $40,000, it wasn't like you weren't
 9   getting a paycheck from the City of Detroit, right?
10   A.   I wasn't getting the same paycheck that I was getting
11   before.
12   Q.   And so the jury understands, you mean because you weren't
13   getting court time, right?
14   A.   Court time, overtime, things like that.
15   Q.   And as a narcotics officer, you spend a lot of time
16   testifying in court, right?
17   A.   Correct.
18   Q.   Which you've done a zillion times, right?
19   A.   Yes.
20   Q.   And you get paid extra if you work overtime and you get
21   paid what's called court time, particularly if you're not
22   working that day, right?
23   A.   Correct.
24   Q.   So your check, even though it was still coming from the
25   citizens, was smaller than it was before?
```

1    A.   Whole lot smaller.

2    Q.   A whole lot smaller, right?

3    A.   Correct.

4    Q.   Are you telling the jury that's why you agreed to get

5    involved in trying to steal the 40,000 along with Gary Jackson,

6    was it 'cuz you weren't getting enough dough from the city?

7    A.   No, I made a bad judgment.

8    Q.   All right.  That didn't enter into it though.  It wasn't

9    the fact that you weren't getting enough money from the city

10   that caused you to say, you know, "I'm going to go in and

11   participate in a robbery," it wasn't that?

12   A.   Made a mistake.

13   Q.   Okay.  But -- but it was greed, wasn't it?  I mean, to be

14   blunt, wasn't it just greed?

15   A.   How was it greed?

16   Q.   I'm asking you.  Didn't it seem like it's -- "I can get

17   $20,000 or $19,000, I can do it easy" and you were greedy,

18   isn't that right?

19   A.   That's not greedy.

20   Q.   Okay.  It is stealing though, you would agree with that,

21   yes?

22   A.   It's taking money.

23   Q.   Okay.  And do -- would -- would you agree that when Mr.

24   Jackson called you and proposed this idea, that one of the

25   things you were thinking about was, "Boy, what's in it for

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5656   Page 115 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

115

1   Q.  But you hope, do you not, that it will be as low as

2   possible, right?

3   A.  Correct.

4   Q.  Okay.  So --

5           MR. FISHMAN:  Thank you, Ms. Koch.

6   BY MR. FISHMAN:

7   Q.  It's your testimony that everybody that you worked with in

8   Narcotics, particularly on Sergeant Hansberry's crew except for

9   Beasley and Bray, were all dirty cops, am I right?

10  A.  I don't know about Amy Metalic.

11  Q.  Okay.  Barnett, he's dirty for sure, right?

12  A.  I don't know.

13  Q.  Well, didn't you -- didn't you tell us yesterday you saw

14  Officer Barnett take an ounce of cocaine and stick it in his

15  pocket and walk out with it?

16  A.  Yeah, I seen him do that.

17  Q.  Don't you think that kind of meets the definition of a

18  dirty cop, or is that something that's -- what -- what you're

19  supposed to do?

20  A.  I mean I just knew he wasn't right.

21  Q.  Okay.  Officer Napier?

22  A.  Right.

23  Q.  Officer Tourville?

24  A.  Right.

25  Q.  Officer Riley?

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5657   Page 116 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

116

1    A.   Right.

2    Q.   What about Officer Whitten, W-H-I-T-T-E-N, did she work on

3    your crew?

4    A.   Yeah, she did.

5    Q.   Is she a crook?

6    A.   Not that I know of.

7    Q.   Okay.  So she's no, Beasley's no, Bray's no, Metalic,

8    question mark?

9    A.   Yeah, I don't know.

10   Q.   And Geelhood?

11   A.   Yeah

12   Q.   Yes.  Okay.

13        And the people, whoever their names are that you

14   recognize as the code names that were given to you, do you say

15   they're crooked or no?  Sting, Seal, Lobo, Dragon.

16   A.   I have no idea.

17   Q.   Okay.

18   A.   Dragon, no.

19   Q.   When you saw Officer Barnett take the cocaine during a

20   raid, can you tell the jury approximately when that was?

21   A.   I don't know exactly.

22   Q.   Was it before or after the large money seizure that we're

23   going to talk about in a second?

24   A.   After.

25   Q.   Okay.  And you said that you -- you talked to Sergeant

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5658   Page 117 of
Jury Trial: Volume 14 • Tuesday, June 28, 2016

117

1    Hansberry and Officer Watson about it, correct?

2    A.   Correct.

3    Q.   Did you -- did you have lieutenants still in those days?

4    A.   Did I have who?

5    Q.   Were there lieutenants in the Narcotics Section?

6    A.   Correct.

7    Q.   And over the lieutenant is what, the inspector, used to

8    be, now the captain?

9    A.   Right.

10   Q.   And then there are commanders, correct?

11   A.   Correct.

12   Q.   And then there's the Chief of Police.  Deputy chiefs and

13   then the Chief of Police, correct?

14   A.   Inspectors and... yeah.

15   Q.   All right.  So you -- you told us you talked to Hansberry

16   and Watson and they asked you what did you want to do about it,

17   right?

18   A.   Correct.

19   Q.   And you didn't want to do anything about it, did you?

20   A.   I told them whatever they wanted to do.

21   Q.   Because if you wanted to do something about it, whatever

22   these two said, you could have gone to the lieutenant, the

23   inspector, all the way up to the Chief of Police and say, "Hey,

24   I just saw crookery in a search warrant execution," right?

25   A.   I mean I went to my immediate supervisor.

USA v. David Hansberry, et al., 15-20217

1   Q.   I know that.  But my question is, sir, if your immediate

2   supervisor didn't do anything, there was nothing keeping you

3   from going way higher than him in the police department and

4   reporting what you say you saw, right?

5   A.   Yeah, wasn't nothing stopping me.

6   Q.   You told the jury, in response to Mr. Light's question at

7   the end of your direct testimony, if you would have stayed in

8   southwest Detroit, you wouldn't be here right now, correct?

9   A.   Correct.

10  Q.   So are you blaming other people for the fact that you lied

11  on search warrant affidavits, gave weed to Calvin Turner and

12  all the other things that you've talked about, is that somebody

13  else's fault?

14  A.   Did I say that?

15  Q.   I'm asking you.

16  A.   I didn't say that.  I said that if I'd a stayed there, I'd

17  a been okay.

18  Q.   And my question is are you blaming that on other people or

19  are you taking responsibility for it yourself?

20  A.   I'm a man.  I take responsibility for myself.

21  Q.   You -- you'd agree, had you gone to some superior officer

22  higher than your sergeant about Officer Barnett, you could have

23  put a stop to whatever was going on right then, couldn't you?

24  A.   No.

25  Q.   Okay.  You told us you knew Calvin Turner from childhood,

1    A.   They got people out the house.

2    Q.   Did you learn that somebody was arrested?

3    A.   Yes.

4    Q.   Did you learn that that person's name was Dante Mitchell?

5    A.   I don't recall the name, sir.

6    Q.   Did you learn that that person wound up being charged in

7    court, in Recorder's Court in Frank Murphy?

8    A.   I have no idea.

9    Q.   Did you talk to Gary Jackson about what kind of story that

10   guy should tell to the police or to the prosecutors?

11   A.   What story?

12   Q.   Did you talk to Gary Jackson about what kind of story the

13   person who was being held hostage -- and let's assume his name

14   is Fred Tucker -- did you talk to Gary Jackson about what that

15   guy ought to tell the police and prosecutors about the whole

16   incident?

17   A.   I don't know exactly.  I don't know.

18   Q.   Do you know today that during May of 2014 there was a

19   federal wiretap on Mr. Jackson that picked up his phone calls?

20   A.   How would I know that?

21   Q.   I don't know.  That's why I'm just -- you didn't know and

22   you don't know it now?

23   A.   You're telling me.

24          MR. FISHMAN:  Okay.  That's all.

25          THE COURT:  Thank you.  Anything from you, Mr. Sasse?

USA v David Hansberry, et al., 15-20217

Jury Trial: Volume 14 • Tuesday, June 28, 2016

```
 1              MR. SASSE:  No.  Thank you, Your Honor.
 2              THE COURT:  Mr. Light, you want to ask some
 3    questions?
 4              MR. LIGHT:  I have just a few, Your Honor.
 5              Could I see that report from Glynn Court, sir --
 6              MR. FISHMAN:  Sure.
 7              MR. LIGHT:  -- that you asked about, sir?
 8              MR. FISHMAN:  Yes, sir.
 9                        REDIRECT EXAMINATION
10    BY MR. LIGHT:
11    Q.   Just -- just one area I want to try to clarify a little
12    bit with you, Mr. Leavells.  That seizure from the cab of the
13    truck, of the semi truck, was a lot of money, correct, sir?
14    A.   Correct.
15    Q.   The final count of what was brought downtown to DBT -- DPD
16    headquarters was about $2.197 million, is that right?
17    A.   Correct.
18    Q.   Now, Gary Jackson insisted that there was more money than
19    that in that -- in that cab, correct?
20    A.   Correct.
21    Q.   How much did he insist was there?
22    A.   It was a range, but he kept saying 3 million.
23    Q.   And Little, Gary Jackson's nephew, you talked with him
24    about that as well?
25    A.   Correct.
```

USA v David Hansberry, et al., 15-20217

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5689   Page 148 of
156
Jury Trial: Volume 14  •  Tuesday, June 28, 2016

148

1    Q.   And he insisted what amount of money was present in that

2    cab, as he understood it?

3    A.   Three million, and kept showing me pictures.

4    Q.   Now, there's a difference of about $800,000 there,

5    correct?

6    A.   Correct.

7    Q.   If that $800,000 went walkabout away from that cab during

8    the execution of -- of -- of that street enforcement, do you

9    know how it walked away, how it got away?

10   A.   No.

11   Q.   You're not saying that somebody stuffed it all in the

12   cargo pockets of the cargo pants that Napier and Tourville had

13   on, you're not saying that, are you, sir?

14   A.   Nope.

15   Q.   You just don't know if or how that money was stolen,

16   correct?

17   A.   Correct.

18   Q.   Mr. Fishman asked you some questions about your grand jury

19   testimony.  Do you recall that?

20   A.   Yes.

21   Q.   And he asked you a question and your answers from pages 30

22   to 31 of your grand jury testimony, right?

23   A.   Right.

24   Q.   That wasn't all your grand jury testimony on this subject,

25   was it, sir?

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5690   Page 149 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

149

```
 1   A.   No.
 2   Q.   On page 36, starting at line 12, were these -- was this
 3   question asked and did you give this answer:  Question, "After
 4   the fact, were there discussions involving Gary Jackson about
 5   how much money was in the cab?"  Answer, "Correct.  What the
 6   final tally was that we came up with was 2.197.  The number
 7   that Gary Jackson told us was 3 million.  We didn't give him
 8   any money out of this.  We paid him through city funds which
 9   was $250,000 cash."
10   A.   Correct.
11   Q.   Was that your testimony before the grand jury as well?
12   A.   Yes.
13        MR. LIGHT:  No further questions.
14        THE COURT:  Okay.  Well, now hold on just a sec.  Do
15   you want to respond to any of that, Mr. Harrison?
16        MR. HARRISON:  One question.
17                    RECROSS-EXAMINATION
18   BY MR. HARRISON:
19   Q.   I just want to make sure I heard what I heard just now
20   right.  With regard to the southwest Detroit big money seizure
21   that Mr. Light just asked -- asked you about, you agreed with
22   his question, you don't know if or how that money was stolen,
23   right?
24   A.   Correct.  It wasn't southwest either.
25        MR. FISHMAN:  Yeah, it's east -- east side.
```

USA v David Hansberry, et al., 15-20217

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5696   Page 155 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

155

```
 1    communicate electronically about it, and keep your minds open.

 2    We'll see you tomorrow morning and we'll get through this,

 3    okay?

 4            All right.  Let's all rise for our jurors please.

 5            (Whereupon the jury was excused at 12:41 p.m.)

 6            THE COURT:  Okay.  Everybody may be seated.  We're

 7    going to be in recess.  Thank you all very much.

 8            MR. LIGHT:  Thank you, Your Honor.

 9            MR. BUCKLEY:  Thank you, Your Honor.

10            (Court in recess at 12:42 p.m.)

11            (Whereupon proceedings in the above-entitled matter

12            were adjourned to Wednesday, June 29, 2016)

13                             —  —  —

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5697   Page 156 of
156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

156

1            C E R T I F I C A T I O N

2            I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 155 comprise a full, true and correct transcript of the

7    proceedings held in the matter of United States of America vs.

8    David Hansberry, Bryan Watson and Kevlin Omar Brown, Case No.

9    15-20217, on Tuesday, June 28, 2016.

10

11

12                    s/Linda M. Cavanagh
                 Linda M. Cavanagh, CSR-131, RPR, RMR, CRR
13               Federal Official Court Reporter
                 United States District Court
14               Eastern District of Michigan

15

16

17   Date: May 1, 2017
     Detroit, Michigan
18

19

20

21

22

23

24

25