# EXHIBIT J

1  UNITED STATES DISTRICT COURT
2  EASTERN DISTRICT OF MICHIGAN
3  SOUTHERN DIVISION
4
5  DEBRA METRIS-SHAMOON,
6  MUKHLIS SHAMOON,
7  CARL VERES, PAUL METRIS,
8  JULIA METRIS,
9      Plaintiffs,
10     vs.                    Case #18-cv-13683
11 CITY OF DETROIT, and        HON. ARTHUR J. TARNOW
12 SGT. JOE TUCKER, SGT. CANDACE
13 MATSCHIKOWSKI, in their Individual
14 and Official Capacities; SGT. STEPHEN
15 GEELHOOD, JUAN DAVIS, and BRIAN JOHNSON,
16 In their Individual Capacities;
17 jointly and severally,
18     Defendants.
19 _____/
20 PAGE 1 TO 132
21     The Virtual deposition of CHIEF JAMES CRAIG,
22     Taken Via Hanson Remote
23     Commencing at 11:00 a.m.
24     Thursday, May 21, 2020
25     Before Kelley Whitaker, CSR 0977.

1
2  Court reporter, attorneys & witness appearing remotely.
3
4  APPEARANCES:
5
6  DENNIS A. DETTMER, P27043
7  MICHAEL DEZSI, P64530
8  Dettmer & Dezsi, PLLC
9  613 Griswold, #1400
10 Detroit, MI  48224
11 (313) 281-8090
12 ddettmeresq@yahoo.com
13 bbentley@dezsilaw.com
14     Appearing on behalf of the Plaintiffs.
15
16 JAMES M. SUROWIEC, P49560
17 LINDSEY R. JOHNSON, P67081
18 Allen Brothers, PLLC
19 401 N. Main Street
20 Royal Oak, MI  48-67-1812
21 (248) 951-9060
22 jsurowiec@allenbrotherspllc.com
23     Appearing on behalf of the Defendants
24
25 APPEARANCES CONTINUED:

1  APPEARANCES CONTINUED:
2
3  GRANT HA, P53403
4  City of Detroit Police Department
5  1301 3rd St., #75-751
6  Detroit, MI  48226-2503
7  (313) 596-2158
8      Appearing on behalf of Witness, Chief Craig
9
10 ALSO PRESENT:  DEBRA METRIS-SHAMOON
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              TABLE OF CONTENTS
2  Witness                             Page
3              CHIEF JAMES CRAIG
4
5  EXAMINATION BY MR. DETTMER            9
6  EXAMINATION BY MR. SUROWIEC          122
7  RE-EXAMINATION BY MR. DETTMER        131
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    E X H I B I T S - Not Attached

2    (Exhibits retained by Mr. Dettmer)

3    EXHIBIT 1    10

4    Notice of Deposition

5    EXHIBIT 2    10

6    May 13, 2020, Email

7    EXHIBIT 4    14

8    Wikipedia History of Craig

9    EXHIBIT 5    15

10    Excerpt from Board

11    EXHIBIT 5A    16

12    Excerpt from Board

13    EXHIBIT 6    17

14    Organizational Charts

15    EXHIBIT 7    42

16    Detroit News Article

17    EXHIBIT 7A    49

18    Detroit News Report

19    EXHIBIT 8    61

20    Police Commissioner Meeting

21    EXHIBIT 9    66

22    Administrative Message

23    EXHIBIT 10    86

24    Comerica Bank Deposit

25    Tally Sheet

---

1    EXHIBIT 11A    83

2    Photo

3    EXHIBIT 11B    83

4    Photo

5    EXHIBIT 12    93

6    Detroit News Article

7    11/03/2014

8

9    EXHIBIT 12    93

10    Detroit News Article

11    11/03/2014

12    EXHIBIT 12C    96

13    Indictment, Hansberry/Watson

14    EXHIBIT 12D    97

15    Free Press Article

16    6/30/16

17    EXHIBIT 12E    98

18    Leavells Testimony

19    EXHIBIT 12F    98

20    Leavells Testimony

21    EXHIBIT 12G    99

22    Jackson Testimony

23    EXHIBIT 13    101

24    Money Counter Memo

25

---

1    EXHIBIT 12J    102

2    Hansberry Conviction

3    EXHIBIT 13    90

4    Investigation money counter

5    EXHIBIT 14    102

6    Use of Paid Informants

7    EXHIBIT 14A    103

8    Protective Order

9    EXHIBIT 14B    103

10    Confidentiality of SOI

11    EXHIBIT 14C    103

12    Confidentiality of SOI

13    EXHIBIT 15    107

14    Internal Affairs Investigation

15    EXHIBIT 16    108

16    Matelic File

17    EXHIBIT 17    108

18    Geelhood Case

19    EXHIBIT 18    109

20    Darell Chancellor Case

21    EXHIBIT 19    109

22    Darell Chancellor Case

23

24

25

---

1    Virtual Deposition

2    May 27, 2020

3    About 11:00 a.m.

4    - - -

5    COURT REPORTER:  My name is Kelley

6  Whitaker, CSR-0977, a Michigan State Notary Public and

7  Certified Shorthand Reporter, and this deposition is

8  being held via videoconferencing equipment and

9  telecommunication.

10    The counsel, witness, and reporter are not in

11  the same room.  The witness will be sworn in remotely,

12  pursuant to stipulation and agreement of all parties.

13    Will the parties please stipulate on the

14  record that they consent and waive any objections to

15  this manner of conducting the deposition and the

16  attorneys participating in this deposition acknowledge

17  that I am not physically present in the deposition room

18  and that I will be reporting this deposition remotely.

19    Please indicate your agreement by stating your name

20  and your agreement on the record.

21    MR. DETTMER:  Dennis Dettmer, on behalf of the

22  plaintiffs.  And I agree to this remote deposition

23  taking and have no objection whatsoever.

24    MR. SUROWIEC:  James Surowiec, on behalf of

25  City of Detroit, defendants, and I agree to the



1   deposition being taken remotely in the manner that you

2   just described.

3                   -   -   -

4                   CHIEF JAMES CRAIG,

5   having first been duly sworn, was examined and testified

6   on his oath as follows:

7           MR. DETTMER:  Chief Craig, I'm Dennis Dettmer,

8   and it's a pleasure to meet you.

9           THE WITNESS:  Nice meeting you, too.

10  EXAMINATION BY MR. DETTMER:

11  Q.  I'd like to ask you a series of questions.  And starting

12      off, we have given four Notices of Deposition to your

13      counsel and his firm.  And I am wondering if you've seen

14      any one of those, because they have attached a subpoena

15      duces tecum to the City of Detroit asking for certain

16      documents.

17          Have you seen that -- any one of those four

18      deposition notices?

19  A.  I don't recall seeing any of the notices.  I was made

20      aware that there was a disposition (sic) by an attorney

21      that works at my office, or how or could have been, but

22      personally I have not seen it.  But I was advised that

23      there was a deposition.

24

25

1           EXHIBIT 1

2           Notice of Deposition

3           WAS MARKED FOR IDENTIFICATION

4           EXHIBIT 2

5           May 13, 2020, Email

6           WAS MARKED FOR IDENTIFICATION

7   BY MR. DETTMER:

8   Q.  Okay.  The Notice of Deposition is Exhibit 1 to your

9       deposition today.  I have as a Notice, also, a second

10      exhibit, Number 2, which is an email dated May 13th,

11      2020, from counsel for the defendant -- Lindsey Johnson

12      for the defendants.

13          And she indicates -- I'll read it into the

14      record.  Thank you for your Notice of Deposition which

15      we will have our clients appear remotely.  However,

16      Defendant City will not respond to the duces tecum

17      portion of the deposition since discovery has already

18      closed in this matter May 7th.

19          Also, this Deposition Notice requests

20      documents that have already been provided to you by the

21      Defendant City in response to client's numerous prior

22      Discovery Requests.

23          I would suggest that that mission is totally

24      improper.  We initially sent our First Notice of

25      Deposition on October 30th, 2019.  We Re-Noticed it on

1   December 9th, 2019, February 25, 2020, May 13th, 2020,

2   and May 18th, 2020.  And I'll reference Court Order that

3   was entered on December 20th, 2019, by Judge Whalen that

4   ordered that we could take your deposition today.

5           And the point I'm making, the subpoena and the

6   Exhibit A attached to that subpoena directed to the

7   City, all were duplicative and all really started to

8   originate on October 30th, 2019.  And the assertion that

9   it's not timely, since Discovery is cut off, as

10  indicated by what I am saying, that is not a

11  well-founded objection at all.

12          We will proceed accordingly --

13          MR. SUROWIEC:  I would like to --

14          MR. DETTMER:  -- with the Court.  Now I would

15  like --

16          MR. SUROWIEC:  I would like to respond to that

17  just briefly.

18          We have provided all of the records requested

19  in the subpoena duces tecum, and the form of that, I

20  believe, is improper.  Chief Craig doesn't have those

21  records.  We provided them, all of them, to Plaintiffs

22  on numerous occasions.  We filed objections to that --

23  to that subpoena.  To the extent that -- to the extent

24  that the discovery is closed, that's not really the

25  issue.

1           The issue is, this information has been

2   provided.  Chief Craig is not going to show up at this

3   deposition with a bunch of papers, which you yourself

4   and Mr. Dezsi have already agreed this is very

5   cumbersome.  We are remote; he is remote.  What good is

6   it going to do?  So that's our objection.

7           MR. DETTMER:  That's not a proper reason not

8   to produce the records that I requested in that

9   subpoena.

10          MR. SUROWIEC:  We object.

11          MR. DETTMER:  The documents have been

12  subpoenaed and you have not produced the records that I

13  requested --

14          MR. SUROWIEC:  We are a party.

15          MR. DETTMER:  But let me go on.

16          (Multiple speakers)

17          MR. SUROWIEC:  Go ahead.

18          We are a party to the subpoena.

19          MR. DETTMER:  Chief Craig, have you seen any

20  of the exhibits?

21          THE WITNESS:  The only predeposition -- I have

22  seen some exhibits.  I couldn't tell you which ones or

23  what was contained.  As it was already referenced, I

24  don't have anything in my possession right now.

25



1  BY MR. DETTMER:

2  Q.  All right.  I am going to run through some of these

3      fairly quickly.  I'll make a reference to them.  Your

4      counsel has them.  If you want to take a look at them,

5      we can bring them up on the screen.  Okay?

6          So if you have any question about any single

7      exhibit as we are discussing it, please indicate that

8      and we'll put it on the screen so you can see it in

9      detail.  Okay?

10 A.  Okay.

11         MR. SUROWIEC:  Dennis, can I ask a quick

12     question?  Are you referring to the exhibits that were

13     sent by Beth yesterday?

14         MR. DETTMER:  Yes.

15         MR. SUROWIEC:  Okay.  So she indicated

16     1 through 10 and then 12 through 22 or 23.  We didn't

17     get 1 through 10.  Are there about 23 exhibits we're

18     talking about?

19         MR. DETTMER:  There are actually more than 23

20     because some had subparts.  If you looked at them, you

21     would have seen that.  I've looked at the same email

22     chain that you did -- that you got, and I had all my --

23     all of the exhibits.  But I don't want to argue about

24     that.  You made that point.  I don't agree with it.

25         MR. SUROWIEC:  Dennis --



1          MR. DETTMER:  You should have gotten them,

2      should have looked at the end of that chain, the first

3      email, and they were there.

4          MR. SUROWIEC:  Dennis, I am just telling you,

5      for the record, we didn't get 1 through 10, so we'll

6      look at what you have, but I'm just telling you, I've

7      made my record and I asked Lindsey, did you get them.

8      We have what we have, which you sent last night.

9          That's fine.  Go ahead.

10         MR. DETTMER:  The email chain will show what

11     you got.  And if you somehow overlooked it, that's it.

12         MR. SUROWIEC:  Okay.

13     EXHIBIT 4

14     Wikipedia History of Craig

15     WAS MARKED FOR IDENTIFICATION

16         MR. DETTMER:  Our Exhibit 4 is a Wikipedia

17     page, and it's about you.  And it gives a history of

18     your starting in the police department in Detroit after

19     you graduated high school here from Cass Tech.

20         And have you seen this document?

21     THE WITNESS:  I don't know if I've seen this

22     specific document.  I have seen my name on Wikipedia,

23     and I know those things get updated, so this particular

24     page, I'm not certain.  I'm skimming through it as you

25     move up.



1          MR. DETTMER:  It's a brief history.  Rather

2      than going through it with you in any detail, Exhibit 4

3      kind of gives your biographical background.

4      THE WITNESS:  Yes, this would be one that I

5      hadn't seen.  I notice that there is some reference made

6      to US Representative Rashida Tlaib, so I haven't

7      personally seen this page.

8          MR. DETTMER:  I would ask that, if you have

9      any questions about it, Mr. Surowiec will provide you

10     the -- Exhibit 4 and you can raise that -- an issue with

11     me and through him about --

12         MR. SUROWIEC:  I don't have the exhibit.

13         MR. DETTMER:  But it's a general statement

14     about your background.

15     THE WITNESS:  I understand.

16 BY MR. DETTMER:

17 Q.  Captain prepared you well and you're off and running.

18 A.  Yes, he did.

19 Q.  The next exhibit -- I have 5 and 5A.  These are excerpts

20     from the Detroit Board of Police Commissioners.

21     EXHIBIT 5

22     Excerpt from Board

23     WAS MARKED FOR IDENTIFICATION

24

25

1      EXHIBIT 5A

2      Excerpt from Board

3      WAS MARKED FOR IDENTIFICATION

4  BY MR. DETTMER:

5  Q.  This is related to your appointment.  Okay?

6          What was the relationship between the Detroit

7      Board of Police Commissioners and the Detroit Police

8      Department?

9  A.  They provide oversight to the police department;

10     however, when I was appointed as police chief in 2013,

11     it was not on the approval -- there was some

12     conversation, as I recall, between the Police Commission

13     and representation of the emergency manager who was in

14     place when I was appointed, and so as is reflected, and

15     I am relying on my memory, Executive Order Number 11,

16     that I was not under the supervisory oversight of the

17     police commission at that time.

18 Q.  Once the bankruptcy was completed, did the relationship

19     you and the Detroit Board of Police Commissioners

20     change?

21 A.  At some point.  I don't know how soon after -- the

22     relationship basically was that they were the

23     supervising or oversight entity as it's reflected in the

24     City Charter of the Detroit Police Department.

25 Q.  You were appointed by then emergency manager, Kevin Orr,

1   on -- effective on July 1, 2013?

2   A.   July 1, 2013, yes.

3   Q.   Then the Exhibit 5A is another emergency manager City of

4        Detroit Order Number 42, which really just deals with

5        powers of the Board of Police Commissioners being

6        reinstated effective immediately, and this is dated

7        September 25, 2014.

8             On that date, through the Order Number 42, how

9        did your relationship change with the board, if at all?

10  A.   The way I describe it, I don't think there was much

11       change.  The order was explicit as to the commission

12       being reinstated in their role, but even prior to the

13       reinstatement, the department was responsive to the

14       police commission, even though by an earlier order

15       before the reinstatement, I didn't have to but we did it

16       because we just felt it was the right thing to do.

17            EXHIBIT 6

18            Organizational Charts

19            WAS MARKED FOR IDENTIFICATION

20  BY MR. DETTMER:

21  Q.   Exhibit 6 is a collection of organizational charts of

22       the Detroit Police Department that were provided to us

23       through discovery.  I wanted to ask you some general

24       questions about the organization and basically to

25       recognize the chain of command.  Right?



---

1             There is a chain of command in any police

2        department, and there is one, obviously, in Detroit;

3        correct?

4   A.   Yes, it is.

5   Q.   And you are, in effect, the chief executive officer as

6        the chief of police, correct?

7   A.   That's correct.

8   Q.   You have a number of assistant chiefs?

9   A.   I do.

10  Q.   And you have -- I'm not sure how many, maybe more than

11       one deputy chiefs?

12  A.   Yes.  Several deputy chiefs.

13  Q.   And then the next level of the chain of command would

14       involve commanders or captains, correct?

15  A.   That's correct.

16  Q.   Captains and commanders are basically equivalent

17       positions?  It's a matter of terminology, right?

18  A.   They're not equivalent.  They're referred to as command

19       officers.  Commander outranks the Captain; the Captain

20       replaces the former rank of inspector.

21  Q.   Thank you for that.

22            Then in the chain of command -- if I can just

23       briefly say this -- lieutenants and sergeants and then

24       police officers, that is right, in that sequence?

25  A.   No.  The sequence in terms of chain of command starts



---

1   out with police officers now in the current

2   organizational structure, corporals, neighborhood police

3   officers, detective, sergeant, and lieutenant.  And

4   within the rank of sergeant, there's a master sergeant

5   that has more rank or more authority than that of a

6   sergeant.

7   Q.   Of what level in the chain of command in the City of

8        Detroit is our supervisory responsibilities played?

9   A.   What level in the department?

10  Q.   Yes.  For example, do -- under the current chain of

11       command, are corporals supervisors?

12  A.   They are not.  But depending on their role, they could

13       perform the role of field training officer, and as a

14       field training officer, they are responsible for

15       providing training to probationary police officers;

16       however, they would not be considered supervisors in the

17       rank structure.  But they are --

18  Q.   I'm sorry.

19  A.   And detectives are not supervisors, either.

20  Q.   So the first level of supervision within the Detroit

21       Police Department is a sergeant, correct?

22  A.   That's correct.

23  Q.   And is that true back to 2010, January 1st, 2010, from

24       your general knowledge of the operation of the police

25       department?

---

1   A.   As you know, I didn't start here until July of 2013.

2        But I would suppose, based on, as you reference, general

3        knowledge, that the sergeant would be the first line of

4        supervision.

5   Q.   Okay.  Generally, the chain of command -- a sergeant

6        reports up the line to a lieutenant, correct?  And at

7        that point the communication is basically in that chain,

8        starting with you, going down to the assistant chiefs to

9        the deputy chiefs and down through the line, and

10       reporting back up is pretty much the same.

11            So if somebody -- if a police officer, for

12       example, makes a mistake, the sergeant is the person

13       that supervises that and deals with that initially,

14       correct?

15  A.   Generally speaking, yes.

16  Q.   If there is a problem, ongoing problem, he reports that

17       up the line to the lieutenant and the discipline

18       process, and the chain of command and communication

19       follows that up.

20            You don't always hear about what's going on at

21       the top of this chain of command, what a

22       sergeant's doing, unless it's a matter that comes up

23       through the chain, correct?

24  A.   I do not always know.  However, to your point, you made

25       some reference into the relationship between sergeant

1 and lieutenant. I believe there are times that the
2 lieutenant may not always know when a sergeant is
3 administering corrective action.
4 It could be counseling. Generally, if it's a
5 written counseling session, I believe the lieutenant
6 would be involved in that at some point through the
7 chain of command. But it's not so rigid, and I can't
8 speak to what occurred in 2010. I can talk about what
9 happens now.
10 There are times where a Captain or a commander
11 of the station may have direct contact with a police
12 officer relative to conduct, and it could be something
13 as simple as advising that police officer to wear a seat
14 belt when operating a motor vehicle, as an example.
15 Q. In the -- you're familiar, obviously, with the different
16 units within the Detroit Police Department, correct?
17 A. Yes.
18 Q. You became the Chief of Police in the day-to-day
19 operation. You've learned quite a bit, I assume, about
20 the day-to-day operations about a lot of these different
21 units.
22 A. Basically, yes.
23 Q. If there's a Narcotics raid, there's usually a sergeant
24 that heads that up, correct?
25 A. I would expect.



1 Q. He has a crew?
2 A. At what period of time are you talking about?
3 Q. Let's go back. I mean -- you're looking -- at least the
4 scope of the current review goes back to 2010, although
5 I understand you're not back to 2010 yet.
6 But going back to prior to your -- the
7 effective date of the reorganization of the Narcotics
8 units in July 2014, you understood that the workings, I
9 assume, of the Narcotics Unit. And you understood that
10 there were sergeants and there were -- and they
11 supervised the police officers that worked under them
12 and their crew, right?
13 A. That's correct.
14 Q. And as far as you know, that goes back to 2010. You
15 don't have any information to the contrary?
16 A. I suppose. I can't say. I mean, you bring up an
17 example of saying an execution of a search warrant, and
18 I can't tell you definitively if, on every execution of
19 the search warrant in 2010, if the sergeant was present.
20 I wouldn't know that.
21 In fact, I can't tell you even after my
22 appointment if that was a consistent practice. An
23 expectation, yes. But to say that I know in every
24 single execution of a search warrant a sergeant was
25 present, I can't make that statement.



1 Q. Are you suggesting that your Detroit Police Department,
2 in its organizational structure, didn't have a
3 supervisor in a narcotics raid? That is the sergeant
4 that headed up the crew and oversaw its activities?
5 A. That is the expectation, but I can't tell you on every
6 single search warrant execution that a supervisor was
7 present. The expectation is that a sergeant at minimum
8 should be.
9 Now, since we've opened up, which I am sure
10 you'll get into, the task force that we're now working
11 on, certainly the expectation is greater. At minimum a
12 lieutenant shall be present when a raid is initiated by
13 a Narcotics Unit. But I've also teetered on even the
14 rank of captain being present.
15 Right now, as it stands today, the direction
16 is that a lieutenant shall be present on every execution
17 of a Narcotics search warrant.
18 Q. Chief, when did that policy become established?
19 A. That was during this iteration of the investigative work
20 that we are currently involved in. As we began and
21 started --
22 Q. Going back to August 7th, 2019, correct, when you first
23 started.
24 A. When we started our task force operation -- I don't have
25 the date in front of me -- current task force.

1 During that inquiry, there were some things we
2 learned about how the Narcotics Unit functions, and one
3 thing that we learned is that, generally speaking,
4 sergeants would be present. That would be the highest
5 rank present at Narcotics search warrant executions, as
6 you refer to as raids.
7 I've mandated that the rank of lieutenant, a
8 lieutenant shall be present at all executions of search
9 warrants by Narcotics.
10 Q. The purpose, if I may ask you, of having the lieutenant
11 present would be to elevate the level of supervision
12 because of the terms about sergeants and how they
13 operate?
14 A. Yes. In terms of accountability, some things that we
15 have learned during this most recent task force that we
16 have, that we now just named Operation Clean Sweep.
17 What we have learned is that in some instances sergeants
18 may have been involved, directly involved, in the
19 alleged misconduct that we were investigating.
20 And the extent of their involvement could be
21 nothing more than being complicit and not taking
22 appropriate supervisory action when necessary.
23 Q. Well, from what you say, prior to direct policy that
24 you've initiated, the policy was really one of inaction,
25 which is correctly in these raids that were undertaken

1  (Inaudible) affidavit, correct?

2          COURT REPORTER:  Can you repeat -- can you

3  repeat the question?

4          THE WITNESS:  I'm sorry; the affidavits were

5  not what?

6  BY MR. DETTMER:

7  Q.  The search warrant and affidavits initiated the raids --

8  do you want me to call it search warrant executions?

9  You know, when, previously, prior to what you just

10  described, the sergeants were generally the supervisors

11  on the scene of an execution and search warrant, right?

12  A.  Generally, it is my belief that they were.  And I'm

13  talking about from 2013 going forward.  I can't speak to

14  what was going on prior to that.

15  Q.  And it was your decision that, to reduce any possibility

16  or reduce the problems within the Narcotics Unit, you

17  were looking at having a greater level of supervision,

18  if I understand you correctly.  Is that right?

19  A.  A greater level of supervisor for purposes of managerial

20  oversight.  Lieutenants -- the rank of lieutenant is

21  considered a mid-manager underneath the rank of captain.

22  So at this point where we are in our probe, I feel

23  comfortable that a middle manager or a manager and

24  captain or commander rank should be present at search

25  warrant executions, primarily what we now call the Major



---

1  Violators section.

2          Again, those -- when we started an earlier --

3  and you've heard me reference in newspapers that the FBI

4  started a probe into the Detroit Police Department's

5  Narcotic section in 2010.  That investigation culminated

6  in 2014.

7          What didn't work out at the conclusion of the

8  FBI's work -- it wasn't a seamless transition of that

9  investigated -- that investigation into the Detroit

10  Police Department.

11         So, in other words, so I'm making myself

12  clear, there were a lot of things that we didn't know

13  that we now know because it was a federal investigation

14  that involved federal crimes.  And so they were the lead

15  agency investigating those crimes, and so there was no

16  review of any administrative violations.

17         Now, administrative investigations at times

18  does and do involve criminal allegations; however, they

19  also address any administrative concerns that could

20  result in discipline leading up to termination.

21         So I hope I'm making myself clear, that at the

22  conclusion of the FBI's investigation in 2014, I, along

23  with select members of my executive team were brought

24  into the findings and that it would be several

25  individuals indicted and/or charged.



---

1          What we didn't get is information

2  concerning -- any allegations concerning administrative

3  violations.  Again, administrative violations could

4  result in not only discipline but dismissal.

5  Q.  I'll get into a little more detail about that further

6  into the deposition, if I may.

7          But you would acknowledge, prior to your

8  taking your current position in July of 2013 -- 5/1/2013

9  (sic), there was criminal activity by members of the

10  Narcotics Unit?

11  A.  I only know that because the Federal Bureau of

12  Investigation, I'm told, launched a probe into the

13  Detroit Police Department's Narcotics section in 2010.

14  That investigation was a four-year investigation.  It

15  culminated in 2014, I guess, roughly a year and a half

16  into my tenure.  Narcotics was not on the radar.

17         There were other issues concerning the

18  department relative to accountability.  It had to do

19  with the Federal Consent Decree that we were under.  But

20  nowhere under the Consent Decree was there any reference

21  or review of the operations of the Narcotics section.

22         Again, the FBI's probe was confidential, and

23  because it was confidential, I believe in 2010 most

24  likely the executive levels of this department did not

25  know that there was an FBI probe.

---

1  Q.  Well, you would agree, at some point, and I believe

2  Lieutenant Hansberry was indicted by a filing in federal

3  court on April 8th, 2015.

4          At that point there was some knowledge that

5  there was criminal activity, at least it was alleged at

6  that point in the Narcotics -- then Narcotics -- well, I

7  shouldn't say that -- Major Violators Unit, previously

8  the Narcotics Unit, Hansberry, correct?  That indictment

9  ended it?

10  A.  I was aware, as I've already testified to, that I was

11  made aware that the FBI was planning to indict and in

12  one instance charge members of the department's

13  Narcotics Unit.  That's when I became aware that there

14  was allegations of criminality not reflective of the

15  entire Narcotics Unit.

16         As I've already testified, I believe, as my

17  memory serves me, that two were indicted, one was

18  charged.  There was an additional member that committed

19  suicide, I was told, but more than likely would have

20  been indicted.  So you are talking about a total of

21  maybe four out of the entire Narcotics Unit.

22         Now if your question is, do I believe that

23  there were others involved in misconduct, I can only say

24  it's based on a belief and based on what I know today

25  and what I didn't know at the conclusion of the FBI's

---

1    investigation that I do believe that there were other
2    criminal and administrative violations occurring; not
3    necessarily reflective of every member of the Narcotics
4    Unit.
5    Q.   We're talking about -- actually, there were a number of
6         indictments at the same time.  Hansberry, who was then,
7         I believe, a lieutenant, but he had come out of the
8         Narcotics Unit as a sergeant, and Police Officer Watson,
9         who was in that same Hansberry crew, and Arthur
10        Leavells, and Officer Napier.  And Napier,
11        unfortunately, committed suicide in his family's side
12        drive, as you will recall, in January of 2018.
13             But I think I saw some, and I'll discuss this
14        with you later.  We need to get rolling here.  There
15        were some feelings that the Hansberry crew, which fell
16        into Geelhood's crew, members of those two crews,
17        originating with Hansberry, were involved in criminal
18        activity.  Is that fair to say?
19   A.   There was certainly speculation.  None of these other
20        members were charged, as you know.  Again, I'll repeat,
21        that at the conclusion of the FBI's investigation, the
22        focus was on the folks that were indicted and the one
23        that was charged.
24             The remaining members who were more than
25        likely being investigated by the FBI, they were never



1    charged.  However, it doesn't mean that those additional
2    members were not involved in some other kind of
3    misconduct, maybe some of what they were involved in
4    would be construed as criminal.  However, this attorney
5    did not charge them.  The problem --
6    Q.   Let me ask you this.
7    A.   I'm trying to finish a point.
8    Q.   Yes.
9    A.   The problem with the conclusion is it wasn't a seamless
10        transition from criminality to the possibility of
11        administrative work, and I am not faulting the FBI for
12        that because that's not what they do.
13             The Detroit Police Department investigates
14        misconduct.  And if misconduct is made aware, you
15        investigate and, again, as I have already testified to,
16        sometimes that misconduct amounts to discipline, which
17        could mean suspension days leading up to and including
18        dismissal.
19   Q.   Let me -- I was going to get into this later, but since
20        you are raising it.
21             During the trial of Hansberry and Watson,
22        Leavells testified, and a Source of Information, Gary
23        Jackson, testified.  And I would represent to you that
24        testimony was more inclusive of criminal conduct by
25        other members of Hansberry's crew.



1         And what I'm really getting to, was someone
2    assigned from the Detroit Police Department, whether
3    Internal Affairs or some investigative level, how the
4    events of that trial and evaluate the testimony and
5    consider Internal Affairs investigations of, for
6    example, Napier and others -- I guess, Napier's dead by
7    that time -- but by other members of that crew?
8         MR. SUROWIEC:  Objection; form, foundation,
9    compound question.
10        Go ahead.
11        THE WITNESS:  I can answer the question?
12        MR. SUROWIEC:  Yes, Chief.
13        THE WITNESS:  Factually there were two members
14   of the Detroit Police Department that were part of the
15   Public Corruption Task Force.  These two members -- I
16   can't think of the second member's name.  But Tim Ewald,
17   which I suggested to counsel, had intimacy for years
18   relative to the narcotics investigation that was
19   conducted by the FBI.
20        When I talk about the seamless transition,
21   where I felt it was a failure on the part of the
22   department, is that there was no handoff.  That these
23   are the folks that got charged federally, these are the
24   people that we have concerns with administratively, and
25   we should launch an investigation.

1         These two members of the department primarily
2    didn't do the heavy lifting, as you will, of
3    investigative work.  They were trusted members of the
4    FBI's investigative team, although they were part of the
5    Detroit Police Department.
6    BY MR. DETTMER:
7    Q.   I'm sorry.  If -- I don't mean to interrupt you.  But
8         Ewald and who was the other one?
9    A.   I can't think of the second name right now.  He has
10        since returned.  He is working in the City in IT.  It
11        will come to you, but right now Tim Ewald had been part
12        of the FBI's task force on public corruption, so he was
13        very intimate relative to what was going on with the
14        investigation, and I would imagine he would opine that
15        there were others that were not criminally charged but
16        certainly were engaged in acts of misconduct.
17   Q.   Well, in Leavells' testimony across the trial of
18        Hansberry, it was very clear that other members of
19        Hansberry's were clearly involved in criminal activity
20        and, either inside the court, a hearing, trial, or
21        review of transcripts would have clearly shown that.
22             To your knowledge that didn't happen, correct?
23   A.   There were no --
24        MR. SUROWIEC:  Objection, form, foundation to
25   the question.

1    Chief, I apologize.  Go ahead and answer, if
2 you can.
3        THE WITNESS:  Yes, I -- you know, as I've
4 already testified to, and I made the statement several
5 times, there certainly was no seamless transition at the
6 conclusion of the criminality -- criminal case to moving
7 into the administrative.
8        Again, there were a lot of things that I and
9 my executive team were unaware of.  We knew that there
10 was some problems, and in terms of -- there were other
11 members of Narcotics that may have been involved in
12 criminal activity, however, they weren't charged
13 criminally.
14 BY MR. DETTMER:
15 Q.  Let me ask you -- let me ask you it this way.  Did Ewald
16      prepare any memoranda or writing, that you're aware of,
17      that described the testimony of Leavells at the trial?
18 A.  I am not aware of that memo.
19 Q.  Did any -- are you aware of whether the Detroit Police
20      Department acquired the transcripts of Leavells and Gary
21      Jackson, the SOI?
22 A.  I am not aware of it.
23 Q.  Are you aware of any memoranda or writing that Ewald
24      prepared describing the testimony and the indication of
25      other individuals involved in any criminal activity?



1 A.  I cannot recall any memorandum prepared by Tim Ewald.
2      My -- I have had conversations.  Tim Ewald was very
3      different from the Hansberry case that concluded in 2014
4      to where we are today, without going into details
5      because it's a confidential part of the investigative
6      work that we are doing.
7         We have very specific information that we got
8      from a source.  It was very descriptive of the type of
9      alleged conduct that was going on.  Based on that
10      information and the case that was later brought by the
11      one who was recently charged or indicted, Mosley, we now
12      had a clear picture of what was going on allegedly in
13      the Narcotics Unit.
14         And that is why, based on information that we
15      got from a source, through the FBI, and I can't go into
16      that because it's still very much part of the
17      investigation, we have created a task force operation.
18      And that task force operation has been very surgical,
19      very thorough in looking at everything.
20         As I had testified to earlier, that operation
21      is called Operation Clean Sweep, and so as we have gone
22      on, based on the information that we got from the
23      source, we are getting a lot of information now.  And so
24      information that we did not have at the conclusion of
25      Hansberry.



1        MR. SUROWIEC:  Can we have a time frame,
2 Chief, from when that happened?
3        THE WITNESS:  It would be --
4        MR. DETTMER:  Let me ask you this way.  Let me
5 ask you this way.
6 BY MR. DETTMER:
7 Q.  The raid on the three locations where there were
8      Narcotic Unit's records was on August 22, 2019.  How
9      long prior to that when what is now called Clean Sweep
10      originate and the investigation undertaken?
11 A.  When we raided our own Narcotics Unit, seized all of its
12      records, it was strategically done, based on we knew
13      that former Officer Mosley was going to face charges.
14         So I made a decision based on Mosley being
15      charged and fearful that, if we didn't act by seizing
16      all of our records, that the records could be destroyed.
17      That was one issue.
18         The second issue, I believe that, based on the
19      allegation against Officer Mosley, that that was not his
20      first time engaging in this kind of criminal misconduct.
21         So based on those two factors and the third
22      factor, ironically around the same time period there was
23      a source who provided information about what was going
24      on in Narcotics as to some of the alleged misconduct.
25         Those three things put me in a good position

1      to, one, go in, seize all of our records, and it was
2      from that point that we started a task force.  We didn't
3      have a name for it.  We started off relatively small.
4         At the present time we have 17 members.  We
5      also -- it's a DPD-led task force.  Of the 17 members,
6      5 are the FBI, 3 are part-time, and 2 FBI full-time.
7 Q.  Let me ask you about that, Director Graveline filing
8      a declaration filed with federal court on May 19 of this
9      year.
10         One of the things he's talking about is the
11      sequence of investigation starting most currently and
12      going back historically.  And he raised this question
13      about the concern about the Statute of Limitations.  I'm
14      wondering what you perceive, in any meetings or
15      discussions about this, that the longest Statute of
16      Limitations that may apply as potential criminal conduct
17      by members of the nar- -- the Major Violators or the
18      Narcotics Units.  What do you think?  Three years?  Six
19      years?
20        MR. SUROWIEC:  Objection to form.
21        Chief, one second.
22        Objection; form, foundation.  That's a
23 multiparted question.  I'm not sure what the question
24 is, it's somewhat loaded.
25        If you can answer it, Chief, go ahead.

1    THE WITNESS:  I think I can.  I'll try my
2  best.
3         So there are two things at work here.  One,
4  the criminal statute probably, as was articulated by
5  Chris Graveline, would probably be out.  However, since
6  my tenure I've also initiated what I call a Statute of
7  Limitations for administrative misconduct.
8         So how that works is that, once the department
9  becomes aware of misconduct from any source, it could be
10  from a civil lawsuit like this.  If we become aware of
11  allegations of misconduct, the clock starts.  We have
12  one year from the time we're made aware to complete and
13  adjudicate that allegation.  So that's the
14  administrative statute.
15         Now, you should note that this has not been
16  something that has been agreed to by both the department
17  and the unions.  It's, for the most part, a handshake.
18         At some point in the near future, we will
19  codify and we will develop a memorandum of understanding
20  to solidify the administrative Statute of Limitations.
21  And the reason why that came about, one of the things
22  that was problematic in the Detroit Police Department
23  for years, I was told, is that a lot of cases that were
24  being brought to the arbitrator, and those
25  administrative matters were being dismissed.  And the

1  reasons for the dismissals were because of the lack of
2  timeliness.
3         So based on the lack of timeliness, I felt it
4  was important for both the community and the concerned
5  accused officer that there would be a timely
6  adjudication to all allegations of misconduct.
7  BY MR. DETTMER:
8  Q.  I'm --
9  A.  I am --
10  Q.  Go ahead.
11  A.  So in terms of the criminal statutes relative to some of
12     the officers that were never investigated criminally or
13     were investigated criminally -- and I can't testify as
14     to why, let's say, the FBI did not opt to pursue
15     charges.  Maybe it was a US Attorney said we don't think
16     that there's enough to charge them with whatever the
17     criminal charge was.  I don't know.
18  Q.  The point --
19  A.  However --
20  Q.  The point I'm making, there must be some criminal
21     statutes that are under consideration by the task force,
22     and the question is, do you know what periods of time
23     we're talking?
24  A.  Since we are working with both Federal Bureau of
25     Investigation, US Attorney's Office, anything that we



1  find criminally, if it meets the US Attorney standard --
2     certainly, this task force is a dual task force.  It's
3     addressing allegations of criminality and it's also
4     addressing administration violations.  So it's a twofold
5     task force.
6         FBI certainly is interested in the work.  This
7     is why they had dedicated staff to Operation Clean
8     Sweep.  The belief is there may be some allegations that
9     can be brought forth criminally, even though some of
10     them are dated.  I don't know what the statute of
11     limitation, like, for example, color of law, or whatever
12     that -- there may be some of those.  I don't know if
13     statute of those goes much longer, as Attorney Graveline
14     may have articulated.  When we seized our records, we
15     are going back ten years.  And so right now where we are
16     in this probe, we have gone back to the year of 2017.
17     So we haven't quite gone back ten years.
18  Q.  Yes.  I am aware of that and in some of the articles
19     that we will introduce as we get going, you've made that
20     clear.
21         The point that I am making with you is if I
22     were sitting at the table with the task force as a
23     member, I would say we need to start looking at
24     documents that are relevant to the Statute of
25     Limitations period expiring.

1         For example, if we have a six-year statute, we
2     should be looking at 2014 and start our investigation in
3     2014 and come forward to the current time.  I don't
4     understand it starting in 2020 or '19 and going
5     backward, because the Statute of Limitations is a key
6     element here.  It sounds like a major mistake on the
7     part of whoever is heading this task force not to
8     analyze that as a key issue.
9  A.  I rely strongly on my legal advisers.  There was a
10     method.  You're not a part of the task force, and it's
11     okay to criticize me.  But what I feel good about is
12     finally for the first time -- it may be the books will
13     say -- and the first time we have an opportunity to
14     totally eradicate criminal misconduct from the Narcotics
15     department.
16  Q.  This is an administrative issue you are talking about?
17  A.  Administrative and criminal.  It's no doubt to me.  I
18     can speculate that there are probably many allegations
19     of criminality that have gone untouched for whatever
20     reason.
21         I've talked to members in this organization as
22     recent as a couple of days ago.  And during that meeting
23     with my command staff, I gave a brief update on the task
24     force's work.  In my brief remarks, I indicated that it
25     is our mission and goal to totally for the first time



1    eradicate misconduct from the Narcotics Unit.

2  Q.  I support that, Chief.  But --

3  A.  But, so, like I said, to many of you who have been on

4    the department for in excess of, let's say, 10, 15,

5    20 years, you've heard the stories -- I wasn't here

6    then -- that there was a strong belief that there were

7    members in the Narcotics Unit engaging in misconduct.

8  Q.  Well, would you agree with the point I made a few

9    minutes ago, that really the investigation should have

10   started more timely with the expiration of the Statute

11   of Limitations?  Would you agree to that?

12  A.  I'm not going to agree for this one reason.  I

13   understand where you're going.  Let me tell you why we

14   started where we started.

15              Initially, we didn't know what we were dealing

16   with.  As I pointed out, there were a couple of things

17   in play.  We had another dirty officer that got

18   charged -- Officer Mosley, who got charged and I had a

19   strong belief that Officer Mosley was involved in other

20   criminal misconduct.  I believed it.

21              So part of the reason for this surgical look,

22   it was to go back and look at Mosley, look at the

23   team -- he was a team leader.  And we wanted to know if

24   the involvement even was beyond him.  So we started

25   there because we knew that that was timely.

1              No doubt in my mind that there are going to be

2    cases that as we continue this task force that are not

3    going to meet the criminal statute.

4              However, we've been in consultation with the

5    US Attorney's Office, the FBI, certainly, if there's

6    color of law violations -- as another part that I didn't

7    get into, we have also been meeting regularly with Wayne

8    County Prosecutor's office, primarily the Innocence

9    Project, and we are also looking at -- I'm going

10   to pause for just a minute.  The mayor is calling me

11   so...

12              MR. DETTMER:  We are pausing at 12:05; is that

13   correct?

14              THE WITNESS:  Yes, if we could just pause and

15   I'll be short.

16              (Off the record at 12:02

17              Back on at 12:05 p.m.)

18              EXHIBIT 7

19              Detroit News Article

20              WAS MARKED FOR IDENTIFICATION

21  BY MR. DETTMER:

22  Q.  I'd like to go through articles, and starting with 7.

23   Exhibit 7, and it goes to 7D, and these are basically

24   the comments that you made to newspapers, and I just

25   want to confirm that what you said to the newspapers is

1    properly reported.

2              Secondly, your discussion so far indicates,

3    you know, substantially the same thing.  But first of

4    all, Exhibit 7...

5              MR. SUROWIEC:  Dennis, can I interrupt real

6    quick?  We, honestly, didn't get Exhibits 1 through 10.

7    We did forward the ones we got last night to the Chief,

8    but could Michael put this up on the screen?

9              MR. DETTMER:  Yes, he can put it up.

10   Michael?

11  BY MR. DETTMER:

12  Q.  This is an article from the -- August 22, 2019 --

13   the Detroit News, and we marked it as your Deposition

14   Exhibit 7.

15              And it starts off, a team of Detroit

16   investigators seized records of computer data from three

17   of the department's own facilities Thursday, as part of

18   an ongoing internal probe into the allegations of

19   corruption into the department's drug operations, Chief

20   James Craig said.

21              Is that a fair statement?  Is that accurate?

22  A.  It is.

23  Q.  And then it goes on:  The investigation, the latest in a

24   series of probes in the former Narcotics section, which

25   were closed in 2014 because of rampant corruption,

1    kicked off about four months ago after a large shipment

2    of drugs had been seized in Detroit was switched for

3    another substance by the time it got to Chicago for a

4    court hearing, Craig said.  Is that accurate?  The

5    statement, just generally?

6  A.  Yes, that was an investigation -- we got information

7    that -- from the DEA and FBI about an allegation which I

8    can tell you didn't come to fruition.

9  Q.  It did not?

10  A.  Did not.  However, without going into detail, because it

11   directly concerns what we are doing now, it was

12   beneficial in the investigative work we're doing now.

13   I'll just leave it there.

14  Q.  Let me ask you this.  In terms of the switch out of the

15   drugs on the -- from Detroit to Chicago, was the

16   Narcotics Unit involved in any way in --

17  A.  There was no indication that what came to us occurred.

18   It would have been -- it could have been our Narcotics

19   Unit.  It could have been -- I mean, allegedly it could

20   have been Narcotics.  It could have been the place where

21   the narcotics were being held.

22              Again, it was an allegation only, but in terms

23   of the work that we were proceeding with, and, again, I

24   cannot and will not go into details, but it helped us

25   with the work that we are doing even though that issue



1    was unfounded.

2  Q.  Chief, let me ask you this, then.

3        Was that acquisition of those drugs --

4  A.  Can you hold one second?  The gentleman -- I've got a

5    gentleman in my office that -- the other name -- he just

6    happens to be in the office.

7        (Chief having a discussion

8        off the record.)

9        THE WITNESS:  Saraino.  His name is Saraino.

10  BY MR. DETTMER:

11  Q.  Ewald's partner, in effect?

12  A.  Yes, that's correct.

13  Q.  Do you know how to spell that?

14        THE WITNESS:  How is Saraino's name spelled?

15    Saraino, S A R A I N O.  That's his last name.

16        First name?

17  BY MR. DETTMER:

18  Q.  S, as in "Sam," right?

19  A.  Yes, first name, Michael.

20  Q.  Thank you.

21        THE WITNESS:  You're not in trouble, Mike.

22    Okay.  Anyway.

23  BY MR. DETTMER:

24  Q.  Well, what I am asking you, did the Major Violator's

25    Unit exercise a search warrant and acquire those drugs?



---

1  A.  I don't recall the circumstances involved in the drugs,

2    but based on the DEA, FBI, it was unfounded and so -- in

3    fact, I know the DEA was doing an investigation relative

4    to the DEA's role, and I just don't know the outcome of

5    their role.

6  Q.  All right.  The next page of this article, I saw, Craig

7    said, he initiated the seizure of records and computer

8    files because of concerns about, and they quote, "a

9    residual effect of corruption", and he said has long

10    been part of Narcotics operation, which the chief

11    renamed the Major Violators section five years ago.

12        Is that a proper quote of a residual effect?

13  A.  I could say yes.  I think it was residual.  A lot of it

14    was speculative on my part.  But I made the statement

15    and, again, there were things I didn't -- as I have

16    already testified to in this session, there were things

17    I didn't know about the Hansberry matter, that as we

18    launched this probe, there is a direct nexus to it.

19  Q.  We will get into that in more detail, but...

20  A.  I'm not going to get into a lot of detail because, as I

21    indicated, I am in the middle of a corruption probe, and

22    some of what we are doing is very confidential.

23  Q.  Well, we are under a Protective Order in this

24    proceeding.  And I think the assertion of a privilege

25    we'll deal with, might require a motion and a court



---

1    appearance and maybe more testimony from you.  But right

2    now I want to go through this quickly.

3        Then you go on in the next paragraph, or the

4    article goes on, part of the corruption Craig referred

5    to involved former drug cops Hansberry, Watson, and

6    Leavells, who were convicted in federal court of

7    offenses that include ripping off drug dealers and

8    stealing and buying drugs that had been seized.

9        Basically, you acknowledge that in your

10    testimony so far today, correct?

11  A.  That's correct.

12  Q.  And then at the very bottom of the second page in

13    Exhibit 7, it says, he, referring to you, said

14    allegations made against Hansberry, Watson, and other

15    cops, the federal lawsuit also played a part in the

16    ongoing investigation which is the latest in a string of

17    probes into the department's narcotics operation.

18        Is that a fair statement --

19  A.  Yes.

20  Q.  -- that represented that?

21  A.  Yes.

22  Q.  And -- well, I'll come back to that.  But I'm wondering

23    why Hansberry and Watson, you know, are the -- well,

24    seeming to leading into this.  Why did that -- the

25    allegations made against them play a role in the ongoing

---

1    investigation?

2  A.  Because as we are doing the work that we're doing now,

3    we're finding certain patterns that have continued, that

4    preexisted the FBI's investigation.  We believe that

5    continued even after their indictment.

6  Q.  Going on to the next page of Exhibit 7, page 3.  It

7    states at the very top, Craig disbanded the drug unit in

8    July 2014 because what he said was systemic problems

9    uncovered during the Internal Affairs investigation that

10    includes how drugs and evidence were handled.

11        "Systemic problems," by that do you mean

12    there's an activity according to a fixed plan, a

13    methodical operation within the drug unit?

14  A.  I think it probably would have been better articulated

15    as trying to build in enhanced accountability.  Did I

16    believe that there were other problems inside of the

17    drug unit that we couldn't identify?

18        But one thing that was missing from the

19    conclusion of that investigation and where we are now,

20    we didn't have anyone inside giving us information as to

21    some of the alleged conduct.  However, basically

22    disbanding the Narcotics section and renaming it to

23    Major Violators was done to incorporate some best

24    practices that would tend to build in more

25    accountability.

1    One thing that I recall, and it didn't really
2    work as well as I thought, was to put a time limit of
3    how long officers assigned to Narcotics would work.  So
4    what some did to do a workaround on the rule -- it was
5    like a five-year rule; that if you worked Narcotics for
6    five years, you had to leave.  That's a best practice.
7        And what ultimately happened, individuals
8    would be moved out of Narcotics, not that anybody was
9    accused of any wrongdoing.  It was just a best practice.
10   They were moved out, more cases than not, into
11   precinct-level Special Op Units to do the drug
12   investigations and some -- and I don't know the
13   number -- some ended up returning to the drug unit.  So
14   there was an interruption in their time.  So...
15   Q.  I will get to that issue.  I have an exhibit, the
16   administrative message making -- effective July 14th,
17   2014, the formation of Major Violators, and I'll get to
18   that.
19       EXHIBIT 7A
20       Detroit News Report
21       WAS MARKED FOR IDENTIFICATION
22   BY MR. DETTMER:
23   Q.  I'd like to go on, and there's a December 11th,
24   2019, Exhibit 7A of a Detroit News report and it's
25   titled Detroit Police Probe Yields Allegations of

1    Widespread Corruption on Drug Unit.
2        Would you agree with the lead-in to this
3    article?
4        MR. SUROWIEC:  Object to form, foundation.
5        Go ahead, Chief, and answer the question.
6        THE WITNESS:  Are you talking about the title
7    of the article?
8    BY MR. DETTMER:
9    Q.  Yes.  Right.  Do you see it there?
10   A.  Yes, I'd say there was widespread, given what we were
11   starting to uncover.  But I want to pause for a moment
12   and make it abundantly clear that it didn't mean that
13   everybody working the drug unit was involved in
14   criminality.
15   Q.  In the first paragraph, the indication -- if I just read
16   it into the record.  Four months after Detroit Police
17   and Internal Affairs officers raided their own
18   department Narcotics Unit, investigators have uncovered
19   alleged corruption that includes drug cops planting
20   evidence, lying to prosecutors in search warrants,
21   robbing dope dealers, and embezzling funds, Police
22   Commission said.
23       You don't disagree with that, I assume?
24   A.  I don't disagree that those were allegations that we
25   were looking at.  I'm putting emphasis on

1    "allegations".  We haven't really --
2    Q.  It goes on, since -- the next paragraph.
3        Since the August 22nd raid in which dozens of
4    files and computers were seized and analyzed, Chief
5    James Craig has reassigned everyone in the unit with
6    five or more years' experience, correct?
7        Is that a correct statement?
8    A.  That is.
9    Q.  Then you go on, I am extremely concerned there may be a
10   pattern of practice of criminal misconduct in the
11   Narcotics Unit.  Sadly, as we continue our probe, we
12   think it's going to grow in terms of magnitude.
13       Is that a correct quote from you?
14   A.  That's correct.
15   Q.  And then down lower on the first page, after Director
16   Graveline's picture.  It goes on:  Craig said, he
17   enlisted the FBI, Michigan State Police, US Attorney's
18   Office after materials seized in the raid, he enlisted
19   help -- I'm sorry -- revealed more problems than
20   anticipated.  Is that correct?  Or were they involved
21   prior to?
22   A.  No, I think the FBI came.  We initiated the probe, and
23   the FBI made a commitment.  They gave us two
24   permanent -- and as I indicated earlier, there were
25   three part-time and I think one of the FBI was also part

1    of the Public Corruption Task Force who is a Michigan
2    State Police.  I'm not certain if he's still involved in
3    that, but he was at the time.
4    Q.  You go on after -- by adding people.  Now we are on to
5    17.  And you recorded this saying, this is a major
6    corruption investigation, but I want to caution that
7    these are just allegations at this point.  That's what
8    you've said a number of times, correct?
9    A.  That's correct.
10   Q.  On the second page of Exhibit 7A, in the first full
11   paragraph, it says, one of the investigation's
12   findings -- and I want to skip down -- the second bullet
13   point, false affidavits alleging were presented to --
14   allegedly were presented to prosecutor to get search
15   warrants.
16       And you are then quoted, it's alleged that the
17   probable cause applying the warrants was fabricated.
18   Surveillance that was supposedly conducted to get the
19   warrants wasn't done.  Is that correct?  Is that proper?
20   A.  That's correct.
21   Q.  And you indicated there were identified eight instances
22   where this may have occurred, correct?
23   A.  At that time, yes.
24   Q.  And in the next -- the next bullet point, drug suspects
25   were designated as confidential informants without



1  permission.  Only a prosecutor either from the Wayne
2  County Prosecutor's Office or the US Attorney's Office
3  can authorize a member of the department to turn a
4  suspect in to an informant.  You said that, correct?
5  A.   I did.
6  Q.   And then it goes on, based on our investigation so far,
7       we found 11 instances where officers improperly made
8       suspects into informants.  Based on our investigation so
9       far we -- I'm sorry -- we found 11 of these.
10           Now, let me ask you, how is it recorded that a
11      confidential informant really should be a Source of
12      Information, right -- or Confidential Informant has been
13      authorized by either US Attorney's Office or the Wayne
14      County Prosecutor's Office to act as an informant.
15           How is that done?  What is the trail?
16  A.   I can't tell you what the paperwork is.  But simply put,
17       if an arrest is made, narcotics are seized, then the
18       police officer cannot unilaterally release that person.
19       You're going to work this case off, and you'll work it
20       off.  We're not going to take you into custody, but
21       you'll work it off giving us additional information.
22           Only a prosecutor -- the point is, only a
23       prosecutor can make that decision to say, okay, you've
24       got this person with large amounts of, let's say,
25       cocaine, and we think the information that he or she has



---

1  is invaluable in getting someone, say, higher up.
2       In the drug trade, that prosecutor could make
3       that decision, not a police officer.  I can't make that
4       decision as a police chief.  I certainly -- it can be
5       recommended -- a recommendation that we pursue as -- a
6       word that they use in Narcotics, it's called flipping a
7       source, who they got drugs on.  We found -- as it was
8       indicated, we found that that happened a number of
9       times, and that is improper.
10  Q.  Now, going on the second page in A, down a little bit,
11      you indicate, we're also looking very closely at the
12      supervisors and managers in the Major Violators section.
13      What did they know and what did they do about it?  The
14      investigation is looking very closely at the management
15      that oversaw Narcotics.
16          And so you were very concerned that the
17      Narcotic Units were not being properly supervised,
18      correct?
19  A.  That's correct.
20  Q.  And have you found anything where it's been established
21      that there was a deficiency in supervision?
22  A.  As we continued our probe, based on the alleged conduct
23      or misconduct that supervisors either knew or didn't
24      know but should have known -- I guess that's the best
25      way to describe it -- that is something that we're still



---

1  probing.
2  Q.  On the last page, Exhibit 7A.  You attribute -- I'll
3      read it.
4          You attribute the problem "basic greed", and I
5      assume your basic greed of officers and supervisors in
6      the Narcotics Unit, and including, obviously, the Major
7      Violators Unit, correct?
8  A.  That's correct.
9  Q.  7B, this is a newspaper article in Detroit News,
10      December 12th, 2019.  And you're quoted a number of
11      times and I --
12          MR. DETTMER:  Michael, can you bring that up?
13  BY MR. DETTMER:
14  Q.  Start off, selling drugs in any city is dangerous as
15      dealers risk being killed or robbed by rivals, but in
16      Detroit, pushers for years also have known they could be
17      ripped off by cops, Police Chief James Craig said.
18          Is that accurate?
19  A.  Yes, if I would have -- if I said it that way.  But I
20      guess that's the essence of it -- yes, I don't know if I
21      would have said it just like that.
22  Q.  That's the point you want to make?
23  A.  Yes, but I might have said it differently.
24  Q.  Then it goes on, the next paragraph, the culture here
25      has been such that drug traffickers figure that it was

---

1  just one of the costs of doing business.  They knew I
2  could get killed, robbed by my competition or robbed by
3  cops.  It's not like that in other cities that I have
4  worked.
5          Is that a proper quote from you?
6  A.  That's correct.
7  Q.  You go on on the next page, again, that -- the
8      investigation that's underway, has uncovered a pattern
9      and practice of alleged corruption.  Is that fair to
10      say, in the drug unit?
11  A.  That's correct.
12          And, again, I want to put emphasis on that
13      does not mean that every single member assigned to Major
14      Violators was engaged in this pattern and practice.
15  Q.  I understand.  You've made that point a number of times
16      in the articles being quoted.  And I understand that.
17      I'm not suggesting that every officer that is or was
18      ever in the Narcotics Unit or Major Violators are
19      criminals, but there are some.  That's clearly, I think,
20      the point, correct?
21  A.  That's correct.
22  Q.  You were quoted a number of other times.  Do you want to
23      take a quick look through this?  I don't know if you can
24      see it clearly.
25  A.  Is there anything specific that you want me to see?

1  Q.  For example, on the second page, those who are

2      trafficking in large amounts of drugs got passes based

3      on the decision of a police officer.  They are not going

4      to come back knocking on my door, saying, Chief, we want

5      to make a complaint.

6  A.  That's correct.

7  Q.  That was the problem, right?

8  A.  In essence.

9          I'm not saying with every arrest, but we have

10     seen that what -- you know, what drug dealer who's

11     getting a pass is going to come in and make a complaint.

12 Q.  I understand that.

13         7C is an article titled Detroit Police

14     Officials Revamp Internal Affairs Probe Procedures.

15     This is dated April 27th, 2019, and it's a Detroit News

16     article.

17         Now, the Internal Affairs has what

18     responsibility?

19 A.  To investigate both administrative and criminal

20     misconduct.

21 Q.  And it's a check, in a way.  It has some supervisory

22     responsibility, correct?

23         Well, let me ask you it a different way.  Does

24     it play some role in supervising the police officers?

25 A.  It can play a role in establishing policy, but the probe



1      is separate from IA.  It was birthed out of --

2  Q.  Well, earlier in your testimony today, you indicated

3      that one of the things you changed was the Internal

4      Affairs.  Can you put a time period on investigations

5      from inception to conclusion of one year?  And you

6      indicated some --

7  A.  That was involving -- that was involving allegations of

8      misconduct, and that change had nothing to do with this

9      probe.  That was overall --

10 Q.  Internal Affairs' probes can turn up criminal conduct,

11     correct?

12 A.  That's correct.

13 Q.  So if these things languished and then were not being,

14     if you will, aggressively addressed and putting a cap on

15     the time period made it more efficient, I assume, and

16     more analytical and more factual based, you know, you

17     can't -- four years after the fact, getting the facts

18     established is hard, agreed?  The purpose of --

19         MR. SUROWIEC:  Object to the form and

20     foundation of the question.

21 BY MR. DETTMER:

22 Q.  The purpose of this was to really elevate, in some ways,

23     the effectiveness of the supervision, correct?

24 A.  I don't like your question.

25         I mean, I don't mean to be smug, or...

1  Q.  No.  No, that's okay.

2  A.  It's just that it was done, as I had testified already,

3      to address the lack of timeliness of investigations,

4      and, twofold, to address an accused officer.  They

5      deserve to have a timely resolution to their

6      allegations.  And also to the community that expects

7      that when they initiate allegations of misconduct, that

8      matter is addressed not four or five years later.

9  Q.  Internal Affairs is a process in the discipline of

10     police officers, correct?  In all levels of police

11     officers?

12 A.  That is one -- Internal Affairs is one part.  They

13     execute, initiate -- strike initiate.

14         But they execute the investigative work of

15     serious allegations of misconduct which in some

16     instances includes criminal misconduct.

17 Q.  And it's significant in the process of keeping track of

18     what is occurring within the police department?  If it's

19     not running efficiently, you're not staying on top of

20     the supervision that's needed?

21 A.  Well, there are other -- I disagree with the question.

22         We have audit functions inside the police

23     department that monitor compliance with rules and

24     directives.  Internal Affairs investigates allegations

25     of misconduct.



1  Q.  The practice is that it be done timely.  That's a

2      supervision issue?

3  A.  That's specific to allegations that come forth and,

4      again, as I've already testified to, because there was

5      no timely resolution and many of the cases going before

6      arbitrators that were appealed were being dismissed

7      because of the lack of timeliness.

8          So I felt strongly that Internal Affairs in

9      the department could be more efficient in responding to

10     the completion of internal investigations.

11 Q.  I'd like to go on to 7E now.  And it's an article dated

12     February 11th, of this year, 2020.  And it's titled

13     Craig Defense Inhouse Probe of Police Narcotics Unit.

14         And in the second paragraph you are quoted, do

15     you see that?  It is not -- I don't know if our -- can

16     you read that?

17 A.  Frankly, we are best poised to do this investigation.

18 Q.  Yes.  You can read it to yourself.  Is that an

19     accurate --

20 A.  Yes.

21 Q.  -- recital of your statement?

22 A.  Yes.

23 Q.  And then down below the pictures, the second paragraph,

24     that starts, "Craig said", could you read that?

25 A.  Yes.  It cuts off at a point because of the --

1      MR. DETTMER:  Can you roll that up, Michael?

2          THE WITNESS:  A little bit.  Roll it up.  Not

3      that way, the other way.  Stop there.

4  BY MR. DETTMER:

5  Q.   Is that a correct recitation?

6  A.   That's correct.

7  Q.   The second page, the paragraph that starts the second

8       page, the probe, Craig said, see that?

9          MR. DETTMER:  Pick it up a little, Michael.  A

10      little more.

11         THE WITNESS:  I see it right there.

12  BY MR. DETTMER:

13  Q.   Is that accurate?

14  A.   That's correct.

15  Q.   And then the next paragraph, is that accurate?

16  A.   Meaning if there's a pattern of conduct?

17  Q.   Yes, that's the one.  Is that an accurate recitation?

18  A.   I've already testified to this very same thing not even

19      two minutes ago.

20  Q.   And then going on, you again indicate that the probe was

21      going back to 2010.  That was something that you said a

22      number of times.

23         EXHIBIT 8

24         Police Commissioner Meeting

25         WAS MARKED FOR IDENTIFICATION

1  BY MR. DETTMER:

2  Q.   Go on to Exhibit 8.

3          This is a July 17, 2014, meeting of the

4       Detroit Board of Police Commissioners which occurred on

5       Thursday, July 7th, 2014.

6          I have 2, 3, pages -- actually, a couple of

7       pages identifying who was there and the date again.  But

8       going to page 37, you are discussing, and there's a

9       report in detail by Hanson no less, of what's said at

10      the meeting, correct?

11         And this report starting at line 12 on page 37

12      addressing -- I'm sorry, on line 15, a discussion about

13      the revamping of the Narcotics Unit, the Major

14      Violators.

15         Do you recall that discussion?

16  A.   Not offhand.  That was 2014.  I've been to many --

17  Q.   Basically, though, you described the revamping of the

18      Narcotics Unit into the Major Violators?

19  A.   I'm sure I've had a number of conversations with the

20      Police Commission relative to the Narcotics Unit, and

21      I'm sure I would have briefed them on changes being

22      made.

23  Q.   There's a question about the length of time an officer

24      can be a member of the Narcotics Unit, if you will.  And

25      on page 39 you say:  "I appreciate you bringing that up"

1  and you're referring to Commissioner Crawford's question

2  about finding a rotation in Narcotics.

3          You go on:  I was adhering or adopting, but I

4  know that best practices and police departments that

5  have come under such judgments, they have put limited

6  duration on the tours of duty, high-risk assignments,

7  such as Narcotics, Vice, Gang Units.  And the reason for

8  that is because those assignments have had lengthy tours

9  of duties is a greater likelihood of corruption.

10         You knew that and made that point to the

11  commission, correct?

12  A.   I did.

13  Q.   And you go on, starting at line 19 on a page 39, in

14      Detroit, what we've done in adhering to the best

15      practices, is that the tour of duty in those

16      assignments, Vice, Gangs, Narcotics, would be three

17      years, and the termination of the three-year assignment,

18      the concerned employee could request a one-year

19      extension.

20         Did you enforce that policy consistently?

21  A.   I delegated enforcement down to assistant chief and

22      Deputy Chief Leavell and it candidly wasn't enforced in

23      the manner in which it was articulated.

24         I can say I felt there was some resistance,

25      even though not voiced, because it's always been the way

1  things were done in this department.

2          So if they move someone out, the person still

3       worked -- I have since learned -- worked in Narcotics

4       and sat at the precinct level.  And then at some point

5       they were brought back.  I'm not always aware who

6       left -- I mean, now it's different.  We certainly have a

7       more rigor attacks.

8          The argument that those who have been in the

9       organization was that they felt lengthy experience was

10      important.  Instead of this three-year and a one-year

11      extension, if necessary.  It wasn't really well

12      received, at least that was my sense.  Certainly now,

13      there's no pushback.

14  Q.   Well, are you applying a three-year plus one possible,

15      max of four years?

16  A.   If my memory --

17  Q.   Is that being enforced?

18  A.   If my -- well, since the start of our probe, we moved

19      anybody with five years or more out.  So, yes, it has

20      been.

21         So based on what I know now, there's nobody

22      that has excess of five years, at least to my knowledge.

23  Q.   But until the probe started, 2019, there were people

24      that had maybe as much as five or more years in --

25  A.   Right, there were still some people --



1  Q.  -- Major Violators and Narcotics, right?

2  A.  That's correct.  So we have --

3  Q.  So the supervision wasn't adhering to the policy you

4      instituted --

5             (Indiscernible, multiple

6             speakers at the same time)?

7             THE WITNESS:  I'm wondering, are you going to

8      let me answer the question or are you going to talk,

9      because I can't get a response out.  I would like to get

10     a response out, if that's okay.

11            MR. DETTMER:  I want you to respond.

12            THE WITNESS:  Okay.

13            So the answer is yes, we found instances where

14     it wasn't adhered to.  As I testified to earlier, that

15     in some instances they were moved out and then brought

16     back.

17            In other words, the clock stopped and it was

18     restarted.  So if you are out of Narcotics, say, for a

19     couple of months and you were brought back, the clock is

20     starting all over again.  That was a way to get around

21     an unpopular decision.

22  BY MR. DETTMER:

23  Q.  Well, you, as the chief of police, as CEO of the Detroit

24      Police Department, had the final say on policy, correct?

25      And you expect your officers, including all of your



1      command officers, to follow policy that you oversee and

2      instituted, correct?

3  A.  That's correct.

4  Q.  And the failure to do so is a failure of vision but at

5      different levels, correct?

6  A.  You can say that, yes.

7             EXHIBIT 9

8             Administrative Message

9             WAS MARKED FOR IDENTIFICATION

10  BY MR. DETTMER:

11  Q.  I want to then go on to Exhibit 9.  This is the

12      administrative message dated June 27th, 2014, where

13      there are organizational changes within organized crime.

14  BY MR. DETTMER:

15  Q.  And organized crime is -- has under its umbrella a

16      number of different things.  It had -- I can't -- it had

17      Narcotics Unit, gang intelligence, task force and vice

18      enforcement.  And you changed the name of the Narcotics

19      Unit, and effective July 14, 2014, you named it Major

20      Violators and reduced the number and I think posted

21      other conditions, correct?

22  A.  That's correct.

23  Q.  Do you have something time wise that caused you to do

24      this in the summer of -- or in the period of

25      June 2014 -- or in 2014 that caused you to make this



1      decision?

2  A.  As I remember, it probably was the same time following

3      the conclusion of the Hansberry indictment.  So we were

4      looking for a way to change the culture, move the

5      major -- I mean Narcotics in another direction, that

6      based on what we've learned in our probe, there were

7      things that we didn't know that had we known at that

8      point, that would have been included in the restructure.

9      We just didn't know it.  There was a lot of things we

10     didn't know.

11  Q.  Hansberry was indicted on April 8th, 2015.  But there

12      was an ongoing investigation, correct, prior to that,

13      about Hansberry and his crew members?  Correct?

14  A.  Yes.  I have already testified that the FBI initiated

15      and started the investigation in 2010 --

16  Q.  Right.

17  A.  -- and culminated in 2014.

18  Q.  Now, in terms of the Detroit Police Department, were

19      files opened about this investigation that originated

20      with the investigation you described previously but were

21      giving some direction to the organizational features?

22      You didn't just wake up one day and dictate this five-

23      or six-page document, right?

24      Exhibit 9.  You had some information provided

25      to you before, correct?

1  A.  As I've indicated and I've testified before, the changes

2      were made based on the Hansberry case and his other

3      crime partners.  And it was our way of trying to move

4      the organization in another direction.

5             However, as I've already testified, and I've

6      probably have said this three times, there are a lot of

7      things that we didn't know in terms of practices until

8      the Mosley matter.  And around the same time that Mosley

9      was charged, we had got information from a source who

10     was very familiar with the operations of narcotics and

11     the kind of things that some of the members were

12     allegedly involved in.

13  Q.  Was that person a member of the Narcotics Unit or Major

14      Violators Unit?

15  A.  As I indicated to you earlier in this conversation, we

16      are in the middle of a confidential -- and I'm not going

17      to disclose, unless compelled by a court the name of

18      that person.  That person is a federal -- I guess it's

19      safe to say he is a federal informant, not a Detroit

20      Police Department informant.

21  Q.  So then he's not -- I mean, that suggests to me he was

22      never part of the Detroit Police Department?

23  A.  I am not -- as you know -- well, let me just stop there.

24      I'm not going to get into confidentiality of that part

25      of the investigation.  I'm saying that we had a source

1  that was a federal source.  The information was provided

2  to us, and I'll leave it at that.

3  Q.  Looking at it, you -- well, first of all, the former

4      Narcotics Unit was made up of enforcement, and

5      Conspiracy Unit; is that correct?

6  A.  To the best of my knowledge.

7  Q.  And do you recall what the difference in the two were --

8  A.  Not offhand.

9  Q.  -- as far as conspiracy?

10  A.  Not offhand, I don't.  I'm sorry.

11  Q.  Did the -- at least what I understand, based on prior

12      testimony, that enforcement basically was street level

13      and conspiracy was higher-level drug dealer enforcement

14      addressing higher-level drug.

15          Does that ring a bell with you at all?

16  A.  Yes, that sounds pretty close to correct.

17  Q.  And what was the role of Major Violators?  Did they fill

18      in on the conspiracy side, major drug dealers, or did

19      they deal with enforcement?

20  A.  The idea was to focus on -- as you articulated, the

21      conspiracy side.  Street enforcement we felt could be

22      better focused by precincts as complaints were being

23      made to various complaints -- I mean precincts about

24      street level drug dealing.

25          It would be the station that would handle it

1  because the Major Violator section was smaller than the

2  former, and they were also a part of -- at least a

3  component was part of DEA task force.  We felt that it

4  was better that they focus on Major Violators.

5  Q.  Chief, you, obviously, correct -- let me ask you.  You

6      didn't fully lay out, do all of the investigation and

7      assignments that are made and reflected in Exhibit 9,

8      correct?  You set a policy and you put it in motion

9      based on what you were aware of that was of concerning

10      turnkey, correct?

11  A.  That's correct.

12  Q.  Who participated in putting this document together,

13      assignments, differentiating different components with

14      the meetings.  What's the process of doing something

15      like this, which is a significant chain?

16  A.  It would have probably involved -- I see the name at the

17      conclusion, a Steve Dolunt, a former assistant chief,

18      was the ranking member over operations that came under

19      his chain.  Certainly James White, who was an assistant

20      chief, was involved in that administrative part.

21          So those two assistant chiefs and select staff

22      would be involved in the crafting of policy or

23      documentation.

24  Q.  Are there documents that White and Dolunt were involved

25      in and people would report to them generated so that it

1  resulted that, if you will, in Exhibit 9, the

2  administrative message dated June 27th, 2014?

3  A.  I'm not aware of any additional documents -- or at least

4      I don't recall any additional documents.

5  Q.  Did White and Dolunt have to look at things and have

6      meetings with people related to the implementation of

7      policy change that you directed?

8  A.  I am certain that they had meetings, but I wasn't part

9      of those meetings.

10  Q.  Well, you're aware of the process, right?  You've come

11      up through the ranks and overseeing the processes and

12      methodology.

13          How is something like this implemented if it's

14      not -- if there isn't a paper trail function?

15  A.  As far as I know, this is the only -- there was a

16      conversation and the two assistant chiefs got together

17      and executed launching this change.

18          As to what that involved, I don't have

19      specific information.  As I've testified, I did not sit

20      through that.

21  Q.  Well, you see the enforcement operations?  That's like

22      the third page.

23  A.  Again, I did not participate in the actual planning.  I

24      had discussions with the executive team, and during my

25      conversation, I didn't provide them any written

1  direction.  I ended up telling them what I wanted and

2  delegated to them to create and, at the conclusion,

3  execute.

4  Q.  Are you saying this document was created as a result of

5      verbal discussions only?

6  A.  The initial direction of changing to Major Violators was

7      a discussion, and there was a subsequent -- I'm

8      assuming.  I don't know because I did not sit through

9      meetings with Dolunt and White other than maybe to get

10      an update on what has occurred.

11  Q.  Well, Chief Dolunt in the Enforcement Operations, on the

12      third page of Exhibit 9, discusses the paid positions of

13      different people.

14          You've seen these kinds of documents before,

15      correct?

16  A.  That's correct.

17  Q.  People are reassigned on some regular basis.  Generally,

18      it generates a document similar to what we are looking

19      at on page 3, 5, and Bates Number 1 through -- 1 through

20      7 (sic), correct?  You have seen those?  Correct?

21          I'm sorry, 144 through 147.

22  A.  Yes.

23  Q.  For example, you indicated that there would be one

24      lieutenant over the Major Violators.  And on the Bates

25      Number 144, there is a number of lieutenants that are

1    listed, one of them being James Moore. And he was in
2    the 3rd Precinct, and he was put into Major Violators.
3         Who made that decision? Why was he selected?
4  A. I don't know how the selection was made. I don't know
5    how the selection was made. They make recommendations.
6         Given that that was 2014, at the time, most of
7    these individuals I didn't personally know, so I relied
8    heavily on recommendations made by my executive team,
9    which was the assistant chiefs. So they felt that's who
10   they wanted in these concerned assignments. There was
11   nothing to say they couldn't go there, at least not that
12   I am aware of. Nothing was brought to my attention.
13 Q. Well, approximately at that point in time, there were
14   48 officers, a lieutenant, 6 sergeants, 41 police
15   officers in what was then the Narcotics Unit. And that
16   48 went down to basically 24, right in half.
17        You had no role in any of the decisions of the
18   appointments to be either lieutenant, the sergeants, or
19   the police officers, correct?
20 A. I relied on my executive team to make recommendations
21   and absent anything that was concerning, I supported
22   their decisions. Again, I had been in the department a
23   year. And probably most of these folks -- as I am
24   looking at -- I mean, I know most of them now that I
25   didn't know. So I didn't have any personal knowledge.

1    I didn't handpick myself. I relied on my executives to
2    make their decisions.
3  Q. Well, let me point something out, if I can.
4         Hansberry's crew, that involved Sergeant
5    Geelhood, eventually, nine of those people were in the
6    list of the July 22, 2014, list of people who were
7    removed from the Narcotics Unit, Geelhood, Bray,
8    Leavells, Matelic, Beasley, Riley, Barnett, Tourville,
9    and Napier, who committed suicide sometime after this in
10   January 2015.
11        Do you know if any of those officers I just
12   enumerated and the eight that are still alive are under
13   investigation?
14 A. There are some that are under investigation and one just
15   retired in --
16 Q. Some are currently under investigation?
17 A. Some are, yes. Yes.
18 Q. Do you know which ones?
19 A. Sergeant Geelhood is currently under investigation --
20   Internal has a case of an allegation that emanated out
21   of the Wayne County Prosecutor's office -- and we've
22   opened an investigation relative to him.
23 Q. Is that Sergeant Geelhood?
24 A. That is correct.
25 Q. Anybody else?

1  A. Amy Matelic was under investigation by Internal Affairs
2    and she was --
3  Q. She entered into a consent agreement, correct, and
4    left -- just to refresh your memory -- left the Detroit
5    Police Department?
6  A. She was under investigation involving allegations
7    concerning something that emanated out of a civil
8    lawsuit, and she opted to leave the department. And we
9    allowed her to do so. But it wasn't anything --
10 Q. She was charged with falsifying an affidavit for a
11   search warrant, and she basically, as I recall -- I'm
12   just trying to refresh your memory -- that Stephen
13   Geelhood provided her the information and she did --
14 A. I'm familiar with that case. She --
15        MR. SUROWIEC: Dennis, could you please let
16   the witness answer your questions.
17 BY MR. DETTMER:
18 Q. Go ahead.
19 A. No, it's getting a little old. I start to talk and I
20   get talked over. I mean, can we just let me get my
21   comment out. If that's not satisfactory then -- because
22   I'm feeling like every time I start talking, you over
23   talk me.
24 Q. I don't mean to be and I don't -- really, I'm not trying
25   to be rude to you. We're under a 3 1/2 hour limitation,

1    and I want to move ahead. Some of this stuff, as you
2    said, you repeated.
3  A. A lot of it I just read it -- can I share my
4    frustration?
5         A lot of what I'm saying is repeated, and you
6    want to talk about efficiency of time, why am I saying
7    the exact same thing? I'm not going to lie. I'm going
8    to tell the truth.
9  Q. No, no, no -- I know you're a truthful fellow.
10 A. Yes, sometimes so far I guess, but I would rather be
11   upfront. So relative to this, I'm familiar with Amy
12   Matelic. There was a lawsuit and she was facing
13   termination for false statements.
14        As you know, you articulated, given at the
15   trial, she opted -- in lieu of being terminated, she
16   resigned or retired under charges. I think that is it.
17   So we put under charges. So she has since left the
18   department. So that option is sometimes afforded. I
19   mean, because if a person wants to opt to retire, you
20   know, all we can do is put the reason for the retirement
21   or resignation, and if there's an open case like this
22   was, we put retired under charges. That's generally --
23   not in every case, but that's generally what we do.
24        Relative to Geelhood, that was something, as
25   I've already indicated, it came out of the -- I think

1    this was the Innocence Project case is what I was
2    briefed, so we have an open investigation relative to
3    him and we're not complete with that yet.
4            And I think there was a couple of other names
5    that you mentioned that I am not --
6    BY MR. DETTMER:
7    Q.   Do you recognize any of them?  I will go through them
8         again.
9    A.   Outside of Geelhood and Matelic -- what were the other
10        names you mentioned?
11   Q.   Bray.
12   A.   I've heard Bray's name, but I'm unaware of any open
13        investigations unless he's part of our probe.  There are
14        a lot of names that come up in our probe, that I can't
15        just off the top of my head tell you who they are.
16   Q.   Those nine people I have listed were either in or became
17        under Hansberry and subsequently Geelhood, was in
18        Hansberry's -- and there were nine of them.  And as you
19        know, Napier committed suicide, so there were eight
20        people, and I'll give you the names of other -- you
21        know, Leavells is out, obviously.  But -- and Matelic's
22        out.  But who are still in play are Geelhood, Bray,
23        Beasley, Riley, Barnett, and Tourville.
24            Any of those ring a bell?
25   A.   Tourville comes to mind; I just can't recall what.  It



1    seems as if -- we may have.  I don't know.  I think his
2    name -- again, some of these names are coming up in our
3    probe and we are moving forward.
4            In fact, there are several members, and I
5    don't know if it's Tourville, but we have several
6    members that have chief hearings pending that are
7    dismissal cases.
8    Q.   You've indicated a number of times that you're looking
9         at a lot of Hansberry's crew?
10   A.   Well, not just --
11   Q.   I know, not just, but you are looking at them?
12   A.   Yes, we are.  But, again, to what you -- you've
13        indicated earlier, you think going around -- we're
14        doing this backwards.  We should have started back in
15        fear of the statute.
16            And I will just be candid with you, if the US
17        Attorney wanted us to start at the back, like 2010, or
18        whatever date our files go back to, because of statute
19        issues.  I am certain they would have raised that issue,
20        because, you know, Mr. Graveline was a former US
21        Attorney, very familiar with the statutes.
22            But, again, we opted -- because our initial
23        concern was Mosley, and me believing that Mosley was
24        involved in other allegations, which we have found that
25        he was involved in other allegations of criminality.



1    Q.   I'd like to talk to you about the stop on July 6th,
2         2010, with Hansberry's crew.  And I know you don't have
3         personal knowledge of that.  But recognizing that
4         potentially this is an issue of review and should be --
5         for my valuation of it, I'd like to ask you some
6         questions.
7            Do you recall this is the stop where some
8         millions of dollars were on the way to a Mexican cartel
9         and on the east side near Gratiot and Outer Drive, I
10        believe there was a stop by Hansberry's crew.  And
11        there's a good amount of dispute about the amount of
12        money.  I've had maybe three different numbers, based on
13        various sources, testimony, and trial and things like
14        that.
15            But are you somewhat familiar with all of
16        that?
17   A.   I've heard it.  I'm not intimate with that case.  I
18        can't offer you anything.  You could probably brief me
19        out as to what you know, but I have heard -- and we
20        haven't gone back and did an exhaustive review of that.
21        I just heard just basically what you're saying now.
22   Q.   There is a connection between Arthur Leavells and Gary
23        Jackson, a mutual friend.  Right?  And Gary Jackson was
24        a -- probably a high-level drug dealer.  He owned a --
25        or leased a truck operation for cleaning trucks, in --

1    what really apparently was the issue there, trucks come
2    in and either drop drugs or pick up money, and the semis
3    head down to Mexico or whatever.  That's basically the
4    argument of the US Attorney in the Hansberry trial.
5            But what I'm interested in and wanted to
6    discuss with you is the fact that there are three
7    different numbers, dollar numbers, that were significant
8    in this case.  Gary Jackson testified there was -- he
9    delivered $3 million to the drug runner who was driving
10   the truck to Mexico.  And at the time he did that,
11   Leavells, Hansberry, and Watson and Hansberry's crew
12   were in on this deal.  They were going to stop it and
13   get the money.  It was all prearranged.
14            The second number was a tally sheet that was
15   with the money, and it -- it indicated that there was
16   $2,370,000 on -- in the various bags that had the money
17   in it in the semi.
18            Then there was a dispute that went to Internal
19   Affairs, basically, over the counters -- a dispute over
20   like $15,000.  But what Comerica Bank established and
21   what was deposited in the Detroit Police Department's
22   account with Comerica was $2,084,820.  That's the
23   established amount that was there.
24            Basically, the testimony was that Tourville
25   and Napier grabbed money per an agreement, and they were

1  charged with that. The question is, was there
2  2,084,000, 2,370,000 or 3 million?
3          Now, clearly the evidence that was grabbed at
4  the time indicated in the tally sheet there was
5  2.3 million plus, and for some reason nobody used that
6  in any kind of investigation. It didn't trigger
7  anything. Because them talking about 2,084,000 being
8  deposited, there is a difference of somewhere in excess
9  of $180,000 (sic) that disappeared, if the tally sheet
10  is correct.
11          Jackson is correct in his testimony in federal
12  court, and I'm sure, you know, he faced serious
13  consequences if he perjured himself, that there was
14  3 million.
15          There was no accounting in any form by
16  supervision of the Detroit Police Department on those
17  issues. I hope I'm making it clear to you the issue.
18          MR. SUROWIEC: Thousands of dollars.
19  BY MR. DETTMER:
20  Q.  Hundreds of thousands of dollars disappeared and the
21  testimony of Leavells was that the crew grabbed that by
22  a prearranged agreement.
23          MR. SUROWIEC: I would object to form,
24  foundation. You are testifying. The question is not
25  even a question. It was literally about a three-minute

1  statement.
2          It's inaccurate to the extent that you would
3  say that Tourville and Napier were charged, and it calls
4  for speculation on the part of the chief, who wasn't
5  there.
6          But, Chief, if you can answer that, which I am
7  not sure what that was.
8          THE WITNESS: I can't. I wasn't here then.
9  In fact, I was a police chief in Portland, Maine, in
10  2010. I've heard some discussions about that limited --
11  as I indicated before you started your three-minute
12  narrative on what took place, I say you probably know
13  more about this than I do.
14          As it turns out, you have read testimony in
15  the federal case, which I have not. I don't know. As
16  we continue to do our probe and go back, I am certain
17  that this issue will resurrect. What will come out of
18  it, I don't know.
19  BY MR. DETTMER:
20  Q.  I guess the point I'm making with you, this is an
21  opportunity for supervision, and I would indicate to you
22  that --
23          MR. DETTMER: If we can go to Chief Exhibit
24  11B, Michael.
25

1          EXHIBIT 11A
2          Photo
3          WAS MARKED FOR IDENTIFICATION
4          EXHIBIT 11B
5          Photo
6          WAS MARKED FOR IDENTIFICATION.
7  BY MR. DETTMER:
8  Q.  The highest level of the Detroit Police Department was
9  aware of this event and, in fact, after the money was
10  acquired -- that's Exhibit 11A -- that's the money on
11  the trunk of a car at the scene of the crime.
12          And 11B, unfortunately, is sideways, but --
13  there you go. And you'll recognize all of those
14  individuals, I am sure, Chief Godbee being in the
15  center, correct?
16  A.  That's correct.
17  Q.  There's the money.
18  A.  Correct.
19  Q.  And the point I'm making with you, there was a
20  subsequent investigation of how a money counter being
21  inaccurate over $15,000. Really, we are talking about
22  900,000 or 280,000 disappeared, and the trial was about
23  how Hansberry and his crew grabbed that money.
24          You're not aware of any of that? We're not
25  making (inaudible) --

1  A.  No.
2  Q.  Here is something with the highest level management of
3  the Detroit Police Department at the time and it wasn't
4  properly handled. Is that fair to say?
5  A.  I can't say. Now, I guess --
6  Q.  Assuming what I said is correct?
7  A.  Well, here is a question I --
8          MR. SUROWIEC: He is not going to say --
9          THE WITNESS: I can't say how it was handled.
10  Now, at some point this allegation was made that money
11  was missing. Am I correct to say that?
12          MR. DETTMER: Yes, but it was -- it was
13  focused on a counter -- money counter issue, not on the
14  tally sheet.
15          THE WITNESS: So if it was a counter issue --
16  I mean, either we believe that money was stolen -- as
17  you referenced, the highest levels of the organization
18  were aware that there was some sort of nefarious act or
19  money was alleged to have not been accounted for, then
20  the only thing one could do was then initiate an
21  investigation into it. I don't know if the then Chief
22  Ralph Godbee became aware and initiated an internal
23  investigation. I'm unaware of that.
24  BY MR. DETTMER:
25  Q.  Well, there is evidence to support, as you well know



1    probably --

2  A.    But specific to your -- specific to your question, if

3    the chief became aware of an allegation of theft, the

4    chief would then be responsible to initiate an internal

5    investigation. I don't know because I wasn't here.

6         Maybe as part of the work that we'll be doing

7    in the coming months, however long it takes us to get to

8    that time period, maybe we'll have the answer. Maybe I

9    can find that answer out right now. I don't know.

10 Q.    Chief, what I'm really asking you, though, there was a

11    tally sheet that indicated there was $2,370,000 in that

12    truck.

13 A.    Okay.

14 Q.    That was evidence that the Detroit Police Department had

15    and it was totally ignored. And the point I am making

16    with you, that evidence was an indication that the

17    department should have known there was some problem here

18    and investigated it. They never investigated it.

19 A.    You know --

20         MR. SUROWIEC: That's a mischaracterization of

21    the evidence, and you're painting it in an absolutely

22    false light.

23         But go ahead, Chief, if you can answer that.

24         THE WITNESS: I can't answer that. I mean,

25    the way the question's framed -- I know what I would do

1    in a given situation. But to say a tally sheet

2    reflected one thing, I guess one could argue, if I'm

3    understanding your synopsis, that -- how do we know the

4    tally sheet was correct? I don't know. Who's making

5    the allegation that -- I just don't know.

6         And so what you are doing is -- you want me to

7    say that it wasn't handled properly. I don't know what

8    the chief knew at that time. If I had known that you

9    were going to ask me this question in 2020, I would have

10    called him on July the 27th, say, on the Wayne County

11    to be chief in Detroit and this question's going to be

12    asked. Did you do anything with this money thing.

13         I mean, I'm being facetious, of course. But

14    I'm just saying, there's no way -- I don't know enough

15    about the facts, and the way you framed it, the tally

16    sheet tells me nothing.

17 BY MR. DETTMER:

18 Q.    Well, here, let me make the point for the record. In

19    Exhibit 10, DPD Bates 1643 --

20         EXHIBIT 10

21         Comerica Bank Deposit

22         Tally Sheet

23         WAS MARKED FOR IDENTIFICATION

24 BY MR. DETTMER:

25 Q.    Well, here, let me make the point for the record. In

1    Exhibit 10, DPD Bates 1643 -- is a bank deposit with the

2    Comerica Bank and it shows a deposit of $2,084,830.

3  A.    I understand.

4  Q.    In Bates Number -- DPD Bates Number 1648 in Exhibit 10

5    there's a tally sheet, and there are a number of pages

6    listing each of the deposits that were made -- or the

7    money bags that were in the -- in the vault, and that

8    tally sheet shows 2,370,000. Whether it's accurate or

9    not, no way either you or I know this.

10         But the point is that it raised an issue, and

11    there's no investigation at all at any point about that

12    tally sheet and the discrepancy between the bank

13    deposit, and its significant. All I'm saying is --

14 A.    To your point -- I'll just say, to your point,

15    absolutely it's significant. And if you had asked me

16    the question, if you were the chief and you were made

17    aware of a discrepancy, what would you have done.

18 Q.    What would you have done?

19 A.    That's the question.

20 Q.    What would you have done?

21 A.    If I were the chief in 2010 in Detroit and I became

22    aware of a discrepancy, I would have initiated an

23    investigation to find out was it just an error that

24    somebody -- on the bank slip make a mistake? What would

25    it have been? I don't know.

1    I would have at least wanted to know because,

2    worst-case scenario, somebody stole the money. And then

3    it would have been involving interviews of people

4    involved. It would have been a number of things we

5    could have done.

6         With that kind of money, we would have gotten

7    search warrants to get into bank records of certain

8    department employees, to see if there was an unusual

9    amount of money deposited, which -- and in an

10    administrative case, even if, say, the US Attorney said,

11    well, it's not really enough. Or the Wayne County

12    prosecutor said it's not enough to prove theft, maybe.

13    Based upon a preponderance of evidence, it's enough to

14    support an allegation that a theft occurred. It just

15    doesn't meet a criminal standard. I mean, so that's

16    what I would have done. At least take a look. It

17    doesn't mean that I would have proven that the money was

18    stolen. I don't know. I really don't know.

19 Q.    And the point I think is well taken. There was the

20    opportunity to actually know what occurred, and there

21    was a total lack of indifference to this, from what I

22    can see.

23         And the point I'm making is, Hansberry's crew

24    are basically the defendants in our cases that we have

25    and had they properly proceeded, had the Detroit



1   department supervision properly proceeded, it's -- these
2   people wouldn't have been raided.
3           These are the people who are criminal cops,
4   and they raided our clients' homes, and that's the point
5   I'm making with you. They didn't -- as you are correct,
6   it should have happened and it didn't.
7           MR. SUROWIEC: I would object to the narration
8   -- the narrative there. And I would also object to the
9   fact that you're -- you're giving false evidence because
10  you know that there was an Internal Affairs
11  investigation that was launched after the discrepancy
12  was noted, and that would have been under Chief Godbee,
13  so why are you saying there wasn't, Dennis?
14          MR. DETTMER: Here. Here. That investigation
15  was over whether the money counters were properly
16  operating. That was the issue, over $15,000.
17          MR. SUROWIEC: They did Garrity. They did
18  Garrity. They interviewed about 20 to 30 officers.
19  They did --
20          MR. DETTMER: Here --
21          MR. SUROWIEC: It was done.
22  BY MR. DETTMER:
23  Q.  They weren't interviewing them about the $2,370,000
24  tally sheet. They weren't -- that number never came up
25  at all anyplace.



1   A.  Well, I've got to tell you something. I am a little
2   dismayed because specifically I asked was there an
3   investigation. And counsel is now articulating that
4   there was an investigation. Maybe you don't like how
5   the investigation was conducted.
6           But if people were Garrity'd -- I even took
7   four to five minutes explaining that I would have people
8   interviewed, and it sounds like this is the very same
9   thing that happened anyway.
10  Q.  No. No.
11  A.  Just the outcome is different.
12  Q.  Exhibit 13, that I have is the investigation.
13          EXHIBIT 13
14          Investigation money counter
15          WAS MARKED FOR IDENTIFICATION
16          THE WITNESS: Okay.
17  BY MR. DETTMER:
18  Q.  And it was about the counter, the money counter
19  discrepancy. That is what it was about. $15,370.00.
20  Exhibit 13 of the exhibits that we have. And that's it.
21  It's not about the tally sheet.
22  A.  So I'm curious -- I'm curious, as I'm looking at this
23  memo, you got --
24  Q.  You're looking at it. It's Exhibit 13, for the record.
25  A.  Yes. Exhibit 13, Commander Brian Stair, who was the



1   commanding officer of IA at the time, Sergeant Dietrich
2   Lever, who is now a lieutenant still working for DPD,
3   don't you think either one or at least Lever who's still
4   a department member -- in fact, Lever, a lieutenant, is
5   a key member of our Operation Clean Sweep. I'm sure he
6   can give you and articulate the investigation involved
7   here. I can't.
8   Q.  With all due respect, the only point I'm making was
9   there was evidence that there was $2,370,000 in those
10  bags.
11  A.  Understood.
12  Q.  And it's not mentioned at all anyplace. Anyplace. And
13  this is about 15 grand, I mean, come on. And had it
14  occurred, there's a good chance that Hansberry's crew
15  would have been operating that raided our clients'
16  homes.
17  A.  But I'm looking --
18  Q.  That's the point I'm trying to make with you.
19  A.  I know. But as I'm looking at this memo, I know we're
20  putting a lot of time into this memo that I have no
21  idea. But it does reflect -- the counter reflected
22  2,084,820 and a difference of what you call 15 grand,
23  15,370. I would have to go through the whole thing, but
24  I think if this is a concern, why not have Dietrich
25  Lever deposed? Why not?

1   Q.  I missed what you're saying.
2   A.  Why not have Lieutenant Lever deposed to find out what
3   he would tell you about this? He's the investigator.
4   Q.  My point is, it was there, it was -- and the evidence
5   was there. The tally sheet. There's no mention of it
6   anyplace. I mean --
7   A.  Okay.
8   Q.  -- if the head of Internal Affairs was aware of it, it
9   surely isn't reflected in any way --
10  A.  Okay.
11  Q.  -- in any document that I am aware of, of an Internal
12  Affairs investigation related to that.
13          Let's go on.
14          MR. SUROWIEC: I'm just going to pose an
15  objection. This is a 17-page document. Mr. Dezsi is
16  literally on page 1, has not moved off of page 1. The
17  witness is being cross-examined with zero (inaudible) to
18  this. It's not proper.
19          (Multiple speakers
20          speaking at the same time.)
21          MR. DETTMER: Are you suggesting someplace in
22  this document there's a tally sheet showing the
23  $2,370,000, in any way it's a part of this
24  investigation?
25          MR. SUROWIEC: I'm suggesting that you -- you

1    initially started your question off by actually

2    testifying that there was no IA investigation. That's

3    what you said. Leaving the chief to believe that --

4         MR. DETTMER: There was no investigation about

5    the amount of money --

6         MR. SUROWIEC: You need to join the police

7    force because --

8         (Multiple speakers

9         speaking at the same time)

10        MR. DETTMER: -- the $2,370,000. Are you

11   suggesting there was an investigation of the $2,370,000

12   tally sheet, Jim? Come on.

13        MR. SUROWIEC: Dennis, you need to be a police

14   officer because you don't like the way they do their

15   job. But as the chief said, Lieutenant Lever's the guy

16   who knows. You know, you're looking at half the

17   information.

18        MR. DETTMER: Let's move on.

19        Exhibit 12.

20        EXHIBIT 12

21        Detroit News Article

22        11/03/2014

23        WAS MARKED FOR IDENTIFICATION

24   BY MR. DETTMER:

25   Q.  Exhibit 12 is a November 3, 2014, Detroit News article.



---

1    And it's about four Detroit police officers suspended

2    following a probe.

3         You are quoted in here a number of times. But

4    this really involves two different crews of the four

5    cops. There are two and two. It's not all four of them

6    related to one incident. But you go on. I'm looking at

7    Paragraph 1, 2, 3 -- it's the third paragraph. It's out

8    on the -- the first one out on the margin. Detroit

9    Police Chief Craig disbanded the drug unit.

10        Do you see that?

11        Again, they use systemic problems with

12   something you had previously said.

13        And what I am looking at is this relates to

14   Hansberry and others in his crew, correct?

15   A.  Yes. I think I've already testified that even though

16   there were those who were part of the crew weren't

17   charged, I believe they still had limited knowledge that

18   they were involved in criminal and/or administrative

19   misconduct.

20   Q.  You're quoted a number of times here, but I think that

21   the points that -- I need to go on. I want to get done

22   with some of this stuff. Let's skip 12A.

23        12B, this is recording (sic) the suicide of

24   James Napier, an article in the Detroit News,

25   January 22, 2015. And the second paragraph.

---

1    I'm sorry. Let me go back to the first

2    paragraph. I'll read it. Detroit police officer,

3    according to two police sources, was being investigated

4    by the FBI and Detroit Internal Affairs narcotics

5    corruption died of a self-inflicted gunshot wound on

6    Thursday morning, January 22, 2015. It doesn't say that

7    that's the morning.

8         And the second paragraph -- I'll skip over the

9    first couple of lines. But it again says two sources --

10   last two lines. Two sources familiar with the

11   investigation into corruption of the former narcotics

12   section, that he was one of the officers being

13   investigated.

14        Do you know who was being investigated at that

15   time?

16        MR. SUROWIEC: Objection; hearsay to what you

17   just read, form, foundation.

18        Chief, go ahead and answer, if you know.

19        THE WITNESS: Well, I think you've named all

20   of them I think early on in my testimony. I feel like I

21   keep going over the same role. I talked about --

22   BY MR. DETTMER:

23   Q.  The people I previously mentioned you're talking about?

24   A.  Earlier on in this deposition, I referenced three people

25   that were charged -- no, two people charged -- I mean,

---

1    two people indicted, one charged, and one committed

2    suicide, and this would be that person. That's it.

3    That's what I know.

4    Q.  Just for the record, I have as Exhibit 12C, this is the

5    indictment of Hansberry, Watson.

6         EXHIBIT 12C

7         Indictment, Hansberry/Watson

8         WAS MARKED FOR IDENTIFICATION

9    BY MR. DETTMER:

10   Q.  Also, Leavells was indicted but not part of --

11   A.  He was charged. He was charged.

12   Q.  Well, he pled.

13   A.  Okay. Okay. That's fine.

14   Q.  He really testified about the criminality, and it was a

15   plea deal.

16   A.  Right.

17   Q.  But the point I was just making with you, and I

18   mentioned this before, the indictment was on April 8th,

19   2015. That was the significance of that exhibit.

20        And I -- based on your testimony, I assume you

21   didn't really have much knowledge about the actual

22   trial, correct?

23   A.  I did not.

24   Q.  There's an article in this Exhibit 12D, the Free Press

25   on June 30th, 2016.

1    EXHIBIT 12D

2    Free Press Article

3    6/30/16

4    WAS MARKED FOR IDENTIFICATION

5    BY MR. DETTMER:

6    Q.   The trial's ongoing and the papers are reporting what's

7         occurring.

8              MR. DETTMER:  And point to the bottom,

9         Michael.

10   BY MR. DETTMER:

11   Q.   During the trial, which is in its fourth week,

12        prosecutors had portrayed Hansberry as a fast-talking

13        schemer and a big spender who was motivated by greed.

14             Thursday they cited his bank and tax records

15        that bolster that claim, showing jurors how Hansberry

16        spent his money while working for the Detroit Police

17        Department.  I have writing over it; I'm sorry.

18             It goes on and explains about how much money

19        he had and what he was doing.  He had an Aston Martin, a

20        Cadillac, a Cadillac ATS, Corvette, and a Mazda6.

21             And I've raised this about supervision.  He

22        was at the Dexter base of the Narcotics Unit, and when I

23        was taking testimony of his crew members, I asked about

24        the cars.  Yes, he brought those cars to the base.  You

25        know, and the point that's being made in this article,

---

1    on the next page --

2    A.   Is there a question?

3    Q.   -- the FBI made the point that his earnings were covered

4         by cash -- I'm sorry; his earnings and purchases and

5         spendings, the difference, a shortage, earnings of his

6         salary as a Detroit police officer, was made up by cash

7         deposits and substantial, you know, cash deposits.

8              And the question is, the supervisors at the

9         base, the narcotics base on Dexter, never raised with

10        you, sir, or do you have any knowledge that Hansberry

11        seems to be living pretty high considering his earnings?

12             Anybody ever raise that with you?

13   A.   They did not.

14             MR. SUROWIEC:  Objection; form, foundation.

15        Time frame.

16             This is talking about 2010, Dennis.

17             MR. DETTMER:  I have a number of the

18        transcripts from the trial of Hansberry, two of them

19        were Leavells testimony, and that's Exhibits 12E and F.

20        EXHIBIT 12E

21        Leavells Testimony

22        WAS MARKED FOR IDENTIFICATION

23        EXHIBIT 12F

24        Leavells Testimony

25        WAS MARKED FOR IDENTIFICATION

---

1              MR. DETTMER:  And 12G is Gary Jackson's

2         testimony.

3              EXHIBIT 12G

4         Jackson Testimony

5         WAS MARKED FOR IDENTIFICATION

6    BY MR. DETTMER:

7    Q.   Gary Jackson clearly indicates there was $3 million.

8         I'm sure his testimony was thoroughly vetted by the FBI,

9         and he ran a risk of being -- to have no deal based on

10        perjury.

11             I would also indicate to you that Godbee

12        testified at the trial for the defense.  He came on and

13        he claimed a meeting that's in dispute that Gary Jackson

14        never mentioned that there was $3 million being shipped

15        on July 26th, 2010, and -- well, that matter is in

16        dispute.

17             But the point is he, Gary Jackson, testified

18        that there was 3 million and he told Chief Godbee that

19        and he just testified that Godbee said, I knew it.

20        Suggesting that he knew there was some crime going on.

21             Have you talked to anybody about that aspect

22        of Gary Jackson's testimony?

23             Were you aware of it?

24             MR. SUROWIEC:  Objection; form, foundation,

25        hearsay, completely improper question.

---

1              But, Chief, go ahead, answer it, if you can.

2         Have you talked to anyone?

3              THE WITNESS:  I have heard some loose

4         conversation about it.  I'll reiterate for purposes of

5         the record.  I was not here when that meeting took

6         place.  I've had conversations with Chris Graveline as

7         part of our probe, and this is something that was talked

8         about.  I'm just not understanding what I can add to

9         that meeting.

10   BY MR. DETTMER:

11   Q.   Okay.  When you meet with somebody that brings you

12        serious information about wrongdoing, do you generate

13        any paper?  Do you do a memo?  On such and such a date,

14        I spoke with so and so, and he said A, B, C?

15   A.   I do not.  I called Chris Graveline, and if it's a

16        serious matter, I'll call in the commander, and I say, I

17        need you to open an investigation into X, Y, and Z.

18   Q.   It appears to be your testimony that Graveline, Director

19        Graveline, is familiar with the testimony at the trial,

20        correct?

21   A.   I don't know if he was familiar.  It was a discussion we

22        had as part of this probe, and certainly he talked about

23        a -- some testimony provided by former Chief Godbee

24        relative to that and the exact specific statements you

25        made about I thought so.



1      Like you, when I heard that, I had -- I asked
2  Graveline the same question.  I said, if he thought
3  that, did he do anything about it?  That's what I asked
4  Graveline.  I said, do we know in our investigation if
5  he did anything about it?  Because if you think
6  somebody's involved in criminal behavior, what, if
7  anything, did you do as the chief executive?
8      And so at this point, I don't have an answer
9  for you because we haven't gotten -- I was concerned
10  enough that I said, well, maybe as part of our
11  investigative work, I know that he testified in the
12  civil matter.  Maybe we need to call him in as part of
13  our probe to find out, what, if anything, was done.
14      That was the conversation that Chris Graveline
15  and I had.
16  Q.  Thank you.  We've already discussed the Exhibit 13,
17  which is the interoffice memo about the money counter
18  here.
19      EXHIBIT 13
20      Money Counter Memo
21      WAS MARKED FOR IDENTIFICATION
22  BY MR. DETTMER:
23  Q.  12I is out of order.  (Inaudible) 12I is a
24  Warrendale/Detroit -- and I only raise this, and I'm
25  sure you haven't seen this.  But that there was public

1  knowledge, as of July 26th, 2010, that there was
2  suggested $2.3 million that was, in fact, seized, a
3  little less than the tally sheet of 2.370.
4      But this is the only specific time I've seen a
5  document that says -- that suggests the amount was more
6  than $2,080,000 -- 85,000.  But the point I'm making
7  with you, Chief, this issue was in the public media, and
8  I don't know where the source of this is, but it's out
9  there and it's probably the most accurate thing about
10  the tally sheet that I saw.
11      Going on, 12J is the conviction of Hansberry,
12  and it's dated February 22nd, 2017.  That's when he was
13  convicted by the jury.
14      EXHIBIT 12J
15      Hansberry Conviction
16      WAS MARKED FOR IDENTIFICATION
17      EXHIBIT 14
18      Use of Paid Informants
19      WAS MARKED FOR IDENTIFICATION
20  BY MR. DETTMER:
21  Q.  Exhibit 14 is reigning in the use of paid informants.
22  We talked about that a little bit.  I'd like to just
23  point out maybe one or two things.
24      You had a very serious concern about
25  informants, the reliability and the use of them.  And

1  this is your discussion about that with the media.
2  Okay?  Exhibit 14.
3      Then I'd like to go on.  There's a stipulated
4  Protective Order that we marked as Exhibit 14A.
5      EXHIBIT 14A
6      Protective Order
7      WAS MARKED FOR IDENTIFICATION
8      EXHIBIT 14B
9      Confidentiality of SOI
10      WAS MARKED FOR IDENTIFICATION
11      EXHIBIT 14C
12      Confidentiality of SOI
13      WAS MARKED FOR IDENTIFICATION
14  BY MR. DETTMER:
15  Q.  That relates to the confidentiality of the SOI documents
16  that I have that were produced to us, and it's
17  Exhibit 14B and C.  So subject to Protective Order, and
18  this actually was in the Reid versus City of Detroit.
19  But we all recognize that this is confidentiality.
20      One of them is an individual named Ken
21  Jackson, and he's SOI 2499, and the other one is Gary
22  Jackson, SOI 2449.
23      Gary Jackson is the one that had provided the
24  information about the transfer -- the money on July 27,
25  2010.  And if we can go to that.

1      Unfortunately these aren't Bates marked.  But
2  I'd like to indicate the stop was on July 26, 2010.
3  Arthur Leavells signs up Gary Jackson as SOI 2449 on
4  July 27, 2010, the day after the raid.
5      Is that proper procedure?  He's already used
6  him as the Source of Information.  Signs him up the next
7  day after the stop of 2 million plus is --
8  A.  I can't speak to what -- gee, I don't know.  I don't
9  know what...
10      MR. DETTMER:  Well, look at the next page,
11  Michael, I think it is, looking at the record of payment
12  to informant.
13  BY MR. DETTMER:
14  Q.  Now, the -- apparently, Leavells worked very hard at
15  getting Jackson a reward for the stop on the 26th, and
16  on August 14, 2010, a little more than two weeks after
17  the stop, Leavells, it appears with some advisory DPD
18  people and $250,000 in cash, and he signs --
19      MR. DETTMER:  Michael, can you move it a
20  little bit to the left?
21  BY MR. DETTMER:
22  Q.  Well, you can see the $250,000, and he got -- he, Gary
23  Jackson, received $250,000 from the Detroit Police
24  Department as a result of that stop on July.
25      Were you aware of that?

1  A.  It's signed 8/14.  I mean, I've seen documents -- that
2      document, I believe I saw doing predep, but I wasn't
3      aware of it in 2010, no.
4  Q.  Were you aware of it prior to the last couple of weeks
5      of deposition, unrelated to dep preparation?
6  A.  I mean, I may have been.  I don't recall specifically.
7      If you have a direct question and I was signed off on
8      anything, I can verify that.  But I don't --
9  Q.  You don't have any information, that's what I'm asking
10     you, prior to that?
11 A.  I don't have any knowledge of -- of that.
12 Q.  Is this consistent with Detroit Police Department
13     policy, once you came on board in 2013?  The day after
14     the stop, the acquisition of the money, the SOI had
15     signed off --
16 A.  I can't tell what was happening seven years ago.  In
17     fact, to be candid, Narcotics was not on my radar until
18     the FBI advised me as to what they were planning on
19     doing.
20         We had a 12-year Consent Judgment, and the key
21     issues concerning the department accountability were
22     outlined in the Consent Judgment, but narcotics was not
23     one of them.
24 Q.  You notice on -- well, you can't see it.
25         MR. DETTMER:  But, Michael, can you run it up

1      or down?
2  BY MR. DETTMER:
3  Q.  This is Informant's Code 2499, which is not Gary Jackson
4      SOI number, he's 2449.  And Leavells has used these
5      numbers kind of interchangeably in cases we have.  And
6      you will see that -- there's another payment, and this
7      one is again to 2499 of $5,000 to -- Leavells to,
8      apparently, for Jackson, Gary Jackson, and it's listed
9      as a bonus payment.
10         Are you aware of the DPD paying bonus
11     payments?
12 A.  I don't have specific -- I reviewed that document within
13     a couple of months after I got here.  I was briefed.  I
14     don't have any independent recall.  I did make my
15     signature at some point, so it's mine.  I know that.  I
16     just don't have any independent recall.
17         And I don't know who was working, which AC
18     briefed me.  I don't recall, really, having to approve
19     informant payments.  I know we have done them, but,
20     again, a lot of what I've discussed today has to do with
21     this unilateral flipping and, as you indicated, the
22     transposing informant numbers.
23         I'm learning some of this as we go through the
24     probe.  And given the name of the officer who is listed
25     here, who's been implicated for criminal misconduct,

1      certainly that causes me concern.  But I don't have
2      any -- I think I signed off on that in September of
3      2013, two months after I was here.  I just don't recall
4      it.
5          EXHIBIT 15
6          Internal Affairs Investigation
7          WAS MARKED FOR IDENTIFICATION
8  BY MR. DETTMER:
9  Q.  Next, Exhibit 15.  This is an Internal Affairs
10     investigation following a raid by a spinoff of
11     Hansberry's crew.  You can see who it included.
12     Geelhood, Barnett, Riley, Matelic, Leavells, and
13     Tourville.
14 A.  Right.
15 Q.  These officers, including Sergeant Geelhood who was a
16     supervisor of his crew, were suspended for a year.
17         Are you aware of that?
18 A.  Suspended for a year?
19 Q.  Yes.  Suspended with pay for a year.
20 A.  I don't independently recall that.  It wouldn't surprise
21     me.  A lot of times we -- the police commission, and
22     this would have been pre them getting their authority
23     back, so I don't recall them being suspended for a year
24     with pay.
25 Q.  They always make it very clear to me when you ask them

1      about it, well, we were suspended but with pay.
2  A.  Well, that's a fact.  I mean, that's kind of been the
3      process.  I don't understand it.  But in order to take
4      pay away, pre the adjudication of this matter, it would
5      have to go before the police commission.
6          So that was a standing practice.  I have since
7      changed that on case-by-case.  So this happened -- like
8      I have two former narcotic officers off right now
9      suspended with pay.
10         And ordinarily if they were pending criminal
11     charges, I would give it to the police commission, but
12     I've opted to move forward with the disciplinary
13     hearing, and it is my anticipation that that's a
14     termination case.
15 Q.  Exhibit 16 -- I want to go on.  We're almost done.
16         EXHIBIT 16
17         Matelic File
18         WAS MARKED FOR IDENTIFICATION
19 BY MR. DETTMER:
20 Q.  16 is the file on Matelic that we previously talked
21     about just so you know.
22 A.  Okay.
23         EXHIBIT 17
24         Geelhood Case
25         WAS MARKED FOR IDENTIFICATION

1 BY MR. DETTMER:

2 Q.   17 deals with a case involving Steven Geelhood, and this

3      is the matter that the director has raised to Geelhood

4      and an issue about a guy named by Michael Hathaway in

5      the criminal division of the Third Circuit, and then a

6      civil lawsuit following that that was initially assigned

7      to -- was assigned to --

8 A.   I think that's the case that we are investigating

9      Sergeant Geelhood on now.  I think -- I'm almost certain

10     that's the case.

11 Q.  But this, again, goes back to an April 25, 2014, raid

12     where Geelhood is the affiant, okay?  That's being

13     investigated.

14          And then finally 18 and 19.

15          EXHIBIT 18

16          Darell Chancellor Case

17          WAS MARKED FOR IDENTIFICATION

18          EXHIBIT 19

19          Darell Chancellor Case

20          WAS MARKED FOR IDENTIFICATION.

21 BY MR. DETTMER:

22 Q.  Exhibits 18 and 19 involve a Darell Chancellor.  I don't

23     know if you know about him.  But the records provided

24     that and he actually initiated an investigation related

25     to this lawsuit.

1          And this involves a search warrant that goes

2      back -- well, Chancellor was convicted and sent to

3      prison, and he was still in prison until the Conviction

4      Integrity Unit release suggested to the Prosecutor

5      Worthy that he be released, and he was and the case was

6      dismissed.

7 A.   And this is the case about Geelhood, yes?

8 Q.   Yes, this is another case.

9 A.   Yes, there's got to be a case -- I don't know -- you're

10     telling me that Chris Graveline provided.  I know that

11     we opened a case against Geelhood based on an integrity.

12     I think I mentioned that earlier in my --

13 Q.  Yes.  Yes.  Okay.  That's this case.  Okay.

14 A.  Right.

15          MR. DETTMER:  Let's take a moment.

16          (Off the record at 12:15 p.m.)

17 BY MR. DETTMER:

18 Q.  Chief Craig, you would acknowledge that you're

19     attempting to change the culture of the Detroit Police

20     Department to the extent that there are some groups, for

21     example, the Hansberry and Geelhood crews that were

22     doing apparently dishonest acts, correct?

23 A.  I made a full commitment.  I think I spelled it out

24     early on in my deposition that we missed some things

25     with the Hansberry case.  It wasn't a seamless

1      transition from criminal to administrative relative to

2      the other members of the Hansberry crew.

3          We know that now looking back, so I think key

4      for where we are today is that we have information on

5      practices, illegal practices occurring in -- alleged

6      illegal practices occurring in Narcotics that we are

7      aggressively tackling.

8          The reason for the seizure of all of the

9      records, the person that provided information, the one I

10     told you I couldn't talk about that was a federal -- it

11     came from the federal side of the house, gave us

12     information.  From that person, it kind of spelled it

13     out to specific alleged criminal actions.

14          So given that and the timing of Mosley, I felt

15     very strongly that what we didn't know at the conclusion

16     of Hansberry we know now.  So now we have a template

17     where we can totally eradicate any type of corruption

18     involving Narcotics.  There was so much we didn't have,

19     that we now do have.

20 Q.  Well, Chief, you indicated --

21 A.  And so my goal is just -- I'm sorry.

22 Q.  What position was --

23          COURT REPORTER:  I missed that question.  Can

24     you repeat the question?

25          THE WITNESS:  You were broken up.

1 BY MR. DETTMER:

2 Q.  What level of rank does Ted (sic) Ewald have?

3 A.  He's an investigator.  One of the original investigator

4      ranks.  As I've testified to, Tim Ewald -- Tim Ewald has

5      been a long-time assigned investigator with the FBI's

6      public corruption unit.  He is a DPD officer but

7      assigned to the FBI.

8 Q.  Well --

9 A.  And he was --

10 Q.  Well, does he have a liaison relationship with the

11     Detroit Police Department where he reports to someone

12     about the investigations, ongoing investigations by the

13     FBI?

14 A.  He does now.  He does now.  One of the problems that

15     I've discovered early on that it was technically a

16     liaison, but because he was -- I mean, this -- for

17     example, he is a DPD officer working with the FBI on the

18     Hansberry case, but, again, I didn't find out about the

19     Hansberry case until sometime in 2014.

20          So it is not like that the DPD liaison came

21     over and said, okay, here's a list of cases that the FBI

22     was investigating.  It was a confidential investigation.

23     And many times the FBI will initiate and have ongoing

24     confidential investigations and will not tell the

25     department.

1   Q.   Yes, but after --

2   A.   Now, the DPD officer --

3        MR. DETTMER:  We are losing you.

4        MR. SUROWIEC:  Chief, hold on one second.

5   This is Jim Surowiec.

6        Whoever the IT person is, if they are on the

7   line or if anybody who can help, Chief is frozen.  Chief

8   Craig, I'm not seeing you move at all.  And, Dennis,

9   you're clipping in and out.

10       THE WITNESS:  You can't see this?

11       MR. SUROWIEC:  I'm wondering if there's

12  something we can do.

13       MR. DETTMER:  It says bandwidth is low.  It

14  says your bandwidth is low, Chief.  That's what I'm

15  getting a report of.

16       THE WITNESS:  Yes, I am in the office.  I'm in

17  my office, so this should be a good bandwidth, you know.

18       MR. DETTMER:  Yes, I would think so.

19       MR. SUROWIEC:  Should we reconnect?  Is there

20  an IT person?  Michael?

21       THE REPORTER:  The chief could go out and come

22  back in.

23       (Pause in proceedings

24       12:21 - 12:32 p.m.)

25       THE WITNESS:  In the interest of addressing

1   the transition between Han- -- can you hear me okay?

2        The transition of the Hansberry with the

3   Detroit staff that was embedded in the FBI was certainly

4   not something I was quite impressed with.  In fact, I

5   can candidly say that I went through a number of

6   commanding officers over at Internal Affairs prior to

7   getting to the one before Chris Graveline.  There was

8   someone named commander, who is now a Deputy Chief.

9        But the communication, seamless, didn't work

10  out in a manner that it should have, and at a point I

11  even moved Tim Ewald out of the FBI task force.  He has

12  since been restored to that position.  The communication

13  has changed dramatically.

14       My perception was that the DPD liaison role

15  was to work closely with the department executive team.

16  I recognize that there were some cases that the FBI were

17  investigating that they didn't necessarily want to brief

18  the department on.

19       However, because of the intimacy our DPD staff

20  had with the Hansberry case, I assumed or thought that

21  anything that wasn't addressed by the Feds could have

22  been easily been addressed by the department.  That did

23  not happen.

24       So as a result of that, it wasn't until -- and

25  I think I have said this several times throughout this

1   deposition -- it wasn't until that information we got

2   from the source of the type of alleged conduct that was

3   going on in Narcotics that we were able to effectively

4   launch our own probe, which we've done.

5        It's a DPD-led tasks force and, again, the FBI

6   is part of that task force.  There's a total of five

7   agents, three part-time, two permanent, and so now I

8   have a high level of confidence that the work that we're

9   doing now is the work that will finally make a

10  difference.

11       And finally eradicating, not describing

12  different points, a pattern of misconduct, and, again,

13  not by all, but just things that were allowed to happen

14  in Narcotics that weren't challenged.

15  BY MR. DETTMER:

16  Q.   You would agree the conviction of Hansberry and Watson

17  in February of 2017 should have opened up a lot of

18  information through Ewald to the Internal Affairs

19  people, correct?

20  A.   Absolutely.  He was technically assigned to Internal

21  Affairs, but it wasn't -- and, again, I liked --

22  personally liked him, Ewald.  I just think I

23  overestimated his capabilities, meaning that while he

24  had been attached to the FBI for a long time, clearly

25  working as an investigator in Internal Affairs is very

1   different than being a task force officer in the FBI.

2        You're not actually writing up investigations

3   and doing the kind of investigative work that IA is

4   doing.  The agents that worked there are on a much

5   different level.

6        I mean, for example, a lot of what the DPD

7   task force officers, Ewald would do, is they would

8   listen to wire conversations and make notes that would

9   then go off to the agents who were the ones who were

10  presenting the cases to the U.S. Attorney.

11       And so that was a piece of the transition that

12  didn't make a lot of sense.  And very frustrating, to be

13  honest, because I knew then -- I felt we had a missed

14  opportunity on some of the others that worked Narcotics,

15  that while they didn't meet the threshold for federal

16  prosecution, they certainly could have met the threshold

17  of administrative prosecution, if you will.

18       And so -- that was then.  But, again, the good

19  news was we were able to get very clear information on

20  the type of behaviors that were going on in Narcotics by

21  some.

22  Q.   Well, Chief, you would agree you're trying to change the

23       culture.  That's what you are talking about, correct?

24  A.   That has been something I've been trying to do for --

25       and have been successful.  I mean, we are in a 13-year

1    Consent Judgment.

2              The department was not compliant because there

3    was a culture of a lack of accountability by management.

4    That's a fact.  I've said it publicly then and I'll say

5    it publicly now.

6              So once we got out from under Consent Judgment

7    and we start to build a new management, an executive

8    team, that's when change started to take place.

9    Q.   We talked about -- I mentioned that Hansberry and

10   Watson, the conviction was in February of 2017.  And

11   between that period and August of 2019, 2 1/2 years, is

12   reflective of kind of a historical lack of supervision

13   that's gone on, at least going back to 2010, correct?

14   A.   I would say even before that.  I think the culture was

15   such that -- and this is my opinion.  It's not based on

16   fact.  It's -- my opinion is that when there were

17   investigations like the FBI would come in, do their

18   investigation, whoever got convicted got convicted, and

19   it was done.  It was over.

20             Mosley was different.  Mosley popped up.  He

21   got charged with the one incident.  I believe had

22   business or status quo had -- we had allowed it to be

23   that, he would have been charged and business would

24   have continued.

25             But instead, I'm going to say it now for the

1    fifth time, a couple of things worked out in our favor.

2    One, we had some information.  Two, I had a hunch, if

3    you will, and the hunch was Mosley; this was not the

4    first time he engaged in this kind of criminal behavior.

5    There was no way for me to believe that.

6              So it was based on those two primary factors

7    that we launched the probe.  The fact that I had now a

8    former US Attorney who understood the workings on the

9    other side certainly was a recipe for success.

10             So -- and while this is a lengthy undertaking,

11   we're in the process, as of now, adding additional

12   staff, task force operation, because we are going back,

13   and, as I think I indicated early in my deposition,

14   we're really only back to 2017.

15             Again, I recognize that counsel believes that

16   we should have started in reverse.  It didn't work out

17   that way.  I'm still comfortable that we started where

18   we started and we're doing what we're doing now.

19   Q.   I'd like to raise two points.  We talked about the

20   July 2010 stop and 2 million whatever, officers, and

21   we've talked about Hansberry and Watson being convicted

22   in February '17.

23             Those two events on the Detroit Police

24   Department had constructive notice that there was a

25   problem with the police department, correct?  And they

1    investigated --

2              (Mulitple speakers

3              speaking at the same time.)

4    A.   I don't know if I -- I don't -- I can't agree with --

5    Q.   -- that they had Ewald?

6    A.   I am not going to agree with you.  So -- I'm not going

7    to agree with you, and I'm going to tell you on this

8    reason.

9              Number one, I wasn't here in 2010.  I don't

10   know about this tally sheet investigation.

11             You, on the record, said there was no

12   investigation.  The City's attorney said there was an

13   investigation.  And then you show that there was an

14   investigative report.  So I'm troubled by that.

15             So when you make a statement that the

16   department basically ignored -- let me just say this to

17   you.  I have never ignored anything in my tenure in this

18   police department.  I respond to what I am aware of, and

19   sometimes, as we are going down this journey of change,

20   there were things I wasn't made aware of.  So I can take

21   responsibility for that.

22             But if I had known what I know now, would I

23   have done things differently maybe at the conclusion of

24   Hansberry?  Absolutely.  I didn't know.  I didn't know.

25   I would have launched the task force then.

1    BY MR. DETTMER:

2    Q.   Chief, let me make the point about the tally sheet.  The

3    point really I was making with you, was there was never

4    an investigation of the tally sheet.

5              The investigation was solely related to the

6    money counters and the inefficiency there.  And the real

7    issue was the tally sheet.  Why wasn't that

8    investigated?  We're talking about $280,000, not $15,000

9    because of a defective machine.

10             (Multiple speakers

11             speaking at the same time)?

12             THE WITNESS:  How about in my -- how about in

13   my expert opinion?  I don't think it's just about the

14   tally machine.  If you've got a concern, I think the

15   concern is more about there was an inadequate

16   investigation.

17             There was an investigation.  There wouldn't be

18   two separate investigations of the same issue.  That's

19   not even logical.  I've been doing this too long.  I'm

20   suggesting that you could have confronted me with --

21   said, well, do you think that, based on the fact that

22   the tally sheet was not mentioned in the counter

23   investigation, that the investigation was inadequate?

24   And I probably would have said to you, I'd agree.  If

25   the tally sheet was an issue, I would have wanted to



1    look at that if it wasn't mentioned.  But I haven't even

2    read that investigation to even know if the tally sheet

3    was mentioned.

4  BY MR. DETTMER:

5  Q.   I appreciate that.  But, Chief, I wasn't trying to

6    mislead you.  I actually had that, Internal Affairs

7    document as an exhibit.  If you can look at it and get

8    all of the exhibits from Mr. Surowiec, but I was not

9    trying to mislead you.

10        The whole point is the issue of the tally

11   sheet was some indication of a serious problem, and as

12   events played out in the federal trial, it was the

13   essence of the criminality going back to 2010.

14 A.   And I can't argue with you.  I'm just saying that given

15   the way you described the investigation, because

16   initially you said there was no investigation.  And I

17   know what you were saying now.

18 Q.   No investigation of the tally sheet.

19 A.   Of the tally.  But why wouldn't the tally sheet and the

20   money counter have been all in one, because it's part of

21   the same issue.  It's the same issue.

22 Q.   And I agree with you.  Why wasn't that picked up when

23   Internal Affairs looked at a $15,000 discrepancy.  Why

24   didn't they pick that up?

25 A.   I don't know the answer to that.



1         MR. SUROWIEC:  And I'm going to just object.

2    I object to --

3         (Multiple speakers

4          speaking at the same time)

5  BY MR. DETTMER:

6  Q.   And they should have had notice of that.  Or if they did

7    have notice, they just ignored it.

8         MR. SUROWIEC:  Dennis, can I just raise a

9    point here?  I'd like to be able to ask him about five

10   minutes of cleanup questions.  I would like -- we're at

11   the 2:27 mark, and you're going over old stuff.

12        MR. DETTMER:  Go ahead.

13        Chief, nice talking to you.  Enjoy the rest of

14   your day.

15        THE WITNESS:  Say what now?

16        MR. SUROWIEC:  Chief, this is Jim Surowiec.  I

17   have about five minutes or less of cleanup questions I

18   just want to ask you.  Okay?

19 EXAMINATION BY MR. SUROWIEC:

20 Q.   You indicated you started here in 2013.  When you

21   started, you came from Cincinnati; is that correct?

22 A.   That's correct.

23 Q.   Okay.  When you found out about Hansberry, Watson, and

24   Leavells, you were informed by the FBI in 2014 that they

25   had been indicted and they were going to be charged?



1  A.   I would guess it was in 2014 only because soon after the

2    FBI brought me in to advise me, Hansberry and crew were

3    indicted not long after that.  So they had started --

4    they had an investigation that they started in 2010 that

5    was ongoing through 2013 up until the culmination time

6    of 2014.

7  Q.   Okay.  Were you ever informed at any point in time prior

8    to finding out in 2014 that the FBI was looking at

9    Hansberry and Watson and Leavells?

10 A.   I did not, no.  In fact --

11 Q.   Okay.

12 A.   What I wanted to say is in support of that.  So

13   Hansberry was a lieutenant working at the 12th Precinct,

14   and we were getting ready to make captains.  And so

15   right at the time that he came up as a potential

16   candidate, I learned about the investigation, so, of

17   course, it was confidential.

18        I said nothing, but that was in 2014.  Up

19   until that point, he was -- at least by the team around

20   me, regarded him very favorably as a top candidate in

21   Detroit Police Department.

22 Q.   So there was nothing that anybody had notice of up until

23   the point the FBI said, knock knock.  He's getting

24   indicted, Watson is going indicted, Leavells is going

25   down, that would have --

1  A.   Well, it wasn't that close.  They gave me a little bit.

2    By that time the investigation was rock solid.

3  Q.   Got you.

4  A.   And, again, when they're doing a confidential

5    investigation, they're not necessarily going to alert

6    the department because they don't know who to trust.

7  Q.   They could have been looking into you?

8  A.   I doubt that they were looking into me, but --

9  Q.   But they look at the highest levels.  I'm just saying

10   they look at everybody.

11 Q.   I don't --

12 Q.   No?

13 A.   No.  I'm not saying that.  What I'm suggesting to you is

14   they do their investigation and they only bring in the

15   people who they feel they should, and the two task force

16   officers were already embedded.

17        So to my knowledge, they were the only two

18   that knew about those Narcotic officers being

19   investigated.

20 Q.   In terms of 2010 when you weren't there, 2011, 2012,

21   2013, before you arrived, you have an opinion but you

22   don't have any evidence because your director has not

23   looked back that far, that there was a pattern or

24   culture of corruption, correct?  You haven't gotten back

25   that far?

1   A.   I have an opinion -- I have a strong opinion, yes.
2   Q.   Okay.  But it's not evidence based; is that fair?
3   A.   It's not evidence based.
4   Q.   It's based on your police -- you have police instincts
5        and gut and you're looking back and you're looking back
6        hard on and at everything?
7   A.   And I follow my gut sometimes, and I did on Mosley and I
8        was absolutely correct.  So, yes, I have a strong
9        opinion and instinct that's the result of almost
10       44 years of experience.
11  Q.   So when they're talking about -- when they are talking
12       about the newspaper articles where you are being quoted
13       as saying there is a culture of corruption or pattern
14       and practice, you're referencing, and correct me if I'm
15       wrong, you just found out about Hansberry, Watson,
16       Leavells.  There was also a civilian out of the
17       department by the name of Kenyal Brown, who was
18       indicted.
19            And then when you thought everything had been
20       shaken out and everybody had learned their lesson, in
21       2018 or '19, Mosley gets indicted.
22            Those are the individuals that we're talking
23       about in terms of being criminally charged, correct?
24  A.   Mosley gets -- the difference with Mosley, we had
25       additional information that we started to look at.  And



1        looking at that additional information helped me form an
2        opinion that there is a pattern.
3   Q.   Okay.
4   A.   Based on what I learned I'm telling you there's a
5        pattern of criminality that we started to see among
6        some.  Allegations.
7   Q.   Okay.
8   A.   And that we are investigating right now.
9        And I know that we have -- we have talked in the past
10       and we discussed the concept of Monell, which is a
11       Monell claim, a constitutional claim against the City
12       for having an unconstitutional custom and practice and
13       policy.
14            When you say a pattern and practice, are you
15       saying it in legal terms or are you saying it in your
16       terms as a layman saying I see a pattern?  I'm a police
17       officer --
18  A.   Not legal.  In lay terms as a police -- it's like when I
19       look at crime and I see that there's a cluster of
20       robberies in a certain location.  I call it a pattern.
21            If I see a cluster or similar type of alleged
22       misconduct, I'll call that a pattern, too.  Now, again,
23       we're talking about allegations.
24  Q.   Okay.  How many at high point did you say Narcotics had
25       in it before you cut the staff in half?



1   A.   I think it was already asked and answered.  I think
2        Dennis had an accurate account.  Roughly 40-something,
3        down to maybe 24, almost in half.  We focused on the
4        Major Violators, which was the old conspiracy, if you
5        will, and street enforcement, which is going to be left
6        with the precincts.
7   Q.   So of 40 officers at the high point, we have -- in terms
8        of police officers, Hansberry, Watson, Leavells, and
9        Mosley who were convicted.  No one else, correct?
10  A.   As far as I know.
11  Q.   Okay.  Who has -- at the department, under your watch,
12       who has the final decisionmaking authority as to what
13       policies are enacted?  Like the one that was enacted on
14       Major Violators and establishing the new day?
15  A.   I initiate the policy, and I don't know the date that
16       the police commission came back into their authority,
17       but they have to approve policy enacted by the Detroit
18       Police Department.
19  Q.   Okay.  Does a police officer have the authority to enact
20       policy?
21  A.   They do not.
22  Q.   Does a sergeant have the power to enact a policy?
23  A.   No.  Carry out policy.
24  Q.   Lieutenant, captain, commander, do any of those
25       individuals have the ability or authority to enact

1        policy?
2   A.   No.
3   Q.   Let me take a quick look here.
4   A.   I'm getting close.  Help me out.  Help me out.
5   Q.   The last question I'll ask you is, so when you're making
6        these statements, because Mr. Dezsi showed you a lot of
7        news articles about widespread corruption, that is in
8        direct response to Hansberry, Leavells, Watson, and
9        Mosley; is that fair?
10  A.   Mosley, but in the interest of fairness, because of the
11       probe -- the probe was just not for Mosley.  We didn't
12       launch this probe just for Mosley.
13  Q.   Right.
14  Q.   Okay?
15       But I'm saying it wasn't in connection to 2010, '11,
16       '12, '13, '14 --
17  A.   No, I didn't have any information then.
18  Q.   Fair enough.
19  A.   I might have had suspicions, but the 2010 matter that
20       was culminating in 2014, I did not have the information
21       that I now have.
22  Q.   All right.
23  A.   So if I'm saying there's a pattern, a widespread, given
24       what I now know, the allegations, and I've got to put
25       emphasis on alleged, because there's been no additional

1  people charged.  There has been one that has been
2  retired or resigned in lieu of termination, which was
3  part of the alleged misconduct.  She just didn't get
4  terminated.  She resigned in lieu of.
5  Q.  Here is my windup.  The cases that we are now dealing
6      with, because one has been dismissed, one of the five
7      cases has been dismissed.  So we've got this case, which
8      is Metris-Shamoon versus City of Detroit and all of the
9      individuals.  Frontczak versus City of Detroit.  Reid
10     versus City of Detroit, and Gardella -- I'm sorry,
11     that's --
12 A.  You know, you're naming all of these cases.  I don't
13     have them in front of me to know which, so...
14 Q.  That was my question.  There was one more there.
15     Lockard versus City of Detroit.
16         Do you know anything about those cases?
17 A.  Not definitively, no.  I mean --
18 Q.  Okay.
19 A.  If you named officers involved in the cases, the names
20     may --
21 Q.  But in terms of the allegations that are involved in
22     those cases -- I mean, they're asking you questions
23     about a Monell claim and about policy in the City.
24     We're really here to talk about these cases.
25         Do you have any intimate knowledge of the

1  lawsuits?
2  A.  Some of the lawsuits we have opened up and initiated
3      misconduct investigations, as I indicated during our
4      predeposition, as I've indicated here.  Matelic came out
5      of a civil lawsuit.  Geelhood came out of Wayne County
6      Prosecutor's Integrity Unit, if my memory serves me
7      correct.  So I know for a fact, those two -- one for
8      sure came out of a lawsuit.
9  Q.  Okay.
10 A.  That's very different today.  That if people are filing
11     lawsuits, and in the lawsuit they are alleging
12     misconduct, we will open up and initiate an Internal
13     Affairs investigation.
14         It happened early on because it wasn't a
15     seamless transition.  A lot of times the Law Department
16     didn't notify the department of allegations.  This has
17     been, fortunately, a recent change.
18         This is something that I gave Grant Ha, who
19     works on my staff, that anytime a lawsuit comes in
20     alleging misconduct, we have to be notified so that we
21     can open up a misconduct.  That didn't happen before.
22 Q.  Okay.  Thank you, sir.
23 A.  All right.  Thank you.
24         MR. DETTMER:  One quick question.  Very quick.
25

1  RE-EXAMINATION BY MR. DETTMER:
2  Q.  You're still looking at crew members of Hansberry and
3      Geelhood's crews, and I would suggest to you those crews
4      are members of the various grades of our four current
5      cases.  You don't know any of the detail of that; fair
6      to say?
7  A.  No, haven't gone that far back.  As I indicated in my
8      earlier testimony, we are working from Mosley back.
9      Possibly when we get to 2010, 2011, or if -- or through
10     the course of lawsuits that are coming in, we'll
11     initiate investigations.
12         So I am certain that we're going to be looking
13     at individuals who are probably no longer members of the
14     department, and who have retired.  There's some cases
15     that the Wayne County Prosecutor's office is also
16     interested in exonerating.  Hey, folks, I've got to
17     really -- I mean, I'm actually ten minutes out.  So...
18         MR. SUROWIEC:  I am done.
19         MR. DETTMER:  Good to you see you, Chief.
20     Thank you.
21         THE WITNESS:  Thank you.
22         (Deposition concluded about 3:00 p.m.)
23
24
25

1           CERTIFICATE OF NOTARY.
2  STATE OF MICHIGAN        )
3                          ) SS
4  COUNTY OF ST. CLAIR      )
5      I, Kelley Whitaker, Certified Shorthand Reporter, a
6  Notary Public in and for the above county and state, do
7  hereby certify that the above deposition was taken by
8  Virtual means; that the witness was by me first duly
9  sworn to testify to the truth, and nothing but the
10 truth, that the foregoing questions asked and answers
11 made by the witness were duly recorded by me
12 stenographically and reduced to computer transcription;
13 that this is a true, full and correct transcript of my
14 stenographic notes so taken; and that I am not related
15 to, nor of counsel to either party nor interested in the
16 event of this cause.
17
18
19
20        Kelley A. Nader
21        RPR, CSR 0977 Notary Public,
22        St. Clair County, Michigan
23 My Commission expires:  1/27/2026
24
25