**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S OBJECTION TO RICHARD WERSHE, JR'S MOTION FOR ENTRY OF NOTICE OF CLAIM AFTER BAR DATE [DOC. NO. 13560]

The City of Detroit ("City") by its undersigned counsel, Miller, Canfield, Paddock and Stone, P.L.C., files this objection to *Richard Wershe, Jr's Motion for Entry of Notice of Claim After Bar Date* ("Motion"). [Doc. No. 13560]. In support of its Objection, the City respectfully states as follows:

## I.    INTRODUCTION

The Motion should be denied because equitable tolling does not apply to proof of claim deadlines, and the reasons Wershe proffers for his failure to timely file a proof of claim do not constitute excusable neglect. The proof of claim deadline expired more than eight years ago and Wershe has been making similar claims against the City for around twenty years. And, he has been making these claims publicly in a documentary that was released before he left Michigan prison to serve another sentence in Florida prison. Thus, his excuse for not filing a proof of claim – fear of retaliation – is not credible and should be dismissed by this Court.

1

Further, the City is prepared to make its first and final distribution to class 14 unsecured creditors in this case. Allowing Wershe to file a proof of claim nearly eight years after the bar date would delay a final distribution, likely by several years, while Wershe's claims are litigated. This would severely prejudice the City and its creditors who have been waiting for a long time to realize on their claims.

Wershe was served with the City's motion seeking authority to make distributions on Class 14 Claims and did not object. The Court entered an order granting this motion, holding that no Class 14 Claims may be asserted. This order provides yet another reason why Wershe's Motion should be denied.

Finally, there is no valid reason to stay the City's motion filed against Wershe at docket number 13491. This Court is in the best position to interpret its own orders and consider the prejudice to the City and its creditors. The City respectfully requests that this Court deny the Motion.

## II. RELEVANT BACKGROUND

The factual background related to Wershe and the Motion have been extensively briefed by the City in the *City's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Richard Wershe Jr.* ("Motion to Enforce") [Doc. No. 13491], the *City's Reply in Support of its Motion*

*to Enforce* ("Reply to Motion to Enforce") [Doc. No. 13516] and the City's Supplement[1] to these filings, which the City incorporates here.

## A.  This Court's Bar Date Order

On July 18, 2013 ("Petition Date"), the City filed this chapter 9 case.

On October 10, 2013, the City filed its *Motion Pursuant to Section 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* ("Bar Date Motion") [Doc. No. 1146], which was approved by this Court on November 21, 2013 ("Bar Date Order") [Doc. No. 1782].

The deadline for filing claims against the City was February 21, 2014 ("Bar Date"). Bar Date Order, ¶ 6. The Bar Date Order permitted the City to publish notice of the Bar Date "which publication is hereby approved and shall be deemed good, adequate and sufficient publication notice of the Bar Dates." Bar Date Order ¶ 26. The City published notice in accordance with the Bar Date Order. *See* Doc. Nos. 3007 (Detroit News and Free Press), 3008 (USA Today), and 3009 (Wall Street Journal).

## B.  The City Is Ready to Distribute B Notes to Class 14 Creditors

On October 22, 2014, the City filed its *Eighth Amended Plan of the*

---

[1] *Ex Parte Motion of City of Detroit for Leave to File Response in Connection with (I) Order Requiring Richard Wershe, Jr. to File a Supplement Regarding the City of Detroit's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Richard Wershe, Jr. and (ii) Richard Wershe, Jr's Supplemental Brief Regarding Certain Dates of Events* ("Supplement," Doc. No. 13551).

3

*Adjustment of Debts of the City of Detroit* ("Plan") [Doc. No. 8045] which this Court

confirmed with slight modifications on November 12, 2014 ("Confirmation Order")

[Doc. No. 8272]. The Plan became effective on December 10, 2014 ("Effective

Date"). The Plan states that each Holder[2] of an Allowed Other Unsecured Claim

shall receive a pro rata share of B Notes. Plan, Art. II.B.3.u.i, p. 44.

On March 16, 2022, the City filed its *Motion for an Order (A) Approving First*

*and Final Distribution of New B Notes to Holders of Allowed Class 14 Claims Under*

*the City's Plan of Adjustment and (B) Granting Other Related Relief* ("Distribution

Motion") [Doc. No. 13521]. The Distribution Motion provided "interested parties

the opportunity to review the planned Distribution and to timely raise any concerns

they may have or be permanently and forever barred, estopped, and enjoined from

raising any objection to the proposed first and final Distribution or asserting any

Class 14 Claim against the City or any of its property." Distribution Motion, p. 3.

The Distribution Motion included, as Exhibit 6-B, a list of all Holders of

Allowed Class 14 Claims whom the City believed were entitled to receive a

Distribution under the Plan.[3] The City received informal objections to the Distribution

Motion, which resulted in a few Claims being added to Exhibit 6-B. A revised

---

[2] Capitalized terms not defined in this Objection have the meanings ascribed to them in the Plan.

[3] For informational purposes, the Distribution Motion also included Exhibit 6-C, a list of all Holders of Allowed Class 14 Claims who had not provided the City with tax and brokerage account information and thus had waived their Claims.

4

Exhibit 6-B, reflecting these changes, was attached to the City's certification to the Court that no timely formal objections were received to the Distribution Motion and that all informal objections had been resolved. [Doc. No. 13568.] The Court thus approved the Distribution Motion ("Distribution Order") [Doc. No. 13570]. In the Distribution Order, the Court found that the revised Exhibit 6-B contains a complete and exhaustive list of Allowed Class 14 Claims and that only claims on the revised Exhibit 6-B will receive Distributions under Class 14 of the Plan. *Id.*, ¶ 5. The Distribution Order further states that "no other alleged Holder of a Class 14 Claim will be entitled to a Distribution under the Plan, and each such other alleged Holder of a Class 14 Claim will be permanently estopped, barred, and enjoined from seeking a Distribution or any other relief from the City or any of its property." *Id.*, ¶ 8. Wershe's late claim is not included on either the original Exhibit 6-B filed with the Distribution Motion nor the revised Exhibit 6-B approved by the Distribution Order. Wershe was served with the Distribution Motion but did not object.[4]

---

[4] The Distribution Motion was served on Wershe by email at ayadlaw@hotmail.com; williamsavage@ayadlawpllc.com; and nabihayad@ayadlawpllc.com and by ECF service ("Distribution CoS") [Doc. 13522], Ex. A, p. 1 (p. 3 of 22). The latter two emails were requested in counsel's notice of appearance ("Ayad Appearance") [Doc. No. 13510]. Wershe was also served with the Distribution Motion by first class U.S. mail at Ayad Law PLLC, Nabih H Ayad, 2200 Canton Ctr Rd Ste 220, Canton MI, 48187 and at Ayad Law PLLC, Nabih H Ayad and William D. Savage, 645 Griswold St, Ste 2202, Detroit MI, 48226. Distribution CoS, Ex. B, p. 1 (p. 10 of 22) and Ex. D, p. 1 (p. 21 of 22). The latter address is the one provided in the Ayad Appearance.

5

The only thing standing in the way of the City making a final distribution is the resolution of this Motion.[5]

### C.     Wershe's Belated Lawsuit and Claims

On July 20, 2021, more than seven years after the Bar Date, Wershe filed a lawsuit against the City ("Federal Lawsuit") in the District Court for the Eastern District of Michigan ("District Court") seeking monetary damages on account of alleged events that occurred a decade or more before the City filed for bankruptcy. *See* Motion to Enforce.   Wershe never sought permission from this Court to commence the Federal Lawsuit even though the claims asserted in it arose more than ten years before the Petition Date.  On September 14, 2021, Wershe filed his First Amended Complaint[6] in the Federal Lawsuit ("Amended Complaint").

On January 4, 2022, the City filed its Motion to Enforce because the Federal Lawsuit violates the Confirmation Order and the Bar Date Order.  The Motion to Enforce is still pending before this Court.

On May 9, 2022, Wershe filed the Motion, seeking leave to file a claim against the City more than eight years after the Bar Date.  Wershe asserts that the Court

---

[5] Out of an abundance of caution, the City currently does not intend to make a Distribution to Holders of Allowed Class 14 Claims until the Motion and the Motion to Enforce are resolved.  The City reserves the right, however, to make a final Distribution under the authority provided to it in the Distribution Order prior to resolution of the Motion and/or the Motion to Enforce.

[6] The Amended Complaint was attached as Exhibit 6-1 to the Motion to Enforce.

39108494.8/022765.00213

should apply the doctrine of equitable tolling to the Bar Date or, in the alternative, find Wershe's failure to timely file a claim was the result of excusable neglect. Both of these issues were briefed by the City in its Motion to Enforce, its Reply to Motion to Enforce, and its Supplement. The issues were also argued extensively at the hearing on April 20, 2022. The City incorporates all of its written and oral arguments into this Objection, but summarizes some of the relevant factual background here.

### D. Wershe's Claims Stem from Events Alleged to Have Occurred in the 1980's and a Parole Hearing in 2003

Wershe alleges in the Amended Complaint that the main events underlying his claims against the City occurred in the 1980s and in 2003, a decade or more before the City filed for bankruptcy. Although Wershe states that he could not contemplate the claims he now asserts until he was released from prison in 2020, Wershe admits that in 2003, at his parole hearing, he asked his former attorney, Ralph Bufalino, about making a claim that his sealed grand jury testimony had been illegally distributed (the accusation that underlies Count III of the Amended Complaint). Amended Complaint, ¶¶ 71, 92-94; Affidavit of Richard Wershe Jr. (attached to the Amended Complaint at ECF No. 4-1), ¶¶ 18, 23-24, 43 ("Just like Bufalino, Ralph Musilli assured me on many occasions that I would have one years [sic] after I got out of prison to bring my lawsuit."); Response,[7] p. 19 of 32, ¶ 8. In

_____

[7] *Richard Wershe, Jr's Response to the City of Detroit's Motion to Enforce Judgment and Request for Stay of Bankruptcy Court Proceedings (Corrected Certificate Of Service)* ("Response") [Doc. No. 13511].

39108494.8/022765.00213

2004, Wershe retained new counsel, Ralph Musilli. Amended Complaint, ¶ 111.

Wershe states that he "inquired with Musilli about potentially taking legal action

against the defendants named herein . . . ." Amended Complaint, ¶ 112.

While sitting in a Michigan prison in 2016, Wershe publicly asserted these

claims in connection with the "White Boy" documentary.[8] Supplement, Ex. 6. In

an article published on September 6, 2016, some of the claims that Wershe made in

the documentary against former Mayor Coleman Young and Gil Hill, a former City

of Detroit police officer, were made public, as stated in the following article excerpt:

**FBI informant**

In an attempt to shorten his prison time, Wershe began assisting
the FBI as an informant, ultimately resulting in the conviction of
corrupt police officers in the Detroit area.

"I embarrassed a lot of people," said Wershe. "All I did was what
I was asked, and all I did was tell the truth."

The information provided by Wershe led to the arrests of family
and friends of Coleman Young, including his favorite
bodyguard, Jimmy Harris; his brother-in-law, Willie Volsen, and
his niece, Cathy Volsen.

"He was extremely upset at me," said Wershe. "I thought any
mayor would love to have corrupt cops off of their force but to
Coleman Young, I was a stool pigeon."

Gregg Schwarz was the FBI agent who turned Wershe's
information into new arrests and said that Wershe should have
been thanked by the Michigan Parole Board and released from
prison.

---

[8] The White Boy documentary was filed with this Court at docket number 13541.

39108494.8/022765.00213

> Wershe also provided information on one of Detroit's most popular cops, Gil Hill, a homicide boss who allegedly helped a drug dealer cover up the shooting death of a 12-year-old. Wershe claims he heard a phone call between Hill and the murderer.
>
> "Basically Gil told him everything that was going on and that he had it under control and that he would be in touch and not to worry about anything," said Wershe.
>
> Hill was investigated but never charged.

Supplement, Ex. 6.

Wershe also made the above allegations about former Mayor Coleman Young and Gil Hill in the documentary. *See* Doc. No. 13505-1, p, 61 of 65, ¶ 7 (regarding Mayor Young); "White Boy" Documentary at 33:55 – 34:30 (regarding Gil Hill).

Further, years before Wershe filed the Federal Lawsuit and while still sitting in Michigan prison, the "White Boy" documentary was released. It was first shown at the Freep Film Festival on March 31, 2017, and was more widely distributed in the months that followed. [Doc. No. 13546.] The documentary was cited twenty-three times in Wershe's Response to Defendant City of Detroit's Motion to Dismiss filed in the Federal Lawsuit ("District Court Response").

In the documentary, Wershe and his former attorney, Ralph Musilli,[9] made numerous allegations against the City, including allegations which form the basis for the claims asserted in Counts II and III of the Amended Complaint.

---

[9] Wershe discusses Mr. Musilli in paragraphs 39-42 of his declaration attached as an Exhibit to the Amended Complaint. Page ID 136.

9

- With respect to the assassination alleged in paragraphs 36 and 37 of the Complaint (which is incorporated into Count II of the Amended Complaint), Wershe states "The police told me to say the shooting was an accident because it was the best way to sweep it under the rug and I could continue to work for them if I said it was an accident." District Court Response, Ex. D, ¶ 2, Page ID 291.

- Wershe and Musilli allege that there was a conspiracy to deny Wershe parole at the same 2003 parole hearing that is the subject of Count III of the Amended Complaint. District Court Response, Page ID 247-48, Ex. D ¶ 10, Page ID 293-94; Response, pages 19-20 of 32, ¶¶ 10-11. Further, a former Detroit Police Department detective alleges that he was "approached by Deputy Chief Dennis Richardson, and I was told that I was gonna go to the parole hearing. The goal of the hearing was to make sure that he was not released." *Id.*

- Wershe alleges that he assisted in the conviction of a dozen high-ranking members of the Detroit Police Department as part of Operation Backbone. District Court Response, Page ID 246-47, Ex. D, ¶ 2, Page ID 290-91.

- Werhse alleges that he was asked to go to Las Vegas to get information on some people that were involved in the drug trade when he was 15. He also alleges that on this trip he was given a fake ID which made him 21 years old. His attorney, Musilli, asserts: "So they give him money, they give him false ID and they set him up at a casino. This is insanity." Wershe alleges "And that's when I found out that Gil Hill was responsible for covering up the kid's murder." White Boy Documentary, 31:06-34:05.

- Wershe and Musilli allege that Wershe was unfairly left in the drug trade by law enforcement after he was an informant. Wershe: "At some point these guys said sooner or later something's going to go bad and we're going to be held accountable." Musilli: They don't debrief him. They don't send him to a boarding school where he can get over what they've just subjected him to. They turn him loose on the streets." Wershe: "It wasn't like they ever said 'Rick, stop selling drugs.' 'Rick, stop buying drugs.' One day they just never called again and that's how we broke ties." … Wershe: "It wasn't like I

10

went out and said I want to become this big drug dealer and want everyone in the state of Michigan to know me. I was led down this path by law enforcement. I think about every day if I would have walked away. I was a kid. I was stupid." White Boy Documentary, 39:20-39:50; 43:49-44:05.

- Wershe and Musilli allege that Mayor Coleman Young and his niece were responsible for providing him with attorneys at his criminal trial who tanked his case. Musilli: "The attorney that was representing him at the time was an attorney named William Bufalino and he brought motions to suppress the evidence. Shortly thereafter Coleman Young's niece told Rick everything will be OK but you need to get different attorneys...hire Ed Bell and Sam Gardner and everything will be OK...Fatal mistake." Wershe: "Sam Gardner was Coleman Young's lawyer at the time and the only reason they were brought in was to watch me. It wasn't to help me." Wershe (appearing substantially younger and in prison): "Basically every time I went to see him he just told me that I had nothing to worry about. Things were looking good. I was told at one time that I wouldn't go to trial. He didn't think that we would go to trial." Musilli: "Before they went to trial, his trial attorneys agreed to withdraw all of the pretrial motions, they agreed not to admit any evidence in front of the jury that he had been working for the government since he was fourteen. So the jury never heard that." Wershe: "Basically I think the fix was in. And Coleman didn't want me on the streets anymore. So them being my attorneys I think they tanked the case." White Boy Documentary, 47:24-48:50.

- Wershe alleges that former Mayor of Detroit Coleman Young endangered his life by identifying him as an informant as part of Operation Backbone. District Court Response, Ex. D, ¶ 7, Page ID 292-93.

The documentary also makes additional claims including that

- Wershe was set up by police and had fabricated evidence used against him. District Court Response, Page ID 243-44; Ex. D, ¶¶ 4-5, Page ID 291-92

- Wershe was beaten to the point of hospitalization. District Court Response, Page ID 243-44; Ex. ,D ¶ 4, Page ID 291-92.

39108494.8/022765.00213

- Wershe believed that members of law enforcement were conspiring to have him murdered. District Court Response Ex. D, ¶ 3, Page ID 291.

Wershe remained in Michigan prison until August 22, 2017, when he was immediately transferred to Florida prison. Doc. No. 13546; *see also* Amended Complaint, ¶¶ 113-14. A few years later, he was released.

## III.  ARGUMENT

### A.  Equitable Tolling Does Not Apply Here

Wershe again incorrectly asserts that equitable tolling applies to bar dates, pointing to a number of bankruptcy cases which he claims support his position. None of these cases, however, apply equitable tolling to a claims bar date.

The Supreme Court has explained that "[e]quitable tolling is not permissible where it is inconsistent with the text of the relevant statute." *United States v. Beggerly*, 524 U.S. 38, 48 (1998). Thus, for example, in chapter 13 cases, courts have concluded that "the existing authority suggests that equitable tolling may not be used as a mechanism to allow otherwise untimely filed claims" because it is inconsistent with the governing bankruptcy rules and statutes. *In re Sykes*, 451 B.R. 852, 860 (Bankr. S.D. Ill. 2011); *In re Tench*, No. 15-8026, 2016 WL 2858792, at *4 (B.A.P. 6th Cir. May 11, 2016).

Courts have uniformly rejected applying equitable tolling to extend the deadline to file a proof of claim. *Gardenhire v. I.R.S. (In re Gardenhire),* 209 F.3d

1145 (9th Cir.2000) (declining to apply equitable tolling to extend a proof of claim deadline in chapter 13); *Sykes*, 451 B.R. at 861 (same); *In re Mackinder-Manous*, No. 13-21211, 2015 WL 790883, at *4 (Bankr. E.D. Ky. Feb. 24, 2015) (same); *In re Brooks*, 370 B.R. 194, 197 (Bankr. C.D. Ill. 2007) (same); *see also In re Greenig*, 152 F.3d 631 (7th Cir. 1998) (same in a chapter 12 context).

In chapter 9 cases such as this one, Federal Rule of Bankruptcy Procedure 9006(b)(1) dictates when a late-filed proof of claim is allowable. Fed. R. Bankr. P. 9006(b)(1). "The 'excusable neglect' standard of Rule 9006(b)(1) governs late filings of proofs of claim" in these cases, because Federal Rule of Bankruptcy Procedure 9006(b)(1) applies to Federal Rule of Bankruptcy Procedure 3003(c), which governs the filings of claims in chapter 9 and chapter 11 bankruptcy cases. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389, 389 n.4 (1993). In these cases, equitable tolling is inconsistent with Federal Rules of Bankruptcy Procedure 3003(c) and 9006(b)(1) and with 11 U.S.C. § 502(b)(9), which already provide the standards for evaluating the timeliness of claims. Thus, equitable tolling is equally inapplicable in chapter 9 cases. *Beggerly*, 524 U.S. at 48.

Wershe's Motion makes reference to the Court's equitable powers under 11 U.S.C. § 105, but this does not avail him. Motion, pp. 7-8 of 16. The Supreme Court explained relatively recently that, although a bankruptcy court has authority to issue orders as necessary or appropriate the provisions of the Bankruptcy Code, that does

39108494.8/022765.00213

not give the court *carte blanche* to issue any order it may wish. *Law v. Siegel*, 571 U.S. 415, 420-21 (2014). The Supreme Court held that "a bankruptcy court may not contravene specific statutory provisions" in exercising its authority. *Id.* at 421. Instead, it must look to the Bankruptcy Code, as augmented by the Bankruptcy Rules, for its authority. *See id.* at 427 (directing bankruptcy courts to Federal Rule of Bankruptcy Procedure 9011 for sanctions authority). Here, where Federal Rules of Bankruptcy Procedure 3003(c) and 9006(b)(1) set forth the process for evaluating the timeliness of a claim there is no need—or room—for § 105(a) gap filling.

Wershe's cited cases[10] do not contradict or refute this analysis. Reviewing the cases he cites in his Motion on pages 7-9 in turn,

- *Baker v. Highland (In re Salem Mortg. Co.)*, 50 B.R. 34 (Bankr. E.D. Mich. 1985) – <u>Claims bar dates were not at issue</u>. Court applied equitable tolling to plaintiffs in a class action case.

- *Wahrman v. Bajas (In re Bajas)*, 443 B.R. 768 (Bankr. E.D. Mich. 2011) – <u>Claims bar dates were not at issue</u>. This Court held that equitable tolling may apply to the deadline for filing a complaint under § 523(c), though it did not find it applicable in that particular instance.

- *In re Spenlinhauer*, 572 B.R. 18 (Bankr. D. Mass. 2017) – The I.R.S. argued for application of equitable tolling of the claims bar date. The bankruptcy court applied the *Pioneer* factors, found that excusable neglect applied, and, rather than apply equitable tolling, equitably estopped the debtor from contending that the IRS had not established cause for an extension of the claims bar date as well excusable neglect.

- *Doyaga v. Schretter (In re Smith)*, 190 B.R. 753 (Bankr. E.D.N.Y. 1996) – <u>Claims bar dates were not at issue</u>. The court declined to apply equitable

---

[10] In summarizing these cases, Wershe incorrectly implies that they were decided by circuit courts of appeal.

39108494.8/022765.00213

tolling in context of § 546(a) as applied to the filing of a preference complaint.

- *DeAngelis v. Rychalsky (In re Rychalsky)*, 318 B.R. 61 (Bankr. D. Del. 2004) – <u>Claims bar dates were not at issue</u>. The court applied equitable tolling in the context of a chapter 7 trustee's request to amend a complaint objecting to discharge.

- *In re Eden*, 637 B.R. 446 (Bankr. D.S.C. 2021) – <u>Claims bar dates were not at issue</u>. Creditor sought equitable tolling of deadline to file adversary complaint asserting debt nondischargeability so as to convert a prior motion for stay relief into an adversary proceeding opposing discharge. Court denied request noting "high hurdle" for application of equitable tolling.

- *In re Gilmore*, 198 B.R. 686 (Bankr. E.D. Tex. 1996) - <u>Claims bar dates were not at issue</u>. Court declined to equitably toll limitations period for IRS to allow it to collect discharged taxes, although taxes within allowable limitation period could still be pursued.

- *Manty v. Bougie (In re Bougie)*, 510 B.R. 606 (Bankr. D. Minn. 2014) - <u>Claims bar dates were not at issue</u>. Court applied equitable tolling to § 549(d) two-year period of limitation to challenge postpetition transfers.

- *Montoya v. Sasso (In re Sasso)*, 550 B.R. 550 (Bankr. D.N.M. 2016) - <u>Claims bar dates were not at issue</u>. Because of genuine issues of material fact, court denied motion for partial summary judgment requesting equitable tolling of § 546 limitation period for avoidance claim.

- *Brook v. Alphamed Pharmas. Corp. (In re J & D Scis., Inc.)*, 335 B.R. 791 (Bankr. M.D. Fla. 2006) – <u>Claims bar dates were not at issue</u>. Court equitably tolled § 546 limitation period for avoidance claim.

Thus, not one of Wershe's cited cases holds that a bankruptcy court may apply equitable tolling in the context of a claims bar date.

The *Pioneer* court made clear that the timeliness of a late filed claim governed by Federal Rule of Bankruptcy 3003(c), as here, is determined under the excusable neglect standard of Federal Rule of Bankruptcy Procedure 9006(b)(1). The *Beggerly*

39108494.8/022765.00213

and *Law* courts have reinforced that a bankruptcy court's equitable powers should not be used to "reinvent" procedures already governed by the Bankruptcy Code and Rules. Wershe has not cited a single case where equitable tolling has been applied to a claims bar date in a chapter 9 context or under any other chapter of the Bankruptcy Code. The City respectfully asserts that this Court should decline Wershe's invitation to apply equitable tolling here.

**B.    Wershe Fails to Demonstrate Excusable Neglect**

As this Court explained earlier in this case, the Supreme Court's decision in *Pioneer* is the leading case on what "excusable neglect" means. *In re City of Detroit, Mich.*, 576 B.R. 552, 558 (Bankr. E.D. Mich. 2017) (*citing Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993)). Notwithstanding Wershe's statement to the contrary, it is not a "comparatively much lower standard" than that applied in equitable tolling. In any event, Wershe does not satisfy it.

**1.  Excusable neglect cannot be based on a choice made based upon bad advice of counsel.**

A party cannot use "excusable neglect" to seek relief from the effects of its choices simply by claiming that it received bad advice of counsel. As this Court has observed, a party voluntarily chooses its attorney and must "be held accountable for the acts and omissions of their chosen counsel." *Hauk v. Valdivia (In re Valdivia)*, 540 B.R. 621, 623 (Bankr. E.D. Mich. 2015) (quoting *Pioneer*), vacated on other grounds, No. 15-13677, 2016 WL 3912019 (E.D. Mich. 2016). The Sixth Circuit

39108494.8/022765.00213

has held that reliance on mistaken advice of counsel, even is the advice was given "out of ignorance," does not constitute excusable neglect. *Kizy v. U.S. Dept. of Agric.*, 883 F.2d 75 (6th Cir. 1989) (table dec'n); *see also Broach v. City of Cinncinatti*, 244 Fed. Appx. 729 (6th Cir. 2007). Thus, Wershe's discussion of what his counsel did or did not advise is of no moment for the excusable neglect analysis.[11]

### 2. Excusable neglect does not have a "comparatively much lower standard" in a chapter 9 bankruptcy case, especially this one.

Wershe's assertion that excusable neglect has a relatively low standard for application is also wrong, as this Court has already explained. "'Excusable neglect' under Rule 9006(b)(1) is a more demanding requirement than the general concept of 'cause' that is used in various places in the Bankruptcy Code and Bankruptcy Rules, including Rule 3003(c)(3)." *City of Detroit*, 576 B.R. at 558. Establishing and enforcing a proof of claim deadline is critical in chapter 9 or 11 cases. *Id.* at 559-60. It allows debtors to create and seek confirmation of a plan and to implement and administer it. *Id.* It allows creditors to have confidence in the process and thus meaningfully participate in it. *Id.*

> These concerns are greatly magnified in a massive and complex
> Chapter 9 case like this one, in which there are thousands of
> creditors. . . . Allowing creditors to casually ignore the deadline
> for filing proofs of claim would run the risk of creating chaos in

---

[11] Wershe's repeated assertions that years prior to the Bar Date he discussed the claims at issue in the Amended Complaint does, however, demonstrate that these claims were within his fair contemplation as argued in the Motion to Enforce.

17

such a large case, and undermining the confidence of all parties in interest.

In addition, allowing creditors to ignore the claims-filing deadline would create needless delays in the post-confirmation phase of the case, by lengthening the time it takes for the Debtor to fully implement and administer the confirmed plan and get the case closed. Such delay would inevitably increase the cost of the case to the Debtor, and could delay interim and final distributions to creditors under the confirmed plan.

Firmness in enforcing the claims-filing deadline in this case is necessary, and the need for such firmness weighs heavily against the Court allowing any proofs of claim to be filed after the deadline set by the Court.

*Id.*, 576 B.R. at 560.

This Court has laid out the requirements that a claim of "excusable neglect" must satisfy to be applicable in this case.  First, a movant must show "neglect."  *Id.* at 559.  After that, the party must show that the neglect was "excusable."

> In *Pioneer*, the Supreme Court explained that a determination of
>
> > whether a party's neglect of a deadline is excusable ... is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission ... [including] the danger of prejudice to the [party opposing relief], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* (quoting *Pioneer*, 507 U.S. at 395).  Wershe fails to meet any of these criteria.

To begin with, Wershe's allegation that he relied on advice of counsel negates his assertion that there was "neglect" in the first instance.  A conscious choice based

upon advice of counsel cannot be the basis for excusable neglect. *Valdivia*, 540 B.R. at 622-623. Even if that were not fatal to Wershe's argument (and it is), he fails to satisfy any of the other *Pioneer* factors, as discussed below.

### a. The length of the delay and its potential impact on judicial proceedings

Wershe is extraordinarily late in attempting to file a late proof of claim. The deadline to file claims was February 21, 2014. The Motion was not filed until eight years later on May 9, 2022. This is nearly six years after Wershe aired similar claims in a public interview in 2016 (Supplement, Ex. 6). As the City points out in its Supplement and Reply , these allegations were also made in the "White Boy" Rick Documentary. Supplement, ¶ 5. Wershe admits that the documentary was shown over five years ago at a film festival and widely distributed four years ago. (Doc. No. 13546.) Even his 2019 release from prison predates the filing of the Motion by approximately three years.[12] Motion, ¶ 5, p. 2 of 16. No matter which date the Court picks as a reference, Wershe's Motion is years late.

The City is now on the cusp of making its first and final distribution on Class 14 "Other Unsecured Claims." *See* Doc. No. 13521 (seeking approval of distribution), Doc. No. 13568 (certificate of no response regarding distribution), Doc. No 13570 (order approving distribution). As discussed in the next section,

---

[12] The Motion allegation conflicts with the first paragraph of Wershe's Amended Complaint, which states he was released from prison in 2020. Whichever year is correct, is predates the filing of the Motion by a few years.

19

allowing Wershe to file a proof of claim now could add years to the City's bankruptcy case as his claim is liquidated.

The Motion was filed extremely late in this bankruptcy case and has the potential for adding years of proceedings to the City's bankruptcy case. This factor weighs strongly against Wershe's Motion.

### b. The danger of prejudice to the opposing party

Wershe's delay in seeking to file a proof of claim in this case is prejudicial to both the City and its creditors. As noted in the preceding section, the City has finalized the distribution amounts for all Class 14 Creditors. (Doc. Nos. 13521, 13568, 13570.) Creditors have been awaiting this distribution for years. Were Wershe's late filing to be allowed, it could delay and extend this process for many more years. His $100,000,000 claim is objectionable and would need to be liquidated before a final distribution could be made. Although the City could reestablish a Disputed Unsecured Claim Reserve and attempt an interim distribution while this occurred, this would impose significant additional costs on the City. Also, the City believes that many creditors will deem that the wait for the remaining distribution on their claims is too much to bear and will drop out of further participation rather than make the effort to keep their address, tax, and brokerage account information current with the Court. Thus, further significant delay presents a real and significant danger of prejudice to Class 14 Creditors.

39108494.8/022765.00213

This danger of prejudice to the City and its Class 14 Creditors also weighs against granting Wershe permission to file this extremely late proof of claim.

### c.  Whether the movant acted in good faith

Wershe did not begin by filing his Motion seeking leave to file an untimely proof of claim.  Instead, he first filed suit against the City in the District Court, and even that was done without seeking relief from the Plan injunction.

As the City notes in its Reply to Motion to Enforce, Wershe knew of these claims for years, and admits to having discussed them with his attorney nearly twenty years ago.  Reply to Motion to Enforce, pp. 11-12.  He has asserted these claims against the City for years in the press and even in a documentary, as noted in section 2(a), *supra*.  Nothing about this suggests that he suddenly became aware that he may have claims and rushed off to the District Court without thinking.

Were Wershe acting in good faith with respect to his asserted proof of claim, he would have filed the Motion first, along with a motion for relief from the injunction in the Plan, before filing his Amended Complaint.  He did not.  He cannot claim to have filed the Amended Complaint without knowledge of the bankruptcy case—the attorney who filed it for him has been involved in the City's bankruptcy case from the beginning. *See* Doc. No. 737, Appearance by Attorney Nabih Ayad.  Taken together, Wershe's admitted long awareness of his claims, and his counsel's long knowledge of and involvement in the City's bankruptcy case, suggests that

39108494.8/022765.00213

Wershe's choice to initially eschew proceeding in this Court was a deliberate attempt to avoid this issue.

Wershe's offered rationale for his actions does not address this concern. He claims he was too fearful of retribution from the City to timely file a proof of claim. Even if it were true (and his willingness to grant interviews and star in a documentary strongly indicates otherwise), it does not explain why he would choose to assert his claim against the City in the District Court without first moving in this Court for authority to file an untimely proof of claim. His Motion does not address this question at all. Thus, the factor of "good faith" also weighs against Wershe.

### d. The reason for the delay, including whether it was within the reasonable control of the movant

Wershe has not offered a credible reason for his extraordinary delay in seeking to file a proof of claim in this case. The reason he has proffered is not a valid excuse.

Excusable neglect generally involves a mistake or inadvertence on the part of counsel or client which results in the missing of a deadline. It does not encompass voluntary choices, even if made on advice of counsel. *Valdivia*, 540 B.R. at 623; *Kizy*, 883 F.2d 75; *see also Broach*, 244 Fed. Appx. 729. Wershe alleges that he chose not to file a proof of claim on advice of counsel and on fear of retaliation. As set forth above, a party cannot use "excusable neglect" to seek relief from the effects of its choices simply by claiming that it received bad advice of counsel. And, Wershe's retaliation excuse is not plausible given that he made these same exact

39108494.8/022765.00213

claims in a public documentary while he was still sitting in a Michigan prison. Wershe's argument fails for the additional reason that he offers no case law to suggest that fear of retaliation or bad advice of counsel falls under the doctrine of excusable neglect. To the contrary, Wershe's allegations show that he chose not to file a proof of claim.

As Wershe proffers nothing to indicate that his failure to file a proof of claim was outside his reasonable control, this factor also weighs against him.

### 3. Conclusion

For all of these reasons—the failure to allege actual "neglect" and the failure to satisfy any of the *Pioneer* factors as to why any neglect would be "excusable"— the Court should determine that Wershe has not demonstrated excusable neglect.

### C. Wershe's Alleged Claim Is Also Barred by the Distribution Order

The relief Wershe seeks is also barred by the Distribution Order. Wershe was served with the Distribution Motion but did not object. The Distribution Order states that anyone not included on revised Exhibit 6-B will not receive a distribution under Class 14 and that anyone alleging that they hold a Class 14 Claim is "permanently estopped, barred, and enjoined from seeking a Distribution or any other relief from the City or any of its property." Distribution Order, ¶ 8. Wershe's Motion seeks to file an unsecured claim against the City, which claim would be a Class 14 Claim if allowed, and as such, the Motion is barred by the Distribution Order.

39108494.8/022765.00213

13-53846-tjt   Doc 13572   Filed 05/23/22   Entered 05/23/22 17:37:43   Page 23 of 26

**D.     The Court Should Not Stay the Adjudication of the Motion to Enforce**

Finally, the Court should reject Wershe's request for a stay of the Motion to Enforce in this bankruptcy case while the District Court adjudicates the City's motion to dismiss in the Federal Lawsuit.   This Court is in the best position to interpret and enforce its own orders and to evaluate the prejudice to the City and its creditors from his filings.

Wershe's arguments in support of a stay are simply wrong and unsupported. He states that he "technically does not have a claim until he receives a judgment from the district court," (Motion, p. 12, quoting Fed. R. Bankr. P. 3003(c)(3) and 3002(c)(3)[13]).   This is not so; the definition of "claim" includes any "right to payment, whether or not such right is reduced to judgment . . . ." 11 U.S.C. § 101(5). His alleged claim arose when the underlying facts giving rise to it took place.   *In re City of Detroit, Mich.*, 548 B.R. 748 (Bankr. E.D. Mich. 2016) (explaining "fair contemplation" test).   Wershe is simply wrong here.

Wershe also cites Federal Rules of Bankruptcy Procedure 3002(c)(2) and 3002(c)(6) with little discussion, leaving it to the Court and the City to determine what relevance they might have.   The City cannot see how Wershe's citation of these

---

[13] Fed. R. Bankr. P. 3002(c)(3) generally comes into play when a secured creditor's interest in property is avoided after the filing of the petition date. It is not a vehicle to file an untimely and unsecured prepetition claim.

39108494.8/022765.00213

rules amounts to anything more than a fervent hope that the Court will find some meaning in them. But "[l]itigants cannot expect the court to do their homework for them." *Ondine Shipping Corp. v. Cataldo*, 24 F.3d 353, 356 (1st Cir. 1994). The Court should decline to do so here and reject Wershe's request for a stay.

## IV. CONCLUSION

The City thus respectfully requests that this Court deny the Motion. There are neither legal nor equitable reasons to allow Wershe to delay the conclusion of this case. If granted, the Motion would almost certainly delay a final distribution by several years and severely prejudice the City and its creditors that have been waiting patiently for a distribution on their claims.

Dated: May 23, 2022

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

*Attorneys for the City of Detroit*

39108494.8/022765.00213

# CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 23, 2022, he served a copy of the foregoing **OBJECTION TO RICHARD WERSHE, JR'S MOTION FOR ENTRY OF NOTICE OF CLAIM AFTER BAR DATE [DOC. NO. 13560]** via the Court's ECF service and upon counsel for Richard Wershe Jr. in the manner described below:

Via email:

filing@ayadlawpllc.com; williamsavage@ayadlawpllc.com; and nabihayad@ayadlawpllc.com.

By: /s/ Marc N. Swanson
Marc N. Swanson (P71149)

1