**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE CONFIRMATION ORDER AGAINST THE DFFA

The City of Detroit, Michigan ("City") by its undersigned counsel, Miller, Canfield, Paddock and Stone, PLC, files this *Motion for the Entry of an Order Enforcing the Confirmation Order Against the DFFA* ("Motion"). In support of this Motion, the City respectfully states as follows:

## I.      Introduction

Firefighters are heroes. It is a dangerous job and firefighters often sustain injuries that keep them off work for weeks or months at a time. While on leave for such injuries, firefighters do not receive workers compensation. Rather, they receive a special benefit sometimes called "J-time," that replaces their **full** pay and **all** benefits. In other words, firefighters are made financially whole – just as if they had continued working.

The City filed this motion to seek dismissal of a grievance filed by the Detroit Fire Fighters Association ("DFFA") relating to J-time compensation. The Grievance does not argue that the City has failed to provide full pay and benefits to all

- 1 -

firefighters on J-time. Rather, DFFA's grievance claims that the J-time payments should **also be tax exempt**.

DFFA has never provided any rational theory for its claim, nor is there any support for the claim in any collective bargaining agreement. Indeed, there is no possible justification for a firefighter to reap a financial windfall while on injury leave and come out better off than firefighters who continued to work. Evidently, this arose as some "past practice" long before the City's bankruptcy filing – one of a myriad of improper/unlawful practices that resulted in the City's financial crisis.

As discussed below, expert analysis confirms that DFFA's position violates the City's bankruptcy plan, pension plan and federal tax law. The City respectfully asks this Court to enter an order requiring the DFFA to dismiss with prejudice its grievance.

## II. Factual Background

### A. The History of J-Time Payments

1. Historically and starting many years before the City's 2013 bankruptcy filing, members of the DFFA were placed on what is known as "J-Time" when they were off work temporarily for a work-related injury. Under that status, members continued to receive full compensation and all pre-and post-tax benefits. However, for reasons unknown the City, compensation was not subject to federal, state, or city tax.

- 2 -

2. This practice was not documented in any collective bargaining agreement. To the City's knowledge, this practice was not known to Kevyn Orr, the emergency manager, or his lawyers, and was not addressed in the bankruptcy proceedings.

3. The City's administration became aware of the practice in 2020. At that time, members of DFFA were transitioned to the City's new payroll system known as Ultipro. Ultipro was unable to accommodate or process the J-Time practice for reasons that included Ultipro's inability to process pre-tax benefits (such as pension and 457 plan contributions) when the member's compensation was not taxable.

4. The City ultimately determined that to comply with federal law and its bankruptcy plan, J-Time payments had to be taxable. In December 2020, the City advised DFFA by providing it with a memorandum that J-Time benefits would be taxable beginning January 1, 2021. **December 2020 Memorandum, Exhibit 6-1.** In that memorandum, the City explained:

> The short explanation why J/Injured-time compensation must be taxable is because the practice entails not only continuation of wages, but also continuation of all benefits. Those include pre-tax deductions for deferred compensation and pension contributions. Other deductions, such as for health insurance, also are continued. It is not possible to continue those benefits and benefit contributions unless the compensation is taxable.

- 3 -

In this regard, the J/Injured-time practice is materially different than workers compensation benefits which are not taxable. First, workers compensation replaces only 80% of income subject to a maximum of roughly $934 per week ($48,568 per year). J/Injured-time replaces 100% of compensation. Second, when an employee is on workers' compensation, she or he receives no benefits and no benefit deductions or contributions are made. Pension and 457 deferred compensation are terminated. If the employee wishes to remain on City health care, the employee must remit regular payments to the City. In contrast, under J/Injured-time, all benefits and benefit deductions including health care are continued.

Because the goal of the J/Injured-time practice is to allow the injured officer to retain the same compensation and benefits as if she or he were still on active duty, it is not only mandatory that the J/Injured-time compensation be taxable but it is eminently reasonable as well. The officer remains in the same position as if actively employed where the compensation would likewise be taxable.

Both the PFRS retirement plan and the City's 457 deferred compensation plan are governed by, and must comply with, Federal Tax law. That tax law requires, and the whole premise of these programs, is that the benefit deductions are "pre-tax," meaning the underlying compensation from which the "pre-tax" deductions are made must be taxable. See, for example, City 457 plan, City Ord sections 35-3-2 (definition of "includable compensation") and 35-3-6 (eligibility for participation); and see PFRS retirement plan, component I, section 13.1 (IRC controls), and IRC section 415 and reg. 1.415(c)-2(b)(1), (definition of compensation).

December 2020 Memorandum, pp. 1-2.

5. Accordingly, throughout 2021, tax was deducted from firefighters' J-time payments and such deductions were shown on the relevant pay stubs. However,

- 4 -

on March 1, 2022, the DFFA filed a grievance against the City ("Grievance").  The Grievance is attached as **Exhibit 6-2**. The Grievance states: "This is a grievance over the City's improper payment and taxation of Injured-on-duty or 'Js' Time, including its designation of Js Time as taxable, rather than non-taxable, income.  This includes the City's improper W-2 treatment of Js Time."  Grievance at 2.

6.     The Grievance identifies 1,079[1] "affected members" and requests the following retrospective and prospective relief: "That the City make all members affected whole, including providing any necessary W-2 revisions, cease and desist from this improper treatment of Js time, and pay all DFFA costs and fees incurred in this matter."  Grievance at 2.

### B.     The City's Bankruptcy Case

7.     The relief requested in the Grievance violates the *Eighth Amended Plan of the Adjustment of Debts of the City of Detroit* ("POA"), which this Court confirmed on November 12, 2014 ("Confirmation Order").  Doc. Nos. 8045 & 8272.

8.     Class 10 of the POA established a new pension system for police and firefighters, which is called the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (Amendment and Restatement Effective July 1, 2014) ("Retirement System").  The Retirement System was attached to the

---

[1] The names have been redacted.

39104033.6/022765.00213

Plan as an exhibit and is attached as **Exhibit 6-3**.  POA, pp. 38-39; Exhibits I.A.254.a, Exhibit I.A.281.

9.     The Retirement System has two components:  Component I of the Retirement System applies to benefits accrued by members of the PFRS on or after July 1, 2014, and to the operation of the PFRS on or after July 1, 2014 (*i.e.*, to active employees).[2]  The POA identified Component I as the "New PFRS Active Pension Plan."  *See* Exhibit I.A.254.a to the POA, Doc. No. 8045-1, pp. 448 & 456 of 809.

10.    The POA provides that Component I (*i.e.*, the New PFRS Active Pension Plan) governs pension benefits for service on or after July 1, 2014.

> Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

POA, Art. II.B.q.ii.E, p. 39.

11.    The POA was supported by extensive actuarial analyses which were designed to limit benefit cuts while, at the same time, limit the City's contribution obligations to allow it to successfully emerge from bankruptcy.  In its opinion

---

[2] Component II of the Plan Document (which is not at issue here) generally applies to benefits accrued by members of the PFRS prior to July 1, 2014.  The POA identifies Component II as the "Prior PFRS Pension Plan."  *See* Exhibit I.A.281, Doc. No. 8045-1, pp. 590 & 599 of 809.

39104033.6/022765.00213

confirming the POA, the Court discussed the PFRS settlement as part of the Pension Global Settlement, calling it "[t]he final component of the Grand Bargain." ("Confirmation Opinion") [Doc. No. 8993], p. 41 of 219.

> The GRS, the PFRS and the retiree committee, on one hand, and the City, on the other hand, aggressively disputed the pension plans' UAAL.[3] The GRS and PFRS reported that as of June 30, 2013, the GRS was 70% funded and the PFRS was 89.3% funded with a combined total UAAL for both retirement systems of only $1.5 billion. The City claimed that the UAAL is actually $2 billion for the GRS and $1.4 billion for the PFRS, for a total of $3.4 billion.

Confirmation Opinion, p. 32 of 219 (citations omitted).

The Court concluded that the pension settlement was "fair and equitable" and stated as follows:

> It is therefore a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. Without the outside funding from the Grand Bargain, the City anticipated having to reduce pensions by as much as 27%. The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

Confirmation Opinion, pp. 46-47 of 219 (citation omitted).

---

[3] Unfunded Actuarial Accrued Liabilities.

39104033.6/022765.00213

12.     The Court was not nearly as bullish, however, when it came to the subject of the feasibility of the POA.   There was significant concern about the feasibility of the POA.

> In this case, examining the feasibility of the plan is difficult for a number of reasons.   The City's debt is enormous and the City proposes to pay most of its creditors over a long period of time.   As the Court discusses below, the City's revenue and expense projections extend forty years into the future.
>
> Second, the feasibility of the plan depends upon the City's ability to fix and maintain its broken governmental operations.   This is significant because the chapter 9 feasibility inquiry requires an analysis of whether the City can reasonably provide sustainable municipal services, as the court found in *In re Mount Carbon*.   It is also significant because the City's ability to repay its creditors pursuant to the plan depends upon the City's ability to increase its revenues from taxes and fees by improving the efficiency of City operations and by identifying and accessing untapped sources of revenue.
>
> The feasibility analysis is yet more complex because several key parts of the plan depend upon performance by parties who are completely beyond the City's control.   **For example, because the City's contributions to the retirement systems are fixed through FY2023, a risk remains that the pension plans will be significantly more underfunded than anticipated if one of the many organizations participating in the Grand Bargain fails to perform in the time or manner promised.**
>
> As the City itself succinctly states in its pretrial brief in support of plan confirmation, "[T]he City was—and remains today—enmeshed in a financial crisis of unsurpassed proportions and complexity."   Despite efforts from both the City and the State of Michigan, "the City is

- 8 -

trapped in a vicious circle of cash crises, general fund deficits, crushing long-term liabilities and tumbling credit ratings exacerbated by the City's bureaucratic structure and frequent deviations from established budgets.

Confirmation Opinion, pp. 115-16 of 219 (emphasis added and citations omitted).

13.    Martha Kopacz, the Court's appointed feasibility expert, explained that the POA left "little space of the continuum of feasibility."

I want to emphasize, however, that there is little space remaining on the continuum of [feasibility]. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they have imposed additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern.

Confirmation Opinion, at pp. 113-14 (Court's quotation of expert, alterations in original).

14.    The PFRS Settlement, and its contribution to the overall Grand Bargain, was thus an integral part of the City's POA and a linchpin in the successful restructuring of the City's finances.

## C.    The Injunction and Exculpation Provisions in the POA

15.    To protect the pension settlement and the Grand Bargain, the POA contained two injunctions.

16.    The first injunction provides that

- 9 -

Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, **the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS,** or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

POA, Art. II.B.q.ii.G, p. 39 (boldface removed from original and emphasis added).

17. The POA also contained a broader injunction, which provides in pertinent part:

**Injunction**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

**a. all Entities that have been, are or may be holders of Claims against the City . . . shall be permanently enjoined from taking any of the following actions against or affecting the City or its property** . . .

**1. commencing, conducting or continuing in any manner, directly or indirectly, any**

- 10 -

**suit, action or other proceeding of any kind against or affect the City of its property** . . .

> **5.** **proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

> **6.** **taking any actions to interfere with the implementation or consummation of the Plan.**

POA, Article III.D.5, at pp.50-51 (emphasis added).[4]

18. Finally, the Court retained jurisdiction to enforce the POA injunction and to resolve any suits that may arise in connection with the consummation, interpretation, or enforcement of the POA. POA, Art. VII.F, VII.G, & VII.I, at p.70.

## III. Argument

19. The relief requested by the DFFA in its Grievance violates the Retirement System, the POA, and the Internal Revenue Code.

20. The City retained Plante Moran to provide guidance related to the tax treatment of J-Time payments and its impact on the Retirement System, the City of Detroit Deferred Compensation Plan (the "457(b) Plan"), and City of Detroit Flexible Benefits Plan (the "FSA Plan," and together with the Retirement System

---

[4] The defined term "Plan" in the POA includes "all Exhibits attached hereto or referenced herein . . . ." POA, p. 23. The Retirement System is an Exhibit to the POA. POA, p. vi, Exhibit I.A.254.a. Consequently, the capitalized term "Plan" in the injunction provision also includes the Retirement System.

39104033.6/022765.00213

and the 457(b) Plan, the "Plans").[5]  The 457(b) Plan and the FSA Plan are attached

as **Exhibit 6-4 and 6-5**, respectively.  Plante Moran's Opinion is attached as **Exhibit**

**6-6.**

     21.    Plante Moran confirmed in its Opinion that the relief requested by the

DFFA violates applicable tax law and the Retirement System.

> If J-Time payments are included as taxable income (and
> therefore, considered "compensation" under the Plans),
> then DFFA members who receive J-Time payments ("J-
> Time Recipients") will be entitled to coverage through the
> intended provisions of the Retirement System and may
> contribute amounts from J-Time payments to fund benefits
> under the Benefit Plans.

> In contrast, characterizing J-Time payments as non-
> taxable income would be contrary to the relevant Internal
> Revenue Code ("Code") provisions as well as the terms
> and purpose of certain provisions of the Retirement
> System, including funding provisions. J-Time Recipients
> would also be ineligible to contribute to the Retirement
> System and Benefit Plans.

> The Plans discussed in this opinion are designed and
> structured, in accordance with the Code provisions that
> enable the Plans, to provide for payment of pre-tax
> funding for retirement plan contributions, deferred
> compensation and health and welfare benefits. That allows

---

[5] In addition to accruing benefits under the Retirement System, DFFA members are
also eligible for benefits under the 457(b) Plan and the FSA Plan.  The purpose of a
457(b) Plan is to provide DFFA members with an employer-sponsored, tax-favored
retirement account. The purpose of the FSA Plan (which is a plan offered under
Internal Revenue Code Section 125) is to provide eligible employees a vehicle by
which to convert taxable compensation into non-taxable health and welfare benefits
(*e.g.*, insurance premiums, health flexible spending amounts).

39104033.6/022765.00213

employees to obtain these important benefits in a fashion that minimizes the employee's tax liability.

Plante Moran Opinion, p. 2.

**A.     The Relief Requested in the Grievance Violates the POA, the Retirement System, and the Internal Revenue Code**

22.     With respect to the Retirement System, sections 1.2 and 13.1 of the Retirement System provide that it is a qualified plan under Internal Revenue Code § 414(d) and shall be administered in compliance with Internal Revenue Code § 415(b).  Retirement System, pp. 9, 58.  Section 1.3 provides that the Retirement System must comply with all relevant provisions, including exhibits of the POA, and that any inconsistency is to be construed to give full effect to the POA.  Retirement System, p. 9.  Further, section 9.1 of the Retirement System states that funding for Component I is intended to fully cover the actuarial cost of benefits anticipated to be paid to Members.  Retirement System, p. 46.

23.     As Plante Moran opined, the relief requested in the Grievance would violate each of those requirements:

> J-Time payments can only be treated as compensation for purposes of the Retirement System if such payments are includible in the employee's gross income.  *See* Section 13.1 of the Retirement System; Code §415(b); and Treasury Regulation §1.415(c)-2(b).  However, under the terms of the Retirement System, J-Time Recipients still earn service credit while on J-Time.  This means that a failure to treat J-Time payments as compensation results in an underfunding of the Retirement System that is contrary to its terms.  *See* Section 9.1.  It would also have

- 13 -

other consequences for the Retirement System, including but not necessarily limited to, potential missed mandatory employee contributions and lower average final compensation values for J-Time Recipients. *See* Sections 1.3, 2.1(7), 9.1, and 9.3(3) of the Retirement System. In short, member contributions to the Retirement System are tied to and inseparable from a Member's taxable income. Unless the Member's J-Time compensation is taxable income, there can be no Member contributions to the Retirement System.

Plante Moran Opinion, p. 2.

24.    Consequently, the Grievance must be dismissed with prejudice because it seeks relief which violates the POA's mandate that Component I govern the calculation of pension benefits and that the provisions of the Retirement System may not be modified.

**B.    The Relief Requested in the Grievance Also Conflicts with the 457(b) Plan and the FSA Plan**

25.    Furthermore, if J-Time payments are considered non-taxable, members on J-Time will not be permitted to make 457(b) elective deferrals and the FSA plan is unnecessary with respect to Member contributions to health benefits while on J-Time status.

26.    With respect to the 457(b) Plan, Plante Moran opined that

Employees in J-Time status are only permitted to make 457(b) elective deferrals from J-Time payments if such payments are properly treated as taxable income (compensation). *See* 457(b) Plan definition of "compensation", "includible compensation," and Code §415(c)(3). Therefore, an employee may only elect to

- 14 -

defer a portion of his or her J-Time payments under the 457(b) Plan if such payments constitute taxable compensation. In addition, employer contributions are also limited by the participant's includible compensation and therefore employer contributions potentially available the 457(b) Plan will also be limited if J-Time payments are excluded from gross income and, therefore, from includible compensation.

Plante Moran Opinion, p. 3.

27. With respect to the FSA Plan, Plante Moran opined that it would be "superfluous with respect to member contributions to health benefits made while on J-Time status. It would further lead to a non-sensical result if J-Time payments are determined to be non-taxable income but used to fund benefits under the FSA Plan. If the J-Time payments are characterized as non-taxable then the use of flexible spending account serves no purpose with respect to such payments." Plante Moran Opinion, p. 3.

28. Consequently, in addition to violating the POA and the Retirement System, the relief requested in the Grievance would also conflict with the proper operation of the 457(b) Plan and the FSA Plan.

## IV. Conclusion

29. In short, the Grievance violates the POA, the Retirement System, and applicable tax law, and conflicts with the City's other benefit plans. It should also be emphasized that the underlying purpose of J-Time is to allow an injured Member to remain financially whole while temporarily off work due to an injury. The City's

- 15 -

current procedure does exactly that. The relief requested in the Grievance would provide a windfall to an injured Member by continuing all compensation and benefits but make the compensation tax free.

30.    The City thus respectfully requests that this Court enter an order, in substantially the same form as the one attached as Exhibit 1, directing the DFFA to dismiss, or cause to be dismissed, the Grievance with prejudice. The City sought, but did not obtain, concurrence to the relief requested in the Motion.

Dated: May 27, 2022              MILLER, CANFIELD, PADDOCK AND
                                 STONE, P.L.C.

                                 By: /s/ Marc N. Swanson
                                 Marc N. Swanson (P71149)
                                 150 West Jefferson, Suite 2500
                                 Detroit, Michigan 48226
                                 Telephone: (313) 496-7591
                                 Facsimile: (313) 496-8451
                                 swansonm@millercanfield.com

                                 Attorneys for the City of Detroit

- 16 -

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## EXHIBIT LIST

| | |
|---|---|
| Exhibit 1 | Proposed Order |
| Exhibit 2 | Notice of Opportunity to Object |
| Exhibit 3 | None |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None |
| Exhibit 6-1 | December 2020 Memorandum |
| Exhibit 6-2 | Grievance |
| Exhibit 6-3 | Retirement System |
| Exhibit 6-4 | 457(b) Plan |
| Exhibit 6-5 | FSA Plan |
| Exhibit 6-6 | Plante Moran Opinion |

39104033.6/022765.00213

**EXHIBIT 1 – PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**ORDER GRANTING CITY OF DETROIT'S
MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE
CONFIRMATION ORDER AGAINST THE DFFA**

This matter, having come before the Court on the Motion for the Entry of an Order Enforcing the Confirmation Order Against the DFFA ("Motion"),[1] upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.      The Motion is granted.

2.      Within five days of the entry of this Order, the DFFA must dismiss, or cause to be dismissed, the City of Detroit with prejudice from the Grievance attached to the Motion as Exhibit 6-2.

---

[1] Capitalized terms used but not otherwise defined in this Order have the meanings given to them in the Motion.

3. The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

## EXHIBIT 2 – NOTICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### NOTICE OF OPPORTUNITY TO OBJECT TO CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE CONFIRMATION ORDER AGAINST THE DFFA

The City of Detroit has filed papers with the Court requesting the Court to enforce the Confirmation Order Against the DFFA

**Your rights may be affected.** **You should read these papers carefully and discuss them with your attorney.**

If you do not want the Court to enter an Order granting the *Motion for the Entry of an Order Enforcing the Confirmation Order Against the DFFA,* within 14 days, you or your attorney must:

1.   File with the court a written response or an answer, explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above. You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2. If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

Dated: May 27, 2022

**EXHIBIT 3 – NONE**

## EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 27, 2022, he served a copy of the foregoing **CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE CONFIRMATION ORDER AGAINST THE DFFA** in the manner described below:

Via first class mail:

Christopher A. Smith
Vice President – Local 344
333 West Fort Street, Suite 1420
Detroit, MI 48226-3149

Via first class mail and email:

Christopher Legghio and Megan B. Boelster
Legghio & Israel, P.C.
306 S. Washington, Suite 600
Royal Oak, MI 48067
mbb@legghioisrael.com
cpl@legghioisrael.com

DATED:  May 27, 2022

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

# EXHIBIT 5 – NONE

# **EXHIBIT 6-1**

MEMORANDUM

To: Detroit Police and Detroit Firefighters union representatives
From: C. Raimi, law
Re: Revision to treatment of "J-time" and "Injured Time" payments effective
January 1, 2021
Date: December 17, 2020

When public safety officers are on leave for a temporary disability sustained in the line of duty, they historically have received what is called "J-time" (for DFD) or "Injured Time" (for DPD) compensation. These officers have continued to receive full compensation and benefits as if they were actively employed, except the J-time/Injured time compensation was tax exempt. This practice predates the City's 2013 bankruptcy filing and is not mentioned in the current or prior collective bargaining agreements. We believe the practice was unknown to the Jones Day attorneys and was not identified as an issue in the City's bankruptcy. We also believe that had it been identified, the practice would have been discontinued or materially revised.

Michigan law allows a City to provide public safety officers with "like benefits" in replacement of workers compensation benefits. MCL 418.161(1)(c). Under federal law, the City has the option to make those "like benefits" taxable or non-taxable. IRC §104(a)(1) and Reg 1.104-1(b).

Historically, the City has not included J/Injured-time compensation as taxable income. In 2020, following implementation of Ultipro for the DFD, and significant due diligence, the City has learned that the J/Injured-time compensation must be taxable for the program to continue to provide full compensation and benefits.

The short explanation why J/Injured-time compensation must be taxable is because the practice entails not only continuation of wages, but also continuation of all benefits. Those include pre-tax deductions for deferred compensation and pension contributions. Other deductions, such as for health insurance, also are

1

continued. It is not possible to continue those benefits and benefit contributions unless the compensation is taxable.

In this regard, the J/Injured-time practice is materially different than workers compensation benefits which are not taxable. First, workers compensation replaces only 80% of income subject to a maximum of roughly $934 per week ($48,568 per year). J/Injured-time replaces 100% of compensation. Second, when an employee is on workers' compensation, she or he receives no benefits and no benefit deductions or contributions are made. Pension and 457 deferred compensation are terminated. If the employee wishes to remain on City health care, the employee must remit regular payments to the City. In contrast, under J/Injured-time, all benefits and benefit deductions including health care are continued.

Because the goal of the J/Injured-time practice is to allow the injured officer to retain the same compensation and benefits as if she or he were still on active duty, it is not only mandatory that the J/Injured-time compensation be taxable but it is eminently reasonable as well. The officer remains in the same position as if actively employed where the compensation would likewise be taxable.

Both the PFRS retirement plan and the City's 457 deferred compensation plan are governed by, and must comply with, Federal Tax law. That tax law requires, and the whole premise of these programs, is that the benefit deductions are "pre-tax," meaning the underlying compensation from which the "pre-tax" deductions are made must be taxable. See, for example, City 457 plan, City Ord sections 35-3-2 (definition of "includable compensation") and 35-3-6 (eligibility for participation); and see PFRS retirement plan, component I, section 13.1 (IRC controls), and IRC section 415 and reg. 1.415(c)-2(b)(1), (definition of compensation).

Because of tax implications, this change will be implemented on January 1, 2021.

2

# **EXHIBIT 6-2**

39104033.6/022765.00213



# DETROIT FIRE FIGHTERS ASSOCIATION

I.A.F.F. Local 344 · Organized May 1933

333 West Fort Street, Suite 1420 · Detroit, MI 48226-3149

(313) 962-7546 │ (313) 962-7899 fax │ www.dffa344.org

March 1, 2022

**VIA EMAIL ONLY**

**Thomas M. Gehart**
*President*

**Christopher A. Smith**
*Vice President*

**Jeffrey M. Pegg**
*Secretary*

**Timothy R. Carter, II**
*Treasurer*

**Directors**
M. Cretu
A. Wyatt
G. Stewart
R. Best
J. Cangialosi
A. Schwedler
J. Koch

**Emeritus Presidents**
Daniel Delegato
Daniel F. McNamara

Charles Simms
Executive Fire Commissioner
City of Detroit Fire Department
Detroit Public Safety Headquarters
1301 Third Street, Suite 728
Detroit, MI 48226
*simmsc@detroitmi.gov*

    Re:    **Grievance #01-22—Js Time Taxation**
           **Grievance on Behalf of All Affected Members**
           **NOTICE OF INTENT TO ARBITRATE**

Dear Commissioner Simms:

    This letter responds to the Detroit Fire Department's denial of the above-referenced grievance at Step 2.

    This serves as DFFA's notice of intent to arbitrate under Article 9 of the 2020-2026 Collective Bargaining Agreement.

                    Sincerely,

                    DETROIT FIRE FIGHTERS ASSOCIATION

                    CHRISTOPHER A. SMITH
                    Vice President - Local 344

        attachment
        cc:    DFFA Executive Board
               Robert Shinske, Chief of Department (shinsker@0663@detroitmi.gov)
               Robert Distelrath, 2nd Deputy Commissioner (distelrathr0739@detroitmi.gov)
               Reginald T. Jenkins, 2nd Deputy Commissioner (regjen@detroitmi.gov)
               Hakim Berry, Labor Relations (berryh@detroitmi.gov)
               Christopher P. Legghio, Attorney for DFFA (cpl@legghioisrael.com)
               Megan B. Boelstler, Attorney for DFFA (mbb@legghioisrael.com)



| CITY OF DETROIT FIRE DEPARTMENT | **GRIEVANCE FORM** | GRIEVANCE NO. **01-22** |

## ALL AFFECTED EMPLOYEES (SEE ATTACHED LIST), INCLUDING ALL MEMBERS WHO WERE ON Js TIME
## SINCE JANUARY 1, 2021                                    02-01-2022
NAME OF AGGRIEVED EMPLOYEE          TITLE              DATE

**STATEMENT OF GRIEVANCE:**

This is a grievance over the City's improper payment and taxation of Injured-on-Duty or "Js" Time, including its designation of Js Time as taxable, rather than non-taxable, income. This includes the City's improper W-2 treatment of Js Time.

Among other provisions, this violates the CBA, including Article 1, Article 16, and 24.

_CHRISTOPHER A. SMITH, Vice President_ _____ 02-01-2022
**Aggrieved Employee**                **Director**        **Date Presented to Officer**

**DESIRED REMEDY OF GRIEVANCE:**

That the City make all members affected whole, including providing any necessary W-2 revisions, cease and desist from this improper treatment of Js Time, and pay all DFFA costs and fees incurred in this matter.

_CHRISTOPHER A. SMITH, Vice President_
**Aggrieved Employee**

## STEP I:
**ANSWER OF DIVISION HEAD:**

_____          _____
**Division Head**                         **Date Returned**

**UNION STATEMENT:**      **ANSWER IS ACCEPTED** ☐      **ANSWER IS REJECTED** ☐

_____   _____   _____
**Aggrieved Employee**      **Director**                **Date**

## ADDITIONAL INFORMATION ON BACK

*This "Grievance Form" is subject to revision – pending contract negotiations.*

Grievance Form Revised 11-2014

**STEP II:**

Date Presented

**ANSWER OF EXECUTIVE FIRE COMMISSIONER OR DESIGNATED REPRESENTATIVE:**

**[Denied at Step II, 02-28-2022].**

Executive Fire Commissioner or Designated Representative                  Date Returned

**UNION STATEMENT:**          **ANSWER IS ACCEPTED** ☐          **ANSWER IS REJECTED** ☒

**[See statement of grievance, above].**

Grievance Committee                                        Grievance Committee

Christopher A. Smith, Vice President  3-1-2022
Grievance Committee                                        **Executive Board Member**

**ARBITRATION:** _____
                    **Date Filed**

**ALL AFFECTED MEMBERS LISTED**                                              **02-01-2022**



**EXHIBIT 6-3**

**EXHIBIT I.A.254.a**

FORM OF NEW PFRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT I ........................................................................................................ 1

ARTICLE 1.        GENERAL PROVISIONS ..................................................................... 1

Sec 1.1.        Police and Fire Retirement System Established; Adoption of 2014 Plan Document .......................................................................... 1

Sec 1.2.        Retirement System Intended to be Tax-Qualified; Governmental Plan ............................................................................. 1

Sec 1.3.        Compliance With Plan of Adjustment ...................................... 1

Sec 1.4.        Board of Trustees ...................................................................... 2

Sec 1.5.        Board of Trustees – Membership; Appointment ...................... 2

Sec 1.6.        Board of Trustees; Scheduling of Elections for Active and Retiree Trustees ....................................................................... 3

Sec 1.7.        Procedures for election of Retiree Trustees ............................. 3

Sec 1.8.        Board of Trustees; Oath; Term; Vacancies .............................. 4

Sec 1.9.        Board of Trustees; Officers and Employees ............................ 4

Sec 1.10.        Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 4

Sec 1.11.        Board of Trustees; Compensation; Expenses ........................... 5

Sec 1.12.        Rules for Administration of Funds ........................................... 5

Sec 1.13.        Board of Trustees; Certain Data to be Kept ............................. 5

Sec 1.14.        Board of Trustees; Annual Audit Report .................................. 5

Sec 1.15.        Board of Trustees; Legal Advisors .......................................... 5

Sec 1.16.        Board of Trustees; Medical Director ........................................ 6

Sec 1.17.        Designation of Actuary; Authority to Engage Additional Actuaries ........ 6

Sec 1.18.        Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System ...................................................................... 6

Sec 1.19.        Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities ................................................................................. 7

Sec 1.20.        Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties ...................................................................... 7

Sec 1.21.        Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties .......................................................... 7

Sec 1.22.        Investment Committee; Membership; Appointment ................. 8

Sec 1.23.    Investment Committee; Term; Resignation and Removal; Vacancies ..................................................................... 9

Sec 1.24.    Investment Committee; Operation; Meetings; Quorum; Voting ............ 10

Sec 1.25.    Investment Committee; Compensation; Expenses; Employment of Advisors ........................................................ 12

Sec 1.26.    Investment Committee; Special Reporting Obligation ........................ 12

ARTICLE 2.    DEFINITIONS ................................................................ 14

Sec 2.1.    Definitions ................................................................ 14

ARTICLE 3.    MEMBERSHIP ................................................................ 22

Sec 3.1.    Eligible Employees ....................................................... 22

Sec 3.2.    Cessation of Membership; Re-Employment ................................. 22

Sec 3.3.    Report From City ......................................................... 23

ARTICLE 4.    SERVICE CREDIT ............................................................ 24

Sec 4.1.    Credited Service .......................................................... 24

Sec 4.2.    Vesting Service ........................................................... 24

Sec 4.3.    Service Credit; Military Service .......................................... 24

Sec 4.4.    Service Credit; Qualified Military Service ................................ 25

ARTICLE 5.    ELIGIBILITY FOR RETIREMENT ............................................. 26

Sec 5.1.    Eligibility for Unreduced Normal Retirement Benefit ..................... 26

Sec 5.2.    Eligibility for Deferred Vested Retirement Benefit ....................... 26

Sec 5.3.    Eligibility for Disability Retirement Benefit – Duty Disability .............. 26

Sec 5.4.    Eligibility for Disability Retirement Benefit – Non-Duty Disability ...... 28

Sec 5.5.    Disability Retirees; Reexamination ....................................... 28

Sec 5.6.    Disability Benefits; Procedures for Determination of Disability ............ 29

Sec 5.7.    Return of Accumulated Mandatory Contributions to Non-Vested Member .................................................................. 31

Sec 5.8.    Benefits Offset by Compensation Benefits; Subrogation ................... 31

ARTICLE 6.    RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) ............................... 33

Sec 6.1.    Retirement Allowance ..................................................... 33

Sec 6.2.    Variable Pension Improvement Factor (Escalator) ......................... 33

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:43   Page 40 of 268
13-53846-swr   Doc 5045-1   Filed 05/22/14   Entered 05/22/14 03:49:29   Page 45 of 63
809

# TABLE OF CONTENTS
(continued)

Page

ARTICLE 7.        DEATH BENEFITS .................................................. 34

    Sec 7.1.    Accidental Death Benefit; Performance of Duty .................... 34

    Sec 7.2.    Non-Duty Death Benefits ......................................... 35

    Sec 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member ........................................................... 35

ARTICLE 8.        FORMS OF PAYMENT ............................................... 36

    Sec 8.1.    Retirement Allowance Options .................................... 36

    Sec 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ..................................................... 37

ARTICLE 9.        FUNDING AND RESERVES .......................................... 38

    Sec 9.1.    Funding Objective of the Retirement System ...................... 38

    Sec 9.2.    Funds ........................................................... 38

    Sec 9.3.    Method of Financing Retirement System Benefits .................. 39

    Sec 9.4.    Member Contributions Picked-Up ................................ 40

    Sec 9.5.    Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations .................................................... 40

ARTICLE 10.       VOLUNTARY EMPLOYEE CONTRIBUTIONS ..................... 42

    Sec 10.1.   Voluntary Employee Contributions; Amount; Vesting ........... 42

    Sec 10.2.   Changing an Election to Contribute .............................. 42

    Sec 10.3.   Individual Member Accounting; Crediting of Earnings .......... 42

    Sec 10.4.   Distribution of Accumulated Voluntary Employee Contributions .......... 42

ARTICLE 11.       LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS ................................................ 44

    Sec 11.1.   The Loan Program ............................................. 44

    Sec 11.2.   Eligibility for Loan ............................................ 44

    Sec 11.3.   Amount of Loan ............................................... 44

    Sec 11.4.   Terms and Conditions ......................................... 44

    Sec 11.5.   Loan Balance .................................................. 45

    Sec 11.6.   Default ........................................................ 45

    Sec 11.7.   Distribution ................................................... 46

ARTICLE 12.       DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM ....... 47

# TABLE OF CONTENTS
(continued)

Page

| | | Page |
|---|---|---|
| Sec 12.1. | General Provisions | 47 |
| Sec 12.2. | Conversion to Retirement Allowance | 47 |
| Sec 12.3. | Investment of DROP Assets | 47 |
| Sec 12.4. | Distribution of Amounts Credited to DROP Account | 48 |
| Sec 12.5. | Death of Member While Participating in the DROP Program | 48 |
| Sec 12.6. | Disability of Member While Participating in the DROP Program | 48 |
| Sec 12.7. | Cost Neutrality | 49 |
| ARTICLE 13. | LIMITATION ON BENEFITS AND CONTRIBUTIONS | 50 |
| Sec 13.1. | Compliance With Code Section 415(b) And Regulations | 50 |
| Sec 13.2. | Compliance with Code Section 415(c) and Regulations | 53 |
| ARTICLE 14. | RETIREMENT SYSTEM ADMINISTRATION | 54 |
| Sec 14.1. | Board of Trustees as Retirement System Administrator | 54 |
| Sec 14.2. | Powers and Duties of Board | 54 |
| Sec 14.3. | Executive Director; Employees | 56 |
| Sec 14.4. | Discretionary Authority | 56 |
| Sec 14.5. | Administrator's Decision Binding | 57 |
| ARTICLE 15. | MANAGEMENT OF FUNDS | 58 |
| Sec 15.1. | Board as Trustee of Retirement System Assets | 58 |
| Sec 15.2. | Maintenance of Segregated Funds | 58 |
| Sec 15.3. | Custodian of Funds | 58 |
| Sec 15.4. | Exclusive Purpose | 58 |
| Sec 15.5. | Prohibited Conduct | 58 |
| ARTICLE 16. | INVESTMENT OF RETIREMENT SYSTEM ASSETS | 60 |
| Sec 16.1. | Investment Powers of the Board and the Investment Committee | 60 |
| Sec 16.2. | Investment Management | 61 |
| Sec 16.3. | Best Practices | 62 |
| Sec 16.4. | Chief Investment Officer | 62 |
| Sec 16.5. | Investment Consultants | 63 |
| Sec 16.6. | Consistency With Plan of Adjustment | 64 |
| ARTICLE 17. | RETIREE MEDICAL ACCOUNT | 65 |

-iv-

13-53846-tjt Doc 13575-1 Filed 05/27/22 Entered 05/27/22 09:23:48 Page 42 of 268
13-53846-swr Doc 5045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 45 of 68
809

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---:|
| Sec 17.1. | Establishment of Account | 65 |
| Sec 17.2. | Effective Date | 65 |
| Sec 17.3. | Funding of Benefits | 65 |
| Sec 17.4. | Limitation on Contributions | 65 |
| Sec 17.5. | Impossibility of Diversion | 65 |
| Sec 17.6. | Administration | 66 |
| Sec 17.7. | Right to Amend or Terminate Medical Plans | 66 |
| Sec 17.8. | Reversion | 66 |
| Sec 17.9. | Limitation of Rights | 66 |
| ARTICLE 18. | MISCELLANEOUS | 67 |
| Sec 18.1. | Nonduplication of Benefits | 67 |
| Sec 18.2. | Assignments Prohibited | 67 |
| Sec 18.3. | Protection Against Fraud | 67 |
| Sec 18.4. | Conviction of Felony; Forfeiture of Rights | 67 |
| Sec 18.5. | Amendment; Termination; Exclusive Benefit | 67 |
| Sec 18.6. | Forfeitures Not to Increase Benefits | 68 |
| Sec 18.7. | Required Distributions - Compliance with Code Section 401(a)(9) and Regulations | 68 |
| Sec 18.8. | Direct Rollovers | 68 |
| Sec 18.9. | Construction | 70 |
| Sec 18.10. | Severability | 70 |

# COMPONENT I

# ARTICLE 1.  GENERAL PROVISIONS

**Sec 1.1.  Police and Fire Retirement System Established; Adoption of 2014 Plan Document**

Effective July 1, 1941, a Pension System for Policemen and Firemen of the City of Detroit was established for the purpose of providing retirement allowances and death benefits for Policemen and Firemen and their beneficiaries by amendment to the Charter of the City of Detroit.  That Pension System was amended on numerous occasions after July 1, 1941, including an amendment renaming the Retirement System as the "Police and Fire Retirement System of the City of Detroit." The provisions of the Police and Fire Retirement System of the City of Detroit, as in effect July 1, 2014, are set forth in this Plan Document (including Appendix A attached hereto).  Component I of the Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Police and Fire Retirement System of the City of Detroit on and after July 1, 2014.  Component II of the Plan Document generally applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Plan Document are frozen effective June 30, 2014.

Pursuant to Section 47-1-2 of the Detroit City Code, this Combined Plan Document shall replace the provisions of the Police and Fire Retirement System of the City of Detroit as set forth in the City of Detroit Charter, the Detroit City Code and any conflicting provisions in any collective bargaining agreements, rulings or opinions covering Members (including, without limitation, City Employment Terms).  All resolutions and policies of the Board previously enacted which are inconsistent with the provisions of this Plan Document are also hereby repealed to the extent of such inconsistency.

**Sec 1.2.  Retirement System Intended to be Tax-Qualified; Governmental Plan**

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.  The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

**Sec 1.3.  Compliance With Plan of Adjustment**

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment").  Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment.  To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

13-53846-swr  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:29  Page 45 of 268
13-53846-tjt  Doc 5045-1  Filed 05/20/14  Entered 05/20/14 03:49:29  Page 45 of 68
809

### Sec 1.4.    Board of Trustees

Effective July 1, 1941, a Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created.    The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document.

### Sec 1.5.    Board of Trustees – Membership; Appointment

The Board of Trustees of the Police and Fire Retirement System of the City of Detroit shall consist of seventeen Trustees, as follows:

(1)    The Mayor, *ex-officio*, or the Mayor's designee;

(2)    The President of City Council or a member thereof elected by the City Council, *ex-officio*;

(3)    The City Treasurer or Deputy City Treasurer, *ex-officio*;

(4)    The City Finance Director, or a designated representative, *ex-officio*;

(5)    The City Budget Director, or a designated representative, *ex-officio*;

(6)    The Corporation Counsel of the City, or a designated representative, *ex-officio*;

(7)    Three Fire Members of the Retirement System to be elected by the Fire Members under such rules and regulations as may be established by the Board of Fire Commissioners to govern such elections, as follows:

    (a)    Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)    One to be elected by and from Members holding ranks above the rank of lieutenant (or its equivalent);

(8)    Three Police Members of the Retirement System to be elected by the Police Members under the rules and regulations as may be established by the Commissioner of Police to govern such elections, as follows:

    (a)    Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)    One to be elected by and from Members holding a rank above lieutenant (or its equivalent); and

(9)    One individual who neither is a Member of the Retirement System nor an employee of the City in any capacity to be selected by the Board;

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:29  Page 46 of 268
13-53846-swr  Doc 5045-1  Filed 05/22/14  Entered 05/22/14 03:43:29  Page 45 of 68
809

(10) Two Retirees receiving benefits under the Retirement System, one of whom shall be elected by Retired Police Members and one of whom will be elected by Retired Fire Members pursuant to Sections 1.6 and 1.7 below;

(11) One Trustee appointed by the Mayor upon election of a Retiree Police Trustee; and

(12) One Trustee appointed by the Mayor upon election of a Retiree Fire Trustee.

### Sec 1.6. Board of Trustees; Scheduling of Elections for Active and Retiree Trustees

(1) Annual elections for active Police Officers and Fire Fighters shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(2) Elections to fill vacancies created by the expiration of a term for a Retiree Trustee shall be held every three years during the month of May.

(3) A special election for Retiree Trustees shall be held as soon as practicable after the Plan of Adjustment is confirmed. Unless a Retiree Trustee elected by reason of this special election resigns or is removed from the position of Trustee in accordance with the terms of the Combined Plan Document, a Retiree elected to the office of Trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the last day of June that follows the third anniversary of the special election, at which time an election for Retiree Trustees shall be held in accordance with Section 1.7.

### Sec 1.7. Procedures for election of Retiree Trustees

The procedures for the election of the Retiree Trustees shall be as follows:

(1) *Notice*. Notice of a primary election shall be sent to each Retiree by United States Mail.

(2) *Notice of Candidacy*. A proposed candidate shall submit a notarized letter to the executive director notifying the Retirement System of his or her candidacy.

(3) *Ballot*. Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position the Retiree held at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4) *Voting*. Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.7 shall be handled in accordance with such rules and regulations as the Board may adopt and Michigan law.

## Sec 1.8.     Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the City Clerk.

The term of office for each elected Trustee under Sections 1.5(7), (8) and (10) shall be three years.  The term of office for the Trustee who is selected by the Board under Section 1.5(9) shall be two years.  The term of office for the Trustees appointed by the Mayor under Sections 1.5(11) and (12) shall be three years.  Except as provided in Section 1.6(3), elected Trustees holding office on June 30, 2014 shall serve the remainder of their terms.

If a Trustee resigns or is removed by the other Trustees for cause, or if an elected or appointed Trustee fails to attend three consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled.  No vacancy shall result by reason of a change in the rank or grade of a Trustee during the term of office.

## Sec 1.9.     Board of Trustees; Officers and Employees

The Board of Trustees shall elect from its membership a chairman and a vice chairman. The executive director of the Retirement System or his or her representative shall serve as secretary of the Board of Trustees.  The Board may employ such special actuarial, medical and other employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

## Sec 1.10.   Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)     The Board shall hold regular meetings, at least one in each month, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.*  All Board meetings shall be held within the City of Detroit.

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:43:29   Page 48 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 03:43:29   Page 45 of 363
809

(2) Each Trustee shall be entitled to one vote on each question before the Board. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3) Eight members of the Board, four of whom must be elected members, shall constitute a quorum.

### Sec 1.11. Board of Trustees; Compensation; Expenses

All members of the Board of Trustees shall serve without additional compensation from the City or the Retirement System; however Retiree Trustees shall receive a hourly stipend from the Retirement System equal to the lowest rate of pay received by an active employee Trustee for attending Board meetings, educational time and travel out of the City on official business of the Retirement System. All Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec 1.12. Rules for Administration of Funds.

Subject to the limitations contained in this Combined Plan document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Combined Plan document and for the transaction of its business.

### Sec 1.13. Board of Trustees; Certain Data to be Kept

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the Retirement System and for checking and compiling the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec 1.14. Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec 1.15. Board of Trustees; Legal Advisors

(1) The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

13-53846-tjt Doc 13575-1 Filed 05/27/22 Entered 05/27/22 09:23:48 Page 49 of 268
13-53846-swr Doc 5045-1 Filed 05/20/14 Entered 05/20/14 09:43:29 Page 464 of 668
809

(2)     Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)     Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

## Sec 1.16. Board of Trustees; Medical Director

(1)     The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in a retirement system maintained by the City. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(2)     The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of the Combined Plan, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred to it.

## Sec 1.17. Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board. In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary. The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the governance terms attached to the that certain Agreement by and between the Michigan Settlement Administration Authority, the Retirement System, the General Retirement system for the City of Detroit, Michigan ("GRS"), and the City (the "State Contribution Agreement") as Exhibit B (the "Governance Term Sheet"), and the Plan of Adjustment. Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

## Sec 1.18. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

13-53846-tjt Doc 13575-1 Filed 05/27/22 Entered 05/27/22 09:23:43 Page 50 of 268
13-53846-swr Doc 5045-1 Filed 05/20/14 Entered 05/20/14 09:43:29 Page 46 of 63
809

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this Section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this Section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

## Sec 1.19.   Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.18, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

## Sec 1.20.   Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee.  To the extent the Board exercises discretion with respect to investment of Retirement System assets, the Board shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*., and a Board member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose.  Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

## Sec 1.21.   Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties

As of the effective date the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to, and approving certain actions by, the Board of Trustees and/or making determinations and taking action under and with respect to certain investment management matters relating to the Retirement System.  The creation and operation of the Investment

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:29   Page 51 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 03:43:29   Page 46 of
809

Committee is controlled by the Governance Term Sheet. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*. The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

**Sec 1.22.   Investment Committee; Membership; Appointment**

The Investment Committee shall consist of nine (9) members, determined as follows:

(1)     Five independent members, at least two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as necessary to bring the number of independent Investment Committee members to five (5);

(2)     Two Retirees who shall be appointed by the Board consisting of one elected retired Police Member and one elected retired Fire Member who are serving on the Board and who are receiving benefit payments under the Retirement System; and

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:29   Page 52 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 03:43:29   Page 463 of
809

(3)     Two Employee members who shall be appointed by the Board consisting of one Fire Department Employee and one Police Department Employee who are active members of the Board.


**Sec 1.23.   Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|---|---|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or Employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees.  Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier.  Notwithstanding any provision of this Combined Plan document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee.  An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in accordance with the voting procedure set forth in Section 1.24; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government.  A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings.  In the event of any removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:29  Page 53 of 268
13-53846-swr  Doc 5045-1  Filed 05/27/14  Entered 05/27/14 09:48:29  Page 464 of
809

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("Treasurer"), in consultation with the Foundation, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

**Sec 1.24. Investment Committee; Operation; Meetings; Quorum; Voting**

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Investment Committee meetings shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Each independent Investment Committee member shall be entitled to one vote on each question before the Investment Committee. Each Retiree and Employee member shall be entitled to one-half vote on each question before the Investment Committee. Except as otherwise provided in the Governance Term Sheet, at least four concurring votes shall be necessary for a decision by the Investment Committee and each Investment Committee member shall be entitled to one vote on each question before the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a state or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

**Sec 1.25.  Investment Committee; Compensation; Expenses; Employment of Advisors**

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties.  All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.  The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions, and such parties or persons may be reasonably compensated from the assets of the Retirement System.  Such engagements shall not be subject to approval of the Board.

**Sec 1.26.  Investment Committee; Special Reporting Obligation**

(1)     Beginning in calendar year 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)     In the event the Retirement System receives a written notice from the Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the Treasurer a written certification that (i) the default has been cured, and (ii) no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)     Beginning in calendar year 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)     Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)     a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b)     a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:29  Page 56 of 268
13-53846-swr  Doc 3045-1  Filed 03/20/14  Entered 03/20/14 03:45:29  Page 46 of 68
809

the Foundation that, as of the date of the annual report ("Annual Report") required to be provided by the City to the Foundation:

(i)      the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

(ii)      the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan document; and

(iii)      the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)      a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the Treasurer; and (iv) in the event that the Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee. Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d)      any additional information that may be reasonably requested by the Foundation from time to time.

(e)      Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

# ARTICLE 2. DEFINITIONS

## Sec 2.1.    Definitions

Unless a different definition is contained within this Combined Plan Document, or a different meaning is plainly required by context, for purposes of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1)    *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the Compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)    *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System.

(3)    *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.   The rates of interest adopted by the Board from time to time shall not violate the terms of the Plan of Adjustment.

(4)    *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5)    *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)    *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)    *Average Final Compensation* means the average Compensation received by a Member during the five consecutive years of Credited Service which immediately precede the date of the Member's last termination of City employment as an employee of the Police Department or the Fire Department.   If a Member has less than five years of Credited Service, the Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.

(8)    *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(9)    *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Police and Fire Retirement System of the City of Detroit.

(10)    *City* means the City of Detroit, Michigan, a municipal corporation.

13-53846-tjt    Doc 13575-1    Filed 05/27/22    Entered 05/27/22 09:23:48    Page 58 of 268
13-53846-swr    Doc 5045-1    Filed 05/20/14    Entered 05/20/14 03:48:29    Page 46 of 68
809

(11)     *City Council or Council* means the legislative body of the City.

(12)     *Combined Plan* means the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan, effective July 1, 2014, and as amended thereafter.

(13)     *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which is contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the City.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14)     *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)     the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:48   Page 59 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 03:49:29   Page 47 of 68
809

(b)     the 2014 Defined Contribution Plan which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15)    *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)     the Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)     the Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16)    *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(17)    *Disability or Disabled*: see Total Disability or Totally Disabled.

(18)    *DFFA* means the Detroit Fire Fighters Association.

(19)    *DPCOA* means the Detroit Police Command Officers Association.

(20)    *DPLSA* means the Detroit Police Lieutenants and Sergeants Association.

(21)    *DPOA* means the Detroit Police Officers Association.

(22)    *DROP Account* means the account established by the Board for a Member who is eligible for and who elects to participate in the DROP Program.

(23)    *DROP Program* means a program established for eligible Members pursuant to Article 12.

(24)    *Employee* means an employee of the City's Police Department who has taken an oath of office or a Fire Fighter providing services to the City, but does not include:

(a)     individuals whose City services are compensated on a contractual or fee basis;

(b)     any person during any period when such person is classified by the City as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the City;

(c)     the Medical Director of the Retirement System.

If a person described in (b) above is reclassified by the City as a common-law employee of the City and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:43  Page 60 of 268
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:43:29  Page 47 of 68
809

reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(25) *Employer* means the City.

(26) *Final Compensation* means the annual compensation of a Member at the time of his or her termination of employment.

(27) *Fire Fighter* means the rank in the Fire Department currently or formerly classified by the civil service commission as Fire Fighter.

(28) *Fire Member* means an employee of the Fire Department of the City of Detroit who is a participant in the Retirement System.

(29) *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(30) *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the City for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the City for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(31) *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(32) *Investment Committee* means the committee established pursuant to Section 1.22 which shall have the powers and duties described herein.

(33) *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(34) *Medical Beneficiary* means a Member who has retired from employment with the Employers and the spouses and dependents of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(35) *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(36) *Medical Benefits Account* means the bookkeeping account established under Section 17.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(37) *Medical Director* means the physician appointed by the Board pursuant to Section 1.16.

(38) *Member* means any Police Member or Fire Member who has not retired or died.

13-53846-tjt Doc 13575-1 Filed 05/27/22 Entered 05/27/22 09:23:48 Page 61 of 268
13-53846-swr Doc 5045-1 Filed 05/20/14 Entered 05/20/14 03:49:29 Page 47 of 268
809

(39) *Normal Retirement Age* means for any Member Age fifty with twenty-five years of Credited Service, with the following transition period regarding payment of Component I benefits only:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon Attainment of Normal Retirement Age while in Service.

(40) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(41) *Patrolman* means the rank in the Police Department currently or formerly known as patrolman.

(42) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience, and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(43) *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.17 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Investment Committee or the Board may direct.

(44) *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(45) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan,* Case No. 13-53846.

(46) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(47) *Police and Fire Retirement System of the City of Detroit or Retirement System* means the Police and Fire Retirement System of the City of Detroit created and, prior to July 1, 2014, memorialized in Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code, Article 54 of the Detroit City Code of 1964, and

13-53846-tjt Doc 13575-1 Filed 05/27/22 Entered 05/27/22 09:33:29 Page 62 of 268
13-53846-swr Doc 5045-1 Filed 05/20/14 Entered 05/20/14 03:49:29 Page 473 of
809

collective bargaining agreements and, on and after July 1, 2014, pursuant to Section 47-1-2 of the Detroit City Code, memorialized in this Combined Plan Document, as amended from time to time.

The Retirement System consists of:

(a)     The 2014 Defined Benefit Plan, which is described in Component I hereof;

(b)     the Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, which are described in Component I hereof;

(c)     the Frozen Defined Benefit Plan, which is described in Component II hereof; and

(d)     the Frozen Defined Contribution Plan, which is described in Component II hereof.

References to the words Retirement System in Component I of the Plan Document shall mean the provisions of the Defined Benefit Plan and Defined Contribution Plan described in Component I, unless a different meaning is plainly required by context.

(48)     *Police Member* means a Police Officer who has taken the oath of office as prescribed in the Detroit City Charter, excluding patrolmen of other City departments, privately employed patrolmen and special patrolmen, who is a participant in the Retirement System.

(49)     *Police Officer* means the rank in the Police Department currently or formerly known as Police Officer.

(50)     *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(51)     *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(52)     *Retirement* means a Member's withdrawal from the employ of the City with a Retirement Allowance paid by the Retirement System.

(53)     *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(54)     *Service* means personal services rendered to the City by an employee of the Police Department or Fire Department, provided such person is compensated by the City for such personal services.

(55)     *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

13-53846-tjt Doc 13575-1 Filed 05/27/22 Entered 05/27/22 09:23:29 Page 63 of 268
13-53846-swr Doc 5045-1 Filed 05/20/14 Entered 05/20/14 03:49:29 Page 47 of 68
809

(56)    *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(57)    *Total Disability or Totally Disabled* means:

    (a)    during the first twenty-four (24) months that a Member receives benefits from the Retirement System due to injury, illness or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of the Member's occupation; and

    (b)    during all subsequent months that a Member receives benefits from the Retirement System due to illness, injury or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the Member is suited, based on education, training and experience.

(58)    *Vesting Service* means service credited to a Member to the extent provided in Section 4 of Component I of this Combined Plan Document.

(59)    *Voluntary Employee Contributions* mean the after-tax contributions made by an eligible Member to the Retirement System pursuant to Section 10.1.

(60)    *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for an eligible Member who elects to make Voluntary Employee Contributions.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 13.2(2) |
| Annual Report | Section 1.26(4)(b) |
| Authority | Section 1.26(1) |
| compensation | Section 13.1(12) |
| Compliance Report | Section 1.26(1) |
| Cure Certification | Section 1.26(2) |
| current active | Section 9.3(3) |
| Default Notice | Section 1.26(2) |
| Deferred Retirement Option Plan Fund | Section 9.2(3) |
| Deferred Retirement Option Plan Program (DROP) | Section 12.1 |
| Differential Wage Payment | Section 4.4 |
| Direct rollover | Section 18.8(1)(b) |
| Distributee | Section 18.8(1)(c) |
| Dollar Limit | Section 13.1(3)(b) |
| DRRB | Section 5.6 |
| Eligible retirement plan | Section 18.8(1)(d) |
| Eligible rollover distribution | Section 18.8(1)(e) |
| Expense Fund | Section 9.2(7) |

| | |
|---|---|
| Foundation | Section 1.22 |
| funding level | Section 9.5(3) |
| Governance Term Sheet | Section 1.17 |
| Income Fund | Section 9.2(8) |
| ING | Section 12.3(1) |
| investment management decision or investment management matter | Section 16.2 |
| limitation year | Section 13.1(2) |
| Medical Benefits Account Fund | Section 9.2(4) |
| Medical Plans | Section 17.1 |
| new employee | Section 9.3(3) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One. Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(5) |
| Pension Certificate | Section 1.26(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| Plan of Adjustment | Section 1.3 |
| Police and Fire Retirement System of the City of Detroit | Section 1.1 |
| Pop-up Form | Section 8.1(2)(b) |
| Rate Stabilization Fund | Section 9.2(6) |
| Standard Form | Section 8.1(2)(a) |
| State Contribution Agreement | Section 1.17 |
| Straight Life Retirement Allowance | Section 8.1(1) |
| Treasurer | Section 1.23 |

13-53846-tjt Doc 13575-1 Filed 05/27/22 Entered 05/27/22 09:23:29 Page 65 of 268
13-53846-swr Doc 5045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 47 of 68
809

## ARTICLE 3.  MEMBERSHIP

### Sec 3.1.    Eligible Employees

(1)     Except as provided in Section 3.2, the membership of the Retirement System shall consist of all persons who are employed with the Police and Fire Departments of the City and who are employed as Police Officers or Fire Fighters according to the rules and regulations of the respective Departments.  An eligible Employee's membership in the Retirement System shall be automatic; no eligible Employee shall have the option to elect to become a Member of the Retirement System.

(2)     Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)     Any Police Officer or Fire Fighter who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member as of his or her date of death.

(4)     Any Member who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

### Sec 3.2.    Cessation of Membership; Re-Employment

(1)     If a Member dies, or is separated from service with the City by resignation, dismissal, retirement or disability, he shall cease to be a Member.  A Member who elects to participate in the DROP Program under Component I, Component II or both shall be considered to have separated from service with the City by reason of retirement and shall neither accrue a benefit under the Retirement System nor be required to make Mandatory Employee Contributions to the Retirement System pursuant to Section 9.3(3) or 9.5 or permitted to make Voluntary Employee Contributions pursuant to Section 10.1.

(2)     If a Member ceases to be a Member under paragraph (1) other than by reason of participation in the DROP Program and later becomes a Police Officer or Fire Fighter other than in the position of Police Assistant, he shall again become a Member, subject to the obligations of a Member.

(3)     If a Member ceases to be a Member under paragraph (1) and later becomes employed as a Police Assistant, such Member shall not become a Member upon reemployment.  If such Member was receiving a Retirement Allowance from the Retirement System prior to his or her date of rehire, such Retirement Allowance shall not be suspended during the period of the Member's reemployment as a Police Assistant.

(4)     Retirement benefits for a Retiree who returns to active full time employment other than as a Police Assistant shall be subject to the following:

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:49   Page 66 of 268
13-53846-swr   Doc 5045-1   Filed 05/10/22   Entered 05/10/22 09:48:29   Page 47 of 63
809

(a)      A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment. The variable Pension Improvement Factor (Escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)      A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)      A Retiree's Average Final Compensation and Credited Service for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation and Credited Service earned by the Retiree after he returns to work.

(d)      An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his second Retirement Allowance.

## Sec 3.3.   Report From City

It shall be the duty of the City to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4. SERVICE CREDIT

## Sec 4.1.    Credited Service

(1)    The Board shall keep an accurate record of each Member's accumulated Service credit from the date of commencement of employment with the City to the date of termination of employment with the City.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the City as a Police Officer or Fire Fighter beginning on the later of (i) July 1, 2014 or (ii) his date of hire with the City as a Police Officer or Fire Fighter and ending on the date his employment with the City as a Police Officer or Fire Fighter is terminated.  Service shall be credited in years and twelfths $(1/12^{th})$ of a year.  Not more than one-twelfth $(1/12^{th})$ of a year of Credited Service shall be credited to a Member on account of all Service rendered to the City in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the City in any period of 12 consecutive months.

(3)    Not more than one month of Credited Service shall be granted for any period of more than one month during which the Member is absent without pay; notwithstanding the foregoing, any Member who shall  be suspended from duty and subsequently reinstated to duty without further disciplinary action shall receive credit for the time of such period of suspension.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Sections 5.1 and 5.4, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).  The period of time during which a Member is on layoff from the service of the City shall be included in the Member's Credited Service solely for the purposes of determining whether the Member has attained his Normal Retirement Age for purposes of Section 5.1.

## Sec 4.2.    Vesting Service

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the City.

(2)    A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec 4.3.    Service Credit; Military Service

A Member who enters the military service of the United States while employed with the City shall have the period of such military service credited as City Service in the same manner as if the Member had served the City without interruption, provided that (1) the Member's entry into such military service and re-employment thereafter shall be in accordance with applicable

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:48   Page 68 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 03:48:29   Page 473 of 868
809

laws, ordinances, and regulations of the State of Michigan and the City, (2) he or she is re-employed by the City upon completion of such military service, and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service. The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder. During the period of military service and until return to City employment, the Member's Mandatory Employee Contributions to the Retirement System shall be suspended.

## Sec 4.4.    Service Credit; Qualified Military Service

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u). Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than thirty days, such Differential Wage Payment will be treated as compensation under the Code Section 415(c)(3) limits, but not for purposes of benefit accruals under the Retirement System. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the City to an individual who is performing service in the uniformed services while on active duty for a period of more than thirty days.

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:43:29  Page 69 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 03:43:29   Page 48 of 68
809

# ARTICLE 5. ELIGIBILITY FOR RETIREMENT

## Sec 5.1.     Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Age while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

## Sec 5.2.     Eligibility for Deferred Vested Retirement Benefit

Any Member who terminates employment with the City prior to satisfying the requirements for receipt of a retirement benefit under Section 5.1 and who is credited with ten (10) or more years of Vesting Service upon his or her termination of employment (regardless of Age) shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his Attainment of Age sixty-two.  At a Member's election, the Member may begin receiving a Retirement Allowance following his Attainment of Age fifty-five, actuarially reduced for early commencement, in lieu of an unreduced Retirement Allowance beginning at age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec 5.3.     Eligibility for Disability Retirement Benefit – Duty Disability

(1)     If, prior to attainment of his Normal Retirement Date, a Member shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if, pursuant to Section 5.6, the Board shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board by or on behalf of such Member or by the head of his Department such Member shall be retired; notwithstanding that during such period of notification he or she may have separated from service and provided further that the Medical Director, after examination of such Member shall certify to the Board the Member's Total Disability.  A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

(a)     a basic benefit equal to fifty percent (50%) of his Final Compensation at the time his duty disability retirement begins, and

(b)     a supplemental benefit equal to sixteen and two-thirds percent (16-2/3%) of his Final Compensation at the time his duty disability retirement begins.

Subject to Section 9.5, on the first day of each Plan Year, a Member's duty disability benefit will be increased as provided in Section 6.2.

(2)     After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation.  If the

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:43:29  Page 70 of 268
13-53846-swr  Doc 5045-1  Filed 05/20/14  Entered 05/20/14 03:45:29  Page 481 of
809

Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (1)(a) and (1)(b) until such time as the Member would have attained twenty-five years of Credited Service had he continued in active Service with the City. At that time, the Member shall continue to receive the benefit described in paragraph 1(a) above; however, benefits described in paragraph (1)(b) above will cease. If the Member is not disabled from any occupation, he shall continue to receive the benefit described in paragraph (1)(a) above; benefits described in paragraph 1(b) will cease.

(3)     In the event a Member receiving duty disability benefits has attained twenty-five years of Credited Service, duty disability benefits shall continue to be paid to the Member until the earlier of (i) the Member's Attainment of Age sixty-five, or (ii) the date the Member ceases to be Totally Disabled as determined by the Board. Upon termination of disability or Attainment of Age sixty-five, a Member with twenty-five years of Credited Service shall be eligible to receive a Retirement Allowance as provided in Section 6.1. The amount of such Retirement Allowance shall be equal to the amount which would have been payable to the Member if the Member's conversion from duty disability retirement to a Retirement Allowance had occurred on the date the Member attained twenty-five years of Credited Service.

(4)     If a Member on duty disability retirement returns to active Service with the City and shall re-qualify for duty disability retirement for the same or related reasons within twenty-four months of his return to active Service, then the disability shall be deemed a continuation of the prior Total Disability and the period of the Member's active Service following the return to work will not qualify the Member to be entitled to a new initial determination of disability for purposes of determining the benefit payable to the Member. Instead, such Member will return to duty disability retirement benefits based on the number of months of disability with which the Member was credited at the time of his return to active Service, as if there had not been a break in his period of duty disability retirement.

(5)     During the period a Member is eligible to receive duty disability benefits under this Section 5.3, the Member shall continue to be credited with Credited Service until the Member accrues twenty-five years of Credited Service, at which time accrual of Credited Service shall cease.

(6)     In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Plan Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of duty disability, increased by the variable Pension Improvement Factor (Escalator) (if any) applicable to such benefit pursuant to Section 6.2 multiplied by the number of full Plan Years from the date of the Member's duty disability to the year in which the earnings offset is applied, and (ii) the amount of the Member's remuneration from gainful employment during the prior calendar year. The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources. Furnishing such information to the Board at such

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:29  Page 71 of 268
13-53846-swr  Doc 5045-1  Filed 05/20/14  Entered 05/20/14 03:48:29  Page 48 of 68
809

times as the Board shall require shall be a condition for the Member's continued eligibility for duty disability benefits.

## Sec 5.4.    Eligibility for Disability Retirement Benefit – Non-Duty Disability

(1)    Upon the application of a Member or the Member's Department head, a Member who becomes totally and permanently disabled prior to his or her Normal Retirement Date in the employ of the City not resulting from the performance of duty shall be retired by the Board; provided that the Medical Director shall certify to the Board after a medical examination, that such Member is mentally or physically totally and permanently disabled for the further performance of duty to the City.  Such a Member shall receive the following applicable benefits:

   (a)    If such Member has less than five years of Credited Service at the time of his disability retirement, his Accumulated Mandatory Employee Contributions standing to his credit in the Accumulated Mandatory Employee Contributions Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his Accumulated Mandatory Employee Contributions.

   (b)    If such Member has five or more years of Credited Service at the time of his disability retirement, he shall receive a disability Retirement Allowance computed in accordance with the provisions of Section 6.1 payable in any of the optional forms provided in Section 8.1 hereof.  His annual Straight Life Retirement Allowance shall not be less than twenty per cent (20%) of his Average Final Compensation.

(2)    If a Member receiving non-duty disability retirement benefits is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the disabled Member's Retirement Allowance and Average Final Compensation, the Member's Retirement Allowance shall be reduced by the amount of such difference.  If the amount of the Retiree's earnings changes, the Retirement Allowance may be adjusted accordingly.  The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources.  Furnishing such information to the Board at such times as the Board shall require shall be a condition for the Member's continued eligibility for non-duty disability benefits.

## Sec 5.5.    Disability Retirees; Reexamination

(1)    At least once each year during each year following the retirement of a Member under Section 5.3 or Section 5.4, the Board shall require that such disability Retiree who has not attained his Normal Retirement Age undergo a medical examination, to be made by, or under the direction of the Medical Director; provided, however, that medical examinations shall not be required if the Medical Director determines that the Retiree's condition is permanent and there is no need for further reexamination.  Retirees shall be reimbursed for reasonable costs actually incurred by the Retirees in connection with such

examinations. Should any such Retiree who has not attained Normal Retirement Age fail to submit to a required medical examination, the Retiree's Retirement Allowance may be suspended by the Board until the examination is completed. Should such failure continue for one year, all of the disability Retiree's rights in and to the duty or non-duty disability Retirement Allowance may be revoked by the Board. If upon such examination of a Retiree, the examiner reports that the Retiree is no longer Totally Disabled, and such report is concurred in by the Board, the Retiree shall be restored to active service with the City and the Retirement Allowance paid pursuant to Section 5.3 or Section 5.4 shall be suspended until the Retiree terminates active Service with the City.

(2)     A disabled Retiree who has been, or shall be, reinstated to active Service in the employ of the City shall again become a Member. All Credited Service at the time of the disability retirement shall be restored to the Member.

**Sec 5.6.     Disability Benefits; Procedures for Determination of Disability**

(1)     The Board shall establish procedures for determining whether a Member is Totally Disabled. Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(2)     If a Member is determined to be Totally Disabled under Section 5.3(1) or 5.4(1), the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan. If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits. If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility. If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board. The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members. The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in accordance with the agreements between the City and the unions representing Members.

(3)     The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

(a)     The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

(b)     A court reporter will be present and make a stenographic record of the proceedings;

(c)     The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

(d)     The witnesses will be sequestered;

(e)     The witnesses will be sworn by the court reporter and testify under oath;

(f)     The Member may not be called by the City as an adverse witness;

(g)     The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

(h)     If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department executive for the release of the employee for the purpose of so testifying;

(i)     The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

(j)     The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

(k)     The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan. The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan: and

(l)     The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(4)     If a disability Retiree is determined by the Board to no longer be Totally Disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination. The Board shall promptly arrange for such re-examination. The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer Totally Disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:48   Page 74 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 03:48:29   Page 483 of
809

(5)     The Board shall not act upon or grant the application filed by a Member who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

    (a)     regularly assigned to a position, the full duties of which he or she is capable of performing; or

    (b)     assigned to a restricted duty position, unless the Member's Department advises that it intends to seek a disability retirement for the Member in the foreseeable future.

(6)     The provisions in paragraph (5) above are not intended to and will not:

    (a)     affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

    (b)     restrict in any way the existing authority of the Chief of Police or the Fire Commissioner to seek a duty or non-duty disability retirement for a Member for that Member at that time to request a duty or non-duty disability retirement.

## Sec 5.7.     Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases employment with the City before becoming eligible for a Retirement Allowance under Section 5.1 or 5.2 or a disability Retirement Allowance pursuant to Section 5.3 or 5.4, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

## Sec 5.8.     Benefits Offset by Compensation Benefits; Subrogation

(1)     Any amounts which may be paid or payable to a Member, Retiree, or Beneficiary on account of disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be an offset against any amounts payable from funds of the Retirement System (Component I and Component II combined) on account of the same disability or death.  If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance payable by the Retirement System (under both Component I and Component II), the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System (under both Component I and Component II), and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)    In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

13-53846-tjt Doc 13575-1 Filed 05/27/22 Entered 05/27/22 09:23:48 Page 76 of 268
13-53846-swr Doc 5045-1 Filed 05/27/22 Entered 05/27/22 09:23:48 Page 48 of 68
809

## ARTICLE 6.  RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Age or his actual retirement from employment with the City in the form of a Straight Life Retirement Allowance shall be equal to two percent (2%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth $(1/12^{th})$ year) of Credited Service earned after June 30, 2014.

### Sec 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2015 and effective the first day of each Plan Year thereafter, the Board may determine that the annual Retirement Allowance of a Member shall be increased by a factor of one percent (1.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement ("Pension Improvement Factor (Escalator)"); provided, that the recipient of said Retirement Allowance shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.  The Pension Improvement Factor (Escalator) shall be compounded.

# ARTICLE 7.  DEATH BENEFITS

## Sec 7.1.    Accidental Death Benefit; Performance of Duty

(1)    If a Member is killed in the performance of duty in the service of the City, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the City, and such death, illness, or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the City, the following benefits shall be paid:

    (a)    the Accumulated Mandatory Employee Contributions standing to his or her credit in the Accumulated Mandatory Employee Contributions Fund at the time of his or her death shall be paid to such person or persons as the Member shall have nominated by written designation duly executed and filed with the Board.  If no such designated person survives the Member, the said Accumulated Mandatory Employee Contributions shall be paid to the Member's legal representative, subject to paragraph (e) of this Section 7.1(1).

    (b)    the surviving spouse shall receive a pension of five-elevenths of the Member's Final Compensation payable for the spouse's lifetime.  If the Member's child or children under age eighteen years also survive the deceased Member, each such child shall receive a pension of one-tenth of such Final Compensation; provided, that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of seven thirty-thirds of such Final Compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution of the benefit by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of the Member's Final Compensation.  In no case shall the total of the benefits provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the Member's Final Compensation.

    (c)    if no surviving spouse survives the deceased Member or if the Member's surviving spouse dies before his youngest unmarried surviving child attains Age eighteen years, his unmarried child or children under Age eighteen years shall each receive a pension of one-fourth of the Member's Final Compensation; provided that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of one-half of such Final Compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the Member's Final Compensation.

    (d)    if the Member has no surviving spouse or surviving children under Age eighteen years and if the Member leaves surviving either a father or mother or both, whom the Board shall find to be actually dependent upon such Member for financial

support, such dependent father and mother shall each receive a pension of one-sixth of the Member's Final Compensation.

(e)      If a Member dies intestate, without having designated a person or persons, as provided in paragraph (a) of this Section 7.1(1), and without heirs, the amount of his Accumulated Mandatory Employee Contributions in the Accumulated Mandatory Employee Contribution Fund, not to exceed a reasonable sum, to be determined by the Board, shall be used to pay his burial expenses, provided the Member leaves no other estate sufficient for such purpose. Any balance credited to such Member in the Accumulated Mandatory Employee Contribution Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

## Sec 7.2.    Non-Duty Death Benefits

The surviving spouse of any Member who dies while in the employ of the City (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, shall receive a Retirement Allowance computed in the same manner in all respects as if said Member had (i) retired effective on the day preceding the Member's death, notwithstanding that the Member had not attained Normal Retirement Age, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving spouse as Beneficiary.

## Sec 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member who is not covered by Section 7.1 dies while employed by the City or following termination of employment but prior to commencement of a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 8. FORMS OF PAYMENT

### Sec 8.1. Retirement Allowance Options

(1)    Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary, in accordance with the options set forth below:

    (a)    *Option One.  Cash Refund Annuity.*  A Retiree will receive a reduced Retirement Allowance for as long as he or she lives, provided that if the Retiree dies before payment of the Accumulated Mandatory Employee Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

    (b)    *Option Two.  Joint and One Hundred Percent Survivor Allowance.*  Upon the death of a Retiree  who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the Member's reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (c)    *Option "A".  Joint and Seventy-Five Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (d)    *Option Three.  Joint and Fifty Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (e)    *Option "B".  Joint and Twenty-Five Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the Member's reduced Retirement Allowance shall be

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:29   Page 80 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 09:48:29   Page 491 of
809

continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2)     *Joint and Survivor Optional Forms of Payment*.  The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

   (a)     *Standard Form*.  Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

   (b)     *Pop-up Form*.  Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary.  In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance payable to the Retiree shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

### Sec 8.2.     Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1, both a Retiree and Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions (and if the Retiree makes an election pursuant to Section 10.4(2), his Accumulated Voluntary Employee Contributions) at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions (and Accumulated Voluntary Employee Contributions, if applicable) and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board.  If there is no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the Retiree or the Beneficiary, whichever is the last to die.

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:29   Page 81 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 23:45:29   Page 492 of
809

# ARTICLE 9.  FUNDING AND RESERVES

## Sec 9.1.    Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive City and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of the Retirement System).

## Sec 9.2.    Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Contribution Fund, the Deferred Retirement Option Program Fund (if applicable), the Medical Benefits Account Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Expense Fund and the Income Fund, as follows:

(1)    The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the retirement, termination, disability or death of a Member with a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's or Beneficiary's Retirement Allowance.

(2)    The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members, together with earnings thereon.

(3)    The Deferred Retirement Option Plan Fund shall be the fund in which shall be accumulated the amounts credited to the DROP Accounts of Members who have elected to participate in the DROP Program pursuant to Article 12, together with earnings thereon, provided that the DROP Accounts are held and invested within the Retirement System.

(4)    The Medical Benefits Account Fund shall be the fund in which shall be accumulated the amounts contributed to the Retirement System for the purposes of paying Medical Benefits.

(5)    The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the City's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II and from which shall be paid Retirement Allowances and other benefits on account of Members.

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:29  Page 82 of 268
13-53846-swr  Doc 5045-1  Filed 05/22/14  Entered 05/22/14 03:43:29  Page 493 of
809

(6)     The Rate Stabilization Fund shall be the Fund to which shall be credited City contributions in excess of the amount of the City's contribution which is credited to the Pension Accumulation Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II.

(7)     The Expense Fund shall be the fund to which shall be credited any money provided by the City, if any, to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(8)     The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the assets of Component I of the Retirement System, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9.  There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.  Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

### Sec 9.3.     Method of Financing Retirement System Benefits

(1)     The pension liabilities for Members under this Component I shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)     The City's annual contribution to finance the prospective pension liabilities during the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be (a) eleven and two-tenths percent (11.2%) of the base Compensation of active employees who are members of the DFFA (for pay periods ending on or before the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA) and members of DPOA (for pay periods ending on or before October 3, 2014) and (b) twelve and one-quarter percent (12.25%) of the base Compensation of active employees who are members of the DPCOA, the DPLSA, the DPOA (for pay periods beginning on or after October 3, 2014) and the DFFA (for pay periods beginning on or after the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA).  A portion of the City's annual contribution for each Plan Year shall be credited to the Rate Stabilization Fund.  The remainder of the City's annual contribution shall be allocated to the Pension Accumulation Fund.

(3)     Except as provided in Section 9.5, for each Plan Year, a Member who was an active employee as of June 30, 2014 ("current active") shall contribute to the Retirement System an amount equal to six percent (6%) of his or her base Compensation for such Plan Year and a Member who is hired or rehired by the City on or after July 1, 2014 ("new employee") shall contribute to the Retirement System an amount equal to eight percent

(8%) of his or her base Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014. The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014 and (ii) the Member's date of hire, to the date he ceases to be a Member. The contribution shall be deducted from the Members' Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

## Sec 9.4.  Member Contributions Picked-Up

(1)     The City shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)     The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code. The City shall pay the  contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)     The City shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both. The City shall designate the Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

## Sec 9.5.  Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations

(1)     To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below ninety percent (90%), the Trustee may not award the variable Pension Improvement Factor (Escalator) described in Section 6.2 to any individual beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than ninety percent (90%).

(2)     In the event the funding level of the Retirement System projected over a five year period falls below ninety percent (90%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:48  Page 84 of 268
13-53846-swr  Doc 5045-1  Filed 05/20/14  Entered 05/20/14 03:43:29  Page 493 of
809

such determination is made and continuing until the funding level is projected to be one hundred percent (100%) on a market value basis within the next five years:

(a)     the remedial action required in Section 9.5(1) shall be implemented or continued;

(b)     all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under the Retirement System;

(c)     Mandatory Employee Contributions for active and new employees shall be increased by one percent (1%) for up to the next following five Plan Years;

(d)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(e)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(f)     the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently paid to the Retiree on the date the funding level is projected to fall below ninety percent (90%);

(g)     the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently added to the Member's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (f) above;

(h)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year; and

(i)     contributions made to the Retirement System by the City shall be increased, consistent with applicable actuarial principles and the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

(3)     For purposes of this Section 9.5, the "funding level" shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System.  The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee.  The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:48  Page 85 of 268
13-53846-swr  Doc 5045-1  Filed 05/22/14  Entered 05/22/14 03:49:29  Page 496 of
809

# ARTICLE 10.  VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec 10.1.  Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member who is covered by a collective bargaining agreement with the City that permits the Member to make Voluntary Employee Contributions to Component I of the Retirement System may elect to reduce his Compensation for any Plan Year by a whole percentage not less than one percent (1%) nor more than ten percent (10%) and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  A Member represented by the DPOA may elect to reduce the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours by a whole percentage not less than one percent (1%) nor more than one hundred percent (100%) of such amount and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

## Sec 10.2.  Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

## Sec 10.3.  Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second Fiscal Year immediately preceding the Fiscal Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

## Sec 10.4.  Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases employment with the City other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the Actuarial Equivalent

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:33:29  Page 86 of 268
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 09:49:29  Page 49 of 68
809

Value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)     If a Member dies while employed by the City or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Voluntary Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate.  If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose.  Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 11.  LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec 11.1.   The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

## Sec 11.2.   Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve (12) months or more.  Former Members, spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

## Sec 11.3.   Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount, which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Fifteen Thousand Dollars ($15,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

## Sec 11.4.   Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)      Each loan application shall be made in writing.

(b)      All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)      Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:29  Page 88 of 268
13-53846-swr  Doc 5075-1  Filed 05/20/14  Entered 05/20/14 03:49:29  Page 493 of
809

principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the City's costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec 11.5.   Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec 11.6.   Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:48   Page 89 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 09:49:29   Page 50 of 68
809

**Sec 11.7.   Distribution**

No distribution shall be made to a Member, former Member, spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the Member from the Retirement System.

# ARTICLE 12.  DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM

## Sec 12.1.  General Provisions

The following provisions are hereby established as the Deferred Retirement Option Plan ("DROP") Program under Component I, which shall be available to Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and those non-union executives of the Police Department and the Fire Department.

(1)     In lieu of terminating employment and accepting a Retirement Allowance under the Component I, any Member of the Retirement System who is eligible for the DROP program and who is eligible to immediately retire and receive an unreduced Retirement Allowance under Section 5.1 may elect to participate in the DROP program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article 12.  Any such election shall be irrevocable.

(2)     A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years.  At the end of such five year period of participation in the DROP program, the Member shall be retired from employment.

## Sec 12.2.  Conversion to Retirement Allowance

Upon the effective date of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance pursuant to Section 6.1 and shall elect a form of payment for his Retirement Allowance pursuant to Section 8.1.  Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable Pension Improvement Factor (Escalator) increases) that would have been payable, had the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

## Sec 12.3.  Investment of DROP Assets

(1)     ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program.  ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (4) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(2)     As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts invested under the Retirement System.  If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(3)     If amounts credited to a DROP Account are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees.  A Member's DROP Account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP Account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(4)     The Board of Trustees entered into an administrative services agreement with ING.  Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(5)     The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(6)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from their DROP Accounts.

## Sec 12.4.  Distribution of Amounts Credited to DROP Account

A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City.  Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account.  In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program. Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec 12.5.  Death of Member While Participating in the DROP Program

If a Member dies while participating in the DROP program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate.  In addition, one hundred percent (100%) of the Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP program will be restored.  Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased Member at the time the Member elected to participate in the DROP program.

## Sec 12.6.  Disability of Member While Participating in the DROP Program

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:43  Page 92 of 368
13-53846-swr  Doc 5045-1  Filed 05/20/14  Entered 05/20/14 03:48:29  Page 503 of
809

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section 12.1(2), and (b) shall be entitled to receive payment of the funds in his DROP Account (in the form of a lump sum or other form of payment described in Section 8.1). Such Member shall not be entitled to disability retirement benefits under Section 5.3 or Section 5.4 hereof.

### Sec 12.7.   Cost Neutrality

(1)    The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(2)    If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect, the Board and the City, along with the Plan Actuary as well as an actuary appointed by the City (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost.  If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan Actuary and the City's actuary.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program cost-neutral.  Upon the implementation of changes necessary to make the DROP program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw from the DROP program and resume active participation in Component I of the Retirement System.  The Board shall notify DROP participants of these changes prior to implementation.  Those DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP program (under either Component I or Component II).  Those not making either election shall remain participants in the DROP program.

(3)    In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire or (ii) continue active employment with the City and resume active participation in Component I of the Retirement System.  DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:48   Page 93 of 268
13-53846-swr   Doc 5075-1   Filed 05/20/14   Entered 05/20/14 03:49:29   Page 50 of 68
809

# ARTICLE 13.  LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec 13.1.  Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

(a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 13.1(2) has been satisfied shall be made, in  accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 13.1(9) or (10);

(b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 13.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two (adjusted for participation of fewer than 10 years, if applicable); provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System,  commencing at Age sixty-two; and

(c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an

annual benefit payable in the form of a straight life annuity, commencing when the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     The adjustments in Sections 13.1(3)(b) shall not apply to a Member with at least 15 years of Credited Service as a Police Member or a Fire Member within the meaning of Code Section 415(b)(2)(H).  In addition, the adjustments in Sections 13.1(3)(b) and 13.1(6) shall not apply to benefits payable on account of the disability or the death of a Member.

(5)     Notwithstanding the foregoing provisions of this Section 13.1, except as provided in Section 13.1(6), the maximum annual benefit specified in Section 13.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by the City, does not exceed $10,000 for the Plan Year or any prior Plan Year, and (b) the Member was not at any time a participant in a Defined Contribution Plan maintained by the City.

(6)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 13.1(2) shall be such limitation (without regard to this Section 13.1(6)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten.  In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 13.1(2) and in Section 13.1(5) shall be such limitations (determined without regard to this Section 13.1(6)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.  The adjustment in this Section 13.1(6) shall not apply to benefits paid on account of the disability or death of a Member.

(7)     Notwithstanding anything in this Section 13.1 to the contrary, if the annual benefit of a Member who has terminated employment with the City is limited pursuant to the limitations set forth in Section 13.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(8)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 13.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

13-53846-tjt   Doc 13575-1   Filed 05/27/22   Entered 05/27/22 09:23:29   Page 95 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 03:43:29   Page 50 of 63
809

(9)     The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 13.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 13.1(8).

(10)    The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 13.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(11)    For purposes of applying the limitations set forth in this Section 13.1, all qualified defined benefit plans (whether or not terminated) ever maintained by the City shall be treated as one defined benefit plan.

(12)    For purposes of this Section 13.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year.  The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with the City or (b) the end of the limitation year that includes the date of the Member's severance from employment with the City, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the City and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(13)    This Section 13.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to those interpreting Section 415(b)(2)(H), and any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:23:48  Page 96 of 268
13-53846-swr  Doc 5045-1  Filed 05/20/14  Entered 05/20/14 09:43:29  Page 50 of 68
809

**Sec 13.2.   Compliance with Code Section 415(c) and Regulations**

(1)     The "Annual Addition" with respect to a Member for a limitation year shall in no event exceed the lesser of:

(a)     $40,000 (adjusted as provided in Code Section 415(d)); or

(b)     One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)     The Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions made to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified Defined Contribution Plan (whether or not terminated) maintained by the City, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)     In the event the Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 13.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

## ARTICLE 14.  RETIREMENT SYSTEM ADMINISTRATION

### Sec 14.1.   Board of Trustees as Retirement System Administrator

(1)     The Retirement Board shall have the power and authority to manage and administer  the Retirement System in accordance with the provisions of this Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 14.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document.  This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

### Sec 14.2.   Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

(a)     exclusive authority regarding the  administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Retirement System required of the City and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

13-53846-tjt  Doc 13575-1  Filed 05/27/22  Entered 05/27/22 09:28:29  Page 98 of 268
13-53846-swr   Doc 5045-1   Filed 05/20/14   Entered 05/20/14 09:49:29   Page 509 of
809

(g) except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h) to prepare an annual report for the Retirement System for each Fiscal Year in compliance with generally accepted accounting principles. The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the Fiscal Year. The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and the Investment Committee. The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i) to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and contributions of each Member who has made contributions to the Retirement System;

(j) to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the City or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System. In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k) to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System. The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)     except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec 14.3.   Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)     manage and administer the Retirement System under the supervision and direction of the Board;

(b)     annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following Fiscal Year; and

(c)     perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may but need not be an employee of the City.

## Sec 14.4.   Discretionary Authority

The Board shall have sole and absolute discretion to:

(a)     interpret the provisions of the Retirement System;

(b)     make factual findings with respect to any and all issues arising under the Retirement System;

(c)     determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)     decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)     make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

## Sec 14.5.   Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

13-53846-swr   Doc 8675   Filed 05/07/21   Entered 05/07/21 00:29:43   Page 101 of
209
13-53846-tjt   Doc 8675   Filed 10/22/14   Entered 10/22/14 03:49:29   Page 912 of
809

# ARTICLE 15.  MANAGEMENT OF FUNDS

## Sec 15.1.  Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City, and subject to the terms of Article 16, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.

## Sec 15.2.  Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan document.  Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan document may be commingled for investment purposes and transferred as provided in Section G-2(f) of Component II.

## Sec 15.3.  Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.  The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

## Sec 15.4.  Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

## Sec 15.5.  Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)    Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)     Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

# ARTICLE 16.  INVESTMENT OF RETIREMENT SYSTEM ASSETS

## Sec 16.1.  Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 16, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 16.

All investment management decisions made by the Board, as more fully described in Section 16.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has responsibility and authority, including the investment management matters described in Section 16.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If (a) the Board fails to approve or disapprove an investment management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an investment management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee and the chief investment officer are authorized to implement the decision.

If the Board disapproves an investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not less than five business days, of the request by the Investment Committee to discuss the disapproval by the Board described in the written response.  Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended investment management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended investment management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision.  Any action taken by the Board or the Investment Committee in violation of the terms of this Article 16 shall constitute an *ultra vires* act and the Investment Committee or the Board is

granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

### Sec 16.2.   Investment Management

(1)     For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

(a)     development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

(b)     within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

(c)     evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

(d)     review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

(e)     in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

(f)     communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

(g)     determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

(h)     the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(i)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment or other financial determination that could affect funding or benefit levels;

(j)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(k)     determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l)     causing an asset/liability valuation study to be performed for the Retirement System every three years or, more often, as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314* and *Plan Investment Guidelines*.

### Sec 16.3.   Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

### Sec 16.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.  The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board.  The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall

provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

## Sec 16.5.  Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Investment Committee and the Board with oversight of the Retirement System's investment portfolio.  Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.  Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.  The duties of an investment consultant may include, but shall not be limited to:

(a)     providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)     identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)     implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)     monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)     recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations in the event of a deviation from expectations;

(g)     communicating the investment policies of the Retirement System to the investment managers;

(h)     reviewing the investment policies with the appropriate employees of the Retirement System;

(i)     aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)      attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)      meeting with the Investment Committee to provide detailed quarterly performance reports and executive summaries of performance;

(l)      meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)      meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manager selections.

## Sec 16.6.  Consistency With Plan of Adjustment

Nothing herein shall be interpreted as permitting the Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment.

# ARTICLE 17.  RETIREE MEDICAL ACCOUNT

## Sec 17.1.  Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board of Trustees shall pay the cost, which would otherwise be borne by the City, for certain medical and related benefits provided under the plans or programs maintained by the City to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 17 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec 17.2.  Effective Date

Medical Benefits shall be paid from the Medical Benefits Account beginning October __, 2014 or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec 17.3.  Funding of Benefits

Subject to the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Combined Plan document under Section 18.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time the City makes a contribution to the Trustee, the City shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec 17.4.  Limitation on Contributions

At all times the aggregate of the contributions made by the City to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the City to the Plan under Sections 9.3 and 9.5, other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 17.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

## Sec 17.5.  Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the City.

## Sec 17.6.    Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  Notwithstanding, the interpretation and administration of the terms of this Article 17 shall be pursuant to the provisions of the Combined Plan document.

## Sec 17.7.    Right to Amend or Terminate Medical Plans

The City expressly reserves the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by the City that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible spouses and dependents to pay all or any portion of the cost of such medical benefits.

## Sec 17.8.    Reversion

At any time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, no part of the Medical Benefits Account may be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the City to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the City.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the City's contributions.

## Sec 17.9.    Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

# ARTICLE 18.  MISCELLANEOUS

## Sec 18.1.   Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by the City (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec 18.2.   Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of benefit, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec 18.3.   Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec 18.4.   Conviction of Felony; Forfeiture of Rights

If a Member or Beneficiary shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active Service, the Board shall have the power to order the forfeiture of all rights of the Member or Beneficiary to benefits hereunder, except the return of the Member's Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.

## Sec 18.5.   Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments permitted under the terms of the Plan of Adjustment (including amendments contemplated in Section K-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Combined Plan or any successors plan or trust that govern the calculation of pension benefits, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in the

Plan of Adjustment.  Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code.  The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law.  Any amendment of the Retirement System by the City must be approved by the Council or a person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

## Sec 18.6.   Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

## Sec 18.7.   Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan document to the contrary.  Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year that he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires.  Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9.  The provisions of this Section 18.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

## Sec 18.8.   Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(a)     For purposes of this Section 18.8, the following terms shall have the following meanings:

(b)     *"Direct rollover"* means a payment by the Retirement System to an eligible retirement plan specified by a distributee.

(c)     *"Distributee"* means a Member or former Member.  It also includes the Member's or former Member's surviving spouse, a spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E).  However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

(d)     *"Eligible retirement plan"* means any of the following that accepts a distributee's eligible rollover distribution:

(i)      a qualified trust described in Code Section 401(a);

(ii)     an annuity plan described in Code Section 403(a);

(iii)    an annuity contract described in Code Section 403(b);

(iv)    an individual retirement account described in Code Section 408(a);

(v)     an individual retirement annuity described in Code Section 408(b);

(vi)    a Roth IRA described in Code Section 408A; or

(vii)   a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the Retirement System.

(e)     *"Eligible rollover distribution"* means any distribution of all or any portion of the balance to the credit of a distributee under the Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year.  Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the Retirement System.  However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion

of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec 18.9.   Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate.  The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I of this Combined Plan document and not to any particular provision or section thereof.  The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan document or the Retirement System created hereunder.

## Sec 18.10. Severability

If any section or part of a section of this Combined Plan document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan document or Retirement System or of the Combined Plan document or Retirement System in its entirety.

13-53846-swr   Doc 8675   Filed 05/07/22   Entered 05/07/22 00:28:39   Page 145 of
13-53846-tjt   Doc 8051   Filed 10/22/14   Entered 10/22/14 03:45:29   Page 525 of
309

**EXHIBIT I.A.254.b**

PRINCIPAL TERMS OF NEW PFRS ACTIVE PENSION PLAN

## NEW PFRS ACTIVE PENSION PLAN -- MATERIAL TERMS

1.  Benefit Formula for all employees is Final Average Compensation (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%.  Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

2.  Actual time for benefit accrual is actual time served.  For vesting service, 1,000 hours in a 12 month period to earn a year of service.

3.  Normal Retirement Age for all employees is age 50 with 25 years of service, with the following 7 year transition period:

    | Fiscal Year | Age and Service |
    | --- | --- |
    | 2015 | Age 43 and 20 years |
    | 2016 | Age 43 and 20 years |
    | 2017 | Age 44 and 21 years |
    | 2018 | Age 45 and 22 years |
    | 2019 | Age 46 and 23 years |
    | 2020 | Age 47 and 24 years |
    | 2021 and thereafter | Age 50 and 25 years |

4.  10 Years of Service for vesting.

5.  Deferred vested  pension -- 10 years of service and age 55 for reduced benefit; 10 years of service and age 62 for unreduced benefit.

6.  Duty Disability  - consistent with current PFRS

7.  Non-Duty Disability – consistent with current PFRS

8.  Non-Duty Death Benefit for Surviving Spouse – consistent with current PFRS

9.  Duty Death Benefit for Surviving Spouse – consistent with current PFRS

10. COLA: 1% compounded, variable

11. DROP Accounts will be available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements.  No more than 5 years of DROP participation (both for Old PFRS and New PFRS) for employees not already in DROP.  DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible.  If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.

12. Annuity Savings Fund – employees may make voluntary Annuity Savings Fund contributions up to 10% of total after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted. An employee represented by the Detroit Police Officers Association may elect to contribute up to 100% of the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours.

13. Investment Return/Discount rate – 6.75%

14. City Contributions

    a. Detroit Fire Fighters Association Employees
       i. 11.2% of the base compensation of eligible employees for payroll periods beginning prior to the effective date of the collective bargaining agreement and 12.25% of the base compensation of eligible employees for payroll periods beginning after the effective date of the collective bargaining agreement. A portion of such contribution will be credited to a rate stabilization fund.

    b. Detroit Police Command Officers Association Employees
       i. 12.25% of the base compensation of eligible employees. A portion of such contribution will be credited to a rate stabilization fund.

    c. Detroit Police Officers Association Employees
       i. 11.2% of the base compensation of eligible employees for payroll periods beginning prior to the effective date of the collective bargaining agreement and 12.25% of the base compensation of eligible employees for payroll periods beginning after the effective date of the collective bargaining agreement. A portion of such contribution will be credited to a rate stabilization fund.

    d. Detroit Police Lieutenants and Sergeants Association Employees
       i. 12.25% of the base compensation of eligible employees. A portion of such contribution will be credited to a rate stabilization fund.

15. Employee Contributions – Employees hired before July 1, 2014 (current actives) will contribute 6% of base compensation (pre-risk shifting); employees hired on or after July 1, 2014 (new employees) will contribute 8% of base compensation (pre-risk shifting). Maximum employee contributions of 10% (current actives) and 12% (new employees).

16. Risk Shifting:

    a. If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable).

b.  If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until the actuary can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:

    i.   eliminate COLAs (if applicable);
    ii.  use amounts credited to the rate stabilization fund to fund accrued benefits;
    iii. increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees) for up to 5 years;
    iv.  increase employee contributions (active and new employees) by an additional 1% per year;
    v.   increase employee contributions (active and new employees) by an additional 1% per year;
    vi.  implement a 1 year COLA fallback;
    vii. implement a second 1 year COLA fallback;
    viii. increase employee contributions by an additional 1% per year; and
    ix.  increase City contributions consistent with applicable actuarial principles and PERSIA.

**EXHIBIT I.A.280**

PRIOR GRS PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

13-53846-tjt   Doc 13575   Filed 05/07/21   Entered 05/07/21 00:29:43   Page 120 of
13-53846-swr   Doc 8657-1   Filed 12/12/14   Entered 12/12/14 03:46:29   Page 89 of
269

# TABLE OF CONTENTS

COMPONENT II ............................................................................................................... 1

ARTICLE A.  COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM ........................................................................................................ 2

    Sec. A-1.    Common Provisions .................................................................... 2

ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30, 2014 ................................................................................................................ 4

    Sec. B-1.    Freeze of Eligibility and Benefits Under General Retirement System ................................................................................................ 4

ARTICLE C.  DEFINITIONS ......................................................................................... 6

    Sec. C-1.    Definitions .................................................................................. 6

ARTICLE D.  SERVICE CREDIT .................................................................................. 11

    Sec. D-1.    Service Credit ............................................................................. 11

    Sec. D-2.    Service Credit; Former Employees of the Founder's Society—Detroit Institute of Arts ........................................................... 11

    Sec. D-3.    Service Credit; Transfer to Other Governmental Service ........................ 11

    Sec. D-4.    Service Credit; Military Service ................................................. 11

    Sec. D-5.    Service Credit; Qualified Military Service (Pre-Employment Service) .................................................................................... 11

ARTICLE E.  DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM ............................... 13

    Sec. E-1.    Membership ............................................................................... 13

    Sec. E-2.    Cessation of Membership; Re-Employment by the Employer ............... 13

    Sec. E-3.    Service Retirement .................................................................... 16

    Sec. E-4.    Service Retirement Allowance ................................................. 19

    Sec. E-5.    Disability Retirement ................................................................ 20

    Sec. E-6.    Accidental Death Benefit; Performance of Duty .................................. 23

    Sec. E-7.    Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount ............................................................ 24

    Sec. E-8.    Retirement Allowance Options ................................................. 25

    Sec. E-9.    Benefits for Surviving Spouses; Generally ............................... 27

    Sec. E-10.    Benefits for Surviving Spouses; Disability Retirees .............................. 27

    Sec. E-11.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ............................................................................... 28

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| Sec. E-12. | Pensions Offset by Compensation Benefits; Subrogation | 28 |
| Sec. E-13. | Disability Retirees; Reexamination; Authority of the Board | 28 |
| Sec. E-14. | Transfer of Department or Department Functions; Generally | 29 |
| Sec. E-15. | Pension Improvement Factor (Escalator) | 30 |
| Sec. E-16. | Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate | 31 |
| Sec. E-17. | Funds | 32 |
| Sec. E-18. | Method of Financing | 32 |
| Sec. E-19. | Determination of City's Annual Contribution | 35 |
| ARTICLE F. | PARTICIPANT LOAN PROGRAM | 36 |
| Sec. F-1. | Established | 36 |
| Sec. F-2. | The Loan Program | 36 |
| Sec. F-3. | Eligibility | 36 |
| Sec. F-4. | Amount of Loan | 37 |
| Sec. F-5. | Terms and Conditions | 37 |
| Sec. F-6. | Renewal of Loan | 38 |
| Sec. F-7. | Loan Balance | 38 |
| Sec. F-8. | Distributions | 38 |
| Sec. F-9. | Annual Report | 38 |
| ARTICLE G. | SPECIAL PLAN OF ADJUSTMENT PROVISIONS | 39 |
| Sec. G-1. | Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment | 39 |
| Sec. G-2. | Annuity Savings Fund Recoupment | 40 |
| Sec. G-3. | Income Stabilization Benefits | 43 |
| Sec. G-4. | Restoration of Pension Benefits | 46 |
| ARTICLE H. | MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM | 56 |
| Sec. H-1. | Enforcement; Civil Action | 56 |
| Sec. H-2. | Limitation of Other Statutes | 56 |

# COMPONENT II

## ARTICLE A.  COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM

### Sec. A-1.  Common Provisions

Certain provisions of the Combined Plan for the General Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Sections of Component I:

(a)     Article I (General Provisions);

(b)     Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

Employer

Fiscal Year

General Retirement System or Retirement System

Internal Revenue Code or Code

Investment Committee

Member

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

13-53846-tjt   Doc 13575   Filed 05/07/21   Entered 05/07/21 00:29:43   Page 124 of
13-53846-swr   Doc 8875   Filed 12/12/14   Entered 12/12/14 03:45:29   Page 645 of
209
269

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse; and

Straight Life Retirement Allowance;

(c)     Article 12 (Limitation on Benefits and Contributions);

(d)     Article 13 (Retirement System Administration);

(e)     Article 14 (Management of Funds);

(f)     Article 15 (Investment of Retirement System Assets); and

(g)     Article 17 (Miscellaneous).

13-53846-swr    Doc 8057-1    Filed 10/22/14    Entered 10/22/14 03:40:29    Page 156 of
209
13-53846-tjt    Doc 13575    Filed 05/07/21    Entered 05/07/21 00:29:43    Page 125 of
268

## ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30, 2014

### Sec. B-1.  Freeze of Eligibility and Benefits Under General Retirement System

Notwithstanding anything in Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code or this Combined Plan for the General Retirement System of the City of Detroit, Michigan to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

(a)     No new employee hired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the General Retirement System in effect as of the Freeze Date;

(b)     No employee who is rehired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue either a benefit or service credit for any purpose under the terms of the General Retirement System in effect as of the Freeze Date; provided, however, that a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (c) of this Section B-1 and who is rehired by an Employer on or after July 1, 2014 but prior to the date the Member incurs a six-year break in service shall be eligible to accrue service credit following rehire solely for the purpose of determining the Member's vesting in and eligibility for payment of his Frozen Accrued Benefit;

(c)     Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service, Average Final Compensation, and the pension multiplier formulae in effect as of such Freeze Date under the terms of the General Retirement System ("Frozen Accrued Benefit");

(d)     Except as otherwise provided in subsection (e) of this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit.  No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the General Retirement System;

(e)     Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of his unused accrued sick leave to increase his Average Final Compensation ("Sick Leave Rollover") if the Member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election ("Special Election") to add the value of twenty-five percent (25%) of the Member's unused sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance to the earnings used in computing Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit; provided, however, that at least twenty-five percent (25%) of the Member's sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance remains in the Member's sick leave bank at the time the completed Special Election form is received by the Retirement System and, provided further that the completed Special Election form is received by the Retirement System no later than August 22, 2014 or, if later, the date set forth in a collective bargaining

13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:28:39   Page 126 of
209
13-53846-tjt   Doc 13575   Filed 05/07/24   Entered 05/07/24 00:29:49   Page 167 of
209

agreement between the City and a union whose members are eligible to make a Special Election. A Member's Special Election shall be made in the manner set forth by the Board of Trustees and the Retirement System. A Member may revoke a Special Election, as long as such revocation occurs on or before the latest date upon which such Member is permitted to make a Special Election. Notwithstanding anything in this subsection (e) to the contrary, a Member's Special Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's unused sick leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement if he retired as of June 30, 2014, and (ii) the electing Member's employment with an Employer is terminated before the electing Member becomes eligible for an immediate service retirement under the Retirement System;

(f)     Service earned after the Freeze Date shall be credited to a Member solely for purposes of determining the Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the General Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the General Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(g)     No Member shall make contributions to the Annuity Savings Fund under the General Retirement System in effect as of June 30, 2014 with respect to wages earned on or after the earliest date following June 30, 2014 that the City's payroll department can implement the freeze. All after tax contributions made on or after the date referenced in the preceding sentence shall be made to and in accordance with the terms of Component I of the Combined Plan.

The foregoing terms shall be referred to as the "Freeze" of the provisions of the General Retirement System as in effect on the Freeze Date and the provisions of Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code and this Component II of the Combined Plan shall be interpreted and construed by the Board of Trustees and the Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1, the provisions in Chapter 47, or any collective bargaining agreement or other document governing the terms of employment of any employee, the Board of Trustees and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

# ARTICLE C.  DEFINITIONS

## Sec. C-1.  Definitions

Unless a different meaning is plainly required by context, for purposes of this Component II the following words and phrases have the meanings respectively ascribed to them by this Section C-1:

(1)     *Accrued Service* means a Member's credited service for employment rendered before July 1, 2014.

(2)     *Accumulated Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Member's individual account in the Annuity Savings Fund, together with regular interest thereon.

(3)     *Annuity* means the portion of the retirement allowance which is paid for by a Member's accumulated contributions.

(4)     *Annuity Reserve* means the present value of all payments to be made on account of any annuity or benefit in lieu of any annuity.  Such annuity reserve shall be computed upon the basis of such mortality tables and regular interest as shall be adopted by the Board.

(5)     *Average Final Compensation* means:

a.      On or before June 30, 1992.  For those Members who retired or separated from active service with vested pension rights on or before June 30, 1992, the highest average compensation received by a Member during any period of five consecutive years of credited service selected by the Member from the ten years of credited service which immediately preceded the date of the Member's last termination of City employment. If a Member has less than five years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

b.      On or after July 1, 1992 but before July 1, 1998.  For those Members who retired or separated from active service with vested pension rights on or after July 1, 1992 but before July 1, 1998, the highest average compensation received by a Member during any period of four consecutive years of credited service during the ten years of credited service which immediately preceded the date of the Member's last termination of City employment.  If a Member has less than four years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

c.      On or after July 1, 1998.  For those Members who retire or separate from active service with vested pension rights on or after July 1, 1998, the

highest average compensation received by a Member during any period of three consecutive years of credited service during ten years of credited service which immediately precede the date of the Member's last termination of City employment. If a Member has less than three years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

d.  Sick Leave Election. For those nonunion Members with a regular or early service retirement who retire on or after July 1, 1999, in computing the highest average compensation received by a Member, the Member shall have the option of adding the value of twenty-five percent (25%) of the Member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation. Bargaining unit members who retire on or after July 1, 1999 and prior to July 1, 2014 shall have the Unused Sick Leave On Retirement benefit provided for in the applicable bargaining agreement. For any Member choosing to exercise this option, the lump sum payment the Member will receive will be the remaining value of the unused accrued sick leave bank as provided in the bargaining agreement.

(6)  *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a retirement allowance or pension payable from funds of the General Retirement System due to the participation of a Member.

(7)  *Compensation* means:

a.  On or before June 30, 1992. For those Members retired or separated from active service with vested pension rights, on or before June 30, 1992, all remuneration, excluding longevity payments, paid to a Member because of personal services rendered by the Member to the Employer. Compensation in excess of the limitations set forth in Section 401(a)(17) of the Internal Revenue Code shall be disregarded.

b.  On or after July 1, 1992. For those Members who retire on or after July 1, 1992, all remuneration, including longevity payments, paid to a Member because of personal services rendered by the Member to the Employer. Compensation in excess of the limitations set forth in Section 401(a)(17) of the Internal Revenue Code shall be disregarded.

(8)  *Conversion* means that date on which a Member's benefits change from disability retirement benefits to normal retirement benefits.

(9)  *Credited Service* means membership service credited to a Member to the extent provided in this Component II.

(10) *Final Compensation* means a Member's annual rate of compensation at the time employment with all Employers is last terminated.

(11) *Pension* means, for purposes of this Component II, the portion of a retirement allowance which is paid for by appropriations made by the Employers into the appropriate funds.

(12) *Pension Reserve* means the present value of all payments to be made on account of any pension, or benefit in lieu of any pension. Such pension reserve shall be computed upon the basis of such mortality and other tables of experience, and regular interest, as shall be adopted by the Board.

(13) *Regular Interest* means such rate or rates per annum, compounded annually, as the Board of Trustees shall determine in accordance with the limitations contained in Section E-16 of this Component II.

(14) *Retiree* means a former Member who is receiving a retirement allowance from Component II of the Retirement System.

(15) *Retirement* means a Member's withdrawal from the employ of the Employers with a retirement allowance or pension paid by Component II of the Retirement System.

(16) *Retirement Allowance* means the sum of the annuity and the pension.

(17) *Service* means personal services rendered to the Employer by a person as an employee of the Employer, provided such person is compensated by the Employer for such personal services.

(18) *Service credit for purposes of the 1973 Defined Benefit/Defined Contribution (Annuity) Plan* means that, in accordance with such rules and regulations as the Board shall adopt, each Member shall be credited with service as follows: (1) One month of service credit is earned when the Member is paid for eighty hours of work during the month; (2) A full year of credit is earned for nine months of credit in any calendar year, except the Member's last year of work, which service credit shall be determined as of the Member's last day on the Employer's payroll. Less than nine months of service rendered in a calendar year shall neither be credited as a full year of service, nor shall more than one year of service be credited to any Member for service rendered in any one calendar year. Service credit is used to determine eligibility for service retirement, vesting, non-duty disability and survivor benefits. Service credit is also earned by a Member while retired on a duty disability or while receiving Workers' Compensation benefits.

The following terms shall have the meanings given to them in the Sections of this Component II set forth opposite such term:

| | |
|---|---|
| 2023 UAAL Amortization | Section G-4(3)a |
| Accrued Liability Fund | Section E-18(d) |

| | |
|---|---|
| Actual Return | Section G-2(5) |
| Adjusted Accrued Benefit | Section G-1(1)a |
| Adjusted Deferred Accrued Benefit | Section G-1(1)b |
| Annuity Reserve Fund | Section E-18(b) |
| Annuity Savings Fund Excess Amount | Section G-2(1) |
| Annuity Savings Fund of the 1973 Defined Contribution Plan | Section E-18(a) |
| ASF | Section G-2 |
| ASF account | Section G-2(1) |
| ASF Recalculation Period | Section G-2 |
| ASF Excess Return | Section E-16(c) |
| ASF Recoupment | Section G-1(1)(c) |
| Cash Option Cap | Section G-2(4) |
| Cash Repayment Option | Section G-2(4) |
| Certificate of Default | Section G-3(7) |
| COLA | Section G-4 |
| Determination Date | Section E-18 |
| Eligible Pensioner | Section G-3(5) |
| Estimated Adjusted Annual Household Income | Section G-3(3)b |
| Excess Assets | Section G-3(7) |
| Expense Fund | Section E-18(f) |
| Extra Contribution Account | Section G-4(3)b |
| Federal Poverty Level | Section G-3(6) |
| Final Payment Notice | Section G-2(4) |
| Freeze | Section B-1 |
| Freeze Date | Section B-1 |
| Frozen Accrued Benefit | Section B-1(c) |
| Funded Level | Section G-4(2) |
| Funding Conditions | Section G-1(1)a |
| Funding Proceeds | Section E-18(d) |
| Funding Target | Sections G-4(2)a, G-4(3)a, G-4(4)a |
| Governor | Section G-4(5) |
| IME | Section E-5(a) |
| Income Fund | Section E-18(g) |
| Income Stabilization Benefit | Section G-3(2) |
| Income Stabilization Benefit Plus | Section G-3(3) |
| Income Stabilization Fund | Section G-3(4) |
| Monthly Annuity Savings Fund Excess Amount | Section G-2(2) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section E-8(a) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section E-8(a) |
| Option One.  Cash Refund Annuity | Section E-8(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section E-8(a) |
| Option Two. Joint and One Hundred Percent Survivor | |

| | |
|---|---|
| Allowance | Section E-8(a) |
| Participant Loan Program | Section F-1 |
| Pension Accumulation Fund | Section E-18(c) |
| Pension Funding Transaction | Section E-18(d) |
| Pension Improvement Factor (Escalator) | Sections E-15, G-1(2) |
| Pension Reserve Fund | Section E-18(e) |
| Pension Restoration Agreement | Section G-4 |
| Permanent Restoration Target | Section G-4(2)g,  G-4(3)a, G-4(4)a |
| Pop-up Form | Section E-8(b)(2) |
| Restoration Reserve Account | Section G-4(2)a |
| Restoration Reserve Suspension Trigger | Sections G-4(2)g, G-4(3)a, G-4(4)a |
| Restoration Target | Sections G-4(2)a, G-4(3)a, G-4(4)a |
| Sick Leave Rollover | Section B-1(e) |
| Special Election | Section B-1(e) |
| Standard Form | Section E-8(b)(1) |
| Straight Life Retirement Allowance | Section E-8(a) |
| Transition Cost | Section E-16(c) |
| UAAL | Sections E-18(d), G-4 |
| Waterfall Classes | Section G-4(1) |

13-53846-tjt   Doc 8572   Filed 05/07/21   Entered 05/07/21 00:29:39   Page 132 of
13-53846-swr   Doc 8575   Filed 10/22/14   Entered 10/22/14 03:40:29   Page 843 of
269

# ARTICLE D.  SERVICE CREDIT

## Sec. D-1.  Service Credit

The Board shall keep an accurate record of each employee's accumulated service credit from the date of commencement of employment with the Employers.

## Sec. D-2.  Service Credit; Former Employees of the Founder's Society—Detroit Institute of Arts

Pursuant to Section 6-519 of the 1974 Detroit City Charter, and for the sole purpose of computing service credit to determine eligibility for a retirement allowance from the General Retirement System, a person who was inducted into the classified service of the City during the calendar year 1984 as a result of the transfer of certain functions at the Detroit Institute of Arts from The Founder's Society/Detroit Institute of Arts to the City, shall be credited with service credit equivalent to continuous time worked as a full time employee of the Founder's/Detroit Institute of Arts retroactive to January 1, 1984.  Such Founder's Society/Detroit Institute of Arts service credit shall have no effect upon the amount of retirement benefits paid by the General Retirement System.  Such Founder's Society/Detroit Institute of Arts service credit shall be added to the service credit earned as a City employee only for purposes of meeting service credit eligibility requirements under the General Retirement System.  The Board of Trustees of the General Retirement System shall make all determinations of crediting of such Founder's Society/Detroit Institute of Arts service credit in accordance with the provisions of this Component II of the Combined Plan.

## Sec. D-3.  Service Credit; Transfer to Other Governmental Service

A Member transferred from the City payroll by his or her department head to the payroll of any City, county, state, or federal government to serve the interests of the City during peace time shall continue to be a Member of the Retirement System for purposes of service credit in accordance with the ordinance or resolution passed to implement such transfer.

## Sec. D-4.  Service Credit; Military Service

An Employee of the Employer who enters the military service of the United States while so employed shall have such service credited as City service for purposes of this Component II in the same manner as if the employee had served the employer without interruption, provided that (1) the employee's entry into such service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, and (2) he or she is re-employed by the Employer upon completion of such service.  During the period of service and until return to City employment, his or her contributions to the fund shall be suspended and the fund balance shall be accumulated at regular interest.

## Sec. D-5.  Service Credit; Qualified Military Service (Pre-Employment Service)

(a) Notwithstanding any provision of this Component II to the contrary, contributions, benefits, and service credit with respect to qualified military service, shall be provided in accordance with Section 414(u) of the Internal Revenue Code.  Up to three years of pre-

employment service credit may be purchased prior to June 30, 2014 for the following periods: service for a period of not less than ninety days between (1) the date of declaration of war by Congress and the recognized date of cessation of military hostilities; (2) the onset of World War II on December 8, 1941 to its conclusion on July 1, 1946; (3) the onset of the Korean Conflict on June 27, 1950 to its conclusion on December 31, 1953; (4) the onset of the Vietnam Conflict on February 28, 1961 to its conclusion on May 7, 1975, or (5) beginning on the date of the recognition of an emergency condition by the issuance of a presidential proclamation or a presidential executive order, during which emergency condition the Member received the Armed Forces Expeditionary or other Campaign Service Medal authorized by the Federal Government for the Expedition or Campaign.

(b)    This time may be applied toward a Member's credited service and may be used in meeting the minimum time needed for an automatic Option Two or automatic Option Three pension.

(c)    This time shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability pension, or for a service pension.

## ARTICLE E.  DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM

### Sec. E-1.  Membership

The membership of the General Retirement System 1973 Defined Benefit/Defined Contribution (Annuity) Plan – Component II of the Combined Plan - shall consist of all persons who are full time employees of the Employer except:

(a)     persons who are members of the Police and Fire Retirement System of the City of Detroit, Michigan, established under Title IX, Chapter VII of the 1918 Detroit City Charter and continued in the 1974, 1997 and 2012 Detroit City Charters and as continued in the form of the Combined Plan for the Police and Fire Retirement System for the City of Detroit, Michigan, effective July 1, 2014 and as thereafter amended;

(b)     persons who are hired or rehired by an Employer on or after July 1, 2014; and

(c)     Any person who is a member of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

Special Service employees who worked more than fourteen hundred forty (1440) hours per Fiscal Year ending on or before June 30, 2014 will be eligible to participate in Component II of the Retirement System.

### Sec. E-2.  Cessation of Membership; Re-Employment by the Employer

(a)     Any Member who retires under Section E-3(a), (b), or (c), or dies, shall have a non-forfeitable right to a benefit.

(b)     With respect to persons not on the active payroll prior to October 1, 2005, the following provisions of this subsection shall apply:

(1)     Except as otherwise provided for in this Component II, if any non-vested Member leaves City employment for any reason other than retirement or death, such person shall thereupon cease to be a Member and his or her credited service at that time shall be forfeited.  In the event of re-employment by the City prior to July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component II of the Combined Plan.  In the event of reemployment by the employer on or after July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component I of the Combined Plan.  If re-employment occurs prior to July 1, 2014 and within a period of six (6) years from and after the date City employment last terminated, credited service last forfeited shall be restored to the employee's credit for purposes of accruing a benefit after re-employment.

13-53846-tjt   Doc 13575   Filed 05/07/21   Entered 05/07/21 00:29:39   Page 135 of
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 135 of
269
209

(2)     With respect to persons on the active payroll on or after October 1, 2005, re-employment prior to July 1, 2014 shall restore any previously forfeited service credit notwithstanding the time of re-employment.

(c)     Vested former employees rehired prior to receiving pension benefits and prior to July 1, 2014.

(1)     Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to July 1, 2014 and prior to being separated for six (6) years shall have their pensions calculated in accordance with the rules in effect at the earlier of (i) the time of their last termination of active service or retirement and (ii) June 30, 2014.

(2)     Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 1992 but prior to July 1, 2014 and after being separated for more than six (6) years who accumulate enough service credit to be eligible for a second pension shall be entitled to two (2) separate and distinct pensions, each to be calculated in accordance with the rules in effect at the earlier of (i) the time of each separation from service and (ii) June 30, 2014.

(3)     An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor earned through June 30, 2014 added to the vested amount of the original pension for payment when the employee eventually retires.  The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(d)     Vested former employees rehired prior to receiving pension benefits and on or after July 1, 2014.

(1)     Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to being separated for six (6) years and on or after July 1, 2014 shall have their Component II pension calculated in accordance with the rules in effect on June 30, 2014 and their Component I pension calculated in accordance with the rules in effect at the time of their last termination of active service or retirement.

(2)     Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 2014 after being separated for more than six (6) years who accumulate enough service credit to be eligible for a Component I pension shall be entitled to two (2) separate and distinct pensions under Component I and Component II, each to be calculated in accordance with the rules in effect at the time of each separation from service.

(3)     An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor added to the vested

amount of the original pension for payment when the employee eventually retires. The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(e)     Retirement benefits for retirees who return to active full time employment prior to July 1, 2014.

(1)     Retirees who return to work will have their pension benefit amount suspended upon re-employment. However, retirees who have not withdrawn the amounts credited to their defined contribution account shall be entitled to continue to receive the monthly annuity from the 1973 Defined Contribution Plan. The pension improvement factor shall continue to be added to the vested amount of the original pension but shall not be paid on the defined benefit amount until the employee again separates from service.

(2)     Retirees who return to work prior to July 1, 2014 will be entitled to receive a second pension benefit in accordance with the rules in effect at the earlier of (1) their final separation, or (ii) June 30, 2014, with respect to service credit earned after the retiree returns to active employment. Previous service credit will be used to determine the retirement factors that will be credited to service time earned after return to active employment and used to calculate the new pension amount.

(3)     Average Final Compensation will be based upon the amounts earned after the retiree returns to work through the earlier of (1) their final separation and (ii) June 30, 2014.

(4)     Employees who retire under this Section E-2(e) for a second time will not be allowed to change the original option selection with respect to the original pension benefit. However, employees may make a separate option selection on their second pension benefit amount.

(5)     The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will be included only on the employee's original pension.

(6)     The coordination of benefits (equated Social Security) option will not be available on a second pension amount.

(7)     If a retiree who returns to work and dies while working, had an accumulated combined total service time of at least twenty years, the employee's Spouse will be eligible for automatic Option Two benefits, notwithstanding the option form of retirement originally elected.

(8)     If a retiree who returns to work and dies while working had an accumulated combined total service time of at least fifteen years but less than twenty years, the employee's Spouse will be eligible for automatic Option Three benefits, notwithstanding the option form of retirement originally elected.

(9)     If the employee returns to work and dies prior to accumulating a combined total of fifteen years of service credit, the original pension and benefit option chosen shall resume unless the employee had chosen the Straight Life Option which would result in no survivor pension benefits.

(10)    The Board of Trustees will determine all entitlements for re-employed individuals on a case by case basis consistent with this section and will resolve all issues based upon special circumstances or unique situations.

## Sec. E-3.  Service Retirement

(a)     *Retirement after thirty years of service*.  Any Member hired prior to January 1, 1996 who has accumulated at least thirty or more years of credited service regardless of age, or, for any Member who was hired on or after January 1, 1996 and who has accumulated at least thirty or more years of credited service and has attained age fifty-five, may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement, the Member shall receive a retirement allowance as provided in Section E-4 of this Component II of the Combined Plan.

(b)     *Retirement after twenty-five years of service*.  Any Employee who is covered by the provisions of this Component II and who is a member of the International Union of Operating Engineers IUOE Local 324 (Principal Clerks), the International Brotherhood of Teamsters Teamster Local 214, the Police Officers Association of Michigan, or the Emergency Medical Service Officers Association, who on July 1, 1995, or later has twenty-five (25) or more years of credited service may retire upon his or her written application filed with the Board of Trustees setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement the Member shall receive a Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan.

(c)     *Retirement at age sixty-five with eight years of service; at age sixty with ten years of service*.

(1)     Sixty-five and eight.  Any Member who has attained sixty-five years of age and has at least eight years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

(2)     Sixty and ten.  Any Member who has attained sixty years of age and has at least ten years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement, the former Member shall receive the retirement allowance provided for in Section E-4 of this Component II of the Combined Plan.

(d)     *Conversion of Duty-Disability benefit to Retirement Allowance.*

   (1)     Retirees who are members of the Emergency Medical Service Officers Association or the Police Officers Association of Michigan and who began receiving a Duty Disability Pension after July 1, 1995 may choose to convert to a service retirement at the time they would have had twenty-five (25) years of service with the City.

(e)     *Retirement after twenty-five years of service without attaining age sixty years; reduced pension.*

   (1)     Early retirement.  Any Member of the Retirement System who is on the payroll on or after July 1, 1992, and who has twenty-five years of credited service and has not attained sixty years of age, shall have the option of early retirement by accepting an actuarially reduced retirement allowance as determined by the Board after consultation with the Plan Actuary, notwithstanding the age of the Member who elects early retirement; provided however that any Member hired by an Employer on or after January 1, 1996 must have twenty-five years of credited service and have attained age fifty-five to have such early retirement option.  Said election shall be made within ninety days of separation from City service. Actuarial tables provided by the Plan Actuary shall always provide this actuarially reduced retirement allowance at no cost to the employee.

   Notwithstanding the foregoing, any Member hired by an Employer on or after January 1, 1996 who has twenty-five years of credited service and has attained age fifty-five shall have the option of early retirement by accepting

   (2)     Fringe benefits.  Employees utilizing the early retirement provision in Section E-3(e)(1) will not be entitled to the fringe benefits, if any, accruing to employees who qualify for a normal service retirement until such time as they would have qualified for a normal service retirement under Section E-3(a) or (b) of this Component II of the Combined Plan.

(f)     *Vested retirement allowance; age forty and eight years of service; ten years of service regardless of age.*

   (1)     Eligibility.

      a.     Any Member hired before July 1, 1980 who has reached forty years of age and has acquired eight or more years of credited service shall be eligible to receive benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan.

      b.     Any Member hired on or after July 1, 1980 who has acquired ten years of credited service shall be eligible to receive the benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan, regardless of age.

c.       Any non-union Member hired on or after July 1, 1980 but before March 31, 1992 who has acquired ten years of credited service regardless of age or has reached age forty with eight or more years of credited service, whichever is earlier, shall be eligible to receive benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan.

(2)    *Benefits*.

a.       Any Member described in Section E-3(f)(1) of this Component II who left City employment on or before June 30, 1992 but prior to the date the Member would have first become eligible to retire as provided in Section E-3(a), (b) or (c) of this Component II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law, retirement or death, shall be entitled to a retirement allowance based upon one point five percent (1.5%) of Average Final Compensation for the first ten years of service and one point six three percent (1.63%) for service in excess of ten years. There shall be no change to the base pension upon which future increases are based.

b.       Any Member described in Section E-3(f)(1) of this Component II of the Combined Plan who leaves City employment on or after July 1, 1992, but prior to the date the Member would have first become eligible to retire as provided in Section E-3(a), (b) or (c) of this Component II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law, retirement or death, shall be entitled to a retirement allowance computed according to Section E-4 of this Component II of the Combined Plan.

(3)    *Commencement of retirement allowance*. The retirement allowance shall begin on the first day of the calendar month following the month in which a retirement application is filed with the Board, on or after that date on which the Member would have been eligible to retire with an unreduced service retirement under Section E-3(a) or (b) of this Component II of the Combined Plan, had City employment continued or on the date when age sixty is reached, whichever is earlier. Unless otherwise provided in this Article, no service credit shall be earned for the period of absence from City employment and such person's beneficiary shall not be entitled to any other benefit afforded in this Article except those benefits afforded either in Section E-3 or in Section E-4 of this Component II of the Combined Plan notwithstanding termination of membership.

(4)    *Withdrawal of accumulated contributions*. Upon separation from City employment, Members who qualify for benefits pursuant to Section E-3(f)(1) of this Component II of the Combined Plan may withdraw their 1973 Defined Contribution Plan accumulated contributions and all other funds standing to their credit in the Annuity Savings Fund at that time without affecting their benefits under Section E-3(f)(2) or E-4 of this Component II of the Combined Plan.

In the event that any law, State or Federal, is passed during the term of the collective bargaining agreement or City Employment Terms agreement which permits Employees to vest their pension prior to meeting the vesting requirements set forth in this Component II, any Employee who vests his or her pension in such a manner shall not be eligible for any pension benefits until his or her sixty-second (62nd) birthday. This provision will not affect the current practice governing disabled Employees.

### Sec. E-4. Service Retirement Allowance

Upon retirement, a Member who meets the qualifications set forth in section E-3(a), (b) or (c) of this Component II of the Combined Plan, shall receive a Straight Life Retirement Allowance, and shall have the right to elect to receive in lieu of the Straight Life Retirement Allowance, a reduced retirement allowance under an option provided for in E-8 of this Component II of the Combined Plan.

The Straight Life Retirement Allowance shall consist of:

(a) An Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the 1973 Defined Contribution Annuity Savings Fund at the time of retirement; and

(b) A Basic Pension of twelve dollars ($12.00) per annum multiplied by the number of years, and fractions of years of credited service, not to exceed ten (10) years; and

(c) A Membership Service Pension.

(1) For Members who retire on or before June 30, 1992, a membership service pension of one point five percent (1.5%) of Average Final Compensation for the first ten (10) years of service and one point six three percent (1.63%) for service in excess of ten (10) years.

(2) For Members who retire on or after July 1, 1992 but prior to July 1, 1998, a membership service pension of one point five percent (1.5%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point seven percent (1.7%) of Average Final Compensation for each year of service in excess of ten (10) years up to twenty (20) years of service, plus one point nine percent (1.9%) of Average Final Compensation for each year of service in excess of twenty years. In no event shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(3) For Members who retire on or after July 1, 1998, a membership service pension for service rendered prior to July 1, 2012 of one point six percent (1.6%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point eight percent (1.8%) of Average Final Compensation for each year of service in excess of ten (10) years, up to twenty (20) years of service, plus two percent (2%) of Average Final Compensation for each year of service in excess of twenty (20) years up to twenty-five (25) years, plus two point two percent (2.2%) of Average Final Compensation for each year of service in excess of twenty-five

(25) years; plus, for service rendered after July 1 2012 and prior to July 1, 2014, one and one-half percent (1.5%) of Average Final Compensation for each year of service; plus twelve dollars ($12) for each year of City service not to exceed one hundred twenty dollars ($120). Notwithstanding the foregoing, for members of the Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920 and the Detroit Senior Water Systems Chemists Association bargaining units, the effective date of the one and one-half percent multiplier was April 1, 2013 for all years of service rendered after that date. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(d)     With respect to regular service retirees under Section E-3(a) and (b) of this Component II of the Combined Plan only and excluding persons who receive vested benefits under Section E-3(c) and (d) of this Component II of the Combined Plan, in no case shall the total of the annual Straight Life Pension be less than three hundred sixty dollars ($360.00) times each of the first ten (10) years of service at retirement, plus one hundred twenty dollars ($120.00) for each year of service in excess of ten (10) years. Effective July 1, 2007, each year of service in excess of ten (10) years earned prior to July 1, 2014 shall be calculated using two hundred twenty-five dollars ($225.00).

(e)     The recalculation of the pension benefit shall include previous pension improvement factors but shall not include special increases granted by prior separate ordinances.

(f)     If a retiree dies before receipt of Straight Life Retirement allowance payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between these accumulated contributions and the aggregate amount of Straight Life Retirement allowance payments received, shall be paid to such person or persons nominated by written designation duly executed by the retiree and filed with the Board. If there is no such designated person or persons surviving the retiree, such difference shall be paid to his or her estate. In no case shall any benefits be paid under this section because of the death of a retiree if the retiree had elected any of the Options provided for in Section E-8 of this Component II of the Combined Plan.

## Sec. E-5. Disability Retirement

(a)     *Duty Disability; Eligibility*.  Upon the application of a Member or the Member's department head, a Member who becomes totally and permanently incapacitated for duty in the employ of the Employer shall be retired by the Board; provided, such incapacity is found by the Board to be the natural and proximate result of the actual performance of duty, without willful negligence on the part of the Member; provided further, that any employee who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner ("IME"). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City, the employee shall not be eligible for the duty disability retirement.

(b)     *Duty disability; Benefits.*  Upon retirement for disability as provided in Section E-5(a) of this Component II of the Combined Plan, a retiree shall receive the following benefits:

(1)     Any Member who is eligible for a Service Retirement under Section E-3(a) or (b) of this Component II of the Combined Plan shall receive a Service Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan and shall have the right to elect an option provided for in Section E-8 of this Component II of the Combined Plan.

(2)     Any Member prior to eligibility for a Service Retirement under Section E-3(a) or (b) of this Component II of the Combined Plan shall receive a Disability Retirement Allowance to begin as of the date of disability.  In no case shall the Disability Retirement Allowance be retroactive to more than six months before the date the application for Disability Retirement is filed with the Board, or prior to the date the Member's name last appeared on a City payroll with pay, whichever is later.  The Disability Retirement Allowance shall continue until the Member reaches eligibility for Service Retirement or recovers prior to that event.  Upon reaching eligibility for Service Retirement, he or she shall receive a pension as provided in Sections E-4(b)-(e) of this Component II of the Combined Plan, together with an annuity which shall be the equivalent of the annuity which would have been received had contributions to the Annuity Savings Fund continued.  Said contributions are to be based on the final compensation at the date of duty disability and the annuity percentage in effect for the employee on the July first prior to the effective date on which the employee is added to the disability retirement payroll, provided said July first is at least six months prior to the effective date that the employee is added to the regular retirement payroll.  In computing the pension, membership service credit shall be given for the period a Duty Disability Retirement Allowance is received.  The Disability Retirement Allowance shall consist of:

(i)     Cash Refund Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the Annuity Savings Fund at the time of retirement.  If a retiree dies before receipt of annuity payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions, the difference between the accumulated contributions and the aggregate amount of annuity payments received shall be paid in a single lump sum to such person or persons nominated by written designation duly executed and filed with the Board.  If there is no such designated person surviving the retiree, such difference shall be paid to the retiree's estate.

(ii)    In addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the Member's Average Final Compensation at the time of duty disability, subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.  This Disability Pension shall in no event exceed fifty-seven hundred dollars ($5,700.00) per annum.

(iii) For Members who retired on disability on or after January 1, 1999 or on or after July 1, 2012 for members of the Emergency Medical Service Officers Association and Police Officers Association of Michigan bargaining units, in addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the Member's average compensation at the time of duty disability, subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan. This Disability Pension shall in no event exceed nine thousand dollars ($9,000.00) per annum.

(c) *Non-Duty Disability; Eligibility.* Upon the application of a Member or the Member's department head, a Member who has at least ten years of credited service who becomes totally and permanently incapacitated for duty as a result of causes which do not occur in the actual performance of duty to the employer, may be retired by the Board if the IME certifies to the Board after examination that such Member is mentally or physically totally incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such Member should be retired.

(d) *Non-Duty Disability; Benefits.* Upon retirement for non-duty disability as provided in Section E-5(c) of this Component II of the Combined Plan, a Member shall receive the following benefits:

(1) After attaining sixty years of age, a Member shall receive a Service Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan and shall have the right to elect an Option as provided in Section E-8 of this Component II.

(2) Prior to age sixty, a Member shall receive benefits as provided in Section E-5(d)(2)(i)-(iv) of this Component II of the Combined Plan:

i. A Cash Refund Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the Annuity Savings Fund at the time of retirement. In the event a retiree dies before the total of the Cash Refund Annuity payments received equals or exceeds the amount of his or her accumulated contributions at the time of retirement, the remainder shall be paid in a single lump sum to such person or persons nominated by written designation duly executed by the Member and filed with the Board. If there is no such designated person or persons surviving, any such remainder shall be paid to the retiree's estate.

ii. In addition to the Annuity, a Disability Pension which shall be based on the Service Retirement factors in effect on the effective date of disability. The service retirement factors shall be multiplied by the Average Final Annual Compensation multiplied by the number of years and fractions of years of service credited to the retiree. In addition, a basic pension of twelve dollars ($12.00) per annum for a maximum of ten years of credited service shall be added for a total not to exceed one hundred twenty dollars ($120.00) and adjustments thereto, as calculated pursuant to applicable

provisions of this Component II of the Combined Plan. Said Disability Pension shall begin as of the date of the disability. However, in no case shall the Disability Pension begin more than six months before the date the application for disability retirement was filed with the Board, or prior to the date his or her name last appeared on a City payroll with pay, whichever is later. Payment of the Disability Pension shall continue to age sixty. Said Disability Pension shall not exceed thirty-nine hundred dollars ($3,900.00) per annum, and shall be subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.

iii.     A Member who retired on disability on or after January 1, 1999 shall receive a Disability Pension as provided for in Section E-5(d)(2)(ii) of this Component II of the Combined Plan. Said Disability Pension shall not exceed six thousand dollars ($6,000.00) per annum, and shall be subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.

iv.     Effective July 1, 1967, notwithstanding the limitations contained in Section E-5(d)(2)(ii) of this Component II of the Combined Plan, disability retirees under Section E-5(c) of this Component II of the Combined Plan, who retired (1) prior to August 13, 1953, shall receive a supplementary Disability Pension of forty dollars ($40.00) per month; or (2) after August 13, 1956 and prior to July 1, 1966, shall receive a supplementary Disability Pension of twenty dollars ($20.00) per month.

v.     Upon Attaining Age Sixty, the retiree shall receive a Pension computed according to the provisions of Section E-4(b)-(e) of this Component II of the Combined Plan; provided, that no service credit shall be given for the time a Disability Pension provided for in Section E-5(d)(2)(ii) of this Component II of the Combined Plan was received. Upon attaining age sixty, the retiree shall have the right to make an election under Section E-8 of this Component II of the Combined Plan.

**Sec. E-6. Accidental Death Benefit; Performance of Duty**

If a Member is killed in the performance of duty in the service of the employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the employer, and such death, illness, or injuries resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the employer, the following benefits shall be paid, subject to Section E-12 of this Component II of the Combined Plan:

(a)     *Annuity Savings Fund.* Accumulated savings in the Member's Annuity Savings Fund at the time of death shall be paid in a single lump sum to such person or persons as the Member nominated in a writing duly executed and filed with the Board. In the event there is no designated person or persons surviving the Member, the accumulated contributions shall be paid to the Member's estate.

(b)   *A Pension* of one-third of the final compensation of said Member shall be paid to the surviving Spouse to continue until remarriage.  If an unmarried child, or children under age eighteen also survive the deceased Member, each surviving child shall receive a pension of one-fourth of said final compensation, to be divided equally.  Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, such child's pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen.  In no event shall any child receive a pension of more than one-fourth of said final compensation.

(c)   *No Surviving Spouse; Children*.  If there is no surviving Spouse, or if such surviving Spouse dies or remarries before the youngest surviving child of a deceased Member shall have attained the age of eighteen, any unmarried child or children under age eighteen, if any, shall receive a Pension equal to one-fourth of the deceased Member's final compensation; provided, that if there are more than two such surviving children, each shall receive a pension of an equal share of one-half of said final compensation.  Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, the child's Pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen.  In no case shall any such child's Pension be more than one-fourth of the deceased Member's final compensation.

(d)   *Annual Limit*.  The total amount payable under Section E-6(b) and (c) of this Component II of the Combined Plan on account of the death of a Member, shall not exceed nine thousand dollars ($9,000.00) per annum.

(e)   *Dependent Father and/or Mother*.  If the deceased Member has no surviving Spouse or children eligible for a Pension under this section, a Pension equal to one-sixth of the deceased Member's final compensation shall be paid to the Member's surviving dependent father and/or mother; provided that in no case shall either parent's Pension exceed fifty dollars ($50.00) per month.  Payment to a dependent parent or parents shall be contingent upon a finding by the Board of Trustees after investigation that such parent or parents were actually dependent upon said deceased Member through a lack of earning power resulting from physical or mental disability.

(f)   *Section E-12 of Component II of the Combined Plan Applicable*.  The benefits provided in Section E-6 of this Component II shall be subject to Section E-12 of this Component II.

## Sec. E-7.  Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount

(a)   *Cessation of Employment*.

(1)   If a Member ceases to be an employee of the employer before becoming eligible for a Pension paid out of City contributions to the Retirement System, such Member shall be paid all or part of the Member's Annuity Savings Fund, being the 1973 Defined Contribution Plan amount, as the Member shall demand by written application filed with the Board.

(2) Except as otherwise provided in this Article, upon the death of a Member, the Member's Annuity Savings Fund shall be paid to such person or persons nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated person or persons surviving, the Member's said accumulated contributions shall be paid to the Member's estate.

(3) If a Member who dies without a legal will is not survived by a Spouse and has not nominated a beneficiary as provided in Section E-7(a)(2) of this Component II, the Member's accumulated Annuity Savings Fund contributions at the time of death may be used to pay burial expenses, if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

(4) Accumulated contributions to be returned as provided in this section may be paid in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time. After a Member ceases to be a Member, any balance in the Annuity Savings Fund which is unclaimed by the said Member or the Member's heirs, shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

(b) *One-Time Withdrawal; Twenty-Five Years*. Prior to the receipt of the first retirement benefit check, an employee with twenty-five or more years of service shall be allowed to withdraw either a partial or full amount of his or her accumulated contributions, one time only.

(c) *One-Time Withdrawal; Duty and Non-Duty Disability Retirees*. Duty and non-duty disability retirees shall be allowed to withdraw either a partial or full amount of their accumulated contributions, one time only.

(d) *One-Time Withdrawal*. Withdrawal by a Member under either (b) or (c) of this Section E-7 constitutes the one time withdrawal allowed.

### Sec. E-8. Retirement Allowance Options

(a) *Election by Member*. Until the earlier of the first time a retirement allowance payment check is cashed, or six months after the first payment check is issued, but not thereafter, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the actuarial equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced retirement allowance payable throughout life, with the exception that there will be no reduction in the benefits received pursuant to Section E-4(e) of this Component II of the Combined Plan, and nominate a beneficiary to receive benefits following the Member's death, in accordance with the options set forth below:

*Option One. Cash Refund Annuity*. If a retiree who elected a Cash Refund Annuity dies before payment of the annuity portion of the reduced retirement allowance has been

received in an aggregate amount equal to, but not exceeding the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between said accumulated contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to such person or person nominated by written designation duly executed by the Member and filed with the Board. If no such designated person or persons survive the retiree, any such difference shall be paid to the retiree's estate.

*Option Two. Joint and One Hundred Percent Survivor Allowance*. Upon the death of a retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced retirement allowance shall be paid to and continued throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "A". Joint and Seventy-Five Percent Survivor Allowance*. Upon the death of a retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option Three. Joint and Fifty Percent Survivor Allowance*. Upon the death of a retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "B". Joint and Twenty-Five Percent Survivor Allowance*. Upon the death of a retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced retirement allowance shall be paid throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

(b)     *Joint and Survivor Optional Forms of Payment*. The Joint and Survivor Optional Forms of Payment provided under Section E-8(a) of this Component II of the Combined Plan shall be made available in either the standard form or the pop-up form, as follows:

   (1)    *Standard Form*. Under the Standard Form, the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

   (2)    *Pop-up Form*. Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the Straight Life Retirement Allowance form of payment.

13-53846-swr   Doc 8657   Filed 10/22/14   Entered 10/22/14 03:49:29   Page 589 of
809
13-53846-tjt   Doc 13751   Filed 05/07/21   Entered 05/07/21 00:29:39   Page 148 of
268

(c)     *Coordination of Benefits.*  According to such rules and regulations as the Board shall adopt, until the first payment of a retirement allowance becomes due, but not thereafter, a Member under age sixty-five may elect to have the Member's Straight Life Retirement Allowance provided for in Section E-4 of this Component II of the Combined Plan equated on an actuarial equivalent basis to provide an increased retirement allowance payable to age sixty-two or age sixty-five, and to provide a decreased retirement allowance thereafter.  The increased retirement allowance payable to such age shall approximate the total of the decreased retirement allowance payable thereafter and the estimated social security benefit.  If a Member elects to receive increased and then decreased retirement allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (a) of this section.  This coordination of benefits option shall not create any additional actuarial costs.

### Sec. E-9.  Benefits for Surviving Spouses; Generally

(a)     The surviving Spouse of any Member who dies while in the employ of the City or in the employ of a second governmental unit as provided in Section E-14 of this Component II after the date such Member either (1) has earned twenty years of credited service regardless of age, or (2) has earned eight years of credited service and has attained age sixty-five, or (3) has earned ten or more years of credited service and has attained age sixty, shall receive a retirement allowance.  The Spouse's retirement allowance shall be computed according to Section E-4 of this Component II of the Combined Plan in the same manner in all respects as if the said Member had retired effective the day preceding the Member's death, notwithstanding that the Member had not attained age sixty, elected a Joint and One Hundred Percent Survivor Allowance as provided for in Section E-8 of this Component II, and nominated the surviving Spouse as beneficiary.  No payments shall be made under this Section E-9 on account of the death of a Member if any benefits are paid under Section E-6 of this Component II.  If an Employee dies with twenty (20) years of service and without a surviving Spouse, dependent children shall be paid a total of nine thousand dollars ($9,000.00) per year which shall be divided equally among all eligible dependent children until the youngest child reaches age nineteen, or for life, if a child is permanently physically or mentally impaired and such impairment occurred prior to the child's attainment of age nineteen.  There shall be no retirement escalator for this payment.

(b)     In addition to in-service death benefits which existed prior to July 1, 1998 for Members with twenty or more years of service, if a Member dies on or after July 1, 1998 or such later date as provided in a collective bargaining agreement, after having attained fifteen or more but less than twenty years of creditable service at any age below sixty, the surviving Spouse will be paid a Fifty Percent Joint and Survivor benefit.  If there is no eligible surviving Spouse, dependent children shall be paid a total of six thousand dollars ($6,000.00) which shall be divided equally among all eligible dependent children until the youngest child reaches age nineteen, or for life if a child is permanently physically or mentally impaired.

### Sec. E-10.  Benefits for Surviving Spouses; Disability Retirees

The surviving Spouse of a disability retiree who retired under the provisions of Section E-5 of this Component II of the Combined Plan and who died before the age of sixty shall receive a retirement allowance computed in the same manner as if the disability retiree had been a Member who became eligible for death benefits under Section E-9 of Component II of the Combined Plan, provided the disability retiree had earned fifteen or more years of credited service. In the case of a non-duty disability retiree, credited service shall be determined on the effective date of the non-duty disability retirement. In the case of a duty disability retiree, credited service shall be determined on the date of death of the disability retiree assuming City employment had continued until the date of death.

## Sec. E-11. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint Twenty-Five Percent Survivor allowance as provided for under Section E-8 of this Component II of the Combined Plan, both a retiree and beneficiary die before they have received in retirement allowance payments, an aggregate amount equal to the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, less withdrawals, the difference between the said accumulated contributions and the said aggregate amount of retirement allowances paid the retiree and beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the retiree duly executed and filed with the Board. If there are no person or persons surviving retiree and beneficiary, any such difference shall be paid to the retiree's estate.

## Sec. E-12. Pensions Offset by Compensation Benefits; Subrogation

(a)     Generally.  Any amounts which may be paid or payable to a Member, retiree, or to the dependents of a Member or retiree on account of any disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be offset against any pensions payable from funds of the Retirement System on account of the same disability or death.  If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for said pension payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the Pension Reserve, and such pensions as may be provided by the Pension Reserve so reduced shall be payable as provided in this Article E.

(b)     The City's right of subrogation.  In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the City shall be subrogated to the rights of said person against such third party to the extent of the benefit which the City or the Retirement System pays or becomes liable to pay.

## Sec. E-13. Disability Retirees; Reexamination; Authority of the Board

(a) *Medical examination*.  At least once each year during the first five years following the retirement of a Member with a Disability Retirement Allowance or Disability Pension, and at least once in every three year period thereafter, the Board may, and upon the retiree's application shall, require that any disability retiree who has not attained age sixty undergo a medical examination, to be made by, or under the direction of, the Medical Director.  Should any such disability retiree who has not attained age sixty refuse to submit to at least one such medical examination in any such period, the retiree's retirement allowance or pension may be discontinued by the Board until withdrawal of such refusal.  Should such refusal continue for one year, all of the disability retiree's rights in and to the Pension portion of the Retirement Allowance may be revoked by the Board.  If upon such examination of a disability retiree, the Medical Director reports that the retiree is physically able and capable of resuming employment, and such report is concurred in by the Board, the retiree shall be restored to active service with the City and the Disability Retirement Allowance shall terminate.

(b) *Other employment*.  If such disability retiree is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the retiree's Disability Retirement Allowance and final compensation, the Pension portion of the Disability Retirement Allowance shall be reduced by the amount of such difference.  If the amount of the earnings changes, the Pension may be adjusted accordingly.

(c) *Reinstatement to active service*.  A disability retiree who has been, or shall be, reinstated to active service in the employ of the City as provided in this Section, shall again become a Member of the Retirement System.  All credited service at the time of the retirement shall be restored to full force and effect and a duty disability retiree shall be given membership service credit for the period said retiree was out of service due to such duty disability.

## Sec. E-14.  Transfer of Department or Department Functions; Generally

In the event a function or functions of a City Department or the Department itself is transferred to the federal or state government, or to a political subdivision of the State of Michigan (second governmental unit), a Member of the Retirement System whose employment is transferred from the City to the second governmental unit shall be entitled to a retirement allowance payable by the Retirement System subject to the following conditions:

(a) *Employment within sixty days of transfer*.  The employee enters the employment of the second governmental unit within sixty days from and after the effective date of the transfer of the function or functions of a City Department or the Department itself to the second governmental unit.

(b) *Credited service combined; ten year minimum*.  The employee's credited service as a Member of the Retirement System plus any credited service acquired in the employ of the second governmental unit totals at least ten years.

(c) *Retirement; second governmental unit*.  If the employee retires from employment with the second governmental unit on account of age and service, the employee's Retirement

Allowance shall be computed in accordance with Section E-3(b) or Section E-4 of this Component II of the Combined Plan, whichever is applicable. If the employee retires from employment in the second governmental unit because of total and permanent disability arising from non-service connected causes, the Retirement Allowance shall be computed in accordance with Section E-5(d) of this Component II of the Combined Plan. In computing the Retirement Allowance, the basic pension shall not exceed twelve dollars ($12.00) per year for a maximum of ten years for a total amount to not exceed one hundred twenty dollars ($120.00), and the membership service pension shall be based only upon City-credited service existing at the time of transfer. In determining the Average Final Compensation defined in Section C-1 of this Component II of the Combined Plan, the compensation received as an employee of the second governmental unit shall be regarded as compensation paid by the City. If the employee leaves the employ of the second governmental unit with a deferred retirement allowance, no City retirement allowance shall be paid unless the employee has met the requirements of Section E-3(d)(1) of this Component II of the Combined Plan. Notwithstanding the foregoing, effective as of the Freeze Date, for purposes of calculating a Retirement Allowance for a Member whose employment was transferred prior to July 1, 2014 from the City to a second governmental unit, Average Final Compensation for the transferred Member shall be compensation received by such transferred Member prior to July 1, 2014 as an employee of the second governmental unit.

(d)     *Allowance starting date.* The retirement allowance shall begin upon retirement from the employment of the second governmental unit, but in no event prior to the date the employee would have become eligible for retirement had the employee continued in City employment. If retirement is because of total and permanent disability arising from non-service-connected causes, the retirement allowance shall begin upon the approval of retirement by the Board.

## Sec. E-15. Pension Improvement Factor (Escalator)

(a)     *Increase of pension.* On or after July 1, 1992 and prior to the effective date of the Plan of Adjustment, effective as of the first day of July of each year, the pension portion of any Retirement Allowance or Duty Death Benefit which is paid or payable under this Article shall be increased by a factor of two and one quarter percent (2.25%), computed on the basis of the amount of the original pension received at the time of retirement, including, if applicable, any supplemental pensions provided under this Article; provided, that the recipient of said pension shall have been on the retirement rolls at least one year prior to said July first date. If the recipient has been on the retirement payroll less than one year prior to said July first date, the amount of the increase shall be prorated accordingly.

(b)     *Payment.* Except as provided in paragraph (c) below, the pension improvement factor of two and one quarter percent (2.25%) provided for in Section E-15(a) of this Component II, shall be payable notwithstanding any Retirement Allowance or pension amount limitation provisions in this Article to the contrary.

(c)     After the effective date of the City Employment Terms between the City of Detroit and Police Officers Association of Michigan presented to the union on July 18, 2012,

employees represented by the union will no longer receive the two and one-quarter percent (2.25%) per annum escalation.

(d)     Effective April 1, 2013, the post-retirement escalator factor for all service after that date shall be eliminated for any employee who is a member of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920.

## Sec. E-16.   Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate

(a)     The Retirement System and the Board of Trustees shall not make any payment to active or retired Members other than payments that are required by the Retirement System as established by this Combined Plan to govern the Retirement System or the Plan of Adjustment.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(b)     The Retirement System and the Board of Trustees shall not provide any savings plan, annuity plan, or other Member investment or savings vehicle that provides an annual return to investing Members which in any year is greater than the actual investment return net of expenses of the Retirement System's invested reserves for the year in which the return is earned and accrued, provided that such return shall neither be greater than the assumed annual return as expressed in the Retirement System's valuation for that year nor less than zero.  This prohibition shall apply to all annual returns credited to accounts of investing Members in the Annuity Savings Fund of the 1973 Defined Contribution Plan from the effective date of Ordinance 37-11 to June 30, 2013.  Notwithstanding anything in this Section E-16 to the contrary, effective for Plan Years beginning on and after July 1, 2013, the annual rate of return credited to a Member's account in the Annuity Savings Fund of the 1973 Defined Contribution Plan shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Plan Year immediately preceding the Plan Year in which the annual return is credited.

(c)     In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (b) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I. The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary.  In the event there is an ASF Return Excess for a Plan Year following the Plan

Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I. "Transition Cost" shall be determined by the Plan Actuary.

## Sec. E-17. Funds

The 1973 Defined Benefit/Defined Contribution (Annuity) Plan shall consist of the Annuity Savings Fund, the Annuity Reserve Fund, the Pension Accumulation Fund, the Pension Reserve Fund, and the Income Fund.

## Sec. E-18. Method of Financing

(a)    *Annuity Savings Fund of the 1973 Defined Contribution Plan.*

(1)    The Annuity Savings Fund of the 1973 Defined Contribution Plan shall be the fund in which shall be accumulated at regular interest, in accordance with the limitations that are contained in Section E-16 of this Component II of the Combined Plan, the contributions of Members made prior to the first payroll date occurring in August 2014 to provide their annuities. At the election of the Member, the amount of the basic contribution of a Member to the Retirement System prior to the first payroll date occurring in August 2014 were zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of annual compensation. If a Member elected three percent (3%), his or her contribution shall be that amount which is subject to taxation under the provisions of the *Federal Insurance Contribution Act, 26 USC 3101 et seq. (Act)*, plus five percent (5%) of the portion of annual compensation, if any, which exceeds the amount subject to taxation under that *Act*.

(2)    The contribution rate elected by the Member under Section E-18(a)(1) of this Component II of the Combined Plan were deducted from the Member's compensation notwithstanding that the minimum compensation provided by law for any Member were reduced thereby. Payment of compensation, less said deductions, constituted a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment, except as to benefits provided under this Article E.

(3)    Upon retirement of a Member with a Retirement Allowance, the Member's accumulated contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund, refunded to the Member, or a combination thereof.

(b)    *Annuity Reserve Fund.* The Annuity Reserve Fund shall be the fund, from which all annuities and benefits in lieu of annuities payable as provided in this Article E, shall be paid. If a disability retiree is reinstated to active City service, the retiree's Annuity Reserve at that time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or her individual account therein.

(c)     *Pension Accumulation Fund*.  The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from the contributions made by the City, including various departments thereof, the Detroit Public Library, and certain third parties pursuant to the Plan of Adjustment and from which shall be paid pensions and other benefits on account of Members with prior service credit, and transfers as provided in this Section E-18.  Contributions to the Pension Accumulation Fund from the effective date of the Plan of Adjustment through Fiscal Year 2023, shall be made only in the amounts and from the sources identified in the Plan of Adjustment.

For Fiscal Years beginning after June 30, 2023, contributions to fund pension benefits (adjusted as provided in the Plan of Adjustment) shall be made as follows:

(1)     Certain amounts shall be contributed by certain third parties as provided in the Plan of Adjustment.

(2)     The City's annual contribution shall be calculated by the Actuary as provided in Section E-19.

(3)     Upon the retirement of a Member without prior service credit, or upon a Member's death in the performance of duty, the Pension Reserve Fund for the pension or pensions to be paid on the Member's account shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund.

(4)     Upon the basis of such mortality and other tables of experience and interest as the Board shall adopt from time to time consistent with Section 1.16(d) of Component I, the Actuary shall compute annually the pension reserve liabilities for pension benefits being paid to retirees and beneficiaries.

(5)     On an annual basis, the Board shall ascertain and report to the Mayor and the Council the amount of City contributions due to the Retirement System.  The Council shall appropriate and the City shall pay such contributions during the appropriate Fiscal Year.  When paid, such contributions shall be credited to the Pension Accumulation Fund.

(6)     If the amount appropriated by the City and paid to the Retirement System for any Fiscal Year is insufficient to make the transfers and pay the pensions, as adjusted in the Plan of Adjustment, from the Pension Accumulation Fund as provided in this Section E-18, the amount of such insufficiency shall be provided by the appropriating authorities of the City.

(d)     *Accrued Liability Fund*.  Pursuant to *Ordinance No. 5-05*, which authorized the creation of the Detroit General Retirement Service Corporation, the City previously entered into a transaction (the "Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described above in Subsection (c).  The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transactions, as described below) that were deposited into the System are termed the "Funding Proceeds." The Funding Proceeds were deposited into a new fund in the System to be called the Accrued Liability Fund.  The purpose of the Funding

Proceeds was to fund all or part of the heretofore unfunded actuarial accrued liability ("UAAL") of the Retirement System, as determined as of a date certain, that is, the "Determination Date," pursuant to the Retirement System's actuarial valuation as of that date. The Funding Proceeds are assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay pension benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of this Pension Funding Transaction, and any earnings thereon. Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund to the Pension Accumulation Fund as provided in *Chapter 47 of the 1984 Detroit City Code* and *Ordinance No. 5-05*.

As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

(e)     *Pension Reserve Fund*. The Pension Reserve Fund shall be the fund from which pensions shall be paid to retirees and beneficiaries. Should a disability retiree be reinstated to active service, the retiree's Pension Reserve at that time, shall be transferred from the Pension Reserve Fund to the Pension Accumulation Fund.

(f)     *Expense Fund*. The Expense Fund shall be the fund to which shall be credited all money provided by the City to pay the administrative expenses of the Retirement System, and from which shall be paid all the expenses necessary in connection with the administration and operation of the Retirement System.

(g)     *Income Fund*. The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the Retirement System (other than those derived from the investments credited to any Accrued Liability Fund), all gifts and bequests received by the Retirement System, and all other moneys the disposition of which is not specifically provided for in this Article E. There shall be paid or transferred from the Income Fund, all amounts required to credit regular interest to the various Funds of the Retirement System, except for the Accrued Liability Fund which is to be credited with interest, dividends and other earnings pursuant to Section E-18(d)(2) of this Component II of the Combined Plan in accordance with the limitations that are contained in Section E-18 of this Component II of the Combined Plan.

(h)     *Maintenance of Reserves*.

(1)     The maintenance of proper reserves in the various Funds of the Retirement System except the Expense Fund are hereby made obligations of the Pension Accumulation Fund.

(2)     City contributions to the Retirement System to the extent necessary to provide pensions on account of Members who are employees of a revenue-supported division of the City shall be made from the revenues of the said division. Any City contribution to the Retirement System from any Fund by law with a certain

13-53846-swr   Doc 8057-1   Filed 10/22/14   Entered 10/22/14 03:45:29   Page 156 of
209
13-53846-tjt   Doc 13675   Filed 05/07/24   Entered 05/07/24 00:28:43   Page 157 of
309

and definite purpose shall, at the direction of the Finance Director, be accounted for separately.

### Sec. E-19. Determination of City's Annual Contribution

(a)     For the period ending June 30, 2023, the City shall make only those contributions to the Retirement System as are set forth in the Plan of Adjustment.

(b)     For Fiscal Years beginning on and after July 1, 2023, the annuity and pension reserve liabilities for Members, retirees, and beneficiaries, shall be actuarially evaluated as set forth in this Article for each division as is accounted for separately pursuant to Section E-18(h)(2) of this Component II of the Combined Plan.

(1)     *Pension Liabilities.*

a.      The pension liabilities for Members shall be determined by the Actuary using reasonable and appropriate actuarial assumptions approved by the Board and the Investment Committee.

b.      The City's annual contribution to finance any unfunded accrued pension liabilities, expressed as a percentage of active employees' compensation, shall be determined by amortizing such unfunded accrued pension liabilities as a level percentage of such compensation over a period or periods of future years as established by the Board and approved by the Investment Committee.

(2)     *Pension Accumulation Fund.*   Based upon the provisions of this Article E including any amendments, the Board shall compute the City's annual contributions to the Retirement System, expressed as a percentage of active Member compensation each Fiscal Year, using actuarial valuation data as of the June thirtieth date which date is a year and a day before the first day of such Fiscal Year.  The Board shall report to the Mayor and Council the contribution percentages so computed.   Such contribution percentages shall be used in determining the contribution dollars to be appropriated by Council and paid to the Retirement System.  Such contribution dollars shall be determined by multiplying the applicable contribution percentage for such Fiscal Year by the Member compensation paid for such Fiscal Year.  Such contribution dollars for each Fiscal Year shall be paid to the Retirement System in such Fiscal Year in a manner to be agreed upon from time to time by the Board and the City, provided, for any Fiscal Year for which an agreement has not been reached before the first day of such Fiscal Year, such contribution dollars shall be paid in equal monthly installments at the end of each calendar month in such Fiscal Year.

# ARTICLE F.  PARTICIPANT LOAN PROGRAM

## Sec. F-1.  Established.

Any loans granted or renewed shall be made pursuant to a Participant Loan Program which shall conform with the requirements of Section 72(p) of the Internal Revenue Code.  Such loan program shall be established in writing by the Board of Trustees, and must include, but need not be limited to the following:

(1)  The identity of the administrator of the Participant Loan Program;

(2)  A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

(3)  The procedures under the program for determining a reasonable rate of interest; and

(4)  The events constituting default and the steps that will be taken to preserve plan assets.

## Sec. F-2.  The Loan Program.

(1)  This Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the Retirement System for prospective participants in the Loan Program.  The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program.  Copies of the rules shall also be made available to prospective Members in the offices of the Retirement System; and

(2)  All collective bargaining agreements which accept the terms of this section are specifically agreeing to be subject to the Board's authority to modify or amend the Participant Loan Program from time to time, including during the effective terms of the applicable labor agreement and no such modification or amendment shall be deemed a violation of said labor agreement and no grievance or other form of action shall be effective to overturn or alter the Board's decision.

## Sec. F-3.  Eligibility.

Subject to rules and procedures established by the Board, loans will initially be made only to non-union Members of the Retirement System.  Union employees will be eligible when their respective bargaining unit has accepted the Loan Program.  Former Members, spouses of Members, and beneficiaries are not eligible to receive any loans from the Retirement System.  Subject to rules and procedures established by the Board, a Member who has been in the Combined Plan for twelve (12) months or more is eligible to apply for a loan under this Component II.  No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

## Sec. F-4.  Amount of Loan.

A Member who has satisfied applicable rules and procedures may borrow from his or her account an amount, which does not exceed fifty percent (50%) of the Member's vested accumulated balance, or ten thousand dollars ($10,000.00) reduced by the excess, if any, of: 1) the highest outstanding balance of loans from the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or 2) the outstanding balance of loans from the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be one thousand dollars ($1,000.00).

## Sec. F-5.  Terms and Conditions.

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(1)  Loan applications shall be in writing;

(2)  Loans shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period;

(3)  Each loan shall be made against the assignment of the Member's entire right, title, and interest in and to the Retirement System, supported by the Member's collateral promissory note for the amount of the loan, including interest payable to the order of the Board of Trustees;

(4)  Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the Combined Plan.  The loan interest rate shall be calculated in a manner that will not negatively affect the Employers' costs with respect to the Retirement System or the investment return allocated to Members;

(5)  Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code.  A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

**Sec. F-6.  Renewal of Loan.**

Any loans granted or renewed shall be made pursuant to the Participant Loan Program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

**Sec. F-7.  Loan Balance.**

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's account balance, and shall not be part of net investment income or part of the Member's account balance for the purpose of allocation of net investment income under the Retirement System.

**Sec. F-8.  Distributions.**

No distributions shall be made to a Member, former Member, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

**Sec. F-9.  Annual Report.**

The Retirement System shall include, in its annual report to all Members, an accounting of the Loan Program established by this Article F, which contains the number and amount of loans made under this Component II, the costs of administering the Loan Program under Component II, the amount of payments made including interest received by Component II of the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that Fiscal Year covered the costs of administering the Loan Program maintained under this Component II.

# ARTICLE G.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS

## Sec. G-1.  Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment

Notwithstanding anything in Articles A, C, D or E of Component II to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following provisions to comply with the terms of the Plan of Adjustment shall be implemented:

(1)     *Reduction in monthly pension payments.*

    a.     For a retiree or a surviving beneficiary who is receiving a monthly pension benefit as of the effective date of the Plan of Adjustment, as soon as practicable following such effective date such retiree's or surviving beneficiary's monthly pension benefit will be reduced to an amount that is equal to 95.5% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment ("Adjusted Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then such retiree's or surviving beneficiary's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment.

    b.     The Frozen Accrued Benefit that will be paid as a monthly Retirement Allowance upon the retirement or death of an active employee Member or a vested former employee Member on or after the Effective Date, will be reduced to an amount that is equal to 95.5% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1 ("Adjusted Deferred Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on an annual basis that the "Funding Conditions" as defined herein have been satisfied, and in the event such Funding Conditions have not been satisfied then such active employee Member's or vested former employee Member's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1.

c. *Cap on Benefit Reductions for Certain Retirees.* With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, such retiree's or surviving beneficiary's Adjusted Accrued Benefit, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

For purposes of this Sec. G-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2) *Elimination of Pension Improvement Factor.* For all pension benefits payable after the Effective Date, the Pension Improvement Factor (Escalator) that will be applied to the monthly Adjusted Accrued Benefit or Adjusted Deferred Accrued Benefit of a Member, retiree, surviving beneficiary or vested former employee will be equal to 0%.

(3) *Recoupment of Excess Returns on Annuity Savings Fund Account.* The terms of Section G-2 Annuity Savings Fund Recoupment shall apply to the Annuity Savings Fund account of Members, retirees and vested former employees as provided in Section G-2.

(4) *Future Disability Pensions Eliminated.* The Duty Disability Retirement Allowance and Non-Duty Disability Retirement Allowance are eliminated with respect to Members who become disabled on or after July 1, 2014.

(5) *Effect of Payment Default.* In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall automatically reduce the monthly pension benefits payable to Members, retirees, surviving beneficiaries, and former employees to the extent of such default.

## Sec. G-2.  Annuity Savings Fund Recoupment

Notwithstanding anything in Articles A, B, C, D or E to the contrary, upon the effective date of the Plan of Adjustment, Members, retirees or vested former employees who were identified by the City as a Class 11 Holder under the Plan of Adjustment and who participated in the Annuity Savings Fund ("ASF") at any time during the period that began on July 1, 2003 and ended on June 30, 2013 ("ASF Recalculation Period") are subject to the following provisions:

(1) *Recoupment from Members, retirees and vested former employees who maintain an Annuity Savings Fund account ("ASF account") as of the Effective Date.* For each Member, retiree or vested former employee who maintains an ASF account

in the Retirement System as of the effective date of the Plan of Adjustment, such individual's ASF account balance will be reduced by such individual's Annuity Savings Fund Excess Amount, as determined by the City in accordance with this Section G-2 (1).

a.  For a Member, retiree or former vested employee who did not receive any distribution or loan from such individual's ASF account during the ASF Recalculation Period, the Annuity Savings Fund Excess Amount means the difference between the value of such individual's ASF account as recalculated using the Actual Return (as defined in paragraph (3) below) and the actual value of such individual's ASF account as of June 30, 2013; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance relating to the ASF account) during the ASF Recalculation Period.

b.  For a Member, retiree or vested former employee who during the ASF Recalculation Period has received a distribution (other than a total distribution) or loan from the ASF, the Annuity Savings Fund Excess Amount means the difference between (i) the sum of (A) the value of such individual's ASF account as of June 30, 2013 and (B) all distributions (including any unpaid loans) received by such individual from his or her ASF account during the ASF Recalculation Period, and (ii) the value of such individual's ASF account as of June 30, 2013 as recalculated using the Actual Return; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loans made to the individual) during the ASF Recalculation Period.

(2)  *Recoupment from Members, retirees and former employees who previously took total Annuity Savings Fund account distributions.*  Except as provided in paragraph (4) below, for each Member, retiree or vested former employee who has received a total distribution of the individual's ASF account during the ASF Recalculation Period, the individual's monthly pension benefit (and the survivor monthly pension benefit payable to the Member's survivor, if any) will be reduced by the individual's "Monthly Annuity Savings Fund Excess Amount" as determined by the City in accordance with this Section G-2(2).

A Monthly Annuity Savings Fund Excess Amount means the difference between (i) the value of the ASF account of a Member, retiree or vested former employee as of the date of distribution to such individual from the ASF, provided such date falls within the ASF Recalculation Period, and (ii) the value of the individual's ASF account as of such date, as recalculated using the Actual Return; provided, however, such difference shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance) during the ASF Recalculation Period; provided, further, such amount will be converted into

a monthly annuity amount based on the individual's life expectancy, gender and, if the Member has not already retired, the expected date of retirement.

(3) *Recoupment from Members, retirees and former employees who received partial Annuity Savings Fund account distributions.* A Member, retiree or vested former employee who previously received a distribution of a portion but not the entirety of the Member's Annuity Savings Account shall be subject to paragraph (1) to the extent of any funds then credited to the Member's Annuity Savings Fund account and shall be subject to paragraph (2) to the extent of any Excess Amount that cannot be recovered pursuant to paragraph (1).

(4) *Cash repayment option.* Notwithstanding paragraphs (2) and (3) above and subject to the Cash Option Cap described below, a Member, retiree, employee or former employee whose monthly pension benefit will be reduced pursuant to paragraph (2) or (3) may elect to make a single lump sum cash payment to the Retirement System of the Annuity Savings Fund Excess Amount by cashier's check or wire transfer ("Cash Repayment Option"). Each individual eligible for the Cash Repayment Option shall be provided by first-class U.S. mail an election notice and an election form no later than seven days following the Effective Date. The individual shall have thirty-five days from the date on which the election form is mailed to return the election form as directed on the form. An election of the Cash Repayment Option shall be effective only if it is received by the deadline set forth on the election form.

No later than fourteen days following the election deadline, the Board shall notify each individual who timely elects the Cash Repayment Option of the amount to be repaid to the Retirement System ("Final Payment Notice"). Such amount must be paid to the Retirement System on or before the later of (i) ninety days after the Effective Date, or (ii) fifty days following the date on which the Final Payment Notice is mailed to the individual.

If payment is not timely received, the monthly pension benefit of an individual who elects the Cash Repayment Option shall be reduced as provided in paragraph (2) or (3).

The Cash Repayment Option shall be limited to an aggregate amount of $30 million (the "Cash Option Cap"). In the event the Retirement System receives timely and properly completed election forms representing an aggregate recovery amount in excess of the Cash Option Cap, then each individual who made a timely election of the Cash Repayment Option shall be permitted to repay an amount equal to his pro rata share of the Cash Option Cap. Any Annuity Savings Fund Excess Amount that is not repaid under the Cash Repayment Option shall be repaid as provided in paragraph (2) or (3).

(5) *Definition of Actual Return.* "Actual Return" means the actual net return percentage on the Retirement System's invested assets for each Fiscal Year

during the ASF Recalculation Period; provided, however, that for any such Fiscal Year the net return shall not be greater than 7.9% nor less than 0%.

(6) *Limitation on recoupment.* Notwithstanding anything in this Section G-2 to the contrary:

a. a Member's ASF account value after recoupment of the Member's Annuity Savings Fund Excess Amount will never be less than the contributions made to the ASF by such Member and will reflect all interest credited by the Board to the Member's ASF account for the Fiscal Years ending prior to July 1, 2002; and

b. in no event shall the amount recovered from a Member described in Section G-2(2) (or G-2(3), with respect to amounts that may not be recovered pursuant to Section G-2(1)) exceed the Member's Annuity Savings Fund Excess Amount plus interest on such amount at a rate of 6.75%. Upon the Member's repayment of such amount in full, the Member's monthly pension benefit in effect immediately prior to adjustment as provided in Section G-2(2) (adjustment as provided in Section G-1), increased as provided in Section G-4, if applicable, shall be fully restored.

(7) *Cap on benefit reductions for certain retirees.* With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, the Adjusted Accrued Benefit of such retiree or surviving beneficiary, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

Annuity Savings Fund Excess Amounts of Members described in paragraphs (1) and (3) shall be transferred from the Annuity Savings Fund to the Pension Accumulation Fund and shall be used to pay pensions and other benefits to Members as provided in Component II of the Combined Plan.

## Sec. G-3. Income Stabilization Benefits

(1) The provisions of this Section G-3 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer.

(2) Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section G-3, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i) the amount needed to restore an Eligible Pensioner's reduced

annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013. The Income Stabilization Benefit as determined under this Section G-3(2) will not increase after the date on which the Income Stabilization Benefit is determined. The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3)  To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section G-3) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section G-3 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

   a.  The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

   b.  An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the pension benefit paid to the Eligible Pensioner from the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Accrued Benefit that is payable to the Eligible Pensioner for that year as determined under Section G-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section G-4; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4)  A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of

13-53846-swr   Doc 8057   Filed 10/22/14   Entered 10/22/14 03:45:29   Page 166 of
269
13-53846-tjt   Doc 13757   Filed 05/07/24   Entered 05/07/24 00:28:39   Page 167 of
309

Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section G-3 (7).

(5) For purposes of this Section G-3, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section G-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

    a. An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

    b. The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board. The Board, with the assistance of the Investment Committee, shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

    c. After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

    d. An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death, or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6) For purposes of this Section G-3, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7) In the event that in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income

13-53846-swr   Doc 8657   Filed 05/07/22   Entered 05/07/22 00:28:39   Page 167 of
309
13-53846-tjt   Doc 13575   Filed 10/22/24   Entered 10/22/24 03:46:29   Page 678 of
807

Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System. The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)     In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System.

### Sec. G-4.  Restoration of Pension Benefits

The following rules shall govern how accrued pensions, including Pension Improvement Factor ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re. City of Detroit, Michigan*, Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)     *Waterfall Classes.*

There will be three Waterfall Classes:

a.      Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries.

b.      Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

c.      Waterfall Class 3 – All other Members who as of June 30, 2014 are not in retirement benefit pay status.

(2)     *Restoration of Benefits Through June 30, 2023.*

a.      Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial

accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (investment and administrative), future Employer contributions as set forth in the Plan of Adjustment (subject to the conditions in the Plan of Adjustment) and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 70% funded ratio, the Restoration Target will be a 75% funded ratio, and the Restoration Reserve Suspension Trigger will be a 71% funded ratio, all projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Actuary projects that the projected Funded Level as of June 30, 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 75%), a credit of assets for bookkeeping purposes will be made into a new notional "Restoration Reserve Account". The notional credit will be in an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Reserve Account assets will be credited with interest in an amount equal to the net return on Retirement System investments, but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the Pension Reserve Fund.

b. To the extent that the City's (including DWSD or a successor authority) actual contributions in any of the Fiscal Years 2015 through 2023 are less than the contributions provided for in the Plan of Adjustment, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c. Actual restoration payments and credits will work as follows: each year in conjunction with preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore a portion of the 4.5% across the board pension cuts in one or more minimum incremental amounts equal to ½% of the monthly benefit for each member of Waterfall Class 1 (i.e. reducing the initial across the board cut to 4.0%). This restoration only occurs if the funding level in the Restoration Reserve Account can fund 100% of each incremental increase over the remaining actuarially projected lives of the eligible recipients in Waterfall Class 1. If the Restoration Reserve Account satisfies the required funding level, then in the next Fiscal Year, actual restoration payments will be made to Waterfall Class 1 members in amounts equal to the benefit associated with each increment that have been fully funded in the Restoration Reserve Account. Once Waterfall Class 1 has sufficient

assets in the Restoration Reserve Account to fully fund and restore the 4.5% cut in their monthly benefits, and to the extent that additional assets in the Restoration Reserve Account remain and will fully fund at least ½% of the monthly benefit for each member of Waterfall Class 2 over their remaining actuarially projected lives, then Waterfall Class 2 members will receive pension restoration in minimum ½% benefit increments until an amount equal to the 4.5% cuts in their monthly benefits has been fully funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account remain and will fund at least a minimum ½% of the monthly benefit of each member in Waterfall Class 3 over their remaining actuarially projected lives, then each such member of Waterfall Class 3 shall receive a credit granting them a right upon retirement to receive pension restoration equal to the benefit increments that are fully funded. Restoration payments will be calculated and paid on a prospective basis only.

d. After the full 4.5% across the board pension cuts are restored for all three Waterfall Classes, and to the extent there are additional assets in the Restoration Reserve Account to fully fund COLA benefits over the actuarially-projected lives of the eligible recipient Waterfall Class, such assets will be used to fully fund and restore a portion of the COLA values that were eliminated as part of the Plan of Adjustment. COLA will be restored in minimum 10% COLA value increments up to 50% of the future COLA values for each member of Waterfall Class 1 (i.e., a 50% future COLA value will constitute a 1.25% simple COLA), then up to 50% of the future COLA values for each member of Waterfall Class 2, and then up to 50% of the future COLA values for each member of Waterfall Class 3 until all members of the three Waterfall Classes have had 50% of the value of their COLAs fully funded and restored. After 50% of the future values of COLA have been fully funded and restored, and to the extent there are additional assets in the Restoration Reserve Account for each of the three Waterfall Classes, then a second 50% COLA restoration will be made, first to members of Waterfall Class 1, then Waterfall Class 2, and then Waterfall Class 3. Classes will be restored in minimum 10% COLA value increments. Restoration payments will be calculated and paid on a prospective basis only.

e. If the amounts in the Restoration Reserve Account are sufficient to fully-fund the 4.5% across the board pension cuts for all three Waterfall Classes and 100% COLA restoration for all three Waterfall Classes, then any additional assets in the Restoration Reserve Account shall be used to increase the frozen accrued benefits of active and other Members whose Annuity Savings Fund accounts were diminished as part of the Annuity Savings Fund Recoupment (described in Section G-2), such that they receive treatment equal to the 20%/20% ceiling applied to retirees in pay status under the Plan of Adjustment. If after such pension restoration there are additional assets in the Restoration Reserve Account to fully

13-53846-swr  Doc 8657-1  Filed 05/07/21  Entered 05/07/21 00:28:39  Page 170 of
13-53846-tjt  Doc 8045  Filed 10/22/14  Entered 10/22/14 03:45:29  Page 191 of
309

fund benefit increments over their remaining actuarially projected lives, Waterfall Class 1 members will receive pension restoration in ½% benefit increments of the reductions to their monthly pension due to Annuity Savings Fund Recoupment, and once such pension benefits are restored, Waterfall Class 2 members will receive pension restoration in ½% benefit increments in connection with the reductions to their monthly pensions due to Annuity Savings Fund Recoupment. Restoration payments will be calculated and paid on a prospective basis only

f.    Once restoration payments to applicable retirees and restoration credits to active employees begin, as long as the Restoration Reserve Account continues to have assets sufficient to fund 100% of an incremental pension restoration amount for such Waterfall Class members for their actuarially projected lives, such restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments (over their actuarially projected lives), falls below 100% for the second or greater increment, the annual amounts to pay such second or other additional increment can continue until the Restoration Reserve Account lacks any assets to fund it. For example, assume a ½% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019, (i.e., a 1% pension increase). Assume further that in the following Fiscal Year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment of ½% would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid). For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

g.    In the event the Funded Level (not including the assets in the Restoration Reserve Account) falls below 71% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 71% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net investment returns for the Retirement System for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 70%) then restoration payments and credits in the following year will be modified in the following manner: (1) funds previously credited to the Restoration Reserve Account will be notionally transferred and credited to the Pension Reserve Account in sufficient amounts to restore the projected Funded Level in 2023 to 70%; (2) following such transfer, the remaining assets in the Restoration Reserve

Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph f.

h.    Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level as of 2023 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 71%.

(3)    *Restoration of Benefits from July 1, 2023 to June 30, 2033*.

a.    During this period, the Funding Target, the Restoration Target, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2033 Permanent Restoration Target
75%, or if greater, 1% more  than 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Reserve Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows.

13-53846-tjr   Doc 13757   Filed 05/07/21   Entered 05/07/21 00:28:39   Page 172 of
13-53846-swr   Doc 8045   Filed 06/30/21   Entered 06/30/21 03:49:29   Page 583 of
209

For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 at the then current investment return assumption which is assumed to be net of expenses (administrative and investment) and the applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL at market value over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the Funding Target set forth above as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded.

b.     To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Targets. To the extent that the City's (including for this purpose DWSD or a successor authority) actual contributions in any of the Fiscal Years 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.     Each year, in addition to the credit of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest equal to the net return on Retirement System investments, but capped at the then investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

d.     In connection with preparation of the actuarial report for Fiscal Year 2028, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, which shall be 75%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to

satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2028 has satisfied  the Permanent Restoration Target (75%), then the amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.  Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in paragraph a and otherwise in accordance with this Section G-4, notwithstanding whether the Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

e.     In connection with preparation of the annual actuarial valuation report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target for 2033, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension  Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.     Following receipt of the actuarial reports for 2028, and in the event that the projected Funded Level of the Retirement System as of 2033 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual normal course administrative expenses until 2033 equal to the average annual administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus

interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 71%.

(4) *Restoration of Benefits from July 1, 2033 to June 30, 2043.*

    a.    During this period, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2043 Permanent Restoration Target
75% ,or if greater, 1% more  than 2043 Restoration Target

2043 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining  whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

    b.    In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the amounts in the

Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable payments for the applicable Waterfall Class shall be permanently restored and shall no longer be variable.

(5)     *Modification of the Pension Restoration Program.*

If any time after July 1, 2026, the Investment Committee (by vote of 5 of its 7 members), or the Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement, such that the continued operation of the Pension Restoration Agreement without amendment will: (a) materially harm the long-term economic interests of the City, or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the restoration program, if as of that juncture (and for purposes of applying this subsection 5) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section G-4 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund the Retirement System's frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Pension Restoration Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor of the State of Michigan ("Governor") in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall

furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, inter alia, whether or in what manner to amend the Pension Restoration Agreement and this Section G-4.

## ARTICLE H.  MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM

### Sec. H-1.  Enforcement; Civil Action.

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, 1984 Detroit City Code or the terms of this Plan, may be brought by:

(1)     A Plan participant who is or may become eligible to receive benefit;

(2)     A beneficiary who is or may become eligible to receive a benefit;

(3)     A Plan fiduciary, including a Trustee;

(4)     The Finance Director, on behalf of the City as Plan sponsor.

### Sec. H-2.  Limitation of Other Statutes.

No other provision of law, charter, or ordinance, which provides pensions or retirement benefits wholly or partly at the City expense, exclusive of federal Social Security old-age and survivors' insurance benefits for City employees, their surviving spouses and other dependents, shall apply to Members, retirees or beneficiaries of the Retirement System, their surviving spouses or other dependents.

# **EXHIBIT 6-4**

## PARTICIPANT LOAN PROGRAM
### City of Detroit Deferred Compensation Plan

The City of Detroit Deferred Compensation Plan (the "Plan") provides that the Employer (the "Administrator") may, in the Administrator's sole discretion, make Plan loans to Participants. The Plan document requires that a written loan program be established which sets forth the rules and guidelines for making loans. The Administrator's decisions regarding the application or interpretations of this loan program are final and binding on Participants. The Administrator specifically reserves the right to amend these policies and procedures from time to time.

For purposes of this loan program, all terms not defined herein shall have the meanings ascribed to them in the Plan.

1. **Who is Responsible for the Participant Loan Program?** The Administrator is authorized to administer the Plan's loan program. All discretionary decisions concerning loans shall be made by the Administrator. The Administrator may make loans to Participants under the following circumstances: (a) loans shall be made available to all Participants on a reasonably equivalent basis; (b) loans shall bear a reasonable rate of interest; (c) loans shall be adequately secured; and (d) loans shall provide for periodic repayment over a reasonable period of time. No loan will be made from the Plan if it would constitute a prohibited transaction as defined in Internal Revenue Code §4975.

2. **How to Apply for a Loan.** All applications for loans shall be made by Participants to the Administrator in writing. A Participant's ability to make such application, either in writing or by electronic means, will be subject to the qualification guidelines adopted by the Administrator and as set forth in this loan program. All loan applications are subject to consideration by the Administrator in a timeframe commensurate with the form of application. In making application for a loan, a Participant may be required to provide such supporting information deemed necessary by the Administrator. This may include a financial statement, tax returns and such other financial information, which the Administrator may consider necessary and appropriate to determine whether a loan should be granted.

3. **Basis for Loan Approval.** The Administrator, in making a determination as to whether a Participant qualifies for a loan, may consider, in a uniform and nondiscriminatory manner, such criteria as a commercial lender of funds would apply in like circumstances with respect to the Participant and any other reasonable factors it deems relevant. Such criteria may include, but need not be limited to, the creditworthiness of the Participant and his or her general ability to repay the loan, the period of time the Participant has been employed by the Employer, whether adequate security has been provided for the loan, whether the Participant has defaulted on a previous loan or who has had a previous loan declared to be a deemed distribution on account of failure to timely repay a loan in accordance with its terms. The Administrator may, in its discretion, require as a condition to the granting of the loan, that the Participant provide to the Employer an election for direct, after-tax payroll withholding for the loan repayments. Loans repayments will be repaid by ACH until he City's payroll system is administratively able to allow loan repayment by payroll deductions.

4. **Limitations on the types and amount of Loans.** With regard to any loan made pursuant to this program, the following rule(s) and limitation(s) shall apply, in addition to such other requirements set forth in the Plan:

    i. All loans made pursuant to this program shall be considered a directed investment from the Account Balance of the Participant maintained under the Plan. As such, all payments of principal and interest made by the Participant shall be credited only to the Account Balance of such Participant.

    ii. The maximum amount of a loan shall be the lesser of (a) 50% of the Participant's vested account balance; or (b) $50,000, reduced by the excess of the highest outstanding balance of loans from the Plan to the Participant during the one year period ending on the day before the date on which such loan was made, over the outstanding balance of loans from the Plan to the Participant on the date on which such loan was made, or, if less, one-half (½) the Participant's account balance under this Plan and all other plans of the Employer.

    iii. The minimum loan term is 12 months.

    iv. Loans are required to provide that the amount of such loan, plus interest, will be amortized over the repayment period with payments to be made not less frequently than quarterly over a period not to exceed five (5) years. However, if the loan proceeds are used to acquire a principal residence of the Participant, the loan repayment period may be for a period up to thirty (30) years. This means that payments will be level throughout the repayment period, and each payment will include both principal and interest. With the consent of the Administrator, the Participant may repay the outstanding principal amount with interest to the date of repayment at any time prior to the loan due date, but may not make a partial prepayment, provided the loan obligation has not been treated as a deemed distribution by the Administrator.

    v. Reasonable and necessary fees and expenses incurred by the Plan in the origination and ongoing maintenance of the loan may be charged against the Participant's Account Balance.

    vi. Only active Participants are members of the Detroit Police Lieutenants & Sergeants Association (DLSA) are entitled to maintain participant loans. This means that if a Participant who is not a member of DLSA and a member of the DLSA who is not currently employed by the Employer is not entitled to initiate a new Participant loan or continue to maintain an existing Participant loan.

    vii. No loan in an amount less than $1,000 shall be granted to any eligible Participant.

    viii. A Participant may only have 1 loan(s) outstanding at any time.

5. **Interest.** Any loan granted under this program shall bear a reasonable rate of interest. In determining such rate of interest, the Plan shall require a rate of return commensurate with the prevailing interest rate charged on similar commercial loans under like circumstances by

persons in the business of lending money. Such prevailing interest rate standard shall permit the Administrator to consider factors pertaining to the opportunity for gain and risk of loss that a professional lender would consider on a similar arms' length transaction, such as the creditworthiness of the Participant and the security given for the loan. Therefore, in establishing the rate of interest, the Administrator shall conduct a reasonable and prudent inquiry with professional lenders in the same geographic locale where the Participant and Employer reside to determine such prevailing interest rate for loans under like circumstances. The Interest Rate for loans from the City of Detroit will be Prime + 1%.

6. **Collateral.** The Plan shall require that adequate security be provided by the Participant before a loan is granted. For this purpose, the Plan shall consider a Participant's interest under the Plan to be adequate security. However, in no event shall more than 50% of a Participant's interest in the Plan (determined immediately after the origination of the loan) be used as security for the loan.

7. **Default Procedures.** Generally, a default occurs upon the failure of a Participant to timely remit payments under the loan when due. The Administrator will consider a loan in default no later than the last business day of the calendar quarter following the calendar quarter in which the Participant failed to timely remit a scheduled payment (the cure period). The Administrator will also consider a loan in default if the Participant makes or furnishes any false representation or statement to the Plan.

8. **Consequences of Default.** At the time of such default, the Participant will have the opportunity to repay the loan, resume current status of the loan by paying any missed payment(s) plus accrued interest or, if a distribution is available under the terms of the Plan, request a distribution of the note. Any loans that in arrears will be made current when the City's payroll system is able to allow repayment by payroll deduction. The Administrator will treat a loan that has been defaulted upon and not timely corrected during the cure period as a deemed distribution from the Plan. In such event, the outstanding balance of the loan plus accrued interest shall become taxable to the Participant as if it had been distributed and reported on a Form 1099-R issued to the Participant. Pending final disposition of the note, the Participant remains obligated for any unpaid principal and accrued interest. If repayment of a defaulted loan had been made by method other than payroll deduction, then method of loan repayment for any subsequent loans will be made by payroll deduction (pursuant to Treasury Regulation Section 1.72(p)-1 Q&A 19).

If the loan remains in default at the time the Participant's employment with the Employer terminates for any reason, the Administrator will offset the Participant's Account Balance by the outstanding balance of the loan to the extent permitted by law. The Administrator will treat the note as repaid to the extent of any permissible offset. With the consent of the Administrator, the Participant may elect to repay the outstanding principal with all accrued interest to the date of repayment as a lump sum.

In the event a loan is outstanding on the date of a Participant's death, his or her estate shall be his or her Beneficiary as to the portion of his or her interest in the Plan invested in such loan. At the time of such default, the Participant's estate will not have the opportunity to repay the loan. In such event, the outstanding balance of the loan note shall be foreclosed and

distributed from the Plan, and become taxable to the Participant's estate and reported on a Form 1099-R issued to the Participant's estate.

9. Notwithstanding the foregoing, Participants will be allowed to suspend payments for a bona fide leave of absence and the loan will not default during such leave to the extent provided below:

The Plan may suspend the obligation to repay a loan made to a Participant for any part of a period during which the Participant is performing service in the uniformed services (as defined in 38 U.S.C. chapter 43), whether or not qualified military service, even if the suspension exceeds one year and even if the term of the loan is extended. However, to avoid a default, the loan repayments shall resume upon the completion of such period of military service and the loan shall be repaid thereafter by amortization in substantially level installments over a period that ends not later than the latest permissible term of the loan plus the period of military service. Suspended loan payments may also be allowed in certain other circumstances or for reasons provided for in applicable IRS guidance, as issued from time to time.

The Plan may suspend the obligation to repay a loan made to a Participant for a period during which the Participant is on a bona fide leave of absence (other than for military service) either without pay or at a rate of pay (after applicable employment withholdings) that is less than the amount of the installment payments required under the terms of the loan. Such period may not exceed one year. Loan interest accrued during such period must be paid no later than the latest permissible term of the loan. Installment payments due after the end of the leave period must not be less than the installment payments required under the terms of the original loan. Repayment of suspended payments may be made by either increasing the amount of installment payments upon the Participant's return to work or by making a lump sum payment for the suspended payments at any time prior to the latest permissible term of the loan.

10. Upon satisfaction of the criteria established for granting a loan, the Administrator may grant the Plan loan request. The Administrator shall then require that the Participant execute all documents necessary to establish the Plan loan, including a promissory note and payroll deduction agreement, a truth-in-lending disclosure and such other documents, which will provide the Plan with adequate security.

Adopted this _28th_ day of _November_ , 20 _18_ .

Employer (signature) _____

Name: (please print) _Hakim W. Berry_

TITLE: _Director of Labor Relations_

# AMENDMENT TO
## ADMINISTRATIVE SERVICES AGREEMENT

## WITNESSETH

**WHEREAS,** Hartford Life Insurance Company, a Connecticut corporation (hereinafter "**Hartford**") entered into an Administrative Services Agreement (hereinafter "**Agreement**") effective **November 21, 1975,** with **City of Detroit** (hereinafter "**Plan Sponsor**") to provide certain nondiscretionary recordkeeping, reporting and processing services to the **City of Detroit Deferred Compensation Plan** (hereinafter "**Plan**") on behalf of the Plan Sponsor; and

**WHEREAS,** effective January 1, 2013, Massachusetts Mutual Life Insurance Company (hereinafter referred to as "**MassMutual**") has been appointed by Hartford Life to act as its Agent;

**WHEREAS,** MassMutual, in its role as Agent for Hartford Life and the Plan Sponsor desire and agree to amend the Agreement;

**NOW THEREFORE,** effective **December 1, 2018,** the Agreement is hereby amended as set forth with the addition of Exhibit A, which forms a part of this Amendment. The terms of the Agreement shall apply herein except as may be otherwise provided by the terms of this Agreement.

### "Administrative Services Agreement

### Exhibit A
### Addition of Participant Loans

The Plan Sponsor shall notify Hartford in writing of each Participant the Plan Sponsor has determined is entitled to receive a loan under the terms of the Plan. Loan requests will be processed within one business day following receipt by Hartford. The loan agreement and promissory note outlining the terms of the loan will be mailed with the distribution by Hartford within three business days following trade settlement. Hartford will prepare an amortization schedule for the loan based upon the data provided, a copy of which will be sent to the Plan Sponsor. Loans from a Participant's Account will be accounted for separately and repayments of the loans will be allocated to the Participant's Account in accordance with the instructions filed with Hartford by the Plan Sponsor. Loan repayments will be submitted to, or received by, Hartford using one or more of the administrative methods offered by Hartford and selected in writing by the Plan Sponsor. In the event that a repayment is less than or exceeds the amount expected under the amortization schedule on file at The Hartford, the payment will be applied to the next payment(s) due under such schedule without reamortization. Hartford will provide the Plan Sponsor a listing of Participant loans that are in arrears.

If Hartford processed and distributed such loan, and if Hartford has no record of receiving any loan repayment during the quarter within which the loan repayment is due and none during the quarter following that quarter (the "subsequent quarter"), then the Plan Sponsor agrees Hartford shall: i) record the loan as "defaulted" (and/or deemed distributed) as of the last date of the subsequent quarter on its administrative recordkeeping system and ii) notify the Plan Sponsor. Notification will be provided as soon as reasonably and administratively practical after the subsequent quarter via a report mailed to the Plan Sponsor or posted to the internet site made available to Plan Sponsor under this Agreement ("loan report(s)"). Plan Sponsor agrees it, the Plan Administrator, or its designee, and not Hartford, has the final authority to determine whether or not, and when, any loan is in default under the terms of the Plan and agrees to promptly review all such reports and notify Hartford in writing of any loan it determines is not in default and/or not deemed distributed. Unless Plan Sponsor so notifies Hartford, the loan shall remain defaulted and deemed distributed on Hartford's recordkeeping system and Hartford will prepare and file the appropriate federal tax reporting forms. Hartford is not responsible for any recordkeeping or tax reporting for any loans the records of which have not been transferred to, or record kept by, Hartford.

For loans in default, where Hartford processed and distributed such loan, Hartford will prepare and file the appropriate federal tax reporting form."

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be signed.

For the **City of Detroit, as** Plan Sponsor:

By: _____   Date: _11/28/18_____

Name: _Hakim W. Berry_____   Title: _Director, Labor Relations_

For Hartford Life Insurance Company
By Massachusetts Mutual Life Insurance Company
As Its Administrative Services Provider:

November 26, 2018

By: Tina Wilson
    Senior Vice President

# CITY OF DETROIT DEFERRED COMPENSATION PLAN

## Effective Date of This Document December 1, 2018

Neither MassMutual nor any of its employees can provide legal or tax advice in connection with the execution of this specimen document. Prior to execution of this document, you should consult with your legal or tax advisor on whether this document is appropriate for your plan.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

# TABLE OF CONTENTS

PREAMBLE .................................................................................................................. 1

SECTION I DEFINITIONS ...................................................................................... 2

    1.1    Plan Definitions .................................................................................... 2

SECTION II PARTICIPATION AND CONTRIBUTIONS ...................................... 6

    2.1    Eligibility.............................................................................................6
    2.2    Election................................................................................................6
    2.3    Commencement of Participation .......................................................6
    2.4    Amendment of Annual Deferral Election, Investment Direction, or Beneficiary Designation.....................................................................7
    2.5    Information Provided by the Participant .........................................7
    2.6    Contributions Made Promptly ..........................................................7
    2.7    Employer Contributions ....................................................................7
    2.8    Leave of Absence ................................................................................7
    2.9    Disability ..............................................................................................7
    2.10   Protection of Persons Who Serve in a Uniformed Service ..............8
    2.11   Corrective Measures...........................................................................8

SECTION III LIMITATIONS ON AMOUNTS DEFERRED ................................... 9

    3.1    Basic Annual Limitation ...................................................................9
    3.2    Age 50 Catch-up Annual Deferral Contributions ...........................9
    3.3    Special Section 457 Catch-up Limitation.........................................9
    3.4    Special Rules......................................................................................10
    3.5    Correction of Excess Deferrals .......................................................11

SECTION IV INVESTMENT RESPONSIBILITIES...............................................12

    4.1    Investment of Deferred Amount.....................................................12
    4.2    Investment Election for Future Contributions...............................12
    4.3    Investment Changes for an Existing Account Balance...................12
    4.4    Investment Responsibility ...............................................................12
    4.5    Default Investment Fund..................................................................12
    4.6    Statements.........................................................................................13

SECTION V LOANS ...............................................................................................14

    5.1    Loans .................................................................................................14
    5.2    Maximum Loan Amount..................................................................14
    5.3    Terms of Loan ..................................................................................14
    5.4    Security for Loan; Default ...............................................................16
    5.5    Repayment ........................................................................................16

SECTION VI DISTRIBUTIONS ............................................................................18

    6.1    Distributions from the Plan.............................................................18
    6.2    Benefit Distributions Upon Severance from Employment...............18

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

| 6.3 | Distributions on Account of Participant's Death | 19 |
| 6.4 | Distribution of Small Account Balances Without Participant's Consent | 19 |
| 6.5 | Forms of Distribution | 20 |
| 6.6 | Minimum Distribution Requirements | 20 |
| 6.7 | Payments to Minors and Incompetents | 26 |
| 6.8 | Procedure When Distributee Cannot Be Located | 26 |
| 6.9 | Direct Rollover | 27 |
| 6.10 | Inservice Distributions | 28 |
| 6.11 | Qualified Distributions for Retired Public Safety Officers | 30 |

**SECTION VII ROLLOVERS AND PLAN TRANSFERS** ... 31

| 7.1 | Eligible Rollover Contributions to the Plan | 31 |
| 7.2 | Plan-to-Plan Transfers to the Plan | 31 |
| 7.3 | Plan-to-Plan Transfers from the Plan | 32 |
| 7.4 | Permissive Service Credit Transfers | 33 |

**SECTION VIII BENEFICIARY** ... 34

| 8.1 | Beneficiary Designation | 34 |

**SECTION IX ADMINISTRATION AND ACCOUNTING** ... 35

| 9.1 | Administrator | 35 |
| 9.2 | Administrative Costs | 35 |
| 9.3 | Paperless Administration | 35 |

**SECTION X AMENDMENTS** ... 37

| 10.1 | Amendment | 37 |
| 10.2 | Conformation | 37 |
| 10.3 | Plan Termination | 37 |

**SECTION XI TRUST FUND** ... 38

| 11.1 | Trust Fund | 38 |

**SECTION XII MISCELLANEOUS** ... 39

| 12.1 | Non-Assignability | 39 |
| 12.2 | Domestic Relation Orders | 39 |
| 12.3 | IRS Levy | 39 |
| 12.4 | Mistaken Contributions | 39 |
| 12.5 | Employment | 40 |
| 12.6 | Successors and Assigns | 40 |
| 12.7 | Written Notice | 40 |
| 12.8 | Total Agreement | 40 |
| 12.9 | Gender | 40 |
| 12.10 | Controlling Law | 40 |

**SECTION XIII SUPERSEDING PROVISIONS** ... 41

**EMPLOYER ADOPTION PAGE** ... 44

ii

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt   Doc 13575   Filed 05/27/22   Entered 05/27/22 09:29:43   Page 188 of 268

# 457(b) PLAN DOCUMENT

## DEFERRED COMPENSATION PLAN

## PREAMBLE

### Adoption of Plan

The City of Detroit Deferred Compensation Plan (hereinafter "the Plan"), an eligible deferred compensation plan within the meaning of Section 457(b) of the Internal Revenue Code of 1986, as amended (hereinafter the "Code"), of a State or local government as described in Code Section 457(e)(1)(A), adopted by City of Detroit (hereinafter the "Employer") effective December 1, 2018.

### Purpose of Plan

The primary purpose of this Plan is to permit Employees of the Employer to enter into an agreement which will provide for deferral of payment of a portion of his or her current compensation until death, retirement, severance from employment, or other event, in accordance with the provisions of the Code Section 457(b), with other applicable provisions of the Code, and in accordance with the General Statutes of the State.

### Status of Plan

It is intended that the Plan shall qualify as an eligible deferred compensation plan within the meaning of Code Section 457(b) sponsored by an eligible employer within the meaning of Code Section 457(e)(1)(A), i.e., a State, political subdivision of a State, and agency or instrumentality of a State or political subdivision of a State.

### Tax Consequences of Plan

The Employer does not and cannot represent or guarantee that any particular federal or State income, payroll, or other tax consequence will occur by reason of participation in this Plan. A Participant should consult with his or her own counsel or other representative regarding all tax or other consequences of participation in this Plan.

1

## 1.1 Plan Definitions

For purposes of this Plan, the following words and phrases have the meaning set forth below, unless a different meaning is plainly required by the context:

An **"Account Balance"** means the bookkeeping account maintained with respect to each Participant which reflects the value of the deferred Compensation credited to the Participant, including the Participant's Annual Deferrals, the earnings or loss of the Trust Fund (net of Trust Fund expenses) allocable to the Participant, any transfers for the Participant's benefit, and any distribution made to the Participant or the Participant's Beneficiary. If a Participant has more than one Beneficiary at the time of the Participant's death, then a separate Account Balance shall be maintained for each Beneficiary. The Account Balance includes any account established under Section VII for rollover contributions and plan-to-plan transfers made for a Participant, the account established for a Beneficiary after a Participant's death, and any account or accounts established for an alternate payee (as defined in Code Section 414(p)(8)).

The **"Administrator"** means the Employer. The term Administrator includes any person or persons, committee, or organization appointed by the Employer to administer the Plan.

An **"Annual Deferral"** means the amount of Compensation deferred in any calendar year.

The **"Beneficiary"** of a Participant means the person or persons (or, if none, the Participant's estate) who is entitled under the provisions of the Plan to receive a distribution in the event the Participant dies before receiving distribution of his or her entire interest under the Plan.

The **"Code"** means the Internal Revenue Code of 1986, as now in effect or as hereafter amended from time to time. Reference to a Code Section includes such section and any comparable section or sections of any future legislation that amends, supplements, or supersedes such section.

The **"Compensation"** of a Participant means all cash compensation for services to the Employer, including salary, wages, fees, commissions, bonuses, and overtime pay, that is includible in the Employee's gross income for the calendar year, including, as applicable, compensation attributable to services as an independent contractor, plus amounts that would be cash compensation for services to the Employer includible in the Employee's gross income for the calendar year but for a compensation reduction election under Code Section 125, 132(f), 401(k), 403(b), or 457(b) (including an election to defer compensation under Section II).

Any payments described below made to a Participant after a Severance from Employment shall qualify as Compensation for purposes of the Plan, but only if the payments are made by the later of (a) the end of the calendar year in which the Severance from Employment occurred or (b) within 2 ½ months of such Severance from Employment:

2

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 190 of
268

(a)     Payments that, absent a Severance from Employment, would have been paid to the Participant while the Participant continued in employment with the Employer, but only if such payments constitute regular compensation for services during the Participant's regular working hours, compensation for services outside the Participant's regular working hours (such as overtime or a shift differential), commissions, bonuses or other similar compensation.

(b)     Payments for accrued bona fide sick, vacation or other leave, but only if the Participant would have been able to use the leave if employment had continued.

Any payment that is not described above shall not be considered Compensation if it is paid after the date of the Participant's Severance from Employment, even if it is paid within 2 ½ months of such date. Thus, for example, Compensation does not include severance pay.

For years beginning after December 31, 2008, (a) a Participant receiving a differential wage payment, as defined by Code §3401(h)(2), by reason of qualified military service (within the meaning of Code Section 414(u)), is treated as an Employee of the Employer making the payment and (b) the differential wage payment is treated as Compensation.

An **"Employee"** means each natural person who is employed by the Employer as a common law employee on a full time basis or on a part-time basis and any employee in an elected or appointed position; provided, however, that the term Employee shall not include a leased employee or any employee who is included in a unit of employees covered by a collective bargaining agreement that does not specifically provide for participation in the Plan.

Any individual who is not treated by the Employer as a common law employee of the Employer shall be excluded from Plan participation even if a court or administrative agency determines that such individual is a common law employee of the Employer, unless the Employer has included the individual in Plan participation as an independent contractor.

An **"Employer"** means the eligible employer (within the meaning of Code Section 457(e)(1)) that has adopted the Plan. In the case of an eligible employer that is an agency or instrumentality of a political subdivision of a State within the meaning of Code Section 457(e)(1)(A), the term Employer shall include any other agency or instrumentality of the same political subdivision that has adopted the Plan.

**"Includible Compensation"** means, with respect to a taxable year, the Participant's compensation as defined in Code Section 415(c)(3) and the regulations thereunder, for services performed for the Employer. The amount of Includible Compensation is determined without regard to any community property laws.

**"Normal Retirement Age"** means age 70 ½, unless the Participant has elected an alternate Normal Retirement Age and delivered such election to the Administrator. Such date shall be no earlier than the earliest date that the Participant will become eligible to retire and receive, under the basic defined benefit pension plan of the Employer (or a money purchase plan in which the Participant also participates if the Participant is not eligible to participate in a defined benefit plan) immediate retirement benefits without actuarial or similar reduction because of retirement

3

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 191 of 268

before some later specified age, but not greater than age 70 ½. If a Participant continues employment after attaining age 70 ½, not having previously elected an alternate Normal Retirement Age, the Participant's alternate Normal Retirement Age shall not be later than the mandatory retirement age, if any, established by the Employer, or any age at which the Participant actually has a Severance from Employment if the Employer has no mandatory retirement age. If the Participant will not become eligible to receive benefits under a basic defined benefit pension plan (or money purchase pension plan, if applicable) maintained by the Employer, the Participant's alternate Normal Retirement Age may not be earlier than age 65 and may not be later than age 70 ½.

In the event a Participant is a qualified police or firefighter (as defined under Code Section 415(b)(2)(H)(ii)(I)) Normal Retirement Age means age 70 ½, unless the Participant has elected an alternate Normal Retirement Age and delivered such election to the Administrator. Such date shall be no earlier than the earliest date that the Participant will become eligible to retire and receive, under the basic defined benefit pension plan of the Employer (or a money purchase plan in which the Participant also participates if the Participant is not eligible to participate in a defined benefit plan), immediate retirement benefits without actuarial or similar reduction because of retirement before some later specified age which may not be earlier than age 40 and may not be later than age 70 ½.

A Participant's Normal Retirement Age must be the same as his or her normal retirement age under any other eligible deferred compensation plan or plans sponsored by the Employer. The designation of a Normal Retirement Age under the Plan does not compel retirement with the Employer.

The **"Participant"** means an individual who is currently deferring Compensation, or who has previously deferred Compensation under the Plan by salary reduction and who has not received a distribution of his or her entire benefit under the Plan. Only individuals who perform services for the Employer as an Employee may defer Compensation under the Plan.

**"Plan Year"** means the calendar year.

**"Roth Contributions"** means the amount of any Annual Deferral elected by a Participant that is irrevocably designated by the Participant as being made pursuant to, and intended to comply with, Code Section 402A. Roth Contributions are includable in the Participant's taxable gross income at the time they are contributed to the Plan and have been irrevocably designated as Roth Annual Deferrals by the Participant in their deferral agreement. The Administrator shall establish and maintain for the Employee a separate account for any Roth Contributions made to the Plan, to which only Roth Contributions and the income attributable thereto shall be allocated. Roth Contributions also includes any contributions made to another eligible retirement plan that are rolled over to the Plan in accordance with the provisions of Section 7.1 and that the Participant designated as Roth contributions at the time they were contributed to such other plan.

**"Severance from Employment"** means the date that the Employee dies, retires, or otherwise has a severance from employment with the Employer, as determined by the Administrator (and taking into account guidance issued under the Code). Solely for the purpose of determining whether the Participant is entitled to receive a distribution of his or her Account Balance

4

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 192 of
268

pursuant to Section 6.2, a Participant shall be treated as having incurred a severance from employment during any period the Participant is performing service in the uniformed services (as defined in chapter 43 of title 38, United States Code) while on active duty for a period of more than 30 days.

The **"State"** means the State that is the Employer or of which the Employer is a political subdivision, and any agency, or instrumentality, including any agency or instrumentality of a political subdivision of the State, or the State in which the Employer is located.

The **"Trust Fund"** means the trust fund created under and subject to a trust agreement or a custodial account or contract described in Code Section 401(f) held on behalf of the Plan.

The **"Valuation Date"** means each business day.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## SECTION II
## PARTICIPATION AND CONTRIBUTIONS

### 2.1    Eligibility

Each Employee shall be eligible to participate in the Plan and defer Compensation hereunder immediately upon becoming employed by the Employer.

### 2.2    Election

An Employee may elect to become a Participant by executing an election to defer a portion of his or her Compensation (and to have that amount contributed as an Annual Deferral on his or her behalf) and filing such election with the Administrator. This participation election shall be made on the deferral agreement provided by the Administrator under which the Employee agrees to be bound by all the terms and conditions of the Plan. Any such election shall remain in effect until a new election is filed. The Administrator may establish a minimum deferral amount, and may change such minimums from time to time. The deferral agreement shall also include designation of investment funds and a designation of Beneficiary. The deferral agreement may also include a Participant's designation that all or a portion of the Annual Deferral elected by the Participant shall be treated as Roth Contributions.

(a)    **Special Deferral Election of Sick, Vacation, or Back Pay:**  A Participant who has not had a Severance from Employment may authorize a special election to defer accumulated sick pay, accumulated vacation pay, and back pay for any calendar month if an election to defer is entered into before the beginning of the month in which the amounts would otherwise be paid or made available and the Participant is an Employee on the date the amounts would otherwise be paid or made available. For this purpose, Compensation that would otherwise be paid for a payroll period that begins before Severance from Employment is treated as an amount that would otherwise be paid or made available before an Employee has a Severance from Employment. In addition, a Participant who is a former Employee may authorize a special election to defer accumulated sick pay, accumulated vacation pay, and back pay that is paid by the later of 2 ½ months following the date of the Participant's Severance from Employment or the end of the calendar year in which the Severance from Employment occurred, provided that the special election to defer is entered into before the amount is currently available.

### 2.3    Commencement of Participation

An Employee shall become a Participant as soon as administratively practicable following the date the Employee files an election pursuant to Section 2.2. Such election shall become effective no later than the calendar month following the month in which the election is made. A new Employee may defer compensation payable in the calendar month during which the Participant first becomes an Employee if an agreement providing for the deferral is entered into on or before the first day on which the Participant performs services for the Employer.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## 2.4 Amendment of Annual Deferral Election, Investment Direction, or Beneficiary Designation

Subject to other provisions of the Plan, a Participant may at any time revise his or her participation election, including a change of the amount of his or her Annual Deferrals, his or her investment direction and his or her designated Beneficiary. The revised participation election may also include a change in the Participant's designation of the amount of the Annual Deferral elected by the Participant that is to be treated as Roth Contributions. Unless the election specifies a later effective date, a change in the amount of the Annual Deferrals shall take effect as of the first day of the next following month or as soon as administratively practicable if later. A change in the investment direction shall take effect as of the date provided by the Administrator on a uniform basis for all Employees. A change in the Beneficiary designation shall take effect when the election is accepted by the Administrator.

## 2.5 Information Provided by the Participant

Each Employee enrolling in the Plan should provide to the Administrator at the time of initial enrollment, and later if there are any changes, any information necessary or advisable for the Administrator to administer the plan, including, without limitation, whether the Employee is a participant in any other eligible plan under Code Section 457(b).

## 2.6 Contributions Made Promptly

Annual Deferrals by the Participant under the Plan shall be transferred to the Trust Fund within a period that is not longer than is reasonable for the proper administration of the Participant's Account Balance. For this purpose, Annual Deferrals shall be treated as contributed within a period that is not longer than is reasonable for the proper administration if the contribution is made to the Trust Fund within 15 business days following the end of the month in which the amount would otherwise have been paid to the Participant, or earlier if required by law.

## 2.7 Employer Contributions

Nothing in this Plan prohibits the Employer from making annual deferrals to the Account Balance of a Participant on a non-elective basis, subject to the Participant's contribution limits in Section III.

## 2.8 Leave of Absence

Unless an election is otherwise revised, if a Participant is absent from work by leave of absence, Annual Deferrals under the Plan shall continue to the extent that Compensation continues.

## 2.9 Disability

A disabled Participant (as determined by the Administrator) may elect Annual Deferrals during any portion of the period of his or her disability to the extent that he or she has actual Compensation (not imputed Compensation and not disability benefits) from which to make contributions to the Plan and has not had a Severance from Employment.

7

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## 2.10    Protection of Persons Who Serve in a Uniformed Service

An Employee whose employment is interrupted by qualified military service under Code Section 414(u) or who is on a leave of absence for qualified military service under Code Section 414(u) may elect to make additional Annual Deferrals upon resumption of employment with the Employer equal to the maximum Annual Deferrals that the Employee could have elected during that period if the Employee's employment with the Employer had continued (at the same level of Compensation) without the interruption or leave, reduced by the Annual Deferrals, if any, actually made for the Employee during the period of the interruption or leave. This right applies for five years following the resumption of employment (or, if sooner, for a period equal to three times the period of the interruption or leave).

A reemployed Employee shall also be entitled to an allocation of any additional Employer Contributions, if applicable, that such Employee would have received under the Plan had the Employee continued to be employed as an eligible Employee during the period of qualified military service. Such restorative Employer Contributions (without interest), if applicable, shall be remitted by the Employer to the Plan on behalf of the Employee within 90 days after the date of the Employee's reemployment or, if later, as of the date the contributions are otherwise due for the year in which the applicable qualified military service was performed.

## 2.11    Corrective Measures

In the event that an otherwise eligible Employee is erroneously omitted from Plan participation, or an otherwise ineligible individual is erroneously included in the Plan, the Employer shall take such corrective measures as may be permitted by applicable law. Such measures may include, in the case of an erroneously omitted Employee, contributions made by the Employer to the Plan on behalf of such Employee equal to the missed deferral opportunity, subject to the Participant's contribution limits in Section III, and, in the case of an erroneously included individual, a payment by the Employer to such individual of additional compensation in an amount equal to the amount of the individual's elective deferrals under the Plan.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## SECTION III
## LIMITATIONS ON AMOUNTS DEFERRED

**3.1    Basic Annual Limitation**

(a)    The maximum amount of the Annual Deferral and, if applicable, Employer Contributions under the Plan for any calendar year shall not exceed the lesser of:

   (i)    The "applicable dollar amount" (as defined in paragraph (b) below); or

   (ii)   The Participant's Includible Compensation for the calendar year.

(b)    The "applicable dollar amount" means the amount established under Code Section 457(e)(15), as indexed, and in accordance with Section 3.4(a).

(c)    Rollover amounts received by the Plan under Treasury Regulation Section 1.457-10(e) and any plan-to-plan transfer into the Plan made pursuant to Section 7.2 shall not be applied against the Annual Deferral limit.

**3.2    Age 50 Catch-up Annual Deferral Contributions**

A Participant who will attain age 50 or more by the end of a calendar year is permitted to elect an additional amount of Annual Deferral for the calendar year, up to the maximum age 50 catch-up Annual Deferral limit under §414(v)(2), as indexed.

The amount of the age 50 catch-up Annual Deferral for any calendar year cannot exceed the amount of the Participant's Compensation, reduced by the amount of the elective deferred compensation, or other elective deferrals, made by the Participant under the Plan and in accordance with Section 3.4(a).

The age 50 catch-up Annual Deferral limit is not available to a Participant for any calendar year for which the Special Section 457 Catch-up Limitation described in Section 3.3 is available and applied.

**3.3    Special Section 457 Catch-up Limitation**

Notwithstanding the provisions of Sections 3.1 and 3.2, with respect to a year that is one of a Participant's last three (3) calendar years ending before the year in which the Participant attains Normal Retirement Age and the amount determined under this Section 3.3 exceeds the amount computed under Sections 3.1 and 3.2, then the Annual Deferral limit under this Section 3.3 shall be the lesser of:

(a)    An amount equal to two (2) times the Section 3.1 Applicable Dollar Amount for such year; or

(b)    The sum of:

9

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

(i)    An amount equal to (A) the aggregate Section 3.1 limit for the current year plus each prior calendar year beginning after December 31, 2001, during which the Participant was an Employee under the Plan, minus (B) the aggregate amount of Compensation that the Participant deferred under the Plan during such years, plus

(ii)    An amount equal to (A) the aggregate limit referred to in Code Section 457(b)(2) for each prior calendar year beginning after December 31, 1978, and before January 1, 2002, during which the Participant was an Employee (determined without regard to Sections 3.2 and 3.3), minus (B) the aggregate contributions to Pre-2002 Coordination Plans (as defined in Section 3.4(c)) made by or on behalf of the Participant for such years.

However, in no event can the deferred amount be more than the Participant's Compensation for the year.

**3.4    Special Rules**

For purposes of this Section III, the following rules shall apply:

(a)    <u>Participant Covered By More Than One Eligible Plan</u>. If the Participant is or has been a participant in one or more other eligible plans within the meaning of Code Section 457(b), then this Plan and all such other plans shall be considered as one plan for purposes of applying the foregoing limitations of this Section III. For this purpose, the Administrator shall take into account any other such eligible plan maintained by the Employer and shall also take into account any other such eligible plan for which the Administrator receives from the Participant sufficient information concerning his or her participation in such other plan.

(b)    <u>Pre-Participation Years</u>. In applying Section 3.3, a year shall be taken into account only if (i) the Participant was eligible to participate in the Plan during all or a portion of the year and (ii) Compensation deferred, if any, under the Plan during the year was subject to the Basic Annual Limitation described in Section 3.1 or any other plan ceiling required by Code Section 457(b).

(c)    <u>Pre-2002 Coordination Years</u>. For purposes of Section 3.3(b)(ii)(B), "contributions to Pre-2002 Coordination Plans" means any employer contribution, salary reduction or elective contribution under any other eligible Code Section 457(b) plan, or a salary reduction or elective contribution under any Code Section 401(k) qualified cash or deferred arrangement, Code Section 402(h)(1)(B) simplified employee pension (SARSEP), Code Section 403(b) annuity contract, and Code Section 408(p) simple retirement account, or under any plan for which a deduction is allowed because of a contribution to an organization described in Code Section 501(c)(18), including plans, arrangements or accounts maintained by the Employer or any employer for whom the Participant performed services. However, the contributions for any calendar year are only taken into account for purposes of Section 3.3(b)(ii)(B) to the extent that the total of such contributions does not exceed the aggregate limit referred to in Code Section 457(b)(2) for that year.

10

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 198 of 268

(d) <u>Disregard Excess Deferral</u>. For purposes of Sections 3.1, 3.2, and 3.3, an individual is treated as not having deferred compensation under a plan for a prior taxable year if excess deferrals under the plan are distributed, as described in Section 3.5. To the extent that the combined deferrals for pre-2002 years exceeded the maximum deferral limitations, the amount is treated as an excess deferral for those prior years.

## 3.5    Correction of Excess Deferrals

If the Annual Deferral on behalf of a Participant for any calendar year exceeds the limitations described above, or the Annual Deferral on behalf of a Participant for any calendar year exceeds the limitations described above when combined with other amounts deferred by the Participant under another eligible deferred compensation plan under Code Section 457(b) for which the Participant provides information that is accepted by the Administrator, then the Annual Deferral, to the extent in excess of the applicable limitation (adjusted for any income or loss in value, if any, allocable thereto), shall be distributed to the Participant as soon as administratively practicable after the Administrator determines that the amount is an excess deferral. If a Participant to whom distribution must be made in accordance with the preceding sentence has made Roth Contributions for the year, the amount distributed as an excess deferral shall be made first from pre-tax Annual Deferrals, then from Roth Contributions for the year unless otherwise specified.

11

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 199 of 268

## SECTION IV
## INVESTMENT RESPONSIBILITIES

### 4.1    Investment of Deferred Amount

Each Participant or Beneficiary shall direct the investment of amounts held in his or her Account Balance under the Plan among the investment options of the Trust Fund. The investment of amounts segregated on behalf of an alternate payee pursuant to a Plan approved domestic relations order (as defined under Code Section 414(p)) may be directed by such alternate payee to the extent provided in such order. In the absence of such direction, such amounts shall be invested in the same manner as they were immediately before such segregation was made on account of such order. Each Account Balance shall share in any gains or losses of the investment(s) in which such account is invested.

### 4.2    Investment Election for Future Contributions

A Participant may amend his or her investment election at such times and by such manner and form as prescribed by the Administrator. Such election will, unless specifically stated otherwise, apply only to future amounts contributed under the Plan.

### 4.3    Investment Changes for an Existing Account Balance

The Participant, Beneficiary, alternate payee, or Administrator may elect to transfer amounts in his Account Balance among and between those investments available under the Trust Fund at such times and by such manner and form prescribed by the Administrator, subject further to any restrictions or limitations placed on any investment by the Administrator to be uniformly applied to all Participants.

### 4.4    Investment Responsibility

To the extent that a Participant, Beneficiary, or alternate payee exercises control over the investment of amounts credited to his Account Balance, the Employer, the Administrator, and any other fiduciary of the Plan shall not be liable for any losses that are the direct and necessary result of investment instructions given by a Participant, Beneficiary or an alternate payee.

### 4.5    Default Investment Fund

The Employer shall maintain a Default Investment Fund which shall be held and administered under the Trust Fund. Any Participant who does not make an investment election on the deferral agreement provided by the Administrator will have his contributions invested in the Default Investment Fund until such time he provides investment direction under Sections 4.2 and 4.3. Additionally, a Beneficiary or alternate payee who does not make an investment election will have his Account Balance invested in the Default Investment Fund until such time he provides investment direction under Section 4.3. The interest of each Participant, Beneficiary, or alternate payee under the Plan in the Default Investment Fund shall be an undivided interest.

12

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## 4.6    Statements

The Administrator will cause statements to be issued periodically to reflect the contributions and actual earnings posted to the Account Balances.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## SECTION V
## LOANS

### 5.1    Loans

The Employer may elect to make loans available to Participants who are Employees. If the Employer has elected to make loans available to Participants who are Employees, the Employer shall establish written guidelines governing the granting and administration of loans, which are hereby incorporated into and made part of the Plan provided that such guidelines are approved by the Administrator and are not inconsistent with the provisions of this Section V. To the extent such guidelines are more restrictive than the provisions of the Plan and are not inconsistent with the provisions of Code Section 72(p) and regulations issued thereunder, the guidelines shall be controlling.

Except as modified by the Plan's loan program policy and procedures adopted by the Administrator, the following rules shall apply to loans under the Plan. Any loans that are issued under the Plan shall be administered in a manner consistent with the requirements of Code Section 72(p), Treasury Regulations 1.72(p) and any other applicable guidance issued thereunder.

### 5.2    Maximum Loan Amount

No loan to a Participant hereunder may exceed the lesser of:

(a)    $50,000, reduced by the excess (if any) of (i) the highest outstanding balance of loans from the Plan during the preceding one-year period ending on the day before the date the loan is approved by the Administrator (not taking into account any payments made during such one-year period) over (ii) the outstanding balance of loans from the Plan on the date the loan is approved by the Administrator; or

(b)    one half of the value of the Participant's Account Balance (as of the Valuation Date immediately preceding the date on which such loan is approved by the Administrator).

For purposes of this Section 5.2, any loan from any other plan maintained by a participating employer shall be treated as if it were a loan made from the Plan, and the Participant's vested interest under any such other plan shall be considered a vested interest under this Plan; provided, however, that the provisions of this paragraph shall not be applied so as to allow the amount of a loan under this Section 5.2 to exceed the amount that would otherwise be permitted in the absence of this paragraph.

### 5.3    Terms of Loan

The terms of the loan shall:

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

(a)     charge a reasonable interest rate commensurate with current interest rates charged for loans made under similar circumstances by persons in the business of lending money (subject to the requirements of the Servicemembers Civil Relief Act).

(b)     require that the minimum loan term be 12 months;

(c)     require that the loan be repaid within five years unless the Participant certifies in writing to the Administrator that the loan is to be used to acquire any dwelling unit which within a reasonable time is to be used (determined at the time the loan is made) as a principal residence (as defined in Code Section 121) of the Participant;

(d)     require substantially level amortization of such loan with payments not less frequently than quarterly throughout the repayment period. If a loan is made from both a Participant's Roth Contribution account and his or her other accounts under the Plan, the level amortization requirement shall be met with respect to both his or her Roth Contributions account and his or her other accounts under the Plan. Notwithstanding the foregoing, if so provided in the written guidelines applicable to Plan loans, the amortization schedule may be waived and payments suspended while a Participant is on a leave of absence from employment with an Employer (for periods in which the Participant does not perform military service as described in paragraph (d)), provided that all of the following requirements are met:

   (i)     Such leave is either without pay or at a reduced rate of pay that, after withholding for employment and income taxes, is less than the amount required to be paid under the amortization schedule;

   (ii)    Payments resume after the earlier of (1) the date such leave of absence ends or (2) the one-year anniversary of the date such leave began;

   (iii)   The period during which payments are suspended does not exceed one year;

   (iv)    Payments resume in an amount not less than the amount required under the original amortization schedule; and

   (v)     The waiver of the amortization schedule does not extend the period of the loan beyond the maximum period permitted under this Section 5.3.

(e)     If a Participant is absent from employment with any participating employer for a period during which he or she performs services in the uniformed services (as defined in chapter 45 of title 38 of the United States Code), whether or not such services constitute qualified military service, the suspension of payments shall not be taken into account for purposes of applying paragraph (d) of this Section 5.3 provided that all of the following requirements are met:

   (i)     Payments resume upon completion of such military service;

15

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt   Doc 13575   Filed 05/27/22   Entered 05/27/22 09:29:43   Page 203 of 268

(ii)    Payments resume in an amount not less than the amount required under the original amortization schedule and continue in such amount until the loan is repaid in full;

(iii)    Upon resumption, payments are made no less frequently than required under the original amortization schedule and continue under such schedule until the loan is repaid in full; and

(iv)    The loan is repaid in full, including interest accrued during the period of such military service, no later than the maximum period otherwise permitted under this Section V extended by the period of such military service.

(f)    The loan shall be evidenced by a legally enforceable agreement that demonstrates compliance with the provisions of this Section.

### 5.4    Security for Loan; Default

(a)    _Security_. Any loan to a Participant under the Plan shall be secured by the pledge of the portion of the Participant's Account Balance in the Plan invested in such loan.

(b)    _Default_. In the event that a Participant fails to make a loan payment under this Section V on the last business day before the end of the calendar quarter following the quarter in which the payment is due, unless payment is not made because the Participant is on a bona fide leave of absence as determined by the Administrator and the amortization schedule is suspended while the Participant is on leave of absence from employment with an Employer, a default on the loan shall occur. In the event of such default, (i) all remaining payments on the loan shall be immediately due and payable (including accrued interest) at the time of the default, and (ii) interest shall continue to accrue on the outstanding loan balance until the loan is foreclosed.

In the case of any default on a loan to a Participant, the Administrator shall apply the portion of the Participant's interest in the Plan held as security for the loan in satisfaction of the loan on the date of Severance from Employment. In addition, the Administrator may take any legal action it shall consider necessary or appropriate to enforce collection of the unpaid loan, with the costs of any legal proceeding or collection to be charged to the Account Balance of the Participant.

Notwithstanding anything elsewhere in the Plan to the contrary, in the event a loan is outstanding hereunder on the date of a Participant's death, his or her estate shall be his or her Beneficiary as to the portion of his or her interest in the Plan invested in such loan (with the Beneficiary or Beneficiaries as to the remainder of his or her interest in the Plan to be determined in accordance with otherwise applicable provisions of the Plan).

### 5.5    Repayment

A Participant shall be required, as a condition to receiving a loan, to enter into an agreement for the repayment of the loan in accordance with a method set forth in the written guidelines

16

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt   Doc 13575   Filed 05/27/22   Entered 05/27/22 09:29:43   Page 204 of 268

governing the granting of Plan loans that are established by the Employer pursuant to Section 5.1.

A Participant may prepay the entire outstanding balance of his or her loan at any time (but may not make a partial prepayment).

17

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## SECTION VI
## DISTRIBUTIONS

**6.1    Distributions from the Plan**

(a)    <u>Earliest Distribution Date</u>. Payments from a Participant's Account Balance shall not be made earlier than:

    (i)    the Participant's Severance from Employment pursuant to Section 6.2

    (ii)    the Participant's death pursuant to Section 6.3

    (iii)    Plan termination under Section 10.3

    (iv)    an unforeseeable emergency withdrawal pursuant to Section 6.10(a), if permitted under the Plan

    (v)    a de minimis account balance distribution pursuant to Section 6.10(b), if permitted under the Plan

    (vi)    a rollover account withdrawal pursuant to Section 6.10(c), if permitted under the Plan

    (vii)    attainment of age 70 ½ withdrawal pursuant to Section 6.10(d), if permitted under the Plan

    (viii)    Qualified Military Service Deemed Severance withdrawal pursuant to Section 6.10(e), if permitted under the Plan

    (ix)    Qualified Military Reservist withdrawal pursuant to Section 6.10(f), if permitted under the Plan

    (x)    Qualified Distributions for Retired Public Safety Officers pursuant to Section 6.11, if permitted under the Plan

(b)    <u>Latest Distribution Date</u>. In no event shall any distribution under this Section VI begin later than the Participant's "required beginning date". Such required minimum distributions must be made in accordance with Section 6.6.

(c)    <u>Amount of Account Balance</u>. Except as provided in Section 6.3, the amount of any payment under this Section VI shall be based on the amount of the Account Balance as of the Valuation Date.

**6.2    Benefit Distributions Upon Severance from Employment**

Upon Severance from Employment (other than due to death), a Participant may elect to commence distribution of benefits at any time after such Severance from Employment by filing a

18

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 206 of 268

request with the Administrator before the date on which benefits are to commence. However, in no event may distribution of benefits commence later than his or her "required beginning date".

Distributions required to commence under this section shall be made in the form of benefit provided under Section 6.5. Distributions postponed until the Participant's "required beginning date" will be made in a manner that meets the requirements of Section 6.6.

### 6.3    Distributions on Account of Participant's Death

Upon receipt of satisfactory proof of the Participant's death, the designated Beneficiary may file a request with the Administrator to elect a form of benefit provided under Section 6.5 and made in a manner that meets the requirements of Section 6.6.

(a)     Death of Participant Before Distributions Begin. If the Participant dies before his or her distributions begin, the designated Beneficiary may elect to have distributions to be made (i) in full within 5 years of the Participant's death (5-year rule) or (ii) in installments over the designated Beneficiary's "life expectancy" (life expectancy rule).

If the designated Beneficiary does not make an election by September 30 of the year following the year of the Participant's death, the Participant's Account Balance will be distributed in a lump sum payment by December 31 of the calendar year containing the fifth anniversary of the Participant's death or if the Participant's spouse is the sole designated Beneficiary by December 31 of the year the Participant would have attained age 70 ½.

(b)     Death of Participant On or After Date Distributions Begin. If the Participant dies on or after his or her distributions began, the Participant's Account Balance shall be paid to the Beneficiary at least as rapidly as under the payment option used before the Participant's death.

For purposes of this Section, a Participant who dies on or after January 1, 2007, while performing qualified military service (as defined in Code Section 414(u)) will be deemed to have resumed employment in accordance with the Participant's reemployment rights under chapter 43 of title 38, United States Code, on the day preceding death and to have terminated employment on the actual date of death for purposes of determining the entitlement of the Participant's survivors to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided under the Plan, in accordance with the provisions of Code Sections 401(a)(37), 414(u)(9), and 457(g)(4).

### 6.4    Distribution of Small Account Balances Without Participant's Consent

Notwithstanding any other provision of the Plan to the contrary, if the amount of a Participant's or Beneficiary's Account Balance (including the rollover contribution separate account) is not in excess of the amount specified below on the date that payments commence under Section 6.2 or on the date the Administrator is notified of the Participant's death, the Administrator may direct

19

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

payment without the Participant's or Beneficiary's consent as soon as practicable following the Participant's retirement, death, or other Severance from Employment.

(a)     The Plan does not provide for distribution of small Account Balances without Participant or Beneficiary consent.

## 6.5     Forms of Distribution

In an election to commence benefits under Section 6.2, a Participant entitled to a distribution of benefits under this Section VI may elect to receive payment in any of the following forms of distribution:

(a)     a lump sum payment of the Participant's total Account Balance.

(b)     partial distribution of the Participant's Account Balance.

(c)     in a series of installments over a period of years (payable on a monthly, quarterly, semi-annual or annual basis) which extends no longer than the life expectancy of the Participant as permitted under Code Section 401(a)(9).

(d)     a purchase of a single premium nontransferable annuity contract for such term and in such form as the Participant selects that provides for payments in the form of an irrevocable annuity each calendar year of amounts not less than the amount required under Code Section 401(a)(9).

## 6.6     Minimum Distribution Requirements

(a)     General Rules.

Notwithstanding anything in this Plan to the contrary, distributions from this Plan shall commence and be made in accordance with Code Section 401(a)(9) and the regulations promulgated thereunder. Additionally, the requirements of this Section 6.6 will take precedence over any inconsistent provisions of the Plan.

(b)     Time and Manner of Distribution.

(i)     <u>Required Beginning Date</u>. The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's "required beginning date".

(ii)     <u>Death of Participant Before Distributions Begin</u>. If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(A)     If the Participant's surviving spouse is the Participant's sole "designated Beneficiary", then distributions to the surviving spouse will begin by

20

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt     Doc 13575     Filed 05/27/22     Entered 05/27/22 09:29:43     Page 208 of 268

December 31 of the calendar year immediately following the calendar year in which the Participant dies, or by December 31 of the calendar year in which the Participant would have attained age 70 ½, if later.

(B)     If the Participant's surviving spouse is not the Participant's sole "designated Beneficiary" (i.e., multiple beneficiaries), then distributions to the "designated Beneficiaries" will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(C)     If the Participant's sole "designated Beneficiary" is not the Participant's spouse, then distributions to the "designated Beneficiary" will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(D)     If there is no "designated Beneficiary" as of September 30 of the year following the year of the Participant's death, the Participant's Account Balance will be distributed in a lump sum payment by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(E)     If the Participant's surviving spouse is the Participant's sole "designated Beneficiary" and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, this subparagraph (b)(ii), other than subsection (b)(ii)(A), will apply as if the surviving spouse were the Participant.

For purposes of this subparagraph (ii) and paragraph (d), unless subsection (b)(ii)(D) applies, distributions are considered to begin on the Participant's "required beginning date". If subsection (b)(ii)(E) applies, distributions are considered to begin on the date distributions are required to begin to the surviving spouse under subsection (b)(ii)(A). If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's "required beginning date" (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under subsection (b)(ii)(A)), the date distributions are considered to begin is the date distributions actually commence.

(iii)    <u>Death of Participant On or After Distributions Begin</u>. If the Participant dies on or after distributions begin and before depleting his or her Account Balance, distributions must commence to the "designated Beneficiary" by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(iv)    <u>Forms of Distribution</u>. Unless the Participant's Account Balance is distributed in the form of an annuity contract or in a lump sum on or before the Participant's "required beginning date", as of the first distribution calendar year, distributions will be made in accordance with paragraphs (c) and (d). If the Participant's

21

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt     Doc 13575     Filed 05/27/22     Entered 05/27/22 09:29:43     Page 209 of 268

interest is distributed in the form of an annuity contract, distributions thereunder will be made in accordance with the requirements of Code Section 401(a)(9).

(c)    Required Minimum Distributions During the Participant's Lifetime.

    (i)    <u>Amount of Required Minimum Distribution For Each "Distribution Calendar Year"</u>. During the Participant's lifetime, the minimum amount that will be distributed for each distribution calendar year is the lesser of:

        (A)    The quotient obtained by dividing the "Participant's account balance" by the distribution period in the Uniform Lifetime Table set forth in Treasury Regulation Section 1.401(a)(9)-9, Q&A-2 using the Participant's age as of the Participant's birthday in the "distribution calendar year"; or

        (B)    if the Participant's sole "designated Beneficiary" for the "distribution calendar year" is the Participant's spouse and the spouse is more than 10 years younger than the Participant, the quotient obtained by dividing the "Participant's account balance" by the distribution period in the Joint and Last Survivor Table set forth in Treasury Regulation Section 1.401(a)(9)-9, Q&A-3 using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the "distribution calendar year".

    (ii)    <u>Lifetime Required Minimum Distributions Continue Through Year of Participant's Death</u>. Required minimum distributions will be determined under this paragraph (c) beginning with the first "distribution calendar year" and up to and including the "distribution calendar year" that includes the Participant's date of death.

(d)    Required Minimum Distributions After Participant's Death.

For purposes of this Section 6.6(d), the Participant's and Beneficiary's "life expectancy" determination will use the Single Life Table set forth in Treasury Regulation Section 1.401(a)(9)-9, Q&A-1.

    (i)    <u>Death On or After Date Distributions Begin</u>.

        (A)    Participant Survived by Designated Beneficiary.

If the Participant dies on or after the date distributions begin and there is a "designated Beneficiary", the minimum amount that will be distributed for each "distribution calendar year" after the year of the Participant's death is the quotient obtained by dividing the "Participant's account balance" by the longer of the remaining "life expectancy" of the Participant or the remaining "life expectancy" of the Participant's "designated Beneficiary", determined as follows:

22

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

(1)    The Participant's remaining "life expectancy" is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(2)    If the Participant's surviving spouse is the Participant's sole "designated Beneficiary", the remaining "life expectancy" of the surviving spouse is calculated for each "distribution calendar year" after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year. For "distribution calendar years" after the year of the surviving spouse's death, the remaining "life expectancy" of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

(3)    If the Participant's surviving spouse is not the Participant's sole "designated Beneficiary" (i.e., multiple beneficiaries), the "designated Beneficiary's" remaining "life expectancy" is calculated using the age of the oldest Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(4)    If the Participant's sole "designated beneficiary" is not the Participant's spouse, the "designated Beneficiary's" remaining "life expectancy" is calculated using the age of the Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(B)    No Designated Beneficiary.

If the Participant dies on or after the date distributions begin and there is no "designated Beneficiary" as of September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each "distribution calendar year" after the year of the Participant's death is the quotient obtained by dividing the "Participant's account balance" by the Participant's remaining "life expectancy" calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(ii)    Death Before Date Distributions Begin.

(A)    Participant Survived by Designated Beneficiary.

Except as provided in this Section, if the Participant dies before the date distributions begin and there is a "designated Beneficiary", the minimum amount that will be distributed for each "distribution calendar year" after the year of the Participant's death is the quotient obtained by dividing the

23

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 211 of 268

"Participant's account balance" by the remaining "life expectancy" of the Participant's "designated Beneficiary", determined as follows:

(1)   If the Participant's surviving spouse is the Participant's sole "designated Beneficiary", the remaining "life expectancy" of the surviving spouse is calculated for each "distribution calendar year" after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year.

(2)   If the Participant's surviving spouse is not the Participant's sole "designated Beneficiary" (i.e., multiple beneficiaries), the "designated Beneficiary's" remaining "life expectancy" is calculated using the age of the oldest Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(3)   If the Participant's sole "designated beneficiary" is not the Participant's spouse, the "designated Beneficiary's" remaining "life expectancy" is calculated using the age of the Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(B)   No Designated Beneficiary.

If the Participant dies before the date distributions begin and there is no "designated Beneficiary" as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(C)   Death of Surviving Spouse Before Distributions to Surviving Spouse Are Required to Begin.

If the Participant dies before the date distributions begin, the Participant's surviving spouse is the Participant's sole "designated Beneficiary", and the surviving spouse dies before distributions are required to begin to the surviving spouse under subsection (b)(ii)(A), this subparagraph (d)(ii) will apply as if the surviving spouse were the Participant.

(e)   Definitions.

(i)   A Participant's "required beginning date" is April 1 of the year that follows the later of (1) the calendar year the Participant attains age 70 ½ or (2) retires due to Severance from Employment. If the Participant postpones the required distribution due in calendar year he or she attains age 70 ½ or severs employment, to the "required beginning date", the second required minimum distribution must be taken by the end of that year.

24

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

(ii) Participant's "designated Beneficiary" means the individual who is designated as the Beneficiary under Section 8.1 and is the designated Beneficiary under Code Section 401(a)(9) and Treasury Regulation Section 1.401(a)(9)-4.

(iii) A "distribution calendar year" means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first "distribution calendar year" is the calendar year the Participant attains age 70 ½ or retires, if later. For distributions beginning after the Participant's death, the first "distribution calendar year" is the calendar year in which distributions are required to begin under subparagraph (b)(ii).

The required minimum distribution for the Participant's first "distribution calendar year" will be made on or before the Participant's "required beginning date". The required minimum distribution for other "distribution calendar years", including the required minimum distribution for the "distribution calendar year" in which the Participant's "required beginning date" occurs, will be made on or before December 31 of that "distribution calendar year".

(iv) A married Participant's "life expectancy", whose spouse is the sole Beneficiary and is more than 10 years younger than the Participant, means the Participant's and spouse Beneficiary's life expectancy as computed by use of the Joint and Last Survivor Life Table under Treasury Regulation Section 1.401(a)(9)-9, Q&A 3. All other Participants will have his or her life expectancy computed by use of the Uniform Lifetime Table under Treasury Regulation Section 1.401(a)(9)-9, Q&A 2. A deceased Participant's or Beneficiary's "life expectancy" means his or her life expectancy as computed by use of the Single Life Table under Treasury Regulation Section 1.401(a)(9)-9, Q&A 1.

(v) A "Participant's account balance" means the Account Balance as of the last valuation date in the calendar year immediately preceding the "distribution calendar year" (valuation calendar year) increased by the amount of any contributions made and allocated or forfeitures allocated to the Account Balance as of dates in the valuation calendar year after the valuation date and decreased by distributions made in the valuation calendar year after the valuation date. The Account Balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the valuation calendar year or in the "distribution calendar year" if distributed or transferred in the valuation calendar year.

(f) Special Provision Applicable to 2009 Required Minimum Distributions.

A Participant who would otherwise be required to receive a minimum distribution from the Plan in accordance with Code Section 401(a)(9) for the 2009 "distribution calendar year" may elect not to receive any such distribution that is payable with respect to the 2009 "distribution calendar year".

25

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 213 of 268

Notwithstanding the provisions of Section 6.9(b)(iii), the Administrator may permit a Participant who receives a minimum distribution from the Plan for the 2009 "distribution calendar year" to make a direct rollover of such distribution to an "eligible retirement plan" in accordance with the provisions of Section 6.9.

The Administrator may also permit a Participant or former Participant who has received a minimum distribution for the 2009 "distribution calendar year" to roll over such distribution back into the Plan, provided the requirements of Code Section 402(c), as modified by Notice 2009-82, extending the 60-day rollover deadline, and the requirements of Section 7.1 are otherwise satisfied. If the distribution received by the Participant included amounts in addition to the minimum required under Code Section 401(a)(9), the Administrator may allow the Participant to include a portion or all of the amount that was not a minimum distribution in the Rollover Contribution made to the Plan in accordance with this paragraph.

The provisions of this Section 6.6(f) are effective for minimum payments made for the 2009 "distribution calendar year" and do not include any minimum payment that is made in 2009, but is attributable to a different year (i.e., the participant reached his required beginning date in 2008, but payment of the 2008 minimum is not made until 2009).

## 6.7    Payments to Minors and Incompetents

If a Participant or Beneficiary entitled to receive any benefits hereunder is a minor or is adjudged to be legally incapable of giving valid receipt and discharge for such benefits, or is deemed so by the Administrator, benefits will be paid to such person as the Administrator or a court of competent jurisdiction may designate for the benefit of such Participant or Beneficiary. Such payments shall be considered a payment to such Participant or Beneficiary and shall, to the extent made, be deemed a complete discharge of any liability for such payments under the Plan.

## 6.8    Procedure When Distributee Cannot Be Located

The Administrator shall make all reasonable attempts to determine the identity and address of a Participant or a Participant's Beneficiary entitled to benefits under the Plan. For this purpose, a reasonable attempt means (a) the mailing by certified mail of a notice to the last known address shown in the Administrator's records; (b) use of a commercial locator service, the internet or other general search method; or (c) use such other methods as the Administrator believes prudent.

If the Participant or Beneficiary has not responded within 6 months, the Plan shall continue to hold the benefits due such person until, in the Administrator's discretion, the Plan is required to take other action under applicable law.

Notwithstanding the foregoing, if the Administrator is unable to locate a person entitled to benefits hereunder after applying the search methods set forth above, then the Administrator, in its sole discretion, may pay an amount that is immediately distributable to such person in a direct rollover to an individual retirement plan designated by the Administrator.

26

**6.9     Direct Rollover**

(a)     A Participant or spouse Beneficiary (or a Participant's spouse or former spouse who is the alternate payee under a domestic relations order, as defined in Code Section 414(p)) who is entitled to an "eligible rollover distribution" may elect, at the time and in the manner prescribed by the Administrator, to have all or any portion of the distribution paid directly to an "eligible retirement plan" specified by the Participant or spouse Beneficiary in a direct rollover.

(b)     For purposes of this Section 6.9, an "eligible rollover distribution" means any distribution of all or any portion of a Participant's Account Balance, except that an eligible rollover distribution does not include (i) any distribution that is one of a series of substantially equal periodic payment made not less frequently than annually for the life or life expectancy of the Participant or the joint lives or life expectancies of the Participant and the Participant's designated beneficiary, or for a specified period of ten years or more (ii) any distribution made as a result of an unforeseeable emergency, or (iii) any distribution that is a required minimum distribution under Code Section 401(a)(9).

In addition, an "eligible retirement plan" with respect to the Participant, the participant's spouse, or the Participant's spouse or former spouse who is an alternate payee under a domestic relations order as defined in Code Section 414(p) means any of the following: (i) an individual retirement account described in Code Section 408(a), (ii) an individual retirement annuity described in Code Section 408(b), (iii) an annuity plan described in Code Section 403(a), (iv) a qualified defined contribution plan described in Code Section 401(a), (v) an annuity contract described in Code Section 403(b), (vi) an eligible deferred compensation plan described in Code Section 457(b) that is maintained by a State, political subdivision of a State, or any agency or instrumentality of a State or political subdivision of a State, or (vii) effective for distributions made on or after January 1, 2008, a Roth IRA, as described in Code Section 408A, provided, that for distributions made before January 1, 2010, such rollover shall be subject to the limitations contained in Code Section 408A(c)(3)(B) .

Notwithstanding any other provision of this Section 6.9(b), a plan or contract described in clause (iii), (iv), (v), or (vi) above shall not constitute an "eligible retirement plan" with respect to a distribution of Roth Contributions unless such plan or contract separately accounts for such distribution, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

(c)     A Beneficiary who is not the spouse of the deceased Participant may elect a direct rollover of a distribution to an individual retirement account described in Code Section 408(b) or to a Roth individual retirement account described in Code Section 408A(b) ("IRA"), provided that the distributed amount satisfies all the requirements to be an eligible rollover distribution. The direct rollover must be made to an IRA established on behalf of the designated nonspouse Beneficiary that will be treated as an inherited IRA pursuant to the provisions of Code Section 402(c)(11). The IRA must be established in a

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

manner that identifies it as an IRA with respect to a deceased Participant and also identifies the deceased Participant and the nonspouse Beneficiary. This Section applies to distributions made on or after January 1, 2007.

**6.10  Inservice Distributions**

(a)   <u>Unforeseeable Emergency Distributions</u>. If the Participant who has not incurred a Severance from Employment or Beneficiary has an unforeseeable emergency, the Administrator may approve a single sum distribution of the amount requested or, if less, the maximum amount determined by the Administrator to be permitted to be distributed under this Section 6.10(a), Treasury Regulation Section 1.457-6(c) or other regulatory guidance. The Administrator shall determine whether an unforeseeable emergency exists based on relevant facts and circumstances, and Treasury Regulation Section 1.457-6(c) or other regulatory guidance.

    (i)   An unforeseeable emergency is defined as a severe financial hardship resulting from the following:

        (A)   an illness or accident of the Participant or Beneficiary, the Participant's or Beneficiary's spouse, or the Participant's or Beneficiary's dependent or the Participant's "primary Beneficiary";

        (B)   loss of the Participant's or Beneficiary's property due to casualty (including the need to rebuild a home following damage to a home not otherwise covered by homeowner's insurance, e.g., as a result of a natural disaster);

        (C)   the need to pay for the funeral expenses of a Participant's or Beneficiary's spouse, Participant's or Beneficiary's dependent or "primary Beneficiary" of the Participant;

        (D)   the need to pay for medical expenses of the Participant or Beneficiary, the Participant's or Beneficiary's spouse, Participant's or Beneficiary's dependent or the Participant's "primary Beneficiary" which are not reimbursed or compensated by insurance or otherwise, including non-refundable deductibles, as well as for the cost of prescription drug medication;

        (E)   the imminent foreclosure of or eviction from the Participant's or Beneficiary's primary residence; or

        (F)   other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant or Beneficiary. However, except as otherwise specifically provided in this Section 6.10(a), certain circumstances are not considered an unforeseen emergency such as the purchase of a home or the payment of college tuition or credit card debt.

28

For purposes of this paragraph, if the Participant is not deceased, a "primary Beneficiary" shall be limited to a primary Beneficiary under the Plan, which is an individual who is named as a Beneficiary pursuant to Section 8.1 and has an unconditional right to all or a portion of the Participant's Account Balance upon the death of the Participant, and which shall not include a contingent beneficiary. Additionally, dependent shall be limited to the definition under Code Section 152(a), and, for taxable years beginning on or after January 1, 2005, without regard to Code Sections 152(b)(1), (b)(2) and (d)(1)(B).

(ii)     <u>Unforeseeable emergency distribution standard</u>. A distribution on account of unforeseeable emergency may not be made to the extent that such emergency is or may be relieved through reimbursement or compensation from insurance or otherwise; by liquidation of the Participant's assets, to the extent the liquidation of such assets would not itself cause severe financial hardship; or by cessation of deferrals under the Plan if the cessation of deferrals would alleviate the financial need.

(iii)    <u>Distribution necessary to satisfy emergency need</u>. Distributions because of an unforeseeable emergency may not exceed the amount reasonably necessary to satisfy the emergency need (which may include any amounts necessary to pay any federal, State, or local income taxes or penalties reasonably anticipated to result from the distribution).

(b)    <u>De minimis Account Balance Distributions</u>. A Participant before Severance of Employment may request a distribution of his or her total Account Balance (excluding the rollover contribution separate account), which shall be paid in a lump sum payment as soon as practical following the direction if (i) the total Account Balance does not exceed $5,000 (or the dollar limit under Code Section 411(a)(11), if greater), (ii) the Participant has not previously received a distribution of their total Account Balance payable to the Participant under this Section 6.10(b), and (iii) no Annual Deferral has been made with respect to the Participant during the two-year period ending immediately before the date of the distribution.

The Plan does not permit the Administrator to direct payments under the terms of this Section 6.10(b) without the Participant's consent.

(c)    <u>Rollover Account Distributions</u>. If a Participant has a separate account attributable to rollover contributions under the Plan, the Participant before Severance of Employment may at any time elect to receive an inservice distribution of all or any portion of the amount held in the rollover separate account. Any designated Roth contributions rolled over to the Plan are treated as Roth Contributions for Plan purposes and are not eligible for inservice withdrawal under this Section 6.10(c).

(d)    <u>Age 70 ½ Distributions</u>. Prior to Severance from Employment, a Participant may withdraw all or a portion of his or her Account Balance on or after first day of the calendar year in which the Participant shall attain age 70½.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

(e)　Qualified Military Service Deemed Severance Distributions. The Plan does not permit "qualified military service deemed severance withdrawals".

(f)　Qualified Military Reservist Distributions. The Plan does not permit "qualified military reservist withdrawals".

**6.11　Qualified Distributions for Retired Public Safety Officers**

A Participant who is an "eligible retired public safety officer" may elect to have qualified health insurance premiums deducted from amounts to be distributed to the Participant from the Plan, and to have such amounts paid directly to the insurer or group health plan, subject to the provisions of this Section 6.11. "Qualified health insurance premiums" include premiums for accident and health insurance (including under a self-insured plan) or qualified long-term care insurance contracts for the Participant and the Participant's spouse and dependents. It is intended that, pursuant to Code Section 402(l), the distribution shall be excluded from the Participant's gross income to the extent that the aggregate amount of the distributions does not exceed the amount used to pay the qualified health insurance premiums of the Participant and the Participant's spouse and dependents.

(a)　A Participant shall qualify as an "eligible retired public safety officer" for purposes of this Section 6.11 only if the Participant is an individual who separated from service, either by reason of disability (as determined by the Administrator) or after attainment of normal retirement age, as a public safety officer with the Employer. Consequently, a public safety officer who retires before the attainment of normal retirement age is not an eligible retired public safety officer unless the public safety officer retires by reason of disability (as determined by the Administrator).

(b)　For purposes of this Section 6.11, the term "public safety officer" means an individual serving the Employer in an official capacity, with or without compensation, as a law enforcement officer, a firefighter, a chaplain, or as a member of a rescue squad or ambulance crew.

(c)　In order to avoid unintended taxation, the aggregate amount that a Participant elects to have directly distributed to an insurer or group health plan pursuant to this Section 6.11 for any calendar year shall be limited to $3,000. Moreover, for purposes of applying this $3,000 limitation, distributions with respect to the Participant that are used to pay for qualified health insurance premiums from all qualified retirement plans of the Employer shall be aggregated.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## SECTION VII
## ROLLOVERS AND PLAN TRANSFERS

### 7.1 Eligible Rollover Contributions to the Plan

(a)     A Participant who is an Employee or a Participant who has separated from service and has an Account Balance and who is entitled to receive an eligible rollover distribution from another "eligible retirement plan", as defined in 6.9(b) excluding the direct rollover of after-tax contributions, may request to have all or a portion of the eligible rollover distribution paid to the Plan. The Administrator may require such documentation from the distributing plan as it deems necessary to effectuate the rollover in accordance with Code Section 402 and to confirm that such plan is an "eligible retirement plan" within the meaning of Code Section 402(c)(8)(B).

(b)     If an Employee makes a rollover contribution to the Plan of amounts that have previously been distributed to him or her, the Employee must deliver to the Administrator the cash that constitutes his or her rollover contribution within 60 days of receipt of the distribution from the distributing "eligible retirement plan". Such delivery must be made in the manner prescribed by the Administrator.

(c)     The Plan shall establish and maintain for the Participant a separate account for any eligible rollover distribution paid to the Plan from any "eligible retirement plan" that is an eligible governmental plan under Code Section 457(b). In addition, the Plan shall establish and maintain for the Participant a separate account for any eligible rollover distribution paid to the Plan from any "eligible retirement plan" that is not an eligible governmental plan under Code Section 457(b).

(d)     To the extent that the Plan accepts rollover contributions attributable to Roth Contributions, the Administrator shall account for such contributions separately from other rollover contributions. In administering rollover contributions attributable to Roth Contributions, the Administrator shall be entitled to rely on a statement from the distributing plan's administrator identifying (i) the Participant's basis in the rolled over amounts and (ii) the date on which the Participant's 5-taxable-year period of participation (as required under Code Section 402A(d)(2) for a qualified distribution of Roth Contributions) started under the distributing plan. If the 5-taxable-year period of participation under the distributing plan would end sooner than the Participant's 5-taxable-year period of participation under the Plan, the 5-taxable-year period of participation applicable under the distributing plan shall continue to apply with respect to the Roth Contributions included in the rollover contribution. Roth Contributions that are rolled over to the Plan shall be subject to the provisions of the Plan applicable to Roth Contributions rather than the provisions of the Plan applicable to rollover contributions.

### 7.2 Plan-to-Plan Transfers to the Plan

At the direction of the Employer, the Administrator may permit Participants or Beneficiaries who are participants or beneficiaries in another eligible governmental plan under Code Section 457(b)

31

to transfer assets to the Plan as provided in this Section 7.2. Such a transfer is permitted only if the other plan provides for the direct transfer of each Participant's or Beneficiary's interest therein to the Plan. The Administrator may require in its sole discretion that the transfer be in cash or other property acceptable to the Administrator. The Administrator may require such documentation from the other plan as it deems necessary to effectuate the transfer in accordance with Code Section 457(e)(10) and Treasury Regulation Section 1.457-10(b) and to confirm that the other plan is an eligible governmental plan as defined in Treasury Regulation Section 1.457-2(f). The amount so transferred shall be credited to the Participant's Account Balance and shall be held, accounted for, administered and otherwise treated in the same manner as an Annual Deferral by the Participant under the Plan, except that the transferred amount shall not be considered an Annual Deferral under the Plan in determining the maximum deferral under Section III.

**7.3    Plan-to-Plan Transfers from the Plan**

(a)    At the direction of the Employer, the Administrator may permit Participants or Beneficiaries to elect to have his or her Account Balance transferred to another eligible governmental plan within the meaning of Treasury Regulatory Section 1.457-2(f), if the other eligible governmental plan provides for the receipt of transfers, the Participant or Beneficiary whose amounts deferred are being transferred will have an amount deferred immediately after the transfer at least equal to the amount deferred with respect to that Participant or Beneficiary immediately before the transfer, and the conditions of subparagraph (i), (ii), or (iii) are met.

    (i)    A transfer from the Plan to another eligible governmental plan is permitted in the case of a transfer for a Participant if the Participant has had a Severance from Employment with the Employer and is performing services for the entity maintaining the other eligible governmental plan.

    (ii)    A transfer from the Plan to another eligible governmental plan is permitted if:

        (A)    The transfer is to another eligible governmental plan within the same State as the Plan;

        (B)    All the assets held by the Plan are transferred; and

        (C)    A Participant or Beneficiary whose amounts deferred are being transferred is not eligible for additional annual deferrals in the other eligible governmental plan unless he or she is performing services for the entity maintaining the other eligible governmental plan.

    (iii)    A transfer from the Plan to another eligible governmental plan of the Employer is permitted if:

        (A)    The transfer is to another eligible governmental plan of the Employer (and, for this purpose, an employer is not treated as the Employer if the Participant's compensation is paid by a different entity); and

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

(B) A Participant or Beneficiary whose deferred amounts are being transferred is not eligible for additional annual deferrals in the other eligible governmental plan unless he or she is performing services for the entity maintaining the other eligible governmental plan.

(b) Upon the transfer of assets under this Section 7.3, the Plan's liability to pay benefits to the Participant or Beneficiary under this Plan shall be discharged to the extent of the amount so transferred for the Participant or Beneficiary. The Administrator may require such documentation from the receiving plan as it deems appropriate or necessary to comply with this Section (for example, to confirm that the receiving plan is an eligible governmental plan under paragraph (a) of this Section 7.3, and to assure that the transfer is permitted under the receiving plan) or to effectuate the transfer pursuant to Treasury Regulation Section 1.457-10(b).

## 7.4 Permissive Service Credit Transfers

(a) If a Participant is also a participant in a tax-qualified defined benefit governmental plan (as defined in Code Section 414(d)) that provides for the acceptance of plan-to-plan transfers with respect to the Participant, then the Participant may elect to have any portion of the Participant's Account Balance transferred to the defined benefit governmental plan. A transfer under this Section 7.4(a) may be made before the Participant has had a Severance from Employment and without regard to whether the defined benefit governmental plan is maintained by the Employer. The distribution rules applicable to the defined benefit governmental plan to which any amounts are transferred under this Section 7.4 shall apply to the transferred amounts and any benefits attributable to the transferred amounts.

(b) A transfer may be made under Section 7.4(a) only if the transfer is either for the purchase of permissive service credit (as defined in Code Section 415(n)(3)(A)) under the receiving defined benefit governmental plan, including service credit for periods for which there is no performance of services, service credited in order to provide an increased benefit for service credit which a participant is receiving under the plan, and service (including parental, medical, sabbatical, and similar leave) as an employee (other than as an employee described in Code Section 415(n)(3)(C)(i)) of an educational organization described in Code Section 170(b)(1)(A)(ii) which is a public, private, or sectarian school which provides elementary or secondary education (through grade 12) or a comparable level of education, as determined under the applicable law of the jurisdiction in which the service was performed, without application of the limitations of Code Section 415(n)(3)(B) in determining whether the transfer is for the purchase of permissive service credit, or a repayment to which Code Section 415 does not apply by reason of Code Section 415(k)(3).

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## SECTION VIII
## BENEFICIARY

### 8.1    Beneficiary Designation

A Participant has the right, by written notice filed with the Administrator, to designate one or more beneficiaries to receive any benefits payable under the Plan in the event of the Participant's death prior to the complete distribution of benefits. The Participant accepts and acknowledges that he or she has the burden for executing and filing, with the Administrator, a proper beneficiary designation form.

The form for this purpose shall be provided by the Administrator. The form is not valid until it is signed, filed with the Administrator by the Participant, and accepted by the Administrator. Upon the Participant filing the form and acceptance by the Administrator, the form revokes all beneficiary designations filed prior to that date by the Participant.

If no such designation is in effect upon the Participant's death, or if no designated Beneficiary survives the Participant, the Beneficiary shall be the Participant's estate. If a Beneficiary dies after becoming entitled to receive a distribution under the Plan but before distribution is made to him or her in full the estate of the deceased Beneficiary shall be the Beneficiary as to the balance of the distribution.

34

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 222 of 268

# SECTION IX
## ADMINISTRATION AND ACCOUNTING

### 9.1    Administrator

The Administrator shall have the responsibility and authority to control the operation and administration of the Plan in accordance with the terms of the Plan, the Code and regulations thereunder, and any State law as applicable.

The Administrator may contract with a financially responsible independent contractor to administer and coordinate the Plan under the direction of the Administrator. The Administrator shall have the right to designate a plan coordinator or other party of its choice to perform such services under this agreement as may be mutually agreed to between the Administrator and the plan coordinator or other party. Notwithstanding any other provisions to the contrary, the Administrator agrees that it shall be solely responsible to the Employer for any and all services performed by a plan coordinator, subcontractor, assignee, or designee under this agreement.

The Administrator has full and complete discretionary authority to determine all questions of Plan interpretation, policy, participation, or benefit eligibility in a manner consistent with the Plan's documents, such determinations shall be conclusive and binding on all persons except as otherwise provided by law.

### 9.2    Administrative Costs

All reasonable expenses of administration may be paid out of the Plan assets unless paid (or reimbursed) by the Employer. Such expenses shall include any expenses incident to the functioning of the Administrator, or any person or persons retained or appointed by any named fiduciary incident to the exercise of his or her duties under the Plan, including, but not limited to, fees of accountants, counsel, investment managers, agents (including nonfiduciary agents) appointed for the purpose of assisting the Administrator in carrying out the instructions of Participants as to the directed investment of his or her accounts and other specialists and his or her agents, and other costs of administering the Plan. In addition, unless specifically prohibited under statute, regulation or other guidance of general applicability, the Administrator may charge to the Account Balance of an individual a reasonable charge to offset the cost of making a distribution to the Participant, Beneficiary, or Alternate Payee or to the Participant for Plan loans. If liquid assets of the Plan are insufficient to cover the fees of the Administrator, then Plan assets shall be liquidated to the extent necessary for such fees. In the event any part of the Plan assets becomes subject to tax, all taxes incurred will be paid from the Plan assets. Until paid, the expenses shall constitute a liability of the Trust Fund described in Section 11.1.

### 9.3    Paperless Administration

The Administrator may use telephonic or electronic media to satisfy any notice requirements required by this Plan, to the extent permissible under regulations (or other generally applicable guidance). In addition, a Participant's consent to immediate distribution may be provided through telephonic or electronic means, to the extent permissible under regulations (or other generally

35

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

applicable guidance). The Administrator also may use telephonic or electronic media to conduct plan transactions such as enrolling participants, making (and changing) salary reduction elections, electing (and changing) investment allocations, applying for Participant Plan loans, and other transactions, to the extent permissible under regulations (or other generally applicable guidance).

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## SECTION X
## AMENDMENTS

### 10.1 Amendment

The Employer may at any time either prospectively or retroactively amend the Plan by notifying Participants of such action. The Employer shall not have the right to reduce or affect the value of any Participant's Account Balance or any rights accrued under the Plan prior to amendment.

### 10.2 Conformation

The Employer shall amend and interpret the Plan to the extent necessary to conform to the requirements of Code Section 457 and any other applicable law, regulation or ruling, including amendments that are retroactive. In the event the Plan is deemed by the Internal Revenue Code to be administered in a manner inconsistent with Code Section 457, the Employer shall correct such inconsistency within the period provided in Code Section 457(b).

### 10.3 Plan Termination

In the event of the termination of the Plan, all Account Balances shall be disposed to or for the benefit of each Participant or Beneficiary in accordance with the provisions of Section VI or Section VII as soon as reasonably practicable following the Plan's termination. The Employer shall not have the right to reduce or affect the value of any Participant's account or any rights accrued under the Plan prior to termination of the Plan. The Participant's or Beneficiary's written consent to the commencement of distribution shall not be required regardless of the value of his or her Account Balance.

37

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

# SECTION XI
# TRUST FUND

## 11.1    Trust Fund

All amounts in a Participant's or Beneficiary's Account Balance, all property and rights purchased with such amounts, and all income attributable to such amounts, property, or rights shall be held and invested in the Trust Fund in accordance with this Plan. The Trust Fund, and any subtrust established under the Plan, shall be established pursuant to a written agreement that constitutes a valid trust, custodial agreement, annuity contract, or similar agreement under the laws of the State. All investments, amounts, property, and rights held under the Trust Fund shall be held in trust for the exclusive benefit of Participants and their Beneficiaries and defraying reasonable expenses of the Plan and of the Trust Fund. Prior to the satisfaction of all liabilities with respect to Participants and their Beneficiaries, no part of the assets and income of the Trust Fund may be used for, or diverted to, for purposes other than for the exclusive benefit of Participants and their Beneficiaries. The Employer has no beneficial interest in the Trust Fund and no part of the Trust Fund shall ever revert to the Employer, directly or indirectly, provided, however, that a contribution or any portion thereof made by the Employer through a mistake of fact under Section 12.4 shall upon written request of the Employer, reduced by losses attributable thereto, shall be returned to the Employer.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

## SECTION XII
## MISCELLANEOUS

### 12.1    Non-Assignability

Except as provided in Sections 12.2 and 12.3, no benefit under the Plan at any time shall be subject in any manner to anticipation, alienation, assignment (either at law or in equity), encumbrance, garnishment, levy, execution, or other legal or equitable process; and no person shall have power in any manner to anticipate, transfer, assign (either law or in equity), alienate or subject to attachment, garnishment, levy, execution, or other legal or equitable process, or in any way encumber his or her benefits under the Plan, or any part thereof, and any attempt to do so shall be void except to such extent as may be required by law.

### 12.2    Domestic Relation Orders

The Employer shall establish reasonable procedures to determine the status of domestic relations orders and to administer distributions under domestic relations orders which are deemed to be qualified orders. Such procedures shall be in writing and shall comply with the provisions of Code Section 414(p) and regulations issued thereunder.

Notwithstanding Section 12.1, the Administrator may affect a Participant's Account Balance for a "qualified domestic relations order" as defined in Code Section 414(p), and those other domestic relations orders permitted to be so treated by the Administrator under the provisions of the Retirement Equity Act of 1984. The amount of the Participant's Account Balance shall be paid in the manner and to the person or persons so directed in the qualified domestic relations order. Such payment shall be made without regard to whether the Participant is eligible for a distribution of benefits under the Plan.

### 12.3    IRS Levy

Notwithstanding Section 12.1, the Administrator may pay from a Participant's or Beneficiary's Account Balance the amount that the Administrator finds is lawfully demanded under a levy issued by the Internal Revenue Service to the Plan with respect to that Participant or Beneficiary or is sought to be collected by the United States Government under a judgment resulting from an unpaid tax assessment against the Participant or Beneficiary.

### 12.4    Mistaken Contributions

Notwithstanding any other provision of the Plan or the Trust Fund to the contrary, in the event any contribution of an Employer is made under a mistake of fact (and not a Plan operational error), such contribution may be returned to the Employer within one year after the payment of the contribution. Earnings attributable to the excess contribution may not be returned to the Employer, but losses attributable thereto must reduce the amount to be so returned.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 227 of 268

## 12.5 Employment

Neither the establishment of the Plan nor any modification thereof, nor the establishment of any account, nor the payment of any benefits, shall be construed as giving to any Participant or other person any legal or equitable right against the Employer except as herein provided; and, in no event, shall the terms or employment of any Employee be modified or in any way affected hereby.

## 12.6 Successors and Assigns

The Plan shall be binding upon and shall inure to the benefit of the Employer, its successors and assigns, all Participants and Beneficiaries and their heirs and legal representatives.

## 12.7 Written Notice

Any notice or other communication required or permitted under the Plan shall be in writing, and if directed to the Administrator shall be sent to the designated office of the Administrator, and, if directed to a Participant or to a Beneficiary, shall be sent to such Participant or Beneficiary at his or her last known address as it appears on the Administrator's record. To the extent permitted by law, regulation or other guidance from an appropriate regulatory agency, the Administrator, Employer or any other party may provide any notice or disclosure, obtain any authorization or consent, or satisfy any other obligation under the Plan through the use of any other medium acceptable to the Administrator. Such other medium may include, but is not necessarily limited to, electronic or telephonic medium. In addition, any communication or disclosure to or from Participants or Beneficiaries that is required under the terms of the Plan to be made in writing may be provided in any other medium (electronic, telephonic, or otherwise) that is acceptable to the Administrator and permitted under applicable law.

## 12.8 Total Agreement

This Plan and Participant deferral election, and any subsequently adopted Plan amendment thereof, shall constitute the total agreement or contract between the Employer and the Participant regarding the Plan. No oral statement regarding the Plan may be relied upon by the Participant.

## 12.9 Gender

As used herein the masculine shall include the neuter and the feminine where appropriate.

## 12.10 Controlling Law

This Plan is created and shall be construed, administered and interpreted in accordance with Code Section 457 and the regulations thereunder, and under laws of the State as the same shall be at the time any dispute or issue is raised. If any portion of this Plan is held illegal, invalid or unenforceable, the legality, validity and enforceability of the remainder shall be unaffected.

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

# SECTION XIII
# SUPERSEDING PROVISIONS

The superseding provisions applicable to the plan are described below:

**Section 5.1, 'Loans', is hereby amended and replaced in its entirety with the following:**

The Employer may elect to make loans available to Participants who are members of the Detroit Police Lieutenants & Sergeants Association (DLSA). If the Employer has elected to make loans available to Participants who are members of the Detroit Police Lieutenants & Sergeants Association (DLSA), the Employer shall establish written guidelines governing the granting and administration of loans, which are hereby incorporated into and made part of the Plan provided that such guidelines are approved by the Administrator and are not inconsistent with the provisions of this Section V. To the extent such guidelines are more restrictive than the provisions of the Plan and are not inconsistent with the provisions of Code Section 72(p) and regulations issued thereunder, the guidelines shall be controlling.

Except as modified by the Plan's loan program policy and procedures adopted by the Administrator, the following rules shall apply to loans under the Plan. Any loans that are issued under the Plan shall be administered in a manner consistent with the requirements of Code Section 72(p), Treasury Regulations 1.72(p) and any other applicable guidance issued thereunder.

**Section 5.3, 'Terms of Loan', is hereby amended and replaced in its entirety with the following:**

The terms of the loan shall:

(a)    charge a reasonable interest rate commensurate with current interest rates charged for loans

made under similar circumstances by persons in the business of lending money (subject to

the requirements of the Servicemembers Civil Relief Act).

(b)    require that the minimum loan term be 12 months;

(c)    require that the loan be repaid within five years unless the Participant certifies in writing to

the Administrator that the loan is to be used to acquire any dwelling unit which within a reasonable time is to be used (determined at the time the loan is made) as a principal residence (as defined in Code Section 121) of the Participant;

(d)    require substantially level amortization of such loan with payments not less frequently than

quarterly throughout the repayment period. If a loan is made from both a Participant's Roth

Contribution account and his or her other accounts under the Plan, the level amortization requirement shall be met with respect to both his or her Roth Contributions account and

41

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt    Doc 13575    Filed 05/27/22    Entered 05/27/22 09:29:43    Page 229 of 268

his

    or her other accounts under the Plan. Notwithstanding the foregoing, if so provided in the written guidelines applicable to Plan loans, the amortization schedule may be waived and payments suspended while a Participant is on a leave of absence from employment with

an

    Employer (for periods in which the Participant does not perform military service as described in paragraph (d)), provided that all of the following requirements are met:

(i)  Such leave is either without pay or at a reduced rate of pay that, after withholding for employment and income taxes, is less than the amount required to be paid under the amortization schedule;

(ii)  Payments resume after the earlier of (1) the date such leave of absence ends or (2) the one-year anniversary of the date such leave began;

(iii)  The period during which payments are suspended does not exceed one year;

(iv)  Payments resume in an amount not less than the amount required under the original amortization schedule; and

(v)  The waiver of the amortization schedule does not extend the period of the loan beyond

the

    maximum period permitted under this Section 5.3.

(e)  If a Participant is absent from employment with any participating employer for a period during which he or she performs services in the uniformed services (as defined in chapter 45 of title 38 of the United States Code), whether or not such services constitute qualified military service, the suspension of payments shall not be taken into account for purposes

of

    applying paragraph (d) of this Section 5.3 provided that all of the following requirements are met:

(i)  Payments resume upon completion of such military service;

(ii)  Payments resume in an amount not less than the amount required under the original amortization schedule and continue in such amount until the loan is repaid in full;

(iii)  Upon resumption, payments are made no less frequently than required under the original amortization schedule and continue under such schedule until the loan is repaid in full;

and

(iv)  The loan is repaid in full, including interest accrued during the period of such military service, no later than the maximum period otherwise permitted under this Section V extended by the period of such military service.

(f)  The loan shall be evidenced by a legally enforceable agreement that demonstrates compliance with the provisions of this Section.

(g)  Loans will be repaid by ACH until the City's payroll system is administratively able to allow repayment by payroll deduction.

## Section 5.4, 'Security for Loan; Default', is hereby amended and replaced in its entirety with the following:

(a)  Security. Any loan to a Participant under the Plan shall be secured by the pledge of the portion of the Participant's Account Balance in the Plan invested in such loan.

(b)  Loans in arrears. Any loans that are in arrears will be made current when the City's

42

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

13-53846-tjt   Doc 13575   Filed 05/27/22   Entered 05/27/22 09:29:43   Page 230 of 268

payroll
system will allow repayment by payroll deductions.

(c)    Default. In the event that a Participant fails to make a loan payment under this Section V
on

the last business day before the end of the calendar quarter following the quarter in which
the payment is due, unless payment is not made because the Participant is on a bona fide
leave of absence as determined by the Administrator and the amortization schedule is
suspended while the Participant is on leave of absence from employment with an
Employer, a default on the loan shall occur. In the event of such default, (i) all remaining
payments on the loan shall be immediately due and payable (including accrued interest)
at

the time of the default, and (ii) interest shall continue to accrue on the outstanding loan
balance until the loan is foreclosed.

In the case of any default on a loan to a Participant, the Administrator shall apply the portion of
the Participant's interest in the Plan held as security for the loan in satisfaction of the loan on the
date of Severance from Employment. In addition, the Administrator may take any legal action it
shall consider necessary or appropriate to enforce collection of the unpaid loan, with the costs of
any legal proceeding or collection to be charged to the Account Balance of the Participant.
Notwithstanding anything elsewhere in the Plan to the contrary, in the event a loan is outstanding
hereunder on the date of a Participant's death, his or her estate shall be his or her Beneficiary as
to the portion of his or her interest in the Plan invested in such loan (with the Beneficiary or
Beneficiaries as to the remainder of his or her interest in the Plan to be determined in accordance
with otherwise applicable provisions of the Plan).

**Qualified Domestic Relationship Orders (QDRO's) are not recognized by the City and thus
Section 12.2 Domestic Relation Orders is hereby removed in its entirety.**

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

# EMPLOYER ADOPTION PAGE

**IN WITNESS WHEREOF,** the Employer has executed this Plan document this _28th_ day of _November_ , _2018_ .

City of Detroit

SEAL

By _[signature]_

Name _Hakim W. Berry_

Title _Director Labor Relations_

Attest:

_Director Human Resources_

Title

_Denise Starr_

(Witness)

GN - 107560
GPLANLVL – CORRSPND

Specimen 457(b) Plan Document
Deferred Compensation Plan
Ver 102011

# EXHIBIT 6-5

**CITY OF DETROIT FLEXIBLE BENEFITS PLAN**

**AND ALL SUPPORTING FORMS HAVE BEEN PRODUCED FOR**

**CITY OF DETROIT**

Copyright 2014 SunGard
All Rights Reserved

**CITY OF DETROIT FLEXIBLE BENEFITS PLAN**

# TABLE OF CONTENTS

## ARTICLE I
### DEFINITIONS

## ARTICLE II
### PARTICIPATION

| | | |
|---|---|---|
| 2.1 | ELIGIBILITY | 2 |
| 2.2 | EFFECTIVE DATE OF PARTICIPATION | 2 |
| 2.3 | APPLICATION TO PARTICIPATE | 2 |
| 2.4 | TERMINATION OF PARTICIPATION | 3 |
| 2.5 | TERMINATION OF EMPLOYMENT | 3 |
| 2.6 | DEATH | 3 |

## ARTICLE III
### CONTRIBUTIONS TO THE PLAN

| | | |
|---|---|---|
| 3.1 | SALARY REDIRECTION | 3 |
| 3.2 | APPLICATION OF CONTRIBUTIONS | 4 |
| 3.3 | PERIODIC CONTRIBUTIONS | 4 |

## ARTICLE IV
### BENEFITS

| | | |
|---|---|---|
| 4.1 | BENEFIT OPTIONS | 4 |
| 4.2 | HEALTH CARE FLEXIBLE SPENDING ARRANGEMENT BENEFIT | 4 |
| 4.3 | DAY CARE FLEXIBLE SPENDING ARRANGEMENT BENEFIT | 4 |
| 4.4 | HEALTH INSURANCE BENEFIT | 4 |
| 4.5 | DENTAL INSURANCE BENEFIT | 4 |
| 4.6 | VISION INSURANCE BENEFIT | 5 |
| 4.7 | NONDISCRIMINATION REQUIREMENTS | 5 |

## ARTICLE V
### PARTICIPANT ELECTIONS

| | | |
|---|---|---|
| 5.1 | INITIAL ELECTIONS | 5 |
| 5.2 | SUBSEQUENT ANNUAL ELECTIONS | 5 |
| 5.3 | FAILURE TO ELECT | 6 |
| 5.4 | CHANGE IN STATUS | 6 |

## ARTICLE VI
### HEALTH CARE FLEXIBLE SPENDING ARRANGEMENT

| | | |
|---|---|---|
| 6.1 | ESTABLISHMENT OF PLAN | 8 |
| 6.2 | DEFINITIONS | 8 |
| 6.3 | FORFEITURES | 8 |
| 6.4 | LIMITATION ON ALLOCATIONS | 8 |
| 6.5 | NONDISCRIMINATION REQUIREMENTS | 9 |
| 6.6 | COORDINATION WITH CAFETERIA PLAN | 9 |
| 6.7 | HEALTH CARE FLEXIBLE SPENDING ARRANGEMENT CLAIMS | 9 |
| 6.8 | DEBIT AND CREDIT CARDS | 10 |

## ARTICLE VII
## DAY CARE FLEXIBLE SPENDING ARRANGEMENT

7.1     ESTABLISHMENT OF ACCOUNT ................................................................................................ 11

7.2     DEFINITIONS ............................................................................................................................... 11

7.3     DAY CARE FLEXIBLE SPENDING ARRANGEMENTS ......................................................... 11

7.4     INCREASES IN DAY CARE FLEXIBLE SPENDING ARRANGEMENTS .............................. 11

7.5     DECREASES IN DAY CARE FLEXIBLE SPENDING ARRANGEMENTS ............................. 12

7.6     ALLOWABLE DAY CARE REIMBURSEMENT....................................................................... 12

7.7     ANNUAL STATEMENT OF BENEFITS .................................................................................... 12

7.8     FORFEITURES .............................................................................................................................. 12

7.9     LIMITATION ON PAYMENTS ................................................................................................... 12

7.10    NONDISCRIMINATION REQUIREMENTS .............................................................................. 12

7.11    COORDINATION WITH CAFETERIA PLAN............................................................................ 12

7.12    DAY CARE FLEXIBLE SPENDING ARRANGEMENT CLAIMS............................................ 12

## ARTICLE VIII
## BENEFITS AND RIGHTS

8.1     CLAIM FOR BENEFITS ............................................................................................................... 13

8.2     APPLICATION OF BENEFIT PLAN SURPLUS ........................................................................ 15

## ARTICLE IX
## ADMINISTRATION

9.1     PLAN ADMINISTRATION............................................................................................................ 15

9.2     EXAMINATION OF RECORDS .................................................................................................. 16

9.3     PAYMENT OF EXPENSES .......................................................................................................... 16

9.4     INSURANCE CONTROL CLAUSE ............................................................................................. 16

9.5     INDEMNIFICATION OF ADMINISTRATOR ............................................................................ 16

## ARTICLE X
## AMENDMENT OR TERMINATION OF PLAN

10.1    AMENDMENT ............................................................................................................................... 16

10.2    TERMINATION.............................................................................................................................. 16

## ARTICLE XI
## MISCELLANEOUS

11.1    PLAN INTERPRETATION ............................................................................................................ 16

11.2    GENDER AND NUMBER ............................................................................................................. 16

11.3    WRITTEN DOCUMENT .............................................................................................................. 17

11.4    EXCLUSIVE BENEFIT ................................................................................................................ 17

11.5    PARTICIPANT'S RIGHTS ........................................................................................................... 17

11.6    ACTION BY THE EMPLOYER .................................................................................................... 17

11.7    NO GUARANTEE OF TAX CONSEQUENCES .......................................................................... 17

11.8    INDEMNIFICATION OF EMPLOYER BY PARTICIPANTS ..................................................... 17

11.9    FUNDING ...................................................................................................................................... 17

11.10   GOVERNING LAW ....................................................................................................................... 17

11.11   SEVERABILITY............................................................................................................................. 17

11.12    CAPTIONS ................................................................................................................................................................... 17

11.13    CONTINUATION OF COVERAGE (COBRA) ........................................................................................................ 18

11.14    FAMILY AND MEDICAL LEAVE ACT (FMLA) ................................................................................................... 18

11.15    HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) .............................................. 18

11.16    UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT (USERRA) ......................... 18

11.17    COMPLIANCE WITH HIPAA PRIVACY STANDARDS ...................................................................................... 18

11.18    COMPLIANCE WITH HIPAA ELECTRONIC SECURITY STANDARDS ........................................................... 19

11.19    MENTAL HEALTH PARITY AND ADDICTION EQUITY ACT ........................................................................... 19

11.20    GENETIC INFORMATION NONDISCRIMINATION ACT (GINA) ..................................................................... 19

11.21    WOMEN'S HEALTH AND CANCER RIGHTS ACT ............................................................................................. 19

11.22    NEWBORNS' AND MOTHERS' HEALTH PROTECTION ACT .......................................................................... 20

# CITY OF DETROIT FLEXIBLE BENEFITS PLAN

## INTRODUCTION

The Employer has amended this Plan effective January 1, 2014, to recognize the contribution made to the Employer by its Employees. Its purpose is to reward them by providing benefits for those Employees who shall qualify hereunder and their Dependents and beneficiaries. The concept of this Plan is to allow Employees to choose among different types of benefits based on their own particular goals, desires and needs. This Plan is a restatement of a Plan which was originally effective on October 1, 2012. The Plan shall be known as City of Detroit Flexible Benefits Plan (the "Plan").

The intention of the Employer is that the Plan qualify as a "Cafeteria Plan" within the meaning of Section 125 of the Internal Revenue Code of 1986, as amended, and that the benefits which an Employee elects to receive under the Plan be excludable from the Employee's income under Section 125(a) and other applicable sections of the Internal Revenue Code of 1986, as amended.

## ARTICLE I
## DEFINITIONS

1.1 **"Administrator"** means the Employer unless another person or entity has been designated by the Employer pursuant to Section 9.1 to administer the Plan on behalf of the Employer. If the Employer is the Administrator, the Employer may appoint any person, including, but not limited to, the Employees of the Employer, to perform the duties of the Administrator. Any person so appointed shall signify acceptance by filing written acceptance with the Employer. Upon the resignation or removal of any individual performing the duties of the Administrator, the Employer may designate a successor.

1.2 **"Affiliated Employer"** means the Employer and any corporation which is a member of a controlled group of corporations (as defined in Code Section 414(b)) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code Section 414(m)) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to Treasury regulations under Code Section 414(o).

1.3 **"Benefit"** or **"Benefit Options"** means any of the optional benefit choices available to a Participant as outlined in Section 4.1.

1.4 **"Cafeteria Plan Benefit Dollars"** means the amount available to Participants to purchase Benefit Options as provided under Section 4.1. Each dollar contributed to this Plan shall be converted into one Cafeteria Plan Benefit Dollar.

1.5 **"Code"** means the Internal Revenue Code of 1986, as amended or replaced from time to time.

1.6 **"Compensation"** means the amounts received by the Participant from the Employer during a Plan Year.

1.7 **"Dependent"** means any individual who qualifies as a dependent under the self-funded plan for purposes of that plan or under Code Section 152 (as modified by Code Section 105(b)).

**"Dependent"** shall include any Child of a Participant who is covered under an Insurance Contract, as defined in the Contract, or under the Health Care Flexible Spending Arrangement or as allowed by reason of the Affordable Care Act.

For purposes of the Health Care Flexible Spending Arrangement, a Participant's "Child" includes his/her natural child, stepchild, foster child, adopted child, or a child placed with the Participant for adoption. A Participant's Child will be an eligible Dependent until reaching the limiting age of 26, without regard to student status, marital status, financial dependency or residency status with the Employee or any other person. When the child reaches the applicable limiting age, coverage will end at the end of the calendar year.

The phrase "placed for adoption" refers to a child whom the Participant intends to adopt, whether or not the adoption has become final, who has not attained the age of 18 as of the date of such placement for adoption. The term "placed" means the assumption and retention by such Employee of a legal obligation for total or partial support of the child in anticipation of adoption of the child. The child must be available for adoption and the legal process must have commenced.

1.8 **"Effective Date"** means October 1, 2012.

1.9 **"Election Period"** means the period immediately preceding the beginning of each Plan Year established by the Administrator, such period to be applied on a uniform and nondiscriminatory basis for all Employees and Participants. However, an Employee's initial Election Period shall be determined pursuant to Section 5.1.

1.10 **"Eligible Employee"** means any Employee who has satisfied the provisions of Section 2.1.

An individual shall not be an "Eligible Employee" if such individual is not reported on the payroll records of the Employer as a common law employee. In particular, it is expressly intended that individuals not treated as common law employees by the Employer on its payroll records are not "Eligible Employees" and are excluded from Plan participation even if a court or administrative agency determines that such individuals are common law employees and not independent contractors.

1.11 **"Employee"** means any person who is employed by the Employer. The term Employee shall include leased employees within the meaning of Code Section 414(n)(2).

1.12 **"Employer"** means City of Detroit and any successor which shall maintain this Plan; and any predecessor which has maintained this Plan. In addition, where appropriate, the term Employer shall include any Participating, Affiliated or Adopting Employer.

1.13 **"Grace Period"** means, with respect to any Plan Year, the time period ending on the fifteenth day of the third calendar month after the end of such Plan Year, during which Medical Expenses and Employment-Related Day Care Expenses incurred by a Participant will be deemed to have been incurred during such Plan Year.

1.14 **"Insurance Contract"** means any contract issued by an Insurer underwriting a Benefit.

1.15 **"Insurer"** means any insurance company that underwrites a Benefit under this Plan or, with respect to any self-funded benefits, the Employer.

1.16 **"Key Employee"** means an Employee described in Code Section 416(i)(1) and the Treasury regulations thereunder.

1.17 **"Participant"** means any Eligible Employee who elects to become a Participant pursuant to Section 2.3 and has not for any reason become ineligible to participate further in the Plan.

1.18 **"Plan"** means this instrument, including all amendments thereto.

1.19 **"Plan Year"** means the 12-month period beginning January 1 and ending December 31. The Plan Year shall be the coverage period for the Benefits provided for under this Plan. In the event a Participant commences participation during a Plan Year, then the initial coverage period shall be that portion of the Plan Year commencing on such Participant's date of entry and ending on the last day of such Plan Year.

1.20 **"Premiums"** mean the Participant's cost for the self-funded Benefits described in Section 4.1.

1.21 **"Premium Conversion Benefit"** means the account established for a Participant pursuant to this Plan to which part of his Cafeteria Plan Benefit Dollars may be allocated and from which Premiums of the Participant shall be paid or reimbursed. If more than one type of insured or self-funded Benefit is elected, sub-accounts shall be established for each type of insured or self-funded Benefit.

1.22 **"Salary Redirection"** means the contributions made by the Employer on behalf of Participants pursuant to Section 3.1. These contributions shall be converted to Cafeteria Plan Benefit Dollars and allocated to the funds or accounts established under the Plan pursuant to the Participants' elections made under Article V.

1.23 **"Salary Redirection Agreement"** means an agreement between the Participant and the Employer under which the Participant agrees to reduce his Compensation or to forego all or part of the increases in such Compensation and to have such amounts contributed by the Employer to the Plan on the Participant's behalf. The Salary Redirection Agreement shall apply only to Compensation that has not been actually or constructively received by the Participant as of the date of the agreement (after taking this Plan and Code Section 125 into account) and, subsequently does not become currently available to the Participant.

1.24 **"Spouse"** means "spouse" as defined in the self-funded plan for purposes of that plan or the "spouse," as defined under Federal law, of a Participant, unless legally separated by court decree.

**ARTICLE II**
**PARTICIPATION**

## 2.1 ELIGIBILITY

Any Eligible Employee shall be eligible to participate hereunder as of the date he satisfies the eligibility conditions for the Employer's group medical plan, the provisions of which are specifically incorporated herein by reference. However, any Eligible Employee who was a Participant in the Plan on the effective date of this amendment shall continue to be eligible to participate in the Plan.

## 2.2 EFFECTIVE DATE OF PARTICIPATION

An Eligible Employee shall become a Participant effective as of the entry date under the Employer's group medical plan, the provisions of which are specifically incorporated herein by reference.

## 2.3 APPLICATION TO PARTICIPATE

An Employee who is eligible to participate in this Plan shall, during the applicable Election Period, complete an application to participate in a manner set forth by the Administrator. The election shall be irrevocable until the end of the applicable Plan Year unless the Participant is entitled to change his Benefit elections pursuant to Section 5.4 hereof.

An Eligible Employee shall also be required to complete a Salary Redirection Agreement during the Election Period for the Plan Year during which he wishes to participate in this Plan. Any such Salary Redirection Agreement shall be effective for the first pay period beginning on or after the Employee's effective date of participation pursuant to Section 2.2.

Notwithstanding the foregoing, an Employee who is eligible to participate in this Plan and who is covered by the Employer's insured or self-funded Benefits under this Plan shall automatically become a Participant to the extent of the Premiums for such insurance unless the Employee elects, during the Election Period, not to participate in the Plan.

## 2.4    TERMINATION OF PARTICIPATION

A Participant shall no longer participate in this Plan upon the occurrence of any of the following events:

(a)    **Termination of employment.** The Participant's termination of employment, subject to the provisions of Section 2.5;

(b)    **Death.** The Participant's death, subject to the provisions of Section 2.6; or

(c)    **Termination of the plan.** The termination of this Plan, subject to the provisions of Section 10.2.

## 2.5    TERMINATION OF EMPLOYMENT

If a Participant's employment with the Employer is terminated for any reason other than death, his participation in the Benefit Options provided under Section 4.1 shall be governed in accordance with the following:

(a)    **Insurance Benefit.** With regard to Benefits provided under Section 4.1, the Participant's participation in the Plan shall cease, subject to the Participant's right to continue coverage under any Insurance Contract or self-funded benefit for which premiums have already been paid.

(b)    **Day Care FSA.** With regard to the Day Care Flexible Spending Arrangement, the Participant's participation in the Plan shall cease and no further Salary Redirection contributions shall be made. However, such Participant may submit claims for employment related Day Care Expense reimbursements for claims incurred through the remainder of the Plan Year in which such termination occurs and submitted within 90 days after the end of the Plan Year, based on the level of the Participant's Day Care Flexible Spending Arrangement as of the date of termination.

(c)    **COBRA applicability.** With regard to the Health Care Flexible Spending Arrangement, the Participant may submit claims for expenses that were incurred during the portion of the Plan Year before the end of the period for which payments to the Health Care Flexible Spending Arrangement have already been made. Thereafter, the health benefits under this Plan including the Health Care Flexible Spending Arrangement shall be applied and administered consistent with such further rights a Participant and his Dependents may be entitled to pursuant to Code Section 4980B and Section 11.13 of the Plan.

## 2.6    DEATH

If a Participant dies, his participation in the Plan shall cease. However, such Participant's spouse or Dependents may submit claims for expenses or benefits for the remainder of the Plan Year or until the Cafeteria Plan Benefit Dollars allocated to each specific benefit are exhausted. In no event may reimbursements be paid to someone who is not a spouse or Dependent. If the Plan is subject to the provisions of Code Section 4980B, then those provisions and related regulations shall apply for purposes of the Health Care Flexible Spending Arrangement.

**ARTICLE III**
**CONTRIBUTIONS TO THE PLAN**

## 3.1    SALARY REDIRECTION

Benefits under the Plan shall be financed by Salary Redirections sufficient to support Benefits that a Participant has elected hereunder and to pay the Participant's Premiums. The salary administration program of the Employer shall be revised to allow each Participant to agree to reduce his pay during a Plan Year by an amount determined necessary to purchase the elected Benefit Options. The amount of such Salary Redirection shall be specified in the Salary Redirection Agreement and shall be applicable for a Plan Year. Notwithstanding the above, for new Participants, the Salary Redirection Agreement shall only be applicable from the first day of the pay period following the Employee's entry date up to and including the last day of the Plan Year. These contributions shall be converted to Cafeteria Plan Benefit Dollars and allocated to the funds or accounts established under the Plan pursuant to the Participants' elections made under Article IV.

Any Salary Redirection shall be determined prior to the beginning of a Plan Year (subject to initial elections pursuant to Section 5.1) and prior to the end of the Election Period and shall be irrevocable for such Plan Year. However, a Participant may revoke a Benefit election or a Salary Redirection Agreement after the Plan Year has commenced and make a new election with respect to the remainder of the Plan Year, if both the revocation and the new election are on account of and consistent with a change in status and such other permitted events as determined under Article V of the Plan and consistent with the rules and regulations of the Department of the Treasury. Salary

Redirection amounts shall be contributed on a pro rata basis for each pay period during the Plan Year. All individual Salary Redirection Agreements are deemed to be part of this Plan and incorporated by reference hereunder.

## 3.2 APPLICATION OF CONTRIBUTIONS

As soon as reasonably practical after each payroll period, the Employer shall apply the Salary Redirection to provide the Benefits elected by the affected Participants. Any contribution made or withheld for the Health Care Flexible Spending Arrangement or Day Care Flexible Spending Arrangement shall be credited to such fund or account. Amounts designated for the Participant's Premium Conversion Benefit shall likewise be credited to such account for the purpose of paying Premiums.

## 3.3 PERIODIC CONTRIBUTIONS

Notwithstanding the requirement provided above and in other Articles of this Plan that Salary Redirections be contributed to the Plan by the Employer on behalf of an Employee on a level and pro rata basis for each payroll period, the Employer and Administrator may implement a procedure in which Salary Redirections are contributed throughout the Plan Year on a periodic basis that is not pro rata for each payroll period. However, with regard to the Health Care Flexible Spending Arrangement, the payment schedule for the required contributions may not be based on the rate or amount of reimbursements during the Plan Year.

**ARTICLE IV**
**BENEFITS**

## 4.1 BENEFIT OPTIONS

Each Participant may elect any one or more of the following optional Benefits:

(1)     Health Care Flexible Spending Arrangement

(2)     Day Care Flexible Spending Arrangement

In addition, each Participant shall have a sufficient portion of his Salary Redirections applied to the following Benefits unless the Participant elects not to receive such Benefits:

(3)     Health Insurance Benefit

(4)     Dental Insurance Benefit

(5)     Vision Insurance Benefit

## 4.2 HEALTH CARE FLEXIBLE SPENDING ARRANGEMENT BENEFIT

Each Participant may elect to participate in the Health Care Flexible Spending Arrangement option, in which case Article VI shall apply.

## 4.3 DAY CARE FLEXIBLE SPENDING ARRANGEMENT BENEFIT

Each Participant may elect to participate in the Day Care Flexible Spending Arrangement option, in which case Article VII shall apply.

## 4.4 HEALTH INSURANCE BENEFIT

(a)     **Coverage for Participant and Dependents.** Each Participant may elect to be covered under a health Contract for the Participant, his or her Spouse, and his or her Dependents.

(b)     **Employer selects contracts.** The Employer may select suitable health Contracts for use in providing this health insurance benefit, which policies will provide uniform benefits for all Participants electing this Benefit.

(c)     **Contract incorporated by reference.** The rights and conditions with respect to the benefits payable from such health Contract shall be determined therefrom, and such Contract shall be incorporated herein by reference.

## 4.5 DENTAL INSURANCE BENEFIT

(a)     **Coverage for Participant and/or Dependents.** Each Participant may elect to be covered under the Employer's dental Insurance Contract. In addition, the Participant may elect either individual or family coverage under such Insurance Contract.

(b)     **Employer selects contracts.** The Employer may select suitable dental Insurance Contracts for use in providing this dental insurance benefit, which policies will provide uniform benefits for all Participants electing this Benefit.

(c)     **Contract incorporated by reference.** The rights and conditions with respect to the benefits payable from such dental Insurance Contract shall be determined therefrom, and such dental Insurance Contract shall be incorporated herein by reference.

## 4.6     VISION INSURANCE BENEFIT

(a)     **Coverage for Participant and/or Dependents.** Each Participant may elect to be covered under the Employer's vision Insurance Contract. In addition, the Participant may elect either individual or family coverage.

(b)     **Employer selects contracts.** The Employer may select suitable vision Insurance Contracts for use in providing this vision insurance benefit, which policies will provide uniform benefits for all Participants electing this Benefit.

(c)     **Contract incorporated by reference.** The rights and conditions with respect to the benefits payable from such vision Insurance Contract shall be determined therefrom, and such vision Insurance Contract shall be incorporated herein by reference.

## 4.7     NONDISCRIMINATION REQUIREMENTS

(a)     **Intent to be nondiscriminatory.** It is the intent of this Plan to provide benefits to a classification of employees which the Secretary of the Treasury finds not to be discriminatory in favor of the group in whose favor discrimination may not occur under Code Section 125.

(b)     **25% concentration test.** It is the intent of this Plan not to provide qualified benefits as defined under Code Section 125 to Key Employees in amounts that exceed 25% of the aggregate of such Benefits provided for all Eligible Employees under the Plan. For purposes of the preceding sentence, qualified benefits shall not include benefits which (without regard to this paragraph) are includible in gross income.

(c)     **Adjustment to avoid test failure.** If the Administrator deems it necessary to avoid discrimination or possible taxation to Key Employees or a group of employees in whose favor discrimination may not occur in violation of Code Section 125, it may, but shall not be required to, reduce contributions or non-taxable Benefits in order to assure compliance with this Section. Any act taken by the Administrator under this Section shall be carried out in a uniform and nondiscriminatory manner. If the Administrator decides to reduce contributions or non-taxable Benefits, it shall be done in the following manner. First, the non-taxable Benefits of the affected Participant (either an employee who is highly compensated or a Key Employee, whichever is applicable) who has the highest amount of non-taxable Benefits for the Plan Year shall have his non-taxable Benefits reduced until the discrimination tests set forth in this Section are satisfied or until the amount of his non-taxable Benefits equals the non-taxable Benefits of the affected Participant who has the second highest amount of non-taxable Benefits. This process shall continue until the nondiscrimination tests set forth in this Section are satisfied. With respect to any affected Participant who has had Benefits reduced pursuant to this Section, the reduction shall be made proportionately among Health Care Flexible Spending Arrangement Benefits and Day Care Flexible Spending Arrangement Benefits, and once all these Benefits are expended, proportionately among self-funded Benefits. Contributions which are not utilized to provide Benefits to any Participant by virtue of any administrative act under this paragraph shall be forfeited and deposited into the benefit plan surplus.

## ARTICLE V
## PARTICIPANT ELECTIONS

## 5.1     INITIAL ELECTIONS

An Employee who meets the eligibility requirements of Section 2.1 on the first day of, or during, a Plan Year may elect to participate in this Plan for all or the remainder of such Plan Year, provided he elects to do so on or before his effective date of participation pursuant to Section 2.2.

Notwithstanding the foregoing, an Employee who is eligible to participate in this Plan and who is covered by the Employer's insured or self-funded benefits under this Plan shall automatically become a Participant to the extent of the Premiums for such insurance unless the Employee elects, during the Election Period, not to participate in the Plan.

## 5.2     SUBSEQUENT ANNUAL ELECTIONS

During the Election Period prior to each subsequent Plan Year, each Participant shall be given the opportunity to elect, on an election of benefits form to be provided by the Administrator, which spending account Benefit options he wishes to select. Any such election shall be effective for any Benefit expenses incurred during the Plan Year which follows the end of the Election Period. With regard to subsequent annual elections, the following options shall apply:

(a)     A Participant or Employee who failed to initially elect to participate may elect different or new Benefits under the Plan during the Election Period;

(b)        A Participant may terminate his participation in the Plan by notifying the Administrator in writing during the Election Period that he does not want to participate in the Plan for the next Plan Year;

(c)        An Employee who elects not to participate for the Plan Year following the Election Period will have to wait until the next Election Period before again electing to participate in the Plan, except as provided for in Section 5.4.

## 5.3        FAILURE TO ELECT

With regard to Benefits available under the Plan for which no Premiums apply, any Participant who fails to complete a new benefit election form pursuant to Section 5.2 by the end of the applicable Election Period shall be deemed to have elected not to participate in the Plan for the upcoming Plan Year. No further Salary Redirections shall therefore be authorized or made for the subsequent Plan Year for such Benefits.

With regard to Benefits available under the Plan for which Premiums apply, any Participant who fails to complete a new benefit election form pursuant to Section 5.2 by the end of the applicable Election Period shall be deemed to have made the same Benefit elections as are then in effect for the current Plan Year. The Participant shall also be deemed to have elected Salary Redirection in an amount necessary to purchase such Benefit options.

## 5.4        CHANGE IN STATUS

(a)        **Change in status defined.** Any Participant may change a Benefit election after the Plan Year (to which such election relates) has commenced and make new elections with respect to the remainder of such Plan Year if, under the facts and circumstances, the changes are necessitated by and are consistent with a change in status which is acceptable under rules and regulations adopted by the Department of the Treasury, the provisions of which are incorporated by reference. Notwithstanding anything herein to the contrary, if the rules and regulations conflict, then such rules and regulations shall control.

In general, a change in election is not consistent if the change in status is the Participant's divorce, annulment or legal separation from a Spouse, the death of a Spouse or Dependent, or a Dependent ceasing to satisfy the eligibility requirements for coverage, and the Participant's election under the Plan is to cancel accident or health insurance coverage for any individual other than the one involved in such event. In addition, if the Participant, Spouse or Dependent gains or loses eligibility for coverage, then a Participant's election under the Plan to cease or decrease coverage for that individual under the Plan corresponds with that change in status only if coverage for that individual becomes applicable or is increased under the family member plan.

Regardless of the consistency requirement, if the individual, the individual's Spouse, or Dependent becomes eligible for continuation coverage under the Employer's group health plan as provided in Code Section 4980B or any similar state law, then the individual may elect to increase payments under this Plan in order to pay for the continuation coverage. However, this does not apply for COBRA eligibility due to divorce, annulment or legal separation.

Any new election shall be effective at such time as the Administrator shall prescribe, but not earlier than the first pay period beginning after the election form is completed and returned to the Administrator. For the purposes of this subsection, a change in status shall only include the following events or other events permitted by Treasury regulations:

(1)        Legal Marital Status: events that change a Participant's legal marital status, including marriage, divorce, death of a Spouse, legal separation or annulment;

(2)        Number of Dependents: Events that change a Participant's number of Dependents, including birth, adoption, placement for adoption, or death of a Dependent;

(3)        Employment Status: Any of the following events that change the employment status of the Participant, Spouse, or Dependent: termination or commencement of employment, a strike or lockout, commencement or return from an unpaid leave of absence, or a change in worksite. In addition, if the eligibility conditions of this Plan or other employee benefit plan of the Employer of the Participant, Spouse, or Dependent depend on the employment status of that individual and there is a change in that individual's employment status with the consequence that the individual becomes (or ceases to be) eligible under the plan, then that change constitutes a change in employment under this subsection;

(4)        Dependent satisfies or ceases to satisfy the eligibility requirements: An event that causes the Participant's Dependent to satisfy or cease to satisfy the requirements for coverage due to attainment of age, student status, or any similar circumstance; and

(5)        Residency: A change in the place of residence of the Participant, Spouse or Dependent, that would lead to a change in status (such as a loss of HMO coverage).

For the Day Care Flexible Spending Arrangement, a Dependent becoming or ceasing to be a "Qualifying Dependent" as defined under Code Section 21(b) shall also qualify as a change in status.

Notwithstanding anything in this Section to the contrary, the gain of eligibility or change in eligibility of a child, as allowed under Code Sections 105(b) and 106, and IRS Notice 2010-38, shall qualify as a change in status.

(b)     **Special enrollment rights.** Notwithstanding subsection (a), the Participants may change an election for accident or health coverage during a Plan Year and make a new election that corresponds with the special enrollment rights provided in Code Section 9801(f), including those authorized under the provisions of the Children's Health Insurance Program Reauthorization Act of 2009 (SCHIP); provided that such Participant meets the sixty (60) day notice requirement imposed by Code Section 9801(f) (or such longer period as may be permitted by the Plan and communicated to Participants). Such change shall take place on a prospective basis, unless otherwise required by Code Section 9801(f) to be retroactive.

(c)     **Qualified Medical Support Order.** Notwithstanding subsection (a), in the event of a judgment, decree, or order (including approval of a property settlement) ("order") resulting from a divorce, legal separation, annulment, or change in legal custody which requires accident or health coverage for a Participant's child (including a foster child who is a Dependent of the Participant):

(1)     The Plan may change an election to provide coverage for the child if the order requires coverage under the Participant's plan; or

(2)     The Participant shall be permitted to change an election to cancel coverage for the child if the order requires the former Spouse to provide coverage for such child, under that individual's plan and such coverage is actually provided.

(d)     **Medicare or Medicaid.** Notwithstanding subsection (a), a Participant may change elections to cancel accident or health coverage for the Participant or the Participant's Spouse or Dependent if the Participant or the Participant's Spouse or Dependent is enrolled in the accident or health coverage of the Employer and becomes entitled to coverage (i.e., enrolled) under Part A or Part B of the Title XVIII of the Social Security Act (Medicare) or Title XIX of the Social Security Act (Medicaid), other than coverage consisting solely of benefits under Section 1928 of the Social Security Act (the program for distribution of pediatric vaccines). If the Participant or the Participant's Spouse or Dependent who has been entitled to Medicaid or Medicare coverage loses eligibility, that individual may prospectively elect coverage under the Plan if a benefit package option under the Plan provides similar coverage.

(e)     **Cost increase or decrease.** If the cost of a Benefit provided under the Plan increases or decreases during a Plan Year, then the Plan shall automatically increase or decrease, as the case may be, the Salary Redirections of all affected Participants for such Benefit. Alternatively, if the cost of a benefit package option increases significantly, the Administrator shall permit the affected Participants to either make corresponding changes in their payments or revoke their elections and, in lieu thereof, receive on a prospective basis coverage under another benefit package option with similar coverage, or drop coverage prospectively if there is no benefit package option with similar coverage.

A cost increase or decrease refers to an increase or decrease in the amount of elective contributions under the Plan, whether resulting from an action taken by the Participants or an action taken by the Employer.

(f)     **Loss of coverage.** If the coverage under a Benefit is significantly curtailed or ceases during a Plan Year, affected Participants may revoke their elections of such Benefit and, in lieu thereof, elect to receive on a prospective basis coverage under another plan with similar coverage, or drop coverage prospectively if no similar coverage is offered.

(g)     **Addition of a new benefit.** If, during the period of coverage, a new benefit package option or other coverage option is added, an existing benefit package option is significantly improved, or an existing benefit package option or other coverage option is eliminated, then the affected Participants may elect the newly-added option, or elect another option if an option has been eliminated prospectively and make corresponding election changes with respect to other benefit package options providing similar coverage. In addition, those Eligible Employees who are not participating in the Plan may opt to become Participants and elect the new or newly improved benefit package option.

(h)     **Loss of coverage under certain other plans.** A Participant may make a prospective election change to add group health coverage for the Participant, the Participant's Spouse or Dependent if such individual loses group health coverage sponsored by a governmental or educational institution, including a state children's health insurance program under the Social Security Act, the Indian Health Service or a health program offered by an Indian tribal government, a state health benefits risk pool, or a foreign government group health plan.

(i)     **Change of coverage due to change under certain other plans.** A Participant may make a prospective election change that is on account of and corresponds with a change made under the plan of a Spouse's, former Spouse's or Dependent's employer if (1) the cafeteria plan or other benefits plan of the Spouse's, former Spouse's or Dependent's employer permits its participants to make a change; or (2) the cafeteria plan permits participants to make an election for a period of coverage that is different from the period of coverage under the cafeteria plan of a Spouse's, former Spouse's or Dependent's employer.

(j)     **Change in Day Care provider.** A Participant may make a prospective election change that is on account of and corresponds with a change by the Participant in the Day Care provider. The availability of Day Care services from a new childcare provider is similar to a new benefit package option becoming available. A cost change is allowable in the Day Care Flexible Spending Arrangement only if the cost change is imposed by a Day Care provider who is not related to the Participant, as defined in Code Section 152(a)(1) through (8).

(k)     **Health FSA cannot change due to insurance change.** A Participant shall not be permitted to change an election to the Health Care Flexible Spending Arrangement as a result of a cost or coverage change under any health insurance benefits.

## ARTICLE VI
## HEALTH CARE FLEXIBLE SPENDING ARRANGEMENT

### 6.1     ESTABLISHMENT OF PLAN

This Health Care Flexible Spending Arrangement is intended to qualify as a medical reimbursement plan under Code Section 105 and shall be interpreted in a manner consistent with such Code Section and the Treasury regulations thereunder. Participants who elect to participate in this Health Care Flexible Spending Arrangement may submit claims for the reimbursement of Medical Expenses. All amounts reimbursed shall be periodically paid from amounts allocated to the Health Care Flexible Spending Arrangement. Periodic payments reimbursing Participants from the Health Care Flexible Spending Arrangement shall in no event occur less frequently than monthly.

### 6.2     DEFINITIONS

For the purposes of this Article and the Cafeteria Plan, the terms below have the following meaning:

(a)     **"Health Care Flexible Spending Arrangement"** means the account established for Participants pursuant to this Plan to which part of their Cafeteria Plan Benefit Dollars may be allocated and from which all allowable Medical Expenses incurred by a Participant, his or her Spouse and his or her Dependents may be reimbursed.

(b)     **"Highly Compensated Participant"** means, for the purposes of this Article and determining discrimination under Code Section 105(h), a participant who is:

(1)     one of the 5 highest paid officers;

(2)     a shareholder who owns (or is considered to own applying the rules of Code Section 318) more than 10 percent in value of the stock of the Employer; or

(3)     among the highest paid 25 percent of all Employees (other than exclusions permitted by Code Section 105(h)(3)(B) for those individuals who are not Participants).

(c)     **"Medical Expenses"** means any expense for medical care within the meaning of the term "medical care" as defined in Code Section 213(d) and the rulings and Treasury regulations thereunder, and not otherwise used by the Participant as a deduction in determining his tax liability under the Code. "Medical Expenses" can be incurred by the Participant, his or her Spouse and his or her Dependents. "Incurred" means, with regard to Medical Expenses, when the Participant is provided with the medical care that gives rise to the Medical Expense and not when the Participant is formally billed or charged for, or pays for, the medical care.

A Participant may not be reimbursed for the cost of any medicine or drug that is not "prescribed" within the meaning of Code Section 106(f) or is not insulin.

A Participant may not be reimbursed for the cost of other health coverage such as premiums paid under plans maintained by the employer of the Participant's Spouse or individual policies maintained by the Participant or his Spouse or Dependent.

A Participant may not be reimbursed for "qualified long-term care services" as defined in Code Section 7702B(c).

(d)     The definitions of Article I are hereby incorporated by reference to the extent necessary to interpret and apply the provisions of this Health Care Flexible Spending Arrangement.

### 6.3     FORFEITURES

The amount in the Health Care Flexible Spending Arrangement as of the end of any Plan Year (and after the processing of all claims for such Plan Year pursuant to Section 6.7 hereof) shall be forfeited and credited to the benefit plan surplus. In such event, the Participant shall have no further claim to such amount for any reason, subject to Section 8.2.

### 6.4     LIMITATION ON ALLOCATIONS

(a)     Notwithstanding any provision contained in this Health Care Flexible Spending Arrangement to the contrary, the maximum amount that may be allocated to the Health Care Flexible Spending Arrangement by a Participant in or on account of any Plan Year is $2,500.

(b) **Cost of Living Adjustment.** In no event shall the amount of salary redirections on the Health Care Flexible Spending Arrangement exceed $2,500 as adjusted by law. Such amount shall be adjusted for increases in the cost-of-living in accordance with Code Section 125(i)(2). The cost-of-living adjustment in effect for a calendar year applies to any Plan Year beginning with or within such calendar year. The dollar increase in effect on January 1 of any calendar year shall be effective for the Plan Year beginning with or within such calendar year. For any short Plan Year, the limit shall be an amount equal to the limit for the calendar year in which the Plan Year begins multiplied by the ratio obtained by dividing the number of full months in the short Plan Year by twelve (12).

(c) **Participation in Other Plans.** All employers that are treated as a single employer under Code Sections 414(b), (c), or (m), relating to controlled groups and affiliated service groups, are treated as a single employer for purposes of the $2,500 limit. If a Participant participates in multiple cafeteria plans offering Health Care Flexible Spending Arrangements maintained by members of a controlled group or affiliated service group, the Participant's total Health Care Flexible Spending Arrangement contributions under all of the cafeteria plans are limited to $2,500 (as adjusted). However, a Participant employed by two or more employers that are not members of the same controlled group may elect up to $2,500 (as adjusted) under each Employer's Health Care Flexible Spending Arrangement.

(d) **Grace Period.** Payment of expenses from a previous year in the first months of the next Plan Year, the $2,500 limit applies to the Plan Year including the Grace Period. Amounts carried into the next Plan Year as part of the Grace Period shall not affect the limit for that next Plan Year.

## 6.5    NONDISCRIMINATION REQUIREMENTS

(a) **Intent to be nondiscriminatory.** It is the intent of this Health Care Flexible Spending Arrangement not to discriminate in violation of the Code and the Treasury regulations thereunder.

(b) **Adjustment to avoid test failure.** If the Administrator deems it necessary to avoid discrimination under this Health Care Flexible Spending Arrangement, it may, but shall not be required to, reject any elections or reduce contributions or Benefits in order to assure compliance with this Section. Any act taken by the Administrator under this Section shall be carried out in a uniform and nondiscriminatory manner. If the Administrator decides to reject any elections or reduce contributions or Benefits, it shall be done in the following manner. First, the Benefits designated for the Health Care Flexible Spending Arrangement by the member of the group in whose favor discrimination may not occur pursuant to Code Section 105 that elected to contribute the highest amount to the fund for the Plan Year shall be reduced until the nondiscrimination tests set forth in this Section or the Code are satisfied, or until the amount designated for the fund equals the amount designated for the fund by the next member of the group in whose favor discrimination may not occur pursuant to Code Section 105 who has elected the second highest contribution to the Health Care Flexible Spending Arrangement for the Plan Year. This process shall continue until the nondiscrimination tests set forth in this Section or the Code are satisfied. Contributions which are not utilized to provide Benefits to any Participant by virtue of any administrative act under this paragraph shall be forfeited and credited to the benefit plan surplus.

## 6.6    COORDINATION WITH CAFETERIA PLAN

All Participants under the Cafeteria Plan are eligible to receive Benefits under this Health Care Flexible Spending Arrangement. The enrollment under the Cafeteria Plan shall constitute enrollment under this Health Care Flexible Spending Arrangement. In addition, other matters concerning contributions, elections and the like shall be governed by the general provisions of the Cafeteria Plan.

## 6.7    HEALTH CARE FLEXIBLE SPENDING ARRANGEMENT CLAIMS

(a) **Expenses must be incurred during Plan Year.** All Medical Expenses incurred by a Participant, his or her Spouse and his or her Dependents during the Plan Year including the Grace Period shall be reimbursed during the Plan Year subject to Section 2.5, even though the submission of such a claim occurs after his participation hereunder ceases; but provided that the Medical Expenses were incurred during the applicable Plan Year. Medical Expenses are treated as having been incurred when the Participant is provided with the medical care that gives rise to the medical expenses, not when the Participant is formally billed or charged for, or pays for the medical care.

(b) **Reimbursement available throughout Plan Year.** The Administrator shall direct the reimbursement to each eligible Participant for all allowable Medical Expenses, up to a maximum of the amount designated by the Participant for the Health Care Flexible Spending Arrangement for the Plan Year. Reimbursements shall be made available to the Participant throughout the year without regard to the level of Cafeteria Plan Benefit Dollars which have been allocated to the fund at any given point in time. Furthermore, a Participant shall be entitled to reimbursements only for amounts in excess of any payments or other reimbursements under any health care plan covering the Participant and/or his Spouse or Dependents.

(c) **Payments.** Reimbursement payments under this Plan shall be made directly to the Participant. However, in the Administrator's discretion, payments may be made directly to the service provider. The application for payment or reimbursement shall be made to the Administrator on an acceptable form within a reasonable time of incurring the debt or paying for the service. The application shall include a written statement from an independent third party stating that the Medical Expense has been incurred and the amount of such expense. Furthermore, the Participant shall provide a written statement that the Medical Expense has not been reimbursed or is not reimbursable under any other health plan coverage and, if reimbursed from the Health

Care Flexible Spending Arrangement, such amount will not be claimed as a tax deduction. The Administrator shall retain a file of all such applications.

(d)　　**Grace Period.** Notwithstanding anything in this Section to the contrary, Medical Expenses incurred during the Grace Period, up to the remaining account balance, shall also be deemed to have been incurred during the Plan Year to which the Grace Period relates.

(e)　　**Claims for reimbursement.** Claims for the reimbursement of Medical Expenses incurred in any Plan Year shall be paid as soon after a claim has been filed as is administratively practicable; provided however, that if a Participant fails to submit a claim within 90 days after the end of the Plan Year, those Medical Expense claims shall not be considered for reimbursement by the Administrator.

## 6.8　　DEBIT AND CREDIT CARDS

Participants may, subject to a procedure established by the Administrator and applied in a uniform nondiscriminatory manner, use debit and/or credit (stored value) cards ("cards") provided by the Administrator and the Plan for payment of Medical Expenses, subject to the following terms:

(a)　　**Card only for medical expenses.** Each Participant issued a card shall certify that such card shall only be used for Medical Expenses. The Participant shall also certify that any Medical Expense paid with the card has not already been reimbursed by any other plan covering health benefits and that the Participant will not seek reimbursement from any other plan covering health benefits.

(b)　　**Card issuance.** Such card shall be issued upon the Participant's Effective Date of Participation and reissued for each Plan Year the Participant remains a Participant in the Health Care Flexible Spending Arrangement. Such card shall be automatically cancelled upon the Participant's death or termination of employment, or if such Participant has a change in status that results in the Participant's withdrawal from the Health Care Flexible Spending Arrangement.

(c)　　**Maximum dollar amount available.** The dollar amount of coverage available on the card shall be the amount elected by the Participant for the Plan Year. The maximum dollar amount of coverage available shall be the maximum amount for the Plan Year as set forth in Section 6.4.

(d)　　**Only available for use with certain service providers.** The cards shall only be accepted by such merchants and service providers as have been approved by the Administrator following IRS guidelines.

(e)　　**Card use.** The cards shall only be used for Medical Expense purchases at these providers, including, but not limited to, the following:

(1)　　Co-payments for doctor and other medical care;

(2)　　Purchase of drugs prescribed by a health care provider, including, if permitted by the Administrator, over-the-counter medications as allowed under IRS regulations;

(3)　　Purchase of medical items such as eyeglasses, syringes, crutches, etc.

(f)　　**Substantiation.** Such purchases by the cards shall be subject to substantiation by the Administrator, usually by submission of a receipt from a service provider describing the service, the date and the amount. The Administrator shall also follow the requirements set forth in Revenue Ruling 2003-43 and Notice 2006-69. All charges shall be conditional pending confirmation and substantiation.

(g)　　**Correction methods.** If such purchase is later determined by the Administrator to not qualify as a Medical Expense, the Administrator, in its discretion, shall use one of the following correction methods to make the Plan whole. Until the amount is repaid, the Administrator shall take further action to ensure that further violations of the terms of the card do not occur, up to and including denial of access to the card.

(1)　　Repayment of the improper amount by the Participant;

(2)　　Withholding the improper payment from the Participant's wages or other compensation to the extent consistent with applicable federal or state law;

(3)　　Claims substitution or offset of future claims until the amount is repaid; and

(4)　　if subsections (1) through (3) fail to recover the amount, consistent with the Employer's business practices, the Employer may treat the amount as any other business indebtedness.

**7.1     ESTABLISHMENT OF ACCOUNT**

This Day Care Flexible Spending Arrangement is intended to qualify as a program under Code Section 129 and shall be interpreted in a manner consistent with such Code Section. Participants who elect to participate in this program may submit claims for the reimbursement of Employment-Related Day Care Expenses. All amounts reimbursed shall be paid from amounts allocated to the Participant's Day Care Flexible Spending Arrangement.

**7.2     DEFINITIONS**

For the purposes of this Article and the Cafeteria Plan the terms below shall have the following meaning:

(a)        **"Day Care Flexible Spending Arrangement"** means the account established for a Participant pursuant to this Article to which part of his Cafeteria Plan Benefit Dollars may be allocated and from which Employment-Related Day Care Expenses of the Participant may be reimbursed for the care of the Qualifying Dependents of Participants.

(b)        **"Earned Income"** means earned income as defined under Code Section 32(c)(2), but excluding such amounts paid or incurred by the Employer for Day Care assistance to the Participant.

(c)        **"Employment-Related Day Care Expenses"** means the amounts paid for expenses of a Participant for those services which if paid by the Participant would be considered employment related expenses under Code Section 21(b)(2). Generally, they shall include expenses for household services and for the care of a Qualifying Dependent, to the extent that such expenses are incurred to enable the Participant to be gainfully employed for any period for which there are one or more Qualifying Dependents with respect to such Participant. Employment-Related Day Care Expenses are treated as having been incurred when the Participant's Qualifying Dependents are provided with the Day Care that gives rise to the Employment-Related Day Care Expenses, not when the Participant is formally billed or charged for, or pays for the Day Care. The determination of whether an amount qualifies as an Employment-Related Day Care Expense shall be made subject to the following rules:

(1)        If such amounts are paid for expenses incurred outside the Participant's household, they shall constitute Employment-Related Day Care Expenses only if incurred for a Qualifying Dependent as defined in Section 7.2(d)(1) (or deemed to be, as described in Section 7.2(d)(1) pursuant to Section 7.2(d)(3)), or for a Qualifying Dependent as defined in Section 7.2(d)(2) (or deemed to be, as described in Section 7.2(d)(2) pursuant to Section 7.2(d)(3)) who regularly spends at least 8 hours per day in the Participant's household;

(2)        If the expense is incurred outside the Participant's home at a facility that provides care for a fee, payment, or grant for more than 6 individuals who do not regularly reside at the facility, the facility must comply with all applicable state and local laws and regulations, including licensing requirements, if any; and

(3)        Employment-Related Day Care Expenses of a Participant shall not include amounts paid or incurred to a child of such Participant who is under the age of 19 or to an individual who is a Dependent of such Participant or such Participant's Spouse.

(d)        **"Qualifying Dependent"** means, for Day Care Flexible Spending Arrangement purposes,

(1)        a Participant's Dependent (as defined in Code Section 152(a)(1)) who has not attained age 13;

(2)        a Dependent or the Spouse of a Participant who is physically or mentally incapable of caring for himself or herself and has the same principal place of abode as the Participant for more than one-half of such taxable year; or

(3)        a child that is deemed to be a Qualifying Dependent described in paragraph (1) or (2) above, whichever is appropriate, pursuant to Code Section 21(e)(5).

(e)        The definitions of Article I are hereby incorporated by reference to the extent necessary to interpret and apply the provisions of this Day Care Flexible Spending Arrangement.

**7.3     DAY CARE FLEXIBLE SPENDING ARRANGEMENTS**

The Administrator shall establish a Day Care Flexible Spending Arrangement for each Participant who elects to apply Cafeteria Plan Benefit Dollars to Day Care Flexible Spending Arrangement benefits.

**7.4     INCREASES IN DAY CARE FLEXIBLE SPENDING ARRANGEMENTS**

A Participant's Day Care Flexible Spending Arrangement shall be increased each pay period by the portion of Cafeteria Plan Benefit Dollars that he has elected to apply toward his Day Care Flexible Spending Arrangement pursuant to elections made under Article V hereof.

**7.5     DECREASES IN DAY CARE FLEXIBLE SPENDING ARRANGEMENTS**

A Participant's Day Care Flexible Spending Arrangement shall be reduced by the amount of any Employment-Related Day Care Expense reimbursements paid or incurred on behalf of a Participant pursuant to Section 7.12 hereof.

**7.6     ALLOWABLE DAY CARE REIMBURSEMENT**

Subject to limitations contained in Section 7.9 of this Program, and to the extent of the amount contained in the Participant's Day Care Flexible Spending Arrangement, a Participant who incurs Employment-Related Day Care Expenses shall be entitled to receive from the Employer full reimbursement for the entire amount of such expenses incurred during the Plan Year or portion thereof during which he is a Participant.

**7.7     ANNUAL STATEMENT OF BENEFITS**

On or before January 31st of each calendar year, the Employer shall furnish to each Employee who was a Participant and received benefits under Section 7.6 during the prior calendar year, a statement of all such benefits paid to or on behalf of such Participant during the prior calendar year. This statement is set forth on the Participant's Form W-2.

**7.8     FORFEITURES**

The amount in a Participant's Day Care Flexible Spending Arrangement as of the end of any Plan Year (and after the processing of all claims for such Plan Year pursuant to Section 7.12 hereof) shall be forfeited and credited to the benefit plan surplus. In such event, the Participant shall have no further claim to such amount for any reason.

**7.9     LIMITATION ON PAYMENTS**

(a)     **Code limits.** Notwithstanding any provision contained in this Article to the contrary, amounts paid from a Participant's Day Care Flexible Spending Arrangement in or on account of any taxable year of the Participant shall not exceed the lesser of the Earned Income limitation described in Code Section 129(b) or $5,000 ($2,500 if a separate tax return is filed by a Participant who is married as determined under the rules of paragraphs (3) and (4) of Code Section 21(e)).

**7.10     NONDISCRIMINATION REQUIREMENTS**

(a)     **Intent to be nondiscriminatory.** It is the intent of this Day Care Flexible Spending Arrangement that contributions or benefits not discriminate in favor of the group of employees in whose favor discrimination may not occur under Code Section 129(d).

(b)     **25% test for shareholders.** It is the intent of this Day Care Flexible Spending Arrangement that not more than 25 percent of the amounts paid by the Employer for Day Care assistance during the Plan Year will be provided for the class of individuals who are shareholders or owners (or their Spouses or Dependents), each of whom (on any day of the Plan Year) owns more than 5 percent of the stock or of the capital or profits interest in the Employer.

(c)     **Adjustment to avoid test failure.** If the Administrator deems it necessary to avoid discrimination or possible taxation to a group of employees in whose favor discrimination may not occur in violation of Code Section 129 it may, but shall not be required to, reject any elections or reduce contributions or non-taxable benefits in order to assure compliance with this Section. Any act taken by the Administrator under this Section shall be carried out in a uniform and nondiscriminatory manner. If the Administrator decides to reject any elections or reduce contributions or Benefits, it shall be done in the following manner. First, the Benefits designated for the Day Care Flexible Spending Arrangement by the affected Participant that elected to contribute the highest amount to such account for the Plan Year shall be reduced until the nondiscrimination tests set forth in this Section are satisfied, or until the amount designated for the account equals the amount designated for the account of the affected Participant who has elected the second highest contribution to the Day Care Flexible Spending Arrangement for the Plan Year. This process shall continue until the nondiscrimination tests set forth in this Section are satisfied. Contributions which are not utilized to provide Benefits to any Participant by virtue of any administrative act under this paragraph shall be forfeited.

**7.11     COORDINATION WITH CAFETERIA PLAN**

All Participants under the Cafeteria Plan are eligible to receive Benefits under this Day Care Flexible Spending Arrangement. The enrollment and termination of participation under the Cafeteria Plan shall constitute enrollment and termination of participation under this Day Care Flexible Spending Arrangement. In addition, other matters concerning contributions, elections and the like shall be governed by the general provisions of the Cafeteria Plan.

**7.12     DAY CARE FLEXIBLE SPENDING ARRANGEMENT CLAIMS**

The Administrator shall direct the payment of all such Day Care claims to the Participant upon the presentation to the Administrator of documentation of such expenses in a form satisfactory to the Administrator. However, in the Administrator's discretion, payments may be made directly to the service provider. In its discretion in administering the Plan, the Administrator may utilize forms and require documentation of costs as may be necessary to verify the claims submitted. At a minimum, the form shall include a statement from

an independent third party as proof that the expense has been incurred during the Plan Year including the Grace Period and the amount of such expense. In addition, the Administrator may require that each Participant who desires to receive reimbursement under this Program for Employment-Related Day Care Expenses submit a statement which may contain some or all of the following information:

        (a)      The Dependent or Dependents for whom the services were performed;

        (b)      The nature of the services performed for the Participant, the cost of which he wishes reimbursement;

        (c)      The relationship, if any, of the person performing the services to the Participant;

        (d)      If the services are being performed by a child of the Participant, the age of the child;

        (e)      A statement as to where the services were performed;

        (f)      If any of the services were performed outside the home, a statement as to whether the Dependent for whom such services were performed spends at least 8 hours a day in the Participant's household;

        (g)      If the services were being performed in a day care center, a statement:

        (1)      that the day care center complies with all applicable laws and regulations of the state of residence,

        (2)      that the day care center provides care for more than 6 individuals (other than individuals residing at the center), and

        (3)      of the amount of fee paid to the provider.

        (h)      If the Participant is married, a statement containing the following:

        (1)      the Spouse's salary or wages if he or she is employed, or

        (2)      if the Participant's Spouse is not employed, that

        (i)      he or she is incapacitated, or

        (ii)      he or she is a full-time student attending an educational institution and the months during the year which he or she attended such institution.

        (i)      **Grace Period.** Notwithstanding anything in this Section to the contrary, Employment-Related Day Care Expenses incurred during the Grace Period, up to the remaining account balance, shall also be deemed to have been incurred during the Plan Year to which the Grace Period relates.

        (j)      **Claims for reimbursement.** If a Participant fails to submit a claim within 90 days after the end of the Plan Year, those claims shall not be considered for reimbursement by the Administrator.

### ARTICLE VIII
### BENEFITS AND RIGHTS

**8.1    CLAIM FOR BENEFITS**

        (a)      **Insurance claims.** Any claim for Benefits underwritten by Insurance Contract(s) shall be made to the Insurer. If the Insurer denies any claim, the Participant or beneficiary shall follow the Insurer's claims review procedure.

        (b)      **Health and Day Care Flexible Spending Arrangement Claims.** The Participant must submit all claims no later than 90 days after the end of the Plan Year. Any claims submitted after that time will not be considered.

        If a claim under the Plan is denied in whole or in part, the Participant will receive written notification. The notification will include the reasons for the denial, with reference to the specific provisions of the Plan on which the denial was based, a description of any additional information needed to process the claim and an explanation of the claims review procedure.

        A level one appeal must be submitted within 180 days of receipt of the denial.  Any such request should be accompanied by documents or records in support of the appeal. The Participant may review pertinent documents and submit issues and comments in writing. The claims administrator will review the claim and provide, within 30 days, a written response to the appeal (extended by reasonable time if necessary).  In this response, the claims administrator will explain the reason for the decision, with specific reference to the provisions of the Plan on which the decision is based. If the Participant disagrees with the level one appeal decision the Participant may submit a request for a level two appeal to be determined by the Employer.  The Participant must submit the request for level two appeal within 60 days of receipt of the level one notice.  The Participant will be notified within 30 days after the Employer receives the appeal (extended by reasonable time if necessary). The Employer has the exclusive right to interpret the appropriate plan provisions. Decisions of

the Employer are conclusive and binding.

The following timetable for claims applies:

| | |
|---|---|
| Notification of whether claim is accepted or denied | 30 days |
| Extension due to matters beyond the control of the Plan | 15 days |
| Denial or insufficient information on the claim:<br>Notification of | 15 days |
| Response by Participant | 45 days |
| Review of claim denial | 30 days |

The Participant must file the appeal by submitting a written request by email, fax, or mail to Flex-Plan and indicate either level one or two appeal on the email, fax, or letter.

Email: claims@flex-plan.com

Fax: 425-451-7002 or 866-535-9227

Mail: Flex-Plan Services, PO Box 53250, Bellevue WA 98015.

The response will provide written or electronic notification of any claim denial. The notice will state:

(a)     The specific reason or reasons for the denial;

(b)     Reference to the specific Plan provisions on which the denial was based;

(c)     A description of any additional material or information necessary for the Participant to perfect the claim and an explanation of why such material or information is necessary;

(d)     A description of the Plan's review procedures and the time limits applicable to such procedures.

(e)     A statement that the Participant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim; and

(f)     If the denial was based on an internal rule, guideline, protocol, or other similar criterion, the specific rule, guideline, protocol, or criterion will be provided free of charge. If this is not practical, a statement will be included that such a rule, guideline, protocol, or criterion was relied upon in making the denial and a copy will be provided free of charge to the Participant upon request.

When the Participant receives a denial, the Participant will have 180 days following receipt of the notification in which to appeal the decision. The Participant may submit written comments, documents, records, and other information relating to the claim. If the Participant requests, the Participant will be provided, free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim.

The period of time within which a denial on review is required to be made will begin at the time an appeal is filed in accordance with the procedures of the Plan. This timing is without regard to whether all the necessary information accompanies the filing.

A document, record, or other information shall be considered relevant to a claim if it:

(a)     was relied upon in making the claim determination;

(b)     was submitted, considered, or generated in the course of making the claim determination, without regard to whether it was relied upon in making the claim determination;

(c)     demonstrated compliance with the administrative processes and safeguards designed to ensure and to verify that claim determinations are made in accordance with Plan documents and Plan provisions have been applied consistently with respect to all claimants; or

(d)     constituted a statement of policy or guidance with respect to the Plan concerning the denied claim.

The review will take into account all comments, documents, records, and other information submitted by the Participant relating to the claim, without regard to whether such information was submitted or considered in the initial claim determination. The review will not afford deference to the initial denial and will be conducted by a fiduciary of the Plan who is neither the individual who made the adverse determination nor a subordinate of that individual.

(e)     **Forfeitures.** Any balance remaining in the Participant's Day Care Flexible Spending Arrangement or Health Care Flexible Spending Arrangement as of the end of the time for claims reimbursement for each Plan Year and Grace Period (if applicable) shall

be forfeited and deposited in the benefit plan surplus of the Employer pursuant to Section 6.3 or Section 7.8, whichever is applicable, unless the Participant had made a claim for such Plan Year, in writing, which has been denied or is pending; in which event the amount of the claim shall be held in his account until the claim appeal procedures set forth above have been satisfied or the claim is paid. If any such claim is denied on appeal, the amount held beyond the end of the Plan Year shall be forfeited and credited to the benefit plan surplus.

## 8.2    APPLICATION OF BENEFIT PLAN SURPLUS

Any forfeited amounts credited to the benefit plan surplus by virtue of the failure of a Participant to incur a qualified expense or seek reimbursement in a timely manner may, but need not be, separately accounted for after the close of the Plan Year (or after such further time specified herein for the filing of claims) in which such forfeitures arose. In no event shall such amounts be carried over to reimburse a Participant for expenses incurred during a subsequent Plan Year for the same or any other Benefit available under the Plan; nor shall amounts forfeited by a particular Participant be made available to such Participant in any other form or manner, except as permitted by Treasury regulations. Amounts in the benefit plan surplus shall be used to defray any administrative costs and experience losses or used to provide additional benefits under the Plan.

**ARTICLE IX**
**ADMINISTRATION**

## 9.1    PLAN ADMINISTRATION

The Employer shall be the Administrator, unless the Employer elects otherwise. The Employer may appoint any person, including, but not limited to, the Employees of the Employer, to perform the duties of the Administrator. Any person so appointed shall signify acceptance by filing written acceptance with the Employer. Upon the resignation or removal of any individual performing the duties of the Administrator, the Employer may designate a successor.

If the Employer elects, the Employer shall appoint one or more Administrators. Any person, including, but not limited to, the Employees of the Employer, shall be eligible to serve as an Administrator. Any person so appointed shall signify acceptance by filing written acceptance with the Employer. An Administrator may resign by delivering a written resignation to the Employer or be removed by the Employer by delivery of written notice of removal, to take effect at a date specified therein, or upon delivery to the Administrator if no date is specified. The Employer shall be empowered to appoint and remove the Administrator from time to time as it deems necessary for the proper administration of the Plan to ensure that the Plan is being operated for the exclusive benefit of the Employees entitled to participate in the Plan in accordance with the terms of the Plan and the Code.

The operation of the Plan shall be under the supervision of the Administrator. It shall be a principal duty of the Administrator to see that the Plan is carried out in accordance with its terms, and for the exclusive benefit of Employees entitled to participate in the Plan. The Administrator shall have full power and discretion to administer the Plan in all of its details and determine all questions arising in connection with the administration, interpretation, and application of the Plan. The Administrator may establish procedures, correct any defect, supply any information, or reconciles any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan. The Administrator shall have all powers necessary or appropriate to accomplish the Administrator's duties under the Plan. The Administrator shall be charged with the duties of the general administration of the Plan as set forth under the Plan, including, but not limited to, in addition to all other powers provided by this Plan:

> (a)    To make and enforce such procedures, rules and regulations as the Administrator deems necessary or proper for the efficient administration of the Plan;

> (b)    To interpret the provisions of the Plan, the Administrator's interpretations thereof in good faith to be final and conclusive on all persons claiming benefits by operation of the Plan;

> (c)    To decide all questions concerning the Plan and the eligibility of any person to participate in the Plan and to receive benefits provided by operation of the Plan;

> (d)    To reject elections or to limit contributions or Benefits for certain highly compensated participants if it deems such to be desirable in order to avoid discrimination under the Plan in violation of applicable provisions of the Code;

> (e)    To provide Employees with a reasonable notification of their benefits available by operation of the Plan and to assist any Participant regarding the Participant's rights, benefits or elections under the Plan;

> (f)    To keep and maintain the Plan documents and all other records pertaining to and necessary for the administration of the Plan;

> (g)    To review and settle all claims against the Plan, to approve reimbursement requests, and to authorize the payment of benefits if the Administrator determines such shall be paid if the Administrator decides in its discretion that the applicant is entitled to them. This authority specifically permits the Administrator to settle disputed claims for benefits and any other disputed claims made against the Plan;

(h)     To appoint such agents, counsel, accountants, consultants, and other persons or entities as may be required to assist in administering the Plan.

Any procedure, discretionary act, interpretation or construction taken by the Administrator shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall be consistent with the intent that the Plan shall continue to comply with the terms of Code Section 125 and the Treasury regulations thereunder.

**9.2     EXAMINATION OF RECORDS**

The Administrator shall make available to each Participant, Eligible Employee and any other Employee of the Employer such records as pertain to their interest under the Plan for examination at reasonable times during normal business hours.

**9.3     PAYMENT OF EXPENSES**

Any reasonable administrative expenses shall be paid by the Employer unless the Employer determines that administrative costs shall be borne by the Participants under the Plan or by any Trust Fund which may be established hereunder. The Administrator may impose reasonable conditions for payments, provided that such conditions shall not discriminate in favor of highly compensated employees.

**9.4     INSURANCE CONTROL CLAUSE**

In the event of a conflict between the terms of this Plan and the terms of an Insurance Contract of an independent third party Insurer whose product is then being used in conjunction with this Plan, the terms of the Insurance Contract shall control as to those Participants receiving coverage under such Insurance Contract. For this purpose, the Insurance Contract shall control in defining the persons eligible for insurance, the dates of their eligibility, the conditions which must be satisfied to become insured, if any, the benefits Participants are entitled to and the circumstances under which insurance terminates.

**9.5     INDEMNIFICATION OF ADMINISTRATOR**

The Employer agrees to indemnify and to defend to the fullest extent permitted by law any Employee serving as the Administrator or as a member of a committee designated as Administrator (including any Employee or former Employee who previously served as Administrator or as a member of such committee) against all liabilities, damages, costs and expenses (including attorney's fees and amounts paid in settlement of any claims approved by the Employer) occasioned by any act or omission to act in connection with the Plan, if such act or omission is in good faith.

**ARTICLE X**
**AMENDMENT OR TERMINATION OF PLAN**

**10.1     AMENDMENT**

The Employer, at any time or from time to time, may amend any or all of the provisions of the Plan without the consent of any Employee or Participant. No amendment shall have the effect of modifying any benefit election of any Participant in effect at the time of such amendment, unless such amendment is made to comply with Federal, state or local laws, statutes or regulations.

**10.2     TERMINATION**

The Employer reserves the right to terminate this Plan, in whole or in part, at any time. In the event the Plan is terminated, no further contributions shall be made. Benefits under any Contract shall be paid in accordance with the terms of the Contract.

No further additions shall be made to the Health Care Flexible Spending Arrangement or Day Care Flexible Spending Arrangement, but all payments from such fund shall continue to be made according to the elections in effect until 90 days after the termination date of the Plan. Any amounts remaining in any such fund or account as of the end of such period shall be forfeited and deposited in the benefit plan surplus after the expiration of the filing period.

**ARTICLE XI**
**MISCELLANEOUS**

**11.1     PLAN INTERPRETATION**

All provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner. This Plan shall be read in its entirety and not severed except as provided in Section 11.11.

**11.2     GENDER AND NUMBER**

Wherever any words are used herein in the masculine, feminine or neuter gender, they shall be construed as though they were also used in another gender in all cases where they would so apply, and whenever any words are used herein in the singular or plural form, they shall be construed as though they were also used in the other form in all cases where they would so apply.

**11.3    WRITTEN DOCUMENT**

This Plan, in conjunction with any separate written document which may be required by law, is intended to satisfy the written Plan requirement of Code Section 125 and any Treasury regulations thereunder relating to cafeteria plans.

**11.4    EXCLUSIVE BENEFIT**

This Plan shall be maintained for the exclusive benefit of the Employees who participate in the Plan.

**11.5    PARTICIPANT'S RIGHTS**

This Plan shall not be deemed to constitute an employment contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee. Nothing contained in this Plan shall be deemed to give any Participant or Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge any Participant or Employee at any time regardless of the effect which such discharge shall have upon him as a Participant of this Plan.

**11.6    ACTION BY THE EMPLOYER**

Whenever the Employer under the terms of the Plan is permitted or required to do or perform any act or matter or thing, it shall be done and performed by a person duly authorized by its legally constituted authority.

**11.7    NO GUARANTEE OF TAX CONSEQUENCES**

Neither the Administrator nor the Employer makes any commitment or guarantee that any amounts paid to or for the benefit of a Participant under the Plan will be excludable from the Participant's gross income for federal or state income tax purposes, or that any other federal or state tax treatment will apply to or be available to any Participant. It shall be the obligation of each Participant to determine whether each payment under the Plan is excludable from the Participant's gross income for federal and state income tax purposes, and to notify the Employer if the Participant has reason to believe that any such payment is not so excludable. Notwithstanding the foregoing, the rights of Participants under this Plan shall be legally enforceable.

**11.8    INDEMNIFICATION OF EMPLOYER BY PARTICIPANTS**

If any Participant receives one or more payments or reimbursements under the Plan that are not for a permitted Benefit, such Participant shall indemnify and reimburse the Employer for any liability it may incur for failure to withhold federal or state income tax or Social Security tax from such payments or reimbursements. However, such indemnification and reimbursement shall not exceed the amount of additional federal and state income tax (plus any penalties) that the Participant would have owed if the payments or reimbursements had been made to the Participant as regular cash compensation, plus the Participant's share of any Social Security tax that would have been paid on such compensation, less any such additional income and Social Security tax actually paid by the Participant.

**11.9    FUNDING**

Unless otherwise required by law, contributions to the Plan need not be placed in trust or dedicated to a specific Benefit, but may instead be considered general assets of the Employer. Furthermore, and unless otherwise required by law, nothing herein shall be construed to require the Employer or the Administrator to maintain any fund or segregate any amount for the benefit of any Participant, and no Participant or other person shall have any claim against, right to, or security or other interest in, any fund, account or asset of the Employer from which any payment under the Plan may be made.

**11.10    GOVERNING LAW**

This Plan is governed by the Code and the Treasury regulations issued thereunder (as they might be amended from time to time). In no event shall the Employer guarantee the favorable tax treatment sought by this Plan. To the extent not preempted by Federal law, the provisions of this Plan shall be construed, enforced and administered according to the laws of the State of Michigan.

**11.11    SEVERABILITY**

If any provision of the Plan is held invalid or unenforceable, its invalidity or unenforceability shall not affect any other provisions of the Plan, and the Plan shall be construed and enforced as if such provision had not been included herein.

**11.12    CAPTIONS**

The captions contained herein are inserted only as a matter of convenience and for reference, and in no way define, limit, enlarge or describe the scope or intent of the Plan, nor in any way shall affect the Plan or the construction of any provision thereof.

**11.13    CONTINUATION OF COVERAGE (COBRA)**

Notwithstanding anything in the Plan to the contrary, in the event any benefit under this Plan subject to the continuation coverage requirement of Code Section 4980B becomes unavailable, each Participant will be entitled to continuation coverage as prescribed in Code Section 4980B, and related regulations. This Section shall only apply if the Employer employs at least twenty (20) employees on more than 50% of its typical business days in the previous calendar year.

**11.14    FAMILY AND MEDICAL LEAVE ACT (FMLA)**

Notwithstanding anything in the Plan to the contrary, in the event any benefit under this Plan becomes subject to the requirements of the Family and Medical Leave Act and regulations thereunder, this Plan shall be operated in accordance with Regulation 1.125-3.

**11.15    HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA)**

Notwithstanding anything in this Plan to the contrary, this Plan shall be operated in accordance with HIPAA and regulations thereunder.

**11.16    UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT (USERRA)**

Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service credit with respect to qualified military service shall be provided in accordance with the Uniform Services Employment And Reemployment Rights Act (USERRA) and the regulations thereunder.

**11.17    COMPLIANCE WITH HIPAA PRIVACY STANDARDS**

(a)    **Application.** If any benefits under this Cafeteria Plan are subject to the Standards for Privacy of Individually Identifiable Health Information (45 CFR Part 164, the "Privacy Standards"), then this Section shall apply.

(b)    **Disclosure of PHI.** The Plan shall not disclose Protected Health Information to any member of the Employer's workforce unless each of the conditions set out in this Section are met. "Protected Health Information" shall have the same definition as set forth in the Privacy Standards but generally shall mean individually identifiable information about the past, present or future physical or mental health or condition of an individual, including genetic information and information about treatment or payment for treatment.

(c)    **PHI disclosed for administrative purposes.** Protected Health Information disclosed to members of the Employer's workforce shall be used or disclosed by them only for purposes of Plan administrative functions. The Plan's administrative functions shall include all Plan payment functions and health care operations. The terms "payment" and "health care operations" shall have the same definitions as set out in the Privacy Standards, but the term "payment" generally shall mean activities taken to determine or fulfill Plan responsibilities with respect to eligibility, coverage, provision of benefits, or reimbursement for health care. Genetic information will not be used or disclosed for underwriting purposes.

(d)    **PHI disclosed to certain workforce members.** The Plan shall disclose Protected Health Information only to members of the Employer's workforce who are designated and authorized to receive such Protected Health Information, and only to the extent and in the minimum amount necessary for that person to perform his or her duties with respect to the Plan. "Members of the Employer's workforce" shall refer to all employees and other persons under the control of the Employer. The Employer shall keep an updated list of those authorized to receive Protected Health Information.

(1)    An authorized member of the Employer's workforce who receives Protected Health Information shall use or disclose the Protected Health Information only to the extent necessary to perform his or her duties with respect to the Plan.

(2)    In the event that any member of the Employer's workforce uses or discloses Protected Health Information other than as permitted by this Section and the Privacy Standards, the incident shall be reported to the Plan's privacy official. The privacy official shall take appropriate action, including:

(i)    investigation of the incident to determine whether the breach occurred inadvertently, through negligence or deliberately; whether there is a pattern of breaches; and the degree of harm caused by the breach;

(ii)    appropriate sanctions against the persons causing the breach which, depending upon the nature of the breach, may include oral or written reprimand, additional training, or termination of employment;

(iii)    mitigation of any harm caused by the breach, to the extent practicable; and

(iv)    documentation of the incident and all actions taken to resolve the issue and mitigate any damages.

(e)    **Certification.** The Employer must provide certification to the Plan that it agrees to:

(1)     Not use or further disclose the information other than as permitted or required by the Plan documents or as required by law;

(2)     Ensure that any agent or subcontractor, to whom it provides Protected Health Information received from the Plan, agrees to the same restrictions and conditions that apply to the Employer with respect to such information;

(3)     Not use or disclose Protected Health Information for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Employer;

(4)     Report to the Plan any use or disclosure of the Protected Health Information of which it becomes aware that is inconsistent with the uses or disclosures permitted by this Section, or required by law;

(5)     Make available Protected Health Information to individual Plan members in accordance with Section 164.524 of the Privacy Standards;

(6)     Make available Protected Health Information for amendment by individual Plan members and incorporate any amendments to Protected Health Information in accordance with Section 164.526 of the Privacy Standards;

(7)     Make available the Protected Health Information required to provide an accounting of disclosures to individual Plan members in accordance with Section 164.528 of the Privacy Standards;

(8)     Make its internal practices, books and records relating to the use and disclosure of Protected Health Information received from the Plan available to the Department of Health and Human Services for purposes of determining compliance by the Plan with the Privacy Standards;

(9)     If feasible, return or destroy all Protected Health Information received from the Plan that the Employer still maintains in any form, and retain no copies of such information when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible; and

(10)    Ensure the adequate separation between the Plan and members of the Employer's workforce, as required by Section 164.504(f)(2)(iii) of the Privacy Standards and set out in (d) above.

## 11.18    COMPLIANCE WITH HIPAA ELECTRONIC SECURITY STANDARDS

Under the Security Standards for the Protection of Electronic Protected Health Information (45 CFR Part 164.300 et. seq., the "Security Standards"):

(a)     **Implementation.** The Employer agrees to implement reasonable and appropriate administrative, physical and technical safeguards to protect the confidentiality, integrity and availability of Electronic Protected Health Information that the Employer creates, maintains or transmits on behalf of the Plan. "Electronic Protected Health Information" shall have the same definition as set out in the Security Standards, but generally shall mean Protected Health Information that is transmitted by or maintained in electronic media.

(b)     **Agents or subcontractors shall meet security standards.** The Employer shall ensure that any agent or subcontractor to whom it provides Electronic Protected Health Information shall agree, in writing, to implement reasonable and appropriate security measures to protect the Electronic Protected Health Information.

(c)     **Employer shall ensure security standards.** The Employer shall ensure that reasonable and appropriate security measures are implemented to comply with the conditions and requirements set forth in Section 11.17.

## 11.19    MENTAL HEALTH PARITY AND ADDICTION EQUITY ACT

Notwithstanding anything in the Plan to the contrary, the Plan will comply with the Mental Health Parity and Addiction Equity Act and ERISA Section 712.

## 11.20    GENETIC INFORMATION NONDISCRIMINATION ACT (GINA)

Notwithstanding anything in the Plan to the contrary, the Plan will comply with the Genetic Information Nondiscrimination Act.

## 11.21    WOMEN'S HEALTH AND CANCER RIGHTS ACT

Notwithstanding anything in the Plan to the contrary, the Plan will comply with the Women's Health and Cancer Rights Act of 1998.

**11.22 NEWBORNS' AND MOTHERS' HEALTH PROTECTION ACT**

Notwithstanding anything in the Plan to the contrary, the Plan will comply with the Newborns' and Mothers' Health Protection Act.

IN WITNESS WHEREOF, this Plan document is hereby executed this _____ day of _____.

City of Detroit

By _____
EMPLOYER

# ADOPTING RESOLUTION

The undersigned authorized representative of City of Detroit (the Employer) hereby certifies that the following resolutions were duly adopted by the Employer on _____, and that such resolutions have not been modified or rescinded as of the date hereof:

RESOLVED, that the form of amended Cafeteria Plan including a Health Care Flexible Spending Arrangement and Dependent Care Flexible Spending Arrangement effective January 1, 2014, presented to this meeting is hereby approved and adopted and that an authorized representative of the Employer is hereby authorized and directed to execute and deliver to the Administrator of the Plan one or more counterparts of the Plan.

The undersigned further certifies that attached are true copies of City of Detroit Flexible Benefits Plan as amended and restated, and the Summary Plan Description approved and adopted in the foregoing resolutions.

Date: _____

Signed: _____

_____
[print name/title]

**I**
## INTRODUCTION

This is a Summary of Material Modifications regarding the Employer Name Flexible Benefits Plan (the "Plan"). This is merely a summary of the most important changes to the Plan and information contained in the Summary Plan Description ("SPD") previously provided to you. It supplements and amends that SPD so you should retain a copy of this document with your copy of the SPD. If you have any questions, contact the Administrator. If there is any discrepancy between the terms of the Plan, as modified, and this Summary of Material Modifications, the provisions of the Plan will control.

**II**
## SUMMARY OF CHANGES

### Health and Day Care FSA Claims Run-Out Extensions for Plan Year 2019 and Plan Year 2020.

The employer hereby amends the Plan as follows:

On April 29, 2020, the Department of Labor, Revenue, and Treasury (the "Departments") issued guidance extending certain timeframes for group health plans during the COVID-19 National Emergency.

As background, on March 13, 2020, President Trump issued the Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak and by separate letter declared a national emergency under the Stafford Act effective March 1, 2020.

As a result of the National Emergency, the Departments recognized that participants may find it difficult to meet or comply with certain pre-established timeframes, specifically the health and day care FSA claims run out and the FSA appeals timeline.

The guidance announced that plans, "must disregard the period from March 1, 2020 until sixty (60) days after the announced end of the National Emergency or such other date announced by the Agencies [Departments] in a future notice (the "Outbreak Period") for all plan participants, beneficiaries, qualified beneficiaries, or claimants wherever located in determining the following periods and dates— "

Pursuant to this guidance the Employer amends the plan to extend the following timeframes that apply to Employer's Health and Day Care FSA. Specifically, any claims run-out or appeals timeframes that fall within the outbreak period shall be tolled (paused or suspended) and added onto the end of the outbreak period to create the new applicable deadline. The deadline for plan years 2019 and 2020 have been extended by 1 year. The following examples are illustrative.

1)     **The Heath and Day Care FSA Claims Timeframes.** The date within which individuals must file a claim under the plan's claims procedures.

The following examples illustrate the application of the guidance to the claims run-out deadline.

**January 1st – December 31st 2019 Plan Year.**
Employer's plan runs January through December with a ninety-day claims run-out period ending March 31, 2020. The national emergency is effective March 1, 2020. The new claims runout deadline is **March 31, 2021.**

**January 1st – December 31st 2020 Plan Year.**
Employer's plan runs January through December with a ninety-day claims run-out period ending March 31, 2021. The national emergency is effective March 1, 2020. The new claims runout deadline is **March 31, 2022.**

**CERTIFICATE OF ADOPTING RESOLUTION**

The undersigned authorized representative of The City of Detroit hereby certifies that the following resolutions were duly adopted on December 31, 2021 (date) and that such resolutions have not been modified or rescinded as of the date hereof;

RESOLVED, that the Amendment to the Plan (the Amendment) is hereby approved and adopted, and that an authorized representative of the Employer is hereby authorized and directed to execute and deliver to the Administrator of the Plan one or more counterparts of the amendment.

The undersigned further certifies that attached hereto is a copy of the Amendment approved and adopted in the foregoing resolution.

Date: 2-16-2022

Signed: _Jeremiah Gross_

Jeremiah Gross - Benefits Manager
[*print name/title*]

**January 1ˢᵗ – December 31ˢᵗ 2019 Plan Year.**
Employer's plan runs January through December with a ninety-day claims run-out period ending March 31, 2020. The national emergency is effective March 1, 2020. The new claims runout deadline is **March 31, 2021.**

**January 1ˢᵗ – December 31ˢᵗ 2020 Plan Year.**
Employer's plan runs January through December with a ninety-day claims run-out period ending March 31, 2021. The national emergency is effective March 1, 2020. The new claims runout deadline is **March 31, 2022.**

This amendment has been executed this _16th_ day of _February_ , _2022_

Name of Employer: _City of Detroit_

By: _Jeremiah Sipos_
EMPLOYER

# THE CITY OF DETROIT FLEXIBLE BENEFITS PLAN
## AMENDMENT [1]

### ARTICLE I
### PREAMBLE

1.1 **Adoption and effective date of amendment.** The Employer adopts this Amendment to The City of Detroit Flexible Benefits Plan (the "Plan"). The sponsor intends this Amendment as good faith compliance with the requirements of these provisions. This Amendment shall be effective on or after the date the Employer elects in Section 2.1 below.

1.2 **Supersession of inconsistent provisions.** This Amendment shall supersede the provisions of the Plan to the extent those provisions are inconsistent with the provisions of this Amendment.

1.3 **Construction.** Except as otherwise provided in this Amendment, any reference to "Section" in this Amendment refers only to sections within this Amendment and is not a reference to the Plan. The Article and Section numbering in this Amendment is solely for purposes of this Amendment, and does not relate to any Plan article, section, or other numbering designations.

### ARTICLE II
### ELECTIONS

2.1 **Effective Date.** The provisions of this Amendment, unless otherwise indicated are effective as of January 1, 2020 (the "Effective date").

2.2 **Health and Day Care FSA Claims Run-Out Extensions for Plan Year 2019 and Plan Year 2020.**

The employer hereby amends the Plan as follows:

On April 29, 2020, the Department of Labor, Revenue, and Treasury (the "Departments") issued guidance extending certain timeframes for group health plans during the COVID-19 National Emergency.

As background, on March 13, 2020, President Trump issued the Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak and by separate letter declared a national emergency under the Stafford Act effective March 1, 2020.

As a result of the National Emergency, the Departments recognized that participants may find it difficult to meet or comply with certain pre-established timeframes, specifically the health and day care FSA claims run out and the FSA appeals timeline.

The guidance announced that plans, "must disregard the period from March 1, 2020, until sixty (60) days after the announced end of the National Emergency or such other date announced by the Agencies [Departments] in a future notice (the "Outbreak Period") for all plan participants, beneficiaries, qualified beneficiaries, or claimants wherever located in determining the following periods and dates— "

Pursuant to this guidance the Employer amends the plan to extend the following timeframes that apply to Employer's Health and Day Care FSA. Specifically, any claims run-out or appeals timeframes that fall within the outbreak period shall be tolled (paused or suspended) and added onto the end of the outbreak period to create the new deadline. The deadline for plan years 2019 and 2020 have been extended by 1 year. The following examples are illustrative.

1) **The Heath and Day Care FSA Claims Timeframes.** The date within which individuals must file a claim under the plan's claims procedures.

The following examples illustrate the application of the guidance to the claims run-out deadline.

# EXHIBIT 6-6



Plante & Moran, PLLC
1098 Woodward Avenue
Detroit, MI 48226-1906
Tel: 313.496.7200
Fax: 313.496.7201
plantemoran.com

*Privileged and confidential – work product*

# Memorandum

| | |
|---|---|
| **To:** | Mr. Charles Raimi, Deputy Corporation Counsel for City of Detroit |
| **From:** | Michael Krucker & Preston Ridinger, Plante & Moran, PLLC |
| **Date:** | May 9, 2022 |
| **Re:** | J-Time Payment as Compensation under the Retirement System |

---

**Purpose and Understanding of Historical J-Time Status Practice**

The purpose of this memorandum is to provide guidance to the City of Detroit (the "City") related to the tax treatment of J-Time payments and its impact on provisions of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Retirement System"), the City of Detroit Deferred Compensation Plan (the "457(b) Plan"), and City of Detroit Flexible Benefits Plan (the "FSA Plan", and together with the 457(b) Plan, the "Benefit Plans"). The Retirement System and the Benefit Plans shall be referred to as the "Plans".

Based solely on discussions with the City and without having done any independent investigation, it is our current understanding that:

- Historically and starting many years prior to the City's 2013 bankruptcy filing, certain members of the Detroit Fire Fighters Association ("DFFA") injured while performing duties for the City were placed on "J-Time" status. Under that status, the members continued to receive full compensation and certain pre- and post-tax benefits. Historically, such compensation was not treated as subject to federal, state, or city taxation. This practice was not documented in any collective bargaining agreement, was not directly addressed in the City's bankruptcy proceedings, and was not known by the emergency manager.

- The City's administration became aware of the practice in 2020. At that time members of DFFA were transitioned to the City's new payroll system known as Ultipro. Ultipro was unable to accommodate or process the J-time practice for reasons that included Ultipro's inability to process pre-tax benefits (such as 457 contributions) when the member's compensation was not taxable.

- In December 2020, the City provided to the Public Safety Unions a memorandum advising that it would begin treating J-time payments as taxable compensation beginning on January 1, 2021, in order to conform the program with the Bankruptcy Plan of Adjustment ("POA"), federal law, and administrative practices. There was no objection at that time.

- More than a year later, on March 1, 2022, DFFA filed a grievance against the City. The grievance states: "This is a grievance over the City's improper payment and taxation of Injured-on-duty or "Js" Time, including its designation of Js Time as taxable, rather than non-taxable, income. This includes the City's improper W-2 treatment of Js Time."

- The grievance requested the following relief: "That the City make all members affected whole, including providing any necessary W-2 revisions, cease and desist from this improper treatment of Js time, and pay all DFFA costs and fees incurred in this matter."

**Executive Summary:**

If J-Time payments are included as taxable income (and therefore, considered "compensation" under the Plans), then DFFA members who receive J-time payments ("J-Time Recipients") will be entitled to coverage through the intended provisions of the Retirement System and may contribute amounts from J-Time payments to fund benefits under the Benefit Plans.

In contrast, characterizing J-Time payments as non-taxable income would be contrary to the relevant Internal Revenue Code ("Code") provisions as well as the terms and purpose of certain provisions of the Retirement System, including funding provisions. J-Time Recipients would also be ineligible to contribute to the Retirement System and Benefit Plans.

The Plans discussed in this opinion are designed and structured, in accordance with the Code provisions that enable the Plans, to provide for payment of **pre**-tax funding for retirement plan contributions, deferred compensation and health and welfare benefits. That allows employees to obtain these important benefits in a fashion that minimizes the employee's tax liability.

**Interplay of J-Time Status and the Retirement System**

The Retirement System has two "Components." Component I, which is relevant here, covers services after July 1, 2014. Component II covers services prior to that date, and that plan was frozen effective July 1, 2014. Pursuant to the POA, current DFFA members are to accrue benefits under Component I.

J-Time payments can only be treated as compensation for purposes of the Retirement System if such payments are includible in the employee's gross income. *See* Section 13.1 of the Retirement System; Code §415(b); and Treasury Regulation §1.415(c)-2(b). However, under the terms of the Retirement System, J-Time Recipients still earn service credit while on J-Time. This means that a failure to treat J-Time payments as compensation results in an underfunding of the Retirement System that is contrary to its terms. *See* Section 9.1. It would also have other consequences for the Retirement System, including but not necessarily limited to, potential missed mandatory employee contributions and lower average final compensation values for J-Time Recipients. *See* Sections 1.3, 2.1(7), 9.1, and 9.3(3) of the Retirement System. In short, member contributions to the Retirement System are tied to and inseparable from a Member's taxable income. Unless the Member's J-time compensation is taxable income, there can be no Member contributions to the Retirement System.

**Interplay of J-Time Status with the 457(b) Plan Document and FSA Plan Document**

In addition to accruing benefits under the Retirement System, DFFA members are also eligible for benefits under the 457(b) Plan and the FSA Plan.

Employees in J-Time status are only permitted to make 457(b) elective deferrals from J-Time payments if such payments are properly treated as taxable income (compensation). *See* 457(b) Plan definition of "compensation", "includible compensation," and Code §415(c)(3). Therefore, an employee may only elect to defer a portion of his or her J-Time payments under the 457(b) Plan if such payments constitute taxable compensation. In addition, employer contributions are also limited by the participant's includible compensation and therefore employer contributions potentially available the 457(b) Plan will also be limited if J-Time payments are excluded from gross income and, therefore, from includible compensation.

The purpose of the FSA Plan (which is a plan offered under Code Section 125) is to provide eligible employees a vehicle by which to convert taxable compensation into non-taxable health & welfare benefits (e.g., insurance premiums, health flexible spending amounts). If J-Time payments were characterized as non-taxable, the FSA Plan is superfluous with respect to member contributions to health benefits made while on J-Time status. It would further lead to a non-sensical result if J-Time payments are determined to be non-taxable income but used to fund benefits under the FSA Plan. If the J-Time payments are characterized as non-taxable then the use of flexible spending account serves no purpose with respect to such payments.

**Limitations of Memorandum**

Our advice in this memorandum is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the stated facts, assumptions and/or representations included. In rendering our advice, we may consider tax authorities that are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of our advice. We will not update our advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof. This communication is intended to provide general information for discussion purposes only and cannot be relied upon to avoid tax exposure, penalties, or any other purpose.

Plante Moran's statements herein are intended to provide insight with respect to arguments made to support past and current practices, as opposed to providing assurance with respect to future matters. Plante Moran's statements herein are not designed to provide any assurance with respect to economic rights or benefits of the City, or any assurance with respect to economic rights or benefits or tax obligations with respect to any J-Time Recipient or other employee of the City.