In re:

City of Detroit, Michigan,

     Debtor.

_____/

Bankruptcy Case No. 13-53846

Judge Thomas J. Tucker

Chapter 9

# DFFA'S OPPOSITION TO THE CITY MOTION FOR AN ORDER ENFORCING THE CONFIRMATION ORDER AGAINST THE DFFA (R13575), AND ITS SUPPLEMENT AND AMENDMENT (R13582)

Christopher P. Legghio (P27378)
Megan B. Boelstler (P79125)
Legghio & Israel, P.C.
306 South Washington, Suite 206
Royal Oak, MI 48067
(248) 398-5900
cpl@legghioisrael.com
mbb@legghioisrael.com

Attorneys for Detroit Fire Fighters
   Association (DFFA)

- *"The DFFA hereby withdraws Grievance #01-22 (Js Time Taxation)."*

  > -- The DFFA's June 2, 2022 letter to Charles Simms, Executive Fire Commissioner; Hakim W. Berry, City Labor Relations Director; Reginald Jenkins, City's Deputy Fire Commissioner, and Valerie Colbert-Osamuede, City Labor Relations Deputy Director (Docket #13582, Ex. 1 at pp. 10-11)

  * * *

- *"By this letter, the DFFA asks that the City withdraw its Motion* [R13575].

  *As you surely must also know…the DFFA withdrew the grievance [G #01-22 Js Time Taxation] cited in your Motion"* [R13575]

  > -- DFFA Counsel's June 2, 2022 letter to the only City's attorney that signed the Motion (Docket #13582, Ex. 1 at pp. 8-9)

  * * *

- *"The Union asks for an Order directing the City to negotiate…and promptly respond to DFFA's request for information…"*

  > -- The DFFA's May 31, 2022 ULP charge filed with MERC over J-Time taxation (Docket #13582, Ex. 2)

i

**TABLE OF CONTENTS**

GUIDE TO ABBREVIATIONS, ACRONYMS, AND CITATIONS ................... iv

TABLE OF AUTHORITIES ................................................................. vi

INTRODUCTION ........................................................................... 1

SUMMARY OF PERTINENT FACTS ................................................. 3

    A.    Background Facts ............................................................. 3
    B.    The POA ........................................................................ 4
    C.    The 2014 CBA ................................................................ 5
    D.    The City Exited Bankruptcy Nearly Eight (8) Years Ago ............. 5
    E.    Background of J-Time ...................................................... 6
    F.    The City-Issued W-2s and the Payroll System Change ............. 7
    G.    The DFFA's Settlement Proposal ........................................ 10
    H.    The City's Motion and DFFA's ULP ................................... 10

ARGUMENT ................................................................................ 12

    I.    THIS COURT LACKS JURISDICTION ........................................... 12

        A.    The Duty to Bargain ................................................. 12

        B.    The Outcome of Bargaining ........................................ 14

            1.    Powers of This Bankruptcy Court ................................. 14
            2.    Court's Subject Matter Jurisdiction -- "Arising In
                    or Related To" ....................................................... 16

        C.    Post-Confirmation Jurisdiction "Shrinks" ........................ 18

            1.    The Court Must Review Subject Matter
                    Jurisdiction ......................................................... 19
            2.    This Post-Confirmation Bargaining Dispute is
                    Unrelated to The City's Chapter 9 Case ..................... 19
            3.    The City Cannot Use Bankruptcy to Avoid Future
                    Bargaining Disputes ............................................. 20
            4.    There is No Close Nexus and No Threat to the
                    POA ................................................................... 21

        D.    There Is No Justiciable Issue Before This Court .................. 22

E.     The City's Attempts to Bootstrap This Dispute to the POA Fails ........................................................................22

F.     The PM Opinion........................................................................23

CONCLUSION .........................................................................................25

# GUIDE TO ABBREVIATIONS, ACRONYMS, AND CITATIONS

For purposes of readability and concision, the following abbreviations, acronyms, and citations are used in this *Opposition to the City's Motion for Entry of an Order Enforcing the Confirmation Order Against the DFFA (R13575), and its Supplement and Amendment (R13582)*:

1.    "**Bankruptcy Court**" refers to the United States Bankruptcy Court, Eastern District of Michigan.

2.    "**Bankruptcy Rules**" refer to the Federal Rules of Bankruptcy Procedure.

3.    "**CBA**" refers to collective bargaining agreements generically.

4.    The "**2014 CBA**" refers specifically to the 2014-2019 collective bargaining agreement, and its extension to July 2020, between the DFFA and the City. *See POA below.*

5.    "**City**" refers to the City of Detroit.

6.    "**Confirmation Order**" or "**CO**" refers to the Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit, Docket #8272. The CO and Plan of Adjustment (see no. 23 below) are collectively referred to as the "**POA.**"

7.    "**DFD**" refers to the Detroit Fire Department.

8.    "**DFFA**" is the Defendant Detroit Fire Fighters Association, Local 344, a creditor.

9.    "**Effective Date**" is December 10, 2014, the date the POA became effective. (Docket #8649).

10.    "**EM**" refers, depending on the context, to a generic Emergency Manager or to Emergency Manager Kevin Orr who was appointed by the Governor in March 2013 pursuant to MCL 141.1549(1).

11.    "**FRC**" refers to the Detroit Financial Review Commission.

12.    "**J-Time**" or "**Injured Time**" refers to the compensation fire fighters collect pursuant to the 2014 CBA and earlier CBAs, when they are on leave for a temporary work-related disability.

**13.** "**Local Rules**" refer to the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan.

**14.** "**MERC**" refers to the Michigan Employment Relations Commission, which resolves labor disputes involving public and private sector employees, including adjudicating unfair labor practices. (MCL 423.1, *et seq.*).

**15.** "**Motion**" refers to the *Motion for the Entry of an Order Enforcing the Confirmation Order Against the DFFA* (Docket #13575).

**16.** "**NLRB**" refers to the National Labor Relations Board.

**17.** **PA 436** refers to Michigan Public Act 436 (MCL 141.1549(1)).

**18.** "**PERA**" refers to the Michigan Public Employment Relations Act, 1965 PA 379, as amended, MCL 423.201, *et seq*.

**19.** "**PFRS**" refers to Police and Fire Retirement System of the City of Detroit.

**20.** "**Plan Document**" or "**Plan**" refers to the POA-provided new plan for the PFRS, which is called the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (Amendment and Restatement Effective July 1, 2014).

**21.** "**PM Opinion**" refers to the City's Exhibit 6-6 in Docket #13575, the Plante Moran Opinion.

**22.** "**POA**" refers to the City Bankruptcy Plan of Adjustment which included a ten (10) year injunction against any pension changes. (Docket #8045).

**23.** "**Supplement**" refers to the City's *Supplement and Amendment to the City's Motion* (Docket #13582).

**24.** "**ULP**" refers to an Unfair Labor Practice charge.

# TABLE OF AUTHORITIES

## CASES

*Cantor v. Am. Banknote Corp.*, 2007 WL 3084966 (S.D.N.Y.)..............................18

*Cent. Michigan Univ. Fac. Ass'n v. Cent. Michigan Univ.*, 404 Mich. 268 (1978)........................................................................................................13

*Dep't of the Air Force, Scott Air Force Base, Ill. v. Nat'l Ass'n of Gov't Emps.*, 31 F.L.R.A. 1013 (Mar. 25, 1988).........................................................14

*Detroit Police Officers Ass'n v. City of Detroit*, 391 Mich. 44 (1974) ............ 12, 13

*Gibraltar Sch. Dist. v. Gibraltar MESPA-Transp.*, 443 Mich. 326 (1993).............14

*Guccione v. Bell*, 2006 WL 2032641 (S.D.N.Y.) .....................................................18

*In re City of Detroit, Mich.*, 504 B.R. 97 (Bankr. E.D. Mich. 2013) .....................15

*In re City of Detroit, Michigan*, 838 F.3d 792 (6th Cir. 2016).................................6

*In re City of Stockton, Cal.*, 478 B.R. 8 (Bankr. E.D. Cal. 2012)...........................15

*In re Ener1, Inc.*, 558 B.R. 91 (Bankr. S.D.N.Y. 2016) .................................. 18, 19

*In re Foremost Mfg. Co.*, 137 F.3d 919 (6th Cir. 1998) .........................................15

*In re Gainey Corp.*, 447 B.R. 807 (Bankr. W.D. Mich. 2011), *aff'd*, 481 B.R. 264 (B.A.P. 6th Cir. 2012)................................................................................18

*In re General Media, Inc.*, 335 B.R. 66 (Bankr. S.D.N.Y. 2005) ...........................18

*In re Harstad*, 155 B.R. 500 (Bankr. D. Minn. 1993) .............................................17

*In re Metro-Goldwyn-Mayer Studios Inc.*, 459 B.R. 550 (Bankr. S.D.N.Y. 2011) ...........................................................................................................18

*In re Reliant Exploration, Ltd.*, 336 B.R. 286 (Bankr. S.D. Tex. 2005) .................19

*In re Thickstun Bros. Equip. Co., Inc.*, 344 B.R. 515 (B.A.P. 6th Cir. 2006).........18

*In re Trans-Indust., Inc.*, 419 B.R. 21 (Bankr. E.D. Mich. 2009) ..........................20

*In re Western Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990) ....................15

*In re Wolverine Radio Co., Inc.*, 930 F.2d 1132 (6th Cir. 1991)...........................17

*Ishpeming Supervisory Emps. v. City of Ishpeming*, 155 Mich. App. 501 (1986)..............................................................................................14

*Kalamazoo City Educ. Ass'n v. Kalamazoo Pub. Sch.*, 406 Mich. 579 (1979).......13

*Matter of Holly's, Inc.*, 172 B.R. 545 (Bankr. W.D. Mich. 1994), *aff'd sub nom. In re Holly's, Inc.*, 178 B.R. 711 (W.D. Mich. 1995) ................... 17, 18

*Matter of Walway Co.*, 69 B.R. 967 (Bankr. E.D. Mich. 1987) .............................16

*N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984)...........................................16

*N.L.R.B. v. Tomco Commc'n, Inc.*, 567 F.2d 871 (9th Cir. 1978) ..........................14

*Resorts Int'l Fin., Inc. v. Price Waterhouse & Co.*, 372 F.3d 154 (3rd Cir. 2004) ..............................................................................................18

*Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579 (6th Cir. 1990) .................17

*Rockwell v. Bd. of Educ. of the Sch. Dist. of Crestwood*, 393 Mich. 616 (1975), *app. dismissed* 427 U.S. 901 (1976) .................................................13

*The Matter of Zale Corp.*, 62 F.3d 746 (5th Cir. 1995)..........................................15

*U.S. Dep't of Homeland Sec. U.S. Immigr. & Customs Enf't & Am. Fed'n of Gov't Emps. Nat'l Council, 118-Ice*, 70 F.L.R.A. 628 (June 15, 2018)........14

*Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831 (4th Cir. 2007) ....................................................................................... 17, 19

*Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994)...........................17

**STATUTES**

11 U.S.C. §105 ................................................................................ 15, 16

11 U.S.C. §943(b)(4)..............................................................................16

18 U.S.C. §151, *et seq.*.................................................................... 4, 16

28 U.S.C. §1334 ........................................................................ 16, 17, 18

28 U.S.C. §157 .......................................................................................17

28 U.S.C. §157(b)(2)(O) ..........................................................................20

Act 312, MCL 423.231, *et seq.* ..............................................................14

Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541, *et seq.* ....................................................................... iv, v, 3, 4, 5

MCL 141.1552(1) ......................................................................................3

MCL 141.1552(1)(k) ..................................................................................3

MCL 141.1567(3) ...................................................................................3, 4

MCL 423.1, *et seq.* ...................................................................................v

MCL 423.216 ............................................................................................13

Michigan Public Employment Relations Act, 1965 PA 379, MCL 423.201, *et seq.* ........................................................................ v, 4, 12, 13, 14

**REGULATION**

26 CFR §1.104-1(b) .................................................................................23

**CONSTITUTIONAL PROVISION**

U.S. CONST. AMEND. X ...........................................................................16

## INTRODUCTION

This is the DFFA's brief in opposition to the City's improper effort to use the POA and this Court to avoid its 2022 duty to bargain over a mandatory subject -- *viz.*, the taxation of firefighters' J-Time compensation.[1]

The DFFA challenged -- via a February 2022 grievance -- the City's abrupt, unilateral, yet spasmodic changes in J-Time tax treatment for fire fighters.[2] This unilateral change abrogated a 30-year practice unchanged by the negotiation of at least six (6) CBAs -- including the 2014 CBA (negotiated during bankruptcy) and the current post-bankruptcy 2020-2026 CBA.

On May 17, 2022 -- *before the City filed its Motion* -- the DFFA offered to settle the grievance. The DFFA settlement offer specifically acknowledged the taxability of *some* J-Time compensation -- a crucial fact the City omitted in its Motion.

The City ignored this DFFA grievance settlement offer.

---

[1] At the threshold, the DFFA acknowledges that *some* J-Time compensation is taxable. But, the substance and merits of this dispute are *not* before this Court. (See, *e.g.*, Docket #13274, pp. 18-19) ("The issue [before the Court] is whether Respondents violated the POA and its injunction.").

[2] This City J-time tax treatment change applies to fire fighters *only* (DFFA I members). EMTs (DFFA II members), who are injured on duty, are "covered under the State['s]…Worker Compensation Laws." (Ex. 4).

Instead, the City filed its May 27, 2022 Motion "seeking dismissal of" the DFFA grievance -- while mischaracterizing the DFFA's position and without ever informing this Court about the DFFA's pending settlement offer.

On May 31, 2022, the DFFA filed a ULP with MERC. By this ULP, the Union sought *only* to compel the City to negotiate changes in J-Time taxation and to provide information. The DFFA ULP contains no damages or monetary claims for relief.[3]

On June 2, 2022, the DFFA *withdrew* its J-Time grievance -- unprompted and without qualification or conditions.

Faced now with a justiciability issue, the City filed -- on June 6, 2022 -- an analysis-impoverished, five (5) page Supplement and Amendment to its Motion that largely whines about notice and service of both the grievance-withdrawal and the ULP charge.[4]

In these additional pleadings, the City simply declares that the withdrawn DFFA grievance and the now-pending ULP are equivalent matters. As such, the City urges, the pending ULP should also be dismissed.

---

[3] The City's claim that the DFFA seeks full tax exemption for J-Time compensation -- in conflict with the "Retirement System, the POA, and the Internal Revenue Code" -- is manifestly absurd. (Ex. 6; Docket #13582, Ex. 2).

[4] These City complaints are non-starters. The City was properly served with all documents.

2

As explained below, the City is wrong. The DFFA members have post-bankruptcy statutory bargaining rights that are beyond this Court's jurisdiction. And, MERC is the exclusive venue for resolution of the DFFA's ULP claims. As such, the pending DFFA ULP does not violate the "POA, the Retirement System…[or] the Internal Revenue Code" -- as claimed by the City.

So, the City's Motion and its additional pleadings should be dismissed. And, given the City's vexatious conduct, the DFFA should be awarded its costs and fees incurred in litigating this frivolous and mooted action.

## SUMMARY OF PERTINENT FACTS

### A.    Background Facts

**1.**    Under PA 436, an EM has broad, sweeping powers. *See* MCL 141.1552(1).

**2.**    In the context of labor relations and collective bargaining, an EM's powers are virtually absolute, though of limited duration. MCL 141.1552(1); MCL 141.1567(3).

**3.**    Under PA 436, an EM can amend, modify or terminate "1 or more terms and conditions" of any existing collective bargaining agreement (CBA). MCL 141.1552(1)(k).

3

**4.** PA 436 also temporarily suspends a city's duty to bargain over mandatory subjects -- a PERA statutory duty that has been recognized for nearly 50 years. MCL 141.1567(3).

**5.** PA 436's suspension of PERA's duty to bargain "sunsets" when a city exits receivership, but no later than 5 years from the date a city is placed into receivership. MCL 141.1567(3).

**6.** On March 28, 2013, Governor Snyder appointed Kevyn Orr as the City's PA 436 EM.

**7.** On June 30, 2013, the DFFA-City CBA expired by its terms. Rather than negotiate a new CBA, the EM unilaterally imposed terms and conditions of employment under PA 436.

**8.** On July 18, 2013, the City filed this Chapter 9 case.

**B.     The POA**

**9.** The POA was confirmed on November 12, 2014.[5]

**10.** The POA became effective on December 10, 2014.[6]

**11.** The POA contains a "broad" injunction with respect to litigation that challenges the POA. It precludes, among other things, litigation that "does not

---

[5] Docket #8045; Docket #8272.

[6] *See* Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit and (II) Occurrence of Effective Date, filed December 10, 2014 (Docket #8649).

conform . . . or comply with . . ." the terms of the POA or "the settlements" contained in the POA. (Docket #13274, pp.14-15).

**12.**     It bars too litigation that interferes with the "implementation and consummation" of the POA. (POA, Article III.D.5, pp. 50-51; see also Docket #13274, pp. 14-15).

**C.     The 2014 CBA**

**13.**     The 2014 CBA -- which was negotiated with "Court-ordered mediation" -- was incorporated into the POA. (Docket #8272, p. 20).

**14.**     The 2014 CBA was ratified and approved, including by the EM and State Treasurer. (See Docket #13430-1, Ex. 6B).

**D.     The City Exited Bankruptcy Nearly Eight (8) Years Ago**

**15.**     On December 10, 2014, the POA's effective date, the City exited bankruptcy, the City's receivership ended, and the EM's contract terminated.

**16.**     The City then moved to FRC oversight.

**17.**     In April 2018 -- over four (4) years ago -- the FRC released the City from *state* financial oversight. (Ex. 7, Resolution 2018-13).[7]

---

[7] This was based upon, among other things, the City's three (3) consecutive years of audited balanced budgets (under MCL 141.1638), which released the City from the MCL 141.1636 requirement that the FRC review and approve all CBAs.

**18.** "[T]he Plan [POA] has been substantially consummated." *In re City of Detroit, Michigan*, 838 F.3d 792 (6th Cir. 2016). The case remains open only at the City's insistence. (Docket #13578).

**19.** As of the date of this City's May 27, 2022 Motion and Supplement, the City has been out of bankruptcy for *nearly eight (8) years*.

**E.     Background of J-Time**

**20.** "Injured-on-Duty" is the designation or status for fire fighters who incur a work-related injury and cannot perform fire fighter duties.

**21.** This is a *specific* current (2020-2026) DFFA CBA term that has appeared, uninterrupted, in the parties' CBAs for over thirty (30) years, including in the 2014 bankruptcy-negotiated CBA. (Exs. 4-5).

**22.** The current 2020-2026 CBA states that (Ex. 4):

Members [fire fighters] who are injured on duty shall be carried on injured-on-duty status...

**23.** For decades -- long before the City Bankruptcy -- the City paid fire fighters on Js their *full* compensation. That is, the City paid full wages and benefits to fire fighters who were disabled from a work-related injury. (Docket #13575, p. 2).

**24.     Full Taxes Each Pay Period While on Js:** During the same decades-long period, the City withheld -- bi-weekly -- routine state and federal taxes from

the full compensation paid to firefighters on Js. These taxes were taken *just as if the fire fighter on Js had been on active duty.*

25. **Pre-Tax Employee Contributions:** Also during this same period, the City deducted, on a *pre-tax* basis, each employee's designated contributions for pension and healthcare from their full Js compensation. These deductions are CBA requirements. (See, *e.g.*, Ex. 4, Art. 24(B)(2) and 24(K) and 2014 PFRS-DFFA MOU §A(1)-(2)).

**F. The City-Issued W-2s and the Payroll System Change**

26. **The Year End W-2s:** During the same decades-long time period, the City annually provided fire fighters on Js with a letter or W-2 that designated the full Js compensation paid by the City as *non-taxable* sick pay.

27. In December 2019, the City changed the DFD payroll system to Ultipro.

28. **The 2019 W-2:** The City-issued 2019 W2s -- *issued in early 2020 for 2019 earnings* -- followed the long practice of designating Js income as *nontaxable* sick pay.

29. **The Ultipro System Didn't Withhold Bi-Weekly Taxes in 2020:** Shortly after UltiPro's DFD December 2019 implementation, the City *stopped* taking taxes out of the 2020 bi-weekly compensation paid to fire fighters on Js.

30. **Employees' Contributions After Ultipro:** Although no longer withholding bi-weekly taxes from the full compensation paid to fire fighters on Js,

7

the City -- in 2020 -- still withheld or deducted from the employee's Js compensation their designated *pre-tax* pension and healthcare contributions.

**31.** **March/April 2020 -- DFFA and City Meet Regarding the Halt in Bi-Weekly Taxes:** In March/April 2020, the DFFA met with the City regarding the new payroll system and the City's unilateral decision to no longer withhold bi-weekly taxes from the Js compensation.

**32.** **The City Restores Bi-Weekly Taxes for Those on Js:** As a result of these DFFA/City meetings, the City resumed withholding taxes, bi-weekly, from the compensation of those on Js Time.

**33.** The DFFA understood that *the W-2s that would be issued (in 2021) for 2020* income would also follow the long practice of designating Js compensation as *non-taxable* sick pay.

**34.** **The City's December 2020 Memos:** On December 17, 2020, the City issued memos to the Union leaders of both the DPOA and DFFA, among others. (Docket #13575, Ex. 6-1).

**35.** Both memos declared that, ***effective January 1, 2021***, the City would now tax ***all*** "J/injured-time compensation." (Docket #13575, Ex. 6-1).

**36.** The City also claimed, in its memo, that it had "the option to make…[J-Time compensation] 'taxable or non-taxable.'" (Docket #13575, Ex. 6-1 at p. 27).

8

37.     The City also declared that, *had* the Bankruptcy Court or the City's bankruptcy attorneys identified this issue, *i.e.*, the non-taxing of J-Time compensation -- which the City concedes they hadn't -- this decades-long practice would have been "discontinued or materially revised." (Docket #13575, Ex. 6-1 at p. 27).

38.     **The City Corrects the 2020 W-2s Pursuant to Past Practice:** In early 2021, the City issued the 2020 W-2s for income earned in 2020. These 2020 W-2s initially did ***not*** designate Js compensation as untaxable sick pay.

39.     The DFFA objected. The City then voluntarily "corrected" the 2020 W-2s to now designate 2020 Js compensation as *untaxable*. (See, *e.g.*, Ex. 1).

40.     The City "corrected" the 2020 W-2s of approximately 500 fire fighters on Js in this manner.

41.     **2021 -- Full Taxes Each Payroll Period:** Consistent with the past practice, the City withheld routine taxes each payroll period in 2021 -- for those receiving J-Time compensation -- and made *pre-tax* employee deductions from this Js compensation.

42.     **The 2020-2026 CBA:** Between June 2020 to July 2021, the parties negotiated a new 2020-2026 CBA.[8] This new CBA does not add or change any prior CBA language regarding J-Time taxation.

---

[8] City Council approved it in July 2021.

**43.     City W-2s for 2021 Income:** In January 2022, the City issued the 2021 W-2s for income earned in 2021.

**44.**     On these 2021 W-2s, the City designated Js compensation, received in 2021, as *taxable income*. That is, the City discontinued its prior, decades-long practice of designating Js compensation as *non-taxable* sick pay.

**45.     The DFFA Grievance and Bargaining Request:** In February 2022, the DFFA grieved the City's decision to tax all Js income. The City denied the grievance.

**46.**     The DFFA also explicitly and repeatedly demanded bargaining over the decision, its impact and effects, and the failure to produce information requested by the Union. (Ex. 2 and Docket #13582, Ex. 1 at p. 11).

**G.     The DFFA's Settlement Proposal**

**47.**     On May 17, 2022 -- ***before*** the City filed its Motion with this Court -- the DFFA made a comprehensive *initial* grievance settlement proposal. Consistent with its grievance discussions with the City -- the DFFA *conceded* the partial taxability of Js Time compensation and the need to revise the past taxation practice regarding J-Time compensation. (Ex. 6 and Docket #13582, Ex. 2 at pp. 10-11).

**H.     The City's Motion and DFFA's ULP**

**48.**     The City did not respond to the DFFA *initial* proposal.

**49.**     Instead, on May 27, 2022, the City filed its Motion seeking "the dismissal of" the DFFA grievance "relating to J time compensation." The City never mentioned, in its Motion, the DFFA pending grievance settlement offer. (Docket #13575).

**50.**     *After* filing its Motion, the City categorically rejected any negotiations or settlement discussions with the DFFA.[9]

**51.**     On May 31, 2022, the DFFA filed a ULP charge with the MERC over the City's failure to bargain -- *i.e.*, its unilateral changes regarding J-time compensation -- and to compel the production of information. (Docket #13582, Ex. 2 at pp. 13-16).

**52.**     The ULP seeks *bargaining* and information -- *not* a specific outcome of bargaining. (*Id.*).

**53.**     **Grievance Withdrawn:** On June 2, 2022, the DFFA completely withdrew -- unprompted and *without reservation or conditions* -- its J-Time Grievance. (Docket #13581, Ex. 1 at pp. 7-11).

**54.**     DFFA *again* sought bargaining over the City's J-Time tax decisions and the impact/effects of those decisions.

---

[9] In its May 27 Motion, the City omitted the significant, probative fact that the DFFA had made a settlement proposal that conceded the taxability of Js Time compensation. This is notable because, in its May 27 Motion, the City misrepresented that the DFFA's grievance sought complete tax exemption of these J-time payments. See Docket #13582, Ex. 1 at 10.

11

**55.** DFFA noted again that "the DFFA concedes that the City's prior practice regarding Js Time taxation must be corrected." (*Id.*).

**56.** The DFFA asked the City to withdraw its May 27 Motion in that the DFFA Grievance was now withdrawn. The City refused.

**57.** Instead, on June 6, the City filed a *Supplement and Amendment* to its May 27 Motion. (Docket #13582).

**58.** In its *Supplement and Amendment*, the City summarily claims that the DFFA's pending MERC ULP (Docket #13582, Ex. 2) -- *which only raises duty-to-bargain and information request issues* -- are the equivalent to the now-withdrawn grievance. (Docket #13582 at p. 3).[10]

**59.** The PFRS, which the City claims is impacted by the DFFA's ULP has made no appearance in these proceedings.

## ARGUMENT

### I. THIS COURT LACKS JURISDICTION

#### A. The Duty to Bargain

PERA, Section 15, requires a public employers to bargain over "wages, hours, and other terms and conditions of employment." *Detroit Police Officers Ass'n v. City of Detroit*, 391 Mich. 44, 54 (1974).[11]

---

[10] The City makes this claim even though the relief sought by the pending ULP is substantively different than the relief sought by the now-withdrawn grievance. *Cf.*, Docket #13582, Ex. 2 and Docket #13575, Ex. 6-2.

[11] These are mandatory subjects of bargaining. (*Id.* at 54-55).

PERA, Section 15, also defines "collective bargaining" as the "mutual obligation" of both parties to "meet" and "confer" in "good faith." *Detroit Police Officers Ass'n v. City of Detroit*, *supra*, at 54.

MERC has exclusive jurisdiction to decide unfair labor practice charges under PERA. *Rockwell v. Bd. of Educ. of the Sch. Dist. of Crestwood*, 393 Mich. 616, 630 (1975), *app. dismissed* 427 U.S. 901 (1976).

It is MERC alone, therefore, that decides whether a disputed subject is a mandatory subject of bargaining. MCL 423.216(d) and (e); *Kalamazoo City Educ. Ass'n v. Kalamazoo Pub. Sch.*, 406 Mich. 579 (1979).

This duty to bargain has undergirded labor relations law -- both federal and state law -- for decades. Consistent with its exalted position in the labor relations law cosmogony, it is broadly applied. *Cent. Michigan Univ. Fac. Ass'n v. Cent. Michigan Univ.*, 404 Mich. 268, 277-278 (1978) ("Following the Federal courts' approach, Michigan has adopted a broad view of other terms and conditions of employment").

So, even where an employer has the undisputed discretion to make a specific management decision, often the employer must bargain over the *impacts and effects*

of that decision. *See, Ishpeming Supervisory Emps. v. City of Ishpeming*, 155 Mich. App. 501, 511 (1986).[12]

## B. The Outcome of Bargaining

The *outcome* of bargaining is up to the parties exclusively.

Neither a state nor federal court -- nor the NLRB, nor MERC -- can impose mandatory terms and conditions of employment on any bargaining party.[13] *Gibraltar Sch. Dist. v. Gibraltar MESPA-Transp.*, 443 Mich. 326, 341-342 (1993) ("…the NLRA and the PERA…provide *only a process* by which the parties might reach agreement, the power to agree to a proposal remains with each party.") (emphasis added).[14]

### 1. Powers of This Bankruptcy Court

The Bankruptcy Code defines the Bankruptcy Court's authority. And, the goal of a Chapter 9 bankruptcy is to adjust the debtor-creditor relationship. *In re City of*

---

[12] In some cases, employers who have the right to terminate an illegal past practice unilaterally must still bargain over the impacts of its changes. *See, e.g.*, *U.S. Dep't of Homeland Sec. U.S. Immigr. & Customs Enf't & Am. Fed'n of Gov't Emps. Nat'l Council, 118-Ice*, 70 F.L.R.A. 628, 634-635 (June 15, 2018); *Dep't of the Air Force, Scott Air Force Base, Ill. v. Nat'l Ass'n of Gov't Emps.*, 31 F.L.R.A. 1013, 1050 (Mar. 25, 1988).

[13] The rare exception, of course, is Act 312 (MCL 423.231, *et seq.*) arbitration, which is a statutory mechanism to resolve public safety *new* CBA disputes. Even here, though, the parties themselves seek Act 312 mediation assistance and arbitration.

[14] See also, *N.L.R.B. v. Tomco Commc'n, Inc.*, 567 F.2d 871, 884 (9th Cir. 1978).

*Stockton, Cal.*, 478 B.R. 8, 25 (Bankr. E.D. Cal. 2012). The debtor's pre-petition

contracts and its creditors' claims comprise the debtor-creditor relationship.

The Court's authority is to fix a debtor's then-existing debts. *In re City of*

*Detroit, Mich.*, 504 B.R. 97, 131, 142, 150 (Bankr. E.D. Mich. 2013) (the bankruptcy

court has the power to impair "existing" debt, such as "ordinary contract debt" or

current "pension debt"; "A bankruptcy court may determine matters that arise

directly under the bankruptcy code, such as fixing a creditor's claim in the claims

allowance process."); *In re City of Stockton*, *Cal.*, 478 B.R. at 25 ("The core of a

chapter 9 case is adjustment of the debtor-creditor relationship.").

To this end, the bankruptcy court has broad equitable powers. *In re Foremost*

*Mfg. Co.*, 137 F.3d 919, 924 (6th Cir. 1998). But, the Court's equitable powers are

not unlimited or unmoored. *Id.* at 924.

Thus, when issuing a §105 injunction, the Court cannot "alter another

provision of the Code." *The Matter of Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995);

*In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 601 (10th Cir. 1990) ("a

bankruptcy court's supplementary equitable powers [under §105(a)] may not be

exercised in a manner that is inconsistent with the other, more specific provisions of

the Code").

Equitable powers do not license this Court to engage in a broad, "freewheeling" balancing act. *Matter of Walway Co.*, 69 B.R. 967, 971 (Bankr. E.D. Mich. 1987) (citing *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 529 (1984)).

And, the Court's equity powers cannot usurp clear statutory rights. 11 U.S.C. §943(b)(4).

A Bankruptcy Court's authority is further circumscribed *vis-à-vis* collective bargaining. In *Bildisco*, 465 U.S. at 534 -- a private sector case where the court had broader bankruptcy powers than in this City Chapter 9 case, and no 10th Amendment balancing concerns -- the Supreme Court warned the bankruptcy court not to step into the collective bargaining process that followed the debtor's rejection of a current CBA.

### 2. Court's Subject Matter Jurisdiction -- "Arising In or Related To"

This Court's subject matter jurisdiction exists if the proceeding being challenged is one "arising under Title 11, or arising in or related to cases under Title 11." 28 U.S.C. §1334(b).

So, for the bankruptcy court to have jurisdiction, the issue before it must be "related to" a case under Title 11. 28 U.S.C. §1334. And, the extent of the

jurisdiction is determined by 28 U.S.C. §157 -- the bankruptcy court may decide "core" proceedings.[15]

A civil proceeding is "related to" only if it "could conceivably have any effect on the estate being administered in bankruptcy." *Wolverine*, 930 F.2d at 1142 (internal citations omitted). Attenuated connections to the bankruptcy does not satisfy the jurisdictional requirement. *Wolverine*, 930 F.2d at 1142, citing *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 583 (6th Cir. 1990).

Further, the Court must determine jurisdiction on the basis of the statute, and cannot rely simply on the authority the Court approved for itself in a plan or its confirmation order. *Matter of Holly's, Inc.*, 172 B.R. 545, 555 (Bankr. W.D. Mich. 1994), *aff'd sub nom. In re Holly's, Inc.*, 178 B.R. 711 (W.D. Mich. 1995) ("The parties to an agreement cannot confer subject matter jurisdiction upon a federal court").[16]

In short, a bankruptcy court "cannot write its own jurisdictional ticket." *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 837 (4th Cir. 2007) (internal citations omitted).

---

[15] In "non-core" proceedings, bankruptcy courts are limited to submitting proposed findings of fact and conclusions of law to the district court subject to de novo review. *In re Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1144 (6th Cir. 1991)

[16] *See In re Harstad*, 155 B.R. 500, 507 (Bankr. D. Minn. 1993) (footnote omitted) ("neither a plan of reorganization nor a court can substitute its ideas of section 1334 jurisdiction for what Congress has articulated") and *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994).

17

## C. Post-Confirmation Jurisdiction "Shrinks"

Most courts agree that "once confirmation occurs, the bankruptcy court's jurisdiction shrinks." *In re General Media, Inc.*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005); *see also Cantor v. Am. Banknote Corp.*, 2007 WL 3084966, at *3 (S.D.N.Y.) ("Generally a bankruptcy court's jurisdiction abates upon confirmation of the reorganization plan.").[17]

There is logic to this shrinkage in jurisdiction. It prevents parties from creating a perpetual bankruptcy case. *Holly's*, 172 B.R. at 562.

Courts that have reviewed the post-confirmation standard require a "close nexus," between the bankruptcy law and the challenged litigation. See, *In re Thickstun Bros. Equip. Co., Inc.*, 344 B.R. 515, 521-522 (B.A.P. 6th Cir. 2006) (noting the 3rd Circuit's conclusion that "the essential inquiry appears to be whether there is a ***close nexus*** to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter") (emphasis added).[18]

Debtors cannot use the bankruptcy forum indefinitely to resolve unrelated disputes simply due to the debtor's post-confirmation status. *See General Media*,

---

[17] *Guccione v. Bell*, 2006 WL 2032641, at *4 (S.D.N.Y.) ("Courts generally agree that federal jurisdiction pursuant to section 1334 shrinks once plan confirmation has occurred."); *In re Ener1, Inc.*, 558 B.R. 91, 95 (Bankr. S.D.N.Y. 2016); see also *In re Metro-Goldwyn-Mayer Studios Inc.*, 459 B.R. 550, 555 (Bankr. S.D.N.Y. 2011).

[18] *In re Gainey Corp.*, 447 B.R. 807, 813 (Bankr. W.D. Mich. 2011), *aff'd*, 481 B.R. 264 (B.A.P. 6th Cir. 2012), citing *Thickstun*, 344 B.R. at 521, quoting *Resorts Int'l Fin., Inc. v. Price Waterhouse & Co.*, 372 F.3d 154, 166-167 (3rd Cir. 2004).

335 B.R. at 75 (warning against post-confirmation jurisdiction rationale that would "**endlessly stretch** the bankruptcy court's jurisdiction") (emphasis added) (internal citations omitted).

Predictably enough, courts are particularly skeptical about jurisdiction when a dispute arises *years* after plan confirmation and it does not involve the *property* of the bankruptcy estate. *See In re Reliant Exploration, Ltd.*, 336 B.R. 286 (Bankr. S.D. Tex. 2005).

Finally, the Court has an "unflagging obligation to examine subject matter jurisdiction at every stage of the proceedings." *Valley Historic*, 486 F.3d at 838.

### 1. The Court Must Review Subject Matter Jurisdiction

The City must establish this Court's jurisdiction. (*Ener1*, 558 B.R. at 94-95). But, the City has failed to meet its burden of demonstrating the Court's jurisdiction.

Indeed, the City's pleadings are bereft of jurisdictional analysis beyond summarily citing to the Court's retained jurisdiction over the POA. (Docket #13575 at p. 11).

### 2. This Post-Confirmation Bargaining Dispute is Unrelated to The City's Chapter 9 Case

Here, the City seeks to bar DFFA from pursuing its MERC action that seeks *only* bargaining (and information) -- not a specific outcome. As such, the City seeks to improperly extirpate the DFFA's statutory bargaining rights and usurp MERC's exclusive jurisdiction of collective bargaining matters.

19

This Court has no jurisdiction over the DFFA's ULP. The ULP is not related to, nor a core proceeding, under 28 U.S.C. §157(b)(2)(O). It does not "affect[]...the adjustment of the debtor-creditor...relationship." The issues -- involving collective bargaining -- did *not* arise because of a bankruptcy proceeding.

The dispute clearly arose *post-confirmation* and involves the taxability of injury pay -- issues the City admits were not even raised during the bankruptcy. The dispute does not invoke a substantive right created by federal bankruptcy law or the POA. And, the proceeding could exist outside of bankruptcy.

DFFA's ULP against the City is unrelated to the POA. It does not affect any distributions to creditors or the amount of the bankruptcy estate. *See, In re Trans-Indust., Inc.*, 419 B.R. 21, 41 (Bankr. E.D. Mich. 2009).

In December 2014, the City once again had a duty to bargain. It cannot now evade that statutory duty by merely waving the bankruptcy flag and lamely declaring a connection between the bargaining demand/information request with the bankruptcy matter.

And, this Court cannot improperly expand its post-confirmation authority to accommodate the City's strategy to avoid its bargaining duties.

### 3. The City Cannot Use Bankruptcy to Avoid Future Bargaining Disputes

The City's effort to avoid *post-confirmation* bargaining duties over midterm CBA modifications is improper. Spun to its logical conclusion, any topic even

tangentially related to "taxation" or PFRS would be sufficient to come under this Court's power -- even many years after the POA confirmation. And, the City could seek the Court's shelter to *enjoin even the possibility of bargaining*. This is nonsense.

### 4. There is No Close Nexus and No Threat to the POA

There is no evidence -- and the City presents none -- that the POA's implementation and funding is jeopardized by a change in how Js Time taxation is treated.

DFFA's ULP does not seek monetary relief -- it requests only bargaining and information. And, its request does not increase the City's debt. Simply put, the City's observance of the POA does not depend on the outcome of DFFA's ULP that seeks *only* bargaining and information.

Finally, the City's complaints regarding "illegality" -- claiming that the City cannot be forced to bargain an illegal issue -- mischaracterizes the Union's bargaining demand.

***To be clear:*** the DFFA does not seek to bargain over an "illegal" arrangement that fully exempts J-Time compensation from taxation. Rather, it seeks to bargain over ***how*** taxes -- which the Union acknowledges must be paid on at least some J-Time compensation -- will now be assessed against J-Time compensation.

## D. There Is No Justiciable Issue Before This Court

The DFFA has *withdrawn* its grievance -- the action that ostensibly triggered the City's Motion.

By its ULP, DFFA seeks *only* to compel bargaining. Over what? Bargaining over the way to change a decades-long past practice that has survived, unchanged, through several CBAs -- including the 2014 CBA that was negotiated with the Bankruptcy Court's oversight and ultimate approval.

MERC can order the parties to bargain. But, it cannot dictate the resolution of bargaining. MERC has not yet determined whether the City had a duty to bargain.[19] There is no current MERC bargaining order and no bargaining result. Simply put, there is no issue before the Court for adjudication.

The Court cannot enjoin statutorily-required bargaining on the notion that bargaining *could* lead to a result that *could* conflict with the POA.

## E. The City's Attempts to Bootstrap This Dispute to the POA Fails

The City fails to tie the POA to this dispute, or to establish that all possible bargaining options would violate the POA.

---

[19] Though the merits of this matter are not before this Court, the DFFA submits that MERC will likely conclude that the City must bargain over *how* taxes are taken from J-Time compensation.

The City fails to acknowledge or address that there is more than one way to legally tax J-Time compensation. The availability of other options -- and the City's silence about them -- underscores the DFFA's argument that this is a mandatory subject of bargaining to be resolved by the bargaining parties.

At a minimum, MERC must determine the bargaining obligation. Then, the parties can negotiate a legally-permissible tax arrangement for J-Time compensation. Thus, for example, the City and Union could agree to tax the J-Time compensation amounts in a way that is comparable to the taxation pattern for those who collect workers' compensation. See 26 CFR §1.104-1(b).

## F.    The PM Opinion

The PM Opinion the City relies upon fails to address or analyze other options for the City's tax treatment of Js time, including taxing only the "excess" amounts paid above the applicable workmen's compensation acts. (This is significant, as DFFA has already acknowledged that the Js Time pay must be taxed in part).[20]

The PM Opinion -- which is the equivalent to unexamined testimony and, therefore, should be discounted -- is flawed.

---

[20] See, for example, the Ann Arbor firefighters' CBA excerpt. It provides for a supplement beyond workers' compensation, which is considered taxable gross income. (Ex. 3). Further, the City current EMS division employees receive workers' compensation, which is untaxed, and do not receive contribution deductions. (Ex. 4).

The PM Opinion claims a link between the Js Time status and the Retirement System, and subsequent "underfunding" concerns.

This clumsy, obviously City-attorney inspired effort to marry-up these items is simply wrong.[21]

Here's why: the PM Opinion claims that "J-Time Recipients still earn service credit while on J-Time. This means that a failure to treat J-Time payments as compensation [taxable income] results in an underfunding of the Retirement System that is contrary to its terms."

Not so. The POA *itself* permits members receiving untaxed disability benefits to still earn service credit.[22]

The PM Opinion's further ruminations -- *e.g.*, its underdeveloped notion that not treating J-Time compensation as taxable compensation lowers a fire fighter's final average compensation -- are just that: untested, parlor-game like ruminations that do not articulate a threat to the POA's implementation.

---

[21] The PM Opinion contains a disclaimer that it is "Based solely on discussions with the City and without having done any independent investigation ..."
[22] For example, under the POA Section 5.3(5), Doc 8045-1 page 482 of 809, Duty Disability Retirees are credited with Credited Service (until accruing twenty-five (25) years of service). But, the amount of the untaxed payments are *not* treated as compensation. (See Ex. 8).

## CONCLUSION

For the reasons explained above, DFFA respectfully asks that the Court dismiss the City's Motion and Supplement (Docket #13575 and 13582) and award the DFFA its costs and fees incurred in litigating this mooted action.

/s/Christopher P. Legghio
Christopher P. Legghio (P27378)
Megan B. Boelstler (P79125)
Legghio & Israel, P.C.
306 S. Washington, Suite 206
cpl@legghioisrael.com
mbb@legghioisrael.com

July 22, 2022                    Attorneys for Detroit Fire Fighters
                                 Association

**CERTIFICATE OF SERVICE**

I certify that on July 22, 2022, I caused the foregoing paper to be electronically filed with the Clerk of the Court using the ECF system which will send notification of filing to all participating in the CM/ECF system.

s/Megan B. Boelstler
Megan B. Boelstler