## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE UAAL IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN

The City of Detroit, Michigan ("City"), by its undersigned counsel, Miller, Canfield, Paddock and Stone, PLC, files this *Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan*. In support of this Motion, the City relies on and incorporates herein the Brief attached to this Motion as Exhibit 3. The City sought consent to the relief requested in this Motion on August 1, 2022, but concurrence was denied.

[signature block on following page]

Dated: August 3, 2022            Respectfully submitted,

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 963-6420
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

        and

By: /s/ Charles N. Raimi
    Charles N. Raimi (P29746)
    Deputy Corporation Counsel
    City of Detroit Law Department
    2 Woodward Avenue, Suite 500
    Coleman A. Young Municipal Center
    Detroit, Michigan  48226
    Telephone: (313)-237-5037
    raimic@detroitmi.gov

    ATTORNEYS FOR THE CITY OF DETROIT

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## **EXHIBIT LIST**

Exhibit 1          Proposed Order

Exhibit 2          Notice of Opportunity to Object

Exhibit 3          Brief

Exhibit 4          Certificate of Service

Exhibit 5          None

Exhibit 6          Exhibits to Brief (summarized below)

Ex. 1 — Declaration of Mayor Michael Duggan

Ex. 2 — Gabriel Roeder's March 4, 2021, PFRS funding policy

Ex. 3 — March 4, 2021, PFRS Board minutes approving 20-year amortization

Ex. 4 — Detroit CFO's July 21, 2021, memo objecting to 20-year amortization

Ex. 5 — Gabriel Roeder's August 2, 2021, supplemental funding report

Ex. 6 — October 1-14, 2021, emails between Ms. Brader and Mr. Raimi

Ex. 7 — October 18, 2021, PFRS IC minutes approving 20-year amortization

Ex. 8 — October 18, 2021, PFRS IC resolution approving 20-year amortization

Ex. 9 — November 18, 2021, PFRS Board minutes ratifying 20-year amortization

Ex. 10 — Stout report dated October 13, 2021

Ex. 11 — Michigan Tax Tribunal Order dated June 11, 2021

Ex. 12 — Cheiron report dated June 6, 2022

Ex. 13 — Gabriel Roeder's June 17, 2022, letter re Restoration Reserve Account

Ex. 14 — Excerpt from 40-year projection

39400576.3/022765.00213

# EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**ORDER GRANTING THE CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE UAAL IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN**

This matter, having come before the Court on the *Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan* ("Motion"),[1] upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.      The Motion is granted.

2.      The resolutions passed and the votes taken by Police and Fire Retirement System ("PFRS") and the Investment Committee which shortened the amortization period to 20 years are void and of no force or effect, and the PFRS and

---

[1] Capitalized terms used but not otherwise defined in this Order shall have the meanings given to them in the Motion.

the Investment Committee are enjoined and barred from shortening the 30-year amortization period.

3.     The PFRS shall amortize the PFRS's plan's unfunded actuarial accrued liability that will exist as of June 30, 2023, over an additional 30 years commencing on June 30, 2023.

4.     The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

39400576.3/022765.00213

<u>**EXHIBIT 2 – NOTICE**</u>

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**NOTICE OF OPPORTUNITY TO OBJECT TO CITY OF
DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND
REQUIRE 30-YEAR AMORTIZATION OF THE UAAL IN THE POLICE
AND FIRE RETIREMENT SYSTEM PENSION PLAN**

The City of Detroit has filed the *Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan.*

**<u>Your rights may be affected.</u> You should read these papers carefully and discuss them with your attorney.**

If you do not want the Court to enter an Order granting the *Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan,* within 14 days, you or your attorney must:

1.    File with the court a written response or an answer, explaining your position at:[2]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above.  You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2.   If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

---

[2] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

39400576.3/022765.00213

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
      Marc N. Swanson (P71149)
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      Telephone: (313) 496-7591
      Facsimile: (313) 496-8451
      swansonm@millercanfield.com

Dated: August 3, 2022

# EXHIBIT 3 – BRIEF

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## BRIEF IN SUPPORT OF CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE UAAL IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN

Marc N. Swanson (P71149)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-8451
swansonm@millercanfield.com

Charles N. Raimi (P29746)
Deputy Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Coleman A. Young Municipal Ctr
Detroit, Michigan 48226
Telephone: (313)-237-5037
Facsimile: (313) 224-5505
raimic@detroitmi.gov

ATTORNEYS FOR THE CITY OF DETROIT

Dated: August 3, 2022

# TABLE OF CONTENTS

ISSUES AND MOST APPROPRIATE AUTHORITY .....................................III

I.  FACTS .................................................................................................1

    A.  DUGGAN'S DUE DILIGENCE AND TESTIMONY IN SUPPORT OF THE POA. ............1

    B.  DUGGAN LEARNS THE ACTUARIAL ASSUMPTIONS FOR THE POA WERE GROSSLY INACCURATE AND MATERIALLY UNDERSTATED THE PLANS' LIABILITIES.  THE CITY RESPONDS BY CREATING AND PLACING HUNDREDS OF MILLIONS OF DOLLARS INTO A RETIREE PROTECTION TRUST FUND, LARGELY NEGATING THE POA'S "PENSION HOLIDAY" FOR THE CITY. ..............8

    C.  IN NOVEMBER 2021 PFRS ADOPTS A RESOLUTION WHICH, CONTRARY TO THE POA, SHORTENED THE AMORTIZATION PERIOD FOR PFRS' UAAL FROM 30 TO 20 YEARS. ..................................................................................10

        1.  PFRS' governance by its Board of Trustees and Investment Committee (IC). .......................................................................10

        2.  Events leading to PFRS' adoption of 20-year amortization. ..................11

    D.  THE DEVASTATING IMPACT TO THE CITY OF 20-YEAR AMORTIZATION. ...........15

    E.  THE STOUT REPORT PREPARED FOR THE IC LACKS ALL CREDIBILITY. ............17

    F.  THE CHEIRON REPORT CONFIRMS THERE IS NO ACTUARIAL BASIS FOR 20-YEAR AMORTIZATION. ....................................................................23

    G.  PFRS' MOST RECENT ACTIONS AGAIN CONFIRM THERE IS NO NEED FOR 20-YEAR AMORTIZATION. ....................................................................24

II.  ARGUMENT................................................................................25

    A.  THE COURT HAS JURISDICTION OVER THIS DISPUTE. ........................................25

    B.  THE COURT SHOULD ORDER PFRS TO AMORTIZE THE PFRS' PLAN'S UAAL THAT WILL EXIST AS OF JUNE 30, 2023, OVER 30 YEARS, RATHER THAN 20 YEARS, BECAUSE THE POA PROVIDES THAT 30 YEARS IS THE PROPER AMORTIZATION PERIOD. ....................................................25

C. The Court also should order 30-year amortization to carry out the intent of, and allow the City to successfully implement, the POA. ..................................................................................27

    1. *Governing law.*............................................................................27

    2. *The Court should order 30-year amortization to carry out the intent of, and allow the City to successfully implement, the POA.*....................28

**III. FURTHER PROCEEDINGS. .........................................................30**

**IV. CONCLUSION AND RELIEF.......................................................30**

39371989.8/022765.00213

## ISSUES AND MOST APPROPRIATE AUTHORITY

1.  The City of Detroit Police and Fire Retirement System (PFRS) recently adopted (over the City's objections) a resolution providing that the plan's unfunded actuarial accrued liability (UAAL) for retirement benefits, existing as of June 30, 2023, be amortized over 20 years. The Plan of Adjustment (POA) provides that the proper period is 30 years. 20-year amortization will require the City to pay additional hundreds of millions of dollars in front-loaded funding over the amounts that would be due under 30-year amortization (and under the original projections in the POA).

The first issue in this case is:

> Should the Court compel PFRS to amortize the PFRS' plan's UAAL that will exist as of June 30, 2023, over 30 years, rather than 20 years, where the POA provides that 30-years is the proper amortization period.

> City answers **yes**.

The Confirmation Order explicitly requires the UAAL to be amortized over 30 years. *In re City of Detroit, Mich.*, 524 B.R. 147, 231-32 (Bankr. E.D. Mich. 2014) ("Confirmation Opinion") *and see* Confirmation Order, ¶ G, p. 10 of 225, (incorporating the Confirmation Opinion). Consequently, the PFRS's attempt to change the 30-year amortization period is a violation of the Confirmation Order. Further, the governing pension plan documents (section 16.6) provide that "Nothing [in the PFRS pension plan documents] shall be interpreted as permitting the

39371989.8/022765.00213

Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment."

2.     The City learned shortly after the POA was confirmed that, due to material actuarial mistakes in devising the POA, the accrued pension liabilities for the two legacy plans had been understated by some $500 million.  To ensure the legacy plans would be properly funded, the City voluntarily created the Retiree Protection Trust Fund.  By June of 2023, the City will have paid $445 million of general fund monies into the Trust Fund.  As a result, and directly contrary to the POA, the City has been deprived of much of the benefit of the POA's ten-year "pension holiday" during which the City was to have made only nominal contributions to the legacy plans.

The second issue in this case is:

> Should the Court compel PFRS to amortize the PFRS' plan's UAAL that will exist as of June 30, 2023, over 30 years, rather than 20 years, where (i) 20-year amortization, together with (ii) the City's need to use $445 million from the Retiree Protection Trust Fund–depriving the City of much of the benefit of the POA's "pension holiday"–will threaten the City's ability to successfully implement the POA?

City answers **yes**.

POA Article VII gives the Court broad authority to enter orders necessary for the successful implementation of the POA, including the order requested here.

iv

## I.    FACTS

This factual recitation is supported by the declaration of Michael Duggan, Mayor of the City of Detroit, attached as exhibit 1, and other documents appended as exhibits.

### A.    Duggan's due diligence and testimony in support of the POA.

Duggan was first elected in November 2013 and then again in November 2017 and 2021. His prior jobs included Deputy County Executive of Wayne County, elected Wayne County Prosecutor, and Chief Executive Officer of the Detroit Medical Center. Ex. 1 ("Duggan Dec'l."), ¶ 1.

The City filed for Chapter 9 bankruptcy in July 2013 and was in bankruptcy when Duggan became Mayor effective January 1, 2014. Kevyn Orr was the state appointed emergency manager and supervised the bankruptcy activities. *Id.*, ¶ 3.

For much of Duggan's first year in office (2014), he was excluded from ongoing bankruptcy activities. However, as the Plan of Adjustment ("POA") was being negotiated, and it became clear to Mr. Orr and his team that Duggan would need to support the POA to secure its approval, Duggan was provided access to significant information about the bankruptcy. After extensive due diligence Duggan ultimately testified in support of the POA and its feasibility. *Id.*, ¶ 4.

Perhaps the most important and contentious issue in the bankruptcy, and one of Duggan's primary concerns about the POA and its feasibility, was the City's

- 1 -

legacy retirement obligations. The City historically had two defined benefit pension plans for employees and retirees. The Police and Fire Retirement System ("PFRS") managed the plan for public safety employees and retirees. The General Retirement System ("GRS") managed the plan for all other City employees and retirees. Both plans were frozen in bankruptcy and, under the POA, covered only City retirees and employees who performed services for the City prior to July 1, 2014. *Id.*, ¶ 5.

Both plans were replaced going forward with hybrid plans that combined elements of both defined benefit and defined contribution plans. In the POA, the new hybrid plans are known as Component I plans, and the frozen plans are known as Component II plans.

At issue in this case is the PFRS Component II plan that was frozen in bankruptcy and now covers only public safety employees and retirees who provided services prior to July 1, 2014. *Id.*, ¶ 6. References in this brief to the PRFS plan are to the PFRS Component II plan that was frozen in bankruptcy. Because the plan was frozen and no new beneficiaries are being added, it is a "closed plan" and will terminate after all beneficiaries have died.

The eighth, final, and operative POA incorporated what became known as the "Grand Bargain." The Grand Bargain raised the equivalent of $816 million from the state of Michigan, the Detroit Institute of Arts, and various charities and, as a result:

- Pension cuts to retirees were minimized. The only cut to public safety pensions was a 55% reduction to the cost-of- living adjustment (COLA).

Other City employees' pensions were cut more but still far less than had been anticipated.

- The Detroit Institute of Arts' collection was protected.

- The POA gave the City a 10-year pension contribution "holiday" and, thereafter, the legacy plans' UAAL was to be amortized over a 30-year period. This was to allow the City to devote as many resources as reasonably possible to address ongoing issues that had substantially contributed to the bankruptcy, such as blight, public safety, loss of employment opportunities, etc.

*Id.*, ¶ 7.

On November 12, 2014, this Court entered the Confirmation Order and found the POA to be feasible. To make this determination, the Court relied on the City's 40-year forecast. Confirmation Order, ¶ 11, pp. 41-42 of 225. The City has attached as Exhibit 14 an excerpt of one of the forecasts that it believes was referenced by the Court in paragraph 11(c) of the Confirmation Order. This 40-year forecast specifically provides for a 30-year amortization. The Court found the 40-year forecasts refenced in paragraph 11(c) of the Confirmation Order to be "reasonable, made in good faith, accurate and consistent with other financial projections made by the City and based upon assumptions that are reasonable when considered individually and collectively." Confirmation Order, ¶ 11, pp. 41-42 of 225.

On December 31, 2014, Bankruptcy Judge Steven Rhodes issued a supplemental opinion approving the Plan of Adjustment. *In re City of Detroit, Mich.*, 524 B.R. 147 (Bankr. E.D. Mich. 2014), ("Supp Op").

As Judge Rhodes noted, the pension classes voted to accept the POA by 82% in class 10 (PFRS) and 73% in class 11 (GRS).  Supp Op at 180.  The Supplemental Opinion explains:

> Because of the outside money committed as part of the Grand Bargain, the City will have little responsibility for funding the GRS [General Retirement System] and the PFRS [Police/Fire Retirement System] through June 2023.  During that time period, the PFRS will be funded exclusively from contributions from the DIA, the DIA Funders, the Foundation Funders and the State under the Grand Bargain, as described previously.

*Id.* at 179.

Judge Rhodes concluded that the pension settlement was "fair and equitable" and stated as follows:

> It is therefore a vast understatement to say that the pension settlement is reasonable.  It borders on the miraculous.  No one could have foreseen this result for the pension creditors when the City filed this case.  Without the outside funding from the Grand Bargain, the City anticipated having to reduce pensions by as much as 27%.  The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

*Id.* at 181.

At the time of the bankruptcy, both the public safety (PFRS) and general retirement (GRS) legacy (Component II) plans were underfunded.  Under financial projections prepared for the POA, the plans were likewise projected to be underfunded at the end of the 10-year pension holiday.  Actuaries identify the

amount of such underfunding as the plan's "unfunded actuarial accrued liability," or "UAAL." Duggan Dec'l., ¶ 10.

In examining the feasibility of the POA, experts addressed how the Component II plans' UAAL would be amortized after the end of the 10-year pension holiday. Those projections showed that after the 10-year holiday, the then existing UAAL would be amortized over the following 30 years. The Supplemental Opinion confirmed in two separate places that the Component II Plans' UAAL at the end of the pension holiday were to be amortized over a thirty-year period:

> However, at the end of FY2023, the GRS and PFRS will remain significantly underfunded. Using the assumptions from the global pension settlement, including the 6.75% discount rate, the City projects that the PFRS will only achieve 78% funding, leaving a UAAL of $681 million. For the GRS, the City projects a 70% funded status by the end of FY2023, leaving a UAAL of $695 million. **The City will then amortize the remaining UAAL for both plans over the next thirty years at an interest rate of 6.75%.** Between FY2024 and FY2033, the City will receive an additional $68 million in Grand Bargain proceeds to pay toward the UAAL amortization for PFRS, and $188 million for GRS. The balance of the amortized UAAL will come from the City.

> The plan greatly reduces the City's pension obligations, thanks to the State Contribution Agreement, the Grand Bargain funding, and the modification of the City's obligations to its current retirees."

Supp Op at 231-32 (emphasis added and citations removed).

> As discussed in part III.F. above, the City's obligations to the GRS and the PFRS are fixed under the plan from FY2014-FY2023. During this time, as the City works to stabilize its finances and implement the RRIs, the majority of the City's contributions to the GRS and the PFRS will come from the DWSD, the State Contribution Agreement, and the

- 5 -

Grand Bargain funding. However, after 2023, the City projects the retirement systems will remain somewhat underfunded. **The balance of the underfunding in 2023 will be amortized over a thirty year period of time.**

Supp Op at 230 n.23 (emphasis added and citations removed).

Despite the funding provided by the Grand Bargain, Judge Rhodes was extremely concerned about the feasibility of the POA. His opinion stated:

> In this case, examining the feasibility of the plan is difficult for a number of reasons. The City's debt is enormous and the City proposes to pay most of its creditors over a long period of time. As the Court discusses below, the City's revenue and expense projections extend forty years into the future [40 years is the 10-year pension holiday plus 30-year amortization].

> Second, the feasibility of the plan depends upon the City's ability to fix and maintain its broken governmental operations. This is significant because the chapter 9 feasibility inquiry requires an analysis of whether the City can reasonably provide sustainable municipal services, as the court found in *In re Mount Carbon.* It is also significant because the City's ability to repay its creditors pursuant to the plan depends upon the City's ability to increase its revenues from taxes and fees by improving the efficiency of City operations and by identifying and accessing untapped sources of revenue.

> The feasibility analysis is yet more complex because several key parts of the plan depend upon performance by parties who are completely beyond the City's control. For example, because the City's contributions to the retirement systems are fixed through FY2023, a risk remains that the pension plans will be significantly more underfunded than anticipated if one of the many organizations participating in the Grand Bargain fails to perform in the time or manner promised.

> As the City itself succinctly states in its pretrial brief in support of plan confirmation, "[T]he City was—and remains today—enmeshed in a financial crisis of unsurpassed proportions and complexity." Despite

- 6 -

efforts from both the City and the State of Michigan, "the City is trapped in a vicious circle of cash crises, general fund deficits, crushing long-term liabilities and tumbling credit ratings exacerbated by the City's bureaucratic structure and frequent deviations from established budgets."

Supp Op at 220-21 (citations omitted, alterations in original).

Martha Kopacz, the Court's appointed feasibility expert, was likewise extremely concerned about the feasibility of the POA:

> I want to emphasize, however, that there is little space remaining on the continuum of [feasibility]. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they have imposed additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern."

Supp Op, at p. 219 (Court's quotation of expert, alterations in original).

Duggan worked closely with Ms. Kopacz and her staff, and major City departments, in examining the POA's feasibility. Ultimately, Duggan and Ms. Kopacz came to the same conclusion–that the POA was feasible but enormous work would be required and financially there was no room to spare. Critical to Duggan's support for the POA was that the City's legacy pension liabilities would be minimized for the initial ten years and then amortized over a 30-year period, thus providing the City as much funding as reasonably possible to address the City's problems by investing in what were called "RRIs," or recovery and reinvestment

- 7 -

initiatives. As of the time of the confirmation hearing, Duggan believed the City was perhaps 10% of the way toward providing proper City services, and that many years of implementing major service improvements and job creation initiatives would be needed to successfully carry out the POA. Duggan Dec'l., ¶ 14.

In considering the feasibility of the POA, Duggan was aware that the POA provided an assumed rate of return of 6.75% for the legacy pension plans. During his due diligence, Duggan learned that a proposal had been made to raise the assumed rate of return to 7%. That would have allowed the actuaries to more easily "make the numbers work" for the feasibility analysis but would have put more funding stress on the City when it came time to resume funding the plans. Duggan advised the participants that if they raised the assumed rate of return to 7%, he would testify against the feasibility of the POA. *Id.*, ¶ 15.

**B.    Duggan learns the actuarial assumptions for the POA were grossly inaccurate and materially understated the plans' liabilities. The City responds by creating and placing hundreds of millions of dollars into a Retiree Protection Trust Fund, largely negating the POA's "pension holiday" for the City.**

The POA was approved and then became effective in December 2014. Sometime in 2015, Duggan learned that the actuarial assumptions for the legacy pension plans were seriously flawed. Specifically, the plans' projected UAAL had been understated by roughly $500 million. That information was provided by Gabriel Roeder Smith & Company ("Gabriel Roeder"), the actuary for both legacy

plans. Neither Gabriel Roeder, nor any of the other actuaries or experts who worked on the POA, ever explained how the error occurred. *Id.*, ¶ 16.

The City considered bringing a lawsuit. The City's investigation revealed serious concerns about the way in which the retirement liability issues were handled by the "experts" in the bankruptcy process. Those included use of outdated mortality tables. Duggan also learned that the "experts" were seemingly more concerned about the making the numbers work, *i.e.*, minimizing retiree pension cuts, than with the City's ability to successfully carry out the POA. Duggan spoke with Ms. Kopacz who advised she likewise had no idea that the retirement plan projections were materially incorrect, and that information would likely have changed her view on the feasibility of the POA. Duggan ultimately decided not to bring a lawsuit because the POA had broad exculpatory provisions. *Id.*, ¶ 17.

Thereafter, to further ensure proper funding of legacy pensions, Duggan's administration voluntarily put in place an irrevocable Retiree Protection Trust Fund to provide additional funding for the legacy plans after the end of the 10-year pension "holiday." To date, the City has deposited $355 million, and will be adding $90 million later this year. Accordingly, by the time City funding of the PFRS plan is to begin (FY 2024), the City will have funded the Retiree Protection Trust Fund with $445 million of general fund money. *Id.*, ¶ 18.

31167884.1\022765-00213

Under the POA, that $445 million should have been available for recovery and reinvestment initiatives such as blight remediation, public safety, job creation initiatives etc. It has instead irrevocably been set aside for the retirees' pension security. *Id.*, ¶ 19.

## C. In November 2021 PFRS adopts a resolution which, contrary to the POA, shortened the amortization period for PFRS' UAAL from 30 to 20 years.

This litigation challenges PFRS' adoption of a funding resolution which provides for amortizing the UAAL that will exist after the expiration of the pension "holiday" (June 30, 2023) over 20 years – rather than the 30-years required by the POA. Section 16.6 of the governing plan documents makes crystal clear PFRS had no right to violate the POA. "Nothing herein [in the PFRS plan document] shall be interpreted as permitting the Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment."[1]

Relevant background to that action is discussed below.

### 1. PFRS' governance by its Board of Trustees and Investment Committee (IC).

In reaction to serious investment abuses in prior years, the POA materially changed the governance of the City's GRS and PFRS retiree legacy plans. Investment decisions were entrusted to newly created Investment Committees, or

---

[1] Doc. No. 8045-1, p. 519 of 809. Section 16.6 of the Component I plan also applies to Component II. Doc. No. 8045-1, pp. 597-98 of 809.

- 10 -

ICs.  The PFRS IC has 9 members as follows:  four public safety representatives and five independent members.  The City and Mayor have no representation.  The public safety members each have one-half vote.  The independent members originally were appointed by Governor Snyder, typically based on their investment expertise.

PFRS has a 17-member Board of Trustees.  Because the City and public safety representatives could never agree on an "independent" trustee, at all relevant times there have been 16 trustees.  Five represent the Mayor's administration.  One represents the City Council president.  Eight directly represent public safety employee/retiree interests.  Two trustees were appointed by the Mayor but the chosen individuals had to be retired public safety officers.  As a result, public safety representatives control the Board, as evidenced by their votes adopting 20-year amortization, discussed below.

### 2.  Events leading to PFRS' adoption of 20-year amortization.

**August 20, 2020, City presentation.**  After learning that PFRS was considering accelerated amortization, the City's CFO and Deputy made a presentation to PFRS' Board and IC.  The City opposed acceleration for reasons that included, *inter alia*, the POA expressly provides for 30-year amortization.

**March 4, 2021, Gabriel Roeder's 20-year funding policy**.  At the urging of the PFRS' public safety representatives, Gabriel Roeder prepared an Actuarial Funding Policy providing for 20-year amortization.  Ex. 2, p. 3, § 3(b)(a).  Gabriel

Roeder gave no consideration whatsoever to the points made by the City in its prior presentation. PFRS' Board's public safety representatives, over the objections of the City, adopted the funding policy on March 4, 2021, with an 8-6 vote. Ex. 3, pp. 6-7. IC approval also was needed for a funding policy.

**July 21, 2021, City continues to object.** The IC had previously engaged the Stout Consulting Firm to prepare an analysis of the City's "ability to pay" using the proposed 20-year amortization funding. On July 21, 2021, the City provided to Stout and the IC's counsel documents and information requested by Stout to complete its analysis, together with a transmittal memorandum attached as Exhibit 4. The memorandum again reiterated the City's fundamental concerns with accelerated amortization. Ex. 4, pp. 1-3. The memo also asked the Board and IC to hear both from the City's Mayor, and the independent actuary the City had engaged (Cheiron) before taking any final action on the funding policy. Ex. 4, p. 3.

**August 2, 2021, Gabriel Roeder's supplemental report.** At the IC's request, Gabriel Roeder prepared a supplemental report that examined financial projections using 20- and 25-year amortizations under various assumptions of baseline or unfavorable investment results. Ex. 5. Six projections were considered. The worst-case scenario was "25-year amortization, Downside Level 2." Ex. 5, p. 11. Even under the worst case, the funded level percentage never dropped below

- 12 -

40%. Neither PFRS nor Gabriel Roeder has ever articulated any need to accelerate the POA's 30-year amortization.

**October 1 – 14, 2021, email exchanges between counsel for the City and IC.** On October 1, 2021, the City's deputy corporation counsel (Raimi) reminded the IC's counsel (Valerie Brader) of the City's prior request for the PFRS Board and IC to hear from the City's Mayor and actuarial expert prior to making a final decision of the funding policy. Ex. 6, pp. 5-6, Raimi email dated 10/1/21. Ms. Brader responded that the Stout report was not yet complete. Ex. 6, p. 5.

Ms. Brader advised on October 12 that the IC would be taking up the Stout report at its October 18 meeting and "would be happy to have the Mayor present." Ex. 6, p. 4. That timing was, of course, impossible. Raimi responded that the City had not even seen the Stout report and both the Mayor and the City's expert (Cheiron) would need reasonable time to review the report and prepare the presentations. Ex. 6, pp. 3-4. The Stout report was dated October 13, 2021, Exhibit 6, but the City did not receive a copy until sometime later.

Raimi questioned why the IC insisted on moving so quickly, and without input from the Mayor and Cheiron, since the funding policy would not take effect until July 2023. Ex. 6, p. 1. Ms. Brader responded that the IC was attempting to accommodate an earlier City request for guidance on the funding issue by the fall of 2021. *Id.* The City, obviously, was perfectly willing to push this back so the IC

- 13 -

could be fully informed, but it clearly was not interested.  Ms. Brader also advised

that any action by the IC would also need Board ratification, *id.*, but it was perfectly

clear that the public safety-controlled Board would again approve 20-year

amortization.  *Id.*[2]

**October 18, 2021, IC adopts 20-year amortization.**  On October 18, Stout's

Robert Roth presented to the IC his report addressing the City's ability to pay using

20-year amortization. Gabriel Roeder presented its supplemental analysis.  Ex. 7, IC

minutes.  The IC adopted 20-year amortization, *id.*, and approved the appended

resolution.  Ex. 8.

There was never any doubt that the "independent" members of the IC would

follow fiduciary law 101–which instructs fiduciaries that they generally cannot be

criticized or sued if they act in accordance with their "expert's" (Gabriel Roeder's)

advice.  And here, the City had no representation on the IC to offer any contrary

view.

**November 18, 2021, PFRS Board ratifies 20-year amortization.**  At the

November 18 PFRS Board meeting, trustee Conrad Mallett, the City's deputy

---

[2]Ms. Brader's October 1, 2021, email expressed her concerns about the so-called
"pay-as-you-go" funding proposal which the City's CFO offered as one option in
his August 2020 presentation.  Ex. 6, p. 5.  Raimi advised Ms. Brader that Cheiron
would be offering a different and more focused approach.  Ex. 6, p. 2.  The City is
not pursuing the "pay-as-you-go" approach, nor is it relevant because both Gabriel
Roeder and Cheiron agree that there is no foreseeable danger that the City would not
be able to pay benefits under 30-year amortization.

mayor, offered a resolution asking the Board to disaffirm its prior approval of 20-year funding and agree to mediation concerning the funding dispute. On the strength of the votes of the public safety representatives, that resolution was defeated and the Board affirmed 20-year amortization. Ex. 9, pp. 9-10.

**D.    The devastating impact to the City of 20-year amortization.**

The critical importance of the amortization issue is illustrated by the following diagram which is addressed in Duggan's affidavit. Duggan Dec'l., ¶ 21. This shows (i) the City's funding obligation as originally estimated under the (POA) (in green), (ii) the City's increased funding obligation over the POA estimates, using 30-year amortization (green and yellow), and (iii) the City's increased funding obligation over the POA estimates, using 20-year (green, yellow, and red). The 20-year and 30-year amortization projections (yellow and red) are based on the most recently available data from PRFS's actuaries, which is as of June 30, 2021. (Gabriel Roeder's June 30, 2021, actuarial report was not released until March 24, 2022, and is the most recent data available. That data is used for the chart below and in the Cheiron expert report discussed below.)

31167884.1\022765-00213



Duggan Dec'l., ¶ 21.

The additional hundreds of millions of dollars of front-loaded payments under 20-year amortization would be devastating to the City's ability to fund critical programs needed to improve City services, attract employment opportunities, and otherwise continue to successfully implement the POA. Duggan Dec'l., ¶ 22.

Moreover, in addition to the PFRS frozen legacy plan, there is also the frozen legacy GRS pension plan for non-public safety employees. The Investment Committee for that plan is carefully following this funding dispute. If this Court were to allow PFRS to violate the POA and impose 20-year amortization, the City is justly apprehensive that GRS will feel compelled to do likewise. That would roughly double the additional upfront pension funding payments for the City. *Id.*, ¶ 39.

**E.     The Stout Report prepared for the IC lacks all credibility.**

The Stout Report was prepared by Raymond Roth and is appended (without exhibits) as Exhibit 10.  The report's stated purpose is to advise the IC "regarding the capability of Detroit to make specified levels of pension contributions [using 20-year amortization] beginning in 2024."  Ex. 10, ¶ 12. The report concludes "Thus, it is my opinion that Detroit will have the ability to pay the additional amounts of PFRS Legacy Plan contributions under the scenarios projected by its actuaries." *Id.*, ¶ 84.

Mayor Duggan has carefully reviewed the Stout Report and concludes that it is meaningless to the amortization dispute for reasons including the following (Ex. 1, ¶¶ 29-38):

The report purports to compare Detroit to four allegedly "comparable" cities, namely, Indianapolis, Cleveland, Columbus, and Minneapolis.  That is absurd on its face.  Stout's own report shows (Ex. 10, p. 9) that in 2015, the year after Detroit exited from bankruptcy, Detroit's median income was roughly $25,000 per year, versus $43,000 for Indianapolis, $45,000 for Columbus, and $51,000 for Minneapolis.  None of those cities are remotely "comparable" to Detroit.  Although Cleveland's median income was similar to Detroit's, in 2015 some 40% of Detroit residents were below the poverty line versus 35% for Cleveland.  Stout Report, Ex. 10, p. 11.  And, of course, Cleveland never declared bankruptcy, nor has it ever faced

31167884.1\022765-00213

problems such as those described in Judge Rhodes' Supplemental Opinion (describing his tour of the City):

> The primary impression that remains with the Court following the tour is that blight in Detroit is extensive. The statistics do not fully convey its extent or impact. In neighborhood after neighborhood, short and long stretches of streets have abandoned structures—they can no longer be called homes—that are intimidating hulks. Some are partially or mostly burned out. Some have gaping holes in their roofs or collapsed garages. Many have missing doors and windows, and broken front steps and porches. Some are strewn with illegal dumping. All are vivid statements of their former owners' emotional and financial struggles, and of community loss.
>
> These streets also have vacant lots, or collections of vacant lots, on which unmanaged and unsightly vegetation has taken over from the structures after their removal. On the commercial streets, block after block of abandoned, boarded up and graffiti-littered strip shopping centers far outnumbered the occasional small businesses that have survived.
>
> It is heartbreaking, maddening and sad. No one should have to endure, day in and day out, the damage to the human spirit that can result from living in those surroundings. City residents who live, work and play in these neighborhoods deserve better. Detroit deserves better."

Supp. Op. at 167. Ironically, the Stout Report (Ex. 10, ¶ 17) acknowledges the following:

> Detroit has experienced a remarkable transformation since its emergence from bankruptcy. The median income of its residents has risen, while the number of families living below poverty, unemployment, and crime has declined. In addition, blight has been reduced, street lighting improved, emergency medical services ("EMS") response times are down, and credit ratings have stabilized. However, Detroit's population remains at lower income levels, including higher concentrations of poverty and crime rates, than the Comparable Midwestern Cities."

- 18 -

Nevertheless, Mr. Roth inexplicably "concludes" that Detroit could "afford" the dramatically increased up-front payments under 20-year amortization. Roth argues that Detroit allegedly is spending too much of its budget on "central government." Duggan Dec'l., ¶ 32 (citing Stout report, Ex. 10, ¶¶ 54-67).

The City's review of Mr. Roth's report raises substantial questions whether the "central government" comparison properly analyzes each City's unique accounting policies and practices. But even if it does, Mr. Roth's "opinion" completely ignores the fact that the City's "remarkable transformation" was precisely the result of the Duggan administration's spending priorities including "central government." Duggan Dec'l., ¶ 33. The "central government" spending was critical to the City's job creation, housing initiatives, blight removal, neighborhood revitalization, revamping of City departments, and myriad other activities that produced the "remarkable transformation." Mr. Roth never asked to speak to the Mayor about this or any other aspect of his report. Nor did the PFRS Board of Trustees or its Investment Committee request the Mayor's input on the report or on the impact the 20-year amortization would have on the City. Duggan Dec'l., ¶ 33.

The Stout Report (Ex. 10, ¶¶ 54-55) notes that Detroit has lower levels of public safety spending as a percentage of general fund revenue than the "comparable cities." As explained in his declaration, Mayor Duggan did not need Mr. Roth's

- 19 -

report to tell him that Detroit needs additional resources for public safety and many other priorities. The City's financial crisis and bankruptcy devastated all City departments and employee morale, and none more than public safety. Improving public safety recruiting, pay, benefits and performance has been a top priority to which Mayor Duggan and his administration have devoted enormous time and effort. Mr. Roth also ignores the fact that the City would have been able to spend more on public safety had it not been required to fund the $445 million Retiree Protection Trust Fund. Duggan Dec'l., ¶ 34.

It is extremely disturbing that Mr. Roth, after acknowledging the City's need for additional resources for public safety, would nevertheless conclude that the City can "afford" sharp increases in pension funding payments under 20-year amortization. It is quite evident that Mr. Roth has no understanding of the realities and complexities of managing the City of Detroit. Nor does his resume list anything that would qualify him to opine on these subjects. *Id.*, ¶ 35.

The Stout Report also speculates that the City may in the future gain additional revenues via internet gaming. What is known for certain is that the pandemic wreaked havoc on the City's finances, including income tax which is the City's largest revenue source. As a result of the pandemic, many thousands of employees who formerly worked in City offices are working from their homes in the suburbs.

As a result, they are not paying City income tax. City restaurants, businesses, etc. are adversely affected. *Id.*, ¶ 36.

To the extent the City does realize additional gaming tax from internet gaming, those have already been considered in the City's spending projections, so that would not be "additional revenues" available for pension funding. *Id.*, ¶ 37.

Wholly apart from the fact that Mr. Roth has no crystal ball to see into the future, the Bankruptcy Court, the Court appointed mediators, Ms. Kopacz, myriad interested parties and their advisors spent thousands of hours working out the POA. In addition to Gabriel Roeders, the national/international law firms and actuaries included:

- The Official Committee of Retirees engaged the Dentons law firm, the Segal Company financial/actuarial firm and the Lazard actuarial/financial firm.

- PFRS and GRS engaged Clark Hill and the financial/actuarial firm of Greenhill & Co.

- Kevyn Orr, the emergency manager, engaged multiple law firms including Jones Day and actuarial firm Milliman.

The advisors collectively charged tens of millions of dollars for their services. After all of that, the POA provided for a 30-year amortization period for the legacy plans' UAAL beginning with the 2024 fiscal year. The Mayor rightly points out that if PFRS had recently identified some compelling need to violate the POA to ensure

proper funding, PFRS should have petitioned the Court for relief. But PFRS has never identified any such need and there is no reason for violating the POA with a 20-year amortization schedule. *Id.*, ¶ 38.

Finally, this Court should be aware of Stout firm's recent history with the City. For the last 7 years Raimi has been lead counsel in the City's defense of a property tax appeal by MGM Grand Detroit casino-hotel. MGM seeks past refunds and future reductions likely totaling more than $100 million. MGM engaged the Stout firm (Kevin Kernen) to issue a report supporting MGM's novel and, in the City's view untenable theory, supporting those reductions. The Tribunal, on June 11, 2021, issued a 100-page Order addressing the parties' dispositive motions. The Tribunal ruled in the City's favor (affirmed on reconsideration) and spent much of the decision attacking the Stout report in the harshest possible terms. For example:

> [The Tribunal] cannot draw a "uniform assessment" from Mr. Kernen's Report which relies on inaccurate information and, frankly, makes little sense. The methodology in the Report is not found in any appraisal textbook, treatise, scholarly article, case law or statute and appears to have been presented to Kernen by counsel for its client's own self-interest, not from any independent thought.

Ex. 11, p. 91-92. The current Stout report is as deeply flawed and incredible as the Kernen report.

**F.     The Cheiron report confirms there is no actuarial basis for 20-year amortization.**

The most recent PFRS data available is Gabriel Roeder's June 30, 2021, actuarial report, which was not released until March 24, 2022. The Cheiron report, which is attached as Exhibit 12, used that data. The report was authored by Gene Kalwarski, whose impeccable credentials are discussed at page 7 of the report.

The report's key finding is that "The differences between a 20-year and 30-year amortization are negligible in terms of ensuring sufficient assets will be available to pay all future benefits under the plan." Ex. 12, p. 1, point 1. The balance of the report provides the supporting data for that statement. Likewise, even under Gabriel Roeder's worst-case scenario the plan's funded level percentage never dropped below 40%. Ex. 5, p. 11.

There is one major difference in Cheiron's analysis versus Gabriel's. Cheiron states "Because a 20-year amortization results in increased assets when compared to a 30-year amortization, this level of assets increases the exposure the City has to investment risk, without any offsetting benefit to taking such risk due to conclusion number 1 (quoted above)." Ex. 12, p. 1, point 3. In other words, if the City is compelled to front-load the funding, and the stock market falls, the accelerated amortization will impose even more financial stress on the City.

The City commissioned the Cheiron report to determine whether 30-year amortization posed any risk to retirees. It would not. Duggan's administration

would never take any action to jeopardize pension benefits. Duggan Dec'l., ¶ 24. That is exactly why his administration voluntarily created the Retiree Protection Trust Fund and will soon have funded it with $445 million in general fund money. *Id.*

Finally, to alleviate any possible concerns, the Mayor would support, in connection with 30-year amortization, adoption of a "trigger" such that if the funded percentage of the plan fell below a certain agreed upon threshold, the City would be required to provide additional funding. But there is nothing to currently suggest that will ever be an issue. *Id.*, ¶ 28.

## G. PFRS' most recent actions again confirm there is no need for 20-year amortization.

The POA contemplates that if the PFRS achieves a funded ratio in excess of 78%, PFRS can establish a "Restoration Reserve Account." The Account's purpose is to pay PFRS retirees' amounts they lost under the 55% COLA reduction in the POA. On June 17, 2022, Gabriel Roeders wrote to PFRS advising that $26+ million dollars could be placed in the Restoration Account. Ex. 13. Although minutes are not yet available, the IC approved creation of the account at its June 22, 2022, meeting. In short, the PFRS plan is so healthy that public safety retirees are seeking to recoup their minor pension reductions (55% of COLA) resulting from the POA.

## II. ARGUMENT

### A. The Court has jurisdiction over this dispute.

The Court has jurisdiction over this dispute under POA Article VII, paragraphs E, F, G, I, K, L, and Q.

### B. The Court should order PFRS to amortize the PFRS' plan's UAAL that will exist as of June 30, 2023, over 30 years, rather than 20 years, because the POA provides that 30 years is the proper amortization period.

Judge Rhodes' Supplemental Opinion approving the POA confirmed in two separate places that the Component II Plans' liabilities at the end of the pension holiday were to be amortized over a thirty-year period. See excerpts of the Supplemental Opinion at p. 230, n. 23 and pages 231-232 quoted above.

Judge Rhodes' Supplemental Opinion was incorporated as part of the Confirmation Order. Confirmation Order, ¶ G, p. 10 of 225. In both instances in which Judge Rhodes discussed the 30-year amortization, he affirmatively stated that the balance "will" be amortized over a thirty-year period. Judge Rhodes' directives in the Confirmation Opinion should be treated as conclusions of law under the Confirmation Order. Indeed, the Confirmation Order states that "All findings of fact and conclusions of law announced by the Court on the record in connection with confirmation of the Plan or otherwise at the Confirmation Hearing or in the Confirmation Opinion are incorporated herein by reference." Confirmation Order, Section B, ¶ 4, p. 73-74 of 225. Because of this express incorporation, the

31167884.1\022765-00213

Confirmation Opinion is construed as part of the Confirmation Order. *See In re Terrell*, 637 B.R. 129, 135-38 (Bankr. E.D. Wisc. 2021) (discussing, in chapter 13 context, how courts construe plans, the orders confirming them, and "other documents expressly incorporated" into them); *Somerset Trust Co. v. Mostoller (In re Somerset Regional Water Res., LLC)*, 592 B.R. 38, 49-50 (Bankr. W.D. Pa. 2018) (similar, in chapter 11 setting).

Section 16.6 of the governing PFRS plan document provides that "Nothing herein shall be interpreted as permitting the Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment." Doc. No. 8045-1, p. 519 or 809, and see Doc. No. 8045-1, pp. 597-98 of 809 (Sec. 16.6 applies both to Component I and Component II plans).

Because the POA requires 30-year amortization, and PFRS has no legal right to change that, the POA enjoins the PFRS from changing the amortization period to 20 years because this action "does not conform to or comply with the provisions of the Plan or the settlements" and it is an action which "interfere[s] with the implementation or consummation of the Plan." POA, pp. 50-51, Art. III.D.5 and III.D.6. PFRS' proposed 20-year amortization is directly contrary to the POA and the governing PFRS plan documents. The Court should Order PFRS to continue with 30-year amortization.

**C.    The Court also should order 30-year amortization to carry out the intent of, and allow the City to successfully implement, the POA.**

**1.    Governing law.**

Article VII of the POA gives the Court broad powers to enter Orders necessary

to the successful implementation of the POA:

> Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to: [. . .]

> F.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

> G.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

> H.    Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.  Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

[. . .]

L.  Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order [. . . .]"

POA, Art. VII. pp. 69-71.

> **2. The Court should order 30-year amortization to carry out the intent of, and allow the City to successfully implement, the POA.**

An integral and critical component of the Court's finding that the POA was feasible was the POA's provision of a ten year "pension holiday" for the City, which was to be followed by 30-year amortization. The stated purpose was to provide the City with many millions of dollars to spend on initiatives to improve City services including public safety, create of new economic opportunities and deal with blight and other endemic City problems. Facts, Section I.A of this Brief, *supra*.

But the City learned shortly after the POA was confirmed that due to material actuarial mistakes in devising the POA, the UAAL for the two legacy plans had been understated by some $500 million. To ensure the legacy plans would be properly funded, the City voluntarily created the Retiree Protection Trust Fund. By June of

2023 the City will have paid $445 million of general fund monies into the Trust Fund. Facts, Section I.B, *supra*. As a result, and directly contrary to the POA, the City has been deprived of much of the benefit of the POA's pension holiday.

The deprivation of much of the benefits of the pension holiday, together with the greatly accelerated funding that would be required by the proposed 20-year amortization, seriously threaten the City's ability to continue to improve City services and thereby successfully implement the Plan of Adjustment. Facts, Section I.D, *supra*.

There are no countervailing facts supporting 20-year amortization. Gabriel Roeder's worst-case projection did not result in the PFRS' plan funding level dropping below 40%. Facts, Section I.C.2, *supra*. Cheiron found that "The differences between a 20-year and 30-year amortization are negligible in terms of ensuring sufficient assets will be available to pay all future benefits under the plan." Facts, Section I.F, *supra*. But Cheiron also pointed out that the increased up-front funding would expose the City to unnecessary investment risk if there is a drop in the stock market. *Id.*

Gabriel Roeders and PFRS' IC recently recognized that funding is so adequate that it can begin to set aside money to restore pension benefits to plan members. Facts, section G. And to avoid any possible concern, the City is prepared to agree to a reasonable "trigger" to increase payments if a problem arises in the future. *Id.*

Finally, the Stout report is utterly meaningless and has zero credibility. Facts, Section I.E, *supra*. It praises the City's comeback while criticizing its alleged failure to spend enough money on public safety. The report completely ignores the fact that the City was forced to divert some $445 million of general fund monies from public safety and other City priorities to fund the Retiree Protection Trust Fund. That shortfall was the result of Gabriel Roeders and other actuaries understating the legacy pension plans' liabilities by some $500 million in preparing the POA. That "mistake," in turn, allowed the public safety retirees to escape bankruptcy with *de minimis* cuts to their pensions – cuts they are now looking to restore at the City's expense.

## III.   Further proceedings.

The City's arguments are supported by the POA, Judge Rhodes' Supplemental Opinion, and other documents and facts that should be uncontested. However, to the extent the Court believes there are disputed questions of fact, the City respectfully seeks the opportunity for discovery and an evidentiary hearing.

## IV.   Conclusion and Relief

For the reasons stated, the City asks the Court to order PFRS to continue with 30-year amortization for Plan's UAAL that will exist as of June 30, 2023.

Dated: August 3, 2022                  Respectfully submitted,


                                       By: /s/ Marc N. Swanson
                                           Marc N. Swanson (P71149)
                                           MILLER, CANFIELD, PADDOCK AND
                                           STONE, P.L.C.
                                           150 West Jefferson, Suite 2500
                                           Detroit, Michigan 48226
                                           Telephone: (313) 963-6420
                                           Facsimile: (313) 496-8451
                                           swansonm@millercanfield.com

                                                          and

                                       By: /s/ Charles N. Raimi
                                           Charles N. Raimi (P29746)
                                           Deputy Corporation Counsel
                                           City of Detroit Law Department
                                           2 Woodward Avenue, Suite 500
                                           Coleman A. Young Municipal Center
                                           Detroit, Michigan  48226
                                           Telephone: (313)-237-5037
                                           raimic@detroitmi.gov


                                       ATTORNEYS FOR THE CITY OF DETROIT

31167884.1\022765-00213

## EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>City of Detroit, Michigan,<br><br>      Debtor. | Bankruptcy Case No. 13-53846<br><br>Judge Thomas J. Tucker<br><br>Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 3, 2022, he served a copy of the foregoing *Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan* via the Court's ECF system which will provide service to all registered parties and in the manner described below:

Via first class mail and email:

Counsel to the PFRS
Ronald King
Clark Hill
215 South Washington Square, Suite 200
Lansing, MI 48933
rking@clarkhill.com

Counsel to the Investment Committee
Valerie Brader
RIVENOAK LAW GROUP PC
3331 W. Big Beaver Rd., Suite 109
Troy, MI 48084
valerie@rivenoaklaw.com

DATED:  August 3, 2022

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

- 2 -

## EXHIBIT 5 – NONE