# EXHIBIT 6

## Exhibits to Brief

### Part 1

Ex. 1 — Declaration of Mayor Michael Duggan

Ex. 2 — Gabriel Roeder's March 4, 2021, PFRS funding policy

Ex. 3 — March 4, 2021, PFRS Board minutes approving 20-year amortization

Ex. 4 — Detroit CFO's July 21, 2021, memo objecting to 20-year amortization

Ex. 5 — Gabriel Roeder's August 2, 2021, supplemental funding report

Ex. 6 — October 1-14, 2021, emails between Ms. Brader and Mr. Raimi

Ex. 7 — October 18, 2021, PFRS IC minutes approving 20-year amortization

# EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## DECLARATION OF MICHAEL DUGGAN

Michael Duggan states as follows for his declaration:

1.    I am the elected Mayor of the City of Detroit. I was first elected in November 2013 and then again in November 2017 and 2021.  My prior jobs included Deputy County Executive of Wayne County, elected Wayne County Prosecutor, and Chief Executive Officer of the Detroit Medical Center.

2.    This declaration is made on my personal knowledge or upon reliable records and information made known to me in the course of my duties as Mayor.

3.    The City filed for Chapter 9 bankruptcy in July 2013 and was in bankruptcy when I became Mayor effective January 1, 2014.  Kevyn Orr was the state appointed emergency manager and supervised the bankruptcy activities.

4.    For much of my first year (2014) I was excluded from the ongoing bankruptcy activities.  However, as the Plan of Adjustment ("POA") was being negotiated, and it became clear to Mr. Orr and his team that I would need to support the POA to secure its approval, I was provided access to significant information about the

1

bankruptcy. After extensive due diligence I ultimately testified in support of the POA and its feasibility.

5. Perhaps the most important and contentious issue in the bankruptcy, and one of my primary concerns about the POA and its feasibility, was the City's legacy retirement obligations. The City historically had two defined benefit pension plans for employees and retirees. The Police and Fire Retirement System ("PFRS") managed the plan for public safety employees and retirees. The General Retirement System ("GRS") managed the plan for all other City employees and retirees. Both plans were frozen in bankruptcy and, under the POA, covered only City retirees and employees who performed services for the City prior to July 1, 2014.

6. Both plans were replaced going forward with hybrid plans that combined elements of defined benefit and defined contribution plans. In the POA the new hybrid plans are known as Component I plans, and the frozen plans are known as Component II plans. At issue in this case is the PFRS Component II plan that was frozen in bankruptcy and now covers only public safety employees and retirees who provided services prior to July 1, 2014.

7. The eighth, final and operative POA incorporated what became known as the "Grand Bargain." The Grand Bargain raised the equivalent of $816 million from the state of Michigan, the Detroit Institute of Arts, and various charities and, as a result:

2

- Pension cuts to retirees were minimized. The only cut to public safety pensions was a 55% reduction to the cost of living adjustment (COLA); other City employees' pensions were cut more but far less than had been anticipated.

- The Detroit Institute of Arts' collection was protected.

- The POA gave the City a 10-year pension contribution "holiday" and, thereafter, the legacy plans' unfunded liabilities were to be amortized over a 30-year period. This was to allow the City to devote as many resources as reasonably possible to address ongoing issues that had substantially contributed to the bankruptcy such as blight, public safety, loss of employment opportunities, etc.

8. On December 31, 2014, Bankruptcy Judge Steven Rhodes issued a supplemental opinion approving the Plan of Adjustment. *In re City of Detroit*, 524 B.R. 147 (Bankr. E.D. Mich. 2014), ("Supp Op"). As Judge Rhodes noted, the pension classes voted to accept the POA by 82% in class 10 (PFRS) and 73% in class 11(GRS).  Supp Op, at 180.

9.   The Opinion explains:

> "Because of the outside money committed as part of the Grand Bargain, the City will have little responsibility for funding the GRS [General Retirement System] and the PFRS [Police/Fire Retirement System] through June 2023. During that time period, the PFRS will be funded exclusively from contributions from the DIA, the DIA Funders,

3

the Foundation Funders and the State under the Grand Bargain, as described previously." Supp Op, at 179-80.

Judge Rhodes concluded that the pension settlement was "fair and equitable" and stated as follows:

> "It is therefore a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. Without the outside funding from the Grand Bargain, the City anticipated having to reduce pensions by as much as 27%. The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain." Supp Op, at 181 (citation omitted).

10.    At the time of the bankruptcy, both the public safety (PFRS) and general retirement (GRS) legacy (Component II) plans were underfunded. Under financial projections prepared for the POA, the plans were likewise projected to be underfunded at the end of the 10-year pension holiday.  Actuaries identify the amount of such underfunding as the plan's unfunded actuarial accrued liability, or "UAAL."

11.    In examining the feasibility of the POA, experts addressed how the Component II plans' UAAL would be amortized after the end of the 10-year pension holiday. Those projections showed that after the 10-year holiday, the then existing UAAL would be amortized over the following 30 years. Judge Rhode's Opinion approving the POA confirmed that the Component II Plans' UAAL at the end of the pension holiday were to be amortized over a thirty-year period:

4

"However, at the end of FY2023, the GRS and PFRS will remain significantly underfunded. Using the assumptions from the global pension settlement, including the 6.75% discount rate, the City projects that the PFRS will only achieve 78% funding, leaving a UAAL of $681 million. Ex. 793 at 2. For the GRS, the City projects a 70% funded status by the end of FY2023, leaving a UAAL of $695 million. *Id.* **The City will then amortize the remaining UAAL for both plans over the next thirty years at an interest rate of 6.75%.** *Id.* Between FY2024 and FY2033, the City will receive an additional $68 million in Grand Bargain proceeds to pay toward the UAAL amortization for PFRS, and $188 million for GRS. The balance of the amortized UAAL will come from the City. *Id.* at 5.

"The plan greatly reduces the City's pension obligations, thanks to the State Contribution Agreement, the Grand Bargain funding, and the modification of the City's obligations to its current retirees." Supp Op, at 231-32 (emphasis added).

12.     Despite the funding provided by the Grand Bargain, Judge Rhodes was

extremely concerned about the feasibility of the POA. His opinion stated:

"In this case, examining the feasibility of the plan is difficult for a number of reasons. The City's debt is enormous and the City proposes to pay most of its creditors over a long period of time. As the Court discusses below, the City's revenue and expense projections extend forty years into the future.

"Second, the feasibility of the plan depends upon the City's ability to fix and maintain its broken governmental operations. This is significant because the chapter 9 feasibility inquiry requires an analysis of whether the City can reasonably provide sustainable municipal services, as the court found in *In re Mount Carbon*. It is also significant because the City's ability to repay its creditors pursuant to the plan depends upon the City's ability to increase its revenues from taxes and fees by improving the efficiency of City operations and by identifying and accessing untapped sources of revenue.

"The feasibility analysis is yet more complex because several key parts of the plan depend upon performance by parties who are

completely beyond the City's control.  For example, because the City's contributions to the retirement systems are fixed through FY2023, a risk remains that the pension plans will be significantly more underfunded than anticipated if one of the many organizations participating in the Grand Bargain fails to perform in the time or manner promised.

> "As the City itself succinctly states in its pretrial brief in support of plan confirmation, "[T]he City was—and remains today—enmeshed in a financial crisis of unsurpassed proportions and complexity." Despite efforts from both the City and the State of Michigan, "the City is trapped in a vicious circle of cash crises, general fund deficits, crushing long-term liabilities and tumbling credit ratings exacerbated by the City's bureaucratic structure and frequent deviations from established budgets."" Supp Op, at 220-21 (citations omitted).

13.     Martha Kopacz, the Court's appointed feasibility expert, was likewise extremely concerned about the feasibility of the POA:

> "I want to emphasize, however, that there is little space remaining on the continuum of [feasibility].  The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment.  Conversely, they have imposed additional financial obligations on the City.  I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment.   The financial obligations associated with the recent settlements only intensify this concern." Supp Op, at p. 219 (Court's quotation of expert, alterations in original).

14.     I worked closely with Ms. Kopacz and her staff, and major City departments, in examining the POA's feasibility.  Ultimately, Ms. Kopacz and I came to the same conclusion – that the POA was feasible but enormous work would be required and financially there was no room to spare.  Critical to my support for the POA was that the City's legacy pension liabilities would be minimized for the

initial ten years and then amortized over a 30-year period - providing the City as much funding as reasonably possible to address the City's problems by investing in what were called "RRIs," or recovery and reinvestment initiatives. As of the time of the confirmation hearing, I believed the City was perhaps 10% of the way toward providing proper City services, and that many years of implementing major service improvements and job creation initiatives would be needed to successfully carry out the POA.

15.     In considering the feasibility of the POA, I was aware that the POA provided an assumed rate of return of 6.75% for the legacy pension plans. During my due diligence I learned that a proposal had been made to raise the assumed rate of return to 7%. That would have allowed the actuaries to more easily "make the numbers work" for the feasibility analysis but would have put more funding stress on the City when it came time to resume funding the plans. I advised the participants that if they raised the assumed rate of return to 7%, I would testify against the feasibility of the POA.

16.     The POA was approved and then became effective in December 2014. Sometime in 2015 I learned that the actuarial assumptions for the legacy pension plans were seriously flawed. Specifically, the plans' projected unfunded liabilities had been understated by roughly $500 million. That information was provided by Gabriel Roeder Smith & Company, the actuary for both legacy plans. Neither

7

Gabriel Roeder, nor any of the other actuaries or experts who worked on the POA, ever explained how the error occurred.

17. The City considered bringing a lawsuit. The City's investigation revealed serious concerns about the way in which the retirement liability issues were handled by the attorneys and actuaries in the bankruptcy process. Those included use of outdated mortality tables. I also learned that the "experts" were seemingly more concerned about the making the numbers work, i.e., minimizing retiree pension cuts, than with the City's ability to successfully carry out the POA.. I spoke with Ms. Kopacz who advised she likewise had no idea that the retirement plan projections were materially incorrect, and that information would likely have changed her view on the feasibility of the POA. I ultimately decided not to bring a lawsuit because the POA had broad exculpatory provisions protecting the attorneys and experts from liability.

18. Thereafter, to further ensure proper funding of legacy pensions, my administration voluntarily put in place an irrevocable Retiree Protection Trust Fund to provide additional funding for the legacy plans after the end of the 10-year pension "holiday." To date the City has deposited $355 million, and will be adding $90 million later this year. Accordingly, by the time City funding of the PFRS plan is to begin (FY 2024), the City will have funded the Retiree Protection Trust Fund with $445 million of general fund money.

19.     Under the POA, that $445 million should have been available for recovery and reinvestment initiatives such as blight remediation, public safety, job creation initiatives etc.  It has instead irrevocably been set aside for the retirees' pension security.

20.     The PFRS' Investment Committee and Board, on the recommendation of their actuary Gabriel Roeder, recently adopted a funding policy for amortizing the UAAL that will exist after the expiration of the pension "holiday." As confirmed by the above quotation from Judge Rhodes opinion confirming the POA, it provided for amortizing that liability over 30 years. The PFRS' Investment Committee and Board nevertheless adopted Gabriel Roeder's recommendation that the liability be amortized over 20 years – which would require enormous additional up-front funding by the City.  The City has filed this legal action to reverse that action and require compliance with the POA's 30-year amortization schedule.

21.     The critical importance of this issue to the City is illustrated by the following diagram.  This shows (i) the City's funding obligation as originally estimated under the (POA) (in green), (ii) the City's increased funding obligation over the POA estimates, using 30-year amortization (green and yellow), and (iii) the City's increased funding obligation over the POA estimates, using 20-year (green, yellow and red).  The 20-year and 30-year amortization projections (yellow and red) are

based on the most recently available data from PRFS's actuaries, which is as of June 30, 2021.





**Difference in Annual Pension Contributions
Detroit PFRS Legacy Plan**
($ in millions)

22.     The additional hundreds of millions of dollars of front-loaded payments under 20-year amortization would be devastating to the City's ability to fund critical programs needed to improve City services, attract employment opportunities, and otherwise continue to successfully implement the POA.

10

23.     To my knowledge, neither the PFRS Board nor its Investment Committee has ever explained why they believed they could violate the 30-year amortization schedule provided by the POA. I understand that Gabriel Roeder's recommendation for 20-year amortization was in reaction to pressure by the public safety unions' representatives on the PFRS board who wanted faster amortization to "better protect" their retirement benefits. But all such concerns – as well as countervailing concerns as to the POA's feasibility - were fully vetted in the development of the POA. The same public safety unions who, together with Gabriel Roeder, successfully argued for minimal pension cuts under the POA, also agreed to the POA's 30-year amortization schedule. Having locked in the minimal pension cuts, the unions and Gabriel Roeder now want to drastically increase the City's funding obligations. And Gabriel Roeder was responsible in whole or part for "underestimating" the legacy plans' liabilities – necessitating the City's use of $445 million for the Retiree Protection Trust Fund.

24.     My administration would never take any action to jeopardize pension benefits. That is exactly why my administration voluntarily created the Retiree Protection Trust Fund and will soon have funded it with $445 million in general fund money.

25.     I am aware that Gabriel Roeder, in recommending 20-year amortization, prepared a report that showed projections of the future funding level percentage of the plan assuming (i) City contributions using 20- or 25-year amortization and (ii)

11

different investment return scenarios including several in which future investment returns were significantly below the POA assumed rate of 6.5%. The report does not state or suggest that there is any foreseeable risk that the plan would be unable to pay the legacy retirement benefits. None of those projections resulted in the plan ever being less than 40% funded.

26. In this regard, the City has also received advice from Cheiron, a premier actuarial firm having extensive experience with governmental pension plans. Cheiron's report explains that "The differences between a 20-year and 30-year year amortization as of June 30, 2022 are negligible in terms of ensuring sufficient assets will be available to pay all future benefits under the Plan." The report provides extensive data supporting that conclusion. Gabriel Roeder's report recommending 20-year amortization provided nothing to suggest otherwise.

27. Cheiron's report likewise advises that front-loading the funding via 20-year amortization unnecessarily increases investment risk. If the City is compelled to front load the funding, and the stock market falls, the losses will impose even more funding stress on the City.

28. Moreover, to alleviate any possible concerns, I would support, in connection with 30-year amortization, adoption of a "trigger" such that if the funded percentage of the plan fell below a certain agreed upon threshold, the City would be required to

12

provide additional funding. But there is nothing to currently suggest that will ever be an issue.

29.     I am aware that the Investment Committee engaged Raymond Roth of the Stout firm to prepare a report "regarding the capability of Detroit to make specified levels of pension contributions [using 20-year amortization] beginning in 2024." The report concludes "Thus, it is my opinion that Detroit will have the ability to pay the additional amounts of PFRS Legacy Plan contributions under the scenarios projected by its actuaries." I have carefully reviewed that report and conclude it is meaningless to the amortization dispute for reasons including the following.

30.     The report purports to compare Detroit to four allegedly "comparable" cities, namely, Indianapolis, Cleveland, Columbus and Minneapolis. That is absurd on its face. Stout's own report shows (page 9) that in 2015, the year after Detroit exited from bankruptcy, Detroit's median income was roughly $25,000 per year, versus $43,000 for Indianapolis, $45,000 for Columbus and $51,000 for Minneapolis. None of those cities are remotely "comparable" to Detroit. Although Cleveland's median income was similar to Detroit's, in 2015 some 40% of Detroit residents were below the poverty line versus 35% for Cleveland. Stout report, p. 11. And, of course, Cleveland never declared bankruptcy. For example, Judge Rhodes' supplemental Opinion described his tour of the City as follows:

13

"The primary impression that remains with the Court following the tour is that blight in Detroit is extensive. The statistics do not fully convey its extent or impact. In neighborhood after neighborhood, short and long stretches of streets have abandoned structures—they can no longer be called homes—that are intimidating hulks. Some are partially or mostly burned out. Some have gaping holes in their roofs or collapsed garages. Many have missing doors and windows, and broken front steps and porches. Some are strewn with illegal dumping. All are vivid statements of their former owners' emotional and financial struggles, and of community loss.

"These streets also have vacant lots, or collections of vacant lots, on which unmanaged and unsightly vegetation has taken over from the structures after their removal. On the commercial streets, block after block of abandoned, boarded up and graffiti-littered strip shopping centers far outnumbered the occasional small businesses that have survived.

"It is heartbreaking, maddening and sad. No one should have to endure, day in and day out, the damage to the human spirit that can result from living in those surroundings. City residents who live, work and play in these neighborhoods deserve better. Detroit deserves better." Supp. Op. at 167.

31.    The Stout report (¶17) acknowledges the following:

"Detroit has experienced a remarkable transformation since its emergence from bankruptcy. The median income of its residents has risen, while the number of families living below poverty, unemployment, and crime has declined. In addition, blight has been reduced, street lighting improved, emergency medical services ("EMS") response times are down, and credit ratings have stabilized. However, Detroit's population remains at lower income levels, including higher concentrations of poverty and crime rates, than the Comparable Midwestern Cities."

32.    Nevertheless, Mr. Roth "concludes" that Detroit could "afford" the dramatically increased funding payments under 20-year amortization because

14

Detroit allegedly is spending too much of its budget on "central government." Stout report, ¶¶54 – 67.

33. The City's review of Mr. Roth's report raises substantial questions whether the "central government" comparison properly analyzes each City's unique accounting policies and practices. But even if it does, Mr. Roth's "opinion" completely ignores the fact that the City's "remarkable transformation" was precisely the result of my administration's spending priorities including "central government." The "central government" spending was critical to the City's job creation, housing initiatives, blight removal, neighborhood revitalization, revamping of City departments, and myriad other activities that produced the "remarkable transformation." Mr. Roth never asked to speak to me about this or any other aspect of his report. Nor did the PFRS Board of Trustees or its Investment Committee request my input on the report or on the impact the 20-year amortization would have on the City.

34. The Stout report (¶¶54 – 55) notes that Detroit has lower levels of public safety spending as a percentage of general fund revenue than the "comparable cities." I did not need Mr. Roth's report to tell me that Detroit needs additional resources for public safety and many other priorities. The City's financial crisis and bankruptcy devastated all City departments and employee morale, and none more than public safety. Improving public safety recruiting, pay, benefits and performance has been

a top priority to which my administration and I have devoted enormous time and effort. Mr. Roth also ignores the fact that the City would have been able to spend more on public safety had it not been required to fund the $445 million Retiree Protection Trust Fund.

35. It is extremely disturbing that Mr. Roth, after acknowledging the City's need for additional resources for public safety, would nevertheless conclude that the City can "afford" sharp increases in pension funding payments under 20-year amortization. It is quite evident that Mr. Roth has no understanding of the realities and complexities of managing the City of Detroit. Nor does his resume list anything that would qualify him to opine on these subjects.

36. The Stout report also speculates that the City may in the future gain additional revenues via internet gaming. What we know for certain is that the pandemic wreaked havoc on the City's finances including income tax which is the City's largest revenue source. As a result of the pandemic, many thousands of employees who formerly worked in City offices are working from their homes in the suburbs. As a result, they are not paying City income tax. City restaurants, businesses, etc. are adversely affected.

37. To the extent the City does realize additional gaming tax from internet gaming, those have already been considered in the City's spending projections, so that would not be "additional revenues" available for pension funding.

16

38.    Wholly apart from the fact that Mr. Roth has no crystal ball to see into the future, the Bankruptcy Court, the Court appointed mediators, Ms. Kopacz, the parties and their attorneys and advisors, spent thousands of hours working out the POA. The POA provided for a 30-year amortization period for the legacy plans' unfunded liabilities beginning with the 2024 fiscal year. It seems to me that if PFRS had identified some compelling need to change the POA, PFRS should have petitioned the Court for relief. But PFRS has never identified any such need and there is no reason for violating the POA with a 20-year amortization schedule.

39.    Finally, as mentioned, in addition to the PFRS legacy plan, there is a legacy pension plan for non-public safety employees known as the General Retirement System ("GRS") plan. The Investment Committee for that Plan has advised that it is carefully following this funding dispute. In the event this Court allows PFRS to violate the POA, the City is justly apprehensive that GRS will feel compelled to do likewise. That would roughly double the additional upfront pension funding payments for the City.

    I declare under the penalty of perjury that the foregoing is true and correct.

Michael Duggan

Dated:    6/15/22

17

# EXHIBIT 2

# Police and Fire Retirement System of the City of Detroit
# Actuarial Funding Policy



EXHIBIT

2
_____

## Introduction

The purpose of this Actuarial Funding Policy is to record the funding objectives and policy set by the Board of Trustees (Board) for the Police and Fire Retirement System of the City of Detroit (the System). The Board establishes this Actuarial Funding Policy to help ensure the systematic funding of future benefit payments for members of the Plan.

In 2014, the Plan for the System was written and approved by the bankruptcy court as part of the City's Plan of Adjustment (POA). At that time, the original retirement plan was split into two Retirement Plans: Component I (Hybrid) and Component II (Legacy). In accordance with the POA, employer contributions and certain assumptions cannot be changed until fiscal year 2024. This Policy is intended to recognize those items as fixed until 2024 and establish a funding policy for the period beginning in fiscal year 2024, when employer contributions must be determined on an actuarial basis. Nothing in this Policy is intended to prevent the Board from altering the Policy prior to fiscal year 2024 as conditions change or additional information becomes available to the Board.

This Policy shall be regularly reviewed by the Board.

## Funding Objectives

1. Provide benefit security to members of the System:

    a. For purposes of this policy, benefit security means having adequate liquidity to pay benefits when due.

2. Establish an appropriate employer contribution based on the following objectives:

    a. Fully funding the Legacy Plan liability no later than 2054;

    b. Keeping the Hybrid Plan fully funded; and

    c. Managing employer contribution volatility.

3. Provide a reasonable margin for adverse experience to help offset risks.

4. Measure and monitor funding status, post-2024 contribution estimates and risk.

    a. Perform annual valuations; and

    b. Include post-2024 contribution estimates (based on this Policy) in annual actuarial valuations.



## Elements of Actuarial Funding Policy

The Plans will have annual actuarial valuations each June 30. Employer contributions will be determined for the fiscal year ending two years after the valuation date. For example, the actuarially determined employer contribution for the fiscal year ending June 30, 2024 will be determined by the June 30, 2022 annual actuarial valuation.

Annual actuarial valuations may or may not also serve other purposes such as Legacy Plan restoration, Hybrid plan Section 9.5 fiscal responsibility calculations, and/or Annuity Savings Fund excess interest transfers between components. Unless otherwise stated, those purposes are not subject to this Policy.

For all other funding purposes, annual actuarial valuations will include the following elements of the Actuarial Funding Policy:

1. **Actuarial Cost Method**

   a. Hybrid Plan: The Entry Age actuarial cost method shall be used in determining the Actuarial Accrued Liability (AAL) and Normal Cost with the entry age based on date of hire. Since this component was created in July 2014 and granted eligibility and vesting service prior to July 2014 (for members hired before that date), this Plan had an unfunded actuarial accrued liability on the effective date, known as the transition cost. As of June 30, 2017, the AAL (including the transition cost) in the Hybrid Plan was fully funded. This Plan could become less than fully funded in the future if experience is less favorable than assumed or there are changes in assumptions or Plan provisions.

   b. Legacy Plan: The Unit Credit Normal actuarial cost method shall be used in determining Actuarial Accrued Liability (AAL) and Normal Cost. Since this component is closed and accrued benefits are frozen as of June 30, 2014, this method results in no normal costs and an AAL that equals the Present Value of Accrued Benefits (PVAB) of each member.

2. **Asset Smoothing Method**

   a. For estimating contributions prior to June 30, 2023, the Funding Value of Assets (or actuarial value of assets) will be equal to the Market Value of Assets, as mandated by the Plan of Adjustment. For determining (or estimating) employer contributions on or after fiscal year 2024, the Funding Value of Assets will be based on a method that employs smoothing of market gains and losses over a closed period. The smoothing period for recognized market gains and losses (above or below the assumed rate of return) will be a 3-year period.

   b. The Funding Value of Assets shall not diverge from the Market Value of Assets by more than 15%.

   c. The annual actuarial valuation will calculate results on both the smoothed value of assets and the (non-smoothed) Market Value of Assets beginning with the June 30, 2019 valuation (the Funding Value of Assets will initially be set to the Market Value of Assets as of June 30, 2018 with smoothing beginning prospectively). The post-2024 contribution estimate will always be based on the smoothed value of assets. Other results (UAAL, Funded Status, etc.) will be based on the Market Value of Assets prior to 2024 and the smoothed value of assets after 2023.



3. **Amortization Method**

   a. Hybrid Plan

      a) A Level Percent of Payroll amortization method shall be used to systematically eliminate (pay off) the Unfunded Actuarial Accrued Liability (UAAL) over a closed 15-year period from the later of July 1, 2023 or the applicable fiscal year after the funded status falls below 100%.

      b) If funded status is above 100%, the contribution requirements for the UAAL will be $0 (thereby creating a minimum employer contribution of employer normal cost).

      c) Layered amortizations will be considered by the Board post-2024.

   b. Legacy Plan

       a) The Level Dollar amortization method shall be used to systematically eliminate (pay off) the Unfunded Actuarial Accrued Liability (UAAL) over a closed period of 20 years from July 1, 2023 for the UAAL as of July 30, 2022 (projected to July 1, 2023), and

      b) Layered amortizations that use 20-year closed periods for gains and losses occurring after June 30, 2022 (each 20-year period starts with the first payment after the applicable gain or loss occurs).

4. **Funding Target and Cash Flow Projections**

   a. The targeted funded ratio shall be 100%.

   b. The Legacy Plan annual actuarial valuation shall include projections of estimated employer contributions, expected benefit payments and estimated funded status to the later of fiscal year 2054 or 30 years after the applicable employer contribution fiscal year.

   c. Section 9.5 of the Plan details the actions to be taken if the 5-year projected funded status falls below 90% (Hybrid Plan, only).

5. **Risk Management**

   a. Assumption Changes

      a) The actuarial assumptions used shall be those last adopted by the Board based on the most recent experience study and upon the advice and recommendation of the actuary. In accordance with the City Ordinance, the actuary shall conduct an experience study at least every five years. The results of the study shall be the basis for the actuarial assumption changes recommended to the Board. However, the assumed rate of return and the actuarial value of assets are mandated by the City's POA and cannot be changed prior to June 30, 2023.

      b) The actuarial assumptions may be updated at any time, as advised by the actuary, if significant Plan design changes or other significant events occur.

      c) The next experience study will be performed after the 2020 actuarial valuation and will include both economic (investment return, inflation, etc.) and demographic (mortality, retirement, disability, etc.) assumptions. Even though the investment rate of return may not be changed for determining employer contributions until after June 30, 2023, the Board may elect to show valuation results under an alternative reasonable assumed rate of investment return prior to 2023.



b. Risk Measures

a) Risk measures will be included in the annual actuarial valuations. Below is a list of potential measures to be included. The measures may be changed over time as deemed appropriate.

(i) Classic measures currently determined

— Funded ratio (assets / liability) on both a market value and funding value (if funding value is not equal to market).

— UAAL amortization period (years required to pay down the UAAL based on current funding rates).

— Portfolio rate of return for the year on both the market value and funding value of assets.

— 5- and 10-year geometric average portfolio rate of return on both the market value and funding value of assets (developed prospectively beginning with the 2019 valuation).

— 5- and 10-year standard deviation of return on both the market value and funding value of assets (developed prospectively beginning with the 2019 valuation).

(ii) Duration of the Actuarial Accrued Liability

— Measures the sensitivity of the liability to a 1% change in assumed rate of return. A decrease in this measure indicates a decrease in assumed rate sensitivity and vice versa.

(iii) Total UAAL / Covered Payroll

— Measures the risk associated with contribution rates relative to the impact on the ability to fund the UAAL. A decrease in this measure indicates a decrease in UAAL contribution risk and vice versa.

— Consideration will be given to using total payroll or revenue source, if available.

(iv) Total Assets / Covered Payroll

— Measures the risk associated with the potential impact of asset experience on contributions. A decrease in this measure indicates a decrease in asset risk and vice versa.

— Consideration will be given to using total payroll or revenue source, if available.

(v) Total AAL / Covered Payroll

— Measures the risk associated with the potential impact of liability experience on contributions. A decrease in this measure indicates a decrease in experience risk and vice versa. This also provides a long-term measure of the asset risk where the System has a target funded ratio of 100%.

— Consideration will be given to using total payroll or revenue source, if available.

(vi) Non-Investment Cash flow / Beginning of year assets

— Measures depletion risk, sensitivity to annual investment gains and losses risk and the maturity of the plan. For a mature open plan, this may converged to the negative of the real rate of return assumption (investment return less wage inflation). A less negative number (or a positive number) indicates a less mature plan and/or a plan that is at lower risk of fund depletion and less sensitive to annual gains and losses. A more negative number indicates a more mature plan and/or a plan that is more at risk of fund depletion and more sensitive to annual gains and losses. For a super-mature closed plan such as the Legacy plan, this may become more negative over time as liquidity needs increase.



(vii) Market Value of Assets / Benefit Payments

- Measure depletion risk. A low value estimates the number of years to depletion disregarding future contributions and investment return.

(viii) Solvency Liability

- Measures the estimated cost of accrued benefits as a result of minimizing investment risk in the portfolio.

b) Risk Control: The Board shall carefully monitor the risk measures above and shall consider steps to mitigate risk, particularly as the Legacy Plan funded ratio increases. Examples of risk mitigating techniques include, but are not limited to:

(i) Reviewing investment risk in accordance with the Board's Investment Policy

(ii) Adding provisions for adverse deviation in the actuarial assumptions

(iii) Increasing employer contributions (through a change in methods, assumptions, or amortization period)

(iv) Other



# Glossary

1. **Actuarial Accrued Liability (AAL):** The difference between (i) the actuarial present value of future plan benefits; and (ii) the actuarial present value of future normal cost. Sometimes referred to as "accrued liability" or "past service liability."

2. **Actuarial Assumptions:** Estimates of future plan experience with respect to rates of mortality, disability, turnover, retirement, rate or rates of investment income and salary increases. Decrement assumptions (rates of mortality, disability, turnover and retirement) are generally based on past experience, often modified for projected changes in conditions. Economic assumptions (salary increases and investment income) consist of an underlying rate in an inflation-free environment plus a provision for a long-term average rate of inflation.

3. **Actuarial Cost Method:** A mathematical budgeting procedure for allocating the dollar amount of the "actuarial present value of future plan benefits" between the actuarial present value of future normal cost and the actuarial accrued liability. Sometimes referred to as the "actuarial funding method."

4. **Actuarial Gain (Loss):** A measure of the difference between actual experience and that expected based upon a set of actuarial assumptions during the period between two actuarial valuation dates, in accordance with the actuarial cost method being used. For example, if during a given year the assets earn more than the investment return assumption, the amount of earnings above the assumption will cause an unexpected reduction in UAAL, or "actuarial gain" as of the next valuation. These include contribution gains and losses that result from actual contributions made being greater or less than the level determined under the policy.

5. **Actuary:** A person who is trained in the applications of probability and compound interest to problems in business and finance that involve payment of money in the future, contingent upon the occurrence of future events. Most actuaries in the United States are Members of the American Academy of Actuaries (MAAA). The Society of Actuaries is an international research, education and membership organization for actuaries in the life and health insurance, employee benefits, and pension fields. It administers a series of examinations leading initially to Associateship and the designation ASA and ultimately to Fellowship with the designation FSA.

6. **Amortization:** Paying off an interest-bearing liability by means of periodic payments of interest and principal, as opposed to paying it off with a lump sum payment.

7. **Unit Credit Normal Actuarial Cost Method:** A funding method that calculates the Normal Cost as the present value of the change in accrued benefits for active members.

8. **Experience Study:** An actuarial investigation of demographic and economic experiences of the system during the period studied. The investigation was made for the purpose of updating the actuarial assumptions used in valuing the actuarial liabilities.

9. **Funding Value of Assets:** The value of current plan assets recognized for valuation purposes. Generally based on a phased-in recognition of all or a portion of market related investment return. Sometimes referred to as Actuarial Value of Assets or Smoothed value of Assets.

10. **Market Value of Assets:** The fair value of plan assets as reported in the plan's audited financial statements.

11. **Normal Cost (NC):** The annual cost assigned, under the actuarial funding method, to current and subsequent plan years. Sometimes referred to as "current service cost." Any payment toward the unfunded actuarial accrued liability is not part of the normal cost.

12. **Unfunded Actuarial Accrued Liability (UAAL):** The positive difference, if any, between the actuarial accrued liability and valuation assets. Sometimes referred to as "unfunded accrued liability."


13-53846-tjt    Doc 13602-1    Filed 08/03/22    Entered 08/03/22 15:36:22    Page 26 of 68

# EXHIBIT 3

EXHIBIT
Ex. 3

MEETING NO. **3279**
JOURNAL OF PROCEEDINGS
**BOARD OF TRUSTEES OF THE POLICE AND FIRE RETIREMENT SYSTEM**
OF THE CITY OF DETROIT
HELD **THURSDAY, MARCH 04, 2021**

9:00 A.M.
RETIREMENT SYSTEMS' CONFERENCE ROOM
ALLY DETROIT CENTER, 500 WOODWARD AVENUE; SUITE 3000
DETROIT, MICHIGAN 48226

### TRUSTEES PRESENT

| | |
|---|---|
| Douglas Baker | Ex/Officio Trustee/Corporation Counsel Alternate/Vice-Chairperson |
| Shawn Battle | Ex/Officio Trustee/Fire Prevention Chief/Mayoral Designee |
| Michael F. Berent | Elected Trustee/Fire/Chairperson |
| Matthew Gnatek | Elected Trustee/Police |
| Brenda Jones | Ex/Officio Trustee/City Council President |
| Angela R. James | Ex/Officio Retiree Trustee/Police/Mayoral Designee |
| Christa McLellan | Ex/Officio Trustee/Treasurer |
| John Naglick Jr. | Ex/Officio Trustee/Finance Director |
| George Orzech | Elected Retiree Trustee/Fire |
| Jeffrey Pegg | Elected Trustee/Fire |
| Dean Pincheck | Elected Trustee/Fire |
| John Serda | Elected Trustee/Police |
| Ronald Thomas | Elected Trustee/Police/Vice-Chairperson |
| Gregory Trozak | Elected Retiree Trustee/Police |
| Steven Watson | Ex/Officio Trustee/Budget Director |

### TRUSTEES EXCUSED

| | |
|---|---|
| Portia Roberson | Ex/Officio/Mayor's Designee |

### ALSO PRESENT

| | |
|---|---|
| David Cetlinski | Executive Director |
| Kelly Tapper | Assistant Executive Director |
| Ryan Bigelow | Chief Investment Officer |
| Marcella Brewer | Recording Secretary |
| Ronald King | General Counsel |
| Bruce Babiarz | Public Relations Advisor |
| Dr. Oscar King III | Board Lobbyist |

### STAFF EXCUSED

None

## PUBLIC COMMENT

> **Trustee Jones joined the meeting at 9:40 am (Detroit, MI)**

The following persons spoke on behalf of the sale of Baldwin Hills Crenshaw Mall:

> Veronica
> Amber High
> Donald Beyers
> Elaine
> Harold Huggins
> Patrice Fisher

## PUBLIC RELATIONS REPORT

- WXYZ TV Inquiry
- Draft Medicare Letter

Trustee Pegg asked that letters be sent. Trustee James asked that some details on how many members would be affected be added to the letter if possible.

Trustee Pegg also noted that Bruce Babiarz of our Public Relations team did a great job with the draft Medicare Letter.

## LOBBYIST'S REPORT

- Medicare Act of 50
- Legislative Log

Trustee Naglick moved to table any decisions on adopting a Funding Policy. Trustee McLellan supported. A roll call vote was taken. The motion did not pass.

Yeas: Baker, James, Jones, McLellan, Naglick, Watson - 6

Nays: Battle, Gnatek, Orzech, Pegg, Pincheck, Serda, Thomas, Trozak and Chairperson Berent - 9

## Re: Gabriel Roeder Smith & Co., Presentation

Representatives Judith Kermans and David Kausch discussed the following with the Board of Trustees:

- Funding Policy Projection

6

The system's actuary, GRS Consulting, presented information and scenarios with respect to the adoption of various actuarial assumptions for purposes of developing and finalizing a funding policy for PFRS. Following a detailed discussion related to this matter,

Trustee Pegg moved that the Board approve a funding policy which adopts layered amortization of any unfunded accrued liability using a 20-year amortization period and that the Funding Policy contained in Appendix II of the GRS March 3, 2020 Funding Policy Report presented to the Board be amended such that under Elements of Actuarial Funding Policy:

3. Amortization Method

        b.

                a) delete "to 25" and add at the end of the sentence, "using layered amortizations."

                    (i) delete

                b) delete

Trustee Gnatek supported. A roll call vote was taken. The motion passed.

Yeas: Gnatek, Orzech, Pegg, Pincheck, Serda, Thomas, Trozak and Chairperson Berent – 8

Nays: Baker, James, Jones, McLellan, Naglick, Watson – 6

Abstain: Battle

## Re: Wilshire Presentation

Representatives David Lindberg and Calvin Born discussed the following with the Board of Trustees:

- Asset Class Performance
- Actual Allocation v Policy Allocation
- Composite Performance Summary
- Plan Sponsor Peer Group Analysis – Multi Statistics
- Diversification Challenges
- Looking Forward
- Illustration of Risk – Examples
- Economic Factor Exposures
- Distribution of Returns (One Year)
- Drawdown Potential and Liquidity Considerations

**Presentation materials provided.**

# EXHIBIT 4



**OFFICE OF THE**
**CHIEF FINANCIAL OFFICER**

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1100
Detroit, Michigan 48226

Phone 313•628•2535
Fax 313•224•2135
OCFO@detroitmi.gov
www.detroitmi.gov

**City of Detroit – PFRS Ability to Pay Analysis**

<u>Introduction</u>

In response to the list of questions and request for information to evaluate what is characterized as an "Ability to Pay Analysis" for the Police and Fire Retirement System, please find the following responses and attached information.

These responses must be considered in context of the City's recent financial history and the constraints, and requirements, of the Plan of Adjustment supervised by the Federal Bankruptcy Court and the Financial Review Commission.

Questions asked, such as what are "mandated" or "essential" departments or budget items, may have one definition in accounting or statutory terms, but have a much different meaning in the context of the service levels required and the $1.7 billion Plan of Adjustment ("POA") obligation upon the City to reduce blight, improve technology, reduce crime and recreate the City as a vibrant, solvent and sustainable community. These were essential factors assumed by the Court in determining the feasibility of the POA.

In the bankruptcy proceeding, Jones Day, its many attorneys and experts, and a laundry list of actuaries and other experts, spent thousands of hours and many millions of dollars devising the Plan of Adjustment. The POA made 40-year projections which included, after FYE June 30, 2023, a 30-year amortization of the frozen GRS and PFRS UAAL. In conjunction with those efforts, enormous time and money was spent on the question whether the POA was feasible.

Judge Rhoades found the POA "feasible," but just barely. That finding was based in part on the assumption that the City, based on the "Grand Bargain," would not have to make any meaningful contributions to the frozen pension plans until after FY 2023. Also on that basis, public safety retirees were relieved of any pension cuts other than a 55% reduction to scheduled cost of living increases. Even then the Court appointed independent expert, Martha Kopacz, expressed grave concerns about the POA's feasibility:

> "I want to emphasize, however, that there is little space remaining on the continuum of [feasibility]. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they have imposed additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern." *In re City of Detroit*, 524 B.R. 147, 219 (2014).

Your inquiry also seeks to determine, and presumably evaluate, the basis for revenue estimates for the City's Four-Year Financial Plan. It is important to understand that a Four-Year forecast, which is annually revised, is substantively different in both purpose and concept from the forecast used by the Court in reviewing the feasibility of the Plan of Adjustment. Revenue variances and pressures, and budgetary needs, can change dramatically on an annual basis, let alone on a 4 year or 30 year basis.

EXHIBIT
4

The City submits that there is no basis on which Stout, the Board or the Investment Committee (IC), could possibly make a better forecast or create a better plan than the POA. There, despite a 30-year amortization schedule, both the Court and its feasibility expert recognized the serious risks that the City would end up in bankruptcy again. It is inconceivable that conclusion be second-guessed now for shortening the POA's 30-year amortization schedule.

We ask you to consider just two of the major events that have happened in only 7+ years since the approval of the POA.

- It was only one year after the POA that PFRS' actuaries – who were intimately involved with the POA – "discovered" that due to a dreadful actuarial mistake, the frozen plans were underfunded by many more hundreds of millions of dollars than believed when the POA was devised.
- No one could have foreseen, at the time of the POA that a worldwide pandemic would hit in 2020. That pandemic, among other things, threatens all of the POA's assumptions about City revenues, particularly the income tax revenue.

In the relatively short time since the POA there have been two major disruptions to the assumptions underlying the POA, both of which are significantly detrimental to the City. Likewise, it is impossible to foresee the future including how the City's economy and tax base may change due to the pandemic and whether and when future recessions and other events may occur.

While the City has made significant progress since the bankruptcy, it is useful to remember what Judge Rhoades wrote in his Opinion after taking a tour of the City:

> "The primary impression that remains with the Court following the tour is that blight in Detroit is extensive. The statistics do not fully convey its extent or impact. In neighborhood after neighborhood, short and long stretches of streets have abandoned structures—they can no longer be called homes—that are intimidating hulks. Some are partially or mostly burned out. Some have gaping holes in their roofs or collapsed garages. Many have missing doors and windows, and broken front steps and porches. Some are strewn with illegal dumping. All are vivid statements of their former owners' emotional and financial struggles, and of community loss.

> "These streets also have vacant lots, or collections of vacant lots, on which unmanaged and unsightly vegetation has taken over from the structures after their removal. On the commercial streets, block after block of abandoned, boarded up and graffiti-littered strip shopping centers far outnumbered the occasional small businesses that have survived.



> "It is heartbreaking, maddening and sad. No one should have to endure, day in and day out, the damage to the human spirit that can result from living in those surroundings. City residents who live, work and play in these neighborhoods deserve better. Detroit deserves better."

The City, through extraordinary efforts, has thus far demolished some 21,000 blighted homes. However, approximately 17,500 remain standing. This is only the residential blight. Commercial and industrial blight continues to pervade the community. We suggest the IC take a similar tour of the City. Immense challenges remain as to blight, public safety, and endemic poverty.

Finally, before the IC and PFRS Board make any decisions on the amortization issue, the City believes it is critically important to hear from Mayor Mike Duggan and a representative of the City's expert actuarial firm, Cheiron. Certainly, in making a decision this important, the IC and Board should want to be fully informed to the extent possible. Mayor Duggan's knowledge and expertise about the City is unique, and has views that should be heard.

The City's expert has views that conflict with the actuaries advising the Board and IC. The City's expert believes that the fact this is a closed and frozen plan should be an important factor in the amortization discussion. The expert's opinion would mitigate market risk. These are views that should be heard.

The possibility of another City bankruptcy was a real concern when the POA was devised. Again, while progress has been made in mitigating that risk, enormous challenges remain. We look forward to a meaningful dialogue with you.

## Questions & Responses

1. In the FY2022 to FY2025 Four-Year Financial Plan, what departments or budget items are considered to be "mandated" or "essential"?[1]
    a. How are "mandated and other essential programs and activities" determined?
    b. Are any different processes used to forecast "mandated and other essential programs and activities" from items that do not have this designation?

**Response:** The cited provision of the Home Rule City Act relates to our General Fund budget reserve (or "Rainy Day Fund"). The Home Rule City Act further requires the City maintain this reserve equal to at least 5% of all projected General Fund expenditures. As such, all approved budget expenditures are considered mandated or other essential programs to deliver City services to Detroiters.

The Adopted FY22-FY25 Four-Year Financial Plan restores the Rainy Day Fund to about 10% after the City utilized $50 million during FY21 due to pandemic-induced revenue losses. According to the Government Finance Officers Association's best practices, the City should be maintaining two months' worth of expenditures (17%). While our Rainy Day Fund exceeds the bare minimum today, we will need to add another $72 million to reach this best practice standard of 17%.

2. The February 2021 Revenue Estimating Conference Report includes an estimation for reduced levels of income tax due to remote work (see p. 13-14).
    a. How were these estimates developed?
    b. What data was used?
    c. Were any formal studies used in creating this forecast?

**Response:**
   a. Estimates were developed by applying 3 year moving averages of employment and wage data to resident and non-resident income derived from total withholding in the most recently completed

---

[1] Section 4t(1)(b)(vi) of the Home Rule City Act includes states that the City's financial plan must include "measures to assure adequate reserves for mandated and other essential programs and activities in the event of an overestimation of revenue, an underestimation of expenditures, or both".

# EXHIBIT 5



800.521.0498 | P: 248.799.9000 | www.grsconsulting.com

August 2, 2021

CONFIDENTIAL

**EXHIBIT**
*Ex. 5*

Police and Fire Retirement System
  of the City of Detroit
One Detroit Center
500 Woodward Ave., Suite 3000
Detroit, Michigan 48226

Attention: Mr. David Cetlinski, Executive Director

Re:  **Alternate Funding Policy Projections for the Police and Fire Retirement System of the City of Detroit**

Dear Mr. Cetlinski:

At the request of the Investment Committee (IC) of the Police and Fire Retirement System of the City of Detroit, we have prepared this supplemental report of alternate funding policy projections.  The underlying projection tool that is used to develop this report has been updated to reflect June 30, 2020 valuation results. At the request of the IC, this report shows two funding policies: (1) initial 20-year period with separate 20-year amortization of each gain/loss; and (2) a single closed 25-year amortization period. We have been asked to show both policies under three possible investment return scenarios. We look forward to presenting this report. We will also have the tool available during that presentation, if additional scenarios are needed.

Sincerely,

Jamal Adora, ASA, EA, MAAA

JJA:sc
Enclosure

cc:   Ryan Bigelow, City of Detroit Retirement Systems
      Kelly Tapper, City of Detroit Retirement Systems
      Gail Oxendine, City of Detroit Retirement Systems
      Judith A. Kermans, GRS
      David T. Kausch, GRS

One Towne Square | Suite 800 | Southfield, Michigan 48076-3723

# Police and Fire Retirement System of the City of Detroit
# Supplemental Actuarial Report as of June 30, 2020

| | |
|---|---|
| **Requested By**: | Police and Fire Retirement System of the City of Detroit (PFRS) |
| **Date**: | August 2, 2021 |
| **Submitted By**: | Jamal Adora, ASA, EA, MAAA |
| | David T. Kausch, FSA, EA, FCA, MAAA, PhD |
| | Judith A. Kermans, EA, FCA, MAAA |
| | Gabriel, Roeder, Smith & Company |

This report contains:

- Results of actuarial projections and cash flow modeling under alternate scenarios requested by the Investment Committee;
- A discussion of considerations related to establishing a funding policy; and
- The current funding policy adopted by the PFRS Board (adopted on March 4, 2021).

The purpose of this report is to model how different post-2023 employer contribution determinations might affect projected cash flow and projected funded status under various possible scenarios.

David T. Kausch, Judith A. Kermans, and Jamal Adora are Members of the American Academy of Actuaries (MAAA) and meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

This report may be shared with other parties, but only in its entirety and only with the permission of the PFRS. Gabriel, Roeder, Smith & Company is not responsible for unauthorized use of this report. This report should not be used for any purpose other than the purpose stated above. The actuaries issuing this report are independent of the Plan and the Plan Sponsor.

**The initial date of the projection was June 30, 2020.** This means that the membership census was as of June 30, 2020 and the projected benefits came from an actuarial valuation as of June 30, 2020. All actuarial assumptions and methods are the same as those used in the June 30, 2020 actuarial valuation, except as described in the various scenarios. It is important to note that projections do **not** predict the result of future actuarial valuations. Rather, they indicate the relative changes or sensitivity to certain changes in parameters such as investment return and patterns of employer contributions.

For additional information on actuarial assumptions, please see the June 30, 2020 actuarial valuation of Component II. Actuarial assumptions are adopted by the Board and the Investment Committee (unless mandated by the Plan). Please note the following:

- The assumed rate of interest was 6.75% (as mandated by the Plan);
- Component II benefits were frozen as of June 30, 2014; and
- Employer contributions through 2023 are fixed by the Plan and/or the Plan of Adjustment (POA) approved by the Bankruptcy Court. The Board has not yet established a funding policy for post-2023 contributions.

As part of the City's Bankruptcy, the Courts approved the City's Plan of Adjustment (POA), which included a re-writing of the Plan document and certain mandated employer contributions. Our understanding is that while the Board is charged with setting actuarial assumptions for use in the valuation, the assumed rate of return used in the annual valuation cannot be changed until FY 2024. In addition, employer contributions are set forth in the POA. While the City has some discretion to accelerate the Component II (Legacy) Plan contributions, the Board has no discretion to adopt contribution requirements beyond what is provided for in the POA until FY 2024. On and after July 1, 2023 (FY 2024) the Board will establish the methods and assumptions to be used for computing the employer contributions to the Plan (See Article 9 of the Component I Plan and Article G of the Component II Plan). The FY 2024 contribution will be determined by the June 30, 2022 actuarial valuation.

**Background**

Gabriel, Roeder, Smith & Company has been working with the Trustees to assist them with the development of a funding policy over the last several years. On March 4, 2021, the PFRS Board adopted the Funding Policy shown in the Appendix of this report.

Since the adoption of a Funding Policy by the PFRS Board, we have been working with Retirement System staff to assist the IC with Funding Policy scenarios. We met with the IC Board on April 12, 2021 and again on June 14, 2021. During that meeting we were asked to update the funding policy tool and this report.

**Discussion**

In developing their funding policy, the Trustees were concerned with the following :

- The adequacy of the contributions coming into the fund; and
- The affordability of the computed employer contributions determined under the policy.

Taking the second issue first, GRS does not have the data nor the expertise to determine the employer's ability to pay any specific level of contributions. The employer does, however, have representation on the Board and IC. We defer this question to those representatives.

The first issue (the adequacy of the contributions) can be considered in more than one way. The adequacy of a funding policy (and the contributions produced by it) can certainly be confirmed if all of the promised benefits are able to be paid. However, waiting until that determination can be made is too late. Instead, a reasonable approach is to estimate the adequacy of the contributions by looking at the projected funded status of the Plan and whether or not the fund is projected to run out of money before all future estimated benefits are paid. In addition, by varying parameters that model future plan experience we can estimate how the funding policy reacts to different future potential experience. In general, the policy should not only work under the baseline (when all future experience is exactly as assumed under current valuation assumptions) but also under pessimistic scenarios (when future experience is less favorable than current valuation assumptions). The policy should "react" to future System losses to ensure continued funding progress as well as maintaining contribution levels that comply with Michigan State laws. If certain scenarios indicate that projected future funding status is likely to fall below a level that the Board views as reasonable or even result in a depletion of all plan assets, then a more aggressive policy should be considered.

The scenarios shown herein were requested by the IC. However, the illustrations come from our funding policy utility tool which we have modeled in live presentations many times for the Board and IC. If the IC members believe they need to see additional scenarios in order to evaluate a specific policy, we are happy to model those scenarios as well.

The Component II (Legacy Plan) illustrations we have included illustrate two funding methods (Method 1 and Method 2) under three investment return scenarios (Scenario A, Scenario B, and Scenario C):

**Funding Method Description:**

Method 1: 20-Year Level Dollar with 20-Year Layered Amortization
- 20-year level dollar financing beginning with the FY 2024 Employer Contribution. Gains and losses occurring after 2024 are amortized over separate 20-year closed layers. This is the amortization policy adopted by the PFRS Board.

Method 2: 25-Year Level Dollar
- 25-year level dollar financing beginning with the FY 2024 Employer Contribution. For purposes of these illustrations there is a single, closed 25-year amortization period throughout the projection for all gains and losses.

**Investment Return Scenario:**

Scenario A: Baseline (slightly different than the 6.75% valuation assumption)
- Fiscal Year 2021: 23.50% investment return based on the market return reported near the end of the fiscal year
- Fiscal Year 2022 to 2031: 6.00%
- Fiscal Year 2032 to 2041: 7.00%
- Fiscal Year 2042+: 6.75%
- No asset smoothing

Scenario B: Downside Level 1
- Fiscal Year 2021: 23.50% investment return based on market return reported near the end of the fiscal year
- Fiscal Year 2022 to 2031: 4.50%
- Fiscal Year 2032 to 2041: 6.00%
- Fiscal Year 2042+: 6.75%
- No asset smoothing

Scenario C: Downside Level 2
- Fiscal Year 2021: 23.50% investment return based on market return reported near the end of the fiscal year
- Fiscal Year 2022 to 2031: 3.50%
- Fiscal Year 2032 to 2041: 5.50%
- Fiscal Year 2042+: 6.75%
- No asset smoothing

We have parameters in the tool that also model:

- Rate of investment earned in each future year
  - Input in each future year
  - Randomly generated based on a lognormal distribution with entered mean and standard deviation
- Asset Smoothing of 1 to 5 years on and after the June 30, 2023 actuarial valuation
- Layered closed amortizations for future gains and losses based on an initial period parameter
- Adding/Simplifying the displays of different possible results

The Appendix includes the current Funding Policy approved by the PFRS Board on March 4, 2021.

### Funding Method 1: 20-Year Level Dollar with 20-Year Layered Amortization
### Investment Return Scenario A: Baseline





### Employer Contributions for FYE June 30, ($ Millions)

| 2021 | 2024 | 2026 | 2031 | 2036 | 2041 | 2043 | 2044 | 2046 | 2048 | 2049 | 2051 | 2056 | 2057 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 18.3 | 104.1 | 107.4 | 114.7 | 116.1 | 114.3 | 113.6 | 9.5 | 2.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

**Note:** Contributions remain relatively stable and the funded status remains above 64%.

### Funding Method 1: 20-Year Level Dollar with 20-Year Layered Amortization
### Investment Return Scenario B: Downside Level 1





#### Employer Contributions for FYE June 30, ($ Millions)

| 2021 | 2024 | 2026 | 2031 | 2036 | 2041 | 2043 | 2044 | 2046 | 2048 | 2049 | 2051 | 2056 | 2057 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 18.3 | 107.7 | 117.5 | 137.6 | 147.2 | 151.6 | 153.3 | 45.6 | 35.8 | 27.1 | 23.1 | 15.7 | 6.0 | 5.1 |

**Note**: Contributions increase each year until 2044 when the initial 20-year amortization period ends. After 2044, amortization layers resulting from investment losses begin to expire and the contribution requirement continues to go down. The funded level stays above 55% and becomes 100% funded in 2062.

### Funding Method 1: 20-Year Level Dollar with 20-Year Layered Amortization
### Investment Return Scenario C: Downside Level 2





### Employer Contributions for FYE June 30, ($ Millions)

| 2021 | 2024 | 2026 | 2031 | 2036 | 2041 | 2043 | 2044 | 2046 | 2048 | 2049 | 2051 | 2056 | 2057 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 18.3 | 110.2 | 124.0 | 151.5 | 164.6 | 171.0 | 173.5 | 63.4 | 49.5 | 37.5 | 32.0 | 22.0 | 8.9 | 7.6 |

**Note**: Contributions increase each year until 2044 when the initial 20-year amortization period ends. After 2044, amortization layers resulting from investment losses begin to expire and the contribution requirement continues to go down. The funded level stays above 49% and becomes 100% funded in 2062.

### Funding Method 2: 25-Year Level Dollar Contribution
### Investment Return Scenario A: Baseline





| Employer Contributions for FYE June 30, ($ Millions) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | 2024 | 2026 | 2031 | 2036 | 2041 | 2043 | 2044 | 2046 | 2048 | 2049 | 2051 | 2056 | 2057 |
| 18.3 | 94.3 | 97.4 | 104.6 | 106.0 | 103.6 | 102.5 | 102.5 | 102.5 | 102.5 | 0.0 | 0.0 | 0.0 | 0.0 |

**Note:** Contributions are generally stable, funded level stabilizes around 60% for several year before increasing to 100% in 2048.

### Funding Method 2: 25-Year Level Dollar Contribution
### Investment Return Scenario B: Downside Level 1





| Employer Contributions for FYE June 30, ($ Millions) | | | | | | | | | | | | | |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2021 | 2024 | 2026 | 2031 | 2036 | 2041 | 2043 | 2044 | 2046 | 2048 | 2049 | 2051 | 2056 | 2057 |
| 18.3 | 97.6 | 106.7 | 126.4 | 136.7 | 142.3 | 144.9 | 144.9 | 144.9 | 144.9 | 0.0 | 0.0 | 0.0 | 0.0 |

**Note**: Contributions increase each year in reaction to asset losses, funded level bottoms out near 50% in 2036 then increases to 100% in 2048.

### Funding Method 2: 25-Year Level Dollar Contribution
### Investment Return Scenario C: Downside Level 2





#### Employer Contributions for FYE June 30, ($ Millions)

| 2021 | 2024 | 2026 | 2031 | 2036 | 2041 | 2043 | 2044 | 2046 | 2048 | 2049 | 2051 | 2056 | 2057 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 18.3 | 99.8 | 112.7 | 139.6 | 153.5 | 161.4 | 165.2 | 165.2 | 165.2 | 165.2 | 0.0 | 0.0 | 0.0 | 0.0 |

**Note**: Contributions increase each year in reaction to asset losses, funded level bottoms out near 43% around 2036 then increases to 100% in 2048.

13-53846-tjt   Doc 13602-1   Filed 08/03/22   Entered 08/03/22 15:36:22   Page 47 of 68

## Comments

**Comment 1** — It is our understanding that the first actuarially determined employer contribution for Fiscal Year 2024 will be determined by the June 30, 2022 actuarial valuation.

**Comment 2** — The projections included herein are provided at the Investment Committee's request and are intended to illustrate possible future trends in funding, given the specific input parameters. These results are not intended to detail the full range of results. This report is designed to be used in connection with a projection tool to allow for the varying of certain parameters in order to assist the IC in the evaluation of various funding scenarios. The projection tool used for this report has been modified from the version presented on June 14, 2021 to adjust for expected contributions between the valuation date and applicable fiscal year for determining the employer contribution. Results may differ from those shown in the presentation on June 14th.

**Comment 3** — For the purposes of these illustrations, the prescribed economic assumptions of modeled future investment return for the three scenarios are reasonable to use for testing the downside investment risk of different funding policies. However, other alternatives exist and can be modeled with this tool. Assessing the reasonableness of the assumed rate of return for discounting plan liabilities in future valuations is a separate project independent of this report.

**Comment 4** — This report was prepared using our proprietary valuation model, funding policy tool and related software which, in our professional judgment, have the capability to provide results that are consistent with the purposes of the request and have no material limitations or known weaknesses. We performed tests to ensure that the model reasonably represents that which is intended to be modeled.

**Comment 5** — We believe the amortization period used for financing unfunded liabilities must be at or below 30 years. A maximum 30-year period is set by Michigan Public Act 314 of 1965, as amended. New reporting requirements as detailed in Michigan Public Act 202 of 2017 and may result in the additional reporting of computed contributions based on a 20-year or shorter period if a longer period is used in the funding policy.

**Comment 6** — These projections do not reflect any potential benefit changes under restoration or asset transfers to the Component I (Hybrid Plan). In particular if the FY 2021 returns equal 23.50% (as modeled), then the Legacy Plan will actually see a smaller investment return in that year due to the excess investment return transfer to the Hybrid Plan that is called for under the Plan provisions.

**Comment 7** — Once an initial funding policy is developed, it should be monitored, reviewed and updated as needed.

**Comment 8** — The calculations are based upon assumptions regarding future events, which may or may not materialize. If you have reason to believe that the assumptions that were used are unreasonable, that the Plan provisions are incorrectly described, that important Plan aspects relevant to the projections are not included, or that conditions have changed since the calculations were made, you should contact the authors of this report prior to relying on information in the report.

## Comments

**Comment 9 —** If you have reason to believe that the information provided in this report is inaccurate, or is in any way incomplete, or if you need further information in order to make an informed decision on the subject matter of this report, please contact the authors of the report prior to making such decision.

**Comment 10 —** Projections are not predictions. The reader of this report should keep in mind that actuarial calculations are mathematical estimates based on current data and assumptions about future events (which may or may not materialize). Please note that actuarial calculations can and do vary from one valuation year to the next.

**Comment 11 —** A determination of the plan sponsor's ability to make contributions when due (before and/or after the illustrated funding policies modeled) was outside our scope of expertise and was not performed.

# APPENDIX

## FUNDING POLICY

# Police and Fire Retirement System of the City of Detroit
## Actuarial Funding Policy

## Introduction

The purpose of this Actuarial Funding Policy is to record the funding objectives and policy set by the Board of Trustees (Board) for the Police and Fire Retirement System of the City of Detroit (the System). The Board establishes this Actuarial Funding Policy to help ensure the systematic funding of future benefit payments for members of the Plan.

In 2014, the Plan for the System was written and approved by the bankruptcy court as part of the City's Plan of Adjustment (POA). At that time, the original retirement plan was split into two Retirement Plans: Component I (Hybrid) and Component II (Legacy). In accordance with the POA, employer contributions and certain assumptions cannot be changed until fiscal year 2024. This Policy is intended to recognize those items as fixed until 2024 and establish a funding policy for the period beginning in fiscal year 2024, when employer contributions must be determined on an actuarial basis. Nothing in this Policy is intended to prevent the Board from altering the Policy prior to fiscal year 2024 as conditions change or additional information becomes available to the Board.

This Policy shall be regularly reviewed by the Board.

## Funding Objectives

1. Provide benefit security to members of the System:
    a. For purposes of this policy, benefit security means having adequate liquidity to pay benefits when due.
2. Establish an appropriate employer contribution based on the following objectives:
    a. Fully funding the Legacy Plan liability no later than 2054;
    b. Keeping the Hybrid Plan fully funded; and
    c. Managing employer contribution volatility.
3. Provide a reasonable margin for adverse experience to help offset risks.
4. Measure and monitor funding status, post-2024 contribution estimates and risk.
    a. Perform annual valuations; and
    b. Include post-2024 contribution estimates (based on this Policy) in annual actuarial valuations.

## Elements of Actuarial Funding Policy

The Plans will have annual actuarial valuations each June 30. Employer contributions will be determined for the fiscal year ending two years after the valuation date. For example, the actuarially determined employer contribution for the fiscal year ending June 30, 2024 will be determined by the June 30, 2022 annual actuarial valuation.

Annual actuarial valuations may or may not also serve other purposes such as Legacy Plan restoration, Hybrid plan Section 9.5 fiscal responsibility calculations, and/or Annuity Savings Fund excess interest transfers between components. Unless otherwise stated, those purposes are not subject to this Policy.

For all other funding purposes, annual actuarial valuations will include the following elements of the Actuarial Funding Policy:

1. **Actuarial Cost Method**

   a. Hybrid Plan: The Entry Age actuarial cost method shall be used in determining the Actuarial Accrued Liability (AAL) and Normal Cost with the entry age based on date of hire. Since this component was created in July 2014 and granted eligibility and vesting service prior to July 2014 (for members hired before that date), this Plan had an unfunded actuarial accrued liability on the effective date, known as the transition cost. As of June 30, 2017, the AAL (including the transition cost) in the Hybrid Plan was fully funded. This Plan could become less than fully funded in the future if experience is less favorable than assumed or there are changes in assumptions or Plan provisions.

   b. Legacy Plan: The Unit Credit Normal actuarial cost method shall be used in determining Actuarial Accrued Liability (AAL) and Normal Cost. Since this component is closed and accrued benefits are frozen as of June 30, 2014, this method results in no normal costs and an AAL that equals the Present Value of Accrued Benefits (PVAB) of each member.

2. **Asset Smoothing Method**

   a. For estimating contributions prior to June 30, 2023, the Funding Value of Assets (or actuarial value of assets) will be equal to the Market Value of Assets, as mandated by the Plan of Adjustment. For determining (or estimating) employer contributions on or after fiscal year 2024, the Funding Value of Assets will be based on a method that employs smoothing of market gains and losses over a closed period. The smoothing period for recognize market gains and losses (above or below the assumed rate of return) will be a 3-year period.

   b. The Funding Value of Assets shall not diverge from the Market Value of Assets by more than 15%.

   c. The annual actuarial valuation will calculate results on both the smoothed value of assets and the (non-smoothed) Market Value of Assets beginning with the June 30, 2019 valuation (the Funding Value of Assets will initially be set to the Market Value of Assets as of June 30, 2018 with smoothing beginning prospectively). The post-2024 contribution estimate will always be based on the smoothed value of assets. Other results (UAAL, Funded Status, etc.) will be based on the Market Value of Assets prior to 2024 and the smoothed value of assets after 2023.

3. **Amortization Method**

   a. Hybrid Plan

      a) A Level Percent of Payroll amortization method shall be used to systematically eliminate (pay off) the Unfunded Actuarial Accrued Liability (UAAL) over a closed 15-year period from the later of July 1, 2023 or the applicable fiscal year after the funded status falls below 100%.

      b) If funded status is above 100%, the contribution requirements for the UAAL will be $0 (thereby creating a minimum employer contribution of employer normal cost).

      c) Layered amortizations will be considered by the Board post-2024.

   b. Legacy Plan

      a) The Level Dollar amortization method shall be used to systematically eliminate (pay off) the Unfunded Actuarial Accrued Liability (UAAL) over a closed period of 20 years from July 1, 2023 for the UAAL as of July 30, 2022 (projected to July 1, 2023), and

      b) Layered amortizations that use 20-year closed periods for gains and losses occurring after June 30, 2022 (each 20-year period starts with the first payment after the applicable gain or loss occurs).

4. **Funding Target and Cash Flow Projections**

   a. The targeted funded ratio shall be 100%.

   b. The Legacy Plan annual actuarial valuation shall include projections of estimated employer contributions, expected benefit payments and estimated funded status to the later of fiscal year 2054 or 30 years after the applicable employer contribution fiscal year.

   c. Section 9.5 of the Plan details the actions to be taken if the 5-year projected funded status falls below 90% (Hybrid Plan, only).

5. **Risk Management**

   a. Assumption Changes

      a) The actuarial assumptions used shall be those last adopted by the Board based on the most recent experience study and upon the advice and recommendation of the actuary. In accordance with the City Ordinance, the actuary shall conduct an experience study at least every five years. The results of the study shall be the basis for the actuarial assumption changes recommended to the Board. However, the assumed rate of return and the actuarial value of assets are mandated by the City's POA and cannot be changed prior to June 30, 2023.

      b) The actuarial assumptions may be updated at any time, as advised by the actuary, if significant Plan design changes or other significant events occur.

      c) The next experience study will be performed after the 2020 actuarial valuation and will include both economic (investment return, inflation, etc.) and demographic (mortality, retirement, disability, etc.) assumptions. Even though the investment rate of return may not be changed for determining employer contributions until after June 30, 2023, the Board may elect to show valuation results under an alternative reasonable assumed rate of investment return prior to 2023.

b. Risk Measures

a) Risk measures will be included in the annual actuarial valuations. Below is a list of potential measures to be included. The measures may be changed over time as deemed appropriate.

(i) Classic measures currently determined

– Funded ratio (assets / liability) on both a market value and funding value (if funding value is not equal to market).

– UAAL amortization period (years required to pay down the UAAL based on current funding rates).

– Portfolio rate of return for the year on both the market value and funding value of assets.

– 5- and 10-year geometric average portfolio rate of return on both the market value and funding value of assets (developed prospectively beginning with the 2019 valuation).

– 5- and 10-year standard deviation of return on both the market value and funding value of assets (developed prospectively beginning with the 2019 valuation).

(ii) Duration of the Actuarial Accrued Liability

– Measures the sensitivity of the liability to a 1% change in assumed rate of return. A decrease in this measure indicates a decrease in assumed rate sensitivity and vice versa.

(iii) Total UAAL / Covered Payroll

– Measures the risk associated with contribution rates relative to the impact on the ability to fund the UAAL. A decrease in this measure indicates a decrease in UAAL contribution risk and vice versa.

– Consideration will be given to using total payroll or revenue source, if available.

(iv) Total Assets / Covered Payroll

– Measures the risk associated with the potential impact of asset experience on contributions. A decrease in this measure indicates a decrease in asset risk and vice versa.

– Consideration will be given to using total payroll or revenue source, if available.

(v) Total AAL / Covered Payroll

– Measures the risk associated with the potential impact of liability experience on contributions. A decrease in this measure indicates a decrease in experience risk and vice versa. This also provides a long-term measure of the asset risk where the System has a target funded ratio of 100%.

– Consideration will be given to using total payroll or revenue source, if available.

(vi) Non-Investment Cash flow / Beginning of year assets

– Measures depletion risk, sensitivity to annual investment gains and losses risk and the maturity of the plan. For a mature open plan, this may converged to the negative of the real rate of return assumption (investment return less wage inflation). A less negative number (or a positive number) indicates a less mature plan and/or a plan that is at lower risk of fund depletion and less sensitive to annual gains and losses. A more negative number indicates a more mature plan and/or a plan that is more at risk of fund depletion and more sensitive to annual gains and losses. For a super-mature closed plan such as the Legacy plan, this may become more negative over time as liquidity needs increase.

(vii) Market Value of Assets / Benefit Payments

- Measure depletion risk. A low value estimates the number of years to depletion disregarding future contributions and investment return.

(viii) Solvency Liability

- Measures the estimated cost of accrued benefits as a result of minimizing investment risk in the portfolio.

b) Risk Control: The Board shall carefully monitor the risk measures above and shall consider steps to mitigate risk, particularly as the Legacy Plan funded ratio increases. Examples of risk mitigating techniques include, but are not limited to:

(i) Reviewing investment risk in accordance with the Board's Investment Policy

(ii) Adding provisions for adverse deviation in the actuarial assumptions

(iii) Increasing employer contributions (through a change in methods, assumptions, or amortization period)

(iv) Other

# Glossary

1. **Actuarial Accrued Liability (AAL):** The difference between (i) the actuarial present value of future plan benefits; and (ii) the actuarial present value of future normal cost. Sometimes referred to as "accrued liability" or "past service liability."

2. **Actuarial Assumptions:** Estimates of future plan experience with respect to rates of mortality, disability, turnover, retirement, rate or rates of investment income and salary increases. Decrement assumptions (rates of mortality, disability, turnover and retirement) are generally based on past experience, often modified for projected changes in conditions. Economic assumptions (salary increases and investment income) consist of an underlying rate in an inflation-free environment plus a provision for a long-term average rate of inflation.

3. **Actuarial Cost Method:** A mathematical budgeting procedure for allocating the dollar amount of the "actuarial present value of future plan benefits" between the actuarial present value of future normal cost and the actuarial accrued liability. Sometimes referred to as the "actuarial funding method."

4. **Actuarial Gain (Loss):** A measure of the difference between actual experience and that expected based upon a set of actuarial assumptions during the period between two actuarial valuation dates, in accordance with the actuarial cost method being used. For example, if during a given year the assets earn more than the investment return assumption, the amount of earnings above the assumption will cause an unexpected reduction in UAAL, or "actuarial gain" as of the next valuation. These include contribution gains and losses that result from actual contributions made being greater or less than the level determined under the policy.

5. **Actuary:** A person who is trained in the applications of probability and compound interest to problems in business and finance that involve payment of money in the future, contingent upon the occurrence of future events. Most actuaries in the United States are Members of the American Academy of Actuaries (MAAA). The Society of Actuaries is an international research, education and membership organization for actuaries in the life and health insurance, employee benefits, and pension fields. It administers a series of examinations leading initially to Associateship and the designation ASA and ultimately to Fellowship with the designation FSA.

6. **Amortization:** Paying off an interest-bearing liability by means of periodic payments of interest and principal, as opposed to paying it off with a lump sum payment.

7. **Unit Credit Normal Actuarial Cost Method:** A funding method that calculates the Normal Cost as the present value of the change in accrued benefits for active members.

8. **Experience Study:** An actuarial investigation of demographic and economic experiences of the system during the period studied. The investigation was made for the purpose of updating the actuarial assumptions used in valuing the actuarial liabilities.

9. **Funding Value of Assets:** The value of current plan assets recognized for valuation purposes. Generally based on a phased-in recognition of all or a portion of market related investment return. Sometimes referred to as Actuarial Value of Assets or Smoothed value of Assets.

10. **Market Value of Assets:** The fair value of plan assets as reported in the plan's audited financial statements.

11. **Normal Cost (NC):** The annual cost assigned, under the actuarial funding method, to current and subsequent plan years. Sometimes referred to as "current service cost." Any payment toward the unfunded actuarial accrued liability is not part of the normal cost.

12. **Unfunded Actuarial Accrued Liability (UAAL):** The positive difference, if any, between the actuarial accrued liability and valuation assets. Sometimes referred to as "unfunded accrued liability."



# EXHIBIT 6

Oct 1-14, 2021
emails V. Brader + C. Raimi

| | |
|---|---|
| **From:** | Valerie Brader <valerie@rivenoaklaw.com> |
| **Sent:** | Thursday, October 14, 2021 5:46 PM |
| **To:** | Charles Raimi |
| **Cc:** | Jeanet Kulcsar; Steven Watson; Tanya Stoudemire; Jay Rising; John Naglick |
| **Subject:** | [EXTERNAL]Re: PFRS - Stout report and funding issue |

Hi Chuck,

I think our committee has shown a consistent willingness to have the City's input. The schedule we have is in line with what we were asked to do by the City when we began looking at this issue in the spring, and is intended to allow the budget forecasts (the 3 year look) done this year could be more clear regarding the policy. As you note, any contributions that are required by the policy would not begin until the middle of 2024, and as I noted in my prior e-mail, nothing that is adopted now could not be changed, especially if new information is received. But in order to allow a funding policy to guide the City's three-year budget, the Committee would need to act at this meeting.

I will also note that under my reading of the Plan of Adjustment, all these discussions must begin at the IC level, then go to the Board, and then if there is a disagreement come back to the IC (See Section 16.1). Thus, whatever the IC's action tomorrow, it would not result in the PFRS policy being formally adopted until the Board acts on any recommendation the Committee may make.

Best,
Valerie

On Thu, Oct 14, 2021 at 5:32 PM Charles Raimi <raimic@detroitmi.gov> wrote:

> Thanks Valerie.
>
>
> My understanding is that from the City's perspective, the funding policy need not be adopted until October of next year, which coincides with the timeframe that the City will begin work on the FY 2024 budget. So, we are surprised at the rush to adopt something given that the City has only received the Stout report today and before the PFRS Investment Committee can hear from the Mayor and our expert. It suggests your client is not interested in receiving meaningful input from the City on an issue that is of critical importance to it. While we understand any funding policy can be changed next year, hasty adoption of a policy now significantly changes the dynamics.

①

**EXHIBIT**
Ex. 6

Further, under Jay Rising's leadership we have asked the City's expert, Cheiron to prepare a report that we believe will be extremely important for your client to consider. It will provide a different and more focused perspective than Dave Massaron's presentation.

Chuck Raimi

Deputy corporation counsel

313 237 5037

---

**From:** Valerie Brader <valerie@rivenoaklaw.com>
**Sent:** Tuesday, October 12, 2021 1:20 PM
**To:** Charles Raimi <raimic@detroitmi.gov>
**Cc:** John Naglick <naglickj@detroitmi.gov>; Jay Rising <Jay.Rising@detroitmi.gov>; Jeanet Kulcsar <kulcsarj@detroitmi.gov>; Steven Watson <WatsonSt@detroitmi.gov>; Tanya Stoudemire <tanya@detroitmi.gov>; David Cetlinski <dcetlinski@rscd.org>; Ryan Bigelow <rbigelow@rscd.org>
**Subject:** [EXTERNAL]Re: [EXTERNAL]Re: [EXTERNAL]Re: PFRS - Stout report and funding issue

Chuck -- Understood re the Mayor's schedule. This is the last scheduled meeting prior to the next budgeting cycle, which the prior input from the City had stressed for us was very important to meet. I expect the Committee will take up the funding policy at the upcoming meeting. (The next scheduled meeting is Dec. 13.) Obviously, the funding policy is not engraved in stone for all time upon adoption, so we can certainly continue the dialogue regardless.

Best,

Valerie

On Tue, Oct 12, 2021 at 12:29 PM Charles Raimi <raimic@detroitmi.gov> wrote:

Thanks Valerie - Given the Mayor's extremely busy schedule, we will need his appearance to be several weeks after receiving the report.

We will be talking with our expert this week and I will get back with you after that discussion.

Chuck Raimi

Deputy corporation counsel

313 237 5037

---

**From:** Valerie Brader <valerie@rivenoaklaw.com>
**Sent:** Tuesday, October 12, 2021 11:35 AM
**To:** Charles Raimi <raimic@detroitmi.gov>
**Cc:** John Naglick <naglickj@detroitmi.gov>; Jay Rising <Jay.Rising@detroitmi.gov>; Jeanet Kulcsar <kulcsarj@detroitmi.gov>; Steven Watson <WatsonSt@detroitmi.gov>; Tanya Stoudemire <tanya@detroitmi.gov>; David Cetlinski <dcetlinski@rscd.org>; Ryan Bigelow <rbigelow@rscd.org>
**Subject:** [EXTERNAL]Re: [EXTERNAL]Re: PFRS - Stout report and funding issue

Hi Chuck -- I don't have the final report yet, but expect to in the next day. It will be supplied to you this week. As you know we had several data delays that have pushed this later than planned and that I would have liked. Please let me know if you would still like the Mayor to address the Committee on Monday given that timing.

Regarding the City's actuary, I renew my query as to whether they would simply be re-presenting the material Mr. Massaron ably shared with the IC earlier this year and which the Committee has previously discussed or have a new proposal/information they would like to give. If the latter, it would help to know so we can adjust the presentation time.

Best,

Valerie



On Tue, Oct 12, 2021 at 11:16 AM Charles Raimi <raimic@detroitmi.gov> wrote:

Valerie – You have not responded to my request for a copy of the Stout report. We will need the report, and reasonable time, before the Mayor can address the Committee.

Also, we are in touch with the City's expert and would like them to have reasonable time to prepare and then address the Committee on this issue that is of critical importance to the City.

Chuck Raimi

Deputy corporation counsel

313 237 5037

---

**From:** Valerie Brader <valerie@rivenoaklaw.com>
**Sent:** Tuesday, October 12, 2021 10:56 AM
**To:** Charles Raimi <raimic@detroitmi.gov>
**Cc:** John Naglick <naglickj@detroitmi.gov>; Jay Rising <Jay.Rising@detroitmi.gov>; Jeanet Kulcsar <kulcsarj@detroitmi.gov>; Steven Watson <WatsonSt@detroitmi.gov>; Tanya Stoudemire <tanya@detroitmi.gov>; David Cetlinski <dcetlinski@rscd.org>; Ryan Bigelow <rbigelow@rscd.org>
**Subject:** [EXTERNAL]Re: PFRS - Stout report and funding issue

Dear Chuck,

I was able to confirm we will be taking up the Stout report and the funding policy at the meeting on Monday. We would be happy to have the Mayor present at the committee, if he would still like to do so. The meeting is scheduled from 10-noon, and will be virtual in conformance with the health orders. We would be happy to shift this item to accommodate his schedule. Please feel free to call me if you have any questions, if something just before or just after our window would work better, or just let me know what time during the meeting would be preferred for his schedule.

4

Best,

Valerie


On Fri, Oct 1, 2021 at 2:49 PM Valerie Brader <valerie@rivenoaklaw.com> wrote:

Thanks for reaching out. I do recall the request, and it has been on my mind, so thanks for this opportunity to quickly touch base on this. I expect to be able to confer with folks on the request very soon and be back on that. I did want to confirm whether you are requesting a meeting with Stout, or more to confer with the IC. I was taking it as the latter, and assuming therefore that we would need to look at having this at a public meeting, but if I am missing something I am happy to discuss further. I also wanted to touch base on the request-- is the idea to have the actuary present the same analysis/approach as the City's CFO presented to the IC previously? Or if it would be a new analysis? Just wanting to understand how much time such a presentation would be likely to take so I can bring that to folks as we do hone in on the agenda.


Also, as I know I shared with you by phone, I have significant concerns with the legality of the approach the City previously presented, as I believe state law is pretty much designed to prevent pension funds from deliberately getting into a pay-as-you-go situation. It also sounds like the examples that were presented of folks who have used this were all of entities that are prevented by federal law from going bankrupt (i.e. states, territoires), thus eliminating any risk to pensioners of not having their pensions paid in such a situation. I know at the time you said you didn't have a formal memo or any materials beyond the powerpoint on the legality of the approach the City is advocating. If you have any legal memoranda or other materials that have been developed since this was first presented, I would be very happy to review them.


As you are probably aware the next meeting of the IC is on October 18 but the agenda has not been set yet; it would certainly be my hope and expectation that the Stout report would be on the agenda but I can't say for sure yet. I still don't have a draft of the report, which was postponed based on certain information the CFO's office was providing recently; I learned yesterday the CFO's office was likely sending additional information to Stout even today. I am hoping to see a draft very shortly so I can look at where we are heading into the October meeting.


Thanks for all the work on the City's side to get us the requested information.


Best,

Valerie


On Fri, Oct 1, 2021 at 2:32 PM Charles Raimi <raimic@detroitmi.gov> wrote:

# EXHIBIT 7



POLICE AND FIRE
INVESTMENT COMMITTEE
OF THE
CITY OF DETROIT

500 WOODWARD AVE STE 3000
DETROIT, MICHIGAN 48226
PHONE 313 • 224 • 3362
TOLL FREE 800 • 339 • 8344
FAX 313 • 224 • 3522

---

**MINUTES**
**Meeting No. 062**
**Police and Fire Retirement System Investment Committee**
**October 18, 2021**

A meeting of the Investment Committee of the Police and Fire Retirement System of the City of Detroit was held on **Monday, October 18, 2021**.  In conformance with public health orders from the Director of the Michigan Department of Health and Human Services, the meeting was held electronically, and members of the Committee and the public participated by telephonic and electronic means.  Joseph Bogdahn, Chairperson, called the meeting to order at 10:01 a.m.

A quorum was present.

**EXHIBIT**
**Ex.7**

***ROLL CALL:***

Attendance was taken by the Committee's Administrative Assistant with the following Committee Members present Joseph Bogdahn (*Chairperson*) (*Winter Haven, Polk County, FL*), Matthew Gnatek (*Detroit, Wayne County,  MI*) Orim Graves (*Philadelphia, Philadelphia County, PA*), Jerry Mingione (*Detroit, Wayne County,  MI*)), George Orzech (*West Bloomfield, Oakland County, MI*), Jeff Pegg (*Denver, Denver County, CO*), Robert Skandalaris (*Bloomfield Hills, Oakland County, MI*), Gregory Trozak (*Macomb Township, Macomb County, MI*),  and Woodrow Tyler (*Dexter Township, Washtenaw County, MI*).

Staff Present:  David Cetlinski (*Executive Director*), Kelly Tapper (*Assistant Executive Director*), Ryan Bigelow (*Chief Investment Officer*),and Valerie Brader (*General Counsel – Rivenoak Law Group, P.C.*).

Committee Members Excused: None

Staff Excused:  Ryan Bigelow (*Note, Mr. Bigelow was able to join for a portion of the meeting*)

## Approval of Agenda

**Motion #01:** Woodrow Tyler moved to approve the agenda dated **Monday, October 18, 2021.** Matthew Gnatek supported. The motion passed unanimously.

## Approval of Minutes

**Motion #02:** Orim Graves moved to approve the Minutes of Meetings No. **059**, held on **Monday, June 14, 2021,** No. **060**, held on **Monday, August 9, 2021,** and No. 0**61**, held on **Wednesday, September 1, 2021.** Woodrow Tyler supported. The motion passed unanimously, with Matthew Gnatek abstaining as to the Minutes of Meeting No. 060.

## Funding Policy – Stout Risius Ross

Representative Raymond Roth discussed the following with the Committee:

- Ability to Pay
- Public Protection
- Lower Spending
- Central Government Spending
- Detroit Employee Headcount

Ryan Bigelow joined the meeting at 10:11 am

- Salaries, Wages and Benefits
- 2022 Municipal Income Tax Revenue
- Payroll Jobs
- Municipal Income Tax
- Summary of Opportunities for Cost Savings

**Presentation materials provided.**

The System Actuary also made a presentation regarding the funding policy.

**Motion #03:** Jeff Pegg moved to approve a resolution setting a 20-year amortization funding policy. Matthew Gnatek supported. The motion passed unanimously.

> **Joseph Bogdahn left the meeting at 10:52 am. Robert Skandalaris assumed the Chair.**

## Consultant RFP – Status Update/Timeline – North Pier

Representatives Gregory Metzger and Jim Scheinberg discussed the following with the Committee:

2

- Investment Program Review
- Organizations Bidding
- Proposal Options
  - o Public Markets Only
  - o All Asset Classes
- Fee Ranges
- Next Steps
- Finalist Interviews

**Presentation materials provided.**

  ➢ **Joseph Bogdahn rejoined the meeting at 11:20 am and resumed as Chair.**

**Investment Committee Topics - Investment Consultant – Wilshire**

Representatives David Lindberg, Calvin Born and Joanna Bewick discussed the following with the Committee:

- **Capital Market Return**
  - Summary Changes
  - Fixed Income
  - Equity Markets
  - Real Assets

- **Capital Market Assumptions**
  - Current Policy
  - Real Assets

- **Monthly Performance Summary – 8/2021**
  - Monthly Dashboard
  - Market Yields & Breakeven Inflation
  - Actual Allocations vs Policy
  - Total Fund Attribution
  - Asset Allocation and Performance
  - Background and Overview

- **Risk Assessment Framework**
  - Why should I care about Inflation
  - Catalysts of Inflation
  - Rationale for Real Assets
  - Correlation to Inflation
  - Midstream Energy Infrastructure
  - Midstream Energy – Merits and Challenges
  - Real Asset Investments

3

*Presentation materials were provided*

➢ **Ryan Bigelow left the meeting at 11:59 am**
➢ **Valerie Brader left the meeting at 12:05 pm**

## General Counsel – Engagement/Review Invoice

**Motion #04:** Robert Skandalaris moved to extend the contract of Rivenoak Law Group (Valerie Brader) as general counsel for an additional 12 months. Orim Graves supported. The motion passed.

Yeas – Gnatek, Graves, Mingione, Orzech, Skandalaris, Trozak, Tyler, and Chairperson Bogdahn – 6 ½

Nays – Pegg – ½

➢ **Valerie Brader rejoined the meeting at 12:15 pm**

## Ethics Policy

The Committee requested that adjustments be made and sent to the Committee and bring back policy at the next meeting.

## Legal Report

Robert Skandalaris term will be ending early in 2022. He stated he will not be seeking reappointment. The replacement will have to be a resident of the State of Michigan. Committee members were encouraged to offer names of individuals to contact regarding their interest.

## Public/Member Comments

None

## IC Member Comments

None

## ADJOURNMENT

Woodrow Tyler moved to adjourn Meeting #062. Orim Graves supported.

There being no further business before the Investment Committee, the meeting was adjourned at 12:23 p.m. The Investment Committee's next meeting is scheduled for **Monday, December 13, 2021,** at 10:00 a.m.

4

**RESPECTFULLY SUBMITTED,**

_____

**VALERIE BRADER**
**GENERAL COUNSEL**

Administrative Assistant:  Marcella Brewer

5