# EXHIBIT 6

## Exhibits to Brief

## Part 2

Ex. 8 — October 18, 2021, PFRS IC resolution approving 20-year amortization

Ex. 9 — November 18, 2021, PFRS Board minutes ratifying 20-year amortization

Ex. 10 — Stout report dated October 13, 2021

Ex. 11 — Michigan Tax Tribunal Order dated June 11, 2021

Ex. 12 — Cheiron report dated June 6, 2022

Ex. 13 — Gabriel Roeder's June 17, 2022, letter re Restoration Reserve Account

Ex. 14 — Excerpt from 40-year projection

# EXHIBIT 8

**Resolution Regarding the Adoption of a Funding Policy for the
Police and Fire Retirement System of the City of Detroit
For Contributions Beginning in 2024**

**October 18, 2021**



EXHIBIT
Ex. 8

**WHEREAS,** the Investment Committee members are fiduciaries for the Police and Fire Retirement System of the City of Detroit ("PFRS") and have a duty to take action on certain investment decisions including actuarial assumptions affecting the large sponsored system's funding levels, including its funding policy; and

**WHEREAS,** under the Plan of Adjustment, beginning in 2024 the City of Detroit is required to resume making contributions to PFRS, and the Investment Committee has certain duties regarding the actuarial assumptions that underlie the determination of those required contributions;

**WHEREAS,** the Investment Committee has considered a report from the System actuary, Gabriel Roeder Smith ("GRS"), that evaluates certain funding policies based on assumptions including the expected investment returns and system liabilities to project the required contributions of the City under such policies; and

**WHEREAS,** the Investment Committee has considered information from GRS estimating payments that might be required under 20 and 25 year layered amortization policies in scenarios that assume lower-than-anticipated investment returns over the 2022-2041 period (essentially testing the policies in more challenging economic conditions); and

**WHEREAS,** the Investment Committee has considered a report from Stout Risius Ross regarding the ability of the City to afford contributions in the scenarios that involve higher contribution levels due to lower-than-anticipated investment returns; and

**WHEREAS,** the Investment Committee has considered presentations from GRS and Stout Risius Ross, as well as from the Chief Financial Officer of the City of Detroit regarding the funding policy; and

**WHEREAS,** the Board of Trustees has also communicated with the Investment Committee regarding the funding policy; and

**THEREFORE,** the Investment Committee of the PFRS recommends that:

1. The reports of the System actuary regarding the funding policy, including the calculations, actuarial assumptions, and assessments underlying the annual funding levels and amortization of funding levels, and recommended

contributions to the large sponsored system under the potential funding policies, are accepted.

2. The IC recommends a funding policy, as approved by the PFRS Board, which includes the following:

   a. For the unfunded accrued liability measured in 2024, a 20-year, level dollar, layered amortization period.
   b. The gains or losses of the system shall be re-amortized yearly.

# EXHIBIT 9

*November 18, 2021*
*PFRS Board*
*Minutes*

---

MEETING NO. **3296**
JOURNAL OF PROCEEDINGS
**BOARD OF TRUSTEES OF THE POLICE AND FIRE RETIREMENT SYSTEM**
OF THE CITY OF DETROIT
HELD **THURSDAY, NOVEMBER 18, 2021**

9:00 A.M.
RETIREMENT SYSTEMS' CONFERENCE ROOM
ALLY DETROIT CENTER, 500 WOODWARD AVENUE; SUITE 3000
DETROIT, MICHIGAN  48226

---

**TRUSTEES PRESENT**

| | |
|---|---|
| Douglas Baker | Ex/Officio Trustee/Corporation Counsel Alternate |
| Shawn Battle | Ex/Officio Trustee/Fire Prevention Chief/Mayoral Designee |
| Michael F. Berent | Elected Trustee/Fire |
| Matthew Gnatek | Elected Trustee/Police |
| Angela R. James | Ex/Officio Retiree Trustee/Police/Mayoral Designee |
| Brenda Jones | Ex/Officio Trustee/City Council President |
| Conrad Mallett | Ex/Officio/Mayor's Designee |
| Christa McLellan | Ex/Officio Trustee/Treasurer |
| John Naglick Jr. | Ex/Officio Trustee/Finance Director |
| George Orzech | Elected Retiree Trustee/Fire |
| Jeffrey Pegg | Elected Trustee/Fire |
| Dean Pincheck | Elected Trustee/Fire/Vice-Chairperson |
| John Serda | Elected Trustee/Police |
| Ronald Thomas | Elected Trustee/Police/Chairperson |
| Gregory Trozak | Elected Retiree Trustee/Police |
| Steven Watson | Ex/Officio Trustee/Budget Director |



EXHIBIT
Ex. 9

**TRUSTEES EXCUSED**

None

**ALSO PRESENT**

| | |
|---|---|
| David Cetlinski | Executive Director |
| Kelly Tapper | Assistant Executive Director |
| Ryan Bigelow | Chief Investment Officer |
| Ronald King | General Counsel |
| Marcella Brewer | Recording Secretary |
| Dr. Oscar King III | Board Lobbyist |
| Bruce Babiarz | Public Relations Advisor |

**STAFF EXCUSED**

None

POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT
MEETING NUMBER 3296 – THURSDAY – NOVEMBER 18, 2021

"Declaration of Continued Emergency Due to Covid-19 To Allow Public Meetings of Governmental Bodies To Be Held Remotely Under Public Act 228 of 2020 Extended From September 1, 2021 to December 31, 2021."- Detroit, MI.

<u>CHAIRPERSON</u>

**Ronald Thomas**

A verbal Roll Call commenced at 9:08 a.m. and Chairperson Thomas called the meeting to order.

**Present at Roll Call:** Baker (Detroit, MI), Battle (Detroit, MI), Berent (Detroit, MI), Gnatek (Detroit, MI), James (Detroit, MI), Jones (Detroit, MI), McLellan (Livonia, MI), Naglick (Detroit, MI), Orzech (Clarkston, MI), Pegg (Detroit, MI), Pincheck (Northville, MI), Serda (Detroit, MI), Trozak (Macomb County, MI), Watson (Detroit, MI) and Thomas – Chairperson (Detroit, MI)

**Re: Approval of November 18, 2021 Agenda**

Trustee Berent moved to approve the agenda dated Thursday, November 18, 2021. Trustee Gnatek supported.  The motion passed unanimously.

**Re: Approval of RETIREMENT Applications**

Trustee Berent moved to approve the RETIREMENT applications as listed below.  Trustee Gnatek supported. The motion passed unanimously.

| NAME, TITLE, DEPARTMENT | Roland C. Brown – Police Detective - Police |
| RETIREMENT TYPE-PLAN | Hybrid - Vested |
| SERVICE CREDIT-EFFECTIVE DATE | 06 10 00 – 09 20 21 |

| NAME, TITLE, DEPARTMENT | Kerry R. Byars – Police Lieutenant -Police |
| RETIREMENT TYPE-PLAN | Hybrid – Drop |
| SERVICE CREDIT-EFFECTIVE DATE | 07 05 00 – 10 15 21 |

| NAME, TITLE, DEPARTMENT | Terrence D. Childress – Fire Engine Operator - Fire |
| RETIREMENT TYPE-PLAN | Service - New |
| SERVICE CREDIT-EFFECTIVE DATE | 14 11 09 – 11 15 21 |

2

## PRESENTATION – Deputy Mayor Conrad Mallett

Trustee Mallett made a presentation to the Board regarding the PFRS Funding Policy and the recommendation from the PFRS IC with respect to adoption of the Funding Policy. Trustee Mallett provided a resolution for consideration by the Board. At the conclusion of his presentation a motion was made to adopt the proposed resolution.

Motion By: Trustee Mallett – Supported By: Trustee Naglick

**WHEREAS**, the Police and Fire Retirement System Investment Committee (PFRS IC) on October 18, 2021 recommended a funding policy, as previously approved by the PFRS Board, which includes the following:

1. For the unfunded accrued liability measured in FY 2024, a 20-year, level dollar, layered amortization period.
2. The gains and losses of the system shall be re-amortized yearly.

**WHEREAS**, Sec 16.1 of the Combined Plan for the Police and Fire Retirement System contained in the City's Bankruptcy Plan of Adjustment (POA) provides that all actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.

**WHEREAS**, Sec 16.1 of the Combined Plan further provides that if the Board fails to approve or disapprove an investment management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or the Board disapproves an investment management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee and the chief investment officer are authorized to implement the decision.

**WHEREAS**, the POA used a 30-year amortization period for amortization of the Unfunded Actuarial Accrued Liability from the Component II plan beginning in Fiscal Year 2024 and the resulting City contributions using the 30-year amortization period were used in establishing the feasibility of the POA.

**WHEREAS**, on July 21, 2021, the City's Office of the Chief Financial Officer (OCFO) sent to legal counsel for the PFRS IC a memo explaining the fundamental reasons why it would be improper for the PFRS IC to approve a shorter funding plan than the POA's 30-year plan and asked that the PFRS IC hear from both Mayor Duggan and the City's actuarial expert before the PFRS IC and PFRS Board made any decisions on the funding policy.

**THEREFORE**, the PFRS Board disaffirms the action taken by the PFRS IC at its October 18, 2021 meeting because the PFRS IC acted without first hearing from Mayor Duggan and the City's OCFO actuarial expert. The PFRS Board of Trustees recognizing the fundamental

9

difference between the PFRS IC and the City of Detroit's OCFO and rather than spend hundreds of thousands of dollars on legal fees the PFRS Board of Trustees directs its legal counsel to contact the City of Detroit's OCFO and agree to participate in non-binding mediation to develop a funding policy upon which both parties can agree. It is expected both parties will have available to them necessary experts. Mediation shall commence the second Monday in January 2022. The parties shall agree to complete their work and present back to the Board the final work product no later than third Thursday in April 2022.

Yeas: Baker, James, Jones, Mallett, McLellan, Naglick, Serda, Watson – 8

Nays: Battle, Berent, Gnatek, Orzech, Pegg, Pincheck, Trozak, and Chairperson Thomas – 8

The motion failed.

> **Trustee Mallett left the meeting at 10:56 am**

After discussion, Trustee Pegg moved to un-table the motion by Trustee Berent from October 21, 2021 acknowledging and affirming the recommendation of the PFRS IC of adopting the Funding Policy including the 20-year amortization of the unfunded accrued liability. Trustee Berent supported.

Yeas: Battle, Berent, Gnatek, Orzech, Pegg, Pincheck, Trozak, Chairperson Thomas – 8

Nays: Baker, James, Jones, McLellan, Naglick, Serda, Watson – 7

The motion passed.

Trustee Pegg moved to affirm the resolution from the PFRS Investment Committee regarding the adoption of the 20-year Funding Policy dated October 18, 2021. Trustee Berent supported.

Yeas: Battle, Berent, Gnatek, Orzech, Pegg, Pincheck, Trozak, Chairperson Thomas – 8

Nays: Baker, James, Jones, McLellan, Naglick, Serda, Watson – 7

The motion passed.

## ADJOURNMENT

Trustee Gnatek moved to adjourn meeting #3296. Trustee Pegg supported.

Chairperson Thomas adjourned the meeting at 11:05 AM. The Board's next meeting is scheduled for Thursday, December 2, 2021 at 9:00 a.m. via Go to Meeting. Please see the news tab on our website for meeting login instructions.

POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT
MEETING NUMBER 3296 – THURSDAY – NOVEMBER 18, 2021

RESPECTFULLY SUBMITTED,

Kelly Tapper, Assistant Executive Director

# EXHIBIT 10

# EXPERT REPORT OF
# Raymond A. Roth III, CPA, CFE

**October 13, 2021**

**Presented in:**

## The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit



**– This Page Intentionally Left Blank –**



**STOUT**
Dispute Consulting

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021

## Table of Contents

| I. | Scope of Opinion and Disclosures | 3 |
| II. | Qualifications | 4 |
| III. | Background | 5 |
| IV. | Use of Benchmarks | 7 |
| V. | Demographic Analysis | 8 |
| VI. | Financial Analysis | 16 |
| VII. | Detroit's Ability to Pay PFRS Legacy Pension Contributions | 29 |
| VIII. | Conclusion | 35 |
| IX. | Assumptions and Limiting Conditions | 37 |

1



The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit

Expert Report of Raymond A. Roth, III, CPA, CFE

October 13, 2021

## Exhibits

Exhibit A……………………………………………………List of Documents Considered
Exhibit B……………………………………………………..………………Curriculum Vitae
Exhibit C……………Comparable Midwestern Cities General Fund Benchmarking
Exhibit D…………………….Sub-Accounts to Detroit Public Protection Expenditures
Exhibit E………………………Cost Centers to Detroit Public Protection Expenditures
Exhibit F…Sub-Accounts to Central Government (Development and Management) Expenditures
Exhibit G…Cost Centers to Central Government (Development and Management) Expenditures
Exhibit H…Alternative Contribution Scenarios to PFRS Component II Legacy Plan
Exhibit I…………………..Detroit Cost Savings from Central Government Efficiencies
Exhibit J…………………..Detroit Cost Savings from Salaries, Wages, and Benefits
Exhibit K………Additional Detroit Municipal Income Tax Above Projected Amount
Exhibit L……………Summary of Cost Savings and Additional Revenue for Detroit

2



**Dispute Consulting**

**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

**October 13, 2021**

## I. Scope of Analysis and Disclosures

1.  This report presents my opinions regarding the ability of the City of Detroit ("Detroit") to make annual pension contributions to the Detroit Police & Fire Retirement System ("PFRS") beginning in 2024 under the funding scenarios provided by PFRS actuaries. In addition, this report contains a summary of the information I considered in the development of my opinions and a statement of my qualifications. My opinions, detailed herein, are based on the data available to me as summarized in this report.

2.  Detroit has represented it will fund the General Retirement System of Detroit ("GRS") Legacy plan at $102.4 million per annum. In preparing my analyses included in this report, I did not consider any additional funding requests or scenarios related to the ("GRS").

3.  A detailed list of the sources of information considered is presented in *Exhibit A*.

4.  My curriculum vitae, which includes lists of publications and relevant presentations, is presented in *Exhibit B*.

5.  Stout Risius Ross, LLC ("Stout") was compensated at a fixed fee of $100,000 for the preparation of this report.

3



**Dispute Consulting**

**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

**October 13, 2021**

## II. Qualifications

6. I am a Director in the Disputes, Compliance & Investigations Group at Stout. Stout is a financial and operational advisory services firm serving a variety of businesses in numerous industries and countries. Stout focuses its services in the areas of Investment Banking; Valuation Advisory; Transaction Advisory; and Dispute Consulting. Stout has over 500 professionals located in offices worldwide.

7. I am a licensed Certified Public Accountant ("CPA") in the State of Michigan and a Certified Fraud Examiner ("CFE"), with 15 years of experience providing a wide range of professional consulting services.

8. I have consulted with lawyers and their clients, boards of directors, and municipalities regarding business, economic, and financial issues related to litigation, business disputes, and financial investigations. These assignments have been across a wide array of industries.

9. I received a Bachelor of Business Administration, with a focus in Accounting, degree from Cleveland State University in 2005.

10. I am a member of the American Institute of Certified Public Accountants ("AICPA"), Association of Certified Fraud Examiners ("ACFE"), and the immediate past Chairman of the Michigan Association of Certified Public Accountants ("MICPA") Fraud Task Force.

11. With the aforementioned education, training, and experience, I am well qualified to present the information contained herein.

4



**STOUT**
Dispute Consulting

**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

October 13, 2021

12.    I was engaged by legal counsel of the Investment Committee to PFRS to evaluate financial data of Detroit and prepare a report regarding the capability of Detroit to make specified levels of pension contributions beginning in 2024.

13.    The Investment Committee provided me with two potential contribution scenarios that simulated the required contribution by Detroit to PFRS Component Two Plan ("Legacy Plan") required if an economic downtown were to result in lower investment returns from 2024-2034. These scenarios assumed the following contribution schedules:

| | Fiscal Year | Scenario C: Downside Level 2 Investment Return | 20-Year Level Dollar With 20-Year Layers ($ Millions) | 25-Year Level Dollar With 25-Year Layers ($ Millions) |
|---|---|---|---|---|
| 1 | 2020 | 1.00% | $    18.3 | $    18.3 |
| 2 | 2021 | 19.00% | 18.3 | 18.3 |
| 3 | 2022 | 3.50% | 18.3 | 18.3 |
| 4 | 2023 | 3.50% | 18.3 | 18.3 |
| 5 | 2024 | 3.50% | 134.8 | 122.1 |
| 6 | 2025 | 3.50% | 140.5 | 127.4 |
| 7 | 2026 | 3.50% | 146.0 | 132.3 |
| 8 | 2027 | 3.50% | 151.1 | 136.8 |
| 9 | 2028 | 3.50% | 155.9 | 141.1 |
| 10 | 2029 | 3.50% | 160.5 | 145.1 |
| 11 | 2030 | 3.50% | 164.7 | 148.7 |
| 12 | 2031 | 3.50% | 168.7 | 152.1 |
| 13 | 2032 | 5.50% | 172.5 | 155.2 |
| 14 | 2033 | 5.50% | 173.9 | 156.3 |
| 15 | 2034 | 5.50% | 175.2 | 157.4 |
| 16 | 2035 | 5.50% | 176.5 | 158.3 |
| 17 | 2036 | 5.50% | 177.7 | 159.2 |
| 18 | 2037 | 5.50% | 179.0 | 160.1 |
| 19 | 2038 | 5.50% | 180.2 | 160.9 |
| 20 | 2039 | 5.50% | 181.3 | 161.6 |
| 21 | 2040 | 5.50% | 182.5 | 162.4 |
| 22 | 2041 | 5.50% | 183.7 | 163.0 |
| 23 | 2042 | 6.75% | 184.9 | 163.7 |
| 24 | 2043 | 6.75% | 184.9 | 163.7 |
| 25 | 2044 | 6.75% | 50.1 | 163.7 |
| 26 | 2045 | 6.75% | 44.4 | 163.7 |
| 27 | 2046 | 6.75% | 38.9 | 163.7 |
| 28 | 2047 | 6.75% | 33.8 | 163.7 |
| 29 | 2048 | 6.75% | 29.0 | 163.7 |
| 30 | 2049 | 6.75% | 24.5 | 41.6 |
| 31 | 2050 | 6.75% | 20.2 | 36.3 |
| 32 | 2051 | 6.75% | 16.2 | 31.4 |
| 33 | 2052 | 6.75% | 12.4 | 26.9 |
| 34 | 2053 | 6.75% | 11.0 | 22.6 |
| 35 | 2054 | 6.75% | 9.7 | 18.6 |
| 36 | 2055 | 6.75% | 8.4 | 15.0 |
| 37 | 2056 | 6.75% | 7.2 | 11.6 |
| 38 | 2057 | 6.75% | 2.6 | 8.5 |
| 39 | 2058 | 6.75% | - | 7.4 |
| | | Total | $ 3,756 | $ 4,139 |

5



**STOUT**
Dispute Consulting

**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

**October 13, 2021**

14. It should also be noted that if Detroit cannot make the pension contributions detailed above, and it were to exhaust the Legacy Plan funding prior to expiration of its obligations, the contributions required by Detroit to the Legacy Plan may greatly exceed the amounts projected in the above funding policies. Therefore, these scenarios carry less than the funding policy budgeted by Detroit as the funding ratio will never fall below 60%.

6



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021

15.    In analyzing Detroit's finances and other relevant metrics, I identified other Midwestern cities ("Comparable Midwestern Cities") to use as comparable benchmarks throughout my analysis. The use of financial and other benchmarks provides for a means of comparison to objectively assess the populations that comprise the cities, the level of revenue collected, and how that revenue is used.

16.    Comparable cities identified included Cleveland, Columbus, Minneapolis, and Indianapolis. These cities were chosen based on characteristics such as population size, square mileage, and cost of living index. These metrics are presented in Figure 1 below.

*Figure 1*

|   | City | Total Population [1] | Square Mileage [2] | Cost of Living Index [3] |
|---|------|----------------------|--------------------|--------------------------|
| 1 | Detroit | 674,841 | 138.8 | 87.6 |
| 2 | Indianapolis | 864,447 | 361.4 | 83.5 |
| 3 | Cleveland | 385,282 | 77.7 | 72.6 |
| 4 | Columbus | 878,553 | 217.2 | 85.5 |
| 5 | Minneapolis | 420,324 | 53.9 | 106.5 |

[1] Source: 2015-2019 ACS 5-year estimates.
[2] Source: Census QuickFacts
[3] Source: bestplaces.net. Indexed against national average (National Average = 100).

7



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

**October 13, 2021**

17. Detroit has experienced a remarkable transformation since its emergence from bankruptcy. The median income of its residents has risen, while the number of families living below poverty, unemployment, and crime has declined. In addition, blight has been reduced, street lighting improved, emergency medical services ("EMS") response times are down, and credit ratings have stabilized. However, Detroit's population remains at lower income levels, including higher concentrations of poverty and crime rates, than the Comparable Midwestern Cities.

**Median Income**

18. Figure 2 below shows the increase in median income in Detroit from approximately $26,000 in 2014 per household to nearly $31,000 in 2019, a 17% increase.



*Figure 2*



19. Figure 3 below shows that the annual percentage growth in median income of Detroit residents has generally outpaced that of the Comparable Midwestern Cities. Detroit is represented by the solid blue line at the bottom of Figure 3 and had a median income decline of more than 2% in 2013, which improved to 6% annual growth in 2017 and 2018 surpassing all other Comparable Midwestern Cities before falling to 4.8% growth in 2019.

8



Dispute Consulting

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021



*Figure 3*

20.   Figure 4 below shows that despite the growth in Detroit residents' median income since 2013, the median household income in Detroit remains lower than most of the Comparable Midwestern Cities.

*Figure 4*



9



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

**October 13, 2021**

**Poverty Rate**

21.    Figure 5 below shows that Detroit's poverty rate has declined from 41% in 2013 to 35% in 2019, representing a 15% improvement over the illustrated period.

*Figure 5*



22.    Despite the reduction in poverty in Detroit, Figure 6 below shows that the poverty rate in Detroit remains higher than the Comparable Midwestern Cities.

10



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021



*Figure 6*



## Unemployment

23. Figure 7 below shows a decline in the unemployment rate in Detroit of 50% since 2013 from over 20% to approximately 10% in 2021 and has nearly returned to pre-pandemic levels.

*Figure 7*



11



**STOUT**
Dispute Consulting

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021

24.     Figure 8 below shows that the expected growth in Detroit's payroll jobs is expected to increase faster than that of the State of Michigan. This is represented by the separation between the blue and gray lines in Figure 8. Figure 8 also projects payroll employment in Detroit to return to pre-pandemic levels by 2022.

*Figure 8*



25.     Figure 9 below shows that Detroit household income is to return to levels commensurate with the rest of the State of Michigan by 2023.

*Figure 9*



12



STOUT

**Dispute Consulting**

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021

26.     The growth in payroll jobs and increase in income can be directly attributed to major job creation investments in Detroit. The opening of Stellantis' Mack Avenue assembly complex this year and additional projects under construction or planned for the near future including the Gordie Howe International Bridge, Ford's conversion of Michigan Central Station, Bedrock's Hudson's site, General Motors' Factory Zero, and a new Amazon distribution center at the old Michigan State Fairgrounds.[1]

---

[1] City of Detroit Economic Outlook: 2020 – 2026. August 2021.

13



**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

October 13, 2021

**Crime Rate**

27.     Figure 10 below shows a decline in the crime rate by almost 24% between 2013 at 16,613 reports per 100,000 of population to 2019 at 12,655 reports per 100,000 of population.

*Figure 10*



28.     Figure 11 below shows that the crime rate in Detroit remains higher than in the other Comparable Midwestern Cities.

*Figure 11*



14



**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

**October 13, 2021**

## Other

29.    In addition to the aforementioned metrics, Detroit has made concerted efforts to reduce blight, increase street lighting, and decrease EMS response times.

30.    Since 2014, Detroit has demolished over 21,000 unoccupiable homes, rehabbed approximately 8,200 homes, and sold over 15,000 side lots.[2] Detroit has added 65,000 street lights since 2013 when it was estimated that 40% of City street lights were not working.[3]

31.    In 2014, the average EMS response time was 18 minutes,[4] which was reduced to eight minutes and 30 seconds by 2016[5] through the addition of 31 new emergency medical technicians and the acquisition of 15 new ambulances.[6]

## Conclusion

32.    Since its emergence from bankruptcy, Detroit has become a cleaner, safer, and more vibrant place to live, which is reflected in the aforementioned facts and figures. In addition, the Detroit Riverwalk was rated the best river walk in the U.S. in 2021[7] exemplifying the transformation experienced by Detroit.

33.    Detroit has attracted major investment from large employers that has, and is expected to continue the, increased level of employment in Detroit.

34.    Detroit, however, remains behind Comparable Midwestern Cities in terms of income earned by its residents and the crime rate experienced. Detroit's ability to grow future revenues will be largely predicated on its ability to increase employment, attract higher income residents, and increase City-wide property values.

---

[2] "Detroit Demolition Department." The City of Detroit.
[3] "Construction Schedule." Public Lighting Authority. August 28, 2015.
[4] "In Detroit, EMS response times must improve." The Detroit News. September 25, 2014.
[5] Neavling, Steve "How Detroit's EMS response times went from miserable to above average." Motor City Muckraker. April 3, 2017.
[6] "New paramedics to help Detroit improve 911 response time." Detroit Free Press. January 23, 2015.
[7] "Best Riverwalk (2021)." USA TODAY – 10Best.

15



**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

**October 13, 2021**

## VI. Financial Analysis

35.    I focused my financial analysis on Detroit's General Fund where retirement contributions have been made. In addition, I consider fiscal year 2020 to be an outlier year because of the Covid-19 pandemic ("Pandemic") and did not incorporate that year into my review and analysis.[8] Review of Detroit's audited financial statements found that both General Fund Revenues and Expenditures have been generally consistent year-over-year with few exceptions. I also identified concentrations in certain categories in Detroit's General Fund Revenues and Expenditures.

36.    In benchmarking Detroit's historical General Fund financial activity to other Comparable Midwestern Cities, I identified deviations in the amount of normalized General Fund Revenue collected and how those revenues are spent. A more detailed overview of my financial analysis is presented below.

**Revenue Analysis**

37.    Figure 12 below shows that Detroit generates most of its General Fund Revenue from four main sources: Municipal Income Tax, State-Shared Revenue, Wagering Taxes, and Property Taxes. In 2019, these four items combined for more than 75% of General Fund Revenues.

*Figure 12*



---

[8] Detroit's Office of the Chief Financial Officer also cautioned me that 2020 was unrepresentative of other years and certain financial activity normally accounted for in the General Fund was accounted in other funds.

16



**STOUT**
Dispute Consulting

**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

**October 13, 2021**

38. The components of each of these revenue sources are further explained below.

   a. **Municipal Income Taxes** are collected from both residents (2.4% of income), non-residents (1.2% of income) and corporations (2% of income).[9]

   b. **State-Shared Revenue** is based on the sharing by the State of Michigan of 15% of state sales tax collected.[10] Michigan shares this revenue with each of its municipalities based on census determined population.[11]

   c. **Wagering Taxes** are collected at 11.9% of the adjusted gross receipts of the three casinos operating within Detroit.[12] In addition, these casinos pay a supplemental 1% tax if their gross receipts exceed $400 million and a municipal service fee also based upon adjusted gross receipts, assessed at the greater of 1.25% or $4 million.[13] Beginning in 2021, casinos will remit an effective tax of 4.62% related to retail sports betting to Detroit.[14]

   d. **Property taxes** are levied each year on July 1 to non-exempt properties based on the taxable value of each property multiplied by the applicable millage rate.[15] The City currently levies 19.952 mills for general operating purposes.[16]

39. Figure 13 below shows that between 2014 and 2019, State Shared Revenue and Wagering Taxes have been consistent year-over-year and Property Taxes have fluctuated but are generally decreasing. Municipal Income Tax on the other hand experienced a 42% revenue increase over this time period.

---

[9] City of Detroit, February 2021 Revenue Estimating Conference Report, p. 13.
[10] Ibid p. 14.
[11] Ibid.
[12] Ibid p. 15.
[13] Ibid.
[14] City of Detroit, Wagering and Tax Information,
https://www.michigan.gov/mgcb/0,4620,7-351-79127_82898-244408--,00.html
[15] City of Detroit, February 2021 Revenue Estimating Conference Report, p. 16
[16] Ibid.

17



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021



*Figure 13*



40. The revenue growth in Municipal Income Tax prior to the Pandemic is reflective of the positive demographic shifts Detroit has experienced post-bankruptcy. Detroit has attributed this growth to a four-prong approach: (1) the creation of jobs through business attraction and expansion; (2) leading land development efforts that unlock economic growth City-wide; (3) supporting small and large businesses to locate and grow in Detroit; and (4) activating industrial and commercial spaces that support neighborhood employment growth.[17] Detroit identified the growth of Rock Ventures, which includes Rocket Mortgage, the new headquarters of TCF Bank, the opening of regional offices by major technology companies such as Google, Microsoft, and LinkedIn, and other organizations such as the DIA, Wayne State University, Detroit Medical Center, and the Henry Ford Health System as contributing to the growth in employment.[18] Between 2018 and 2019 alone, $4.6 billion worth of private investment was recently completed or under construction leading to the announcement of 13,425 new jobs.[19]

41. In addition, the opening of Stellantis' Mack Avenue assembly complex this year and additional projects planned for the near future including the Gordie Howe International Bridge, Ford's conversion of Michigan Central Station, Bedrock's Hudson's site, General Motors' Factory Zero, and a new Amazon distribution center at the old Michigan State Fairgrounds are also expected to have positive effects on Detroit area employment, which will lead to increased income tax opportunities for Detroit.[20] However, the Pandemic and the shift to remote work has significantly impacted this revenue stream as many employees that work in Detroit do not live in Detroit. As a result, Detroit realized a decline in Municipal Income Tax in 2020 from both the

---

[17] City of Detroit Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2019.
[18] Ibid.
[19] Ibid.
[20] City of Detroit Economic Outlook: 2020 – 2026. August 2021.

18



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021

loss of employment caused by the Pandemic as well as from employees who had previously commuted into Detroit but have since been working remotely.

42.    Figure 14 below shows Detroit's past experience and future expectations of its four major General Fund Revenue sources.  Detroit's projections show all but its largest revenue source, Municipal Income Tax, returning to pre-Pandemic levels by 2022.

*Figure 14*



### Expense Analysis

43.    Figure 15 below shows that most of Detroit's expenses are concentrated in Public Protection and Development and Management whereby these two

19



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

**October 13, 2021**

expense categories combined for approximately 80% of all General Fund Expenditures in 2019.

*Figure 15*



44.  Figure 16 below shows that Public Protection spending increased 6% and Development and Management spending increased 14% between 2014 and 2019.

*Figure 16*



20



**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

**October 13, 2021**

45.     Figure 17 below shows Detroit's past experience and future expectations of its two major General Fund Expenditures. Public Protection costs are expected to increase to over $477 million from approximately $452 million in 2019 and grow modestly thereafter.   Development and Management expenses are also expected to grow in future periods with the increase in 2024 and 2025 related to the planned retirement contributions.

*Figure 17*





**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

**October 13, 2021**

*Financial Benchmarks*

46.    I benchmarked financial metrics of Detroit to those of the Comparable Midwestern Cities. To make valid comparisons, I normalized revenues by population and square miles and expenditures as a percentage of revenue. I also made adjustments to certain items within Detroit's Development and Management expense category for greater comparability to the Comparable Midwestern Cities, which will be further explained in the following paragraphs. Expenditures were grouped into five basic categories: Public Protection, Central Government, Health, Economic Development, and Other. See ***Exhibit C*** for a financial benchmark analysis between Detroit and the Comparable Midwestern Cities.

47.    Figure 18 below shows that Detroit's General Fund Revenue per capita is more than that of Minneapolis, Indianapolis, and Columbus, and slightly below that of Cleveland.



*Figure 18*



48.    Figure 19 below shows that Detroit's General Fund Revenue per square mile are commensurate with that of Cleveland, slightly below Minneapolis, and higher than that of Indianapolis, and Columbus.

22



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021

*Figure 19*



49.    These comparisons demonstrate that Detroit reports generally as much, or more than, General Fund Revenues of the Comparable Midwestern Cities on a relative basis. However, Detroit spends this collected revenue differently than the Comparable Midwestern Cities. I focused expenditure benchmarking on Public Protection and Development and Management spending in making these comparisons. I renamed what Detroit refers to as Development and Management to Central Government for purposes of comparison to similar expenditures of the Comparable Midwestern Cities. The expense categories reported by each city that combine into these categories are presented in *Exhibit C*.

50.    I also reviewed additional detailed financial information from Detroit regarding the sub-accounts and cost centers that comprised the line items presented on its audited financial statements. I reviewed this financial detail to identify any expense line items that might be unique to Detroit or where other adjustments might be relevant for an applicable comparison.

51.    In 2019, I identified 149 separate accounts, across 124 cost centers for Public Protection and 194 sub-accounts across 182 cost centers for Central Government. See *Exhibits D* and *E* for sub-accounts and cost-centers related to Public Protection and *Exhibits F* and *G* for the sub-accounts and cost-centers related to Central Government. From this review, I identified certain expenditures classified as Central Government activities that might not be relevant to the Comparable Midwestern Cities and made adjustments to the analysis to account for these items.

52.    Within the expenses recorded as Central Government in 2019, I identified several items related to demolition, Police and Fire, and pension related payments where further consideration is warranted.

23


*Demolition / Blight Related Expenses*

a. I identified $14 million under cost center 350014 – Detroit Land Bank Authority.

b. I identified $12,945,934 in Demolition and Excavation Expenses under cost centers 350310 Detroit Building Authority and 350011 – Blight Remediation.

c. I identified $103,352 in cost center 160020 – Residential Demolition.

*Police and Fire Related Expenses*

d. I identified $21,360,133 in litigation, workers compensation, and miscellaneous claims related to police and fire under cost center 350890 – Risk Management.

e. I identified $2,677,820 under cost center 310220 – Public Safety.

f. I identified $1,209,462 under cost center 230201 – ODFS – Public Safety – Police.

g. I identified $899,821 under cost center 230211 – ODFS – Public Safety – Fire.

h. I identified $467,406 under cost center 310210 – DoIT Public Safety and Cyber Security.

i. I identified $152,566 under cost center 370020 – Office of the Chief.

j. I identified $60,246 for contract services – Fire Department under cost center 470115 – 36th District Court Madison Center, 230070 – Treasury, 330010 – Office of the Mayor, 450010 – DAH Administration, and 710010 – Elections Administration.

24



**STOUT**
Dispute Consulting

**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021

k.  I identified $20,000,000 in Non-Actuarial Pension expenses under cost center 351026 – Retirement Systems.

l.  I identified $18,582,863 in Non-Actuarial Pension expenses under cost center 351020 – Retirement Systems.

53.  Of the aforementioned expense items classified as Central Government expenses, I removed the Demolition / Blight Related Expenses from the analysis as other cities are not likely to incur similar costs as Detroit. The Police and Fire Related Expenses have been reclassified from Central Government expenses to Public Protection expenses to ensure that all Police and Fire expenses are included within the Public Protection categorization. I also removed Pension Related Expenses of Detroit from the analysis.[21]

54.  Figure 20 below shows that in 2019, Detroit spent considerably less of its revenue on Public Protection than the Comparable Midwestern Cities. Detroit's 2019 reported Public Protection spending was 40% of General Fund Revenue, compared to 53% for Cleveland, 59% for Minneapolis, 71% for Indianapolis, and 67% for Columbus.

*Figure 20*



55.  Figure 21 below shows that the amount of Public Protection spending is generally inversely related to each city's crime rate in 2019. The cities that

---

[21] I identified the amount of pension contributions from the Comparable Midwestern Cities but it is unclear from which funds these contributions are made and the financial statement line items. Because Detroit's pension expenditures have been removed from my analysis, Detroit's costs may be understated in comparison to Comparable Midwestern Cities, which has a conservative effect in this analysis.

25



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

**October 13, 2021**

spent more on Public Protection generally have lower crime rates than the cities that spent less.

*Figure 21*



56.  Figure 22 below shows that Detroit spent a larger proportion of its General Fund Revenues on Central Government, after adjustments, than all of the Comparable Midwestern Cities in 2019.    Detroit's adjusted Central Government spending comprised 22% of General Fund Revenue in 2019, after the aforementioned expense adjustments, while Cleveland spent 16%, Minneapolis 17%, Indianapolis 6%, and Columbus 15%.

*Figure 22*



26



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021

57. Figure 23 below shows that Detroit's total employee headcount in 2019, measured on a full-time equivalent ("FTE") basis, is higher than Cleveland, Minneapolis, and Indianapolis, and slightly lower than Columbus. Employee compensation and benefit costs represent the highest categories of spending in both Public Protection and Central Government for Detroit. Detroit's lower Public Protection spending than the Comparable Midwestern Cites and higher spending in Central Government suggests that the additional FTEs employed by Detroit are Central Government employees.

*Figure 23*



58. Figure 24 below compares the total headcount of Detroit and the Comparable Midwestern Cities normalized on a per capita basis. This normalization reflects a metric of how many employees are available per city resident. Based on this metric, Detroit has a lower city employment rate than Cleveland, but higher than Minneapolis, Indianapolis, and Columbus.

27



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021

*Figure 24*





**STOUT**
Dispute Consulting

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021

59.   Detroit anticipates making annual contributions to the PFRS Legacy Plan of $130 million annually beginning in 2024 which represents approximately 13% of its general fund budget. [22]   The scenarios specified for my evaluation by the Investment Committee involved different levels of funding needs based on two separate analyses.

a.   Under a 20-Year Level Dollar with 20-Year Layers ("20 Year Scenario") and investment returns between 3.5% and 6.75% between 2024 and 2043, (with the lower returns assumed in the earlier years and a return to 6.75% in later years) PRFS actuaries project that contributions between $135 and $185 million per annum are needed to fund the PFRS Legacy Plan.  The average annual contribution of the 20 Year Scenario is $169 million over the 20-year time period and is at $156 million after year 2028, five years after contributions will have begun.  Under this scenario, PFRS's actuarially developed contributions are between $5 million and $55 million higher than Detroit's anticipated contribution with an average annual contribution $39 million higher than Detroit's anticipated contribution and $26 million higher after five years of funding.

b.   PFRS actuaries prepared an additional scenario where a 25-Year Level Dollar with 25-Year Layers ("25 Year Scenario") is used to project required PFRS Legacy Plan contributions.  This scenario projects PFRS Legacy Plan contributions between $122 million and $164 million per annum using the same investment return assumptions as the 20 Year Scenario.  The average annual contribution of the 25 Year plan is $154 million over the 25 year time period and is at $141 million after year 2028, five years after contributions will have begun.  Under the 25 Year Scenario, PFRS's actuarially developed contributions are between $8 million under Detroit's planned contribution and $34 million higher than Detroit's anticipated contribution with an average annual contribution $24 million higher than Detroit's anticipated contribution and $11 million higher after five years of funding.

c.   See **Exhibit H** for PFRS actuarially computed amounts to its Legacy Plans.

60.   Based on the aforementioned average differences of $39 million and $24 million, the difference in contribution amounts represent between approximately 2.4% and 3.9% of Detroit's annual average General Fund Revenues from 2014 to 2025.  With these additional amounts, the PFRS Legacy Plan would account for between 15.4% to 16.9% of General Fund Revenue on average and 14.1% to 15.6% after five years of funding. [23]

---

[22] OCFO Document Response to PFRS 7.22.2021.
[23] When adding an additional $71.2 million, net of DIA, Library and DWSD/GLWA contributions, for the General Retirement System Legacy Plan the combined Legacy Plan

29



**STOUT**
Dispute Consulting

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021

61. Detroit's current General Fund Four-Year Financial Plan for 2022 through 2025 currently projects expenditures at the same level of revenue. Thus, for Detroit to increase its PFRS Legacy Plan contribution amounts, it will need to cut its anticipated levels of spending or realize revenue in addition to its current projections.

## Expense Reductions

62. In order for Detroit to realize the savings needed to fund additional PFRS Legacy Plan contributions, it would most likely need to reduce its spending in either Public Protection or Central Government. All other expenditure line items in 2019 were between .24% and 3.92% of General Fund Revenue. Incorporating spending reductions from these categories, while not impossible, would necessitate essentially eliminating spending in some categories. Other amounts such as debt service, which represented a combined 5.97% of 2019 General Fund Revenues, have little flexibility for cost reduction.

63. Public Protection represents the largest category of Detroit General Fund Expenditures. However, Detroit's Public Protection spending is already lower than that of Comparable Midwestern Cities in proportion to revenue and its crime rate is higher. Further cuts in this expenditure might dissuade further investment in Detroit and compromise future revenues.

64. Central Government expenditures however represent an area where Detroit has historically spent proportionately more than Comparable Midwestern Cities, even after Demolition, Police and Fire, and Pension Related Expenses have been removed for comparative purposes.

65. In 2019, Detroit spent 22% of its General Fund Revenue on Central Government expenditures, after my adjustments, compared to 6% to 17% for the Comparable Midwestern Cities. However, it is not just one single comparison alone that suggests Detroit's Central Government spending is relatively higher than the Comparable Midwestern Cities. Instead, it is a confluence of factors, taken in totality, that triangulate this conclusion.

    a. First, Detroit is generally collecting as much, or more, revenue than the Comparable Midwestern Cities on a relative basis. Therefore, the difference in Central Government spending cannot be explained by a lack of revenue.

    b. Second, Detroit spends less on Public Protection than the Comparable Midwestern Cities. The lower amount of Public Protection spending allows for higher spending in other expenditure categories.

    c. Third, Detroit generally has a larger workforce than the Comparable Midwestern Cities. The biggest costs in both Public Protection and Central Government are employment related costs. With

---

Contributions would represent between 22.8% of General Fund Revenues after five years of funding and 24.1% on average under the more costly 20 Year Scenario.

30



**STOUT**

Dispute Consulting

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021

proportionately lower spending in Public Protection and higher spending in Central Government suggests the excess employees reside in Central Government roles.

66. Looking ahead to 2024 and 2025, Detroit is budgeting approximately 23% of its General Fund Revenues to Central Government after making adjustments for Demolition/Blight, Police and Fire, and Pension Related Expenses. If this amount is reduced to the 17% of revenue spent by the next highest of the Comparable Midwestern Cities on Central Government, then Detroit would realize approximately $65 million and $64 million in cost savings for 2024 and 2025, respectively. See ***Exhibit I*** for the cost savings available to Detroit if it realized Central Government efficiencies reported by the Comparable Midwestern Cities.

67. The higher Central Government spending by Detroit is highlighted in its own projections of Salaries, Wages, and Benefits amounts compared to its own historical costs. In 2019, Detroit spent 50% of its General Fund Revenues on Salaries, Wages, and Benefits after removal of payments related to the Retiree Protection Fund ("RPF"). In 2022 and 2023, these expenditures increase to 63% and 58% of General Fund Revenues, respectively, after removal of RPF payments. If Detroit were to maintain its Salary, Wages, and Benefits amounts at 50% of its General Fund Revenue in 2022 and 2023, it would realize savings of $128 million and $82 million, respectively, which could be used for future pension contributions. Similarly, in 2024 and 2025, Salaries, Wages, and Benefits are projected to be approximately 57% of General Fund Revenues, after removal of $220 million in pension contributions. If these amounts are reduced to the 50% of General Fund Revenues spent in 2019, then $80 million and $77 million, respectively, could be available for PFRS Legacy Plan contributions.[24] These changes in the proportion of employment related costs identify that Detroit is not managing its employment related costs with changes in revenues. See ***Exhibit J*** for the cost savings available to Detroit if it maintained the same proportion of Salaries, Wages, and Benefits expenditures in 2022 through 2025 that it had achieved in 2019.

## Additional Sources of Revenue

68. My analysis of Detroit's historical revenues found that Municipal Income Tax Revenue increased by 42% between 2014 and 2019. However, the Pandemic and the resulting trend of remote work has significantly impacted this revenue source as remote work outside of Detroit is currently not taxable by Detroit even if the employer is domiciled in Detroit.

69. As such, Municipal Income Tax is the only major revenue category that Detroit does not project to return to pre-Pandemic levels. Figure 25 below shows the projected levels of Municipal Income Tax Revenue Detroit is expecting for years 2021 through 2026, as developed in the September

---

[24] It is important to note that cost savings from Salaries, Wages, and Benefits are not additive to the aforementioned Central Government savings as Salaries, Wages, and Benefit amounts are partially included in Central Government expenditures.

31



**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

**October 13, 2021**

2021 Revenue Estimating Conference, in the blue bars and the percent of 2019 revenue this represents in the green line.[25]



*Figure 25*



70. In preparing its projections for years 2022 and thereafter, Detroit assumed a loss in Municipal Income Tax Revenue because of remote work between 13.8% and 15.9%.[26]  However, if the gross Municipal Income Tax Revenue is reviewed, prior to a remote work loss discount, its 2022 Municipal Income Tax Revenue remains below the Municipal Income Tax Revenue reported in 2019.  With all of the aforementioned past and future investment in projects that have been made in Detroit, the assumption that Municipal Income Tax Revenue would decline absent any remote work considerations is conservative (i.e., a low estimation of future revenue).  All of the aforementioned investments related to workforce and employment opportunities within Detroit support a higher estimation of revenue projected by Detroit prior to the consideration of any discounts for remote work.  A joint study conducted by the University of Michigan and Michigan State and Wayne State Universities project the total number of payroll jobs in Detroit to return to pre-Pandemic levels by 2022.[27]

---

[25] It is my understanding that the revenue forecast developed at the September 2021 Revenue Estimating Conference now represents Detroit's official economic forecast of anticipated City revenues. Stout did not update other sections based on this revenue as expenditures around these anticipated revenues has not yet been determined.
[26] Office of the Chief Financial Officer.  Revenue Estimating Conference.  2021 September 15. P8.
[27] City of Detroit Economic Outlook:  2020 – 2026.  August 2021.

32



**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

October 13, 2021

71. If Detroit were to use the same level of Municipal Income Tax Revenue reported in 2019, discounted for remote work, as the projection for Municipal Income Tax Revenue in 2022, it could expect an additional $8 million in revenue. If the same growth rates are assumed that are used for Detroit's current projection, combined with the remote work discount, an additional $8.5 million, $8.8 million, $9 million and $9 million would be expected in years 2023 through 2026, respectively. If the remote work loss is removed from the projections and the 2019 Municipal Income Tax Revenue is substituted for 2022 and grown at the rates within the current projection, then Detroit could expect an additional $61.6 million in Municipal Income Tax Revenue in 2022 increasing to $62.8 million by 2026. See **Exhibit K** for a comparison of Detroit's Municipal Income Tax Revenue projections.

72. The uncertainty in Municipal Income Tax Revenue caused by the Pandemic presents a material challenge in determining the amount of revenue lost due to remote work. With rapid changes in both employee and employer preferences it is impossible to predict the level of remote work that will occur in 2024 and beyond. However, available data and information related to employment in Detroit, regardless of whether it is performed remotely or physically within a Detroit workplace, suggests a return to 2019 levels by 2022.[28]

73. On January 22, 2021, the State of Michigan legalized online sports betting.[29] However, Detroit did not forecast this revenue in its Four-Year Financial Plan for fiscal years 2022-2025.[30] In the September 2021 Revenue Estimating Conference, Detroit now estimates iGaming/Sports Betting in excess of $75 million annually in fiscal years 2024 – 2026.[31]

74. My review and analysis of Detroit's other major revenue sources: State-Shared Revenue and Property Taxes found that Detroit has not had significant increases to these revenues despite the growth and investments being made in Detroit. I therefore find Detroit's projections of these amounts as generally returning to 2019 levels to be reasonable.

### *Economic Downturns*

75. The Legacy Plan funding scenarios developed by the PFRS actuaries intentionally use lower investment returns in their analysis to identify contributions necessary if investment returns are not met. Future economic downturns can be one reason why investment returns are not met. As such, I considered how such downturns might affect Detroit's ability to fund contributions to the Legacy Plan.

---

[28] City of Detroit Economic Outlook: 2020 – 2026. August 2021.
[29] Haddad, Ken "Online sports betting to begin in Michigan on Jan. 22." Click on Detroit. January 19, 2021.
[30] City of Detroit Four-Year Financial Plan: FY 2022 – 2025, A16.
[31] Office of the Chief Financial Officer. Revenue Estimating Conference. 2021 September 15. P10.

33



Dispute Consulting

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021

76. In the event of an economic downturn, then Detroit will have more control in managing its expenses than protecting certain revenue streams. If Detroit's forecasted revenue declined by 10%, then it would have $59.5 million and $58.7 million in fiscal years 2024 and 2024, respectively, available for Legacy Plan contributions from reducing its Central Government spending to 17% of General Fund Revenue. Similarly, cost savings from managing its employee compensation related expenses at 50% of General Fund Revenue would make available $80 million and $77 million in fiscal years 2024 and 2025, respectively, for Legacy Plan contributions.[32]

77. However, in the event of a future economic downturn that results in a loss of employment, a decline in employee compensation or other events related to Detroit's ability tax the earnings of its residents and/or workers that commute into the city then the additional revenue identified from Municipal Income tax might not be available.

78. The additional revenue identified by Detroit from iGaming / Sports Betting may also be at risk during an economic downturn, however, studies have mixed opinions. For example, in the last recession beginning in 2007, the Detroit casinos did not experience revenue declines.[33] However, other studies have found casino revenues to be negatively affected during economic downturns.[34]

---

[32] Cost savings from Central Government efficiencies and employee compensation are not additive.
[33] "Bottom Line: Are Casinos Recession Proof?" NPR. 2008 May 5.
[34] Duggan, Wayne. "Casinos Among the Hardest-Hit Businesses During Economic Downturns." Yahoo. 2019 January 12.

34



**STOUT**
Dispute Consulting

**The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit**

**Expert Report of
Raymond A. Roth, III,
CPA, CFE**

**October 13, 2021**

**VIII.  Conclusion**

79. Detroit has experienced growth and prosperity since its bankruptcy, which is apparent in many quantifiable measures.  The median income of its residents has increased and the number of residents living in poverty, unemployment, and crime has decreased.  Problems such as blight, street lighting, and EMS response times have all significantly improved. Significant investments by major employers such as Stellantis, Ford, GM, Google, Microsoft, LinkedIn and Waymo have or are committed to be made in Detroit.

80. When benchmarking the historical levels of General Fund Revenue reported by Detroit to the Comparable Midwestern Cities, Detroit generally collects as much or more revenue on a normalized basis.  Therefore, any budgetary constraints realized by Detroit is not because of a lack of revenue, but rather how it uses that revenue for the benefit of its residents. When benchmarking Detroit's Central Government expenditures to those of Comparable Midwestern Cities, I identified significant opportunity for continued improvements for efficiency in service delivery.

81. When comparing Detroit only to itself for past employee compensation amounts and future projections of those same amounts, Detroit's projections do not manage this expense in relation to its anticipated revenues.  This results in fluctuations in the proportion of these costs between its past and anticipated revenues.

82. It is my opinion that Detroit is taking a conservative approach to forecasting Municipal Income Tax Revenue, notwithstanding its discount for remote work loss.  Certain data suggests that Detroit could expect more revenue from this source than it is currently projecting that could be used for additional contributions to the Plan.  Detroit also now anticipates significant revenue from iGaming and Sports Betting that it was not projecting earlier this year.

83. The cost savings and additional revenues identified in this report are summarized in ***Exhibit L***, as well as presented below.  When preparing this combined summary, care was taken to not double count the effects of the different scenarios previously discussed.  First, it is important to separate the cost savings from Central Government efficiencies from more effectively managing employee compensation expenses which forms the basis for two separate scenarios.  When projecting cost savings available, I also considered the effects of the increased revenue on these calculations.  In the first scenario, it is reasonable that Detroit could expect an additional $148 million by 2025 above its current projections, which already includes $130 million in PFRS Legacy Plan contributions, to fund extra Legacy Plan Contributions.  In the second scenario, Detroit could expect an additional $119 million by 2025 above its current projections, which already includes $130 million in PFRS Legacy Plan contributions, to fund extra Legacy Plan Contributions.

35

13-53846-tjt    Doc 13602-2    Filed 08/03/22    Entered 08/03/22 15:36:22    Page 48 of 70



**STOUT**
Dispute Consulting

The Investment
Committee of the
Detroit Police & Fire
Retirement System v.
City of Detroit

Expert Report of
Raymond A. Roth, III,
CPA, CFE

October 13, 2021

|  | FY2022 | FY2023 | FY2024 | FY2025 |
|---|---|---|---|---|
| **Scenario 1:** | | | | |
| 1 Detroit Cost Savings From Central Government Efficiencies | $ 69,260,228 | $ 61,527,717 | $ 64,974,392 | $ 63,929,739 |
| 2 Additional Detroit Municipal Income Tax Above Projected Amount | 8,026,446 | 8,549,152 | 8,755,331 | 8,941,182 |
| 3 Additional Revenue from Retail Sports Betting | 66,400,000 | 73,800,000 | 75,400,000 | 75,400,000 |
| 4 Total Scenario 1 Savings | $ 143,686,674 | $ 143,876,869 | $ 149,129,723 | $ 148,270,921 |
| | | | | |
| **Scenario 2:** | | | | |
| 5 Detroit Cost Savings From Salaries, Wages, and Benefits with Additional Revenue Projections | 91,453,667 | 41,328,062 | 38,110,439 | 34,961,676 |
| 6 Additional Detroit Municipal Income Tax Above Projected Amount | 8,026,446 | 8,549,152 | 8,755,331 | 8,941,182 |
| 7 Additional Revenue from Retail Sports Betting | 66,400,000 | 73,800,000 | 75,400,000 | 75,400,000 |
| 8 Total Scenario 2 Savings | $ 165,880,112 | $ 123,677,214 | $ 122,265,769 | $ 119,302,858 |

84.　Detroit's current projections of $130 million for PFRS Legacy Plan contributions are between $11 million and $26 million lower than the funding scenarios projected by PFRS actuaries after five years of funding by 2028. On average, Detroit's PFRS Legacy Plan projected contributions are between $24 million and $39 million lower than the PFRS actuary projections. The combined cost savings and additional revenue of $119 - $148 million, as presented in this report and the table above, exceed the projected shortfalls in PFRS Legacy Plan contributions. Thus, it is my opinion that Detroit will have the ability to pay the additional amounts of PFRS Legacy Plan contributions under the scenarios projected by its actuaries.

36



**The Investment Committee of the Detroit Police & Fire Retirement System v. City of Detroit**

**Expert Report of Raymond A. Roth, III, CPA, CFE**

October 13, 2021

## IX. Assumptions and Limiting Conditions

85. My conclusions are based on the information received to date. I reserve the right to change those conclusions should additional information be provided.

86. No one that worked on this engagement has any known financial interest in the Defendant or the Plaintiff or the outcome of the analysis. Further, Stout Risius Ross, LLC's compensation is neither based nor contingent on the results of the analysis.

87. My conclusions are applicable for the stated date and purpose only and may not be appropriate for any other date or purpose. This report is solely for use in the cited dispute, for the purpose stated herein, and is not to be referred to or distributed, in whole or in part, without prior written consent.

Raymond A. Roth, III, CPA, CFE
Director
Stout Risius Ross, LLC

37

# EXHIBIT 11



STATE OF MICHIGAN
**DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS**
LANSING

GRETCHEN WHITMER
GOVERNOR

ORLENE HAWKS
DIRECTOR

MGM Grand Detroit LLC,
    Petitioner,

**MICHIGAN TAX TRIBUNAL**

v

MOAHR Docket No. 15-002842

City of Detroit,
    Respondent, and
Michigan Department of Treasury,
    Intervenor-Respondent.

<u>Presiding Judge</u>
Preeti P. Gadola

<u>ORDER DENYING PETITIONER'S MOTION FOR PARTIAL SUMMARY DISPOSITION</u>

<u>ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY DISPOSITION
WITH RESPECT TO PETITIONER'S UNIFORMITY CLAIMS AS SET FORTH IN
THE STOUT "UNIFORMITY REPORT"</u>

<u>ORDER PARTIALLY GRANTING INTERVENOR-RESPONDENT'S MOTION FOR
SUMMARY DISPOSITION AS TO UNIFORMITY AND RELATED CONSTITUTIONAL
CLAIMS</u>

<u>ORDER OF PARTIAL DISMISSAL</u>

**INTRODUCTION**

This case commenced on May 28, 2015, for tax year 2015 and now includes tax

years 2016, 2017, and 2018.[1] A deadline for dispositive motions was set and revised at

several points but ultimately was established for July 20, 2020. A deadline for

responses to dispositive motions was also modified and ultimately was set for

September 18, 2020. Oral arguments on the motions and responses occurred on

November 17, 2020.

**EXHIBIT**

Ex. 11

---

[1] Subsequent tax years were severed by order of the Tribunal on August 21, 2019.

MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES
MICHIGAN TAX TRIBUNAL
611 W. OTTAWA ST • P.O. BOX 30232 • LANSING, MICHIGAN 48909-8195 • 517-335-9760

with the question to be determined, "[w]hat is the average level of assessment of all real

and personal property within the City of Livonia?" [364] The Court found,

> The Michigan Constitution of 1908, controlling here, provided:
>
> "The legislature shall provide by law a uniform rule of taxation, except on property paying specific taxes, and taxes shall be levied on such property as shall be prescribed by law." Article X, §3.
>
> *"All assessments hereafter authorized shall be on property at its cash value."* Article X, § 7.
>
> The constitutional mandates were implemented by the General Property Tax Act (PA 1893, No 206, as amended [C.L. 1948 and C.L.S 1961, § 211.1 et seq., as amended by PA 1963, No 66, (Stat. Ann. 1960 Rev. and Stat. Ann. 1963 Cum. Supp. § 7.1 et seq.)]). *The Act provides for the uniform assessment and taxation of all taxable property, both real and personal other than intangibles, at the standard of true cash value* (C.L. 1948, § 211.1, C.L.S. 1961, § 211.24, as amended by PA 1963, No 66, § 211.27 [Stat. Ann. 1960 *378 Rev. § 7.1, Stat. Ann. 1963 Cum. Supp. § 7.24, Stat. Ann. 1960 Rev. § 7.27]).[365]

The matter before us has little to do with the average level of assessment determined

by the State Tax Commission with regard to all real and personal property, included in

one category, in the city of Detroit.[366] Here, Petitioner is requesting the Tribunal

consider the uniformity in assessment of three Casino Facilities. However, the Tribunal,

again, has no jurisdiction over the assessments of Greektown and MotorCity and it

cannot draw a "uniform assessment" from Mr. Kernen's Report which relies on

inaccurate information and frankly, makes little sense. The methodology in the Report is

not found in any appraisal textbook, treatise, scholarly article, case law or statute and

appears to have been presented to Kernen by counsel for its client's own self-interest,

---

[364] *Appeal of General Motors, supra* at 381.
[365] *Appeal of General Motors, supra* at 377-378 (emphasis supplied and added).
[366] *Appeal of General Motors* predates the current statutory formula of true cash value equalized by class. See MCL 211.34 and 211.34c

not from any independent thought. When an "appraisal" is performed for the Tax Tribunal by a qualified appraiser, the Tribunal confirms its purpose is to independently determine the true cash value of the property, not based on any client coercion, instruction, or self-interest.[367] Further, Mr. Kernen attempts to manipulate assessments on the tax roll, without any assessor qualifications. Finally, as noted above, the Court in General Motors found, "[t]he act provides for the uniform assessment and taxation of all taxable property, both real and personal other than intangibles, *at the standard of true cash value.*"[368]

Petitioner also cites *Edward Rose Building Co. v Independence Township,*[369] to support its contention that uniformity in the mode and method of assessment is still required, twenty-five years after the holding in *Titus.* In *Rose Building Co,* the property consisted of 100 residential lots. Petitioner only sold single lots developed with houses, it did not sell multiple lots to other developers or builders. Lot sales slumped and the valuation experts valued the lots as if each were of equal value. However, Petitioner's appraiser concluded that no market for individual lots existed so it based its valuation on multi-lot sales to builders. The Tribunal rejected Petitioner's multi-lot sales comparables and accepted Respondent's value per lot; however, the Tribunal discounted the value per lot, "'to allow an 18% mark up for the influence of development costs during the holding period of liquidation.' Thus the Tribunal essentially took the 'wholesale'

---

[367] Uniform Standards of Professional Appraisal Practice, Ethics Rules state, "An appraiser:" "must not perform an assignment with bias;" "must not advocate the cause or interest of any party or issue." Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* (Appraisal Foundation, 2020- 2021 ed, 2020) p. 7. Mr. Kernen, to his credit, he does fully disclose that he created the Uniformity Report, per specific client instruction.
[368] *Appeal of General Motors, supra* at 377. (emphasis supplied and added).
[369] *Rose Bldg. Co., supra* at 639–40.

# EXHIBIT 12



Classic Values, Innovative Advice

June 6, 2022

Mr. Charles Raimi
Deputy Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue
Detroit, Michigan 48226

**Re:** *Police and Fire Retirement System of the City of Detroit – Recommended Amortization Period*

Dear Mr. Raimi:

The purpose of this letter is to provide Cheiron's independent assessment of 20 versus 30 year funding periods for amortizing the unfunded actuarial liability of the Police and Fire Retirement System of the City of Detroit (PFRS).

**Summary**

The most recent actuarial valuation report for PFRS was prepared as of June 30, 2021 by Gabriel, Roeder, Smith & Company (GRS). As recommended by GRS, the PFRS Board and Investment Committee adopted a funding policy that amortizes the initial unfunded actuarial liability (UAL) over 20 years, determined as of June 30, 2022 with payments commencing in fiscal year 2024.

Based on our analysis which is detailed in this report, Cheiron's primary conclusions are as follows;

1. The differences between a 20-year and 30-year amortization as of June 30, 2022 are negligible in terms of ensuring sufficient assets will be available to pay all future benefits under the Plan.

2. The increase in annual City contributions to the Plan under a 20-year amortization period are significantly greater than those determined under a 30-year amortization period.

3. Because a 20-year amortization results in increased assets when compared to a 30-year amortization, this level of assets increases the exposure the City has to investment risk, without any offsetting benefit to taking such risk due to conclusion number 1.



www.cheiron.us · 1.877.CHEIRON (243.4766)

**Detailed Analysis**

An amortization policy is a part of the overall pension plan funding policy. There are three primary principles to be followed in selection of a contribution policy:

1. The primary principle for funding is that the contribution policy should result in the plan accumulating assets adequate to make all future benefit payments when due.

2. The contribution policy should result in contributions which are affordable for the plan sponsor, i.e., the City of Detroit.

3. Under any contribution policy that results in sufficient assets to pay future benefits when due, the level of investment risk should be minimized.

The amortization policy recommended by GRS would meet the first principle above.

Whether it meets the second principle is an important consideration for all stakeholders. The Bankruptcy Plan of Adjustment provided for a 10-year "pension holiday" for City contributions to the PFRS plan. It also provided that the resulting UAL would be amortized over the subsequent 30 years. Cheiron understands that those provisions of the POA were integral to the Court's feasibility analysis of the POA, which recognized the City's need to minimize pension contributions while the City used general fund dollars to address critical needs in other areas. To the extent the POA provides guidance on what is "affordable," the contribution policy should be consistent with the POA.

To the extent contributions are front-loaded, the investment risk is increased for the system. The 20-year amortization policy requires increased contributions in the early years. In the event of a market downturn, because assets are higher, the losses will be more significant and the requirement for contributions would increase.

It is our opinion that a longer initial amortization period of 30 years would still meet the first principle of accumulating adequate assets, and also result in contributions which are more affordable for the City. Finally, given that both a 20-year and 30-year amortization period meet the first principle, and that a 20-year amortization results in a greater asset build-up, a 20-year amortization period has increased investment risk and therefore does not meet principle three.

In arriving at our conclusions, we relied on the most recent information available, including the June 30, 2021 GRS actuarial valuation of the PFRS supplemented by GRS cash flow projections provided in the June 30, 2021 GASB 67/68 report.

Mr. Charles Raimi
June 6, 2022
Page 3

In the graph shown below is a projection of the actuarial liability and plan assets through 2077. Plan assets are represented by the lines in the chart and are shown assuming 20-year (grey line) and 30-year (green line) funding of the June 30, 2022 unfunded actuarial liability. These projections assume that the fund earns 1% for the plan year ending June 30, 2022 and then the assumed rate of return of 6.75% each year thereafter with no further actuarial gains or losses. The grey bars represent the actuarial liability as of each actuarial valuation date.

As can be seen in the chart, both the 20-year and 30-year funding ultimately reach 100% funding. Also, under 30-year funding the plan is never less than 66% funded.



| **Funded Ratios** | | |
|---|---|---|
| | **20-yr** | **30-yr** |
| 2022 | 75% | 75% |
| 2024 | 74% | 73% |
| 2026 | 74% | 72% |
| 2028 | 74% | 72% |
| 2030 | 75% | 71% |
| 2032 | 76% | 70% |
| 2034 | 78% | 69% |
| 2036 | 81% | 68% |
| 2038 | 85% | 67% |
| 2040 | 91% | 67% |
| 2042 | 99% | 66% |
| 2044 | 100% | 67% |
| 2046 | 100% | 71% |
| 2048 | 100% | 78% |
| 2050 | 100% | 89% |
| 2052 | 100% | 100% |
| 2054 | 100% | 100% |

The next graph shows the projections of the City's contributions to the plan starting in 2024 under both 20-year and 30-year funding of the June 30, 2022 unfunded actuarial liability. This graph shows that the City contribution for the first 20 years are 20% greater under 20-year funding than under 30-year funding. Under the 30-year funding, even though the City contributions are much greater in years 21 through 30 (i.e. 2043-2052), those additional contributions are all less than the contribution levels for the first twenty years under 20-year funding, and are much more affordable at that time than having to pay 20% higher contributions in the first twenty years.



These projections are helpful to see the expected funding results when all actuarial assumptions are met each year into the future. However, there is a significant level of uncertainty in any projections into the future. The largest source of uncertainty is the projection of investment returns. In order to reflect this uncertainty, we have also included a stochastic projection of plan assets. The stochastic projections, based on assumptions provided by PFRS's investment consultant Wilshire, assume a geometric return of 6.88% and a standard deviation of 10.8%. The stochastic projection contains 1,000 trials over the projection period.

The first stochastic graph below shows projections of the market value of assets from 2023 to 2037. The results are shown within percentiles, with the least favorable in the 0.01 percentile at the bottom of the red bars for the 30-year funding scenario, and the bottom of the dark brown for the 20-year funding scenario. The bottom of both bars are never less than $200 million meaning there is a 0% probability of insolvency during these years, which assures all benefits can be paid.

Just for informational purposes, the top of the bright green bars (for 30-year funding), and light brown bars (for 20-year funding) represent the most favorable results at the 99th percentile. Finally, the pink (30-year funding) and blue (20-year funding) dashes represent the 50th percentile result in each scenario. In both the most favorable results and the expected results for each year, the difference between 20-year and 30-year funding is, in our opinion, negligible.



The next stochastic chart shows the cumulative probability of plan insolvency through 2052 under 30-year funding, based on the 6.88% expected return and 10.8% standard deviation described earlier. It shows again, a 0% chance of insolvency.



GRS has stated that the current asset allocation may have to be de-risked over time in order to pay benefits and as such, the expected return can't be assumed to be the same over the long-term projection. To acknowledge and address this concern, we ran the same scenario as above, but assuming a 0% expected return over the projection period. Even under this scenario, our stochastic results produced a 0% chance of insolvency. This result addresses and eliminates this concern expressed by GRS. **Because of the 20-year amortization of future gains and losses, any de-risking of the portfolio would result in the plan being able to pay all benefits under a 30-year amortization funding policy.**

**Finally, given that under a 30-year funding policy, the plan is not expected to become insolvent, there is no need for the City to absorb the additional investment risk that arises under the 20-year funding policy due to more assets in the trust over a longer period.**

## Disclosures

The calculations in this letter are based upon the data, assumptions, methods, and plan provisions as outlined in the June 30, 2021 Actuarial Valuation Report prepared by Gabriel, Roeder, Smith & Company (GRS). We have accepted these assumptions for purposes this letter.

The results of this letter rely on future plan experience conforming to the underlying assumptions and methods outlined in the June 30, 2021 Actuarial Valuation Report. To the extent that the actual plan experience deviates from the underlying assumptions and methods, or there are any changes in plan provisions or applicable laws, the results would vary accordingly.

This letter includes projections of future contributions, assets, and funded status for the purpose of assisting the City and PFRS with the management of the Fund. We have used Cheiron's R-Scan model to develop these projections. The R-Scan projection uses projected benefit payments for current members based upon information included in the June 30, 2021 GASB 67/68 report produced by GRS. The stochastic projections of investment returns are based on the assumption that each future year's investment return is independent from all other years and is identically distributed according to a lognormal distribution. This assumption may result in an unrealistically wide range of compound investment returns over longer periods of time. The standard deviation used in the stochastic projection of investment returns was provided by Wilshire Associates.

This letter has been prepared exclusively for the City of Detroit for the purpose described herein. This analysis is not intended to benefit any third party, and Cheiron assumes no duty or liability to any such party.

Finally, this letter has been prepared in accordance with generally recognized and accepted actuarial principles and practices and our understanding of the Code of Professional Conduct and applicable Actuarial Standards of Practice set out by the Actuarial Standards Board as well as applicable laws and regulations. Furthermore, as a credentialed actuary, I meet the Qualification Standards of the American Academy of Actuaries to render the opinion contained in this report.

If you have any questions or need additional information, please let us know.

Sincerely,
Cheiron

Gene Kalwarski
Principal Consulting Actuary, FSA, MAAA, EA

## **Gene Kalwarski, FSA, MAAA, EA**
### **Chief Executive Officer / Principal Consulting Actuary**

Gene Kalwarski is CEO and co-founder of Cheiron Inc., and one of the most well regarded pension actuaries in the nation.

For nearly four decades he has advised many of the nation's largest public pension funds. He is often hired as an expert to help financially troubled funds. He popularized the use of interactive projection modeling, and was one of the first actuaries to encourage plans to conduct stress testing to manage risk. He also designed Cheiron's proprietary interactive pension projection tool, *P-Scan*. He has testified before Congress, and often addresses state legislatures and Boards of Trustees on behalf of state pension funds.

His roster of clients has included:
- California State Teachers Retirement System
- New York State Teachers' Retirement System
- State Teachers Retirement System of Ohio
- Maine Public Employees Retirement System
- Connecticut State Employees Retirement System
- Delaware Public Employees Retirement System
- Maryland State Retirement and Pension System
- Florida Retirement System
- Kansas Public Employees Retirement System
- Vermont Municipal Employees' Retirement System
- Arlington County Employees Retirement System
- Fairfax County Employees Retirement System
- Montgomery Employees Retirement System
- San Diego City Employees' Retirement System
- San José Federated and Police and Fire Department Retirement Plans

Before co-founding Cheiron, he worked for more than two decades at Milliman Inc., where he established the firm's Washington office. In 1984 he became the firm's youngest Equity Principal and by 1990 he was the youngest Equity Principal to serve on the firm's Board of Directors. He is a Fellow in the Society of Actuaries, an Enrolled Actuary under ERISA, and a Member of the American Academy of Actuaries.

# EXHIBIT 13



800.521.0498 | P: 248.799.9000 | www.grsconsulting.com

June 17, 2022

**EXHIBIT**

Ex. 13

CONFIDENTIAL

The Police and Fire Retirement System
 of the City of Detroit
One Detroit Center
500 Woodward Ave., Suite 3000
Detroit, Michigan 48226

Attention: Mr. David Cetlinski, Executive Director

Re: **June 30, 2021 Restoration Reserve Account for Component II of the Police and Fire Retirement System
 of the City of Detroit**

Dear Mr. Cetlinski:

In accordance with Section K-3(2)a, of Exhibit E (see excerpt below) of the City of Detroit's Plan of
Adjustment:

> *"For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 75%
> funded ratio, and the Restoration Target will be a 78% funded ratio, both projected to
> June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve
> Account will be excluded. Each year, if the Plan Actuary projects that the Funded Level as of 2023
> (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration
> Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new
> notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of
> assets above the amount projected to be needed to satisfy the Restoration Target."*

You have requested that we calculate a potential credit of assets to be made into the Restoration Reserve
Account as of June 30, 2021.

Our calculations are based on the results of the June 30, 2021 valuation, using the assumptions outlined in
Section K-3(2)a, including use of the market value of assets and a 6.75% assumed rate of investment return
net of administrative and investment expenses, and assuming no future ASF transfers due to future
investment gains. The assumptions and methods to be used were agreed upon by the legal counsels of the
Police and Fire Retirement Board and the Investment Committee.

Please note that we are not attorneys and nothing in this letter is intended to provide legal advice. We
suggest that your attorney and/or the IC's legal counsel review this letter to ensure that we have correctly
interpreted Section K-3.

One Towne Square | Suite 800 | Southfield, Michigan 48076-3723

In accordance with Section K-3(2)a, the Actuarial Accrued Liability (AAL) and the Market Value of Assets (MVA) are projected to June 30, 2023. The projection is based on estimates of benefit payments and refunds of member contributions. **The projection is illustrated below:**

|  | ($ Millions) | |
| --- | --- | --- |
|  | Actuarial Accrued Liability (AAL) (A) | Market Value of Assets (MVA) (B) |
| (1) Value on June 30, 2021 | $ 3,374.9 | $ 2,749.1 |
| (2) Contributions - Fiscal Year (FY) 2022 | N/A | 18.3 |
| (3) Expected Benefit Payments and Refunds - FY 2022 | (299.3) | (299.3) |
| (4) Interest - FY 2022* | 217.9 | 175.6 |
| (5) Value on June 30, 2022 (1)+(2)+(3)+(4) | $ 3,293.5 | $ 2,643.7 |
| (6) Contributions - FY 2023 | N/A | 18.3 |
| (7) Expected Benefit Payments and Refunds - FY 2023 | (298.5) | (298.5) |
| (8) Interest - FY 2023* | 212.4 | 168.5 |
| (9) Value on June 30, 2023 (5)+(6)+(7)+(8) | $ 3,207.3 | $ 2,531.9 |

*\* Employer contributions are assumed to occur at the end of the year. Expected benefit payments and refunds are assumed to occur mid-year.*

The 78% Restoration Target is applied to the projected June 30, 2023 AAL in order to determine whether the projected June 30, 2023 MVA exceeds that amount. Since the credit of assets to be made into the Restoration Reserve Account is as of June 30, 2021, the excess of the June 30, 2023 MVA over the target is discounted back to June 30, 2021 using an annual discount rate of 6.75%.

**Calculation of notional credit needed to satisfy the Restoration Target**

|  | ($ Millions) |
| --- | --- |
| (1) June 30, 2023 Restoration Target | 78% |
| (2) June 30, 2023 AAL | $ 3,207.3 |
| (3) June 30, 2023 Projected Target MVA (1)x(2) | $ 2,501.7 |
| (4) June 30, 2023 Projected MVA | 2,531.9 |
| (5) Projected MVA excess over target (4)-(1) | $ 30.2 |
| (6) Discount factor to June 30, 2021 | 0.8775 |
| (7) June 30, 2021 value of excess (5)x(6) | $ 26.5 |



The end result is an amount of **$26,526,870** as a credit of assets to be made into the Restoration Reserve Account as of June 30, 2021.

**Additional Notes:**

- This information should be considered in conjunction with the June 30, 2021 actuarial valuation of the Police and Fire Retirement System of the City of Detroit of Component II, which we issued on March 16, 2022 (the 2021 valuation report).

- Future valuations will likely be affected by the Restoration Reserve Account. We expect to issue a memo with additional requests for guidance from the legal counsels (Board and Investment Committee) on the appropriate treatment.

- Upon request, we are prepared to provide an estimate as to whether there are sufficient funds in the newly established Restoration Reserve Account to restore any COLA benefits under the POA as of June 30, 2021. The calculation of the COLA will likely depend on the answers to some of the questions in the memo described above.

- We recommend the System adopt administrative procedures for this account (crediting of interest, treatment of gains/losses, and credits and debits to the reserve as called for in the plan document).

If you have any questions regarding this information, please call. We would be happy to meet with the Board or Investment Committee to discuss this information.

David T. Kausch, Judith A. Kermans, and Jamal Adora are Members of the American Academy of Actuaries (MAAA) and meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

Sincerely,
Gabriel, Roeder, Smith & Company

*David T. Kausch*

David T. Kausch, FSA, EA, FCA, MAAA, PhD

*Judith A. Kermans*

Judith A. Kermans, EA, FCA, MAAA

*Jamal Adora*

Jamal Adora, ASA, EA, MAAA

JA:ah

GRS

Valerie – I am attaching the OCFO's response to Stout's information requests that was provided to you and Stout some time ago. The response (page 3) asks that the IC hear from Mayor Duggan and the City's actuarial expert in conjunction with its consideration of the funding issue.

We would be grateful if you would confirm that will be arranged before the IC begins deliberations on the funding issue.

Also, we would be grateful if you would send us a copy of the Stout report.

Thanks.

Chuck Raimi

Deputy corporation counsel

313 237 5037

--

Valerie Brader

Rivenoak Law Group

valerie@rivenoaklaw.com

Cell: 734-478-0165

# EXHIBIT 14

# City of Detroit

Plan of Adjustment - 40 year projections

The attached Plan of Adjustment preliminary forecast (the "POA Financial Projections"), its assumptions and underlying data are the product of the Client and its management ("Management") and consist of information obtained solely from the Client. With respect to prospective financial information relative to the Client, Ernst & Young LLP ("EY") did not examine, compile or apply agreed upon procedures to such information in accordance with attestation standards established by the AICPA and EY expresses no assurance of any kind on the information presented. It is the Client's responsibility to make its own decision based on the information available to it. Management has the knowledge, experience and ability to form its own conclusions related to the Client's POA Financial Projections. There will usually be differences between forecasted and actual results because events and circumstances frequently do not occur as expected and those differences may be material. EY takes no responsibility for the achievement of forecasted results. Accordingly, reliance on this report is prohibited by any third party as the projected financial information contained herein is subject to material change and may not reflect actual results.

POA00706603

**Plan of Adjustment - 40 year projections**
**Assumptions**
*($ in millions)*

| Plan of Adjustment - 40 year projections | | |
|---|---|---|
| **General Fund Cash Flows** | GF 40yr cash flows | $4.3b funds available for unsecured claims |
| | DIP financing | Quality of Life ($129m @ 3.5% assumed to be refinanced as part of exit facility) |
| | Exit financing | $300m note @ 6.0% maturing in FY26 |
| | Swap treatment | $85m settlement |
| | Contingency | Reflects 1.0% of total revenues |
| **Revenue stream from DWSD** | Pension | $429m for pension in the first 10 years |
| | OPEB | 12.1% of OPEB - current retirees payments |
| | POC | 11.5% of total POC payments |
| **Reimbursement from other funds** | Reimbursements from Parking (non-GF) and Library | |
| **Hypothetical art proceeds (a)** | Foundations | $366m over 20 years |
| | DIA | $100m over 20 years |
| **Hypothetical State settlement (a)** | Contributions to pension | $195m in FY15 |
| **Hypothetical claims treatment** | | |
|    PFRS | | |
|       Pension | Contributions (years 1-10) | Estimated to be $261m from foundations / State settlement |
| | Contributions (years 11-40) | UAAL as of June 30, 2023 estimated to be ~$681m (b) amortized over |
| | | 30yr, including contributions in second decade from DIA and foundations |
| | Discount rate | 6.75% |
| | Targeted funded status as of 2023 | 78% |
|    GRS | | |
|       Pension | Contributions (years 1-10) | Estimated to be $99m from State settlement; $429m from DWSD; $46m from DIA; $146m from GF & other funds |
| | Contributions (years 11-40) | UAAL as of June 30, 2023 estimated to be ~$695m (b) amortized over |
| | | 30yr, including contributions in second decade from DIA and foundations |
| | Discount rate | 6.75% |
| | Targeted funded status as of 2023 | 70% |
|    UTGO | Hypothetical Note A1 | $287.5m note funded with pass-through UTGO millage |
|    LTGO | Hypothetical Note A2 | $55m settlement note |
|    Other unsecured | Hypothetical Notes B | $632m note paid over 30 years - $450m OPEB, $162m POC, $4m notes/loans and $16m other |

*Footnotes:*

(a)   Hypothetical art and State settlement proceeds are subject to a consensual agreement with respect to the treatment of pension-related claims.

(b)   Estimated pension contributions to retirement systems and unfunded pension liabilities as of June 30, 2023 are subject to change.