# Exhibit 6

STATE OF MICHIGAN
IN THE SUPREME COURT

THE PEOPLE OF THE STATE OF
MICHIGAN,

               Plaintiffs-Appellants,

v

NICOLAS LYON,

               Defendant-Appellee.

Michigan Supreme Court No. 164410

Court of Appeals No. 360124

Genesee County Circuit Court No.
21-047378-FH

## APPELLEE NICOLAS LYON'S ANSWER TO PEOPLE'S APPLICATION FOR LEAVE TO APPEAL

WILLEY & CHAMBERLAIN LLP
Charles E. Chamberlain (P33536)
Britt M. Cobb (P69556)
300 Ottawa Avenue, N.W., Suite 810
Grand Rapids, Michigan 49503-2314
(616) 458-2212

VARNUM LLP
Ronald G. DeWaard (P44117)
Brion B. Doyle (P67870)
Regan A. Gibson (P83322)
333 Bridge Street, N.W., Suite 1700
Grand Rapids, Michigan 49504
(616) 336-6000

BURSCH LAW PLLC
John J. Bursch (P57679)
9339 Cherry Valley Avenue, S.E., Unit 78
Caledonia, Michigan 49316-0004
(616) 450-4235

Dated: June 15, 2022

# TABLE OF CONTENTS

RECEIVED by MSC 6/15/2022 8:54:19 PM

Page

INDEX OF AUTHORITIES ................................................................................................ iii

STATEMENT OF JURISDICTION ................................................................................... vi

STATEMENT OF QUESTION PRESENTED ................................................................. vii

REASONS FOR DENYING LEAVE .................................................................................. 1

STATEMENT OF FACTS AND PROCEEDINGS ............................................................ 4

    I.     THE OSC INVESTIGATION AND SUBPOENAS ............................................ 4

    II.    THE FIRST PROSECUTION ............................................................................ 7

    III.   THE 2019 SEARCH WARRANTS ................................................................... 9

    IV.   THE INVESTIGATION BY THE "ONE-PERSON GRAND JURY" AND THE SECOND INDICTMENT ....................................................................................... 10

    V.    THE PROSECUTION'S PRODUCTIONS ...................................................... 10

    VI.   PROCEEDINGS IN THE DETROIT BANKRUPTCY ................................... 13

    VII.  THE PROSECUTION ATTEMPTS TO AMEND THE STIPULATED PROTECTIVE ORDER TO ALLOW THEM TO RETAIN, REVIEW AND PRODUCE PRIVILEGED MATERIALS ................................................................................................ 14

    VIII. DIRECTOR LYON MOVES FOR A PROTECTIVE ORDER AND DISCOVERY INTO THE PROSECUTION'S SEIZURE, REVIEW, AND PRODUCTION OF DEFENDANTS' PRIVILEGED MATERIALS ................................................... 16

    IX.   THE CIRCUIT COURT'S ORDER AND THE PROSECUTION'S MOTION FOR RECONSIDERATION ..................................................................................... 19

    X.    THE PROSECUTION'S APPLICATION FOR LEAVE TO APPEAL AND MOTION TO STAY PENDING APPEAL ............................................................................ 21

STANDARD OF REVIEW ............................................................................................... 22

LAW AND ARGUMENT .................................................................................................. 23

    I.     THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION BY REJECTING ARGUMENTS ALREADY CONSIDERED OR THAT COULD HAVE BEEN RAISED IN CONNECTION WITH THE MOTION FOR PROTECTIVE ORDER .............. 23

i

A.     Legal Standard for Reconsideration............................................23

B.     There is No Abuse of Discretion Where a Trial Court Rejects Arguments at Reconsideration That Were Previously Addressed by the Court.......................................................................................24

C.     There is No Abuse of Discretion Where the Trial Court Rejects Reconsideration Based on Unsupported Arguments That Could Have Been Raised in Connection With The Prior Motion ........................25

II.    THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING THE PROSECUTION'S CLAIM OF PALPABLE ERROR .........................................................26

A.     The Circuit Court Did Not Abuse its Discretion When it Declined to Find "Palpable Error" Regarding its Application of the "Good Cause Standard".................................................................................27

       1.    *Legal standard to grant a protective order*....................................27

       2.    *The Joly test is irrelevant to determining good cause* ...................28

       3.    *The facts of this case more than satisfy the "good cause" standard* ........................................................................................29

       4.    *Taint teams are not "unprecedented" in Michigan*.........................32

B.     The Circuit Court Did Not Abuse its Discretion When it Rejected the Prosecution's Claims Regarding the Purported "Burden" of Implementing a Taint Team....................................................................35

       1.    *The prosecution grossly misstates the burden of implementing a taint team*............................................................35

       2.    *Any burden of implementing the taint review is outweighed by the benefits of ensuring a fair trial of this matter* .....................40

CONCLUSION AND RELIEF REQUESTED ...........................................................................42

ii

# INDEX OF AUTHORITIES

Page(s)

**Cases**

*Boertmann v Cincinnati Ins Co,*
    493 Mich 963; 828 NW2d 675 (2013)...........................................................24

*Brady v Maryland,*
    373 US 83 (1963)...........................................................................................39

*Cason v Auto Owners Ins Co,*
    181 Mich App 600 (1989)..............................................................................24

*Charbeneau v Wayne Co Gen Hosp,*
    158 Mich App 730; 405 NW2d 151 (1987)..............................................23, 25

*Churchman v Rickerson,*
    240 Mich App 223; 611 NW2d 333 (2000)....................................................22

*Dep't of Health & Human Svs v Genesee Circuit Judge,*
    318 Mich App 395; 899 NW2d 57 (2016)........................................................7

*Ensink v Mecosta General Hosp.,*
    262 Mich App 518; 687 NW2d 143 (2004)....................................................26

*Hicks v Bush,*
    452 F Supp 2d 88 (CA DC, 2006) ................................................................33

*Huntington Nat Bank v Daniel J Aronoff Living Trust,*
    305 Mich App 496; 853 NW2d 481 (2014)....................................................23

*In re City of Detroit, Michigan,*
    Case No.: 13-53846-tjt, 2 App 297 ...............................................................13

*In re Grand Jury Subpoenas,*
    454 F3d 511 (CA 6 2006) ..............................................................................33

*In re Sealed Search Warrant and App for a Warrant By Telephone or Other Electronic Means,*
    11 F4th 1235 (CA 11 2021) ...........................................................................33

*In re Search of 5444 Westheimer Rd Suite 1570, Houston, Texas, on May 4, 2006,*
    No. H-06-238, 2006 WL 1881370 (SD Tex, July 6, 2006) .............................34

*In re Search Warrant Issued June 13, 2013,*
    942 F3d 159 (CA4 2019) ...............................................................................34

*In re Search Warrants Executed on April 28, 2021,*
    No. 21-MC-425, 2021 WL 2188150 (SDNY May 28, 2021)...........................33

iii

RECEIVED by MSC 6/15/2022 8:54:19 PM

RECEIVED by MSC 6/15/2022 8:54:19 PM

*In re Search Warrants*,
  No. 1:21-cv-04969, 2021 WL 5917983 (ND Ga Dec 15, 2021) ..................................... 33

*Luckow v Luckow*,
  291 Mich App 417; 805 NW2d 453 (2011) ................................................................... 2, 23

*Maldonado v Ford Motor Co*,
  476 Mich 372; 719 NW2d 809 (2006) .............................................................................. 22

*People v Cross*,
  No. 307374, 2013 WL 4404229 (Mich Ct App Aug 15, 2013) ..................................... 27

*People v Joly*,
  336 Mich App 388; 970 NW2d 426 (2021) .......................................... 3, 24, 25, 27, 28, 32

*Pierron v Pierron*,
  282 Mich App 222, 765 NW2d 345 (2009) ...................................................................... 25

*Stamp v Mill Street Inn*,
  152 Mich App 290; 393 NW2d 614 (1986) ...................................................................... 23

*Thomas M Cooley Law School v Doe 1*,
  300 Mich App 245; 833 NW2d 331 (2013) ...................................................................... 27

*United States v Blankenship*,
  No. 5:14-cr-00244, 2015 WL 3687864 (SDWV June 12, 2015) .................................... 39

*United States v Meek*,
  No. 1:19-cr-00378-JMS-MJD, 2021 WL 1049773 (SD Ind Mar. 19, 2021) .................. 39

*United States v Vepuri*,
  No. 21-132, 2021 WL 4860744 (ED Pa Oct 19, 2021) .................................................... 33

*United States v Voigt*,
  89 F3d 1050 (CA 3 1996) ................................................................................................. 28

*Woods v SLB Prop Mgt, LLC*,
  277 Mich App 622; 750 NW2d 228 (2008) ................................................................. 22, 26

*Yachcik v Yachcik*,
  319 Mich App 24; 900 NW2d 113 (2017) ........................................................................ 26

## **Statutes**

MCL 750.321 ......................................................................................................................... 10

MCL 750.478 ......................................................................................................................... 10

MCL 767A.1 ............................................................................................................................. 5

iv

**<u>Other Authorities</u>**

Black's Law Dictionary (5th ed.) ................................................................................................... 23

**<u>Rules</u>**

MCR 2.119(F)(3) ........................................................................................... 2, 3, 24, 25, 26

MCR 2.601 .................................................................................................................... 30

MCR 6.201(C)(1) ........................................................................................................... 29

MCR 6.201(E) ......................................................................................... 3, 17, 20, 25, 29, 30, 31

MCR 6.201(J) ........................................................................................................ 17, 18, 29

MCR 7.205(A)(4)(a) ......................................................................................................... 2

MCR 7.305(B)(2) ............................................................................................................ 2

MCR 7.305(B)(3) ............................................................................................................ 2

MCR 7.305(C)(1)(b) ......................................................................................................... 2

RECEIVED by MSC 6/15/2022 8:54:19 PM

## STATEMENT OF JURISDICTION

Appellee Nick Lyon does not contest that the prosecution timely filed its Application for Leave to Appeal, nor that this Court has jurisdiction to consider that Application. Nonetheless, there is no need for this Court's interlocutory review because the trial court properly applied applicable precedent in denying reconsideration and rejecting the prosecutor's invitation to ignore the attorney-client privilege in criminal proceedings.

RECEIVED by MSC 6/15/2022 8:54:19 PM

## STATEMENT OF QUESTION PRESENTED

The prosecution executed search warrants and seized, reviewed, and produced materials in violation of the attorney-client privilege, work product doctrine, the Michigan Court Rules, state and federal law, and a conflict wall. The prosecution did all this despite having been advised beforehand—by its own office, attorneys for the defendant, and attorneys for other defendants—that the materials subject to the search warrant were in fact privileged.

The question presented is whether the Circuit Court abused its substantial discretion when it denied the prosecution's Motion for Reconsideration of the Court's Order granting a protective order preventing the prosecution from reviewing or producing documents seized in the search warrants, including thousands of privileged documents, until the prosecution implemented an independent taint team to properly screen the materials.

The Prosecutor answers: Yes.

Nicolas Lyon answers: No.

The Trial Court answered: No.

The Court of Appeals summarily denied the prosecutor's interlocutory Application for Leave "for lack of merit in the grounds presented."

RECEIVED by MSC 6/15/2022 8:54:19 PM

## REASONS FOR DENYING LEAVE

Nearly seven months ago, the Honorable Elizabeth Kelly of the Genesee County Circuit Court ordered Plaintiff-Appellant, the People of the State of Michigan (the "prosecution") to implement a taint team review of millions of documents that had been seized pursuant to search warrants executed at the Department of the Attorney General and KLDiscovery in May 2019. After losing a motion for reconsideration on that order, the prosecution appeals only the order denying reconsideration to the Court of Appeals, which denied leave "for lack of merit in the grounds presented." The prosecution now asks this Court to review the trial court's order denying a discretionary pre-trial discovery ruling, on which the dispositive fact (the prosecution's possession of Director Lyon's privileged materials) is undisputed. Indeed, given the prosecution's failure to offer even a single piece of evidence to support its claims of expense or burden, there is no basis for any reviewing court to disturb the trial court's discretionary ruling on its reconsideration of a discovery order that seeks to screen the prosecution team from reviewing the defendants' privileged materials. The prosecution's application fails to meet an even more fundamental threshold: it does not come close to satisfying the grounds for review by this Court. The application instead represents the latest effort by the prosecution to delay and avoid facing the consequences of its own actions for failing to safeguard and segregate Director Lyon's privileged materials.

While the prosecution attempts to frame its Application for Leave as an appeal of the merits of the Circuit Court's Order on the Motion for Protective Order, that order is ultimately not before this Court. The prosecution's Application explicitly stated that it seeks review only of the Circuit Court's denial of its *Motion for Reconsideration.* See App. for Leave at v (stating that the prosecution seeks leave to appeal the Circuit Court's January 7, 2022, order denying the Motion

for Reconsideration). The prosecution failed to seek appellate review of the Order on the Motion for Protective Order by the Court of Appeals, either within 21 days of the entry of the Order or as a delayed application for leave pursuant to MCR 7.205(A)(4)(a). The time for filing a delayed application for leave expired on May 18, 2022, and thus the time for filing a delayed by-pass application to this Court has similarly expired. See MCR 7.305(C)(1)(b) (requiring a bypass application be filed within 42 days after an application for leave to appeal is filed in the Court of Appeals).

The appeal of the denial of a motion for reconsideration on what is, ultimately, a discovery ruling well within the considerable discretion of the Circuit Court, does not rise to the level of "significant public interest" or involve "a legal principle of major significance to the state's jurisprudence" that is required to support an application to this Court. See MCR 7.305(B)(2)-(3). The only question on appeal is whether the Circuit Court abused its discretion in declining to find that it had made a "palpable error" in ruling on the Motion for Protective Order and that a different disposition would have resulted from the correction of the error. See MCR 2.119(F)(3); *Luckow v Luckow*, 291 Mich App 417, 426; 805 NW2d 453 (2011). There is no public interest or jurisdictional significance in answering this question. Circuit courts have broad discretion in ruling on discovery matters, including determining what constitutes "good cause" to grant a motion for protective order and what constitutes "palpable error" in connection with a motion for reconsideration.

As to the prosecution's claims of "palpable error," the prosecution cannot demonstrate that the Circuit Court made such an error. The prosecution's first claim of error, that the Circuit Court erred in finding "good cause" to enter the protective order because it did not *also* find that the prosecution had committed "outrageous conduct" sufficient to show a constitutional violation or

2

require an evidentiary hearing, is simply a re-hashing of the prosecution's flawed argument in response to the Motion for Protective Order and as such, is not a proper basis for reconsideration. See MCR 2.119(F)(3). Accordingly, the Circuit Court did not abuse its discretion in failing to credit this argument.

The prosecution's second purported "error" was that the Court erred in finding that the burden of the taint review would be outweighed by its benefits. The prosecution justified this argument using vague claims about the cost and time required for the review, claims for which the prosecution provided no evidentiary support and failed to raise in response to the Motion for Protective Order. The Circuit Court did not abuse its discretion by rejecting the prosecution's unsupported assertions dressed up as "facts," particularly when the issue was not timely raised in response to the Motion for Protective Order.

The Court could stop its analysis there and deny this Application, but there is more. With regard to the "good cause" determination, the prosecution has continued to erroneously conflate the "good cause" finding required for a protective order with the three-part test articulated in *People v Joly* relating to a finding that a defendant's constitutional rights have been violated. Under MCR 6.201(E), a Circuit Court must only justify a protective order by a finding of good cause, a standard easily satisfied by the facts and circumstances underlying the prosecution's seizure of privileged materials here. Accordingly, the Circuit Court did not abuse its discretion when it rejected this claim in the Motion for Reconsideration.

Further, the Circuit Court did not abuse its discretion when it rejected the prosecution's unsubstantiated and often contradictory claims regarding the costs and time necessary to implement a taint team. The prosecution failed to offer even a single piece of evidence to support its claims of expense or burden, leaving reviewing courts no basis to disturb the trial court's

3

RECEIVED by MSC 6/15/2022 8:54:19 PM

discretionary ruling on its reconsideration of a discovery order. Moreover, whatever burden the prosecution would bear is a consequence of its own actions and its failure to appropriately safeguard and segregate Director Lyon's privileged materials.

To date, the prosecution has made no material effort whatsoever to comply with the Circuit Court's order, which was entered nearly seven months ago. The prosecution ignored defense counsel's attempt to start negotiations of the taint team protocol for months, despite being ordered by the Circuit Court to do so. While the prosecution finally produced a draft "protocol" less than three weeks before this answer was filed, the seven months of supposed work yielded only a three-page letter devoid of any specifics regarding the proposed review and an incomplete list of search terms. The continued efforts to delay these proceedings shows a remarkable apathy for moving this case forward, a disregard of the trial court's authority, and contempt for the attorney-client privilege's protections.

In sum, because the trial court's ruling on the Motion for Reconsideration was well within the realm of "principled outcomes," this Court should deny the prosecution's Application and allow the taint review to proceed.

## STATEMENT OF FACTS AND PROCEEDINGS

### I. THE OSC INVESTIGATION AND SUBPOENAS

The criminal cases relating to Flint water matters have been continuing, in some fashion, since January 2016, when the Department of the Attorney General announced it was investigating matters related to the Flint water crisis, and later established the Office of Special Counsel, known as the OSC and formerly led by Todd Flood, to handle the investigation. As was necessary given the Department's direct role in representing various state agencies and their agents in civil cases related to Flint water matters, a conflict wall was established between OSC and the Department's

4

civil attorneys (the "Civil AAGs"). See Ex. 2 to Mot for Prot. Order, First Conflict Notice, 1 App 041.

As part of its investigation, the OSC issued investigative subpoenas to a number of state agencies, including MDHHS, the Office of the Governor, MDEQ, and the Department of Treasury pursuant to the Michigan Investigative subpoena statute, MCL 767A.1 *et seq.* The state agencies hired outside criminal counsel to respond to the OSC subpoenas and other requests from the U.S. Department of Justice and the Genesee County Prosecutor's office. See Ex. 4 to Mot. for Prot. Order, Notice of Intervention, 1 App 095-96. The Civil AAGs, who were already representing the various agencies in related civil actions, remained involved in responding to the subpoenas and were principally tasked with collecting responsive communications, including any from the e-mail folders of designated current and former employees. *Id.* at 1 App 096. To address the challenges of reviewing and producing a vast amount of documents, the Civil AAGs hired KLDiscovery to assist with the document collection, review, and production. *Id.*

The parties worked cooperatively and came to an agreement regarding search terms and a production schedule. All subpoenaed agencies followed a similar track. With regard to MDHHS, the process included: (1) multiple voluntary productions; (2) collection of over four million MDHHS documents based on relevant custodians and search terms; (3) two rounds of predictive coding, including follow-up quality check review and accuracy sampling; (4) a linear review of additional documents determined to be likely responsive by the second predictive coding project that utilized additional keyword searches requested by OSC; and (5) privilege review by outside counsel. Ex. 3 to Mot. for Prot. Order, MDHHS Collection and Review Narrative, 1 App 043-046. The privilege review meant that the agencies were given the customary opportunity to review potentially privileged documents *prior to their production to OSC*, which ensured that the OSC

5

RECEIVED by MSC 6/15/2022 8:54:19 PM

investigative processes would not be tainted by the receipt and use of privileged information. The agencies provided extensive privilege logs to OSC. *Id.* at 1 App 046.

The parties went to great lengths to protect privileged information from being shared with the OSC. This methodical review and production process was particularly important given the complex privilege issues. The representation of MDHHS and its Director, Director Lyon, was split between the Civil AAGs in the civil matters and by outside and in-house counsel in relation to the OSC criminal investigation. There was significant overlap in both facts and interest in the different Flint water matters; as a result, the Department of Attorney General on behalf of Director Lyon and the MDHHS entered into a common-interest agreement along with others so they could freely pursue their common interests and protect the privilege, work product, and confidentiality attached to shared communications and documents.

The agreement confirmed that the Department of Attorney General had erected a conflict wall to isolate and screen the OSC staff involved on the criminal side from the civil AAGs who were subject to the common interest agreement. This agreement ensured that privileged information would not be shared with the OSC. In reliance on this agreement, there were significant discussions between the parties related to the common legal issues and the parties' strategies in the various matters—*many of which would not have occurred but for the common interest agreement.*

There was also communication between defendants and their own counsel, including Director Lyon, as well as the MDHHS and other parties to the common interest agreement and their counsel, regarding the investigation and prosecutions. Director Lyon and the parties to the agreement engaged in open and privileged communication with their lawyers from the civil side

6

RECEIVED by MSC 6/15/2022 8:54:19 PM

regarding their defense strategy, all with the assurance that these communications were protected by the attorney-client privilege.

## II. THE FIRST PROSECUTION

OSC's investigation into Flint water matters led to the prosecution of Director Lyon, which included a year-long preliminary examination with dozens of witnesses and hundreds of exhibits that concluded in the summer of 2018.[1] A few months later, Attorney General Nessel was elected and subsequently appointed Solicitor General Fadwa Hammoud to oversee the Flint criminal cases. Soon after, the prosecution claimed to have discovered unreviewed documents related to the Flint water prosecution. Ex. 4 to Mot. for Prot. Order, No. of Intervention at 1 App 101-04.

The Civil AAGs--who had overseen the document collection and review process for the OSC subpoenas--explained that the documents and hard drives that were purportedly "discovered" had already been reviewed for production and/or were back-up forensic images of already-collected computers. See id. at 1 App 109-10. Despite the Civil AAGs' explanation, Prosecutor Flood was fired in April 2019, based in part on the current prosecution's claim that "discovery was not fully and properly pursued from the onset of this investigation." See Ex. 5 to Mot. for Prot. Order, 4/29/19 Press Release, 1 App 117. The prosecution sought a six-month adjournment, claiming that they could not ethically proceed without reviewing all the seized (i.e., "newly

---

[1] While this Appeal is focused on the conduct of the current prosecution team, the first prosecution was similarly marred by extraordinary and inappropriate behavior by the prosecution. *See, e.g.,* *Dep't of Health & Human Svs v Genesee Circuit Judge*, 318 Mich App 395; 899 NW2d 57 (2016) (invalidating three *ex parte* protective orders entered at the behest of the OSC prosecution team and McLaren Hospital that prevented MDHHS from collecting any information from McLaren Hospital as part of a public health investigation related to the legionella outbreak within the hospital).

7

discovered") documents, even citing its ethical obligation to determine the existence of exculpatory evidence.[2]

The prosecution made a number of false and even defamatory claims in the effort to delay the proceedings, which led to the unprecedented circumstance of the Civil AAGs intervening in the case to challenge the false statements made by attorneys in their own office. See Ex. 4 to Mot. for Prot. Order, No. of Intervention, 1 App 085. The Civil AAGs identified numerous misstatements of fact the prosecution made to the court in connection with the motion to stay, including the following false claims:

- The prosecution's allegation that the Department of the Attorney General took direction from Director Lyon's defense attorney on what documents the Department should produce in response to OSC's subpoenas.

- The prosecution's allegation that the Department of the Attorney General concealed millions of responsive documents from them in a basement.

- The prosecution's allegation that the Department of the Attorney General failed to respond to the investigative subpoenas issued by OSC.

- The prosecution's allegation that the Department of the Attorney General represented that phone data did not exist when it did exist.

- The prosecution's allegation that the Department of the Attorney General was complicit in an alleged destruction of evidence.

---

[2] See, e.g., 5/3/19 Tr. of Hearing on Mot. to Stay/Mot. to Intervene at 40:1-7, 1 App 191 (SG Hammoud stating, "We don't know what is out there, *if it's inculpatory evidence or if it's exculpatory evidence, and, to be honest, that has been a fear, is that we have the obligation to review this*. That's what separates us from a different—from a civil case. We are dealing with people's lives and we do not take that lightly.") (emphasis added); Ron Fonger, "Flint water prosecutors to set stage to drop charges if unable to review new docs," MLive (May 15, 2019) ("Flint water prosecutors appear ready to walk away from two pending criminal cases against state health officials if they aren't first able to fully review 20 million pages of documents discovered in recent months. 'We cannot ethically proceed and will not' without the review, Special Assistant Attorney General Molly Kettler told Genesee District Court Judge Jennifer Manley on Wednesday, May 15.") 1 App 224. While these documents were not attached to Director Lyon's Motion for Protective Order, copies were provided to the Circuit Court at the hearing on the motion.

8

- The prosecution's allegation that the Department of the Attorney General produced millions of pages of documents in non-searchable format.

As the Civil AAGs demonstrated in detail in their brief and with supporting affidavits, every one of these claims was not true. See *id.* at 1 App 091.

## III. THE 2019 SEARCH WARRANTS

Despite being assured by its *own office* that all responsive information had already been produced, the prosecution executed search warrants on the Department's State Operations Division and KLDiscovery. The agents executing the warrants seized all the raw data collected, including the complete e-mail boxes from which the previous productions had been made, which the prosecution knew from the privilege logs in its possession contained thousands of privileged documents. Days later, counsel for Director Lyon explicitly warned the prosecution in writing that the materials they had seized included privileged information and requested that the prosecution "advise as to what protocols are in place to protect confidential and privileged information from disclosure to inappropriate parties." See Ex. 1 to Mot. for Prot. Order, 5/28/19 Ltr. to Hammoud 1 App 039. The prosecution never responded.

While Judge Farah denied the request for a six-month adjournment, he did grant the prosecution one additional month. The day before Judge Farah was going to issue his ruling on Director Lyon's motion to quash—a ruling that, based on oral argument, all expected to go poorly for the prosecution—the prosecution dismissed all pending Flint water cases without prejudice. With hindsight, it is now apparent that the prosecution's dismissal was to avoid an adverse ruling from Judge Farah with the intent to develop new charges against Director Lyon, Governor Snyder, and other public servants, and potentially draw a different Genesee County judge. That background sets the table for the prosecution's invocation of Michigan's "one-person grand jury" statute, the use of which is now being reviewed by this Court.

9

RECEIVED by MSC 6/15/2022 8:54:19 PM

## IV. THE INVESTIGATION BY THE "ONE-PERSON GRAND JURY" AND THE SECOND INDICTMENT

Armed with thousands of privileged documents from the May 2019 search warrants—including defense counsel's strategy notes—the Solicitor General petitioned the 7th Judicial Circuit, Genesee County, on December 27, 2019, to conduct yet another investigation, using a so-called "one-person grand jury" investigation. The petition was granted by Chief Judge Duncan M. Beagle, and the Hon. David M. Newblatt was appointed as the one-person grand juror. 1/9/20 Order for App. of One-Person Grand Jury, 2 App 228. Because this Court is now well aware of the abuse and irregularities that defined that process, they will not be restated here.

Indictments were ultimately handed down on January 13, 2021, and a "Grand Jury Felony Indictment" was filed with the circuit court charging Director Lyon with nine counts of involuntary manslaughter, MCL 750.321, and one count of willful neglect of duty, MCL 750.478. Indictment, 2 App 233. These charges are nearly identical to the ones the prosecution charged the first time around, with the addition of only a few new, alleged victims, vindicating the civil AAGs who said the prosecution was lying about the "discovery" of "new documents." Filed on the same day were "Grand Jury Felony Indictments" against six other defendants and misdemeanor "Grand Jury Indictments" against two others.

## V. THE PROSECUTION'S PRODUCTIONS

Soon after the indictments were unsealed in the Flint cases in January 2021, counsel for Governor Snyder received confirmation from the prosecution that, despite counsel for Director Lyon's warning in May 2019, the prosecution had no intention of using a taint or filter team to review the privileged material seized in connection with the 2019 search warrants. See Ex. 6 to Mot. for Prot. Order, 1/20/21 Email from Hammoud, 1 App 120. In fact, the prosecution made no effort whatsoever to cull privileged materials from the seized document set. Nevertheless, the

prosecution proceeded to produce many of defendants' custodial documents en masse in March and April 2021, including privileged materials. Counsel knows this because each defendant received not only their own privileged information, *but privileged information belonging to the other defendants.*

Around April 2, 2021, the Civil AAGs learned from newspaper reports that privileged materials seized in the search warrants were being produced in this matter. The Civil AAGs notified their peers on the criminal side that the Civil AAGs continued to assert privilege on behalf of their clients (including Director Lyon) over the "thousands of privileged communications between the [civil] assistant attorneys general and their client agencies" that had been seized and were being produced. See Ex. 7 to Mot. for Prot. Order 4/2/21 E-mail to Hammoud, 1 App 125. The Civil AAGs further documented in writing their request that the prosecution notify the defendants that the Civil AAGs were requesting the return of the privileged documents. *Id.*

After receiving the prosecution's first production, counsel for Governor Snyder alerted the prosecution on April 13, 2021, that the produced documents included many privileged documents and requested that an independent taint team be assembled to evaluate the privileged documents. See Ex. 8 to Mot. for Prot. Order, 4/13/21 E-mail to Hammoud, 1 App 127. Once again, this communication was ignored and no taint team was assembled. To this day, the prosecution has not made any attempt to explain *how* the document collection and review was conducted or provide evidence of steps taken to protect defendants' privileged documents.

While the prosecution has repeatedly stated that they have between 20-22 million documents for production, only approximately four million have been produced to defendants to date. The review to date has identified *thousands* of documents and communications subject to Director Lyon's attorney-client privilege with both his criminal and civil counsel, privileged

11

RECEIVED by MSC 6/15/2022 8:54:19 PM

communications with MDHHS's internal and external counsel, communications with other parties subject to the common interest privilege, attorney work product specifically related to the facts underlying the allegations in this matter, communications subject to privileges of other defendants, including Dr. Wells, Mr. Baird, Mr. Agen, and Governor Snyder, and communications protected by executive privilege. Notably—and as if to emphasize the contrast between the productions made to OSC and the improper approach employed by the current prosecution team—the prosecution reproduced documents with OSC Bates numbers *where the document was redacted for privilege by MDHHS prior to production to OSC* while simultaneously producing the complete, *unredacted* privileged email elsewhere in the production.

Director Lyon estimates that there are at least 20,000 privileged documents contained in the prosecution's production to date. By way of example, an initial data review has revealed over 12,000 hits on searching the terms "attorney" within two words of the term "privilege," over 5,000 hits on the term "attorney work product," over 600 emails including Director Lyon's criminal counsel, and over 4,600 emails including *just one* of the Civil AAGs representing Director Lyon in the civil matters.[3] Ex. 9 to Mot. for Prot. Order, 1 App 130. The privileged documents already improperly produced by the prosecution include:

- Communications between Director Lyon, his civil counsel, and criminal counsel regarding legal strategy and preparation for testimony before Congress regarding Flint water matters;

- Communications between Director Lyon, his civil counsel, and his criminal counsel regarding responses to requests for information from state and federal agencies;

- Communications between MDHHS and its civil and criminal counsel regarding Flint water matters and common interest communications;

---

[3] The Report also includes terms related to Governor Snyder's counsel, Dr. Wells' counsel, internal and external counsel for MDHHS, and several of the Civil AAGs representing Director Lyon and MDHHS.

RECEIVED by MSC 6/15/2022 8:54:19 PM

- Communications between MDHHS and its civil and criminal counsel including draft legal documents and communications; and

- Communications between parties to the common interest agreement regarding Flint water matters, including draft documents.[4]

In sum, Director Lyon and the other defendants have no way of knowing what privileged materials are contained in the remaining documents that the prosecution has in their possession. All they know is that the prosecution has in its possession documents *known to be privileged* and is refusing to do anything about it.

## VI. PROCEEDINGS IN THE DETROIT BANKRUPTCY

The prosecution's indiscriminate seizure and production of privileged information also violated a confidentiality order issued by the Federal Bankruptcy Court. Per that Order, the government is prohibited from disclosing confidential mediation materials related to the Detroit Bankruptcy, which involved Governor Snyder. This breach led Governor Snyder to file a motion for contempt and an evidentiary hearing in that matter.[5] In his Motion, Governor Snyder noted that his counsel had located thousands of privileged documents in the first four million documents produced. *Id.* ¶ 10. Remarkably, the Office of the Attorney General initially represented in its Response to Governor Snyder's Motion that the People had used "computer-aided review" to separate potentially privileged materials. See Ex. 6 to Resp. to Am. Mot. for Am. Prot. Order, AG

---

[4] Director Lyon provided a representative sample of 21 of his privileged documents identified in the production to the Circuit Court for *in camera* review in connection with his Motion for Protective Order. These documents represented only a small sampling of the privileged materials included in the prosecution's production. Director Lyon is willing to produce copies of the documents provided for review by this Court *in camera* and under seal.

[5] See Ex. 5 to Resp. to Mot. To Am. Protect Order, Snyder's Motion for Evidentiary Hearing and Contempt in *In re City of Detroit, Michigan*, Case No.: 13-53846-tjt, 2 App 297.

Resp. to Mot. for Evid. Hearing and Contempt, ¶ 1, 2 App 323-24. But then the Attorney General reversed course at the hearing on the motion, claiming that the documents produced by the prosecution lacked "clear metadata" and that any review would have to be "on a document-by-document basis." 6/16/21 Tr. Mot. for Evid. Hearing, 52:14-25, 2 App 428.[6]

On June 17, 2021, Judge Tucker issued an order directing Governor Snyder to file a sample of the privileged materials under seal and prohibiting the prosecution from any further disclosures covered by the confidentiality order. This matter remains pending.

## VII.  THE PROSECUTION ATTEMPTS TO AMEND THE STIPULATED PROTECTIVE ORDER TO ALLOW THEM TO RETAIN, REVIEW, AND PRODUCE PRIVILEGED MATERIALS

Recognizing the serious implications of their decision to produce millions of documents without conducting even the most basic privilege screen, and shortly after Governor Snyder filed his motion in the Bankruptcy Court, the People filed a motion to amend the Stipulated Protective Order on June 9, 2021. See Mot. to Am. Prot. Order, 2 App 236.[7] A review of the prosecution's proposed order makes clear that it was drafted in a misguided attempt to provide cover for the prosecution's failure to conduct a proper taint review at the time of the 2019 search warrants, and to obtain the Circuit Court's imprimatur to continue to possess, review and produce the privileged materials.

---

[6] A copy of this transcript was provided to the Circuit Court at the hearing on Director Lyon's Motion for Protective Order.

[7] On April 7, 2021, this Court entered a Stipulated Protective Order limiting the disclosure and use of certain discovery materials, including personal and identifiable information and medical records. See Exhibit 3 to Resp. to Mot. to Am. Prot. Order, Stip. Prot. Order 2 App 286. The language of the Stipulated Protective Order was negotiated amongst the parties, and related to the protection of certain confidential personal, financial, and medical information that was included in the prosecution's production. See *id.*

RECEIVED by MSC 6/15/2022 8:54:19 PM

The proposed Amended Protective Order (the "First Amended Protective Order") filed with the Motion used largely identical language to the Stipulated Protective Order, with two key distinctions: (1) references to "Confidential" information were changed to read "Privileged Or Confidential Information," and (2) adding a paragraph requiring parties who wished to use "Privileged Or Confidential Information" that is subject to another court's order (i.e., in the Detroit Bankruptcy) must seek approval from the court that entered the order prior to utilizing the designated information. See Ex. A to Mot. to Am. Prot. Order, ¶ 15, 2 App 244. By simply changing the references to "Confidential Information" to "Privileged and Confidential Information," the People drastically changed the scope of the Protective Order from one reasonably crafted to prevent the disclosure of confidential personal and medical information outside the litigation to one that apparently contemplated—and asked the Court to approve!—the People's ability to review, analyze, produce, and use in this litigation privileged information belonging to other parties, including Director Lyon and the other defendants.[8]

As Director Lyon argued in his response to the prosecution's motion to amend the stipulated protective order, see Ex. 3 to Resp. to Am. Mot. to Am. Prot. Order, 2 App 286, the proposed amended protective order was based on the misguided premise that the prosecution would be entitled to possess, review, and use privileged information belonging to other parties. In other words, having obtained the defendants' legal-strategy playbook, the prosecution should be allowed to keep and use that playbook against the defendants. The proposal would have further allowed

---

[8] Following Judge Tucker's order in the Detroit bankruptcy case, on July 29, 2021, the prosecution filed an "Amended Motion to Amend The Protective Order," along with a second Proposed Amended Protective Order (the "Second Amended Protective Order"). The Second Amended Protective Order is identical to the First Amended Protective Order, with the exception of the addition of paragraphs 5, 6, and 10. See Ex. A to Am. Mot. for Am. Prot. Order, ¶ 4, 2 App 251.

RECEIVED by MSC 6/15/2022 8:54:19 PM

the prosecution the unilateral authority to determine what is subject to privilege. This was unprecedented for a Michigan criminal proceeding.

Importantly for this appeal, the proposed Second Amended Protective Order also showed that the prosecution intended to *review, use, and produce* the privileged materials seized in the search warrants. See Ex. A to Am. Mot. to Am. Prot. Order, ¶ 5, 2 App 251 ("The Documents gathered pursuant to the search warrants on the Department of the Attorney General – Civil Team, KL Discovery, and other state agencies in May 2019, and which have and will continue to be produced in discovery in this case by the People, may include Privileged or Confidential Information"); ¶ 10, 2 App 252-53 ("Privileged or Confidential Information produced in this case *will be used solely for the preparation, trial, and appeal of this action . . .*") (emphasis added). The prosecution wanted to continue to keep privileged documents that set forth the mental impressions and private communications between lawyers and their clients directly relevant to the defense of this case. Appropriately, the Circuit Court denied the prosecution's motion. See 8/26/22 Order on Am. Mot. to Am. Prot. Order, 2 App 462.

## VIII. DIRECTOR LYON MOVES FOR A PROTECTIVE ORDER AND DISCOVERY INTO THE PROSECUTION'S SEIZURE, REVIEW, AND PRODUCTION OF DEFENDANTS' PRIVILEGED MATERIALS

On September 3, 2021, Director Lyon filed his Motion for Protective Order and Discovery seeking (1) a protective order barring the prosecution from reviewing or producing any seized documents until a protocol could be established to allow for the proper review of privileged material by a taint team and (2) an order pursuant to MCR 6.201(J) allowing Director Lyon to take discovery into the seizure, review, and production processes employed by the prosecution. See Mot. for Prot. Order, 1 App 012.

The Motion for Protective Order requested two distinct forms of relief. First, Director Lyon argued that there was "good cause" for a protective order and the implementation of a taint team under MCR 6.201(E) because, despite warnings from defense counsel *and their own peers in the Department of the Attorney General*, the prosecution had indiscriminately seized, reviewed,[9] and produced privileged materials belonging to Director Lyon and other defendants. See, generally, Mot. for Prot. Order, 1 App 011. Emphasizing that taint teams are commonly used by prosecutors to ensure that they are able to investigate their case while protecting a defendant's Sixth Amendment right to counsel, Director Lyon argued that such a protective order and a taint review was necessary to ensure that his rights were protected *going forward*, given that the prosecution remains in possession of tens of thousands of privileged documents (likely more) and planned to review them. *Id.* at 1 App 035.

Second, Director Lyon requested discovery and an evidentiary hearing pursuant to MCR 6.201(J) to determine the scope of the prosecution's intrusion into his privileged materials, to determine whether he had been prejudiced by such intrusion. *Id.* at 1 App 035-36. Director Lyon's request for discovery was further supported by the prosecution's decision to violate the conflict wall between the civil and criminal AAGs that was supposed to protect the attorney-client relationship between Director Lyon and his civil counsel from intrusion by the prosecution, by

---

[9] While the prosecution has maintained that they have never reviewed privileged documents, that assertion is both unverifiable and subject to substantial doubt, given their continued possession of the documents at issue and (1) their repeated public statements that they intended to review all of the seized documents; (2) their argument that that it was *not possible* to use computer-aided review to segregate privileged documents; and (3) that the prosecution has *never* provided any specific information regarding the scope of their review, which, according to information not raised until their Application for Leave in the Court of Appeals, apparently included at least 500,000 unspecified documents. *See* 5/3/19 Tr. of Hearing on Mot. to Stay/Mot. to Intervene at 40:1-7, 1 App 191; (emphasis added); Ron Fonger, "Flint water prosecutors to set stage to drop charges if unable to review new docs," MLive (May 15, 2019) 1 App 223; 6/16/21 Tr. Mot. for Evid. Hearing, 52:14-25, 2 App 428, Mot. for Recon 2 App 569; App. for Leave at 5.

obtaining privileged communications including the Civil AAGs *who continue to represent Director Lyon, MDHHS, and the other defendants and agencies to this day*. This includes emails in which the Civil AAGs provide legal advice to their clients, including Director Lyon. *Id.* at 1 App 034.

The prosecution filed its response on October 7, 2021. In it, the prosecution effectively ignored the request for a protective order, and instead made the straw-man argument that Director Lyon had allegedly failed to demonstrate that the prosecution had committed "outrageous conduct" sufficient to prove a Sixth Amendment violation. See Resp. to Mot. for Prot. Order at 2 App 470-74. That argument had nothing to do with Director Lyon's request, which was not based on the Sixth Amendment, but rather on the court rule that only requires "good cause." The prosecution argued that Director Lyon could not prove a "deliberate intrusion" into his attorney-client privilege because he could not prove which of his privileged materials had been reviewed by the prosecution. *Id.* at 10, 1 App 479. The only explanation of the scope of the review offered in the prosecution's response was a purported "offer of proof," without any attestation or supporting affidavit, contained in a footnote where they stated, "[t]he People . . . . have, in fact, applied screening tools intended to segregate the privileged communications from the body of evidence reviewed by human beings." *Id.* at 1 App 479. The prosecution further argued that Director Lyon could not prove that he had been prejudiced by the prosecution's seizure and production of his privileged communications and argued that any such prejudice would be negated by the exclusion of privileged communications at trial. *Id.* at 1 App 479-81. In essence, the argument was, "We should be allowed to keep and review the privileged documents to prepare for trial, but maybe not introduce them into evidence."

The Circuit Court heard oral argument on October 12, 2021. See 10/12/21 Tr. 2 App 491. At the hearing, Director's Lyon's counsel emphasized the scope of the seizure of privileged materials, including, but not limited to, communications regarding preparation for Director Lyon's congressional testimony on matters directly at issue in this litigation, and a 50-page timeline providing a roadmap to the criminal defense at issue in this case. *Id.* at 26:21-27:6 2 App 516-17.[10] Counsel for other defendants who had joined in Director Lyon's motion also indicated that that they had discovered thousands of their clients' privileged documents in production. See *id.* at 42:23-43:1, 2 App 532-33 (counsel for Mr. Baird stating that he had located thousands of privileged documents including his client's in the production).

## IX. THE CIRCUIT COURT'S ORDER AND THE PROSECUTION'S MOTION FOR RECONSIDERATION

On November 19, 2021, the trial court granted in part Director Lyon's motion for a protective order and discovery. See 11/19/21 Order on Mot. for Prot. Order, 1 App 001. The Court acknowledged the importance of protecting privileged documents from disclosure to the government in a criminal case, and it noted that taint teams are routinely used by prosecutors in the very circumstances here, i.e., when documents containing privileged material have been seized in connection with a search warrant. *Id.* at 1 App 002-03. The Circuit Court flatly rejected the prosecution's claim that a showing of "outrageous conduct" was required for a finding of "good cause" under MCR 6.201(E). *Id.* at 1 App 005. In reaching its determination, the Court stated that it is "interested in mitigating the *potential of a future violation*." *Id.* at 1 App 006 (emphasis added). Specifically, the Court found that, "[a]lthough likely slowing the discovery process, taint

---

[10] Copies of these documents, along with other sample privileged documents, were provided to the Circuit Court for *in camera* review at the hearing.

19

teams are *commonly used to prevent the dissemination and review of privileged materials and this Court believes that the use of a taint team will help ensure a fair trial in this matter.*" *Id.* (emphasis added). Thus, the Court found that Director Lyon had satisfied the good cause requirement under MCR 6.201(E) and ordered the prosecution to implement a taint team to facilitate the discovery in this matter. *Id.* The Court denied Director Lyon's request for discovery, at least for the time being. *Id.* at 1 App 007-08.

The prosecution filed a Motion for Reconsideration on December 10, 2021. See Mot. for Recon., 2 App 569. The Motion essentially rephrased the prosecution's flawed argument that Director Lyon is required to show "outrageous conduct" and a constitutional violation in order to satisfy the "good cause" standard required for a protective order and for a taint team. See *id.* at 2 App 573-75. The prosecution then added a new argument, making the unsubstantiated—and frankly ridiculous—claim that implementation of a taint team would somehow cost $48 million and take three years to complete. *Id.* at 2 App 578. The prosecution provided no data and zero affidavits to support their claims on the cost and time required for the review; rather, they simply asserted vague claims about "large groups" of scanned hard copy documents that are unreviewable by search terms or artificial intelligence, and large PDFs of scanned documents that will allegedly need to be manually reviewed. *Id.* These new claims directly contradicted the prosecution's previous "offer of proof" that they had been able to screen privileged communications from those reviewed by the prosecution team. See Resp. to Mot. for Prot. Order at n 4, 2 App 479.

The Circuit Court denied the Motion for Reconsideration, finding that the prosecution had "failed to demonstrate a palpable error by which the court and the parties have been misled or that a different disposition of the motion must result from correction of the error." 1/7/2022 Order on Mot. for Recon. at 2 App 010. The Court further ordered the prosecution to "provide a detailed

written protocol for the establishment and implementation of the taint team, as previously ordered" and provide that protocol to each defendant "for review and approval." *Id.* Counsel for Director Lyon and for other Defendants have repeatedly requested meetings with the prosecution to discuss a protocol for the taint review; however, these requests were effectively ignored for months.

## X.  THE PROSECUTION'S APPLICATION FOR LEAVE TO APPEAL AND MOTION TO STAY PENDING APPEAL

The prosecution filed its Application for Leave to Appeal in the Court of Appeals on January 28, 2022. After filing their Application, the prosecution filed a perfunctory motion to stay pending appeal in the Circuit Court. See Mot. Stay Proceedings, 2 App 584. In their motion, the prosecution failed to even *cite* the standard for a motion to stay pending appeal, and instead simply acknowledged that the circuit court had ordered them to draft a taint team protocol for review and approval by defendants and asked the Circuit Court to stay enforcement of that order until the appeal was resolved because "the establishment of the taint team will require considerable time and resources." *See id.* 2 App 585.

Director Lyon responded to Motion to Stay on or about February 3, 2022. *See* Response to Mot. to Stay, 2 App 597. In his response, Director Lyon noted that his counsel had already sent two letters to the prosecution seeking preliminary meetings regarding the potential protocol in the three months since the Circuit Court had ordered its establishment, both of which went unanswered. *Id.* Exs. 1 & 2, 2 App 610-14. Director Lyon argued that there was no reason the taint team protocol could not be drafted while the appeal was pending and that any alleged costs for implementation would not be incurred until after the protocol was drafted. *Id.* at 2 App 607. The Circuit Court agreed and denied the prosecution's motion to stay as to the taint team protocol, but ordered that the prosecution would not be required to have the taint team review or produce any documents until the appeal was resolved. *See* 3/7/22 Order on Mot. to Stay 2 App 644. The

21

RECEIVED by MSC 6/15/2022 8:54:19 PM

Court of Appeals denied the prosecution's Application for Leave for lack of merit on March 24. 2022. *See* 3/24/22 MCOA Order, 2 App 646.

Despite having been ordered three times by the Circuit Court to prepare a taint team protocol and having been denied a stay pending appeal, the prosecution produced a draft protocol less than three weeks before the filing of this Answer. After nearly seven months of delay, the draft protocol consisted of a three-page letter that outlines a process that would apply privilege *only* to communications between Defendants and their criminal counsel and documents related to the Detroit Bankruptcy, and a list of potential search terms largely made up of criminal attorney names. The prosecution now attempts to delay this process even further by seeking this Court's review of the same legally and factually deficient arguments that have been repeatedly rejected by the lower courts.

## STANDARD OF REVIEW

As outlined above, the only issue before this Court is whether the Circuit Court abused its discretion in denying the prosecution's Motion for Reconsideration. See *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 629; 750 NW2d 228 (2008). Under this standard, the reviewing court must defer to the trial court's judgment provided the trial court reached a "principled outcome," even if that judgment is not the only outcome. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). See also *Churchman v Rickerson*, 240 Mich App 223, 233; 611 NW2d 333 (2000) (noting that a decision on a motion for reconsideration is reviewed for an abuse of discretion and "an abuse of discretion exists where the result is so palpably and grossly violative of fact and logic that evidences perversity of will or the exercise of passion or bias rather than the exercise of discretion"). The Circuit Court's Order on the Motion for Reconsideration has more than met that standard, and the Application for Leave should be denied summarily.

22

## LAW AND ARGUMENT

I.  **THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION BY REJECTING ARGUMENTS ALREADY CONSIDERED OR THAT COULD HAVE BEEN RAISED IN CONNECTION WITH THE MOTION FOR PROTECTIVE ORDER**

### A.  Legal Standard for Reconsideration

To succeed on its Motion for Reconsideration, the prosecution must demonstrate that the Circuit Court made a "palpable error" and that a different disposition would result from the correction of the error. See *Luckow v Luckow*, 291 Mich App 417, 426; 805 NW2d 453 (2011); MCR 2.119(F)(3). Palpable error is that which is "[e]asily perceptible, plain, obvious, readily visible, noticeable, patent, distinct, [or] manifest." *Id.* 426 (quoting *Stamp v Mill Street Inn*, 152 Mich App 290, 294; 393 NW2d 614 (1986) [quoting Black's Law Dictionary (5th ed.), p. 1000]). Evidence sufficient to establish palpable error would be that which would "actually prejudice[] [the requesting party] or might prejudice them in the future." *Huntington Nat Bank v Daniel J Aronoff Living Trust*, 305 Mich App 496, 516; 853 NW2d 481 (2014). Further, a motion "which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted." MCR 2.119(F)(3).

Moreover, even if the prosecution had presented new arguments or information in their motion, the court is entitled to deny the motion for reconsideration where the prosecution presented no new arguments or facts that could not have been raised in their original response. See *Charbeneau v Wayne Co Gen Hosp*, 158 Mich App 730, 733; 405 NW2d 151 (1987), quoting MCR 2.119(F)(3) (affirming denial of motion for reconsideration where the motion rested "on a legal theory and facts which could have been pled or argued prior to the trial court's original order" because the motion did not "demonstrate a 'palpable error by which the court and the parties ha[d] been misled'").

23

RECEIVED by MSC 6/15/2022 8:54:19 PM

In its Motion for Reconsideration, and in both its Applications for Leave, the prosecution claimed that the Circuit Court made palpable errors where (1) it found sufficient "good cause" to warrant granting a protective order pursuant to MCR 6.201(E) while also declining to find that a constitutional violation had already occurred; and (2) it failed to consider the prosecution's vague and unsubstantiated claims regarding the purported burden of implementing the taint team. Neither claim comes close to showing the level of "palpable error" required for granting a motion for reconsideration, and thus the Circuit Court did not abuse its discretion in denying the Motion.

**B.    There is No Abuse of Discretion Where a Trial Court Rejects Arguments at Reconsideration That Were Previously Addressed by the Court**

First, the Circuit Court did not abuse its discretion where it rejected the prosecution's claim of "palpable error" regarding the "good cause" standard required for the entry of a protective order because it had already considered the prosecution's argument in connection with the Motion for Protective Order.  MCR 2.119(F)(3) makes clear that a motion "which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted." See MCR 2.119(F)(3);  *Boertmann v Cincinnati Ins Co*, 493 Mich 963; 828 NW2d 675 (2013). Accord *Cason v Auto Owners Ins Co,* 181 Mich App 600, 609-10 (1989) (rejecting motion for reconsideration because "the same issue was ruled on by the court when it granted summary disposition").

In the Motion for Reconsideration, the prosecution claimed the Circuit Court made a "palpable error" where it "improperly severed the 'good cause' standard advanced by Defendants from Defendants' arguments under *People v Joly*."  Mot. for Recon., 2 App 574; Resp. to Mot. for Prot. Order, 2 App 472-73 (arguing that judicial intervention is not required where an opposing party possesses privileged materials absent a showing of "outrageous conduct").  The Circuit Court's Order on the Motion for Protective Order specifically addressed this issue, noting that "the

24

People oppose the issuance of a protective order because they deny violating the Defendant's attorney-client privilege and *because Defendant has not demonstrated 'outrageous misconduct' by the government.*" 11/19/22 Order on Mot. For Prot. Order, 1 App 5. As outlined below, this argument erroneously conflates the "good cause" standard with the standard for a constitutional violation and evidentiary hearing under *Joly*. However, the Court need not even consider the merits of these claims; the fact that it was already considered and rejected by the Circuit Court is a sufficient basis for denial of the Motion for Reconsideration. See MCR 2.119(F)(3). As such, the Circuit Court did not abuse its discretion in denying the reconsideration on these grounds.

### C. There is No Abuse of Discretion Where the Trial Court Rejects Reconsideration Based on Unsupported Arguments That Could Have Been Raised in Connection With The Prior Motion

The second alleged "error" identified by the prosecution related to the purported burden of implementing the taint team. The prosecution claimed for the first time in its Motion for Reconsideration that implementing a taint team would take three years and cost $48 million. But Michigan Courts have long held that a circuit court does not err by declining to consider arguments that could have been raised in connection with the original motion. *Pierron v Pierron*, 282 Mich App 222, 264, 765 NW2d 345, 372 (2009). Accord *Charbeneau v Wayne Co Gen Hosp*, 158 Mich App 730, 733; 405 NW2d 151 (1987) (affirming denial of motion for reconsideration where the motion rested "on a legal theory and facts which could have been pled or argued prior to the trial court's original order" because the motion did not "demonstrate a 'palpable error by which the court and the parties ha[d] been misled'").

The prosecution had every opportunity to raise the purported burden of the taint team in connection with its response to the Motion for Protective Order. It failed to do so and that failure is not a reason to grant reconsideration. This is particularly true where the prosecution's claims

RECEIVED by MSC 6/15/2022 8:54:19 PM

regarding the burden of the taint team were limited to unsupported factual assertions in its Motion for Reconsideration and did not include affidavits or any other credible evidence to justify the purported burden. See *Ensink v Mecosta General Hosp.*, 262 Mich App 518, 540; 687 NW2d 143 (2004) (no abuse of discretion in denying motion for reconsideration where movant "request[ed] this Court to find that the trial court abuse its discretion because the court did not indulge their speculation").

Further, a trial court does not abuse its discretion when it rejects a party's challenges to factual assertions where it had the opportunity to do so in the earlier motion. See *Woods*, 271 Mich App at 629-30 (finding no abuse of discretion where plaintiff had the opportunity to challenge the factual accuracy of an affidavit in the original motion but only raised the issue in the motion for reconsideration); *Yachcik v Yachcik*, 319 Mich App 24, 42; 900 NW2d 113 (2017) (finding no abuse of discretion where a trial court declined to consider new evidence presented "without citation or supporting documentation," because "[a] court has full discretion to decline to consider evidence presented with a motion for reconsideration that could have been presented the first time the issue was argued"). Accordingly, the Circuit Court did not abuse its discretion when it declined to find a "palpable error" based on the alleged burden of the taint team.

## II.  THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING THE PROSECUTION'S CLAIM OF PALPABLE ERROR

The prosecution's arguments also fail on the merits. First, the prosecution's argument that "outrageous conduct" by the prosecution is necessary to a finding of good cause to grant a protective order and implement a taint team is flatly wrong and is based on a misunderstanding of Director Lyon's argument. Second, the prosecution's claims regarding the alleged burden of implementing a taint team are unsubstantiated and inflated.

26

**A.** **The Circuit Court Did Not Abuse its Discretion When it Declined to Find "Palpable Error" Regarding its Application of the "Good Cause Standard"**

In its Motion for Reconsideration, the prosecution claimed that the Circuit Court made a "palpable error" where it "improperly severed the 'good cause' standard advanced by Defendants from Defendants' arguments under *People v Joly*." Mot. for Recon., 2 App 572. The prosecution asserted, without any legal basis, that because the Circuit Court found that Director Lyon had not established "outrageous misconduct" at this point in the case, he also had not demonstrated "good cause" for a protective order or a taint team. *Id.* at 2 App 574. Mot. for Recon., 2 App 574. The prosecution continues to conflate the two standards in its Application for Leave. See App. for Leave at 13-14. Although the prosecution's behavior is indeed outrageous, that is not the applicable standard to grant a protective order.

1. ***Legal standard to grant a protective order***

As the Circuit Court recognized, a trial court may grant a protective order based on a showing of "good cause." MCR 6.201(E). Michigan courts have long held that trial courts have "broad discretion to determine what constitutes 'good cause.'" *Thomas M Cooley Law School v Doe 1*, 300 Mich App 245, 264; 833 NW2d 331 (2013). Moreover, as the Circuit Court noted in its Order, pursuant to MCR 6.201(C)(1), "there is no right to discover information or evidence that is protected from disclosure by constitution, statute, or privilege, including information or evidence protected by a defendant's right against self-incrimination, except as provided in subrule (2)." 11/19/21 Order on Mot. for Prot. Order, 1 App 002. If a party fails to comply with the requirements of MCR 6.201, the court may craft an appropriate remedy, including "enter[ing] such other order as it deems just under the circumstances." MCR 6.201(J). Accord *People v Cross*, No. 307374, 2013 WL 4404229 at *2 (Mich Ct App Aug 15, 2013) (noting that trial court has "broad discretion" to fashion an appropriate remedy for a discovery violation and "must examine the facts and weigh

27

the competing interests involved"). MCR 2.601 is clear: The trial court may enter a protective order based only on a showing of "good cause," and is given significant discretion in addressing the violation of discovery rules, including with regard to the discovery of privileged information.

### 2. *The Joly test is irrelevant to determining good cause*

In their Motion for Reconsideration and Application for Leave, the prosecution conflates the "good cause" standard under MCR 6.201(E) with the test articulated in *People v Joly* for a court to find a violation of a defendant's constitutional right to due process. In *Joly*, the Michigan Court of Appeals adopted the three-part test articulated in *United States v Voight* for the purpose of determining whether evidence should be excluded on the grounds of a "violation of due process." *People v Joly*, 336 Mich App 388, 404; 970 NW2d 426 (2021) (appeal denied by *People v Joly*, 508 Mich 971; 965 NW2d 543 (2021)). That test includes determining whether: (1) the government was aware of an ongoing attorney-client relationship between the defendant and attorney; (2) deliberate intrusion by the prosecution into that relationship; and (3) actual and substantial prejudice. *Id.* at 401 (citing *United States v Voigt*, 89 F3d 1050, 1067 (CA 3 1996)).

The issue in *Joly* related to the *exclusion* of key evidence *at trial* (the gas can used to start the fire at issue in the case) on the basis that the prosecution had violated the defendant's constitutional right to due process when they deliberately used privileged information to find the gas can. *Id.* at 405-406. The *Joly* opinion does not address the "good cause" standard, protective orders, or MCR 6.201(E), as they were not at issue in that case. The *Joly* opinion does reference the use of "taint" or "filter" agents as a common method of insuring that privileged communications obtained during an otherwise lawful search are screened from other materials—a fact which, as outlined below, everyone outside of the prosecution team seems to be aware. *Id.* at 405. But the issue in *Joly* was not whether a taint team should be implemented. Such a determination was

28

irrelevant to the question before the Court of Appeals, which related to a violation of the attorney-client privilege *that had already been proven to have occurred.*

The prosecution has never cited any case law demonstrating that "outrageous conduct" or proof of a constitutional violation is required for a protective order or to implement a taint review because none exists. The prosecution is confusing remedies for past violations of the privilege with protection from potential future violations. Indeed, the purpose of any protective order is to prevent privileged, confidential, or sensitive material from being disclosed to parties who should not have access. This is also the primary purpose of a taint team: not to *remedy a violation* of the attorney-client or work product privilege, but *to prevent a violation from occurring in the first place.* See *id.* ("In the case where a potentially privileged communication does get caught up in an otherwise lawful search, there are also steps that can be taken to identify and segregate privileged information from the rest, including filter agents or taint teams.").

### 3. *The facts of this case more than satisfy the "good cause" standard*

The prosecution has repeatedly argued that there cannot be good cause for a protective order "by the mere fact that the People possess privileged materials." Mot. for Recon. at 2 App 575. That argument ignores the actual problem. It is possession *plus* refusal to use a taint team to screen privileged materials, which is the prosecution's unprecedented position. In its Application for Leave, the prosecution acknowledges that it possessed defendants' privileged materials. See App. for Leave at 7. Without a protective order, the prosecution may, *at any time and without Director Lyon's or other defendants' knowledge*, access, review, produce, and use all of the privileged material—i.e., defense strategy—seized in the 2019 search warrants. The trial court acted well within its considerable discretion to oversee discovery when it entered the protective order and ordered the implementation of a taint team.

29

RECEIVED by MSC 6/15/2022 8:54:19 PM

Moreover, the "good cause" for the protective order and taint team is underscored by the history of this case. Before the abrupt execution of the search warrant, the parties engaged in a methodical and comprehensive review of documents which resulted in the production of all relevant, *non-privileged* documents to OSC; these documents remain in the possession of the prosecution to this day. It must be emphasized: it is not simply Director Lyon and the other defendants who assert that the prosecution was already in possession of all relevant documents to which they were entitled prior to the 2019 search warrants. *This is the stated position of the prosecution's colleagues in the Department of the Attorney General.* See, generally, Ex. 4 to Mot. for Prot. Order, Not. of Intervention 1 App 085. The only relevant documents that had been left out of the productions to OSC were *privileged*, as the prosecution can see from the privilege logs that were produced. Moreover, the Civil AAGs debunked all of the prosecution's claims regarding the inadequacy of the review. See *id.* Despite its awareness of all these facts prior to the execution of the 2019 search warrants, the prosecution instead chose to indiscriminately seize documents held by their own office and the e-Discovery vendor they had chosen, including all the privileged documents. What's more, they were explicitly warned by counsel for Director Lyon, counsel for Governor Snyder, and the Civil AAGs that some procedure must be implemented to screen privileged materials.[11]

Further, despite the prosecution continually claiming that it has not and will not review any privileged information, it has provided no credible information regarding what review has been done, what further review will be done on the remaining documents, and how they have ensured

---

[11] See Ex. 1 to Mot. to Prot. Order, 5/29/19 Ltr. to Hammoud, 1 App 039; Ex. 6 to Mot. for Prot. Order, 1/20/21 E-Mail from Hammoud, 1 App 120; Ex. 7 to Mot. for Prot. Order, 4/2/21 E-Mail from Hammoud, 1 App 125; Ex. 8 to Mot. for Prot. Order, 4/13/21 E-mail to Hammoud, 1 App 127.

RECEIVED by MSC 6/15/2022 8:54:19 PM

that privileged documents are excluded. To the contrary, since the execution of the search warrants, the prosecution has made numerous contradictory statements about the review of the seized materials, calling all such representations into question. These inconsistencies only further undermine any claim that the prosecution can be trusted with the "mere possession" of defendants' privileged materials.

For example, when the prosecution was attempting to convince Judge Farah to grant them a six-month adjournment, it was the prosecution's stated ethical obligation to review *every* document seized in search warrants, presumably including those that are privileged. See 5/3/19 Tr. of Hearing on Mot. to Stay/Mot. to Intervene, at 40:1-7, 1App 191. When the prosecution attempted to convince Judge Tucker that it had taken steps to prevent the production of confidential mediation materials from the Detroit Bankruptcy, the prosecution said it had conducted "computer-aided review," to screen out privileged materials. See Ex. 6 to Resp. to Am. Mot. for Am. Prot. Order, AG Response to Mot. for Evid. Hearing and Contempt, 2 App 323-24. When Judge Tucker later questioned the prosecution about its failure to protect the mediation materials, the documents had insufficient metadata and had to be reviewed on a "document-by-document basis." 6/16/21 Tr. Mot. for Evid. Hearing, 52:14-25, 2 App 428.

When the prosecution was attempting to defeat Director's Lyon's Motion for Protective Order, it returned to its unsupported "offer of proof" that computer-aided review had screened out privileged materials (yet these privileged materials were disclosed to all of the defendants.) Resp. to Mot. For Prot. Order at n 4, 2 App 479. But after losing that motion, the prosecution then admitted that its prior representations to the court were not true, claiming that screening out privileged materials is virtually impossible. Mot. for Recon., 2 App 569. Even now, when seeking leave to appeal, the prosecution's explanation has changed yet again, with new claims of a review

31

RECEIVED by MSC 6/15/2022 8:54:19 PM

process that are still entirely unsupported by affidavit and were never presented to the Circuit Court.

The Circuit Court was entirely correct: The only way to ensure against a future violation of Director Lyon and the other defendants' constitutional rights is to remove these documents from the prosecution's possession until a taint review has concluded. The prosecution has provided no credible information that would show that privileged materials have been adequately screened from the documents to which the prosecution still has access; indeed, the prosecution's conflicting statements show no reliable screening at all. Instead, the prosecution's sole proposed solution is that it should be allowed to continue to be in possession of the thousands of privileged documents, and if someone manages to catch the prosecution using or reviewing any privileged materials, the exclusionary rule could apply. That is an outrageous proposal, without any authority or precedent, and it was properly rejected by the Circuit Court. Accordingly, there is good cause to establish a taint team to ensure that these documents are screened and that Director Lyon and the other defendants may have a fair trial in this matter. See 11/19/21 Order on Mot. for Prot. Order, 1 App 006. The prosecution previously represented that it was its "ethical obligation" to review all documents. But the prosecution's ethical obligation *certainly* includes screening and returning privileged documents.

### 4. *Taint teams are not "unprecedented" in Michigan*

While not raised in its Motion for Reconsideration, the Application for Leave decries taint teams as "unprecedented" in Michigan jurisprudence. App. for Leave at 12. This is not true. As both the Circuit Court and the *Joly* Court recognized, taint teams are commonly used in connection with search warrants where significant amounts of privileged information will be seized. 11/19/21 Order on Mot. For Prot. Order, 1 App 004. See *Joly*, 336 Mich App at 405 ("In the case where a potentially privileged communication does get caught up in an otherwise lawful search, there are

32

RECEIVED by MSC 6/15/2022 8:54:19 PM

also steps that can be taken to identify and segregate privileged information from the rest, including filter agents or taint teams."). In fact, taint teams are commonly used throughout the country to ensure the protection of privileged information during criminal investigations. E.g. *In re Grand Jury Subpoenas*, 454 F3d 511, 522-23 (CA 6 2006) (noting that "taint teams" are often used when "the potentially-privileged communications are already in the government's possession, and so the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege"); *In re Sealed Search Warrant and App for a Warrant By Telephone Or Other Electronic Means*, 11 F4th 1235, 1250 (CA 11 2021) (noting that "the use of a filter team" is "respectful of, rather than injurious to, the protection of privilege" and that the "Second, Third, Fourth, Seventh, Eighth, Ninth and Tenth Circuits" have approved the use of taint teams"); *Hicks v Bush*, 452 F Supp 2d 88, 102 (CA DC, 2006) (authorizing the use of a taint team and noting that "the Sixth Circuit acknowledged that taint teams are typically used in 'exigent circumstances' when the 'potentially-privileged documents are already in the government's possession'"); *In re Search Warrants*, No. 1:21-cv-04969, 2021 WL 5917983 at *3 (ND Ga Dec 15, 2021) (noting that "[t]he Eleventh Circuit has expressly permitted the use of filter or taint teams to review potentially privileged communications in criminal investigations"); *United States v Vepuri*, No. 21-132, 2021 WL 4860744 at *2 (ED Pa Oct 19, 2021) ("The use of a filter or taint team separate from the prosecution team is well established. Such a procedure promotes the expeditious review of documents, helps avoid delay in the investigation of criminal conduct, and ultimately assists in effecting a speedy trial or other resolution of the action."); *In re Search Warrants Executed on April 28, 2021*, No. 21-MC-425, 2021 WL 2188150 at *2 (SDNY May 28, 2021) ("This Court finds that the filter team process adequately safeguards the attorney-client privilege and the constitutional rights of the search subjects and their clients"); *In re Search of*

33

RECEIVED by MSC 6/15/2022 8:54:19 PM

*5444 Westheimer Rd Suite 1570, Houston, Texas, on May 4, 2006*, No. H-06-238, 2006 WL
1881370, at \*3 (SD Tex, July 6, 2006) (noting that taint teams "allow expeditious review of all
seized documents," and "allow the Court . . . to resolve ultimate privilege disputes before any
potentially privileged materials are disclosed to the prosecution team").[12] Accord USDOJ, *Justice
Manual*, Section 9-13.420, "Obtaining Evidence: Searches of Premises of Subject Attorneys,"
*available at* https://www.justice.gov/jm/jm-9-13000-obtaining-evidence#9-13.420 (noting that,
"during searches of business organizations where such searches involve materials in the possession
of individuals serving in the capacity of a legal advisory to the organization," in order "to protect
the attorney-client privilege and to ensure that the investigation is not compromised by exposure
to privileged material relating to the investigation or to defense strategy, a 'privilege team' should
be designated, consisting of agents and lawyers not involved in the underlying investigation.").

In sum, use of a taint team is a standard procedure in cases where privileged materials may
be caught up in an otherwise lawful search, and the use of a taint team in such a scenario is the
stated policy of the U.S. Department of Justice. What is "unprecedented" is a prosecutor executing
search warrants through which she knows she will obtain thousands of privileged documents and
doing nothing to screen those documents from her possession and review. A responsible
prosecution team would have conducted the taint review at the time of the search warrants.

---

[12] Some courts have found that even taint teams do not provide sufficient protection for
privileged materials, finding that allowing prosecutors and agents, even those unconnected to an
investigation, to rifle through privileged materials and to exercise their own judgment as to whether
a document is privileged is akin to leaving "the government's fox in charge of guarding the
[target's] henhouse." *In re Search Warrant Issued June 13, 2013*, 942 F3d 159, 179 (CA 4 2019)
(finding that the "appearance of unfairness" arising from use of filter team of prosecutors and
federal agents was "especially apparent" where the prosecutors were employed by the same
judicial district where clients of the searched law firm were being investigated by federal officials).

34

RECEIVED by MSC 6/15/2022 8:54:19 PM

Given that they were in possession of the privilege logs provided during the OSC investigation, the prosecution was well aware that seizing documents from the Civil AAGs representing the defendants in the civil Flint water matters on *identical issues* would result in the improper seizure of privileged information. Moreover, the prosecution was repeatedly warned by defendants' counsel *and its own office* that their decision to indiscriminately seize privileged information was problematic. See Exs. 1, 6, & 7 to Mot. for Prot. Order, 1 App 039, 120, 125. But instead of heeding the warnings and conducting a proper taint review, the prosecution relied on the principle that has defined this entire prosecution: that the rules that bind other prosecutors do not apply, and any means may be used in pursuit of its perceived version of "justice."

The circumstances of this prosecution demonstrate that the remedy was certainly a "principled outcome" within the Court's considerable discretion over discovery.

### B. The Circuit Court Did Not Abuse its Discretion When it Rejected the Prosecution's Claims Regarding the Purported "Burden" of Implementing a Taint Team

#### 1. *The prosecution grossly misstates the burden of implementing a taint team*

The second purported "error" identified by the prosecution in its Motion for Reconsideration and Application for Leave is the Circuit Court's finding that any burden on the prosecution in implementing the taint review was outweighed by the benefits and its rejection of the prosecution's vague and unsubstantiated claims in the Motion for Reconsideration concerning that alleged burden. Mot. for Recon., 2 App 576, App. for Leave at 18. In its Order on Director Lyon's Motion for Protective Order, the Circuit Court found that the burden on the prosecution will be "slight in contrast to the benefits it will provide in this case" because a taint team would "protect defendants' attorney-client privilege, while shielding the People from allegations of constitutional violations." Order on Mot. For Prot. Order, 1 App 006. In its Motion for

35

Reconsideration, the prosecution claimed that the taint review would cost $48 million and take three years to complete. In its application to the Court of Appeals, that estimate was arbitrarily adjusted downward to two years and $36 million. In the Application to this Court, the estimate is now somewhere between five months and $2.2 million, and 7.3 years and $37 million.[13] These contradictory assertions are irrelevant. No amount of time or money allows the prosecution to keep and use privileged materials against a criminal defendant. In addition, these assertions are unsubstantiated and wrong.

Moreover, the claims regarding the alleged burden are not credible because the prosecution provided no specifics regarding the scope of the seized documents, such as a breakdown of the volume of documents that were scanned versus those that were collected electronically from servers or email inboxes. Instead, the prosecution asserted vague claims about large groups of scanned hard copy documents that are unreviewable by search terms or artificial intelligence, and large PDFs of scanned documents that will allegedly need to be manually reviewed. Mot. for Recon., 2 App 578; App. for Leave at 4-5. In short, the prosecution relies on unsubstantiated hyperbole and inflated figures to avoid protecting the privilege.

*First*, the prosecution's assertions regarding the "impossible burden" of the taint review cannot be accurate, because the Civil AAGs representing defendants in the Flint water matters successfully *undertook the same process on the exact documents at issue in this case.* As outlined in Director Lyon's motion, with regard to MDHHS alone, the Civil AAGs used standard e-

---

[13] The prosecution claims that the lack of clarity in this estimate is the result of the Circuit Court not ruling on the parameters of the review. App. for Leave at 11. However, the reason the Circuit Court has not yet ruled is that the prosecution rejected defendants' attempts to discuss the process and took *nearly seven months* to come up with a two-page "protocol." Had the prosecution complied with the Circuit Court's order and engaged in the process sooner, the issues of the scope of the taint review might have been largely resolved.

Discovery methods to winnow millions of potentially relevant Flint documents from much larger data sets from various sources within MDHHS alone, including from Microsoft Outlook accounts, system drives, and paper files, and ultimately produced thousands of relevant and non-privileged documents that were potentially responsive to requests. See Ex. 3 to Mot. for Prot. Order, MDHHS Review Narrative, 1 App 043. Similar processes were undertaken with regard to other state agencies. See Ex. 4 to Mot. for Prot. Order, Notice of Intervention, 1 App 094. In all, the Civil AAGs were able, with the assistance of their e-Discovery vendor and outside counsel, to narrow a collection of nearly 20 million documents to the hundreds of thousands that were produced to OSC, *and* to produce privilege logs for the privileged documents that were withheld. *Id.*[14]

*Second*, the prosecution's focus on small portions of the 22 million documents that were apparently scanned obscures the fact that the vast majority of documents are searchable. For example, of the nearly 4 million documents produced by the prosecution to date, 3.738 million include native files that are readily searchable, approximately 94% of the total documents. A taint team could certainly search these documents electronically for attorney names and other privilege-related terms. This percentage is supported by the draft protocol that was recently produced; of the 16 million documents remaining for production, the prosecution claims 1 million (or 6.2 %) of these documents are not searchable.

---

[14] There is ample reason for the Court to give more credence to the representations made by the Civil AAGs than the current prosecution team. Instead of relying on unsubstantiated, hyperbolic assertions regarding the costs of the review, the Civil AAGs attached to their Notice of Intervention affidavits from one AAG and a representative of their E-Discovery vendor outlining each and every step of the collection and review process, along with separate documents detailing the process for each state agency. See, generally, Ex. 4 to Mot. for Prot. Order, Notice of Intervention, 1 App 094. Because the exhibits to the Notice of Intervention include over 1000 pages, they have not been included herein, but are available to the Court upon request.

The prosecution further presents no credible reason why the other emails and server documents that were seized from the Department of the Attorney General and KLDiscovery cannot be searched as well. There is no question that many of the custodial documents of defendants and other custodians exist in searchable native format because *the prosecution has already produced millions of them in native format.* Even where attorneys' names do not appear in the top of an email, a search for attorney names and email addresses in the full text of the document accomplishes the same purpose. The prosecution's current claims that the documents are unsearchable also contradict their representations in their response to Director's Lyon's motion that they "have, in fact, *applied screening tools to segregate privileged communications from the body of evidence reviewed by human beings."* Resp. to Mot. for Prot. Order, 2 App 479.

*Third,* even now, nearly seven months after the Circuit Court ordered the implementation of the taint team, the prosecution *still* makes reference to "an unknown number of additional documents that has yet to be uploaded and catalogued by the People's e-discovery vendor" that would allegedly increase their burden. Mot. for Recon., 2 App 576-77; App. for Leave at 4. Putting aside that they have had the documents seized in the 2019 search warrants for over three years and any failure to process and upload them at this point is indefensible, the prosecution does not specify from where these "unknown documents" were seized or collected. The Circuit Court's Order regarding the taint team specifically related to "seized documents," that is, documents seized in the May 2019 search warrants. 11/19/21 Order on Mot. for Prot. Order, 1 App 008. Despite this clear direction, the prosecution argues in its appeal that the taint team's review would include "documents inherited from OSC, including documents collected from publicly available sources, by investigative subpoenas, through voluntary productions, and by other investigative methods," as well as "documents obtained by the present prosecution team through its own investigation,

RECEIVED by MSC 6/15/2022 8:54:19 PM

which has involved the execution of search warrants, the issuance of subpoenas, and other means of investigation." App. for Leave at 3-4. In conflating the documents covered by the Circuit Court's Order with those obtained from other sources, the prosecution obfuscates the true scope of the taint review to convince this Court that such a review is impossible.

Moreover, the Circuit Court's Order denying the Motion for Reconsideration specifically directed the prosecution to prepare a detailed taint team protocol for review and approval by defendants. 1/7/22 Order on Motion for Recon, 1 App 009. This process should resolve many of the issues claimed by the prosecution: if certain categories of documents were not seized from sources that would be likely to include defendants' privileged documents, these "unknown documents" may not even need to be individually reviewed by the taint team. While the recently-produced protocol provides no information regarding the sources of the documents to be reviewed, the negotiations of the protocol between defendants and the prosecution will necessarily include the determination of whether there are classes of documents that could be excluded, such as the documents produced by OSC, which have already been screened. Moreover, even if these "unknown documents" were excluded from the taint review, the prosecution would be required to review them to satisfy their *Brady* obligations.[15] Any burden on the prosecution is ultimately not

---

[15] *See Brady v Maryland*, 373 US 83 (1963). Courts have previously ordered prosecutors to specifically designate *Brady* material in cases involving particularly voluminous document productions. See e.g., *United States v Blankenship*, No. 5:14-cr-00244, 2015 WL 3687864 at *6 (SDWV June 12, 2015) (ordering government to specifically designate *Brady* material because " . . . without more, the United States does not comply with the requirement of *Brady* by merely including all known *Brady* material within the four million plus pages of discovery"). Even where the courts allow the government to produce *Brady* material in a large document production, it is because the documents were *searchable*. *See e.g., United States v Meek*, No. 1:19-cr-00378-JMS-MJD, 2021 WL 1049773 (SD Ind Mar. 19, 2021) (noting that that while *Brady* material was contained in a voluminous document production, the defendants had access to them "in the same user-friendly, searchable, and indexed format as the Government.").

RECEIVED by MSC 6/15/2022 8:54:19 PM

a function of the lower court's order but of the prosecution's own conduct in refusing to do any screening at the outset and to meet and confer with defense counsel over screening protocols.

2.   ***Any burden of implementing the taint review is outweighed by the benefits of ensuring a fair trial of this matter***

The prosecution's position ignores the impropriety of its actions. The prosecution did what no prosecutor should ever do, and on a scale that appears unprecedented: it *knowingly* seized a massive number of privileged materials and made no effort to screen those materials from the dozens and dozens of prosecutors and investigators working on this matter. Without further discovery, the defendants will not know the full extent to which these privileged materials were reviewed and used by the prosecution. The Circuit Court's Order represents a necessary step in preventing additional, future abuse, which is the absolute minimum remedy that should be imposed.[16]

As outlined above, Director Lyon and the other defendants have no way of knowing if or when the prosecution will review its privileged material if it is not removed from the prosecution's possession. While the prosecution now claims that it has no need to review any further documents because the prosecution already built the case before the grand jury, the prosecution has repeatedly declared its need to review the documents seized in the search warrants, including for exculpatory evidence.[17]

---

[16] The prosecution claims in conclusory fashion in note 4 of its application that Director Lyon failed to preserve the argument that the benefits of a taint team outweighs the burden. This argument fails to recognize that the prosecution is the party that raised this issue in the first place (albeit in a belated fashion). Further, it is the prosecution that is in possession of the documents at issue; Director Lyon is not required to speculate as to the burden of reviewing these documents where the prosecution has provided no credible information regarding their source or contents. Finally, no burden on the prosecution justifies the violation of the attorney-client privilege, particularly given any burden which is the result of the prosecution's own actions.

[17] See n. 2, supra.

40

RECEIVED by MSC 6/15/2022 8:54:19 PM

Contrary to the prosecution's claims, a protective order that bars all use or derivative use of the privileged material is not sufficient to protect the defendants' constitutional rights. The seized documents contain, as evidenced by those provided to the Court for *in camera* review in connection with Director Lyon's motion, actual roadmaps to the defense strategy in the previous prosecution, which is identical to the current case. The exclusion of evidence can provide no protection against the derivative use of these documents because the use of a privileged document will not come in the form of the introduction of that document in the grand jury or at trial. Rather, the violation would occur, for example, where the prosecution is able to obtain insight into Director Lyon's defense strategy in this case, or in the review of privileged materials in preparation for the cross-examination of Director Lyon at trial, should he choose to testify.

If the privileged materials remain in the possession of the prosecution, the defendants will have no way to know whether there was any derivative use of privileged material unless a whistleblower from the prosecution team comes forward to tell them. A protective order and the exclusion of evidence similarly do nothing to remedy the prosecution's production of privileged information *to other defendants*. The only guarantee to ensure that the prosecution does not access and review these documents is to remove them from the prosecution's possession through the use of a taint team.

As the Circuit Court noted in its Order, the circumstances of this case necessitate the "mitigat[ion] of a future violation" 11/19/21 Order on Mot. for Prot. Order, 1 App 006. As the Circuit Court found, "[t]he taint team will protect defendants' attorney-client privilege," and "will promote the parties' interests in a fair trial." *Id.* These benefits vastly outweigh any alleged burden of implementing a taint team, *which was necessitated by the prosecution's own discovery strategy and which it should have done in the first place.* Given that the prosecution has presented no

41

RECEIVED by MSC 6/15/2022 8:54:19 PM

credible evidence regarding the *actual* cost and scope of the taint review, any alleged burden is outweighed by the need to protect the defendant's privileged information and ensure that Director Lyon and the other defendants have a fair trial in this matter. The Circuit Court's Order is well within the realm of "principled outcomes." It thus did not abuse its discretion in denying the prosecution's motion for reconsideration and ordering that the taint review proceed. Claims of prejudice to the prosecution must ring hollow as this situation was entirely preventable, entirely in the control of the prosecution, and the prosecution was *repeatedly* warned, including by its own office, of the steps that should be taken to avoid these very circumstances.

## CONCLUSION AND RELIEF REQUESTED

This appeal is just the latest misstep of a prosecution that has gone horribly awry and yet, even now, the prosecution refuses to take any accountability for the mistakes that have been made. Director Lyon respectfully requests that this Court not only summarily deny the prosecution's Application for Leave, but also include a written, public reprimand of prosecution's conduct. Absent such a comment, the prosecution will continue to feel that it operates outside the rules that govern every other Michigan criminal proceeding.

VARNUM LLP
Attorneys for Defendant Lyon

Date: June 15, 2022

By:/s/ *Ronald G. DeWaard*
Ronald G. DeWaard (P44117)
Brion B. Doyle (P67870)
Regan A. Gibson (P83322)
333 Bridge Street, N.W., Suite 1700
Grand Rapids, Michigan 49504
(616) 336-6000

42

WILLEY & CHAMBERLAIN LLP
Charles E. Chamberlain (P33536)
Britt M. Cobb (P69556)
300 Ottawa Avenue, N.W., Suite 810
Grand Rapids, Michigan 49503-2314
(616) 458-2212

BURSCH LAW PLLC
John J. Bursch (P57679)
9339 Cherry Valley Avenue, S.E., Unit 78
Caledonia, MI 49316-0004
(616) 450-4235

19614825.4

RECEIVED by MSC 6/15/2022 8:54:19 PM

43

# Exhibit 7

STATE OF MICHIGAN

IN THE SUPREME COURT

———————————

| | |
|---|---|
| PEOPLE OF THE STATE OF MICHIGAN, | Supreme Court No. 164410 |
| Plaintiff-Appellee, | Court of Appeals No. 360124 |
| v | 7th Circuit Court |
| NICOLAS LYON, | Case No. 21-47378-FH |
| Defendant-Appellant. | |

——————————————————/

**_Amicus Curiae_ Brief of Gov. Richard Snyder in Opposition to The People's Application for Leave to Appeal**

**FILED UNDER AO 2019-6**

════════════════════════════════════

Gaëtan Gerville-Réache (P68718)
Brian Lennon (P47361)
Charles Ash (P55941)
WARNER NORCROSS + JUDD LLP
Attorneys for _Amicus Curiae_
Richard Snyder
150 Ottawa Ave. NW, Suite 1500
Grand Rapids, MI 49503-2832
616.752.2000
greache@wnj.com

Dated: July 7, 2022

Fadwa A. Hammoud (P74185)
Solicitor General

Kim Worthy (P38875)
Wayne County Prosecutor

Christopher Kessell (P71960)
Gallant Fish (P82196)
Molly Kettler (P59877)
Assistant Attorney General
Attorney for the Plaintiff-Appellee
Solicitor General's Division
3030 W. Grand Blvd., Suite 10-200
Detroit, Michigan 48202
313.456.3870

Charles E. Chamberlain, Jr.
(P33536)
Britt M. Cobb (P29556)
WILLEY & CHAMBERLAIN LLP
Attorneys for Defendant-Appellant
    Lyon
300 Ottawa Avenue NW, Suite 810
Grand Rapids, MI 49503-2314
616.458.2212
cec@willeychamberlain.com
bmc@willeychamberlain.com
Ronald G. DeWaard (P44117)

John J. Bursch (P57679)
BURSCH LAW PLLC
Attorneys for Defendant-Appellant
    Lyon
9339 Cherry Valley Ave. SE, Unit 78
Caledonia, MI 49316-0004
616.450.4235
jbursch@burschlaw.com

Alexander S. Rusek (P77581)
Rusek Law PLLC
Attorneys for Amicus Curiae
    Howard D. Croft
500 E. Michigan Avenue, #211
Lansing, Michigan 48912
586.838.7387
alexrusek@gmail.com

Brion B. Doyle (P67870)
Regan A. Gibson (P83322)
VARNUM LLP
Attorneys for Defendant-Appellant
Lyon
333 Bridge Street NW, Suite 1700
Grand Rapids, MI 49503-5365
616.336.6000
rgdewaard@varnumlaw.com
bbdoyle@varnumlaw.com
ragibson@varnumlaw.com

RECEIVED by MSC 7/7/2022 7:37:59 PM

**TABLE OF CONTENTS**

<u>Page</u>

STATEMENT OF INTEREST ......................................................6

REASONS FOR DENYING LEAVE ...........................................8

STATEMENT OF QUESTION PRESENTED..........................10

STATEMENT OF FACTS .........................................................11

ARGUMENT ...............................................................................11

    I.  When the prosecution knowingly seizes privileged materials, those privileges still must be protected, and a taint team is a reasonable approach ..................11

    II.  The Prosecution's complaint that the screening process will be too burdensome is speculative and unfounded .......................................................................20

CONCLUSION AND REQUESTED RELIEF ...........................29

CERTIFICATE OF COMPLIANCE .........................................31

RECEIVED by MSC 7/7/2022 7:37:59 PM

# TABLE OF AUTHORITIES

RECEIVED by MSC 7/7/2022 7:37:59 PM

<u>Page(s)</u>

## Cases

*Chen-Oster v Goldman, Sachs & Co*,
    2020 WL 6504448 (SDNY, Nov 5, 2020)..............................30

*Enslin v Coca-Cola Co*,
    2016 WL 7042206 (ED Pa, June 8, 2016)...........................28

*Harbor Healthcare Systems, LP v United States*,
    5 F4th 593 (CA 5, 2021).......................................................14

*Heebe v United States*,
    2012 WL 3065445 (ED La, July 27, 2012)...........................14

*In re Grand Jury Subpoena, JK-15-029*,
    828 F3d 1083 (CA 9, 2016) ..................................................15

*In re Grand Jury Subpoenas*,
    454 F3d 511 (CA 6, 2006) ...................................13, 16, 17, 29

*In re Sealed Search Warrant & Application for a Warrant
by Tel or Other Reliable Elec Means*,
    11 F4th 1235 (CA 11, 2021)..........................................15, 16

*In re Search of 5444 Westheimer Rd Suite 1570, Houston,
Tex, on May 4, 2006*,
    2006 WL 1881370 (SD Tex, July 6, 2006) ....................16, 18

*In re Search of Scranton Housing Authority*,
    436 F Supp 2d 714 (MD Pa, 2006) ......................................16

*In re Search Warrant dated November 5, 2021*,
    2021 WL 5845146 (SDNY, Dec 8, 2021 ...............................18

*In re Search Warrant for Law Offices Executed on March
19, 1992*,
    153 FRD 55 (SDNY, Jan 21, 1994) ......................................17

*In re Search Warrants Executed on April 28, 2021*,
    2021 WL 2188150 (SDNY, May 28, 2021)....................15, 17

*National City Trading Corp v United States*,
    635 F2d 1020 (CA 2, 1980) ..................................................14

*People v Joly,*
    336 Mich App 388; 970 NW2d 426 (2021) ........................... 13

*Spieker v Quest Cherokee, LLC,*
    2009 WL 2168892 (D Kan, July 21, 2009) ........................... 30

*Toussie v Suffolk Co,*
    2007 WL 4565160 (EDNY, Dec 21, 2007) ........................... 30

*United States v Avenatti,*
    559 F Supp 3d 274 (SDNY, 2021) ........................................ 16

*United States v Castro,*
    2020 WL 241112 (ED Mich, Jan 16, 2020) ........................... 17

*United States v Esformes,*
    2018 WL 5919517 (SD Fla, Nov 13, 2018) ........................... 19

*United States v Gallego,*
    2018 WL 4257967 (D Ariz, Sept 6, 2018) ............................ 14

*United States v Grant,*
    2004 WL 1171258 (SDNY, May 25, 2004) ........................... 16

*United States v Satary,*
    504 F Supp 3d 544 (ED La, 2020) ........................................ 15

*United States v SDI Future Health, Inc,*
    464 F Supp 2d 1027 (D Nev, 2006) ..................................... 17

*United States v Sullivan,*
    2020 WL 1815220 (D Hawaii, Apr 9, 2020) ......................... 14

## Rules

MCR 2.602 ................................................................................ 20

MRPC 1.1 ............................................................................... 24

RECEIVED by MSC 7/7/2022 7:37:59 PM

**STATEMENT OF INTEREST[1]**

Former Governor Richard Snyder ("Governor Snyder") has a protected interest in the appeal filed by Appellant, the People of the State of Michigan ("the Prosecution"), because it directly concerns his privilege against disclosure of documents currently in the possession of the Prosecution. The Prosecution has appealed a single order entered on January 7, 2022, denying reconsideration of an earlier order requiring the Prosecution to establish a taint team to review documents seized from the attorneys at the Department of Attorney General who represented Director Lyon, Governor Snyder, and other defendants in a civil action brought against them arising out of the Flint Water Crisis.

Two weeks after the Circuit Court denied reconsideration of that order, Governor Snyder filed a motion to intervene for the limited purpose of participating in development of the taint team protocol. (1/19/2022 Mot to Intervene.) The Circuit Court denied intervention, but confirmed the taint team "is to address all privileged communications and is not limited to communications of the defendants [in this case]." (2/11/2022 Ord Den Mot to Intervene 3 (emphasis omitted).) The Prosecution's attempt through this appeal to avoid its obligation to establish a taint team for the protection of those privileges therefore directly threatens Governor Snyder's and other defendants' legally protected interest in preventing the disclosure of those documents to the Prosecution and others.

---

[1] No counsel for any other party authored this brief in part or whole, although Amicus did expand upon a chart contained in Director Lyon's Brief. Nor did any counsel or party make any monetary contribution to fund the preparation or submission of this brief.

RECEIVED by MSC 7/7/2022 7:37:59 PM

RECEIVED by MSC 7/7/2022 7:37:59 PM

Governor Snyder wholly agrees with the reasons given in Director Lyon's Answer for why the Prosecution's Application should be denied. As Director Lyon aptly points out, the decision to order establishment of a taint team to protect the defendants' privileges of nondisclosure was not appealed by the Prosecution and therefore is not before the Court in this appeal. (Lyon's Answer to Appl 21.) Only the order denying reconsideration of that decision is squarely presented for review. Thus, the only question before the Court is whether the Circuit Court abused its discretion in denying reconsideration under the difficult standards for granting such relief. (*Id.* at 22) The procedural hurdles, standards for obtaining reconsideration, and failings of the Prosecution to overcome those hurdles and meet those standards are well addressed in Director Lyon's Answer and will not be repeated here.

Instead, this amicus brief focuses on two specific counter-factual and unsubstantiated assertions made by the Prosecution: (1) that taint teams are a novel method for protecting privilege when the government seizes records of the defendants' legal counsel, and (2) that having a taint team screen privileged documents from the Prosecution's view is so cost- and time-prohibitive that it justifies disregarding these privileges against disclosure. The Court should never reach these issues for the reasons stated in Director Lyon's Answer, Section I. But if the Court were to reach these issues, it would find that neither of these assertions accurately represents the law or reality, given current document review methodology and technology.

## REASONS FOR DENYING LEAVE

When the prosecution seizes thousands of privileged documents from a defendant's legal counsel and neither implements nor offers a solution for preventing an invasion of the defendant's privileges, it is far from an abuse of discretion for the circuit court to impose a reasonable solution. As the Prosecution itself admits, once privileged documents are reviewed by the Prosecution, "the bell cannot be un-rung." (Mot for Recons 13, Def's App 581.) The solution the court chose to prevent this—an independent taint team—is manifestly reasonable. And it is no more burdensome than the process typically employed in civil cases, where privilege reviews are routinely conducted on large volumes of electronically stored information.

The Prosecution has argued the relief ordered is unprecedented. (People's Appl 12-14.) But the only thing unprecedented is the Prosecution's obstinate refusal to take even this most basic step to protect invasion of the defendants' privileges. Taint teams are so well-recognized as an essential method for protecting a defendant's privilege that the Department of Justice treats it as standard practice when privileges are at risk. Legions of courts have recognized this as a valid method of protecting privilege, and some have even questioned whether it is protective enough. In fact, ordering the use of a taint team was the least burdensome option available to the trial court, short of the alternative already rejected by the Prosecution of leveraging the prior screening performed. In the end, not even the Prosecution has deigned to actually say that a taint team is outside the range of principled solutions. It therefore cannot show the Circuit Court abused its discretion in denying reconsideration on that basis.

RECEIVED by MSC 7/7/2022 7:37:59 PM

The Prosecution's other argument—that the solution chosen by the trial court will be too burdensome—is purely speculative at this point, has no basis in reality, and, frankly, deserves no consideration given that the Prosecution has never offered another reasonable solution. (*Id.* at 18-20.) To start, the actual orders entered by the Circuit Court do not dictate which documents in the Prosecution's possession must be screened or how—it says nothing about what the review process would be. (See Ord Grant in Part, Den in Part Mot for Protective Order 8, Def's App 008; Order Den Mot for Recons 2, Def's App 010.) As the Prosecution admits in its Application, the number of documents to be reviewed by the taint team is something between 1 million and 17 million, *depending* on what protocols the Circuit Court orders enters in the future. (People's Appl 11.)

Moreover, the Prosecution's speculations about what the review would entail presume a process that pretends basic e-discovery methods and technology do not exist to conjure an astronomical project cost and timeline. Section II below focuses primarily on this issue and demonstrates the many ways in which the Prosecution's contemplations fall short of demonstrating basic competency in current e-discovery methodology and technology. The strategy of presenting over-inflated burden estimates in an effort to avoid necessary discovery tasks—like privilege screening—has been roundly condemned by courts in this country. This Court should not encourage this tactic by granting leave and should instead deny review.

## STATEMENT OF QUESTION PRESENTED

Did the Circuit Court abuse its substantial discretion when it denied reconsideration of a protective order requiring the Prosecution to establish an independent taint team to prevent documents seized from Director Lyon's (and other defendants') attorneys from being disclosed to the Prosecution and others?

| | |
|---|---|
| The Prosecution answered: | Yes. |
| Director Lyon answered: | No. |
| The trial court answered: | No. |
| Amicus Governor Snyder answers: | No. |

RECEIVED by MSC 7/7/2022 7:37:59 PM

## STATEMENT OF FACTS

Governor Snyder relies upon and incorporates by reference the Statement of Facts in Appellee Lyon's Answer to People's Application for Leave to Appeal.

## ARGUMENT

**I. When the prosecution knowingly seizes privileged materials, those privileges still must be protected, and a taint team is a reasonable approach.**

The trial court's chosen path—to establish protocols for a taint team review—is a well-established solution to the problem posed in this case. When prosecutors possess potentially privileged materials, it raises unique concerns regarding the sanctity of the attorney-client privilege, the appearance of impartiality on behalf of prosecutors, and a defendant's right to a fair trial. Courts have used various methods to address these concerns, including approving the use of taint teams with appropriate protocols in place.

The prosecution claims such a method is "unprecedented," pointing out that the use of taint team protocols have not been frequently discussed by the courts of this state and obliquely suggests this means the Circuit Court lacked authority to order such a measure. (People's Appl 12-14.) This argument can be roundly rejected for two reasons.

First, the attorney-client privilege is a common law protection, and the Prosecution offers no basis for believing Michigan is or should be less protective of the privilege than other common law jurisdictions in this country. It is therefore inappropriate to just ignore the wealth of precedent outside of Michigan for requiring implementation of measures—such as a

RECEIVED by MSC 7/7/2022 7:37:59 PM

RECEIVED by MSC 7/7/2022 7:37:59 PM

taint team—that will protect those privileges from being violated.

Second, the sparsity of Michigan precedence merely demonstrates that the execution of a search warrant on an attorney's office is an exceedingly rare occurrence, and that a prosecution's refusal to implement any procedures to prevent disclosure of privileged documents known to exist in that set of seized documents is rarer still. It is only the "limited" and "exigent circumstance[]" of "government officials [having] . . . physical control of potentially-privileged documents," *In re Grand Jury Subpoenas*, 454 F3d 511, 522 (CA 6, 2006), that calls for measures that would otherwise be unnecessary. And the matter is only litigated when—as here—such measures are not properly implemented.

Faced with this unique situation, the trial court turned to the recent decision in *People v Joly*, which approvingly noted the use of taint teams for protecting privileged documents seized by the government. 336 Mich App 388, 405; 970 NW2d 426, lv den 508 Mich 971; 965 NW2d 543 (2021) ("In the case where a potentially privileged communication does get caught up in an otherwise lawful search, there are also steps that can be taken to identify and segregate privileged information from the rest, including filter agents or taint teams.") The Prosecution identifies no reason why *Joly*'s observations as to how such situations should be handled is insufficient support for the Circuit Court's order. But regardless, a litany of decisions from other courts recognizes the need to take measures to protect the defendants' privileges against non-disclosure and approve of the use of taint teams.

Courts have explained that a "law office search should be executed with special care to avoid unnecessary intrusion on attorney-client communications." *Nat'l City Trading Corp v United States*, 635 F2d 1020, 1026 (CA 2, 1980). See also *United States v Gallego*, No. CR-18-01537-001, 2018 WL 4257967, at *1 (D Ariz, Sept 6, 2018) ("searches of law offices should be executed with special care") (quotation marks and citation omitted). This concern is only heightened when the material is seized from attorneys known to represent individuals under investigation. See *Harbor Healthcare Sys, LP v United States*, 5 F4th 593, 600 (CA 5, 2021) (even the prosecution's mere possession of privileged materials belonging to the subject of an investigation constitutes an "irreparable injury" that continues for "as long as the government retains [the] privileged documents").

Ultimately, procedures should be in place to ensure that "only documents known to be privilege-free should pass . . . to the prosecution team." *United States v Sullivan*, No. 17-00104 JMS-KJM, 2020 WL 1815220, at *8 (D Hawaii, Apr 9, 2020) (emphasis omitted). "[P]roper procedure" also requires that potentially privileged documents be returned to the party claiming privilege. *Heebe v United States*, No. 10-3452, 2012 WL 3065445, at *3 (ED La, July 27, 2012).

Sometimes a prosecuting office comes to possess potentially privileged material post-search. "Taint teams" (also known as "filter teams") are a routine solution to this problem, one the Department of Justice even considers to be standard practice.[2]

---

[2] Dep't of Justice & Admin Office of the U.S. Courts Joint Working Group on Elec Tech in the Crim Justice Sys (JETWG), *Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases, Recommendations* 5

RECEIVED by MSC 7/7/2022 7:37:59 PM

Correspondingly, numerous courts have observed the ubiquitous use of taint teams in cases like this. See, e.g., *In re Sealed Search Warrant & Application for a Warrant by Tel or Other Reliable Elec Means*, 11 F4th 1235, 1249 (CA 11, 2021) (observing that the "Second, Third, Fourth, Seventh, Eighth, Ninth and Tenth Circuits" have approved of the use of taint teams); *In re Grand Jury Subpoena, JK-15-029*, 828 F3d 1083, 1094 (CA 9, 2016) (describing a "taint/filter team" as "a standard protocol designed to remove any privileged communication before passing the non-protected information along to the prosecutorial team"). See also *In re Search Warrants Executed on April 28, 2021*, No. 21-MC-425, 2021 WL 2188150, at *2 (SDNY, May 28, 2021) ("The use of a filter team . . . has been deemed adequate in numerous cases to protect attorney-client communications.") (collecting cases).

Courts have typically approved two types of taint team protocols: protocols where the taint team conducts the first review and ones where the party claiming privilege conducts the first review.

An example of the first method can be found in *United States v Satary*, 504 F Supp 3d 544, 546 (ED La, 2020). There, a taint team reviewed all documents seized in the search warrant and identified documents as potentially privileged or not potentially privileged (erring on the side of marking documents potentially privileged). *Id.* at 545. The documents were then produced to the defendant first, allowing the defendant to make any necessary challenges to the taint team's privilege determinations. *Id.* at 546. This is a common

---

(2012), available at https://www.justice.gov/archives/dag/page/file/913236/download.

approach.  See *In re Search of 5444 Westheimer Rd Suite 1570, Houston, Tex, on May 4, 2006*, No. H-06-238, 2006 WL 1881370, at *2 (SD Tex, July 6, 2006) (approving Government's plan for taint team to conduct initial review followed by opportunity for defense counsel to review and object to taint team determinations before any documents turned over to prosecution team); *United States v Grant*, No. 04 CR 207BSJ, 2004 WL 1171258, at *2-3 (SDNY, May 25, 2004) (same).

On the other hand, some courts have tended toward protocols that allow the party claiming privilege to conduct the initial review.  See *Sealed Search Warrant & Application for a Warrant*, 11 F4th at 1243, 1249 (approving protocols that allowed the party claiming privilege to conduct an initial privilege review and produce a privilege log, followed by an opportunity for a walled-off taint team to challenge specific documents identified on the log); *United States v Avenatti*, 559 F Supp 3d 274, 283 (SDNY, 2021) (observing that party claiming privilege "was given an opportunity to review all communications before they were turned over to the prosecution team").  Notably, employing these protocols here would have resolved the Prosecution's screed about the costs and delay caused by taint team protocols.  See *In re Grand Jury Subpoenas*, 454 F3d at 523 (noting that protocols that allowed outside counsel for the party claiming privilege to take the first cut at emails listing particular attorneys greatly reduced the prosecution's review burden).  But the Prosecution eschewed that approach.

Several courts have questioned whether taint teams offer parties asserting privilege the necessary bare minimum protection.  See *In re Search of Scranton Hous Auth*, 436 F Supp 2d 714, 722 (MD Pa, 2006) (collecting cases that have

RECEIVED by MSC 7/7/2022 7:37:59 PM

"questioned or outright rejected" the use of taint teams)[3]; *United States v SDI Future Health, Inc*, 464 F Supp 2d 1027, 1037 (D Nev, 2006) ("Federal courts have taken a skeptical view of the Government's use of 'taint teams' as an appropriate method for determining whether seized or subpoenaed records are protected by the attorney-client privilege.").

Others have outright held that taint teams do not suffice. The Sixth Circuit's opinion in *In re Grand Jury Subpoenas* explained that even the "walled off" attorneys conducting the taint team review "possess[] a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations." 454 F3d at 523. See also *United States v Castro*, No. 19-20498, 2020 WL 241112, at *2 (ED Mich, Jan 16, 2020) (rejecting a proposed taint team approach, citing *In re Grand Jury Subpoenas*); *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 FRD 55, 59 (SDNY, Jan 21, 1994) ("[R]eliance on the implementation of [a taint team], especially in the context of a criminal prosecution, is highly questionable, and should be discouraged.").

Lastly, and as relevant here, some courts have noted that the *appearance* of impropriety is an even heightened concern in high-profile matters, and that this too should counsel courts toward a stricter approach. See *Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *4 (appointing a special master to review sequestered documents to ensure the "perception of fairness" in a matter concerning a search

---

[3] Vacated sub nom *In re Search of Scranton Hous Auth*, 487 F Supp 2d 530 (MD Pa, 2007).

warrant executed on Rudy Giuliani); *In re Search Warrant dated November 5, 2021*, No. 21 Misc. 813, 2021 WL 5845146, at *2 (SDNY, Dec 8, 2021) (same, in a matter concerning the founder of Project Veritas).

Regardless of their position, all of these decisions acknowledge that taint teams are a well-recognized method of protecting the unique privileges and interests at play. See, e.g., *Search of 5444 Westheimer Rd Suite 1570*, 2006 WL 1881370, at *3 (finding that taint teams "allow expeditious review of all seized documents," "allow the Government to continue with its investigations," and "allow the Court . . . to resolve ultimate privilege disputes before any potentially privileged materials are disclosed to the prosecution team").

These cases also acknowledge something far more fundamental and salient to this appeal: when the government knows it has seized privileged material, the government is expected and even *required* to implement protective measures that will prevent improper disclosure of those privileged materials to agents and the prosecution team. These cases, like nearly all that discuss the use of taint teams, do so in the context of a defendant's challenge to the adequacy of the taint team procedures in place. The Prosecution in these cases had initiated a taint team protocol on its own, and the question before the courts was whether those protocols were adequate or not to protect the claimed privileged materials. The underlying, undisputed presumption was that adequate protective measures must be used—otherwise there would be no reason to evaluate whether the Prosecution's methods were adequate. The Prosecution's obligation is too well-established for dispute. In the words of a Department of Justice ESI working group:

RECEIVED by MSC 7/7/2022 7:37:59 PM

RECEIVED by MSC 7/7/2022 7:37:59 PM

> Criminal case discovery entails certain responsibilities for all parties in the careful handling of a variety of sensitive information, for example, grand jury material, the defendant's records, witness identifying information, information about informants, information subject to court protective orders, confidential personal or business information, *and privileged information*."[4]

The posture of this case—where the Prosecution proceeded with the collection, possession, review, and production of potentially privileged materials without *any* procedure in place—is unheard of. Indeed, amicus counsel could not find any case where the prosecution had proceeded as the Prosecution has in this case—knowingly possessing privileged material without any procedure in place for protecting the defendants' privileges. See *United States v Esformes*, No. 16-20549-CR, 2018 WL 5919517, at *23 (SD Fla, Nov 13, 2018) (describing a prosecution that failed to strictly adhere to taint protocols that were in place *at the time the search warrant was executed* as "clumsy and border-line incompetent"). And the Prosecution has not cited even one case where a court has concluded that protective measures were not expected and even required in circumstances where the prosecution knows it is in possession of privileged material. In short, the only thing unprecedented about this appeal is the Prosecution's defiance of its discovery obligations and utter disregard for defendants' legally protected privileges.

---

[4] JETWG, *Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases*, *Recommendations* 5 (emphasis added).

RECEIVED by MSC 7/7/2022 7:37:59 PM

To be clear, the question before the Circuit Court, and the question that would be before this Court if it granted review, was not whether taint teams are mandatory. It is whether taint teams are a reasonable measure to impose when the Prosecution **has refused** to take any steps to protect the defendants' privileges of non-disclosure. The Prosecution's alternative solution of applying an exclusionary rule at trial only prevents disclosure of privileged material to a jury; it does not prevent disclosure of privileged material to the *Prosecution*. (See People's Appl 7-8.) Rather, such a solution presumes the Prosecution may review and use the privileged material to its advantage to prepare its trial strategy as long as it does not use it as evidence. An exclusionary rule is therefore not a reasonable or fair solution for protecting defendants' privileges of non-disclosure.

The trial court faced an extraordinary situation: the Prosecution's knowing seizure of privileged materials without any protocols in place to prevent the disclosure of those materials to the prosecution team. Under MCR 2.602(J), the trial court had authority to craft an appropriate remedy for this discovery violation. Among the reasonable and principled approaches to dealing with this problem, the trial court chose one that is common, a method that even the Department of Justice considers standard practice. See Dep't of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 78 (2001) ("When agents seize a computer that contains legally privileged files, a trustworthy third party must comb through the files to separate those files within the scope of the warrant from files that contain privileged material."). Some courts would even call the practice lenient to the Prosecution.

RECEIVED by MSC 7/7/2022 7:37:59 PM

In sum, the Court should deny review because Director Lyon (and all other defendants) are unquestionably entitled to the protection of their privileges of nondisclosure and the implementation of a taint team was within the range of principled measures for protecting those privileges, especially when the Prosecution did not offer—and still has not offered— any other sensible solution.

## II. The Prosecution's complaint that the screening process will be too burdensome is speculative and unfounded.

Prior to seizing records from the civil AGs, those attorneys—colleagues of prosecution team within the same Department of Attorney General—had completed the work of identifying relevant documents and screening those documents for privileged material.  (Lyon's Answer to Appl 30.)  After refusing to rely on the screening already performed and deciding to start over from scratch, the Prosecution complains that performing this task again would be too much work and too expensive.  (People's Appl 18-20.)  Undue burden, expense, or delay resulting from a party's own actions or inactions should be weighed against that party.[5]  Given that it rejected the less costly solution of leveraging the prior screening performed and offered no other solution for fulfilling its obligation to protect defendants' privileges, its complaint that the trial court's solution is too burdensome deserved no consideration below and likewise deserves no further review.

---

[5] Sedona Conf, *Commentary on Proportionality in Electronic Discovery*, 18 Sedona Conference J 159-62(2017), available at https://thesedonaconference.org/sites/default/files/publications/Comme ntary%20on%20Proportionality%20in%20Electronic%20Discovery.18T SCJ141.pdf.

However, even if the weight of this burden could be considered, it was not an abuse of discretion for the Circuit Court to reject the Prosecution's burden arguments for numerous reasons, two of which are discussed here. First, the Prosecution's arguments are entirely speculative, since it admits it has no idea what review process will ultimately be ordered by the Circuit Court. Second, the Prosecution's speculative assertions about what the review process may entail are untethered to reality.

### A. The Circuit Court soundly exercised its discretion in rejecting speculations about a review process it had not yet ordered.

The Circuit Court at this point has merely ordered a taint team to be established and a protocol for review and screening to be developed. (Ord Grant in Part, Den in Part Mot for Protective Order 8, Def's App 008; Order Den Mot for Recons 2, Def's App 010.) After the Prosecution complained about how burdensome it would be to review every document for privilege, the Circuit Court modified its order to require the development of protocols for review in coordination with the defense. The very purpose of developing protocols is to minimize the burden of review. See American Law Institute, *Model Code of Pre-Arraignment Procedure* § SS 220.5 (in addendum) (suggesting procedures in which both parties can offer minimization procedures appropriate to the case prior to any search of those materials). In modifying its order, the Court clarified that it had not yet determined what should be reviewed or how.

In the Court of Appeals, the Prosecution entirely ignored this clarification and claimed it would be required to manually screen all 17 million documents for privilege, something the

lower court had not ordered it to do. Now, in its application to this Court, it finally admits that the extent of the review will depend entirely on what protocol the Circuit Court ultimately decides to order. In the Prosecution's own words:

> [I]t is difficult to know the true breadth and depth of this task because the trial court has not ruled on the parameters of the filtering process. There could be anywhere between one and seventeen million documents that will require review. If 1 million, a team of 30 attorneys could accomplish the task in just over 5 months at a cost of approximately $2,200,000. If 17 million, it could take the same team just over 7.3 years and cost upwards of $37,000,000. [People's Appl 11.]

Given no particular process had been ordered at this point, the Prosecution's argument that it would be overburdened was entirely premature. It was well within the Circuit Court's sound discretion to deny reconsideration of the taint-team order on the basis of speculations about what the burden might be when this was yet to be determined.

### B. The Prosecution speculates an unrealistic process to pump up its burden estimate.

Rather than propose a reasonable process for screening, the Prosecution proceeds to speculate the most onerous process one could imagine—a manual review of 17 million documents for privilege.[6] That speculation is entirely unrealistic and

---

[6] Originally the Prosecution posited a manual review of 22 million, but the Circuit Court clarified on reconsideration that its order applied

RECEIVED by MSC 7/7/2022 7:37:59 PM

inconsistent with Michigan Rules of Professional Conduct Rule 1.1. There are numerous protocols and technology-based techniques not considered by the Prosecution that reduce the data set to be reviewed and reduce costs to a tiny fraction of the Prosecution's projections.

As a basic starting principle, those documents that would not be manually reviewed by the Prosecution without a taint team do not need to be manually reviewed by a taint team either. Take, for instance, the 1 million documents the Prosecution claims are not text searchable. If the Prosecution intends to review these documents, it costs no more for a taint team to conduct that review that it does for the Prosecution to conduct the review—and it would likely cost a lot less for a taint team to do it. If the Prosecution does not intend to review these documents, then why did it seize them?

The same goes for the 16 million other documents at issue in this appeal. The Prosecution has already admitted reviewing these would be too costly and time-consuming. (People's Appl 10-11.) But if the Prosecution is ever to identify any useful documents in the set of 16 million, the Prosecution will have to do exactly what was done pre-seizure: eliminate irrelevant or duplicative documents from the set. The methods and technologies for accomplishing this with large volumes of electronically stored information are well understood and routine. They include taking the following steps:

- Deduplication – The process of comparing electronic files or records based on their characteristics and removing,

---

only to documents not yet disclosed. (Ord Den Mot for Recons 2, Def's App 010.)

suppressing, or marking exact duplicate files or records within the dataset for the purposes of minimizing the amount of data for review and production.

- deNisting – The use of an automated filter program that screens files against the National Institute of Standards and Technology list in order to remove files that are generally accepted to be system generated and have no substantive value in most instances.

- System file elimination – System files are non-user created files that allow computer systems to run.

- Threading – A process of recombining email or other electronic message conversations into a single comprehensive chronologically correct chain.[7]

Additional tools at the Prosecution's disposal include the use of keyword searching, filtering (by sender, recipient, author, date, subject, etc.) and Computer Assisted Review.[8]

Computer Assisted Review ("CAR") is a commonly used e-discovery term of art that refers to AI-supported document review. According to Relativity, CAR is a "process of training a computer to group documents based on responsiveness using examples provided by humans."[9] Relativity is a company that

---

[7] See Sedona Conference, *The Sedona Conference Glossary: eDiscovery and Digital Information Management, Fifth Edition*, 21 Sedona Conference J 263 (2020), available at https://thesedonaconference.org/sites/default/files/publications/Sedona%20Conference%20Glossary%2C%20Fifth%20Edition.pdf.

[8] See *id*.

[9] *White Paper: Understanding the Components of Computer-Assisted Review and the Workflow that Ties Them Together* 5, Relativity (2012), available at https://resources.relativity.com/rs/447-YBT-

RECEIVED by MSC 7/7/2022 7:37:59 PM

sells a CAR tool as part of its e-discovery offerings.  The People's vendor, N1 Discovery, is hosting the 21 million documents on a Relativity platform (Discovery Letter (logistics) 1-2, Pl's Ex 4).  The use of these tools is very effective at reducing the size of large datasets.

For example, when Department of Health and Human Services ("HHS") used these steps to cull relevant documents for review, it reduced the review set from 4,800,000 documents to 220,000 documents.  (Ex 3 to Lyon Mot for Protective Ord 1-3, Def's App 043-045.)  Because multiple custodians had the same document, KLDiscovery's software was able to first eliminate 2,000,000 document duplicates.  (*Id.* at 1, Def's App 043.)  Email threading was then used to identify the most inclusive email in a chain.  (*Id.* at 2, Def's App 044.)  The software identified 400,000 less inclusive email chains that did not need to be reviewed.  (*Id.* at 2 n 6, Def's App 044.)  Predictive coding (CAR) was then used to reduce the set of documents to those documents that were in any way related to the ongoing situation in Flint, such as documents related to water quality, incidents of Legionnaires' disease, decisions to change Flint's water source, and so on.  (*Id.* at 2, Def's App 044.)  This resulted in a set of 220,000 documents that were likely to be responsive, which was only 7% of the original set of 4,800,000 documents.  (*Id.* at 4, Def's App 046.)  Only that 7% needed to be manually reviewed for relevancy and privilege.  (*Id.*)

---

249/images/WhitePaper_UnderstandingTheComponentsOfAssistedRev iew.pdf. Computer assisted review is "also referred to as technology-assisted review, predictive coding, etc."  *Id.*

At the heart of the Prosecution's burden argument lies the assertion that some unstated number of documents must be manually reviewed as a result of three problems: (1) poor quality scans, (2) consolidated emails (which forwarded as attachments to emails), and (3) "hundreds" of PDF documents of printed emails. (People's Appl 4-5; Mot for Recons 9, Pl's Ex 10.) None of these problems is insurmountable or even significant.

The only documents in these categories that may not be searchable are those poorly scanned. The Prosecution has never been forthcoming in its court filings about what number of documents fall into this category. But recently the Prosecution admitted in correspondence to Director Lyon that this set comprises about 1 million documents. (Lyon's Answer to Appl 37.)

That leaves 16 million text-searchable documents that could be sorted for relevancy using the methods described above. Emails in native form, whether provided as attachments to other emails or not, contain metadata and are undisputedly searchable and subject to the computer-assisted screening process described above. PDFs likewise are a commonly encountered file format in e-discovery and also searchable except when poorly scanned, as discussed above. There are automated and semi-automated e-discovery tools and workflows to streamline review of these types of

RECEIVED by MSC 7/7/2022 7:37:59 PM

documents, including OCR technologies that can glean much, if not all, of the searchable text within them.[10]

Using the 7% relevancy figure from the HHS review as an indicator, performing the steps described above could reduce the 16 million remaining searchable documents to 1,120,000 relevant documents or even fewer. For this remaining set of documents and the 1 million unsearchable documents, a team of contract reviewers could conduct an initial review and even further reduce the number of relevant documents. Only the remaining relevant documents would need to be reviewed for privilege. The remaining documents that are not relevant would not need to be disclosed to the Prosecution or produced to anyone else.

This process would cost a tiny fraction of the grossly exaggerated figure of $37 million proffered by the Prosecution (which started as $48 million in the trial court). (People's Appl 11; Mot for Recons 10, Def's App 578) The manual review of 800,000 documents already performed by non-attorneys at N1 Discovery cost $250,000. (People's Appl 5-6.) That is $0.31 per document.[11] Extrapolating from this, the cost of reviewing 2.1

---

[10] See, e.g., JETWG, *Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases*, *Recommendations* 1, ¶ 1(b).

[11] Cost per document is a metric commonly used by e-discovery project managers, attorneys and courts for estimating, budgeting and monitoring of review projects. See e.g., *Enslin v Coca-Cola Co*, No. 2:14-CV-06476, 2016 WL 7042206, at *14 (ED Pa, June 8, 2016); Andrew M. Pardieck, *The Shifting Sands of Cost Shifting*, 69 Clev St L Rev 349, 439 (2021); Rob Robinson, *Alternative Reality? Winter 2022 eDiscovery Pricing Survey Results*, Complex Discovery (Nov 29, 2021), available at https://complexdiscovery.com/alternative-reality-winter-2022-ediscovery-pricing-survey-results.

RECEIVED by MSC 7/7/2022 7:37:59 PM

million documents (1 million unsearchable and 1.1 million determined potentially relevant after CAR) would cost $651,000.

Even if attorneys must be used for final privilege review of the final smaller subset of relevant documents, the cost of manually reviewing this set for privilege is not insignificant, but it is tiny fraction of the trumped-up cost represented to the trial court below, and it is a cost the Prosecution itself chose to bear when it decided to start over from scratch after a relevancy and privilege screening had already been conducted. Using that prior screening as at least a starting point would have greatly reduced the costs and delay caused by taint team protocols. See *In re Grand Jury Subpoenas*, 454 F3d at 523 (noting that protocols that allowed counsel for the party claiming privilege to take the first cut at emails listing particular attorneys greatly reduced the prosecution's review burden). Having eschewed that approach, it should not be heard to complain that the only alternative left is too burdensome.

In short, Prosecution's speculation that it could cost $37,000,000 and take 7.3 years to conduct the necessary privilege screening could easily be rejected out of hand by the Circuit Court. (People's Appl 11.) There is no real-world scenario that requires a manual review of 17 million documents. And the Prosecution presented absolutely no evidence at all to the trial court supporting its cost estimate. The Circuit Court saw the Prosecution's estimate for what it is—another pumped-up burden estimate, like so many others

RECEIVED by MSC 7/7/2022 7:37:59 PM

that the courts have rejected.[12]  It did not abuse its discretion in rejecting the Prosecution's wild assertions and denying reconsideration, particularly when the Prosecution had eschewed a less costly approach and offered no other reasonable solution.

## CONCLUSION AND REQUESTED RELIEF

The Prosecution has not and cannot deny that Director Lyon has legally recognized privileges of nondisclosure to the Prosecution.  It has merely argued that taint teams are an

---

[12] See, e.g., *Spieker v Quest Cherokee, LLC*, No. 07-1225-EFM, 2009 WL 2168892, at *3 (D Kan, July 21, 2009) (noting "there are multiple approaches to electronic discovery and alternatives for reducing costs and it appears that defendant asserts the highest estimates possible merely to support its argument that electronic discovery is unduly burdensome."); *Chen-Oster v Goldman, Sachs & Co*, No. 10-CV-6950, 2020 WL 6504448, at *1 (SDNY, Nov 5, 2020) ("With respect to burden, Goldman greatly exaggerates the amount of time (17 months) and money ($24 million) the requested discovery would take."); *Toussie v Suffolk Co*, No. CV 01-6716, 2007 WL 4565160, at *3 (EDNY, Dec 21, 2007) (noting that "it was clear from the parties' submissions that notwithstanding the court's instructions, the County had not really attempted to outline a more efficient plan for the e-mail search"). Exaggerated burden claims are common enough that they are a recurring topic for e-discovery authorities. See e.g., Ralph Losey, *The Top Twenty-Two Most Interesting e-Discovery Opinions of 2016*, e-Discovery Team Blog (Jan 2, 2017), available at https://e-discoveryteam.com/2017/01/02/the-top-twenty-two-most-interesting-e-discovery-opinions-of-2016/; Nicholas M. Pace & Laura Zakaras, *Where the Money Goes: Understanding Litigant Expenditures for Producing Electronic Discovery*, RAND Institute for Civil Justice 100 (2012) ("An equally important reason for paying closer attention to discovery expenditures is the need to present a credible argument to a judge . . . . Back-of-the-envelope calculations for estimating one's discovery costs may be adequate for internal planning, but a court is likely to require a more persuasive level of precision, including the projected costs of alternative approaches for complying with discovery obligations.").

unprecedented solution for protecting those privileges (which they are not) and complained that this method of protecting defendants' privileges is too burdensome (after jettisoning the prior privilege screening that was conducted). Neither of these arguments is jurisprudentially significant or of public importance, nor are they meritorious, given that the Prosecution offered no alternative solution whatever for preventing disclosure. It simply cannot be said the Circuit Court abused its discretion in refusing reconsideration of the taint team solution that it chose. For these reasons and the reasons given in Director Lyons's Answer, this Court should deny further review.

Respectfully submitted,

Dated: July 7, 2022          WARNER NORCROSS + JUDD LLP

By /s/ *Gaëtan Gerville-Réache*
Gaëtan Gerville-Réache
150 Ottawa Ave. NW, Suite 1500
Grand Rapids, Michigan 49503
616.752.2000
greache@wnj.com
Attorneys for *Amicus Curiae*
Richard Dale Snyder

RECEIVED by MSC 7/7/2022 7:37:59 PM

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief complies with the type-volume limitation pursuant to Administrative Order 2019-6. The brief contains 6,105 words of Century Schoolbook 13.5-point proportional type. The word processing software used to prepare this brief was Microsoft Word 2016.

Dated: July 7, 2022                   WARNER NORCROSS + JUDD LLP

By /s/ *Gaëtan Gerville-Réache*
    Gaëtan Gerville-Réache (P68718)

167716.195661 #26653399-10

RECEIVED by MSC 7/7/2022 7:37:59 PM

# Exhibit 8

## U.S. BANKRUPTCY COURT

### EASTERN DISTRICT OF MICHIGAN (DETROIT)

### BANKRUPTCY PETITION#: 13-53846-tjt

Assigned to: Judge Thomas J. Tucker

Chapter 9

Voluntary

No asset

_____

Transcript of Motion for Evidentiary Hearing

Taken via teleconference

Wednesday, June 16, 2021

Transcribed by Carolyn Grittini, CSR-3381

**Fortz Legal Support**

**www.FortzLegal.com**

**844.730.4066**



1              U.S. BANKRUPTCY COURT

2         EASTERN DISTRICT OF MICHIGAN (DETROIT)

3         BANKRUPTCY PETITION#: 13-53846-tjt

4

5   Assigned to: Judge Thomas J. Tucker

6   Chapter 9

7   Voluntary

8   No asset

9

10

11   _____

12

13       Transcript of Motion for Evidentiary Hearing

14       Taken via teleconference

15       Wednesday, June 16, 2021

16       Transcribed by Carolyn Grittini, CSR-3381

17

18

19

20

21

22

23

24

25

1   APPEARANCES:

2   MOLLY KETTLER

3   Wayne County Prosecutor's Office

4   1441 St. Antoine, 2nd Floor

5   Detroit, Michigan 48226

6   313.224.6692

7        Appearing on behalf of the People of the State of

8        Michigan.

9

10  JOHN VANDEVENTER

11  Michigan Department of Attorney General

12  P.O. Box 30212

13  Lansing, Michigan 48909

14  517.335.7624

15       Appearing on behalf of the the Department of the

16       Attorney General.

17

18  CHARLES ASH

19  Warner, Norcross & Judd

20  150 Ottawa Avenue NW, Suite 1500

21  1500 Warner Building

22  Grand Rapids, Michigan 49503

23  616.752.2490

24       Appearing on behalf of Former Governor Rick Snyder.

25

1

2          COURT CLERK:  Please be advised this Court

3     is back in session with the Honorable Thomas J.

4     Tucker presiding.

5          THE COURT:  Good afternoon to everyone.

6     This is Judge Tucker on the phone.  I will first call

7     our two p.m. case and then I will direct the attorneys

8     to enter their appearances for the record.  Let's call

9     the case first.

10          COURT CLERK:  Call the matter of the City

11     of Detroit, case number 13-53846.

12          THE COURT:  Good afternoon again.  This

13     case is before the court today for a hearing, as you

14     know, on the motion filed by former Governor Richard

15     Snyder, motion for an evidentiary hearing and an order

16     holding the Michigan Department of Attorney General in

17     contempt and granting related relief.  For the record,

18     that motion was filed May 12th, 2021.  It's docket

19     13361 on this Court's docket.

20          I did, of course, review the motion and

21     related papers, the response filed by the Michigan

22     Department of Attorney General on May 26th, docket

23     13375, and related papers and the reply filed by

24     former Governor Snyder on June 10, 2021, docket 13391,

25     and related papers and exhibits.  I have also reviewed

1        some other documents in the record in this case,

2        including the Court's various mediation orders,

3        including their confidentiality provisions and some

4        other things in the record in this case to prepare for

5        today's hearing.

6                    Let's have entries of appearance now for

7        the record.  I'll call on you separately to do that.

8        Attorneys for former Governor Snyder, please.

9                    MR. ASH:  Good afternoon Your Honor.

10       Charles Ash from Warner Norcross & Judd, for former

11       Governor Rick Snyder.  I'm here with my colleague,

12       Brian Lennon.  Also on the line is Stephen Grow,

13       another partner in the firm.

14                    THE COURT:  Mr. Ash, you're going to speak

15       for the former governor in this hearing?

16                    MR. ASH:  Yes, I am, Your Honor.

17                    THE COURT:  Then let's hear entries of

18       appearance on behalf of the Michigan Department of

19       Attorney General, please.

20                    MR. VANDEVENTER:  Good afternoon, Your

21       Honor.  John VanDeventer on behalf of Department of

22       Attorney General.

23                    MS. KETTLER:  Good afternoon, Your Honor.

24       Molly Kettler on behalf of the People of the State of

25       Michigan.

1              THE COURT:  I'm sorry, Miss Kettler, you

2      broke up.  On behalf of who?

3              MS. KETTLER:  The People of the State of

4      Michigan.  I'm a Special Assistant Attorney General

5      working on the Flint water crisis criminal

6      prosecution.

7              THE COURT:  Anyone else on the State side

8      to enter an appearance?  Thank you.  I hear nothing.

9              For the record, is there any other attorney

10     that wants to enter an appearance on this case in this

11     matter today?  I hear nothing.  I understand we have a

12     large number of callers, I assume that many of those

13     are various persons who want to listen into the

14     hearing and are certainly welcome to do that and I

15     welcome all of you for this hearing.

16             We're holding the hearing by telephone as

17     the bankruptcy court has for the last year plus been

18     holding non-evidentiary hearings by telephone because

19     of -- for reasons related to the COVID pandemic.  And

20     so we will -- I'll hear arguments from the parties

21     regarding this motion.  I'll start with allowing the

22     movement of former Governor Snyder's counsel to argue,

23     be heard on the motion, then, of course, the Michigan

24     Department of Attorney General may argue and be heard,

25     and then after that, I will give, as I always do on

1    motions, the moving party's attorney, so that's former

2    Governor Snyder's attorney, an opportunity to reply at

3    least briefly in support of the motion.

4            So I will -- I think you may have been

5    cautioned before I came out for this, on the phone for

6    this hearing, I don't want anyone interrupting anyone,

7    other than I reserve the right to interrupt the

8    attorneys as you're going through your argument to ask

9    questions, so don't be thrown by that.  So go ahead,

10   we'll hear first from the attorney for former Governor

11   Snyder, Mr. Ash.

12           MR. ASH:  Thank you, Your Honor.  May it

13   please the Court.  This is former Governor Rick

14   Snyder's motion for an evidentiary hearing and

15   ultimately to hold the Department of Attorney General

16   in civil contempt for violations of orders of this

17   Court issued in conjunction with the mediation process

18   in the Detroit bankruptcy.

19           As this Court is well aware, the mediation

20   process in the Detroit bankruptcy was a tremendous

21   success, and Governor Snyder takes great pride in that

22   he was integral to that.  And as with all mediations

23   conducted under the auspices of this Court, strict

24   confidentiality is the very foundation, and if that

25   foundation of strict confidentiality erodes or

1    weakens, the whole structure of mediation collapses,

2    and unfortunately, Your Honor, we're here today

3    because there has been a massive breach of that

4    confidentiality by the Department of Attorney General.

5            My firm estimates that thousands upon

6    thousands of documents, confidential Detroit mediation

7    privileged documents, many instances clearly marked as

8    such, including probably some of the most sensitive

9    discussions and negotiations in the various Detroit

10   bankruptcy mediations have been released by the

11   Department of Attorney General to nine criminal

12   defendants, including former Governor Snyder in the

13   Flint water criminal cases.

14           Only two of those nine defendants, Your

15   Honor, Governor Snyder and Rich Baird, who is the

16   Governor's transformation manager, are arguably bound

17   by the confidentiality mediation orders of this court,

18   leaving thousands upon thousands of confidential

19   documents in the hands of seven individuals who have

20   no duty whatsoever to keep that information

21   confidential.  And also leaving Governor Snyder and

22   Mr. Baird in the untenable position of having

23   thousands of documents that they didn't ask for, that

24   are protected by this Court's orders, and now must

25   concern themselves with how to handle those documents,

1    and that's why we're here today.

2              Your Honor, my firm has done searches,

3    basic searches, we have a group here who takes

4    electronic information and can use technology assisted

5    review tools to run basic searches or more complex

6    searches.  In this instance, what we've done is

7    started with the basics of the judges who participated

8    in the mediation.  It's astonishing, Your Honor.

9    Judge Rosen, 2,959 hits; Judge Roberts, 598 hits;

10   Eugene Driker, 1,980 hits; and Judge Sean Cox, 8,376;

11   thousands for emergency manager Kevin Orr.  Indeed,

12   our team believes that happened with Mr. Orr was, his

13   entire mailbox was seized and then just simply dumped

14   on the criminal defendants.  Also documents from Mayor

15   Mike Duggan.

16             These documents also include, Your Honor,

17   e-mails where Governor Snyder was receiving legal

18   advice at the time he was governor from his legal

19   counsel in the executive office regarding the Detroit

20   bankruptcy mediation.  So we also have attorney-client

21   privileged documents regarding the Detroit bankruptcy

22   mediation that themselves would, of course, reveal the

23   goings on in the various mediations.  This was not an

24   innocent mistake.

25             As described in our motion, the Department

1      of Attorney General sent a search warrant to itself in

2      2019, meaning the criminal side sent the civil side a

3      search warrant, and in particular, seized documents

4      from the master database created during the first wave

5      of criminal charges housed by KL Discovery, that's an

6      e-discovery vendor, Your Honor, in Virginia.

7                  So, in essence, the prosecution sent a

8      search warrant to a law firm.  That should have been

9      the first indication that there were privileged

10     documents seized, and should have given the

11     prosecution an indication of the need to deploy a

12     taint team and to put processes in place to protect

13     attorney-client privileged information and other

14     privileged communications.

15                  We strongly suspect, Your Honor, that there

16     may have been warnings by the civil side at the time

17     to the criminal side, but that was not done.  There

18     was no taint team, there was no other process put in

19     place apparently to protect privileged communications.

20                  After several demands from my partner, Mr.

21     Brian Lennon, you've seen those communications, Your

22     Honor, at the outset of the second wave of charges in

23     January of 2021, Mr. Lennon advised Solicitor General

24     Fawda Hammoud, who is in charge of this criminal

25     investigation, that they're in possession of

1       privileged documents.  We heard there were 21 million

2       documents that the government is in possession of, and

3       Mr. Lennon warned Solicitor General Hammoud and

4       said -- asked her, are you using a taint team?  What

5       are you doing to protect privileged information?

6                    She finally responded and said, we are not

7       using a taint team.  Shockingly then, Your Honor, she

8       did not take Mr. Lennon's warnings and did not heed

9       those warnings, ran roughshod right over those

10      warnings, and then we, as the Department of Attorney

11      General beings rolling out its productions, we start

12      seeing privileged attorney-client communications, not

13      just our own, not just -- my firm has represented

14      Governor Snyder since 2016 -- not just our

15      communications, all the other communications.  We have

16      privileged communications that have been produced to

17      us, for example, from Chip Chamberlain, who is an

18      attorney for Nick Lyon, the former director of DHHS.

19      We have all those documents.  They were just simply

20      dumped on us to all defendants.

21                   In addition, Your Honor, we then, as these

22      productions rolled out, discovered that there were

23      Detroit bankruptcy mediation privileged documents, and

24      that's what spurred the instant filing.

25                   It's also interesting to know that in

1          Exhibit 13 of our reply brief, an e-mail was sent from

2          Deputy Attorney General Christina Grossi, to Chip

3          Chamberlain, as I mentioned, Nick Lyon's attorney, on

4          May 25th, 2021, and Deputy Attorney General Grossi

5          says to Mr. Chamberlain, that lastly, you know the

6          same information that we do about the privileged

7          documents.

8                    The documents were taken pursuant to a

9          search warrant, as you know, and we sent clawback

10         e-mails when we found out that they were being

11         produced in discovery in the criminal cases, as you

12         know.  So not only did Mr. Lennon warn, apparently,

13         the civil attorneys in the department warned the

14         criminal attorneys in the department, but they ignored

15         those warnings and ran roughshod right over those and

16         have produced literally tens of thousands of

17         documents.

18                    The last estimate I received from our team,

19         Your Honor, was that running again, just basic

20         searches, privileged, attorney-client, attorney names,

21         mediator names, over 45,000 documents were just simply

22         dumped on all nine criminal defendants in the Flint

23         water criminal cases.

24                    THE COURT:  Mr. Ash, a couple questions.

25         First of all, I assume that the nine criminal

1          defendants are those that are named in the case

2          captions that are page, I see on page 3 of this

3          proposed amended order that was attached to the

4          Attorney General's response, docket 13375-2.  It lists

5          the criminal cases, and that's an accurate list of the

6          criminal cases, including at least the last names of

7          all the defendants; is that correct?

8                    MR. ASH:  Yes, it is, Your Honor.

9                    THE COURT:  And so it's those defendants,

10         other than, of course, former Governor Snyder, to whom

11         these documents were all produced, same documents; is

12         that correct?

13                   MR. ASH:  That's our information, yes, Your

14         Honor.

15                   THE COURT:  And when were these documents--

16         and again, I'm focusing, as I think I must, on the

17         documents that you contend were production which

18         violated the confidentiality orders regarding

19         mediation in this bankruptcy case.  All nine -- when

20         were these documents that you contend violated those

21         provisions produced to these defendants?

22                   MR. ASH:  We believe this has been a

23         rolling production, Your Honor, and we're still trying

24         to appreciate the full extent of it.  We believe it

25         started in April.

1          THE COURT:  And were all nine defendants

2    sent the same batch of documents?

3          MR. ASH:  Yes, Your Honor.

4          THE COURT:  You said it's a rolling

5    production, how many rolls, how many batches, do you

6    know?

7          MR. ASH:  We have received approximately

8    four million documents over a number of rolling

9    productions.  Approximately four or five, I believe.

10          THE COURT:  Most recent of which being

11    when, do you know?

12          MR. ASH:  The last production we received

13    was on the 8th of June.  That was grand jury material,

14    though, to be clear, Your Honor.  So there's two

15    things happening.  There is both the release of grand

16    jury material happening and then the department is

17    releasing on a rolling basis documents.

18          THE COURT:  So what I'm trying to get a

19    handle on, if I can, is what are the dates on the

20    rolling production in which documents that you say

21    violated the mediation confidentiality orders were

22    produced to these defendants, do you know?

23          MR. ASH:  Your Honor, I can get you the

24    specific dates.  Again, we believe it's April time

25    frame, and I'm going to have -- we're looking that up

1      right now, as to the exact information that we have.

2                  THE COURT:  I would like to know that.  And

3      also, do you happen to know at the moment when the

4      last such production of offense documents -- by

5      offensive, I mean ones you claimed violated the

6      mediation confidentiality orders -- were produced?

7                  MR. ASH:  I will find that out momentarily.

8                  THE COURT:  That's fine, you have somebody

9      looking that up.  In the meantime, let me ask you

10     another question.  As you know, you have not put into

11     the record in connection with your motion or your

12     reply any of the what I'll call just for shorthand,

13     offensive documents.  I see what you've said in your

14     papers about the number of hits and search methods

15     used and so forth.  But you haven't actually put into

16     the record in this bankruptcy case any of the

17     documents.

18                 Now, it may be that there's a large number

19     of them and it's just too voluminous to put in, and

20     I'm sure you were concerned about keeping the

21     confidentiality by not filing those documents except

22     perhaps under seal.  If I ordered you to file some or

23     all of these documents under seal, under our

24     administrative procedure, ECF Administrative Procedure

25     9, that would be doable or what kind of volume are we

1       talking about do you think?  Much larger than easily

2       manageable, apparently; is that right?

3                MR. ASH:  It would be an extremely large

4       number of pages, Your Honor.  The numbers I've been

5       referring to are numbers of documents or hits on

6       e-mails, so perhaps not including attachments and so

7       forth.  What might make sense, if I could suggest,

8       would be a set of exemplar documents that we could

9       submit under the Court's -- the process the Court

10      mentioned under seal.  And you're exactly right, Your

11      Honor, we were very concerned about maintaining the

12      confidentiality of these documents.

13               THE COURT:  That's what I was coming to

14      next.  Given the volume, I did notice that you stated

15      I think in your opening motion at page 8, in footnote

16      5, a sample of these documents -- you said for in

17      camera review, but, of course, filing under seal would

18      be the terminology I would use for it -- and a sample

19      of the documents, that's one thing.  And I noticed

20      also that in your reply brief in support of the

21      motion, this is docket 13391, page 10 lists a number

22      of specific documents by Bates type numbers, and those

23      I assume could all be produced as well or filed under

24      seal as well, right?

25               MR. ASH:  Yes, they could, Your Honor.

1                    THE COURT:  I couldn't tell from your --

2                    MR. ASH:  Those documents would not be

3          voluminous.

4                    THE COURT:  Like what, how many pages?

5                    MR. ASH:  I suspect each document is

6          probably only a few pages, and we identified I think

7          four or five documents at page 10.

8                    THE COURT:  So then getting back to this

9          exemplar or sample, what kind of volume are you

10         talking about there?

11                   MR. ASH:  We could do documents that we

12         select, which is what I would recommend, Your Honor.

13         We could also do a random sample of some number of 50

14         documents or 25 documents for the Court, we could do

15         both.  We could handpick 25 documents, do a random

16         sample of 25 documents or 50 documents, something like

17         that could work as well.

18                   THE COURT:  So how quickly could you file

19         these things under seal if I ordered you to do so?

20                   MR. ASH:  We could do it within seven days,

21         Your Honor.

22                   THE COURT:  Well, we'll come back to that

23         perhaps.  But do you have your answer yet on when

24         these documents were produced on these rolls?

25                   MR. ASH:  The first time we noticed, we

1    believe the date, Your Honor, of that production was

2    April 29th of 2021, and then the last (inaudible) we

3    believe has offensive documents of May 7th of 2021.

4                    THE COURT:  So none have been produced

5    after you filed your motion, your contempt motion?

6                    MR. ASH:  Correct.  We suspect that the

7    Attorney General's office stopped after our motion was

8    filed or after Mr. Lennon's warning letter was sent in

9    May.

10                   THE COURT:  And, of course, there have been

11   more production of documents after that motion was

12   filed.  You mentioned June 8th grand jury material,

13   things that are not really pertinent to this

14   particular motion.

15                   MR. ASH:  Correct.  We have received --

16   sorry, Your Honor?

17                   THE COURT:  They are continuing to produce

18   documents, but not the offensive documents as I'll

19   just refer to them for shorthand here, after you filed

20   your motion.

21                   MR. ASH:  Yes, we believe that is true.

22                   THE COURT:  I interrupted you with these

23   questions.  What else did you want to say?

24                   MR. ASH:  Your Honor, a few more points if

25   I might make, and you touched on one, which is,

1    nothing in terms of the relevancy of these documents

2    to -- there was some suggestion by the prosecution

3    they may have some relevancy to the criminal

4    prosecutions.  The documents that we referenced in our

5    reply brief would suggest that's not true.  Documents

6    related to the Detroit Institute of Art, statements

7    regarding the United Auto Workers Union's

8    participation in the mediation, statements regarding

9    various foundations, we listed several examples there

10   of specific documents; these have nothing at all to do

11   with the Flint water criminal cases, and certainly

12   wouldn't constitute any sort of evidence favorable

13   that may exonerate the defendants as was suggested in

14   the Department's papers.

15            I'll also say, Your Honor, the suggestion

16   by the Department that there was some type of

17   technology assisted review used, some form of

18   technology deployed to search, identify, segregate

19   documents, we find that just simply not credible.  Our

20   team has been able to type in basic words,

21   confidential, privileged, e-mail addresses, and what

22   we're finding is that literally in the subject line of

23   e-mails, there is reference to privilege, mediation,

24   things that could have easily been identified by only

25   the most basic of search tools, wouldn't have taken

1       hardly any effort at all.

2                      So these documents could have been

3       identified, segregated.  There certainly should have

4       been a taint team or some sort of filter team or

5       special master brought in to assist if the Department

6       needed that.  That's Prosecution 101, really, Your

7       Honor; that you type in to Google "taint team" or

8       "filter team", the Department of Justice Justice

9       Manual pops up and deals with this specifically.

10      There's well established case law on the need for

11      prosecution teams to have separate taint or filter

12      teams to deal with privileged issues and to assist the

13      prosecution so that this precise problem and other

14      problems that we have in this case related to the

15      attorney-client privilege don't happen.

16                     This reckless disregard for

17      confidentiality, and again, Solicitor General Hammoud

18      and her team simply ran roughshod over warnings raises

19      a lot of questions.  How did this happen, Your Honor?

20      Did the civil sign warn the criminal side?  What is

21      the full extent of this problem?  Have documents that

22      are Detroit bankruptcy mediation privileged been given

23      to witnesses who might be cooperating, then given to

24      experts who may be used by the prosecution.  We don't

25      know the full extent of this problem.  These are

1        pressing questions that require answers and the need

2        for this Court to hold an evidentiary hearing to find

3        out what happened.

4                This Court -- I will make two more points,

5        Your Honor, and I'll turn it over -- should not enter

6        the order proposed by the prosecution.  First of all,

7        documents have been carelessly foisted upon the nine

8        criminal defendants.  They didn't ask for these

9        documents, they don't need these documents and they

10        certainly should not bear any cost or burden

11        associated with having these documents.  The

12        Department is responsible and should bear the full

13        burden and expense of its own conduct.

14                I also think when you look at the order

15        that's been proposed, abstention comes to mind,

16        problems with jurisdiction, due process and notice to

17        the criminal defendants; as I mentioned, I think seven

18        of whom are not at all bound in any way.

19                Take someone like Howard Croft, who was the

20        director of the Flint Department of Public Works.  He

21        wasn't involved in the bankruptcy and should his

22        lawyer have to do anything or spend any of Mr. Croft's

23        resources dealing with all these tens of thousands of

24        documents that have been foisted upon him?  No, of

25        course not; the Department should be called to

1    account, and then after we understand what's happened

2    and the Court has evidence before it, fashion a proper

3    remedy and require the Department to take action,

4    remedial action.

5              And then lastly Your Honor, I'll mention,

6    there was a contention that the criminal side, as it's

7    been referred to, of the conflict wall, those

8    attorneys are new, so to speak, and didn't know that

9    these potential documents, privileged documents

10   existed.  I just simply find that again incredible, in

11   light of the team assembled here.  Solicitor General

12   Hammoud herself was a former prosecutor in Wayne

13   County.  Everyone in Detroit knew about the mediation

14   and the confidential -- and how confidential and

15   strictly secret they were.  It's just not credible,

16   Your Honor, but that's again why we need an

17   evidentiary hearing to find out.

18              I'll end by asking today, Your Honor, that

19   this Court enter an order either for the Department to

20   show cause in setting an evidentiary hearing or simply

21   setting an evidentiary hearing to determine what

22   happened here to understand the extent of the problem

23   and then for the Court to fashion a remedy.  I would

24   also ask that the Court grant limited discovery in

25   advance of the hearing.  Thank you, Your Honor.

1          THE COURT:  I have a few more questions for

2     you, Mr. Ash, so let me do you that.

3          MR. ASH:  Surely.

4          THE COURT:  You mentioned earlier on that

5     these documents, the ones that had to do with the

6     mediation in the bankruptcy case that were produced

7     were not documents that any of the criminal defendants

8     asked for.  Is there anything in the -- looks like, if

9     you look at Exhibit 10 to your reply, docket 13391,

10    Exhibit 10, it's 13391-5.  It says Defendants'

11    Discovery Request.  Appears to be a copy of a

12    discovery request you made back in January in the

13    state criminal case to the State, and your position is

14    what, there's nothing in there that requests any of

15    these mediation-related documents?

16         MR. ASH:  Well, that's correct, Your Honor.

17    That would certainly be our position.  What we're

18    obviously interested in, documents that they would use

19    that would bear on former Governor Snyder's possible

20    guilt or innocence and so forth; not anything related

21    to the Detroit Institute of Art and the Grand Bargain

22    mediation and all the other kinds of documents that

23    we're seeing that were produced.

24         THE COURT:  What about the mediation-

25    related documents having to do with mediation with

1  Judge Cox that involve the Great Lakes Water

2  Authority?

3           MR. ASH:  Your Honor, I don't know that

4  there's not some sliver of relevance with the Great

5  Lakes Water Authority in some aspect of that.  As to

6  the mediation itself, I find it very hard to believe

7  that there would be anything about the negotiations

8  and the discussion in the mediation that would be

9  relevant to the prosecution.

10           (Short pause in recording)

11           THE COURT:  -- or that Governor Snyder or

12  any of the other criminal defendants might want to use

13  themselves?

14           MR. ASH:  Correct, Your Honor.

15           THE COURT:  Just so we're clear on this,

16  Governor Snyder, former Governor Snyder takes the

17  position that none of the mediation-related documents

18  that have been produced, which are covered by this

19  Court's confidentiality orders, are documents that the

20  State of Michigan and Attorney General Department has

21  any legal or ethical obligation of any kind to produce

22  to any of the criminal defendants, including former

23  Governor Snyder in the State criminal case?

24           MR. ASH:  That is certainly our position,

25  and if they thought they had, the better course would

1    have been to approach Your Honor, approach this Court,

2    and to raise that issue.

3              THE COURT:  By way of, for example, asking

4    for some relief from the mediation confidentiality

5    order, I take it?

6              MR. ASH:  That's correct.  My

7    understanding, Your Honor, is that has been done by

8    other parties in the mediation.  Or excuse me, in the

9    larger context of the bankruptcy.

10             THE COURT:  You're referring there, I think

11   probably to orders that made exemptions to the

12   confidentiality that were issued rather later in the

13   game, had to do with the mediation with Judge Cox; is

14   that right?

15             MR. ASH:  That is what I was referring to,

16   Your Honor.

17             THE COURT:  I think those are among the

18   documents you cited in your motion, right?

19             MR. ASH:  Correct.

20             THE COURT:  One moment.  The proposed order

21   that you filed, which your motion, of course, you know

22   set an evidentiary hearing and granted leave to

23   conduct discovery regarding the motion, it didn't

24   limit it in any way, it just said discovery regarding

25   the motion, and required dates for parties to serve on

1    each other.

2              The ultimate relief you're seeking here

3    isn't an evidentiary hearing, it is rather something

4    more and different.  I want to get a good handle on

5    what exactly that is.  You mentioned an order

6    requiring the Attorney General Department to pay

7    former Governor Snyder's attorney fees in bringing

8    this motion.  And you've referred in this hearing to

9    some sort of remedial action that the Court you think

10   should require the Attorney General Department to

11   take.  But I want to get as clear and specific an idea

12   as I can from you today, for former Governor Snyder,

13   exactly what relief ultimately are you seeking from

14   this Court?

15             MR. ASH:  If the evidence bears this out, a

16   finding that the Department is in civil contempt, that

17   the Department be ordered to take action to claw back

18   or whatever the evidence bears out as an appropriate

19   way to deal with and remediate this problem, and that

20   may first require some sort of special master or

21   independent taint team, because the documents need to

22   be identified.

23             That's part of the problem here, Your

24   Honor, is we can't -- the suggestion by the Department

25   is simply foist these obligations on the criminal

1      defendants, some of whom have no idea what went on,

2      certainly not in the inner workings of the mediation.

3      So those documents that they shouldn't have, that none

4      of us should have, ought to be identified by the

5      Department, which will require evidence.

6                    And then as you mentioned, Your Honor,

7      finally, after that process, Governor Snyder would ask

8      that this Court award attorney's fees, reasonable fees

9      for having to bring this motion and go through that

10     process.

11                   THE COURT:  So ultimately, it's some sort

12     of order requiring the State to try to claw back the

13     documents, to bring the horse back into the barn

14     somehow, right?

15                   MR. ASH:  That's right, ultimately.  That's

16     right, Your Honor.

17                   THE COURT:  And the State, the Attorney

18     General's office, if they were to do that, or try to

19     do that, might or might not be fully successful.

20                   MR. ASH:  Again, that's part of the problem

21     here.  We don't know how this happened and don't

22     really know the full extent of the problem, I suspect.

23     Something clearly went very wrong.

24                   THE COURT:  Tell me more about Exhibit 13

25     to your reply, docket 13391-8.  You referred to it

1    earlier, from the e-mail dated, it looks like May 25,

2    2021 from Christina Grossi.

3              MR. ASH:  Grossi, Your Honor.

4              THE COURT:  Chuck Chamberlain, cc Nick

5    Lyon.  You referenced the last paragraph of text

6    there, referring to a possible clawback.  What's that

7    about?

8              MR. ASH:  That was, my point was in terms

9    of the warnings that were given, not only Mr. Lennon,

10   but also, apparently, this would suggest the

11   attorneys, because Christina Grossi is the Deputy

12   Attorney General, she supervises the Assistant

13   Attorneys General on the civil side; this suggests

14   there was a warning or a request for clawback that was

15   sent from the civil side to the criminal side.  Now

16   when that happened, what it says and whether it was

17   responded to and how, we don't know.

18             THE COURT:  So you don't have any more

19   details about that than what you can gather from that

20   e-mail; is that right?

21             MR. ASH:  That's correct, Your Honor.

22             THE COURT:  Mr. Ash, is there anything

23   going on, you mentioned abstention, and there are

24   possible -- is there anything going on in any of the

25   State criminal cases, the nine cases here, including

1    former Governor Snyder's case, in which the defendants

2    are seeking relief because of the problem of

3    privileged documents being disclosed?

4              MR. ASH:  There have been communications

5    back and forth on that but nothing yet has been filed

6    on the attorney-client privilege issues, is my

7    understanding, Your Honor.

8              THE COURT:  And the State Court has not

9    taken any sort of action on that?

10             MR. ASH:  I'm sorry, Your Honor, you were

11   breaking up there.

12             THE COURT:  The State Court has not yet

13   taken any sort of action on this really different

14   issue of attorney-client privileged documents and

15   other privileged documents, not involving the

16   mediation and the bankruptcy case; is that right?

17             MR. ASH:  That's correct, Your Honor.  The

18   State Court has not taken any action on that.

19             THE COURT:  One moment.  Do you want to

20   address the argument by the State, the Michigan

21   Attorney General's Department, that former Governor

22   Snyder lacks standing to bring this motion?  I know

23   you -- you filed a reply brief and I read that, but

24   anything further you want to say about it?

25             MR. ASH:  Briefly, Your Honor, I'd say

1    Governor Snyder is a participant in the mediation.

2    He's still bound.  If the shoe were on the other foot,

3    he could certainly be called to account for

4    disclosures he made and the participants have

5    interests, legal interests in not having their, what

6    they thought were confidential communications

7    disclosed to those with no obligation to keep them

8    confidential.

9         You might imagine, and I know there was a

10   suggestion that while this was Governor Whitmer's

11   issue, now imagine a situation in which a party uses

12   some of these documents in a proceeding.  I can assure

13   Your Honor that governor Gretchen Whitmer would not be

14   the one answering questions, it would be former

15   Governor Snyder, because these were his statements and

16   his discussions and he would be the one.  So this

17   is -- clearly, Governor Snyder has a legal interest to

18   protect here, as do all the other participants in the

19   mediation and as does this Court.

20        THE COURT:  Getting back to the relief

21   you're seeking.

22        MR. ASH:  Yes, Your Honor.

23        THE COURT:  This concept of limited

24   discovery, what is the scope of the discovery that you

25   want this court to grant you leave to conduct?  And

1          I'll just remind you that under our local rules, in

2      contested matters, there is no leave to conduct

3      discovery unless the Court grants it.  It's granted

4      when it's needed.  What's the limited discovery?  Your

5      proposal doesn't limit the discovery at all.

6              MR. ASH:  Your Honor, we would follow the

7      rules and file a motion on that and give you the very

8      specifics or attach the proposed discovery.  Certainly

9      we want to understand what happened here from the

10     civil side to the criminal side.  We strongly suspect

11     warnings were given even at the time of the issuance

12     of the search warrant and since then, all of that

13     would be, of course, relevant to a contempt finding.

14     And we may need to get into issues with the way these

15     documents were handled when they were taken in, how

16     they were processed, their use or lack of any use of

17     technology assisted review and those sorts of issues.

18              But again, Your Honor, we would present the

19     court with a motion.

20              THE COURT:  You have presented the Court

21     with a motion in which you asked for, it says leave to

22     conduct discovery regarding the motion, but you

23     haven't been specific.  You talk about limited

24     discovery, and that's why I asked the question.  All

25     right.  One moment.  I would like anything further

1          that you would like to say about this theme that's

2          part of the Attorney General Department's response to

3          your motion, that seems to sort of want to portray the

4          Department, Michigan Attorney General Department as

5          being really two separate entities; one, the Flint

6          criminal team and one, the Flint civil team, and argue

7          that the Court can only hold the Michigan Department

8          of Attorney General in contempt for violating the

9          mediation confidentiality orders if the Court can find

10         the elements of contempt as to the current attorneys

11         on the Flint criminal case, rather than focusing on

12         the Department of the Attorney General as a whole,

13         which obviously had actual knowledge and notice from

14         the very beginning of the terms of the mediation

15         orders.  Did you want to say anything more about that?

16                    MR. ASH:  I'll say a couple of things, Your

17         Honor.  I think, and we had asked in the very first

18         hearing in the State Court, the criminal team says

19         they are the Department of Attorney General, and

20         that's on the record in Governor Snyder's criminal

21         case.  So they are part of the Department, and as

22         such, I don't understand the argument then that is,

23         well, we shouldn't -- we're not to be held to know

24         anything in terms of the Department.  There really is

25         only one Department.  And then if someone is hired new

1       to the Department, he or she should know, and I think

2       can be attributed with certain knowledge, and then we

3       have this other issue of warnings that were given by

4       the civil side to the criminal side; and how even the

5       most basic of searches, privilege, confidential, would

6       have immediately revealed that there were thousands

7       upon thousands of Detroit bankruptcy mediation

8       documents in what they were about to produce to

9       individuals who had absolutely no obligation to keep

10      that information confidential.  So I think that

11      argument fails for a number of reasons, Your Honor.

12                  THE COURT:  All right.  Anything else you

13      would like to say, Mr. Ash, before we hear from

14      counsel for the Michigan Department of d?

15                  MR. ASH:  No, Your Honor.  Thank you for

16      the Court's time.

17                  THE COURT:  Thank you.  Mr. VanDeventer?

18                  MR. VANDEVENTER:  Yes, Your Honor.  Thank

19      you.  Again, for the record, John VanDeventer on

20      behalf of the Department of Attorney General.

21                  I think it's important upfront to briefly

22      recap the events that are at issue in this motion.

23      The documents that we believe are at issue, although

24      as the Court noted, we have not actually seen them,

25      but the ones that we believe are at issue in the

1        motion are documents that were seized by the criminal

2        team prosecuting the Flint water crisis cases on May

3        28th, 2019, pursuant to a search warrant.  And that

4        warrant sought only those documents that were

5        maintained on servers owned by the State of Michigan

6        or its discovery vendor that were related to the Flint

7        water crisis investigation.  It says that on the face

8        of the search warrant.

9                It was a huge volume of documents,

10       approximately 20 million pages worth, and most of them

11       were produced in the format that can't be easily or

12       completely reviewed by a computer because there's no

13       metadata, for example, for the documents.  We did

14       attempt to do a basic computer level review, but given

15       the volume of the documents, it's incredibly

16       difficult.

17               So to facilitate the criminal team's

18       production of those documents to Mr. Snyder and to the

19       other criminal defendants pursuant to the prosecutor's

20       ethical obligations, the criminal team negotiated a

21       protective order that the criminal courts entered on

22       March 31st, 2021.  And after that date, as counsel

23       acknowledges, the criminal team began production of

24       the documents indicating in a cover e-mail that these

25       productions contained documents that are subject to

1          that protective order.

2                    On May 12th, Mr. Snyder filed this contempt

3          motion seeking to hold the entire Department of

4          Attorney General in contempt as swell as unspecified

5          attorneys within the Department, and in responding to

6          Mr. Snyder's motion, I have spoken with attorneys on

7          the civil team, since the allegations in the motion

8          have been made against attorneys on both sides of the

9          (inaudible).

10                   Now, the Department believes that this

11         motion has little to do with the protection of

12         sensitive information and everything to do with

13         bringing the Flint water criminal prosecution to a

14         halt.  Regardless of that, we have no interest in

15         fighting about motive, and to the extent that there

16         are concerns about the protection of information, we

17         are committed to taking reasonable steps to address

18         them.

19                   So after Mr. Snyder filed this motion, the

20         criminal team not only drafted a proposed order to be

21         entered in this bankruptcy case that would protect the

22         mediation documents, it also worked with the civil

23         team to draft an order in the criminal cases, that

24         made crystal clear that the protective to applies to

25         and protects all privileged information, including

1          mediation documents in the Detroit bankruptcy to

2          resolve this issue once and for all.  That was in the

3          works when we filed our response, it wasn't finalized

4          until after our deadline so we didn't attach it to our

5          brief, but those motions have been filed with the

6          courts, the criminal courts, and one of them I believe

7          is available as Exhibit 15 to Mr. Snyder's reply.

8                    Now, to be clear, we believe the previous

9          order adequately protects sensitive documents in the

10         Flint criminal cases, but we'd rather resolve any

11         doubt whatsoever so we can get on with the merits of

12         the criminal prosecution.

13                   Now, with respect to the allegations made

14         in Mr. Snyder's briefing and argument here today,

15         there are a number of inaccuracies that I want to

16         address just briefly.  The first is that Mr. Snyder

17         has no standing here, and his argument to the contrary

18         really misconstrues the basics of bankruptcy standing.

19                   Mr. Snyder complains the obligation to

20         comply with the Bankruptcy Court's order, with

21         standing to object or be heard on various matters in

22         the case, and those two are not the same.  Probably

23         the most prototypical example in the bankruptcy

24         context would be an insolvent Chapter 7 debtor, where

25         there is no doubt that the debtor must comply with the

1          Bankruptcy Court orders in his case, but that doesn't

2          mean he has standing to raise any number of issues

3          that don't of affect his pecuniary interest.

4                  In the 6th Circuit in Kahn, which we cite

5          in our brief, and other cases across the circuits made

6          clear that really being interested in the outcome of a

7          matter or having that matter be important to the

8          person for whatever reason is not enough for

9          bankruptcy standing; you have to have an actual

10         pecuniary interest.  And here, Mr. Snyder does not

11         have that.  He's not a creditor, a secured lender;

12         he's not any other party with a pecuniary interest,

13         and he no longer represents the State of Michigan,

14         which is the party involved in the mediation.

15                 As to the allegation that Mr. Snyder raises

16         in his reply to support a contempt ruling, there are a

17         number of troubling misrepresentations that I just

18         want to touch on briefly.  The first is this idea that

19         despite the fact that there is a conflict wall with

20         the Attorney General on one side and Solicitor General

21         Hammoud on the other, that somehow that has been

22         breached because there has been hundreds of meetings

23         between the two over the past two years.

24                 Now, both Solicitor General Hammoud and I

25         are members of the Attorney General's executive team,

1          and in addition to that, the Solicitor General

2          oversees multiple divisions of our department that

3          handles a large number of cases.  So we meet with the

4          Attorney General regularly on any number of matters

5          that have absolutely nothing to do with the Flint

6          water crisis.

7                    And that really is the whole point of the

8          conflict wall, is to block the flow of information on

9          a particular matter or a particular case between

10         parties who otherwise would interact with each other.

11         And I think it's notable that in the brief, they say

12         they filed a FOIA with the Department, but they can't

13         quote a specific instance of the wall being violated.

14                   In addition to that, they assert that the

15         civil team has denied Mr. Snyder access to his

16         lawyers.  Now, this is a surprising allegation to me,

17         and again, I reached out to the civil team and have

18         confirmed speaking with attorneys on that team that

19         this simply is not true.  According to the civil team,

20         they didn't reveal the nature of the conversation, but

21         they confirmed that Mr. Snyder has spoken directly to

22         his lawyers within the last few weeks.

23                   In addition to that, I would just point out

24         that Mr. Snyder has made it difficult for anyone in

25         the Department on either side to discuss the issues

1          raised in this motion because he is currently seeking

2          to hold the entire department in contempt, as well as

3          various unnamed individuals.

4                    And then the final contention that I want

5          to address in the briefing is this idea that's come up

6          multiple times that the criminal team did not use a

7          quote, "taint team", and that somehow that's a

8          problem.  Now, Mr. Snyder as he acknowledges in his

9          brief has been raising this issue for months, but in

10         the entire time, as the Court inquired about, has

11         never filed a motion about this and has never provided

12         to the Court or to the criminal team a single case,

13         statute, rule or any other authority that even

14         suggests that such a team is required for criminal

15         cases in Michigan.  In fact, this concept does not

16         appear anywhere in Michigan's Rules of Criminal

17         Procedure.  But the rules do provide a mechanism for

18         the production of sensitive information in a criminal

19         case, and that is a protective order.  And that is

20         what the criminal team has implemented here with the

21         approval of the criminal court.  That is the proper

22         procedure to use when dealing with such a large volume

23         of documents that may contain sensitive information.

24                    Now, I also have to say today they talked

25         about seeking a clawback order, having the Department

1      claw back documents.  I think this is the first time

2      that I have ever heard a party seeking a clawback

3      order against itself.  And the reason I think that

4      that doesn't come up is because if a party is

5      concerned about documents that it has in its

6      possession, it can simply destroy them, it doesn't

7      need a court order to do that.

8                  Your Honor, Mr. Snyder is asking this Court

9      to step in and establish policies and procedures to

10     govern the Flint water criminal cases that are

11     currently underway before competent judges in State

12     Court, and we would respectfully urge you to decline

13     that invitation.  The Department understands its

14     strategic thinking behind bringing a contempt motion

15     in this high profile bankruptcy case, as Mr. Snyder

16     has done here, but believes it is wholly inappropriate

17     to use this Court's time and resources as weaponry to

18     gain any tactical advantage in the Flint criminal

19     cases.

20                  And to the extent there are legitimate

21     concerns about the protection of mediation documents

22     in this case, the Department has proposed an order

23     both in this bankruptcy and in the criminal cases that

24     would address those concerns and preserve the

25     privilege and confidentiality of mediation documents.

1     We would ask the Court to enter that order and to deny

2     Mr. Snyder's motion for sanctions, not only because he

3     does not have standing to bring the motion, but

4     because there's no merits to his claims.

5                 THE COURT:  I have a few questions for you.

6                 MR. VANDEVENTER:  Sure.

7                 THE COURT:  First, the protective order

8     that was entered was already entered, I think you said

9     on March 31, 2021 in the criminal cases.  Is that in

10    the record in this case?

11                MR. VANDEVENTER:  It is, Your Honor.

12                THE COURT:  Where is it?

13                MR. VANDEVENTER:  Let me find it for you.

14                THE COURT:  That's fine.  I got Exhibit E,

15    I got you.  I see it.

16                MR. VANDEVENTER:  Correct.

17                THE COURT:  Thank you.  On the issue of

18    standing, who would have standing to seek any relief

19    from this Court if someone violated this Court's

20    mediation confidentiality order?  Anyone?

21                MR. VANDEVENTER:  Yeah, I think it would be

22    the debtor, it would be the current officeholders

23    within the State of Michigan, anyone who holds those

24    offices that were involved in the mediation, I think

25    they would have standing to come in.

1              THE COURT:  Why would the debtor have

2      standing?

3              MR. VANDEVENTER:  I believe the debtor

4      would have standing simply because the mediation

5      affects the ongoing outcome of the Chapter 9 case and

6      their success of the Chapter 9 reorganization.

7              THE COURT:  How does it do that?

8              MR. VANDEVENTER:  Well, we'll certainly

9      acknowledge that the mediation was an important part

10     of the Chapter nine 9 and integral into having a plan

11     implemented, and so in that sense, it's important to

12     the City.

13             THE COURT:  But is there some way the City,

14     the debtor, the City of Detroit has a pecuniary

15     interest in seeking such relief?

16             MR. VANDEVENTER:  I guess really, I would

17     have to think about it more.  I haven't thought about

18     it in terms of the debtor.  I would think if anybody

19     has standing to come in and object, it would be the

20     parties that were involved in the mediation, and my

21     understanding is that includes the debtor.

22             THE COURT:  Well, that includes -- the

23     mediation orders required among parties to attend at

24     least several of the mediation sessions, not just the

25     State of Michigan but also the Michigan Attorney

1          General, who at the time was Mr. Schuette.

2                    MR. VANDEVENTER:  Correct.

3                    THE COURT:  So when you talk about who's

4          parties to the mediation, I'm not sure what that

5          means.  Certainly, the Michigan Department of Attorney

6          General was a participant in some of the mediation

7          sessions.  That's clear from the record, you don't

8          dispute that, right?

9                    MR. VANDEVENTER:  That's right, Your Honor.

10                    THE COURT:  So isn't it correct that the

11         Michigan Department of Attorney General had actual

12         knowledge and had notice from the very beginning of

13         the provisions of these various mediation orders and

14         their confidentiality provisions?

15                    MR. VANDEVENTER:  Attorneys within the

16         Department of Attorney General, yes, who have that

17         knowledge.  The difficulty here, and admittedly, it is

18         a unique situation that I think outside of government

19         offices probably rarely, if ever, arises, is that our

20         office, the Department is often called on to represent

21         multiple parties on different sides in a particular

22         matter.  And so the rules and case law recognize that

23         from time to time the Department has to elect conflict

24         walls to prevent the flow of information between one

25         set of attorneys and another.

1               On this case, every single attorney who is

2       on the criminal side of the Flint conflict wall, as we

3       state in the brief, was hired after a certain date,

4       well after the date of the Detroit mediation, and so

5       had no participation in the Detroit bankruptcy.

6               So when the criminal team received these

7       documents, pursuant to a search warrant, they had no

8       ability to go to the attorneys on the other side of

9       the conflict wall and say, can we go through these

10      documents with you and determine what, if any,

11      privilege applies to each and every one.  There's a

12      block on the flow of information between the two

13      teams.  And so there's really no way for the knowledge

14      that the one team has about a particular set of

15      documents to be imputed to the attorneys on the

16      criminal team.  And so that's again part of the reason

17      that there's a protective order in place in case there

18      are privileged documents that are produced as part of

19      this case.

20              THE COURT:  Well, why does this conflict

21      wall stuff, why does that form any sort of legal

22      excuse, valid legal excuse for the Michigan Department

23      of Attorney General violating --

24              (Short gap in recording)

25              MR. VANDEVENTER:  Your Honor, under the

1        standards that Sixth Circuit Court have articulated

2        about knowing violation of a court order, any attorney

3        sort of by definition by the terms of the conflict

4        wall that's in a place, that participated in the

5        Detroit bankruptcy case or had knowledge of the

6        Court's orders, would not be an attorney making

7        decisions about how to use the documents once they

8        were seized pursuant to the search warrant.  Those

9        decisions had been made by the criminal attorneys in

10       the Department who can't consult with the civil team

11       about how to use the documents one they were seized

12       pursuant to the court order.

13                THE COURT:  Why does that matter, under the

14       contempt, the standards for establishing contempt that

15       are applicable in this case, which require that the

16       respondent have knowledge of the order at the time

17       that they take action that violates a specific and

18       definite provision of the order?

19                MR. VANDEVENTER:  Your Honor, again, I

20       think that the conduct that has been alleged as worthy

21       of contempt in the motion was all taken by the

22       criminal team, and the members of the criminal team

23       were not involved in the Detroit bankruptcy mediation;

24       did not have knowledge of the mediation orders that

25       were entered.  So it's difficult to understand how

1          that team can be held in contempt when they had no

2          knowledge of the orders applicable allegedly to these

3          documents.  We haven't seen the documents but

4          understand what the allegations have been in this

5          motion.

6                    THE COURT:  Well, the criminal team

7          attorneys are employees of the Michigan Department of

8          Attorney General, aren't they?

9                    MR. VANDEVENTER:  Correct.  Well, I should

10         be careful, Your Honor.  Many of them are, some are

11         like special attorneys general who are contractors who

12         are appointed on the Flint water prosecution.

13                    THE COURT:  And they act as agents of the

14         Michigan Department of Attorney General in that role,

15         don't they?

16                    MR. VANDEVENTER:  Correct.

17                    THE COURT:  So putting aside for a minute

18         the question whether individual attorneys within the

19         Flint criminal team or the Flint civil team should be

20         held in contempt, if we focus instead on the question

21         should the Michigan Department of Attorney General be

22         held accountable, why isn't the focus properly on what

23         the Department knew, which means what did their

24         attorneys know at any point, and if new attorneys come

25         in and old ones leave, the Department is still

1       responsible.

2                    MR. VANDEVENTER:  Well --

3                    THE COURT:  It's an order, isn't it?

4                    MR. VANDEVENTER:  Your Honor, I would say

5       two things in response.  One is, it's difficult to

6       discuss the Department as a whole knowledge when there

7       is an ethical obligation for the Department to divide

8       its knowledge among two different teams.  The whole

9       point of an ethical law is to protect the flow of

10      information from one side to the other.  So it's

11      difficult to say the Department knew something when

12      there are really two teams within the Department that

13      have completely separate knowledge from each other.

14      That's the whole point of the wall.

15                   The broader response I would say is,

16      regardless of the issue of knowledge on either side of

17      the wall, the Flint criminal team did take reasonable

18      steps to try and protect this information.  The whole

19      point of the protective order is to protect sensitive

20      information that is being produced as part of the

21      case, and it can't be entered into evidence and can't

22      otherwise be publicized.  So again, even putting aside

23      the question of knowledge, there's also -- I think

24      it's important to note that the criminal team did take

25      reasonable steps to protect this information, and when

1    Mr. Snyder and the defendants raise this issue of

2    mediation documents apparently being part of the

3    documents produced to them, we proposed an order in

4    this court and an order in the criminal cases that

5    makes it very clear that these documents are to remain

6    privileged and protected.  And there's case law that

7    says just because something is seized pursuant to a

8    search warrant doesn't mean it loses its privilege.

9    So these documents remain privileged and confidential

10   and subject to a protective order in the criminal

11   court.

12              THE COURT:  I think the point I think of

13   the contempt motion really is that -- and part of what

14   I'm focusing on here is, there's -- the mediation

15   confidentiality orders entered by this Court didn't

16   just say you can produce these mediation-related

17   documents to somebody as long as there's some court

18   order requiring them to keep them quiet, or some

19   protective order.  It's broader than that.  It says,

20   these documents shall not be disclosed.  Period.  And

21   that means to anyone.  And these were disclosed, these

22   documents were disclosed to the nine defendants in

23   these criminal cases and their attorneys and they were

24   disclosed by a department, Michigan Department of

25   Attorney General, that had knowledge of the mediation

1          order.  There's nothing about this conflict wall or

2          this division of knowledge between a criminal team and

3          a civil team, even to the extent that may be relevant

4          to this contempt motion, there's nothing in that, the

5          restriction of knowledge in that that restricted

6          either team from having knowledge or being given

7          knowledge about the existence of these mediation

8          confidentiality orders entered in this bankruptcy

9          case.  Right?

10                    MR. VANDEVENTER:  Correct, Your Honor.

11         There's nothing that would keep us from knowing about

12         the order generally.  The issue is --

13                    THE COURT:  More specifically --

14                    MR. VANDEVENTER:  Specifically, but what it

15         does prevent us from doing is consulting with the

16         civil team about potential court orders that may apply

17         to any one of the 20 million documents that were

18         seized as part of the search warrant.  And that's the

19         challenge, is that there's really no way for the

20         criminal team to know about what court orders may be

21         subject to all the different 20 million documents that

22         were produced; hence, the need for a protective order.

23                    THE COURT:  What is it in the -- perhaps

24         this is in the record somewhere, but explain to me

25         what is it in the conflict wall, somewhere is it

1          documented that prevents the criminal team from asking

2          the civil team from whom they have seized documents

3          about whether there are court orders protecting the

4          documents?

5                    MR. VANDEVENTER:  I think the concern, Your

6          Honor, is generally discussing documents that were

7          seized from one side to the other in the Flint case

8          with attorneys who are walled off from discussing that

9          matter with each other.

10                   THE COURT:  But how are they walled off?

11         Where is it in the wall that says they can't talk

12         about that subject?  Are any of these documents

13         protected from disclosure by court orders?

14                   MR. VANDEVENTER:  Your Honor, I'm looking

15         at the term -- I'm pulling out the exhibit to our

16         response, and it says that members of the civil team

17         are prohibited from engaging in any discussions

18         concerning the Flint water crisis criminal matters

19         with members of the criminal team.  It's a very broad

20         prohibition --

21                   THE COURT:  That is Exhibit B?

22                   MR. VANDEVENTER:  That's correct, yes.

23                   THE COURT:  So you're reading from where in

24         there?

25                   MR. VANDEVENTER:  That is paragraph 1 in

1         the shall (inaudible) paragraph.  Paragraph 2 goes on

2         to say that the wall prevents all of the department

3         staff from viewing criminal team's files, documents or

4         materials relating to the Flint water crisis criminal

5         matters.

6                   THE COURT:  The Fifth Amended Notice of

7         Conflict Wall, right?

8                   MR. VANDEVENTER:  Correct.

9                   THE COURT:  Paragraph 1 that you read from

10        has an exception, it says:  Unless consistent with the

11        Rules of Professional Conduct.  You see that?

12                  MR. VANDEVENTER:  Yes, Your Honor.

13                  THE COURT:  Actually, paragraph 2 and 3

14        also have that "unless" provision, right?

15                  MR. VANDEVENTER:  Correct.

16                  THE COURT:  So what does that add to this

17        question, anything?

18                  MR. VANDEVENTER:  I think, Your Honor, it

19        doesn't.  I think if we had sat down and walked

20        through the documents with the civil team that we

21        received pursuant to the search warrant, the complaint

22        we would be hearing from the criminal defendants would

23        be that we violated the conflict wall and the two

24        teams are sharing information with each other.

25                  We take the conflict wall very seriously,

1       so it seems to me completely inappropriate for the two

2       teams to discuss the nature of the various documents

3       that were produced under the search warrant,

4       especially when those documents may have direct

5       relevance to Flint water prosecution.

6                   THE COURT:  Well, do you think it would be

7       a violation of the conflict wall if somebody on the

8       criminal team had written a letter to the civil team

9       saying, simply saying, dear so and so, of these

10      however many thousands of documents that we have

11      seized, are there any that you know of that disclosure

12      of which is prohibited by an order of any court,

13      period, and then get an answer.  If the criminal

14      defendants had discovered such a letter and such a

15      written answer to that, that they would have had any

16      basis to complain that the wall had been breached?

17                  MR. VANDEVENTER:  I don't know the answer

18      to that, Your Honor.  I don't think there would be

19      anything wrong with sending that letter.  So what we

20      did in this case, when the issue of the mediation

21      documents was raised, is, we did reach out to the

22      civil team and said the allegations in this motion are

23      that there are confidential mediation documents and we

24      worked with them to craft the language for this

25      amended protective order to make sure that those

1      documents are covered.

2              I think it's important to remember, even if

3      there are privileged documents, it doesn't negate the

4      prosecution's obligation to produce documents to the

5      criminal defendants when we have an ethical obligation

6      to do so.  And these are documents that were obtained

7      pursuant to a search warrant limited in scope to those

8      documents related to the Flint water crisis

9      prosecution.

10             So regardless of privilege, we still have a

11     competing obligation to produce documents as

12     prosecutors, and that again is the point of the

13     protective order that the Court entered.

14             THE COURT:  So what did your criminal team

15     side do when you got all these documents and before

16     you produced them to any of these criminal defendants,

17     what did you do?  You mentioned you tried to do some

18     searching in them but you had trouble or limits.

19             MR. VANDEVENTER:  Yes, Your Honor.  My

20     understanding, and I can try to answer the best I can,

21     I'm not really technologically advanced, but my

22     understanding is the documents were produced in a

23     format that don't have clear metadata.  So to review

24     the document, you really have to review them on a

25     document-by-document basis.

1           I believe that the team was able to

2      segregate a chunk of documents that we believed had

3      absolutely no relevance to the case whatsoever and so

4      would not need to be produced to the defendants.  But

5      again, by and large, the documents that we received

6      pursuant to this particular search warrant at issue

7      here are theoretically all documents related to the

8      Flint water criminal prosecution because that was the

9      scope of the search warrant.  And so we have an

10     obligation to broadly produce documents to the

11     criminal defendants that have that relationship to the

12     prosecution -- I'm sorry, to the criminal case.

13          THE COURT:  We'll come back to that in a

14     minute as it relates to the mediation documents.  But

15     let me just follow up on what you've said.  You heard

16     what Mr. Ash said about searching that they were able

17     to do, according to him, without much trouble to

18     locate thousands of documents that were from the

19     Detroit mediation.  Why were they so able to easily

20     find all those and your criminal team was not?

21          MR. VANDEVENTER:  Your Honor, it's

22     difficult to talk about a set of documents that we

23     haven't seen and we don't know the nature of them.  I

24     would say that because a document contains a name or

25     frankly, even because it's marked as privileged, does

1      not make the document privileged, does not make it

2      subject to the court order.

3              It's difficult to comment on the specifics

4      of these documents when all we know is he said the

5      documents hit on particular names, for example.  He

6      also said that -- sorry.

7              (Background noise/music interrupting

8              hearing).

9              THE COURT:  Is that your music or someone

10     else's?

11             MR. VANDEVENTER:  That's not me.  I'm not

12     sure where that's coming from.

13             THE COURT:  Somebody mute their phone so we

14     don't hear that music.  Are you still there?

15             MR. ASH:  Yes, I'm here.

16             THE COURT:  Go on.  So one of the things

17     they searched for, I think, was mediation, and they

18     searched for mediator names, whose names of some of

19     the mediators at least were very well known, including

20     Chief Judge Rosen, and it must have been well known to

21     anybody having to do with the Flint water situation,

22     Judge Sean Cox.  Simple basic searches like that were

23     able to turn up documents by the other side and your

24     side apparently didn't do that kind of search; is that

25     right?

1          MR. VANDEVENTER:  Your Honor, again, I

2     think it's important to remember, we're talking about

3     20 million documents, and what could be any number of

4     different cases that the documents come from, where

5     some may be documents are not tied to any particular

6     case.  So it's unclear what sort of review the

7     defendants are even proposing we would conduct; a

8     search for every single judge and every single case

9     the State of Michigan has ever been involved in.

10     Again, I don't mean to be repetitive, but I go back to

11     this is why the Court in the criminal cases entered

12     this protective order, pursuant to which we could

13     produce documents and protect the confidential and

14     privileged nature of those documents.

15          THE COURT:  All right.  So let's talk about

16     this point that you've made I think a little bit in

17     your brief and also a little bit ago.  What legal or

18     ethical obligation did the Department have to produce

19     to these criminal defendants any documents, mediation-

20     related documents from the City of Detroit bankruptcy

21     case?

22          MR. VANDEVENTER:  Your Honor, the

23     prosecutor had an obligation to produce documents that

24     are potentially relevant, potentially exculpatory to

25     the criminal defendants, and courts uniformly have

1          said that prosecutors should interpret that obligation

2          very broadly.  And here, again, it's of particular

3          concern to interpret it broadly because the documents

4          on these servers that were obtained pursuant to the

5          search warrant were pursuant to a search warrant that

6          was limited to documents related to the Flint water

7          crisis.  So already, there's sort of a presumption

8          that the documents that were produced to us have some

9          relationship to the case.

10                     And so again, I think counsel used the term

11         Prosecution 101.  Prosecution 101 is, you don't

12         jeopardize the integrity of the prosecution by holding

13         back documents that may potentially be -- the

14         defendants may potentially be entitled to receive.

15         And so here, that's what the team did is broadly

16         produce documents that were received pursuant to the

17         search warrant.

18                     THE COURT:  And you received roughly how

19         many documents in this seizure?

20                     MR. VANDEVENTER:  Our understanding, it

21         would be -- it's electronic data, but it would equate

22         to approximately 21 million pages of documents.

23                     THE COURT:  And did you produce all of

24         those to the defendants or not all of those?

25                     MR. VANDEVENTER:  Not all of them to date.

1     We've produced approximately four million documents,

2     and counsel is correct, I believe that those

3     productions started in April, and once this motion was

4     filed, we ceased production of any documents that

5     would have come from these servers while this motion

6     is pending.  We have produced documents from the grand

7     jury proceedings, but nothing that would have been

8     ceased pursuant to the search warrant.

9              I'm sorry, I'm being told it's 21 million

10    documents, and each document could be multiple pages.

11    So we're talking even more, a volume even higher than

12    that.

13             THE COURT:  Does the Department have any

14    intention or plan to produce any more documents to

15    these criminal defendants that might include documents

16    covered by the mediation orders in this bankruptcy

17    case?

18             MR. VANDEVENTER:  Yes, Your Honor.  And

19    again, there are documents in the bankruptcy case that

20    may very well be relevant to the Flint water

21    prosecution, which is why we would propose an order

22    explicitly protecting those documents from publication

23    or from use in evidence without permission of this

24    Court, and also clarify in the criminal cases in that

25    protective order that those documents are protect.

1          But, of course, we don't that until there's a final

2          resolution of this motion.

3                    THE COURT:  That's part of what I was

4          getting at with my question.  I want to stop the

5          bleeding while the Court is considering this motion

6          and before there's a final resolution of it.  And so

7          what I'm getting at is, what I'm contemplating doing

8          is ordering the Michigan Department of Attorney

9          General, which would cover the criminal side and the

10         civil side, everybody, prohibited, pending (beeping

11         sound) from the Court from producing to any of these

12         criminal defendants or anyone else any documents, and

13         I would describe them in a way that is consistent with

14         the mediation orders, basically documents -- actually,

15         by the mediation orders.

16                    Do you have any particular problem with me

17         ordering that immediately?

18                    MR. VANDEVENTER:  I don't think so, Your

19         Honor.  We're voluntarily doing that now.

20                    THE COURT:  So this is the sort of related

21         to your obligation, this issue of your prosecutor's

22         obligation to produce documents to criminal defendants

23         that are potentially relevant, they're potentially

24         exculpatory, which is the Brady case concern.

25                    You cited a couple of cases in your brief

1           arguing, I think, that that prosecutor obligation

2           essentially trumps any court order that would protect

3           mediation-related materials, that would prohibit

4           disclosure of mediation-related materials.  This

5           court's orders I think are very clear that ordered

6           that these materials, these documents were not to be

7           disclosed, period.

8                      Now, if you think that conflicts with the

9           Flint criminal team's obligations as prosecutors,

10          legal or ethical, to produce documents to the criminal

11          defendant, why is it that you argue or think that or

12          contend that the prosecutor's obligation to produce

13          the document takes priority over an order of this

14          Court prohibiting disclosure of the document, at least

15          without first coming to this Court and asking for

16          relief or an exception to that order to permit the

17          production of these documents in this instance?

18                      MR. VANDEVENTER:  To be clear, Your Honor,

19          that's not what the Department would contend.  And

20          those cases are cited for more general proposition

21          that prosecutors often have to balance competing

22          interests and in certain circumstances it's the

23          interest of protecting privileged and confidential

24          mediation communications with the obligation to

25          disclose to defendants.

1          The cases are cited in our brief really in

2     support for the idea of entering this amended order in

3     the Detroit bankruptcy case and the protective order

4     in the criminal cases to try and effectively balance

5     those obligations that we have as prosecutors in a way

6     that protects the sensitivity of the documents and

7     also allows us to fulfill our ethical obligations in

8     the criminal cases.

9          So certainly, we do not contend that we

10     have carte blanche to continue to produce without the

11     Court's input; but rather, that we are obligated to

12     try and seek some sort of solution that allows us to

13     protect the documents and still fulfill our ethical

14     obligations.

15          THE COURT:  Anything further you would like

16     to say, Mr. VanDeventer?

17          MR. VANDEVENTER:  No, Your Honor.  Thank

18     you.

19          THE COURT:  Thank you.  Mr. Ash, on behalf

20     of the moving party, former Governor Snyder, as I

21     mentioned at the outset of the hearing, you have an

22     opportunity now to reply at least briefly in support

23     of the motion if you want to.

24          MR. ASH:  Briefly, Your Honor, thank you.

25     I would like to start with the suggestion that the

1    existing stipulated order would in some way cover the

2    Detroit bankruptcy mediation privileged documents that

3    have been produced to all the Flint water criminal

4    defendants; it does not, Your Honor.  It's Exhibit E

5    to the Department's response brief.  The first

6    paragraph, which has several subparagraphs, defines

7    confidential information.  It speaks to financial

8    information, Social Security numbers, bank account and

9    credit card numbers, protected health information and

10   water sampling results.  It does not say anything that

11   would cover the various documents that have been

12   produced to the criminal defendants concerning the

13   Detroit bankruptcy mediation privilege.

14           The proposed order, which is only that,

15   that was proposed by the Department the day after our

16   filing, mind you, Your Honor, that is not an order of

17   the Court, it will probably be objected to, we have no

18   idea whether it will be entered, and there is

19   certainly the matter of currently, there are at least

20   seven defendants who have absolutely no obligation

21   whatsoever to hold this information and keep it

22   protected.

23           I was also curious when I heard counsel

24   speak to conversations with the civil team.  I think

25   that says a lot about this so-called conflict wall and

1          the points Your Honor made about, well, why couldn't

2          you just ask and have the civil team assure you or

3          warn you that --

4                    (Short gap in recording).

5                    MR. ASH:  --would have revealed the names

6          of Judge Sean Cox, former Chief Judge Rosen, et

7          cetera, who could have been contacted, and certainly

8          any, just a minimum amount of due diligence, would

9          have led to the revelation that these documents are

10         most certainly covered by the Detroit bankruptcy

11         mediation orders.

12                   I was also interested in the comment that

13         Solicitor General Fawda Hammoud serves on the

14         executive team of the Department of Attorney General,

15         has long responsibilities, I believe the comment was

16         made, supervising other attorneys in a variety of

17         different capacities, which completely undercuts the

18         argument that she as the lead of the prosecution team

19         could not be imputed with knowledge of the Detroit

20         bankruptcy mediation orders, and again, Fawda Hammoud

21         was a prosecutor in Ken Worthy's office.

22                   There was also some suggestion, Your Honor,

23         that the search warrant only asked for documents

24         related to Flint water.  That might be true, but it

25         gets into this issue of what search terms were used to

1          then pull the documents out, what was pulled out.  We

2          have uncovered documents, Your Honor, that are as far

3          afield as Michigan Department of Corrections menus and

4          recipes, because of the way -- for example, water and

5          brown, you're browning something and you're putting it

6          in water, that's in a Michigan Department of

7          Corrections recipe, that has been produced to us

8          because that's what came through this very loose

9          filter.  So the suggestion that, well, we only asked

10         for documents related to Flint water, that's not what

11         they received, and it's not what they then dumped on

12         the criminal defendants indiscriminately.

13                  The other suggestion that I want to touch

14         on, Your Honor, is the conflict wall.  You were right

15         there, as I was looking, when counsel was making his

16         argument, I noted it too, that there is an exception,

17         and of course, this is just a document that the

18         Attorney General's office wrote.  It doesn't have any

19         independent legal significance or standing, unless

20         consistent with the Rules of Professional Conduct.  Of

21         course, lawyers are supposed to follow court orders

22         and prosecutors are supposed to be careful and guard

23         and keep confidential privileged materials.

24                  Now, to the point of how we were able to

25         search for and so easily found these documents that

1      are clearly violative of the Court's order, the

2      metadata, I believe I heard counsel say there was not

3      clear metadata, that's not true, Your Honor.  Our team

4      has been able through searches, using technology,

5      assisted review and being able to search with the

6      metadata provided, we have the documents that

7      presumably the department has.  We got them from them

8      and we've been able to run all these searches and find

9      the documents that we noted in the motion, and also,

10     again, I reiterate, Your Honor, I think it would be

11     appropriate for us to provide a sample of the

12     documents so the Court can see for itself under seal

13     the kinds of things we're talking about.  21 million

14     documents is a lot of documents, but when you deploy

15     these now fairly commonplace tools for technology

16     assisted review, it's a funnel, Your Honor.  You can

17     plug in these various search terms, you can also

18     have -- these systems become smarter, and as searches

19     are done, they can more readily predict and be able to

20     grab potentially relevant documents.  There's all

21     kinds of things, and this is low cost.  A lot of these

22     are very low cost solutions, Your Honor, and they are

23     using a very sophisticated vendor.  N1 Discovery is

24     well known in the state; they could have had the

25     vendor do it.

1              (Short pause in recording).

2              MR. ASH:  -- anything else I would like to

3      touch on.  We certainly would agree with Your Honor's

4      suggestion that today there be an order prohibiting

5      the entire Department of the Attorney General, either

6      side of the so-called conflict wall, from producing

7      any documents barred by the Detroit bankruptcy

8      mediation orders, and with that, I'll thank the Court

9      for its time.

10             THE COURT:  Thank you.  Thank you both,

11     both parties' attorneys.  I appreciate your patience,

12     your effort in making today's oral argument meaningful

13     and helpful to the court.  I appreciate it and I

14     appreciate your patience, in answering my questions

15     and bearing with my interruptions to ask you

16     questions.

17             (Short pause in recording).

18             THE COURT:  -- very short, to think further

19     about the arguments made in today's hearing, as well

20     as arguments made by parties in their papers, and

21     decide what, if any, further proceedings are necessary

22     with respect to this motion, and if so, what they are,

23     and to put those in the form of an order.

24             I will prepare and enter a written order

25     within the next day or two that will be filed, which

1 will order any further proceedings that I think are

2 necessary.  The order will include, however, an order

3 that pending further order of this Court, the

4 Department of Michigan Attorney General is prohibited,

5 and that includes the entire Department, including

6 Flint criminal team, Flint civil team is prohibited

7 from disclosing these mediation-related documents to

8 anyone.  And as I understand it, there's no dispute by

9 former Governor Snyder that I should do that and no

10 opposition to the Court doing that by the Michigan

11 Department of Attorney General.  But in any event, I

12 would probably do it anyway, basically, to stop the

13 bleeding while the Court considers the motion further,

14 and look further.

15     (Short pause in recording).

16     THE COURT:  -- within the next couple days,

17 Friday of this week.  So that's it for now.  Thank you

18 all very much and have a good rest of the week.  Thank

19 you.

20     MR. ASH:  Thank you, Your Honor.

21     MR. VANDEVENTER:  Thank you, Your Honor.

22     (Proceedings concluded).

23

24

25

1                         CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                          ) SS

4    COUNTY OF MACOMB   )

5

6

7              I, CAROLYN GRITTINI, certify that this

8        proceeding was transcribed by me on the date

9        hereinbefore set forth; that the foregoing hearing was

10       recorded by me stenographically and reduced to

11       computer transcription; that this is a true, full and

12       correct transcript of my stenographic notes so taken;

13       and that I am not related to, nor of counsel to,

14       either party nor interested in the event of this

15       cause.

16

17

18

19                         *Carolyn Grittini*

20

21

22                         CAROLYN GRITTINI, CSR-3381

23                         Notary Public,

24                         Macomb County, Michigan.

25       My Commission expires: July 15, 2024

---

**-**

---

**--would** 62:5

---

**1**

---

**1** 49:25 50:9

**1,980** 8:10

**10** 3:24 15:21 16:7 22:9,10

**101** 19:6 56:11

**12th** 3:18 34:2

**13** 11:1 26:24

**13-53846** 3:11

**13361** 3:19

**13375** 3:23

**13375-2** 12:4

**13391** 3:24 15:21 22:9

**13391-5** 22:10

**13391-8** 26:25

**15** 35:7

---

**2**

---

**2** 50:1,13

**2,959** 8:9

**20** 33:10 48:17,21 55:3

**2016** 10:14

**2019** 9:2 33:3

**2021** 3:18,24 9:23 11:4 17:2,3
27:2 33:22 40:9

**21** 10:1 56:22 57:9 64:13

**25** 16:14,15,16 27:1

**25th** 11:4

**26th** 3:22

**28th** 33:3

**29th** 17:2

---

**3**

---

**3** 12:2 50:13

---

**31** 40:9

**31st** 33:22

---

**4**

---

**45,000** 11:21

---

**5**

---

**5** 15:16

**50** 16:13,16

**598** 8:9

---

**6**

---

**6th** 36:4

---

**7**

---

**7** 35:24

**7th** 17:3

---

**8**

---

**8** 15:15

**8,376** 8:10

**8th** 13:13 17:12

---

**9**

---

**9** 14:25 41:5,6,10

---

**A**

---

**ability** 43:8

**able** 18:20 53:1,16,19 54:23
63:24 64:4,5,8,19

**about** 11:6 14:14,20 15:1,11
16:10 21:13 22:24 23:7 26:24
27:7,19 28:24 30:23 31:1,15
32:8 34:15,16 38:10,11,25
39:5,21 41:17 42:3 43:14 44:2,
7,11 48:1,7,11,16,20 49:3,12
53:16,22 55:2,15 61:25 62:1
64:13 65:19

---

**absolutely** 32:9 37:5 53:3
61:20

**abstention** 20:15 27:23

**access** 37:15

**according** 37:19 53:17

**account** 21:1 29:3 61:8

**accountable** 45:22

**accurate** 12:5

**acknowledge** 41:9

**acknowledges** 33:23 38:8

**across** 36:5

**act** 45:13

**action** 21:3,4 25:9,17 28:9,13,
18 44:17

**actual** 31:13 36:9 42:11

**actually** 14:15 32:24 50:13
58:14

**add** 50:16

**addition** 10:21 37:1,14,23

**address** 28:20 34:17 35:16
38:5 39:24

**addresses** 18:21

**adequately** 35:9

**administrative** 14:24

**admittedly** 42:17

**advance** 21:25

**advanced** 52:21

**advantage** 39:18

**advice** 8:18

**advised** 3:2 9:23

**affect** 36:3

**affects** 41:5

**afield** 63:3

**after** 5:25 9:20 17:5,7,8,11,19
21:1 26:7 33:22 34:19 35:4
43:3,4 61:15

**afternoon** 3:5,12 4:9,20,23

**again** 3:12 11:19 12:16 13:24
19:17 21:10,16 26:20 30:18

---

32:19 37:17 43:16 44:19 46:22
52:12 53:5 55:1,10 56:2,10
57:19 62:20 64:10

**against** 34:8 39:3

**agents** 45:13

**ago** 55:17

**agree** 65:3

**ahead** 6:9

**allegation** 36:15 37:16

**allegations** 34:7 35:13 45:4
51:22

**alleged** 44:20

**allegedly** 45:2

**allowing** 5:21

**allows** 60:7,12

**already** 40:8 56:7

**also** 3:25 4:12 7:21 8:14,16,20
10:25 14:3 15:20 16:13 18:15
20:14 21:24 27:10 34:22 38:24
41:25 46:23 50:14 54:6 55:17
57:24 60:7 61:23 62:12,22
64:9,17

**although** 32:23

**always** 5:25

**amended** 12:3 50:6 51:25
60:2

**among** 24:17 41:23 46:8

**amount** 62:8

**another** 4:13 14:10 42:25

**answer** 16:23 51:13,15,17
52:20

**answering** 29:14 65:14

**answers** 20:1

**any** 5:9 14:12,16 18:12 19:1
20:10,18,22 22:7,14 23:12,21,
22 24:24 27:18,24 28:9,13,18
30:16 35:10 36:2,12 37:4
38:13 39:18 40:18 43:10,21
44:2 45:24 48:17 49:12,17
51:11,12,15 52:16 55:3,5,19
57:4,13,14 58:11,12,16 59:2
62:8 63:18 65:7,21 66:1,11

**anybody** 41:18 54:21

**anyone** 5:7 6:6 37:24 40:20,
23 47:21 58:12 66:8

**anything** 20:22 22:8,20 23:7
27:22,24 28:24 30:25 31:15,24
32:12 50:17 51:19 60:15 61:10
65:2

**anyway** 66:12

**anywhere** 38:16

**apparently** 9:19 11:12 15:2
27:10 47:2 54:24

**appear** 38:16

**appearance** 4:6,18 5:8,10

**appearances** 3:8

**Appears** 22:11

**applicable** 44:15 45:2

**applies** 34:24 43:11

**apply** 48:16

**appointed** 45:12

**appreciate** 12:24 65:11,13,14

**approach** 24:1

**appropriate** 25:18 64:11

**approval** 38:21

**approximately** 13:7,9 33:10
56:22 57:1

**April** 12:25 13:24 17:2 57:3

**are** 5:13,14 7:16,24 10:4,5,6
12:1,2 13:19 14:25 15:5 16:9
17:13,17 19:22,25 20:18 21:8
23:18,19 24:17 25:13 27:23
28:2 31:19,21 32:22,23,25
33:1,25 34:16,17 35:15,22
36:16,25 39:10,20 43:18 44:15
45:7,10,11,12 46:12 47:5 49:3,
8,10,12,17 50:24 51:11,22,23
52:1,3,6 53:7 54:14 55:5,7,24
57:19,25 58:23 59:5,20 60:1,
11 61:19 62:9 63:2,21,22 64:1,
19,22 65:21,22 66:1

**aren't** 45:8

**arguably** 7:16

**argue** 5:22,24 31:6 59:11

**arguing** 59:1

**argument** 6:8 28:20 31:22

32:11 35:14,17 62:18 63:16
65:12

**arguments** 5:20 65:19,20

**arises** 42:19

**Art** 18:6 22:21

**articulated** 44:1

**Ash** 4:9,10,14,16 6:11,12
11:24 12:8,13,22 13:3,7,12,23
14:7 15:3,25 16:2,5,11,20,25
17:6,15,21,24 22:2,3,16 23:3,
14,24 24:6,15,19 25:15 26:15,
20 27:3,8,21,22 28:4,10,17,25
29:22 30:6 31:16 32:13,15
53:16 54:15 60:19,24 62:5
65:2 66:20

**aside** 45:17 46:22

**ask** 6:8 7:23 14:9 20:8 21:24
26:7 40:1 62:2 65:15

**asked** 10:4 22:8 30:21,24
31:17 62:23 63:9

**asking** 21:18 24:3 39:8 49:1
59:15

**aspect** 23:5

**assembled** 21:11

**assert** 37:14

**assist** 19:5,12

**Assistant** 5:4 27:12

**assisted** 8:4 18:17 30:17
64:5,16

**associated** 20:11

**assume** 5:12 11:25 15:23

**assure** 29:12 62:2

**astonishing** 8:8

**attach** 30:8 35:4

**attached** 12:3

**attachments** 15:6

**attempt** 33:14

**attend** 41:23

**attorney** 3:16,22 4:19,22 5:4,
9,24 6:1,2,10,15 7:4,11 9:1
10:10,18 11:2,3,4,20 12:4 17:7
23:20 25:6,7,10 26:17 27:12
28:21 31:2,4,8,12,19 32:20

34:4 36:20,25 37:4 41:25 42:5, 11,16 43:1,23 44:2,6 45:8,14, 21 47:25 58:8 62:14 63:18 65:5 66:4,11

**attorney's** 26:8

**attorney-client** 8:20 9:13 10:12 11:20 19:15 28:6,14

**attorneys** 3:7 4:8 6:8 11:13, 14 21:8 27:11,13 31:10 34:5,6, 8 37:18 42:15,25 43:8,15 44:9 45:7,11,18,24 47:23 49:8 62:16 65:11

**attributed** 32:2

**auspices** 6:23

**authority** 23:2,5 38:13

**Auto** 18:7

**available** 35:7

**award** 26:8

**aware** 6:19

---

**B**

**back** 3:3 16:8,22 22:12 25:17 26:12,13 28:5 29:20 39:1 53:13 55:10 56:13

**background** 54:7

**Baird** 7:15,22

**balance** 59:21 60:4

**bank** 61:8

**bankruptcy** 5:17 6:18,20 7:10 8:20,21 10:23 12:19 14:16 19:22 20:21 22:6 24:9 28:16 32:7 34:21 35:1,18,20,23 36:1, 9 39:15,23 43:5 44:5,23 48:8 55:20 57:16,19 60:3 61:2,13 62:10,20 65:7

**Bargain** 22:21

**barn** 26:13

**barred** 65:7

**basic** 8:3,5 11:19 18:20,25 32:5 33:14 54:22

**basically** 58:14 66:12

**basics** 8:7 35:18

**basis** 13:17 51:16 52:25

**batch** 13:2

**batches** 13:5

**Bates** 15:22

**bear** 20:10,12 22:19

**bearing** 65:15

**bears** 25:15,18

**because** 5:18 7:3 25:21 27:11 28:2 29:15 33:12 36:22 38:1 39:4 40:2,4 41:4 47:7 53:8,24, 25 56:3 63:4,8

**become** 64:18

**been** 5:17 6:4 7:3,10 9:8,16 10:16 12:22 15:4 17:4,10 18:20,24 19:2,4,22 20:7,15,24 21:7 23:18 24:1,7 28:4,5 30:23 34:8 35:5 36:21,22 38:9 44:9, 20 45:4 51:16 54:20 55:9 57:7 61:3,11 62:7 63:7 64:4,8

**beeping** 58:10

**before** 3:13 6:5 21:2 32:13 39:11 52:15 58:6

**began** 33:23

**beginning** 31:14 42:12

**behalf** 4:18,21,24 5:2 32:20 60:19

**behind** 39:14

**being** 11:10 13:10 28:3 31:5 36:6 37:13 46:20 47:2 48:6 57:9 64:5

**beings** 10:11

**believe** 12:22,24 13:9,24 17:1, 3,21 23:6 32:23,25 35:6,8 41:3 53:1 57:2 62:15 64:2

**believed** 53:2

**believes** 8:12 34:10 39:16

**best** 52:20

**better** 23:25

**between** 36:23 37:9 42:24 43:12 48:2

**bit** 55:16,17

**blanche** 60:10

**bleeding** 58:5 66:13

**block** 37:8 43:12

**both** 13:15 16:15 34:8 36:24 39:23 65:10,11

**bound** 7:16 20:18 29:2

**Brady** 58:24

**breach** 7:3

**breached** 36:22 51:16

**breaking** 28:11

**Brian** 4:12 9:21

**brief** 11:1 15:20 18:5 28:23 35:5 36:5 37:11 38:9 43:3 55:17 58:25 60:1 61:5

**briefing** 35:14 38:5

**briefly** 6:3 28:25 32:21 35:16 36:18 60:22,24

**bring** 26:9,13 28:22 40:3

**bringing** 25:7 34:13 39:14

**broad** 49:19

**broader** 46:15 47:19

**broadly** 53:10 56:2,3,15

**broke** 5:2

**brought** 19:5

**brown** 63:5

**browning** 63:5

**burden** 20:10,13

---

**C**

**call** 3:6,8,10 4:7 14:12

**called** 20:25 29:3 42:20

**callers** 5:12

**came** 6:5 63:8

**camera** 15:17

**can** 8:4 13:19,23 25:12 27:19 29:12 31:7,9 32:2 35:11 39:6 43:9 45:1 47:16 52:20 64:12, 16,17,19

**can't** 25:24 33:11 37:12 44:10 46:21 49:11

**capacities** 62:17

**captions** 12:2

**card** 61:9

**careful** 45:10 63:22

**carelessly** 20:7

**carte** 60:10

**case** 3:7,9,11,13 4:1,4 5:10
12:1,19 14:16 19:10,14 22:6,
13 23:23 28:1,16 31:11,21
34:21 35:22 36:1 37:9 38:12,
19 39:15,22 40:10 41:5 42:22
43:1,17,19 44:5,15 46:21 47:6
48:9 49:7 51:20 53:3,12 55:6,
8,21 56:9 57:17,19 58:24 60:3

**cases** 7:13 11:11,23 12:5,6
18:11 27:25 33:2 34:23 35:10
36:5 37:3 38:15 39:10,19,23
40:9 47:4,23 55:4,11 57:24
58:25 59:20 60:1,4,8

**cause** 21:20

**cautioned** 6:5

**ceased** 57:4,8

**certain** 32:2 43:3 59:22

**certainly** 5:14 18:11 19:3
20:10 22:17 23:24 26:2 29:3
30:8 41:8 42:5 60:9 61:19
62:7,10 65:3

**cetera** 62:7

**challenge** 48:19

**Chamberlain** 10:17 11:3,5
27:4

**Chapter** 35:24 41:5,6,10

**charge** 9:24

**charges** 9:5,22

**Charles** 4:10

**Chief** 54:20 62:6

**Chip** 10:17 11:2

**Christina** 11:2 27:2,11

**Chuck** 27:4

**chunk** 53:2

**Circuit** 36:4 44:1

**circuits** 36:5

**circumstances** 59:22

**cite** 36:4

**cited** 24:18 58:25 59:20 60:1

**City** 3:10 41:12,13,14 55:20

**civil** 6:16 9:2,16 11:13 19:20
25:16 27:13,15 30:10 31:6
32:4 34:7,22 37:15,17,19
44:10 45:19 48:3,16 49:2,16
50:20 51:8,22 58:10 61:24
62:2 66:6

**claimed** 14:5

**claims** 40:4

**clarify** 57:24

**claw** 25:17 26:12 39:1

**clawback** 11:9 27:6,14 38:25
39:2

**clear** 13:14 23:15 25:11 34:24
35:8 36:6 42:7 47:5 52:23
59:5,18 64:3

**clearly** 7:7 26:23 29:17 64:1

**CLERK** 3:2,10

**collapses** 7:1

**colleague** 4:11

**come** 16:22 38:5 39:4 40:25
41:19 45:24 53:13 55:4 57:5

**comes** 20:15

**coming** 15:13 54:12 59:15

**comment** 54:3 62:12,15

**committed** 34:17

**commonplace** 64:15

**communications** 9:14,19,21
10:12,15,16 28:4 29:6 59:24

**competent** 39:11

**competing** 52:11 59:21

**complain** 51:16

**complains** 35:19

**complaint** 50:21

**completely** 33:12 46:13 51:1
62:17

**complex** 8:5

**comply** 35:20,25

**computer** 33:12,14

**concept** 29:23 38:15

**concern** 7:25 49:5 56:3 58:24

**concerned** 14:20 15:11 39:5

**concerning** 49:18 61:12

**concerns** 34:16 39:21,24

**concluded** 66:22

**conduct** 20:13 24:23 29:25
30:2,22 44:20 50:11 55:7
63:20

**conducted** 6:23

**confidential** 7:6,18,21 18:21
21:14 29:6,8 32:5,10 47:9
51:23 55:13 59:23 61:7 63:23

**confidentiality** 4:3 6:24,25
7:4,17 12:18 13:21 14:6,21
15:12 19:17 23:19 24:4,12
31:9 39:25 40:20 42:14 47:15
48:8

**confirmed** 37:18,21

**conflict** 21:7 36:19 37:8 42:23
43:2,9,20 44:3 48:1,25 50:7,
23,25 51:7 61:25 63:14 65:6

**conflicts** 59:8

**conjunction** 6:17

**connection** 14:11

**considering** 58:5

**considers** 66:13

**consistent** 50:10 58:13 63:20

**constitute** 18:12

**consult** 44:10

**consulting** 48:15

**contacted** 62:7

**contain** 38:23

**contained** 33:25

**contains** 53:24

**contemplating** 58:7

**contempt** 3:17 6:16 17:5
25:16 30:13 31:8,10 34:2,4
36:16 38:2 39:14 44:14,21

**contend** 12:17,20 59:12,19 60:9

**contention** 21:6 38:4

**contested** 30:2

**context** 24:9 35:24

**continue** 60:10

**continuing** 17:17

**contractors** 45:11

**contrary** 35:17

**conversation** 37:20

**conversations** 61:24

**cooperating** 19:23

**copy** 22:11

**correct** 12:7,12 17:6,15 22:16 23:14 24:6,19 27:21 28:17 40:16 42:2,10 45:9,16 48:10 49:22 50:8,15 57:2

**Corrections** 63:3,7

**cost** 20:10 64:21,22

**could** 15:7,8,23,25 16:11,13, 14,15,17,18,20 18:24 19:2 29:3 55:3,12 57:10 62:7,19 64:24

**couldn't** 16:1 62:1

**counsel** 5:22 8:19 32:14 33:22 56:10 57:2 61:23 63:15 64:2

**County** 21:13

**couple** 11:24 31:16 58:25 66:16

**course** 3:20 5:23 8:22 12:10 15:17 17:10 20:25 23:25 24:21 30:13 58:1 63:17,21

**court** 3:2,5,10,12,13 4:14,17 5:1,7,17 6:13,17,19,23 7:17 11:24 12:9,15 13:1,4,10,18 14:2,8 15:9,13 16:1,4,8,14,18, 22 17:4,10,17,22 20:2,4 21:2, 19,23,24 22:1,4,24 23:11,15 24:1,3,10,17,20 25:9,14 26:8, 11,17,24 27:4,18,22 28:8,12, 18,19 29:19,20,23,25 30:3,19, 20 31:7,9,18 32:12,17,24 36:1

38:10,12,21 39:7,8,12 40:1,5, 7,12,14,17,19 41:1,7,13,22 42:3,10 43:20 44:1,2,12,13 45:6,13,17 46:3 47:4,11,12,15, 17 48:13,16,20,23 49:3,10,13, 21,23 50:6,9,13,16 51:6,12 52:13,14 53:13 54:2,9,13,16 55:11,15 56:18,23 57:13,24 58:3,5,11,20 59:2,14,15 60:15, 19 61:17 63:21 64:12 65:8,10, 13,18 66:3,10,13,16

**court's** 3:19 4:2 7:24 15:9 23:19 32:16 35:20 39:17 40:19 44:6 59:5 60:11 64:1

**courts** 33:21 35:6 55:25

**cover** 33:24 58:9 61:1,11

**covered** 23:18 52:1 57:16 62:10

**COVID** 5:19

**Cox** 8:10 23:1 24:13 54:22 62:6

**craft** 51:24

**created** 9:4

**credible** 18:19 21:15

**credit** 61:9

**creditor** 36:11

**criminal** 5:5 7:11,13 8:14 9:2, 5,17,24 11:11,14,22,23,25 12:5,6 18:3,11 19:20 20:8,17 21:6 22:7,13 23:12,22,23 25:25 27:15,25 30:10 31:6,11, 18,20 32:4 33:1,17,19,20,21, 23 34:13,20,23 35:6,10,12 38:6,12,14,16,18,20,21 39:10, 18,23 40:9 43:2,6,16 44:9,22 45:6,19 46:17,24 47:4,10,23 48:2,20 49:1,18,19 50:3,4,22 51:8,13 52:5,14,16 53:8,11,12, 20 55:11,19,25 57:15,24 58:9, 12,22 59:9,10 60:4,8 61:3,12 63:12 66:6

**crisis** 5:5 33:2,7 37:6 49:18 50:4 52:8 56:7

**Croft** 20:19

**Croft's** 20:22

**crystal** 34:24

**curious** 61:23

**current** 31:10 40:22

**currently** 38:1 39:11 61:19

---

**D**

**data** 56:21

**database** 9:4

**date** 17:1 33:22 43:3,4 56:25

**dated** 27:1

**dates** 13:19,24 24:25

**day** 61:15 65:25

**days** 16:20 66:16

**deadline** 35:4

**deal** 19:12 25:19

**dealing** 20:23 38:22

**deals** 19:9

**dear** 51:9

**debtor** 35:24,25 40:22 41:1,3, 14,18,21

**decide** 65:21

**decisions** 44:7,9

**decline** 39:12

**defendant** 59:11

**defendants** 7:12,14 8:14 10:20 11:22 12:1,7,9,21 13:1, 22 18:13 20:8,17 22:7 23:12, 22 26:1 28:1 33:19 47:1,22 50:22 51:14 52:5,16 53:4,11 55:7,19,25 56:14,24 57:15 58:12,22 59:25 61:4,12,20 63:12

**Defendants'** 22:10

**defines** 61:6

**definite** 44:18

**definition** 44:3

**demands** 9:20

**denied** 37:15

**deny** 40:1

**department** 3:16,22 4:18,21 5:24 6:15 7:4,11 8:25 10:10

11:13,14 13:16 18:16 19:5,8
20:12,20,25 21:3,19 23:20
25:6,10,16,17,24 26:5 28:21
31:4,7,12,19,21,24,25 32:1,14,
20 34:3,5,10 37:2,12,25 38:2,
25 39:13,22 42:5,11,16,20,23
43:22 44:10 45:7,14,21,23,25
46:6,7,11,12 47:24 50:2 55:18
57:13 58:8 59:19 61:15 62:14
63:3,6 64:7 65:5 66:4,5,11

**Department's** 18:14 31:2
61:5

**deploy** 9:11 64:14

**deployed** 18:18

**Deputy** 11:2,4 27:11

**describe** 58:13

**described** 8:25

**despite** 36:19

**destroy** 39:6

**details** 27:19

**determine** 21:21 43:10

**Detroit** 3:11 6:18,20 7:6,9
8:19,21 10:23 18:6 19:22
21:13 22:21 32:7 35:1 41:14
43:4,5 44:5,23 53:19 55:20
60:3 61:2,13 62:10,19 65:7

**DHHS** 10:18

**did** 3:20 10:8 11:12 15:14
17:23 19:19,20 31:15 33:13
38:6 44:24 45:23 46:17,24
51:20,21 52:14,17 55:18
56:15,23

**didn't** 7:23 20:8 21:8 24:23
35:4 37:20 47:15 54:24

**different** 25:4 28:13 42:21
46:8 48:21 55:4 62:17

**difficult** 33:16 37:24 44:25
46:5,11 53:22 54:3

**difficulty** 42:17

**diligence** 62:8

**direct** 3:7 51:4

**directly** 37:21

**director** 10:18 20:20

**disclose** 59:25

**disclosed** 28:3 29:7 47:20,21,
22,24 59:7

**disclosing** 66:7

**disclosure** 49:13 51:11 59:4,
14

**disclosures** 29:4

**discovered** 10:22 51:14

**discovery** 9:5 11:11 21:24
22:11,12 24:23,24 29:24 30:3,
4,5,8,22,24 33:6 64:23

**discuss** 37:25 46:6 51:2

**discussing** 49:6,8

**discussion** 23:8

**discussions** 7:9 29:16 49:17

**dispute** 42:8 66:8

**disregard** 19:16

**divide** 46:7

**division** 48:2

**divisions** 37:2

**doable** 14:25

**docket** 3:18,19,22,24 12:4
15:21 22:9 26:25

**document** 16:5 52:24 53:24
54:1 57:10 59:13,14 63:17

**document-by-document**
52:25

**documented** 49:1

**documents** 4:1 7:6,7,19,23,
25 8:14,16,21 9:3,10 10:1,2,
19,23 11:7,8,17,21 12:11,17,
20 13:2,8,17,20 14:4,13,17,21,
23 15:5,8,12,16,19,22 16:2,7,
11,14,15,16,24 17:3,11,18
18:1,4,5,10,19 19:2,21 20:7,9,
11,24 21:9 22:5,7,15,18,22,25
23:17,19 24:18 25:21 26:3,13
28:3,14,15 29:12 30:15 32:8,
23 33:1,4,9,13,15,18,24,25
34:22 35:1,9 38:23 39:1,5,21,
25 43:7,10,15,18 44:7,11 45:3
47:2,3,5,9,17,20,22 48:17,21
49:2,4,6,12 50:3,20 51:2,4,10,
21,23 52:1,3,4,6,8,11,15,22
53:2,5,7,10,14,18,22 54:4,5,23
55:3,4,5,13,14,19,20,23 56:3,

6,8,13,16,19,22 57:1,4,6,10,
14,15,19,22,25 58:12,14,22
59:6,10,17 60:6,13 61:2,11
62:9,23 63:1,2,10,25 64:6,9,
12,14,20 65:7 66:7

**documents--** 12:15

**doubt** 35:11,25

**down** 50:19

**draft** 34:23

**drafted** 34:20

**Driker** 8:10

**due** 20:16 62:8

**Duggan** 8:15

**dumped** 8:13 10:20 11:22
63:11

**during** 9:4

**duty** 7:20

---

# E

**e-discovery** 9:6

**e-mail** 11:1 18:21 27:1,20
33:24

**e-mails** 8:17 11:10 15:6 18:23

**earlier** 22:4 27:1

**easily** 15:1 18:24 33:11 53:19
63:25

**ECF** 14:24

**effectively** 60:4

**effort** 19:1 65:12

**either** 21:19 37:25 46:16 48:6
65:5

**elect** 42:23

**electronic** 8:4 56:21

**elements** 31:10

**else** 5:7 17:23 32:12 58:12
65:2

**else's** 54:10

**emergency** 8:11

**employees** 45:7

end 21:18

engaging 49:17

enough 36:8

enter 3:8 5:8,10 20:5 21:19
40:1 65:24

entered 33:21 34:21 40:8
44:25 46:21 47:15 48:8 52:13
55:11 61:18

entering 60:2

entire 8:13 34:3 38:2,10 65:5
66:5

entities 31:5

entitled 56:14

entries 4:6,17

equate 56:21

erodes 6:25

especially 51:4

essence 9:7

essentially 59:2

establish 39:9

established 19:10

establishing 44:14

estimate 11:18

estimates 7:5

ethical 23:21 33:20 46:7,9
52:5 55:18 59:10 60:7,13

Eugene 8:10

even 30:11 32:4 38:13 46:22
48:3 52:2 53:25 55:7 57:11

event 66:11

events 32:22

ever 39:2 42:19 55:9

every 43:1,11 55:8

everybody 58:10

everyone 3:5 21:13

everything 34:12

evidence 18:12 21:2 25:15,18
26:5 46:21 57:23

evidentiary 3:15 6:14 20:2

21:17,20,21 24:22 25:3

exact 14:1

exactly 15:10 25:5,13

example 10:17 24:3 33:13
35:23 54:5 63:4

examples 18:9

except 14:21

exception 50:10 59:16 63:16

exculpatory 55:24 58:24

excuse 24:8 43:22

executive 8:19 36:25 62:14

exemplar 15:8 16:9

exemptions 24:11

exhibit 11:1 22:9,10 26:24
35:7 40:14 49:15,21 61:4

exhibits 3:25

existed 21:10

existence 48:7

existing 61:1

exonerate 18:13

expense 20:13

experts 19:24

explain 48:24

explicitly 57:22

extent 12:24 19:21,25 21:22
26:22 34:15 39:20 48:3

extremely 15:3

— — —

F

— — —

face 33:7

facilitate 33:17

fact 36:19 38:15

fails 32:11

fairly 64:15

fashion 21:2,23

favorable 18:12

Fawda 9:24 62:13,20

fees 25:7 26:8

Fifth 50:6

fighting 34:15

file 14:22 16:18 30:7

filed 3:14,18,21,23 15:23 17:5,
8,12,19 24:21 28:5,23 34:2,19
35:3,5 37:12 38:11 57:4 65:25

files 50:3

filing 10:24 14:21 15:17 61:16

filter 19:4,8,11 63:9

final 38:4 58:1,6

finalized 35:3

finally 10:6 26:7

financial 61:7

find 14:7 18:19 20:2 21:10,17
23:6 31:9 40:13 53:20 64:8

finding 18:22 25:16 30:13

fine 14:8 40:14

firm 4:13 7:5 8:2 9:8 10:13

first 3:6,9 6:10 9:4,9 11:25
16:25 20:6 25:20 31:17 35:16
36:18 39:1 40:7 59:15 61:5

five 13:9 16:7

Flint 5:5 7:13 11:22 18:11
20:20 31:5,6,11 33:2,6 34:13
35:10 37:5 39:10,18 43:2
45:12,19 46:17 49:7,18 50:4
51:5 52:8 53:8 54:21 56:6
57:20 59:9 61:3 62:24 63:10
66:6

flow 37:8 42:24 43:12 46:9

focus 45:20,22

focusing 12:16 31:11 47:14

FOIA 37:12

foist 25:25

foisted 20:7,24

follow 30:6 53:15 63:21

foot 29:2

footnote 15:15

form 18:17 43:21 65:23

format 33:11 52:23

former 3:14,24 4:8,10,15 5:22 6:1,10,13 7:12 10:18 12:10 21:12 22:19 23:16,22 25:7,12 28:1,21 29:14 60:20 62:6 66:9

forth 14:15 15:7 22:20 28:5

found 11:10 63:25

foundation 6:24,25

foundations 18:9

four 13:8,9 16:7 57:1

frame 13:25

frankly 53:25

Friday 66:17

fulfill 60:7,13

full 12:24 19:21,25 20:12 26:22

fully 26:19

funnel 64:16

further 28:24 30:25 60:15 65:18,21 66:1,3,13,14

## G

gain 39:18

game 24:13

gap 43:24 62:4

gather 27:19

general 3:16,22 4:19,22 5:4, 24 6:15 7:4,11 9:1,23 10:3,11 11:2,4 19:17 21:11 23:20 25:6, 10 27:12,13 31:2,4,8,12,19 32:20 34:4 36:20,24 37:1,4 42:1,6,11,16 43:23 45:8,11,14, 21 47:25 58:9 59:20 62:13,14 65:5 66:4,11

General's 12:4 17:7 26:18 28:21 36:25 63:18

generally 48:12 49:6

give 5:25 30:7

given 9:10 15:14 19:22,23 27:9 30:11 32:3 33:14 48:6

goings 8:23

good 3:5,12 4:9,20,23 25:4 66:18

Google 19:7

govern 39:10

government 10:2 42:18

governor 3:14,24 4:8,11,15 5:22 6:2,10,13,21 7:12,15,21 8:17,18 10:14 12:10 22:19 23:11,16,23 25:7,12 26:7 28:1, 21 29:1,10,13,15,17 31:20 60:20 66:9

Governor's 7:16

grab 64:20

grand 13:13,15 17:12 22:21 57:6

grant 21:24 29:25

granted 24:22 30:3

granting 3:17

grants 30:3

great 6:21 23:1,4

Gretchen 29:13

Grossi 11:2,4 27:2,3,11

group 8:3

Grow 4:12

guard 63:22

guess 41:16

guilt 22:20

## H

halt 34:14

Hammoud 9:24 10:3 19:17 21:12 36:21,24 62:13,20

handle 7:25 13:19 25:4

handled 30:15

handles 37:3

handpick 16:15

hands 7:19

happen 14:3 19:15,19

happened 8:12 20:3 21:1,22 26:21 27:16 30:9

happening 13:15,16

hard 23:6

hardly 19:1

he 6:22 8:18 20:20 29:3,4,16 32:1 36:2,13 38:1,8 40:2 54:4, 5

he's 29:2 36:11,12

health 61:9

hear 4:17 5:8,11,20 6:10 32:13 54:14

heard 5:23,24 10:1 35:21 39:2 53:15 61:23 64:2

hearing 3:13,15 4:5,15 5:14, 15,16 6:6,14 20:2 21:17,20,21, 25 24:22 25:3,8 31:18 50:22 54:8 60:21 65:19

hearings 5:18

heed 10:8

held 31:23 45:1,20,22

helpful 65:13

hence 48:22

her 10:4 19:18

here 4:11 7:2 8:1,3 17:19 21:11,22 25:2,23 26:21 27:25 29:18 30:9 35:14,17 36:10 38:20 39:16 42:17 47:14 53:7 54:15 56:2,15

herself 21:12

high 39:15

higher 57:11

him 20:24 53:17

hired 31:25 43:3

his 8:12,18 20:21 29:15,16 35:17 36:1,3,16 37:15,22 38:8 40:4 63:15

hit 54:5

hits 8:9,10 14:14 15:5

hold 6:15 20:2 31:7 34:3 38:2 61:21

holding 3:16 5:16,18 56:12

holds 40:23

**Honor** 4:9,16,21,23 6:12 7:2,
15 8:2,8,16 9:6,15,22 10:7,21
11:19 12:8,14,23 13:3,14,23
15:4,11,25 16:12,21 17:1,16,
24 18:15 19:7,19 20:5 21:5,16,
18,25 22:16 23:3,14 24:1,7,16
25:24 26:6,16 27:3,21 28:7,10,
17,25 29:13,22 30:6,18 31:17
32:11,15,18 39:8 40:11 42:9
43:25 44:19 45:10 46:4 48:10
49:6,14 50:12,18 51:18 52:19
53:21 55:1,22 57:18 58:19
59:18 60:17,24 61:4,16 62:1,
22 63:2,14 64:3,10,16,22
66:20,21

**Honor's** 65:3

**Honorable** 3:3

**horse** 26:13

**housed** 9:5

**Howard** 20:19

**huge** 33:9

**hundreds** 36:22

## I

**idea** 25:11 26:1 36:18 38:5
60:2 61:18

**identified** 16:6 18:24 19:3
25:22 26:4

**identify** 18:18

**ignored** 11:14

**imagine** 29:9,11

**immediately** 32:6 58:17

**implemented** 38:20 41:11

**important** 32:21 36:7 41:9,11
46:24 52:2 55:2

**imputed** 43:15 62:19

**inaccuracies** 35:15

**inappropriate** 39:16 51:1

**inaudible** 17:2 34:9 50:1

**include** 8:16 57:15 66:2

**includes** 41:21,22 66:5

**including** 4:2,3 7:8,12 12:6
15:6 23:22 27:25 34:25 54:19

66:5

**incredible** 21:10

**incredibly** 33:15

**Indeed** 8:11

**independent** 25:21 63:19

**indicating** 33:24

**indication** 9:9,11

**indiscriminately** 63:12

**individual** 45:18

**individuals** 7:19 32:9 38:3

**information** 7:20 8:4 9:13
10:5 11:6 12:13 14:1 32:10
34:12,16,25 37:8 38:18,23
42:24 43:12 46:10,18,20,25
50:24 61:7,8,9,21

**inner** 26:2

**innocence** 22:20

**innocent** 8:24

**input** 60:11

**inquired** 38:10

**insolvent** 35:24

**instance** 8:6 37:13 59:17

**instances** 7:7

**instant** 10:24

**instead** 45:20

**Institute** 18:6 22:21

**integral** 6:22 41:10

**integrity** 56:12

**intention** 57:14

**interact** 37:10

**interest** 29:17 34:14 36:3,10,
12 41:15 59:23

**interested** 22:18 36:6 62:12

**interesting** 10:25

**interests** 29:5 59:22

**interpret** 56:1,3

**interrupt** 6:7

**interrupted** 17:22

**interrupting** 6:6 54:7

**interruptions** 65:15

**investigation** 9:25 33:7

**invitation** 39:13

**involve** 23:1

**involved** 20:21 36:14 40:24
41:20 44:23 55:9

**involving** 28:15

**issuance** 30:11

**issue** 24:2 28:14 29:11 32:3,
22,23,25 35:2 38:9 40:17
46:16 47:1 48:12 51:20 53:6
58:21 62:25

**issued** 6:17 24:12

**issues** 19:12 28:6 30:14,17
36:2 37:25

## J

**January** 9:23 22:12

**jeopardize** 56:12

**John** 4:21 32:19

**Judd** 4:10

**judge** 3:6 8:9,10 23:1 24:13
54:20,22 55:8 62:6

**judges** 8:7 39:11

**June** 3:24 13:13 17:12

**jurisdiction** 20:16

**jury** 13:13,16 17:12 57:7

**Justice** 19:8

## K

**Kahn** 36:4

**keep** 7:20 29:7 32:9 47:18
48:11 61:21 63:23

**keeping** 14:20

**Ken** 62:21

**Kettler** 4:23,24 5:1,3

**Kevin** 8:11

**kind** 14:25 16:9 23:21 54:24

**kinds** 22:22 64:13,21

**KL** 9:5

**knew** 21:13 45:23 46:11

**know** 3:14 10:25 11:5,9,12 13:6,11,22 14:2,3,10 19:25 21:8 23:3 24:21 26:21,22 27:17 28:22 29:9 31:23 32:1 45:24 48:20 51:11,17 53:23 54:4

**knowing** 44:2 48:11

**knowledge** 31:13 32:2 42:12, 17 43:13 44:5,16,24 45:2 46:6, 8,13,16,23 47:25 48:2,5,6,7 62:19

**known** 54:19,20 64:24

---

**L**

---

**lack** 30:16

**lacks** 28:22

**Lakes** 23:1,5

**language** 51:24

**large** 5:12 14:18 15:3 37:3 38:22 53:5

**larger** 15:1 24:9

**last** 5:17 11:18 12:6 13:12 14:4 17:2 27:5 37:22

**lastly** 11:5 21:5

**later** 24:12

**law** 9:8 19:10 42:22 46:9 47:6

**lawyer** 20:22

**lawyers** 37:16,22 63:21

**lead** 62:18

**least** 6:3 12:6 41:24 54:19 59:14 60:22 61:19

**leave** 24:22 29:25 30:2,21 45:25

**leaving** 7:18,21

**led** 62:9

**legal** 8:17,18 23:21 29:5,17 43:21,22 55:17 59:10 63:19

**legitimate** 39:20

**lender** 36:11

**Lennon** 4:12 9:21,23 10:3 11:12 27:9

**Lennon's** 10:8 17:8

**letter** 17:8 51:8,14,19

**level** 33:14

**light** 21:11

**like** 14:2 16:4,16 20:19 22:8 27:1 30:25 31:1 32:13 45:11 54:22 60:15,25 65:2

**limit** 24:24 30:5

**limited** 21:24 29:23 30:4,23 52:7 56:6

**limits** 52:18

**line** 4:12 18:22

**list** 12:5

**listed** 18:9

**listen** 5:13

**lists** 12:4 15:21

**literally** 11:16 18:22

**little** 34:11 55:16,17

**local** 30:1

**locate** 53:18

**long** 47:17 62:15

**longer** 36:13

**look** 20:14 22:9 66:14

**looking** 13:25 14:9 49:14 63:15

**looks** 22:8 27:1

**loose** 63:8

**loses** 47:8

**lot** 19:19 61:25 64:14,21

**low** 64:21,22

**Lyon** 10:18 27:5

**Lyon's** 11:3

---

**M**

---

**made** 22:12 24:11 29:4 34:8, 24 35:13 36:5 37:24 44:9

55:16 62:1,16 65:19,20

**mailbox** 8:13

**maintained** 33:5

**maintaining** 15:11

**make** 15:7 17:25 20:4 51:25 54:1

**makes** 47:5

**making** 44:6 63:15 65:12

**manageable** 15:2

**manager** 7:16 8:11

**Manual** 19:9

**many** 5:12 7:7 13:5 16:4 45:10 51:10 56:19

**March** 33:22 40:9

**marked** 7:7 53:25

**massive** 7:3

**master** 9:4 19:5 25:20

**material** 13:13,16 17:12

**materials** 50:4 59:3,4,6 63:23

**matter** 3:10 5:11 36:7 37:9 42:22 44:13 49:9 61:19

**matters** 30:2 35:21 37:4 49:18 50:5

**Mayor** 8:14

**me** 14:9 22:2 24:8 26:24 37:16 40:13 48:24 51:1 53:15 54:11 58:16

**mean** 14:5 36:2 47:8 55:10

**meaning** 9:2

**meaningful** 65:12

**means** 42:5 45:23 47:21

**meantime** 14:9

**mechanism** 38:17

**mediation** 4:2 6:17,19 7:1,6, 17 8:8,20,22 10:23 12:19 13:21 14:6 18:8,23 19:22 21:13 22:6,22,25 23:6,8 24:4, 8,13 26:2 28:16 29:1,19 31:9, 14 32:7 34:22 35:1 36:14 39:21,25 40:20,24 41:4,9,20, 23,24 42:4,6,13 43:4 44:23,24 47:2,14,25 48:7 51:20,23

53:14,19 54:17 57:16 58:14,15 59:24 61:2,13 62:11,20 65:8

**mediation-** 22:24 55:19

**mediation-related** 22:15 23:17 47:16 59:3,4 66:7

**mediations** 6:22 7:10 8:23

**mediator** 11:21 54:18

**mediators** 54:19

**meet** 37:3

**meetings** 36:22

**members** 36:25 44:22 49:16, 19

**mention** 21:5

**mentioned** 11:3 15:10 17:12 20:17 22:4 25:5 26:6 27:23 52:17 60:21

**menus** 63:3

**merits** 35:11 40:4

**metadata** 33:13 52:23 64:2,3, 6

**methods** 14:14

**Michigan** 3:16,21 4:18,25 5:4, 23 23:20 28:20 31:4,7 32:14 33:5 36:13 38:15 40:23 41:25 42:5,11 43:22 45:7,14,21 47:24 55:9 58:8 63:3,6 66:4,10

**Michigan's** 38:16

**might** 15:7 17:25 19:23 23:12 26:19 29:9 57:15 62:24

**Mike** 8:15

**million** 10:1 13:8 33:10 48:17, 21 55:3 56:22 57:1,9 64:13

**mind** 20:15 61:16

**minimum** 62:8

**minute** 45:17 53:14

**misconstrues** 35:18

**misrepresentations** 36:17

**Miss** 5:1

**mistake** 8:24

**Molly** 4:24

**moment** 14:3 24:20 28:19

30:25

**momentarily** 14:7

**months** 38:9

**more** 8:5 17:11,24 20:4 22:1 25:4 26:24 27:18 31:15 41:17 48:13 57:11,14 59:20 64:19

**most** 7:8 13:10 18:25 32:5 33:10 35:23 62:10

**motion** 3:14,15,18,20 5:21,23 6:3,14 8:25 14:11 15:15,21 17:5,7,11,14,20 24:18,21,23, 25 25:8 26:9 28:22 30:7,19,21, 22 31:3 32:22 33:1 34:3,6,7, 11,19 38:1,11 39:14 40:2,3 44:21 45:5 47:13 48:4 51:22 57:3,5 58:2,5 60:23 64:9 65:22 66:13

**motions** 6:1 35:5

**motive** 34:15

**movement** 5:22

**moving** 6:1 60:20

**multiple** 37:2 38:6 42:21 57:10

**music** 54:9,14

**mute** 54:13

---

**N**

**N1** 64:23

**name** 53:24

**named** 12:1

**names** 11:20,21 12:6 54:5,18 62:5

**nature** 37:20 51:2 53:23 55:14

**necessary** 65:21 66:2

**need** 9:11 19:10 20:1,9 21:16 25:21 30:14 39:7 48:22 53:4

**needed** 19:6 30:4

**negate** 52:3

**negotiated** 33:20

**negotiations** 7:9 23:7

**never** 38:11

**new** 21:8 31:25 45:24

**next** 15:14 65:25 66:16

**Nick** 10:18 11:3 27:4

**nine** 7:11,14 11:22,25 12:19 13:1 20:7 27:25 41:10 47:22

**noise/music** 54:7

**non-evidentiary** 5:18

**none** 17:4 23:17 26:3

**Norcross** 4:10

**notable** 37:11

**note** 46:24

**noted** 32:24 63:16 64:9

**nothing** 5:8,11 18:1,10 22:14 28:5 37:5 48:1,4,11 57:7

**notice** 15:14 20:16 31:13 42:12 50:6

**noticed** 15:19 16:25

**number** 3:11 5:12 13:8 14:14, 18 15:4,21 16:13 32:11 35:15 36:2,17 37:3,4 55:3

**numbers** 15:4,5,22 61:8,9

---

**O**

**object** 35:21 41:19

**objected** 61:17

**obligated** 60:11

**obligation** 23:21 29:7 32:9 35:19 46:7 52:4,5,11 53:10 55:18,23 56:1 58:21,22 59:1, 12,24 61:20

**obligations** 25:25 33:20 59:9 60:5,7,14

**obtained** 52:6 56:4

**obviously** 22:18 31:13

**offense** 14:4

**offensive** 14:5,13 17:3,18

**office** 8:19 17:7 26:18 42:20 62:21 63:18

**officeholders** 40:22

**offices** 40:24 42:19

**once** 35:2 44:7 57:3

**one** 15:19 17:25 24:20 28:19 29:14,16 30:25 31:5,6,25 35:6 36:20 42:24 43:11,14 44:11 46:5,10 48:17 49:7 54:16

**ones** 14:5 22:5 32:25 45:25

**ongoing** 41:5

**only** 7:14 11:12 16:6 18:24 27:9 31:7,25 33:4 34:20 40:2 61:14 62:23 63:9

**opening** 15:15

**opportunity** 6:2 60:22

**opposition** 66:10

**oral** 65:12

**order** 3:15 12:3 20:6,14 21:19 24:5,20 25:5 26:12 33:21 34:1, 20,23 35:9,20 38:19,25 39:3,7, 22 40:1,7,20 43:17 44:2,12,16, 18 46:3,19 47:3,4,10,18,19 48:1,12,22 51:12,25 52:13 54:2 55:12 57:21,25 59:2,13, 16 60:2,3 61:1,14,16 64:1 65:4,23,24 66:1,2,3

**ordered** 14:22 16:19 25:17 59:5

**ordering** 58:8,17

**orders** 4:2 6:16 7:17,24 12:18 13:21 14:6 23:19 24:11 31:9, 15 36:1 41:23 42:13 44:6,24 45:2 47:15 48:8,16,20 49:3,13 57:16 58:14,15 59:5 62:11,20 63:21 65:8

**Orr** 8:11,12

**other** 4:1,4 5:9 6:7 9:13,18 10:15 12:10 19:13 22:22 23:12 24:8 25:1 28:15 29:2,18 32:3 33:19 36:5,12,21 37:10 38:13 43:8 46:10,13 49:7,9 50:24 54:23 62:16 63:13

**otherwise** 37:10 46:22

**ought** 26:4

**our** 3:7 8:12,25 10:13,14 11:1, 18 12:13 14:23 17:7 18:4,19 22:17 23:24 30:1 35:3,4 36:5 37:2 42:19 49:15 56:20 60:1,7, 13 61:15 64:3

**out** 6:5 10:11,22 11:10 14:7 20:3 21:17 25:15,18 37:17,23 49:15 51:21 63:1

**outcome** 36:6 41:5

**outset** 9:22 60:21

**outside** 42:18

**over** 10:9 11:15,21 13:8 19:18 20:5 36:23 59:13

**oversees** 37:2

**own** 10:13 20:13

**owned** 33:5

---

**P**

---

**p.m.** 3:7

**page** 12:2 15:15,21 16:7

**pages** 15:4 16:4,6 33:10 56:22 57:10

**pandemic** 5:19

**papers** 3:21,23,25 14:14 18:14 65:20

**paragraph** 27:5 49:25 50:1,9, 13 61:6

**part** 25:23 26:20 31:2,21 41:9 43:16,18 46:20 47:2,13 48:18 58:3

**participant** 29:1 42:6

**participants** 29:4,18

**participated** 8:7 44:4

**participation** 18:8 43:5

**particular** 9:3 17:14 37:9 42:21 43:14 53:6 54:5 55:5 56:2 58:16

**parties** 5:20 24:8,25 37:10 41:20,23 42:4,21 65:20

**parties'** 65:11

**partner** 4:13 9:20

**party** 29:11 36:12,14 39:2,4 60:20

**party's** 6:1

**past** 36:23

**patience** 65:11,14

**pause** 23:10 65:1,17 66:15

**pay** 25:6

**pecuniary** 36:3,10,12 41:14

**pending** 57:6 58:10 66:3

**People** 4:24 5:3

**perhaps** 14:22 15:6 16:23 48:23

**period** 47:20 51:13 59:7

**permission** 57:23

**permit** 59:16

**person** 36:8

**persons** 5:13

**pertinent** 17:13

**phone** 3:6 6:5 54:13

**place** 9:12,19 43:17 44:4

**plan** 41:10 57:14

**please** 3:2 4:8,19 6:13

**plug** 64:17

**plus** 5:17

**point** 27:8 37:7,23 45:24 46:9, 14,19 47:12 52:12 55:16 63:24

**points** 17:24 20:4 62:1

**policies** 39:9

**pops** 19:9

**portray** 31:3

**position** 7:22 22:13,17 23:17, 24

**possession** 9:25 10:2 39:6

**possible** 22:19 27:6,24

**potential** 21:9 48:16

**potentially** 55:24 56:13,14 58:23 64:20

**precise** 19:13

**predict** 64:19

**prepare** 4:4 65:24

**present** 30:18

**presented** 30:20

**preserve** 39:24

**presiding** 3:4

**pressing** 20:1

**presumably** 64:7

**presumption** 56:7

**prevent** 42:24 48:15

**prevents** 49:1 50:2

**previous** 35:8

**pride** 6:21

**priority** 59:13

**privilege** 18:23 19:15 28:6 32:5 39:25 43:11 47:8 52:10 61:13

**privileged** 7:7 8:21 9:9,13,14, 19 10:1,5,12,16,23 11:6,20 18:21 19:12,22 21:9 28:3,14, 15 34:25 43:18 47:6,9 52:3 53:25 54:1 55:14 59:23 61:2 63:23

**probably** 7:8 16:6 24:11 35:22 42:19 61:17 66:12

**problem** 19:13,21,25 21:22 25:19,23 26:20,22 28:2 38:8 58:16

**problems** 19:14 20:16

**procedure** 14:24 38:17,22

**procedures** 39:9

**proceeding** 29:12

**proceedings** 57:7 65:21 66:1,22

**process** 6:17,20 9:18 15:9 20:16 26:7,10

**processed** 30:16

**processes** 9:12

**produce** 17:17 23:21 32:8 47:16 52:4,11 53:10 55:13,18, 23 56:16,23 57:14 58:22 59:10,12 60:10

**produced** 10:16 11:11,16 12:11,21 13:22 14:6 15:23 16:24 17:4 22:6,23 23:18 33:11 43:18 46:20 47:3 48:22 51:3 52:16,22 53:4 56:8 57:1,6 61:3,12 63:7

**producing** 58:11 65:6

**production** 12:17,23 13:5,12, 20 14:4 17:1,11 33:18,23 38:18 57:4 59:17

**productions** 10:11,22 13:9 33:25 57:3

**Professional** 50:11 63:20

**profile** 39:15

**prohibit** 59:3

**prohibited** 49:17 51:12 58:10 66:4,6

**prohibiting** 59:14 65:4

**prohibition** 49:20

**proper** 21:2 38:21

**properly** 45:22

**proposal** 30:5

**propose** 57:21

**proposed** 12:3 20:6,15 24:20 30:8 34:20 39:22 47:3 61:14, 15

**proposing** 55:7

**proposition** 59:20

**prosecuting** 33:2

**prosecution** 5:6 9:7,11 18:2 19:6,11,13,24 20:6 23:9 34:13 35:12 45:12 51:5 52:9 53:8,12 56:11,12 57:21 62:18

**prosecution's** 52:4

**prosecutions** 18:4

**prosecutor** 21:12 55:23 59:1 62:21

**prosecutor's** 33:19 58:21 59:12

**prosecutors** 52:12 56:1 59:9, 21 60:5 63:22

**protect** 9:12,19 10:5 29:18 34:21 46:9,18,19,25 55:13 57:25 59:2 60:13

**protected** 7:24 47:6 49:13 61:9,22

**protecting** 49:3 57:22 59:23

**protection** 34:11,16 39:21

**protective** 33:21 34:1,24 38:19 40:7 43:17 46:19 47:10, 19 48:22 51:25 52:13 55:12 57:25 60:3

**protects** 34:25 35:9 60:6

**prototypical** 35:23

**provide** 38:17 64:11

**provided** 38:11 64:6

**provision** 44:18 50:14

**provisions** 4:3 12:21 42:13, 14

**Public** 20:20

**publication** 57:22

**publicized** 46:22

**pull** 63:1

**pulled** 63:1

**pulling** 49:15

**pursuant** 11:8 33:3,19 43:7 44:8,12 47:7 50:21 52:7 53:6 55:12 56:4,5,16 57:8

**put** 9:12,18 14:10,15,19 65:23

**putting** 45:17 46:22 63:5

### Q

**question** 14:10 30:24 45:18, 20 46:23 50:17 58:4

**questions** 6:9 11:24 17:23 19:19 20:1 22:1 29:14 40:5 65:14,16

**quickly** 16:18

**quiet** 47:18

**quote** 37:13 38:7

### R

**raise** 24:2 36:2 47:1

**raised** 38:1 51:21

**raises** 19:18 36:15

**raising** 38:9

**ran** 10:9 11:15 19:18

**random** 16:13,15

**rarely** 42:19

**reach** 51:21

**reached** 37:17

**read** 28:23 50:9

**readily** 64:19

**reading** 49:23

**really** 17:13 19:6 26:22 28:13
31:5,24 35:18 36:6 37:7 41:16
43:13 46:12 47:13 48:19
52:21,24 60:1

**reason** 36:8 39:3 43:16

**reasonable** 26:8 34:17 46:17,
25

**reasons** 5:19 32:11

**recap** 32:22

**receive** 56:14

**received** 11:18 13:7,12 17:15
43:6 50:21 53:5 56:16,18
63:11

**receiving** 8:17

**recent** 13:10

**recipe** 63:7

**recipes** 63:4

**reckless** 19:16

**recognize** 42:22

**recommend** 16:12

**record** 3:8,17 4:1,4,7 5:9
14:11,16 31:20 32:19 40:10
42:7 48:24

**recording** 23:10 43:24 62:4
65:1,17 66:15

**refer** 17:19

**reference** 18:23

**referenced** 18:4 27:5

**referred** 21:7 25:8 26:25

**referring** 15:5 24:10,15 27:6

**regarding** 5:21 8:19,21 12:18
18:7,8 24:23,24 30:22

**regardless** 34:14 46:16 52:10

**regularly** 37:4

**reiterate** 64:10

**related** 3:17,21,23,25 5:19
18:6 19:14 22:20,25 33:6 52:8
53:7 55:20 56:6 58:20 62:24
63:10

**relates** 53:14

**relating** 50:4

**relationship** 53:11 56:9

**release** 13:15

**released** 7:10

**releasing** 13:17

**relevance** 23:4 51:5 53:3

**relevancy** 18:1,3

**relevant** 23:9 30:13 48:3
55:24 57:20 58:23 64:20

**relief** 3:17 24:4 25:2,13 28:2
29:20 40:18 41:15 59:16

**remain** 47:5,9

**remedial** 21:4 25:9

**remediate** 25:19

**remedy** 21:3,23

**remember** 52:2 55:2

**remind** 30:1

**reorganization** 41:6

**repetitive** 55:10

**reply** 3:23 6:2 11:1 14:12
15:20 18:5 22:9 26:25 28:23
35:7 36:16 60:22

**represent** 42:20

**represented** 10:13

**represents** 36:13

**request** 22:11,12 27:14

**requests** 22:14

**require** 20:1 21:3 25:10,20
26:5 44:15

**required** 24:25 38:14 41:23

**requiring** 25:6 26:12 47:18

**reserve** 6:7

**resolution** 58:2,6

**resolve** 35:2,10

**resources** 20:23 39:17

**respect** 35:13 65:22

**respectfully** 39:12

**responded** 10:6 27:17

**respondent** 44:16

**responding** 34:5

**response** 3:21 12:4 31:2 35:3
46:5,15 49:16 61:5

**responsibilities** 62:15

**responsible** 20:12 46:1

**rest** 66:18

**restricted** 48:5

**restriction** 48:5

**results** 61:10

**reveal** 8:22 37:20

**revealed** 32:6 62:5

**revelation** 62:9

**review** 3:20 8:5 15:17 18:17
30:17 33:14 52:23,24 55:6
64:5,16

**reviewed** 3:25 33:12

**Rich** 7:15

**Richard** 3:14

**Rick** 4:11 6:13

**right** 6:7 10:9 11:15 14:1 15:2,
10,24 24:14,18 26:14,15,16
27:20 28:16 30:25 32:12 42:8,
9 48:9 50:7,14 54:25 55:15
63:14

**Roberts** 8:9

**role** 45:14

**rolled** 10:22

**rolling** 10:11 12:23 13:4,8,17,
20

**rolls** 13:5 16:24

**Rosen** 8:9 54:20 62:6

**roughly** 56:18

roughshod 10:9 11:15 19:18

rule 38:13

rules 30:1,7 38:16,17 42:22
50:11 63:20

ruling 36:16

run 8:5 64:8

running 11:19

_____

**S**

said 10:4,6 13:4 14:13 15:16
24:24 40:8 51:22 53:15,16
54:4,6 56:1

same 11:6 12:11 13:2 35:22

sample 15:16,18 16:9,13,16
64:11

sampling 61:10

sanctions 40:2

sat 50:19

say 13:20 17:23 18:15 28:24,
25 31:1,15,16 32:13 37:11
38:24 43:9 46:4,11,15 47:16
50:2 53:24 60:16 61:10 64:2

saying 51:9

says 11:5 22:10 27:16 30:21
31:18 33:7 47:7,19 49:11,16
50:10 61:25

Schuette 42:1

scope 29:24 52:7 53:9

seal 14:22,23 15:10,17,24
16:19 64:12

Sean 8:10 54:22 62:6

search 9:1,3,8 11:9 14:14
18:18,25 30:12 33:3,8 43:7
44:8 47:8 48:18 50:21 51:3
52:7 53:6,9 54:24 55:8 56:5,17
57:8 62:23,25 63:25 64:5,17

searched 54:17,18

searches 8:2,3,5,6 11:20 32:5
54:22 64:4,8,18

searching 52:18 53:16

second 9:22

secret 21:15

secured 36:11

Security 61:8

see 12:2 14:13 40:15 50:11
64:12

seeing 10:12 22:23

seek 40:18 60:12

seeking 25:2,13 28:2 29:21
34:3 38:1,25 39:2 41:15

seems 31:3 51:1

seen 9:21 32:24 45:3 53:23

segregate 18:18 53:2

segregated 19:3

seized 8:13 9:3,10 33:1 44:8,
11 47:7 48:18 49:2,7 51:11

seizure 56:19

select 16:12

sending 51:19

sense 15:7 41:11

sensitive 7:8 34:12 35:9
38:18,23 46:19

sensitivity 60:6

sent 9:1,2,7 11:1,9 13:2 17:8
27:15

separate 19:11 31:5 46:13

separately 4:7

seriously 50:25

serve 24:25

servers 33:5 56:4 57:5

serves 62:13

session 3:3

sessions 41:24 42:7

set 15:8 24:22 42:25 43:14
53:22

setting 21:20,21

seven 7:19 16:20 20:17 61:20

several 9:20 18:9 41:24 61:6

shall 47:20 50:1

sharing 50:24

she 10:6,7 27:12 32:1 62:18

Shockingly 10:7

shoe 29:2

short 23:10 43:24 62:4 65:1,
17,18 66:15

shorthand 14:12 17:19

should 9:8,10 19:3 20:5,10,
12,21,25 25:10 26:4 32:1 45:9,
19,21 56:1 66:9

shouldn't 26:3 31:23

show 21:20

side 5:7 9:2,16,17 19:20 21:6
27:13,15 30:10 32:4 36:20
37:25 43:2,8 46:10,16 49:7
52:15 54:23,24 58:9,10 65:6

sides 34:8 42:21

sign 19:20

significance 63:19

Simple 54:22

simply 8:13 10:19 11:21 18:19
19:18 21:10,20 25:25 37:19
39:6 41:4 51:9

since 10:14 30:12 34:7

single 38:12 43:1 55:8

situation 29:11 42:18 54:21

Sixth 44:1

sliver 23:4

smarter 64:18

Snyder 3:15,24 4:8,11 6:11,21
7:12,15,21 8:17 10:14 12:10
23:11,16,23 25:12 26:7 28:22
29:1,15,17 33:18 34:2,19
35:16,19 36:10,15 37:15,21,24
38:8 39:8,15 47:1 60:20 66:9

Snyder's 5:22 6:2,14 22:19
25:7 28:1 31:20 34:6 35:7,14
40:2

so-called 61:25 65:6

Social 61:8

Solicitor 9:23 10:3 19:17
21:11 36:20,24 37:1 62:13

**solution** 60:12

**solutions** 64:22

**some** 4:1,3 7:8 14:22 16:13 18:2,3,16,17 19:4 23:4,5 24:4 25:9,20 26:1,11 29:12 41:13 42:6 45:10 47:17,18 52:17 54:18 55:5 56:8 60:12 61:1 62:22

**somebody** 14:8 47:17 51:7 54:13

**somehow** 26:14 36:21 38:7

**someone** 20:19 31:25 40:19 54:9

**something** 16:16 25:3 26:23 46:11 47:7 63:5

**somewhere** 48:24,25

**sophisticated** 64:23

**sorry** 5:1 17:16 28:10 53:12 54:6 57:9

**sort** 18:12 19:4 25:9,20 26:11 28:9,13 31:3 43:21 44:3 55:6 56:7 58:20 60:12

**sorts** 30:17

**sought** 33:4

**sound** 58:11

**speak** 4:14 21:8 61:24

**speaking** 37:18

**speaks** 61:7

**special** 5:4 19:5 25:20 45:11

**specific** 13:24 15:22 18:10 25:11 30:23 37:13 44:17

**specifically** 19:9 48:13,14

**specifics** 30:8 54:3

**spend** 20:22

**spoken** 34:6 37:21

**spurred** 10:24

**staff** 50:3

**standards** 44:1,14

**standing** 28:22 35:17,18,21 36:2,9 40:3,18,25 41:2,4,19 63:19

**start** 5:21 10:11 60:25

**started** 8:7 12:25 57:3

**state** 4:24 5:3,7 22:13 23:20, 23 26:12,17 27:25 28:8,12,18, 20 31:18 33:5 36:13 39:11 40:23 41:25 43:3 55:9 64:24

**stated** 15:14

**statements** 18:6,8 29:15

**statute** 38:13

**step** 39:9

**Stephen** 4:12

**steps** 34:17 46:18,25

**still** 12:23 29:2 45:25 52:10 54:14 60:13

**stipulated** 61:1

**stop** 58:4 66:12

**stopped** 17:7

**strategic** 39:14

**strict** 6:23,25

**strictly** 21:15

**strongly** 9:15 30:10

**structure** 7:1

**stuff** 43:21

**subject** 18:22 33:25 47:10 48:21 49:12 54:2

**submit** 15:9

**subparagraphs** 61:6

**success** 6:21 41:6

**successful** 26:19

**such** 7:8 14:4 31:22 38:14,22 41:15 51:14

**suggest** 15:7 18:5 27:10

**suggested** 18:13

**suggestion** 18:2,15 25:24 29:10 60:25 62:22 63:9,13 65:4

**suggests** 27:13 38:14

**supervises** 27:12

**supervising** 62:16

**support** 6:3 15:20 36:16 60:2, 22

**supposed** 63:21,22

**sure** 14:20 40:6 42:4 51:25 54:12

**Surely** 22:3

**surprising** 37:16

**suspect** 9:15 16:5 17:6 26:22 30:10

**swell** 34:4

**systems** 64:18

---

**T**

---

**tactical** 39:18

**taint** 9:12,18 10:4,7 19:4,7,11 25:21 38:7

**take** 10:8 20:19 21:3 24:5 25:11,17 44:17 46:17,24 50:25

**taken** 11:8 18:25 28:9,13,18 30:15 44:21

**takes** 6:21 8:3 23:16 59:13

**taking** 34:17

**talk** 30:23 42:3 49:11 53:22 55:15

**talked** 38:24

**talking** 15:1 16:10 55:2 57:11 64:13

**team** 8:12 9:12,18 10:4,7 11:18 18:20 19:4,7,8,18 21:11 25:21 31:6,18 33:2,20,23 34:7, 20,23 36:25 37:15,17,18,19 38:6,7,12,14,20 43:6,14,16 44:10,22 45:1,6,19 46:17,24 48:2,3,6,16,20 49:1,2,16,19 50:20 51:8,22 52:14 53:1,20 56:15 61:24 62:2,14,18 64:3 66:6

**team's** 33:17 50:3 59:9

**teams** 19:11,12 43:13 46:8,12 50:24 51:2

**technologically** 52:21

**technology** 8:4 18:17,18 30:17 64:4,15

**telephone** 5:16,18

**tell** 16:1 26:24

**tens** 11:16 20:23

**term** 49:15 56:10

**terminology** 15:18

**terms** 18:1 27:8 31:14,24 41:18 44:3 62:25 64:17

**text** 27:5

**theme** 31:1

**theoretically** 53:7

**thing** 15:19

**things** 4:4 13:15 16:19 17:13 18:24 31:16 46:5 54:16 64:13, 21

**think** 6:4 12:16 15:1,15 16:6 20:14,17 24:10,17 25:9 31:17 32:1,10,21 37:11 39:1,3 40:8, 21,24 41:17,18 42:18 44:20 46:23 47:12 49:5 50:18,19 51:6,18 52:2 54:17 55:2,16 56:10 58:18 59:1,5,8,11 61:24 64:10 65:18 66:1

**thinking** 39:14

**Thomas** 3:3

**thought** 23:25 29:6 41:17

**thousands** 7:5,6,18,23 8:11 11:16 20:23 32:6,7 51:10 53:18

**through** 6:8 26:9 43:9 50:20 63:8 64:4

**thrown** 6:9

**tied** 55:5

**time** 8:18 9:16 13:24 16:25 30:11 32:16 38:10 39:1,17 42:1,23 44:16 65:9

**times** 38:6

**today** 3:13 5:11 7:2 8:1 21:18 25:12 35:14 38:24 65:4

**today's** 4:5 65:12,19

**told** 57:9

**tools** 8:5 18:25 64:15

**touch** 36:18 63:13 65:3

**touched** 17:25

**transformation** 7:16

**tremendous** 6:20

**trouble** 52:18 53:17

**troubling** 36:17

**true** 17:21 18:5 37:19 62:24 64:3

**trumps** 59:2

**Tucker** 3:4,6

**turn** 20:5 54:23

**two** 3:7 7:14 13:14 20:4 31:5 35:22 36:23 43:12 46:5,8,12 50:23 51:1 65:25

**type** 15:22 18:16,20 19:7

---

**U**

**ultimate** 25:2

**ultimately** 6:15 25:13 26:11, 15

**unclear** 55:6

**uncovered** 63:2

**under** 6:23 14:22,23 15:9,10, 17,23 16:19 30:1 43:25 44:13 51:3 64:12

**undercuts** 62:17

**understand** 5:11 21:1,22 30:9 31:22 44:25 45:4 66:8

**understanding** 24:7 28:7 41:21 52:20,22 56:20

**understands** 39:13

**underway** 39:11

**unfortunately** 7:2

**uniformly** 55:25

**Union's** 18:7

**unique** 42:18

**United** 18:7

**unless** 30:3 50:10,14 63:19

**unnamed** 38:3

**unspecified** 34:4

**untenable** 7:22

**until** 35:4 58:1

**up** 5:2 13:25 14:9 19:9 28:11 38:5 39:4 53:15 54:23

**upfront** 32:21

**upon** 7:5,18 20:7,24 32:7

**urge** 39:12

**use** 8:4 15:18 22:18 23:12 30:16 38:6,22 39:17 44:7,11 57:23

**used** 14:15 18:17 19:24 56:10 62:25

**uses** 29:11

**using** 10:4,7 64:4,23

---

**V**

**valid** 43:22

**Vandeventer** 4:20,21 32:17, 18,19 40:6,11,13,16,21 41:3,8, 16 42:2,9,15 43:25 44:19 45:9, 16 46:2,4 48:10,14 49:5,14,22, 25 50:8,12,15,18 51:17 52:19 53:21 54:11 55:1,22 56:20,25 57:18 58:18 59:18 60:16,17 66:21

**variety** 62:16

**various** 4:2 5:13 7:9 8:23 18:9 35:21 38:3 42:13 51:2 61:11 64:17

**vendor** 9:6 33:6 64:23,25

**viewing** 50:3

**violated** 12:18,20 13:21 14:5 37:13 40:19 50:23

**violates** 44:17

**violating** 31:8 43:23

**violation** 44:2 51:7

**violations** 6:16

**violative** 64:1

**Virginia** 9:6

**volume** 14:25 15:14 16:9 33:9,15 38:22 57:11

**voluminous** 14:19 16:3

**voluntarily** 58:19

---

**W**

**walked** 50:19

**wall** 21:7 36:19 37:8,13 43:2,9,
21 44:4 46:14,17 48:1,25
49:11 50:2,7,23,25 51:7,16
61:25 63:14 65:6

**walled** 49:8,10

**walls** 42:24

**warn** 11:12 19:20 62:3

**warned** 10:3 11:13

**Warner** 4:10

**warning** 17:8 27:14

**warnings** 9:16 10:8,9,10
11:15 19:18 27:9 30:11 32:3

**warrant** 9:1,3,8 11:9 30:12
33:3,4,8 43:7 44:8 47:8 48:18
50:21 51:3 52:7 53:6,9 56:5,17
57:8 62:23

**water** 5:5 7:13 11:23 18:11
23:1,5 33:2,7 34:13 37:6 39:10
45:12 49:18 50:4 51:5 52:8
53:8 54:21 56:6 57:20 61:3,10
62:24 63:4,6,10

**wave** 9:4,22

**Wayne** 21:12

**weakens** 7:1

**weaponry** 39:17

**week** 66:17,18

**weeks** 37:22

**welcome** 5:14,15

**well** 6:19 15:23,24 16:17,22
19:10 22:16 31:23 38:2 41:8,
22 43:4,20 45:6,9 46:2 51:6
54:19,20 57:20 62:1 63:9
64:24 65:19

**went** 26:1,23

**whatsoever** 7:20 35:11 53:3
61:21

**Whitmer** 29:13

**Whitmer's** 29:10

**whole** 7:1 31:12 37:7 46:6,8,
14,18

**wholly** 39:16

**witnesses** 19:23

**words** 18:20

**work** 16:17

**worked** 34:22 51:24

**Workers** 18:7

**working** 5:5

**workings** 26:2

**works** 20:20 35:3

**worth** 33:10

**worthy** 44:20

**Worthy's** 62:21

**written** 51:8,15 65:24

**wrong** 26:23 51:19

**wrote** 63:18

---

**Y**

**year** 5:17

**years** 36:23

# Exhibit 9

STATE OF MICHIGAN
IN THE 67TH JUDICIAL DISTRICT
_____

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff,

v

RICHARD DALE SNYDER,

      Defendant.

Case No. 21G-0046-SM

Hon. William H. Crawford

---

Fadwa Hammoud (P74185)
Bryant Osikowicz (P72377)
Daniel John Ping (P81482)
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, Michigan 48933
517.335.7622
hammoudF1@michigan.gov
osikowiczb@michigan.gov
pingd@michigan.gov

Kym L. Worthy (P38875)
Molly Kettler (P59877)
Wayne County Prosecuting Attorney
1441 Saint Antoine Street, Floor 12
Frank Murphy Hall of Justice
Detroit, Michigan 48226
313.224.5777
kworthy@waynecounty.com
kettlerm@michigan.gov

Attorneys for the People

Brian P. Lennon (P47361)
Charles N. Ash, Jr. (P55941)
Madelaine C. Lane (P71294)
Warner Norcross + Judd LLP
150 Ottawa Avenue NW
Suite 1500
Grand Rapids, Michigan 49503
616.752.2000
blennon@wnj.com
cash@wnj.com
mlane@wnj.com

Judith S. Gracey (P39766)
The Gracey Law Firm
2200 Beechmont Street
Keego Harbor, MI 48320
248.221.7726
judith@thegraceylawfirm.com

Attorneys for Defendant

---

# DEFENDANT SNYDER'S MOTION FOR PROTECTIVE ORDER AND EVIDENTIARY HEARING

Defendant, former Governor Richard Snyder, respectfully moves this Court to issue a protective order on the terms set forth in the accompanying brief, and then order an evidentiary hearing, with discovery in advance, to determine what sanctions and other remedies are

appropriate. As discussed in greater detail in the accompanying brief, the People's document productions to date are riddled with attorney–client privileged, executive privileged, and work-product-protected information, *including attorney–client communications regarding Governor Snyder's defense strategy in this matter*. And by their own admission, the *same lawyers* trying this case on behalf of the People *have reviewed those privileged materials*. The People's failure to take standard, common-sense steps in their review and production of materials that they undoubtedly knew contained privileged and protected information demands the relief requested in this Motion.

     I hereby certify that on September 7, 2021, I contacted Solicitor General Fadwa Hammoud and Chief Legal Counsel John VanDeventer via email requesting concurrence in the relief sought in this Motion. Neither responded.

Respectfully submitted,

Dated: September 8, 2021

Brian P. Lennon (P47361)
Charles N. Ash, Jr. (P55941)
Madelaine C. Lane (P71294)
Warner Norcross + Judd, LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, Michigan 49503
616.752.2000
blennon@wnj.com
cash@wnj.com
mlane@wnj.com

Judith S. Gracey (P39766)
The Gracey Law Firm
2200 Beechmont Street
Keego Harbor, MI 48320
248.221.7726
judith@thegraceylawfirm.com

Attorneys for Defendant Richard Snyder

PEOPLE OF THE STATE OF MICHIGAN,

Case No. 21G-0046-SM

     Plaintiff,

v

Hon. William H. Crawford
District Court Judge

RICHARD DALE SNYDER,

     Defendant.

---

Fadwa Hammoud (P74185)
Bryant Osikowicz (P72377)
Daniel John Ping (P81482)
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, Michigan 48933
517.335.7622
hammoudF1@michigan.gov
osikowiczb@michigan.gov
pingd@michigan.gov

Kym L. Worthy (P38875)
Molly Kettler (P59877)
Wayne County Prosecuting Attorney
1441 Saint Antoine Street, Floor 12
Frank Murphy Hall of Justice
Detroit, Michigan 48226
313.224.5777
kworthy@waynecounty.com
kettlerm@michigan.gov

Attorneys for the People

Brian P. Lennon (P47361)
Charles N. Ash, Jr. (P55941)
Madelaine C. Lane (P71294)
Warner Norcross + Judd LLP
150 Ottawa Avenue NW
Suite 1500
Grand Rapids, Michigan 49503
616.752.2000
blennon@wnj.com
cash@wnj.com
mlane@wnj.com

Judith S. Gracey (P39766)
The Gracey Law Firm
2200 Beechmont Street
Keego Harbor, MI 48320
248.221.7726
judith@thegraceylawfirm.com

Attorneys for Defendant

---

# BRIEF IN SUPPORT OF DEFENDANT SNYDER'S FIRST MOTION FOR PROTECTIVE ORDER AND EVIDENTIARY HEARING REGARDING PROSECUTION'S UNAUTHORIZED RELEASE OF PRIVILEGED INFORMATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    Governor Snyder Produced Hundreds of Thousands of Relevant Documents to
    OSC Through A Routinely Used Protocol That Protected Privileged Information ............ 2

    The Prosecution Was Notified that It had Collected Privileged Materials that
    Needed to be Filtered Out Before Review and Production by Prosecutors ....................... 3

ARGUMENT ....................................................................................................................... 7

    I.     This Court should hold an evidentiary hearing to determine how privileged
           materials were used in this investigation and what evidence must be
           suppressed as a result ......................................................................................... 7

    II.    A protective order is warranted to prevent further violations of the
           executive and attorney-client privileges and work-product doctrine .................... 10

CONCLUSION .................................................................................................................. 11

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Hickman v Taylor,*
329 US 495 (1947)..................................................................................................7

*Hunt v Blackburn,*
128 US 464 (1888)..................................................................................................7

*In re Grand Jury Subpoena Dated Nov. 8, 1979,*
622 F3d 933 (CA 6, 1980)......................................................................................8

*Maerz v United States Steel Corp,*
116 Mich App 710; 323 NW2d 524 (1982) ........................................................10

*People v Joly,*
__ Mich App __; __ NW2d __ (2021) (Docket No. 354379) ..........................1, 6, 8

*Swidler & Berlin v United States,*
524 US 399 (1998)..................................................................................................7

*Trammel v United States,*
445 US 40 (1980)....................................................................................................7

*United States v Nobles,*
422 US 225 (1975)..................................................................................................8

*United States v Voigt,*
89 F3d 1050 (CA 3, 1996)......................................................................................8

*Upjohn Co v United States,*
449 US 383 (1981)..................................................................................................7

## Statutes

MCL 767A.1.............................................................................................................2

## Rules

MCR 2.302 .............................................................................................................10

MCR 6.201 .............................................................................................................10

Page(s)

MRPC 1.6 ..............................................................................................................9

MRPC 4.4 ..............................................................................................................9

## Other Authorities

Michigan Constitution 1963, Article 6 § 17 .................................................................8

United States Constitution, Amendment V ...................................................................8

# INTRODUCTION

The People's production of discovery to the Defendant, former Michigan Governor Rick Snyder ("Governor Snyder"), shows the prosecution's utter disregard for the sanctity of the attorney-client privilege and protected attorney work product, in violation of Governor Snyder's due process rights, the Michigan Rules of Professional Conduct ("MRPC"), and well-established prosecutorial protocol and jurisprudence. As set forth in more detail herein, the prosecutors in this matter:

> (1) possess of tens of thousands of documents protected by the executive privilege, attorney-client privilege, and work-product doctrine;
>
> (2) failed to use an independent taint or filter team to identify and segregate those documents from the investigative and prosecution team;
>
> (3) reviewed those privileged documents; and
>
> (4) flagrantly violated the MRPC and Governor Snyder's due process rights by producing those documents—unredacted—both to Governor Snyder and to other Defendants charged by a one-judge grand juror in Genesee County.

An evidentiary hearing is needed to determine what evidence must be excluded, see *People v Joly*, __ Mich App __; __ NW2d __ (2021) (Docket No. 354379) (attached as Ex D-17), and to consider other sanctions, including but not limited to the disqualification of the investigators and prosecutors responsible for these breaches of well-established prosecutorial protocol[1] and violations of Governor Snyder's due process rights.

---

[1] On April 28, 2021, federal authorities searched the home and office of Attorney Rudy Giuliani, former counsel to President Trump. (available at https://www.msnbc.com/opinion/giuliani-search-warrants-mean-trump-ukraine-scandal-far-over-n1265839.) Federal authorities are appropriately using an independent taint team to review and segregate privileged documents and information from the information that the investigative and prosecution teams can review and use. SG Hammoud and Prosecutor Worthy's failure to use this well-established protocol can only be explained in two ways: they either did not know about this well-established protocol or

# BACKGROUND

## Governor Snyder Produced Hundreds of Thousands of Relevant Documents to OSC Through A Routinely Used Protocol That Protected Privileged Information

Since January 2016, Governor Snyder has produced hundreds of thousands of <u>relevant, non-privileged</u> documents to the prosecution's predecessor—the Todd Flood-led Office of Special Counsel ("OSC") and to federal and county prosecutors and Congress, both voluntarily and pursuant formal document requests and subpoenas. The use of federal grand jury subpoenas in large-scale criminal investigations is well-established. The OSC, beginning in 2016, followed this federal investigative model through the use of Michigan's Investigative Subpoena statute, MCL 767A.1, *et seq.* Specifically regarding this matter, the OSC issued, and Governor Snyder responded to, various investigative subpoenas, including Investigative Subpoena 16-002, which the OSC issued on June 10, 2016. That subpoena sought an extraordinarily variety of documents and data from various electronic devices assigned to Governor Snyder, his staff, and his legal counsel, with an unreasonable return date of June 20, 2016—a mere 10 days after the subpoena was served. The Governor timely submitted his objections to that investigative subpoena.

Ultimately, the parties were able to agree to an October 6, 2016 stipulation (the "Stipulation") preserving Governor's Snyder's Objections to Investigative Subpoena 16-002 and resolving OSC's concerns. (Ex D-18, Stipulated Agreement Concerning Compliance with Investigative Subpoena.) The Stipulation provided, among other things, that Governor Snyder, through counsel, would produce responsive, non-privileged documents to OSC on a biweekly

---

they intentionally disregarded it. Both are unacceptable and subject to sanctions. What sanctions this Court should consider can only be determined after full evidentiary hearing.

basis.[2]  (See *id.*)  Years later this prosecution criticized the investigative subpoena protocol used by OSC.  However, the OSC's investigative protocol shifted the burden of and costs for identifying privileged information to the subpoena recipients—like counsel for Governor Snyder—which ensured that the OSC prosecution team would not be tainted by receipt and use of privileged information.  Rather than following this routinely used subpoena model of federal investigators in large-document cases, the prosecution here executed search warrants without any consideration for procedural safeguards or the due process rights of their targets, including Governor Snyder.  Who made that decision and why must be explored.

**The Prosecution Was Notified that It had Collected Privileged Materials that Needed to be Filtered Out Before Review and Production by Prosecutors**

The prosecution has publically announced that it has approximately 21 million documents (not pages of documents) to produce to Governor Snyder and the other eight defendants.  Based on that number, Governor Snyder's counsel was concerned that the prosecution had collected privileged information in the emails and other electronic documents it had seized.

The prosecution was first warned on May 28, 2019 that the materials it seized in the search warrants for the Department of the Attorney General and AG's electronic discovery vendor, KLDiscovery, likely contained attorney-client privileged communications and protected work product.  (See 5/28/19 Letter from C. Chamberlain to SG Hammoud (Ex D-19).)  On January 20, 2021, counsel for Governor Snyder brought this matter to the attention of Solicitor General Fadwa Hammoud ("SG Hammoud").  (See 1/20/21 Letter from B. Lennon to SG

---

[2] Governor Snyder fully complied with the Stipulation.  The last rolling document production was provided to OSC on September 15, 2017—over three years ago.  In total, Governor Snyder produced over 38,000 documents, totaling almost a quarter million pages, to OSC.

Hammoud (Ex D-20).)  Mr. Lennon wrote SG Hammoud a second time on April 13, 2021. (See 4/13/21 Email from B. Lennon to SG Hammoud (Ex D-21).) That email requested, among other immediate actions, that SG Hammoud hire an independent taint or filter team to identify and claw back all the privileged documents that were improperly disclosed.  Mr. Lennon also asked SG Hammoud to refrain from making any subsequent disclosures of Governor Snyder's privileged materials.  SG Hammoud refused.  Rather, her response completely missed the point: rather than justifying this breach or acknowledging this misstep, SG Hammoud instead responded that the three-part test for "outrageousness" set forth by Michigan Court of Appeals in *Jolly* did not require disqualification.  (*Id*.)

On March 15, 2021, the prosecution finally began producing the emails and electronic data it seized from Governor Snyder's civil attorneys in the Michigan Attorney General's Office ("the AAG's Flint Civil Team") and the eDiscovery vendor hosting all Governor Snyder's documents after he left office on January 1, 2019.  This initial production contains over two million documents.[3]  The production was riddled with executive privileged, attorney-client privileged, and work-product-protected information, including communications regarding Governor Snyder's legal strategy *in this matter*.  (See, e.g., Privilege log regarding examples of privileged materials in People's 3/30/21 production (Ex D-22).)[4]  And the privileged information

_____

[3] Other than the astonishing discovery of all the privileged material contained therein, the vast majority of the People's first production contained entirely irrelevant documents.  The prosecution team provided automated news emails, discussions of Michigan Department of Corrections menus, communications regarding casinos, and other information and documents wholly unrelated to Flint and/or the Flint Water Crisis.  Indeed, the production appears to be an effort to either to bury Governor Snyder and the other defendants in irrelevant documents causing them to incur unnecessary attorney's fees, or an attempt to hide these privileged documents within a data dump hoping they would be missed among the irrelevant documents.

[4] Based on a quick review, Governor Snyder estimated that over 24,000 documents in the People's March 30, 2021 production may be attorney-client or work-product privileged.  The estimate of potentially executive privileged documents is significantly higher.  Exhibit D-22

is not solely Governor Snyder's. A quick review of the People's first production revealed privileged communications between Defendants Nick Lyon, Richard Baird, and other Defendants, <u>with their respective counsel</u> regarding *this matter*. Undersigned counsel has now confirmed that this same initial production containing Governor Snyder's privileged information was provided to the other Defendants, who also received the privileged information of other defendants.

Additionally, the prosecution was warned about the presence of privileged information in the documents they collected a third time. On April 2, 2021, AAG Richard Kuhl, a member of the AAG's Flint Civil Team, warned SG Hammoud that her team was in possession of privileged materials that should not be disclosed to the criminal defendants. (4/2/21 Email R. Kuhl to SG Hammoud (Ex D-23).) SG Hammoud then forwarded AAG Kuhl's email to Attorney General Dana Nessel. (*Id.*) Despite this clear warning, the prosecution continued to produce privileged materials to Governor Snyder and the other defendants.[5]

Only Governor Snyder, and in the case of work product, only Governor Snyder and his attorneys, has the right to waive privilege over documents and communications between himself and his counsel. This includes his outside counsel, his in-house legal counsel while governor, and the AAG's Flint Civil Team who continue to represent him in the civil Flint Water cases pending in federal court. SG Hammoud, Wayne County Prosecuting Attorney Kym Worthy

---

describes a sample of these documents in a privilege log. The documents are not being attached to protect the privilege but are available for this Court's *in camera* review if requested.

[5] On April 28, 2021, the prosecution produced further attorney-client-privileged documents, including emails between Governor Snyder's in-house counsel and Warner Norcross attorneys regarding the investigative subpoena response in this case. (See, e.g., AG_SG_PROD0022_0000371440 (Ex D-24), AG_SG_PROD0022_0000371839 (Ex D-25), AG_SG_PROD0023_0000232419 (Ex D-26).) To protect Governor Snyder's attorney-client privilege and work product protection, Exhibits D-24, D-25, and D-26, will be provided to this Court for *in camera* review upon request.

("Prosecutor Worthy"), and the AAGs and investigators prosecuting these cases have no such right.

Accordingly, Governor Snyder seeks an evidentiary hearing at which members of the prosecution and investigation teams must testify, under oath, about the privileged information in their possession; how it was obtained, who reviewed it, and how it was used. Moreover, the Court should hear from the AAG's Flint Civil Team, including AAG Richard Kuhl, who continue to represent Governor Snyder and other defendants in the civil Flint Water litigation. Only then can this Court begin to determine what evidence should be suppressed because of the prosecution's "outrageous" conduct, see *Joly*, __ Mich App at __; slip op 6, and other sanctions as may be appropriate, including disqualification of members of the prosecution team who ignored these warnings, and reviewed and disclosed privileged materials and protected work product.

In the meantime, Governor Snyder moves this Court to issue a protective order prohibiting additional disclosure of documents that may contain privileged information and prohibiting the prosecution from reviewing the documents until SG Hammoud and Prosecutor Worthy hire a neutral third-party, paid for by the People, to review and scrub the initial and all subsequently planned productions of any information protected by executive privilege, the attorney-client privilege, the attorney-work-product protection, and any other privileges recognized by Michigan law.[6]

---

[6] U.S. Bankruptcy Judge Thomas Tucker has already ordered prosecutors to stop producing mediation confidential documents involving the City of Detroit bankruptcy after undersigned counsel discovered that the prosecution's discovery contained thousands of documents in violation of numerous U.S. Bankruptcy Court orders. See *In re City of Detroit, Michigan*, Case No. 13-53846 (attached as Ex D-27). Still pending before Judge Tucker is Governor Snyder's request for discovery in the matter and sanctions if there is a finding that the People violated the U.S. Bankruptcy Court's numerous orders.

# ARGUMENT

## I.   This Court should hold an evidentiary hearing to determine how privileged materials were used in this investigation and what evidence must be suppressed as a result.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co v United States*, 449 US 383, 389 (1981) (citation omitted). It is "rooted in the imperative need for confidence and trust," *Trammel v United States*, 445 US 40, 51 (1980), "recogniz[ing] that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client," *Upjohn*, 449 US at 389; see also *Hunt v Blackburn*, 128 US 464, 470 (1888) (the privilege is "founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure"). So powerful is the privilege that it survives the death of the attorney's client. *Swidler & Berlin v United States*, 524 US 399, 410 (1998).

Further, courts have long recognized that the need for confidentiality extends beyond attorney–client communications to attorney work product. Indeed, to perform his duties, "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v Taylor*, 329 US 495, 510 (1947). Such "work is reflected . . . in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways." *Id.* at 511. "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v Nobles*, 422 US 225,

238 (1975). Both a client and his lawyer may invoke the privilege the work product doctrine provides. *In re Grand Jury Subpoena Dated Nov. 8, 1979*, 622 F3d 933, 935 (CA 6, 1980).

Under both the U.S. and Michigan Constitutions, a person may not be deprived of life, liberty, or property without due process of law. US Const, Am V; Mich Const 1963, art 6 § 17. Although the attorney-client and other privileges are not constitutional rights, courts in Michigan and other jurisdictions have recognized that the government's violation of a criminal defendant's privilege may violate his constitutional right to due process. In *People v Joly*, the Michigan Court of Appeals adopted the Third Circuit's three-part test from *United States v Voigt*, to determine when the prosecutor's behavior regarding privileged materials constituted "outrageousness" constituting a due process violation and, as a remedy, warranting exclusion of evidence. *Joly*, __ Mich App at __; slip op 6 (citing *United States v Voigt*, 89 F3d 1050, 1067 (CA 3, 1996)). [7]

> To make a colorable claim of "outrageousness," a defendant must show all of the following: "(1) the government's objective awareness of an ongoing, personal attorney-client relationship between [the attorney] and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice." [*Id.*]

The facts in this case are not in dispute. The People were aware of the attorney-client relationships between Governor Snyder and WNJ, Barris Sott, and other outside and internal legal counsel. Indeed, the police reports produced so far include multiple references to Governor Snyder's attorneys by name including undersigned counsel, Travis Weber, Valerie Brader, and others. Similarly, the People were aware of the attorney-client relationships between the civil

---

[7] *People v Joly* involved the exclusion of evidence derived from privileged materials. In this case, like in *U.S. v Voigt*, the People's conduct is even more egregious because it involves the improper use of direct, privileged evidence. *Id.*

AGs and Governor Snyder and other state defendants, Defendant Nick Lyon and his counsel (Chip Chamberlain), and Defendant Eden Wells and her counsel (Jerold Lax)—they were all parties to existing lawsuits and criminal prosecutions when SG Hammoud took over the case. Finally, there is no question that the People have intruded into that relationship when it obtained and produced privileged materials—without redaction, without any waiver, and without a court order permitting them to do so.

The People can make one of two arguments—both of which are unavailing here. Perhaps they failed to review the 21 million documents at all. That not only is unlikely but also flies in the face of the on-the-record representation that the People made to the Court when they asked to pause the Wells and Lyon cases to permit them to review this new material. See, e.g., https://www.mlive.com/news/flint/2019/04/millions-of-flint-water-documents-found-in-basement-prosecutors-claim.html. Alternatively, perhaps the People reviewed the documents and simply did not bother to redact or pull the privileged material from the production. Those actions have no support in the law and clearly violate their ethical duties as attorneys in the State of Michigan. MRPC 1.6 & 4.4.

This Court should hold an evidentiary hearing requiring the prosecution team and its eDiscovery vendor, N1, to testify under oath to determine what data was obtained, who reviewed it, and how it was used. We simply cannot take the People's word for it—at least not unless it is under oath. As *Voigt* and *Joly* make clear, Governor Snyder's due process rights are at issue here and this Court will need to determine what privileged information was used and what direct and derivative evidence must be suppressed as a result.

## II.  A protective order is warranted to prevent further violations of the executive and attorney-client privileges and work-product doctrine.

Discovery rules are to be liberally construed.  *Maerz v United States Steel Corp*, 116 Mich App 710, 722; 323 NW2d 524 (1982).  Generally, parties may obtain discovery regarding any matter <u>not privileged</u>, which is relevant to the subject matter involved in the pending action. MCR 2.302(B)(1) (emphasis added). A trial court has wide discretion in applying the rules of discovery.  MCR 2.302(C)(1) provides, in relevant part, that a party from whom discovery is sought may request protection from annoyance, embarrassment, oppression, or undue burden or expense, including entry of an order that the discovery not be had.  To obtain such an order, good cause must be shown.  MCR 2.302(C)(1).

MCR 6.201(E) states:

> On motion and a showing of good cause, the court may enter an appropriate protective order. In considering whether good cause exists, the court shall consider the parties' interests in a fair trial; the risk to any person of harm, undue annoyance, intimidation, embarrassment, or threats; the risk that evidence will be fabricated; and the need for secrecy regarding the identity of informants or other law enforcement matters. On motion, with notice to the other party, the court may permit the showing of good cause for a protective order to be made in camera. If the court grants a protective order, it must seal and preserve the record of the hearing for review in the event of an appeal.  [MCR 6.201(E).]

There is good cause in this case to pause the production of electronic documents to prevent further improper disclosure of privileged materials.  This initial production is less than a tenth of the electronic data Governor Snyder has been told to expect to be produced by the People in this case.  And, based on what was included in this initial set, Governor Snyder has every reason to believe that subsequent productions will also be full of privileged and irrelevant materials.  To prevent further disclosure of privileged materials, Governor Snyder seeks a

protective order temporarily halting all further productions of electronic data seized pursuant to search warrants and prohibiting the People from reviewing any of these materials until a neutral third-party, appointed by this Court and paid for by the People, reviews the data to redact and remove executive-privileged, attorney-client privileged, and work-product-protected materials. Further, this third-party shall confirm that any previously produced privileged material to defendants or any third party (including investigators) has been destroyed or returned to the People and is not used in any way in the investigation or prosecution.

## CONCLUSION

The People have shown complete disregard for Governor Snyder's due process rights and the attorney-client, executive, and work product privileges that he enjoys under the law. The number of documents collected by the People are no excuse for its disregard of the legal and ethical duties the People have to prevent the review and use of privileged materials and the subsequent disclosure of the same. Governor Snyder is currently in possession of privileged materials belonging to himself and to other Defendants—in the other related cases. This is a clear violation of the law. To prevent further disclosure of privileged materials, this Court should enter an order temporarily halting all further productions of documents seized pursuant to search warrants and prohibiting the People from reviewing any of these materials and then order an evidentiary hearing, with discovery in advance, to determine how this happened and what sanctions and other remedies are appropriate.

WARNER NORCROSS + JUDD LLP

Dated: September 8, 2021        By _____

Brian P. Lennon (P47361)
Charles N. Ash, Jr. (P55941)
Madelaine C. Lane (P71294)

150 Ottawa Avenue NW, Suite 1500
Grand Rapids, Michigan 49503
616.752.2000
blennon@wnj.com
cash@wnj.com
mlane@wnj.com

Judith S. Gracey (P39766)
The Gracey Law Firm
2200 Beechmont Street
Keego Harbor, MI 48320
248.221.7726
judith@thegraceylawfirm.com

Attorneys for Defendant Richard Snyder

# Exhibit 10

PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

NICOLAS LYON,

                Defendant.

Case No. 21-047378-FH

Hon. Elizabeth A. Kelly

Molly A. Kettler (P59877)
SPECIAL ASSISTANT ATTORNEY GENERAL
1441 Saint Antoine Street, 12th Floor
Frank Murphy Hall of Justice
Detroit, Michigan 48226-2387
(313) 224-6692
kettlerm@michigan.gov

Charles E. Chamberlain (P33536)
Britt M. Cobb (P69556)
WILLEY & CHAMBERLAIN LLP
Attorneys for Defendant Lyon
300 Ottawa Avenue, N.W., Suite 810
Grand Rapids, Michigan 49503-2314
(616) 458-2212
cec@willeychamberlain.com
bmc@willeychamberlain.com

Alexandria L. Casperson (P79189)
ASSISTANT ATTORNEY GENERAL
3030 West Grand Blvd., Ste. 10-200
Detroit, Michigan 48226
caspersona@michigan.gov

Ronald G. DeWaard (P44117)
VARNUM LLP
Attorneys for Defendant Lyon
333 Bridge St NW Ste 1700
Grand Rapids, Michigan 49504
(616) 336-6424
rgdewaard@varnumlaw.com

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AND DISCOVERY PURSUANT TO MCR 6.201(E) AND 6.201(J)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

I.   INTRODUCTION .................................................................................................... 1

II.  FACTUAL AND PROCEDURAL HISTORY ........................................................ 4

     A.   The Initial Investigation and Prosecution. ................................................. 4

     B.   The January 2021 Indictment and the Prosecution's Productions........................... 8

III. LAW AND ARGUMENT ....................................................................................... 11

     A.   Legal Standard. ........................................................................................... 11

     B.   The Prosecution has Seized, Reviewed, and Produced Materials in Violation of the Attorney-Client Privilege and Work Product Doctrine in Violation of the Michigan Court Rules, State and Federal Law, and the Conflict Wall................. 12

          1.   The Prosecution's Invasion of the Attorney-Client and Work Product Privileges of Other Parties is Contrary to State and Federal Law. ........... 12

          2.   The Prosecution Improperly Collected, Reviewed, and Produced Mr. Lyon's Privileged Materials and Communications. ................................... 14

          3.   The Prosecution Violated the Conflict Wall. ............................................ 16

     C.   A Protective Order and Discovery Are Necessary to Stop the Continued Violation of Mr. Lyon's Rights and to Determine the Scope of the Dissemination of Privileged Information. ........................................................................................ 18

IV.  CONCLUSION...................................................................................................... 19

# **TABLE OF AUTHORITIES**

**Cases**

*Atty Gen v Mich Pub Serv Com'n,*
  243 Mich App 487; 625 NW2d 16 (2000) ........................................................ 16, 18

*Barkley v Detroit,*
  204 Mich App 194; 514 NW2d 242 (1994) ............................................................ 16

*D'Alessandro Contracting Grp, LLC v Wright,*
  308 Mich App 71; 862 NW2d 466 (2014) ............................................................. 13

*Dep't of Health & Human Services v Genesee Cty Circuit Judge,*
  318 Mich App 395 (2016) ....................................................................................... 11

*Estate of Nash by Nash v City of Grand Haven,*
  321 Mich App 587; 909 NW2d 862 (2017) ........................................................... 13

*Hickman v Taylor,*
  329 US 495 (1947) ................................................................................................... 12

*In re Grand Jury Subpoenas,*
  454 F3d 511 (CA6 2006) ......................................................................................... 15

*In re Search Warrant Issued June 13, 2013,*
  942 F3d 159 (CA4 2019) ......................................................................................... 15

*Leibel v Gen Motors Corp,*
  250 Mich App 229; 646 NW2d 179 (2002) ........................................................... 12

*Meister v People,*
  31 Mich 99 (1875) ................................................................................................... 18

*People v Banks,*
  249 Mich App 247; 642 NW2d 351 (2002) ........................................................... 11

*People v Davenport,*
  280 Mich App 464; 760 NW2d 743 (2008) ........................................................... 18

*People v Doyle,*
  159 Mich App 632; 406 NW2d 893 (1987, mod in part on other grounds on reh 161 Mich App
  743; 411 NW2d 730 (1987) ..................................................................................... 18

*People v Joly,*
  __ NW2d ___, 2021 WL 935704 (Mich Ct App Mar 11, 2021) ................................. 12, 14, 15

*People v Waclowski*,
  286 Mich App 634; 780 NW2d 321 (2009) ............................................................ 12

*Shillinger v Haworth*,
  70 F3d 1132 (CA10 1995) ...................................................................................... 14

*State v Robinson*,
  209 A3d 25 (Del 2019) ........................................................................................... 14

*United States v Horn*,
  811 F Supp 739 (DNH 1992) ................................................................................. 14

*United States v Neal*,
  952 F Supp 834 (DDC 1997) ................................................................................. 13

*United States v Nobles*,
  422 US 225 (1975) ................................................................................................. 13

*United States v Voigt*,
  89 F3d 1050 (CA 3 1996) ...................................................................................... 13

*Upjohn v United States*,
  449 US 383 (1981) ................................................................................................. 12

**Statutes**

MCL 767A.1 *et seq.* .................................................................................................... 4

**Other Authorities**

MRPC 1.7 ..................................................................................................................... 18

MRPC 1.7(a) ............................................................................................................... 16

MRPC 3.8 ..................................................................................................................... 18

**Rules**

MCR 6.201 .................................................................................................................... 11

MCR 6.201(C)(1) ........................................................................................................ 11

MCR 6.201(E) ........................................................................................................ 3, 11, 18

MCR 6.201(J) ........................................................................................................ 3, 11, 19

# I.	INTRODUCTION

The prosecution's initial productions of documents – a small fraction of the documents in their possession – reveals a textbook example of prosecutorial abuse of power and the violation of basic and fundamental rights and process.  Against all reason, and without heed for the multiple timely warnings it received, *including from Mr. Lyon's counsel in 2019*, after seizing a trove of privileged communication and documents belonging to Mr. Lyon and the other defendants, the prosecution reviewed and produced those documents to all defendants in this matter, and, most recently, attempted to assert its claimed right to potentially use those privileged documents at trial.

While the prosecution has produced only 4 million of the 21 million documents claimed to be in its possession, a preliminary review of the documents produced has already unearthed thousands of privileged documents, including privileged communications between Mr. Lyon and his civil and criminal attorneys related to the Flint Water Crisis.  This point bears emphasis: <u>after being informed that they possessed privileged documents, the prosecution has reviewed and then produced to Mr. Lyon and the other defendants Mr. Lyon's communication with his attorneys – <em>including Mr. Lyon's personal criminal attorneys and his personal civil attorneys in the Michigan Attorney General's office</em> – regarding the Flint Water Crisis and this criminal investigation and prosecution</u>.  As is discussed below, this occurred on a large scale.

Just as the prosecution's conduct in reviewing and producing seized privileged materials was inappropriate, the process it used, executing search warrants on governmental agencies and their e-discovery vendor that had already cooperated and produced responsive documents to the former prosecution team, was unnecessary and avoidable.  The same agencies whose documents were seized in the search warrants by the current prosecution team had already produced millions of documents pursuant to a protocol and process agreed to by the former prosecution team.  Civil

attorneys from the Michigan Attorney General's Office worked with the former prosecution team to identify relevant custodians, hired an e-discovery vendor and dozens of contract attorneys to review documents, and then employed established industry standard tools to search for responsive documents, including targeted keyword searches, predictive coding, test searches, deduplication, and, perhaps most significantly, privilege screening and the creation of privilege logs, which were provided to the prosecution.

This agreed process and production occurred over the course of years, at great expense, and the former prosecution team received a full production of all potentially relevant documents. The current prosecution team disregarded those prior productions and issued search warrants, an approach that resulted in the prosecution seizing entire email boxes for the defendants and other governmental employees, which, of course, included privileged materials. Making matters worse, it does not appear that the prosecution employed any date cutoff (as was the case with the agreement between the civil AAGs and OSC), so the search warrants swept up communications with counsel that occurred while the Defendants were under investigation and being prosecuted for a period of years. This point also bears emphasis. <u>By using search warrants without restriction, the prosecution obtained the only relevant documents and communications that were missing from the prior production: the Defendants' privileged and work product materials</u>. And while this information would be of great interest to any prosecutor, it is obviously wholly inappropriate for any of it to be in the prosecution's hands.

None of this was accidental. The investigations and the previous charges against the same individuals had been pending for years, such that all of the defendants were required to have personal criminal counsel during that time. Additionally, the prosecution was informed by the civil attorneys in its own office that it had previously received all potentially relevant documents,

and the prosecution was warned that its search warrants would have gathered privileged materials. Moreover, Mr. Lyon's counsel <u>specifically notified the prosecution on May 28, 2019 that the search</u> <u>warrants would likely contain privileged and work product material</u>. See **Ex. 1,** 5/28/19 Letter to Hammoud. The prosecution never responded to this communication and ignored all of the other warnings it received. Instead, the prosecution moved forward with full knowledge of the privileged materials in its possession. As a result, Mr. Lyon received back from the current prosecution team his own communications with his attorneys regarding the criminal investigation and previous prosecution, which concerns the same subject matter, witnesses, and evidence as the current prosecution. The Court is thus faced with an unprecedented and systematic violation of the rights of Mr. Lyon and the other defendants. And while it is now certain that the scope of the problem arising from the prosecution's folly is pervasive and the effects severe, the full extent of the prosecution's actions is still unknown. Moreover, the prosecution remains in possession of Mr. Lyon's privileged materials, as well as the privileged materials of the other defendants.

Accordingly, Mr. Lyon respectfully moves the Court pursuant to MCR 6.201(E) for a Protective Order barring the prosecution from reviewing or producing any seized documents until an appropriate process for the segregation of privileged materials can be implemented. Mr. Lyon further seeks an order pursuant to MCR 6.201(J) allowing him to seek discovery into the seizure, review, and production processes utilized by the prosecution to date in order to allow him to determine the scope of the intrusion into his privileged relationships and determine the appropriate remedy. Such discovery should include at minimum (1) written interrogatories; (2) written requests to admit; (3) written requests for production of documents; (4) depositions of representatives of the prosecution with knowledge of the review and production process; and (5) an evidentiary hearing where the prosecution is required to present evidence regarding the review

and production of materials in this matter. Mr. Lyon further requests that the Court set a status conference to discuss the proposed discovery into the taint issue and the appropriate protocol for the review of the documents for privilege by an outside party, including a mechanism to allow Mr. Lyon and other defendants to object to privilege determinations made during this taint review.

## II.     FACTUAL AND PROCEDURAL HISTORY

### A.     The Initial Investigation and Prosecution.

In January 2016, the Department of the Attorney General ("DAG") announced it was investigating matters related to the Flint water crisis, and later established the Office of Special Counsel ("OSC"), formerly led by Todd Flood. As was necessary, a conflict wall was established between OSC and the DAG civil attorneys (the "Civil AAGs") representing various state agencies and their agents. See **Ex. 2,** First Conflict Notice.

As part of its investigation, OSC issued investigative subpoenas to a number of state agencies, including MDHHS, the Office of the Governor, MDEQ, and the Department of Treasury pursuant to the Michigan Investigative subpoena statute, MCL 767A.1 *et seq*. The state agencies hired outside criminal counsel to respond to the OSC subpoenas, along with other requests from the U.S. Department of Justice and the Genesee County Prosecutor's office. The Civil AAGs, who were already representing the various agencies in related civil actions, remained involved in responding to the subpoenas and were principally tasked with collecting responsive communication from the e-mail folders of designated current and former employees. In order to address the challenges of reviewing and producing a vast amount documents, the Civil AAGs hired KLDiscovery to assist with the document collection, review, and production.

The OSC's original subpoenas were initially so broad as to be unworkable, which led to negotiations and ultimately an agreement with between the agencies' criminal counsel and OSC regarding search terms and a production schedule. All subpoenaed agencies followed a similar

track.  In particular, MDHHS relied upon the Civil AAGs to use standard e-Discovery methods to winnow more than 4,800,000 potentially relevant Flint documents from various sources within MDHHS alone, including from Microsoft Outlook accounts, system drives, and paper files, and ultimately produced 120,000 relevant and non-privileged documents that were potentially responsive to requests.  See **Ex. 3,** MDHHS Review Narrative.  This process included (1) multiple voluntary productions; (2) collection of over four million MDHHS documents based on relevant custodians and search terms; (3) two rounds of predictive coding, including follow-up quality check review and accuracy sampling; (4) a linear review of additional documents determined to be likely responsive by the second predictive coding project that utilized additional keyword searches requested by OSC; and (5) privilege review by outside counsel.  *Id.* at 1-4.  The privilege review meant that the agencies were given the customary opportunity to review potentially privileged documents *prior to their production to OSC*, which ensured that the OSC investigative processes would not be tainted by the receipt and use of privileged information.  The agencies provided privilege logs to OSC identifying privileged documents.

This methodical review and production process was particularly important given the complex privilege issues.  MDHHS was represented by the Civil AAGs in the civil matters and by outside and in-house counsel in relation to the OSC investigation and other criminal matters.  Mr. Lyon, as director of MDHHS, was also represented by the Civil AAGs in the civil matters, and by outside counsel in the OSC investigation and prosecution.  There was significant overlap in both facts and interest in the different Flint water matters; as a result, Mr. Lyon and the MDHHS entered into a common interest agreement along with others in connection with the pending criminal charges and civil claims, in order to pursue their common interests and avoid waiver of privilege, work product, and confidentiality attached to shared communications and documents.  The

5

agreement confirmed that the DAG had erected a conflict wall to isolate and screen the OSC staff involved with investigating and prosecuting conduct related to Flint drinking water from the civil AAGs who were subject to the common interest agreement. Thus, common interest materials could not and would not be shared with the OSC. The result of this agreement is that there were significant discussions between the parties related to the common legal issues in the various matters, *many of which would not have occurred but for the common interest agreement*. There was also communication between defendants and their own counsel, including Mr. Lyon, as well as the MDHHS and other parties to the common interest agreement and their counsel regarding the investigation and prosecutions. Mr. Lyon and the parties to the agreement engaged in open communication with the Civil AAGs regarding the related civil and criminal matters, with the assurance that that these communications were covered by attorney-client privilege.

In early 2019, the prosecution claimed to have discovered unreviewed documents related to the Flint water prosecution. The Civil AAGs explained that the documents and hard drives that were "discovered" had already been reviewed for production and/or were back-up forensic images of already-collected computers. See **Ex. 4**, Notice of Intervention at 19-20. Prosecutor Flood was then fired in April 2019, based on the current prosecution team's claim that "discovery was not fully and properly pursued from the onset of this investigation." See **Ex. 5**, 4/29/19 Press Release. At the same time, Judge Farah was considering Mr. Lyon's motion to quash the bind over. The prosecution sought to stall the case, and moved for a six-month adjournment of the case.

This effort, along with the false claims asserted by the prosecution, led the Civil AAGs to intervene to correct the record. See Ex. 4, Notice of Intervention. The AAGs identified a number of incorrect statements made by the prosecution in connection with the motion to stay, including, but not limited to, that the Civil AAGs concealed responsive documents and took direction from

the defendants' outside counsel as to what the Civil AAGs' clients should produce in response to OSC subpoenas. See *id.* The Civil AAGs debunked each of the prosecution's claims regarding the discovery process and carefully outlined the processes used for the various state agencies to respond to the OSC subpoenas. See *id.* Judge Farah denied the request for adjournment, which led to the prosecution dismissing all pending Flint water cases without prejudice.

Despite being assured by its <u>own office</u> that all responsive information had already been produced, the prosecution executed search warrants at the DAG State Operations Division and the Civil AAGs e-discovery vendor KLDiscovery to obtain all of the raw data collected, including the complete e-mail boxes from which the previous productions had been made. It was obvious that these communications would have included e-mails between the defendants and their counsel, given the existence of the investigation and previous prosecution. These were the documents that were removed from the previous productions following the privilege review process described above, <u>as was evidenced by the privilege logs that were in the prosecution's possession at the time it issued the search warrants</u>. However, leaving nothing to chance, counsel for Mr. Lyon *explicitly warned* the prosecution that their search warrants would include privileged materials in May 2019, shortly after the search warrant was executed for the raw data. See Ex. 1, 5/28/19 Letter to Hammoud. Moreover, Mr. Lyon's counsel requested that the prosecution "advise as to what protocols are in place to protect confidential and privileged information from disclosure to inappropriate parties." *Id*. The prosecution never responded. It is now evident that the prosecution defied the request from Mr. Lyon's counsel, put no protocols in place to have an independent team remove and segregate privileged material from the prosecution team's possession, and went a step further in actually reviewing and then producing privileged materials.

## B. The January 2021 Indictment and the Prosecution's Productions.

Following the dismissal of the first prosecution, the current prosecution team petitioned for appointment of a one-person grand jury, and ultimately obtained indictments of Mr. Lyon and others. Soon after, counsel for Mr. Snyder confirmed that the prosecution used no taint or filter team to review potentially privileged material seized in connection with the 2019 search warrants. See **Ex. 6**, 1/20/21 Email from Hammoud. On April 2, 2021 the Civil AAGs contacted SG Hammoud after *learning from newspaper reports* that privileged materials seized in the search warrants were being produced in this matter and notified her that they continued to assert privilege over the "thousands of privileged communications between the [civil] assistant attorneys general and their client agencies" that had been seized and were being produced. See **Ex. 7,** 4/2/21 Email to Hammoud. The Civil AAGs further requested that the prosecution team notify the defendants that the Civil AAGs would be requesting the return of any privileged documents. *Id.* While SG Hammoud provided this communication to AG Nessel on April 15, 2021, no claw backs of the privileged materials have been requested by the prosecution or the Civil AAGs. Finally, on April 13, 2021, after receiving the prosecution's first production, counsel for Mr. Snyder alerted the prosecution that their production included privileged documents and requested that an independent taint team be assembled to evaluate the privileged documents. See **Ex. 8,** 4/13/21 E-mail to Hammoud. No such taint team was assembled.

While the prosecution has publicly stated that they have approximately 21 million documents for production, only approximately four million have been produced to Mr. Lyon to date. Although Mr. Lyon is still in the process of reviewing the four million documents provided, the review to date has identified documents and communications subject to his attorney-client privilege with both his criminal and civil counsel, privileged communications with MDHHS's internal and external counsel, communications with other parties subject to the common interest

privilege, attorney work product specifically related to the facts underlying the allegations in this matter, and communications subject to privileges of other defendants, including Dr. Wells, Mr. Baird, Mr. Agen, and Mr. Snyder. Notably, and as if to emphasize the contrast between the productions made to OSC and the improper approach employed by the current prosecution team, the prosecution has reproduced documents with OSC Bates numbers where the document was redacted for privilege by MDHHS prior to production to OSC, while simultaneously producing the complete, unredacted privileged email elsewhere in their production.

Mr. Lyon estimates that there are at least 20,000 privileged documents contained in the prosecution's production to date. By way of example, the report attached as **Ex. 9** illustrates the results of searches for only a few of the privilege-related terms that have been run in the production. This includes over 12,000 hits on the terms "attorney w/2 privilege," over 5,000 hits on the term "attorney work product," over 600 emails including Mr. Lyon's criminal counsel, and over 4,600 emails including *just one* of the Civil AAGs representing Mr. Lyon in the civil matters.[1] While Ex. 9 may give the Court a sense for the scale of the issue, such searches only go so far in identifying the privileged material involved. Mr. Lyon's review of the production remains ongoing, but thus far has identified the following categories of privileged communications:

- Communications between Mr. Lyon, his civil counsel, and his criminal counsel regarding responses to requests for information from state and federal agencies;

- Communications between Mr. Lyon, his civil counsel, and criminal counsel regarding legal strategy and preparation for testimony before Congress regarding Flint water matters;

- Communications between MDHHS and its civil and criminal counsel regarding Flint water matters and common interest communications;

- Communications between MDHSS and its civil and criminal counsel including draft legal documents and communications; and

[1] The Report also includes terms related to Mr. Snyder's counsel, Dr. Wells' counsel, internal and external counsel for MDHHS, and several of the Civil AAGs representing Mr. Lyon and MDHHS.

- Communications between parties to the common interest agreement regarding Flint water matters, including draft documents.[2]

Further, according to the prosecution, the four million documents represent *only 20% of the documents the prosecution has indicated it will produce in this matter*. Mr. Lyon and the other defendants have no way of knowing what privileged materials are contained in the remaining documents that the prosecution has reviewed and apparently intend to produce.

The prosecution's indiscriminate seizure, review, and production of privileged information also resulted in the production of confidential mediation materials related to the Detroit Bankruptcy, which led Mr. Snyder to file a motion for contempt and an evidentiary hearing in that matter. Mr. Snyder's request for discovery is currently pending in that court. While the bankruptcy court is concerned with the production of documents subject to its own protective order, that is not the primary issue with the prosecution's unethical conduct. In contrast to the systematic, reasonable approach that was utilized with the previous prosecution team for the OSC subpoenas, the prosecution has chosen to run roughshod over the privileges and constitutional rights of Mr. Lyon, the other defendants, and the other parties to the common interest agreement. Despite being warned on multiple occasions and by multiple parties, including the Civil AAGs, that they had seized privileged materials, the prosecution has decided that the rules do not apply to them, and that they are under no obligation to respect rights to free and frank communication with counsel. This misconduct has violated Mr. Lyon's right to due process and Sixth Amendment right to counsel *with regard to matters directly at issue in this case*. Moreover, this conduct violates the DAG conflict wall that is required to protect the integrity of both the civil and criminal matters.

---

[2] A privilege log identifying a representative sample of these documents, along with copies of those documents, is available for *in camera* review upon request.

At this point, it is important to determine the scope of dissemination of privileged and protected information within the prosecution team, including (1) what documents were seized; (2) who in the prosecution team has reviewed privileged material, and how far the taint has spread through the DAG; (3) what, if any precautions the prosecution took to avoid reviewing or using privileged material; and, most critically (4) whether, after this intrusion into privileged relationships, it is possible for Mr. Lyon to have a fair trial in this matter.

## III.    LAW AND ARGUMENT

### A.    Legal Standard.

Pursuant to MCR 6.201(E), "**On motion and a showing of good cause**, the court may enter an appropriate protective order . . . .  If the court grants a protective order, it must seal and preserve the record of the hearing for review in the event of an appeal."  MCR 6.201(E) (emphasis added).  See also *Dep't of Health & Human Services v Genesee Cty Circuit Judge*, 318 Mich App 395, 408-409 (2016) (MCR 6.201(E) requires a showing of good cause for the entry of a protective order).  Moreover, pursuant to MCR 6.201(C)(1), "there is no right to discover information or evidence that is protected from disclosure by constitution, statute, or privilege, including information or evidence protected by a defendant's right against self-incrimination, except as provided in subrule (2)."  If a party fails to comply with the requirements of MCR 6.201, such as those prohibiting discovery of privileged information, the court may craft an appropriate remedy, including ordering the party to provide the discovery not previously disclosed, granting a continuance, prohibiting the party from introducing into evidence the material not disclosed, "or enter[ing] such other order as it deems just under the circumstances."  MCR 6.201(J).  When determining the appropriate remedy for discovery violations, trial courts must balance the interests of courts, the public, and the parties in light of all relevant circumstances, including reasons for noncompliance.  *People v Banks*, 249 Mich App 247, 252; 642 NW2d 351 (2002).

**B.    The Prosecution has Seized, Reviewed, and Produced Materials in Violation of the Attorney-Client Privilege and Work Product Doctrine in Violation of the Michigan Court Rules, State and Federal Law, and the Conflict Wall.**

1.    The Prosecution's Invasion of the Attorney-Client and Work Product Privileges of Other Parties is Contrary to State and Federal Law.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." See *Leibel v Gen Motors Corp*, 250 Mich App 229, 237; 646 NW2d 179 (2002) (quoting *Upjohn v United States*, 449 US 383, 389 (1981)). The privilege "recognizes that sound legal advice and advocacy serves public ends and that such advice or advocacy depends on the lawyer's being fully informed." *Id.* It is "based upon the wise policy that considers the interests of society are best promoted by inviting the utmost confidence on the part of the client in disclosing secrets to the professional adviser." *People v Joly*, __ NW2d ___, 2021 WL 935704 at *3 (Mich Ct App Mar 11, 2021) (internal citations omitted).[3] "The purpose of the privilege is to allow a client to confide in his or her attorney secure in the knowledge that the communication will not be disclosed." *People v Waclowski*, 286 Mich App 634, 693-94; 780 NW2d 321 (2009). The privilege is personal to the client, and only the client can waive it. *Id.*

Similarly, under the attorney work-product doctrine, "any notes, working papers, memoranda, or similar materials, prepared by an attorney in anticipation of litigation are protected from discovery." *Leibel*, 250 Mich App at 244. Courts have long held that "[i]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v Taylor*, 329 US 495, 510 (1947). Such "work is reflected . . . in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways." *Id.* at 511. "At its core, the work-product

---

[3] A copy of this case is attached hereto as **Ex. 13.**

doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v Nobles*, 422 US 225, 238 (1975).

The "common interest" privilege applies when parties who would otherwise not share privileged communications "undertake a joint effort with respect to a common legal interest." *Estate of Nash by Nash v City of Grand Haven*, 321 Mich App 587, 596; 909 NW2d 862 (2017). The common interest doctrine is limited to communications made to further an ongoing enterprise, but communications subject to the common interest doctrine are not required to be made in anticipation of litigation. *Estate of Nash*, 321 Mich App at 596. Michigan courts have applied the common interest doctrine to both the attorney-client and work product privileges. See *id.* at 598 (applying the common interest doctrine to the attorney-client privilege); *D'Alessandro Contracting Grp, LLC v Wright*, 308 Mich App 71, 783-84; 862 NW2d 466 (2014) (applying the common interest doctrine to attorney work product).

Courts have long recognized the invasion of the attorney-client and work privileges by the government in a criminal case may violate the Sixth Amendment right to counsel and the right to due process. See *United States v Voigt,* 89 F3d 1050, 1067-68 (CA 3 1996) (finding that invasion of the attorney-client privilege violates the Sixth Amendment where (1) the government is objectively aware of an ongoing, personal, attorney-client relationship between and attorney and the defendant; (2) the government deliberately intruded upon that relationship; and (3) the defendant was prejudiced by the intrusion). See also *United States v Neal*, 952 F Supp 834, 839 (DDC 1997) ("One of the principal purposes of the attorney-client privilege is to promote the free and open exchange between the attorney and client, and substantial questions of fundamental fairness are raised where, in connection with a criminal prosecution, the government invades that privilege"). Moreover, the "Supreme Court has recognized that the work-product doctrine is vital

to assur[e] the proper functioning of the criminal justice system in that it provides a privileged area within which a lawyer can analyze and prepare his client's case." See *id.* at 174.

Some violations of the attorney-client and work product privileges have been so severe as to lead to the exclusion of key evidence, disqualification of prosecutors, and even dismissal of criminal cases. See *United States v Horn*, 811 F Supp 739, 753 (DNH 1992) (disqualifying lead prosecutor who instructed copy vendor to obtain copies of protected attorney work product, which were reviewed even after warnings from the defense); *Joly*, 2021 WL 935704 at *7-*8 (excluding evidence after finding that a defendant's right to due process was violated where government analyst reviewing computer seized in search warrant purposefully accessed privileged communication and used the information to locate key evidence of arson); *Shillinger v Haworth*, 70 F3d 1132, 1143 (CA10 1995) (noting that dismissal may be appropriate in cases involving "extreme" invasions of privilege); *State v Robinson*, 209 A3d 25, 60 (Del 2019) (disqualifying prosecution team and ordering destruction of government trial preparation materials where the prosecution had reviewed privileged documents detailing defense strategy seized in a search warrant of defendant's jail cell).

   2.   The Prosecution Improperly Collected, Reviewed, and Produced Mr. Lyon's Privileged Materials and Communications.

The prosecution violated the privileges of Mr. Lyon and others through their review and production of privileged materials. It is also undisputed by the prosecution that they took no steps to mitigate the risk of violating the defendants' rights and tainting their own case through the review of privileged materials.

It is common in criminal cases for search warrants to result in the discovery of privileged materials. For this reason, prosecutors executing warrants typically employ "taint" or "filter teams," that is, teams of prosecutors and/or agents unconnected to the investigation or prosecution

who can review and evaluate potentially privileged material without passing it to the investigators or prosecutors. See *Joly*, 2021 WL 935704 at *7 ("In the case where a potentially privileged communication does get caught up in an otherwise lawful search, there are also steps that can be taken to identify and segregate privileged information from the rest, including filter agents or taint teams"). See also *In re Grand Jury Subpoenas*, 454 F3d 511, 522-23 (CA6 2006) (noting that "taint teams" are often used when "the potentially-privileged communications are already in the government's possession, and so the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege").[4]

The prosecution failed to employ a taint team or other screening procedure when conducting the search warrants in this matter, even after being warned *at the time* that the documents seized would include privileged material. See Ex. 1, 5/28/19 Letter to Hammoud; see also Ex. 6, 1/20/21 Email from Hammoud. They were also aware that the documents seized in the search warrants contained privileged communications, as they had been warned by both the Civil AAGs and, again, by defense counsel. See Ex. 7, 4/2/21 E-mail from Kuhl to Hammoud; Ex. 8, 4/13/21 E-mail from Lennon to Hammoud. Moreover, it was obvious that the seized documents from the discovery vendor were privileged, given the pendency of the investigation and previous prosecution, as well as the fact that prosecution already had in their possession the privilege logs prepared in connection with the previous productions. Despite the well-established law regarding privilege, the prosecution intends to continue reviewing, utilizing, and producing the privileged

---

[4] Importantly, some courts have even frowned upon the practice of using taint or filter teams in matters where significant numbers of documents may be privileged, finding that allowing prosecutors and agents, even those unconnected to an investigation, to rifle through privileged materials and to exercise their own judgment as to whether a document is privileged is akin to leaving "the government's fox in charge of guarding the [target's] henhouse." *In re Search Warrant Issued June 13, 2013*, 942 F3d 159, 179 (CA4 2019) (finding that the "appearance of unfairness" arising from use of filter team of prosecutors and federal agents was "especially apparent" where the prosecutors were employed by the same judicial district where clients of the searched law firm were being investigated by federal officials).

materials seized in the search warrants. Without a protective order, the prosecution will continue their abuse of the criminal investigation process and continue to violate defendants' rights.

### 3. The Prosecution Violated the Conflict Wall.

This case presents the unique situation where attorneys from the same office are both prosecuting and defending Mr. Lyon. Such an arrangement is only permissible if the Attorney General's Office maintains a strict conflict wall preventing any contact or communication between the criminal and civil teams. "An attorney owes undivided allegiance to a client and usually may not represent parties on both sides of a dispute." *Atty Gen v Mich Pub Serv Com'n*, 243 Mich App 487, 501; 625 NW2d 16 (2000). This maxim is based on Michigan Rule of Professional Conduct 1.7, which prohibits an attorney from representing a party adverse to a current client <u>unless (1) the attorney reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation.</u> MRPC 1.7(a). This rule represents a "frank recognition that, human nature being what it is, a dual relationship involving adverse or conflicting interest, constitutes *an enormous temptation to take advantage of one or both parties to such a relationship.*" *Barkley v Detroit*, 204 Mich App 194, 203; 514 NW2d 242 (1994) (emphasis added). While courts have recognized that the Attorney General holds a "unique role" given the responsibility to represent "the various and sometimes conflicting interests of numerous government agencies," that role does not exempt the Attorney General from the rules of professional conduct. *Mich Pub Serv Comm'n,* 243 Mich App at 507. This is consistent with DAG's Conflict Policy, which is designed to "prevent conflict disqualification of the Department in any matter where one or more conflicts occur and to facilitate departmental compliance with applicable ethical standards." See **Ex. 10**, Conflict Policy at 1. The policy imposes specific restrictions on matters involving conflicts between department divisions, including requiring that

employees "take necessary steps to prevent the screened staff members from viewing documents or material related to the screened matter, except as would occur in the ordinary course of the representation if the screened member were employed by a law firm or entity representing an opposing party." *Id.* at 8.

The prosecution acknowledges this conflict wall requirement, and claims to have followed it. Since the outset of the investigation, the criminal prosecutors in this matter, both from the OSC and the current team, have purportedly been subject to a "conflict wall" screening them from the ongoing Flint water civil matters. See Ex. 2, First Conflict Notice; **Ex. 11,** 5th Amended Conflict Notice. The DAG website extolls the virtues of this conflict wall, declaring that it "prohibits the exchange of information between staff on either side of the conflict wall, allowing those on the civil litigation side of the wall to uphold the office's responsibilities in serving as legal counsel for state agencies and officials, while also allowing the criminal prosecution team to proceed with the independent investigation." See **Ex. 12**, Dep't of Attorney General, "Investigation Conflict Wall." The DAG further states that the wall "prohibits the two sides from engaging in discussions concerning their respective efforts and ensures the ethical integrity of both civil proceedings and criminal prosecutions." *Id.*

Despite these clear prohibitions, the prosecution indiscriminately seized and reviewed privileged materials including the Civil AAGs *who continue to represent Mr. Lyon, MDHHS, and the other defendants and agencies to this day.* This includes emails in which the Civil AAGs explicitly provide legal advice to their clients, including Mr. Lyon. These communications have been reviewed and produced despite unsuccessful attempts from the Civil AAGs to claw back the privileged materials. See Ex. 7, 4/02/21 Email to Hammoud. Far from "ensuring the ethical integrity of both [the] civil proceedings and criminal prosecutions," the prosecution apparently

determined that the conflict wall does not apply to their investigation and have reviewed and utilized privileged communications in direct violation of the wall. Such violations of conflict rules may lead to the disqualification of prosecutors. *See People v Davenport,* 280 Mich App 464, 470; 760 NW2d 743 (2008) ("The Trial Court should be promptly informed of a defense attorney's move to the prosecutor's office, and it should inquire into the matter and order an appropriate safeguard, such as disqualifying the individual attorney affected by the conflict of interest, or the entire prosecutor's office, if necessary").[5]

    **C.**    **A Protective Order and Discovery Are Necessary to Stop the Continued Violation of Mr. Lyon's Rights and to Determine the Scope of the Dissemination of Privileged Information.**

It is undisputed that (1) the prosecution are in the possession of privileged materials belonging to Mr. Lyon and others, including privileged information that was obtained in violation of the Conflict Wall; (2) the prosecution has reviewed and produced a portion of that privileged material; and (3) the prosecution intends to continue reviewing, producing, and ultimately utilizing privileged materials. Having demonstrated good cause, Mr. Lyon moves for the entry of a Protective Order pursuant to MCR 6.201(E) to immediately enjoin the prosecution from reviewing or producing any additional documents in their possession, until a proper protocol can be developed to ensure that the privileged material is reviewed and evaluated by a party outside the prosecution team, with Mr. Lyon being given the ability to object to such determinations.

---

[5] See also *Michigan Public Service Com'n*, 243 Mich App at 517-518 (finding a conflict of interest pursuant to MRPC 1.7 where the Attorney General acted as a party litigant while actively representing the defendant agency even where a conflict wall allegedly separated the attorneys for the parties). Further, prosecutors occupy a special position in our system of jurisprudence to "obtain justice, not merely to convict;" and to preserve "public confidence in the impartiality and integrity of the criminal justice system." *People v Doyle*, 159 Mich App 632, 643-644; 406 NW2d 893 (1987, mod in part on other grounds on reh 161 Mich App 743; 411 NW2d 730 (1987); *see also* Comments to Michigan Rule of Professional Conduct 3.8 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.") Indeed, the prosecutor's "duty of impartiality" has been described as "not altogether unlike that of the judge himself." *Meister v People*, 31 Mich 99, 104 (1875).

Further, based on the information known to date, the prosecution has violated Mr. Lyon's rights under state and federal law, as well as the conflict rules created to ensure the integrity of this prosecution. What is unknown is who on the prosecution team has been tainted by the review of improper evidence, what additional privileged materials are in the possession of the prosecution, and most importantly, whether there is any remedy that makes it possible for Mr. Lyon to have a fair trial in this matter. Accordingly, Mr. Lyon moves the Court to exercise its discretion under MCR 6.201(J) to enter an order allowing Mr. Lyon to seek discovery in the seizure, review, and production process employed by the prosecution to date, in order to determine the scope of the violation of his rights and the appropriate remedy for the violation. In particular, Mr. Lyon needs to know the extent of the prosecution's review of his privileged materials to determine if the prosecution team should be disqualified. Such discovery should therefore include, at minimum, (1) written interrogatories; (2) written requests to admit; (3) written requests for production of documents; (4) depositions of representatives of the prosecution with knowledge of the review and production process; and (5) an evidentiary hearing where the prosecution is required to present evidence regarding the seizure, review, and production of materials in this matter. Mr. Lyon further requests that the Court set a status conference to determine the scope of the discovery.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Lyon respectfully requests that this Court (1) enter a Protective Order barring the prosecution from reviewing or producing any seized documents in this matter until a protocol can be established to allow for the proper evaluation of the privileged material, (2) enter an order authorizing defendants to seek discovery into the prosecution's seizure, review, and production of the privileged documents, and (3) set a status conference to discuss the proposed discovery into the taint issue and the appropriate protocol for the review of the documents

for privilege by an outside party, including a mechanism to allow Mr. Lyon and other defendants to object to privilege determinations made during the review process.

VARNUM LLP
Attorneys for Defendant Lyon

Date: September 7, 2021

By: _____
Ronald G. DeWaard (P44117)
333 Bridge St NW Ste 1700
Grand Rapids, Michigan 49504
(616) 336-6000

WILLEY & CHAMBERLAIN LLP
Attorneys for Defendant Lyon
Charles E. Chamberlain (P33536)
Britt M. Cobb (P69556)
300 Ottawa Avenue, N.W., Suite 810
Grand Rapids, Michigan 49503-2314
(616) 458-2212

# Exhibit 11

# Exhibit D-22

| Date | To | From | CC | Subject | ID | Privilege Description |
|---|---|---|---|---|---|---|
| 2/24/2016 | Valerie Brader* | Todd Mendel* | Brian Lennon*, Travis Weber*, Paul Smith* | RE: Flint Emails - ATTORNEY WORK PRODUCT | AG_SG_PROD0016_0000026364 | Attorney client privileged and work product privileged communication regarding the review and production of documents, including privilege review |
| 1/15/2016 | Rick Snyder | James Redford* | Jarrod Agen, Allison Scott | ATTORNEY CLIENT PRIVILEGE -- DRAFT DOCUMENT -- ATTORNEY WORK PRODUCT NOT SUBJECT TO FOIA OR DISCOVERY | AG_SG_PROD0016_0000093340 | Attorney client privileged and work product privileged communication attaching a draft timeline for Flint water issues |
| 1/28/2016 | Rick Snyder, Allison Scott | James Redford* | | Privileged Communication - Litigation strategy Related - Attorney Client Communication and Attorney Work Product | AG_SG_PROD0020_0000014058 | Attorney client privileged and work product privileged communication attaching a memo regarding legal strategy in Flint Water case |
| 3/15/2016 | Rick Snyder, Allison Scott | Valerie Brader* | Mark Paoletta*, Michael Brownfield* | Summary of hearing, key EPA e-mail (Fwd: Attorney Client Privileged/Work Product Privileged) | AG_SG_PROD0020_0000548127 | Attorney client privileged and work product privileged communication attaching summaries of testimony and an assessment from counsel of next steps |
| 2/24/2016 | Andrew Banas*, Margaret Nelson* | Brian Lennon* | Valerie Brader*, Peter Manning*, Todd Mendel*, Charles Ash*, Scott Carvo*, Adam Cefai* | ATTORNEY-CLIENT COMMUNICATION & WORK PRODUCT PURSUANT TO JDA - Document production by Friday | AG_SG_PROD0022_0000371440 | Attorney client privileged communication regarding redactions of documents before production |
| 2/24/2016 | Valerie Brader*, Travis Weber*, Brian Lennon*, Charles Ash* | Scott Carvo* | | RE: Flint | AG_SG_PROD0022_0000371453 | Attorney client privileged communication regarding document production |
| 2/29/2016 | Valerie Brader*, Brian Lennon* | Todd Mendel* | | RE: UptonPalloneResponse022916 - attorney work product | AG_SG_PROD0022_0000371823 | Attorney client privileged and work product privileged communication regarding draft response letter |
| 3/1/2016 | Charles Ash*, Andrew Banas*, Jennifer Paris* | Richard Kuhl* | Margaret Nelson*, Brian Lennon*, Scott Carvo*, Todd Mendel*, Valerie Brader*, Travis Weber* | RE: Search Terms - Attorney Client Privileged Communication and Pursuant to JDA | AG_SG_PROD0022_0000371848 | Attorney client privileged communication regarding document review and production |
| 3/13/2016 | Michael Brownfield, Valerie Brader*, Brian Lennon* | Mark Paoletta* | Irene Sherman* | Gov Snyder timeline | AG_SG_PROD0022_0000372237 | Attorney client privileged and work product privileged communication attaching a draft timeline related to Flint water |
| 4/2/2016 | Valerie Brader* | Brian Lennon* | | Re: ATTY CLIENT: Subpoena | AG_SG_PROD0022_0000372612 | Attorney client privileged communication regarding subpoena |
| 5/3/2016 | Valerie Brader* | Madelaine Lane* | Travis Weber*, Charles Ash* | FW: Confidential and Privileged Communication: First batch of documents for your review | AG_SG_PROD0022_0000373119 | Attorney client privileged and work product privilegd communication regarding privilege review before document production |
| 3/9/2016 | Brian Lennon* | Valerie Brader* | Jarrod Agen, Elizabeth Clement*, Michael Brownfield* | Fwd: Updated spoken testimony - ATTORNEY-CLIENT PRIVILEGED | AG_SG_PROD0022_0000373771 | Attorney client privileged and work product privileged communication attaching draft testimony |
| 4/2/2016 | Brian Lennon* | Valerie Brader* | Morely Witus*, Todd Mendel* | Fwd: 3 issues - Privileged and Confidential Attorney/Client Communication and Work Product | AG_SG_PROD0022_0000374072 | Attorney client privileged and work product privileged communication attaching draft memoranda related to Flint |
| 5/6/2016 | Travis Weber*, Elizabeth Clement* | Madelaine Lane* | Charles Ash*, Scott Carvo*, Eric Jamison*, Julie Hartzler* | Fwd: Flint water - discussion of documents Confidential and Privileged Communication (Subject to JDA) | AG_SG_PROD0022_0000383790 | Attorney client privileged and work product privileged communication regarding document review and production |
| 5/5/2016 | Madelaine Lane*, Eric Jamison*, Andrew Banas*, Adam Cefai* | Scott Carvo* | Charles Ash*, Brian Lennon* | RE: Confidential and Privileged Communication (Subject to JDA) -- Conference Call - PRIVILEGED AND CONFIDENTIAL -- DO NOT DISCLOSE IN RESPONSE TO FOIA OR DISCOVERY REQUESTS | AG_SG_PROD0022_0000383791 | Attorney client privileged and work product privileged communication regarding document review and production |

# Exhibit 12

**Manning, Peter (AG)**

| | |
|---|---|
| **From:** | Manning, Peter (AG) |
| **Sent:** | Wednesday, February 13, 2019 12:37 AM |
| **To:** | Hammoud, Fadwa (AG) |
| **Subject:** | RE: Possible Flint documents |

I would be nice to meet you in person. I am pretty tied up between 9:30 and 2:30 but am happy to try to make time.

Peter

**From:** Hammoud, Fadwa (AG) <HammoudF1@michigan.gov>
**Sent:** Wednesday, February 13, 2019 12:25 AM
**To:** Manning, Peter (AG) <ManningP@michigan.gov>
**Subject:** Re: Possible Flint documents

Peter,

Thank you for forwarding this information. I will discuss with my team and call you tomorrow. I plan to be in Lansing tomorrow so maybe we can meet briefly to discuss.

My best,

Fadwa

**From:** Manning, Peter (AG)
**Sent:** Wednesday, February 13, 2019 12:15:03 AM
**To:** Hammoud, Fadwa (AG)
**Subject:** FW: Possible Flint documents

Fadwa,

I'm sorry it took me a while to get this to you. I have a few irons in the fire myself.

Eric Jamison's description of the contents of the boxes and the context for how they came to be located in storage at DTMB is below. The boxes are in the AG evidence room in the Williams Building and won't go anywhere until you decide how you want to proceed.

We can discuss when you have a chance.

Peter

**From:** Jamison, Eric (AG) <JamisonE@michigan.gov>
**Sent:** Tuesday, February 12, 2019 4:06 PM
**To:** Manning, Peter (AG) <ManningP@michigan.gov>; Kuhl, Richard (AG) <KuhlR@michigan.gov>
**Cc:** Morse, Stephen (AG) <Morses1@michigan.gov>; Teter, Scott (AG) <TeterS@michigan.gov>; Root, Alexander (AG) <RootA@michigan.gov>
**Subject:** RE: Possible Flint documents

Peter:

I spoke with Mr. Christensen this morning to find out more about the contents and location of the boxes. According to Mr. Christensen, after a meeting between DTMB and DEQ, he was asked to provide a storage location for some Flint Water related information. Mr. Christensen indicated that he was not asked to "hide" the boxes and that the boxes were not stored in the old chiller plant. The boxes of information were stored at the Central Control office. The boxes were delivered to Mr. Christensen by Mike Marshall who worked at DEQ, and who was responsible for Flint Water document preservation and collection efforts. Mr. Marshall no longer works for DEQ, but works at MSP as a digital forensic analyst. I spoke with him this afternoon.

According to Mr. Marshall, the boxes contain two categories of information. The first category of information is external hard drives with back-up copies of forensic images of computers from DEQ staff involved with Flint. DEQ or DTMB Cyber Security have the original images - the information on the external hard drives is simply a back-up copy.

The second category of information, is non-Flint related records removed from Steven Bush's or Mike Prysby's office. According to Mr. Marshall, after Mr. Bush and Mr. Prsyby were placed on leave, he was tasked with clearing out their offices. AAG Megan Miller, and Sarah Shultz a paralegal from our office, went through the contents of Mr. Bush's and Mr. Prysby's office with Mr. Marshall. Any documents that were related to Flint Water were given to Mr. Marshall for preservation, and anything else was placed in a box. According to Mr. Marshall, the documents in the boxes stored by DTMB are the non-Flint related documents. My understanding is that Mr. Marshall has already provided us with any relevant Flint related documents from Steven Bush's or Mike Prysby's office.

Agent Morse from our office picked up the boxes this morning. There are approximately 24 boxes. AAG Root, Sara VanOrd, our paralegal, and I briefly reviewed the contents of the boxes this afternoon. The contents appear to be consistent with the explanations provided by Mr. Christensen, Mr. Marshall, and AAG Miller. The date range of the documents is from the 1990's through 2017 and contain the typical types of documents you'd expect to find in someone's office – industry information, training materials, binders of various documents, text books, HR records, etc. I do note that there were two boxes that contained flyers about the drinking water in Flint that appear to have been mailed to Flint residents, but were returned as undeliverable. I do not believe that these are relevant to the litigation.

I do not think that it is necessary to review the documents again. I also don't believe that it is necessary for the information to be held in the evidence room by our Special Agents. Aside from the hard drives which we should maintain in the eDiscovery file, the non-Flint related information from Steven Bush's or Mike Prysby's office can be returned to DEQ for handling in accordance with the applicable document retention schedules.

Please let me know if you agree with the approach above.

Eric M. Jamison
Michigan Department of Attorney General
State Operations Division
(517) 335-7573 – Main line **(NEW NUMBER)**
(517) 335-7616 – Direct dial **(NEW NUMBER)**
Jamisone@michigan.gov

---

**From:** Manning, Peter (AG) <ManningP@michigan.gov>
**Sent:** Monday, February 11, 2019 10:53 PM
**To:** Teter, Scott (AG) <TeterS@michigan.gov>
**Cc:** Morse, Stephen (AG) <Morses1@michigan.gov>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Grossi, Christina (AG) <GrossiC@michigan.gov>; Jackson, Jennifer (AG) <JacksonJ5@michigan.gov>; Jamison, Eric (AG) <JamisonE@michigan.gov>
**Subject:** FW: Possible Flint documents

Scott,

I'm sorry I had to pull your division into what may be a wild goose chase but, assuming they exist, the AG would like us to get custody of the boxes we discussed earlier today. The one thing that has changed since I spoke to you and Steve is that State Police will not be involved.

The obvious sensitivity in this situation is that the person claiming the boxes exist, Mr. Christensen (this is the correct spelling), is involved in an employment dispute with DTMB, and the person who allegedly told him to "hide" the boxes is the current deputy director of DTMB. Mr. Christensen is still employed with DTMB so it may be possible to contact him and get the information from him, but I don't know if and how we can get access to the area where the boxes were allegedly taken.

I defer to you and Steve on how to handle this best, but ENRA is happy to help to the extent we can.

Peter

---

**From:** Nessel, Dana (AG) ██████████████
**Sent:** Monday, February 11, 2019 6:21 PM
**To:** Manning, Peter (AG) <ManningP@michigan.gov>; Keenan, Kelly (AG) <KeenanK@michigan.gov>; Moody, Laura (AG) <MoodyL@michigan.gov>
**Subject:** Re: Possible Flint documents

Yes. Please make arrangements to take custody of the items immediately. We can discuss how to proceed after we have them.

Thanks for your quick work on this.

Dana

Get Outlook for iOS

---

**From:** Manning, Peter (AG) <manningp@michigan.gov>
**Sent:** Monday, February 11, 2019 6:15 PM

**To:** Nessel, Dana (AG); Keenan, Kelly (AG); Moody, Laura (AG)
**Subject:** Possible Flint documents

I spoke to Kelly about an issue briefly this afternoon, and now have more information. Richard Kuhl was informed by the Governor's office that there may be twelve boxes with hard drives, other hardware, and documents related to Flint in the basement of a state office building. Because nothing can be straight-forward when it involves Flint, this information was relayed to the Governor's office through the following chain:

- Chris Christiansen is the former head of DTMB's Office of Cybersecurity and Infrastructure Protection. Mr. Christianson has apparently been demoted and is in an employment dispute with DTMB. He told his employment lawyer that the current Deputy Director of DTMB, Brom Stibitz, told him to put the boxes in the basement of the old "chiller plant" (the corner of Allegan and Pine Streets)
- The employment lawyer, with her client's permission, told the former chief of staff to Governor Snyder, Rich Baird.
- Rich Baird called the current head of State Police, Colonel Joe Gasper (who was the head of former Governor Snyder's security detail)
- Colonel Gasper called the Governor's legal counsel, who called Richard

Leaving aside the soap operatic way the information got to us, the civil side of the conflict wall in our office has issued litigation holds to all of the relevant state agencies and has custody of all of the agency documents related to Flint. Our office has provided those documents, on behalf of the state, for the past three year to parties in the civil litigation, the U.S. Attorney's Office, the Office of Special Counsel, and the U.S. House Committee on Oversight and Governmental Reform. Given our role as the custodian of Flint related documents for the state, I recommend that we have an AG investigator (Scott Teter has volunteered Stephen Morse) determine where the boxes are and take custody of them so whatever is in them can be reviewed. If it is previously unknown information, it should be processed and disclosed.

We should inform Fadwa of the situation but I assume the criminal side won't want anything to do with it because of the potential that evidence could be tainted. After the documents have been reviewed (there could be nothing there, it may be unrelated to Flint, it may contain documents we already have, etc.), the office can determine whether there is an issue that needs to be investigated.

Please let me know if you concur.

Peter