**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## RESPONSE TO CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE UAAL IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN [ECF NO. 13602]

The Police and Fire Retirement System of the City of Detroit, Michigan (the "PFRS"), through its counsel, hereby responds in opposition to the City of Detroit's *Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan*. In support of its Response, the PFRS relies on the Brief and exhibits attached herein.

Respectfully submitted,

By: */s/ Jennifer K. Green*
    Jennifer K. Green
    Clark Hill PLC
    151 S. Old Woodward, Ste 200
    Birmingham, MI 48009
    (248) 988-2315
    jgreen@clarkhill.com
    *Attorney for Creditor – PFRS*

Date: September 9, 2022

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## EXHIBIT LIST

Exhibit 1    None

Exhibit 2    None

Exhibit 3    Brief

Exhibit 4    Certificate of Service

Exhibit 5    None

Exhibit 6    Documentary Exhibits to Brief (summarized below):

    Exhibit A:    Emergency Manager Order No. 44 and PFRS Report

    Exhibit B:    Bowen Dep Transcript – July 1, 2014

    Exhibit C:    Kermans Dep Transcript - August 8, 2014

    Exhibit D:    Thomas Dep Transcript - July 15, 2014

    Exhibit E:    Hearing Transcript – September 15, 2014

    Exhibit F:    M. Kopacz Supplemental Report

    Exhibit G:    Hearing Transcript – September 29, 2014

    Exhibit H:    Moore Dep Transcript – July 24, 2014

    Exhibit I:    City of Detroit Legacy Report

    Exhibit J:    Gabriel Roeder Report – September 28, 2020

    Exhibit K:    Crain's Article dated March 7, 2022, "Duggan Budget Plan Includes Putting More Money in Retiree Protection Fund as Pension Cliff Nears"

# EXHIBIT 3 – BRIEF

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

City of Detroit, Michigan,

        Debtor.

Bankruptcy Case No. 13-53846

Judge Thomas J. Tucker

Chapter 9

## BRIEF IN SUPPORT OF RESPONSE TO CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE UAAL IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN [ECF NO. 13602]

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................1

II.  FACTUAL BACKGROUND..............................................................5

  A.  The Plan—as Part of the Grand Bargain—Required Formation of an
  Investment Committee With Authority to Determine Amortization.......................5

    (1)  The Plan's Treatment of the PFRS Claim Lacks an Amortization Term.......6

    (2)  The State Contribution Agreement.................................................8

    (3)  Composition and Authority of the Investment Committee............................9

    (4)  The Investment Committee's Authority to Select Amortization Periods
    Under the Plan Documents..................................................................9

    (5)  The Investment Committee's Authority to Select Amortization Periods
    Under Michigan Law ........................................................................11

    (6)  The DIA Settlement Terms Also Required Governance Changes...............13

    (7)  The Amended PFRS Plan Documents Under the Plan of Adjustment.........14

  B.  The Larger Extrinsic Records Reveals Why a 30-Year Amortization Period Is
  Absent from the Plan ............................................................................16

    (1)  The City's Plan Always Envisioned That the Economic Terms for the 2023
    Payment—Even the Amount—Were Subject to Change ..................................16

    (2)  The City's Expert Admits an Amortization Schedule Was Not Yet Set......19

    (3)  The City's Plan Is Bereft of a 30-YearAmortization Term Because Its Own
    Experts Did Not Support It .............................................................21

  C.  The PFRS, In Consultation With Advisors, Selects a 20-Year Amortization..26

  D.  The City Admits That It Lacks Control Over the Amortization Decision.......29

III.  LAW & ARGUMENT ...................................................................31

  A.  The Plan Does Not Require a 30-Year Amortization and Instead Gives the
  PFRS Unfettered Discretion to Determine the Applicable Period .........................31

    (1)  The Plan Documents Unambiguously Grant the PFRS the Power to Decide
    Amortization So Extrinsic Evidence Cannot Be Considered..............................31

i

(2) Even If Considered, the Extrinsic Evidence Is Unavailing ..........................33

B.   Any Request to Modify the Plan Fails Because the Plan Has Already Been
Substantially Consummated. ..................................................................................36

C.   The City Should be Estopped from Arguing Against Its Prior Positions ........37

D.   The City's Motion Is Procedurally Improper ..................................................39

# I.   INTRODUCTION

In the supreme irony for a so-called motion to "enforce a plan," the City cites no actual text—not one sentence—from the Plan of Adjustment (the "Plan") to support its claim that the Plan "requires" a 30-year amortization period for the upcoming payment to the PFRS.  Because it cannot rely on the Plan to support its position, the City instead resorts to extrinsic evidence—a financial projection from the confirmation trial—which is also unavailing, as it (i) states on its face that it was merely a "hypothetical" scenario for payment of the PFRS claim that was "subject to change," (ii) was one of 2,300 exhibits introduced at trial and was never incorporated into the Plan, (iii) was cited by the Court in its Confirmation Opinion only in passing, and (iv) whose author admitted at trial that the parties would have to "decide what the amortization methodology is of the UAAL at the year 10."  It is as though it was the City's "plan" in the colloquial sense—as in, its subjective intent—to use a 30-year amortization period, but it is confusing that with "the Plan"—as in, the formal legal document governing its exit from bankruptcy.  The City's unilateral intent, no matter how sincerely held, does not trump the four corners of the Plan.

Under the four corners of the Plan, the PFRS was granted exclusive authority to decide its own funding policies, specifically including "amortization periods" for any unfunded liability that the is the City's responsibility to pay.  The State Contribution Agreement entered into as part of Grand Bargain—which, unlike the financial

projection the City hangs it hat upon, *is* attached to the Plan and expressly incorporated into it—required that the Retirement Systems appoint an independent Investment Committee to make decisions precisely like the one at issue here. The Investment Committee's authority to select applicable amortization periods was not only part and parcel to the overall Plan, it was even codified into Michigan law in conjunction with the Plan. In fact, the City, as the plan sponsor and payor source for the pension funds— is *prohibited* by state law from steering the Investment Committee's decision because the City is deemed a "party in interest." In other words, the City is presumed biased and not an "independent fiduciary" to the PFRS, and therefore, it is forbidden from controlling this decision.

These governance changes were specifically negotiated during the bankruptcy, and for good reason—the parties to the Grand Bargain were seeking to avoid the prior turbulent history between the City and the two Retirement Systems, which included numerous lawsuits for nonpayment, the disastrous Certificates of Participation ("COPs") transaction, a takeover by an Emergency Manager, and ultimately, this bankruptcy in which the City threatened to force a drastic reduction in thousands of retirees' pension payment via cramdown. Accordingly, in exchange for its contribution of nearly $200 million to the City's coffers—the State demanded that the City not be permitted to steer the funding policy for the PFRS in the future. The State was prescient in this regard, as that is precisely what the City is attempting to do now

in this Motion: forcing the PFRS to accept a risky repayment schedule over three decades so the City can avoid its pension obligations and divert funds earmarked for the pensions to pay for other initiatives. The PFRS Investment Committee, though, exercising its fiduciary duties (and in complete lockstep with the PFRS Board of Trustees, who passed a resolution recommending adoption of the 20-year amortization period), determined it was more prudent for the PFRS to receive its money sooner than 30 years to shore up underfunding more quickly. The City's refusal to comply is proving the point—this Motion is a glaring example as to *why* the City is boxed out of this decision-making process.

While the Plan is silent as to the specific length of the applicable amortization period, it is not silent as to which party (the City versus the PFRS) gets to decide that issue. It is undisputedly the PFRS. In fact, Mayor Duggan's own statements to the media admit precisely this—he has openly complained about the "lack of control" the City has over this decision. But that is the deal the City struck. The City may now regret the deal it struck—but that was the deal. It is enshrined in the Plan of Adjustment, approved by this Court nearly a decade ago, long since substantially consummated under Section 1127 of the Bankruptcy Code, codified in Michigan law under Public Act 314—and enforceable by the PFRS. By asking this Court to enjoin the PFRS from setting its own funding policy, the City is not seeking "enforcement" of the Plan, it is actually seeking a wholesale modification of the Plan. And a tardy

one at that, as the Sixth Circuit already held years ago that the Plan was substantially consummated and also specifically ruled that the Grand Bargain cannot be unwound.

While the Plan is abundantly clear that the PFRS is entitled to make the call regarding its amortization policy—and therefore, evidence extrinsic should not be consulted—if the Court does consider evidence outside the four corners of the Plan, then **all** the extrinsic evidence needs to be weighed, not just one financial projection out of 2,300 documents at trial. When the larger record is reviewed, the reason that a 30-year amortization period is absent from actual text of the Plan is clear: because the City's own experts on its "Pension Task Force" testified that no amortization period decision had been made and that a shorter period is the better practice. Those experts actually agree with the PFRS actuary, the Investment Committee and the PFRS Board's position—a shorter amortization period is the more prudent funding policy.

Moreover, raising the specter of "feasibility" now gets the City nowhere. It is undisputed that the City *has* the money. To its credit, the City has set aside hundreds of millions of dollars in trust to fund the 2023 Payment. The issue is not whether the City can afford a shorter 20-year amortization—it admits it can—the issue is that the City would rather spend that money on other things. The PFRS Board has diligently implemented the Plan and complied with it to a tee, and its Investment Committee is functioning precisely how it was intended under the Plan. Unfortunately, as was all too common pre-petition, the City wants to ignore its pension obligations and divert the

cash to meet other needs—which was a recipe for disaster pre-bankruptcy. This is exactly what the Court-appointed feasibility expert, Martha Kopacz, warned against: "The City must be continually mindful that a root cause of the financial troubles it now experiences is the failure to properly address future pension obligations… if the City does not monitor the obligation that is going to be there in 2023… they could wake up with a bad nightmare, not unlike what they've been through with the pension systems to get to this point." The City's habit of reverting to the all-too-familiar routine of not paying its pension obligations as they become due should not be countenanced, and more importantly, the clear language of the Plan should not be ignored. The City's Motion should be roundly denied.

## II.    FACTUAL BACKGROUND

### A.    The Plan—as Part of the Grand Bargain—Required Formation of an Investment Committee With Authority to Determine Amortization

This Court, in confirming the City's Plan, emphasized that the "Grand Bargain" was the "cornerstone" of the entire Plan:

> [T]he Grand Bargain, which includes the State Contribution Agreement and the DIA settlement, is the cornerstone of the City's plan… Without these settlements, several other creditor settlements would also collapse. In addition, the approximately $816 million in outside funding provided as part of the Grand Bargain would not be available.

*In re City of Detroit*, 524 B.R. 147, 174-75 (2014). The Grand Bargain was a complex negotiated settlement involving at least twenty-seven different constituents, including the City, the State of Michigan (the "State"), the Official Committee of Retirees, the

GRS, the PFRS, the Detroit Institute of Arts (the "DIA"), two unions, seven employee and retiree associations, and fifteen charitable foundations (the "Foundations"). *Id.* at 169-70. It disposed of the City's largest creditor—the Retirement Systems—who had asserted a roughly $3 billion claim—and resolved two classes of creditor claims (Classes 10 and 11). *Id.* at 172-174. In exchange for funding from the State, the DIA, and the Foundations, extensive governance changes were required for both the GRS and PFRS. As will be set forth below, these governance changes divested the City of any ability to control the PFRS's funding policies (including any applicable amortization period) and granted that power exclusively to the Investment Committee and the Board within the PFRS.

### (1) The Plan's Treatment of the PFRS Claim Lacks an Amortization Term

While the City claims the Plan "requires" a 30-year amortization period, the Plan's treatment for Class 10 claimants (the PFRS Pension Claim) makes no mention of any amortization period—let alone a 30-year one. Instead, the Plan only states:

> **A.** Contribution to PFRS… ***After June 30, 2023***, (1) PFRS will receive certain additional DIA Proceeds and (2) *the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto.*

(Plan, Art. II(B)(3)(q)(ii)(A)) (emphasis added). At bottom, the only express economic term in the Plan regarding the lump sum payment owed by the City in 2023 was that the City would pay it. No other economic terms were included in the Plan for this

payment (hereafter, the "2023 Payment"), and there is no mention of a 30-year amortization.[1]  The City *did* expressly include amortization periods for other transactions contemplated in the Plan (*e.g.*, the New LTGO Bonds, the New B Notes, and the New C Notes)—but not for the PFRS Claim.  *Id.* at 282, 315, 348.

The Plan also required key changes to the PFRS "governance," including the advent of an Investment Committee:

> F.    Governance. On or as soon as reasonably practicable after the Effective Date, ***an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement…*** [.]

*Id.* at Art. II.B.3.q.ii.F (emphasis added). The State Contribution Agreement referenced in Paragraphs (A) and (F) was attached as an exhibit to the Plan and is therefore part of the Plan itself.  (Plan, Art. 1(283), pg. 23) (defining the "Plan" as "this plan of adjustment and All Exhibits attached hereto or referenced herein, as the same may amended, restated, supplemented, or otherwise modified").[2]

---

[1]    The only substantive term on a go forward basis for the PFRS under the Plan was a mandatory investment return assumption of 6.75% and that term was expressly stated in the Plan.  *Id.* at Art. II.B.3.q.ii.B.

[2]    The Confirmation Order—which the City repeatedly argues throughout its Motion is the "Plan"—is not part of the Plan.  In fact, the "Confirmation Order" is a separately defined term in the Plan. (Plan, Art. 1(72), pg. 7) (defining the "Confirmation Order" as the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented, or otherwise modified").

### (2) The State Contribution Agreement

The funding contribution from the State under the Plan—which was the net present value of $350 million payable over 20 years (or $194.8 million)—was expressly contingent upon "the governance terms and conditions set forth in the State Contribution Agreement" being adopted by both the PFRS and GRS. (Plan, Art. IV.D(1), (3); see also Plan, Exhibit I.A.332 - State Contribution Agreement, Recital F, pg. 1) ("the State has agreed, subject to the satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS…").

The most critical governance change under the State Contribution Agreement was the implementation of an Investment Committee:

> 2. <u>Governance Requirements of the GRS and PFRS</u>. At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "Investment Committee") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on Exhibit A and Exhibit B, respectively… [.]

(Plan, Ex. B thereto, State Contribution Agreement, ¶ 1, pg. 716 of 809). In the list of specifically identified "Conditions Precedent," the State once again reiterated that it was not obligated to contribute funds unless "the Court enters a final, non-appealable order confirming the Plan, that includes… [a] requirement that the governing documents of the GRS and the governing documents of the PFRS be amended to

8

include… the governance terms and conditions set forth in Paragraph 2, Exhibit A and B of this Agreement… [.]" *Id.* at ¶ 4(f)(ii)(a). The referenced "Exhibit B" is the "Investment Committee Governance" term sheet for the PFRS (the "Governance Term Sheet"). *Id.* at pg. 733 of 809.

### (3) Composition and Authority of the Investment Committee

Before the State would agree to contribute its nearly $200 million cash infusion to the Retirement Systems, it required that an Investment Committee be formed, comprised of five independent members, two active employee members, and two retirees—but no City representatives. The State Contribution Agreement required a truly independent board; one insulated from interference by the City as the plan sponsor. It explicitly forbid any of the "independents" from being a City appointee: "None of the Independent Members shall be a party in interest as defined by MCL 38.1132d(4)." *Id.* That statute, in turn, defines a "party in interest" as: "The political subdivision sponsoring the [pension] system." MCL 38.1132d(4)(c) (emphasis added).

Due to these governance changes, the City was unable to obtain majority control and was stripped of any power to "control" any particular vote of the Investment Committee.

### (4) The Investment Committee's Authority to Select Amortization Periods Under the Plan Documents

The Governance Term Sheet expressly granted the Investment Committee (via recommendations by the Investment Committee to the PFRS Board of Trustees) the

power to decide a proper amortization period, not the City:

> "Investment management" with respect to plan assets shall mean:
> ***
> 4. ***Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary***, including, but not limited to: (i) those underlying the restoration of pension benefits, ***funding levels and amortization thereof***, all in accordance with the Pension Restoration Program… (ii) ***those underlying the determination of annual funding levels and amortization thereof*** . . . [.]
> ***
> 8. Any interpretation of Plan documents, existing law, ***the POA, or other financial determination that could affect funding or benefit levels.***

*Id.* at pg. 737 of 809 (emphasis added). Thus, while the Plan is silent as to the specific length of the applicable amortization period, it is not silent as to which party (the City versus the PFRS) gets to decide the proper amortization period.

These governance changes are key to this Motion for three reasons. First, the Governance Term Sheet was expressly incorporated into the Plan and is enforceable as part of the Plan. Second, the State's funding obligation was contingent upon the Investment Committee being given authority to make "investment management decisions" so without these governance changes, the State would not have contributed its $194.8 million. Lastly, as set forth above, the Plan expressly states that the City's 2023 Payment must be made "in accordance" with these governance changes—which means that if the Investment Committee selects a 20-year amortization period for the

2023 Payment, the City must comply.[3]  If the PFRS Investment Committee and the PFRS Board (which are in complete agreement that a shorter amortization period is necessary) had capitulated to the City's recent demand for a longer 30-year amortization period, the PFRS would be in breach of the Plan.

### (5)  The Investment Committee's Authority to Select Amortization Periods Under Michigan Law

The State Contribution also required the Investment Committee to comply with Michigan's Public Employee Retirement Act ("PERA" or "Public Act 314"):

> The IC [Investment Committee] shall be an investment fiduciary to the PFRS.  An IC Member or other fiduciary under the PFRS shall discharge his or her duties with respect to the PFRS in compliance with the provisions of Public Act 314 of 1965, *as amended.*

*Id.* at 735 of 809 (emphasis added).  To implement the Governance Term Sheet, Michigan law itself was amended to clarify that the Investment Committee was bestowed with the authority to make *all* investment management decisions, including amortization.  Public Act 314, as amended to carry out the Plan, provides:

> (1) Subject to a plan for adjustment,[4] each large sponsored system shall establish an investment committee.
> (2) ***The investment committee shall recommend to the governing board of the large sponsored system investment management decisions, including, but not limited to, all of the following:***

---

[3]    As noted above, the Plan treatment for the Class 10 PFRS Pension claim states: "[a]fter June 30, 2023… the City will contribute sufficient funds … in accordance with the State Contribution Agreement and exhibits thereto."

[4]  A "Plan for adjustment" means "a plan for the adjustment of debts entered and approved by a federal bankruptcy court for a city that has established a large sponsored system."  MCL 38.1133g(d).  This statute was amended in 2014 in connection with the City's bankruptcy.

***

(d) Subject to a plan for adjustment,[5] all calculations, actuarial assumptions, or assessments used by an actuary, including, but not limited to, those underlying the restoration of pension benefits, ***funding levels, and amortization of the restoration of pension benefits***, and those underlying the determination of annual funding levels and ***amortization of annual funding levels,*** and recommended contributions to the large sponsored system in accordance with applicable law.

***

(g) Interpretation of the large sponsored system's governing documents, applicable laws, ***plans of adjustment approved by United States bankruptcy courts, and other financial determinations affecting the large sponsored system's funding or benefit levels.***

MCL 38.1133g (emphasis added). Thus, the State Contribution Agreement and the accompanying Governance Term Sheet—which included the PFRS's right to control amortization decisions—was not only expressly incorporated into the Plan, it was codified into Michigan law. The Plan states that the parties' rights and obligations under the Plan must be performed in accordance with Michigan law: "the laws of the State of Michigan… shall govern the rights, obligations, construction and implementation of the Plan and any contract… instrument, release or other agreement or document entered into or delivered in connection with the Plan." (Plan, Article VIII(I), pg. 72). Both the City and the PFRS are bound by MCL 38.1133g and must act in accordance with its mandate that the Investment Committee (in consultation with the PFRS Board) choose the amortization period. For this separate and independent

---

[5] As noted previously, the only term the PFRS could not change under the Plan of Adjustment was the assumed investment rate of return 6.75%.

reason, the PFRS—not the City—undisputedly has exclusive authority for this decision.

The wisdom of removing the employer who pays into the retirement system from pulling the proverbial purse strings and deciding the amount of its annual contribution or repayment terms is obvious—the fiduciary responsibility of each Investment Committee member and the PFRS Board of Trustees is to the PFRS, not to the City. One way of ensuring the members are not "serving two masters" with potentially conflicting interests is to structure the Investment Committee in a way that would minimize the City's influence. Insulating the Investment Committee from these pressures was not only a requirement under the Plan, it became a requirement under Michigan law.

### (6) The DIA Settlement Terms Also Required Governance Changes

The governance changes were echoed in the DIA Settlement, too, as part of the larger Grand Bargain. An express requirement of the DIA Settlement was that the City shall "adopt and maintain pension governance mechanisms that meet or exceed commonly accepted best practices reasonably satisfactory to the [DIA] Funders and the State to ensure acceptable fiscal practices and procedures for management and investment of pensions and selection of acceptable pension boards to ensure the foregoing." (Plan, Exhibit I.A.126 – Principal Terms of DIA

Settlement, pg. 67 of 809).[6]

Without these governance changes, the funding from both the State and the DIA would not have materialized, and the "cornerstone" of the City's entire Plan would have crumbled.

### (7) The Amended PFRS Plan Documents Under the Plan of Adjustment

As part of the extensive changes to the PFRS under the Plan of Adjustment, new plan documents for the pension fund were drafted by the City's bankruptcy attorneys at Jones Day and ratified via Emergency Manager Order No. 44. (Ex. A, EM Order No. 44, ¶ 13, Ex. E thereto, "PFRS Plan"). Consistent with the State Contribution Agreement, the new PFRS Plan documents also expressly confer the amortization decision upon the Investment Committee. Under the new PFRS Plan:

> As of the effective date of the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees and ***taking action under and with respect to certain investment management matters relating to the Retirement System.*** The creation and operation of the Investment Committee ***is controlled by the Governance Term Sheet*** . . . The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of investment return assumptions, and Board compliance with provisions of the governing documents[.]

(Ex. A, PFRS Plan, Art. I, Sec. 1.21). The "Governance Term Sheet" referenced in

---

[6]    All governance terms were required for a period of twenty (20) years after the Plan of Adjustment. (Plan, Exhibit I.A.126 – Omnibus Transaction Agreement, Art. V, Section 5.2(a), pg. 104 of 809).

this paragraph, as set forth above, explicitly gave the Investment Committee the right

to decide amortization, and this was repeated in Article 16.2 of the PFRS Plan:

> For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:
>
> ***
>
> (d) *review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including*, but not limited to (i) those underlying the restoration of the pension benefits, *funding levels and amortization thereof*, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of *annual funding levels and amortization thereof*, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;
>
> ***
>
> Interpretation of Retirement System governing documents, existing law, *the Plan of Adjustment or other financial determination that could affect funding or benefit levels*[.]

*Id.* at Art. 16.2(1), pg. 62-63 (emphasis added).[7]  In fulfilling its duties, the Investment

Committee is also expressly required to "give appropriate consideration" to the

"liquidity needs of the Retirement System." *Id.* at Art. 16.3(3).  Thus, the Plan could

---

[7]     The power to decide any applicable amortization periods was also repeated in Section 9.3 as it relates to Component I (the hybrid plan). It states: "***For plan years commencing July 1, 2023 and later***, the accrued pension liabilities for Members shall be determined by the Actuary using reasonable and appropriate actuarial assumptions approved by the Board and the Investment Committee. The City's annual contributions to finance the normal cost of benefits and any such unfunded accrued pension liabilities shall be determined by the Actuary ***amortizing such unfunded accrued pension liabilities over a period or period of future years as established by the Board and approved by the Investment Committee***." *Id.* at Art. 9.3(2), pg. 39-40 (emphasis added).

not be more clear—the decision as to which amortization period to select is within the sole discretion of the Investment Committee and the Board of the PFRS.

## B. The Larger Extrinsic Records Reveals Why a 30-Year Amortization Period Is Absent from the Plan

The Plan unambiguously grants the PFRS the right to set its own funding policy and the Court need look no further than the Plan document. But if the Court finds an ambiguity in the Plan and deems it appropriate to consult extrinsic evidence, then the entirety of the record needs to be examined—not just one financial projection out of a multi-week trial with dozens of witnesses.

### (1) The City's Plan Always Envisioned That the Economic Terms for the 2023 Payment—Even the Amount—Were Subject to Change

In its Motion, the City pretends as if the amount and the repayment terms of its lump sum payment at the end of its ten-year hiatus was set in stone back in 2014 when the City exited from bankruptcy.[8] Neither term (either the amount or amortization

---

[8] While not central to resolution of the City's Motion, the City improperly blames the PFRS and its actuaries for the City's own failure to properly calculate the underfunding amounts. [ECF No. 13602, pg. 30]. A brief historical recounting will clarify the record in this regard for the Court. In April of 2013, the City set up a "pension task force" comprised of multiple lawyers from Jones Day and at least three different experts – Charles Moore formerly of Conway Mackenzie, Glenn Bowen from Milliman and Gaurav Malhotra from Ernst & Young. (Ex. B, Bowen 7/1/2014 Dep at 304). The calculations and financial projections presented at the Confirmation Trial by the City were performed by Malhotra and Bowen. The Retirement Systems' actuary, Gabriel Roeder, did not testify or contribute to these calculations, and no one from either of the Retirement Systems—the GRS or the PFRS—were asked to participate on the pension task force. (Ex. C, Kermans Dep at 22, 133, 136; Ex. D, C. Thomas Dep at 135-140). The Retirement Systems' actuary, Gabriel Roeder, who has now been the actuary for nearly 80 years and

methodology) was set in stone. Far from it—the amount of the future payment was merely a reasoned "guess" but was ultimately dependent on how well the PFRS's investment portfolio performed over that ten-year period when all the parties knew the PFRS would be defunded. In fact, various scenarios were run by the City's actuary (Milliman) that analyzed what the effect of the PFRS's investment portfolio returns would be on the size of the City's payment at the end of the ten-year hiatus, and Milliman concluded the amount could fluctuate wildly—by over a *billion* dollars if the PFRS investments performed poorly.[9] This was always a "risk" inherent in the City's

---

knows the systems more intimately than any third party—was not asked to join the Pension Task Force. Neither was the former Director of the Retirement Systems, Cynthia Thomas. *Id.* In September of 2014, at the Confirmation Trial, Glenn Bowen testified that he used the Gabriel Roeder 2013 Valuation Report to conduct his analysis and he adopted all of the assumptions for his go forward model—including the mortality table assumptions regarding life expectancy. (Ex. E, 9/15/2014 Hrg. Tr., pg. 53-60). Milliman also ran the projections to determine the funding levels for 2023 both pension plans—not the GRS, PFRS, or its actuaries. *Id* at 75. Thus, any accusation that the PFRS "failed" to do proper calculations is an outright falsehood.

[9]     The City's scenarios for the 2023 Payment amounts were set out in the table below in the Court-appointed expert's Supplemental Report (Ex. F), and despite these wild fluctuations, Kopacz still found the Plan "feasible" as did the Court.

### PFRS Average Rate of Return Scenario Analysis[7]

| Average Rates of Return July 2014 - June 2023 | Estimated Funding Status June 2023 | Estimated Projected Unfunded Liability June 2023 | Estimated Projected Unfunded Liability Variance |
|---|---|---|---|
| 3.00% | 43% | $ 1,717 | $ 1,036 |
| 5.00% | 60% | $ 1,208 | $ 527 |
| 6.00% | 70% | $ 917 | $ 236 |
| 6.75% | 78% | $ 681 | $ - |
| 8.00% | 92% | $ 252 | $ (429) |
| 0% - 1st 5 years; 10% - 2nd five years | 53% | $ 1,439 | $ 758 |
| 10% - 1st 5 years; 0% - 2nd five years | 64% | $ 1,097 | $ 416 |

Plan.  Further, the City's financial expert, Malhotra, admitted to the Court that unlike the other creditor settlements—which were locked in, both in terms of amount and other economic terms—the pension liability at the end of the ten-year hiatus was not:

> THE COURT:  Okay.  I want to ask you, what are the two or three most critical assumptions in the City's 10-year forecast or projections that concern you the most?
> A.    The first one, Your Honor, would be the unfunded pension liability of the City at the end of the 10 years because in a lot of this in terms of the settlement to the creditors, we have boxed in what the City's liability will be.  On the side of the pensions, we are still using calculations to estimate what that 10-year unfunded liability will be.  So that will be my first one as a concern because it's an unknown, it's an estimate, but it's still not boxed in in terms of how we have boxed in our best ability of the other claims.

(Ex. G, Malholtra Conf. Tr. Hrg. Tr. 9/29/2014, pg. 272).

To account for this uncertainty, the financial projections prepared by Malhotra—and cited by the City as support for this Motion—were replete with cautions and caveats to make clear that the projections were merely a "best guess":

> The attached Plan of Adjustment preliminary forecast… its assumptions and underlying data... consist of information obtained solely from the Client.  With respect to prospective financial information relative to the Client, Ernst & Young … *expresses no assurance of any kind on the information presented … There will usually be differences between forecasted and actual results* because events and circumstances *frequently do not occur as expected and those differences can be material*… reliance on this report is prohibited by any third party as the projected financial information contained herein *is subject to material change and may not reflect actual results.*

(ECF No. 13606-2, pg. 69-70, the "<u>Financial Projection</u>") (emphasis added).   In addition to this general caveat, the specific language the City cites in support of its claim that a 30-year amortization was "required" actually cautions that the entire exercise

was a "hypothetical" treatment of the PFRS claim that was "subject to change:"

| *Hypothetical* claims treatment | |
|---|---|
| PFRS Pension | |
| Contribution (years 1-10) | Estimated to be $261m from foundations/State settlement |
| Contributions (years 11-40) | UAAL as of June 30, 2023 *estimated* to be ~$681m[b] amortized over 30yr, including contributions in second decade from DIA and foundations |
| | *** |
| Footnotes: | |
| (a) Hypothetical art and State settlement proceeds are subject to a consensual agreement with respect to the treatment of pension-related claims | |
| (b) *Estimated* pension contributions to retirement systems and unfunded pension liabilities as of June 30, 2023 are *subject to change* | |

*Id.* (emphasis added).

### (2) The City's Expert Admits an Amortization Schedule Was Not Yet Set

With respect to the amortization issue, Malhotra—the author of the very Financial Projection the City pins its entire Motion on—outright admitted that the amortization period was not yet determined for the pension liability that would be paid at end of the ten-year payment hiatus and would have to be decided later:

> THE COURT: Does the plan commit the City, legally commit the City to make those payments?
> THE WITNESS: My understanding is the City is committed to fund the unfunded liability. I just don't know -- ***the City and the Retirement Systems have to decide what the amortization methodology is of the UAAL at the year 10.*** And the City is committed to fund that underfunded liability. ***Depending on what amortization schedule gets picked, the payments can change slightly because of the interest rate.*** But my understanding is the City is committed to make the payments beyond 2024 into those pension systems.
> ***
> Q. Let me ask this: How would the change in amortization after 2024 affect the contribution level?
> A. ***It depends on the amortization methodology.*** What we have used

13-53846-tjt   Doc 13634   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 25 of 49

in the projections is a straight line principal in which the City is making higher payments in the first decade and over the course of the 30 years makes lower payments going forward. You can change the amortization methodology to make it like a level payment over 30 years in which the City will have lower payments in the first say 10 years, but over the course of the 30 years the City will end up paying more because it has to pay more interest. ***So it's more on the methodology aspect as to how that liability gets serviced.***

(Ex. G, Malholtra Conf. Tr. Hrg. Tr. 9/29/2014, pg. 183-84) (emphasis added). Even without either (i) the amount of the unfunded pension liability in 2023 (which could swing by $100 million or even $1 billion), or (ii) the amortization schedule solidified, the Court still found the Plan feasible.

In addition to the Financial Projection admittedly being just a "best guess," it was not expressly incorporated into the Plan. At best, it was one piece of evidence ***out of 2,300*** that were admitted at the Confirmation Trial.[10] In fact, there were at least ten different versions of the City's financial projections admitted into evidence a trial. (Conf. Order at pg. 37). The sum total the Court commented about this particular Financial Projection—and the other ten iterations of it—was that the "City's revenue and expense projections… are reasonable, made in good faith, accurate, consistent with other financial projections made by the City and based upon assumptions that are reasonable when considered individually or collectively." *Id.* at 37-38. The Court ***summarized*** this "hypothetical" payment scenario for the 2023 Payment in the

---

[10]    See Conf. Order, pg. 1-2 (noting the Court conducted a 24-day evidentiary hearing that entailed 41 witnesses and 2,300 exhibits).

Confirmation Opinion, but it did not expressly incorporate the Financial Projection into the Plan, nor did the Court find that any other (shorter) amortization period would impact the feasibility of the Plan. *In re City of Detroit*, 524 B.R. 147, 231-32 (Bankr. E.D. Mich. 2014). Thus, while the Financial Projection cited by the City may have been evidence to support the Plan's feasibility, that is a far cry from transforming a single line item within that projection into an express "requirement" of the Plan.

### (3) The City's Plan Is Bereft of a 30-YearAmortization Term Because Its Own Experts Did Not Support It

As noted, Malhotra modeled a "hypothetical" scenario where the 2023 Payment was paid over 30 years, but he also admitted the amortization decision would not be made until the end of the ten years. The record is otherwise bereft of any mention of a 30-year amortization period—likely because the other two of the City's Pension Task Force experts, Glenn Bowen and Charles Moore—admitted at their depositions that the trend was toward shorter amortization periods.[11] And none of the City's experts (including Malhotra) testified that a 30-year amortization was (i) required under the Plan, or (ii) a requirement for the Plan's "feasibility." Even the Court-appointed feasibility expert, Martha Kopacz, took no position on amortization.[12] Again, while the Plan is clear, if the Court is going to look outside

---

[11] A 30-year amortization is the longest period allowable under Michigan law.

[12] Kopacz, offered no opinion on the topic of amortization and did *not* testify that the Plan would be unfeasible with a shorter amortization period. (Ex. E, M. Kopacz 9/15/14 Hrg. Tr. at 188 – 190) ("Q. And you were not retained to opine on

of it, then it should consider the more fulsome evidentiary record as to precisely *why* this term is found nowhere in the Plan.

In connection with modeling performed throughout the Bankruptcy process, the City's own actuary, Bowen, admitted that he at times recommended shorter amortization periods to the City, and regardless, ultimately noted that this would be an issue for the Retirement System's actuaries to determine:

> Q.   Okay.  Scenario three, if you look at it, changes to a closed 30-year amortization.  Do you see that?
> A.   I do…
> Q.   And you say… that the change from open to closed amortization and level percent of payroll to level dollar payroll for this scenario is based on our expectation of changes that the system actuary might make in response to the closing of the plan to new hires. . . Can you explain what you meant by that?
> A.   The level percent of payroll amortization develops a payment pattern in dollars, where the dollars are smaller today than they are in the future, and basically increase geometrically over time as payroll increases.  So it's a significantly backloaded way to pay off a debt…
> Q.   Okay.  And why are you trying to project what the system actuary might do?
> A.   We were asked to value the particular scenario which was closing the plan to new hires.  So with a finite future, given our expectation of what the system actuary would do, this represents the -- these results represent the information that we would expect that the system and the plan sponsor would see if the actuary took those steps.
> Q.   And it's also a reflection, isn't it, ***that ultimately the decision is going to be made by the system actuary about how to deal with these things?***

_____

the appropriateness of any smoothing method or amortization period used by the Detroit Retirement Systems; correct? A. Correct.")  When asked specifically about an "appropriate amortization period," she stated she would "have to study that" in order to be able to offer an opinion and agreed that she would "have no basis to know whether a five- or a ten- or a twenty- or a thirty-year amortization period would appropriate[.]"  *Id.* at 190.

13-53846-tjt   Doc 13634   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 28 of 49

A. ***Yes.***

Q. And, in fact, you say in the next sentence, ***they might choose not to make any change or could make a different change.*** Do you see that?

A. Yes, I do.

Q. And so ultimately how… this will actually work out ***will depend on what the system actuary decides, correct? Or they decide in, the [pension] plan decides in consultation with the system actuary?***

A. ***That is exactly what I was going to say.***

Q. Okay. And then you go on and say: ***Milliman's recommendation in this instance would be to make both changes and also to decrease the term of the amortization period.*** Do you see that?

A. I do.

Q. Okay. ***And so, first, you are recommending here that there be a less than 30-year amortization period in the event that the plan is closed, correct?***

A. ***Yes, we are***.

(Ex. B, Bowen 7/1/2014 Dep Tr. at 297-300) (emphasis added). Consistent with Bowen's testimony that the Retirement System's actuary would determine amortization, he explained that he did not ultimately make a recommendation to the City as to amortization with respect to either (i) the Plan design, generally or (ii) the 2023 Payment, specifically:

Q. Okay. And what I'm trying to understand is whether, because of your role on the pension task force, you did more than simply receive instructions, but provide input to the pension task force about what your instructions should be, what scenario should be chosen, what parameters, what assumptions you made, any of those things?

A. I don't believe that we played that role. We received, as you mentioned, many different plan design scenarios to model. We received many different investment returns to run those scenarios at. And we performed the modeling as requested…

Q. ***So there's no circumstance where you ever recommended an amortization period, for example, other than what we've just seen?***

A. ***To the best of my recollection, no.***

\*\*\*

> Q.   Is there any analysis here -- and ***I believe the answer is no, but I just want to make sure I'm not missing something -- of what the amortization period will be for the remainder of the UAAL after 2023?*** Anything to show how the remaining 30 percent is going to be amortized?
> A.   I'll check just to make sure. ***I don't see any mention in this letter***.

*Id.* at 304-95, 354 (emphasis added).  When asked about multiple scenarios he ran regarding amortization periods for closed ("frozen") plans, Bowen admitted that while there was no "rule" forbidding 30 years, his general stance as an actuary is to prefer something shorter. "[I]f a plan sponsor were to conclude that we are closing our plan but we're going to fund over 30 years because that's what our budget permits, I can't tell them not to do it" but as an actuary, "***I would wish they would do something shorter[.]***"  *Id.* at 331 (emphasis added). Lastly, when asked about a 20-year amortization period used in modeling certain scenarios for the City, he reiterated:

> Q.   Did you tell the city at any point that use of a 20-year amortization period would be contrary to best practices?
> A.   I don't recall using those words, no… I'm more inclined to make statements that a shorter amortization period will cost more but will secure pension benefits sooner and will set the plan in a better position.  If you choose to use a longer period, you'll have more, more risk of downside experience, to the extent you don't have the money in the plan to support the benefits[.]

*Id.* at 329-332 (emphasis added).    Not surprisingly, when Bowen testified at the Confirmation Trial on September 15, 2014, he offered no testimony that a 30-year amortization period should be adopted.

Similarly, the City's other pension task force expert, Moore, testified that a 30-year amortization period would *not* be in line with what most public pension systems

were adopting and noted the "trend" was toward a shorter period:

> Q. And, generally speaking, UAAL is amortized over a 30-year period; correct?
> A. No. That's incorrect. We're talking about two different things here. First of all, I've been -- I've attempted to be very careful to say that $292 million is an unfunded amount. UAAL stands for unfunded actuarial accrued liability… In addition to that, this is a closed and frozen plan. There's no new accrual of benefits. So what you were referring to with an amortization of a UAAL, that's the amortization of an unfunded actuarial amount and in the context of a plan that is still accruing benefits. ***The last point is there's no set standard in terms of 30 years. As a matter of fact, most plans are moving towards a shorter period of amortization, plus you have to get into whether it's an open 30-year or closed 30-year period.*** So there are a variety of factors that go into amortizing UAAL, but regardless, that's a completely separate topic than what we have here, which is an unfunded liability associated with a closed frozen plan.
> Q. What's the basis for your statement that most plans are moving towards a shorter period?
> A. ***I have reviewed many municipal plans and that is a trend that I have seen.***

(Ex. H, Moore 7/24/2014 Dep. Tr. at 333-334).[13] Against this backdrop, it is no surprise the Plan did not contain a requirement that the 2023 Payment must be amortized over 30 years—the City's own Pension Task Force was not supportive.

Mayor Duggan—setting aside for the moment that he openly threatened to *sue* these advisors for their alleged incompetence—now lauds the work done by the "parties and their attorneys and their advisors, as well as Kopacz" during the Bankruptcy and argues that the "thousands of hours" spent "working out the POA"

---

[13] The trend toward a shorter period as identified by Moore continued in the years since he testified—according to the Public Plans Database, in 2012, approximately 40% of plans used a 30-year amortization period but as of 2019, it had declined to only 24%. (See https://publicplansdata.org/, last visited September 6, 2022).

must be considered and given deference. (ECF No. 13602, Duggan Dec. at ¶ 38).

Giving deference to the "experts," however—Bowen, Moore, and now Gabriel

Roeder, the PFRS Board, and the PFRS Investment Committee (which is comprised

of independent financial experts who unanimously voted in favor of the 20-year

period)—dictates the same result the PFRS already arrived at: it is exceedingly more

prudent from a funding policy perspective to seek payment in a shorter time frame.

## C.     The PFRS, In Consultation With Advisors, Selects a 20-Year Amortization

The PFRS Board and the Investment Committee studied the amortization issue

thoroughly for years and views it as an essential piece of its funding policy. Although

it had absolutely no obligation to do so, the PFRS permitted the City to present its

position multiple times prior to making its decision. The first presentation occurred in

August of 2020, and was set forth in a report entitled "Legacy Pension Obligations."

(Ex. I, Legacy Report, ECF No. 13478, Exhibit 2). In that presentation, the City warned

that the City's financial situation had deteriorated during the pandemic. The

Retirement Systems' long-time actuaries, Gabriel Roeder, analyzed the situation and

cautioned the PFRS against a risky 30-year funding policy:

> [A]ssuming those comments to be accurate, the Retirement Systems face
> significant risk that the City will default on <u>any</u> funding policy, even the
> absolute minimum 30-year amortization… The City is proposing a benefit
> plan that allows for the Retirement Systems to run out of money.

(Ex. J, Report from Gabriel Roeder dated Sep. 28, 2020, pg. 2) (emphasis in original).

Gabriel Roeder reminded PFRS of the potential for a payment default, as the City

leaders admitted that as a result of "significant lost tax revenue due to the [pandemic] shutdowns," the City had only closed "budget gaps" by "taking advantage of funds available through the CARES act." *Id.* at 1. Gabriel Roeder offered detailed analysis, including the City's candid admission that its finances had deteriorated, and advised that "[i]n mature Legacy plans, the risk of plan insolvency is increased when amortization periods are longer than 10 or 15 years." *Id.* at 2.

Following that presentation, the City commissioned a report from Gene Klowarski of the Cheiron firm in which he opined that a 20-year amortization period would significantly increase the size of the City's payment but that in his opinion, the decrease in risk by front-loading the payments was "negligible." (ECF No. 13602-2, Ex. 12). With all due respect to Mr. Klowarski, his report is largely irrelevant, as the Investment Committee is entitled to rely on its own actuarial expert's opinions over the City's viewpoint. Plus, it undisputed that the City can "afford" a shorter amortization; it simply does not want to.

While the City (to its deserved credit) has diligently set aside funds in a trust to pay the 2023 Payment, in exercising their fiduciary duties, the Investment Committee and the PFRS Board are also entitled to consider the current financial condition of the City, as well as the long history of payment defaults that nearly bankrupted the Retirement Systems. The PFRS had to sue the City each and every year leading up to

the Bankruptcy for failing to make its pension contributions.[14]  In addition to lawsuits, the PFRS had to deal with a takeover of the City by an emergency manager, oversight by a state financial review commission, an arguably illegal transaction used to fund the City's pension obligations (*i.e*., the COPs) that risked bankrupting the Systems altogether,[15] and then the ultimate payment default—the largest municipal bankruptcy in history—in which the City threw the Retirement Systems into the most serious funding crisis to date, refused to abide by the Michigan Constitution's prohibition against to not "impairing" pension obligations, and threatened to drastically cut retirees' pension payments via a cramdown, if necessary.  Finally, after over a year of complex negotiations, the Grand Bargain was crafted and the Plan confirmed, but consistent with past practices, the City once again wants to avoid its pension

---

[14]     See e.g., Wayne County Circuit Court Case Nos. 12-009119-AW, 11-008267-AW, 10-007555-AW and 09-017512-AW.

[15]     As the Court described this history in the Confirmation Opinion: "By 2005, the City had fallen behind in its constitutional and statutory requirements to make contributions to the PFRS and GRS.  At the time, the City did not have sufficient resources to fully fund its pension plans, and the amounts it needed to borrow would have exceeded the debt limits under the Home Rule City Act ("HRCA")… In an attempt to meet its funding obligations without violating the HRCA, the City entered into a series of complex financial transactions."  (Conf. Order, p. 192-193).  These "complex financial transactions" included the certificates of participation (the "COPS"), which the City later argued were illegal and unenforceable transactions in violation of Michigan law and admitted that the City had created "sham entities" for the "sole purpose of making a one-time payment to the PFRS and GRS."  *Id.* In short, the City openly admitted that it funded the pension systems in a highly questionable financial transaction that, if unwound, could have resulted in bankrupting the Systems if the COPs funds had to be disgorged.

obligations and spend the money elsewhere, jeopardizing PFRS's funding with a longer amortization period. The Investment Committee and the PFRS Board would not be exercising prudent fiduciary judgment if they failed to take the City's historical default risk into account when setting its funding policy—and they have.

When it came time to vote on the issue, the entire Investment Committee unanimously voted in favor of the shorter 20-year amortization period, and the Board agreed and also voted in favor of it. (ECF 13602, Exhibits 7-8, PFRS Mtg. Minutes).

**D.      The City Admits That It Lacks Control Over the Amortization Decision**

The PFRS is fully within its rights to rely upon its own advisors and ignore the City's request for a longer amortization period. And the City knows this—Mayor Duggan has publicly admitted as much. The Mayor has expressed to the media that his frustration lies in the fact that his administration lacks control over the decision because the amortization payment schedule is determined by the PFRS Board and Investment Committee, stating:

> My bigger question is, why does the City of Detroit have no role in picking the investment committee that's making the decision on our retirees' pensions? … Now we've got an investment committee that was essentially appointed by [former Gov. Snyder] that doesn't report to anybody, that has voted to shorten the amortization to 20 years.

(Ex. K, Crain's Article 3/17/2022, "Duggan Budget Plan Includes Putting More Money in Retiree Protection Fund as Pension Cliff Nears"). The answer to this question is simple: the reason the City has no role in the Investment Committee is

because (a) the State Contribution Agreement—and hence, the City's own bankruptcy plan—required this governance change in exchange for the nearly $200 million in funding donated by the State,[16] and (b) Michigan law forbids City officials, since they are representatives of the plan sponsor and the funding source for the PFRS, from comprising a majority of the Investment Committee and dictating the PFRS's funding policies. This Motion illustrates exactly *why* the City was required to give up its influence on these issues.

The admissions by Mayor Duggan undermine the entire premise of the City's Motion—the real complaint is that in hindsight, the Mayor is frustrated that he does not hold sway over the PFRS to force it to adopt a funding policy with a longer amortization period that is friendlier to the City's budget. As set forth above, the actual Plan is bereft of *any* mention of an amortization period, let alone a 30-year one. The City's anger or disappointment does not change the outcome. The City may now regret the deal it struck—but that was the deal. Any other outcome is actually a "modification" of the Plan, not "enforcement" of it.

---

[16] The Mayor's criticism is also not factually accurate. The State did not "appoint" the individual members of the Investment Committee, nor does the Investment Committee have unfettered discretion with no oversight (it reports to the PFRS Board of Trustees).

# III. LAW & ARGUMENT

## A. The Plan Does Not Require a 30-Year Amortization and Instead Gives the PFRS Unfettered Discretion to Determine the Applicable Period

"In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and its creditors." *In re Conco, Inc.*, 855 F.3d 703, 711 (6th Cir. 2017) (citation omitted). "State law governs those interpretations, and under long-settled contract law principles, if a plan term is unambiguous, it is to be enforced as written, regardless of whether it is in line with parties' prior obligations." *In re Dow Corning*, 456 F.3d 668, 676 (6th Cir. 2006) (citation omitted). Accordingly, "[a]bsent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence." *In re Conco*, 855 F.3d at 711 (citation omitted); accord *In re Settlement Facility Dow Corning Trust*, 628 F.3d 769, 772 (6th Cir. 2010) (noting the Court may only "open the cleanroom of textual interpretation to whatever extrinsic evidence awaits outside" after the court has found a provision in the plan is "ambiguous"). "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *In re Conco*, 855 F.3d at 712 (citation omitted).

### (1) The Plan Documents Unambiguously Grant the PFRS the Power to Decide Amortization So Extrinsic Evidence Cannot Be Considered

Here, there is no ambiguity in the Plan—the documents clearly divest the City

of any ability to unilaterally force the PFRS to accept a 30-year amortization and instead expressly give the Investment Committee (and the PFRS Board) the discretion to make this decision. The Governance Term Sheet and the new PFRS Plan documents are both expressly incorporated into the Plan itself and are directly enforceable as "the Plan." This Court already held that the amended PFRS Plan documents are part of the Plan of Adjustment and enforceable on their own accord. *In re City of Detroit*, 614 B.R. 255, 266-67 (E.D. Mich. Bkr. Crt., 2020). In fact, the City even went so far as to seek sanctions against certain retired firefighters that it claimed were acting in violation of the new PFRS Plan (in particular, the Deferred Retirement Option Plan or "DROP Program"). In that case, the City argued that the new PFRS Plan took effect on December 10, 2014, and that any actions taken by retirees in violation of the new PFRS Plan were a violation of the broad discharge injunction in the Plan of Adjustment. *Id.* at 266. The Court agreed that the new PFRS Plan was part of the Plan of Adjustment, reasoning:

> The Plan is defined the 'Plan' to mean 'this plan of adjustment and all Exhibit attached hereto or referenced herein, as the same may be amended, restated, supplemented, or otherwise modified.' The word 'Exhibits,' in turn, is defined to mean 'the documents listed on the 'Table of Exhibits' included herein…' and that the Table of Exhibits includes Exhibit I.A.254.a, entitled 'Form of New PFRS Active Pension Plan' and Exhibit I.A.254.b, entitled 'Principal Terms of New PFRS Active Pension Plan.' These two exhibits were attached to the Plan when it was filed on October 22, 2014. The first of these exhibits, Exhibit A.A.254.a, is entitled 'Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan[,] Amendment and Restatement Effective July 1, 2014.' … Based on the foregoing, it is clear that the City's POA

includes the provisions of the New PFRS Plan[.]

*Id.* at 266-267.  Just as the DROP program terms were enforceable against the retired firefighters, so too are the governance terms in the PFRS Plan enforceable here.  The only difference is that in this case, the PFRS Plan terms do not aid the City—as they explicitly direct the PFRS to select the applicable amortization period—so the City seeks to ignore them.  When it was to its benefit, the PFRS Plan documents were enforceable—even *sanctionable* if not followed.  When it is now to the City's detriment, the City ignores the PFRS Plan documents altogether. As set forth above in painstaking detail, amortization is clearly for the PFRS to decide, and the City should be held to that.  As the Court in *In re Conco* noted: "[t]he fact that one party may have intended different results… is insufficient to construe a contract at variance with its plain and unambiguous terms."  The same is true here—while the City apparently "intended different results" with respect to the 30-year amortization period—that is no reason to ignore the Plan's plain and unambiguous terms.

### (2) Even If Considered, the Extrinsic Evidence Is Unavailing

Despite there being no ambiguity in the Plan, the City attempts to rely on a piece of extrinsic evidence—its Financial Projection. While numerous projections were entered into evidence at the Confirmation Trial in support of "feasibility" of the Plan, there were nearly a dozen iterations of those projections and none of them were expressly incorporated into the Plan. Moreover, there were 2,300 exhibits entered into

the evidentiary record at the Confirmation Trial, and under the City's argument, this entire evidentiary record would be part of the City's "Plan of Adjustment"—including multiple iterations of the same financial projections. There were literally *thousands* of exhibits introduced at trial to support plan confirmation. All 2,300 exhibits are not a "finding of fact" or "conclusion of law" as urged by the City.

Because there is no ambiguity, the Court can look no further than the Plan itself and resorting to extrinsic evidence is not permitted. Even if the Court did look to the extrinsic evidence the City relies on, it does not aid the City's case. On its face, the line item on the Financial Projection touted by the City as a "requirement" that the 2023 Payment be amortized over thirty years is replete with caveats and warnings that it was merely a "hypothetical" scenario that was "subject to change." In fact, the author of the Financial Projection, Malhotra, outright admitted that the details surrounding the "amortization schedule" and "amortization methodology" would be decided later. (Ex. G, Malhotra Conf. Hrg. Tr. at 183-84). The City's other two pension experts admitted that a shorter period than a 30-year amortization schedule would be preferable from an actuarial and funding policy perspective.

Moreover, the City *knows* that extrinsic documents not expressly incorporated into the Plan are irrelevant. In fact, the City successfully argued this position to defeat a similar claim by certain retirees who sought to enforce a Term Sheet executed between the Retired Detroit Police and Fire Fighters Association ("RDPFFA") prior

to the Plan. When the RDPFFA attempted to enforce the Term Sheet post-confirmation, the City objected, and argued:

> The RDPFFA's position is palpably meritless. As a bankruptcy law ***and*** contractual matter… reliance on the Term Sheet itself is inappropriate because the Plan superseded the Term Sheet, and the Term Sheet is not enforceable independently from the Plan. . . The Plan is a new and binding contract between the City and the RDPFFA covering these topics . . . As a matter of law, the Term Sheet, as a stand-alone document, no longer binds the parties and is superseded by the Plan. See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 676 (6th Cir. 2006), cert denied, 549 U.S. 1317 (2007) ("In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and creditors.") . . . Notably, paragraph 8 of the Term Sheet – the only provision at issue here—specifically states that it relates to the treatment of claims in Classes 10 and 12 under the Plan. **Plan treatment is governed only by the confirmed Plan, not by other documents extrinsic to—and whose substantive provisions are incorporated into—the Plan.** In re A.P. Liquidating Co., 283 B.R. 456, 459 (Bankr. E.D. Mich. 2002)… the Plan incorporated all the applicable terms set out in the Term Sheet, and the RDPFFA never objected to the omission of any terms from the Plan. **As such, the Plan replaced the Term Sheet and relevant rights of RDPFFA retirees are governed by the Plan.**

[ECF No. 9571, ¶¶ 24-26] (bold and italics emphasis original, bold and underlined emphasis added). This Court agreed, finding that the term sheet was not "incorporated into or made part of the Plan" and thus the term sheet "did not survive confirmation of the Plan." *In re City of Detroit*, 538 B.R. 314, 320 (E.D. Mich. Bkr. 2015). Further, the Court held that "only the Plan, and not the Term Sheet, governed the treatment of Classes 10 and 12." *Id.*

In a complete about face, the City is arguing the opposite here. As the City

13-53846-tjt    Doc 13634    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 41 of 49

itself previously argued, the RDPFFA did not object when one of the salient terms from its Term Sheet was not expressly incorporated into the Plan, and therefore, the forfeited the right to object after confirmation.  Here, the City *itself* wrote the Plan.  It is the City's own Plan.  If the City needed a 30-year amortization in order to make the Plan feasible, it should have insisted on making that an express term in the Plan. It did not. Moreover, unlike the RDPFFA Term Sheet, the Governance Term Sheet at issue here *was* expressly incorporated into the Plan, as were the new PFRS Plan documents—both of which expressly grant the PFRS with the decision-making authority on the amortization issue.  Thus, the City's own prior interpretation and enforcement of the Plan undermines its current Motion, and the Court should not deviate from its prior holding.

**B.    Any Request to Modify the Plan Fails Because the Plan Has Already Been Substantially Consummated.**

The Plan does not permit the City to unilaterally impose a 30-year amortization period on the System.  Instead, as established above, the Plan unequivocally requires that decision be made by the PFRS itself—in particular, the Board and the Investment Committee. What the City is the *really* asking the Court for is a modification to the Plan—and a tardy modification, at that.

The Bankruptcy Code provides that a debtor may modify a plan "at any time after confirmation of such plan and before substantial consummation of such plan[.]" 11 U.S.C. § 1127(b); see also Plan, Art. VIII(B) ("the City may alter, amend, or modify

the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan"). Here, it is undisputed that the Plan has already been substantially consummated. In prior appeals brought by aggrieved retirees, the City argued that it had already "substantially consummated the Plan" and therefore, it was too late to make any modifications to its terms, and the Sixth Circuit agreed:

> We measure "substantial consummation" by the Bankruptcy Code definition, which considers the extent of the debtor's transfer of property, assumption of responsibilities, and distribution of assets as prescribed by the plan. . . In this case. . . ***the Plan has been substantially consummated, inasmuch as numerous significant—even colossal—actions have been undertaken or completed, many irreversible***; and the requested relief of omitting the bargained-for (and by majority vote agreed-upon) pension reduction would necessarily rescind the Grand Bargain, its $816 million in outside funding, and the series of other settlements and agreements contingent upon the Global Retiree Settlement, thereby unravelling the entire Plan and adversely affecting countless third parties, including, among others, the entire City population… This is not a close call. In fact, the doctrine of equitable mootness was created and intended for exactly this type of scenario, to "prevent[] a court from unscrambling complex bankruptcy reorganizations" after "the plan [has become] extremely difficult to retract."

*In re City of Detroit, Michigan*, 838 F.3d 792, 799 (6th Cir. 2016) (citations omitted) (emphasis added). Thus, the City cannot modify the Plan now, particularly as it relates to the pensions or the Grand Bargain.

## C.    The City Should be Estopped from Arguing Against Its Prior Positions

The City has argued the *opposite* of what it is currently arguing in no less than three prior cases post-confirmation (each cited above) and should be estopped from its current arguments under the doctrine of judicial estoppel.  In its prior dispute with

retirees, the City argued the Plan was already substantially consummated and could not be modified, particularly as it relates to the pension settlement, since the Grand Bargain was the cornerstone for the rest of the Plan. In its dispute with the RDPFFA, the City successfully argued that the Court cannot look to extrinsic documents to modify the express terms of the Plan. Lastly, in a dispute with retired firefighters over the DROP Program, the City argued the PFRS Plan documents are enforceable as part of the Plan. The City won each of these cases and yet is disingenuously now attempting to argue the exact opposite: (i) that it can modify the Plan's governance terms, which expressly state that the PFRS gets to set the amortization period; (ii) that extrinsic documents—the Financial Projection—should supersede the Plan's express terms; and (iii) that the PFRS Plan documents are somehow not an enforceable part of the Plan. This is a violation of the doctrine of judicial estoppel and should not be countenanced.[17]

---

[17]    Judicial estoppel is meant to preserve "the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *In re B & P Baird Holdings, Inc.,* 759 Fed.Appx. 468, 483 (6th Cir. 2019) (citation omitted). It is intended to prevent a party from "playing fast and loose with the courts," or "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002). Judicial estoppel is an "equitable doctrine that is 'not reducible to any general formulation of principle' and for which 'there are no inflexible or exhaustive prerequisites for determining [its] applicability.'" *In re B & P*, 759 Fed. Appx. at 482. While it is often limited to positions taken "under oath," this element does not mean in a strictly "testimonial sense" and includes the submissions of arguments, pleadings and papers to a court. *Id.*; *Valentine,* 386 F.3d at 812.

**D.    The City's Motion Is Procedurally Improper**

While the Court should deny the City's Motion outright for all of the reasons cited above, the Motion (as currently postured) seeks entry of an Order that provides "the PFRS and the Investment Committee are enjoined and barred from shortening the 30-year amortization period." (Motion, Exhibit 1 – Proposed Order at ¶ 2).  The core of the City's relief request in conjunction with the Motion is injunctive relief. Such requested relief is procedurally inappropriate pursuant to the Federal Rules of Bankruptcy Procedure, which provide, in relevant part: "An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings: … (7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief[.]"  F.R.B.P. 7001(7).  Here, the City seeks relief from this Court enjoining the PFRS from carrying out the very functions and duties set forth in the Plan.  Further, the factual and legal issues related to the 2023 Payment and the Plan are complex matters.  The City should be required to initiate any request akin to the relief request in the Motion via an adversary proceeding, which, in turn, provides the PFRS with full due process rights vis-à-vis an injunction request, as contemplated in F.R.B.P. 7001(7), as the Motion is a contested matter with significant factual and legal issues that more appropriately requires an adversary proceeding with full discovery, dispositive motions, if necessary, a trial, and the complete landscape of due process for the PFRS. To the extent this Court determines the City is permitted to

advance the Motion, as opposed to filing an adversary proceeding, the Motion is, at the very least, contested matter pursuant to F.R.B.P. 9014. In such event, the PFRS requests this Court direct the parties to proceed with discovery in accordance with F.R.B.P. 9014(c). The PFRS reserves all rights to discovery and/or evidentiary hearing with respect to the Motion.

Respectfully submitted,

Date: September 9, 2022

By: */s/ Jennifer K. Green*
Jennifer K. Green
Clark Hill PLC
151 S. Old Woodward, Ste 200
Birmingham, MI 48009
(248) 988-2315
jgreen@clarkhill.com
*Attorney for Creditor – PFRS*

**EXHIBIT 4 – CERTIFICATE OF SERVICE**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2022, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

Respectfully submitted,

Date:  September 9, 2022

By: */s/ Jennifer K. Green*
Jennifer K. Green
Clark Hill PLC
151 S. Old Woodward, Ste 200
Birmingham, MI 48009
(248) 988-2315
jgreen@clarkhill.com
*Attorney for Creditor – PFRS*

## EXHIBIT 5 – NONE

# EXHIBIT 6 – EXHIBITS TO BRIEF