# EXHIBIT A (PART 1)

EMERGENCY MANAGER
CITY OF DETROIT

ORDER No. 44

FINAL EMERGENCY MANAGER ORDER

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager (the "EM") for the City of Detroit (the "City") with all of the authority, powers and duties provided under PA 436; and

Pursuant to Section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the City's Mayor (the "Mayor") and the Detroit City Council (the "Council"); and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Section 10(1) of PA 436 provides, in part, that "[a]n emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act, including, but not limited to, orders for the timely implementation of a financial and operating plan..., or to take actions or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan. An order issued under this section is binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued. Local elected and appointed officials and employees, agents, and contractors of the local government shall take and direct those actions that are necessary and advisable to maintain compliance with the financial and operating plan;" and

1

The EM has developed and implemented a written financial and operating plan for the City consistent with the requirements of Section 11 of PA 436, the objective of which has been to enable City officials to provide, or cause to be provided, governmental services essential to the public health, safety and welfare of residents of the City, and assure the fiscal accountability of the City; and

Section 12 of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to exercise certain rights and powers, along with the other rights, duties and powers set forth in PA 436; and

Section 21 of PA 436 states, "[b]efore the termination of receivership and the completion of the emergency manager's term, or if a transition advisory board is appointed under section 23, then before the transition advisory board is appointed, the emergency manager shall adopt and implement a 2-year budget, including all contractual and employment agreements, for the local government commencing with the termination of receivership;" and

On July 18, 2013, consistent with the authorization of the Governor of the State of Michigan (the "Governor") provided under Section 18(1) of PA 436, the City filed a petition for relief pursuant to chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as it may be amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

By an order dated December 5, 2013 (Docket No. 1945) (the "Eligibility Order"), the Bankruptcy Court determined that the City is eligible for relief under chapter 9 of the Bankruptcy Code; and

On October 22, 2014, the City filed the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit in the Bankruptcy Court (Docket No. 8045) (as it may be further amended, modified or supplemented, the "Plan of Adjustment");[1] and

By an order dated November 12, 2014 (the "Confirmation Order") (Docket No. 8272), the Bankruptcy Court confirmed the Plan of Adjustment pursuant to the Bankruptcy Code; and

In connection with the Plan of Adjustment, the City, Title Source, Inc. (the "Title Company"), The Detroit Institute of Arts (the "DIA") and the Foundation for Detroit's Future ("FDF") have entered into that certain Deposit Escrow Agreement dated September 19, 2014 (the "Deposit Escrow Agreement"), whereby the parties thereto have agreed to deposit certain agreements relating to the conveyance of the assets of the Detroit Institute of Arts to the DIA to be held in perpetual charitable trust, including, but not limited to, the Omnibus Transaction Agreement by and among the City, the DIA and the FDF (the "Omnibus Agreement"); the Settlement Conveyance and Charitable Trust Agreement by and between the City and the DIA (the "Conveyance Agreement"); the Quit Claim Deed from the City to the DIA granting the DIA the City's interest in the cultural center garage (the "Garage Deed"); the Quit Claim Deed from the City to the DIA granting the DIA the City's interest in the real property of the Detroit

---

[1]  Capitalized terms not otherwise defined herein have the meanings given to them in the Plan of Adjustment.

2

Institute of Arts (the "DIA Deed"); the Bill of Sale by and between the City and the DIA (the "Bill of Sale"); and the Intellectual Property Transfer Agreement by and between the City and the DIA (together with the Omnibus Agreement, the Conveyance Agreement, the Garage Deed, the DIA Deed, the Bill of Sale and any other document referenced in Schedule 1 of the Deposit Escrow Agreement, the "DIA Transfer Documents"); and

The City also is entering into various settlement agreements and other resolutions as set forth in the Plan of Adjustment and the exhibits thereto (collectively, the "Plan Settlements"), which will be effective upon effective date of the Plan of Adjustment (the "Effective Date"), including, without limitation, the following (as further defined or described in the Plan of Adjustment): (a) the UTGO Settlement Agreement, in substantially the form as Exhibit I.A.360 to the Plan of Adjustment, (b) the LTGO Settlement Agreement, in substantially the form as Exhibit I.A.237 of the Plan of Adjustment, (c) the 36th District Court Settlement, as outlined in Exhibit I.A.9 to the Plan of Adjustment; (d) the settlement of OPEB Benefits, as set forth in Section IV.G of the Plan of Adjustment and the Retiree Health Care Settlement Agreement attached as Exhibit I.A.298 to the Plan of Adjustment; (e) the DIA Settlement, as outlined in Exhibit I.A.126 of the Plan of Adjustment and pursuant to the DIA Settlement Documents substantially in the form as Exhibit I.A.127 of the Plan of Adjustment; (f) the State Contribution Agreement in substantially the form as Exhibit I.A.332 of the Plan of Adjustment (the "State Contribution Agreement"); (g) matters relating to the DWSD Authority; (h) the Syncora Settlement, including the Syncora Development Agreement in substantially the form as Exhibit I.A.340 of the Plan of Adjustment and the other Syncora Settlement Documents in substantially the forms as Exhibit I.A.344 of the Plan of Adjustment; (i) the FGIC/COP Settlement, including the FGIC Development Agreement in substantially the form as Exhibit I.A.198 to the Plan of Adjustment and the other FGIC/COP Settlement Documents in substantially the forms as Exhibit I.A.197; and (j) all other compromises and settlements included in, incorporated into or related to the Plan of Adjustment; and

On September 25, 2014, in accordance with Section 9(6)(c) of PA 436, the Council voted unanimously to remove the EM as of the Effective Date (the period from the appointment of the EM through such removal, the "EM Tenure"). By a letter to the Governor, the Mayor approved of the Council's vote on the same day; and

On September 25, 2014, in connection with the vote of Council to, and the Mayor's approval of, the removal of the EM as of the Effective Date, the EM adopted and issued his Order No. 42. By Order No. 42, the EM, among other things, (a) restored the authority of the Mayor and the Council over day-to-day operations and activities effective immediately as permitted by PA 436, (b) agreed not to exercise his powers under PA 436 to interfere with the powers restored to the Mayor and the Council and (c) agreed that he will exercise his powers through the conclusion of the EM Tenure only with respect to any action (or the prevention of any action) that is necessary or convenient for (i) the management of the case captioned "*In re City of Detroit, Michigan*, Case No 1353846" (the "Bankruptcy Case") and related bankruptcy proceedings and (ii) the implementation of the Plan of Adjustment; and

3

The EM has concluded that, as of and conditioned on the occurrence of the Effective Date, the financial conditions of the City will have been corrected in a sustainable fashion consistent with the requirements of Section 9(7) of PA 436; and

Section 22(1) of PA 436 provides that "[i]f an emergency manager determines that the financial emergency that he or she was appointed to manage has been rectified, the emergency manager shall inform the governor and the state treasurer;" and

By letter dated December 8, 2014, the EM will notify the Governor and the Treasurer of the State of Michigan (the "State Treasurer") of the EM's determination that the financial emergency he was appointed to manage within the City will have been rectified as of, and conditioned on the occurrence of, the Effective Date; and

As the EM Tenure approaches its conclusion and in anticipation of the Effective Date, the EM has determined that this Order is appropriate to: (a) promote the successful conclusion of the City's restructuring efforts and its capacity to provide or cause to be provided necessary governmental services essential to the public health, safety and welfare; and (b) otherwise fulfill the intents and purposes of PA 436 and chapter 9 of the Bankruptcy Code; and

As part of this Order, the EM has determined, among other things, that the terms hereof are appropriate to provide for a smooth transition at the conclusion of the EM Tenure and to promote the long-term financial recovery of the City and the health, safety and welfare of the public; and

Pursuant to Order No. 42, the EM has consulted with the Mayor and the Council regarding the terms of this Order.

**It is hereby ordered that:**

*Restoration of City Governance*

1. To the extent not already restored pursuant to the EM's Order No. 42, and except as provided by this Order or other or applicable Michigan or Federal statute, the powers and authority of the Mayor and the Council previously exercised by the EM shall be restored as of, and conditioned upon the occurrence of, the Effective Date.

*Cooperation and Compliance by City Officials*

2. The Mayor, Council members, department heads and other employees, agents and contractors of the City shall promptly and fully do all of the following:

   a. Cooperate with the EM through the end of the EM Tenure to the extent necessary to effectuate the implementation of a Plan of Adjustment, the Confirmation Order or other orders entered or that may be entered in connection therewith by

4

the Bankruptcy Court in the Bankruptcy Case or in any related proceeding or appeal from any order entered or that may be entered by the Bankruptcy Court.

b. Comply with requests from the Michigan Financial Review Commission (the "Commission") created by Michigan Public Act 181 of 2014 ("PA 181"), known as the Michigan Financial Review Commission Act, to the extent necessary or appropriate to effectuate the purposes of PA 181. Such compliance shall include, at a minimum and without limitation, all of the following:

  i. Providing to the Commission any documents, records or other information requested of City officials by the Commission or its staff, including any documents, records or other information specifically required by PA 181.

  ii. Appearing before the Commission to provide testimony, documents, records or other information as and when requested by the Commission or its staff.

  iii. Providing to the Commission upon its request verification of compliance by the City with all of the following consistent with the requirements of Section 6(3) of PA 181:

    A. Section 8 of Michigan Public Act 152 of 2011, the Publicly Funded Health Insurance Contribution Act;

    B. Sections 4i, 4p, 4s and 4t of Michigan Public Act 279 of 1909, the Home Rule City Act;

    C. Michigan Public Act 34 of 2001, the Revised Municipal Finance Act; and

    D. Michigan Public Act 2 of 1968, the Uniform Budgeting and Accounting Act;

  *provided that* nothing herein shall limit, modify or excuse the City's obligation to comply with the applicable law, whether or not listed herein.

*Plan of Adjustment Matters*

3. Without limiting the terms of paragraph 2 above, the Mayor, the Council and all City officers, department heads and other employees, agents and contractors shall take such steps as are necessary or appropriate from and after the Effective Date to pursue the prompt implementation of the Plan of Adjustment, the Confirmation Order and all agreements necessary thereto, including the Plan Settlements. For the avoidance of doubt, such steps include, without limitation, the following:

5

a. The City shall defend any appeals of the Confirmation Order and any appeals of the Eligibility Order or other orders of the Bankruptcy Court necessary for the success of the Plan of Adjustment.

b. On or promptly after the Effective Date and provided that the conditions set forth in the Deposit Escrow Agreement and the DIA Transfer Documents have been otherwise satisfied, the City shall provide the certification described in Schedule 2 of the Deposit Escrow Agreement to the Title Company, and, upon release of the DIA Transfer Documents in accordance with the Deposit Escrow Agreement, the City shall cause the transfer of the assets of the Detroit Institute of Art described in the DIA Transfer Documents and the governance thereof to The Detroit Institute of Arts in accordance with the DIA Transfer Documents.

c. The City shall comply with all covenants set forth in Sections 5.2 and 5.3 of the Omnibus Agreement.

d. Without limiting any other provision hereof, the City shall make such distributions and take such actions as are contemplated in the Plan of Adjustment for the establishment of and distribution to the Detroit General VEBA and Detroit Police and Fire VEBA (as such terms are defined in the Plan of Adjustment), in substantially the form provided in the Plan of Adjustment, and consistent with the measures set forth in the letter agreement filed at Docket No. 8183, all of which are hereby specifically adopted, approved and ratified in all respects.

e. Upon the negotiation of documentation mutually acceptable to the parties, the City shall be authorized and is directed to take such actions and sign such documents as are necessary or appropriate to establish the DWSD Authority (i.e., the Great Lakes Water Authority) and implement the DWSD Authority Transaction consistent with the Memorandum of Understanding (as defined in the Confirmation Order).

f. The City is authorized to enter into and implement, and the EM hereby approves, the *Memorandum of Understanding Between the City of Detroit and Wayne County Community College* in the form approved by the Council on December 8, 2014.

4. All Plan Settlements and related agreements (including, without limitation, the DIA Transfer Documents), to the extent not previously approved by an order of the EM, are hereby expressly adopted, approved and ratified in all respects.

*Restructuring Advisors*

5. The Mayor or his designee may determine whether to retain the restructuring advisors listed on the attached Exhibit A (collectively, the "Restructuring Advisors") for such period as is necessary or appropriate to complete their work to implement the Plan of Adjustment and defend the appeals thereof (the "Restructuring Period"), subject to the terms of the Restructuring Advisors' contracts with the City, *provided that* the Mayor shall consult with the Commission with respect to any decision not to retain a Restructuring Advisor through the conclusion of the Restructuring Period.

6

6. The Emergency Manager, on behalf of the City, hereby restates and ratifies his approval of all fees and expenses for the City's restructuring professionals that have been subject to the Fee Examiner review process in the City's bankruptcy case (including the Restructuring Advisors) for services rendered through the Effective Date, subject to the Bankruptcy Court's independent review of reasonableness. The City is directed to continue to process and pay invoices of the City's restructuring professionals (including the Restructuring Advisors) for their work through the Effective Date based on the invoices presented, subject only to the Bankruptcy Court's independent review of reasonableness. For the avoidance of doubt, the City also shall pay any creditor advisors or court-appointed professionals and experts consistent with orders of the Bankruptcy Court. The City's Chief Financial Officer ("CFO") shall be responsible for the foregoing on behalf of the City, under the supervision of the Mayor.

7. Consistent with the foregoing, the City shall: (a) set aside a reserve account solely for the payment of restructuring fees consistent with full funding of the amounts identified for "Restructuring Professional Fees" in the City of Detroit Ten-Year Financial Projections; and (b) otherwise implement the fee provisions of the Plan of Adjustment, the Confirmation Order and any further orders of the Bankruptcy Court. The CFO shall be responsible for the foregoing on behalf of the City, under the supervision of the Mayor.

*Two-Year Budget*

8. Attached hereto as Exhibit B is the City's two-year budget consistent with the requirements of Section 21(1) of PA 436 (the "Two-Year Budget").

9. Consistent with the requirements of Section 21(2) of PA 436, the City shall not amend the Two-Year Budget without the written approval of the State Treasurer. In addition to approval by the State Treasurer, an amendment by the City to the Two-Year Budget shall not take effect unless approved by the Commission consistent with Section 7(c) of PA 181.

*Labor Matters*

10. All Collective Bargaining Agreements ("CBAs") set forth on Exhibit II.D.5 of the Plan of Adjustment and all CBAs identified on the attached Exhibit C (including CBAs relating to the Detroit Water and Sewerage Department), and any addenda, exhibits, schedules, appendices, supplements or related agreements though the date of this Order, are hereby adopted, approved and ratified in all respects. In addition to the foregoing, all City Employment Terms ("CETs") and other labor-related agreements approved or authorized by the EM are hereby adopted, ratified and approved in all respects, including, without limitation, the CETs and other agreements identified on the attached Exhibit C. The EM also ratifies and approves the CETs that were implemented prior to the EM Tenure and that remain in effect as of the date of this Order, including the CETs identified on the attached Exhibit C.

7

*Pension Plan Matters*

11. For the avoidance of doubt, and without limiting anything herein, the EM hereby expressly reaffirms his Order Nos. 25, 26, 29, 30 and 43 with respect to the changes to the City's pension plans and related ordinances, subject to the additional provisions below.

12. Pursuant to Section 16.4 of Component I of the Combined Plan for the General Retirement System of the City of Detroit, Michigan (the "Combined GRS Plan"), the EM, on behalf of the City, adopts the Combined GRS Plan, as amended and restated, in the form attached hereto as Exhibit D, which document (a) conforms the Combined GRS Plan to the terms of the confirmed Plan of Adjustment and (b) makes other clarifying modifications.

13. Pursuant to Section 17.5 of Component I of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Combined PFRS Plan"), the EM, on behalf of the City, adopts the Combined PFRS Plan, as amended and restated, in the form attached hereto as Exhibit E, which document: (a) reflects changes in the terms and conditions of retirement benefits as provided in the CBAs and memoranda of understanding negotiated with certain of the employee representatives; (b) conforms the Combined PFRS Plan to the terms of the confirmed Plan of Adjustment; and (c) makes other clarifying modifications.

14. Copies of the Combined GRS Plan, as amended and restated, and the Combined PFRS Plan, as amended and restated, will be kept in the Office of the City Clerk for the City of Detroit and shall be available for public inspection.

15. The appropriate City officers, department heads and other employees shall cause the Boards of Trustees of the General Retirement System of the City of Detroit ("GRS") and the Police and Fire Retirement System of the City of Detroit ("PFRS") to timely file or cause to be filed on behalf of GRS and PFRS applications for Favorable Determination Letters with the Internal Revenue Service pursuant to Revenue Procedure 2014-6 (or any successor procedure) to obtain rulings that the Combined GRS Plan and the Combined PFRS Plan satisfy the requirements for favorable tax treatment under Sections 401(a) and 501(a) of the Internal Revenue Code. City officers, department heads and other employees, agents and contractors shall cooperate with and provide such information as the Boards of Trustees and their legal counsel may require in connection with such Favorable Determination Letter applications.

16. The Mayor, Council members and appropriate City officers, department heads and other employees shall cause the Boards of Trustees of the GRS and the PFRS to: (a) comply with the governance requirements set forth in Section 2 of the State Contribution Agreement (including, with respect to the GRS, the requirements of Exhibit A and, with respect to the PFRS, the requirements of Exhibit B) at all times during the 20-year period

8

following the disbursement to the GRS and the PFRS of the State Contribution (as defined in the State Contribution Agreement); and (b) establish and implement an income stabilization program that complies in all respects with Section 3 of the State Contribution Agreement.

*Other EM Orders and Bond Orders*

17. All prior Orders of the EM, to the extent that they are not otherwise inconsistent with this Order and have not previously been modified or rescinded (the "Prior Orders"), shall be incorporated by reference into this Order.

18. The reaffirmation herein of specific Orders of the EM shall not render the Orders not explicitly mentioned herein revoked, rescinded or altered in any way unless such Orders are otherwise inconsistent with this Order.

19. The bond orders issued by the EM, including the bond orders identified on the attached Exhibit F (collectively, the "Bond Orders"), are hereby ratified and affirmed.

*Administrative Matters*

20. The City shall maintain access to the EM page via the City's website for a period of at least one year following the end of the EM Tenure.

21. Nothing in this Order shall be construed as contrary to applicable law.

22. Nothing in this Order shall be construed to restrict or impair the authority of the Governor, in the Governor's sole discretion, to determine that the financial conditions of the City have not been corrected in a sustainable fashion as required by Section 9(7) of PA 436 and appoint a new emergency manager pursuant to Section 24 of PA 436.

23. If any provision of this Order is declared by a court of competent jurisdiction to be illegal, unenforceable or ineffective, such provision shall be deemed severable to the extent necessary so that all other provisions contained in this Order shall remain valid, enforceable and effective.

24. The City shall, and is directed to, maintain all insurance called for by Article 8 of the EM's Contract for Emergency Manager Services dated March 27, 2013 between Mr. Orr and the State of Michigan (the "EM Contract"), including, without limitation, any general liability, professional liability or errors and omissions policy under Sections 8.1 and 8.3 of the EM Contract, and any tail coverage for such insurance.

25. The City shall, and is directed to, fulfill its obligations under Section 8.2 of the EM Contract after the end of the EM Tenure, including, without limitation, by paying the costs of any judgment, settlement or attorneys' fees relating to any uninsured claim,

9

demand or lawsuit against the EM or any employee, agent, appointee or contractor of the EM for actions taken during the EM Tenure. If Mr. Orr is sued personally for any action performed within the scope of his official capacity as the EM, Mr. Orr shall have the right to direct the defense of any such action, and the Mayor, the Council, the Corporation Counsel and the other employees, officers, department heads and agents of the City shall not take any action contrary to, or to interfere with, Mr. Orr's right to direct such defense.

26. Prior to the Effective Date, and pursuant to Section 5.1 of the Financial Stability Agreement, as Amended and Restated on November 7, 2013 (the "FSA"), the EM hereby consents, with the mutual consent of the State Treasurer, to amend Section 6.1(c) of the FSA for the purpose of terminating the FSA as of the Effective Date. To that end, the *Addendum to the Financial Stability Agreement* in the form attached hereto as Exhibit G (the "FSA Amendment") is approved and ratified in all respects. For the avoidance of doubt, the mutual execution of the FSA Amendment by the EM and the State Treasurer shall not preclude the Council from voting to ratify execution of the FSA Amendment prior to the Effective Date.

27. This Order shall be distributed to the Governor, the State Treasurer, the Mayor, Council members, the CFO and all department heads.

28. This Order is effective immediately.


*Modification of This Order and Prior EM Orders*

29. Prior to the Effective Date, the EM may modify, amend, rescind, replace, supplement or otherwise revise this Order at any time. Further, nothing herein shall preclude the EM from issuing any other appropriate Orders, consistent with EM Order No. 42, prior to the Effective Date.

30. Pursuant to Section 21(2) of PA 436, the Council shall not revise this Order or any other Orders or ordinances implemented by the EM during his term, and that remain in effect, prior to one year after the termination of receivership. In addition, after the Effective Date, this Order, or any other Order issued by the EM that remains in effect, may be amended, modified or rescinded only by the following methods:

a. By a subsequent Order issued by an emergency manager appointed by the Governor under Section 9 of PA 436, including:

   i. After a selection by the Council pursuant to Section 7(1)(b) of PA 436; or

   ii. Pursuant to Section 24 of PA 436; or

b. By the City by resolution of the Council, approved by the Mayor and ratified by the Commission pursuant to Section 7(n) or 7(o) of PA 181.

10

Dated: December 8, 2014

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc: Governor of the State of Michigan
   State Treasurer
   Mayor Michael Duggan
   Members of Detroit City Council
   Chief Financial Officer
   City Department Heads

# EXHIBIT E

## Combined PFRS Plan

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

### Amendment and Restatement Effective July 1, 2014

# TABLE OF CONTENTS

Page

COMPONENT I ................................................................................................... 1

ARTICLE 1.      GENERAL PROVISIONS ................................................................. 1

Sec 1.1.      Police and Fire Retirement System Established; Adoption of 2014 Plan Document ................................................................................. 1

Sec 1.2.      Retirement System Intended to be Tax-Qualified; Governmental Plan ...................................................................................................... 1

Sec 1.3.      Compliance With Plan of Adjustment ................................................ 1

Sec 1.4.      Board of Trustees .............................................................................. 2

Sec 1.5.      Board of Trustees – Membership; Appointment ................................ 2

Sec 1.6.      Board of Trustees; Scheduling of Elections for Active and Retiree Trustees ............................................................................................. 3

Sec 1.7.      Procedures for election of Retiree Trustees ...................................... 3

Sec 1.8.      Board of Trustees; Oath; Term; Vacancies ...................................... 4

Sec 1.9.      Board of Trustees; Officers and Employees ..................................... 4

Sec 1.10.      Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum ........... 4

Sec 1.11.      Board of Trustees; Compensation; Expenses ................................... 5

Sec 1.12.      Rules for Administration of Funds .................................................... 5

Sec 1.13.      Board of Trustees; Certain Data to be Kept ..................................... 5

Sec 1.14.      Board of Trustees; Annual Audit Report .......................................... 5

Sec 1.15.      Board of Trustees; Legal Advisors .................................................... 5

Sec 1.16.      Board of Trustees; Medical Director ................................................ 6

Sec 1.17.      Designation of Actuary; Authority to Engage Additional Actuaries ......... 6

Sec 1.18.      Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System ............................................................................. 7

Sec 1.19      Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities ........................................................................................... 7

Sec 1.20      Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties ................................................................................................. 7

Sec 1.21      Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties ............................................................................... 8

Sec 1.22      Investment Committee; Membership; Appointment .......................... 8

-i-

# TABLE OF CONTENTS
(continued)

Page

| Sec 1.23. | Investment Committee; Term; Resignation and Removal; Vacancies. | 9 |
|---|---|---|
| Sec 1.24 | Investment Committee; Operation; Meetings; Quorum; Voting | 10 |
| Sec 1.25 | Investment Committee; Compensation; Expenses; Employment of Advisors | 11 |
| Sec 1.26. | Investment Committee; Special Reporting Obligation | 11 |
| ARTICLE 2. | DEFINITIONS | 14 |
| Sec 2.1. | Definitions | 14 |
| ARTICLE 3. | MEMBERSHIP | 22 |
| Sec 3.1. | Eligible Employees | 22 |
| Sec 3.2. | Cessation of Membership; Re-Employment | 22 |
| Sec 3.3. | Report From City | 23 |
| ARTICLE 4. | SERVICE CREDIT | 24 |
| Sec 4.1. | Credited Service | 24 |
| Sec 4.2. | Vesting Service | 24 |
| Sec 4.3. | Service Credit; Military Service | 24 |
| Sec 4.4. | Service Credit; Qualified Military Service | 25 |
| ARTICLE 5. | ELIGIBILITY FOR RETIREMENT | 26 |
| Sec 5.1. | Eligibility for Unreduced Normal Retirement Benefit | 26 |
| Sec 5.2. | Eligibility for Deferred Vested Retirement Benefit | 26 |
| Sec 5.3. | Eligibility for Disability Retirement Benefit – Duty Disability | 26 |
| Sec 5.4. | Eligibility for Disability Retirement Benefit – Non-Duty Disability | 28 |
| Sec 5.5. | Disability Retirees; Reexamination | 29 |
| Sec 5.6. | Disability Benefits; Procedures for Determination of Disability | 30 |
| Sec 5.7. | Return of Accumulated Mandatory Contributions to Non-Vested Member | 32 |
| Sec 5.8. | Benefits Offset by Workers' Compensation and Benefits; Subrogation | 32 |
| ARTICLE 6 | RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) | 33 |
| Sec 6.1 | Retirement Allowance | 33 |
| Sec 6.2 | Variable Pension Improvement Factor (Escalator) | 33 |

-ii-

13-53846-tjt    Doc 13634-1    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 16 of 101

| | | | |
|---|---|---|---|
| ARTICLE 7. | DEATH BENEFITS | | 34 |
| Sec 7.1. | Accidental Death Benefit; Performance of Duty | | 34 |
| Sec 7.2. | Non-Duty Death Benefits | | 35 |
| Sec 7.3. | Refund of Accumulated Mandatory Contributions Upon Death of Member | | 35 |
| ARTICLE 8. | FORMS OF PAYMENT | | 36 |
| Sec 8.1. | Retirement Allowance Options | | 36 |
| Sec 8.2. | Disposition of Surplus Benefits upon Death of Retiree and Beneficiary | | 37 |
| ARTICLE 9. | FUNDING AND RESERVES | | 38 |
| Sec 9.1. | Funding Objective of the Retirement System | | 38 |
| Sec 9.2. | Funds | | 38 |
| Sec 9.3. | Method of Financing Retirement System Benefits | | 39 |
| Sec 9.4. | Member Contributions Picked-Up | | 40 |
| Sec 9.5. | Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations | | 40 |
| ARTICLE 10. | VOLUNTARY EMPLOYEE CONTRIBUTIONS | | 43 |
| Sec 10.1. | Voluntary Employee Contributions; Amount; Vesting | | 43 |
| Sec 10.2. | Changing an Election to Contribute | | 43 |
| Sec 10.3. | Individual Member Accounting; Crediting of Earnings | | 43 |
| Sec 10.4. | Distribution of Accumulated Voluntary Employee Contributions | | 43 |
| ARTICLE 11. | LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS | | 45 |
| Sec 11.1. | The Loan Program | | 45 |
| Sec 11.2. | Eligibility for Loan | | 45 |
| Sec 11.3. | Amount of Loan | | 45 |
| Sec 11.4. | Terms and Conditions | | 45 |
| Sec 11.5. | Loan Balance | | 46 |
| Sec 11.6. | Default | | 46 |
| Sec 11.7. | Distribution | | 47 |
| Sec 11.8. | Annual Report | | 47 |

ARTICLE 12.     DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM ....... 48

    Sec 12.1.     General Provisions ................................................................ 48

    Sec 12.2.     Conversion to Retirement Allowance .................................. 48

    Sec 12.3.     Investment of DROP Assets.................................................. 48

    Sec 12.4.     Distribution of Amounts Credited to DROP Account.................. 49

    Sec 12.5.     Death of Member While Participating in the DROP Program ........ 49

    Sec 12.6.     Disability of Member While Participating in the DROP Program ....... 50

    Sec 12.7.     Cost Neutrality ................................................................... 50

ARTICLE 13.     LIMITATION ON BENEFITS AND CONTRIBUTIONS ..................... 51

    Sec 13.1.     Compliance With Code Section 415(b) And Regulations............ 51

    Sec 13.2.     Compliance with Code Section 415(c) and Regulations............ 54

ARTICLE 14.     RETIREMENT SYSTEM ADMINISTRATION ................................. 55

    Sec 14.1.     Board of Trustees as Retirement System Administrator ............ 55

    Sec 14.2.     Powers and Duties of Board................................................. 55

    Sec 14.3.     Executive Director; Employees............................................. 57

    Sec 14.4.     Discretionary Authority....................................................... 57

    Sec 14.5.     Administrator's Decision Binding.......................................... 58

ARTICLE 15.     MANAGEMENT OF FUNDS.......................................................... 59

    Sec 15.1.     Board as Trustee of Retirement System Assets...................... 59

    Sec 15.2.     Maintenance of Segregated Funds ...................................... 59

    Sec 15.3.     Custodian of Funds............................................................. 59

    Sec 15.4.     Exclusive Purpose ............................................................. 59

    Sec 15.5.     Prohibited Conduct ............................................................ 59

ARTICLE 16.     INVESTMENT OF RETIREMENT SYSTEM ASSETS...................... 61

    Sec 16.1.     Investment Powers of the Board and the Investment Committee ...... 61

    Sec 16.2.     Investment Management ...................................................... 62

    Sec 16.3.     Best Practices .................................................................... 63

    Sec 16.4.     Chief Investment Officer...................................................... 63

    Sec 16.5.     Investment Consultants ....................................................... 64

ARTICLE 17.     RETIREE MEDICAL ACCOUNT .................................................... 66

| | | |
|---|---|---|
| Sec 17.1. | Establishment of Account | 66 |
| Sec 17.2. | Effective Date | 66 |
| Sec 17.3. | Funding of Benefits | 66 |
| Sec 17.4. | Limitation on Contributions | 66 |
| Sec 17.5. | Impossibility of Diversion | 67 |
| Sec 17.6. | Administration | 67 |
| Sec 17.7. | Right to Amend or Terminate Medical Plans | 67 |
| Sec 17.8. | Reversion | 67 |
| Sec 17.9. | Limitation of Rights | 67 |
| ARTICLE 18. | MISCELLANEOUS | 68 |
| Sec 18.1. | Nonduplication of Benefits | 68 |
| Sec 18.2. | Assignments Prohibited | 68 |
| Sec 18.3. | Protection Against Fraud | 68 |
| Sec 18.4. | Errors | 68 |
| Sec 18.5. | Conviction of Felony; Forfeiture of Rights | 68 |
| Sec 18.6. | Amendment; Termination; Exclusive Benefit | 69 |
| Sec 18.7. | Expenses of Administration; Forfeitures Not to Increase Benefits | 69 |
| Sec 18.8. | Required Distributions - Compliance with Code Section 401(a)(9) and Regulations | 69 |
| Sec 18.9. | Direct Rollovers | 70 |
| Sec 18.10. | Construction | 71 |
| Sec 18.11. | Severability | 71 |
| COMPONENT II | | 72 |
| ARTICLE A. | COMMON PROVISIONS OF THE POLICE AND FIRE RETIREMENT SYSTEM | 73 |
| Sec. A-1. | Common Provisions | 73 |
| ARTICLE B. | FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM AS OF JUNE 30, 2014 | 75 |
| Sec. B-1 | Freeze of Police and Fire Retirement System as of June 30, 2014 | 75 |
| ARTICLE C. | DEFINITIONS | 78 |
| Sec. C-1 | Definitions | 78 |

ARTICLE D.     MEMBERSHIP ........................................................................ 85

    Sec. D-1.     Generally ......................................................................... 85

    Sec. D-2.     Membership election option prior to July 1, 2014 ............ 86

    Sec. D-3.     Cessation of membership ................................................. 87

ARTICLE E.     SERVICE CREDITABLE ...................................................... 88

    Sec. E-1.     Members to file statement of service, etc........................ 88

    Sec. E-2.     Credit for service ............................................................ 88

    Sec. E-3.     Employees in military service commencing prior to July 1, 2014 ........... 88

    Sec. E-4.     Verification of service claimed ...................................... 91

    Sec. E-5.     Prior Service certificates ................................................ 91

    Sec. E-6.     Creditable service at retirement...................................... 91

ARTICLE F.     BENEFITS PROVIDED TO MEMBERS ............................. 92

    Sec. F-1.     Petition for retirement, mandatory age........................... 92

    Sec. F-2.     Old Plan/New Plan ......................................................... 94

    Sec. F-3.     Pension Multiplier .......................................................... 95

    Sec. F-4.     Disposition of surplus benefits upon death of retired member ............ 96

    Sec. F-5.     Retirement allowance for certain persons leaving City employment after eight years service (40 & 8) ......................... 96

    Sec. F-6.     Reduced Early Pension Benefits (40 & 8 Vesting Retirees) ................... 97

    Sec. F-7.     Duty disability ................................................................ 98

    Sec. F-8.     Duty disability benefits; Members in service on or after July 1, 1941 but prior to January 1, 1969................................. 98

    Sec. F-9.     Duty disability benefits; Members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10 ............................................ 100

    Sec. F-10.     Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below ................................. 101

    Sec. F-11.     Non-duty disability.......................................................... 103

    Sec. F-12.     Disability retirement procedures ..................................... 105

    Sec. F-13.     Generally ......................................................................... 107

    Sec. F-14.     Increase of Benefits; Pension Improvement Factor (Escalator).. ......... 107

| | | |
|---|---|---|
| Sec. F-15. | Payment | 108 |
| Sec. F-16. | Generally | 108 |
| Sec. F-17. | Payment of Accumulated Contributions | 110 |
| Sec. F-18. | Allowances to surviving spouses | 110 |
| Sec. F-19. | Payment of benefits to employees who became Members before January 1, 1969 | 112 |
| Sec. F-20. | Payment of benefits to employees who became Members on or after January 1, 1969 | 113 |
| Sec. F-21. | Deferred vested benefits | 113 |
| Sec. F-22. | Forfeiture of rights | 113 |
| Sec. F-23. | Generally | 114 |
| Sec. F-24. | Disposition of surplus benefits upon death of Member and Beneficiary | 116 |
| Sec. F-25. | Generally | 116 |
| Sec. F-26. | Generally | 116 |
| Sec. F-27. | Authority of Board | 116 |
| Sec. F-28. | Member With Twenty or Twenty-Five Years of Service | 117 |
| Sec. F-29. | Disabled Member | 118 |
| Sec. F-30. | Optional Annuity Withdrawal | 118 |
| ARTICLE G. | METHOD OF FINANCING | 121 |
| Sec. G-1. | General | 121 |
| Sec. G-2. | Annuity Savings Fund | 121 |
| Sec. G-3. | Annuity Reserve Fund | 122 |
| Sec. G-4. | Alternative Financing Method | 122 |
| Sec. G-5. | Contributions to and payments from Pension Accumulation Fund | 123 |
| Sec. G-6. | Retiree payments from Pension Reserve Fund; reinstatement of disability Retirees to active service | 124 |
| Sec. G-7. | Expense Fund | 124 |
| Sec. G-8. | Deferred Retirement Option Plan Fund | 124 |
| Sec. G-9. | Appropriations prior to July 1, 2014 and after June 30, 2023 | 124 |
| Sec. G-10 | Maintenance of reserves | 124 |

Sec. G-11.  Survivors Benefit Fund ............................................................. 125

Sec. G-12.  Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries ......................................... 126

Sec. G-13  Determination of City's annual contribution — Disability Pension liabilities ................................................................................... 129

Sec. G-14.  Determination of City's annual contribution — Death Pension liabilities ................................................................................... 129

Sec. G-15  Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities ......................... 130

Sec. G-16.  Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014 and after June 30, 2023 ............................................................... 130

Sec. G-17.  Board of trustees to compute City's annual contribution ...................... 130

Sec. G-18.  Employer Contribution ............................................................. 131

ARTICLE H.  MISCELLANEOUS ................................................................. 132

Sec. H-1.  Recall of Retirees during emergencies ........................................... 132

ARTICLE I.  DEFERRED RETIREMENT OPTION PLAN ................................... 133

Sec. I-1.  General provisions .................................................................. 133

Sec. I-2.  Conversion to Retirement Allowance ............................................. 133

Sec. I-3.  Investment of DROP assets ........................................................ 133

Sec. I-4.  Distribution of amounts credited to DROP Account ............................ 134

Sec. I-5.  Death of Member while participating in the DROP program ................... 134

Sec. I-6.  Disability of Member While Participating in the DROP Program ........... 135

Sec. I-7.  Cost Neutrality ...................................................................... 135

ARTICLE J.  PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM .......... 137

Sec. J-1.  Participant Annuity Savings Fund Loan Program ................................ 137

ARTICLE K.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS ......................... 140

Sec. K-1.  Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment ................................................................. 140

Sec. K-2.  Income Stabilization Benefits ..................................................... 140

Sec. K-3.  Restoration of Pension Benefits ................................................... 143

APPENDIX A ....................................................................................... 152

## TABLE OF CONTENTS
(continued)

| | Page |
|---|---|
| ARTICLE IX, SECTION 24 OF STATE OF MICHIGAN CONSTITUTION | 152 |
| CITY OF DETROIT CHARTER | 153 |
| DETROIT CITY CODE | 154 |
| COLLECTIVE BARGAINING AGREEMENTS | 155 |

# COMPONENT I

# ARTICLE 1.  GENERAL PROVISIONS

**Sec 1.1.    Police  and  Fire  Retirement  System  Established;  Adoption  of  2014  Plan Document**

Effective July 1, 1941, a Pension System for Policemen and Firemen of the City of Detroit was established for the purpose of providing retirement allowances and death benefits for Policemen and Firemen and their beneficiaries by amendment to the Charter of the City of Detroit. That Pension System was amended on numerous occasions after July 1, 1941, including an amendment renaming the Retirement System as the "Police and Fire Retirement System of the City of Detroit." The provisions of the Police and Fire Retirement System of the City of Detroit, as in effect July 1, 2014, were set forth in a Combined Plan Document (including Appendix A attached thereto).  As provided in Ordinance 15-14 and Ordinance 16-14 and Section 47-1-2 of the Detroit City Code, the Combined Plan Document replaced the provisions of the Police and Fire Retirement System of the City of Detroit as set forth in the City of Detroit Charter, the Detroit City Code and any conflicting provisions in any collective bargaining agreements, rulings or opinions covering Members (including, without limitation, City Employment Terms). All resolutions and policies of the Board previously enacted which were inconsistent with the provisions  of  the  Combined  Plan  Document  were  also  repealed  to  the  extent  of  such inconsistency.

This Combined Plan Document is hereby amended and restated effective July 1, 2014, in the form of this instrument.  Component I of the Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Police and Fire Retirement System of the City of Detroit on and after July 1, 2014.  Component II of the Plan Document generally applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Plan Document are frozen effective June 30, 2014.

**Sec 1.2.    Retirement System Intended to be Tax-Qualified; Governmental Plan**

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue  Code  which  is  intended  to  be  a  qualified  plan  and  trust  pursuant  to  applicable provisions  of  the  Internal  Revenue  Code.    The  Board  shall  construe  and  administer  the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

**Sec 1.3.    Compliance With Plan of Adjustment**

The  Retirement  System  is  intended  to  comply  with  all  relevant  provisions  (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment").  Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment.  To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the

Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

## Sec 1.4. Board of Trustees

Effective July 1, 1941, a Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created. The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document.

## Sec 1.5. Board of Trustees – Membership; Appointment

The Board of Trustees of the Police and Fire Retirement System of the City of Detroit shall consist of seventeen Trustees, as follows:

(1)   The Mayor, *ex-officio*, or the Mayor's designee;

(2)   The President of City Council or a member thereof elected by the City Council, *ex-officio*;

(3)   The City Treasurer or Deputy City Treasurer, *ex-officio*;

(4)   The City Finance Director, or a designated representative, *ex-officio*;

(5)   The City Budget Director, or a designated representative, *ex-officio*;

(6)   The Corporation Counsel of the City, or a designated representative, *ex-officio*;

(7)   Three Fire Members of the Retirement System to be elected by the Fire Members under such rules and regulations as may be established by the Board of Fire Commissioners to govern such elections, as follows:

    (a)   Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)   One to be elected by and from Members holding ranks above the rank of lieutenant (or its equivalent);

(8)   Three Police Members of the Retirement System to be elected by the Police Members under the rules and regulations as may be established by the Commissioner of Police to govern such elections, as follows:

    (a)   Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)   One to be elected by and from Members holding a rank above lieutenant (or its equivalent); and

(9)     One individual who neither is a Member of the Retirement System nor an employee of the City in any capacity to be selected by the Board;

(10)    Two Retirees receiving benefits under the Retirement System, one of whom shall be elected by Retired Police Members and one of whom will be elected by Retired Fire Members pursuant to Sections 1.6 and 1.7 below;

(11)    One Trustee appointed by the Mayor upon election of a Retiree Police Trustee; and

(12)    One Trustee appointed by the Mayor upon election of a Retiree Fire Trustee.

**Sec 1.6.    Board of Trustees; Scheduling of Elections for Active and Retiree Trustees**

(1)     Annual elections for active Police Officers and Fire Fighters shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(2)     Elections to fill vacancies created by the expiration of a term for a Retiree Trustee shall be held every three years during the month of May.

(3)     A special election for Retiree Trustees shall be held as soon as practicable after the Plan of Adjustment is confirmed.  Unless a Retiree Trustee elected by reason of this special election resigns or is removed from the position of Trustee in accordance with the terms of the Combined Plan Document, a Retiree elected to the office of Trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the last day of June that follows the third anniversary of the special election, at which time an election for Retiree Trustees shall be held in accordance with Section 1.7.

**Sec 1.7.    Procedures for election of Retiree Trustees**

The procedures for the election of the Retiree Trustees shall be as follows:

(1)     *Notice*.  Notice of a primary election shall be sent to each Retiree by United States Mail.

(2)     *Notice of Candidacy*.  A proposed candidate shall submit a notarized letter to the executive director notifying the Retirement System of his or her candidacy.

(3)     *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position the Retiree held at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election.  No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4)     *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes

shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)   *Procedures.*  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)   *Board Rules.*  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.7 shall be handled in accordance with such rules and regulations as the Board may adopt and Michigan law.

## Sec 1.8.   Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the City Clerk.

The term of office for each elected Trustee under Sections 1.5(7), (8) and (10) shall be three years.  The term of office for the Trustee who is selected by the Board under Section 1.5(9) shall be two years.  The term of office for the Trustees appointed by the Mayor under Sections 1.5(11) and (12) shall be three years.  Except as provided in Section 1.6(3), elected Trustees holding office on June 30, 2014 shall serve the remainder of their terms.

If a Trustee resigns or is removed by the other Trustees for cause, or if an elected or appointed Trustee fails to attend three consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled.  No vacancy shall result tj reason of a change in the rank or grade of a Trustee during the term of office.

## Sec 1.9.   Board of Trustees; Officers and Employees

The Board shall elect from its membership a chairman and a vice chairman.  The executive director of the Retirement System or his or her representative shall serve as secretary of the Board.  The Board may employ such special actuarial, medical and other contractors and employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

## Sec 1.10.   Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)   The Board shall hold regular meetings, at least one in each month, and shall hold special meetings as necessary.  The Board shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.*  All Board meetings shall be held within the City of Detroit.

(2)   Each Trustee shall be entitled to one vote on each question before the Board. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)   Eight members of the Board, four of whom must be elected members, shall constitute a quorum.

## Sec 1.11.   Board of Trustees; Compensation; Expenses

All members of the Board of Trustees shall serve without additional compensation from the City or the Retirement System; however Retiree Trustees shall receive a hourly stipend from the Retirement System equal to the lowest rate of pay received by an active employee Trustee for attending Board meetings, educational time and travel out of the City on official business of the Retirement System. All Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

## Sec 1.12.   Rules for Administration of Funds.

Subject to the limitations contained in this Combined Plan Document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Combined Plan Document and for the transaction of its business.

## Sec 1.13.   Board of Trustees; Certain Data to be Kept

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the Retirement System and for checking and compiling the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

## Sec 1.14.   Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

## Sec 1.15.   Board of Trustees; Legal Advisors

(1)   The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)     Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)     Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec 1.16.   Board of Trustees; Medical Director

(1)     The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in a retirement system maintained by the City. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(2)     The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of the Combined Plan, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred to it.

### Sec 1.17.   Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board. In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary. The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Board and the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Board and the Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the term sheet regarding Investment Committee Governance for Police and Fire Retirement System, attached to that certain agreement by and between the Michigan Settlement Administration Authority, a Michigan body public corporation (the "Authority"), the Retirement System, the General Retirement system for the City of Detroit, Michigan ("GRS"), and the City (the "State Contribution Agreement") as Exhibit B (the "Governance Term Sheet"), and the Plan of Adjustment. Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

**Sec 1.18.  Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System**

(1)     Subject to Section 16.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this Section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this Section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

**Sec 1.19.  Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities**

Subject to Section 16.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.18, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

**Sec 1.20.  Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties**

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee.  To the extent the Board exercises discretion with respect to investment of Retirement System assets, each member of the Board of Trustees shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*, and shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*  A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose.  Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

## Sec 1.21. Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties

As of the effective date of the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees and taking action under and with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment Committee is controlled by the Governance Term Sheet. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*. The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

## Sec 1.22. Investment Committee; Membership; Appointment

The Investment Committee shall consist of nine (9) members, determined as follows:

(1)     Five independent members, at least two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee

members as necessary to bring the number of independent Investment Committee members to five (5);

(2)     Two Retirees who shall be appointed by the Board consisting of one elected retired Police Member and one elected retired Fire Member who are serving on the Board and who are receiving benefit payments under the Retirement System; and

(3)     Two Employee members who shall be appointed by the Board consisting of one Fire Department Employee and one Police Department Employee who are active members of the Board.

## Sec 1.23.   Investment Committee; Term; Resignation and Removal; Vacancies

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|:---:|:---:|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or Employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees. Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier. Notwithstanding any provision of this Combined Plan Document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee. An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in accordance with the voting procedure set forth in Section 1.24; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government. A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings. In the event of any

removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("State Treasurer"), in consultation with the Foundation, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the State Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

## Sec 1.24.  Investment Committee; Operation; Meetings; Quorum; Voting

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq*. All Investment Committee meetings shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Each independent Investment Committee member shall be entitled to one vote on each question before the Investment Committee. Each Retiree and Employee member shall be entitled to one-half vote on each question before the Investment Committee. Except as otherwise provided in the Governance Term Sheet, at least four concurring votes shall be necessary for a decision by the

Investment Committee and each Investment Committee member shall be entitled to one vote on each question before the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a state or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

### Sec 1.25.  Investment Committee; Compensation; Expenses; Employment of Advisors

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties.  All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.  The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions, and such parties or persons may be reasonably compensated from the assets of the Retirement System.  Such engagements shall not be subject to approval of the Board.

### Sec 1.26.  Investment Committee; Special Reporting Obligation

(1)     Beginning in calendar year 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the State Treasurer on a semi-annual basis and at such other times as the State Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)     In the event the Retirement System receives a written notice from the State Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the State Treasurer a written certification that (i) the default has been cured, and (ii) no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)     Beginning in calendar year 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)     Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)    a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b)    a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to the Foundation that, as of the date of the annual report required to be provided by the City to the Foundation under the Omnibus Transaction Agreement by and among the City, The Detroit Institute of Arts and Foundation For Detroit's Future ("Annual Report"):

   (i)    the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

   (ii)   the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan Document; and

   (iii)  the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)    a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the State Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the State Treasurer; and (iv) in the event that the State Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee. Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d)    any additional information that may be reasonably requested by the Foundation from time to time.

(e)    Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City

confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

# ARTICLE 2. DEFINITIONS

## Sec 2.1.    Definitions

Unless a different definition is contained within this Combined Plan Document, or a different meaning is plainly required by context, for purposes of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1)  *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the Compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)  *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System representing after-tax amounts deducted from the Compensation of the Member, together with earnings on such contributions.

(3)  *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.

(4)  *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee. The rates of interest, tables and factors adopted by the Board from time to time to determine Actuarial Equivalence shall not violate the terms of the Plan of Adjustment.

(5)  *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)  *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)  *Average Final Compensation* means the average Compensation received by a Member during the five consecutive years of Credited Service which immediately precede the date of the Member's last termination of City employment as an employee of the Police Department or the Fire Department. If a Member has less than five years of Credited Service, the Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.

(8)  *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(9)  *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Police and Fire Retirement System of the City of Detroit.

- 14 -

(10)     *City* means the City of Detroit, Michigan, a municipal corporation.

(11)     *City Council or Council* means the legislative body of the City.

(12)     *Combined Plan* means the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan, effective July 1, 2014, and as amended thereafter.

(13)     *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the taxable income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which is contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, solely for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the City.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14)     *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)     the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)     the 2014 Defined Contribution Plan which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15)    *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)     the Frozen Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)     the Frozen Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16)    *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(17)    *Disability or Disabled*: see Total Disability or Totally Disabled.

(18)    *DFFA* means the Detroit Fire Fighters Association.

(19)    *DPCOA* means the Detroit Police Command Officers Association.

(20)    *DPLSA* means the Detroit Police Lieutenants and Sergeants Association.

(21)    *DPOA* means the Detroit Police Officers Association.

(22)    *DROP Account* means the account established by the Board for a Member who is eligible for and who elects to participate in the DROP Program.

(23)    *DROP Program* means a program established for eligible Members pursuant to Article 12.

(24)    *Employee* means an employee of the City's Police Department who has taken an oath of office or a Fire Fighter providing services to the City, but does not include:

(a)     individuals whose City services are compensated on a contractual or fee basis;

(b)     any person during any period when such person is classified by the City as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the City;

(c)     the Medical Director of the Retirement System.

If a person described in (b) above is reclassified by the City as a common-law employee of the City and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(25)   *Employer* means the City.

(26)   *Final Compensation* means the annual compensation of a Member at the time of his or her termination of employment.

(27)   *Fire Fighter* means the rank in the Fire Department currently or formerly classified by the civil service commission as Fire Fighter.

(28)   *Fire Member* means an employee of the Fire Department of the City of Detroit who is a participant in the Retirement System.

(29)   *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(30)   *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the City for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the City for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(31)   *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(32)   *Investment Committee* means the committee established pursuant to Section 1.22 which shall have the powers and duties described herein.

(33)   *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(34)   *Medical Beneficiary* means a Member who has retired from employment with the City and the Spouses and dependents of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by the City.

(35)   *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(36)   *Medical Benefits Account* means the bookkeeping account established under Section 17.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(37)   *Medical Director* means the physician appointed by the Board pursuant to Section 1.16.

- 17 -

(38)   *Member* means any Police Member or Fire Member who has not retired or died.

(39)   *Normal Retirement Age* means for any Member Age fifty with twenty-five years of Credited Service, with the following transition period for a Member who is an active employee on June 30, 2014 regarding payment of Component I benefits only:

| Fiscal Year | Age and Credited Service |
| --- | --- |
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his or her accrued benefit under the Retirement System upon Attainment of Normal Retirement Age while in Service.

(40)   *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(41)   *Patrolman* means the rank in the Police Department currently or formerly known as patrolman.

(42)   *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance payable under Component I of the Combined Plan. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience, and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(43)   *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.17 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Investment Committee or the Board may direct.

(44)   *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(45)   *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan,* Case No. 13-53846.

(46)   *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(47)   *Police and Fire Retirement System of the City of Detroit or Retirement System* means the Police and Fire Retirement System of the City of Detroit created and, prior to July 1, 2014, memorialized in Title IX, Chapter VI, of the 1918 Detroit City Charter, as

amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code, Article 54 of the Detroit City Code of 1964, and collective bargaining agreements and, on and after July 1, 2014, pursuant to Section 47-1-2 of the Detroit City Code, memorialized in this Combined Plan Document, as amended from time to time.

The Retirement System consists of:

(a)     The 2014 Defined Benefit Plan, which is described in Component I hereof;

(b)     the 2014 Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, which is described in Component I hereof;

(c)     the Frozen Defined Benefit Plan, which is described in Component II hereof; and

(d)     the Frozen Defined Contribution Plan, which is described in Component II hereof.

References to the words Retirement System in Component I of the Plan Document shall mean the provisions of the 2014 Defined Benefit Plan and/or the 2014 Defined Contribution Plan described in Component I, unless a different meaning is plainly required by context.

(48)    *Police Member* means a Police Officer who has taken the oath of office as prescribed in the Detroit City Charter, excluding patrolmen of other City departments, privately employed patrolmen and special patrolmen, who is a participant in the Retirement System.

(49)    *Police Officer* means the rank in the Police Department currently or formerly known as Police Officer.

(50)    *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(51)    *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(52)    *Retirement* means a Member's withdrawal from the employ of the City with a Retirement Allowance paid by the Retirement System.

(53)    *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(54)    *Service* means personal services rendered to the City by an employee of the Police Department or Fire Department, provided such person is compensated by the City for such personal services.

(55)     *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

(56)     *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(57)     *Total Disability or Totally Disabled* means:

    (a)     during the first twenty-four (24) months that a Member receives benefits from the Retirement System due to injury, illness or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of the Member's occupation; and

    (b)     during all subsequent months that a Member receives benefits from the Retirement System due to illness, injury or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the Member is suited, based on education, training and experience.

(58)     *Vesting Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(59)     *Voluntary Employee Contributions* mean the after-tax contributions made by a Member to the Retirement System pursuant to Section 10.1.

(60)     *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for a Member who elects to make Voluntary Employee Contributions.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 13.2(1) |
| Annual Report | Section 1.26(4)(b) |
| Authority | Section 1.17 |
| cash refund annuity | Section 5.4(1)(a) |
| compensation | Section 13.1(12) |
| Compliance Report | Section 1.26(1) |
| Cure Certification | Section 1.26(2) |
| current active | Section 9.3(3) |
| Default Notice | Section 1.26(2) |
| Deferred Retirement Option Plan Fund | Section 9.2(5) |
| Deferred Retirement Option Plan Program (DROP) | Section 12.1 |
| Differential Wage Payment | Section 4.4 |
| Direct rollover | Section 18.9(1)(b) |
| Distributee | Section 18.9(1)(c) |
| Dollar Limit | Section 13.1(3)(b) |
| Disability Retirement Review Board/DRRB | Section 5.6(2) |

| | |
|---|---|
| Eligible retirement plan | Section 18.9(1)(d) |
| Eligible rollover distribution | Section 18.9(1)(e) |
| Expense Fund | Section 9.2(7) |
| Foundation | Section 1.22(1) |
| funding level | Section 9.5(3) |
| Governance Term Sheet | Section 1.17 |
| Income Fund | Section 9.2(8) |
| ING | Section 12.3(1) |
| investment management decisions/investment management matters | Section 16.2 |
| limitation year | Section 13.1(2) |
| Medical Benefits Account Fund | Section 9.2(6) |
| Medical Plans | Section 17.1 |
| new employee | Section 9.3(3) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(i)(e) |
| Option One. Modified Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(3) |
| Pension Certificate | Section 1.26(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| Plan of Adjustment | Section 1.3 |
| Police and Fire Retirement System of the City of Detroit | Section 1.1 |
| Pop-up Form | Section 8.1(2)(b) |
| Rate Stabilization Fund | Section 9.2(4) |
| Standard Form | Section 8.1(2)(a) |
| State Contribution Agreement | Section 1.17 |
| State Treasurer | Section 1.23 |
| Straight Life Retirement Allowance | Section 8.1(1) |

# ARTICLE 3.  MEMBERSHIP

## Sec 3.1.    Eligible Employees

(1)    Except as provided in Section 3.2, the membership of the Retirement System shall consist of all persons who are employed with the Police and Fire Departments of the City and who are employed as Police Officers or Fire Fighters according to the rules and regulations of the respective Departments.  An eligible Employee's membership in the Retirement System shall be automatic; no eligible Employee shall have the option to elect to become a Member of the Retirement System.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member, paying contributions and entitled to benefits as though he or she had remained in the rank, grade or position held at the date of his or her appointment.

(3)    Any Police Officer or Fire Fighter who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member as of his or her date of death.

(4)    Any Member who shall be transferred to a civilian position in his or her Department shall continue as a Member, subject to all the obligations of a Member.

## Sec 3.2.    Cessation of Membership; Re-Employment

(1)    If a Member dies, or is separated from service with the City by resignation, dismissal, retirement or Disability, he or she shall cease to be a Member.  A Member who elects to participate in the DROP Program under Component I, Component II or both shall be considered to have separated from service with the City by reason of retirement and shall not accrue a benefit under the Retirement System, be required to make Mandatory Employee Contributions to the Retirement System pursuant to Section 9.3(3) or 9.5, or be permitted to make Voluntary Employee Contributions pursuant to Section 10.1.

(2)    If a vested Member ceases to be a Member under paragraph (1) other than by reason of participation in the DROP Program and later becomes a Police Officer or Fire Fighter other than in the position of Police Assistant, he or she shall again become a Member, subject to the obligations of a Member.  The benefit payable to the Member upon a subsequent termination shall be based upon his or her total Credited Service earned on and after July 1, 2014, provided that, if the Member received a distribution of his or her Accumulated Mandatory Contributions following termination, the Member recontributes the Accumulated Mandatory Contributions to the Retirement System within two years of his or her re-employment date.  If a Member who receives a distribution of his or her Accumulated Mandatory Contributions fails to recontribute such amount to the Retirement System within two years of re-employment, only the Credited Service earned on and after the Member's re-employment date shall be taken into consideration in determining his or her Retirement Allowance.

(3)     If a Member ceases to be a Member under paragraph (1) and later becomes employed as a Police Assistant, such Member shall not become a Member upon re-employment. If such Member was receiving a Retirement Allowance from the Retirement System prior to his or her date of rehire, such Retirement Allowance shall not be suspended during the period of the Member's reemployment as a Police Assistant.

(4)     Retirement benefits for a Retiree who returns to active full time employment other than as a Police Assistant shall be subject to the following:

    (a)     A Retiree who returns to work will have his or her Retirement Allowance suspended upon re-employment. The variable Pension Improvement Factor (Escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

    (b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his or her re-employment period.

    (c)     A Retiree's Average Final Compensation and Credited Service for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation and Credited Service earned by the Retiree after he or she returns to work.

    (d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his or her second Retirement Allowance.

**Sec 3.3.     Report From City**

It shall be the duty of the City to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4.  SERVICE CREDIT

## Sec 4.1.    Credited Service

(1)    The Board shall keep an accurate record of each Member's accumulated Credited Service from the date of commencement of employment with the City to the date of termination of employment with the City.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he or she performs one hundred forty (140) or more Hours of Service for the City as a Member beginning on the later of (i) July 1, 2014 or (ii) his or her date of hire with the City as a Police Officer or Fire Fighter and ending on the date his or her employment with the City as a Police Officer or Fire Fighter is terminated.  Service shall be credited in years and twelfths ($1/12^{th}$) of a year.  Not more than one-twelfth ($1/12^{th}$) of a year of Credited Service shall be credited to a Member on account of all service rendered to the City in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all service rendered to the City in any period of 12 consecutive months.

(3)    Not more than one month of Credited Service shall be granted for any period of more than one month during which the Member is absent without pay; notwithstanding the foregoing, any Member who shall  be suspended from duty and subsequently reinstated to duty without further disciplinary action shall receive credit for the time of such period of suspension.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Sections 5.1 and 5.4, a Member shall be credited with the sum of his or her Prior Service as determined by the Board and his or her Credited Service on and after July 1, 2014 determined under Section 4.1(2).  The period of time during which a Member is on layoff from the service of the City shall be included in the Member's Credited Service solely for the purposes of determining whether the Member has attained his or her Normal Retirement Age for purposes of Section 5.1.

## Sec 4.2.    Vesting Service

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the City.

(2)    A Member's total Vesting Service shall be the sum of his or her Prior Service and his or her Vesting Service determined under Section 4.2(1).

## Sec 4.3.    Service Credit; Military Service

A Member who enters the military service of the United States while employed with the City shall have the period of such military service credited as Credited Service and Vesting Service in the same manner as if the Member had served the City without interruption, provided that (1) the Member's entry into such military service and re-employment thereafter shall be in

accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, (2) he or she is re-employed by the City upon completion of such military service, and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service. The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder. During the period of military service and until return to City employment, the Member's Mandatory Employee Contributions to the Retirement System shall be suspended.

**Sec 4.4.    Service Credit; Qualified Military Service**

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u). Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than thirty days, such Differential Wage Payment will be treated as compensation under the Code Section 415(c)(3) limits, but not for purposes of benefit accruals under the Retirement System. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the City to an individual who is performing service in the uniformed services while on active duty for a period of more than thirty days.

## ARTICLE 5.  ELIGIBILITY FOR RETIREMENT

### Sec 5.1.    Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his or her Normal Retirement Age while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

### Sec 5.2.    Eligibility for Deferred Vested Retirement Benefit

Any Member who terminates employment with the City prior to satisfying the requirements for receipt of a retirement benefit under Section 5.1 and who is credited with ten (10) or more years of Vesting Service upon his or her termination of employment (regardless of Age) shall be entitled to receive an unreduced Retirement Allowance calculated pursuant to Section 6.1 commencing at any time following his or her Attainment of Age sixty-two; provided that any member of DPLSA or DPCOA who is credited with ten (10) or more years of Vesting Service upon his or her termination of employment (regardless of Age) shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his or her Attainment of Age fifty-five.  Any Member (other than a member of DPLSA or DPCOA), may elect to begin receiving a Retirement Allowance following his or her Attainment of Age fifty-five, actuarially reduced for commencement prior to age sixty-two, in lieu of an unreduced Retirement Allowance beginning at age sixty-two.  The Retirement Allowance payable to a Member who makes such an election shall be the Actuarial Equivalent of the deferred Retirement Allowance that would be payable to the Member at his Normal Retirement Date pursuant to Section 6.1, assuming the Member terminated employment on the early retirement date, as determined by the Plan Actuary based upon factors, assumptions and methods adopted by the Board upon recommendation of the Investment Committee. Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

### Sec 5.3.    Eligibility for Disability Retirement Benefit – Duty Disability

(1)    If, prior to attainment of his or her Normal Retirement Date, a Member shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if, pursuant to Section 5.6, the Board shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board by or on behalf of such Member or by the head of his or her Department such Member shall be retired, notwithstanding that during such period of notification he or she may have separated from service and provided further that the Medical Director, after examination of such Member shall certify to the Board the Member's Total Disability.  A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

(a)     a basic benefit equal to fifty percent (50%) of his or her Final Compensation at the time his or her duty disability retirement begins, and

(b)     a supplemental benefit equal to sixteen and two-thirds percent (16-2/3%) of his or her Final Compensation at the time his or her duty disability retirement begins.

Subject to Section 9.5, on the first day of each Plan Year, a Member's duty disability benefit will be increased as provided in Section 6.2.

(2)     After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation. If the Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (1)(a) and (1)(b) until such time as the Member would have attained twenty-five years of Credited Service had he or she continued in active service with the City. At that time, the Member shall continue to receive the benefit described in paragraph 1(a) above; however, benefits described in paragraph (1)(b) above will cease. If the Member is not disabled from any occupation, he or she shall continue to receive the benefit described in paragraph (1)(a) above; benefits described in paragraph (1)(b) will cease.

(3)     Duty disability benefits shall continue to be paid to a Member on duty disability retirement after the Member has attained twenty-five years of Credited Service to the earlier of (i) the Member's Attainment of Age sixty-five, or (ii) the date the Member ceases to be Totally Disabled as determined by the Board. Upon termination of disability or Attainment of Age sixty-five, a Member with twenty-five years of Credited Service shall be eligible to receive a Retirement Allowance as provided in Section 6.1. The amount of such Retirement Allowance shall be equal to the amount which would have been payable to the Member if the Member's conversion from duty disability retirement to a Retirement Allowance had occurred on the date the Member attained twenty-five years of Credited Service.

(4)     If a Member on duty disability retirement returns to active service with the City and shall re-qualify for duty disability retirement for the same or related reasons within twenty-four months of his or her return to active service, then the disability shall be deemed a continuation of the prior Total Disability and the period of the Member's active service following the return to work will not qualify the Member to be entitled to a new initial determination of disability for purposes of determining the benefit payable to the Member. Instead, such Member will return to duty disability retirement benefits based on the number of months of disability with which the Member was credited at the time of his or her return to active service, as if there had not been a break in his or her period of duty disability retirement.

(5)     During the period a Member is eligible to receive duty disability benefits under this Section 5.3, the Member shall continue to be credited with Credited Service until the Member accrues twenty-five years of Credited Service, at which time accrual of Credited Service shall cease.

(6)     In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Plan Year will be adjusted so it does not exceed the difference between (i) the Member's Compensation at the date of duty disability, increased by the Pension Improvement Factor (Escalator) (if any) applicable to such benefit pursuant to Section 6.2 during the period of duty disability, and (ii) the amount of the Member's remuneration from gainful employment during the prior calendar year. The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources. Furnishing such information to the Board at such times as the Board shall require shall be a condition for the Member's continued eligibility for duty disability benefits. In the event a Member's Retirement Allowance was not appropriately reduced for any period in which he or she is engaged in a gainful occupation, the Board shall adjust future benefit payments to such Member until the amount of the overpayment is recouped by the Retirement System.

**Sec 5.4.     Eligibility for Disability Retirement Benefit – Non-Duty Disability**

(1)     Upon the application of a Member or the Member's Department head, a Member who becomes totally and permanently disabled prior to his or her Normal Retirement Age in the employ of the City not resulting from the performance of duty shall be retired by the Board; provided that the Medical Director shall certify to the Board after a medical examination, that such Member is Totally Disabled. Such a Member shall receive the following applicable benefits:

      (a)     If such Member has less than five years of Credited Service at the time of his or her disability retirement, his or her Accumulated Mandatory Employee Contributions standing to his or her credit in the Accumulated Mandatory Employee Contributions Fund shall be returned to him or her, or at his or her option he or she shall receive a cash refund annuity which shall have the Actuarial Equivalent Value of his or her Accumulated Mandatory Employee Contributions. For purposes of this Section 5.4(1)(a), a "cash refund annuity" is an annuity that provides a death benefit equal to the positive difference, if any, between the original cost of the annuity and the sum of annuity payments received by the Member prior to his or her death.

      (b)     If such Member has five or more years of Credited Service at the time of his or her disability retirement, he or she shall receive a disability Retirement Allowance commencing as of the date of disability computed in accordance with the provisions of Section 6.1 and payable in any of the optional forms provided in Section 8.1 hereof. His or her annual Straight Life Retirement Allowance shall not be less than twenty per cent (20%) of his or her Average Final Compensation.

(2)     If a Member receiving non-duty disability retirement benefits is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the disabled Member's Retirement Allowance increased by the Pension Improvement Factor (Escalator) (if any) applicable to such benefit pursuant to Section 6.2, and his or

her Average Final Compensation determined as of the date of non-duty disability, the Member's Retirement Allowance shall be reduced by the amount of such difference. If the amount of the Member's earnings changes, the Retirement Allowance may be adjusted accordingly. The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources. Furnishing such information to the Board at such times as the Board shall require shall be a condition for the Member's continued eligibility for non-duty disability benefits. In the event a Member's Retirement Allowance was not appropriately reduced for any period in which he or she is engaged in a gainful occupation, the Board shall adjust future benefit payments to such Member until the amount of the overpayment is recouped by the Retirement System.

## Sec 5.5.    Disability Retirees; Reexamination

(1)    At least once each year following the retirement of a Member under Section 5.3 or Section 5.4, the Board shall require that such disabled Member who has not attained his or her Normal Retirement Age undergo a medical examination, to be made by, or under the direction of the Medical Director; provided, however, that medical examinations shall not be required if the Medical Director determines that the Member's condition is permanent and there is no need for further reexamination. Members shall be reimbursed for reasonable costs actually incurred by the Members in connection with such examinations. Should any such Retiree who has not attained Normal Retirement Age fail to submit to a required medical examination, the Member's Retirement Allowance may be suspended by the Board until the examination is completed. Should such failure continue for one year, all of the disabled Member's rights in and to the duty or non-duty disability Retirement Allowance may be revoked by the Board. If upon such examination of a Member, the examiner reports that the Member is no longer Totally Disabled, and such report is concurred in by the Board, the Member shall be restored to active service with the City and the Retirement Allowance paid pursuant to Section 5.3 or Section 5.4 shall be suspended until the Member terminates active service with the City.

(2)    A disabled Member who has been, or shall be, reinstated to active service in the employ of the City shall again become an active Member. All Credited Service at the time of reinstatement, in the case of a duty disabled Member, or at the time of the disability retirement, for a non-duty disabled Member, shall be restored to the Member; provided that, if a non-duty disabled Member received a distribution of his or her Accumulated Mandatory Contributions following the disability retirement pursuant to Section 5.4(1)(a), the Member recontributes the Accumulated Mandatory Contributions to the Retirement System within two years of his or her re-employment date. If a Member who receives a distribution of his or her Accumulated Mandatory Contributions fails to recontribute such amount to the Retirement System within two years of re-employment, only the Credited Service earned on and after the Member's re-employment date shall be taken into consideration in determining his or her Retirement Allowance.

**Sec 5.6.    Disability Benefits; Procedures for Determination of Disability**

(1)    The Board shall establish procedures for determining whether a Member is Totally Disabled.  Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(2)    If a Member is determined to be Totally Disabled under Section 5.3(1) or 5.4(1), the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan.  If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits.  If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility.  If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board.  The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members.  The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in accordance with the agreements between the City and the unions representing Members.

(3)    The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

(a)    The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

(b)    A court reporter will be present and make a stenographic record of the proceedings;

(c)    The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

(d)    The witnesses will be sequestered;

(e)    The witnesses will be sworn by the court reporter and testify under oath;

(f)    The Member may not be called by the City as an adverse witness;

(g)    The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

(h)    If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department executive for the release of the employee for the purpose of so testifying;

(i)    The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

(j)    The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

(k)    The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan. The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan; and

(l)    The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(4)    If a disabled Member is determined by the Board to no longer be Totally Disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination. The Board shall promptly arrange for such re-examination. The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer Totally Disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

(5)    The Board shall not act upon or grant the application filed by a Member who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

(a)    regularly assigned to a position, the full duties of which he or she is capable of performing; or

(b)    assigned to a restricted duty position, unless the Member's Department advises that it intends to seek a disability retirement for the Member in the foreseeable future.

(6)    The provisions in paragraph (5) above are not intended to and will not:

(a)    affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

- 31 -

(b)  restrict in any way the existing authority of the Chief of Police or the Fire Commissioner to seek a duty or non-duty disability retirement for a Member or for that Member, at that time, to request a duty or non-duty disability retirement.

## Sec 5.7.  Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases employment with the City other than by reason of retirement, death or Disability, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member. If a Member elects to receive his or her Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time. Other than as provided in Section 3.2(2), a Member who receives a refund of his or her Accumulated Mandatory Employee Contributions shall not receive a Retirement Allowance from Component I of the Retirement System.

## Sec 5.8.  Benefits Offset by Workers' Compensation and Benefits; Subrogation

(1)  Any amounts which may be paid or payable to a Member, Retiree, or Beneficiary on account of disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be an offset against any amounts payable from funds of the Retirement System (Component I and Component II combined) on account of the same disability or death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Retirement Allowance payable by the Retirement System (under both Component I and Component II), the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System (under both Component I and Component II), and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)  In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

## ARTICLE 6.  RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his or her Normal Retirement Age or his or her actual retirement from employment with the City in the form of a Straight Life Retirement Allowance shall be equal to two percent (2%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth $(1/12^{th})$ year) of Credited Service earned after June 30, 2014.

### Sec 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2015 and effective the first day of each Plan Year thereafter, the Board may determine that the annual Retirement Allowance of a Member payable under this Component I shall be increased by a factor of one percent (1.0%), compounded ("Pension Improvement Factor (Escalator)"); provided, that the recipient of said Retirement Allowance shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.

# ARTICLE 7.  DEATH BENEFITS

## Sec 7.1.    Accidental Death Benefit; Performance of Duty

(1)     If a Member is killed in the performance of duty in the service of the City, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the City, and such death, illness, or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the City, the following benefits shall be paid:

(a)     the Accumulated Mandatory Employee Contributions standing to his or her credit in the Accumulated Mandatory Employee Contributions Fund at the time of his or her death shall be paid to such person or persons as the Member shall have nominated by written designation duly executed and filed with the Board.  If no such designated person survives the Member, the said Accumulated Mandatory Employee Contributions shall be paid to the Member's legal representative, subject to paragraph (e) of this Section 7.1(1).

(b)     the Member's surviving Spouse shall receive a pension of five-elevenths of the Member's Final Compensation payable for the Spouse's lifetime.   If the Member's child or children under age eighteen years also survive the deceased Member, each such child shall receive a pension of one-tenth of such Final Compensation; provided, that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of seven thirty-thirds of such Final Compensation.   Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution of the benefit by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of the Member's Final Compensation.  In no case shall the total of the benefits provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the Member's Final Compensation.

(c)     if no surviving Spouse survives the deceased Member or if the Member's surviving Spouse dies before his or her youngest unmarried surviving child attains Age eighteen years, his or her unmarried child or children under Age eighteen years shall each receive a pension of one-fourth of the Member's Final Compensation; provided that if there are more than two such surviving children under Age eighteen years, each such child's pension shall be an equal share of one-half of such Final Compensation.   Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the Member's Final Compensation.

(d)     if the Member has no surviving Spouse or surviving children under Age eighteen years and if the Member leaves surviving either a father or mother or both, whom

the Board shall find to be actually dependent upon such Member for financial support, such dependent father and mother shall each receive a pension of one-sixth of the Member's Final Compensation.

(e)     If a Member dies intestate, without having designated a person or persons, as provided in paragraph (a) of this Section 7.1(1), and without heirs, the amount of his or her Accumulated Mandatory Employee Contributions in the Accumulated Mandatory Employee Contribution Fund, not to exceed a reasonable sum, to be determined by the Board, shall be used to pay his or her burial expenses, provided the Member leaves no other estate sufficient for such purpose. Any balance credited to such Member in the Accumulated Mandatory Employee Contribution Fund which is not used for burial expenses shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

## Sec 7.2.     Non-Duty Death Benefits

The surviving Spouse of any Member who dies while in the employ of the City (other than in the performance of duty) after the date such Member has earned ten or more years of Vesting Service, shall receive a Retirement Allowance computed in the same manner in all respects as if said Member had (i) retired effective on the day preceding the Member's death, notwithstanding that the Member had not attained Normal Retirement Age, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving Spouse as Beneficiary.

## Sec 7.3.     Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member who is not covered by Section 7.1 or 7.2 dies while employed by the City or following termination of employment but prior to commencement of a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board. Any balance credited to such Member in the Accumulated Mandatory Employee Contribution Fund which is not used for burial expenses shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

# ARTICLE 8. FORMS OF PAYMENT

## Sec 8.1.  Retirement Allowance Options

(1)  Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary, in accordance with the options set forth below:

(a)  *Option One.  Modified Cash Refund Annuity.*  A Retiree will receive a reduced Retirement Allowance for as long as he or she lives, provided that if the Retiree dies before payment of the Accumulated Mandatory Employee Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there is no such designated Beneficiary surviving said Retiree, any such difference shall be paid to the Retiree's estate.

(b)  *Option Two.  Joint and One Hundred Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the Member's reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(c)  *Option "A".  Joint and Seventy-Five Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(d)  *Option Three.  Joint and Fifty Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(e)  *Option "B".  Joint and Twenty-Five Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the Member's reduced Retirement Allowance shall be

continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2)  *Joint and Survivor Optional Forms of Payment.*  The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

    (a)  *Standard Form.*  Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

    (b)  *Pop-up Form.*  Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance payable to the Retiree shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

## Sec 8.2.  Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1, both a Retiree and Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions (and if the Retiree makes an election pursuant to Section 10.4(2), his or her Accumulated Voluntary Employee Contributions) at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions (and Accumulated Voluntary Employee Contributions, if applicable) and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board. If there is no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the Retiree or the Beneficiary, whichever of them is the last to die.

# ARTICLE 9. FUNDING AND RESERVES

## Sec 9.1.  Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive City and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of Component I of the Retirement System).

## Sec 9.2.  Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Contribution Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Deferred Retirement Option Program Fund (if applicable), the Medical Benefits Account Fund, the Expense Fund and the Income Fund, as follows:

(1)  The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the retirement, termination, disability or death of a Member with a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's or Beneficiary's Retirement Allowance.

(2)  The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members, together with earnings thereon.

(3)  The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the City's annual contribution as is designated by the City to be utilized for payment of Retirement Allowances, and amounts transferred to Component I as provided in Section G-2(f) of Component II to finance Transition Cost (as defined in Section G-2(f) of Component II), together with earnings thereon, and from which shall be paid Retirement Allowances and other benefits on account of Members.

(4)  The Rate Stabilization Fund shall be the Fund to which shall be credited the City's contributions in excess of the amount of the City's contribution which is credited to the Pension Accumulation Fund, together with earnings thereon, and amounts transferred to Component I as provided in Section G-2(f) of Component II.

(5)  The Deferred Retirement Option Plan Fund shall be the fund in which shall be accumulated the amounts credited to the DROP Accounts of Members who have elected to participate in the DROP Program pursuant to Article 12, together with earnings

thereon, provided that the DROP Accounts are held and invested within the Retirement System.

(6)     The Medical Benefits Account Fund shall be the fund in which shall be accumulated the amounts contributed to the Retirement System for the purposes of funding Medical Benefits, together with earnings thereon.

(7)     The Expense Fund shall be the fund to which shall be credited funds, if any, provided to the Retirement System by the City to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(8)     The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the assets of Component I of the Retirement System and earnings thereon, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9.  There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.  Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be used in the following manner in the following order: (i) to pay administrative expenses of Component I (to the extent there are insufficient funds for this purpose credited to the Expense Fund), and/or (ii) transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

## Sec 9.3.     Method of Financing Retirement System Benefits

(1)     The pension liabilities for Members under this Component I shall be determined by the Plan's Actuary using the Entry Age Actuarial Cost Method of actuarial valuation.

(2)     The City's annual contribution to finance the prospective pension liabilities during the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be (a) eleven and two-tenths percent (11.2%) of the Compensation of active employees who are members of the DFFA (for pay periods ending on or before November 6, 2014) and members of DPOA (for pay periods ending on or before October 3, 2014) and (b) twelve and one-quarter percent (12.25%) of the Compensation of active employees who are members of the DPCOA, the DPLSA, the DPOA (for pay periods beginning on or after October 3, 2014) and the DFFA (for pay periods beginning on or after November 6, 2014).  A portion of the City's annual contribution for each Plan Year shall be credited to the Pension Accumulation Fund and a portion shall be credited to the Rate Stabilization Fund, each amount as determined by the City in its sole discretion.  For plan years commencing July 1, 2023 and later, the accrued pension liabilities for Members shall be determined by the Actuary using reasonable and appropriate actuarial assumptions approved by the Board and the Investment Committee.  The City's annual contributions to finance the normal cost of benefits and any such unfunded accrued pension liabilities

shall be determined by the Actuary amortizing such unfunded accrued pension liabilities over a period or periods of future years as established by the Board and approved by the Investment Committee.

(3)     Except as provided in Section 9.5, for each Plan Year, a Member who was an active employee as of June 30, 2014 ("current active") shall contribute to the Retirement System an amount equal to six percent (6%) of his or her Compensation for such Plan Year and a Member who is hired or rehired by the City on or after July 1, 2014 ("new employee") shall contribute to the Retirement System an amount equal to eight percent (8%) of his or her Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014. The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014 and (ii) the Member's date of hire, to the date he or she ceases to be an active Member. The contribution shall be deducted from a Member's Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

## Sec 9.4.    Member Contributions Picked-Up

(1)     The City shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)     The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code. The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)     The City shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both. The City shall designate the Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

## Sec 9.5.    Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations

(1)     To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a

five year period falls below ninety percent (90%), the Trustee may not award the variable Pension Improvement Factor (Escalator) described in Section 6.2 to any individual beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than ninety percent (90%).

(2)   In the event the funding level of the Retirement System projected over a five year period falls below ninety percent (90%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is projected to be not less than one hundred percent (100%) on a market value basis within the next five years:

    (a)   the remedial action required in Section 9.5(1) shall be implemented or continued;

    (b)   all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under the Retirement System;

    (c)   Mandatory Employee Contributions for active and new employees shall be increased by one percent (1%) per year for up to the next following five Plan Years;

    (d)   Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year for up to the next following five Plan Years;

    (e)   Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year for up to the next following five Plan Years;

    (f)   the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently paid to the Retiree on the date the funding level is projected to fall below ninety percent (90%);

    (g)   the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently added to the Member's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (f) above;

    (h)   Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year for up to the next following five Plan Years; and

    (i)   contributions made to the Retirement System by the City shall be increased, consistent with applicable actuarial principles and the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

(3)     For purposes of this Section 9.5, the "funding level" of Component I of the Retirement System shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System.  The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee.  The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

## ARTICLE 10.  VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec 10.1.  Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member who is covered by a collective bargaining agreement with the City that permits the Member to make Voluntary Employee Contributions to Component I of the Retirement System may elect to contribute a whole percentage not less than one percent (1%) nor more than ten percent (10%) of his or her Compensation for a Plan Year to a Voluntary Employee Contribution Account maintained on his or her behalf under Component I of the Retirement System.  A Member represented by the DPOA may elect to reduce the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours by a whole percentage not less than one percent (1%) nor more than one hundred percent (100%) of such amount and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his or her behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

### Sec 10.2.  Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

### Sec 10.3.  Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second Fiscal Year immediately preceding the Fiscal Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

### Sec 10.4.  Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases employment with the City other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions credited to his or her Voluntary Employee Contribution Account.  If a Member elects to receive his or her Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his or her Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the Actuarial

Equivalent Value of his or her Accumulated Voluntary Employee Contributions added to his or her Retirement Allowance and paid in the form of an annuity described in Section 8.1. Any such annuity shall be subject to market rates of investment return and other market-related assumptions, as adopted by the Board upon recommendation of the Investment Committee.

(3)     If a Member dies while employed by the City or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Voluntary Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

## ARTICLE 11.  LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec 11.1.  The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account under Component I of the Retirement System.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

### Sec 11.2.  Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve months or more.  Former Members, Spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.  No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan under either Component I or Component II shall not be eligible for a loan from the Retirement System.

### Sec 11.3.  Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his or her Voluntary Employee Contribution Account an amount which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Fifteen Thousand Dollars ($15,000.00), in each case reduced by: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less. The minimum loan amount shall be One Thousand Dollars ($1,000.00).

### Sec 11.4.  Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)    Each loan application shall be made in writing.

(b)    All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)    Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five years, or, where the loan is for the purpose of buying a

principal residence, a period not to exceed fifteen years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his or her compensation in an amount sufficient to repay the loan over its term.

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the City's costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec 11.5.   Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec 11.6.   Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

### Sec 11.7. Distribution

No distribution shall be made to a Member, former Member, Spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the Member from the Retirement System.

### Sec 11.8. Annual Report

The Retirement System shall include, in its annual report to all Members, an accounting of the loan program established by this Component I, which contains the number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the Fiscal Year covered the costs of administering the loan program.

## ARTICLE 12.  DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM

### Sec 12.1.  General Provisions

The following provisions are hereby established as the Deferred Retirement Option Plan ("DROP") Program under Component I, which shall be available to Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and those non-union executives of the Police Department and the Fire Department.

(1)     In lieu of terminating employment and accepting a Retirement Allowance under the Component I, any Member of the Retirement System who is eligible for the DROP program and who is eligible to immediately retire and receive an unreduced Retirement Allowance under Section 5.1 may elect to participate in the DROP program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article 12.  Any such election shall be irrevocable.

(2)     A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years.  At the end of such five year period of participation in the DROP program, the Member shall be retired from employment.

### Sec 12.2.  Conversion to Retirement Allowance

Upon the effective date of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance pursuant to Section 6.1 and shall elect a form of payment for his or her Retirement Allowance pursuant to Section 8.1.  Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable Pension Improvement Factor (Escalator) increases) that would have been payable, had the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

### Sec 12.3.  Investment of DROP Assets

(1)     ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program.  ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (4) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(2)     As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts invested under the Retirement System.  If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(3)     If amounts credited to a DROP Account are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees. A Member's DROP Account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP Account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(4)     The Board of Trustees previously entered into an administrative services agreement with ING. Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(5)     The Board of Trustees may replace ING with a trust-type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(6)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from their DROP Accounts.

## Sec 12.4.   Distribution of Amounts Credited to DROP Account

A Member shall not receive a distribution of amounts credited to his or her DROP Account prior to his or her termination of employment with the City. Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his or her DROP Account. Any such annuity shall be subject to market rates of interest return and other market-related assumptions as adopted by the Board upon recommendation of the Investment Committee. In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid as of the date the Member's participation in the DROP program commenced (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program. Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec 12.5.   Death of Member While Participating in the DROP Program

If a Member dies while participating in the DROP program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate. In addition, one hundred percent (100%) of the Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP program will be restored. Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased Member at the time the Member elected to participate in the DROP program.

### Sec 12.6.   Disability of Member While Participating in the DROP Program

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his or her employment with the City is terminated because he or she is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance that would have been paid to the Member as of the date the Member's participation in the DROP program commenced (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section 12.1(2), and (b) shall be entitled to receive payment of the funds in his or her DROP Account (in the form of a lump sum or other Actuarially Equivalent form of payment described in Section 8.1). Such Member shall not be entitled to disability retirement benefits under Section 5.3 or Section 5.4 hereof.

### Sec 12.7.   Cost Neutrality

(1)    The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(2)    If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect, the Board and the City, along with the Plan Actuary and an actuary appointed by the City (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost. If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary chosen or agreed upon by the Plan Actuary and the City's actuary. This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program cost-neutral. Upon the implementation of changes necessary to make the DROP program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City, or (b) withdraw from the DROP program and resume active participation in Component I of the Retirement System. The Board shall notify DROP participants of these changes prior to implementation. Those DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP program (under either Component I or Component II). Those not making either election shall continue to participate in the DROP program.

(3)    In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire, or (ii) continue active employment with the City and resume active participation in Component I of the Retirement System. DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under either Component I or Component II).

## ARTICLE 13. LIMITATION ON BENEFITS AND CONTRIBUTIONS

### Sec 13.1.  Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

(a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 13.1(2) has been satisfied shall be made, in   accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 13.1(9) or (10);

(b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 13.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two (adjusted for participation of fewer than 10 years, if applicable); provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System,  commencing at Age sixty-two; and

(c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an

annual benefit payable in the form of a straight life annuity, commencing when the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     The adjustments in Sections 13.1(3)(b) shall not apply to a Member with at least 15 years of Credited Service as a Police Member or a Fire Member within the meaning of Code Section 415(b)(2)(H). In addition, the adjustments in Sections 13.1(3)(b) and 13.1(6) shall not apply to benefits payable on account of the disability or the death of a Member.

(5)     Notwithstanding the foregoing provisions of this Section 13.1, except as provided in Section 13.1(6), the maximum annual benefit specified in Section 13.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by the City, does not exceed $10,000 for the Plan Year or any prior Plan Year, and (b) the Member was not at any time a participant in a Defined Contribution Plan maintained by the City.

(6)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 13.1(2) shall be such limitation (without regard to this Section 13.1(6)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten. In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Section 13.1(2) and in Section 13.1(5) shall be such limitations (determined without regard to this Section 13.1(6)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten. The adjustment in this Section 13.1(6) shall not apply to benefits paid on account of the disability or death of a Member.

(7)     Notwithstanding anything in this Section 13.1 to the contrary, if the annual benefit of a Member who has terminated employment with the City is limited pursuant to the limitations set forth in Section 13.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(8)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 13.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(9) The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 13.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 13.1(8).

(10) The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 13.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(11) For purposes of applying the limitations set forth in this Section 13.1, all qualified defined benefit plans (whether or not terminated) ever maintained by the City shall be treated as one defined benefit plan.

(12) For purposes of this Section 13.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year. The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with the City or (b) the end of the limitation year that includes the date of the Member's severance from employment with the City, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the City and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(13) This Section 13.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to those interpreting Section 415(b)(2)(H), and any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

**Sec 13.2.   Compliance with Code Section 415(c) and Regulations**

(1)     The "Annual Addition" with respect to a Member for a limitation year shall in no event exceed the lesser of:

(a)     $40,000 (adjusted as provided in Code Section 415(d)); or

(b)     One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)     The Annual Addition with respect to a Member for a limitation year means the sum of his or her Voluntary Employee Contributions made to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his or her accounts under any other qualified Defined Contribution Plan (whether or not terminated) maintained by the City, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his or her account.

(3)     In the event the Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his or her benefit under the limitation contained in this Section 13.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

## ARTICLE 14.  RETIREMENT SYSTEM ADMINISTRATION

### Sec 14.1.   Board of Trustees as Retirement System Administrator

(1)     The Retirement Board shall have the power and authority to manage and administer the Retirement System in accordance with the provisions of this Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 14.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document.  This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

### Sec 14.2.   Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

(a)     exclusive authority regarding the  administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Retirement System required of the City and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h)     to prepare an annual report for the Retirement System for each Fiscal Year in compliance with generally accepted accounting principles.  The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the Fiscal Year.  The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and the Investment Committee.  The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)     to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and contributions of each Member who has made contributions to the Retirement System;

(j)     to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the City or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System.  In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System.  The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his or her duties; and

(l)      except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec 14.3.  Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions. The executive director shall do all of the following:

(a)      manage and administer the Retirement System under the supervision and direction of the Board;

(b)      annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following Fiscal Year; and

(c)      perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System. Any person employed by the Retirement System may but need not be an employee of the City.

## Sec 14.4.  Discretionary Authority

The Board shall have sole and absolute discretion to:

(a)      interpret the provisions of the Retirement System;

(b)      make factual findings with respect to any and all issues arising under the Retirement System;

(c)      determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)      decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)      make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

## Sec 14.5.   Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

## ARTICLE 15. MANAGEMENT OF FUNDS

### Sec 15.1.    Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City, and subject to the terms of Article 16, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.

### Sec 15.2.    Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan Document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan Document. Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan Document may be commingled for investment purposes, and transferred as provided in Section G-2(f) of Component II.

### Sec 15.3.    Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.   The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

### Sec 15.4.    Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose other than payment of the reasonable expenses of maintaining the Retirement System.   In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

### Sec 15.5.    Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)    Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)     Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

# ARTICLE 16.  INVESTMENT OF RETIREMENT SYSTEM ASSETS

## Sec 16.1.   Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 16, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 16.

All investment management decisions made by the Board, as more fully described in Section 16.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has responsibility and authority, including the investment management matters described in Section 16.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If (a) the Board fails to approve or disapprove an investment management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an investment management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee and the chief investment officer are authorized to implement the decision.

If the Board disapproves an investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not less than five business days, of the request by the Investment Committee to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended investment management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended investment management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision. Any action taken by the Board or the Investment Committee in violation of the terms of this Article 16 shall constitute an *ultra vires* act and the Investment Committee or the Board is

granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

## Sec 16.2.  Investment Management

(1)     For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

  (a)    development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

  (b)    within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

  (c)    evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

  (d)    review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

  (e)    in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of all or a portion of the lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

  (f)    communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

  (g)    determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

  (h)    the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(i) interpretation of Retirement System governing documents, existing law, the Plan of Adjustment or other financial determination that could affect funding or benefit levels;

(j) review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(k) determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l) performance of an asset/liability valuation study for the Retirement System every three years, or more often as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314* and *Plan Investment Guidelines*.

## Sec 16.3.  Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a) the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b) the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c) the liquidity needs of the Retirement System.

## Sec 16.4.  Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System. The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it. The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board. The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio. The chief investment officer shall

provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

## Sec 16.5. Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Board and the Investment Committee with oversight of the Retirement System's investment portfolio. Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets. Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it. The duties of an investment consultant may include, but shall not be limited to:

(a)     providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)     identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)     implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)     monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)     recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations in the event of a deviation from expectations;

(g)     communicating the investment policies of the Retirement System to the investment managers;

(h)     reviewing the investment policies with the appropriate employees of the Retirement System;

(i)     aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)     attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)     meeting with the Investment Committee and the Board to provide  detailed quarterly performance reports and executive summaries of performance;

(l)     meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)     meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manager selections.

# ARTICLE 17.  RETIREE MEDICAL ACCOUNT

## Sec 17.1.  Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board shall pay the cost, which would otherwise be borne by the City, for certain medical and related benefits provided under the plans or programs maintained by the City to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 17 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec 17.2.  Effective Date

Medical Benefits shall be paid from the Medical Benefits Account beginning October 19, 2014 or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec 17.3.  Funding of Benefits

Subject to the Plan of Adjustment and the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Combined Plan Document under Section 18.6, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time the City makes a contribution to the Trustee, the City shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec 17.4.  Limitation on Contributions

At all times the aggregate of the contributions made by the City to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the City to the Plan under Sections 9.3, 9.4 and 9.5, other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 17.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

### Sec 17.5.  Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the City.

### Sec 17.6.  Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  The interpretation and administration of the terms of this Article 17 shall be as provided in the provisions of the Combined Plan Document.

### Sec 17.7.  Right to Amend or Terminate Medical Plans

The City expressly reserves the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by the City that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible Spouses and dependents to pay all or any portion of the cost of such medical benefits.

### Sec 17.8.  Reversion

At no time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, shall any part of the Medical Benefits Account be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the City to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the City.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the City's contributions to the Medical Benefits Account.

### Sec 17.9.  Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

# ARTICLE 18.  MISCELLANEOUS

## Sec 18.1.  Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by the City (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he or she is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec 18.2.  Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of benefit, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec 18.3.  Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec 18.4.  Errors

If any change or error in the records results in any person receiving from the Retirement System more or less than the person would have been entitled to receive from the Retirement System had the records been correct, the Board shall correct such error and, as far as practicable, shall adjust the payment in such a manner that the Actuarially Equivalent benefit of the benefit to which such person was correctly entitled shall be paid.

## Sec 18.5.  Conviction of Felony; Forfeiture of Rights

If a Member or Retiree shall be convicted of by a court of competent jurisdiction or enters a nolo contendere plea accepted by a court for a felony against the City arising out of his or her service as an employee of the City and while a Member of the Retirement System, the court may order the forfeiture of all or a portion of the rights of the Member to benefits hereunder, except the return of his or her Accumulated Contributions, as provided in the *Public Employee Retirement Benefits Forfeiture Act, MCL 38.2701, et. seq.*   In such case, the Retirement System shall pay to an individual, if any, who would otherwise be a Beneficiary of the Member or Retiree whose retirement benefit is being forfeited under this Section 18.5 an

Actuarially Equivalent monthly retirement allowance at the Age that the Member or Retiree would have become eligible for unreduced retirement benefits under the Retirement System.

## Sec 18.6.  Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan Document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments permitted under the terms of the Plan of Adjustment (including amendments contemplated in Section K-3(5) of Component II) may be made to the terms, conditions and rules of operation of the Retirement System, the Combined Plan Document or any successors plan or trust that govern the calculation of pension benefits during the period ending June 30, 2023, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in the Plan of Adjustment. Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan Document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code.  The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law.  Any amendment of the Retirement System by the City must be approved by the Council or a person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

## Sec 18.7.  Expenses of Administration; Forfeitures Not to Increase Benefits

All expenses relating to administration of Component I of the Retirement System shall be paid from the assets maintained under this Component I and all expenses relating to administration of Component II of the Retirement System shall be paid from the assets maintained under Component II.  Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the appropriate Component of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

## Sec 18.8.  Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan Document to the contrary.  Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year that he or she attains the Age of seventy and one-

half (70-1/2), or (ii) April 1 of the calendar year following the year in which he or she retires. Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section 18.8 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

**Sec 18.9.  Direct Rollovers**

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

    (a)     For purposes of this Section 18.9, the following terms shall have the following meanings:

    (b)     "Direct rollover" means a payment by the Retirement System to an eligible retirement plan specified by a distributee.

    (c)     "Distributee" means a Member or former Member.  It also includes the Member's or former Member's surviving Spouse, a Spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse Beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E).  However, a nonspouse Beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

    (d)     "Eligible retirement plan" means any of the following that accepts a distributee's eligible rollover distribution:

        (i)      a qualified trust described in Code Section 401(a);

        (ii)     an annuity plan described in Code Section 403(a);

        (iii)    an annuity contract described in Code Section 403(b);

        (iv)     an individual retirement account described in Code Section 408(a);

        (v)      an individual retirement annuity described in Code Section 408(b);

        (vi)     a Roth IRA described in Code Section 408A; or

        (vii)    a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the Retirement System.

(e)     "Eligible rollover distribution" means any distribution of all or any portion of the balance to the credit of a distributee under the Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated Beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year. Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the Retirement System. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec 18.10. Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate. The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I and/or Component II of this Combined Plan Document or to the Combined Plan Document in its entirety, as the context may require, and not to any particular provision or section thereof. The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan Document or the Retirement System created hereunder.

## Sec 18.11. Severability

If any section or part of a section of this Combined Plan Document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan Document or Retirement System or of the Combined Plan Document or Retirement System in its entirety.

# COMPONENT II

## ARTICLE A.  COMMON PROVISIONS OF THE POLICE
## AND FIRE RETIREMENT SYSTEM

**Sec. A-1.**     **Common Provisions**

Certain provisions of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Articles and

Sections of Component I:

(a)     Article I (General Provisions);

(b)     Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Board of Trustees

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

DFFA

DPLSA

DPCOA

DPOA

Detroit Police and Fire Retirement System or Retirement System

Fiscal Year

Internal Revenue Code or Code

Investment Committee

Medical Director

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse;

Straight Life Retirement Allowance; and

Total Disability or Totally Disabled;

(c)     Article 13 (Limitation on Benefits and Contributions);

(d)     Article 14 (Retirement System Administration);

(e)     Article 15 (Management of Funds);

(f)     Article 16 (Investment of Retirement System Assets); and

(g)     Article 18 (Miscellaneous).

## ARTICLE B. FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM
## AS OF JUNE 30, 2014

**Sec. B-1.      Freeze of Police and Fire Retirement System as of June 30, 2014.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code, or in Chapter 54, Article II of the 1964 Detroit City Code, or any ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

(a)     No new employee hired by the City on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date;

(b)     No employee who is rehired by the City on or after July 1, 2014 and who received a distribution of his or her accumulated employee contributions prior to July 1, 2014, shall become a Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date; provided, however, that if a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (d) of this Section B-1 and who is rehired by the City on or after July 1, 2014 repays to the Police and Fire Retirement System in accordance with a payment schedule approved by the Board of Trustees the amount of accumulated employee contributions that he or she withdrew, then such Member shall be eligible to accrue service credit under this Component II following rehire solely for the purpose of determining the Member's eligibility for payment of his or her Frozen Accrued Benefit;

(c)     No Member shall make contributions to the Annuity Savings Fund under the Police and Fire Retirement System in effect as of June 30, 2014 with respect to payroll dates occurring on or after August 1, 2014 and all Member contributions made with respect to payroll dates occurring on or after August 1, 2014 shall be made to and in accordance with the terms of Component I of the Combined Plan;

(d)     Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service and Average Final Compensation and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(e)     Except as otherwise provided in this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit. No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the Police and Fire Retirement System;

(f)     Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of the unused accrued sick leave that he or she could have received in cash upon retirement ("Cashable Sick Leave") to increase his or her Average Final

Compensation if the Member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election to have the value of twenty-five percent (25%) of the Member's Cashable Sick Leave as of June 30, 2014 included in the computation of the Member's Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit ("Sick Leave Election"); provided, however, that the amount of the member's Cashable Sick Leave at the time the completed election form is received by the Retirement System is at least equal to the value of twenty-five percent (25%) of the Member's Cashable Sick Leave as of June 30, 2014 and, provided further that the completed election form is received by the Retirement System no later than the dates established by the City. A Member's Sick Leave Election shall be made in the manner set forth by the Board of Trustees and the Police and Fire Retirement System. Notwithstanding anything in this subsection (f) to the contrary, a Member's Sick Leave Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's Cashable Sick Leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement benefit if he or she retired as of June 30, 2014, and (ii) the electing Member's employment with the City is terminated before the electing Member becomes eligible for an immediate service retirement benefit under the Police and Fire Retirement System. In any such case, the value of twenty-five percent (25%) of the Member's Cashable Sick Leave shall be restored to such Member;

(g)     Service earned after the Freeze Date shall be credited to a Member under this Component II solely for purposes of determining a Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit and to a rehired Member solely for purposes of determining the Member's eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the Police and Fire Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the Police and Fire Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(h)     The Deferred Retirement Option Plan ("DROP") program shall remain in effect for all Members who have either enrolled in or elected to participate in the DROP program as of June 30, 2014. Members also may elect to participate in the DROP program after June 30, 2014 with respect to their Frozen Accrued Benefits; however, a Member's participation in the DROP program with respect to such Frozen Accrued Benefits shall be limited to five years.

The foregoing terms of Section B-1 shall be referred to as the "Freeze" of the provisions of the Police and Fire Retirement System as in effect on the Freeze Date and the provisions of Component II of the Police and Fire Retirement System shall be interpreted and construed by the Board of Trustees and the Police and Fire Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1 and the provisions of Chapter 54 of the 1964 Detroit City Code, or any Charter, ordinances, resolutions, or orders, or parts thereof,

whether codified or not codified, or any collective bargaining agreement or other document governing terms of employment of an employee, the Board of Trustees and the Police and Fire Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.