# EXHIBIT B

GLENN BOWEN

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In re ) Chapter 9

CITY OF DETROIT, MICHIGAN, ) Case No. 13-53846

Debtor. ) Hon. Steven W. Rhodes

_____

The Videotaped Deposition of GLENN BOWEN, VOLUME II,

Taken at 1114 Washington Boulevard,

Detroit, Michigan,

Commencing at 9:00 a.m.,

Tuesday, July 1, 2014,

Before Rebecca L. Russo, CSR-2759, RMR, CRR.

1             GLENN BOWEN
2   JENNIFER K. GREEN, ESQ.
3   Clark Hill, PLC
4   500 Woodward venue
5   Suite 3500
6   Detroit, Michigan 248226
7      Appearing on behalf of the Retirement Systems for the
8      City of Detroit.
9
10
11
12   MARK R. JAMES, ESQ.,
13   MAY A. SAAD, ESQ.
14   Williams, Williams, Rattner & Plunkett, P.C.
15   380 North Old Woodward Avenue
16   Suite 300
17   Birmingham, Michigan 48009
18      Appearing on behalf of the Financial Guaranty
19      Insurance Company.
20
21
22
23
24
25

1             GLENN BOWEN
2   APPEARANCES:
3
4   EVAN MILLER, ESQ.,
5   MIGUEL F. EATON, ESQ.
6   Jones Day
7   51 Louisiana Avenue, N.W.
8   Washington, D.C. 20001
9      Appearing on behalf of the Debtor.
10
11
12
13
14   CLAUDE D. MONTGOMERY, ESQ.
15   Dentons US LLP
16   1221 Avenue of the Americas
17   New York, New York 10020-1089
18      Appearing on behalf of the Retiree Committee.
19
20
21
22
23
24
25

1             GLENN BOWEN
2   DAWN R. COPLEY, ESQ.
3   Dickinson Wright, PLLC
4   500 Woodward Avenue
5   Suite 4000
6   Detroit, Michigan 48226
7      Appearing on behalf of the State of Michigan.
8
9
10
11   PAUL S. DAVIDSON, ESQ.
12   Waller Lansden Dortch & Davis, LLP
13   511 Union Street
14   Suite 2700
15   Nashville, Tennessee 37219
16      Appearing on behalf of U.S. Bank National Association,
17      as Trustee for the Water and Sewer Bonds.
18
19
20
21
22
23
24
25

1 (Pages 237 to 240)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-3   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 2 of 65

```
 1            GLENN BOWEN
 2    ROBERT A. WEISBERG, ESQ.
 3    Carson Fischer, PLC
 4    4111 Andover Road West
 5    Second Floor
 6    Bloomfield Hills, Michigan 48302
 7        Appearing on behalf of Oakland County.
 8
 9
10
11    ROBIN D. BALL, ESQ.
12    Chadbourne & Parke, LLP
13    350 South Grand Avenue
14    32nd Floor
15    Los Angeles, California 90071
16        Appearing on behalf of Assured Guaranty Municipal
17    Corp.
18
19
20
21
22
23
24
25
```

```
 1            GLENN BOWEN
 2    ALLAN S. BRILLIANT, ESQ. (Via Telephone)
 3    Dechert, LLP
 4    1095 Avenue of the Americas
 5    New York, New York 10036
 6        Appearing on behalf of Macomb County.
 7
 8
 9
10    PAUL J. KOOB, ESQ. (Via Telephone)
11    Ballard Spahr LLP
12    1735 Market Street
13    51st Floor
14    Philadelphia, Pennsylvania 19103
15        Appearing on behalf of Hypothekenbank Frankfurt AG;
16    Hypothekenbank Frankfurt International S.A.; and Erste
17    Europaische Pfandbriefund Kommunalkreditbank
18    Aktiengelsellschaft in Luxemburg S.A.
19
20
21
22
23
24
25
```

```
 1            GLENN BOWEN
 2    GUY S. NEAL, ESQ.
 3    Sidley Austin, LLP
 4    1501 K Street, N.W.
 5    Washington, D.C. 20005
 6        Appearing on behalf of National Public Finance
 7    Guarantee Corporation.
 8
 9
10
11    CHARLES D. BULLOCK, ESQ.
12    Stevenson & Bullock, PLC
13    26100 American Drive
14    Suite 500
15    Southfield, Michigan 48034
16        Appearing on behalf of Gabriel Roeder Smith.
17
18
19
20
21
22
23
24
25
```

```
 1            GLENN BOWEN
 2    R. TIMOTHY MUTH, ESQ.
 3    Reinhart Boerner Van Deuren, S.C.
 4    1000 North Water Street
 5    Suite 1700
 6    Milwaukee, Wisconsin 53202
 7        Appearing on behalf of the Witness.
 8
 9
10
11    ALSO PRESENT:
12    Liaw Huang - Terry Consulting, LLC
13    Joseph Esuchanko - Actuarial Service Co.
14    Rob Girkin - Video Technician
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 241 to 244)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-3   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 3 of 65

## TABLE OF CONTENTS

WITNESS                          PAGE

GLENN BOWEN

EXAMINATION BY MR. BALL          250

EXHIBITS

EXHIBIT                          PAGE

DEPOSITION EXHIBIT 25            273
DEPOSITION EXHIBIT 26            276
DEPOSITION EXHIBIT 27            289
DEPOSITION EXHIBIT 28            295
DEPOSITION EXHIBIT 29            302
DEPOSITION EXHIBIT 30            313
DEPOSITION EXHIBIT 31            320
DEPOSITION EXHIBIT 32            326
DEPOSITION EXHIBIT 33            341
DEPOSITION EXHIBIT 34            345
DEPOSITION EXHIBIT 35            349
DEPOSITION EXHIBIT 36            357
DEPOSITION EXHIBIT 37            360

DEPOSITION EXHIBIT 38            362
DEPOSITION EXHIBIT 39            363
DEPOSITION EXHIBIT 40            374
DEPOSITION EXHIBIT 41            377
DEPOSITION EXHIBIT 42            383
DEPOSITION EXHIBIT 43            393
DEPOSITION EXHIBIT 44            398
DEPOSITION EXHIBIT 45            404
DEPOSITION EXHIBIT 46            404
DEPOSITION EXHIBIT 47            407
DEPOSITION EXHIBIT 48            407
DEPOSITION EXHIBIT 49            409
DEPOSITION EXHIBIT 50            416
DEPOSITION EXHIBIT 51            439
DEPOSITION EXHIBIT 52            464
DEPOSITION EXHIBIT 53            477

GLENN BOWEN

Detroit, Michigan

Tuesday, July 1, 2014

9:00 a.m.

VIDEO TECHNICIAN:  We are now on the record.  This is the continuation of the videotaped deposition of Glenn Bowen, being taken on Tuesday, July 1st, 2014.  The time is now 9:00 a.m.

Counsel may proceed.

MR. BALL:  Okay.

MR. MONTGOMERY:  Before we get started, Counsel, I would just like the transcript record to reflect that yesterday we sent an email to counsel involved in yesterday's deposition regarding Bowen Exhibit 10 as having been produced erroneously by the city.

It was delivered to the mediators on April 9th, the date that's on the letter, and we would request that the parties agree not to engage in any further questioning with respect to that document, and we'd further ask yesterday's counsel to agree to remove references from the record with respect to that letter.

MR. MILLER:  And Evan Miller, for the City

GLENN BOWEN

of Detroit.

I concur that the document in question, which is POA98715 through 98718, was indeed provided to the city by Mr. Montgomery, pursuant to a mediation order, and consequently, it falls within the confidentiality protection set forth in Judge Rhodes' mediation order of August 2013.

The city supports the request of the Retiree Committee that the document be withdrawn and the questions of Mr. Bowen in connection with the document be stricken from the record.

MR. BALL:  Let's start by taking a roll call of who's in attendance.

This is Robin Ball, from Chadbourne & Park, representing Assured.

If I could ask the others present to identify themselves for the record.

MR. HUANG:  Liaw Huang, from the Terry Group, with Mr. Ball.

MR. NEAL:  Guy Neal, Sidley Austin, for National Public Finance Guarantee Corporation.

MR. WEISBERG:  Bob Weisberg, for Oakland County.

MR. ESUCHANKO:  Joe Esuchanko, for Oakland

3 (Pages 245 to 248)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-3   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 4 of 65

1       GLENN BOWEN
2   County.
3           MS. GREEN:  Jennifer Green, on behalf of
4   the General Retirement System for the City of Detroit
5   and the Police and Fire Retirement System for the City
6   of Detroit.
7           MS. SAAD:  May Saad, on behalf of Financial
8   Guaranty Insurance Company.
9           MS. COPLEY:  Dawn Copley, for the State of
10  Michigan.
11          MR. MONTGOMERY:  Claude Montgomery, Dentons
12  US, for the Retiree Committee.
13          MR. DAVIDSON:  Paul Davidson, Waller
14  Lansden, for U.S. Bank.
15          MR. EATON:  Miguel Eaton, from Jones Day,
16  on behalf of the city.
17          MR. MILLER:  Evan Miller, Jones Day, on
18  behalf of the City of Detroit.
19          MR. MUTH:  Tim Muth, Reinhart Boerner
20  Van Deuren, on behalf of Mr. Bowen.
21          GLENN BOWEN,
22  was thereupon called as a witness herein, and after
23  having first been previously duly sworn to testify to
24  the truth, the whole truth and nothing but the truth,
25  was examined and testified as follows:

1           GLENN BOWEN
2           EXAMINATION
3   BY MR. BALL:
4   Q.  Good morning, Mr. Bowen.
5   A.  Good morning.
6   Q.  Welcome back.
7   A.  Thank you.
8   Q.  You understand that you're still under oath?
9   A.  Correct.
10  Q.  Today we'll observe the same ground rules that you
11      went through with counsel yesterday, in regards to
12      breaks, and if I ask a question that you don't
13      understand, you'll let me know; all of those same
14      ground rules, are those acceptable to you?
15  A.  Yes.
16          MR. MILLER:  Robin, excuse me, before you
17      begin, I'm sorry to interrupt, can we have
18      identification of the individuals who are listening
19      and participating by telephone?
20          MR. BALL:  Yeah, if I could ask those on
21      the line to identify themselves, please.
22          MR. KOOB:  Paul Koob, from Ballard Spahr.
23          MR. BALL:  And I believe we have at least
24      one other party on the line.
25  BY MR. BALL:

1           GLENN BOWEN
2   Q.  All right.  Mr. Bowen, you discussed yesterday that
3       you have served, or serve as the system actuary for
4       several pension systems?
5   A.  Yes.
6   Q.  Okay.  And those include the Puerto Rico Government
7       Employees Pension System, Puerto Rico Teachers Pension
8       System, and the Puerto Rico Judiciary Pension System?
9   A.  Those are three of the biggest, yes.
10  Q.  Okay.  And are there other pension systems for which
11      you serve as the system actuary?
12  A.  Not at the -- not at the moment that I'm a lead
13      actuary on another system.
14  Q.  What's that lead actuary, what's that mean?
15  A.  Lead consultant, as opposed to being a member of the
16      project team.
17  Q.  And what system is that?
18  A.  The Social Insurance Scheme of the Kingdom of Saudi
19      Arabia.
20  Q.  And what's the difference between being -- well,
21      first, what's the difference between being a system
22      actuary and serving in a consultant role as you've
23      served here?
24  A.  The distinction I'm drawing is, if you will, for
25      Puerto Rico, I'm the first point of contact and work

1           GLENN BOWEN
2   with the client to set the scope of the engagement,
3   and I'm responsible for every single aspect of the
4   engagement, attending meetings.
5           My work on the Kingdom of Saudi Arabia
6   differs, in that I'm on the project team.
7   Q.  And I asked you a slightly different question, I
8       apologize.  It was a little confusing because I
9       shifted from Kingdom of Saudi Arabia to what you're
10      doing here.
11          What's the difference between being a
12      system actuary and playing the role of a consultant to
13      the city, as you've played here?
14  A.  Absolutely.  A system actuary is a retained actuary
15      who will perform valuations; for instance, every year
16      we perform valuations for the three Puerto Rico
17      retirement systems that you mentioned.  We do other
18      work where we are retained by sometimes a retirement
19      system and/or sometimes a legislative oversight body.
20      For instance, we do work for the state of Pennsylvania
21      and we do actuarial valuations of the systems, not for
22      purposes of producing the valuation report but for
23      purposes of advising the state, in much the same way
24      we've performed valuations of the City of Detroit's
25      retirement systems for the purpose of further advising

4 (Pages 249 to 252)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-3   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 5 of 65

GLENN BOWEN

1  the City of Detroit.
2  Q.  Okay.  And in terms of the role with respect to the
3     system itself, if you're a consultant, as you are
4     here, do you have any role with respect to the system
5     itself?
6  A.  No, we don't have a relationship with the system
7     itself.
8  Q.  Okay.  And in making actuarial recommendations --
9     strike that.
10        Do you have -- in addition to your work on
11    the public pensions that you've talked about, do you
12    have experience with working on transactional matters?
13       MR. BALL:  Could we ask whoever just joined
14    to identify themselves for the record, please?
15       MR. BRILLIANT:  Allan Brilliant.
16       MR. BALL:  Thank you.
17 BY MR. BALL:
18 Q.  I'm sorry, let me -- I'll start that question over.
19       Do you have experience working on
20    transactional matters as an actuary?
21 A.  Could you describe more specifically what you mean by
22    transactional matters?
23 Q.  Something involving the purchase or sale or
24    acquisition of either an entity or a book of business

1  the City of Detroit.
2  Q.  Okay.  And in terms of the role with respect to the
3     system itself, if you're a consultant, as you are
4     here, do you have any role with respect to the system
5     itself?
6  A.  No, we don't have a relationship with the system
7     itself.
8  Q.  Okay.  And in making actuarial recommendations --
9     strike that.
10        Do you have -- in addition to your work on
11    the public pensions that you've talked about, do you
12    have experience with working on transactional matters?
13       MR. BALL:  Could we ask whoever just joined
14    to identify themselves for the record, please?
15       MR. BRILLIANT:  Allan Brilliant.
16       MR. BALL:  Thank you.
17 BY MR. BALL:
18 Q.  I'm sorry, let me -- I'll start that question over.
19       Do you have experience working on
20    transactional matters as an actuary?
21 A.  Could you describe more specifically what you mean by
22    transactional matters?
23 Q.  Something involving the purchase or sale or
24    acquisition of either an entity or a book of business

GLENN BOWEN

1  or liabilities, anything involving the purchase or
2     sale of a business or a part of a business.
3  A.  I can't say I've been involved in any M and A.
4  Q.  Is there any part of your business that you would
5     describe as transactional?
6  A.  Within Milliman, potentially; within my practice, we
7     may have worked on M and A engagements, but it's not a
8     standard -- you know, it would be if it arose based on
9     a client being acquired.  I know that has happened in
10    the past.  I'm not sure to what extent we've been
11    involved in the transactional aspects of it.
12 Q.  But you personally haven't been involved in any
13    transactional matters?
14 A.  I don't recall.
15 Q.  Do you have an understanding as to whether there is a
16    difference in the nature or level of rigor involved in
17    transactional matters as opposed to the kind of
18    consulting matters that you're involved in?
19 A.  Well, within the actuarial aspect of it, there are
20    certain different accounting rules for purchases.
21 Q.  And I'm not trying to ask about the governing
22    accounting rules, but the level of rigor required in
23    either the kind of data you use to make decisions, or
24    the examination of the data, anything involving the

GLENN BOWEN

1  level of rigor that attaches to your work.
2  A.  I can give you one example, which may or may not
3     answer your question, but I was involved in the merger
4     of two pension plans within one plan sponsor several
5     years ago, and there was a requirement that the data
6     be retained for either a five or seven-year period, so
7     that the starting position of each entity could be
8     recreated if it was needed.
9  Q.  There was some discussion yesterday of a disparity of
10    300 members in the, in the -- among the beneficiaries
11    or potential beneficiaries of the GRS retirement
12    system.  Do you recall that?
13 A.  I do.
14 Q.  Do you know whether, in a transactional matter -- you
15    said that you didn't believe that that 300-member
16    difference would end up being material, essentially,
17    do you recall that?
18 A.  I do.
19 Q.  Do you know whether the same conclusion would apply if
20    you were looking at that analysis in the context of a
21    transaction?
22 A.  My role as an actuary would be to bring it to the
23    attention of our client, as we did, setting forth our
24    results in the letter at the request of the retirement

GLENN BOWEN

1  system.  We laid out our complete analysis of their
2     data.  Since we were not able to use the same data as
3     was prepared by Gabriel Roeder Smith for their
4     evaluation, we had to do our own work.  At the end of
5     the day, our replication of Gabriel Roeder Smith's
6     valuation was within five to ten million dollars out
7     of 3.6 billion.
8        So given that result, I'll say I imputed
9     the difference in head count was based on records,
10    which would have had a very minor impact.
11 Q.  300 employees out of how many people?  What was the
12    workforce?
13 A.  I don't have that number, off the top of my head.  It
14    would be in our letter.
15 Q.  All right.  And would you -- or if your reviving
16    transactional client had recommended that that
17    difference be reconciled?
18 A.  My original recommendation was that all three
19    actuarial firms that were doing the work start from
20    the same edited census data, and as an actuary, I was
21    not able to force that to happen.
22 Q.  So, optimally, you would have been working with the
23    same set of data, all three firms that were involved?
24 A.  That was my view as to what would have been optimal.

GLENN BOWEN

2 Q. Has your entire tenure at Milliman been in
3 Philadelphia?
4 A. Yes.
5 Q. Okay. And is there a particular focus or expertise of
6 the Philadelphia office of Milliman?
7 A. Well, the Philadelphia office of Milliman has four
8 divisions: Health actuarial consulting, life
9 insurance and financial services, property and
10 casualty, and the employee benefits discipline, where
11 I work.
12 Q. Okay. Yesterday you identified several other Milliman
13 actuaries who had been involved, or their names came
14 up during the course of the day. Suzanne Taranto, who
15 did health work. You also -- there was also mention
16 of Ms. Warren? Can you tell me what -- who she is and
17 what her role is?
18 A. Yes, she's an employee benefits consultant, as well.
19 Q. And is she a principal, does she work under you?
20 What's the relationship?
21 A. She's a principal.
22 Q. Okay. And does she report to you?
23 A. She does report to me, yes.
24 Q. Okay. And you mentioned Allen Perry, I believe?
25 A. Yes.

GLENN BOWEN

2 Q. And what is Mr. Perry's position, what is his role?
3 A. He's a principal. I'm not sure of his exact title,
4 but he is the head of our asset liability management
5 practice.
6 Q. Okay. Were there any other -- other than those four
7 that we've mentioned, were there any other Milliman
8 principals or consulting actuaries who worked on --
9 who have worked on City of Detroit projects, to your
10 knowledge?
11 A. I mean, we certainly have a staff that has been
12 assigned to prepare various analyses and run
13 valuations, et cetera. I couldn't name, over the past
14 two years with certainty, who has worked on various
15 assignments. The simple characterization is that
16 Kathy and I are the two who are ultimately responsible
17 for every assignment.
18 Q. Including those done by Mr. Perry?
19 A. Well, for every pension assignment. Mr. Perry has
20 been working with the city on investment consulting
21 issues over time.
22 Q. He worked with you on the November 4th letter?
23 A. He did.
24 Q. And apart from that, what other projects has Mr. Perry
25 undertaken on behalf of the city?

GLENN BOWEN

2 A. I know that he put together an analysis of ASF
3 accounts with projection. Mr. Perry has come to me
4 over the course of time, where, you know, he'd say, "I
5 have an assignment to do, you know, and help me
6 understand the larger context of what we're working
7 within." And, to my knowledge, there has been stops
8 and starts. So I don't know all of his projects off
9 the top of my head.
10 Q. What projects do you know, besides the analysis of ASF
11 accounts, that he has undertaken?
12 A. He's been working with investment consultants in our
13 San Francisco office. I'm trying to think of what the
14 original assignment was. I guess it was developing
15 what less-risky portfolios would look like.
16 Q. Okay. Do you know when that project began?
17 A. General impression is around the turn of this year,
18 early 2014.
19 Q. Do you know whether they generated any written work
20 product as part of that project?
21 A. I don't know.
22 Q. Were you involved in collecting documents for
23 responses to the parties' discovery in this case?
24 A. When you say collecting, in terms of -- we received a
25 request for documents, and our IT department handled

GLENN BOWEN

2 the moving documents off of our network and presenting
3 them to whoever they were to be presented to, so...
4 Q. Okay. Were you involved in any other way in
5 retrieving documents from Milliman in response to the
6 parties' discovery in this case?
7 A. I did have a conversation with Jones Day to let them
8 know which documents would have personally
9 identifiable information for plan participants in
10 them.
11 Q. Okay. Did you conduct any search of your own files,
12 not IT, not electronic files, but of your own files
13 for documents in this case?
14 A. That wasn't necessary, because they were all filed
15 where the IT department could lift them simply.
16 Q. So you're saying you have no hard copy files related
17 to this case?
18 A. We have hard copy files.
19 Q. Okay. And did you search those documents for
20 production of materials responsive to the parties'
21 discovery requests in this case?
22 A. I did not.
23 Q. Did anybody?
24 A. I'm not aware.
25 Q. So far as you're aware, nobody did that?

GLENN BOWEN

1
2 A. Yeah, so far as I'm aware, nobody did that.
3 Q. Do you know whether anybody searched for hard copy
4 files of any Milliman personnel in connection with the
5 parties' discovery request in this case?
6 A. I don't know.
7 MR. BALL: We'd ask that Mr. Bowen's and
8 the rest of the Milliman personnel's hard copy files
9 be searched. We've made a previous request in
10 response to a disclosure that Mr. Buckfire's hard copy
11 files had not been searched, and that your experts and
12 your consultants -- not experts, your consultants'
13 hard copy files be searched. It sounds as if that has
14 not happened. We'd ask that that occur.
15 MR. EATON: This is Miguel Eaton, for the
16 city. We should probably talk outside of the presence
17 of the witness, but --
18 MR. BALL: I understand. I'm just making,
19 for the record, my request, and I understand you'll
20 respond.
21 MR. EATON: Understood.
22 MR. MILLER: And to clarify, I think the
23 witness' testimony was he is not aware, one way or the
24 other.
25 BY MR. BALL:

GLENN BOWEN

1
2 Q. Mr. Bowen, has anybody come to you and asked to search
3 your hard copy files?
4 A. No.
5 Q. And where are they located?
6 A. They would be in the office.
7 Q. In your office?
8 A. Yes.
9 Q. And would you -- and in order for somebody to search
10 them -- do you know whether anybody has searched
11 them -- strike that.
12 So they're physically located in your
13 office. Does anybody have access other than you?
14 A. When I say the office, the Philadelphia office, not my
15 personal space.
16 Q. All right. So they're maintained in files in the
17 Philadelphia office?
18 A. Yes.
19 Q. And to the best of your knowledge -- did you tell
20 anybody where your files related to this matter are
21 located so that they could be searched?
22 A. I wasn't asked to point out which file cabinet they're
23 in.
24 Q. Milliman documents have been produced in several
25 different tranches over the course of document

GLENN BOWEN

1
2 production in this case. Do you have any
3 understanding of why they were produced in several
4 different ways?
5 A. No.
6 Q. Who at Milliman would know that?
7 A. I don't know.
8 Q. Let's go to what was marked as Exhibit 1 yesterday.
9 And you testified about this a bit. I have a couple
10 of questions about it. Exhibit 1, for the record, is
11 the July 6th, 2012, letter from you and Ms. Taranto to
12 Chris Brown of the city.
13 And this overlaps with some testimony
14 you've given in a prior deposition, and I just want to
15 confirm that your position has not changed.
16 First, there's a discussion here of an
17 asset smoothing methodology that was employed by
18 Gabriel Roeder. Do you recall that being the case?
19 And you're welcome to look at the letter to refresh
20 yourself if you need to.
21 A. I see the section on asset smoothing.
22 Q. Okay. And my understanding from your prior deposition
23 testimony is that you have not opined or are not
24 opining that Gabriel Roeder's use of asset smoothing,
25 in the fashion that they implemented it, was improper

GLENN BOWEN

1
2 or in some way not within actuarial standards, is that
3 correct?
4 A. I was not asked to make that opinion.
5 Q. All right. Have you ever rendered that opinion?
6 A. I have not.
7 Q. And has -- and have you ever formed that opinion?
8 A. I have not.
9 Q. There's also a discussion here in connection with
10 asset smoothing of a corridor being used in connection
11 with the asset smoothing. Do you recall that?
12 A. I do.
13 Q. Okay. And you note that a 20 percent corridor is a
14 very common corridor. Do you see that?
15 A. I do.
16 Q. And do you recall -- I mean, what's the basis for your
17 conclusion that 20 percent is a commonly used
18 corridor?
19 A. Experience.
20 Q. Okay. And what experience are you talking about?
21 A. Working with various systems over time.
22 Q. Have you seen higher corridors used than 20 percent?
23 A. I have.
24 Q. And are there other corridors that are commonly used
25 besides 20 percent?

GLENN BOWEN

2 A. I noted 20 because in my experience it was the most
3 common that I've seen.
4 Q. Okay. And I understand it may be the most common.
5 I'm just asking whether there are other corridors
6 besides 20 percent that are commonly used.
7 A. I'm not sure if there's one that's in second place.
8 Q. What's the range of what you've seen, in terms of
9 corridors that have been used?
10 A. I think the highest I've seen has been maybe 40
11 percent.
12 Q. And again, the corridor application is part of the
13 smoothing methodology that Gabriel Roeder employed,
14 correct?
15 A. I'd have to take a minute to read this to see exactly
16 what they were employing.
17 Q. The point of my question is just to make sure that
18 that is encompassed within your testimony, that you're
19 not offering an opinion that Gabriel Roeder's
20 smooth -- application or implementation of smoothing
21 methodology was improper or contrary to actuarial
22 standards. I want to make the sure that that includes
23 the corridor that they employed.
24 A. That was -- that's not the purpose of this, these
25 three paragraphs.

GLENN BOWEN

2 Q. I understand that. But I'm asking a further question,
3 which is -- confirmed that your testimony about not
4 having an opinion that what Gabriel Roeder did was
5 inconsistent with actuarial standards or improper in
6 some way, that that encompasses their implementation
7 of the corridor.
8 A. I was not asked to perform a review to make opinions
9 on that issue.
10 Q. And you have not formed an opinion on that issue?
11 A. I have not.
12 Q. There's also a discussion in this letter of the
13 amortization methodology that Gabriel Roeder employed.
14 Do you recall that?
15 A. I do.
16 Q. And you, again, are not offering an opinion and have
17 not formed an opinion that the amortization
18 methodology that Gabriel Roeder employed was improper
19 or inconsistent with actuarial standards, correct?
20 A. Correct.
21 Q. Okay. And there's a reference here to 30-year maximal
22 amortization periods under then governing GASB rules;
23 do you see that?
24 A. I do.
25 Q. Has there been a change or is there about to be a

GLENN BOWEN

2 change in GASB rules concerning amortization
3 methodologies?
4 A. There is.
5 Q. Okay. Can you tell me what that is, what the change
6 is that's occurring?
7 A. In one sense -- and I'll preface this by saying this
8 is accounting. GASB handles accounting, not funding.
9 The new GASB standard, GASB 67/68, removes everything
10 that existed under 25 and 27 in terms of quantities
11 that are calculated, sets up an entire new matrix of
12 rules, and is a significant shift towards a
13 corporate-style accounting, a more market-based
14 accounting, significantly shorter amortization rules
15 and significantly more constrained liability reporting
16 rules.
17 Q. Are there rules under the new -- first of all, when
18 did those rules become effective?
19 A. Fiscal year '14.
20 Q. So they would be becoming effective now for the GRS
21 and the PFRS, correct?
22 A. It phases in over two years for the plans and the plan
23 sponsors. So, yes, basically now.
24 Q. And how do the new rules, in lieu of the 30-year max
25 that existed previously, how do the new rules address

GLENN BOWEN

2 amortization for UAAL?
3 A. The period is significantly shorter in terms of the
4 expense calculation, and I just don't know the numbers
5 off the top of my head.
6 Q. Do you know if there are rules about how you should
7 determine the appropriate amortization period for UAAL
8 under the new GASB rules?
9 A. As I said, it's very constrained. There are rules for
10 everything.
11 Q. I understand that. I'm asking you if you know what
12 the rule is and what is -- what the rule specifies
13 about how to determine amortization periods for UAAL
14 under the new GASB rules.
15 A. Yeah, as I mentioned, I don't know the number off the
16 top of my head.
17 Q. All right. And do you know what the methodology is
18 for determining, as opposed to the number? Is it your
19 understanding there's a specific number that's the
20 cap, or is it that there's a methodology? Explain to
21 me what your understanding of it is.
22 A. There are very low numbers, I mean, in five, seven,
23 ten-year time frame, and amortization is a net present
24 value, mortgage-style calculation.
25 Q. Do you know what the rules are for determining how the

GLENN BOWEN

2     amortization period is selected?
3   A. I don't think there's any flexibility in selecting the
4     amortization period for financial reporting purposes.
5   Q. I understand that. I'm just asking you if you
6     understand what the methodology is for determining
7     what the rule is, what the amortization period is.
8   A. Other than it's mandated, and I don't recall off the
9     top of my head what the number is.
10   Q. Is there anything more that you can recall, as you sit
11     here, about how the new GASB rules work, in terms of
12     determining amortization periods for UAAL?
13   A. No.
14   Q. Okay. You did not make particular recommendations in
15     this letter about -- and I'm referring to the July 6th
16     letter that is Exhibit 1 -- about the applicable
17     amortization period or the appropriate amortization
18     period, is that right?
19   A. I'd have to see, but I doubt that we did.
20   Q. You have made recommendations about amortization
21     periods to other clients, haven't you?
22   A. To answer your first question, I do not see a
23     recommendation in this letter. This is informational
24     in nature.
25   Q. Yeah, I don't think there's controversy about that,

GLENN BOWEN

2     I'm just trying to get to where we are.
3   A. Sure.
4   Q. But you have made recommendations to other clients
5     about amortization periods, is that right?
6   A. Recommendations I would say is a little strong. When
7     we have worked with clients on this issue, there are
8     different ways to prepare an amortization, and our
9     job, in my mind, has been to illustrate the options
10     and allow a plan sponsor to be cognizant of the impact
11     of making a selection.
12   Q. Have you made recommendations about changes in
13     amortization periods to clients?
14   A. Again, the word recommendations is strong. Take, for
15     example, this letter. This was pointing out that the
16     payments going towards the unfunded were less than the
17     interest on the unfunded, and the unfunded liability
18     could grow unbounded. It's an important piece of
19     information. I don't know that -- that's not a
20     recommendation for a change necessarily, but it's an
21     important piece of information that I might expect a
22     plan sponsor to ask further questions about.
23   Q. I understand that. I'm asking a more particular
24     question. Have you made recommendations to any of
25     your clients about amortization periods?

GLENN BOWEN

2   A. I would characterize my work as I just did, in that
3     when we're consulting on the issue of amortization
4     periods, we'll prepare amortization schedules and
5     explain the impact of the various types of
6     amortizations. The plan sponsor can choose how they
7     wish to fund the plan.
8   Q. What amortization period is used by the Puerto Rico
9     Government Employees Pension Plan?
10   A. That is a closed 30-year level dollar amortization for
11     accounting purposes.
12   Q. And for funding purposes, you're drawing that
13     distinction?
14   A. They have a statutory contribution rate.
15   Q. What about the Puerto Rico teachers?
16   A. That is a shorter period, to my recollection, and is a
17     level percent of payroll as opposed to level dollar.
18   Q. And by shorter period, what do you mean?
19   A. In the range of 20 years.
20   Q. And the Puerto Rico judiciary system?
21   A. I believe that is the same as the employees retirement
22     system.
23   Q. So, closed 30-year?
24        MR. MUTH: You need to answer audibly.
25   A. Yes.

GLENN BOWEN

2   Q. Sorry, I should have repeated that one.
3   A. Fair enough.
4   Q. And I saw you shaking your head and didn't say
5     anything.
6        Thank you, Counsel.
7        And the Texas County District Retirement
8     System?
9   A. That has a varied amortization period. When systems
10     have losses, they're recognized over a faster pattern
11     than when they have gains.
12   Q. And what are the alternatives in that varied system?
13   A. Again, going off the top of my head, I believe losses
14     are recognized over a 15-year period and gains are
15     recognized over a 20 or 30-year period.
16   Q. And for the New Jersey state teachers system that your
17     office serves as the system actuary for, what's the
18     amortization period for that?
19   A. I don't know the amortization period for accounting.
20   Q. If you look at Exhibit 13 that was marked yesterday,
21     if you look at the third page of that document, which
22     is POA -- I'm sorry, let me know when you have it and
23     I'll tell you where to go.
24   A. I have the document.
25   Q. Okay. If you go to the third page of it, at the very

GLENN BOWEN

1         GLENN BOWEN
2    bottom, so that's at POA6 -- 00600121, there's a
3    reference there in an email from Ms. Warren to
4    Mr. Porter about a 30-year amortization period for New
5    Jersey.  Do you see that?
6   A.  Yes.
7   Q.  Does that refresh your recollection as to whether the
8    amortization period employed for the New Jersey plan
9    is 30 years?
10  A.  Well, I don't work on that client's valuation, so
11    rather than refreshing my recollection, it provides me
12    the piece of information that I assume the way the
13    question is phrased, they're using a 30-year
14    amortization period.
15         MARKED FOR IDENTIFICATION:
16         DEPOSITION EXHIBIT 25
17         9:36 a.m.
18  BY MR. BALL:
19  Q.  Mr. Bowen, I'm showing you what has been marked as
20    Exhibit 25, which is a letter dated July 18th, 2012,
21    Bates number is POA00261017.  And my first question
22    is, do you recognize that letter?
23  A.  I do.
24  Q.  Okay.  And that's a letter you signed?
25  A.  It is.

GLENN BOWEN

1         GLENN BOWEN
2   Q.  And it makes a proposal under pension on page -- on
3    the second page of the letter, that there be a DGRS
4    five-year projection.  Do you see that?
5  A.  I do.
6   Q.  Why are you proposing a five-year projection there?
7  A.  Well, I would say this entire proposal was in response
8    to questions that were asked of us by the city at the
9    time.
10  Q.  So the city requested a five-year projection?
11  A.  Yes.
12  Q.  Okay.  And there is, on the third page of the letter,
13    a discussion of a potential phase three, end of the
14    first full paragraph.  Do you see that?
15  A.  I do.
16  Q.  Can you -- and there's a reference there to phase
17    three addressing changes in pension accounting will
18    occur under the new GASB standards.  Do you see that?
19  A.  I do.
20  Q.  Did you ever do that?
21  A.  No.
22  Q.  Why not?
23  A.  We were never asked to.
24  Q.  But that's something that Milliman could have done?
25  A.  Had we been asked, we could have.

GLENN BOWEN

1         GLENN BOWEN
2   Q.  There's also a discussion in that paragraph about the
3    kind of estimate you're going to be able to do in the
4    phase two discussion -- in the phase two that you're
5    discussing here.  Do you see that?
6  A.  I do.
7   Q.  And that kind of discussion says, it says that you'll
8    be based -- it will be based on the annual valuation
9    reports, actuarial techniques and rules of thumb that
10    won't involve full valuations using actual census
11    data.  Do you see that?
12  A.  I do.
13  Q.  Did you ultimately obtain -- did you ultimately
14    perform a full valuation using actual census data?
15  A.  We did.
16  Q.  All right.  And when did you do that?
17  A.  That was this year, 2014.
18  Q.  And is that in the April 2014 time frame?
19  A.  I believe that was when the letters were issued.  It
20    was -- there was a runup to that, but, yes, in the
21    2014 time frame.
22  Q.  So you'd gotten the census data at some point before
23    that, but the actual letters issued containing the
24    results of your analysis were issued in the April 2014
25    time frame, or the initial ones, is that right?

GLENN BOWEN

1         GLENN BOWEN
2  A.  Yes.
3   Q.  And so all of the analyses that you did until that
4    time all have -- are all based on the information
5    available in the Gabriel Roeder reports and your
6    application of actuarial techniques and rules of
7    thumb?
8  A.  Correct.
9         MARKED FOR IDENTIFICATION:
10         DEPOSITION EXHIBIT 26
11         9:40 a.m.
12  BY MR. BALL:
13  Q.  Having marked Exhibit 26, which is a November 16th,
14    2012, letter with Bates number POA00260237, is this
15    the -- first, Mr. Bowen, do you recognize this
16    document?
17  A.  I do.
18  Q.  And it's a letter that you authored?
19  A.  Yes.
20  Q.  And you signed it?
21  A.  Yes, I signed it.
22  Q.  Okay.  Is this the five-year projection that was the
23    subject of the July proposal we just looked at?
24  A.  It seems to follow that it is, yes.
25  Q.  Okay.  And can you explain the timing of it, why it

GLENN BOWEN

1
2  took from July until November for you to perform this
3  valuation? And maybe it didn't take you the entire
4  time. I just want to understand the timing of the
5  response.
6  A. Certainly. The project was not that time intensive,
7  given the time period you mentioned. I don't recall
8  when we were hired to perform phase two.
9  Q. Okay. And so as I understand that, you don't know
10  when you actually got retained. You don't think the
11  project took you that long. Is that -- am I
12  understanding your answer correctly?
13  A. I know the project didn't take that long, yes.
14  Q. Okay. There is a reference in the first paragraph of
15  the letter, first you say your modeling is based on
16  valuation results, actuarial assumptions and methods
17  as set forth in the preliminary June 30th, 2011 DGRS
18  actuarial valuation prepared by Gabriel Roeder Smith &
19  Company.
20            And so that's the latest version of the
21  Gabriel Roeder report that you had available to you at
22  that point, is that right?
23  A. We would have used the most recently available report
24  to conduct the study.
25  Q. All right. And then the next sentence says:

GLENN BOWEN

1
2  Recursive formulas in actuarial judgment and rules of
3  thumb were applied to project current results to
4  future years.
5            Can you explain what you mean by recursive
6  formulas?
7  A. Sure. A recursive formula, for instance, is you have
8  a liability at one date, recursive formula is used to
9  project liability to future dates, and estimates are
10  needed in terms of demographic movements, benefit
11  payments, benefit accruals, in order to move the
12  liability from one date to the next date.
13  Q. Okay. So, essentially, it's the methodology you use
14  to project from one -- the status at one date to a
15  future date?
16  A. Yes.
17  Q. Okay. And you still did not have the actual census
18  data at this point?
19  A. We did not.
20  Q. Okay. There's a discussion, the last sentence of that
21  paragraph says: Our projection is suitable for
22  explaining emerging trends and cost in liabilities but
23  is significantly less robust than a projection based
24  on full valuation.
25            Do you see that?

GLENN BOWEN

1
2  A. I do.
3  Q. And can you explain what that means?
4  A. What that means is that we were using recursive
5  formulas where a significant amount of judgment was
6  needed in each quantity, as opposed to a valuation
7  where we would have collected census data and been
8  able to do individual projections and capture the full
9  demographic spectrum of the population.
10  Q. In the last sentence that begins at the end of the
11  page, there's a reference to the market value of
12  assets and the actuarial value of assets, under two,
13  at the bottom of the first page. Do you see that?
14  A. I see it.
15  Q. How did you obtain information about the market value
16  of assets that were, that were in the plan? And I'm
17  focusing specifically on DGRS.
18  A. My supposition is that we would have taken the, both
19  quantities from the 2011 preliminary valuation report.
20  Q. Okay. So you took the numbers that were reflected in
21  the Gabriel Roeder report?
22  A. To the best of my recollection, that would have been
23  what we did.
24  Q. And that's true for both the market value and the
25  actuarial value?

GLENN BOWEN

1
2  A. Yes.
3  Q. And later you did further analyses when you had later
4  versions of the Gabriel Roeder report. My general
5  question is, did you ever change how you derived the
6  market value of assets or the actuarial value of
7  assets? In other words, did you ever do anything
8  other than taking them from the most current version
9  of the Gabriel Roeder report?
10  A. I can't definitively say that we did or didn't. If we
11  had been provided at some point in time with an asset
12  statement from the city which was more recent than
13  what the valuation reflected, we would have
14  incorporated that information into our models and it
15  would be noted in the letter that we provided the
16  analysis for.
17  Q. Okay. So either you took the value from Gabriel
18  Roeder reports, or in some circumstances a value may
19  have been provided to you by the city directly, as
20  opposed to you using the Gabriel Roeder reports. But
21  you did one of those two things in every case?
22  A. Those are the, those are the two things I can think of
23  that we would have done.
24  Q. Okay. Do you recall ever doing anything other than
25  that?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

GLENN BOWEN

1
2    A.  I do not.
3    Q.  Okay.  Do you know how Gabriel Roeder derived the
4        information in its reports about the market value of
5        the assets involved?
6    A.  I cannot say this with one hundred percent certainty,
7        but typically the system actuary is provided an asset
8        statement by the plan sponsor and accepts the numbers
9        as presented.
10   Q.  And you don't recall one way or the other how it
11       happened here?
12   A.  I never had occasion to ask that question.
13   Q.  Okay.  At various points you did analyses that focused
14       specifically on the DWSD, do you recall that?
15   A.  Yes.
16   Q.  And in those circumstances, your analysis looked at a
17       market value and maybe an actuarial value, but at
18       least a market value for assets for the DWSD,
19       specifically.  Do you recall that?
20   A.  I do.
21   Q.  And how did you derive those values, the ones that you
22       used for the DWSD, specifically?
23   A.  The inputs that we had were the overall actuarial
24       value of assets for the entire system, the overall
25       market value of assets for the entire system, and a

GLENN BOWEN

1
2        ratioed actuarial value of assets for each component
3        employer that had its own separate contribution
4        calculation.  And as set forth in our various letters,
5        we ratioed the overall actuarial value -- we used the
6        overall actuarial value and overall market value to
7        ratio the reported component actuarial values to the
8        component market values.
9    Q.  Okay.  Do you know how the reported actuarial values
10       were derived?  And by that -- let me back up.  The
11       reported actuarial values that you used, where did you
12       get them?
13   A.  The valuation report.
14   Q.  From Gabriel Roeder?
15   A.  Yes.
16   Q.  Okay.  And do you know how those values were derived?
17   A.  I do not know exactly how the historical valuations
18       have been done on the assets.
19   Q.  And I just want to make sure I understand.  In the --
20       there is in the Gabriel Roeder reports an actuarial
21       valuation for each of the city divisions, or at least
22       several city divisions, including DWSD, broken up --
23       the entire actuarial values broken into those
24       components, correct?
25   A.  The actuarial value of assets is split across the

GLENN BOWEN

1
2        components, yes.
3    Q.  Okay.  And you used the actuarial value split to
4        derive a market value split?
5    A.  Yes.
6    Q.  Okay.  In the same ratios as the actuarial value
7        split?
8    A.  Yes.
9    Q.  And then -- but you do not know how the actuarial
10       value split that Gabriel Roeder provided was derived?
11   A.  I do not.
12   Q.  Okay.  Did you ever discuss that issue with anyone
13       from Gabriel Roeder or anyone from the city?
14   A.  I don't recall a discussion with Gabriel Roeder.
15       Discussions with the city were basically along the
16       lines of what was presented in our letter.
17   Q.  Meaning along the lines of deriving a market value
18       split that was in the same ratios as the actuarial
19       value split between the different city divisions?
20   A.  Correct.
21   Q.  Okay.  Did the city ever provide you with -- you said
22       in some circumstances that you were provided asset --
23       market value asset values from the city to perform
24       your analysis.  Do you recall that?
25   A.  I said it's potential that that happened.

GLENN BOWEN

1
2    Q.  Okay.  All right, fair enough, and we'll get into some
3        individual letters.
4    A.  Okay.
5    Q.  But do you recall whether the city ever provided a
6        market value split for DWSD?  In other words, they may
7        have provided an overall value, market value for the
8        assets in the system.  Did they ever provide you
9        information that split the DWSD assets from the
10       remaining assets of the system, other than giving you
11       copies of the Gabriel Roeder report?
12   A.  I don't recall ever receiving a market value split.
13   Q.  Okay.  There are in the November 16th letter that we
14       were looking at several different scenarios that you
15       examined.  And the first one, I take it, the
16       amortization period that you're employing is the same
17       as the Gabriel Roeder amortization period.  Would I be
18       correct in assuming that?
19   A.  I can review it to confirm --
20   Q.  Sure.
21   A.  -- but given that it's baseline, that's my
22       supposition, so a moment, please.
23   Q.  Take a minute, because I have a few questions about
24       it.
25   A.  Yes, that appears to be the case.

GLENN BOWEN

Q. Okay. And then the second scenario applies an 18-year amortization period. Do you see that?

A. I do.

Q. And how did you come to apply an 18-year closed amortization period in scenario two?

A. A moment, please.

Okay. The request was to take the 30-year level percent of pay amortization which was used in determining the employer contributions, and develop a lower amortization period where the contribution toward the unfunded liability at least covered the interest on the unfunded liability in the initial year and grew from there.

The period that was necessary to do that in this case was 18 years.

Q. So Milliman calculated the 18 years on, on -- using those parameters to calculate an amortization period?

A. Yes.

Q. Okay. And in the third scenario -- well, first, let me ask, the parameters that were provided, did you discuss those with the city in advance of determining those would be the parameters used?

A. To my recollection, the discussion would have been: In your July letter you stated that the contribution

GLENN BOWEN

doesn't cover the unfunded liability interest; please find us one that does.

Q. So they asked you to come up with a methodology to find one that met that requirement?

A. The same methodology as shorter amortization period with the same methodology.

Q. And so the particular parameters were ones that Milliman chose to reach that result, is that right?

A. I wouldn't say Milliman chose the parameters. Milliman used the parameters that were given and did a calculation.

Q. Well, the parameter that was actually given to you give us an amortization that does cover the unfunded liability, right, the unfunded liability interest?

A. We were given that parameter, to the best of my recollection, to produce this result.

Q. Okay. So using that overarching parameter of giving them something that produced the result of an amortization period that covered the unfunded liability interest, you developed further parameters that resulted in the 18-year amortization period, correct?

A. I wouldn't say we developed further parameters. We used the parameters you mentioned --

GLENN BOWEN

Q. Well, that's one --

A. -- and did a calculation. Well, the additional parameters were that it was a level percentage of payroll amortization method which was in existence. We were asked to tweak one parameter.

Q. In the third scenario, there's an adjustment to the expected investment return, do you see that?

A. Yes.

Q. And you -- this is where you tell them that your expected rate of return, or it's a discussion of your expected rate of return at that point being 6.3 percent. Do you see that?

A. I do.

Q. It's actually 6.8 percent, but 6.3 percent net of admin and interest expense, correct?

A. Correct.

Q. So the 6.3 percent rate that you use here is net of admin and interest, just to be clear?

A. Yes, it is.

Q. And you note at the end of the second paragraph under scenario three that a decrease in the investment return assumption causes an increase in the plan's liability and annual accruals.

Do you see that?

GLENN BOWEN

A. Yes.

Q. And there was some discussion of that yesterday, but basically the relationship is that if you decrease the investment return rate, the unfunded liability goes up. Is that right?

A. True.

Q. All right. On page 4 of the letter, in the second paragraph under Basis For Analysis, your first sentence says: A projection model can be used to understand the pattern of emerging costs and liabilities of a retirement system -- I think it says systems but should be system -- but should not be relied upon as a guarantee of actual costs being incurred by the city.

And that's similar to the discussion we saw earlier about the kind of analysis that you were doing here and the limitations there are, correct?

A. I view this as actually different.

Q. Okay. In what way?

A. This sentence that you read to me recently is used in the context of regardless of the inputs and the robustness of the inputs to the projection model, this sentence still holds true. It's not a guarantee of actual costs, it's a projection into the future to

GLENN BOWEN

1  show emerging trends.
2
3  Q.  All right, fair enough.  I understand your point.
4      Future fund -- the second sentence says:  Future
5      funding and accounting obligations will be determined
6      by an actuarial valuation of the systems as of each
7      future valuation date, to be prepared by the systems
8      actuary.
9          And can you explain to me what you mean by
10     that?
11 A.  In this situation, we are serving as a consultant to
12     the city, providing them with responses to the
13     questions that they've asked.  Milliman will not be
14     preparing the future valuation reports that determine
15     the city's contributions.  The system actuary will be
16     doing that.
17 Q.  And that's part of the difference between the role of
18     a consultant to a sponsor as opposed to the system
19     actuary for the system itself, correct?
20 A.  Exactly.
21 Q.  Okay.  And so, ultimately, those judgments are left to
22     the system's actuary, correct?
23 A.  Yes.
24 Q.  All right.
25          MARKED FOR IDENTIFICATION:

GLENN BOWEN

1
2          DEPOSITION EXHIBIT 27
3          9:59 a.m.
4          MR. BALL:  This is 27.
5  BY MR. BALL:
6  Q.  Mr. Bowen, for the record, I've asked you to look at a
7      document that's been marked as Exhibit 27, which is a
8      November 16th, 2012, letter, Bates-stamped
9      POA00260318, and it's of the same date as the prior
10     letter, but the prior letter we were looking at is a
11     DGRS letter and this letter is about the PFRS.  Do you
12     see that?
13 A.  I do.
14 Q.  And this is another letter that you authored and
15     signed?
16 A.  Yes.
17 Q.  And to the extent it's about pension matters, that's
18     within your bailiwick, correct, between you and
19     Ms. Taranto?
20 A.  Correct.
21 Q.  And in this letter, in scenario two -- so take a
22     minute and look at it.  I want to talk to you about
23     scenario two.
24 A.  Okay.  I've read scenario two.
25 Q.  And in scenario two, you propose a -- or you discuss a

GLENN BOWEN

1
2  15-year closed amortization period and analyze a
3  15-year closed amortization period for the PFRS plan,
4  correct?
5  A.  We do discuss that.
6  Q.  All right.  And that proposal, or that amortization
7      period has been proposed and has been recommended by
8      the system actuary, because the PFRS plan is a closed
9      plan, is that right?
10 A.  That is what is stated in the paragraph here, yes.
11 Q.  All right.  And in the last -- in particular, that
12     amortization period has been recommended because it is
13     in line with the, quote, the expected future working
14     lifetime of the remaining active members.
15          Do you see that?
16 A.  I do.
17 Q.  And can you explain what that means?
18 A.  That recommendation by the system actuary means that
19     the concept is to fund the liability over the lifetime
20     of the remaining active working members to match the
21     allocation of costs to the period where the service is
22     being rendered by those members to the city.
23 Q.  Okay.  And is that a concept that is important in
24     determining the period over which funding will take
25     place for a closed plan?

GLENN BOWEN

1
2  A.  In my mind, yes, it is an important concept.
3  Q.  Okay.  And there's a reference here to promoting
4      intergenerational equity.  Can you explain what that
5      means?
6  A.  To repeat my last answer, that is the, the taxpayers
7      who are funding the plan sponsor, who make
8      contributions to the pension plan, are the ones who
9      are receiving the services for the participants who
10     are benefitting under the plan accruing benefits.
11 Q.  So the concept is, in general, that you're matching
12     the amortization period, and the funding in
13     particular, to the people who have received the
14     benefit of the services that are -- that the pension
15     benefits relate to, is that right?
16 A.  Yes.
17 Q.  And why is that important, or is that -- strike that.
18          Is that an important concept in looking at
19     funding periods in your work as an actuary?
20 A.  It's an important concept.
21 Q.  Is it one you agree with?
22 A.  It is one that I agree with, yes.
23 Q.  And the basic idea is that the burden associated with
24     the pension benefits should be borne by those who have
25     benefitted from the services provided by the employees

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

GLENN BOWEN

1 who are receiving the pension benefit, is that right?
2 A. That is.
3 Q. And so does that same issue -- so we've been talking
4 about the funding period. Does that same issue apply
5 in consideration of whether you're choosing an
6 appropriate investment return rate? And to be more
7 particular, what I mean is if you choose a rate that
8 is too high, then the period -- then the payment of
9 the liabilities will be over one period of time. If
10 you choose a rate that's too low, it will be over
11 another period of time, the impact of the payments.
12 So does the investment return rate raise
13 the same sort of intergenerational equity issue?
14 A. One could argue that it does, but mechanically I don't
15 understand your question about the, how the investment
16 rate of return stretches or shrinks the amortization
17 period.
18 Q. Not the amortization period, but the timing at which
19 the costs are borne or who bears the costs.
20 MR. MILLER: Object to form.
21 A. I will attempt to answer your question as follows:
22 The higher the assumed rate of return, the less likely
23 the rate of return is met, the more likely losses will
24 emerge over time and have to be funded, as opposed to

GLENN BOWEN

1 being recognized up front.
2 Q. All right. So people in later years wind up paying
3 for it instead of people in early years, correct?
4 A. If experience does not bear out to the assumed rate of
5 return.
6 Q. And if the rate is too low, what happens? If you set
7 a rate that's too low, what happens?
8 A. If the rate is set lower than what experience turns
9 out to be, the plan sponsor benefits from additional
10 investment return beyond that expected, which would
11 lower future cash and employer contributions into the
12 plan.
13 Q. And result in greater contribution -- in early years,
14 what happened to the people in early years?
15 A. They would have paid more than had they known that
16 there would be returns in excess of what was
17 anticipated.
18 Q. So it shifts the burden from people in later years to
19 people in early years, if the rate is set too low?
20 A. Once you know what happens in the future, you can
21 determine --
22 Q. Right.
23 A. -- who paid more or less than what was expected.
24 Q. Of course, all investment return projections are

GLENN BOWEN

1 projections, and I understand that, but if you set a
2 rate that is overly conservative, it could have that
3 impact, correct?
4 A. If the rate that you set is less than what is
5 achieved, it will have that impact.
6 Q. And if the rate you set is unduly conservative, it
7 will have that impact. In other words, if you know,
8 going in, that you've set a rate that by your prior
9 description is less than the 50 percentile, for
10 example, it will have that impact, right?
11 A. Not necessarily.
12 Q. It depends on what actually happens --
13 A. Correct.
14 Q. -- but your projection would be that it would have
15 that impact, right?
16 A. If you set a rate below your expected 50th percentile
17 return, you would expect that somewhat more than half
18 the time it would be met.
19 Q. And by "be met," you mean have the impact that we
20 talked about of shifting the burden to people in early
21 years instead of in later years?
22 A. Yes.
23 MARKED FOR IDENTIFICATION:
24 DEPOSITION EXHIBIT 28

GLENN BOWEN

1 10:09 a.m.
2 BY MR. BALL:
3 Q. Mr. Bowen, for the record, I'm showing you what has
4 been marked as Exhibit 28, which is a letter dated
5 January 28th, 2013, Bates-stamped POA00258685, and
6 this is again a letter about DGRS, or the GRS. First
7 it is -- do you recognize this letter?
8 A. I do.
9 Q. And it's a letter that you authored and signed?
10 A. It is.
11 Q. And I have particular questions about a couple of the
12 scenarios, particularly scenario two and scenario
13 three.
14 So the first question is, does your
15 reference in scenario two to the multiplier, can you
16 explain what that means?
17 A. In a final average salary pension plan, the benefit
18 will be determined by using the final average salary
19 of the participant, the length of their service, and a
20 multiplier, some percentage of that amount.
21 Q. And how does the multiplier work, can you explain to
22 me how that works?
23 A. Sure. If you have -- if the plan were to be two
24 percent times service times final average pay, and you

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

GLENN BOWEN

1 had 25 years of service, your benefit would be two
2 percent times 25 years times your final average
3 salary.
4 Q. And so scenario two looks at an open 30-year
5 amortization as a level percent of payroll, do you see
6 that? It's in the next-to-the-last paragraph under
7 two.
8 A. I do.
9 Q. Okay. Scenario three, if you look at it, changes to a
10 closed 30-year amortization. Do you see that?
11 A. I do.
12 Q. All right. And it also goes from a level percent of
13 payroll to a level dollar contribution funding plan,
14 do you see that?
15 A. I do.
16 Q. And you say, in the second full paragraph on page 3,
17 that the change from open to closed amortization and
18 level percent of payroll to level dollar payroll for
19 this scenario is based on our expectation of changes
20 that the system actuary might make in response to the
21 closing of the plan to new hires.
22 Do you see that?
23 A. I do.
24 Q. Can you explain what you meant by that?

GLENN BOWEN

1 A. The level percent of payroll amortization develops a
2 payment pattern in dollars, where the dollars are
3 smaller today than they are in the future, and
4 basically increase geometrically over time as payroll
5 increases. So it's a significantly backloaded way to
6 pay off a debt. In the existing case, the debt
7 actually grows for a number of years before any
8 principal is retired.
9 The level dollar payment is akin to your
10 mortgage, if you will, if you have a traditional
11 mortgage where you have a level dollar payment and
12 you're writing down principal immediately.
13 Q. Okay. So you say going from open to closed -- you
14 talked about level percent to level dollar, and you're
15 also going from open to closed, correct?
16 A. Yes.
17 Q. Okay. So those are two changes that this scenario
18 discusses?
19 A. Yes.
20 Q. Okay. And you say it's based on your expectation of
21 changes that the system actuary might make in response
22 to the closing of the plan to new hires. Can you
23 explain what you meant by that?
24 A. Other than the words that were used there, that's --

GLENN BOWEN

1 Q. Okay.
2 A. -- that's explanatory.
3 Q. What you were attempting to do is project what the
4 system actuary might do, correct?
5 A. Yes.
6 Q. Okay. And why are you trying to project what the
7 system actuary might do?
8 A. We were asked to value the particular scenario which
9 was closing the plan to new hires. So with a finite
10 future, given our expectation of what the system
11 actuary would do, this represents the -- these results
12 represent the information that we would expect that
13 the system and the plan sponsor would see if the
14 actuary took those steps.
15 Q. And it's also a reflection, isn't it, that ultimately
16 the decision is going to be made by the system actuary
17 about how to deal with these things?
18 A. Yes.
19 Q. And, in fact, you say in the next sentence, they might
20 choose not to make any change or could make a
21 different change.
22 Do you see that?
23 A. Yes, I do.
24 Q. And so ultimately how -- you're giving them your best

GLENN BOWEN

1 estimate here, but how this will actually work out
2 will depend on what the system actuary decides,
3 correct? Or they decide in, the plan decides in
4 consultation with the system actuary?
5 A. That is exactly what I was going to say.
6 Q. Okay. And then you go on and say: Milliman's
7 recommendation in this instance would be to make both
8 changes and also to decrease the term of the
9 amortization period.
10 Do you see that?
11 A. I do.
12 Q. Okay. And so, first, you are recommending here that
13 there be a less than 30-year amortization period in
14 the event that the plan is closed, correct?
15 A. Yes, we are.
16 Q. Okay. But you're not saying particularly what it is,
17 what amortization period you recommend?
18 A. We don't say in this letter.
19 Q. All right. But you do, then, it appears, sometimes
20 make recommendations to your clients about the
21 appropriate amortization period, don't you?
22 A. In the event of this discrete change, yes, we made a
23 recommendation.
24 Q. Okay. Have you made other similar recommendations --

GLENN BOWEN

1         I'll go back to my question from earlier.
2
3  A.  Sure.
4  Q.  Have you made other -- are there other scenarios where
5      you have made recommendations to clients about
6      amortization periods?  Is this the only time you've
7      ever done it?
8  A.  I appear to be tripped up on the word recommendation
9      here.  Had I written this knowing we'd have this
10     discussion, I might have written:  Milliman recommends
11     you consider.
12          We've been asked by clients when they do --
13     when they have a discrete event.  That's where I would
14     say this arises.  As an example, a client puts in an
15     early retirement incentive, and the impact of that
16     early retirement incentive is a very short-term
17     impact, we'll be asked by the client and/or their
18     auditor, what should we use as an amortization period.
19     And 30 may be inappropriate, five or ten may be more
20     appropriate.
21  Q.  Okay.  So in those circumstances, where you're asked,
22     and you have a view about whether an amortization
23     period is appropriate or inappropriate, you make a
24     recommendation, don't you?
25  A.  Yes.

GLENN BOWEN

1
2  Q.  Now, I take it here, however, you were trying to
3     project what you thought the system actuary would do,
4     and so notwithstanding your recommendation that there
5     might be a lower amortization period, your expectation
6     would have been that the system actuary would maintain
7     a 30-year amortization period, is that right?
8  A.  That's what we've written here.
9  Q.  Okay.  And that's what you thought at the time?
10  A.  We thought that at the time.
11         MARKED FOR IDENTIFICATION:
12         DEPOSITION EXHIBIT 29
13           10:20 a.m.
14  BY MR. BALL:
15  Q.  Mr. Bowen, I don't think you'll wind up needing to
16     spend a lot of time on this because I'm not going to
17     ask a lot of detailed questions, but this Exhibit 29
18     is a letter dated April 18th, 2013, with Bates stamp
19     POA00221957.  Do you see that?
20  A.  I do.
21  Q.  And this is a letter, again, that you authored and
22     signed?
23  A.  Yes.
24  Q.  And this is the first correspondence, at least that I
25     was able to find, between you and Jones Day, as

GLENN BOWEN

1
2     opposed to you and an employee or representative of
3     the -- an employee of the city.  And you spoke
4     yesterday about at some point beginning work with the
5     pension task force.
6         Can you tell me when you began work with
7     the pension task force as opposed to directly with the
8     city?
9  A.  It was early in 2013.
10  Q.  Okay.  And so even -- do you recall how far before
11     April of that year you began work with the pension
12     task force?
13  A.  I don't recall exactly how far before.
14  Q.  All right.  Can you explain how the change came about
15     that you were working with the pension task force and
16     not directly with the city?  From your perspective, at
17     least, how did that happen?
18  A.  From my simplistic perspective, we were told to be on
19     the pension task force.
20  Q.  So you're actually on the pension task force?
21  A.  Yes.
22  Q.  And did Milliman -- so what role did Milliman play on
23     the pension task force?
24  A.  Milliman would join conference calls on a weekly basis
25     and we would prepare measurements that were requested

GLENN BOWEN

1
2     of us.
3  Q.  Okay.  In participating in the pension task force, did
4     Milliman make recommendations to the pension task
5     force about what tasks Milliman should undertake?
6  A.  No, Milliman did not.
7  Q.  Okay.  Did Milliman make recommendations about
8     investment rate as part of the pension task force?
9  A.  We were asked to prepare an investment rate analysis,
10     which is somewhere in this pile which we --
11  Q.  Would be in the November 4th letter, but I'm not
12     asking about the various analyses that wind up being
13     embodied in the letter.  Your general testimony is
14     that you got instructions from the pension task force
15     about scenarios to run or the ways to -- you know,
16     what scenario to look at, what assumptions to make and
17     what scenario to look at.  Is that basically right,
18     that that's the way it worked?
19  A.  Yes.
20  Q.  Okay.  And what I'm trying to understand is whether,
21     because of your role on the pension task force, you
22     did more than simply receive instructions, but provide
23     input to the pension task force about what your
24     instructions should be, what scenario should be
25     chosen, what parameters, what assumptions you made,

GLENN BOWEN

1                  GLENN BOWEN
2      any of those things?
3   A.  I don't believe that we played that role.  We
4      received, as you mentioned, many different plan design
5      scenarios to model.  We received many different
6      investment returns to run those scenarios at.  And we
7      performed the modeling as requested.
8   Q.  Okay.  So your participation on the task force was one
9      of receiving assignments, not designing the
10     assignments, but receiving assignments and then
11     executing the assignments, and those were reflected in
12     your letters to the -- to Jones Day in connection with
13     your work on the project?
14   A.  Yes.
15   Q.  So there's no circumstance where you ever recommended
16     an amortization period, for example, other than what
17     we've just seen?
18   A.  To the best of my recollection, no.
19   Q.  Okay.  And apart from the November 4th letter that we
20     looked at yesterday that analyzed an appropriate rate
21     of return, did you make any recommendations about the
22     investment rate that should be used in your analyses?
23   A.  Apart from that letter, no.  And to put a fine point
24     on it, we didn't recommend the rates that should be
25     used in our analyses.  We were provided with a range

GLENN BOWEN

1                  GLENN BOWEN
2      of rates.  That letter was a different request.
3   Q.  You analyzed an appropriate investment return
4      assumption based on a set of asset mandates in the
5      investment policy, is that fair?
6   A.  For the purposes of that letter.
7   Q.  And in the various analyses that you ran for the
8      pension task force, did you have an understanding
9      about how or for what purpose the numbers and the
10     analyses Milliman was providing were going to be used?
11   A.  My understanding is that we were asked for a vast
12     array of scenarios to model over time, and that the
13     analyses were reviewed by the city so they could
14     understand the sensitivity of the results to the
15     various inputs they provided and would further be used
16     in their negotiation.
17   Q.  All right.  So I guess I'm asking -- you understood
18     that the city would be using the analyses you provided
19     for purposes of negotiation with various parties?
20   A.  I understood that.
21   Q.  All right.  And did you understand which negotiations
22     particular scenarios were going to be used for?
23   A.  Not in any -- there wasn't a standard thing that I was
24     informed of.
25   Q.  All right.  So I'm just trying to understand.  When

GLENN BOWEN

1                  GLENN BOWEN
2      you got the instructions, say, to perform a valuation
3      of the DWSD as a spinoff, for example, that happened
4      several times, right?
5   A.  We performed some analysis of DWSD, yes.
6   Q.  And did you have an understanding, when you got those
7      assignments, about what purposes those assignments
8      were going to be used for, those analyses were going
9      to be used for?
10   A.  Other than the fact it seemed self-evident that it
11     would be used in conjunction with negotiations
12     regarding DWSD, I didn't ask for or receive any other
13     information.
14   Q.  And just to be clear, that was your assumption based
15     on the nature of the project, or were you told that
16     that's what it was going to be used for?  I'm trying
17     to understand generally how it works, and this is a
18     particular example.
19   A.  I'm not sure that once given an assignment regarding
20     DWSD I would have asked the question, are you going to
21     use this in negotiations regarding DWSD.  I don't
22     think any further conversation occurred after I was
23     asked to perform a certain project.
24   Q.  So when you got projects, you weren't told
25     specifically what the purpose for the project was, you

GLENN BOWEN

1                  GLENN BOWEN
2      were just given the project and you might have been
3      able to estimate or make an informed guess about what
4      the purpose was, but you weren't specifically told
5      what the purpose was?
6   A.  That's a fair characterization.
7   Q.  All right.  Did it matter, for purposes of your
8      analyses, to know what the purpose of the analysis
9      was, to know what use it was going to be put to?
10   A.  I can't recall any projects where I was confused as to
11     what the project description was and asked questions,
12     other than here is how we interpret your request, so
13     that we could prepare the analysis, as opposed to what
14     are you guys going to do with this once we give it to
15     you, who are you going to talk to.
16         That would have been necessary to prepare
17     the analysis.
18   Q.  So it did not matter to you what the purpose was, all
19     you needed to know was what the parameters were that
20     were being assigned?
21   A.  Well, I mean, I'll just take objection to the first
22     part when you say it did not matter, it makes it sound
23     as if we were blast and didn't think about what we
24     were doing, and I don't think that's a fair
25     characterization.

18 (Pages 305 to 308)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-3   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 19 of
65

GLENN BOWEN

Q. And that's not what I'm trying to suggest. What I am
trying to ask about is not whether you cared about
your work, and I do not mean that at all. I'm sure
you care very deeply about it. I'm trying more to
understand whether it was important for purposes of
your analysis to know with any particularity what use
was actually going to be made of the analysis?

A. To the extent that we had questions or were unclear on
developing the assignment, we asked the city questions
and may have given examples and said, do you mean A,
B, or C by this.

We asked questions necessary to complete
our work and respond to the city's questions, and
that's how we conducted our projects.

Q. Okay. But my question is not what did you ask
questions, my question is, was it significant or
important, for purposes of your analysis, to
understand what the purpose was that the analysis was
being undertaken for? Not do we need to know, do we
have questions about what amortization period you use
or anything like that, I'm not asking about the
assumptions you're being assigned or the parameters
you're being assigned.

I'm asking, is it significant, or was it

GLENN BOWEN

significant to you, to understand the use that was
going to be made, the specific use that was going to
be made of a particular analysis that you were being
assigned?

A. I'm having trouble with the question, just because
there's not a clear-cut yes or no. When it was
important for us to have more understanding in terms
of doing our project, that was conveyed to the city
with the questions that we asked them.

Q. Okay. Did you ever go back to the city and say, what
are you going to do with this analysis, what is the
purpose for which you're having us prepare it?

A. I never asked that particular question.

Q. Okay. Was it significant to you to know what the
purpose was or what the use was that the city was
planning to make of any of the particular assignments
that you were given?

A. Yes, it's significant in the fact that we had to make
sure we understood the request and respond to the
city, and perhaps I can give you one example.

We discussed yesterday various cash inputs
from foundations from the state, et cetera. It was
self-evident to me that those matters were being
discussed via pension task force, city, all the

GLENN BOWEN

parties. When we were provided the number as an
input, to put into our model, the financial situation
of the system does not change whether the dollar came
from the institute or whether it came from the state.

So while we would have looked at that and
been aware that this was what was being discussed, we
did not feel the need to say, are you sure these
dollars are from the state or are you sure these
dollars are from some other funding source.

To our work, it was important to know that
the dollars were coming in.

Q. Okay. Again, that's, I think, not responsive to the
question.

A. Okay.

Q. And the question is just was it significant or
important to you to know the use that was going to be
made of the analysis that you were undertaking, on any
of the analyses that you were undertaking?

A. To reduce it to its simplest form and combine all of
those answers, yes.

Q. Okay. And did you ever ask the city specifically what
use it was going to make of any of the analyses that
you were undertaking?

A. We never felt the need to ask the specific question

GLENN BOWEN

that you used a few moments ago, as to what are you
going to do with this.

Q. Why not?

A. Because it was either rather self-evident, or the
particulars, as in the example I gave you, were
sufficient for us to prepare our analysis, and the
city could use that to further their negotiations
without us asking which day are you going to talk to
the institute, which day are you going to talk to the
foundations, which day are you going to talk to the
state. We knew -- we assumed they would have taken
that information and gone forth with it.

Q. So you assumed you understood the purposes for which
your analyses were going to be used, without being
told and without asking?

A. To go back to my earlier point, I think you're asking
me if we had some very explicit conversations, which I
think would have been gratuitous. We did not receive
an assignment regarding DWSD and receive an extra
statement from the city: This regards DWSD, we're
going to use it to discuss with DWSD.

So there is some difficulty I have with
answering your question the way it's posed, because,
as I said, we didn't feel the need to ask if a DWSD

GLENN BOWEN

1  assignment was regarding DWSD.
2
3       MR. MUTH: We've been going an
4  hour-and-a-half, so ...
5       MR. BALL: Sure. We can take a break.
6       MR. MUTH: Okay, great.
7       VIDEO TECHNICIAN: The time is 10:34 a.m.
8  We are off the record.
9       (Off the record at 10:34 a.m.)
10      (Back on the record at 10:53 a.m.)
11      MARKED FOR IDENTIFICATION:
12      DEPOSITION EXHIBIT 30
13      10:53 a.m.
14      VIDEO TECHNICIAN: We're back on the
15  record. The time is 10:53 a.m.
16 BY MR. BALL:
17 Q. Okay. Welcome back, Mr. Bowen.
18 A. Thank you.
19 Q. And you should have in front of you what has been
20  marked as Exhibit 30, which is a letter dated
21  May 20th, 2013, Bates-numbered POA0022046. Do you see
22  that?
23 A. I do.
24 Q. And that, again, is a letter that you authored and
25  signed?

GLENN BOWEN

1
2 A. Correct.
3 Q. And it's a -- in it you are analyzing a scenario
4  involving you're providing a DGRS simple ten-year
5  projection of plan freeze and a future COLA, is that
6  right?
7 A. Correct.
8 Q. And the ten-year projection, why are you performing a
9  ten-year projection here?
10 A. We were requested to perform a ten-year projection.
11 Q. Did you have any understanding of why ten years, as
12  opposed to five years, which we saw previously, or 20
13  years or 30 years, why you were requested in
14  particular to provide a ten-year projection?
15 A. I don't remember the specific reason why ten.
16 Q. Okay. And it's not the amortization period that's
17  used here, right?
18 A. This is a ten-year projection.
19 Q. Right. But you're looking at -- but the amortization
20  period that you're looking at, in looking at a
21  ten-year projection, is not a ten-year amortization
22  period, correct?
23      It's, for example, the first scenario is an
24  18-year amortization. I'm just trying to draw a
25  distinction between the projection and the

GLENN BOWEN

1
2  amortization period.
3 A. Absolutely, yes, the projection period is the amount
4  of time that results were calculated for, given all of
5  the underlying parameters.
6 Q. So you looked at what was going to happen over ten
7  years, but you used different scenarios involving
8  amortization periods that were longer than ten years?
9 A. Correct.
10 Q. Okay. And there are -- in the first scenario, you
11  apply an 18-year amortization period. Was that based
12  on a recommendation by Milliman?
13 A. This would seem to follow from a letter we looked at
14  recently where we were asked to determine what
15  amortization period would be needed, such that the
16  amortization payments would cover interest on the
17  unfunded liability in the very first year.
18 Q. Okay. And so over the life of the project, you
19  perform a number of analyses that use an 18-year
20  amortization period, which we saw calculated in the
21  letter that we looked at earlier. Was that always
22  based, to your understanding, on your initial
23  calculation of that 18-year amortization period?
24      Did the reasons for the use of an 18-year
25  amortization period change? I'm just trying to

GLENN BOWEN

1
2  understand, because it reappears numerous times, I'm
3  trying to understand if anything changed to prompt it.
4 A. Understood. I would say that in the particular letter
5  you're asking me about right now, it seems logical
6  that the 18 would have been reused for the exact
7  purpose that we just described it, and I have done
8  enough scenarios that I can't recall. We may have
9  been asked at some point in time to do a scenario
10  where the result was also 18 given a different set of
11  parameters. I can't rule that out, but this
12  particular analysis appears to be following directly
13  from the previous one we reviewed.
14 Q. Okay. So your best recollection -- do you recall
15  specifically, or you're just assuming, based on what
16  you're seeing and the timing in this letter, that it's
17  based on the prior analysis?
18 A. Yes, based on the prior, based on the prior analysis,
19  yes.
20 Q. Okay. And so you're assuming, you're assuming that
21  that's the reason for it?
22 A. Without reading the entire letter, yes.
23 Q. Okay. Well, you're welcome to read it. I just want
24  to understand what's going -- I'm trying to understand
25  what's going on and what the history of the use of the

GLENN BOWEN

1                GLENN BOWEN
2     18-year amortization period is and why it gets used.
3   A.  Yeah, for the purpose of this letter, that appears to
4     be the case.  It's based on the prior letter.
5   Q.  And is there something in particular you're seeing
6     here that makes you think that, or is it just the
7     context in which this is -- the circumstances?
8   A.  It's the context.
9   Q.  Okay.  And you don't have a specific recollection
10    about it, but it's from the context you're concluding
11    that must be the case?
12  A.  Yes.
13  Q.  In the second scenario, you change from an 18-year
14    level percent of payroll to a 15-year level dollar
15    payment beginning with the June 30th, 2013, valuation.
16    Do you see that?
17  A.  I do.
18  Q.  It's in the second paragraph.
19  A.  I do.
20  Q.  Okay.  And so the 18-year amortization period you
21    believe was wrong from your prior letter?
22  A.  Yes.
23  Q.  Why are you looking at a 15-year amortization period
24    in this scenario?
25  A.  I don't specifically state why in this letter, other

GLENN BOWEN

1                GLENN BOWEN
2    than the difference between scenario one and scenario
3    two is the plan being frozen.
4   Q.  Okay.  And we looked earlier at the analysis for a
5    PFRS amortization, where the PFRS had been closed and
6    a 15-year amortization period was closed -- was chosen
7    for the closed PFRS plan.  Is a similar thought
8    process producing the 15-year proposal here, where the
9    assumption is the plan's closed for DGRS?
10  A.  It's logical to assume that's where this 15-year level
11    dollar arose from.
12  Q.  Okay.  And in the PFRS circumstance, that was based on
13    consideration of the average working lifetime of the
14    workforce, and the concerns about intergenerational
15    equity that we talked about, is that right?
16  A.  The average working lifetime, I believe, was stated as
17    the reason by the system actuary in their valuation
18    report, and then we would have added the comment, I
19    believe, about the intergenerational equity to further
20    explain that to our client.
21  Q.  Okay.  So just to make sure I understand that, there
22    was -- the comment about intergenerational equity is
23    not something you took from the Gabriel Roeder report,
24    but something that you added by way of explanation to
25    your client about why that made sense?

GLENN BOWEN

1                GLENN BOWEN
2  A.  That is my recollection.
3  Q.  And so here, the choice to use a 15-year level dollar
4    amortization for a closed plan would have been
5    prompted by the same sort of considerations, is that
6    fair?
7  A.  The same sort of considerations, yes.
8  Q.  Okay.  And had you actually undertaken an analysis of
9    the average working lifetime of the DGRS employees at
10    this point?
11  A.  At this point, we would not have done that.
12  Q.  Did you do it eventually?
13  A.  I don't recall if we did or not.
14  Q.  So, sitting here today, you don't recall whether you
15    ever analyzed the average working lifetime of the
16    beneficiaries under the DGRS plan.  Eventually, it's
17    proposed to be a closed plan, you didn't, you didn't
18    analyze what the average working lifetime of the
19    remaining beneficiaries in the plan was, the actives?
20  A.  I'll state it this way.  When we did our replication
21    valuation, that would have been an output.  I don't
22    recall that we were ever asked to do any analysis
23    where we had to use that output to prepare any further
24    results.
25  Q.  Okay.  So it may be in your work papers, and it may

GLENN BOWEN

1                GLENN BOWEN
2    even be in one of your letters, but it's not something
3    you ever did anything with?
4  A.  That's, that's my recollection.
5  Q.  In both of these scenarios that you're running here,
6    you look at alternate investment return rates, a 6.3
7    rate and a seven percent rate, do you see that?
8  A.  I do.
9  Q.  And those are both net investment and admin expense,
10    correct?
11  A.  The 6.3 was developed as net of admin and investment.
12    The seven was requested by the city.  I believe we
13    would have treated it the same way.
14  Q.  Okay.  So both, in both cases, your analysis treated
15    it as net of investment and admin expense?
16  A.  That's what I believe from reading this letter, yes.
17  Q.  You can put that one aside.
18         MARKED FOR IDENTIFICATION:
19         DEPOSITION EXHIBIT 31
20         11:04 a.m.
21  BY MR. BALL:
22  Q.  Okay, Mr. Bowen -- and I actually only have a couple
23    of questions about this, but this is a letter that is
24    dated June 3rd, 2013.  So a few weeks after the letter
25    we just looked at.  And it's Bates-stamped

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-3   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 22 of
65

GLENN BOWEN

1  
2 POA00260055. So my first question about this is if it  
3 is a letter that you authored and signed?  
4 A. Yes.  
5 Q. Okay. And I was trying to figure out, and I'm not  
6 sure I ever did figure out, what the difference is  
7 between the analysis that you're doing here and the  
8 one that you did in the letter we just looked at, both  
9 DGRS simple ten-year projections of plan freeze and no  
10 future COLA.  
11     Do you have an understanding about what the  
12 difference was between these two analyses, why you're  
13 doing them separate?  
14 A. I do.  
15 Q. Okay. Can you tell me what that is?  
16 A. In the prior letter, Exhibit 30, the benefit payment  
17 projection which we used in the course of our  
18 recursive formulas was based upon Milliman judgment  
19 and noted under the rule of thumb adjustments.  
20     In the interim, we received a valuation  
21 report, whether preliminary or final, that Gabriel  
22 Roeder had prepared for the system as of 2012. In  
23 that valuation report, they had several projections  
24 based upon 2011 valuation results, and based upon the  
25 quantities they showed in those projections, we were  

GLENN BOWEN

1  
2 able to impute the benefit payments that they were  
3 projecting.  
4 Q. Okay. So you had more up-to-date Gabriel Roeder  
5 information that allowed you to look again at the  
6 analysis?  
7 A. Correct.  
8 Q. And if you look on page, pages 4 to 5, there's a  
9 discussion there about expected benefit payments. Do  
10 you see that?  
11 A. Yes.  
12 Q. Okay. And in the first full paragraph on page 5,  
13 there's a discussion there about the anticipated  
14 benefit payments developed by Gabriel Roeder Smith &  
15 Company in projections for the 2011-2012 fiscal year,  
16 or 225.5 million; however, the actual benefit payments  
17 for the 2011-2012 fiscal year 394.2 million, a  
18 difference of 168.7 million.  
19     Did you ever learn what the reason for that  
20 disparity was?  
21 A. We never learned specifically the reason.  
22 Q. Okay. And in undertaking your analysis, did -- at  
23 least at this point, how did you deal with that  
24 disparity, what did you do?  
25 A. We did not specifically deal with the disparity beyond  

GLENN BOWEN

1  
2 reporting it here.  
3 Q. Okay. And so did you assume that the higher Gabriel  
4 Roeder -- I mean, the Gabriel Roeder number was  
5 correct, as opposed to the higher number -- I mean,  
6 how did you, what did you use, what numbers did you  
7 use to determine your analysis of the benefits or  
8 projections?  
9 A. Our projections would have started at 2012's. We  
10 wouldn't have used the trailing number.  
11 Q. Can you explain what you mean by that? When you say  
12 they would not have used the trailing number, what do  
13 you mean?  
14 A. We started -- we seeded our model with 2012  
15 liabilities and projected forward from there, to the  
16 best of my recollection. Just give me a moment to  
17 confirm that, make sure we're looking at that letter.  
18     So when we started, as noted in the first  
19 paragraph, with June 30, 2012, liabilities, we moved  
20 forward from June 30, 2012, based upon the assets and  
21 liabilities as reported for that date, and the note  
22 here was our -- basically, the purpose of the table  
23 was to show that we looked at the 2011 projections  
24 that were included in the 2012 valuation report and  
25 prepared these benefit payments.  

GLENN BOWEN

1  
2     And the reason why we put this table in is  
3 because while several quantities were shown in the  
4 projection in the valuation report, the benefit  
5 payments were not. However, they were a solve-for  
6 item. The projections started at 2011 forward. We  
7 had to solve each year to be able to impute the  
8 benefit payments.  
9     However, in our projection, we started at  
10 June 30, 2012, and moved forward. So trailing numbers  
11 from 2011-12 did not directly make it into our model.  
12 Q. I'm trying to figure out why, then, you have the  
13 numbers listed for 2011-12 in your table and why you  
14 have the discussion about the disparity here. Can you  
15 explain that? If we're doing this starting with the  
16 next and using that as the jumping-off point for your  
17 analysis, why do you have listed the 2011-2012 number?  
18 A. We're starting with 2011-12 in this table because  
19 that's what we had to do to impute the numbers to draw  
20 out the benefit payments from the projections in the  
21 Gabriel Roeder valuation report which started with  
22 2011. So this was informational.  
23 Q. So did you use the 225.5 million in your analysis in  
24 any way?  
25 A. We would have started with the assets as of 2012 that

GLENN BOWEN

1  were reported in the valuation report.
2  Q. Okay. So I think you just said assets, and I'm not
3     sure that's what you meant. Did you mean to say
4     assets there?
5  A. Yeah.
6  Q. As opposed to the payments?
7  A. We would have seeded our projection system with the
8     assets and liabilities that were stated as of June 30,
9     2012, in the valuation report.
10  Q. So in projecting the benefit, how does that -- I'm
11     trying to understand how that connects to the benefit
12     payments piece.
13  A. In our earlier letter, we would have estimated
14     benefits prospectively based upon Milliman's rule of
15     thumb adjustment that was stated in the letter. In
16     this letter, prospective to 2012, we used the benefit
17     payments that were imputed and are listed in this
18     table prospective to 2012.
19  Q. One last question about this. Did you ever discuss
20     with Gabriel Roeder what the reason was for the
21     disparity?
22  A. Did not discuss that with Gabriel Roeder.
23  Q. Is there a reason why you didn't?
24  A. Did not feel it was necessary to discuss it with them


1  were reported in the valuation report.
2  Q. Okay. So I think you just said assets, and I'm not
3     sure that's what you meant. Did you mean to say
4     assets there?
5  A. Yeah.
6  Q. As opposed to the payments?
7  A. We would have seeded our projection system with the
8     assets and liabilities that were stated as of June 30,
9     2012, in the valuation report.
10  Q. So in projecting the benefit, how does that -- I'm
11     trying to understand how that connects to the benefit
12     payments piece.
13  A. In our earlier letter, we would have estimated
14     benefits prospectively based upon Milliman's rule of
15     thumb adjustment that was stated in the letter. In
16     this letter, prospective to 2012, we used the benefit
17     payments that were imputed and are listed in this
18     table prospective to 2012.
19  Q. One last question about this. Did you ever discuss
20     with Gabriel Roeder what the reason was for the
21     disparity?
22  A. Did not discuss that with Gabriel Roeder.
23  Q. Is there a reason why you didn't?
24  A. Did not feel it was necessary to discuss it with them

---

GLENN BOWEN

1  to complete the assignment that we were given.
2           MARKED FOR IDENTIFICATION:
3           DEPOSITION EXHIBIT 32
4           11:12 a.m.
5  BY MR. BALL:
6  Q. This is 32. Mr. Bowen, I'm showing you what's been
7     marked as Exhibit 32, which is a letter dated June
8     14th, 2013, Bates number is POA00221998. And my first
9     question -- and it's got an attachment, which is
10     another letter dated June 4th, so those are both
11     included in the package.
12           First, is the June 14th letter a letter you
13     authored and signed?
14  A. Yes, it is.
15  Q. All right. And is the June 4th letter a letter you
16     authored and signed? It starts at POA00222002.
17  A. Yes, it is.
18  Q. Okay. And this -- the June 14th letter uses a seven
19     percent investment return assumption and a closed
20     30-year level dollar amortization period. Do you see
21     that?
22  A. I do.
23  Q. And the decision to use those parameters for the
24     analysis, whose decision was that?

---

GLENN BOWEN

1  A. In a letter that we reviewed recently, seven percent
2     was noted as the city's request. So I will assume
3     that, in addition to the rest of the parameters, were
4     all provided to us as inputs for our modeling in the
5     June 14th and June 4th letter.
6  Q. Okay. So are you assuming it, or do you know that
7     that was what happened here?
8  A. I know that that's what happened here.
9  Q. Okay. And how do you know it?
10  A. Because I remember running multiple scenarios, as is
11     evidenced in the July, or June 4th letter, and I
12     didn't go asking the city, let me run 20 scenarios for
13     you. But it was defined for me and we prepared those
14     results.
15  Q. Okay. And if you look -- is this a plan-freeze
16     scenario? It's a follow onto the June 4th letter,
17     which appears to be a plan-freeze scenario. I'm just
18     trying to understand if this is a plan-freeze
19     scenario, as well.
20  A. Sure. And I haven't reviewed every scenario here yet.
21     If you are referring to Exhibit 2D on Bates 222001,
22     that is not a plan-freeze scenario.
23  Q. Okay. So is that the analysis that you're performing
24     in the June 14th letter, is for an open plan, I mean,

---

GLENN BOWEN

1  a -- without a plan freeze?
2  A. Correct.
3  Q. In the June 4th letter, the analysis is of a plan
4     freeze, correct?
5  A. There are ten or 12 scenarios in that letter and there
6     are some of each. There are 14 scenarios in the
7     letter, there are some of each.
8  Q. Okay. Fair enough. There are -- in scenario two,
9     does scenario two assume a plan freeze, in the
10     June 4th letter?
11  A. There are seven scenario ones and seven scenario twos.
12     Each scenario two is labeled as plan freeze.
13  Q. Okay. And the -- in scenario two, you looked at
14     multiple amortization periods, correct?
15  A. In the various scenario twos, there appear to be
16     different amortization periods.
17  Q. Okay. And that includes a 15-year scenario, a 20-year
18     scenario, and a 30-year scenario, correct?
19  A. I didn't actually see the 20, but that does sound
20     familiar. I'm going to check.
21  Q. I'm looking at 222005.
22  A. Okay. The table. I'm with you, yes, 15, 20 and 30,
23     and 18.
24  Q. And so we've talked about a 15-year amortization

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

GLENN BOWEN

1
2       scenario previously for a frozen plan?
3    A.  Mmm-hmm.
4    Q.  Here you are advising -- I mean, analyzing not only
5        that, but a 20 and 30-year amortization period.  Do
6        you see that?
7    A.  Yes.
8    Q.  And did you advise the city that the use of a 20 or
9        30-year plan -- amortization period in connection with
10       a frozen plan would be inappropriate or advisable in
11       any way?
12   A.  In the context of this letter, I don't recall we made
13       those -- that type of analysis, other than doing the
14       mechanical analysis.
15   Q.  Is there -- you said in the context of this letter, so
16       I'd like to understand whether you told the city that
17       a 30-year amortization period for a closed plan, with
18       a closed, 30-year closed amortization period, would be
19       inappropriate?
20   A.  I never recall using the word inappropriate, but you
21       did point out a letter earlier where we said we would
22       recommend some changes in the event of a freeze or
23       close.
24   Q.  Okay.
25   A.  That's what I was referring to.

GLENN BOWEN

1
2    Q.  And I think that's a fair point.  I'm just -- you
3        recommended a lesser period than 30 years.  My
4        question is, did you tell them that it was
5        inappropriate or improper in any way?
6    A.  I don't recall using those words.
7    Q.  All right.  Other than what we saw in the earlier
8        letter where you recommended a shorter period, did you
9        tell them, did you ever tell the city that a 30-year
10       period for amortization for a closed plan would be
11       contrary to good practice or contrary to actuarial
12       standards?
13   A.  Well, there are two separate questions there.
14   Q.  Okay.  Let's start with good practice and then we'll
15       do actuarial.
16   A.  Okay.  Good practice is a significantly broad topic,
17       funding a pension plan.  It can be done in many, many
18       different ways.  As an actuary, my -- I'm generally
19       happy when plan sponsor say, we'd like to contribute
20       to the pension plan.  I also realize there are other
21       uses for plan sponsors' money.
22           So if a plan sponsor were to conclude that
23       we are closing our plan but we're going to fund over
24       30 years because that's what our budget permits, I
25       can't tell them not to do it.  I would wish they would

GLENN BOWEN

1
2        do something shorter, but that's not my decision to
3        make.
4            In terms of actuarial standards of
5        practice, I know of nothing that says 30 years is an
6        unreasonable amortization period.
7    Q.  So I assume that what you just said about 30 years,
8        and having not told the city that it was contrary to
9        good practice or contrary to actuarial standards would
10       apply equally to the use of a 20-year amortization
11       period?
12   A.  I'm not -- sorry, I'm missing --
13   Q.  It's a complicated way to ask the question.  I
14       apologize.  Did you tell the city at any point that
15       use of a 20-year amortization period would be contrary
16       to best practices?
17   A.  I don't recall using those words, no.
18   Q.  In sum or substance?
19   A.  I'm not sure exactly what that means, but in general,
20       the reason why I say I don't recall doing that is
21       because I'm more inclined to make statements that a
22       shorter amortization period will cost more but will
23       secure pension benefits sooner and will set the plan
24       in a better position.  If you choose to use a longer
25       period, you'll have more, more risk of downside

GLENN BOWEN

1
2        experience, to the extent you don't have the money in
3        the plan to support the benefits.  That's the way that
4        I would typically address that type of situation.
5            I would find it odd if I had typed a letter
6        that said this is inappropriate.
7    Q.  Okay.  And the point of my question was just to see,
8        even though you hadn't used those words, whether you
9        were going to say that you had said something to
10       similar effect, right, as opposed to inconsistent with
11       best practices.  That means the same thing even if not
12       phrased the same way.
13           MR. MONTGOMERY:  Objection to form.
14   BY MR. BALL:
15   Q.  So, with that understanding, do you have any different
16       answer?
17   A.  No, I do not.
18   Q.  In the summer of 2013, did you have meetings with
19       Gabriel Roeder?
20   A.  In the summer of 2013, I attended a meeting in the
21       city of Detroit, Gabriel Roeder attended, Jones Day,
22       Conway MacKenzie, various other parties.  I don't
23       recall the date of the meeting.
24   Q.  Okay.  Sometime in the summer of 2013?
25   A.  Sometime in the summer.

GLENN BOWEN

1
2  Q.  Okay.  And apart from that meeting, have you attended
3      other meetings with Gabriel Roeder?
4  A.  There was a subsequent meeting, and let me
5      characterize that first meeting.  That was not a
6      meeting between Milliman and Gabriel Roeder.  It was a
7      large, large meeting.  There was a meeting of the
8      actuaries that was mandated by the Court, and I cannot
9      recall whether that was summer or fall of 2013.
10 Q.  So that was in connection with the mediation, correct?
11 A.  Correct.
12 Q.  Okay.  So leaving aside the meeting in connection with
13     the mediation, you have attended a single meeting with
14     Gabriel Roeder that was not -- at which other people
15     were present, is that right?
16 A.  In the summer of 2013, I attended a meeting as
17     described.  Do you have further questions?
18 Q.  Yeah.  I think I asked, but maybe I didn't.
19 A.  Okay.
20 Q.  Other than that meeting and the mediation --
21 A.  Mmm-hmm.
22 Q.  -- and a related meeting, have you attended other
23     meetings with Gabriel Roeder?
24 A.  I've not attended meetings with Gabriel Roeder that
25     were not connected to mediation, other than the

GLENN BOWEN

1
2      meeting in the summer of 2013.
3  Q.  Okay.  Have you had calls with Gabriel Roeder,
4      conference calls or telephone calls with Gabriel
5      Roeder or representatives of Gabriel Roeder, other
6      than the meeting from the summer of 2013 or calls in
7      the context of the mediation?
8  A.  The calls we had were in the context of mediation.
9  Q.  Okay.  So are the only direct communications you've
10     had with -- first of all, did you have any
11     communications at that first meeting with Gabriel
12     Roeder?
13 A.  I don't believe we had -- hello, how are you, nice to
14     meet you.  Beyond that, I don't -- it was not a
15     meeting where the actuaries were presenting.
16 Q.  Okay.  Other than in the mediation, then, and the
17     introductions at that first meeting, have you had any
18     direct communications with Gabriel Roeder?
19 A.  Not that I recall, no.
20 Q.  All right.  Have you, with the exception of those
21     introductions at the first meeting and the mediation,
22     have you had any direct communications with
23     representatives of Gabriel Roeder, including counsel?
24 A.  I don't recall that I have, other than the gentleman
25     is here today and I spoke to him in the hallway.

GLENN BOWEN

1
2  Q.  And so attendance at your deposition I would exclude.
3  A.  Okay.
4  Q.  The others -- have you ever had -- so you said you.
5      Are you aware of whether other Milliman personnel have
6      had communications with Gabriel Roeder, excluding the
7      introductions at the first meeting, mediation, and
8      the, you know, saying hello or shaking hands at your
9      deposition?  Excluding those things, any
10     communications by any Milliman personnel with Gabriel
11     Roeder that you're aware of?
12 A.  Not that I'm aware of.
13 Q.  So far as you're aware, Ms. Warren had no
14     communications with Gabriel Roeder, excluding the ones
15     we've --
16 A.  The ones that we have discussed?
17 Q.  Excluding the ones we've discussed.
18 A.  Excluding the ones we've discussed, I don't believe
19     she has.
20 Q.  Okay.  And at the meeting that you attended with
21     Gabriel Roeder in the summer of 2013, what was
22     discussed?
23 A.  To the best of my recollection, there was no
24     presentation by Gabriel Roeder and no presentation by
25     Milliman, and I don't recall the rest, other than the

GLENN BOWEN

1
2      other pension task force experts and other attorneys
3      speaking about whatever they spoke about.
4  Q.  So what was discussed at the meeting by the people who
5      did speak?
6  A.  I don't recall.
7  Q.  Do you recall anything anybody said at that meeting?
8  A.  My recollection is I walked out and said there was no
9      need for me to be there.  And so I did not -- I did
10     not recollect, I did not put into my long-term memory
11     anything that was discussed at the meeting.
12 Q.  Okay.  And do you recall who spoke at all or what the
13     topics were that you were not really on point for?
14 A.  It would have been non-actuarial issues that did not
15     concern any projects that we were working on.
16 Q.  So when you have obtained materials from Gabriel
17     Roeder -- well, first of all, have you at various
18     points obtained materials that came from Gabriel
19     Roeder, and if so, how did you get them?
20 A.  The valuation reports are -- one's complete publicly
21     available on the websites of the retirement systems.
22     We have been provided with draft valuation reports at
23     points in time that are mentioned in our letters, and
24     they, I believe, would have come to us via Jones Day.
25     I'm not sure that Gabriel Roeder -- when we

GLENN BOWEN

1    received our census data, it was directly from the
2    system. I'm not sure Gabriel Roeder provided us
3    directly any materials.
4  Q. Okay. My next set of questions is about the system.
5    What meetings -- how many meetings, if any, have you
6    attended with representatives of the retirement
7    system?
8        MR. MILLER: Outside of mediation?
9        MR. BALL: Outside of mediation.
10 A. Outside of mediation, no meetings.
11 BY MR. BALL:
12 Q. Okay. What communications have you had with
13   representatives of the systems, the retirement
14   systems, other than any communications in mediation?
15 A. Well, the retirement systems provided us census data,
16   so I'm not sure if that's considered inside or outside
17   of mediation.
18 Q. Did you use it for non-mediation purposes? You used
19   it in some of the analyses here which have been
20   provided to us, so I assume you used it.
21 A. We used it to prepare replication valuations that were
22   discussed yesterday in this, in this room. So I don't
23   know if that's inside or outside of mediation, but we
24   certainly had conversations with the retirement system

GLENN BOWEN

1    during the process of collecting the census data and
2    understanding it.
3  Q. Okay. And apart from collecting the communications in
4    the context of collecting the census data and
5    mediation, have you had any other communications with,
6    directly with the retirement system or its
7    representatives?
8  A. Not that I can recall.
9  Q. Okay. And did you have discussions with
10   representatives -- or communications with
11   representatives of the retirement system about issues
12   related to the census data?
13       MR. MILLER: Outside of mediation?
14       MR. BALL: Outside of mediation.
15       THE WITNESS: So I'll ask, is our
16   collection of census data considered to be outside of
17   mediation?
18       MR. MILLER: The position of the city is,
19   no, it is not outside of mediation.
20       MR. MONTGOMERY: The position of the
21   Retiree Committee is also, at least as far as we are
22   concerned, the only information came via mediation
23   directions of Eugene --
24       MR. BALL: Right, and so are you taking the

GLENN BOWEN

1    position, then, that his use of the census data and
2    the things that are said about the census data in all
3    his various letters to you in which he performs
4    analyses are covered by the mediation? Because you've
5    produced a ton of documents that have discussion about
6    the census data, communications with Clark Hill, and
7    other communications related to issues with the census
8    data that are in the analyses, including the April
9    10th analysis and the April 25th analysis, and I
10   believe the April 17th analysis he's done.
11       Are you taking the position that all of
12   those things are covered by the mediation privilege?
13       MR. MILLER: No, we are not.
14       MR. BALL: Okay. So can you explain to me
15   how he can disclose those communications, or you can
16   disclose to them -- them in the context of producing
17   those documents and using those documents, but still
18   claim that any communications he had about -- with
19   Clark Hill about them are subject to the mediation?
20       MR. MILLER: If he had communications with
21   Clark Hill, and those communications were in the
22   presence of a mediator or ordered by a mediator, those
23   are protected.
24       MR. BALL: But you've waived it by

GLENN BOWEN

1    producing -- at a minimum, you've waived it by
2    producing them and using them in the analyses that are
3    a part of -- significant part of the -- what you rely
4    on in the report and you've produced in this case.
5        MR. MILLER: And I believe the Court made
6    quite clear just last week that the confidentiality
7    that attaches to mediation is not waivable.
8        MR. BALL: So you're using it -- just to be
9    clear, you want to use it for some purposes and
10   disclose it there, but if I have further questions
11   about anything concerning those communications beyond
12   what is actually in the documents, you will object
13   based on mediation --
14       MR. MILLER: I think we've made our
15   position quite clear. We're trying to be very
16   forthcoming, and we are not drawing an unnecessarily
17   broad cloak for this confidentiality.
18       What we have said is that in connection
19   with communications that were made in the course of
20   mediation or ordered by a mediator, those
21   communications are confidential and will not be
22   disclosed.
23       To the extent that there were
24   communications between Milliman and the city, that

GLENN BOWEN

1
2 were outside of mediation, those we have, we have
3 disclosed.
4        MR. BALL:  All right.  There are -- but
5 you're taking the same position -- you're saying the
6 position that communications with Clark Hill about the
7 census data are subject to the mediation privilege?
8        MR. MILLER:  If those communications
9 occurred either in the presence of a mediator or
10 directly pursuant to an order of a mediator that said
11 communications take place.
12        MR. BALL:  There are -- well, it will be
13 simpler when I get to the documents, so I'll wait and
14 get to that.  But I think the -- I'll just do it then.
15        MARKED FOR IDENTIFICATION:
16        DEPOSITION EXHIBIT 33
17        11:37 a.m.
18 BY MR. BALL:
19 Q.  I'm back, Mr. Bowen.  I'm asking you to look at what
20 has been marked as Exhibit 33, which is a letter dated
21 October 3rd, 2013, Bates-stamped POA260193.
22        And first, is this a letter that you
23 authored and signed?
24 A.  Yes.
25 Q.  And if you look at the discussion on page 2 --

GLENN BOWEN

1
2 actually, page 3, about the requested baseline,
3 there's a discussion toward the end of the page about
4 the amortization period being reduced to 18 years.
5 And then in the last bullet on the page, there's a
6 discussion about the UAAL being -- amortizations being
7 layered.  Do you see that?
8 A.  I do.
9 Q.  Can you explain to me what that means?
10 A.  Sure.  The word amortization, just in general, has the
11 overall connotation of paying down debt and the myriad
12 ways to accomplish that.  The existing method that was
13 being used was an open amortization period, which
14 meant that every year, the debt was effectively
15 refinanced, not exactly at all, but akin to
16 refinancing a mortgage every year.  That's one way to
17 perform an amortization.
18        Earlier we discussed closed amortization,
19 where the unfunded liability was written down over a
20 schedule that was not re-amortized every year.  Layers
21 is each year you write down the unfunded liability on
22 schedule, but any new, newly emerging gains or losses
23 from experience which deviates from assumptions are
24 set up in their own layer as opposed to being rolled
25 into the existing amortization.

GLENN BOWEN

1
2        So you'll have a whole series of
3 amortizations, as opposed to one overall amortization
4 of the existing unfunded.
5 Q.  And why would you approach it that way?  Why would you
6 use layering as opposed to not using layering?  What's
7 the rationale for doing it one way or the other?
8 A.  Well, the rationale for a plan sponsor using it would
9 be to say that we are going to, over a finite period,
10 pay down the debt of each -- and we're dealing with
11 that so much, there are surpluses, so you can take
12 credits if you have better experience.  But over a
13 finite period of time, the experience that emerges
14 each year, which is different from what is expected,
15 is set on its own schedule and recognized, and the
16 process is repeated and you're not at the risk of,
17 under a closed scenario, say, moving from 30, and by
18 the time you're down to five you have a huge gain or
19 loss which you're amortizing over five.
20        So it's a way of developing an amortization
21 schedule which in the aggregate can be smoother and
22 easier to budget than using a closed amortization
23 schedule, where you're at risk of having a significant
24 deviation when you have a short term left in your
25 amortization schedule.

GLENN BOWEN

1
2 Q.  And did you use layered amortization in your analysis,
3 all of your analyses after this, or some or none?  How
4 did, how did things develop after this?
5 A.  Well, in this particular letter, as I was reviewing
6 it, there's over 20 scenarios.  I stopped counting.
7 So each scenario, we should be able to find the
8 description in the letter as to what methods and
9 parameters were based on that scenario.
10        I don't believe that level amortization was
11 used in every single case in this letter, but I'd have
12 to read the letter to confirm.
13 Q.  There are three different investment return rates
14 referenced on page 4.  6.3, 7, and 7.5, do you see
15 that?
16 A.  I do.
17 Q.  And those, I take it, again, are all net of admin and
18 investment expense?
19 A.  I assumed that to be the case here, yes.
20 Q.  And back on page 2, there was a discussion yesterday
21 about the caveats in your reports about the use that
22 could be made of them and who could rely on them.  Do
23 you recall that?
24 A.  I do.
25 Q.  Okay.  And the general intent is that the city be able

27 (Pages 341 to 344)

GLENN BOWEN

1
2      to rely on them, but that third parties not be able to
3      rely on them. Is that fair?
4 A. That's a fair characterization.
5 Q. And just to be clear, do you have an intent or an
6      understanding about whether that means that the Court
7      should be able to rely on them, as opposed to the city
8      and various objectors and other parties?
9 A. I don't know the law around the Court relying on
10      product we prepared for our client.
11 Q. Okay. But the directive here is that -- not to be
12      relied upon by any third parties other than the city,
13      is that fair?
14 A. That is what is written here.
15 Q. And that was Milliman's intent, as you understand it?
16 A. Yes.
17           MARKED FOR IDENTIFICATION:
18           DEPOSITION EXHIBIT 34
19           11:45 a.m.
20 BY MR. BALL:
21 Q. Mr. Bowen, I'm asking you to look at what has been
22      marked as Exhibit 34, and my first question to you
23      about this again is whether it is a letter that you
24      authored and signed?
25 A. Yes, it is.

GLENN BOWEN

1
2 Q. And for the record, it's a letter dated November 19th,
3      2013, and Bates number POA00260270. And the "re"
4      line on this says that it is a DGRS rough plan
5      termination estimate. Can you explain to me what that
6      is?
7 A. Well, it's a rough estimate of the cost of plan
8      termination, and I'd have to read further to see
9      exactly the parameters of the termination.
10         I mean, as stated, it's a rough estimate of
11      the cost of plan termination.
12 Q. And can you tell me what that means, what you mean by
13      the cost of plan termination?
14 A. Sure. Plan termination is, in concept here, the city,
15      or the system's, or whoever, purchasing annuities from
16      a private carrier paying a market based annuity rate.
17 Q. Okay. And in the project description, there's a
18      reference to being directed to use a 3.5 and five
19      percent interest rate scenario. Do you understand
20      what the basis for those directions were?
21 A. I understand the 3.5. I don't necessarily recall the
22      reason for the five.
23 Q. Okay. What do you recall about the 3.5?
24 A. It's in the, it's in the area of an interest rate that
25      we would expect an insurance carrier to use in valuing

GLENN BOWEN

1
2      a liability for such a termination.
3 Q. And how's that determined?
4 A. General knowledge of what insurance carriers are using
5      to cost out group annuities.
6 Q. So other, other companies in the industry, what
7      insurance carriers would use in the industry?
8 A. Yeah, not actuarial companies.
9 Q. And is there an amortization period imbedded in this
10      analysis in any way?
11 A. There is not.
12 Q. Okay. And did you have an understanding of what the
13      purpose was for undertaking this analysis?
14 A. The purpose was to answer the question of what would a
15      market based price be to terminate these pension
16      plans, retirement systems.
17 Q. And did you have any further understanding besides
18      that?
19 A. None that was needed to conduct this project.
20 Q. Okay. That's not my question. My question was, did
21      you have any understanding besides that?
22 A. I did not feel I had the need to ask any additional
23      questions to respond to this, so I had no
24      understanding other than I was answering the question
25      of what is a market based price for plan termination.

GLENN BOWEN

1
2 Q. And that may all be fair, but my question is, did you
3      have any understanding of what the purpose was, beyond
4      the one that you stated?
5 A. I have a broad understanding, as we note in the
6      beginning of all of our letters, of our service to the
7      city being in conjunction with the proposed
8      restructuring and negotiations that they're entering
9      in. I did not on any individual letter necessarily
10      need to have a more detailed understanding.
11 Q. Again, that's not my question. My question is, did
12      you have any understanding about the purpose, other
13      than the one you've stated, for this letter, for this
14      analysis?
15 A. The purpose being that we were answering a question
16      that could potentially be used in mediation at the
17      city's discretion was my understanding.
18 Q. Okay. And how did you have that understanding?
19 A. They asked me in this particular engagement to value
20      the cost of the plan termination, and our broad
21      service to the city was based upon providing them
22      information that they could potentially use in
23      mediation at their discretion.
24 Q. Okay. So your analyses at this point are all being
25      performed for mediation purposes?

GLENN BOWEN

1
2  A.  I did not say that.
3  Q.  Okay.  So what you said was:  Our broad service to the
4      city was based upon providing them information that
5      they could potentially use in mediation at their
6      discretion.
7  A.  That is accurate.
8  Q.  Okay.  And were you providing them analyses for
9      purposes other than use in mediation?
10 A.  No.
11 Q.  Did that change at any point?
12 A.  Not to my recollection.
13         MARKED FOR IDENTIFICATION:
14         DEPOSITION EXHIBIT 35
15         11:52 a.m.
16 BY MR. BALL:
17 Q.  Mr. Bowen, I'm asking you to look at what's been
18     marked as Exhibit 35, which is a letter dated
19     November 26, 2013, Bates-stamped POA26047.
20         My first question is, is this a letter that
21     you authored and signed?
22 A.  Yes.
23 Q.  And the "re" line here says that this is about the
24     DGRS estimated liability reduction in 2013 to have 70
25     percent funded status in 2023 under various scenarios.

GLENN BOWEN

1
2      Do you see that?
3  A.  I do.
4  Q.  And so the -- so the various scenarios that you're
5      looking at here, you're looking at having a result of
6      having the GRS 70 percent funded in 2023, is that
7      fair?
8  A.  That is the target of the projections, yes.
9  Q.  The idea of the DGRS having 70 percent funded status,
10     the use of the 70 percent threshold, where did that
11     come from?
12 A.  It was provided to us by the city.
13 Q.  Did you have any understanding of what the basis for
14     choosing 70 percent as opposed to another threshold
15     was?
16 A.  My understanding is that it was as a result of
17     mediation.
18 Q.  So it's a result of mediation the city is in, it's not
19     a result of any analysis performed by you or by
20     Milliman, is that right?
21 A.  Correct.
22 Q.  All right.  And the choice of 2023 as a date to
23     achieve that status, do you have an understanding
24     about what that's based on?
25 A.  The same thing.

GLENN BOWEN

1
2  Q.  All right.  So the use of 2023 as a date for achieving
3      that status is not a product of any analysis or any
4      recommendation by you or by Milliman, is that fair?
5  A.  Correct.
6  Q.  Do you know what mediation those numbers, 70 percent
7      and 2023, are the result of?
8  A.  No, I do not know what particular mediation.
9  Q.  And I take it that so far as you are aware, that those
10     numbers, 70 percent, or the 2023 target date, those
11     are not the product of -- they're not based on any
12     accounting standards you're aware of, is that fair?
13 A.  Yeah, I have no awareness of that.
14 Q.  And if you look at Exhibit 1 to the letter, which is
15     on page 260253, you analyze a variety of investment
16     return rate assumptions, do you see that?
17 A.  Yes.
18 Q.  And they range from 5.75 up to a high of the level
19     Milliman had originally recommended of 6.3.  Do you
20     see that?
21 A.  I do.
22 Q.  Okay.  How were those numbers derived or determined?
23 A.  They were requests made by the city.
24 Q.  Okay.  Other than the fact that the city asked for
25     them, do you have any basis, I mean, any understanding

GLENN BOWEN

1
2      about how those numbers were -- what the basis is for
3      those numbers, where they came from?
4  A.  Not the particular numbers.
5  Q.  Okay.  And you had -- this is November 26, 2013.  You
6      had, in the letter we saw yesterday, dated
7      November 4th, provided Milliman's analysis of what the
8      expected investment return would be, the 50th
9      percentile and the range up to -- from 25 up to 75, as
10     well, were the asset allocation that existed at that
11     point in the GRS, right?
12 A.  The November 4th sounds like the right date.
13 Q.  Okay.  You've only done one such analysis.  We can
14     pull it back out, but it's the -- I believe it's in
15     the fourth letter.  Is there a reason why -- do you
16     have an understanding about why the analysis that
17     Milliman performed three weeks before this is not used
18     as the basis for the interest rate, I mean, the
19     investment rate assumption here?
20 A.  Other than the fact that various interest rates were
21     requested, which is very common to prepare
22     sensitivities, I don't have a reason why the city did
23     not request an additional rate.
24 Q.  All right.  Fair enough.  I was just trying -- I
25     understand the city requested these particular rates.

GLENN BOWEN

1
2    You had provided an analysis that would support a
3    different rate. I'm just trying to understand if you
4    know anything about why they chose rates other than
5    one that was contained in your -- that was provided
6    through the analysis conducted in your November 4th
7    letter.
8    A.    The context I just mentioned, sensitivity analysis
9    shows results under different rates.
10   Q.    But not including the rate that you had suggested,
11   right?
12   A.    That is not included in this exhibit.
13   Q.    Okay. And again, I'm just trying to make sure that I
14   know what you know. Do you know why the rate that you
15   had proposed or had -- that was the product of your
16   analysis in the November 4th letter was not used as
17   one of the rates here?
18   A.    It wasn't used because it wasn't requested.
19   Q.    Okay. I know why you didn't do it. Do you know why
20   the city didn't request it? Do you have any
21   understanding of why it wasn't requested?
22   A.    I do not.
23   Q.    And, in fact, in all the analyses you performed after
24   this, that rate is never used in any of those
25   analyses, is that right?

GLENN BOWEN

1
2    A.    To the best of my recollection, that is right.
3    Q.    There is no analysis here about funding levels after
4    2023, is that right?
5    A.    In this letter, the target was 2023.
6    Q.    For 70 percent funding?
7    A.    Yes.
8    Q.    Is there any analysis here -- and I believe the answer
9    is no, but I just want to make sure I'm not missing
10   something -- of what the amortization period will be
11   for the remainder of the UAAL after 2023? Anything to
12   show how the remaining 30 percent is going to be
13   amortized?
14   A.    I'll check just to make sure. I don't see any mention
15   in this letter.
16   Q.    And can you tell me what the funding level is
17   currently -- well, strike that.
18         In the fall of 2013, what was the funding
19   level for the Puerto Rico Employees Retirement System,
20   the various Puerto Rico systems for which you are the
21   system actuary?
22   A.    Off the top of my head, I will say the employees
23   retirement system was five percent funded. The other
24   two systems are probably in the 20s. I don't recall
25   the exact numbers.

GLENN BOWEN

1
2    Q.    All right. Is that -- that was in the fall of 2013,
3    is that what you're answering?
4    A.    That's based on my recollection of the 2013 valuation
5    results, which we didn't have done by the fall of
6    2013, but would have been the funded status had we
7    been able to measure it sooner.
8    Q.    I was just trying to understand the timing of it. So
9    have those numbers changed substantially since that
10   time?
11   A.    Valuations are conducted once a year, so we don't do
12   interim measurements of funded status, but I would
13   expect they would be constantly changing if we
14   measured more often.
15   Q.    Okay. And so the most recent data you have, that's
16   the most recent data you have?
17   A.    Yes.
18   Q.    And do you have an understanding, under the current
19   parameters that have been set for the plan, what the
20   current plan is for those plans, what you anticipate
21   the funding level for those plans will be in 2023?
22   A.    We have not projected future funding levels for those
23   systems.
24   Q.    Okay. So you don't know what the level will be for
25   those plans in 2023, if your current projections and

GLENN BOWEN

1
2    analyses and the plans that are in place hold form?
3    A.    As I said, we did not project funded status in future
4    years for those plans.
5    Q.    What about the New Jersey State Teachers Fund. Do you
6    know what the current funding level is for that?
7    A.    Not off the top of my head.
8    Q.    Any idea what the, what the ballpark is?
9    A.    I wouldn't want to venture a guess and be incorrect,
10   so, no, I don't really know the ballpark.
11   Q.    Do you know whether it's more or less than 70 percent?
12   I'm just trying to get -- if you know, you know, and
13   if you don't, you don't. I'm just trying to find out
14   what you know.
15   A.    I don't know the specific number.
16   Q.    Okay. And I'm not asking a specific number, I'm
17   asking do you know if it's more or less than 70
18   percent?
19   A.    I believe it is less than 70 percent.
20   Q.    Okay. Is it less than 50 percent?
21   A.    I don't believe that.
22   Q.    Okay. So your best understanding is it's somewhere
23   between 50 and 70 percent currently?
24   A.    With not a tremendous amount of certainty, that's my
25   best understanding.

GLENN BOWEN

1  
2  Q. Okay. What about the Texas County -- I'm going to not
3      remember what the full name of the plan is, but the
4      Texas County District Retirement System?
5  A. It is in the high eighties, to my recollection.
6  Q. And the Saudi system that you're involved with, do you
7      know what the funding level is for that?
8  A. I do not.
9  Q. And I can't remember what the name of it was, it was
10     quite interesting, but can you tell me what was the
11     name of it again?
12  A. General Organization For Social Insurance.
13  Q. Okay. Do you know whether it's over 50 percent?
14  A. I believe it's fairly well, I just, again, don't have
15     the funded status number off the top of my head.
16  Q. Do you know if it's over 70 percent?
17  A. I have less certainty about that than the New Jersey
18     system.
19  Q. Okay.
20          MARKED FOR IDENTIFICATION:
21          DEPOSITION EXHIBIT 36
22          12:06 p.m.
23  BY MR. BALL:
24  Q. Mr. Bowen, I'm showing you what's been marked as
25     Exhibit 36, which for the record is a document

GLENN BOWEN

1  
2      Bates-stamped POA00604157. It is -- the date is
3      updated December 2013, and you were shown yesterday a
4      NASRA issue brief public pension plan investment
5      return assumptions document that was updated as of
6      March 2013. I only have a few questions about this.
7          This was identified in the document
8      production set we saw as having you -- with you being
9      the custodian of this document. And so my question to
10     you is, what you were doing with it? Why did you have
11     this document?
12  A. NASRA is the industry trade group for state retirement
13     systems, and in my business I read their issue briefs.
14  Q. Okay. And it was in among the files that were
15     produced to us as being responsive to our document
16     request about this case. Was there a use you were
17     making of this document that was related to your work
18     for the City of Detroit?
19  A. I don't recall specific use for this document.
20  Q. Okay. Do you recall any context in which you reviewed
21     it?
22  A. As I mentioned, I review NASRA issue briefs just in
23     the normal course of staying abreast of the
24     discipline.
25  Q. So it would be part of your ordinary reading to make

GLENN BOWEN

1  
2      sure you knew what was going on in the discipline in
3      the industry?
4  A. Yes.
5  Q. And you don't recall using it for any particular
6      purposes in connection with your work for the City of
7      Detroit?
8  A. I do not.
9  Q. Any idea why it would have been produced in response
10     to our document requests that related to your work for
11     the City of Detroit?
12  A. I do not.
13          MR. BALL: We're at like 12:10. I'm happy
14     to keep going, but if people would like, I'm also
15     completely flexible about lunch break. So you guys
16     tell me.
17          MR. MONTGOMERY: Keep our eye on the ball
18     game?
19          MR. BALL: I'm deferential to those things,
20     as well.
21          MR. MILLER: Take a 35-minute break, begin
22     at 12:45?
23          MR. BALL: Good with everybody else?
24          VIDEO TECHNICIAN: The time is 12:10 p.m.
25     We are off the record.

GLENN BOWEN

1  
2      (Off the record at 12:10 p.m.)
3      (Back on the record at 12:53 p.m.)
4          VIDEO TECHNICIAN: We're back on the
5      record. The time is 12:53 p.m.
6          MARKED FOR IDENTIFICATION:
7          DEPOSITION EXHIBIT 37
8          12:53 p.m.
9  BY MR. BALL:
10  Q. Mr. Bowen, welcome back.
11  A. Thank you.
12  Q. So you have been handed what has been marked as
13     Exhibit 37, which is a letter dated December 7th,
14     2013, and its Bates stamp is POA00260356, and I have
15     just a couple of questions about this before we look
16     at the next document.
17          If you look on the second page, within the
18     project description, there's a -- the project looks at
19     whether the -- asks you to look both at whether it
20     would be necessary -- strike that.
21          What the estimated additional reduction in
22     liability would be that would be necessary to achieve
23     a 70 percent funded ratio and an 80 percent funded
24     ratio on -- in 2023.
25          Do you see that?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 13634-3    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 32 of 65

GLENN BOWEN

1
2   A. I do.
3   Q. Okay. And this is the only analysis I've seen
4       anywhere that asks for an 80 percent funded ratio as
5       opposed to a 70 percent funded ratio, and my question
6       is, do you have an understanding about why this letter
7       asks for 70 and 80 percent? Do you have any knowledge
8       about what the origin of that request is or the basis
9       for it is?
10  A. The origin of the request is that it came from the
11      city.
12  Q. Fair enough. But the basis for it. Before we talked
13      about what your understanding was for the basis for
14      the 70 percent request, and now this one asks for both
15      70 and 80. I'm just trying to understand if there's
16      anything else to be said about what the basis for the
17      80 percent request is in addition to the 70 percent.
18  A. Well, the basis is that it's tougher to get to 80 than
19      70, and this calculation shows how much so.
20  Q. Okay. So is it a sensitivity analysis, comparing 80
21      to 70, is that what you understood the purpose to be?
22  A. That's my understanding of this assignment, yes.
23  Q. Okay. And the 70 percent was still a number derived
24      from the results of a mediation, from what you said
25      earlier, right?

GLENN BOWEN

1
2   A. Yes.
3   Q. And this looks at a five percent, 5.5 percent city
4       specified investment return assumption. Do you see
5       that?
6   A. Yes.
7   Q. And I assume that is net of admin and investment
8       expense, correct?
9   A. I would assume at this point that that is the case,
10      but I don't definitively see it written in the letter.
11  Q. Okay. Well, over the course of the letters we've
12      looked at so far, you've employed a variety of
13      investment return assumptions, and my understanding of
14      each of them so far has been that it has been net of
15      investment and admin expense, and I just want to
16      confirm the same, to the best of your understanding,
17      is true here?
18  A. That's correct so far, and thus I assume here, as
19      well.
20  Q. Okay. Don't let that one stray too far.
21              MARKED FOR IDENTIFICATION:
22              DEPOSITION EXHIBIT 38
23              12:57 p.m.
24  BY MR. BALL:
25  Q. Mr. Bowen, you've been handed what's been marked as

GLENN BOWEN

1
2       Exhibit 38, which is a letter dated December 18th,
3       which is Bates-stamped POA0 -- strike that.
4               December 18th, 2013, it is Bates-stamped
5       POA00260345, and --
6   A. Excuse me, that's not the letter I've been handed.
7   Q. Sorry. Got ahead of myself, I apologize. Leave it
8       marked, I'll come back to it. We'll ask about this
9       one first. I pulled the wrong folder, so I apologize
10      for that.
11              MARKED FOR IDENTIFICATION:
12              DEPOSITION EXHIBIT 39
13              12:58 p.m.
14  BY MR. BALL:
15  Q. So sorry about that, Mr. Bowen. You've now been
16      handed an exhibit that's marked Exhibit Number 39,
17      which is a letter dated December 18th, 2013, and the
18      Bates stamp is POA00260345. Are we on the same page
19      now?
20  A. Yes.
21  Q. Okay. And this again is a letter that you authored
22      and signed?
23  A. Yes.
24  Q. And this letter uses, again uses a 5.5 percentage -- a
25      5.5 percent investment return assumption, if you look

GLENN BOWEN

1
2       at page 3?
3   A. Yes.
4   Q. Okay. And it adds language in this letter, which I
5       think is the first time it appears, and correct me if
6       you believe otherwise, but it says: Our understanding
7       is that the city specified investment return
8       assumption of 5.5 percent is not reflective of
9       expected returns for the current portfolio, but rather
10      is due to the city's plan to reduce risk by investing
11      more conservatively.
12              Do you see that?
13  A. I do.
14  Q. Now, if you'll look at the letter preceding this, that
15      is Exhibit 37, on December 7th, it doesn't contain
16      that language, although it's talking about the same
17      investment return rate.
18              Am I right about that?
19  A. I don't see it in the December 7th letter.
20  Q. Okay. When and how did you learn that the basis for
21      the 5.5 percent rate that was being proposed here was
22      a city plan to reduce risk by investing more
23      conservatively?
24  A. I would not say that we learned that fact definitively
25      with this letter, as you've seen the variety of

GLENN BOWEN

1
2      letters are all variations on a theme of
3      different discount rates.  My best recollection is
4      that sometime in between December 17th and December
5      18th we thought that would be a good phrase to put
6      into our letter to make clear what the interest rate
7      assumption is and what it is not.
8   Q.  And so you were trying to reflect accurately that the
9      5.5 percent rate was not a rate that you believe
10     reflected the expected rate of return on the existing
11     portfolio, is that fair?
12  A.  It would be fairer to say that the city was not
13     telling us to use that rate because that was what they
14     believed the city was telling us that, for the
15     specific reason that they were looking at investing
16     more conservatively, thus a lower rate be used in the
17     analysis.
18  Q.  Okay.  So when did you -- when were you told that the
19     reason for the lower rates that were being evaluated
20     was the city had a plan to reduce risk by investing
21     more conservatively?  When and how?
22  A.  Prior to December 18th, 2013.
23  Q.  Okay.  Do you recall anything more about when it was
24     you learned that?
25  A.  It was obviously prior to this letter, and I can't

GLENN BOWEN

1
2      recall specifically how much prior to this letter.
3   Q.  Do you recall how you learned it?
4   A.  It would have been in discussions with the city.
5   Q.  Okay.  And what discussions with the city?
6   A.  In the context of receiving the assignments to model
7      these various scenarios.
8   Q.  Okay.  So are you saying that when you got an
9      assignment, the assignments to model scenarios, that's
10     something they told you?
11  A.  Yes.
12  Q.  Okay.  And when they told you that, was it in the
13     context of this assignment or in the context of
14     earlier assignments?
15  A.  Well, what I was saying earlier is it potentially
16     could have been in the context of earlier assignments
17     and we did not think to add the phrase to the letter
18     to provide additional description.  It's also possible
19     it happened between December 17th and December -- or
20     December 7th and December 18th.  I don't know exactly
21     what phone call.
22  Q.  Fair enough.  So you don't know if it was before the
23     December 7th letter or after the December 7th letter,
24     but at least by the time of the December 18th letter?
25  A.  Correct.

GLENN BOWEN

1
2   Q.  Okay.  And those discussions would have been with the
3      pension benefit task force, pension plan task force?
4   A.  Yes.
5   Q.  Okay.  And do you recall any discussion in the pension
6      plan task force prior to receiving the assignment
7      where that -- where you were told that that was the
8      basis for lowering the interest rate about why or what
9      the basis was for the plan to reduce risk by investing
10     more conservatively?
11  A.  I have to apologize, I didn't follow the arc of that
12     question.
13  Q.  Okay.  It may not have been a felicitously phrased
14     one, so I will rephrase.
15         My question is just, before they -- at the
16     time or before you were told that that was the basis
17     for the reduced interest rate, were you privy to any
18     discussions of the pension plan task force or any
19     discussions with any other representative of the city
20     that explained what the basis was or the rationale was
21     for the plan's reduced risk by investing more
22     conservatively?
23  A.  Again, I'll have to state that the reason the
24     rationale is as expressed here, so I'm not sure what
25     else you may be asking me to state.

GLENN BOWEN

1
2   Q.  I'm not asking about the reason for the 5.5 percent, I
3      understand that you're saying you've been told that
4      the city plans to reduce risk by investing more
5      conservatively, right --
6   A.  Yes.
7   Q.  -- I understand that.  What I'm asking is, do you have
8      any understanding about what the rationale or the
9      basis was for the city's reported decision to reduce
10     risk by investing more conservatively?  Do you know
11     why they had decided to do that?
12  A.  A desire to reduce a volatility.
13  Q.  And where did you have those discussions?
14  A.  Within the pension task force.
15  Q.  Okay.  And who said that?
16  A.  It could have been several parties on the pension task
17     force.  I'm not sure who stated it, exactly.
18  Q.  And what was said about a desire to reduce volatility?
19  A.  The city has no ability within the next ten years to
20     have contributions respond to investment experience,
21     thus we wish to investigate lower volatility.
22  Q.  All right.  And did you undertake any measurement of
23     the comparative volatility of the existing investment
24     portfolio or investment and the city's proposed
25     investment portfolio?

GLENN BOWEN

1
2  A.  No, that was not this assignment.
3  Q.  All right.  And has Milliman done that?
4  A.  I know it's been discussed.  I can't say for sure
5     whether it was completed or was a project that was
6     stopped and started.
7  Q.  What do you mean by a project that was stopped and
8     started?
9  A.  In the course of, you know, an engagement such as
10    this, not every project that is requested sees its way
11    through to fruition, because the changes are so
12    frequent, and the project that you're discussing would
13    have been handled by our investment consultants, so...
14 Q.  By Mr. Perry?
15 A.  He would have been involved in that project.
16 Q.  All right.  And when you say stopped and started, do
17    you know whether it has been restarted if it was
18    stopped?
19 A.  As I said, I don't know conclusively whether it was
20    completed or what the status of it is.
21 Q.  Okay.  Now let's go to what was marked previously as
22    Exhibit 38, and that should be a letter dated
23    December 19th, 2013, Bates page POA00260371.  Is that
24    right?
25 A.  Correct.

GLENN BOWEN

1
2  Q.  Okay.  And so, again, is that a letter that you
3     authored and signed, Mr. Bowen?
4  A.  Yes.
5  Q.  Okay.  And I want to look at a couple of things in
6     this letter.  First, on page 4, there was some
7     discussion yesterday about what the impact of the
8     investment rate, or higher or lower investment rate,
9     was on and how it affects the projected funded status
10    of a plan, and I think maybe this is a more crisp way
11    of putting it, but I just want to make sure that I
12    have it right.  But there's a paragraph about a third
13    of the way down the page that begins:  Note that the
14    investment return assumption.  Do you see that?
15 A.  Yes.
16 Q.  Okay.  And it says:  Note that the investment return
17    assumption impacts the projected funded status for two
18    reasons.  One, the assumption forms the basis for the
19    assumed asset returns for the ten-year period from
20    July 1 through June 20 -- June 30, 2023.  And, two,
21    the assumption is used for measuring the liabilities
22    by discounting future benefit payments at the rate of
23    the assumed investment return.
24        Are those statements accurate?
25 A.  Yes.

GLENN BOWEN

1
2  Q.  Okay.  And the first statement, can you explain what
3     it means, the assumption forms the basis?  How does
4     that -- can you explain what it means and how it
5     affects the projected funded status?
6  A.  Certainly.  We start with a July 1, 2013, asset value,
7     and through the projection period the asset value will
8     change as contributions are made, benefits are paid,
9     and investment income is realized.
10 Q.  Okay.  And so if you use a higher rate of return, the
11    UAAL will go up as a result of this, correct?  I mean,
12    the UAAL will go down as a result of this -- sorry,
13    strike that.  Start that one over again.
14        If you use a higher rate of return as your
15    assumption, then the asset returns will increase and
16    the unfunded status of the plan will decrease,
17    correct, the UAAL will decrease?
18 A.  You will have more money by using a higher rate of
19    return.
20 Q.  All right.  And that affects the projected funded
21    status by reducing the amount, the unfunded
22    liabilities if the plan is not fully funded, correct?
23 A.  The funded status is assets in the numerator and
24    liabilities in the denominator.  So if the investment
25    term is higher and the numerator grows, the funded

GLENN BOWEN

1
2  status of the plan will increase.
3  Q.  Okay.  And the second part, the assumption is used for
4     measuring liabilities by discounting future benefit
5     payments, can you explain now that affects the funded
6     status of the plan?
7  A.  Certainly.  Once the actuarial valuation has produced
8     a stream of future benefit payments, a present value
9     is determined by discounting at a certain rate, and
10    the higher the investment return used to discount
11    those benefit payments, the lower the current measure
12    of liability; vice versa, the lower the discount rate
13    used to discount those payments, the higher the
14    current measure of liability, and the resulting
15    liability goes into the denominator of the funded
16    status equation.
17 Q.  Okay.  On the next page, under baseline expected
18    benefit payments, do you see the chart similar to the
19    one we looked at earlier today?
20 A.  Yes.
21 Q.  Okay.  And there's a discussion there about the
22    disparity again between the Gabriel Roeder projection
23    for 2011 and 2012, to 2012, and the actual benefit
24    payments during that time period?  Do you see that?
25 A.  I'm sorry --

GLENN BOWEN

1
2  Q.  The sentence is just under the chart.
3  A.  Okay, yes.
4  Q.  The anticipated benefit payments developed by Gabriel
5      Roeder -- and we discussed this issue earlier today.
6      Gabriel Roeder had projected benefit payments of 225
7      million, and actual payments were over 394 million,
8      and there's a difference between the projected and the
9      actual of 168.7 million.  Do you see that?
10 A.  Mmm-hmm.  Yes, I do.
11 Q.  Okay.  And there's a sentence that follows this that
12     says:  This is potentially due to lump sum
13     distributions of annuities savings fund balances to
14     members who retired during 2011 and 2012.
15         Do you see that?
16 A.  I do.
17 Q.  What's the basis for that statement?
18 A.  I believe that would be due to an observation that the
19     active population was decreasing rapidly year over
20     year.
21 Q.  Okay.  So, based on that, you thought this was a
22     possible explanation for the disparity?
23 A.  Yes, it's a possible explanation.
24 Q.  Okay.  And did you do anything to verify whether or
25     not it was in fact the explanation for what had

GLENN BOWEN

1
2      happened?
3  A.  We did not.
4  Q.  Okay.  You can put that one aside.
5          MARKED FOR IDENTIFICATION:
6          DEPOSITION EXHIBIT 40
7          1:14 p.m.
8  BY MR. BALL:
9  Q.  Mr. Bowen, you've been handed what has been marked
10     Exhibit 40, which is a letter dated January 8th, 2014,
11     and Bates-stamped POA00258717.  And my first question
12     to you, is this a letter that you authored and signed?
13 A.  Yes, it is.
14 Q.  Okay.  And I only have a couple of questions about
15     this.  This letter asks you to evaluate three
16     different investment return assumptions, 5.75, 6.25
17     and 6.75 percent, under various other parameters.
18         Do you see that?
19 A.  I do.
20 Q.  Okay.  And all three rates are listed as reflecting
21     the city's plan to reduce risk.
22         Do you see that?  It's on the second page.
23 A.  Yes.
24 Q.  Okay.  And not being reflective of current expected
25     returns, right?

GLENN BOWEN

1
2  A.  That's what it says here, yes.
3  Q.  Okay.  Do you have an understanding of why -- well,
4      first of all, all three of these rates are net of
5      investment and admin expense, correct?
6  A.  I would believe that to be the case here.
7  Q.  Okay.  And do you have an understanding of why those
8      three different rates were being evaluated at this
9      point?
10 A.  To repeat myself, sensitivity analysis to review the
11     results under varying rates.
12 Q.  Okay.  Had the city, to your knowledge, at this point
13     determined what rate was commensurate with -- was the
14     rate that it wanted to develop any offset portfolio to
15     provide a reduced level of risk for?
16 A.  I cannot tell you which date the city settled on the
17     rate in the plan of adjustment.
18 Q.  Had it happened at this point?
19 A.  I cannot tell you what they, the city settled on the
20     rate they used in the plan of adjustment.
21 Q.  All right.  I know you may not be able to tell me a
22     precise date.  I'm asking if you know whether it
23     occurred before January 8th, 2014.
24 A.  I don't know the date that the city settled on the
25     rate in the plan of adjustment, and I thus don't know

GLENN BOWEN

1
2      whether it was prior or after January 8th of 2014.
3  Q.  So you not only don't know the specific date, but you
4      can't tell me whether it had already occurred by
5      January 8th, 2014.  Is that fair?
6  A.  That is fair.
7  Q.  Or after that date?  You just don't know with any
8      specificity when the city decided?
9  A.  I do not know with specificity when the city decided.
10 Q.  Do you recall being told at some point that the city
11     had decided on the rate?
12 A.  I'm not certain that I received a phone call that said
13     we've decided on the rate.
14 Q.  Okay.
15 A.  I don't recall that communication.
16 Q.  Do you recall any communication in which you were told
17     the city had settled on a rate for the plan of
18     adjustment?
19 A.  Potentially in context with the preparation of ballot
20     data when we were told the rate to use, it became
21     evident that the rate had been settled on.
22 Q.  Okay.  So maybe when you were told, maybe at that
23     point, but you're not entirely sure.  Is that fair?
24 A.  That is fair.  It runs together.
25 Q.  And do you know when you were told to prepare data for

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

GLENN BOWEN

1              GLENN BOWEN
2    the ballot?
3    A.  The letters are dated.  I believe it was the April and
4      May time frame that we were working on that analysis.
5    Q.  Okay.  And do you know whether Milliman -- strike
6      that.
7             MARKED FOR IDENTIFICATION:
8             DEPOSITION EXHIBIT 41
9             1:19 p.m.
10   BY MR. BALL:
11   Q.  Mr. Bowen, you've been handed what has been marked as
12     Exhibit 41, and I will tell you that it consists of
13     two documents, two copies of the same letter,
14     separated by a four-inch separator page.  It's a
15     letter dated January 9th, 2014.  The Bates page is on
16     the first letter, first version of POA00258696, and on
17     the second letter it's Bates-stamped MCOPW021051.  And
18     there's a redaction out of the first letter, but
19     otherwise I believe they are the same letter.
20         And so my first question to you about it
21     is, is this a letter you authored and signed?
22         MR. MUTH:  Which one?
23         MR. BALL:  Both of them.  It's the same
24    letter.
25   A.  I signed both of them.

GLENN BOWEN

1              GLENN BOWEN
2    BY MR. BALL:
3    Q.  One of them has -- one version has Ms. Warren's
4     signature, as well.  Do you see that?
5    A.  I would say for some reason Ms. Warren's signature is
6     not appearing in several of the documents, neither is
7     the Milliman logo.  So I'm not sure if there's some
8     issue with the copying or printing.
9    Q.  Okay.  So it's your understanding that she would have
10    signed at the same time as you, and it may just be
11    some production problem that's resulting in her
12    signature not appearing on the various letters where
13    she's listed as a signatory?
14   A.  That is my guess, sitting here these past two days.
15   Q.  Okay.  So let's just focus on the first one, the first
16    version of it.  This version, this letter asks you
17    to -- or it says it's Re: DGRS unfunded liability for
18    DWSD members in June 30, 2012, actuarial valuation
19    report prepared by Gabriel Roeder Smith & Company.
20        As I understand it, this is the first
21    analysis we've seen prepared by you that specifically
22    focuses on the DWSD.  Is that right, or do you recall
23    whether there were any prior analyses that focused
24    specifically on the DWSD?
25   A.  This time frame seems right on to me.

GLENN BOWEN

1              GLENN BOWEN
2    Q.  Okay.  And did you have an understanding of what the
3     purpose of conducting an analysis that was specific to
4     the DWSD was?
5    A.  I was at a mediation session in New York, at the Jones
6     Day office, for the majority of a week in early
7     January, and it came to my attention.
8         MR. MILLER:  Glenn, let's stop you right
9    there.  Do not reveal anything that occurred during
10    the course of that mediation session.
11   BY MR. BALL:
12   Q.  Apart from any communications to you in the context of
13     mediation, do you have any understanding of why you
14     were being asked to provide an analysis that was
15     specific to the DWSD?
16         MR. MILLER:  Can you repeat the question?
17      (The following portion of the record was
18    read by the reporter at 1:23 p.m.:
19         Q.  "Apart from any communications to you
20    in the context of mediation, do you have any
21    understanding of why you were being asked to
22    provide an analysis that was specifically to the
23    DWSD?")
24         MR. BALL:  Specifically about the DWSD, or
25    specific to the DWSD.

GLENN BOWEN

1              GLENN BOWEN
2    A.  Not apart from the mediation.
3    BY MR. BALL:
4    Q.  Did you have any understanding, leaving aside anything
5     you were told in mediation -- and for the next several
6     questions, just assume that you're not going to tell
7     me anything about communications in the course of
8     mediation -- did you -- did anyone tell you why this
9     was being requested?
10   A.  Not outside of mediation.
11   Q.  Okay.  Did you have any understanding of what purpose
12    this document was going to be used for, or this
13    analysis was going to be used for?
14   A.  Based upon what I was told in mediation.
15   Q.  Okay.  So you had an understanding, but it was based
16    on what you learned in mediation?
17   A.  Yes.
18   Q.  Did you understand that the information you were
19    generating was going to be shared with the counties?
20    And by that I mean Oakland, Macomb, and potentially
21    Wayne?
22         MR. MONTGOMERY:  Again I'd ask you to make
23    sure his understanding is outside of the mediation.
24         MR. BALL:  I will accept that as a
25    predicate for all these questions about what the

36 (Pages 377 to 380)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-3   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 37 of 65

GLENN BOWEN

1
2     purpose of this letter is, so that you know.
3     A.  Not outside of mediation.
4     BY MR. BALL:
5     Q.  Okay.  This letter asks for an analysis about
6         amortization over 40 years.  Do you see that on page
7         3?
8     A.  I'm on page 2 under project description.
9     Q.  It's also there, too.
10    A.  Okay.  So are you in a different place?
11    Q.  But I'll take it from whichever -- I was just trying
12        to help you with a location, but 2 is as good as 3.
13        Do you see that it asks for amortization on the level
14        annual basis over 40 years?
15    A.  Yes.
16    Q.  Did you have an understanding about why you were
17        looking at it over a 40-year period?
18    A.  The understanding was gained during mediation.
19    Q.  Okay.  Was that 40-year amortization period consistent
20        with GASB rules applicable at the time?
21    A.  The 40-year period for amortization is not applicable
22        to GASB funding rules at that time, or, I'm sorry,
23        GASB accounting rules.
24    Q.  GASB accounting -- I'm sorry.
25    A.  GASB accounting standard.

GLENN BOWEN

1
2     Q.  I'll ask it again.
3     A.  Yes.
4     Q.  Was a 40-year amortization period consistent with GASB
5         accounting rules in place at the time?
6     A.  No, it was not.
7     Q.  Okay.  And I think we've seen earlier that the
8         maximum, maximum amortization period permissible under
9         GASB rules at the time was 30 years?
10    A.  That is correct.
11    Q.  Okay.  Did you advise the city or any other recipient
12        of this information that the 40-year period being
13        requested was inconsistent with GASB rules?
14    A.  It would have been a discussion in mediation, so I
15        will say if I did, it was within mediation.
16    Q.  Apart from communications in mediation, in this letter
17        itself you do not say that, is that correct?
18    A.  Right.
19    Q.  And did you -- did you advise the city that the
20        40-year period discussed in this letter was
21        inconsistent with GASB rules?
22    A.  I did not advise them in this letter.
23    Q.  Did you advise them of that fact?
24    A.  I do not recollect doing so.
25    Q.  Mr. Bowen, you recall we discussed earlier the value

GLENN BOWEN

1
2     of the assets that were attributed to the system and
3     to the DWSD, in particular?
4     A.  Yes.
5     Q.  And that you took that information from the Gabriel
6         Roeder reports?
7     A.  The actuarial smooth value of assets was taken from
8         the reports, yes.
9     Q.  And then you develop the market value based on the
10        actuarial value?
11    A.  Correct.
12            MARKED FOR IDENTIFICATION:
13            DEPOSITION EXHIBIT 42
14            1:30 p.m.
15    BY MR. BALL:
16    Q.  In the letter we were just looking at, your reference
17        of the June 30th, 2012, Gabriel Roeder reports, do you
18        see that, the as-of date for the Gabriel Roeder
19        reports?
20    A.  I do.
21    Q.  Okay.  So is what has been marked as Exhibit 42 the
22        June 30th, 2012, Gabriel Roeder valuation report,
23        annual actual -- strike that.
24            The June 30th, 2012, Gabriel Roeder report
25        you're referring to?

GLENN BOWEN

1
2     A.  Yes.
3     Q.  Okay.  And in analyzing the allocation of accrued
4         liabilities between the DWSD, analyzing what share of
5         the accrued liabilities are allocable to the DWSD, how
6         did you do that?
7     A.  One moment, please.  On page 2 of Milliman's letter
8         under results, it refers to page B3 of the valuation
9         report where the actuarial accrued liabilities are
10        broken out for four different groups within the DGRS.
11    Q.  Okay.  So let's look at that page, B3.
12            MR. MONTGOMERY:  Do you have a Bates
13        number?
14            MR. BALL:  I do.  There are multiple
15        versions of it, but the Bates page for the Gabriel
16        Roeder report, the version I'm looking at is
17        MCOPW018381, and if you could go to page B3, which I
18        have as Bates page MCOPW018411.
19            So is the information that appears there
20        allocating the accrued liabilities, is that the
21        information you used?
22    A.  Yes.
23    Q.  Okay.  And did you ever do Milliman's own calculation
24        of how the accrued liabilities should be allocated
25        among different parts of the city?

GLENN BOWEN

1
2  A.  We did.
3  Q.  Okay.  And how did you do that?
4  A.  We received census data from the retirement systems
5      and performed a valuation of DGRS.
6  Q.  Okay.  So that would be in the April time frame when
7      you had the census data?
8  A.  That was when the results were issued, yes.
9  Q.  Okay.  You got the census data you discussed
10     previously, and then you -- and is there also
11     information here -- so for this analysis you accepted
12     what Gabriel Roeder had done, for the later analysis
13     you did your own, your own analysis based on the
14     census data?
15 A.  Correct.
16 Q.  Okay.  On the asset side, did you ever do your own
17     analysis of the allocation?
18 A.  When you say our own --
19 Q.  I mean, in each case did you take the smooth value of
20     the assets from the Gabriel Roeder report, and the
21     allocation that the Gabriel Roeder report reflected,
22     and over to then analyze the market value attributable
23     to DWSD, or did you ever do your own analysis or own
24     calculation of the asset value, smooth or -- the
25     smooth asset value attributable to the DWSD?

GLENN BOWEN

1
2  A.  I don't recall doing anything other than the former.
3  Q.  Okay.  So in every case you took the smooth value of
4      the asset -- the smooth value asset allocation from
5      the Gabriel Roeder report and then used that to
6      calculate a market value allocable to the DWSD?
7  A.  That's my recollection.
8  Q.  But the basis was always the Gabriel Roeder report's
9      allocation of the assets under the smoothing
10     methodology?
11 A.  That's my recollection.
12 Q.  Okay.  And do you know how Gabriel Roeder calculated
13     or how anybody calculated the allocation of the assets
14     for the smooth asset valuation that they undertook?
15 A.  I do not know with specificity.
16 Q.  Okay.  What do you know about it?
17 A.  I know what is presented in the valuation report, and
18     as indicated in our letters, we used that ratio
19     consistent.
20 Q.  All right.  And I'm trying to make sure I understand
21     what you know about how the numbers in the Gabriel
22     Roeder report were derived.  Do you know anything
23     about how they were derived?
24 A.  I'm not sure how to respond to your question, what do
25     I know.  I'll say my understanding is that they have

GLENN BOWEN

1
2      been, for some historical period of time, receiving
3      separate rollups of asset value to attribute assets
4      and incorporate cash flows for each of the various
5      systems so that they can have their own unfunded
6      liability and contribution rates developed.
7  Q.  Okay.  And how do you know that?
8  A.  This exhibit has appeared in several valuation
9      reports.
10 Q.  Okay.  But the exhibit doesn't say what you just said,
11     right?  It just provides a breakdown, correct?
12 A.  This exhibit provides a breakdown of one point in
13     time.
14 Q.  If you -- all right.  Would you look at page B2 with
15     me, which is MCOPW018410?  And you see that this is an
16     exhibit reflecting the allocation of assets between
17     the different -- totaling them up for different
18     components of the city?
19 A.  Yes.
20 Q.  Okay.  And if you look at the totals for the sewage
21     component, do you see that if you add each of those
22     up, and in particular the pension accumulation fund is
23     a significant negative number, that the total for the
24     sewage side is negative?  Do you see that?
25 A.  It would be negative or close to being so.

GLENN BOWEN

1
2  Q.  Okay.  Well, it's 14 -- as of June 30, 2012, it's 14
3      million plus 2.6 million, minus 112 million, plus 74,
4      plus 13.  Looks to me like it's substantially negative
5      if you add those numbers up.
6  A.  It is negative, yes.
7  Q.  Okay.  Do you have an understanding of why that's
8      case?
9  A.  I don't have an understanding of this exhibit.
10 Q.  Okay.  And so the water/sewer numbers that are
11     provided later are a combination of the water and
12     sewer components of this, is that your understanding?
13 A.  They're a combination of the smooth value of assets
14     reported for the water and sewer departments.
15 Q.  Okay.  If you look with me at page A5, and there's a
16     discussion there, the funding value of assets.  Do you
17     see that?
18 A.  I do.
19 Q.  And is it -- my understanding, and I just want to know
20     if it's your understanding, is that the funds here --
21     in fact, there's a single fund, and they are --
22     they're not segregated, the funds themselves are not
23     actually segregated by division and it's all in one
24     trust.  Is that consistent with your understanding?
25         MR. MILLER:  Can you repeat the question?

38 (Pages 385 to 388)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 13634-3    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 39 of 65

GLENN BOWEN

1             GLENN BOWEN
2    There was a lot of --
3        MR. BALL:  There were some interruptions.
4        MR. MILLER:  -- interruptions.
5   BY MR. BALL:
6    Q.  My understanding of the GRS system is that the funds
7       are held in a single trust, is that right?
8    A.  I have not been informed otherwise.
9    Q.  All right.  And it's not, the funds themselves are not
10      actually segregated by division, is that right?
11    A.  I've not been informed otherwise, yes.
12    Q.  That's your best understanding, right?
13    A.  That's my best understanding.
14    Q.  And the last paragraph here says:  The current method
15      of allocation of investment income between divisions,
16      and it's provided by retirement system staff, results
17      in each division recognizing a rate of return that may
18      differ from the fund in total.
19        Do you see that?
20    A.  I do.
21    Q.  Do you have an understanding of how it is that there
22      is a disparate rate of return applied to different
23      divisions for the funds held by the system which are
24      held in a single fund?
25    A.  I don't have specific knowledge of the allocation

GLENN BOWEN

1             GLENN BOWEN
2    methodology.
3    Q.  Okay.  Do you know why it would be the case, do you
4      have any understanding why it would be the case that
5      different rates of return would be applied to
6      different divisions of the city?
7    A.  As I said, I don't know the specific policy of the
8      city, but depending upon how interest is credited
9      throughout a year to a system where allocations are
10      made to different divisions with different cash
11      flows, I could understand different investment returns
12      resulting for different divisions.
13    Q.  All right.  So you could conceive of that scenario,
14      but you don't know how the city actually did it here,
15      is that fair?
16    A.  Yes.
17    Q.  Okay.  Do you know whether the city -- I'll ask first
18      about the city, and GRS -- strike that -- whether the
19      GRS or Gabriel Roeder, in their allocation of assets
20      between the divisions, looked solely to the current
21      employment status of a particular employee in the
22      census rolls or whether they took a count of what
23      portion of the employee's career had been spent in
24      other portions of the city?
25    A.  I never asked Gabriel Roeder that specific question.

GLENN BOWEN

1             GLENN BOWEN
2    Q.  When you did it, when you did an analysis, did you
3      understand -- did you do an analysis of whether, for
4      example, the unfunded liabilities associated with
5      particular employees were predicated on portions of
6      their careers spent in other divisions besides, for
7      example, in the case of the DWSD, from employees who
8      spent time in other portions of the city besides the
9      DWSD?
10    A.  I'm sorry, could you repeat that?
11    Q.  Yeah, it got long.
12        You did an analysis, as you said earlier,
13      of the allocation of assets among the different
14      divisions of the city when you had the census data,
15      right?
16    A.  You just asked about assets and liabilities.
17    Q.  I'm sorry, you're right.  It's the afternoon.  I'll
18      try this one over again.
19        You did an analysis, as you testified a few
20      minutes ago, once you had the census data, about
21      attribution of unfunded liabilities between different
22      components of the city, including the DWSD versus
23      other components of the city, correct?
24    A.  To be precise, I would say we allocated liabilities in
25      that analysis you're referring to.

GLENN BOWEN

1             GLENN BOWEN
2    Q.  Okay.  And in allocating liabilities, did you
3      predicate the allocation purely on the current
4      employment status of active employees, for active
5      employees, did you do it purely on their current
6      employment status or did you look and see what portion
7      of their career had been spent in other portions of
8      the city?
9    A.  We valued active employees based upon the department
10      code, if you will, that came to us in the census data.
11    Q.  Okay.  And your best understanding is that the
12      department code that came to you in the census data
13      was the code for their current employer.  Is that
14      fair?
15    A.  That is our best understanding.
16    Q.  And for retired employees, did you do it based purely
17      on the department they were in when they retired?
18    A.  We based our analysis on the department code that was
19      in the census data.
20    Q.  Okay.  And your best understanding of the department
21      code in the census data was that the department code
22      of the department that employed them when they
23      retired?
24    A.  That's our best understanding.
25    Q.  All right.  And so did you -- you did not, as I

GLENN BOWEN

1  
2      understand it, undertake any analysis to see whether  
3      any portion of the unfunded liabilities associated  
4      with those employees arose at a time when they were  
5      not -- arose in connection with service they provided  
6      when they were not employees of the DWSD, is that  
7      fair?  
8  A.  We did not.  
9          MARKED FOR IDENTIFICATION:  
10          DEPOSITION EXHIBIT 43  
11          1:47 p.m.  
12 BY MR. BALL:  
13 Q.  Okay.  Mr. Bowen, let me ask you to look at what has  
14      been marked as Exhibit 43, which is a letter dated  
15      January 16th, 2014.  And it is Bates-stamped  
16      POA00258700.  And my first question to you is whether  
17      it is a letter that you authored and signed?  
18 A.  Yes.  
19 Q.  Okay.  And this again looks at DWSD as a -- on a  
20      stand-alone basis, right?  
21 A.  Yes.  
22 Q.  Okay.  And it looks at potentially being spun off  
23      DWSD, do you see that?  
24 A.  I see that on page 2, yes.  
25 Q.  And did you have any understanding about what the  

GLENN BOWEN

1  
2      purpose was for providing this analysis?  
3  A.  To answer the question of the DWSD employer  
4      contributions during the ten-year period to reach a 70  
5      percent funded status under the specified scenarios  
6      and the specified investment return assumption.  
7  Q.  Right.  That's the analysis they're asking you for,  
8      correct?  
9  A.  Yes.  
10 Q.  Okay.  And my question is, did you have an  
11      understanding of what purpose or use was going to be  
12      made, what use was going to be made of this analysis?  
13 A.  Again, I'll reply as I did earlier.  We had a broad  
14      understanding that the work we were doing for the  
15      pension task force would potentially be used in  
16      mediation at their discretion.  I did not have a  
17      specific understanding of each and every letter to  
18      know if it was informational or if it was something  
19      that they were specifically negotiating.  So I can't  
20      answer specifically the genesis of the request for  
21      this particular letter.  
22 Q.  Okay.  So you had the general understanding you  
23      testified about earlier, but you don't have a specific  
24      understanding of what the purpose of this particular  
25      analysis was, is that fair?  

GLENN BOWEN

1  
2  A.  That's fair.  
3  Q.  Okay.  And this is still looking at a 70 percent --  
4      this is, for DWSD, is looking at a 70 percent funded  
5      level as of January 2023, right?  
6  A.  Yes.  
7  Q.  It's not a hundred percent funded level, correct?  
8  A.  This analysis is 70 percent.  
9  Q.  And, in fact, you also provide an analysis for what  
10      would happen after those ten years, correct?  If you  
11      look on page 4.  
12 A.  Yes.  
13 Q.  All right.  And, in fact, you looked at potential  
14      amortization of the remaining unfunded liability over  
15      an additional ten years, an additional 20 years, and  
16      an additional 30 years after June 30th, 2023, correct?  
17 A.  Yes.  
18 Q.  And did you have an understanding of why you were  
19      looking at those additional amortization periods for  
20      the DWSD liability?  
21 A.  My answer is exactly the same as I gave a moment ago.  
22      Should I try to repeat it in its entirety, or is it --  
23 Q.  Well, are you saying that that request about those  
24      amortization periods was specifically requested by the  
25      city?  

GLENN BOWEN

1  
2  A.  Yes.  
3  Q.  Okay.  Can you show me where that request is in the  
4      project description?  
5  A.  That was not typed in the project description --  
6  Q.  Okay.  
7  A.  -- in this letter.  
8  Q.  Do you have a specific recollection that the city  
9      actually asked you to perform that analysis in  
10      connection with this letter?  
11 A.  No, I do not.  
12 Q.  Okay.  And so my question again is what's the basis on  
13      which you decided to look at the period of  
14      amortization reflected on page 4?  
15 A.  The basis would be a city request.  I have no  
16      recollection of inventing an additional assignment.  
17 Q.  Okay.  So you don't actually recall the city  
18      requesting it, but your assumption is they must have,  
19      even though you don't say it in the letter?  
20 A.  I would characterize this as an oversight for not  
21      including further description of this in the project  
22      description section of the letter.  
23 Q.  But you don't actually recall getting the request,  
24      you're just assuming that that's the case, is that  
25      fair?

GLENN BOWEN

1
2  A.  I am, because I cannot imagine another scenario where
3      this would have occurred.
4  Q.  Do you have an understanding of why it was -- I just
5      want to -- and the answer may be no, and that's fine,
6      but I want to understand if you know why you're
7      looking at those specific periods, other than it came
8      from, you know, a city request.  If it came from a
9      city request, do you have an understanding of why
10     those periods or what's being looked at?
11 A.  Well, my understanding, not based on just this letter,
12     but on other letters I remember authoring, was that if
13     there's an unfunded liability existing in 2023, it
14     needs to be paid off, what options exist for us to pay
15     that off over various periods of time.
16 Q.  Okay.  So you would be looking at an option of a full
17     amortization ending 20 years, 30 years, and 40 years
18     out, is that fair?
19 A.  That is this particular letter, yes.
20 Q.  And this again is 70 percent in 2023.  I take it your
21     answers to me previously about what the origin of the
22     70 percent level and the 2023 date would apply equally
23     to this letter?
24 A.  Yes.
25 Q.  That is, if they were -- stemmed from mediation?

GLENN BOWEN

1
2  A.  They would.
3  Q.  And just to be clear, they were not the product of a
4      Milliman analysis, correct?
5  A.  They were not.
6          MARKED FOR IDENTIFICATION:
7          DEPOSITION EXHIBIT 44
8          1:56 p.m.
9  BY MR. BALL:
10 Q.  Mr. Bowen, you've been handed another letter that is
11     like the one we just looked at, dated January 16th,
12     2014.  This one has Bates numbers POA00258748, but
13     it's a different analysis.  And in this case, the "re"
14     line says:  DGRS ten-year level dollar payments to
15     have 70 percent funded status in 2023 subsequent to a
16     spinoff of DWSD under two specific additional
17     reduction scenarios with 6.25 percent investment
18     return assumption.
19         So, first question is, is this likewise a
20     letter that you authored and signed?
21 A.  Yes, it is.
22 Q.  Okay.  And is this essentially a companion piece with
23     the letter that we just looked at?  One shows the DWSD
24     on a stand-alone basis with a spinoff, and this
25     shows -- this addresses what the remainder of the

GLENN BOWEN

1
2  retirement system looks like with a spunoff DWSD under
3  certain scenarios?
4  A.  It appears to be the case.
5  Q.  Okay.  In fact, you did a number of such letters over
6      the time where you would -- over time where you would
7      look at a separate DWSD and the city without the DWSD,
8      is that right?
9  A.  We did a number of letters, I absolutely agree with.
10 Q.  If nothing else today?
11 A.  I'm not sure how many times we did a companion piece
12     as such here, I don't recollect that.  I'm sure, you
13     know, you have them.
14 Q.  I was trying to short-circuit some of it, but it
15     happened several times, is that fair?
16 A.  I recall doing a significant number of letters in the
17     January time frame.  So I believe that's probably
18     true.
19 Q.  And this -- well, I have sort of a basic question.  At
20     the end of the day, this uses a, this uses a 6.25
21     percent investment rate, as does the letter we just
22     looked at.  At the end of the day, one should use,
23     when you're looking at the DWSD by itself, presumably,
24     the same investment return rate as for the system as a
25     whole.  If you're going to calculate the overall

GLENN BOWEN

1
2  unfunded liability, and DWSD shared that unfunded
3  liability, you should be using the same investment
4  return rate to calculate those two things, is that
5  fair?
6  A.  That was rather long, if you could please --
7  Q.  Okay.  I assume that in calculating the overall UAAL,
8      and the investment rate you used to calculate the
9      overall UAAL, you should use, as you've done in these
10     two letters, the same investment rate for the overall
11     UAAL and for the DWSD, unless somebody tells you
12     there's going to be a different asset allocation, that
13     you would use the same investment rate to calculate
14     those two things?
15 A.  I'm not clear whether you're talking about a -- when
16     you said different asset allocation, I'm not sure
17     whether you're asking about a spinoff or not with two
18     separate plans.
19 Q.  Okay.  Let's do it -- assume they're not spun off,
20     because at the end of the day that's probably what we
21     care about the most.  But if you're going to look at
22     the DWSD's share of unfunded liability in a scenario
23     where they're not spun off, and so we're still talking
24     about the same asset pool with the same investment
25     policy governing it, presumably, you would use the

GLENN BOWEN

1      same investment return rate to calculate DWSD's share
2      of the unfunded liability as you would to calculate
3      the unfunded liability itself, correct, the overall
4      unfunded liability?
5  A.  That would be a logical starting point.
6  Q.  Okay. And so one would assume that -- well, fair
7      enough.
8         And if, in a scenario where the DWSD hasn't
9      been spun off and is still part of the system, you
10     would, if you used a different rate to calculate the
11     total unfunded liability for the system as a whole,
12     and used a lower rate to calculate the DWSD's share of
13     the -- in a calculation -- the DWSD's share of the
14     unfunded liability, that would result in a higher
15     assessment of the DWSD's share than if you used the
16     same rate for both. Is that right?
17 A.  I tried to follow all the pieces, and if what you're
18     saying is if you valued the entire system at X,
19     including DWSD, and then went back and valued DWSD at
20     Y --
21 Q.  Y is --
22 A.  -- the pieces wouldn't add up, if Y differed from X.
23 Q.  That's I think right, and if you used a lower
24     investment rate of return for -- in the Y calculation

GLENN BOWEN

1      of DWSD alone, that would result in a statement of its
2      share of the liabilities, or the liabilities
3      attributable to it that's bigger, because you've used
4      a lower investment rate than for your analysis of the
5      system as a whole, is that right?
6  A.  If you used X as the system as a whole and didn't use
7      Y to develop DWSD's portion for some reason.
8  Q.  All right. So I'm just trying to make sure that if
9      you use a -- in general, if you use a higher rate, you
10     wind up with lower UAAL, right?
11 A.  For a given asset amount, yes.
12 Q.  Okay. And if you -- say if you used a higher rate in
13     calculating the overall UAAL, and a lower rate when
14     you went back and tried to calculate DWSD's share of
15     the UAAL, that would result in DWSD's share of the
16     UAAL being higher than if you'd used the same rate as
17     the original analysis of the whole system?
18 A.  Again, I'm having trouble with your concept of --
19 Q.  Using different rates?
20 A.  -- why you would measure twice under the same rate in
21     that question. So I could state, you know, if you use
22     a different -- if you measure, if you measure a plan
23     at one rate and measure a plan at a different rate,
24     you'll have a different liability, all else equal.

GLENN BOWEN

1  That is true.
2  Q.  And if you use the measurement at the higher rate, to
3      the system as a whole, and then go back and do a
4      calculation using a lower rate, and then out of that
5      derive DWSD's liability, you'd wind up with a higher
6      share for DWSD than you would if you'd used the higher
7      rate scenario throughout. Does that make sense?
8  A.  I'm having trouble figuring out the basis for the
9      question, but you've measured DWSD two different ways
10     and got two different liabilities.
11 Q.  Right. Let's say you use seven percent to calculate
12     the overall UAAL, and you do that set of calculations,
13     and that's -- that will result in an overall UAAL
14     that's smaller than if you used 6.75, correct?
15 A.  Yes, I agree, all else equal.
16 Q.  Okay. And so if you use the seven percent to
17     determine what the total unfunded liability is, but
18     you go back and do a separate set of calculations at
19     6.75 percent when you said about determining what the
20     DWSD's share is, that will result in the DWSD's share
21     being stated as being higher than it would have been
22     if you'd used seven percent, correct?
23 A.  I would say that, again, the premise is difficult to
24     comprehend. If you're going and measuring DWSD under

*(line numbering continues)*

GLENN BOWEN

1  a different rate, you would get a different answer. I
2  wouldn't characterize that as their share on the seven
3  percent basis.
4  Q.  Right. It would be incompatible, because you should
5      be using the same rate for both the overall and the
6      DWSD share, correct? You shouldn't use two different
7      sets of calculations?
8  A.  I don't see the relation. I think you're trying to
9      get at some relation which I'm just not grasping, but
10     you would get a different number if you used a
11     different rate.
12 Q.  And I assume that the 6.25 rate that we saw in those
13     two letters is net of admin and administrative -- of
14     administrative expense and investment expense, is that
15     right?
16 A.  I believe that is correct.
17        MARKED FOR IDENTIFICATION:
18        DEPOSITION EXHIBIT 45
19        2:07 p.m.
20 BY MR. BALL:
21 Q.  I'm just going to give you two to look at together.
22        MARKED FOR IDENTIFICATION:
23        DEPOSITION EXHIBIT 46
24        2:07 p.m.

GLENN BOWEN

BY MR. BALL:

Q. All right. Mr. Bowen, I've asked you to look at what have been marked as Exhibits 45 and 46. Exhibit 45 is -- they're both letters dated February 28th, 2014. Exhibit 45 is POA00258956, and Exhibit 46 is POA00259001. And my first question is, for Exhibit 45, is this a letter that you authored and signed?

A. Yes.

Q. And for Exhibit 46, is the same true?

A. Yes.

Q. Okay. And I asked you a few minutes ago about whether you'd done additional analyses that were DWSD spinoffs and looking at a DWSD spinoff under a set of circumstances, and using the same set of circumstances analyzed DGRS absent -- or in connection with the DWSD spinoff. And is this another example of your doing that kind of analysis?

A. Based on the titles on the various letters, that certainly seems to be the case.

Q. Okay. And did you have an understanding of why you were doing these analyses?

A. As specific as my understanding is, that there was ongoing DGRS mediation occurring during this time

GLENN BOWEN

period --

Q. Okay. And I'm not asking you about what you learned in mediation. You can say, "I have knowledge from mediation," and I don't want to know the details. But apart from knowledge you have from mediation, is there anything else you know, know about, besides mediation, about why you were doing these analyses?

A. No.

Q. Okay. And were you aware that at some point there were discussions between the DWSD and the counties about the creation of a regional authority, sometimes called the GLWA, or Great Lakes Water Authority? Were you aware of that, separate from anything you know about mediation?

A. No.

Q. Okay. So, all right, then. The only other questions I have here is, these letters reflect a 6.75 percent investment return. I take it that, again, is net admin and investment expense, is that fair?

A. I believe in that case, yes.

Q. And this is late February. Do you know whether you had learned by that point that the city had settled on an investment rate that was a more conservative -- reflecting a more conservative portfolio?

GLENN BOWEN

A. I do not know that they, that the city settled on the rate in the plan of adjustment.

Q. All right. And I understand that that was your answer previously, I'm just -- having shown you these, does this refresh your recollection in any way about when you learned that, that information?

A. No.

MR. MILLER: Can we take a ten-minute break?

MR. BALL: Sure. I'm trying to condense the number that I'm using so I don't belabor the point unnecessarily.

VIDEO TECHNICIAN: The time is 2:11 p.m. We are off the record.

(Off the record at 2:11 p.m.)

MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBITS 47 and 48
2:18 p.m.

(Back on the record at 2:25 p.m.)

VIDEO TECHNICIAN: We are back on the record. The time is 2:25 p.m.

BY MR. BALL:

Q. Mr. Bowen, you've been handed what have been marked as Exhibits 47 and 48, both of which are letters dated

GLENN BOWEN

March 28th, 2014. And the first is -- Exhibit 47 is Bates-stamped POA00259255 and Exhibit 48 is Bates-stamped POA00259277.

So my first question is, are both of these letters that you authored and signed?

A. Yes, I did.

Q. Okay. And they're both on the same date, right?

A. They are.

Q. And they're another set of companion letters looking at a spunoff DWSD and a DGRS with a spunoff DWSD, correct?

A. Yes.

Q. Okay. And this is about a month later than the last set of letters we looked at, and I'm not saying there aren't others in the interim, but are you still looking at that -- strike that.

Do you have any different understanding of the purpose of these letters or analyses than you've answered with respect to the prior letters in this series?

A. No different understanding.

Q. Okay. And there is a 6.75 percent investment rate assumption in these letters, as well, right?

A. There is.

GLENN BOWEN

1
2 Q. Okay. And does this refresh your recollection as to
3 when you learned that the city intended to use a 6.75
4 percent investment rate assumption to derive a set of
5 assets, an asset allocation that was more conservative
6 for use in the plan?
7 A. No, it does not.
8 Q. Okay. And do you know whether you had learned it by
9 this time, on March 28th, 2014?
10 A. I do not know anything beyond what I've said already.
11 Q. Okay. Fair enough. I just want to make sure that if
12 something prompts your recollection, because you see a
13 later letter that gives you some greater certainty
14 about when you understood that, that I get it, so ...
15 A. Understood.
16 Q. Okay.
17     MARKED FOR IDENTIFICATION:
18     DEPOSITION EXHIBIT 49
19     2:29 p.m.
20 BY MR. BALL:
21 Q. Mr. Bowen, you've been handed what's been marked as
22 Exhibit 49, which is a letter dated March 31, 2014.
23 So three days later than the letters we just looked
24 at. The Bates stamp is POA00259245.
25     My first question is, is this a letter you

GLENN BOWEN

1
2 drafted and signed?
3 A. Yes, it is.
4 Q. Okay. And this letter -- prior letters we looked at
5 about a spunoff DWSD have all looked at a 70 percent
6 funded DWSD as of 2023, correct?
7 A. I believe that's the case, yes.
8 Q. All right. So I believe this is the first letter that
9 looks at a hundred percent funded status for DWSD in
10 2023. Is that correct, your understanding?
11 A. I'll say it's correct based upon the letters you've
12 shown me. I can't definitively state there aren't
13 interim letters.
14 Q. At least of the ones we've looked at, this is the
15 first, and I'll tell you, I've looked at, and it looks to
16 me like it's the first, but I understand you may not
17 recall that.
18     What prompted -- first, I assume, did the
19 city give you, or the pension plan task force give you
20 the instruction to do an analysis that used -- that
21 looked at a hundred percent funded status in 2023?
22 A. Yes.
23 Q. Okay. And was the decision to use a hundred percent
24 funded status in your analysis based on any Milliman
25 recommendation or analysis?

GLENN BOWEN

1
2 A. No.
3 Q. Okay. What's your best understanding of why the
4 request was made, or what prompted the request that
5 you look at a hundred percent funded status?
6 A. What prompted my request to look at a hundred percent
7 funded status is that we were asked to look at a
8 hundred percent funded status.
9 Q. No-no, I'm asking not what prompted your request. I'm
10 asking if you have an understanding of what prompted
11 the request to you. Why was the request made to you,
12 to your understanding, that you look at a hundred
13 percent funded status?
14 A. I don't have particular understanding of that.
15 Q. Okay. Do you have any information about why that
16 request was made?
17 A. I don't have any information.
18 Q. Okay. And so no explanation was given to you, at the
19 time the request was made, about why you were being
20 asked to look at a hundred percent funded status?
21 A. Not to my recollection.
22 Q. This hundred percent funded status in 2023 is
23 effectively, given this is written in March of 2014,
24 effectively a nine-year amortization period for the
25 DWSD liabilities, is that fair?

GLENN BOWEN

1
2 A. This letter, in the title, says July 1, 2013, to
3 June 30, 2023. So this was based upon a ten-year
4 period.
5 Q. All right. Although the July 1, 2013, period had
6 already begun and you were near the end of the fiscal
7 year for 2013 at the time this was written, right?
8 A. That is correct.
9 Q. Okay. So you're doing some retrospective analysis
10 here in assuming contributions for the 2013-2014
11 fiscal year?
12 A. In this analysis, that period is included.
13 Q. Okay. So, effectively, it would be a ten-year
14 amortization period under this analysis?
15 A. Yes.
16 Q. Okay. But if you shifted the date to July 1, 2014,
17 and did the same analysis, that would make it a
18 nine-year amortization period?
19 A. If you kept the end date the same --
20 Q. Right.
21 A. -- yes.
22 Q. And I take it Milliman had never recommended a nine or
23 ten-year amortization period for either the plan as a
24 whole or for the DWSD assets, is that fair?
25 A. Yes.

GLENN BOWEN

Q.  And I think I've asked this, but just to make sure, that nine or ten-year amortization period, to your knowledge, is not based on any Milliman analysis or recommendation, is that right?

A.  That is correct.

Q.  And are you aware of any actuarial or accounting basis for the nine or ten-year amortization period employed here?

A.  No specific actuarial or accounting basis.

Q.  Did you ever make a determination that a nine or ten-year amortization period for either the DWSD liabilities or liabilities of the -- for the plan as a whole, that a nine or ten-year amortization period was more appropriate or desirable in any way than a 15-year period?

A.  I did not make a specific determination on that in this case.

Q.  Did you make a general determination on that in this case?

A.  As a pension actuary, I'm happy to have more money come into the pension plan, always, other than I recognize that plan sponsors have competing uses for their funds.

Q.  So other than that generalized desire, nothing, is

GLENN BOWEN

that fair?

A.  Yes.

Q.  Had Milliman undertaken any research or analysis about whether a nine or ten-year amortization period is employed by any other public pension plans?

A.  We did not research other public pension plans in conducting this assignment.

Q.  Okay.  So under prior GASB rules, assuming the ones that are currently in effect, as opposed to the ones that are about to phase in, there's no reason why a nine or a ten-year period is more appropriate under applicable actuarial or accounting standards than the 30-year period that Milliman had employed, correct?

A.  You said the 30-year period that Milliman had employed.

Q.  I'm sorry.  Getting my actuarial firms confused.  All right.  Let's just talk about actuarial standards and accounting standards, I'll try not combine in it one question, make it a little simpler and get the right names.

There's no matter -- no actuarial standard that would dictate that nine or ten years is more appropriate than a 30-year closed amortization period, is there, under current actuary -- under actuarial

GLENN BOWEN

standards?

A.  There is no standard that states it in that fashion.

Q.  And under -- let's talk about current GASB rules as opposed to those that are about to phase in.  There's no reason why a nine or ten-year period for amortization is more appropriate under those GASB rules than the 30-year period that those rules permitted, correct?

A.  GASB provides a range up to 30, as we've discussed, and I do not know anything in the standard which recommends a specific interim period as the most appropriate.

Q.  Okay.  And you haven't conducted an analysis of what the application of the new GASB rules would be to the amortization period here, correct?

A.  Well, we mentioned earlier today that -- can I say strike that?

Q.  Yes.  You can say.  It doesn't happen.  It doesn't happen when I say it, either, but ...

A.  We've not performed a GASB 67/68 valuation for the Detroit retirement systems.

Q.  Okay.  And just to ask again, the 6.75 investment return rate in this letter is net of administrative and investment expense, correct?

GLENN BOWEN

A.  I believe that to be the case here.

MARKED FOR IDENTIFICATION:

DEPOSITION EXHIBIT 50

2:40 p.m.

BY MR. BALL:

Q.  Mr. Bowen, you've been shown what is marked as Exhibit 50, which is a letter dated April 10th, 2014, which has Bates numbers POA00259558.  And again, my first question about this letter is whether it's a letter that you authored and signed?

A.  Yes.

Q.  Okay.  And if you look at pages 3 to 5, we'll start with page 3, there's a discussion there about actuarial assumptions and methods?

A.  Yes.

Q.  All right.  So let me ask, back up and ask a first question.  At this point had you received the census data?

A.  Yes.

Q.  Okay.  And is the analysis here based on your -- is it an actuarial valuation based on the census data you were provided?

A.  Yes.

Q.  Okay.  And in -- on page 3, there's a discussion of

GLENN BOWEN

1
2 post-retirement mortality. Do you see that?
3 A. I do.
4 Q. All right. And there's a discussion there about
5 Gabriel Roeder Smith & Company. In the second
6 sentence it says: Gabriel Roeder Smith & Company, the
7 actuary for DGRS, has indicated that there is
8 uncertainty surrounding the extent, if any, of
9 allowance for future mortality improvement in this
10 assumption.
11 MR. MONTGOMERY: Excuse me. Do you have a
12 copy of that letter? I'd like to know if that's a
13 document that was shared with the GRS and the
14 retirement committee as part of the mediation process.
15 MR. BALL: Maybe counsel can pass one down.
16 It's not addressed to you. It does, however, and it
17 is going to get to the census data, because it does
18 have a discussion of exchanges with Clark Hill. And
19 this is the letter I was referencing earlier when I --
20 MR. MILLER: Well, it exchanges with
21 Gabriel Roeder.
22 MR. BALL: Actually with Clark Hill, I
23 think, if you look at Exhibit 3.
24 MR. MILLER: It's dated April 10th.
25 MR. BALL: Let me know when you're ready,

GLENN BOWEN

1
2 Counsel.
3 MR. MONTGOMERY: I've handed the document
4 to counsel for the retirement system.
5 MS. GREEN: I don't know by looking at it
6 if it was part of the mediation clause or--
7 MR. MONTGOMERY: Okay, then I will say that
8 it is not, because it was quite -- the date is quite
9 similar, but I think this may actually be a different
10 document, so ...
11 MR. BALL: Okay. I'll ask some questions
12 and we'll see if we can figure it out.
13 MR. MILLER: Not quite yet.
14 MR. BALL: You're still looking, okay.
15 MR. MILLER: No. This document was not
16 prepared in -- it was not a document that was ordered
17 by the mediator to be distributed to other parties,
18 and in the absence of such order would not have been.
19 However, page 3, and the particular
20 paragraph that I believe you're about to question the
21 witness on, memorializes certain conversations that
22 occurred in mediation. And as I indicated earlier,
23 the city's position as it relates to the scope of the
24 mediation confidentiality is essentially as follows:
25 Conversations that occurred in mediation

GLENN BOWEN

1
2 are confidential. Documents that were prepared and
3 exclusively used in mediation would be confidential,
4 and documents that were prepared and distributed to
5 mediation parties as a consequence of the mediation
6 order, and in the absence of such order would not have
7 been communicated, also fall within the
8 confidentiality protection.
9 Let me make this suggestion to the parties
10 on the record. I think the way we can solve this
11 problem is if the parties were willing to destroy the
12 copies of this April 10th, 2014, letter that they
13 have, and the city would be prepared to provide a
14 version of this April 10th letter that redacts, I
15 believe, one sentence that is the offending sentence
16 and discusses --
17 MR. BALL: Which sentence?
18 MR. MILLER: The sentence that begins,
19 Gabriel Roeder Smith & Company has indicated.
20 That is the sentence that reflects and
21 memorializes a conversation and a communication that
22 was made in mediation.
23 I think the remainder, from the standpoint
24 of the city, the remainder of that paragraph does not
25 reveal what went on in mediation and would therefore

GLENN BOWEN

1
2 not be subject to redaction.
3 Does the retirement system or Retirees
4 Committee have any additional observations to make on
5 the subject?
6 MR. MONTGOMERY: For the record,
7 co-counsel, after examination of the letter, I don't
8 believe it's something the Retiree Committee received
9 in the context of mediation, and we have no difficulty
10 with an exclusion or redaction of that sentence.
11 MS. GREEN: The retirement systems do
12 concur with the city that the portion of the letter
13 that was quoted by Mr. Miller was indeed the subject
14 of some mediation discussions, and counsel for Gabriel
15 Roeder is also present here today and concurs that
16 this is indeed something that arose out of mediation.
17 We have no objection to redacting the
18 letter as Mr. Miller has set forth.
19 MR. BULLOCK: Whether it was stated or not,
20 the context was mediation. So that's to be clear.
21 MR. BALL: Are there any other -- I want to
22 consider that and let me talk with co-counsel about
23 it, but are there any other portions of this letter,
24 because there are certainly other portions I intend to
25 ask about, because it is the assumptions here, the

GLENN BOWEN

1
2  analysis here, used in several succeeding analyses and
3  are specifically referenced there, and so I would like
4  to know in advance whether there's anything else in
5  this letter that you guys looking at it believe are
6  subject to a mediation privilege.  And we can take a
7  few minutes --
8          MR. MUTH:  Fairly asked, and so I suggest
9  in the interest of time, let's take a five, ten-minute
10  break.  Each of the mediation parties that have an
11  interest in this letter will look at it more
12  carefully, and then when we can get back on the
13  record, we'll identify if there are any other language
14  elements that memorialize confidential statements in
15  the mediation, and, concurrently, you can mull over
16  the suggestion that I made in terms of how to handle
17  the letter going forward for questioning.  Great.
18          MR. BALL:  Okay.  Let's go off the record.
19          VIDEO TECHNICIAN:  The time is 2:48 p.m.
20  We are off the record.
21          (Off the record at 2:49 p.m.)
22          (Back on the record at 3:15 p.m.)
23          VIDEO TECHNICIAN:  The time is 3:15 p.m.
24  We're back on the record.
25          MR. MILLER:  Okay.  During the course of

GLENN BOWEN

1
2  the break, I had an opportunity to speak with counsel
3  for the Retiree Committee and the retirement systems,
4  as well as counsel for Gabriel Roeder, and our
5  collective judgment is that in connection with the
6  letter that's been tabbed as Exhibit 50 in the
7  exhibits, the only language in the body of the letter
8  that reveals communications that occurred in mediation
9  is the one sentence on page 3 that I previously
10  mentioned.  And so the city would be desirous of
11  redacting that sentence.
12          MR. BULLOCK:  It was the paragraph.
13          MS. GREEN:  The whole paragraph.
14          MR. BALL:  The whole paragraph?
15          MR. MILLER:  No, that's not the judgment of
16  the city.
17          MS. GREEN:  Oh.
18          MR. MILLER:  It is not the judgment -- let
19  me finish and then you can go on the record.
20          The judgment of the city is that there is
21  one sentence, the sentence that begins "Gabriel Roeder
22  Smith & Company, comma, the actuary for DGRS," that
23  reveals mediation communications, and the rest of that
24  paragraph is not in conflict with the mediation order
25  by the Court.

GLENN BOWEN

1
2          In connection with the exhibits, however, I
3  have been advised that Exhibit 2 was information that
4  was expressly ordered by one of the mediators,
5  Mediator Dryker, to be provided by the general
6  retirement system to Milliman in a mediation session.
7  And so we're going to take the position that Exhibit 2
8  is -- falls within the mediation order.
9          And in connection with Exhibit 3,
10  similarly, that was the subject of discussion among
11  actuaries at a mediation session, and the explanation
12  and the description that is set forth in Exhibit 3
13  also is material that was ordered by the mediators to
14  be provided to, to Milliman, and it was provided
15  through Clark Hill.
16          And so we will also take the position that
17  Exhibit 3 is mediation protected.
18          So the request of the city, to sum up, is
19  that Exhibit 50 be destroyed, and the city is willing
20  to provide a new redacted version of Exhibit 50
21  consistent with my remarks.
22          MR. BALL:  Okay.  So -- and I guess I
23  should let the others involved in the mediation say
24  what they have to say.
25          MR. BULLOCK:  Speaking on behalf of Gabriel

GLENN BOWEN

1
2  Roeder, I stand corrected with respect to the single
3  sentence.  That is subject to the confidentiality
4  order.  In the event, however, because of the
5  expeditious nature of this review process where we
6  stepped out into the hallway, if there is anything
7  else within the body of the document that is subject
8  to confidentiality order, we are not waiving the right
9  to claim confidentiality protection or mediation
10  protection.
11          MR. BALL:  Okay.  So the difficulty that
12  that poses is that, as I understand it from reviewing
13  each of Mr. Bowen's subsequent analyses, including
14  those that are used to generate the numbers that
15  appear in the plan for the UAAL payments to be made by
16  the DWSD, they are derived from analyses using this
17  data, and subject to the descriptions he provides in
18  this letter.  And so it's the position here that the
19  information contained in those exhibits, which among
20  other things discuss problems with the data and
21  limitations with the data, and the extent to which it
22  is reliable for the purposes for which it is being
23  used are not to be subject to question or examination
24  here today.
25          I would take it that the answer to that is

GLENN BOWEN

1
2  you're going to object if I have questions, for
3  example, about Exhibit 3.
4        MR. MILLER:  That's right.  We will, we
5  will object.
6        MR. BALL:  So I will say, for the record,
7  that that's completely unacceptable, and to the extent
8  that the -- I don't see how you can rely on the
9  analyses he's performed and use them in the plan if
10 they are dependent, as it appears they are, on
11 information he's obtained purely in mediation and
12 which we do not have the ability to cross-exam him
13 about.
14       So I will talk to Mr. Neal for a few
15 minutes about how best to proceed here today, but I
16 don't understand how we can fairly examine the
17 analyses that he has done without being able to
18 question him about the limitations in the data that
19 are recited in this letter.
20       MR. MILLER:  Let's do the following.  Why
21 don't you speak with Mr. Neal, and I will also speak
22 with the retirement systems and the Retiree Committee.
23       MR. JAMES:  This is Mark James, on behalf
24 of Financial Guaranty.  At the last hearing on
25 June 26, Judge Rhodes invited any issues arising

GLENN BOWEN

1
2  during discovery to call his chambers.  In the name of
3  expediency, may I suggest that a call be made to Judge
4  Rhodes' chambers?  It's only 3:20.
5        MR. MILLER:  I'm fine with that.  The city
6  does not want to unfairly impede this, this
7  deposition.  But -- and so I think that getting
8  guidance from the Court is the right way to proceed,
9  and I'd be -- I'd welcome that guidance.  These are
10 not easy issues.  It's not easy to draw the line here.
11       So let's see if we can ring up the judge
12 and get a quick ruling, and obviously the city will
13 abide by it.
14       MR. BALL:  Give us a couple minutes to
15 consult.
16       MR. MUTH:  Yeah, sure.
17       VIDEO TECHNICIAN:  Off the record at
18 3:22 p.m.
19       (Off the record at 3:22 p.m.)
20       (Back on the record at 3:38 p.m.)
21       VIDEO TECHNICIAN:  We're back on the
22 record.  The time is 3:37 p.m.
23       MR. BALL:  The concert of Vienna has
24 completed its negotiations.
25       Counsel off the record have discussed the

GLENN BOWEN

1
2  letter, which is Exhibit 50, and the issues related to
3  the mediation privilege and have reached this
4  arrangement, and I'll state it for the record.  If I
5  get anything wrong, you'll correct me.
6        With respect to the single sentence in --
7  on page 3, under post retirement mortality, it has
8  been objected to as revealing mediation discussions.
9        I will not ask questions today about that
10 particular sentence.  The rest of the paragraph is
11 fair game, but I will not ask questions about that
12 particular sentence.
13       With respect to Exhibits 2 and 3, we will
14 ask the reporter to separate and seal the portion of
15 the transcript that involves any questions I may ask
16 about those portions of the letter, and we will
17 attempt in the fashion we've discussed off the record
18 to present the issue for resolution.  If we can't work
19 it out among ourselves, present that issue for
20 resolution by the Court at an appropriate time, I
21 assume as reasonably possible, and the exact timing
22 is -- we haven't settled on, because we're going to
23 try to see if there is something additional we can do
24 to reach an informal resolution, but if we can't, it
25 will be presented to the judge.

GLENN BOWEN

1
2        The sealed portion of the transcript will
3  be made available only to counsel who are present --
4  for the parties who are present at this deposition
5  until the issue is further resolved, and I will say on
6  the record when I'm about to ask questions about those
7  portions of the exhibit and let you know when I'm done
8  with those portions so it will be clearly demarcated.
9        Is that fair?
10       MR. MILLER:  Yeah, that's a fair
11 description of what the lawyers agreed to off the
12 record, and indeed, as soon as practicable following
13 the deposition, there will be a formal meet and
14 confer, and the parties will work in good faith to try
15 to reach a resolution on the subject without the
16 necessity of judicial intervention.
17       MR. BALL:  And we are, there's a
18 possibility that other sources of evidence may moot
19 some or all of the issue, and we'll see how that pans
20 out, as well.
21       MR. MONTGOMERY:  Counsel for the Retiree
22 Committee agrees with the description.
23       MS. GREEN:  Counsel for the Retirement
24 Systems also agrees with the description.
25       MR. BULLOCK:  So, too, does counsel for

GLENN BOWEN

1          GLENN BOWEN
2      Gabriel Roeder.
3  BY MR. BALL:
4  Q.  Okay.  So let's go back to the letter, Mr. Bowen.  Do
5      you recall that we were discussing a letter dated
6      April 10th, 2014, which is marked as Exhibit 50?
7  A.  I do.
8  Q.  Okay.  And we had gotten to page 3, to the section
9      that's headed post-retirement mortality.  Do you see
10     that?
11 A.  Yes.
12 Q.  Okay.  And the results you prepared in this valuation
13     were based -- prepared based on the post retirement
14     mortality assumption used in Gabriel Roeder's June 30,
15     2012, actuarial valuation of DGRS, is that right?
16     It's the first sentence, I believe.
17 A.  Yes.
18 Q.  Okay.  And, however, Milliman had not been provided
19     with historical data necessary to conduct an
20     experience study in order to opine on the
21     applicability of that mortality assumption for use in
22     these analyses, is that right?
23 A.  That is true.
24 Q.  And, in fact, you recommend at the end of the last
25     sentence that an updated experience study be conducted

GLENN BOWEN

1          GLENN BOWEN
2      benefit restoration in the event of a significantly
3      positive experience, better than expected.
4  Q.  Okay.  And had you seen the plan of adjustment -- at
5      the time that you wrote this letter, had you seen
6      versions of the plan of adjustment or the disclosure
7      statement at this point?
8  A.  I cannot recall at this point in time if it was verbal
9      or an email direction in this assignment, but we had
10     prepared letters.  I don't know which came first.
11 Q.  Okay.  Was Milliman involved in any way in designing
12     the provisions for benefit restoration that wound up
13     appearing in the plan?
14 A.  No.
15 Q.  Okay.  Did you have any involvement in developing the
16     proposals that resulted in the benefit restoration
17     provisions?
18 A.  No.
19 Q.  Okay.  Do you know who developed those provisions?
20 A.  I don't know specifically who developed them.
21 Q.  Do you know generally who developed them?
22 A.  Other than that I imagine it was a group of people that I
23     could not name all of in a negotiation process.
24 Q.  Okay.  Is there anybody in particular whom you know
25     was involved in designing those provisions on behalf

GLENN BOWEN

1          GLENN BOWEN
2      to develop a current best estimate of the expected
3      future mortality experience of DGRS members.  Is that
4      right?
5  A.  That is true.
6  Q.  Okay.  Did Milliman ever get the historical census
7      data necessary to conduct the experience study you
8      mention in this paragraph?
9  A.  We did not.
10 Q.  Okay.  And did you ever perform or were you ever
11     provided an updated experience study such as that you
12     recommend in the last sentence of the paragraph?
13 A.  We were not.
14 Q.  Okay.  And there's a reference in the next-to-the-last
15     sentence, it says:
16         To the extent that members live longer than
17     what is anticipated in the valuation mortality
18     assumption, there will be a downward pressure on the
19     future funded status of the system and a decreased
20     likelihood of any benefit restoration to members.
21         Do you see that?
22 A.  I do.
23 Q.  What is the reference to benefit restoration to
24     members about?
25 A.  In the plan of adjustment, there is some provision for

GLENN BOWEN

1          GLENN BOWEN
2      of the city?
3  A.  I know that Mr. Miller was involved in that process.
4  Q.  Okay.  Anybody else?
5  A.  With certainty, no.
6  Q.  Okay.  And was Milliman ever asked for input on the
7      design -- were you ever requested to provide any input
8      on the design of those provisions?
9  A.  Not input on the design, no.
10 Q.  What were you -- were you requested to provide input
11     on something else related to those provisions?
12 A.  We were requested to make measurements regarding how
13     the design -- how things may occur.
14 Q.  So the design was presented to you, and then you were
15     asked for evaluations of what results would obtain
16     with that design in place?
17 A.  Yes.
18 Q.  Okay.  So it was provided to you as a parameter, is
19     that --
20 A.  Yes.
21 Q.  -- what you're saying?
22 A.  Yes.
23 Q.  This letter is dated April the 10th.  A Gabriel
24     Roeder's June 30th, 2013, valuation was issued --
25     strike that.

GLENN BOWEN

1  GLENN BOWEN
2          Gabriel Roeder's 75th annual actuarial
3  valuation of the GRS as of June 30th, 2013, was issued
4  on April the 4th, about a week earlier.  Had you seen
5  Gabriel Roeder's latest report at the time you
6  prepared this letter?
7  A.  I do not, I do not believe -- at the time I prepared
8  this letter, I'm not certain, but I don't recollect
9  whether I had or hadn't.
10  Q.  Okay.  The reason I ask, of course, is it says in this
11  letter that you're relying on the June 30th, 2012,
12  actuarial valuation.  And so I was trying to figure
13  out whether if at this point you already had the 2013
14  in hand or not.
15          Does that refresh your recollection in any
16  way?
17  A.  Yeah, to the extent that it's possible we received a
18  draft copy, that's a possibility.  I can't place all
19  the dates exactly in sequence.
20  Q.  Did you go back and modify your analysis in any way --
21  well, let's start with the post-retirement mortality
22  point.  Did you modify your analysis in any way after
23  receipt of the June 30th of 2013 actuarial valuation?
24          In other words, you're relying here on this
25  version.  Did you perform an analysis that updated

1  GLENN BOWEN
2  this post -- this portion of your analysis on
3  post-retirement mortality based on the June 30th,
4  2013, actuarial data?
5  A.  I do not remember doing that.
6  Q.  Okay.  And so there are a number of subsequent
7  analyses that you performed that incorporated the
8  analysis of the data that's presented in this April
9  10th letter.  Do you recall that?  I mean, I can show
10  them to you, but there are a number of --
11  A.  Yes, I do recall.
12  Q.  Okay.  And so when you did those subsequent analyses,
13  your recollection is that you did not go back and
14  update this portion of the analysis to reflect the
15  2013 Gabriel Roeder report, is that fair?
16  A.  That's correct.
17  Q.  Have you ever looked at whether any modification of
18  your analysis would be warranted if you used the
19  June 30th, 2013, valuation instead of the June 30th,
20  2012, valuation?  In other words, would it make a
21  difference if you had used the later report or not, do
22  you know?
23  A.  I think in terms of this overall analysis, the phrase
24  "used the valuation" is not an appropriate
25  characterization.  This analysis is based upon census

1  GLENN BOWEN
2  data provided by the valuation system and an
3  independent valuation by Milliman.  These pieces that
4  are listed in the letter are pieces that we have taken
5  from the Gabriel Roeder valuation.
6  Q.  All right, fair enough.  So I was imprecise in the
7  question, and I apologize for that.  My question is,
8  here you used a particular assumption from the
9  June 30th, 2012, version of the Gabriel Roeder report,
10  correct?
11  A.  That is correct.
12  Q.  Okay.  And I'm asking whether you looked at the
13  subsequent version to see if that warranted any change
14  in the assumption that you used when you did this
15  analysis using the 2012 version of the report.
16  A.  I reviewed the 2013 valuation report for DGRS,
17  prepared by Gabriel Roeder.
18  Q.  Okay.  I know you reviewed the report.  I'm asking
19  whether you analyzed whether the June 30th, 2013,
20  report, and the assumptions it used about
21  post-retirement mortality, whether those warranted any
22  change in the assumption you used in relying on the
23  June 30th, 2012, version of the report.
24  A.  My review of 2013 did not indicate any change was
25  warranted.

1  GLENN BOWEN
2  Q.  Okay.  So did you look at it specifically to see
3  whether a change was warranted based on the 2013
4  report or -- I'm just asking whether you looked at
5  that issue, specifically.
6  A.  The review of the report was many fold, and that issue
7  was looked at as a portion of the review of the
8  report.
9  Q.  Okay.  So you looked at it, and you concluded after
10  review of the June 30th, 2013, report that it did not
11  warrant that you revise the post-retirement mortality
12  assumption that you used in this April 10th analysis?
13  A.  That's correct.
14  Q.  Okay.  If you look at compensation, it also says that
15  you -- which is at the bottom of page 3 and on to
16  page 4, it also says that you used the June 30th,
17  2012, actuarial valuation, and then you estimated
18  compensation for the 2013-2014 year, fiscal year using
19  the June 30th, 2012, actuarial valuation.
20          Did you go back and look at that set of
21  assumptions in light of the June 30th, 2013, actuarial
22  report issued by Gabriel Roeder to see whether there
23  was -- that report, for example, provided you --
24  provided information that warranted a change in your
25  assumptions?

GLENN BOWEN

A. The development of this methodology, assumption set, was a result of mediation discussions between the actuarial firms.

Q. Okay. What I see it saying here is that you used the June 30th actuarial valuation and that you estimated it, the 2013-2014, based on the June 30th, 2012, actuarial valuation. Is that what you did, or did you do something else based on mediation?

A. We did what is stated here as a result of mediation discussions between the actuarial firms.

Q. All right. So does that mean you did not go back and look at those assumptions in light of the June 30th, 2013, Gabriel Roeder report to determine whether any alteration in your assumptions was warranted?

A. This analysis we're looking at is not a 2013 valuation by Milliman, to the best of my recollection. And so, to that extent, there was no reason to go back and look at that for this analysis.

Q. Okay. It does say, does it not, at the top of page 4 that you're estimating compensation for the 2013-2014 fiscal year, doesn't it?

A. Yes, it does.

Q. Okay. And that you did that using the 2012 actuarial valuation?

GLENN BOWEN

A. Using the merit and seniority salary increase assumption in the 2012 valuation, not using the 2012 valuation.

Q. All right, so using the assumptions. Again, I apologize for saying valuation instead of the assumptions from the valuation. I'm just asking, did you look at the 2013 report to see whether your reliance upon the assumptions used in the 2012 report were still warranted?

A. I did not, because those are apples and oranges.

Q. Okay. And you are looking for estimated liabilities as of June 30th, 2014, correct?

A. In this analysis, yes, 2014.

Q. And did you look at -- when you received the 2013 valuation, did you look at what the actual salary increases had been in the additional year of experience that you had?

A. The 2013 valuation would not have provided compensation for 2013-2014.

Q. Right. It would have provided it for the year preceding that, right?

A. It would have provided the change from '11-'12 to '12-'13.

Q. Right, which you did not have until you saw that

GLENN BOWEN

report, right, saw the 2013 report?

A. We had census data as of June 30, 2013, from the system, which we relied on in our analysis.

Q. Then why are you saying that you relied on -- you used -- compensation for the 2013-14 fiscal year was estimated, using the merit and seniority salary increase, if you actually had that data?

A. I'm guessing that we did not have 2013-14 compensation in the 2013 data and had to estimate it for this purpose.

Q. I'll see if there are other questions I want before I get to the --

Okay, the next question will relate to Exhibit 2, at least the portion of the tax reference in Exhibit 2, so I would ask that we start the sealed portion of the transcript here.

(At this point in the proceedings a portion of the record was excised, made a separate record, and put under seal)

MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 51
4:27 p.m.

BY MR. BALL:

Q. Okay, Mr. Bowen, you're being shown what has been

GLENN BOWEN

marked as Exhibit 51, which is a letter dated April 14th, 2014, and is Bates-stamped POA00259476. And so my first question to you is, is this a letter that you authored and signed?

A. Yes.

Q. And it is an analysis for the DGRS, and for what it would take in certain parameters for the DGRS to have 70 percent funded status in 2023, do you see that?

A. I do.

Q. And it asks you to assume that the DWSD will not be spun off, but will reach -- but will make contributions sufficient to reach a hundred percent funded status for the DWSD as of 2023. Do you see that?

A. If you could point me to it, I ...

Q. Sure. In the project description and -- on page 2, and then DWSD contribution projection on page 3.

A. Okay. It says DWSD contribution projection is discussed in more detail below, so page 3.

Q. Right.

A. Okay, I see that on the top of page 3.

Q. All right. And so the concept is that the DWSD will contribute the full amount of its allocated unfunded liability on the market value assets basis over a

51 (Pages 437 to 440)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 13634-3    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 52 of 65

GLENN BOWEN

1           GLENN BOWEN
2    nine-year period, right?
3   A.  That is correct.
4   Q.  And that would be through June 30 of 2023 under this
5    analysis, right?
6   A.  Yes.
7   Q.  So -- and there are other specified contributions here
8    from other sources, from non-DWSD sources. Do you see
9    that?
10   A.  Contributions from non-DWSD, I do see that.
11   Q.  Okay. This is the first analysis that I've seen, or
12    the earliest analysis I've seen in which there's a
13    concept of DWSD not being spun off but DWSD,
14    separately from the rest of the city, making
15    contributions that fund its entire UAAL, allocated
16    UAAL by 2023. Is that consistent with your
17    recollection?
18   A.  I can't guarantee you this is the first, but there was
19    a first.
20   Q.  Okay. Can you explain whose idea it was to have -- or
21    do you know whose idea it was to have DWSD make
22    contributions over a nine-year period without the
23    rest -- and reach a hundred percent funded basis over
24    a nine-year period without the rest of the city and
25    the remainder of the contributors to the GRS make

1           GLENN BOWEN
2    similar funding, so that there is a disparate
3    amortization period for DWSD and the rest of the city?
4   A.  I do not know the individual who had the original
5    idea.
6   Q.  Okay. How did you learn about it?
7   A.  Upon the request to complete this project.
8   Q.  Okay. And do you have any understanding about why you
9    were being asked to analyze a scenario in which there
10    would be that kind of disparate amortization period
11    between the DWSD and the rest of the city?
12   A.  I can't say that I had specific information as to why
13    this request was initiated.
14   Q.  Okay. Did you have an understanding at the time?
15   A.  I find it difficult to answer that question, which is
16    in the style of similar questions. The assignment was
17    provided to us and the assignment was self-evident, if
18    you will, and, beyond that, had an understanding as
19    needed to complete the assignment and completed the
20    assignment as requested.
21   Q.  Were there any specific communications to you about
22    the purpose of the structure such as that and why you
23    were being asked to analyze a structure such as that?
24   A.  Again, when I say it's self-evident, I mean that we
25    were told -- or, you know, the request is that you

1           GLENN BOWEN
2    model DWSD paying their full unfunded liability over
3    nine years, and my response was, okay, I understand
4    the request.
5   Q.  Okay. And I understand that you understood what
6    parameters were being provided to you. I'm asking if
7    you understood the purpose for which those parameters
8    were being requested.
9   A.  It's very difficult to answer yes or no. Obviously,
10    the description of the project request itself
11    indicates what's under consideration. In terms of any
12    particular mediation or negotiation session that may
13    have arisen from, I was not involved.
14   Q.  And were there any commune -- apart from just telling
15    you what the parameters are, and I understand that
16    carries a certain amount of information with it, did
17    you get any other communication about what the purpose
18    of the analysis was?
19   A.  Not that I recall.
20   Q.  And we've talked before about the market value of the
21    assets and how you used Gabriel Roeder information to
22    analyze the share of the assets that were attributed
23    to the DWSD. Do you recall that?
24   A.  I do.
25   Q.  Okay. And in this analysis, did you take the same

1           GLENN BOWEN
2    approach as you've discussed previously in earlier
3    analyses?
4   A.  I think it was one step more complex. It was based on
5    the same approach, but then we had to project forward
6    to 2014.
7   Q.  2023?
8   A.  No, 2014.
9   Q.  2014?
10   A.  Yes.
11   Q.  And so the numbers you were using at this point were
12    Gabriel Roeder numbers in the June 30th, 2013, report?
13   A.  That was the initial numbers used in the first part of
14    the analysis.
15   Q.  Okay. And how did you roll those forward to 2014?
16   A.  The bottom of page 3, the second, second-to-the-last
17    sentence in the big paragraph discusses the estimated
18    market value of assets as of June 30, 2014,
19    attributable to DWSD was 477 million. This amount was
20    estimated in the same manner as the estimated market
21    value of assets for the entire system.
22         So we were provided with an estimate of
23    actual market returns during 2013-14 used to roll the
24    entire system's asset forward, and then an allocation
25    was done to DWSD to get a 2014 estimated starting

GLENN BOWEN

1     point.
2  Q.  Okay.  Do you know whether that method of rolling
3     forward and the resulting allocation to DWSD is
4     consistent with the allocation methodology that had
5     been used by Gabriel Roeder and/or the city to
6     allocate assets between DWSD and other components of
7     the city that you had relied on in your prior
8     analyses?
9  A.  I don't know.
10  Q.  Okay.  And did you ever discuss with anyone from
11    Gabriel Roeder or from the retirement system or anyone
12    else whether that, that roll forward of the analysis
13    and the method that you used was consistent with
14    what -- the historically-used methodology for
15    allocating assets between divisions in the city?
16  A.  I don't recall those conversations.
17  Q.  Okay.  So the best of your recollection is you did not
18    have such conversations, is that fair?
19  A.  That is fair.
20  Q.  All right.  Did you attempt to undertake any analysis
21    of whether or not the methodology you're using here is
22    consistent with the methodology that had been used
23    historically to allocate assets between different
24    divisions of the city?


GLENN BOWEN

1     not a interim letter out of a whole series of letters.
2  Q.  And I will say to you that --
3  A.  This is the first one you found.
4  Q.  This is the first one I've seen, and we've looked at a
5    number, including the April 10th letter, which was
6    four days before this, that still specifies a rate
7    that is net of admin and investment expenses, and
8    everyone we've looked at so far has involved that.  If
9    there's an earlier one, I'm happy to see it.
10    But my, my question to you is, what has
11    prompted the change?  Why is it now that the 6.75
12    percent rate that you've looked at repeatedly, in a
13    way that was net of both admin and investment expense,
14    is now being presented as net only of investment
15    expense and not admin?
16  A.  This was a request from the city that came along with
17    this project.
18  Q.  And so other than knowing that that's what the city
19    requested, do you have any understanding of why it is
20    that a shift has occurred so that the investment
21    return assumption is to be net only of investment and
22    not admin expense?
23  A.  No particular reason for any of the shifts, including
24    this one.

GLENN BOWEN

1  A.  I did not.
2  Q.  If you look at the first couple of pages, it
3    references that you're applying a 6.75 percent
4    investment return assumption.  Am I correct that that
5    is net of admin and investment expenses?
6  A.  In this letter, it appears it is net of investment
7    expenses.
8  Q.  And admin expenses?
9  A.  Not net of admin expenses.
10  Q.  Okay.  And can you show me where in the letter it
11    reflects that the 6.75 is net only of investment and
12    not admin expenses?
13  A.  The bottom of page 2 states the amount of
14    administrative expenses that were applied, and,
15    actually, the sentence prior to that states that it is
16    net of investment expenses.
17  Q.  Until this point, every iteration of the
18    investment return assumption has provided or as you've
19    understood to be net of both admin and investment
20    expenses, is that fair?
21  A.  That is fair.
22  Q.  Okay.  What prompted --
23  A.  I'm sorry, this letter states what's done in this
24    letter.  I cannot specifically guarantee that there's

GLENN BOWEN

1  Q.  All right.  I assumed that's the case, but I have to
2    ask the question.
3  A.  Understood.
4  Q.  Okay.  And in the result section, can you show me
5    where it reflects the addition of admin expenses?
6  A.  If you look at the exhibit, which is Bates 259485, at
7    the bottom of the exhibit there is a vector of
8    expected benefit payments, and they're indicated as a
9    negative because they're a cash outflow, and a vector
10    of expected administrative expenses by fiscal year.
11  Q.  Okay.  So those are all in parentheses, indicating
12    that there's been a -- there's an outflow for admin
13    expense in addition to the, so that you're actually
14    subtracting it from the results here?
15  A.  Correct.
16  Q.  Okay.  And so if I wanted to see whether any of the
17    earlier analyses involved a rate that was net of admin
18    expense or in addition to, would I see a similar kind
19    of entry in the charts for prior letters?
20  A.  I'm sorry, you'll have to take that from the top
21    again, please.
22  Q.  In other words, you have charts like this in most of
23    the letters.  I assume if I wanted to know whether the
24    rate that you proposed -- that you analyzed was

GLENN BOWEN

1
2       intended to be net of admin expense or to not be net
3       of admin expense, a way of checking that would be to
4       look at any such chart and see whether it reflects a
5       charge for admin this way?
6    A.  I believe that's reasonable to assume, yes.
7    Q.  All right, and -- and so the admin expense would be
8        part of the contribution from DWSD in this scenario,
9        where the investment rate is not net of admin expense?
10   A.  I'm sorry, could you repeat that again?
11   Q.  Sure.  When you were analyzing DWSD's contributions
12       here, is the result of excluding admin expense from --
13       providing an investment return assumption that is not
14       net of admin expense, that DWSD would wind up paying a
15       component of admin expense as part of its
16       contributions, separate from -- as a separate part of
17       its contributions?
18   A.  It doesn't note in this letter, unless I'm missing it,
19       that DWSD was assigned a portion of administrative
20       expenses.
21   Q.  Okay.  So in this letter, the investment return
22       assumption is not net of the admin expenses, but
23       there's no reference here to the funding that DWSD is
24       required to make, including an additional component
25       for admin, is that fair?

GLENN BOWEN

1
2    A.  Just give me one second to confirm that, please.
3        I don't see any specific reference in this
4        letter to assigning a portion of administrative
5        expenses to DWSD.
6    Q.  There is a results section on page 6.  It says it's
7        based on a city-specified iteration methodology.  Do
8        you see that?
9    A.  Yes.
10   Q.  Can you explain what that means?
11   A.  I cans.  I'll need to refresh my memory, momentarily.
12       At the top of page 3 describes the iteration process.
13   Q.  Okay.  Can you explain what you mean by "iteration"?
14   A.  Sure, and I will.  Just let me finish the paragraph,
15       please.
16   Q.  Sure, go ahead.
17   A.  The -- to get to the end -- the iteration is moot, but
18       I'll describe the process to you.  The concept as
19       stated in the initial paragraph on page 2 was that
20       DWSD would be charged the full amount of their
21       unfunded liability over the nine-year period, and an
22       iterative process would be set up such that we would
23       run that analysis, but those assets would be available
24       to all members to support benefit payments for all
25       members.

GLENN BOWEN

1
2        Then the process would be run again, and
3        again, and again, and again, until DWSD was -- reached
4        their, reached the limit which was their unfunded
5        liability, and that was the way the project was
6        described to us.  The result of that is, is there is
7        no iteration.  We figured DWSD's entire unfunded
8        liability, and it was amortized over a nine-year
9        period.  And in the very first step they were at their
10       limit, and there was no further iterations needed.
11   Q.  Okay.  The nine-year period here, we've discussed an
12       earlier version of a review of DWSD as a spinoff, in
13       which we talked about the nine year, the nine or
14       ten-year amortization period.
15       I take it the same answers would hold here
16       as did in our prior discussion, that the nine-year
17       period is not a product of a Milliman analysis or an
18       actuarial analysis, is that fair?
19   A.  That is fair.
20   Q.  And it is not the product of a Milliman
21       recommendation, is that fair?
22   A.  That is fair, as well.
23   Q.  And you just mentioned in -- can you tell me what the
24       amortization period is for the city under this
25       analysis -- for the rest of the city, other than DWSD?

GLENN BOWEN

1
2    A.  I'm not sure that that's included in this analysis,
3        but I'll take a look and see if it happens to be.
4    Q.  I think it may not be, but that's --
5    A.  Okay.  I see nothing in here that indicates that the
6        rest of the city was subject to any particular
7        amortization period in this analysis.
8    Q.  And, in fact, the concept is that the city, other than
9        DWSD, is not going to be contributing towards paydown
10       of the UAAL during this nine-year period at this
11       point, right?
12   A.  There is -- there's a contribution in the first year
13       which is larger than the subsequent eight, and I'd
14       have to check and see if we have indicated in the
15       letter what that contribution represents.
16   Q.  Is it consistent with your understanding that that was
17       coming from other sources besides the DWSD?
18   A.  I'll just -- if you give me a moment, I'll check and
19       see if I can find where we would have mentioned that.
20       Yeah, there is a contribution labeled as
21       non-DWSD, but I don't see anywhere in this letter
22       where we specifically stated what the source of that
23       non-DWSD contribution was, unless I'm missing it
24       still.
25   Q.  Okay.  You eventually did another -- other analyses

GLENN BOWEN

2  that involved DWSD's hundred percent amortization by
3  2023, correct?
4  A.  We did additional analyses, yes.
5  Q.  And those -- and is it your understanding under the
6  plan that ultimately gets proposed as to whether --
7  that that involves a contribution by DWSD,
8  contributions which result in amortization of its
9  entire unfunded liability over nine years, correct?
10  A.  I do recall doing subsequent letters with that
11  parameter for DWSD.
12  Q.  And do you have an understanding that under the plan
13  as proposed by the city, that the city itself, the
14  rest of the city, as opposed to private sources and
15  the state, and other sources besides the city would
16  not contribute towards UAAL during the first nine
17  years?
18  A.  You may be putting them front of me soon, but I do
19  recall letters where we listed by bullet point the
20  source of the contributions, and there were some
21  acronyms that I recall that I'm not sure who they
22  were, and we listed them -- we used the dollar
23  amounts.  We ran the analysis.
24  Q.  Okay.  But, in general, the effect of what's being
25  proposed here is that contributions by the DWSD and

GLENN BOWEN

2  some private sources, principally, and perhaps state
3  sources, will fund the entire UAAL for the first nine
4  years and have the system as a whole reach 70 percent
5  funded without equal contributions on a similar
6  amortization period by the balances, is that fair?
7  A.  As I said, we have letters where we have illustrated a
8  variety of sources of non-DWSD contributions.  I can't
9  exclusively say that none of them were a city source.
10  Q.  All right.  Until this, until this period -- until
11  this letter, in general, your analyses had assumed the
12  same amortization period for the city as a whole and
13  for the DWSD, is that fair?
14  A.  If you could refer me to a particular letter or a
15  particular subset of letters ...
16  Q.  We've seen a number of them earlier today, where we
17  looked at -- those companion letters we looked at,
18  which looked at getting both the DWSD and the GRS to a
19  70 percent funded level in 2023.  Do you recall that?
20  A.  Yes.
21  Q.  Okay.  And here what's being proposed is that the DWSD
22  would be at a hundred percent funded level and that
23  the remainder of the city, the fund as a whole, will
24  only be at a 70 percent funded level.  Is that right?
25  A.  You've got --

GLENN BOWEN

2  Q.  The system as a whole would only be at a 70 percent
3  funded level.
4  A.  We did letters of that variety.
5  Q.  Well, in fact, this one says that DGRS estimated
6  liability reduction -- you were analyzing the
7  liability reduction they would need in order for the
8  system as a whole to have 70 percent funded status in
9  2023, and the contemplation is that DWSD will be a
10  hundred percent funded at that point, right?
11  A.  Yes.
12  Q.  Okay, and so -- and that the funds contributed by DWSD
13  are going to be available not just to satisfy
14  obligations with respect to DWSD retirees or actives,
15  but with respect to anybody in the system, correct?
16  A.  That was the origin of the iterative methodology
17  requested in this letter.
18  Q.  Right.  And was there any justification provided to
19  you for treating DWSD and the rest of the city
20  differently?
21  A.  There was no justification provided to me for that.
22  Q.  All right.  Did you ever analyze whether it was
23  appropriate to treat the DWSD differently from the
24  balance of the city in terms of amortization period or
25  the point at which it reached a hundred percent funded

GLENN BOWEN

2  level or 70 percent funded level?  Did you ever
3  analyze that?
4      MR. MILLER:  Object to form.
5  A.  I don't deem that analysis as within the actuarial
6  sphere.
7  BY MR. BALL:
8  Q.  Okay.  Isn't the result of this that, that disparity
9  in amortization period between DWSD and the city, at
10  the point at which they reach a hundred percent funded
11  status, that DWSD rate payers in early years will be
12  responsible for funding the liabilities associated
13  with non-DWSD personnel, because those funds are going
14  to be available to satisfy claims for anybody?
15      MR. MILLER:  Object to form.
16  A.  I have a couple issues that I'll say are unclear from
17  your question.  In this analysis, there is no
18  amortization mentioned for the rest of the city, and
19  beyond the first year I'm -- beyond the first year it
20  appears there's no city contribution; what, if
21  anything, is represented by the contribution in the
22  first year is not listed in this letter and may not
23  have been provided to us in any bullet point detail.
24      Your question about rate payers is, in my
25  mind, beyond the actuarial analysis of developing a

GLENN BOWEN

1    contribution stream and saying that it is on behalf of
2    a liability in a subgroup of the system.
3    Q. Okay. Let me ask about that. We discussed earlier
4        the notion of intergenerational equity, right?
5    A. Mmm-hmm.
6    Q. And we discussed the idea -- what is an important
7        actuarial concept, right?
8    A. I agree.
9    Q. Okay. And part of the derivation of that is the
10       concern that those who have benefitted from the
11       services should -- provided by the people whose
12       retirement benefits in question should fund those
13       services, those benefits, correct?
14   A. That is the concept.
15   Q. Okay. And so in a scenario where DWSD is -- so let's
16       back up to the amortization period.
17           In this scenario, DWSD is going to be a
18       hundred percent funded in 2023, correct?
19   A. Given future experience matching the assumptions used
20       in the scenario, yes.
21   Q. But that's what you're projecting here?
22   A. That is the target of the ...
23   Q. And the target here is that the system, as a whole, is
24       only going to be 70 percent funded, right?

GLENN BOWEN

1    A. That is correct.
2    Q. Okay. So for the balance of the city, it is obviously
3        the case that the amortization period is going to be
4        longer than nine years, would you agree with me about
5        that? Since they're only going to be 70 percent
6        funded in 2023, presumably they're not going to reach
7        a hundred percent funded status until sometime after
8        that, if ever?
9    A. Then just to put a fine point on it, so I can let you
10       know where some of my confusion is, I'm not sure the
11       city has an amortization period that I would recognize
12       as such during this nine-year period if they're not
13       making payments, so ...
14   Q. Right, that's fair. But, at a minimum, they will not
15       have reached -- while the DWSD will have paid out over
16       a nine-year amortization period, the city, if it's
17       paying at all, is going to reach a hundred percent
18       funded status, at a minimum, at some point later, at a
19       minimum at some later date, right?
20   A. That is this analysis, yes.
21   Q. Okay. And so isn't it true, in that analysis, that
22       the DWSD is funding liabilities, effectively funding
23       liabilities, because the amounts it's contributing are
24       going to be available to pay claims for the entire

GLENN BOWEN

1    system, that it is funding liabilities that are
2    associated with services provided by other parts of
3    the -- by employees of other parts of the city under
4    this contract?
5        MR. MILLER: Object to the form.
6        MR. MUTH: Object to the form.
7    A. I think it's important to parse that. DWSD is
8        contributing on behalf of liabilities that arose due
9        to past service of DWSD members. The statement in the
10       letter would have been based upon conversations or
11       emails that developed in the project description that
12       the money is going in and is not going to be
13       segregated in a DWSD account. That's my understanding
14       of this letter.
15           Further, my understanding, which I did not
16       have to generate in terms of this analysis, is that
17       the DWSD would be assigned their employer
18       contributions in their asset roll forward in the four
19       subcomponent breakout, and that would be, that would
20       be what it is.
21   BY MR. BALL:
22   Q. I agree with that, and I believe I understand that,
23       but, in the meanwhile, in fact, the assets that are in
24       the system that would have been contributed by DWSD
25

GLENN BOWEN

1    would be available for and be used for liabilities
2    associated with employees of the other divisions of
3    the city, correct? That's part of the assumption
4    here.
5    A. That is stated in the letter, yes.
6    Q. Okay. And so in 2023, in a scenario in which the city
7        is unable to contribute further because it has further
8        financial difficulties, DWSD would be left having
9        funded the benefits associated with services provided
10       by employees in the other parts of the city, and the
11       remaining funds to pay benefits for DWSD employees
12       would be impaired, right? It would be less than the
13       full contribution available to fund DWSD's own
14       employees, right?
15           MR. MILLER: Object to form.
16   A. I do not know what the resolution would be in the
17       scenario that you describe.
18   BY MR. BALL:
19   Q. All right.
20           MR. MUTH: Counsel, do you know how much
21       more you have? Because if it's not going to be, you
22       know, five or ten minutes, I'd like to take a break.
23           MR. BALL: It is probably about fifteen or
24       twenty minutes.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

GLENN BOWEN

1
2  MR. MILLER: Yeah, can we take a quick
3  break?
4  VIDEO TECHNICIAN: The time is 5:02 p.m.
5  We are off the record.
6  (Off the record at 5:02 p.m.)
7  (Back on the record at 5:13 p.m.)
8  VIDEO TECHNICIAN: We are back on the
9  record. The time is 5:13 p.m.
10  BY MR. BALL:
11  Q. Mr. Bowen, have you undertaken any analysis of whether
12  it's appropriate as an actuarial matter to apply
13  different amortization periods to DWSD than to the
14  balance of the participants under the GRS plan?
15  A. No.
16  Q. Okay. And are you aware of any actuarial basis for
17  applying different amortization periods to the DWSD
18  than to other portions of the -- other participants in
19  the GRS plan?
20  A. No.
21  Q. Okay. And if you were advising an employer who's
22  participating in a multi-employer benefit plan, where
23  the other employers involved in the plan were not
24  economically or financially stable, and the fund
25  assets were not segregated by employer, and there was

GLENN BOWEN

1
2  a proposal made that your client assume all funding
3  obligations for the first nine years for an
4  outstanding UAAL balance, with the other employers
5  deferring any contributions towards the UAAL until
6  after that, what would you advise your client?
7  MR. MUTH: Object to the form. You're
8  asking an opinion question of a lay witness.
9  MR. BALL: Okay.
10  BY MR. BALL:
11  Q. You can answer.
12  A. I don't consult on multi-employer plans, so that's the
13  first piece of your question. And you asked what --
14  your question was what would my advice be?
15  Q. To the employer that you represent in those
16  circumstances.
17  A. Beyond providing the calculation, if that was my task
18  in such a construct as you have set forth, I'm not
19  sure whether there's any further actuarial advice to
20  that employer.
21  Q. Okay. So you wouldn't provide any advice about that
22  topic to the employer in that scenario, other than
23  just running the calculation?
24  A. From an actuarial perspective, I don't know that I
25  would have additional advice to provide beyond.

GLENN BOWEN

1
2  Q. And without the limitation from an actuarial
3  perspective, would you have advice to provide?
4  MR. MUTH: Same objection.
5  THE WITNESS: And that means I ...
6  MR. MUTH: You may answer if you've got an
7  opinion. You respond to his hypothetical.
8  BY MR. BALL:
9  Q. You gave the qualification from an actuarial
10  perspective, and I just want to know if you eliminated
11  anything from your answer as a result of that
12  qualification.
13  A. No, I'm trying to just make sure I understand what I
14  can and cannot answer. If I am hired as an actuary, I
15  would provide advice from my perspective as a pension
16  actuary. If the matter moved into a legal realm, I
17  would advise that my client seek the advice of their
18  counsel.
19  Q. Okay. Other than that, any other advice that you
20  would provide?
21  A. I think the advice beyond the actuarial advice all
22  falls outside of an area that I could practice in.
23  Q. In the exhibit we've been looking at, which is
24  Exhibit 51, the April 14th letter, if you would look
25  with me at page 8, is the analysis here based on the

GLENN BOWEN

1
2  actuarial valuation that is reflected in your April
3  10th letter?
4  A. Well, it says under basis for analysis: Except as
5  indicated above, this analysis is based upon the plan
6  provisions, actuarial assumptions, methods, and census
7  data set forth in the April 10th letter.
8  Q. Okay. And there's a copy of the April 10th letter
9  attached?
10  A. Yes, it is attached.
11  Q. And so there are places in this letter where it
12  specifically says you're not doing what you did or
13  relying on the April 10th letter, but with that
14  exception, your actuarial assumptions, methods, and
15  census data and plan provisions that you're relying on
16  are set forth in the April 10th letter?
17  A. That's the construct, yes.
18  Q. Okay.
19  MARKED FOR IDENTIFICATION:
20  DEPOSITION EXHIBIT 52
21  5:19 p.m.
22  BY MR. BALL:
23  Q. Mr. Bowen, you've been provided what has been marked
24  as Exhibit 52, which is a letter dated April 25, 2014,
25  and the Bates number is POA00259371, and my first

GLENN BOWEN

1
2    question to you is, is this a letter you drafted and
3    signed?
4    A.  Yes.
5    Q.  And if you look at page 8, do you see the similar
6    incorporation of your analysis from April 10th that we
7    just discussed from -- that was reflected in your
8    April 14th letter, this letter, too, relies on the
9    April 10th letter in the same fashion, is that right?
10   A.  Yes, except for as indicated.
11   Q.  Okay.  And in this letter, you again are analyzing
12   getting -- how the DGRS, as a whole, can get to a 70
13   percent funded level from 2014 to 2023, is that right,
14   over that period?
15   A.  Yes.
16   Q.  Okay.  And there are various other parameters
17   specified, but one of them is a 6.75 investment
18   return.  Do you see that?
19   A.  Yes.
20   Q.  And the 6.75 percent investment return here is, again,
21   net of investment expenses but not admin expenses?
22   And if you look at pages 2 to 3, I think you'll see
23   that.
24   A.  I see that.
25   Q.  Okay.  And in this letter there's still an analysis --

GLENN BOWEN

1
2    A.  That is at the top of page 3.
3    Q.  Okay.  What is the additional 2.5 million per year in
4    administrative expenses?  What is that?
5    A.  That is a rough proxy of the DWSD portion of the
6    overall system administrative expenses.
7    Q.  Okay.  And is that -- had there been any charge before
8    this letter to DWSD for those expenses contemplated in
9    the prior letters?
10   A.  Again, we wrote letters very frequently, so on
11   April 14th there was not that explicit charge to DWSD.
12   In the April 25th letter, there was.
13   Q.  Okay.  Can you explain how it came to be that you
14   included that expense in the April 25th letter as an
15   item to be charged to the DWSD?
16   A.  We were requested to include an allocation of the
17   expenses to DWSD.
18   Q.  And had you done any analysis or made any
19   recommendation that prompted the use of the 2.5
20   million dollar figure for administrative expenses
21   here?
22   A.  We were requested to allocate expenses to DWSD.  It
23   was not Milliman's suggestion to do so.
24   Q.  Okay.  And were you directed specifically to use the
25   2.5 million dollar figure for those expenses?

GLENN BOWEN

1
2    there's still the concept here is that the DWSD is
3    going to contribute to reach a hundred percent funded
4    status on the DWSD share of unfunded liability over a
5    nine-year period, so by 2023, correct?
6    A.  I mean, yes, but that's not the entire picture.
7    Q.  Okay.  What's not the entire picture about it?
8    A.  In this April 25th letter there are additional benefit
9    changes made that were not included in the April 14th
10   letter.
11   Q.  Fair enough, and there -- each of these letters had
12   some different analyses about benefit reductions or
13   treatment of recoupment of the ASF funds, and things
14   like that, other things that are going on on the
15   liability side besides the DWSD's contribution.  Is
16   that fair?
17   A.  That is fair.
18   Q.  Okay.  But the idea is still that the DWSD is going to
19   contribute and going to pay a full amount of its
20   allocated unfunded liability on a market-value basis
21   over nine years, correct?
22   A.  That is correct.
23   Q.  And that in addition to that, it's going to pay
24   another 2.5 in administrative, 2.5 million per year in
25   administrative expenses, correct?

GLENN BOWEN

1
2    A.  To the best of my recollection, we were requested to
3    do some fractional allocation, and upon looking at the
4    fractional allocation, we said let's use a flat 2.5
5    for simplicity instead of trying to use numbers that
6    vary very little over the nine-year period.
7    Q.  Okay.  Is there anything in this letter that reflects
8    you're doing that calculation as opposed to being
9    directed by the city to use that contribution schedule
10   that specified a 2.5 million figure?  And the reason
11   I'm asking is, as I read the first sentence under DWSD
12   contribution projection, it says the city's specified
13   contribution schedule is based on a concept of, and
14   then it says plus 2.5 million.
15          So I'm just trying to figure out if that's
16   something you derived or something you were told to
17   do.
18   A.  Well, let me address what I believe may have been the
19   scenario.  As I probably mentioned over the course of
20   the past two days, projects don't come in complete
21   and/or clear.  So we'll have a back and forth with the
22   pension task force to define and/or ask for
23   clarification as to what we propose to do, and the way
24   this may have arisen was assign some percentage of the
25   overall administrative expenses to DWSD, and in the

GLENN BOWEN

1  process of developing the project scope, we noted
2  you're going to have a large DWSD contribution on
3  behalf of the unfunded liability and a relatively much
4  smaller contribution on behalf of their administrative
5  expense.
6       And we can parse -- or we can try to
7  fine-tune what might be 2.45 million, 2.47, 2.49,
8  2.51, 2.53, something of that nature, or for
9  simplicity, how about we just use 2.5. And if I had
10 asked that and the city said yes, I don't know that we
11 can specifically say it's a Milliman recommendation to
12 assign 2.5 million in expenses, but in the
13 back-and-forth of the defining the project
14 description, we may have said we have a simpler way of
15 accomplishing the same goal.
16 Q. All right. My only question about that is, are you
17 assuming that that's what may have happened, or do you
18 recall that's what happened?
19 A. I do recall that, that type of conversation is
20 something that I had. I cannot specifically say this
21 particular letter, but when the numbers are for
22 administrative expense small relative to the
23 contributions and the liability, it didn't seem to
24 make sense to say let's go to another decimal place.

GLENN BOWEN

1  Q. Okay. Now, are these administrative expenses that are
2  being covered here things that would have been
3  embraced with the investment return assumption, when
4  the investment return assumption that was being
5  provided was net of investment and admin expense?
6  A. Yes.
7  Q. Okay, so -- and did you do any comparison of what --
8  there was a specified level of assumed administrative
9  expenses, a percentage of assumed investment return,
10 do you recall that? In the November 4th letter, for
11 example, you adjusted down from an expected rate based
12 on a presumed level of administrative expense.
13 A. Yeah, I'm mixed up --
14 Q. It was a number of basis points that --
15 A. For -- I'm sorry, please continue and then I'll
16 respond.
17 Q. I'm sorry. I didn't mean to interrupt you, and it's
18 getting late in the day, so I apologize. But do you
19 recall that in your November 4 letter, there was a
20 specific basis point load for administrative expense
21 that was deducted from a gross investment return to
22 reach the net investment return, along with several
23 other items that were deducted?
24 A. I don't recall that being the case in the November 4th

GLENN BOWEN

1  letter.
2  Q. Okay. And that's the letter that analyzes the
3  investment return?
4  A. Yes, that's the one I'm thinking of.
5  Q. All right, let me ask you to looking at what was
6  marked as Exhibit 2, and look at page 3, in
7  particular -- actually, page 5 of the letter.
8  A. Okay.
9  Q. All right. In this letter there is an assumption that
10 administrative expenses would be added to the normal
11 cost for the fiscal year. Do you see that?
12 A. Yes.
13 Q. Okay. And do you know whether administrative expenses
14 were contemplated in subsequent analyses to be
15 included in the normal cost for the year as opposed to
16 payment for UAAL?
17 A. We looked at -- in the progression of the last several
18 letters you've shown me, at one point in time they
19 weren't and then at one point in time they were.
20 Q. Okay. There's been two letters, I think, the last,
21 this one and the one before it --
22 A. Okay.
23 Q. -- that, that were -- where admin expense was -- the
24 interest was not net of the admin expense. So the

GLENN BOWEN

1  assumption at least until the last couple of letters
2  that we've looked at was that admin expense would
3  actually be included in the normal cost, is that
4  right?
5  A. I'm, I'm very sorry, that was -- I wasn't able to
6  follow it. Between the November 4th letter -- could
7  you just please repeat?
8  Q. It's fine. I think we've got it, anyway. But at this
9  point you are adding in as a part of UAAL an
10 additional payment for admin expense that hadn't been
11 reflected until the last -- until this letter, in
12 fact. This is the first letter we've seen where you
13 were adding in an additional payment for admin expense
14 as part of UAAL, is that fair?
15 A. It's not added in as part of UAAL, and it effectively
16 is a re-characterization of what the numerical, the
17 denominal numerical amount of the investment
18 assumption means.
19 Q. Fair enough. You are specifying an amount in this
20 letter as an amount to be paid for UAAL amortized over
21 nine years for the DWSD, is that fair? Among other
22 things, you analyzed that, right?
23       If you look at results on page 6, there's a
24 42.9 million per year that you analyze being the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

GLENN BOWEN

1  
2     annual contribution for DWSD using the nine-year
3     amortization period, is that right?
4  A. Yes.
5  Q. Okay. And that's a payment on behalf of -- in respect
6     of UAAL, is that fair?
7  A. Yes.
8  Q. Okay. And then the 2.5 million you add in here, but
9     you're saying it's for admin expenses, not actually
10    part of the UAAL, is that fair?
11 A. That is.
12 Q. Okay. And so the result is 45.4 million added to -- I
13    mean per year, inclusive of the UAAL payment, and 2.5
14    million of admin expense?
15 A. Correct.
16 Q. And the total payment that the DWSD winds up making
17    under this analysis is 408.6 million for the nine-year
18    period?
19 A. That's what's stated, yes.
20 Q. Okay. We have discussed the market value of assets
21    previously, and there's a -- I just want to understand
22    how you derive the market value of assets you used for
23    the purposes of this analysis, and I believe that's
24    set forth on page 7?
25 A. I'm not sure if I can ask you questions, but I'll say

GLENN BOWEN

1  
2     assets, is that fair?
3  A. That is correct.
4  Q. Okay. Have you done -- since the time of this
5     April 25th letter, have you done any further analyses
6     of the amount that DWSD would be required to
7     contribute over a nine-year period to reach a hundred
8     percent funded status?
9  A. I'm not sure.
10 Q. Okay. These, as I understand it, are the numbers that
11    actually appear in the plan, and so my question is
12    whether you've revisited this analysis since.
13         MR. MUTH: By "these," you're referring to
14    Exhibit 52?
15         MR. BALL: I'm referring to Exhibit 52,
16    and, in particular, the numbers that are shown on
17    page 6 under the results with respect to the DWSD
18    contributions.
19 A. I'm sorry, I mean, I don't know if I answered your
20    question, if you want to ask it again.
21 Q. I'm just trying to make sure, have you done any
22    further analyses beyond those in this letter of the
23    annual contributions that DWSD would be required to
24    make to reach a hundred percent funded status in 2023?
25 A. I cannot definitively state that we did not do any

GLENN BOWEN

1  
2     the 2014 assets?
3  Q. Right. So you do an analysis that assumes the market
4     value of the assets has increased by 11.3 percent in
5     the 2013-14 fiscal year?
6  A. Yes.
7  Q. And then you apply 6.75 percent as an investment
8     return rate thereafter?
9  A. Yes.
10 Q. Okay. And in terms of the allocation between DWSD and
11    other components of the city, did you do the same sort
12    of analysis here that we discussed you having done in
13    prior letters?
14 A. Yes, as on page 3.
15 Q. Okay, and the difference -- in this case you used the
16    June 30th, 2013, Gabriel Roeder report, is that fair?
17 A. Yes, we did, the June 30, 2013, report.
18 Q. And you got to the numbers for 2014, the roll forward
19    that you did here, in the same way as in the letter we
20    looked at earlier, is that fair?
21 A. Yes.
22 Q. And you again have not done any analysis of whether
23    that methodology squares with the asset allocation
24    methodology that was used by Gabriel Roeder or the
25    retirement systems to develop their allocation of

GLENN BOWEN

1  
2     further analyses.
3  Q. Okay. You don't know, one way or the other?
4  A. I don't have a demarcation line in my mind as to when
5     the last letter was.
6  Q. I want to probe that just a little bit, just to make
7     sure. Were you aware that numbers you were providing
8     for contributions by DWSD were going to be
9     incorporated in the plan?
10 A. I'll say I was aware that there was a possibility that
11    that could happen.
12 Q. Okay. And did you at some point learn that it had
13    happened?
14 A. The plan adjustment was discussed with me last week.
15 Q. Okay. And was there any discussion -- okay, is that
16    the first time it was discussed with you?
17 A. I'm sorry, the plan document was set in front of me,
18    if you will, during that period of time. I have not
19    read the entire plan document, or much of any of it.
20 Q. Okay. Do you know whether you've done any analysis --
21    here's all I'm trying to figure out, is whether you
22    know whether you've done any analysis of the DWSD
23    contribution subsequent to the analysis that is
24    reflected in the plan.
25         And maybe you don't know enough facts to

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-3   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 61 of 65

GLENN BOWEN

1 know that. I'm just asking whether or not -- whether
2 you have any understanding about that.
3
4 A. Well, saying understanding is, I'll say, a word I
5 would object to. You're asking me if I remember out
6 of a series of a dozen letters or so that I wrote over
7 the course of a short period of time which one was the
8 final one. I cannot definitively say that this one
9 was the final one, just because this one happened to
10 appear in the plan.
11 It is entirely possible that a subsequent
12 analysis could have been done, and along with all
13 prior analysis was discarded by the city, and this one
14 was selected and reached in mediation. I cannot
15 answer the particular question you're asking more
16 specifically than that.
17 Q. Okay, fair enough. I'm just trying to make sure
18 there's not something there that if I help you with
19 the knowledge that this is what -- these are the
20 numbers that appear in the plan, whether that gives
21 you anything further to go on whether you've done any
22 later analysis. And I'm hearing the answer is no, so
23 I'll move on to the next question.
24 If you would --
25 MARKED FOR IDENTIFICATION:

GLENN BOWEN
DEPOSITION EXHIBIT 53
5:39 p.m.

BY MR. BALL:

4
5 Q. Mr. Bowen, you've been provided what's been marked as
6 Exhibit 53, which is a letter dated May 7th, 2014,
7 with Bates number POA00259896.
8 My first question to you is whether this is
9 a letter that you authored and signed?
10 A. Yes, it is.
11 Q. Okay. And you'll see that it attaches copies of both
12 the April 25th letter that we were just reviewing and
13 the April 10th letter that we looked at earlier. And
14 if I ask you to look at page 2, is it fair to say that
15 this letter incorporates by reference the scenario
16 analyzed in the April 25th, 2014, letter?
17 A. Given the phrase as a follow-up to our April 25th,
18 2014, letter, it would appear to be a follow-on
19 letter.
20 Q. All right. And if you look at the next page, on
21 page 3, you see that it says that the investment
22 return assumption -- except for the investment return
23 assumption mentioned above, plan provisions, actuarial
24 assumptions and methods, and census data used in this
25 analysis are all as set forth in our letter regarding

GLENN BOWEN

1 DGRS liabilities, dated April 10th, 2014. Do you see
2 that?
3 A. I do.
4 Q. Okay. And so those are all matters incorporated by
5 reference from the 2014 letter, is that fair?
6 A. Yes.
7 Q. Okay. And this letter provides an estimate of the
8 funded status for the system as a whole in 2033 and
9 2043, right?
10 A. It does.
11 Q. And it assumes the DWSD contributions that were
12 anticipated in the April 25th letter, is that fair?
13 A. I can take a few minutes to compare, but I don't see
14 anything here that says we have made a revision to
15 DWSD from the prior attached letter.
16 Q. And my understanding is that it incorporates that
17 scenario, but I want you to be --
18 A. Sure, okay. Bottom of page 2, please refer to
19 attached letter, the DWSD contribution projection. So
20 I'll believe that not seeing else regarding change in
21 DWSD, this would directly follow on from the attached
22 April 25th letter for that parameter.
23 Q. All right. And so, first, as I understand it, this
24 letter reflects that under the scenario that's being
25

GLENN BOWEN

1 analyzed, that as of June 2033, the plan as a whole
2 still will not be fully funded, is that fair?
3 A. That is.
4 Q. And as of 2043, it still will not be fully funded?
5 A. Correct.
6 Q. Okay, and so -- and as of 2053, is it fully funded?
7 A. Yes.
8 Q. Okay. So it is -- and in what year does it become
9 fully funded?
10 A. Best of my recollection, slightly before 2053.
11 Q. All right. So that would be a period of amortization
12 of almost 40 years for the city as a -- for the DGRS
13 as a whole, is that right?
14 A. Yes, it would be a period -- yes.
15 Q. Okay. And, in fact, the funding level reaches 70
16 percent in June 2023, right? That's at the bottom of
17 page 3.
18 A. Excuse me one moment. Can you continue with the
19 question, please?
20 Q. My question was the -- I was going to ask about the
21 funding levels at various points under the scenario,
22 but in 2023 it would be 70 percent, which was the
23 target of the original analysis, correct?
24 A. At 2023, it will be 70 percent under this scenario.
25

61 (Pages 477 to 480)

GLENN BOWEN

1                        GLENN BOWEN

2  Q.  All right. And then the funding level actually

3      declines after that, right?

4  A.  Just as it had declined prior to that, yes.

5  Q.  Okay. And so it declines to 64 percent as of June

6      2040, is that right? I'm looking, in particular, at

7      the bottom of page 3.

8  A.  Yes.

9  Q.  And it remains 64 percent for several years after

10     that?

11  A.  It bottoms out at 64 percent.

12  Q.  And so during the period where the city is making

13     contributions and after DWSD has reached a hundred

14     percent analysis, under the scenario provided here,

15     it's not going to be maintained, the funding is not

16     going to be maintained at a 70 percent level, is that

17     right?

18  A.  It will go below 70 percent.

19  Q.  Okay. In the paragraph, second paragraph at the top

20     on page 3, the last sentence says: Beginning with the

21     2023 fiscal year, administrative expenses were limited

22     to no more than five percent of the estimated benefit

23     payments for the respective fiscal year.

24         So that is an assumption about admin

25     expenses that is imposed for the year, first year when

GLENN BOWEN

1                        GLENN BOWEN

2     the city becomes -- when the DWSD has completed its

3     contributions and the city begins to make

4     contributions. Is that right?

5  A.  It is imposed but not -- does not necessarily apply.

6  Q.  Okay, explain what you mean by that.

7  A.  The administrative expenses, as noted in the middle of

8     that paragraph, are assumed to increase 2.5 percent

9     per year beginning with the current dollar amount, and

10     ultimately there is an annual test. When the prior

11     year administrative expenses are increased 2.5 percent

12     per year, that dollar amount is compared to five

13     percent of the estimated benefit payments for that

14     year, and if that dollar amount exceeds five percent,

15     the five percent of the estimated benefit payments is

16     used as the administrative expense assumption that

17     year.

18  Q.  Okay. And is there a reason why you imposed that cap

19     as of 2023 as opposed to some earlier or later period?

20  A.  Beyond the request to limit the growth in

21     administrative expenses at the far-out year, when the

22     system is shrinking, there was no particular specific

23     reason that said 2023, 2024, is the best year to begin

24     applying that test.

25  Q.  Okay. And so you did that because you were directed

GLENN BOWEN

1                        GLENN BOWEN

2     to by the city, but not because it was a

3     recommendation by Milliman. Is that fair?

4  A.  Again, I'll say this falls into the gray area that I

5     had discussed earlier where there was a limit on

6     administrative expenses that was desired because of

7     the knowledge that the plan would be winding down and

8     administrative expenses would not continue, or not be

9     expected to continue to grow on the current basis for

10     a frozen, winding-down plan.

11         I believe the way that this arose was we

12     said, currently, administrative expenses are a certain

13     percentage of benefit payments, and it may have been

14     two-and-a-half or three or four, some number less than

15     five, and in the context of setting the project scope,

16     there was an agreement upon five percent.

17  Q.  Okay. And the timing of the five percent?

18  A.  Well, the timing of the five percent is twofold, as we

19     just discussed. There was a, a period of when the

20     test would first be implemented whether or not it

21     applies in a given year is then -- depends upon the

22     results of the particular test as described here.

23  Q.  Okay. Back to the questions about the funding level

24     and the funding level declines from 70 percent after

25     2023, is there a reason, a principal reason that

GLENN BOWEN

1                        GLENN BOWEN

2     you're aware of for setting a funding level at 70

3     percent as opposed to 65 percent or 62 percent or 78

4     percent in 2023?

5  A.  My understanding of the 70 percent was that it arose

6     out of mediation. I believe that's the same question

7     as previously.

8  Q.  Okay.

9         MR. BALL: All right, I may be done. Give

10     me a few minutes.

11        VIDEO TECHNICIAN: The time is 5:50 p.m.

12     we are off the record.

13        (Off the record at 5:50 p.m.)

14        (Back on the record at 5:51 p.m.)

15        VIDEO TECHNICIAN: The time is 5:51. We

16     are back on the record.

17  BY MR. BALL:

18  Q.  Mr. Bowen, do you know whether you have undertaken any

19     further analyses with respect to the DWSD since

20     May 7th, 2014? And again, I understand you may not.

21     I just want to make sure that having seen this

22     document, whether that jars your recollection one way

23     or the other.

24  A.  Let me say this, just out of some way to hopefully

25     give you a better answer than I have previously. I

GLENN BOWEN

1
2  don't have my computer here with access to all of my
3  letters arranged in numerical order, so -- and any
4  question of that variety as to is this the last or
5  first or middle letter is not something that I have
6  sufficient recollection to provide you an absolute
7  answer to.
8          So I apologize for not being able to do so,
9  but I cannot say definitively whether there were
10  letters of this variety subsequent to May 7th, and
11  that's not meant to imply that there were and I'm
12  forgetting them or that there weren't.  I just simply
13  do not remember that level of chronological detail.
14  Q.  And I asked the question only because this looks to us
15      to be essentially the last letter from you that has
16      analysis with respect to these issues, at least.
17          If there were such a letter, would it have
18      been produced to us as a result of the document
19      searches that have been undertaken by Milliman?
20  A.  Yes, our IT department just went on to our network and
21      lifted all the letters.
22  Q.  Okay.  And since that happened, since the IT
23      department went on the network and lifted all the
24      letters, have you generated any additional letters
25      reflecting your work on behalf of the city?  In other

GLENN BOWEN

1
2  words, they did it at some point in time.  Since that
3  point in time, have you done anything else?
4  A.  Again, I mean, it's possible.  That happened two,
5      three weeks ago.  We could have issued another letter
6      or two.
7  Q.  All right.  Can I ask that you look to see whether you
8      have issued any further letters to the city or in
9      connection with your work for the city since that
10      search was performed, and that those be provided to
11      us?
12          MR. MILLER:  Yes, we will provide them.
13          MR. BALL:  Okay, I don't have further
14      questions.  Anyone else?
15          MR. WEISBERG:  I know you're disappointed.
16          MR. BALL:  Thank you very much, Mr. Bowen.
17          THE WITNESS:  You're welcome.
18          VIDEO TECHNICIAN:  The time is 5:53 p.m.
19      We are off the record.
20          (Deposition concluded at 5:53 p.m.
21          Signature of the witness was requested.)
22
23
24
25

GLENN BOWEN

1
2  In re              ) Chapter 9
3  CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846
4      Debtor.     ) Hon. Steven W. Rhodes
5
6  _____
7
8
9          VERIFICATION OF DEPONENT
10
11      I, having read the foregoing deposition
12  consisting of my testimony at the aforementioned time
13  and place, do hereby attest to the correctness and
14  truthfulness of the transcript.
15
16
17      _____
18      GLENN BOWEN
19      Dated:
20
21
22
23
24
25

GLENN BOWEN

1
2  ERRATA SHEET
3  PAGE  LINE  READS          PAGE  LINE  SHOULD READ
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23      _____
24      GLENN BOWEN
25      Dated:

63 (Pages 485 to 488)

1          GLENN BOWEN
2          CERTIFICATE OF NOTARY
3     STATE OF MICHIGAN )
4               ) SS
5     COUNTY OF KENT    )
6
7          I, REBECCA L. RUSSO, certify that this
8     deposition was taken before me on the date
9     hereinbefore set forth; that the foregoing questions
10    and answers were recorded by me stenographically and
11    reduced to computer transcription; that this is a
12    true, full and correct transcript of my stenographic
13    notes so taken; and that I am not related to, nor of
14    counsel to, either party nor interested in the event
15    of this cause.
16
17
18
19
20
21
22          REBECCA L. RUSSO, CSR-2759
23          Notary Public,
24          Kent County, Michigan.
25    My Commission expires: 6-3-2017

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022