# EXHIBIT C

JUDITH KERMANS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In re                          ) Chapter 9
CITY OF DETROIT, MICHIGAN,      ) Case No. 13-53846
        Debtor.      ) Hon. Steven W. Rhodes

_____

The Videotaped Deposition of JUDITH KERMANS,
a 30 (b)(6) witness,
Taken at 500 Woodward Avenue, Suite 3500,
Detroit, Michigan,
Commencing at 9:06 a.m.,
Friday, August 8, 2014,
Before Rebecca L. Russo, CSR-2759, RMR, CRR.

---

1                  JUDITH KERMANS
2  APPEARANCES:
3
4  RICHARD U.S.HOWELL, ESQ.
5  Kirkland & Ellis LLP
6  300 North LaSalle
7  Chicago, Illinois 60654
8
9      Appearing on behalf of Syncora Guarantee,
10 Inc., and Syncora Capital Assurance, Inc.
11
12
13 CHARLES D. BULLOCK, ESQ.
14 ELLIOT G. CROWDER, ESQ. (Via Telephone)
15 Stevenson & Bullock PLC
16 26100 American Drive
17 Suite 500
18 Southfield, Michigan 48034
19
20      Appearing on behalf of Gabriel Roeder
21 Smith & Company
22
23
24
25

---

1                  JUDITH KERMANS
2  SAM J. ALBERTS, ESQ. (Via Telephone)
3  Dentons US LLP
4  1301 K Street, N.W.
5  Suite 600, East Tower
6  Washington, D.C. 20005
7
8      Appearing on behalf of the Retiree Committee
9
10
11 GREGORY G. PLOTKO, ESQ. (Via Telephone)
12 Kramer Levin Naftalis & Frankel, LLP
13 1177 Avenue of the Americas
14 New York, New York 10036
15
16      Appearing on behalf of Certificates of
17 Participation Holders
18
19
20
21
22
23
24
25

---

1                  JUDITH KERMANS
2  CHRISTOPHER A. GROSMAN, ESQ. (Via Telephone)
3  Carson Fischer PLC
4  4111 Andover Road West - Second Floor
5  Bloomfield Hills, Michigan 48302
6
7      Appearing on behalf of Oakland County
8
9
10 MICHAEL BHARGAVA, ESQ.
11 Chadbourne & Parke LLP
12 1200 New Hampshire Avenue, N.W.
13 Washington, DC 20036
14
15      Appearing on behalf of Assured Guaranty
16 Municipal Corporation
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 2 of 42

```
 1              JUDITH KERMANS
 2   JENNIFER K. GREEN, ESQ.
 3   RONALD A. KING, ESQ.
 4   Clark Hill PLC
 5   500 Woodward Avenue
 6   Suite 3500
 7   Detroit, Michigan 48226
 8
 9   Appearing on behalf of the Retirement Systems
10   for the City of Detroit.
11
12
13
14   ROBERT D. GORDON, ESQ.
15   Clark Hill PLC
16   151 South Old Woodward Avenue
17   Suite 200
18   Birmingham, Michigan 48009
19
20   Appearing on behalf of the Retirement Systems
21   for the City of Detroit
22
23
24
25
```

```
 1              JUDITH KERMANS
 2   SEAN P. GALLAGHER, ESQ. (Via Telephone)
 3   Clark Hill PLC
 4   212 East Grand River Avenue
 5   Lansing, Michigan 48906
 6
 7   Appearing on behalf of the Retirement
 8   Systems for the City of Detroit
 9
10
11   MARK R. JAMES, ESQ.
12   Williams, Williams, Rattner & Plunkett PC
13   380 North Old Woodward Avenue
14   Suite 300
15   Birmingham, Michigan 48009
16
17   Appearing on behalf of the Financial
18   Guaranty Insurance Company
19
20
21
22
23
24
25
```

```
 1              JUDITH KERMANS
 2   MIGUEL F. EATON, ESQ.
 3   EVAN MILLER, ESQ. (Via Telephone)
 4   Jones Day
 5   51 Louisiana Avenue, N.W.
 6   Washington, D.C. 20001
 7
 8   Appearing on behalf of the City of Detroit
 9
10
11
12
13   ALSO PRESENT:
14   Ben Solorzano - Video Technician
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              TABLE OF CONTENTS
 2
 3   WITNESS                    PAGE
 4   JUDITH KERMANS
 5
 6   EXAMINATION BY MR. HOWELL        11
 7   EXAMINATION BY MR. BHARGAVA      156
 8
 9              EXHIBITS
10
11   EXHIBIT                    PAGE
12   (Exhibits attached to transcript.)
13
14   DEPOSITION EXHIBIT 1        15
15   DEPOSITION EXHIBIT 2        30
16   DEPOSITION EXHIBIT 3        100
17   DEPOSITION EXHIBIT 4        110
18   DEPOSITION EXHIBIT 5        126
19   DEPOSITION EXHIBIT 6        135
20
21
22
23
24
25
```

2 (Pages 5 to 8)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 3 of 42

JUDITH KERMANS

1           JUDITH KERMANS
2 Detroit, Michigan
3 Friday, August 8, 2014
4 9:06 a.m.
5
6
7       VIDEO TECHNICIAN: We are now on the
8 record. This is the videotaped deposition of Judith
9 Kermans, being taken on Friday, August 8th, 2014. The
10 time is now 9:06 a.m.
11       We are located at 500 Woodward Avenue,
12 Detroit, Michigan.
13       We are here in the matter of the City of
14 Detroit bankruptcy case. This is Case Number
15 13-53846. This matter is being held in the United
16 States Bankruptcy Court for the Eastern District of
17 Michigan.
18       My name is Ben Solorzano, video technician.
19       Will the court reporter swear in the
20 witness and the attorneys briefly identify themselves,
21 for the record, please.
22           JUDITH KERMANS,
23 was thereupon called as a witness herein, and after
24 having first been duly sworn to testify to the truth,
25 the whole truth and nothing but the truth, was

---

1           JUDITH KERMANS
2 examined and testified as follows:
3       MR. BULLOCK: My name is Charles Bullock,
4 of the firm Stevenson & Bullock, PLC, on behalf of
5 Gabriel Roeder Smith & Company.
6       MS. GREEN: Jennifer Green, Clark Hill, on
7 behalf of the General Retirement System for the City
8 of Detroit and the Police and Fire Retirement System
9 for the City of Detroit.
10       MR. KING: Ron King, with Clark Hill, on
11 behalf of the Detroit Retirement Systems.
12       MR. GORDON: Robert Gordon, Clark Hill, on
13 behalf of the Detroit Retirement Systems.
14       MR. BHARGAVA: Mark Bhargava, Chadbourne &
15 Parke, on behalf of Assured Guaranty Municipal
16 Corporation.
17       MR. EATON: Miguel Eaton, from Jones Day,
18 on behalf of the City of Detroit.
19       MR. JAMES: Mark James, Williams, Williams,
20 Rattner & Plunkett, on behalf of Financial Guaranty
21 Insurance Company.
22       MR. HOWELL: Rush Howell, with Kirkland &
23 Ellis, on behalf of Syncora Guarantee, Inc., and
24 Syncora Capital Assurance, Inc.
25       I believe there are also several people on

---

1           JUDITH KERMANS
1 the phone. So if the people on the phone could please
2 put in their appearance, for the record.
4       MR. ALBERTS: Sam Alberts, from Dentons, on
5 behalf of the Official Committee of Retirees.
6       MR. PLOTKO: Gregory Plotko, Kramer Levin,
7 on behalf of COPs holders.
8       MR. CROWDER: Elliot Crowder, from the law
9 firm of Stevenson & Bullock, PLC, also appearing on
10 behalf of Gabriel Roder Smith & Company.
11       MR. GALLAGHER: Sean Gallagher, from Clark
12 Hill, on behalf of the Detroit Retirement Systems.
13       MR. HOWELL: Evan, I think that was perfect
14 timing. We were in the middle of having people put
15 appearances on. Would you mind putting your
16 appearance on, for the record?
17       MR. MILLER: Thanks so much, yes, Evan
18 Miller, Jones Day, on behalf of the City of Detroit.
19           EXAMINATION
20 BY MR. HOWELL:
21 Q. Good morning, Ms. Kermans.
22 A. Good morning.
23 Q. Could you please state your full name, for the record?
24 A. Judith Ann Kermans.
25 Q. My name is Rush Howell. We met very briefly before we

---

1           JUDITH KERMANS
2 went on the record, but I represent Syncora Guarantee
3 and Syncora Capital Assurance, and I may refer to them
4 collectively as Syncora, okay?
5 A. Yes.
6 Q. Have you ever been deposed before?
7 A. Yes.
8 Q. So I know that you know kind of the ground rules, but
9 I'm still going to go over a few, just to make sure
10 for the ease of our conversation that we're on the
11 same page, okay?
12 A. Okay.
13 Q. First, I want to talk about a couple of acronyms that
14 can get confusing. Specifically, when I use the term
15 GRS today, I'm referring to the General Retirement
16 System of Detroit, okay?
17 A. Yes.
18 Q. And I'll try to say Gabriel Roeder or Gabriel Roeder
19 Smith rather than GRS for Gabriel Roeder, okay?
20 A. Yes.
21 Q. If I use the term PFRS, I'm referring to the Police
22 and Fire Retirement Systems of the City of Detroit,
23 okay?
24 A. Okay.
25 Q. If I use the term OPEB, I'm referring to other post

---

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 4 of 42

JUDITH KERMANS

1
2    employment benefits, okay?
3    A.  Okay.
4    Q.  Now, Ms. Kermans, a couple of other things that I
5        think will help us out.  The first is, both for the
6        ease of our conversation and because we have a court
7        reporter taking down the record, I would ask that you
8        let me finish my question before you begin your answer
9        even if you think you know where I'm going with the
10       question, okay?
11   A.  Okay.
12   Q.  And I'll try to do you the same courtesy and not
13       interrupt your answer with my next question, and if I
14       do, you know, please let me know and I'll make sure
15       that you're able to give a complete answer, okay?
16   A.  Okay.
17           MR. ALBERTS:  Just as an FYI for the folks
18       there, the witness's statements are not really
19       audible, so you may want to, you know, hop on the
20       mikes for people on the phone.
21           MR. BULLOCK:  She is miked, but let's do
22       this, let's move that over.
23           THE WITNESS:  I can speak more loudly if
24       that's helpful.
25           MS. GREEN:  Well, and I think to your

JUDITH KERMANS

1
2    questions she was just kind of saying yes and nodding
3    in agreement with you, so ...
4           MR. BULLOCK:  Just speak up.  If there's
5        still a problem, anyone on the phone, obviously, can
6        interject and we'll try to take some remedial or
7        corrective measures.
8    BY MR. HOWELL:
9    Q.  In fact, you anticipated the next point I was going
10       to, which is, you need to make sure that you give a
11       verbal answer to any question.  If you nod or shake
12       your head or give kind of an uh-huh or nuh-uh, that
13       can be hard for the court reporter and for everyone to
14       pick up, okay?
15   A.  Okay.
16   Q.  And I'm naturally pretty loud, but I'll ask you, as
17       was just requested on the phone, to try to keep your
18       voice up, just because we do have several people
19       listening on the phone, as well, okay?
20   A.  Okay.
21   Q.  If you don't understand the question that I've asked,
22       I would ask you to let me know that and ask me to
23       restate or rephrase the question, okay?
24   A.  Okay.
25   Q.  And if you do go ahead and answer a question, I'm

JUDITH KERMANS

1
2    going to assume that you did understand the question.
3    Fair enough?
4    A.  Yes.
5    Q.  I understand that you are testifying here today in
6        your capacity as a 30(b)(6) representative for Gabriel
7        Roeder Smith, is that correct?
8    A.  Yes.
9    Q.  Ms. Kermans, are you on any medication this morning
10       that would prevent you from being able to testify
11       truthfully and accurately today?
12   A.  No.
13   Q.  Any other reason that you can think of that you would
14       be unable to testify truthfully and accurately today?
15   A.  No.
16   Q.  If you want to take a break at any time, just let me
17       know.  The only thing that I would ask is that if
18       there's a question pending, you answer that question
19       before taking a break, okay?
20   A.  Okay.
21   Q.  Okay.  I'm going to hand you what I've premarked as
22       Kermans Exhibit 1.
23           MARKED FOR IDENTIFICATION:
24           DEPOSITION EXHIBIT 1
25           9:16 a.m.

JUDITH KERMANS

1
2           MR. HOWELL:  For identification purposes,
3        Kermans Exhibit 1 is the notice of 30(b)(6) deposition
4        of Gabriel Roder Smith & Company, Docket Number 5786,
5        filed July 7, 2014.
6    BY MR. HOWELL:
7    Q.  Ms. Kermans, do you recognize this document?
8    A.  Yes.
9    Q.  And did you review this document in advance of your
10       deposition?
11   A.  Yes.
12   Q.  And did you understand that pursuant to this 30(b)(6)
13       request, Gabriel Roeder Smith was to designate someone
14       who had knowledge of and was adequately prepared to
15       testify concerning the topics listed in the deposition
16       topic section of this 30(b)(6) notice?
17   A.  Yes.
18   Q.  And I just want to briefly go through the topics,
19       which we'll cover in more detail later, just to make
20       sure that you either have knowledge or are adequately
21       prepared to testify on those topics.
22           So beginning with topic one, actuarial
23       valuations performed by Gabriel Roeder of the DGRS and
24       DPFRS, first of all, you were involved in the
25       actuarial valuations performed by Gabriel Roeder for

4 (Pages 13 to 16)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 5 of 42

JUDITH KERMANS

1  GRS and PFRS for the period ending June 30, 2013,
2  correct?
3  A. Yes.
4  Q. Okay. And you have knowledge regarding the actuarial
5  valuations performed by Gabriel Roeder of the GRS and
6  PFRS over the last several years, correct?
7  A. Yes.
8  Q. And turning to topic three: Analysis performed by
9  Gabriel Roeder relating to projections of investment
10  rates of return of the GRS and PFRS.
11        Have you had an opportunity to prepare on
12  that topic, as well?
13  A. I don't know of any particular such assignments.
14  Q. You don't know of any analysis done by Gabriel Roeder
15  relating to projections of investment rates of return
16  for the GRS or PFRS?
17  A. No.
18  Q. And did you take the opportunity to inquire of others
19  at Gabriel Roeder as to whether anyone at Gabriel
20  Roeder had performed an analysis relating to
21  projection of investment rates of return for the GRS
22  or PFRS?
23  A. I don't understand what this topic is asking for.
24  Q. Okay. Let me ask you, did you, did you review the

JUDITH KERMANS

1  target investment rates used by Gabriel Roeder to
2  discount actuarial liability for the GRS and PFRS in
3  the most recent actuarial valuation?
4  A. I don't understand the question.
5  Q. You understand that as part of the actuarial
6  valuations performed by Gabriel Roeder Smith for the
7  GRS and PFRS, there's an investment return assumption
8  included?
9  A. Yes.
10  Q. And did you review the particular investment return
11  assumptions included in the recent actuarial
12  valuations for GRS and PFRS?
13  A. Yes.
14  Q. And are you aware of the fact that Gabriel Roeder
15  Smith has on occasion conducted experience studies
16  that relate to assumptions used in the actuarial
17  valuations for GRS and PFRS?
18  A. Yes.
19  Q. And did you have occasion in preparation for this
20  deposition to review any of those experience studies?
21  A. Yes.
22  Q. And is there anything else that you can think of that
23  you did in preparation for this deposition that
24  related to investment return assumptions that have

JUDITH KERMANS

1  been used by GRS or -- excuse me, that have been used
2  by Gabriel Roeder Smith in connection with actuarial
3  valuations of GRS or PFRS?
4  A. No.
5  Q. The fourth topic is analyses and reviews performed by
6  Milliman with respect to GRS and PFRS, as well as any
7  review by Gabriel Roeder of such analyses or reviews
8  and any communications concerning such analyses or
9  reviews.
10        So let me start by asking, have you
11  yourself prior to preparation for this deposition
12  analyzed -- or reviewed -- excuse me, reviewed any
13  analyses or reviews performed by Milliman of the work
14  that Gabriel Roeder Smith has done for either the GRS
15  or the PFRS?
16  MR. BULLOCK: Rush, objection, to the
17  extent that it violates the mediation confidentiality
18  order.
19  MR. HOWELL: Okay.
20  BY MR. HOWELL:
21  Q. I think it may be helpful, your counsel can tell me if
22  he disagrees, but I think it may be helpful to just
23  put on the record early on, for the ease of our
24  conversation for the rest of the day, that I'm not

JUDITH KERMANS

1  going to be asking you to divulge material that is
2  subject to any mediation privilege in this case.
3        If there are questions that you cannot
4  answer due to mediation privilege, I would like you to
5  make that clear. However, it should be understood
6  that I'm not asking you to provide any information
7  that you believe to be subject to the mediation
8  privilege. I'm sure your counsel will step in
9  throughout the day when he believes that may be a
10  concern, but I think we should make that clear.
11        Is that fair enough?
12  A. Yes.
13  Q. So let me go back and subject to your counsel's
14  instruction ask, prior to your preparation for this
15  deposition, had you ever reviewed any analysis or
16  reviews performed by Milliman that related to work
17  that Gabriel Roeder Smith had done for the GRS or
18  PFRS?
19  A. We did not, outside of mediation, do any of that type
20  of work.
21  Q. And in preparation for this deposition, did you review
22  any analysis or review of Gabriel Roeder Smith's work
23  for the GRS or PFRS that had been performed by
24  Milliman?

JUDITH KERMANS

1
2 A. I don't understand the question.
3 Q. Did you look at any Milliman documents in which anyone
4    at Milliman reviewed work done by Gabriel Roeder Smith
5    in its capacity as system actuary for the PFRS or GRS?
6 A. Could you repeat the question, please?
7 Q. Sure.
8         MR. HOWELL: Would you mind reading that
9   back?
10        (The following portion of the record was
11   read by the reporter at 9:24 a.m.:
12        Q. "Did you look at any Milliman documents
13     in which anyone at Milliman reviewed work
14     done by Gabriel Roeder Smith in its
15     capacity as system actuary for the PFRS or
16     GRS?")
17        MR. BULLOCK: Mr. Howell, I think it's
18   simply the form of the question, and rather than
19   lodging a formal objection, I think she's struggling
20   with analysis and review, because you said looked at
21   anything, and I think that there's a distinction
22   between the two, and I'm happy to work our way through
23   the question.
24        MR. HOWELL: Okay. Well, let me try to
25   address the form objection.

JUDITH KERMANS

1
2 BY MR. HOWELL:
3 Q. All I'm trying to figure out is, are you aware that
4    there came a time where Milliman began to do work for
5    the City of Detroit in which Milliman provided
6    opinions/comments on the work that Gabriel Roeder
7    Smith had done as system actuary?
8 A. Yes.
9 Q. And have you had occasion to review any documents from
10    Milliman reflecting that work that Milliman did
11    regarding the work that Gabriel Roeder Smith had done?
12 A. We have not been asked to perform any professional
13    reviews or analysis of the Milliman work outside of
14    mediation.
15 Q. And I am not -- so here's maybe where we're talking
16    past each other. I'm not asking whether Gabriel
17    Roeder Smith has done any kind of formal review or
18    formal analysis. I'm asking whether you have had the
19    opportunity to review analysis or review done by
20    Milliman that related to work that Gabriel Roeder
21    Smith had done.
22 A. We have not done any professional reviews or analysis
23    of any of the Milliman work.
24 Q. Okay. But you have in preparation for this deposition
25    at least been able to review -- to look at those

JUDITH KERMANS

1
2    Milliman documents without performing any sort of
3    formal analysis or review, correct?
4 A. Yes.
5 Q. With respect to topic number five, assumptions
6    underlying Gabriel Roeder's actuarial valuations,
7    including information provided to Gabriel Roeder by
8    the DGRS, DPFRS, or the City, is that a topic that you
9    have knowledge of?
10 A. Yes.
11 Q. With respect to topic number six, information provided
12    to Gabriel Roeder regarding the DGRS and DPFRS
13    investment policies, is that a topic which you have
14    knowledge of?
15 A. I have knowledge of the DGRS policy.
16 Q. So I take it from your answer, you do not have, you do
17    not have -- well, let me strike and go back.
18        So I take it from your answer that you do
19    not have knowledge of the PFRS investment policy?
20 A. Correct.
21 Q. And were you able to speak with others at Gabriel
22    Roeder Smith to confirm that Gabriel Roeder Smith does
23    not have access to the PFRS investment policy?
24 A. No.
25 Q. In topic number seven, any work done by Gabriel Roeder

JUDITH KERMANS

1
2    relating to health care benefits provided to retiree
3    participants of GRS and PFRS, do you have knowledge
4    regarding that topic?
5 A. Yes.
6 Q. And, finally, any analysis performed by Gabriel Roeder
7    relating to the City's plan of adjustment, do you have
8    knowledge regarding that topic?
9 A. We've not been asked to do a formal evaluation or
10    review of the plan of adjustment.
11 Q. Okay, thanks. So you kind of anticipated my next
12    question there, but in addition to not having reviewed
13    the City's plan of adjustment, is it also fair to say
14    that Gabriel Roeder Smith was not involved in the
15    drafting or creation of the City's plan of adjustment?
16 A. We have not done any work on the plan of adjustment
17    outside of mediation.
18 Q. Have you ever been asked by the City -- and when I say
19    you, I mean Gabriel Roeder Smith -- has Gabriel Roeder
20    Smith ever been asked by the City to assist with the
21    drafting or creation of any of the various amended
22    plans of adjustment in this case?
23 A. We have not done any analysis or drafting, or
24    otherwise, outside of the mediation process.
25 Q. I understand that you haven't done any analysis or

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 7 of 42

JUDITH KERMANS

1  
2  done any drafting outside of the mediation process,  
3  but outside of the mediation process, have you been  
4  asked by the City to do any analysis or any drafting  
5  or any assistance with the creation of any of the  
6  plans of adjustment?  
7  A. No.  
8  Q. And is that something that Gabriel Roeder Smith would  
9  have been able to do if, if requested, specifically,  
10  to assist with work regarding the claim for the GRS or  
11  PFRS retirement systems as listed under the plan of  
12  adjustment?  
13  MR. BULLOCK: I'm going to object to the  
14  form of the question. There's an awful lot, I  
15  believe, in the plan of adjustment. So for purposes  
16  of Gabriel Roder Smith & Company, I don't believe my  
17  witness is able to respond to that question unless  
18  it's asked more specifically.  
19  MR. HOWELL: Well, let me --  
20  BY MR. HOWELL:  
21  Q. Did you understand the question?  
22  A. No.  
23  Q. Okay. Gabriel Roeder Smith has conducted multiple  
24  actuarial -- Gabriel Roeder Smith has conducted  
25  multiple actuarial valuations for the GRS and PFRS,

JUDITH KERMANS

1  
2  correct?  
3  A. Yes.  
4  Q. And as part of those actuarial valuations, GRS -- or  
5  excuse me, Gabriel Roeder Smith has calculated a UAAL  
6  for the GRS and PFRS for many years, correct?  
7  A. Yes.  
8  Q. And are you aware that as part of the plan of  
9  adjustment, a UAAL was calculated for both the PFRS  
10  and GRS?  
11  A. We've not been asked to do a formal analysis or review  
12  of the plan of adjustment.  
13  Q. I think my question was a little bit different, which  
14  is, are you aware that in the plan of adjustment,  
15  there has been a calculation done for the UAAL for the  
16  PFRS and GRS as of June 30, 2013?  
17  A. I can't tell you whether it's a UAAL that's in the  
18  plan of adjustment.  
19  Q. But you understand that there has been a calculation  
20  of a claim amount for the PFRS and GRS retirement  
21  systems that's included in the various versions of the  
22  plan of adjustment, correct?  
23  A. Yes.  
24  Q. And do you have an understanding as to which actuarial  
25  firm provided those calculations?

JUDITH KERMANS

1  
2  A. No.  
3  Q. But it was not Gabriel Roeder Smith, correct?  
4  A. It was not.  
5  Q. How long has Gabriel Roeder Smith worked with the  
6  PFRS?  
7  A. For over 70 years.  
8  Q. How long has Gabriel Roeder Smith worked with the GRS?  
9  A. For over 70 years.  
10  Q. And it's fair to say that Gabriel Roeder Smith has a  
11  long history of a working relationship with both PFRS  
12  and GRS, correct?  
13  A. Yes.  
14  Q. And, to your knowledge, have there been any complaints  
15  from the PFRS or GRS related to the actuarial  
16  valuation performed by Gabriel Roeder Smith for the  
17  PFRS and for the GRS as of June 30, 2013?  
18  A. Could you repeat the question?  
19  Q. Sure. So -- let me ask it a little bit better.  
20  So Gabriel Roeder Smith performed an  
21  actuarial valuation for the PFRS as of June 30, 2013,  
22  correct?  
23  A. Yes.  
24  Q. And that was completed in around April of 2014, is  
25  that correct?

JUDITH KERMANS

1  
2  A. Yes.  
3  Q. And since submitting that actuarial valuation of the  
4  PFRS, has Gabriel Roeder Smith received any complaints  
5  from the PFRS regarding the accuracy of the work done  
6  by Gabriel Roeder Smith in its annual actuarial  
7  valuation for the PFRS as of June 30, 2013?  
8  A. No.  
9  Q. Gabriel Roeder Smith also conducted a June 30, 2013,  
10  actuarial valuation for the GRS, correct?  
11  A. Yes.  
12  Q. Gabriel Roeder Smith also submitted that actuarial  
13  valuation for the GRS around April of 2014, correct?  
14  A. Yes.  
15  Q. Have there been any complaints from the GRS regarding  
16  the accuracy of the actuarial valuation for the GRS  
17  performed as of June 30, 2013?  
18  A. No.  
19  Q. Any other complaints that you are aware of that the  
20  GRS has made regarding the annual actuarial valuation  
21  as of June 30, 2013, for the GRS?  
22  A. No.  
23  Q. Any other complaints that you're aware of -- or any  
24  complaints that you're aware of from the PFRS  
25  regarding Gabriel Roeder Smith's June 30, 2013, annual

```
1              JUDITH KERMANS
2     actuarial valuation for the PFRS?
3     A.  No.
4     Q.  Would you say that Gabriel Roeder Smith or Milliman
5     has more knowledge of the history of the PFRS and GRS
6     systems?
7     A.  Gabriel Roeder Smith.
8     Q.  Would you say that Gabriel Roeder Smith or Milliman
9     has more extensive history of work with the PFRS?
10    A.  Gabriel Roeder Smith.
11    Q.  The same for the GRS?
12    A.  Yes.
13          MR. BULLOCK:  Right, I'd like to make sure
14    our record is accurate.  If you're moving off the
15    notice now, I suspect, where you've referenced the
16    notice of the 30(b)(6) deposition of Gabriel Roder
17    Smith & Company, found at Docket 5786, filed on 7-7 of
18    2014, we're actually here on the second amended
19    notice, found at Docket 6439.
20          And although Ms. Kermans has, I think,
21    adequately and accurately recited the breadth of her
22    knowledge and will continue to testify, the second
23    amended notice, which provided at exhibit, or
24    schedule A the subject matter --
25          MR. HOWELL:  Yes.
```

```
1              JUDITH KERMANS
2          MR. BULLOCK:  -- there is no schedule A and
3     no subject matter on the second amended notice.
4          You may continue.
5          MARKED FOR IDENTIFICATION:
6          DEPOSITION EXHIBIT 2
7          9:38 a.m.
8     BY MR. HOWELL:
9     Q.  I'm going to hand you what I've marked as Kermans
10    Exhibit 2.
11          MR. HOWELL:  For identification purposes,
12    Kermans Exhibit 2 does not have a Bates range, however
13    is labeled Gabriel Roder Smith & Company, a document
14    entitled the Police and Fire Retirement System of the
15    City of Detroit, 72nd Annual Actuarial Valuation,
16    June 30, 2013, and was produced in this case.
17          I'm not sure of the entity due to the lack
18    of a Bates number.
19    BY MR. HOWELL:
20    Q.  Ms. Kermans, do you recognize this document?
21    A.  Yes.
22    Q.  And is this document the annual actuarial valuation as
23    of June 30, 2013, for the PFRS that we've referenced a
24    couple of times?
25    A.  Yes.
```

```
1              JUDITH KERMANS
2     Q.  Now, if you turn to page 2 of an April 4 -- well, I
3     guess if you turn to the third page of this document,
4     do you see a letter from April 4, 2014, to the board
5     of trustees of the Police and Fire Retirement Systems
6     that's from Gabriel Roeder Smith?
7     A.  Yes.
8     Q.  And if you turn to the second page of this letter, you
9     were one of the signatories to this letter, correct?
10    A.  Yes.
11    Q.  Now, kind of in general terms, can you tell me what
12    the purpose of performing an annual actuarial
13    valuation for a pension system is?
14    A.  The purpose is to determine the contribution rate for
15    the fiscal year that is lined up with the valuation.
16    Q.  Could you also walk me through the process that
17    generally would go into the creation of an annual
18    actuarial valuation for a pension system?
19    A.  The general process would be that we would request
20    information from the retirement system, and then we
21    would receive that information, including census data,
22    financial information, and plan provisions.
23          Then we would review that information, ask
24    any questions, receive responses to the questions,
25    process the data, and calculate the contribution rate,
```

```
1              JUDITH KERMANS
2     draft a report, meet with the retirement system
3     trustees.  That would be it.
4     Q.  Would you typically meet with the retirement system
5     trustees before or after issuing a draft report?
6     A.  I don't understand the question.
7     Q.  Well, two of the steps that you laid out, one was
8     Gabriel Roeder Smith will typically draft a report,
9     correct?
10    A.  Yes.
11    Q.  And another step you said was that Gabriel Roeder
12    Smith will typically meet with retirement system
13    trustees, correct?
14    A.  Yes.
15    Q.  Is the meeting -- in kind of a general sense, is the
16    meeting with retirement system trustees typically
17    before or after Gabriel Roeder Smith has issued a --
18    its report to the retirement systems?
19    A.  We issue a draft report to the retirement systems.
20    Then we meet with the retirement systems to review the
21    report with them, and then afterwards we issue a final
22    report.
23    Q.  And what is the purpose of the meeting with the
24    retirement system trustees after you've submitted a
25    draft report but before you have submitted the final
```

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

JUDITH KERMANS

1
2 report?
3 A.  To go through the results of the valuation.
4 Q.  And if the retirement system trustees have issues that
5     they see with the draft report, is that an opportunity
6     for them to raise those issues with Gabriel Roeder
7     Smith?
8 A.  Yes.
9 Q.  And from time to time will Gabriel Roeder Smith make
10    adjustments to its draft report that will be reflected
11    in the final report based on the conversation, the
12    meeting with a pension plan's board of trustees?
13 A.  Rarely, but yes.
14 Q.  Can you recall whether there was a meeting with the
15    PFRS retirement system trustees between issuing a
16    draft report and the final report of this 72nd annual
17    actuarial valuation for the period ending June 30,
18    2013?
19 A.  I believe there was a meeting.
20 Q.  And do you recall whether as a result of that meeting
21    there were any changes between the draft report
22    submitted to the PFRS and the final report submitted
23    to the PFRS?
24 A.  Well, the draft report is actually only a portion of
25    the final report.

JUDITH KERMANS

1
2 Q.  What, typically, would be added between the draft
3     stage and the final stage to this sort of annual
4     actuarial valuation?
5 A.  The draft report only has three or four key pages from
6     the full report.
7 Q.  And which are the key pages from a draft -- or from
8     what will become a final report that are usually
9     included in the draft report?
10 A.  I don't recall all of the pages, but the -- page 3
11    would have been included in the draft.
12 Q.  And when you say page 3, you're referring to the page
13    marked 3 of Kermans Exhibit 2 that says Employer
14    Contribution Rates Computed Payable Last Day of Fiscal
15    Year at the top?
16 A.  Yes.
17 Q.  Other than that page 3, are there any other pages here
18    that you would recognize as being part of the key
19    pages that would be included in a draft?
20 A.  Page 20.
21 Q.  And page 20 is the one with funding value of assets at
22    the top, correct?
23 A.  Yes.
24 Q.  Okay.  Other than page 3 and page 20, do you recognize
25    any additional pages that would be part of the key

JUDITH KERMANS

1
2 pages that would include the -- that would be included
3 in the draft report?
4 A.  Pages 13 and 14.
5 Q.  Pages 13 and 14 are the comments and conclusion pages?
6 A.  Yes.
7 Q.  And, typically, would the comments and conclusion
8     pages undergo any changes between draft and final
9     absent any comments from the trustees during a review?
10 A.  No.
11 Q.  So you've help me out by pointing out pages 3, pages
12    13 and 14 and 20 as key pages.  Any others that you've
13    noted?
14 A.  I can't recall.
15 Q.  Now, turning back to the April 4, 2014, letter that is
16    pages, the pages marked 1 and 2 in this Kermans
17    Exhibit 2, what is the purpose of this letter that is
18    at the front of the annual actuarial valuation?
19 A.  The purpose of the letter is to indicate what the
20    purpose of the report is for.
21 Q.  And that purpose of the report is the same that you've
22    described to me a few minutes ago regarding why
23    Gabriel Roeder Smith typically issues annual actuarial
24    valuations?
25 A.  Yes.

JUDITH KERMANS

1
2 Q.  And this particular annual actuarial valuation, I take
3     it, is the final, not a draft report, correct?
4 A.  Yes.
5 Q.  And it was issued in April of 2014, correct?
6 A.  Yes.
7 Q.  And the PFRS was already in -- or, excuse me, the --
8     as of April 4, 2014, the City of Detroit was already
9     in bankruptcy, correct?
10 A.  Yes.
11 Q.  Now, the date of the valuation was June 30, 2013.  Is
12    the time period between June 30, 2013, and the
13    issuance of this annual actuarial valuation on
14    April 4, 2014, typical for around the amount of time
15    that usually takes place between a valuation date and
16    the issuance of a valuation report?
17 A.  It varies.
18 Q.  And if you had to kind of ballpark the general range,
19    around how long would you say that variance is, from
20    how long to how long?
21 A.  Could you repeat the question?
22 Q.  Sure.  In your typical experience, what would you say
23    is the range of time between the measurement date for
24    a valuation report and the date of issuance of that
25    valuation report?

### JUDITH KERMANS

2 A. Six months to a year.
3 Q. So the time between the valuation date here and the
4 issuance of this final report would fit, you know,
5 well within that kind of typical range, fair to say?
6 A. Yes.
7 Q. There's an appendix to, to the annual actuarial
8 valuation that lists the actuarial assumptions used in
9 the valuation, correct?
10 A. I would not call it an appendix.
11 Q. Okay. Well, I'm specifically referring to the
12 section -- well, first of all, let's look at page 1 of
13 the April 4 letter. About two-thirds of the way down
14 the page there's a paragraph beginning the actuarial
15 assumptions. Do you see that?
16 A. Yes, it's called an appendix.
17 Q. Okay. Well, just to be clear for the record, so the
18 actuarial assumptions used in the valuation are, are
19 what I'll find in the section that's marked appendix
20 in this report, correct?
21 A. Yes.
22 Q. And are these assumptions that are included in the
23 appendix in whole or in part provided to the, the
24 retirement system in advance of issuance of the final
25 report?

### JUDITH KERMANS

2 A. I don't recall whether they are part of the draft
3 report.
4 Q. And you don't recall whether they typically are or
5 whether they specifically were in this case, is that
6 fair?
7 A. Either.
8 Q. Now, some of the assumptions would be included in the
9 comments and conclusion section that you said was
10 included in the draft report that's on pages 13 and
11 14, correct?
12 A. Yes.
13 Q. For instance, under experience during the past year on
14 page 13, we can see that there is an assumed eight
15 percent --
16 MR. BULLOCK: Just hold on a minute.
17 MR. HOWELL: Certainly, sorry.
18 MR. BULLOCK: Thank you. Okay, go ahead.
19 MR. HOWELL: I'm sorry about that.
20 MR. BULLOCK: And I apologize for
21 interrupting you. I just think it's important --
22 MR. HOWELL: No problem.
23 MR. BULLOCK: -- that she sees that, so ...
24 BY MR. HOWELL:
25 Q. So are you with me on page 13, the comments and

### JUDITH KERMANS

2 conclusion section?
3 A. Yes.
4 Q. And you see that kind of the first section on that
5 page is experience during the past year?
6 A. Yes.
7 Q. And you see that it says: Investment experience for
8 the year ended June 30, 2013, was favorable, with a
9 market rate of return of 14.4 percent, which is 6.4
10 percent above the assumed 8 percent investment rate of
11 return. Do you see that?
12 A. Yes.
13 Q. So that would be an example of one of the actuarial
14 assumptions that was included, the eight percent
15 investment rate of return assumption that was included
16 in the draft report, correct?
17 A. Yes.
18 Q. Now, I'll turn your attention to page 2 of the April 4
19 letter that's at the, kind of the front of Kermans
20 Exhibit 2, and let me know when you're with me there.
21 A. I'm there.
22 Q. Okay, and the second -- well, actually, let me start
23 with -- at the bottom there are three different people
24 who have signed this letter, correct?
25 A. Yes.

### JUDITH KERMANS

2 Q. Can you describe what your role -- you were one of the
3 three signatories, correct?
4 A. Yes.
5 Q. Can you describe what your role was in putting
6 together the 72nd annual actuarial valuation, dated
7 June -- for the period ending June 30, 2013, for the
8 PFRS?
9 A. I'm one of the signing actuaries.
10 Q. And as a signing actuary, what are your kind of roles
11 and responsibilities with respect to an actuarial
12 valuation?
13 A. A signing actuary has responsibility for the report
14 and the contents of it.
15 Q. Now, earlier you described several steps that go into
16 the creation of one of these annual actuarial
17 valuation reports, including requesting information
18 from the system, review of that information,
19 requesting the data, et cetera, et cetera.
20 As a signing actuary, kind of what steps
21 are you involved in in the process, other than kind of
22 ultimate signoff on the material that's contained
23 within the report?
24 A. I would review the analysis that was done by one of
25 the team members of the data that was received, I

10 (Pages 37 to 40)

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 11 of 42

JUDITH KERMANS

would review any calculations, and I would compare our
four-person peer review and analysis procedures with
what was done, and I would perhaps draft some of the
comments or review comments that were drafted by
others, and I would be responsible for the
presentation to the board of trustees.

Q. One of the things that you said you would be involved
with was to review the analysis done by team members
for the project, is that correct?

A. Yes.

Q. Do you recall how many people were on the team for
putting together the June 30, 2013, annual actuarial
valuation for the PFRS?

A. Yes.

Q. How many people were on the team?

A. The three folks listed here; plus, there would be one
or two analysts involved, as well.

Q. Is it the same team for the PFRS and the GRS actuarial
valuation reports?

A. These three folks are involved in both. The analysts
might not be the same.

Q. And can you recall how many analysts you used for the
June 30, 2013, actuarial valuation for the GRS?

A. Two.

JUDITH KERMANS

Q. And I think you said it was one or two for the PFRS.
Do you remember, specifically?

A. It's two for the PFRS, as well.

Q. And I take it that you work as signing actuary for
multiple projects, not just for the PFRS and GRS,
correct?

A. Correct.

Q. And you work with different analysts when you work on
different projects, is that correct?

A. Yes.

Q. And have you had an opportunity to work with the
analysts who you worked with on the PFRS valuation for
June 30, 2013, on other projects, as well?

A. Yes.

Q. And are you -- do you have a favorable opinion of the
work done by those analysts?

A. Yes.

Q. Do you also have experience outside of the GRS
valuation in working with the analysts who assisted
with the GRS valuation?

A. Yes.

Q. And do you have a favorable opinion of the work done
by those analysts?

A. Yes.

JUDITH KERMANS

Q. Now, what was the role of Kenneth Alberts with respect
to putting together this valuation?

A. Kenneth is the project coordinator.

Q. And, in general, what are the roles and
responsibilities of a project coordinator at Gabriel
Roeder Smith working on a valuation report?

A. Kenneth would supervise the analysts that are doing
the initial work and make sure that information is
received and analyzed from the client. Kenneth also
would be one of the individuals that would go to the
meeting with the board of trustees.

Q. Would you have the role as sort of the lead presenter
of -- to the board of trustees of the report?

A. It would be a shared responsibility with either David
or Kenneth --

Q. Okay.

A. -- and myself.

Q. So let's speak about David. How do you pronounce this
is last name?

A. Kausch.

Q. Okay. So what were David Kausch's responsibilities
with respect to this PFRS valuation report that's
Exhibit 2?

A. Similar to my responsibilities, he's the other signing

JUDITH KERMANS

actuary.

Q. Does Gabriel Roeder Smith typically have two signing
actuaries for valuation reports they provide?

A. Yes.

Q. Have you had an opportunity to work with Mr. Kausch on
other assignments during your time at Gabriel Roeder
Smith?

A. Yes.

Q. And what's your opinion of the work done by
Mr. Kausch?

A. It's excellent.

Q. And the same question for the work generally done by
Mr. Alberts.

A. Same opinion.

Q. So it's fair to say that you feel that the team that
worked on this, these June 30, 2013, actuarial
valuations for both PFRS and GRS is a competent
valuation report team?

A. Yes.

Q. And you would consider your co-workers to be a team
that you're excited and happy to work with, correct?

A. Yes.

Q. To the extent that any of us can be excited and happy
to work with on any project.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

JUDITH KERMANS

1
2          Now, in, in the list of kind of roles and
3    responsibilities that you provided for the signing
4    actuary on a valuation report, one thing that you said
5    was prepare for peer review. Can you describe what
6    the process is for having an actuarial valuation peer
7    review at Gabriel Roeder Smith?
8    A.  We have a four-person process at Gabriel Roder Smith &
9       Company that involves a doer, a checker, a reviewer,
10      and a peer reviewer.
11   Q.  Okay. What does the doer do?
12   A.  The doer is the individual that takes the data and
13      pushes it through the Gabriel Roder Smith & Company
14      proprietary software, does the initial calculations
15      and spreadsheet work.
16   Q.  So here that would have been one of the two analysts
17      on the team for either PFRS or GRS?
18   A.  Yes.
19   Q.  What does the checker do?
20   A.  The checker reviews all of the calculations and
21      decisions of the doer.
22   Q.  I'm going to guess, I could be wrong here, but would
23      Mr. Alberts be in the role of the checker here or is
24      it someone else that's one of the analysts?
25   A.  The analysts.

JUDITH KERMANS

1
2    Q.  Okay. Who, then, serves as the reviewer for this
3       project?
4    A.  It depends. We do occasionally switch those roles. I
5       believe that Mr. Alberts was the reviewer on this
6       particular report.
7    Q.  And the role of a reviewer, then, I take it is just
8       what you laid out earlier when you spoke about
9       Mr. Alberts' kind of roles and responsibilities on
10      this project, is that accurate?
11   A.  Yes.
12   Q.  And then the peer reviewer, what does the peer
13      reviewer do?
14   A.  The two peer reviewers in this case look everything
15      over, check for reasonableness, compare the decisions
16      made with actuarial standards of practice, and see if
17      the results seem reasonable, make sure all of the work
18      was done in a proper fashion.
19   Q.  Are the peer reviewers typically other signing
20      actuaries that work on other projects, or is there
21      another group of people who typically do peer review?
22   A.  We all do peer review if we are credentialed.
23   Q.  And do you recall who did the peer review for the
24      June 30, 2013, valuations for PFRS and GRS?
25   A.  Both David Kausch and myself.

JUDITH KERMANS

1
2    Q.  Would anyone else besides the three people listed here
3       be involved in the peer review process in looking over
4       this valuation report?
5    A.  Not officially.
6    Q.  How about unofficially?
7    A.  Any number of people may have looked at this report.
8    Q.  So from time to time when working on a report at
9       Gabriel Roeder Smith you may ask some of your other
10      certified colleagues to take a look at a report and
11      give their thoughts or comments?
12   A.  Correct.
13   Q.  And do you remember whether that was specifically done
14      with respect to this report or not?
15   A.  I don't.
16   Q.  Okay. In the second paragraph on page 2, it begins:
17      This report has been prepared by actuaries. Do you
18      see that --
19   A.  Yes.
20   Q.  -- paragraph? Okay. So that sentence says: This
21      report has been prepared by actuaries who have
22      substantial experience valuing public sector
23      retirement systems.
24          You stand behind that statement, right?
25   A.  Yes.

JUDITH KERMANS

1
2    Q.  Do you personally have substantial experience valuing
3       public sector retirement systems?
4    A.  Yes.
5    Q.  Around how many different public sector retirement
6       systems have you had the opportunity to work in
7       valuing?
8          MR. BULLOCK: Counsel, are you looking for
9       simply an estimate?
10         MR. HOWELL: Yes, just an estimate.
11   A.  Fifty.
12   BY MR. HOWELL:
13   Q.  Do you have an understanding as to around the number
14      of public sector retirement systems that Mr. Kausch
15      would have valued in the past, just -- again, just an
16      estimate?
17   A.  Twenty-five.
18   Q.  Same question for Mr. Alberts.
19   A.  Fifty.
20   Q.  The next sentence says: To the best of our knowledge,
21      this report is complete and accurate and was made in
22      accordance with standards of practice promulgated by
23      the Actuarial Standards Board of the American Academy
24      of Actuaries.
25          You stand behind that statement, correct?

JUDITH KERMANS

1    A.  Yes.
2    Q.  Since issuing this report, have you become aware of
3        any inaccuracies within this report?
4    A.  No.
5    Q.  Since issuing the report dated -- well, issued in
6        April of 2014 but that was for the period ending
7        June 30, 2013, for the GRS, are you aware of any
8        inaccuracies in that report?
9    A.  No.
10   Q.  Do you still today believe this report to be complete
11       as it was at the time that you issued it?
12   A.  Yes.
13   Q.  The next sentence says:  The actuarial assumptions
14       used for the valuation produce reports which,
15       individually and in the aggregate, are reasonable.
16           Do you see that?
17   A.  Yes.
18   Q.  And you stand by that statement, correct?
19   A.  Yes.
20   Q.  And so if I understand that statement correctly, it
21       means that the, the individual actuarial assumptions,
22       they are each, in the view of Gabriel Roeder Smith,
23       reasonable actuarial assumptions, correct?
24   A.  For this purpose of this report, yes.

JUDITH KERMANS

1    Q.  And apologies if I've asked this already, but could
2        you elaborate what you mean by for the purpose of this
3        report?
4    A.  This report is a specific measurement, the calculation
5        of a contribution rate for a fiscal year.  For that
6        purpose, the assumptions are, individually and in the
7        aggregate, reasonable.
8    Q.  Now, in order to get to that contribution rate,
9        another calculation that goes into this report is the
10       calculation of the UAAL as of June 30, 2013, for the
11       PFRS, correct?
12   A.  Yes.
13   Q.  And in order for the calculation for the contribution
14       rate to be complete and accurate, the calculation for
15       the UAAL as of June 30, 2013, also needs to be
16       complete and accurate, correct?
17   A.  Yes.
18   Q.  In the fourth paragraph it says:  David Kausch and
19       Judith Kermans are members of the American Academy of
20       Actuaries (MAAA).
21           Could you just briefly describe for me what
22       the American Academy of Actuaries is?
23   A.  It's one of the professional organizations that
24       actuaries typically belong to.  It provides guidance

JUDITH KERMANS

1    on how to do our work.
2    Q.  Do you have any other -- are you a member of any other
3        actuarial associations besides the American Academy of
4        Actuaries?
5    A.  I am a member of the Conference of Consulting
6        Actuaries.  I'm a fellow of the Conference of
7        Consulting Actuaries.
8    Q.  Are you aware of whether or not Mr. Kausch is a member
9        of any other actuarial associations besides the
10       American Academy of Actuaries?
11   A.  He's a fellow of the Society of Actuaries.  I also
12       believe that he is a fellow of the Conference of
13       Actuaries.
14           MR. GALLAGHER:  Mr. Howell, Sean Gallagher
15       here.  It sounds to me like we've had someone else
16       join the conference on the telephone, but we didn't
17       get a name of that person.
18           Could that person please announce their
19       presence on the phone?
20           MR. GROSMAN:  Yes, it's Chris Grosman, from
21       the Carson Fischer firm, on behalf of Oakland County.
22           MR. GALLAGHER:  Thank you, Mr. Grosman.
23       Sorry, Rush.
24           MR. HOWELL:  No, thanks for pointing that

JUDITH KERMANS

1    out.
2    BY MR. HOWELL:
3    Q.  What are the qualification standards of the American
4        Academy of Actuaries to render actuarial opinions?
5    A.  We have actuarial standards of practice that we have
6        to follow when we do our work, and the American
7        Academy of Actuaries provides those standards for us.
8        There are 48 of them.
9    Q.  Do you have to take any sort of test or is it -- or is
10       there a different process by which you meet the
11       qualification standards?
12   A.  You meet the qualifications through exam, examinations
13       and also through experience.
14   Q.  In the bottom full paragraph on this page it says:
15       The plan sponsor (City of Detroit) is currently in
16       Chapter 9 bankruptcy.  Due to this situation, there is
17       a great deal of uncertainty regarding the structure of
18       the plan.  If the plan structure changes as a result
19       of the bankruptcy, the board should consider having
20       this report reissued to account for those changes.
21           Do you see that?
22   A.  Yes.
23   Q.  And you believe that was a prudent recommendation at
24       the time?

13 (Pages 49 to 52)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 14 of
42

JUDITH KERMANS

1
2    A.  Yes.
3    Q.  Has the board for the PFRS reached out to Gabriel
4        Roeder Smith regarding having this report reissued?
5    A.  No.
6    Q.  Has the board of the GRS reached out to Gabriel Roeder
7        Smith about having the GRS June 30, 2013, valuation
8        report reissued?
9    A.  No.
10   Q.  If you'll turn with me to page 4 of Kermans Exhibit 2,
11       at the top it says Actuarial Accrued Liabilities as of
12       June 30, 2013.  Are you -- tell me when you're with me
13       there.
14   A.  I'm there.
15           MR. BULLOCK:  Counsel, we've been at this
16       for about an hour.  When you find a reasonable place
17       to break, can we take a minute or two break?
18           MR. HOWELL:  I'm perfectly happy to break
19       now if we'd like to take a five or ten-minute break.
20           MR. BULLOCK:  This would be a good point.
21           MR. HOWELL:  Okay, great.
22           MR. BULLOCK:  Thank you.
23           VIDEO TECHNICIAN:  The time is 10:09 a.m.
24       We are now off the record.
25           (Off the record at 10:09 a.m.)

JUDITH KERMANS

1
2           (Back on the record at 10:22 a.m.)
3           VIDEO TECHNICIAN:  The time is 10:22 a.m.
4       We are now on the record.
5    BY MR. HOWELL:
6    Q.  Ms. Kermans, before we went off the record, we were
7        looking at page 4, or the page marked 4 in Kermans
8        Exhibit 2, the June 20 -- June 30, 2013, valuation for
9        PFRS.  Are you with me on page 4 there?
10   A.  Yes.
11   Q.  And this page is entitled Actuarial Accrued
12       Liabilities as of June 30, 2013, correct?
13   A.  Correct.
14   Q.  And the unfunded actuarial accrued liability,
15       otherwise known as UAAL, at the bottom of the page is
16       listed at a little over $415,600,000 right?
17   A.  Correct.
18   Q.  Now, there's a pound signal that, if we follow to the
19       bottom of the page shows that that number assumes that
20       past-due contributions of $71 million are not made.
21       Do you see that?
22   A.  Yes.
23   Q.  Do you have an understanding as to what those $71
24       million of past-due contributions refer to?
25   A.  Contributions for prior fiscal years.  If you look at

JUDITH KERMANS

1
2        page 3, you can match it.
3    Q.  And where on page 3 will I match that $71 million in
4        prior-year contributions that were not made?
5    A.  Under the row titled past-due payments for fiscal year
6        2013.
7    Q.  And do you have an understanding as to whether those
8        past-due payments of fiscal year 2013 were entirely
9        past-due payments during that year or whether that
10       included the roll forward of other past-due payments
11       from prior years besides fiscal year 2013?
12   A.  I don't understand the question.
13   Q.  Well, I guess my question is, do you have an
14       understanding as to whether there were past-due
15       payments for fiscal year 2012 at the time of the
16       June 30, 2012, valuation report?
17   A.  I don't have an understanding.
18   Q.  And so you don't know whether that $71 million of
19       past-due payments from fiscal year 2013 all related to
20       payments that originated in fiscal year 2013?
21   A.  The 71 million is entirely related to past-due
22       payments from fiscal year 2013.  I don't know if there
23       were additional payments that were outstanding at the
24       time from '12.
25   Q.  If you turn with me to page 5, with Valuation Results

JUDITH KERMANS

1
2        Comparative Statement at the top?
3    A.  Yes.
4    Q.  We see that the computed total in the second-to-bottom
5        row, the 2013(c) for the actuarial accrued liability,
6        or the AAL, is $3,890,000 and change, correct?
7    A.  Yes.
8    Q.  And then the unfunded amount in 2013(c) is that 415
9        million amount that we just saw, correct?
10   A.  Yes.
11   Q.  And if you subtract out the 71 million in past
12       contributions or you assume that those contributions
13       will be made, that's what would take you to row
14       2013(d), correct?
15   A.  Yes.
16   Q.  Now, if I want to get an unfunded percentage, I could
17       just take the unfunded number there of 415 million and
18       change and divide that by the AAL computed total of
19       3.89 million and change, correct -- 3.89 billion and
20       change, correct?
21   A.  I don't understand the purpose of that calculation.
22   Q.  Well, that's okay, I'm just asking -- I mean, you do
23       calculate -- in fact, in this report you list a funded
24       percentage, correct?
25   A.  Correct.

```
 1              JUDITH KERMANS
 2   Q.  And it may take me a couple questions that don't make
 3       sense to get to that, but if I wanted to know the
 4       unfunded percentage, it would be one minus the funded
 5       percentage, correct?
 6   A.  Correct.
 7   Q.  Okay.  So if you have a 90 percent funded percentage,
 8       you have a 10 percent unfunded percentage, fair
 9       enough?
10   A.  Yes.
11   Q.  So if I wanted to know what the unfunded percentage
12       was here, I could take the 415 million and divide that
13       by the AAL number of 3.89 billion, correct?
14   A.  Yes.
15   Q.  And so if I wanted the funded percentage, it would be
16       one minus the result of 415 million and change divided
17       by 3.89 billion and change, right?
18   A.  Yes.
19   Q.  And now that funded percentage, if you turn with me to
20       page 13, the comments and conclusion section, under
21       the section that's employer contribution rate, are you
22       with me in that section?
23   A.  Yes.
24   Q.  About halfway down the paragraph there's a sentence
25       that says:  As of June 30, 2013, the system is 89.3
```

```
 1              JUDITH KERMANS
 2       percent funded, so the computed employer contribution
 3       is above the employer normal cost.
 4              Do you see that?
 5   A.  Yes.
 6   Q.  And that 89.3 funded percentage is, subject to, you
 7       know, rounding, is the same amount that we would get
 8       if we did that calculation I just talked about a
 9       moment ago, where we take 415 million, divided by 3.89
10       billion, and then subtract that result from one,
11       correct?
12   A.  Yes.
13   Q.  Now, that 89.3 percent funded percentage is a
14       calculation that you reviewed, right, as the signing
15       actuary?
16   A.  Yes.
17   Q.  And it's a calculation that you believe was correct at
18       the time the report was issued, correct?
19   A.  Yes.
20   Q.  And you have no reason between the time the report was
21       issued on April 4, 2014, and today to think that
22       number's incorrect, right?
23   A.  I don't think the number is incorrect.
24   Q.  Now, that number is not done with the unfunded -- or,
25       excuse me, let me strike that.
```

```
 1              JUDITH KERMANS
 2       That 89.3 funded percentage is not done on
 3   a market value basis, correct?
 4   A.  Correct.
 5   Q.  Now, could you describe for me the difference between
 6       that funded percentage calculation and a funded
 7       percentage calculation done on a market value basis?
 8   A.  In this plan, if that calculation were done on a
 9       market value basis, the number would be 78 percent
10       rather than 89.3 percent.
11   Q.  Okay, and I may not have asked the question very
12       clearly.  I understand that that's the result.  I'm
13       asking, in kind of a more general sense, what's the
14       difference between a market value funding percentage
15       calculation and the calculation that led to the 89.3
16       percent, not the actual numerical difference but kind
17       of the methodological difference?
18   A.  The numerator is a different number.
19   Q.  And why is that?
20   A.  One uses the funding value as the numerator and the
21       other uses the market value as the numerator.
22   Q.  And that's the funding value of unfunded assets?
23   A.  It's the funding value of assets.
24   Q.  Okay.  So would the assets, in performing that
25       calculation, be in the numerator or the denominator?
```

```
 1              JUDITH KERMANS
 2   A.  In the numerator.
 3   Q.  And how does the -- how does Gabriel Roeder Smith
 4       arrive at a funding value of assets as opposed to a
 5       market value of assets, in particular for the PFRS?
 6          MR. BULLOCK:  Counsel, while she's flipping
 7       pages, there was a request a few minutes ago that we
 8       move some microphones around and she speak up.  Does
 9       anyone know if we're having some success here in terms
10       of reception?
11          Can everyone hear us on line?
12          MR. CROWDER:  Yes.
13          MR. BULLOCK:  Can you hear the witness?
14          MR. CROWDER:  Yes, we can.
15          MR. BULLOCK:  Good.  Thank you, counsel.
16   BY MR. HOWELL:
17   Q.  So my question was, how does Gabriel Roeder Smith,
18       specifically for the PFRS, arrive at a funding value
19       of assets versus a market value of assets?
20   A.  That calculation is illustrated on page 20 of this
21       report.
22   Q.  And can you just walk me through on page 20 how
23       Gabriel Roeder Smith does a calculation that leads to
24       a funding value of assets?
25   A.  The funding value of assets and the parameters used
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 16 of
42

JUDITH KERMANS

here are adopted by the board of trustees. They
involve a seven-year smoothing period for gains and
losses above and below market rates of return, and the
smoothing process is illustrated in this section here
that goes to the right.

Q. So section G of the -- on page 20?

A. Yes.

Q. And the impact of a smoothing process is that the
particular -- or one impact of a smoothing process is
that the particular gains or losses for a particular
year will be spread out over a number of years rather
than being entirely allocated to the year when they
actually occurred, correct?

A. Correct.

Q. So, for instance, the year 2008, which we all know to
be a very poor year for investment returns worldwide,
really, if you have a smoothing process, then those --
that poor year will be reflected, kind of divided out
over a period of seven years rather than the entire
impact being felt in one year, correct?

A. Correct.

Q. Now, you said that the board of trustees for the PFRS
was the one that had adopted the seven-year smoothing
method, correct?

JUDITH KERMANS

A. Yes.

Q. Was Gabriel Roeder Smith involved in conversations
relating to the decision to apply a seven-year
smoothing period?

A. Yes.

Q. And do you know whether that was a recommendation from
Gabriel Roeder Smith or a recommendation from
somewhere else, or a collaborative effort to reach
that assumption?

A. It was not a recommendation from Gabriel Roeder Smith.

Q. Do you know where the recommendation came from?

A. One of the trustees.

Q. Now, adopting a seven-year smoothing period would be
considered an actuarial assumption that went into this
calculation, correct?

A. I would call this an actuarial method.

Q. And when Gabriel Roeder Smith performs analysis using
actuarial methods, Gabriel Roeder Smith has to be
comfortable that those methods are reasonable,
correct?

A. Yes.

Q. So even though it wasn't a recommendation from Gabriel
Roeder Smith, you nonetheless were able to gain
comfort that a seven-year smoothing period was a

JUDITH KERMANS

reasonable actuarial method to use in putting together
the June 30, 2013, actuarial valuation, correct?

A. Yes. This method has something called a corridor, and
we feel that it is reasonable.

Q. When you refer to a corridor, the corridor
specifically is designed to make sure that the
difference between the funding value of assets and the
market value of assets does not go outside of a
predetermined range, correct?

A. Correct.

Q. And the corridor here was that the funding value of
assets should not be less than 80 percent of the
market value of assets, nor more than 120 percent of
the market value of assets, is that correct?

A. No.

Q. Okay, I'm sorry, what is the range here?

A. 30 percent.

Q. Okay, my mistake. So the corridor here is that the
funding value of assets shall not be less than 70
percent of the market value of assets, nor more than
130 percent of the market value of assets, correct?

A. Correct.

Q. And that must be the case for each year in the
analysis?

JUDITH KERMANS

A. Yes.

Q. Do you know whether Gabriel Roeder Smith will be
performing an annual actuarial valuation for the PFRS
for the period ending June 30, 2014?

A. I do not.

Q. Have there been any discussions between the PFRS and
Gabriel Roeder Smith regarding an annual actuarial
valuation for the period ending June 30, 2014?

A. No.

Q. Typically, when would the process begin for working on
an annual actuarial valuation for the prior fiscal
year?

A. Once the census data was received.

Q. Do you know when the census data was received for the
period ending June 30, 2013, for the PFRS?

A. No.

Q. Do you have an estimate as to when work began on this
72nd annual actuarial valuation for the PFRS?

A. My estimate would be at the beginning of the year.

Q. And beginning of the year meaning beginning of --

A. Calendar year.

Q. -- calendar year 2014?

A. Correct.

Q. Do you have any reason to believe that Gabriel Roeder

JUDITH KERMANS

1
2      Smith will not be the system actuary performing the
3      73rd annual actuarial valuation for the PFRS?
4      A.  No.
5      Q.  And you would expect, then, to begin that process
6          sometime maybe early calendar year 2015, correct?
7      A.  Yes.
8      Q.  And so you haven't -- fair to say Gabriel Roeder Smith
9          hasn't arrived at any actuarial assumptions that it
10         will use for the 73rd annual actuarial valuation for
11         the PFRS for the period ending June 30, 2014?
12     A.  That's correct.
13     Q.  Now, earlier you testified, you pointed me to the fact
14         that on a market value basis -- and this was on page
15         13 in the employer contribution rate section.  Let me
16         know when you're there.
17     A.  Okay.
18     Q.  And so you testified that on a market value basis, the
19         fund is approximately 78 percent funded, correct?
20     A.  Yes.
21     Q.  So that would mean it was around 22 percent unfunded,
22         correct?
23     A.  Correct.
24     Q.  So on a market value basis, the UAAL calculation would
25         be a little more than -- well, right around double

JUDITH KERMANS

1
2      what it was on page 4 of this report, correct?
3      A.  I would have to -- I would have to do that
4          calculation.
5      Q.  Okay.  Well, let me just ask you, if you were going to
6          do that calculation -- so we know it to be 78 percent
7          funded on a market value basis, correct?
8      A.  Yes.
9      Q.  So if you were going to do the funding calculation,
10         you would take the computed total of actuarial accrued
11         liabilities that we looked at earlier is about $3.89
12         billion and take 70 -- take 78 percent of that,
13         correct?
14     A.  That's not the way I would do the calculation.
15     Q.  Okay.  Why don't you tell me how you would do the
16         calculation.
17     A.  I would take the accrued liability and I would
18         subtract the market value of assets.
19     Q.  And then the resulting number would be the unfunded
20         liability on a market value basis, correct?
21     A.  Yes.
22     Q.  And then if you wanted the funding percentage, it
23         would be one minus that divided by the actuarial
24         liability, correct?
25     A.  The funded percent is actually shown on this page, the

JUDITH KERMANS

1
2      78 percent.
3      Q.  Right.  So my question, though, and I apologize, I got
4          myself turned around, how would you do the calculation
5          to determine what the unfunded actuarial accrued
6          liability would be on a market value basis?
7      A.  As mentioned, I would take the accrued liability, and
8          I would subtract the market value of assets.
9      Q.  And how would you calculate the market value of assets
10         for purposes of that calculation?
11     A.  The market value of assets is a reported number.  It's
12         not a calculated number.  It's also contained on
13         page 20 and other places in the report.
14     Q.  Okay.  So where would we find the market value of
15         assets on page 20 of the report?
16     A.  Row B.
17     Q.  And, specifically, we would take the 2013 number in
18         row B, the $3.034 billion?
19     A.  That is the market value of assets at the end of the
20         year.
21     Q.  And so to calculate the unfunded actuarial accrued
22         liability on a market value basis, you would take the
23         computed total of actuarial accrued liabilities of
24         3.89 billion and subtract the market value of assets
25         of, roughly, 3.034 billion, correct?

JUDITH KERMANS

1
2      A.  Yes.
3      Q.  So that number would be somewhere, roughly, in the
4          $850 million range, correct?
5      A.  Correct.
6      Q.  If you could turn with me to page 7, the assets and
7          accrued liabilities graph, and let me know when you're
8          there?
9      A.  Okay.
10     Q.  I had a little difficulty -- the asset section is
11         quite clear and is marked with the darker shade of
12         gray and has the black line showing the top -- showing
13         the assets amount, correct?
14     A.  Correct.
15     Q.  I had a little difficulty distinguishing between the
16         UAAL shading and the assets over accrued liability
17         shading.  First of all, can you describe for me what
18         the assets over accrued liabilities represents?
19     A.  This graph is supposed to be in color.  That would be
20         very helpful to you.
21     Q.  Okay.  Well, since I don't have it in color, can you
22         tell me what the assets over accrued liabilities
23         refers to?
24     A.  This graph is intended to indicate how much of the
25         accrued liability is covered by the assets in a

17 (Pages 65 to 68)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 13634-4    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 18 of
42

JUDITH KERMANS

2    graphical presentation. So the largest part of the
3    graph is the actuarial accrued liability, as indicated
4    by the arrow here, and then the assets are also
5    indicated by the arrow which portion covers the
6    actuarial accrued liability.
7  Q. And so if I'm following this correctly, from 1972 up
8    through, you know, roughly 1996, there was an AAL that
9    was in excess of the amount of assets in the PFRS
10    system?
11  A. Yes.
12  Q. And then what I can't tell on the shading is going
13    forward from 1996 until around 2002, there is a, what
14    appears to me to be a different color shading, and I'm
15    trying to figure out whether the AAL was above or not
16    above assets during that time.
17  A. As I said, this chart should be in color.
18  Q. So are you unable to tell, then, as well, by looking
19    at the chart?
20  A. I cannot tell for sure, but I suspect that is the area
21    when the plan was fully funded.
22  Q. And so then we also see that the plan was fully funded
23    as recently as, say, around 2010-2011, and then I
24    think there's a little bit of additional shading that
25    represents AAL going back above assets at the end of

JUDITH KERMANS

2    this graph. I'm just making sure that I'm reading
3    that correctly. Is that right?
4  A. I think that's correct. The graph is -- I'm not able
5    to tell without the color.
6  Q. Turning to page 13, the comments and conclusion
7    section that we've talked about a little bit,
8    investment -- this is an experience during the past
9    year. It says: Investment experience for the year
10    ended June 30, 2013, was favorable, with a market rate
11    of return of 14.4 percent.
12        Do you see that?
13  A. Yes.
14  Q. Now, due to the asset smoothing, the entirety of that
15    14.4 percent would not be allocated to the fiscal year
16    2013, correct?
17  A. Correct.
18  Q. And so, in fact, the recognized rate of return over
19    the seven-year funding period was only 4.1 percent,
20    correct?
21  A. The recognized rate of return as of June 30, 2013, was
22    4.1 percent.
23  Q. And that's for the seven-year period ending June 30,
24    2013, correct?
25  A. No.

JUDITH KERMANS

2  Q. What is -- what period is that for?
3  A. It's for the period ending June, the one-year period
4    ending June 30, 2013.
5  Q. I'm sorry, I asked the wrong question. That 4.1
6    percent reflects the seven, seven prior years of
7    smoothed assets in order to arrive at the one-year
8    investment return ending on June 30, 2013, correct?
9  A. Correct.
10  Q. So it would include one-seventh of each of the seven
11    prior years' investment return in order to -- and then
12    that's aggregated to determine an average to determine
13    the one-year investment return, correct?
14  A. Close enough, correct.
15  Q. So it will include, for instance, the, you know,
16    negative 20 percent return, or in excess of negative
17    20 percent return of 2008, one-seventh of that, right?
18  A. No.
19  Q. And so can you explain to me why that is not the case?
20  A. That period is so far in the past that that gain or
21    loss, likely loss, has been fully recognized by 2013.
22  Q. The 2008 loss has?
23  A. I believe so. It doesn't show on this page, anyway,
24    on page 20.
25        On page 20, what happened was, there was a

JUDITH KERMANS

2    restatement of assets at some point in the past, and
3    that was rolled all together. So you cannot determine
4    whether or not a 2008 loss is in here. There are
5    three bases in 2013.
6  Q. Okay. And can you point me to where I'd find that on
7    page 20?
8  A. It is in section G.
9  Q. And you said there's three bases for the year 2013?
10  A. Three bases are being recognized in 2013, and there
11    are portions of loss and a gain from prior years, but
12    if you go down to G4, you see a larger number. The
13    assets were restated at some point in the past.
14  Q. Okay, thanks. I think I'm with you now.
15        So when we look at that number, the
16    negative 139 million number that's in the 2013 column,
17    in row G4, that's the number that's a restatement of
18    some prior years, and it's impossible just by looking
19    at this to ascertain which years are included or not
20    included in that number?
21  A. Correct.
22  Q. So you don't know one way or another whether 2008 is
23    still showing up in this number, correct?
24  A. That's correct.
25  Q. Now, there's a section entitled data furnished for

JUDITH KERMANS

1
2    valuation, and you testified earlier that one of the
3    early parts of the process is receiving data from a
4    system that you will then use in performing the
5    calculations that go into a valuation report, correct?
6    A.  Correct.
7    Q.  Are you aware of any problems or inconsistencies in
8       any of the data provided by PFRS that was used in the
9       June 30, 2013, valuation?
10   A.  The data that was used in the June 30, 2013, data
11      valuation report was reasonable by the time the report
12      was completed.
13   Q.  Subsequent to this report being completed, are you
14      aware of anything that would make the data that was
15      included in this report unreasonable?
16   A.  No.
17   Q.  And that's also true for the GRS, correct; you're not
18      aware of anything that would, subsequent to the
19      issuance of the June 30, 2013, GRS report that makes
20      you believe that the data used therein was
21      unreasonable, correct?
22   A.  Correct.
23   Q.  Turn your attention to the appendix at page 30, and
24      then we'll move to the first page of the appendix,
25      at 31.  Are you with me there?  We're still on Kermans

JUDITH KERMANS

1
2    Exhibit 2.
3    A.  Yes.
4    Q.  Under assumption review at the top of the page, it
5       says:  As required by City ordinance, assumptions are
6       formally reviewed every five years and changes are
7       recommended as experience emerges.
8          Do you see that?
9    A.  Yes.
10   Q.  Gabriel Roeder Smith will do a formal review every
11      five years of the assumption, is that correct?
12   A.  That is what the City ordinances states.
13   Q.  And do you know whether Gabriel Roeder Smith in fact
14      does a formal review every five years or more
15      frequently of the assumptions used for the valuation
16      reports?
17   A.  I know that we've done such studies in the past.
18   Q.  Now, is a formal review of that sort sometimes
19      referred to as an experience study?
20   A.  Yes.
21   Q.  Does Gabriel Roeder Smith also do informal reviews of
22      the assumptions used in its valuation reports?
23   A.  Yes.
24   Q.  How often would you say the informal reviews are done
25      of the assumptions used in a Gabriel Roeder Smith

JUDITH KERMANS

1
2    valuation report?
3    A.  Annually.
4    Q.  And, in fact, every time you issue a report, you have
5       to make sure that you're comfortable with the
6       assumptions that -- the actuarial assumptions used
7       therein, correct?
8    A.  Correct.
9    Q.  And you do in fact do that; you make sure that you
10      believe that the actuarial assumptions contained in a
11      valuation report that you issue and that you're the
12      signing actuary for are reasonable, correct?
13   A.  Correct.
14   Q.  And you did that for all valuation reports you've
15      provided for the PFRS, correct?
16   A.  Correct.
17   Q.  And you've also made sure that all of the assumptions
18      used in valuation reports for the GRS are, in your
19      opinion, reasonable, correct?
20   A.  Correct.
21   Q.  One of the -- I guess there's two economic assumption
22      paragraphs, and I'll turn your attention to the first
23      economic assumption paragraph.  Are you with me there?
24   A.  Yes.
25   Q.  There it says:  The investment return rate used in the

JUDITH KERMANS

1
2    valuation was eight percent per year compounded
3    annually (net after investment expenses).
4          Do you know what the process was for
5    selecting an eight percent investment return rate
6    assumption for use in the 72nd annual actuarial
7    valuation report for the PFRS?
8    A.  Yes.
9    Q.  What was that process?
10   A.  Well, that board -- that particular assumption is
11      adopted by the board of trustees, and that assumption
12      was changed in between the last experience study and
13      what we would call the next experience study, which is
14      underway now.
15   Q.  So there's an experience study underway now for the
16      PFRS?
17   A.  Yes.
18   Q.  There's an experience study underway now for the GRS?
19   A.  Yes.
20   Q.  Do you know whether those experience studies began
21      before or after the City of Detroit declared
22      bankruptcy?
23   A.  No.
24   Q.  Do you have a general understanding for roughly when
25      those experience studies began?

1                    JUDITH KERMANS
2    A.  Around the same time as the bankruptcy.
3    Q.  So sometime in kind of mid-2013?
4    A.  The summer of 2013, yeah.
5    Q.  Now, the PFRS had an investment assumption -- well,
6        let me ask you, first of all, just you personally, how
7        long have you worked on the valuation reports for the
8        PFRS and GRS?
9    A.  Approximately fifteen years.
10   Q.  So you're aware that in 2011 the PFRS changed its
11       investment return assumption from 7.5 percent to 8
12       percent, correct?
13   A.  Correct.
14   Q.  And you're also aware that -- let me get the exact
15       date.
16           You're also aware that the -- that Gabriel
17       Roeder Smith issued an experience study for the PFRS
18       and GRS in kind of early 2009, correct?
19   A.  Correct.
20   Q.  And at that time, in 2009, GRS had an investment
21       return assumption of 7.9 percent, correct?
22   A.  I think that's correct.
23   Q.  And in early 2009, when Gabriel Roeder Smith issued
24       its experience study, the PFRS had an investment
25       return assumption of 7.8 percent, correct?

1                    JUDITH KERMANS
2    A.  I think that's correct, as well.
3    Q.  And subsequent to the issuance of the experience study
4        in 2009, the PFRS changed its investment return
5        assumption for 2009 and 2010 to 7.5 percent, correct?
6    A.  Correct.
7    Q.  And then there was a change made that we just
8        discussed in 2011 for the PFRS from 7.5 percent to 8
9        percent, correct?
10   A.  Correct.
11   Q.  Now, when -- for each of these assumed actuarial rates
12       of return or target investment rate -- you understand
13       those are synonymous, basically, right?
14           MS. GREEN:  Object to the form of the
15       question.
16           MR. HOWELL:  Fair enough.
17   BY MR. HOWELL:
18   Q.  So let me try to fix that question.  I am going to
19       refer to, as I already have, to the concept of an
20       investment return rate.  You understand what that
21       means, right?
22   A.  Yes.
23   Q.  All right.  And then sometimes that's also called an
24       investment return assumption, right?
25   A.  Correct.

1                    JUDITH KERMANS
2    Q.  And is that sometimes also called an
3        actuarially-assumed rate of return?
4    A.  Yes.
5    Q.  Okay.  So my apologies that I may sometimes use those
6        terms, you know -- I may not use the same term every
7        time, but you'll understand if I use any of those
8        three terms, I'm talking about the same thing, okay?
9    A.  Okay.
10   Q.  So for each report, for each actuarial valuation
11       report that Gabriel Roeder Smith issues to the PFRS,
12       there is an investment return rate assumption,
13       correct?
14   A.  Correct.
15   Q.  And for each such report, Gabriel Roeder Smith,
16       regardless of who initially chooses or arrives at the
17       investment rate assumption, Gabriel Roeder Smith has
18       to become comfortable that that is a reasonable
19       assumption, correct?
20   A.  Correct.
21   Q.  And for every year that Gabriel Roeder Smith has
22       issued a valuation report for the actuarial valuation,
23       actuarial liability valuation for PFRS, Gabriel Roeder
24       Smith has deemed the investment return assumption to
25       be reasonable, correct?

1                    JUDITH KERMANS
2    A.  Correct.
3    Q.  And if Gabriel Roeder Smith believed the investment
4        rate assumption to be unreasonable, that's something
5        that you would raise with the plans, correct?
6    A.  Yes, and we would disclose that in the valuation
7        report.
8    Q.  And there's no disclosure that -- in any valuation
9        report from Gabriel Roeder Smith for the PFRS that the
10       investment return assumption was deemed unreasonable
11       by Gabriel Roeder Smith, correct?
12   A.  Correct.
13   Q.  Now, do you recall having any conversations in
14       association with the 2013 fiscal year actuarial
15       valuation report for PFRS in which you discussed
16       whether or not eight percent was a reasonable
17       investment return rate?
18   A.  I don't recall one way or the other.
19   Q.  Can you recall any time where the PFRS, in association
20       with the preparation of this Exhibit 2, the 2013
21       fiscal year valuation report, where the PFRS came to
22       Gabriel Roeder Smith and said, "I think the investment
23       return assumption is too high"?
24   A.  I don't recall that.
25   Q.  Now, you said that the eight percent investment return

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 21 of
42

```
1              JUDITH KERMANS
2       assumption was something initially provided by the
3       board of trustees for the PFRS to Gabriel Roeder
4       Smith, is that a fair characterization?
5   A.  No.
6   Q.  So how, then, was the 8.0 percent investment return
7       assumption arrived at for use as the investment return
8       rate in this report?
9   A.  The board of trustees adopted an eight percent assumed
10      rate of return.
11  Q.  So then what does Gabriel Roeder Smith do to make sure
12      it's comfortable with that assumption?
13  A.  We, we, we look at the assumption, we consider
14      something called a best estimate range, and we
15      determine whether or not this falls within that, and
16      whether we feel this is likely to occur at least 50
17      percent of the time.
18  Q.  And if you feel that it's likely to occur at least 50
19      percent of the time, you deem it to be within the best
20      estimate range and a reasonable assumption, correct?
21  A.  Correct.
22  Q.  And if you feel that it's not likely to occur 50
23      percent of the time, then you may have to raise that
24      issue with the plan, correct?
25  A.  Correct.
```

```
1              JUDITH KERMANS
2   Q.  And you didn't raise that issue with the plan in this
3       case, correct?
4   A.  Correct.
5   Q.  When looking at the investment return assumption, do
6       you ever also consider the investment return
7       assumption of other large public pension plans?
8   A.  That can be one of the decision points, but not, not a
9       major one.
10  Q.  So that could be a data point.  It wouldn't be, it
11      wouldn't be a sole data point that you would rely on?
12  A.  No.
13  Q.  Do you ever look at the investment policy of a
14      retirement system when kind of testing the investment
15      assumption of that system?
16  A.  Yes.
17  Q.  So that's another thing that could be a helpful data
18      point?
19  A.  Correct.
20  Q.  But not necessarily the only thing you would rely on,
21      correct?
22  A.  Correct.
23  Q.  Do you ever look at the historical returns for a
24      particular system when testing an assumption regarding
25      the investment return rate for that system?
```

```
1              JUDITH KERMANS
2   A.  Yes.
3   Q.  That's another thing that could be a helpful data
4       point in getting comfortable with an investment rate
5       assumption, correct?
6   A.  Correct.
7   Q.  So you look at kind of a variety of data points, and
8       then based on all of that, you determine whether or
9       not you think it fits within your best estimate range,
10      right?
11  A.  Yes.  A couple of other things that would be
12      considered is the purpose of the measurement that
13      you're taking, the materiality of the assumption that
14      you're making, relevant data, as you mentioned.
15  Q.  When you say the materiality of the assumption, you
16      would agree that the investment return rate is always
17      a material assumption, correct?
18  A.  Yes.
19  Q.  Now, with respect to the pay increase assumptions that
20      are the second paragraph of the economic assumptions
21      on page 31 of Kermans Exhibit 2, those pay increase
22      assumptions assume that the PFRS plan would be an
23      ongoing plan, correct?
24  A.  Yes.
25  Q.  And they include both increases in salary and
```

```
1              JUDITH KERMANS
2       increases in salary that are tied to service-related
3       benefits, correct?
4   A.  They do, although for the very next year we have a
5       zero percent assumption for wage increase.
6   Q.  Thank you for that clarification.  So with respect to
7       salary increase -- first of all, you incorporate
8       tables where you make assumptions regarding salary
9       increases for different ages and different years of
10      service with the PFRS, correct?
11  A.  Yes.
12  Q.  Now, moving back up to the previous paragraph, about
13      halfway through the paragraph you say:  Considering
14      other financial assumptions, the eight percent total
15      investment return rate translates to an assumed real
16      rate of return of four percent over wage inflation.
17          Do you see that?
18  A.  Yes.
19  Q.  And you still agree with that statement today,
20      correct?
21  A.  I agree with -- that that statement is appropriate for
22      this report and the calculations done in the report.
23  Q.  And wage inflation is typically about a half percent
24      to a percent higher than price inflation, is that
25      correct?
```

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 13634-4    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 22 of
42

JUDITH KERMANS

1
2  A.  According to the Social Security Administration, yes.
3  Q.  So you say considering other financial assumptions.
4      Do you have an understanding as to what those other
5      financial assumptions are?
6  A.  I think that is referring to the Consumer Price Index
7      and the wage inflation.
8  Q.  How does Gabriel Roeder Smith go about deriving its
9      inflation assumption, inflation rate assumption for
10     use in an actuarial valuation?
11 A.  The wage inflation assumption is part of the
12     experience study process.  We have numerous things
13     that we look at, involving starting with the Consumer
14     Price Index and then looking at, as you mentioned, the
15     differential between that and potential wage
16     inflation.
17 Q.  Now, when Gabriel Roeder Smith performs the informal
18     review, the annual informal review when preparing a
19     valuation report for a system, if you believe that
20     there is an unreasonable assumption in the most recent
21     experience study, you would adjust that assumption to
22     make it reasonable going forward, correct?
23 A.  Yes.
24 Q.  You also have several noneconomic assumptions listed
25     on page 31, continuing through page 33.  One relates

JUDITH KERMANS

1
2  to a mortality table.
3      Where does Gabriel Roeder Smith obtain the
4      mortality information that it uses in coming up with a
5      mortality assumption for a valuation report?
6  A.  That analysis is part of the five-year experience
7      study.
8  Q.  So do you know whether there were any changes to the
9      mortality assumptions used in this 2013 valuation
10     report versus the mortality assumptions listed in the
11     most recent experience study?
12 A.  I believe this is the same table.  I would have to
13     confirm that, though.
14 Q.  And while I understand you said you're not a hundred
15     percent sure on that, if you felt that the mortality
16     table included in the prior experience study was no
17     longer reasonable, you wouldn't continue to use it,
18     waiting until the next experience study came out,
19     right?
20 A.  Correct.
21 Q.  And that's true for any assumption that would be no
22     longer valid in the experience study.  You would, you
23     would change that during your review of the valuation
24     report rather than wait for the next experience study
25     to come out, right?

JUDITH KERMANS

1
2      MS. GREEN:  I'll object to form and
3  foundation.
4      Rush, I think you're assuming that there
5  are certain assumptions that she has the ability to
6  change, and I think she already testified there are
7  certain assumptions the board has to authorize
8  previously.  So if we could just clarify which
9  assumptions you're -- I don't know if that makes sense
10 to you or not, but ...
11     MR. HOWELL:  Well, for one thing, and I
12 don't mean to -- I mean, I appreciate the
13 clarification, but I would prefer that we not have
14 speaking objections, if possible, and object to the
15 form, and then I'll ask her if she understands the
16 question and do my best to clarify it.
17     But, you know, I'll take this form
18 objection and just -- I'll strike that question.
19 BY MR. HOWELL:
20 Q.  On page 32 there's something called miscellaneous
21     loads, and I want to focus on the second sentence
22     there that says:  Active accrued liability (excluding
23     DROP members) was increased by one percent to
24     approximate the effect of missing or incomplete data.
25     Do you see that?

JUDITH KERMANS

1
2  A.  Yes.
3  Q.  And can you explain for me -- well, if I'm
4      understanding this correctly, this is just kind of a
5      one percent that's added to the AAL to deal with the
6      fact that there might be some problems with the data?
7  A.  Correct.
8  Q.  And how does Gabriel Roeder Smith determine that one
9      percent is the, is the best number to use for this
10     miscellaneous load?
11 A.  Each year we analyze the data and we try to determine
12     whether or not we think it's a reasonable data set to
13     use in the valuation, and one of the things that we
14     can do, if we think it is reasonable to use in the
15     valuation but we think that it may be missing certain
16     data elements, is we can make what we view in our
17     judgment to be an appropriate load to the liabilities
18     to reflect that.
19 Q.  So Gabriel Roeder Smith will from time to time apply a
20     miscellaneous load to -- in this same circumstance for
21     other retirement systems, as well?
22 A.  Yes.
23 Q.  Do you know whether it's typical to include a
24     miscellaneous load or typical not to include a
25     miscellaneous load?

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 23 of
42

JUDITH KERMANS

A.  I think it is typical to include a miscellaneous load
for data.
Q.  And is one percent the typical number used by Gabriel
Roeder Smith, or does that vary?
A.  It varies.
Q.  And what would you say, in your experience, is the
range that you would use for a miscellaneous load for
purposes of approximating the effect of missing or
incomplete data?
A.  One to three percent.
Q.  There's also in -- the first sentence says:  Normal
retirement accrued liability (excluding DROP members)
was increased by three percent for service purchases.
        Can you just explain to me what that is
referring to?
A.  Individuals, active individuals when they're working
will sometimes purchase service that they've earned in
other municipalities or military service, and this is
a load to reflect that there may be a cost to that
that is not already reflected in the accrued liability
numbers.
Q.  Can you describe for me what the DROP program is for
PFRS?
A.  The DROP program is detailed in this report on

JUDITH KERMANS

page 17.
Q.  And do you know whether Gabriel Roeder Smith has ever
undertaken an effort to analyze the effect on the UAAL
for the PFRS as a result of the implementation of the
DROP plan?
A.  Michigan State law, I believe, requires that an
analysis be done for every single change in benefit
provisions, and I would assume that it was done for
this one, as well.
Q.  And do you, as you sit here, do you have any
understanding of the impact on the UAAL for the PFRS
as a result of the implementation of the DROP plan?
A.  No.
Q.  On page 34 of Exhibit 2 to the Kermans deposition is a
page entitled Funding Methods.  Do you see that?
A.  Yes.
Q.  And the first sentence there says:  The entry age
actuarial cost method was used in determining age and
service liabilities and normal cost, vesting
liabilities and normal cost, and casual liabilities
and normal cost.
        Do you see that?
A.  Yes.
Q.  And that's the entry age normal actuarial cost method,

JUDITH KERMANS

correct?
A.  Yes.
Q.  Do you know how long the -- how long Gabriel Roeder
Smith has been using the entry age normal cost method
in performing valuations of the actuarial liability
for PFRS?
A.  No.
Q.  Has that been the case for as long as you can
remember?
A.  Yes.
Q.  Would you agree that entry age normal is an
appropriate cost funding methodology for an ongoing
plan?
        MS. GREEN:  Object to form, foundation.
BY MR. HOWELL:
Q.  You can answer if you understood the question.
A.  No, I don't.
Q.  You do not.  And why is that?
A.  I think your question was too broad for me to answer
it.
Q.  Oh, I'm sorry.  So you did not understand the
question?
A.  Correct.
Q.  Okay.  I think we just need to make sure the record's

JUDITH KERMANS

clear there so it doesn't sound like --
        MS. GREEN:  I was confused, too, so let's
maybe re-ask that or restate it.
        MR. HOWELL:  I mean, I think the record's
clear, but I just -- I want to make sure we don't have
something that's on there that looks goofy.
BY MR. HOWELL:
Q.  So I asked you, would you agree that entry age normal
is an appropriate cost funding methodology for an
ongoing plan, and your answer to that question was you
don't understand the question, right?
A.  Correct.
Q.  For purposes of the work Gabriel Roeder Smith did
here, it assumed that the PFRS plan was an ongoing
plan, correct?
A.  Yes.
Q.  And it assumed that there would be future salary and
service benefits, correct?
A.  Yes.
Q.  Now, you're aware that there can be circumstances in
which a plan is frozen, correct?
A.  Correct.
Q.  And in some frozen plans there will be no future
increases in salary or service increases, correct?

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 24 of
42

JUDITH KERMANS

1
2  A.  Correct.
3  Q.  In that situation, a frozen plan in which there's no
4      future salary increases nor will there be future
5      service-based increases, do you think using the entry
6      age normal funding method can overstate the UAAL of
7      that plan?
8  A.  I would have to do an analysis for that.
9      MS. GREEN:  I wanted to place an objection
10     on the record before you answer.
11         Rush, to the extent these are outside of
12     the scope of the 30(b)(6) topics and seem to be
13     hypotheticals may be more appropriate for an expert
14     witness.  I'll place the objection, but obviously her
15     answer is already on the record.
16 BY MR. HOWELL:
17 Q.  And I think your answer was that you'd have to do an
18     analysis of that, is that correct?
19 A.  My answer is that it would depend.
20 Q.  What would it depend on?
21 A.  The purpose of the measurement, the plan involved, and
22     other factors.
23 Q.  Could you give me an example of a set of factors in
24     which using the entry age normal cost funding
25     methodology for a frozen -- plan that's frozen for

JUDITH KERMANS

1
2      salary and service increases could lead to an
3      overstated UAAL?
4      MR. BULLOCK:  I'm going to object to the
5      form of the question.  You're asking for her to render
6      some form of an expert opinion.  She's here as a lay
7      witness.
8  BY MR. HOWELL:
9  Q.  You can, you can answer the question if you understood
10     it.
11 A.  I don't understand it.
12 Q.  Well, you told me that in order to determine whether
13     or not the entry age normal cost method, cost funding
14     method would -- in a frozen plan, with frozen salary
15     and frozen service, would lead to an overstated UAAL
16     would depend on an analysis of a variety of factors,
17     correct?
18 A.  Yes.
19 Q.  And I am trying to figure out what factors you were
20     referring to that could result in the -- use of entry
21     age normal cost funding methodology in a frozen plan
22     lead to an overstated UAAL.
23     MS. GREEN:  I'm going to lodge the same
24     objection.  Maybe we can just do a standing objection.
25     I don't want to slow you down, but I do think it's

JUDITH KERMANS

1
2      somewhat outside the scope of the 30(b)(6) topics, and
3      I do think you're sort of getting close to the line of
4      an expert witness hypothetical sort of question.
5          But if we can just make that agreement, I
6      won't re-lodge the objection every time.
7          MR. HOWELL:  Sure, we can stipulate to a
8      standing objection on this line of question.
9          MR. BULLOCK:  With that being said, are you
10     planning on asking the same question again?
11         MR. HOWELL:  Yes.  I think the question's
12     still pending, but I can ask it again.
13 BY MR. HOWELL:
14 Q.  So my question is, can you provide for me any of the
15     factors that you referenced that might indicate that
16     the use of an entry age normal cost funding
17     methodology for a frozen plan would lead to an
18     overstated UAAL?
19 A.  Not without a lot more consideration.
20 Q.  Have you ever worked on a plan that was frozen before?
21 A.  Yes.
22 Q.  Have you ever changed your cost funding methodology
23     for a frozen plan?
24 A.  That's a complex question.  Can you please restate it?
25 Q.  Well, so you use a particular cost funding methodology

JUDITH KERMANS

1
2      when you're performing actuarial -- performing any
3      actuarial valuation, right?
4  A.  Yes.
5  Q.  And you testified that you have worked on plans before
6      that were ongoing at one point and then became frozen,
7      is that correct?
8  A.  Yes.
9  Q.  And I'm just asking, on those, with respect to those
10     specific plans, at the time the plan was frozen, did
11     you change the cost funding methodology that you used
12     in performing actuarial valuations for that plan?
13 A.  Typically, if a plan becomes frozen, although "frozen"
14     is not a technical term, you would consider cash flow
15     needs and other such things that would lead you to
16     possibly changing a method or two in the process; not
17     necessarily the cost method, though.
18 Q.  So it might lead to an adjustment of the, of the cost
19     funding methodology, though not necessarily a complete
20     change to which cost funding methodology is used?
21 A.  Correct.
22 Q.  The entry age normal cost funding method for an
23     ongoing plan assumes future salary and service
24     increases, correct?
25 A.  Yes.

JUDITH KERMANS

Q. If a plan was frozen and wasn't going to have future
salary and service increases, would you agree that you
should not include accruals for future salary and
service increases in the cost funding methodology you
use to value that plan?

A. It depends on the measurement that you're taking.

Q. What if you're -- the measurement that you're taking
is a valuation of the UAAL?

A. I don't understand the question.

Q. So it's your testimony that there would be certain
purposes, certain measurements that you would be
taking, where even though a plan had been frozen as to
future salary and service increases, that you would
still want to accrue for future salary and service
increases as part of the cost funding methodology?

A. I don't understand that question.

Q. Well, let me try to make it more simple. If you have
a situation in which there aren't going to be future
service and future salary increases, should you
include future service and future salary increases
when calculating a UAAL for that plan?

MS. GREEN: I'm going to object. I still
want to be clear for the record that we have a
standing objection to all of these hypothetical

JUDITH KERMANS

questions to a 30(b)(6) witness who's not here in an
expert capacity, and I don't want there to be a
misunderstanding that you had a certain line of
questions and now you're in a different line of
questions.

Throughout the record there have been
several hypothetical questions lodged to this witness.
I just want to restate and clarify for the record that
it's well beyond the scope of the eight topics listed
on the 30(b)(6) notice. But you may proceed.

MR. HOWELL: Okay, and I will state for the
record that I disagree. Part of the topics here were
the actuarial valuations performed by Gabriel Roeder
that includes the actuarial cost method used, and I
believe that I've established foundation with this
witness that she's worked on multiple plans and used
different cost funding methodologies, but I understand
the objection, and if you want -- I think we're close
to the end of this line of questions, but if you want
to just object each time to make sure that it's clear,
I don't have a problem with that.

BY MR. HOWELL:

Q. So, all right, we were talking about cost funding
methodologies, right?

JUDITH KERMANS

A. Yes.

Q. My question to you is, in a situation in which a plan
is frozen and there is no future salary increase
contemplated and no future service increase
contemplated, in your experience as an actuary, do you
believe that those -- the cost funding methodology can
still include accruals for future salary and future
service increases?

A. If you are working on an actuarial valuation for the
purpose of measuring the employer contribution rate,
then you would want your funding method to line up
with what's actually going to happen.

Q. On page 35 of sample salary adjustment rates, is this
an example of a table, the top table on page 35 that
was derived from the prior experience study?

A. Yes.

Q. And the base (economic) there is -- that, that refers
to wage inflation, correct?

A. Correct.

Q. Do you have an understanding as to what Gabriel Roeder
Smith viewed to be price inflation in putting together
this valuation report? I know the range is between a
half and one percent lower. Do you know whether
one-half or one percent lower was applied?

JUDITH KERMANS

A. I do not.

MR. HOWELL: I don't know how long we're
going. I'm getting ready to go to a new exhibit, if
we want to take a break.

MS. GREEN: I think lunch is going to be
here at 11:45 or noon. Do you want me to see if it's
here and we can break, or do you want to just muddle
along for another fifteen minutes and then we'll do
lunch?

MR. HOWELL: If it's okay -- whatever you
guys want to do.

THE WITNESS: I'm okay with fifteen more
minutes, yeah.

MR. BULLOCK: Are we within that time
frame?

MR. HOWELL: Sure.

MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 3
11:37 a.m.

BY MR. HOWELL:

Q. Ms. Kermans, I'm going to hand you what I am marking
as Kermans Exhibit 3.

MR. HOWELL: And for identification
purposes, Kermans Exhibit 3 also doesn't have a Bates

JUDITH KERMANS

1
2 number but is the Gabriel Roeder Smith & Company 75th
3 Annual Actuarial Valuation for the General Retirement
4 System of the City of Detroit.
5 BY MR. HOWELL:
6 Q. And, Ms. Kermans, do you recognize this document?
7 A. Yes.
8 Q. And this is a document we've referred to several
9 times, but this is the final actuarial valuation as of
10 June 30, 2013, for the GRS, correct?
11 A. Yes.
12 Q. And if you turn to the third page within here,
13 which -- it's another letter on April 4, 2014, do you
14 see that?
15 A. Yes.
16 Q. So this is a similar letter from Mr. Kausch, yourself,
17 and Mr. Alberts that kind of lays out the purpose of
18 the actuarial valuation, correct?
19 A. Yes.
20 Q. And in the second sentence on the first paragraph of
21 the letter it says: This report was prepared at the
22 request of the board and is intended for use by the
23 retirement system and those designated or approved by
24 the board.
25     Is it the board of trustees of the GRS that

JUDITH KERMANS

1
2 Q. In the past have you, have you ever attended a board
3 meeting of the GRS?
4 A. Yes.
5 Q. And I know you can't say specifically on this one, but
6 from time to time you will be involved in the
7 presentation of the report to the board of trustees of
8 the GRS and PFRS, correct?
9 A. Correct.
10 Q. And these board meetings are open to members of the
11 GRS and PFRS, as well, correct?
12 A. I don't understand the question.
13 Q. Okay. Who -- in your experience, who has been at
14 these board meetings when you present this report?
15 A. The board of trustees, not necessarily all of the
16 members, but some of them. Retirement system staff.
17 Occasionally reporters. Attorneys.
18 Q. And how does the process go? Do you kind of walk
19 through the report and then open it up for questions,
20 or is there a different process?
21 A. We go through the report. We have questions
22 throughout the process and sometimes at the end.
23 Q. And can you recall making any significant changes
24 between the presentation of the draft valuation report
25 in March and the submission of the final version in

JUDITH KERMANS

1
2 typically comes to Gabriel Roeder Smith and says, "We
3 want to go ahead and do the actuarial valuation for
4 the next year"?
5 A. The typical process starts with us requesting the
6 data, assuming that we have an ongoing relationship
7 with them.
8 Q. Do you know who your engagement is with? Is it with
9 the plan system itself or the board of trustees?
10 A. It's with the system, represented by the board of
11 trustees.
12 Q. In the bottom paragraph, the one that's bolded, the
13 first line is: We presented preliminary valuation
14 reports at the March 9, 2014, board meeting.
15     Do you see that?
16 A. March 19th.
17 Q. Oh, I'm sorry.
18 A. Yes.
19 Q. Thanks for that clarification. So it says: We
20 presented preliminary valuation results at the
21 March 19, 2014, board meeting. Correct?
22 A. Correct.
23 Q. And you attended that board meeting, correct?
24 A. I don't recall whether I attended or David Kausch,
25 along with Kenneth Alberts.

JUDITH KERMANS

1
2 April for this GRS 75th annual actuarial valuation?
3 A. No.
4 Q. And this bolded paragraph explains that after that
5 meeting, you received some additional information or
6 additional data, but based on your analysis, the
7 addition of that data wasn't material enough to make
8 any changes, basically, right?
9 A. The addition of that data, with the result of
10 incorporating that data, ended up being less than our
11 one percent load that we have in the valuation process
12 already, and so we did not suggest a redo of the
13 valuation.
14 Q. Okay. You anticipated my next question, which was
15 whether that adjustment was the load, so thank you.
16     Turning to the second page, second
17 paragraph, second sentence, it says: To the best of
18 our knowledge, this report is complete and accurate
19 and was made in accordance with actuarial standards of
20 practice promulgated by the Actuarial Standards Board.
21     You stand by that statement, correct?
22 A. Yes.
23 Q. Then you say: The actuarial assumptions used for the
24 valuation are set by the board. Different assumptions
25 would produce different results. The actuarial

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 13634-4    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 27 of
42

JUDITH KERMANS

1
2  assumptions are reasonable.
3          You stand by that statement, correct?
4  A.  Yes.
5  Q.  Turning to page A4, which is the actuarial accrued
6      liabilities as of June 30, 2013, retirement system
7      totals, are you with me on that page?
8  A.  Yes.
9  Q.  There is an unfunded accrued pension liability of
10     $1,084,210,716, correct?
11 A.  Yes.
12 Q.  And that includes $36 million of past-due
13     contributions, an assumption that those would not be
14     made, correct?
15 A.  Correct.
16 Q.  And like the past-due contributions we looked at for
17     PFRS, were those entirely fiscal year 2013 past-due
18     contributions?
19 A.  Correct.
20 Q.  Turning to page A8, the conclusion section of the
21     comments, it says:  The retirement system is 70
22     percent funded as of June 30, 2013, based on the
23     funding value of assets.
24          Do you see that?
25 A.  Yes.

JUDITH KERMANS

1
2  Q.  And again, it's a 58 percent on market value of
3      assets, is that right?
4  A.  Correct.
5  Q.  So if I wanted to determine the UAAL on a market value
6      basis, I would take the actuarial accrued liabilities
7      of 3.6 billion and change -- as listed, for instance,
8      on page A4, and subtract from that the market value
9      end of year on page A13 for 2013 of just about $2.1
10     billion, correct?
11 A.  Correct.
12 Q.  So that would lead to a UAAL on a market value basis
13     of just a little bit over $1.5 billion, correct?
14 A.  Correct.
15          MS. GREEN:  Rush, I got an email from my
16     assistant that lunch is here and ready, so whenever
17     you are ready to take a break.
18          MR. HOWELL:  This is a decent spot, if you
19     want to take a break now.
20          MS. GREEN:  How much time do we think we
21     need?  It's just across the hall, but ...
22          MR. HOWELL:  Well, I'm sure everyone --
23          MS. GREEN:  12:30?
24          MR. HOWELL:  However long you guys would
25     like to take.

JUDITH KERMANS

1
2          VIDEO TECHNICIAN:  The time is 11:44 a.m.
3  We are now off the record.
4          (Off the record at 11:44 a.m.)
5          (Back on the record at 12:37 a.m.)
6          VIDEO TECHNICIAN:  The time is 12:37 p.m.
7  We are now on the record.
8  BY MR. HOWELL:
9  Q.  Ms. Kermans, this morning we spent a great deal of
10     time going through the actuarial valuations for both
11     the PFRS and GRS, and I was hoping you could have both
12     Exhibit 2 and Exhibit 3, which are those two
13     valuations, for your reference.  I just want to ask a
14     few final questions on these documents.
15          Now, the unfunded actuarial accrued
16     liability, or the UAAL, that you had listed for the
17     PFRS was about $415 million, correct, and that's as of
18     June 30, 2013?
19 A.  Correct.
20 Q.  And the UAAL as of June 30, 2013, that you had for the
21     GRS was about $1.084 billion, correct?
22 A.  Correct.
23 Q.  And so if we add those two together, the 415 million,
24     roughly, and the 1.084 billion, roughly, we get a
25     combined UAAL for the two retirement systems of almost

JUDITH KERMANS

1
2  exactly $1.5 billion, correct?
3  A.  Well, those are not two numbers that I would add
4      together, because they're created on different bases,
5      but, yes, mathematically, that's the answer.
6  Q.  And what do you mean when you say they're created on
7      different bases?
8  A.  They have two different assumed rates of return, for
9      example.
10 Q.  So, for example, the GRS has a 7.9 percent assumed
11     rate of return, whereas the PFRS has an 8 percent rate
12     of return?
13 A.  Correct.
14 Q.  But if I simply wanted to say what is the combined
15     UAAL of the PFRS and GRS pursuant to the Gabriel
16     Roeder June 30, 2013, valuations, it would be about
17     $1.5 billion between the two just added together,
18     right?
19 A.  Yes.
20 Q.  And we went through the calculations, and do you
21     recall that if you were to do the UAAL on a market
22     value basis for the GRS, it was a little, just a
23     little above $1.5 billion?
24 A.  Yes.
25 Q.  And do you recall that when we looked at the UAAL for

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 13634-4    Filed 09/09/22    Entered 09/09/22 18:47:23    Page 28 of 42

JUDITH KERMANS

1  
2  the PFRS on a market value basis that -- going through
3  the calculation you explained, we got about $850
4  million, or right around there, for the UAAL for the
5  PFRS on a market value basis?
6  A. Correct.
7  Q. And again, understanding that there are differences in
8  how those two calculations occurred, but if you were
9  to add the UAAL of the PFRS and the UAAL of the GRS on
10  a market value basis, you would add the roughly 1.5
11  billion to the roughly 850 million, for something
12  around 2.35 billion or so, is that about right?
13  A. Correct.
14  Q. And those numbers, the UAAL, first on a funding value
15  basis, the 415 million for PFRS and the 1.084 for the
16  GRS, you believe those to be accurate at the time you
17  issued this report, correct?
18  A. Yes.
19  Q. And subsequent to issuing the report, you have not
20  determined that those were inaccurate at the time they
21  were issued, right?
22  A. Correct.
23  Q. And with respect to the calculations that we did for
24  the UAAL on a market value basis for PFRS, you believe
25  those are also correct at the time the report was

JUDITH KERMANS

1  
2  issued, correct?
3  A. I didn't do those calculations at the time the report
4  was done, but I see no reason to -- why they wouldn't
5  be still correct.
6  Q. And the same is true for the GRS market value
7  calculations; you didn't do them at the time, but you
8  see no reason why they wouldn't be correct, right?
9  A. Remain correct.
10  Q. Did you review the report of the Court's feasibility
11  expert, Martha Kopacz, as part of your preparation?
12  A. I did not review the report. I was not asked to
13  review the report.
14  Q. Now, we've talked a bit about the experience studies
15  that were done and completed in early 2009 for GRS and
16  PFRS. Do you recall discussing those?
17  A. Yes.
18  Q. I'm going to hand you what I will mark as Kermans
19  Exhibit 4.
20  MARKED FOR IDENTIFICATION:
21  DEPOSITION EXHIBIT 4
22  12:46 p.m.
23  MR. HOWELL: And for identification
24  purposes, Kermans Exhibit 4 does not have a Bates
25  stamp but is the Gabriel Roeder Smith Police and Fire

JUDITH KERMANS

1  
2  Retirement System for the City of Detroit Five-Year
3  Experience Study, July 1, 2002, through June 30, 2007.
4  And I will note and apologize that we have
5  this large kind of water mark on the top of each page.
6  The reason for that is that this exhibit was listed in
7  the expert report of William Fornia. We then
8  requested a copy of it from Mr. Fornia after reviewing
9  his expert report, and he provided it, unfortunately,
10  with this stamp across the top.
11  BY MR. HOWELL:
12  Q. So that's why it's there, and I'll ask you to try your
13  best to ignore it as we flip through the pages.
14  A. I will try my best.
15  Q. Yeah. Ms. Kermans, do you recognize this document?
16  A. Yes.
17  Q. And this is, in fact, the 2009 five-year experience
18  study for the PFRS that we've discussed a few times,
19  right?
20  A. Yes.
21  Q. And so I'm going to refer to this to try to save a
22  little time going forward as the PFRS experience
23  study, okay?
24  A. Okay.
25  Q. What is the purpose of an experience study as done by

JUDITH KERMANS

1  
2  Gabriel Roeder Smith for a system?
3  A. That information is outlined on page A2 of the report.
4  Q. And where, specifically, is the purpose of the report
5  laid out?
6  A. Underneath the flick@trusteepensionadvisers.com,
7  primarily, some information indicating that the
8  purpose of the study is to review experience related
9  to withdrawal of active members, rates of disability,
10  et cetera.
11  Q. So you're referring to those six or so bullet points
12  kind of near the top of page A2?
13  A. Yes.
14  Q. And is it fair to say that one of the purposes of an
15  experience study is to look at past experience to
16  evaluate assumptions that have been used in actuarial
17  calculations for a particular system?
18  A. Could you repeat that?
19  Q. Yes. Is one of the purposes of an experience study to
20  go back and look at past history to assess the quality
21  of actuarial assumptions that are used in performing
22  actuarial calculations for the system in question?
23  A. I can't really answer yes or no to that question.
24  Q. Part of the reason that you do an experience study is
25  to gain additional comfort with actuarial assumptions,

JUDITH KERMANS

1   right?
2   A.  Okay, yes.
3
4   Q.  And one reason you do an experience study is to
5       determine whether or not you need to update actuarial
6       assumptions that are used in valuing the actuarial
7       liabilities, right?
8   A.  Yes.
9   Q.  Now, you also have an informal review that takes
10      place, as well, and this experience study is a formal
11      review that supplements that process, correct?
12  A.  Yes.
13  Q.  This experience study for the PFRS related to the
14      five-year period from 2000 -- July 1, 2002, to
15      June 30, 2007, correct?
16  A.  Can I ask what you're looking at?
17  Q.  Sure, I'm happy to refer you to page 1, and it's a
18      January 29, 2009, letter from you and from Norman
19      Jones to the board of trustees for the PFRS --
20  A.  Okay.
21  Q.  -- and about halfway down it says the investigation
22      covered the five-year period from July 1, 2002, to
23      June 30, 2007.
24          And is that consistent with your
25      understanding of when the -- this experience study

JUDITH KERMANS

1   covers?
2
3   A.  Yes.
4   Q.  What is your role in performing this -- or what was
5       your role in performing this experience study?
6   A.  The role would typically be that I would review
7       analyses done by analysts regarding experience that
8       happened during the five-year period and to work with
9       the other signing actuary in developing probabilities
10      of events going forward for the next five-year period.
11  Q.  Norman Jones was the other signing actuary here?
12  A.  Yes.
13  Q.  Have you worked with Mr. Jones on other experience
14      studies besides this one?
15  A.  Yes.
16  Q.  And in your experience with Mr. Jones, have you found
17      him to be competent in his role as a signing actuary?
18  A.  Yes.
19  Q.  How would you characterize the work that Mr. Jones
20      does?
21  A.  It's excellent.
22  Q.  Did Mr. Jones work with you on the GRS experience
23      study, as well?
24  A.  I worked on the GRS experience study, but I was not
25      one of the signing actuaries on that study.

JUDITH KERMANS

1
2   Q.  That study, the signing actuaries were Mr. Jones and
3       Mr. Alberts, correct?
4   A.  Mr. Alberts and Mr. Jones were the individuals that
5       signed that study, yes.
6   Q.  But you had some involvement in working on the GRS
7       experience study, as well?
8   A.  Yes.
9   Q.  Do you recall what that involvement was?
10  A.  It would be in a peer review role and really not much
11      different than my role here, to be honest, so ...
12  Q.  So in a general sense, reviewing analyses done by the
13      team of analysts, and looking at probabilities, and
14      just generally the same things you laid out regarding
15      the PFRS?
16  A.  Correct.
17  Q.  Okay.  In the first paragraph -- I'm sorry, strike
18      that.
19          In the fourth paragraph, the bolded
20      paragraph, it says:  We believe that the actuarial
21      assumptions recommended in this experience study
22      report represent, individually and in the aggregate,
23      reasonable estimates of future experience of the
24      Police and Fire Retirement System of the City of
25      Detroit.

JUDITH KERMANS

1
2           You stand by that statement, correct?
3   A.  I stand by that statement when -- in 2009, yes.
4   Q.  Subsequent to 2009, have you come to believe that
5       certain actuarial assumptions in this experience study
6       needed to be changed?
7   A.  We have not completed our analysis of the subsequent
8       experience study.
9   Q.  I understand that the next experience study is
10      ongoing.  However, I also understand that you do an
11      informal review with each valuation in which you look
12      at the actuarial assumptions used for that valuation,
13      correct?
14  A.  Correct.
15  Q.  And you have not found, since issuing this report
16      January 29 of 2009, that any of the actuarial
17      assumptions in this experience study that are used in
18      the valuation reports that you do for PFRS or GRS need
19      to be changed, correct?
20          MS. GREEN:  Asked and answered.
21  A.  We are still in the midst of the next experience
22      study.  It's a different process than what's done
23      annually.
24  BY MR. HOWELL:
25  Q.  I understand that, and apologies if this is asked and

JUDITH KERMANS

1               JUDITH KERMANS
2  answered. I just want to make clear, you have not in
3  the year-over-year actuarial valuations that you've
4  done since January 29, 2009, including, for instance,
5  the June 30, 2013, valuation, you've not seen
6  actuarial assumptions that are included in this
7  experience study that needed to be changed for use in
8  one of the valuation reports, correct?
9  A. Correct.
10  Q. Now, on page A1 of this report, in the first bullet it
11  says: A spread for funding purposes between three and
12  four percent, with the wage inflation assumption
13  between 4.8 percent and 3.5 percent, resulting in
14  overall investment return assumption of between 7.5
15  percent and 7.8 percent.
16         Do you see that?
17  A. Yes.
18  Q. And that is the recommended actuarial assumption
19  regarding the investment return assumption that
20  resulted from this experience study, correct?
21  A. There are two numbers there that are investment return
22  assumptions. So I can't answer the question that
23  you're asking.
24  Q. Fair enough. There's a 7.5 percent investment return
25  assumption and a 7.8 investment return assumption

JUDITH KERMANS

1               JUDITH KERMANS
2  there, correct?
3  A. Correct.
4  Q. And there's a statement that the investment return
5  assumption is between 7.5 percent and 7.8 percent. Do
6  you see that?
7  A. Yes.
8  Q. So would it be fair to say that the 7.5 percent to 7.8
9  percent reflected the recommended actuarial
10  assumption -- that the recommended actuarial
11  assumption should be between those two numbers
12  following this experience study?
13         MS. GREEN: Object to form.
14         MR. BULLOCK: Object to form.
15  BY MR. HOWELL:
16  Q. You can answer if you understood the question.
17  A. No.
18  Q. Well, maybe I can ask it in an easier way. If we look
19  at page A2, go towards the bottom, the short paragraph
20  about three from the bottom, it starts, "We are
21  recommending." Are you there with me?
22  A. Yes.
23  Q. It says: We are recommending certain changes and
24  assumptions. The various assumption changes and their
25  impact on the required contribution are described on

JUDITH KERMANS

1               JUDITH KERMANS
2  the following pages.
3         And, in fact, this experience study
4  reflects certain recommendations by Gabriel Roeder for
5  changes of actuarial assumptions for the PFRS,
6  correct?
7  A. Correct.
8  Q. And can you describe the process for me of how -- not
9  specifically, but generally a recommendation from GRS
10  would go to a system and then how a determination
11  would be made whether to adopt or not adopt that
12  recommendation?
13  A. It would depend on the recommendation.
14  Q. So let's talk about an investment return assumption
15  recommendation.
16  A. As part of this process, we would provide an analysis
17  that included a range of results that we felt were
18  reasonable, and then the board of trustees would
19  select from those, from those alternates.
20  Q. So you would only put forward investment return
21  assumptions that you believed to be reasonable, and
22  then after discussion with the board, they could
23  choose from that menu of reasonable assumptions, and
24  you would know that that was okay with you because
25  you'd already said these are a reasonable set of

JUDITH KERMANS

1               JUDITH KERMANS
2  assumptions?
3  A. Correct.
4  Q. So looking at page A9, this is -- at the top of this
5  page it says Economic Assumptions. Do you see that?
6  A. Yes.
7  Q. And then below it says: In summary, our recommended
8  range of economic assumptions for the system -- system
9  are as follows.
10         And the current investment return and wage
11  inflation assumptions are listed, and then several
12  alternates are also included, correct?
13  A. Correct.
14  Q. And that's just an example of what you just described,
15  which is you may provide a few different reasonable
16  options to the system and then they can choose?
17  A. Correct.
18  Q. So on January of 2009, you provided three
19  alternatives, and of those three alternatives, there
20  were two investment return assumptions recommended by
21  Gabriel Roeder Smith to the PFRS, correct?
22  A. I see three alternates.
23  Q. I agree that there are three alternates, but of the
24  three alternates, there are only two different
25  investment return assumptions, correct?

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

```
1              JUDITH KERMANS
2     A.  Correct.
3     Q.  So Gabriel Roeder Smith recommended in January of 2009
4         that the PFRS could use an investment return
5         assumption of 7.5 percent or of 7.8 percent, correct?
6     A.  If you read the last paragraph from the bottom, it
7         says:  We would recommend considering a three basis
8         point reduction in the assumed rate of return to 7.5
9         percent.
10    Q.  So one of the recommendations was to consider going
11        from 7.8 percent, which had been the investment return
12        rate, to 7.5 percent, correct?
13    A.  Correct.
14    Q.  Now, you also say that continuation of a 7.8 percent
15        investment return assumption would be reasonable in
16        your view at that time, correct?
17    A.  Correct.
18    Q.  However, you also provide a recommendation that it
19        would be worth considering going down to 7.5 percent?
20    A.  Correct.
21    Q.  Now, ultimately, after providing this menu of options
22        to the PFRS board, PFRS did in fact adjust their
23        return assumption from 7.8 percent to 7.5 percent in
24        2009, correct?
25    A.  Correct.
```

```
1              JUDITH KERMANS
2     Q.  Now, later in 2011 the PFRS again adjusted its
3         investment return assumption from 8 -- from 7.5
4         percent to 8 percent, correct?
5     A.  Correct.
6     Q.  Do you recall whether Gabriel Roeder Smith was
7         involved in discussions around that adjustment from
8         7.5 percent to 8 percent?
9     A.  I don't recall.
10    Q.  And -- strike that.
11              On page A9 there's also a couple of
12        different wage inflation recommendations, depending on
13        which alternate to use, either 3.5 percent or 4
14        percent for wage inflation, correct?
15    A.  Or 4.8.
16    Q.  The current is 4.8, and then the suggested alternates
17        are 4 percent or 3.5 percent, correct?
18    A.  Correct.
19    Q.  Do you know what Gabriel Roeder Smith did to arrive at
20        the wage inflation numbers that were presented as
21        alternates to the PFRS?
22    A.  I believe that's detailed in the report, as well.  If
23        you'll give me a moment, I'll try to find it.
24    Q.  Sure.
25    A.  It's on page C1 -- actually, that's a merit and
```

```
1              JUDITH KERMANS
2         seniority portion.
3              Part of the analysis is on page A11, and
4         then the remaining part is on page C1.
5     Q.  And can you describe for me -- let's start with page
6         A11.  Can you describe for me the methodology that
7         Gabriel Roeder Smith used, including page A11, to
8         arrive at a recommended inflation assumption?
9     A.  What typically happens is we start with an inflation
10        rate, and we use a building-block method to determine
11        all of the other assumptions, including the wage
12        inflation and the assumed rate of return.
13              This page just outlines some of the
14        historical data that was used as part of the
15        decision-making process and shows what types of yields
16        and national average earnings have indicated over the
17        last 50-some years.
18    Q.  So, in your view, one of the helpful data points in
19        arriving at an inflation rate assumption would be
20        historical rates of inflation, right?
21    A.  Correct.
22    Q.  And here you look at 58 years of history of price
23        inflation and other data points to help arrive at an
24        inflation assumption recommendation, correct?
25    A.  Correct.
```

```
1              JUDITH KERMANS
2     Q.  If we turn back to page A7, there's some description
3         of the process used to arrive at the inflation
4         assumption, is that correct?
5     A.  Yes.
6     Q.  And subsequent to the issuance of this experience
7         study, setting aside the fact that I know you have not
8         completed the next experience study, have you ever
9         made any adjustments to the inflation rate assumption
10        when performing an annual actuarial valuation for PFRS
11        and GRS, different than what's in this experience
12        study?
13              MS. GREEN:  Object to form.
14    A.  Could you repeat the question?
15  BY MR. HOWELL:
16    Q.  Sure.  So again, I'll just preface this by saying I
17        know that the next experience study is not completed.
18    A.  Okay.
19    Q.  Subsequent to the issuance of this experience study,
20        in preparing any of the annual actuarial valuations
21        that you've done for PFRS and GRS, have you used any
22        inflation assumptions that are different than what is
23        laid out in the experience study?
24    A.  In the 2013 valuation and at least one or two before,
25        we had a zero percent wage inflation assumption for
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 32 of 42

JUDITH KERMANS

1
2    one or two years, which was not discussed in this
3    valuation -- in this experience study.
4    Q.   Other than the use of a zero percent wage inflation
5        for a period of one or two years in some of the annual
6        actuarial valuations, are there any other changes that
7        you have made in issuing an annual actuarial valuation
8        for the PFRS or GRS to the inflation assumptions
9        listed in this experience study?
10   A.   Not that I'm aware.
11   Q.   Okay.  Do you recall why zero percent wage inflation
12       was used for a period of one or two years in certain
13       of the annual actuarial valuations?
14   A.   Our understanding was that there was a pay freeze for
15       those individuals.
16   Q.   So that assumption changed due to a particular set of
17       circumstances in which there was a, a specific reason
18       not to include the inflation assumption in the
19       experience study?
20   A.   Could you rephrase the question, please?
21   Q.   I think I've asked and answered it.  We'll move on.
22   A.   Okay.
23   Q.   I'll ask you to keep that Kermans Exhibit 4 in front
24       of you, but I'm going to hand you what we'll mark as
25       Kermans Exhibit 5.

JUDITH KERMANS

1
2            MARKED FOR IDENTIFICATION:
3            DEPOSITION EXHIBIT 5
4            1:10 p.m.
5        MR. HOWELL:  For identification purposes,
6    Kermans Exhibit 5 doesn't have a Bates range but is
7    the City of Detroit General Retirement System
8    Five-Year Experience Study for the period July 1,
9    2002, through June 30, 2007, issued February 17, 2009.
10   BY MR. HOWELL:
11   Q.   Ms. Kermans, do you recognize this document?
12   A.   Yes.
13   Q.   And this is just the five-year experience study for
14       the GRS that's analogous to the one we were just
15       looking at for the PFRS, right?
16   A.   Correct.
17   Q.   Now here if you'll turn with me to page A10, again,
18       the title of this page is Economic Assumptions, and
19       again, there are certain recommended ranges of
20       economic assumptions for the GRS, where you provide
21       the current and two alternates at the top of the page.
22       Do you see that?
23   A.   Yes.
24   Q.   And at the time that this report was issued in
25       February of 2009, the GRS had an investment return of,

JUDITH KERMANS

1
2    assumption of 7.9 percent, correct?
3    A.   Correct.
4    Q.   And it's your understanding that the GRS has used a
5        7.9 percent investment return assumption for more than
6        a decade, correct?
7    A.   Correct.
8    Q.   Now, the alternates that you provide here both have a
9        7.5 percent investment return assumption, correct?
10   A.   Yes.
11   Q.   And in the text below the menu of options, the first
12       sentence says:  Funding value rates of return for the
13       ten-year period ending June 30, 2007, averaged 7.8
14       percent for the plan in total, close to the currently
15       assumed 7.9 percent.
16           Do you see that?
17   A.   Yes.
18   Q.   And you understood that that was accurate at least at
19       the time that you reviewed this document, correct?
20   A.   Yes.
21   Q.   You go on to say -- or Gabriel Roeder goes on to say:
22       However, due to the board's gainsharing program, the
23       funding value rates of return credited to the pension
24       funds have averaged only 5.9 percent.
25           Do you see that?

JUDITH KERMANS

1
2    A.   Yes.
3    Q.   Do you have an understanding of what is meant by the
4        board's gainsharing program?
5    A.   Yes.
6    Q.   What is the board's gainsharing program?
7    A.   One of the benefit provisions that the plan has is an
8        annuity savings fund, and interest is credited to the
9        annuity savings fund, and that is a type of
10       gainsharing program.
11   Q.   You go on to say:  A continuation of a 7.9 percent
12       investment return assumption would be reasonable if,
13       going forward, investment returns are credited
14       proportionately to all reserve funds.
15           Do you see that?
16   A.   Yes.
17   Q.   Can you explain to me the difference between what is
18       described in that sentence and what was done under the
19       gainsharing or ASF program?
20   A.   I believe that's illustrated in the funding value
21       rates of return shown below.
22   Q.   And can you explain to me how I would see from the
23       funding value rates of return chart the difference
24       between a proportional credit of investment returns to
25       all reserve funds versus the gainsharing program?

JUDITH KERMANS

A.  The pension funds have averaged a 5.9 percent rate of
    return, but the funds in total have averaged 7.8
    percent.
Q.  And what is represented in addition to pension funds
    in the fund total?
A.  The annuity savings fund.
Q.  And so without the gainsharing but instead a
    proportional credit, the fund total would be the
    column to look at rather than the pension fund column?
A.  Correct.
Q.  Gabriel Roeder goes on to say:  If the current
    gainsharing practice is to be continued, we would then
    recommend a reduction in the investment return
    assumption to -- excuse me, at least to 7.5 percent
    and eventually to an even lower rate.
        Do you see that?
A.  Yes.
Q.  Do you have an understanding as to whether the
    gainsharing practice continued subsequent to this
    report, and if so for how long?
A.  My understanding is that it continued until 2011.
Q.  It is also your understanding that the GRS did not
    adopt a change from 7.9 percent for a target
    investment return to 7.5 percent, correct?

JUDITH KERMANS

A.  Correct.
Q.  Did you nonetheless still view the 7.9 percent target
    investment return as a reasonable target -- as a
    reasonable investment return assumption while
    performing the actuarial valuations for GRS in 2009
    and 2010?
A.  Yes.
Q.  And you did that because you still believed that it
    was more likely than not that the GRS would return
    investment returns of 7.9 percent or higher, correct?
A.  Correct.
Q.  Since February of 2009, has Gabriel Roeder issued any
    recommendations to the GRS for the GRS to change its
    investment return assumption?
A.  There would be no official recommendations until such
    time as the experience study's completed.
Q.  Well, if you while performing an actuarial valuation
    believed the investment return assumption to be
    unreasonable, you would have to disclose that, right?
A.  Yes.
Q.  And you haven't done that between 2009 and today,
    correct?
A.  We have not declared the investment return assumption
    used in the valuation as being unreasonable.

JUDITH KERMANS

Q.  And nor have you, whether, you know -- from an
    experience study or otherwise, you haven't provided
    any additional recommendation for a change to the
    investment return assumption for the GRS, correct?
A.  We would not provide an official recommendation until
    such time as we completed the experience study.
Q.  So you haven't done it, right?
A.  We would not do it until we completed the experience
    study.
Q.  I understand your point.  I just want to make sure
    that you're not going to tell me that you have done
    it.  So the answer is that you haven't provided an
    official recommendation to the GRS to change their
    investment return assumptions since 2009's experience
    study, correct?
A.  I don't recall having done that.
Q.  Do you recall making any informal recommendations, not
    official, but unofficial recommendations to change the
    investment return assumption for GRS subsequent to
    February of 2009?
A.  I don't recall.  It is possible.
Q.  In preparation for your deposition, did you ask anyone
    else at Gabriel Roeder Smith whether there had been
    any informal or unofficial recommendations to the GRS

JUDITH KERMANS

    to change the investment return assumption since 2009?
A.  I did not ask that question.
Q.  And, to your knowledge, as you're sitting here now,
    you can't refer me to any informal or unofficial
    recommendation by Gabriel Roeder to GRS to change its
    investment return assumption since 2009, correct?
A.  Correct.
Q.  Sitting here today, you cannot point me to any
    official or unofficial recommendation from Gabriel
    Roeder Smith to the PFRS to change its investment
    policy assumption, return assumption since 2009,
    correct?
A.  Correct.
Q.  Turning back to, I believe it was Kermans Exhibit 4,
    the PFRS experience study, if we look at A2 and those
    six bullets that you talked about, which were the
    different areas of assumptions that were kind of
    analyzed in this experience study?
A.  Correct.
Q.  I don't want to belabor the point by walking through
    each of them, although I'm happy to do so if we need
    to, but just the same question for these different
    assumptions, the retirement assumptions, the salary
    increase assumptions, mortality assumptions.

JUDITH KERMANS

1           JUDITH KERMANS
2       In looking at these, are there any changes
3 to any of these assumptions, any of these categories
4 of assumptions, that you can recall making for any of
5 the annual actuarial valuations for PFRS or GRS
6 between the time of this experience study and today,
7 other than the change for the first two years of
8 inflation that you already, that you already
9 mentioned?
10 A. I cannot recall any other changes.
11 Q. I don't want to misstate your prior testimony, but I
12 believe that you said subject to a privilege around
13 mediation discussions, that prior to preparing for
14 this deposition you had not reviewed any documents
15 prepared by Milliman in which Milliman provided
16 comments related to the actuarial work done by Gabriel
17 Roeder Smith for the GRS and PFRS, correct?
18 A. I believe that we were not asked to do any formal
19 reviews of any Milliman work.
20 Q. When did you first become aware that Milliman was
21 working with the City of Detroit with regard to
22 actuarial work associated with review of the actuarial
23 work for the PFRS and GRS?
24 A. I believe that would be about a year ago.
25 Q. Have you ever had any conversations, you know,

JUDITH KERMANS

1           JUDITH KERMANS
2 separate and apart from any mediation privilege here,
3 any conversations with Milliman about the work that
4 Gabriel Roeder Smith has done for the PFRS or GRS?
5 A. I have not.
6 Q. Anyone from Milliman ever reach out to anyone at
7 Gabriel Roeder Smith to discuss any of the actuarial
8 assumptions or actuarial valuations done by Gabriel
9 Roeder Smith for PFRS or GRS?
10 A. I believe that there was some discussion
11 pre-bankruptcy with someone at our office and the
12 Milliman company.
13 Q. And do you have any understanding of the subject of
14 those discussions?
15 A. I believe they were trying to either do a retiree
16 health valuation or do some kind of an analysis for
17 the City.
18 Q. Do you know what kind of analysis?
19 A. As I mentioned, it's either a health valuation or some
20 other kind of pension analysis.
21 Q. You don't know the specific type of pension analysis?
22 A. No.
23 Q. Do you know Glenn Bowen at Milliman?
24 A. Outside of mediation, no.
25 Q. What about Kathryn Warren?

JUDITH KERMANS

1           JUDITH KERMANS
2 A. Same answer.
3 Q. What about Allen Perry?
4 A. I've never met Allen Perry.
5 Q. What about Suzanne Taranto?
6 A. I've never met Suzanne Taranto.
7 Q. I'm going hand you what I will mark as Kermans
8 Exhibit 6.
9       MARKED FOR IDENTIFICATION:
10       DEPOSITION EXHIBIT 6
11       1:26 p.m.
12       MR. HOWELL: For identification purposes,
13 Kermans Exhibit 6 has the Bates range POA00260505
14 through 522.
15 BY MR. HOWELL:
16 Q. Ms. Kermans, do you recognize this document?
17 A. I don't believe that I do.
18 Q. At the -- this document is a July 6th, 2012, letter
19 from Glenn Bowen and Suzanne Taranto of Milliman to
20 the chief operating officer of the City of Detroit,
21 and in the first paragraph it says: As you have
22 requested, Milliman has begun an analysis of the City
23 of Detroit's actuarial liabilities in support of the
24 City and Financial Advisory Board ("FAB"). This
25 letter summarizes Milliman's assessment of the current

JUDITH KERMANS

1           JUDITH KERMANS
2 actuarial and financial status of the pension and
3 post-retirement health programs.
4       Do you see that?
5 A. Yes.
6 Q. Now, in July of 2012, Gabriel Roeder Smith had
7 conducted assessments annually for years of the
8 current actuarial and financial status of the GRS and
9 PFRS pension programs, correct?
10 A. Could you repeat the question?
11 Q. Certainly. In July of 2012, Gabriel Roeder Smith had
12 at that point in time been assessing the current
13 actuarial and financial status of the GRS and PFRS
14 pension systems in yearly valuations for decades,
15 right?
16 A. Correct.
17 Q. Do you know whether the City reached out to Gabriel
18 Roeder Smith in 2012 to perform assessments of the
19 current actuarial and financial status of the PFRS and
20 GRS pension systems?
21 A. Please repeat the question?
22 Q. Do you know if the City reached out to Gabriel Roeder
23 Smith in 2012 to assess the current actuarial and
24 financial status of the PFRS and GRS pension systems?
25 A. I don't recall that happening.

JUDITH KERMANS

1
2 Q.  Do you believe that Gabriel Roeder Smith would have
3     been in a better position than Milliman in July of
4     2012 to provide an assessment of the current actuarial
5     and financial status of the GRS and PFRS pension
6     systems?
7         MS. GREEN:  Object to form.
8 A.  I believe we did assess the financial position of both
9     pension plans in our actuarial valuation.
10 BY MR. HOWELL:
11 Q.  I understand that.  My question is a little different.
12     It's do you believe that Gabriel Roeder Smith was in a
13     better position in July of 2012 to assess the current
14     actuarial and financial status of the GRS and PFRS
15     pensions than was Milliman?
16 A.  You're asking me if the analysis done by Milliman was
17     better done by Milliman than by Gabriel Roeder Smith,
18     and I cannot answer that question because I don't know
19     what this analysis was about.
20 Q.  Apologies.  That is not the question I was trying to
21     ask.  What I'm trying to ask is whether you believe
22     that in July of 2012, Milliman or Gabriel Roeder Smith
23     would have been better situated to assess the current
24     actuarial and financial status of the PFRS and GRS
25     pension systems.

JUDITH KERMANS

1
2 A.  It is common for other actuaries to audit the work of
3     each other, and Gabriel Roeder Smith would not have
4     been in a position to audit their own work.  So the
5     question that you asked cannot really be answered the
6     way you're expecting.
7 Q.  So it's your testimony that it can't be answered as to
8     whether Milliman or Gabriel Roeder Smith was in a
9     better position to assess the current actuarial and
10     financial status of the GRS and PFRS pension systems
11     in July of 2012?
12 A.  I'm saying it depends on the project.
13 Q.  The next paragraph says:  Based on a preliminary
14     review of the June 30, 2010, actuarial valuation
15     reports for the General Retirement System for the City
16     of Detroit and the Police and Fire Retirement System
17     of the City of Detroit, we have the following high
18     level recommendations.
19         Do you see that?
20 A.  Yes.
21 Q.  Are you aware of any June 30, 2010, actuarial
22     valuations performed for the GRS and PFRS other than
23     those done by Gabriel Roeder Smith?
24 A.  No.
25 Q.  They go on to say that one of the recommendations is

JUDITH KERMANS

1
2     to remeasure assets and liabilities using unbiased
3     assumptions.
4         Do you have an opinion as to whether
5     Gabriel Roeder Smith had used biased assumptions in
6     its June 30, 2010, actuarial valuation reports --
7 A.  Yes.
8 Q.  -- for the GRS and PFRS?
9 A.  Yes, I have an opinion.
10 Q.  What is your opinion?
11 A.  Our assumptions were unbiased.
12 Q.  Now, if you look on the second page, ending in Bates
13     number 506, it says:  The following table provides our
14     very rough preliminary guesstimates ("VRPG") of the
15     potential actual state of the systems.
16         Do you see that?
17 A.  Yes.
18 Q.  And you wouldn't use, just generally, very rough
19     preliminary guesstimates in putting together an annual
20     actuarial valuation, correct?
21 A.  It is not an actuarially-defined term.
22 Q.  Safe to say that the material that is in your annual
23     actuarial valuations are not very rough preliminary
24     guesstimates, in your opinion, right?
25 A.  You are correct.

JUDITH KERMANS

1
2 Q.  Okay.  Now, if you see, there's a chart right below
3     that and there are a series of items listed.  Do you
4     see that?
5 A.  Yes.
6 Q.  And below is a, there's kind of a section over the
7     next couple of pages that relate to several of these
8     items in the chart, and I just want to walk through a
9     few of those with you, but I want to make sure I give
10     you an opportunity to review these sections before I
11     do, but we're going to hop around a little bit in this
12     document so that we don't have to go through the whole
13     thing, okay?
14         MS. GREEN:  Rush, if I could interject, she
15     has not seen this document, and you want her to read
16     it?  Can we take a ten-minute break, anyway, because
17     we've been going a little over an hour, just to take a
18     restroom break?
19         MR. HOWELL:  Yeah, absolutely, we can take
20     a break.
21         VIDEO TECHNICIAN:  The time is 1:32 p.m.
22     We are now off the record.
23         (Off the record at 1:32 p.m.)
24         (Back on the record at 1:51 p.m.)
25         VIDEO TECHNICIAN:  The time is 1:51 p.m.

35 (Pages 137 to 140)

JUDITH KERMANS

1              JUDITH KERMANS
2       We are now on the record.
3  BY MR. HOWELL:
4  Q.  Ms. Kermans, we were discussing Kermans Exhibit 6,
5      which is the July 6, 2012, Milliman letter to the
6      chief operating officer of Detroit, and we were
7      looking at a chart that's labeled the VRPG of
8      Potential Actual State of Systems as of June 30, 2010.
9      Do you see that?
10  A.  Yes.
11  Q.  And I don't want to take too much time going through
12     this, I understand you haven't reviewed the document,
13     but I just want to ask you to look at a couple
14     sections that relate to two of these items that are
15     listed in the chart, because you can see in the chart
16     that with each item, either assets go down or
17     liability goes up, leading to a reduction in
18     Milliman's VRPG of the funded status of the GRS and
19     PFRS. Do you see that?
20  A.  Yes.
21  Q.  So directly below the chart there's something that
22     says optimism of demographic assumptions, and it was
23     your testimony earlier that demographic assumptions
24     that you use in performing your actuarial valuations
25     are in the view of Gabriel Roeder Smith neither

JUDITH KERMANS

1              JUDITH KERMANS
2      optimistic nor pessimistic, but are best estimate
3      assumptions, correct?
4  A.  They are the best estimate assumptions until the
5     experience study is completed.
6  Q.  And it says: For both DGRS and PFRS, the valuation
7     reports indicate the use of a mortality assumption
8     that does not explicitly provide for the projection of
9     mortality improvements.
10    Do you see that?
11  A.  Yes.
12  Q.  Do you know whether the valuation reports and the
13     mortality assumptions in the Gabriel Roeder Smith
14     valuation reports provide for projection of mortality
15     improvements?
16  A.  The 2013 reports for both police and fire and the DGRS
17     do not provide for expected mortality improvements.
18  Q.  That's also true for the 2010 report, to your
19     knowledge?
20  A.  I don't recall.
21  Q.  Why not include explicit provisions for projection of
22     mortality improvements in the 2013 reports?
23  A.  It's the same mortality table that we were using from
24     the 2009 study. It's just that we've now determined
25     that we can no longer say that it provides a margin

JUDITH KERMANS

1              JUDITH KERMANS
2      for future mortality improvements.
3      When we do the experience study, chances
4      are we will update the assumptions to include a margin
5      for future improvements.
6  Q.  So you can't say for sure, one way or another, what
7     you're going to have in the updated experience study,
8     correct?
9  A.  Correct.
10  Q.  And in 2013 you wouldn't have used a set of
11     assumptions, mortality assumptions that you didn't
12     think were reasonable, correct?
13  A.  Correct.
14  Q.  So you believe that the 2013 assumptions that you used
15     did not explicitly provide for -- projection of
16     mortality improvements were reasonable at the time you
17     used them, correct?
18  A.  They were reasonable for the purpose of that
19     measurement.
20  Q.  And the purpose of that measurement was to determine
21     contribution rate necessary for those -- PFRS and GRS,
22     correct?
23  A.  Correct.
24  Q.  Do you see in item E it says adjust out pension
25     obligation certificates in the VRPG chart in the

JUDITH KERMANS

1              JUDITH KERMANS
2      center of page 2 of this July 6th letter?
3  A.  Yes.
4  Q.  And I can turn your attention to page 4, which lists
5     the bottom section as impact on the City of past
6     pension obligation certificates -- and you're familiar
7     with what the pension obligation certificates are,
8     correct?
9  A.  Yes.
10  Q.  And you'll see in the middle of that section it says:
11     In item E of the table above, we have adjusted out the
12     pension obligation certificate value to present the
13     big picture view.
14    Do you see that?
15  A.  Yes.
16  Q.  Now, in the actuarial valuations performed by Gabriel
17     Roeder Smith, you do not remove the pension obligation
18     certificates from the assets of the DGRS and -- or the
19     GRS and PFRS, correct?
20  A.  The assets as reported include the pension obligation
21     certificate money.
22  Q.  And why do you include them rather than adjust them
23     out when you are performing the valuations for the GRS
24     and PFRS?
25  A.  It is our understanding that they are included in the

1            JUDITH KERMANS
2    trust fund money.
3   Q. And so in the opinion of Gabriel Roeder Smith, it's
4    correct to assume that those are included in the
5    assets?
6   A. They're included in the assets when they're reported
7    to us.
8   Q. And you have no reason to doubt that that's correct,
9    right?
10        MR. BULLOCK: Object to form.
11        MS. GREEN: Same objection.
12   BY MR. HOWELL:
13   Q. You can answer if you understood the question.
14   A. Sounds like a legal issue rather than an actuarial
15    one.
16   Q. Well, I'm not asking you a legal issue, I'm asking
17    you -- you have to make a determination as an actuary
18    whether or not to accept data that's provided to you,
19    correct?
20   A. We are not -- under no obligation to audit data or to
21    assume that it's deceitful in any way.
22   Q. If you thought that there was over a billion dollars
23    incorrectly included in assets, based on your review,
24    is that the sort of thing you would maybe bring up to
25    a system?

1            JUDITH KERMANS
2   A. Yes.
3   Q. And you didn't, you didn't think that was the case
4    here, right?
5        MR. BULLOCK: Object to form.
6   BY MR. HOWELL:
7   Q. You can answer.
8   A. We had no reason to bring it up.
9   Q. Ms. Kermans, you would agree that it's important to
10    choose a reasonable investment return assumption when
11    preparing an actuarial valuation of a crude actuarial
12    liability, correct?
13   A. We don't choose the valuation assumption. I would
14    agree that it's important to use a reasonable assumed
15    rate of return when completing the actuarial
16    valuation.
17   Q. Thanks for that clarification. And, in fact, if you
18    believed that the investment return assumption that
19    you were using was not reasonable, you would have to
20    either not go forward with the analysis or disclose
21    that you believed that investment return assumption
22    was unreasonable, correct?
23   A. Correct.
24   Q. Would you agree with the statement that an investment
25    return assumption that is set too low will overstate

1            JUDITH KERMANS
2    liabilities and costs, causing current taxpayers to be
3    overcharged and future taxpayers to be undercharged?
4        MS. GREEN: Object to form and foundation.
5   A. Could you repeat the question, please?
6   BY MR. HOWELL:
7   Q. Do you agree with the statement that an investment
8    return assumption that is set too low will overstate
9    liabilities and costs, causing current taxpayers to be
10    overcharged and future taxpayers to be undercharged?
11        MS. GREEN: Same objection, but go ahead
12    and answer.
13   A. Can you tell me what you're looking at, please?
14   BY MR. HOWELL:
15   Q. I'm just asking you --
16   A. Questions?
17   Q. -- if you agree with that statement.
18   A. I think it's more complicated than that.
19   Q. And how so?
20   A. I think there are other parties that would be affected
21    by that decision than just the taxpayers, but ...
22   Q. Setting aside other parties for a moment, just
23    focusing on the taxpayers, the current and future
24    taxpayers, would you agree that if you set an
25    investment return assumption too low, you could

1            JUDITH KERMANS
2    overstate liabilities and costs, hurting the current
3    taxpayers and benefiting the future taxpayers,
4    whereas if you set it, an investment return assumption
5    too high, you could hurt the future taxpayers at
6    the -- to the benefit of current taxpayers?
7        MS. GREEN: I'm going to object again or
8    reiterate my prior objection. That just seems to be
9    sort of an expert witness type of question, a
10    hypothetical, and outside of the scope of the 30(b)(6)
11    notice under which Ms. Kermans is being presented as a
12    witness.
13   BY MR. HOWELL:
14   Q. You can answer.
15   A. I will say that if you set your assumed rate of return
16    too low, you can increase liabilities and create a
17    contribution rate that is too high for the intended
18    measurement.
19   Q. And your belief is that could, that could affect
20    multiple parties, one of which could be taxpayers?
21        MR. BULLOCK: Object to form, Counsel. I
22    think, in fairness, because you've moved outside of
23    her role as a lay witness, she needs some context for
24    your question.
25   BY MR. HOWELL:

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

JUDITH KERMANS

1
2 Q. Well, did you understand the question?
3 A. I heard the question.
4 Q. Okay. I mean, I'm not asking you for an expert
5 opinion here. You perform actuarial valuations,
6 right? We've discussed that at length.
7 A. Yeah.
8 Q. And one of the things you have to do is get
9 comfortable with investment return assumptions,
10 because if they're not reasonable, you can't use them,
11 right?
12 A. Correct.
13 Q. So do you in that position, including the work that
14 you've done for PFRS and GRS, do you have an
15 understanding as to why an investment return
16 assumption needs to be reasonable?
17 A. Yes.
18 Q. And explain for me why it is that you view it
19 important that an investment return assumption be
20 reasonable.
21 A. A number of reasons, but it depends on the measurement
22 and for the actuarial valuation so that the
23 contribution rate is calculated properly.
24 Q. What would some other reasons be, in addition to the
25 one that you just listed?

JUDITH KERMANS

1
2 A. So the generations of citizens are treated fairly.
3 Q. What do you mean by that?
4 A. Taxpayers.
5 Q. And what do you mean when you say so the generations
6 of taxpayers would be treated fairly?
7        MS. GREEN: Object to form and foundation
8 again.
9 A. I think some of that information is listed in our
10 report.
11 BY MR. HOWELL:
12 Q. Fair enough. You're welcome to point me to where in
13 your report you think that that's listed, but it would
14 be helpful for me if you could explain why it is that
15 you think it's important to set a reasonable
16 investment return assumption so that generations of
17 citizens would be treated fairly.
18 A. So that, in line with the goals and objectives of the
19 retirement system, that generations of citizens would
20 have equitable contribution rates, and, as you
21 mentioned, that we wouldn't charge too much to this
22 generation and less to the other.
23 Q. As part of the work that you do in putting together
24 annual actuarial valuations for GRS and PFRS, do you
25 undertake a review of the asset allocations for those

JUDITH KERMANS

1
2 systems?
3 A. No, not a review.
4 Q. Do you look at the asset allocations for those
5 systems? And I'm not asking if you, you know, provide
6 recommendations or do an analysis of them, but do you
7 at least observe what they are?
8 A. We use the asset allocations provided to us as part of
9 the valuation process for the DGRS. There is no
10 allocation in the PFRS.
11 Q. So you're not aware of the asset allocation of the
12 PFRS?
13 A. PFRS has one contribution rate and one group
14 contribution rate calculated.
15 Q. I may be asking -- I should be more clear. I'm
16 talking about the allocation of investments across
17 different asset classes for the GRS and PFRS.
18 A. Okay.
19 Q. That information is provided to Gabriel Roeder Smith,
20 as well, correct?
21 A. We receive assets by class, yes.
22 Q. And is that something that you look at, as well, as
23 part of your actuarial analysis?
24 A. We would look at that as part of the experience study
25 process.

JUDITH KERMANS

1
2 Q. And that could be helpful in determining the
3 appropriate investment return assumption, correct?
4 A. Correct.
5 Q. In fact, an investment return assumption is largely
6 tied to a particular asset allocation, correct?
7        MS. GREEN: Object to foundation.
8 A. Could you repeat the question?
9 BY MR. HOWELL:
10 Q. An investment return assumption is largely a function
11 of the asset allocation for the system in question,
12 correct?
13 A. I would say that the asset allocation of a system's
14 money is one of the decision-making points in
15 selecting the assumed rate of return.
16 Q. In general, if you have a more aggressive asset
17 allocation, you would generally expect higher returns
18 but also more risk, correct?
19        MS. GREEN: Object to foundation again.
20 A. I'm not an investment adviser. What you're saying
21 makes common sense.
22 BY MR. HOWELL:
23 Q. Well, if a, if a system wants to adjust -- make a
24 significant adjustment to its investment return
25 assumption, that new return assumption has to be tied

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 39 of 42

JUDITH KERMANS

2  to some sort of asset allocation, correct?
3         MS. GREEN:  Object to form.
4  A.  I would say that the asset allocation would help you
5     decide what the assumed rate of return should be.
6  BY MR. HOWELL:
7  Q.  And other things being equal, if I have the same asset
8     allocation, I can't just say I'm going to have a
9     significantly different investment return assumption,
10    correct?
11        MS. GREEN:  Objection.
12 A.  I can't answer that question in the form that you've
13    asked it.
14 BY MR. HOWELL:
15 Q.  Well, you review investment return assumptions as part
16    of your job, correct?
17 A.  As part of the experience study process, we will
18    evaluate and make recommendations for a reasonable
19    range of investment return assumptions for the
20    five-year period going forward.
21 Q.  And a plan -- a system, rather, can't just come to you
22    and say, "We're going to set our investment return
23    assumption five hundred basis points higher and we're
24    not going to make any changes to our asset
25    allocation," right?  That wouldn't make any sense,

JUDITH KERMANS

2  would it?
3  A.  We have plans that we work with that have prescribed
4     assumptions that are set by the State.  So there is a
5     situation where they would tell us what the assumed
6     rate of return would be.
7  Q.  And in that circumstance, you would still have to
8     justify the reasonableness of that assumption by
9     making sure that it's something you believe would
10    occur more often than not, correct?
11 A.  Not exactly.
12 Q.  In a situation where you have a prescribed return
13    assumption, in order for that return assumption to be
14    reasonable, you would still need it to -- you would
15    still need to believe that it would be reached more
16    often than not, correct?
17        MS. GREEN:  Object to the form of the
18    question.
19 A.  We would determine what a reasonable range of results
20    would be, and what we would generally do is we would
21    choose a number within that range, primarily
22    recommending something that's in the 50th percentile
23    of likely occurrences.
24 BY MR. HOWELL:
25 Q.  When you're performing actuarial valuations, the

JUDITH KERMANS

2  discount rate that you use in calculating a UAAL is
3  typically the same as the investment return assumption
4  for that plan, correct?
5  A.  The discount rate used to calculate the present value
6     of future benefits is generally the same in public
7     sector plans as the assumed rate of return on assets.
8  Q.  And when you say "generally the same," have you ever
9     seen an example where it wasn't?
10 A.  I have not.
11 Q.  Is there anything in either of the 2013 annual
12    actuarial valuations, either the one for the PFRS or
13    the GRS, that you would like to change as you sit here
14    today?
15 A.  Could you be more specific?
16 Q.  Just anything that comes to mind that you think you
17    would want to change.
18 A.  No.
19 Q.  I don't think I have anything further.  Thanks for
20    your patience today.  I believe we may have --
21        MR. HOWELL:  Does anyone on the phone,
22    before we move on, have any questions they're going to
23    ask today?
24        MR. PLOTKO:  I don't.  This is Greg Plotko.
25        MR. HOWELL:  Okay.  I think we just have

JUDITH KERMANS

1  one other set, then.
2         Would you like to take a break or ...
3         MR. BHARGAVA:  We can go off the record for
4  a couple minutes while we transition.
5         VIDEO TECHNICIAN:  The time is 2:12 p.m.
6  We are now off the record.
7         (Off the record at 2:12 p.m.)
8         (Back on the record at 2:21 p.m.)
9         VIDEO TECHNICIAN:  The time is 2:21 p.m.
10 We are now on the record.
11        EXAMINATION
12 BY MR. BHARGAVA:
13 Q.  Good afternoon, Ms. Kermans.
14 A.  Hi.
15 Q.  As I said before, my name is Mike Bhargava, and I'm
16    representing Assured Guaranty Municipal Corporation.
17 A.  Okay.
18 Q.  I just have a few hopefully very quick questions for
19    you.  Have you, have you had the opportunity to review
20    any of the various iterations of the City's plan of
21    adjustment?
22 A.  I have not done a formal review of the plan of
23    adjustment.
24 Q.  Okay.  Have you seen parts of the plan?

JUDITH KERMANS

1
2  A.  I have briefly read parts that would pertain to the
3      pension system.
4  Q.  Okay.  So are you generally familiar with what the
5      plan proposes in terms of the pension systems?
6  A.  I am somewhat familiar with the cuts that are being
7      proposed.
8  Q.  Are you, are you aware that the plan allocates a
9      portion of the UAAL that it attributes specifically to
10     DWSD?
11 A.  I have not been asked to perform an analysis --
12     Gabriel Roeder has not been asked to perform an
13     analysis of the numbers that appear in the plan of
14     adjustment to even determine whether or not they're,
15     in fact, an unfunded accrued liability.
16 Q.  Okay.  So are you aware -- but you're aware that there
17     is a portion of the UAAL that is attributed to DWSD,
18     is that right?
19 A.  I am aware that a certain portion of the claim is
20     attributed to the DWSD.
21 Q.  Okay.  And are you aware that this amount is amortized
22     over nine years?
23 A.  Yes.
24 Q.  Okay.  Was the decision to amortize the UAAL over nine
25     years, was that the result of any actuarial

JUDITH KERMANS

1
2      recommendation by Gabriel Roeder?
3           MR. BULLOCK:  Objection to the extent that
4      it calls for a violation of the mediation
5      confidentiality provision.
6  BY MR. BHARGAVA:
7  Q.  Okay, and let me -- again, as the previous counsel
8      did, I want to make it clear that I'm not asking for
9      anything that happened during mediation.
10 A.  We made no recommendations regarding the plan of
11     adjustment outside of mediation.
12 Q.  Okay.  And again, outside of mediation, did Gabriel
13     Roeder perform any actuarial analysis in support of
14     the nine-year amortization period?
15 A.  We did not.
16 Q.  Okay.  Were you asked to review the nine-year
17     amortization period before it was included in the plan
18     of adjustment?
19 A.  Outside of mediation, we weren't asked to do any
20     analysis regarding the plan of adjustment.
21 Q.  Okay, and is -- do these answers also hold in terms of
22     the proposed 6.75 percent investment return
23     assumption?  In other words, were you -- was Gabriel
24     Roeder asked to perform any analysis with regard to
25     the 6.75 percent investment return assumption?

JUDITH KERMANS

1
2  A.  Outside of the mediation process, we were not asked to
3      perform any analysis of any of the assumptions or
4      numbers in the plan of adjustment.
5  Q.  Okay.  Was Gabriel Roeder asked to analyze in any way
6      the -- well, let me back up.
7           Are you aware that there -- the plan
8      proposes that DWSD contribute money to the UAAL in a
9      way that other divisions of the City are not asked to
10     contribute?
11 A.  I'm aware that the DWSD is making some type of a
12     contribution based on the nine-year amortization
13     period -- actually, that's not right.
14          I'm aware that DWSD is being asked to make
15     contributions during the nine-year period between now
16     and the 2023 year.
17 Q.  Okay.  And are you aware that other City divisions are
18     not being asked to make a similar contribution?
19 A.  That's my understanding.
20 Q.  Okay.  Did Gabriel Roeder perform any actuarial
21     analysis in support of the plan's deferential
22     treatment of DWSD versus other City divisions?
23 A.  We did not perform any analysis of anything regarding
24     the plan of adjustment outside of the mediation
25     process.

JUDITH KERMANS

1
2  Q.  Okay.  And, similarly, you didn't provide any
3      recommendations regarding the differential treatment
4      of different City divisions, is that right?
5  A.  Outside of mediation, that is correct.
6  Q.  Okay, that's all I have.
7           MR. BHARGAVA:  Anyone else on the phone
8      have any questions?
9           All right, I think we are concluded.
10          VIDEO TECHNICIAN:  The time is 2:27 p.m.
11     We are now off the record.
12          (The deposition was concluded at 2:27 p.m.
13     Signature of the witness was not requested by
14     counsel for the respective parties hereto.)
15
16
17
18
19
20
21
22
23
24
25

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 41 of 42

```
 1              JUDITH KERMANS
 2          CERTIFICATE OF NOTARY
 3   STATE OF MICHIGAN )
 4               ) SS
 5   COUNTY OF KENT   )
 6
 7          I, REBECCA L. RUSSO, certify that this
 8   deposition was taken before me on the date
 9   hereinbefore set forth; that the foregoing questions
10   and answers were recorded by me stenographically and
11   reduced to computer transcription; that this is a
12   true, full and correct transcript of my stenographic
13   notes so taken; and that I am not related to, nor of
14   counsel to, either party nor interested in the event
15   of this cause.
16
17
18
19
20
21
22          REBECCA L. RUSSO, CSR-2759
23          Notary Public,
24          Kent County, Michigan.
25   My Commission expires: 6-3-2017
```

41 (Page 161)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-4   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 42 of 42