# EXHIBIT G

```
                UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
                      SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .       Docket No. 13-53846
        MICHIGAN,             .
                             .       Detroit, Michigan
                             .       September 29, 2014
                  Debtor.    .       9:06 a.m.
. . . . . . . . . . . . . . . .


        HEARING RE. (#7667) EMERGENCY MOTION FOR RELIEF FROM
          STAY AND WAIVING THE FRBP 4001(a)(3) FILED BY
        CREDITOR CITIZENS UNITED AGAINST CORRUPT GOVERNMENT;
          CONTINUED TRIAL RE. OBJECTIONS TO CHAPTER 9 PLAN
                BEFORE THE HONORABLE STEVEN W. RHODES
                UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:       Jones Day
                      By:  HEATHER LENNOX
                      222 East 41st Street
                      New York, NY  10017
                      (212) 326-3837

                      Jones Day
                      By:  GREGORY M. SHUMAKER
                           GEOFFREY S. STEWART
                           THOMAS CULLEN
                      51 Louisiana Avenue, N.W.
                      Washington, DC  20001
                      (202) 879-3939

                      Jones Day
                      By:  DAVID G. HEIMAN
                      North Point, 901 Lakeside Avenue
                      Cleveland, OH  44114
                      (216) 586-3939

                      Pepper Hamilton, LLP
                      By:  ROBERT S. HERTZBERG
                      4000 Town Center, Suite 1800
                      Southfield, MI  48075-1505
                      (248) 359-7333

                      Miller, Canfield, Paddock & Stone, PLC
                      By:  MEGAN P. NORRIS
                      150 West Jefferson, Suite 2500
                      Detroit, MI  48226
                      (313) 963-6420
```

APPEARANCES (continued):

| | |
|---|---|
| For Citizens United Against Corrupt Government: | Paterson Law Office By:  ANDREW A. PATERSON, JR. 46350 Grand River Avenue, Suite C Novi, MI  48374 (248) 568-9712 |
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP By:  EDWARD SOTO 1395 Bricknell Avenue, Suite 1200 Miami, FL  33131 (305) 577-3177 |
| For Macomb County Drain Drainage District: | Dechert, LLP By:  DEBRA O'GORMAN 1095 Avenue of the Americas New York, NY  10036 (212) 698-3600 |
| For AFSCME: | Miller Cohen, PLC By:  RICHARD MACK, JR. 6700 West Lafayette Blvd., 4th Floor Detroit, MI  48226-3191 (313) 566-4787 |
| For Ad Hoc Water and Sewer Bondholders: | Kramer Levin Naftalis & Frankel, LLP By:  JONATHAN M. WAGNER 1177 Avenue of the Americas New York, NY  10036 (212) 715-9393 |
| Court Recorder: | LaShonda Moss United States Bankruptcy Court 211 West Fort Street, 21st Floor Detroit, MI  48226-3211 (313) 234-0068 |
| Transcribed By: | Lois Garrett 1290 West Barnes Road Leslie, MI  49251 (517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1       THE COURT:  Let's turn our attention to the

2   emergency motion for relief from stay, please.

3       MR. PATERSON:  Andrew Paterson on behalf of the

4   petitioners.

5       MS. NORRIS:  Megan Norris of Miller Canfield --

6       THE COURT:  All right.  Stand by one second while

7   those who would like to leave the courtroom get an

8   opportunity to do that.

9       MR. THORNBLADH:  Thank you, your Honor.

10      MS. JENNINGS:  Thank you, your Honor.

11      THE COURT:  You're welcome.  Let's give folks one

12  more minute.  And I think we are ready to proceed, sir.

13      MR. PATERSON:  Your Honor, this is petitioner's --

14  movant's motion for relief from the stay for purposes of

15  filing in the Wayne County Circuit Court an open meetings

16  case against the Detroit City Council.  And I would first

17  indicate that the ideal of a democratic government is too

18  often thwarted by bureaucratic secrecy and unresponsive

19  officials.  Citizens frequently find it difficult to discover

20  what decisions are being made and what facts lie behind those

21  decisions.  The Open Meetings Act protects citizens' right to

22  know what's going on in government by opening to full public

23  view the process by which elected and nonelected officials

24  make decisions on citizens' behalf.  Those are not my words.

25  Those are the words of the Michigan legislature upon the

1 introduction of the Open Meetings Act and the Freedom of

2 Information Act in 1976 in the post-Watergate era. The

3 Section 3 of the Open Meetings Act states in its very first

4 sentence, "All meetings of a public body shall be open," and

5 the law as it is developed construes exemptions from that

6 narrowly and broadly protects the right of citizens to know

7 what's going on in their government.

8         The response from the debtor on behalf of the city

9 council indicated, and I think correctly, that the violation

10 of the Open Meetings Act is not really the issue before this

11 Court, and I think that's correct, although the bulk of the

12 response did try to repeat over and over and over again that

13 it was a permitted meeting under various exemptions,

14 particularly the legal matters. The evidence that the

15 movants intend to introduce would be the extensive public

16 statements about the meetings from the participants in the

17 meetings indicating that there were negotiations and

18 discussions for three full days. I think it was a patent

19 violation of the Open Meetings Act, and the plaintiffs intend

20 to seek as well as a declaration of that an injunction

21 against further violations by the Detroit City Council with

22 respect to the Open Meetings Act.

23         THE COURT: Well, how do you deal with the city's

24 argument that your claim is moot?

25         MR. PATERSON: It's not. I mean they've

1   indicated --

2          THE COURT:  How do you deal with it?  What's your

3   response?

4          MR. PATERSON:  They've indicated repeatedly that

5   these were meetings and discussions addressing the facts

6   behind the decisions, and those are clearly covered by the

7   Open Meetings Act.  The city's response or the debtor's

8   response is the response that it may want to make to a

9   circuit judge, but for purposes of this Court's relief, the

10  merits of the case aren't really before it, although I'm

11  confident this is a lay-down open meetings violation.  The

12  city has failed in its response to point to any specific harm

13  that would happen to this proceeding or in this court.

14  They've made --

15         THE COURT:  Well, but I need an answer to my

16  question because if the matter is moot, there's no sense in

17  granting relief from the stay.

18         MR. PATERSON:  I'm seeking an injunction.

19         THE COURT:  What's not moot about it?

20         MR. PATERSON:  I'm seeking --

21         THE COURT:  What relief can a court provide to your

22  clients?

23         MR. PATERSON:  The Circuit Court can and probably

24  will enjoin them from further violations of the Open Meetings

25  Act.  Citizen's right to know.  It's a fundamental right of

1  every citizen of this state to see that public bodies --

2          THE COURT:  But there's no more --

3          MR. PATERSON:  I did in our motion --

4          THE COURT:  Let me just -- let me just finish my

5  question.

6          MR. PATERSON:  Yeah.  Go ahead.

7          THE COURT:  There's no more imminent or threatened

8  violation of the Open Meeting Act at this point.

9          MR. PATERSON:  The circuit judge may determine that

10  and may not issue an injunction, but I am going to seek an

11  injunction against further violations.  I must say I have in

12  the past sued the city's city council for past violations.

13  This is not a new thing to disregard the public's right to

14  know.  I don't understand it as a philosophy of governance.

15  I would think that you would want to educate your

16  constituents as to all of the issues behind all of your

17  decisions so that they better understand it and don't suspect

18  that there's some secret deal, I think particularly in this

19  case.  There's not been any decision made by this city

20  council other than the initial one back 18 months ago that's

21  been more important.  The citizens are wondering.

22          THE COURT:  What happened 18 months ago?

23          MR. PATERSON:  Mr. Orr was accepted and appointed to

24  the emergency manager position under Act 43 --

25          THE COURT:  Did the city council do that?

1         MR. PATERSON: City council did not oppose it. I

2  think it was a five to four vote, as I recall, or four -- it

3  was a one vote majority. That's that last decision that the

4  council made that had the importance to this decision, and I

5  don't think that there's any particular dispute with the

6  merits of the decision. It's probably a good thing. I don't

7  think that's the issue. I think the way they have gone about

8  it in hiding it from their constituents is the issue. That

9  doesn't serve the public interest well. It doesn't --

10       THE COURT: Does the law require a public body to

11  open up its meetings when it's seeking legal advice from its

12  attorneys?

13       MR. PATERSON: I think it's pretextual that they

14  said that. How do you negotiate --

15       THE COURT: Please answer my question.

16       MR. PATERSON: Oh, the law permits certain matters

17  that are legal matters that are involved in litigation but

18  also in the public body's obligations under contract or the

19  law to be discussed, and they do allow them to be discussed

20  in private.

21       THE COURT: And so why -- where is the evidence that

22  something other than that happened here?

23       MR. PATERSON: The evidence is in the public

24  statements of the participants in the meeting.

25       THE COURT: Like what?

1          MR. PATERSON:  Pardon?

2          THE COURT:  Like what?  Name one.

3          MR. PATERSON:  Three days of negotiations.  Even in

4    their own brief, they talked about reaching a consensus.  All

5    of the facts that underlie the decision that was made and the

6    agreements that were reached have been excluded from the

7    public view.

8          THE COURT:  Now, you said there were public

9    statements that suggest that something at these meetings

10   happened other than council deliberating with its attorneys

11   on legal matters.

12         MR. PATERSON:  I do say that.  I do say that, and I

13   think the defendants --

14         THE COURT:  I'd ask you to identify one.

15         MR. PATERSON:  The defendants indicate that in their

16   response.  They indicate that the closed sessions were

17   conducted for the purposes of obtaining legal advice.

18   They've said that repeatedly, repeatedly, repeatedly, but

19   they also indicate --

20         THE COURT:  The fact that they state it repeatedly

21   doesn't make it wrong.

22         MR. PATERSON:  No, but if I call a dog's tail a leg,

23   he still only has four legs, as Lincoln observed.

24         THE COURT:  Okay.

25         MR. PATERSON:  The statement in the defendant's

1  response indicates that they reached a consensus and that the

2  consensus was reflected in the agreements that were signed

3  and authorized by the city council.  Those agreements --

4         THE COURT:  Well, but they were -- it was a -- it

5  was a consensus concerning this litigation.

6         MR. PATERSON:  It's a consensus as to how to proceed

7  with respect to the future --

8         THE COURT:  This litigation.

9         MR. PATERSON:  I don't see that as an exemption

10  under the Open Meetings Act.

11         THE COURT:  Well, but --

12         MR. PATERSON:  All public meetings -- all

13  meetings --

14         THE COURT:  I thought you had already admitted that

15  there was an exemption for legal advice relating to

16  litigation.

17         MR. PATERSON:  Yes, and I think the public

18  statements by the participants in the meeting indicate that

19  was pretextual, very simply pretextual.

20         THE COURT:  Okay.  But I'm asking you --

21         MR. PATERSON:  In fact, you don't need to see the

22  smirk of the mayor when he was asked that question to know

23  that it was pretextual.  Other members that attended the

24  meeting saw that they had a lot of negotiations to do over

25  the timing and all of those issues that were involved that

1   are substantive.

2          THE COURT:  But I'm asking you why isn't all of that

3   covered by the exemption?

4          MR. PATERSON:  It's not.  It's not legal matters.

5          THE COURT:  But to tell me it's not doesn't answer

6   my question.  Why isn't it?  What's the --

7          MR. PATERSON:  Participating --

8          THE COURT:  What's the legal analysis that

9   establishes that it's not?

10         MR. PATERSON:  Participating in a negotiation with

11  parties is not legal analysis.  That's not discerning legal

12  analysis.  That's my right to participate in a negotiation,

13  and the city council is told that in their legal opinion, and

14  then they proceed to negotiate.  Those are public

15  discussions.

16         THE COURT:  But it's negotiation over a legal matter

17  in litigation.

18         MR. PATERSON:  It does not exempt the facts that

19  underlie the decision and the consensus and the discussions

20  that were reached with respect to this.  Not all legal --

21         THE COURT:  What's the best case you've got in

22  support of your position?

23         MR. PATERSON:  I think I cited them in my brief, and

24  they do address the scope of the legal exemption.  It's

25  certainly in the context of litigation it can arise.  It is

1    also, though, important to know what were the bases reached

2    for some compromise within those litigations or the facts

3    underlying -- the discussion of the facts underlying and the

4    truth of those facts.  The substance of that decision is the

5    kind of decision that a Circuit Court would make.

6            THE COURT:  Well, let me propose -- let me propose

7    to you a hypothetical.  Counsel for the city wants to give --

8    all right.  The term "counsel" obviously has two distinct

9    meaning here.  The attorney for the city wants to give the

10   council -- the city council legal advice on how to settle a

11   personal injury suit and explain why he's recommending a

12   settlement at X dollars.  Okay.  They go into closed session

13   because it's in litigation, and one of the members says, "I

14   don't want to -- I don't think we should settle this for X.

15   I think we should settle it for Y," and they continue to have

16   a discussion with the attorney about the legal merits of the

17   case, the strengths and weaknesses on each side, and they

18   come to a resolution to offer a settlement at Z.  How much,

19   if any, of that needs to be in public under the Open Meetings

20   Act?

21           MR. PATERSON:  The legal obligations or the

22   recommendation of the attorney if it's in writing is

23   certainly something that can be discussed.  Why did you reach

24   that number, why do you propose settling it, and here's what

25   I propose settling it for because of and gives them the

1   merits, objections to it, discussion of it, starts to

2   borderline whether or not that is exempt.  That's the circuit

3   judge's obligation to determine in the proceeding, and the

4   minutes --

5         THE COURT:  So your position is that even the

6   attorney's statement of reasons why the case should not be

7   settled at Y, it should be settled at X, is something that

8   might be subject to the Open Meetings Act?

9         MR. PATERSON:  Might be; might be.  Not likely, but

10  might be.  More than often -- more often than not there will

11  be a consensus reached, but the discussions here travel

12  beyond the settlement of a lawsuit.  This is the active

13  participation of the city in its future of the most

14  fundamental aspects of it and the regaining of the power to

15  do that.  That was what was on the table according to Mr. Orr

16  and his orders that were entered in respect to that.  Those

17  are matters that reach well beyond the legal obligations of

18  the city and involve widespread negotiation over the

19  regaining of the power of the elected members of the city

20  council.

21        THE COURT:  Well, but all in relation to the

22  administration of this bankruptcy from the city's

23  perspective.

24        MR. PATERSON:  The city is also obligated and the

25  emergency manager is also obligated to administer the city

1  and administer under the law all of the obligations of the

2  city and the business of the city.  They can't blanket the

3  business of the city with a, well, it's in Bankruptcy Court;

4  therefore, the stay is a shield against violations of the

5  Open Meetings Act and other violations of law.

6          THE COURT:  Anything further, sir?

7          MR. PATERSON:  No, other than I did in my motion

8  indicate to the Court that I'm not seeking to undo, as I'd

9  have the right to do under the Open Meetings Act, the actions

10 taken.  The relief that we're seeking in the Circuit Court

11 would be prospective only, and it would be prospective with

12 respect to further violations of the Open Meetings Act by the

13 Detroit City Council.

14          THE COURT:  And of course you'd want attorney fees.

15          MR. PATERSON:  And of course I would want attorney's

16 fees.

17          THE COURT:  Thank you.

18          MR. PATERSON:  Thank you.

19          MS. NORRIS:  Good morning, your Honor.  Megan Norris

20 on behalf of the city.  I'll be brief.  It's clear that

21 you've reviewed everything.  First of all, the timing of the

22 motion and the substance of plaintiff's motion makes it clear

23 that the events at issue are over.  Plaintiffs filed their

24 motion mid-day on Thursday.  By the end of the day Thursday,

25 the city and state had filed with this Court a joint notice

1  of transition plan, which outlines a proposed transition from
2  the emergency manager to the city elected officials.
3  Plaintiff in their motion does not -- petitioners don't argue
4  that there have been any other violations of the Closed
5  Meetings Act by city council.  City council has been in and
6  out of closed session for a number of reasons on a number of
7  occasions since this bankruptcy trial began.  The only issue
8  are the meetings that have just taken place.  One of the
9  Garzoni factors is the creditor's claim -- whether the
10  creditor's claim is likely to succeed on the merits, and as
11  the Court has noted, there is no evidence of any violation.
12  The meeting was properly closed.  The statute was cited.  The
13  transition -- the subject being the transition, specifically
14  PA 436 transition matters, was cited in city council's
15  closure resolution.  This was not a blanket business of the
16  city closure.  This was not even a blanket attorney-client
17  privilege closure.  This was specifically to discuss the
18  memoranda of counsel and the advice of counsel and discussion
19  of the memoranda relating to the transition.  Clearly there
20  can be harm to the city if this is allowed to go forward at
21  this time, and that really is the question.  It's not whether
22  it can go forward.  It's whether it can go forward at this
23  time, whether the stay should be lifted.  As this Court has
24  noted repeatedly in the trial in front of it as we speak, the
25  issue on the plan of adjustment is not simply whether debts

1  can be resolved.  The issue is also whether the city has a

2  viable plan to go forward, and a big part of that plan is how

3  the city moves from the emergency manager that has

4  effectively guided the city through this bankruptcy back to

5  the elected officials as the city goes forward to allow a

6  lawsuit against exactly those players, city council, but

7  obviously the mayor would be involved.  Obviously the

8  emergency manager would be involved.  To allow a lawsuit

9  involving those folks to go forward at this time would be

10  detrimental to exactly what this Court is trying to

11  accomplish in smoothing the transition of the city out of

12  bankruptcy.  If you have any questions, I'm happy to answer

13  them.

14        THE COURT:  What's the connection given that Mr.

15  Paterson says all he wants is an injunction against future

16  violations of the Open Meetings Act?

17        MS. NORRIS:  Right.  So the connection is it's a

18  law -- first, he has to prove a violation, so there's a

19  lawsuit, and in that lawsuit there will be arguments about

20  what happened or didn't happen.  That will require at minimum

21  an in camera review of what happened in closed session.  In

22  many cases Mr. Paterson has sought to take depositions of

23  people involved to determine whether the mayor's smirk -- I

24  use Mr. Paterson's term -- means anything, to determine

25  whether, as in the Wyoming case, there were winks or nods or

1    slips of paper across the table, so there's discovery in that

2    case. So before there's any finding of a violation, before

3    any injunction is issued, before any attorney's fees are

4    awarded, there has to be a finding, and that is exactly the

5    kind of action that the city does not need to be going

6    through right now. It is a very sensitive area. The orders

7    have been issued. You've seen the transition, the joint

8    notice of transition. As Mr. Paterson noted, there was a

9    city council meeting at the beginning not to oppose the

10   appointment of Kevyn Orr, and there has been a meeting at the

11   end. The parties have agreed that there is a date certain --

12   i.e., the effective date of the plan of adjustment -- and

13   Mr. Orr has begun the transition, so there's no evidence that

14   there would be meetings on this topic going forward. If

15   there were, they would be noticed in the same way, but to say

16   that the notice was pretextual in some way when the results

17   of the meeting are exactly the topic identified in the legal

18   memoranda, it's not like the results of the meeting are

19   something unrelated to exactly what was identified. The

20   transition plan is absolutely without any support.

21           THE COURT: Thank you.

22           MS. NORRIS: Thank you.

23           MR. PATERSON: If the Court is concerned, I'm fairly

24   satisfied that there's ample evidence that won't require the

25   deposition of the mayor or the emergency manager in this

1　case.　Statements made by city council members and others are

2　public and ample, and I, frankly, expect that they will have

3　to admit those statements once the proceeding has begun.

4　　　　　THE COURT:　The city questions why this can't wait,

5　if it needs to be pursued at all, until after the bankruptcy

6　is over.

7　　　　　MR. PATERSON:　The injunction relief would prevent

8　further violations of the Open Meetings Act and allow the

9　citizens to see what decisions are being made in public and

10　what the facts are that lie behind those decisions.

11　　　　　THE COURT:　Well, fair enough, but you don't have

12　any evidence of any imminent or threatened violation of the

13　Open Meetings Act other than, well, they did it once, so they

14　might do it again.

15　　　　　MR. PATERSON:　I think that question flips the

16　burden.　I think the proceeding, if the stay were lifted, is

17　not going to affect this Court's actions or anything in this

18　Court whatsoever.　It's going to carry on independent of

19　that, and there's absolutely no burden on this Court by

20　removing and lifting the stay with respect to this

21　litigation, and, in fact, I think that --

22　　　　　THE COURT:　Well, the argument isn't based on burden

23　on this Court.　The argument is based on burden to the city

24　in having to address your lawsuit while it's trying to wrap

25　up this --

1      MR. PATERSON:  The city --

2      THE COURT:  -- critical litigation here.

3      MR. PATERSON:  The city law department has had

4  little to do during this proceeding because many of the cases

5  that were stayed did not proceed.  I know for --

6      THE COURT:  You're concerned about full employment

7  for the city law department?

8      MR. PATERSON:  I think they're more than able and

9  capable of defending this action.

10     THE COURT:  Well, but it's not just the law

11 department.  It's the city.

12     MR. PATERSON:  I don't see how potentially, I guess,

13 a deposition -- if there's a failure to admit public

14 statements that were made and a request for that admission is

15 denied, I suppose at that point I need to take the deposition

16 of the person that made the statement, and in most cases it's

17 members of the city council that were explaining their vote

18 and why they carried out for three days the discussions on

19 this matter.  That doesn't seem to impose any burden on this

20 Court.

21     THE COURT:  All right.  Thank you.  Anything

22 further?

23     MR. PATERSON:  Thank you.

24     MS. NORRIS:  No, your Honor.

25     THE COURT:  All right.  I'll take this under

1  advisement for 15 minutes, and we'll reconvene at 9:45,

2  please.

3      THE CLERK:  All rise.  Court is in recess.

4      (Recess at 9:30 a.m., until 9:50 a.m.)

5      THE CLERK:  All rise.  Court is back in session.

6  You may be seated.

7      THE COURT:  It appears everyone is present.  The

8  standard by which the Court determines this and other motions

9  for relief from the stay is whether the moving party has

10 established cause.  The matter is, of course, addressed to

11 the Court's discretion.  In evaluating whether there is cause

12 for relief from the stay, the Court considers the harm to the

13 moving party if the stay is maintained and the harm to the

14 debtor if this motion is granted and relief from stay is

15 granted.  In this case, if relief from the stay is denied and

16 the stay is maintained in effect, the plaintiffs will be

17 forced to wait to pursue their claim against the city until

18 the stay terminates, which would happen either upon

19 confirmation or dismissal of the case.  If the motion is

20 granted, the city will be, of course, required to defend the

21 lawsuit that would be filed.

22      The city maintains that the lawsuit is moot and that

23 it otherwise lacks merit under the Open Meetings Act and that

24 it should not be forced to defend a lawsuit that is either

25 moot or lacks merit or both.  There are certainly aspects of

1  the claimed violation of the Open Meetings Act that are moot,

2  but it appears that there are aspects that are not moot.  For

3  example, the motion states that if the Circuit Court were to

4  find a violation of the Open Meetings Act, the plaintiffs

5  would seek disclosure of certain materials relating to the

6  closed meeting such as minutes or transcripts, et cetera.

7        The Court also must find in the circumstances that

8  the claimed violation of the Open Meetings Act is not a

9  frivolous claim.  If it were, the Court, of course, would not

10 grant relief from the stay since no party should be required

11 to defend a frivolous action.  The claim is not frivolous.

12 The city has a defense to it, perhaps even a strong defense,

13 but the claim itself is not a frivolous claim.

14        On the city's contention that the requirement to

15 defend the lawsuit may somehow impact its ability to

16 efficiently pursue this bankruptcy, the Court must find that

17 there is really nothing to support or suggest that.

18        Accordingly, in the circumstances, the Court

19 concludes that its discretion should be exercised in favor of

20 granting the motion, and the motion is granted.  Mr.

21 Paterson, please prepare an order, have it approved as to

22 form by city counsel -- the city's attorneys and have it --

23 and then submit it to the Court.

24        MR. PATERSON:  Will do, your Honor.  Thank you.

25        THE COURT:  All right.  Let's turn our attention

1   back to the trial then.  And let's stand by one second while
2   the courtroom settles down again.  Sir.
3          MR. HEIMAN:  Good morning, your Honor.  David Heiman
4   of Jones Day for the city.  I would like to just take a
5   minute, with your indulgence, to mark the moment of the
6   transition that was just the subject of your prior hearing,
7   and we did not want to let this moment pass.  At a time like
8   this, many thoughts race through one's mind, and I'm sure in
9   Mr. Orr's case hundreds or thousands of thoughts race through
10  his mind based on the last 18 months.  But as your Honor
11  knows, his term, if I can call it that, essentially expired
12  yesterday at the conclusion of the 18 months, and that term
13  was dealt with by the four legal authorities, government
14  entities, including Mr. Orr, that have some participation in
15  this matter.  That would be the state, the mayor, Mayor
16  Duggan, city council, and Mr. Orr himself.  And at least in
17  my view, this should be looked upon as somewhat of a right of
18  passage for the City of Detroit, a very momentous occasion
19  even though we are, indeed, in the middle of a trial seeking
20  confirmation of the plan of adjustment.  So I would like to
21  address both perhaps gratuitously all the benefits that have
22  been derived from the implementation of 436 and explain to
23  the Court, as I assume you've read in the newspapers as well
24  as the papers that were filed, the joint notice that was
25  filed, but an event that is perhaps new and different for

1   those who have lived in Detroit the last few decades where

2   four legal authorities that impact the City of Detroit have

3   come together in a unified fashion in the best interest of

4   Detroit.

5         So in doing that and explaining what we see is

6   happening now, I would also like to make it clear to the

7   Court that we -- that I rise without presumption. We are

8   fully cognizant that it is and will continue to be the city's

9   burden to demonstrate that it has earned the right to emerge

10  from Chapter 9. We are in the process of doing that. We

11  have every hope and expectation we will be able to do that,

12  but we also totally recognize that the gavel remains in the

13  hands of your Honor and that we submit ourselves to that

14  process with the hope that we will swiftly emerge from

15  Chapter 9.

16        As I said, Mr. Orr's statutory reign, if you will,

17  has expired, but not without a lot of consideration on how to

18  transition from Mr. Orr's supervision back to the city

19  council and the mayor, and so what you've seen through the

20  joint notice is a 9-0 resolution of the city -- city council,

21  that is -- which is confirmed by the mayor, and as

22  acknowledged and confirmed by Mr. Orr, that the city itself

23  is ready to take back the reins through the mayor's office

24  and city council. And the good news for the bankruptcy is

25  that the city council, the mayor, and the state have

1   recognized that we are here today this far in the progress --

2   in the process as a result of Mr. Orr's supervision, and it

3   only makes good sense to provide that Mr. Orr shall see it to

4   its conclusion hopefully and that his ability to continue to

5   supervise the bankruptcy, the pursuit of the confirmation of

6   the plan of adjustment as well as implementation of a plan of

7   adjustment should it be confirmed should remain intact, and,

8   therefore, the authorities have determined that he should

9   stay in place for that limited purpose until the effective

10  date of the plan.

11          With that, I would like to refer you to the

12  specifics of the city council resolution.  There is a recital

13  on the first page that confirms that the city council is

14  supportive of the plan of adjustment and seeks a smooth

15  completion and that it has agreed to retain with Mr. Orr

16  those powers necessary to see that occur.  And Mr. Orr

17  himself has issued Order #42, Emergency Manager Order Number

18  42, which delineates the allocation of responsibilities among

19  himself, the city council, and the mayor, and, of course, his

20  role will continue to be, as I said, the management of the

21  bankruptcy proceeding and the implementation of the plan of

22  adjustment, so with that -- and if the Court has any

23  questions, I'd be happy to try to address them.

24          THE COURT:  No.  Thank you, sir.

25          MR. HEIMAN:  Thank you.

1          MR. HERTZBERG:  Good morning, your Honor.  Robert

2   Hertzberg, Pepper Hamilton, on behalf of the city.  Tomorrow

3   is a date that the Court set aside to handle the objection

4   filed by the UAW.  We've been in discussions with the UAW.

5   We have a mediation now set up for tomorrow in a hope to try

6   and resolve the dispute with the UAW.  Based upon that, we

7   would ask that the Court allow us to go to mediation

8   tomorrow, adjourn the hearing on the UAW's objection, and

9   allow them to come back if we're not able to resolve our

10  differences in the future and have a full hearing.

11         THE COURT:  Who is your mediation with?

12         MR. HERTZBERG:  Mr. Driker.

13         THE COURT:  Does the UAW support this request?

14         MR. HERTZBERG:  I believe they do, your Honor.

15         THE COURT:  Is there anyone here from the UAW?

16         MR. MACK:  Richard Mack, your Honor, with AFSCME.

17  We've actually filed objections as well over a similar issue,

18  and we do, in fact, support the request.

19         THE COURT:  Are you involved or is your client

20  involved in the mediation also?

21         MR. MACK:  Yes.

22         THE COURT:  What time is the mediation set for?

23         MR. MACK:  9:30.  I just got the e-mail a little bit

24  ago.

25         THE COURT:  All right.  Well, it's been the Court's

1    practice and policy when these kinds of situations arise to
2    consult with the mediator and to follow the mediator's advice
3    regarding my processes, and so that's what I'll do here, and
4    I'll get back to you.
5              MR. HERTZBERG:  Thank you, your Honor.
6              MR. MACK:  Thank you, your Honor.
7              THE COURT:  One more thing before we get underway.
8    My apologies to you for not printing out the compilation of
9    your remaining time for today.  I'm showing for the city a
10   balance of 46 hours and 53 minutes and for the objectors 67
11   hours and 9 minutes.  And while we're on the subject, I want
12   to have a discussion with you all tomorrow about the extent
13   to which it is appropriate to reduce these times in light of
14   the Syncora settlement.
15             MR. SHUMAKER:  Certainly, your Honor.  Greg
16   Shumaker, Jones Day, for the city, your Honor.  Just a couple
17   of housekeeping matters that we wanted to raise with you.
18             THE COURT:  Go ahead.
19             MR. SHUMAKER:  First of all, your Honor, as you
20   know, we broke last week, and the city and the objectors had
21   multiple discussions about discovery in light of the Syncora
22   settlement.  I wanted to advise you -- your Honor probably
23   noticed -- that FGIC issued two 30(b)(6) deposition notices,
24   one to the city and one to Syncora.  Those depositions are to
25   take place tomorrow and -- tomorrow is going be Mr. Doak's

 1  deposition.  He's going to be the gentleman from Miller

 2  Buckfire who is the 30(b)(6) witness for the city.  And --

 3  I'm sorry -- M.J. is the name of the woman who was being

 4  designated for Syncora.  I don't know her last name.  She is

 5  being deposed on Wednesday, so that's proceeding apace.

 6      The city also, as we informed your Honor last

 7  probably Tuesday or two Tuesdays ago, put forth a

 8  supplemental expert report for Mr. Buckfire, and so that went

 9  out in the middle of last week, and the objectors agreed that

10  they did not want to depose Mr. Buckfire, so that took place

11  as well.

12      Another matter -- just a couple of other things.  We

13  understand that the objectors, FGIC in particular, will be

14  submitting a supplemental expert report from Mr. Spencer, and

15  I believe that's going to come on Friday of this week, if I'm

16  not mistaken, and so that's also moving forward.  And then

17  also the parties got together about stipulating to two

18  declarations from two witnesses at KCC, the voting tally --

19  voting tallier, and so we're putting together those

20  declarations, and we'll be able to submit those to the Court

21  later today or tomorrow.

22      The impact of UAW day on witness scheduling and

23  order I wanted to raise with your Honor.  What we were hoping

24  to do is Mr. Malhotra will go today.  We'll see how long he

25  takes.  He will have a significant amount of testimony.

1   Obviously don't know how long cross will last.  But then
2   Mr. Buckfire is scheduled to go after Mr. Malhotra.  What the
3   city plans on doing is trying to move up Mr. Kaunelis, who is
4   a DWSD witness on the capital expenditures, going to move him
5   up in front because the Doak deposition is going forward
6   tomorrow.  We're trying to work this so that then Mr. Doak
7   can testify after Mr. Kaunelis, and then Mr. Orr would
8   testify, so that's a slight modification to the order that
9   was currently -- that's currently in place or that the city
10  has filed.  One issue, though, your Honor, because of UAW day
11  perhaps moving to keep in mind is notice to the pro se
12  objectors about Mr. Orr's appearance.  Depending on how fast
13  this moves, Mr. Orr could come up sometime tomorrow, and I
14  just wanted to raise that with your Honor because I know
15  that's something your Honor has been concerned about in the
16  past.

17          THE COURT:  So are you representing that if we
18  adjourn the UAW testimony or portion of the trial off of
19  tomorrow, that Mr. Doak would testify after Mr. Orr or still
20  before?

21          MR. SHUMAKER:  Well, we're hoping Mr. Doak could
22  testify before Mr. Orr about the Syncora settlement so that
23  your Honor has the benefit of his before Mr. Orr gets on and
24  starts, you know, talking about why the Syncora settlement
25  was a good thing.  That's why we had ordered it the way we

1   had.

2           THE COURT:  It still feels a little aggressive to

3   suggest that Mr. Orr might testify tomorrow, but I do want to

4   thank you for alerting the Court to the possibility because

5   we do want to try to notify people.  It will either be

6   tomorrow or Wednesday might be --

7           MR. SHUMAKER:  That's fine, your Honor.  Wonderful.

8           THE COURT:  -- might be the message we should send.

9           MR. SHUMAKER:  And then one final matter, your

10  Honor, was during the break the city took the opportunity to

11  review its exhibit list and to take a look at those exhibits

12  that with the withdrawal of the objections by the DWSD

13  parties, the counties, and Syncora, there are no longer any

14  outstanding objections to those exhibits, and -- in other

15  words, neither FGIC nor the COPs holders nor MIDDD has

16  objected to them, so we would ask that those exhibits be

17  admitted into the record pursuant to the Court's protocol

18  previously.  We have a list of those.  There are about 144.

19  I could read them into the record, but I also have copies

20  that I could hand up to you and proceed in that way.

21          THE COURT:  Let me suggest a slightly different

22  procedure.  Please share that list with the remaining

23  objecting parties, and then perhaps after lunch I can hear

24  from them on any issues arising from your request.

25          MR. SHUMAKER:  Will do, your Honor.

1          THE COURT:  Is that all right with you, sir?

2          MR. SOTO:  Yes, your Honor.

3          MR. SHUMAKER:  I think that's all I had, your Honor.

4    Thank you.

5          THE COURT:  All right.

6          MR. SOTO:  Your Honor, with respect to those

7    logistics -- by the way, Ed Soto, FGIC.  With respect to

8    those logistics, we have --

9          THE COURT:  Pull the microphone closer to in front

10   of you.

11         MR. SOTO:  -- we have only an issue with the timing

12   of Doak, which we thought we had discussed with the city.

13   Mr. Doak can only be made available to be deposed tomorrow.

14   We are going to, in fact, depose him tomorrow.  We did get

15   access to M.J. prior to that through the people at Syncora,

16   but we had hoped to be able to take his deposition, as we've

17   now read his 30-page expert report, prepare for his testimony

18   and then do his testimony, and we hope to be able to do that

19   on Friday, your Honor, because of the sequence of the

20   difficulty of just trying to get it all together.  From a

21   timing standpoint, that's where we are.

22         One other thing, your Honor, the -- we're now -- and

23   we've informed the city of this -- working on trying to

24   obtain our fifth labor expert.  We've gone through four of

25   them who were unable to appear either because of timing or

1  because of some other conflicts.  We know the Court has given

2  us an opportunity to do that.  We know the time is getting

3  short.  We just wanted to let the Court know we're --

4          THE COURT:  Right.

5          MR. SOTO:  -- frantically deciding whether we need

6  that expert or if we can obtain that expert.

7          THE COURT:  Mr. Shumaker, it does feel appropriate

8  to have Mr. Doak's testimony after his deposition, doesn't

9  it?

10         MR. SHUMAKER:  I would agree that would be fair,

11 your Honor.

12         THE COURT:  All right.  Well, let's work that out

13 then.

14         MR. SHUMAKER:  Yes.  And part of this complication

15 is there are some witnesses can -- only can testify on

16 Friday, so we're trying to --

17         THE COURT:  And Friday is a half a day --

18         MR. SHUMAKER:  That's right, your Honor.  That's

19 right.

20         THE COURT:  -- or at least part -- we're going to

21 stop at one.

22         MR. SHUMAKER:  Correct; correct.  So we will

23 continue to work on that.

24         THE COURT:  All right.  All right.

25         MR. SHUMAKER:  But the Mr. Orr issue is still out

1  there because --

2  　　　　　THE COURT:  Right.

3  　　　　　MR. WAGNER:  Your Honor, Jonathan Wagner on behalf

4  of the COPs.  You may remember that if the -- when the UAW

5  hearing was scheduled, Ms. Thomas, the executive director of

6  the pension plans, was going to testify, and then we were

7  going to do our cross, so if that's -- if we're going forward

8  tomorrow, we'll do the cross tomorrow.  If not, we'll do it

9  probably at the beginning of our case.

10 　　　　　THE COURT:  Okay.

11 　　　　　MR. WAGNER:  The second point is there are, I think,

12 six witnesses on the city's may call list.  It would be good

13 to have a date by which we know whether those witnesses are

14 going to be called.

15 　　　　　THE COURT:  Any thoughts on that, Mr. Shumaker?

16 　　　　　MR. SHUMAKER:  I would think, your Honor, that we

17 would be in a position to tell the objectors that by the end

18 of the week.  I think that's right.

19 　　　　　THE COURT:  Okay.

20 　　　　　MR. SHUMAKER:  Thank you.

21 　　　　　THE COURT:  Can we get underway now?

22 　　　　　MR. STEWART:  Your Honor, Geoffrey Stewart of Jones

23 Day for the city.  The city would call its next witness,

24 Mr. Gaurav Malhotra.

25 　　　　　THE COURT:  Raise your right hand.

1          GAURAV MALHOTRA, CITY'S WITNESS, SWORN

2          THE COURT:  Please sit down.

3          MR. STEWART:  Your Honor, if I may approach, I have

4   binders and USB drives for the exhibits.  Just for the

5   record, the binders are full of paper.  We have five exhibits

6   which are, in fact, the EY model of the city's finances,

7   which are only in electronic form, so we've reduced them to

8   USB drives, which --

9          THE COURT:  Okay.

10          MR. STEWART:  -- I would bring forward.

11          THE COURT:  Thank you for that, sir.  You may

12   proceed.

13          MR. STEWART:  Thank you, your Honor.

14                    DIRECT EXAMINATION

15   BY MR. STEWART:

16   Q   Mr. Malhotra, could you please give for us your name and

17   address?

18   A   Gaurav Malhotra.  I live in Chicago, Illinois.

19   Q   Okay.  And tell us if you could -- you, by the way, have

20   testified before in the court, have you not?

21   A   Yes, I have.

22   Q   Okay.  Tell us briefly, if you could, about your

23   education.

24   A   I went to -- for my undergrad to the University of Delhi

25   where I graduated with a bachelor's in commerce, and then I

1  went for my grad school to Case Western Reserve University

2  where I got an MBA in finance and business policy.

3  Q   What year did you receive your MBA from Case?

4  A   In 2001.

5  Q   Okay.  What was your first job after you received your

6  MBA?

7  A   I joined Ernst & Young in the corporate finance practice.

8  Q   In Chicago?

9  A   In Cleveland.

10  Q   In Cleveland.  And how long were you with them in

11  Cleveland?

12  A   I was with Ernst & Young in Cleveland for, I think,

13  approximately five years.

14  Q   Okay.  And then what happened?

15  A   And then I moved to Michigan.  I stayed here for five

16  years, again, with Ernst & Young, doing restructuring and

17  distressed M&A transactions following which the restructuring

18  practice of Ernst & Young was sold to Giuliani Capital, and I

19  continued to do restructuring advisory work there.

20  Q   Okay.  Let me stop you right there.  You just used the

21  phrase "restructuring and distressed asset analysis."  Just

22  for the record, tell us what that is.

23  A   So restructuring advisory is where we help distressed

24  clients evaluate their business plans, their operations, and

25  long-term projections in order to -- how to recover as a part

1    of an overall restructuring strategy.

2    Q   Okay.  And then you said there came a time when that part

3    of EY's practice was sold.

4    A   That is correct.

5    Q   And when was it sold, and who was it sold to?

6    A   In 2004 the U.S. restructuring practice was sold to

7    Giuliani Capital Advisors.

8    Q   You better slow down.  I'm having trouble following you.

9    It just may be the acoustics of the room.  So it was sold to

10   who again?

11   A   To Giuliani Capital Advisors.

12   Q   Okay.  All right.  And did you still remain in the office

13   you'd occupied before?

14   A   Yes.

15   Q   And did your practice change at all after Giuliani

16   Capital Advisors purchased the practice?

17   A   No.  It was essentially a different name but continued to

18   do restructuring.

19   Q   Okay.  Did there come a time when the name changed again?

20   A   Yes.  The Giuliani Capital Advisors restructuring and M&A

21   practice was sold to Macquarie Capital Advisors.

22   Q   Okay.  And then how long did Macquarie control the

23   practice?

24   A   For about three years.

25   Q   What year are we up to by now?

1   A   2009.

2   Q   Okay.  And after that what came of the practice?

3   A   Well, I was offered an opportunity to come back to Ernst

4   & Young --

5   Q   Okay.

6   A   -- and join the restructuring practice at EY, so I left

7   Macquarie and came to Ernst & Young.

8   Q   What year did you return to EY?

9   A   It was 2009.

10  Q   '09.  And you've been at Ernst & Young ever since?

11  A   That is correct.

12  Q   Been five years?

13  A   Yes.

14  Q   What is your title at Ernst & Young?

15  A   I am a principal and a senior managing director in our

16  restructuring practice --

17  Q   Okay.

18  A   -- as well as I lead our central region restructuring

19  practice.

20  Q   All right.  And so tell the Court, if you could, the sort

21  of work your restructuring practice has involved since you

22  returned to Ernst & Young in 2009.

23  A   It has involved helping distressed companies and -- in

24  terms of developing their business plans, taking some through

25  bankruptcy, involving asset sales as well as developing long-

1  term business plans for either a city or a public school

2  district.

3  Q   Let me ask you just the names of some of the

4  representative private sector clients that you've worked with

5  since you returned to Ernst & Young.

6  A   Schutt Sports, which we took through Chapter 11 process,

7  ongoing with Liberty Medical that we are helping with right

8  now are two that come to mind straightaway.

9  Q   Now, in addition to the private sector clients, what work

10 have you done for public sector clients?

11 A   On the public sector side, we have been involved with the

12 Detroit Public Schools.

13 Q   And when did you start your involvement with the public

14 schools?

15 A   Sometime in late 2011.

16 Q   Is that ongoing?

17 A   It is still ongoing in some fashion, yes.

18 Q   Okay.  Any other public sector clients?

19 A   Yes.  We've also helped two other cities in terms of

20 helping evaluate their cash flows and long-term projections.

21 Q   And what cities are those, if you can disclose them?

22 A   They're confidential in terms of our involvement with

23 them.

24 Q   Okay.  When did you begin your work for the City of

25 Detroit?

1  A    Approximately just over three years ago.

2  Q    And when you began your work, what was Ernst & Young

3  hired to do?

4  A    Our role initially was to help the city assess its short-

5  term cash flow projections.

6  Q    Okay.  And what did that entail?

7  A    It entailed first trying to just get a clear

8  understanding of what the city's cash position truly was for

9  the general fund and trying to break out the cash that was

10  restricted or that was related to enterprise funds, so we had

11  to sort of manually create reports based on the information

12  that was given that, to the best our ability, we could

13  ascertain what the general fund's starting cash position was

14  and from there on based on discussions with departments,

15  going through budgets, going through bank balance -- bank

16  statements, developing short-term projections to really

17  highlight what the city's cash and liquidity position would

18  be in the coming 12 months or so.

19  Q    Now, you used a term a moment ago "general fund."

20  A    Yes.

21  Q    What is the general fund?

22  A    The general fund is what essentially is the core

23  operating fund that is not related to any enterprise fund, so

24  it's where the majority of the taxes are collected and

25  services such as police and fire and budget are paid for.

1   Q   And then you used the term "enterprise fund."  What is an

2   enterprise fund?  What's an example of an enterprise fund?

3   A    Until now Detroit Water and Sewer Department has been an

4   enterprise fund in which their operations are essentially

5   break-even and not -- should not be impacting the operations

6   of the general fund.

7   Q   Now, let me direct your attention to spring of last year.

8   Did there come a time in the spring of 2013 when the scope of

9   EY's work changed?

10  A   Yes.

11  Q   How did it change?

12  A    It began to evolve in terms of expanding the outlook of

13  what the cash and revenue and expense projections were going

14  to be over a longer time frame versus looking at it on a much

15  shorter time frame.

16  Q   What had been the time frame you were using?

17  A   I would say all through 2011 and majority of the year

18  2012 we were looking at 12, 18, or 24 months of cash flows.

19  That was the context of what we were working within.

20  Q   Okay.  And how did things change?

21  A    Well, they changed in which we started to go over to ten-

22  year projections and to look at what the city's financial

23  profile would look like over a ten-year time frame under a

24  couple of different scenarios, and then from there it just

25  evolved into looking at 40-year estimates in terms of what

1  the city's revenues and expenses could be over a much longer

2  time frame.

3  Q   And what was the purpose of forecasting the city's

4  financial position out so long as ten years or even forty

5  years?

6  A   Well, on the ten-year projections, we used that to really

7  highlight what the city's cash and deficit position would be

8  over the next ten years really to illustrate the cost and the

9  weight of the legacy liabilities the city was carrying and

10 what revenues it would have or not have in order to service

11 those liabilities, and over forty years we had wanted to

12 expand it to really ascertain the commitments that the city

13 was making to its creditors that are long-term commitments as

14 to what the potential was and how the city would make up for

15 those commitments.

16 Q   Now, the city filed for Chapter 9 protection on July 18,

17 2013?

18 A   That is correct.

19 Q   At that time, just describe for us what was the work EY

20 was doing for the city?  Just enumerate what projects EY had

21 going on.

22 A   We were developing the cash flow projections in detail.

23 We were continuing to work on the ten-year plan on a

24 department-by-department basis.  We were also looking at the

25 different claims information that was coming through.  We

1   were assisting with the -- assisting the city's management

2   team with vendor management because of all the vendor issues

3   that were taking place, and we were really trying to develop

4   the -- at least at that point of time right around the filing

5   is what sort of funds the city would have available for its

6   unsecured obligations.

7   Q   Okay.  Now, in the 18 -- well, 14 months since the

8   bankruptcy filing, has E&Y added additional tasks to its

9   scope of work?

10  A   We have been assisting with all those.  In addition, our

11  technology teams are helping the city evaluate its HR

12  technology and ERP technology footprint, but the majority of

13  these services have been related to what I mentioned earlier.

14  Q   What is the total amount of fees Ernst & Young has

15  charged or billed the city for since it began its work three

16  years ago?

17  A   Over the last three-plus years, I believe we've been paid

18  roughly $20 million in total over the -- and majority of that

19  I believe are during the bankruptcy process.

20  Q   Now, do I understand correctly that the city negotiated

21  something called a holdback arrangement with Ernst & Young?

22  A   Yes.

23  Q   What's being held back and why?

24  A   Ten percent of all of our invoices post-bankruptcy

25  separate and apart from the fee examiner holdback are being

1  held back over and above, which was an additional

2  accommodation we provided to -- provided we could wrap up the

3  bankruptcy case prior to the end of December of this year.

4  Q    So if the bankruptcy case is wrapped up before December

5  31, what happens to the money that's being held back?

6  A    If the case is wrapped up by December 31st, the ten-

7  percent holdbacks would be payable to EY.

8  Q    And if it's not wrapped up, what happens?

9  A    Those amounts are in no way payable to EY.

10  Q    Now, you served as an expert witness before.

11         THE COURT:  Excuse me one second.  What does

12  "wrapped up" mean?

13         THE WITNESS:  Your Honor, I believe our engagement

14  letter says that a plan -- it's tied to the plan of

15  confirmation date is -- has to be prior to December 31st.

16  BY MR. STEWART:

17  Q    Now, Mr. Malhotra, you've testified before in this

18  proceeding and, in fact, have testified as an expert witness

19  before, have you not?

20  A    Yes, I have.

21  Q    Before this case, you had never served as an expert

22  witness before?

23  A    No, I have not.

24  Q    And fair to say that when you took on the engagement for

25  the city, no one told you it would involve being an expert

1  witness; is that right?

2  A    That is correct.

3  Q    But you understand that the city has designated you as an

4  expert witness for purposes of this hearing?

5  A    Yes.

6  Q    And you've submitted an expert report?

7  A    Yes.

8  Q    Now, you testified earlier that you work in the field of

9  restructuring, and tell us, since you received your graduate

10  degree, what percentage of your time has been spent in that

11  field?

12  A    I would say pretty much a hundred percent.

13  Q    Okay.  Now, in order to be a specialist in the field of

14  financial restructuring, what sort of things does a

15  professional need to know?

16  A    Have a robust knowledge of the interplay of financial

17  statements, be able to understand Excel working models to

18  take large amounts of data and to be able to analyze trends

19  as well as what are short-term events versus long-term

20  trends, is to interview management teams and to understand at

21  a very detail level, to break down large components of data

22  into smaller pieces and then once you deconstruct the data to

23  build back up with some robust assumptions.

24  Q    Now, when you're dealing with a client that is a

25  municipality, what else do you need to know?

1  A   I think you have to know the interplay between the

2  general fund versus enterprise funds and also how different

3  departments come together in terms of the buildup of each

4  department and the services that are being provided by

5  certain departments, and so -- as well as to really

6  understand clearly what the legacy liabilities are versus

7  core operating cash flows are, but really to understand the

8  different departments and how they come together is something

9  that's important.

10  Q   What knowledge do you need to have of the manner in which

11  municipalities account for their funds?

12  A   I think you have to have a pretty decent understanding of

13  the overall impact of a general fund and its transfers and

14  revenues and expenses and compared to how they break out from

15  enterprise funds overall.

16  Q   And do I understand correctly that municipalities use a

17  principle called fund accounting and do not follow what is

18  often known as generally accepted accounting principles?

19  A   That is correct.

20  Q   What do you need to know in order to apply what you've

21  learned in the private sector to assignments in the public

22  sector when it comes to understanding their accounting?

23  A   It's actually pretty straightforward in terms of the

24  principles that are applied with respect to financial reviews

25  and analyses.  I would say they are very identical in terms

1    of how the auditors who deal with municipalities may deal

2    with versus situations in the corporate side may differ

3    slightly, but from a financial review standpoint, the

4    principles are pretty much similar of going through the

5    financial analytics.

6    Q   Now, and since the time of the bankruptcy -- actually,

7    let me start earlier than that.  In the past two years, what

8    sort of analyses -- in other words, work product -- has Ernst

9    & Young generated for the city?

10   A   We have helped the city in developing ten-year

11   projections on a department-by-department basis with detailed

12   revenue and expense assumptions.  We have then developed 40-

13   year projections that show on a line item basis what the

14   revenues and expenses could be predominantly for the general

15   fund, and as a part of that, we have also overlaid the

16   construct of the city's restructuring plan and its overall --

17   in terms of the settlements that have been reached with

18   various creditors, how those payments are going to be funded

19   over the next 10 and 40 years.

20   Q   Okay.  Now, in preparing these analyses, where do you get

21   the information that you need in order to do your work?

22   A   It's a combination of places.  It starts with the city's

23   management team and their core data and reports that are

24   available in the system.

25   Q   And just by name, who would some of those individuals be

1   or by position?  Excuse me.

2   A    People like Rick Drumb from the finance department, folks

3   that we dealt with extensively, people in the treasury

4   department that we dealt with, John Hill, the CFO; Pam

5   Scales, the budget director.  So I would say there are a

6   number of people that we have gone through to try and pull

7   the data together in terms of the raw data.  And then in the

8   course of building up these projections, we have also relied

9   on other subject matter experts where their expertise on

10  particular topics has been taken into consideration.  And

11  then we sort of build it up piece by piece to ascertain how

12  all of the information comes together before -- as we build

13  up the projections.

14  Q    You used the phrase "raw data."  What's an example of

15  some of the raw data you would have compiled or worked with

16  in preparing your analyses?

17  A    So we have this in our financial models, but it was raw

18  data that we got from the city for 2008, 2009, '10, '11, and

19  '12 historically that was the files that they used to develop

20  their audited financial statements.

21  Q    Okay.  The audited financial statements were sometimes

22  called a CAFR?

23  A    That is correct.

24  Q    Okay.  And who audits them?

25  A    KPMG.

1  Q   That's another large auditing firm?

2  A   Yes.

3  Q   Okay.  Now, you'd mentioned earlier that you relied upon

4  the work of other advisors to the city.

5  A   Yes.

6  Q   Who are those entities or people?

7  A   For pieces when it came to the quality of life, all the

8  exit financing assumptions, we had and relied upon the

9  discussions with Miller Buckfire.

10 Q   Okay.

11 A   When it came to developing specific revenue assumptions

12 that required our economist to be involved, I relied on Bob

13 Cline and Caroline Sallee.  When it came to some of the

14 reinvestment initiatives, I relied on the information given

15 by Chuck Moore.

16 Q   At Conway MacKenzie?

17 A   That is correct.

18 Q   Okay.

19 A   When it came to understanding all of the other revenues

20 and all of the expenditure line items, it was myself and my

21 team that I was working with, and also we relied upon the

22 plan of adjustment in terms of certain other revenues that

23 were coming through as a part of the overall plan so I could

24 sit back and see how these pieces were coming together and

25 what impact they were having on the city's financial profile.

1  Q   Now, you mentioned your team, and I apologize for not

2  having asked you before.  How large was your team at EY?

3  A   The team that I have working here is roughly about ten or

4  fifteen people at any given point of time.

5  Q   Now, is there a standard methodology in your field that

6  is used to create financial models?

7  A   Yes.  It's generally in Excel.

8  Q   Okay.  Walk us through how professionals in your field

9  create financial models.

10  A   So we start with the raw data that -- to the best of the

11  information that we have available from the client, and then

12  we really deconstruct it to understand what the different

13  components are of that particular buildup versus just taking

14  the high level information.  We kind of understand the data

15  at a very detailed level.  We look at it on a line-by-line

16  basis to understand what of that information is one-off

17  events versus ongoing trends.  We have discussions with the

18  management team to understand our understanding of their data

19  to make sure that we corroborate what we think we are seeing.

20  We also then use either run rates as assumptions for short-

21  term and long-term projections as well as we overlay specific

22  changes that we know are going to happen based on discussions

23  with the management team of the client to then at a very

24  detailed level forecast changes, and then on a longer-term

25  basis also rely upon information that we have from public

1    agencies for inflation-type assumptions to overlay those

2    items that may not be specifically highlighted over the long

3    term but may grow because of an inflationary component.

4    Q    What do you do to test the accuracy of this information

5    that you rely upon?

6    A    We compare the raw data to the information in the audited

7    financial statements.  For some of the items where we can, we

8    actually compare it to the cash receipts and disbursements

9    activity of the client to ensure that we can understand the

10   linkage between the financial statements and the cash

11   activity, and so we scrub through the data to make sure we

12   understand what the components are, and the process of the

13   interviews with the management team is in large part a

14   validation process also.

15   Q    Now, a couple of times you've mentioned the computer

16   application called Excel.  Just for the record, what is

17   Excel?

18   A    It's a Microsoft application that helps on addition,

19   subtraction, and just basic financial analyses.

20   Q    And your model is actually put into a Microsoft Excel

21   workbook?

22   A    That is correct.

23   Q    Okay.  So tell us then how you went about preparing the

24   financial analyses that you did prepare from the information

25   that the city gave you in this case as opposed to as you do

1  it, you know, theoretically.

2  A    We started with getting the raw information by department

3  for the last five years.  By "raw information," I mean

4  detailed sales and expense categories that were not only

5  broken down by department but by fund because a particular

6  department could have operations that impact different funds,

7  and we started the process of first analyzing all of that

8  information on a department-by-department basis.  Then we

9  actually took that department information and broke it down

10  by fund so that we could focus our efforts on all of that

11  activity across every department that was impacting the

12  general fund.  Once we did that, we were then at a much lower

13  level of detail able to come up with for all of the revenue

14  and expense line items after discussions with the management

15  team what specifically items would change in a baseline

16  scenario if nothing had changed, so went through and looked

17  at the 2012-2013 information as well as the previous four

18  years to ascertain what were ongoing trends where we saw big

19  changes in either the revenue line items or the expense line

20  items, what was driving that change, and so that's where we

21  started to develop the forecast at a much more granular level

22  to understand what each department and each department's fund

23  position would be from a forecast standpoint.

24  Q    Thank you.

25          MR. STEWART:  Your Honor, I would proffer

1 Mr. Malhotra as an expert witness based upon his testimony

2 about his qualifications and background.

3          THE COURT:  Expert witness on --

4          MR. STEWART:  Issues of restructuring and financial

5 analysis, your Honor.

6          THE COURT:  Any objections?

7          MR. SOTO:  No objection, your Honor.

8          MR. WAGNER:  No objection.

9          THE COURT:  All right.  You may proceed.

10          MR. STEWART:  Thank you.

11 BY MR. STEWART:

12 Q   If we could, Mr. Malhotra, let's now turn to the details

13 of your work.  Let's begin, if we could, with Exhibit 738.

14 Do you have 738 before you, Mr. Malhotra?

15 A   Yes, I do.

16 Q   738 is -- I think you've already testified about the

17 sources you relied upon in your work, but I wanted to ask you

18 in a little bit more detail about the organization of the

19 effort that led to the construction of your financial models.

20 Have you seen 738 before?

21 A   Yes, I have.

22 Q   And who prepared it?

23 A   It was the Jones Day team along with our input.

24 Q   Does this reflect in a schematic way the organization of

25 the effort that was put together in order to prepare the

1  financial analyses for the city?

2  A   Yes, it does.

3        MR. STEWART:  Your Honor, I would move admission of

4  738 as a demonstrative exhibit.

5        THE COURT:  Any objections?

6        MR. SOTO:  Well, your Honor, I see that it is a

7  chart, and I see the names.  I don't see how it is a

8  schematic of what he did.  I assume he will testify about

9  that at some point, so I'm wondering if he shouldn't give

10  some meat to these bones, and then I have no problem with it

11  as a demonstrative.  And I certainly don't mind him using it

12  while he testifies about it.

13        THE COURT:  Well, all right.  Subject to that

14  connection, the Court will admit it into evidence.

15      (City Exhibit 738 received at 10:44 a.m.)

16  BY MR. STEWART:

17  Q   Mr. Malhotra, so let's look at Exhibit 738.  Your name is

18  in the upper left-hand corner?

19  A   That's correct.

20  Q   In the upper right-hand corner who appears?

21  A   Kevyn Orr, Mayor Duggan, and John Hill.

22  Q   And why are they in the upper right-hand corner in this

23  structure?

24  A   Because they're essentially the client at the end of the

25  day that has to review and approve what we're seeing in

1  aggregate.

2  Q  Okay.  Now, on the left-hand side of Exhibit 738 is a

3  column entitled "revenues."

4  A  Yes.

5  Q  On the right-hand side a column entitled "expenditures"?

6  A  That is correct.

7  Q  Do I understand correctly the left-hand side lists the

8  sources of information you relied upon for revenues?

9  A  That is correct.

10  Q  Could you tell us then quickly what each of the persons

11  or groups on the left-hand side contributed to your analysis?

12  A  Sure.  So from Bob Cline from EY, the detailed

13  information that he provided us was with respect to the

14  forecasts over ten and forty years for the income, wagering,

15  and utility users' taxes under two different scenarios, and I

16  was able to take the information that Bob had provided, have

17  a number of discussions with him in terms of the assumptions

18  and look at the output that was being provided by Bob as well

19  as make sure that it was consistent with the numbers we're

20  using and overall also look at some of the public sources of

21  information that he had used with respect to the assumption,

22  so that built up the -- once we had the final information

23  from Bob, the input for the income, wagering, and utility

24  taxes.

25  Q  And then below Mr. Cline is Caroline Sallee?

1    A    Yes.  With Ms. Sallee we did the similar process for

2    property taxes and state revenue sharing in which I went

3    through the files that they had sent over.  We had

4    discussions about it and also made sure that I understood the

5    broad assumptions that were being used in addition to some of

6    the public sources of data that were being relied upon.

7    Q    Okay.  And the next, it's the EY restructuring team?

8    A    Yes.  That's essentially my day-to-day team where I

9    looked at the other revenue items and sales and charges for

10   services, some other transfers that were coming into the

11   general fund in addition to UTGO-type property tax

12   collection, so -- that were related to debt service as well

13   as the overall assumption of the DWSD revenue stream that has

14   been incorporated into the plan of adjustment.

15   Q    And then city management is the next line.

16   A    Yes.  And this is similar to the line item up above on

17   other revenue items because there are a number of line items

18   that make up the other revenue category, and we went through

19   department by department to make sure we understood what were

20   certain run rates and what changes were being made or should

21   have been made to those line items going forward.

22   Q    Now, the next two boxes are for the advisors you've

23   spoken of, Conway MacKenzie and Miller Buckfire.  In a

24   nutshell, what did they -- what input did they have to your

25   work?

1   A    So Mr. Moore provided us the information with respect to

2   the department revenue initiatives on a department-by-

3   department basis where I actually wanted to make sure that

4   there was no double count between the other revenue line

5   items or any of the information that Mr. Cline or Ms. Sallee

6   used compared to the information that Mr. Moore was using, so

7   that was a process to make sure that there was no double

8   counting.  And from Mr. Buckfire it was the assumptions in

9   terms of the quality of life loan proceeds as well as the

10  assumptions related to the exit financing.

11  Q    And, finally, what inputs were there from the plan of

12  adjustment itself?

13  A    It was predominantly the proceeds from the grand bargain.

14  Q    Okay.  On the right-hand side under expenditures, the EY

15  team, again, what did they give you in terms of information

16  there?

17  A    So I worked with my team there on looking at all of the

18  salaries and benefit costs for the active employees as well

19  as the expenditures related to the legacy liabilities of the

20  city in terms of the assumptions we used for the contingency

21  reserve, and those would be -- and the other expense

22  categories with respect to the main operating costs of the

23  city.

24  Q    And actually all of the remaining boxes are people or

25  entities that you dealt with on the revenue side as well.

1    Just quickly run down what their input was to you on the

2    expenditure side.

3    A    So in city management it was the input on the operating

4    expenditures as well as the information we received on debt

5    schedules to highlight the nonrestructured debt service.

6    From Mr. Moore it was the information with respect to

7    incremental costs required on a department-by-department

8    basis and the blight budget.  For Mr. Buckfire it was the

9    costs and structure of the quality of life and exit

10   financing.  And then in terms of the plan of adjustment is

11   where we have incorporated the settlements or the

12   potential -- the settlements that were reached with the

13   various classes in terms of what the financial implications

14   of those would be.

15   Q    Thank you.  And we can take that down if you'd like.

16   Now, did there come a time when you began the construction of

17   the financial model?

18   A    Yes.

19   Q    When?  When did that start?

20   A    I would say it was early part of 2013 is where we really

21   started to build out the projections over ten years.

22   Q    And who was it on your team if there was only one

23   person -- or who on your team constructed the model?

24   A    It was several people, but I would say two or three of

25   our analysts did the heavy lifting with respect to the actual

1   construction of the model, but we had different people build

2   up specific modules for different work streams, and that's

3   how the models came together.

4   Q   How well do you know the model personally?

5   A   I know it very well.

6   Q   What did EY do to test the model for its completeness?

7   A   For its completeness, we made sure that, "A," the model

8   was accurate, and we go through internal quality check

9   processes.  I spot-checked a significant number of places in

10   the model to make sure that the accuracy was valid as well as

11   from a completeness standpoint is the sources of information

12   that we were relying upon for the input that I was able to

13   tie back to the sources of data that were used for some of

14   the assumptions.

15        MR. STEWART:  Let's put up, if we could, Exhibit

16   112, and I believe that's an electronic document.

17   BY MR. STEWART:

18   Q   Mr. Malhotra, we've put up on the screen here Exhibit

19   112.  Can you tell us what Exhibit 112 is?

20   A   Exhibit 112 is the ten-year financial projections model,

21   which I think this would be the baseline scenario.

22   Q   Now, at the bottom I see a number of tabs.  What do those

23   represent?

24   A   Those are individual worksheets that contain information

25   either on a summary or department-by-department basis.

1    Q    How many worksheets are there?

2    A    I think there's over 300-plus worksheets in this model.

3    Q    Okay.

4            MR. STEWART:  Your Honor, I'd move the admission of

5    Exhibit 112.

6            THE COURT:  Any objections?

7            MR. SOTO:  No, your Honor.

8    BY MR. STEWART:

9    Q    Now --

10           THE COURT:  It is admitted.

11           MR. STEWART:  I'm sorry, your Honor.

12       (City Exhibit 112 received at 10:52 a.m.)

13   BY MR. STEWART:

14   Q    Mr. Malhotra, this is an Excel spreadsheet?

15   A    Yes, it is.

16   Q    And the spreadsheet itself sometimes is known as a

17   workbook?

18   A    Yes.

19   Q    And the pages sometimes are called worksheets; correct?

20   A    Correct.

21   Q    Let's go to any worksheet you'd like.  Just choose one,

22   if you could.

23   A    We can go to ESUM or --

24   Q    Right there.  Okay.  Okay.  Let's scroll to the center.

25   Okay.  Now, the construction of worksheets is such that

1  vertically you have something called columns?

2  A    Yes.

3  Q    Okay.  And this column is entitled "Column A"; correct?

4  A    That's correct.

5  Q    What's in Column A?

6  A    Those are -- highlight the revenue titles and the expense

7  titles on this page.

8  Q    Okay.  And then across, those are called rows; correct?

9  A    Yes.

10  Q    What is Row 17, for example?  What is that?  What is

11  that?

12  A    That shows general fund reimbursements.

13  Q    Okay.  Now, when rows and columns intersect, you have

14  something called a cell?

15  A    Yes.

16  Q    Let's highlight cell G-17.  Now, up at the top there's a

17  box.  Do you see that?  There's a -- I don't know what you

18  call -- you tell me what you call it.  Do you see at the top

19  there's something that says "sum," and then there's a bunch

20  of words after it or figures after it?

21  A    Yes.

22  Q    What is that?

23  A    It's a formula.

24  Q    It's a formula, and the formulas or the values of cells

25  appear in that box?

1  A    That's correct.

2  Q    What does that formula represent, if you can tell?

3  A    It's summing up from the EDET tab, which would be the

4  detail tab, rows 21 through 23 of Column G, so this tab, for

5  instance, would be a more summary view of the detail tab on

6  the EDET tab.

7  Q    Okay.  So, in other words, these worksheets borrow from

8  each other?

9  A    Yes.

10 Q    How complex is the borrowing of one worksheet to another?

11 A    In my view, it's not overly complex.  I mean it's --

12 they're formulas, and once you understand the logic, it's not

13 overly complex.

14 Q    Okay.

15        MR. STEWART:  Let's, if we could, scroll to the

16 right just to show the number -- no -- just of the workbook

17 just to show the number of -- not the sheet, the workbook

18 itself -- just to show the number of tabs we're talking about

19 here.

20 BY MR. STEWART:

21 Q    Each of those tabs, Mr. Malhotra, represents a set of

22 calculations?

23 A    I would say the information on the raw data that would be

24 in the model would not be calculations, but a lot of these

25 tabs would have some calculations on them unless they're raw

1  data files.

2  Q   And so the tabs we see scrolling by would be where the

3  raw data was captured or compiled?

4  A   The tabs that we are looking at right now would be

5  where -- would be the output of the information that would

6  have been after the raw data had been analyzed.

7  Q   Okay.  And we're still scrolling.  I should have asked

8  you something earlier.  You're aware that the Court has

9  appointed an expert, Marti Kopacz of Phoenix, as the Court's

10  expert?

11  A   Yes, I am.

12  Q   What access has Phoenix had to this model?

13  A   Full access of working Excel models.

14  Q   In this -- in the native format as we see it here on the

15  screen?

16  A   That is correct.

17  Q   Okay.  Now, what is done on your model to take all of

18  this raw data and put it in one place?

19  A   Well, it's sort of like that summary tab that we were

20  looking at is you take all of the raw data that is developed

21  that is provided by fund by department, and you take that

22  information and then deconstruct it to basically highlight

23  for every single department how that information is then

24  broken out between each fund, so we take all of the

25  information that is given to us by every department, break it

1  down by every individual department for every single tab, and

2  then that department is further broken down into a general

3  fund component or the enterprise fund component.  And then we

4  sum up all of the general fund only tabs for every single

5  department.

6  Q   Now, let's turn in your book, if we could, to Exhibit

7  109.

8          MR. STEWART:  And please put, Tom, if you could --

9  BY MR. STEWART:

10  Q   Mr. Malhotra, could you tell us what is Exhibit 109?

11  A   This is a sample of the ten-year projections of the city.

12  Q   Okay.  Is this the hard copy version of the model we were

13  just looking at?

14  A   Yes.  I believe this is the July 2nd version, so it -- I

15  think it is.

16          MR. STEWART:  Your Honor, I'd move the admission of

17  Exhibit 109.

18          THE COURT:  Any objections?

19          MR. WAGNER:  No, your Honor.

20  BY MR. STEWART:

21  Q   Could you show us --

22      (City Exhibit 109 received at 10:58 a.m.)

23          THE COURT:  It is admitted.

24          MR. STEWART:  Sorry, your Honor.

25  BY MR. STEWART:

1  Q   Mr. Malhotra, could you show us on Exhibit 109 where

2  you'd see the summary page you described to us just a minute

3  ago?

4  A   It would be on page 6 of 82.

5  Q   Okay.  And so that is a page where all of the data we saw

6  in the model ultimately bubbles up to to become a one-page

7  analysis?

8  A   Yes.  For the baseline information, that would be the

9  page that it would all sum up to.

10  Q   Okay.

11         MR. STEWART:  Let's now put up on the screen Exhibit

12  113.

13  BY MR. STEWART:

14  Q   Mr. Malhotra, we've now placed on the screen Exhibit 113.

15  Could you tell us what is Exhibit -- what is Exhibit 113?

16  A   Exhibit 113 looks like the tab from the 40-year

17  projections as the tab from what I can tell.

18  Q   What's the relationship between the 40 -- is this the 40-

19  year model?

20  A   This should be the 40-year model, yes.

21  Q   What is the relationship between the ten-year model --

22  and what's the date, by the way, of this version of the

23  forty-year model?

24  A   I believe this one is the July 2nd version.

25  Q   What's the relationship between the 40-year model and the

1  10-year model?

2  A   Well, the ten-year model is 300 plus tabs, so we have to

3  bring in the summary information off the ten-year into the

4  forty-year and then on a line-by-line item basis project over

5  the forty years what the revenues and expenses would be using

6  primarily the same sources I had talked about earlier, and

7  then the forty-year model was used to really illustrate

8  what -- how the city was going to pay for the overall

9  settlements it has reached with various classes, so the

10  forty-year was more of an expansion of the ten-year but

11  looking at it purely from the lens more so of how the

12  restructuring plan comes together.

13  Q   Okay.

14        MR. STEWART:  Now, let's put up Exhibit 111, please.

15  BY MR. STEWART:

16  Q   Could you tell us, Mr. Malhotra, what is Exhibit 111?

17  A   Exhibit 111 is the 40-year projections of the city.

18  Q   Is this the hard copy version of the model we just looked

19  at?

20  A   Yes.

21        MR. STEWART:  Your Honor, I'd move the admission of

22  Exhibit 111.

23        THE COURT:  Any objections?

24        MR. SOTO:  No.

25        MR. WAGNER:  No, your Honor.

1          MR. SOTO:  No.  Sorry.

2          THE COURT:  It is admitted.

3      (City Exhibit 111 received at 11:02 a.m.)

4   BY MR. STEWART:

5   Q   Now, during the period of time --

6          MR. STEWART:  And you can take down 111 if you'd

7   like.

8   BY MR. STEWART:

9   Q   During the period of time you've been preparing the

10  model, is it fair to say there have been a succession of

11  models?

12  A   Yes.

13  Q   And some have had different forecast periods; correct?

14  A   That is correct.

15  Q   And some have had different assumptions in them?

16  A   Yes.

17  Q   Has EY archived each version of each model?

18  A   We do the best we can.  There's hundreds of versions, but

19  I think most of them are saved somewhere.

20  Q   Okay.  Let me ask you just about a few of the models

21  leading up to where we are today, and let's start with

22  Exhibit 33.  Mr. Malhotra, do you have Exhibit 33 in front of

23  you?

24  A   I do.

25  Q   And could you tell us what is Exhibit 33?

1  A    Exhibit 33 is the original June 14th proposal for

2  creditors.

3  Q    Did you prepare any part of Exhibit 33?

4  A    I did.

5  Q    Let's go, if we could --

6           MR. STEWART:  And, your Honor, I am going -- I'm not

7  going to move the admission of the entire exhibit because the

8  witness did not prepare the entire exhibit.  I would move to

9  pages he did prepare and move those into evidence and leave

10  it to another witness to get the larger document in.

11  BY MR. STEWART:

12  Q   Mr. Malhotra, let's go, if we could, to page 90, nine

13  zero, of our document here.

14           MR. STEWART:  It would be nine zero in the -- Tom,

15  it would be -- apparently, your Honor, I'm advised it's

16  already been admitted into evidence.

17           MR. SOTO:  Your Honor, it's one of those that was --

18  the only objecting party was Syncora, and they're no longer

19  here, so we have no objection to this.

20           THE COURT:  All right.  The Court will admit Exhibit

21  33.

22      (City Exhibit 33 received at 11:04 a.m.)

23  BY MR. STEWART:

24  Q    Okay.  All right.  But I'm still going to confine my

25  questions to page 90 and 91.  You have page 90 of the exhibit

1    before you, Mr. Malhotra.  Could you tell me, first of all,

2    what is Exhibit 190 -- I mean -- I'm sorry -- what is page

3    90?  Confused myself.

4    A    Page 90 shows the operating revenues and operating

5    expenditures of the general fund for the next ten years as

6    was presented in the June 13th proposal absent any

7    restructuring.

8    Q    And let's just go down briefly the revenues.  First of

9    all, we have various taxes and revenue sharing; correct?

10   A    That is correct.

11   Q    And from whom did you get those numbers?

12   A    The municipal income taxes and state revenue sharing

13   would have been provided by -- the income tax would have been

14   provided by Bob Cline.  State revenue sharing would have come

15   from Caroline Sallee.  And the wagering taxes would have come

16   from Bob Cline, and the property taxes would have come from

17   Caroline Sallee.  And the utility users would have come from

18   Bob Cline as well.  I'm positive about the income taxes and

19   property taxes.  I don't know about the other two if Bob and

20   Caroline were doing it for us at that point in time or not,

21   but they were for income taxes and property taxes for sure.

22   Q    All right.  And these were projected out for the coming

23   ten years; correct?

24   A    That is correct.

25   Q    And tell us how you went about being able to project

1  these numbers out for ten years.

2  A    Well, we would have started by looking at each one of

3  those categories on a historical basis, so for the income

4  taxes it would have been what the city's historical

5  performance was but also, more importantly, as to where the

6  city was headed in terms of projected population and wage

7  assumptions to ascertain what the income levels were assuming

8  there were no changes in the property tax or in the income

9  tax rates.  State revenue sharing, we get input even from the

10  state budget department.  Wagering taxes was again based on

11  what some of the historical casino revenues were and sort of

12  using a small reduction based on the introduction of the new

13  Ohio casinos and then a one-percent growth rate over the

14  forecast period.  For the sales and charges for services, it

15  would have been looking at each one of the departments in

16  detail to understand what the charges were for the services

17  being offered.  Property taxes would have been developed on a

18  commercial and residential standpoint.  The other revenue

19  would have also been broken down in terms of what was the

20  overall other taxes or other revenues that were not included

21  in the services above, whether it was court fines or parking

22  tickets, and then general fund reimbursements for the

23  reimbursements that come from some of the historical -- on a

24  by fund basis and even on a projected basis, and then what

25  the UTGO millage was in certain non-general fund POCs, so --

1    Q    Sure.

2    A    -- it was the historical information combined with the

3    forecast on a line-by-line basis.

4    Q    While we're at it, could you tell us what is meant when

5    you have a line that says "general fund reimbursements"?

6    A    Those are items such as reimbursements from the

7    Department of Transportation for their share of the insurance

8    costs or risk management costs, come in as a general fund

9    reimbursement, but there's a corresponding expense in the

10   operating expenditures, so there's at times a net effect for

11   some of these revenues and expenses based on how the city

12   accounts for them.

13   Q    Okay.  And then you have transfers in for UTGO millage

14   and non-general fund POCs.  Tell us what that represents.

15   A    The transfers in from the UTGO millage represents the --

16   would have represented the portion that comes in as UTGO tax

17   collections.  There would be a corresponding transfer out to

18   reflect the transfer that would be made to the debt service

19   fund, so this was basically reflected to show what the

20   activity was.  And also on non-general fund POCs there were a

21   certain portion of the COPs that were allocated to the

22   different enterprise funds, and we wanted to make sure that

23   those reimbursements under a base case scenario or a no

24   restructuring scenario were shown up above.

25   Q    Okay.  Now, the expenditures, without going into a lot of

1   detail, also done generally the same way?

2   A    Yes.

3   Q    At the bottom you have something called net operating

4   surplus.  Just, first of all, what is it?

5   A    It is the difference between the operating revenues and

6   the operating expenditures.

7   Q    Okay.  Let's go, if we could -- and, by the way, this was

8   presented at the June 2013 meeting with the creditors;

9   correct?

10  A    That's correct.

11  Q    Did you speak at that meeting?

12  A    I did.

13  Q    And what did you speak about at that meeting?

14  A    Well, in addition to the city's precarious cash position,

15  this was one of the -- a couple of the pages that I talked

16  about that showed that on an operating basis the city was

17  actually generating potentially a $3 billion surplus over the

18  next ten years or roughly 300 million a year without

19  accounting for any of the costs related to the city's legacy

20  liabilities.

21  Q    So let's go to the next page of Exhibit 33.  Is this a

22  continuation of the calculations we just looked at?

23  A    Yes.

24  Q    And what does this page reveal?

25  A    So on this page, as we continue from the previous page

1  where we had three -- the city was projecting almost $3

2  billion of surplus over ten years, this page showed the

3  nonrestructured costs of debt service, the POCs, the swaps as

4  they stood, the pension contributions under the assumption

5  the city was using at that point of time, under changed

6  assumptions that the city wanted to use at that point of

7  time, the ongoing costs of health benefits for retirees,

8  which in aggregate from the line items up above, it showed

9  that the city would have almost $7 billion potentially in

10  forthcoming legacy liability expenditures over the next ten

11  years.

12  Q    And you called these in this page legacy expenditures;

13  correct?

14  A    Yes.

15  Q    What do you mean by "legacy"?

16  A    Our way of looking at the legacy expenditures was what

17  the -- the costs that were not associated with providing

18  service or operations today, so it was -- we were trying to

19  exclude the majority of the share of costs related to the

20  active employees and supplies as well as exclude the costs

21  associated with debt that the city had taken on in prior

22  periods.

23  Q    Now, we have a line that says "total surplus" and then in

24  parentheses the word "deficit."  What does that line

25  represent?

1  A   That line represents that the -- the delta between the

2  operating surplus that we saw on the prior page, and if you

3  reduce that operating surplus by the full impact of the cost

4  of the legacy expenditures, what the delta is.

5  Q   Okay.  So so far in our analysis, on an operating basis,

6  the city actually had a surplus, but once the legacy

7  expenditures were taken into account, that turned into the

8  deficit we see in the middle of the page?

9  A   That's correct.

10  Q   Okay.  And the deficit is how much projected over ten

11  years back in June of 2013?

12  A   For the ten years, the projection showed in excess -- or

13  just shy of $4 billion or roughly 390 to $400 million a year.

14  Q   Below that is a series of lines under the heading

15  "reinvestment in the city."  What is that section of this

16  page about?

17  A   In that section, we were showing the information that we

18  had gotten from Conway MacKenzie that was provided with

19  respect to revenue and operating expenditure assumptions on a

20  by department basis as well as capital investments and blight

21  that were at that point in time estimated for the city, which

22  in aggregate added up to about a billion dollars net.

23  Q   But how could the city be spending money on reinvestment

24  when it had a deficit at the levels we see in the middle of

25  the -- of page 91?

1  A    It was probably unlikely that the city would have been

2  able to.

3  Q    So why did we have -- why do you have here a section

4  about reinvestment at all?

5  A    Well, the reason we wanted to show it is because based on

6  the discussions we had with the city that the reinvestment

7  was a necessity.  It was in order to get the city back and

8  avoid a spiral, but that was the assumption as of then.

9  Q    Okay.  Is this analysis, page 90 and 91, sometimes called

10  a baseline analysis?

11  A    Yes.

12  Q    Why is it called a baseline analysis?

13  A    Because on 90 and 91 we have not incorporated any

14  bankruptcy-type provisions, so it's sort of outside of a

15  bankruptcy what the projections could look like, but it does

16  not take into impact any of the restructuring activities that

17  the city has undertaken as a part of the bankruptcy.

18  Q    Okay.  Thank you.

19          MR. STEWART:  And we can take down that exhibit.

20  Your Honor, I'm reminded I failed to move Exhibit 113 into

21  evidence.  That was the native -- in other words, the

22  electronic version -- of the 40-year forecast, and I'd move

23  it into evidence now.

24          THE COURT:  Any objections?

25          MR. WAGNER:  No, your Honor.

1          THE COURT:  All right.  It is admitted.

2     (City Exhibit 113 received at 11:15 a.m.)

3          MR. STEWART:  Let's, if we could, put up Exhibit 3.

4  BY MR. STEWART:

5  Q   Mr. Malhotra, Exhibit 3 is in front of you.  Can you tell

6  us what is Exhibit 3?

7  A   That's the fourth amended disclosure statement.

8  Q   Okay.

9          MR. STEWART:  And, your Honor, I believe this has

10  been admitted into evidence, although I'm susceptible of

11  correction if I have that wrong.

12  BY MR. STEWART:

13  Q   Mr. Malhotra, did this disclosure statement also set

14  forth forecasts that Ernst & Young had prepared?

15  A   Yes.

16          MR. STEWART:  Let's go, if we could, to page 89 of

17  212, so we have to go to the appendix, Appendix A, page 89.

18  No, that's not it.

19  BY MR. STEWART:

20  Q   While they're doing that, let me just ask you some

21  questions about the disclosure statement, Mr. Malhotra.

22          THE COURT:  Excuse me.  Excuse me just one second,

23  please.

24          MR. STEWART:  Yes.

25          THE COURT:  So what I'm showing is -- I'm sorry.

1  One more second.  What I'm showing is that on September 9th

2  the document was admitted during the testimony of Terri

3  Renshaw but only to show what she relied upon --

4          MR. STEWART:  Okay.

5          THE COURT:  -- for what she did, and then I'm also

6  showing that, although Exhibit 3 was initially admitted as

7  part of the final pretrial order, that was vacated and only

8  Exhibit M to Exhibit 3 was subsequently admitted on September

9  8th.

10          MR. SOTO:  Your Honor, we have no objection to the

11  admission of Exhibit 3.  I think the only party that had

12  objected on the exhibit list, again, was Syncora.  There's

13  some of their objections which we would adopt, but this is

14  not one of them.

15          THE COURT:  All right.  Would you like to offer

16  Exhibit 3 then?

17          MR. STEWART:  Yes, your Honor.

18          THE COURT:  All right.  Exhibit 3 is admitted for

19  all purposes.

20      (City Exhibit 3 received at 11:17 a.m.)

21  BY MR. STEWART:

22  Q   Now, Mr. Malhotra, I'm now going to direct you to one of

23  the appendices of Exhibit 3, page 89 of 200 and -- I think of

24  212.

25          MR. STEWART:  Let's go back, if we could.  Just go

1   one more page.  Do you have -- sorry.  It's page 99.  Oops.

2   Where were we?  Just next page, please, and keep going.  One

3   more.  Keep going.  Keep going.  There you go.  Page 94.

4   BY MR. STEWART:

5   Q   Tell us, if you could, what page 94 of 212 is on Exhibit

6   3.

7   A   This would have been the same slightly updated baseline

8   scenario that was used for the disclosure statement, so I

9   believe this would be the May 5th version of the projections.

10  Q   Okay.  And did the disclosure statement also have a

11  comparable summary of the 40-year model that E&Y had

12  produced?

13  A   I believe so, yes.

14  Q   Okay.  Let's move on.  Let's go back, if we could, now to

15  Exhibit 109 and use the hard copy form of 109, and this has

16  been admitted into evidence.  So a couple of months after the

17  disclosure statement, you had a new edition of your model?

18  A   Yes.

19  Q   Okay.  And that's what you have before you is Exhibit

20  109?

21  A   That is correct.

22  Q   Now, it appears to be 82 pages long?

23  A   That is correct.

24  Q   Now, the cover has this red language there.  Can you tell

25  me what that's doing on the cover of your model?

1    A    It's our standard disclaimer.

2    Q    Okay.  What are you disclaiming?

3    A    That the assumptions and the data are at the end of the

4    day the product of the client.

5    Q    Are you disclaiming the accuracy of the model?

6    A    No.

7    Q    Are you disclaiming that you believe it to be an accurate

8    forecast?

9    A    Yeah.  Based on the assumptions, we believe this is --

10   it's accurate.

11   Q    Okay.  So now let's go to page 3.

12          MR. SOTO:  You know, Judge, on that one -- forgive

13   me for interrupting, but I couldn't read a thing of what he

14   was -- what he had there, so I have no idea what he was

15   disclaiming, so -- and I would point that out, your Honor.

16          MR. STEWART:  Well, we could go back, and can we

17   make it any bigger?

18          MR. SOTO:  Could you?  Thanks.

19          MR. STEWART:  There we go.  Probably going to have

20   to read it in halves.

21          MR. SOTO:  Thank you, Geoff.  Thank you, your Honor.

22   BY MR. STEWART:

23   Q    If we could, let's go to page 5.  And what is page 5 of

24   the model?

25   A    It's a continuation of the assumptions --

1  Q   Okay.

2  A   -- that are being used, the primary assumptions that are

3  being used in the model.

4  Q   So the beginning of the model, we set forth what your

5  assumptions are?

6  A   Yes.

7  Q   Okay.  Now let's go to page 6.  And just for the

8  record -- I think we've seen this before -- what is page 6?

9  A   Page 6 is the slightly updated baseline scenario that was

10 used for the disclosure statement projections.  I think it

11 was around May 5th.

12 Q   Okay.  So this is an updated version of the forecast we

13 saw that had also been in the June 2013 documentation;

14 correct?

15         MR. WAGNER:  Objection.  Leading.  I think in

16 general there's been too much leading.

17         THE COURT:  I agree, and that objection is

18 sustained.

19         MR. STEWART:  Okay.

20 BY MR. STEWART:

21 Q   How does this relate to the pages we looked at, page 91

22 of Exhibit 33?

23 A   109 is the July 2nd update of the projections, and so we

24 would have updated it since May 5th for the items that we

25 knew we had changed because it was during this time frame

1   that there were a couple of settlements that were reached,

2   but on the baseline scenario, other than some changes that we

3   would have made for new information that we would have

4   received, majority of this would have essentially remained

5   the same or close to it.

6   Q    What is the next page of the exhibit?

7   A    Well, on this page of the exhibit we have tried to show

8   the restructuring scenario specifically before distributions

9   are made or could be made to unsecured creditors because what

10  we have done on this page is taken the operating revenues and

11  expenditures from the prior page, eliminated majority of

12  the -- eliminated the majority of the unsecured creditor

13  payments, included in here the reinvestment expenditures to

14  show what funds the city would have available for the next

15  ten years to make payments for its unsecured creditors.

16  Q    Okay.  Let's look at the next page.  What is this page?

17  A    Page 8 of 82 on Exhibit 4.  I think it is a detailed

18  version of the pages we saw two pages prior, which was the

19  summary view of the baseline.  This is a detailed view of the

20  baseline.

21  Q    Okay.  Let's now go to page 10.  This says it's a general

22  fund department detail.  What is a department detail?

23  A    This is how we have built up the ten-year projections, so

24  it shows the detail of the summary view and the summary

25  detail view but now being broken down by department.

1    Q    Let's go to the next page then.  What is page 11?

2    A    This is the summary of the budget department.

3    Q    That's a department of the city?

4    A    Yes.

5    Q    And why is this page organized the way that it is

6    organized?

7    A    Because all the pages after this on every single

8    department is organized the same way.

9    Q    And how many such pages are there that go through the

10   department detail?

11   A    Probably 50-plus.

12   Q    Let's go to one in particular just so I can ask you about

13   it, which will be page 17 of 82.  This is the detail for the

14   fire department.

15           MR. STEWART:  And can we blow that up so it's easier

16   to see?  Just blow up the left-hand half of it.  Maybe

17   that'll be easier.

18   BY MR. STEWART:

19   Q    So, Mr. Malhotra, I want you to walk us through how this

20   detail was done for, in this case, the fire department.

21   A    So the information that is here on the left would have

22   been the information that we would have gotten first in the

23   raw data from the city by line item, and this would have

24   probably been only for the general fund because fire just has

25   the general fund essentially, and then we would have gone

1    through actually the details that broke up the licenses,

2    permits, and charges, and the same things for sales and

3    charges for services and then looked at each one of the

4    expense categories in terms of the salaries, the overtime,

5    what the pension allocation was, the basis for the fringe

6    benefits that were allocated to the fire department, so there

7    would be another layer down in terms of the detail.  And

8    based on that, we would have actually developed the

9    projections on a headcount basis for the fire department.

10   Q   What part of this sheet is purely historical information?

11   A   The left part, 2008 through 2012.

12   Q   Okay.  So let's now expand the right side so we can see

13   some of the projected information.  Now, Mr. Malhotra, how

14   did you go about projecting revenue and expense items as they

15   related to the fire department?

16   A   Well, when it came to the revenues, the fire department

17   does not have a lot of revenues, so we would have looked at

18   the assumptions with respect to like the first line here

19   would have been the -- I believe it would be the inspection

20   charges, but they had generally been following a consistent

21   trend, and then based on discussions with management for any

22   specific initiative that was being undertaken to increase the

23   overall fees or the inspection charges, we would have

24   increased it and then left it flat over the forecast period

25   because there was not necessarily a plan in terms of how

1   those inspection charges would continue to go up.

2   Q   Now -- go ahead.  Have you finished?

3   A   The second line, I think, is the sales and charges for

4   services, and those, again, would be EMS fees or charges that

5   could be generated by the fire department.  And, again,

6   between 12.6 and the 14.9, we would have been specifically

7   highlighting any specific initiative based on discussions

8   with the management team that were being used or looking at

9   even what those charges were historically to come up with

10  what the 2014 number would be and also for keeping that flat

11  depending on the kind of revenue initiative it was.  The

12  grant revenue was essentially the SAFER grant in which we

13  knew that the city has gotten the SAFER grant extended

14  through fiscal year '15 and '16, so we left that in but

15  dropped it '17, '18, and '19 in the baseline, but when you

16  will look below in the revenue initiatives that are not shown

17  on this page, we assumed that the grant would actually get

18  renewed for two more years, but we did not want to

19  incorporate that in the baseline that's shown down below in

20  terms of the reinvestment initiatives.

21  Q   Then under "expenditures," just in a nutshell, tell us

22  how you went about coming up with the numbers that we see.

23  A   So the biggest line item again, which is salaries and

24  wages, that would have been developed based on -- again, we

25  have schedules in the back -- based on the assumptions of the

1   actual headcount by department.  We had that historically as

2   well as the most current state, and we would have used the

3   current assumptions of the headcount at the average salary

4   level that we had been provided for that particular

5   department and forecast that over the course of the time

6   frame.  And, again, we would have based headcount assumptions

7   compared to what the headcount assumptions were a few months

8   ago because there had been an ongoing attrition, and so we

9   assumed in the baseline that the attrition would be replaced

10   in the projections.

11   Q   Okay.  Now, at the bottom of this page -- let's go to the

12   whole page once again.  What do we have in the bottom couple

13   of lines?

14   A   So those are the operational restructuring and

15   reinvestment initiatives, which was the information that was

16   given to us by Conway MacKenzie on a department-by-department

17   basis, but we ensured that there was -- that these

18   expenditures were reviewed, so there was not a double

19   counting of either a revenue or an expense between what was

20   in the baseline versus not.

21   Q   Okay.  And this was done for how many of the city's

22   departments?

23   A   All the departments that impacted the general fund.

24   Q   And if we could just flip to the next page and the page

25   after that, what sort of departments do we have here?  That's

1   fire.  What's the next one?

2   A   Health and wellness.

3   Q   Do you see it on your screen, Mr. Malhotra?  It may be

4   easier to see it on the screen.

5   A   Yes.  The health and wellness department.

6   Q   And after that?  And let's do the next page after that.

7   A   The human resources department.

8   Q   Okay.  And could we go on until we've gone through every

9   department in the city?

10  A   Yes.

11  Q   And where were these all compiled in this forecast?

12  A   All of the information for the general fund came together

13  in the summary tab, which we had looked at earlier.

14  Q   That's what?  Page 6 and 7?

15  A   Yes.  Page 6 was the baseline view, which is where all of

16  the individual departments would add up to, and then page 7

17  was more for restructured view.

18  Q   Now, let's look at Exhibit -- we can put that down.

19  Let's look at Exhibit 111, and if we can go back to page 4 of

20  11.  What does page 4 do?

21  A   Page 4 is -- shows the projected ten-year and forty-year

22  view of the city under the restructuring view scenario, which

23  shows what funds are available to pay unsecured claims over

24  the next ten, twenty, thirty, or forty years.

25  Q   Okay.  All right.

1      MR. STEWART:  So now let's go back to Exhibit 111

2  and, in particular, to pages 5 and 6.  Sorry.  Let's make it

3  page 6 actually.  Is that 6?  I'm losing my eyesight.  I'm

4  sorry.  Make it 109, page -- that's the wrong page -- make it

5  page 109 -- sorry -- Exhibit 109, page 6, please, and let's

6  highlight, if we could, the left-hand column that has the --

7  all the way down, please.  There we go.  Thank you.  Okay.

8  BY MR. STEWART:

9  Q   So I think I've already asked you, Mr. Malhotra, about

10  the sources of some of the information you have here, and I

11  believe we talked about other revenues.

12      MR. STEWART:  Could we put up, if we could --

13  BY MR. STEWART:

14  Q   We have sales and charges for services.  Do you see that?

15  A   Yes, I do.

16  Q   And also other revenues?

17  A   Yes, I do.

18  Q   Okay.

19      MR. STEWART:  Let's put up --

20  BY MR. STEWART:

21  Q   I'm going to ask you about the details of sales and

22  charges for services.

23      MR. STEWART:  Let's put up demonstrative Exhibit

24  716.  Okay.

25  BY MR. STEWART:

1  Q   And, Mr. Malhotra, what I would like to do is ask you

2  what the detail is that is behind the line that says "sales

3  and charges for services."  First of all, what is Exhibit

4  716?

5  A   It shows the build-up of the sales and charges for

6  services by department.

7  Q   Who prepared Exhibit 716?

8  A   We did.

9  Q   Okay.

10         MR. STEWART:  Your Honor, I'd move the admission of

11  716 solely for purposes of being a demonstrative exhibit.

12         MR. SOTO:  No objection, your Honor.

13         MR. STEWART:  Could we --

14         THE COURT:  It is admitted.

15     (City Exhibit 716 received at 11:35 a.m.)

16         MR. STEWART:  Sorry.  I'm never going to get this

17  right, your Honor.

18  BY MR. STEWART:

19  Q   Mr. Malhotra, could you walk us through and tell us what

20  items of revenue there are that underlie the line that's

21  entitled "Sales and Charges for Services"?

22  A   Yes.  The main categories are by department.  The first

23  one is nondepartmental in which you have probably three or

24  four main items that are captured in there, the first one

25  being the municipal service fee.  The second main item that

1  is also captured in there is the overall reimbursements that

2  come from other departments for services that are provided by

3  the general fund, so it's almost a netting out of an expense

4  with a revenue. The PLD Department also has all of -- has

5  the costs or the revenues related to its customers, which are

6  continuing to show -- go down, which is as the grid is

7  transitioned to a third party provider, the PLD Department is

8  no longer going to be collecting revenues from those

9  particular customers. The fire department is, again -- this

10 specifically relates to predominantly the fees that are being

11 charged also by EMS. That is sort of built up in the fire

12 department. The 36th District Court as well, this is related

13 to the fees that are historically charged, so -- and we can

14 go down, but those are sort of the main components of the

15 sales and charges for services.

16 Q  Okay. And then if we went back to Exhibit 109, there's

17 also this category entitled -- pardon me -- "Other Revenue."

18       MR. STEWART: Let's put up, if we could, Exhibit

19 717.

20 BY MR. STEWART:

21 Q  Do you have Exhibit 717 before you, Mr. Malhotra?

22 A  Yes, I do.

23 Q  What is Exhibit 717?

24 A  Exhibit 717 breaks down the other revenues into more

25 detail in terms of how we -- the items that we had included

1    in other revenues in the summary.

2    Q    Who prepared Exhibit 717?

3    A    We did.

4         MR. STEWART:  Your Honor, I'd move its admission as

5    a demonstrative exhibit.

6         MR. SOTO:  No objection, your Honor.

7         THE COURT:  It is admitted.

8         (City Exhibit 717 received at 11:37 a.m.)

9    BY MR. STEWART:

10   Q    Mr. Malhotra, could you walk us through what items

11   comprise the line entry that has been entitled "Other

12   Revenues"?

13   A    The items there would be other taxes, which I believe is

14   an industrial facility tax; the parking and court fines,

15   which is predominantly parking tickets; grant revenue, which

16   would be related to the grant revenues in specific

17   departments such as the SAFER grant or the COPs grant.  The

18   licenses and permits would be fees charged by the building

19   department and building permits and the inspections by even

20   the fire department.  The revenue from use of assets would be

21   some rental income, some one-time asset sales.  The general

22   fund reimbursements would be, again, predominantly

23   reimbursements coming from the Department of Transportation

24   for paying the self-insurance funds.  The transfers in from

25   UTGO would be the component of property -- of tax collections

1    that were related to the UTGO millage.  The department

2    revenue initiatives would be the operating initiatives by

3    department that would be shown on a department-by-department

4    basis that would be flowing into other revenue.

5    Q   Let me ask you about the transfers in for the UTGOs.  Why

6    is that treated as revenue?

7    A   Because there is an incoming source that is coming in in

8    terms of the taxes that are collected and then a

9    corresponding transfer, though, to the debt service fund

10   under a baseline scenario initially, yes.

11   Q   And then the department revenue initiatives, I believe

12   we've talked about those before.  Are those existing revenues

13   or projected revenues?

14   A   Those are projected revenues coming through the

15   reinvestment initiatives.  We got that line from Conway

16   MacKenzie.

17           MR. STEWART:  So let's go back to Exhibit 109 and to

18   the general fund summary that we were looking at there, and

19   let's expand the lower left-hand corner.  Now, we're going to

20   want to go higher up to the expense part.  See the -- yeah,

21   there we are.

22   BY MR. STEWART:

23   Q   What was the source of your information for the items,

24   first of all, that are salaries, health benefits, and other

25   operating expenses?

1  A    On a historical basis, it would be the city's information

2  that we got on a department-by-department basis of what

3  salaries and wages were allocated by fund by department.

4  Q    Okay.  Let me direct your attention.  The top line says

5  "salaries over time and fringe"; correct?

6  A    Yes.

7  Q    And that's projected out for a number of years?

8  A    That is correct.

9  Q    What inflation assumption did you make with respect to

10  wage inflation over that term of years?

11  A    With respect to wage inflation in the first few years, we

12  used the information that was at the time being discussed

13  with the different unions with respect to five percent up

14  front in terms of the wage increase, zero following, and then

15  it was about 2-1/2, 2-1/2, 2-1/2 after that.  Beyond the

16  first five years, we used a two-percent wage inflation

17  assumption.

18  Q    Do you know how that compared with the wage rate of

19  inflation Dr. Cline used in his projections of income taxes?

20  A    The two percent should be similar.

21  Q    Okay.

22        MR. STEWART:  Now, if we go further down, under net

23  operating surplus, we have -- oops -- let's see.  Go, if you

24  could, back to what we -- just stay with what we had

25  originally, if you could.  Thank you.  You got to go to the

 1   next page.  Let's go to the next page, if we could.  And you

 2   see the upper left-hand corner?  Go further down.  Oops.

 3   There you go.  Thank you.

 4   BY MR. STEWART:

 5   Q    Under expenses we have a variety of expenses I wanted to

 6   ask you about.  Let's talk about the reinvestment.  You have

 7   OPEB payments for current and future retirees?

 8   A    That is correct.

 9   Q    Where did those -- where did those numbers come from?

10   A    For the current retirees, we had the information based on

11   what the historical performance of the city was with respect

12   to payments for its existing plans as well as some of the

13   information we would have received from Milliman on the cost

14   of the plans on a per head basis.

15   Q    Okay.

16   A    And for future retirees, it was based on two percent of

17   healthcare -- two percent of wages for the nonuniform

18   employees, and for the uniform employees it was a million

19   dollar fixed payment for the forecast period.

20   Q    Now, let's go, if we could, to the overall sheet, to the

21   overall page that we had, and as a result of your modeling

22   exercise that you've described to us, Mr. Malhotra, have you

23   reached an opinion looking at these pages of Exhibit 109 as

24   to the reasonableness of the city's projections of its

25   revenues and expenditures for the next ten years?

1  A    Yes.

2  Q    What is your opinion?

3  A    My opinion is based on the assumptions here, the revenues

4  and expenditures appear to be reasonable as shown here until

5  the funds available for unsecured claims that the revenues

6  and expenses seem reasonable.

7  Q    Let's now go -- pardon me -- if we could, to Exhibit 111

8  and, in particular, to page 4 of 9.  I believe you looked at

9  this sheet before, Mr. Malhotra.  As a result of the work you

10 did that you described to us, have you reached an opinion

11 about the reasonableness of the city's forecast of revenues

12 and expenditures for the 40-year period that's set forth on

13 page 4 of 9 of Exhibit 111?

14 A    Yes.

15 Q    What is your opinion?

16 A    My opinion is that based on the assumptions we have here,

17 these revenues and expenses appear reasonable for 40 years in

18 terms of the line item up to the funds available for

19 unsecured claims.

20 Q    Thank you.  Now, more recently you updated your July

21 forecast just last week, did you not?

22 A    That is correct.

23 Q    Let's put up -- and tell us why you updated the July

24 forecast.

25 A    The primary change for that was the Syncora settlement.

1    It is why we updated the projections recently, and there were

2    some other small changes as well.

3            MR. STEWART:  Let's put up Exhibit 733, please.

4    BY MR. STEWART:

5    Q    What is Exhibit 733?

6    A    733 is the ten-year projections that were prepared last

7    week.

8    Q    And who prepared Exhibit 733?

9    A    We did in conjunction with the other advisors and the

10   city.

11   Q    What was Exhibit 733 based upon?

12   A    It was the same information that we had in the prior

13   versions other than an update for the Syncora settlement as

14   well as some of the timing changes based on the updated

15   information we have.

16           MR. STEWART:  Your Honor, I'd move the admission of

17   Exhibit 733.

18           MR. SOTO:  No objections, your Honor.

19           MR. STEWART:  Let's put up 734 if we could.  Your

20   Honor, I'm never going to get this right.  I mean I just give

21   up.  I think you should imprison me or something.  I've now

22   messed this up, I think, seven times.

23           THE COURT:  It is admitted.

24       (City Exhibit 733 received at 11:45 a.m.)

25           MR. STEWART:  I apologize.  Let's put up --

1 BY MR. STEWART:

2 Q   Exhibit 734, Mr. Malhotra, is front of you.  Can you tell

3 us what is Exhibit 734?

4 A   734 is the 40-year projections that were prepared last

5 week.

6 Q   And why was there an update as of last week of the 40-

7 year projections?

8 A   It was to reflect the -- primarily the Syncora

9 settlement, and there were other -- some small changes from a

10 timing standpoint.

11 Q   What's the relationship between the recent update for the

12 40-year projections and what we saw back in July?

13 A   It's the -- essentially the same data.  It's just been

14 updated for the settlement and the timing of the changes.

15 Q   Do these documents also exist in native format?

16 A   Yes.

17        MR. STEWART:  Do we have those loaded?  If not, we

18 can do it after the break.

19 BY MR. STEWART:

20 Q   While we're waiting for that to happen, let me ask you

21 this.  Are you familiar with something in analytics called a

22 bridge?

23 A   Yes.

24 Q   What is a bridge?

25 A   It helps compare, in my view, the previous set of

1  projections to the current set of projections.

2  Q   Did you prepare a bridge to span the change from the July

3  projections to the September projections?

4  A   Yes.

5       MR. STEWART:  Let's put up Exhibit -- I'm sorry.

6  Let's go to page 11 of this exhibit.

7  BY MR. STEWART:

8  Q   What is page 11 of our exhibit?

9  A   Page 11 shows the annual changes over the next ten years

10 and forty years of the changes that were made to the July 2nd

11 projections to the most recent projections.

12      MR. STEWART:  Your Honor, I'm wondering if I

13 remembered to move into evidence Exhibit 734.  I'm not sure

14 that I did.

15      MR. SOTO:  Your Honor, our only point on Exhibit

16 734, the witness said there were some minor  -- I think he

17 called them changes.  Could he describe what it is so we can

18 find them or see them?  I don't have a problem with it,

19 but --

20      MR. STEWART:  I'm doing it right now.

21      MR. SOTO:  Is that what you're doing?  Okay.  Then

22 no objection, your Honor.

23      THE COURT:  All right.  It is admitted.

24    (City Exhibit 734 received at 11:48 a.m.)

25 BY MR. STEWART:

1  Q   All right.  So let's focus, if we could, on page 11 of

2  14.  Please tell us how this page connects the July forecast

3  to the September forecast.

4  A   So each one of these sections are highlighting the

5  changes that have been made since the July projections, so

6  the first section is the financing changes.

7        MR. STEWART:  Let's blow up that left side of this

8  so we can see those all the way down.  There you go.  Thank

9  you.

10  BY MR. STEWART:

11  Q   So please tell us what the changes were.

12  A   The first section shows the financing changes in terms of

13  the assumptions on the quality of life borrowings and amount

14  of exit financing.  The next section shows the changes in

15  terms of the Syncora settlement as well as other items that

16  were related to Syncora.  The next section showed the 36th

17  District Court settlement, and the fourth section showed the

18  changes in terms of the timing of when the quality of life

19  proceeds were being drawn and when the expenditures were

20  made.  And there's also a slight change in the contingency

21  amount based on the new borrowing.  The blight timing was

22  updated.  There was amount included for a draw from the

23  state-controlled escrow as well as the professional fees were

24  updated based on the latest information we had, and the

25  overall reinvestment deferrals were also updated.

1  Q   Okay.

2        MR. STEWART:  Let's go back to the full view, if we

3  could, again, Tom.

4  BY MR. STEWART:

5  Q   And so what do these numbers mean as they're scheduled

6  across the columns of this page?

7  A   The first line shows a negative number in '15 and '16

8  which essentially represents that the city is borrowing less

9  cash.  The initial assumption in July was that the city would

10  borrow $300 million in exit financing whereas the latest

11  assumption that the -- that we are using is the city will

12  only borrow $275 million of exit financing.  The line below

13  just shows the changes in the assumptions with respect to the

14  principal and interest payments for the exit financing based

15  on the latest information we had from Miller Buckfire.  The

16  POC settlements show for note C the Syncora portion of note

17  C, which is a payment of roughly $2.4 million a year for 12

18  years.  There were some nonbankruptcy settlement items, which

19  was about a $5 million cash payment, as well as the extension

20  of a tunnel lease or foregone rent from the tunnel until a

21  period of time in which it capped out at about $8 million.

22  We also updated for increased other fund reimbursements and

23  increased DWSD revenue stream to allocate the increased cost

24  of the Syncora settlement to DWSD and the other funds because

25  they typically have about 11-1/2 percent allocation of the

1    POCs.  The 36th District Court settlement was based on what's

2    in the plan with respect to the settlement of claims.  It's

3    about $2 million over the next five years.  The contingency

4    was just changed to reflect the one-percent amount based on

5    updated revenues.  Quality of life proceeds, in July we had

6    still assumed that we would have borrowed 52-1/2 million in

7    2014, which we did not, so we pushed it forward to 2015.

8    Also, the timing of certain expenditures that were

9    incorporated through fiscal year '14 of 131.2 million were

10    forecasted to be made in the following year in terms of when

11    the cash is really going to go out.  Blight timing in terms

12    of where the city was, instead of $100 million expense in

13    2015, it was taken down to 80, so this reflected the $20

14    million variance for 2015 that would subsequently get caught

15    up over the following four years.  We also had now shown the

16    full draw of the available escrow proceeds.  While the city

17    has to continue to reserve for some self-insurance reasons,

18    there is -- the remaining balance in the escrow proceeds was

19    assumed to be drawn.  We also did on an advisor-by-advisor

20    basis analysis of the invoices that the city has been

21    receiving and updated the estimate of the professional fees

22    through the end of December 2015 based on the information we

23    had from the various professionals.  And then we had -- we

24    changed some of the reinvestment deferrals so increased a

25    portion of the deferrals in '16 and '17 cumulatively between

1  2017 of about 25-plus million dollars and then caught those

2  up in the subsequent years in the forecast period, so there

3  was a timing change in terms of how the reinvestments were

4  being spread.

5  Q  Let me ask about the professional fees.  Those increased

6  between your July forecast and your September forecast by $52

7  million?

8  A  That is correct.

9  Q  How did that happen?

10  A  We asked for all the professionals to give us their

11  estimates, and we wanted to -- we included them in the

12  forecast.

13  Q  And who are the professionals we're talking about whose

14  projections or invoices are combined in that line,

15  "additional professional fees"?

16  A  It is a combination of the city's advisors, which

17  includes the financial and the legal advisors, as well as the

18  Retiree Committee's advisors and the other advisors the city

19  has been using in this process.  It included some estimates

20  through December.

21  Q  Is there a detail on this document or another document

22  that sets -- that breaks that down by advisor?

23  A  Yes.  We have the information by advisor.  It's not -- I

24  don't think it's in this document, but we have the supporting

25  schedules that break down all of the variances.

1  Q   Okay.  All right.  So now you've told us about --

2           THE COURT:  Excuse me.  Do you have that here?

3           THE WITNESS:  I don't have it here, but I can get it

4  over the break, but I do have it, yes, your Honor.

5           THE COURT:  Please.

6  BY MR. STEWART:

7  Q   Now, you've described for us, Mr. Malhotra, this bridge,

8  and so if you take all these numbers, how do they connect the

9  two forecasts?

10 A   If you take the July forecast, you incorporate these

11 changes, you will get to the September forecast.

12 Q   Okay.  Now, we've looked at the general fund summary

13 before.  It has all sorts of lines.  Why are there so few

14 lines, relatively speaking, on the bridge compared on the --

15 to the general fund summary?

16 A   Because these are the only line items that changed.

17 Q   Okay.  Now, let's go, if we could, to page 10 of this

18 exhibit.  What is page 10 of the exhibit?

19 A   Page 10 of this exhibit is the 40-year bridge, which is a

20 summary view of the bridge that we were just looking at in

21 detail, and it just breaks down the financing charges

22 changes, the impact of the Syncora settlement plus some of

23 the other impacts from the nonbankruptcy changes with

24 Syncora, but it's just a summary view of what we were just

25 looking at, the detail view over 40 years.

1    Q    And how does it connect the July 40-year forecast to the

2    September 40-year forecast?

3    A    The detail line items would be the only changes that

4    would have been made since the July forecast.

5    Q    Okay. Let's, if we could, now go to Exhibit 733. Okay.

6    And this is the ten-year; correct?

7    A    That is correct.

8    Q    Exhibit 109 was the ten-year forecast for the -- in July,

9    and, of course, this the one in September. What differences

10    are there in the format of these two forecasts?

11    A    The September forecast on Exhibit 733 is about 113 pages.

12    The July projections for the ten-year were about 82 pages.

13    The first -- the format of the first 82 pages is essentially

14    identical, but in these projections we have included just a

15    different way of looking at the numbers, so none of the

16    numbers have essentially changed, but we recut the ten-year

17    projections as well based on input that we were receiving as

18    to a more -- a simpler view of looking at the department

19    budgets post-restructuring.

20    Q    Okay. And where does that simpler view begin?

21    A    It should be on page 83 of this.

22         MR. STEWART: Let's go, if we could, to page 83.

23    Back up to page 82 actually first.

24    BY MR. STEWART:

25    Q    So these are Appendices E to F?

1    A    Yes.

2    Q    Okay.  So what is it that begins on page 83?

3    A    So what page 83 does is it's, again, a summary view of

4    the general fund, revenues and expenditures, in which all of

5    the restructuring revenue initiatives, restructuring expenses

6    have been flown -- have been followed through by department,

7    so this is a sum of a department view again, but unlike the

8    restructuring initiatives or expenditures or revenues being

9    broken out separately or just using the historical

10   nonrestructured legacy liabilities, what we have tried to do

11   here is to show a more simplistic view of the general fund,

12   probably a more realistic view as to how the financial

13   information will come about post-restructure.

14   Q    Does this analysis have a name?

15   A    It's a post-restructuring view.

16   Q    Have you heard the phrase used "the mayor's view"?

17   A    Yes.  At times we have referred to this format and

18   another format as the mayor's view because it is a better

19   format to kind of look at the overall picture.

20   Q    Did the mayor ask for it to be done this way?

21   A    No, not directly.  We did it.

22   Q    What conversations did you have with the Court's expert,

23   Ms. Kopacz, about preparing a different view to set forth the

24   data in the way you've just described to us?

25   A    I mentioned to the Court's expert that this is another

1  way that we are looking at it, you know, based on some of the

2  comments that we had also read through in the report as to

3  how to make this more user friendly since we've been looking

4  at it over the evolution for the last couple of years as to

5  how to sort of make this a much more effective document going

6  forward.  I'm sure there will be some more changes to the

7  format, but this is along the lines of making it more user

8  friendly going forward.

9  Q   Does this view also have department-by-department

10 breakdowns?

11 A   It does.

12 Q   Let's go to the one for the fire department, if we could.

13         THE COURT:  Actually, before we do that, let's stop

14 now for lunch.

15         MR. STEWART:  Your Honor, in three minutes I can

16 wrap up this whole section --

17         THE COURT:  Oh, all right.  Go for it.

18         MR. STEWART:  -- because it's just one page and then

19 two questions, and then we --

20         THE COURT:  Okay.

21         MR. STEWART:  -- move on to something perhaps more

22 interesting.

23         MR. SOTO:  I don't believe it.

24 BY MR. STEWART:

25 Q   Do you have the fire department before you, Mr. Malhotra?

1  A   Yes, I do.

2  Q   How does this compare to the sheet we looked at earlier

3  in the other view for the fire department?

4  A   It should be very similar in terms of the line items, but

5  the sales and charges for services, like, for instance, in

6  2015 would be a summation of what was in the baseline plus

7  the revenue initiatives below the line that were highlighted

8  would now be captured together.

9  Q   Okay.  You've heard of the -- pardon me -- the phrase

10  "harmonization"?

11  A   Yes.

12  Q   What is harmonization?

13  A   It's syncing up essentially of two different files'

14  formats.

15  Q   Okay.  What role does this part of the exhibit play in

16  the process of harmonization between the forecast of Ernst &

17  Young and the budgeting process of the city?

18  A   I think it's the first couple of steps because 2015 is

19  going to be a transition year for the budget department as

20  well as as we continue to look at the projections, but this

21  is along the road of trying to harmonize the budget

22  department, but like I said, there will still continue to be

23  some changes the way the budget department creates the

24  budget, but this will definitely go -- be sort of the first

25  step of that harmonization process.

1      MR. STEWART:  Thank you.  Your Honor, if this is a

2  good time to break, this would be an appropriate time for me,

3  too.

4      THE COURT:  Okay.  We'll be in recess until 1:30,

5  please.

6      THE CLERK:  All rise.  Court is in recess.

7      (Recess at 12:03 p.m., until 1:30 p.m.)

8      THE CLERK:  All rise.  Court is back in session.

9  You may be seated.  Recalling Case Number 13-53846, City of

10  Detroit, Michigan.

11      THE COURT:  You may proceed.

12      MR. STEWART:  Thank you, your Honor.  Your Honor,

13  may I approach the bench, please?

14      THE COURT:  Yes.

15      MR. STEWART:  And may I also approach the witness?

16      THE COURT:  Yes.

17  BY MR. STEWART:

18  Q   Mr. Malhotra -- for the record, Geoffrey Stewart, Jones

19  Day, for the city.  Mr. Malhotra, I placed before you a

20  document marked as Exhibit 767.  Could you tell the Court

21  what Exhibit 767 is?

22  A   This exhibit shows the breakdown of professional fees by

23  advisor for fiscal year '14 and the estimates through fiscal

24  year '15 and then the total column for professional fees by

25  advisor and also the breakdown of the variance that we had

1  spoken about earlier.

2  Q   Is this a detail of fees that you testified to before the

3  lunch break?

4  A   Yes, the variance of the professional fees by advisor.

5  That is correct.

6  Q   Okay.  And the detail that Judge Rhodes asked you to

7  prepare and bring to Court this afternoon?

8  A   That is correct.

9         MR. STEWART:  Your Honor, I'd move the admission of

10  Exhibit 767.

11         THE COURT:  Any objections?

12         MR. WAGNER:  No objection, your Honor.

13         MR. SOTO:  No objection.

14         THE COURT:  It is admitted.

15     (City Exhibit 767 received at 1:32 p.m.)

16         MR. STEWART:  I also wanted to go back to some other

17  exhibits we spoke of this morning and move their admission.

18  Could we first put up Exhibit 757?

19  BY MR. STEWART:

20  Q   Mr. Malhotra, do you see exhibit 757 on your screen?

21  A   I do.

22  Q   Could you tell us what Exhibit 757 is?

23  A   757 looks like the ten-year projections.  I'm just trying

24  to see which version they would be.

25  Q   I'm sorry.

1  A   I'm just trying to figure out which version they would

2  be.

3  Q   Perhaps at the bottom there would be a time or a date

4  shown on the first page.

5  A   I would be able to tell if you could please go to the e-

6  summary tab.  If you scroll to the bottom right, please.

7  These appear to be the September projections of the ten

8  years.

9  Q   In native format?

10 A   That is correct.

11         MR. STEWART:  Your Honor, I'd move the admission of

12 Exhibit 757.

13         THE COURT:  Any objections?

14         MR. SOTO:  No objection, your Honor.  I would note

15 for the record that he couldn't tell what it was from just

16 the front page.

17         THE COURT:  I noticed.  Okay.  757 is admitted.

18     (City Exhibit 757 received at 1:33 p.m.)

19         MR. STEWART:  Let's put up 758.

20 BY MR. STEWART:

21 Q   Could you tell -- if you'd like, go to the second or

22 third page of 758.  Can you tell us, Mr. Malhotra, what is

23 Exhibit 758?

24 A   758 is the post-restructuring scenario which we spoke

25 about earlier from pages 83 onwards, which is a recut of the

1  ten-year financials under a different format.

2  Q   Did you prepare 758?

3  A   Yes.

4          MR. STEWART:  Your Honor, I'd move the admission of

5  758.

6          MR. SOTO:  No objection, your Honor.

7          THE COURT:  It is admitted.

8      (City Exhibit 758 received at 1:34 p.m.)

9          MR. STEWART:  Let's look up 759, please, 759.

10  BY MR. STEWART:

11  Q   Mr. Malhotra, do you have Exhibit 759 before you?

12  A   I do.

13  Q   What is Exhibit 759?

14  A   759 should be the 40-year projections and should be the

15  September version, but I can just confirm if you go to the

16  40-year tab.  Yeah.  I believe these are the September

17  projections.

18          MR. STEWART:  Your Honor, I'd move the admission of

19  Exhibit 759.

20          MR. SOTO:  No objection, your Honor.

21          THE COURT:  It is admitted.

22      (City Exhibit 759 received at 1:35 p.m.)

23          THE COURT:  I meant to announce at the beginning of

24  court here after lunch that the mediator did recommend

25  adjourning tomorrow's proceedings relating to the UAW claim,

1  so the Court will agree to do that.  Do you have a new date

2  in mind for that?

3       MR. HERTZBERG:  We hadn't discussed a date, and what

4  I suggest is let's see how it goes tomorrow, and then I can

5  talk to the other side about slotting in a date and come back

6  to you.

7       THE COURT:  I do want a date.

8       MR. HERTZBERG:  Okay.

9       THE COURT:  I don't want to leave it open.

10      MR. HERTZBERG:  I'll take good care of it, your

11 Honor.

12      THE COURT:  Before you leave the lectern, Mr.

13 Hertzberg -- and I don't know if you're the right person to

14 talk to about this, but we had an inquiry this morning from

15 Mr. Flynn on behalf of the Detroit Fire Fighters Association.

16 They were also scheduled for their issues tomorrow, and he

17 was asking about whether and how that was going to proceed.

18 Is that your issue or someone else's?

19      MR. HERTZBERG:  I'm not aware of that issue, your

20 Honor.  Let me check over here.  Your Honor, could I suggest

21 that Mr. Flynn check with Heather Lennox?  And we can track

22 it down, and then we can come back and report to you.

23      THE COURT:  Okay.  I will do that, but I will ask

24 you to try to communicate to Ms. Lennox to reach out to Mr.

25 Flynn also.

1    MR. HERTZBERG:  I will, your Honor.

2    THE COURT:  All right.

3    MR. STEWART:  Your Honor, I'm sorry if I jumped the

4    gun even after the lunch break, but I have a note to myself

5    now stuck on the lectern which says "wait."

6    THE COURT:  Always good advice.

7    BY MR. STEWART:

8    Q   So, Mr. Malhotra, let me -- let's move on to a new area.

9    You understand that the city has settled with the claims of

10   some of its creditors?

11   A   Yes.

12   Q   What is the extent of your knowledge of those

13   settlements?

14   A   It's pretty extensive.

15   Q   And do you understand the city proposes to issue

16   securities as part of some of those settlements?

17   A   Yes.

18   MR. STEWART:  Let's put up Exhibit 728.

19   BY MR. STEWART:

20   Q   Do you see Exhibit 728 before you, Mr. Malhotra?

21   A   I do.

22   Q   What is Exhibit 728?

23   A   Exhibit 728 highlights the new notes that are going to be

24   issued as a part of the overall restructuring in order to

25   settle the claims of various classes.

1  Q   Who prepared Exhibit 728?

2  A   It was our team along with the Jones Day team.

3          MR. STEWART:  Your Honor, I'd move the admission of

4  728 as a demonstrative exhibit.

5          THE COURT:  Any objections?

6          MR. SOTO:  No objection as a demonstrative.

7          THE COURT:  It is admitted.

8      (City Exhibit 728 received at 1:38 p.m.)

9  BY MR. STEWART:

10  Q   Mr. Malhotra, let's go, if we could, through the exhibit,

11  and at the top there's something called restructured UTGO

12  notes.  Please tell us what those are.

13  A   Those are the restructured unlimited tax general

14  obligation notes that will be issued in $288 million in face

15  value and would be paid off over 14 years at various interest

16  rates by tranche, but essentially these notes are going to be

17  paid off over the same time frame and at the same interest

18  rate as the original UTGO notes.

19  Q   So what about them has been restructured?

20  A   The face value and the claim amount compared to the claim

21  amount.

22  Q   And do you know what the original face value of the UTGO

23  claims was?

24  A   The claim amount is about 388 million.

25  Q   What's the next line?

1   A    New LTGO bonds.

2   Q    And what are those for?

3   A    Those are new limited tax general obligation bonds that

4   are being issued by the city in order to settle the LTGO --

5   settle with the LTGO class, but the city does have the option

6   to pay off the entire amount in cash at emergence.

7   Q    And please tell us about the face value and other terms

8   of the new LTGO bonds.

9   A    The bonds would be $55 million in face value payable over

10  23 years at an interest rate of 5.65 percent if the city does

11  not pay the -- those notes off earlier in its entirety in

12  cash.

13  Q    And who will be the holders of these new notes?

14  A    They would be the LTGO bondholders.

15  Q    Okay.  Now, below that is something called the new B

16  notes.  What are the new B notes?

17  A    The new B notes are new notes that are being issued as a

18  part of the plan for reaching settlement with the classes of

19  the LTGOs, the OPEBs, as well as a portion of the COPs and

20  other unsecured creditors.  They would be $632 million of

21  notes payable over 30 years at an interest rate of four

22  percent for the first 20 years and six percent for the last

23  decade, and they're going to be interest only for the first

24  ten years.

25  Q    And you told us who the holders would be of the B notes?

1    A    Yes.  It would be a combination of the classes for OPEB,

2    LTGOs, the COPs, notes, and the other unsecured creditors.

3    Q    Now, have you heard of something called a COPs reserve?

4    A    Yes.

5    Q    What is the COPs reserve?

6    A    The COPs reserve is the -- it's a portion of the B notes

7    that was set aside in connection with the COPs litigation.

8         MR. STEWART:  Let's put up demonstrative Exhibit

9    751, please.

10   BY MR. STEWART:

11   Q    Do you see Exhibit 751 before you, Mr. Malhotra?

12   A    I do.

13   Q    Who prepared 751?

14   A    We did along with the Jones Day team.

15   Q    And what does 751 purport to depict?

16   A    It breaks down the overall B notes of $632 million into

17   as to how they get allocated between the different classes.

18        MR. STEWART:  I'd move the admission of

19   demonstrative Exhibit 751, your Honor, but only as a

20   demonstrative.

21        MR. SOTO:  No objection, your Honor.

22        THE COURT:  It is admitted.

23     (City Exhibit 751 received at 1:42 p.m.)

24   BY MR. STEWART:

25   Q    Mr. Malhotra, on the left-hand side we see a pie chart;

1    correct?

2    A    That is correct.

3    Q    What part of the pie chart represents the COPs reserve?

4    A    The $162 million.

5    Q    And then there is a segment to the right, a bar chart, I

6    guess.  Why is that there?

7    A    That was there to illustrate as to depending on how the

8    COPs litigation plays out, how the COPs reserve would get

9    allocated between the OPEB class, the LTGOs, and the other

10   unsecured creditors.

11   Q    Now, you mentioned the COPs litigation.  What are you

12   referring to?

13   A    There's ongoing litigation in terms of the validity of

14   the COPs.

15   Q    And does that litigation affect the -- or how, if at all,

16   does that litigation affect the COPs reserve?

17   A    Well, if the litigation -- from my understanding, if the

18   litigation goes in favor of the city, the $162 million of

19   COPs reserve would be broken out pretty much between the

20   OPEB, the LTGOs, and the other unsecured creditors for the

21   most part.

22   Q    And if it goes against the city, how does it get broken

23   up?

24   A    If it goes against the city, the city would be reserving

25   that $162 million of the B notes for the COPs holders.

1  Q   Okay.  Let's go back to Exhibit 728 now.

2         MR. SOTO:  Excuse me, your Honor.  Just to clarify

3  something in that last one, is that -- if you'd go back to

4  the last one --

5         MR. STEWART:  Yeah.

6         MR. SOTO:  It says sixth amended plan.  Is that

7  what's intended there?

8         MR. STEWART:  Let me ask.

9  BY MR. STEWART:

10  Q   Mr. Malhotra, this says sixth amended plan, does it not?

11  A   Yes, it does.

12  Q   Do you know why it says sixth amended plan?

13  A   This chart did not reflect on this particular page the

14  component of the COPs reserve that gets crystallized for

15  Syncora as a part of the seventh amended plan, so that

16  portion would change to reflect the Syncora settlement.

17  Q   This is how things stood before there was a Syncora

18  settlement?

19  A   That is correct.

20  Q   Now, if we could go back to 728.  Right.  We're back to

21  728, and there's a category called new C notes.  What are the

22  new C notes?

23  A   The new C notes are new notes that are being issued for

24  Syncora in a face value of $21 million that would be payable

25  over 12 years at an interest rate of five percent, so it's

1   approximately $2.4 million a year.

2   Q   Is there a particular stream of revenue that is pledged

3   to service the new C notes?

4   A   I don't know if there's a revenue item that's

5   particularly pledged, but it is tied into some parking, but I

6   don't know if the parking revenue is pledged.

7   Q   So let's look at the balance of 728.  In the lower left-

8   hand corner we have a pie chart that says face value.  What

9   is that intended to reflect?

10  A   That reflects all the new notes that are going to be

11  issued under the plan.

12  Q   And to the right there is a bar chart that says "debt

13  service."  What is debt service intended to depict here?

14  A   It shows the cost of servicing the new notes that are

15  being issued over the next approximately 40 years.

16  Q   Okay.  So could you walk us through the bar chart and

17  show us -- the bars are segmented by color, are they not?

18  A   Yes.

19  Q   If you could please walk us through the chart to show us

20  how the debt service depiction works here.

21  A   So the first column or the first decade really from 2014

22  to 2023, lion's share of that debt service is the UTGO bonds

23  because, as I mentioned earlier, they're getting -- going to

24  get repaid over 14 years consistent with their original

25  repayment schedule, so the yellow gets -- UTGO bonds get paid

1  off in the first decade, and then there's a sliver in the

2  second decade.  The second component is the LTGO bonds, which

3  is in purple, and in the assumptions that we have in the

4  projections, the city is assuming that the $55 million will

5  be paid off in cash at emergence versus being paid off over

6  23 years, which is why that is only in the first stack chart.

7  The third section, which is the section in orange, represents

8  the servicing of the B notes, and the reason that is smaller

9  in the first ten years compared to the next two columns is

10 because that -- the new B notes are interest only for the

11 first ten years, and the last sliver is the new C notes,

12 which are getting paid off over 12 years, which is why we

13 have the stack in the first column and a small amount in the

14 second decade.

15 Q   And then starting in year 2034 and thereafter, what

16 notes, if any, are still being serviced?

17 A   At '34 and onwards it's only the new B notes that are

18 being serviced.

19 Q   Okay.  All right.

20       MR. STEWART:  Thank you.  You can take that down.

21 BY MR. STEWART:

22 Q   Now, I think I've asked you about settlements the city

23 has reached with creditors, and let me go through them now.

24       MR. STEWART:  Let's put up Exhibit 718.

25 BY MR. STEWART:

1  Q   Do you see demonstrative Exhibit 718, Mr. Malhotra?

2  A   Yes, I do.

3  Q   Who prepared this exhibit?

4  A   We did along with the Jones Day team.

5  Q   And very briefly, what is it?  What does it purport to

6  depict?

7  A   It shows a summary of the settlement of the Class 7

8  claims and also shows what the claims actually were.

9  Q   And do I understand correctly Class 7 claims are the LTGO

10  claims, the LTGO claims?

11  A   Yes.

12  Q   Please walk us through this, the terms of the settlement.

13  A   So as a part of the settlement, the LTGO class is going

14  to get new LTGO bonds.

15  Q   Actually, stop.

16        MR. STEWART:  Your Honor, I move into evidence as a

17  demonstrative exhibit Exhibit 718.

18        MR. SOTO:  No objection, your Honor.

19  BY MR. STEWART:

20  Q   Sorry I interrupted you, Mr. Malhotra.

21        THE COURT:  It is admitted.

22      (City Exhibit 718 received at 1:49 p.m.)

23  BY MR. STEWART:

24  Q   Now, could you walk us through Exhibit 718?

25  A   Yes.  The settlement on -- with Class 7 is essentially to

1  settle the claims of the LTGO bondholders on the series that
2  are listed here.  As a part of the settlement, the class is
3  going to get new LTGO bonds in the amount of $55 million.  In
4  addition, as a part of the settlement with Syncora, there is
5  a portion of the COPs reserve that now -- that was initially
6  being attributable to the LTGO notes that gets crystallized
7  and is given, and the LTGO class is given new B notes.  So
8  essentially it's $55 million of new LTGO bonds and $4.2
9  million of B notes assuming a Syncora settlement in exchange
10 for $164 million of claims.  The interest is 5.65 percent on
11 the new LTGO bonds, and it is four to six percent on the B
12 notes, as I mentioned earlier, with a maturity of 23 years
13 for the new LTGO bonds and 30 years on the B notes.  However,
14 the city is going to in its current assumptions pay the $55
15 million with the exit financing in settlement of the new --
16 with the LTGO class.
17 Q   Now, in the lower right-hand corner is a circle that says
18 "recovery illustrative."  Could you tell me what that is?
19 A   That shows under a five-percent discount rate what sort
20 of recovery is generated in the -- as a part of the
21 settlement against the claims of Class 7.
22       MR. STEWART:  Let's put up Exhibit 719, please.
23 BY MR. STEWART:
24 Q   Mr. Malhotra, do you see Exhibit 719 before you?
25 A   Yes, I do.

1    Q    Who prepared Exhibit 719?

2    A    We did with the Jones Day team.

3    Q    What does this represent?

4    A    This represents the settlement with Class 8, the

5    unlimited tax GO bonds claims in which the existing claim is

6    being restructured as new -- as restructured UTGO bonds.

7    Q    Let me stop you there so I can move the admission of our

8    exhibit.

9          MR. STEWART:  Your Honor, I'd move the admission of

10   Exhibit 719 as a demonstrative exhibit.

11          MR. SOTO:  No objection, your Honor, as a

12   demonstrative.

13          MR. WAGNER:  No objection.

14          THE COURT:  It is admitted.

15       (City Exhibit 719 received at 1:52 p.m.)

16   BY MR. STEWART:

17   Q    Please continue, Mr. Malhotra.

18   A    The face value of the new notes is -- of the new

19   restructured UTGO bonds is going to be $288 million, and the

20   interest rate and the maturity of the these bonds will be the

21   same as it was as the original UTGO bonds.  They will be paid

22   over the course of approximately 14 years consistent with the

23   way they were being scheduled to be paid off earlier, and

24   there is a portion of stub UTGO bonds that is reinstated, but

25   that's not a part of the settlement, but the overall

1  settlement of the UTGO bonds is the $288 million.

2  Q   What happens to the stub UTGO bonds that have been

3  reinstated?

4  A   The stub UTGO bonds that are reinstated are broken down

5  into two components.  They, too, will be being paid

6  consistent with the collections from the UTGO tax millage.

7  The 20 million of those bonds will be paid into the income

8  stabilization fund, and approximately $23 million will be

9  paid into the General Retirement System.

10 Q   What is the income stabilization fund?

11 A   It's a fund that has been established to assist those

12 retirees whose pension does get cut and who are below certain

13 income threshold levels in order to provide assistance to get

14 their income back to either the level it was pre-cut or back

15 to a threshold level.

16 Q   Now, once again, in the lower right-hand corner we have a

17 circle speaking of recoveries.  What is that?

18 A   That shows the illustrative recovery using a five-percent

19 discount rate.

20 Q   And what is the recovery?

21 A   Seventy-four percent.

22 Q   Seventy-four percent of what?

23 A   Of their claim.

24      MR. STEWART:  Let's put up 737 now.

25 BY MR. STEWART:

1  Q   Mr. Malhotra, you have Exhibit 737 before you.  Who

2  prepared this exhibit?

3  A   We did along with the input from the Jones Day team.

4  Q   And what does it represent?

5  A   It represents the settlement with Syncora of Class -- of

6  part of Class 9.

7          MR. STEWART:  Your Honor, I would move the admission

8  of Exhibit 737 as a demonstrative exhibit.

9          MR. SOTO:  No objection, your Honor.

10          THE COURT:  It is admitted.

11      (City Exhibit 737 received at 1:55 p.m.)

12  BY MR. STEWART:

13  Q   If you could, Mr. Malhotra, please walk us through

14  Exhibit 737 and what it depicts.

15  A   It shows that the settlement with Syncora is -- in

16  exchange for their claim is going to be -- take the form of

17  new B notes in the amount of $23-1/2 million, which would

18  essentially be coming out of the COPs reserve and at an

19  interest rate of four to six percent and payable over 30

20  years consistent with the overall B notes.  In addition,

21  Syncora will be getting new C notes in the face value of

22  $21.3 million at a five-percent interest rate payable over 12

23  years.  In addition, Syncora will also receive as a part of

24  the bankruptcy settlement credits in the nominal amount of

25  $6.3 million.

1    Q    Credits to do what?

2    A    My understanding is it's credits that can be used in

3    terms of purchases of real estate down the road.

4    Q    Okay.  And then what's the illustrative recovery for

5    Syncora?

6    A    The illustrative recovery including the $6.3 million of

7    credits, assuming those are at par, was 13 percent.

8    Q    Okay.  Now, you had mentioned that when it came to the B

9    notes, the 23.5 million came from the COPs reserve.

10   A    That is correct.

11          MR. STEWART:  Let's put up, if we could, Exhibit

12   727.

13   BY MR. STEWART:

14   Q    Could you tell me, first of all, what is Exhibit 727?

15   A    727 shows the breakdown of the new B note -- of the B

16   notes of $632 million and who the holders of those B notes

17   will be.

18   Q    Okay.  Now, in the pie chart on the left a segment has

19   been pulled out.  What does that segment represent?

20   A    On the left that segment represents the original COPs

21   reserve is the one that is in brackets.

22   Q    Okay.  And then the -- that's the COPs reserve, but it's

23   been subdivided now.  Can you tell me why it has been

24   subdivided?

25   A    It's been subdivided because there's a portion of the

1  COPs -- original COPs reserve in the amount of $24 million

2  that's going to now become B notes for Syncora.  That

3  remainder of the COPs reserve that was initially reserved for

4  Syncora in the amount of $15 million is now split between the

5  OPEB and LTGO classes, so the $15 million is broken down

6  between OPEB and LTGOs.  Syncora gets its $24 million, and

7  $123 million remains in the COPs reserve.

8  Q   How does this splitting of the $15 million differ from

9  the original allocation of the COPs reserve among OPEB, LTGO

10  and the other unsecured creditors?

11  A   I believe it is higher.  The split of the $15 million is

12  higher in favor of the OPEB and the LTGOs compared to the

13  previous split.

14  Q   Now, the purple segment of our chart says 123 million.

15  What does that represent?

16  A   That represents the remaining COPs reserve.

17  Q   And who are the claimants, to your understanding, on the

18  remaining part of the COPs reserve?

19  A   My understanding is it's in litigation, and it's with

20  FGIC.

21  Q   So FGIC seeks it, but if FGIC doesn't get it, it goes to

22  these other people?

23  A   That is my understanding.

24  Q   Now, before we move from Class 9, let's go back, by the

25  way, to -- let's just leave it here.  You understand, do you

1  not, that under the plan FGIC is also put into Class 9?

2  A    That is correct.

3  Q    What is the status, if any, to your knowledge, to the

4  extent you're free to disclose it, of FGIC's possible

5  settlement with the city?

6  A    My understanding from reading the seventh plan is that

7  FGIC has an option to opt into a similar settlement as or the

8  same settlement as Syncora, but I don't know all the details.

9  Q    If FGIC did opt in, what would the effect be on the COPs

10  reserve?

11  A    If they were to opt in under the same structure, a

12  portion of that $123 million would get allocated to FGIC, and

13  the remaining portion at a certain percentage would -- my

14  guess is get allocated between the unsecureds, the LTGOs --

15          MR. SOTO:  Objection, your Honor.  I don't think

16  he's here to guess.

17          MR. STEWART:  Okay.  We can move on.  That's fine.

18  Let's put up Exhibit 720.

19  BY MR. STEWART:

20  Q    Do you see Exhibit 720?

21  A    I do.

22  Q    What is Exhibit 720?

23  A    720 shows the settlement with the -- with Class 12, the

24  OPEB claims.

25  Q    And who prepared 720?

1   A    We did with the Jones Day team.

2        MR. STEWART:  Your Honor, I'd move the admission of

3   Exhibit 720 as a demonstrative exhibit.

4        MR. SOTO:  No objection.

5        THE COURT:  It is admitted.

6        (City Exhibit 720 received at 2:01 p.m.)

7   BY MR. STEWART:

8   Q    Please describe for us, Mr. Malhotra, what is set forth

9   in Exhibit 720.

10  A    On Exhibit 720 shows the settlement with the -- with

11  Class 12, and it shows that the original claim of four

12  point -- in exchange for the original claim of $4.303

13  billion, which represented the OPEB claim pursuant to the

14  settlement, the settlement is going to be $450 million of B

15  notes contributed to GRS and PFRS VEBAs in total and also as

16  a -- pursuant to the Syncora settlement, $11 million of

17  additional B notes that would be coming out of the COPs

18  reserve.

19  Q    So let me stop you there.  What is a VEBA?

20  A    It's a voluntary employee beneficiary association trust.

21  Q    And what does a VEBA do?

22  A    It's supposed to go forward, manage the benefit plans for

23  the retirees or the employees that it is set up for.

24  Q    And do I understand correctly all of the value going to

25  Class 12 is in B notes?

1   A    That is correct.  There are some other start-up costs,

2   but the value that is going to the VEBA trust is in the form

3   of B notes.

4   Q    Now, on the amount line, we have on the right-hand side

5   the 11.0 million.  Tell us where those B notes come from.

6   A    They come from the original COPs reserve -- from the

7   original COPs reserve, from the portion that was left behind

8   after the Syncora settlement.

9   Q    And is that consistent with the exhibit we looked at a

10  minute ago that showed how it was broken up?

11  A    Yes.  That's the breakdown of the $15 million.

12  Q    Please let's go to the line about interest.  Tell us,

13  please, what is the interest relating to the B notes?

14  A    It is four percent for the first two decades and six

15  percent for the last decade.

16  Q    And maturity?

17  A    It's 30 years.

18  Q    And under "other" you have a few items.  Please tell us

19  what those are.

20  A    That shows certain start-up costs that are also going --

21  are benefitting the VEBA, which is $8 million from the rate

22  stabilization fund and approximately $3-1/2 million from

23  charitable contributions as well as advance of the October

24  2015 interest on the excess B notes to be advanced earlier.

25  Q    Why were these start-up costs added as part of the

1   settlement with Class 12?

2   A    It's a part of the settlement to essentially get the

3   VEBAs going.

4   Q    Okay.  And what's the recovery of Class 12 as you

5   calculated it?

6   A    Ten percent.

7           MR. STEWART:  And we can take that down.  Actually,

8   no.  Before you take it down -- sorry about that -- put up

9   721 or take that down and put up 721.

10  BY MR. STEWART:

11  Q    What is Exhibit 721, Mr. Malhotra?

12  A    721 shows the nominal dollars and as a percentage of

13  general fund revenue, the comparison of both costs and

14  percentage both post-restructuring and before restructuring

15  in terms of what the trends were over the next 20 years.

16  Q    Who prepared Exhibit 721?

17  A    We did.

18          MR. STEWART:  Your Honor, I'd move the admission of

19  Exhibit 721 as a demonstrative exhibit.

20          MR. SOTO:  No objection as a demonstrative.

21          THE COURT:  It is admitted.

22      (City Exhibit 721 received at 2:05 p.m.)

23  BY MR. STEWART:

24  Q    Mr. Malhotra, let's focus on 721.  There are two

25  different sets of bars and two different sets of lines.

1   First of all, if you could tell us what the bars represent in

2   the exhibit.

3   A    The pink or orange bars that are on that chart represent

4   the projected payments on retiree healthcare obligations for

5   the existing retirees and forthcoming retirees over a 20-year

6   period.

7   Q    Where did these projections come from?

8   A    We got the inflation assumptions with respect to retiree

9   healthcare from Milliman, and we used the count of retirees

10  that we had.

11  Q    All right.  So the top bars, they show what for each

12  year?

13  A    Show what the retiree healthcare payments would have been

14  absent a restructuring.

15  Q    Okay.  And then below that we have a line.  What does

16  that line represent?

17  A    The line represents what those payments for retiree

18  healthcare are as a percentage of general fund revenue as to

19  how it was going to continue to increase over the next 20

20  years.

21  Q    So, for example, what would the number be for 2026 as a

22  percentage of general fund revenue absent restructuring?

23  A    It would show that absent the restructuring the retiree

24  healthcare as a percentage of general fund revenue would

25  approximately be 23 percent, so 23 cents of every dollar

1   would be used to fund retiree healthcare.

2   Q   So now let's look at the lower part of the chart.  First

3   of all, explain to us what the bars mean.  I guess they're

4   light blue.

5   A   The light blue represents the portion of the B note that

6   is the city's obligation going forward in terms of this class

7   is going to be -- is shown in the blue chart.  In addition,

8   we have added the ongoing potential cost of retiree

9   healthcare for active employees that will be retiring in the

10   future to ensure we can do an apples to apples comparison.

11   Q   Why is the number higher in 2015 than it is in 2016?

12   A   Because the existing run rate that the city is on for

13   fiscal year '15 was slightly higher than January 1, 2015,

14   when the city transitions to the new VEBA plans.

15   Q   Why does it rise as it does in 2026?

16   A   That's because that's when the city starts servicing the

17   principal on the B note, and we wanted to make sure that we

18   can show that it's not just the first ten years where it was

19   more of an interest only comparison but going forward 2026

20   onwards once we -- once the city is servicing the principal

21   on the B notes, what that delta still is.

22   Q   Explain for us, if you would, the -- looks like a green

23   line across the bottom of the chart.

24   A   It shows the retiree healthcare costs as a percentage of

25   revenue, general fund revenue.

1  Q    So as a result of the settlement with the OPEB class, how

2  have the city -- how has the city's exposure to OPEB cost

3  changed?

4  A    The city, as a part of the settlement, is not exposed to

5  OPEB costs any longer other than for the commitments that the

6  city is making to provide an amount -- a nominal amount for

7  its active employees and what their retiree healthcare plans

8  would be or their healthcare contribution would be, but in

9  terms of the city's obligations for its existing retirees,

10 the city's obligations are limited to it servicing the B

11 notes.

12         MR. STEWART:  Let's put up Exhibit 722.

13 BY MR. STEWART:

14 Q    Could you please tell us what is Exhibit 722?

15 A    It is a settlement with Class 17 claims for the 36th

16 District Court.

17 Q    And who prepared Exhibit 722?

18 A    It was the Jones Day team primarily with some input from

19 us as well.

20         MR. STEWART:  Your Honor, I would move the admission

21 of 722 as a demonstrative exhibit.

22         MR. SOTO:  No objection.

23         MR. WAGNER:  No objection.

24         THE COURT:  It is admitted.

25     (City Exhibit 722 received at 2:10 p.m.)

1  BY MR. STEWART:

2  Q   Please describe to us, if you could, Mr. Malhotra, the

3  settlement with Class 17 as set forth in our exhibit.

4  A   It shows that as a part of the settlement in the claims

5  that were approximately $6 million for those claims that are

6  less than $100,000, 33 percent of the claim would be paid in

7  cash at emergence, and for those individual claims that

8  are -- or those claims that are greater than $100,000 each,

9  33 percent of the claims would be payable in five equal

10  annual installments at -- and there's a simple interest rate

11  of five percent.

12  Q   And what's the illustrative recovery of Class 17?

13  A   Thirty-three percent.

14  Q   I don't know if I remembered to ask you what the

15  illustrative recovery was of Class 12.

16  A   Ten percent.

17  Q   Do you remember what that was?  How much?

18  A   Ten percent.

19  Q   Ten percent.  Okay

20       MR. STEWART:  We can take that down.

21  BY MR. STEWART:

22  Q   Let me move to ask you about something else.  Among other

23  things, what occasion did you have to look at the city's

24  pension liabilities?

25  A   We've looked at the city's pension liabilities,

1    especially over the course of the last year, last 18 months.

2    Q    Let's go back to Exhibit 33 and, in particular, to page

3    91.  I believe we looked at this page before today.  This is,

4    Mr. Malhotra, a page from the proposal to creditors of June

5    of last year that you talked about earlier.  What analysis

6    had you done as of that time of the city's exposure to

7    pension liabilities?

8    A    At that point in time, the main work that was done with

9    respect to the pension liabilities was under a variety of

10   assumptions like the changes in the rate of investment return

11   or the amortization period of the unfunded liability, what

12   the city's required contributions would be over the next ten

13   years.

14   Q    And what had you found that those contributions would be

15   in 2023 as matters stood back in June of 2013?

16   A    Based on the assumptions that were being used for the

17   preparation of this report, the pension contributions were

18   going to be close to $3 billion under the assumptions that

19   were being used for this report.

20   Q    So has the city reached a settlement with the Retirement

21   Systems?

22   A    Yes.

23            MR. STEWART:  And just for the record, let's put up

24   Exhibit 723.  Maybe that will be simpler.

25   BY MR. STEWART:

1   Q    Do you see Exhibit 723, Mr. Malhotra?

2   A    I do.

3   Q    What is this?

4   A    It shows the key items of the settlement with GRS and

5   PFRS as a part of the plan of adjustment.

6   Q    Okay.  And just for the record, could you tell us what

7   are GRS and PFRS?

8   A    The General Retirement System and the Police and Fire

9   Retirement System.

10  Q    Do you know off the top of your head what class each is

11  in?

12  A    Class 10 and 11.

13  Q    Now, tell us --

14          MR. STEWART:  Your Honor, if I could, I would move

15  the admission of Exhibit 723 as a demonstrative exhibit.

16          MR. SOTO:  No objection, your Honor.

17          MR. WAGNER:  Yeah.  No objection as a demonstrative.

18          THE COURT:  It is admitted.

19      (City Exhibit 723 received at 2:14 p.m.)

20  BY MR. STEWART:

21  Q    Mr. Malhotra, could you explain to us what is set forth

22  on Exhibit 723?

23  A    Yes.  It shows the components of some of the changes

24  between what the assumptions were and what the funding status

25  was of the -- each of the pension plans compared to where

1  they are as a part of the plan of adjustment.

2  Q   Okay.  Let's start at the top.  There's something called

3  an assumed rate of return.  Please tell us how that has

4  changed.

5  A   That has changed from 7.9 percent for GRS and eight

6  percent for PFRS to 6.75 percent for GRS and PFRS, which is

7  fixed for the next -- through 2023.

8  Q   And do you know how the rate of 6.75 percent was derived?

9  A   It was a part of the settlement.

10  Q   Below that is UAAL?

11  A   That's right.

12  Q   First of all, what is UAAL?

13  A   That's the unfunded actuarial accrued liability.

14  Q   And please describe to us what this part of the

15  demonstrative shows.

16  A   It shows that the pre-petition UAAL for GRS and PFRS was

17  about 1.879 billion and 1.25 billion respectively, so

18  collectively roughly about $3.1 billion, and as of June 2013

19  and as a part of the plan of adjustment, the June 2014 UAAL

20  is 894 million for GRS and 553 million for PFRS.

21  Q   And then underneath that it says "Target."  How did those

22  targets come to be calculated?

23  A   Those were calculated overall as the UAAL that would be

24  remaining based on the targeted funding percentage status, so

25  70 percent for GRS and 78 percent for PFRS.

1  Q   And that takes us to the next line, which is funding

2  status.  What does the term "funding status" mean?

3  A   Funding status means the overall comparison of the assets

4  in the plan to the liabilities in the plan.

5  Q   And what -- tell us -- walk us through what the funding

6  status percentages were and what they are projected to

7  become.

8  A   They were 53 and 71 percent, and the target is by 2053 to

9  have these plans fully funded.

10 Q   Do you know what the funding percentage is today?

11 A   I believe it's pretty close to the target as of 2023, but

12 that's what I believe it is.

13 Q   Do you know why today's funding status is so close to the

14 target in 2023?

15 A   Well, the assets have returned better, so the assets have

16 done better than what -- so the funding status has improved

17 since June of 2013.

18 Q   Do you know of a term called "defunding" as it applies to

19 retirement systems?

20 A   I have a general understanding.

21 Q   What, if anything, is going on with these retirement

22 systems in terms of defunding in the coming years?

23 A   In the coming years, from the information that I have

24 seen, there's going to be ongoing defunding of these plans

25 based on the contributions that are going in relative to the

1    assets that are coming out of the pension systems.

2    Q    And do you know why that is?

3    A    It's the nature of the demographics and the profiles of

4    the plan.

5    Q    Our next line says "POA liability reduction."  Could you

6    tell us what that's -- what that describes?

7    A    That describes some of the changes that have taken place

8    as a part of the overall plan of adjustment in each one of

9    the plans.

10   Q    Okay.  So what does "plan freeze" mean?

11   A    It means that there's no more accrual of benefits under

12   these plans, so they are frozen, which has an impact of

13   reducing the liability of the plans.

14   Q    And then there's a reference to monthly pension

15   reduction.

16   A    Yes.

17   Q    Can you tell us what that is?

18   A    In GRS that's a 4-1/2 percent cut in the actual pension

19   checks that are going out, and there's no change in that

20   under PFRS, which also has an impact from a liability

21   reduction standpoint as a part of the plan of adjustment.

22   Q    Okay.  And then there is a reference to COLA.  Is that

23   cost of living allowance?

24   A    Yes.

25   Q    What has happened to the cost of living allowance?

1  A    It has been eliminated for GRS, and it has been reduced
2  by 55 percent for PFRS.
3  Q    And then finally it's -- there's something called an ASF
4  recoupment.  What is that?
5  A    That is basically some of the excess interest that was
6  earned that is being transferred back into the General
7  Retirement System in the neighborhood of $200 million.
8  Q    Then at the bottom we have the segment entitled "Future
9  Contributions."  Please tell us what those are and, more
10 importantly, how you calculated them.
11 A    Those contributions through 2023 are 719 million and 261
12 million, and the majority of that funding is coming through
13 either the contributions through the grand bargain or from
14 the DWSD contributions, and beyond 2024 to 2053, that shows
15 the contributions required to amortize the UAAL at the end of
16 2023 as to what the cost would be assuming a 6.75-percent
17 interest rate.  And majority of those contributions, though,
18 would be paid by the general fund, although there will still
19 be some portion through 2024 in that decade from external
20 funding.
21 Q    And so the total of future contributions turns out to be
22 what?
23 A    Through 2023 it is just shy of a billion dollars, and
24 then from 2024 to 2053, the nominal dollars over that time
25 frame are roughly $2-1/2 billion, $2.8 billion.

1 Q   And so the total at the very bottom of the contributions

2 the city is facing turns out to be what?

3 A   Just about $3.8 billion.

4         MR. STEWART:  So let's put up Exhibit 732.

5         THE COURT:  Excuse me.  Before we leave this one --

6         MR. STEWART:  Sorry.

7         THE COURT:  Thank you.  What does the phrase we see

8 here, "equivalent to 8.8-percent reduction in liability,"

9 mean?

10         THE WITNESS:  Your Honor, it means that as a part of

11 the overall changes from the ASF recoupment, the actual GRS

12 liability has been reduced by approximately $200 million.

13         THE COURT:  What is 8.8 percent?  What is that a

14 percent of?

15         THE WITNESS:  It would be a percentage of the actual

16 total accrued liability, your Honor, versus just the UAAL.

17 It would be the accrued liability in its entirety.

18         THE COURT:  Does the plan commit the city to make

19 the payments in your section of the chart here called "Future

20 Contributions"?

21         THE WITNESS:  Those contributions are assumed in the

22 plan, your Honor, and the city --

23         THE COURT:  They are what?

24         THE WITNESS:  They are assumed to be made in the

25 plan, your Honor, so the city is in the projections making

1  those payments beyond 2024 into the pension systems in the
2  plan.

3          THE COURT:  My question was a slightly different
4  one.  Does the plan commit the city, legally commit the city
5  to make those payments?

6          THE WITNESS:  My understanding is the city is
7  committed to fund the unfunded liability.  I just don't
8  know -- the city and the Retirement Systems have to decide
9  what the amortization methodology is of the UAAL at the
10  end -- at the end of year ten, and the city is committed to
11  fund that underfunded liability.  Depending on what
12  amortization schedule gets picked, the payments can change
13  slightly because of the interest rate, but my understanding
14  is the city is committed to make the payments beyond 2024
15  into those pension systems.

16          THE COURT:  Do you know the answer to my question?
17          MR. STEWART:  Your Honor, I confess that I do not.
18          THE COURT:  Anybody know the answer to my question?
19          MR. CULLEN:  The answer is yes, your Honor.
20          THE COURT:  All right.  Thank you.
21  BY MR. STEWART:
22  Q   Let me ask this.  How would the change in amortization
23  after 2024 affect the contribution level?
24  A   It depends on the amortization methodology.  What we have
25  used in the projections is a straight line principle in which

1  the city is making higher payments in the first decade, and

2  over the course of the 30 years it makes lower payments going

3  forward.  You can change the amortization methodology to make

4  it like a level payment over 30 years in which the city will

5  have lower payments in the first, say, ten years, but over

6  the course of the 30 years the city will end up paying more

7  because it has to pay more interest, so it's more on the

8  methodology aspect as to how that liability gets serviced.

9            MR. STEWART:  Can we now put up Exhibit 732?

10 BY MR. STEWART:

11 Q   Mr. Malhotra, what is Exhibit 732?

12 A   732 shows the pension contributions for the General

13 Retirement System and the Police and Fire Retirement System

14 over the first ten years and the sources of the funding.

15 Q   And who prepared Exhibit 732?

16 A   We did.

17            MR. STEWART:  Your Honor, I would move the admission

18 of Exhibit 732 as a demonstrative exhibit.

19            MR. SOTO:  No objection.

20            MR. WAGNER:  Same.

21            THE COURT:  It is admitted.

22      (City Exhibit 732 received at 2:25 p.m.)

23 BY MR. STEWART:

24 Q   Mr. Malhotra, please explain to us what is depicted in

25 Exhibit 732.

1  A    732 for the General Retirement System shows that the

2  total contributions going into the retirement -- General

3  Retirement System are 719 million through 2023.  $428.5

4  million of that is coming through DWSD.  $31.7 million in

5  nominal dollars is coming through UTGOs, which are really the

6  stub UTGOs.  $98.8 million is coming from the state

7  settlement.  $45 million is coming from DIA, and the

8  remaining 114.6 million is coming from the general/other

9  funds, which is reimbursement from other funds.  Of that

10 114.6 approximately $90 million is general fund dollars.

11 Q    Nine zero?

12 A    That's right, about 90 million.  That's right.

13 Q    Why is such a large segment of the GRS side of this

14 coming from the DWSD?

15 A    It's a part of the overall pension settlement in terms of

16 the required dollars for the -- for GRS.

17 Q    Okay.  Now, to the right we have another pie chart;

18 correct?

19 A    Yes.

20 Q    Why is it smaller than the one on the left?

21 A    It's smaller because the overall contributions to the

22 police and fire system are 261 million compared to the 719

23 million on the left side.  And one thing I would just

24 clarify, the DWSD contributions -- sorry -- are coming in

25 over nine years because they're fully repaying their unfunded

1   liability over a much shorter time frame, so I just wanted to

2   clarify that as well.

3   Q   Let's go back and deal with it before we go to the PFRS.

4   You're saying that the 428.5 million is from the DWSD;

5   correct?

6   A   That is correct.

7   Q   What does that represent with respect to the DWSD?

8   A   It represents DWSD paying its UAAL that exists today but

9   paying it over the course of the next nine years in its

10  entirety in addition to some professional fees and admin

11  expenses that are being allocated for to DWSD, but they're

12  essentially paying their UAAL at a much faster rate compared

13  to the rest of the General Retirement System.

14  Q   How does one know how much of the UAAL for the GRS is

15  attributable to the DWSD as opposed to attributable to

16  everybody else?

17  Q   It's given to us by Milliman.

18  Q   By the actuaries?

19  A   That is correct.

20  Q   Then you mentioned the nine years.  Tell me, once again,

21  why they're paying it in nine years instead of some other

22  period of time.

23  A   They're paying it over nine years as a part of an overall

24  settlement because in aggregate the total dollars that are

25  coming from DWSD are still significantly lower than what DWSD

1    would have been responsible for outside of a restructuring.

2    Q    Now let's go back to the PFRS, and I believe there are

3    two sources of payment there.  Please describe those to us.

4    A    The blue chart represents the -- the blue part of the pie

5    chart represents the money that is going to come in from the

6    foundations into PFRS over the first ten years and -- through

7    2023, and $96 million is coming in from the state.

8    Q    All right.  Now, the contributions you've talked about,

9    are any of those the result of something known as the grand

10   bargain?

11   A    Yes.

12   Q    What is the grand bargain?

13   A    The grand bargain in terms of the financial elements that

14   are -- the contributions that are coming into the city,

15   there's approximately $366 million of contributions that are

16   supposed to come in from the foundations over a 20-year time

17   frame and nominal dollars -- excuse me -- approximately $100

18   million from DIA in nominal dollars over 20 years and from

19   the state approximately $194.8 million that are coming in up

20   front, which is their share of $350 million at a present

21   value.

22          MR. STEWART:  Let me ask to put up Exhibit 724.

23   BY MR. STEWART:

24   Q    Do you have Exhibit 724 before you?

25   A    I do.

1    Q    Is that a summary of the terms of the grand bargain?

2    A    Yes.

3    Q    Who prepared this?

4    A    Jones Day team along with our input.

5         MR. STEWART:  Your Honor, I'd move the admission for

6    demonstrative purposes alone of Exhibit 724.

7         MR. SOTO:  No objection, your Honor.

8         MR. WAGNER:  No objection.

9         THE COURT:  It is admitted.

10        (City Exhibit 724 received at 2:31 p.m.)

11   BY MR. STEWART:

12   Q    Mr. Malhotra, I probably should have put this up before I

13   asked you the question I asked a minute ago, but could you

14   walk us through what the economic terms are for the grand

15   bargain?

16   A    Yes.  The state contribution agreement is -- provides for

17   $194.8 million in cash, which is equal to the PV of $350

18   million over 20 years at a 6.75-percent discount rate.

19   Q    What does PV mean?

20   A    Present value.

21   Q    And why is there -- and that's at a discount rate of 6.75

22   percent?

23   A    That's correct.

24   Q    Where did that discount rate come from?

25   A    The state was using the same discount rate that the

1  pension systems are using.

2  Q    Okay.  And why was the period of 20 years chosen?

3  A    The general parameters of the contributions coming in for

4  the grand bargain was over 20 years.

5  Q    So the state contribution, how much in dollars is it

6  going to end up being?

7  A    I'm sorry.

8  Q    How much will the state contribution end up being in

9  actual dollars?

10 A    The present value dollars are $194.8 million, which would

11 be dollars much earlier, versus $350 million over 20 years.

12 Q    Do you know when it is the state is going to make that

13 payment?

14 A    I do not know the exact date.  It's, of course, tied to

15 the effective date of the plan.  I do not know the exact

16 date.

17 Q    Let me ask a different way.  Do you know what the state

18 will do versus making a single payment versus spreading the

19 payment out over a period of time?

20 A    The state is planning to make a single payment.

21 Q    And then going further we have the income stabilization

22 payments.  Can you tell me what those are?

23 A    Those are the payments that are going into the income

24 stabilization fund that are being paid through the stub

25 UTGOs, so this would be no less than $20 million over 14

1   years in which the city continues to collect its UTGO taxes

2   per the millage, and a portion of that money is going to be

3   paid into the income stabilization fund.

4   Q   Why is that not shown on your table here?

5   A   That is basically money that's coming -- it's not new

6   money that's coming from the state.  This is UTGO collections

7   that are going to be set aside, and it's just a part of the

8   overall state settlement in terms of the state also

9   contributing the 194.8 million is to ensure that this 20

10  million will be available for the income stabilization fund

11  that will be funded through the collection of UTGO taxes.

12  Q   Please describe to us then the economic elements of the

13  DIA settlement.

14  A   The foundations are required to contribute $366 million

15  of nominal amount over 20 years, and the DIA is required to

16  contribute $100 million in nominal dollars over 20 years.

17  Q   And how does the grand bargain then affect the city's

18  unfunded actuarial accrued liabilities?

19  A   It definitely will help reduce it or at least reduces the

20  city's requirement of funding those contributions.

21  Q   Now, let me ask you --

22          MR. STEWART:  Set's put up Exhibit 732, please.

23  BY MR. STEWART:

24  Q   What is -- I believe we looked at 732 a minute ago, and

25  I'd ask you about the portion of this that's coming from the

1  DWSD, and that's the $428.5 million; correct?

2  A    That is correct.

3  Q    Have you performed a calculation of the overall economic

4  effect on the DWSD of the city's plan of adjustment?

5  A    Yes.

6         MR. STEWART:  Let's put up Exhibit 201.

7         THE COURT:  Excuse me.  Before we do that, can we go

8  back to the screen that was up and now the one before this

9  one and back to the next one, please?  Am I missing

10 something, or is the pie chart on the left for the General

11 Retirement System not showing the foundations' contribution?

12        THE WITNESS:  Your Honor, this chart represents the

13 first ten years only, so the foundations' money that's coming

14 into the General Retirement Systems is coming in the second

15 decade, and so it's --

16        THE COURT:  Okay.

17        THE WITNESS:  -- a timing issue.

18        THE COURT:  Okay.  Thank you.

19 BY MR. STEWART:

20 Q    Mr. Malhotra, I have Exhibit 201 on the screen, and we've

21 been able to blow it up.  I realize this can be hard to read.

22 That's why it's in the binders, and it may be easier for

23 some --

24        THE COURT:  I can read it.  Thank you.

25        MR. STEWART:  -- to look at in hard copy.

1   BY MR. STEWART:

2   Q   Please tell us, if you could, Mr. Malhotra, first of all,

3   who prepared Exhibit 201.

4   A   This was a schedule we had prepared some time ago.

5   Q   And what is it a schedule of?

6   A   It was -- it's a schedule that shows the pension payments

7   under the plan of adjustment and the OPEB payments under the

8   plan of adjustment for DWSD as compared to those under no

9   restructuring scenario.

10  Q   Okay.  So let me, if I could, ask you about it.  At the

11  top -- and this was based on an Excel spreadsheet, I assume?

12  A   That is correct.

13  Q   Let's look at the top.  The top segment says POA, and

14  what does that part of our exhibit discuss?

15  A   The pension payments and the professional fees and the

16  pension administration costs that are assumed to come in from

17  DWSD as a part of the plan of adjustment.

18  Q   And what period of time is covered by the POA segment of

19  Exhibit 201?

20  A   It went through 40 years.

21  Q   Okay.  Now, we, first of all, have pension payments at

22  the top.  What are those?

23  A   Those are the payments that are coming in from DWSD over

24  the next nine years in terms of DWSD fully funding its UAAL

25  over the next nine years.

1   Q   And then professional fees, what is that for?

2   A   Professional fees is the allocation to DWSD of the total

3   professional fees that were projected at that point of time

4   for DWSD to get its pro rata share.

5   Q   Would that be higher today?

6   A   Yes.

7   Q   Do you know how much higher it would be today?

8   A   It would probably be seven or eight -- could be seven or

9   $8 million higher.

10   Q   What's the next line?

11   A   Pension administration, administrative costs.

12   Q   Okay.  And what are those?

13   A   Those are admin costs related to the General Retirement

14   System and DWSD's allocation.

15   Q   Below that?

16   A   That represents the OPEB for current retirees, so the

17   allocation of the B note to DWSD for its pro rata -- on the

18   basis of its pro rata share.

19   Q   And that would be going forward as long as there are B

20   notes out there?

21   A   Yes.

22   Q   What's POC a reference to?

23   A   Similar in terms of an allocation to DWSD of the B notes

24   or the reserve in some fashion to what would be allocated to

25   DWSD.

1  Q   Has that changed recently?

2  A   We have -- well, this schedule does not reflect the

3  Syncora settlement.

4  Q   What would the effect of the Syncora settlement be on

5  this line?

6  A   It would go up slightly.

7  Q   How much?

8  A   Probably a hundred or $200,000 per year.

9  Q   What does the reference to swaps mean?

10  A   That's a part of the overall swaps settlement and a

11  portion that could be allocated to DWSD.

12  Q   Okay.  So let's go back so we can see the full view.  As

13  a result of this, you have something called total DWSD legacy

14  payments.  What does that represent?

15  A   The total DWSD legacy payments represents the summation

16  of the subtotal up above -- that's the subtotal DWSD legacy

17  payments -- plus what DWSD could theoretically be paying --

18  or could be paying for its pension and OPEB obligations for

19  its current active employees.

20  Q   And what is the assumption this part of the exhibit is

21  based on?

22  A   The assumption is that DWSD, similar to the rest of the

23  general nonuniform employees, will be contributing

24  approximately 5.75 percent with respect to the pension for

25  active employees and on the future retirees would be paying

1  two percent of payroll.

2  Q   So this segment shows what the effect would be on DWSD

3  under the plan.  Do I understand that correctly?

4  A   That is correct.

5  Q   So let's go down to no restructuring.  And before getting

6  into any numbers, what do you mean by "no restructuring"?

7  A   No restructuring -- when we developed the schedule, it

8  was meant to reflect what DWSD's obligations were going to be

9  had none of the OPEB or POC obligations or swap obligations

10  been settled or restructured, and with respect to the pension

11  payment, given the fact that there are multiple scenarios,

12  all we did is we took the Gabriel, Roeder report and saw what

13  the 2015 pension payment was attributable to DWSD and kept

14  that flat.

15  Q   So let's go look at the full view.  You have a line,

16  "Total DWSD Legacy Payments," and so what does that

17  represent?

18  A   That represents what the DWSD legacy payments would be

19  absent a restructuring and assuming these very conservative

20  pension payments.

21  Q   And at the bottom we have "Savings/Additional Cost."

22  What are those calculations intended to depict?

23  A   What they were intended to do was to show how much

24  savings are being generated as a part of the restructuring

25  that benefit DWSD.

1 Q   And let's go back to the full view, and what did you

2 determine in terms of the overall economic effect on DWSD of

3 the plan as it exists -- proposed, I should say, today?  Go

4 ahead.

5 A   We saw that the total additional -- the total savings for

6 2015 to 2023 just on a conservative basis would be

7 approximately $172.8 million -- could be higher than that --

8 just for those nine years, and then DWSD continued to benefit

9 from these savings going into the next two decades partly

10 because, of course, they have assumed to pay their pension

11 faster, but, more importantly, there's significant savings in

12 the OPEB costs for DWSD as a part of this plan of adjustment.

13         MR. STEWART:  Your Honor, I would like to move

14 Exhibit 201 into evidence.

15         MR. SOTO:  No objection, your Honor.

16         MR. WAGNER:  Same.

17         THE COURT:  It is admitted.

18     (City Exhibit 201 received at 2:44 p.m.)

19 BY MR. STEWART:

20 Q   Let me ask you -- let's go, if we could, now to Exhibit

21 734 again and to page 3 of 14.  Could you tell us,

22 Mr. Malhotra, what page 3 of 14 of Exhibit 734 sets forth?

23 A   It sets forth per the September projections under the

24 assumptions in there -- the first section on top is -- first

25 section over the next ten years by different creditor

1  classes, what distributions are going to be in nominal

2  dollars for those classes and the source of that funding over

3  the next ten years, and that same has been repeated down

4  below for 40 years along with recovery calculations using a

5  five-percent discount rate.

6  Q   So this is a table; correct?

7  A   That's correct.

8          MR. STEWART:  If we can, let's blow up the top part

9  and the left side of the top part so we can all see it more

10  legibly.  That's fine.  Good.  All right.

11  BY MR. STEWART:

12  Q   And so we have for the ten-year the various settlements

13  that we've talked about; correct?

14  A   That's correct.

15  Q   All right.  Then walk us through this table and show how

16  you've scheduled out these various settlements.

17  A   So for Class 7, which is the limited tax general

18  obligation bonds, those are assumed to get paid $55 million

19  in full upon the effective date, so -- or right around the

20  effective date, so there is no interest that is being paid on

21  that.  In addition, they're getting a portion of the B notes

22  as well.

23  Q   Without going through each of these, tell us how this

24  table correlates to the settlements you described to us

25  earlier when we went through the various demonstratives.

1  A    They're the same.

2  Q    Okay.  And it shows the amount of the claim and then what

3  the claimant is getting; correct?

4  A    That's right.  And this table reflects the cash over the

5  first ten years, and the table below it showed over forty.

6  Q    So let's go to the 40-year now.  Why, by the way, has it

7  been necessary to extend this table out to 40 years instead

8  of just stopping at 10?

9  A    Because the commitments that the city is making in terms

10 of its B notes as well as its pension obligation commitments

11 at the end of ten years go nearly forty years, and that's the

12 reason we've developed a forty-year forecast.

13 Q    So let's now focus on the right side of the part that we

14 have -- we've expanded here, and tell us, if you could, what

15 that depicts.

16 A    The right side shows the nominal dollars that are getting

17 paid in the first column over the 40-year time frame and the

18 present value calculation assuming a five-percent discount

19 rate for all of these classes.

20 Q    And then you have percentages there.  Well, first of all,

21 let me ask this.  Why do we -- the middle column is PV for

22 present value; correct?

23 A    That is correct.

24 Q    Why have you reduced these to present value?

25 A    Because these are getting paid over a period of time to

1    reflect what the value today is assuming a five-percent

2    discount rate.

3    Q    Okay.  And then you have a percentage column.  Tell us

4    again what that stands for.

5    A    It stands for the percentage of the present value divided

6    by the claim.

7    Q    And if we just look from the creditor line over to the

8    percentage line, that will tell us what each class is getting

9    as a percentage is.  Have I read that correctly?

10    A    That is correct.

11    Q    So let's go now on the same exhibit to page 7.  You can

12    just leave it like that for now.  So I want to recap with you

13    where we've been in your testimony, Mr. Malhotra.  As we look

14    at our page, have we now gone over all the elements of

15    revenues and expenditures for the city?

16    A    On this page 7, we have gone through all of the revenues

17    and operating expenditures, but the settlements or the

18    payments are shown on the following page.

19    Q    You're getting ahead of me.  I wanted to go to the very

20    bottom line on this page and have you describe for me what

21    that represents.

22    A    That represents the funds available for unsecured claims.

23    Q    When you say "funds available for unsecured claims," what

24    are you referring to?

25    A    It refers to the amount of cash the city will have

1  available to meet its unsecured -- to meet its obligations as

2  proposed under the plan of adjustment under these assumptions

3  going forward.

4  Q  So let's now go to the next page, which would be eight of

5  fourteen.  Now, eight of fourteen has a line called

6  "Sources."  Do you see that?

7  A  Yes.

8  Q  And what do you mean when you use the word or you refer

9  to sources?

10 A  An inflow of cash.

11 Q  And what's the relation between what we just looked at,

12 which is funds available for unsecured claims, and where we

13 begin on page 8 with sources?

14 A  It should be the same amount.  It's carrying forward from

15 the previous page.

16 Q  So that's the first line?

17 A  That is correct.

18 Q  Okay.  Show us the additional sources then that we have

19 in the coming years as set forth on this page of our exhibit.

20 A  Those are shown below in terms of the amounts that are

21 coming from DWSD for its pension obligations, its OPEB

22 obligations and POC, which both are essentially their pro

23 rata share of B note payments, some of the reimbursements

24 from other funds that include library and parking, the

25 funding from the grand bargain, which includes the

1     foundations, the DIA, and the state settlement, to come up

2     with the total sources that are going to be available for

3     making distributions.

4     Q   And my eyes aren't as good as they once were, but it

5     appears to be 1664.5 as the total sources for the ten-year

6     period or the period that will end in 2023?

7     A   That's correct.

8     Q   So now let's go to uses, if we could.  What do you mean,

9     first of all, by the phrase "uses"?

10     A   An outflow of cash.

11     Q   Okay.  So let's go through them.  Tell us what the top

12     part of uses is.

13     A   The top part is the PFRS and GRS pension contributions

14     that are going to be made over the next ten years in

15     aggregate, some PFRS and GRS OPEB payments for current

16     retirees.

17     Q   So we have a subtotal for retiree distributions; correct?

18     A   That's correct.

19          MR. STEWART:  Let's go back to the full view so we

20     can see what that adds up to if we can just expand that on

21     the right-hand side.

22     BY MR. STEWART:

23     Q   That comes up to how much?

24     A   Just shy of a billion dollars.

25     Q   And below that we have "note and cash payments."  Are we

1  on the same part of the document?

2       MR. STEWART:  Actually, what you just had.  Put that

3  back up.  Thanks.  There we go.

4  BY MR. STEWART:

5  Q   What notes are we talking about here?

6  A   The same notes we went through earlier, UTGOs, LTGOs, the

7  B notes, and the C notes.

8  Q   And what do they add up to as uses during this period?

9  A   $620 million.

10  Q   Okay.  And then so we add up the uses, and what do they

11  aggregate to?

12  A   Just north of a billion six, 1.61 billion.

13  Q   Okay.

14       MR. STEWART:  So let's now go back to the full view

15  again.  I'm sorry to go back and forth this way.

16  BY MR. STEWART:

17  Q   So we then have a line that says surplus or deficit.  Do

18  you see that?

19  A   Yes.

20  Q   And where does that number come from?

21  A   It's just the delta between the total sources and the

22  total uses.

23  Q   Okay.  And below that we have ending cash balance.

24  A   That's correct.

25       MR. STEWART:  Let's go back to the full view again.

1   BY MR. STEWART:

2   Q   And the ending cash balance is going -- is projected to

3   be how much as of the end of 2015?

4   A   The end of 2015 the ending cash balance is projected to

5   be 75.6 million.

6   Q   Now, in the years after 2015, how much does that number

7   change?

8   A   Not much.  It only goes up to $80 million.

9   Q   Do you know why it is the ending cash balance remains the

10  way it is over the period of these years?

11  A   That's because under these assumptions, the city is

12  distributing what it is collecting from an overall

13  perspective.

14  Q   Has the city -- what policy decision, if any, has the

15  city made with respect to the cash balance it intends to keep

16  on hand in the coming ten years?

17  A   Well, the assumption that's used in here is a two month

18  of payroll and benefits minimum cash balance or at the same

19  time to at least hold five percent of -- excuse me -- five

20  percent of the following year's budgeted expenditures to --

21  for the city to have that in cash at the end of the previous

22  fiscal year.

23  Q   And although we didn't focus on it, fair to say that if

24  we looked at the previous page, we'd see an entry for

25  contingency there?

1    A    Yes.

2    Q    And why don't we go to the previous page and look at it

3    briefly at the bottom left?  What is that a reference to?

4    A    That is a contingency for unforeseen items of either a

5    revenue reduction or an increase in an expense, and we've

6    assumed a one percent of revenue contingency throughout this

7    forecast period.

8    Q    Let's go then to the following page one more time and

9    look at the cash.  Are you aware of recent legislation in

10   Michigan that would require the city to maintain reserves of

11   five percent of expenses?

12   A    Yes.

13   Q    And where is that reflected in your analysis?

14   A    Our assumption is that in the ending cash balance of the

15   75 or $80 million at the end of any fiscal year the city

16   should still have -- will still have at least five percent of

17   its following year's budgeted expenditures reserved in that

18   cash number, so it's basically at least a minimum cash

19   threshold over the forecast period.

20   Q    Now, you've reviewed with us for some period of time

21   today the model that you prepared and the settlements and so

22   on.  What does this analysis tell us in terms of the city's

23   ability in the coming years to satisfy its operating

24   expenses?

25   A    Based on these assumptions, the city should be able to

1  satisfy its operating expenses.

2  Q   What does this analysis say in the coming years about the

3  city's ability to pay its obligations under the plan?

4  A   Based on the assumptions in this forecast, the city

5  should have the ability to pay its obligations as scheduled

6  in these distributions.

7  Q   And, finally, what does this analysis say in terms of the

8  city's ability to maintain a cash reserve in the coming

9  years?

10  A   Based on these assumptions, the city should be able to

11  maintain a cash balance consistent with these assumptions.

12  Q   Let's go now to page 4 of this --

13       THE COURT:  Excuse me.  Before we leave this page,

14  is the five-percent contingency that the law requires

15  reflected here in the line called "Ending Cash Balance"?  Is

16  that your testimony?

17       THE WITNESS:  Yes, your Honor.  That's the way we

18  are anticipating it, that these are June 30th, so these are

19  fiscal year-end cash balances, and so the city should at

20  least have five percent of the following year's expenditures,

21  which are roughly approximately a billion dollars.  So the

22  city should at least have at any given point of time five

23  percent of those budgeted expenditures in its cash balance.

24  BY MR. STEWART:

25  Q   Let me ask one thing about timing.  Is it the case that

1   the city's revenue receipts are not steady month to month

2   over the course of the year?

3   A    That is correct.

4   Q    What is the time during the year when the cash on hand

5   typically is at its lowest?

6   A    Typically it is at the end of the fiscal year before the

7   summer taxes start flowing in.

8   Q    Sorry.  Summer taxes?

9   A    Sorry.  Summer property taxes start coming into the city

10  in the July, August time frame, so end of the fiscal year

11  generally is a low point in terms of the city's cash balance.

12  Q    Let's, if we could, then go to page --

13         THE COURT:  All right.  Before we move on, let's go

14  ahead and take our afternoon recess at this time, and we'll

15  reconvene at 3:15, please.

16         THE CLERK:  All rise.  Court is in recess.

17      (Recess at 3:00 p.m., until 3:17 p.m.)

18         THE CLERK:  All rise.  Court is back in session.

19  You may be seated.

20         MR. HERTZBERG:  Your Honor, Robert Hertzberg.  We

21  are trying to track down who Mr. Flynn is, and we're not

22  aware of what it is.  We're going to check with Mr. Legghio

23  and Ms. Patek, but unless the Court has any other

24  information, we're struggling right now on it.

25         THE COURT:  The only additional information I can

1  share with you is that he called my office today asking what

2  the consequences would be for tomorrow's hearing if he

3  withdrew his joinder in the DPOA objections, and, of course,

4  we were not able to answer that question, so --

5          MR. HERTZBERG:  So it sounds like he --

6          THE COURT:  -- we suggested that he reach out, you

7  know, to you all to try to work it out, whatever you could do

8  in terms of answering that question.

9          MR. HERTZBERG:  It sounds like maybe he filed an

10  objection, he wants withdrawal, because we looked on the pro

11  se list also in the -- a scheduling order, and his name was

12  not in there.

13          THE COURT:  No.

14          MR. HERTZBERG:  Okay.

15          THE COURT:  I mean --

16          MR. HERTZBERG:  We'll keep trying to track it down,

17  though.

18          THE COURT:  Let me ask you -- maybe the most

19  efficient way to get your question answered is for you to

20  talk to my assistant, Chris, directly --

21          MR. HERTZBERG:  Okay.

22          THE COURT:  -- you know, here in the next few

23  minutes, and she might be able to fill you in a little bit

24  better.

25          MR. HERTZBERG:  Okay.  Thank you, your Honor.

1          THE COURT:  Okay.

2          MR. STEWART:  Your Honor, one -- I think I neglected

3     to move into evidence demonstrative Exhibit 727, which I

4     would move into evidence now.  Maybe we should put it up so

5     that others can see the document we're talking about.  And I

6     would move it into evidence as a demonstrative exhibit.

7          THE COURT:  Any objections?

8          MR. WAGNER:  No.

9          MR. SOTO:  No, your Honor.

10         THE COURT:  All right.  It is admitted.

11     (City Exhibit 727 received at 3:19 p.m.)

12    BY MR. STEWART:

13    Q    So if we could, let's now go to page 4 of Exhibit 734.

14    Mr. Malhotra, do you have page 4 of Exhibit 734 in front of

15    you?

16    A    I do.

17    Q    And is this a sources and uses for the 40-year period?

18    A    Yes.

19    Q    And what does it have -- and the first column is for the

20    first ten years; correct?

21    A    That is correct.

22    Q    But then there are three more columns.  Tell us, if you

23    could, what those three columns are intended to represent.

24    A    They represent the revenue and expenditures over the next

25    three decades.

1  Q   Now, where, if at all, here do the city's obligations

2  under the plan appear under the 30 years that begin in 2024?

3  A   They are not included in here on this particular page.

4  Q   Okay.  Is there a page -- let's go to the next page then.

5  We've been looking at the sources page; correct?

6  A   That is correct.

7  Q   Let's go to the next page, page 5.  And, first of all,

8  the top line, is that the carry-over from the previous page?

9  A   That is correct.

10  Q   And then further down, where does it appear what the

11  city's ongoing obligations will be under the plan if the plan

12  were confirmed?

13  A   Under the uses.

14  Q   Okay.  Where in particular should we be looking?

15  A   Under the uses you would see under the retiree payments

16  the PFRS and GRS payments extending all the way into 40 years

17  to reflect the amortization of the UAAL over the time frame,

18  and it shows that the second decade payments are higher, of

19  course, compared to the following two decades, and then

20  further down below it shows the obligations of the city under

21  the new notes, so it's the UTGOs, the LTGOs, the B notes, and

22  the payments on the C notes as well over the forecast period.

23  Q   What is your analysis -- so this is the analysis for the

24  40-year period; correct?

25  A   Yes.  Under these assumptions, yes.

1  Q   What does your analysis indicate in terms of the city's

2  ability in the coming 40 years to pay its operating expenses?

3  A   Based on the assumptions that are included here, I

4  believe the city should be able to have the resources to make

5  its obligations.

6  Q   And what does it indicate in terms of the city's ability

7  in that time frame to pay its obligations under the plan?

8  A   Based on the assumptions that are included in these set

9  of projections, it shows that the city should be able to meet

10  its obligations.

11  Q   And, finally, what does it indicate in terms of the

12  city's ability to retain a sufficient cash balance over those

13  40 years after having met its other obligations?

14  A   So it shows under these obligations the city will have

15  $80 million of cash and up to 160 -- $160 million of cash at

16  the end of 2053, so the city is always maintaining a minimum

17  cash balance.

18  Q   Now, under these two forecasts, you have included C

19  notes; correct?

20  A   That is correct.

21  Q   Now, have you -- what C notes have you included in these

22  two forecasts?

23  A   The C notes related to Syncora.

24  Q   Now, how would this change, if at all, if FGIC chose to

25  opt into a settlement like the Syncora settlement?

1  A    Using the same assumptions as the Syncora settlement, the

2  cost of FGIC opting in is somewhere between 85 and $90

3  million over a 12-year time frame, so we would have to look

4  at the assumptions with respect to the costs, the

5  reinvestment expenses to ascertain -- and certain policy

6  decisions that will have to be made by the leadership team of

7  the city to ascertain the appropriate way of handling a FGIC

8  settlement -- potential FGIC opt-in.

9  Q    If they opted in.  Okay.  Let's go, if we could, to

10  Exhibit 614.  Let me ask a background question or two.  Who

11  prepared Exhibit 614?

12  A    We did.

13  Q    And what does it purport to set forth?

14  A    It shows the COPs balances under the three components,

15  those COPs that had a fixed rate interest rate, those COPs

16  that had a variable interest rate through -- due 2029, and

17  those portion of the COPs that had a variable interest rate

18  and they were due in 2034.

19        MR. STEWART:  Your Honor, I would move the admission

20  of Exhibit 614 as a set of calculations.

21        THE COURT:  Any objections?

22        MR. SOTO:  No, your Honor.

23        THE COURT:  It is admitted.

24      (City Exhibit 614 received at 3:25 p.m.)

25  BY MR. STEWART:

1   Q   Can you tell me why you prepared Exhibit 614?

2   A   It was at the request of counsel.

3   Q   Counsel being who?

4   A   Mr. Bruce Bennett.

5   Q   And let's go through the calculations, if we could.  Tell

6   us, first of all, at the highest level what these

7   calculations purport to be calculating?

8   A   The first three sections just calculate the total

9   principal and interest payments that would be due under these

10  three sets of COPs that were outstanding and with the LIBOR

11  assumptions over the forecast period that were provided to us

12  based on the spread that exists under the existing

13  agreements.

14  Q   Let me stop you there.  The upper left-hand corner it

15  says "fixed rate."  Is that referring to any particular part

16  of the COPs?

17  A   The fixed interest rate, yes.

18  Q   Okay.  What part of the COPs does variable rate 2029

19  refer to?

20  A   The ones with the outstanding balance of 299.2 million.

21  Q   Okay.

22  A   Those ones had a variable interest rate.

23  Q   And what part of the COPs does the entry "variable rate

24  2034" refer to?

25  A   The COPs had about $500.8 million of principal that was

1  outstanding that had a variable interest rate component.

2  Q   And then there's a reference here to LIBOR in different

3  ways.  First of all, what is LIBOR?

4  A   It's the London Interbank Offered Rate.

5  Q   Why is it relevant here?

6  A   It's a forward looking interest rate curve or more like

7  an index that is used often.

8  Q   Okay.  And as a result of doing the analysis that you did

9  on these three issues of COPs, what did you calculate?

10  A   We calculated what the payments would be.  We got the

11  LIBOR forward forecast from Miller Buckfire, and we did the

12  calculation as to what the payments of interest and principal

13  would be on these COPs in the three different tranches that

14  we were looking at.

15  Q   And where does that -- where does the sum of that appear

16  on Exhibit 614?

17  A   Under the total payment section.

18  Q   I see.  And is that the bold number we see as the sum

19  there that starts with 39.7?

20  A   Yes.

21  Q   And were those added up to some overall amount at some

22  point?

23  A   Yes.

24  Q   Where is the sum of all those?

25  A   In the total payments.

1   Q   Okay.  If we looked at the lower right, would there be a

2   number that sums up all the total payments?

3   A   It doesn't appear to be the case.

4   Q   Okay.  So once you had calculated the total payments,

5   what did you next do?

6   A   We were asked to discount those payments at a 6.75-

7   percent discount rate.

8   Q   Why a 6.75 discount rate?

9   A   That was what was given to us by counsel.

10  Q   And did you do that?

11  A   Yes.

12  Q   And what was the result of your calculation?

13  A   It showed that based on that payment stream, if you were

14  to discount it at 6.75 percent, it would equate to a sum of

15  about a billion one.

16  Q   And is that what is shown in the lower left-hand

17  corner --

18  A   Yes.

19  Q   -- of the exhibit?

20          MR. WAGNER:  Your Honor, just --

21  BY MR. STEWART:

22  Q   Right now --

23          MR. WAGNER:  I'm sorry.  Just before we leave the

24  document, it does have a notation, which is very hard to

25  read, and you can't see it on the screen, "Privileged and

1   confidential settlement communication in court-ordered

2   mediation, not to be presented to or admitted into evidence

3   in any action or proceeding."  I mean it's just numbers, so

4   maybe we don't have an objection to it, but that shouldn't be

5   taken as any sort of waiver that the mediation -- that

6   documents covered by the mediation order can be selectively

7   produced and shown to witnesses.

8           THE COURT:  Okay.  Thank you.

9   BY MR. STEWART:

10  Q   If we could now go to Exhibit 742, what is Exhibit 742?

11  A   742 shows the present value at 6.75 percent of the

12  payments to the Retirement Systems for a 40-year period.

13  Q   And who calculated the numbers we see on Exhibit 742?

14  A   We calculated the payments based on the 6.75-percent

15  discount rate.

16  Q   And why did you do that?

17  A   At the request of counsel.

18  Q   And who was the counsel who requested that of you?

19  A   Bruce Bennett.

20  Q   Let's put up --

21          MR. STEWART:  Your Honor, I would move into evidence

22  Exhibit 742 as a demonstrative exhibit.

23          MR. SOTO:  No objection, your Honor.

24          MR. WAGNER:  Same.

25          THE COURT:  It is admitted.

1          (City Exhibit 742 received at 3:30 p.m.)

2              MR. STEWART:  Let's put up briefly Exhibit 749, and

3    we'll come back to this.

4    BY MR. STEWART:

5    Q    What is Exhibit 749?

6    A    749 shows --

7    Q    First of all, who prepared Exhibit 749?

8    A    We did.

9    Q    Okay.  And why did you prepare it?

10   A    The top part of 749, which shows the GRS and PFRS, was

11   the backup for the contributions by source that are going

12   into GRS and PFRS respectively.  The section at the bottom

13   starting at Row 42 we added at the request of counsel to

14   present value those contributions at a 6.75-percent discount

15   rate.

16             MR. STEWART:  Your Honor, I'd move into evidence

17   Exhibit 749.

18             MR. SOTO:  No objection, your Honor.

19             MR. WAGNER:  Same.

20             THE COURT:  It is admitted.

21        (City Exhibit 749 received at 3:31 p.m.)

22   BY MR. STEWART:

23   Q    Let's now go back to 742.  Tell me, if you could,

24   Mr. Malhotra, what Exhibit 742 discloses to us.  What does it

25   describe?

1   A   It describes the total payments that are going into the

2   pension systems by various source over the course of the next

3   40 years,, what the present value of those contributions

4   would be at 6.75-percent discount rate.

5   Q   And what did you determine that that present value would

6   be?

7   A   As this chart shows, it would be about $976 million for

8   GRS and about 608 million for PFRS.

9   Q   Thank you.

10         MR. STEWART:  We can take that down.

11   BY MR. STEWART:

12   Q   Let's, if we could, go to Exhibit 733 and, in particular,

13   to page 6 of our document, of this exhibit.  Can you tell me,

14   Mr. Malhotra, what is page 6 of Exhibit 733?

15   A   Page 6 is the ten-year projections under a pre-

16   restructuring or sort of a no bankruptcy scenario.

17   Q   Is this the baseline scenario you disclosed to us

18   earlier?

19   A   Yes.

20   Q   And what was the date on which you prepared page 6 of

21   Exhibit 733?

22         MR. SOTO:  What exhibit is that?

23         MR. STEWART:  733.

24         MR. SOTO:  Thank you.

25         THE WITNESS:  It was slightly updated in September,

1    but most of the schedule has generally remained intact other

2    than some changes, but I would have updated it in September

3    consistent with the rest of the projections.

4    BY MR. STEWART:

5    Q    All right.  And the page we have before us, tell us just

6    in very general terms what it sets forth.

7    A    It shows that under a no restructuring scenario, the

8    city's revenues over the next ten years were forecasted to be

9    approximately 10.4 billion, operating expenditures in total

10   of about 7.4 billion, so an operating surplus of roughly

11   three billion and legacy liabilities of the original debt and

12   UTGO debt service, POC principal and interest, the POC swaps

13   had the settlement not been made, the pension contributions

14   based on the assumptions that were being used from the June

15   13th proposal and the health benefits for the retirees, the

16   legacy expenditures were roughly seven billion, so resulting

17   in a deficit of approximately four billion over the next ten

18   years.

19   Q    And then this below that talks about reinvestment in the

20   city?

21   A    That's correct.

22   Q    What's that a reference to?

23   A    That refers to the latest reinvestment forecast, which

24   was a net 876 million.

25   Q    Okay.  So let's go to the next page, please.  What does

1  the next page cover?

2  A   It just covers the restructuring scenario and what the

3  funds available for unsecured claims were.

4  Q   Now, so page 6 is the baseline, and page 7 is the

5  restructuring; is that right?

6  A   Yes.  Page 7 lays out a restructuring of the amounts

7  available for unsecured claims.

8  Q   Okay.  And in terms of the plan of adjustment, what does

9  page 7 describe?  Let me ask a different question.  Fair to

10  say page 7 is the representation of what would happen if the

11  plan were confirmed?

12  A   That is correct.  Under these assumptions, these would be

13  the funds that would then get allocated to the various

14  creditors if the plan were confirmed.

15  Q   And what does page 6 represent today?

16  A   Page 6 would represent what would happen if there was no

17  bankruptcy or if the city was just continuing as though

18  nothing had happened.

19  Q   Have you heard of something called a dismissal analysis?

20         MR. SOTO:  Objection, your Honor.

21         MR. STEWART:  I think I'm allowed to ask him if he's

22  heard of it.

23         MR. SOTO:  Well, I don't want to have another one of

24  these where we waived it.

25         THE COURT:  What is the objection, sir?

1    MR. SOTO:  In his expert report and during his

2  deposition Mr. Malhotra did not offer us -- he offered no

3  opinions regarding a dismissal analysis, exactly none.  He

4  was specifically asked, as the city's Rule 30(b)(6) witness,

5  if he had prepared a dismissal analysis, and his answer was a

6  very clear, no, I had not, because he had not been asked to.

7  And what the city is about to try to do is to try to backfill

8  on the fact that this witness did not prepare a dismissal

9  analysis by asking him if he can prepare one or if the

10  baseline could be arguably one.  When he answered his

11  questions at deposition and when he gave his expert report,

12  the baseline already existed, and yet he knew and he

13  testified and he admitted on behalf of the city that he had

14  not prepared a dismissal analysis.  And it would be highly

15  prejudicial at this point to allow the city to try to turn

16  Mr. Malhotra into something that he already admitted he was

17  not.

18    MR. STEWART:  The question was, "Have you heard" --

19    THE COURT:  Excuse me one second.

20    MR. WAGNER:  We join the objection, very eloquently

21  stated.

22    THE COURT:  You, too?

23    MS. O'GORMAN:  Yes.

24    MR. STEWART:  The question was has he heard of

25  something called a dismissal analysis.

1          THE COURT:  True enough, and normally I would deal
2    with objections on a question-by-question basis, but where
3    are you going with this?
4          MR. STEWART:  I'm going to ask him how this is
5    different from a dismissal analysis.
6          THE COURT:  How what is different?
7          MR. STEWART:  This document is different.
8          THE COURT:  What's the purpose of asking that?
9          MR. STEWART:  It would be a foundation to something
10   else, but it would also be useful so that we could see what
11   we do have versus what we do not have.
12         MR. SOTO:  Your Honor, this --
13         THE COURT:  Is that just another way of saying you
14   want to use this as your dismissal analysis?
15         MR. STEWART:  No.  It's what it is.  I, frankly,
16   don't think it's very far from one, but I'm not saying it is
17   a dismissal analysis.  On the other hand, I think it's very
18   probative of other issues in the case.
19         THE COURT:  What other issues?
20         MR. STEWART:  Well, it's probative of what the
21   legacy liabilities look like if the case is dismissed.  It's
22   probative of what the city's cash flows look like if the case
23   is dismissed.  It's probative of all those things.  The
24   question he was asked is did he do a dismissal analysis, and
25   he said he did not.  Fair point.  They didn't ask further

1    questions than that, but I don't think that should handcuff

2    him to talk about the things that he did do.

3            THE COURT:  Well, but wasn't the city asked to

4    provide whatever -- well, wasn't the city asked to provide

5    whatever testimony it was going to provide about a dismissal

6    analysis, and isn't this that testimony?

7            MR. STEWART:  It is not that testimony.  He was

8    asked about dismissal analysis.  He was not asked to prepare

9    one and so on.  This, though, as Mr. Soto correctly says, has

10   been in the record one way or the other for over a year.  He

11   was questioned about this at no small length, and he did

12   testify about this, so there's no surprise as to this

13   document.  In fact, as we remember, this is something we

14   first saw in June of 2013, so I don't believe that.  If the

15   objection instead is, well, this isn't called a dismissal

16   analysis, and you're not offering it as such, I'll say that's

17   certainly true, but on the other hand, I don't think it is an

18   absolutely irrelevant exercise that he went through, and I

19   think certain of the things that are shown here as a result

20   of the meticulous modeling we have been through all too much

21   today are improbative or not probative of anything.  And I

22   would add, finally, much of this would even go to weight and

23   could be dealt with on cross-examination.

24           MR. SOTO:  Your Honor, if I can respond when you

25   feel it's necessary.

1    THE COURT:  It feels to me like the relevance that

2  you offer for this is a dismissal analysis, although you deny

3  that, so I'm going to sustain the objection.

4    MR. STEWART:  Okay.  Let me then ask a few

5  questions, and I will wrap up.

6  BY MR. STEWART:

7  Q   What does -- what do these two pages of Exhibit 733 set

8  forth?

9  A   Page 6 shows the baseline scenario or pre-restructuring

10 scenario, and page 7 -- which basically shows the deficit,

11 and page 7 shows the post-restructuring scenario and the

12 funds available for unsecured claims.

13 Q   Did you discuss this with any of the other advisors to

14 the city?

15 A   Yes.  These pages have been in our -- in the ten-year

16 projections, and so they've been discussed with all the other

17 advisors.

18 Q   What did you say, if anything, to Mr. Buckfire about it?

19 A   Page 6 and 7 have been a package, so what we've talked

20 about at length is the cost of the legacy liabilities and the

21 projection of the legacy liabilities of the city.

22 Q   What discussions, if any, have you had with Mr. Orr about

23 your baseline analysis?

24 A   It was similar in terms of the assumptions behind the

25 projections and the cost of the legacy liabilities for the

1  city.

2  Q   Thank you.

3       MR. STEWART:  Your Honor, one last thing.  I'm not

4  sure I moved Exhibit 742 into evidence, so if I failed to do

5  so, I would move it in now.  If you could put that up --

6       THE COURT:  Any objections?

7       MR. SOTO:  No objection, your Honor.

8       MR. WAGER:  As a demonstrative, that's fine.

9       MR. STEWART:  As a demonstrative.  That's right.

10      THE COURT:  All right.  It is admitted.

11   (City Exhibit 742 received at 3:42 p.m.)

12      MR. STEWART:  Thank you.  Your Honor, that is all I

13  have with Mr. Malhotra.

14      MR. SOTO:  Your Honor, not to impose on the Court,

15  but if the Court wouldn't mind if I could turn the podium a

16  little.

17      THE COURT:  Fine.

18      MR. SOTO:  Okay.  Thanks.

19      THE COURT:  Yep.

20                    CROSS-EXAMINATION

21  BY MR. SOTO:

22  Q   Mr. Malhotra, I had a neck operation, and I'm not

23  supposed to turn to the right.  That's why I'm --

24  Mr. Malhotra, we haven't met, and my name is Ed Soto.  I have

25  a few questions on some of the exhibits that you just went

1  over.  And I think I'll hit those first, and then we'll go to

2  some questions I have about your expert opinions and your

3  prior testimony.  All right.  So, first of all, if I could

4  ask you to take a look at Exhibit 728.  I just had a question

5  about your testimony on that.

6          MR. SOTO:  And if we could put up Exhibit 728 --

7  BY MR. SOTO:

8  Q    So looking at Exhibit 728, under the column of interest

9  where it says -- so on the first line where it says

10 "restructured UTG notes," and it goes to interest, various,

11 3.7 to 5.375, you see that?

12 A    Yes.

13 Q    Okay.  So as to that interest rate, in calculating it,

14 did you take into account whether or not the UTG notes were

15 taxable or nontaxable?

16 A    No, because those interest rates are the same as they

17 were on the original UTGO bonds.

18 Q    Okay.  And going down to the --

19          THE COURT:  Excuse me one second.  I want to nip

20 this issue in the bud.  I want you just to answer the

21 question.  Do you see how you didn't just answer the last

22 question?  It was, "Did you take into account the tax,"

23 whatever.  You said, "No, because."  Please just answer the

24 question.  We'll be here, I think, much less time.

25 BY MR. SOTO:

1    Q    And then again with respect to the new LTGO bonds where
2    you have a 5.65 percent, do you know whether the underlying
3    obligations of those LTGO bonds are taxable or nontaxable?
4    A    No.
5    Q    You don't know?
6    A    I don't know.
7    Q    And then again with respect to the new B notes where it's
8    four percent and four percent and six percent, do you know if
9    the obligations reflected under those notes are taxable or
10   untaxable?
11   A    I do not.
12   Q    And then again with respect to the new C notes where it
13   was five percent, do you know if the obligations reflected by
14   the new C notes are taxable or untaxable?
15   A    No, I do not.
16   Q    And with respect to the restructured UTGO notes, do you
17   know if those obligations are taxable or untaxable?
18   A    I do not.
19   Q    All right.
20          MR. SOTO:  If you could put up 737.  That's my next
21   slide I had a question on.
22   BY MR. SOTO:
23   Q    So looking at -- I think it's -- yeah, 737, what discount
24   rate did you use to determine the value of the B notes?
25   A    We used five percent.

1  Q    Five percent?  Okay.  And what discount rate did you use

2  to determine the value of the C notes?

3  A    We used a five-percent discount rate to calculate the

4  present value.

5  Q    And how did you value the settlement credits of -- I

6  think it's 6.3 million?

7  A    In the 13 percent, they were included at the value of 6.3

8  million.

9  Q    That's it?

10  A    Yes.

11  Q    Did you value the extension of the tunnel lease in

12  connection with this exhibit?

13  A    No.

14  Q    Did you value what Syncora got under the development

15  agreement in connection with this exhibit?

16  A    No.

17  Q    Did you value any other consideration received by Syncora

18  like the $5 million in cash in arriving at this exhibit?

19  A    No.

20  Q    So if I could -- this is so hard to read, but Exhibit

21  614 -- on Exhibit 614, if the city intends to reject the

22  service contracts, did you calculate the rejection damages in

23  connection with your preparation of this exhibit?

24  A    There were no rejection damages that were a part of this

25  exhibit.

1  Q   All right.  Let's change gears just a second.  It's true,

2  isn't it, that in your view the biggest source of untapped

3  revenue for the City of Detroit is asset sales; correct?

4  A   Yes.  That is a primary -- that was a primary

5  opportunity, yes.

6  Q   And it's also true that other cities all over the country

7  have privatized assets, and by that I mean they've taken

8  public assets and sold them and, therefore, made them

9  private; correct?

10  A   They've entered P3 partnerships, yes.

11  Q   But in all of your projections that we just went through,

12  you didn't consider the impact of the sale of even a single

13  piece of the art from the DIA collection, the impact that

14  would have on the city's revenues, did you?

15  A   That is correct.

16  Q   And so the record is clear, you also didn't consider the

17  impact that the sale of the entire collection of the DIA

18  would have on the city's revenue either, did you?

19  A   That is correct.

20  Q   And you also didn't consider the impact that any

21  alternative form of monetization of that art -- for example,

22  a loan against that art or a lease against that art, you

23  didn't consider what impact that would have on the city's

24  revenues; right?

25  A   We included the proceeds from the grand bargain, so I

1  don't know if that's what you mean by "alternate" or not, but

2  that's --

3  Q   Other than the grand bargain, you didn't include any

4  other potential monetization of the art?

5  A   That is correct.

6  Q   And you haven't run any alternative ten-year or forty-

7  year forecast that provided for a different treatment of the

8  art than what is currently contemplated by what is referred

9  to as the grand bargain; correct?

10  A   Not that I recall.  That is correct.

11  Q   And you didn't perform that alternative analysis because

12  you weren't asked to; correct?

13  A   That's correct.

14  Q   Switching gears again, Mr. Malhotra, you talked briefly

15  about the new B notes that are included in the plan of

16  adjustment, and in the 40-year projection you summarize

17  hypothetical distributions to creditors; right?

18  A   That is correct.

19  Q   And you've included a present value calculation of the

20  new B notes using a five-percent discount rate; right?

21  A   We have used a five-percent discount rate to calculate

22  the present value of recoveries, yes.

23  Q   And you base this discount rate in part on what the

24  average interest rate on the outstanding limited tax general

25  obligation debt is of the city or I think you called it the

1    LTGO debt rate; right?

2    A    That's one of the factors.

3    Q    And so when you considered the appropriateness of a five-

4    percent discount rate for the present valuing of, you know,

5    creditor distributions, you looked at the LTGO interest rates

6    but not at their yields; correct?

7    A    That is correct.

8    Q    And just to clarify for the Court, the interest rate is a

9    static rate; right?  It's set at the time of the issuance of

10   the bonds; correct?

11   A    That is correct unless it's a floating rate, yes.

12   Q    And a bond's yield reflects not only the interest rate

13   but also the price the bond is trading at on the open market;

14   right?

15   A    Sure.

16   Q    So the bond's yields tells us how the market values that

17   bond, right, which would include not only the interest rate

18   but also other factors that might impact the price of the

19   bond on the open market; correct?

20   A    Potentially, yes.

21   Q    But you didn't know at the time that you did your

22   analysis whether or not the new B notes were going to be LTGO

23   bonds or some other type of obligation; right?

24   A    That is correct.

25   Q    And you don't know if the market will value the new B

1  notes in the same way the market values the city's LTGO debt,

2  do you?

3  A   The market will value what the market will value.  I do

4  not know what the market will value.

5  Q   Thank you.  I agree.  Now, you also based the five-

6  percent discount rate for present valuing the new B notes in

7  part on the long-term interest rates of AA-rated municipal

8  bonds; right?

9  A   That is correct.

10  Q   But you don't know whether the city will be a AA-rated

11  municipality for purposes of bond financing upon emergence of

12  Chapter 9, do you?

13  A   I do not.

14  Q   Switching gears again, Mr. Malhotra, you've been working

15  with the city now on various projects, if I understood your

16  testimony, since May of 2011; correct?

17  A   That is correct.

18  Q   And before the city filed its Chapter 9 petition, the

19  city was already engaged in restructuring efforts to improve

20  its fiscal condition; correct?

21  A   That is correct.

22  Q   And prior to that Chapter 9 filing, the emergency manager

23  put together an operating plan; correct?

24  A   I would have to think back.  I believe that's the case,

25  but I would have to see it just to get the exact date.

188

1  Q   Let me hone in on then something you did testify.  And on

2  June 14th, 2013, prior to the commencement of this Chapter 9

3  case, the city provided creditors with a proposal that you

4  referred to earlier, the proposal to creditors; right?

5  A   That is correct.

6  Q   You had some input on the creation of that proposal;

7  correct?

8  A   I did.

9  Q   And that proposal to creditors included restructuring and

10 reinvestment initiatives, didn't it?

11 A   That is correct.

12 Q   And so you understand as you worked on that proposal that

13 the city didn't need to file a Chapter 9 filing in order to

14 identify and propose a plan of action with respect to those

15 operational restructuring reinvestment initiatives that it

16 had proposed in the proposal to creditors in June of 2013;

17 correct?

18 A   You would have to repeat that question.  It was way too

19 long.

20 Q   So you understood as you worked on that proposal that the

21 city didn't need to file a Chapter 9 filing in order to

22 identify and propose reinvestment initiatives like they did

23 in the proposal to creditors; correct?

24 A   I want to make sure I answer this in -- the way I

25 understand your question is --

1  Q   Oh, please do.  If I can help you, let me know.

2  A   Yeah.  If you could just break that down into two

3  components because all I'm -- this sounds like there's two

4  questions in there.  The city identified at that point --

5  Q   You knew -- so, for example, in June of 2013, you knew

6  you were working on a proposal that included reinvestment

7  initiatives; correct?

8  A   Yes.

9  Q   And you knew there was no Chapter 9 filing; right?

10 A   At that point in time, there wasn't.

11 Q   And yet you knew you were proposing a proposal to

12 creditors that included reinvestment initiatives; correct?

13 A   Yes.  It was meant to -- yes.

14 Q   Okay.  Now, the city was proposing to do those

15 initiatives outside of Chapter 9; right?

16 A   The city was highlighting the need that it had for the

17 different departments, and I'm highlighting the funding

18 required for those costs, but --

19 Q   And, in fact, it was proposing those initiatives, wasn't

20 it, in a proposal to creditors?

21 A   It was proposing what the city wanted to do in terms of

22 right-sizing the city's operations.

23 Q   And you were doing that outside of Chapter 9; correct?

24 A   That is correct.

25 Q   Now, Mr. Malhotra, you had done work for the Detroit

1  Public Schools before your engagement by the City of Detroit

2  here; right?

3  A   That is correct.

4  Q   But you hadn't done a forecast of an actual city or

5  municipality before you performed the forecasts for the City

6  of Detroit in this Chapter 9; correct?

7  A   That is correct.

8  Q   Before you worked for the City of Detroit in this Chapter

9  9 proceeding, you had never done forecasting specifically for

10  any city; correct?

11  A   Yes.  That's correct.

12  Q   And you haven't published any publications on

13  forecasting; right?

14  A   Not on -- no, I have not.

15  Q   And you don't hold yourself out as an expert in Chapter 9

16  bankruptcy, do you?

17  A   No, I don't.

18  Q   In fact, this is the first Chapter 9 bankruptcy that

19  you've worked on; correct?

20  A   It is.

21  Q   Now, the model that you used for the forecasting was

22  created by you and the folks at E&Y for the City of Detroit;

23  correct?

24  A   Yes.

25  Q   It didn't exist before E&Y created it in this engagement;

1   correct?

2   A    That's correct.

3   Q    And in connection with your work for the city when you

4   were pulling together that model, you didn't look at any

5   other Chapter 9 financial models; correct?

6   A    We did not look at other Chapter 9 financial models.

7   Q    And, in fact, when you were putting together your model,

8   you didn't know the components of financial models used in

9   other Chapter 9 cases, did you?

10  A    The components of -- no.  I think the components of

11  financial models are revenues and expenses, so I don't know

12  about if there's a Chapter 9 model somewhere.  I did not look

13  at other Chapter 9 models.

14  Q    One second.  Let me hand you your deposition, see if --

15  A    Okay.

16  Q    It's a copy of your July 15th, 2014, deposition, and I'll

17  ask you to look at page 38 starting at line 5 to line 9.  Did

18  I ask you this question --

19          MR. STEWART:  Could we wait till I can get to it in

20  my --

21          MR. SOTO:  Sure.

22          MR. STEWART:  Go ahead.

23  BY MR. SOTO:

24  Q          "Question:  That wasn't my question.  You

25          haven't looked at any other Chapter 9 financial

1      models; correct?

2            Answer:  I did not go and look at other Chapter

3            9 financial models.  That is correct."

4      Is that your -- is that your answer to that

5   question?

6   A    Yes.

7   Q    And you were telling the truth then?

8   A    Yes.

9   Q    And, in fact, when you were putting together your

10  financial model, you didn't know the components is the next

11  question I asked you.  Do you recall -- looking again at line

12  16 through 20 of page 39, did I ask you this question, and

13  did you give this answer?

14            MR. SOTO:  Geoff, you ready?

15            MR. STEWART:  Oh, yeah.  I would object.  I don't

16  think it's proper impeachment, your Honor, because I don't

17  think there was an inconsistent answer, but -- so I don't

18  think it's appropriate, but I'll leave that up to Court.

19            THE COURT:  You may proceed.

20  BY MR. SOTO:

21  Q            "Question:  You don't know what financial models

22            have been used in Chapter 9's; correct?" is the

23            question.

24            "Answer:  I do not know the components of the

25            financial models of other Chapter 9 cases.  That is

1       correct."

2           Did I ask that question?  Did you give that answer?

3   A    Yeah.  That was a question that was asked, and that was

4   the answer that I gave at that time, yes.

5   Q    And you were telling the truth then; correct?

6   A    Yes.

7   Q    And you can't identify any Chapter 9 bankruptcy where an

8   expert has done forecasting similar to what you've done in

9   this case; right?

10  A    That is correct.

11  Q    In fact, before you put together your expert report in

12  this case, you didn't attempt to investigate what had been

13  done in other Chapter 9 bankruptcies; right?

14  A    What had done with financial models in bankruptcies?

15  Q    Right.

16  A    That is -- could you ask me that question once again,

17  please?

18  Q    Sure.  The question I asked before was can you identify

19  any Chapter 9 bankruptcy where an expert has done forecasting

20  similar to what you've done in this case?

21  A    I do not -- yes, I cannot.

22  Q    Okay.  Switching gears again so you get in the context,

23  it's correct, isn't it, that as of the time of your analysis

24  and, in fact, even when you were deposed, the city had made

25  no arrangement with Ernst & Young to continue updating your

1  forecast after this bankruptcy is done; right?

2  A    Yeah.  We had not reached a formal arrangement.  That is

3  correct --

4  Q    And the scope --

5  A    -- at that point in time.

6  Q    I'm sorry.  Go ahead.  I didn't mean to interrupt.

7  A    At that point in time.

8  Q    And the scope of Ernst & Young's role in the event that

9  the plan of adjustment is confirmed has not been agreed upon

10  yet, has it?

11  A    It has.

12  Q    Okay.  Fair enough.  Can you tell the Court what it is?

13  A    EY's restructuring team is going to continue to assist

14  the city through December of 2015 in monitoring cash flows

15  and helping with actual versus forecast performance.

16  Separately, EY is engaged to help the city on its HR

17  implementation technology and its ERP program.

18  Q    And, again, through December of 2015 on both of those?

19  A    I'm not sure of the exact date of -- the outside date of

20  both of those.  I'm confident of the date for the

21  restructuring services.

22  Q    But it's a fact, isn't it, that you've produced many

23  versions of your -- I think I saw many today -- of your ten-

24  year projection and your forty-year projection; correct?

25  A    Yes.

1  Q   And that's because you've had to continuously update the

2  forecasts as assumptions change and other inputs change;

3  correct?

4  A   That is correct.

5  Q   And you agree that any of the assumptions in your model

6  can change over a ten-year and forty-year period; correct?

7  A   Some assumptions can change over a ten-year and forty-

8  year period.

9  Q   And you agree that the timing of the reinvestment

10 expenditures, for example, as they're paced could change,

11 which, again, would affect the assumptions in your model;

12 right?

13 A   If you change the timing assumptions from what they are

14 today, the numbers will change.

15 Q   And you agree that unforeseen changes can have an impact

16 on your forecast; right?

17 A   Yes.

18 Q   And, again, you haven't included a line item in your

19 forecasts -- I went back to look -- in which you've provided

20 for ongoing professional fees of Ernst & Young for a ten-year

21 period or a forty-year period consistent with your

22 projections; right?

23 A   The fees for Ernst & Young for the forthcoming year after

24 the current fiscal year will be funded through specific

25 projects, but there are no additional fees over ten and forty

1  years.

2  Q   Because you might not be there over ten or forty years;

3  correct?

4  A   That is correct.

5  Q   And it would also be fair to say that the assumptions in

6  your forecast depend on certain policy choices by Detroit

7  officials; correct?

8  A   Yes.

9  Q   And in the future during the ten-year period addressed by

10  your ten-year forecast, there might be different decision-

11  makers who are responsible for determining Detroit's

12  policies; right?

13  A   Yes.  People -- yes.

14  Q   You would agree that the projections that you testified

15  about this morning and actually through the afternoon are

16  dependent on the successful implementation of the city's

17  budget and the reliability of other estimates and assumptions

18  that are the basis of your projections; correct?

19  A   I'd request you to break that question down, please.

20  Q   Sure.  Would you agree that the projections that you

21  testified about today are dependent on the successful

22  implementation of the city's budget, that they stick to the

23  budget that's part of your projections?

24  A   The city generally does a one-year budget or two --

25  they're going to go to a triennial budget.  The 2015 budget

1  is going to be a transitional year, so the city is going to

2  use these projections to form the basis of a budget, so I'm

3  just not sure that I completely understand your question

4  because there isn't -- the budget is going to continue to

5  evolve and is an iterative process that continues to get

6  amended, so 15 and 16 and 17 will be essentially based on the

7  projections that are existing today.

8  Q  So it's your view that, for example, the projections that

9  you created have both form of budgets in it.  They presume

10  certain things are going to be done and certain items are

11  going to be in the city's budget; correct?  That's part of

12  your projection for ten years.  That's also part of your

13  projection for forty years; correct?

14  A  Yes.

15  Q  And if those presumptions are not carried on by the city,

16  if they're not included, for example, in the one-year budgets

17  that you just discussed, they would have an impact on your

18  projections; correct?

19  A  I'm trying to just think of specifics.  If you change the

20  assumptions, the numbers do change.

21        MR. SOTO:  Thank you, Mr. Malhotra.  Your Honor, we

22  have to proffer two clips of Mr. Malhotra's testimony as a

23  30(b)(6) witness for the city.  We would proffer them at this

24  time and play them at this time.

25        THE COURT:  Any objections?

1    MR. STEWART:  I need to know what clips they are and

2    what page and lines they are.

3    MR. SOTO:  Sure.  They are the  -- they're both from

4    the July 15th, 2014, deposition.  They are page 144, lines 9

5    through 12, and page 115, line 25, through page 116, line 6.

6    They have actually both been played before in this courtroom.

7    MR. STEWART:  I have no objection, but we'll have to

8    on redirect, your Honor, deal with a completeness issue as to

9    the second clip.

10    THE COURT:  Okay.  Mr. Stewart, can you pull that

11    microphone closer to you, please?

12    MR. STEWART:  Very good.

13    THE COURT:  All right.  You may proceed, sir.

14    MR. SOTO:  And actually I'm only playing the first

15    clip, so you won't have to worry about it.  I don't know why

16    I said that.  The first clip, which is page 144, nine through

17    twelve, is the only one we're proffering.  If you could play

18    it --

19    (Deposition clip of Mr. Malhotra's deposition played as

20    follows:)

21    "Question:  You haven't been asked to look at

22    what would happen if the petition is dismissed by

23    the city or the state; correct?

24    Answer:  That is correct."

25    (Deposition clip concluded)

1          MR. SOTO:  No further questions, your Honor.

2          THE COURT:  Okay.

3          MR. WAGNER:  Your Honor, Jonathan Wagner on behalf

4     of the COPs.  May I proceed?

5          THE COURT:  Yes, please.

6                    CROSS-EXAMINATION

7     BY MR. WAGNER:

8     Q    Good afternoon, Mr. Malhotra.  You and I have never met,

9     have we?

10    A    I don't believe so, no.

11    Q    I also have some questions -- a few questions about the

12    exhibits that we're seeing for the first time today.

13         MR. WAGNER:  Can you put up Exhibit 742?

14    BY MR. WAGNER:

15    Q    Now, this is one of the calculations that you were

16    instructed to perform at the direction of counsel; is that

17    correct?

18    A    That is correct.

19    Q    Now, the totals there by my math equal about 1.6 billion;

20    is that fair?

21    A    Yes.

22    Q    And if the UAAL was 3.1 billion, then the -- or if the

23    liability -- if the amount of the claim was 3.1 billion, then

24    the return rate for the pension classes would be about 51, 52

25    percent, 1.6 over 3.1?

1  A    Could you ask me that question again?  I apologize.

2  Q    If you add those two together and you divide by 3.1

3  billion, which is the size of the pension claim you testified

4  to earlier today, that's a recovery rate of about 52, 53

5  percent; right?

6  A    That math sounds right.

7  Q    Okay.  But that's not anywhere in the plan, is it?

8         THE COURT:  Excuse me one second.  We've had a

9  disconnect here.  The question was not or not entirely about

10 the math.  The question was whether the recovery rate is 50

11 or 51 percent.

12        THE WITNESS:  Your Honor, under -- using $1.6

13 billion of a present value over a $3.2 billion claim and

14 where the $1.6 billion has been calculated at a 6.75-percent

15 discount rate, that recovery percentage equates as long as

16 the claim is also valued at $3.2 billion.

17        THE COURT:  Okay.

18 BY MR. WAGNER:

19 Q    But the percentages in the plan are 59 and 60 percent,

20 are they not?

21 A    Are we using a five-percent discount rate?

22 Q    That's what you used in the plan; correct?

23 A    That is the same -- that is the five percent discount

24 rate we have used, yes.

25 Q    And the plan has been amended several times since you

1    first laid out -- since the city first laid out the 59- and
2    60-percent return rates?
3    A    Yes.  The plan has been amended.
4    Q    The plan was amended as late as two weeks ago; correct?
5    A    That is correct.
6    Q    And it still uses 59 and 60 percent; right?
7    A    Yes.  We use the same discount rate.
8    Q    And your projections that you prepared originally showed
9    a recovery rate of 59 and 60 percent, did they not?
10   A    Yes.  They showed a 59- or 60-percent on that claim
11   amount and the distributions assuming a five-percent discount
12   rate.
13   Q    Okay.  And the projections that you prepared just a week
14   ago also show 59- and 60-percent recovery, do they not?
15   A    Based on the same assumptions that I just answered
16   earlier, yes.
17   Q    And, again, the only reason you prepared -- used 6.75 is
18   because your counsel told you to; right?
19   A    That is correct.
20           MR. WAGNER:  Now, can you put up Exhibit 723?  No.
21   The city has to put it up, 723.
22   BY MR. WAGNER:
23   Q    Now, here you showed UAAL pre-petition of a billion eight
24   for GRS and a billion 250 for PFRS; correct?
25   A    That's correct.

1  Q   And now -- this is as of 2014 -- you've had a substantial

2  reduction in the UAAL; correct?

3  A   Yes.

4  Q   I think you testified that the unfunded liability has

5  gone from 53 percent -- about 53 percent and 71 percent to in

6  the 70s for both of them; is that correct?

7  A   I think I said it was pretty close to the target.  PFRS

8  may be slightly higher.  I do not remember the exact funded

9  percentage status today.  I think GRS may be close to 70, and

10  PFRS may be a little higher, but I do not remember the exact

11  numbers.

12  Q   I'm right for PFRS you've already hit the target; right?

13  A   Yes.

14  Q   And by the way, the billion 879 and a billion 250, that

15  was calculated and used -- that was calculated using a 6.75

16  discount rate; correct?

17  A   That is correct.

18  Q   And if you used a higher discount rate, the UAAL would be

19  smaller, correct, or the unfunded portion would be smaller?

20  A   If that is the only assumption that you changed, the

21  numbers would be different.

22  Q   And you also testified that the 6.75 was a negotiated

23  rate; right?

24  A   It was a part of the settlement, yes.

25  Q   And are you aware that the retiree has said that the 6.75

1  is not based on pension practice?

2  A   I'm not aware of that.

3  Q   Okay.  And are you aware that the expert for the Retiree

4  Committee --

5       MR. STEWART:  Objection, your Honor.  I'd like to

6  know why he's asking one witness about the testimony of

7  another.

8       THE COURT:  Well, let me hear the whole question,

9  and then I'll hear your objection.  Go ahead, sir.

10 BY MR. WAGNER:

11 Q   Are you aware that the Retiree Committee expert has

12 testified that the 6.75 is an outlier?

13      MR. STEWART:  I'd repeat my objection, your Honor.

14      MR. WAGNER:  Well, he's testified to why he used

15 particular numbers.  I think I'm entitled to show because he

16 has given testimony about the UAAL that the numbers he's used

17 misstate the UAAL.

18      THE COURT:  The objection is sustained.

19 BY MR. WAGNER:

20 Q   Now, this past year I'm right that the returns have

21 exceeded 6.75 percent?

22 A   Yes.

23 Q   And that's why the unfunded liability has gone down;

24 correct?

25 A   That's only one of the reasons.

1  Q   We'll get to that in a minute.  You testified concerning

2  the fees that have been incurred.  This is Exhibit 767.  I

3  think the total fees are 182 million for 2014 and 2015;

4  correct?

5  A   That is correct.  It includes an estimate as well for

6  fiscal year '15, but that is what the schedule shows.  That

7  is correct.

8  Q   Now, does this figure also include the fees prior to

9  2014?

10 A   No.

11 Q   Do you know what the fees have been from the time -- all

12 the professional fees from the time you were retained in 2011

13 until this chart?

14 A   I do not.

15 Q   Was it $10 million?  Was it more than $10 million?

16 A   My recollection is it would be less than $10 million.

17 Q   Okay.  But just the 182 million, that exceeds the amount

18 of the COP reserve, does it not?

19 A   The $182 million is larger than the $162 million COPs

20 reserve.

21 Q   You also gave some testimony about the return to COPs.

22 The total amount of COPs are a billion four; right?

23 A   That's the COPs claim.

24 Q   And the interest rate on those COPs under the B notes at

25 the beginning is four percent; right?

1  A    Yes.  The B notes the interest rate is four percent for

2  the first decade.

3  Q    So am I right that the debt service on another ten

4  percent of the COPs, 140 million, would be $5-1/2 million?

5  Putting aside amortization, just the interest cost would be

6  5-1/2 -- about 5.6 million, 140 times .04?

7  A    Yeah.  I mean that -- overall in terms of the actual

8  incremental interest, if you're just looking at interest, I

9  think that would be the rough math.

10  Q    Now, you also gave some testimony about a plan freeze.

11  Do you recall that?

12  A    Yes.

13  Q    And I think you said there'd be no more accrual of

14  benefits under the plan on account of a plan freeze.  Do you

15  recall that?

16  A    Yes, under the old plan.

17  Q    And do you recall that you said that that would reduce

18  the pension liability?

19  A    Yes.

20  Q    And there's no dispute about that, is there?

21  A    I do not know there's a dispute or not.

22  Q    Okay.

23          MR. WAGNER:  Can you put up Exhibit 1009?  Your

24  Honor, this is a letter from Milliman.  It's already in

25  evidence based on your Honor's September 2nd order.

1    BY MR. WAGNER:

2    Q   Can you turn to page 3 of the document?

3           MR. STEWART:  Do you have a hard copy version of

4    that?

5           MR. WAGNER:  I don't with me.  I didn't realize he'd

6    be testifying about these issues, so I didn't know.

7           MR. STEWART:  Excuse me a moment.

8           MR. WAGNER:  Now, can you blow up the portion that

9    says "estimated plan freeze impact"?

10   BY MR. WAGNER:

11   Q   Do you see it says, "Our preliminary result as of June

12   30, 2013, based on an investment return assumption of 6.75 is

13   that the impact of the plan freeze represents a decrease of

14   roughly 95 billion -- 95 million or roughly 12 percent of the

15   active liability"?  Do you see that?

16   A   Yes.

17          MR. WAGNER:  And can you just go to page one of the

18   document, and can you highlight the "re." line?

19   BY MR. WAGNER:

20   Q   So this is for -- this is for GRS; right?

21   A   Yes.

22   Q   So the impact of a plan freeze with respect to GRS is a

23   reduction of liability of 95 million; right?

24          MR. STEWART:  Objection.

25          THE COURT:  What is your objection?

1    MR. STEWART:  That's what the document says.  A

2  question is -- I don't know if he's saying that that's what

3  the document says or whether he's asking the witness his

4  independent view.

5    THE COURT:  Which is it?

6    MR. WAGNER:  I'm asking if he knows.  He testified

7  he got input from Milliman.  I'm asking whether he -- if

8  that's his understanding.

9    THE WITNESS:  That's what the document says.

10    MR. WAGNER:  Can you turn to Exhibit 1010?  Can you

11  put up Exhibit 1010?

12    THE COURT:  Well, let me say, counsel, that we don't

13  need you to have this witness read into the record documents

14  that are already in evidence.  If there's some other purpose,

15  go for it, but --

16    MR. WAGNER:  That's fine.

17  BY MR. WAGNER:

18  Q    Now, you discounted the state contribution at a rate of

19  6.75 percent?

20  A    That is correct.

21  Q    And why did you do that?  Is that also at the instruction

22  of counsel?

23  A    That was part of the discussion with the state.

24  Q    And was the 6.75 supposed to represent any risk that

25  payment would not be made?

1   A    That's a question I guess to ask the state, but the 6.75-

2   percent discount rate used to calculate the present value of

3   the $350 million the state is contributing was based on an

4   overall agreement with the state.

5   Q    So that was simply another agreement that was negotiated;

6   correct?

7   A    Yes.

8          MR. WAGNER:  Nothing further, your Honor.

9                        CROSS-EXAMINATION

10  BY MS. O'GORMAN:

11  Q    Good afternoon, Mr. Malhotra.  My name is Debra O'Gorman.

12  I represent MIDDD.  Now, you're not an expert in tax policy,

13  are you?

14  A    I am not.

15  Q    And you're not an expert in tax forecasting, are you?

16  A    I am not.

17  Q    You're not an economist, are you?

18  A    I am not.

19  Q    You have no expertise in pensions; correct?

20  A    I'm not an actuary.

21  Q    You don't have any expertise in urban policy or planning,

22  do you?

23  A    No, I do not.

24  Q    You don't have any expertise in blight reduction, do you?

25  A    No, I do not.

1  Q   Are you an expert in art valuation?

2  A   No.

3  Q   Are you a CPA?

4  A   I am not.

5  Q   And you've never before been qualified as an expert in

6  accounting; correct?

7  A   That is correct.

8  Q   Now, in preparing your forecast, you relied on many

9  others to provide assumptions for you; is that correct?

10  A   Input, yes.

11  Q   And these were other experts as well as various people

12  from the city; correct?

13  A   Yes.

14  Q   And as to the anticipated tax revenues that are built

15  into your forecasts, you didn't perform your own work in that

16  regard; correct?

17  A   We had experts for that, but I did look through the

18  assumptions.

19  Q   Thank you.  You answered my question.  So you relied on

20  Mr. Cline and Ms. Sallee for that information?

21  A   I relied on Ms. Sallee and Bob Cline.

22  Q   And you're not offering any opinions on tax policy;

23  correct?

24  A   That's correct.

25  Q   And you're not offering any opinions on whether the city

1   could seek to increase taxes, are you?

2   A    I'm not making any comment on policy, tax policy.

3   Q    And you're not offering any opinion on whether the city

4   could ask the state to collect taxes on their behalf, are

5   you?

6   A    That is correct.

7   Q    Would you agree that Mr. Cline and Ms. Sallee are the

8   most knowledgeable about the analysis they performed with

9   respect to tax revenues?

10  A    Yes, for each of the purposes that they -- for each of

11  the tax lines that they forecasted, yes.

12  Q    And would you agree that taxes are the biggest driver of

13  city revenues?

14  A    Yes.

15  Q    And they're the primary source of revenue for any

16  municipality; correct?

17  A    They are.  They are.  Taxes are a primary source of

18  revenues and -- yes.

19  Q    Okay.  And you relied on others for that work; right?

20  A    I relied on experts for that work.

21  Q    Okay.  And you also relied on Conway MacKenzie; correct?

22  A    Yes, for specific revenue and expense items.

23  Q    And those were the reinvestment initiative items that you

24  relied on Conway MacKenzie for?

25  A    Yes, and, as I said, in conjunction with the work that we

1 had already done to make sure there was no double counting.

2 Q   And you didn't do any independent analysis or testing of

3 those numbers, did you?

4 A   I did.

5 Q   You did?

6 A   Yes.  I just said I made sure that none of the operating

7 revenue initiatives or any of the operating expenditures were

8 double counted in any fashion in the baseline.

9 Q   So you just avoided the double counting, but you did no

10 other analysis of the accuracy of any of the numbers

11 themselves?

12 A   In terms of the analysis, I mean we also went through the

13 headcount assumptions in a lot of detail in terms of what

14 were the average revenue -- average salary assumptions that

15 were being used in terms of all the headcount that was coming

16 in and regardless of any double counting to make sure that

17 the fringe rates and the average salary levels and the

18 headcount assumptions were vetted by department.

19 Q   Okay.  But you would agree that Conway MacKenzie would be

20 the most knowledgeable about their work; correct?

21 A   Yes.  People who only do specific work, yes, are more

22 knowledgeable about their work.

23 Q   Okay.  And you also relied on Miller Buckfire for your

24 assumptions?

25 A   For the quality of life loan and the exit financing

1  assumptions, yes.

2  Q   Did you verify the accuracy of Miller Buckfire's work?

3  A   I had supporting information that was provided by the

4  financing sources, and we had discussions about the structure

5  based on what input they got from the financing sources, so

6  we did spend a lot of time discussing those versus just

7  plugging them into a model.

8  Q   Okay.  Did you also rely on Milliman in forming your

9  assumptions?

10 A   Yes.  We used Milliman's input on the assumptions in some

11 of the legacy liabilities.

12 Q   And Milliman would be most knowledgeable about the work

13 that they performed; correct?

14 A   Yes.

15 Q   And you were asked by Mr. Soto about policy choices by

16 future decision-makers.  Would you be required to speculate

17 in order to determine what policy choices Detroit's future

18 leaders would make over the next ten years?

19 A   Could you ask me that question again, please?

20 Q   Would it be speculation on your part for you to determine

21 now today what Detroit's future leaders -- what decisions

22 they would make?

23 A   Yeah.  I cannot decide or comment on all the policy

24 decisions the future governments make.

25 Q   So you'd be speculating; right?

1  A    Yes.  I mean they -- yes.  If any --

2  Q    Okay.  Thank you.

3  A    I can't comment on all the policy decisions or policy

4  decisions that government leaders will make in the future.

5  Q    Because you'd have no way of knowing what will happen;

6  right?

7  A    Well, I would not know of anything about tax policies

8  that -- yes.  I would not know what some administration does

9  down the road in the future.

10 Q    You wouldn't know what decisions would be made in the

11 future; correct?

12 A    That is correct, in the future.

13 Q    Okay.  Now, you didn't use any kind of mathematical

14 formula in identifying the historical trends that went into

15 your forecast; correct?

16 A    No, that's not.

17 Q    In what way is that incorrect?

18 A    Well, I just want to make sure I'm -- there are lots of

19 line items if you've gone through individual line items, and

20 in terms of looking at the trends, we've looked at some of

21 the line items that needed either an average or we used some

22 of the last 2013 numbers in terms of the forecast, so --

23 Q    So you used averages, but you didn't use a regression

24 analysis or any kind of sophisticated mathematical modeling;

25 correct?

1  A   I don't know if regression analysis is sophisticated

2  mathematical modeling, but in terms of the actual costs that

3  were in specific departments or revenues, we did use

4  mathematical formulas in our forecasting.

5  Q   But I'm asking you a different question about historical

6  trends.  Didn't you just take a couple of years of data and

7  do an average and make some adjustments and carry those

8  numbers forward?  Isn't that what you did?

9  A   No.  I think we went through a very robust process of

10  looking through and understanding what the changes were, what

11  the assumptions were.  We spoke to the management team.  We

12  reviewed those numbers with the management team and then

13  started to come up with forecasts versus just look at a

14  couple of years and put a number in there.

15  Q   Right.  So you had historical data, and you made some

16  adjustments based on your conversations with city department

17  heads; right?

18  A   And analyses of each of those line items to understand

19  what was in there, what were one-time trends, what was

20  repeating numbers and going -- that would impact the forecast

21  going forward.

22  Q   Now, would you agree that increased taxes would be a

23  potential source of revenue for the city?  I'm just asking if

24  it could be a potential source of revenue.

25  A   Leaving everything else aside and leaving everything else

1  the same, if taxes go up, the revenues -- the overall picture

2  will look better.

3  Q   Right.  And you were instructed by the emergency manager

4  to assume that tax rates would remain constant; correct?

5  A   That's right.

6  Q   And you were also asked to assume by the emergency

7  manager that there would be no new taxes, you know,

8  additional taxes that don't exist today?

9  A   That is correct.

10  Q   And you've done no analysis of the collection of

11  delinquent taxes in your model?

12  A   We have not.

13  Q   And I wanted to ask you about the B and C notes that we

14  talked about earlier.  Now, the new B notes are interest only

15  for ten years; correct?

16  A   That is correct.

17  Q   And those are unsecured obligations of the city; correct?

18  A   Yes.

19  Q   And you don't know whether they're taxable or not?

20  A   I do not.

21  Q   Now, would you agree that as a general proposition that a

22  higher rate of return would typically be demanded by the

23  market for a taxable bond versus a nontaxable bond?

24  A   I don't want to -- I can't comment on that.

25  Q   Now, under the plan the city is issuing new C notes;

1  correct?

2  A    That is correct.

3  Q    And those have a 12-year maturity as opposed to 30 years

4  with B notes; correct?

5  A    That is correct.

6  Q    And would you agree that notes with shorter maturities

7  would typically have less payment risk than those with longer

8  maturities?

9  A    I would not want to comment on that.

10  Q    And the new C notes amortize principal with the first

11  annual payment; correct?

12  A    That is correct.

13  Q    And the B notes are interest only; correct?

14  A    They are interest only for the first ten years.

15  Q    And the C notes pay what interest rate?

16  A    Five percent.

17  Q    And the B notes pay four percent for the first 20 years;

18  correct?

19  A    That is correct.

20  Q    Would you agree that the amortizations -- that under the

21  new C notes there's less of a risk of nonpayment than the B

22  notes?

23  A    The money is coming from the city.  The risk profile is

24  the risk profile.

25  Q    But the new C notes, there is a payment of principal from

1  the start; correct?

2  A    That is correct.  I'm saying the source of the funding is

3  the same.  It's the city, its cash flows.

4  Q    Well, that's not really true, is it, because the C notes

5  are paid from parking revenues; correct?

6  A    At the end of the day, the C notes are paid through

7  improvement in parking revenues, but it's going to come out

8  of the general fund at the end of the day.

9  Q    Okay.  Well, is there any segregation of funds for

10  payment of the new B notes?

11  A    No.

12  Q    They come from the general obligations of the city;

13  correct?

14  A    Yes.

15  Q    Have you taken into account improvements in the economy

16  in the last four or five years in your forecast?

17  A    In terms of the tax forecasts?

18  Q    Generally, the economy in general.

19  A    I would think that the pieces that impact Detroit, for

20  instance, for what we have seen in the trends and the sales

21  and charges for services -- I don't know if it's anything

22  related to the improvement in economy versus not, but I've

23  looked at in detail all the revenue items that are impacting

24  Detroit, so I don't know if -- what you would ascertain to an

25  improvement in economy versus not.

1  Q   But you do agree that the economy of Detroit has been

2  improving since 2008, 2009; correct?

3  A   I would say that overall since 2008, 2009 I think the

4  economy overall has improved.

5  Q   And you didn't make any specific effort to include those

6  improvements in your forecast; correct?

7  A   Well, we have looked at the trends from 2008, 2009 in all

8  of the department financials, so my point is they would be

9  imbedded in there if there was any direct improvement.

10         MS. O'GORMAN:  Okay.  Thank you.  That's all I have.

11         THE COURT:  Any other cross-examination of the

12  witness?

13         MR. SOTO:  No, your Honor.

14         THE COURT:  Redirect?

15         MR. STEWART:  No redirect, your Honor.

16         THE COURT:  Stand by one second, please.  So to what

17  extent, sir, did you make independent judgment about the

18  reasonableness of the assumptions in the city's ten-year

19  forecast or projections?

20         THE WITNESS:  It was quite extensive, your Honor.

21         THE COURT:  It was.  Are you familiar with the

22  concept of critical assumption?

23         THE WITNESS: Yes.

24         THE COURT:  Okay.  I want to ask you what are the

25  two or three most critical assumptions in the city's ten-year

1  forecast or projections that concern you the most?

2       THE WITNESS:  The first one, your Honor, one would

3  be the unfunded pension liability of the city at the end of

4  the ten years because -- and a lot of this in terms of the

5  settlements of the creditors we have boxed in what the city's

6  liability will be.  On the side of the pensions, we are still

7  using calculations to estimate what that ten-year unfunded

8  liability will be.  So that would be my first one as a

9  concern because it's an unknown.  It's an estimate, but it's

10  still not boxed in in terms of how we have boxed in our best

11  ability of the other claims.

12       The second assumption in terms of what would give me

13  concern is we are trying to get five-year labor agreements,

14  and we just want to make sure that even after those five

15  years there are various assumptions in the plan with respect

16  to retiree healthcare for our current active employees that

17  have been taken down significantly, so just so that the city

18  has gone through a painful process of dealing with the

19  retiree healthcare of its current retirees so that it does

20  not happen again could be a five-year contract, so I just

21  don't know what happens after those five years.

22       Those would be the top two, and then the last one,

23  which is more general, is just the implementation of the plan

24  now because the roadwork has been created in some fashion.

25  Our blueprint is existing, but I think the same amount of

1 rigor has to now go into the implementation or probably even

2 more rigor than in sort of developing the blueprint, and I

3 would say those, in my view --

4      THE COURT: What concerns you about the

5 implementation of the plan? Can you be more specific about

6 what your concerns are?

7      THE WITNESS: There's a lot of change, your Honor --

8 I mean that has to happen over the next four to five years

9 with respect to the -- all of the department revenue

10 initiatives as well as the process improvements, and so I

11 am -- from all the time I've spent with the mayor and the

12 CFO, I'm very comfortable there in terms of the

13 implementation ability, but it's just the speed of the

14 implementation. We have significant uptick in revenues in

15 the plan that are based on reinvestments. Yes, they come

16 five years down the road, but -- so I think we will just have

17 to make sure that we have the rigor to implement the plan.

18      THE COURT: Make sure we have the what?

19      THE WITNESS: A rigorous focus on implementing the

20 plan. I'm less concerned about line items moving up and down

21 in terms of costs, but I would not want to have a change in

22 terms of taking one-time CAPEX items and converting that into

23 long-term increased cost of the -- increasing the fixed cost

24 structure of the city long term.

25      THE COURT: Well, do you have any concern about

1   willingness or the ability of the city to implement the plan?

2             THE WITNESS:  From all the conversations I have had

3   with the leadership team, I have -- I do not have concern

4   about the willingness to implement the plan.  The ability of

5   the collective team to implement the plan is a function of

6   time and focus on these particular efforts once the city

7   exits from bankruptcy.  And I've been involved with the city

8   for over three and a half years and understand the practical

9   limitations that the city will be faced with of implementing

10  the plan post-bankruptcy, and it's that constant focus of

11  making sure that the city is going to implement this plan is

12  critical.

13            THE COURT:  Did you testify earlier that E&Y's

14  contract with the city has been extended through 2015?

15            THE WITNESS:  That is correct, your Honor.

16            THE COURT:  Calendar year or fiscal year?

17            THE WITNESS:  December 31st, 2015.

18            THE COURT:  December 31st.  And will part of that

19  work continue the work that E&Y has done with respect to cash

20  management?

21            THE WITNESS:  Yes, your Honor.

22            THE COURT:  What is your judgment on whether the

23  city will be able to take over those cash management

24  functions that E&Y does now and will do through December of

25  2015 at that time?

1        THE WITNESS:  It will -- it depends, your Honor, on

2   the people that are hired over the course of the next few

3   months, and so it's hard for me to comment today.  Today I

4   wouldn't be comfortable saying that I could just hand it

5   over, but I think as the existing team at the city continues

6   to get some more resources around them, there is a potential

7   that these cash management services can be transitioned,

8   especially once we have a little more stability through this

9   transitional year that the city is going to be going through.

10       THE COURT:  What would the consequences be if the

11  city did not renew the contract after December of 2015 or

12  find a substitute contractor to do the work and it were not

13  ready to assume proper cash management functions?

14       THE WITNESS:  The risk in that scenario, your Honor,

15  is exactly twofold, one, because of the state law and having

16  a clear amount -- a handle on cash before you're going into

17  the next budget year because you have to maintain that five

18  percent, so it's a controls issue in terms of that may get

19  impacted, and really so -- and I would say what would get

20  impacted is the long-term forecast ability of the city will

21  get impacted because a lot of -- a lot of the issues have

22  come up because the city did these one-year budgets or one-

23  year outlooks whereas looking at cash flows over a longer

24  time frame and managing cash over the long term, so that is

25  the risk that we run into in which we can again focus back

1    into the very short term and make decisions based on the

2    outlook of a very short term.

3            THE COURT:  So is it fair to say that it is your

4    judgment that maintaining adequate cash flow competency

5    either by an outside contractor or adequate inside resources

6    is critical to the implementation and feasibility of the

7    plan?

8            THE WITNESS:  I do, your Honor.

9            THE COURT:  All right.  That's all I have.  Any

10   follow-up questions?  All right.  Before we break for the

11   day -- you're excused, sir.

12       (Witness excused at 4:45 p.m.)

13           THE COURT:  I think that rather than start on

14   another witness, we will recess here in a moment, but,

15   Ms. Lennox, I want to talk to you, please.

16           MS. LENNOX:  Yes, sir.

17           THE COURT:  First, I have a news flash for you.

18           MS. LENNOX:  Okay.

19           THE COURT:  You have a message from my assistant,

20   Chris.  Please call her.

21           MS. LENNOX:  Okay.  I will do that, your Honor.

22           THE COURT:  Have you had any conversation with Mr.

23   Flynn about the plans to deal with the Detroit Fire Fighters'

24   issues tomorrow?

25           MS. LENNOX:  I have, your Honor, and --

1          THE COURT:  Where are we with that?

2          MS. LENNOX:  So I guess we were confused where this

3     came from, and apparently it came from an entry that your

4     Honor put on the docket on September 3rd stating that the

5     issues for the UAW and the DFFA will be presented on

6     September 30th.

7          THE COURT:  Right.

8          MS. LENNOX:  Well, the DFFA had never designated any

9     witnesses.  They were not -- they did not indicate to us that

10    they were planning to put on a fact case, and so we were a

11    little confused by what DFFA issues because they hadn't

12    designated witnesses.  After I spoke with Mr. Flynn, he

13    indicated that they do not intend to present factual issues.

14    In fact, they will be withdrawing the objections to

15    confirmation as to certain factual matters.  They are

16    preserving their objections with respect to the legal issues,

17    which, as your Honor may recall, Mr. Legghio and I argued

18    back in July.  So I believe it is their view -- and we would

19    concur since they don't plan to present witnesses -- that

20    they would have no need to come into court tomorrow unless

21    your Honor has questions for them that you'd like them to

22    answer.

23         THE COURT:  Okay.  Thank you for that report.  Has

24    the mediation with the Detroit Fire Fighters Association

25    concluded yet?

1    MS. LENNOX:  It has not concluded.  I can report

2  that we've made --

3    THE COURT:  It has not concluded?

4    MS. LENNOX:  No.  And I believe they're planning to

5  meet again this Wednesday.  I can report that we have made

6  significant progress actually since last time we were before

7  your Honor.  Certainly it's our view that we'd like to

8  conclude this as soon as we can.

9    THE COURT:  All right.  So it sounds like we will be

10  proceeding with our regular trial schedule tomorrow

11  uninterrupted by any previously slotted in issues.  Does that

12  sound right?  Wednesday we do have to carve out some time for

13  objections to claims; right?

14    MS. LENNOX:  Correct, your Honor.

15    THE COURT:  That's what --

16    MS. LENNOX:  I believe the MIDD trial is on

17  Wednesday as well.

18    THE COURT:  You believe what?

19    MS. LENNOX:  The MIDD objection is up Wednesday.

20    THE COURT:  I think that's what Ms. Sikula wants to

21  talk to you about.

22    MS. LENNOX:  Okay.

23    THE COURT:  All right.  Anything further for today?

24  Sir?

25    MR. STEWART:  Nothing further from me, your Honor.

1          THE COURT:  Thank you.

2          MS. LENNOX:  Thank you, your Honor.

3          MR. SHUMAKER:  Your Honor, one thing on Mr. Orr.  I

4   just wanted to let you know that I've been talking with Mr.

5   Soto about when Mr. Doak will testify, and I don't think that

6   that's going to happen until Thursday or Friday, which would

7   mean tomorrow's lineup would be Mr. Buckfire, Mr. Kaunelis

8   from the DWSD, and then Mr. Orr.  And I just wanted to advise

9   your Honor of that for notice purposes.

10         THE COURT:  All right.

11         MR. SHUMAKER:  Thank you, your Honor.

12         THE COURT:  Anything else for today?  All right.

13   We're in recess until tomorrow morning then.

14         THE CLERK:  All rise.  Court is adjourned.

15       (Proceedings concluded at 4:49 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Gaurav Malhotra | 32 | 180/199/208 | | |

| EXHIBITS: | Received |
|---|---|
| City Exhibit 3 | 74 |
| City Exhibit 33 | 65 |
| City Exhibit 109 | 61 |
| City Exhibit 111 | 64 |
| City Exhibit 112 | 57 |
| City Exhibit 113 | 73 |
| City Exhibit 201 | 152 |
| City Exhibit 614 | 167 |
| City Exhibit 716 (demonstrative) | 85 |
| City Exhibit 717 (demonstrative) | 87 |
| City Exhibit 718 (demonstrative) | 117 |
| City Exhibit 719 (demonstrative) | 119 |
| City Exhibit 720 (demonstrative) | 125 |
| City Exhibit 721 (demonstrative) | 127 |
| City Exhibit 722 (demonstrative) | 130 |
| City Exhibit 723 (demonstrative) | 133 |
| City Exhibit 724 (demonstrative) | 144 |
| City Exhibit 727 (demonstrative) | 164 |
| City Exhibit 728 (demonstrative) | 110 |
| City Exhibit 732 (demonstrative) | 140 |
| City Exhibit 733 | 92 |
| City Exhibit 734 | 94 |
| City Exhibit 737 (demonstrative) | 121 |
| City Exhibit 738 (demonstrative) | 51 |
| City Exhibit 742 (demonstrative) | 171/180 |
| City Exhibit 749 | 172 |
| City Exhibit 751 (demonstrative) | 112 |
| City Exhibit 757 | 106 |
| City Exhibit 758 | 107 |
| City Exhibit 759 | 107 |
| City Exhibit 767 | 105 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                    October 3, 2014
_____    _____
Lois Garrett