# EXHIBIT H

CHARLES MOORE

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In re:                    ) Chapter 9
CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846
        Debtor.        ) Hon. Steven W. Rhodes

_____

The Videotaped Deposition of CHARLES MOORE - Volume 2,
in his personal capacity as a Rule 30(b)(6) witness,
Taken at 1114 Washington Boulevard,
Detroit, Michigan,
Commencing at 9:00 a.m.,
Thursday, July 24, 2014,
Before Cheri L. Poplin, CSR-5132, RPR, CRR.

1            CHARLES MOORE
2    JENNIFER K. GREEN, ESQ.
3    Clark Hill, PLC
4    500 Woodward venue
5    Suite 3500
6    Detroit, Michigan 48226
7        Appearing on behalf of the Retirement Systems for the
8        City of Detroit.
9
10
11
12    ANTHONY B. ULLMAN, ESQ.
13    Dentons US LLP
14    1221 Avenue of the Americas
15    New York, New York, 10020-1089
16        Appearing on behalf of the Retiree Committee.
17
18
19
20
21
22
23
24
25

1            CHARLES MOORE
2    APPEARANCES:
3
4    ROBERT W. HAMILTON, ESQ.
5    Jones Day
6    325 John H. McConnell Boulevard
7    Suite 600
8    Columbus, Ohio 43215
9        Appearing on behalf of the Debtor.
10
11
12
13    LAIRD E. NELSON, ESQ.
14    Jones Day
15    222 East 41st Street
16    New York, New York 10017
17        Appearing on behalf of the Debtor.
18
19
20
21
22
23
24
25

1            CHARLES MOORE
2    ROBERT A. SCHWINGER, ESQ.
3    Chadbourne & Parke, LLP
4    30 Rockefeller Plaza
5    New York, New York 10112
6        Appearing on behalf of Assured Guaranty Municipal
7        Corp.
8
9
10
11    GUY S. NEAL, ESQ.,
12    KATHLEEN M. HITCHINS, ESQ.
13    Sidley Austin, LLP
14    1501 K. Street, N.W.
15    Washington, D.C. 20005
16        Appearing on behalf of the National Public Finance
17        Guarantee Corp.
18
19
20
21
22
23
24
25

```
1              CHARLES MOORE
2    MARK R. JAMES, ESQ.
3    Williams, Williams, Rattner & Plunkett, P.C.
4    380 North Old Woodward Avenue
5    Suite 300
6    Birmingham, Michigan 48009
7       Appearing on behalf of the Financial Guaranty
8       Insurance Company.
9
10
11
12   JAYE QUADROZZI, ESQ.
13   Young & Associates
14   27725 Stansbury Boulevard
15   Suite 125
16   Farmington Hills, Michigan 48334
17      Appearing on behalf of Oakland County, Michigan.
18
19
20
21
22
23
24
25
```

```
1              CHARLES MOORE
2    COURTNEY ROGERS, ESQ.
3    Waller, Lansden, Dortch & Davis, LLP
4    511 Union Street
5    Suite 2700
6    Nashville, Tennessee 37219
7       Appearing on behalf of U.S. Bank National Association,
8       as Trustee for the Water and Sewer Bonds.
9
10
11
12   DORON YITZCHAKI, ESQ.
13   Dickinson Wright, PLLC
14   350 South Main Street
15   Suite 300
16   Ann Arbor, Michigan 48104
17      Appearing on behalf of the State of Michigan.
18
19
20
21   ALSO PRESENT:
22   John Schmitzer - Video Technician
23
24
25
```

```
1              TABLE OF CONTENTS
2
3    WITNESS                 PAGE
4    CHARLES MOORE
5
6    EXAMINATION BY MR. NEAL          243
7    EXAMINATION BY MS. QUADROZZI       371
8
9              EXHIBITS
10
11   EXHIBIT                 PAGE
12   (Exhibit attached to transcript.)
13
14   DEPOSITION EXHIBIT 8          289
15
16
17
18
19
20
21
22
23
24
25
```

EXAMINATION BY MR. NEAL — 243
EXAMINATION BY MS. QUADROZZI — 371
DEPOSITION EXHIBIT 8 — 289

```
1              CHARLES MOORE
2    Detroit, Michigan
3    Thursday, July 24, 2014
4    9:00 a.m.
5
6              CHARLES MOORE,
7    was thereupon called as a witness herein, and after
8    having been previously duly sworn to testify to the
9    truth, the whole truth and nothing but the truth, was
10   examined and testified as follows:
11             EXAMINATION
12   BY MR. NEAL:
13   Q.  Good morning, Mr. Moore.
14   A.  Good morning.
15   Q.  You recognize that you are still under oath?
16   A.  Yes.
17          MR. NEAL:  I think just for housekeeping
18   purposes, because there may be new people in the room,
19   such as myself, the parties in the room and on the
20   phone should identify themselves for the record.  Bob,
21   do you want to begin?
22          MR. HAMILTON:  Robert Hamilton, Jones Day,
23   on behalf of the City of Detroit.
24          MS. NELSON:  Laird Nelson from Jones Day on
25   behalf of the City.
```

2 (Pages 240 to 243)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 3 of 39

CHARLES MOORE

1
2     MR. ULLMAN:  Anthony Ullman, Dentons, for
3  the Retiree Committee.
4     MS. QUADROZZI:  Jaye Quadrozzi, Young &
5  Associates, on behalf of Oakland County.
6     MR. YITZCHAKI:  Doron Yitzchaki on behalf
7  of the State of Michigan.
8     MS. GREEN:  Jennifer Green, Clark Hill, on
9  behalf of the Retirement Systems for the City of
10  Detroit.
11     MR. JAMES:  Mark James, Williams, Williams,
12  Rattner & Plunkett on behalf of Financial Guaranty
13  Insurance Company.
14     MS. ROGERS:  Courtney Rogers for U.S. Bank,
15  National Association, as Trustee for the water and
16  sewer bonds.
17     MR. SCHWINGER:  Robert Schwinger from
18  Chadbourne & Parke for Assured Guaranty Municipal
19  Corporation.
20     MS. HITCHINS:  Kathleen Hitchins with
21  Sidley Austin on behalf of National Public Finance
22  Guarantee Corporation.
23     MR. NEAL:  Guy Neal, Sidley Austin,
24  National Public Finance Guarantee Corporation.
25  BY MR. NEAL:

CHARLES MOORE

1
2  Q.  Mr. Moore, you have been designated in response to a
3     couple 30(b)(6) deposition notices, and I'm going to
4     show you those designations to you and ask you to
5     confirm that you are so designated on these topics.
6     So I'm going to show you what's in the binder set as
7     Tab 1.  It's a document that has previously been
8     marked as Malhotra Exhibit Number 2.  And, Mr. Moore,
9     I would turn your attention to Topic Number 3-F.
10  A.  Yes.
11  Q.  There is a deposition topic Number 3-f reads, "Any
12     planned or projected collection issues."  And on the
13     next page you are designated as the City's designee
14     for Subtopic f.  Do you see that?
15  A.  I do, yes.
16  Q.  And you are prepared to testify on that issue today?
17  A.  Yes.
18  Q.  Turning to Topic Number 9.  There are three subtopics
19     in Deposition Topic Number 9.  That would be 9-a, "The
20     methodology used for the City's determination of the
21     amount of the DWSD's full allocable share of the past,
22     present and future GRS UAAL."  Do you see that, sir?
23  A.  I do, yes.
24  Q.  The next topic is Topic 9-e, "Any pro forma impact on
25     rates and the potential impact of higher rates on

CHARLES MOORE

1
2     wholesale contract renewals."  Do you see that, sir?
3  A.  Yes.
4  Q.  And Topic 9-g, "The use(s) that will be made under the
5     Plan of the 428.5 million to be contributed by the
6     DWSD."  Do you see that?
7  A.  Yes.
8  Q.  Oh, excuse me.  I missed the intervening b, c, and d.
9     I'm not going to read those out loud.  But I misread
10     the notice.  Why don't we just turn to the next page.
11     It says here at the top of the next page,
12     ". . . Mr. Charles Moore to testify on its behalf for
13     the general topic and subtopics (a) through (e) and
14     (g)."  Do you see that?
15  A.  Yes.
16  Q.  Okay.  With that clarification, are you prepared to
17     testify today on Subtopics a through e and g?
18     MR. HAMILTON:  Well, but you left out some
19  of our objections in there, but that's okay.
20     Go ahead and answer the question.
21  A.  Yes.
22  BY MR. NEAL:
23  Q.  Okay.  I'd like to show you what's in Tab 2 of our
24     binder set.  Mr. Moore, I'm going to hand you a
25     document previously marked as Malhotra Number 4.  For

CHARLES MOORE

1
2     the record, Malhotra Number 4 is the City of Detroit's
3     Identification of 30(b)(6) Witnesses in response to
4     Oakland County's Notice of Rule 30(b)(6) Deposition to
5     the City of Detroit.  Direct your attention to Topic
6     Number 1, "All financial projections for DWSD
7     operations through June 30th, 2023."  Do you see that,
8     sir?
9  A.  Yes.
10  Q.  And you're prepared to testify today on that topic?
11  A.  Yes.
12  Q.  Deposition Topic Number 5, "The factual and legal
13     basis for and the assumptions underlying Exhibits L
14     and M to the Plan."  Do you see that, sir?
15  A.  I see that.
16  Q.  And you are prepared to testify today on that topic?
17  A.  If you look at the response, I'm prepared to testify
18     to the factual basis but not the legal basis for the
19     assumptions.
20  Q.  Deposition Topic Number 6, "The factual and legal
21     basis for the Plan proposal for DWSD to pre-fund
22     pension liabilities, including the means by which such
23     pre-funding will be made and the effect on DWSD's
24     operations of such pre-funding."
25     Sir, you've been designated to testify as

CHARLES MOORE

1
2  to the factual basis with respect to this topic?
3  A.  Yes.
4  Q.  And just two more, sir.  Deposition Topic Number 7,
5      "The factual and legal basis to require the DWSD to
6      fund 100 percent of the GRS for fiscal years 2014 to
7      2023."  Do you see that, sir?
8  A.  Yes.
9  Q.  And it appears that this topic has been reworded as
10     follows:  "The factual basis to require the DWSD to
11     fund the UAAL of the GRS for fiscal years 2014 to
12     2023."  And with that rewording, you are designated to
13     testify on this topic?
14 A.  Yes.
15 Q.  Lastly, sir, the very last topic in Malhotra 4,
16     Deposition Topic Number 21, "The City's determination
17     of the size of the PFRS and GRS Pension Claims, and
18     its decision to utilize a 6.75 percent discount rate
19     to value liabilities and a 6.75 percent investment
20     return rate."
21         And you have been designated to testify on
22     the City's behalf with respect to the size of the PFRS
23     and GRS pension claims; is that correct?
24 A.  Yes.
25 Q.  And you're prepared to do so today?

CHARLES MOORE

1
2  A.  Yes.
3  Q.  I'm going to show you what is Tab 3 in our binder set,
4      a document previously marked as Orr Exhibit Number 19.
5      Orr Exhibit Number 19 is Plan Confirmation Factual
6      Propositions.  I believe this was filed on the docket
7      as Docket Number 5704-1.  First, sir, have you seen
8      this document before?
9  A.  I have not.
10 Q.  I'm going to point you to several of these topics.
11     The first one where your name appears is 1-b Romanette
12     iii, "Restructuring and reinvestment initiatives are
13     reasonably expected to lead to a slightly
14     increased" -- let me start again.  "Restructuring and
15     reinvestment initiatives are reasonably expected to
16     lead to slightly increased revenues and decreased
17     expenses over the next ten years."
18         Do you see your name there?
19 A.  I do.
20 Q.  Do you anticipate providing testimony on this issue?
21 A.  Today or at the confirmation hearing?
22 Q.  At the confirmation hearing.
23 A.  I have not been told on which topics that I would be
24     testifying to, but I think it's reasonable to assume
25     that I would be testifying to those topics or to that

CHARLES MOORE

1
2  topic.
3  Q.  Can we make the same assumption with respect to Topic
4      4-f, Page 5 of the document?  4-f, "Restructuring and
5      reinvestment initiatives help the City provide
6      adequate levels of municipal services."
7  A.  There are three sub bullets below that.  Do you want
8      me to just focus on f right now?
9  Q.  Why don't you just read to yourself f-i, Romanette i,
10     Romanette ii, and Romanette iii where your name
11     appears under each.  Excuse me.  I misstated that.
12     It's early in the morning.  F-ii and f-iii.  That's
13     where your name appears.
14 A.  I think it's reasonable to assume that I might be
15     asked to testify to those two items at the
16     confirmation hearing, yes.
17 Q.  Turning to Page 7.  Topic Number 6-c and 6-c
18     Romanette i.  Is it reasonable to assume that you may
19     provide testimony at the confirmation hearing on those
20     topics?
21 A.  It is reasonable to assume that I may provide
22     testimony at the confirmation hearing on 6-c
23     Romanette i.
24 Q.  And moving up, so I don't forget this one, 6-b
25     Romanette iii, "The Plan's distribution percentages

CHARLES MOORE

1
2  should be regarded as lower than calculated based on
3  settlement assumption of 6.75 percent."
4         Is it reasonable to assume that you may
5  provide testimony on this topic?
6  A.  It is reasonable to assume that.
7  Q.  Okay, sir.  I'm going to show you Tab 4 of the binder
8      set, but it was a document that was marked yesterday,
9      and that's your expert report.  Sir, I'm going to hand
10     you what is Moore Exhibit Number 1 from yesterday's
11     deposition.  Ask you to turn to Pages 8 and 9.
12         First, let me ask you what was your
13     understanding of the scope of your engagement related
14     to your expert report?
15 A.  When I was initially engaged, and when I say I, I'm
16     referring to Conway MacKenzie, in January of 2013,
17     there was not a specific scope item that related to
18     preparation of an expert report.  However, as the City
19     filed for Chapter 9 and the Chapter 9 proceeding
20     continued, it became clear to me that the City would
21     like for me to prepare an expert report related to the
22     reinvestment initiatives.
23 Q.  Is that a shorthand way of calling it or do you also
24     call it restructuring and reinvestment initiatives?
25     How do you refer to it?

CHARLES MOORE

1
2  A.  Sure.  In this document, that is essentially a
3      shorthand way of referring to it.  The reinvestment
4      initiatives are a defined term in my expert report.
5      The -- in the Disclosure Statement, the 70-page
6      document is titled "Restructuring and Reinvestment
7      Initiatives," which contain all of the financial
8      information tying into what are referred to here as
9      the reinvestment initiatives.
10 Q.  Do Pages 8 and 9, do they provide a summary of all the
11     opinions that you provide in this expert report?
12 A.  Yes.
13 Q.  Do they provide a summary of all the opinions that you
14     intend to provide as an expert in this case?
15 A.  It is unclear to me if I may be asked to provide
16     additional opinions, but at least as it relates to
17     this report, these are my opinions.
18 Q.  For clarification, sir, are you providing an expert
19     opinion on the City's ten-year projections?
20 A.  Could you define what you mean by ten-year
21     projections?
22 Q.  Well, I'll show you later, but I'm making specific
23     reference to Exhibit M that contains the DWSD ten-year
24     projections.
25 A.  I am not making an expert opinion at this point in

CHARLES MOORE

1
2      this expert report on Exhibit M to the Disclosure
3      Statement, and when I say Disclosure Statement, I'm
4      referring to the Fourth-Amended Disclosure Statement
5      filed May 5th.
6  Q.  Are you providing an expert opinion on the City's
7      40-year projections?
8  A.  Can you clarify what you mean by the 40-year
9      projections?
10 Q.  Certainly.  It may take me a minute to find it.  Sir,
11     rather than hold up the deposition -- oh.  No.  Very
12     good.  Exhibit K to the Disclosure Statement, and I'll
13     just show it to you for purposes of completeness here.
14     Tab F in the binder set.  Sir, I'm going to hand you
15     what has previously been marked as McCormick Exhibit
16     Number 13.
17         MR. ULLMAN:  What tab is that?
18         MR. NEAL:  It's Tab F in the binder set.
19     It's Exhibit K to the Disclosure Statement, Forty-Year
20     Financial Projections.
21 BY MR. NEAL:
22 Q.  And, sir, can you identify this document?
23 A.  This is a document referred to as Plan of Adjustment,
24     40-year projections.
25 Q.  And who prepared this document?

CHARLES MOORE

1
2  A.  This is a document that was prepared by Ernst & Young.
3  Q.  And what involvement did Conway MacKenzie have in the
4      preparation of this document?
5  A.  There are certain line items within the 40-year
6      projections for which Conway MacKenzie provided input
7      in values.
8  Q.  Can you identify those line items?
9  A.  Yes.  The -- Conway MacKenzie had involvement in the
10     PFRS and GRS pension contributions as well as if you
11     look at Page, I believe it's 4 of 9, the print is on
12     top of it, but Exhibit 3-A under the "Revenue" section
13     where it says "Restructuring" near the bottom,
14     "Department Revenue Initiatives," and then down below
15     under "Expenditures," under the "Restructuring"
16     section, "Additional Operating Expenditures," the
17     reorganization and then in parenthetical "Capital
18     Investments, Blight, and Reinvestment Deferrals."
19 Q.  Are you providing any expert opinion with respect to
20     either Exhibit K or any of the numbers contained
21     therein?
22         MR. HAMILTON:  I'm going to object to form.
23         But you can go ahead and answer if you
24     understand the question.
25 A.  As I just went through, the -- there are line items

CHARLES MOORE

1
2      within Exhibit K that tie directly to my expert
3      report.  Within my expert report, I don't have
4      opinions specifically related to the 40-year
5      projections, so at this point I have not been asked to
6      render an expert opinion on the 40-year projections
7      other than what is contained within my expert report.
8  BY MR. NEAL:
9  Q.  Mr. Moore, I'm going to go back to the -- the ten-year
10     projections for DWSD.  Are you providing any opinion
11     testimony with respect to the forecasted revenues and
12     expenses that the DWSD may expect in future years?
13         MR. HAMILTON:  Object to form.
14         You can answer.
15 A.  It's unclear if I will be asked to provide opinion
16     testimony on Exhibit M.
17 BY MR. NEAL:
18 Q.  Are you providing any opinion testimony at all with
19     respect to the DWSD?
20         MR. HAMILTON:  Object to form.
21         You can answer.
22 A.  Again, it's unclear if I will be asked to provide any
23     opinion testimony to Exhibit M.
24 BY MR. NEAL:
25 Q.  Is there anything in Moore Exhibit Number 1, your

CHARLES MOORE

1
2    expert report, that provides an opinion with respect
3    to any matters related to the DWSD?
4    A.   No, sir.
5    Q.   My understanding is that Conway MacKenzie was engaged
6         around the January 2013 time period; is that correct?
7    A.   That's correct.
8    Q.   And what was Conway MacKenzie hired to do with respect
9         to the DWSD?
10   A.   First of all, to clarify, Conway MacKenzie was engaged
11        by the City of Detroit, I think it was implied in what
12        you said but just to be clear, and Conway MacKenzie
13        was engaged to be the operational restructuring
14        advisor to the City.  The initial activity that Conway
15        MacKenzie was asked to perform related to DWSD began
16        in about July of 2013, and that was to assist in the
17        development of ten-year projections for the water and
18        sewer funds.
19   Q.   Okay.  So between the time period of January 2013 and
20        the end of June of 2013, what -- what was Conway
21        MacKenzie asked to do or what did -- let me rephrase
22        it.  What did Conway MacKenzie do with respect to the
23        DWSD?
24   A.   Again, just to clarify, from January of 2013 until
25        July of 2013?

CHARLES MOORE

1
2    Q.   Yes.
3    A.   Very little, if any, activity related to DWSD.
4    Q.   So starting in the July 2013 time frame, you said that
5         you were asked to assist in the development of
6         ten-year projections for the water and sewer funds; is
7         that right?
8    A.   Yes.
9    Q.   And who asked you to provide that assistance?
10   A.   The Emergency Manager.
11   Q.   Do you recall specifically what he asked you to do?
12   A.   This was in conjunction with activities being
13        undertaken by Miller Buckfire, and there were thoughts
14        about potential alternatives for DWSD, and to
15        facilitate pursuing those alternatives, there was a
16        need -- it was identified that there was a need for
17        ten-year financial projections for the water and sewer
18        funds, and so Conway MacKenzie was specifically to
19        assist in the development of those financial
20        projections for use in pursuing various alternatives.
21   Q.   What were those alternatives?
22   A.   As I understood it at that time, the alternatives
23        could include formation of a regional authority, a
24        transaction with a third party or a separate private
25        party, or no transaction or no changes at all.

CHARLES MOORE

1
2    Q.   At this time was the City -- is it your understanding
3         that the City was looking for ways to monetize the
4         DWSD?
5    A.   I have heard that word used a number of times
6         throughout the 18 months that I've been engaged by the
7         City.  I can't recall specifically when I would have
8         heard that the first time, if that was before July of
9         2013 or after.
10   Q.   Do you recall the context in which the word "monetize"
11        or "monetization" was used?
12   A.   Generally I recall it being used in the context of
13        figuring out ways to potentially create value or
14        realize value on an asset of the City.
15   Q.   And that value would be created or realized for whom?
16   A.   Well, in the context of a transaction, that value
17        could potentially, and I underscore the word
18        "potentially," benefit the general fund of the City of
19        Detroit.
20   Q.   And a transaction could include a regional authority
21        or a third party sale or Operating Agreement?
22   A.   Yes.  Possibly.  There are other benefits that could
23        be realized from a transaction as well.  The general
24        fund of the City is one example.  The DWSD itself
25        could also benefit.  And then there could be other

CHARLES MOORE

1
2    beneficiaries as well from different types of
3    transactions.
4    Q.   So that we're speaking the same language, when you say
5         a transaction, a transaction could include an
6         authority, a sale, or an Operating Agreement?
7    A.   Yes.  That's what I'm referring to when I say
8         transaction.
9    Q.   Not just an authority?
10   A.   Correct.
11   Q.   Okay.  When you started this process in July of 2013,
12        was there a particular dollar amount you were looking
13        for out of the DWSD?
14            MR. HAMILTON:  Object to form.
15            You can answer.
16   A.   When you say a dollar amount that we were looking for
17        out of DWSD, can you clarify that?
18   BY MR. NEAL:
19   Q.   Sure.  Were you looking for a certain dollar amount in
20        the form of a -- of a lease payment, transaction
21        payment, a PILOT payment?
22   A.   No.
23   Q.   So there was no dollar amount in mind?
24   A.   Correct.
25   Q.   But going back over different ways to -- what are the

6 (Pages 256 to 259)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 7 of 39

CHARLES MOORE

1 
2 different ways in which to realize value? Would it
3 be -- a lease payment would be one of them?
4 A. Certainly. And since I'm not the investment banker on
5 the engagement, I can list out some areas that I have
6 been made aware of, but I'm sure that my listing is
7 not going to be complete or all-inclusive. The lease
8 payment that you just referred to to the extent that
9 that lease payment benefits DWSD or -- and/or the
10 general fund of the City, that could certainly be a
11 benefit. And if you could repeat the question just so
12 I make sure that I answer any other --
13 Q. Sure. I appreciate that. I will move on. Sticking
14 with the lease payment for now, how does that provide
15 any benefit to the DWSD?
16 A. Well, to the extent that there is a lease payment made
17 and a portion of those lease payments or lease
18 proceeds go to DWSD, presumably that would be a
19 benefit for DWSD, but it would all have to depend on
20 what the other terms and conditions surrounding the
21 lease payment are.
22 Q. The lease payment would go from -- would not go to
23 DWSD, would it?
24 A. We're talking about a hypothetical here. A lease
25 payment -- and I have no idea what different types of

CHARLES MOORE

1 
2 transactions there could be.
3 Q. Okay.
4 A. So I'm -- my point is is that I can't exclude a
5 scenario whereby some portion of a lease payment could
6 either be retained with DWSD or somehow otherwise
7 benefit DWSD.
8 Q. At any time did Conway MacKenzie explore or evaluate a
9 PILOT payment?
10 A. Could you explain what you mean by explore or
11 evaluate?
12 Q. Are you familiar with what a PILOT payment is?
13 A. Yes.
14 Q. And that would be a payment in lieu of taxes; correct?
15 A. Yes.
16 Q. And the purpose of a -- of structuring a PILOT payment
17 is to make up for lost tax revenue; correct?
18 A. Yes.
19 Q. Did you look into structuring any type of transaction
20 that would result in a PILOT payment?
21 A. Subsequent to the activities that we're talking about
22 here, I had some involvement in discussions with the
23 counties, as they're commonly referred to, the
24 surrounding county -- counties, and in those
25 discussions, certainly there were discussions

CHARLES MOORE

1 
2 surrounding specific lease payments, and at that point
3 I was involved in discussions that constituted amounts
4 of a lease payment, but not at this time that we're
5 referring to in the July 2013 time period.
6 Q. Okay. Sticking with the July 2013 time period, what
7 exactly were you doing with respect to DWSD?
8 A. As I mentioned before, specifically developing a
9 ten-year or assisting in the development of a 10-Year
10 Business Plan, ten-year set of financial projections
11 for the water and sewer funds, so that -- those
12 activities were being undertaken without regard to
13 what transaction alternatives would be pursued or
14 considered.
15 Q. Who were you working with at the DWSD in connection
16 with this effort to put together and develop a
17 ten-year business plan and a ten-year set of
18 financials?
19 A. There were four primary individuals. However, there
20 were a significant number of other people that were
21 interacted with, but the four primary individuals were
22 Sue McCormick, Nickie Bateson, Bill Wolfson, and then
23 Bart Foster. I include Bart Foster even though he's
24 not an employee of DWSD.
25 Q. And who were your primary team members on the Conway

CHARLES MOORE

1 
2 MacKenzie side?
3 A. Sure. I had two colleagues of mine that were very
4 actively involved in this process. Mike Hausman,
5 Hausman, and Wade Johnston, J-o-h-n-s-t-o-n.
6 Q. Mr. Moore, can you describe generally the process by
7 which you put together these financials? In other
8 words, how long did it take? How many meetings were
9 held? Just big picture, what was the process in
10 putting together the ten-year business plan and
11 financials?
12 A. Sure. It followed the process that we would normally
13 undertake for pretty much any organization in terms of
14 developing longer term financial projections, and in
15 no particular order and certainly not listing every
16 activity that would have been undertaken, first
17 seeking to understand historical financial
18 information, a significant number of meetings and
19 interviews with management itself, understanding how
20 the operation is being handled or -- or how it's being
21 operated today as well as various factors that may
22 impact its operation in the future, understanding in
23 this case previous activities that had been explored,
24 as an example, operational studies that were conducted
25 as to potential operational savings that could be

7 (Pages 260 to 263)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 8 of 39

CHARLES MOORE

1                 CHARLES MOORE
2 realized, management's own plans, their financial
3 projections that existed at that time, the changes
4 from the standpoint of the litigation that had been
5 dismissed, however, focal points of that that were
6 being implemented by the management team. And all of
7 that took place from approximately mid July until the
8 end of September, so I believe that we completed the
9 ten-year financial projection on or around
10 September 30th of 2013.
11       Just one further point. We certainly
12 interacted with other advisors as well. Other
13 advisors include, number one, there was an engineering
14 group specifically tasked with developing the capital
15 improvement plan during that ten-year period, OHM
16 Advisors. And then we also interacted with Miller
17 Buckfire and the Emergency Manager and his staff.
18 Q. How is Miller Buckfire's role distinct from the role
19   of Conway MacKenzie?
20 A. Miller Buckfire as the investment banker for the City
21   was specifically looking at transaction alternatives
22   or ways to harness value, those are my words, not
23   their words, out of DWSD, and in order to do that,
24   Miller Buckfire needs good financial information.
25   The -- DWSD had some amount of financial projections

1                 CHARLES MOORE
2   when we were asked to take on the task, but they only
3   went out a few years, and they were not developed in
4   the type of format that an investment banker typically
5   would be looking for. That was one of the reasons why
6   we were tasked with that activity. So getting into
7   the details of developing these ten-year projections
8   is something that is more our forte than say a -- an
9   investment banker.
10 Q. To your knowledge, had DWSD ever prepared a set of
11   ten-year business plan and -- let me restart.
12       To your knowledge, had DWSD ever prepared a
13   ten-year business plan or set of projections?
14 A. I don't know.
15 Q. Did they have a five-year set of projections when you
16   started this project?
17 A. I believe that's the duration of the projections that
18   existed at the time that we began our process.
19 Q. And can you describe your personal level of
20   involvement between this July, August, and September
21   time frame?
22 A. Yes. Mike Hausman, a managing director with Conway
23   MacKenzie, was the point person with Wade Johnston
24   assisting him, and I probably had at least ten
25   conversations with Mr. Hausman and Mr. Johnston during

1                 CHARLES MOORE
2   that time period from July through September. The
3   conversations would have revolved around number --
4   early on in the process the information and the
5   approach that they were using, followed by the
6   observations of the information that they had
7   reviewed, the cooperation that they were receiving.
8   We had been instructed to complete the projections by
9   the end of September, and so I certainly was focused
10   in on making sure that we were on track to deliver
11   what we were asked to do. I had a pretty significant
12   amount of involvement as it relates to how some of the
13   legacy costs would be handled in the projections, and
14   then I queried Mr. Hausman and Mr. Johnston on several
15   of the assumptions that underlie various line items in
16   the projections.
17 Q. Had you ever prepared a business plan for a water or
18   sewer district before?
19 A. Over the last 20 years, I have worked on well over a
20   hundred financial projections, so I can't say if I've
21   worked on specifically water or sewer operations or
22   not. I have been involved with developing projections
23   for municipalities. I just can't recall if they would
24   have included water or sewer operations or not.
25 Q. Do you know if either Mr. Hausman or Mr. Johnston had

1                 CHARLES MOORE
2   ever prepared a business plan before for a water or a
3   sewer district?
4 A. I don't know.
5 Q. I'm going to show you what is Tab Number 6 in our
6   binder set. Mr. Moore, this has previously been
7   marked as Orr Exhibit Number 10. Orr Exhibit
8   Number 10 is Detroit Water and Sewer Department
9   10-Year Business Plan dated October 2nd, 2013. Sir,
10   have you seen this document before?
11 A. Yes.
12 Q. And is this the --
13       MR. NEAL: Whoever's on the phone, if you
14   could go on mute, that would be great.
15 BY MR. NEAL:
16 Q. Is this the final version of the Detroit Water and
17   Sewer Department 10-Year Business Plan that you and
18   your team prepared?
19 A. When you say final version, I just want to clarify.
20   This was final as of this point. Exhibit M to the
21   Disclosure Statement has certain updates to the
22   10-Year Business Plan. But yes, this is the -- the
23   final that was presented to a number of parties on
24   October 2nd.
25 Q. And who was it presented to?

CHARLES MOORE

1
2 A. There were probably 40 or more people in the room
3     where this was presented, but that would have included
4     representatives of at least Wayne, Oakland, and Macomb
5     Counties and various advisors of theirs. There may
6     have been other people involved as well, other
7     external parties to whom this was presented.
8 Q. Were you involved in negotiations with the counties
9     prior to October 2nd, 2013?
10 A. No.
11 Q. Do you know if the City had been involved in
12     negotiations with the counties between the time of its
13     Chapter 9 bankruptcy filing July 18th and August 2nd
14     of 2013?
15 A. When you say the City, are you including its advisors?
16 Q. Yes, sir.
17 A. It is unclear to me what conversations, if any, may
18     have taken place with the counties prior to this time.
19 Q. And what was the purpose of the meeting?
20 A. To present two documents. One was the business plan.
21     I think actually we may have used a shortened version
22     of it for the actual presentation, but we would have
23     distributed this full document. And the other
24     document was a -- a document prepared by Miller
25     Buckfire which utilized quite a bit of the information

CHARLES MOORE

1
2     in the business plan but talked a little bit more
3     about the basis for a proposed lease payment.
4 Q. Mr. Moore, I'm going to show you what is Tab 7 of the
5     binder set previously marked, twice. One is Orr
6     Exhibit 9 and McCormick Exhibit 30. Sir, can you
7     identify the document I just handed you?
8 A. This appears to be that second document that I was
9     referring to that was prepared by Miller Buckfire that
10     was also discussed at the October 2nd meeting.
11 Q. If we could go back to Orr Number 10, your firm's
12     10-Year Business Plan. If I could ask you to turn to
13     Page 40 of that document.
14 A. This is Bates stamp 70 -- ending 7084?
15 Q. Yes, sir.
16 A. Yes. I'm there.
17 Q. Actually going back one page to Page 39. It's
18     Section VII, "Estimated Cost Savings"; is that
19     correct?
20 A. Yes.
21 Q. So you and your team prepared a section in this report
22     on the estimated cost savings that would be realized
23     in the event of a transaction?
24 A. Yes. This section was prepared based on certain
25     assumptions as it relates to how these costs

CHARLES MOORE

1
2     associated with the line items that you see there
3     would be addressed.
4 Q. And they may appear elsewhere, sir, but at least I can
5     spot those assumptions on Pages 6 and 7 of the
6     document. Is that where some of them at least reside?
7 A. Yes. It does appear multiple places throughout the
8     document, and specifically on Page 7 the assumption --
9     the individual assumption that I'm referring to is the
10     second bullet under "Lease Payment," "Anticipated
11     savings that have been factored into the lease payment
12     include legacy liabilities retained by the City of
13     Detroit . . ." And so what this is specifically
14     getting at or what I was referring to in my comment
15     earlier is the assumption about how certain costs
16     would be handled as part of a -- assumed to be handled
17     as part of a transaction.
18 Q. So going back to Page 40.
19 A. Yes.
20 Q. The table here based on bullet point one represents a
21     summary of the estimated payment and expense
22     reductions including legacy and debt service savings?
23 A. Yes.
24 Q. Do they include any operational savings?
25 A. Yes.

CHARLES MOORE

1
2 Q. Where are they?
3 A. The line item that is entitled "Optimization" are
4     operational -- projected operational savings.
5 Q. And how are those numbers determined? In other words,
6     what did you look at? Who did you talk to?
7 A. Sure. We spent a significant amount of time with the
8     management team. We also reviewed the report that had
9     been prepared by an outfit within perhaps the two
10     years or so before we performed our work, and if I
11     recall correctly, I think that was EMA --
12 Q. Yes.
13 A. -- was the name of the firm. And that contained a
14     number of operational savings. So between discussing
15     with management what was possible, looking at various
16     trends in the expenses, understanding how the system
17     was anticipated to be operated in the future, as well
18     as benchmarking that against, at a minimum, the EMA
19     information, there were a number of cost savings
20     primarily related to labor that were built into the
21     business plan. What you see here are actually only
22     50 percent of those. So there were certain labor --
23     or I'll call it optimization savings identified in
24     total, and then as it relates to this specific table,
25     only 50 percent of those are included here.

CHARLES MOORE

Q. And why only 50 percent?

A. If I recall correctly, this is based on -- this -- this was based on a specific lease scenario, and the underlying thinking was you would want the management team to be incentivized to deliver on these savings, and having the system retain some portion of the benefit, which here 50 percent is used, is a way of providing management that incentive.

Q. There is a line item here on Page 40 for debt service savings. Do you see that?

A. Yes.

Q. And there's also a section in your report, that's Section 10 starting on Page 51, that concerns debt service.

A. Yes.

Q. So how did you arrive at the debt service savings?

A. This actually is all based on information that was provided by Miller Buckfire, so Conway MacKenzie did not do anything as it relates to calculation of the potential savings that you're referring to for debt service.

Q. So going back to Page 40, the bottom line in the chart is for the -- says "Lease Payment"; right?

A. Yes.

CHARLES MOORE

Q. So at this time on October 2nd, 2013, it was contemplated that the lease payment would be determined by the total cost savings that DWSD would experience if there were a transaction?

A. I would characterize it a little bit differently. This is really providing a basis for how this level of lease payment could be supported, but the lease payment itself would be a payment for a number of factors, including a transfer of control.

Q. At this time was there any consideration by the City and its professional advisors to keep the savings within the systems?

A. Well, I just went through right now under this -- this page here --

Q. Yes.

A. -- 50 percent of the optimization of what is referred to as the operational savings are being retained in the system.

Q. And what would that total be? Is it reflected in the -- 

A. It is not reflected in this chart here. But if you -- if -- if you add up all of those rows, we don't have a total here on the far right, --

Q. Sure.

CHARLES MOORE

A. -- but if you were to add -- if you were to add up the water and the sewer system amounts, that same amount in total is being retained by the system.

Q. Any other savings being retained by the system?

A. Well, what's not contemplated in here is additional savings that could result as a result of a different management approach. So perhaps if there was a regional authority or perhaps as a result of a private operator, there could be additional savings that could be realized that would be retained by the system.

Q. Was any analysis undertaken to determine the amount of those additional savings if there were a change in management?

A. No. We typically would stay away from something like that because those aren't our assumptions to make. Obviously it would depend on who that other party is and the approach that they would take.

Q. Was there ever a time when the lease payment that was being proposed was not tied to anticipated cost savings?

MR. HAMILTON: I'm going to object because of the way you've worded that question. I have to instruct the witness not to answer to the extent his answer would disclose anything that was discussed or

CHARLES MOORE

done in connection with court-ordered mediation.

But putting -- if you can answer the question with respect to anything that was considered outside of the mediation, you should do so.

THE WITNESS: Understood.

A. I want to -- Mr. Neal, if I can clarify.

BY MR. NEAL:

Q. Sure.

A. Because I think your question is different than what I had responded to before. I think your question was is there a time that the lease payment was not tied to cost savings. As I indicated before, what is really shown here is how a lease payment could be supported because of these cost savings, but the lease payment itself has not been specifically tied to the actual cost savings. So there have been times that the lease payment that has been discussed has varied, but in each of those instances the cost savings are more to show how a lease payment could be supported rather than the basis for the lease payment.

Q. Thank you. At this time was the City asking for a lease payment in the amount reflected here on Page 40, that is, 94.2 million in 2015 going all the way up to 228.5, I believe, million in 2023?

CHARLES MOORE

1
2  A. I believe that's what was being requested. This --
3  this is sort of the transition point from the work
4  that Conway MacKenzie was doing to then getting into
5  the investment banker approach that Miller Buckfire
6  used.
7  Q. What was the county's reaction to the -- can I call
8  this a proposal, sir? Would you characterize this as
9  a proposal?
10 A. When you say this, can you clarify what this is?
11 Q. Yes. Or Exhibit 10, your 10-Year Business Plan and
12 the lease payment reflected on Page 40.
13 A. The document itself is just the business plan. It
14 contains information about a potential lease payment.
15 I don't know if the word "proposal" is used in here.
16 From Conway MacKenzie's standpoint, we were not
17 developing a business plan for a specific proposal.
18 The output of our work, I believe, was generally used
19 to make various proposals. But I don't -- I would not
20 consider this a proposal. I don't know if that word
21 is used anywhere in this document.
22 Q. What was the county's reaction to the 10-Year Business
23 Plan as reflected in Orr Exhibit 10?
24 A. Can you clarify what you mean by their reaction?
25 Q. Sure. I will be a little more focused. What was

CHARLES MOORE

1
2  their reaction to the estimated cost savings that are
3  reflected in Orr Exhibit 10?
4  A. Well, I don't know specifically what the reaction is,
5  but what I can tell you is that as a result of this
6  meeting, actually the -- I don't know if it was a
7  consortium of the counties or one county in
8  particular, but an accounting firm by the name of UHY
9  was engaged. They -- by the county or counties. They
10 attended this meeting and then subsequent to this
11 meeting undertook a variety of due diligence efforts
12 through which we provided them additional information.
13 And that transpired over the period of, if I recall
14 correctly, the month of October, maybe into early
15 November.
16 Q. And did you have any direct interaction with this
17 accounting firm during this time period?
18 A. I personally did not. I have interacted with an
19 individual that I believe oversaw the team for UHY,
20 but not in detail, more just acknowledging that they
21 were undertaking efforts, due diligence efforts, but
22 Mr. Hausman and Mr. Johnston interacted with them
23 quite a bit.
24 Q. Let me state it a different way. Did the counties
25 agree with the calculations reflected on Page 40? Did

CHARLES MOORE

1
2  they agree with your estimated cost savings for each
3  of the years from 2015 to 2023?
4  A. I don't know if they agreed with them or not. I know
5  that a transaction at least at this point hasn't
6  gotten done.
7  Q. But you don't know if the counties or their
8  representatives had a view or opinion with respect to
9  your calculation of the estimated cost savings at this
10 time?
11 A. Well, when you say at this time, are you referring to
12 just October 2nd or following October 2nd?
13 Q. Well, I know there was a tremendous amount of
14 activity. If it -- if you can answer the question in
15 the October, November, December time frame.
16 A. Yes. So what I do recall is a fair amount of
17 correspondence from one county in particular, Oakland
18 County, from Mr. Daddow indicating various questions
19 and views on these two documents, the two documents
20 that we previously discussed that were presented on
21 October 2nd, 2013.
22 Q. And do you recall whether Oakland agreed or disagreed
23 with the cost savings estimates as reflected on Page
24 40 of Orr 10?
25 A. Well, rather than speculate on whether they agree or

CHARLES MOORE

1
2  disagree, I would let the communications from the
3  county or counties speak for themselves.
4  Q. Is it fair to say there was a -- that Oakland County
5  disagreed with the cost savings summary that you
6  prepared?
7     MR. HAMILTON: Can you put a time period on
8  that question or do I have to object again?
9     MR. NEAL: I'm happy to put a time frame on
10 it.
11 BY MR. NEAL:
12 Q. And that's in the October, November, December time
13 frame.
14 A. What I seem to recall is that there were -- there was
15 not necessarily a good understanding of a number of
16 the calculations. I think that lack of understanding
17 perhaps caused them to not agree, but at the same
18 time -- and -- and there are a variety of -- obviously
19 there's a lot of information here, so I'm using a very
20 general statement. I think that a significant amount
21 of information was provided on areas where there may
22 not have been a good understanding and -- and the
23 perception as a result that they didn't agree. I am
24 aware also of, and this is information that was very
25 commonly reported on in the -- in the press, their

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 12 of 39

CHARLES MOORE

1
2 differing views on the amount of capital improvement
3 that was required. So I -- that's the information
4 that was coming my way.
5 Q. During this time period did you ever receive emails
6 directly or copies of emails from Robert Daddow of
7 Oakland County?
8 A. Yes.
9 Q. And did you ever respond to emails that -- that he
10 sent to your team about your estimate of the cost
11 savings?
12 A. Specifically between October and December, I recall
13 one response in particular that we, we being Conway
14 MacKenzie, had significant involvement in terms of
15 providing information for the response, help --
16 helping to draft the response. I don't recall how
17 many communications there were from Mr. Daddow during
18 that October through December time period beyond I
19 think it was the initial communication from
20 Mr. Daddow, the reply to which I was just referring to
21 where we had pretty significant involvement. I don't
22 know if we provided significant input on any other
23 responses. We were not, when I say we again, Conway
24 MacKenzie, was not the primary point for
25 communications with the counties. That was Miller

CHARLES MOORE

1
2 Buckfire.
3 Q. Last question along these lines and I'll move on. In
4 the October through December time period, did you have
5 meetings with Oakland County? You being you,
6 Mr. Moore, not the broader group. But, I mean, did
7 you have any meetings with Oakland County in this time
8 period?
9 A. I've -- we've covered the October 2nd meeting.
10 Q. Yes.
11 A. Following the October 2nd meeting, the following week
12 was a comprehensive mediation day, and counsel will
13 stop me if I'm going too far on this, I don't think
14 this is, but at the beginning of the mediation day
15 Conway MacKenzie presented information that we have
16 here, again, these documents, to all of the parties
17 involved in the mediation, and I believe the counties
18 were there then. I'm not positive about that, but I
19 think the counties were there then. After that time,
20 through the end of December, I don't -- I don't
21 believe that I met with anyone else from the counties.
22 There was a time that I had a sit-down discussion with
23 Brooks Patterson, the Oakland County Executive. I
24 can't recall when exactly that was. But we did -- we
25 did discuss the -- the process that was being

CHARLES MOORE

1
2 undertaken. That may have been before the end of
3 December. I don't recall.
4 Q. What was your understanding of the City's motivation
5 for pursuing a proposed authority?
6 A. There could have been multiple reasons for it.
7 Certainly one that was -- or I should say two primary
8 items that I believe that I heard mentioned multiple
9 times was positioning DWSD as a stronger entity and
10 realizing value from DWSD.
11 Q. Are those two motivations or one?
12 A. Two.
13 Q. Okay. So the first would be positioning DWSD as a
14 stronger entity, and the second would be -- if you
15 could say it again.
16 A. Sure. Realizing value. I think that's what I said.
17 Q. Okay. And how would an authority position DWSD as a
18 stronger entity?
19 A. Well, to the extent that you have stronger management,
20 that could potentially strengthen it. To the extent
21 that the cost structure is different, that could
22 position it as a stronger entity. There are a variety
23 of -- of ways that the -- the management and operation
24 of the entity could potentially be improved through
25 some sort of transaction.

CHARLES MOORE

1
2 Q. Was one of the reasons to pursue an authority to
3 obtain a better credit rating for the systems?
4 A. Certainly I heard that numerous times. The general
5 belief that DWSD was tainted to a certain extent by
6 its association with the City of Detroit and on a
7 standalone basis may be a stronger rated credit.
8 Q. And was it the belief that if the authority would be a
9 stronger rated credit, that it would be able to obtain
10 lower financing costs?
11 MR. HAMILTON: Object to form.
12 You can answer.
13 A. That was the assumption, yes.
14 BY MR. NEAL:
15 Q. And that would lead to debt service savings?
16 A. Presumably, yes.
17 Q. And that was the assumption of the Emergency Manager
18 and his professional advisors?
19 A. Yes. And that is what is essentially contained,
20 although Conway MacKenzie did not develop that when we
21 were discussing before on Page 40 of this October 2nd
22 document the debt savings or debt service savings.
23 That was the underlying principle there.
24 Q. Did Conway MacKenzie perform any analysis with respect
25 to debt service savings as they related to the -- the

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 13 of
39

CHARLES MOORE

1
2  DWSD at any time?
3  A.  No.
4  Q.  Conway MacKenzie relied upon the work of Miller
5      Buckfire and others?
6  A.  Yes.
7  Q.  Okay.  Was the proposed lease payment to the City
8      presented as something that would be user rate neutral
9      to the counties?
10  A.  I don't know about the word "user," but certainly we
11      used multiple times the words "rate neutral."
12      Management views rate increases of four percent per
13      year to be what is referred to as rate neutral, and
14      that is -- other than two years for the water fund,
15      within this ten-year projection, those are the implied
16      rate increases every year.
17  Q.  So if the lease payment did not require rates to be
18      raised higher than four percent a year, it would be
19      considered rate neutral?
20  A.  I think that's a fair statement.
21  Q.  Okay.  Was there a general agreement among the
22      Emergency Manager and his professional advisors that
23      in the absence of the regional authority that DWSD's
24      financing costs would be higher?
25  A.  Higher than what?

CHARLES MOORE

1
2  Q.  Higher than what they would be if an authority were
3      created.
4  A.  I'm not sure that I understood your question.  It
5      seems like what we just talked about, which is --
6  Q.  It's the inverse of that.
7  A.  Yes.  Yes.  If it's the inverse of it, then yes.  If
8      there are savings with an authority, then as compared
9      to the authority, it would be higher.
10  Q.  Going back to Page 40 of Orr Exhibit 10.  The lease
11      payment that's reflected there.  How would these funds
12      be used by the City as proposed?
13  A.  There's -- there's no proposal as to how these funds
14      would be used, and I know Conway MacKenzie never took
15      a position as it relates to this document as to how
16      those proceeds would be used.
17  Q.  Let me ask it a little differently.  The answer may
18      very well be the same.  At -- during this time period,
19      were you plugging in any revenue stream from DWSD into
20      any of your models that Conway MacKenzie was
21      preparing, for instance, the restructuring or
22      reinvestment initiatives?
23          MR. HAMILTON:  I'm going to object to the
24      form of that question.  He's already testified they --
25      if you say the models, that includes the ten-year

CHARLES MOORE

1
2      projections they were working on for DWSD, and I don't
3      think you intend to do that in your question, do you?
4          MR. NEAL:  No.  I can be more specific.
5  BY MR. NEAL:
6  Q.  Let me ask the question more broadly.  Were you
7      looking to fill a hole at all with this lease payment
8      with respect to any of the operations of the City's
9      general fund or any proposed Plan of Adjustment that
10      was being contemplated at the time?
11  A.  As it relates to what's referred to as the
12      restructuring and reinvestments, this -- in the
13      Disclosure Statement, the 70-page document, it's
14      Exhibit 5 in my expert report, --
15  Q.  Yes.
16  A.  -- there never has been and there still is not any
17      cash from DWSD that plays a role in that.  As it
18      relates to the City's overall projections, as an
19      example, what you referred to before, the 40-year
20      projections or the ten-year projections, certainly
21      from time to time throughout this entire process there
22      have been funds that come from DWSD.  In the ordinary
23      course, there are funds that come from DWSD as an
24      allocation of costs for services that are provided by
25      the City.  Scenarios that involve changes to cost

CHARLES MOORE

1
2      reimbursement certainly have been looked at throughout
3      this entire process.
4  Q.  Other than legacy liability costs, at any time did you
5      consider a dollar amount that the City would or should
6      obtain from the DWSD?
7  A.  The only reason I'm hesitating here is I want to make
8      sure that I don't run into any issues with the
9      mediation.  I think I can -- I think I can answer the
10      question yes.  I'm not sure if I can go further than
11      that.
12  Q.  Well, let me see if you can answer the question if I
13      restrict the time period.  Leading up to the filing of
14      the Fourth-Amended Plan of Adjustment on May 5th,
15      2014, was the City at any time looking to obtain a
16      certain dollar amount from DWSD aside from the legacy
17      obligations to help fund its plan?
18          MR. HAMILTON:  Again, I'm going to have to
19      object and instruct the witness not to disclose
20      anything that was considered in connection with
21      court-ordered mediation.
22  A.  So we've already discussed the October 2nd document,
23      and this contains a lease payment, specific amounts.
24  BY MR. NEAL:
25  Q.  Yes.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

CHARLES MOORE

1
2  A.  Subsequent to that, there were discussions around a
3  specific lease payment.
4  Q.  Yes.
5  A.  And I'm referring to in the January time period,
6  January and February time period.  After that, I
7  really did not have any discussions with DWSD -- or
8  I'm sorry, with -- with the counties, that is, from
9  about early March on.  I think mediation was ordered
10  in April.  So I can speak to what was discussed in the
11  January and February time period, but that's probably
12  it.
13  Q.  Mr. Moore, that's very fair, and I'll show you a
14  couple of the presentations that you prepared in that
15  time period, and we'll deal with them in due course.
16  A.  Okay.
17          MR. HAMILTON:  Before we do that, can we
18  take a break?
19          MR. NEAL:  Yes.  Now would be a good time.
20          VIDEO TECHNICIAN:  The time is 10:14 a.m.
21  We are now off the record.
22          (Recess taken at 10:14 a.m.)
23          (Back on the record at 10:26 a.m.)
24  BY MR. NEAL:
25  Q.  Mr. Moore, I'm going to show you what is Tab 22 in our

CHARLES MOORE

1
2  binder set.
3          MR. NEAL:  If I could have this marked.  I
4  don't know where we are in terms of exhibit numbers.
5  Are we continuing with the numbering scheme from
6  yesterday?  Do we know which number we left off on
7  yesterday?  Can anyone provide assistance?  I think we
8  went through Number 7 yesterday I'm told.  So if were
9  could mark this as Number 8.  This will be Moore
10  Number 8.
11          MARKED BY THE REPORTER:
12          DEPOSITION EXHIBIT 8
13          10:27 a.m.
14          MS. QUADROZZI:  And I'm sorry.  What tab is
15  this?
16          MR. NEAL:  Tab 22.
17  BY MR. NEAL:
18  Q.  Mr. Moore, if you could take a moment and familiarize
19  yourself with this document.  It purports to be an
20  email from Kevin Haggard dated Monday, October 21,
21  2013, to Bob Daddow and you are cc'd it appears.
22  A.  Yes.
23  Q.  Mr. Moore, have you seen this -- these email exchanges
24  before?
25  A.  I don't specifically recall the email at the top here

CHARLES MOORE

1
2  from Mr. Haggard on which I'm copied.  Obviously you
3  can imagine I have thousands of emails related to the
4  City.  But certainly the document that's attached
5  here, Conway/Miller Buckfire Response, that's what I
6  was referring to either -- earlier as it relates to
7  something that my team and I provided a significant
8  amount of input to.
9  Q.  Do you recall seeing, independently of any email
10  chain, the email from Robert Daddow to Ken Buckfire
11  that's at the bottom of Page 1 and continues on to
12  Pages 2, 3, and 4?
13  A.  Actually that's the one that I don't recall
14  specifically.  I know that I'm not on that email.  But
15  it is part of Kevin's email.  So I just don't -- I
16  don't recall reviewing that one from Bob Daddow to Ken
17  Buckfire.
18  Q.  Do you ever recall Mr. Daddow or anyone from Oakland
19  claiming that all the purported savings of the
20  proposed new authority are going to the City and no
21  benefits are going to the DWSD or words to that
22  effect?
23  A.  I generally -- I generally recall him saying something
24  like that, yes.  Or reading something where he had put
25  that in.

CHARLES MOORE

1
2  Q.  And do you agree or disagree with that position?
3  A.  I disagree with that.
4  Q.  On what basis?
5  A.  Well, I specifically pointed out before the
6  optimization savings, 50 percent of those were staying
7  with the system, not to mention what I indicated
8  before.  What we did not do is we did not incorporate
9  in with the projections any other potential savings
10  that could be realized as a result of a different
11  management team, a different approach to the
12  operation.
13  Q.  So focusing on the attachment, the caption is "City of
14  Detroit:  DWSD, Oakland County Business Issues Memo,
15  Conway/Miller Buckfire Response, October 18th, 2013."
16  Do you see that?
17  A.  Yes.
18  Q.  And this is a document you recall working on?
19  A.  Yes.
20  Q.  I see that it's broken down between the Miller
21  Buckfire response and the Conway MacKenzie comments.
22  Do you see that?
23  A.  Yes.
24  Q.  Did you provide any input with respect to the Miller
25  Buckfire response?

14 (Pages 288 to 291)

CHARLES MOORE

1
2  A. I don't recall. It's very possible, yes. We -- we
3     both would have prepared responses and then reviewed
4     each other's work, if I recall correctly, to provide
5     any comments for additional clarifications.
6  Q. Thank you. I'm going to show you what is in Tab 24 of
7     our binder set. This is a document previously marked
8     as Orr Number 13. My first question, sir, is, have
9     you seen this document before?
10 A. Yes.
11 Q. Did Conway MacKenzie provide any input with respect to
12    this document?
13 A. No.
14 Q. And for the record, it purports to be an analysis of
15    DWSD's savings dated December 2013. So when I asked
16    you if you'd seen it before, had you seen it at or
17    about the time this document was prepared?
18 A. I saw it after it was prepared.
19 Q. In what context? At a meeting?
20 A. I believe that I received it directly from Miller
21    Buckfire, I can't recall who from Miller Buckfire,
22    after it had been presented to, at a minimum, Oakland
23    County. I'm not sure if any other counties received
24    it.
25 Q. If you'd turn to Page 3. I'm not sure if you can

CHARLES MOORE

1
2     provide an answer to my questions, but let me take a
3     stab at it. You see the chart -- well, I don't know
4     what you would call it. On Page 3. You're on Page 3,
5     sir?
6  A. Yes, I am.
7  Q. And Page 3 is captioned "Use of Savings"; correct?
8     And it's broken down between the City and the
9     counties; correct?
10 A. Yes.
11 Q. So let me just ask you, did you prepare or provide any
12    input with respect to the estimated NPV numbers that
13    are reflected on this page?
14 A. No.
15 Q. Do you know what is meant by City of Detroit Retail
16    Capital Improvements that's in one of the boxes on
17    this chart?
18 A. Again, I did not prepare this document. I can only
19    speculate in terms of the City of Detroit has -- DWSD
20    is comprised of a lot of infrastructure around
21    southeastern Michigan, and there is a retail part
22    servicing the City of Detroit that I would assume
23    that's what that's referring to.
24 Q. But you don't know for certain?
25 A. I don't know for certain.

CHARLES MOORE

1
2  Q. And you don't know how the number was arrived at?
3  A. I do not.
4  Q. On the next slide, Slide 4, there's a chart here, and
5     one of the -- one of the shades in this bar chart is
6     "DWSD Business Plan." Ask you, sir, do you know what
7     that is in reference to?
8  A. No. I did not prepare this document.
9  Q. So in terms of the proposed breakdowns reflected in
10    this chart, you're not in a position to provide any
11    testimony on it?
12 A. Correct. It's not my document.
13 Q. Is it your document?
14 A. It is not my document.
15 Q. Very good. Show you what is marked as Tab -- what's
16    in our binder set as Tab 25, previously marked as Orr
17    Exhibit Number 14. Orr Exhibit Number 14 is
18    Comparison of DWSD Frameworks, January 2nd, 2014, a
19    document that appears to have been prepared by Miller
20    Buckfire.
21 A. Yes.
22 Q. Have you seen this document before?
23 A. I have.
24 Q. When did you first see it?
25 A. I believe that I saw it on or around January 2nd.

CHARLES MOORE

1
2  Q. And what input did you and your team have with respect
3     to Orr Exhibit 14?
4  A. I don't recall if we provided input to this document
5     or not.
6  Q. And who was the intended audience for this document;
7     do you know?
8  A. I don't recall. There was -- I don't recall if it was
9     intended for internal purposes, at least initially,
10    which I'm inclined to recall that's -- I seem to
11    recall that may be the case. But right around that
12    same time is when significant mediation activities
13    were occurring, so it could have been prepared for use
14    in mediation.
15 Q. If you turn to Slide 10 of this document. Did you or
16    your team have any input in the -- in the construction
17    of this slide, which is "Change in Transaction
18    Savings"?
19 A. I don't recall if we had any input on this document at
20    all.
21 Q. This document aside, did you prepare any different
22    calculations of any proposed savings that could be
23    achieved between the October 2nd time frame and the
24    January 2nd time frame?
25 A. Not that I recall.

CHARLES MOORE

1      CHARLES MOORE
2  Q. There came a time when the Emergency Manager and his
3     advisors were proposing a $47 million annual lease
4     payment; is that right?
5  A. Yes.
6  Q. And when was that time period?
7  A. I believe that was in January of 2014.
8  Q. And what supported the -- what was the basis for the
9     $47 million lease payment that was being proposed?
10 A. That was something that Mr. Buckfire came up with.
11    I -- again, going back to what I indicated earlier,
12    any of the lease payments, there are a whole host of
13    items that go into a lease payment, including transfer
14    of control. There were -- as part of just the
15    $47 million, there were specific costs that were
16    identified that were anticipated to be dealt with as
17    part of the Chapter 9 process which supported payment
18    of that $47 million.
19 Q. And what were those specific costs that were
20    identified?
21 A. The OPEB costs. By OPEB, other post-employment
22    benefits. And also, if I recall correctly, savings
23    that related to the Certificates of Participation.
24 Q. And how would those savings be achieved at that time
25    period?

CHARLES MOORE

1      CHARLES MOORE
2  A. It was based on what the anticipated treatment of
3     those claims was going to be.
4  Q. Under a Plan of Adjustment?
5  A. Yes.
6  Q. So the operating assumption by the Emergency Manager
7     and his advisors at that time is that to the extent
8     the plan achieves savings on the part of OPEB and COPs
9     in particular that DWSD should pay for its share?
10 A. I can't tell you what the thinking was, but what I'm
11    referring to, again, going back to there were a
12    variety of times that specific items pointed to
13    that would support the payment of a lease payment, and
14    in that regard, to the extent that as a result of the
15    treatment of certain claims costs that DWSD would
16    otherwise be paying free up room to make a lease
17    payment, that's what I was referring to.
18 Q. Such that the lease payment would be cost neutral to
19    the DWSD?
20 A. Yes.
21 Q. During the period of January 2nd through early April
22    of 2014, can you describe the level of Conway
23    MacKenzie's involvement with negotiations over the
24    creation of a new authority?
25 A. Somewhere in, I believe it may have been later

CHARLES MOORE

1      CHARLES MOORE
2     January, Stacy Fox, the Deputy Emergency Manager,
3     became involved -- I think she had been involved
4     before, but she took much more of a leadership role in
5     interacting with the counties on behalf of the City.
6     It had -- it seemed at that point that the discussions
7     had hit some significant roadblocks, and so Ms. Fox
8     asked me to get involved in the process, so I
9     participated in multiple meetings with county
10    representatives, and that would have been, as I
11    recall, beginning in January, continuing through
12    February and into early March, I believe, and that
13    would have included face-to-face meetings as well as
14    conference calls.
15 Q. And generally, broadly speaking, what was the purpose
16    of those meetings?
17 A. To provide information that the counties were looking
18    for, to understand other issues that the counties had,
19    and essentially get to a conclusion in the most
20    expeditious manner as to whether there was the
21    possibility of a transaction to form a regional
22    authority or not.
23 Q. And you were unable to get to such a conclusion during
24    this time period, is that correct, between January and
25    April of 2014?

CHARLES MOORE

1      CHARLES MOORE
2  A. When you say such a conclusion, you're referring to
3     the response that I just gave?
4  Q. Exactly.
5  A. Okay. We did not embark upon the process that I was
6     advocating to get to that answer.
7  Q. Why not?
8  A. I think that there were a variety of reasons, some
9     that were cited. The counties wanted support for
10    payment of professionals. That was one factor.
11    Another factor is the counties were looking for, I'll
12    use the word backstop from the State of Michigan as
13    it relates to bad debts of DWSD, and the State was not
14    able to provide the type of response that the counties
15    were looking for, and, probably my words, not their
16    words, but I think that that was deemed sort of a
17    non-starter if that didn't exist. And there may have
18    been -- oh. Another item. I think it's fair to say
19    that the City, and when I say the City, the EM team
20    and the advisors, didn't see eye to eye with the
21    counties, in particular Oakland County, as it relates
22    to the information that was critical to getting to the
23    next point. The counties were looking for information
24    that just did not exist but which the City did not
25    feel was critical at that point to get to where we

CHARLES MOORE

1
2  were trying to go.
3  Q. Can you give me a couple of examples?
4  A. The 2013 audited financials, fiscal year 2013 audited
5  financials.
6  Q. Did you view that as an unreasonable request by the
7  counties?
8  A. What I indicated quite specifically is that I can
9  understand how that information would be important,
10 but really what we were -- the whole focus was to
11 conduct diligence around the future business plan, and
12 the 2013 audit report is certainly something that
13 could be reviewed when it becomes available as part of
14 confirmatory due diligence, but the critical element
15 that we were -- that we should all be focused on was
16 the future, not what happened in the past, because it
17 would be the future operations of DWSD that would be
18 critical.
19 Q. But isn't it fair to say you can only project future
20 operations by looking at past performance?
21 A. Oh, there was plenty of past or historical
22 information. So we had plenty of historical
23 information. The -- I think the point of contention
24 is -- I'm involved in a lot of transactions all the
25 time, and people seem to be able to conduct diligence

CHARLES MOORE

1
2  without having the most recent audit report because
3  they look at historical information and they look at,
4  most importantly, the future information, which is
5  what they're really buying into. So while that may be
6  a condition or part of confirmatory due diligence, in
7  my mind I did not think that that was a reasonable --
8  that item I'm referring to in particular, the 2013
9  audit report, as a reasonable basis to say without
10 that that they would not be able to conduct due
11 diligence.
12 Q. Going back to the issue of professional fees, what was
13 the City requesting at that time?
14 A. Not the City. The counties were requesting payment
15 for professionals.
16 Q. And what was the City's response?
17 A. I think the City actually indicated, Mr. Orr and
18 Ms. Fox, indicated that that is something that we
19 could talk about. I don't know if the City ever gave
20 a concrete response, especially because of the -- the
21 issue as it relates to the proposed backstop from the
22 state. The City had conversations with the State
23 about assisting with payment of professionals. There
24 was going to be potentially a timing issue by when the
25 State would be able to go through its process to

CHARLES MOORE

1
2  appropriate funds -- appropriate funds for the
3  counties' professionals, and the City was looking at
4  potentially providing interim funds for those fees
5  between now and when the State would be able to go
6  through its process.
7  Q. Did the counties take particular issue with the
8  $47 million proposed lease payment?
9  A. What do you mean by particular issue?
10 Q. The number's too high, the number's not supported.
11 Any issue with respect to the 47 million.
12 A. I think I probably heard both of those items.
13 Q. I assume you attempted to respond to those concerns;
14 right?
15 A. Yes, sir.
16 Q. Were -- did you view it as your role to try to justify
17 the $47 million payment?
18 A. Certainly I -- I felt that it was important to provide
19 information to the counties that supported what we had
20 indicated, which is specific cost savings alone would
21 cover this proposed $47 million lease payment, and in
22 that regard information was provided to the counties
23 specifically as it relates to OPEB costs, both without
24 any sort of restructuring in what was being
25 contemplated as well as the potential treatment of the

CHARLES MOORE

1
2  Certificates of Participation.
3  Q. What explains the shift from the City in proposing a
4  lease payment that's 90 plus million a year in the
5  early years to 200 plus million in the outer years to
6  the $47 million fixed lease payment?
7  A. I was not actively involved in those discussions from
8  the time period of October through say early January.
9  Q. When did these -- well, let me ask the question
10 differently. At a certain point in time in the spring
11 of 2014 these negotiations over the formation of a new
12 authority broke off; correct?
13 A. I don't -- I don't know if I could characterize it
14 that way. Simply stated, we had proposed a process, a
15 specific process with the counties, as I indicated,
16 and that was late February time period. There were a
17 number of roadblocks to embark upon that process and
18 so as a result that process did not occur. And then
19 there were a series of letters that went back and
20 forth between the counties and the City. So there
21 weren't many activities going on during that period,
22 which would include March into April, and then
23 mediation was ordered, and I had not been a part of
24 that mediation. So it would seem to me that
25 discussions continue but in the context of mediation.

13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 18 of
39

CHARLES MOORE

1
2 Q. I believe in the March 2014 time frame Brooks
3    Patterson made a statement that no deal is better than
4    a bad deal. Do you recall that statement being made?
5 A. I recall that statement being made, at least reported
6    in the press many times over about a six-month period,
7    from September to -- or maybe October until that time
8    period.
9 Q. Do you recall Mr. Patterson making a statement that
10    the City is -- has a take it or leave it approach?
11 A. I don't recall Mr. Patterson saying that.
12 Q. Do you know how much money the City spent in terms of
13    professional fees on the effort to create an authority
14    up through the filing of the May 5th Plan of
15    Adjustment?
16 A. I don't.
17 Q. As part of your engagement, do you have to record your
18    time?
19 A. Yes, sir.
20 Q. And do you provide a short description of the -- of
21    the work and tasks performed?
22 A. Yes.
23 Q. And all of your fees go through the fee examiner
24    process; is that right?
25 A. Yes.

CHARLES MOORE

1
2 Q. And how much has your firm been paid to date for its
3    engagement by the City of Detroit from 20 -- excuse
4    me, January 2013 to the present?
5 A. Just for a clarification, there are two elements to
6    our engagement. When we were engaged in January of
7    2013 -- or after we were engaged in January of 2013,
8    there were a number of instances departments where
9    there were critical positions that were not filled.
10    The City was having a very difficult time finding
11    qualified resources to fill those positions. They --
12    the City asked -- the CFO at that time asked Conway
13    MacKenzie to provide interim management resources,
14    which we do quite often, for a number of positions,
15    and so beginning around July of 2013, we have utilized
16    subcontractors for various interim management
17    positions. It's obviously -- I shouldn't say
18    obviously. But the reason why we've used
19    subcontractors is it's a very cost-effective way of
20    doing it. Rather than using Conway MacKenzie
21    professionals at their billing rates, we utilize
22    qualified candidates at lower billing rates for those
23    positions. So with that said, through the end of May,
24    which is the last invoice that we have submitted, we
25    have billed approximately eleven and a half million

CHARLES MOORE

1
2    dollars and then an additional $1.6 million for all of
3    these interim management roles. So that's about
4    $13.1 million in total.
5 Q. I'm going to show you what is Tab I in the binder set,
6    a document previously marked Porter Number 11. I
7    suspect after three weeks of asking witnesses about
8    this document we have the right person. Tab I in the
9    binder set, Porter Number 11, Exhibit L to the
10    Disclosure Statement, DWSD Current and Historical
11    Financial Information. Have you seen this before?
12 A. Yes, sir.
13 Q. Did Conway MacKenzie prepare this exhibit?
14 A. Yes.
15 Q. And can you describe generally the process by which
16    Conway MacKenzie prepared it?
17 A. We, we being Conway MacKenzie, compiled this
18    information from previous annual financial statements.
19 Q. And these would be previous audited financial
20    statements for the water and sewer funds?
21 A. Yes. And the item that I -- I think June 30th of 2013
22    are preliminary at the time that we compiled this. I
23    don't think that the audit was finalized.
24 Q. For your benefit, sir, I think there's a footnote that
25    may direct you on that point.

CHARLES MOORE

1
2 A. Yeah. Exactly. Thank you.
3 Q. And where -- where do audited results stand for fiscal
4    year ended June 30th, 2013? Where do they stand
5    today?
6 A. I have actually lost touch of that over the last
7    couple of weeks. There was communication in late June
8    that I was reviewing on some of the final items that
9    were necessary in order to finalize the June --
10    June 30th, 2013, audited financials. I don't know if
11    they have been finalized at this point or not, but at
12    least as of, if I recall correctly, late June that was
13    not the case.
14 Q. Let me ask you, sir -- this was filed, as you know, on
15    May 5th, 2014. Between now -- between that period of
16    time and today, was there any comparison made between
17    the preliminary results and any subsequent refinement
18    of those results or final results for fiscal year
19    June 30th, 2013?
20 A. The information that I reviewed, again, I believe it
21    was in late June, contained financial information, and
22    I reviewed that, but one of my colleagues reviewed it
23    in more detail, Mr. Johnston, and I don't believe that
24    we put together a comparison on that, but if I recall
25    correctly, I don't believe that there were any

18 (Pages 304 to 307)

CHARLES MOORE

1          CHARLES MOORE
2   significant changes to this information.
3   Q. You're not aware of any material changes?
4   A. Correct. At least not that I recall.
5   Q. Does Exhibit L reflect how both the Water and Sewer
6   Fund have historically reported their operating
7   results?
8   A. There are -- when you look at the line items that are
9   listed here, there are two different ways that we look
10   at the information, and DWSD presents information in
11   these different ways. The line -- as an example,
12   the -- what's labeled as Page 182 of 212, the line
13   items that you see there, "Source of Supply,"
14   "Low-lift Pumping," "High-lift Pumping, those are
15   almost what you could consider cost centers rather
16   than the types of cost elements that a lot of people
17   look at. And so we prepare and certainly DWSD
18   prepares and presents information in a different
19   format oftentimes which is based on more traditional
20   line items, such as salaries and benefits and a
21   variety of those types of costs that would be
22   underlying these various cost centers.
23   Q. Do you know the difference between low-lift pumping
24   and high-lift pumping?
25   A. I don't know specifically, no. I could guess, but I'm

1          CHARLES MOORE
2   not going to speculate.
3   Q. Did you work with anyone at the DWSD or any of the
4   DWSD consultants in preparing Exhibit L?
5   A. Yes. Both Exhibits L and M, we worked closely with
6   the management team to ensure that they were in
7   agreement with this information.
8   Q. And were they in agreement?
9   A. Yes.
10   Q. Do you recall any areas of disagreement with respect
11   to Exhibit L?
12   A. No.
13   Q. Okay. Show you what is in the plan binder as Tab J.
14   If you give me a moment, sir. This may have been an
15   exhibit yesterday, in which case we should use it
16   again. I'm told it was not used yesterday. Sir, I
17   just handed you what is previously marked as Porter
18   12, Exhibit M, DWSD Financial Projections. We talked
19   briefly about this document earlier today. Sir, can
20   you identify it?
21   A. Yes. This is Exhibit M to the Fourth-Amended
22   Disclosure Statement filed around May 5th of 2014, and
23   it contains the updated ten-year financial projections
24   for the water and sewer funds.
25   Q. We went over this briefly this morning. You prepared

1          CHARLES MOORE
2   a 10-Year Business Plan and ten-year set of
3   projections that were dated October 2nd, 2013; right?
4   A. Yes.
5   Q. And then you brought those projections forward with
6   respect to what is now Exhibit M in the May 5th
7   Disclosure Statement?
8   A. Yes.
9   Q. And this Exhibit M would be the product of the Conway
10   MacKenzie team?
11   A. Yes. We would have also interacted with the DWSD
12   management team to have them review this product as
13   well.
14   Q. Did the DWSD management team sign off on these
15   projections?
16   A. Yes.
17   Q. The assumptions that are contained within Exhibit
18   M, --
19   A. Yes.
20   Q. -- whose assumptions are those? If you understand
21   where I'm going with that.
22   A. Well, these are the assumptions that underlie these
23   numbers. These numbers were prepared by Conway
24   MacKenzie. There are projections that -- as an
25   example, DWSD is in the process of seeking financing

1          CHARLES MOORE
2   for the Sewer Fund right now, and as part of that, it
3   has prepared financials -- financial projections, and
4   from time to time what we will do is actually make
5   sure that our numbers reconcile to those, so there are
6   instances where the assumptions that you see here are
7   assumptions that we have included. DWSD may have used
8   different assumptions. But typically they are --
9   there are offsetting items to bring us back down to
10   the same net point.
11   Q. I'm not sure I understand your prior answer. Let's
12   try to unpack it a little bit. DWSD historically used
13   perhaps in some instances a different set of
14   assumptions?
15   A. The -- DWSD prepares its own projections from time to
16   time for different purposes. It has recently prepared
17   a set of projections that don't go out ten years but
18   projections that are being used for financing for the
19   Sewer Fund, and if you were to compare those
20   projections to these, they would not match in every
21   instance. There are different assumptions that
22   underlie those projections versus these. However, to
23   get to the second point, whereas they may have higher
24   revenue, there would be a higher cost associated with
25   that. So from a net standpoint, we are within a

CHARLES MOORE

1
2 million dollars of their projections, so they're
3 incredibly close compared to anything that DWSD has
4 prepared on its own.
5 Q. Was there a reason you chose not to use the DW -- the
6 DWSD set of projections?
7 A. They did not exist at the time that these were
8 prepared.
9 Q. They were subsequently prepared by DWSD management and
10 consultants?
11 A. Yes. And when you say consultants, specifically
12 Mr. Bart Foster, who, although he's been working with
13 the department for many, many, many years, officially
14 is not an employee.
15 Q. Understood. So your primary contacts with DWSD I
16 believe you testified earlier, Ms. McCormick,
17 Ms. Bateson, Mr. Foster, and Mr. Wolfson; correct?
18 A. Yes.
19 Q. Any changes in assumption between what the DWSD
20 projections contain and what these projections in
21 Exhibit M contain?
22 A. Yes. As I indicated, there are a variety of line
23 items where there are different assumptions that are
24 used, so some lines may be higher, but they would have
25 corresponding offsets as well. Most importantly, the

CHARLES MOORE

1
2 projections are incredibly close from a bottom line
3 perspective. Also, there are differences in
4 allocations between water and sewer that are very
5 easily reconcilable, how DWSD and its projections
6 allocated amounts differently between water and sewer,
7 and that's -- that's one other change.
8 Q. So the total for water and sewer may be the same, but
9 the allocation between the two for a revenue or
10 expense item may be slightly different?
11 A. That's right. Even with those differences in
12 allocations, to put it in perspective, we're talking
13 about maybe $2 million, and so once you re -- once you
14 reconcile those allocations, you're incredibly close
15 from a net basis.
16 Q. Turning to Page 3 of Porter 12. I want to ask you
17 about the assumptions relating to financing. So as
18 part of the assumptions for this Exhibit M for
19 existing debt is that it represents existing debt
20 amortization on currently outstanding DWSD debt;
21 correct?
22 A. Yes.
23 Q. So this -- this set of projections does not include
24 any -- does not assume that the DWSD bonds will be
25 restructured; is that correct?

CHARLES MOORE

1
2 A. Not necessarily. As -- first of all, this area in
3 particular was provided by Miller Buckfire. So
4 similar to in the October 2nd business plan, this is
5 not something that Conway MacKenzie develops at all.
6 The -- if I recall correctly, the proposed treatment
7 of DWSD bonds in the plan have an option whereby the
8 existing terms are continued to be paid, and that --
9 but there are other things that would not show up in
10 these projections that happen in that instance. And
11 so that is essentially the path that's been modeled
12 here.
13 Q. So the -- the interest rate -- excuse me. The
14 interest expense for both water and sewer reflected in
15 years 2014 to 2023 is the same interest expense that
16 is due and owing under the existing DWSD bonds;
17 correct?
18 A. Yes.
19 Q. Same with respect to the amortization of bond issuance
20 cost?
21 A. I believe so, yes.
22 Q. Looking at the base year -- is that an appropriate
23 terminology, sir, base year being 2014?
24 A. That's not a term that I would use, but I understand
25 what you're getting at.

CHARLES MOORE

1
2 Q. What would you use?
3 A. I would say the initial year.
4 Q. Very good. Let's stick with that.
5 A. Okay.
6 Q. The initial year numbers for 2014, how have they
7 tracked to the year-end numbers that were achieved as
8 of June 30th, 2014?
9 A. I review the packet of information that DWSD produces
10 for its Finance Committee, and through April, I
11 believe that's the last month that I have reviewed,
12 through April of 2014, revenues are down, and that is
13 primarily due to a weather-related item. Usage last
14 year -- the fiscal year begins July 1st obviously.
15 There was not the water usage in the first fiscal year
16 quarter that was anticipated, and so that sort of set
17 DWSD behind from the get-go. I think things have
18 tracked pretty close to budget from a revenue
19 standpoint since that time. If I recall correctly,
20 water may be down seven or eight percent below budget
21 through April of 2014.
22 Q. What about with respect to sewer?
23 A. Sewer I think is less so. One of the reasons, and
24 this -- this will certainly be the case going forward,
25 is a transition to billing more just a fixed flat

20 (Pages 312 to 315)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt Doc 13634-9 Filed 09/09/22 Entered 09/09/22 18:47:23 Page 21 of
39

CHARLES MOORE

1
2     amount.  So I believe sewer is down, I'm thinking
3     maybe five percent.  I just -- I can't recall exactly.
4     That will not be the case going forward, though, with
5     how sewer billing is handled.
6  Q.  So if we were to focus just on the consolidated
7     systems, Slide Number 4, Page Number 4, total
8     operating revenues, 894.4 million; correct?
9  A.  Yes.
10 Q.  So as of July 24th, can you tell me whether that
11    number is -- is right?
12 A.  I can't.  The last -- as I indicated, I think the last
13    financials that I've reviewed would have been through
14    April 30th of 2014.  What -- in addition, I should
15    just point out a few other items.  While revenue is
16    below budget, expenses are below budget by even more.
17 Q.  That's where I was going next.
18 A.  Yes.
19 Q.  So that's helpful.  Thank you.  Do you know of any
20    changes that you would consider material with respect
21    to the initial year results?
22 A.  No.
23 Q.  And the projections for the subsequent years all are
24    based off of initial year projections; correct?
25       MR. HAMILTON:  Object to form.

CHARLES MOORE

1
2       You can answer.
3  A.  Generally, yes, because it's all about growth or
4     reduction based on the initial year.  I'd have to walk
5     through each line item.  There may be some that are
6     not based on growth or decline from that initial year.
7  BY MR. NEAL:
8  Q.  So let me ask the question this way.  Do you believe
9     that there are any differences between DWSD's actual
10    performance in fiscal year 2014 and the projections
11    for fiscal year 2014 that weren't revision of any of
12    these projections for the years beyond 2014?
13 A.  No, I don't.
14 Q.  Was DWSD able to pay all of its bond debt in full
15    during fiscal year 2014?
16 A.  Yes.  I understand that's the case.
17 Q.  Looking at it another way, did DWSD default on any of
18    its bonds during fiscal year 2014?
19 A.  Not that I'm aware of.
20 Q.  Have you seen the fiscal year 2015 budget for DWSD?
21 A.  Yes, I have.  It's been a little while.  When we --
22    when Conway MacKenzie developed this, we looked at the
23    fiscal year '15 budget as well.  So it's -- it's been
24    a little while, but yes, I've generally viewed that
25    before.

CHARLES MOORE

1
2  Q.  And how do those -- how does that budget compare with
3     the Disclosure Statement, Exhibit M?
4  A.  I can't recall offhand the comparison.
5  Q.  Do you know if they sync up?
6  A.  Well, as I indicated before, from a sewer fund
7     standpoint, and that's where we focused primarily
8     because DWSD has prepared five-year projections for
9     the sewer fund in anticipation of financing, and those
10    sync up very well.  I have not done a comparison
11    between the sewer fund for fiscal year '15 and the
12    fiscal '15 budget, but I'm going to make the
13    assumption that those are close, so based on those
14    couple of assumptions, I'm -- I'm pretty sure that
15    2015, especially on a net basis, would sync up very
16    closely.
17 Q.  What about with respect to the water fund?
18 A.  The DWSD -- two responses there.  First, I, again,
19    have not done a comparison of the 2015 budget to this.
20    My colleagues may have.  I just -- I can't recall
21    looking at that comparison.  Secondly, DWSD has not
22    prepared an updated projection for the water fund like
23    it did for the sewer fund for the sewer fund
24    financing.
25 Q.  Show you what is Tab 15 in the binder set and Tab 16.

CHARLES MOORE

1
2     I'm going to walk you through these documents in a
3     second, sir.  You've been provided what has previously
4     been marked as Malhotra Exhibit Number 12.  I'm now
5     going to provide you a similar looking document that
6     was marked as Malhotra 13.  I have a representation to
7     make on the record.  We took the Malhotra Exhibit 12
8     and 13 off of the court reporter website.  The clarity
9     of these two documents is less than ideal, so what we
10    did is stapled to it a clean copy on Page 2, so Pages
11    1 and 2 of each exhibit are -- should be identical.
12 A.  Okay.
13 Q.  You may want to operate off of the clean page unless
14    your eyesight is better than mine.
15 A.  I'll do so based on your representation that they're
16    the same.
17 Q.  Okay.  And it's the same with respect to Malhotra 13.
18    Have you seen these two documents before?
19 A.  Yes.
20 Q.  What involvement did you -- well, please identify
21    these documents if you can.
22 A.  These documents represent savings that DWSD is
23    anticipated to realize as a result of the proposed
24    terms in the Plan of Adjustment for certain creditors,
25    and there are two different scenarios represented

21 (Pages 316 to 319)

CHARLES MOORE

1    here.
2 Q.  And one scenario is presented in Malhotra 12 and the
3    other scenario in Malhotra 13; correct?
4 A.  Yes.
5 Q.  How would you describe the scenario in Malhotra 12?
6 A.  The scenario in Malhotra 12, the primary difference
7    between 12 and 13 is the pension payments under the no
8    restructuring comparative set are set at 31.3 million
9    per year going all the way out through 2043, whereas
10    in Exhibit 13 the pension payments are listed as the
11    amounts under what are referred to as the June 4th
12    Milliman letters assuming a continued pension plan
13    with the contributions necessary based on the
14    actuarial assumptions used in those letters.
15 Q.  Can you describe generally the prospe -- process by
16    which these -- these two documents were created?  And
17    I'm talking just the basic mechanics.  Did -- did you
18    prepare this chart or did you simply provide data
19    inputs to the E & Y team?
20 A.  Neither actually.  E & Y prepared these.  I did not
21    provide any inputs to this.
22 Q.  I may have missed your earlier answer.  When did you
23    first see these charts?
24 A.  Sometime last week.  A colleague of mine that has been

CHARLES MOORE

1    involved in DWSD, Mr. Johnston, was involved, not from
2    the standpoint of providing input I don't believe, but
3    just the distribution of these as they were being
4    developed, and he provided them to me.
5 Q.  I'm going to ask a different way based on your
6    answer, Mr. Moore.  Recognizing that you didn't
7    prepare these charts, there are purported savings that
8    are reflected in them, and I'm going to just go
9    through some of the line items to see what your
10    involvement or your team's involvement was in
11    determining those savings.  Okay?
12 A.  Okay.
13 Q.  We'll come back to the pension payment, but if we
14    could start with -- and it's the same on both exhibits
15    for Malhotra 12.  Let's start with the professional
16    fees.  On Malhotra 12 it's $20 million for fiscal year
17    2015.  Do you see that?
18 A.  Yes.
19 Q.  Do you know what comprises those fees?
20 A.  Yes.
21 Q.  And what are -- what's the composition of the
22    $20 million number?  How does it break down?
23 A.  While I did not prepare that calculation, I've
24    reviewed that and so I understand that it is based on

CHARLES MOORE

1    a total budgeted amount of professional fees of 130
2    million and four different potential allocation bases,
3    head count, pension, OPEB, and Certificates of
4    Participation, and the portion of -- that DWSD
5    represents compared to the total for each of those
6    four items to then come up with four different
7    potential amounts for allocation to DWSD of that
8    $130 million total budgeted professional fee amount,
9    and then an average of those four was taken, which, if
10    I recall correctly, resulted in $20.7 million and
11    $20 million as used here.
12 Q.  And did you do that work?
13 A.  No.
14 Q.  Did your team members do that work?
15 A.  No.
16 Q.  What about with respect to the pension administrative
17    costs?  I recognize there's a -- there's a lengthy
18    footnote, and I'm not going to ask you to repeat
19    what's in that footnote.  So the same question.  What
20    role did you play personally or Conway MacKenzie team
21    members in determining the number that's reflected
22    here for pension admin costs?
23 A.  Prior to the time of the Fourth-Amended Disclosure
24    Statement being filed, the actuary for the City,

CHARLES MOORE

1    Milliman, was conducting various analyses, and those
2    analyses were utilized in the projections that were
3    included in the Disclosure Statement, Fourth-Amended
4    Disclosure Statement, and I would have weighed in on
5    various assumptions that Milliman was using as well as
6    reviewed the actual analyses.
7 Q.  The next line, "OPEB current retirees."  What role did
8    you and Conway MacKenzie have in arriving at the
9    numbers reflected here?
10 A.  None.
11 Q.  Same question with respect to the POC.
12 A.  None.
13 Q.  Same question with respect to the swaps.
14 A.  None.
15 Q.  Are these numbers that are reflected in the POA
16    scenario for fiscal years 2015 through 2023
17    incorporated into your ten-year financial projections?
18 A.  Yes.
19 Q.  Turning to the difference between Malhotra 12 and
20    Malhotra 13 as it relates to the -- the investment
21    return for the pensions.  Give me a moment, sir.  I
22    lost track.  So for clarity of the record, Malhotra
23    12, Footnote 8, what is being utilized here is the
24    7.9 percent investment rate -- investment return

CHARLES MOORE

1
2  assumption; correct?
3  A.  Yes.
4  Q.  And a 30-year UAAL amortization; correct?
5  A.  Yes.
6  Q.  And in Malhotra 13, same footnote.  What is being
7      utilized here, however, is a seven percent investment
8      return assumption and an 18-year UAAL amortization; is
9      that correct?
10 A.  Yes.  I would just point out one item.  The Footnote 8
11     in Exhibit 13 is based on contributions that cover
12     this time period.  Footnote 8 in Malhotra 12 is based
13     on taking the amount for fiscal year '15, the
14     contribution -- projected contribution amount from the
15     Gabriel Roeder June 30th, 2013, actuarial valuation
16     report and running that forward every year.  There's
17     not a -- ten-year projection that existed as it
18     relates to that.  The last time that I saw projected
19     information from Gabriel Roeder using these
20     assumptions was after the June 30th of 2011 actuarial
21     valuation wherein actually the unfunded position was
22     lower than it is now, and that projected contribution
23     requirement's growing to the point where I think the
24     last year in that scenario was 2021 and the pension
25     contributions were just north of $40 million per year.

CHARLES MOORE

1      And so my point here is that I think that the numbers
2      on Malhotra 12 under the no restructuring scenario for
3      pension payments could be low.
4  Q.  Could potentially understate the pension liabilities
5      in the outer years?
6  A.  Could potentially understate the pension payments that
7      would be required at least in the initial years based
8      on what I had seen from Gabriel Roeder in the past
9      through 2021.
10 Q.  How have the pension costs of DWSD been allocated
11     historically by the DWSD?
12 A.  First of all, DWSD participates in the general
13     retirement system, and, Mr. Neal, I apologize if -- if
14     I go through information that you already know, but it
15     would be important as sort of a logical argument here
16     as I go through each step.  So DWSD is a division
17     within the general retirement system.  Individuals
18     that participate in the general retirement system may
19     be flagged as belonging to the DWSD division.  And so
20     those individuals will have a liability associated
21     with them for accrued benefits.  In addition to that,
22     those individuals may accrue benefits in the future,
23     which is commonly referred to as normal cost.  The
24     DWSD calculation for what it should contribute to GRS

CHARLES MOORE

1      in the past has been a combination of the anticipated
2      normal cost for future benefits to be earned that year
3      as well as the -- the amortization of the UAAL,
4      unfunded actuarial accrued liability, that is
5      specifically associated with DWSD for that year.
6  Q.  So, in essence, the DWSD would be charged both the
7      normal cost and the -- and its share of its UAAL for
8      its DWSD employees?
9  A.  Yes.
10 Q.  And do you know whether those payments were made as
11     part of operations and maintenance expenses
12     historically?
13 A.  Yes.  My understanding is that they were part of O&M,
14     operations and maintenance.
15 Q.  And how did you obtain that understanding?
16 A.  When I looked at the financial statements, I -- again,
17     the financial statements sometimes were in the form of
18     more cost centers, sometimes the underlying cost
19     elements.  When you look at the cost elements that
20     support the cost centers, they are part of operations
21     and maintenance, and that includes fringe payments in
22     addition to wages.
23 Q.  Show you what is in the plan binder as Tab E,
24     McCormick Exhibit 10.  Mr. Moore, I handed you what

CHARLES MOORE

1      has previously been marked as McCormick 10.  This is a
2      section of the Disclosure Statement dated May 5, 2014,
3      Section IV, "Means of Implementation of the Plan."
4      And my questions are going to be restricted to B-2 on
5      this very first page.
6  A.  Okay.
7  Q.  What role did you have in determining the DWSD pension
8      funding contribution as set forth here on
9      McCormick 10?
10 A.  I worked with the City's actuary, its attorneys, and
11     Ernst & Young in the calculation of that amount.  And
12     by the City's actuary, I'm referring to Milliman.
13 Q.  And when you say that amount, you mean the
14     428.5 million?
15 A.  Yes.  That was the amount that you were asking about.
16 Q.  And how is that amount calculated?
17 A.  Could you clarify what you mean by that question?
18 Q.  Yes.  How did you determine ultimately that
19     428.5 million represents the UAAL for the DWSD?
20 A.  There are three components that make up the
21     428.5 million.  The first component we discussed
22     earlier, which is $20 million related to professional
23     fees.  The second component relates to DWSD's share,
24     allocable share of administrative costs for the

CHARLES MOORE

1
2 pension, and that's approximately two and a half -- it
3 is two and a half million dollars per year for nine
4 years. And then the third element, which is the
5 largest component of it, is the amount of
6 contributions necessary to pay the calculated unfunded
7 liability as of June 30th, 2014, in full by June 30th
8 of 2023.
9 Q. And did you -- for that third component, did you rely
10 upon Milliman to provide you with that number?
11 A. Yes.
12 Q. Did you do any independent calculations?
13 A. Yes.
14 Q. Describe your -- the work you did independent of
15 Milliman.
16 A. Just simple present value type calculations. The
17 underlying assumption within the Plan of Adjustment is
18 that benefits under the defined benefit plans that
19 exist today, GRS and PFRS, will be frozen, and in that
20 regard the unfunded -- unfunded liability related to
21 the accrued benefits which has been calculated for
22 DWSD as of June 30th of 2014 at approximately
23 $292 million is essentially paid off over that
24 nine-year period. So when you look at just simple
25 payments using an equal payment in the middle of each

CHARLES MOORE

1
2 employed now or where they retired from, and the
3 liability associated with that employee follows --
4 or -- or is then assigned to whatever department
5 they're -- or whatever division they're flagged with.
6 Q. Was any analysis undertaken to determine whether the
7 DWSD is a net beneficiary of the bumping or whether
8 it's a -- comes out on the short end with respect to
9 the bumping?
10 A. Well, bumping is just one way that someone could move
11 from one department to another. There are a whole
12 host of other reasons besides --
13 Q. They could move independent from bumping?
14 A. Yes. The answer to your question is no, no analysis
15 has taken place that I'm aware of that would quantify
16 the impact.
17 Q. Do you know what percentage of DWSD's payroll works on
18 non-DWSD projects?
19 A. I don't.
20 Q. Do you know what are the average years of service for
21 each W -- DWSD employee?
22 A. I don't know if I've ever seen that just for DWSD. I
23 certainly have seen that information for GRS as a
24 whole.
25 Q. Has the Conway MacKenzie team reached a conclusion

CHARLES MOORE

1
2 year using a 6.75 percent interest rate, you can get
3 to this specific amount, this amount being the
4 approximately $42 million per year.
5 Q. Have you heard the term "bumping" before?
6 A. I've heard that term many times.
7 Q. Have you heard it in the context of your -- in the
8 context of the City of Detroit and in specific the
9 DWSD?
10 A. I have heard that term in the context of my engagement
11 with the City of Detroit in a variety of departments.
12 Q. And what does it mean to you?
13 A. It's commonly -- at least when I have heard that term,
14 it's commonly used in the context of a term within
15 Collective Bargaining Agreements that allow for an
16 individual that may be -- whose job may be impacted to
17 bump into or move into a different area.
18 Q. Could there be a scenario where someone spends
19 15 years at the Department of Transportation, spends
20 his last five years at DWSD, and that DWSD has to
21 assume the entire UAAL for that individual?
22 A. My understanding based on conversations directly with
23 the GRS pension system is that employees have one
24 flag, and that is the department to which they're
25 associated, whether that's where they are actively

CHARLES MOORE

1
2 that the DWSD head count is currently excessive?
3 A. The business plan itself contemplates head count going
4 down to approximately 1,000 by the year -- fiscal year
5 2020, and right now the last head count that I saw for
6 DWSD is just south of 1600, but you would not be able
7 to, and this is the view both of Conway MacKenzie and
8 DWSD management, you would not be able to eliminate
9 600 positions right now. So there are a number of
10 things that have to happen to facilitate getting to
11 that 1,000, but we certainly believe that that is
12 possible.
13 Q. Do you know what the peak head count was for DWSD in
14 the past ten years?
15 A. I have seen historical reports that have labor well
16 into the 2,000s and I believe even north of 2500.
17 Q. Did you ever look to determine whether the head count
18 of DWSD grew as the City's financial problems
19 increased over the past decade?
20 A. I can't recall.
21 Q. Going back to McCormick 10 en and the provision here
22 B-2 on DWSD pension funding contribution. It states
23 here that this amount should be paid over a nine-year
24 period ending June 30th, 2023; is that correct?
25 A. Yes.

24 (Pages 328 to 331)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 25 of 39

CHARLES MOORE

1
2　Q.　Why nine years?
3　A.　There are a couple of factors here.  As you can see,
4　　　the interest rate that's being used is 6.75 percent,
5　　　so that's why, as I referenced earlier, the calculated
6　　　amount of the unfunded liability for DWSD as of
7　　　June 30th of 2014 is approximately 292 million.  The
8　　　total payments over the nine-year period is
9　　　approximately 380 million.  I think it's maybe 383.  I
10　　can't recall the exact number.  Because of the
11　　interest cost there.  The longer the period of time
12　　that is used to repay that liability which already
13　　exists, the greater the total payments would be.  So
14　　as an example, if you were to take that $292 million
15　　and pay it off over 40 years, DWSD would be paying
16　　approximately $21 million per year instead of
17　　$42 million per year, but it would end up paying well
18　　over $800 million for that liability as compared to
19　　approximately 380 million, and when you look at the
20　　rate here, this is quite simple finance, which is to
21　　say if you have the cash, it would be better to pay
22　　off higher priced debt than to let that go on if you
23　　are -- if your cost of capital -- or you can otherwise
24　　raise capital for a lower cost.
25　Q.　But these considerations are not unique to the DWSD,

CHARLES MOORE

1
2　　　are they?
3　A.　Well, the principle that I just indicated is a general
4　　　finance concept.
5　Q.　And, generally speaking, UAAL is amortized over a
6　　　30-year period; correct?
7　A.　No.  That's incorrect.  We're talking about two
8　　　different things here.  First of all, I've been --
9　　　I've attempted to be very careful to say that
10　　$292 million is an unfunded amount.  UAAL stands for
11　　unfunded actuarial accrued liability.  It's using an
12　　actuarial value of the assets which may or may not be
13　　the actual value of the assets, market value of the
14　　assets.  In addition to that, this is a closed and
15　　frozen plan.  There's no new accrual of benefits.  So
16　　what you were referring to with an amortization of a
17　　UAAL, that's the amortization of an unfunded actuarial
18　　amount and in the context of a plan that is still
19　　accruing benefits.  The last point is there's no set
20　　standard in terms of 30 years.  As a matter of fact,
21　　most plans are moving towards a shorter period of
22　　amortization, plus you have to get into whether it's
23　　an open 30-year or closed 30-year period.  So there
24　　are a variety of factors that go into amortizing UAAL,
25　　but regardless, that's a completely separate topic

CHARLES MOORE

1
2　　　than what we have here, which is an unfunded liability
3　　　associated with a closed frozen plan.
4　Q.　What's the basis for your statement that most plans
5　　　are moving towards a shorter period?
6　A.　I have reviewed many municipal plans and that is a
7　　　trend that I have seen.
8　Q.　There's no other city department that is paying off
9　　　its UAAL over a nine-year period; correct?
10　A.　In the context of this plan, and, again, I'm going to
11　　use the word "unfunded liability" versus UAAL, and I
12　　understand it's probably even used in our own
13　　documents, but to be technically correct, the unfunded
14　　liability, there are no other divisions within GRS
15　　that contemplate paying their unfunded amount as of
16　　June 30th of 2014 over nine years.
17　Q.　So why should the DWSD have to do so?
18　A.　Therein we go back to a couple of reasons.  But first
19　　and foremost, if you have the cash to pay it, that's a
20　　wise thing to do based on the interest rate associated
21　　with that liability versus the anticipated costs for
22　　other debt that DWSD is expected to raise.
23　Q.　Has the DWSD management or its consultants requested
24　　that this amount be paid over nine years as opposed to
25　　a longer period of time?

CHARLES MOORE

1
2　A.　Not that I'm aware of.
3　Q.　Who made this determination that it's in the best
4　　　interest of the DWSD?
5　A.　This is just one factor that I was pointing to.
6　Q.　Okay.
7　A.　In terms of the decision that DWSD would fund this
8　　　unfunded liability over nine years, that was a
9　　　decision ultimately made by the Emergency Manager in
10　　conjunction with -- or based on the advice and input
11　　from his advisors in the context of this plan.
12　Q.　Did Conway MacKenzie provide any advice or input?
13　A.　Yes.
14　Q.　And what was your advice and input?  That it's a good
15　　thing to do?
16　A.　Yes.
17　Q.　For the reasons you've already said?
18　A.　Yes.
19　Q.　Did anyone disagree or express a different view in
20　　these meetings, excluding meetings that involved
21　　counsel of course?
22　A.　I don't think that I had any meetings that did not
23　　include counsel.
24　Q.　Okay.  I mean, was nine years chosen because there
25　　would be no other pension contributions being made by

Elisa Dreier Reporting Corp.　(212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt　Doc 13634-9　Filed 09/09/22　Entered 09/09/22 18:47:23　Page 26 of
39

CHARLES MOORE

1
2    the City into the GRS during that nine-year period?
3    A.  There is certainly a factor that comes into play here.
4        First of all, nine years takes us to June 30th of
5        2023.  That's when the first segment of the
6        projections ends.  As -- as you probably have seen,
7        beyond the ten years, the information is less detail.
8        It's based on a decade-by-decade basis.  So through
9        June 30th of 2023 is the -- time period that we're
10       talking about here.  There are actually contributions
11       coming from the general fund now.  Initially the City
12       did not contemplate that it would be making any other
13       contributions itself to GRS during that time period.
14       That has changed.  And the amount that goes towards
15       blight has been reduced from $500 million down to
16       $420 million, and as a result of that, the amount
17       going into the general retirement system during this
18       time period includes money from the general fund.
19   Q.  How much money?
20   A.  There is 2.5 million a year coming from library.
21       There's, I believe it's 92 million coming from the
22       general fund, just the general City operations.  So if
23       you add those two amounts together, which would be 22
24       million or thereabouts -- this is an exhibit to the
25       Disclosure Statement, so I'm going off the top of my

CHARLES MOORE

1
2        head, but if you were to provide that exhibit to me, I
3        could tell you exactly.  The -- so if you were to take
4        22 and a half million I believe from the -- from the
5        library and add I believe it's $92 million to that
6        from the general fund, that would be the total amount
7        coming from the City to GRS during this time period.
8        There are other sources of funds, though, as well.
9    Q.  Any other factor that goes to the determination of
10       nine years versus any other period of time?
11   A.  Well, the negotiations that have taken place as it
12       relates to the pension systems and the Retiree
13       Committee and the unions, especially as it relates to
14       the treatment of accrued benefits under the defined
15       benefit plans, have had elements associated with
16       June 30th of 2023 as important inputs to those
17       negotiations, one of which is funding level, and so
18       the funding level related to the --
19            MR. ULLMAN:  I'll just interrupt.  To the
20       extent you're getting into things that were the
21       subject of mediation, I just want to caution you not
22       to disclose that.
23            THE WITNESS:  Thank you.
24   BY MR. NEAL:
25   Q.  Can you answer the question without disclosing

CHARLES MOORE

1
2    media -- mediation communications?
3            MR. HAMILTON:  Can we -- I think we're
4        probably -- what is the pending question?  Can you
5        read back the pending question for me, please?  Not
6        his -- not what he just said but the previous
7        question.
8            (The requested portion of the record was
9            read by the reporter at 11:54 a.m.)
10           COURT REPORTER:  Any other factor that goes
11       to the determination of nine years versus any other
12       period of time?
13           MR. HAMILTON:  What I'd like to do, I'd
14       like to confer with the witness for a second to make
15       sure we don't -- that we address the concern about
16       mediation, but I do believe he can answer this
17       question, but I'd like to confer with the witness for
18       a second.
19           MR. NEAL:  Please do.
20           VIDEO TECHNICIAN:  The time is 11:54 a.m.
21       We are now off the record.
22           (Recess taken at 11:54 a.m.)
23           (Back on the record at 11:56 a.m.)
24           MR. HAMILTON:  So what I would like to do
25       is just have the court reporter read back the question

CHARLES MOORE

1
2    again that's pending and have the witness answer the
3    question.  Is that okay with you?
4            MR. NEAL:  Yes.
5            MR. HAMILTON:  All right.
6            MR. ULLMAN:  Are we striking what's already
7        on the record or . . .?
8            MR. HAMILTON:  No.  Just starting over.
9            MR. ULLMAN:  So just for confirmation, what
10       you've said so far does not reveal any confidential
11       mediation --
12           MR. HAMILTON:  We don't believe it does.
13       We believe it's appropriate to say how the number --
14       what the number is designed to do in the plan, and
15       that's appropriate.  We're not going to disclose what
16       happened in mediation that may have led to that.  But
17       what the number is in the plan and why it's there I
18       don't think is -- requires us to disclose what was in
19       mediation, and the witness is going to answer the
20       question to that -- to that extent.
21           MR. ULLMAN:  Okay.  I think we'll just
22       reserve our rights to what's on the transcript and to
23       the extent we think it improperly discloses anything
24       from the mediation, we'll make an appropriate motion
25       or consult with you as to how to deal with it.

CHARLES MOORE

1
2 MR. HAMILTON: We're not making any
3 representations as to what happened in mediation and
4 his answer isn't going to do that.
5 MR. ULLMAN: Let's proceed.
6 MR. GREEN: Retirement Systems will join
7 Mr. Ullman's reservation because the answer did state
8 that negotiations took place between the pension
9 system and the Retiree Committee, so just to be clear.
10 MR. HAMILTON: I'm not talking about his
11 reference to the mediation earlier in his earlier
12 answer. I'm talking about the answer he's going to
13 give now.
14 MR. GREEN: Right. So we're just reserving
15 the right to the prior answer that was already on the
16 record.
17 MR. HAMILTON: I don't think he disclosed
18 too much in that one, but go ahead.
19 (The requested portion of the record was
20 read by the reporter at 11:58 a.m.)
21 COURT REPORTER: Any other factor that goes
22 to the determination of nine years versus any other
23 period of time?
24 A. As I indicated previously, June 30th of 2023 is the
25 end of this first time period, so there are a number

CHARLES MOORE

1
2 of factors that we look at as of that date to say we
3 want the City to be positioned a certain way
4 financially at that point, and so having contributions
5 during that time period provides a basis for getting
6 the City to a certain point versus contributions
7 outside of that ten-year period, and, again, that --
8 those -- if contributions occur during this nine-year
9 period, that allows the City to understand what it's
10 going to have in the way of liabilities beyond that
11 ten-year period.
12 BY MR. NEAL:
13 Q. So one of the factors is trying to reach a certain
14 funding level for the GRS at the end of this period,
15 that being June 30th, 2023; correct?
16 A. Yes.
17 Q. And the desire was to reach a funding level at or
18 about 70 percent?
19 A. Yes.
20 Q. And in the absence of this pension contribution from
21 the DWSD, you would not be able to achieve the
22 70 percent funding level; correct?
23 A. Well, we could, but we would have to go about it in
24 different ways.
25 Q. And what would those different ways be generally?

CHARLES MOORE

1
2 A. Perhaps greater cuts to pension benefits, accrued
3 pension benefits.
4 Q. Did Milliman recommend this nine-year amortization
5 period?
6 A. No. Milliman just ran the analyses based on inputs
7 from the City and its advisors.
8 Q. So the nine-year amortization period is not an
9 actuarially determined period of time within which to
10 amortize the unfunded liabilities?
11 A. I'm not sure I understand that question.
12 Q. So there -- I'll rephrase it. So there is no actuary,
13 Milliman or otherwise, that said nine years is the
14 state-of-the-art and the actuarial practice for
15 amortizing unfunded liabilities?
16 A. Correct. I did not hear them make that statement.
17 Q. Nor did you hear them give an opinion one way or the
18 other as to whether you should choose nine years,
19 15 years, or 30 years?
20 A. Correct.
21 Q. You gave Milliman a set of assumptions and they came
22 back to you with what the funding levels would have to
23 be; correct?
24 A. The -- just so we're clear, when you say the funding
25 levels, what the project -- or what the contributions

CHARLES MOORE

1
2 would need to be.
3 Q. Yes. Thank you. That was helpful. Cleaned up a
4 messy question.
5 Did anyone at the City, including its
6 professional advisors, determine what the impact would
7 be if this amount, this unfunded liability was
8 amortized over 30 years as opposed to nine?
9 MR. ULLMAN: Objection. Form.
10 A. I know that I've looked at what that contribution
11 would be, but in terms of what the impact would be, it
12 could impact a lot of things and there are a lot of
13 moving parts, so it's a question of whether those
14 other parts would move. So from that standpoint,
15 it's -- it's really not just one other scenario, if
16 you will. There are a variety of things that could
17 come into play if the proje -- or if the contributions
18 took place over a period longer than nine years.
19 BY MR. NEAL:
20 Q. And what are those variety of things, those moving
21 pieces?
22 A. Well, as I just indicated, what the level of benefit
23 reduction is plays into that. What contributions
24 would be taking place in the sources to make those
25 contributions after 2023 also comes into play.

CHARLES MOORE

1
2  Q.  So there is the potential that benefit reductions to
3      all retirees would be lower if the DWSD funded over a
4      longer period of time?
5  A.  The reductions would be higher.  You would need
6      greater reductions or -- or more reductions
7      potentially, but it all depends on the various
8      parameters that you use.
9  Q.  Thank you.  I'm 0 for two in my last questions.  Let
10     me try to wrap this section up and I think we should
11     take a lunch break so I can get some sugar in my
12     system.
13         Is the Grand Bargain -- you've heard of the
14     term "Grand Bargain"; correct?
15 A.  Yes.
16 Q.  Is that dependent on approval of the 428.5 million
17     pension allocation?
18 A.  No.  Those are completely separate items.
19 Q.  Is any part of the plan dependent upon the approval of
20     this 428.5 pension allocation?
21         MR. HAMILTON:  Object to form.
22 A.  Not that I'm aware of.
23         MR. NEAL:  I think now would be a good time
24     for -- for a lunch break.
25         VIDEO TECHNICIAN:  The time is 12:03 p.m.

CHARLES MOORE

1
2      We are now off the record.
3      (Recess taken at 12:03 p.m.)
4      (Back on the record at 12:50 p.m.)
5  BY MR. NEAL:
6  Q.  Good afternoon, Mr. Moore.
7  A.  Good afternoon.
8  Q.  The 6.75 percent investment return that is used to
9      calculate the DWSD pension contribution, how is that
10     percentage selected?
11 A.  That was the product of negotiation.
12 Q.  In essence, a settlement between the City and the
13     retirees?
14 A.  Yes.
15 Q.  What happens if projections are worse than projected?
16     That is, what happens during that nine-year period if
17     the projections come in at six percent?  Does that
18     mean --
19         MR. HAMILTON:  You mean the returns?
20         MR. ULLMAN:  Objection.  Form.
21 BY MR. NEAL:
22 Q.  Returns.
23         MR. HAMILTON:  Yeah.
24 BY MR. NEAL:
25 Q.  What does that mean with respect to DWSD's payment

CHARLES MOORE

1
2      obligation?
3         MR. ULLMAN:  I'm going to object to the
4      form.
5  A.  I just want to make sure that I understand the
6      question.
7  BY MR. NEAL:
8  Q.  Yes.
9  A.  You're asking what happens if the actual return on
10     plan assets associated with DWSD is worse than the
11     6.75 percent?
12 Q.  As always, you do a better job than I do in framing
13     the question.  That is my question.
14 A.  Okay.  The payments that are contemplated in this
15     nine-year period are not in any way a full settlement
16     on that unfunded liability.  It is -- they are the
17     payments that are necessary in order to fund the
18     unfunded liability amount as of June 30th of 2014.  So
19     to the extent that actual performance or return on
20     plan assets is lower and therefore the contributions
21     that are made do not fully pay for or fund the
22     unfunded amount, then DWSD would have an additional
23     amount to be funded.
24 Q.  Now, what if investment returns are greater than
25     projected?

CHARLES MOORE

1
2  A.  Then we would have a situation where, all else being
3      equal, potentially at the end of this period that
4      we're talking about, June 30th of 2023, that the
5      amount related to DWSD for GRS for the previously
6      accrued benefits could be greater than 100 percent
7      funded at that time.
8  Q.  Does that mean the DWSD gets a refund or rebate of
9      sorts?
10 A.  That wouldn't be likely, but there are a variety of
11     factors that could happen over time, so my guess, and
12     this is purely a guess because there's nothing set in
13     this regard, is that if, for instance, it's funded at
14     105 percent at June 30th of 2023, it would be funded
15     at that level to allow for or to absorb any future
16     negative variances, negative variances not just
17     related to return on plan assets but also actuarial
18     variances.
19 Q.  All right.  Let me explore that a little further.
20     What if -- different scenario.  What if the City,
21     unfortunately and regrettably, has to file for
22     bankruptcy again in 2024?  Will the DWSD employees
23     have their share of the -- of their pension
24     contributions a hundred percent funded by virtue of
25     this 428.5 payment over nine years?

CHARLES MOORE

1
2 A. That's a hypothetical that I can't speculate on.
3 Q. Well, let's -- let's talk about the actual, and, that
4 is, under the plan, as projected by 2023, the GRS will
5 be 70 percent funded; correct?
6 A. Yes.
7 Q. Such that that 70 percent funding ratio applies to all
8 employees and retirees that are subject to the GRS;
9 correct?
10 A. Yes. GRS does maintain separate reporting for the
11 four different divisions within GRS.
12 Q. So would it be fair to say at that point or not that
13 if you're a DWSD employee you'd be a hundred percent
14 funded but if you're a DOT employee you're only
15 70 percent funded?
16 A. Well, I'm going to continue on with the hypothetical
17 as far as I can.
18 Q. Yes.
19 A. Just based on what we have in the plan, and if
20 everything goes exactly as we anticipate, plan assets,
21 return, 6.75 percent year, there are no unanticipated
22 actuarial variances, positive or negative, and we get
23 to June 30th of 2023, I would anticipate that the
24 actuarial valuation report for GRS at that time,
25 assuming that there are still four divisions of GRS,

CHARLES MOORE

1
2 would show DWSD funded at 100 percent and the other
3 three divisions at something less than 100 percent.
4 Q. At the time of the bankruptcy last year, July 18th,
5 2013, was there such a breakdown within each
6 department?
7 A. Each division.
8 Q. Each division.
9 A. Yes.
10 Q. But you can't say one way or another whether in that
11 hypothetical, a bankruptcy filing in 2024, whether the
12 DWSD employees would get a hundred percent of their
13 pension whereas a DOT employee would get 70 percent?
14 A. That seems to me like a legal issue that I'm not in a
15 position to respond to.
16 Q. Are you expressing a view or an opinion as to whether
17 or not this DWSD pension allocation should be treated
18 as a current expense under the water or sewer
19 indentures?
20 A. That's how it's been treated in the projections, so
21 based on the information that I have, that and how it
22 has been handled previously, that is how we've
23 included it.
24 Q. But are you, Charles Moore, saying that's how it
25 should be treated?

CHARLES MOORE

1
2 A. I have not received all of the guidance that I think
3 should be obtained before making a conclusion on that.
4 Certainly as we sit here today, I'm not expressing an
5 opinion on that. I'm just conveying how we have
6 presented it.
7 Q. What other guidance are you awaiting?
8 A. We have sought questions of the City's accountants in
9 terms of treatment, and I'm sure that there will also
10 be legal input to that as well.
11 Q. And who are the City's accountants?
12 A. I believe the questions have been posed to Plante
13 Moran at this point in time. The auditors for the
14 City are KPMG.
15 Q. And when do you expect to hear back from Plante Moran?
16 A. I would expect fairly shortly, fairly shortly being
17 within the next month I would assume.
18 Q. Do you have a view or an opinion as to whether DWSD's
19 payment of its 428.5 million over nine years is
20 something that is feasible for DWSD to do?
21 A. The projections -- the projections, specifically
22 Exhibit L to the Disclosure Statement, would indicate
23 that there is adequate cash to be able to do that.
24 Q. You testified in December 2013 in this case; is that
25 right?

CHARLES MOORE

1
2 A. I believe that's when my deposition related to the
3 post petition financing occurred, yes.
4 Q. And I'm going to read you part of that transcript and
5 then show it to you. It's just a couple sentences.
6 You testified that "DWSD does not operate at a
7 deficit. The surplus, however, cannot flow to the
8 general fund, so the proposal to creditors was based
9 on a general fund projection, and as a result, the
10 subsequent activities occurred related to the
11 enterprise fund operations of the water and sewer
12 funds."
13 Do you recall that testimony?
14 A. Not really. And I don't know what the question was
15 that I was responding to. May I look at the question?
16 Q. Let me see if there is -- is a question. Okay. Let
17 me hand you -- yes. The question starts at the bottom
18 of Page 68 of this mini transcript and continues on to
19 Page 69.
20 A. Okay. I see -- I've read the preceding question and
21 what you pointed me to.
22 Q. And that was your understanding then and that is your
23 understanding today; correct?
24 A. Just to clarify, the information that you read, which
25 was my response, seemed to be getting at the fact that

CHARLES MOORE

1 we did not look at DWSD during the January to
2 June 2013 time period, and I was responding that DWSD
3 is a separate enterprise fund and therefore it's not
4 included in the general fund, only enterprise funds
5 that operate on a deficit or at a deficit were, and
6 that DWSD does not operate at a deficit.
7 Q. Well, let me just ask you. The second sentence that I
8 read earlier, I'll read it again, "The surplus,
9 however, cannot flow to the general fund," and the
10 sentence continues from there. Do you see where I'm
11 reading?
12 A. Yes.
13 Q. And that was your understanding then and that's your
14 understanding today, correct, that there's no surplus
15 that can flow from the general fund -- excuse me, can
16 flow from the DWSD to the general fund; correct?
17 A. I would just expand on that a little bit. Certainly
18 my understanding then is the same as it is now, which
19 is that funds to reimburse for the cost of services
20 can flow from an enterprise fund to the general fund,
21 but just in general, if an enterprise fund makes a
22 profit, those profits can't flow over to the general
23 fund.
24 Q. Are you familiar with the concept of closed loop?

CHARLES MOORE

1 Have you heard that term used before?
2 A. I have, yes.
3 Q. And what -- what's your understanding of that term as
4 it relates to DWSD?
5 A. Essentially that the profits, if there are any, stay
6 within the system.
7 Q. I want to spend five -- five minutes or so on -- on
8 your background unrelated to the City of Detroit.
9 Now, have you provided professional services to
10 Chapter 11 debtors?
11 A. Yes, I have.
12 Q. Can you identify the Chapter 11 debtors that you've
13 provided services to over the past five years?
14 A. Sure. Let's see here. I'm involved in a case right
15 now, The Budd Company which filed in Chicago. I was
16 involved in the Greektown Casino and Hotel bankruptcy.
17 These are debtor side cases.
18 Q. That's all I'm asking for. Thank you.
19 A. Within the last five years, just on the debtor side
20 alone, that may be it. But I typically will work on
21 25 cases a year, so I'd have to go back and review my
22 files for any other debtor side cases that I've worked
23 on in the five-year period besides City of Detroit
24 obviously.

CHARLES MOORE

1 Q. Let me expand the question a little bit. What are
2 some of your larger debtor side engagements in your
3 career, Chapter 11 cases?
4 A. Certainly. Again, off the top of my head, it's --
5 it's going to be fairly difficult because there are so
6 many, but certainly Greektown Casino and Hotel was a
7 very large debtor side case. The Budd Company is a
8 very large debtor side case. And these are only
9 Chapter 11 filings? Okay. One thing to just make
10 clear, probably -- it would depend on any given year,
11 but less than half of my work is done within
12 bankruptcy court versus out-of-court work, even though
13 the vast majority of my work is done on the debtor
14 side. Hastings Manufacturing, Willard Corporation.
15 I'd have to go back and look at my records for other
16 large Chapter 11 cases.
17 Q. In any of those engagements, had you been asked to
18 prepare a liquidation analysis?
19 A. Yes.
20 Q. And what is your understanding of a liquidation
21 analysis in the context of a Chapter 11 case?
22 A. A liquidation analysis is oftentimes used in what's
23 referred to as best interest to creditors to determine
24 whether what is being proposed will be at least what

CHARLES MOORE

1 creditors could get if the entity or the assets were
2 liquidated.
3 Q. Recognizing that municipalities cannot nor should
4 liquidate. You and I would agree on that; correct?
5 A. Yes.
6 Q. And understanding that you had a brief exchange
7 yesterday with Mr. Soto about a dismissal analysis,
8 have you or your team at Conway MacKenzie prepared a,
9 for lack of a better term, a dismissal analysis for
10 the DWSD?
11 A. No. The business plan that we put together
12 essentially contemplates the operation of DWSD outside
13 of Chapter 9. However, there are certain line items,
14 which we've covered here today, that have been
15 adjusted based on the proposed treatment of those
16 liabilities, but when it comes to the operations of
17 the DWSD projections, those would not differ whether
18 DWSD was operating as part of the Chapter 9 process or
19 not.
20 Q. Do you know if anyone outside of Conway MacKenzie
21 prepared a dismissal analysis for the DWSD?
22 A. I don't know.
23 Q. The adjustments that were made in Exhibit M, which is
24 your -- Exhibit M to the Disclosure Statement, which

CHARLES MOORE

1
2    is Porter Exhibit Number 12, the adjustments that were
3    made to account for a post restructuring environment
4    include adjustments for pension; is that right?
5 A.  Yes. Both accrued and prospectively earned benefits.
6 Q.  It also includes adjustments for OPEB; correct?
7 A.  Yes.
8 Q.  It includes adjustments for the DWSD's allocated share
9    of the COPs; correct?
10 A.  Yes.
11 Q.  It includes the pension admin fee; correct?
12 A.  I would say that in -- in a sense it does because it
13    calls out separately administrative charges. Those
14    have always been paid by DWSD, but they have been just
15    taken out of the contributions that DWSD makes. So I
16    would not say that there is really a change. It's
17    more of a change in approach or presentation.
18 Q.  It also includes payment of professional fees for the
19    City's Chapter 9 professionals; correct?
20 A.  Yes.
21 Q.  Before I go on, and I know we covered this briefly
22    before lunch, the professional fee number is not based
23    on time actually devoted to DWSD matters; correct?
24 A.  The professional fee number that you're referring to
25    is the $20 million?

CHARLES MOORE

1
2 Q.  Yes, sir.
3 A.  It -- it is -- that's correct. The calculation is
4    based off of, as I indicated before, the $130 million
5    allocated under four different methods and then using
6    an average of those four methods.
7 Q.  Do you know if the professional fees devoted to DWSD
8    matters is more or less than the $20 million that is
9    reflected in the ten-year projections?
10 A.  I don't know. Obviously the City has not actually
11    incurred or paid, at least to the best of my
12    knowledge, $130 million yet, so that $130 million
13    takes into account fees to be earned and/or paid in
14    the future, which certainly could get to $20 million
15    or more related to DWSD if it's not already there.
16 Q.  So going back to the restructured obligations under
17    the ten-year projections that you and your team
18    prepared, pension, OPEB, COPs, the pension admin fee
19    subject to your qualification -- or clarification,
20    excuse me, and professional fees; correct?
21 A.  Yes. The swaps as well.
22 Q.  Thank you. Anything else?
23 A.  Well, it doesn't have a -- an impact on the numbers,
24    again, as I indicated, which we received from Miller
25    Buckfire. It does take into account the option that

CHARLES MOORE

1
2    is included in the plan for DWSD bondholders.
3 Q.  And that is the option to elect to receive existing
4    rate DWSD bonds; correct?
5 A.  That's correct.
6 Q.  Anything else?
7 A.  No. I believe that's it.
8 Q.  So I have listed seven items. I just want to go
9    over it with you again. Pension, number one; OPEB,
10    number two; COPs, number three; pension admin, number
11    four; professional fees, number five; swaps, number
12    six; and the option to elect existing rate DWSD bonds
13    is number seven?
14         MR. HAMILTON: If that's a question, I'm
15    going to object to form because I don't think that's
16    fair to characterize pension admin as a change given
17    what his testimony was, but . . .
18         MR. NEAL: And I'll accept what his
19    testimony was.
20 BY MR. NEAL:
21 Q.  I'm not trying to put words in your mouth. But do
22    you -- other than those seven items, can you think of
23    any other items or obligations that are being
24    restructured in the Chapter 9 plan that are reflected
25    in the ten-year business projections for DWSD?

CHARLES MOORE

1
2 A.  No others that I can think of.
3 Q.  If the Chapter 9 case were dismissed, the DWSD would
4    have to pay its unrestructured obligations with
5    respect to let's just assume all of the items, items
6    one through seven that we went through; is that right?
7 A.  I haven't done that specific analysis, and I'm sure
8    that there are legal considerations involved in what
9    DWSD would have to do if the Chapter 9 case was
10    dismissed.
11 Q.  Do you have any basis to believe that the DWSD would
12    not be able to charge rates sufficient to pay these
13    obligations as well as its -- all of these obligations
14    under the ten-year forecast if the Chapter 9 case were
15    dismissed?
16 A.  Certainly it would be a concern.
17 Q.  What do you mean by a concern?
18 A.  Well, there are multiple aspects of what DWSD or any
19    utility, for that matter, charges. It's one thing to
20    say we're going to increase rates as necessary to
21    cover costs, but an important consideration is
22    affordability, and to the extent that you have to --
23    or to the extent that you increase rates beyond what
24    would be considered affordable, then what you would
25    see is that it really doesn't matter what rates you

31 (Pages 356 to 359)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 32 of 39

CHARLES MOORE

1 charge if you're not actually collecting. And so
2 based on how you asked the question, while DWSD may be
3 able to increase the rates to whatever, and I'm not --
4 and I'm not fully aware of the various legal framework
5 within the State of Michigan for caps or other
6 constraints on increasing those rates, assuming that
7 there aren't any, even if DWSD was able to raise its
8 rates as necessary to cover these costs, you would
9 still have to at a minimum consider the affordability
10 aspect.
11 Q. Well, recognizing that you view it as a concern and
12 taking into consideration your prior answer, have you
13 prepared any analysis that would demonstrate whether
14 or not the DWSD would be able to charge rates
15 sufficient to meet all of these obligations outside of
16 a Chapter 9 case?
17 A. I have not been asked to prepare that analysis.
18 Q. Have you seen an analysis prepared by anyone?
19 A. Not that I recall.
20 MR. NEAL: Can I have what's in Tab 35 of
21 the binder set?
22 BY MR. NEAL:
23 Q. Mr. Moore, I've handed you what has previously been
24 marked as Orr Exhibit Number 18. And as an aside, I
25

CHARLES MOORE

1 Q. You were a consultant for a preeminent bond insurance
2 company; is that correct?
3 A. I was.
4 Q. If I could have you turn to the last page, A-25. What
5 I ask you to do here, sir, is to read Points 1 through
6 6, and my question is going to be the same with
7 respect to each point, and that is, do you have any
8 information that would lead you to disagree with any
9 of the factual propositions in 1 through 6?
10 A. Would you like me to read those out loud or to myself?
11 Q. Read them to yourself.
12 A. Okay. Thank you.
13 Q. Take as much time as you need.
14 MR. HAMILTON: While he's reading them,
15 counsel, I don't want to get into a philosophical
16 dispute as to the difference between a factual
17 proposition and an opinion, but given the first
18 sentence on that -- of those, it's -- I'm not sure if
19 your question is asking the witness to distinguish
20 between facts and opinions or if he's disagreeing with
21 anything, whether it's a fact or an opinion, on this
22 page. Because your question was just about facts.
23 MR. NEAL: Then I will broaden my question
24 to include anything.
25

CHARLES MOORE

1 can't stress to you how difficult it is to take Orr
2 and Moore depositions in the same week. You can
3 ignore that comment. I'm going to represent on the
4 record this is an appendix. I think it's Appendix
5 1-A, Feasibility Report. Well --
6 MR. HAMILTON: II-A.
7 MR. NEAL: II-A. Thank you.
8 BY MR. NEAL:
9 Q. That has a cover letter dated July 17th, 2014, Foster
10 Group letterhead, letter to Ms. Sue McCormick. The
11 first question is, have you seen this document before?
12 A. I have not.
13 Q. Have you ever prepared a feasibility report for a bond
14 issuance?
15 A. I don't believe that I have.
16 Q. Have you ever prepared any rate analysis or rate
17 studies for a water or sewer department?
18 A. That has come into play with previous work that I've
19 done, yes.
20 Q. What previous work are you referring to?
21 A. In the Jefferson County, Alabama, case, that was an
22 important topic, and while certainly I was not serving
23 as a rate consultant, I looked at analyses associated
24 with their issues.
25

CHARLES MOORE

1 BY MR. NEAL:
2 Q. Do you disagree with either the fact or the opinions?
3 A. Can you restate your question one more time?
4 Q. Certainly. I will reframe it. You've had an
5 opportunity in the past few minutes to review what you
6 said is for the first time what is on Page A-25 of
7 Exhibit -- of Orr Exhibit 18; correct?
8 A. Yes.
9 Q. And you've read through all the items on Page A-25;
10 correct?
11 A. Items 1 through 6, yes.
12 Q. Do you have any disagreement with any of the facts or
13 opinions that are set forth in Items 1 through 6 on
14 Page A-25?
15 A. None of the underlying data that I would assume --
16 which would support these items has been provided to
17 me, so I'm not in a position to have an opinion either
18 way, to agree or to disagree or even to take a
19 position as it relates to these.
20 Q. Thank you. You can put the document aside.
21 What is the subject of litigation, and
22 there are several subjects of litigation for the DWSD
23 parties in this case, is the Interest Rate Reset Chart
24 in the Plan of Adjustment. Have you seen that chart
25

32 (Pages 360 to 363)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 33 of
39

CHARLES MOORE

1
2 before?
3 A. I've scanned it.
4 Q. What involvement did you have in the determination of
5 whether or not to impair or leave unimpaired certain
6 series of bonds?
7 A. I had no involvement.
8 Q. What involvement did you have, if any, with respect to
9 whether or not to strip or modify the call protection
10 features of certain of the DWSD bonds?
11 A. I had no involvement.
12 Q. Do you have any view or opinion as to whether or not
13 the proposed new interest rates under the plan are
14 market?
15 A. No, I don't.
16 Q. As you may know, the DWSD is pursuing a new sewer bond
17 issuance in the rough approximate amount of 150
18 million. What involvement do you have in that
19 process?
20 A. I made mention of that a few times earlier today in my
21 testimony, and my involvement has been, first of all,
22 to understand the projections, the draft projections
23 that have been put together by DWSD in support of that
24 financing and differences that exist between Exhibit M
25 and those projections for the sewer fund. In addition

CHARLES MOORE

1
2 to that, I participated in a meeting with DWSD
3 management and several others, including DWSD's bond
4 counsel, to address a number of questions as it
5 relates to the Plan of Adjustment and Exhibit M, and
6 through my colleagues, Mr. Hausman and Mr. Johnston, I
7 have essentially kept tabs on the status of the
8 financing process.
9 Q. Have you done any analysis to determine whether the
10 DWSD will experience higher financing costs as a
11 result of the proposed impairment of certain of the
12 DWSD bonds?
13 A. No.
14 Q. Do you know if that matter has been discussed amongst
15 the Emergency Manager and his professionals outside of
16 counsel and outside of mediation?
17 A. I'm not sure if it's been discussed outside of counsel
18 or mediation.
19 Q. Do you know if any sensitivity analysis has been
20 conducted to determine what if scenarios, that is, if
21 the D -- the new DWSD bonds are rated below investment
22 grade or above investment grade?
23      MR. HAMILTON: Object and instruct the
24 witness not to disclose any information in response to
25 that question that was developed in connection with

CHARLES MOORE

1
2 court-ordered mediation.
3 A. I'm not aware if any of that analysis has been
4 developed outside of use with counsel or as part of
5 the mediation process.
6 BY MR. NEAL:
7 Q. As part of the ten-year projections that you put
8 together as Exhibit M, are you projecting that the
9 DWSD will have to access the capital markets beyond
10 the 150 million new sewer bond issuance proposed for
11 this year?
12 A. Yes.
13 Q. And you have an assumption in Exhibit M as to the cost
14 of financing; correct?
15 A. Yes.
16 Q. I just want to make sure I'm reading the right line.
17 You could certainly pull it up. It's Porter Exhibit
18 12. I believe it's Page 3.
19 A. Yes.
20 Q. And so you have an assumption as to the cost of
21 financing that the interest rate will be approximately
22 4.63 percent?
23 A. Yes.
24 Q. And that's based on a Miller Buckfire analysis?
25 A. Correct.

CHARLES MOORE

1
2 Q. And you did not perform any such analysis yourself or
3 as a group within Conway MacKenzie?
4 A. Correct.
5 Q. And excuse me. I should have -- maybe I could be able
6 to find this myself, but since I have the author here,
7 where is the cost of -- where are the future
8 financings reflected in your projections?
9 A. Okay. So let me point you to a couple of things here.
10 If you look at Page 6, this is on a consolidated
11 basis, which is probably the easiest way to show this
12 to you. What you have here at the top is the
13 projected capital spending and then down below you
14 have the sources and uses. The improvement and
15 extension fund refers to revenue-financed capital
16 improvements, and then you have down below that this
17 relates to the new debt that is anticipated to be
18 obtained. And so the bond issuance row is that new
19 debt, and I believe that totals approximately
20 $1.6 billion.
21 Q. Sorry. What totals? Where would I -- what would I
22 total to reach that total?
23 A. Sure. Do you see the section called "Construction
24 Bond Fund"?
25 Q. Yes.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

CHARLES MOORE

1
2    A.  The second row, "Plus:  Bond issuance."
3    Q.  Um-hmm.
4    A.  And beginning in 2015, 123.8, 253.6, 208.5.  Those
5        across I believe will total to approximately
6        1.6 billion.
7    Q.  Thank you.  And this is for the consolidated systems;
8        correct?
9    A.  Correct.
10   Q.  Okay.  Just a few more questions, sir, and then I'm
11       going to yield to others in the room.  I want to go
12       just all the way back to your expert report, so Moore
13       Exhibit Number 1.  And I suspect this may be
14       self-evident, but I'm good at belaboring the obvious.
15       If you could look at Pages 6 through 8.  And this
16       would include a section that provides an overview of
17       the reinvestment initiatives that are the subject of
18       your expert report; is that correct?
19   A.  Yes.
20   Q.  And, generally speaking, that's about $1.7 billion
21       that the City proposes to invest through fiscal year
22       ending June 30th, 2023; correct?
23   A.  Just to clarify, I use three words here:  Investment,
24       which is 1.7 billion, revenue initiatives, which are
25       482 million, and then cost reductions or cost savings

CHARLES MOORE

1
2        of 358 million.  The three of those together are a net
3        approximately $877 million, and that's what -- the
4        three together is what we refer to as reinvestment
5        initiatives.  So investment is 1.7 billion.  You had
6        used the word "reinvestment," I believe.
7    Q.  I take it would this jump out at me on Slide --
8        Page 8, that you have your subtotal for investment is
9        1.7; correct?
10   A.  Yes.  If you -- actually if you look at Page 7.
11   Q.  Um-hmm.
12   A.  The second paragraph which begins "As set more fully."
13   Q.  Okay.
14   A.  You see $1.7 billion there, and the rest of that
15       paragraph just breaks out the 1.7 into six categories,
16       and then below that it indicates cost, this is in the
17       paragraph after that, cost savings of 358 million and
18       then revenue initiatives of 482 million, and on
19       Page 8, then, you see the total net reinvestment
20       initiatives of approximately 877 million.
21           MR. HAMILTON:  If you'll look at Exhibit 3,
22       there's a really cool graphic representation of that
23       if you want to see it.  The second page of Exhibit 3
24       of his report.  We worked hard on that.
25           MS. NELSON:  We did.

CHARLES MOORE

1
2           MR. NEAL:  Let the record note Jones Day is
3        proud of Exhibit 3.
4    BY MR. NEAL:
5    Q.  The total of the investment -- none of these
6        investment initiatives go toward or benefit the DWSD;
7        correct?
8    A.  Not directly.
9    Q.  Any benefits would be indirect based on improving life
10       within the City of Detroit; correct?
11   A.  That certainly could be one of them.  The -- the
12       strength of the City in general I would assume could
13       have indirect benefits to DWSD as well.
14   Q.  But a decision was made not to direct -- not to invest
15       directly within the DWSD; right?
16   A.  I'm not sure I understand your question.
17   Q.  Let me go back.  There's no direct investment of any
18       of these proceeds within the DWSD; correct?
19   A.  No.  But separately within Exhibit M there's
20       approximately $2.9 billion in capital improvements
21       that are being invested in DWSD.  Part of that
22       actually relates to its operations, including enhanced
23       information systems and other operational
24       efficiencies.  So that is included within Exhibit M.
25       This relates to the general fund as well as any

CHARLES MOORE

1
2        enterprise funds that are operating at a -- with a
3        subsidy from the general fund.
4    Q.  What about with respect to the department cost savings
5        initiatives?
6    A.  Same thing.  That is included in Exhibit M, not
7        included here.
8    Q.  And, lastly, the revenue initiatives?
9    A.  Same response.
10           MR. NEAL:  If we can go off the record.  I
11       need five minutes to see if I have just a few more
12       questions.
13           VIDEO TECHNICIAN:  The time is 1:34 p.m.
14       We are now off the record.
15           (Recess taken at 1:34 p.m.)
16           (Back on the record at 1:39 p.m.)
17              EXAMINATION
18   BY MS. QUADROZZI:
19   Q.  Good afternoon.
20   A.  Good afternoon.
21   Q.  I have a few questions for you.  Just a few.
22           Can you take a look at Exhibit M?  I think
23       it was identified as Porter 12 in front of you.
24           MR. HAMILTON:  That's correct.
25           MR. ULLMAN:  Do you remember what tab

34 (Pages 368 to 371)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 13634-9   Filed 09/09/22   Entered 09/09/22 18:47:23   Page 35 of
39

CHARLES MOORE

1
2    number that was?
3         MR. NEAL: J.
4    A. Yes. I have it.
5    BY MS. QUADROZZI:
6    Q. The capital improvement line -- lines in Exhibit M are
7       based on the OHM report; correct?
8    A. For the most part.
9    Q. Okay.
10   A. They're --
11   Q. I want to talk to you about the not most part, in
12     particular those. So if you take a look at what is,
13     and I'm using the numbers that you previously looked
14     at, so Page 193 out of 212 --
15   A. Yes.
16   Q. -- at the bottom. There is a line underneath "Capital
17     spending." It describes OHM Advisors, CIP estimates,
18     and then there is a line item "Unidentified capital
19     projects." And those are for the years 2020 through
20     2023.
21   A. Yes.
22   Q. From where did you derive those numbers?
23   A. These numbers are a placeholder based on the City --
24     I'm sorry, DWSD and its operating metrics by that time
25     in terms of how much cash that it would have. There

CHARLES MOORE

1
2    was capacity to take on additional capital
3    improvements. So while there were not specific
4    projects that were identified outside of the OHM work,
5    we put this in as a placeholder to provide for even
6    more capital improvements if those were necessary to
7    show that they would be able to -- that DWSD would be
8    able to fund those.
9   Q. Let me just make sure that I understand that. The
10    placeholder that you're describing, was that a
11    function just of a roll forward of dollars based on
12    your forecasts that would be in the system?
13   A. I'm not sure I understand your question.
14   Q. Okay. Well, let me see if I can make it clearer for
15    you. What I'm trying to understand is whether or not
16    there were any factors other than the forecasts, the
17    financial forecasts, that you used that allowed you to
18    decide what the size of those placeholders would be.
19   A. No. The amounts that you see, those four years, are
20    based purely on capacity, if you will, to fund
21    additional projects to the extent that those projects
22    would be identified and validated.
23   Q. So, for example, if your assumptions that led to the
24    2014 and 2015 revenue numbers proved to be incorrect,
25    those placeholder amounts could -- would be subject to

CHARLES MOORE

1
2    change based on what the actuals in those years
3    yielded?
4   A. Not necessarily.
5   Q. Okay. Explain to me how that is not correct.
6   A. To the extent that actual results for, as you say,
7    2014 and 2015 differ than what's in here, favorably or
8    un -- or unfavorably, what would be more likely to
9    happen is that in the future years, '16, '17, '18, as
10    an example, rates would likely be adjusted to make up
11    for that one way or another, and so you would have
12    quite a bit of operating experience that would take
13    place between '14 and '15, as you mentioned before,
14    you would get out to 2020, and as the process occurs
15    every year, rates are set taking into account not only
16    what the costs are anticipated to be but also what has
17    happened in the past.
18   Q. Okay. Let's -- let's stay with that for a minute.
19    Let's assume that the results of '14 and '15 are
20    unfavorable. Let's assume that the revenue is not as
21    you had projected. Let's then assume that you keep
22    everything else constant, that rates don't go up.
23    Fair to say that the amounts for the capital projects,
24    unidentified capital projects in those outlying years
25    would have to be adjusted?

CHARLES MOORE

1
2    A. No.
3   Q. Okay. Other than raising rates, would the -- would
4    the other option be to increase financing?
5   A. No.
6   Q. What would be the third option?
7   A. Most likely cost would be adjusted so that to the
8    extent that there's a variance in revenue, cost would
9    also be adjusted, and, as I indicated earlier, right
10    now revenues for fiscal year '14 at least to date as
11    far as I saw them, which I believe was through April
12    of 2014, revenue was below plan, but expenses are also
13    below plan, and they're even more favorable in terms
14    of a variance than the revenue variance. So we would
15    have a situation where the net for 2014 would
16    potentially come in better than the net, and it's
17    really all about the net cash flow in the end.
18    Revenue can be higher or lower, expenses can be higher
19    or lower, but it's about the net amount of cash flow
20    that the operation generates.
21   Q. Would you agree that it has been historically the
22    case, based on your expert review of the DWSD
23    financials, that the manner in which DWSD has operated
24    is to provide a decrease in capital expenditures in
25    order to make up in the bottom line a loss in revenue

CHARLES MOORE

1  
2 over the past say seven of the last ten years?
3 A. No. I would not agree with that. If you look at the
4 OHM study, their ten-year capital improvement plan,
5 you can actually see, and I'd have to have the study
6 in front of me, but there are years within the
7 ten-year period that you're referencing, several
8 years, where you see a pretty significant spike in
9 capital improvements that were undertaken. So this
10 has not been a situation where capital improvement
11 dollars have actually been shrinking. There was a lot
12 spent on capital within the last ten years.
13 Q. To your knowledge, based on the DWSD, so I'm not
14 talking the OHM, I'm talking the typical five-year
15 DWSD Capital Improvement Plans that they perform
16 within that department. You're familiar with those?
17 A. Yes.
18 Q. Okay. So based on just those, is -- is it fair to say
19 that DWSD has underspent its Capital Improvement Plans
20 in each of the last seven of ten years?
21 A. I don't recall looking at that specific analysis,
22 meaning going back and looking at five-year plans and
23 comparing that to what was actually spent, so I don't
24 think I can answer that question.
25 Q. I think when you were speaking this morning with

CHARLES MOORE

1  
2 Mr. Neal, you indicated that DWSD, you might have
3 called it executive staff, I might have the wording
4 wrong, approved your -- the work that you had done in
5 connection with Exhibit M, and my question to you is,
6 who specifically at DWSD did you review Exhibit M with
7 who said yes, we sign off on this?
8 A. My colleague, Wade Johnston, who I referenced earlier,
9 before Exhibit M was included with the Disclosure
10 Statement, I made sure that the DWS -- DWSD management
11 team, that was for sure Ms. Bateson, it may have been
12 Mr. Wolfson and it may have been Mr. Foster as well,
13 did not have any remaining concerns on this
14 information before it went into the Disclosure
15 Statement.
16 Q. Would it surprise you that Ms. McCormick testified
17 that she did not see Exhibit M prior to the time that
18 it was included in the Plan of Adjustment?
19 A. No. That doesn't surprise me, especially based on the
20 answer that I just gave.
21 Q. Does it surprise you that that was also Ms. Bateson's
22 testimony?
23 MR. HAMILTON: I'm not sure it was, but
24 let's assume it was. Would it surprise you?
25 A. If -- if Ms. Bateson -- I guess I would like to

CHARLES MOORE

1  
2 understand the specific question and I'd like to see
3 the answer. She may not have seen a cover page that
4 says Exhibit M on it. But that would definitely
5 surprise me if there was an indication that she had
6 not seen these projections.
7 BY MS. QUADROZZI:
8 Q. Okay. When you were talking this morning, this might
9 have been this afternoon, with Mr. Neal, you were
10 talking about the -- your involvement in connection
11 with the discussions about a regional authority. Do
12 you remember that testimony generally?
13 A. Yes.
14 Q. You talked in specific with Mr. Neal about your
15 involvement in connection with a proposal, you can
16 correct me if you don't like that word, that included
17 a $47 million a year lease payment. Do you remember
18 that?
19 A. Yes.
20 Q. And you also remember that there -- prior to that 47
21 million number there was an analysis that Conway
22 MacKenzie and you were involved in that had a larger
23 lease payment; correct?
24 A. Yes. We discussed two things this morning.
25 Q. Right.

CHARLES MOORE

1  
2 A. The business plan that had a higher lease payment in
3 it, and then when I was brought in by Ms. Fox around
4 the end of January, the discussions were around a
5 $47 million constant lease payment over 40 years.
6 Q. Okay. And I wasn't trying to reget your testimony. I
7 was just kind of trying to bring you back to where I'm
8 now going to leap off with with some questions. Were
9 you involved at all in a analysis that had a
10 $44 million a year constant payment?
11 A. I don't recall a $44 million. It certainly could be.
12 I just don't recall right now.
13 Q. Okay. Let me -- let me see if we can -- if we can --
14 if I can refresh your recollection at all,
15 understanding it's not a memory test. In January --
16 in December '13, January '14, during the discussions
17 with the counties, were you involved in any meetings
18 at which there was a proposal outlined by Miller
19 Buckfire with a constant $44 million lease payment?
20 A. Not that I can recall. My first involvement with the
21 counties after the initial time period in October was
22 in January.
23 Q. Do you recall in January any discussions with anyone
24 at Miller Buckfire or anyone else within Conway
25 MacKenzie, including Mr. Hausman, about whether or not

CHARLES MOORE

2   there had been a refinement of the -- of a constant
3   lease payment that made a jump from 44 to 47?
4 A. Not that I can recall. The $47 million number is the
5   one that always sticks out in my head, and I just
6   don't recall discussions around $44 million. It
7   certainly could be the case. Again, I -- I just don't
8   recall offhand discussions around 44 million.
9 Q. Okay. One more area, sir. If you can take a look
10   at -- this was Orr Exhibit 10. The tab is Tab 6.
11 A. What did this relate to?
12 Q. I don't believe that we --
13      MR. HAMILTON: It's the October 2nd 10-Year
14   Business Plan.
15 BY MS. QUADROZZI:
16 Q. Yeah. I don't believe it was separately marked, but
17   if you recall, there was a bit of discussion this
18   morning about in particular Page 40 of that.
19 A. Yes. I have it.
20 Q. Okay. Now, you -- and you can take a look at Page 40
21   if you want, but I just have a few questions on this.
22   You talked with Mr. Neal this morning about
23   optimization savings and how that was the line item
24   where only 50 percent was included in the business
25   plan number and the other amount was to be a benefit

CHARLES MOORE

2   that DWSD achieved. Do you remember that testimony?
3 A. A benefit that DWSD would retain.
4 Q. Correct.
5 A. Yes.
6 Q. My question to you, sir, is, and correct me if I'm
7   wrong, your testimony also was that you -- that
8   optimization savings was something that you analyzed
9   in connection with the EMA report?
10 A. The --
11      MR. HAMILTON: Go ahead.
12 A. The EMA report, as I testified earlier today, that was
13   something that was looked at. The optimization
14   savings is more based on the discussions with
15   management on the initiatives that they're
16   undertaking, and one of the -- one of the activities
17   that we looked at or that we undertook specifically
18   was to sit down with management and understand the
19   items in the EMA report versus -- and get management's
20   thoughts on the achievability of those as well as why
21   certain items could not be undertaken.
22 BY MS. QUADROZZI:
23 Q. And those items in the EMA report were a portion or
24   were considered and rolled into the optimization
25   savings that you have on that -- on that table?

CHARLES MOORE

2 A. The EMA report largely related to head count, and
3   there were a variety of reasons why the EMA number was
4   not used. This is the plan that management is
5   pursuing right now as it relates to head count in
6   particular.
7 Q. Well, you're aware, sir, that the EMA report was done
8   in 2012?
9 A. Yeah. I had indicated within the last two years, yes.
10 Q. Okay. And you are aware that the -- the EMA report,
11   just for clarification, was not improved -- approved
12   in its entirety by the City Council; correct?
13 A. I actually don't know that.
14 Q. Okay. The activities that were recommended in the EMA
15   report had begun to be put into place at DWSD within
16   calendar year 2013; correct?
17 A. Yes.
18 Q. So they were working along those lines, the head count
19   reductions, at least the portion that they were doing
20   of the EMA report, that was happening in 2013?
21 A. Yes.
22 Q. And continuing to this day?
23 A. Yes.
24 Q. What of this optimization savings is attributable to
25   the bankruptcy, sir?

CHARLES MOORE

2 A. Well, as we've talked about here, the -- I think
3   Mr. Neal essentially asked this question already. As
4   it relates to adjustments to the projections,
5   specifically for the Chapter 9 process, we covered
6   what he referred to as seven categories, Mr. Hamilton
7   objected about pension administrative costs, but as
8   you can tell, I didn't respond and we didn't cover
9   anything related to optimization as part of the
10   Chapter 9 process. So these activities are activities
11   that can and are being effectuated regardless of
12   whether the City is in bankruptcy or not.
13      MS. QUADROZZI: Okay. I don't have any
14   other questions.
15      MR. HAMILTON: Anybody else?
16      VIDEO TECHNICIAN: This concludes today's
17   deposition. The time is 1:57 p.m. We are now off the
18   record.
19      (The deposition was concluded at 1:57 p.m.
20   Signature of the witness was not requested by
21   counsel for the respective parties hereto.)
22
23
24
25

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1              CHARLES MOORE
 2          CERTIFICATE OF NOTARY
 3    STATE OF MICHIGAN )
 4              ) SS
 5    COUNTY OF WAYNE   )
 6
 7          I, Cheri L. Poplin, certify that this
 8    deposition was taken before me on the date
 9    hereinbefore set forth; that the foregoing questions
10    and answers were recorded by me stenographically and
11    reduced to computer transcription; that this is a
12    true, full and correct transcript of my stenographic
13    notes so taken; and that I am not related to, nor of
14    counsel to either party nor interested in the event of
15    this cause.
16
17
18
19
20
21
22          Cheri L. Poplin, CSR 5132, RPR, CRR
23          Notary Public,
24          Wayne County, Michigan
25    My Commission expires:  August 21, 2019
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022