# EXHIBIT 6-2 – OPINION

38907400.4/022765.00213

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA METRIS-SHAMOON, ET AL.,

Plaintiff,

v.

CITY OF DETROIT, ET AL.,

Defendant.

Case No. 18-13683

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
R. STEVEN WHALEN

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [121] AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [123]**

This case stems from the September 13, 2012, raid of Plaintiffs' homegrown medical marijuana business by members of the now defunct Detroit Police Department ("DPD") Narcotics Unit. (Am. Compl. ¶ 10). Plaintiffs initially brought claims under the Fourth and Fourteenth Amendments via 42 U.S.C. § 1983, alleging both individual and institutional liability. (*Id.* ¶¶ 29-48). Plaintiffs have since dropped their Fourteenth Amendment claim and have agreed to dismissal of several DPD Defendants. (ECF No. 123, PageID.2458; ECF No. 128, PageID.4037). What remain are Plaintiffs' Fourth Amendment claim against Sgt. Stephen Geelhood and

1

Plaintiffs' municipal liability claim against the City of Detroit. (ECF No. 125, PageID.3014).

Defendants argue in their Motion for Judgment on the Pleadings [121] that Plaintiffs' action is barred by the applicable statute of limitations and that their Amended Complaint fails to put Defendants on notice as to what they allegedly did to violate the Constitution. (ECF No. 121, PageID.2287). Defendants argue in their Motion for Summary Judgment [123] that Sgt. Geelhood is entitled to qualified immunity and that Plaintiffs have failed to set forth genuine issues of material fact as to their Fourth Amendment and municipal liability claims. (ECF No. 123, PageID.2472, 2483). For the reasons articulated below, Defendants' Motion for Judgment on the Pleadings [121] will be **GRANTED in part and DENIED in part** and Defendants' Motion for Summary Judgment [123] will be **DENIED**. Plaintiffs will be permitted to proceed to trial only on their municipal liability claim.

## FACTUAL BACKGROUND

On September 13, 2012, Sgt. Stephen Geelhood of the DPD swore out an affidavit in support of a search warrant for two houses—one located on Kings Dr., the other located on Wiloray Ave.—in Shelby Township, Michigan. (ECF No. 126-1, PageID.3052). His asserted bases for probable cause, both of which Plaintiffs challenge as to veracity, were a tip from a confidential informant/cooperating

2

individual ("CI") and his own surveillance. (*Id.* at 3053-54). The warrant issued and was executed later that day by Sgt. Geelhood, Sgt. Joe Tucker, Officer Juan Davis, and Officer Brian Johnson (the "Narcotics Crew" or "Crew Members").[1] (ECF No. 126-2, PageID.3056-58).

After finding no evidence of criminal activity at the Kings Dr. address, the Narcotics Crew made their way to the Wiloray Ave. address, home to Plaintiffs Mukhlis ("Mark") Shamoon and Debra Metris-Shamoon ("the Shamoons"), where Debra's elderly parents, Plaintiffs Paul and Julia Metris ("the Metrises"), were visiting for lunch. (ECF No. 123-2, PageID.2565; ECF No. 126-3, PageID.3076; ECF No. 126-59, PageID.3966). It was early afternoon, around 12:00 or 12:30 PM. (ECF No.126-3, PageID.3076, 3080). Plaintiff Carl Veres, a family friend of the Shamoons, was outside. (ECF No. 126-3, PageID.3067-68). What happened next is subject to some dispute.

## I.   PLAINTIFFS' VERSION

Carl was the first to notice something unusual was happening. He was traveling to the Wiloray Ave. house to pick up some clothes for an upcoming trip with the Shamoon's son, Adam, and observed a DPD vehicle following him. (ECF No. 123-19, PageID.2978-79, 2989). He thought little of it until he parked outside

---

[1] Other non-party law enforcement officials also appear to have been involved in the execution of the warrant.

the Shamoon's home and noticed several other law enforcement vehicles pulling up behind him. (*Id.* at 2980). He was on the phone with Adam at the time, and notified him of the vehicles. (*Id.* at 2981). Adam proceeded to call his mother. (ECF No. 126-3, PageID.3076).

Before Carl could get out of his truck, two Crew Members approached. (ECF No. 123-19, PageID.2981-82). The Crew Members did not identify themselves, though Carl later learned that one of them was Sgt. Tucker. (*Id.*). Sgt. Tucker pointed a shotgun at Carl's head through the passenger-side window; the other officer, armed with an assault rifle, "opened up the driver's side door, pulled [Carl] out by [his] shirt, slammed [him] to the ground, . . . cuffed [him,] and then picked [him] up and took [him] to the back of [his] truck." (*Id*. at 2982). Carl then observed several Crew Members break into the house through the front door without announcing their presence, while two others proceeded around the side of the house towards the back yard. (*Id.* at 2894).

Inside, Debra and her parents were having coffee. (ECF No. 126-3, PageID.3077; ECF No. 123-17, PageID.2890; ECF No. 123-18, PageID.2945, 2948). Debra had just started a phone call with Adam, who was attempting to pass along what Carl had told him, when Crew Members burst through the front door. (ECF No. 126-3, PageID.3076, 3080; ECF No. 123-17, PageID.2890-91; ECF No.

4

123-18, PageID.2945). One Crew member pointed a gun at Debra's face and "scream[ed] at [her] to shut [her] dogs up or he would shoot them." (ECF No. 126-3, PageID.3076). Julia, Debra's mother, immediately had her purse searched by a Crew Member; she believed they were looking for money. (ECF No. 123-18, PageID.2948, 2950). After three or four minutes of being held at gunpoint, Debra was permitted to remove her dogs to a bathroom. (ECF No. 126-3, PageID.3077). Paul, Debra's father, a former reserve sergeant with the Oakland County Sheriff's Department, was eventually relieved of a gun he lawfully carried. (ECF No. 123-17, PageID.2891-92). At no did time before entry did Crew Members announce who they were, provide a warning, or say, "police, search warrant." (ECF No. 126-3, PageID.3076). No Crew Member wore a badge or identified the police department to which they belonged. (*Id.* at 3076, 3078).

Outside, in the back yard, Mark was preparing to grill some steaks for lunch. (ECF No. 126-59, PageID.3982). Two Crew Members approached with guns aimed at his head and told him to drop what he was holding and put his hands up. (*Id.* at 3982, 3989). He was led to the front of the house, handcuffed behind his back, and directed to stand near Carl at the back of the Carl's truck. (*Id.* at 3982-83; ECF No. 123-19, PageID.2988). The two were instructed not to communicate with one another. (ECF No. 123-19, PageID.2984). Mark, who had a history of shoulder

surgeries, had asked not to be handcuffed from behind when he was first restrained. (ECF No. 126-59, PageID.3982). Nevertheless, it took Mark fifteen minutes of "almost begging" for his handcuffs to be repositioned, at which point he "was ready to cry from the pain," before an officer finally heeded his request. (*Id.* at 3983). Mark was taken inside the house after about thirty minutes. (*Id.*).

Prior to Mark being taken inside, Crew Members searched Carl's truck and questioned him about why he had come to the house. (ECF No. 123-19, PageID.2989). While conducting the search, which lasted about ten minutes, Crew Members punctured one of Carl's seats and "completely ripped everything out" of his vehicle, destroying the sound system. (*Id.* at 2998). Carl remained outside after Mark was taken into the house. (*Id.* at 2995). Eventually, about forty-five minutes after he had first arrived, Carl's handcuffs were removed, and he was instructed to leave. (*Id.*).

Back inside, Crew Members led Mark to the kitchen where Debra was being questioned and began to question him as well. (ECF No. 126-59, PageID.3984). They first asked Mark how much money was in his safe and instructed him to open it. (*Id.*). When he complied, Crew Members confiscated the $200 they found in the safe as well as $115 they found in Mark's wallet. (*Id.*). Two other safes were also in the house. One, an antique for which Mark did not have the combination, was broken

6

open by Crew Members but was empty. (*Id.*). The other, in the Shamoon's bedroom, contained twenty-two freezer bags of dried marijuana leaves that Mark was storing away from his children until he could dispose of them.[2] (ECF No. 126-2, PageID.3057; ECF No. 126-59, PageID.3985, 3987).

In addition to taking $315 from Mark, Crew Members confiscated all of the Shamoon's marijuana—just under seventy live plants—as well as their lawfully owned firearms. (ECF No. 123-15, PageID.2842; 2848). Both Mark and Debra were licensed medical marijuana caregivers and they cared for their plants jointly. (ECF No. 126-3, PageID.3069). Debra offered to let the Narcotics Crew see their paperwork and caregiver cards, but they were not interested. (*Id.* at 3071).

The Narcotics Crew left the Shamoon's home with as little notice as they provided upon entry. All in all, the raid lasted about an hour and a half or two hours and no warrant was displayed. (*Id.* at 3061, 3080). None of the Plaintiffs were charged with any crimes after the raid. (ECF No. 126-59, PageID.3980-81). Crew Members forgot to remove Mark's handcuffs before they left, and he remained cuffed for approximately ten hours. (ECF No. 126-59, PageID.3986; ECF No. 126-66, PageID.4029). Eventually, Mark's son, who worked in security and had his own handcuffs, was able to unlock Mark's cuffs. (ECF No. 123-15, PageID.2849, 2856).

---

[2] The part of the marijuana plant that is commonly smoked is the flower, which is where high levels of THC are found. (ECF No. 126-59, PageID.3959). The leaves have no value. (*Id.*).

## II.   DEFENDANTS' VERSION

Before the Narcotics Crew broke through the front door of the Shamoon's home, they announced "police, search warrant" and received no response. (ECF No. 123-2, PageID.2620). Their warrant, which would have been left at the scene, had been lawfully procured by Sgt. Geelhood. (*Id.* at 2616-20). He based his affidavit on information from a CI, which he corroborated with his own surveillance. (*Id.* at 2510). The CI, whom Sgt. Geelhood knew only as "Harry," is now deceased. (ECF No. 132-2, PageID.4124-31). Sgt. Geelhood does not have any records documenting the information he received from the CI or his own surveillance because, "as a matter of practice, [he does] not keep records or notes when using [a CI] and [does] not keep records from previous investigations." (ECF No. 126-48, PageID.3740).

After the Narcotics Crew forced their way into the Shamoon's home, they observed that there were no medical marijuana cards on display and concluded that "[n]othing about the grow operation was legal." (ECF No. 123-2, PageID.2580). Accordingly, Sgt. Geelhood deemed it unnecessary to ask for proof of licensure or inquire about whether there was more than one licensed provider. (*Id.*). Despite the operation's apparent illegality, Sgt. Geelhood declined to charge the Shamoons with a crime because he thought it might hinder future investigations and hoped to obtain

a "bigger haul." (ECF No. 123, PageID.2464). The Narcotics Crew ultimately confiscated 285 marijuana plants, not seventy. (*Id.* at 3056).

## PROCEDURAL BACKGROUND

Plaintiffs allege that they were asserted class members in the case of *Davis v. City of Detroit, et. al.*, No. 15-10547 (E.D. Mich.), filed February 11, 2015. (ECF No. 121-2, PageID.2311-15). The Davises claimed that they had been subject to illegal raids conducted by members of the DPD Narcotics Unit and sought institutional liability against the City of Detroit. (*Id.*). Once the Davises had an opportunity to conduct discovery, they were able to determine the specific officers involved, and filed an amended complaint on July 14, 2015, identifying those officers, who included Sgt. Geelhood. The Davises moved for class certification on July 14, 2016, but their motion was ultimately denied by Judge Borman on August 31, 2018. (ECF No. 121-4; ECF No. 121-6).

Upon denial of class certification, several putative class members filed individual lawsuits.[3] Plaintiffs here filed suit against the City of Detroit and several "Doe" DPD personnel on November 26, 2018. (Compl.). Through the discovery process, Plaintiffs identified Sgts. Joe Tucker, Candace Matschikowski, and Stephen

---

[3] In addition to the instant action, these lawsuits include: *Reid v. City of Detroit, et. al.*, No. 18-13681; *Frontczak v. City of Detroit, et al.*, No. 18-13781; *Lockard v. City of Detroit, et al.*, No. 18-13045; and *Gardella v. City of Detroit, et al.*, No. 18-13678.

9

Geelhood, as well as Officers Juan Davis and Brian Johnson, as the DPD members involved with the raid of their home. Plaintiffs amended their complaint to name those Defendants on March 21, 2019. (Am. Compl.). On October 23 and 24, 2020, Defendants moved for judgment on the pleadings and for summary judgment, respectively. (ECF No. 121; ECF No. 123). Plaintiffs responded on November 20, 2020. (ECF No. 128; ECF No. 125). Defendants replied in support of judgment on the pleadings on December 4, 2020, and in support of summary judgment on December 7, 2020. (ECF No. 130; ECF No. 132).

Plaintiffs have agreed to dismiss Defendants Johnson, Matschikowski, Davis, and Tucker, as well as their Fourteenth Amendment claim. (ECF No. 128, PageID.4037; ECF No. 123, PageID.2458). Remaining are Plaintiffs' Fourth Amendment claim against Sgt. Geelhood and Plaintiffs' municipal liability claim against the City of Detroit. (ECF No. 125, PageID.3014).

## STANDARD OF REVIEW

## I.   FED. R. CIV. P. 12(C)

Courts review a FED. R. CIV. P. 12(c) motion for judgment on the pleadings under the same standard applicable to a FED. R. CIV. P. 12(b)(6) motion to dismiss. *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 608 (6th Cir. 2014) (citing *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)). Judgment is

appropriate where the plaintiff fails to "allege 'enough facts to state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "Detailed factual allegations" are not strictly necessary, "but the complaint must contain more than conclusions and an unsubstantiated recitation of the necessary elements of a claim." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012). The court "assume[s] the veracity of well-pleaded factual allegations and determine[s] whether the plaintiff is entitled to legal relief as a matter of law." *Id.* (citing *Ashcroft*, 556 U.S. at 679). And although "the court primarily considers the allegations in the complaint, . . . matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (emphasis omitted) (quoting *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir.1997)).

## II.   FED. R. CIV. P. 56

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

C<small>IV</small>. P. 56(a). "A 'material' fact is one that 'might affect the outcome of the suit under the governing law.' And a genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the [nonmoving] party.'" *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) (citations omitted) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); then quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)).

The moving party bears the burden of demonstrating an absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

> If the moving party meets this burden, the burden then shifts to the nonmoving party to establish a "genuine issue" for trial via "specific facts." Additionally, the moving party is entitled to summary judgment when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Abu-Joudeh*, 954 F.3d at 840 (citations omitted) (quoting *Celotex Corp.*, 477 U.S. at 322, 324).

The court views all of the facts in the light most favorable to the nonmoving party and draws "all justifiable inferences" in the nonmoving party's favor. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "In other words, 'at the summary judgment stage[,] the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial.'" *Jackson*, 814 F.3d at 775 (alteration in original) (quoting *Anderson*, 477 U.S. at 249).

**ANALYSIS**

**I.     Defendants' Motion for Judgment on the Pleadings [121]**

     a.  <u>Statute of Limitations</u>

     Defendants first argue they are entitled to judgment on the pleadings because the statute of limitations has run on Plaintiffs' claims. (ECF No. 121, PageID.2287). In Michigan, the statute of limitations for § 1983 actions is three years and begins to run when a plaintiff becomes aware of the injury for which they are bringing an action. *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007); *Carroll v. Wilkerson*, 782 F.2d 44, 45 (6th Cir. 1986). Pursuant to the tolling doctrine announced in *American Pipe*, however, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974). Here, although the parties agree that the statute of limitations began to run on September 13, 2012, the date Plaintiffs became aware of the alleged constitutional violations, they disagree as to if, and for how long, the statute of limitations tolled. (ECF No. 121, PageID.2296; ECF No. 128, PageID.4038).

13

### i. City of Detroit

Plaintiffs will benefit from *American Pipe* tolling as to the City of Detroit if they are deemed asserted class members in *Davis v. City of Detroit, et. al.*, No. 15-10547 (E.D. Mich.). Defendants contend Plaintiffs are not asserted class members, while Plaintiffs argue they are. (ECF No. 121, PageID.2299-2303; ECF No. 128, PageID.4042-46). The Davises set forth six identifiers for their proposed class:

> (a) individuals who were the owners and/or occupants of homes and/or businesses engaged in the licensed distribution of marijuana for medical purposes; (b) who were subjected to search and/or seizure by agents and/or members of the Detroit Police Department's Narcotics' Unit; [(c)] from the period of February 11, 2012 until the date of judgment or settlement of this case; [(d)] who were never convicted of any offense arising from the search and/or seizure; [(e)] whose search and seizure were executed without probable cause; and [(f)] where such searches and/or seizures were conducted pursuant to Defendant City of Detroit's policies, practices, and/or customs.

(ECF No. 121-6, PageID.2391) (alterations in original).

Defendants argue that Plaintiffs fail to meet the first identifier because they have not alleged specific facts showing "they were operating in compliance with the Michigan Medical Marijuana Act." (ECF No. 121, PageID.2300). But this asks the Court to read an additional identifier into the class definition that simply is not there. Moreover, even if the Court were to infer this additional identifier, Defendants' analysis would fail. Nothing in the record suggests that Plaintiffs engaged differently in the distribution of marijuana than the plaintiffs in the *Davis* action.

Accordingly, Plaintiffs plausibly plead that they were asserted members of the putative class in *Davis*. (Am. Compl. ¶¶ 9-10, 16, 19, 27, 30). The statute of limitations thus tolled with respect to the City of Detroit from February 11, 2015, the date the Davises filed their complaint, to August 31, 2018, the date class certification was denied. (ECF No. 121-2, PageID.2309; ECF No. 121-6, PageID.2389).

From the time the raid took place on September 13, 2012, until February 11, 2015, 881 days had run on the statute of limitations. Another eighty-seven days elapsed between August 31, 2018, when class certification was denied, and November 26, 2018, when Plaintiffs commenced this action. Because the total number of days (968) is fewer than 1,095 (three years), the statute of limitations does not bar Plaintiffs' claims against the City of Detroit.

### ii. Sgt. Geelhood

According to Defendants, Sgt. Geelhood is subject to a separate tolling calculation because he was given a "John Doe" placeholder in the original *Davis* complaint and was not added by name until it was amended on July 14, 2015. (ECF No. 121, PageID.2297; ECF No. 121-2, PageID.230; ECF No. 121-3, PageID.2318).

In general, *American Pipe* tolling only applies to defendants named in the prior related class action. *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553,

15

568 (6th Cir. 2005). Plaintiffs concede that Sgt. Geelhood was not named in the original *Davis* complaint but argue that the February 11, 2015, tolling date should apply because the July 14, 2015, amendment related back to the original complaint. (ECF No. 128, PageID.4039).

FED. R. CIV. P. 15(c) determines whether an amendment to a complaint relates back to the filing date of the original complaint. *See generally Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010). In order for an amendment to relate back, "the party to be brought in by amendment . . . [must have] (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) [known] or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." FED. R. CIV. P. 15(c)(1)(C). Although Plaintiffs may satisfy the notice requirement, *see Berndt v. Tennessee,* 796 F.2d 879, 883 (6th Cir. 1986) (permitting amendment under Rule 15(c) based on constructive, rather than actual, notice), they cannot satisfy the "but for a mistake" requirement. *See Cox v. Treadway*, 75 F.3d 230 (6th Cir. 1996) (explaining that although the imputed knowledge doctrine is still recognized, "[s]ubstituting a named defendant for a 'John Doe' defendant is considered a change in parties, not a mere substitution of parties," and "such amendments do not satisfy the 'mistaken identity' requirement"); *see also Brown v.*

16

*Cuyahoga Cty.*, 517 F. App'x 431, 433-34 (6th Cir. 2013) (affirming "the continued vitality of *Cox*" and holding that "an absence of knowledge is not a mistake, as required by Rule 15(c)(1)(C)(ii)"). Accordingly, even though Geelhood may have had constructive notice under *Berndt*, his addition by the Davises did not relate back under Rule 15(c), and Plaintiffs' individual claims against him are barred by the statute of limitations.

      b. <u>Adequate Pleading</u>

Defendants next argue that "the Amended Complaint fails . . . to specify which of the named defendants were personally involved in or responsible for each alleged constitutional violation." (ECF No. 121, PageID.2303). Because all that remains is Plaintiffs' municipal liability claim, this argument is moot.

**II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      a. <u>An Underlying Constitutional Violation</u>

Defendants next argue that there has not been an underlying constitutional violation, and that without such a violation, there cannot be municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (ECF No. 123, PageID.2483). Defendants are correct that "[a] municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) (citing *City of Los Angeles v.*

17

*Heller*, 475 U.S. 796, 799 (1986)). Nevertheless, as long as a plaintiff can prove that they have suffered an underlying injury, they need not prevail on a claim against a specific actor in order to pursue municipal liability. *See, e.g.*, *Barnett v. Macarthur*, 956 F.3d 1291, 1301 (11th Cir. 2020) ("*Monell* . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government." (quoting *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985))); *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to [municipal] liability under § 1983."). Accordingly, although Plaintiffs' Fourth Amendment claims against the individual officers are now out of the picture, proceeding to the *Monell* analysis is proper as long as there is a question of fact as to whether Plaintiffs' Fourth Amendment rights were violated. As set forth below, there is.

It is axiomatic that "an officer [or investigator] cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (quoting *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir.1989)) (alteration in original). "Such reliance is unreasonable, and [search or seizure] . . . pursuant to such

deceptive practices violates the Fourth Amendment." *McCallum v. Geelhood*, 742 F. App'x 985, 991 (6th Cir. 2018) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006)). *See generally Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (establishing procedure for challenging warrant veracity).

Here, Plaintiffs allege that the material portions of Sgt. Geelhood's warrant affidavit—his claims of being tipped off by a CI called Harry and conducting independent surveillance—were untruthful, and that the resulting raid on the Shamoon's home was invalid. (ECF No. 125, PageID.3019). As an initial matter, the Court agrees that without the alleged tip and surveillance, the only evidence in support of the warrant would have been excessive electricity use, which could not have supported a finding of probable cause. (ECF No. 126-1, PageID.3053-54); *see United States v. Thomas*, 605 F.3d 300, 315 (6th Cir. 2010). Accordingly, the question is whether Plaintiffs' evidence creates a reasonable dispute of material fact as to whether Sgt. Geelhood received and corroborated a tip from a CI. The Court finds that it does.

First, although Defendants have produced a death certificate for an individual whom Sgt. Geelhood apparently knew as "Harry," nothing in the record apart from Sgt. Geelhood's word connects Harry to the Shamoons, narcotics trafficking, or anything in this case. (ECF No. 132-3, ECF No. 132-4, ECF No. 132-5, ECF No.

132-6). Indeed, the DPD detective overseeing the investigation on Harry's death "[did] not recall [Sgt. Geelhood] telling [him] that [Harry] was working as an informant," and believed "that [Harry] was [likey] killed in connection with . . . auto theft," not narcotics trafficking. (ECF No. 125-5, PageID.4151-52). In addition, Sgt. Geelhood had no record of meeting or speaking with Harry in relation to the Shamoon warrant and could not recall any other cases in which Harry provided information. (ECF No. 132-7, PageID.4157). In an interview with DPD Internal Affairs regarding misconduct in the department, DPD Deputy Chief Charles Fitzgerald opined that 1) even "nine years later," an officer "should have knowledge of who [their] CI is," and that 2) an officer's alleged reliance upon a CI whose true name is unknown, even "for anonymity purposes," raises the question of whether there is "truly a CI."  (ECF No. 126-14) (audio recording 34:43-37:20).[4] Although Defendants offer a plausible explanation for why Sgt. Geelhood had no written records of his dealings with Harry,[5] his inability to recall even one other instance in

---

[4] Defendants contend that Fitzgerald's interview is inadmissible hearsay. (ECF No. 132, PageID.4113). But Plaintiffs' "evidence need not be in admissible *form*," so long as "its *content* [is] . . . admissible." *Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 324; *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994)). Here, because the only portion of the interview the Court relies upon would be admissible at trial if Deputy Chief Fitzgerald were to testify, it is appropriate for consideration at summary judgment.

[5] Unlike Sources of Information ("SOIs"), CIs are not registered with the DPD and are not paid for their information. (ECF No. 126-6, PageID.3135-36). According to Sgt. Geelhood, it was the practice of the Narcotics Unit "not [to] keep files on [CIs]." (ECF No. 132-7, PageID.4157).

which Harry provided information is concerning, particularly since he claims that

"[t]he information [Harry] was giving [him had] proved to be reliable." (ECF No.

132-7, PageID.4157). Likewise, the fact that Sgt. Geelhood was apparently helping

Harry "[get] in touch with the right people" at U.S. Immigration and Customs

Enforcement further undercuts the credibility of the warrant affidavit, which alleged

that the CI was providing information against their own interest. (ECF No. 126-1,

PageID.3053; ECF No. 132-2, PageID.4125). In sum, while Defendants may have

established the existence of a man Sgt. Geelhood knew as "Harry," Defendants have

not established beyond a reasonable dispute of material fact that Harry was the CI

referenced in Sgt. Geelhood's affidavit or that such a CI even existed.[6]

Second, while Sgt. Geelhood claims to have surveilled the Shamoon's address

on approximately five occasions prior to seeking a warrant, Defendants have

produced no documentary evidence in support of this claim. (ECF No. 126-50,

PageID.3768; ECF No. 132-7, PageID.4158). According to Deputy Chief Fitzgerald,

DPD officers are required to document their surveillance, even if it is just jotting a

---

[6] Because of the ease with which an officer could allege reliance upon a non-existent CI, courts in the Eastern District have sometimes held that where a CI cannot be produced for an in-camera deposition, "[the defendants] must be precluded from presenting any evidence at trial based on, or flowing from, the alleged existence of the CI." *Smith v. City of Detroit*, 212 F.R.D. 507, 511 (E.D. Mich. 2003). Though an order to this effect may ultimately be necessary if this case goes to trial, the Court will not make a final decision at this juncture. Plaintiffs are free to raise their request again later via a motion in limine.

21

note on the back of a receipt. (ECF No. 126-14) (audio recording 10:45-12:05). Although it is reasonable that some of Sgt. Geelhood's documentation might have been discarded after nearly nine years, Sgt. Geelhood claims his investigation was ongoing, and the City's record retention policies require that case reports for felony investigations, including case logs, be retained for at least twenty years. (ECF No. 126-44, PageID.3709-10; ECF No. 126-50, PageID.3771). Against this backdrop, the absence of any documentation is, at least, peculiar. Accordingly, there also remains a question of fact about whether, and to what extent, Sgt. Geelhood surveilled the Shamoon's home.

Based on the foregoing, the Court finds that Plaintiffs have demonstrated a genuine dispute of material fact as to whether Sgt. Geeelhood included knowingly false statements in his warrant affidavit with the intent to mislead the issuing judge.[7] Defendants' argument that Plaintiffs must make a "strong preliminary showing" (*i.e.* go beyond merely establishing a question of fact) is unpersuasive. (ECF No. 123, PageID.2474). In § 1983 cases, this heightened standard from *Franks* applies only

---

[7] Plaintiffs also proffer considerable evidence of a culture of corruption in the Narcotics Unit pursuant to which it would have been easy for a sergeant to falsify a warrant affidavit. Some of this evidence may be inadmissible propensity evidence, but certainly not all of it. For example, Plaintiffs offer deposition testimony from DPD Chief James Craig that "there were [previously uninvestigated] criminal and administrative violations occurring" in the Narcotics Unit, and that "sergeants may have been . . . directly involved." (ECF No. 126-34, PageID.3522, 3524). In any case, this evidence, though persuasive, is not vital to the Court's finding.

when qualified immunity is at issue or where there are no "factual questions *underlying* the probable-cause determination." *Harmon v. Hamilton Cty.*, 675 F. App'x 532, 543 (6th Cir. 2017); *see Vakilian*, 335 F.3d at 517l. Neither of those circumstances are present here. Moreover, even assuming for the sake of argument that the heightened *Franks* standard did apply, the Court would find it satisfied on the evidence above. Accordingly, the question of probable cause is one for the jury, and the Court will proceed to Plaintiffs' *Monell* claim.[8] *See Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) ("[I]n a § 1983 action[,] fact-finding under the *Franks* standard is the province of the jury." (citing *Hindman v. City of Paris*, 746 F.2d 1063, 1067 (5th Cir. 1984))); *see also Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("[A] jury trial is appropriate where reasonable disputes of material fact exist on facts underlying a probable cause determination.").

### b. *Monell* Liability

It is well established that "[a] municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). Rather, to prevail on a municipal liability claim, a plaintiff

---

[8] Because a question of fact exists as to probable cause, the Court need not reach the question of whether Plaintiffs' other alleged Fourth Amendment violations, each of which stem from Sgt. Geelhood's allegedly fraudulent warrant affidavit, also present a question of fact.

23

must "show[] that the municipality had a 'policy or custom' that caused the violation

of [the plaintiff's] rights." *Griffith v. Franklin Cty.*, 975 F.3d 554, 581 (6th Cir. 2020)

(quoting *Monell*, 436 U.S. at 694); *see Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981)

(noting that the policy or custom "must be 'the moving force of the constitutional

violation'" (quoting *Monell*, 436 U.S. at 694)).

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of*

*Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). Here, Plaintiffs allege liability

under the second, third, and fourth theories. (ECF No. 125, PageID.3029).

### i. *Actions Taken By Officials with Final Decision-Making Authority (i.e. Ratification Theory)*

Where an "authorized policymaker[] approve[s] a subordinate's decision and

the basis for it, their ratification [is] chargeable to the municipality." *St. Louis v.*

*Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion). Here, Plaintiffs argue that

"the numerosity of [allegedly] illegal raids" by the Narcotics Unit makes "the

City . . . liable for the unconstitutional conduct of its sergeants who were the highest-

ranking officers in charge of th[ose] raids." (ECF No. 125, PageID.3035-36).

24

The first question the Court must answer is whether the sergeants to which Plaintiffs refer can be considered authorized policymakers. *See Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (explaining that "the municipality is liable for an official's unconstitutional action only when the official is the one who has the 'final authority to establish municipal policy with respect to the action ordered.'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986))). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and . . . whether an official had final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483 (plurality opinion).

Sgt. Tucker was the highest-ranking officer in charge of the raid on Plaintiffs' home, however, he apparently was not required to review Sgt. Geelhood's affidavit until the warrant had already issued. (ECF No. 126-50, PageID.3777, 3793-94). Accordingly, it is unclear who, in Plaintiffs' view, should be considered the final policymaker for the purpose of this analysis. Regardless, because Plaintiffs cite no authority in support of *either* sergeant being a municipal policymaker, this detail matters little. According to former DPD Chief James Craig, sergeants can only "[c]arry out policy," not make it. (ECF No. 132-10, PageID.4318). Chief Craig's position is backed up by the 2012 Narcotics Standard Operating Procedures, which

25

make "sergeant[s] . . . directly accountable to the lieutenants in charge of the[ir] units," and the 2012 Charter of the City of Detroit, which states that the Board of Police Commissioners shall, "[i]n consultation with the Chief of Police, and with the approval of the Mayor[,] establish policies, rules and regulations." (ECF No. 126-43, PageID.3634); DETROIT, MICH. CHARTER § 7-803 (2012), https://detroitmi.gov/sites/detroitmi.localhost/files/2018-05/2_29_2012_CharterDocument_2_1_WITHOUT_COMMENTARY_1.pdf [https://perma.cc/3WDJ-RAH8]. Against this backdrop, it is clear that sergeants were not final policymakers in a statutory sense.

Moreover, while it is true that policymaking authority can also be delegated, *see Pembaur*, 475 U.S. at 483, merely being given the "authority to exercise discretion while performing particular functions does not [by itself] make a municipal employee a final policymaker." *Feliciano*, 988 F.2d at 655 (citing *Praprotnik*, 485 U.S. at 127). In other words, even where an official is delegated final *decisionmaking* authority by a superior, they will not necessarily be a final policymaker with respect to those decisions. *See Cristini v. City of Warren*, No. 07-11141, 2012 U.S. Dist. LEXIS 162325, at *40 (E.D. Mich. Nov. 14, 2012). Rather, a municipal employee can be said to have final policymaking authority only when

26

their "decisions are final and unreviewable *and are not constrained by the official policies of superior officials*." *Id.* (emphasis added).

In *Miller v. Calhoun Cty.*, the Sixth Circuit considered whether a shift commander at a county jail had been delegated policymaking authority with respect to overnight medical treatment for pretrial detainees. 408 F.3d 803, 814 (6th Cir. 2005). The plaintiff argued that despite state law giving the sheriff final policymaking authority over the jail, liability should be imputed to the municipality because "[the sergeant] was, by county policy, the *de facto* decision-maker as to emergency care for inmates on the midnight shift." *Id.* But the Sixth Circuit disagreed. *Id.* It explained that the plaintiff was "conflate[ing] decisionmaking with policymaking," and noted that there was "no evidence that [the sergeant's] decisions were not subject to review, or that [the sergeant] possessed any authority to 'formulate[] plans for the implementation of broad goals.'" *Id.* (quoting *Hager v. Pike Cty. Bd. of Educ.*, 286 F.3d 366, 376 (6th Cir. 2002)).

Here, like in *Miller*, Plaintiffs have failed to demonstrate how the actions of Narcotics Unit sergeants, even those who supervised raids, were anything more than discretionary decisions subject to the review of superior officials. Accordingly, Plaintiffs may not proceed on their *Monell* claim under a ratification theory.

27

> ii. A Custom of Tolerance or Acquiescence of Federal Rights Violations (i.e. Inaction Theory)

A municipal liability claim premised upon a "custom of tolerance or acquiescence of federal rights violations" is sometimes referred to as an "inaction theory." *See D'Ambrosio*, 747 F.3d at 387. To prevail under this theory, a plaintiff must demonstrate:

> (1) the existence of a clear and persistent pattern of violating federal rights . . . ; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the 'moving force,' or direct causal link for the constitutional deprivation.

*Powers v. Hamilton County Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

Plaintiffs argue that "the City knew, in the summer of 2010, about the corruption of DPD's Narcotics Unit" but "waited until July 2014 . . . to address [it]." (ECF No. 125, PageID.3031). In support, Plaintiffs cite several allegedly unlawful raids by the Narcotics Unit, as well as examples they argue show the City's notice of allegedly illegal conduct. (ECF No. 125, PageID.3031-33). But the majority of Plaintiffs' examples are from 2013 to 2017, and "contemporaneous or subsequent conduct" cannot be relied upon to prove an inaction theory. *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011). Accordingly, the Court will only consider Plaintiffs'

28

evidence to the extent that it relates to events before the raid on Plaintiffs' home. Several pieces of evidence fall within these parameters.

First, documents from the Wayne County Prosecutor's Office ("WCPO") regarding the exoneration of Darell Chancellor,  who was arrested in 2011 following the execution of a search warrant by Sgt. Geelhood. The evidence within these records, which include a WCPO press release[9] and a memo by the WCPO's Conviction Integrity Unit ("CIU"), would enable a jury to find that there had been illegal conduct in the Narcotics Unit by Sgt. Geelhood well before the raid on Plaintiffs' home. Defendants have objected to Plaintiffs' reliance upon the CIU memo, but the Court need not address the merits of this objection here. The press release by itself makes clear that Chancellor was released from prison because the WCPO determined that the evidence against him "ha[d] been credibly refuted" and "was based upon a fraudulent search warrant" by Sgt. Geelhood. (ECF No. 126-8, PageID.3253-54; ECF No. 126-17, PageID.3314).

Second, a letter from DPD Lt. Kelly Fitzgerald to the City's Office of the Inspector General ("OIG"), chronicling how, in late 2011, officials in the Narcotics

---

[9] Because the press release sets forth the conclusions of the WCPO based on its own investigation, it falls within the public records exception to hearsay under FED. R. EVID. 803(8)(A). *See Patterson v. Cent. Mills, Inc.*, 64 F. App'x 457, 462 (6th Cir. 2003) ("The Supreme Court has interpreted this 'public records' exception to the hearsay rule broadly to include both conclusions and opinions of public offices and agencies." (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162 (1988))).

Unit and Internal Affairs swept evidence of allegedly falsified surveillance and overtime "under the rug." (ECF No. 126-56, PageID.3886-91). This letter, which Defendants do not address in their Reply [132], provides specific, detailed examples of fabricated surveillance and overtime by Sgt. Tucker, who was in charge of the raid on Plaintiffs' home. (*Id.* at 3887). For example, it notes how "[o]n October 22, 2011, Tucker tagged himself [on Facebook] at J. Alexanders restaurant (suburb) at 4:03 PM, yet . . . was paid [overtime] to be on narcotics surveillance from [1:00 PM to 8:00 PM]." (*Id.*). In addition, Lt. Fitzgerald explains that even though she alerted Internal Affairs to Sgt. Tucker's conduct, the case was administratively closed without a full investigation after Lt. Kevin Robinson, the Commanding Officer of Narcotics, explained to investigators that what Sgt. Tucker did "is done all the time at Narcotics." (*Id.* at 3890). In short, Lt. Fitzgerald's letter not only documents a second pre-2012 example of misconduct in the Narcotics Unit, but also evidences a culture of indifference to such misconduct by the Unit's highest-ranking officials. (*Id.* at 3887, 3889-90).

Third, the trial testimony of Gary Jackson and related supporting evidence, which go to when the City first became aware of alleged corruption in the Narcotics Unit. Jackson was a drug dealer turned DPD informant who served as a cooperating witness in the 2015 prosecution of David Hansberry, Bryan Watson, and Arthur

Leavells, three of Sgt. Geelhood's former colleagues in the Narcotics Unit. *See United States v. Hansberry, et. al.*, No. 15-20217 (E.D. Mich.). Along with two civilian associates, Hansberry, Watson, and Leavells were charged with multiple crimes arising out of a conspiracy to steal drugs and money from drug dealers.[10] (ECF No. 126-23, PageID.3401; ECF No. 126-26, PageID.3444). Leavells and Calvin Turner, one of the civilian associates, pleaded guilty, while Hansberry, Watson, and Kevlin Omar Brown, the other civilian associate, went to trial. (ECF No. 126-26, PageID.3444; ECF No. 126-58).

At trial, Jackson testified as follows: In the summer of 2010, he had learned of a $3 million cocaine deal in Detroit, including how and when the profits would be moved out of the city. (ECF No. 126-26, PageID.3441-43). To make the most of this knowledge, he made an agreement with Leavells and Watson to exchange his information for a formal reward from the City of Detroit and an off the books cut of the seized money. (*Id.* at 3446-47). The bust was successful, but afterwards, Leavells told Jackson that there had been no opportunity to skim money off the top of the

---

[10] *See generally United States v. Watson*, 778 F. App'x 340, 343 (6th Cir. 2019) ("The basic con went as follows: Defendants would raid a house or stop a car (generally with the help of an informant) knowing that drugs and money would be there. These pretextual raids would . . . scare [drug-dealing victims] 'to death' about getting arrested or hurt. So the victims would hand over their drugs and money to Defendants. And once Defendants got what they wanted, they would leave without making arrests or filing charges. Instead, Defendants would keep the money and sell the drugs (generally with the help of the same informant), splitting the profits. And if Defendants did report the bust, they would first take some money or drugs 'off the top.'").

seizure before other officers arrived. (*Id.* at 3451). Jackson was furious, and even more so when the publicly reported total of the seizure was several hundred thousand dollars less than he expected. (*Id.* at 3451-52). Jackson thought he had been duped, and that Watson and Leavells had pocketed the missing money for themselves and lied to him. (*Id.* at 3452). Jackson began to worry he was not going to get any money at all and decided to take matters into his own hands. (*Id.* at 3452, 3455). Thanks to a coincidental mutual acquaintance, Jackson was able to arrange a dinner meeting with the then-DPD Chief, Ralph Godbee. (*Id.* at 3456; ECF No. 126-53, PageID.3834). At the meeting, Jackson told Chief Godbee that there had actually been $3 million in play, significantly more than the amount reported, and Chief Godbee responded, "I knew it."[11] (ECF No. 126-26, PageID.3456).

Chief Godbee agrees that he met with Jackson very soon after the bust, but disputes Jackson's version of their meeting. (ECF. No. 126-53, PageID.3836-37, 3840). He claims that Jackson did not mention a shortfall in the seized money and

---

[11] Defendants contend that all of Jackson's trial testimony "is inadmissible hearsay that cannot be considered." (ECF No. 132, PageID.4116). But Jackson is currently under the supervision of the U.S. Probation Department for the Eastern District of Michigan and is subject to this Court's subpoena power. *See United States v. Jackson*, No. 15-20507, 2020 U.S. Dist. LEXIS 132228 (E.D. Mich. July 27, 2020) (granting Jackson compassionate release and imposing a sixty-month period of supervise release); *see also* FED. R. CIV. P. 45(c)(1). And Defendants have not argued that Jackson would be unavailable to testify at trial. Accordingly, to the extent the substance of Jackson's trial testimony is otherwise admissible, it is competent evidence for the purpose of opposing summary judgment. *See Bailey*, 106 F.3d at 145. Here, because Plaintiffs rely upon Jackson only to show the City's knowledge of alleged misconduct in the Narcotics Unit and not to prove the truth of the underlying misconduct, it is admissible.

that the primary topic of discussion was the danger to Jackson and his family in light of the information he had given about the drug bust. (*Id.* at 3854). Regardless of who is telling the truth, there is plainly a dispute of material fact about whether Chief Godbee knew, in the summer of 2010, of allegations that members of the Narcotics Unit had stolen or attempted to steal a large sum of money from a drug bust.

Also supporting a finding of constructive notice is the fact that there were several discrepancies in the amount of currency reportedly seized as the cash moved through the chain of custody. (ECF No. 125, PageID.3039-41). The initial police report references a "tally sheet" that was discovered with the cash, which listed the amount of currency as $2,370,000. (ECF No. 126-51, PageID.3807-08; ECF No. 126-53, PageID.3846, 3857). This is the number that Chief Godbee first reported to the media. (ECF No. 126-53, PageID.3841). But by the time the money was logged into the property room, only $2,100,190 was accounted for. (ECF No. 126-51, PageID.3815; ECF No. 126-53, PageID.3846). And an additional shortfall of approximately $15,000 was discovered when the money was deposited at Comerica Bank. (ECF No. 126-51, PageID.3810; ECF No. 126-53, PageID.3846). This final shortfall triggered an Internal Affairs investigation, which concluded that it was attributable to a faulty counting machine, but the first shortfall was never investigated. (ECF No. 126-34, PageID.3547; ECF No. 126-54). In other words,

33

regardless of whether the initial $2.37 million figure was accurate, there are sufficient facts for a jury to conclude that DPD officials knew of a several hundred-thousand-dollar discrepancy and did not investigate. (ECF No. 126-34, PageID.3547).

Defendants argue that these questions regarding missing money were already resolved by the jury when it found Hansberry and Watson not guilty on all counts except conspiracy and fully acquitted Brown. (ECF No. 132, PageID.4116; ECF No. 132-8, PageID.4160). But this argument fails to account for the differing burdens of proof in civil and criminal cases. And, in any event, the issue here is not whether Plaintiffs can prove that members of the Narcotics Unit stole currency from a drug bust, but whether the City had notice that they might have done so, and failed to look into it.

Taken together, these three examples—the Chancellor investigation and exoneration, the Fitzgerald OIG complaint, and the City's knowledge of a possible shortfall in the Hansberry seizure—are sufficient to create a reasonable dispute of material fact as to whether there was a pattern of illegal conduct in the Narcotics Unit about which the City had notice. In addition, a reasonable jury could find, based on Plaintiffs' evidence that Sgts. Geelhood and Tucker had previously falsified DPD records, that a raid premised upon a fraudulent warrant affidavit could have been

34

prevented if the City had opened an investigation into the Narcotics Unit sooner. In other words, there is also a reasonable dispute of material fact as to whether the City's inaction was the moving force behind Plaintiffs' injury. *See Powers*, 501 F.3d at 607. Finally, because Plaintiffs have "advance[d] sufficient evidence to create a genuine issue of material fact[,] . . . the question of 'deliberate indifference' is one for the jury." *Doe*, 103 F.3d at 509 (citing *Hicks v. Frey*, 992 F.2d 1450, 1456-57 (6th Cir. 1993)). Accordingly, Plaintiffs' inaction theory of *Monell* liability may proceed to trail.

### iii. *A Policy of Inadequate Training or Supervision*

In deposition, Chief Craig opined that there was a lack of supervision in the Narcotics Unit going back "even before [2010]." (ECF No. 126-34, PageID.3546). It is unsurprising, therefore, that several of the evidentiary items that support Plaintiffs' inaction theory also support a claim for failure to supervise. *See Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) ("To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992))).

35

For example, as described in Lt. Fitzgerald's complaint to OIG: The Commanding Officer of Narcotics, Lt. Robinson, believed that Unit members would report being on the clock, doing things like conducting surveillance, when they were actually engaging in recreational activities. (ECF No. 126-56, PageID.3887-90). Lt. Robinson even told Internal Affairs investigators as much. (*Id.*). But no action was taken, and Unit members continued to submit warrant affidavits that relied upon alleged surveillance without any requirement that they seek approval from a superior officer before presenting their affidavit to a judge. (ECF No. 126-50, PageID.3794). In short, regardless of whether this practice was as widespread as Lt. Robinson intimated to Internal Affairs, a reasonable jury considering Plaintiffs' evidence could find both that there was inadequate supervision in the Narcotics Unit, and that the absence of a warrant review process was closely related to the allegedly fraudulent affidavit in Plaintiffs' case. Accordingly, Plaintiffs' failure to supervise theory of *Monell* liability may also proceed to trail.

## CONCLUSION

**IT IS ORDERED** that Defendants' Motion for Judgment on the Pleadings [121] is **GRANTED in part and DENIED in part**. The Motion [121] is **GRANTED** as to Plaintiffs' claims against the individual officers. It is **DENIED** as to Plaintiffs' *Monell* claim against the City of Detroit.

36

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [123] is **DENIED**.

**IT IS FURTHER ORDERED** that, within thirty days, Plaintiffs may file a Second Amended Complaint consistent with the conclusions set forth above.


**SO ORDERED**.


s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: June 25, 2021              Senior United States District Judge

37

# EXHIBIT 6-3 – SECOND AMENDED COMPLAINT

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DEBRA METRIS-SHAMOON,
MUKHLIS SHAMOON, CARL VERES,
PAUL METRIS, JULIA METRIS,

      Plaintiffs,                          Case No.: 18-cv-13683

vs.                                        Hon.  Arthur J. Tarnow

CITY OF DETROIT, and
STEPHEN GEELHOOD,
in his Individual Capacity; jointly and severally,

      Defendants.

_____

## SECOND AMENDED COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs, DEBRA METRIS-SHAMOON, MUKHLIS SHAMOON, CARL VERES, PAUL METRIS, JULIA METRIS, by and through their counsel, DETTMER & DEZSI, PLLC, and for their SECOND Amended Complaint and Jury Demand state as follows:

## PARTIES

1.     Plaintiffs are citizens of the State of Michigan.

2.     Upon information and belief, Defendant GEELHOOD is a citizen of the State of Michigan.[1]

---

[1] Plaintiffs recognize that Defendant Geelhood was previously dismissed by the Court, however, he is listed herein for purposes of Plaintiffs' preserving their claims against him.

1

3.    Defendant City of Detroit ("City") is a governmental entity in the State of Michigan.

4.    At all times relevant to this lawsuit, Defendant GEELHOOD was acting under color of law with respect to the events set forth in the Complaint.

5.    At all material times, Defendant City of Detroit employed the Individual Defendant and is liable for his acts.  City of Detroit is also liable for the unconstitutional policies, practices, and customs of its Police Department.

6.    Defendants are jointly and severally liable to Plaintiff for the claims asserted herein.

## JURISDICTION AND VENUE

7.    The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, § 1343(a)(1)-(4) and 1343(b).

8.    Venue is proper under 28 U.S.C. § 1391(b).

## COMMON ALLEGATIONS

9.    In September 2012, Plaintiffs Deborah Metris-Shamoon and Mukhlis Shamoon were the lawful and licensed operator of a marijuana grow facility located at their residence in Shelby Township, Michigan.

10.   On or about September 13, 2012, Defendants, acting under color of law and as officers of Defendant City of Detroit's Narcotics Unit, conducted an unlawful raid of Plaintiffs' home in Shelby Township, Michigan.  The raid

2

was supervised by, among others, Sgt. Joe Tucker of the Detroit Police
Department.

11.   Officers gained entry into Plaintiffs' residence via forced entry with at least
one of the officers' weapons drawn.

12.   The Officers purposefully concealed their identities during the raid and
neither knocked or announced their presence before making a forced entry
into Plaintiffs' home.

13.   At no time during the raid did any of the officers show or present to
Plaintiffs a lawfully issued search warrant.

14.   During the raid, the officers destroyed Plaintiffs' home. Plaintiffs were
unlawfully searched and seized within the meaning of the fourth amendment
during the raid.

15.   For an unknown duration of time, the officers extensively tore apart
Plaintiffs' property and removed, without lawful authority, marijuana plants
and other related legitimate and lawful by-products of Plaintiffs' business.

16.   The officers had no probable cause to seize and/or arrest Plaintiffs nor were
Plaintiffs ever shown a search or arrest warrant.

17.   The officers also confiscated, without lawful authority, an Armsport 12-
gauge shotgun, a BSA 9mm handgun, a Winchester Wildcat .22 Rifle, a
BSR .45 Caliber Colt handgun, and money totaling $315.00 from Plaintiffs'

3

residence.

18.   At no time were Plaintiffs ever given a copy of any search warrant or a list of items that were unlawfully seized from their property.

19.   Plaintiffs were eventually released by Defendants and never charged with any violations of law.

20.   During the raid, Plaintiff Mukhlis Shamoon was placed in handcuffs which the officers left on him after leaving the property such that Mukhlis was forced to wear the handcuffs for approximately ten hours.

21.   Following the raid, Defendants produced a search warrant and affidavit sworn out by Defendant Geelhood in which Defendant falsely swore to facts in an attempt to manufacture probable cause.

22.   In particular, Defendant Geelhood falsely swore to having conducted surveillance of the Plaintiffs' home and having witnessed illegal drug transactions at Plaintiffs' residence.

23.   Defendant Geelhood also falsely swore to having relied on a confidential informant to establish probable cause.

24.   Upon information and belief, members of the Detroit Police Department's Narcotics Unit, including officers who participated in raid upon Plaintiffs' residence, have engaged in similar unlawful searches and seizures of other legitimate marijuana grow facilities in and around the City of Detroit.

4

25.   Defendant City of Detroit has allowed an unconstitutional policy, custom
      and practice to flourish within its police department under which its police
      officers, including Defendant Geelhood, have unlawfully seized,
      confiscated, destroyed, or otherwise disposed of legitimate products of
      marijuana grow facilities.

26.   Prior to the unlawful raid of Plaintiffs' home, Defendant City of Detroit had
      knowledge and notice that members of its Narcotics Unit were falsifying
      reports of narcotics surveillance, and despite such knowledge and notice
      Defendant City of Detroit ignored such misconduct.

27.   Prior to the unlawful search and seizure of Plaintiffs' home, Defendant City
      of Detroit had knowledge and notice that officers of its Narcotics Unit were
      unlawfully seizing money and controlled substances for the officers' own
      pecuniary gain, and despite such knowledge and notice Defendant City of
      Detroit ignored such misconduct.

28.   During these unconstitutional searches and seizures, Plaintiffs and dozens of
      other similar business owners would be threatened, intimidated, detained,
      and falsely arrested without probable cause.

29.   Upon information and belief, Defendant City of Detroit's officers, including
      its supervisory personnel like Sgt. Tucker and Sgt. Geelhood routinely
      conducted, participated, and/or allowed the types of illegal searches and

5

seizures described herein.

30.   As a result of Defendants' actions, Plaintiffs were degraded, humiliated, and subjected to an unlawful search, seizure, and false arrest in violation of their constitutional rights.

31.   Plaintiffs suffered extreme emotional distress, humiliation, embarrassment, and damage as a result of Defendants' unlawful actions.

32.   Plaintiffs were putative class members in the case of *Timothy and Hatema Davis v. City of Detroit, et. al.*, Case No.: 15-cv-10547 (E.D. Mich)(J. Borman) that sought to challenge as unconstitutional the acts, policies, and/or customs of Defendants as alleged herein.

33.   Recently, the Court denied class certification in the *Davis* matter such that the instant Plaintiffs now seek to pursue their identical claims herein.

## COUNT I; UNLAWFUL SEARCH AND SEISURE IN VIOLATION OF THE FOURTH AMENDMENT

34.   Plaintiffs hereby incorporate by reference herein the allegations contained in the above Paragraphs of the Complaint.

35.   The acts of Defendants as ratified, endorsed, and cultivated by the City of Detroit and its Police Department as described herein violated Plaintiffs' rights against unlawful and unreasonable search and seizure as guaranteed by the Fourth Amendment to the United States Constitution.

6

36.   Plaintiffs' arrest and detention as described herein were undertaken by Defendants without probable cause and without regard to any legitimate law enforcement interest.

37.   The raid of Plaintiffs' home was based on a false affidavit sworn out by Defendant Geelhood who manufactured the bases of probable cause as described herein.

38.   Defendants failed to knock and announce their presence before making forced entry into Plaintiffs' residence.

39.   Plaintiffs' were unlawfully seized when the officers displayed and pointed their weapons at Plaintiffs without provocation or justification.

40.   Defendant's actions were not taken spontaneously in response to an emergency, but rather in conformity with the City's deliberate policies, customs, and practices as carried out through the Detroit Police Department.

41.   The constitutional rights that Defendant violated were clearly established at all times when Defendant violated such rights and a reasonable person in Defendant's position would have understood that his conduct was in violation of those rights.

42.   Defendant Geelhood is thus not entitled to qualified immunity.

43.   By virtue of Defendants' actions, Plaintiff is entitled to compensatory and punitive damages.

7

## COUNT II; *MONELL* CLAIM AGAINST CITY OF DETROIT FOR UNCONSTITUTIONAL POLICIES, PRACTICES, AND/OR CUSTOMS

44.    Plaintiffs hereby incorporate by reference herein the allegations contained in the above paragraphs of this Complaint.

45.    Defendant City of Detroit maintained an unconstitutional policy, custom, and/or practice of tolerating the misconduct and unlawful activity of officers within its Narcotics Unit.

46.    Defendant City of Detroit's unconstitutional policy, custom, and/or practice of tolerating misconduct and the unlawful activity of its Narcotics Unit continued from, at least, 2010 through 2015 during which time Plaintiffs and several other individuals were subjected to unlawful searches and seizures by members of Defendant City of Detroit's Narcotics Unit.

47.    Defendant City of Detroit knew about, or should have known about, the misconduct and unlawful activities of its officers within the Narcotics Unit before the raid of Plaintiffs' residence, and despite having such knowledge Defendant City of Detroit failed to remedy the misconduct and unlawful activity.

48.    By failing to stop the misconduct and unlawful activity of its Narcotics Unit despite having knowledge of same, Defendant City of Detroit tacitly approved and condoned such unlawful activity which continued for several

years.

49.    For these reasons, Defendant City of Detroit is liable for the violation of

Plaintiffs' constitutional rights which occurred as a direct result of

Defendant City of Detroit's unconstitutional policy, custom, and/or practice

as set forth herein.

## COUNT III; *MONELL* CLAIM AGAINST CITY OF DETROIT FOR INADEQUATE TRAINING AND/OR SUPERVISION OF ITS AGENTS AND EMPLOYEES REGARDING THE CONSTITUTIONAL RIGHTS OF CITIZENS

50.    Plaintiffs hereby incorporate by reference herein the allegations contained in

the above paragraphs of this Complaint.

51.    Defendants City of Detroit had an obligation to train its employees, police

officers, and/or agents regarding the constitutional rights of citizens under

the Fourth Amendment.

52.    Defendant City of Detroit had an obligation to supervise its agents and

employees, including the individual Defendant named herein, to insure that

the constitutional rights of Plaintiffs and similarly situated business owners

were not violated.

53.    Defendant City of Detroit failed to comply with its duty to train and/or

supervise its employees, officers, and/or agents and had a custom or policy

of acting with deliberate indifference to the types of egregious violations of

9

the constitutional rights of Plaintiffs and other similarly situated business owners.

54.  In this instance, the specific acts complained of herein were directed and encouraged by Sgt. Joe Tucker who were exercising supervisory authority over the individual officers and members of the narcotics unit.

55.  Prior to the unlawful search and seizure of Plaintiffs' home, Defendant City of Detroit had knowledge that its narcotic officers, including Sgt. Joe Tucker, were falsifying time cards that purported to show narcotics surveillance that never occurred.

56.  Despite having such knowledge, Defendant City of Detroit and its highest-ranking supervisory offices ignored such misconduct which Defendant "swept under the rug."

57.  By failing to supervise its employees and officers, Defendant City of Detroit allowed a culture of corruption to flourish within certain ranks of its Police Department including the Narcotics Unit.

58.  By inadequately training and/or supervising its employees, officers, and agents and having a custom or policy of deliberate indifference to the constitutional rights of Plaintiffs, Defendant City of Detroit encouraged and cultivated the conduct that resulted in the violation of Plaintiffs' constitutional rights.

10

59.  Defendant City of Detroit had notice that its employees and officers were engaging in the types of actions described herein and failed to implement any preventative or corrective measures to ensure the safety of citizens including Plaintiffs.

60.  Defendant City of Detroit's policies, practices, and customs were the moving force in causing Plaintiffs their injuries as described herein.

61.  By virtue of the actions of Defendant City of Detroit, Plaintiffs are entitled to compensatory and punitive damages.

## DAMAGES AND RELIEF REQUESTED

62.  Plaintiffs hereby incorporate by reference herein the allegations contained in the above paragraphs of this Complaint.

63.  As a direct and proximate result of Defendants' conduct, each and every one of them, as set forth herein, Plaintiffs' constitutional rights under the Fourth Amendment were violated.

64.  As a direct and proximate result of Defendants' conduct, each and every one of them, as set forth herein, Plaintiffs suffered extreme injury including emotional distress, humiliation, anguish, embarrassment, and loss of their valuable property.

65.  Plaintiffs are entitled to any and all damages or losses compensable under federal and state law including, but not limited to, those damages authorized

11

under 42 U.S.C. §§ 1983, 1988, and/or Michigan law.

66.    Plaintiffs are also entitled to declaratory and injunctive relief to prevent the

further degradation, humiliation, embarrassment, injury, and emotional

distress caused by Defendants' actions and unconstitutional policies,

practices, and customs.

   **WHEREFORE**, Plaintiffs respectfully request that this Honorable Court, by

and through its trier of fact enter Judgment in favor of Plaintiffs and against

Defendants, together with interest, costs and attorney fees or as otherwise

determined by the court or trier of fact.

                    Respectfully submitted,

                    DETTMER & DEZSI, PLLC,

Dated: July 8, 2021        */s/ Michael R. Dezsi*
                    MICHAEL R. DEZSI
                    Counsel for Plaintiffs
                    1523 N. Main St.
                    Royal Oak, MI 48067
                    (313) 757-8112
                    mdezsi@dezsilaw.com
                    P64530

## DEMAND FOR JURY TRIAL

By and through their counsel, DETTMER & DEZSI, PLLC, Plaintiffs hereby demand a trial by jury in the above captioned matter.

Respectfully submitted,

DETTMER & DEZSI, PLLC,

Dated: July 8, 2021

*/s/ Michael R. Dezsi*
MICHAEL R. DEZSI (P64530)
Counsel for Plaintiffs
1523 N. Main St.
Royal Oak, MI 48067
(313) 757-8112
mdezsi@dezsilaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on 07/08/2021, I electronically filed the Second Amended Complaint and Demand for Jury Trial with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

*/s/Michael R. Dezsi*
MICHAEL R. DEZSI (P64530)
DETTMER & DEZSI, PLLC
1523 N. Main St.
Royal Oak, MI 48067
(313) 757-8112
mdezsi@dezsilaw.com
P64530