# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

*In re:*

CITY OF DETROIT, MICHIGAN,

     *Debtor.*

Case No. 13-53846
Hon. Thomas J. Tucker
Chapter 9

---

## DEBRA METRIS-SHAMOON, MUKHLIS SHAMOON, CARL VERES, PAUL METRIS AND JULIA METRIS RESPONSE IN OPPOSITION TO DEBTOR CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER (DKT #13532)

By and through their counsel, Dettmer & Dezsi, PLLC, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres, Paul Metris and Julia Metris ("Shamoons") hereby file their Response in Opposition to the City of Detroit's Motion for the Entry of an Order Enforcing the Bar Date and Confirmation Order (Dkt #13532).

In its motion, the City of Detroit asserts that the Shamoons are pursuing a pre-petition claim that has been discharged pursuant to the City's Confirmed plan. The City's motion should be denied for the following reasons:

1. The Shamoons were known creditors whose claims and/or identities were "readily ascertainable" by the City such that they were entitled to actual

notice, and having failed to give the Shamoons such notice their claims are not subject to discharge;

2.  The Shamoons did not fairly contemplate their claims against the City until after the effective date of the City's Confirmed plan such that they are not subject to discharge; and,

3.  The City's right to discharge the Shamoons' claims are barred by the equitable doctrines of estoppel and laches.

Respectfully submitted,

DETTMER & DEZSI, PLLC

Dated: May 17, 2022

*/s/Michael R. Dezsi*
MICHAEL R. DEZSI
Counsel for Interested Parties
Debra Metris-Shamoon, Mukhlis Shamoon,
Carl Veres, Paul & Julia Metris
1523 N. Main St.
Royal Oak, MI 48067
(313) 757-8112
mdezsi@dezsilaw.com
P64530

**BRIEF IN OPPOSITION TO DEBTOR CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER (DKT #13532)**

## I.    Background Facts

A discussion of the facts relevant to the Shamoons' instant response require both a recitation of the facts underlying the Shamoons' case as well as the predecessor case of *Timothy and Hatema Davis v. City of Detroit*. The *Davis* case was filed as a putative class action alleging claims similar to the Shamoons.

Plaintiffs Debra Metris-Shamoon ("Debra") and her husband Mukhlis Shamoon ("Mukhlis") allege that they were subjected to an unlawful raid of their home in Shelby Township, Michigan by members of Detroit Police Department's Narcotics Unit. The raid took place on September 13, 2012, under the command of Sgt. Joe Tucker who supervised the raid crew which included, among others, Sgt. Stephen Geelhood. Both of Debra's octogenarian parents, Paul and Julia Metris, were visiting for lunch at the time of the raid, and so was a family friend, Carl Veres, who was picking up some clothes.

The raid lasted about an hour and a half during which she was never shown a warrant. The officers took all of her marijuana plants and product, about $315 cash, and some legally owned handguns that belonged to her son Adam. Debra testified that she was a licensed caregiver to provide marijuana though none of the officers ever asked to see any of her caregiver cards despite her offer to produce them.

Mukhlis was also a licensed caregiver. None of the Shamoons were ever charged with any crimes arising from the raid.

At the conclusion of the raid, Sgt. Joe Tucker left a Notice of Seizure and Intent to Forfeit form (**Ex. O**). Within a few days of the raid, both Debra Shamoon and her son Adam, had contacted the City of Detroit via telephone. Adam contacted Sgt. Tucker to inquire about why his parents' house was raided and inquired of the handguns taken from the home (**Ex. G**). According to Adam, he spoke to Sgt. Tucker and demanded answers about what had happened at his parents' home and about the status of their handguns. *Id.* Sgt. Tucker told Adam that he would have to wait before getting the guns and to call back a couple weeks later.

Debra, on the other hand, also contacted the Detroit Police department on two separate occasions in the couple weeks following the raid and before the 1st of October (**Ex. H**). During each of her calls, Debra also demanded answers about why her house had been raided and asked for a search warrant. Both times, Debra was told by some unknown lady from the department that she couldn't find any information on any of the Shamoons or a warrant in the department's computer system. *Id.*

After a couple weeks, Adam called Sgt. Tucker back and again demanded answers about what happened at his parents' home and the status of the handguns. Adam also advised Sgt. Tucker that he would get an attorney if necessary. *Id.*

2

Eventually, Sgt. Tucker told Adam to contact someone else at the department who told Adam he could come pick up his handguns though no one at the department explained to him what had happened at his parents' house. No one had shown him a warrant or other legal documentation regarding the search and seizure of the Shamoons' house.

On February 11, 2015, plaintiffs Timothy and Hatema Davis filed in the Eastern District of Michigan a putative class action under § 1983 against both the City of Detroit and several members of the Narcotics Unit claiming that they, along with several other individuals in and around Detroit, were subjected to unlawful raid of their home in Warren, Michigan. The Davis raid occurred in December 2013. See Case No. 15-cv-10547 (E.D. Mich.)(J. Borman)(**Ex. A**). The Davises allegations closely mirrored the allegations later made by the Shamoons insofar as the manner in which officers conducted the raid.

There was much media attention about the *Davis* case given the allegations of misconduct against the City of Detroit and its narcotics officers (**Ex. B**). Along with others, the Shamoons saw these media articles and contacted the undersigned counsel regarding the September 2012 raid of their home (**Ex. H**). According to Debra, these news reports were the first time that she or her family had any idea that her rights may have been violated by the actions of the officers.

On April 8, 2015, the U.S. Attorney indicted several members of the City of Detroit's Narcotics Unit, including narcotics officer Arthur Leavells (**Ex. C**).

On April 23, 2015, the undersigned counsel served on the City of Detroit the Davis plaintiffs' First Request to Produce Documents seeking documents related to the City's raids on several homes including the Shamoons' home (**Ex. D**, Plaintiffs' First Request to Produce, Nos. 1 and 2, pgs. 1-2).

Ultimately, after conducting some class-related discovery, the Davis plaintiffs moved to certify a class action consisting of individuals, including the Shamoons, who had been subjected to unlawful raids by members of the City of Detroit's now-defunct narcotics unit. See Motion to Certify Class, Case No. 15-cv-10547 ECF No. 88 (E.D. Mich.). Ultimately, the district court denied the Davises' Motion to Certify Class, see Case No. 15-cv-10547 ECF No. 168 (J. Borman Opinion and Order Denying Motion for Class). Not long after the district court denied the Davises' Motion to Certify Class, the Davises and the City of Detroit settled the Davises' claims for $350,000 (**Ex. E**). The release makes clear that the <u>City of Detroit</u> was a released party under the settlement.

On November 26, 2018, the Shamoons filed their own individual action naming as defendants both the City of Detroit and several individual officers who supervised and/or participated in the raid on the Shamoons' home including Sgt. Stephen Geelhood and Sgt. Joe Tucker. Since the filing of the Shamoons' case, the

parties conducted extensive discovery that resulted in numerous discovery motions, motions for show cause, and dispositive motions (**Ex. S** Shamoon Docke**t**).

On October 23, 2020, the individual Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(c) (Case No. 3:18-cv-13683 ECF No. 121), and the City of Detroit filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (ECF No. 122). On November 20, 2020, Plaintiffs filed their response to Defendants' dispositive motions (ECF No. 125 and ECF No. 126).

On June 25, 2021, Judge Tarnow issued his Opinion and Order Granting in part and denying in part Defendants' Motion to Dismiss and/or for Summary Judgment (Case No. 3:18-cv-13683 ECF No. 145). In his Opinion and Order, Judge Tarnow denied Defendant City of Detroit's Motion for Summary Judgment finding that there were questions of as to (1) whether Plaintiffs' Fourth Amendment rights were violated by the search and seizure of their home; and, (2) whether the City of Detroit is liable under *Monell* based on both an "inaction theory" and a policy of inadequate supervision. Opinion and Order, Case No. 3:18-cv-13683, ECF No. 145, PageID.4466-4474 (E.D. Mich.).

In reaching his conclusion, Judge Tarnow relied on the extensive summary judgment record that included evidence that the City of Detroit was aware, as early as 2010, that members of its Narcotics Unit, including specifically Sgt. Stephen Geelhood, were conducting unlawful raids in and around the City of Detroit.

For instance, there was sworn testimony from Arthur Leavells,[1] the affiant of the purported search warrant for the Davises' home, that he routinely lied on affidavits in support of search warrants and would simply make up phony affidavits with "all kinds of lies" and that "it's not hard to do."  (Ex. I, Trans. Pg. 72-73). Leavells admitted that he got bogus search warrants on "countless occasions" (Ex. I, Tr. 77), and there was "a lot of crookery going on in Detroit Police Narcotics" including "money seizures[.]" (*Id.* at Tr. 80:16 - 81:5).  Leavells also testified that Sgt. Geelhood, the affiant of alleged search warrant affidavit for the Shamoons, had full knowledge of the misconduct, (*id.* at Tr. 81:11, 82:24—83:3), and that the narcotics officers were "ripping off marijuana when [they'd] go for raids[.]" *Id.* at Tr. 83.  Leavells testified the officers would divide up the seized money (*Id.* at 82), and take "personal property like jewelry, cash, drugs, and guns." (Ex. I, Tr. 84-85).

In another instance, several officers of the narcotics crew were caught (on camera) stealing from another narcotics raid in February 2014 (Ex. N).  That raid was also supervised and carried out at the direction of Sgt. Geelhood.  The property owner had hidden cameras on the premises which recorded the narcotics officers stealing items.  The owner of the property indicated that his Chase debit card was

---

[1] Leavells pled guilty to federal charges similar to the allegation alleged herein.

also taken and he subsequently discovered an unauthorized charge for $1,000 (Ex. N, pg 1-2).

Further evidence of Sgt. Geelhood's misconduct came from Wayne County Prosecutor Kym Worthy who recently moved to vacate a 2012 drug conviction of a defendant who was convicted upon the testimony and search warrant affidavit of Sgt. Geelhood. In an official press release, Worthy remarked "[t]hese are the ***first cases*** that deal directly with fraudulent search warrant affidavits and other activities by highly unethical and compromised narcotics police officers." Ex. M.[2]

Former Chief of Police James Craig also testified in his deposition that he believed that the narcotics unit's sergeants were "directly involved in the alleged misconduct" or "complicit and not taking appropriate supervisory action when necessary (Ex. J, Craig Depo. 24:14-22). Chief Craig's testimony is entirely consistent with the testimony of Leavells that Sgt. Geelhood was an active participant in the scheme.

In sum, Judge Tarnow concluded based on the voluminous summary judgment record that there was sufficient evidence that the City of Detroit knew

---

[2] Judge Tarnow concluded that Worthy's press release was competent evidence for purposes of opposing the City of Detroit's motion for summary judgment. See Case No. 18-cv-13683 ECF No. 145, Opinion and Order on Summary Judgment, pg. 29 n.9)(citing to FRE 803(8)(A)(i)-(iii); *Patterson v. Central Mills, Inc.*, 64 Fed. Appx. 457, 462 (6th Cir. 2003)

about, but failed to stop, the rampant corruption and misconduct of the Narcotics Unit during the time of the Shamoons raid. Accordingly, Judge Tarnow denied the City of Detroit's Motion for Summary Judgment.

The Shamoons' case was recently referred to Magistrate Judge Stafford for all final pre-trial matters, including motions in limine, jury instructions, verdict form, etc. See Case No. 18-cv-13863 ECF No. 154, Order Referring All Pretrial Matters. On March 16, 2022, Magistrate Judge Stafford issued a Notice to Appear which directed the parties to file a joint factual and procedural summary of the case before March 30, 2022. ECF No. 155.

In response to Magistrate Judge Stafford's Order, the City of Detroit asserted, for the first time ever, its defense that the Shamoons' claims were subject to discharge under the City's Confirmed Plan. The City of Detroit has now filed with this Court its Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order against the Shamoons.

For the reasons that follow, the Court should deny the City's motion and allow the matter to proceed to trial.

## II. Discussion and Analysis

**A. The Shamoons were known creditors whose claims and/or identities were "readily ascertainable" by the City such that they were entitled to actual notice, and having failed to give the Shamoons such actual notice their claims are not subject to discharge.**

8

To the extent that the City asserts that the Shamoons' pre-petition claims are subject to discharge, the Court should reject the City's assertion and find that the Shamoons were known creditors who should have received actual notice of the City's bankruptcy. Without such notice, a discharge of their claims would violate the Shamoons' right to due process.

The Bankruptcy Code provides that notice shall be given of the commencement of a Chapter 9 case. 11 U.S.C. § 923. The Code also provides that "The debtor shall file a list of creditors." 11 U.S.C. § 924. Under the Code, a creditor is defined as an entity, which includes a person, that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. 11 U.S.C. § 101(10). Known creditors are entitled to actual notice. 11 U.S.C. § 944(c)(2); *Paging Network, Inc. v. Nationwide Paging, Inc.*, 534 F.3d 76, 80-81 (1st Cir. 2008).

A known creditor is one whose claims or identities are "readily ascertainable" by the debtor. *See Paging Network*, 534 F.3d at 81 (citing *Tulsa Prof'l Collection Servs, Inc. v. Pope*, 485 U.S. 478, 490 (1988)). Readily ascertainable means a debtor can discover a creditor's claims through "reasonably diligent efforts." *Paging Network*, 534 F.3d at 81. Reasonably diligent efforts require a debtor to examine its "own books and records." *In re U.S. Home Corp.*, 223 B.R. 654, 659 (Bankr. S.D. N.Y. 1998). A claim is also discoverable to a debtor if the debtor has something in

9

its possession like a demand or payment or "some communication with a debtor concerning the existence of the creditor's claim." *In re Talon Auto Group*, 284 B.R. 622, 626 (Bankr. E.D. Mich. 2002)(quoting *In re Drexel Burnham Lambert Group, Inc.*, 151 B.R. 674, 681 (Bankr. S.D. N.Y. 1993)).

The Shamoons assert that their potential claim was known to the City such that they were entitled to receive actual notice. The Shamoons' house was raided by several members of the Narcotics Unit including, specifically, Sgt. Stephen Geelhood who was the affiant of the purported search warrant for the Shamoons' home. According to the sworn testimony of former narcotics officer Arthur Leavells, Sgt. Geelhood participated in a scheme to conduct unlawful raids by falsifying search warrants (Ex. I, Trans. pg. 81:11, 82:24-83:3 and Trans. pg. 84-85).

On this point, Judge Tarnow found that there were questions of fact as to whether Sgt. Geelhood's affidavit was knowingly falsified. Case No. 3:18-cv-13683 ECF No. 145, PageID.4457-4460, Opinion and Order (finding ample record evidence creating a question of fact as to whether Geelhood falsified his affidavit in support of search warrant). In light of this evidence, the Court should conclude that the debtor knew of the Shamoons' claims given that claims relate directly to the willful misconduct of a supervisory agent (i.e., Sgt. Geelhood) and for which the debtor's own records would have reflected that the Shamoons were subject to this bogus raid.

Additionally, the Shamoons' son, Adam Shamoon, contacted Sgt. Tucker and spoke to him no less than twice about the status of his firearms that were confiscated during the raid and inquired of Sgt. Tucker as to City's legal basis for raiding the Shamoons' house (Ex. 7). These facts satisfy the "some communication with a debtor concerning the existence of the [Shamoons'] claim." Despite having knowledge of such a claim, the City failed to list the Shamoons as creditors on their Schedule H.

It should also be pointed out that, if the City would have listed the Shamoons as known creditors in its Schedule H, their claims would not have been subject to discharge under the terms of the confirmed plan. Specifically, the plan exempts from discharge claims by known creditors to the extent that such claims "result from any act or omission to the extent that the act or omission subsequently is determined by a Final Order to have constituted . . . willful misconduct[.]" Ex. L, Excerpt of Confirmed Plan, Art III, Sec D, sub. (7)(a), pg. 52 (entitled "Releases").

Based on the allegations of their Complaint, and the findings by Judge Tarnow in his Opinion and Order on summary judgment, there is more than an adequate basis from which to conclude that the Shamoons' claims were based on willful misconduct. The crux of their *Monell* claims against the City is premised on the theory that the City had knowledge of the misconduct within the narcotics unit and despite such knowledge the City failed to stop the misconduct. Such facts constitute

"omissions" by the City to stop the rampant and widespread willful misconduct within the Narcotics Unit.

On this point, it should be noted that both Sgt. Tucker and Sgt. Geelhood have demonstrated histories for dishonest and willful misconduct. While now former convicted felon Arthur Leavells implicated Sgt. Geelhood in the ongoing misconduct, Sgt. Tucker also has a similar history of falsifying affidavit in support of narcotics-related search warrants and Sgt. Tucker had been the subject of several Internal Affairs investigations regarding perjury, misconduct, and fraud (**Ex. P**, DPD # 2255, 2257, 2259).

In one such investigation by Internal Affairs (IAU Case # 00-213), Sgt. Tucker was accused of perjury (i.e., falsifying a narcotics-related search warrant affidavit and swearing to have observed an individual selling narcotics whereas such individual was incarcerated at the time of Tucker's alleged observation) (**Ex. Q**, DPD 2350-2353)(finding that Sgt. Tucker neglected his duty "by swearing to and signing a Search Warrant and Affidavit that contained false information[.]").

Sgt. Tucker was accused or engaging in criminal fraud by falsifying time records and daily activity logs which included false entries purporting to reflect narcotics surveillance (**Ex. R**, DPD 2734-2741); (DPD 2736, "Tucker was falsifying OT requests and activity logs saying he worked OT that he did not work."). The complainant in that instance, Sgt-turned-Lt. Kelly Fitzgerald, described the City's

12

response to credible allegations of Tucker's misconduct as being "swept . . . under the rug" by the Lieutenant, Commander, Deputy Chief of the Narcotics Unit, and Internal Affairs (**Ex. R**, DPD 2740). Lt. Fitzgerald was sufficiently concerned about the Department's deliberate indifference to the matter that she sought an investigation by Office of Inspector General asking that it investigate why the "initial complaint of criminal conduct" on the part of Tucker was "Administratively" closed by Internal Affairs, and further requesting that the OIG investigate "both criminal and department charges" related to Tucker's misconduct and those who swept the matter "under the rug." Judge Tarnow relied on, and specifically pointed to some of this record evidence in reaching his conclusion that the City had knowledge, and ignored, the willful misconduct that was pervasive in the former narcotics unit.

In sum, there is record evidence that Sgt. Tucker was aware that the Shamoons were challenging the manner in which the raid of their home was carried out, and as a sergeant of the narcotics department, Sgt. Tucker's knowledge of the Shamoons' claims should be imputed to the City. There is also evidence that the City knew about the misconduct within the narcotics department (specifically about Sgt. Tucker), and that despite such knowledge the City turned a blind eye to such misconduct. Collectively, this record evidence compels the conclusion that the City should have discovered the Shamoons' claims through the exercise of reasonably diligent efforts.

Even without reaching the merits of whether the Shamoons' claims fall within the exemption from discharge as set forth above, the City's motion should nevertheless be denied based on the violation of the Shamoons' due process rights because the City's failed to provide them with actual notice. In this context, the due process clause requires a reasonable search for contingent or unmatured claims so that ascertainable creditors, like the Shamoons, would have received adequate notice of the proceedings and deadlines.

What is reasonable depends on the particular facts of each case. However, a known claim arises from facts that would alert the reasonable debtor of the possibility that a claim might reasonably be filed against it. *In re Drexel Burnham Lambert Grp. Inc.,* 151 B.R. 674, 680-81 (Bankr. S.D.N.Y.), *aff'd sub nom. In re Drexel Burnham Lambert Grp., Inc.,* 157 B.R. 532 (S.D.N.Y. 1993). In this instance, the Debtor was aware of facts sufficient to alert it to the possibility that the Shamoons might have claims against the City.

In addition to the facts stated above, former Chief of Police James Craig's testimony supports the conclusion that the City should have known that the Shamoons were creditors based on the unlawful raid carried out by its narcotics officers and supervisors. Chief Craig confirmed, publicly and under oath during his deposition, that the City's Internal Affairs uncovered "false affidavits" that Craig described as "fabricated" and further acknowledged that "surveillance that was

supposedly conducted to get the warrants wasn't done; information (officers) said they got from confidential informants was erroneous[.]"  Craig also testified that these "patterns" of false affidavits and bogus claims of surveillance suggest the misconduct of the Narcotics Unit was more widespread than he previously thought (**Ex. J**, Craig Depo. pg. 52:10-53:5).

Importantly, former Chief Craig disbanded the City's Narcotics Unit effective July 22, 2014 (Ex. F) which occurred **before** the debtor's Eighth Amended Plan of the Adjustment of Debts of the City of Detroit was confirmed by this Court on November 12, 2014.  From these facts, it is clear that: (1) the debtor's supervisory agents (i.e., Sgt. Geelhood and Sgt. Tucker) knew about the Shamoons' constitutional claims against the City;  (2) the City's Internal Affairs department had knowledge of the misconduct within the narcotics unit well before July 2014; and, (3) former Chief of Police James Craig knew about the misconduct within the Narcotics Unit including, specifically, that narcotics officers were falsifying affidavits in support of narcotics-related search warrants.

In light of the foregoing, the Debtor could have discovered the Shamoons' constitutional claims through reasonably diligent efforts.  In particular, a review of the debtor's "own books and records" of the Narcotics Unit would have uncovered the Shamoons' claims.  As Judge Tarnow pointed out, the City was unable to produce in discovery any records that confirmed the existence of the Confidential

Informant allegedly relied upon by Sgt. Geelhood. Nor could the City produce any records that confirmed the alleged surveillance of the Shamoons' home conducted by Sgt. Geelhood. See Case No. 3:18-cv-13683 ECF No. 145, PageID.4457-4458 (noting the absence of any records produced by the City to substantiate Geelhood's alleged reliance on a confidential informant); *Id.* at pg. 21-22 (Judge Tarnow noting that "while Geelhood claims to have surveilled the Shamoons' address on approximately five occasions prior to seeking a warrant, Defendants have produced no documentary evidence in support of this claim."); *id.* at 22 (Judge Tarnow further noting that according to Deputy Chief Fitzgerald, DPD officers are required to document their surveillance, even if it is just jotting a note on the back of a receipt" and that "the City's record retention policies require that case reports for felony investigations, including case logs, be retained for at least twenty years.").

In light of former Chief Craig's statements coupled with the lack of any documentation whatsoever to substantiate Geelhood's affidavit and search warrant to raid the Shamoons' home, this Court should conclude that the City's "own books and records" would have put the City on notice of the Shamoons' constitutional claims relating to the bogus raid conducted upon their home by Sgt. Geelhood. And having such knowledge and failing to give the Shamoons' actual notice, the City's untimely attempt to discharge their claims should fail.

Discharge under the Bankruptcy Code presumes that all creditors bound

by the plan have been given notice sufficient to satisfy due process. *See In re First Am. Health Care of Georgia,* 220 B.R. 720, 723 (Bankr.S.D.Ga.1998). Both the Bankruptcy Code, 11 U.S.C. 944(c)(2), and the City's Confirmed Plan (Article III D.4.b.) provide that the debtor *is not discharged* from any debt owed to an entity that, before confirmation of the plan, had neither notice nor actual knowledge of the Chapter 9 case.

Here, the Shamoons should have been a scheduled creditor and should have received the statutory notice required under the Code. The purpose of statutorily requiring a debtor to list its creditors with their mailing addresses is to provide them with basic due process notice. *In re Glenwood Medical Group, Ltd.,* 211 B.R. 282, 285 (Bankr.N.D.111.1997). It is the debtor's burden to establish that the creditor received adequate notice. *See In re O'Sullivan,* 488 B.R. 510, 513 (Bankr. D. Mass. 2013)(citing *In re Massa,* 187 F.3d 292, 296 (2d Cir.1999)).

The totality of the circumstances should have alerted the City to the possibility that the Shamoons might reasonably have a claim for damages arising from the bogus raid upon their home in September 2012. Despite having knowledge of their claims, the Shamoons are not listed as creditors in the Debtor's Schedule H attached to its Second Amended List of Creditors and Claims (Doc No. 1059, Notice of Filing of Second Amended List of Creditors and Claims). The City had an obligation to mail the Shamoons notice of the bankruptcy. And the

17

Shamoons had neither notice, nor actual knowledge of the City's Chapter 9 bankruptcy case. (Ex. H). Since the Shamoons were known claimants who did not receive the required notice their claims were not discharged in bankruptcy.

**B. The Shamoons did not fairly contemplate their claims against the City of Detroit until after the effective date of the City's Confirmed plan such that they are not subject to discharge.**

Alternatively, the Court should conclude that the Shamoons' did not fairly contemplate their claims against the City until after the City's confirmation plan was approved by the Court in 2014. For purposes of bankruptcy law, whether a party has a claim against a debtor is determined under the "fair contemplation" test. "[A] claim cannot fall within the purview of section 101(5) – and thus cannot be discharged as a pre-petition claim – unless that claim could have been contemplated by the parties prior to the bankruptcy proceedings." *In re City of Detroit, Michigan*, 548 B.R. at 761.

Here, while the raid on the Shamoons' house took place in September 2012, the Shamoons had no reason to suspect that the raid was carried out pursuant to a scheme by corrupt narcotics officers. At best, the Shamoons were concerned about the potential of criminal liability, but never thinking that the raid of their home was carried out by corrupt narcotics officers and sergeants who were falsifying affidavits with the intent to raid medical marijuana providers and reap the rewards of their misconduct.

18

The Shamoons had no reason to know, until the early part of 2015, that there was rampant corruption within the narcotics unit and that these corrupt officers were deliberating targeting medical marijuana providers in and around the City of Detroit for their own pecuniary gain. The first time that the Shamoons had any reason to believe they may have had a claim to assert against the City of Detroit was after hearing news reports about the *Davis* case in or around February 2015, followed by the federal indictments of several City of Detroit narcotics officers in April 2015 (Ex. H and B). By this point in time, the City's confirmed plan had already been approved by the Court in November 12, 2014.

Given the willful misconduct by the officers involved, the Shamoons did not fairly contemplate their constitutional claims against the City until after it was too late. For this reason, the Court should conclude that their claims are not barred.

### C. The City's right to discharge the Shamoons' claims are barred by the equitable doctrines of estoppel and laches.

Assuming, *arguendo*, that the Court finds rejects the Shamoons' arguments above, the City's motion should also be denied under the equitable doctrines of estoppel and laches. It is well established that this Court retains equitable powers as codified in 11 U.S.C. § 105. Based on the facts presented here, the Court should decide, as a matter of equity, that the City's motion should be denied based on equitable estoppel and laches.

"The defense of laches 'requires proof of (1) lack of diligence by the party against whom the defense is asserted; and, (2) prejudice to the party asserting the defense.'" *In re Rechis*, 339 B.R. 643, 645 (Bankr. E.D. Mich. 2006)(J. Rhodes). The Shamoons satisfy each of these requirements relative to the City's untimely motion.

First, it should be noted that the instant case was filed more than three-and-a-half years ago on November 18, 2018. During the lengthy pendency of this matter, the parties have extensively litigated numerous discovery disputes at great expense to the Shamoons. At no time during any of the last 3.5 years of this protracted litigation did the City seek to assert its rights, whatever they may be, to discharge and/or enjoin the Shamoons' constitutional claims based on its confirmed plan.[3]

To the contrary, the City first raised its purported discharge defense only after the City had filed lengthy motions for summary judgment and after the Shamoons responded in opposition to such motions with a nearly 1,000 page summary judgment record of exhibits. See Case No. 3:18-cv-13683 ECF Nos. 121, 122, 123 (Motion(s) to Dismiss and for Summary Judgment, and ECF Nos. 125, 126, 128 (Shamoons' Responses to Motion(s) to dismiss and for Summary Judgment along with Appendix of Exhibits. Only now after more than 3.5 years of litigation, and

---

[3] In fact, the City knew about the Shamoons' claims during the pendency of the predecessor Davis case. In Davis, the undersigned counsel sought discovery relating to the Shamoon raid. Additionally, the parties had discussed the possibility of settling not just the Davis case, but all of the other individually filed actions including the Shamoon case. As such, the City has known about the Shamoons' claims as long ago as 2015.

having not prevailed on summary judgment and facing an imminent trial, has the City raised, for the first time, its purported discharge defense. The City had a duty to raise its purported discharge defense without prejudicial delay, and the City failed to do so here.

As to the prejudice prong, the Court should consider that the Shamoons have incurred expenses totaling nearly $12,500 during this litigation. Such expenses include fifteen depositions and expert witness fees. Forcing the Shamoons to incur such costs while sitting idle for more than 3.5 years on its purported discharge defense constitutes prejudice to the Shamoons and should be considered under this Court's equitable powers. *See, e.g., In re Dixon*, 295 B.R. 226, 234 (Bankr. E.D. Mich. 2003)(J. Shefferly)(highlighting that "the equitable doctrine of laches, which has as its goal the prevention of prejudicial delay in the bringing of a proceeding, is a relevant and necessary doctrine in the bankruptcy context."). Clearly the City knew about its purported discharge defense long before now. In fact, the City has known of their potential discharge defense since 2015 during the litigation (and settlement) of the *Davis* case. Based on the City's egregious 3.5 year delay in raising such a defense, it appears just as likely that the City's instant motion is simply a litigation strategy to derail a trial on the merits.

These same facts should also compel the Court to conclude that the City is equitably estopped from seeking the relief raised in its instant motion. The doctrine

of equitable estoppel may apply based on (1) conduct or language amounting to a representation of material facts; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on or must act in such manner that the party asserting the estoppel has a right to believe it so intended; (4) the party asserting the estoppel must be unaware of the true facts; and, (5) the party asserting the estoppel must detrimentally and justifiably rely on the representation. *In re H.R.P. Auto Center, Inc.*, 130 B.R. 247, 254 (Bankr. N.D. Ohio 1991)(citing *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210 (6th Cir. 1987), *cert. denied* 484 U.S. 820 (1987)).

Here, the Shamoons had no reason to believe their claims were subject to discharge. This is especially so given that the City settled the predecessor *Davis* case which was filed as a putative class action and in which the City was made aware, specifically, of the identity of the Shamoons as putative class members. At no time during the *Davis* litigation did the City ever assert that the Shamoons' claims (or any of the other putative class member's claims) were barred or subject to discharge under the City's confirmed plan. Instead, the City proceeded to discuss settlement of all the putative class cases, including the Shamoons, but ultimately the parties settled only the *Davis* case after which the Shamoons' instant case was filed in November 2018. Based on these actions, the Shamoons reasonably relied, to their detriment, in filing their instant claims without any knowledge of the City's

purported discharge defense. During the more than 3.5 years litigating this matter, the Shamoons expended considerable time, money, and effort in prosecuting these claims.

Based on the sequence and timing of these facts, the Court should conclude that the City is now equitably estopped from the relief it now seeks.

## CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, the Court should deny the City's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order as to the Shamoons.

<div style="margin-left:40%">

Respectfully submitted,

DETTMER & DEZSI, PLLC,

</div>

Dated: May 17, 2022          */s/Michael R. Dezsi*
                             MICHAEL R. DEZSI
                             Counsel for Interested Parties
                             Debra Metris-Shamoon, Mukhlis Shamoon,
                             Carl Veres, Paul & Julia Metris
                             1523 N. Main St.
                             Royal Oak, MI 48067
                             (313) 757-8112
                             mdezsi@dezsilaw.com
                             P64530