# **EXHIBIT G**

## DECLARATION OF ADAM SHAMOON

I, ADAM SHAMOON, state as follows:

1.  I am competent to testify as to the contents of this declaration.

2.  I am the son of Debra and Mukhlis Shamoon.

3.  I was not home at my parents house, located in Shelby Township, Michigan, on the date of September 13, 2012, when narcotics officers from the City of Detroit raided by parents' home.

4.  I learned after the raid that the officers took several of my firearms from my parents' home. In particular, they took 2 long guns and 2 handguns.

5.  My mom, Debra, showed me a paper that was left behind by the officers entitled "Notice of Seizure and Intent to Forfeit" dated September 13, 2012, which lists Sgt. Joe Tucker as a "witness." (Attachment A).

6.  In the days following the raid, I contacted Sgt. Joe Tucker demanding to know why my parents' house was raided and also about the status of my handguns. I spoke directly with Sgt. Tucker who told me that I would have to wait a couple weeks and call him back.

7.  A couple weeks later, I contacted Sgt. Tucker per his instructions, and again I demanded to know what happened at my parents' house and also about my handguns. Sgt. Tucker again told me that I would have to wait longer before I could possibly retrieve my handguns.

8.  A couple weeks later, I again contacted Sgt. Tucker who told me to contact another sergeant from the drug enforcement unit whose name I don't remember.

9.  When I spoke with this other sergeant, I threatened to retain an attorney if necessary to straighten out the matter. This sergeant seemed agitated by my comment and responded with

something to the effect of, "I don't know why people always run out and get attorneys." He then told me to come down to the department to pick up my guns.

10. When I did go down to get my guns, nobody there seemed to know what I was talking about, though eventually I was given my guns without any paperwork and I didn't sign anything when I picked them up.

11. There was never any explanation or justification given to me by anyone about why they had raided my parents' house.

I declare under the penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Dated: 05-15-2022

# NOTICE OF SEIZURE AND INTENT TO FORFEIT

| | | | |
|---|---|---|---|
| Notice Served To: Mukhlis Shamoon | | | |
| Address: 8929 Wilcray | City: Shelby Twp | State: MI | |
| Date: 9/13/12 | Time: 1:40 | Location Of Seizure: 8929 Wilcray | |

## NOTIFICATION

On, day/ 13 month/ 9 year/ 12 the Detroit Police Department determined that the property described below is subject to forfeiture pursuant to Michigan Law MCLA 333.7521, et. seq., and that the Department intends to seek forfeiture of this property.

If you desire to challenge the forfeiture of this property, you MUST DO ALL of the following within twenty (20) days of receiving this notice:

1. FILE A CLAIM WITH THE DETROIT POLICE DEPARTMENT FORFEITURE UNIT 2121 W. Fort, DETROIT, MI 48201, (313) 596.2630, DESCRIBING YOUR INTEREST IN THE PROPERTY.
2. POST A BOND THAT IS 10% OF THE VALUE OF THE PROPERTY CLAIMED (said BOND will be no less than $250.00 and NO GREATER THAN $5000.00).

After filing a written claim and posting the required BOND, the case will be referred to the Wayne County Prosecutor's Office for filing in the Wayne County Circuit Court. If the Court orders the property forfeited to the Detroit Police Department, you May be required to pay ALL costs incurred during the forfeiture proceedings.

Failure to file a claim and post BOND within TWENTY (20) days will result in your DEFAULT and your property will be declared forfeited to the Detroit Police Department.

**THIS FORM MUST BE FAXED IMMEDIATELY TO FORFEITURE AT 596-2309**

## DESCRIPTION OF PROPERTY

| Amount of Currency: $ 315 - | | ET#: E40273504 | | |
|---|---|---|---|---|
| Vehicle/yr. | | | | |
| Veh /Mileage: | Make: | Model: | Style: | Color: |
| | License Plate # | | Vin# | |
| ET# Other Property: | | (loc veh stored) | | |

## ACKNOWLEDGEMENTS

| | | |
|---|---|---|
| Notice Received By: Mukhlis Shamoon | Signature: X Mukhlis W. Shamoon | |
| Notice Served By: Briana Johnson | Signature: Briana A Johnson | |
| Rank: P.O. | Badge#: 5010 | Assignment: NB |
| Date: 9/13/12 | Time: 1:40 | Location of Service: 8929 Wilcray |
| Witness: Joe Tucker | Signature: X | |
| Rank: SGT | Badge#: S-95 | Assignment: N/B |

(Revised: 03.7.2005)

# EXHIBIT H

# DECLARATION OF DEBRA METRIS-SHAMOON

I, DEBRA METRIS-SHAMOON, state as follows:

1. I am competent to testify as to the contents of this declaration.

2. Along with my husband and parents, I was at my house located in Shelby Township, Michigan, on the date of September 13, 2012, when my house was raided by unknown agents.

3. I say "unknown" because none of the officers identified themselves, the officers were dressed in black, and none of them displayed badges. When I was able to look outside I did see that one of the cars was a Detroit Police vehicle.

4. At the time I thought my house was being robbed, though one of the officers later identified himself by the name "Tucker."

5. At no time during the raid did any of the officers show us a warrant.

6. The officers took my and my husband's medical marijuana plants, about $315 of cash, and also took several registered firearms belonging to my son Adam.

7. We had no idea what was happening as we thought there must have been some kind of mix up with another house.

8. Neither I nor any of my family members were ever charged with any crimes arising from this raid.

9. In the weeks after the raid, I twice contacted the Detroit Police Department asking why they had raided our house and demanded to see a warrant. Both times I spoke with a woman who told me she couldn't find anything in the system under either my name or our home address.

10. My son Adam contacted one of the officers whose name was written down on a paper and my son asked what was going on and why did they raid our home. My son never got any

answers about what had happened, though in November or December of 2012 he was told to come down to the station to pick up his firearms.

11. It wasn't until February or March of 2015 that I saw media reports about another raid carried out by officers from the City of Detroit that I had any idea that the officers may have violated our rights.

12. After seeing these media reports, I contacted my current attorneys' office and inquired if they could help us sort out what happened to us in September 2012.

13. A couple months later, in or around April 2015, I learned through other media reports that federal agents had indicted several Detroit police officers for conducting unlawful searches and seizures in and around Detroit. It wasn't until then I firmly believed that my family's rights had also been violated by the raid on our house in September 2012.

14. At no time did the City ever send me or my family any kind of notice or paperwork about the City filing for bankruptcy, and I didn't know about the City's bankruptcy until my attorneys talked to me about it well after I contacted them in the Spring of 2015.

I declare under the penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Dated: _5-15-22_    *Albra Metris-Shamoon*

# **EXHIBIT I**

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
       UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5        vs.                             Case No. 15-20217
                                          Hon. Stephen J. Murphy, III
 6        D-1 DAVID HANSBERRY
          D-2 BRYAN WATSON
 7        D-3 KEVLIN OMAR BROWN,

 8                        Defendants.
       _____/
 9
                         JURY TRIAL: VOLUME 14
10
              BEFORE THE HONORABLE STEPHEN J. MURPHY, III
11                   United States District Judge
                 Theodore Levin United States Courthouse
12                   231 West Lafayette Boulevard
                        Detroit, Michigan  48226
13                      Tuesday, June 28, 2016

14     APPEARANCES:

15     For the Plaintiff        J. MICHAEL BUCKLEY
       United States of America: SHELDON N. LIGHT
16                              U.S. Attorney's Office
                                211 W. Fort Street
17                              Suite 2001
                                Detroit, Michigan  48226
18                              313-226-9732

19     For the Defendant        MICHAEL J. HARRISON
       David Hansberry:         Harrison Law PLC
20                              240 Daines Street
                                Birmingham, Michigan  48009
21                              248-430-6421

22     For the Defendant        STEVEN F. FISHMAN
       Bryan Watson:            615 Griswold
23                              Suite 1125
                                Detroit, Michigan  48226
24                              313-962-4090

25
```

Case 2:15-cr-20217-SJM-APP ECF No. 229 filed 05/02/17 PageID.5543 Page 2 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

2

```
 1   APPEARANCES:   Continued

 2   For the Defendant            KENNETH SASSE
     Kevlin Omar Brown:           27 E. Flint Street
 3                                2nd Floor
                                  Lake Orion, Michigan  48362
 4                                248-821-7325

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      To obtain a copy of this official transcript, contact:
           Linda M. Cavanagh, Official Court Reporter
25        (248) 884-0327 • linda_cavanagh@mied.uscourts.gov
```

```
 1                        TABLE OF CONTENTS

 2   Government Witnesses Continued:                      Page

 3   ARTHUR LEAVELLS

 4       Direct Examination Continued by Mr. Light          5
         Cross-Examination by Mr. Harrison                 15
 5       Cross-Examination by Mr. Fishman                  71
         Redirect Examination by Mr. Light                147
 6       Recross-Examination by Mr. Harrison              149
         Recross-Examination by Mr. Fishman               150
 7

 8

 9

10

11

12

13

14

15
                              EXHIBITS
16
     Identification                    Offered   Received
17
     NONE
18

19

20

21

22

23

24

25
```

Jury Trial: Volume 14 • Tuesday, June 28, 2016

4

```
 1          Detroit, Michigan
 2          Tuesday, June 28, 2016
 3                      —  —  —
 4          (Proceedings commenced at 8:36 a.m., all parties
 5          present)
 6          (Whereupon the jury entered the courtroom at
 7          8:36 a.m.)
 8          THE LAW CLERK:  United States District Court for the
 9   Eastern District of Michigan is now in session, the Honorable
10   Stephen J. Murphy presiding.
11          The Court calls Case No. 15-20217, United States of
12   America versus David Hansberry and others.
13          THE COURT:  Okay.  Everybody's in place and let's all
14   be seated please.  Morning to everybody.
15          THE JURORS:  Good morning.
16          THE COURT:  We're going to get back to work here in
17   just a few seconds.  I -- at the end of the day yesterday, you
18   know, your mind is in a number of different places, but we're
19   going to go from now until 1:30, and what I'd like to do, if
20   possible, is, you know, stretch out the morning session.  If we
21   don't have to take a break, we won't, and we'll go from now til
22   about 10:45 or 11:00, take our usual 25 or 30-minute break,
23   come back and then go from 11:30 roughly til 1:30.  So that's
24   my idea.  If it doesn't work out that way, it's fine.  If any
25   of the parties or lawyers or the jury, of course, needs a break
```

1   prior to 11:00, just get Mr. Lepola's attention or whatever the

2   case may be and we'll take -- we'll take a quick comfort break.

3        But my idea that I didn't put very artfully yesterday

4   was that if we compress our -- our time, even though we're

5   knocking off a little early today, we might be able to get in

6   just as much testimony.  Regardless of whether we do, we're

7   making very good progress, as I mentioned yesterday, and I

8   think we are -- we are right on schedule.

9        So continue to pay good attention.  Thank you for

10  being on time.  Keep your minds open.

11       And if you're ready to go, Mr. Light --

12       MR. LIGHT:  Thank you, Your Honor.

13       THE COURT:  -- we're ready to go as well.  Yes, sir.

14                 DIRECT EXAMINATION CONTINUED

15  BY MR. LIGHT:

16  Q.   Good morning, Mr. Leavells.

17  A.   Good morning.

18  Q.   When we finished yesterday, we had listened to a recording

19  that you made of your conversations with David Hansberry on

20  September 7, 2014, correct?

21  A.   Correct.

22  Q.   And in those conversations you talked about a number of

23  different topics, including your mutual interest in growing

24  marijuana?

25  A.   Correct.

1   Q.   Including the plan that purportedly came from Gary Jackson

2   to stage another rip-off like the ones that had occurred

3   before?

4   A.   Correct.

5   Q.   Including Mr. Watson's idea --

6            MR. HARRISON:   Your Honor, I'm going to object --

7   Q.   -- about how to manipulate that?

8            MR. HARRISON:   -- I'm going to object again, Your

9   Honor, to the continued leading.

10           THE COURT:   I think we're setting the stage for

11   further testimony, so I'll hold the objection in abeyance and

12   ask you to, when we're back into the testimony, go ahead and --

13           MR. LIGHT:   I just have a couple more along those

14   lines.

15           THE COURT:   Yeah.  Sum -- sum up where we were and

16   then get out of the leading questions and we'll move forward.

17           Go right ahead.

18   BY MR. LIGHT:

19   Q.   Did your discussions also include what Mr. Watson and you

20   had talked about about how to implement what Gary Jackson had

21   been talking about?

22   A.   Yes.

23   Q.   And finally, did you talk some about contacts between Mr.

24   Hansberry and the person he called "my man" in Kentucky?

25   A.   Yes.

1   Q.   Now, four days later did you meet again with Officer Bryan

2   Watson on September 11, 2014?

3   A.   Yes.

4   Q.   And did you record that conversation as well?

5   A.   Yes.

6        MR. LIGHT:  I'm going to ask the Court if we may play

7   and publish to the jury Government Exhibit 808.

8        THE COURT:  Yes, sir.  Go right ahead.

9        (Audio clip being played at 8:41 a.m.)

10        MR. LIGHT:  Stop there.

11   BY MR. LIGHT:

12   Q.   Where's this conversation taking place?

13   A.   At his house.

14   Q.   Where?

15   A.   At his house.

16   Q.   And where is that located?

17   A.   In Novi.

18   Q.   And you're outside?

19   A.   Yes.

20   Q.   Looking at a hornets nest or something like that?

21   A.   Yes.

22        MR. LIGHT:  Go ahead.

23        (Audio clip being played at 8:41 a.m.)

24        MR. LIGHT:  Would you stop there?

25   BY MR. LIGHT:

13-53846-tjt   Doc 13683-86   Filed 05/21/22   Entered 05/21/22 15:36:48   Page 15 of
USA v David Hansberry, et al, 15-20217
109

 1    Hansberry, you tell him the truck's en route, they take the
 2    truck down, correct?
 3    A.   Correct.
 4    Q.   And lots of notification are made, correct?
 5    A.   Yes.
 6    Q.   Federal agents you told us were notified, right?
 7    A.   Correct.
 8    Q.   A Border Patrol agent with a dog was called, correct?
 9    A.   Correct.
10    Q.   Other federal agents arrive, correct?
11    A.   Correct.
12    Q.   Your supervisors arrived, correct?
13    A.   Yeah.
14    Q.   In all, would it be fair to say that there were at least
15    20 or 30 law enforcement officers at that scene?
16    A.   It was a lot.
17    Q.   And you tell us that when you arrived on the scene, that
18    the semi was stopped, correct?
19    A.   Correct.
20    Q.   And that there were officers inside the cab, correct?
21    A.   Correct.
22    Q.   And that there was money that appeared to already be out
23    on the -- on the ground in duffle bags, correct?
24    A.   It didn't appear to be but it was, laying right there on
25    the ground next to the car.

13-53846-tjt   Doc 13685-86   Filed 05/27/22   Entered 05/27/22 15:36:48   Page 16 of
USA v. David Hansberry, et al. 15-20217
109

1  Q.   Okay.  And the officers -- what month was this?

2  A.   This was in July.

3  Q.   July 2010, right?

4       Officers are wearing their summer plainclothes

5  uniforms, correct?

6  A.   Summer plainclothes uniforms?

7  Q.   The officers on your crew are wearing polo shirts, right?

8  A.   Officers on my crew?  No.

9  Q.   No?

10  A.   Just two officers that had the raid gear on.  The rest of

11  us was in plainclothes.

12  Q.   And who were the officers in the raid gear?

13  A.   Tourville and Napier.

14  Q.   Tourville and Napier.

15       And explain to us what the raid gear is.

16  A.   At that time it was polo shirts with "Police" on it,

17  narcotic patches on the side and BDU pants.

18  Q.   So the raid gear would be polo shirts that say "Police"

19  and BDU -- like 511 BDU pants, right?

20  A.   Correct.

21  Q.   Okay.  And you say that when Officer Napier exited the

22  truck cab, you tried to hug him, right?

23  A.   Correct.

24  Q.   And he kept you away, correct?

25  A.   Pushed me away.

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5583   Page 42 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

42

```
 1    Q.   Pushed you away.
 2             And now in retrospect, you're inferring to the jury
 3    that you believe that Officer Napier had stolen money and
 4    didn't want to hug you because then you would have noticed the
 5    money that he had on him, correct?
 6    A.   I say -- you could say that.
 7    Q.   That's your inference, right?
 8    A.   Mm-hmm.
 9    Q.   All right.  And Gary Jackson told you and you believed
10    that there was $3 million in that truck when it was stopped,
11    correct?
12    A.   He said it before and he said it after and stayed to it.
13    Q.   And what you all found was $2.1 million, correct?
14    A.   2.1197.
15    Q.   Okay.  And so approximately $900,000 was missing, right?
16    A.   Correct.
17             MR. HARRISON:  And can we take a look at 724-F?
18    BY MR. HARRISON:
19    Q.   What do we see there?
20    A.   What part?
21    Q.   How much of the money do we see there?
22    A.   That's the 2.1197.
23    Q.   That's all of it, right?
24    A.   Correct.
25             MR. HARRISON:  Can we see G?
```

```
 1   BY MR. HARRISON:
 2   Q.   Do these numbers mean anything to you, sir?
 3   A.   Yes.
 4   Q.   What do they mean?
 5   A.   The numbers to the left is the itemized number and then to
 6   the right is how much is in that pack.
 7   Q.   Okay.  And so the 20 would mean $20,000, right?
 8   A.   Correct.
 9   Q.   So one of those packets that is labeled 20 would have --
10   would be $20,000, right?
11   A.   Correct.
12   Q.   Okay.  And, sir, would you agree with me that those
13   packets are approximately eight to ten inches long and
14   approximately six to eight inches across, does that sound about
15   accurate?
16   A.   I don't -- I don't know.
17   Q.   About the size of a legal pad, that'd be a fair estimate?
18   A.   I don't know.
19   Q.   You don't know.
20        And would you agree with me, sir, that they're about
21   four to five inches thick?
22   A.   I don't know the dimensions of it.
23   Q.   Okay.  So what we see there is $2.1 million, right?
24   A.   2.1197.
25   Q.   Right.  So you would agree with me that half of that would
```

1    be a little more than a million, right?

2    A.   Somewhere around there.

3    Q.   And you believe or you surmise that Officers Tourville and

4    Officers Napier were able to take half of that money and hide

5    it under their polo shirts and in their pants, and they were

6    able to do that before any of the other officers arrived,

7    that's what you're suggesting to us, correct?

8    A.   That's not what I'm suggesting.  I didn't say a million

9    dollars.

10   Q.   $900,000, right?

11   A.   2.1197, so that's more like seven to eight thousand,

12   800,000.

13   Q.   Okay.  Fair enough.  I want to move you on to some of the

14   specific incidents that you talked about, other ones.  You

15   talked -- you told us about an incident in South -- Southfield

16   involving a raid that you did with Sergeant Hansberry's crew

17   where a woman was in the bathroom asking you to shoot her,

18   right?

19   A.   Asking officers to shoot her, yes.

20   Q.   Asking officers to shoot her.

21          And you remember specifically her saying that, right,

22   "Please shoot me," something like that?

23   A.   Something around -- like that.

24   Q.   Okay.  And you remember that there were officers from

25   another department there as well, correct?

1   A.   Southfield.

2   Q.   And you told us that your recollection was that somewhere

3   around $40,000 was found, right?

4   A.   It was on the table.

5   Q.   It was on the table?

6   A.   Correct.

7   Q.   What was your role in that entry, that raid?

8   A.   I didn't really have a role in that one.  I was just in

9   the -- in the entry crew.

10  Q.   So you were part of the entry crew?

11  A.   Correct.

12  Q.   Part of the crew that went in after the door was -- was --

13  was taken down, right?

14  A.   Correct.

15  Q.   Part of the crew that went around and searched and

16  secured, right?

17  A.   Correct.

18  Q.   And you don't remember specifically what you did, what

19  your role was?

20  A.   No.  I was just on the stack that I can remember.

21  Q.   On the stack.

22        Can you explain to the jury what that means, to be on

23  the stack?

24  A.   Just stacked up in the -- in the line.

25  Q.   Okay.  And you recall that after the money was secured,

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5611   Page 70 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

70

```
 1              THE COURT:  Five minutes?
 2              MR. BUCKLEY:  Judge, I would agree with Mr. Fishman
 3      as well.
 4              THE COURT:  All right.  Let's take five minutes,
 5      ladies and gentlemen.  It's 10:25 and let's get back at 10:30.
 6      Let's all rise for our jurors please.
 7              (Whereupon the jury was excused at 10:25 a.m.)
 8              THE COURT:  Okay.  Five-minute recess.  You can step
 9      down.
10              (Court in recess at 10:26 a.m.)
11              (Proceedings resumed at 10:36 a.m., all parties
12              present)
13              (Whereupon the jury entered the courtroom at
14              10:36 a.m.)
15              THE COURT:  Okay.
16              MR. FISHMAN:  We all feel a lot better now, Judge.
17              THE COURT:  I know.  Always ready to help.
18              MR. FISHMAN:  Especially those of us who are a little
19      up in years, you know.
20              THE COURT:  I was ready myself.
21              All right.  Let's all be seated.  Our jury's back.
22              Now, listen, Mr. Fishman, we -- maybe, you know,
23      when -- 35, 40 minutes, 11:00, 11:15, when you think it's a
24      good time for our break, you let us know --
25              MR. FISHMAN:  I will.
```

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5612   Page 71 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

71

```
 1              THE COURT:  -- and we'll take -- okay.  Go right
 2    ahead.
 3                        CROSS-EXAMINATION
 4    BY MR. FISHMAN:
 5    Q.   Okay.  So Mr. Levels [sic], you started -- or Leavells,
 6    you started as a police officer in 1999, correct?
 7    A.   Correct.
 8    Q.   When you were asked at the grand jury why you wanted to
 9    become a police officer, you said as follows, page 5:  Answer,
10    "Well, I thought I could make a difference, you know, and
11    wanted to support my family."  Do you remember that answer?
12    A.   Correct.
13    Q.   All right.  So that was part of your intention, when you
14    said "make a difference," you meant do something good out for
15    the community, correct?
16    A.   Correct.
17    Q.   And then you told Mr. Harrison about an incident that
18    happened where you were trying to help Benny Doughrity, it's
19    D-O-U-G-H-R-I-T-Y, because he was some type of kin to Mr.
20    Jackson, am I right?
21    A.   Correct.
22    Q.   And Gary Jackson approached you and he asked you if you
23    could do something to help his kin, whatever he was to him,
24    right?
25    A.   Correct.
```

1    Q.   And you said you'd see what you could do, something like

2    that, correct?

3    A.   Yes.

4    Q.   And what you decided to do, according to what you were

5    telling us before the break, was you typed up a search warrant

6    affidavit, am I right?

7    A.   Correct.

8    Q.   And I'm not going to read through the same things that Mr.

9    Harrison read through, but you'd agree with me that it

10   contained all kinds of lies, right?

11   A.   Some.

12   Q.   Well, I don't want to go through all of them, but the ones

13   you agreed with Mr. Harrison were lies, you still agree those

14   were lies, right?

15   A.   Correct.

16   Q.   And you knew from your experience that you can't just type

17   up a search warrant affidavit, you have to actually swear to it

18   and sign it, am I right?

19   A.   Correct.

20   Q.   And you knew then as a police officer that swearing to an

21   affidavit was exactly the same as what you did yesterday when

22   Judge Murphy asked you if you're telling the truth, correct?

23   A.   Correct.

24   Q.   It's an oath, isn't it?

25   A.   Correct.

1    Q.   And what you did was you swore to something that you knew

2    contained a number of lies, am I right?

3    A.   Correct.

4    Q.   Can you tell us, sir, how did you decide which lies to

5    stick in there, for instance, the surveillances that you

6    claimed you observed narcotics transactions, how -- how did you

7    decide what lie you should stick in there?

8    A.   It's just wording.

9    Q.   Well, it's word -- how did you pick a black male,

10   heavyset, wearing a tan jacket, did you just pick that out of

11   the sky?

12   A.   Yeah.  It's not hard to do.

13   Q.   It's not hard to do.

14        Had -- had you done that before?

15   A.   Yeah, I've done it before.

16   Q.   You've submitted false affidavits both to the Prosecutor's

17   Office and to judges before this?

18   A.   Correct, just like your client did.

19   Q.   Okay.  Mr. Levels [sic], we're going to -- Leavells --

20   we're going to have a real -- I'm going to ask you questions

21   and you answer my question.  If you want to make a speech, you

22   tell the Judge.  If he lets you do it, you can speech, okay?

23   You got it?  You got it?

24   A.   I understand what you're saying.

25   Q.   All right.  So my question is are you telling the jury

1    that in addition to this false affidavit, you've submitted

2    other false affidavits, true?

3    A.   I made others.

4    Q.   And on each occasion you did the same thing in terms of

5    typing it up, swearing to it, eventually talking to a

6    prosecutor and then seeing a judge about it, am I right?

7    A.   Correct.

8    Q.   And in this instance, the one that we have here, was March

9    the 14th of 2013, correct?

10   A.   Correct.

11   Q.   And based on your testimony, you said you went to the FBI

12   task force in October of 12, am I right?

13   A.   Yeah, late October, 12.

14   Q.   Halloween I think you said, true?

15   A.   During Halloween.

16   Q.   And then you stayed about six or seven months, correct?

17   A.   Up until May, June -- I mean April, May.

18   Q.   April, May of 2013, right?

19   A.   Correct.

20   Q.   Which means that on March the 14th of 2013 when you

21   submitted this false affidavit, you were working for the FBI?

22   A.   I was working for Detroit Police Department.

23   Q.   Okay.  Let me use a different preposition.  You were

24   working with the FBI at the time you did this?

25   A.   I was on the joint task force, yes.

```
 1    Q.  And did you tell any of your superiors, either Sergeant
 2    Weathers or maybe one of the FBI agents, say, "Guess what,
 3    fellas?  I've got to help this guy out so I'm going to go
 4    submit a false affidavit to a prosecutor and a judge."  Did you
 5    tell anybody that?
 6    A.  No.
 7    Q.  Because you knew if you told them, number one, you'd be
 8    booted off the task force in 15 minutes, right?
 9    A.  I don't know that.
10    Q.  You don't.
11        Well, you figure they would say, "Hey, we're going to
12    give you one of those commendations for doing this."  Is that
13    what you figured would happen?
14    A.  Never thought of it.
15    Q.  Okay.  You -- you certainly thought of the notion if you
16    told the FBI or other officers that you were about to submit a
17    false affidavit, you knew something bad would happen to you,
18    didn't you?  I'm sorry?
19    A.  Well, you didn't give me a chance to answer.
20    Q.  Go ahead.  Somebody coughed.  I thought you did.
21    A.  Oh.  I didn't -- can you repeat the question now?
22    Q.  Yeah.  My question is you knew, did you not, that if you
23    told the FBI or anybody on your task force, "I'm about to
24    submit a false affidavit to a judge and to a prosecutor," that
25    something bad would happen to you, right?
```

```
1    A.    I don't know what will happen.

2    Q.    How well did you know Assistant Prosecutor Sarah DeYoung

3    as of March 24th of 2013?

4    A.    I knew her.

5    Q.    And you knew she was a narcotics prosecutor over there,

6    correct?

7    A.    Correct.

8    Q.    And from what you saw, first she appeared to be a good

9    lawyer, true?

10   A.    True.

11   Q.    And she appeared to be a straightforward,

12   straight-shooting, honest person, true?

13   A.    True.

14   Q.    Did it bother you in the least when you were reading this

15   affidavit over the phone to her that you were telling her a

16   bunch of lies, did that bother you?

17   A.    I was reading what was on there.

18   Q.    I know that, but my question is, sir, did it bother your

19   conscience, did it bother your mind, did it bother you at all

20   to be reading a pack of lies to somebody like Sarah DeYoung

21   who's a narcotics prosecutor at the Wayne County Prosecutor's

22   Office?

23   A.    I didn't know my state of mind at that time so I can't

24   tell you something from not -- from back then.

25   Q.    What you do know though about your state of mind was you
```

1    were certainly trying to help Gary Jackson, that's for sure?

2    A.    Correct.

3    Q.    And if it required you to lie on the phone to the

4    prosecutor, whatever your state of mind was, it wasn't enough

5    to keep you from doing it, agreed?

6    A.    I did what I did.

7    Q.    All right.  And after you lied to Sarah DeYoung, you had

8    to go in front of some judge or magistrate with your affidavit

9    and have a brief conversation with that judge or magistrate,

10    true?

11    A.    True.

12    Q.    And you've done that countless occasions, true?

13    A.    Correct.

14    Q.    And the judge or magistrate, whether they happen to be

15    sitting on the bench at the time or they're in chambers or

16    they're somewhere, they do the same thing that Judge Murphy did

17    that we talked about earlier:  You put your hand in the air,

18    you tell that judge or that magistrate everything in here is

19    true, right?

20    A.    Correct.

21    Q.    So when you stuck your hand in the air on March

22    the 24th -- I'm sorry, March the 14th of 2013 and you were

23    asked is everything true, did it bother you to lie outright to

24    the judge or magistrate, did it bother you?

25    A.    I don't know my state of mind at that time so I don't

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5619   Page 78 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

78

1    know.

2    Q.   Okay.  You told Mr. Harrison that you know nothing of

3    whether or not -- strike that.  Let me start over.

4         Whether it was in person, on the phone, on e-mail or

5    by carrier pigeon, did you ever say to Sarah DeYoung after this

6    raid where you got the phony stuff, did you inform Sarah

7    DeYoung that you wanted her to give a break to Benny Doughrity?

8    A.   After?

9    Q.   After you had the phony raid with the phony warrant and

10   whatever the phony stuff you found in there, did you

11   communicate in any way with Sarah DeYoung that you wanted her

12   to give a break to Benny Doughrity on his case?

13   A.   After?

14   Q.   At any time.

15   A.   I asked her what was needed to make that case go away.

16   Q.   And you asked her that before the phony affidavit?

17   A.   I asked her what was needed.

18   Q.   Right.  My question is did you ask her that before you

19   read that phony affidavit to her or after?

20   A.   I had to ask her before.

21   Q.   All right.  So you talked to her before and you asked her

22   what was needed, and her answer was?

23   A.   Some drugs and a gun.

24   Q.   So that gave you the brilliant idea to look -- to create a

25   search warrant affidavit looking for drugs and a gun, right?

```
 1    A.   Correct.
 2    Q.   And after you found whatever you found, did you then
 3    contact Sarah DeYoung and say, "Hey, we went in, he was my
 4    source and we found drugs and guns, what are you going to do
 5    for him?" or something like that?
 6    A.   No.  I just let her know what we got and that was it.
 7    Q.   You never then -- I'm asking you this for the last time.
 8    This is your last chance.  You never said to Sarah DeYoung,
 9    "Look, we found this stuff and I want you to do something, I'm
10    asking you to do something for Doughrity on his criminal case."
11    A.   Once again, I called her and let her know what we got.
12    Q.   Okay.  The whole purpose of the exercise, including the
13    phony affidavit, was to try to help Mr. Jackson's kin, Benny
14    Doughrity, correct?
15    A.   Correct.
16    Q.   Do you know, sir, where Mr. Doughrity is today?
17    A.   No.
18    Q.   Do you know, do you have any information whatsoever that
19    tells you that he's sitting in the penitentiary today on that
20    case?
21              MR. LIGHT:  Objection, Your Honor.  He's already said
22    he doesn't know.
23              THE COURT:  I'll overrule.  You can answer that.
24              Go ahead.
25    BY MR. FISHMAN:
```

```
 1    Q.   Do you know that he's in the penitentiary today on the
 2    case you were supposedly trying to help him on?
 3    A.   No, I don't know.
 4    Q.   Okay.  Did Sarah DeYoung ever say to you at any time,
 5    either before or after, did she ever say to you, "Hey, don't
 6    worry about it, I'll take care of that case, nothing will
 7    happen to him"?
 8    A.   I don't recall.
 9    Q.   Okay.  All right.  You started your police career at the
10    Third Precinct, correct?
11    A.   Correct.
12    Q.   You worked Special Operations, correct?
13    A.   Correct.
14    Q.   You went to Narcotics, correct?
15    A.   Correct.
16    Q.   And then you went to the FBI task force around 2012,
17    around Halloween as you've told us, right?
18    A.   Correct.
19    Q.   When you got to the FBI task force, did you tell anybody
20    there, "Hey, there's a lot of crookery going on in Detroit
21    Police Narcotics; in fact, I'm one of them."  Did you tell them
22    that?
23    A.   No.
24    Q.   But by then, according to you, there was all kinds of
25    crookery going on in the Detroit Police Narcotics Section,
```

Case 2:15-cr-20217-SJM-APP ECF No. 229 filed 05/02/17 PageID.5622 Page 81 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

81

1    right?

2    A.   It was things going on.

3    Q.   Right.  Including money seizure and some of the other

4    things you've told us about, correct?

5    A.   Correct.

6    Q.   But just so we're clear, you never said to anybody at the

7    FBI or anybody at the task force, you know, "You don't want me,

8    I've been a crook, and I know some other guys and I can tell on

9    them."  You didn't do that, did you?

10   A.   Nope.

11   Q.   So by January of 2014 you were in Narcotics again and you

12   were working on Sergeant Geelhood's crew, is that correct?

13   A.   In January, yes.

14   Q.   And did you have some suspicions about Sergeant Geelhood?

15   A.   What do you mean?

16   Q.   Well, I mean did you think Sergeant Geelhood was a crook?

17   A.   I don't know if he was a crook.

18   Q.   Did you have any suspicions about him at all?

19   A.   That's a wide open question.  I mean --

20   Q.   You're right.

21   A.   -- be specific.

22   Q.   No, that's my question.  The answer is easy, yes or no?

23   A.   I can't answer that question.

24   Q.   Okay.  Did Sergeant Geelhood before he was a sergeant work

25   on Sergeant Hansberry's crew with you, Hansberry, Watson and

1    the other people you've named?

2    A.    I wasn't on there when he was there.

3    Q.    Did you know him to have worked on Sergeant Hansberry's

4    crew?

5    A.    Yes.

6    Q.    And your answer is, when I asked you were you -- did you

7    have any suspicions, you don't know?  Is that your answer?

8    A.    You have to specify what you're talking about.  Other than

9    that, I can't answer the question.

10    Q.    Okay.  When you were on Sergeant Geelhood's crew in

11    January of 2014, were you still selling marijuana to Calvin

12    Turner?

13    A.    Yes.

14    Q.    And tell the jury again how -- how many times you figure

15    you gave weed to Calvin Turner.

16    A.    Several.

17    Q.    Well, does several mean four or five, 10 or 12, what does

18    that mean?

19    A.    I don't know, sir.

20    Q.    More than 10?

21    A.    Several.

22    Q.    Okay.  And what kind of quantities were you giving him?

23    A.    Pounds.

24    Q.    And how were you dividing up the money, splitting it?

25    A.    Yes.

1    Q.   And that was while you were -- continued while you were
2    working on Geelhood's crew, correct?
3    A.   Correct.
4    Q.   You were also running a grow house, right, or being
5    involved in a grow house, correct?
6    A.   Correct.
7    Q.   And was the marijuana that was being grown in the house
8    being sold?
9    A.   It still hadn't been sold.
10   Q.   I'm sorry?
11   A.   It wasn't sold.
12   Q.   It was just in the process of being grown?
13   A.   Yeah.
14   Q.   Did you tell Sergeant Geelhood, "Hey, I hope you don't
15   mind, but I've got a grow house and I'm giving weed to Calvin
16   Turner.  Is it okay if I stay on the crew?"  Did you have a
17   conversation like that with him?
18   A.   No.
19   Q.   Were you guys also ripping off marijuana when you'd go for
20   raids while you were working with Sergeant Geelhood's crew?
21   A.   Sometimes.
22   Q.   And was the sergeant in the middle of that, was he either
23   taking it himself or watching you guys?
24   A.   He pretty much knew.
25   Q.   He pretty much knew.  Okay.

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5625    Page 84 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

84

```
1            And the crew was what, five, six, seven, eight
2    people?
3    A.    It all depends.
4    Q.    Were Beasley and Bray still on the crew?
5    A.    Yes.
6    Q.    And you've testified on numerous occasions Beasley and
7    Bray were not crooks, correct?
8    A.    Correct.
9    Q.    And you're saying they knew and looked the other way, or
10   are you saying they didn't know and they got nothing out of it?
11   A.    You have to ask them.
12   Q.    No, I'm asking you, sir, from what you observed and what
13   you heard.
14   A.    I mean I don't know if they knew anything.
15   Q.    Okay.  You'd -- you'd agree with me that -- that in most
16   raids, at some point in time, everybody is inside the location
17   at some point in time, true?
18   A.    Pretty much.
19   Q.    And you'd agree with me the evidence has to be catalogued
20   and listed, correct?
21   A.    Correct.
22   Q.    And you'd agree with me that oftentimes that evidence
23   includes controlled substances, it may also include personal
24   property like jewelry and it may also include cash, correct?
25   A.    Rarely jewelry, but...
```

1   Q.   Okay.  Let's say cash and drugs.  Yes?

2   A.   And guns, yeah.

3   Q.   And guns, right?  Okay.

4        The incident occurs where you have the raid and

5   there's some equipment that's taken, the one that you've been

6   talking about to both the government and Mr. Harrison, correct?

7   A.   Correct.

8   Q.   You didn't think ahead of time that maybe this crook who's

9   growing marijuana is slick enough that he might have some

10  surveillance inside, did you?

11  A.   I don't know.

12  Q.   Well, did it cross your mind, hey, maybe we shouldn't

13  steal this stuff because maybe the guy's got surveillance

14  equipment?

15  A.   A lot of places have surveillance.

16  Q.   That's not my question though.  I'm talking about this

17  incident, did it occur to you that it might not be a good idea

18  to participate in stealing because he might have surveillance

19  equipment?

20  A.   I don't know.

21  Q.   Did anybody say while the stealing was going on or before

22  the stealing or after the stealing, "Hey, fellas, we could get

23  caught, maybe the guy's got surveillance equipment."  Anybody

24  say that?

25  A.   Not that I remember.

1    Q.   But you -- you'd agree, as you've just said, these days a

2    lot of people do have surveillance equipment; houses,

3    buildings, parking lots, right?

4    A.   Courtrooms.

5    Q.   Courtrooms.

6    A.   Mm-hmm.

7    Q.   Okay.  So when you got suspended, tell us again what's the

8    month and year?

9    A.   It was 2014 in July.

10   Q.   July.

11        That meant when you were suspended, there's two ways

12   of being suspended in the police department, with pay and

13   without pay.  Which way were you suspended?

14   A.   With pay.

15   Q.   All right.  So you were still getting your pay, correct?

16   A.   Correct.

17   Q.   And your understanding was that the -- there'd be an

18   investigation generally by Internal Affairs, is that true?

19   A.   Correct.

20   Q.   And at some point in time there'd be some recommendation

21   and maybe you'd have a trial board or maybe not and you'd get

22   some kind of a punishment or not, correct?

23   A.   I don't know what would happen.

24   Q.   You were not concerned then, though, that you were going

25   to get fired as a result of the stealing from the weed house,

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5628   Page 87 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

87

1    were you?

2    A.   I didn't get fired.

3    Q.   Sir, I'm asking you, were you concerned at the time when

4    you were suspended and you were still getting paid, were you

5    concerned that you were going to be fired or did you figure

6    you'll get 30 days off or something?

7    A.   I knew I wasn't going to get fired.

8    Q.   Okay.  So you were still getting a check from the police

9    department every two weeks, correct?

10   A.   Correct.

11   Q.   And in April of 2014 you started having a marijuana

12   connection with this fellow Timothy Davis, am I right?

13   A.   Correct.

14   Q.   Did I hear you correctly, did you tell Mr. Harrison you

15   didn't know Timothy Davis was working with the government until

16   he mentioned it to you today?

17   A.   No, that isn't what he said.

18   Q.   All right.  You -- you -- you've -- you've learned that he

19   was -- he was an informant for the government, right, you knew

20   that before you came in here today, didn't you?

21   A.   Right.

22   Q.   You knew that those deliveries you were making of weed and

23   hash and cannabis oil and whatever the other stuff was, you

24   knew that he was working for the government when you gave those

25   things to him, right?

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5629    Page 88 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

88

```
 1    A.    No.
 2    Q.    You -- you -- you know that now though, don't you?
 3    A.    Yeah, now, afterwards.
 4    Q.    And you learned afterwards, you learned that the money
 5    that you got came from the FBI?
 6    A.    Correct.
 7    Q.    Okay.  So now you didn't learn that until after you were
 8    busted in the phony rip set up by Gary Jackson correct?
 9    A.    Correct.
10    Q.    All right.  So nobody, the FBI or the government, for
11    whatever reasons, they didn't grab you when you took the money
12    from Timothy Davis, right?
13    A.    Correct.
14    Q.    They didn't grab you when you provided them with whatever
15    you provided them, right?
16    A.    Yes.
17    Q.    They left you out there, right?
18    A.    I guess.
19    Q.    Under suspension from the police department, true?
20    A.    No.
21    Q.    Working as a police officer?
22    A.    Which time?
23    Q.    Timothy Davis.  We're talking about April of 2014.
24    A.    I was off, sir.
25    Q.    All right.  And then the suspension came what -- when
```

```
 1    again?
 2    A.   In July.
 3    Q.   And was it early July?
 4    A.   It was in July.
 5    Q.   All right.  And again, you were still getting paid, right?
 6    A.   Correct.
 7    Q.   So when Gary Jackson came to you and proposed this robbery
 8    where y'all could split $40,000, it wasn't like you weren't
 9    getting a paycheck from the City of Detroit, right?
10    A.   I wasn't getting the same paycheck that I was getting
11    before.
12    Q.   And so the jury understands, you mean because you weren't
13    getting court time, right?
14    A.   Court time, overtime, things like that.
15    Q.   And as a narcotics officer, you spend a lot of time
16    testifying in court, right?
17    A.   Correct.
18    Q.   Which you've done a zillion times, right?
19    A.   Yes.
20    Q.   And you get paid extra if you work overtime and you get
21    paid what's called court time, particularly if you're not
22    working that day, right?
23    A.   Correct.
24    Q.   So your check, even though it was still coming from the
25    citizens, was smaller than it was before?
```

1    A.   Whole lot smaller.

2    Q.   A whole lot smaller, right?

3    A.   Correct.

4    Q.   Are you telling the jury that's why you agreed to get

5    involved in trying to steal the 40,000 along with Gary Jackson,

6    was it 'cuz you weren't getting enough dough from the city?

7    A.   No, I made a bad judgment.

8    Q.   All right.  That didn't enter into it though.  It wasn't

9    the fact that you weren't getting enough money from the city

10   that caused you to say, you know, "I'm going to go in and

11   participate in a robbery," it wasn't that?

12   A.   Made a mistake.

13   Q.   Okay.  But -- but it was greed, wasn't it?  I mean, to be

14   blunt, wasn't it just greed?

15   A.   How was it greed?

16   Q.   I'm asking you.  Didn't it seem like it's -- "I can get

17   $20,000 or $19,000, I can do it easy" and you were greedy,

18   isn't that right?

19   A.   That's not greedy.

20   Q.   Okay.  It is stealing though, you would agree with that,

21   yes?

22   A.   It's taking money.

23   Q.   Okay.  And do -- would -- would you agree that when Mr.

24   Jackson called you and proposed this idea, that one of the

25   things you were thinking about was, "Boy, what's in it for

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5656   Page 115 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

115

1    Q.   But you hope, do you not, that it will be as low as

2    possible, right?

3    A.   Correct.

4    Q.   Okay.  So --

5         MR. FISHMAN:  Thank you, Ms. Koch.

6    BY MR. FISHMAN:

7    Q.   It's your testimony that everybody that you worked with in

8    Narcotics, particularly on Sergeant Hansberry's crew except for

9    Beasley and Bray, were all dirty cops, am I right?

10   A.   I don't know about Amy Metalic.

11   Q.   Okay.  Barnett, he's dirty for sure, right?

12   A.   I don't know.

13   Q.   Well, didn't you -- didn't you tell us yesterday you saw

14   Officer Barnett take an ounce of cocaine and stick it in his

15   pocket and walk out with it?

16   A.   Yeah, I seen him do that.

17   Q.   Don't you think that kind of meets the definition of a

18   dirty cop, or is that something that's -- what -- what you're

19   supposed to do?

20   A.   I mean I just knew he wasn't right.

21   Q.   Okay.  Officer Napier?

22   A.   Right.

23   Q.   Officer Tourville?

24   A.   Right.

25   Q.   Officer Riley?

Jury Trial: Volume 14 • Tuesday, June 28, 2016

1    A.   Right.

2    Q.   What about Officer Whitten, W-H-I-T-T-E-N, did she work on

3    your crew?

4    A.   Yeah, she did.

5    Q.   Is she a crook?

6    A.   Not that I know of.

7    Q.   Okay.  So she's no, Beasley's no, Bray's no, Metalic,

8    question mark?

9    A.   Yeah, I don't know.

10   Q.   And Geelhood?

11   A.   Yeah

12   Q.   Yes.  Okay.

13        And the people, whoever their names are that you

14   recognize as the code names that were given to you, do you say

15   they're crooked or no?  Sting, Seal, Lobo, Dragon.

16   A.   I have no idea.

17   Q.   Okay.

18   A.   Dragon, no.

19   Q.   When you saw Officer Barnett take the cocaine during a

20   raid, can you tell the jury approximately when that was?

21   A.   I don't know exactly.

22   Q.   Was it before or after the large money seizure that we're

23   going to talk about in a second?

24   A.   After.

25   Q.   Okay.  And you said that you -- you talked to Sergeant

1   Hansberry and Officer Watson about it, correct?

2   A.   Correct.

3   Q.   Did you -- did you have lieutenants still in those days?

4   A.   Did I have who?

5   Q.   Were there lieutenants in the Narcotics Section?

6   A.   Correct.

7   Q.   And over the lieutenant is what, the inspector, used to

8   be, now the captain?

9   A.   Right.

10  Q.   And then there are commanders, correct?

11  A.   Correct.

12  Q.   And then there's the Chief of Police.  Deputy chiefs and

13  then the Chief of Police, correct?

14  A.   Inspectors and... yeah.

15  Q.   All right.  So you -- you told us you talked to Hansberry

16  and Watson and they asked you what did you want to do about it,

17  right?

18  A.   Correct.

19  Q.   And you didn't want to do anything about it, did you?

20  A.   I told them whatever they wanted to do.

21  Q.   Because if you wanted to do something about it, whatever

22  these two said, you could have gone to the lieutenant, the

23  inspector, all the way up to the Chief of Police and say, "Hey,

24  I just saw crookery in a search warrant execution," right?

25  A.   I mean I went to my immediate supervisor.

```
1    Q.   I know that.  But my question is, sir, if your immediate
2    supervisor didn't do anything, there was nothing keeping you
3    from going way higher than him in the police department and
4    reporting what you say you saw, right?
5    A.   Yeah, wasn't nothing stopping me.
6    Q.   You told the jury, in response to Mr. Light's question at
7    the end of your direct testimony, if you would have stayed in
8    southwest Detroit, you wouldn't be here right now, correct?
9    A.   Correct.
10   Q.   So are you blaming other people for the fact that you lied
11   on search warrant affidavits, gave weed to Calvin Turner and
12   all the other things that you've talked about, is that somebody
13   else's fault?
14   A.   Did I say that?
15   Q.   I'm asking you.
16   A.   I didn't say that.  I said that if I'd a stayed there, I'd
17   a been okay.
18   Q.   And my question is are you blaming that on other people or
19   are you taking responsibility for it yourself?
20   A.   I'm a man.  I take responsibility for myself.
21   Q.   You -- you'd agree, had you gone to some superior officer
22   higher than your sergeant about Officer Barnett, you could have
23   put a stop to whatever was going on right then, couldn't you?
24   A.   No.
25   Q.   Okay.  You told us you knew Calvin Turner from childhood,
```

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5687   Page 146 of
Jury Trial: Volume 14 • Tuesday, June 28, 2016

146

1    A.   They got people out the house.

2    Q.   Did you learn that somebody was arrested?

3    A.   Yes.

4    Q.   Did you learn that that person's name was Dante Mitchell?

5    A.   I don't recall the name, sir.

6    Q.   Did you learn that that person wound up being charged in

7    court, in Recorder's Court in Frank Murphy?

8    A.   I have no idea.

9    Q.   Did you talk to Gary Jackson about what kind of story that

10   guy should tell to the police or to the prosecutors?

11   A.   What story?

12   Q.   Did you talk to Gary Jackson about what kind of story the

13   person who was being held hostage -- and let's assume his name

14   is Fred Tucker -- did you talk to Gary Jackson about what that

15   guy ought to tell the police and prosecutors about the whole

16   incident?

17   A.   I don't know exactly.  I don't know.

18   Q.   Do you know today that during May of 2014 there was a

19   federal wiretap on Mr. Jackson that picked up his phone calls?

20   A.   How would I know that?

21   Q.   I don't know.  That's why I'm just -- you didn't know and

22   you don't know it now?

23   A.   You're telling me.

24        MR. FISHMAN:  Okay.  That's all.

25        THE COURT:  Thank you.  Anything from you, Mr. Sasse?

Jury Trial: Volume 14 • Tuesday, June 28, 2016

```
 1                  MR. SASSE:  No.  Thank you, Your Honor.
 2                  THE COURT:  Mr. Light, you want to ask some
 3      questions?
 4                  MR. LIGHT:  I have just a few, Your Honor.
 5                  Could I see that report from Glynn Court, sir --
 6                  MR. FISHMAN:  Sure.
 7                  MR. LIGHT:  -- that you asked about, sir?
 8                  MR. FISHMAN:  Yes, sir.
 9                        REDIRECT EXAMINATION
10      BY MR. LIGHT:
11      Q.   Just -- just one area I want to try to clarify a little
12      bit with you, Mr. Leavells.  That seizure from the cab of the
13      truck, of the semi truck, was a lot of money, correct, sir?
14      A.   Correct.
15      Q.   The final count of what was brought downtown to DBT -- DPD
16      headquarters was about $2.197 million, is that right?
17      A.   Correct.
18      Q.   Now, Gary Jackson insisted that there was more money than
19      that in that -- in that cab, correct?
20      A.   Correct.
21      Q.   How much did he insist was there?
22      A.   It was a range, but he kept saying 3 million.
23      Q.   And Little, Gary Jackson's nephew, you talked with him
24      about that as well?
25      A.   Correct.
```

Jury Trial: Volume 14 • Tuesday, June 28, 2016

1   Q.   And he insisted what amount of money was present in that

2   cab, as he understood it?

3   A.   Three million, and kept showing me pictures.

4   Q.   Now, there's a difference of about $800,000 there,

5   correct?

6   A.   Correct.

7   Q.   If that $800,000 went walkabout away from that cab during

8   the execution of -- of -- of that street enforcement, do you

9   know how it walked away, how it got away?

10  A.   No.

11  Q.   You're not saying that somebody stuffed it all in the

12  cargo pockets of the cargo pants that Napier and Tourville had

13  on, you're not saying that, are you, sir?

14  A.   Nope.

15  Q.   You just don't know if or how that money was stolen,

16  correct?

17  A.   Correct.

18  Q.   Mr. Fishman asked you some questions about your grand jury

19  testimony.  Do you recall that?

20  A.   Yes.

21  Q.   And he asked you a question and your answers from pages 30

22  to 31 of your grand jury testimony, right?

23  A.   Right.

24  Q.   That wasn't all your grand jury testimony on this subject,

25  was it, sir?

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5690   Page 149 of
Jury Trial: Volume 14 • Tuesday, June 28, 2016

149

1    A.   No.

2    Q.   On page 36, starting at line 12, were these -- was this

3    question asked and did you give this answer:  Question, "After

4    the fact, were there discussions involving Gary Jackson about

5    how much money was in the cab?"  Answer, "Correct.  What the

6    final tally was that we came up with was 2.197.  The number

7    that Gary Jackson told us was 3 million.  We didn't give him

8    any money out of this.  We paid him through city funds which

9    was $250,000 cash."

10   A.   Correct.

11   Q.   Was that your testimony before the grand jury as well?

12   A.   Yes.

13            MR. LIGHT:  No further questions.

14            THE COURT:  Okay.  Well, now hold on just a sec.  Do

15   you want to respond to any of that, Mr. Harrison?

16            MR. HARRISON:  One question.

17                      RECROSS-EXAMINATION

18   BY MR. HARRISON:

19   Q.   I just want to make sure I heard what I heard just now

20   right.  With regard to the southwest Detroit big money seizure

21   that Mr. Light just asked -- asked you about, you agreed with

22   his question, you don't know if or how that money was stolen,

23   right?

24   A.   Correct.  It wasn't southwest either.

25            MR. FISHMAN:  Yeah, it's east -- east side.

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5696   Page 155 of
Jury Trial: Volume 14 • Tuesday, June 28, 2016

155

```
 1   communicate electronically about it, and keep your minds open.
 2   We'll see you tomorrow morning and we'll get through this,
 3   okay?
 4           All right.  Let's all rise for our jurors please.
 5           (Whereupon the jury was excused at 12:41 p.m.)
 6           THE COURT:  Okay.  Everybody may be seated.  We're
 7   going to be in recess.  Thank you all very much.
 8           MR. LIGHT:  Thank you, Your Honor.
 9           MR. BUCKLEY:  Thank you, Your Honor.
10           (Court in recess at 12:42 p.m.)
11           (Whereupon proceedings in the above-entitled matter
12            were adjourned to Wednesday, June 29, 2016)
13                          —  —  —
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T I O N

 2              I, Linda M. Cavanagh, Official Court Reporter of the

 3    United States District Court, Eastern District of Michigan,

 4    appointed pursuant to the provisions of Title 28, United States

 5    Code, Section 753, do hereby certify that the foregoing pages 1

 6    through 155 comprise a full, true and correct transcript of the

 7    proceedings held in the matter of United States of America vs.

 8    David Hansberry, Bryan Watson and Kevlin Omar Brown, Case No.

 9    15-20217, on Tuesday, June 28, 2016.

10

11

12                      s/Linda M. Cavanagh
                      Linda M. Cavanagh, CSR-131, RPR, RMR, CRR
13                    Federal Official Court Reporter
                      United States District Court
14                    Eastern District of Michigan

15

16

17    Date: May 1, 2017
      Detroit, Michigan
18

19

20

21

22

23

24

25
```

# EXHIBIT J

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF MICHIGAN

3    SOUTHERN DIVISION

4

5    DEBRA METRIS-SHAMOON,

6    MUKHLIS SHAMOON,

7    CARL VERES, PAUL METRIS,

8    JULIA METRIS,

9         Plaintiffs,

10       vs.                    Case #18-cv-13683

11   CITY OF DETROIT, and        HON. ARTHUR J. TARNOW

12   SGT. JOE TUCKER, SGT. CANDACE

13   MATSCHIKOWSKI, in their Individual

14   and Official Capacities; SGT. STEPHEN

15   GEELHOOD, JUAN DAVIS, and BRIAN JOHNSON,

16   In their Individual Capacities;

17   jointly and severally,

18        Defendants.

19   _____/

20   PAGE 1 TO 132

21       The Virtual deposition of CHIEF JAMES CRAIG,

22       Taken Via Hanson Remote

23       Commencing at 11:00 a.m.

24       Thursday, May 21, 2020

25       Before Kelley Whitaker, CSR 0977.

2    Court reporter, attorneys & witness appearing remotely.

3

4    APPEARANCES:

5

6    DENNIS A. DETTMER, P27043

7    MICHAEL DEZSI, P64530

8    Dettmer & Dezsi, PLLC

9    613 Griswold, #1400

10   Detroit, MI  48224

11   (313) 281-8090

12   ddettmeresq@yahoo.com

13   bbentley@dezsilaw.com

14       Appearing on behalf of the Plaintiffs.

15

16   JAMES M. SUROWIEC, P49560

17   LINDSEY R. JOHNSON, P67081

18   Allen Brothers, PLLC

19   401 N. Main Street

20   Royal Oak, MI  48-67-1812

21   (248) 951-9060

22   jsurowiec@allenbrotherspllc.com

23       Appearing on behalf of the Defendants

24

25   APPEARANCES CONTINUED:

1    APPEARANCES CONTINUED:

2

3    GRANT HA, P53403

4    City of Detroit Police Department

5    1301 3rd St., #75-751

6    Detroit, MI  48226-2503

7    (313) 596-2158

8        Appearing on behalf of Witness, Chief Craig

9

10   ALSO PRESENT:  DEBRA METRIS-SHAMOON

1              TABLE OF CONTENTS

2    Witness                              Page

3              CHIEF JAMES CRAIG

4

5    EXAMINATION BY MR. DETTMER            9

6    EXAMINATION BY MR. SUROWIEC           122

7    RE-EXAMINATION BY MR. DETTMER         131



1     E X H I B I T S - Not Attached
2     (Exhibits retained by Mr. Dettmer)
3     EXHIBIT 1                          10
4     Notice of Deposition
5     EXHIBIT 2                          10
6     May 13, 2020, Email
7     EXHIBIT 4                          14
8     Wikipedia History of Craig
9     EXHIBIT 5                          15
10    Excerpt from Board
11    EXHIBIT 5A                         16
12    Excerpt from Board
13    EXHIBIT 6                          17
14    Organizational Charts
15    EXHIBIT 7                          42
16    Detroit News Article
17    EXHIBIT 7A                         49
18    Detroit News Report
19    EXHIBIT 8                          61
20    Police Commissioner Meeting
21    EXHIBIT 9                          66
22    Administrative Message
23    EXHIBIT 10                         86
24    Comerica Bank Deposit
25    Tally Sheet

1     EXHIBIT 11A                        83
2     Photo
3     EXHIBIT 11B                        83
4     Photo
5     EXHIBIT 12                         93
6     Detroit News Article
7     11/03/2014
8
9     EXHIBIT 12                         93
10    Detroit News Article
11    11/03/2014
12    EXHIBIT 12C                        96
13    Indictment, Hansberry/Watson
14    EXHIBIT 12D                        97
15    Free Press Article
16    6/30/16
17    EXHIBIT 12E                        98
18    Leavells Testimony
19    EXHIBIT 12F                        98
20    Leavells Testimony
21    EXHIBIT 12G                        99
22    Jackson Testimony
23    EXHIBIT 13                         101
24    Money Counter Memo
25

HANSON RENAISSANCE  hansonreporting.com
COURT REPORTING & VIDEO    313.567.8100

1     EXHIBIT 12J                        102
2     Hansberry Conviction
3     EXHIBIT 13                         90
4     Investigation money counter
5     EXHIBIT 14                         102
6     Use of Paid Informants
7     EXHIBIT 14A                        103
8     Protective Order
9     EXHIBIT 14B                        103
10    Confidentiality of SOI
11    EXHIBIT 14C                        103
12    Confidentiality of SOI
13    EXHIBIT 15                         107
14    Internal Affairs Investigation
15    EXHIBIT 16                         108
16    Matelic File
17    EXHIBIT 17                         108
18    Geelhood Case
19    EXHIBIT 18                         109
20    Darell Chancellor Case
21    EXHIBIT 19                         109
22    Darell Chancellor Case
23
24
25

1                 Virtual Deposition
2                 May 27, 2020
3                 About 11:00 a.m.
4                 -  -  -
5          COURT REPORTER:  My name is Kelley
6     Whitaker, CSR-0977, a Michigan State Notary Public and
7     Certified Shorthand Reporter, and this deposition is
8     being held via videoconferencing equipment and
9     telecommunication.
10         The counsel, witness, and reporter are not in
11    the same room.  The witness will be sworn in remotely,
12    pursuant to stipulation and agreement of all parties.
13         Will the parties please stipulate on the
14    record that they consent and waive any objections to
15    this manner of conducting the deposition and the
16    attorneys participating in this deposition acknowledge
17    that I am not physically present in the deposition room
18    and that I will be reporting this deposition remotely.
19         Please indicate your agreement by stating your name
20    and your agreement on the record.
21         MR. DETTMER:  Dennis Dettmer, on behalf of the
22    plaintiffs.  And I agree to this remote deposition
23    taking and have no objection whatsoever.
24         MR. SUROWIEC:  James Surowiec, on behalf of
25    City of Detroit, defendants, and I agree to the



1  deposition being taken remotely in the manner that you
2  just described.
3              -   -   -
4              CHIEF JAMES CRAIG,
5  having first been duly sworn, was examined and testified
6  on his oath as follows:
7       MR. DETTMER:  Chief Craig, I'm Dennis Dettmer,
8  and it's a pleasure to meet you.
9       THE WITNESS:  Nice meeting you, too.
10 EXAMINATION BY MR. DETTMER:
11 Q.  I'd like to ask you a series of questions.  And starting
12     off, we have given four Notices of Deposition to your
13     counsel and his firm.  And I am wondering if you've seen
14     any one of those, because they have attached a subpoena
15     duces tecum to the City of Detroit asking for certain
16     documents.
17          Have you seen that -- any one of those four
18     deposition notices?
19 A.  I don't recall seeing any of the notices.  I was made
20     aware that there was a disposition (sic) by an attorney
21     that works at my office, or how or could have been, but
22     personally I have not seen it.  But I was advised that
23     there was a deposition.
24
25

1       EXHIBIT 1
2       Notice of Deposition
3       WAS MARKED FOR IDENTIFICATION
4       EXHIBIT 2
5       May 13, 2020, Email
6       WAS MARKED FOR IDENTIFICATION
7  BY MR. DETTMER:
8  Q.  Okay.  The Notice of Deposition is Exhibit 1 to your
9      deposition today.  I have as a Notice, also, a second
10     exhibit, Number 2, which is an email dated May 13th,
11     2020, from counsel for the defendant -- Lindsey Johnson
12     for the defendants.
13          And she indicates -- I'll read it into the
14     record.  Thank you for your Notice of Deposition which
15     we will have our clients appear remotely.  However,
16     Defendant City will not respond to the duces tecum
17     portion of the deposition since discovery has already
18     closed in this matter May 7th.
19          Also, this Deposition Notice requests
20     documents that have already been provided to you by the
21     Defendant City in response to client's numerous prior
22     Discovery Requests.
23          I would suggest that that mission is totally
24     improper.  We initially sent our First Notice of
25     Deposition on October 30th, 2019.  We Re-Noticed it on

1  December 9th, 2019, February 25, 2020, May 13th, 2020,
2  and May 18th, 2020.  And I'll reference Court Order that
3  was entered on December 20th, 2019, by Judge Whalen that
4  ordered that we could take your deposition today.
5          And the point I'm making, the subpoena and the
6  Exhibit A attached to that subpoena directed to the
7  City, all were duplicative and all really started to
8  originate on October 30th, 2019.  And the assertion that
9  it's not timely, since Discovery is cut off, as
10 indicated by what I am saying, that is not a
11 well-founded objection at all.
12          We will proceed accordingly --
13          MR. SUROWIEC:  I would like to --
14          MR. DETTMER:  -- with the Court.  Now I would
15 like --
16          MR. SUROWIEC:  I would like to respond to that
17 just briefly.
18          We have provided all of the records requested
19 in the subpoena duces tecum, and the form of that, I
20 believe, is improper.  Chief Craig doesn't have those
21 records.  We provided them, all of them, to Plaintiffs
22 on numerous occasions.  We filed objections to that --
23 to that subpoena.  To the extent that -- to the extent
24 that the discovery is closed, that's not really the
25 issue.

1          The issue is, this information has been
2  provided.  Chief Craig is not going to show up at this
3  deposition with a bunch of papers, which you yourself
4  and Mr. Dezsi have already agreed this is very
5  cumbersome.  We are remote; he is remote.  What good is
6  it going to do?  So that's our objection.
7          MR. DETTMER:  That's not a proper reason not
8  to produce the records that I requested in that
9  subpoena.
10          MR. SUROWIEC:  We object.
11          MR. DETTMER:  The documents have been
12 subpoenaed and you have not produced the records that I
13 requested --
14          MR. SUROWIEC:  We are a party.
15          MR. DETTMER:  But let me go on.
16          (Multiple speakers)
17          MR. SUROWIEC:  Go ahead.
18          We are a party to the subpoena.
19          MR. DETTMER:  Chief Craig, have you seen any
20 of the exhibits?
21          THE WITNESS:  The only predeposition -- I have
22 seen some exhibits.  I couldn't tell you which ones or
23 what was contained.  As it was already referenced, I
24 don't have anything in my possession right now.
25



1  BY MR. DETTMER:

2  Q.  All right.  I am going to run through some of these

3      fairly quickly.  I'll make a reference to them.  Your

4      counsel has them.  If you want to take a look at them,

5      we can bring them up on the screen.  Okay?

6          So if you have any question about any single

7      exhibit as we are discussing it, please indicate that

8      and we'll put it on the screen so you can see it in

9      detail.  Okay?

10 A.  Okay.

11         MR. SUROWIEC:  Dennis, can I ask a quick

12     question?  Are you referring to the exhibits that were

13     sent by Beth yesterday?

14         MR. DETTMER:  Yes.

15         MR. SUROWIEC:  Okay.  So she indicated

16     1 through 10 and then 12 through 22 or 23.  We didn't

17     get 1 through 10.  Are there about 23 exhibits we're

18     talking about?

19         MR. DETTMER:  There are actually more than 23

20     because some had subparts.  If you looked at them, you

21     would have seen that.  I've looked at the same email

22     chain that you did -- that you got, and I had all my --

23     all of the exhibits.  But I don't want to argue about

24     that.  You made that point.  I don't agree with it.

25         MR. SUROWIEC:  Dennis --



1          MR. DETTMER:  You should have gotten them,

2      should have looked at the end of that chain, the first

3      email, and they were there.

4          MR. SUROWIEC:  Dennis, I am just telling you,

5      for the record, we didn't get 1 through 10, so we'll

6      look at what you have, but I'm just telling you, I've

7      made my record and I asked Lindsey, did you get them.

8      We have what we have, which you sent last night.

9          That's fine.  Go ahead.

10         MR. DETTMER:  The email chain will show what

11     you got.  And if you somehow overlooked it, that's it.

12         MR. SUROWIEC:  Okay.

13     EXHIBIT 4

14     Wikipedia History of Craig

15     WAS MARKED FOR IDENTIFICATION

16         MR. DETTMER:  Our Exhibit 4 is a Wikipedia

17     page, and it's about you.  And it gives a history of

18     your starting in the police department in Detroit after

19     you graduated high school here from Cass Tech.

20         And have you seen this document?

21         THE WITNESS:  I don't know if I've seen this

22     specific document.  I have seen my name on Wikipedia,

23     and I know those things get updated, so this particular

24     page, I'm not certain.  I'm skimming through it as you

25     move up.



1          MR. DETTMER:  It's a brief history.  Rather

2      than going through it with you in any detail, Exhibit 4

3      kind of gives your biographical background.

4          THE WITNESS:  Yes, this would be one that I

5      hadn't seen.  I notice that there is some reference made

6      to US Representative Rashida Tlaib, so I haven't

7      personally seen this page.

8          MR. DETTMER:  I would ask that, if you have

9      any questions about it, Mr. Surowiec will provide you

10     the -- Exhibit 4 and you can raise that -- an issue with

11     me and through him about --

12         MR. SUROWIEC:  I don't have the exhibit.

13         MR. DETTMER:  But it's a general statement

14     about your background.

15         THE WITNESS:  I understand.

16 BY MR. DETTMER:

17 Q.  Captain prepared you well and you're off and running.

18 A.  Yes, he did.

19 Q.  The next exhibit -- I have 5 and 5A.  These are excerpts

20     from the Detroit Board of Police Commissioners.

21     EXHIBIT 5

22     Excerpt from Board

23     WAS MARKED FOR IDENTIFICATION

24

25

1      EXHIBIT 5A

2      Excerpt from Board

3      WAS MARKED FOR IDENTIFICATION

4  BY MR. DETTMER:

5  Q.  This is related to your appointment.  Okay?

6          What was the relationship between the Detroit

7      Board of Police Commissioners and the Detroit Police

8      Department?

9  A.  They provide oversight to the police department;

10     however, when I was appointed as police chief in 2013,

11     it was not on the approval -- there was some

12     conversation, as I recall, between the Police Commission

13     and representation of the emergency manager who was in

14     place when I was appointed, and so as is reflected, and

15     I am relying on my memory, Executive Order Number 11,

16     that I was not under the supervisory oversight of the

17     police commission at that time.

18 Q.  Once the bankruptcy was completed, did the relationship

19     you and the Detroit Board of Police Commissioners

20     change?

21 A.  At some point.  I don't know how soon after -- the

22     relationship basically was that they were the

23     supervising or oversight entity as it's reflected in the

24     City Charter of the Detroit Police Department.

25 Q.  You were appointed by then emergency manager, Kevin Orr,

1    on -- effective on July 1, 2013?

**2    A.  July 1, 2013, yes.**

3    Q.  Then the Exhibit 5A is another emergency manager City of

4        Detroit Order Number 42, which really just deals with

5        powers of the Board of Police Commissioners being

6        reinstated effective immediately, and this is dated

7        September 25, 2014.

8             On that date, through the Order Number 42, how

9        did your relationship change with the board, if at all?

**10   A.  The way I describe it, I don't think there was much**

**11       change.  The order was explicit as to the commission**

**12       being reinstated in their role, but even prior to the**

**13       reinstatement, the department was reporting to the**

**14       police commission, even though by an earlier order**

**15       before the reinstatement, I didn't have to but we did it**

**16       because we just felt it was the right thing to do.**

**17            EXHIBIT 6**

**18            Organizational Charts**

**19            WAS MARKED FOR IDENTIFICATION**

20   BY MR. DETTMER:

21   Q.  Exhibit 6 is a collection of organizational charts of

22       the Detroit Police Department that were provided to us

23       through discovery.  I wanted to ask you some general

24       questions about the organization and basically to

25       recognize the chain of command.  Right?



---

1             There is a chain of command in any police

2        department, and there is one, obviously, in Detroit;

3        correct?

**4    A.  Yes, it is.**

5    Q.  And you are, in effect, the chief executive officer as

6        the chief of police, correct?

**7    A.  That's correct.**

8    Q.  You have a number of assistant chiefs?

**9    A.  I do.**

10   Q.  And you have -- I'm not sure how many, maybe more than

11       one deputy chiefs?

**12   A.  Yes.  Several deputy chiefs.**

13   Q.  And then the next level of the chain of command would

14       involve commanders or captains, correct?

**15   A.  That's correct.**

16   Q.  Captains and commanders are basically equivalent

17       positions?  It's a matter of terminology, right?

**18   A.  They're not equivalent.  They're referred to as command**

**19       officers.  Commander outranks the Captain; the Captain**

**20       replaces the former rank of inspector.**

21   Q.  Thank you for that.

22            Then in the chain of command -- if I can just

23       briefly say this -- lieutenants and sergeants and then

24       police officers, that is right, in that sequence?

**25   A.  No.  The sequence in terms of chain of command starts**



---

1    out with police officers now in the current

2        organizational structure, corporals, neighborhood police

3        officers, detective, sergeant, and lieutenant.  And

4        within the rank of sergeant, there's a master sergeant

5        that has more rank or more authority than that of a

6        sergeant.

7    Q.  Of what level in the chain of command in the City of

8        Detroit is our supervisory responsibilities played?

**9    A.  What level in the department?**

10   Q.  Yes.  For example, do -- under the current chain of

11       command, are corporals supervisors?

**12   A.  They are not.  But depending on their role, they could**

**13       perform the role of field training officer, and as a**

**14       field training officer, they are responsible for**

**15       providing training to probationary police officers;**

**16       however, they would not be considered supervisors in the**

**17       rank structure.  But they are --**

18   Q.  I'm sorry.

**19   A.  And detectives are not supervisors, either.**

20   Q.  So the first level of supervision within the Detroit

21       Police Department is a sergeant, correct?

**22   A.  That's correct.**

23   Q.  And is that true back to 2010, January 1st, 2010, from

24       your general knowledge of the operation of the police

25       department?

---

**1    A.  As you know, I didn't start here until July of 2013.**

**2        But I would suppose, based on, as you reference, general**

**3        knowledge, that the sergeant would be the first line of**

**4        supervision.**

**5    Q.  Okay.  Generally, the chain of command -- a sergeant**

**6        reports up the line to a lieutenant, correct?  And at**

**7        that point the communication is basically in that chain,**

**8        starting with you, going down to the assistant chiefs to**

**9        the deputy chiefs and down through the line, and**

**10       reporting back up is pretty much the same.**

**11            So if somebody -- if a police officer, for**

**12       example, makes a mistake, the sergeant is the person**

**13       that supervises that and deals with that initially,**

**14       correct?**

**15   A.  Generally speaking, yes.**

16   Q.  If there is a problem, ongoing problem, he reports that

17       up the line to the lieutenant and the discipline

18       process, and the chain of command and communication

19       follows that up.

20            You don't always hear about what's going on at

21       the top of this chain of command, what a

22       sergeant's doing, unless it's a matter that comes up

23       through the chain, correct?

**24   A.  I do not always know.  However, to your point, you made**

**25       some reference into the relationship between sergeant**

---

1    and lieutenant.  I believe there are times that the
2    lieutenant may not always know when a sergeant is
3    administering corrective action.
4           It could be counseling.  Generally, if it's a
5    written counseling session, I believe the lieutenant
6    would be involved in that at some point through the
7    chain of command.  But it's not so rigid, and I can't
8    speak to what occurred in 2010.  I can talk about what
9    happens now.
10          There are times where a Captain or a commander
11   of the station may have direct contact with a police
12   officer relative to conduct, and it could be something
13   as simple as advising that police officer to wear a seat
14   belt when operating a motor vehicle, as an example.
15   Q.   In the -- you're familiar, obviously, with the different
16        units within the Detroit Police Department, correct?
17   A.   Yes.
18   Q.   You became the Chief of Police in the day-to-day
19        operation.  You've learned quite a bit, I assume, about
20        the day-to-day operations about a lot of these different
21        units.
22   A.   Basically, yes.
23   Q.   If there's a Narcotics raid, there's usually a sergeant
24        that heads that up, correct?
25   A.   I would expect.



1    Q.   He has a crew?
2    A.   At what period of time are you talking about?
3    Q.   Let's go back.  I mean -- you're looking -- at least the
4         scope of the current review goes back to 2010, although
5         I understand you're not back to 2010 yet.
6         But going back to prior to your -- the
7         effective date of the reorganization of the Narcotics
8         units in July 2014, you understood that the workings, I
9         assume, of the Narcotics Unit.  And you understood that
10        there were sergeants and there were -- and they
11        supervised the police officers that worked under them
12        and their crew, right?
13   A.   That's correct.
14   Q.   And as far as you know, that goes back to 2010.  You
15        don't have any information to the contrary?
16   A.   I suppose.  I can't say.  I mean, you bring up an
17        example of saying an execution of a search warrant, and
18        I can't tell you definitively if, on every execution of
19        the search warrant in 2010, if the sergeant was present.
20        I wouldn't know that.
21          In fact, I can't tell you even after my
22        appointment if that was a consistent practice.  An
23        expectation, yes.  But to say that I know in every
24        single execution of a search warrant a sergeant was
25        present, I can't make that statement.



1    Q.   Are you suggesting that your Detroit Police Department,
2         in its organizational structure, didn't have a
3         supervisor in a narcotics raid?  That is the sergeant
4         that headed up the crew and oversaw its activities?
5    A.   That is the expectation, but I can't tell you on every
6         single search warrant execution that a supervisor was
7         present.  The expectation is that a sergeant at minimum
8         should be.
9           Now, since we've opened up, which I am sure
10        you'll get into, the task force that we're now working
11        on, certainly the expectation is greater.  At minimum a
12        lieutenant shall be present when a raid is initiated by
13        a Narcotics Unit.  But I've also teetered on even the
14        rank of captain being present.
15          Right now, as it stands today, the direction
16        is that a lieutenant shall be present on every execution
17        of a Narcotics search warrant.
18   Q.   Chief, when did that policy become established?
19   A.   That was during this iteration of the investigative work
20        that we are currently involved in.  As we began and
21        started --
22   Q.   Going back to August 7th, 2019, correct, when you first
23        started?
24   A.   When we started our task force operation -- I don't have
25        the date in front of me -- current task force.

1         During that inquiry, there were some things we
2         learned about how the Narcotics Unit functions, and one
3         thing that we learned is that, generally speaking,
4         sergeants would be present.  That would be the highest
5         rank present at Narcotics search warrant executions, as
6         you refer to as raids.
7           I've mandated that the rank of lieutenant, a
8         lieutenant shall be present at all executions of search
9         warrants by Narcotics.
10   Q.   The purpose, if I may ask you, of having the lieutenant
11        present would be to elevate the level of supervision
12        because of the terms about sergeants and how they
13        operate?
14   A.   Yes.  In terms of accountability, some things that we
15        have learned during this most recent task force that we
16        have, that we now just named Operation Clean Sweep.
17        What we have learned is that in some instances sergeants
18        may have been involved, directly involved, in the
19        alleged misconduct that we were investigating.
20          And the extent of their involvement could be
21        nothing more than being complicit and not taking
22        appropriate supervisory action when necessary.
23   Q.   Well, from what you say, prior to direct policy that
24        you've initiated, the policy was really one of inaction,
25        which is correctly in these raids that were undertaken

1    (Inaudible) affidavit, correct?

2            COURT REPORTER:  Can you repeat -- can you

3    repeat the question?

4            THE WITNESS:  I'm sorry; the affidavits were

5    not what?

6    BY MR. DETTMER:

7    Q.   The search warrant and affidavits initiated the raids --

8         do you want me to call it search warrant executions?

9         You know, when, previously, prior to what you just

10        described, the sergeants were generally the supervisors

11        on the scene of an execution and search warrant, right?

12   A.   Generally, it is my belief that they were.  And I'm

13        talking about from 2013 going forward.  I can't speak to

14        what was going on prior to that.

15   Q.   And it was your decision that, to reduce any possibility

16        or reduce the problems within the Narcotics Unit, you

17        were looking at having a greater level of supervision,

18        if I understand you correctly.  Is that right?

19   A.   A greater level of supervisor for purposes of managerial

20        oversight.  Lieutenants -- the rank of lieutenant is

21        considered a mid-manager underneath the rank of captain.

22        So at this point where we are in our probe, I feel

23        comfortable that a middle manager or a manager and

24        captain or commander rank should be present at search

25        warrant executions, primarily what we now call the Major



---

1    Violators section.

2            Again, those -- when we started an earlier --

3    and you've heard me reference in newspapers that the FBI

4    started a probe into the Detroit Police Department's

5    Narcotic section in 2010.  That investigation culminated

6    in 2014.

7            What didn't work out at the conclusion of the

8    FBI's work -- it wasn't a seamless transition of that

9    investigated -- that investigation into the Detroit

10   Police Department.

11           So, in other words, so I'm making myself

12   clear, there were a lot of things that we didn't know

13   that we now know because it was a federal investigation

14   that involved federal crimes.  And so they were the lead

15   agency investigating those crimes, and so there was no

16   review of any administrative violations.

17           Now, administrative investigations at times

18   does and do involve criminal allegations; however, they

19   also address any administrative concerns that could

20   result in discipline leading up to termination.

21           So I hope I'm making myself clear, that at the

22   conclusion of the FBI's investigation in 2014, I, along

23   with select members of our executive team were brought

24   into the findings and that it would be several

25   individuals indicted and/or charged.



---

1            What we didn't get is information

2    concerning -- any allegations concerning administrative

3    violations.  Again, administrative violations could

4    result in not only discipline but dismissal.

5    Q.   I'll get into a little more detail about that further

6         into the deposition, if I may.

7            But you would acknowledge, prior to your

8    taking your current position in July of 2013 -- 5/1/2013

9    (sic), there was criminal activity by members of the

10   Narcotics Unit?

11   A.   I only know that because the Federal Bureau of

12        Investigation, I'm told, launched a probe into the

13        Detroit Police Department's Narcotics section in 2010.

14        That investigation was a four-year investigation.  It

15        culminated in 2014, I guess, roughly a year and a half

16        into my tenure.  Narcotics was not on the radar.

17           There were other issues concerning the

18        department relative to accountability.  It had to do

19        with the Federal Consent Decree that we were under.  But

20        nowhere under the Consent Decree was there any reference

21        or review of the operations of the Narcotics section.

22           Again, the FBI's probe was confidential, and

23        because it was confidential, I believe in 2010 most

24        likely the executive levels of this department did not

25        know that there was an FBI probe.

---

1    Q.   Well, you would agree, at some point, and I believe

2         Lieutenant Hansberry was indicted by a filing in federal

3         court on April 8th, 2015.

4            At that point there was some knowledge that

5         there was criminal activity, at least it was alleged at

6         that point in the Narcotics -- then Narcotics -- well, I

7         shouldn't say that -- Major Violators Unit, previously

8         the Narcotics Unit, Hansberry, correct?  That indictment

9         ended it?

10   A.   I was aware, as I've already testified to, that I was

11        made aware that the FBI was planning to indict and in

12        one instance charge members of the department's

13        Narcotics Unit.  That's when I became aware that there

14        was allegations of criminality not reflective of the

15        entire Narcotics Unit.

16           As I've already testified, I believe, as my

17        memory serves me, that two were indicted, one was

18        charged.  There was an additional member that committed

19        suicide, I was told, but more than likely would have

20        been indicted.  So you are talking about a total of

21        maybe four out of the entire Narcotics Unit.

22           Now if your question is, do I believe that

23        there were others involved in misconduct, I can only say

24        it's based on a belief and based on what I know today

25        and what I didn't know at the conclusion of the FBI's

1       investigation that I do believe that there were other
2       criminal and administrative violations occurring; not
3       necessarily reflective of every member of the Narcotics
4       Unit.
5   Q.  We're talking about -- actually, there were a number of
6       indictments at the same time.  Hansberry, who was then,
7       I believe, a lieutenant, but he had come out of the
8       Narcotics Unit as a sergeant, and Police Officer Watson,
9       who was in that same Hansberry crew, and Arthur
10      Leavells, and Officer Napier.  And Napier,
11      unfortunately, committed suicide in his family's side
12      drive, as you will recall, in January of 2018.
13          But I think I saw bound, and I'll discuss this
14      with you later.  We need to get rolling here.  There
15      were some feelings that the Hansberry crew, which fell
16      into Geelhood's crew, members of those two crews,
17      originating with Hansberry, were involved in criminal
18      activity.  Is that fair to say?
19  A.  There was certainly speculation.  None of these other
20      members were charged, as you know.  Again, I'll repeat,
21      that at the conclusion of the FBI's investigation, the
22      focus was on the folks that were indicted and the one
23      that was charged.
24          The remaining members who were more than
25      likely being investigated by the FBI, they were never

1       charged.  However, it doesn't mean that those additional
2       members were not involved in some other kind of
3       misconduct, maybe some of what they were involved in
4       would be construed as criminal.  However, this attorney
5       did not charge them.  The problem --
6   Q.  Let me ask you this.
7   A.  I'm trying to finish a point.
8   Q.  Yes.
9   A.  The problem with the conclusion is it wasn't a seamless
10      transition from criminality to the possibility of
11      administrative work, and I am not faulting the FBI for
12      that because that's not what they do.
13          The Detroit Police Department investigates
14      misconduct.  And if misconduct is made aware, you
15      investigate and, again, as I have already testified to,
16      sometimes that misconduct amounts to discipline, which
17      could mean suspension days leading up to and including
18      dismissal.
19  Q.  Let me -- I was going to get into this later, but since
20      you are raising it.
21          During the trial of Hansberry and Watson,
22      Leavells testified, and a Source of Information, Gary
23      Jackson, testified.  And I would represent to you that
24      testimony was more inclusive of criminal conduct by
25      other members of Hansberry's crew.



1           And what I'm really getting to, was someone
2       assigned from the Detroit Police Department, whether
3       Internal Affairs or some investigative level, how the
4       events of that trial and evaluate the testimony and
5       consider Internal Affairs investigations of, for
6       example, Napier and others -- I guess, Napier's dead by
7       that time -- but by other members of that crew?
8           MR. SUROWIEC:  Objection; form, foundation,
9       compound question.
10          Go ahead.
11          THE WITNESS:  I can answer the question?
12          MR. SUROWIEC:  Yes, Chief.
13          THE WITNESS:  Factually there were two members
14      of the Detroit Police Department that were part of the
15      Public Corruption Task Force.  These two members -- I
16      can't think of the second member's name.  But Tim Ewald,
17      which I suggested to counsel, had intimacy for years
18      relative to the narcotics investigation that was
19      conducted by the FBI.
20          When I talk about the seamless transition,
21      where I felt it was a failure on the part of the
22      department, is that there was no handoff.  That these
23      are the folks that got charged federally, these are the
24      people that we have concerns with administratively, and
25      we should launch an investigation.

1           These two members of the department primarily
2       didn't do the heavy lifting, as you will, of
3       investigative work.  They were trusted members of the
4       FBI's investigative team, although they were part of the
5       Detroit Police Department.
6   BY MR. DETTMER:
7   Q.  I'm sorry.  If -- I don't mean to interrupt you.  But
8       Ewald and who was the other one?
9   A.  I can't think of the second name right now.  He has
10      since returned.  He is working in the City in IT.  It
11      will come to you, but right now Tim Ewald had been part
12      of the FBI's task force on public corruption, so he was
13      very intimate relative to what was going on with the
14      investigation, and I would imagine he would opine that
15      there were others that were not criminally charged but
16      certainly were engaged in acts of misconduct.
17  Q.  Well, in Leavells' testimony during the trial of
18      Hansberry, it was very clear that other members of
19      Hansberry's were clearly involved in criminal activity
20      and, either inside the court, a hearing, trial, or
21      review of transcripts would have clearly shown that.
22          To your knowledge that didn't happen, correct?
23  A.  There were no --
24          MR. SUROWIEC:  Objection, form, foundation to
25      the question.



1          Chief, I apologize.  Go ahead and answer, if
2   you can.
3          THE WITNESS:  Yes, I -- you know, as I've
4   already testified to, and I made the statement several
5   times, there certainly was no seamless transition at the
6   conclusion of the criminality -- criminal case to moving
7   into the administrative.
8          Again, there were a lot of things that I and
9   my executive team were unaware of.  We knew that there
10  was some problems, and in terms of -- there were other
11  members of Narcotics that may have been involved in
12  criminal activity, however, they weren't charged
13  criminally.
14  BY MR. DETTMER:
15  Q.  Let me ask you -- let me ask you it this way.  Did Ewald
16  prepare any memoranda or writing, that you're aware of,
17  that described the testimony of Leavells at the trial?
18  A.  I am not aware of that memo.
19  Q.  Did any -- are you aware of whether the Detroit Police
20  Department acquired the transcripts of Leavells and Gary
21  Jackson, the SOI?
22  A.  I am not aware of it.
23  Q.  Are you aware of any memoranda or writing that Ewald
24  prepared describing the testimony and the indication of
25  other individuals involved in any criminal activity?



1   A.  I cannot recall any memorandum prepared by Tim Ewald.
2   My -- I have had conversations.  Tim Ewald was very
3   different from the Hansberry case that concluded in 2014
4   to where we are today, without going into details
5   because it's a confidential part of the investigative
6   work that we are doing.
7          We have very specific information that we got
8   from a source.  It was very descriptive of the type of
9   alleged conduct that was going on.  Based on that
10  information and the case that was later brought by the
11  one who was recently charged or indicted, Mosley, we now
12  had a clear picture of what was going on allegedly in
13  the Narcotics Unit.
14         And that is why, based on information that we
15  got from a source, through the FBI, and I can't go into
16  that because it's still very much part of the
17  investigation, we have created a task force operation.
18  And that task force operation has been very surgical,
19  very thorough in looking at everything.
20         As I had testified to earlier, that operation
21  is called Operation Clean Sweep, and so as we have gone
22  on, based on the information that we got from the
23  source, we are getting a lot of information now.  And so
24  information that we did not have at the conclusion of
25  Hansberry.

1          MR. SUROWIEC:  Can we have a time frame,
2   Chief, from when that happened?
3          THE WITNESS:  It would be --
4          MR. DETTMER:  Let me ask you this way.  Let me
5   ask you this way.
6   BY MR. DETTMER:
7   Q.  The raid on the three locations where there were
8   Narcotic Unit's records was on August 22, 2019.  How
9   long prior to that when what is now called Clean Sweep
10  originate and the investigation undertaken?
11  A.  When we raided our own Narcotics Unit, seized all of its
12  records, it was strategically done, based on we knew
13  that former Officer Mosley was going to face charges.
14         So I made a decision based on Mosley being
15  charged and fearful that, if we didn't act by seizing
16  all of our records, that the records could be destroyed.
17  That was one issue.
18         The second issue, I believe that, based on the
19  allegation against Officer Mosley, that that was not his
20  first time engaging in this kind of criminal misconduct.
21         So based on those two factors and the third
22  factor, ironically around the same time period there was
23  a source who provided information about what was going
24  on in Narcotics as to some of the alleged misconduct.
25         Those three things put me in a good position



1   to, one, go in, seize all of our records, and it was
2   from that point that we started a task force.  We didn't
3   have a name for it.  We started off relatively small.
4          At the present time we have 17 members.  We
5   also -- it's a DPD-led task force.  Of the 17 members,
6   5 are the FBI, 3 are part-time, and 2 FBI full-time.
7   Q.  Let me ask you about that, Director Graveline filing
8   a declaration filed with federal court on May 19 of this
9   year.
10         One of the things he's talking about is the
11  sequence of investigation starting most currently and
12  going back historically.  And he raised this question
13  about the concern about the Statute of Limitations.  I'm
14  wondering what you perceive, in any meetings or
15  discussions about this, that the longest Statute of
16  Limitations that may apply as potential criminal conduct
17  by members of the nar- -- the Major Violators or the
18  Narcotics Units.  What do you think?  Three years?  Six
19  years?
20         MR. SUROWIEC:  Objection to form.
21         Chief, one second.
22         Objection; form, foundation.  That's a
23  multiparted question.  I'm not sure what the question
24  is, it's somewhat loaded.
25         If you can answer it, Chief, go ahead.

1          THE WITNESS:  I think I can.  I'll try my

2    best.

3          So there are two things at work here.  One,

4    the criminal statute probably, as was articulated by

5    Chris Graveline, would probably be out.  However, since

6    my tenure I've also initiated what I call a Statute of

7    Limitations for administrative misconduct.

8          So how that works is that, once the department

9    becomes aware of misconduct from any source, it could be

10   from a civil lawsuit like this.  If we become aware of

11   allegations of misconduct, the clock starts.  We have

12   one year from the time we're made aware to complete and

13   adjudicate that allegation.  So that's the

14   administrative statute.

15         Now, you should note that this has not been

16   something that has been agreed to by both the department

17   and the unions.  It's, for the most part, a handshake.

18         At some point in the near future, we will

19   codify and we will develop a memorandum of understanding

20   to solidify the administrative Statute of Limitations.

21   And the reason why that came about, one of the things

22   that was problematic in the Detroit Police Department

23   for years, I was told, is that a lot of cases that were

24   being brought to the arbitrator, and those

25   administrative matters were being dismissed.  And the

1    reasons for the dismissals were because of the lack of

2    timeliness.

3          So based on the lack of timeliness, I felt it

4    was important for both the community and the concerned

5    accused officer that there would be a timely

6    adjudication to all allegations of misconduct.

7    BY MR. DETTMER:

8    Q.   I'm --

9    A.   I am --

10   Q.   Go ahead.

11   A.   So in terms of the criminal statutes relative to some of

12        the officers that were never investigated criminally or

13        were investigated criminally -- and I can't testify as

14        to why, let's say, the FBI did not opt to pursue

15        charges.  Maybe it was a US Attorney said we don't think

16        that there's enough to charge them with whatever the

17        criminal charge was.  I don't know.

18   Q.   The point --

19   A.   However --

20   Q.   The point I'm making, there must be some criminal

21        statutes that are under consideration by the task force,

22        and the question is, do you know what periods of time

23        we're talking?

24   A.   Since we are working with both Federal Bureau of

25        Investigation, US Attorney's Office, anything that we

1    find criminally, if it meets the US Attorney standard --

2    certainly, this task force is a dual task force.  It's

3    addressing allegations of criminality and it's also

4    addressing administration violations.  So it's a twofold

5    task force.

6          FBI certainly is interested in the work.  This

7    is why they had dedicated staff to Operation Clean

8    Sweep.  The belief is there may be some allegations that

9    can be brought forth criminally, even though some of

10   them are dated.  I don't know what the statute of

11   limitation, like, for example, color of law, or whatever

12   that -- there may be some of those.  I don't know if

13   statute of those goes much longer, as Attorney Graveline

14   may have articulated.  When we seized our records, we

15   are going back ten years.  And so right now where we are

16   in this probe, we have gone back to the year of 2017.

17   So we haven't quite gone back ten years.

18   Q.   Yes.  I am aware of that and in some of the articles

19        that we will introduce as we get going, you've made that

20        clear.

21         The point that I am making with you is if I

22        were sitting at the table with the task force as a

23        member, I would say we need to start looking at

24        documents that are relevant to the Statute of

25        Limitations period expiring.

1          For example, if we have a six-year statute, we

2    should be looking at 2014 and start our investigation in

3    2014 and come forward to the current time.  I don't

4    understand it starting in 2020 or '19 and going

5    backward, because the Statute of Limitations is a key

6    element here.  It sounds like a major mistake on the

7    part of whoever is heading this task force not to

8    analyze that as a key issue.

9    A.   I rely strongly on my legal advisers.  There was a

10        method.  You're not a part of the task force, and it's

11        okay to criticize me.  But what I feel good about is

12        finally for the first time -- it may be the books will

13        say -- and the first time we have an opportunity to

14        totally eradicate criminal misconduct from the Narcotics

15        department.

16   Q.   This is an administrative issue you are talking about?

17   A.   Administrative and criminal.  It's no doubt to me.  I

18        can speculate that there are probably many allegations

19        of criminality that have gone untouched for whatever

20        reason.

21         I've talked to members in this organization as

22        recent as a couple of days ago.  And during that meeting

23        with my command staff, I gave a brief update on the task

24        force's work.  In my brief remarks, I indicated that it

25        is our mission and goal to totally for the first time

1  eradicate misconduct from the Narcotics Unit.

2  Q.  I support that, Chief.  But --

3  A.  But, so, like I said, to many of you who have been on

4  the department for in excess of, let's say, 10, 15,

5  20 years, you've heard the stories -- I wasn't here

6  then -- that there was a strong belief that there were

7  members in the Narcotics Unit engaging in misconduct.

8  Q.  Well, would you agree with the point I made a few

9  minutes ago, that really the investigation should have

10  started more timely with the expiration of the Statute

11  of Limitations?  Would you agree to that?

12  A.  I'm not going to agree for this one reason.  I

13  understand where you're going.  Let me tell you why we

14  started where we started.

15          Initially, we didn't know what we were dealing

16  with.  As I pointed out, there were a couple of things

17  in play.  We had another dirty officer that got

18  charged -- Officer Mosley, who got charged and I had a

19  strong belief that Officer Mosley was involved in other

20  criminal misconduct.  I believed it.

21          So part of the reason for this surgical look,

22  it was to go back and look at Mosley, look at the

23  team -- he was a team leader.  And we wanted to know if

24  the involvement even was beyond him.  So we started

25  there because we knew that that was timely.

1  No doubt in my mind that there are going to be

2  cases that as we continue this task force that are not

3  going to meet the criminal statute.

4          However, we've been in consultation with the

5  US Attorney's Office, the FBI, certainly, if there's

6  color of law violations -- as another part that I didn't

7  get into, we have also been meeting regularly with Wayne

8  County Prosecutor's office, primarily the Innocence

9  Project, and we are also looking at -- I'm going

10  to pause for just a minute.  The mayor is calling me

11  so...

12          MR. DETTMER:  We are pausing at 12:05; is that

13  correct?

14          THE WITNESS:  Yes, if we could just pause and

15  I'll be short.

16          (Off the record at 12:02

17          Back on at 12:05 p.m.)

18          EXHIBIT 7

19          Detroit News Article

20          WAS MARKED FOR IDENTIFICATION

21  BY MR. DETTMER:

22  Q.  I'd like to go through articles, and starting with 7.

23  Exhibit 7, and it goes to 7D, and these are basically

24  the comments that you made to newspapers, and I just

25  want to confirm that what you said to the newspapers is

1  properly reported.

2          Secondly, your discussion so far indicates,

3  you know, substantially the same thing.  But first of

4  all, Exhibit 7...

5          MR. SUROWIEC:  Dennis, can I interrupt real

6  quick?  We, honestly, didn't get Exhibits 1 through 10.

7  We did forward the ones we got last night to the Chief,

8  but could Michael put this up on the screen?

9          MR. DETTMER:  Yes, he can put it up.

10          Michael?

11  BY MR. DETTMER:

12  Q.  This is an article from the -- August 22, 2019 --

13  the Detroit News, and we marked it as your Deposition

14  Exhibit 7.

15          And it starts off, a team of Detroit

16  investigators seized records of computer data from three

17  of the department's own facilities Thursday, as part of

18  an ongoing internal probe into the allegations of

19  corruption into the department's drug operations, Chief

20  James Craig said.

21          Is that a fair statement?  Is that accurate?

22  A.  It is.

23  Q.  And then it goes on:  The investigation, the latest in a

24  series of probes in the former Narcotics section, which

25  were closed in 2014 because of rampant corruption,

1  kicked off about four months ago after a large shipment

2  of drugs had been seized in Detroit was switched for

3  another substance by the time it got to Chicago for a

4  court hearing, Craig said.  Is that accurate?  The

5  statement, just generally?

6  A.  Yes, that was an investigation -- we got information

7  that -- from the DEA and FBI about an allegation which I

8  can tell you didn't come to fruition.

9  Q.  It did not?

10  A.  Did not.  However, without going into detail, because it

11  directly concerns what we are doing now, it was

12  beneficial in the investigative work we're doing now.

13  I'll just leave it there.

14  Q.  Let me ask you this.  In terms of the switch out of the

15  drugs on the -- from Detroit to Chicago, was the

16  Narcotics Unit involved in any way in --

17  A.  There was no indication that what came to us occurred.

18  It would have been -- it could have been our Narcotics

19  Unit.  It could have been -- I mean, allegedly it could

20  have been Narcotics.  It could have been the place where

21  the narcotics were being held.

22          Again, it was an allegation only, but in terms

23  of the work that we were proceeding with, and, again, I

24  cannot and will not go into details, but it helped us

25  with the work that we are doing even though that issue

1  was unfounded.

2  Q.  Chief, let me ask you this, then.

3       Was that acquisition of those drugs --

4  A.  Can you hold one second?  The gentleman -- I've got a

5  gentleman in my office that -- the other name -- he just

6  happens to be in the office.

7       (Chief having a discussion

8        off the record.)

9  THE WITNESS:  Saraino.  His name is Saraino.

10 BY MR. DETTMER:

11 Q.  Ewald's partner, in effect?

12 A.  Yes, that's correct.

13 Q.  Do you know how to spell that?

14 THE WITNESS:  How is Saraino's name spelled?

15 Saraino, S A R A I N O.  That's his last name.

16 First name?

17 BY MR. DETTMER:

18 Q.  S, as in "Sam," right?

19 A.  Yes, first name, Michael.

20 Q.  Thank you.

21 THE WITNESS:  You're not in trouble, Mike.

22 Okay.  Anyway.

23 BY MR. DETTMER:

24 Q.  Well, what I am asking you, did the Major Violator's

25 Unit exercise a search warrant and acquire those drugs?

HANSON RENAISSANCE  hansonreporting.com  313.567.8100

1  A.  I don't recall the circumstances involved in the drugs,

2  but based on the DEA, FBI, it was unfounded and so -- in

3  fact, I know the DEA was doing an investigation relative

4  to the DEA's role, and I just don't know the outcome of

5  their role.

6  Q.  All right.  The next page of this article, I saw, Craig

7  said, he initiated the seizure of records and computer

8  files because of concerns about, and they quote, "a

9  residual effect of corruption", and he said has long

10 been part of Narcotics operation, which the chief

11 renamed the Major Violators section five years ago.

12 Is that a proper quote of a residual effect?

13 A.  I could say yes.  I think it was residual.  A lot of it

14 was speculative on my part.  But I made the statement

15 and, again, there were things I didn't -- as I have

16 already testified to in this session, there were things

17 I didn't know about the Hansberry matter, that as we

18 launched this probe, there is a direct nexus to it.

19 Q.  We will get into that in more detail, but...

20 A.  I'm not going to get into a lot of detail because, as I

21 indicated, I am in the middle of a corruption probe, and

22 some of what we are doing is very confidential.

23 Q.  Well, we are under a Protective Order in this

24 proceeding.  And I think the assertion of a privilege

25 we'll deal with, might require a motion and a court

HANSON RENAISSANCE  hansonreporting.com  313.567.8100

1  appearance and maybe more testimony from you.  But right

2  now I want to go through this quickly.

3       Then you go on in the next paragraph, or the

4  article goes on, part of the corruption Craig referred

5  to involved former drug cops Hansberry, Watson, and

6  Leavells, who were convicted in federal court of

7  offenses that include ripping off drug dealers and

8  stealing and buying drugs that had been seized.

9       Basically, you acknowledge that in your

10 testimony so far today, correct?

11 A.  That's correct.

12 Q.  And then at the very bottom of the second page in

13 Exhibit 7, it says, he, referring to you, said

14 allegations made against Hansberry, Watson, and other

15 cops, the federal lawsuit also played a part in the

16 ongoing investigation which is the latest in a string of

17 probes into the department's narcotics operation.

18 Is that a fair statement --

19 A.  Yes.

20 Q.  -- that represented that?

21 A.  Yes.

22 Q.  And -- well, I'll come back to that.  But I'm wondering

23 why Hansberry and Watson, you know, are the -- well,

24 seeming to leading into this.  Why did that -- the

25 allegations made against them play a role in the ongoing



1  investigation?

2  A.  Because as we are doing the work that we're doing now,

3  we're finding certain patterns that have continued, that

4  preexisted the FBI's investigation.  We believe that

5  continued even after their indictment.

6  Q.  Going on to the next page of Exhibit 7, page 3.  It

7  states at the very top, Craig disbanded the drug unit in

8  July 2014 because what he said was systemic problems

9  uncovered during the Internal Affairs investigation that

10 includes how drugs and evidence were handled.

11 "Systemic problems," by that do you mean

12 there's an activity according to a fixed plan, a

13 methodical operation within the drug unit?

14 A.  I think it probably have been better articulated

15 as trying to build in enhanced accountability.  Did I

16 believe that there were other problems inside of the

17 drug unit we couldn't identify?

18 But one thing that was missing from the

19 conclusion of that investigation and where we are now,

20 we didn't have anyone inside giving us information as to

21 some of the alleged conduct.  However, basically

22 disbanding the Narcotics section and renaming it to

23 Major Violators was done to incorporate some best

24 practices that would tend to build in more

25 accountability.

1           One thing that I recall, and it didn't really

2    work as well as I thought, was to put a time limit of

3    how long officers assigned to Narcotics would work.  So

4    what some did to do a workaround on the rule -- it was

5    like a five-year rule; that if you worked Narcotics for

6    five years, you had to leave.  That's a best practice.

7           And what ultimately happened, individuals

8    would be moved out of Narcotics, not that anybody was

9    accused of any wrongdoing.  It was just a best practice.

10    They were moved out, more cases than not, into

11    precinct-level Special Op Units to do the drug

12    investigations and some -- and I don't know the

13    number -- some ended up returning to the drug unit.  So

14    there was an interruption in their time.  So...

15  Q.  I will get to that issue.  I have an exhibit, the

16    administrative message making -- effective July 14th,

17    2014, the formation of Major Violators, and I'll get to

18    that.

19           EXHIBIT 7A

20           Detroit News Report

21           WAS MARKED FOR IDENTIFICATION

22  BY MR. DETTMER:

23  Q.  I'd like to go on, and there's a December 11th,

24    2019, Exhibit 7A of a Detroit News report and it's

25    titled Detroit Police Probe Yields Allegations of



---

1    Widespread Corruption on Drug Unit.

2           Would you agree with the lead-in to this

3    article?

4           MR. SUROWIEC:  Object to form, foundation.

5           Go ahead, Chief, and answer the question.

6           THE WITNESS:  Are you talking about the title

7    of the article?

8  BY MR. DETTMER:

9  Q.  Yes.  Right.  Do you see it there?

10  A.  Yes, I'd say there was widespread, given what we were

11    starting to uncover.  But I want to pause for a moment

12    and make it abundantly clear that it didn't mean that

13    everybody working the drug unit was involved in

14    criminality.

15  Q.  In the first paragraph, the indication -- if I just read

16    it into the record.  Four months after Detroit Police

17    and Internal Affairs officers raided their own

18    department Narcotics Unit, investigators have uncovered

19    alleged corruption that includes drug cops planting

20    evidence, lying to prosecutors in search warrants,

21    robbing dope dealers, and embezzling funds, Police

22    Commission said.

23    You don't disagree with that, I assume?

24  A.  I don't disagree that those were allegations that we

25    were looking at.  I'm putting emphasis on

---

1    "allegations".  We haven't really --

2  Q.  It goes on, since -- the next paragraph.

3           Since the August 22nd raid in which dozens of

4    files and computers were seized and analyzed, Chief

5    James Craig has reassigned everyone in the unit with

6    five or more years' experience, correct?

7           Is that a correct statement?

8  A.  That is.

9  Q.  Then you go on, I am extremely concerned there may be a

10    pattern of practice of criminal misconduct in the

11    Narcotics Unit.  Sadly, as we continue our probe, we

12    think it's going to grow in terms of magnitude.

13           Is that a correct quote from you?

14  A.  That's correct.

15  Q.  And then down lower on the first page, after Director

16    Graveline's picture.  It goes on:  Craig said, he

17    enlisted FBI, Michigan State Police, US Attorney's

18    Office after materials seized in the raid, he enlisted

19    help -- I'm sorry -- revealed more problems than

20    anticipated.  Is that correct?  Or were they involved

21    prior to?

22  A.  No, I think the FBI came.  We initiated the probe, and

23    the FBI made a commitment.  They gave us two

24    permanent -- and as I indicated earlier, there were

25    three part-time and I think one of the FBI was also part

---

1    of the Public Corruption Task Force who is a Michigan

2    State Police.  I'm not certain if he's still involved in

3    that, but he was at the time.

4  Q.  You go on after -- by adding people.  Now we are on to

5    17.  And you recorded this saying, this is a major

6    corruption investigation, but I want to caution that

7    these are just allegations at this point.  That's what

8    you've said a number of times, correct?

9  A.  That's correct.

10  Q.  On the second page of Exhibit 7A, in the first full

11    paragraph, it says, one of the investigation's

12    findings -- and I want to skip down -- the second bullet

13    point, false affidavits alleging were presented to --

14    allegedly were presented to prosecutor to get search

15    warrants.

16           And you are then quoted, it's alleged that the

17    probable cause against the warrants was fabricated.

18    Surveillance that was supposedly conducted to get the

19    warrants wasn't done.  Is that correct?  Is that proper?

20  A.  That's correct.

21  Q.  And you indicated there were identified eight instances

22    where this may have occurred, correct?

23  A.  At that time, yes.

24  Q.  And in the next -- the next bullet point, drug suspects

25    were designated as confidential informants without

1  permission.  Only a prosecutor either from the Wayne
2  County Prosecutor's Office or the US Attorney's Office
3  can authorize a member of the department to turn a
4  suspect in to an informant.  You said that, correct?
5  A.  I did.
6  Q.  And then it goes on, based on our investigation so far,
7      we found 11 instances where officers improperly made
8      suspects into informants.  Based on our investigation so
9      far we -- I'm sorry -- we found 11 of these.
10         Now, let me ask you, how is it recorded that a
11      confidential informant really should be a Source of
12      Information, right -- or Confidential Informant has been
13      authorized by either US Attorney's Office or the Wayne
14      County Prosecutor's Office to act as an informant.
15         How is that done?  What is the trail?
16  A.  I can't tell you what the paperwork is.  But simply put,
17      if an arrest is made, narcotics are seized, then the
18      police officer cannot unilaterally release that person.
19      You're going to work this case off, and you'll work it
20      off.  We're not going to take you into custody, but
21      you'll work it off giving us additional information.
22         Only a prosecutor -- the point is, only a
23      prosecutor can make that decision to say, okay, you've
24      got this person with large amounts of, let's say,
25      cocaine, and we think the information that he or she has


1  is invaluable in getting someone, say, higher up.
2         In the drug trade, that prosecutor could make
3      that decision, not a police officer.  I can't make that
4      decision as a police chief.  I certainly -- it can be
5      recommended -- a recommendation that we pursue as -- a
6      word that they use in Narcotics, it's called flipping a
7      source, who they got drugs on.  We found -- as it was
8      indicated, we found that that happened a number of
9      times, and that is improper.
10  Q.  Now, going on the second page in A, down a little bit,
11      you indicate, we're also looking very closely at the
12      supervisors and managers in the Major Violators section.
13      What did they know and what did they do about it?  The
14      investigation is looking very closely at the management
15      that oversaw Narcotics.
16         And so you were very concerned that the
17      Narcotic Units were not being properly supervised,
18      correct?
19  A.  That's correct.
20  Q.  And have you found anything where it's been established
21      that there was a deficiency in supervision?
22  A.  As we continued our probe, based on the alleged conduct
23      or misconduct that supervisors either knew or didn't
24      know but should have known -- I guess that's the best
25      way to describe it -- that is something that we're still


1  probing.
2  Q.  On the last page, Exhibit 7A.  You attribute -- I'll
3      read it.
4         You attribute the problem "basic greed", and I
5      assume your basic greed of officers and supervisors in
6      the Narcotics Unit, and including, obviously, the Major
7      Violators Unit, correct?
8  A.  That's correct.
9  Q.  7B, this is a newspaper article in Detroit News,
10      December 12th, 2019.  And you're quoted a number of
11      times and I --
12         MR. DETTMER:  Michael, can you bring that up?
13  BY MR. DETTMER:
14  Q.  Start off, selling drugs in any city is dangerous as
15      dealers risk being killed or robbed by rivals, but in
16      Detroit, pushers for years also have known they could be
17      ripped off by cops, Police Chief James Craig said.
18         Is that accurate?
19  A.  Yes, if I would have -- if I said it that way.  But I
20      guess that's the essence of it -- yes, I don't know if I
21      would have said it just like that.
22  Q.  That's the point you want to make?
23  A.  Yes, but I might have said it differently.
24  Q.  Then it goes on, the next paragraph, the culture here
25      has been such that drug traffickers figure that it was

1  just one of the costs of doing business.  They knew I
2      could get killed, robbed by my competition or robbed by
3      cops.  It's not like that in other cities that I have
4      worked.
5         Is that a proper quote from you?
6  A.  That's correct.
7  Q.  You go on on the next page, again, that -- the
8      investigation that's underway, has uncovered a pattern
9      and practice of alleged corruption.  Is that fair to
10      say, in the drug unit?
11  A.  That's correct.
12         And, again, I want to put emphasis on that
13      does not mean that every single member assigned to Major
14      Violators was engaged in this pattern and practice.
15  Q.  I understand.  You've made that point a number of times
16      in the articles being quoted.  And I understand that.
17      I'm not suggesting that every officer that is or was
18      ever in the Narcotics Unit or Major Violators are
19      criminals, but there are some.  That's clearly, I think,
20      the point, correct?
21  A.  That's correct.
22  Q.  You were quoted a number of other times.  Do you want to
23      take a quick look through this?  I don't know if you can
24      see it clearly.
25  A.  Is there anything specific that you want me to see?

1  Q.  For example, on the second page, those who are

2      trafficking in large amounts of drugs got passes based

3      on the decision of a police officer.  They are not going

4      to come back knocking on my door, saying, Chief, we want

5      to make a complaint.

6  A.  That's correct.

7  Q.  That was the problem, right?

8  A.  In essence.

9          I'm not saying with every arrest, but we have

10     seen that what -- you know, what drug dealer who's

11     getting a pass is going to come in and make a complaint.

12 Q.  I understand that.

13         7C is an article titled Detroit Police

14     Officials Revamp Internal Affairs Probe Procedures.

15     This is dated April 27th, 2019, and it's a Detroit News

16     article.

17         Now, the Internal Affairs has what

18     responsibility?

19 A.  To investigate both administrative and criminal

20     misconduct.

21 Q.  And it's a check, in a way.  It has some supervisory

22     responsibility, correct?

23         Well, let me ask you it a different way.  Does

24     it play some role in supervising the police officers?

25 A.  It can play a role in establishing policy, but the probe



1      is separate from IA.  It was birthed out of --

2  Q.  Well, earlier in your testimony today, you indicated

3      that one of the things you changed was the Internal

4      Affairs.  Can you put a time period on investigations

5      from inception to conclusion of one year?  And you

6      indicated some --

7  A.  That was involving -- that was involving allegations of

8      misconduct, and that change had nothing to do with this

9      probe.  That was overall --

10 Q.  Internal Affairs' probes can turn up criminal conduct,

11     correct?

12 A.  That's correct.

13 Q.  So if these things languished and then were not being,

14     if you will, aggressively addressed and putting a cap on

15     the time period made it more efficient, I assume, and

16     more analytical and more factual based, you know, you

17     can't -- four years after the fact, getting the facts

18     established is hard, agreed?  The purpose of --

19         MR. SUROWIEC:  Object to the form and

20     foundation of the question.

21 BY MR. DETTMER:

22 Q.  The purpose of this was to really elevate, in some ways,

23     the effectiveness of the supervision, correct?

24 A.  I don't like your question.

25         I mean, I don't mean to be smug, or...



1  Q.  No.  No, that's okay.

2  A.  It's just that it was done, as I had testified already,

3      to address the lack of timeliness of investigations,

4      and, twofold, to address an accused officer.  They

5      deserve to have a timely resolution to their

6      allegations.  And also to the community that expects

7      that when they initiate allegations of misconduct, that

8      matter is addressed not four or five years later.

9  Q.  Internal Affairs is a process in the discipline of

10     police officers, correct?  In all levels of police

11     officers?

12 A.  That is one -- Internal Affairs is one part.  They

13     execute, initiate -- strike initiate.

14         But they execute the investigative work of

15     serious allegations of misconduct which in some

16     instances includes criminal misconduct.

17 Q.  And it's significant in the process of keeping track of

18     what is occurring within the police department?  If it's

19     not running efficiently, you're not staying on top of

20     the supervision that's needed?

21 A.  Well, there are other -- I disagree with the question.

22         We have audit functions inside the police

23     department that monitor compliance with rules and

24     directives.  Internal Affairs investigates allegations

25     of misconduct.

1  Q.  The practice is that it be done timely.  That's a

2      supervision issue?

3  A.  That's specific to allegations that come forth and,

4      again, as I've already testified to, because there was

5      no timely resolution and many of the cases going before

6      arbitrators that were appealed were being dismissed

7      because of the lack of timeliness.

8          So I felt strongly that Internal Affairs in

9      the department could be more efficient in responding to

10     the completion of internal investigations.

11 Q.  I'd like to go on to 7E now.  And it's an article dated

12     February 11th, of this year, 2020.  And it's titled

13     Craig Defense Inhouse Probe of Police Narcotics Unit.

14         And in the second paragraph you are quoted, do

15     you see that?  It is not -- I don't know if our -- can

16     you read that?

17 A.  Frankly, we are best poised to do this investigation.

18 Q.  Yes.  You can read it to yourself.  Is that an

19     accurate --

20 A.  Yes.

21 Q.  -- recital of your statement?

22 A.  Yes.

23 Q.  And then down below the pictures, the second paragraph,

24     that starts, "Craig said", can you read that?

25 A.  Yes.  It cuts off at a point because of the --

1          MR. DETTMER:  Can you roll that up, Michael?

2          THE WITNESS:  A little bit.  Roll it up.  Not

3    that way, the other way.  Stop there.

4    BY MR. DETTMER:

5    Q.   Is that a correct recitation?

6    A.   That's correct.

7    Q.   The second page, the paragraph that starts the second

8    page, the probe, Craig said, see that?

9          MR. DETTMER:  Pick it up a little, Michael.  A

10   little more.

11         THE WITNESS:  I see it right there.

12   BY MR. DETTMER:

13   Q.   Is that accurate?

14   A.   That's correct.

15   Q.   And then the next paragraph, is that accurate?

16   A.   Meaning if there's a pattern of conduct?

17   Q.   Yes, that's the one.  Is that an accurate recitation?

18   A.   I've already testified to this very same thing not even

19   two minutes ago.

20   Q.   And then going on, you again indicate that the probe was

21   going back to 2010.  That was something that you said a

22   number of times.

23         EXHIBIT 8

24         Police Commissioner Meeting

25         WAS MARKED FOR IDENTIFICATION



1    BY MR. DETTMER:

2    Q.   Go on to Exhibit 8.

3          This is a July 17, 2014, meeting of the

4    Detroit Board of Police Commissioners which occurred on

5    Thursday, July 7th, 2014.

6          I have 2, 3, pages -- actually, a couple of

7    pages identifying who was there and the date again.  But

8    going to page 37, you are discussing, and there's a

9    report in detail by Hanson no less, of what's said at

10   the meeting, correct?

11         And this report starting at line 12 on page 37

12   addressing -- I'm sorry, on line 15, a discussion about

13   the revamping of the Narcotics Unit, the Major

14   Violators.

15         Do you recall that discussion?

16   A.   Not offhand.  That was 2014.  I've been to many --

17   Q.   Basically, though, you described the revamping of the

18   Narcotics Unit into the Major Violators?

19   A.   I'm sure I've had a number of conversations with the

20   Police Commission relative to the Narcotics Unit, and

21   I'm sure I would have briefed them on changes being

22   made.

23   Q.   There's a question about the length of time an officer

24   can be a member of the Narcotics Unit, if you will.  And

25   on page 39 you say:  "I appreciate you bringing that up"



1    and you're referring to Commissioner Crawford's question

2    about finding a rotation in Narcotics.

3          You go on:  I was adhering or adopting, but I

4    know that best practices and police departments that

5    have come under such judgments, they have put limited

6    duration on the tours of duty, high-risk assignments,

7    such as Narcotics, Vice, Gang Units.  And the reason for

8    that is because those assignments have had lengthy tours

9    of duties is a greater likelihood of corruption.

10         You knew that and made that point to the

11   commission, correct?

12   A.   I did.

13   Q.   And you go on, starting at line 19 on a page 39, in

14   Detroit, what we've done in adhering to the best

15   practices, is that the tour of duty in those

16   assignments, Vice, Gangs, Narcotics, would be three

17   years, and the termination of the three-year assignment,

18   the concerned employee could request a one-year

19   extension.

20         Did you enforce that policy consistently?

21   A.   I delegated enforcement down to assistant chief and

22   Deputy Chief Leavell and it candidly wasn't enforced in

23   the manner in which it was articulated.

24         I can say I felt there was some resistance,

25   even though not voiced, because it's always been the way

1    things were done in this department.

2          So if they move someone out, the person still

3    worked -- I have since learned -- worked in Narcotics

4    and sat at the precinct level.  And then at some point

5    they were brought back.  I'm not always aware who

6    left -- I mean, now it's different.  We certainly have a

7    more rigor attacks.

8          The argument that those who have been in the

9    organization was that they felt lengthy experience was

10   important.  Instead of this three-year and a one-year

11   extension, if necessary.  It wasn't really well

12   received, at least that was my sense.  Certainly now,

13   there's no pushback.

14   Q.   Well, are you applying a three-year plus one possible,

15   max of four years?

16   A.   If my memory --

17   Q.   Is that being enforced?

18   A.   If my -- well, since the start of our probe, we moved

19   anybody with five years or more out.  So, yes, it has

20   been.

21         So based on what I know now, there's nobody

22   that has excess of five years, at least to my knowledge.

23   Q.   But until the probe started, 2019, there were people

24   that had maybe as much as five or more years in --

25   A.   Right, there were still some people --

1  Q.  -- Major Violators and Narcotics, right?

2  A.  That's correct.  So we have --

3  Q.  So the supervision wasn't adhering to the policy you

4      instituted --

5          (Indiscernible, multiple

6                    speakers at the same time)?

7          THE WITNESS:  I'm wondering, are you going to

8  let me answer the question or are you going to talk,

9  because I can't get a response out.  I would like to get

10 a response out, if that's okay.

11         MR. DETTMER:  I want you to respond.

12         THE WITNESS:  Okay.

13         So the answer is yes, we found instances where

14 it wasn't adhered to.  As I testified to earlier, that

15 in some instances they were moved out and then brought

16 back.

17         In other words, the clock stopped and it was

18 restarted.  So if you are out of Narcotics, say, for a

19 couple of months and you were brought back, the clock is

20 starting all over again.  That was a way to get around

21 an unpopular decision.

22 BY MR. DETTMER:

23 Q.  Well, you, as the chief of police, as CEO of the Detroit

24     Police Department, had the final say on policy, correct?

25     And you expect your officers, including all of your



1  command officers, to follow policy that you oversee and

2  instituted, correct?

3  A.  That's correct.

4  Q.  And the failure to do so is a failure of vision but at

5      different levels, correct?

6  A.  You can say that, yes.

7          EXHIBIT 9

8          Administrative Message

9          WAS MARKED FOR IDENTIFICATION

10 BY MR. DETTMER:

11 Q.  I want to then go on to Exhibit 9.  This is the

12     administrative message dated June 27th, 2014, where

13     there are organizational changes within organized crime.

14 BY MR. DETTMER:

15 Q.  And organized crime is -- has under its umbrella a

16     number of different things.  It had -- I can't -- it had

17     Narcotics Unit, gang intelligence, task force and vice

18     enforcement.  And you changed the name of the Narcotics

19     Unit, and effective July 14, 2014, you named it Major

20     Violators and reduced the number and I think posted

21     other conditions, correct?

22 A.  That's correct.

23 Q.  Do you have something time wise that caused you to do

24     this in the summer of -- or in the period of

25     June 2014 -- or in 2014 that caused you to make this



1  decision?

2  A.  As I remember, it probably was the same time following

3      the conclusion of the Hansberry indictment.  So we were

4      looking for a way to change the culture, move the

5      major -- I mean Narcotics in another direction, that

6      based on what we've learned in our probe, there were

7      things that we didn't know that had we known at that

8      point, that would have been included in the restructure.

9      We just didn't know it.  There was a lot of things we

10     didn't know.

11 Q.  Hansberry was indicted on April 8th, 2015.  But there

12     was an ongoing investigation, correct, prior to that,

13     about Hansberry and his crew members?  Correct?

14 A.  Yes.  I have already testified that the FBI initiated

15     and started the investigation in 2010 --

16 Q.  Right.

17 A.  -- and culminated in 2014.

18 Q.  Now, in terms of the Detroit Police Department, were

19     files opened about this investigation that originated

20     with the investigation you described previously but were

21     giving some direction to the organizational features?

22     You didn't just wake up one day and dictate this five-

23     or six-page document, right?

24         Exhibit 9.  You had some information provided

25     to you before, correct?

1  A.  As I've indicated and I've testified before, the changes

2      were made based on the Hansberry case and his other

3      crime partners.  And it was our way of trying to move

4      the organization in another direction.

5          However, as I've already testified, and I've

6      probably have said this three times, there are a lot of

7      things that we didn't know in terms of practices until

8      the Mosley matter.  And around the same time that Mosley

9      was charged, we had got information from a source who

10     was very familiar with the operations of narcotics and

11     the kind of things that some of the members were

12     allegedly involved in.

13 Q.  Was that person a member of the Narcotics Unit or Major

14     Violators Unit?

15 A.  As I indicated to you earlier in this conversation, we

16     are in the middle of a confidential -- and I'm not going

17     to disclose, unless compelled by a court the name of

18     that person.  That person is a federal -- I guess it's

19     safe to say he is a federal informant, not a Detroit

20     Police Department informant.

21 Q.  So then he's not -- I mean, that suggests to me he was

22     never part of the Detroit Police Department?

23 A.  I am not -- as you know -- well, let me just stop there.

24     I'm not going to get into confidentiality of that part

25     of the investigation.  I'm saying that we had a source

1    that was a federal source. The information was provided

2    to us, and I'll leave it at that.

3  Q.  Looking at it, you -- well, first of all, the former

4    Narcotics Unit was made up of enforcement, and

5    Conspiracy Unit; is that correct?

6  A.  **To the best of my knowledge.**

7  Q.  And do you recall what the difference in the two were --

8  A.  **Not offhand.**

9  Q.  -- as far as conspiracy?

10  A.  **Not offhand, I don't. I'm sorry.**

11  Q.  Did the -- at least what I understand, based on prior

12    testimony, that enforcement basically was street level

13    and conspiracy was higher-level drug dealer enforcement

14    addressing higher-level drug.

15        Does that ring a bell with you at all?

16  A.  **Yes, that sounds pretty close to correct.**

17  Q.  And what was the role of Major Violators? Did they fill

18    in on the conspiracy side, major drug dealers, or did

19    they deal with enforcement?

20  A.  **The idea was to focus on -- as you articulated, the**

21    **conspiracy side. Street enforcement we felt could be**

22    **better focused by precincts as complaints were being**

23    **made to various complaints -- I mean precincts about**

24    **street level drug dealing.**

25        **It would be the station that would handle it**



1    because the Major Violator section was smaller than the

2    former, and they were also a part of -- at least a

3    component was part of DEA task force. We felt that it

4    was better that they focus on Major Violators.

5  Q.  Chief, you, obviously, correct -- let me ask you. You

6    didn't fully lay out, do all of the investigation and

7    assignments that are made and reflected in Exhibit 9,

8    correct? You set a policy and you put it in motion

9    based on what you were aware of that was of concerning

10    turnkey, correct?

11  A.  **That's correct.**

12  Q.  Who participated in putting this document together,

13    assignments, differentiating different components with

14    the meetings. What's the process of doing something

15    like this, which is a significant chain?

16  A.  **It would have probably involved -- I see the name at the**

17    **conclusion, a Steve Dolunt, a former assistant chief,**

18    **was the ranking member over operations that came under**

19    **his chain. Certainly James White, who was an assistant**

20    **chief, was involved in that administrative part.**

21        **So those two assistant chiefs and select staff**

22    **would be involved in the crafting of policy or**

23    **documentation.**

24  Q.  Are there documents that White and Dolunt were involved

25    in and people would report to them generated so that it



1    resulted that, if you will, in Exhibit 9, the

2    administrative message dated June 27th, 2014?

3  A.  **I'm not aware of any additional documents -- or at least**

4    **I don't recall any additional documents.**

5  Q.  Did White and Dolunt have to look at things and have

6    meetings with people related to the implementation of

7    policy change that you directed?

8  A.  **I am certain that they had meetings, but I wasn't part**

9    **of those meetings.**

10  Q.  Well, you're aware of the process, right? You've come

11    up through the ranks and overseeing the processes and

12    methodology.

13        How is something like this implemented if it's

14    not -- if there isn't a paper trail function?

15  A.  **As far as I know, this is the only -- there was a**

16    **conversation and the two assistant chiefs got together**

17    **and executed launching this change.**

18        **As to what that involved, I don't have**

19    **specific information. As I've testified, I did not sit**

20    **through that.**

21  Q.  Well, you see the enforcement operations? That's like

22    the third page.

23  A.  **Again, I did not participate in the actual planning. I**

24    **had discussions with the executive team, and during my**

25    **conversation, I didn't provide them any written**

1    direction. I ended up telling them what I wanted and

2    delegated to them to create and, at the conclusion,

3    execute.

4  Q.  Are you saying this document was created as a result of

5    verbal discussions only?

6  A.  **The initial direction of changing to Major Violators was**

7    **a discussion, and there was a subsequent -- I'm**

8    **assuming. I don't know because I did not sit through**

9    **meetings with Dolunt and White other than maybe to get**

10    **an update on what has occurred.**

11  Q.  Well, Chief Dolunt in the Enforcement Operations, on the

12    third page of Exhibit 9, discusses the paid positions of

13    different people.

14        You've seen these kinds of documents before,

15    correct?

16  A.  **That's correct.**

17  Q.  People are reassigned on some regular basis. Generally,

18    it generates a document similar to what we are looking

19    at on page 3, 5, and Bates Number 1 through -- 1 through

20    7 (sic), correct? You have seen those? Correct?

21        I'm sorry, 144 through 147.

22  A.  **Yes.**

23  Q.  For example, you indicated that there would be one

24    lieutenant over the Major Violators. And on the Bates

25    Number 144, there is a number of lieutenants that are

1    listed, one of them being James Moore.  And he was in
2    the 3rd Precinct, and he was put into Major Violators.
3         Who made that decision?  Why was he selected?
4  A.  I don't know how the selection was made.  I don't know
5    how the selection was made.  They make recommendations.
6         Given that that was 2014, at the time, most of
7    these individuals I didn't personally know, so I relied
8    heavily on recommendations made by my executive team,
9    which was the assistant chiefs.  So they felt that's who
10   they wanted in these concerned assignments.  There was
11   nothing to say they couldn't go there, at least not that
12   I am aware of.  Nothing was brought to my attention.
13 Q.  Well, approximately at that point in time, there were
14   48 officers, a lieutenant, 6 sergeants, 41 police
15   officers in what was then the Narcotics Unit.  And that
16   48 went down to basically 24, right in half.
17        You had no role in any of the decisions of the
18   appointments to be either lieutenant, the sergeants, or
19   the police officers, correct?
20 A.  I relied on my executive team to make recommendations
21   and absent anything that was concerning, I supported
22   their decisions.  Again, I had been in the department a
23   year.  And probably most of these folks -- as I am
24   looking at -- I mean, I know most of them now that I
25   didn't know.  So I didn't have any personal knowledge.

1    I didn't handpick myself.  I relied on my executives to
2    make their decisions.
3  Q.  Well, let me point something out, if I can.
4         Hansberry's crew, that involved Sergeant
5    Geelhood, eventually, nine of those people were in the
6    list of the July 22, 2014, list of people who were
7    removed from the Narcotics Unit, Geelhood, Bray,
8    Leavells, Matelic, Beasley, Riley, Barnett, Tourville,
9    and Napier, who committed suicide sometime after this in
10   January 2015.
11        Do you know if any of those officers I just
12   enumerated and the eight that are still alive are under
13   investigation?
14 A.  There are some that are under investigation and one just
15   retired in --
16 Q.  Some are currently under investigation?
17 A.  Some are, yes.  Yes.
18 Q.  Do you know which ones?
19 A.  Sergeant Geelhood is currently under investigation --
20   Internal has a case of an allegation that emanated out
21   of the Wayne County Prosecutor's office -- and we've
22   opened an investigation relative to him.
23 Q.  Is that Sergeant Geelhood?
24   That is correct.
25 Q.  Anybody else?

1  A.  Amy Matelic was under investigation by Internal Affairs
2    and she was --
3  Q.  She entered into a consent agreement, correct, and
4    left -- just to refresh your memory -- left the Detroit
5    Police Department?
6  A.  She was under investigation involving allegations
7    concerning something that emanated out of a civil
8    lawsuit, and she opted to leave the department.  And we
9    allowed her to do so.  But it wasn't anything --
10 Q.  She was charged with falsifying an affidavit for a
11   search warrant, and she basically, as I recall -- I'm
12   just trying to refresh your memory -- that Stephen
13   Geelhood provided her the information and she did --
14 A.  I'm familiar with that case.  She --
15        MR. SUROWIEC:  Dennis, could you please let
16   the witness answer your questions.
17 BY MR. DETTMER:
18 Q.  Go ahead.
19 A.  No, it's getting a little old.  I start to talk and I
20   get talked over.  I mean, can we just let me get my
21   comment out.  If that's not satisfactory then -- because
22   I'm feeling like every time I start talking, you over
23   talk me.
24 Q.  I don't mean to be and I don't -- really, I'm not trying
25   to be rude to you.  We're under a 3 1/2 hour limitation,

1    and I want to move ahead.  Some of this stuff, as you
2    said, you repeated.
3  A.  A lot of it I just read it -- can I share my
4    frustration?
5         A lot of what I'm saying is repeated, and you
6    want to talk about efficiency of time, why am I saying
7    the exact same thing?  I'm not going to lie.  I'm going
8    to tell the truth.
9  Q.  No, no, no -- I know you're a truthful fellow.
10 A.  Yes, sometimes so far I guess, but I would rather be
11   upfront.  So relative to this, I'm familiar with Amy
12   Matelic.  There was a lawsuit and she was facing
13   termination for false statements.
14        As you know, you articulated, given at the
15   trial, she opted -- in lieu of being terminated, she
16   resigned or retired under charges.  I think that is it.
17   So we put under charges.  So she has since left the
18   department.  So that option is sometimes afforded.  I
19   mean, because if a person wants to opt to retire, you
20   know, all we can do is put the reason for the retirement
21   or resignation, and if there's an open case like this
22   was, we put retired under charges.  That's generally --
23   not in every case, but that's generally what we do.
24        Relative to Geelhood, that was something, as
25   I've already indicated, it came out of the -- I think

1  this was the Innocence Project case is what I was
2  briefed, so we have an open investigation relative to
3  him and we're not complete with that yet.
4          And I think there was a couple of other names
5  that you mentioned that I am not --
6  BY MR. DETTMER:
7  Q.  Do you recognize any of them?  I will go through them
8  again.
9  A.  Outside of Geelhood and Matelic -- what were the other
10  names you mentioned?
11  Q.  Bray.
12  A.  I've heard Bray's name, but I'm unaware of any open
13  investigations unless he's part of our probe.  There are
14  a lot of names that come up in our probe, that I can't
15  just off the top of my head tell you who they are.
16  Q.  Those nine people I have listed were either in or became
17  under Hansberry and subsequently Geelhood, was in
18  Hansberry's -- and there were nine of them.  And as you
19  know, Napier committed suicide, so there were eight
20  people, and I'll give you the names of other -- you
21  know, Leavells is out, obviously.  But -- and Matelic's
22  out.  But who are still in play are Geelhood, Bray,
23  Beasley, Riley, Barnett, and Tourville.
24          Any of those ring a bell?
25  A.  Tourville comes to mind; I just can't recall what.  It



1  seems as if -- we may have.  I don't know.  I think his
2  name -- again, some of these names are coming up in our
3  probe and we are moving forward.
4          In fact, there are several members, and I
5  don't know if it's Tourville, but we have several
6  members that have chief hearings pending that are
7  dismissal cases.
8  Q.  You've indicated a number of times that you're looking
9  at a lot of Hansberry's crew?
10  A.  Well, not just --
11  Q.  I know, not just, but you are looking at them?
12  A.  Yes, we are.  But, again, to what you -- you've
13  indicated earlier, you know we're going around -- we're
14  doing this backwards.  We should have started back in
15  fear of the statute.
16          And I will just be candid with you, if the US
17  Attorney wanted us to start at the back, like 2010, or
18  whatever date our files go back to, because of statute
19  issues.  I am certain they would have raised that issue,
20  because, you know, Mr. Graveline was a former US
21  Attorney, very familiar with the statutes.
22          But, again, we opted -- because our initial
23  concern was Mosley, and me believing that Mosley was
24  involved in other allegations, which we have found that
25  he was involved in other allegations of criminality.



1  Q.  I'd like to talk to you about the stop on July 6th,
2  2010, with Hansberry's crew.  And I know you don't have
3  personal knowledge of that.  But recognizing that
4  potentially this is an issue of review and should be --
5  for my valuation of it, I'd like to ask you some
6  questions.
7          Do you recall this is the stop where some
8  millions of dollars were on the way to a Mexican cartel
9  and on the east side near Gratiot and Outer Drive, I
10  believe there was a stop by Hansberry's crew.  And
11  there's a good amount of dispute about the amount of
12  money.  I've had maybe three different numbers, based on
13  various sources, testimony, and trial and things like
14  that.
15          But are you somewhat familiar with all of
16  that?
17  A.  I've heard it.  I'm not intimate with that case.  I
18  can't offer you anything.  You could probably brief me
19  out as to what you know, but I have heard -- and we
20  haven't gone back and did an exhaustive review of that.
21  I just heard but basically what you're saying now.
22  Q.  There is a connection between Arthur Leavells and Gary
23  Jackson, a mutual friend.  Right?  And Gary Jackson was
24  a -- probably a high-level drug dealer.  He owned a --
25  or leased a truck operation for cleaning trucks, in --

1  what really apparently was the issue there, trucks come
2  in and either drop drugs or pick up money, and the semis
3  head down to Mexico or whatever.  That's basically the
4  argument of the US Attorney in the Hansberry trial.
5          But what I'm interested in and wanted to
6  discuss with you is the fact that there are three
7  different numbers, dollar numbers, that were significant
8  in this case.  Gary Jackson testified there was -- he
9  delivered $3 million to the drug runner who was driving
10  the truck to Mexico.  And at the time he did that,
11  Leavells, Hansberry, and Watson and Hansberry's crew
12  were in on this deal.  They were going to stop it and
13  get the money.  It was all prearranged.
14          The second number was a tally sheet that was
15  with the money, and it -- it indicated that there was
16  $2,370,000 on -- in the various bags that had the money
17  in it in the semi.
18          Then there was a dispute that went to Internal
19  Affairs, basically, over the counters -- a dispute over
20  like $15,000.  But what Comerica Bank established and
21  what was deposited in the Detroit Police Department's
22  account with Comerica was $2,084,820.  That's the
23  established amount that was there.
24          Basically, the testimony was that Tourville
25  and Napier grabbed money per an agreement, and they were

1    charged with that.  The question is, was there

2    2,084,000, 2,370,000 or 3 million?

3         Now, clearly the evidence that was grabbed at

4    the time indicated in the tally sheet there was

5    2.3 million plus, and for some reason nobody used that

6    in any kind of investigation.  It didn't trigger

7    anything.  Because them talking about 2,084,000 being

8    deposited, there is a difference of somewhere in excess

9    of $180,000 (sic) that disappeared, if the tally sheet

10   is correct.

11        Jackson is correct in his testimony in federal

12   court, and I'm sure, you know, he faced serious

13   consequences if he perjured himself, that there was

14   3 million.

15        There was no accounting in any form by

16   supervision of the Detroit Police Department on those

17   issues.  I hope I'm making it clear to you the issue.

18        MR. SUROWIEC:  Thousands of dollars.

19   BY MR. DETTMER:

20   Q.  Hundreds of thousands of dollars disappeared and the

21   testimony of Leavells was that the crew grabbed that by

22   a prearranged agreement.

23        MR. SUROWIEC:  I would object to form,

24   foundation.  You are testifying.  The question is not

25   even a question.  It was literally about a three-minute



1    statement.

2         It's inaccurate to the extent that you would

3    say that Tourville and Napier were charged, and it calls

4    for speculation on the part of the chief, who wasn't

5    there.

6         But, Chief, if you can answer that, which I am

7    not sure what that was.

8         THE WITNESS:  I can't.  I wasn't here then.

9    In fact, I was a police chief in Portland, Maine, in

10   2010.  I've heard some discussions about that limited --

11   as I indicated before you started your three-minute

12   narrative on what took place, I say you probably know

13   more about this than I do.

14        As it turns out, you have read testimony in

15   the federal case, which I have not.  I don't know.  As

16   we continue to do our probe and go back, I am certain

17   that this issue will resurrect.  What will come out of

18   it, I don't know.

19   BY MR. DETTMER:

20   Q.  I guess the point I'm making with you, this is an

21   opportunity for supervision, and I would indicate to you

22   that --

23        MR. DETTMER:  If we can go to Chief Exhibit

24   11B, Michael.

25

1         EXHIBIT 11A

2         Photo

3         WAS MARKED FOR IDENTIFICATION

4         EXHIBIT 11B

5         Photo

6         WAS MARKED FOR IDENTIFICATION.

7    BY MR. DETTMER:

8    Q.  The highest level of the Detroit Police Department was

9    aware of this event and, in fact, after the money was

10   acquired -- that's Exhibit 11A -- that's the money on

11   the trunk of a car at the scene of the stop.

12        And 11B, unfortunately, is sideways, but --

13   there you go.  And you'll recognize all of those

14   individuals, I am sure, Chief Godbee being in the

15   center, correct?

16   A.  That's correct.

17   Q.  There's the money.

18   A.  Correct.

19   Q.  And the point I'm making with you, there was a

20   subsequent investigation of how a money counter being

21   inaccurate over $15,000.  Really, we are talking about

22   900,000 or 280,000 disappeared, and the trial was about

23   how Hansberry and his crew grabbed that money.

24        You're not aware of any of that?  We're not

25   making (inaudible) --

1    A.  No.

2    Q.  Here is something with the highest level management of

3    the Detroit Police Department at the time and it wasn't

4    properly handled.  Is that fair to say?

5    A.  I can't say.  Now, I guess --

6    Q.  Assuming what I said is correct?

7    A.  Well, here is a question I --

8         MR. SUROWIEC:  He is not going to say --

9         THE WITNESS:  I can't say how it was handled.

10   Now, at some point this allegation was made that money

11   was missing.  Am I correct to say that?

12        MR. DETTMER:  Yes, but it was -- it was

13   focused on a counter -- money counter issue, not on the

14   tally sheet.

15        THE WITNESS:  So if it was a counter issue --

16   I mean, either we believe that money was stolen -- as

17   you referenced, the highest levels of the organization

18   were aware that there was some sort of nefarious act or

19   money was alleged to have not been accounted for, then

20   the only thing one could do was then initiate an

21   investigation into it.  I don't know if the then Chief

22   Ralph Godbee became aware and initiated an internal

23   investigation.  I'm unaware of that.

24   BY MR. DETTMER:

25   Q.  Well, there is evidence to support, as you well know

1    probably --

2  A.   But specific to your -- specific to your question, if

3    the chief became aware of an allegation of theft, the

4    chief would then be responsible to initiate an internal

5    investigation. I don't know because I wasn't here.

6         Maybe as part of the work that we'll be doing

7    in the coming months, however long it takes us to get to

8    that time period, maybe we'll have the answer. Maybe I

9    can find that answer out right now. I don't know.

10  Q.   Chief, what I'm really asking you, though, there was a

11    tally sheet that indicated there was $2,370,000 in that

12    truck.

13  A.   Okay.

14  Q.   That was evidence that the Detroit Police Department had

15    and it was totally ignored. And the point I am making

16    with you, that evidence was an indication that the

17    department should have known there was some problem here

18    and investigated it. They never investigated it.

19  A.   You know --

20         MR. SUROWIEC: That's a mischaracterization of

21    the evidence, and you're painting it in an absolutely

22    false light.

23         But go ahead, Chief, if you can answer that.

24         THE WITNESS: I can't answer that. I mean,

25    the way the question's framed -- I know what I would do

---

1    in a given situation. But to say a tally sheet

2    reflected one thing, I guess one could argue, if I'm

3    understanding your synopsis, that -- how do we know the

4    tally sheet was correct? I don't know. Who's making

5    the allegation that -- I just don't know.

6         And so what you are doing is -- you want me to

7    say that it wasn't handled properly. I don't know what

8    the chief knew at that time. If I had known that you

9    were going to ask me this question in 2020, I would have

10    called him on July the 27th, say, on the day I'm going to

11    be chief in Detroit and this question's going to be

12    asked. Did you do anything with this money thing.

13         I mean, I'm being facetious, of course. But

14    I'm just saying, there's no way -- I don't know enough

15    about the facts, and the way you framed it, the tally

16    sheet tells me nothing.

17  BY MR. DETTMER:

18  Q.   Well, here, let me make the point for the record. In

19    Exhibit 10, DPD Bates 1643 --

20         EXHIBIT 10

21         Comerica Bank Deposit

22         Tally Sheet

23         WAS MARKED FOR IDENTIFICATION

24  BY MR. DETTMER:

25  Q.   Well, here, let me make the point for the record. In

---

1    Exhibit 10, DPD Bates 1643 -- is a bank deposit with the

2    Comerica Bank and it shows a deposit of $2,084,830.

3  A.   I understand.

4  Q.   In Bates Number -- DPD Bates Number 1648 in Exhibit 10

5    there's a tally sheet, and there are a number of pages

6    listing each of the deposits that were made -- or the

7    money bags that were in the -- in the vault, and that

8    tally sheet shows 2,370,000. Whether it's accurate or

9    not, no way either you or I know this.

10         But the point is that it raised an issue, and

11    there's no investigation at all at any point about that

12    tally sheet and the discrepancy between the bank

13    deposit, and its significant. All I'm saying is --

14  A.   To your point -- I'll just say, to your point,

15    absolutely it's significant. And if you had asked me

16    the question, if you were the chief and you were made

17    aware of a discrepancy, what would you have done.

18  Q.   What would you have done?

19  A.   That's the question.

20  Q.   What would you have done?

21  A.   If I were the chief in 2010 in Detroit and I became

22    aware of a discrepancy, I would have initiated an

23    investigation to find out was it just an error that

24    somebody -- on the bank slip make a mistake? What would

25    it have been? I don't know.

---

1    I would have at least wanted to know because,

2    worst-case scenario, somebody stole the money. And then

3    it would have been involving interviews of people

4    involved. It would have been a number of things we

5    could have done.

6         With that kind of money, we would have gotten

7    search warrants to get into bank records of certain

8    department employees, to see if there was an unusual

9    amount of money deposited, which -- and in an

10    administrative case, even if, say, the US Attorney said,

11    well, it's not really enough. Or the Wayne County

12    prosecutor said it's not enough to prove theft, maybe.

13    Based upon a preponderance of evidence, it's enough to

14    support an allegation that a theft occurred. It just

15    doesn't meet a criminal standard. I mean, so that's

16    what I would have done. At least take a look. It

17    doesn't mean that I would have proven that the money was

18    stolen. I don't know. I really don't know.

19  Q.   And the point I think is well taken. There was the

20    opportunity to actually know what occurred, and there

21    was a total lack of indifference to this, from what I

22    can see.

23         And the point I'm making is, Hansberry's crew

24    are basically the defendants in our cases that we have

25    and had they properly proceeded, had the Detroit



1  department supervision properly proceeded, it's -- these

2  people wouldn't have been raided.

3        These are the people who are criminal cops,

4  and they raided our clients' homes, and that's the point

5  I'm making with you. They didn't -- as you are correct,

6  it should have happened and it didn't.

7        MR. SUROWIEC: I would object to the narration

8  -- the narrative there. And I would also object to the

9  fact that you're -- you're giving false evidence because

10 you know that there was an Internal Affairs

11 investigation that was launched after the discrepancy

12 was noted, and that would have been under Chief Godbee,

13 so why are you saying there wasn't, Dennis?

14       MR. DETTMER: Here. Here. That investigation

15 was over whether the money counters were properly

16 operating. That was the issue, over $15,000.

17       MR. SUROWIEC: They did Garrity. They did

18 Garrity. They interviewed about 20 to 30 officers.

19 They did --

20       MR. DETTMER: Here --

21       MR. SUROWIEC: It was done.

22 BY MR. DETTMER:

23 Q. They weren't interviewing them about the $2,370,000

24 tally sheet. They weren't -- that number never came up

25 at all anyplace.



1  A. Well, I've got to tell you something. I am a little

2  dismayed because specifically I asked was there an

3  investigation. And counsel is now articulating that

4  there was an investigation. Maybe you don't like how

5  the investigation was conducted.

6        But if people were Garrity'd -- I even took

7  four to five minutes explaining that I would have people

8  interviewed, and it sounds like this is the very same

9  thing that happened anyway.

10 Q. No. No.

11 A. Just the outcome is different.

12 Q. Exhibit 13, that I have is the investigation.

13       EXHIBIT 13

14       Investigation money counter

15       WAS MARKED FOR IDENTIFICATION

16       THE WITNESS: Okay.

17 BY MR. DETTMER:

18 Q. And it was about the counter, the money counter

19 discrepancy. That is what it was about. $15,370.00.

20 Exhibit 13 of the exhibits that we have. And that's it.

21 It's not about the tally sheet.

22 A. So I'm curious -- I'm curious, as I'm looking at this

23 memo, you got --

24 Q. You're looking at it. It's Exhibit 13, for the record.

25 A. Yes. Exhibit 13, Commander Brian Stair, who was the

1  commanding officer of IA at the time, Sergeant Dietrich

2  Lever, who is now a lieutenant still working for DPD,

3  don't you think either one or at least Lever who's still

4  a department member -- in fact, Lever, a lieutenant, is

5  a key member of our Operation Clean Sweep. I'm sure he

6  can give you and articulate the investigation involved

7  here. I can't.

8  Q. With all due respect, the only point I'm making was

9  there was evidence that there was $2,370,000 in those

10 bags.

11 A. Understood.

12 Q. And it's not mentioned at all anyplace. Anyplace. And

13 this is about 15 grand, I mean, come on. And had it

14 occurred, there's a good chance that Hansberry's crew

15 would have been operating that raided our clients'

16 homes.

17 A. But I'm looking --

18 Q. That's the point I'm trying to make with you.

19 A. I know. But as I'm looking at this memo, I know we're

20 putting a lot of time into this memo that I have no

21 idea. But it does reflect -- the counter reflected

22 2,084,820 and a difference of what you call 15 grand,

23 15,370. I would have to go through the whole thing, but

24 I think if this is a concern, why not have Dietrich

25 Lever deposed? Why not?



1  Q. I missed what you're saying.

2  A. Why not have Lieutenant Lever deposed to find out what

3  he would tell you about this? He's the investigator.

4  Q. My point is, it was there, it was -- and the evidence

5  was there. The tally sheet. There's no mention of it

6  anyplace. I mean --

7  A. Okay.

8  Q. -- if the head of Internal Affairs was aware of it, it

9  surely isn't reflected in any way --

10 A. Okay.

11 Q. -- in any document that I am aware of, of an Internal

12 Affairs investigation related to that.

13       Let's go on.

14       MR. SUROWIEC: I'm just going to pose an

15 objection. This is a 17-page document. Mr. Dezsi is

16 literally on page 1, has not moved off of page 1. The

17 witness is being cross-examined with zero (inaudible) to

18 this. It's not proper.

19       (Multiple speakers

20       speaking at the same time.)

21       MR. DETTMER: Are you suggesting someplace in

22 this document there's a tally sheet showing the

23 $2,370,000, in any way it's a part of this

24 investigation?

25       MR. SUROWIEC: I'm suggesting that you -- you

1  initially started your question off by actually
2  testifying that there was no IA investigation. That's
3  what you said. Leaving the chief to believe that --
4      MR. DETTMER: There was no investigation about
5  the amount of money --
6      MR. SUROWIEC: You need to join the police
7  force because --
8      (Multiple speakers
9       speaking at the same time)
10     MR. DETTMER: -- the $2,370,000. Are you
11 suggesting there was an investigation of the $2,370,000
12 tally sheet, Jim? Come on.
13     MR. SUROWIEC: Dennis, you need to be a police
14 officer because you don't like the way they do their
15 job. But as the chief said, Lieutenant Lever's the guy
16 who knows. You know, you're looking at half the
17 information.
18     MR. DETTMER: Let's move on.
19     Exhibit 12.
20     EXHIBIT 12
21     Detroit News Article
22     11/03/2014
23     WAS MARKED FOR IDENTIFICATION
24 BY MR. DETTMER:
25 Q.  Exhibit 12 is a November 3, 2014, Detroit News article.

1  And it's about four Detroit police officers suspended
2  following a probe.
3      You are quoted in here a number of times. But
4  this really involves two different crews of the four
5  cops. There are two and two. It's not all four of them
6  related to one incident. But you go on. I'm looking at
7  Paragraph 1, 2, 3 -- it's the third paragraph. It's out
8  on the -- the first one out on the margin. Detroit
9  Police Chief Craig disbanded the drug unit.
10     Do you see that?
11     Again, they use systemic problems with
12 something you had previously said.
13     And what I am looking at is this relates to
14 Hansberry and others in his crew, correct?
15 A.  Yes. I think I've already testified that even though
16 there were those who were part of the crew weren't
17 charged, I believe they still had limited knowledge that
18 they were involved in criminal and/or administrative
19 misconduct.
20 Q.  You're quoted a number of times here, but I think that
21 the points that -- I need to go on. I want to get done
22 with some of this stuff. Let's skip 12A.
23     12B, this is recording (sic) the suicide of
24 James Napier, an article in the Detroit News,
25 January 22, 2015. And the second paragraph.

1  I'm sorry. Let me go back to the first
2  paragraph. I'll read it. Detroit police officer,
3  according to two police sources, was being investigated
4  by the FBI and Detroit Internal Affairs narcotics
5  corruption died of a self-inflicted gunshot wound on
6  Thursday morning, January 22, 2015. It doesn't say that
7  that's the morning.
8      And the second paragraph -- I'll skip over the
9  first couple of lines. But it again says two sources --
10 last two lines. Two sources familiar with the
11 investigation into corruption of the former narcotics
12 section, that he was one of the officers being
13 investigated.
14     Do you know who was being investigated at that
15 time?
16     MR. SUROWIEC: Objection; hearsay to what you
17 just read, form, foundation.
18     Chief, go ahead and answer, if you know.
19     THE WITNESS: Well, I think you've named all
20 of them I think early on in my testimony. I feel like I
21 keep going over the same role. I talked about --
22 BY MR. DETTMER:
23 Q.  The people I previously mentioned you're talking about?
24 A.  Earlier on in this deposition, I referenced three people
25 that were charged -- no, two people charged -- I mean,

1  two people indicted, one charged, and one committed
2  suicide, and this would be that person. That's it.
3  That's what I know.
4  Q.  Just for the record, I have as Exhibit 12C, this is the
5  indictment of Hansberry, Watson.
6      EXHIBIT 12C
7      Indictment, Hansberry/Watson
8      WAS MARKED FOR IDENTIFICATION
9  BY MR. DETTMER:
10 Q.  Also, Leavells was indicted but not part of --
11 A.  He was charged. He was charged.
12 Q.  Well, he pled.
13 A.  Okay. Okay. That's fine.
14 Q.  He really testified about the criminality, and it was a
15 plea deal.
16 A.  Right.
17 Q.  But the point I was just making with you, and I
18 mentioned this before, the indictment was on April 8th,
19 2015. That was the significance of that exhibit.
20     And I -- based on your testimony, I assume you
21 didn't really have much knowledge about the actual
22 trial, correct?
23 A.  I did not.
24 Q.  There's an article in this Exhibit 12D, the Free Press
25 on June 30th, 2016.



1       EXHIBIT 12D

2       Free Press Article

3       6/30/16

4       WAS MARKED FOR IDENTIFICATION

5   BY MR. DETTMER:

6   Q.  The trial's ongoing and the papers are reporting what's

7       occurring.

8           MR. DETTMER:  And point to the bottom,

9       Michael.

10  BY MR. DETTMER:

11  Q.  During the trial, which is in its fourth week,

12      prosecutors had portrayed Hansberry as a fast-talking

13      schemer and a big spender who was motivated by greed.

14          Thursday they cited his bank and tax records

15      that bolster that claim, showing jurors how Hansberry

16      spent his money while working for the Detroit Police

17      Department.  I have writing over it; I'm sorry.

18          It goes on and explains about how much money

19      he had and what he was doing.  He had an Aston Martin, a

20      Cadillac, a Cadillac ATS, Corvette, and a Mazda6.

21          And I've raised this about supervision.  He

22      was at the Dexter base of the Narcotics Unit, and when I

23      was taking testimony of his crew members, I asked about

24      the cars.  Yes, he brought those cars to the base.  You

25      know, and the point that's being made in this article,

1       on the next page --

2   A.  Is there a question?

3   Q.  -- the FBI made the point that his earnings were covered

4       by cash -- I'm sorry; his earnings and purchases and

5       spendings, the difference, a shortage, earnings of his

6       salary as a Detroit police officer, was made up by cash

7       deposits and substantial, you know, cash deposits.

8           And the question is, the supervisors at the

9       base, the narcotics base on Dexter, never raised with

10      you, sir, or do you have any knowledge that Hansberry

11      seems to be living pretty high considering his earnings?

12          Anybody ever raise that with you?

13  A.  They did not.

14          MR. SUROWIEC:  Objection; form, foundation.

15      Time frame.

16          This is talking about 2010, Dennis.

17          MR. DETTMER:  I have a number of the

18      transcripts from the trial of Hansberry, two of them

19      were Leavells testimony, and that's Exhibits 12E and F.

20          EXHIBIT 12E

21          Leavells Testimony

22          WAS MARKED FOR IDENTIFICATION

23          EXHIBIT 12F

24          Leavells Testimony

25          WAS MARKED FOR IDENTIFICATION

1           MR. DETTMER:  And 12G is Gary Jackson's

2       testimony.

3           EXHIBIT 12G

4           Jackson Testimony

5           WAS MARKED FOR IDENTIFICATION

6   BY MR. DETTMER:

7   Q.  Gary Jackson clearly indicates there was $3 million.

8       I'm sure his testimony was thoroughly vetted by the FBI,

9       and he ran a risk of being -- to have no deal based on

10      perjury.

11          I would also indicate to you that Godbee

12      testified at the trial for the defense.  He came on and

13      he claimed a meeting that's in dispute that Gary Jackson

14      never mentioned that there was $3 million being shipped

15      on July 26th, 2010, and -- well, that matter is in

16      dispute.

17          But the point is he, Gary Jackson, testified

18      that there was 3 million and he told Chief Godbee that

19      and he just testified that Godbee said, I knew it.

20      Suggesting that he knew there was some crime going on.

21          Have you talked to anybody about that aspect

22      of Gary Jackson's testimony?

23          Were you aware of it?

24          MR. SUROWIEC:  Objection; form, foundation,

25      hearsay, completely improper question.

1           But, Chief, go ahead, answer it, if you can.

2       Have you talked to anyone?

3           THE WITNESS:  I have heard some loose

4       conversation about it.  I'll reiterate for purposes of

5       the record.  I was not here when that meeting took

6       place.  I've had conversations with Chris Graveline as

7       part of our probe, and this is something that was talked

8       about.  I'm just not understanding what I can add to

9       that meeting.

10  BY MR. DETTMER:

11  Q.  Okay.  When you meet with somebody that brings you

12      serious information about wrongdoing, do you generate

13      any paper?  Do you do a memo?  On such and such a date,

14      I spoke with so and so, and he said A, B, C?

15  A.  I do not.  I called Chris Graveline, and if it's a

16      serious matter, I'll call in the commander, and I say, I

17      need you to open an investigation into X, Y, and Z.

18  Q.  It appears to be your testimony that Graveline, Director

19      Graveline, is familiar with the testimony at the trial,

20      correct?

21  A.  I don't know if he was familiar.  It was a discussion we

22      had as part of this probe, and certainly he talked about

23      a -- some testimony provided by former Chief Godbee

24      relative to that and the exact specific statements you

25      made about I thought so.



1    Like you, when I heard that, I had -- I asked
2  Graveline the same question.  I said, if he thought
3  that, did he do anything about it?  That's what I asked
4  Graveline.  I said, do we know in our investigation if
5  he did anything about it?  Because if you think
6  somebody's involved in criminal behavior, what, if
7  anything, did you do as the chief executive?
8    And so at this point, I don't have an answer
9  for you because we haven't gotten -- I was concerned
10 enough that I said, well, maybe as part of our
11 investigative work, I know that he testified in the
12 civil matter.  Maybe we need to call him in as part of
13 our probe to find out, what, if anything, was done.
14    That was the conversation that Chris Graveline
15 and I had.
16 Q.  Thank you.  We've already discussed the Exhibit 13,
17    which is the interoffice memo about the money counter
18    here.
19    EXHIBIT 13
20    Money Counter Memo
21    WAS MARKED FOR IDENTIFICATION
22 BY MR. DETTMER:
23 Q.  12I is out of order.  (Inaudible) 12I is a
24    Warrendale/Detroit -- and I only raise this, and I'm
25    sure you haven't seen this.  But that there was public

1    knowledge, as of July 26th, 2010, that there was
2    suggested $2.3 million that was, in fact, seized, a
3    little less than the tally sheet of 2.370.
4    But this is the only specific time I've seen a
5    document that says -- that suggests the amount was more
6    than $2,080,000 -- 85,000.  But the point I'm making
7    with you, Chief, this issue was in the public media, and
8    I don't know where the source of this is, but it's out
9    there and it's probably the most accurate thing about
10   the tally sheet that I saw.
11   Going on, 12J is the conviction of Hansberry,
12   and it's dated February 22nd, 2017.  That's when he was
13   convicted by the jury.
14   EXHIBIT 12J
15   Hansberry Conviction
16   WAS MARKED FOR IDENTIFICATION
17   EXHIBIT 14
18   Use of Paid Informants
19   WAS MARKED FOR IDENTIFICATION
20 BY MR. DETTMER:
21 Q.  Exhibit 14 is reigning in the use of paid informants.
22    We talked about that a little bit.  I'd like to just
23    point out maybe one or two things.
24    You had a very serious concern about
25    informants, the reliability and the use of them.  And

1    this is your discussion about that with the media.
2    Okay?  Exhibit 14.
3    Then I'd like to go on.  There's a stipulated
4    Protective Order that we marked as Exhibit 14A.
5    EXHIBIT 14A
6    Protective Order
7    WAS MARKED FOR IDENTIFICATION
8    EXHIBIT 14B
9    Confidentiality of SOI
10   WAS MARKED FOR IDENTIFICATION
11   EXHIBIT 14C
12   Confidentiality of SOI
13   WAS MARKED FOR IDENTIFICATION
14 BY MR. DETTMER:
15 Q.  That relates to the confidentiality of the SOI documents
16    that I have that were produced to us, and it's
17    Exhibit 14B and C.  So subject to Protective Order, and
18    this actually was in the Reid versus City of Detroit.
19    But we all recognize that this is confidentiality.
20    One of them is an individual named Ken
21    Jackson, and he's SOI 2499, and the other one is Gary
22    Jackson, SOI 2449.
23    Gary Jackson is the one that had provided the
24    information about the transfer -- the money on July 27,
25    2010.  And if we can go to that.

1    Unfortunately these aren't Bates marked.  But
2    I'd like to indicate the stop was on July 26, 2010.
3    Arthur Leavells signs up Gary Jackson as SOI 2449 on
4    July 27, 2010, the day after the raid.
5    Is that proper procedure?  He's already used
6    him as the Source of Information.  Signs him up the next
7    day after the stop of 2 million plus is --
8 A.  I can't speak to what -- gee, I don't know.  I don't
9    know what...
10   MR. DETTMER:  Well, look at the next page,
11   Michael, I think it is, looking at the record of payment
12   to informant.
13 BY MR. DETTMER:
14 Q.  Now, the -- apparently, Leavells worked very hard at
15    getting Jackson a reward for the stop on the 26th, and
16    on August 14, 2010, a little more than two weeks after
17    the stop, Leavells, it appears with some advisory DPD
18    people and $250,000 in cash, and he signs --
19    MR. DETTMER:  Michael, can you move it a
20    little bit to the left?
21 BY MR. DETTMER:
22 Q.  Well, you can see the $250,000, and he got -- he, Gary
23    Jackson, received $250,000 from the Detroit Police
24    Department as a result of that stop on July.
25    Were you aware of that?


HANSON RENAISSANCE  hansonreporting.com
Court Reporting & Video  313.567.8100

1  A.  It's signed 8/14.  I mean, I've seen documents -- that
2      document, I believe I saw doing predep, but I wasn't
3      aware of it in 2010, no.
4  Q.  Were you aware of it prior to the last couple of weeks
5      of deposition, unrelated to dep preparation?
6  A.  I mean, I may have been.  I don't recall specifically.
7      If you have a direct question and I was signed off on
8      anything, I can verify that.  But I don't --
9  Q.  You don't have any information, that's what I'm asking
10     you, prior to that?
11 A.  I don't have any knowledge of -- of that.
12 Q.  Is this consistent with Detroit Police Department
13     policy, once you came on board in 2013?  The day after
14     the stop, the acquisition of the money, the SOI had
15     signed off --
16 A.  I can't tell what was happening seven years ago.  In
17     fact, to be candid, Narcotics was not on my radar until
18     the FBI advised me as to what they were planning on
19     doing.
20         We had a 12-year Consent Judgment, and the key
21     issues concerning the department accountability were
22     outlined in the Consent Judgment, but narcotics was not
23     one of them.
24 Q.  You notice on -- well, you can't see it.
25         MR. DETTMER:  But, Michael, can you run it up



1      or down?
2  BY MR. DETTMER:
3  Q.  This is Informant's Code 2499, which is not Gary Jackson
4      SOI number, he's 2449.  And Leavells has used these
5      numbers kind of interchangeable in cases we have.  And
6      you will see that -- there's another payment, and this
7      one is again to 2499 of $5,000 to -- Leavells to,
8      apparently, for Jackson, Gary Jackson, and it's listed
9      as a bonus payment.
10         Are you aware of the DPD paying bonus
11     payments?
12 A.  I don't have specific -- I reviewed that document within
13     a couple of months after I got here.  I was briefed.  I
14     don't have any independent recall.  I did make my
15     signature at some point, so it's mine.  I know that.  I
16     just don't have any independent recall.
17         And I don't know who was working, which AC
18     briefed me.  I don't recall, really, having to approve
19     informant payments.  I know we have done them, but,
20     again, a lot of what I've discussed today has to do with
21     this unilateral flipping and, as you indicated, the
22     transposing informant numbers.
23         I'm learning some of this as we go through the
24     probe.  And given the name of the officer who is listed
25     here, who's been implicated for criminal misconduct,



1      certainly that causes me concern.  But I don't have
2      any -- I think I signed off on that in September of
3      2013, two months after I was here.  I just don't recall
4      it.
5         EXHIBIT 15
6         Internal Affairs Investigation
7         WAS MARKED FOR IDENTIFICATION
8  BY MR. DETTMER:
9  Q.  Next, Exhibit 15.  This is an Internal Affairs
10     investigation following a raid by a spinoff of
11     Hansberry's crew.  You can see who it included.
12     Geelhood, Barnett, Riley, Matelic, Leavells, and
13     Tourville.
14 A.  Right.
15 Q.  These officers, including Sergeant Geelhood who was a
16     supervisor of his crew, were suspended for a year.
17         Are you aware of that?
18 A.  Suspended for a year?
19 Q.  Yes.  Suspended with pay for a year.
20 A.  I don't independently recall that.  It wouldn't surprise
21     me.  A lot of times we -- the police commission, and
22     this would have been pre them getting their authority
23     back, so I don't recall them being suspended for a year
24     with pay.
25 Q.  They always make it very clear to me when you ask them

1      about it, well, we were suspended but with pay.
2  A.  Well, that's a fact.  I mean, that's kind of been the
3      process.  I don't understand it.  But in order to take
4      pay away, pre the adjudication of this matter, it would
5      have to go before the police commission.
6         So that was a standing practice.  I have since
7      changed that on case-by-case.  So this happened -- like
8      I have two former narcotic officers off right now
9      suspended with pay.
10         And ordinarily if they were pending criminal
11     charges, I would give it to the police commission, but
12     I've opted to move forward with the disciplinary
13     hearing, and it is my anticipation that that's a
14     termination case.
15 Q.  Exhibit 16 -- I want to go on.  We're almost done.
16         EXHIBIT 16
17         Matelic File
18         WAS MARKED FOR IDENTIFICATION
19 BY MR. DETTMER:
20 Q.  16 is the file on Matelic that we previously talked
21     about just so you know.
22 A.  Okay.
23         EXHIBIT 17
24         Geelhood Case
25         WAS MARKED FOR IDENTIFICATION

1  BY MR. DETTMER:

2  Q.   17 deals with a case involving Steven Geelhood, and this

3       is the matter that the director has raised to Geelhood

4       and an issue about a guy named by Michael Hathaway in

5       the criminal division of the Third Circuit, and then a

6       civil lawsuit following that that was initially assigned

7       to -- was assigned to --

8  A.   I think that's the case that we are investigating

9       Sergeant Geelhood on now.  I think -- I'm almost certain

10      that's the case.

11 Q.   But this, again, goes back to an April 25, 2014, raid

12      where Geelhood is the affiant, okay?  That's being

13      investigated.

14           And then finally 18 and 19.

15           EXHIBIT 18

16           Darell Chancellor Case

17           WAS MARKED FOR IDENTIFICATION

18           EXHIBIT 19

19           Darell Chancellor Case

20           WAS MARKED FOR IDENTIFICATION.

21 BY MR. DETTMER:

22 Q.   Exhibits 18 and 19 involve a Darell Chancellor.  I don't

23      know if you know about him.  But the records provided

24      that and he actually initiated an investigation related

25      to this lawsuit.

1            And this involves a search warrant that goes

2       back -- well, Chancellor was convicted and sent to

3       prison, and he was still in prison until the Conviction

4       Integrity Unit release suggested to the Prosecutor

5       Worthy that he be released, and he was and the case was

6       dismissed.

7  A.   And this is the case about Geelhood, yes?

8  Q.   Yes, this is another case.

9  A.   Yes, there's got to be a case -- I don't know -- you're

10      telling me that Chris Graveline provided.  I know that

11      we opened a case against Geelhood based on an integrity.

12      I think I mentioned that earlier in my --

13 Q.   Yes.  Yes.  Okay.  That's this case.  Okay.

14 A.   Right.

15           MR. DETTMER:  Let's take a moment.

16           (Off the record at 12:15 p.m.)

17 BY MR. DETTMER:

18 Q.   Chief Craig, you would acknowledge that you're

19      attempting to change the culture of the Detroit Police

20      Department to the extent that there are some groups, for

21      example, the Hansberry and Geelhood crews that were

22      doing apparently dishonest acts, correct?

23 A.   I made a full comment.  I think I spelled it out

24      early on in my deposition that we missed some things

25      with the Hansberry case.  It wasn't a seamless



1       transition from criminal to administrative relative to

2       the other members of the Hansberry crew.

3            We know that now looking back, so I think key

4       for where we are today is that we have information on

5       practices, illegal practices occurring in -- alleged

6       illegal practices occurring in Narcotics that we are

7       aggressively tackling.

8            The reason for the seizure of all of the

9       records, the person that provided information, the one I

10      told you I couldn't talk about that was a federal -- it

11      came from the federal side of the house, gave us

12      information.  From that person, it kind of spelled it

13      out to specific alleged criminal actions.

14           So given that and the timing of Mosley, I felt

15      very strongly that what we didn't know at the conclusion

16      of Hansberry we know now.  So now we have a template

17      where we can totally eradicate any type of corruption

18      involving Narcotics.  There was so much we didn't have,

19      that we now do have.

20 Q.   Well, Chief, you indicated --

21 A.   And so my goal is just -- I'm sorry.

22 Q.   What position was --

23           COURT REPORTER:  I missed that question.  Can

24      you repeat the question?

25           THE WITNESS:  You were broken up.

1  BY MR. DETTMER:

2  Q.   What level of rank does Ted (sic) Ewald have?

3  A.   He's an investigator.  One of the original investigator

4       ranks.  As I've testified to, Tim Ewald -- Tim Ewald has

5       been a long-time assigned investigator with the FBI's

6       public corruption unit.  He is a DPD officer but

7       assigned to the FBI.

8  Q.   Well --

9  A.   And he was --

10 Q.   Well, does he have a liaison relationship with the

11      Detroit Police Department where he reports to someone

12      about the investigations, ongoing investigations by the

13      FBI?

14 A.   He does now.  He does now.  One of the problems that

15      I've discovered early on that it was technically a

16      liaison, but because he was -- I mean, this -- for

17      example, he is a DPD officer working with the FBI on the

18      Hansberry case, but, again, I didn't find out about the

19      Hansberry case until sometime in 2014.

20           So it is not like that the DPD liaison came

21      over and said, okay, here's a list of cases that the FBI

22      was investigating.  It was a confidential investigation.

23      And many times the FBI will initiate and have ongoing

24      confidential investigations and will not tell the

25      department.

1  Q.  Yes, but after --

2  A.  Now, the DPD officer --

3       MR. DETTMER:  We are losing you.

4       MR. SUROWIEC:  Chief, hold on one second.

5  This is Jim Surowiec.

6       Whoever the IT person is, if they are on the

7  line or if anybody who can help, Chief is frozen.  Chief

8  Craig, I'm not seeing you move at all.  And, Dennis,

9  you're clipping in and out.

10      THE WITNESS:  You can't see this?

11      MR. SUROWIEC:  I'm wondering if there's

12 something we can do.

13      MR. DETTMER:  It says bandwidth is low.  It

14 says your bandwidth is low, Chief.  That's what I'm

15 getting a report of.

16      THE WITNESS:  Yes, I am in the office.  I'm in

17 my office, so this should be a good bandwidth, you know.

18      MR. DETTMER:  Yes, I would think so.

19      MR. SUROWIEC:  Should we reconnect?  Is there

20 an IT person?  Michael?

21      THE REPORTER:  The chief could go out and come

22 back in.

23      (Pause in proceedings

24      12:21 - 12:32 p.m.)

25      THE WITNESS:  In the interest of addressing

1  the transition between Han- -- can you hear me okay?

2       The transition of the Hansberry with the

3  Detroit staff that was embedded in the FBI was certainly

4  not something I was quite impressed with.  In fact, I

5  can candidly say that I went through a number of

6  commanding officers over at Internal Affairs prior to

7  getting to the one before Chris Graveline.  There was

8  someone named commander, who is now a Deputy Chief.

9       But the communication, seamless, didn't work

10 out in a manner that it should have, and at point I

11 even moved Tim Ewald out of the FBI task force.  He has

12 since been restored to that position.  The communication

13 has changed dramatically.

14      My perception was that the DPD liaison role

15 was to work closely with the department executive team.

16 I recognize that there were some cases that the FBI were

17 investigating that they didn't necessarily want to brief

18 the department on.

19      However, because of the intimacy our DPD staff

20 had with the Hansberry case, I assumed or thought that

21 anything that wasn't addressed by the Feds could have

22 been easily been addressed by the department.  That did

23 not happen.

24      So as a result of that, it wasn't until -- and

25 I think I have said this several times throughout this

1  deposition -- it wasn't until that information we got

2  from the source of the type of alleged conduct that was

3  going on in Narcotics that we were able to effectively

4  launch our own probe, which we've been.

5       It's a DPD-led tasks force and, again, the FBI

6  is part of that task force.  There's a total of five

7  agents, three part-time, two permanent, and so now I

8  have a high level of confidence that the work that we're

9  doing now is the work that will finally make a

10 difference.

11      And finally eradicating, not describing

12 different points, a pattern of misconduct, and, again,

13 not by all, but just things that were allowed to happen

14 in Narcotics that weren't challenged.

15 BY MR. DETTMER:

16 Q.  You would agree the conviction of Hansberry and Watson

17 in February of 2017 should have opened up a lot of

18 information through Ewald to the Internal Affairs

19 people, correct?

20 A.  Absolutely.  He was technically assigned to Internal

21 Affairs, but it wasn't -- and, again, I liked --

22 personally liked him, Ewald.  I just think I

23 overestimated his capabilities, meaning that while he

24 had been attached to the FBI for a long time, clearly

25 working as an investigator in Internal Affairs is very

1  different than being a task force officer in the FBI.

2       You're not actually writing up investigations

3  and doing the kind of investigative work that IA is

4  doing.  The agents that worked there are on a much

5  different level.

6       I mean, for example, a lot of what the DPD

7  task force officers, Ewald would do, is they would

8  listen to wire conversations and make notes that would

9  then go off to the agents who were the ones who were

10 presenting the cases to the U.S. Attorney.

11      And so that was a piece of the transition that

12 didn't make a lot of sense.  And very frustrating, to be

13 honest, because I knew then -- I felt we had a missed

14 opportunity on some of the others that worked Narcotics,

15 that while they didn't meet the threshold for federal

16 prosecution, they certainly could have met the threshold

17 of administrative prosecution, if you will.

18      And so -- that was then.  But, again, the good

19 news was we were able to get very clear information on

20 the type of behaviors that were going on in Narcotics by

21 some.

22 Q.  Well, Chief, you would agree you're trying to change the

23     culture.  That's what you are talking about, correct?

24 A.  That has been something I've been trying to do for --

25     and have been successful.  I mean, we are in a 13-year



1    Consent Judgment.

2              The department was not compliant because there

3    was a culture of a lack of accountability by management.

4    That's a fact.  I've said it publicly then and I'll say

5    it publicly now.

6              So once we got out from under Consent Judgment

7    and we start to build a new management, an executive

8    team, that's when change started to take place.

9    Q.   We talked about -- I mentioned that Hansberry and

10   Watson, the conviction was in February of 2017.  And

11   between that period and August of 2019, 2 1/2 years, is

12   reflective of kind of a historical lack of supervision

13   that's gone on, at least going back to 2010, correct?

14   A.   I would say even before that.  I think the culture was

15   such that -- and this is my opinion.  It's not based on

16   fact.  It's -- my opinion is that when there were

17   investigations like the FBI would come in, do their

18   investigation, whoever got convicted got convicted, and

19   it was done.  It was over.

20             Mosley was different.  Mosley popped up.  He

21   got charged with the one incident.  I believe had

22   business or status quo had -- we had allowed it to be

23   that way, he would have been charged and business would

24   have continued.

25             But instead, I'm going to say it now for the



1    fifth time, a couple of things worked out in our favor.

2    One, we had some information.  Two, I had a hunch, if

3    you will, and the hunch was Mosley; this was not the

4    first time he engaged in this kind of criminal behavior.

5    There was no way for me to believe that.

6              So it was based on those two primary factors

7    that we launched the probe.  The fact that I had now a

8    former US Attorney who understood the workings on the

9    other side certainly was a recipe for success.

10             So -- and while this is a lengthy undertaking,

11   we're in the process, as of now, adding additional

12   staff, task force operation, because we are going back,

13   and, as I think I indicated early in my deposition,

14   we're really only back to 2017.

15             Again, I recognize that counsel believes that

16   we should have started in reverse.  It didn't work out

17   that way.  I'm still comfortable that we started where

18   we started and we're doing what we're doing now.

19   Q.   I'd like to raise two points.  We talked about the

20   July 2010 stop and 2 million whatever, officers, and

21   we've talked about Hansberry and Watson being convicted

22   in February '17.

23             Those two events on the Detroit Police

24   Department had constructive notice that there was a

25   problem with the police department, correct?  And they



1    investigated --

2                   (Mulitple speakers

3                   speaking at the same time.)

4    A.   I don't know if I -- I don't -- I can't agree with --

5    Q.   -- that they had Ewald?

6    A.   I am not going to agree with you.  So -- I'm not going

7    to agree with you, and I'm going to tell you on this

8    reason.

9              Number one, I wasn't here in 2010.  I don't

10   know about this tally sheet investigation.

11             You, on the record, said there was no

12   investigation.  The City's attorney said there was an

13   investigation.  And then you show that there was an

14   investigative report.  So I'm troubled by that.

15             So when you make a statement that the

16   department basically ignored -- let me just say this to

17   you.  I have never ignored anything in my tenure in this

18   police department.  I respond to what I am aware of, and

19   sometimes, as we are going down this journey of change,

20   there were things I wasn't made aware of.  So I can take

21   responsibility for that.

22             But if I had known what I know now, would I

23   have done things differently maybe at the conclusion of

24   Hansberry?  Absolutely.  I didn't know.  I didn't know.

25   I would have launched the task force then.

1    BY MR. DETTMER:

2    Q.   Chief, let me make the point about the tally sheet.  The

3    point really I was making with you, was, there was never

4    an investigation of the tally sheet.

5              The investigation was solely related to the

6    money counters and the inefficiency there.  And the real

7    issue was the tally sheet.  Why wasn't that

8    investigated?  We're talking about $280,000, not $15,000

9    because of a defective machine.

10                  (Multiple speakers

11                  speaking at the same time)?

12             THE WITNESS:  How about in my -- how about in

13   my expert opinion?  I don't think it's just about the

14   tally machine.  If you've got a concern, I think the

15   concern is more about there was an inadequate

16   investigation.

17             There was an investigation.  There wouldn't be

18   two separate investigations of the same issue.  That's

19   not even logical.  I've been doing this too long.  I'm

20   suggesting that you could have confronted me with --

21   said, well, do you think that, based on the fact that

22   the tally sheet was not mentioned in the counter

23   investigation, that the investigation was inadequate?

24   And I probably would have said to you, I'd agree.  If

25   the tally sheet was an issue, I would have wanted to

1    look at that if it wasn't mentioned.  But I haven't even

2    read that investigation to even know if the tally sheet

3    was mentioned.

4  BY MR. DETTMER:

5  Q.    I appreciate that.  But, Chief, I wasn't trying to

6    mislead you.  I actually had that, Internal Affairs

7    document as an exhibit.  If you can look at it and get

8    all of the exhibits from Mr. Surowiec, but I was not

9    trying to mislead you.

10             The whole point is the issue of the tally

11    sheet was some indication of a serious problem, and as

12    events played out in the federal trial, it was the

13    essence of the criminality going back to 2010.

14  A.    And I can't argue with you.  I'm just saying that given

15    the way you described the investigation, because

16    initially you said there was no investigation.  And I

17    know what you were saying now.

18  Q.    No investigation of the tally sheet.

19  A.    Of the tally.  But why wouldn't the tally sheet and the

20    money counter have been all in one, because it's part of

21    the same issue.  It's the same issue.

22  Q.    And I agree with you.  Why wasn't that picked up when

23    Internal Affairs looked at a $15,000 discrepancy.  Why

24    didn't they pick that up?

25  A.    I don't know the answer to that.



1             MR. SUROWIEC:  And I'm going to just object.

2    I object to --

3             (Multiple speakers

4                  speaking at the same time)

5  BY MR. DETTMER:

6  Q.    And they should have had notice of that.  Or if they did

7    have notice, they just ignored it.

8             MR. SUROWIEC:  Dennis, can I just raise a

9    point here?  I'd like to be able to ask him about five

10    minutes of cleanup questions.  I would like -- we're at

11    the 2:27 mark, and you're going over old stuff.

12             MR. DETTMER:  Go ahead.

13             Chief, nice talking to you.  Enjoy the rest of

14    your day.

15             THE WITNESS:  Say what now?

16             MR. SUROWIEC:  Chief, this is Jim Surowiec.  I

17    have about five minutes or less of cleanup questions I

18    just want to ask you.  Okay?

19  EXAMINATION BY MR. SUROWIEC:

20  Q.    You indicated you started here in 2013.  When you

21    started, you came from Cincinnati; is that correct?

22  A.    That's correct.

23  Q.    Okay.  When you found out about Hansberry, Watson, and

24    Leavells, you were informed by the FBI in 2014 that they

25    had been indicted and they were going to be charged?

1  A.    I would guess it was in 2014 only because soon after the

2    FBI brought me in to advise me, Hansberry and crew were

3    indicted not long after that.  So they had started --

4    they had an investigation that they started in 2010 that

5    was ongoing through 2013 up until the culmination time

6    of 2014.

7  Q.    Okay.  Were you ever informed at any point in time prior

8    to finding out in 2014 that the FBI was looking at

9    Hansberry and Watson and Leavells?

10  A.    I did not, no.  In fact --

11  Q.    Okay.

12  A.    What I wanted to say is in support of that.  So

13    Hansberry was a lieutenant working at the 12th Precinct,

14    and we were getting ready to make captains.  And so

15    right at the time that he came up as a potential

16    candidate, I learned about the investigation, so, of

17    course, it was confidential.

18             I said nothing, but that was in 2014.  Up

19    until that point, he was -- at least the team around

20    me, regarded him very favorably as a top candidate in

21    Detroit Police Department.

22  Q.    So there was nothing that anybody had notice of up until

23    the point the FBI said, knock knock.  He's getting

24    indicted, Watson is getting indicted, Leavells is going

25    down, that would have --

1  A.    Well, it wasn't that close.  They gave me a little bit.

2    By that time the investigation was rock solid.

3  Q.    Got you.

4  A.    And, again, when they're doing a confidential

5    investigation, they're not necessarily going to alert

6    the department because they don't know who to trust.

7  Q.    They could have been looking into you?

8  A.    I doubt that they were looking into me, but --

9  Q.    But they look at the highest levels.  I'm just saying

10    they look at everybody.

11  A.    I don't --

12  Q.    No?

13  A.    No.  I'm not saying that.  What I'm suggesting to you is

14    they do their investigation and they only bring in the

15    people who they feel they should, and the two task force

16    officers were already embedded.

17             So to my knowledge, they were the only two

18    that knew about those Narcotic officers being

19    investigated.

20  Q.    In terms of 2010 when you weren't there, 2011, 2012,

21    2013, before you arrived, you have an opinion but you

22    don't have any evidence because your director has not

23    looked back that far, that there was a pattern or

24    culture of corruption, correct?  You haven't gotten back

25    that far?

1  A.  I have an opinion -- I have a strong opinion, yes.
2  Q.  Okay.  But it's not evidence based; is that fair?
3  A.  It's not evidence based.
4  Q.  It's based on your police -- you have police instincts
5      and gut and you're looking back and you're looking back
6      hard on and at everything?
7  A.  And I follow my gut sometimes, and I did on Mosley and I
8      was absolutely correct.  So, yes, I have a strong
9      opinion and instinct that's the result of almost
10     44 years of experience.
11 Q.  So when they're talking about -- when they are talking
12     about the newspaper articles where you are being quoted
13     as saying there is a culture of corruption or pattern
14     and practice, you're referencing, and correct me if I'm
15     wrong, you just found out about Hansberry, Watson,
16     Leavells.  There was also a civilian out of the
17     department by the name of Kenyal Brown, who was
18     indicted.
19         And then when you thought everything had been
20     shaken out and everybody had learned their lesson, in
21     2018 or '19, Mosley gets indicted.
22         Those are the individuals that we're talking
23     about in terms of being criminally charged, correct?
24 A.  Mosley gets -- the difference with Mosley, we had
25     additional information that we started to look at.  And



1      looking at that additional information helped me form an
2      opinion that there is a pattern.
3  Q.  Okay.
4  A.  Based on what I learned I'm telling you there's a
5      pattern of criminality that we started to see among
6      some.  Allegations.
7  Q.  Okay.
8  A.  And that we are investigating right now.
9  Q.  And I know that we have -- we have talked in the past
10     and we discussed the concept of Monell, which is a
11     Monell claim, a constitutional claim against the City
12     for having an unconstitutional custom and practice and
13     policy.
14         When you say a pattern and practice, are you
15     saying it in legal terms or are you saying it in your
16     terms as a layman saying I see a pattern?  I'm a police
17     officer --
18 A.  Not legal.  In lay terms as a police -- it's like when I
19     look at crime and I see that there's a cluster of
20     robberies in a certain location.  I call it a pattern.
21         If I see a cluster or similar type of alleged
22     misconduct, I'll call that a pattern, too.  Now, again,
23     we're talking about allegations.
24 Q.  Okay.  How many at high point did you say Narcotics had
25     in it before you cut the staff in half?



1  A.  I think it was already asked and answered.  I think
2      Dennis had an accurate account.  Roughly 40-something,
3      down to maybe 24, almost in half.  We focused on the
4      Major Violators, which was the old conspiracy, if you
5      will, and street enforcement, which is going to be left
6      with the precincts.
7  Q.  So of 40 officers at the high point, we have -- in terms
8      of police officers, Hansberry, Watson, Leavells, and
9      Mosley who were convicted.  No one else, correct?
10 A.  As far as I know.
11 Q.  Okay.  Who has -- at the department, under your watch,
12     who has the final decisionmaking authority as to what
13     policies are enacted?  Like the one that was enacted on
14     Major Violators and establishing the new way?
15 A.  I initiate the policy, and I don't know the date that
16     the police commission came back into their authority,
17     but they have to approve policy enacted by the Detroit
18     Police Department.
19 Q.  Okay.  Does a police officer have the authority to enact
20     policy?
21 A.  They do not.
22 Q.  Does a sergeant have the power to enact a policy?
23 A.  No.  Carry out policy.
24 Q.  Lieutenant, captain, commander, do any of those
25     individuals have the ability or authority to enact

1      policy?
2  A.  No.
3  Q.  Let me take a quick look here.
4  A.  I'm getting close.  Help me out.  Help me out.
5  Q.  The last question I'll ask you is, so when you're making
6      these statements, because Mr. Dezsi showed you a lot of
7      news articles about widespread corruption, that is in
8      direct response to Hansberry, Leavells, Watson, and
9      Mosley; is that fair?
10 A.  Mosley, but in the interest of fairness, because of the
11     probe -- the probe was just not for Mosley.  We didn't
12     launch this probe just for Mosley.
13 Q.  Right.
14 A.  Okay?
15 Q.  But I'm saying it wasn't in connection to 2010, '11,
16     '12, '13, '14 --
17 A.  No, I didn't have any information then.
18 Q.  Fair enough.
19 A.  I might have had suspicions, but the 2010 matter that
20     was culminating in 2014, I did not have the information
21     that I now have.
22 Q.  All right.
23 A.  So if I'm saying there's a pattern, a widespread, given
24     what I now know, the allegations, and I've got to put
25     emphasis on alleged, because there's been no additional

1  people charged.  There has been one that has been
2  retired or resigned in lieu of termination, which was
3  part of the alleged misconduct.  She just didn't get
4  terminated.  She resigned in lieu of.
5  Q.  Here is my windup.  The cases that we are now dealing
6  with, because one has been dismissed, one of the five
7  cases has been dismissed.  So we've got this case, which
8  is Metris-Shamoon versus City of Detroit and all of the
9  individuals.  Frontczak versus City of Detroit.  Reid
10  versus City of Detroit, and Gardella -- I'm sorry,
11  that's --
12  A.  You know, you're naming all of these cases.  I don't
13  have them in front of me to know which, so...
14  Q.  That was my question.  There was one more there.
15  Lockard versus City of Detroit.
16  Do you know anything about those cases?
17  A.  Not definitively, no.  I mean --
18  Q.  Okay.
19  A.  If you named officers involved in the cases, the names
20  may --
21  Q.  But in terms of the allegations that are involved in
22  those cases -- I mean, they're asking you questions
23  about a Monell claim and about policy in the City.
24  We're really here to talk about these cases.
25  Do you have any intimate knowledge of the



1  lawsuits?
2  A.  Some of the lawsuits we have opened up and initiated
3  misconduct investigations, as I indicated during our
4  predeposition, as I've indicated here.  Matelic came out
5  of a civil lawsuit.  Geelhood came out of Wayne County
6  Prosecutor's Integrity Unit, if my memory serves me
7  correct.  So I know for a fact, those two -- one for
8  sure came out of a lawsuit.
9  Q.  Okay.
10  A.  That's very different today.  That if people are filing
11  lawsuits, and in the lawsuit they are alleging
12  misconduct, we will open up and initiate an Internal
13  Affairs investigation.
14  It happened early on because it wasn't a
15  seamless transition.  A lot of times the Law Department
16  didn't notify the department of allegations.  This has
17  been, fortunately, a recent change.
18  This is something that I gave Grant Ha, who
19  works on my staff, that anytime a lawsuit comes in
20  alleging misconduct, we have to be notified so that we
21  can open up a misconduct.  That didn't happen before.
22  Q.  Okay.  Thank you, sir.
23  A.  All right.  Thank you.
24  MR. DETTMER:  One quick question.  Very quick.
25



1  RE-EXAMINATION BY MR. DETTMER:
2  Q.  You're still looking at crew members of Hansberry and
3  Geelhood's crews, and I would suggest to you those crews
4  are members of the various grades of our four current
5  cases.  You don't know any of the detail of that; fair
6  to say?
7  A.  No, haven't gone that far back.  As I indicated in my
8  earlier testimony, we are working from Mosley back.
9  Possibly when we get to 2010, 2011, or if -- or through
10  the course of lawsuits that are coming in, we'll
11  initiate investigations.
12  So I am certain that we're going to be looking
13  at individuals who are probably no longer members of the
14  department, and who have retired.  There's some cases
15  that the Wayne County Prosecutor's office is also
16  interested in exonerating.  Hey, folks, I've got to
17  really -- I mean, I'm actually ten minutes out.  So...
18  MR. SUROWIEC:  I am done.
19  MR. DETTMER:  Good to you see you, Chief.
20  Thank you.
21  THE WITNESS:  Thank you.
22  (Deposition concluded about 3:00 p.m.)
23
24
25

1  CERTIFICATE OF NOTARY.
2  STATE OF MICHIGAN        )
3                          ) SS
4  COUNTY OF ST. CLAIR      )
5  I, Kelley Whitaker, Certified Shorthand Reporter, a
6  Notary Public in and for the above county and state, do
7  hereby certify that the above deposition was taken by
8  Virtual means; that the witness was by me first duly
9  sworn to testify to the truth, and nothing but the
10  truth, that the foregoing questions asked and answers
11  made by the witness were duly recorded by me
12  stenographically and reduced to computer transcription;
13  that this is a true, full and correct transcript of my
14  stenographic notes so taken; and that I am not related
15  to, nor of counsel to either party nor interested in the
16  event of this cause.
17
18
19                          Kelley A. Nader
20  Kelley A. Nader
21  RPR, CSR 0977 Notary Public,
22  St. Clair County, Michigan
23  My Commission expires:  1/27/2026
24
25

# **EXHIBIT K**

# Detroit police probe yields allegations of widespread corruption in drug unit

<u>George Hunter</u>, The Detroit News | Published 11:23 p.m. ET Dec. 11, 2019 | **Updated 10:05 a.m. ET Dec. 12, 2019**

*Detroit* — Four months after Detroit police internal affairs officers <u>raided their own department's narcotics unit, (/story/news/local/detroit-city/2019/08/22/detroit-cops-seize-drug-records-amid-internal-probe/2084344001/)</u> investigators have uncovered alleged corruption that includes drug cops planting evidence, lying to prosecutors in search warrant affidavits, robbing dope dealers and embezzling funds, police officials said.

Since the Aug. 22 raid, in which dozens of files and 50 computers were seized and analyzed, Chief James Craig has reassigned everyone in the unit with five or more years' experience.

"I'm extremely concerned there may be a pattern and practice of criminal misconduct in the narcotics unit," Craig said. "Sadly, as we continue our probe, we think it's going to grow in terms of magnitude."

The corruption is possibly so extensive that Chris Graveline, director of the department's Professional Standards Section and head of the ongoing investigation, set up a hotline this week, urging anyone with knowledge of misconduct by drug officers to call (313) 596-3190.



**Chris Graveline, director of the Detroit police Professional Standards Section, addresses the media.** *(Photo: George Hunter)*

Craig said he enlisted help from the FBI, Michigan State Police and U.S. Attorney's Office after the material seized in the raid revealed more problems than anticipated.

"This started with a small team of our own Professional Standards investigators, but as they starting seeing the scope of the issues we were dealing with, the team has since grown to 17, and we may ask for even more help," Craig said. "This is a major corruption investigation, but I want to caution that these are just allegations at this point.

"The files we seized in the raid go back as far as 10 years, so the focus of our probe is roughly 10 years," Craig said. "However, since the raid, we've only looked at the past year and a half. So there's a lot more material to go through.

"We're not just looking at documents and case files; so far, we've also interviewed more than 20 complainants who were involved in narcotics trafficking, who had search warrants executed on them but were never arrested," Craig said.

Among the investigation's findings:

- Six instances of narcotics officers stealing money from drug dealers, and two cases of officers planting drugs on suspects.
- False affidavits allegedly were presented to prosecutors to get search warrants. "It's alleged that the probable cause to get the warrants was fabricated," Craig said. "Surveillance that was supposedly conducted to get the warrants wasn't done; information (officers) said they got from confidential informants was erroneous; and information (officers) said they'd gleaned from (the Detroit police drug hotline) 224-DOPE was non-existent. So far, we've identified eight instances where that may have occurred."
- Drug suspects were designated as confidential informants without permission. "Only a prosecutor, either from the Wayne County Prosecutor's Office or U.S. Attorney's Office, can authorize a member of the department to turn a suspect into an informant," Craig said. "Based on our investigation, so far we've found 11 instances where officers improperly made suspects into informants."
- Funds meant to pay informants were embezzled. "We found 50 vouchers with thumb prints and signatures of informants, but no dollar amount listed," Graveline said. It's alleged officers told informants they'd be paid a certain amount for information; the officers allegedly submitted requests for more money and pocketed the difference. (Thumbprints are used on the vouchers to identify informants.)

The first leg of the investigation — the latest in a series of probes into the former Narcotics Section, which was closed in 2014 and reformed as the Major Violators Section because of rampant corruption — kicked off in April, after a large shipment of drugs that had been seized in Detroit was switched for another substance by the time it got to Chicago for a court hearing, Craig said.

Former Detroit narcotics officer Michael Mosley, who was indicted in federal court on charges related to allegations that he took a bribe from a drug dealer, is central to the investigation, Craig said.

Mosley, who was indicted the same day the drug unit was raided, is scheduled to stand trial March 3.

"I can tell you primarily we're looking at the crew (Mosley) was assigned to, which includes a supervisor and five officers," Craig said. All have been reassigned, the chief said.

"I strongly believe that Mosley's criminal activity didn't start with the one time he was caught by the FBI, which is one of the reasons I ordered this investigation," he said.

"We're also looking very closely at the supervisors and managers in the Major Violators Section; what did they know, and what did they do about it?" Craig said. "This investigation is looking very closely at management that oversaw narcotics."

Craig stressed that moving people with five years of experience doesn't necessarily mean they are under suspicion.

Mosley's attorney, Robert Morgan, declined to comment.

Craig said the probe also is focusing on the activities of officers who worked withex-Detroit narcotics cops David Hansberry, Bryan Watson and Arthur Leavells, who in 2017 were convicted in federal court (/story/news/local/detroit-city/2017/02/22/ex-detroit-cops-face-sentencing-extortion/98245018/)of offenses that included ripping off drug dealers and stealing money and drugs that had been seized in raids.

That investigation, which started in 2010, was focused solely on "the criminality of those who were indicted," Craig said. "(The current probe) is also taking a look at processes and other issues that could have contributed to the alleged problems we're uncovering."

Allegations of corruption in the Detroit police narcotics unit go back decades. In 1973, 22 Detroit cops from the 10th Precinct were indicted on charges of involvement in heroin trafficking; nine of the officers were convicted of various crimes.

In 1991, five current and former Detroit cops and a relative of then-Mayor Coleman Young were among a group that was charged with providing protection for FBI agents posing as drug traffickers. Five defendants pleaded guilty in federal court, while other officers were acquitted.

**Buy Photo**



**From left, Detroit Police Chief James Craig and Lt. Charles Flanagan during a raid at 9432 Moross in Detroit on July 3, 2014.** *(Photo: David Coates, The Detroit News)*

Charles Flanagan, a Detroit cop for 30 years before he retired in 2015, ran the former Narcotics Section from 2013-15. He said when he took over the unit, he found "problems that existed long before I got there."

Flanagan reported to Craig that he'd uncovered numerous issues, including a sergeant who had failed to turn in 32 pieces of drug evidence confiscated from hospitalized suspects, and another sergeant who made up false evidence tags for items seized during drug raids, including three flat-screen TVs, a laptop computer and an Xbox 360 video game system.

"I tried to correct some of the obvious issues when I got there," Flanagan said. "Most of the problems I encountered were things that were years old.

"One of the biggest problems in Narcotics historically has been that commanding officers were handcuffed because a lot of people would end up in those specialized units because of cronyism and nepotism," Flanagan said. "They'd have so-called mentors at the higher ranks in the department, and no matter how bad they were, their bosses were afraid to get rid of them."

Craig, who investigated corruption while he was a Los Angeles cop, blamed "basic greed" for many of the problems plaguing the drug unit.

"We thought that the indictment of the Hansberry team would have caused people to walk straight, but greed is the foundation for engaging in corruption," Craig said. "It comes down to basic greed.

"I'm not happy about what we've found in this investigation, but I think it's important to advise the public about what's going on," he said. "Some people might want to say this department is out of control, but I would remind them that this is a DPD-initiated investigation. We're not hiding from this."

ghunter@detroitnews.com

(313) 222-2134

Twitter: @GeorgeHunter_DN

Read or Share this story: https://www.detroitnews.com/story/news/local/detroit-city/2019/12/11/detroit-police-probe-uncovers-widespread-alleged-corruption-drug-unit/4398321002/

# Detroit police chief: Longstanding culture of drug unit corruption

**George Hunter**, **The Detroit News**     Published 4:19 p.m. ET Dec. 12, 2019 | **Updated 4:49 p.m. ET Dec. 12, 2019**

*Detroit* — Selling drugs in any city is dangerous, as dealers risk being killed or robbed by rivals — but in Detroit, pushers for years also have known they could be ripped off by cops, police chief James Craig said Thursday.

"The culture here has been such that drug traffickers figured that was just the cost of doing business," Craig said during a press conference at Public Safety Headquarters. "They knew 'I could get killed, robbed by my competition or robbed by cops.' It's not like that in other cities I've worked in."



**Detroit police chief James Craig and Chris Graveline, director of the Professional Standards Section, address the media on Thursday.** *(Photo: George Hunter)*

Craig's remarks followed a Detroit News report (/story/news/local/detroit-city/2019/12/11/detroit-police-probe-uncovers-widespread-alleged-corruption-drug-unit/4398321002/) about a four-month ongoing investigation that uncovered "a pattern and practice" of alleged corruption in the drug unit, called the Major Violators Section.

The allegations include drug cops planting evidence, lying to prosecutors in search warrant affidavits, robbing dope dealers and embezzling funds meant to pay informants.

The Detroit-initiated investigation started Aug. 22, when Detroit internal affairs officers raided their department's own drug unit, seizing and analyzing dozens of files and 50 computers.

Investigators also have interviewed more than 20 people whose drug houses were raided but were not arrested, and Craig said they told police it's no secret on the street that many Detroit drug cops were crooked.

In multiple instances, investigators found Detroit officers raided drug houses, seized money and drugs, and then told the dealers they could "work off the case" by giving police information about other drug houses.

After getting the information, Craig said the cops allegedly would "start the process all over again" when they raided the locations the dealers had told them about.

Officers would sometimes make confidential informants out of the people whose houses they'd raided without getting the required authorization from prosecutors, Craig said. Then, the officers allegedly embezzled the funds used to pay the informants, the chief said.

"Imagine you're a drug trafficker," Craig said. "A search warrant is executed at your home. Your next thought is, 'I'm going to be arrested.' Instead, you're getting paid, and that case is over.

"Those who are trafficking large amounts of drugs got a pass based on the decision of a police officer. They're not going to come knocking on my door saying, 'chief, we want to make a complaint.'"

Chris Graveline, a former assistant U.S. Attorney who heads the police department's Professional Standards Section, said the alleged corrupt cops could taint other cases in which they testified.

"The first thing you have to ask yourself is, what role did that witness play in my case?" Graveline said. "If it's a major role, then that's a big concern. Immediately, you're thinking 'I need to evaluate each of these cases, and how significant their testimony is in this case.'

"This is going to require a lot of evaluation, not only by the Detroit Police Department but by prosecutors," Graveline said.

Wayne County Prosecutor Kym Worthy declined to comment, her spokeswoman, Maria Miller, said Thursday.

The alleged corruption is thought to be so rampant, police officials set up a 24-hour hotline at (313) 596-3190 to encourage people to call in tips about crooked drug cops.

"It's been up 24 hours, and we've already started to receive tips," Craig said. "One of the things we've learned from the complainants we've already interviewed was that they expect (corruption by narcotics officers)."

Craig stressed the alleged crooked officers make up only a small portion of the police department.

"How are you going to put on the badge ... and you're as much of a criminal as the people you're going after?" Craig said. "If you make the conscious decision to engage in criminal conduct, you're no longer a police officer. We're going to find you, and we're going to arrest you."

Read or Share this story: https://www.detroitnews.com/story/news/local/detroit-city/2019/12/12/detroit-police-chief-longstanding-culture-drug-unit-corruption/4410031002/

# EXHIBIT L

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------------ x
                                         :
In re                                    :          Chapter 9
                                         :
CITY OF DETROIT, MICHIGAN,               :          Case No. 13-53846
                                         :
                Debtor.                  :          Hon. Steven W. Rhodes
                                         :
                                         :
------------------------------------------------------------ x
```

---

**EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**
**(October 22, 2014)**

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

13-53846-tjt   Doc 13505-8   Filed 05/17/22   Entered 05/17/22 13:49:38   Page 96 of
13-53846-swr   Doc 8045-8   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 96 of 82
1109

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................. 1

    A.     Defined Terms. ................................................................................................................ 1

    B.     Rules of Interpretation and Computation of Time. ...................................................... 30

         1.     Rules of Interpretation. ................................................................................... 30

         2.     Computation of Time. ..................................................................................... 30

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................................................................................................... 30

    A.     Unclassified Claims. ..................................................................................................... 31

         1.     Payment of Administrative Claims. ................................................................ 31

         2.     Bar Dates for Administrative Claims. ............................................................. 31

    B.     Classified Claims. ......................................................................................................... 32

         1.     Designation of Classes. ................................................................................... 32

         2.     Subordination; Reservation of Rights to Reclassify Claims. .......................... 33

         3.     Treatment of Claims. ....................................................................................... 33

    C.     Confirmation Without Acceptance by All Impaired Classes. ....................................... 45

    D.     Treatment of Executory Contracts and Unexpired Leases. .......................................... 45

         1.     Assumption. ..................................................................................................... 45

         2.     Assumption of Ancillary Agreements. ............................................................ 45

         3.     Approval of Assumptions and Assignments. ................................................... 45

         4.     Payments Related to the Assumption of Executory Contracts and Unexpired Leases. ............................................................................................................. 46

         5.     Contracts and Leases Entered Into After the Petition Date. ............................ 46

         6.     Rejection of Executory Contracts and Unexpired Leases. ............................... 46

         7.     Rejection Damages Bar Date. .......................................................................... 46

         8.     Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. ........................................................................................... 47

         9.     Insurance Policies. ........................................................................................... 47

ARTICLE III CONFIRMATION OF THE PLAN. ........................................................................... 47

    A.     Conditions Precedent to the Effective Date. ............................................................... 47

    B.     Waiver of Conditions to the Effective Date. ................................................................ 48

    C.     Effect of Nonoccurrence of Conditions to the Effective Date. .................................... 49

    D.     Effect of Confirmation of the Plan. .............................................................................. 49

         1.     Dissolution of Retiree Committee. .................................................................. 49

         2.     Preservation of Rights of Action by the City. ................................................. 49

         3.     Comprehensive Settlement of Claims and Controversies. .............................. 49

         4.     Discharge of Claims. ....................................................................................... 50

13-53846-tjt   Doc 13605-9   Filed 05/17/22   Entered 05/17/22 13:49:38   Page 97 of
13-53846-swr   Doc 8045-9   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 97 of 82
109

| | | | |
|---|---|---|---|
| | 5. | Injunction. | 50 |
| | 6. | Exculpation. | 51 |
| | 7. | Releases | 52 |
| E. | | No Diminution of State Power | 53 |
| F. | | Effectiveness of the Plan | 53 |
| G. | | Binding Effect of Plan | 53 |
| ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN | | | 54 |
| A. | | DWSD. | 54 |
| | 1. | Rates and Revenues. | 54 |
| | 2. | DWSD CBAs. | 54 |
| | 3. | Potential DWSD Authority Transaction. | 54 |
| B. | | The New B Notes, New C Notes and New LTGO Bonds. | 55 |
| C. | | The UTGO Settlement. | 55 |
| D. | | The State Contribution Agreement. | 55 |
| | 1. | State Contribution. | 55 |
| | 2. | Income Stabilization Payments. | 55 |
| | 3. | Conditions to State's Participation. | 56 |
| | 4. | Release of Claims Against the State and State Related Entities. | 56 |
| E. | | The DIA Settlement. | 57 |
| | 1. | Funding Contributions. | 57 |
| | 2. | Transfer of DIA Assets. | 57 |
| | 3. | Conditions to the DIA Funding Parties' Participation. | 57 |
| F. | | Contingent Payment Rights | 58 |
| | 1. | Special Restoration | 58 |
| | 2. | General Restoration | 58 |
| G. | | The OPEB Settlement. | 58 |
| H. | | The LTGO Settlement. | 59 |
| I. | | The Syncora Settlement | 59 |
| J. | | The FGIC/COP Settlement | 59 |
| K. | | Issuance of the New Securities. | 59 |
| L. | | Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents. | 60 |
| M. | | Release of Liens. | 60 |
| N. | | Professional Fees | 61 |
| | 1. | Professional Fee Reserve | 61 |
| | 2. | Fee Review Order | 61 |
| | 3. | Dismissal of the Fee Examiner | 61 |
| | 4. | Potential Review of Fees Not Subject to Fee Review Order | 61 |

13-53846-tjt Doc 13807-9 Filed 05/17/22 Entered 05/17/22 13:49:38 Page 98 of
13-53846-swr Doc 8045-8 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 98 of
109

5. Court-Appointed Expert ............................................................. 62

O. Assumption of Indemnification Obligations. ................................................ 62

P. Incorporation of Retiree Health Care Settlement Agreement. ...................................... 62

Q. Payment of Workers' Compensation Claims. ................................................ 62

R. 36th District Court Settlement. ........................................................ 62

S. Payment of Certain Claims Relating to the Operation of City Motor Vehicles. ........................ 62

T. Payment of Tax Refund Claims. ....................................................... 63

U. Utility Deposits. .................................................................. 63

V. Pass-Through Obligations. ........................................................... 63

W. Exit Facility. .................................................................... 63

X. Post-Effective Date Governance. ....................................................... 63

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN ............................ 64

A. Appointment of Disbursing Agent. ..................................................... 64

B. Distributions on Account of Allowed Claims. .............................................. 64

C. Certain Claims to Be Expunged. ....................................................... 64

D. Record Date for Distributions; Exception for Bond Claims. ..................................... 64

E. Means of Cash Payments. ............................................................ 64

F. Selection of Distribution Dates for Allowed Claims. .......................................... 65

G. Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. ............................................................................ 65

H. City's Rights of Setoff Preserved. ...................................................... 65

I. Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........................... 65

1. Delivery of Distributions Generally. ................................................ 65

2. Delivery of Distributions on Account of Bond Claims. ................................... 65

3. De Minimis Distributions / No Fractional New Securities. ................................ 66

4. Undeliverable or Unclaimed Distributions. ........................................... 66

5. Time Bar to Cash Payment Rights. ................................................. 66

J. Other Provisions Applicable to Distributions in All Classes. .................................... 66

1. No Postpetition Interest. ......................................................... 66

2. Compliance with Tax Requirements. ................................................ 66

3. Allocation of Distributions. ....................................................... 67

4. Surrender of Instruments. ........................................................ 67

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............................... 67

A. Treatment of Disputed Claims. ........................................................ 67

1. General. ..................................................................... 67

2. ADR Procedures. .............................................................. 68

3. Tort Claims. .................................................................. 68

B.    Disputed Claims Reserve. ................................................................. 68

C.    Objections to Claims. ....................................................................... 69

    1.    Authority to Prosecute, Settle and Compromise. ................................ 69

    2.    Expungement or Adjustment of Claims Without Objection. ................ 69

    3.    Extension of Claims Objection Bar Date. ........................................... 69

    4.    Authority to Amend List of Creditors. ................................................ 69

ARTICLE VII RETENTION OF JURISDICTION ................................................. 69

ARTICLE VIII MISCELLANEOUS PROVISIONS .............................................. 71

A.    Plan Supplements. ............................................................................. 71

B.    Modification of the Plan. .................................................................. 71

C.    Revocation of the Plan. ..................................................................... 71

D.    Severability of Plan Provisions. ....................................................... 71

E.    Effectuating Documents and Transactions. ...................................... 71

F.    Successors and Assigns. .................................................................... 72

G.    Plan Controls. .................................................................................... 72

H.    Notice of the Effective Date. ............................................................ 72

I.    Governing Law. ................................................................................. 72

J.    Request for Waiver of Automatic Stay of Confirmation Order. ......... 72

K.    Term of Existing Injunctions and Stays. .......................................... 72

L.    Service of Documents ....................................................................... 72

    1.    The City ............................................................................................. 73

    2.    The Retiree Committee ...................................................................... 73

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit I.A.9 | Principal Terms of 36th District Court Settlement |
| Exhibit I.A.66 | Schedule of Class 9 Eligible City Assets |
| Exhibit I.A.88 | Schedule of COP Swap Agreements |
| Exhibit I.A.108 | Form of Detroit General VEBA Trust Agreement |
| Exhibit I.A.112 | Form of Detroit Police and Fire VEBA Trust Agreement |
| Exhibit I.A.126 | Principal Terms of DIA Settlement |
| Exhibit I.A.127 | Form of DIA Settlement Documents |
| Exhibit I.A.132 | Dismissed FGIC/COP Litigation |
| Exhibit I.A.133 | Dismissed Syncora Litigation |
| Exhibit I.A.148 | Schedule of DWSD Bond Documents & Related DWSD Bonds |
| Exhibit I.A.156 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.159 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.183 | Principal Terms of Exit Facility |
| Exhibit I.A.197 | Form of FGIC/COP Settlement Documents |
| Exhibit I.A.198 | Form of FGIC Development Agreement |
| Exhibit I.A.216 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.230 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.237 | Form of LTGO Settlement Agreement |
| Exhibit I.A.246 | Principal Terms of New B Notes |
| Exhibit I.A.247 | Form of New B Notes Documents |
| Exhibit I.A.248 | Principal Terms of New C Notes |
| Exhibit I.A.249 | Form of New C Notes Documents |
| Exhibit I.A.250.a | Form of New GRS Active Pension Plan |
| Exhibit I.A.250.b | Principal Terms of New GRS Active Pension Plan |
| Exhibit I.A.254.a | Form of New PFRS Active Pension Plan |

13-53846-tjt Doc 13075-1 Filed 09/22/22 Entered 09/22/22 13:60:348 Page 71 of
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 61 of
1109

| | |
|---|---|
| Exhibit I.A.254.b | Principal Terms of New PFRS Active Pension Plan |
| Exhibit I.A.280 | Prior GRS Pension Plan |
| Exhibit I.A.281 | Prior PFRS Pension Plan |
| Exhibit I.A.292 | Restoration Trust Agreement |
| Exhibit I.A.298 | Retiree Health Care Settlement Agreement |
| Exhibit I.A.305 | Schedule of Secured GO Bond Documents |
| Exhibit I.A.332 | State Contribution Agreement |
| Exhibit I.A.340 | Form of Syncora Development Agreement |
| Exhibit I.A.344 | Form of Syncora Settlement Documents |
| Exhibit I.A.354 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit I.A.360 | Form of UTGO Settlement Agreement |
| Exhibit II.B.3.q.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.q.ii.C | Terms of PFRS Pension Restoration |
| Exhibit II.B.3.r.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.r.ii.C | Terms of GRS Pension Restoration |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit III.D.2 | Retained Causes of Action |

6.      taking any actions to interfere with the implementation or consummation of the Plan.

b.      All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.  Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

6.      **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the Syncora Exculpated Parties solely in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in connection with the FGIC/COP Settlement Documents and any actions or litigation positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the RDPMA Exculpated Parties and the COP Agent, solely in its capacity as such and solely in connection with any Distributions made pursuant to the terms of the Plan; provided, further, that the foregoing provisions in this Section III.D.6 shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date.  The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan.  This Section III.D.6 shall not affect any liability of (a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or FGIC or (b) the Syncora Exculpated Parties or FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties.

7.     **Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

a.     each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i.     all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); provided further, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii.     all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

-52-

13-53846-tjt   Doc 13505-89   Filed 05/17/22   Entered 05/17/22 18:09:38   Page 100 of
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 89 of 82
1109

1.	**The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

(Counsel to the City)

2.	**The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone:  (202) 408-6400
Facsimile:  (202) 408-6399

13-53846-tjt   Doc 13505-89   Filed 05/17/22   Entered 05/17/22 18:09:38   Page 105 of
13-53846-swr   Doc 8045-8   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 85 of 81
109

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

(Counsel to the Retiree Committee)


Dated: October 22, 2014       Respectfully submitted,

The City of Detroit, Michigan


By:     /s/ Kevyn D. Orr
Name:   Kevyn D. Orr
Title:     Emergency Manager for the City of Detroit, Michigan

-74-

13-53846-tjt Doc 13505-89 Filed 10/22/14 Entered 10/22/14 23:18:29 Page 108 of
13-53846-swr Doc 8045-9 Filed 10/22/14 Entered 10/22/14 03:43:29 Page 81 of 82
109

# <u>EXHIBIT M</u>



KYM L. WORTHY
PROSECUTING ATTORNEY

COUNTY OF WAYNE
OFFICE OF THE PROSECUTING ATTORNEY

FRANK MURPHY HALL OF
JUSTICE
1441 ST. ANTOINE STREET
DETROIT, MICHIGAN 48226-
2302

Press Release
March 24 ,2020
Two Pages

*For Immediate Release*

Contact:  Maria Miller
Wayne County Prosecutor's Office
Assistant Prosecuting Attorney
(313) 224-5817
(313) 213-0457
mmiller@waynecounty.com

## WCPO to Dismiss Two Narcotics Cases

On March 24, 2020, the Wayne County Prosecutor's Office Conviction Integrity Unit (CIU) presented an order which was signed by Third Circuit Court Chief Judge Timothy Kenny dismissing the case against Darell Chancellor who was convicted on December 12, 2012, of Possession of 450 grams to 999 grams of Cocaine.  He was sentenced to 14 years, three months to 30 years as a Habitual Fourth Offender.

On the same day, the Wayne County Prosecutor's Office Public Integrity Unit presented an order which was signed by to Chief Judge Timothy Kenny dismissing the case against Darrell Richmond, who was convicted on August 9, 2019, of Delivery/Manufacture Narcotics Less than 50 grams and Felony Firearm Second Degree. He was sentenced to three to 20 years on the drug charge and a five-year consecutive sentence on the felony firearm charge.

Both cases were dismissed by order and no court appearances were held due to the Covid-19 pandemic.

### Statement of Prosecutor Kym Worthy

 Prosecutor Worthy said, "The cases that we are announcing today are the result of the tireless work of investigators from the Detroit Police Department and the Federal Bureau of Investigations (Richmond), and the Wayne County Prosecutor's Office Conviction Integrity Unit (Chancellor). These are the first cases that deal directly with fraudulent search warrant affidavits and

other activities by highly unethical and compromised narcotics police officers. These cases take time to review, and we expect that there will be more. I will not hesitate to free other wrongfully convicted individuals if we find tainted or fraudulent evidence."

**-more-**

### Darell Chancellor CIU Recommendation*

The alleged evidence in the case about Mr. Chancellor cannot be corroborated and has been credibly refuted.  It was based upon a fraudulent search warrant. Mr. Chancellor's claim that he was wrongfully convicted is credible and his case will be dismissed by the Conviction Integrity Unit.

### Darrell Richmond - Public Integrity Unit Recommendation *

The DPD and FBI investigation clearly shows that the information provided in the search warrant for Mr. Richmond's home was based upon false and not-credible information.  The conviction of Mr. Richmond will be dismissed by the WCPO Public Integrity Unit.

*Note: At this time limited information is being released BY WCPO due to the ongoing investigation of the Detroit Police Narcotics Unit by DPD and the FBI.

#####