payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 GRS Funded Level to 71%.

3.    <u>General GRS Pension Restoration from July 1, 2023 to June 30, 2033</u>.

During this period, the Funding Target, the Restoration Target, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto.  The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Account asset transfers in the event the 2033 GRS Funded Level falls below the 2033 Funding Target), except as follows.  For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan actuary shall project investment returns through June 30, 2033 at the then current investment return assumption which is assumed to be net of expenses (administrative and investment) and the applicable actuarial assumptions as utilized in the annual actuarial valuation.  Further, the GRS Plan actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the GRS based upon an amortization of the actual 2023 UAAL at market value over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the GRS  Funding Target  (on Exhibit A) as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

To the extent that the City's actual contributions to the GRS in any of the FYs 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited  to a new bookkeeping account in GRS called the Extra Contribution Account.  In determining pension restoration during the period from FY 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Targets.   To the extent that the City's (including for this purpose DWSD or a successor authority) actual contributions in any of the FYs 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Fund Reserve Account.

Each year, in addition to the credit of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest equal to the net return on plan investments, but capped at the then investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

In connection with preparation of the actuarial report for FY 2028, the GRS actuary will determine whether GRS has satisfied the applicable Permanent Restoration Target, which shall be 75%. Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the GRS Funded Level as of June 30, 2028 has satisfied the Permanent Restoration Target(75%), then the amounts in the Restoration Reserve Account , if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more GRS Waterfall Classes over such GRS Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable GRS Waterfall Class and shall no longer be variable from year to year. Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in Exhibit A and otherwise in accordance with this restoration memorandum, notwithstanding whether the Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

In connection with preparation of the annual actuarial valuation report for FY 2033, the GRS actuary will determine whether GRS has satisfied the Permanent Restoration Target for 2033, as set forth on Exhibit A. Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target . If following such transfers the GRS Funded Level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more GRS Waterfall Classes over such GRS Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable GRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for 2028, and in the event that the projected Funded Level of GRS as of 2033 is less than 71%, the GRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual normal course administrative expenses until 2033 equal to the average annual administrative expenses in the prior 4 years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the GRS Restoration Reserve Account than actually were transferred during such look back period, then the GRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 GRS Funded Level to 71%.

4. <u>General GRS Pension Restoration from July 1, 2033 to June 30, 2043</u>.

During this period, the Funding Target, the Restoration Target , the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto. The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers in the event the 2043 GRS Funded Level falls below the 2043 Funding Target). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan actuary shall project annual contributions using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

In connection with preparation of the annual actuarial valuation report for FY 2043, the GRS actuary will determine whether GRS has satisfied the applicable Permanent Restoration Target, as set forth on Exhibit A. Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the GRS Funded Level as of June 30, 2043 is s equal to or greater than the applicable Permanent Restoration Target , then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target),

shall be transferred from the Restoration Reserve Account and credited to the GRS Pension Reserve Account and the applicable payments for the applicable GRS Waterfall Class shall be permanently restored and shall no longer be variable.

5. <u>Modification of the Pension Restoration Program</u>

If any time after July 1, 2026, the GRS Investment Committee (by vote of 5 of its 7 members), or the GRS Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing this Pension Restoration Agreement, such that the continued operation of this Agreement without amendment will: (a) materially harm the long-term economic interests of the City, or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the Restoration program, if as of that juncture (and for purposes of applying this subsection 5(c)) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable PFRS Restoration Targets for a substantial period yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend this Restoration Agreement (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund GRS frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to this Agreement that address the identified risk of harm or impairment, but which also considers this Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Committee and Board (persons who sit on both the Board and Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation. If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such

mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, *inter alia*, whether or in what manner to amend this Agreement.

# EXHIBIT A TO THE GRS PENSION RESTORATION PROGRAM

**GRS -** The 2033 and 2043 Funding Targets shall be equal to the actual 2023 Funded Level rounded to the nearest 10th decimal . The Restoration Target shall be 3.0% higher than the Funding Target but not less than 73%. The Permanent Restoration Targets shall be 75% in 2028, and 1% higher than the Restoration Targets in 2033 and 2024, but not less than 75%.. The Restoration Reserve Suspension Trigger will be set 1% higher than the projected Funding Target for all time periods.

| 2023 Funded Level | 2033 Funding Target/Restoration Target | 2043 Funding Target/Restoration Target |
|---|---|---|
| 75% | 75%/78% | 75%/78% |
| 74% | 74%/77% | 74%/77% |
| 73% | 73%/76% | 73%/76% |
| 72% | 72%/75% | 72%/75% |
| 71% | 71%/74% | 71%/74% |
| 70% | 70%/73% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% | the % = to 2023 Funded Level %/73% |

| 2033 Permanent Restoration Target | 2043 Permanent Restoration Target |
|---|---|
| 75% ,or if greater, 1% more  than 2033 Restoration Target | 75%, or if greater, 1% more than 2043 Restoration Target |

____

**EXHIBIT II.D.5**

SCHEDULE OF POSTPETITION COLLECTIVE BARGAINING AGREEMENTS

## EXHIBIT II.D.5

## SCHEDULE OF POSTPETITION COLLECTIVE BARGAINING AGREEMENTS

## I.  FULLY APPROVED AGREEMENTS[1]

**A.  City of Detroit Collective Bargaining Agreements**

1)  Master Agreement Between the City of Detroit and the Police Officers Association of Michigan (POAM), 2013-2018, dated November 12, 2013.

2)  Master Agreement Between the City of Detroit and the International Brotherhood of Teamsters Local 214 2013-2018, dated December 18, 2013.

    a.  Supplemental Agreement Between the City of Detroit Police Department and Teamsters State, County and Municipal Workers, Local 214 2013-2018, dated December 18, 2013.

    b.  Supplemental Agreement Between the Department of Public Works and Teamsters Local 214 2013-2018, dated December 18, 2013.

    c.  Supplemental Agreement Between the General Services Department and Teamsters Local 214 2013-2018, dated December 18, 2013.

    d.  Supplemental Agreement between the City of Detroit Municipal Parking Department and Local #214 Teamsters State, County and Municipal Workers, 2013-2018, dated December 18, 2013.

3)  Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 2013-2018, dated December 18, 2013.

4)  Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 (Park Management) 2013-2018, dated December 18, 2013.

5)  Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 (Principal Clerks) 2013-2018, dated December 18, 2013.

6)  Master Agreement Between the Assistant Supervisors of Street Maintenance and Construction and the City of Detroit 2014-2018, dated February 26, 2014.

7)  Master Agreement Between the City of Detroit and the Michigan Building and Construction Trades Council 2014-2018, dated May 1, 2014.

8)  Master Agreement Between the City of Detroit and the Emergency Medical Service Officers Association (EMSOA) 2014-2019, dated June 11, 2014.

9)  Master Agreement Between the City of Detroit and Local 1863 of the American Federation of State County and Municipal Employees, AFL-CIO (Detroit Civilian Crossing Guards) 2014-2018, dated June 27, 2014.

10)  Master Agreement Between the City of Detroit and Local 542 of the American Federation of State County and Municipal Employees, AFL-CIO (Motor City Seasonals) 2014-2018, dated June 27, 2014.

---

[1]  "Fully Approved Agreements" means those collective bargaining agreements that have been (i) ratified by the applicable bargaining unit or units, as necessary (ii) approved by the applicable City or Detroit Water and Sewerage Department bargaining representatives, (iii) approved by the Emergency Manager and (iv) approved by the Office of the Treasurer of the State of Michigan.

1204

11)     Master Agreement Between the City of Detroit and Local 1206 of the American Federation of State County and Municipal Employees, AFL-CIO (Detroit Forestry and Landscape Foreman's Union) 2014-2018, dated June 27, 2014.

12)     Master Agreement Between the City of Detroit and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    a.     Supplemental Agreement Between the City of Detroit Elections Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    b.     Supplemental Agreement Between the City of Detroit Municipal Parking Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    c.     Supplemental Agreement Between the City of Detroit Planning and Development Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    d.     Supplemental Agreement Between the City of Detroit Police Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    e.     Supplemental Agreement Between the City of Detroit Recreation Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

13)     Master Agreement Between the City of Detroit and Local 6087 of the American Federation of State County and Municipal Employees, AFL-CIO (Paving Forepersons) 2014-2018, dated June 27, 2014.

14)     Master Agreement Between the City of Detroit and the Detroit Police Command Officers Association 2014-2019, dated June 18, 2014.

15)     Master Agreement Between the City of Detroit and the Detroit Income Tax Investigators Association 2014-2018, dated August 11, 2014.

16)     Master Agreement Between the City of Detroit and the Association of Municipal Inspectors 2014-2018, dated June 27, 2014.

17)     Master Agreement Between the City of Detroit and the Service Employees International Union (SEIU) Local 517-M (Supervisory Unit) 2014-2018, dated June 25, 2014.

18)     Master Agreement Between the City of Detroit and the Service Employees International Union (SEIU) Local 517-M (Non-Supervisory Unit) 2014-2018, dated June 25, 2014.

19)     Master Agreement Between the City of Detroit and the Service Employees International Union (SEIU) Local 517-M (Professional and Technical Unit) 2014-2018, dated June 25, 2014.

20)     Master Agreement Between the City of Detroit and the Association of City of Detroit Supervisors 2014-2018, dated June 27, 2014.

21)     Master Agreement Between the City of Detroit and the Association of Professional and Technical Employees 2014-2018, dated July 22, 2014.

22)     Master Agreement Between the City of Detroit and the Senior Accountants, Analysts and Appraisers Association 2014-2018, dated May 27, 2014.

23) Master Agreement Between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO (Non-Supervisory Bargaining Unit) 2014-2018, dated June 27, 2014.

24) Master Agreement Between the City of Detroit and the Detroit Police Officers Association (DPOA) 2014-2019, dated October 1, 2014.

25) Master Agreement Between the City of Detroit and the Association of Professional Construction Inspectors 2014-2018, dated September 30, 2014.

26) Master Agreement Between the City of Detroit and the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) Local 212 – Police Commission Investigators 2014-2018, dated October 20, 2014.

27) Master Agreement Between the City of Detroit and the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) Local 412 – Legal Assistants 2014-2018, dated October 20, 2014.

**B. Detroit Water and Sewerage Department Collective Bargaining Agreements**

1) 2012-2018 Master Agreement Between the Detroit Water & Sewerage Department and AFSCME, Michigan Council 25 Local 2920.

2) Master Agreement Between the City of Detroit and the Michigan Building and Construction Trades Council 2013-2016, dated June 26, 2013.

    a. Memorandum of Agreement between the Detroit Water and Sewerage Department and the Michigan Building & Construction Trades Council to amend their June 26, 2013 - June 30, 2016 collective bargaining agreement.

3) 2013-2016 Master Agreement Between the Detroit Water & Sewerage Department and the Building Trades Foremen, dated June 26, 2013.

4) 2014-2016 Master Agreement Between the Detroit Water & Sewerage Department and the Detroit Senior Water Systems Chemists Association.

5) 2014-2019 Master Agreement Between the DWSD and Teamsters State, County and Municipal Workers, Local 214.

6) Memorandum of Agreement between the Detroit Water and Sewerage Department and the International Union of Operating Engineers, Local 324 to amend their March 25, 2013 - June 30, 2022 collective bargaining agreement.

7) Memorandum of Agreement between the Detroit Water and Sewerage Department and the Association of Professional Construction Inspectors to amend their March 26, 2013 - June 30, 2020 collective bargaining agreement.

3

1206

## II.  RATIFIED AGREEMENTS PENDING FINAL APPROVALS[2]

### A.  Ratified City of Detroit Collective Bargaining Agreements Pending Final Approvals

1)      Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association 2014-2019.

        a.      Tentative Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association, dated June 19, 2014.

2)      Master Agreement Between the City of Detroit and the Association of Detroit Engineers 2014-2018.

3)      Master Agreement Between the City of Detroit and Michigan Building and Construction Trades Council – Tripartite 2014-2018.

---

[2]      "Ratified Agreements Pending Final Approvals" means those collective bargaining agreements approved by the City bargaining representatives, and  ratified by the applicable bargaining unit or units, as necessary, that remain subject to approval by either, or both, the Emergency Manager and the Office of the Treasurer of the State of Michigan.  The inclusion of such collective bargaining agreements in this Exhibit does not, and shall not be deemed to, modify or waive the requirement for such approvals in any way.

**EXHIBIT II.D.6**

EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED

## Exhibit II.D.6

Executory Contracts and Unexpired Leases to be Rejected

In re City of Detroit, Michigan, Case No. 13-53846 (Bankr. E.D. Mich)

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| 151 W FORT ST ASSOCIATES LLC | 1075036 | 2635434 | | INFORMATION TECHNOLOGY SERVICES |
| 1600 ASSOCIATES LLC | 20396 | 2501191 | | MUNICIPAL PARKING DEPARTMENT |
| 3M CONTRACTING INC | 1107578 | 2809948 | | HUMAN SERVICES DEPARTMENT |
| 455 ASSOCIATES LLC | 19602 | 2600416 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| 455 ASSOCIATES LLC | 19602 | 2722656 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2604895 | | INFORMATION TECHNOLOGY SERVICES |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2809305 | | LAW DEPARTMENT |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2866561 | | LAW DEPARTMENT |
| A & H CONTRACTORS | 1090249 | 2797590 | ICE RINK IMPROVEMENTS | RECREATION DEPARTMENT |
| A NEW BEGINNING II INC | 1010270 | 2626822 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| AARON L FORD | 1101801 | 2759870 | | HEALTH DEPARTMENT |
| ABAYOMI CDC | 1055088 | 2597193 | | FINANCE DEPARTMENT |
| ABBOT NICHOLSON | 1064317 | 2605132 | LEGAL SERVICES | LAW DEPARTMENT |
| ACCENTURE LLP | 19843 | 2582670 | | HUMAN SERVICES DEPARTMENT |
| ACHIEVEMENT RESOURCES LLC | 1075198 | 2640120 | | DEPARTMENT OF PUBLIC WORKS |
| ADAMS HOME REPAIR SERVICE INC | 1031652 | 2532093 | HOME REPAIR FOR LOW INCOME CITIZENS. | HUMAN SERVICES DEPARTMENT |
| ADULT WELL BEING SERVICES | 17259 | 2507595 | ADULT WELL BEING SERVICES | HEALTH DEPARTMENT |
| ADULT WELL BEING SERVICES | 17259 | 2501821 | EZ-PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| ADVANCED ENGINEERING SOLUTION INC | 1043861 | 2613331 | | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| AFFILIATED INTERNISTS CORPORATION | 1007088 | 2541129 | PROVIDE MEDICAL STAFF | HEALTH DEPARTMENT |
| AFL CIO COUNCIL | 9713 | 2505335 | | FINANCE DEPARTMENT |
| AFL CIO COUNCIL | 9713 | 2504234 | AFL/CIO COUNCIL-METRO COUNCIL | FINANCE DEPARTMENT |
| AGAR LAWN SPRINKLER SYSTEMS INC | 1019225 | 2871984 | FURNISH UNDERGROUND SPRINKLER MAINT. | GENERAL SERVICES DEPARTMENT |
| AIRGAS GREAT LAKES | - | 2754331 | PURCHASE ORDER FOR COMMERCIAL GASES | GENERAL SERVICES DEPARTMENT |
| AKT PEERLESS ENVIRONMENTAL SERVICES LLC | 1025663 | 2845810 | DEMOLITION OF PROPERTIES | BUILDINGS AND SAFETY DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2554416 | CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2572989 | | HEALTH DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2511247 | AUDITING SERVICES FY 98/99 FICS 78653 | HUMAN SERVICES DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2501399 | PROFESSIONAL SERVICES | FINANCE DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2507833 | AUDITING - ALAN C YOUNG | HEALTH DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2515896 | AUDIT DRUG TREATMENT/AIDS PROGRAMS | HUMAN SERVICES DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2780084 | | HEALTH DEPARTMENT |

1209

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ALKEBU LAN VILLAGE | 1043877 | 2588741 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2533139 | YOUTH PROGRAM | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2619692 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2804801 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2775178 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2772580 | PROFESSIONAL SERVICES CONTRACT | RECREATION DEPARTMENT |
| ALLEN & ASSOCIATES APPRAISAL GROUP INC | 20517 | 2502141 | PROFESSIONAL SERVICES: CASINO APPRAISAL | LAW DEPARTMENT |
| ALLIANCE FOR A SAFER GREATER DETROIT | 1102712 | 2767089 | | POLICE DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625782 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625784 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625780 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA KAPPA ALPHA FOUNDATION OF DETROIT | 19649 | 2592410 | | FINANCE DEPARTMENT |
| ALTERNATIVE FOR GIRLS | 16279 | 2503526 | TRANSITIONAL HOUSING | FINANCE DEPARTMENT |
| AMERICAN INDIAN HEALTH & FAMILY | 18997 | 2500866 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| AMERITECH | 20497 | 2506112 | | PUBLIC LIGHTING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501028 | PARKING SERVICES | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501362 | KENNEDY SQUARE PARKING SERVICES | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501356 | PARKING SERVICE FOR KENNEDY SQUARE | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501789 | PARKING LOT MANAGEMENT | FINANCE DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2524825 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2525177 | LIHEAP | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2544432 | HOME WEATHERIZATION | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2607320 | | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2789077 | | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2761179 | | HUMAN SERVICES DEPARTMENT |
| ANACAPA SCIENCE INC | 1012433 | 2507585 | | POLICE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2530372 | LEGAL SERVICES: DAVIS/WILLIAMS V CITY | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2634325 | | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2538079 | LEGAL SERVICES: TOMMIE THOMAS V CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2561944 | LEGAL SERVICES: MICHELLE HARPER, ET AL | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2561936 | LEGAL SERVICES | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2501547 | LEGAL SERVICES: RYAN MULLINS V CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2545467 | LEGAL SERVICES: BOSWELL V JORDAN/CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2505202 | LEGAL SERVICES | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2512646 | LEGAL SERVICES | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2505710 | LEGAL SERVICES: KEITH THORNTON V CITY | LAW DEPARTMENT |

1210

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ANDREW J BEAN | 1003634 | 2576673 | | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2505715 | LEGAL SERVICES | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2574494 | | LAW DEPARTMENT |
| AON RISK SERVICES INC OF MICHIGAN | 17959 | 2506866 | AUDIT | AUDITOR GENERAL |
| APCOA INC | 18982 | 2504151 | COBO COMPLEX PARKINGMANAGEMENT SERVICES | MUNICIPAL PARKING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2546963 | PARTNERSHIP FOR ADULT LEARNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2563067 | WORK FIRST & WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2778448 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2797753 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2806229 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2775339 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2714444 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2717186 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2549478 | ENGLISH AS A SECOND LANGUAGE | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2519169 | JOB SEARCH AND TRAINING (WORK FIRST) | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2740257 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2778446 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2797751 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2800934 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2778768 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARTHUR F SMITH ARCHITECTS | 19092 | 2500783 | CAMP MASTERPLAN | NO DEPARTMENT INDICATED |
| ASHPAUGH & SCULCO CPA PLC | 1026075 | 2506711 | RATE CONSULTANT | NON-DEPARTMENTAL |
| AVANCE COMMUNICATIONS INC | 1017277 | 2589125 | | DEPARTMENT OF TRANSPORTATION |
| AVANCE COMMUNICATIONS INC | 1017277 | 2544753 | COMMUNICATIONS | HUMAN SERVICES DEPARTMENT |
| B & B POOLS AND SPAS | 8897 | 2680662 | | RECREATION DEPARTMENT |
| B E I ASSOCIATES INC | 1002153 | 2500794 | PROFESSIONAL ENGINEERING SERVICES | DEPARTMENT OF PUBLIC WORKS |
| BABBIE DEVELOPERS | 1100891 | 2753822 | ROOF REPLACEMENT FORT WAYNE-QUARTERMASTER WAREHOUSE | RECREATION DEPARTMENT |
| BAPCO-SUBSTANCE ABUSE | 15997 | 2501510 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| BARNEY MCCOSKY BASEBALL LEAGUE | 17329 | 2540757 | 36-NTV-NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| BARTECH GROUP | 19194 | 2578539 | | FINANCE DEPARTMENT |
| BARTHEL CONTRACTING | 6174 | 2506716 | PAVEMENT RESURFACING, GROUP 95-3 | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2508554 | WIDENING & RESURFACING | DEPARTMENT OF PUBLIC WORKS |

1211

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| BARTHEL CONTRACTING | 6174 | 2508474 | PAVEMENT RESURFACING, GROUP 96-5 | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2630995 | | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2658806 | | DEPARTMENT OF PUBLIC WORKS |
| BDN INDUSTRIAL HYGIENE CONSULTANT | 19807 | 2502471 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| BDO SEIDMAN LLP | 1073285 | 2659484 | | LAW DEPARTMENT |
| BEACON ENERGY LLC | 1088904 | 2699766 | | SEWERAGE DEPARTMENT |
| BEACON ENERGY LLC | 1088904 | 2763942 | PROVIDE CONSULTING SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BEAL INC | 1104822 | 2786319 | | RECREATION DEPARTMENT |
| BEI ASSOCIATES INC | 19420 | 2586915 | | DEPARTMENT OF PUBLIC WORKS |
| BEI ASSOCIATES INC | 19420 | 2576869 | | PUBLIC LIGHTING DEPARTMENT |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2515001 | LEGAL SERVICES | FINANCE DEPARTMENT |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2502106 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2618387 | LEGAL SERVICES | LAW DEPARTMENT |
| BELMARC INC | 1012648 | 2505560 | PROFESSIONAL SERVICES | LAW DEPARTMENT |
| BERG MUIRHEAD AND ASSOCIATES | 1051572 | 2758875 | | MAYOR'S OFFICE |
| BEST AMERICAN INDUSTRIAL | 17038 | 2501442 | SKILLED TRADES | NO DEPARTMENT INDICATED |
| BETTS MEDICAL GROUP LLC | 1030943 | 2531569 | PHYSICIAN SERVICES | HEALTH DEPARTMENT |
| BLACK & VEATCH | 20115 | 2501009 | PROFESSIONAL SERVICES | NO DEPARTMENT INDICATED |
| BLACK CAUCUS FOUNDATION OF MICHIGAN | 18481 | 2501792 | | HEALTH DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2508726 | PROGRAM COORDINATION OF COOPER | FINANCE DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2506003 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2784374 | | HUMAN SERVICES DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2761029 | | HUMAN SERVICES DEPARTMENT |
| BLOUNT ENGINEERS INC. | 13566 | 2500972 | PROFESSIONAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2507188 | LEGAL SERVICES | LAW DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2501800 | LEGAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2505006 | LEGAL SERVICES | LAW DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2501852 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| BONIFACE HUMAN SRVS | 19449 | 2501513 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| BOOKER T WASHINGTON | 17389 | 2517857 | PUBLIC FACILITY REHABILITATION | FINANCE DEPARTMENT |
| BOOMER CO | 19949 | 2784930 | CITY OF DETROIT CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| BOOTH RESEARCH GROUP INC | 1058277 | 2585080 | | POLICE DEPARTMENT |
| BOOTH RESEARCH GROUP INC | 1058277 | 2759498 | DPD PROMOTIONAL EXAMINATION | POLICE DEPARTMENT |
| BRACEFUL & ASSOCIATES PC | 1002357 | 2508823 | LEGAL SERVICES | FINANCE DEPARTMENT |
| BRACEFUL & ASOCIATES PC | 1002357 | 2507332 | LEGAL SERVICES: TROMEUR V CITY | LAW DEPARTMENT |
| BRADY HATHAWAY PC | 20356 | 2505092 | LEGAL SERVICES: VINES/CHILDS V CITY | LAW DEPARTMENT |
| BRIGHTMOOR COMMUNITY CENTER | 18407 | 2501479 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| C & H BUILDERS | 1025257 | 2544437 | HOME WEATHERIZATION | FINANCE DEPARTMENT |
| C & H BUILDERS | 1025257 | 2524574 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| C & H BUILDERS | 1025257 | 2543531 | LIHEAP-HOME WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| C & H BUILDERS | 1025257 | 2793400 | | HUMAN SERVICES DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2799257 | CPATTON PARK IMPROVEMENT | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2799260 | BELLE ISLE - TENNIS COURT RENOVATIONS | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2789963 | LITTLEFIELD PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2798602 | WINGLE PLAYLOT IMPROVEMENTS | RECREATION DEPARTMENT |
| CADILLAC TOWER MI LLC | 1117104 | 2810553 | | BUDGET DEPARTMENT |
| CAPITAL ACCESS INC | 1033428 | 2536054 | CONSULTING AGREEMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| CAPITAL COMPUTER SOLUTIONS | 16316 | 2507466 | IMAGING SYSTEM  (FICS #76497) | HEALTH DEPARTMENT |
| CAPITAL COMPUTER SOLUTIONS | 16316 | 2760099 | | HEALTH DEPARTMENT |
| CARE GIVERS | 19339 | 2510116 | HOMELESSNESS PREVENTION | FINANCE DEPARTMENT |
| CAREERWORKS INC | 10310 | 2501469 | SUMMER PROGRAM | NO DEPARTMENT INDICATED |
| CAREERWORKS INC | 10310 | 2518192 | WORK FIRST JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2526127 | YOUTH SERVICES PROGRAM PY2000 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2539830 | FOOD STAMP - 10/01/00 - 9/30/01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2560643 | FOOD STAMP 2001-2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2553148 | WIA SUMMER COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2530117 | WIA SUMMER - MICROSOFT PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2536669 | WIA-ELECTRONICS & TELECOMMUNICATIONS | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2740262 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CARNEGIE MORGAN PARTNERS | 18655 | 2600434 | | FINANCE DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2539246 | PUBLIC SERVICE FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2521565 | FOOD PROGRAM, EASTSIDE AND WESTSIDE | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2570923 | | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2775168 | | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY UNITED | 18514 | 2559508 | CASE MANAGEMENT AND COUNSELING | DEPARTMENT OF PUBLIC WORKS |
| CASS COMMUNITY UNITED | 18514 | 2515503 | WARMING CENTER FOR HOMELESS | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY UNITED METHODIST | 7182 | 2588909 | | HUMAN SERVICES DEPARTMENT |
| CASS CORRIDOR NEIGHBORHOOD DEVELOPMENT CORP | 20452 | 2506844 | PRE-DEVELOPMENT ACTIVITIES | FINANCE DEPARTMENT |
| CATHOLIC SOCIAL SERVICES | 3536 | 2501515 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| CATHOLIC YOUTH ORGANIZATION | 1961 | 2501808 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| CDL TRAINING SCHOOL LLC | 1064701 | 2804809 | | HUMAN SERVICES DEPARTMENT |
| CDL TRAINING SCHOOL LLC | 1064701 | 2775174 | | HUMAN SERVICES DEPARTMENT |
| CEI MICHIGAN LLC | 1104760 | 2785400 | EASTERN MARKET SHED NO. 3 RENOVATIONS | RECREATION DEPARTMENT |

1213

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CEI MICHIGAN LLC | 1104760 | 2785393 | CONSTRUCTION CONTRACT FOR EASTERN MARKET SHED NO. 3 | RECREATION DEPARTMENT |
| CENTRAL MAINTENANCE SERVICE | 9209 | 2501782 | 36/LS - MANAGEMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| CENTRAL UNITY METHODIST CHURCH | 5570 | 2503083 | PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| CENTURY CEMENT CO INC | 1393 | 2520066 | REPAIR OF DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| CENTURY CEMENT CO INC | 1393 | 2541213 | REPAIR OF DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| CHARFOOS & CHRISTENSEN | 19681 | 2599095 | LEGAL SERVICES | LAW DEPARTMENT |
| CHARLES MERZ | 19485 | 2501931 | BELLE ISLE PICNIC SHELTER | NO DEPARTMENT INDICATED |
| CHECKER CAB | 1002656 | 2533466 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2620877 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2775459 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2803649 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 6574 | 2743785 | | HUMAN SERVICES DEPARTMENT |
| CHILD CARE COORDINATING COUNCIL OF DETROIT | 18279 | 2751505 | | HUMAN SERVICES DEPARTMENT |
| CHILD CARE COORDINATING COUNCIL OF DETROIT | 18279 | 2774001 | | HUMAN SERVICES DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2516007 | EMPOWERMENT ZONE- PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2500872 | | NO DEPARTMENT INDICATED |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2554216 | EMPOWERMENT ZONE - PUBLIC SERVICES | FINANCE DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2532118 | EMPOWERMENT ZONE - PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2618760 | | POLICE DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2620357 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2563913 | | FINANCE DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2740222 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2775157 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2614565 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2778775 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2778778 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2800817 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2501646 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2535133 | HEAD START MENTAL CONSULTANT SERVICES | HUMAN SERVICES DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2516136 | MENTAL HEALTH CONSULTANT SERVICES | HUMAN SERVICES DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2569653 | | HUMAN SERVICES DEPARTMENT |

1214

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2501812 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| CHRISTIAN GUIDANCE CENTER | 18739 | 2501814 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| CITY CONNECT DETROIT | 1082718 | 2796700 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CLARK & ASSOCIATES PC | 1008458 | 2543328 | ADDICTION TREATMENT | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES PC | 1008458 | 2539765 | TRAINING WORK FIRST PROGRAM | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES PC | 1008458 | 2539650 | YOUTH DEPARTMENT SAFETY PROGRAM | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES PC | 1008458 | 2675311 | | HUMAN SERVICES DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2625022 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2504251 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518285 | CLARK MASTER - SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2588764 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2536507 | CLARK - MEDICAID | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2670290 | | HUMAN SERVICES DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2689636 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2534097 | SUBSTANCE ABUSE MASTER AGREEMENT | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2559955 | CLARK- MEDICAID | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518292 | CLARK MEDICAID-MASTER | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518483 | CLARK - DRUG EDUCATION | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2506642 | EDUCATE FYE 6/30/99 CLARK/POLICE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2501252 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2557597 | CLARK MASTER - SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2625016 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2527241 | YOUTH DEPT. SAFETY ASSESSMENT PROG. | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2618554 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2502443 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2618552 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2700218 | | RECREATION DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2515854 | CLARK - CCA - FYE 6/30/00 SPO2515857 | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2779347 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2797389 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2750134 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2747666 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2779369 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2756507 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2805210 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2875766 | S.A.F.E.T.Y. PROGRAM | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2776664 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2779355 | | HEALTH DEPARTMENT |

1215

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CLARK ASSOCIATES INC | 15176 | 2755767 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2801963 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2803778 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2786574 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2759243 | | HEALTH DEPARTMENT |
| CLARK HILL | 7778 | 2501937 | LEGAL SERVICES | LAW DEPARTMENT |
| CLARK HILL | 7778 | 2543385 | LEGAL SERVICES | LAW DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2679759 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2636522 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2713626 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2714063 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2715398 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2731184 | PARK & PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2709777 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2756725 | PARK & PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2789767 | LAKER PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLAYTON ENVIRONMENTAL | 1002564 | 2519814 | EPA PERMITS & DEREGULATIONS | PUBLIC LIGHTING DEPARTMENT |
| CMTS INC | 18181 | 2501924 | FICS 074776 INSPECTION SERVICES | DEPARTMENT OF PUBLIC WORKS |
| COHL STOKER TOSKEY & MCCLINCHEY PC | 1081162 | 2661933 | | CITY COUNCIL |
| COMMUNITY & EDUCATIONAL SERVICES INC | 1059876 | 2777992 | EMERGENCY SHELTER SERVICES | HUMAN SERVICES DEPARTMENT |
| COMMUNITY DEVELOPMENT SOLUTIONS LLC | 1057282 | 2695015 | | RECREATION DEPARTMENT |
| COMMUNITY DEVELOPMENT SOLUTIONS LLC | 1057282 | 2675021 | | RECREATION DEPARTMENT |
| COMMUNITY HEALTH AWARENESS GROUP INC | 1051231 | 2571474 | | HEALTH DEPARTMENT |
| COMMUTER TRANSPORTATION | 15328 | 2510505 | SHUTTLE SERVICE | CIVIC CENTER DEPARTMENT |
| COMPREHENSIVE DATA PROCESSING | 11248 | 2502241 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| COMPUTECH CORPORATION | 1054040 | 2574424 | | NON-DEPARTMENTAL |
| COMPUTECH CORPORATION | 1054040 | 2620775 | | NON-DEPARTMENTAL |
| COMPUWARE CORPORATION | 1003122 | 2595111 | | NON-DEPARTMENTAL |
| CONNOLLY RODGERS & SCHARMAN PLLC | 1089154 | 2703083 | | LAW DEPARTMENT |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2514647 | ELECTRICAL DESIGN-HIGHWAYS PROJECTS | DEPARTMENT OF PUBLIC WORKS |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2508478 | ENGINEERING | WATER DEPARTMENT |

1216

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2544911 | FICS CONTRACT # 064150, ELECTRICAL DESIGN | DEPARTMENT OF PUBLIC WORKS |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2544914 | FICS CONTRACT 065783, ELECTRICAL DESIGN | DEPARTMENT OF PUBLIC WORKS |
| CORPORATE ASSET MANAGEMENT INC | 1022860 | 2607935 | | DEPARTMENT OF TRANSPORTATION |
| COUNCIL OF ACTION UNITED FOR SERVICE EFFORTS | 14189 | 2608202 | | FINANCE DEPARTMENT |
| COUNCIL OF ISLAMIC ORGANIZATIONS | 20305 | 2501825 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| COURRIER & I | - | 2506952 | | LAW DEPARTMENT |
| COUZENS LANSKY FEALK ELLIS ROEDER & LAZAR | 19705 | 2534094 | LEGAL SERVICES | LAW DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2614501 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2622827 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2563788 | SUPPORTIVE HOUSING | HUMAN SERVICES DEPARTMENT |
| CREEKSIDE COMMUNITY DEVELOPMENT CORPORATION | 1024525 | 2752940 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| CSFB 1998 P1 WOODWARD OFFICE LLC | 1074168 | 2652205 | | FINANCE DEPARTMENT |
| CUMMINGS MCCLOREY DAVIS | 19999 | 2502111 | LEGAL SERVICES: JANE DOE V P.O. JOURNEY | LAW DEPARTMENT |
| CUMMINGS MCCLOREY DAVIS | 19999 | 2502154 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| CURTIS & ASSOCIATES | 18886 | 2563163 | JOB SEARCH WORK FIRST/WFW 2001 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CVS | 1026222 | 2782910 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| D A CENTRAL INC | 1020403 | 2860051 | SECURITY SURVEILLANCE SYSTEM | NO DEPARTMENT INDICATED |
| D C BYERS COMPANY DETROIT | 15847 | 2502244 | FORD RD RESERVOIR REHAB | WATER DEPARTMENT |
| D P VANBLARICOM INC | 1011787 | 2517238 | ESTATE OF LARRY BELL V CITY | LAW DEPARTMENT |
| DATA COMPRESSION TECHNOLOGY INC. | 1057080 | 2584759 | | FINANCE DEPARTMENT |
| DATA CONSULTING GROUP INC | 18268 | 2507857 | PARKING TICKETS | MUNICIPAL PARKING DEPARTMENT |
| DAVID ANDERSON & CATHY STULL | 16925 | 2500749 | | LAW DEPARTMENT |
| DBAKER SOLUTIONS | 1027729 | 2526961 | CONCESSIONS CONTRACT CONSULTANT | ZOO |
| DECISION CONSULTANTS INC | 14788 | 2502051 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| DELOITTE & TOUCHE LLP | 17837 | 2592267 | | CITY COUNCIL |
| DEMARIA BUILDING COMPANY | 19428 | 2819183 | SKILLED TRADES REPAIR AND MAINTENANCE | GENERAL SERVICES DEPARTMENT |
| DEMARIA BUILDING COMPANY | 19428 | 2706154 | BELLE ISLE CONSERVATORY RENOVATIONS | RECREATION DEPARTMENT |
| DEMARIA BUILDING COMPANY | 19428 | 2832912 | EQUIPMENT PURCHASE AND INSTALLATION | WATER DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2803629 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2743788 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2775457 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA HEALTH COUNCIL INC | 1069815 | 2619988 | | RECREATION DEPARTMENT |
| DETROIT ASSOC OF WOMENS CLUBS | 14566 | 2514218 | PUBLIC FACILITY REHAB-FICS #74834 | FINANCE DEPARTMENT |

1217

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2501915 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2502124 | | NO DEPARTMENT INDICATED |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2807055 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2761547 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2740241 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2503530 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2508003 | EZ-PUBLIC SERVICE | FINANCE DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2516130 | DISABILITY SUPPORT TEAM | HUMAN SERVICES DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2501369 | CAREER PREP PLANNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500796 | WINTER HOLDING & LIGHTING | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2510115 | DPD SECURITY SYSTEM UPGRADE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500859 | HUBER BUILDING RESTORE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2513351 | | INFORMATION TECHNOLOGY SERVICES |
| DETROIT BUILDING AUTHORITY | 9266 | 2593193 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2530203 | CENTER & SITE IMPROVE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2526905 | FIRE DETECTION, ALARM & SUPRESSION | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2501859 | EASTERN MARKET RENOVATIONS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2545275 | SECURITY SYSTEM UPGRADE | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2503827 | CUSTOMER SERVICE CENTER | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501051 | FIRESTATION RENOVATION PROGRAM | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2636298 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2508408 | BUILDING RENOVATIONS | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500748 | PARKING IMPROVEMENTS | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2540535 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2502360 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630384 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2514346 | INFRASTRUCTURE IMPROVEMENTS | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2516282 | FIRE SUPPRESSION AND DETECTION SYSTEM | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501977 | ADAMS BUTZEL CENTER | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2506561 | COLEMAN A. YOUNG & ROBERTO CLEMENTE CENTERS IMPROVEMENTS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2560470 | 2001-02 CAPITAL IMPROVEMENT PROGRAM | CIVIC CENTER DEPARTMENT |

1218

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT BUILDING AUTHORITY | 9266 | 2500743 | BIRD & TIGER RENOVATION | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2691117 | | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2506912 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501579 | MCCABE FIELD HOUSE SITE IMPROVEMENTS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501961 | MADISON CTR IMPROVEMENTS | NO DEPARTMENT INDICATED |
| DETROIT BUILDING AUTHORITY | 9266 | 2653472 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2505570 | B.I. CANAL FICS CONTRACT # 073005 | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2594879 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2517916 | | HUMAN SERVICES DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2600472 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2544837 | PUBLIC IMPROVEMENTS AT WOODWARD | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2654364 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2532375 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2505579 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2536241 | COBO CENTERS CAPITAL PROGRAM | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2619410 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2688656 | | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2505726 | MINATURE RAILROAD RENOVATION | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2531292 | ARCHITECTURAL PROGRAMMING | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2561933 | CAPITAL IMPROVEMENTS | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2517985 | | HISTORICAL |
| DETROIT BUILDING AUTHORITY | 9266 | 2638245 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500762 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2545352 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2706199 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2767791 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630436 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2739330 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2726923 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2719133 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630388 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501957 | CAPITAL PROJECTS | HEALTH DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2697790 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630408 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2626704 | | HISTORICAL |
| DETROIT BUILDING AUTHORITY | 9266 | 2675809 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2550346 | GROUND CARE PROJECT | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2675818 | | ZOO |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT BUILDING AUTHORITY | 9266 | 2583964 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2627766 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2653471 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2710513 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2651003 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2697809 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2560660 | DETENTION CENTERS/POLICE HEADQUARTERS | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2796726 | | AIRPORT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2865303 | | DETROIT OFFICE OF HOMELAND SECURITY |
| DETROIT BUILDING AUTHORITY | 9266 | 2749361 | | PUBLIC LIGHTING DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2568320 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2510335 | RENOVATION AT PRECINCTS 2, 5, 7, & 11 | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2510162 | | POLICE DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2855625 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2778107 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2554997 | NEW CONTRACT SET-UP | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CENTRAL CITY COMMUNITY | 17253 | 2501790 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| DETROIT DISCOUNT DISTRIBUTORS INC | 1027457 | 2526361 | EMERGENCY FOOD | HUMAN SERVICES DEPARTMENT |
| DETROIT EAST COMMUNITY MENTAL | 1005394 | 2663209 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT EAST COMMUNITY MENTAL | 1005394 | 2719895 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT EAST INC | 13771 | 2520517 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2515604 | PROFESSIONAL ECONOMIC DEVELOPMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2784670 | ECONOMIC DEVELOPMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2753574 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2809284 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2725283 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT EDISON COMPANY | 5636 | 2501179 | | NO DEPARTMENT INDICATED |
| DETROIT ELECTRICAL SERVICES LLC | 1059639 | 2676228 | | WATER DEPARTMENT |
| DETROIT ENTREPRENEURSHIP INST | 1036516 | 2562737 | SELF EMPLOYMENT INITIATIVE | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ENTREPRENEURSHIP INST | 1036516 | 2507446 | P&DD/PS FICS CONTRACT #75285 | FINANCE DEPARTMENT |

1220

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | - | - | GRS SERVICE CONTRACT 2005, DATED MAY 25, 2005, BY AND BETWEEN THE CITY AND THE DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | NO DEPARTMENT INDICATED |
| DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | - | - | GRS SERVICE CONTRACT 2006, DATED JUNE 7, 2006, BY AND BETWEEN THE CITY AND THE DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION, AS THEREAFTER AMENDED | NO DEPARTMENT INDICATED |
| DETROIT HISPANIC | 20401 | 2564466 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT HOUSING COMMISSION | 1033965 | 2801908 | FUNDING AGREEMENT | DEPARTMENT OF PUBLIC WORKS |
| DETROIT HOUSING COMMISSION | 1033965 | 2833063 | FUNDING AGREEMENT | DEPARTMENT OF PUBLIC WORKS |
| DETROIT HOUSING COMMISSION | 1033965 | 2669571 | | HOUSING DEPARTMENT |
| DETROIT LIGHT HOUSE PROGRAM | 1001492 | 2501736 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| DETROIT LIGHT HOUSE PROGRAM | 1001492 | 2515558 | SUBSTANCE ABUSE FYE 9/99 | HEALTH DEPARTMENT |
| DETROIT MEDICAL CENTER | 20097 | 2501916 | MEDICAL SERVICES | NO DEPARTMENT INDICATED |
| DETROIT METRO CONVENTION | 1027508 | 2615728 | | CIVIC CENTER DEPARTMENT |
| DETROIT NEIGHBORHOOD & FAMILY INITIATIVE | 1018914 | 2520602 | EMPOWERMENT ZONE - PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT NEIGHBORHOOD DEVELOPMENT CORP | 1035571 | 2539512 | NEIGHBORHOOD REVITALIZATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT NONPROFIT HOUSING CORPORATION | 10641 | 2514457 | NOP PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | - | - | PFRS SERVICE CONTRACT 2005, DATED MAY 25, 2005, BY AND BETWEEN THE CITY AND THE DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | NO DEPARTMENT INDICATED |
| DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | - | - | PFRS SERVICE CONTRACT 2006, DATED JUNE 7, 2006, BY AND BETWEEN THE CITY AND THE DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION, AS THEREAFTER AMENDED | NO DEPARTMENT INDICATED |
| DETROIT PUBLIC SCHOOLS | 1835 | 2587295 | | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2557062 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2532505 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2617076 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2657665 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2663934 | | WORKFORCE DEVELOPMENT DEPARTMENT |

1221

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT PUBLIC SCHOOLS | 1835 | 2571396 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2512549 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2771471 | | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2767770 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2502297 | PERMANENT SHELTER & SUPPORT | HEALTH DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2560689 | SUPPORTIVE SERVICES | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2619840 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2548291 | TRANSITIONAL HOUSING (FICS #076950) | FINANCE DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2501406 | SHELTER FOR THE HOMELESS (FICS #079045) | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2559511 | CASE MANAGEMENT AND COUNSELING | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2588816 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2751508 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2774007 | | HUMAN SERVICES DEPARTMENT |
| DETROIT SNAP INC | 19532 | 2501606 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| DETROIT SPECTRUM PAINTERS INC | 11290 | 2785384 | EASTERN MARKET RENOVATIONS | RECREATION DEPARTMENT |
| DETROIT TIGERS BASEBALL CLUB | 1036628 | 2575026 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT TRANSPORTATION CORP DN2 | 14896 | 2624573 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT URBAN LEAGUE | 1587 | 2518492 | DHS EMERGENCY NEED SERVICES PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2504264 | CAREER DEVELOPMENT TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2620591 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2575580 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2563476 | WAGES AND MILEAGE WEATHERIZATION WORKERS | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2515009 | WEATHERIZATION SPECIALIST | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2512778 | WEATHERIZAITON INSPECTORS | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2672024 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2608694 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2557533 | JOB READINESS TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2557619 | EMERGENCY NEEDS PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2533037 | CAREER DEVELOPMENT PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2620874 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2535487 | EMERGENCY NEEDS PROGRAM. | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2518497 | PROVIDE COMPUTER SKILS TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2588385 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2804820 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2775162 | | HUMAN SERVICES DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2693328 | | BUDGET DEPARTMENT |

1222

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2825805 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2738647 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2770051 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2714701 | | BUDGET DEPARTMENT |
| DDETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2800319 | | BUDGET DEPARTMENT |
| DETROIT WAYNE PORT AUTHORITY | 10780 | 2501783 | | NON-DEPARTMENTAL |
| DETROIT WORKFORCE NETWORK INC | 1071709 | 2623415 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2563727 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2597991 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2627616 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2658738 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2778452 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2725743 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2806231 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DFT SECURITY TEAM JV | 1081574 | 2658119 | | WATER DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2504635 | NEAL/WHITFIELD V ARCHER/JAMES | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2501914 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502116 | LEGAL SERVICES: JOAN GHOGIAN V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2500792 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2501982 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502108 | NORDE JAMES V CHIEF ISIAH MCKINNON | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2504874 | LEGAL SERVICES: CHILDS V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502115 | LEGAL SERVICES: TAMARA HARMON V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502105 | NAOMI CONAWAY V CITY OF DETROIT | LAW DEPARTMENT |

1223

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DICKINSON WRIGHT PLLC | 1023465 | 2522227 | ANALYSIS OF PA 374; ARCHER V STATE | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2553236 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2534973 | TIGER STADIUM MGMT AGREEMENT | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2546606 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2543718 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2803153 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2765485 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2781254 | LEGAL SERVICES | LAW DEPARTMENT |
| DIVERSIFIED EDUCATIONAL SERVICE INC | 18910 | 2561519 | WORK FIRST/WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| DIVERSIFIED EDUCATIONAL SERVICE INC | 18910 | 2734876 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DOGWOOD BROOKSIDE NEIGHBORHOODS | 1103646 | 2781555 | SIDEWALKS, CURBS, AND APPROACHES | PLANNING AND DEVELOPMENT DEPARTMENT |
| DOMBROWSKI, ROBERT | 20565 | 2501542 | UNIFORM RELOCATION ASSTISTANCE | LAW DEPARTMENT |
| DON BOSCO HALL | 20026 | 2501185 | | NO DEPARTMENT INDICATED |
| DON BOSCO HALL | 20026 | 2595057 | | RECREATION DEPARTMENT |
| DON BOSCO HALL | 20026 | 2622063 | | RECREATION DEPARTMENT |
| DON BOSCO HALL | 20026 | 2778547 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DON BOSCO HALL | 20026 | 2801085 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DOPAR SUPPORT SYSTEMS INC | 21284 | 2713282 | | INFORMATION TECHNOLOGY SERVICES |
| DOWNTOWN DEVELOPMENT AUTHORITY | 17716 | 2770230 | LOWER WOODWARD IMPROVEMENT | DEPARTMENT OF PUBLIC WORKS |
| DOWNTOWN DEVELOPMENT AUTHORITY | 17716 | 2563708 | EQUIPMENT INSTALLLATION | PUBLIC LIGHTING DEPARTMENT |
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2604131 | | FINANCE DEPARTMENT |
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2770218 | | BUDGET DEPARTMENT |
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2738724 | | BUDGET DEPARTMENT |
| DUREN & ASSOCIATES | 20479 | 2658590 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2517349 | WASHINGTON, D.C. LEGISLATIVE SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2518125 | U.S. DEPT OF JUSTICE DOT INVESTIGATION | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2537039 | ANDRE YOUNG A/K/A DR. DRE V CITY | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2537005 | WASHINGTON D.C. LIAISON | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2501222 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2561984 | LEGAL SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2501872 | LEGAL SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2550459 | EUGENE BROWN V CITY | LAW DEPARTMENT |
| DYNALECTRIC | 1103998 | 2765307 | CLOSED CIRCUIT TELEVISION FOR DOT | DEPARTMENT OF TRANSPORTATION |
| E L S CONSTRUCTION | 1098327 | 2785558 | EASTERN MARKET SHED NO. 3 RENOVATIONS | RECREATION DEPARTMENT |
| EARTH TECH INC | 20544 | 2500983 | BELT FILTER PRESSES | SEWERAGE DEPARTMENT |
| EARTH TECH INC | 20544 | 2502192 | CASINO SITE APPRAISALS | LAW DEPARTMENT |
| EARTH TECH INC | 20544 | 2510034 | ENVIRONMENTAL REAL ESTATE-FICS #71021 | FINANCE DEPARTMENT |
| EASTERN OIL CO. | - | 2809177 | LUBRICANT OIL | GENERAL SERVICES DEPARTMENT |

1224

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| EASTSIDE COMMUNITY RESOURCE | 1018050 | 2538974 | JOB ACCESS REVERSE COMMUTE | EMPLOYMENT AND TRAINING DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2502205 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2532107 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2543569 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| EASTWOOD CLINICS CORP OFFICE | 1000451 | 2501528 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| EASTWOOD CLINICS CORP OFFICE | 1000451 | 2501826 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| EBI DETROIT | 1000452 | 2517413 | WW-529 SCREEN HOUSE REHABILITATION | WATER DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2515748 | PROFESSIONAL ECONOMIC DEVELOPMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2764614 | FOX CREEK INFRASTRUCTURE PROJECT | DEPARTMENT OF PUBLIC WORKS |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2818723 | EAST RIVERFRONT IMPROVEMENT PROJECT | DEPARTMENT OF PUBLIC WORKS |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2641018 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2784665 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2753580 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2809038 | ECONOMIC DEVELOPMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 20423 | 2724428 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 1055746 | 2806233 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 1055746 | 2778455 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| EDWARD C GEORGE | 9826 | 2502379 | | HUMAN SERVICES DEPARTMENT |
| EDWARD C LEVY CO DBA PLANT MAINTENANCE | 1020737 | 2502151 | BITUMINOUS SURFACE REMOVAL | DEPARTMENT OF PUBLIC WORKS |
| EJH CONSTRUCTION | 1020562 | 2808924 | | HUMAN SERVICES DEPARTMENT |
| ELEVATOR TECHNOLOGY | 1000471 | 2500082 | ELEVATOR MAINTENANCE SERVICE | GENERAL SERVICES DEPARTMENT |
| ELMHURST HOME INC | 10998 | 2501829 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| ELMHURST HOME INC | 10998 | 2501729 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| EMERSON PROCESS MANAGEMENT POWER | 1016248 | 2847526 | GAS TURBINE UPGRADE AND REPAIR | PUBLIC LIGHTING DEPARTMENT |
| EMPCO INC | 1118906 | 2878252 | | MAYOR'S OFFICE |
| EMPOWERMENT ZONE DEVELOPMENT CORP | 19637 | 2513278 | ADMINISTRATIVE ACTIVITY | PLANNING AND DEVELOPMENT DEPARTMENT |
| EMPOWERMENT ZONE DEVELOPMENT CORP | 19637 | 2529275 | EMPOWERMENT ZONE - PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| EMPRESA | 1099489 | 2776404 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ENERGY GROUP INC | 1017472 | 2509158 | FICS CONTRACT 076115 - TREE TRIMMING | PUBLIC LIGHTING DEPARTMENT |
| ENGINE SUPPLY OF NOVI | 1994 | 2505264 | PARTS COMPLETE ENGINES (M80372) | FINANCE DEPARTMENT |
| ENOTA INC | 1092130 | 2717072 | | POLICE DEPARTMENT |
| ENTECH PERSONNEL SERVICES INC | 1000768 | 2544596 | CLERICAL ASSISTANCE | CITY CLERK |
| ENVIRONMENTAL CONSULTING & TECHNOLOGY | 1106148 | 2551431 | ENVIRONMENTAL SVCS/GREATER RIVERFRONT | PLANNING AND DEVELOPMENT DEPARTMENT |

1225

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ENVIRONMENTAL TESTING & CONSULTING INC | 1003675 | 2502196 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| EPITEC GROUP INC | 1045979 | 2556386 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| EPITEC GROUP INC | 1045979 | 2573836 | | NON-DEPARTMENTAL |
| EPITEC GROUP INC | 1045979 | 2620773 | | NON-DEPARTMENTAL |
| ESTHER LYNISE BRYANT | 1019604 | 2508103 | IUOE/GIBSON V CITY | LAW DEPARTMENT |
| EVANS GROUP | 1019232 | 2515534 | JOSEPHINE MILLS V CITY | LAW DEPARTMENT |
| EVEREST SOLUTIONS LLC | 1000830 | 2503912 | CONVERSION OF YEAR 2000 | FINANCE DEPARTMENT |
| EVO ACCOUNTING & FINANCIAL SERVICES | 1070752 | 2761823 | | FINANCE DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2541124 | CASE MANAGMENT/COUNSELING SERVICES | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2508864 | P&DD PUBLIC SERVICE | FINANCE DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2559513 | ASE MANAGEMENT AND COUNSELING | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2597464 | | FINANCE DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2620491 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2588790 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2773997 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2751502 | | HUMAN SERVICES DEPARTMENT |
| FARBMAN DEVELOPMENT GROUP INC | 1052543 | 2574590 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| FELIX J LIDDELL MD | 9742 | 2619048 | | HUMAN SERVICES DEPARTMENT |
| FELIX J LIDDELL MD | 9742 | 2771950 | | HUMAN SERVICES DEPARTMENT |
| FEMI TALABI & ASSOCIATES IINC | 1025786 | 2693989 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| FERGUSON ENTERPRISES INC | 1002829 | 2762820 | WATER SYSTEM IMPROVEMENTS | WATER DEPARTMENT |
| FERGUSON ENTERPRISES INC | 1002829 | 2708886 | | RECREATION DEPARTMENT |
| FIRST AMERICAN EQUITY LOAN SERVICES INC | 1053418 | 2572513 | | LAW DEPARTMENT |
| FIRST TEE OF DETROIT | 1106838 | 2509532 | JUNIOR GOLF PROGRAM | RECREATION DEPARTMENT |
| FLORISE E NEVILLE EWELL | 18953 | 2511634 | LAW DEPARTMENT CONTRACTS SECTION | FINANCE DEPARTMENT |
| FOCUS HOPE | 20156 | 2595470 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOCUS HOPE | 20156 | 2517834 | MACHINIST TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOCUS HOPE | 20156 | 2782889 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| FOLIA INDUSTRIES INC | 1078969 | 2647895 | | RECREATION DEPARTMENT |
| FORBES MANAGEMENT INC | 13713 | 2500738 | 8TH FL 2111 WOODWARD | NO DEPARTMENT INDICATED |
| FORBES MANAGEMENT INC | 13713 | 2500736 | | NO DEPARTMENT INDICATED |
| FORENSIC EXAMINATION SERVICE | 19765 | 2511601 | ESTATE OF CARA BELL JONES | LAW DEPARTMENT |
| FORT WAYNE CONSTRUCTION INC | 1002341 | 2508445 | EMER. REPAIR OF STORM DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2562165 | WORK FIRST & WTW | EMPLOYMENT AND TRAINING DEPARTMENT |

1226

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2629097 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2778457 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| FRANCES GREENEBAUM | 15339 | 2500958 | | HUMAN SERVICES DEPARTMENT |
| FRANCES GREENEBAUM | 15339 | 2500968 | | HUMAN SERVICES DEPARTMENT |
| FRANCES S GREENEBAUM | 1001353 | 2663660 | | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2557088 | 2001-2002 EARLY HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2532391 | EARLY HEAD START 2000-2001 | FINANCE DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2512564 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2501500 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| FREEDOM HOUSE | 19860 | 2551708 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| G4S SECURE SOLUTIONS USA, INC. | 1116038 | 2741015 | SECURITY SERVICES | GENERAL SERVICES DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2525486 | ELIZABETH HURD, ET AL V CITY OF DETROIT | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2540460 | LEGAL SERVICES | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505197 | JOHNSON V JECZEN, ET AL | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2502158 | LEGAL SERVICES: TROMEUR V ADKINS | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505077 | LEGAL SERVICES | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2574321 | | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505187 | LEGAL SERVICES: BERNICE MARTIN V CITY | FINANCE DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2623273 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2630629 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2623274 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2625340 | | PUBLIC LIGHTING DEPARTMENT |
| GEORGE E SANSOUCY P E LLC | 1034071 | 2537262 | PROFESSIONAL SERVICES: APPRAISALS | LAW DEPARTMENT |
| GEORGE JOHNSON & COMPANY | 1826 | 2754359 | | HUMAN SERVICES DEPARTMENT |
| GERALD K EVELYN | 1102554 | 2765473 | LEGAL SERVICES | LAW DEPARTMENT |
| GERALD K EVELYN | 1102554 | 2765475 | LEGAL SERVICES | LAW DEPARTMENT |
| GHAFARI ASSOCIATES LLC | 16840 | 2500978 | ADAMS ROAD IMPROVEMENTS | NO DEPARTMENT INDICATED |
| GHAFARI ASSOCIATES LLC | 16840 | 2520892 | ELECTRICAL SERVICES AT 2633 MICHIGAN AVE. | DEPARTMENT OF PUBLIC WORKS |
| GIORGI CONCRETE LLC | 1010405 | 2764704 | REPAIR OF WATER SYSTEM | WATER DEPARTMENT |
| GIRL SCOUTS OF METRO DETROIT | 7539 | 2588820 | | HUMAN SERVICES DEPARTMENT |
| GIRL SCOUTS OF METRO DETROIT | 7539 | 2775160 | | HUMAN SERVICES DEPARTMENT |
| GIS DATA RESOURCES INC | 1087473 | 2696020 | | POLICE DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2775453 | | HUMAN SERVICES DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2803612 | | HUMAN SERVICES DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2778130 | | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2746566 | | HUMAN SERVICES DEPARTMENT |
| GLEN OLIVACHE CPA PC | 1001562 | 2507371 | | FINANCE DEPARTMENT |
| GLOBEWIDE FAVOR CONSTRUCTION CO LLC | 1085092 | 2808926 | | HUMAN SERVICES DEPARTMENT |
| GLOBEWIDE FAVOR CONSTRUCTION CO LLC | 1085092 | 2793406 | | HUMAN SERVICES DEPARTMENT |
| GODFREY J DILLARD ESQ | 1103303 | 2779417 | | LAW DEPARTMENT |
| GOODMAN & HURWITZ PC | 1101745 | 2760433 | SPECIAL COUNSEL | CITY COUNCIL |
| GOODMAN MUSCAT INC | 1015305 | 2509737 | ORGANIZATIONAL ASSESSMENT | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2563438 | WORKFIRST/WTW JS/JR | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2559919 | FOOD STAMPS | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2539285 | WORKFIRST JS/JP 10/01/00-9/30/01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2628317 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2797757 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2736042 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2782892 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2761556 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2740308 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2770617 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2770613 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GRAY & GRAY PRODUCTIONS | 18090 | 2594537 | | RECREATION DEPARTMENT |
| GREAT LAKES CENTER FOR INDEPENDENT LIVING | 19673 | 2501926 | PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| GREATER DETROIT COMMUNITY OUTREACH CENTER INC | 19466 | 2501509 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| GREEN GREEN ADAMS PALMER & CRAIG PC | 1014038 | 2508762 | LEGAL SERVICES | CITY COUNCIL |

1228

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| GREGORY TERRELL & COMPANY | 14501 | 2506562 | AUDIT | HUMAN SERVICES DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2527604 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2546243 | SANDRA MILLER V EUGENE BROWN, ET AL | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2502429 | CHISHOLM, ET AL V CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2550395 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2548219 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2632136 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2545753 | BRANDON BRYANT V EUGENE BROWN/CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2502093 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| GRIER & COPELAND PC | 11779 | 2502430 | LEGAL SERVICES: MCHUGH, ET AL V CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2505089 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2597158 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2576025 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2708898 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2634211 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2649862 | CONTRACT FOR LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2688106 | DAREL DEON CHANCELLOR V CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2551543 | WILLIE BRYANT V EUGENE BROWN | LAW DEPARTMENT |
| GS EQUITIES LLC | 1088912 | 2700328 | | LAW DEPARTMENT |
| HALCROW INC | 1102933 | 2769474 | | MAYOR'S OFFICE |
| HALE CONTRACTING INC | 1025577 | 2757453 | VENTILATION SYSTEM | RECREATION DEPARTMENT |
| HALEY & ALDRICH INC | 1098676 | 2740779 | | WATER DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2507157 | BELLE ISLE MASTER PLAN | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2530873 | FARWELL FIELD ARCHITECTURAL SERVICES | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2508644 | BELLE ISLE'S LOITER WAY REFECTORY | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2563405 | BELLE ISLE'S MASTER PLAN | RECREATION DEPARTMENT |
| HAMPTON RIDGE PROPERTIES LLC | 1019230 | 2515341 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| HARBIN GROUP INC | 16607 | 2507665 | CASINO SITE APPRAISAL | FINANCE DEPARTMENT |
| HARPER HOUSE | 1003691 | 2501737 | | HEALTH DEPARTMENT |
| HARTFORD MEMORIAL BAPTIST CHURCH | 14442 | 2502480 | SENIOR CITIZENS MEALS | HEALTH DEPARTMENT |
| HAYES LAND DEVELOPMENT CORPORATION | 1106003 | 2613519 | | WATER DEPARTMENT |
| HEALTH MANAGEMENT SYSTEMS | 5654 | 2542966 | EMPLOYEE ASSISTANCE PROGRAM | HUMAN RESOURCES DEPARTMENT |
| HEALTH MANAGEMENT SYSTEMS | 1043088 | 2613135 | | HUMAN RESOURCES DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2504678 | TARGET CITIES FYE 9/30/99 | FINANCE DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2501833 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2568871 | | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2570277 | | HEALTH DEPARTMENT |

1229

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2504742 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2512068 | SUBSTANCE ABUSE ASSESSMENT | HEALTH DEPARTMENT |
| HEAT & WARMTH FUND | 18570 | 2717114 | | WATER DEPARTMENT |
| HEIGHTS HEATING & COOLING INC | 1032472 | 2741890 | AIR CONDITIONING INSTALLATION | RECREATION DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2505277 | MEDICAL SERVICES | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2605168 | | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2574218 | | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2621296 | | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2752105 | | HEALTH DEPARTMENT |
| HERBERT REALTY & MANAGEMENT | 1018769 | 2559115 | | FINANCE DEPARTMENT |
| HERITAGE OPTICAL CENTER INC | 16451 | 2515148 | OPTOMETRIC SERVICES | HEALTH DEPARTMENT |
| HERITAGE OPTICAL CENTER INC | 16451 | 2530208 | | HEALTH DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2604598 | | FINANCE DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2761160 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2775593 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2757513 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2783105 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2761157 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2706006 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2804847 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2744129 | | HUMAN SERVICES DEPARTMENT |
| HNTB MICHIGAN INC | 1025696 | 2589459 | | DEPARTMENT OF PUBLIC WORKS |
| HNTB MICHIGAN INC | 1025696 | 2800235 | PROFESSIONAL SERVICES | AIRPORT DEPARTMENT |
| HOUSING & COMMUNITY DEVELOPMENT CORP OF WAYNE COUNTY | 1021017 | 2518243 | HOUSING REHABILITATION SERVICES | FINANCE DEPARTMENT |
| HOWARD & HOWARD ATTORNEYS PC | 1013410 | 2773508 | LEGAL SERVICES | LAW DEPARTMENT |
| HTC GLOBAL SERVICES INC | 1003630 | 2501175 | | INFORMATION TECHNOLOGY SERVICES |
| HUBBARD RICHARD COMMON COUNCIL | 9225 | 2501533 | | NO DEPARTMENT INDICATED |
| HUFFMASTER ASSOCIATES LLC | 1010540 | 2506275 | INVESTIGATIVE SERVICES | FINANCE DEPARTMENT |
| HUNGER ACTION COALITION OF MICHIGAN | 16897 | 2510332 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| HUNT ASSOCIATES 1 INC | 19746 | 2537045 | WIA OUT OF SCHOOL YOUTH | EMPLOYMENT AND TRAINING DEPARTMENT |
| HUNT ASSOCIATES 1 INC | 19746 | 2628062 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| HUTZEL HOSPITAL | 15175 | 2501837 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| HUTZEL HOSPITAL | 15175 | 2508866 | | HEALTH DEPARTMENT |
| IBM CORPORATION | 2865 | 2505095 | | INFORMATION TECHNOLOGY SERVICES |
| ICDS | 1003163 | 2501182 | | PUBLIC LIGHTING DEPARTMENT |
| IMAGE SCAN INC | 18157 | 2512900 | DATA ENTRY SOFTWARE | INFORMATION TECHNOLOGY SERVICES |

1230

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| IMPERIAL CONSTRUCTION CO | 12464 | 2746886 | | WATER DEPARTMENT |
| IMPERIAL CONSTRUCTION CO | 12464 | 2685161 | | WATER DEPARTMENT |
| IMPERIAL CONSTRUCTION CO | 12464 | 2679721 | | WATER DEPARTMENT |
| IN LAND WATERS POLLUTION | 14434 | 2502291 | REMOVAL OF STORAGE TANKS | DEPARTMENT OF PUBLIC WORKS |
| IN LAND WATERS POLLUTION | 14434 | 2502290 | UST UPGRADES | DEPARTMENT OF PUBLIC WORKS |
| INDUSTRIAL RELATIONS INC | 1027976 | 2527324 | PERFORMANCE MANAGEMENT SYSTEM | FINANCE DEPARTMENT |
| INDUSTRIAL RELATIONS INC | 1027976 | 2513432 | EMPLOYEE DEVELOPMENT PROGRAM | HUMAN RESOURCES DEPARTMENT |
| INFRASTRUCTURE MANAGEMENT GROUP INC | 1061121 | 2634315 | | PUBLIC LIGHTING DEPARTMENT |
| INLAND WATERS POLLUTION CONTROL INC | 1055642 | 2556880 | UNDERGROUND STORAGE TANKS | DEPARTMENT OF PUBLIC WORKS |
| INTERCLEAN EQUIPMENT INC | 1011180 | 2504773 | INSTALLATION OF TRUCK WASH SYSTEMS | DEPARTMENT OF PUBLIC WORKS |
| INTERGRAPH CORPORATION | 6153 | 2516412 | 953625- COMPUTER RELATED PRODUCTS | INFORMATION TECHNOLOGY SERVICES |
| INTERNATIONAL INSTITUTE OF METROPOLITAN DETROIT INC | 9144 | 2521334 | | FINANCE DEPARTMENT |
| ISLANDVIEW VILLAGE DEVELOPMENT CORP | 20425 | 2509212 | SITE PREP/STREET IMPROVEMENT | FINANCE DEPARTMENT |
| ITW MORTAGE INVESTMENTS III INC | 1561 | 2501775 | | FINANCE DEPARTMENT |
| J & J YOUTH SERVICES | 1012849 | 2506553 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| J J ASSOCIATES | 17711 | 2589033 | | INFORMATION TECHNOLOGY SERVICES |
| J J ASSOCIATES | 17711 | 2502052 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| J J ASSOCIATES | 1//11 | 2560948 | 2002 PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| J O A CONSTRUCTION CO INC | 1001666 | 2642903 | | RECREATION DEPARTMENT |
| JACKETS FOR JOBS INC | 1064297 | 2778459 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JACKETS FOR JOBS INC | 1064297 | 2754535 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JACKSON & KELLY PLLC | 1016929 | 2511861 | LEGAL SERVICES | LAW DEPARTMENT |
| JAMES C COBB JR PC | 10571 | 2504319 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| JAMES C COBB JR PC | 10571 | 2501780 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2544158 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2513136 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2559396 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2508122 | DRUG TREATMENT PROGRAM PHYSICIAN | FINANCE DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2591486 | | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2746434 | | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2771944 | | HUMAN SERVICES DEPARTMENT |
| JAMES W BURDICK PC | 1101618 | 2760028 | | LAW DEPARTMENT |
| JEFFERSON WELLS INTERNATIONAL INC | 1032623 | 2546414 | PROFESSIONAL SERVICES | AUDITOR GENERAL |
| JEFFERSON WELLS INTERNATIONAL INC | 1032623 | 2534548 | INTERNAL AUDIT PARTNER | AUDITOR GENERAL |

1231

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| JENKINS CONSTRUCTION INC | 17037 | 2541121 | WS-621 WATER MAIN REPAIRS | WATER DEPARTMENT |
| JENKINS CONSTRUCTION INC | 17037 | 2501854 | CONSTRUCTION | DEPARTMENT OF PUBLIC WORKS |
| JENKINS CONSTRUCTION INC | 17037 | 2691365 | | WATER DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2559428 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2544148 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2508116 | DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2513142 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2591460 | | HUMAN SERVICES DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2797759 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2726449 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2777965 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2778659 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2552853 | CASE MANAGEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2513901 | NO WRONG DOOR | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2550062 | PAL BASIC LITERACY | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2538061 | WORK FIRST JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| JOHN KING | 1070289 | 2799418 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JOHN KING | 1070289 | 2781812 | | |
| JOHN PETER QUINN | 1088277 | 2751148 | | LAW DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2544130 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2559403 | MEDICAL DIRECTOR | HUMAN SERVICES DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2771947 | | HUMAN SERVICES DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2577160 | | LAW DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2600509 | | LAW DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2508107 | LEGAL SERVICES | FINANCE DEPARTMENT |
| JORDAN CLINICS LIMITED PARTNERSHIP | 1098511 | 2770685 | | HEALTH DEPARTMENT |
| JOWA ASSOCIATES | 7422 | 2501000 | UNIFORMED GUARD SERVICE | AIRPORT DEPARTMENT |
| JOWA ASSOCIATES | 7422 | 2513434 | GUARD SERVICE FOR DEPARTMENT CLINICS | HUMAN SERVICES DEPARTMENT |
| JOYFIELD CAREGIVERS | 1048950 | 2597503 | | FINANCE DEPARTMENT |
| JOYFIELD CAREGIVERS | 1048950 | 2563712 | 36-NTV-NQF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2575844 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2592232 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2597745 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2566265 | WORK FIRST JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2503637 | LEGAL SERVICES | FINANCE DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2531995 | WAYNE COUNTY V CITY OF DETROIT | LAW DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2502453 | LEGAL SERVICES | FINANCE DEPARTMENT |
| KELLER THOMA SCHWARTZ | 1020326 | 2517263 | EMPLOYMENT-RELATED INVESTIGATIONS | LAW DEPARTMENT |

1232

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| KELLY SERVICES INC | 1000576 | 2583741 | | FINANCE DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760784 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2664187 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2706955 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2755384 | ROOF PLACEMENT | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2798610 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2733881 | BUTZEL PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2734358 | ACTIVITIES CENTER RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760999 | WISH-EGAN PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2761019 | MILAN PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2761662 | KRAINZ PARK RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2789769 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2734388 | DRAINAGE/SEWER | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2731179 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2712232 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760990 | OPTOMIST-STOUT RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2762087 | 2008 PARK IMPROVEMENTS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2711290 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2712252 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2714050 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2807770 | REPAIRS AT HENDERSON MARINA | RECREATION DEPARTMENT |
| KIDSMART SOFTWARE COMPANY | 1072607 | 2781805 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| KIMLEY-HORN OF MICHIGAN INC | 1003415 | 2502474 | CASINO SITE APPRAISER | LAW DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2511508 | PASSALAQUA CHOP HOUSE V DETROIT | FINANCE DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2537217 | PROFESSIONAL SERVICES:  STILLMON V CITY | LAW DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2794993 | PROVIDE ADVICE ON SOLID WASTE FUND | BUDGET DEPARTMENT |
| KPMG CONSULTING, INC | 1028311 | 2529517 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG CONSULTING, INC | 1028311 | 2552186 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG LLP | 1440 | 2510105 | IMPLEMENT TIDEMARK COMPUTER SYSTEM | BUILDINGS AND SAFETY DEPARTMENT |
| KPMG LLP | 1440 | 2513477 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG LLP | 1440 | 2504566 | CONSULTING SERVICES | BUDGET DEPARTMENT |
| KVM DOOR SYSTEMS INC | 1099793 | 2785386 | EASTERN MARKET SHED NO. 3 RESERVATIONS | RECREATION DEPARTMENT |
| L D' AGOSTINI & SONS INC | 1000677 | 2500927 | LATERAL SEWER REPLACEMENT | NO DEPARTMENT INDICATED |
| LACEY & ASSOCIATES | 1010869 | 2590826 | | FINANCE DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2562865 | DPOA ACT 312 2001-2004 PROCEEDINGS | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2502300 | BLUE CROSS/BLUE SHIELD RESERVE FUND | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518960 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2534969 | KELLY FOREMAN V CITY | LAW DEPARTMENT |

1233

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| LACEY & JONES LLP | 1013697 | 2518952 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518964 | EDWARD LEWIS V P.O. STEVEN PEIL/CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2539980 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2520968 | LEGAL SERVICES: KEMP V NOETZEL & KEMP | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2539975 | LEGAL SERVICES: MAURICE BROWN V CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518969 | MICHAEL MCHUGH V CITY OF DETROIT | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518967 | JESSE WILLIAMS V CITY OF DETROIT | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2501959 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518973 | BEAUCHAMP V OWENS/CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2562836 | MAXIMILIAN ENGRAM, ET AL V CITY | LAW DEPARTMENT |
| LAKESHORE ENGINEERING SERVICE INC | 19808 | 2502201 | ABATEMENT ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| LAMONT TITLE CORPORATION | 1070200 | 2501595 | 36/LS - TITLE COMMITMENTS | PLANNING AND DEVELOPMENT DEPARTMENT |
| LAMONT TITLE CORPORATION | 1070200 | 2603572 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| LANIER | 1012355 | 2533656 | EMERGENCY USE FOR POLICE PAYROLL | FINANCE DEPARTMENT |
| LANZO CONSTRUCTION CO | 13425 | 2613521 | | WATER DEPARTMENT |
| LARDNER ELEVATOR COMPANY | 24166 | 2507678 | ELEVATOR LOAD & NO-LOAD TEST | WATER DEPARTMENT |
| LASED | 11513 | 2560786 | WIA IN SCHOOL YOUTH PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| LASED | 11513 | 2501749 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| LASED | 11513 | 2740243 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LASED | 11513 | 2719927 | | DEPARTMENT OF TRANSPORTATION |
| LASED | 11513 | 2801087 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LASED | 11513 | 2778540 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LATINO FAMILY SERVICES INC | 16339 | 2504667 | MEDICAID FYE 9/30/99 | HEALTH DEPARTMENT |
| LATINO FAMILY SERVICES INC | 16339 | 2501843 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| LAW OFFICES COLLINS EINHORN | 1049868 | 2765611 | | LAW DEPARTMENT |
| LAWTON SCHOOL | 1100766 | 2806424 | | HUMAN SERVICES DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502307 | LEGAL SERVICES: CRUMBIE V GUYTON, ET AL | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502427 | GAINES/HARRIS/HINES/HUGHES V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2539985 | SANDRA/DARREN MILLER V EUGENE BROWN | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2539983 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2536840 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2553151 | BERRY/CHENAULT/CROCKETT ET AL V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2553122 | KUE/WALKER/SMITH/WIGGINS V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2634333 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2655854 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2529631 | BRAZIL/PENA V CITY/HOOD | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2561951 | ALLEN/BATTLE/COOPER/GRIFFIN V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2600494 | | LAW DEPARTMENT |

1234

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| LEWIS & MUNDAY PC | 12439 | 2774620 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502303 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2641462 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2649874 | | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2500765 | LEGAL SERVICES: VELA V PRICE/CITY | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2539960 | LEGAL SERVICES | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2517379 | LEGAL SERVICES | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2548909 | LEGAL SERVICES | LAW DEPARTMENT |
| LIFE FITNESS INC | 1085199 | 2704235 | | RECREATION DEPARTMENT |
| LIONEL SAWYER COLLINS | 19940 | 2502230 | PROFESSIONAL SERVICES | CITY COUNCIL |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2562574 | PROFESSIONAL SERVICES | CITY COUNCIL |
| LOCAL INITIATIVES SUPPORT CORPORATION | 18595 | 2502034 | EMPOWERED ZONE | NO DEPARTMENT INDICATED |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2592262 | | FINANCE DEPARTMENT |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2567588 | | FINANCE DEPARTMENT |
| LOOKING FOR MY SISTER | 1104410 | 2784890 | BLOCK GRANT PROGRAM | POLICE DEPARTMENT |
| LOUIS G REDSTONE ASSCS INC | 16448 | 2502006 | DESIGN FOR ROGELL GLF CRS | NO DEPARTMENT INDICATED |
| LUXURY SEDAN VAN SERVICE | 1015148 | 2570671 | | MUNICIPAL PARKING DEPARTMENT |
| MACDERMOTT ROOFING & SHEET METAL | 16537 | 2732369 | BELLE ISLE GARAGE - ROOF REPLACEMENT | RECREATION DEPARTMENT |
| MACDERMOTT ROOFING & SHEET METAL | 16537 | 2796454 | ROOF REPAIRS | RECREATION DEPARTMENT |
| MACK ALIVE INC | 19676 | 2801089 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MACK ALIVE INC | 19676 | 2778765 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MAJOR CEMENT CO | 22141 | 2502189 | PW 7561 REPAIR DEMAGED | NO DEPARTMENT INDICATED |
| MAJOR CEMENT CO | 22141 | 2634038 | | DEPARTMENT OF PUBLIC WORKS |
| MARINERS INN | 5159 | 2509995 | WTW SUBSTANCE ABUSE COUNSELING | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARINERS INN | 5159 | 2549595 | CAREER INITIATIVES CENTER PROJECT | HUMAN SERVICES DEPARTMENT |
| MARJORIE R MALARNEY & ASSOCIATES | 12830 | 2500751 | LANSING LOBBYIST | LAW DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2589338 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2629691 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2595777 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2627961 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2507022 | FIC #76292 WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2512792 | ASSESSMENT CTR TITLES IIA/IIC & III | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2555328 | WIA ADULT & OUT-OF-SCHOOL YOUTH | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2529603 | ASSESS CTR MOD#1 | FINANCE DEPARTMENT |

1235

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2563669 | LEARNING RESOURCE CTR WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2571652 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2777810 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2771650 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2740292 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2725976 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2740278 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2754537 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2512563 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2528270 | ENPOWERMENT ZONE- PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2541817 | PAROLEE EMPLOYMENT TRAINING PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2557083 | 2001-2002 HEAD START CONTRACT | HEALTH DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2502075 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2532520 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2501666 | JOB SEARCH AND PLACEMENT | NO DEPARTMENT INDICATED |
| MATRIX HUMAN SERVICES | 1584 | 2512181 | SHELTER FOR HOMELESS YOUTH | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2561392 | WORK FIRST & WTW. 2001-2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2606499 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2847169 | | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2767093 | | HUMAN SERVICES DEPARTMENT |
| MAYOR'S TIME | 1070618 | 2780286 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| METCO SERVICES INC | 13250 | 2502148 | | DEPARTMENT OF PUBLIC WORKS |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2557075 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2532514 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2505351 | | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2512558 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2768826 | | HUMAN SERVICES DEPARTMENT |
| METRO EAST DRUG TREATMENT | 10996 | 2501534 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| METRO EMPLOYMENT SOLUTIONS | 1007722 | 2564007 | WORK FIRST & WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| METRO EMPLOYMENT SOLUTIONS | 1007722 | 2626981 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| METROPOLITAN ARTS COMPLEX INC | 1001141 | 2501630 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| METROPOLITAN ARTS COMPLEX INC | 1001141 | 2501857 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| METROPOLITAN CHILDREN & YOUTH INC | 1082096 | 2847163 | | HUMAN SERVICES DEPARTMENT |

1236

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| METROPOLITAN DETROIT AFL-CIO | 1001142 | 2502169 | JOB SEARCH | NO DEPARTMENT INDICATED |
| METROPOLITAN DETROIT AFL-CIO | 1001142 | 2603384 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2530321 | ADVERTISING AND PROMTIONAL EXPERTISE | CIVIC CENTER DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2550871 | PROMOTION FOR COBO CENTER | CIVIC CENTER DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2767846 | PROFESSIONAL SERVICES CONTRACT | CIVIC CENTER DEPARTMENT |
| MGM LEGAL MGMT SOLUTIONS | 20133 | 2502235 | | NO DEPARTMENT INDICATED |
| MICHIGAN CONFERENCE SDA DETROIT/METRO | 1012847 | 2506682 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| MICHIGAN DEPARTMENT OF CAREER | 1016600 | 2511440 | EMPLOYMENT SERVICES | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN DEPARTMENT OF CAREER | 1016600 | 2620233 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2510495 | ADVANCE-TRAFFIC SIGNAL MODERNIZATION | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2517085 | BITUMINIOUS COLDMILLING WORK ALONG HWY M102 FROM HWY M53TO KELLY ROAD | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500761 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2518505 | COLDMILLING ALONG HWY. US-24 FROM HWY. M-5(GRAND RIVER) TO M-102 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501400 | RESURFACING | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501407 | RESCONSTRUCTION OF DECK | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2511603 | TRAFFIC SIGNALS AND PAVEMENT MARKINGS | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501807 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500758 | SCREENING | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2518522 | DECK REPLACEMENT | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500787 | REPLACE BRIDGES | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2512565 | CONCRETRE OVERLAY FOR STRUCTURE WHICH CARRIES PORTER ST. OVER I-75 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501877 | BRIDGE | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2521604 | DECK REPLACEMENT | DEPARTMENT OF PUBLIC WORKS |

1237

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2524693 | PEDESTRAIN SCREENING FOR VARIOUS STRUCTURES | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2502178 | RECONSTRUCT HWY - I 75 SPRINGWELL | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501411 | BRIDGE AND DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2567088 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2502469 | RESURFACE DECK | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2538766 | TRAFFIC SIGNALWORK AT DICKERSON ROAD | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2520074 | RECONSTRUCTION OF STRUCTURE WHICH CARRIES GREENFIELD ROAD OVER HWY. M-10 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500781 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500779 | RESURFACING | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2622755 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2740688 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2517764 | DECK REPLACEMENT WORK ON BRIDGE | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2511049 | BITUMINOUS RESURFACING AND CURB WORK ALONG LIVERNOIS | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN FOOD AND BEVERAGE ASSOCIATION | 1101727 | 2759218 | PERIOD SERVICES FOR METRO YOUTH DAY | RECREATION DEPARTMENT |
| MICHIGAN FOOD AND BEVERAGE ASSOCIATION | 1101727 | 2786573 | METRO YOUTH DAY | RECREATION DEPARTMENT |
| MICHIGAN HVAC VOCATIONAL | 17478 | 2512764 | RETRAINING SERVICES | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN STATE AFL-CIO HRDI | 1027005 | 2769866 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MICHIGAN STATE UNIVERSITY | 8167 | 2795800 | ACCIDENT INVESTIGATION COURSES | POLICE DEPARTMENT |
| MIDNIGHT GOLF PROGRAM | 1055952 | 2778544 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2540054 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2562793 | WORK FIRST PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2778461 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2806239 | | WORKFORCE DEVELOPMENT DEPARTMENT |

1238

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MILWAUKEE INVESTMENT CO | 17041 | 2501818 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MILWAUKEE INVESTMENT CO | 17041 | 2524249 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MIRO WEINER & KRAMER PC | 1039572 | 2665562 | | LAW DEPARTMENT |
| MISDEMEANOR DEFENDERS LAW CLINIC PC | 1009823 | 2534641 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| MITCHCO | 1022053 | 2553859 | GAS, COMPRESSED NATURAL | DEPARTMENT OF TRANSPORTATION |
| MOLLY LEVITT | 1951 | 2500956 | | HUMAN SERVICES DEPARTMENT |
| MOLLY LEVITT | 1951 | 2500955 | | HUMAN SERVICES DEPARTMENT |
| MOMS & BABES TOO MSSP/JSSP INC | 1013849 | 2508892 | 25-WIC 9/99 CERTIFICATION | HEALTH DEPARTMENT |
| MONTEZ GROUP | 1100889 | 2769654 | | MAYOR'S OFFICE |
| MOORE & ASSOCIATES INC | 1001299 | 2501402 | EMPOWERMENT ZONE PROJECT | RECREATION DEPARTMENT |
| MOORISH SCIENCE TEMPLE OF AMERICA | 1003703 | 2506282 | NOF PUBLIC SERVICE | FINANCE DEPARTMENT |
| MORGAN FRAZIER SPECIALIZED SERVICES | 1001308 | 2502273 | CONSULTANT NUISANCE ABATEMENT | BUILDINGS AND SAFETY DEPARTMENT |
| MOSAIC YOUTH THEATRE OF DETROIT | 1001332 | 2543835 | THEATRICAL TRAINING | RECREATION DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2581185 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2501432 | ELECTRICAL CONSTRUCTION PL 130 | NO DEPARTMENT INDICATED |
| MOTOR CITY ELECTRIC CO | 13102 | 2611714 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2611719 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC/METCO SERVICES AJV | 1033698 | 2537241 | FREQUENCY DRIVES AT WWTP'S INTERMEDIATE LIFT PUMP STATION #2 | SEWERAGE DEPARTMENT |
| MOTOR CITY PIPE | 1001344 | 2753399 | WING SEALS STAINLESS STEEL STRAPPING | GENERAL SERVICES DEPARTMENT |
| MOTOR CITY PIPE | 1001344 | 2763247 | PLUMBING & STEAM FITTING SUPPLIES | GENERAL SERVICES DEPARTMENT |
| NARDIN PARK DRUG ABUSE CENTER | 1706 | 2501540 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NARDIN PARK DRUG ABUSE CENTER | 1706 | 2506559 | SUBSTANCE ABUSE FYE9/98 NARDIN PARK | HEALTH DEPARTMENT |
| NATIONAL COUNCIL ON ALCOHOLISM | 16455 | 2501541 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEIGHBORHOOD DEVELOPMENT CORPORATION | 20509 | 2501589 | LAND ACQUISITION SITE PREPARATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| NEIGHBORHOOD RECONCILIATION CENTER INC | 1000268 | 2533307 | | HUMAN RIGHTS DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2547780 | WALK IN CENTER FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2532814 | 24 HOUR WALK IN CENTER | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2527949 | 963-STAY (HOMELESS HOTLINE) | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2501594 | SERVICES FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2557085 | 2001-2002 HEAD START (HIPPY) CONTRACT | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2849011 | | HEALTH DEPARTMENT |
| NESS BORIS CORPORATION | 1087558 | 2693925 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| NETCOL ASSOCIATES INC | 1101173 | 2782059 | | HEALTH DEPARTMENT |
| NETCOL ASSOCIATES INC | 1101173 | 2756230 | | HEALTH DEPARTMENT |

1239

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| NETIMATION INC | 20384 | 2502117 | PROFESSIONAL SERVICES | NO DEPARTMENT INDICATED |
| NEW CENTER COMMUNITY | 19199 | 2502090 | | NO DEPARTMENT INDICATED |
| NEW DAY MULTI-PURPOSE COMMUNITY | 14872 | 2510758 | NUTRITIONAL MEALS, TRANSPORTATION | HUMAN SERVICES DEPARTMENT |
| NEW DAY MULTI-PURPOSE COMMUNITY | 14872 | 2533571 | SHELTER AND SUPPORTIVE SERVICES | HUMAN SERVICES DEPARTMENT |
| NEW DETROIT INC | 10869 | 2529859 | WIA CLASSROOM INSTRUCTION | EMPLOYMENT AND TRAINING DEPARTMENT |
| NEW DETROIT INC | 10869 | 2502172 | EZ-PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| NEW LIFE HOME FOR RECOVERING | 18726 | 2501457 | SUBSTANCE ABUSE COOR AGENCY 9-99 | HEALTH DEPARTMENT |
| NEW LIFE HOME FOR RECOVERING | 18726 | 2501621 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEW LIGHT RECOVERY CENTER INC | 1003695 | 2501638 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEW ST PAUL HEAD START AGENCY | 1048766 | 2620502 | | HUMAN SERVICES DEPARTMENT |
| NEW ST PAUL HEAD START AGENCY | 1048766 | 2587304 | | HUMAN SERVICES DEPARTMENT |
| NEW TECHNOLOGY LTD | 16280 | 2500969 | | SEWERAGE DEPARTMENT |
| NITRO TELECOM COMMUNICATIONS SPECIALIST | 1012632 | 2582916 | | FINANCE DEPARTMENT |
| NOETIX CORPORATION | 1067921 | 2649928 | | NON-DEPARTMENTAL |
| NORTH CENTRAL COMMUNITY MENTAL HEALTH | 1003696 | 2501657 | | NO DEPARTMENT INDICATED |
| NORTHEAST HEALTH SERVICES INC | 1003700 | 2507303 | MEDICAID SERVICES | HEALTH DEPARTMENT |
| NORTHERN AREA ASSOCIATION | 19677 | 2509233 | HOME REPAIR TECHNICAL ASSISTANCE | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2565847 | PREDEVELOPMENT ACTIVITIES | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2536554 | 36/LS-CHDU OPERATING SUPPORT | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2517450 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| NORTHWEST COMMUNITY PROGRAMS INC | 1062722 | 2676860 | | HUMAN SERVICES DEPARTMENT |
| NORTHWEST COMMUNITY PROGRAMS INC | 1062722 | 2765500 | PROFESSIONAL SERVICES CONTRACT | RECREATION DEPARTMENT |
| NORTHWEST DETROIT NON-PROFIT | 12557 | 2510026 | PUBLIC FACILITY REHAB.-FICS #74895 | FINANCE DEPARTMENT |
| NOVA CONTRACTING CORPORATION | 14983 | 2504312 | ENLOADER / W OPERATOR (M-80754) | SEWERAGE DEPARTMENT |
| NOVA DEVELOPMENT GROUP DETROIT LLC | 1107544 | 2809435 | | HUMAN SERVICES DEPARTMENT |
| NTH CONSULTANTS LTD | 16602 | 2504056 | CONSULTING UGS TANKS | DEPARTMENT OF PUBLIC WORKS |
| NTH CONSULTANTS LTD | 16602 | 2501727 | ENVIRONMENTAL SERVICES-FICS #73837 | PLANNING AND DEVELOPMENT DEPARTMENT |
| NTH CONSULTANTS LTD | 16602 | 2627188 | | RECREATION DEPARTMENT |
| OFFICE EXPRESS | 1105974 | 2731413 | | MAYOR'S OFFICE |
| O'LAUGHLIN CONSTRUCTION | 12053 | 2507308 | RENOVATION OF HYDRAULIC STRUCTURES | WATER DEPARTMENT |
| O'LAUGHLIN CONSTRUCTION | 12053 | 2574640 | PC-695 IN SYSTEM STORAGE | SEWERAGE DEPARTMENT |

1240

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| OLYMPIA ENTERTAINMENT | 1007150 | 2507725 | PARKING FACILITY MANAGEMENT SERVICES | MUNICIPAL PARKING DEPARTMENT |
| OMNICARE HEALTH PLAN | 1005707 | 2546137 | WIC CERTIFICATION | HEALTH DEPARTMENT |
| OMNICARE HEALTH PLAN | 1005707 | 2507763 | 25 WIC 1999 CERTIFICATION | HEALTH DEPARTMENT |
| OMNILEARN LLC | 1066579 | 2633220 | | NON-DEPARTMENTAL |
| OPERATION ABLE OF MICHIGAN | 17427 | 2519090 | BASIC SKILLS AND OCCUPATIONAL SKILLS | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2519079 | BASIC SKILLS AND OCCUPATIONAL SKILLS. | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2501939 | PUBLIC SERVICE EZ | NO DEPARTMENT INDICATED |
| OPERATION ABLE OF MICHIGAN | 17427 | 2797761 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2771757 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2740218 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2550216 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2533044 | EMERGENCY NEED RESOURCES | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2518996 | EMERGENCY NEED RESOURCES | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2588310 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2557544 | FAMILY AND COMMODITY SERVICES | FINANCE DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2776867 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2746767 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2810794 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2775349 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2803609 | | HUMAN SERVICES DEPARTMENT |
| OPERATION HELP INC | 1442 | 2501652 | WF EMP SKILLS & JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION HELP INC | 1442 | 2721152 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION HELPING HAND INC | 19338 | 2511433 | EMERGENCY SHELTER | FINANCE DEPARTMENT |
| ORCHARDS CHILDRENS SERVICE | 1015406 | 2778756 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2557060 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2532503 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2512545 | HEAD START SERVICES | RECREATION DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2620494 | | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2502084 | | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2797263 | | HUMAN SERVICES DEPARTMENT |
| ORGANIZATION & SYSTEMS CHANGE CONSULTANTS | 1101841 | 2779409 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PARK RITE | 18490 | 2504157 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2570673 | | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2504154 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2504153 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2501379 | EASTERN MARKET GARAGE | MUNICIPAL PARKING DEPARTMENT |
| PARKVIEW COUNSELING CENTER | 1003697 | 2501728 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |

1241

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| PARSONS BRINCKERHOFF MICHIGAN INC | 1025586 | 2531875 | DEVELOP TRAFFIC MASTER PLAN | DEPARTMENT OF PUBLIC WORKS |
| PARSONS BRINCKERHOFF MICHIGAN INC | 1025586 | 2666820 | | RECREATION DEPARTMENT |
| PARTRIDGE ENTERPRISES INC | 19090 | 2515024 | REMOVAL OF DEAD ANIMALS | HEALTH DEPARTMENT |
| PARTRIDGE ENTERPRISES INC | 19090 | 2773727 | | HEALTH DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2508834 | KUE/SWANGER/ WALKER/BOONE V CITY | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2509732 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2521163 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2521178 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2513517 | MAURICE BROWN V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| PATTERSON PHIFER & PHILLIPS | 17376 | 2505725 | LEGAL SERVICES | FINANCE DEPARTMENT |
| PATTERSON PHIFER & PHILLIPS | 17376 | 2505728 | LEGAL SERVICES | LAW DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2564267 | WORKFIRST/WTW, 10/1/01 – 9/30/02, JS/JR | EMPLOYMENT AND TRAINING DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2528278 | WIA BASIC EDUCATION AGES 14-18 | EMPLOYMENT AND TRAINING DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2740260 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2778463 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2801097 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2778760 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PCT SECURITY LLC | 1107205 | 2812357 | SURVEILLANCE EQUIPMENT INSTALLATION | WORKFORCE DEVELOPMENT DEPARTMENT |
| PEGGY YOUNG & ASSOCIATES INC | 7333 | 2502363 | APPRAISAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| PEGGY YOUNG & ASSOCIATES INC | 7333 | 2763958 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| PEOPLE'S COMMUNITY SERVICES OF METROPOLITAN DETROIT | 10686 | 2501460 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| PEOPLE'S CREATIVE ENSEMBLE | 14786 | 2501435 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| PEPPER HAMILTON LLP | 1009412 | 2635807 | | LAW DEPARTMENT |
| PEPPER HAMILTON LLP | 1009412 | 2719996 | | LAW DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2559401 | DRUG TREATMENT PROGRAM PHYSICIAN | FINANCE DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2544150 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2508114 | DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2513140 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| PHARMACY EMPLOYMENT SERVICE | 1053611 | 2572655 | | HEALTH DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2537538 | LEGAL SERVICES:  SMITH/WIGGINS V CITY | LAW DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2537563 | LEGAL SERVICES:  WOODWARD/JEAN V CITY | LAW DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2623900 | | LAW DEPARTMENT |
| PHILLIP G CRAMER MD | 1019205 | 2527982 | TB MEDICAL SERVICES | HEALTH DEPARTMENT |
| PHILLIP G CRAMER MD | 1019205 | 2579701 | | HEALTH DEPARTMENT |

1242

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| PHOENIX SERVICES UNLIMITED INC | 19496 | 2501351 | BATTERER'S SCHOOL | NO DEPARTMENT INDICATED |
| PHOENIX SERVICES UNLIMITED INC | 19496 | 2548814 | DOMESTIC VIOLENCE COUNSELING | POLICE DEPARTMENT |
| PIERCE MONROE & ASSOCIATES INC | 18223 | 2501044 | | FINANCE DEPARTMENT |
| PIERCE MONROE & ASSOCIATES INC | 18223 | 2502104 | | FINANCE DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2803604 | | HUMAN SERVICES DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2775345 | | HUMAN SERVICES DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2743795 | | HUMAN SERVICES DEPARTMENT |
| PLANNED PARENTHOOD | 1012848 | 2603682 | | FINANCE DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2527611 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2536997 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2590835 | | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2540467 | LEGAL SERVICES: ADAMS, ET AL V CITY, ET AL | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2508813 | IRA LEE TODD V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2508816 | GRAZES/IVERZAI/SMITH, ET AL V CITY | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2527406 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2538058 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2501702 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2538244 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2652076 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2502112 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2537223 | LORETTA BOOTH V CITY OF DETROIT | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2569755 | | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2570503 | | LAW DEPARTMENT |
| PLUNKETT & COONEY PC | 10371 | 2774678 | | LAW DEPARTMENT |
| POLICE ATHLETIC LEAGUE INC | 3703 | 2535838 | TENNIS PROGRAM | RECREATION DEPARTMENT |
| POPKIN SOFTWARE SYSTEMS | 20304 | 2518460 | SYSTEMS ARCHITECT AND OPTIONS | INFORMATION TECHNOLOGY SERVICES |
| POSEN CONSTRUCTION CO | 20208 | 2748229 | BELLE ISLE SCOTT FOUNTAIN LAGOON PIPELINE SYSTEM CLEAN-OUT | RECREATION DEPARTMENT |
| POSEN CONSTRUCTION CO | 20208 | 2584529 | | WATER DEPARTMENT |
| POSITIVE IMAGES | 19950 | 2501495 | | HEALTH DEPARTMENT |
| POSITIVE IMAGES | 19950 | 2501653 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| PREMIER STAFFING SOURCE INC | 1118976 | 2877577 | TEMPORARY STAFFING SERVICES | HUMAN RESOURCES DEPARTMENT |
| PRISM SOLUTIONS LLC | 1051836 | 2610132 | | RECREATION DEPARTMENT |
| PROBE ENVIRONMENTAL INC | 19803 | 2502194 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| PROJECT GET | 20363 | 2540814 | JOB SEARCH & PLACEMENT-WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| PROJECT GET | 20363 | 2563946 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| PROJECT GET | 20363 | 2501733 | JOB SEARCH | NO DEPARTMENT INDICATED |
| PROJECT GET | 20363 | 2778465 | | WORKFORCE DEVELOPMENT DEPARTMENT |

1243

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| PROJECT GET | 20363 | 2806247 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778467 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778477 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2761554 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778661 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PVS TECHNOLOGIES INC | 24231 | 2501270 | | SEWERAGE DEPARTMENT |
| R L WINIGER & COMPANY | 1033182 | 2560508 | INVESTIGATIVE SERVICES | FINANCE DEPARTMENT |
| RALPH CALDER & ASSOC | 20041 | 2502210 | PATTON PARK POOL/RECREATION FACILITY | RECREATION DEPARTMENT |
| RAM CONSTRUCTION SERVICES OF MICHIGAN | 1104845 | 2786314 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| RAMA RAO & ALFRED INC | 15030 | 2502274 | A/E SERVICES  WATER WORKS | NO DEPARTMENT INDICATED |
| RAMA RAO & ALFRED INC | 15030 | 2500977 | BLUEHILL STATION ADDITIONS | NO DEPARTMENT INDICATED |
| RAMA RAO & ALFRED INC | 15030 | 2767688 | CONTRACT FOR PROFESSIONAL SERVICES | INFORMATION TECHNOLOGY SERVICES |
| RANDALL S LEVINE PC DBA LEVINE & LEVINE PC | 1017685 | 2513748 | LEGAL SERVICES | OMBUDSPERSON |
| RANDY LANE PC | 1070228 | 2879763 | CONTRACT FOR ACCOUNTING SERVICES | FINANCE DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2513137 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2544138 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2508115 | SERVICES FOR DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2559423 | PHISICIAN FOR DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2591480 | | HUMAN SERVICES DEPARTMENT |
| REACH INC | 17260 | 2504789 | NOF-PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| REACH PROJECT INC | 1048827 | 2599632 | | HEALTH DEPARTMENT |
| REDSTONE ARCHITECTS | 1001648 | 2506677 | CAMPUS MARTIUS PARK DEVELOPMENT | RECREATION DEPARTMENT |
| REID & REID PC | 1012544 | 2633008 | | LAW DEPARTMENT |
| RENAISSANCE PROPERTIES INC | 1032580 | 2562053 | | FINANCE DEPARTMENT |
| RENAISSANCE PROPERTIES INC | 1032580 | 2534576 | | HUMAN SERVICES DEPARTMENT |
| RESOURCE DATA SYSTEMS CORP | 10349 | 2500772 | LAW DEPARTMENT COMPUTER SYSTEMS | LAW DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2560345 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2726455 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2778663 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| RESPONSE NETWORK | 1103012 | 2771949 | CUSTOM SOFTWARE DEVELOPMENT | POLICE DEPARTMENT |
| RIGHT ASSOCIATES /JANNOTTA BRAY & ASSOCIATES | 20383 | 2511677 | EXECUTIVE COACHING SERVICES | HUMAN RESOURCES DEPARTMENT |

1244

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623897 | | LAW DEPARTMENT |
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623906 | | LAW DEPARTMENT |
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623942 | | LAW DEPARTMENT |
| RLI INSURANCE COMPANY | 1099957 | 2765028 | | WATER DEPARTMENT |
| ROBERT C BIRKS MD PC | 7251 | 2578999 | | HUMAN SERVICES DEPARTMENT |
| ROBERT C BIRKS MD PC | 7251 | 2592085 | | HUMAN SERVICES DEPARTMENT |
| ROBERT MATHEWS & ASSOCIATES INC | 1059586 | 2620918 | | HUMAN SERVICES DEPARTMENT |
| ROBERT SEDLER | 9851 | 2769756 | CONSULTANT SERVICES | LAW DEPARTMENT |
| ROSE & ROSE | 15597 | 2500750 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| ROSS LEARNING INC | 10675 | 2562588 | WF WTW TIREMAN/GREYDALE PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2562593 | WF & WTW FORT WAYNE PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2554055 | BASIC LITERACY & COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2562407 | WF & WTW LTC PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2549631 | WTW COMPETITIVE COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2537106 | WIA ITA IMPLEMENTATION PY 01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2540277 | WF & FOOD STAMP ITA PY 01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2572344 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2624160 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2599059 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROY F WESTON INC | 16868 | 2512933 | ENVIRONMENTAL SERVICES - FICS #74431 | FINANCE DEPARTMENT |
| ROY F WESTON INC | 16868 | 2501574 | WATERFRONT RECLAMATION PROJECT | LAW DEPARTMENT |
| ROYAL ROOFING CO INC | 13119 | 2730710 | ROOF REPLACEMENT | RECREATION DEPARTMENT |
| S D HAMILTON GROUP | 1019484 | 2603327 | | FINANCE DEPARTMENT |
| SABRE CONTRACTING LLC | 1106108 | 2797979 | RENOVATIONS | RECREATION DEPARTMENT |
| SACRED HEART MAJOR SEMINARY | 1576 | 2501491 | FICS CONTRACT 078684  SPO 2510159 | HEALTH DEPARTMENT |
| SACRED HEART REHABILITATION CENTER, INC | 1013401 | 2507443 | MEDICAID S.A. FYE 9/99 SACRED HEART | HEALTH DEPARTMENT |
| SAFE CENTER INC | 19547 | 2501207 | | NO DEPARTMENT INDICATED |
| SAFE CENTER INC | 19547 | 2537542 | FAMILY SERVICES AND COUNSELING | FINANCE DEPARTMENT |
| SAFE CENTER INC | 19547 | 2533141 | EMERGENCY SERVICES | HUMAN SERVICES DEPARTMENT |
| SALVATION ARMY BOOTH SERVICES | 15401 | 2510155 | TRANSITIONAL HOUSING | FINANCE DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538824 | LEGAL SERVICES | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538789 | LEGAL SERVICES | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538820 | LEGAL SERVICES: CLAUDE NELSON V CITY | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2505098 | LEGAL SERVICES | FINANCE DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538816 | BRADFORD ERVING V CITY/HAYWARD | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538794 | EST. OF TOMMIE THOMAS V CITY | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2534988 | PATRICK HATFIELD V CITY | LAW DEPARTMENT |

1245

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SCHINDLER ELEVATOR CORPORATION | 6926 | 2558355 | MADISON CENTER ELEVATOR MAINTENANCE | NO DEPARTMENT INDICATED |
| SCHUMAKER & COMPANY INC | 1064547 | 2689171 | | BUDGET DEPARTMENT |
| SER CASA ACADEMY | 1025139 | 2589594 | EMPOWERMENT ZONE- PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2528378 | YOUTH OPPORTUNITY GRANT # 2 | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2519316 | YOUTH OPPORTUNITIES | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2622682 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2536987 | INDIVIDUAL TRAINING ACCOUNTS | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2594584 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2501434 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2778762 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2775948 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2761551 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SERCO INC | 16569 | 2568070 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2623557 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2548196 | PARTNERSHIP FOR ADULT LEARNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2561194 | JOB SEARCH AND JOB PLACEMENT (JSP) | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2561177 | JOB SEARCH AND PLACEMENT(DEC-2K) | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2778471 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SERCO INC | 16569 | 2806253 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SFT INCORPORATED | 1033579 | 2536333 | FOR MISTERSKI POWER PLANT PROJECT | CITY COUNCIL |
| SHAR HOUSE | 11024 | 2501503 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SHAR HOUSE | 11024 | 2501501 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SHAR HOUSE | 11024 | 2564200 | ON-SITE DRUG TESTING | HEALTH DEPARTMENT |
| SHAR HOUSE | 11024 | 2501642 | WOMEN AND CHILDREN EXPANSION GRANT | HEALTH DEPARTMENT |
| SHARON RODDY MD | 1016242 | 2544065 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| SHEVRIN CONSULTING SERVICES | 1081120 | 2658592 | | HUMAN SERVICES DEPARTMENT |
| SIEMENS BUILDING TECHNOLOGIES INC | 1080147 | 2799544 | CONTROL SYSTEM IMPROVEMENTS | WORKFORCE DEVELOPMENT DEPARTMENT |
| SIEMENS HEALTHCARE DIAGONSTICS | 1101501 | 2849348 | | RECREATION DEPARTMENT |
| SILVERI ARCHITECTS | 1031901 | 2549574 | EMPOWERMENT ZONE IMPROVEMENT | HEALTH DEPARTMENT |
| SIMON HOUSE | 18009 | 2541640 | PERMANENT HOUSING (FICS#074931) | RECREATION DEPARTMENT |
| SIMON HOUSE | 18009 | 2510640 | EMERGENCY SHELTER | FINANCE DEPARTMENT |
| SIMONE CONTRACTING CORPORATION | 1000476 | 2786501 | CONSTRUCTION CONTRACT | FINANCE DEPARTMENT |
| SMITH BROS ELECTRIC INC | 1018473 | 2582919 | | RECREATION DEPARTMENT |
| SMITH BROS ELECTRIC INC | 1018473 | 2505208 | INSTALL VOICE AND DATA WIRING SERVICES | FINANCE DEPARTMENT |
| SMITH GROUP JJR LLC | 1003317 | 2504102 | LONG TERM MANAGEMENT | INFORMATION TECHNOLOGY SERVICES |
| SNELL ENVIRONMENTAL GROUP INC | 1000483 | 2502200 | ABATEMENT ASBESTOS | FINANCE DEPARTMENT |
| SNELL ENVIRONMENTAL GROUP INC | 1000483 | 2500795 | ENGINEERING SERVICES FOR NEW BRIDGES | DEPARTMENT OF PUBLIC WORKS |
| SOBH PROPERTY MANAGEMENT LLC | 1018847 | 2515472 | | DEPARTMENT OF PUBLIC WORKS |
| | | | | HEALTH DEPARTMENT |

1246

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SOBRIETY HOUSE INC | 1797 | 2501505 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| SOBRIETY HOUSE INC | 1797 | 2501734 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| SOCIETY OF ST VINCENT DE PAUL | 10460 | 2587915 | | FINANCE DEPARTMENT |
| SONDRA E JENKINS | 1013274 | 2507145 | JOINT L-M/QI PROJECT CONSULTANT | HUMAN RESOURCES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2587309 | | HUMAN SERVICES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2532516 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2504138 | HEAD START PROGRAM 1998-99 | HUMAN SERVICES DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2593437 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501895 | HEALTHY START INIT 8/98 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2560866 | CPBC MASTER AGREEMENT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2516778 | FIDUCIARY SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538658 | HEALTHY START INITIATIVE PROGRAM | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2556341 | FIDUCIARY SERVICES FOR LEAD FREE DETROIT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2537516 | CPBC MASTER CONTRACT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501527 | EPSDT (HEALTHY KIDS) | NO DEPARTMENT INDICATED |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2625403 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2522514 | HEALTHY START INITIATIVE | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2507951 | HIV EMERGENCY RELIEF 2/00 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501918 | 25 STD CONTROL 9-98 AND 9-99 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501498 | HOPWA-PERSONS W/AIDS HSG | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2505868 | 25 STD & TB PHYSICIAN SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2502007 | STD & TB PYHSICIAN | NO DEPARTMENT INDICATED |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2536778 | FETAL INFANT MORTALITY REVIEW GRANT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2516123 | EPSDT ( HEALTHY KIDS ) | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2528888 | SEMHA - CCA ADMINISTRATION | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538739 | HIV/AIDS PROJECT CPO | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2665698 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2587750 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2506174 | 25 TB/HIV CONTROL PROGRAM - 12/99 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2510504 | LEAD FREE DETROIT PROJECT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2581401 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2504657 | FISCAL MANAGEMENT SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2614575 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2612915 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2619300 | | HEALTH DEPARTMENT |

1247

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538646 | REFUGEE HEALTH SCREENING PROGRAM | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2613498 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2571721 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2766781 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2766314 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2793186 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2770373 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2753985 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2761660 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2788671 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2755765 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2784430 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2799776 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2796870 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2797934 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2797936 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2624694 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2799792 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2776660 | | HEALTH DEPARTMENT |
| SOUTHWEST COUNSELING | 1000589 | 2549618 | CAREER INITIATIVES CENTER PROJECT | HUMAN SERVICES DEPARTMENT |
| SOUTHWEST COUNSELING | 1000589 | 2593318 | | FINANCE DEPARTMENT |
| SOUTHWEST DETROIT BUSINESS ASSOCIATION | 19640 | 2548414 | | FINANCE DEPARTMENT |
| SOUTHWEST DETROIT COMMUNITY | 1067854 | 2606819 | | FINANCE DEPARTMENT |
| SPALDING DEDECKER ASSOCIATES INC | 1427 | 2632652 | | RECREATION DEPARTMENT |
| SPEC ASSOCIATES | 19262 | 2765376 | | HUMAN SERVICES DEPARTMENT |
| SPECTRUM HUMAN SERVICES | 20301 | 2501508 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SPIEGEL & MCDIARMID | 19669 | 2501813 | LEGAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| ST GREGORY COMMUNITY CENTER | 16937 | 2511397 | P&DD PUBLIC SERVICE | FINANCE DEPARTMENT |
| ST PATRICKS SENIOR CENTER INC | 12493 | 2502481 | SENIOR CITIZENS MEAL | HEALTH DEPARTMENT |
| ST REGIS DETROIT PARTNERS LLC | 1102961 | 2770016 | | POLICE DEPARTMENT |
| STAR CENTERS INC | 1003699 | 2501619 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| STELLA B SEIDEN | 2398 | 2502097 | | NO DEPARTMENT INDICATED |
| STONE & WEBSTER MICHIGAN INC | 8561 | 2500914 | MISTERSKY PWR PLANT CONSULTING | PUBLIC LIGHTING DEPARTMENT |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2620837 | | NON-DEPARTMENTAL |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2767687 | CONTRACT FOR PROFESSIONAL SERVICES | INFORMATION TECHNOLOGY SERVICES |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2681666 | | INFORMATION TECHNOLOGY SERVICES |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2554729 | 2001/2002 CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |

1248

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2643900 | | INFORMATION TECHNOLOGY SERVICES |
| STROHL SYSTEMS GROUP INC | 19599 | 2514946 | 970259-COMPUTER - SOFTWARE LICENSE | INFORMATION TECHNOLOGY SERVICES |
| STS CONSULTANTS LTD | 1027626 | 2619993 | | RECREATION DEPARTMENT |
| SWORD SOLUTIONS INC | 1075932 | 2634531 | | HEALTH DEPARTMENT |
| SYNC TECHNOLOGIES INC | 1025602 | 2643904 | | INFORMATION TECHNOLOGY SERVICES |
| SYNC TECHNOLOGIES INC | 1025602 | 2681667 | | INFORMATION TECHNOLOGY SERVICES |
| SYNC TECHNOLOGIES INC | 1025602 | 2804856 | | HUMAN SERVICES DEPARTMENT |
| SYNCH SOLUTIONS | 1102866 | 2768084 | CONTRACT FOR TECHNOLOGY RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| SYSTEMS CONSULTING GROUP LLC | 1021802 | 2537205 | CONSULTANT SERVICES | DEPARTMENT OF TRANSPORTATION |
| T & T BUILDERS | 1025258 | 2544439 | HOME WEATHERIZATION | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2524579 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2525183 | | FINANCE DEPARTMENT |
| T & T BUILDERS | 1025258 | 2672030 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2607322 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2789080 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2732569 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2761175 | | HUMAN SERVICES DEPARTMENT |
| TARA TUOMAALA | 1047262 | 2569166 | | CULTURAL AFFAIRS DEPARTMENT |
| TC SIMMONS VISITING MINISTRY | 18571 | 2510152 | SHELTER AND SERVICE | FINANCE DEPARTMENT |
| TECH TOWN | 1107416 | 2807786 | | HUMAN SERVICES DEPARTMENT |
| TEI ENVIRONMENTAL SOLUTIONS LLC | 1109309 | 2548181 | (UNIROYAL) INTERIM RESPONSE ACTIVITIES FOR EAST JEFFERSON AT BELLE ISLE | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| TEI ENVIRONMENTAL SOLUTIONS LLC | 1109309 | 2563252 | BROWNFIELD SAP PHASE I AND PHASE II | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| TETRA TECH MPS | 1030048 | 2633203 | | DEPARTMENT OF PUBLIC WORKS |
| THE ARTS PLACE | 20040 | 2643815 | | RECREATION DEPARTMENT |
| THE BARTECH GROUP | 1036576 | 2681675 | | INFORMATION TECHNOLOGY SERVICES |
| THE BARTECH GROUP | 1036576 | 2643893 | | INFORMATION TECHNOLOGY SERVICES |
| THERMO JARRELL ASH CORP | 23280 | 2502432 | MAINTENANCE | FINANCE DEPARTMENT |
| THOMAS E MARSHALL PC | 17881 | 2511456 | SHAUN NEAL, ET AL V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| THOMAS E MARSHALL PC | 17881 | 2513521 | LIGENS D. MOORE V CITY OF DETROIT | LAW DEPARTMENT |
| THOMAS J WALSH APPRAISAL CO | 20198 | 2502095 | CASINO SITE APPRAISER | LAW DEPARTMENT |
| TIBURON INC | 1072420 | 2614989 | | POLICE DEPARTMENT |
| TIBURON INC | 1072420 | 2637943 | | POLICE DEPARTMENT |
| TILLMAN & TILLMAN PC | 1018624 | 2515016 | WILLIAM GRAHAM V CITY/MANSON | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562545 | LEGAL SERVICES: LYNN/BEAUCHAMP V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544381 | RYAN LACKIE V CITY OF DETROIT/FULKS | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2632190 | | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2534965 | ANDREOS COOPER V CITY | LAW DEPARTMENT |

1249

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| TIMMIS & INMAN LLP | 19998 | 2562570 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2508654 | SHANNON L. TROMEUR V JULIUS LIGE | HEALTH DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2502450 | LEGAL SERVICES: WILLIAM BURKES V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544404 | TITO BURLEIGH V CITY/WILLIAMS | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2508661 | LEGAL SERVICES: TUCKER V CITY OF DETROIT | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562575 | HENRY BROWN V CITY/JULIUS TATE | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562563 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544430 | TOMMIE THOMAS V CITY, ET AL | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562559 | TORI CARTER, ET AL V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2502452 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544420 | RUPERT/HAYES/BOWERS V BROWN | LAW DEPARTMENT |
| TISEO BROTHERS INC | 18296 | 2501389 | VIRGINIA PARK PAVING | NO DEPARTMENT INDICATED |
| TODD PHILLIPS CHILDRENS HOME | 16998 | 2501778 | | NO DEPARTMENT INDICATED |
| TRAVELLERS AID SOCIETY OF DET | 15890 | 2501964 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2563101 | WORKFIRST/WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2550329 | OPERATION FAST BREAK/ PAL | EMPLOYMENT AND TRAINING DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2696181 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2803891 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2778474 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2806255 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TXU ENERGY SERVICE | 1021990 | 2525960 | CITY WIDE NATURAL GAS PURCHASE | PUBLIC LIGHTING DEPARTMENT |
| UNIGLOBE CONSTRUCTION CO | 19275 | 2793402 | | HUMAN SERVICES DEPARTMENT |
| UNITED COMMUNITY HOUSING COALITION | 9812 | 2510128 | HOMELESS ASSISTANCE PROGRAM | FINANCE DEPARTMENT |
| UNIVERSAL SYSTEM TECHNOLOGIES INC | 20223 | 2589037 | | INFORMATION TECHNOLOGY SERVICES |
| UNIVERSAL SYSTEM TECHNOLOGIES INC | 20223 | 2768088 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| UNIVERSITY FAMILY PHYSICIANS | 1045603 | 2541597 | ENV: MEDICAL MONITORING SERVICES | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| UNIVERSITY OF DETROIT MERCY | 1051358 | 2722921 | | RECREATION DEPARTMENT |
| UNIVERSITY OF MICHIGAN | 8466 | 2500990 | EMERGENCY RESPONSE PLANNING | WATER DEPARTMENT |
| UNIVERSITY PHYSICIAN GROUP | 1093137 | 2799075 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2530120 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2595456 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2567920 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2614558 | | HEALTH DEPARTMENT |
| UNLIMITED SOLUTIONS INC | 17906 | 2502050 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| UNLIMITED SOLUTIONS INC | 17906 | 2454534 | 2001/2001 CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| UPTOWN LAND DEVELOPMENT CORP | 18833 | 2501758 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| URBAN MANAGEMENT CORP | 20310 | 2502173 | FLEET MAINTENANCE SERVICES | DEPARTMENT OF PUBLIC WORKS |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| URBANWERKS LLC | 1083053 | 2664787 | | RECREATION DEPARTMENT |
| URS CORPORATION | 1052537 | 2607949 | | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| URSO PALMER & ROSS PC | 1048532 | 2574335 | | CITY COUNCIL |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2506589 | PUBLIC SERVICE AND REHAB | FINANCE DEPARTMENT |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2584237 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2501597 | SITE IMPROVEMENTS HOUSING | NO DEPARTMENT INDICATED |
| V W PROPERTIES | 1084250 | 2531882 | | POLICE DEPARTMENT |
| V W PROPERTIES | 1084250 | 2509482 | | POLICE DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2505192 | LEGAL SERVICES: DEWOLF, ET AL V CITY | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2521182 | LYNN/BEAUCHAMP V CITY/RADFORD | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2505073 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2539172 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2515553 | LEGAL SERVICES: KIMBER V CITY/ADUROJA | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2521167 | LEGAL SERVICES: LONGSTREET V JORDAN | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2536310 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2511869 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN SCOYOC ASSOCIATES INC | 1070940 | 2617193 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2594482 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2563075 | BLUE CROSS/BLUE SHIELD RESERVE FUND | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2544823 | LEGAL SERVICES | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2546318 | LEGAL SERVICES | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2591271 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2563068 | TOYIA MOODY/STEPHANIE BENNETT V CITY | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2632746 | | LAW DEPARTMENT |
| VARNUM RIDDERING SCHMIDT | 17517 | 2502367 | TELECOMMUNICATIONS/FIBER OPTICS | LAW DEPARTMENT |
| VARNUM RIDDERING SCHMIDT | 17517 | 2514143 | LEGAL SERVICES | LAW DEPARTMENT |
| VENABLE BAETJER HOWARD LLP | 20054 | 2503723 | PROFESSIONAL SERVICES | CITY COUNCIL |
| VIRCHOW KRAUSE & CO LLP | 1099691 | 2746850 | | FINANCE DEPARTMENT |
| VIRGINIA PARK CITIZENS SERVICE | 16867 | 2719711 | | DEPARTMENT OF TRANSPORTATION |
| VISION INFORMATION TECHNOLOGIES | 1011855 | 2542788 | WEB DEVELOPMENT | INFORMATION TECHNOLOGY SERVICES |
| VOICE PRINT INTERNATIONAL INC | 1045791 | 2816063 | MAINTENANCE FOR VOICE SERVICES | POLICE DEPARTMENT |
| VORHIES ESTATE INC | 1005399 | 2517975 | | HUMAN SERVICES DEPARTMENT |
| VS VISUAL STATEMENT INC | 1076618 | 2796124 | | POLICE DEPARTMENT |
| W D LEE CENTER FOR LIFE MANAGEMENT | 1003687 | 2502211 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| W-3 CONSTRUCTION COMPANY | 1022302 | 2796096 | LIGHTING IMPROVEMENTS | RECREATION DEPARTMENT |
| WALBRIDGE-ALDINGER CO | 2782 | 2588907 | | WATER DEPARTMENT |
| WALBRIDGE-ALDINGER CO | 2782 | 2529880 | PRIMARY CLARIFIER NUMBERS 17 AND 18 | SEWERAGE DEPARTMENT |
| WALBRIDGE-ALDINGER CO | 2782 | 2517999 | SECONDARY CLARIFIER IMPROVEMENTS | SEWERAGE DEPARTMENT |

1251

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| WALSH CONSTRUCTION | 1003706 | 2540999 | CONNER CREEK PILOT CSO CONTROL FACILITY | SEWERAGE DEPARTMENT |
| WARM TRAINING CENTER | 1099138 | 2798140 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING CENTER | 1099138 | 2761360 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2637413 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2592885 | | FINANCE DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2746897 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2808870 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2706004 | | HUMAN SERVICES DEPARTMENT |
| WARREN CONNER DEVELOPMENT COALITIONS | 1015379 | 2515838 | WARREN CONNER SA FYE 9/99 | HEALTH DEPARTMENT |
| WARREN CONNER DEVELOPMENT COALITIONS | 1015379 | 2736044 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE COUNTY | 18789 | 2560623 | WF/WTW JOB SEARCH AND JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE COUNTY | 18789 | 2574696 | | POLICE DEPARTMENT |
| WAYNE COUNTY | 18789 | 2772891 | | POLICE DEPARTMENT |
| WAYNE COUNTY | - | - | PURCHASE AGREEMENT, DATED JULY 28, 1976 BETWEEN THE CITY AND COUNTY OF WAYNE | NO DEPARTMENT INDICATED |
| WAYNE COUNTY COMMUNITY COLLEGE | 1008933 | 2782908 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE COUNTY COMMUNITY COLLEGE | 1008933 | 2782906 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539793 | | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539816 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539788 | TARGET CITIES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539821 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2516330 | WSU - UNIVERSITY CONSORTIUM | HUMAN RESOURCES DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539807 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2560543 | CITY/UNIVERSITY CONSORTIUM | HUMAN RESOURCES DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2532723 | WIA TITLE I OFFICE AUTOMATION TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2501980 | TITLE III OFFICE AUTOMATION TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2571280 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2552859 | OFFICE AUTOMATION & WORD PROCESSING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2519218 | WORD PROCESS TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2611249 | | POLICE DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2501174 | | NO DEPARTMENT INDICATED |
| WAYNE STATE UNIVERSITY | 3116 | 2765357 | | CITY COUNCIL |
| WAYNE STATE UNIVERSITY | 3116 | 2797492 | | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY COLLEGE | 19759 | 2502190 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| WAYNE STATE UNIVERSITY COLLEGE | 19759 | 2500873 | EZ PROGRAM OPERATIONS | NO DEPARTMENT INDICATED |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| WCI CONTRACTORS | 17607 | 2681202 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2733883 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2762089 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2708713 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2731182 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2762091 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2729538 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2785381 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2799443 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WE CARE DEVELOPMENT CORP | 20361 | 2627183 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WEISS CONSTRUCTION CO | 16586 | 2500908 | DWS-805 SUBURBAN METER AUTOMATION | WATER DEPARTMENT |
| WEISS CONSTRUCTION CO | 16586 | 2501482 | DWS-800 SUBURBAN WATER METERS | WATER DEPARTMENT |
| WELLSPRING | 18110 | 2597175 | | FINANCE DEPARTMENT |
| WEST DETROIT INTERFAITH | 1044949 | 2554192 | | FINANCE DEPARTMENT |
| WESTFIELD DETROIT LLC | 1021039 | 2517679 | | HUMAN SERVICES DEPARTMENT |
| WESTIN ENGINEERING INC | 14468 | 2767695 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| WILDWOOD RANCH | 1012803 | 2547128 | DETROIT RESCUE MISSION | HUMAN SERVICES DEPARTMENT |
| WILDWOOD RANCH | 1012803 | 2516691 | SUMMER CAMPERSHIPS TO URBAN YOUTHS | HUMAN SERVICES DEPARTMENT |
| WILLA R WALKER LLC | 1071151 | 2618732 | | CULTURAL AFFAIRS DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501454 | GRAIMARK REHAB PROJ - FICS #79019 | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501725 | ENVIRONMENTAL STATUTES & REGULATIONS | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2505940 | LEGAL SERVICES-ENVIRONMENTAL | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2500981 | FICS #68652-MID-CITY REVITALIZATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2559971 | ERNEST MONROE V CITY OF DETROIT | WATER DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2623874 | | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501539 | CASINO DEVELOPMENT PROJECT | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2553947 | BRUSH PARK PROJECT | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2641654 | LEGAL SERVICES | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2593326 | LEGAL SERVICES | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2512512 | LEGAL SERVICES | LAW DEPARTMENT |
| WILLIE L MAYO CPA | 1021915 | 2518939 | AUDIT TRAINING | HUMAN SERVICES DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2618093 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2679478 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2566621 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2673433 | | WATER DEPARTMENT |
| WINDHAM REALTY GROUP INC | 17474 | 2500986 | VIC PARK MANAGER | PLANNING AND DEVELOPMENT DEPARTMENT |
| WOMENS JUSTICE CENTER | 14689 | 2508100 | | HUMAN SERVICES DEPARTMENT |

1253

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| WOMENS JUSTICE CENTER/MY SISTER PLACE | 1031434 | 2535491 | DOMESTIC VIOLENCE SERVICES | POLICE DEPARTMENT |
| WORKBRAIN INC | 1087022 | 2688977 | | NON-DEPARTMENTAL |
| WTF COMPANY LLC | 1009825 | 2509611 | | POLICE DEPARTMENT |
| XEROX CORPORATION | 20143 | 2527583 | PHOTOCOPIER MAINTENANCE | COMMUNICATIONS AND CREATIVE SERVICES DEPARTMENT |
| YMCA OF METRO DETROIT | 17203 | 2502285 | PUBLIC FACILITY REHABILITATION | NO DEPARTMENT INDICATED |
| YMCA OF METROPOLITAN DETROIT | 1071155 | 2801079 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2516595 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2797765 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2775343 | | HUMAN SERVICES DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2743797 | | HUMAN SERVICES DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2803602 | | HUMAN SERVICES DEPARTMENT |
| YOUTH CONNECTION | 1054883 | 2801091 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUTH LINKS USA | 1044013 | 2552463 | OPERATION FAST BREAK | EMPLOYMENT AND TRAINING DEPARTMENT |
| YWCA INTERIM HOUSE | 2143 | 2535474 | SERVICES WITH DOMESTIC VIOLENCE UNIT | POLICE DEPARTMENT |
| YWCA INTERIM HOUSE | 2143 | 2508609 | ESG CONTRACT FICS # 078503 | FINANCE DEPARTMENT |
| ZETA STORK'S NEST FOUNDATION | 13210 | 2508767 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |

All collective bargaining agreements that had expired prior to confirmation to the extent that they purported to, or would be determined by applicable law to, provide continuing contractual benefits to employees or former employees of the City

**EXHIBIT III.D.2**

RETAINED CAUSES OF ACTION

## EXHIBIT III.D.2

Reference is made to Section III.D.2 of the Plan. Capitalized terms used but not defined herein shall have the meanings given to them in Section I.A of the Plan.

Without limiting any relevant provision of the Plan (including Section III.D.2 thereof), the City expressly reserves and retains, and may enforce, any and all of its rights with respect to: (i) Causes of Action related to the City's Municipal Parking Department, (ii) Causes of Action related to the City's Finance Department, (iii) Causes of Action related to the City's Airport Department, (iv) Causes of Action related to the City's Public Lighting Department, (v) Causes of Action related to the City's Planning and Development Department, (vi) Causes of Action related to the City's Building Safety, Engineering and Environmental Department, (vii) Causes of Action related to the City's Water and Sewerage Department, (viii) Causes of Action related to the City's Department of Public Works, (ix) Causes of Action related to the City's Police Department, (x) Causes of Action related to the City's Fire Department, (xi) Causes of Action related to the City's Assessment Division, (xii) Causes of Action related to the City's Law Department, (xiii) Causes of Action related to any other City department, (xiv) Causes of Action against all litigation parties listed on Schedule H of the Second Amended List of Creditors and Claims [Docket No. 1059] and (xv) the Causes of Action in the following proceedings:

1. City of Detroit v. MTZ Incorporated, No. 05-121906, Mich. 36th Dist. Ct.;

2. City of Detroit v. Big Daddy's Soul Food, No. 04-109681, Mich. 36th Dist. Ct.;

3. City of Detroit v. Louie's Foods, Inc., No. 05-115153, Mich. 36th Dist. Ct.;

4. City of Detroit v. Robinson Group Home and Rodney Robinson, No. 07-125747, Mich. 36th Dist. Ct.;

5. City of Detroit v. Arthur R. Jett and Mildred S. Jett, No. 97-713173, Mich. 36th Dist. Ct.;

6. City of Detroit v. Celia Y. Collins, No. 02-107182, Mich. 36th Dist. Ct.;

7. City of Detroit v. Anthony Gillam & Kimberly Gillam, No. 01-113119, Mich. 36th Dist. Ct.;

8. City of Detroit v. Caesar Austin and Evelyn Austin, No. 02-119500, Mich. 36th Dist. Ct.;

9. City of Detroit v. Means Construction, Inc., Eric J. Means and Ted Smith, No. 03-105353, Mich. 36th Dist. Ct.;

10. City of Detroit v. Eick B. Jeter and Crystal B. Jeter, No. 03-146312, Mich. 36th Dist. Ct.;

11. City of Detroit v. Albert Green and Loretta Green, No. 06-102852, Mich. 36th Dist. Ct.;

12. City of Detroit v. Marlon Currie, No. 04-110183-GC, Mich. 36th Dist. Ct.;

13. City of Detroit v. Tamara Smith and James Smith, No. 04-114151, Mich. 36th Dist. Ct.;

14. City of Detroit v. Juan Rosado and Lori Rosado, No. 04-420691, Mich. 36th Dist. Ct.;

15. City of Detroit v. Victor Barnes and Gwendolyn Barnes, No. 04-130939, Mich. 36th Dist. Ct.;

16. City of Detroit v. Charles Selmon, No.04-132032-GC, Mich. 36th Dist. Ct.;

17. City of Detroit v. Gregory Webb, No. 04-139195, Mich. 36th Dist. Ct.;

18. City of Detroit v. Alden M. Jarvis and Veronica V. Jarvis, No. 04-136449, Mich. 36th Dist. Ct.;

19. City of Detroit v. Lisa D. Bradley, No. 04-136448, Mich. 36th Dist. Ct.;

20. City of Detroit v. Jarrick F. Goldsby, No. 04-145046, Mich. 36th Dist. Ct.;

21. City of Detroit v. Edgar Butler & Quensetta Butler, No. 04-145049-GC, Mich. 36th Dist. Ct.;

22. City of Detroit v. Michael Marshall and Sheila Marshall, No. 04-415055, Mich. 36th Dist. Ct.;

23. City of Detroit v. Dwight Riddell, Mich. 36th Dist. Ct.;

24. City of Detroit v. Frank Wilson and Edwina J. Wilson, No. 04-142987-GC, Mich. 36th Dist. Ct.;

25. City of Detroit v. Sharon F. Sexton, No. 05-103709, Mich. 36th Dist. Ct.;

26. City of Detroit v. John W. & Winnie M. Plummer, No. 05-108201-GC, Mich. 36th Dist. Ct.;

27. City of Detroit v. Leon Jackson and Harvard Square Center, Mich. 36th Dist. Ct.;

28. City of Detroit v. Michael Franke, No. 05-110302-GC, Mich. 36th Dist. Ct.;

29. City of Detroit v. Caesar Austin and Evelyn Austin, No. 05-116751, Mich. 36th Dist. Ct.;

30. City of Detroit v. Steven P. Morrow and Sophia Morrow, No. 05-121904, Mich. 36th Dist. Ct.;

31. City of Detroit v. Brian L. Reese and Deborah H. Reese, No. 07-121144, Mich. 36th Dist. Ct.;

32. City of Detroit v. Lori Rosado, No. 06-105264, Mich. 36th Dist. Ct.;

33. City of Detroit v. James M. Woodget, No. 08-124280, Mich. 36th Dist. Ct.;

34. City of Detroit v. Calvin L. Hall and Juanda W. Hall, No. 06-111621, Mich. 36th Dist. Ct.;

35. City of Detroit v. Stanley T. and Linda A. Bridges, Mich. 36th Dist. Ct.;

36. City of Detroit v. Nardin Park Recovery Center, No. 07-714583, Mich. 36th Dist. Ct.;

37. City of Detroit v. Jimmie Maddix and Carolyn Maddix, No. 08-137874, Mich. 36th Dist. Ct.;

38. City of Detroit v. Adrian Austin, No. 09-123096, Mich. 36th Dist. Ct.;

39. City of Detroit v. Betty Warmack, No. 09-123865, Mich. 36th Dist. Ct.;

40. City of Detroit v. Caeser Austin and Evelyn Austin, No. 10-106506, Mich. 36th Dist. Ct.;

41. City of Detroit v. Charles & Cheryl Lasley (Moss), No. 09-130913, Mich. 36th Dist. Ct.;

42. City of Detroit v. Sterling J. Brown and Mary Lisa Brown, No. 09-131658, Mich. 36th Dist. Ct.;

43. City of Detroit v. Carter Stevenson and Barbara Stevenson, No. 10-106505, Mich. 36th Dist. Ct.;

44. City of Detroit v. Jacqueline Murry, Mich. 36th Dist. Ct.;

45. City of Detroit v. James Gulley and Phyllis Gulley, Mich. 36th Dist. Ct.;

46. City of Detroit v. John Reed, No.10-124047, Mich. 36th Dist. Ct.;

47. City of Detroit v. Coleman Reed and Laurine Reed, No. 11-118847-GC, Mich. 36th Dist. Ct.;

48. City of Detroit v. Ernest Gardner, No. 11-117750, Mich. 36th Dist. Ct.;

49. City of Detroit v. Ronald Carrington and Delores Carrington, No. 12-109805, Mich. 36th Dist. Ct.;

50. City of Detroit v. Lawrence Harris, Mich. 36th Dist. Ct.;

51. City of Detroit v. Raymond McMurrian, No. 12-117043, Mich. 36th Dist. Ct.;

52. City of Detroit v. Luis Arroyo and Braka Higgins a.k.a. Arroyo, Mich. 36th Dist. Ct.;

53. City of Detroit v. Adrian Austin, Mich. 36th Dist. Ct.;

54. City of Detroit v. Joel Ruffin and Willma Orange-Ruffin, Mich. 36th Dist. Ct.;

55. City of Detroit v. Paulette Cochran, Mich. 36th Dist. Ct.;

56. City of Detroit v. April Kincaid, No. 12-113636, Mich. 36th Dist. Ct.;

57. City of Detroit v. James & Adino, No. 14-10436, Mich. 36th Dist. Ct.;

58. City of Detroit v. Dennis Denmark & Elana Denmark, No. 13-102803, Mich. 36th Dist. Ct.;

59. City of Detroit v. Clarinda Barnett-Harrison, Mich. 36th Dist. Ct.;

60. City of Detroit v. Jason Jordan, Mich. 36th Dist. Ct.;

61. City of Detroit v. Mondry Hardware & Mondrey, Louis, Mich. 36th Dist. Ct.;

62. City of Detroit v. Roland, Lisa, Mich. 36th Dist. Ct.;

63. City of Detroit v. Lazana, Deandre & Natalie, No. 12-123542-GC, Mich. 36th Dist. Ct.;

64. City of Detroit v. William Landrum and Caroline Landrum, No. 13-119468, Mich. 36th Dist. Ct.;

65. City of Detroit v. James Bates and Pricilla Bates, No. 13-102805, Mich. 36th Dist. Ct.;

66. City of Detroit v. Coutia Ramsey, No. 13-102804, Mich. 36th Dist. Ct.;

67. City of Detroit v. Ann Fletcher, No. 13-108163, Mich. 36th Dist. Ct.;

68. City of Detroit v. Jackie Hunter and Mary Hunter, Mich. 36th Dist. Ct.;

69. City of Detroit v. Monica Gordon, Mich. 36th Dist. Ct.;

70. City of Detroit v. Patricia Brown, No. 13-119470, Mich. 36th Dist. Ct.;

71. City of Detroit v. Ronald Coleman & Alice Coleman, No. 13-117682 GC, Mich. 36th Dist. Ct.;

72. City of Detroit v. Rennilda Graham, No. 13-119472, Mich. 36th Dist. Ct.;

73. City of Detroit v. Kamin Davis & Tana Davis, Mich. 36th Dist. Ct.;

74. City of Detroit v. Elaine Ivery, Mich. 36th Dist. Ct.;

75. City of Detroit v. Eric Smith, No. 13-122869, Mich. 36th Dist. Ct.;

76. City of Detroit v. Mary Waters, Mich. 36th Dist. Ct.;

77. City of Detroit v. Todd Philson, Mich. 36th Dist. Ct.;

78. City of Detroit v. Kenneth Holms, Sr., Mich. 36th Dist. Ct.;

79. City of Detroit v. Jack Kene Obi, No. 05-104554-GC, Mich. 36th Dist. Ct.;

80. City of Detroit v. Brandy Marie Duke aka Brandy Niang, No. 08-124279, Mich. 36th Dist. Ct.;

81. City of Detroit v. Cevonia Cherise McClure, No. 07-110343, Mich. 36th Dist. Ct.;

82. City of Detroit v. Henry Ricardo Smith, No. 07-2093, Mich. 36th Dist. Ct.;

83. City of Detroit v. Abdul Raheem Rashed, No. 07-1556323, Mich. 36th Dist. Ct.;

84. City of Detroit v. Milton Lee Newman, No. 07-121142, Mich. 36th Dist. Ct.;

85. City of Detroit v. Andre Williams, Mich. 36th Dist. Ct.;

86. City of Detroit v. Helen Roberts, Mich. 36th Dist. Ct.;

87. City of Detroit v. Terry Darnell Jackson , No. 06-119826-GC, Mich. 36th Dist. Ct.;

88. City of Detroit v. Bushierra McDonald, No. 07-132889, Mich. 36th Dist. Ct.;

89. City of Detroit v. Denna Belton, No. 06-160876, Mich. 36th Dist. Ct.;

90. City of Detroit v. Georgianna Colston , No. 07-132886, Mich. 36th Dist. Ct.;

91. City of Detroit v. Terrance Omar Ford, No. 07-144864, Mich. 36th Dist. Ct.;

92. City of Detroit v. Jessie Al McQuarter, No. 07-127234, Mich. 36th Dist. Ct.;

93. City of Detroit v. Kevin Labrell Howell, No. 07-127238, Mich. 36th Dist. Ct.;

94. City of Detroit v. Deconte Jerdo, Mich. 36th Dist. Ct.;

95. City of Detroit v. Sheila Marie-Maxwell Coleman, Mich. 36th Dist. Ct.;

96. City of Detroit v. Jessie Crutcher and Adrienne Smith, No. 08-133795, Mich. 36th Dist. Ct.;

97. City of Detroit v. Joachba D. Hammound-Grace, Mich. 36th Dist. Ct.;

98. City of Detroit v. Lamont Street, Mich. 36th Dist. Ct.;

99. City of Detroit v. William F. & Constance Harris, No. 08-124278, Mich. 36th Dist. Ct.;

100. City of Detroit v. Shealtiel N. Moore, Mich. 36th Dist. Ct.;

101. City of Detroit v. Mary Rogers, Mich. 36th Dist. Ct.;

102. City of Detroit v. Daniel R. Tapert, Mich. 36th Dist. Ct.;

103. City of Detroit v. Dukes, Emanuel C., Mich. 36th Dist. Ct.;

104. City of Detroit v. Yolanda F. Brady, Mich. 36th Dist. Ct.;

105. City of Detroit v. Erskine Wright II, Mich. 36th Dist. Ct.;

106. City of Detroit v. Lonnie E. Coleman, Mich. 36th Dist. Ct.;

107. City of Detroit v. Calvin Meeks, III, Mich. 36th Dist. Ct.;

108. City of Detroit v. Neandue O. Nance, No. 09-11643, Mich. 36th Dist. Ct.;

109. City of Detroit v. Lula M. Smith, No. 09-119723, Mich. 36th Dist. Ct.;

110. City of Detroit v. Latasha Merriweather, No. 09-119723, Mich. 36th Dist. Ct.;

111. City of Detroit v. Tamieka L. Norris, No. 10-125151, Mich. 36th Dist. Ct.;

112. City of Detroit v. Franceksa Rodriquez, No. 10-124044, Mich. 36th Dist. Ct.;

113. City of Detroit v. Laquanya Candice, No. 08-120177-GC, Mich. 36th Dist. Ct.;

114. City of Detroit v. Latonya Katina-Foxey, No. 08-120173, Mich. 36th Dist. Ct.;

115. City of Detroit v. Raegan Carmell Sweet, No. 08-120172, Mich. 36th Dist. Ct.;

116. City of Detroit v. Oscar Cameron & Oscar G. Cameron II, Mich. 36th Dist. Ct.;

117. City of Detroit v. Macia Sherrie Stokes, No. 08-120171, Mich. 36th Dist. Ct.;

118. City of Detroit v. Angela Conley, No. 08-120174, Mich. 36th Dist. Ct.;

119. City of Detroit v. Eugene Cole & Victory Outreach Detroit, No. 07-120608-GC, Mich. 36th Dist. Ct.;

120. City of Detroit v. Kevin Dittich, No. 14-101640, Mich. 36th Dist. Ct.;

121. City of Detroit v. Morgan McCrary, Mich. 36th Dist. Ct.;

122. City of Detroit v. Twayla Lynette Larry, No. 07-120610, Mich. 36th Dist. Ct.;

123. City of Detroit v. Deandre Lamarr Falls, Mich. 36th Dist. Ct.;

124. City of Detroit v. Latonya Katina-Foxey, No. 08-120173, Mich. 36th Dist. Ct.;

125. City of Detroit v. Raegan Carmell Sweet, No. 08-120172, Mich. 36th Dist. Ct.;

126. City of Detroit v. Milton L. Newman, Mich. 36th Dist. Ct.;

127. City of Detroit v. 3843 Biddle & Scroggins, Daisy, No. 05-122123-GC, Mich. 36th Dist. Ct.;

128. City of Detroit v. Alexander Spencer, Jr., Mich. 36th Dist. Ct.;

129. City of Detroit v. Tonia Williams, Mich. 36th Dist. Ct.;

130. City of Detroit v. Mayor Rissell & Karen Russell, No. 04-113310, Mich. 36th Dist. Ct.;

131. City of Detroit v. Minnie Lee Martin, No. 99-925205, Mich. Third Judicial Cir.;

132. City of Detroit v. Ambassador Nursing Home, Inc. aka Pembrook Nursing Center, No. 02-238630, Mich. Third Judicial Cir.;

133. City of Detroit v. Tyrone and Janice Winfrey, Mich. 36th Dist. Ct.;

134. City of Detroit v. Mark Kulbaba, Inc. dba Servicemaster & Mark Kulbaba, No. 03-302931, Mich. Third Judicial Cir.;

135. City of Detroit v. Nardin Park Recovery Center, Mich. Third Judicial Cir.;

136. City of Detroit v. Page Litho, Inc., No. 11-006743-CZ, Mich. Third Judicial Cir.;

137. City of Detroit v. The Printing Professionals, No. 11-006745-CZ, Mich. Third Judicial Cir.;

138. City of Detroit v. Waterman & Sons Printing Company, Inc., No. 11-007078-CZ, Mich. Third Judicial Cir.;

139. City of Detroit v. Opus One, Mich. Third Judicial Cir.;

140. City of Detroit v. Kyler Reamules, Mich. Third Judicial Cir.;

141. City of Detroit v. B & J Enameling Inc. & Holtshouser, Erin & Kownacki, Sandra, Mich. Third Judicial Cir.;

142. City of Detroit v. Jacquettier Coleman, No. 13-116327, Mich. 36th Dist. Ct.;

143. City of Detroit v. Nardin Park Drug Abuse Center et al., No. 13-011688-CZ, Mich. Third Judicial Cir.;

144. City of Detroit v. Sheila A. Kimbrough, No. 07-155641, Mich. 36th Dist. Ct.;

145. City of Detroit v. Counselo Maurico, No. 07-155674, Mich. 36th Dist. Ct.;

146. City of Detroit v. Christina Morris, No. 07-155726, Mich. 36th Dist. Ct.;

147. DuJon Johnson v. City of Detroit; No. 12-202678, Mich. 36th Dist. Ct.;

148. Bella Marshall, aka Bella Marshall Barden, No. 2012-777-270-DE (Probate);

149. William S. Jordan, No. 03-41137, Bankr. E.D. Mich.;

150. Catherine Gaskin, No. 03-67569, Bankr. E.D. Mich.;

151. Catherine Gaskin, No. 03-41232, Bankr. E.D. Mich.;

152. Dwayne Akra, No. 03-69349, Bankr. E.D. Mich.;

153. Dwayne Akra, No. 00-47216, Bankr. E.D. Mich.;

154. Diana Daniel, No. 05-56536, Bankr. E.D. Mich.;

155. Jerry Lee Miller, No. 09-62314, Bankr. E.D. Mich.;

156. Lyall T Hoggatt and Gwendolyn Hoggatt, No. 09-76296, Bankr. E.D. Mich.;

157. Terri L. Sykes, No. 11-72188, Bankr. E.D. Mich.;

158. Shanta Corporation, No. 12-43956, Bankr. E.D. Mich.;

159. Sareta Jean Cheathem, No. 12-59435, Bankr. E.D. Mich.;

160. Belinda Rochelle Sanders, No. 12-57603, Bankr. E.D. Mich.;

161. Denise Evans Whitley, No. 14-40849, Bankr. E.D. Mich.;

162. Whitley v. City of Detroit Treasurer et al, No. 14-04131 Bankr. E.D. Mich.;

163. Kimberli Powell, No. 13-40036  (Adversary Case No. 13-04134), Bankr. E.D. Mich.;

164. Ruthea Taylor:, No. 13-41265-PJS  (Adversary Case No(s) 13-04235, 13-04237 and 13-04239), Bankr. E.D. Mich.;

165. Louise Williams, No. 13-40374-MBM  (Adversary Case No. 13-04215), Bankr. E.D. Mich.;

166. Dorothy Wilson, No. 13-43731-WSD (Adversary Case No. 13-04296); Bankr. E.D. Mich.;

167. Carol Lowe-Redding, No. 12-60626, Bankr. E.D. Mich.;

168. Rodney A. Bowie, No. 04-40019, Bankr. E.D. Mich.;

169. Christopher D. Baty, No. 04-54408, Bankr. E.D. Mich.;

170. Tonia Howard, No. 07-58025, Bankr. E.D. Mich.;

171. Carl Barner and Yolanda Barner, No. 07-58840, Bankr. E.D. Mich.;

172. Jerome Jenkins, No. 09-67014, Bankr. E.D. Mich.;

173. Romana Bullock v. Wayne County Treasurer, et al. Mich. 36th Dist. Ct.;

174. General Shale Brick v. City of Detroit, No. 06-44397,  Mich. 36th Dist. Ct.;

175. Gloria Jean McLaurin v. Detroit Parking Violations Bureau, No. 293700, Mich. Ct. App.;

176. Dennis Lynval v. City of Detroit, No. 12-012164,  Mich. 36th Dist. Ct.;

177. City of Detroit v. Mdrahi, Mohamed, No. 3-005784-CC (Condemnation);

178. City of Detroit v. True Missionary Baptist Church, No. 13-005785-CC (Condemnation);

179. City of Detroit v. True Missionary Baptist Church, No. 13-005787-CC (Condemnation);

180. City of Detroit v. True Missionary Baptist Church, No. 13-005795-CC (Condemnation);

181. City of Detroit v. True Missionary Baptist Church, No. 13-005814-CC (Condemnation);

182. City of Detroit v. Khami, Issam, et al., No. 13-005816-CC (Condemnation);

183. City of Detroit v. CE Detroit, No. 13-005820-CC (Condemnation);

184. City of Detroit v. State of Michigan, No. 12-014797-CC (Condemnation);

185. City of Detroit v. Wilcox aka Albert, Martha, No. 12-014799-CC (Condemnation);

186. City of Detroit v. Wilson, Kenneth L., No. 13-005825-CC (Condemnation);

187. City of Detroit v. True Missionary Baptist Church, No. 13-05826-CC (Condemnation);

188. City of Detroit v. True Missionary Baptist Church, No. 13-005827-CC (Condemnation);

189. City of Detroit v. Wilson, Gail, et al., No. 12-015039-CC (Condemnation);

190. City of Detroit v. Wilcox, Martha, No. 12-014867-CC (Condemnation);

191. City of Detroit v. CE Detroit, LLC, No. 12-014803-CC (Condemnation);

192. City of Detroit v. Lucido, Steven J., et al., No. 13-05828-CC (Condemnation);

193. City of Detroit v. Detroit Leasing, Inc., No. 13-005829-CC (Condemnation);

194. City of Detroit v. Newell, Nema N., No. 13-005830-CC (Condemnation);

195. City of Detroit v. Jones, James N., No. 13-005831-CC (Condemnation);

196. City of Detroit v. Jones, James N., No. 13-005832-CC (Condemnation);

197. Manos, Dino v. City of Detroit and Abram, Frank H. , No. 12-011400, Mich. 36th Dist. Ct.;

198. City of Detroit v. Priscilla White, No. 06-120153-GC, Mich. 36th Dist. Ct.;

199. City of Detroit v. Tommie L. Douglas, Jr., No. 13-116328, Mich. 36th Dist. Ct.;

200. City of Detroit v. Natoshia Lane Lucas, No. GC-08H559, Mich. 36th Dist. Ct.;

201. City of Detroit v. James Strickland, No. 12-103387-GC, Mich. 36th Dist. Ct.;

202. City of Detroit v. Giant Janitorial Services Inc & Peter J. Huthwaite, No. 02-147508, Mich. 36th Dist. Ct.;

203. City of Detroit v. Deborah Davenport Bankruptcy, No. 03-65075, Bankr. E.D. Mich.;

204. City of Detroit v. Renaissance West Comental Helath Services et al., No. 04-405900-CZ, Mich. Third Judicial Cir.;

205. City of Detroit v. Ernest Karr, No. 13-009376, Mich. 36th Dist. Ct.;

206. City of Detroit v. Clarence & Marilyn Bell, Mich. 36th Dist. Ct.;

207. City of Detroit v. John W. & Martha Higgins, Mich. 36th Dist. Ct.;

208. City of Detroit v. Beverly Jeanette, Mich. 36th Dist. Ct.;

209. City of Detroit v. Gwendolyn Broadnax, Mich. 36th Dist. Ct.;

210. City of Detroit v. Emily Talbert-Holt, No. 09-003020-CZ, Mich. Third Judicial Cir.;

211. City of Detroit v. Linda Terry, No. 09-17213-GC, Mich. 36th Dist. Ct.;

212. City of Detroit v. Dwayne B. Toles, No. 07-157206-GC, Mich. 36th Dist. Ct.;

213. City of Detroit v. Victor C. Travier, No. 08-126677-GC, Mich. 36th Dist. Ct.;

214. City of Detroit v. Victoria L. Cliett, No. 13-118142, Mich. 36th Dist. Ct.;

215. City of Detroit v. Bessie Harris, No. 08-126678-GC, Mich. 36th Dist. Ct.;

216. City of Detroit v. Donald R. & Latania C. McClendon, No. 08-145303-GC, Mich. 36th Dist. Ct.;

217. City of Detroit v. Jeanette Beverly, No. 09-108564-GC, Mich. 36th Dist. Ct.;

218. City of Detroit v. Linda Terry, No. 09-17213-GC, Mich. 36th Dist. Ct.;

219. City of Detroit v. Sharon Brown, No. 09-114024-GC, Mich. 36th Dist. Ct.;

220. City of Detroit v. Emily Talbert-Holt, No. 09-003020-CZ, Mich. 36th Dist. Ct.;

221. City of Detroit v. Deborah Hicks, No. 13-012387, Mich. 36th Dist. Ct.;

222. City of Detroit v. Flozelle Crosby, No. 09-112041-GC, Mich. 36th Dist. Ct.;

223. City of Detroit v. Vanessa A. Hall, No. 09-112039-GC, Mich. 36th Dist. Ct.;

224. City of Detroit v. Milton s. & Brenda K. Campbell, No. 09-114017-GC, Mich. 36th Dist. Ct.;

225. City of Detroit v. Jerel Johnson & Deshawn L. Morrison, No. 09-131660-GC, Mich. 36th Dist. Ct.;

226. City of Detroit v. Will Ivey, No. 13-118143, Mich. 36th Dist. Ct.;

227. City of Detroit v. Melvin Eades and Rachel Eades, No. 09-135760, Mich. 36th Dist. Ct.;

228. City of Detroit v. James Woodget, No. 10-104902-GC, Mich. 36th Dist. Ct.;

229. City of Detroit v. Pamela Franklin and Marvin Franklin, No. 10B2476, Mich. 36th Dist. Ct.;

230. City of Detroit v. Yvette Pugh, No. 11-107209-GC, Mich. 36th Dist. Ct.;

231. City of Detroit v. Everette Driver & Sheila Driver, No. 11-107031-GC, Mich. 36th Dist. Ct.;

232. City of Detroit v. Paul Swanson, No. 1102022H-GC, Mich. 41B Dist. Ct.;

233. City of Detroit v. Gillian John, No. 13-118144, Mich. 36th Dist. Ct.;

234. City of Detroit v. Luther Gray III, No. 07-122557-GC, Mich. 36th Dist. Ct.;

235. City of Detroit v. Tony Davis Garnishment, No. 08-114619-CD, Mich. 36th Dist. Ct.;

236. City of Detroit v. Bennie Hayden, No. 13-C3512-GC, Mich. 36th Dist. Ct.;

237. City of Detroit v. Raymond McMurrian, No. 12-117043-GC, Mich. 36th Dist. Ct.;

238. City of Detroit v. Timothy Ebendick and Colleen Ebendick, No. 13-117680-gc, Mich. 36th Dist. Ct.;

239. City of Detroit v. Sea-Breeze Traing Corp dba City Laundry Pers Prop, Mich. Third Judicial Cir.;

240. City of Detroit v. Jean James, No. 13-117268-GC, Mich. 36th Dist. Ct.;

241. City of Detroit v. Chezcore Inc. & Cieskowksi, David, Mich. Third Judicial Cir.;

242. City of Detroit v. Monica Chavers, No. 13-118145, Mich. 36th Dist. Ct.;

243. City of Detroit v. Slack, Jonathon, No. 13-117270-GC, Mich. 36th Dist. Ct.;

244. City of Detroit v. Kevin Doss, No. 13-117269-GC, Mich. 36th Dist. Ct.;

245. City of Detroit v. Mack Orangelo, No. 13-39949-GC, Mich. 36th Dist. Ct.;

246. Markos Patty Store v. City of Detroit, No. 13-000003-CZ, Mich. Third Judicial Cir.;

247. City of Detroit v. Gloria Ballard, Mich. 36th Dist. Ct.;

248. City of Detroit v. Daryl Johnson & Nadeine Johnson, Mich. 36th Dist. Ct.;

249. City of Detroit v. Rebecca Shelton, Mich. 36th Dist. Ct.;

250. City of Detroit v. Cynthia Snith & Kwame Smith, No. 13-117678-GC, Mich. 36th Dist. Ct.;

251. City of Detroit v. Zeola Carey, No. 09-107281, Mich. 36th Dist. Ct.;

252. City of Detroit v. Kenneth Tinsley & Cheryl Tinsley, Mich. 36th Dist. Ct.;

253. City of Detroit v. Louis Parker, Mich. 36th Dist. Ct.;

254. City of Detroit v. Matthew Underwood & Vantress Underwood, No. 13-117679-GC, Mich. 36th Dist. Ct.;

255. City of Detroit v. James D. & Marva E. Washington, No. 03-145330-GC, Mich. 36th Dist. Ct.;

256. City of Detroit v. Belda P. Garza, No. 07-122553-GC, Mich. 36th Dist. Ct.;

257. City of Detroit v. Fred Hill, No. 14-101263-GC, Mich. 36th Dist. Ct.;

258. City of Detroit v. Kathrine Luckett, No. 13-122872-GC, Mich. 36th Dist. Ct.;

259. City of Detroit v. Mary Majek, No. 14-101262-GC, Mich. 36th Dist. Ct.;

260. City of Detroit v. Kyler Reamuless, No. 13-122874-GC, Mich. 36th Dist. Ct.;

261. City of Detroit v. Mary Waters, No. 13-121800, Mich. 36th Dist. Ct.;

262. City of Detroit v. Meal Tech Products, Inc. & Letitia Gordon, No. 14--000586-CZ, Mich. Third Judicial Cir.;

263. City of Detroit v. Davis McGill & Juwanna D. McGill, No. 13-20224-GC, Mich. 36th Dist. Ct.;

264. City of Detroit v. Majestic Theater center Inc., No. 11-007260-CZ, Mich. Third Judicial Cir.;

265. City of Detroit v. Shelbourne Group In. Y Leipsitz-Makino, Kathy, No. 14-102379-GC, Mich. 36th Dist. Ct.;

266. City of Detroit v. Ali Beidoun, No. 13-121801, Mich. 36th Dist. Ct.;

267. City of Detroit v. Marcel Maurice Moore, No. 07-04395T-GC, Mich. 41B Dist. Ct.;

268. City of Detroit v. Shashu Makeda Harris, No. 06-101803-GC, Mich. 36th Dist. Ct.;

269. City of Detroit v. Lesley Girard Gates, No. 06-120154-GC, Mich. 36th Dist. Ct.;

270. City of Detroit v. Shawn Myatt, Mich. 36th Dist. Ct.;

271. City of Detroit v. Angela Nicole Shelly, No. 07-122578-GC, Mich. 36th Dist. Ct.;

272. City of Detroit v. Ann Francine Smith, No. 07-117414-GC, Mich. 36th Dist. Ct.;

273. City of Detroit v. Saun Roland Scott, No. 07-122576-GC, Mich. 36th Dist. Ct.;

274. City of Detroit v. Faynese deeneil Robinson-Law, No. 06-101802-GC, Mich. 36th Dist. Ct.;

275. City of Detroit v. Celia Harris, No. 13-121803, Mich. 36th Dist. Ct.;

276. City of Detroit v. Delois Kirkman, No. 07-134556-GC, Mich. 36th Dist. Ct.;

277. City of Detroit v. Michael Amthony Hines, No. 06-120152-GC, Mich. 36th Dist. Ct.;

278. City of Detroit v. Derrick James McDowell, No. 07-58101-GC, Mich. 36th Dist. Ct.;

279. City of Detroit v. Tamaara Morris, No. 06-101804-GC, Mich. 36th Dist. Ct.;

280. City of Detroit v. Rhonda Joann White, No. 07-134557-GC, Mich. 36th Dist. Ct.;

281. City of Detroit v. Danetta L. Simpson, No. 12-121739-GC, Mich. 36th Dist. Ct.;

282. City of Detroit v. Kildare Clarke, No. 08-00468-GC, Mich. 36th Dist. Ct.;

283. City of Detroit v. Aretha Lula Crawford, No. 07-145090-GC, Mich. 36th Dist. Ct.;

284. City of Detroit v. Euel Kinsey, No. 14-304163, Mich. 36th Dist. Ct.;

285. City of Detroit v. Natasha Nakie-Nacole Coats, No. 08-C0945-GC, Mich. 36th Dist. Ct.;

286. City of Detroit v. Rebecca Marie Dunn, No. 07155738-GC, Mich. 36th Dist. Ct.;

287. City of Detroit v. Eve Reedy Doster, No. 08-106725-GC, Mich. 36th Dist. Ct.;

288. City of Detroit v. Barnstormer Pilot Club, LLC, No. 14-002984, Mich. 36th Dist. Ct.;

289. City of Detroit v. Virginia Francnessa Flamer, No. 07-145091-GC, Mich. 36th Dist. Ct.;

290. City of Detroit v. Gregory Lynn Delaney, No. 07-145091-GC, Mich. 36th Dist. Ct.;

291. City of Detroit v. Tyrone Jemall Peals, No. 07-117411-GC, Mich. 36th Dist. Ct.;

292. City of Detroit v. Paul Douglas Bosman, No. 07-1805-GC, Mich. 22nd Dist. Ct.;

293. City of Detroit v. Ann Francien Smith, Mich. 36th Dist. Ct.;

294. City of Detroit v. Khatoon Dawood, No. 08-C01778-GC-01, 52nd Dist. Ct.;

295. City of Detroit v. Jaroslaw Sziejter, No. 09-114019, Mich. 36th Dist. Ct.;

296. City of Detroit v. Kimberly James, Mich. 36th Dist. Ct.;

297. City of Detroit v. Rachel Erika Thomas-Sharpe, Mich. 36th Dist. Ct.;

298. City of Detroit v. Tawanda Latreese Wilder, No. 09-114021-GC, Mich. 36th Dist. Ct.;

299. City of Detroit v. Elgin R. Taylor, No. 09-114022-GC, Mich. 36th Dist. Ct.;

300. City of Detroit v. Lasonia Smith, Mich. 36th Dist. Ct.;

301. City of Detroit v. Lamont Street, Mich. 36th Dist. Ct.;

302. City of Detroit v. Shealtiel N. Moore, Mich. 36th Dist. Ct.;

303. City of Detroit v. Jaroslaw Sziejter, No. 09-114019, Mich. 36th Dist. Ct.;

304. City of Detroit v. Christine Myers, Gavin Harrison, Karen Kialka, No. 09-114016-GC, Mich. 36th Dist. Ct.;

305. City of Detroit v. Verizon, Mich. 36th Dist. Ct.;

306. City of Detroit v. Marcus Ricardo Gary, No. 09-114018-GC, Mich. 36th Dist. Ct.;

307. City of Detroit v. Christine Myers, Gavin Harrison, Karen Kialka, No. 09-114016-GC, Mich. 36th Dist. Ct.;

308. City of Detroit v. Derek Culver, No. 13-121802, Mich. 36th Dist. Ct.;

309. City of Detroit v. Rita Lynette Powell-Pyles, No. 09-131657-GC, Mich. 36th Dist. Ct.;

310. City of Detroit v. Kari Burge, No. 10-106504-GC, Mich. 36th Dist. Ct.;

311. City of Detroit v. Jerea Deana Jackson, No. 08-106730-GC, Mich. 36th Dist. Ct.;

312. City of Detroit v. Angelo Iafrate, Mich. 36th Dist. Ct.;

313. City of Detroit v. Jamal Anthony Gaddie, No. 07-141061-GC, Mich. 36th Dist. Ct.;

314. City of Detroit v. Sophia Hawkins, No. 07-141894-GC, Mich. 36th Dist. Ct.;

315. City of Detroit v. Terrance Thomas, No. 10-108337-GC, Mich. 36th Dist. Ct.;

316. City of Detroit v. Terrance Thomas, No. 10-108337-GC, Mich. 36th Dist. Ct.;

317. City of Detroit v. Maia Williams, Mich. 36th Dist. Ct.;

318. City of Detroit v. Frances Blue, No. 10-118297-GC, Mich. 36th Dist. Ct.;

319. City of Detroit v. Jerel D. Matthaw, No. 10-122303, Mich. 36th Dist. Ct.;

320. City of Detroit v. Ashli R. Thomas, No. 10-122302-GC, Mich. 36th Dist. Ct.;

321. City of Detroit v. George Webb, No. 10-121743-GC, Mich. 36th Dist. Ct.;

322. City of Detroit v. Elsie L. Green & Sadie Reynolds, No. 10-124040-GC, Mich. 36th Dist. Ct.;

323. City of Detroit v. Wayne County 7 Raymond J. Wojtowitcz, No. 13-000036-MZ-C30, Mich. 36th Dist. Ct.;

324. City of Detroit v. Kenneth L. Hurt, No. 11-105194-GC, Mich. 36th Dist. Ct.;

325. City of Detroit v. Tiyunna George, Mich. 36th Dist. Ct.;

326. City of Detroit v. Dejuan L. Washington, No. 11-105192-GC, Mich. 36th Dist. Ct.;

327. City of Detroit v. Marc Williams, No. 12-103384-GC, Mich. 36th Dist. Ct.;

328. City of Detroit v. Charles Williams, Mich. 36th Dist. Ct.;

329. City of Detroit v. Jennifer Bramer, No. 12-103386-GC, Mich. 36th Dist. Ct.;

330. City of Detroit v. Ronald Taylor, No. 04-117439-GC, Mich. 36th Dist. Ct.;

331. City of Detroit v. Empire Leasing, No. 14-15917-GC, Mich. 36th Dist. Ct.;

332. City of Detroit v. Wise Finley, No. 14-105916-GC, Mich. 36th Dist. Ct.;

333. City of Detroit v. John Louis Herring, Mich. 36th Dist. Ct.;

334. City of Detroit v. Damon Key, No. 14-15921-GC, Mich. 36th Dist. Ct.;

335. City of Detroit v. Claudio Lopez, Mich. 36th Dist. Ct.;

336. City of Detroit v. Michael Mingo, No. 14-105920-GC, Mich. 36th Dist. Ct.;

337. City of Detroit v. Myrtle Pasha, Mich. 36th Dist. Ct.;

338. City of Detroit v. Larry Callahan, No. 08-105046-GC, Mich. 36th Dist. Ct.;

339. City of Detroit v. Anthony Caslio, No. 07-154008-GC, Mich. 36th Dist. Ct.;

340. City of Detroit v. Antonio L. Johnson, No. 08-122838-GC, Mich. 36th Dist. Ct.;

341. City of Detroit v. Markeeda Morgan, No. 07-124692-GC, Mich. 36th Dist. Ct.;

342. City of Detroit v. 19696 Omira, No. 09-110228-GC, Mich. 36th Dist. Ct.;

343. City of Detroit v. Cadolba Management and Associates, No. 09-120755-GC, Mich. 36th Dist. Ct.;

344. City of Detroit v. Clarence Edward Key, No. 09-114023-GC, Mich. 36th Dist. Ct.;

345. Motor City Bending Inc vs City of Detroit, No. 07-729179, Mich. 36th Dist. Ct.;

346. City of Detroit v. 19696 Omira, No. 09-110228, Mich. 36th Dist. Ct.;

347. City of Detroit v. Cadpba Management and Associates, No. 09-120755, Mich. 36th Dist. Ct.;

348. City of Detroit v. Clarence Edward Key, No. 09-114023, Mich. 36th Dist. Ct.;

CHI-1928932v1

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

------------------------------------------------------x
                                     :

In re                            :          Chapter 9
                                       :

CITY OF DETROIT, MICHIGAN,     :          Case No. 13-53846
                                       :

                 Debtor.          :          Hon. Steven W. Rhodes
                                       :
                                       :

------------------------------------------------------x

**ORDER CONFIRMING EIGHTH AMENDED PLAN FOR**
**<u>THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT</u>**

# TABLE OF CONTENTS

FINDINGS OF FACT AND CONCLUSIONS OF LAW .......................................4

Jurisdiction and Venue .................................................................4

Modifications of the Plan .............................................................5

Standards for Confirmation Under Section 943 of the
Bankruptcy Code ..........................................................................6

Section 943(b)(1) ..........................................................6

Section 1122.......................................................7

Section 1123(a)(1)...........................................7

Section 1123(a)(2)...........................................8

Section 1123(a)(3)...........................................8

Section 1123(a)(4)...........................................8

Section 1123(a)(5)...........................................10

Section 1123(b)(1) ..........................................10

Section 1123(b)(2) ..........................................10

Section 1123(b)(3) ..........................................11

Section 1123(b)(5) ..........................................11

Section 1123(b)(6) ..........................................11

Section 1123(d)................................................12

Section 1127(d)................................................12

Section 1129(a)(2)...........................................12

Section 1129(a)(3)...........................................19

Section 1129(a)(6)...........................................20

Section 1129(a)(8)...........................................21

Section 1129(a)(10) .........................................21

Section 1129(b)(1) – Unfair Discrimination...........................21

Sections 1129(b)(1), (b)(2) – Fair and Equitable......................25

Section 943(b)(2)........................................................26

Section 943(b)(3)........................................................27

Section 943(b)(4)..........................................................................29

Section 943(b)(5)..........................................................................30

Section 943(b)(6)..........................................................................30

Section 943(b)(7)..........................................................................31

Best Interests of Creditors..........................................................31

Feasibility...................................................................................36

Executory Contracts....................................................................42

Settlements and Releases............................................................43

The DIA Settlement....................................................................44

The UTGO Settlement ................................................................48

The LTGO Settlement .................................................................52

The OPEB Settlement .................................................................53

The 36th District Court Settlement ............................................54

The Syncora Settlement .............................................................55

The FGIC/COP Settlement..........................................................58

ASF Recoupment........................................................................60

Plan Releases .............................................................................63

Miscellaneous ............................................................................66

Exit Facility ...............................................................................66

Waiver of Stay of Confirmation Order .......................................68

ORDER ....................................................................................................68

A.    Confirmation of Plan............................................................68

B.    Findings of Fact and Conclusions of Law............................69

C.    Approval of Settlements.......................................................70

D.    Approval of Releases and Exculpation .................................78

E.    Order Binding on All Parties................................................86

F.    Discharge of Claims .............................................................87

G.    Release of Liens ...................................................................88

H.    Injunction..............................................................................89

-ii-

I.     State Contribution Agreement............................................................93

J.     DWSD Authority Transaction............................................................94

K.    ASF Recoupment ...............................................................................95

L.     Survival of Indemnities .....................................................................98

M.   Issuance of New Securities and Exemption From Securities Laws.....................................................................................99

N.    Executory Contracts and Unexpired Leases ....................................100

O.    Plan Distributions ............................................................................103

P.     Retained Causes of Action ...............................................................103

Q.    Claims Bar Dates and Other Claims Matters ..................................104

R.     Plan Implementation.........................................................................109

S.     Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents..............................................................110

T.     Binding Effect of Prior Orders .........................................................114

U.    Final Order; Waiver of Stay .............................................................115

V.    Reversal ............................................................................................115

W.   Notice of Confirmation of Plan........................................................115

X.    Miscellaneous Provisions .................................................................116

Y.    No Diminution of State Power .........................................................124

Z.     Post-Effective Date Governance ......................................................125

AA.  Retention of Jurisdiction ..................................................................125

Appendix I      Plan of Adjustment

Appendix II     Confirmation Notice

The City of Detroit (the "City" or the "Debtor") having proposed its

Eighth Amended Plan for the Adjustment of Debts of the City of Detroit

(October 22, 2014) (the "Plan" or the "Eighth Amended Plan"),[1] a true and correct

copy of which (without exhibits) is attached hereto as Appendix I; the Court

having conducted a 24-day evidentiary hearing to consider confirmation of the

Plan on August 18, September 2-5, September 8-9, September 15-18,

September 29 to October 3, October 6, October 14-16, October 20-22 and

October 27, 2014 (the "Confirmation Hearing"); the Court having conducted a

hearing on July 15, 2014, at which 46 individuals who (i) filed objections to

Confirmation of the Plan with the Court and (ii) appeared in the Chapter 9 Case

*pro se* made presentations with respect to such objections to the Court (the "*Pro Se*

Hearing") and the Court having considered the arguments of such parties at the

*Pro Se* Hearing;[2] the Court having conducted hearings on certain legal issues

related to confirmation of the Plan on July 16, 2014 and August 19, 2014; the

Court having considered:  (i) the testimony of the 41 witnesses called at the

---

[1]    On May 5, 2014, the City filed its Fourth Amended Plan for the Adjustment
       of Debts of the City of Detroit (May 5, 2014) (the "Fourth Amended Plan"),
       which version of the Plan was included in the contents of the solicitation
       packages distributed to creditors entitled to vote thereon.

       All capitalized terms used but not defined herein have the meanings given to
       them in the Plan.

[2]    *See* Notice of Hearing to Individuals Who Filed Plan Objections (Docket
       No. 5264) (June 10, 2014).

Confirmation Hearing, as well as the affidavits and declarations included among the approximately 2,300 exhibits admitted into evidence at the Confirmation Hearing; (ii) the arguments of counsel presented at the Confirmation Hearing; (iii) the pleadings filed by the City in support of the Plan, including the following:

- Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5034) (the "Consolidated Reply"), filed by the City on May 26, 2014;

- Debtor's Supplemental Brief on Legal Issues Relating to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5707), filed by the City on June 30, 2014;

- City's Supplemental Brief Regarding Standing of Syncora to Raise Certain Objections to Confirmation (Docket No. 6010), filed by the City on July 14, 2014;

- The City of Detroit's Brief Regarding the Court's Authority to Determine the Reasonableness of Fees Under 11 U.S.C. § 943(b)(3) (Docket No. 6842), filed by the City on August 18, 2014;

- Consolidated (A) Pretrial Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objections (Docket No. 7143), filed by the City on August 27, 2014 (the "Pretrial Brief"), including the summary of the City's compliance with the standards of section 943 of the Bankruptcy Code (inclusive of the standards of sections 1122, 1123(a)(1)-(a)(5), 1123(b), 1123(d), 1124, 1125, 1126(a)-1126(c), 1126(e)-1126(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy

-2-

Code) attached as Exhibit A thereto (the "<u>Confirmation Standards Exhibit</u>");

- Consolidated Response to Certain *Pro Se* Objections to Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7303) (the "<u>Response to *Pro Se* Objections</u>"), filed by the City on September 5, 2014;

- Consolidated Reply to Supplemental Objections to Confirmation of the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7707), filed by the City on September 26, 2014, as well as all other pleadings filed in support of the Plan by parties in interest; and

- Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (October 22, 2014) (Docket No. 8045), including all Exhibits thereto.

(iv) all other papers filed in support of, and in opposition to, Confirmation of the Plan, including the objections filed with respect to Confirmation of the Plan;[3]

(v) the resolution, settlement or withdrawal of timely objections to Confirmation of the Plan filed by, among others, FGIC, Syncora, the FGIC COP Holders, the DWSD Settlement Parties, the LTGO Insurer, certain insurers of Unlimited Tax General Obligation Bonds, Michigan Council 25 of the American Federation of

---

[3] *See* Summary of the City's Responses to Initial Plan Objections, attached as Exhibit A to the Consolidated Reply; Summary of the City's Responses to (I) Supplemental Objections and (II) Objections filed by (A) the UAW and (B) AFSCME, attached as Exhibit A to the Pretrial Brief; Summary of the City's Responses to (I) *Pro Se* Objections Specified in the Order Requiring City to Respond to Certain *Pro Se* Objections to Confirmation [Docket No. 6640] and (II) *Pro Se* Objections Not Addressed in the Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 5034], attached as Exhibit A to the Response to *Pro Se* Objections.

State, County and Municipal Employees, AFL-CIO ("AFSCME"), the

International Union, UAW, each of the Counties and the Macomb Interceptor

Drain Drainage District; and the Court being familiar with the Plan and other

relevant factors affecting this Chapter 9 Case; the Court having taken judicial

notice of the entire docket of the City's Chapter 9 Case maintained by the Clerk of

the Court and/or its duly appointed agent, pursuant to Federal Rule of Evidence

201(c) (made applicable to this case by Bankruptcy Rule 9017), including, but not

limited to, those orders, pleadings and other documents set forth in the

Confirmation Standards Exhibit; the Court having found that due and proper notice

has been given with respect to the Confirmation Hearing and the deadlines and

procedures for filing objections to the Plan; the appearance of all interested parties

having been duly noted in the record of the Confirmation Hearing; and upon the

record of the Confirmation Hearing, and after due deliberation thereon, and

sufficient cause appearing therefor;

IT IS HEREBY FOUND AND CONCLUDED, that:

## **JURISDICTION AND VENUE**

A.     The Court has jurisdiction over this matter and this Chapter 9

Case pursuant to 28 U.S.C. § 1334 and Rule 83.50(a) of the Local Rules of the

United States District Court for the Eastern District of Michigan.

B.      Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has jurisdiction to enter a final order with respect thereto.

C.      The City is a proper debtor under section 109 of the Bankruptcy Code[4] and the proper proponent of the Plan under section 941 of the Bankruptcy Code.

D.      On the Effective Date of the Plan, or as soon thereafter as is practicable, all appeals of the Opinion Regarding Eligibility and the Order for Relief, in accordance with settlements by and among the appellants and the City, shall be withdrawn.

## MODIFICATIONS OF THE PLAN

E.      The Plan does not materially and adversely affect or change the treatment of any Claim against the City under the Fourth Amended Plan.  Pursuant to sections 942 and 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan does not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections of the Fourth Amended Plan under section 1126 of the Bankruptcy Code, nor does it require that

---

[4]     *See* Opinion Regarding Eligibility (Docket No. 1945), entered on December 5, 2013 (the "Opinion Regarding Eligibility"); Order for Relief Under Chapter 9 of the Bankruptcy Code (Docket No. 1946), entered on December 5, 2013 (the "Order for Relief").

-5-

holders of Claims against the City be afforded an opportunity to change previously cast acceptances or rejections of the Fourth Amended Plan as filed with the Court. The filing of the Plan, and the disclosure of certain modifications and amendments to the Fourth Amended Plan contained therein on the record at the Confirmation Hearing, constitute due and sufficient notice thereof under the circumstances of the Chapter 9 Case. Accordingly, the Plan is properly before the Court, and, except as set forth in the Plan or later orders of the Court, all votes cast with respect to the Fourth Amended Plan prior to the filing of the Plan shall be binding and shall apply with respect to the Plan.

## STANDARDS FOR CONFIRMATION
## UNDER SECTION 943 OF THE BANKRUPTCY CODE

F. The evidentiary record of the Confirmation Hearing and the Confirmation Standards Exhibit support the findings of fact and conclusions of law set forth in the following paragraphs.

G. The Court's supplemental opinion regarding confirmation of the Plan (the "Confirmation Opinion"), to be issued, is incorporated fully herein.

H.    <u>Section 943(b)(1)</u>.  The Plan complies with the provisions of the Bankruptcy Code made applicable to this Chapter 9 Case by sections 103(e) and 901 of the Bankruptcy Code.[5]  In particular:

1.    *Section 1122*.  In accordance with section 1122(a) of the Bankruptcy Code, Section II.B of the Plan classifies each Claim against the City into a Class containing only substantially similar Claims.  The legal rights under applicable law of each holder of Claims within each Class under the Plan are substantially similar in nature and character to the legal rights of all other holders of Claims within such Class.  No Claims were separately classified under the Plan to gerrymander favorable votes with respect to the Plan.  In accordance with section 1122(b) of the Bankruptcy Code, Convenience Claims are separately classified in Class 15 under the Plan solely for the purpose of administrative convenience.

2.    *Section 1123(a)(1)*.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Section II.B of the Plan properly classifies all Claims that require classification.  Valid factual and legal reasons

---

[5]    Section 901 of the Bankruptcy Code incorporates into chapter 9 the following chapter 11 provisions relevant to plan confirmation: sections 1122, 1123(a)(1)-(5), 1123(b), 1123(d), 1125, 1126(a)-(c) and (e)-(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1) and 1129(b)(2)(A)-(B) of the Bankruptcy Code. *See* 11 U.S.C. § 901(a).

exist for the separate classification of (a) certain secured Claims from Other Secured Claims and (b) certain unsecured Claims from Other Unsecured Claims.

3.    *Section 1123(a)(2).*  In accordance with section 1123(a)(2) of the Bankruptcy Code, Section II.B of the Plan properly identifies and describes each Class of Claims that is not impaired under the Plan.[6]

4.    *Section 1123(a)(3).*  In accordance with section 1123(a)(3) of the Bankruptcy Code, Section II.B of the Plan properly identifies and describes the treatment of each Class of Claims that is impaired under the Plan.

5.    *Section 1123(a)(4).*  In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim of a particular Class unless the holder of such a Claim has agreed to less favorable treatment.  Because ASF Recoupment is a settlement mechanism designed to (a) implement a critical component of the City's comprehensive settlement of pension-related issues and (b) enable the trustees of the GRS

---

[6]    *See* Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 7028), entered on August 25, 2014 (the "DWSD Tender Order"); Notice of Occurrence of Settlement Date and Unimpairment of Class 1A Claims and (B) Withdrawal of DWSD Plan Objections by Financial Creditors (Docket No. 7268), filed on September 4, 2014 (the "DWSD Settlement Notice").

13-53846-tjt    Doc 8276-6    Filed 11/05/21    Entered 11/05/21 22:54:07    Page 84 of 205

(collectively, the "GRS Trustees") to recover a portion of excess interest allocated to members' Annuity Savings Fund accounts from the GRS's traditional defined benefit pension plan (the "GRS Traditional Pension Plan"), ASF Recoupment may be deemed (x) separate and distinct from the calculation of recoveries provided to holders of GRS Pension Claims and, thus, (y) disregarded for purposes of determining whether the Plan complies with section 1123(a)(4) of the Bankruptcy Code.

6. The consideration provided to Syncora in connection with the Syncora Settlement that is not provided on account of the Plan COP Settlement (a) is separate and distinct from the treatment of Class 9 COP Claims held or insured by Syncora under the Plan, (b) is provided on account of (i) Syncora's agreement to invest new funds (subject to the terms and conditions of the applicable agreements) pursuant to commercial relationships with the City that are distinct from COP Claims held or insured by Syncora and (ii) Syncora's agreement to resolve all of its pending litigation against the City and, thus, (c) has been disregarded for purposes of determining whether the Plan complies with section 1123(a)(4) of the Bankruptcy Code. The consideration provided to FGIC in connection with the FGIC/COP Settlement that is not provided on account of the Plan COP Settlement (a) is separate and distinct from the treatment of Class 9 COP Claims held or insured by FGIC under the Plan and reflects an agreement to invest

-9-

new funds in a commercial relationship with the City, (b) is provided on account of FGIC's agreement to resolve all of its pending litigation against the City and, thus, (c) has been disregarded for purposes of determining whether the Plan complies with section 1123(a)(4) of the Bankruptcy Code.

7.    *Section 1123(a)(5).*  In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its implementation, including, without limitation, (a) the issuance of the New Securities pursuant to the Plan, (b) the consummation of the Settlements (as such term is defined below) described in the Plan, (c) the consummation of the State Contribution Agreement, (d) the assumption or rejection of Executory Contracts and Unexpired Leases, (e) the establishment and funding of the Professional Fee Reserve, (f) the City's assumption of certain indemnification obligations, (g) the City's entry into the Exit Facility and any agreements and ancillary notes related thereto and (h) the provisions regarding Effective Date transactions and transfers in Article IV of the Plan.

8.    *Section 1123(b)(1).*  In accordance with section 1123(b)(1) of the Bankruptcy Code, Section II.B of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims.

9.    *Section 1123(b)(2).*  In accordance with section 1123(b)(2) of the Bankruptcy Code, Section II.D and other provisions of

-10-

the Plan provide for the assumption, assumption and assignment, or rejection of the Executory Contracts or Unexpired Leases of the City that have not been previously assumed, assumed and assigned, or rejected pursuant to section 365 of the Bankruptcy Code and orders of the Court.

10.    *Section 1123(b)(3)*.  In accordance with section 1123(b)(3) of the Bankruptcy Code, Section III.D.2 of the Plan provides that, except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity (including but not limited to (a) any and all Causes of Action against any party relating to the past practices of the Retirement Systems, (b) the currently pending actions and claims brought by the City identified on Schedule A to Exhibit III.D.2 to the Plan and (c) potential recovery actions that may be brought by the City under the Bankruptcy Code (or similar federal or state law) against, among other parties, the Entities identified on Schedule B to Exhibit III.D.2 to the Plan), to the extent not expressly released under the Plan or by any Final Order of the Court.

11.    *Section 1123(b)(5)*.  In accordance with section 1123(b)(5) of the Bankruptcy Code, Section II.B of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of Claims in each Class.

-11-

12.     *Section 1123(b)(6).*  In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including, without limitation, the provisions of Article III, Article IV, Article V, Article VI, Article VII and Article VIII of the Plan.

13.     *Section 1123(d).*  In accordance with section 1123(d) of the Bankruptcy Code, Section II.D.4 of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.  All Cure Amount Claims will be determined in accordance with the underlying agreements and applicable law.

14.     *Section 1127(d).*  All creditors entitled to vote on the Plan received proper notice of the Confirmation Hearing, and were provided an adequate opportunity to object to any amendments and modifications to the Fourth Amended Plan.[7]

15.     *Section 1129(a)(2).*  The City has complied with all applicable provisions of the Bankruptcy Code with respect to the Plan and the solicitation of acceptances or rejections thereof.  In particular, the Plan complies

---

[7]     *See* Certificate of Service (Docket No. 6177).

with the requirements of sections 1125 and 1126 of the Bankruptcy Code as

follows:

a)   In compliance with the (i) Order (I) Establishing
     Procedures for Solicitation and Tabulation of Votes to
     Accept or Reject Plan of Adjustment and (II) Approving
     Notice Procedures Related to Confirmation of the Plan of
     Adjustment (Docket No. 2984) (the "Solicitation
     Procedures Order"), entered on March 11, 2014, and
     (ii) Order Establishing Supplemental Procedures for
     Solicitation and Tabulation of Votes to Accept or Reject
     Plan of Adjustment with Respect to Pension and OPEB
     Claims (Docket No. 4400) (together with the Solicitation
     Procedures Order, the "Solicitation Orders"), entered on
     May 5, 2014, on or before May 12, 2014, the City,
     through its claims, noticing, balloting and solicitation
     agent, Kurtzman Carson Consultants LLC ("KCC"),
     caused copies of the following materials to be transmitted
     to all holders of Claims in Classes that were entitled to
     vote to accept or reject the Fourth Amended Plan
     (*i.e.*, Allowed Claims in impaired Classes within Class
     1A[8] and Classes 5, 7, 8, 9, 10, 11, 12, 13, 14 and 15):

     •    the Disclosure Statement (together with the
          exhibits thereto, including the Fourth Amended
          Plan);

     •    a notice of the Confirmation Hearing and other
          matters (the "Confirmation Hearing Notice");

     •    an appropriate form of Ballot;

---

[8]   Subsequent to the City's solicitation of acceptances of the Fourth Amended
      Plan, the Plan was amended to unimpair all Classes in Class 1A, and such
      Classes are therefore deemed to have accepted the Plan. *See* DWSD Tender
      Order; DWSD Settlement Notice. As a result, all votes and elections
      previously delivered with respect to Class 1A Claims shall not be counted
      and shall be of no force and effect.

-13-

- a notice summarizing certain dispute resolution procedures to be employed with respect to voting;

- for holders of Claims in Classes 10, 11 and 12, a "Plain Language Supplement," drafted in collaboration with, among others, the Retiree Committee and the Retirement Systems, describing the treatment of such Claims in non-technical terms;

- the procedures for the solicitation and tabulation of votes to accept or reject the Plan, including approval of (i) the deadline for creditors' submission of Ballots, (ii) the rules for tabulating votes to accept or reject the Plan and (iii) the proposed record date for Plan voting (collectively with the materials described in the preceding bullets, the "Solicitation Package"); and

- cover letters from the City, the DRCEA, the RDPFFA, the Detroit Police Lieutenants and Sergeants Association (the "DPLSA") and the Detroit Police Command Officers Association (the "DPCOA") recommending acceptance of the Plan.[9]

b) In compliance with the Solicitation Procedures Order, on or before May 12, 2014, the City, through KCC, caused copies of the Solicitation Package (not including Ballots) to be transmitted to parties entitled to receive notice pursuant to Bankruptcy Rule 2002.[10]

---

[9] *See* Certificate of Service (Docket No. 6177), at ¶¶ 1-41. A separate communication recommending acceptance of the Plan was mailed to holders of Class 10, Class 11 and Class 12 Claims by the Retiree Committee contemporaneously with the solicitation of votes undertaken by the City. In addition, the GRS and the PFRS sent letters recommending acceptance of the Plan to holders of Class 10 and Class 11 Claims.

[10] *See* Certificate of Service (Docket No. 6177), at ¶ 21.

c) In compliance with the Solicitation Procedures Order, on or before May 12, 2014, the City, through KCC, transmitted (i) the Confirmation Hearing Notice and (ii) a "Notice of Non-Voting Status" to all holders of Claims in the Classes not entitled to vote on the Plan (*i.e.*, holders of Claims in unimpaired Classes within Class 1A and in Classes 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3, 4, 6 and 16) that were not entitled to vote on the Plan.[11]

d) In compliance with the Solicitation Procedures Order, on or before May 12, 2014, the City, through KCC, transmitted the Confirmation Hearing Notice to: (i) all other creditors of the City; and (ii) all parties in interest that had filed requests for notice in accordance with Bankruptcy Rule 2002 in the Chapter 9 Case.[12]

e) In compliance with the Solicitation Procedures Order, on May 9, 2014, the City caused a copy of the Confirmation Hearing Notice to be published in the national editions of the *Wall Street Journal* and *USA Today* and the daily editions of the *Detroit Free Press* and the *Detroit News*.[13]

f) Pursuant to the Order Approving the Stipulation Regarding Certain Class 11 and Class 10 Ballots (Docket No. 5209), entered on June 4, 2014, the City mailed replacement ballots to certain members of Classes 10 and 11.[14]

---

[11] *See id.* at ¶ 20.

[12] *See id.* at ¶ 19.

[13] *See* Affidavit of Publication of Confirmation Hearing Notice in the *Detroit Free Press* and the *Detroit News*, dated July 22, 2014 (Docket No. 6209), at page 2; Affidavit of Publication of Confirmation Hearing Notice in *USA Today*, dated July 22, 2014 (Docket No. 6211), at page 2; Affidavit of Publication of Confirmation Hearing Notice in the *Wall Street Journal*, dated July 24, 2014 (Docket No. 6253), at page 2.

[14] *See* Certificate of Service (Docket No. 6177), at ¶¶ 11, 27, Exhibit P.

g)    On July 3, 2014, the City filed (and made available on the Document Website) the following Exhibits: (i) Exhibit I.A.189.a (Form of New GRS Active Pension Plan) (renumbered as Exhibit I.A.250.a to the Eighth Amended Plan); (ii) Exhibit I.A.191.a (Form of New PFRS Active Pension Plan) (renumbered as Exhibit I.A.254.a to the Eighth Amended Plan); (iii) Exhibit I.A.220 (Form of Prior GRS Pension Plan) (renumbered as Exhibit I.A.280 to the Eighth Amended Plan); and (iv) Exhibit I.A.221 (Form of Prior PFRS Pension Plan) (renumbered as Exhibit I.A.281 to the Eighth Amended Plan).[15]

h)    On July 3, 2014, the City filed (and made available on the Document Website) Exhibit II.D.6 (Executory Contracts and Unexpired Leases to be Rejected).[16]

i)    On August 7, 2014, the City filed (and made available on the Document Website) Exhibit I.A.103 (Form of DIA Settlement Documents) (renumbered as Exhibit I.A.127 to the Eighth Amended Plan).[17]

j)    On August 11, 2014, the City filed (and made available on the Document Website) the following Exhibits: (i) Exhibit I.A.146 (Principal Terms of Exit Facility) (renumbered as Exhibit I.A.183 to the Eighth Amended Plan); (ii) Exhibit I.A.255 (Form of Restoration Trust Agreement) (renumbered as Exhibit I.A.292 to the Eighth Amended Plan); (iii) Exhibit II.D.5 (Schedule of Postpetition Collective Bargaining Agreements); and (iv) Exhibit III.D.2 (Retained Causes of Action).[18]

k)    The Confirmation Hearing Notice and the subsequent scheduling orders entered by the Court provided due and

---

[15]    *See* Notice of Filing of Plan Supplement (Docket No. 5755).

[16]    *See* Notice of Filing of Plan Supplement (Docket No. 5756).

[17]    *See* Notice of Filing of Plan Supplement (Docket No. 6576).

[18]    *See* Notice of Filing of Plan Supplement (Docket No. 6647).

-16-

proper notice of the Confirmation Hearing and all relevant dates, deadlines, procedures and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the Voting Deadline, the Objection Deadline (as such term was defined in the Confirmation Hearing Notice), the time, date and place of the Confirmation Hearing and the release provisions in the Plan.[19]

l)    All persons entitled to receive notice of the Disclosure Statement, the Plan and the Confirmation Hearing received proper, timely and adequate notice in accordance with the Solicitation Orders, applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto.[20]

m)    The City solicited votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Orders, including, without limitation, the inclusion of letters from the City, the DRCEA, the RDPFFA, the DPLSA and the DPCOA recommending acceptance of the Plan in the solicitation materials and the separate mailing of solicitation letters from the Retiree Committee, the GRS and the PFRS. Accordingly, the City, the Retiree Committee, the GRS, the PFRS, the DRCEA and the RDPFFA are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section III.D.6 of the Plan.

---

[19]    *See* Solicitation Procedures Order at ¶ 17; Motion of the City of Detroit for Entry of an Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment (Docket No. 2789), at Exhibit 6A.

[20]    *See* Certificates of Service (Docket Nos. 6174, 6177).

-17-

n) Claims in Classes 1A, 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3 and 4 under the Plan are unimpaired, and such Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.[21]

o) KCC has made a final determination of the validity of, and tabulation with respect to, all acceptances and rejections of the Plan by holders of Claims entitled to vote on the Plan, including the amount and number of accepting and rejecting Claims in Classes 5, 7, 8, 9, 10, 11, 12, 13, 14 and 15 under the Plan.[22]

p) Holders of Claims in Class 17 (Indirect 36th District Court Claims) were previously classified in Class 14 under the Fourth Amended Plan. The City solicited acceptances or rejections of the Plan from the holders of Indirect 36th District Court Claims in their previous capacity as holders of Class 14 Claims. Pursuant to the Order Authorizing Certain Holders of Indirect 36th District Court Claims to Change Their Votes on the City's Plan of Adjustment (Docket No. 6288), entered on July 28, 2014, by agreement of the parties, the votes of all known holders of Indirect 36th District Court Claims rejecting the Plan under Class 14 were deemed to be votes accepting the Plan under Class 17.

q) Under the Plan, Class 16 (Subordinated Claims) is Impaired and holders of Claims in such Class will receive

---

[21] *See* DWSD Settlement Notice. Subsequent to the filing of the Fourth Amended Plan, the Parking Bonds giving rise to Parking Bond Claims in Class 6 of the Plan were paid in full by the City, mooting the proposed treatment of such Parking Bond Claims in the Fourth Amended Plan (as reflected in the Plan).

[22] *See* Second Supplemental Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Plan for the Adjustment of Debts of the City of Detroit (Docket No. 8072), filed on October 23, 2014 (the "Second Supplemental Voting Declaration"), at ¶¶ 8-9.

no distributions under the Plan.[23]  Therefore, Class 16 is conclusively presumed to reject the Plan in accordance with section 1126(g) of the Bankruptcy Code, and no votes were solicited from holders of Class 16 Claims.[24]

r)    The Plan was voted on by each Class of impaired Claims that was entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Orders.

s)    Each of Classes 5, 7, 8, 9, 10, 11, 12, 13 and 17 have accepted the Plan by at least two-thirds in amount and a majority in number of the Claims in such Classes actually voting.[25]

t)    The voting declarations admitted into evidence as City Exhibits 764 and 765, and the Second Supplemental Voting Declaration, set forth the tabulation of votes, as required by the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.[26]

16.    *Section 1129(a)(3).*  The Plan has been proposed (a) in good faith; (b) with honesty, sincerity and good intentions; (c) with a basis for expecting that an adjustment of the City's debts and an operational restructuring of the City can be effected in accordance with the purpose of chapter 9, and that the Plan is feasible; and (d) not by any means forbidden by law.  The Plan and the treatment of Claims thereunder are, and the process pursuant to which the City has sought Confirmation thereof has been, fundamentally fair to the City's creditors.

---

[23]    *See* Plan, at § II.B.3.w.i.

[24]    *See id.*.

[25]    *See* Second Supplemental Voting Declaration, at ¶¶ 8-9.

[26]    *See id.* at Exhibits A-C.

The purpose of the Plan is to adjust the City's debts to enable the City to reverse its decades-long financial decline, eliminate its service delivery insolvency, restore adequate municipal services to its residents and meet its future financial obligations, consistent with the overarching remedial purpose of chapter 9 and the objectives and purposes of the Bankruptcy Code. The City's good faith in proposing the Plan and its prior versions, and fundamental fairness in dealing with its creditors, is further evidenced by the fact that the Plan (a) incorporates multiple key settlements that are the result of extensive arm's length negotiations (often conducted within the context of Court-ordered mediation) between the City and representatives of a large proportion of its creditors, (b) has been proposed with the support of the City's largest creditor constituencies and (c) is feasible (*see* ¶¶ N.10-18 below). In so finding, the Court has considered the totality of the circumstances in this Chapter 9 Case.

17. *Section 1129(a)(6)*. Section III.A.7 of the Plan provides that the obtaining of any authorizations, consents and regulatory approvals necessary under applicable nonbankruptcy law is a specific condition to the effectiveness of the Plan, consistent with the language of section 1129(a)(6) of the Bankruptcy Code.[27] The Board of Water Commissioners will continue to have all authority to set and approve the water and sewerage rates charged by the DWSD,

---

[27] *See* Plan, at § III.A.7.

-20-

provided that, if a DWSD Authority is approved and formed, such rates would be determined by the board of such DWSD Authority.[28]

18. *Section 1129(a)(8)*. The Plan has not been accepted by all impaired Classes of Claims because (a) Classes 14 and 15 (collectively, the "Impaired Rejecting Classes") have voted to reject the Plan[29] and (b) consistent with section 1126(g) of the Bankruptcy Code, the holders of Claims in Class 16 (Subordinated Claims) (who receive no Distributions pursuant to Section II.B.3.w.i of the Plan) are deemed to have rejected the Plan.[30] Nevertheless, as more fully explained below, the Plan is confirmable because it satisfies section 1129(b) of the Bankruptcy Code with respect to such Impaired Rejecting Classes.

19. *Section 1129(a)(10)*. The Plan has been accepted by the following impaired Classes of Claims that are entitled to vote on the Plan, determined without including any acceptance of the Plan by any insider: Classes 5, 7, 8, 9, 10, 11, 12, 13 and 17.[31]

20. *Section 1129(b)(1): Unfair Discrimination*. For the reasons set forth in the Confirmation Opinion, the Plan does not discriminate unfairly against the Impaired Rejecting Classes. The Plan provides greater

---

[28]     *See* Plan, at § IV.A.1.

[29]     S*ee* Second Supplemental Voting Declaration, at ¶¶ 8-9.

[30]     *See* Solicitation Procedures Order, at ¶ 10.

[31]     *See* Second Supplemental Voting Declaration, at ¶¶ 8-9.

percentage recoveries to holders of (a) Pension Claims in Classes 10 and 11 (as high as approximately 59% and 60%, respectively, although the Court does not make any specific finding with respect to such percentage recoveries), (b) Class 8 Unlimited Tax General Obligation Bond Claims (approximately 74%), (c) Limited Tax General Obligation Bond Claims (approximately 44%) and (d) Indirect 36th District Court Claims (approximately 33%) than to holders of (x) Other Unsecured Claims (approximately 13%) and (y) Convenience Claims (25% recovery).

21.     Despite the differences in the Classes' respective recoveries, the Court finds that such discrimination is fair in light of, among other things, (a) the circumstances of the City's Chapter 9 Case, (b) the purpose of chapter 9, which is to adjust an insolvent municipality's debt so that it can provide adequate municipal services and (c) the Court's conscience, as informed by the Court's experience, education and sense of morality.

22.     Substantial mission-based considerations justify the differential treatment of Pension Claims.  The City is a municipal service enterprise whose mission is to provide municipal services to its residents and visitors to promote their health, welfare and safety.  The City, therefore, has a strong interest in preserving its relationships with its employees and in enhancing their motivation, consistent with the City's financial resources.  In contrast, the City

has no similar mission-related investment in its relationships with holders of Claims in Classes 14 and 15.

23. The Plan's differential treatment of Pension Claims is further justified because the fulfillment of the City municipal service mission is informed by, and subject to, the provisions of the constitution and laws of the State of Michigan and the City's status as an agency of the State. Article IX, Section 24 of the Michigan Constitution (the "Pensions Clause") (a) singles out municipal pension claims for special protection and (b) in so doing, specifically expresses the considered judgment of the people of the State of Michigan, which is entitled to substantial deference in connection with determining the fairness of the Plan's discrimination against the Impaired Rejecting Classes.

24. The reasonable expectations of creditors further demonstrate that the Plan's treatment of Pension Claims is fair, because the Pensions Clause gives notice to all of the City's unsecured creditors that, outside of bankruptcy, the rights of pension creditors are distinct and entitled to special State-law protections that are unavailable to other unsecured creditors of the City. Such constitutional notice (a) reasonably justifies the enhanced expectations of Holders of Pension Claims in this Chapter 9 Case and (b) should lower the reasonable expectations of all other unsecured creditors.

-23-

25.     Moreover, the Plan's treatment of Pension Claims is the result of a collection of interconnected settlements.  The factors that inform the reasonableness of each individual settlement are the same factors that inform the Court's judgment regarding the fairness of discrimination under the Plan.  Because each such settlement is fair and reasonable, the discrimination in claim treatment resulting from such settlements also is fair.

26.     The treatment of Limited Tax General Obligation Bond Claims, Unlimited Tax General Obligation Bond Claims and Indirect 36th District Court Claims also is fair because, in each instance, such treatment is the result of arm's-length, intensely negotiated and reasonable settlements between the City and the respective creditors and their representatives and is based on the asserted differing legal rights of, and litigation brought by, such parties.  Specifically, a reasonable basis exists for the differential treatment of Limited Tax General Obligation Bond Claims and Unlimited Tax General Obligation Bond Claims, because the treatment of such Claims reflects (a) the results of protracted and comprehensively negotiated settlements between the City and the holders of such Claims and (b) the claimants' arguments to relative priority and security under State law.  In addition, the Plan's treatment of Indirect 36th District Court Claims is related to the City's mission, and therefore is fair, because of the City's continuing legal and funding relationship with the 36th District Court.

-24-

27.     The plan would not be feasible without discriminating among unsecured creditors because, with respect to Pension Claims in particular, the City's recovery will turn in large part on its ability to marshal the support of its residents in general and its retirees, employees and their labor unions in particular. With respect to Pension Claims, Limited Tax General Obligation Bond Claims, Unlimited Tax General Obligation Bond Claims and Indirect 36th District Court Claims, the settlements achieved by the City removed the risk of ongoing litigation over their respective asserted priorities, which litigation posed a significant obstacle to the City's ability to confirm a workable plan.  The City's proposal of the differential treatment between Classes of unsecured Claims under the Plan was made in good faith and was not motivated by personal animosity or antipathy.  The Plan treats holders of Claims in the Impaired Rejecting Classes as well as possible under the circumstances.

28.     The Plan does not discriminate unfairly against Class 16 (Subordinated Claims) because the Claims within such Class are subordinated to all other Claims classified under the Plan in accordance with section 510(b) of the Bankruptcy Code and are entitled to Distributions under the Plan only to the extent that Classes that are senior in priority are paid in full.

*Section 1129(b)(1), (b)(2):  Fair and Equitable*.  For the reasons to be set forth in the Confirmation Opinion, the Plan is "fair and equitable"

with respect to the Impaired Rejecting Classes. No evidence suggests that the City or any Class or group of creditors has committed any overreaching or misconduct that would require the Court to impose a remedy as a condition to Confirmation. Moreover, the circumstances of the City's Chapter 9 Case suggest to the Court's conscience that it is fair and equitable to impose the Plan upon the dissenting creditors against their stated will. A large number of Detroit residents are suffering hardship due to the City's service delivery insolvency. This condition is inhumane and intolerable, and can only be successfully addressed if the Plan is confirmed. No viable alternatives to the Plan exist that would resolve the City's service delivery insolvency and provide a greater recovery to Classes 14 and 15. Requiring creditors in the Impaired Rejecting Classes to share in the sacrifice that other creditors of the City have agreed to endure, and confirming the Plan, thus is fair and equitable under the circumstances.

I. <u>Section 943(b)(2)</u>. The Plan complies with the provisions of chapter 9 of the Bankruptcy Code. The Plan complies with section 941 of the Bankruptcy Code because the City filed the Plan for the Adjustment of Debts of the City of Detroit (Docket No. 2708) on February 21, 2014, consistent with the First Order Establishing Dates and Deadlines (Docket No. 280), entered on August 2, 2013, which order established March 1, 2014 as the deadline for the City to file its plan of adjustment. The Plan complies with section 942 of the

-26-

Bankruptcy Code because the amendments and modifications made to the Fourth Amended Plan are either immaterial to, or do not adversely affect the treatment of, any Claim under the Plan.

J.     Section 943(b)(3).  The Court, with the assistance of counsel, will establish an expeditious mediation and Court-review process to determine the reasonableness and disclosure of all fees and expenses, paid and unpaid, for which the City is obligated in connection with this case through the Effective Date, as required by section 943(b)(3) of the Bankruptcy Code, including (1) the professional fees and expenses of the GRS and the PFRS, to the extent that the City reimburses them, (2) the fees and expenses of the Fee Examiner and his professionals, (3) the Court-appointed feasibility expert and her counsel and (4) the other Fee Review Professionals.  The preceding sentence does not apply with respect to fees and expenses explicitly dealt with in settlements previously approved by orders of the Court.  The review pursuant to such process will satisfy the requirements of section 943(b)(3) of the Bankruptcy Code.

1.     In addition, pursuant to the Fee Review Order and the Fee Examiner Order, and with the City's consent, the Fee Examiner was appointed in the Chapter 9 Case as an officer of the Court and has reviewed, or will review, the fees and expenses of all Fee Review Professionals submitted to the Fee Examiner for review in accordance with the Fee Review Order for the period

beginning on the Petition Date.  Unless the Court subsequently orders otherwise, the fee review process established by the Fee Review Order will continue for fees and expenses incurred through the Effective Date pursuant to Section IV.N.2 of the Plan.  In accordance with the Fee Review Order, each quarterly report and supplemental quarterly report filed by the Fee Examiner to date has determined that all Fee Review Professional Fees incurred during the relevant reporting periods have been fully disclosed and are reasonable or otherwise are commensurate with the complexity and speed of the Chapter 9 Case and the quality of services provided.[32]  Further, the fees and expenses of the Fee Examiner Parties are subject to Court review and approval under the terms of the Fee Review Order and the Plan.

---

[32]     *See* Fee Examiner's Quarterly Report for Months of July, August and September 2013 (Docket No. 2642), at ¶ 15; Fee Examiner's First Supplemental Quarterly Report for Months of July, August and September 2013 (Docket No. 3457), at ¶ 14; Fee Examiner's Second Supplemental Quarterly Report for Months of July, August and September 2013 (Docket No. 7574), at ¶ 14; Fee Examiner's Second Quarterly Report for Months of October, November and December 2013 (Docket No. 4498), at ¶ 16; Fee Examiner's First Supplemental Quarterly Report for Months of October, November and December 2013 (Docket No. 7575), at ¶ 17; Fee Examiner's Third Quarterly Report for Months of January, February and March 2014 (Docket No. 6528), at ¶ 18; Fee Examiner's First Supplemental Quarterly Report for Months of January, February and March 2014 (Docket No. 7332), at ¶ 19; Fee Examiner's Fourth Quarterly Report for Months of April, May and June 2014 (Docket No. 8186), at ¶ 18.

-28-

13-53846-tjt   Doc 8272-5   Filed 11/05/22   Entered 11/05/22 23:09:31   Page 104 of 225
13-53846-tjt   Doc 8036-5   Filed 10/05/22   Entered 10/05/22 16:26:07   Page 92 of 297
297

1300

K.  Section 943(b)(4).

1.  All actions to be taken by the City to carry out the Plan are consistent with, do not violate and are not prohibited by applicable law, including, but not limited to, the following actions:

- the creation of the Detroit General VEBA and the Detroit Police and Fire VEBA;

- payments to be made by the DWSD during the period from the Effective Date through June 30, 2023 on account of (a) the DWSD's $428.5 million currently-calculated allocable share of the unfunded actuarially accrued liabilities of the GRS (as modified by the Plan), (b) related administrative costs and (c) restructuring costs incurred by the City in connection with the Chapter 9 Case allocable to the DWSD (the "DWSD Pension Funding"), consistent with paragraph 24 of the DWSD Tender Order;

- all actions taken in connection with the UTGO Settlement Agreement and all provisions of the Plan addressing recoveries upon Unlimited Tax General Obligation Bond Claims, including Sections II.B.3.n, II.B.3.o, II.B.3.p and IV.C of the Plan (such provisions of the Plan as they relate to such recoveries, and, collectively with the UTGO Settlement Agreement, the "UTGO Settlement"), including, but not limited to, the City's designation of an entity or entities to receive the Assigned UTGO Bond Tax Proceeds;

- the transfer of the DIA Assets to DIA Corp. pursuant to the DIA Settlement;[33] and

---

[33]  *See* Attorney General's Approval of DIA Settlement (Docket No. 5338), filed on June 17, 2014.

-29-

- all actions taken in connection with the Syncora Development Agreement (including the garage option), the Tunnel Lease and the FGIC Development Agreement.

L. <u>Section 943(b)(5)</u>. The Plan satisfies the requirements of section 943(b)(5) of the Bankruptcy Code. The Plan expressly provides for the cash payment, in full, of Allowed Administrative Claims, including administrative expenses allowed under section 503(b) of the Bankruptcy Code either (1) on the Effective Date or as soon as reasonably practicable thereafter or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.[34]

M. <u>Section 943(b)(6)</u>. The Plan satisfies the requirements of section 943(b)(6) of the Bankruptcy Code. The effectiveness of the Plan is expressly conditioned upon the obtaining of any authorizations, consents and regulatory approvals necessary under applicable nonbankruptcy law.[35] Neither the DWSD Pension Funding nor the provisions of the Plan relating to the DWSD CVR constitute a tax upon any DWSD ratepayer subject to electoral approval. The restructuring of the City's obligations pursuant to the Plan, and the consequent restructuring (and lowering) of DWSD's costs, will not necessitate an increase in the rates charged by DWSD in excess of normally scheduled rate increases.

---

[34] *See* Plan, at § II.A.1.a.

[35] *See* Plan, at § III.A.7.

-30-

N.    Section 943(b)(7).

1.    *Best Interests of Creditors*.  The Plan is in the best interests of creditors.  The Plan provides the City's creditor body, as a whole, with a better alternative than dismissal of the Chapter 9 Case and all that creditors can reasonably expect under the circumstances.  Outside of bankruptcy, the City would face several billion dollars in cumulative deficits over the next ten years, even if it attempted only to maintain the current level of inadequate public services.  Although the automatic stay has allowed the City to enhance its cash position during the bankruptcy, the fundamentals of the City's financial forecasts have not changed materially since the City first created the baseline financial forecasts in June 2013.  Moreover, if the City's Chapter 9 Case were dismissed, the City would lose the benefit of many of the settlements it has reached with its creditors. The City does not have sufficient excess revenues to continue paying its creditors outside of bankruptcy.

2.    The legal limitations on the collection of judgments that apply outside of bankruptcy also constrain the best interests of creditors test in bankruptcy.  Because Michigan Public Act 236 of 1961, the Revised Judicature Act, M.C.L. §§ 600.101, *et seq.* (the "Revised Judicature Act"), provides the sole remedy under State law for the City's creditors to recover on their claims, the City cannot be compelled under State law to liquidate City-owned assets to satisfy

-31-

creditors' claims.[36]  The City also cannot be compelled to sell any City-owned assets under the Bankruptcy Code because, in chapter 9 cases, section 904 of the Bankruptcy Code prohibits the Court from interfering with "(1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or enjoyment of any income-producing property."[37]

3.	Maintaining the art collection housed at the DIA (the "DIA Collection") is critical to the feasibility of the Plan and to the City's future because the DIA Collection is an invaluable and irreplaceable resource, and because the DIA stands at the center of the City's cultural life.  Selling the DIA Collection would impede the City's efforts to attract new residents, visitors and businesses and would only deepen the City's fiscal, economic and social problems. In addition, using the DIA Collection or some portion thereof as collateral for a loan to pay creditors would be imprudent because doing so would (a) merely substitute debt for debt and thus not benefit the City and (b) create a risk that the City would lose any art used as collateral in the event of a default.

4.	Moreover, it would be impracticable for the City to liquidate the DIA Collection in an attempt to maximize creditor recoveries. Because (a) many works within the DIA Collection are subject to donor

---

[36]	*See* M.C.L. § 600.6093.

[37]	11 U.S.C. § 904.

restrictions and (b) the Michigan Attorney General and DIA Corp. contend that the entire DIA Collection is held in trust, any attempt to liquidate the DIA Collection or any material portion thereof to satisfy the claims of creditors most likely would result in costly, complex and time-consuming litigation regarding the City's precise ownership interests in the approximately 60,000 works of art that comprise the DIA Collection. A forced liquidation of the DIA Collection would generate only a fraction of its true economic value.

5.   Nevertheless, the Plan provides for multiple new sources of revenue, cost saving initiatives and settlements that improve recoveries for creditors. The City has made reasonable efforts to monetize assets other than the DIA Collection, including the Detroit Windsor Tunnel, certain real estate properties, certain parking properties and the Joe Louis Arena property. The City also has entered into the Great Lakes Water Authority memorandum of understanding, which benefits all of the City's creditors.[38]

6.   The transactions and settlements associated with the "Grand Bargain" – including the State Contribution Agreement, the DIA Settlement and the City's comprehensive settlement of pension-related and labor-related issues negotiated with the Retiree Committee, the Retirement

---

[38]   *See* Memorandum of Understanding Regarding the Formation of the Great Lakes Water Authority, filed as Exhibit A to the Notice of Execution of Framework for Creating a Water and Sewer Authority (Docket No. 7357).

Systems and certain unions and retiree associations – will generate at least an additional $816 million in nominal revenue for the benefit of the holders of Pension Claims.  In addition, the City has entered into favorable settlements with representatives of the holders of Pension Claims, OPEB Claims, COP Claims, Unlimited Tax General Obligation Bond Claims, Limited Tax General Obligation Bond Claims and Indirect 36th District Court Claims.  The difference between the amounts asserted by such claimants and the amounts accepted in settlement of such Claims redounds to the benefit of all the City's stakeholders.  The successful implementation of the reinvestment initiatives incorporated into the Plan (the "Reinvestment Initiatives") is indispensable to the City's efforts to provide its creditors with as significant a recovery as could be expected under the circumstances, and the maximization of such creditor recoveries influenced the design of the Reinvestment Initiatives.  In addition, absent confirmation of the Plan, the City would not have the ability to access the capital markets on reasonable terms, meaning that the issuance of numerous and large judgments against the City would quickly deplete the City's limited resources and its tax base.

       7.      Raising taxes also is not a viable option for the City. The City is legally prohibited from raising property tax rates above their current levels, which rates are higher than those in neighboring communities and among the highest in Michigan.  The likelihood of the people of Detroit or the State

-34-

legislature voting to raise taxes is remote.  Even if the City could legally increase property tax rates, doing so would not increase the City's revenues because the City has reached its practical taxable limit, *i.e.*, tax saturation, meaning that any further tax increases on Detroit residents most likely would (a) exacerbate the City's already high tax collection delinquency rate, (b) continue the flight of residents and businesses from the City, (c) discourage inflow of prospective residents and businesses, (d) destabilize growth and (e) ultimately reduce the City's overall tax revenues.  The loss of population in Detroit has compounded the City's financial difficulties and led to additional cutbacks in municipal services – which cutbacks, in turn, have led to continuing losses of population, industry and tax revenues. Increasing the tax burden on Detroit residents would only perpetuate this vicious cycle.

> 8.     The effect of dismissal of the City's Chapter 9 Case would be the issuance of myriad judgment levies under State law.[39]  In a dismissal scenario, the Revised Judicature Act would require the City to satisfy any judgments obtained by creditors either through bond issuances or property tax levies.[40]  If the Chapter 9 Case were dismissed, the City's creditors would not realize greater recoveries than they would receive under the Plan because the City

---

[39]     *See* M.C.L. § 600.6093.

[40]     *See id.*

would lack the resources and ability to satisfy such judgment levies.  In such a scenario, the City's pension obligations alone likely would quickly eradicate any meaningful recoveries for other unsecured creditors outside of chapter 9.

9.    Dismissal of the Chapter 9 Case would deprive the City of the benefit of the Reinvestment Initiatives.  Without such reinvestment, the City's ability to provide basic services would continue to decline below even today's inadequate levels.  Without the ability to provide adequate levels of basic services, the City would be unable to reverse the exodus of residents and businesses from the City that has depleted the City's tax base, reduced land values and led to widespread abandonment and blight.  In addition, the Plan offers financial benefits that would be unavailable to the City in the event of dismissal, including the $816 million that will be contributed to the Retirement Systems in connection with the Grand Bargain, the Exit Facility and the cost savings to be realized by the Reinvestment Initiatives and the Settlements under the Plan.

10.    *Feasibility*.  The Plan is feasible, within the meaning of section 943(b)(7) of the Bankruptcy Code.  On and after the Effective Date, it is more likely than not that the City will be able to (a) make all payments contemplated by the Plan without a significant probability of default and

(b) sustainably provide adequate municipal services to its residents.[41]  The City has demonstrated a reasonable prospect that the City will successfully implement the Plan and the Reinvestment Initiatives.[42]

        11.    The City's revenue and expense projections contained in (a) the ten-year summary of the Reinvestment Initiatives (the "10-Year Reinvestment Initiative Summary") introduced into evidence as City Exhibit 108 (July 2014); (b) the ten-year statement of projected cash flows (the "10-Year Forecast") introduced into evidence as City Exhibits 109 (July 2014), 733 (September 2014), 780 (October 2014), 781 (October 2014) and 782 (October 2014); (c) the forty-year statement of projected cash flows (the "40-Year Forecast") introduced into evidence as City Exhibits 111 (July 2014), 734 (September 2014), 779 (October 2014) and 793 (October 2014); and (d) the ten-year statement of projected cash flows of the City's water and sewage disposal funds introduced into evidence as part of City Exhibit 3 (collectively with the 10-Year Reinvestment Initiative Summary, the 10-Year Forecast and the 40-Year Forecast, the "Projections"), are reasonable, made in good faith, accurate,

---

[41]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 202-03; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6.

[42]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 29, 164-65, 202-03; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6.

consistent with other financial projections made by the City and based upon assumptions that are reasonable when considered individually or collectively.[43]

12.    The City will have employees that have the necessary skill and commitment to implement, and perform according to the terms of, the Plan.  The City will also have adequate systems, controls and procedures (as modified, modernized and developed by the Reinvestment Initiatives) to (a) monitor the City's financial and operational performance and (b) minimize and eliminate fraud, abuse and waste (both in the City's day-to-day operations and in the implementation of the Reinvestment Initiatives).[44]

13.    The City is beginning to implement appropriate controls to reasonably ensure the City's ongoing compliance with the terms of the Plan.[45] These controls include, but are not limited to:  (a) the Michigan Financial Review Commission (the "Financial Review Commission") established pursuant to Public Act 181 of 2014, M.C.L. §§ 141.1631, *et seq.* ("PA 181" or the "Financial Review Commission Act"); (b) the requirements imposed by Public Act 182 of 2014,

---

[43]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 10, 200-01; Court's Exhibit 12001 (Supplemental Expert Report of Martha E.M. Kopacz), at 3-4; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6.

[44]    *See* Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 29-30.

[45]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 175, 202.

M.C.L. § 117.4s-t ("PA 182" and, together with PA 181, the "Grand Bargain Legislation"), that the City (i) adopt a sound, multi-year financial plan, (ii) appoint a Chief Financial Officer and (iii) post its financial forecasts and contracts to the City's official website; and (c) the adoption of governance and financial oversight mechanisms for the Retirement Systems in connection with the State Contribution Agreement. The Financial Review Commission will have broad authority, under the Grand Bargain Legislation, to obtain and review the City's financial records on an ongoing basis, and to conduct financial audits of the City.[46]

14. The Reinvestment Initiatives provide for the reinvestment of approximately $1.7 billion in the City between the Effective Date and June 30, 2023. The Reinvestment Initiatives will allow the City to achieve approximately $483 million in additional revenue and $358 million in cost savings during that same period, resulting in net reinvestment in the City of approximately $877 million. The Reinvestment Initiatives are reasonably designed to, and more likely than not will, ensure that the City will be able to (a) remedy its service delivery insolvency and provide adequate municipal services to its residents, (b) meet its financial obligations on a prospective basis, (c) promote the stability of

---

[46] *See* M.C.L. § 141.1636.

-39-

the City's population and (d) provide a platform for the growth of both the City's resident and business populations.[47]

15.    The costs associated with the Reinvestment Initiatives are reasonable.  The goals of the Reinvestment Initiatives are achievable.[48]  The City can arrest the reinforcing trends of population loss, declining property values and declining revenues if adequate services are restored, blight is remediated and the City becomes a more attractive place to live and work.  The Reinvestment Initiatives will accelerate investment in the City by business, community and philanthropic organizations.

16.    Absent the Reinvestment Initiatives, the City cannot provide a sustainable level of services to its residents.  The Reinvestment Initiatives are necessary to (a) remedy the City's service delivery insolvency, (b) reduce blight and strengthen neighborhoods, (c) improve the efficiency of, and adequately fund, the City's operations (including, but not limited to, its administrative and support departments and the operations of the 36th District Court), (d) allow elected officials to more effectively manage the City, (e) enhance the City's revenues, (f) reduce the City's costs and (g) ensure the provision of

---

[47]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 202.

[48]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 201-02.

adequate and significantly improved municipal and public safety services to City residents and businesses.[49]  The Mayor's office and the City Council have been consulted in connection with the City's restructuring and are committed to working in concert to implement the Plan and the Reinvestment Initiatives.[50]

17.    It is more likely than not that the Plan is sustainable over the long term.[51]  Based on the Projections, the City will have sufficient liquidity to sustain normal municipal operations, issue and perform under the New Securities, satisfy the Settlements and otherwise meet its financial obligations after the Effective Date.  The amount and terms of the Exit Facility are reasonable.  The City will have sufficient resources to service the Exit Facility.  The Plan and the Exit Facility will enable the City to resolve onerous debts related to the City's excessive prepetition borrowing.  The City's commitment, under the Plan, to use its best efforts to prepay the New LTGO Bonds on the Effective Date, or as soon as reasonably practicable thereafter, is both reasonable and feasible.  Credit markets

---

[49]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 201-02.

[50]    *See* Joint Notice of Transition Plan (Docket No. 7681), Exhibit A (Detroit City Council Resolution adopted Sept. 25, 2014), at 2-3 ("The City Council supports the confirmation and implementation of a Plan of Adjustment.… After, and assuming, confirmation of the Plan of Adjustment, the City Council will support the City's implementation of the confirmed Plan of Adjustment.").

[51]    *See* Court's Exhibit 12001 (Supplemental Expert Report of Martha E.M. Kopacz), at 3-4.

likely (a) will be receptive to the newly de-leveraged City and (b) would be closed to the City absent the restructuring to be implemented pursuant to the Plan and the Reinvestment Initiatives. Although future economic risks cannot be predicted with certainty, and some economic risk factors are outside of the City's control, under the Plan, the City more likely than not will be able to adapt to unforeseen circumstances as necessary to preserve its revitalization.

18. Under the Plan, the DWSD will have sufficient resources to make the capital improvements necessary to enable the DWSD to continue to provide an adequate level of water and sewer service to its customers, and the DWSD's current capital improvement plans are reasonable for this purpose. There is no material risk of a system-wide failure that would prevent the DWSD from providing adequate levels of service. In addition, the DWSD Pension Funding does not negatively impact the feasibility of the Plan with respect to other creditors or the reinvestment initiatives.

## EXECUTORY CONTRACTS

O. Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code (incorporated into this Chapter 9 Case by section 901 of the Bankruptcy Code), upon the occurrence of the Effective Date, Section II.D of the Plan provides for the assumption, assumption and assignment or rejection of certain Executory Contracts and Unexpired Leases. The City's determinations regarding the

-42-

assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the City, are necessary to the implementation of the Plan and are in the best interests of the City, holders of Claims and other parties in interest in the Chapter 9 Case. The City has filed Exhibit II.D.6 to the Plan (as it may have been amended or supplemented) and either has provided or will provide notice of the City's determinations regarding the assumption, assumption and assignment or rejection of Executory Contracts or Unexpired Leases and any related Cure Amount Claims consistent with the procedures (collectively, the "Contract Procedures") set forth in the Order, Pursuant to Sections 365, 901 and 1123 of the Bankruptcy Code, (A) Establishing Procedures with Respect to the Proposed Assumption and Rejection of Executory Contracts and Unexpired Leases and (B) Approving the Form and Manner of Notice Thereof (Docket No. 6512), entered on August 4, 2014 (the "Contract Procedures Order").

## SETTLEMENTS AND RELEASES

P.        Pursuant to Bankruptcy Rule 9019(a) or otherwise, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.

Q. Based upon the representations and arguments of counsel to the City, the Retiree Committee, the Retirement Systems, Syncora, FGIC, the State, DIA Corp., the RDPFFA and the DRCEA, and all other testimony either actually given or proffered and other evidence introduced at the Confirmation Hearing and the full record of this Chapter 9 Case, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, this Order constitutes the Court's approval of all Settlements provided for herein or in the Plan because, among other things, all aspects of such Settlements have been fully disclosed and such Settlements (and, as applicable, the agreements underlying such Settlements): (1) were negotiated and entered into in good faith and at arm's length; (2) comport with the policies and purposes of chapter 9 of the Bankruptcy Code; (3) reflect a reasonable balance between certainty and the risks and expenses of both future litigation and the continuation of the Chapter 9 Case; (4) fall well within the range of reasonableness for the resolution of complex litigation; (5) are fair, equitable and reasonable and in the best interests of the City, its creditors and other parties in interest; (6) represent appropriate exercises of the City's business judgment; (7) are essential to the successful implementation of the Plan; and (8) meet the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a) and other applicable law.

R. <u>The DIA Settlement</u>. The DIA Settlement resolves a substantial dispute surrounding the extent of the City's property rights with respect to the DIA Assets. Under the DIA Settlement, as reflected in Section IV.E.2 of the Plan, the City will irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to hold in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.[52]

1. The City cannot be compelled to liquidate the DIA Collection.[53] Even if such a liquidation could be compelled, however, many works in the DIA Collection are subject to donor restrictions and, contrary to the City's position, the Michigan Attorney General and DIA Corp. assert that the entire DIA Collection is held in trust.[54] The City's likelihood of success in potential litigation over whether the City has sufficient interest in the DIA Assets (or in any of them) to permit it to sell any such assets and use the proceeds of sale for its own purposes, including payment of operating expenses or debt, is uncertain. Any such litigation would likely take substantial time and cause the City to incur substantial expense.

---

[52] *See* Plan, at Exhibit I.A.127 (DIA Settlement Documents).

[53] *See supra*, ¶ N.2; 11 U.S.C. § 904.

[54] *See* Michigan Attorney General Opinion No. 7272 (June 13, 2013).

-45-

2.    For the reasons set forth in the Confirmation Opinion, even if the City were to prevail in whole or in part in such litigation over the City's ability to sell the DIA Assets, it would not be in the City's best interests to liquidate the DIA Assets because (a) the City's ability to realize, on a timely basis, the full value of each of the DIA Assets it would be permitted to sell is uncertain and (b) a forced liquidation of the DIA Collection likely would yield only a fraction of the DIA Collection's true economic value.  A proposed sale or other deaccession of the DIA Assets would have been resisted, and likely would have provoked adverse action, including litigation, by (a) DIA Corp. and donors to DIA Corp. and to the DIA and (b) the international art community.  Preservation of the DIA Assets and the DIA is strongly in the interest of the City and its residents, is an important element in the revitalization of the City, critical to the feasibility of the Plan and to the City's future and therefore is in the interest of its creditors, who are receiving under the Plan payments over a period of time.

3.    The compromises and settlements embodied in the DIA Settlement (a) accurately reflect and effectively resolve a substantial dispute surrounding the extent of the property rights the City possesses with respect to the DIA Assets, (b) avoid objections to confirmation of the Plan regarding the Plan's treatment of Pension Claims, (c) resolve pending appeals regarding the Court's ability to impair pensions under chapter 9 of the Bankruptcy Code, and (d) are,

collectively, a key compromise upon which several provisions of the Plan rest. In the absence of the DIA Settlement, the City's emergence from chapter 9 would likely have been delayed by litigation and burdened with additional expenses.

4.    The DIA Settlement has not been entered into fraudulently, nor with the intent to hinder, delay or defraud any entity to which the City is, or may become, indebted on or after the Effective Date.  The DIA Settlement is not a fraudulent transfer under state or federal law.

5.    The transfer of the DIA Assets to the DIA Corp. serves the public purpose of providing civic, artistic and cultural activities to the general public.  Such transfer is authorized by law, including by Section 4k of the Michigan Home Rule City Act, M.C.L. § 117.4k, and Section 1-102 of the Detroit City Charter.

6.    The DIA Settlement (a) eliminates the risk and expense of litigation regarding the DIA Assets and the Plan's treatment of Pension Claims and (b) leverages the DIA Assets for the benefit of the City's pensioners while also protecting the DIA Assets from the threat of liquidation and preserving the DIA Assets for the benefit of the City, its residents and surrounding communities. Based on the evidence of (a) the amount of the consideration to be provided under the DIA Settlement directly to the Retirement Systems, (b) DIA Corp.'s commitments to the City under the DIA Settlement, including the obligation to

-47-

13-53846-tjt    Doc 8272-5    Filed 11/10/14    Entered 11/10/14 23:09:31    Page 123 of 225
Doc 8636-5    Filed 12/05/22    Entered 12/05/22 16:23:07    Page 124 of 325
297

1319

maintain for the benefit of the public an encyclopedic art museum the permanent primary situs of which will be in the City, and (c) the settlement of litigation over the extent of the City's right, title or interest in the DIA Assets, the DIA Settlement and the transfer of the DIA Assets as provided in the DIA Settlement are for fair value and fair consideration and are fair, equitable, reasonable and in the best interests of the City and its creditors and residents.

S.    The UTGO Settlement.  After sufficient notice and opportunity for all parties to be heard, and after due deliberation, based on the Court's thorough review and full consideration of the UTGO Settlement Agreement and good and sufficient cause appearing therefor, the Court makes the following findings of fact and conclusions of law with respect to the UTGO Settlement:

1.    The UTGO Settlement described in the Plan and the UTGO Settlement Agreement are fair, equitable, reasonable and in the best interests of the City and its creditors and residents.  The UTGO Settlement Agreement is the result of extensive arm's length negotiations among the City and the Settling UTGO Bond Insurers – all of whom were represented by sophisticated counsel.  The compromises and settlements embodied in the UTGO Settlement (a) resolve all disputes with respect to claims classified in Class 8 under the Plan and the issues raised by the Settling UTGO Bond Insurers in the UTGO Litigation and (b) are, collectively, a key compromise upon which several provisions of the

-48-

Plan rest.  In the absence of such compromises and settlements, the City's emergence from chapter 9 would likely have been delayed by litigation and burdened with additional expenses.

2.     The UTGO Settlement and the UTGO Settlement Agreement:  (a) were negotiated and entered into in good faith; (b) comport with the policies and purposes of chapter 9; (c) are fair, equitable and reasonable; (d) are in the best interests of the City and its creditors and residents as they not only fully resolve the UTGO Litigation but also permit the City's assignees to receive value from the Assigned UTGO Bond Tax Proceeds as set forth in the Plan, which receipt fulfills a requirement of the State Contribution Agreement; (e) are within the range of reasonable results if the disputes resolved by the UTGO Settlement, including the UTGO Litigation, were instead litigated to a conclusion; (f) fall above the lowest point in the range of reasonableness; and (g) meet the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a) and other applicable law.

3.     Without limiting any of the foregoing, the Court hereby finds that:

- The Plan incorporates the UTGO Settlement Agreement, and the effectiveness of the Plan is expressly conditioned upon:  (a) the MFA board having approved the issuance of the Restructured UTGO Bonds and such bonds having been issued;

and (b) the City having obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.[55]

- As of the Effective Date, the Plan represents a full, final and complete compromise, settlement, release and resolution of, among other matters, all disputes and pending or potential litigation (including any appeals), including, without limitation, the UTGO Litigation, regarding the allowability, amount, priority and treatment of the Unlimited Tax General Obligation Bond Claims. The treatment of Class 8 Unlimited Tax General Obligation Bond Claims under the Plan is a component of a settlement and compromise of the UTGO Litigation.[56]

- Good and valuable consideration has been provided for all releases and exculpations granted pursuant to the UTGO Settlement Agreement, including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the UTGO Settlement Agreement. Such provisions are fair, equitable, reasonable and integral elements of the UTGO Settlement Agreement.[57]

- The Court confirms that, as of the Effective Date and pursuant to Emergency Manager Bond Order No. 4, the Municipal Obligation shall be secured, to the extent permitted by law, including, without limitation, Section 12(1)(x) of PA 436, by a lien granted by the City on the UTGO Bond Tax Levy

---

[55] *See* Plan, at §§ III.A.9, III.A.10.

[56] *See* Plan, at § II.B.3.o.ii, Exhibit I.A.360.

[57] *See* Plan, at Exhibit I.A.360.

for so long as either the Municipal Obligation or the Stub UTGO Bonds are outstanding.[58]

- As of the Effective Date, the UTGO Bond Tax Levy shall constitute "special revenues," as defined in section 902 of the Bankruptcy Code, and "pledged special revenues," as that term is used in section 922(d) of the Bankruptcy Code.[59]

- As of the Effective Date, the MFA shall possess a valid and enforceable statutory fourth lien and trust on the shared revenue payments that the City is entitled to receive from the State under the Michigan Constitution and Michigan Public Act 140 of 1971, the Glenn Steil State Revenue Sharing Act, M.C.L. §§ 141.901, *et seq.*, as amended ("Distributable State Aid"), as provided in Section 15(2) of Michigan Public Act 227 of 1985, the Shared Credit Rating Act, M.C.L. §§ 141.1051, *et seq.*, or as otherwise provided under applicable law.[60]

- As of the Effective Date, Holders of the Restructured UTGO Bonds shall possess all of the MFA's rights and interest in the Municipal Obligation including all the rights and interest provided herein and under the UTGO Settlement Agreement, subject to the reservation by the MFA of rights to indemnification and to make all determinations and approvals and receive all notices accorded to it under the Municipal Obligation and related documents. Accordingly, the Restructured UTGO Bonds will be payable from and secured by (a) payments made by the City on the Municipal Obligation and to the extent

---

[58]  *See id.*

[59]  *See id.*; 11 U.S.C. §§ 902, 922(d).

[60]  *See* Plan, at Exhibit I.A.360.

-51-

permitted by law, including, without limitation, Section 12(1)(x) of PA 436, a lien on the portion of the UTGO Bond Tax Levy allocable to the Municipal Obligation, pledged by the City to secure the Municipal Obligation; and (b) a lien, made a statutory lien as provided by the Shared Credit Rating Act, on moneys in the funds and accounts established for the Restructured UTGO Bonds under the authorizing resolution for such bonds, including payments pledged by the City and received and held by the MFA or its trustee for the Restructured UTGO Bonds, which include, without limitation, all payments of (i) the proceeds of the UTGO Bond Tax Levy and (ii) Distributable State Aid.[61]

T.    The LTGO Settlement.  The LTGO Settlement Agreement and all Sections of the Plan pertaining to recoveries upon Limited Tax General Obligation Bond Claims, including Sections II.B.3.n and II.B.3.p.i.A of the Plan (such sections of the Plan, collectively with the LTGO Settlement Agreement, the "LTGO Settlement") are fair, equitable, reasonable and in the best interests of the City and its creditors and residents.  The LTGO Settlement is the result of extensive arm's length negotiations among the City, the LTGO Insurer and BlackRock Financial Management (on behalf of certain managed funds and accounts) ("BlackRock").  The compromises and settlements embodied in the LTGO Settlement (1) resolve all disputes with respect to (a) the Plan and any objections filed by the LTGO Insurer or BlackRock related to the Plan, (b) the

---

[61]    *See id.*

-52-

Claims classified in Class 7 under the Plan and (c) all issues relating to Limited Tax General Obligation Bonds raised in the adversary proceeding brought before the Bankruptcy Court, captioned as *Ambac Assurance Corp. v. City of Detroit, Michigan*, No. 13-5310 (Bankr. E.D. Mich.) (the "Ambac Action"); and (2) are, collectively, a key compromise upon which several provisions of the Plan rest.[62] In the absence of such compromises and settlements, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.

The treatment of Limited Tax General Obligation Bonds and related Limited Tax General Obligation Bond Claims under the Plan is part of the settlement of the Ambac Action, as such proceeding relates to such Bonds and Claims.

U.  The OPEB Settlement.  The OPEB Settlement is the result of extensive arm's length negotiations between the City and the Retiree Committee, which was represented by sophisticated counsel, and is an integral component of the City's global settlement of pension-related and other labor-related issues negotiated with, among others, the Retiree Committee.  The compromises and settlements embodied in the OPEB Settlement (1) resolve all disputes with respect to the aggregate valuation of Claims classified in Class 12 under the Plan and the issues raised by the Retiree Committee in the Retiree Health Care Litigation; and

---

[62]  *See* Plan, at Exhibit I.A.237 (LTGO Settlement Agreement).

(2) are, collectively, a key compromise upon which several provisions of the Plan rest. In the absence of such compromises and settlements, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.

1. The OPEB Settlement is in the best interests of the City and its creditors and residents as it fully resolves (a) the dispute between the City and the Retiree Committee regarding the aggregate valuation of OPEB Claims and the treatment of OPEB Claims under the Plan and (b) the Retiree Health Care Litigation. The OPEB Settlement is within the range of reasonable results if the disputes resolved by the OPEB Settlement, including the Retiree Health Care Litigation, were instead litigated to a conclusion.

V. The 36th District Court Settlement. The 36th District Court Settlement is the result of extensive arm's length negotiations among the City, the 36th District Court and the Settling 36th District Court Claimants. The compromises and settlements embodied in the 36th District Court Settlement resolve all disputes with respect to (1) the Plan and any objections filed by Settling 36th District Court Claimants related to the Plan and (2) the treatment of Indirect 36th District Court Claims under the Plan. In the absence of such compromises and settlements, the City's emergence from chapter 9 likely would have been

-54-

delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.

    1. The 36th District Court Settlement is in the best interests of the City and its creditors and residents as it not only resolves the treatment of Indirect 36th District Court Claims under the Plan, but also provides for the payment of the Settling 36th District Court Claimants' Claims at a significant discount while enabling the City to avoid further litigation with the Settling 36th District Court Claimants regarding the City's power to impair Indirect 36th District Court Claims under the Plan. The 36th District Court Settlement is within the range of reasonable results if the disputes resolved by the 36th District Court Settlement were instead litigated to a conclusion.

    W. <u>The Syncora Settlement</u>. The Syncora Settlement is the result of extensive arm's length negotiations among the City, Syncora and other interested parties impacted by the Syncora Settlement, including the Retiree Committee and the LTGO Insurer. The Syncora Settlement includes a long term commitment by Syncora to the revitalization of core areas of the City and a partnership between Syncora and the City focused on the City's growth. Without limiting the foregoing, the Court hereby finds as follows with respect to the Syncora Settlement:

1.     The compromises and settlements embodied in the Syncora Settlement resolve all disputes between the City and Syncora with respect to (a) any Class 9 Claim or Class 14 Claim held by Syncora, (b) the Plan and all objections filed by Syncora related to the Plan (including any objection related to the UTGO Settlement) and (c) all issues arising in connection with the Dismissed Syncora Litigation, including, but not limited to, issues arising in connection with the COP Swap Settlement and the Tunnel Lease.  In the absence of the Syncora Settlement, the City's emergence from chapter 9 likely would have been delayed by additional litigation and burdened with additional expenses, with no assurance of a better result for the City.  The Syncora Settlement is (a) a reasonable exercise of the City's business judgment and (b) within the range of reasonable results if the disputes resolved by the Syncora Settlement were instead litigated to a conclusion.

2.     As part of the Syncora Settlement and to resolve all pending litigation involving the City and Syncora, the parties have agreed to enter into certain transactions (collectively, the "Syncora Redevelopment Transactions"), which include:  (a) the amendment, assumption and extension of the Tunnel Lease;[63] (b) the Syncora Development Agreement;[64] and (c) the agreement between the City and Pike Pointe Holdings, LLC (the "Developer"), a subsidiary of

---

[63]     *See* Plan, at Exhibit I.A.344.

[64]     *See* Plan, at Exhibit I.A.340.

Syncora, that provides the Developer, for a period of one year following the Effective Date, with the option to enter into a 30-year concession agreement to operate and maintain the Grand Circus Parking Garage. The Syncora Redevelopment Transactions will provide the City with benefits that the City otherwise would be unable to realize, including by laying the groundwork for a decades-long partnership between the City and Syncora that promises to provide substantial investment in, and rehabilitation of, City assets on a mutually beneficial basis. In addition, pursuant to the Syncora Settlement, the City will pay Syncora the sum of $5 million (the "Swap-Related Consideration") in consideration for Syncora's (a) dismissal of Syncora's appeals of the COP Swap Settlement Approval Order (Docket No. 4094) and the Order Regarding Casino Revenues and Automatic Stay (Docket No. 670) and (b) withdrawal of Syncora's other litigation claims arising from the COP Swap Documents.[65] The Swap-Related Consideration, and any consideration provided by the City to Syncora in connection with the Syncora Redevelopment Transactions, is separate and distinct from, and constitutes no part of, the treatment under the Plan of Class 9 COP Claims. The Syncora Development Agreement is solely for the benefit of Syncora (subject to any provision set forth in the Plan for payment of COP Agent Fees). The Syncora

---

[65]     *See* Plan, at § IV.I.

-57-

Settlement provides benefits to Classes 7, 12 and 14 under the Plan that would otherwise have been unavailable thereto.

X.    The FGIC/COP Settlement.    The FGIC/COP Settlement is the result of extensive good faith, arm's length negotiations among the City, FGIC, the FGIC COP Holders and the State.    The FGIC/COP Settlement is founded on a long term commitment by FGIC to the revitalization of core areas of the City and a partnership among FGIC, the City and the State focused on the City's growth. Without limiting the foregoing, the Court hereby finds as follows with respect to the FGIC/COP Settlement:

1.    The compromises and settlements embodied in the FGIC/COP Settlement resolve all disputes between the City, FGIC and the FGIC COP Holders with respect to (a) all Class 9 or Class 14 Claims held by FGIC and all Class 9 Claims held by the FGIC COP Holders, (b) the Plan and any objection filed by FGIC or the FGIC COP Holders related to the Plan and (c) all issues arising in connection with the Dismissed FGIC/COP Litigation.    In the absence of the FGIC/COP Settlement, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.    The FGIC/COP Settlement is (a) a reasonable exercise of the City's business judgment and (b) within the range of

-58-

reasonable results if the disputes resolved by the FGIC/COP Settlement were instead litigated to a conclusion.

2.      As part of the FGIC/COP Settlement and to resolve all pending litigation involving the City and FGIC, the City and FGIC have agreed to enter into the FGIC Development Agreement. The FGIC Development Agreement will provide the City with various benefits that the City otherwise would be unable to realize, including by laying the groundwork for a decades-long partnership among the City, FGIC and the State that promises to provide substantial investment in, and rehabilitation of, City assets. Any consideration provided by the City to FGIC in connection with the FGIC Development Agreement is separate and distinct from, and constitutes no part of, the treatment under the Plan of Class 9 COP Claims. The FGIC Settlement Consideration and the FGIC Development Agreement are solely for the benefit of FGIC and the FGIC COP Holders (subject to any provision set forth in the Plan for payment of COP Agent Fees).[66]

---

[66]     In addition, pursuant to the FGIC/COP Settlement, in full satisfaction and discharge of FGIC's Claims against the City related to the COP Swap Documents, FGIC will receive an Allowed Class 14 Claim in the amount of $6.13 million and the Downtown Development Authority shall assign to FGIC all of the Downtown Development Authority's right, title and interest to its distribution of New B Notes under the Plan on account of its $33.6 million Class 13 Claim. This consideration is solely for FGIC's benefit.

The FGIC/COP Settlement provides benefits to Classes 7, 12 and 14 under the Plan that would otherwise have been unavailable thereto.

3.    The consideration to be paid by the City pursuant to the Syncora Settlement and the FGIC/COP Settlement is expected to be offset by certain newly-identified sources of revenue not incorporated into the City's July and September 2014 Projections (the "Prior Projections"), meaning that (a) the City's overall cash position set forth in the Prior Projections remains materially unchanged in the City's October 2014 Projections (incorporating the costs of the Syncora Settlement and the FGIC/COP Settlement) and (b) the City will have sufficient cash and revenues to satisfy its obligations under the Settlements and meet its operating expenses going forward.

Y.    ASF Recoupment.  ASF Recoupment, as set forth at Section II.B.3.r.ii.D of the Plan, is:  (1) an integral component of the City's global settlement of pension-related and other labor-related issues negotiated with, among others, the Retirement Systems and the Retiree Committee; and (2) is well within the range of possible reasonable settlements.

1.    During the period beginning in the mid-1980s until fiscal year 2012, Annuity Savings Fund accounts maintained on behalf of certain participants (who voluntarily contributed after tax dollars into the Annuity Savings Fund maintained by the GRS) often were credited with interest in excess of the

-60-

actual or market rate of return for assets in the GRS Traditional Pension Plan (such interest, the "ASF Excess Interest"). Because the assets credited to such Annuity Savings Fund accounts were coinvested with the assets of the GRS Traditional Pension Plan, assets of the GRS Traditional Pension Plan were allocated to the applicable Annuity Savings Fund accounts to fund such ASF Excess Interest. The City asserts that the aggregate total of such ASF Excess Interest credited during the period from 2003 through 2013 was approximately $387 million. The ASF Recoupment contemplated by the Plan would recover approximately $190 million in total ASF Excess Interest credited to Annuity Savings Fund accounts through reductions to retiree pension benefits and asset transfers from active GRS participants.

2. The City has argued that the crediting of ASF Excess Interest to Annuity Savings Fund accounts constitutes a violation under Michigan Public Act 314 of 1965, the Public Employee Retirement System Investment Act, as well as the common law of trusts of the fiduciary duties owed to the GRS Traditional Pension Plan by the GRS Trustees and was an *ultra vires* act under the Detroit City Charter. Several GRS participants object, and assert a number of defenses to, the ASF Recoupment proposed by the City.

3. The Court does not rule on the merits of the City's claim to recover ASF Recoupment or the merits of the GRS participants' defenses.

-61-

The Court reviews the parties' respective positions solely to determine whether the ASF Recoupment component of the City's broader pension-related settlement is reasonable. The Court finds substantial merit in the City's claim to recover ASF Excess Interest. The legal authority of the GRS Trustees to credit ASF Savings Fund Accounts with ASF Excess Interest was doubtful, and the prudence of the practice even more so. The Court further finds that the defenses to ASF Recoupment asserted by the objecting GRS participants likely have little merit. Accordingly, the Court finds that the City would have a reasonable likelihood of success (between 60% and 70%) on any claim to recover ASF Excess Interest. Nevertheless, the length, complexity and expense of any such litigation, and related issues of collectability, would be substantial.

4. ASF participants received due process of law with respect to ASF Recoupment. In particular, ASF participants received (a) the Plain Language Supplement as part of their Solicitation Packages describing in detail the effect of ASF Recoupment (as well as subsequent communications from the City, the Retiree Committee, the Retirement Systems and certain retiree associations) and (b) sufficient opportunity to object to the Plan and ASF Recoupment, an opportunity exercised by many ASF participants.[67]

---

[67] *See* Certificate of Service (Docket No. 6177), at ¶¶ 10, 14.

-62-

5.      ASF Recoupment will not cause the amounts recovered from ASF Distribution Recipients to exceed the ASF Recoupment Cap or the Current GRS Retiree Adjustment Cap as such amounts are amortized over time using a 6.75% interest rate.  Subject to Section II.B.3.r of the Plan, GRS participants subject to ASF Recoupment have the option to pay the ASF Recoupment Amount in a lump sum.  The caps and other limitations on ASF Recoupment limit the hardship resulting to GRS participants therefrom.

Z.      Plan Releases.  Each non-Debtor party that will benefit from the releases, exculpations and related injunctions set forth in, among others, Sections III.D.5, III.D.6 and III.D.7 of the Plan (collectively, the "Plan Releases") either shares an identity of interest with the City, was instrumental to the successful prosecution of the Chapter 9 Case or provided substantial consideration, which value will allow for distributions that would not otherwise be available but for the contributions made by such non-Debtor parties.  The Plan Releases are, individually and collectively, integral to, and necessary for the successful implementation of, the Plan, essential to the City's restructuring and supported by reasonable consideration.  The City and all creditors that voted to accept the Plan have expressly consented to the Plan Releases.  Releases of non-Debtor parties pursuant to Section III.D.7 of the Plan were appropriately disclosed by the City in the Disclosure Statement, on each Ballot mailed to creditors and in the Plain

-63-

Language Supplement.[68]  Accordingly, in light of all of the circumstances, the Plan

Releases are consonant with the prevailing law in this District and are fair to the

releasing parties.  Without limiting the foregoing, the Court hereby finds as follows

with respect to the Plan Releases:

        1.      The releases set forth in Section III.D.7.a of the Plan are

consensual releases that apply only to holders of Claims that voted to accept the

Plan.  The Plan's consensual release provisions are lawful and appropriate.

        2.      The exculpation provision contained in Section III.D.6 of

the Plan complies with applicable law and is appropriate.  Such provision contains

a carve-out for gross negligence and willful misconduct and is limited to claims

arising out of the City's restructuring efforts and the Chapter 9 Case.  In addition,

the Plan's exculpation provision extends only to certain parties who either have

settled with the City or have actively participated in the City's restructuring

activities.

        3.      The non-consensual third party releases and related

injunctions contained in the Plan (as such releases and injunctions may have been

modified herein with respect to claims asserted against officers and employees of

the City in their individual capacity pursuant to 42 U.S.C. § 1983 (*see* ¶¶ 22, 32

below)) are lawful and appropriate because unusual circumstances exist in the

---

[68]     *See*, *e.g.*, Disclosure Statement, at 16, 28-29, 37, 39, 50, 52, 60.

-64-

City's Chapter 9 Case that justify their application. As far as this Court is aware, this is the first chapter 9 case wherein (a) the debtor has sought to compromise pension benefits for a municipality's active and retired workforce ***and*** (b) third parties under no obligation to contribute funds to creditors of a municipal debtor have volunteered to provide funding in addition to proposed recoveries under the debtor's plan of adjustment.

4. As part of the Grand Bargain, the State has agreed to contribute $194.8 million to reduce the Retirement Systems' underfunding.[69] The settlements the City reached with representatives of its retirees and employees are conditioned upon the receipt of the State funding.[70] The contributions to be made by the State pursuant to the State Contribution Agreement are made in exchange for the release of, among other things, (a) the constitutionally-based claims asserted by the Retirement Systems and holders of Pension Claims that such Claims may not be impaired and (b) certain litigation identified in the State Contribution Agreement. The funding obligation of the State under the State Contribution Agreement is expressly conditioned upon the State and the State Related Entities obtaining the release set forth in Section III.D.7.b of the Plan.[71]

---

[69]  *See* Plan, at Exhibit I.A.332 (State Contribution Agreement).

[70]  *See* Plan, at Exhibits I.A.127, I.A.332.

[71]  *See* Plan, Exhibit I.A.332, at 5.

-65-

The funding obligation of the DIA Funders under the DIA Settlement Documents is expressly conditioned upon the State's provision of funding pursuant to the State Contribution Agreement.[72]  Because (a) the consummation of both the State Contribution Agreement and the DIA Settlement – and, thus, the State's and DIA Funders' respective contributions pursuant thereto – depends upon the approval of the releases set forth at Section III.D.7.b of the Plan; (b) the releases set forth at Section III.D.7.b of the Plan apply only with respect to holders of Class 10 and Class 11 Claims, *i.e.*, direct beneficiaries of both the State Contribution Agreement and the DIA Settlement; and (c) such provisions otherwise comply with applicable law, the Court hereby finds that the releases set forth at Section III.D.7.b of the Plan and any related injunctions are lawful and appropriate under the unusual circumstances of the City's Chapter 9 Case.

## **MISCELLANEOUS**

AA.   <u>Exit Facility</u>.  The terms and conditions of the Exit Facility and all of the transaction documents governing the Exit Facility, including, but not limited to, bond purchase agreements, indentures, bond forms, account control agreements and all other related documents and agreements (collectively, the "<u>Exit Facility Documents</u>") and the fees to be paid thereunder (1) are fair and reasonable, (2) reflect the City's exercise of prudent judgment, (3) are supported by reasonably

---

[72]     *See* Plan, Exhibit I.A.127, at 3.

equivalent value and fair consideration, (4) are proposed in good faith, (5) are critical to the success and feasibility of the Plan and (6) are in the best interests of the City. The Exit Facility and the fees to be paid thereunder are the result of a full and fair marketing process conducted by the City and its agents and advisors. The Exit Facility and the Exit Facility Documents and the fees to be paid thereunder were negotiated in good faith, without fraud or collusion and at arm's length among the parties, without the intent to hinder, delay or defraud any creditor of the City, and are supported by reasonably equivalent value and fair consideration. Credit extended under the Exit Facility and the Exit Facility Documents is extended in good faith for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code or of applicable nonbankruptcy law, and the Exit Facility (including the transactions contemplated by the Exit Facility Documents) is not prohibited by applicable bankruptcy or nonbankruptcy law. Each of (1) the MFA, (2) Barclays Capital Inc. (or such other qualifying affiliate as transferee), (3) the indenture trustee to be named under the Exit Facility Documents and (4) the holders of the bonds to be issued in connection with the Exit Facility (collectively, the "Exit Bonds"), therefore, shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the Order for Relief or any other order.

BB.    Waiver of Stay of Confirmation Order.  To enable the City to (1) consummate the DIA Settlement and the State Contribution Agreement expeditiously, both of which settlements are conditioned upon the occurrence of the Effective Date; (2) begin implementing, and making distributions to the City's creditors pursuant to, the Plan; and (3) emerge from bankruptcy as expeditiously as possible to minimize costs to all parties and remedy its service delivery insolvency, good cause exists to support a waiver of the stay imposed by Bankruptcy Rule 3020(e).

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, AS FOLLOWS:

## A.    Confirmation of Plan

1.    The Plan and each of its provisions (whether or not specifically approved herein) are CONFIRMED in each and every respect, pursuant to section 943 of the Bankruptcy Code.  Failure specifically to include or reference particular sections or provisions of the Plan or any related agreement in this Order shall not diminish or impair the effectiveness of such sections or provisions, it being the intent of the Court that the Plan be confirmed and such related agreements be approved in their entirety.

2.    The Effective Date of the Plan shall occur on the date determined by the City when the conditions set forth in Section III.A of the Plan

-68-

have been satisfied or, if applicable, have been waived in accordance with Section III.B of the Plan.

3.    Any objections or responses to Confirmation of the Plan and the reservation of rights contained therein that (a) have not been withdrawn, waived or settled prior to the entry of this Order or (b) are not cured by the relief granted herein are hereby OVERRULED in their entirety and on their merits, and all withdrawn objections or responses are hereby deemed withdrawn with prejudice.

## B.    Findings of Fact and Conclusions of Law

4.    Any finding of fact set forth in this Order constitutes a finding of fact even if it is stated as a conclusion of law, and any conclusion of law set forth in this Order constitutes a conclusion of law even if it is stated as a finding of fact.  All findings of fact and conclusions of law announced by the Court on the record in connection with confirmation of the Plan or otherwise at the Confirmation Hearing or in the Confirmation Opinion are incorporated herein by reference.[73]  The findings of fact and conclusions of law set forth herein, in the

---

[73]    The findings of fact and conclusions of law that are (a) set forth herein, (b) announced on the record during the Confirmation Hearing and (c) in the Confirmation Opinion shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided*, *however*, that if there is any direct conflict that cannot be reconciled, then, solely to the extent of such conflict, the provisions of the Confirmation Opinion shall govern and

-69-

Confirmation Opinion and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.

## C.    Approval of Settlements

5.    Consistent with the findings herein, the DIA Settlement, the State Contribution Agreement, the UTGO Settlement, the LTGO Settlement, the 36th District Court Settlement, the OPEB Settlement, the Syncora Settlement and the FGIC/COP Settlement (collectively, the "Settlements"), including, without limitation, any and all of the transactions contemplated, liens granted and protections created therein, are approved in all respects as good faith, fair, reasonable and equitable compromises and settlements of all disputes with respect to the subject matter thereof that are in the best interests of the City and its creditors and residents.

6.    The entry of this Order constitutes:  (a) approval of the each of the Settlements pursuant to, as applicable, (i) the Bankruptcy Rules, including Bankruptcy Rule 9019, (ii) the Bankruptcy Code, including section 1123 thereof

_____

(continued…)

shall control and take precedence over any findings of fact or conclusions of law announced on the record at the Confirmation Hearing or in the Confirmation Opinion.

-70-

and (iii) any and all applicable State law, including, but not limited to, (A) Act 279, Public Acts of Michigan, 1909, as amended, (B) PA 436, (C) Act 34, Public Acts of Michigan, 2001, as amended, and (D) Act 80, Public Acts of Michigan, 1981, as amended; and (b) authorization for the City to enter into each Settlement and take any and all actions necessary or appropriate to perform under or implement the terms of the applicable agreements.

7.     The transfer under the Plan and the DIA Settlement of the DIA Assets, including without limitation (a) the real property located at 5200 Woodward Avenue, Detroit, Michigan, (b) the underground parking garage commonly known as the "Cultural Center Garage," located at 41 Farnsworth Street, Detroit, Michigan, (c) the parking lot located at 5200 Woodward Avenue, Detroit, Michigan, (d) the parking lot, commonly known as the "Frederick Lot," located at 318 Frederick Street, Detroit, Michigan and (e) the art collection located in the DIA, shall be free and clear of all liens, claims and interests (as such terms are defined in the Bankruptcy Code) of the City and its creditors.

8.     As provided in the Plan, on the Effective Date, the UTGO Settlement Agreement shall be binding on the City, Ambac, Assured and NPFG. All exculpations and releases granted pursuant to the UTGO Settlement, including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the UTGO Settlement Agreement, are hereby approved in their entirety.

-71-

13-53846-tjt   Doc 8272-5   Filed 11/08/22   Entered 11/08/22 23:09:31   Page 75 of 225
Doc 8036-5   Filed 10/06/22   Entered 10/06/22 15:03:31   Page 147 of 297
1343

The Court approves such settlements and releases on the grounds that good and valuable consideration has been provided therefor, and that such provisions are fair, equitable, reasonable and integral elements of the UTGO Settlement Agreement.

9.     The proceeds of the UTGO Bond Tax Levy collected by the City shall be segregated and transmitted to the Debt Millage Escrow Trustee (as such term is defined at Section 2.4(a) of the UTGO Settlement Agreement) under the Debt Millage Escrow Agreement (as such term is defined at Section 1.2 of the UTGO Settlement Agreement), and the Debt Millage Escrow Trustee shall segregate and transmit the proceeds allocable to the Municipal Obligation to the Master Trustee (as such term is defined at Section 1.2 of the UTGO Settlement Agreement) in accordance with Section 2.4(a) of the UTGO Settlement Agreement.

10.     Pursuant to the Section 2.7(b) of the UTGO Settlement Agreement, the City shall certify annually, not later than June 30 of each year, that it has imposed the debt millage levy as required by and in accordance with the terms of the UTGO Settlement Agreement.

11.     All exculpations and releases granted pursuant to the LTGO Settlement, including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the LTGO Settlement Agreement, are hereby approved in their entirety.  The Court hereby approves such settlements and releases on the grounds that good and valuable consideration has been provided

therefor, and that such provisions are fair, equitable, reasonable and integral elements of the LTGO Settlement.

12. All consent rights granted by the City to the LTGO Settlement Parties, on behalf of the holders of Allowed Limited Tax General Obligation Bond Claims, as reflected in the LTGO Settlement and specifically in Section II.B.3.p.i.A of the Plan, with respect to pre-Effective Date and post-Effective Date settlements of the COP Litigation are integral elements of the LTGO Settlement and supported by good and valuable consideration.

13. In accordance with the LTGO Settlement, each month, the City shall segregate and deposit into a debt service fund monies for the payment of one-sixth of the next semi-annual debt service payable on the New LTGO Bonds, which monies shall not be used for any purpose other than paying debt service on the New LTGO Bonds so long as any New LTGO Bonds remain outstanding.

14. The Syncora Settlement Documents, including, but not limited to, (a) the Settlement Agreement between the City and Syncora, (b) the Syncora Development Agreement (including the garage option) and (c) the Tunnel Lease, and all transactions contemplated thereby, are hereby approved in all respects. The Syncora Development Agreement shall be administered by, and consideration related thereto shall be distributed to, Syncora in a manner consistent with this Order and the Plan.

-73-

15.     Notwithstanding anything to the contrary in this Order or the Plan (including, without limitation, Sections II.B.3.p.i.A, III.D.6 or IV.L of the Plan, the FGIC/COP Settlement or the Syncora Settlement):  (a) none of the form, method, mechanics or allocation of distributions in Section II.B.3.p.i.A of the Plan, nor any findings or orders of the Bankruptcy Court related thereto, shall, or shall be asserted or construed to, affect or prejudice any rights, claims or defenses between the COP Swap Counterparties, on the one hand, and any Settling COP Claimant (including Syncora, FGIC and the FGIC COP Holders) or COP Insurer, on the other hand.  Subject to the proviso at the end of this paragraph, the preceding sentence hereby amends and replaces in its entirety the fourth paragraph of Section II.B.3.p.i.A of the Plan; (b) neither (i) any determinations, adjudications, findings or rulings in the Plan or by the Bankruptcy Court regarding the distributions or consideration provided to the COP Insurers or the Settling COP Claimants under the Plan, including whether such distributions or consideration are solely for the benefit of any particular parties nor (ii) any acceleration or deemed acceleration of any COPs provided for in the Plan or by the Bankruptcy Court shall in any way affect or prejudice any rights, claims or defenses of the COP Swap Counterparties, including with respect to such distributions or consideration; and (c) no release or agreement by any COP Agent provided for in the Plan (including, without limitation any agreement not to sue any COP Holder or any COP Insurer

-74-

13-53846-tjt   Doc 8272-5   Filed 10/06/22   Entered 10/06/22 20:29:31   Page 76 of 225
13-53846-tjt   Doc 8045-5   Filed 10/05/22   Entered 10/06/22 16:06:31   Page 76 of 225
297

1346

in Section II.B.3.p.i.A of the Plan) or by the Bankruptcy Court, shall in any way affect any liability of such COP Holder, COP Insurer or COP Agent to any COP Swap Counterparty (or to any COP Agent on behalf of such COP Swap Counterparty) or impair in any way the rights or obligations of any COP Swap Counterparty or COP Agent (on behalf of any COP Swap Counterparty) to sue any COP Holder, COP Insurer or COP Agent; *provided, however* that, notwithstanding anything in this paragraph to the contrary, the COP Swap Counterparties have agreed not to, and shall not, seek to enjoin, block, prevent, subject to any lien (other than a judgment lien) or otherwise interfere with (a) the distribution by the Debtor of the Class 9 Settlement Asset Pool and New B Notes to, as applicable, FGIC, the FGIC COP Holders, Syncora and the Settling COP Claimants under and as provided for in Section II.B.3.p.i.A of the Plan, (b) any performance, operation, administration of, sale of, transfer of, assignment of or other action with respect to the FGIC Development Agreement, the Syncora Development Agreement or the Tunnel Lease (it being understood that this clause (b) shall not impair any rights or claims of the COP Swap Counterparties to monetary damages related to such agreements or the value thereof), or (c) except as a defense, counterclaim or claim against and in response to a party asserting a counterclaim, in each case asserted by either of the COP Swap Counterparties, distributions to FGIC, the FGIC COP

Holders, Syncora and the Settling COP Claimants (as applicable) of the proceeds of any of the foregoing.

16. The FGIC/COP Settlement Documents, including, but not limited to, (a) the Settlement Agreement between the City and FGIC, (b) the Stipulation Regarding FGIC Plan COP Settlement and FGIC COP Swap Settlement and (c) the FGIC Development Agreement, and all transactions contemplated thereby are hereby approved in all respects. The FGIC Settlement Consideration and the FGIC Development Agreement shall be administered and distributed to FGIC and the FGIC COP Holders in a manner consistent with this Order and the Plan. The allocation of Plan distributions among FGIC and the FGIC COP Holders shall be determined in accordance with agreements among FGIC and the FGIC COP Holders disclosed in a term sheet filed with the Court on October 22, 2014, as the same was amended on October 27, 2014 and may be subsequently amended (with the written consent of the parties thereto) and more fully documented (the "FGIC/FGIC COP Holders Term Sheet"). Pursuant to the FGIC/COP Settlement, the Downtown Development Authority shall, as of the Effective Date, irrevocably assign to FGIC all of the New B Notes that the Downtown Development Authority is entitled to receive pursuant to its Class 13 Allowed Claim.

-76-

17. The COP Service Corporations shall enter into such Supplemental Trust Agreements as FGIC and Syncora may reasonably request with respect to their respective insured COPs as long as such Supplemental Trust Agreements (a) do not impose any additional obligations or liability on the COP Service Corporations and (b) are consistent with the allocation of Plan distributions among FGIC and the FGIC COP Holders agreed to by and among FGIC and the FGIC COP Holders pursuant to the FGIC/FGIC COP Holders Term Sheet.

18. Pursuant to and in accordance with the New C Notes Documents, revenues collected by the City related to (a) tickets issued for parking violations (including, but not limited to, meter collections, towing, storage fees and booting fees), other than revenues that would otherwise be paid to the 36th District Court, and (b) if the New C Notes are issued in a principal amount greater than $21,271,804, garage operations at the Parking Garages (collectively, the "City Parking Revenues") shall be directly remitted to a bank or banks or other financial institution which the Emergency Manager designates as a depository of the City (such institution, the "Depository Bank"). The Depository Bank shall deposit City Parking Revenues received by it into a special, separate and segregated fund (the "City Parking Revenue Fund") established at the Depository Bank. Beginning on the date of delivery of the New C Notes and commencing on the first day of each fiscal year thereafter, each day, City Parking Revenues deposited into the City

-77-

Parking Revenue Fund shall be remitted by the Depository Bank to a special, separate and segregated account held for and on behalf of the City (the "Debt Retirement Fund") by the bond registrar, transfer agent and paying agent for the New C Notes until sufficient funds are on deposit in the Debt Retirement Fund to pay the principal and interest payable on the New C Notes on the last day of that Fiscal Year (such amount, the "Annual Deposit Requirement"). Once the Annual Deposit Requirement is satisfied for that fiscal year, any additional City Parking Revenues deposited in the City Parking Revenue Fund during that fiscal year may be remitted to the City for deposit into the General Fund and may be used by the City for any other purposes permitted by law.

## D. Approval of Releases and Exculpation

19.     The Plan Releases set forth in Section III.D.7 of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court, any of the parties to such releases or any other party.

20.     Without limiting any other applicable provisions of, or releases contained in, the Plan, this Order or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under

-78-

the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), each holder of a Claim that voted in favor of the Plan, to the fullest extent permissible under law, is hereby deemed to forever release, waive and discharge all Liabilities in any way relating to: (a) the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436), *provided that*, for the avoidance of doubt, any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

(b) (i) Claims that are compromised, settled or discharged under or in connection with the Plan, (ii) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (iii) the Plan, (iv) the Exhibits, (v) the Disclosure Statement or

(vi) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; *provided*, *however*, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement.

21.     Nothing in paragraph 20 hereof shall (a) affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; or (b) release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties.

22.     For the avoidance of doubt, notwithstanding anything in the Plan or this Order (including paragraph 20) to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 shall not be released.

23.     If the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed forever to release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the

-80-

authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the foregoing sentence does not provide for a release, waiver or discharge of obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (a) pensions as modified by the Plan or (b) labor-related obligations, which post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, the GRS or the PFRS.

24. As a condition to the State funding, the State and certain parties, including Michigan Council 25, Sub-Chapter 98, Local 3308 and Local 917 of AFSCME, entered into certain Support and Release Agreements and, for the avoidance of doubt, in the event of an express conflict between any such Support and Release Agreement, on the one hand, and the Plan, Plan Supplements or this Order, on the other hand, as to the parties to these Support and Release Agreements, their respective Support and Release Agreement shall govern.

25.     Notwithstanding Sections III.D.5 through III.D.7 and IV.L of the Plan, paragraph Z of the above findings (titled "Plan Releases") and paragraphs 19 through 21 and 29 through 33 hereof, except as set forth in the COP Swap Settlement, nothing in the Plan or this Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order.

26.     Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Settling COP Claimant shall be, and hereby is, to the fullest extent permitted under law, deemed to forever release, waive and discharge all Liabilities relating to COP Documents such Settling COP Claimant has, had or may have against the (a) the GRS, (b) the PFRS or (c) Related Entities of either the GRS or the PFRS.  At the direction of FGIC, which shall be, and hereby is, deemed given on the Effective Date, the COP Contract Administrator shall have irrevocably agreed (on behalf of

itself, any successors and each FGIC COP Holder) to release and not to sue any

COP Holder or any COP Insurer on behalf of any FGIC COP Holder, COP Insurer,

the Detroit Retirement Systems Funding Trust 2005 or the Detroit Retirement

Systems Funding Trust 2006 in connection with any liability arising in connection

with or related to (a) Sections 6.5 and 9.1 of the Contract Administration

Agreements, (b) Section 8.03 of the COP Service Contracts, (c) distributions made

pursuant to or in connection with Section II.B.3.p.i.A of the Plan, (d) the

FGIC/COP Settlement or (e) the Syncora Settlement. On the Effective Date,

Syncora and FGIC shall be, and hereby are, to the fullest extent permitted under

law, deemed to forever mutually release, waive and discharge all liabilities against

each other relating to distributions made pursuant to or in connection with

Section II.B.3.p.i.A of the Plan, Sections 6.5 and 9.1 of the Contract

Administration Agreements or Section 8.03 of the COP Service Contracts.

     27.    The exculpation provision set forth in Section III.D.6 of the

Plan is approved in all respects, is incorporated herein in its entirety, is so ordered

and shall be immediately effective on the Effective Date of the Plan without further

order or action on the part of the Court, any of the parties to such exculpation or

any other party. From and after the Effective Date, to the fullest extent permitted

under applicable law and except as expressly set forth in this paragraph, neither the

City; its Related Entities (including the members of the City Council, the Mayor

and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City; the State; the State Related Entities; the Exculpated Parties; nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; *provided that* the foregoing provisions shall, and hereby do, apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the

-84-

Syncora Exculpated Parties solely in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in connection with the FGIC/COP Settlement Documents and any actions or litigation positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the RDPMA Exculpated Parties and (g) the COP Agent, solely in its capacity as such and solely in connection with any Distributions made pursuant to the terms of the Plan; *provided*, *further*, that the foregoing provisions of this paragraph shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan. This paragraph shall not affect any liability of

(a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or FGIC or (b) the Syncora Exculpated Parties or the FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties. For the avoidance of doubt, notwithstanding anything in the Plan or this paragraph to the contrary, officers or employees of the City acting in their individual capacity shall not be exculpated from liability for claims asserted pursuant to 42 U.S.C. § 1983.

## E.    Order Binding on All Parties

28.    Subject to the provisions of Section III.A of the Plan, in accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of:  (a) the City; (b) any and all holders of Claims (irrespective of whether (i) any such Claim is impaired under the Plan, (ii) proof of any such Claim has been filed or deemed filed under section 501 of the Bankruptcy Code, (iii) any such Claim is allowed under section 502 of the Bankruptcy Code or (iv) whether the holders of such Claims accepted, rejected or are deemed to have accepted or rejected the Plan); (c) the registered and beneficial holders of COPs; (d) any other person giving, acquiring or receiving property under the Plan; (e) any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the City; (f) any party to any Settlement; and (g) the respective heirs, executors, administrators, trustees,

-86-

13-53846-tjt    Doc 8272-5    Filed 10/08/22    Entered 10/08/22 20:29:31    Page 166 of 225
Doc 8045-5    Filed 10/05/22    Entered 10/05/22 14:17:31    Page 90 of 297
297

1358

affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing. All settlements (including, without limitation, the Settlements), compromises, releases (including, without limitation, the Plan Releases), waivers, discharges, exculpations and injunctions set forth in the Plan shall be, and hereby are, operative, effective and binding on all Persons who may have had standing to assert any settled, released, discharged, exculpated or enjoined causes of action, and no other Person or entity shall possess such standing to assert such causes of action after the Effective Date. The compromises and settlements (including, without limitation, the Settlements) embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.

## F.    Discharge of Claims

29.    The Plan discharge provisions set forth in Section III.D.4 of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court or any other party.

30.    In accordance with Section III.D.4 of the Plan, except as specifically provided otherwise in the Plan or this Order, as of the Effective Date, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, all

debts of the City shall be, and hereby are, discharged, and such discharge will void

any judgment obtained against the City at any time, to the extent that such

judgment relates to a discharged debt; *provided that*, in accordance with

section 944(c)(1) of the Bankruptcy Code, such discharge shall not apply to

(a) debts specifically exempted from discharge under the Plan, (b) debts held by an

Entity that, before the Confirmation Date, had neither notice nor actual knowledge

of the Chapter 9 Case, (c) claims against officers or employees of the City in their

individual capacity under 42 U.S.C. § 1983 or (d) Claims of (i) T&T Management,

Inc., (ii) HRT Enterprises and (iii) the John W. and Vivian M. Denis Trust related

to condemnation or inverse condemnation actions against the City alleging that the

City has taken private property without just compensation in violation of the

Takings Clause of the Fifth Amendment to the United States Constitution.

## G.    Release of Liens

31.    The release and discharge of all Liens against the City's

property set forth in Section IV.M of the Plan are approved in all respects, are

incorporated herein in their entirety, are so ordered and shall be immediately

effective on the Effective Date of the Plan without further order or action on the

part of the Court.  As of the Effective Date, (a) the holders of such Liens are

hereby authorized and directed to release any collateral or other property of the

City (including any cash collateral) held by such holder and to take such actions as

may be requested by the City to evidence the release of such Lien, including (i) the execution, delivery, filing or recording of appropriate releases and (ii) the taking of any action necessary to implement, consummate and otherwise effect the Plan in accordance with its terms, and (b) the City shall be authorized to execute and file on behalf of creditors such forms as may be necessary or appropriate to implement the provisions of Section IV.M of the Plan and this paragraph. All entities holding Claims against the City shall be, and hereby are, bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan. Upon the entry of this Order, all entities holding Claims against the City that are treated under the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be, and hereby are, enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

## H. Injunction

32. On the Effective Date, except as otherwise provided in the Plan or in this Order, all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity, along with their Related Entities, shall be, and hereby are, permanently enjoined from taking any of the following actions against or affecting the City or its

property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from this Order): (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (i) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (ii) Indirect 36th District Court Claims and (iii) Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity); (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property; (e) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of this Order, the Plan or the Settlements (to the extent such Settlements have been approved by the Court herein); and (f) taking any actions to interfere with the implementation or consummation of the Plan. For the avoidance of doubt, notwithstanding anything

in the Plan or this Order (including this paragraph) to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 shall not be enjoined. In addition, all individuals affected by the AFS Recoupment are enjoined from commencing any proceeding against the GRS and its trustees, officers, employees or professionals arising from GRS's compliance with the Plan or this Order.

33.    All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan shall be, and hereby are, permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the

DRCEA, or a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or this Order. Notwithstanding the provisions of this paragraph and without limiting the injunctions in Section III.D.5.a of the Plan or paragraph 32 hereof, the holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

34. During the period that begins on the Effective Date and ends on June 30, 2023, the trustees of the PFRS, the trustees of the GRS or the trustees of any successor trust or pension plan to either the PFRS or the GRS shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS or the GRS (as applicable) that shall be 6.75%. Except as may be required to maintain the tax-qualified status of the PFRS or the GRS, or to comply with the terms of the Plan or this Order, the City, the trustees of the PFRS, the trustees of the GRS and all other persons or entities shall be, and hereby are, enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of either the PFRS, the GRS or any successor plan or trust to either the PFRS or the GRS, that govern the calculation of pension benefits (including, as applicable, the PFRS Adjusted

-92-

Pension Amount, the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the Prior GRS Pension Plan, the PFRS Restoration Payment, the GRS Restoration Payment, the New PFRS Active Pension Plan Formula, the New GRS Active Pension Plan Formula, the terms of the New PFRS Active Pension Plan and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumptions described in Section II.B.3.q.ii.B of the Plan (with respect to the PFRS) or Section II.B.3.r.ii.B of the Plan (with respect to the GRS), the contributions to the PFRS or the GRS, or the calculation or amount of PFRS pension benefits or GRS pension benefits (as the case may be), for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

I.    **State Contribution Agreement**

35.    The State Contribution Agreement is approved in all respects, and the City is hereby authorized to enter into, and take any action necessary to perform under or implement, the terms thereof.  The State shall file and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution (as set forth at

Section IV.D.3 of the Plan) have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

36.     In accordance with Section IV.D.2 of the Plan, the Income Stabilization Funds of the GRS and the PFRS shall receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State.

37.     In accordance with Section 4.f.ii of the State Contribution Agreement, filed as Exhibit I.A.332 to the Plan, the governing documents of the GRS and the governing documents of the PFRS shall be amended to include (a) the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of the State Contribution Agreement and (b) the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of the State Contribution Agreement.

**J.     DWSD Authority Transaction**

38.     The Memorandum of Understanding Regarding the Formation of the Great Lakes Water Authority (the "Memorandum of Understanding"), filed as Exhibit A to the Notice of Execution of Framework for Creating a Water and Sewer Authority (Docket No. 7357), is approved in all respects.  The City is

-94-

13-53846-tjt   Doc 8272-5   Filed 10/05/22   Entered 10/05/22 23:09:31   Page 170 of 225
297
1366

hereby authorized to enter into, and take any action necessary to perform under or implement, the terms of the Memorandum of Understanding and any final agreement resulting therefrom creating a regional water and sewer/stormwater authority to be called the Great Lakes Water Authority (the "GLWA") in accordance with, and subject to all approvals and consents required under, State law, the DWSD Tender Order, all documents related to the 2014 DWSD Refinancing Obligations, all documents related to the 2014 Revenue Refinancing Bonds, all documents related to the 2014 Revenue and Revenue Refinancing Bonds and the DWSD Bond Documents.  The GLWA transaction contemplated in the Memorandum of Understanding, if consummated, would constitute a Qualifying DWSD Transaction as such term is defined in the Plan.

**K.     ASF Recoupment**

39.     ASF Recoupment is (a) an integral component of the City's global settlement of pension-related and other labor-related issues negotiated with, among others, the Retiree Committee, (b) is well within the range of possible reasonable settlements and (3) is approved in all respects.  The City is hereby authorized to, and shall, on or as soon as reasonably practicable after the Effective Date, calculate the Annuity Savings Fund Excess Amount for each ASF Current Participant, and the GRS, at the direction of the City, and solely as agent of the City and without any liability accruing to the GRS, shall deduct the Annuity

Savings Fund Excess Amount from each such participant's Annuity Savings Fund account, which deducted amounts shall be used to fund the accrued pension benefits of all GRS participants; *provided*, *however*, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap and the Current GRS Retiree Adjustment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

40. For each ASF Distribution Recipient who, after receipt of notice as required by the Plan and this Order, does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii of the Plan and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the City is hereby authorized to, and shall, on or as soon as reasonably practicable after the Effective Date: (a) calculate the Annuity Savings Fund Excess Amount; and (b) convert such amount into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate, and the GRS, pursuant to the Plan and at the direction of the Court, and

without any liability accruing to the GRS, shall deduct such monthly annuity amounts from the ASF Distribution Recipient's monthly pension check; *provided*, *however*, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension check exceed the ASF Recoupment Cap or the Current GRS Retiree Adjustment Cap, if applicable. The total ASF Recoupment from the ASF Distribution Recipient's monthly pension checks over time shall not exceed the amount necessary to amortize the applicable Annuity Savings Fund Excess Amount at 6.75% interest.

41. Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option. No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (a) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (b) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF

-97-

Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan. An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

42.     The GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, the GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan and paragraph 40 hereof. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

## L.     Survival of Indemnities

43.     Notwithstanding anything to the contrary in this Order or the Plan, nothing in this Order or the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the provisions hereof and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted.  Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan or this Order and shall be, and hereby are, discharged.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this paragraph.

## M.     Issuance of New Securities and Exemption From Securities Laws

44.     The issuance of the New Securities by the City on the Effective Date or on a subsequent Distribution Date (as applicable) is hereby approved and

authorized.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities pursuant to the Plan is, and shall be, exempt from Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities.  Except as set forth in the Plan with respect to the Syncora Excess New B Notes, the New Securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are, and shall be, freely tradable and transferable by any initial recipient (including the Detroit General VEBA and the Detroit Police and Fire VEBA) thereof that (i) is not an "affiliate" of the City or applicable issuer as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.  It is hereby expressly found and determined that the Detroit General VEBA and the Detroit Police and Fire VEBA are not affiliates of the City within the meaning of Rule 144(a)(1) under the Securities Act.

## N.  Executory Contracts and Unexpired Leases

45.    The Executory Contract and Unexpired Lease provisions of Section II.D of the Plan are specifically approved in all respects, are incorporated herein in their entirety and are so ordered.  The City is authorized to assume,

assume and assign, or reject Executory Contracts or Unexpired Leases in accordance with Section II.D of the Plan and the Contract Procedures Order.

46.    The assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 of the Plan (and any related assignment) as of the Effective Date is hereby approved, except for Executory Contracts or Unexpired Leases that:  (a) have been rejected pursuant to a Final Order of the Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan or (e) are designated for rejection in accordance with the last sentence of this paragraph.  If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim filed in accordance with the Contract Procedures is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be, and hereby is, deemed effective as of the Effective Date.

47.    Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course

-101-

of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of this Order.

48.     The rejection of each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan is hereby approved pursuant to section 365 of the Bankruptcy Code as of the later of (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Each contract or lease listed on Exhibit II.D.6 to the Plan shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  The City may, at any time on or prior to the Effective Date, amend Exhibit II.D.6 to the Plan to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1 of the Plan, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to Section II.D.6 of the Plan. The City will provide notice of any such amendments to Exhibit II.D.6 to the Plan in accordance with the terms of the Contract Procedures Order.  Listing a contract or lease on Exhibit II.D.6 to the Plan shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as

Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

## O.    Plan Distributions

49.    On and after the Effective Date, Distributions on account of Allowed Claims and the resolution and treatment of Disputed Claims shall be effectuated pursuant to Section II.B and Article V of the Plan.  The Distribution Record Date shall be 5:00 p.m., Eastern Time, on the date of entry of this Order.

## P.    Retained Causes of Action

50.    Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City shall retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to, (a) any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans or assets) and (b) the currently pending actions and claims brought by the City and identified on Exhibit III.D.2 to the Plan, to the extent not expressly released under the Plan or pursuant to any Final Order of the Court.  The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 to the Plan shall not be

deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity.

**Q.    Claims Bar Dates and Other Claims Matters**

      51.    <u>General Administrative Claim Bar Date Provisions</u>.  Except as otherwise provided in Section II.A.2.b or Section II.A.2.c of the Plan or in a Bar Date Order or other order of the Court, unless previously filed, requests for payment of Administrative Claims must be filed and served on the City no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be filed and served on the City and the requesting party by the later of (a) 150 days after the Effective Date, (b) 60 days after the filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.  The foregoing procedures shall be specified in the notice of entry of this Order and served on all parties in interest.

      52.    Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required

to file or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the holders of such Claims or further action or approval of the Court.

53.     Holders of Administrative Claims that are Postpetition Financing Claims will not be required to file or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b of the Plan.

54.     Professional Fee Reserve. On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where applicable, the DWSD's funds, in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds. The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals and the Fee Examiner Parties as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks); (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively

submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve; and (c) an estimate of the Fee Examiner Parties' unbilled fees and expenses through the projected date of dismissal of the Fee Examiner under Section IV.N.3 of the Plan, as determined by the City in consultation with the Fee Examiner. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order or the process established under paragraph 87 hereof, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable by the Court shall be released to the General Fund or the DWSD's funds, as applicable. If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable by the Court and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

      55.   <u>Bar Date for Rejection Damage Claims</u>. Except as otherwise provided in a Final Order of the Court approving the rejection of an Executory

Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be filed with the Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan. Any Claims not filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

56. Notwithstanding anything to the contrary in the Plan or this Order, neither FGIC nor the COP Trustee shall be required to file any Claims arising out of the rejection of the COP Service Contracts pursuant to the Plan, which Claims are resolved and treated pursuant to the terms of the FGIC/COP Settlement Documents and the Plan.

57. <u>Workers' Compensation Claims</u>. From and after the Effective Date, (a) the City shall continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan or this Order shall discharge, release

-107-

or relieve the City from any current or future liability under applicable State workers' compensation law; *provided that* the City shall retain the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

58. <u>Claims Related to Operation of City Motor Vehicles</u>. From and after the Effective Date, the City shall continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to M.C.L. § 500.3101 in connection with the operation of the City's motor vehicles consistent with the terms of Section IV.S of the Plan. Nothing in the Plan or this Order shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to M.C.L. § 500.3101 or Claims within the minimum coverage limits in M.C.L. § 500.3009(1); *provided that* the City shall retain the right to challenge the validity of any Claim subject to Section IV.S of the Plan or this paragraph, and nothing therein or herein shall be deemed to expand the City's obligations or any claimant's rights with respect to such Claims under State law.

59. <u>Payment of Tax Refund Claims</u>. From and after the Effective Date, the City shall continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax

refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures; *provided that* the City shall retain the right to challenge the validity of any claim for an income tax refund or property tax refund.

60.  Utility Deposits.  From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

61.  Pass-Through Obligations.  The City has certain Pass-Through Obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under the respective tax increment financing enabling statutes.  The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**R.    Plan Implementation**

62.  In accordance with section 1142 of the Bankruptcy Code, without further action by the Court, the City is authorized to:  (a) take any and all actions necessary or appropriate to implement, effectuate and consummate the Plan, this Order or the transactions contemplated thereby or hereby, including the

-109-

transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements (including the Settlements), releases (including the Plan Releases) and other agreements or documents entered into or delivered in connection with the Plan; and (b) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, releases, agreements and documents necessary to implement, effectuate and consummate the Plan, including, without limitation, those contracts, instruments, releases, agreements and documents identified in Article IV of the Plan. All transactions effected by the City during the pendency of the Chapter 9 Case from the Petition Date through the Confirmation Date are approved and ratified.

63.     Each federal, state, commonwealth, county, municipal, local, foreign or other governmental agency is hereby directed and authorized to accept any and all documents, mortgages and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

**S.     Cancellation of Existing Bonds,
Bond Documents, COPs and COP Documents**

64.     Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as

-110-

specifically provided otherwise in the Plan or this Order (including any rejection of Executory Contracts pursuant to Section II.D of the Plan or paragraph 48 hereof), on the Effective Date, the Bonds, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the parties to the City, as applicable, under the Bonds, the Bond Documents, the COPs and the COP Documents shall be discharged; *provided*, *however*, that the Bonds, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (a) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto; (b) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution; (c) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City; (d) as may be necessary to preserve any claim by (i) a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer, (ii) a COPs Holder or COP Agent under a COP Insurance Policy or against any

-111-

COP Insurer or (iii) a COP Swap Counterparty under a Swap Insurance Policy or against any insurer thereunder; and (e) with respect to any obligation of any party (other than the City, except to the extent provided in the COP Swap Settlement or the COP Swap Settlement Approval Order) under any COP Document related to such party's obligations owed in respect of the COP Swap Documents or the COP Swap Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan (or the COP Swap Settlement or the COP Swap Settlement Approval Order), such Bonds, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. For the avoidance of doubt, this paragraph shall not apply to any Bonds that are Reinstated pursuant to Section II.B.3.a.ii of the Plan.

65. As of the Effective Date, the principal amounts of the COPs originally insured by FGIC shall be, and hereby are, deemed accelerated and due and payable, and no interest on the COPs originally insured by FGIC shall accrue thereafter, solely for the purposes of determining distributions from the COP Trustee to FGIC and the FGIC COP Holders. The foregoing acceleration of principal and cessation of interest shall affect only the rights of each FGIC COP Holder to the receipt of proceeds of distributions under the Plan and not the rights of each such FGIC COP Holder against FGIC and shall not in any way modify payments currently required of FGIC under its existing insurance policies or the

First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013 (the "<u>FGIC Rehabilitation Plan</u>").

66.    FGIC (irrespective of the terms of FGIC's COP Insurance Policies including, without limitation, the definition of "Due for Payment") may elect on or prior to the earlier to occur of (a) the Effective Date and (b) December 15, 2014, by filing a notice with the Court on or prior to such date, to treat all (but not less than all) of the outstanding principal owing on all (but not less than all) series of the FGIC-insured COPs as having been accelerated and currently "Due for Payment" (as such term is defined in the applicable FGIC COP Insurance Policy for purposes of such policy) as of the Effective Date, in which case, with respect to each FGIC COP Insurance Policy there shall be deemed a Permitted Policy Claim (as defined in the FGIC Rehabilitation Plan) in the amount of (a) the outstanding principal amount of the FGIC-Insured COPs in each CUSIP, as of the Effective Date, insured by such policy and (b) interest accrued and unpaid on such principal amount of such FGIC-Insured COPs through the Effective Date, in which case no interest shall accrue on or after the Effective Date.  If FGIC does not elect to accelerate its COP Insurance Policies pursuant to the preceding sentence, FGIC's and the FGIC COP Holders' respective rights and obligations with respect to FGIC's COP Insurance Policies shall be governed by the FGIC/FGIC COP Holders Term Sheet.

-113-

67.     Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers, (b) COPs Holders or the COP Agent with respect to claims under COP Insurance Policies and obligations related thereto or (c) COP Swap Counterparties with respect to claims under Swap Insurance Policies and obligations related thereto.

68.     No provision of this Order or the Plan shall (a) enjoin any holder of a COP from enforcing its rights against any COP Insurer or (b) exculpate, release or affect any rights any holder of a COP may have with respect to any COP Insurance Policy.

## T.     Binding Effect of Prior Orders

69.     Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 9 Case, all documents and agreements executed by the City as authorized and directed thereunder and all motions or requests for relief by the City pending before the Court as of the Effective Date shall be binding upon and shall inure to the benefit of the City and any other parties expressly subject thereto.  Nothing in the Plan or this Order shall in any respect modify the DWSD Tender Order, the rulings made and the rights granted

therein or any of the documents approved, authorized or entered into pursuant thereto.

## U.    Final Order; Waiver of Stay

70.    This Order is a final order, and the period in which an appeal must be filed shall commence immediately upon the entry hereof.  The stay of this Order otherwise imposed by Bankruptcy Rule 3020(e) is hereby waived as of the date hereof.

## V.    Reversal

71.    If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other federal appellate court with appropriate jurisdiction, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the City's receipt of written notice of such order.  Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.

## W.    Notice of Confirmation of the Plan

72.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), on or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all creditors a notice (the "Confirmation Notice"), substantially in the form of Appendix II hereto, that informs such creditors of: (a) entry of this Order; (b) the occurrence of the Effective Date; (c) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline and procedures for the filing of Claims arising from any such rejection; (d) the deadline and procedures for the filing of Administrative Claims; and (e) such other matters as the City deems to be appropriate; *provided*, *however*, that the City shall be obligated to serve the Confirmation Notice only on the record holders of Claims as of the Confirmation Date.  The City is directed to publish the Confirmation Notice once in the national editions of *The Wall Street Journal* and *USA Today* and the daily edition of the *Detroit Free Press* no later than ten Business Days after the Effective Date.  As soon as practicable after the entry of this Order, the City shall make copies of this Order and the form Confirmation Notice available on (a) the City's official website at www.detroitmi.gov and (b) the Document Website at www.kccllc.net/Detroit.

## X. Miscellaneous Provisions

73. The City is hereby authorized to make non-material modifications or amendments to the Plan at any time prior to the substantial consummation of the Plan, without further order of the Court. In addition, without the need for a further order or authorization of this Court, but subject to the express provisions of this Order, the City shall be, and hereby is, authorized and empowered to make non-material modifications to the documents filed with the Court, including Exhibits or documents forming part of the evidentiary record at the Confirmation Hearing, in its reasonable business judgment as may be necessary or appropriate.

74. The City shall not, without FGIC's prior written consent, amend the Plan in a manner that (a) would have a materially adverse effect on Class 9 or (b) adversely affect FGIC; *provided, however*, that, notwithstanding anything to the contrary in this Order or the Plan, nothing in this Order or the Plan is intended to or shall be deemed to limit any rights of the FGIC COP Holders to object to any such Plan amendment.

75. On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case. Notwithstanding the foregoing,

-117-

the Retiree Committee's professionals will have standing to participate in the post-Effective Date determination by the Court of the reasonableness of the fees and expenses incurred by the Retiree Committee and its professionals in connection with the City's Chapter 9 Case.

76.     Pursuant to the Order Resolving Corrected Motion of the Official Committee of Retirees for Entry of An Order Allowing an Administrative Expense Claim, entered on March 31, 2014 (Docket No. 3334), approving a stipulation and settlement agreement that requires the City to include a provision under the Barton doctrine first developed in Barton v. Barbour, 104 U.S. 126 (1881), and this Court having previously held that the Barton doctrine is applicable to members of the Retiree Committee, each and every member of the Retiree Committee is not only subject to protections under the release and injunction provisions of the Plan but is further protected by the provisions of the Barton doctrine and thus no action may be taken against any member of the Retiree Committee without separate relief granted by this Court.

77.     On the Effective Date or as soon thereafter as is practicable, all appeals of the Opinion Regarding Eligibility and the Order for Relief, subject to settlements by and among the appellants and the City, shall be withdrawn.

78.     The terms and conditions of the Exit Facility are fair and reasonable, and the Exit Facility has been negotiated in good faith and at arm's

length. The City is hereby authorized to enter into, execute, deliver, file, record and issue the Exit Facility Documents and to incur the obligations under the Exit Facility, including the granting of liens thereunder, the payment of all fees, expenses, indemnities and other amounts provided for in each of the Exit Facility and the other instruments, agreements, guaranties and documents entered into in connection therewith, all of which are hereby approved. The City is authorized and empowered to incur and to perform its obligations in accordance with, and subject to, the Exit Facility Documents and to perform all acts, and make, execute and deliver all instruments and documents which may be required for the performance by the City under the Exit Facility Documents and the creation and perfection of the liens described in and provided for by the Exit Facility Documents. Subject to (a) the terms and conditions set forth in the Exit Facility Documents and (b) the City's compliance with the procedures for authorizing the borrowing of money under Sections 12(1) and 19 of PA 436 and the State Local Emergency Financial Assistance Loan Board's approval of the Exit Facility under Section 36a of Michigan Public Act 279 of 1909, the Home Rule City Act, M.C.L. §§ 117.1, *et seq.* (as amended), the City is hereby authorized to issue the Exit Bonds for purchase by the MFA in accordance with the terms and conditions set forth in the Exit Facility Documents.

-119-

79.     The Exit Facility Documents and the obligations of the City

thereunder, including all related pledges and security agreements, shall, upon

execution, constitute legal, valid, binding and authorized obligations of the City,

enforceable in accordance with their terms.  The loans, advances and financial

accommodations to be extended under the Exit Facility are being extended, and

shall be, and hereby are, deemed to have been extended, in good faith, for

legitimate purposes, are reasonable, shall not be subject to avoidance,

recharacterization or subordination (including equitable subordination) for any

purposes whatsoever, and shall not constitute preferential transfers, fraudulent

transfers or conveyances or other voidable transfers under the Bankruptcy Code or

any other applicable non-bankruptcy law.

80.     Notwithstanding any other provision of this Order or the Plan,

as to the United States, its agencies, departments or agents, nothing in the Plan or

this Order shall discharge, release or otherwise preclude:  (a) any liability of the

City arising on or after the Effective Date; (b) any liability that is not a "claim"

within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid

defense of setoff or recoupment with respect to a Claim; or (d) any liability of any

entity under environmental laws arising, continuing or springing anew after the

Effective Date that any entity would be subject to as a post-Effective Date owner

or operator of property, *provided that*, for the avoidance of doubt and without

limiting the liabilities previously described in sub-paragraph (d), any liability that is a dischargeable "claim" within the meaning of section 101(5) of the Bankruptcy Code and arose before the Effective Date, including any liabilities for costs expended or paid by the United States under environmental laws before the Effective Date or any penalties or fines owed to the United States for days of violation of environmental laws before the Effective Date, shall be treated as otherwise provided in the Plan.

81.     The Plan does not, and shall not be deemed to, modify, limit, release, discharge or enjoin any claims (a) related to the Retirement Systems that Bank of New York Mellon in its capacity as custodian under (i) the Global Custody Agreement with the Policemen and Firemen Retirement System of the City of Detroit, (ii) the Global Custody Agreement with the General Retirement System of the City of Detroit and (iii) the Global Custody Agreement with The Board of Trustees of The City of Detroit Employees' Benefit Plan (in such capacity, "BNY Mellon") may have against persons or entities other than the City or (b) against property of the Retirement Systems held by BNY Mellon in its capacity as custodian.

82.     Any document related to the Plan that refers to a plan of adjustment of the City other than the Plan confirmed by this Order shall be, and it hereby is, deemed to be modified such that the reference to a plan of adjustment of

-121-

the City in such document shall mean the Plan confirmed by this Order, as appropriate.

83.     Without intending to modify any prior Order of this Court (or any agreement, instrument or document addressed by any prior Order), in the event of a direct conflict between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (except as provided in paragraph 24 above, and unless otherwise expressly provided for in such agreement, instrument, or document).  In the event of a direct conflict between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

84.     In accordance with Section III.C of the Plan, if the Effective Date does not occur, then upon motion by the City, the Court may declare that: (a) the Plan is null and void in all respects, including with respect to (i) the discharge of Claims pursuant to section 944 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts or Unexpired Leases pursuant to Section II.D of the Plan and (iii) the releases described in Section III.D.7 of the Plan; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the City or (ii) prejudice in any manner the rights of the City or any other party in interest.

-122-

85.     To the extent that (a) the Court has held that any term or provision of the Plan is invalid, void or unenforceable and (b) with the consent of the City, the Court altered and interpreted such term or provision, consistent with Section VIII.D of the Plan, to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable:  (a) such term or provision, as altered or interpreted, shall be (i) valid and enforceable pursuant to its terms, (ii) considered integral to the Plan and shall not be deleted or modified without the City's consent and (iii) non-severable and mutually dependent; and (b) notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

86.     Pursuant to Section IV.N of the Plan and in accordance with the Fee Review Order, the Fee Examiner shall continue to review and assess all Fee Review Professional Fees for the period through, but not including, the Effective Date pursuant to the standard of section 943(b)(3) of the Bankruptcy Code. The Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses.  All fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall

-123-

remain subject to review and approval of the Court pursuant to the terms of the Fee Review Order. Upon completing his review of all Fee Review Professional Fees and submitting all reports related thereto (as required by the Fee Review Order), the Fee Examiner shall have no further duties or obligations under the Fee Review Order other than obligations of confidentiality thereunder (which obligations, including, but not limited to, the confidentiality obligations set forth at paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date). Nothing in this paragraph prohibits the mediator from requesting or requiring the Fee Examiner to participate in mediation regarding Professional Fees at any time.

87. The Court, with the assistance of counsel, will establish an expeditious mediation and Court-review process to determine the reasonableness and disclosure of all fees and expenses, paid and unpaid, for which the City is obligated in connection with this case through the Effective Date, as required by 11 U.S.C. § 943(b)(3). The preceding sentence does not apply with respect to fees and expenses explicitly dealt with in settlements previously approved by orders of the Court.

88. The provisions in the Plan and in this Order regarding fees and expenses shall include the professional fees and expenses of (a) the GRS and the PFRS, to the extent that the City reimburses them; (b) the Fee Examiner and his

professionals, and the Court-appointed feasibility expert and her counsel; and (c) the other Fee Review Professionals.

89.     Notwithstanding Section II.B.3.s.ii.A of the Plan, Charles Gayney shall serve as an initial member of the Detroit General VEBA board of trustees in place of Suzanne Daniels Paranjpe.

## Y.     No Diminution of State Power

90.     No provision of the Plan or this Order shall be construed:  (a) to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; or (b) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

## Z.     Post-Effective Date Governance

91.     The City shall promptly provide to the Court copies of any reports given to, or received from, the Financial Review Commission.  Nothing in the Plan or this Order shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

## AA.   Retention of Jurisdiction

92.     The Court shall, and hereby does, retain such jurisdiction over the City and the Chapter 9 Case as is consistent with section 1334 of title 28 and

title 11 of the United States Code until the Effective Date. Notwithstanding the entry of this Order, from and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 9 Case to the fullest extent permitted by law, including, among other things, jurisdiction over those matters and issues described in Article VII of the Plan, *provided, however*, that notwithstanding Article VII of the Plan, the Court shall not have jurisdiction over any dispute between or among FGIC and the FGIC COP Holders with respect to agreements between or among them that do not involve the City, the State or any Released Party (other than FGIC and the FGIC COP Holders) as a party.

93. Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over the UTGO Settlement and the UTGO Settlement Agreement and any dispute arising from or related to the UTGO Settlement Agreement. For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-Confirmation authority and power to implement, interpret and enforce the UTGO Settlement Agreement and all Settlement-Related Documents (as such term is defined at Section 1.2 of the UTGO Settlement Agreement), including, without limitation, all exhibits to the UTGO Settlement Agreement, the Restructured UTGO Bonds and the Municipal Obligation. As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained

13-53846-tjt Doc 8272-5 Filed 11/12/14 Entered 11/12/14 22:54:07 Page 202 of 205
297
1398

jurisdiction under the Plan and this Order, including by way of injunction, as long as any of the Municipal Obligation, Stub UTGO Bonds or Restructured UTGO Bonds are outstanding.

94.     Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over the settlement of Limited Tax General Obligation Bond Claims and the LTGO Settlement and any dispute arising from or related to the LTGO Settlement.  For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-Confirmation authority and power to implement, interpret and enforce the LTGO Settlement and all Settlement-Related Documents, including, without limitation, all exhibits to the LTGO Settlement Agreement and the New LTGO Bonds.  As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained jurisdiction under the Plan and this Order, including by way of injunction, as long as any of the New LTGO Bonds are outstanding.

95.     Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over any matters, cases, controversies, suits or disputes that may arise in connection with the FGIC Development Agreement or the Syncora Development Agreement.

-127-

Signed on November 12, 2014

                        /s/ Steven Rhodes
                        Steven Rhodes
                        United States Bankruptcy Judge

# APPENDIX I

## PLAN OF ADJUSTMENT

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------------ x
                                            :
In re                                       :       Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                  :       Case No. 13-53846
                                            :
              Debtor.                       :       Hon. Steven W. Rhodes
                                            :
                                            :
------------------------------------------------------------ x
```

---

**EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**
**(October 22, 2014)**

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................. 1

A.     Defined Terms. ........................................................................................................... 1

B.     Rules of Interpretation and Computation of Time. ................................................... 30

     1.     Rules of Interpretation. ................................................................................. 30

     2.     Computation of Time. ................................................................................... 30

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................................................ 30

A.     Unclassified Claims. ................................................................................................ 31

     1.     Payment of Administrative Claims. .............................................................. 31

     2.     Bar Dates for Administrative Claims. ........................................................... 31

B.     Classified Claims. .................................................................................................... 32

     1.     Designation of Classes. ................................................................................ 32

     2.     Subordination; Reservation of Rights to Reclassify Claims. ......................... 33

     3.     Treatment of Claims. .................................................................................... 33

C.     Confirmation Without Acceptance by All Impaired Classes. .................................... 45

D.     Treatment of Executory Contracts and Unexpired Leases. ....................................... 45

     1.     Assumption. .................................................................................................. 45

     2.     Assumption of Ancillary Agreements. ......................................................... 45

     3.     Approval of Assumptions and Assignments. ................................................ 45

     4.     Payments Related to the Assumption of Executory Contracts and Unexpired Leases. ........................................................................................................ 46

     5.     Contracts and Leases Entered Into After the Petition Date............................ 46

     6.     Rejection of Executory Contracts and Unexpired Leases............................... 46

     7.     Rejection Damages Bar Date......................................................................... 46

     8.     Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. ........................................................................................ 47

     9.     Insurance Policies. ........................................................................................ 47

ARTICLE III CONFIRMATION OF THE PLAN.................................................................................. 47

A.     Conditions Precedent to the Effective Date. ............................................................ 47

B.     Waiver of Conditions to the Effective Date. ............................................................ 48

C.     Effect of Nonoccurrence of Conditions to the Effective Date. ................................. 49

D.     Effect of Confirmation of the Plan. ......................................................................... 49

     1.     Dissolution of Retiree Committee. ............................................................... 49

     2.     Preservation of Rights of Action by the City. ............................................... 49

     3.     Comprehensive Settlement of Claims and Controversies. ............................. 49

     4.     Discharge of Claims. .................................................................................... 50

| | 5. | Injunction. | 50 |
| | 6. | Exculpation. | 51 |
| | 7. | Releases | 52 |
| E. | | No Diminution of State Power | 53 |
| F. | | Effectiveness of the Plan. | 53 |
| G. | | Binding Effect of Plan. | 53 |

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ....... 54

| A. | | DWSD. | 54 |
| | 1. | Rates and Revenues. | 54 |
| | 2. | DWSD CBAs. | 54 |
| | 3. | Potential DWSD Authority Transaction. | 54 |
| B. | | The New B Notes, New C Notes and New LTGO Bonds | 55 |
| C. | | The UTGO Settlement. | 55 |
| D. | | The State Contribution Agreement. | 55 |
| | 1. | State Contribution. | 55 |
| | 2. | Income Stabilization Payments. | 55 |
| | 3. | Conditions to State's Participation. | 56 |
| | 4. | Release of Claims Against the State and State Related Entities. | 56 |
| E. | | The DIA Settlement. | 57 |
| | 1. | Funding Contributions. | 57 |
| | 2. | Transfer of DIA Assets. | 57 |
| | 3. | Conditions to the DIA Funding Parties' Participation. | 57 |
| F. | | Contingent Payment Rights | 58 |
| | 1. | Special Restoration | 58 |
| | 2. | General Restoration | 58 |
| G. | | The OPEB Settlement. | 58 |
| H. | | The LTGO Settlement. | 59 |
| I. | | The Syncora Settlement | 59 |
| J. | | The FGIC/COP Settlement | 59 |
| K. | | Issuance of the New Securities. | 59 |
| L. | | Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents. | 60 |
| M. | | Release of Liens. | 60 |
| N. | | Professional Fees | 61 |
| | 1. | Professional Fee Reserve | 61 |
| | 2. | Fee Review Order | 61 |
| | 3. | Dismissal of the Fee Examiner | 61 |
| | 4. | Potential Review of Fees Not Subject to Fee Review Order | 61 |

|   | 5. | Court-Appointed Expert | 62 |
| O. | | Assumption of Indemnification Obligations. | 62 |
| P. | | Incorporation of Retiree Health Care Settlement Agreement. | 62 |
| Q. | | Payment of Workers' Compensation Claims. | 62 |
| R. | | 36th District Court Settlement. | 62 |
| S. | | Payment of Certain Claims Relating to the Operation of City Motor Vehicles. | 62 |
| T. | | Payment of Tax Refund Claims. | 63 |
| U. | | Utility Deposits. | 63 |
| V. | | Pass-Through Obligations. | 63 |
| W. | | Exit Facility. | 63 |
| X. | | Post-Effective Date Governance. | 63 |

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN ........... 64

| A. | | Appointment of Disbursing Agent. | 64 |
| B. | | Distributions on Account of Allowed Claims. | 64 |
| C. | | Certain Claims to Be Expunged. | 64 |
| D. | | Record Date for Distributions; Exception for Bond Claims. | 64 |
| E. | | Means of Cash Payments. | 64 |
| F. | | Selection of Distribution Dates for Allowed Claims | 65 |
| G. | | Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. | 65 |
| H. | | City's Rights of Setoff Preserved. | 65 |
| I. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 65 |
|   | 1. | Delivery of Distributions Generally. | 65 |
|   | 2. | Delivery of Distributions on Account of Bond Claims. | 65 |
|   | 3. | De Minimis Distributions / No Fractional New Securities. | 66 |
|   | 4. | Undeliverable or Unclaimed Distributions. | 66 |
|   | 5. | Time Bar to Cash Payment Rights. | 66 |
| J. | | Other Provisions Applicable to Distributions in All Classes. | 66 |
|   | 1. | No Postpetition Interest. | 66 |
|   | 2. | Compliance with Tax Requirements. | 66 |
|   | 3. | Allocation of Distributions. | 67 |
|   | 4. | Surrender of Instruments. | 67 |

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ........... 67

| A. | | Treatment of Disputed Claims. | 67 |
|   | 1. | General. | 67 |
|   | 2. | ADR Procedures. | 68 |
|   | 3. | Tort Claims. | 68 |

| | | | |
|---|---|---|---|
| B. | | Disputed Claims Reserve. | 68 |
| C. | | Objections to Claims. | 69 |
| | 1. | Authority to Prosecute, Settle and Compromise. | 69 |
| | 2. | Expungement or Adjustment of Claims Without Objection. | 69 |
| | 3. | Extension of Claims Objection Bar Date. | 69 |
| | 4. | Authority to Amend List of Creditors. | 69 |

**ARTICLE VII RETENTION OF JURISDICTION** ................................................................. 69

**ARTICLE VIII MISCELLANEOUS PROVISIONS** ............................................................ 71

| | | | |
|---|---|---|---|
| A. | | Plan Supplements. | 71 |
| B. | | Modification of the Plan. | 71 |
| C. | | Revocation of the Plan. | 71 |
| D. | | Severability of Plan Provisions. | 71 |
| E. | | Effectuating Documents and Transactions. | 71 |
| F. | | Successors and Assigns. | 72 |
| G. | | Plan Controls. | 72 |
| H. | | Notice of the Effective Date. | 72 |
| I. | | Governing Law. | 72 |
| J. | | Request for Waiver of Automatic Stay of Confirmation Order. | 72 |
| K. | | Term of Existing Injunctions and Stays. | 72 |
| L. | | Service of Documents | 72 |
| | 1. | The City | 73 |
| | 2. | The Retiree Committee | 73 |

# TABLE OF EXHIBITS

| Exhibit I.A.9 | Principal Terms of 36th District Court Settlement |
| Exhibit I.A.66 | Schedule of Class 9 Eligible City Assets |
| Exhibit I.A.88 | Schedule of COP Swap Agreements |
| Exhibit I.A.108 | Form of Detroit General VEBA Trust Agreement |
| Exhibit I.A.112 | Form of Detroit Police and Fire VEBA Trust Agreement |
| Exhibit I.A.126 | Principal Terms of DIA Settlement |
| Exhibit I.A.127 | Form of DIA Settlement Documents |
| Exhibit I.A.132 | Dismissed FGIC/COP Litigation |
| Exhibit I.A.133 | Dismissed Syncora Litigation |
| Exhibit I.A.148 | Schedule of DWSD Bond Documents & Related DWSD Bonds |
| Exhibit I.A.156 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.159 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.183 | Principal Terms of Exit Facility |
| Exhibit I.A.197 | Form of FGIC/COP Settlement Documents |
| Exhibit I.A.198 | Form of FGIC Development Agreement |
| Exhibit I.A.216 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.230 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.237 | Form of LTGO Settlement Agreement |
| Exhibit I.A.246 | Principal Terms of New B Notes |
| Exhibit I.A.247 | Form of New B Notes Documents |
| Exhibit I.A.248 | Principal Terms of New C Notes |
| Exhibit I.A.249 | Form of New C Notes Documents |
| Exhibit I.A.250.a | Form of New GRS Active Pension Plan |
| Exhibit I.A.250.b | Principal Terms of New GRS Active Pension Plan |
| Exhibit I.A.254.a | Form of New PFRS Active Pension Plan |

Exhibit I.A.254.b        Principal Terms of New PFRS Active Pension Plan

Exhibit I.A.280          Prior GRS Pension Plan

Exhibit I.A.281          Prior PFRS Pension Plan

Exhibit I.A.292          Restoration Trust Agreement

Exhibit I.A.298          Retiree Health Care Settlement Agreement

Exhibit I.A.305          Schedule of Secured GO Bond Documents

Exhibit I.A.332          State Contribution Agreement

Exhibit I.A.340          Form of Syncora Development Agreement

Exhibit I.A.344          Form of Syncora Settlement Documents

Exhibit I.A.354          Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds

Exhibit I.A.360          Form of UTGO Settlement Agreement

Exhibit II.B.3.q.ii.A    Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits

Exhibit II.B.3.q.ii.C    Terms of PFRS Pension Restoration

Exhibit II.B.3.r.ii.A    Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits

Exhibit II.B.3.r.ii.C    Terms of GRS Pension Restoration

Exhibit II.D.5           Schedule of Postpetition Collective Bargaining Agreements

Exhibit II.D.6           Executory Contracts and Unexpired Leases to Be Rejected

Exhibit III.D.2          Retained Causes of Action

## INTRODUCTION

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

**A.      Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.      "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.      "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.      "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.      "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.      "2014 DWSD Refinancing Obligations" means, collectively, the (i) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D, (ii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014E, (iii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F, (iv) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014G, (v) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A, (vi) City of Detroit, Michigan, Detroit Water and Sewerage

Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B, (vii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C, and (viii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D.

6.        "2014 Revenue and Revenue Refinancing Bonds" means, collectively, one or more series of Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds.

7.        "2014 Revenue Refinancing Bonds" means, collectively, the Michigan Finance Authority's (i) Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (ii) Local Government Loan Program Revenue Bonds, Series 2014C-5 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iii) Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iv) Local Government Loan Program Revenue Bonds, Series 2014C-7 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (v) Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vi) Local Government Loan Program Revenue Bonds, Series 2014D-2 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vii) Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, and (viii) Local Government Loan Program Revenue Bonds, Series 2014D-4 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds.

8.        "36th District Court" means the district court for the thirty-sixth judicial district of the State.

9.        "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.9.

10.        "Active Employee" means an active employee of the City on and after the Confirmation Date.

11.        "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

12.        "Ad Hoc Committee of DWSD Bondholders" means, collectively, Blackrock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

13.        "Adjusted Pension Amount" means the GRS Adjusted Pension Amount or the PFRS Adjusted Pension Amount, as applicable.

14.        "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days

immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

15.  "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

16.  "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

17.  "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

18.  "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

19.  "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City.  "Allow" and "Allowing" shall have correlative meanings.

20.  "Ambac" means Ambac Assurance Corporation.

21.  "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

22.  "Annuity Savings Fund Excess Amount" means the following:  (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

23.     "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.211, underline(plus) the ASF Recoupment.

24.     "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

25.     "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

26.     "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

27.     "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

28.     "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

29.     "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

30.     "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

31.     "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

32.     "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period plus an interest component of 6.75% if the amount recouped is amortized over time.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

33.     "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

34.     "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

35.     "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

36.     "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.360.

37.     "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

38.     "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

39.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

40.     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

41.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

42.     "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

43.     "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

44.     "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

45.     "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims and the Secured GO Bond Claims.

46.     "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents and the Secured GO Bond Documents.

47.     "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes or the Secured GO Bonds.

48.     "Bondholder" means any beneficial or record holder of a Bond.

49.     "Bond Insurance Policies" means those policies, surety policies or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

50.     "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

51.     "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

52.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

53.     "Cash" means legal tender of the United States of America and equivalents thereof.

54.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or

unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

55.  "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

56.  "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

57.  "City" means the City of Detroit, Michigan.

58.  "City Council" means the duly-elected City Council of the City.

59.  "City Parking Assets" means, collectively, the City's right, title and interest in (a) the Parking Garages, (b) operating revenue received by the City generated by the Parking Garages, (c) revenues collected from fines received by the City related to tickets issued for parking violations (other than any such revenue that would otherwise be paid to the 36th District Court), (d) revenue received by the City generated by parking meters owned by the City and (e) revenue received by the City generated by "boot and tow" operations conducted by the City.

60.  "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

61.  "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

62.  "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the latest of (a) 180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

63.  "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

64.  "Class" means a class of Claims, as described in Section II.B.

65.  "Class 9 Settlement Asset Pool" means (a) either: (i) the New C Notes or (ii) in the event of a disposition or monetization of the City Parking Assets prior to distribution of the New C Notes, the proceeds from such disposition or monetization, in an amount not less than $80 million; and (b) the Class 9 Settlement Credits.

66.  "Class 9 Eligible City Asset" means those assets identified on Exhibit I.A.66.

67.  "Class 9 Settlement Credits" means assignable, transferable settlement credits in the aggregate amount of $25 million that may be applied to offset not more than 50% of the purchase price of a Class 9 Eligible City Asset; provided that, in all cases, to apply a Class 9 Settlement Credit, the owner thereof must (a) be the final party selected in a procurement process or auction conducted by the City and (b) otherwise satisfy all other elements of the procurement or auction process applicable to a particular Class 9 Eligible City Asset (in each of (a) and (b), without regard to such owner's offsetting any portion of the purchase price with such Class 9 Settlement Credit and irrespective of such owner's ability to apply any Class 9 Settlement Credit).

-6-

68.     "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

69.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

70.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

71.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

72.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

73.     "Contract Administration Agreement 2005" means the Contract Administration Agreement dated June 2, 2005, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2005, the COP Contact Administrator and the COP Swap Counterparties.

74.     "Contract Administration Agreement 2006" means the Contract Administration Agreement dated June 12, 2006, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2006, the COP Contact Administrator and the COP Swap Counterparties.

75.     "Contract Administration Agreements" means, together, the Contract Administration Agreement 2005 and the Contract Administration Agreement 2006.

76.     "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

77.     "COP Agent" means a contract administrator, trustee, paying agent or similar Entity, as applicable, under the COP Documents.

78.     "COP Agent Fees" means reasonable, actual and documented fees payable to the COP Agent for services rendered or expenses incurred in accordance with and pursuant to the terms of the COPs Documents.

79.     "COP Claim" means a Claim under or evidenced by the COP Service Contracts.  For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to:  (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

80.     "COP Contract Administrator" means Wilmington Trust, National Association, as successor to U.S. Bank, N.A.

81.     "COP Documents" means, collectively, the COP Service Contracts, the 2005 COPs Agreement, the 2006 COPs Agreement and the Contract Administration Agreements.

82.     "COP Insurance Policies" means those certain polices or other instruments insuring the 2005 COPs issued under the 2005 COPs Agreement and the 2006 COPs issued under the 2006 COPs Agreement, including all ancillary and related documents that may obligate the City to pay any amount to a COP Insurer for any reason.

83.     "COP Insurance Policies Claim" means a Claim held by a COP Insurer arising under or in connection with a COP Insurance Policy.

84.     "COP Insurer" means any party, other than the City, that has issued a COP Insurance Policy.

85.     "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

86.     "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

87.     "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

88.     "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.88, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

89.     "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

90.     "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

91.     "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

92.     "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

93.     "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

94.     "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

95.     "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

96.     "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

97.     "COP Syncora Swap Insurance Policies" shall mean policy numbers CA03049E, CA03049D, CA3049C and CA03049B issued by XL Capital Assurance Inc.

98.     "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

99.     "COP Trustee" means Wilmington Trust, National Association, as Successor Trustee for the Detroit Retirement Systems Funding Trust 2005 and the Detroit Retirement Systems Funding Trust 2006, or any successor thereto.

100.    "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

101.    "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

102.    "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

103.    "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension (including an interest component of 6.75% on the ASF Recoupment portion of the ASF/GRS Reduction if the ASF Recoupment is amortized over time) of a person who was a current retiree as of June 30, 2014.

104.    "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

105.    "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OPEB Claim.

106.    "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

107.    "Detroit General VEBA Beneficiary" means either (a) a Holder of an Allowed OPEB Claim who is a Detroit General Retiree or (b) a retired employee (or surviving beneficiary of a retired employee) of the Detroit Public Library or the Detroit Regional Convention Facility Authority who (i) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (ii) holds a valid claim for OPEB Benefits against the Detroit Public Library or the Detroit Regional Convention Facility Authority.

108.     "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.108.

109.     "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

110.     "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

111.     "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

112.     "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.112.

113.     "Detroit Retirement Systems Funding Trust 2005" means the funding trust established pursuant to the 2005 COPs Agreement.

114.     "Detroit Retirement Systems Funding Trust 2006" means the funding trust established pursuant to the 2006 COPs Agreement.

115.     "Developer" means FGIC or its designee(s) under the FGIC Development Agreement.

116.     "DDA" means the City of Detroit Downtown Development Authority.

117.     "DIA" means The Detroit Institute of Arts, a museum and cultural institution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

118.     "DIA Assets" means the "Museum Assets" as defined in the DIA Settlement Documents.

119.     "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

120.     "DIA Direct Funders" means DIA Corp. and those DIA Funders whose commitments to contribute monies in furtherance of the DIA Settlement are made directly to the CFSEM Supporting Organization.

121.     "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations from which DIA Corp. secures commitments, whether before or after the Effective Date, to contribute monies or otherwise secures contributions of monies in support of DIA Corp.'s payment obligations under the DIA Settlement, whether paid directly to the CFSEM Supporting Organization or to DIA Corp. for the purpose of supporting DIA Corp.'s payments to the CFSEM Supporting Organization.

122.     "DIA Funding Parties" means the Foundations and the DIA Direct Funders.

123.     "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.E.1.

124.     "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

125. "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

126. "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.E and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.126.

127. "DIA Settlement Documents" means the definitive documentation to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.127, which documents substantially conform to the term sheet attached hereto as Exhibit I.A.126.

128. "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

129. "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

130. "Disclosure Statement Order" means the Order Approving the Proposed Disclosure Statement (Docket No. 4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

131. "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

132. "Dismissed FGIC/COP Litigation" means all litigation pending between the City and FGIC (including all appeals) arising out of or related to, and all motions or objections pending in, the Chapter 9 Case, including the litigation set forth on Exhibit I.A.132, which litigation shall be dismissed or withdrawn as set forth in the FGIC/COP Settlement Documents.

133. "Dismissed Syncora Litigation" means all litigation pending between the City and Syncora (including all appeals) arising out of or related to, and all motions or objections pending in, the Chapter 9 Case, including the litigation set forth on Exhibit I.A.133, which litigation shall be dismissed or withdrawn as set forth in the Syncora Settlement Documents.

134. "Disputed Claim" means any Claim that is not Allowed.

135. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

136. "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

137. "Distribution Date" means any date on which a Distribution is made.

138. "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

139. "District Court" means the United States District Court for the Eastern District of Michigan.

140.　　"Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

141.　　"Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

142.　　"Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the DDA, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

143.　　"DRCEA" means the Detroit Retired City Employees Association.

144.　　"DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

145.　　"DWSD Authority" means an authority that may be formed pursuant to a DWSD Authority Transaction to conduct many or all of the operations currently conducted by DWSD as described in Section IV.A.3.

146.　　"DWSD Authority Transaction" means the potential formation (including the potential transfer of certain assets owned by DWSD) and operation of the DWSD Authority, as described in Section IV.A.3.

147.　　"DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

148.　　"DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.148, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

149.　　"DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.148.

150.　　"DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

151.　　"DWSD Exculpated Parties" means, collectively, the DWSD Settlement Parties and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

152.　　"DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

153.　　"DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

154.　　"DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

155.　　"DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

1420

156. "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.156, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

157. "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.156.

158. "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

159. "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.159, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

160. "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.159.

161. "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

162. "DWSD Settlement Date" means the date prior to the Effective Date upon which each of (i) consummation of the purchase of the DWSD Tendered Bonds, (ii) issuance of the 2014 DWSD Refinancing Obligations and (iii) issuance of the 2014 Revenue Refinancing Bonds occurs, which date is identified as September 4, 2014 in the DWSD Tender Invitations (subject to rescheduling to a date earlier or later than that date by the City in its sole discretion).

163. "DWSD Settlement Parties" means, collectively, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc., Berkshire Hathaway Assurance Corp., FGIC (solely in its capacity as a DWSD Bond Insurer), NPFG, the Ad Hoc Committee of DWSD Bondholders and U.S. Bank National Association, as trustee for the DWSD Bonds.

164. "DWSD Tender" means the offers, subject to acceptance at the City's election and in its sole discretion, to purchase for cancellation some or all of the DWSD Bonds that have been tendered and accepted in connection with, and on the terms provided in, the DWSD Tender Invitations.

165. "DWSD Tendered Bonds" means the DWSD Bonds that have been tendered for purchase or cancellation pursuant to the DWSD Tender.

166. "DWSD Tender Invitations" means the invitations and accompanying disclosure statements sent by the City to holders of DWSD Bonds on August 7, 2014, in the form of those collectively attached as Exhibits 8A and 8B to the DWSD Tender Motion.

167. "DWSD Tender Motion" means the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 6644), Filed by the City on August 11, 2014.

168. "DWSD Tender Order" means the Order, Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 7028), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 25, 2014.

169.     "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

170.     "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

171.     "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

172.     "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

173.     "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

174.     "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

175.     "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

176.     "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

177.     "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

178.     "Excess New B Notes" means, collectively:  (a) the Syncora Excess New B Notes and (b) New B Notes in the aggregate face amount of approximately $48.71 million, representing the difference between (i) the New B Notes that would have been distributed to FGIC or the FGIC COP Holders had their respective asserted COP Claims for principal and interest in Class 9 been Allowed in full and (ii) the New B Notes to be provided to FGIC and the FGIC COP Holders as partial consideration pursuant to the terms of the FGIC/COP Settlement.

179.     "Excluded Actions" means (a) any claims with respect to enforcement of the FGIC/COP Settlement Documents or the FGIC Development Agreement, (b) any claims with respect to the New B Notes, the New C Notes or the Class 9 Settlement Credits, (c) any claims held by FGIC against the (i) COP Swap Counterparties or (ii) Related Entities of any of the foregoing, or (d) any claims asserted against the City in the proofs of claim filed by FGIC and the COP Trustee; provided that, with respect to the claims described in clause (d), notwithstanding any other provision of the Plan, such claims shall be subject to the treatment, discharge and injunction provisions set forth herein.

180.     "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors,

attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties, (j) the UTGO Exculpated Parties, (k) the DWSD Exculpated Parties, (l) the RDPMA Exculpated Parties, (m) the Syncora Exculpated Parties, (n) the COP Agent and (o) the FGIC/COP Exculpated Parties. For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

181. "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

182. "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed. The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

183. "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.183.

184. "Exit Facility Agent" means the agent under the Exit Facility.

185. "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

186. "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

187. "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

188. "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

189. "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

190. "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

191. "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order and (b) those additional professionals retained by third parties to provide services in connection with

the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan. For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

192. "Fee Review Professional Fees" means, collectively, (a) the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date and (b) the fees and expenses of the Fee Examiner Parties through the projected date of dismissal of the Fee Examiner pursuant to Section IV.N.3.

193. "FGIC" means Financial Guaranty Insurance Company.

194. "FGIC/COP Exculpated Parties" means (a) FGIC and its Related Entities, (b) the FGIC COP Holders and their respective Related Entities and (c) the COP Agent and its Related Entities, in each case solely in their respective capacities as holders of, insurer of or administrator, trustee, or paying agent with respect to COP Claims.

195. "FGIC COP Holders" means the registered and beneficial holders of COPs originally insured by FGIC.

196. "FGIC/COP Settlement" means the comprehensive settlement with FGIC and the FGIC COP Holders, as described at Section IV.J and as definitively set forth in the FGIC/COP Settlement Documents.

197. "FGIC/COP Settlement Documents" means the definitive documentation to be executed in connection with the FGIC/COP Settlement, in substantially the form attached hereto as Exhibit I.A.197, and in any case in form and substance reasonably acceptable to the City, FGIC and the FGIC COP Holders. Whenever the consent of the FGIC COP Holders is required hereunder, or any document is required to be reasonably satisfactory to the FGIC COP Holders, such consent shall be deemed given and such document shall be deemed reasonably satisfactory unless within the period of time specified for such consent or document (which shall be reasonable under the circumstances and in any event not less than 48 hours after the request for such consent or proposed document shall have been filed with the court) unless beneficial holders of a majority of the COPs originally insured by FGIC shall have objected in writing to the action or document.

198. "FGIC Development Agreement" means that certain development agreement to be entered into by the City and the Developer, in substantially the form attached hereto as Exhibit I.A.198.

199. "FGIC Settlement Consideration" means the share of the Class 9 Settlement Asset Pool and New B Notes to be distributed for the benefit of FGIC and the FGIC COP Holders pursuant to Section II.B.3.p.i.A in respect of COPs originally insured by FGIC.

200. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

201. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

202.    "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

203.    "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, *et seq.*

204.    "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year.  A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

205.    "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.126.

206.    "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

207.    "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

208.    "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

209.    "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

210.    "GRS" means the General Retirement System of the City of Detroit.

211.    "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

212.    "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including,

13-53846-tjt   Doc 8236-6   Filed 11/05/21   Entered 11/05/21 22:54:07   Page 229 of 205

but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

213. "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

214. "Holder" means an Entity holding a Claim. With respect to any COP originally insured by FGIC, "Holder" includes the beneficial holders of any such COP.

215. "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

216. "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.216, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

217. "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.216.

218. "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

219. "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

220. "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

221. "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

222. "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners. The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

223. "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the 36th District Court Settlement.

224. "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification or

payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

225. "Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

226. "Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

227. "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

228. "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

229. "Limited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

230. "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.230, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

231. "Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.230.

232. "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

233. "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries or schedules may be amended, restated, supplemented or otherwise modified.

234. "LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

235. "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

236. "LTGO Insurer" means Ambac, solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

237.     "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.237.

238.     "LTGO Settlement Parties" means (a) the LTGO Insurer and (b) BlackRock Financial Management, on behalf of certain managed funds and accounts set forth in the LTGO Settlement Agreement.

239.     "Macomb County" means the County of Macomb, Michigan.

240.     "Mayor" means the duly-elected mayor of the City.

241.     "MFA" means the Michigan Finance Authority.

242.     "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the MFA in accordance with the UTGO Settlement Agreement and applicable law.

243.     "NPFG" means National Public Finance Guarantee Corporation.

244.     "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

245.     "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction.  In applying this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

246.     "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.246.

247.     "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.247.

248.     "New C Notes" means the unsecured bonds to be issued by the City pursuant to the New C Notes Documents, substantially on the terms set forth on Exhibit I.A.248 and in any case in form and substance reasonably acceptable to the City and Syncora.

249.     "New C Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New C Notes, in substantially the form attached hereto as Exhibit I.A.249 and in any case in form and substance reasonably acceptable to the City and Syncora.

250.     "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, in substantially the form attached hereto as Exhibit I.A.250.a and the material terms of which are attached hereto as Exhibit I.A.250.b.

13-53846-tjt   Doc 8236-6   Filed 11/07/14   Entered 11/07/14 22:54:07   Page 232 of 205

1428

251.	"New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

252.	"New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

253.	"New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

254.	"New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, in substantially the form attached hereto as Exhibit I.A.254.a and the material terms of which are attached hereto as Exhibit I.A.254.b.

255.	"New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final five years of service, as set forth on Exhibit I.A.254.b, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

256.	"New Securities" means, collectively, the New B Notes, the New C Notes, the New LTGO Bonds and the Municipal Obligation.

257.	"Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

258.	"Oakland County" means the County of Oakland, Michigan.

259.	"OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City, the Detroit Public Library or the Detroit Regional Convention Facility Authority and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan, the Employees Death Benefit Plan or any comparable plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

260.	"OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

261.	"Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim or a Secured GO Bond Claim.

262.	"Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim or a

Subordinated Claim.  For the avoidance of doubt, Section 1983 Claims and Indirect Employee Indemnity Claims are included within the definition of Other Unsecured Claim.

263.     "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

264.     "Parking Garages" means, collectively, parking garages owned by the City other than (a) that certain underground parking garage, commonly known as the "Grand Circus Parking Garage," located at 1600-01 Woodward Avenue, Detroit, Michigan, (b) that certain underground parking garage, commonly known as the "Cultural Center Garage," located at 41 Farnsworth Street, Detroit, Michigan and (c) that certain multi-story parking structure near the Riverfront Arena with an address of 900 W. Jefferson Avenue, Detroit, Michigan having a capacity of approximately 3,200 car spaces commonly known as "Joe Louis Arena Garage."  For the avoidance of doubt, (a) that certain parking lot located at 5200 Woodward Avenue, Detroit, Michigan and (b) that certain parking lot, commonly known as the "Frederick Lot," located at 318 Frederick Street, Detroit, Michigan, shall not be considered Parking Garages.

265.     "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

266.     "Pass-Through Recipients" means, collectively, the (a) DDA, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

267.     "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

268.     "Petition Date" means July 18, 2013.

269.     "PFRS" means the Police and Fire Retirement System of the City of Detroit.

270.     "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

271.     "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not

limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

272.  "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

273.  "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

274.  "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.p.i.A.

275.  "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order.

276.  "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement or Ordinance No. 05-09 of the City.

277.  "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

278.  "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

279.  "Postpetition Financing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

280.  "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.280.

281.  "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.281.

282.  "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

283.  "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.N.1.

284.     "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

285.     "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

286.     "RDPMA" means the Retired Detroit Police Members Association.

287.     "RDPMA Exculpated Parties" means the RDPMA and its board of trustees/directors, attorneys, advisors and professionals, solely in their capacity as such.

288.     "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.  "Reinstate" and "Reinstatement" shall have correlative meanings.

289.     "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

290.     "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the Foundations, DIA Corp., the DIA Funders and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

291.     "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

292.     "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.292.

293.     "Restructured UTGO Bonds" means the bonds to be issued by the MFA to the current Holders of Unlimited Tax General Obligation Bond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the MFA and shall be secured as more particularly described in the UTGO Settlement Agreement.

294.     "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

295.    "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

296.    "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

297.    "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

298.    "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.298.

299.    "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

300.    "Retirement Systems" means, collectively, the GRS and the PFRS.

301.    "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

302.    "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

303.    "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

304.    "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

305.    "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

306.    "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

307.    "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

308. "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

309. "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

310. "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

311. "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

312. "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

313. "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

314. "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

315. "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

316. "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

317. "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

318. "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

319. "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

320. "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

321.     "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

322.     "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

323.     "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

324.     "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

325.     "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

326.     "Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.9.

327.     "Settling COP Claimant" means (a) those holders of COP Claims that are the subject of the Syncora Settlement Documents or (b) those Holders of COP Claims that are the subject of the FGIC/COP Settlement Documents.

328.     "Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

329.     "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.F.

330.     "State" means the state of Michigan.

331.     "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement.

332.     "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.D, in substantially the form attached hereto as Exhibit I.A.332.

333.     "State Related Entities" means, collectively:  (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

334.     "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and

Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

335.    "Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

336.    "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

337.    "Supplemental Trust Agreements" means, collectively, (a) one or more supplemental trust agreements between the COP Trustee and COP Service Corporations, entered into with the consent of FGIC and (b) one or more supplemental trust agreements between the COP Trustee and COP Service Corporations, entered into with the consent of Syncora, in each case to be executed prior to the Effective Date, which agreements shall, among other things, for purposes of distributions of trust assets explicitly supersede the 2005 COPs Agreement and the 2006 COPs Agreement, which incorporates by reference Sections 6.5 and 9.1 of each Contract Administration Agreement and Section 8.03 of each COP Service Contract.

338.    "Swap Insurance Policies" means those policies or other instruments insuring the COP Swap Agreements and obligations related thereto.

339.    "Syncora" means, collectively, Syncora Guarantee, Inc. and Syncora Capital Assurance Inc.

340.    "Syncora Development Agreement" means that certain development agreement by and between the City and Pike Point Holdings, LLC, a wholly owned indirect subsidiary of Syncora, in substantially the form attached hereto as Exhibit I.A.340, including all exhibits thereto, and in any case in form and substance reasonably acceptable to the City and Syncora.

341.    "Syncora Excess New B Notes" means New B Notes in the aggregate face amount of approximately $15.43 million, representing the difference between (a) the New B Notes that would have been distributed to Syncora had its asserted COP Claim for principal and interest in Class 9 been Allowed in full and (b) the New B Notes to be provided to Syncora as partial consideration pursuant to the terms of the Syncora Settlement.

342.    "Syncora Exculpated Parties" means Syncora and their Related Entities, solely with respect to issues arising in connection with Syncora's capacity as holder or insurer of Unlimited Tax General Obligation Bond Claims and COP Claims.

343.    "Syncora Settlement" means the comprehensive settlement with Syncora, as described at Section IV.I and as definitively set forth in the Syncora Settlement Documents.

344.    "Syncora Settlement Documents" means the definitive documentation to be executed in connection with the Syncora Settlement, in substantially the form attached hereto as Exhibit I.A.344, and in any case in form and substance reasonably acceptable to the City and Syncora.

345.    "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

1436

346. "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of: (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

347. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

348. "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration pursuant to the Plan of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class. For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

349. "Tunnel Lease" means, collectively, (a) that certain Tube Lease, dated March 20, 1978, by and between the City, as landlord, and Detroit Windsor Tunnel LLC, as successor-in-interest to Detroit & Canada Tunnel Corporation, as tenant, and (b) that certain Sublease, dated March 20, 1978, by and between the City, as landlord, as successor-in-interest to Ford Motor Properties, Inc. as sublandlord, and Detroit Windsor Tunnel LLC, as successor-in-interest to Detroit & Canada Tunnel Corporation, as subtenant, each as may be amended, restated, supplemented or otherwise modified, in any case in form and substance reasonably acceptable to the City and Syncora.

350. "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

351. "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

352. "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

353. "Unlimited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

354. "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.354, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

355. "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.354.

356. "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

357. "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

358. "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents,

1437

attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

359. "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

360. "UTGO Settlement Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.360.

361. "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

362. "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

363. "Wayne County" means the Charter County of Wayne, Michigan.

**B.      Rules of Interpretation and Computation of Time.**

**1.      Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

**2.      Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

<div align="center">

**ARTICLE II**
**CLASSIFICATION OF CLAIMS; CRAMDOWN;**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</div>

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different

Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

A.    **Unclassified Claims.**

       1.    **Payment of Administrative Claims.**

              a.    **Administrative Claims in General.**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.  No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

              b.    **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

       2.    **Bar Dates for Administrative Claims.**

              a.    **General Bar Date Provisions.**

Except as otherwise provided in Section II.A.2.b, Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.  The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

              b.    **Ordinary Course Claims**

Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

### c. Claims Under the Postpetition Financing Agreement.

Holders of Administrative Claims that are Postpetition Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

### d. No Modification of Bar Date Order.

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

## B. Classified Claims.

### 1. Designation of Classes.

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| | **Secured Claims** | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.148) | Unimpaired |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.156) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.159) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Claims Previously Classified in Class 6 Paid in Full | N/A |
| | **Unsecured Claims** | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |

| CLASS | NAME | IMPAIRMENT |
|-------|------|-----------|
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

     **2.**      **Subordination; Reservation of Rights to Reclassify Claims.**

     Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a Holder of a Claim to enforce a subordination agreement against any Entity other than the City to the same extent that such agreement is enforceable under applicable nonbankruptcy law. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to reclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

     **3.**      **Treatment of Claims.**

          **a.**      **Class 1A – DWSD Bond Claims.**

               **i.**      **Classification and Allowance.**

     DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.148, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.148.

               **ii.**      **Treatment.**

     Each Holder of an Allowed DWSD Bond Claim shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. All votes and elections previously delivered in Class 1A shall not be counted and shall be of no force and effect. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents arising in connection with such Allowed DWSD Bond Claims shall be paid in full in Cash once Allowed pursuant to the DWSD Tender Order, by agreement of the parties or by order of the Bankruptcy Court. In addition, all claims for fees, costs and expenses authorized pursuant to or in accordance with the DWSD Tender Order shall be paid as provided therein.

b. **Class 1B – DWSD Revolving Sewer Bond Claims.**

i. **Classification and Allowance.**

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.156, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.156.

ii. **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

c. **Class 1C – DWSD Revolving Water Bond Claims**

i. **Classification and Allowance.**

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.159, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.159.

ii. **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

d. **Class 2A – Secured GO Series 2010 Claims.**

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

e. **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

f. **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

g. **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim

shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### h.    Class 2E - Secured GO Series 2012(B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### i.    Class 2F – Secured GO Series 2012(B2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### j.    Class 3 – Other Secured Claims.

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### k.    Class 4 – HUD Installment Note Claims.

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### l.    Class 5 – COP Swap Claims.

#### i.    Allowance.

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

#### ii.    Treatment.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (A) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

m.      **Class 6.**

[Claims previously classified in Class 6 paid in full – Paragraph intentionally left blank]

n.      **Class 7 – Limited Tax General Obligation Bond Claims.**

    i.      **Allowance.**

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,544,770.

    ii.      **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, (X) a Pro Rata share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions in accordance with Section II.B.3.p.i.A.

The City will use its best efforts to prepay the New LTGO Bonds on the Effective Date or as soon as reasonably practicable thereafter from the proceeds of the Exit Facility.  If the City cannot prepay all of the New LTGO Bonds on the Effective Date or as soon as reasonably practicable thereafter, the City will use its best efforts to prepay as much of the New LTGO Bonds as reasonably possible, and the LTGO Settlement Parties will accept such partial prepayment.  Upon a partial prepayment of the New LTGO Bonds, such New LTGO Bonds will be redeemed by lot.

    iii.      **Impact of UTGO Settlement.**

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

o.      **Class 8 – Unlimited Tax General Obligation Bond Claims.**

    i.      **Allowance.**

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

    ii.      **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement.  Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the Stub UTGO Bonds, subject to Sections I.A.36 and IV.C, which Stub UTGO Bonds shall be reinstated.

1444

p. **Class 9 – COP Claims.**

   i. **Treatment.**

      A. **Plan COP Settlement Option.**

On the Effective Date, the City shall deliver to the COP Trustee, solely for the benefit of, and for distribution to, the COP Insurers and the Settling COPs Claimants in accordance with (1) the Supplemental Trust Agreements and (2) the instructions of the applicable COP Insurer, (x) the Class 9 Settlement Asset Pool and (y) New B Notes in the face amount of $97,692,787, based upon each Settling COP Claimant's Pro Rata share calculated as an amount equal to the proportion that the unpaid principal amount plus accrued prepetition interest of COPs held by such Settling COP Claimant bears to the aggregate unpaid principal amount of all COPs plus all accrued prepetition interest thereon; provided, that the allocation of distributions among FGIC COP Holders shall be determined in accordance with agreements among FGIC and the FGIC COP Holders disclosed in a term sheet filed in court on October 22, 2014, as the same may be subsequently amended and more fully documented. For the avoidance of doubt, a Settling COP Claimant shall not be required to transfer (1) any claim against a COP Insurer or (2) the COPs it holds to the City pursuant to the Plan COP Settlement or otherwise pursuant to the Plan, the Syncora Settlement Documents or the FGIC/COP Settlement Documents. The COP Service Corporations shall enter into such Supplemental Trust Agreements as FGIC and Syncora may reasonably request with respect to their respective insured COPs as long as such Supplemental Trust Agreements do not impose any additional obligations or liability on the COP Service Corporations.

The City has granted the LTGO Settlement Parties, on behalf of the holders of Allowed Limited Tax General Obligation Bond Claims in Class 7, and the Retiree Committee consent rights regarding pre-Effective Date settlements of the COP Litigation if and as permitted under applicable non-bankruptcy law. The LTGO Settlement Parties have consented to the Syncora Settlement and FGIC/COP Settlement. On the Effective Date, on account of such consent rights, the Excess New B Notes shall be distributed as follows: (1) approximately $42.68 million to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; (2) approximately $17.34 million to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7; and (3) approximately $4.12 million to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14. With respect to the distribution of the Syncora Excess New B Notes, on April 1, 2015, the City shall pay the interest then due on the Syncora Excess New B Notes and shall also prepay the October 1, 2015 interest payment on the Syncora Excess New B Notes (as a consequence of which, no interest payment shall be made on the Syncora Excess New B Notes on October 1, 2015). The VEBAs may not sell or otherwise transfer their right, title or interest in the Syncora Excess New B Notes prior to October 2, 2015.

As part of the Plan COP Settlement, on or as soon as reasonably practicable after the Effective Date, Syncora shall cause to be paid $500,126.94 in cash to the COP Agent on account of COP Agent Fees. As part of the Plan COP Settlement, FGIC shall cause to be paid to the COP Agent 75.945% of the reasonable COP Agent Fees in cash out of the first proceeds of the distributions to or for the benefit of the FGIC COP Holders.

Nothing in this Section II.B.3.p.i.A shall, or shall be asserted or construed to, affect or prejudice any rights, claims or defenses between the COP Swap Counterparties on the one hand and any Settling COP Claimant (including Syncora, FGIC and the FGIC COP Holders) on the other hand.

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Settling COP Claimant shall, to the fullest extent permitted under law, be deemed to forever release, waive and discharge all Liabilities relating to COP Documents such Settling COP Claimant has, had or may have against the (1) GRS, (2) PFRS or (3) Related Entities of either GRS or PFRS. At the direction of FGIC, which shall be deemed given on the Effective Date, the COP Contract Administrator shall have irrevocably agreed (on behalf of itself, any successors and each FGIC COP Holder) to release and not to sue any COP Holder or any COP Insurer on behalf of any FGIC COP Holder, COP Insurer, the Detroit Retirement Systems Funding Trust 2005 or the Detroit Retirement

Systems Funding Trust 2006 in connection with any liability arising in connection with or related to (1) Sections 6.5 and 9.1 of the Contract Administration Agreements, (2) Section 8.03 of the COP Service Contracts, (3) distributions made pursuant to or in connection with this Section II.B.3.p.i.A, (4) the FGIC Settlement or (5) the Syncora Settlement. On the Effective Date, Syncora and FGIC shall, to the fullest extent permitted under law, be deemed to forever mutually release, waive and discharge all liabilities against each other relating to distributions made pursuant to or in connection with this Section II.B.3.p.i.A, Sections 6.5 and 9.1 of the Contract Administration Agreements or Section 8.03 of the COP Service Contracts.

### ii. Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### q. Class 10 – PFRS Pension Claims.

### i. Allowance.

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

### ii. Treatment.

#### A. Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

#### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

#### C. Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in

the State Contribution Agreement.  In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D.    Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

### E.    Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

### F.    Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement.  The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.  The initial independent members of the Investment Committee established by PFRS shall be (1) Woodrow S. Tyler, (2) McCullough Williams III, (3) Robert C. Smith, (4) Joseph Bogdahn and (5) Rebecca Sorenson.

### G.    No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### H.    State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms:  (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r.    Class 11 – GRS Pension Claims.

#### i.    Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

### ii. Treatment.

#### A. Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain pension related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments, the Detroit Public Library and the Detroit Regional Convention Facility Authority. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

#### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

#### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

#### D. Annuity Savings Fund Recoupment.

##### 1. ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

## 2. ASF Distribution Recipients.

### i. Monthly Deduction.

For each ASF Distribution Recipient who does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated and converted into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension check exceed the ASF Recoupment Cap or the Current GRS Retiree Adjustment Cap, if applicable. The total ASF Recoupment from the ASF Distribution Recipient's monthly pension checks over time shall not exceed the amount necessary to amortize the applicable Annuity Savings Fund Excess Amount at 6.75% interest.

### ii. Single Lump Sum Payment.

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

### E. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

### F. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

1449

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date. The initial independent members of the Investment Committee established by GRS shall be (1) Kerrie VandenBosch, (2) Doris Ewing, (3) Robert Rietz, (4) David Sowerby and (5) Ken Whipple.

### H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### I. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s. Class 12 – OPEB Claims.

#### i. Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii. Treatment.

##### A. Detroit General VEBA.

Establishment of Detroit General VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents. The Detroit General VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries. The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.108. With respect to the initial appointment of the board of trustees, the Mayor will appoint one member, and the DRCEA and the Retiree Committee will each appoint three board members. The DRCEA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the DRCEA, and the Mayor will fill a board member vacancy created by the departure of the member appointed by the Mayor. The initial members of the Detroit General VEBA board of trustees shall be (1) Floyd Allen, (2) Roger Cheek, (3) Suzanne Daniels Paranjpe, (4) Doris Ewing,

(5) Barbara Wise-Johnson, (6) Shirley Lightsey and (7) Thomas Sheehan. Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA: On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries. The Detroit General VEBA shall also be entitled to additional distributions as set forth in Section II.B.3.p.i.A.

### B. Detroit Police and Fire VEBA.

Establishment of Detroit Police and Fire VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents. The Detroit Police and Fire VEBA will be governed by a seven member board of trustees and, for the first four years, one additional non-voting, ex-officio member. The board of trustees will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.112. With respect to the initial appointment of the board of trustees, the Mayor will appoint one member, and the RDPFFA and the Retiree Committee will each appoint three board members. The RDPMA will appoint the non-voting, ex-officio member. The RDPFFA will fill board member vacancies created by the departure of voting members initially appointed by the Retiree Committee or the RDPFFA, and the Mayor will fill a board member vacancy created by the departure of the member appointed by the Mayor. The RDPMA will fill a non-voting, ex-officio board member vacancy created by the departure of the member initially appointed by the RDPMA, but such non-voting, ex-officio member position shall expire on December 31, 2018. The initial members of the Detroit Police and Fire VEBA board of trustees shall be (1) Floyd Allen, (2) Gregory Best, (3) John Clark, (4) Andrew Dillon, (5) Allan Grant, (6) Thomas Sheehan, (7) Greg Trozak and (8) Shirley Berger (*ex officio*). Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to additional distributions as set forth in Section II.B.3.p.i.A.

### C. No Further Responsibility.

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen for former employees, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary who is a former employee. Existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

Retirees (and active employees that retire prior to December 31, 2014) of the Detroit Public Library and the Detroit Regional Convention Facility Authority are Detroit General VEBA Beneficiaries and will receive the treatment set forth above. However, the collective bargaining and other legal rights and obligations of the Detroit Public Library and the Detroit Regional Convention Facility Authority, on one hand, and their respective unions and former and current employees, on the other hand, are not affected by the Plan. These parties retain the

right to negotiate further or additional benefits; provided, however, that the City shall not be responsible for, or have any obligation with respect to, any such further or additional benefits or the administration thereof. In addition, in consideration of the eligible retirees of the Detroit Public Library and the Detroit Regional Convention Facility Authority participating in the Detroit General VEBA, the Detroit Public Library and the Detroit Regional Convention Facility Authority shall reimburse the City for their allocable share of the New B Note debt service related to the Detroit General VEBA.

t.      **Class 13 – Downtown Development Authority Claims.**

i.      **Allowance.**

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

ii.     **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of approximately $3.69 million in New B Notes.

u.      **Class 14 – Other Unsecured Claims.**

i.      **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive (A) on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of approximately $16.48 million in New B Notes and (B) distributions in accordance with Section II.B.3.p.i.A.

v.      **Class 15 – Convenience Claims.**

i.      **Treatment.**

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.76) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

w.      **Class 16 – Subordinated Claims.**

i.      **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

x.      **Class 17 – Indirect 36th District Court Claims.**

i.      **Treatment.**

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive: (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th

District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

### ii. Further Obligation of City, State and 36th District Court.

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims. Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

## C. Confirmation Without Acceptance by All Impaired Classes.

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan shall constitute a motion for such relief.

## D. Treatment of Executory Contracts and Unexpired Leases.

### 1. Assumption.

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, the City shall assume the Tunnel Lease pursuant to this Section II.D.1.

### 2. Assumption of Ancillary Agreements.

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

### 3. Approval of Assumptions and Assignments.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to

13-53846-tjt   Doc 8272-6   Filed 11/05/21   Entered 11/05/21 22:54:07   Page 257 of 205

the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5.      **Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6.      **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7.      **Rejection Damages Bar Date.**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

8. **Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.**

Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

9. **Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

# ARTICLE III
# CONFIRMATION OF THE PLAN

A. **Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2. The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3. The Confirmation Order shall not be stayed in any respect.

4. The Confirmation Order shall contain (a) a finding that the FGIC Settlement Consideration and the FGIC Development Agreement are solely for the benefit of FGIC and the FGIC COP Holders (subject to any provision set forth herein for payment of COP Agent Fees), and (b) an ordered provision that such consideration be administered and distributed to FGIC and the FGIC COP Holders in a manner consistent therewith and with the Plan.

5. The Confirmation Order shall contain (a) a finding that the Syncora Development Agreement is solely for the benefit of Syncora (subject to any provision set forth herein for payment of COP Agent Fees), and (b) an ordered provision that such consideration be administered and distributed to Syncora in a manner consistent therewith and with the Plan.

6. All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

7.      All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the LTGO Settlement Agreement.

8.      Any legislation that must be passed by the State legislature to effect any term of the Plan shall have been enacted.

9.      The MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

10.     The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

11.     The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.B.

12.     If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

13.     The Syncora Settlement and the Syncora Settlement Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and Syncora, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

14.     The Syncora Development Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and Syncora, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

15.     The FGIC/COP Settlement Documents and the FGIC Development Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and FGIC, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

16.     The New York State Department of Financial Services shall have waived in writing the notice requirement under FGIC's plan of rehabilitation with respect to the settlement contemplated by the FGIC/COP Settlement Documents and the FGIC Development Agreement in form and substance reasonably acceptable to FGIC, and such waiver shall not have been vacated or otherwise modified.

17.     The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B.      Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in (1) Section III.A.9 and Section III.A.10, which conditions cannot be waived, (2) Sections III.A.5, III.A.13 and III.A.14, which may only be waived by the City with the prior written consent of Syncora, (3) Sections III.A.4 and III.A.15, which may only be waived by the City with the prior written consent of FGIC and (4) Section III.A.16, which may be waived by the City at any time on or after November 4, 2014 at 5:00 p.m. (Eastern Time) with the prior written consent of FGIC.

**C.     Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

**D.     Effect of Confirmation of the Plan.**

**1.     Dissolution of Retiree Committee.**

On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case.

**2.     Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court.  A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2.  The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

**3.     Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable.  For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

1457

4. **Discharge of Claims.**

a. **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

b. **Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; <u>provided</u> that such discharge will not apply to (i) debts specifically exempted from discharge under the Plan; and (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

5. **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

a. **all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

1. **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims);**

2. **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

3. **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

4. **asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;**

5. **proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

-50-

6. taking any actions to interfere with the implementation or consummation of the Plan.

b. All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

6. **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; underline provided that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the Syncora Exculpated Parties solely in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in connection with the FGIC/COP Settlement Documents and any actions or litigation positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the RDPMA Exculpated Parties and the COP Agent, solely in its capacity as such and solely in connection with any Distributions made pursuant to the terms of the Plan; provided, further, that the foregoing provisions in this Section III.D.6 shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan. This Section III.D.6 shall not affect any liability of (a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or FGIC or (b) the Syncora Exculpated Parties or FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties.

7. **Releases.**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

a. each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i. all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); provided further, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii. all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

b.   if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds. For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

**E.      No Diminution of State Power.**

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

**F.      Effectiveness of the Plan.**

The Plan shall become effective on the Effective Date. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**G.      Binding Effect of Plan.**

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan. The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the

compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.   **DWSD.**

    1.   **Rates and Revenues.**

        DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues. Rates will be determined by the Board of Water Commissioners or, if a DWSD Authority is formed and approved by the incorporating units' governing bodies, by the board of any such DWSD Authority. The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

    2.   **DWSD CBAs.**

        Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

    3.   **Potential DWSD Authority Transaction.**

        As a result of mediation or otherwise, it is possible that the City may enter into a DWSD Authority Transaction that includes the formation of the DWSD Authority to conduct many or all of the operations currently conducted by DWSD. Any such transaction would be subject to the approval of incorporating units and numerous other conditions. The timing of any such transaction, if it occurs at all, is not known. If any such transaction could occur, unless waived by the City in its sole discretion, the City will enter into such transaction only if Macomb County, Oakland County and Wayne County, and each of their municipal affiliates or related public corporations, withdraw with prejudice or shall have withdrawn with prejudice their objections to the Confirmation of the Plan. Any DWSD Authority Transaction shall be on terms that are consistent with all other provisions of the Plan, applicable law and orders of the Bankruptcy Court. The City shall not enter into any binding agreement with respect to or consummate any DWSD Authority Transaction prior to the Effective Date without first obtaining an order of the Bankruptcy Court approving and authorizing such DWSD Authority Transaction.

        All terms and conditions in respect of any DWSD Authority Transaction set forth in (a) any DWSD Bond Document or (b) any transaction document in respect of such a DWSD Authority Transaction shall in any case include: (i) no material modifications to the source of payment and security for any DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (ii) an opinion of tax counsel that such transfer shall have no material adverse effect on the tax exempt status of the interest on the DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (iii) that the City could issue at least $1 of additional new money DWSD Bonds in compliance with the additional bonds test set forth in the applicable DWSD Bond Documents; and (iv) ratings confirmation of any rating agency then rating the DWSD Bonds and 2014 Revenue and Revenue Refinancing Bonds. A DWSD Authority Transaction shall not affect, impair, modify or otherwise alter the rights of any party under the DWSD Tender Order, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the 2014 DWSD Refinancing Obligations, the 2014 Revenue and Revenue Refinancing Bonds or the 2014 Revenue Refinancing Bonds or any Bond Insurance Policy related to or issued in connection with any of the foregoing.

**B.        The New B Notes, New C Notes and New LTGO Bonds.**

On or before the Effective Date, the City shall (a) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.246, and distribute the New B Notes as set forth in the Plan; (b) execute the New C Notes Documents, issue the New C Notes, substantially on the terms set forth on Exhibit I.A.248 (and in any case in form and substance reasonably acceptable to the City and Syncora), and distribute the New C Notes as set forth in the Plan; and (c) execute the New LTGO Bond Documents, issue the New LTGO Bonds, substantially on the terms set forth on Exhibit I.A.237, and distribute the New LTGO Bonds as set forth in the Plan.

**C.        The UTGO Settlement.**

On the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement Agreement, a copy of which is attached hereto as Exhibit I.A.360. The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things:  (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the MFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (5) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

**D.        The State Contribution Agreement.**

Prior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.332.

**1.        State Contribution.**

The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

**2.        Income Stabilization Payments.**

The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State. Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus. The

-55-

Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner. In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System. In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

3.      **Conditions to State's Participation.**

The payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following: (a) the Confirmation Order becoming a Final Order no later than December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and (ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than April 1, 2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 or (ii) seeking to enforce Article IX, Section 24 of the Michigan Constitution; (g) evidence satisfactory to the State of an irrevocable commitment by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents) to fund $366 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1; and (h) evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to fund $100 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1.

The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

4.      **Release of Claims Against the State and State Related Entities.**

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

E.    **The DIA Settlement.**

On the Effective Date, the City and the DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties that are such as of the Effective Date have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State.  The DIA Settlement Documents attached hereto as Exhibit I.A.127 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.126. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

1.    **Funding Contributions.**

The DIA Settlement will be funded as follows:  (a) irrevocable commitments in an aggregate amount of at least $366 million by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents); and (b) in addition to its continuing commitments outside of the DIA Settlement, irrevocable commitments in an aggregate amount of $100 million from the DIA Direct Funders (including the commitment of the Special Foundation Funders, as that term is defined in the DIA Settlement Documents, and subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents.  The foregoing commitments shall be funded over the course of the 20 year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to the "Agreed Required Minimum Schedule" and subject to the option at any time for the "Present Value Discount," as set forth in the DIA Settlement Documents.  Amounts committed by the Foundations and the DIA Direct Funders will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

2.    **Transfer of DIA Assets.**

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

3.    **Conditions to the DIA Funding Parties' Participation.**

The DIA Funding Parties' participation in the DIA Settlement is conditioned upon, among other things, the following:  (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.E.2; (e) approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described in Exhibit I.A.126; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities' obligations under such agreements to pay millage proceeds to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution; and (k) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

**F.      Contingent Payment Rights.**

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust.  The City shall issue the DWSD CVR to the Restoration Trust.  If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire.  The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities:  (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS.  If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made.  The DWSD CVR may not be transferred.

**1.      Special Restoration.**

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration.  In such case, the City will perform a Value Determination and arrive at the Discounted Value.  The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable.  In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.  In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored.  In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate.  In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction.  Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

**2.      General Restoration.**

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

**G.      The OPEB Settlement.**

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the terms of which settlement are reflected in the Plan.  The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

1466

**H.     The LTGO Settlement.**

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan.  Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement.  In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement.  The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

**I.     The Syncora Settlement.**

The City and Syncora have reached a settlement effecting a global resolution of all matters and litigation between the parties related to the Chapter 9 Case, as set forth in the Syncora Settlement Documents (the terms of which qualify and control over any description of the Syncora Settlement contained herein).  Pursuant to the Syncora Settlement, and in accordance with the Plan, among other things:  (1) the City shall, pursuant to Section II.D.1, assume the Tunnel Lease; (2) the parties shall enter into the Syncora Development Agreement; (3) the parties shall dismiss or withdraw the Dismissed Syncora Litigation as set forth in the Syncora Settlement Agreement; (4) any vote cast by Syncora to reject the Plan shall be deemed a vote to accept the Plan; (5) Syncora shall support Confirmation; and (6) on the Effective Date or as soon thereafter as practical, the City shall pay the sum of $5 million in full satisfaction of all of Claims filed or asserted against the City by Syncora relating to the COP Swap Agreements and any agreements related thereto, including the COP Syncora Swap Insurance Policies and the COP Swap Collateral Agreement.  The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving and authorizing the parties to enter into, (1) the Syncora Settlement pursuant to Bankruptcy Rule 9019 and (2) the related Syncora Development Agreement (including the garage option) and the Tunnel Lease.  The City shall not amend the Plan in any way that adversely affects Syncora without Syncora's prior written consent.

**J.     The FGIC/COP Settlement.**

The City and FGIC have reached a settlement effecting a global resolution of all matters and litigation between the parties related to the Chapter 9 Case, as set forth in the FGIC/COP Settlement Documents (the terms of which qualify and control over any description of the FGIC/COP Settlement contained herein).  Pursuant to the FGIC/COP Settlement, and in accordance with the Plan, among other things:  (1) the City and the Developer, for the benefit of FGIC and the FGIC COP Holders, shall enter into the FGIC Development Agreement; (2) FGIC shall, on behalf of the FGIC COP Holders, become a Settling COP Claimant with respect to all COPs and COP Claims associated with COPs originally insured by FGIC; (3) the parties shall dismiss or withdraw the Dismissed FGIC/COP Litigation as set forth in the FGIC/COP Settlement Documents; (4) except for Excluded Actions, FGIC shall waive any claims it may have against any other party related to the Dismissed FGIC/COP Litigation as set forth in the FGIC/COP Settlement Documents; (5) any vote cast by FGIC to reject the Plan shall be deemed a vote to accept the Plan; and (6) in full satisfaction and discharge of FGIC's claims against the City related to FGIC's Swap Insurance Policies, (a) FGIC shall receive an Allowed Class 14 Claim in the amount of $6.15 million, entitling FGIC to receive the Distributions provided pursuant to Section II.B.3.u.i and (b) the DDA shall assign to FGIC all of its right, title and interest to the New B Notes to be distributed to the DDA pursuant to Section II.B.3.t.ii.  The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving and authorizing the parties to enter into, (1) the FGIC/COP Settlement pursuant to Bankruptcy Rule 9019 and (2) the related FGIC Development Agreement.  The City shall not amend the Plan in any way that adversely affects FGIC without FGIC's prior written consent.

**K.     Issuance of the New Securities.**

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-

bankruptcy law, the issuance of New Securities as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. The New Securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the City or applicable issuer as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

**L.      Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents.**

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts pursuant to Section II.D), on the Effective Date, the Bonds, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the parties to the City, as applicable, under the Bonds, the Bond Documents, the COPs and the COP Documents shall be discharged; provided, however, that the Bonds, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution, (iii) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City, (iv) as may be necessary to preserve any claim by (1) a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer, (2) a COPs Holder or COP Agent under a COP Insurance Policy or against any COP Insurer or (3) a COP Swap Counterparty under a Swap Insurance Policy or against any insurer thereunder and (v) with respect to any obligation of any party (other than the City, except to the extent provided in the COP Swap Settlement or the COP Swap Settlement Approval Order) under any COP Document related to such party's obligations owed in respect of the COP Swap Documents or the COP Swap Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan (or the COP Swap Settlement or the COP Swap Settlement Approval Order), such Bonds, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers, (b) COPs Holders or COP Agent with respect to claims under COP Insurance Policies and obligations related thereto or (c) COP Swap Counterparties with respect to claims under Swap Insurance Policies and obligations related thereto. For the avoidance of doubt, except for the immediately preceding sentence, this Section IV.L shall not apply to any Bonds that are Reinstated pursuant to Section II.B.3.a.ii. As of the Effective Date, the principal amounts of the COPs originally insured by FGIC shall be deemed accelerated and due and payable, and no interest on the COPs originally insured by FGIC shall accrue thereafter, solely for the purposes of determining distributions from the COP Trustee to holders of COPs originally insured by FGIC. The foregoing acceleration of principal and cessation of interest shall affect only the rights of each holder of COPs originally insured by FGIC to the receipt of proceeds of distributions under the Plan and not the rights of each such COPs holder against FGIC or shall not in any way modify payments currently required of FGIC under its existing insurance policies or FGIC's Plan of Rehabilitation.

**M.      Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of

creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.M.

**N.     Professional Fees.**

**1.     Professional Fee Reserve.**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds.  The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals and the Fee Examiner Parties as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks); (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve; and (c) an estimate of the Fee Examiner Parties' unbilled fees and expenses through the projected date of dismissal of the Fee Examiner under Section IV.N.3, as determined by the City in consultation with the Fee Examiner.  The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties.  Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund or the DWSD's funds, as applicable.  If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

**2.     Fee Review Order.**

The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order.  For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

**3.     Dismissal of the Fee Examiner.**

Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder.  The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

**4.     Potential Review of Fees Not Subject to Fee Review Order.**

The City shall have the right to bring before the Bankruptcy Court a request to review and determine the reasonableness of the fees and expenses of any Fee Review Professional retained by a creditor of the City or any of its departments to the extent that such fees and expenses have not been either (a) approved pursuant to or in accordance with the DWSD Tender Order, (b) subject to court review or (c) subject to a Bankruptcy Court-approved or agreed upon process for binding arbitration.

5. **Court-Appointed Expert.**

The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

O. **Assumption of Indemnification Obligations.**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.O shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.O.

P. **Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.298, are incorporated herein by reference and shall be binding upon the parties thereto.

Q. **Payment of Workers' Compensation Claims.**

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law. The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

R. **36th District Court Settlement.**

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.9. The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

S. **Payment of Certain Claims Relating to the Operation of City Motor Vehicles.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows: (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142

or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable). Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1). The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.S, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**T.       Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures. The City expressly reserves the right to challenge the validity of any claim for an income tax refund or property tax refund.

**U.       Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**V.       Pass-Through Obligations.**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**W.      Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**X.       Post-Effective Date Governance.**

Prior to or on the Effective Date, the Financial Review Commission shall be established pursuant to and in accordance with the Financial Review Commission Act. The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that promote more efficient and effective delivery of services to City residents. The City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

## ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.      Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan.  Any Disbursing Agent appointed by the City will serve without bond.  Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.      Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent, the Bond Agent or the COP Agent, as applicable, the Distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.      Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.      Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date.  Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.      Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**F.     Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process.  Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

**G.     Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage.  To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court.  Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City.  For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

**H.     City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

**I.     Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.     Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

**2.     Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims.  The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise.  The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

13-53846-tjt   Doc 8236-6   Filed 11/05/21   Entered 11/05/21 22:54:17   Page 277 of 295

1473

3. **De Minimis Distributions / No Fractional New Securities.**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

4. **Undeliverable or Unclaimed Distributions.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5. **Time Bar to Cash Payment Rights.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

J. **Other Provisions Applicable to Distributions in All Classes.**

1. **No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

2. **Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

-66-

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

**3.      Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

**4.      Surrender of Instruments.**

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make or preserve a claim under any applicable policies or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

**ARTICLE VI**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**A.      Treatment of Disputed Claims.**

**1.      General.**

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or

-67-

unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

### 2. ADR Procedures.

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

### 3. Tort Claims.

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

### B. Disputed Claims Reserve.

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been

entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim.

**C.      Objections to Claims.**

**1.      Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. As of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

**2.      Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

**3.      Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

**4.      Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

**ARTICLE VII**
**RETENTION OF JURISDICTION**

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.       Confirm the maturity date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law);

C.       Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.       Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.       Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.       Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.       Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.       Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.       Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.       Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

K.       Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

L.       Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

M.       Resolve any matters, cases, controversies, suits or disputes that may arise in connection with the FGIC Development Agreement;

N.       Resolve any matters, cases, controversies, suits or disputes that may arise in connection with the Syncora Development Agreement;

O.       Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

P.     Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

Q.     Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.     Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

**B.     Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**C.     Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**D.     Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

**E.     Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City.  On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated

by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

**F.      Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

**G.      Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

**H.      Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

**I.      Governing Law.**

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

**J.      Request for Waiver of Automatic Stay of Confirmation Order.**

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

**K.      Term of Existing Injunctions and Stays.**

**All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**L.      Service of Documents.**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

1. **The City**

    David G. Heiman, Esq.
    Heather Lennox, Esq.
    Thomas A. Wilson, Esq.
    JONES DAY
    North Point
    901 Lakeside Avenue
    Cleveland, Ohio 44114
    Telephone: (216) 586-3939
    Facsimile: (216) 579-0212

    Bruce Bennett, Esq.
    JONES DAY
    555 South Flower Street
    Fiftieth Floor
    Los Angeles, California 90071
    Telephone: (213) 243-2382
    Facsimile: (213) 243-2539

    Jonathan S. Green, Esq.
    Stephen S. LaPlante, Esq.
    MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
    150 West Jefferson
    Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 963-6420
    Facsimile: (313) 496-7500

    (Counsel to the City)

2. **The Retiree Committee**

    Claude Montgomery, Esq.
    Carole Neville, Esq.
    DENTONS US LLP
    1221 Avenue of the Americas
    New York, New York 10020
    Telephone: (212) 768-6700
    Facsimile: (212) 768-6800

    Sam J. Alberts, Esq.
    DENTONS US LLP
    1301 K Street NW, Suite 600, East Tower
    Washington, DC 20005-3364
    Telephone: (202) 408-6400
    Facsimile: (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

(Counsel to the Retiree Committee)


Dated: October 22, 2014       Respectfully submitted,

The City of Detroit, Michigan


By:    /s/ Kevyn D. Orr
Name:   Kevyn D. Orr
Title:    Emergency Manager for the City of Detroit, Michigan

1482

COUNSEL:


 /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

ATTORNEYS FOR THE DEBTOR

# APPENDIX II

## CONFIRMATION NOTICE

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
------------------------------------------------------------ x
                                                  :
In re                                             :         Chapter 9
                                                  :
CITY OF DETROIT, MICHIGAN,                         :         Case No. 13-53846
                                                  :
                              Debtor.             :         Hon. Steven W. Rhodes
                                                  :
                                                  :
------------------------------------------------------------ x
```

## NOTICE OF (I) ENTRY OF ORDER CONFIRMING EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT AND (II) OCCURRENCE OF EFFECTIVE DATE

### PLEASE TAKE NOTICE OF THE FOLLOWING:

1. **Confirmation of the Plan and Occurrence of the Effective Date.**

On _____, 2014, the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") entered an order (Docket No. ____) (the "Confirmation Order") confirming the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (as it may have been amended, supplemented or modified, the "Plan"), in the above-captioned chapter 9 case of the City of Detroit, Michigan (the "City").  The Effective Date of the Plan occurred on _____, 201_.  Unless otherwise defined in this Notice, capitalized terms and phrases used herein have the meanings given to them in the Plan and the Confirmation Order.

2. **Discharge of Claims.**

a.      Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan are in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, as of the Effective Date, the City is discharged from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt was Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt was allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt accepted the Plan.

b.      In accordance with the foregoing, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order is a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge voids any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; provided that, in accordance with section

944(c)(1) of the Bankruptcy Code, such discharge does not apply to (i) debts specifically exempted from discharge under the Plan; (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case; (iii) claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983; or (iv) Claims of (A) T&T Management, Inc., (B) HRT Enterprises and (C) the John W. and Vivian M. Denis Trust related to condemnation or inverse condemnation actions against the City alleging that the City has taken private property without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.

### 3. Releases.

a. <u>General Releases by Holders of Claims</u>. Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), each holder of a Claim that voted in favor of the Plan, to the fullest extent permissible under law, is deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i. all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); <u>provided</u> <u>further</u>, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii. all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; <u>provided</u>, <u>however</u>, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities are released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

<u>provided</u>, <u>however</u>, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; <u>provided</u>, <u>further</u>, that nothing in Section III.D.7.a of the Plan shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 shall not be released.

b. <u>Release by Holders of Pension Claims</u>. Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases,

agreements or documents entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), if the State Contribution Agreement is consummated, each holder of a Pension Claim is deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.  For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations.  Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order.  For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to Section III.D.7 of the Plan by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds.  For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to Section III.D.7 of the Plan by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

4.  **Injunctions.**

**On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order:**

**a.  All Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity, along with their Related Entities, are permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity);  (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;  (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly,**

any encumbrance of any kind against the City or its property; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property; (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth therein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 are not enjoined. In addition, all individuals affected by the AFS Recoupment are enjoined from commencing any proceeding against the GRS and its trustees, officers, employees or professionals arising from GRS's compliance with the Plan or this Order.**

> **b.** **All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan are permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in sub-paragraph 4(a) above, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.**

> **5.** **Treatment of Executory Contracts and Unexpired Leases.**

> a. <u>Assumption</u>. Except for Executory Contracts and Unexpired Leases rejected in the Plan or by other court order, or as requested in any motion Filed by the City on or prior to the Effective Date, as of the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City has been deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations have not been assumed under the Plan and have been discharged. For the avoidance of doubt, the City has assumed the Tunnel Lease pursuant to Section II.D.1 of the Plan.

> b. <u>Assumption of Ancillary Agreements</u>. Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 of the Plan includes any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 of the Plan or designated for rejection in accordance with Section II.D.3 of the Plan.

> c. <u>Approval of Assumptions and Assignments</u>. The Confirmation Order constitutes an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 of the Plan (and any related assignment) as of the

Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan or (e) are designated for rejection in accordance with the last sentence of this paragraph. The City has provided separate notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease are set forth in the Contract Procedures Order (Docket No. 6512). If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

d. <u>Payments Related to the Assumption of Executory Contracts and Unexpired Leases</u>. To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

e. <u>Contracts and Leases Entered Into After the Petition Date</u>. Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

f. <u>Rejection of Executory Contracts and Unexpired Leases</u>. Each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan was deemed rejected as of the Effective Date pursuant to section 365 of the Bankruptcy Code. The Confirmation Order constitutes an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 to the Plan is rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit II.D.6 to the Plan does not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

g. **<u>Rejection Damages Bar Date</u>. Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or**

**Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date, i.e., _____, 20__; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City. Proof of claim forms and instructions for filing claims can be found at the City's restructuring website, https://www.kccllc.net/detroit.**

        h.      <u>Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases</u>. Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

        i.      <u>Insurance Policies</u>. From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date are reinstated and continue in full force and effect in accordance with their terms and, to the extent applicable, are deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1 of the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in Section II.D.9 of the Plan shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

      **6.**      **Payment of Administrative Claims.**

        a.      <u>Administrative Claims in General</u>. Except as specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order and any additional fee process established by the Court.

      **7.**      **Bar Dates for Administrative Claims.**

        **a.**      **<u>General Bar Date Provisions</u>. Except as otherwise provided in subparagraphs 7(b) or 7(c) below or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date, i.e., _____, 20__. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will**

be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, *i.e.*, _____, 20__ , (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

**b.** **Ordinary Course Claims.** Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations are not required to File or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

**c.** **Claims Under the Postpetition Financing Agreement.** Holders of Administrative Claims that are Postpetition Financing Claims are not required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied as set forth in subparagraph 7(b) above.

**d.** **No Modification of Bar Date Order.** The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

**8.** **ASF Recoupment Cash Option.**

a. <u>ASF Recoupment Cash Option Election</u>. No later than seven days following the Effective Date, *i.e.*, _____, 20__, the City, through its Claims and Balloting Agent, will send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Notice will notify ASF Distribution Recipients that each ASF Distribution Recipient may elect to pay the total amount of his or her ASF Recoupment in a single lump sum by timely returning a properly-completed ASF Election Form. The ASF Election Form will explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (i) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (ii) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan. *An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date, i.e., 35 days after the date on which the ASF Election Form is mailed.*

b. <u>ASF Recoupment Cash Payment</u>. GRS will mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. The ASF Final Cash Payment Notice is a notice that will be sent to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option, and will indicate the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment. *ASF Distribution Recipients shall have until the ASF Final Cash Payment Date – i.e., the later of (i) 90 days after the Effective Date, i.e., _____, 20__ or (ii) 50 days after the date of mailing of an ASF Final Cash Payment Notice – to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and*

*ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan.* The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

9. **Copies of the Plan and Confirmation Order.** Copies of the Plan, Confirmation Order and all other documents Filed in the Chapter 9 Case may be obtained, free of charge, from the City's restructuring website at https://www.kccllc.net/detroit or from Kurtzman Carson Consultants LLC by calling (877) 298-6236 (toll-free).

BY ORDER OF THE COURT

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

## <u>CERTIFICATE OF SERVICE</u>

I, Heather Lennox, hereby certify that the foregoing Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit and (II) Occurrence of Effective Date was filed and served via the Court's electronic case filing and noticing system on this _____ day of _____, 201_.

/s/  Heather Lennox_____