# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

*In re:*

CITY OF DETROIT, MICHIGAN,

    *Debtor.*

Case No. 13-53846
Hon. Thomas J. Tucker
Chapter 9

---

## DEBRA METRIS-SHAMOON, MUKHLIS SHAMOON, CARL VERES, PAUL METRIS AND JULIA METRIS RESPONSE IN OPPOSITION TO DEBTOR CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER (DKT #13532)

By and through their counsel, Dettmer & Dezsi, PLLC, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres, Paul Metris and Julia Metris ("Shamoons") hereby file their Response in Opposition to the City of Detroit's Motion for the Entry of an Order Enforcing the Bar Date and Confirmation Order (Dkt #13532).

In its motion, the City of Detroit asserts that the Shamoons are pursuing a pre-petition claim that has been discharged pursuant to the City's Confirmed plan. The City's motion should be denied for the following reasons:

1. The Shamoons were known creditors whose claims and/or identities were "readily ascertainable" by the City such that they were entitled to actual

notice, and having failed to give the Shamoons such notice their claims are not subject to discharge;

2. The Shamoons did not fairly contemplate their claims against the City until after the effective date of the City's Confirmed plan such that they are not subject to discharge; and,

3. The City's right to discharge the Shamoons' claims are barred by the equitable doctrines of estoppel and laches.

Respectfully submitted,

DETTMER & DEZSI, PLLC

Dated: May 17, 2022

*/s/Michael R. Dezsi*
MICHAEL R. DEZSI
Counsel for Interested Parties
Debra Metris-Shamoon, Mukhlis Shamoon,
Carl Veres, Paul & Julia Metris
1523 N. Main St.
Royal Oak, MI 48067
(313) 757-8112
mdezsi@dezsilaw.com
P64530

**BRIEF IN OPPOSITION TO DEBTOR CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER (DKT #13532)**

## I.     Background Facts

A discussion of the facts relevant to the Shamoons' instant response require both a recitation of the facts underlying the Shamoons' case as well as the predecessor case of *Timothy and Hatema Davis v. City of Detroit*.  The *Davis* case was filed as a putative class action alleging claims similar to the Shamoons.

Plaintiffs Debra Metris-Shamoon ("Debra") and her husband Mukhlis Shamoon ("Mukhlis") allege that they were subjected to an unlawful raid of their home in Shelby Township, Michigan by members of Detroit Police Department's Narcotics Unit.  The raid took place on September 13, 2012, under the command of Sgt. Joe Tucker who supervised the raid crew which included, among others, Sgt. Stephen Geelhood.  Both of Debra's octogenarian parents, Paul and Julia Metris, were visiting for lunch at the time of the raid, and so was a family friend, Carl Veres, who was picking up some clothes.

The raid lasted about an hour and a half during which she was never shown a warrant.  The officers took all of her marijuana plants and product, about $315 cash, and some legally owned handguns that belonged to her son Adam.  Debra testified that she was a licensed caregiver to provide marijuana though none of the officers ever asked to see any of her caregiver cards despite her offer to produce them.

1

Mukhlis was also a licensed caregiver. None of the Shamoons were ever charged with any crimes arising from the raid.

At the conclusion of the raid, Sgt. Joe Tucker left a Notice of Seizure and Intent to Forfeit form (**Ex. O**). Within a few days of the raid, both Debra Shamoon and her son Adam, had contacted the City of Detroit via telephone. Adam contacted Sgt. Tucker to inquire about why his parents' house was raided and inquired of the handguns taken from the home (**Ex. G**). According to Adam, he spoke to Sgt. Tucker and demanded answers about what had happened at his parents' home and about the status of their handguns. *Id.* Sgt. Tucker told Adam that he would have to wait before getting the guns and to call back a couple weeks later.

Debra, on the other hand, also contacted the Detroit Police department on two separate occasions in the couple weeks following the raid and before the 1st of October (**Ex. H**). During each of her calls, Debra also demanded answers about why her house had been raided and asked for a search warrant. Both times, Debra was told by some unknown lady from the department that she couldn't find any information on any of the Shamoons or a warrant in the department's computer system. *Id.*

After a couple weeks, Adam called Sgt. Tucker back and again demanded answers about what happened at his parents' home and the status of the handguns. Adam also advised Sgt. Tucker that he would get an attorney if necessary. *Id.*

2

Eventually, Sgt. Tucker told Adam to contact someone else at the department who told Adam he could come pick up his handguns though no one at the department explained to him what had happened at his parents' house. No one had shown him a warrant or other legal documentation regarding the search and seizure of the Shamoons' house.

On February 11, 2015, plaintiffs Timothy and Hatema Davis filed in the Eastern District of Michigan a putative class action under § 1983 against both the City of Detroit and several members of the Narcotics Unit claiming that they, along with several other individuals in and around Detroit, were subjected to unlawful raid of their home in Warren, Michigan. The Davis raid occurred in December 2013. See Case No. 15-cv-10547 (E.D. Mich.)(J. Borman)(**Ex. A**). The Davises allegations closely mirrored the allegations later made by the Shamoons insofar as the manner in which officers conducted the raid.

There was much media attention about the *Davis* case given the allegations of misconduct against the City of Detroit and its narcotics officers (**Ex. B**). Along with others, the Shamoons saw these media articles and contacted the undersigned counsel regarding the September 2012 raid of their home (**Ex. H**). According to Debra, these news reports were the first time that she or her family had any idea that her rights may have been violated by the actions of the officers.

Case 2:18-cv-13248 Doc # 33652-5 Filed 04/07/2022 Entered 04/07/2022 13:44:38 Page 5 of 25
282

On April 8, 2015, the U.S. Attorney indicted several members of the City of Detroit's Narcotics Unit, including narcotics officer Arthur Leavells (**Ex. C**).

On April 23, 2015, the undersigned counsel served on the City of Detroit the Davis plaintiffs' First Request to Produce Documents seeking documents related to the City's raids on several homes including the Shamoons' home (**Ex. D**, Plaintiffs' First Request to Produce, Nos. 1 and 2, pgs. 1-2).

Ultimately, after conducting some class-related discovery, the Davis plaintiffs moved to certify a class action consisting of individuals, including the Shamoons, who had been subjected to unlawful raids by members of the City of Detroit's now-defunct narcotics unit.  See Motion to Certify Class, Case No. 15-cv-10547 ECF No. 88 (E.D. Mich.).  Ultimately, the district court denied the Davises' Motion to Certify Class, see Case No. 15-cv-10547 ECF No. 168 (J. Borman Opinion and Order Denying Motion for Class).  Not long after the district court denied the Davises' Motion to Certify Class, the Davises and the City of Detroit settled the Davises' claims for $350,000 (**Ex. E**).  The release makes clear that the <u>City of Detroit</u> was a released party under the settlement.

On November 26, 2018, the Shamoons filed their own individual action naming as defendants both the City of Detroit and several individual officers who supervised and/or participated in the raid on the Shamoons' home including Sgt. Stephen Geelhood and Sgt. Joe Tucker.  Since the filing of the Shamoons' case, the

Case:13-5849jt Doc:18736254-5 Filed:04/17/2022 Entered:04/17/2022 13:49:43 Page:6 of 25
282

parties conducted extensive discovery that resulted in numerous discovery motions, motions for show cause, and dispositive motions (**Ex. S** Shamoon Docke**t**).

On October 23, 2020, the individual Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(c) (Case No. 3:18-cv-13683 ECF No. 121), and the City of Detroit filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (ECF No. 122). On November 20, 2020, Plaintiffs filed their response to Defendants' dispositive motions (ECF No. 125 and ECF No. 126).

On June 25, 2021, Judge Tarnow issued his Opinion and Order Granting in part and denying in part Defendants' Motion to Dismiss and/or for Summary Judgment (Case No. 3:18-cv-13683 ECF No. 145). In his Opinion and Order, Judge Tarnow denied Defendant City of Detroit's Motion for Summary Judgment finding that there were questions of as to (1) whether Plaintiffs' Fourth Amendment rights were violated by the search and seizure of their home; and, (2) whether the City of Detroit is liable under *Monell* based on both an "inaction theory" and a policy of inadequate supervision. Opinion and Order, Case No. 3:18-cv-13683, ECF No. 145, PageID.4466-4474 (E.D. Mich.).

In reaching his conclusion, Judge Tarnow relied on the extensive summary judgment record that included evidence that the City of Detroit was aware, as early as 2010, that members of its Narcotics Unit, including specifically Sgt. Stephen Geelhood, were conducting unlawful raids in and around the City of Detroit.

1:23-cv-10348-jjt Doc 18356-5 Filed 04/27/22 Entered 04/27/22 23:44:38 Page 7 of 25
282

For instance, there was sworn testimony from Arthur Leavells,[1] the affiant of the purported search warrant for the Davises' home, that he routinely lied on affidavits in support of search warrants and would simply make up phony affidavits with "all kinds of lies" and that "it's not hard to do." (Ex. I, Trans. Pg. 72-73). Leavells admitted that he got bogus search warrants on "countless occasions" (Ex. I, Tr. 77), and there was "a lot of crookery going on in Detroit Police Narcotics" including "money seizures[.]" (*Id.* at Tr. 80:16 - 81:5). Leavells also testified that Sgt. Geelhood, the affiant of alleged search warrant affidavit for the Shamoons, had full knowledge of the misconduct, (*id.* at Tr. 81:11, 82:24—83:3), and that the narcotics officers were "ripping off marijuana when [they'd] go for raids[.]" *Id.* at Tr. 83. Leavells testified the officers would divide up the seized money (*Id.* at 82), and take "personal property like jewelry, cash, drugs, and guns." (Ex. I, Tr. 84-85).

In another instance, several officers of the narcotics crew were caught (on camera) stealing from another narcotics raid in February 2014 (Ex. N). That raid was also supervised and carried out at the direction of Sgt. Geelhood. The property owner had hidden cameras on the premises which recorded the narcotics officers stealing items. The owner of the property indicated that his Chase debit card was

---

[1] Leavells pled guilty to federal charges similar to the allegation alleged herein.

also taken and he subsequently discovered an unauthorized charge for $1,000 (Ex. N, pg 1-2).

Further evidence of Sgt. Geelhood's misconduct came from Wayne County Prosecutor Kym Worthy who recently moved to vacate a 2012 drug conviction of a defendant who was convicted upon the testimony and search warrant affidavit of Sgt. Geelhood. In an official press release, Worthy remarked "[t]hese are the ***first cases*** that deal directly with fraudulent search warrant affidavits and other activities by highly unethical and compromised narcotics police officers." Ex. M.[2]

Former Chief of Police James Craig also testified in his deposition that he believed that the narcotics unit's sergeants were "directly involved in the alleged misconduct" or "complicit and not taking appropriate supervisory action when necessary (Ex. J, Craig Depo. 24:14-22). Chief Craig's testimony is entirely consistent with the testimony of Leavells that Sgt. Geelhood was an active participant in the scheme.

In sum, Judge Tarnow concluded based on the voluminous summary judgment record that there was sufficient evidence that the City of Detroit knew

---

[2] Judge Tarnow concluded that Worthy's press release was competent evidence for purposes of opposing the City of Detroit's motion for summary judgment. See Case No. 18-cv-13683 ECF No. 145, Opinion and Order on Summary Judgment, pg. 29 n.9)(citing to FRE 803(8)(A)(i)-(iii); *Patterson v. Central Mills, Inc.*, 64 Fed. Appx. 457, 462 (6th Cir. 2003)

1:35-3:38-tjt Doc 18-5 Filed 04/27/22 Entered 04/27/22 13:44:38 Page 9 of 255
282

about, but failed to stop, the rampant corruption and misconduct of the Narcotics Unit during the time of the Shamoons raid. Accordingly, Judge Tarnow denied the City of Detroit's Motion for Summary Judgment.

The Shamoons' case was recently referred to Magistrate Judge Stafford for all final pre-trial matters, including motions in limine, jury instructions, verdict form, etc. See Case No. 18-cv-13863 ECF No. 154, Order Referring All Pretrial Matters. On March 16, 2022, Magistrate Judge Stafford issued a Notice to Appear which directed the parties to file a joint factual and procedural summary of the case before March 30, 2022. ECF No. 155.

In response to Magistrate Judge Stafford's Order, the City of Detroit asserted, for the first time ever, its defense that the Shamoons' claims were subject to discharge under the City's Confirmed Plan. The City of Detroit has now filed with this Court its Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order against the Shamoons.

For the reasons that follow, the Court should deny the City's motion and allow the matter to proceed to trial.

## II.    Discussion and Analysis

**A. The Shamoons were known creditors whose claims and/or identities were "readily ascertainable" by the City such that they were entitled to actual notice, and having failed to give the Shamoons such actual notice their claims are not subject to discharge.**

To the extent that the City asserts that the Shamoons' pre-petition claims are subject to discharge, the Court should reject the City's assertion and find that the Shamoons were known creditors who should have received actual notice of the City's bankruptcy. Without such notice, a discharge of their claims would violate the Shamoons' right to due process.

The Bankruptcy Code provides that notice shall be given of the commencement of a Chapter 9 case. 11 U.S.C. § 923. The Code also provides that "The debtor shall file a list of creditors." 11 U.S.C. § 924. Under the Code, a creditor is defined as an entity, which includes a person, that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. 11 U.S.C. § 101(10). Known creditors are entitled to actual notice. 11 U.S.C. § 944(c)(2); *Paging Network, Inc. v. Nationwide Paging, Inc.*, 534 F.3d 76, 80-81 (1st Cir. 2008).

A known creditor is one whose claims or identities are "readily ascertainable" by the debtor. *See Paging Network*, 534 F.3d at 81 (citing *Tulsa Prof'l Collection Servs, Inc. v. Pope*, 485 U.S. 478, 490 (1988)). Readily ascertainable means a debtor can discover a creditor's claims through "reasonably diligent efforts." *Paging Network*, 534 F.3d at 81. Reasonably diligent efforts require a debtor to examine its "own books and records." *In re U.S. Home Corp.*, 223 B.R. 654, 659 (Bankr. S.D. N.Y. 1998). A claim is also discoverable to a debtor if the debtor has something in

9

its possession like a demand or payment or "some communication with a debtor concerning the existence of the creditor's claim." *In re Talon Auto Group*, 284 B.R. 622, 626 (Bankr. E.D. Mich. 2002)(quoting *In re Drexel Burnham Lambert Group, Inc.*, 151 B.R. 674, 681 (Bankr. S.D. N.Y. 1993)).

The Shamoons assert that their potential claim was known to the City such that they were entitled to receive actual notice. The Shamoons' house was raided by several members of the Narcotics Unit including, specifically, Sgt. Stephen Geelhood who was the affiant of the purported search warrant for the Shamoons' home. According to the sworn testimony of former narcotics officer Arthur Leavells, Sgt. Geelhood participated in a scheme to conduct unlawful raids by falsifying search warrants (Ex. I, Trans. pg. 81:11, 82:24-83:3 and Trans. pg. 84-85).

On this point, Judge Tarnow found that there were questions of fact as to whether Sgt. Geelhood's affidavit was knowingly falsified. Case No. 3:18-cv-13683 ECF No. 145, PageID.4457-4460, Opinion and Order (finding ample record evidence creating a question of fact as to whether Geelhood falsified his affidavit in support of search warrant). In light of this evidence, the Court should conclude that the debtor knew of the Shamoons' claims given that claims relate directly to the willful misconduct of a supervisory agent (i.e., Sgt. Geelhood) and for which the debtor's own records would have reflected that the Shamoons were subject to this bogus raid.

Additionally, the Shamoons' son, Adam Shamoon, contacted Sgt. Tucker and spoke to him no less than twice about the status of his firearms that were confiscated during the raid and inquired of Sgt. Tucker as to City's legal basis for raiding the Shamoons' house (Ex. 7). These facts satisfy the "some communication with a debtor concerning the existence of the [Shamoons'] claim." Despite having knowledge of such a claim, the City failed to list the Shamoons as creditors on their Schedule H.

It should also be pointed out that, if the City would have listed the Shamoons as known creditors in its Schedule H, their claims would not have been subject to discharge under the terms of the confirmed plan. Specifically, the plan exempts from discharge claims by known creditors to the extent that such claims "result from any act or omission to the extent that the act or omission subsequently is determined by a Final Order to have constituted . . . willful misconduct[.]" Ex. L, Excerpt of Confirmed Plan, Art III, Sec D, sub. (7)(a), pg. 52 (entitled "Releases").

Based on the allegations of their Complaint, and the findings by Judge Tarnow in his Opinion and Order on summary judgment, there is more than an adequate basis from which to conclude that the Shamoons' claims were based on willful misconduct. The crux of their *Monell* claims against the City is premised on the theory that the City had knowledge of the misconduct within the narcotics unit and despite such knowledge the City failed to stop the misconduct. Such facts constitute

"omissions" by the City to stop the rampant and widespread willful misconduct within the Narcotics Unit.

On this point, it should be noted that both Sgt. Tucker and Sgt. Geelhood have demonstrated histories for dishonest and willful misconduct. While now former convicted felon Arthur Leavells implicated Sgt. Geelhood in the ongoing misconduct, Sgt. Tucker also has a similar history of falsifying affidavit in support of narcotics-related search warrants and Sgt. Tucker had been the subject of several Internal Affairs investigations regarding perjury, misconduct, and fraud (**Ex. P**, DPD # 2255, 2257, 2259).

In one such investigation by Internal Affairs (IAU Case # 00-213), Sgt. Tucker was accused of perjury (i.e., falsifying a narcotics-related search warrant affidavit and swearing to have observed an individual selling narcotics whereas such individual was incarcerated at the time of Tucker's alleged observation) (**Ex. Q**, DPD 2350-2353)(finding that Sgt. Tucker neglected his duty "by swearing to and signing a Search Warrant and Affidavit that contained false information[.]").

Sgt. Tucker was accused or engaging in criminal fraud by falsifying time records and daily activity logs which included false entries purporting to reflect narcotics surveillance (**Ex. R**, DPD 2734-2741); (DPD 2736, "Tucker was falsifying OT requests and activity logs saying he worked OT that he did not work."). The complainant in that instance, Sgt-turned-Lt. Kelly Fitzgerald, described the City's

response to credible allegations of Tucker's misconduct as being "swept . . . under the rug" by the Lieutenant, Commander, Deputy Chief of the Narcotics Unit, and Internal Affairs (**Ex. R**, DPD 2740). Lt. Fitzgerald was sufficiently concerned about the Department's deliberate indifference to the matter that she sought an investigation by Office of Inspector General asking that it investigate why the "initial complaint of criminal conduct" on the part of Tucker was "Administratively" closed by Internal Affairs, and further requesting that the OIG investigate "both criminal and department charges" related to Tucker's misconduct and those who swept the matter "under the rug." Judge Tarnow relied on, and specifically pointed to some of this record evidence in reaching his conclusion that the City had knowledge, and ignored, the willful misconduct that was pervasive in the former narcotics unit.

In sum, there is record evidence that Sgt. Tucker was aware that the Shamoons were challenging the manner in which the raid of their home was carried out, and as a sergeant of the narcotics department, Sgt. Tucker's knowledge of the Shamoons' claims should be imputed to the City. There is also evidence that the City knew about the misconduct within the narcotics department (specifically about Sgt. Tucker), and that despite such knowledge the City turned a blind eye to such misconduct. Collectively, this record evidence compels the conclusion that the City should have discovered the Shamoons' claims through the exercise of reasonably diligent efforts.

Even without reaching the merits of whether the Shamoons' claims fall within the exemption from discharge as set forth above, the City's motion should nevertheless be denied based on the violation of the Shamoons' due process rights because the City's failed to provide them with actual notice. In this context, the due process clause requires a reasonable search for contingent or unmatured claims so that ascertainable creditors, like the Shamoons, would have received adequate notice of the proceedings and deadlines.

What is reasonable depends on the particular facts of each case. However, a known claim arises from facts that would alert the reasonable debtor of the possibility that a claim might reasonably be filed against it. *In re Drexel Burnham Lambert Grp. Inc.,* 151 B.R. 674, 680-81 (Bankr. S.D.N.Y.), *aff'd sub nom. In re Drexel Burnham Lambert Grp., Inc.,* 157 B.R. 532 (S.D.N.Y. 1993). In this instance, the Debtor was aware of facts sufficient to alert it to the possibility that the Shamoons might have claims against the City.

In addition to the facts stated above, former Chief of Police James Craig's testimony supports the conclusion that the City should have known that the Shamoons were creditors based on the unlawful raid carried out by its narcotics officers and supervisors. Chief Craig confirmed, publicly and under oath during his deposition, that the City's Internal Affairs uncovered "false affidavits" that Craig described as "fabricated" and further acknowledged that "surveillance that was

14

supposedly conducted to get the warrants wasn't done; information (officers) said they got from confidential informants was erroneous[.]"  Craig also testified that these "patterns" of false affidavits and bogus claims of surveillance suggest the misconduct of the Narcotics Unit was more widespread than he previously thought (**Ex. J**, Craig Depo. pg. 52:10-53:5).

Importantly, former Chief Craig disbanded the City's Narcotics Unit effective July 22, 2014 (Ex. F) which occurred **<u>before</u>** the debtor's Eighth Amended Plan of the Adjustment of Debts of the City of Detroit was confirmed by this Court on November 12, 2014.  From these facts, it is clear that: (1) the debtor's supervisory agents (i.e., Sgt. Geelhood and Sgt. Tucker) knew about the Shamoons' constitutional claims against the City;  (2) the City's Internal Affairs department had knowledge of the misconduct within the narcotics unit well before July 2014; and, (3) former Chief of Police James Craig knew about the misconduct within the Narcotics Unit including, specifically, that narcotics officers were falsifying affidavits in support of narcotics-related search warrants.

In light of the foregoing, the Debtor could have discovered the Shamoons' constitutional claims through reasonably diligent efforts.  In particular, a review of the debtor's "own books and records" of the Narcotics Unit would have uncovered the Shamoons' claims.  As Judge Tarnow pointed out, the City was unable to produce in discovery any records that confirmed the existence of the Confidential

Informant allegedly relied upon by Sgt. Geelhood. Nor could the City produce any records that confirmed the alleged surveillance of the Shamoons' home conducted by Sgt. Geelhood. See Case No. 3:18-cv-13683 ECF No. 145, PageID.4457-4458 (noting the absence of any records produced by the City to substantiate Geelhood's alleged reliance on a confidential informant); *Id.* at pg. 21-22 (Judge Tarnow noting that "while Geelhood claims to have surveilled the Shamoons' address on approximately five occasions prior to seeking a warrant, Defendants have produced no documentary evidence in support of this claim."); *id.* at 22 (Judge Tarnow further noting that according to Deputy Chief Fitzgerald, DPD officers are required to document their surveillance, even if it is just jotting a note on the back of a receipt" and that "the City's record retention policies require that case reports for felony investigations, including case logs, be retained for at least twenty years.").

In light of former Chief Craig's statements coupled with the lack of any documentation whatsoever to substantiate Geelhood's affidavit and search warrant to raid the Shamoons' home, this Court should conclude that the City's "own books and records" would have put the City on notice of the Shamoons' constitutional claims relating to the bogus raid conducted upon their home by Sgt. Geelhood. And having such knowledge and failing to give the Shamoons' actual notice, the City's untimely attempt to discharge their claims should fail.

Discharge under the Bankruptcy Code presumes that all creditors bound

13-53846-tjt   Doc 13657-5   Filed 05/09/22   Entered 05/09/22 14:34:08   Page 18 of 25
252

by the plan have been given notice sufficient to satisfy due process. *See In re First Am. Health Care of Georgia,* 220 B.R. 720, 723 (Bankr.S.D.Ga.1998). Both the Bankruptcy Code, 11 U.S.C. 944(c)(2), and the City's Confirmed Plan (Article III D.4.b.) provide that the debtor *is not discharged* from any debt owed to an entity that, before confirmation of the plan, had neither notice nor actual knowledge of the Chapter 9 case.

Here, the Shamoons should have been a scheduled creditor and should have received the statutory notice required under the Code. The purpose of statutorily requiring a debtor to list its creditors with their mailing addresses is to provide them with basic due process notice. *In re Glenwood Medical Group, Ltd.,* 211 B.R. 282, 285 (Bankr.N.D.111.1997). It is the debtor's burden to establish that the creditor received adequate notice. *See In re O'Sullivan,* 488 B.R. 510, 513 (Bankr. D. Mass. 2013)(citing *In re Massa,* 187 F.3d 292, 296 (2d Cir.1999)).

The totality of the circumstances should have alerted the City to the possibility that the Shamoons might reasonably have a claim for damages arising from the bogus raid upon their home in September 2012. Despite having knowledge of their claims, the Shamoons are not listed as creditors in the Debtor's Schedule H attached to its Second Amended List of Creditors and Claims (Doc No. 1059, Notice of Filing of Second Amended List of Creditors and Claims). The City had an obligation to mail the Shamoons notice of the bankruptcy. And the

17

Shamoons had neither notice, nor actual knowledge of the City's Chapter 9 bankruptcy case. (Ex. H). Since the Shamoons were known claimants who did not receive the required notice their claims were not discharged in bankruptcy.

**B. The Shamoons did not fairly contemplate their claims against the City of Detroit until after the effective date of the City's Confirmed plan such that they are not subject to discharge.**

Alternatively, the Court should conclude that the Shamoons' did not fairly contemplate their claims against the City until after the City's confirmation plan was approved by the Court in 2014. For purposes of bankruptcy law, whether a party has a claim against a debtor is determined under the "fair contemplation" test. "[A] claim cannot fall within the purview of section 101(5) – and thus cannot be discharged as a pre-petition claim – unless that claim could have been contemplated by the parties prior to the bankruptcy proceedings." *In re City of Detroit, Michigan*, 548 B.R. at 761.

Here, while the raid on the Shamoons' house took place in September 2012, the Shamoons had no reason to suspect that the raid was carried out pursuant to a scheme by corrupt narcotics officers. At best, the Shamoons were concerned about the potential of criminal liability, but never thinking that the raid of their home was carried out by corrupt narcotics officers and sergeants who were falsifying affidavits with the intent to raid medical marijuana providers and reap the rewards of their misconduct.

The Shamoons had no reason to know, until the early part of 2015, that there was rampant corruption within the narcotics unit and that these corrupt officers were deliberating targeting medical marijuana providers in and around the City of Detroit for their own pecuniary gain. The first time that the Shamoons had any reason to believe they may have had a claim to assert against the City of Detroit was after hearing news reports about the *Davis* case in or around February 2015, followed by the federal indictments of several City of Detroit narcotics officers in April 2015 (Ex. H and B). By this point in time, the City's confirmed plan had already been approved by the Court in November 12, 2014.

Given the willful misconduct by the officers involved, the Shamoons did not fairly contemplate their constitutional claims against the City until after it was too late. For this reason, the Court should conclude that their claims are not barred.

## C. The City's right to discharge the Shamoons' claims are barred by the equitable doctrines of estoppel and laches.

Assuming, *arguendo*, that the Court finds rejects the Shamoons' arguments above, the City's motion should also be denied under the equitable doctrines of estoppel and laches. It is well established that this Court retains equitable powers as codified in 11 U.S.C. § 105. Based on the facts presented here, the Court should decide, as a matter of equity, that the City's motion should be denied based on equitable estoppel and laches.

"The defense of laches 'requires proof of (1) lack of diligence by the party against whom the defense is asserted; and, (2) prejudice to the party asserting the defense.'" *In re Rechis*, 339 B.R. 643, 645 (Bankr. E.D. Mich. 2006)(J. Rhodes). The Shamoons satisfy each of these requirements relative to the City's untimely motion.

First, it should be noted that the instant case was filed more than three-and-a-half years ago on November 18, 2018. During the lengthy pendency of this matter, the parties have extensively litigated numerous discovery disputes at great expense to the Shamoons. At no time during any of the last 3.5 years of this protracted litigation did the City seek to assert its rights, whatever they may be, to discharge and/or enjoin the Shamoons' constitutional claims based on its confirmed plan.[3]

To the contrary, the City first raised its purported discharge defense only after the City had filed lengthy motions for summary judgment and after the Shamoons responded in opposition to such motions with a nearly 1,000 page summary judgment record of exhibits. See Case No. 3:18-cv-13683 ECF Nos. 121, 122, 123 (Motion(s) to Dismiss and for Summary Judgment, and ECF Nos. 125, 126, 128 (Shamoons' Responses to Motion(s) to dismiss and for Summary Judgment along with Appendix of Exhibits. Only now after more than 3.5 years of litigation, and

---

[3] In fact, the City knew about the Shamoons' claims during the pendency of the predecessor Davis case. In Davis, the undersigned counsel sought discovery relating to the Shamoon raid. Additionally, the parties had discussed the possibility of settling not just the Davis case, but all of the other individually filed actions including the Shamoon case. As such, the City has known about the Shamoons' claims as long ago as 2015.

having not prevailed on summary judgment and facing an imminent trial, has the City raised, for the first time, its purported discharge defense. The City had a duty to raise its purported discharge defense without prejudicial delay, and the City failed to do so here.

As to the prejudice prong, the Court should consider that the Shamoons have incurred expenses totaling nearly $12,500 during this litigation. Such expenses include fifteen depositions and expert witness fees. Forcing the Shamoons to incur such costs while sitting idle for more than 3.5 years on its purported discharge defense constitutes prejudice to the Shamoons and should be considered under this Court's equitable powers. *See, e.g., In re Dixon*, 295 B.R. 226, 234 (Bankr. E.D. Mich. 2003)(J. Shefferly)(highlighting that "the equitable doctrine of laches, which has as its goal the prevention of prejudicial delay in the bringing of a proceeding, is a relevant and necessary doctrine in the bankruptcy context."). Clearly the City knew about its purported discharge defense long before now. In fact, the City has known of their potential discharge defense since 2015 during the litigation (and settlement) of the *Davis* case. Based on the City's egregious 3.5 year delay in raising such a defense, it appears just as likely that the City's instant motion is simply a litigation strategy to derail a trial on the merits.

These same facts should also compel the Court to conclude that the City is equitably estopped from seeking the relief raised in its instant motion. The doctrine

of equitable estoppel may apply based on (1) conduct or language amounting to a representation of material facts; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on or must act in such manner that the party asserting the estoppel has a right to believe it so intended; (4) the party asserting the estoppel must be unaware of the true facts; and, (5) the party asserting the estoppel must detrimentally and justifiably rely on the representation. *In re H.R.P. Auto Center, Inc.*, 130 B.R. 247, 254 (Bankr. N.D. Ohio 1991)(citing *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210 (6th Cir. 1987), *cert. denied* 484 U.S. 820 (1987)).

Here, the Shamoons had no reason to believe their claims were subject to discharge. This is especially so given that the City settled the predecessor *Davis* case which was filed as a putative class action and in which the City was made aware, specifically, of the identity of the Shamoons as putative class members. At no time during the *Davis* litigation did the City ever assert that the Shamoons' claims (or any of the other putative class member's claims) were barred or subject to discharge under the City's confirmed plan. Instead, the City proceeded to discuss settlement of all the putative class cases, including the Shamoons, but ultimately the parties settled only the *Davis* case after which the Shamoons' instant case was filed in November 2018. Based on these actions, the Shamoons reasonably relied, to their detriment, in filing their instant claims without any knowledge of the City's

purported discharge defense. During the more than 3.5 years litigating this matter, the Shamoons expended considerable time, money, and effort in prosecuting these claims.

Based on the sequence and timing of these facts, the Court should conclude that the City is now equitably estopped from the relief it now seeks.

## **CONCLUSION AND RELIEF REQUESTED**

Based on the foregoing, the Court should deny the City's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order as to the Shamoons.

Respectfully submitted,

DETTMER & DEZSI, PLLC,

Dated: May 17, 2022                  */s/Michael R. Dezsi*
                                      MICHAEL R. DEZSI
                                      Counsel for Interested Parties
                                      Debra Metris-Shamoon, Mukhlis Shamoon,
                                      Carl Veres, Paul & Julia Metris
                                      1523 N. Main St.
                                      Royal Oak, MI 48067
                                      (313) 757-8112
                                      mdezsi@dezsilaw.com
                                      P64530

*In re:*

CITY OF DETROIT, MICHIGAN,

   *Debtor.*

Case No. 13-53846
Hon. Thomas J. Tucker
Chapter 9

---

# EXHIBIT LIST

Exhibit 1 – None

Exhibit 2 – None

Exhibit 3 – None

Exhibit 4 – Proof of Service

Exhibit 5 – None

Exhibit 6 – Documentary Exhibits:

A.    *Davis v. City of Detroit, et al*.; Case No. 15-cv-10547
    (J. Borman); Civil docket

B.    Media articles regarding *Davis* civil Case No. 15-10547

C.    *USA v Hansberry, et al.,* Case No. 15-cr-20217
    (J. Murphy, III); Criminal docket

D.    *Davis v. City of Detroit, et al.;* Case No. 15-cv-10547
    First Request to Produce        4/23/2015

E.    General Release, Waiver and Settlement Agreement
    *Davis v. City of Detroit, et al*.; Case No. 15-10547    02/06/2019

| F. | Detroit Police Department Communications Operations | 06/27/2014 |
| G. | Declaration of Adam Shamoon | |
| H. | Declaration of Debra Metris-Shamoon | |
| I. | Jury Trial Transcript: Vol 14 (Including Testimony of Arthur Leavells); *USA v Hansberry, et al.;* Case No. 15-20217 (J. Murphy, III) | 06/28/2016 |
| J. | Excerpts of Deposition Transcript of Chief James Craig | 05/21/2020 |
| K. | The Detroit News article: Detroit police probe yields allegations of widespread corruption in drug unit; | 12/11/2019 |
| | The Detroit News article: Detroit police chief: Longstanding culture of drug unit corruption | 12/12/2019 |
| L. | Excerpts of Dkt #8045 Eighth Amended Plan for the Adjustment of Debts of The City of Detroit | 10/22/2014 |
| M. | Kym Worthy/WCPO Press Release | 03/24/2020 |
| N. | IA Inter-Office memorandum (Rayis) | 07/18/2014 |
| O. | Notice of Seizure and Intent to Forfeit, witnessed by "Sgt Joe Tucker" | 09/13/2012 |
| P. | Internal Affair Database Report, Disciplinary History; (DPD Bates 2255, 2257, 2259) | |
| Q. | Excerpt of Internal Affairs Case 00 213 (DPD 2350-54) | 05/28/2001 |
| R. | Correspondence (DPD 2734-2741) | 11/25/2011 |
| S. | *Metris-Shamoon, et al., vs. City of Detroit*; Case No. 18-cv-13683 (J. Cleland); Civil Docket | |

2

# EXHIBIT 1
# None

# **EXHIBIT 2**
# **None**

# EXHIBIT 3
# None

# EXHIBIT 4
# Proof of Service

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

*In re:*                                                    Case No. 13-53846

                                                            Judge Thomas J. Tucker

City of Detroit, Michigan                                   Chapter 9

         *Debtor.*

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of May, 2022, I electronically filed and served a copy of the Response to City of Detroit's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order, Exhibit List and Documentary Exhibits A-S with the Clerk of the Court using the ECF system which will send notification to all interested parties and attorneys of record including:

> MILLER, CANFIELD, PADDOCK & STONE, PLC
> ATTN: Mark N. Swanson
> 150 West Jefferson, Suite 2500
> Detroit, MI 48226
> swansonnm@millercanfield.com

May 17, 2022                              */s/ Michael R. Dezsi*
                                         MICHAEL R. DEZSI
                                         DETTMER & DEZSI, PLLC,
                                         1523 N. Main St.
                                         Royal Oak, MI 48067
                                         (313) 757-8112
                                         mdezsi@dezsilaw.com
                                         P64530

1

# EXHIBIT 5
# None

# EXHIBIT 6
# Documentary Exhibits

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re:*                                             Case No. 13-53846
                                                     Hon. Thomas J. Tucker
CITY OF DETROIT, MICHIGAN,                           Chapter 9

       *Debtor.*

---

## INDEX OF EXHIBITS TO DEBRA METRIS-SHAMOON, MUKHLIS SHAMOON, CARL VERES, PAUL METRIS AND JULIA METRIS RESPONSE TO CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER [DKT #13532]

| **Exhibit** | **Description** | **Date** |
|---|---|---|
| A. | *Davis v. City of Detroit, et al.*; Case No. 15-cv-10547 (J. Borman); Civil docket | |
| B. | Media articles regarding *Davis* civil Case No. 15-cv-10547 | |
| C. | *USA v Hansberry, et al.,* Case No. 15-cr-20217 (J. Murphy, III); Criminal docket | |
| D. | *Davis v. City of Detroit, et al.;* Case No. 15-cv-10547 First Request to Produce | 4/23/2015 |
| E. | General Release, Waiver and Settlement Agreement *Davis v. City of Detroit, et al.*; Case No. 15-cv-10547 | 02/06/2019 |
| F. | Detroit Police Department Communications Operations | 06/27/2014 |
| G. | Declaration of Adam Shamoon | |
| H. | Declaration of Debra Metris-Shamoon | |
| I. | Jury Trial Transcript: Vol 14 (Including Testimony of Arthur Leavells); *USA v Hansberry, et al.;* Case No. 15-cr-20217 (J. Murphy, III) | 06/28/2016 |

1

| J. | Excerpts of Deposition Transcript of Chief James Craig | 05/21/2020 |
| K. | The Detroit News article: Detroit police probe yields allegations of widespread corruption in drug unit; | 12/11/2019 |
| | The Detroit News article: Detroit police chief: Longstanding culture of drug unit corruption | 12/12/2019 |
| L. | Excerpts of Dkt #8045 Eighth Amended Plan for the Adjustment of Debts of The City of Detroit | 10/22/2014 |
| M. | Kym Worthy/WCPO Press Release | 03/24/2020 |
| N. | IA Inter-Office memorandum (Rayis) | 07/18/2014 |
| O. | Notice of Seizure and Intent to Forfeit, witnessed by "Sgt Joe Tucker" | 09/13/2012 |
| P. | Internal Affair Database Report, Disciplinary History; (DPD Bates 2255, 2257, 2259) | |
| Q. | Excerpt of Internal Affairs Case 00 213 (DPD 2350-54) | 05/28/2001 |
| R. | Correspondence (DPD 2734-2741) | 11/25/2011 |
| S. | *Metris-Shamoon, et al., vs. City of Detroit*; Case No. 18-cv-13683 (J. Cleland); Civil Docket | |

# EXHIBIT A

CLOSED

# U.S. District Court
## Eastern District of Michigan (Detroit)
## CIVIL DOCKET FOR CASE #: 2:15-cv-10547-PDB-DRG

Davis et al v. Detroit, City of et al                Date Filed: 02/11/2015
Assigned to: District Judge Paul D. Borman          Date Terminated: 03/28/2019
Referred to: Magistrate Judge David R. Grand        Jury Demand: Plaintiff
Cause: 28:1331 Fed. Question                        Nature of Suit: 440 Civil Rights: Other
                                                    Jurisdiction: Federal Question

**Plaintiff**

**Timothy Davis**                      represented by   **Dennis A Dettmer**
                                                        Dettmer and Dezsi, PLLC
                                                        615 Griswold Street
                                                        Suite 1410
                                                        Detroit, MI 48226
                                                        313-281-8090
                                                        Fax: 313-887-0420
                                                        Email: ddettmeresq@yahoo.com
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Michael R. Dezsi**
                                                        Law Office of Michael R. Dezsi, PLLC
                                                        615 Griswold Street
                                                        Suite 1410
                                                        Detroit, MI 48226
                                                        313 879 1206
                                                        Fax: 313 887 0420
                                                        Email: mdezsi@dezsilaw.com
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hatema Davis**                       represented by   **Dennis A Dettmer**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Michael R. Dezsi**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Detroit, City of**                   represented by

**Calvert A. Bailey**
Detroit City Law Department
1650 First National Building
Detroit, MI 48226
313-224-4550
Fax: 313-224-5505
Email: bailc@detroitmi.gov
*ATTORNEY TO BE NOTICED*

**James R. Acho**
Cummings, McClorey, Davis & Acho
PLC
17436 College Parkway
Livonia, MI 48152
Email: jacho@cmda-law.com
*TERMINATED: 12/12/2017*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
Allen Brothers
400 Monroe Street
Suite 220
Detroit, MI 48226
313-962-7777
Email:
jamesallen@allenbrotherspllc.com
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
Allen Brothers, Attorneys and
Counselors, PLLC
400 Monroe, St.
Suite 620
Detroit, MI 48226
(313) 962-7777
Fax: (313) 962-0581
Email: ljohnson@allenbrotherspllc.com
*ATTORNEY TO BE NOTICED*

**Ronald G. Acho**
Cummings, McClorey,
17436 College Parkway
Livonia, MI 48152
734-261-2400
Email: racho@cmda-law.com
*TERMINATED: 12/12/2017*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Charles Flanagan**                    represented by    **Calvert A. Bailey**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **James R. Acho**
                                                         (See above for address)
                                                         *TERMINATED: 12/12/2017*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **James P. Allen**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Lindsey R. Johnson**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ronald G. Acho**
                                                         (See above for address)
                                                         *TERMINATED: 12/12/2017*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Officer Novak**

**Defendant**

**James Napier**                        represented by    **Calvert A. Bailey**
*TERMINATED: 08/02/2017*                                 (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **James R. Acho**
                                                         (See above for address)
                                                         *TERMINATED: 12/12/2017*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **James P. Allen**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Lindsey R. Johnson**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ronald G. Acho**
                                                         (See above for address)
                                                         *TERMINATED: 12/12/2017*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**John Doe**
*TERMINATED: 07/14/2015*

**Defendant**

**John Doe 2**
*TERMINATED: 07/14/2015*

**Defendant**

**Vatasha K Napier**                    represented by    **James P. Allen**
*TERMINATED: 08/24/2017*                                  (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Calvert A. Bailey**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James R. Acho**
                                                          (See above for address)
                                                          *TERMINATED: 12/12/2017*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Lindsey R. Johnson**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ronald G. Acho**
                                                          (See above for address)
                                                          *TERMINATED: 12/12/2017*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Arthur Leavells**                     represented by    **Lawrence T. Garcia**
                                                          Garcia Law Group, PLLC
                                                          The Fisher Building
                                                          3011 West Grand Boulevard
                                                          Suite 2500
                                                          Detroit, MI 48202
                                                          877-643-6255
                                                          Fax: 313-486-3017
                                                          Email:
                                                          lgarcia@garcialawgrouppllc.com
                                                          *TERMINATED: 12/01/2017*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Stephani J. LaBelle**
                                                          LaBelle Law PLLC
                                                          18720 Mack Avenue
                                                          Suite 240

Grosse Pointe Farms, MI 48236
3133009939
Email: slabelle@labellelawpllc.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Officer Amy Matellic**                   represented by   **Calvert A. Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James R. Acho**
(See above for address)
*TERMINATED: 12/12/2017*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ronald G. Acho**
(See above for address)
*TERMINATED: 12/12/2017*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Officer Larry Barnett**                  represented by   **Calvert A. Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James R. Acho**
(See above for address)
*TERMINATED: 12/12/2017*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ronald G. Acho**
(See above for address)

*TERMINATED: 12/12/2017*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Officer Steven Riley**                   represented by   **James P. Allen**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Calvert A. Bailey**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **James R. Acho**
                                                            (See above for address)
                                                            *TERMINATED: 12/12/2017*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Lindsey R. Johnson**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Ronald G. Acho**
                                                            (See above for address)
                                                            *TERMINATED: 12/12/2017*
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Officer Matthew Bray**                   represented by   **Calvert A. Bailey**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **James R. Acho**
                                                            (See above for address)
                                                            *TERMINATED: 12/12/2017*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **James P. Allen**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Lindsey R. Johnson**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Ronald G. Acho**
                                                            (See above for address)
                                                            *TERMINATED: 12/12/2017*
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Officer Brian Johnson**                    represented by    **Calvert A. Bailey**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **James R. Acho**
                                                              (See above for address)
                                                              *TERMINATED: 12/12/2017*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **James P. Allen**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lindsey R. Johnson**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Ronald G. Acho**
                                                              (See above for address)
                                                              *TERMINATED: 12/12/2017*
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Officer Reginald Beasley**                 represented by    **Calvert A. Bailey**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **James R. Acho**
                                                              (See above for address)
                                                              *TERMINATED: 12/12/2017*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **James P. Allen**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lindsey R. Johnson**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Ronald G. Acho**
                                                              (See above for address)
                                                              *TERMINATED: 12/12/2017*
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Sgt. Stephen Geelhood**                    represented by

**Calvert A. Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James R. Acho**
(See above for address)
*TERMINATED: 12/12/2017*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ronald G. Acho**
(See above for address)
*TERMINATED: 12/12/2017*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2015 | 1 | COMPLAINT filed by All Plaintiffs against All Defendants with Jury Demand. Plaintiff requests summons issued. Receipt No: 0645-5022837 - Fee: $ 400. County of 1st Plaintiff: St Clair County - County Where Action Arose: Oakland - County of 1st Defendant: Wayne. [Previously dismissed case: No] [Possible companion case(s): None] (Dezsi, Michael) (Entered: 02/11/2015) |
| 02/12/2015 | 2 | SUMMONS Issued for *Detroit, City of, Charles Flanagan, James Napier, Officer Novak* (TMcg) (Entered: 02/12/2015) |
| 03/02/2015 | 3 | CERTIFICATE of Service/Summons Returned Executed. Detroit, City of served on 3/2/2015, answer due 3/23/2015. (Dezsi, Michael) (Entered: 03/02/2015) |
| 03/02/2015 | 4 | CERTIFICATE of Service/Summons Returned Executed. Charles Flanagan served on 3/2/2015, answer due 3/23/2015. (Dezsi, Michael) (Entered: 03/02/2015) |
| 03/23/2015 | 5 | ANSWER to Complaint with Affirmative Defenses by Detroit, City of. (Bailey, Calvert) (Entered: 03/23/2015) |
| 03/23/2015 | 6 | MOTION to Quash Service by Charles Flanagan. (Attachments: # 1 Exhibit Affidavit of Charles Flanagan, # 2 Exhibit Return of Service) (Bailey, Calvert) Modified on 3/24/2015 (LHos). (Entered: 03/23/2015) |
| 03/30/2015 | 7 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 6 MOTION to Quash filed by Charles Flanagan. Signed by District Judge Paul D. Borman. (DTof) (Entered: 03/30/2015) |

| 03/31/2015 | 8 | NOTICE OF HEARING BY TELEPHONE on 6 MOTION to Quash . **Motion Hearing set for 4/1/2015 03:00 PM before Magistrate Judge David R. Grand** (EBut) (Entered: 03/31/2015) |
| 04/01/2015 | 9 | NOTICE TO APPEAR: **Scheduling Conference set for 5/11/2015 04:15 PM before District Judge Paul D. Borman** *SEE NOTICE FOR FURTHER INFORMATION* (DTof) (Entered: 04/01/2015) |
| 04/01/2015 | 10 | NOTICE of Appearance by Dennis A Dettmer on behalf of Hatema Davis, Timothy Davis. (Dettmer, Dennis) (Entered: 04/01/2015) |
| 04/09/2015 | 11 | CERTIFICATE of Service/Summons Returned Executed. Charles Flanagan served on 4/9/2015, answer due 4/30/2015. (Dezsi, Michael) (Entered: 04/09/2015) |
| 04/14/2015 | 12 | CERTIFICATE of Service/Summons Returned Executed.. (Dezsi, Michael) (Entered: 04/14/2015) |
| 04/23/2015 |  | TEXT-ONLY NOTICE: Scheduling conference set for 5/11/2015 is Cancelled. (DTof) (Entered: 04/23/2015) |
| 04/27/2015 | 13 | ORDER denying as moot 6 Motion to Quash. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 04/27/2015) |
| 04/29/2015 | 14 | ANSWER to Complaint with Affirmative Defenses by Charles Flanagan. (Bailey, Calvert) (Entered: 04/29/2015) |
| 05/01/2015 | 15 | NOTICE TO APPEAR: **Scheduling Conference set for 5/18/2015 04:00 PM before District Judge Paul D. Borman** *Refer to Docket #9 for further information; once the parties file a Rule 26(f) plan, the Court will cancel the conference and issue a scheduling order* (DTof) (Entered: 05/01/2015) |
| 05/13/2015 | 16 | DISCOVERY plan jointly filed pursuant to Federal Rules of Civil Procedure 26(f) (Dezsi, Michael) (Entered: 05/13/2015) |
| 05/14/2015 |  | TEXT-ONLY NOTICE: Scheduling conference set for 5/18/2015 is Cancelled. (DTof) (Entered: 05/14/2015) |
| 05/15/2015 | 17 | SCHEDULING ORDER: **Fact Discovery due by 11/1/2015; Dispositive Motion Cut-off set for 2/15/2016** - Signed by District Judge Paul D. Borman. (Refer to image for additional dates) (DTof) (Entered: 05/15/2015) |
| 06/30/2015 | 18 | MOTION for Protective Order by Detroit, City of. (Attachments: # 1 Exhibit Plaintifs First Request To Produce) (Bailey, Calvert) (Entered: 06/30/2015) |
| 07/14/2015 | 19 | MOTION for Leave to File *Amended Complaint* by All Plaintiffs. (Attachments: # 1 Exhibit First Amended Complaint) (Dezsi, Michael) (Entered: 07/14/2015) |
| 07/14/2015 | 20 | STIPULATED ORDER Allowing Plaintiff to File First Amended Complaint. Signed by District Judge Paul D. Borman. (DTof) (Entered: 07/14/2015) |
| 07/14/2015 | 21 | AMENDED COMPLAINT with Jury Demand filed by All Plaintiffs against All Defendants. NEW PARTIES ADDED. (Dezsi, Michael) (Entered: 07/14/2015) |

| 07/14/2015 |    | REQUEST for SUMMONS for Stephen Geelhood, Brian Johnson, Arthur Leavells, Amy Matellic. (Dezsi, Michael) (Entered: 07/14/2015) |
|------------|----|------|
| 07/14/2015 |    | REQUEST for SUMMONS for Larry Barnett, Reginald Beasley, Matthew Bray. (Dezsi, Michael) (Entered: 07/14/2015) |
| 07/14/2015 |    | REQUEST for SUMMONS for Vatasha K Napier. (Dezsi, Michael) (Entered: 07/14/2015) |
| 07/14/2015 |    | REQUEST for SUMMONS for Steven Riley. (Dezsi, Michael) (Entered: 07/14/2015) |
| 07/14/2015 | 22 | NOTICE by All Plaintiffs of withdrawal of 19 MOTION for Leave to File *Amended Complaint* . (Dezsi, Michael) (Entered: 07/14/2015) |
| 07/14/2015 | 23 | SUMMONS Issued for *Larry Barnett, Reginald Beasley, Matthew Bray, Stephen Geelhood, Brian Johnson, Arthur Leavells, Amy Matellic, Vatasha K Napier, Steven Riley* (SOso) (Entered: 07/14/2015) |
| 07/15/2015 | 24 | RESPONSE to 18 MOTION for Protective Order filed by All Plaintiffs. (Attachments: # 1 Exhibit Pf's First Request to Produce Documents) (Dezsi, Michael) (Entered: 07/15/2015) |
| 07/15/2015 | 25 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 18 MOTION for Protective Order filed by Detroit, City of. Signed by District Judge Paul D. Borman. (DTof) (Entered: 07/15/2015) |
| 08/05/2015 | 26 | NOTICE OF HEARING on 18 MOTION for Protective Order . **Motion Hearing set for 9/15/2015 10:00 AM before Magistrate Judge David R. Grand** (EBut) (Entered: 08/05/2015) |
| 08/12/2015 | 27 | ANSWER to Amended Complaint with Affirmative Defenses by Detroit, City of. (Bailey, Calvert) (Entered: 08/12/2015) |
| 08/12/2015 | 28 | ANSWER to Amended Complaint with Affirmative Defenses by Charles Flanagan. (Bailey, Calvert) (Entered: 08/12/2015) |
| 08/12/2015 | 29 | ANSWER to Amended Complaint with Affirmative Defenses by Vatasha K Napier. (Bailey, Calvert) (Entered: 08/12/2015) |
| 09/01/2015 | 30 | *PLAINTIFFS'* WITNESS LIST by All Plaintiffs (Dezsi, Michael) (Entered: 09/01/2015) |
| 09/02/2015 | 31 | WITNESS LIST by Detroit, City of, Charles Flanagan, Vatasha K Napier (Bailey, Calvert) (Entered: 09/02/2015) |
| 09/08/2015 | 32 | CERTIFICATE of Service/Summons Returned Executed. Stephen Geelhood served on 9/8/2015, answer due 9/29/2015. (Dettmer, Dennis) (Entered: 09/08/2015) |
| 09/08/2015 | 33 | CERTIFICATE of Service/Summons Returned Executed. Reginald Beasley served on 9/8/2015, answer due 9/29/2015. (Dettmer, Dennis) (Entered: 09/08/2015) |
| 09/08/2015 | 34 |  |

| | | CERTIFICATE of Service/Summons Returned Executed. Brian Johnson served on 9/8/2015, answer due 9/29/2015. (Dettmer, Dennis) (Entered: 09/08/2015) |
|---|---|---|
| 09/08/2015 | 35 | CERTIFICATE of Service/Summons Returned Executed. Matthew Bray served on 9/8/2015, answer due 9/29/2015. (Dettmer, Dennis) (Entered: 09/08/2015) |
| 09/15/2015 | 36 | ORDER granting in part and denying in part 18 Motion for Protective Order. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 09/15/2015) |
| 09/15/2015 | | Minute Entry for proceedings before Magistrate Judge David R. Grand: Motion Hearing held on 9/15/2015 re 18 MOTION for Protective Order filed by Detroit, City of Disposition: #18 granted in part, denied in part(Court Reporter Digitally Recorded) (EBut) (Entered: 09/15/2015) |
| 09/22/2015 | 37 | STIPULATED ORDER Extending Expert Disclosure Deadline. Signed by District Judge Paul D. Borman. (DTof) (Entered: 09/22/2015) |
| 09/29/2015 | 38 | ANSWER to Amended Complaint with Affirmative Defenses by Reginald Beasley. (Bailey, Calvert) (Entered: 09/29/2015) |
| 09/29/2015 | 39 | ANSWER to Amended Complaint with Affirmative Defenses by Matthew Bray. (Bailey, Calvert) (Entered: 09/29/2015) |
| 09/29/2015 | 40 | ANSWER to Amended Complaint with Affirmative Defenses by Stephen Geelhood. (Bailey, Calvert) (Entered: 09/29/2015) |
| 09/29/2015 | 41 | ANSWER to Amended Complaint with Affirmative Defenses by Brian Johnson. (Bailey, Calvert) (Entered: 09/29/2015) |
| 10/05/2015 | 42 | CERTIFICATE of Service/Summons Returned Executed. Larry Barnett served on 10/5/2015, answer due 10/26/2015. (Dezsi, Michael) (Entered: 10/05/2015) |
| 10/06/2015 | 43 | CERTIFICATE of Service/Summons Returned Executed. Arthur Leavells served on 10/6/2015, answer due 10/27/2015. (Dezsi, Michael) (Entered: 10/06/2015) |
| 10/08/2015 | 44 | STIPULATED PROTECTIVE ORDER - Signed by District Judge Paul D. Borman. (DTof) (Entered: 10/08/2015) |
| 10/19/2015 | 45 | CERTIFICATE of Service/Summons Returned Executed. Amy Matellic served on 10/19/2015, answer due 11/9/2015. (Dezsi, Michael) (Entered: 10/19/2015) |
| 10/26/2015 | 46 | ANSWER to Amended Complaint with Affirmative Defenses by Larry Barnett. (Bailey, Calvert) (Entered: 10/26/2015) |
| 11/05/2015 | 47 | ANSWER to Amended Complaint with Affirmative Defenses by Amy Matellic. (Bailey, Calvert) (Entered: 11/05/2015) |
| 11/10/2015 | 48 | CERTIFICATE of Service/Summons Returned Executed. Steven Riley served on 11/10/2015, answer due 12/1/2015. (Dezsi, Michael) (Entered: 11/10/2015) |
| 12/04/2015 | 49 | ANSWER to Amended Complaint with Affirmative Defenses by Steven Riley. (Bailey, Calvert) (Entered: 12/04/2015) |
| | | |

| 12/28/2015 | 50 | STIPULATED ORDER Amending dates ( **Fact Discovery due by 6/20/2016, Dispositive Motion Cut-off set for 12/1/2016**)*See order for other deadlines* Signed by District Judge Paul D. Borman. (DTof) (Entered: 12/28/2015) |
|---|---|---|
| 01/25/2016 | 51 | NOTICE of Appearance by Lawrence T. Garcia on behalf of Arthur Leavells. (Garcia, Lawrence) (Entered: 01/25/2016) |
| 01/25/2016 | 52 | ANSWER to Amended Complaint with Affirmative Defenses by Arthur Leavells. (Garcia, Lawrence) (Entered: 01/25/2016) |
| 01/26/2016 | 53 | MOTION for Order to Show Cause *and/or Default Judgment* by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit) (Dezsi, Michael) (Entered: 01/26/2016) |
| 01/26/2016 | 54 | Amended MOTION for Order to Show Cause *and/or Default Judgment for Defendants' Failure to Comply with this Court's Prior Discovery Orders* by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F) (Dezsi, Michael) (Entered: 01/26/2016) |
| 01/26/2016 | 55 | MOTION to Compel *the Deposition to Detroit Police Chief James Craig* by All Plaintiffs. (Attachments: # 1 Exhibit A) (Dezsi, Michael) (Entered: 01/26/2016) |
| 02/02/2016 | 56 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 55 MOTION to Compel *the Deposition to Detroit Police Chief James Craig* filed by Hatema Davis, Timothy Davis. Signed by District Judge Paul D. Borman. (DTof) (Entered: 02/02/2016) |
| 02/10/2016 | 57 | ORDER denying without prejudice 55 Motion to Compel. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 02/10/2016) |
| 03/03/2016 | 58 | ORDER granting in part and denying in part 54 Motion for Order to Show Cause. Signed by District Judge Paul D. Borman. (DTof) (Entered: 03/03/2016) |
| 03/16/2016 | 59 | STIPULATED ORDER to Extend Witness List Filing. Signed by District Judge Paul D. Borman. (DTof) (Entered: 03/16/2016) |
| 03/28/2016 | 60 | MOTION for Default Judgment as to Arthur Leavells by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E) (Dezsi, Michael) (Entered: 03/28/2016) |
| 03/30/2016 | 61 | MOTION to Stay *Proceedings* by Arthur Leavells. (LaBelle, Stephani) (Entered: 03/30/2016) |
| 04/04/2016 | 62 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 60 MOTION for Default Judgment as to Arthur Leavells filed by Hatema Davis, Timothy Davis. Signed by District Judge Paul D. Borman. (DTof) (Entered: 04/04/2016) |
| 04/04/2016 | 63 | RESPONSE to 61 MOTION to Stay *Proceedings* filed by Larry Barnett, Reginald Beasley, Matthew Bray, Detroit, City of, Charles Flanagan, Stephen Geelhood, Brian Johnson, Amy Matellic, James Napier, Vatasha K Napier, Steven Riley. (Bailey, Calvert) (Entered: 04/04/2016) |

| 04/06/2016 | 64 | RESPONSE to 61 MOTION to Stay *Proceedings* filed by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B) (Dezsi, Michael) (Entered: 04/06/2016) |
|---|---|---|
| 04/07/2016 | 65 | Renewed MOTION for Default Judgment as to Detroit, City of by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I) (Dezsi, Michael) (Entered: 04/07/2016) |
| 04/07/2016 | 66 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 61 MOTION to Stay *Proceedings* filed by Arthur Leavells. Signed by District Judge Paul D. Borman. (DTof) (Entered: 04/07/2016) |
| 04/07/2016 | 67 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 65 Renewed MOTION for Default Judgment as to Detroit, City of filed by Hatema Davis, Timothy Davis. Signed by District Judge Paul D. Borman. (DTof) (Entered: 04/07/2016) |
| 04/07/2016 | 68 | SEALED EXHIBIT *G and H* re 65 Renewed MOTION for Default Judgment as to Detroit, City of by All Plaintiffs. (Attachments: # 1 Exhibit G Internal Affairs Documents, # 2 Exhibit H Internal Affairs Documents) (Dezsi, Michael) (Entered: 04/07/2016) |
| 04/11/2016 | 69 | NOTICE OF HEARING on 60 MOTION for Default Judgment as to Arthur Leavells , 65 Renewed MOTION for Default Judgment as to Detroit, City of , 61 MOTION to Stay *Proceedings*. **Motion Hearing set for 6/7/2016 10:00 AM before Magistrate Judge David R. Grand** (EBut) (Entered: 04/11/2016) |
| 04/11/2016 | 70 | RESPONSE to 60 MOTION for Default Judgment as to Arthur Leavells filed by Arthur Leavells. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A) (Garcia, Lawrence) (Entered: 04/11/2016) |
| 04/29/2016 | 71 | WITNESS LIST by Arthur Leavells (LaBelle, Stephani) (Entered: 04/29/2016) |
| 05/02/2016 | 72 | *Amended* WITNESS LIST by All Plaintiffs (Dezsi, Michael) (Entered: 05/02/2016) |
| 05/12/2016 | 73 | MOTION to Compel by Larry Barnett, Reginald Beasley, Matthew Bray, Detroit, City of, Charles Flanagan, Stephen Geelhood, Brian Johnson, Arthur Leavells, Amy Matellic, James Napier, Vatasha K Napier, Steven Riley. (Attachments: # 1 Exhibit Deposition Notice and Certificate of Service, # 2 Email from plaintiff counsel) (Bailey, Calvert) Modified on 6/1/2016 (DTof) - Defendant Arthur Leavells not a filer of this motion. (Entered: 05/12/2016) |
| 05/13/2016 | 74 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 73 MOTION to Compel filed by Matthew Bray, Brian Johnson, Larry Barnett, James Napier, Stephen Geelhood, Reginald Beasley, Arthur Leavells, Charles Flanagan, Detroit, City of, Steven Riley, Vatasha K Napier, Amy Matellic. Signed by District Judge Paul D. Borman. (DTof) Modified on 6/1/2016 (DTof) - Defendant Arthur Leavells not a filer of this motion. (Entered: 05/13/2016) |
| 05/16/2016 | 75 | |

| | | ORDER denying 73 Motion to Compel. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 05/16/2016) |
|---|---|---|
| 05/20/2016 | 76 | MOTION to Compel *Depositions of Plaintiffs* by Arthur Leavells. (Attachments: # 1 Index of Exhibits Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (LaBelle, Stephani) (Entered: 05/20/2016) |
| 05/31/2016 | 77 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 76 MOTION to Compel *Depositions of Plaintiffs* filed by Arthur Leavells. Signed by District Judge Paul D. Borman. (DTof) (Entered: 05/31/2016) |
| 05/31/2016 | 78 | APPEAL OF MAGISTRATE JUDGE DECISION by Charles Flanagan, Stephen Geelhood, Brian Johnson, Arthur Leavells, Amy Matellic, James Napier, Vatasha K Napier, Steven Riley re 75 Order on Motion to Compel. (Bailey, Calvert) Modified on 6/1/2016 (DWor). [ALSO FILED BY LARRY BARNETT, MATTHEW BRAY, REGINALD BEASLEY] (Entered: 05/31/2016) |
| 06/01/2016 | 79 | RESPONSE to 76 MOTION to Compel *Depositions of Plaintiffs* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 06/01/2016) |
| 06/02/2016 | 80 | NOTICE OF HEARING on 76 MOTION to Compel *Depositions of Plaintiffs*. **Motion Hearing set for 6/7/2016 10:00 AM before Magistrate Judge David R. Grand** (EBut) (Entered: 06/02/2016) |
| 06/05/2016 | 81 | RESPONSE to 65 Renewed MOTION for Default Judgment as to Detroit, City of filed by Detroit, City of. (Bailey, Calvert) (Entered: 06/05/2016) |
| 06/06/2016 | 82 | REPLY to Response re 65 Renewed MOTION for Default Judgment as to Detroit, City of filed by Hatema Davis, Timothy Davis. (Dezsi, Michael) (Entered: 06/06/2016) |
| 06/07/2016 | 83 | ORDER REGARDING EVIDENTIARY HEARING. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 06/07/2016) |
| 06/07/2016 | | Minute Entry for proceedings before Magistrate Judge David R. Grand: Motion Hearing held on 6/7/2016 re 65 Renewed MOTION for Default Judgment as to Detroit, City of filed by Hatema Davis, Timothy Davis, 61 MOTION to Stay *Proceedings* filed by Arthur Leavells, 60 MOTION for Default Judgment as to Arthur Leavells filed by Hatema Davis, Timothy Davis, 76 MOTION to Compel *Depositions of Plaintiffs* filed by Arthur Leavells. Disposition: MotionS taken under advisement (Court Reporter: Digitally Recorded) (EBut) (Entered: 06/07/2016) |
| 06/14/2016 | 84 | SUPPLEMENTAL BRIEF re 65 Renewed MOTION for Default Judgment as to Detroit, City of filed by All Plaintiffs. (Dezsi, Michael) (Entered: 06/14/2016) |
| 06/14/2016 | 85 | SEALED EXHIBIT re 84 Supplemental Brief by All Plaintiffs. (Attachments: # 1 Exhibit J, # 2 Exhibit K) (Dezsi, Michael) (Entered: 06/14/2016) |
| 06/21/2016 | 86 | SUPPLEMENTAL BRIEF re 84 Supplemental Brief filed by Detroit, City of. (Bailey, Calvert) (Entered: 06/21/2016) |

| 06/28/2016 | 87 | RENOTICE TO APPEAR: **Evidentiary Hearing set for 8/1/2016 10:00 AM before Magistrate Judge David R. Grand** (EBut) (Entered: 06/28/2016) |
|---|---|---|
| 07/14/2016 | 88 | MOTION to Certify Class by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A1-A4: Affidavits and Search Warrants, # 3 Exhibit B: First Superseding Indictment) (Dezsi, Michael) (Entered: 07/14/2016) |
| 07/14/2016 | 89 | OPINION AND ORDER Denying Objections contained in 78 Appeal of Magistrate Judge Decision, filed by Brian Johnson, James Napier, Stephen Geelhood, Charles Flanagan, Arthur Leavells, Steven Riley, Vatasha K Napier, Amy Matellic. Signed by District Judge Paul D. Borman. (DTof) (Entered: 07/14/2016) |
| 07/14/2016 | 90 | MOTION for Partial Summary Judgment by Arthur Leavells. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Garcia, Lawrence) (Entered: 07/14/2016) |
| 07/25/2016 | 91 | RESPONSE to 88 MOTION to Certify Class filed by Larry Barnett, Reginald Beasley, Matthew Bray, Detroit, City of, Charles Flanagan, Stephen Geelhood, Brian Johnson, Arthur Leavells, Amy Matellic, James Napier, Vatasha K Napier, Steven Riley. (Bailey, Calvert) (Entered: 07/25/2016) |
| 07/29/2016 | 92 | RESPONSE to 88 MOTION to Certify Class filed by Arthur Leavells. (Garcia, Lawrence) (Entered: 07/29/2016) |
| 08/01/2016 |  | Minute Entry for proceedings before Magistrate Judge David R. Grand: Evidentiary Hearing held on 8/1/2016. (Court Reporter: Jeseca Eddington) (EBut) (Entered: 08/02/2016) |
| 08/03/2016 | 93 | REPLY to Response re 88 MOTION to Certify Class filed by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit C, # 3 Exhibit D) (Dezsi, Michael) (Entered: 08/03/2016) |
| 08/04/2016 | 94 | RESPONSE to 90 MOTION for Partial Summary Judgment filed by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C) (Dezsi, Michael) (Entered: 08/04/2016) |
| 08/17/2016 | 95 | REPLY to Response re 90 MOTION for Partial Summary Judgment filed by Arthur Leavells. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E) (Garcia, Lawrence) (Entered: 08/17/2016) |
| 09/29/2016 | 96 | ORDER granting in part and denying in part 76 Motion to Compel. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 09/29/2016) |
| 09/29/2016 | 97 | ORDER denying 61 Motion to Stay. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 09/29/2016) |
| 09/29/2016 | 98 | REPORT AND RECOMMENDATION re 60 MOTION for Default Judgment as to Arthur Leavells filed by Hatema Davis, Timothy Davis Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 09/29/2016) |
| 09/29/2016 | 99 | REPORT AND RECOMMENDATION re 65 Renewed MOTION for Default Judgment as to Detroit, City of filed by Hatema Davis, Timothy Davis Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 09/29/2016) |

| 10/19/2016 | 100 | OPINION AND ORDER Adopting 98 Report and Recommendation Denying 60 Motion for Default Judgment filed by Hatema Davis, Timothy Davis. Signed by District Judge Paul D. Borman. (DTof) (Entered: 10/19/2016) |
| 10/19/2016 | 101 | OPINION AND ORDER Adopting 99 Report and Recommendation Granting in Part and Denying in Part 65 Motion for Default Judgment, filed by Hatema Davis, Timothy Davis. Signed by District Judge Paul D. Borman. (DTof) (Entered: 10/19/2016) |
| 10/19/2016 | 102 | NOTICE OF HEARING on 90 MOTION for Partial Summary Judgment , 88 MOTION to Certify Class **Motion Hearing set for 1/19/2017 02:30 PM before District Judge Paul D. Borman** (DTof) (Entered: 10/19/2016) |
| 11/22/2016 | 103 | ORDER REFERRING OTHER MATTERS to Magistrate Judge Grand: Status conference regarding discovery issues. Signed by District Judge Paul D. Borman. (DTof) (Entered: 11/22/2016) |
| 11/30/2016 | 104 | ORDER REGARDING OUTSTANDING DISCOVERY ISSUES. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 11/30/2016) |
| 12/13/2016 | | Set/Reset Deadlines as to 90 MOTION for Partial Summary Judgment , 88 MOTION to Certify Class . **Motion Hearing RESET for 1/20/2017 02:30 PM before District Judge Paul D. Borman** (DTof) (Entered: 12/13/2016) |
| 12/29/2016 | 105 | MOTION for Extension of Time to File Response/Reply by Detroit, City of. (Bailey, Calvert) (Entered: 12/29/2016) |
| 12/30/2016 | 106 | RESPONSE to 105 MOTION for Extension of Time to File Response/Reply filed by All Plaintiffs. (Attachments: # 1 Exhibit Plaintiffs' 3rd Requests to Produce Documents, # 2 Exhibit City of Detroit's Objections to Discovery Requests) (Dezsi, Michael) (Entered: 12/30/2016) |
| 01/11/2017 | 107 | OPINION AND ORDER Reluctantly Granting 105 MOTION for Extension of Time to File Response/Reply filed by Detroit, City of AND SETTING STATUS CONFERENCE. ( **Status Conference set for 1/20/2017 02:30 PM before District Judge Paul D. Borman**), MOTIONS WILL NOT BE HEARD ON THAT DATE, ALL COUNSEL MUST APPEAR. Signed by District Judge Paul D. Borman. (DTof) (Entered: 01/11/2017) |
| 01/17/2017 | 108 | NOTICE TO APPEAR: **Status Conference RESET(TIME ONLY) for 1/20/2017 11:00 AM before District Judge Paul D. Borman** *ALL COUNSEL MUST APPEAR* (DTof) (Entered: 01/17/2017) |
| 01/20/2017 | | Minute Entry for proceedings before District Judge Paul D. Borman: Status Conference held on 1/20/2017. (Court Reporter: Leann Lizza) (DTof) (Entered: 01/20/2017) |
| 01/20/2017 | 109 | ORDER Referring Pretrial Matters Excluding Dispositive Motions to Magistrate Judge David R. Grand. Signed by District Judge Paul D. Borman. (DTof) (Entered: 01/20/2017) |
| 01/24/2017 | 110 | OPINION AND ORDER denying as moot 90 Motion for Partial Summary Judgment. Signed by District Judge Paul D. Borman. (DTof) (Entered: 01/24/2017) |

| | | |
|---|---|---|
| 02/28/2017 | 111 | TRANSCRIPT of Status Conference held on 01/20/2017. (Court Reporter: Leann S. Lizza) (Number of Pages: 28) The parties have 21 days to file with the court and Court Reporter a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 3/21/2017. Redacted Transcript Deadline set for 3/31/2017. Release of Transcript Restriction set for 5/30/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Lizza, L.) (Entered: 02/28/2017) |
| 03/02/2017 | 112 | NOTICE TO APPEAR BY TELEPHONE: **Status Conference set for 3/6/2017 03:30 PM before District Judge Paul D. Borman** (DTof) (Entered: 03/02/2017) |
| 03/06/2017 | | Minute Entry for proceedings before District Judge Paul D. Borman: Telephonic Status Conference held on 3/6/2017, Set Deadlines/Hearings: ( **TELEPHONIC Status Conference set for 4/17/2017 03:30 PM before District Judge Paul D. Borman**) (Court Reporter: Leann Lizza) (DTof) (Entered: 03/06/2017) |
| 04/17/2017 | | Minute Entry for proceedings before District Judge Paul D. Borman: Telephonic Status Conference held on 4/17/2017. (Court Reporter: Leann Lizza) (DTof) (Entered: 04/17/2017) |
| 05/03/2017 | 113 | NOTICE OF HEARING on 88 MOTION to Certify Class . **Motion Hearing set for 7/14/2017 02:00 PM before District Judge Paul D. Borman** (DTof) (Entered: 05/03/2017) |
| 05/24/2017 | 114 | Notice of E-mail Delivery Failure as to attorney Stephani J. LaBelle. Bounced NEF for 113 Notice of Hearing on Motion. (SSch) (Entered: 05/24/2017) |
| 05/31/2017 | 115 | MOTION for Default Judgment as to All Defendants by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G) (Dezsi, Michael) (Entered: 05/31/2017) |
| 05/31/2017 | 116 | EXHIBIT G - *Amended* re 115 MOTION for Default Judgment as to All Defendants by All Plaintiffs (Attachments: # 1 Exhibit G - Deposition of Arthur Leavells) (Dezsi, Michael) (Entered: 05/31/2017) |
| 06/02/2017 | 117 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 115 MOTION for Default Judgment as to All Defendants filed by Hatema Davis, Timothy Davis. Signed by District Judge Paul D. Borman. (DTof) (Entered: 06/02/2017) |
| 06/02/2017 | | TEXT-ONLY NOTICE: Motion Hearing set for 07/14/2017 is Cancelled re 88 MOTION to Certify Class (DTof) (Entered: 06/02/2017) |
| 06/06/2017 | 118 | RESPONSE to 115 MOTION for Default Judgment as to All Defendants filed by Detroit, City of. (Attachments: # 1 Exhibit A - Timothy Davis Deposition Transcript, # 2 Exhibit B - Concurrence E-Mail) (Bailey, Calvert) (Entered: 06/06/2017) |

| 06/14/2017 | 119 | RESPONSE to 115 MOTION for Default Judgment as to All Defendants filed by Arthur Leavells. (Attachments: # 1 Exhibit A) (Garcia, Lawrence) (Entered: 06/14/2017) |
|---|---|---|
| 06/15/2017 | 120 | NOTICE of Appearance by Ronald G. Acho on behalf of All Defendants. (Acho, Ronald) (Entered: 06/15/2017) |
| 06/15/2017 | 121 | NOTICE of Appearance by James R. Acho on behalf of All Defendants. (Acho, James) (Entered: 06/15/2017) |
| 06/20/2017 | 122 | REPLY to Response re 115 MOTION for Default Judgment as to All Defendants filed by All Plaintiffs. (Dezsi, Michael) (Entered: 06/20/2017) |
| 07/17/2017 | 123 | NOTICE OF HEARING on 115 MOTION for Default Judgment as to All Defendants . **Motion Hearing set for 8/22/2017 10:00 AM before Magistrate Judge David R. Grand** (EBut) (Entered: 07/17/2017) |
| 07/21/2017 | 124 | MOTION to Compel *Independent Medical Examinations of Plaintiffs* by Larry Barnett, Reginald Beasley, Matthew Bray, Detroit, City of, Charles Flanagan, Stephen Geelhood, Brian Johnson, Amy Matellic, James Napier, Vatasha K Napier, Steven Riley. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A: Criminal History, # 3 Exhibit B: Statement, # 4 Exhibit C: Status Report, # 5 Exhibit D: 6/9/2017 corresp., # 6 Exhibit E: 6/20/2017 corresp., # 7 Exhibit F: 7/5/2017 corresp., # 8 Exhibit G: 7/19/2017 corresp., # 9 Exhibit H: Intake form, # 10 Exhibit I: H. Davis Dep, # 11 Exhibit J: T. Davis dep., # 12 Exhibit K: Lahar v. Oakland County, # 13 Exhibit L: Medical records) (Acho, Ronald) (Entered: 07/21/2017) |
| 07/25/2017 | 125 | MOTION for Summary Judgment by James Napier, Vatasha K Napier. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A: Letters of Authority, # 3 Exhibit B: Geelhood Dep., # 4 Exhibit C: Activity Log, # 5 Exhibit D: Napier time cards, # 6 Exhibit E: NED Daily Detail, # 7 Exhibit F: Narc Unit Daily Detail, # 8 Exhibit G: Bennett v. Schroeder) (Acho, Ronald) (Entered: 07/25/2017) |
| 07/26/2017 | 126 | ORDER granting in part and denying in part 124 Motion to Compel. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 07/26/2017) |
| 08/02/2017 | 127 | STIPULATED ORDER Dismissing Defendant James Napier. Signed by District Judge Paul D. Borman. (DTof) (Entered: 08/02/2017) |
| 08/03/2017 |  | Minute Entry for proceedings before Magistrate Judge David R. Grand: Telephonic Conference held on 8/3/2017.Disposition: The Court held a telephonic conference to discuss the parties' respective proposed protective orders. The Court provided guidance which should easily enable counsel to draft a protective order that addresses each side's concerns without burdening either side's rights. The Court declined counsel's request to draft the protective order for the parties. Counsel should forthwith meet and confer in good faith and then submit a joint proposed protective order for entry by close of business on Friday, August 4, 2017. If they are unable to agree on a protective order, Plaintiff shall file a motion for protective order by close of business on Monday, August 7, 2017. Defendant shall file a response to any such motion |

| | | by close of business on Wednesday, August 10, 2017. (EBut) (Entered: 08/03/2017) |
|---|---|---|
| 08/04/2017 | 128 | Notice of E-mail Delivery Failure as to attorney Stephani J. LaBelle. Bounced NEF for 125 MOTION for Summary Judgment , 127 Order, Add and Terminate Parties, Text-Only Notice of Hearing Cancelled, 115 MOTION for Default Judgment as to All Defendants , 120 Notice of Appearance, 116 Exhibit, 123 Notice of Hearing on Motion, 124 MOTION to Compel *Independent Medical Examinations of Plaintiffs*, 117 Order Referring Motion to Magistrate Judge, Status Conference,,, 126 Order on Motion to Compel, 121 Notice of Appearance, 118 Response to Motion, 122 Reply to Response to Motion, 119 Response to Motion. (SSch) (Entered: 08/04/2017) |
| 08/07/2017 | 129 | MOTION for Protective Order *Regarding Independant Medical Examinations* by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Proposed Stipulated Protective Order, # 3 Exhibit B Email from Lawrence Garcia, # 4 Exhibit C Selected Emails between Counsel) (Dezsi, Michael) (Entered: 08/07/2017) |
| 08/09/2017 | 130 | RESPONSE to 129 MOTION for Protective Order *Regarding Independand Medical Examinations* filed by Detroit, City of. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Acho, Ronald) (Entered: 08/09/2017) |
| 08/14/2017 | 131 | [STRICKEN] RESPONSE *and Objection to Plaintiffs′ Subpoena for Documents* by Detroit, City of. (Attachments: # 1 Exhibit A) (Acho, Ronald) Modified on 8/15/2017 (DTyl). (Entered: 08/14/2017) |
| 08/15/2017 | | NOTICE of Error directed to: Ronald G. Acho re 131 Response (Free). Document is prohibited discovery, disclosure or a certificate of service thereof. Document was stricken. [No Image Associated with this docket entry] (DTyl) (Entered: 08/15/2017) |
| 08/15/2017 | 132 | OBJECTION to *Subpoena for Documents* by Arthur Leavells. (Garcia, Lawrence) (Entered: 08/15/2017) |
| 08/16/2017 | 133 | NOTICE by Detroit, City of *Objections to Plaintiffs′ Subpoena for Documents for August 22, 2017 Hearing for Plaintiff's Motion for Entry of Default* (Attachments: # 1 Exhibit A) (Acho, Ronald) (Entered: 08/16/2017) |
| 08/18/2017 | 134 | MOTION to Compel *Production at August 22, 2017 Hearing* by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Subpoenas, # 3 Exhibit B Subpoenas, # 4 Exhibit C City's Objections, # 5 Exhibit D Leavells Objections, # 6 Exhibit E Deposition of Hatema Davis, # 7 Exhibit F Deposition of Timothy Davis, # 8 Exhibit Leavells' Judgment) (Dettmer, Dennis) (Entered: 08/18/2017) |
| 08/21/2017 | 135 | NOTICE by Detroit, City of *to the Court of Objections to Plaintiffs′ August 16, 2017 Subpoena for Documents for August 22, 2017 Hearing on Plaintiffs′ Motion for Entry of Default* (Attachments: # 1 Exhibit A: Subpoena) (Acho, Ronald) (Entered: 08/21/2017) |
| 08/22/2017 | 136 | |

| | | |
|---|---|---|
| | | ORDER granting in part and denying in part 129 Motion for Protective Order. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 08/22/2017) |
| 08/22/2017 | 137 | PROTECTIVE ORDER REGARDING INDEPENDENTMEDICAL EXAMINATIONS OF THE PLAINTIFFSTIMOTHY DAVIS AND HATEMA DAVIS. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 08/22/2017) |
| 08/22/2017 | | Minute Entry for proceedings before Magistrate Judge David R. Grand: Motion Hearing held on 8/22/2017 re 115 MOTION for Default Judgment as to All Defendants filed by Hatema Davis, Timothy Davis Disposition: Motion taken under advisement (Court Reporter: Digitally Recorded) (EBut) (Entered: 08/22/2017) |
| 08/24/2017 | 138 | NOTICE by James Napier re 125 MOTION for Summary Judgment *Withdrawal* (Acho, Ronald) (Entered: 08/24/2017) |
| 09/20/2017 | 139 | REPORT AND RECOMMENDATION re 115 MOTION for Default Judgment as to All Defendants filed by Hatema Davis, Timothy Davis Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 09/20/2017) |
| 10/13/2017 | 140 | NOTICE OF HEARING on 88 MOTION to Certify Class . **Motion Hearing set for 1/10/2018 03:00 PM before District Judge Paul D. Borman** (DTof) (Entered: 10/13/2017) |
| 10/18/2017 | 141 | ORDER Adopting 139 Report and Recommendation Denying 115 Motion for Default Judgment, filed by Hatema Davis, Timothy Davis. Signed by District Judge Paul D. Borman. (DTof) (Entered: 10/18/2017) |
| 10/20/2017 | 142 | MOTION for Withdrawal of Attorney Lawrence T. Garcia by Arthur Leavells. (Garcia, Lawrence) (Entered: 10/20/2017) |
| 10/23/2017 | 143 | RE-NOTICE OF HEARING on 88 MOTION to Certify Class . **Motion Hearing RESET for 12/20/2017 03:00 PM before District Judge Paul D. Borman** (DTof) (Entered: 10/23/2017) |
| 11/01/2017 | | Set/Reset Deadlines as to 88 MOTION to Certify Class . **Motion Hearing RESET(TIME ONLY) for 12/20/2017 03:30 PM before District Judge Paul D. Borman** (DTof) (Entered: 11/01/2017) |
| 11/06/2017 | 144 | MOTION for Leave to File *Supplemental Brief in Response to Plaintiffs' Motion to Certify Class Action* by Detroit, City of. (Acho, Ronald) (Entered: 11/06/2017) |
| 11/06/2017 | 145 | SUPPLEMENTAL BRIEF re 91 Response to Motion, *to Certify Class Action* filed by Detroit, City of. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O) (Acho, Ronald) (Entered: 11/06/2017) |
| 11/08/2017 | 146 | RESPONSE to 144 MOTION for Leave to File *Supplemental Brief in Response to Plaintiffs' Motion to Certify Class Action* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 11/08/2017) |

| 11/17/2017 | 147 | MOTION to Strike *Plaintiffs' Claims for Damages* by Detroit, City of. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U, # 23 Exhibit V, # 24 Exhibit W, # 25 Exhibit X, # 26 Exhibit Y, # 27 Exhibit Z) (Acho, Ronald) (Entered: 11/17/2017) |
| 11/28/2017 | 148 | ORDER Granting 144 MOTION for Leave to File *Supplemental Brief in Response to Plaintiffs' Motion to Certify Class Action* filed by Detroit, City of., RESET Motion and R&R Deadlines/Hearings as to 88 MOTION to Certify Class :( **Motion Hearing RESET for 1/2/2018 03:00 PM before District Judge Paul D. Borman**) Signed by District Judge Paul D. Borman. (DTof) (Entered: 11/28/2017) |
| 11/30/2017 | 149 | STIPULATION *Allowing Withdrawal* by Arthur Leavells (Garcia, Lawrence) (Entered: 11/30/2017) |
| 12/01/2017 | 150 | ORDER granting 142 Motion to Withdraw as Attorney.. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 12/01/2017) |
| 12/04/2017 | 151 | SUPPLEMENTAL BRIEF re 91 Response to Motion, *to Certify Class Action* filed by Detroit, City of. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A: ICHAT report, # 3 Exhibit B: T Davis Dep, # 4 Exhibit C: Arrest Rpt, # 5 Exhibit D: 1st Stmt, # 6 Exhibit E: OTIS Profile, # 7 Exhibit F: 2nd Stmt, # 8 Exhibit G: Aff & Search Warrant, # 9 Exhibit H: Incident Rpt, # 10 Exhibit I: Warren PD Rpt, # 11 Exhibit J: Geelhood Dep, # 12 Exhibit K: Wheeler v Detroit) (Acho, Ronald) (Entered: 12/04/2017) |
| 12/08/2017 | 152 | NOTICE of Appearance by James P. Allen on behalf of Larry Barnett, Reginald Beasley, Matthew Bray, Detroit, City of, Charles Flanagan, Stephen Geelhood, Brian Johnson, Amy Matellic, James Napier. (Allen, James) (Entered: 12/08/2017) |
| 12/11/2017 | 153 | RESPONSE to 147 MOTION to Strike *Plaintiffs' Claims for Damages* filed by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Affidavit and Search Warrant, # 3 Exhibit B First Superseding Indictment, # 4 Exhibit C Testimony of Arthur Leavells, # 5 Exhibit D Deposition of Stephen Geelhood, # 6 Exhibit E Deposition of Timothy Davis, # 7 Exhibit F Deposition of Hatema Davis, # 8 Exhibit G Deposition of Timothy Davis) (Dezsi, Michael) (Entered: 12/11/2017) |
| 12/12/2017 | 154 | ORDER of Attorney Substitution with stipulation. Attorney James P. Allen for Vatasha K Napier,James P. Allen for Steven Riley added. Signed by District Judge Paul D. Borman. (DTof) (Entered: 12/12/2017) |
| 12/14/2017 | 155 | SUPPLEMENTAL BRIEF re 88 MOTION to Certify Class filed by All Plaintiffs. (Dezsi, Michael) (Entered: 12/14/2017) |
| 12/14/2017 | | TEXT-ONLY NOTICE: Motion Hearing set for 01/02/2018 is Cancelled re 88 MOTION to Certify Class (DTof) (Entered: 12/14/2017) |

| 12/18/2017 | 156 | ORDER REFERRING MOTION to Magistrate Judge David R. Grand: 88 MOTION to Certify Class filed by Hatema Davis, Timothy Davis. Signed by District Judge Paul D. Borman. (DTof) (Entered: 12/18/2017) |
|---|---|---|
| 12/18/2017 | 157 | NOTICE OF HEARING on 147 MOTION to Strike *Plaintiffs' Claims for Damages*, 88 MOTION to Certify Class . **Motion Hearing set for 1/23/2018 10:00 AM before Magistrate Judge David R. Grand** (EBut) (Entered: 12/18/2017) |
| 01/10/2018 | 158 | SUPPLEMENTAL BRIEF re 147 MOTION to Strike *Plaintiffs' Claims for Damages*, 91 Response to Motion, filed by All Defendants. (Allen, James) (Entered: 01/10/2018) |
| 01/23/2018 | 159 | ORDER AND NOTICE OF HEARING. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 01/23/2018) |
| 01/23/2018 | | Minute Entry for proceedings before Magistrate Judge David R. Grand: Motion Hearing not held on 1/23/2018 re 88 MOTION to Certify Class filed by Hatema Davis, Timothy Davis, 147 MOTION to Strike *Plaintiffs' Claims for Damages* filed by Detroit, City of (EBut) (Entered: 01/24/2018) |
| 02/22/2018 | 160 | RENOTICE OF HEARING on 147 MOTION to Strike *Plaintiffs' Claims for Damages*, 88 MOTION to Certify Class . **Motion Hearing set for 4/3/2018 10:00 AM before Magistrate Judge David R. Grand** (EBut) (Entered: 02/22/2018) |
| 03/07/2018 | 161 | STIPULATED ORDER TO PERPETUATE TESTIMONY. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 03/07/2018) |
| 03/28/2018 | 162 | SUPPLEMENTAL BRIEF re 88 MOTION to Certify Class filed by All Plaintiffs. (Dezsi, Michael) (Entered: 03/28/2018) |
| 04/03/2018 | 163 | ORDER denying 147 Motion to Strike. Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 04/03/2018) |
| 04/03/2018 | | Minute Entry for proceedings before Magistrate Judge David R. Grand: Motion Hearing held on 4/3/2018 re 88 MOTION to Certify Class filed by Hatema Davis, Timothy Davis, 147 MOTION to Strike *Plaintiffs' Claims for Damages* filed by Detroit, City of Disposition: #88 taken under advisement, #147 denied (Court Reporter: Digitally Recorded) (EBut) (Entered: 04/03/2018) |
| 05/03/2018 | 164 | NOTICE of Appearance by Lindsey R. Johnson on behalf of Larry Barnett, Reginald Beasley, Matthew Bray, Detroit, City of, Charles Flanagan, Stephen Geelhood, Brian Johnson, Amy Matellic, James Napier, Vatasha K Napier, Steven Riley. (Johnson, Lindsey) (Entered: 05/03/2018) |
| 05/11/2018 | 165 | REPORT AND RECOMMENDATION re 88 MOTION to Certify Class filed by Hatema Davis, Timothy Davis Signed by Magistrate Judge David R. Grand. (EBut) (Entered: 05/11/2018) |
| 05/25/2018 | 166 | OBJECTION to 165 Report and Recommendation by All Plaintiffs. (Dezsi, Michael) (Entered: 05/25/2018) |
| 06/08/2018 | 167 | RESPONSE to 166 Objection to Report and Recommendation *Defendants' Response to Plaintiffs' Objections to MagistrateJudge's Report and* |

| | | |
|---|---|---|
| | | *Recommendation to Deny Plaintiffs' Motion for Class Certification and Certificate of Service* by Larry Barnett, Reginald Beasley, Matthew Bray, Detroit, City of, Charles Flanagan, Stephen Geelhood, Brian Johnson, Amy Matellic, James Napier, Steven Riley. (Johnson, Lindsey) (Entered: 06/08/2018) |
| 08/31/2018 | 168 | OPINION AND ORDER overruling plaintiff's objections, adopting 165 Report and Recommendation and denying 88 Motion for class certification.Signed by District Judge Paul D. Borman. (DPer) (Entered: 08/31/2018) |
| 11/14/2018 | 169 | MOTION for Judgment by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Email, # 3 Exhibit B Email, Release) (Dezsi, Michael) (Entered: 11/14/2018) |
| 11/28/2018 | 170 | RESPONSE to 169 MOTION for Judgment filed by Larry Barnett, Reginald Beasley, Matthew Bray, Charles Flanagan, Stephen Geelhood, Brian Johnson, Amy Matellic, James Napier, Vatasha K Napier, Steven Riley. (Allen, James) (Entered: 11/28/2018) |
| 12/28/2018 | 171 | NOTICE TO APPEAR: **Status Conference set for 1/14/2019 03:30 PM before District Judge Paul D. Borman** (DTof) (Entered: 12/28/2018) |
| 01/14/2019 | | Minute Entry for proceedings before District Judge Paul D. Borman: Telephonic Status Conference held on 1/14/2019 (Court Reporter: Leann Lizza) (DTof) (Entered: 02/21/2019) |
| 03/28/2019 | 172 | STIPULATED ORDER DISMISSING CASE - Signed by District Judge Paul D. Borman. (DTof) (Entered: 03/28/2019) |

# **EXHIBIT B**

**The Detroit News**

MACOMB COUNTY

# Warren couple says Detroit police raid violated rights

**Tom Greenwood and George Hunter** The Detroit News
Published 11:45 a.m. ET Feb. 12, 2015 | Updated 11:24 p.m. ET Feb. 12, 2015

A Warren couple whose medical marijuana operation was raided by the Detroit Police Department's narcotics unit have filed a civil lawsuit against the officers, including one who killed himself after being investigated for corruption by the FBI and Internal Affairs.

The complaint was filed Wednesday in federal court by Timothy and Hatema Davis and names the city of Detroit as well as Lt. Charles Flanagan, former head of the DPD's narcotics unit, Detective James Napier and officers "Novak" and "John Doe."

Napier, who according to sources was being investigated for narcotics corruption, shot himself Jan. 22 while sitting in his car outside his parents' home in Sterling Heights.

The lawsuit alleges that on Dec. 28, 2013, the officers illegally raided the Davis home in Warren, which was the site of a legal marijuana growing facility.

The complaint alleges officers broke down a door and pointed weapons at Davis and his wife while failing to produce a search warrant.

Over the next few hours, the officers allegedly tore the house apart, seized 50 marijuana plants and related items and then transported the couple to a location in Detroit where they were questioned for another five hours, according to the lawsuit.

The couple were eventually released and never faced any charges, according to the complaint.

Detroit police spokeswoman June West said Thursday the department had just become aware of the Warren couple's lawsuit.

"We don't comment on litigation ... but there is no indication that this is connected to the federal investigation, which is isolated to a single team in the now disbanded narcotics unit."

He added Napier had left the narcotics squad by the time Flanagan assumed command of the unit.

Flanagan — who reportedly was not the subject of any corruption investigation — declined to expand his comments because of the pending lawsuit.

The lawsuit alleges the defendants "have engaged in similar unlawful searches and seizures of other legitimate marijuana grow facilities in and around the city of Detroit" and that the city "has allowed an unconstitutional policy, custom and practice to flourish within its police department."

The lawsuit also accused the city of failing to properly train its employees and officers, which allows a "culture of corruption to flourish within certain ranks of its police department including the narcotics unit."

The complaint asks for compensation for the Davises plus attorney fees.

In July, Detroit Police Chief James Craig dismantled the narcotics unit in light of the investigation and replaced it with the major violators section.

Meanwhile, Flanagan, along with Craig and Assistant Chief Steve Dolunt, are accused of racism and harassment in a lawsuit filed in October by a former Detroit police officer.

The lawsuit was filed by Sgt. Myron Weathers, a 19-year veteran, in Wayne County Circuit Court. The lawsuit alleges Flanagan appointed an "unqualified white female officer" to a Drug Enforcement Administration Task Force.

Weathers said he was seeking damages of more than $25,000 because of retaliation for "questioning the assignment of an unqualified white, female officer to (Flanagan's) crew."

In response, Flanagan said Weathers took big screen TVs, a tablet and a video game system for his personal use after they were seized from drug dealers.

Flanagan also said rocks of crack cocaine that hadn't been logged as evidence were found inside the desks of officers. Flanagan's allegations initiated an internal investigation in May.

In his lawsuit, Weathers denied Flanagan's accusations, saying he hadn't improperly used the confiscated equipment and he had "repurposed" the TVs "for training purposes."

In an earlier interview, Flanagan called Weathers' suit a case of "sour grapes."

Flanagan filed his own EEOC complaint in May claiming he was the victim of racial discrimination by black supervisors.

He also alleged he was exposed to a hostile work environment because he blew the whistle on alleged wrongdoings in the narcotics unit that happened before he took over the squad.

tgreenwood@detroitnews.com

(313) 222-2023

**NEWS HITS**                                      Thursday, March 12, 2015

# Lawsuit: Officers in Detroit police department's now-defunct narcotics unit executed illegal search based on false affidavit

Posted By Ryan Felton on Thu, Mar 12, 2015 at 11:14 am



Wikipedia

Detroit police officers in the city's now-defunct narcotics unit wrongly detained a Detroit resident after illegally searching his home with a warrant based on false statements, according to a lawsuit filed in Wayne County Circuit Court.

Anthony and Elaine McCallum say two officers executed a search warrant in 2013 on their home that was based on false statements given by a Detroit law enforcement official in a sworn affidavit, according to the complaint. The officers physically assaulted Anthony and threatened Elaine "for no reason," the complaint, filed in November, stated.

As a result of the April 2013 search, Anthony McCallum was charged with intent to deliver and manufacture marijuana, intent to deliver and manufacture less than 50 grams of cocaine, firearms possession by a felon, and felony firearms, court records show — but all charges were eventually dismissed. McCallum was convicted in 1997 of assault with intent to commit sexual penetration, according to the Michigan State Police sex offender registry.

The McCallums filed their seven-page complaint against two officers who conducted the search of their home, Sgt. Stephen Geelhood and "Officer Blue," who have been with the Detroit Police Department since 1994 and 1997, respectively, according to court records. In briefs filed by the McCallums attorney, Geelhood and Blue are identified as "undercover" officers in the city's "now disbanded narcotics unit." (The city later identified Blue in an email to *MT* as Officer Abraham Blue.)

Upon entering the couple's home, the officers assaulted Anthony McCallum, handcuffed and arrested the 47-year-old "without probable cause," and wrongfully pursued prosecution, according to the complaint. It's unclear if more officers were involved in the search.

"Defendants wrongfully pursued prosecution of Plaintiff based on their own wrongful conduct," the complaint alleges.

Thomas Kuhn, co-counsel representing the McCallums, declined comment. Detroit police said Geelhood and Blue remain employed with the department, but declined to comment on the pending litigation.

How Detroit police officers went about getting the search warrant was apparently the chief

reason Anthony McCallum's charges were dropped almost instantaneously, court records show.

Here's what happened: Police obtained the warrant based on an affidavit signed by Officer Amy Matelic, according to a court transcript from an Aug. 8, 2013 hearing on the charges brought against Anthony McCallum, who initially plead not guilty on each count. In the sworn affidavit, Matelic stated she received a tip from a confidential informant that cocaine was being sold and stored within McCallum's home. The informant provided tips in the past that led to arrests and generated cases in 3rd Circuit Court and 36th District Court, according to the transcript.

The problem? According to the transcript, Matelic had no direct conversation with the informant or personal knowledge of the tip; another officer, Gil Hood, actually received it. But, for unclear reasons, Hood didn't sign the affidavit.

"So the affidavit I mean really just cannot be described as anything other than false in that respect," said Wayne County Circuit Court Judge Michael Hathaway, during the 2013 hearing.

The only thing "honestly averred in the affidavit," Hathaway said, is that Matelic and Hood conducted surveillance of McCallum's property. "That in and of itself does not provide probable cause for the warrant," Hathaway said.

In his parting words, Hathaway offered this to Anthony McCallum: "You have dodged a bullet. It is highly unlikely that this will ever happen again. And I strongly urge you to clean up your act."

The case and charges against McCallum were dismissed following the hearing in Hathaway's courtroom.

Peter Henning, a Wayne State University law professor and former federal prosecutor, said the key to affidavits is the veracity of the informant.

"You have to establish the credibility of the tipster and or corroborate what was provided," Henning told *MT* on Wednesday. "So I expect the affidavit wasn't just, 'Hey, I got a tip' — but it was, 'Hey, I got a tip from someone I know and here's what I know.'"

Officer Matelic's decision to sign the affidavit, when she had no personal knowledge of the tip, was "either sloppy practices or it shows the path of least resistance figuring no one would ever notice," Henning said.

"Get your affidavit blown — that would blown the warrant," he said. "It's not like they said, 'Oh, let's let a bad guy go' ... it did not meet the valid, constitutional requirements for a warrant."

The McCallums lawsuit, which also names the city of Detroit as a defendant, seeks compensatory damages in excess of $25,000 and attorney fees. A motion hearing is scheduled March 20 before Judge Annette Berry in Wayne County Circuit Court.

Detroit's narcotics unit was disbanded last summer by Detroit Police Chief James Craig. Since August, it has **reportedly** been been the focus of an FBI probe. (David Porter, special agent in the FBI's Detroit bureau declined comment Thursday.)

Last month, it was also at the center of a separate lawsuit filed by a Warren couple. The couple, Timothy and Hatema Davis, allege officers **forcibly entered their home in December 2013** with assault rifles drawn, demanded to know if they had any money, and seized nearly fifty marijuana plants, according to the complaint.

Timothy Davis — who said he was then taken to a seemingly abandoned building and questioned for five hours — was legally licensed to operate a marijuana grow facility, the complaint says.

The Davises say in the complaint the Detroit officers who conducted the raid never presented a search warrant.

The couple was handcuffed while officers "extensively tore apart Plaintiffs' property and removed ... nearly fifty marijuana plants and other related legitimate and lawful by-products of Plaintiffs' business," the complaint says.

The Davises were eventually released and never charged with any violations. The case remains pending.

Tags: detroit, police, narcotics, lawsuit, Image

# Ex-drug squad member helped feds snare ind

Robert Snell and George Hunter, The Detroit News      *9:41 a.m. EDT April 17, 2015*

A former member of a scandal-plagued Detroit police drug unit wore a secret recording device to help FBI agents catch and extorting drug dealers, The Detroit News has learned.

Officer Arthur Leavells was involved in an alleged conspiracy headed by two suspended members of the Detroit Police federal agents secretly record conversations via a wiretap, according to court records and two sources familiar with the i

The officer's involvement helps flesh out what led to a criminal case that Chief James Craig said undermined the public's cooperation also is a rare instance of a law enforcement member crossing the "thin blue line" to help prosecute colleagu

The FBI and U.S. Attorney's Office refused to comment Thursday about the investigation and Leavells.

"The challenge for prosecutors is piercing the thin blue line, but there comes a point where self-interest takes over," said University law professor and former federal prosecutor. "Anytime someone wears a wire, they're playing on other people is a special bond but once prosecutors breach it, wiretaps end up helping build a much stronger case."

Leavells, 44, was charged in connection with his role in the conspiracy, according to federal court records filed Thursday "information," which means a guilty plea is expected.

Lt. David "Hater" Hansberry and Officer Bryan "Bullet" Watson were charged April 8 in a bare-bones indictment. Court re indicate prosecutors are armed with bank and cellphone records, text messages, tax documents, photos and a wiretap. sources familiar with the investigation told The News.

He allegedly conspired to distribute cocaine between June 2010 and August 2014, according to federal court records. H comment Thursday.

That is the roughly the same period covered in the indictment against Hansberry and Watson, who are accused of arran money, narcotics and property.

Leavells worked in the drug unit under Hansberry, a source told The News, but quit several months ago after being susp of the drug unit. They were suspended after a surveillance video captured them taking away a box that they never logge a suspected drug house.

Hansberry, 34, of Warren and Watson, 46, of Novi, meanwhile, were suspended without pay following the indictment.

They "would also identify themselves as law enforcement officers performing official law enforcement duties in order to c with their demands and to encourage their victims to flee, leaving behind their controlled substances, money or persona the indictment.

Instead of turning over the money, drugs and property to the Detroit Police Department, Hansberry and Watson sold the informants — and split the money, the Justice Department alleged.

In a court filing, prosecutors gave a peek at the types of evidence gathered during the current investigation.

That evidence includes phone records, social media records, receipts and other records of retail purchases.

A lawyer for Watson, a 22-year veteran of the department, declined comment Thursday.

Hansberry is a 16-year veteran — his lawyer called him a "superstar" — who rose through the ranks and was promoted

Hansberry's lawyer, Michael Harrison, could not be reached for comment Thursday but earlier told The News he worried

"My fear is that this case could be about drug dealers and dirty cops looking to get themselves out of trouble by burning Harrison said. "Could there be a much bigger fish than a young rising star of the police department?"

Craig declined comment Thursday, as did a spokeswoman for the U.S. Attorney's Office.

Two others have been charged in the case. Kevlin Brown, allegedly a Hansberry associate, is accused of robbing and e: According to court records filed Thursday, a man named Calvin Turner is expected to plead guilty after being accused of in April 2013, according to court records.

Craig disbanded the drug unit in July because of what he said were systemic problems uncovered during an Internal Aff May. The problems included handling drugs and evidence.

An officer helping prosecute colleagues is rare, and no guarantee of a conviction.

In 2004, three Detroit police officers cooperated in a federal case against eight officers from Detroit's 4th Precinct. The e charges they violated the constitutional rights of suspected criminals by planting evidence and writing phony reports.

rsnell@detroitnews.com

(313) 222-2028

Read or Share this story: http://detne.ws/1FZGxnm

# **EXHIBIT C**

APPEAL

# U.S. District Court
## Eastern District of Michigan (Detroit)
## CRIMINAL DOCKET FOR CASE #: 2:15-cr-20217-SJM-APP All Defendants

Case title: United States of America v. Hansberry et al

Date Filed: 04/08/2015
Date Terminated: 05/25/2017

---

Assigned to: District Judge Stephen J. Murphy, III
Referred to: Magistrate Judge Anthony P. Patti

Appeals court case number: 17-1383/17-1221 U.S. Court of Appeals - Sixth Circuit

### Defendant (1)

**David Hansberry**
*TERMINATED: 02/24/2017*
*also known as*
Sarge
*TERMINATED: 02/24/2017*
*also known as*
Hater
*TERMINATED: 02/24/2017*

represented by **Michael J. Harrison**
Harrison Law
40950 Woodward
Bloomfield Hills, MI 48304
248-220-3324
Fax: 248-220-3326
Email: michael@harrisonlawplc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Elizabeth L. Jacobs**
615 Griswold
Suite 1125
Detroit, MI 48226
313-962-4090
Email: elzjacobs@aol.com
*TERMINATED: 10/10/2017*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**James J. Hunter**
Collins Einhorn Farrell PC
4000 Town Center
9th Floor
Southfield, MI 48075
248-355-4141

Fax: 248-355-2277
Email: james.hunter@ceflawyers.com
*TERMINATED: 04/20/2017*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Philip A. Ragan , Jr.**
1274 Library Street
Suite 304
Detroit, MI 48226
313-790-9776
Email: Paralawfirm@aol.com
*ATTORNEY TO BE NOTICED*

**Robert S. Harrison**
Robert Harrison Assoc.
40950 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304
248-283-1600
Email: rsh@harrisonplc.com
*TERMINATED: 04/20/2017*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Thomas W. Jakuc**
Thomas Legal Centers
22811 Greater Mack
Suite 204
St. Clair Shores, MI 48080
586-573-2694
Fax: 586-573-2697
Email: Thomasjakuc@sbcglobal.net
*TERMINATED: 04/28/2017*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCE (1) | DISPOSED |
| CONSPIRACY TO OBTAIN PROPERTY BY EXTORTION UNDER COLOR OF OFFICIAL RIGHT (1s) | IMPRISONMENT: 151 MONTHS, SUPERVISED RELEASE: 24 MONTHS; SPECIAL ASSESSMENT: $100.00 |
| INTERFERENCE WITH COMMERCE BY THREAT OR | DISPOSED |

VIOLENCE
(2-4)

CONSPIRACY TO POSSESS WITH
INTENT TO DISTRIBUTE                          DISMISSED
CONTROLLED SUBSTANCES
(2s)

OBTAINING PROPERTY BY
EXTORTION UNDER COLOR OF                      DISMISSED
OFFICIAL RIGHT
(3s-8s)

VIOLENT
CRIME/DRUGS/MACHINE GUN                       DISPOSED
(5)

INTERFERENCE WITH
COMMERCE BY THREAT OR                         DISPOSED
VIOLENCE
(6)

CONTROLLED SUBSTANCE -
SELL, DISTRIBUTE, OR DISPENSE                 DISPOSED
(7)

VIOLENT
CRIME/DRUGS/MACHINE GUN                       DISPOSED
(8)

DISTRIBUTION AND POSSESSION
WITH INTENT TO DISTRIBUTE 5
KILOGRAMS OR MORE OF                          DISMISSED
COCAINE
(9s)

CARRYING A FIREARM DURING
AND IN RELATION TO A DRUG                     DISMISSED
TRAFFICKING CRIME
(10s)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                        **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                               **Disposition**

None

---

Assigned to: District Judge Stephen J.
Murphy, III
Referred to: Magistrate Judge Anthony
P. Patti

Appeals court case numbers: 17-1205
U.S. Court of Appeals - Sixth Circuit,
17-1205/17-1221 U.S. Court of Appeals
- Sixth Circuit

### Defendant (2)

**Bryan Watson**                        represented by  **Steven F. Fishman**
*TERMINATED: 02/28/2017*                                615 Griswold
*also known as*                                         Suite 1125
Bullet                                                  Detroit, MI 48226
*TERMINATED: 02/28/2017*                                313-962-4090
                                                        Email: sfish6666@gmail.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

### Pending Counts                                   ### Disposition

CONSPIRACY TO DISTRIBUTE
CONTROLLED SUBSTANCE                                 DISMISSED
(1)

                                                     IMPRISONMENT: 108 Months;
CONSPIRACY TO OBTAIN                                 SUPERVISED RELEASE: 2 Years;
PROPERTY BY EXTORTION                                ASSESSMENT: $100; FINE: $2000
UNDER COLOR OF OFFICIAL                              [AMENDED JUDGMENT]
RIGHT                                                IMPRISONMENT: 108 Months;
(1s)                                                 SUPERVISED RELEASE: 2 Years;
                                                     ASSESSMENT: $100; FINE: $2000

INTERFERENCE WITH
COMMERCE BY THREAT OR                                DISMISSED
VIOLENCE
(2)

CONSPIRACY TO POSSESS WITH
INTENT TO DISTRIBUTE
CONTROLLED SUBSTANCES                                NOT GUILTY
(2s)

OBTAINING PROPERTY BY
EXTORTION UNDER COLOR OF
OFFICIAL RIGHT                                       NOT GUILTY
(3s-5s)

| | |
|---|---|
| INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (4) | DISMISSED |
| VIOLENT CRIME/DRUGS/MACHINE GUN (5) | DISMISSED |
| INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (6) | DISMISSED |
| CONTROLLED SUBSTANCE - SELL, DISTRIBUTE, OR DISPENSE (7) | DISMISSED |
| OBTAINING PROPERTY BY EXTORTION UNDER COLOR OF OFFICIAL RIGHT (7s-8s) | NOT GUILTY |
| VIOLENT CRIME/DRUGS/MACHINE GUN (8) | DISMISSED |
| DISTRIBUTION AND POSSESSION WITH INTENT TO DISTRIBUTE 5 KILOGRAMS OR MORE OF COCAINE (9s) | NOT GUILTY |
| CARRYING A FIREARM DURING AND IN RELATION TO A DRUG TRAFFICKING CRIME (10s) | NOT GUILTY |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: District Judge Stephen J. Murphy, III
Referred to: Magistrate Judge Anthony P. Patti

**Defendant (3)**

**Kevlin Omar Brown**
*TERMINATED: 09/27/2016*

represented by **Federal Community Defender**
Federal Defender Office
613 Abbott
5th Floor
Detroit, MI 48226
313-967-5542
*TERMINATED: 04/10/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Kenneth Sasse**
27 E Flint Street
2nd Floor
Lake Orion, MI 48362
248-821-7325
Email: ksasse11@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (3) | NOT GUILTY |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| OBTAINING PROPERTY BY EXTORTION UNDER COLOR OF OFFICIAL RIGHT (6s) | NOT GUILTY |

**Highest Offense Level (Terminated)**

Felony

| Complaints | Disposition |
|---|---|
| None | |

---

Assigned to: District Judge Stephen J.
Murphy, III
Referred to: Magistrate Judge Anthony
P. Patti

### Defendant (4)

| | | |
|---|---|---|
| **Arthur Leavells**<br>*TERMINATED: 05/25/2017* | represented by | **Federal Community Defender**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or*<br>*Community Defender Appointment* |
| | | **Andrew N. Wise**<br>Federal Community Defender Eastern<br>District of Michigan<br>613 Abbott<br>5th Floor<br>Detroit, MI 48226<br>313-967-5830<br>Email: andrew_wise@fd.org<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or*<br>*Community Defender Appointment* |
| | | **Miriam L. Siefer**<br>Federal Defender Office<br>613 Abbott<br>5th Floor<br>Detroit, MI 48226<br>313-967-5868<br>Email: miriam_siefer@fd.org<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or*<br>*Community Defender Appointment* |

| Pending Counts | Disposition |
|---|---|
| CONSPIRACY TO DISTRIBUTE<br>CONTROLLED SUBSTANCE<br>(1) | IMPRISONMENT: 1 DAY WITH<br>CREDIT FOR TIME SERVED;<br>SUPERVISED RELEASE: 24<br>MONTHS; SPECIAL ASSESSMENT:<br>$100.00 [AMENDED 08/17/17 TO<br>CORRECT CLERICAL MISTAKE] |

IMPRISONMENT: 1 DAY WITH
CREDIT FOR TIME SERVED;
SUPERVISED RELEASE: 24
MONTHS; SPECIAL ASSESSMENT:
$100.00 [AMENDED 08/17/17 TO
CORRECT CLERICAL MISTAKE]

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                    **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                           **Disposition**

None

---

Assigned to: District Judge Stephen J.
Murphy, III
Referred to: Magistrate Judge Anthony
P. Patti

**Defendant (5)**

**Calvin Turner**                   represented by   **James L. Feinberg**
*TERMINATED: 03/15/2017*                             James L. Feinberg & Associates
                                                     28411 Northwestern Highway
                                                     Suite 875
                                                     Southfield, MI 48034
                                                     248-353-0600
                                                     Fax: 248-353-0605
                                                     Email: jlfdefense@mindspring.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     Designation: Retained

**Pending Counts**                                       **Disposition**

CONSPIRACY TO DISTRIBUTE                              IMPRISONMENT: 10 MONTHS;
CONTROLLED SUBSTANCE                                  SUPERVISED RELEASE: 12
(1)                                                  MONTHS; SPECIAL ASSESSMENT:
                                                     $100.00; IMPRISONMENT: 5 Months;
                                                     SUPERVISED RELEASE: One (1)
                                                     Year; SPECIAL ASSESSMENT: $100

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                    **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                           **Disposition**

None

---

**Plaintiff**

**United States of America**    represented by    **Sheldon N. Light**
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226
313-226-9732
Fax: 313-226-3413
Email: sheldon.light@usdoj.gov
*TERMINATED: 10/03/2016*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: U.S. Attorney*

**J. Michael Buckley**
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226
313-226-9581
Fax: 313-226-3413
Email: michael.buckley@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: U.S. Attorney*

**Louis P. Gabel**
U.S. Attorney's Office (E.D. Mich.)
211 W. Fort Street
Suite 2001
Detroit, MI 48226
313-226-9756

Fax: 313-226-2873
Email: USAMIE.ECFCSU@usdoj.gov
*TERMINATED: 12/10/2015*
*ATTORNEY TO BE NOTICED*
*Designation: U.S. Attorney*

**Shane Cralle**
U.S. Attorney's Office
211 W. Fort Street Suite 2001
Detroit, MI 48226
313-226-9551
Fax: 313-226-5892
Email: shane.cralle@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/08/2015 | 1 | INDICTMENT as to David Hansberry (1) count(s) 1, 2-4, 5, 6, 7, 8, Bryan Watson (2) count(s) 1, 2, 4, 5, 6, 7, 8, Kevlin Omar Brown (3) count(s) 3. (DPer) (Entered: 04/09/2015) |
| 04/08/2015 | 5 | ORDER WITH MOTION to Seal 1 Indictment, 2 Arrest Warrant Issued, 3 Arrest Warrant Issued, 4 Arrest Warrant Issued as to David Hansberry, Bryan Watson, Kevlin Omar Brown. Signed by Magistrate Judge Mona K. Majzoub. (DPer) (Entered: 04/09/2015) |
| 04/09/2015 | 6 | ORDER WITH MOTION to Unseal 5 Order to Seal, 1 Indictment, 2 Arrest Warrant Issued, 3 Arrest Warrant Issued, 4 Arrest Warrant Issued as to David Hansberry, Bryan Watson, Kevlin Omar Brown. Signed by Magistrate Judge Mona K. Majzoub. (DPer) (Entered: 04/09/2015) |
| 04/09/2015 | 7 | NOTICE of Change of Assistant U.S. Attorney: Louis P. Gabel added. (Gabel, Louis) (Entered: 04/09/2015) |
| 04/09/2015 | | Minute Entry for proceedings before Magistrate Judge Mona K. Majzoub: Initial Appearance as to David Hansberry held on 4/9/2015. Bond Info: David Hansberry (1) $10,000.00 - Unsecured. Disposition: Bond Issued (Tape #: MKM 04/09/2015) (Defendant Attorney: Michael Harrison) (AUSA: Louis Gabel) (LBar) (Entered: 04/09/2015) |
| 04/09/2015 | | Minute Entry for proceedings before Magistrate Judge Mona K. Majzoub: Arraignment as to David Hansberry (1) Counts 1,2-4,5,6,7,8 held on 4/9/2015. Bond Continued. Disposition: Plea of Not Guilty Entered (Tape #: MKM 04/09/2015) (Defendant Attorney: Michael Harrison) (AUSA: Louis Gabel) (LBar) (Entered: 04/09/2015) |
| 04/09/2015 | | Minute Entry for proceedings before Magistrate Judge Mona K. Majzoub: Initial Appearance as to Bryan Watson held on 4/9/2015. Bond Info: Bryan Watson (2) $10,000.00 - Unsecured. Disposition: Bond Issued (Tape #: MKM 04/09/2015) (Defendant Attorney: Steven Fishman) (AUSA: Louis Gabel) (LBar) (Entered: 04/09/2015) |

| 04/09/2015 | | Minute Entry for proceedings before Magistrate Judge Mona K. Majzoub: Arraignment as to Bryan Watson (2) Counts 1,2,4,5,6,7,8 held on 4/9/2015. Bond Continued. Disposition: Plea of Not Guilty Entered (Tape #: MKM 04/09/2015) (Defendant Attorney: Steven Fishman) (AUSA: Louis Gabel) (LBar) (Entered: 04/09/2015) |
|---|---|---|
| 04/09/2015 | | Minute Entry for proceedings before Magistrate Judge Mona K. Majzoub: Initial Appearance as to Kevlin Omar Brown held on 4/9/2015. Bond Info: Kevlin Omar Brown (3) $10,000.00 - Unsecured. **Arraignment set for 4/10/2015 01:00 PM before Magistrate Judge Unassigned** Disposition: Bond Issued (Tape #: MKM 04/09/2015) (Defendant Attorney: Stacey Studnicki) (AUSA: Louis Gabel) (LBar) (Entered: 04/09/2015) |
| 04/09/2015 | 8 | Audio File of Arraignment on Indictment as to David Hansberry held on 04/09/2015 before Magistrate Judge Mona K. Majzoub. AUDIO FILE SIZE (2.2 MB) (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 9 | Audio File of Arraignment on Indictment as to Bryan Watson held on 04/09/2015 before Magistrate Judge Mona K. Majzoub. AUDIO FILE SIZE (2.3 MB) (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 10 | Audio File of Initial Appearance on Indictment as to Kevlin Omar Brown held on 04/09/2015 before Magistrate Judge Mona K. Majzoub. AUDIO FILE SIZE (2.9 MB) (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 11 | ORDER APPOINTING FEDERAL DEFENDER as to Kevlin Omar Brown. Signed by Magistrate Judge Mona K. Majzoub. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 12 | ORDER Setting Conditions of Release as to Kevlin Omar Brown. Signed by Magistrate Judge Mona K. Majzoub. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 13 | BOND as to Kevlin Omar Brown in the amount of $10,000.00 unsecured entered. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 14 | ATTORNEY APPEARANCE: Steven F. Fishman appearing for Bryan Watson. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 16 | ACKNOWLEDGMENT of Indictment by Bryan Watson. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 17 | ORDER Setting Conditions of Release as to Bryan Watson. Signed by Magistrate Judge Mona K. Majzoub. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 18 | BOND as to Bryan Watson in the amount of $10,000.00 unsecured entered. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 19 | ATTORNEY APPEARANCE: Michael J. Harrison appearing for David Hansberry. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 20 | ACKNOWLEDGMENT of Indictment by David Hansberry. (SOso) (Entered: 04/10/2015) |
| 04/09/2015 | 21 | ORDER Setting Conditions of Release as to David Hansberry. Signed by Magistrate Judge Mona K. Majzoub. (SOso) (Entered: 04/10/2015) |

| 04/09/2015 | 22 | BOND as to David Hansberry in the amount of $10,000.00 unsecured entered. (SOso) (Entered: 04/10/2015) |
|---|---|---|
| 04/10/2015 | 15 | NOTICE OF ATTORNEY APPEARANCE: Kenneth Sasse appearing for Kevlin Omar Brown (Sasse, Kenneth) (Entered: 04/10/2015) |
| 04/10/2015 | | Minute Entry for proceedings before Magistrate Judge Mona K. Majzoub: Arraignment as to Kevlin Omar Brown (3) Count 3 held on 4/10/2015 Bond Continued Disposition: not guilty plea entered (Tape #: MKM 4/10/15) (Defendant Attorney: Kenneth Sasse) (AUSA: Louis Gabel) (EBut) (Entered: 04/10/2015) |
| 04/10/2015 | 23 | 🔊 Audio File of Completion of Arraignment as to Kevlin Omar Brown held on 04/10/2015 before Magistrate Judge Mona K. Majzoub. AUDIO FILE SIZE (0.8 MB) (SOso) (Entered: 04/13/2015) |
| 04/10/2015 | 24 | CJA 20 as to Kevlin Omar Brown: Appointment of Attorney Kenneth R. Sasse, in place of Federal Defender. Signed by Magistrate Judge Mona K. Majzoub. (SOso) (Entered: 04/13/2015) |
| 04/10/2015 | 25 | ACKNOWLEDGMENT of Indictment by Kevlin Omar Brown. (SOso) (Entered: 04/13/2015) |
| 04/15/2015 | 26 | MOTION for Bond by Kevlin Omar Brown. (Sasse, Kenneth) (Entered: 04/15/2015) |
| 04/15/2015 | 28 | SUPERSEDING INFORMATION as to Arthur Leavells (4) count(s) 1. (DPer) (Entered: 04/16/2015) |
| 04/15/2015 | 29 | SECOND SUPERSEDING INFORMATION as to Calvin Turner (5) count(s) 1. (DPer) (Entered: 04/16/2015) |
| 04/16/2015 | 27 | DISCOVERY NOTICE by United States of America as to David Hansberry, Bryan Watson, Kevlin Omar Brown (Gabel, Louis) (Entered: 04/16/2015) |
| 04/16/2015 | 30 | Warrant for Arrest Returned Executed on 02/09/15 as to David Hansberry. (DPer) (Entered: 04/20/2015) |
| 04/16/2015 | 31 | Warrant for Arrest Returned Executed on 04/09/15 as to Kevlin Omar Brown. (DPer) (Entered: 04/20/2015) |
| 04/16/2015 | 32 | Warrant for Arrest Returned Executed on 04/09/15 as to Bryan Watson. (DPer) (Entered: 04/20/2015) |
| 04/17/2015 | | Minute Entry for proceedings before Magistrate Judge Anthony P. Patti: Initial Appearance as to Arthur Leavells held on 4/17/2015. Disposition: $10,000 Unsecured Bond Issued. (Tape #: APP 4/17/2015) (Defendant Attorney: Miraim Seifer) (AUSA: Louis P. Gabel) (MWil) (Entered: 04/17/2015) |
| 04/17/2015 | | Minute Entry for proceedings before Magistrate Judge Anthony P. Patti: Arraignment as to Arthur Leavells (4) Count 1 held on 4/17/2015. Disposition: Plea of Not Guilty Entered. (Tape #: APP 4/17/2015) (Defendant Attorney: Miriam Seifer) (AUSA: Louis Gable) (MWil) (Entered: 04/17/2015) |
| 04/17/2015 | 34 | |

| | | |
|---|---|---|
| | | 🔊 Audio File of Arraignment as to Arthur Leavells held on 04/17/2015 before Magistrate Judge Anthony P. Patti. AUDIO FILE SIZE (4.1 MB) (LHos) (Entered: 04/20/2015) |
| 04/17/2015 | 35 | ORDER APPOINTING FEDERAL DEFENDER as to Arthur Leavells. Signed by Magistrate Judge Anthony P. Patti. (DPer) (Entered: 04/20/2015) |
| 04/17/2015 | 36 | ACKNOWLEDGMENT of first superseding information by Arthur Leavells. (DPer) (Entered: 04/20/2015) |
| 04/17/2015 | 37 | WAIVER OF INDICTMENT by Arthur Leavells. (DPer) (Entered: 04/20/2015) |
| 04/17/2015 | 38 | ORDER Setting Conditions of Release as to Arthur Leavells. Signed by Magistrate Judge Anthony P. Patti. (DPer) (Entered: 04/20/2015) |
| 04/17/2015 | 39 | BOND as to Arthur Leavells in the amount of $10,000.00 unsecured entered. (DPer) (Entered: 04/20/2015) |
| 04/20/2015 | 33 | DISCOVERY NOTICE as to Kevlin Omar Brown (Sasse, Kenneth) (Entered: 04/20/2015) |
| 04/21/2015 | 40 | NOTICE OF ATTORNEY APPEARANCE: Andrew N. Wise appearing for Arthur Leavells (Wise, Andrew) (Entered: 04/21/2015) |
| 04/21/2015 | 41 | NOTICE OF ATTORNEY APPEARANCE: Miriam L. Siefer appearing for Arthur Leavells (Siefer, Miriam) (Entered: 04/21/2015) |
| 04/21/2015 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Initial Appearance as to Calvin Turner held on 4/21/2015. Bond Info: Calvin Turner (5) Released on a $10,000 Unsecured Bond. Disposition: Held. (Tape #: RSW 04/21/2015 SOSO) (Defendant Attorney: James Feinberg) (AUSA: Sheldon Light) (Ciesla, C) (Entered: 04/21/2015) |
| 04/21/2015 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Arraignment as to Calvin Turner (5) Count 1 held on 4/21/2015 - Bond Continued. Disposition: Plea of Not Guilty Entered. (Tape #: RSW 04/21/2015 SOSO) (Defendant Attorney: James Feinberg) (AUSA: Sheldon Light) (Ciesla, C) (Entered: 04/21/2015) |
| 04/21/2015 | 42 | 🔊 Audio File of Initial Appearance/Arraignment as to Calvin Turner held on 04/21/2015 before Magistrate Judge R. Steven Whalen. AUDIO FILE SIZE (1.5 MB) (SOso) (Entered: 04/21/2015) |
| 04/21/2015 | 43 | ATTORNEY APPEARANCE: James L. Feinberg appearing for Calvin Turner. (SOso) (Entered: 04/21/2015) |
| 04/21/2015 | 44 | WAIVER OF INDICTMENT by Calvin Turner (SOso) (Entered: 04/21/2015) |
| 04/21/2015 | 45 | ACKNOWLEDGMENT of Second Superseding Information by Calvin Turner. (SOso) (Entered: 04/21/2015) |
| 04/21/2015 | 46 | ORDER Setting Conditions of Release as to Calvin Turner. Signed by Magistrate Judge R. Steven Whalen. (SOso) (Entered: 04/21/2015) |
| 04/21/2015 | 47 | |

| | | BOND as to Calvin Turner in the amount of $10,000.00 unsecured entered. (SOso) (Entered: 04/21/2015) |
|---|---|---|
| 05/04/2015 | 48 | NOTICE TO APPEAR as to Calvin Turner, **Plea Hearing set for 5/21/2015 02:00 PM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 05/04/2015) |
| 05/06/2015 | 49 | NOTICE TO APPEAR as to Calvin Turner, **Plea Hearing rescheduled to 5/19/2015 11:30 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 05/06/2015) |
| 05/07/2015 | 50 | SCHEDULING ORDER as to David Hansberry, Bryan Watson, Kevlin Omar Brown, and Arthur Leavells **Final Pretrial Conference set for 5/21/2015 02:00 PM before District Judge Stephen J. Murphy III; Plea cut-off: 5/21/2015; Jury Trial set for 6/16/2015 09:00 AM before District Judge Stephen J. Murphy III** Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 05/07/2015) |
| 05/08/2015 | 51 | NOTICE of hearing re: 26 MOTION for Bond as to Kevlin Omar Brown. **Motion Hearing set for 5/20/2015 11:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 05/08/2015) |
| 05/08/2015 | 52 | NOTICE TO APPEAR as to Arthur Leavells, **Plea Hearing set for 6/3/2015 02:00 PM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 05/08/2015) |
| 05/08/2015 | 53 | ORDER on Petition for Action on Conditions of Pretrial Release - bond conditions modified to include the condition to attend mental health treatment as directed by Pretrial Services, as to Kevlin Omar Brown. Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 05/08/2015) |
| 05/19/2015 | 54 | NOTICE TO APPEAR as to Calvin Turner, **Plea Hearing rescheduled to 5/27/2015 11:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 05/19/2015) |
| 05/20/2015 | 55 | STIPULATED PROTECTIVE ORDER as to David Hansberry, Bryan Watson, Kevlin Omar Brown Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 05/20/2015) |
| 05/20/2015 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Motion Hearing as to Kevlin Omar Brown held on 5/20/2015 re 26 MOTION for Bond filed by Kevlin Omar Brown Disposition: TAKEN UNDER ADVISEMENT(Court Reporter: Linda Cavanagh) (Defendant Attorney: Kenneth Sasse) (AUSA: Louis Gabel/Sheldon Light) (CCoh) (Entered: 05/22/2015) |
| 05/22/2015 | 56 | ORDER Denying 26 Motion for Review of Bond Conditions as to Kevlin Omar Brown (3). Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 05/22/2015) |
| 05/27/2015 | 57 | NOTICE TO APPEAR as to Calvin Turner, **Sentencing set for 9/25/2015 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 05/27/2015) |

| 05/27/2015 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Plea Hearing, Plea Entered by Calvin Turner (5) Guilty Count 1(Court Reporter: Rob Smith) (Defendant Attorney: James Feinberg) (AUSA: Louis Gabel/Sheldon Light) (CCoh) (Entered: 05/27/2015) |
| 05/27/2015 | 58 | PLEA AGREEMENT as to Calvin Turner. (DPer) (Entered: 05/28/2015) |
| 06/03/2015 | 59 | STIPULATION AND ORDER for Continuance as to David Hansberry, Bryan Watson, and Kevlin Omar Brown, ( **Final Pretrial Conference set for 7/22/2015 02:00 PM before District Judge Stephen J. Murphy III;**, **Plea cut-off: 7/22/2015;**, **Jury Trial set for 8/18/2015 09:00 AM before District Judge Stephen J. Murphy III**), ORDER TO CONTINUE - Ends of Justice as to David Hansberry, Bryan Watson, Kevlin Omar Brown Time excluded from 6/16/2015 until 8/18/2015. Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 06/03/2015) |
| 06/03/2015 | 60 | NOTICE TO APPEAR as to Arthur Leavells, **Plea Hearing rescheduled to 6/12/2015 09:30 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 06/03/2015) |
| 06/12/2015 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Plea Hearing, Plea Entered by Arthur Leavells (4) Guilty Count 1(Court Reporter: Rene Twedt) (Defendant Attorney: Miriam L. Siefer/Andrew Wise) (AUSA: Louis Gabel/Sheldon Light) (CCoh) (Entered: 06/12/2015) |
| 06/12/2015 | 61 | NOTICE TO APPEAR as to Arthur Leavells, **Sentencing set for 10/9/2015 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 06/12/2015) |
| 06/12/2015 | 62 | PLEA AGREEMENT as to Arthur Leavells. (DPer) (Entered: 06/16/2015) |
| 06/18/2015 | 63 | ORDER on Petition for Action on Conditions of Pretrial Release - removal of weapon from the defendant's residence as to Arthur Leavells. Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 06/18/2015) |
| 07/22/2015 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Pretrial Conference as to David Hansberry, Bryan Watson, Kevlin Omar Brown NOT HELD on 7/22/2015 Disposition: counsel will submit stipulation and order to extend the dates. (CCoh) (Entered: 07/22/2015) |
| 08/12/2015 | 64 | STIPULATION AND ORDER for Continuance as to David Hansberry, Bryan Watson, and Kevlin Omar Brown: ( **Final Pretrial Conference set for 9/24/2015 02:00 PM before District Judge Stephen J. Murphy III;**, **Plea cut-off: 9/24/2015; and**, **Jury Trial set for 10/13/2015 09:00 AM before District Judge Stephen J. Murphy III**) Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 08/12/2015) |
| 09/21/2015 | 65 | NOTICE TO APPEAR as to Calvin Turner, **Sentencing rescheduled to 1/22/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 09/21/2015) |
| 10/07/2015 | 66 | NOTICE TO APPEAR as to Arthur Leavells, **Sentencing rescheduled to 3/18/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 10/07/2015) |

| 10/13/2015 | 67 | STIPULATION AND ORDER for Continuance and Finding of Excludable Delay as to David Hansberry, Bryan Watson, Kevlin Omar Brown: ( **Final Pretrial Conference set for 11/9/2015 10:00 AM before District Judge Stephen J. Murphy III;, Plea cut-off: 11/9/2015;, Jury Trial set for 12/1/2015 09:00 AM before District Judge Stephen J. Murphy III**), ORDER TO CONTINUE - Ends of Justice as to David Hansberry, Bryan Watson, Kevlin Omar Brown Time excluded from 10/13/2015 until 12/1/2015 Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 10/13/2015) |
| --- | --- | --- |
| 10/14/2015 | 68 | STIPULATION AND ORDER as to Kevlin Omar Brown Amending Defendant's Bond Conditions. Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 10/14/2015) |
| 10/19/2015 | 69 | STIPULATION *and Agreement Regarding Admissibility of Business Records* by United States of America as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Gabel, Louis) (Entered: 10/19/2015) |
| 11/09/2015 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Final Pretrial Conference as to David Hansberry, Bryan Watson, Kevlin Omar Brown held on 11/9/2015 - counsel to get back to court as to a new trial date. (Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Steven Fishman/Kenneth Sasse) (AUSA: Louis Gabel/Sheldon Light) (CCoh) (Entered: 11/09/2015) |
| 11/19/2015 | 72 | STIPULATION AND ORDER for Continuance and Finding of Excludable Delay as to David Hansberry, Bryan Watson, and Kevlin Omar Brown: ( **Final Pretrial Conference set for 5/4/2016 02:00 PM before District Judge Stephen J. Murphy III;, Plea cut-off: 5/4/2016;, Jury Trial set for 6/7/2016 09:00 AM before District Judge Stephen J. Murphy III**), ORDER TO CONTINUE - Ends of Justice as to David Hansberry, Bryan Watson, Kevlin Omar Brown Time excluded from 12/2/2015 until 6/7/2016. Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 11/19/2015) |
| 11/24/2015 | 73 | STIPULATION AND ORDER Amending Defendant's Bond Conditions as to Kevlin Omar Brown. Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 11/24/2015) |
| 12/10/2015 | 76 | NOTICE of Change of Assistant U.S. Attorney: J. Michael Buckley added. Attorney Louis P. Gabel terminated. (Buckley, J.) (Entered: 12/10/2015) |
| 01/05/2016 | 77 | NOTICE TO APPEAR as to Calvin Turner. **Sentencing rescheduled to 7/15/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 01/05/2016) |
| 02/02/2016 | 78 | TRANSCRIPT of Final Pretrial Conference held on 11/09/2015 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 24) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 2/23/2016. Redacted Transcript Deadline set for 3/4/2016. Release of Transcript Restriction set for 5/2/2016. Transcript may be viewed at the |

| | | |
|---|---|---|
| | | court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 02/02/2016) |
| 02/10/2016 | 79 | FIRST SUPERSEDING INDICTMENT as to David Hansberry (1) count(s) 1s, 2s, 3s-8s, 9s, 10s, Bryan Watson (2) count(s) 1s, 2s, 3s-5s, 7s-8s, 9s, 10s, Kevlin Omar Brown (3) count(s) 6s. (ATee) (Entered: 02/10/2016) |
| 02/12/2016 | 80 | STIPULATED ORDER to Redact Transcript as to Bryan Watson. Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 02/12/2016) |
| 02/12/2016 | 81 | Redacted Version of 78 TRANSCRIPT of Final Pretrial Conference held on 11/09/2015 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. Release of Transcript Restriction set for 5/2/2016. (Cavanagh, Linda) (Entered: 02/12/2016) |
| 02/29/2016 | | Minute Entry for proceedings before Magistrate Judge Anthony P. Patti: Arraignment as to David Hansberry (1) Count 1s,2s,3s-8s,9s,10s held on 2/29/2016. Disposition: Not Guilty plea entered. Bond Continued.(Court Reporter: Digitally Recorded) (Defendant Attorney: Michael J. Harrison) (AUSA: Steve Hiyama) (MWil) (Entered: 02/29/2016) |
| 02/29/2016 | | Minute Entry for proceedings before Magistrate Judge Anthony P. Patti: Arraignment as to Bryan Watson (2) Count 1s,2s,3s-5s,7s-8s,9s,10s held on 2/29/2016 Disposition: Not Guilty plea entered. Bond Continued.(Court Reporter: Digitally Recorded) (Defendant Attorney: Steven Fishman) (AUSA: Steve Hiyama) (MWil) (Entered: 02/29/2016) |
| 02/29/2016 | | Minute Entry for proceedings before Magistrate Judge Anthony P. Patti: Arraignment as to Kevlin Omar Brown (3) Count 6s held on 2/29/2016. Disposition: Not Guilty plea entered. Bond Continued. (Court Reporter: Digitally Recorded) (Defendant Attorney: Kenneth Sasse) (AUSA: Steve Hiyama) (MWil) (Entered: 02/29/2016) |
| 02/29/2016 | 82 | ◀) Audio File of Arraignment on First Superseding Indictment as to David Hansberry held on 02/29/2016 before Magistrate Judge Anthony P. Patti. AUDIO FILE SIZE (1.3 MB) (SOso) (Entered: 02/29/2016) |
| 02/29/2016 | 83 | ◀) Audio File of Arraignment on First Superseding Indictment as to Bryan Watson held on 02/29/2016 before Magistrate Judge Anthony P. Patti. AUDIO FILE SIZE (1.2 MB) (SOso) (Entered: 02/29/2016) |
| 02/29/2016 | 84 | ◀) Audio File of Arraignment on First Superseding Indictment as to Kevlin Omar Brown held on 02/29/2016 before Magistrate Judge Anthony P. Patti. AUDIO FILE SIZE (1.7 MB) (SOso) (Entered: 02/29/2016) |
| 02/29/2016 | 85 | ACKNOWLEDGMENT of First Superseding Indictment by David Hansberry. (SOso) (Entered: 03/01/2016) |
| 02/29/2016 | 86 | ACKNOWLEDGMENT of First Superseding Indictment by Bryan Watson. (SOso) (Entered: 03/01/2016) |
| 02/29/2016 | 87 | ACKNOWLEDGMENT of First Superseding Indictment by Kevlin Omar Brown. (SOso) (Entered: 03/01/2016) |

| 03/08/2016 | 88 | NOTICE TO APPEAR as to Arthur Leavells, **Sentencing rescheduled to 7/29/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 03/08/2016) |
|---|---|---|
| 04/15/2016 | 89 | STIPULATION AND ORDER Granting Permission to Travel out of state as to Calvin Turner Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 04/15/2016) |
| 04/27/2016 | 90 | MOTION rescind or modify protective order by Kevlin Omar Brown. (Sasse, Kenneth) (Entered: 04/27/2016) |
| 04/28/2016 | 91 | Ex Parte MOTION for Order *Permitting Certain Firearms to be Brought Into Courthouse for Use as Trial Exhibits and Brief* by United States of America as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Buckley, J.) (Entered: 04/28/2016) |
| 05/03/2016 | 92 | NOTICE OF ATTORNEY APPEARANCE: Robert S. Harrison appearing for David Hansberry (Harrison, Robert) (Entered: 05/03/2016) |
| 05/03/2016 | 93 | NOTICE OF ATTORNEY APPEARANCE: James J. Hunter appearing for David Hansberry (Hunter, James) (Entered: 05/03/2016) |
| 05/04/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Final Pretrial Conference as to David Hansberry, Bryan Watson, Kevlin Omar Brown held on 5/4/2016(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Steven Fishman/Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 05/05/2016) |
| 05/06/2016 | 94 | MOTION *for Limited Attorney Voir Dire* by Bryan Watson. (Fishman, Steven) (Entered: 05/06/2016) |
| 05/10/2016 | 95 | RESPONSE by United States of America as to Bryan Watson re 94 MOTION *for Limited Attorney Voir Dire* (Buckley, J.) (Entered: 05/10/2016) |
| 05/27/2016 | 103 | Proposed Voir Dire by United States of America as to David Hansberry, Bryan Watson, Kevlin Omar Brown (Light, Sheldon) (Entered: 05/27/2016) |
| 05/27/2016 | 104 | TRIAL BRIEF by United States of America as to David Hansberry, Bryan Watson, Kevlin Omar Brown (Light, Sheldon) (Entered: 05/27/2016) |
| 05/27/2016 | 105 | MOTION Preliminary Jury Instructions on Elements and Definitions by United States of America as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Light, Sheldon) (Entered: 05/27/2016) |
| 05/28/2016 | 106 | Proposed Voir Dire by Kevlin Omar Brown (Sasse, Kenneth) (Entered: 05/28/2016) |
| 05/29/2016 | 107 | Proposed Voir Dire by Bryan Watson (Fishman, Steven) (Entered: 05/29/2016) |
| 05/29/2016 | 108 | TRIAL BRIEF by Bryan Watson (Fishman, Steven) (Entered: 05/29/2016) |
| 05/31/2016 | 109 | Proposed Voir Dire by David Hansberry (Harrison, Michael) (Entered: 05/31/2016) |
| 05/31/2016 | 110 | TRIAL BRIEF by David Hansberry (Harrison, Michael) (Entered: 05/31/2016) |

| 06/07/2016 | [112](#) | STIPULATION *Regarding Preliminary Jury Instructions* by United States of America as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Light, Sheldon) (Entered: 06/07/2016) |
|---|---|---|
| 06/07/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Voir Dire Held and Concluded and Jury Impaneled on 6/7/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown **Jury Trial set for 6/8/2016 09:00 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 06/08/2016) |
| 06/08/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/8/2016. **Jury Trial set for 6/9/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison/Steve Fishman/Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 06/09/2016) |
| 06/09/2016 | | Set/Reset Deadlines/Hearings as to David Hansberry, Bryan Watson, Kevlin Omar Brown: **Jury Trial set for 6/9/2016 08:30 AM before District Judge Stephen J. Murphy III Jury Trial set for 6/10/2016 08:30 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 06/09/2016) |
| 06/09/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/9/2016. **Jury Trial set for 6/10/2016 08:30 AM before District Judge Stephen J. Murphy III.** (Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison/Steve Fishman/Kenneth Sasse) (AUSA: Michael Buckley/Sheldon Light) (SBur) (Entered: 11/02/2016) |
| 06/10/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/10/2016. **Jury Trial set for 6/13/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison/Steve Fishman/Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 06/10/2016) |
| 06/10/2016 | | Set/Reset Deadlines as to David Hansberry, Bryan Watson, Kevlin Omar Brown: **Jury Trial set for 6/13/2016 08:30 AM - 6/17/2016 8:30 a.m. before District Judge Stephen J. Murphy III <b (CCoh) (Entered: 06/10/2016)** |
| 06/13/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/13/2016. **Jury Trial set for 6/14/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Michael Buckley/Sheldon Light) (CCoh) (Entered: 07/01/2016) |

| 06/14/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/14/2016. **Jury Trial set for 6/15/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 06/15/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/15/2016. **Jury Trial set for 6/16/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 06/16/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/16/2016. **Jury Trial set for 6/20/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 06/20/2016 | [113](#) | TRANSCRIPT of Jury Trial: Volume 2 (Excerpt - opening statements) held on 06/08/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 73) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 7/11/2016. Redacted Transcript Deadline set for 7/21/2016. Release of Transcript Restriction set for 9/19/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 06/20/2016) |
| 06/20/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/20/2016. **Jury Trial set for 6/21/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 06/21/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/21/2016. **Jury Trial set for 6/22/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, |

| | | Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
|---|---|---|
| 06/22/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/22/2016. **Jury Trial set for 6/23/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 06/23/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/23/2016. **Jury Trial set for 6/27/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 06/27/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/27/2016. **Jury Trial set for 6/28/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 06/28/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/28/2016. **Jury Trial set for 6/29/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) Modified on 11/2/2016 [CORRECTED DATE OF TRIAL](SBur). (Entered: 07/01/2016) |
| 06/29/2016 | [114](#) | MOTION *for Mistrial* by Bryan Watson. (Fishman, Steven) (Entered: 06/29/2016) |
| 06/29/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/29/2016. **Jury Trial set for 6/30/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 06/30/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Motion Hearing as to Bryan Watson held on 6/30/2016 re [114](#) MOTION *for Mistrial* Disposition: Motion denied. (Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |

| 06/30/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 6/30/2016. **Jury Trial set for 7/1/2016 09:00 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
|---|---|---|
| 07/01/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 7/1/2016. All defts. moved for judgment of acquittal under FRCRP 29. The Government opposed the oral motions. Taken under advisement at a later date. **Jury Trial set for 7/5/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/01/2016) |
| 07/04/2016 | 115 | MOTION in Limine *to Restrict Defense Character Testimony* by United States of America as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Light, Sheldon) (Entered: 07/04/2016) |
| 07/04/2016 | 116 | RESPONSE by Bryan Watson as to David Hansberry, Bryan Watson re 115 MOTION in Limine *to Restrict Defense Character Testimony* (Fishman, Steven) (Entered: 07/04/2016) |
| 07/05/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 7/5/2016. **Jury Trial set for 7/6/2016 09:00 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steve Fishman, Kenneth Sasse) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 07/05/2016) |
| 07/06/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Continued as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 7/6/2016. **Jury Trial set for 7/7/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison/Steven Fishman/Kenneth Sasse) (AUSA: Michael Buckley/Sheldon Light) (CCoh) (Entered: 07/07/2016) |
| 07/07/2016 | 117 | ORDER for Jurors Luncheon, entered. Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 07/07/2016) |
| 07/07/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 7/7/2016. Jury Deliberation also held. **Deliberations to continue on 7/8/2016 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison/Steve Fishman/Kenneth Sasse) (AUSA: Michael Buckley/Sheldon Light) (CCoh) (Entered: 07/08/2016) |

| 07/08/2016 | [118](#) | NOTICE TO APPEAR as to Calvin Turner, **Sentencing rescheduled to 9/30/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 07/08/2016) |
|---|---|---|
| 07/08/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Deliberation Held All Day as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 7/8/2016. **Jury Deliberations to continue on 7/11/2016 at 08:30 AM before District Judge Stephen J. Murphy III**(Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steven Fishman/Kenneth Sasse) (AUSA: Michael Buckley/Sheldon Light) (CCoh) (Entered: 07/15/2016) |
| 07/11/2016 | [121](#) | Jury Verdict Form as to David Hansberry, Bryan Watson, Kevlin Omar Brown (DPer) (Entered: 07/12/2016) |
| 07/11/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Jury Trial Held and Completed as to David Hansberry, Bryan Watson, Kevlin Omar Brown on 7/11/2016. Jury Deliberation also held. JURY VERDICT as to David Hansberry (1) Guilty on Count 1s and Bryan Watson (2) Guilty on Count 1s David Hansberry (1) Not Guilty on Count 2s,3s-8s,9s,10s and Bryan Watson (2) Not Guilty on Count 2s,7s-8s,9s,10s and Kevlin Omar Brown (3) Not Guilty on Count 6s. (Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison/Robert Harrison, Steven Fishman, Kenneth Sasse) (AUSA: Michael Buckley/Sheldon Light) (CCoh) (Entered: 07/15/2016) |
| 07/12/2016 | [119](#) | NOTICE TO APPEAR as to David Hansberry, **Sentencing set for 11/18/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 07/12/2016) |
| 07/12/2016 | [120](#) | NOTICE TO APPEAR as to Bryan Watson, **Sentencing set for 11/18/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 07/12/2016) |
| 07/12/2016 | [122](#) | TRANSCRIPT of Jury Trial: Volume 11 (Excerpt - testimony of Peter Belcastro) held on 06/22/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 31) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 8/2/2016. Redacted Transcript Deadline set for 8/12/2016. Release of Transcript Restriction set for 10/11/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 07/12/2016) |
| 07/12/2016 | [123](#) | TRANSCRIPT of Jury Trial: Volume 18 (Excerpt - testimony of Ahmed Haidar) held on 07/05/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 53) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public |

| | | without redaction after 90 days. Redaction Request due 8/2/2016. Redacted Transcript Deadline set for 8/12/2016. Release of Transcript Restriction set for 10/11/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 07/12/2016) |
|------------|-----|---------------------------------------------------------------|
| 07/14/2016 | 124 | ORDER Scheduling Rule 29 Briefing as to David Hansberry, Bryan Watson, Kevlin Omar Brown Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 07/14/2016) |
| 07/19/2016 | 125 | NOTICE TO APPEAR as to Arthur Leavells, **Sentencing rescheduled to 12/9/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 07/19/2016) |
| 07/20/2016 | 126 | MOTION for Judgment of Acquittal by Bryan Watson. (Fishman, Steven) (Entered: 07/20/2016) |
| 07/20/2016 | 127 | TRANSCRIPT of Jury Trial: Volume 11 (Excerpt - Testimony of Kelven Pulley) held on 06/22/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 52) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 8/10/2016. Redacted Transcript Deadline set for 8/22/2016. Release of Transcript Restriction set for 10/18/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 07/20/2016) |
| 07/20/2016 | 128 | TRANSCRIPT of Jury Trial: Volume 12 (Excerpt - Testimony of Lamont Calhoun) held on 06/23/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 144) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 8/10/2016. Redacted Transcript Deadline set for 8/22/2016. Release of Transcript Restriction set for 10/18/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 07/20/2016) |
| 07/20/2016 | 129 | TRANSCRIPT of Jury Trial: Volume 15 held on 06/29/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 206) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 8/10/2016. Redacted Transcript Deadline set for 8/22/2016. Release of Transcript Restriction set for 10/18/2016. Transcript may be viewed |

| | | at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 07/20/2016) |
|---|---|---|
| 07/21/2016 | 131 | MOTION *for Judgment of Acquittal* by David Hansberry. (Harrison, Michael) (Entered: 07/21/2016) |
| 07/22/2016 | 132 | TRANSCRIPT of Jury Trial: Volume 13 held on 06/27/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 130) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 8/12/2016. Redacted Transcript Deadline set for 8/22/2016. Release of Transcript Restriction set for 10/20/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 07/22/2016) |
| 07/22/2016 | 133 | TRANSCRIPT of Jury Trial: Volume 14 held on 06/28/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 156) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 8/12/2016. Redacted Transcript Deadline set for 8/22/2016. Release of Transcript Restriction set for 10/20/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 07/22/2016) |
| 07/22/2016 | 134 | TRANSCRIPT of Jury Trial: Volume 21 held on 07/08/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 9) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 8/12/2016. Redacted Transcript Deadline set for 8/22/2016. Release of Transcript Restriction set for 10/20/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 07/22/2016) |
| 07/28/2016 | 135 | RESPONSE by United States of America as to David Hansberry, Bryan Watson re 131 MOTION *for Judgment of Acquittal*, 126 MOTION for Judgment of Acquittal *with Incorporated Brief* (Buckley, J.) (Entered: 07/28/2016) |

| 07/29/2016 | 136 | NOTICE of hearing re: 131 MOTION *for Judgment of Acquittal*, 126 MOTION for Judgment of Acquittal as to David Hansberry, Bryan Watson. **Motion Hearing set for 8/9/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 07/29/2016) |
|---|---|---|
| 08/02/2016 | 137 | Re-NOTICE of hearing re 131 MOTION *for Judgment of Acquittal*, 126 MOTION for Judgment of Acquittal as to David Hansberry, Bryan Watson. **Motion Hearing rescheduled to 8/11/2016 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 08/02/2016) |
| 08/03/2016 | 138 | TRANSCRIPT of Jury Trial: Volume 18 (Excerpt - Testimony of Stephanie Stager and Matthew Bray) held on 07/05/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 63) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 8/24/2016. Redacted Transcript Deadline set for 9/6/2016. Release of Transcript Restriction set for 11/1/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 08/03/2016) |
| 08/11/2016 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Motion Hearing as to David Hansberry, Bryan Watson held on 8/11/2016 re 131 MOTION *for Judgment of Acquittal*, and 126 MOTION for Judgment of Acquittal Disposition: Motions taken under advisement. (Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison and Steven Fishman) (AUSA: Sheldon Light/J. Michael Buckley) (CCoh) (Entered: 08/11/2016) |
| 08/16/2016 | 139 | ORDER Denying 131 Motion for Acquittal as to David Hansberry (1); and Denying 126 Motion for Acquittal as to Bryan Watson (2). Signed by District Judge Stephen J. Murphy, III. (CCoh) (Entered: 08/16/2016) |
| 08/18/2016 | 140 | TRANSCRIPT of Jury Trial: Volume 16 Excerpt - Jury Instruction re: Testimony of Gary Jackson held on 06/30/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 6) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 9/8/2016. Redacted Transcript Deadline set for 9/19/2016. Release of Transcript Restriction set for 11/16/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 08/18/2016) |
| 08/25/2016 | 141 | TRANSCRIPT of Jury Trial: Volume 16 (Excerpt - Motion for Mistrial/Curative Jury Instruction re: Testimony of Gary Jackson) held on 06/30/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 24) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction |

| | | Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 9/15/2016. Redacted Transcript Deadline set for 9/26/2016. Release of Transcript Restriction set for 11/23/2016. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 08/25/2016) |
|---|---|---|
| 09/23/2016 | 142 | MOTION to Reduce Sentence by United States of America as to Calvin Turner. (Buckley, J.) (Entered: 09/23/2016) |
| 09/26/2016 | 143 | NOTICE TO APPEAR as to Calvin Turner, **Sentencing rescheduled to 11/14/2016 02:30 PM before District Judge Stephen J. Murphy III** [ON WRONG DOCKET] (CCoh) Modified on 9/26/2016 (CCoh). (Entered: 09/26/2016) |
| 09/27/2016 | 145 | NOTICE TO APPEAR as to Calvin Turner, **Sentencing rescheduled to 10/25/2016 02:00 PM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 09/27/2016) |
| 09/27/2016 | 146 | JUDGMENT of Acquittal as to Kevlin Omar Brown. Signed by District Judge Stephen J. Murphy, III. (DPer) (Entered: 09/27/2016) |
| 10/03/2016 | | Attorney Sheldon N. Light is discontinued from receiving Notices of Electronic Filing. (Light, Sheldon) (Entered: 10/03/2016) |
| 10/19/2016 | 147 | NOTICE TO APPEAR as to Calvin Turner, **Sentencing rescheduled to 2/24/2017 10:00 AM before District Judge Stephen J. Murphy III** (CCoh) (Entered: 10/19/2016) |
| 10/28/2016 | | TEXT-ONLY NOTICE: Sentencing on 11/18/2016 is Cancelled re 119 Notice to Appear; 120 Notice to Appear as to David Hansberry, Bryan Watson. (DPar) (Entered: 10/28/2016) |
| 10/28/2016 | 148 | NOTICE TO APPEAR as to David Hansberry, Bryan Watson, **Sentencing Reset for 12/8/2016 02:00 PM before District Judge Stephen J. Murphy III** (DPar) (Entered: 10/28/2016) |
| 11/04/2016 | | Set/Reset Deadlines/Hearings as to Arthur Leavells: **Sentencing Reset for 12/12/2016 10:00 AM before District Judge Stephen J. Murphy III**. (DPar) (Entered: 11/04/2016) |
| 11/04/2016 | 149 | [DOCKETING ERROR - ENTRY MADE ON WRONG CASE] STIPULATION AND ORDER TO ADJOURN TRIAL as to David Hansberry, Bryan Watson, Kevlin Omar Brown, Arthur Leavells, Calvin Turner Time excluded from 11/10/2016 until 2/21/2017. **Final Pretrial Conference Reset for 1/17/2017 10:00 AM before District Judge Stephen J. Murphy III, Plea due by 1/17/2017, Jury Trial Reset for 2/21/2017 09:00 AM before District Judge Stephen J. Murphy III**. Signed by District Judge Stephen J. Murphy, III. (Main Document 149 replaced on 11/4/2016) (DPar) (Entered: 11/04/2016) |
| 11/04/2016 | 150 | |

| | | |
|---|---|---|
| | | NOTICE of Correction re 149 Stipulation and Order as to David Hansberry, Bryan Watson, Kevlin Omar Brown, Arthur Leavells, Calvin Turner. (DPar) (Entered: 11/04/2016) |
| 11/09/2016 | 151 | MOTION to Adjourn *Sentencing* by David Hansberry. (Harrison, Michael) (Entered: 11/09/2016) |
| 11/10/2016 | | TEXT-ONLY ORDER Granting 151 Motion to Adjourn *Sentencing* as to David Hansberry, **(Sentencing Reset for 1/27/2017 02:00 PM before District Judge Stephen J. Murphy III)**. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 11/10/2016) |
| 11/10/2016 | | Set/Reset Deadlines/Hearings as to Bryan Watson: **Sentencing Reset for 1/27/2017 02:00 PM before District Judge Stephen J. Murphy III.** (DPar) (Entered: 11/10/2016) |
| 11/18/2016 | 152 | STIPULATED ORDER as to Arthur Leavells, **(Sentencing Reset for 2/27/2017 10:00 AM before District Judge Stephen J. Murphy III)**. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 11/18/2016) |
| 01/03/2017 | 153 | TRANSCRIPT of Jury Trial: Volume 18 (Excerpt - testimony of Ralph Godbee) held on 07/05/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 39) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 1/24/2017. Redacted Transcript Deadline set for 2/3/2017. Release of Transcript Restriction set for 4/3/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 01/03/2017) |
| 01/17/2017 | 154 | MOTION to Adjourn *Sentencing* by David Hansberry. (Harrison, Michael) (Entered: 01/17/2017) |
| 01/17/2017 | 155 | NOTICE of Joinder/Concurrence in 154 MOTION to Adjourn *Sentencing* filed by David Hansberry by Bryan Watson as to David Hansberry (Fishman, Steven) (Entered: 01/17/2017) |
| 01/18/2017 | 156 | RESPONSE by United States of America as to David Hansberry, Bryan Watson re 154 MOTION to Adjourn *Sentencing with Incorporated Brief* (Buckley, J.) (Entered: 01/18/2017) |
| 01/18/2017 | 157 | RESPONSE by United States of America as to David Hansberry, Bryan Watson re 154 MOTION to Adjourn *Sentencing (Amended) with Incorporated Brief* (Buckley, J.) (Entered: 01/18/2017) |
| 01/18/2017 | 158 | ORDER to Submit Briefing as to David Hansberry, Bryan Watson re 154 MOTION to Adjourn *Sentencing*, 155 Notice of Joinder/Concurrence, **(Response due by 1/20/2017)**. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 01/18/2017) |
| 01/18/2017 | 159 | |

| | | REPLY TO RESPONSE by Bryan Watson as to David Hansberry, Bryan Watson re 154 MOTION to Adjourn *Sentencing* (Fishman, Steven) (Entered: 01/18/2017) |
|---|---|---|
| 01/19/2017 | 160 | ORDER Granting Defendant's 154 MOTION to Adjourn Sentencing as to David Hansberry, Bryan Watson (**Sentencing Reset for 2/22/2017 10:00 AM before District Judge Stephen J. Murphy III**). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 01/19/2017) |
| 01/19/2017 | | Set/Reset Deadlines/Hearings as to Bryan Watson: **Sentencing Reset for 2/22/2017 10:00 AM before District Judge Stephen J. Murphy III**. (DPar) (Entered: 01/19/2017) |
| 01/24/2017 | 161 | STIPULATED ORDER to Adjourn Sentencing as to Arthur Leavells, (**Sentencing Reset for 3/22/2017 10:00 AM before District Judge Stephen J. Murphy III**). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 01/24/2017) |
| 02/09/2017 | 162 | STIPULATED ORDER to Adjourn Sentencing as to Calvin Turner, (**Sentencing Reset for 3/15/2017 02:00 PM before District Judge Stephen J. Murphy III**). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 02/09/2017) |
| 02/10/2017 | | Set/Reset Deadlines/Hearings as to Calvin Turner: **Sentencing Reset **TIME CHANGE ONLY** for 3/15/2017 09:30 AM before District Judge Stephen J. Murphy III**. (DPar) (Entered: 02/10/2017) |
| 02/13/2017 | 163 | SENTENCING MEMORANDUM by Bryan Watson (Attachments: # 1 Exhibit 1 - Internal Affairs report) (Fishman, Steven) (Entered: 02/13/2017) |
| 02/14/2017 | 164 | SENTENCING MEMORANDUM by David Hansberry (Harrison, Michael) (Entered: 02/14/2017) |
| 02/15/2017 | 165 | SENTENCING MEMORANDUM by United States of America as to David Hansberry, Bryan Watson (Attachments: # 1 Index of Exhibits, # 2 Exh. A: Transcript of August 14, 2010 meeting involving David Hansberry, Bryan Watson, Arthur Leavells, Gary Jackson, Lavondria Herbert and Jackson's cousin, Sue LNU (recorded by Gary Jackson), # 3 Exh. B: Transcript of September 7, 2014 meeting involving David Hansberry and Arthur Leavells (recorded by Arthur Leavells), # 4 Exh. C: Transcript of September 11, 2014 meeting involving Bryan Watson and Arthur Leavells (recorded by Arthur Leavells), # 5 Exh. D: FBI report of Special Agent Michael FitzGerald, with transcript of May 6, 2014 recording of a telephone conversation between Gary Jackson and Fred Tucker) (Buckley, J.) (Entered: 02/15/2017) |
| 02/17/2017 | 166 | MEMORANDUM *Supplemental Sentencing Memorandum* by Bryan Watson. (Fishman, Steven) (Entered: 02/17/2017) |
| 02/20/2017 | 167 | RESPONSE to *Government's Sentencing Memorandum* by David Hansberry (Harrison, Michael) (Entered: 02/20/2017) |
| 02/20/2017 | 168 | MOTION for New Trial by David Hansberry. (Harrison, Michael) (Entered: 02/20/2017) |

| | | |
|---|---|---|
| 02/20/2017 | 169 | NOTICE *of Joinder* by Bryan Watson (Fishman, Steven) (Entered: 02/20/2017) |
| 02/22/2017 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Sentencing held as to David Hansberry. (Court Reporter: Linda Cavanagh) (Defendant Attorney: Michael Harrison) (AUSA: J. Michael Buckley) (DPar) (Entered: 02/22/2017) |
| 02/22/2017 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Sentencing held as to Bryan Watson. (Court Reporter: Linda Cavanagh) (Defendant Attorney: Steven F. Fishman) (AUSA: J. Michael Buckley) (DPar) (Entered: 02/22/2017) |
| 02/23/2017 | 170 | NOTICE OF ATTORNEY APPEARANCE: Elizabeth L. Jacobs appearing for David Hansberry (Jacobs, Elizabeth) (Entered: 02/23/2017) |
| 02/23/2017 | 171 | NOTICE OF APPEAL by Bryan Watson. Fee Status: No Fee Paid. (Fishman, Steven) (Entered: 02/23/2017) |
| 02/24/2017 | 172 | Certificate of Service re 171 Notice of Appeal as to Bryan Watson. (SOso) (Entered: 02/24/2017) |
| 02/24/2017 | 173 | EXHIBIT *A* re 168 MOTION for New Trial by David Hansberry (Harrison, Michael) (Entered: 02/24/2017) |
| 02/24/2017 | 174 | CERTIFICATE OF SERVICE as to David Hansberry . (Harrison, Michael) (Entered: 02/24/2017) |
| 02/24/2017 | 176 | JUDGMENT as to David Hansberry. Signed by District Judge Stephen J. Murphy, III. (DPer) (Entered: 02/27/2017) |
| 02/26/2017 | 175 | MOTION for Withdrawal of Attorney Michael J. Harrison by David Hansberry. (Harrison, Michael) (Entered: 02/26/2017) |
| 02/27/2017 | 177 | MOTION for Withdrawal of Attorney Robert Harrison and James Hunter by David Hansberry. (Harrison, Robert) (Entered: 02/27/2017) |
| 02/27/2017 | 178 | TRANSCRIPT of Sentencing held on 02/22/2017 as to David Hansberry. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 84) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 3/20/2017. Redacted Transcript Deadline set for 3/30/2017. Release of Transcript Restriction set for 5/30/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 02/27/2017) |
| 02/27/2017 | 179 | TRANSCRIPT of Sentencing held on 02/22/2017 as to Bryan Watson. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 71) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. |

|            |     | Redaction Request due 3/20/2017. Redacted Transcript Deadline set for 3/30/2017. Release of Transcript Restriction set for 5/30/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 02/27/2017) |
|------------|-----|---|
| 02/27/2017 |     | Set/Reset Deadlines for Motion Hearing 168 MOTION for New Trial as to David Hansberry, (**Motion Hearing set for 4/11/2017 10:00 AM before District Judge Stephen J. Murphy III**). (DPar) (Entered: 02/27/2017) |
| 02/28/2017 |     | Set/Reset Deadlines Motion Hearing as to David Hansberry 168 MOTION for New Trial, **Motion Hearing Reset **TIME CHANGE ONLY** for 4/11/2017 02:00 PM before District Judge Stephen J. Murphy III**. (DPar) (Entered: 02/28/2017) |
| 02/28/2017 | 180 | RESPONSE by United States of America as to David Hansberry, Bryan Watson re 168 MOTION for New Trial (Attachments: # 1 Index of Exhibits, # 2 Exh. 1: Pertinent Gary Jackson trial testimony on June 29, 2016, # 3 Exh. 2: Rough transcript of May 6, 2014 recording of a telephone conversation between Gary Jackson and Fred Tucker, prepared by DEA agents) (Buckley, J.) (Entered: 02/28/2017) |
| 02/28/2017 | 181 | JUDGMENT as to Bryan Watson. Signed by District Judge Stephen J. Murphy, III. (SSch) (Entered: 03/01/2017) |
| 03/01/2017 | 182 | NOTICE OF APPEAL by David Hansberry re 176 Judgment. Fee Status: No Fee Paid. (Jacobs, Elizabeth) (Entered: 03/01/2017) |
| 03/01/2017 | 183 | Certificate of Service re 182 Notice of Appeal as to David Hansberry. (LHos) (Entered: 03/01/2017) |
| 03/01/2017 | 184 | AMENDED JUDGMENT as to Bryan Watson. Signed by District Judge Stephen J. Murphy, III. (SSch) (Entered: 03/01/2017) |
| 03/04/2017 | 185 | MOTION for Withdrawal of Attorney Steven Fishman by Bryan Watson. (Attachments: # 1 Exhibit 1 - financial affidavit) (Fishman, Steven) (Entered: 03/04/2017) |
| 03/07/2017 |     | Appeal Fee received for 182 Notice of Appeal filed by David Hansberry in the amount of $ 505.00 - Receipt No. DET101650. (Huff, W.) (Entered: 03/07/2017) |
| 03/08/2017 | 186 | REPLY TO RESPONSE by David Hansberry re 168 MOTION for New Trial (Jacobs, Elizabeth) (Entered: 03/08/2017) |
| 03/08/2017 | 187 | NOTICE *of Withdrawal of Motion to Withdraw as Counsel* by Bryan Watson (Fishman, Steven) (Entered: 03/08/2017) |
| 03/08/2017 | 188 | SENTENCING MEMORANDUM by Calvin Turner (Feinberg, James) (Entered: 03/08/2017) |
| 03/13/2017 | 189 | MOTION to Reduce Sentence by United States of America as to Arthur Leavells. (Buckley, J.) Modified on 5/25/2017 (LHos). (Entered: 03/13/2017) |

| 03/13/2017 | [190](#) | TRANSCRIPT of Jury Trial: Volume 2 (Excerpt - Testimony of Michael Saraino Part 1) held on 06/08/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 44) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 4/3/2017. Redacted Transcript Deadline set for 4/13/2017. Release of Transcript Restriction set for 6/12/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 03/13/2017) |
| 03/13/2017 | [191](#) | TRANSCRIPT of Jury Trial: Volume 3 (Excerpt - Testimony of Michael Saraino Part 2) held on 06/09/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 38) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 4/3/2017. Redacted Transcript Deadline set for 4/13/2017. Release of Transcript Restriction set for 6/12/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 03/13/2017) |
| 03/13/2017 | [192](#) | TRANSCRIPT of Jury Trial: Volume 11 (Excerpt - Testimony of Steven Walton) held on 06/22/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 54) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 4/3/2017. Redacted Transcript Deadline set for 4/13/2017. Release of Transcript Restriction set for 6/12/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 03/13/2017) |
| 03/15/2017 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Sentencing held as to Calvin Turner. Disposition: Rule 11 Plea Agreement accepted by the Court. (Court Reporter: Linda Cavanagh) (Defendant Attorney: James L. Feinberg) (AUSA: J. Michael Buckley) (DPar) (Entered: 03/15/2017) |
| 03/15/2017 | [194](#) | STIPULATED ORDER Adjourning Sentencing as to Arthur Leavells, (**Sentencing Reset for 5/24/2017 10:00 AM before District Judge Stephen J. Murphy III**). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 03/15/2017) |
| 03/15/2017 | [195](#) | JUDGMENT as to Calvin Turner. Signed by District Judge Stephen J. Murphy, III. (LHos) (Entered: 03/15/2017) |

| 03/20/2017 | [196](#) | TRANSCRIPT of Jury Trial: Volume 19 (Excerpt - closing statements) held on 07/06/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 176) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 4/10/2017. Redacted Transcript Deadline set for 4/20/2017. Release of Transcript Restriction set for 6/19/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 03/20/2017) |
| --- | --- | --- |
| 03/20/2017 | [197](#) | STIPULATED ORDER Extending Report Date as to Bryan Watson. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 03/20/2017) |
| 03/20/2017 | [198](#) | STIPULATED ORDER Extending Report Date as to David Hansberry. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 03/20/2017) |
| 03/20/2017 | [199](#) | TRANSCRIPT of Jury Trial: Volume 9 (Excerpt - Testimony of Calvin Turner, Part 1) held on 06/20/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 102) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 4/10/2017. Redacted Transcript Deadline set for 4/20/2017. Release of Transcript Restriction set for 6/19/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 03/20/2017) |
| 03/20/2017 | [200](#) | TRANSCRIPT of Jury Trial: Volume 10 (Excerpt - Testimony of Calvin Turner, Part 2) held on 06/21/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 32) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 4/10/2017. Redacted Transcript Deadline set for 4/20/2017. Release of Transcript Restriction set for 6/19/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 03/20/2017) |
| 03/24/2017 |  | Appeal Fee received for [171](#) Notice of Appeal filed by Bryan Watson in the amount of $ 505.00 - Receipt No. DET102223. (Huff, W.) (Entered: 03/24/2017) |
| 03/24/2017 | [201](#) | OPINION and ORDER Denying Defendant's [168](#) Motion for New Trial as to David Hansberry (1). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 03/24/2017) |

| 03/28/2017 | 202 | STIPULATION *Allowing Calvin Turner to Travel to Alabama* by Calvin Turner. (Feinberg, James) (Entered: 03/28/2017) |
| 03/28/2017 | 203 | ORDER Allowing Defendant to Travel to Alabama as to Calvin Turner re 202 Stipulation. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 03/28/2017) |
| 03/28/2017 | | TEXT-ONLY NOTICE: Motion Hearing on 4/11/2017 is Cancelled re 168 MOTION for New Trial as to David Hansberry. (DPar) (Entered: 03/28/2017) |
| 03/28/2017 | | TEXT-ONLY NOTICE: Motion Hearing on 4/11/2017 is Cancelled re 169 Notice (Other) as to Bryan Watson. (DPar) (Entered: 03/28/2017) |
| 03/31/2017 | 204 | NOTICE OF APPEAL by David Hansberry re 201 Order on Motion for New Trial. Fee Status: No Fee Paid. (Jacobs, Elizabeth) (Entered: 03/31/2017) |
| 03/31/2017 | 205 | Certificate of Service re 204 Notice of Appeal as to David Hansberry. (DWor) (Entered: 03/31/2017) |
| 04/05/2017 | | Appeal Fee received for 204 Notice of Appeal filed by David Hansberry in the amount of $ 505.00 - Receipt No. DET102654. (Huff, W.) (Entered: 04/05/2017) |
| 04/06/2017 | 206 | NOTICE OF APPEAL by Bryan Watson. Fee Status: No Fee Paid. (Fishman, Steven) (Entered: 04/06/2017) |
| 04/06/2017 | 207 | Certificate of Service re 206 Notice of Appeal as to Bryan Watson. (SOso) (Entered: 04/06/2017) |
| 04/12/2017 | 208 | STIPULATION *Extending Calvin Turner's Voluntary Surrender Date* by Calvin Turner. (Feinberg, James) (Entered: 04/12/2017) |
| 04/12/2017 | 209 | ORDER Extending Defendant's Voluntary Surrender Date as to Calvin Turner re 208 Stipulation. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 04/12/2017) |
| 04/13/2017 | 210 | NOTICE by David Hansberry of withdrawal of 177 MOTION for Withdrawal of Attorney Robert Harrison and James Hunter . (Harrison, Robert) (Entered: 04/13/2017) |
| 04/20/2017 | 212 | ORDER Granting Defendant's 175 MOTION for Withdrawal of Attorney as to David Hansberry; and Granting Defendant's 185 MOTION for Withdrawal of Attorney as to Bryan Watson. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 04/20/2017) |
| 04/20/2017 | 213 | STIPULATION and ORDER Directing the Withdrawal of Robert S. Harrison and James J. Hunter as Counsel as to David Hansberry. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 04/20/2017) |
| 04/20/2017 | 214 | TRANSCRIPT of Sentencing held on 03/15/2017 as to Calvin Turner. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 20) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/11/2017. Redacted Transcript Deadline set for |

| | | 5/22/2017. Release of Transcript Restriction set for 7/19/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 04/20/2017) |
|---|---|---|
| 04/26/2017 | 215 | ORDER from U.S. Court of Appeals - Sixth Circuit as to Bryan Watson re 206 Notice of Appeal, 171 Notice of Appeal [Appeal Case Number 17-1391] (Ahmed, N) (Entered: 04/27/2017) |
| 04/28/2017 | | Attorney Thomas W. Jakuc is discontinued from receiving Notices of Electronic Filing. (Jakuc, Thomas) (Entered: 04/28/2017) |
| 05/02/2017 | 216 | SEALED VOIR DIRE TRANSCRIPT held on 06/07/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 197) (Appeal Purposes) Attorneys of record may purchase a copy of the transcript from the Court Reporter/Transcriber. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 217 | TRANSCRIPT of Jury Trial: Volume 2 held on 06/08/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 161) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 218 | TRANSCRIPT of Jury Trial: Volume 3 held on 06/09/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 238) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 219 | TRANSCRIPT of Jury Trial: Volume 4 held on 06/10/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 250) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for |

|  |  | 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
|---|---|---|
| 05/02/2017 | 220 | TRANSCRIPT of Jury Trial: Volume 5 held on 06/13/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 201) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 221 | TRANSCRIPT of Jury Trial: Volume 6 held on 06/14/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 251) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 222 | TRANSCRIPT of Jury Trial: Volume 7 held on 06/15/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 249) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 223 | TRANSCRIPT of Jury Trial: Volume 8 held on 06/16/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 217) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. |

| | | Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
|---|---|---|
| 05/02/2017 | 224 | TRANSCRIPT of Jury Trial: Volume 9 held on 06/20/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 225) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 225 | TRANSCRIPT of Jury Trial: Volume 10 held on 06/21/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 244) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 226 | TRANSCRIPT of Jury Trial: Volume 11 held on 06/22/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 232) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 227 | TRANSCRIPT of Jury Trial: Volume 12 held on 06/23/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 204) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made |

| | | remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
|---|---|---|
| 05/02/2017 | 228 | TRANSCRIPT of Jury Trial: Volume 13 held on 06/27/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 130) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 229 | TRANSCRIPT of Jury Trial: Volume 14 held on 06/28/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 156) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 230 | TRANSCRIPT of Jury Trial: Volume 15 held on 06/29/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 206) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 231 | TRANSCRIPT of Jury Trial: Volume 16 held on 06/30/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 199) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction |

| | | |
|---|---|---|
| | | Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 232 | TRANSCRIPT of Jury Trial: Volume 17 held on 07/01/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 105) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 233 | TRANSCRIPT of Jury Trial: Volume 18 held on 07/05/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 198) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 234 | TRANSCRIPT of Jury Trial: Volume 19 held on 07/06/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 205) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 235 | TRANSCRIPT of Jury Trial: Volume 20 held on 07/07/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 51) (Appeal Purposes) The parties |

| | | have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 236 | TRANSCRIPT of Jury Trial: Volume 21 held on 07/08/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 9) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 237 | TRANSCRIPT of Jury Trial: Volume 22 held on 07/11/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 18) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 238 | TRANSCRIPT of Final Pretrial Conference held on 05/04/2016 as to David Hansberry, Bryan Watson, Kevlin Omar Brown. (Court Reporter/Transcriber: Linda M. Cavanagh) (Number of Pages: 30) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/02/2017 | 239 | TRANSCRIPT of Motion for Judgment of Acquittal held on 08/11/2016 as to David Hansberry, Bryan Watson. (Court Reporter/Transcriber: Linda M. |

| | | |
|---|---|---|
| | | Cavanagh) (Number of Pages: 35) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 5/23/2017. Redacted Transcript Deadline set for 6/2/2017. Release of Transcript Restriction set for 7/31/2017. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Cavanagh, Linda) (Entered: 05/02/2017) |
| 05/09/2017 | 240 | MOTION Motion to Amend Sentence by Calvin Turner. (Feinberg, James) (Entered: 05/09/2017) |
| 05/09/2017 | 241 | [STRICKEN] STIPULATION *Allowing Calvin Turner to Travel to Indiana* by Calvin Turner. (Feinberg, James) Modified on 5/10/2017 (DWor). (Entered: 05/09/2017) |
| 05/10/2017 | 242 | ORDER to Strike 241 Stipulation filed by Calvin Turner as to Calvin Turner. Signed by District Judge Stephen J. Murphy, III. (DWor) (Entered: 05/10/2017) |
| 05/10/2017 | 243 | [STRICKEN] STIPULATION *Allowing Calvin Turner to Travel to Indiana* by Calvin Turner. (Feinberg, James) Modified on 5/11/2017 (DWor). (Entered: 05/10/2017) |
| 05/11/2017 | 244 | ORDER to Strike 243 Stipulation filed by Calvin Turner as to Calvin Turner. Signed by District Judge Stephen J. Murphy, III. (DWor) (Entered: 05/11/2017) |
| 05/11/2017 | 245 | STIPULATION and ORDER Allowing Defendant to Travel to Purdue University in the State of Indiana as to Calvin Turner. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 05/11/2017) |
| 05/24/2017 | | Minute Entry for proceedings before District Judge Stephen J. Murphy, III: Sentencing held as to Arthur Leavells. Disposition: Rule 11 Plea Agreement accepted by the Court. (Court Reporter: Linda Cavanagh) (Defendant Attorney: Miriam L. Siefer, Andrew N. Wise) (AUSA: J. Michael Buckley) (DPar) (Entered: 05/24/2017) |
| 05/25/2017 | 246 | JUDGMENT as to Arthur Leavells. Signed by District Judge Stephen J. Murphy, III. (DPer) (Entered: 05/25/2017) |
| 05/30/2017 | 247 | ORDER Granting Defendant's 189 Motion to Reduce Sentence as to Arthur Leavells (4). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 05/30/2017) |
| 06/02/2017 | 248 | ORDER Granting Defendant's 240 MOTION to Amend Sentence as to Calvin Turner (5). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 06/02/2017) |
| 06/07/2017 | 249 | AMENDED JUDGMENT as to Calvin Turner. Signed by District Judge Stephen J. Murphy, III. (DWor) (Entered: 06/07/2017) |
| 08/17/2017 | 250 | |

| | | AMENDED JUDGMENT as to Arthur Leavells. Signed by District Judge Stephen J. Murphy, III. (DPer) (Entered: 08/17/2017) |
|---|---|---|
| 10/05/2017 | 251 | ORDER from U.S. Court of Appeals - Sixth Circuit as to David Hansberry re 204 Notice of Appeal, 182 Notice of Appeal [Appeal Case Number 17-1221/17-1383] (DWor) (Entered: 10/05/2017) |
| 10/10/2017 | | Attorney Elizabeth L. Jacobs is discontinued from receiving Notices of Electronic Filing. Reason: new counsel substituted. (Fishman, Steven) (Entered: 10/10/2017) |
| 12/06/2017 | 252 | ORDER Instructing Probation Department to Correct Presentence Report as to Bryan Watson re 184 Amended Judgment. Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 12/06/2017) |
| 12/17/2017 | 253 | MOTION for Release from Custody *for Appeal Bond* by David Hansberry as to David Hansberry, Bryan Watson, Kevlin Omar Brown, Arthur Leavells, Calvin Turner. (Ragan, Philip)[AS TO DEFENDANT DAVID HANSBERRY ONLY; DOCUMENT NOT SIGNED] Modified on 12/18/2017 (DPer). (Entered: 12/17/2017) |
| 12/21/2017 | 254 | RESPONSE by United States of America as to David Hansberry re 253 MOTION for Release from Custody *for Appeal Bond* (Attachments: # 1 Exh. A: Pertinent provision of Government Trial Exhibit 807A, transcript of undercover recording of David Hansberry on September 7, 2014 in which he threatens to shoot and kill an informant and witness against him) (Buckley, J.) (Entered: 12/21/2017) |
| 01/05/2018 | 255 | [STRICKEN] REPLY TO RESPONSE by David Hansberry re 253 MOTION for Release from Custody *for Appeal Bond* (Ragan, Philip) Modified on 1/8/2018 (DWor). (Entered: 01/05/2018) |
| 01/08/2018 | | NOTICE of Error directed to: Philip A. Ragan, Jr re 255 Reply to Response to Motion. Wrong or incomplete PDF image was uploaded. Document was stricken and must be refiled correctly. [No Image Associated with this docket entry] (DWor) (Entered: 01/08/2018) |
| 01/08/2018 | 256 | [STRICKEN] Second MOTION for Release from Custody by David Hansberry. (Ragan, Philip) Modified on 1/9/2018 (DWor). [DOCUMENT IS ENTITLED "RESPONSE TO MOTION IN OPPOSITION TO THE DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL" - DOCUMENT IS INCOMPLETE] Modified on 1/9/2018 (DWor). (Entered: 01/08/2018) |
| 01/09/2018 | | NOTICE of Error directed to: Philip A. Ragan, Jr re 256 Second MOTION for Release from Custody . Wrong or incomplete PDF image was uploaded. THE PDF IS INCOMPLETE. Document was stricken and must be refiled correctly. [No Image Associated with this docket entry] (DWor) (Entered: 01/09/2018) |
| 01/12/2018 | 257 | ORDER from U.S. Court of Appeals - Sixth Circuit as to Bryan Watson re 171 Notice of Appeal [Appeal Case Number 17-1205] (SKra) (Entered: 01/12/2018) |
| 02/02/2018 | 258 | |

| | | |
|---|---|---|
| | | [STRICKEN] Renewed MOTION for Bond by David Hansberry. (Ragan, Philip) Modified on 2/5/2018 (DWor). [DOCUMENT ENTITLED "RESPONSE TO GOVERNMENT'S MOTION IN OPPOSITION TO THE DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL"] Modified on 2/5/2018 (DWor). (Entered: 02/02/2018) |
| 02/05/2018 | | NOTICE of Error directed to: Philip A. Ragan, Jr re 258 Renewed MOTION for Bond . Wrong or incomplete PDF image was uploaded. Document presented is a Response to Motion. Document was stricken and must be refiled correctly. [No Image Associated with this docket entry] (DWor) (Entered: 02/05/2018) |
| 04/18/2018 | 259 | MOTION for Release from Custody by David Hansberry. (Ragan, Philip) Modified on 4/18/2018 (DWor). [DOCUMENT ENTITLED "RESPONSE TO GOVERNMENT'S OPPOSITION BRIEF TO THE DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL"] (Entered: 04/18/2018) |
| 05/09/2018 | 260 | ORDER Denying 253 Motion for Release from Custody as to David Hansberry (1). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 05/09/2018) |
| 10/01/2018 | 261 | ORDER from U.S. Court of Appeals - Sixth Circuit as to David Hansberry re 204 Notice of Appeal, 182 Notice of Appeal [Appeal Case Number 17-1221/17-1383] (DWor) (Entered: 10/02/2018) |
| 10/07/2018 | 262 | NOTICE *of Filing Exhibits for Purposes of Appeal* by United States of America as to David Hansberry, Bryan Watson (Attachments: # 1 Exhibit 100-B - Search Warrant for 16500 North Park Drive, # 2 Exhibit 100-D - 24 Hour Information Sheet (Feb. 27, 2011), # 3 Exhibit 200-D - 24 Hour Information Sheet (April 19, 2011), # 4 Exhibit 200-G - Notice of Seizure and Intent to Forfeit, # 5 Exhibit 300-B - Detroit Police Department Report 1111150400.1 (Nov. 15, 2011), # 6 Exhibit 300-C - 24 Hour Information Sheet (Nov. 15, 2011), # 7 Exhibit 300-D - List of Evidence Seized (Nov. 15, 2011), # 8 Exhibit 401 - Picture of Search Warrant for 20426 Klinger, Detroit, Michigan (Jan. 3, 2012), # 9 Exhibit 500-A - Narcotics Activity Form (Sept. 6, 2012), # 10 Exhibit 500-B - Detroit Police Department Report 1209060388.1 (Sept. 6, 2012), # 11 Exhibit 500-C - 24 Hour Information Sheet (Sept. 6, 2012), # 12 Exhibit 500-D - List of Evidence Seized (Sept. 6, 2012), # 13 Exhibit 500-E - Request for Laboratory Service (Sept. 6, 2012), # 14 Exhibit 700-C - Detroit Police Department Report 1303020252.1 (March 2, 2013), # 15 Exhibit 700-D - 24 Hour Information Sheet (March 2, 2013), # 16 Exhibit 700-E - List of Evidence Seized (March 2, 2013), # 17 Exhibit 700-F - Request for Laboratory Service (March 2, 2013), # 18 Exhibit 711-B - Fake Search Warrant for 15747 Snowden, Detroit, Michigan (Dec. 21, 2012), # 19 Exhibit 722-A - Transcript of Meeting Between Gary Jackson, David Hansberry, Bryan Watson, Arthur Leavells, and others (Aug. 14, 2010), # 20 Exhibit 724-A - Picture of Money in Duffle Bags, # 21 Exhibit 724-B - Picture #2 of Money in Duffle Bags, # 22 Exhibit 724-C - Picture of Wrapped Money on Back of Car, # 23 Exhibit 724-D - Picture #2 of Wrapped Money on Back of Car, # 24 Exhibit 724-E - Picture #3 of Wrapped Money on Back of Car, # 25 Exhibit 724-F - Picture #4 of Wrapped Money on Back of Car, # 26 Exhibit 724-G - |

| | | |
|---|---|---|
| | | Picture #5 of Wrapped Money on Back of Car, # 27 Exhibit 724-H - Picture #6 of Wrapped Money on Back of Car, # 28 Exhibit 724-I - Picture #7 of Wrapped Money on Back of Car, # 29 Exhibit 806-A - Transcript of Meeting Between Arthur Leavells and Bryan Watson (Sept. 4, 2014), # 30 Exhibit 807-A - Transcript of Meeting Between Arthur Leavells and David Hansberry (Sept. 7, 2014), # 31 Exhibit 1000 - Financial Summary for David Hansberry 2010 2014, # 32 Exhibit 1002-A - Total Funds Deposited in David Hansberry Accounts 2010 2014, # 33 Exhibit 1002-B - Payroll Summary for David Hansberry 2010 2014, # 34 Exhibit 1002-C - Cash Deposits for David Hansberry 2010 2014, # 35 Exhibit 1005 - Vehicle Payments by David Hansberry 2010 2014, # 36 Exhibit 1007 - Total Expenditures by David Hansberry 2010 2014, # 37 Exhibit 1010 - Financial Summary for Bryan Watson 2010 2014, # 38 Exhibit 1012-B - Payroll Summary for Bryan Watson 2010 2014, # 39 Exhibit 1012-C - Cash Deposits for Bryan Watson 2010 2014, # 40 Exhibit 1017 - Total Expenditures by Bryan Watson 2010 2014) (Cralle, Shane) (Entered: 10/07/2018) |
| 10/07/2018 | 263 | NOTICE *of Filing Exhibits for Purposes of Appeal* by United States of America as to David Hansberry, Bryan Watson (Attachments: # 1 Exhibit 808-A - Transcript of Meeting Between Arthur Leavells and Bryan Watson (Sept. 11, 2014)) (Cralle, Shane) (Entered: 10/07/2018) |
| 03/29/2019 | 264 | MOTION/Letter by Bryan Watson. (NAhm) (Entered: 03/29/2019) |
| 06/13/2019 | 265 | OPINION from U.S. Court of Appeals - Sixth Circuit as to Bryan Watson re 206 Notice of Appeal, 171 Notice of Appeal [Appeal Case Number 17-1205/17-1221] (SKra) (Entered: 06/13/2019) |
| 07/09/2019 | 266 | MANDATE from U.S. Court of Appeals - Sixth Circuit as to Bryan Watson re 171 Notice of Appeal filed by Bryan Watson [Appeal Case Number 17-1205] (DWor) (Entered: 07/11/2019) |
| 07/22/2019 | 267 | ORDER Denying Defendant's 264 MOTION to Transfer to a Federal Prison Camp as to Bryan Watson (2). Signed by District Judge Stephen J. Murphy, III. (DPar) (Entered: 07/22/2019) |
| 08/01/2019 | 268 | MANDATE from U.S. Court of Appeals - Sixth Circuit as to David Hansberry re 204 Notice of Appeal filed by David Hansberry, 182 Notice of Appeal filed by David Hansberry [Appeal Case Number 17-1383/17-1221] (DWor) (Entered: 08/01/2019) |

# **EXHIBIT D**



**LAW OFFICE OF MICHAEL R. DEZSI, PLLC**
615 GRISWOLD STREET, SUITE 1600
DETROIT, MICHIGAN 48226
313-879-1206 • FAX 313-887-0420
WWW.DEZSILAW.COM

MICHAEL R. DEZSI
MDEZSI@DEZSILAW.COM
ADMITTED TO MICHIGAN
NEW MEXICO*
CALIFORNIA*
*INACTIVE

April 23, 2015

**Via First Class Mail**

Mr. Calvert Bailey, Esq.
City of Detroit Law Department
2 Woodward Ave. Ste 500
Detroit, MI 48226

      **RE:   Davis v. City of Detroit; Case No. 15-10547 (E.D. Mich.)**

Dear Mr. Bailey;

     I hope this letter finds you well. In follow up with our recent conversation, I have enclosed Plaintiffs' First Request to Produce Documents directed to Defendants. When we met, you raised the issue of whether Plaintiffs would engage in discussions to possibly resolve their claims. As I indicated to you, I now represent several individuals who allege they were subject to unlawful search and seizure by members of the Detroit Narcotics Unit. As such, I would kindly request that you produce the investigative reports, search warrants, etc. (as contained in Plaintiffs' Request to Produce Nos 1-3) as soon as practicable and/or as part of your initial disclosures. Review of these documents would allow both of us the opportunity to evaluate our claims and defenses for possible early resolution of the claims. Please let me know if you have any questions, and thank you kindly for your attention to this matter.

              Very truly yours,

              Michael R. Dezsi

/enclosures (Plaintiffs' First Request to Produce)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Timothy Davis and Hatema Davis,
Individually and on behalf of all other
similarly situated individuals,

      Plaintiffs,

                                 Case No.: 15-cv-10547

vs.                                Hon.: Paul D. Borman

CITY OF DETROIT, et. al.,

      Defendants.

---

## **PLAINTIFFS' FIRST REQUEST TO PRODUCE DOCUMENTS**

NOW COMES the Plaintiffs, by and through her counsel, DETTMER & DEZSI, and hereby submit the following Requests for Production of Documents.

Pursuant to the federal court rules, Defendants' should produce information that the party can secure from its employees, agents, and/or legal counsel. The documents requested in the should be served on counsel for Plaintiffs within (30) days of service of this pleading to whom it is directed.

1. Produce any and all documents in the possession of, or available to Defendants, including search warrants, affidavits in support of search warrants, returns of search warrants, evidence tags, "SOI" interview reports, investigative reports, internal affairs files, and any and all other documents including e-mails, correspondences, memoranda, and similar documents relating, in any way, to the following addresses dated from January 1, 2012 to the present:

1

a. 25354 Rubin Rd., Warren, Michigan 48079;

b. 1556 West Troy Street, Ferndale, Michigan;

c. 17744 Northrop Street, Detroit, Michigan 48219;

d. 8929 Wilow Ray Avenue, Shelby Township, Michigan 48317;

2. Produce any and all documents in the possession of, or available to Defendants, including search warrants, affidavits in support of search warrants, returns of search warrants, evidence tags, "SOI" interview reports, investigative reports, internal affairs files, and any and all other documents including e-mails, correspondences, memoranda, and similar documents relating, in any way, to the following individuals:

a. Timothy Davis;

b. Debra Metris-Shamoon;

c. Howard Guardella;

d. Michael McShane;

e. Michael Valentino;

3. Produce any and all recorded video (including audio), in whatever format including digital, from dash-cams, law enforcement body cams (i.e., records) taken of the following addresses dated from January 1, 2012 to the present:

e. 25354 Rubin Rd., Warren, Michigan 48079;

f. 1556 West Troy Street, Ferndale, Michigan;

g. 17744 Northrop Street, Detroit, Michigan 48219;

h. 8929 Wilow Ray Avenue, Shelby Township, Michigan 48317;

2

4. Produce any and all of Defendants' policies, memoranda, manuals, directives, or other similar documents relating in any way to Defendants' policies, customs, and/or practices of obtaining and/or executing search warrants by Defendants' agents, police officers, and/or employees.

5. Produce any and all of Defendants' policies, memoranda, manuals, directives, or other similar documents relating in any way to Defendants' policies, customs, and/or practices of collecting, tagging, logging, and preserving evidence gathered from the execution of search warrants by Defendants' agents, police officers, and/or employees.

6. Produce the complete City of Detroit Police Department file for Case No. 13-2878, relating to the execution of a search warrant at 25354 Rubin, Warren, Michigan, including any and all search warrants, affidavits in support of search warrants, returns of search warrants, evidence tags, "SOI" interview reports (unredacted), investigative reports, internal affairs files, and any and all other documents including e-mails, correspondences, memoranda, and similar documents.

7. Produce Defendant' complete internal affairs investigative file dated from May 2013 through the present and relating, in any way, to complaints of any kind, including, but not limited to, obtaining and/or execution of search warrants, unlawful searches and/or seizures, the collection and/or seizure of evidence by members of the Detroit Narcotics Unit including, but not limited to the following individuals:

   a. David Hansberry;

   b. Bryan Watson;

   c. James Napier;

3

     d.  James Flanigan;

     e.  Arthur Leavells;

  f.  Officer Geelhood

Respectfully submitted,

Michael R. Dezsi (P64530)
Attorney for Plaintiff
615 Griswold, Suite 1600
Detroit, MI 48226
313-281-8090

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April, 2015, I served, via first class mail, the

foregoing papers on Defendants via their counsel of record at his office address as it appears on

the court docket.

/s/ Michael R. Dezsi

4

# **EXHIBIT E**

**WHEREAS,** Plaintiffs, Timothy and Hatema Davis ("Plaintiffs") filed suit against City of Detroit ("City"), Charles Flanagan ("Flanagan"), _____ Novak ("Novak"), Vatasha Napier as personal representative of the Estate of Defendant James Napier ("Napier"), Stephen Geelhood ("Geelhood"), Arthur Leavells ("Leavells"), Steven Riley ("Riley"), Larry Barnett ("Barnett") Reginald Beasley ("Beasley"), Matthew Bray ("Bray"), Amy Metallic ("Metallic"), and Brian Johnson ("Johnson") (collectively City, Flanagan, Novak, Napier, Geelhood, Leavells, Riley, Barney, Beasley, Bray, Metallic, and Johnson shall be referred to as "Released Defendants");

**WHEREAS,** Plaintiffs' lawsuit was filed in the United States District Court Eastern District of Michigan ("the Court") and assigned case number 2:15-cv-10547 ("the Litigation");

**WHEREAS,** Plaintiffs sought appointment as lead plaintiffs on behalf of a putative class of other individuals including, but not limited to, Bernard Davis ("Davis"), Jacob Zeigler ("J. Zeigler"), Alex Zeigler ("A. Zeigler"), and Michael Chorazyczewski ("Chorazyczewski") (Davis, J. Zeigler, A. Zeigler, and Chorazyczewski shall be referred to as "Releasing Occupants");

**WHEREAS** the Court denied Plaintiffs' motion to certify class and appoint them lead Plaintiffs;

**WHEREAS** Released Defendants, Releasing Occupants, and Plaintiffs shall hereinafter be collectively referred to as "the Parties";

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

TIMOTHY DAVIS and HATEMA DAVIS,

        Plaintiffs,

v.

CITY OF DETROIT, et al.,

        Defendants.

Case No. 15-10547
Hon. Paul D. Borman
Magistrate Judge David R. Grand

_____/

| | |
|---|---|
| DENNIS A. DETMER (P12708) | JAMES P. ALLEN, SR. (P52885) |
| MICHAEL R. DEZSI (P64530) | LINDSEY R. JOHNSON (P67081) |
| Dettmer & Dezsi, PLLC | Allen Brothers, Attorneys & |
| Attorneys for Plaintiffs | Counselors, PLLC |
| 615 Griswold, Ste. 1600 | Attorneys for Defendants, City of Detroit, |
| Detroit, MI 48226 | Flanagan, Napier, Geelhood, Matellic, |
| (313) 281-8090 | Barnett, Riley, Bray, Johnson and Beasley |
| ddettmeresq@yahoo.com | 400 Monroe, Ste. 620 |
| mdezsi@dezsilaw.com | Detroit, MI 48226 |
| | (313) 962-7777 |
| | jamesallen@allenbrotherspllc.com |
| | ljohnson@allenbrotherspllc.com |
| | |
| | CALVERT BAILEY (P42409) |
| | JERRY L. ASHFORD (P47402) |
| | Attorneys for Defendants, City of Detroit, |
| | Flanagan, Napier, Geelhood, Matellic, |
| | Barnett, Riley, Bray, Johnson, and Beasley |
| | 2 Woodward Ave., Ste. 500 |
| | Detroit, MI 48226 |
| | (313) 237-3004 |
| | bailc@detroitmi.gov |
| | ashfj@detroitmi.gov |

_____/

# GENERAL RELEASE, WAIVER AND SETTLEMENT AGREEMENT

**WHEREAS**, the Released Defendants deny any liability to Plaintiffs;

**WHEREAS,** the Parties, but no other members of the putative class, have agreed to resolve all open issues between them raised or which could have been raised in the Litigation;

**WHEREAS,** the Plaintiffs have agreed to provide the general release and waiver of claims contained in this general release, waiver and settlement agreement ("Agreement") which sets forth the Parties' entire understanding of the terms of settlement for the Litigation;

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL COVENANTS OF THE PARTIES, the Parties agree as follows:

1.　　City shall pay to Plaintiffs, Releasing Occupants and their attorneys Michael Dezsi and Dennis Dettmer, Dettmer & Dezsi, PLLC ("the Firm") (hereinafter collectively known as the "Payees,") the aggregate amount of Three Hundred and Fifty Thousand U.S. Dollars ($350,000.00) ("Settlement Consideration") as full and final consideration for the General Release and Waiver set forth in Paragraph 2 below. The Settlement Consideration shall be paid as follows: Check for the full amount of the Settlement Consideration made payable to: Dettmer & Dezsi, PLLC. Each of the Payees agree to provide an IRS W-9 form upon request. In addition, the Payees, indemnify and hold payor, City, harmless from any and all actions between the Firm, Plaintiffs and Releasing Occupants, regarding the Firm's distribution of the of the Settlement Consideration to Plaintiffs and/or Releasing Occupants.

2.　　The Plaintiffs and Releasing Occupants knowingly and voluntarily without threat or coercion, for themselves, their personal representatives, trustees, beneficiaries, attorneys, heirs, successors, predecessors, shareholders, owners, subsidiaries and assigns ("Releasing Parties") fully and forever release and discharge Released Defendants, their personal representatives, trustees, attorneys, heirs, successors, predecessors, indemnitees, insurers, employees, employers, officers, directors, elected and appointed officials, and assigns ("Released Parties") which shall include

individuals that currently or formerly held positions for which this release applies (e.g. retired/terminated employees not otherwise specifically released herein) from any and all claims, demands, actions, lawsuits, and causes of action of every kind, nature or description, whether known or unknown, which Releasing Parties may have had, may now have, or may hereafter arise before the date of this Agreement by reason of any matter, cause, act, or omission arising out of or in connection with their past dealings and contacts, including but not limited to all attorneys' fees of any kind or nature, charges and claims asserted, or which could have been asserted, in any Litigation that could have been filed from the beginning of time to the date of execution of this Agreement ("Released Claims"). **This Waiver and Release specifically requires, *inter alia*, the release by Releasing Parties of the City of Detroit, its current and former employees, agents, principles, attorneys, officers, indemnitees and elected/appointed officials, all in their individual *and* official capacities.**

3. The Released Defendants shall, upon payment of the Settlement Consideration, be dismissed with prejudice from the Litigation and the Releasing Parties shall be forever barred from asserting Released Claims. The Parties authorize their attorneys to execute a Stipulation for the dismissal of the Litigation as it relates to Plaintiffs and Releasing Occupants only. Said dismissal shall be with prejudice which Plaintiffs' counsel shall file upon receipt of the Settlement Consideration.

4. The Parties understand and agree that the terms of this Release cannot be confidential and that they are subject to disclosure under the Freedom of Information Act.

5. Releasing Parties agree that they will not file a lawsuit or claim of any type in any forum against Released Parties (whether in their individual or official capacities or whether current and/or former employees of City of Detroit) that arises out of the Litigation or relates, in any way, to the Released Claims. Releasing Parties warrant that, if they do file such a waived lawsuit or claim, the lawsuit or claim will be immediately dismissed; and, they will pay to the non-breaching party all of the costs, expenses, and attorney fees incurred by the non-breaching party in defending against such a lawsuit or claim.

6. The above commitments of the Parties are undertaken to avoid the inconvenience and costs of Litigation. The Parties accordingly acknowledge and agree that the Settlement Consideration stated above is made and accepted

in settlement and compromise of disputed claims and shall not be, and shall not be construed to be, an admission of liability by any party to the other.

7.    The Parties further understand and acknowledge that the terms of this Agreement are contractual and not a mere recital and that there are no agreements, understandings, or representations made by the Parties except as expressly stated herein.

8.    The Parties acknowledge that before signing this Agreement they have read it, fully understood its terms, content, and effect, have had the benefit of advice from an attorney of their own choosing, and have relied fully and completely on their own judgment and the advice of their respective attorneys in executing this Release.

9.    It is understood and agreed by the Parties that all understandings and agreements heretofore had by the Parties with respect to matters covered by this Agreement are merged into this Agreement, which alone fully and completely expresses the Parties' agreement.

10.    The Parties acknowledge that they may hereafter discover facts different from or in addition to those, which they know or believe to be true with respect to the released claims, and the Parties agree that this Agreement shall be and remain effective in all respects, including, but not limited to, the released claims, notwithstanding such different or additional facts or the discovery thereof.

11.    This General Release shall be governed and construed in accordance with the Laws of the State of Michigan.

12.    The Parties acknowledge that this Agreement may be executed in counterparts.

**ON BEHALF OF RELEASING PARTIES**

Elvira Nesini
_____
Witness

Elvira Nesini
_____
Witness

_____
By: Timothy Davis

_____
By: Hatema Davis

_Elvira Nesimi_
Witness

_Bernard Davis_
By: Bernard Davis

_____
Witness

_____
By: Jacob Ziegler

_____
Witness

_____
By: Alex Ziegler

_____
Witness

_____
By: Michael Chorazyczewski

_Michael Dezsi_
Michael Dezsi, Attorney for Plaintiffs

_Dennis Dettmer_
Dennis Dettmer, Attorney for Plaintiffs

## ON BEHALF OF DEFENDANTS,

_____
Witness

_____
By:

_____
James P. Allen, Sr., Attorney for
Released Defendants

Page 6 of 7

Witness

Witness

Witness

Witness

By: Bernard Davis

By: Jacob Ziegler

By: Alex Ziegler

By: Michael Chorazyczewski

Michael Dezsi, Attorney for Plaintiffs

Dennis Dettmer, Attorney for Plaintiffs

**ON BEHALF OF DEFENDANTS,**

Witness

By:

James P. Allen, Sr., Attorney for
Released Defendants

Page **6** of **7**

| | |
|---|---|
| _____<br>Witness | _____<br>By: Bernard Davis |
| _____<br>Witness | _____<br>By: Jacob Ziegler |
| _____<br>Witness | _____<br>By: Alex Ziegler |
| _____<br>Witness | _____<br>By: Michael Chorazyewski |

_____
Michael Dezsi, Attorney for Plaintiffs

_____
Dennis Dettmer, Attorney for Plaintiffs

## ON BEHALF OF DEFENDANTS,

| | |
|---|---|
| _____<br>Witness | _____<br>By: |

_____
James P. Allen. Sr., Attorney for
Released Defendants

# EXHIBIT F



# DETROIT POLICE DEPARTMENT
## Communications Operations

### June 27, 2014

# ADMINISTRATIVE MESSAGES

TELETYPE # 14 – 0730

### ORGANIZATIONAL CHANGES WITHIN ORGANIZED CRIME

Effective July 14, 2014, Organized Crime will consist of the following department entities:

- Major Violators;
- Gang Intelligence;
- Task Force Administration; and
- Vice Enforcement

These organizational changes will result in the creation of positions and new opportunities for members of the Detroit Police Department who meet the required criteria.

## MAJOR VIOLATORS

This command will perform, among other types of functions, narcotic enforcement. Members who have served a total of 5 years or more at Narcotics during their service with the Detroit Police Department shall not be considered for any position within Major Violators.

Positions at Major Violators will be limited to the following positions:

| | |
|---|---|
| Lieutenant | 1 |
| Sergeants | 3 |
| Police Officers | 20 |

## TASK FORCE ADMINISTRATION

The duties of Task Force Administration will remain the same.

## VICE ENFORCEMENT

The duties of Vice Enforcement will remain the same.

*Geelhood*
*10/23/19*

*Ex.*
*13*

DPD000142



# DETROIT POLICE DEPARTMENT
## Communications Operations

## June 27, 2014

# ADMINISTRATIVE MESSAGES

**TELETYPE # 14 – 0730**

Continued

## GANG INTELLIGENCE

The duties of Gang Intelligence will remain the same.

The above entities will be "limited-duration assignments"; assignment to any one of these entities will be limited to 3 years. Upon completion of 3 years, a one year extension may be requested from the Chief of Police or his designee.

Members assigned to patrol duties with no previous vice, gang, narcotic, or other specialized experience are encouraged to apply. The evaluation of candidates will include, but may not be limited to, the satisfactory completion of an interview process, as well as a comprehensive review of the member's work and disciplinary history. Members interested shall submit a **DPD568 Inter-Office Memorandum** to the Commanding Officer of Organized Crime no later than July 3, 2014.

**JAMES E. WHITE**
Assistant Chief, Administrative Operations

**STEVEN G. DOLUNT**
Assistant Chief, Enforcement Operations

DPD000143


detroit
**police**
James E. Craig,
Chief of Police      D.P.D. 568 (rev. 9/97)

To:        Chief of Police James E. Craig (Through Channels)

Subject:   (REVISED) TRANSFER OF DEPARTMENT MEMBERS

From:      Assistant Chief Steven Dolunt, Enforcement Operations

The following member(s) are transferred effective Monday, July 14, 2014:

| MEMBER | FROM | TO |
|---|---|---|
| Lt. Donald Hollins | Sixth Precinct | Facilities |
| Lt. Shawn Wesley | Second Precinct | Communications Operations |
| Lt. Charles Clark | Third Precinct | Homicide |
| Lt. Tonya Golfin | Eighth Precinct | Gaming |
| Lt. James Moore | Third Precinct | Major Violators |
| Lt. Elaine Miles | Training | Neighborhood Policing Liaison |
| Lt. Thadarous White | TRU | Second Precinct |
| Lt. James Cashion | Ninth Precinct | Third Precinct |
| Lt. Sheri Meisel | Planning | Third Precinct |
| Lt. Douglas Gross | Twelfth Precinct | Ninth Precinct |
| Sgt. Lynn Carpenter | Twelfth Precinct | Homicide |
| Sgt. Columbus Sykes | Third Precinct | Communications Operations |
| Sgt. Patrick Neal | Seventh Precinct | Downtown Services |
| Sgt. Pamela Webster | Fourth Precinct | Gaming |
| Sgt. Terrance Grimes | Tenth Precinct | Gaming |
| Sgt. Dawn Engel | Investigative Operations | Tenth Precinct |
| Sgt. Raytheon Martin | Investigations | General Assignment Unit |
| Sgt. Tiffany Warren | Investigations | Force Investigation |
| Sgt. Michael Dicicco | Fourth Precinct | Internal Affairs |
| Sgt. James Johnson | Fifth Precinct | Internal Affairs |
| Sgt. Terrance Sims | Homicide | Major Violators |
| Sgt. Gerry Johnson | Investigations | Task Force Administration |
| Sgt. Cregg Hughes | Investigations | Recruiting |
| Sgt. Diaz Graves | Sixth Precinct | Special Victims Unit |
| Sgt. Javier Chapa | GAU | Special Victims Unit |
| Sgt. Michael McGinnis | Homicide | Task Force Administration |
| Sgt. Cory Karssen | Narcotics | Traffic Enforcement Unit |
| Sgt. Travis Kostanko | Investigations | Tactical Response Unit |
| Sgt. Michael Ingles | Eighth Precinct | Training |
| Sgt. Eric Bucy | Investigations | Second Precinct |
| Sgt. Royd Coleman | Sixth Precinct | Second Precinct |
| Sgt. James Demps | Force Investigations | Second Precinct |
| Sgt. Nancy Headapohl | Seventh Precinct | Third Precinct |
| Sgt. Manny Gutierrez | Investigations | Fourth Precinct |
| Sgt. Jamal Hamood | Ninth Precinct | Fourth Precinct |
| Sgt. Roy Harris | Narcotics | Sixth Precinct |

DPD000144

| | | |
|---|---|---|
| Sgt. Michael Osman | Investigations | Sixth Precinct |
| Sgt. Nathan Duda | Investigations | Seventh Precinct |
| Sgt. William Jackson | Investigations | Seventh Precinct |
| Sgt. Steven Geelhood | Narcotics | Eighth Precinct |
| Sgt. Myron Weathers | Narcotics | Ninth Precinct |
| Sgt Courtney Anderson | Investigations | Ninth Precinct |
| Sgt. Beverly Rodgers | Homicide | Twelfth Precinct |
| P.O. John Shelton | Firearms Training | Air Support (Observer-TFO) |
| P.O. Tamara Tillerson | Fifth Precinct | Special Victims Unit |
| P.O. Emina Biogradlija | Ninth Precinct | Crime Control Strategies |
| P.O. Levar Green | Narcotics | Task Force Administration |
| P.O. Walter Atkins | Second Precinct | Vice Enforcement |
| P.O. Oghenerhuemu Wanagho | Tenth Precinct | Vice Enforcement |
| P.O. Arthur Matthews | Eleventh Precinct | Detroit Detention Center |
| P.O. Michael Saffold | Communications | Detroit Detention Center |
| P.O. Nicholas Perez | Crime Control Strategies | Homicide |
| P.O. Jennifer Moreno | Fourth Precinct | Public Info |
| P.O. Elaine Caldwell R/D | Third Precinct | Special Victims Unit |
| P.O. Larry Williams | Narcotics | Violent Crime Task Force |
| P.O. Sandra Chavez | Narcotics | Violent Crime Task Force |
| P.O. Nicole Moore | DDC | Third Precinct |
| P.O. James Kisselburg | Narcotics | Third Precinct |
| P.O. James Wiencek | Sixth Precinct | Fourth Precinct |
| P.O. Rigoberto Velazquez | Third Precinct | Fourth Precinct |
| P.O. Eric Smigielski | Sixth Precinct | Fourth Precinct |
| P.O. Marcus Cummings | Ninth Precinct | Fifth Precinct |
| P.O. Cheri Snow | DDC | Fifth Precinct |
| P.O. Joseph Castro | Narcotics | Fifth Precinct |
| P.O. Juan Davis | Narcotics | Fifth Precinct |
| P.O. Matthew Bray | Narcotics | Sixth Precinct |
| P.O. Arthur Leavells | Narcotics | Sixth Precinct |
| P.O. Philip Rodriguez | Narcotics | Sixth Precinct |
| P.O. Thomas Anton | Narcotics | Sixth Precinct |
| P.O. Vannice Ward | Narcotics | Sixth Precinct |
| P.O. Eshad Ali | Eleven Precinct | Seventh Precinct |
| P.O. William Morrison | Narcotics | Seventh Precinct |
| P.O. Cheryl Muhammad | Narcotics | Seventh Precinct |
| P.O. Amy Matelic | Narcotics | Seventh Precinct |
| P.O. Sha-Mar Woods | Tenth Precinct | Eighth Precinct |
| P.O. Jordan Hall | Ninth Precinct | Eighth Precinct |
| P.O. Jennier Tanquay | Narcotics | Eighth Precinct |
| P.O. Artez Baker | Narcotics | Eighth Precinct |
| P.O. Aaron Yopp | Narcotics | Eighth Precinct |
| P.O. Reginald Beasley | Narcotics | Eighth Precinct |

DPD000145

| | | |
|---|---|---|
| P.O. Adlone Morris | Narcotics | Ninth Precinct |
| P.O. Steven Riley | Narcotics | Ninth Precinct |
| P.O. Larry Barnett | Narcotics | Ninth Precinct |
| P.O. Brian Johnson | Narcotics | Ninth Precinct |
| P.O. Jeffrey Wawrzyniak | Narcotics | Ninth Precinct |
| P.O. Tondalaya Wilson | Narcotics | Ninth Precinct |
| P.O. Michael Bryant | Narcotics | Ninth Precinct |
| P.O. Jeffery Johnson | Police Reserves | Ninth Precinct |
| P.O. Kristopher Richardson | Conspiracy One | Tenth Precinct |
| P.O. Michael Panackia | Narcotics | Tenth Precinct |
| P.O. Leo Rhodes | Narcotics | Eleventh Precinct |
| P.O. Neil Gensler | Narcotics | Eleventh Precinct |
| P.O. Radames Benitez | Narcotics | Eleventh Precinct |
| P.O. Gregory Tourville | Narcotics | Eleventh Precinct |
| P.O. James Napier | Eleventh Precinct | Twelfth Precinct |
| P.O. Alvin Nelson | Third Precinct | Twelfth Precinct |
| P.O. Jose Martinez | Fourth Precinct | Twelfth Precinct |
| P.O. Joe Williams | Third Precinct | Twelfth Precinct |
| Sgt. Ian Severy | Narcotics | Major Violators |
| Sgt. David Meadows | Narcotics | Major Violators |
| P.O. Dennis Christie | Sixth Precinct | Major Violators |
| P.O. Robert Bolden | Narcotics | Major Violators |
| P.O. Brandolyn Johnson | Twelfth Precinct | Major Violators |
| P.O. Bashawn Gaines | Narcotics | Major Violators |
| P.O. Samuel Galloway | Narcotics | Major Violators |
| P.O. William Johnson | Narcotics | Major Violators |
| P.O. Tiffany McCrackin | Narcotics | Major Violators |
| P.O. Alanna Mitchell | Narcotics | Major Violators |
| P.O. Hameed Mohamed | Narcotics | Major Violators |
| P.O. Craig Stewart | Twelfth Precinct | Major Violators |
| P.O. Gary Rowan | Twelfth Precinct | Major Violators |
| P.O. Michael Mosley | Narcotics | Major Violators |
| P.O. Everett Richardson | Fifth Precinct | Major Violators |
| P.O. Carl Mack | Fifth Precinct | Major Violators |
| P.O. Melvin Allen | Eighth Precinct | Major Violators |
| P.O. Donte Jenkins | Twelfth Precinct | Major Violators |
| P.O. Joi Gary-Gaines | Seventh Precinct | Major Violators |
| P.O. Justin Sampson | Seventh Precinct | Major Violators |
| P.O. Calvin Lewis | Second Precinct | Police Reserves |
| P.O. John Hall | Force Investigation | Office of the Chief |
| P.O. Michael Saraino | Internal Affairs | Office of the Chief |
| Inv. Timothy Ewald | Internal Affairs | Office of the Chief |

DPD000146

SIGNATURE PAGE

JAMES E. CRAIG
Chief of Police

DPD000147

# EXHIBIT G

# DECLARATION OF ADAM SHAMOON

I, ADAM SHAMOON, state as follows:

1. I am competent to testify as to the contents of this declaration.

2. I am the son of Debra and Mukhlis Shamoon.

3. I was not home at my parents house, located in Shelby Township, Michigan, on the date of September 13, 2012, when narcotics officers from the City of Detroit raided by parents' home.

4. I learned after the raid that the officers took several of my firearms from my parents' home. In particular, they took 2 long guns and 2 handguns.

5. My mom, Debra, showed me a paper that was left behind by the officers entitled "Notice of Seizure and Intent to Forfeit" dated September 13, 2012, which lists Sgt. Joe Tucker as a "witness." (Attachment A).

6. In the days following the raid, I contacted Sgt. Joe Tucker demanding to know why my parents' house was raided and also about the status of my handguns. I spoke directly with Sgt. Tucker who told me that I would have to wait a couple weeks and call him back.

7. A couple weeks later, I contacted Sgt. Tucker per his instructions, and again I demanded to know what happened at my parents' house and also about my handguns. Sgt. Tucker again told me that I would have to wait longer before I could possibly retrieve my handguns.

8. A couple weeks later, I again contacted Sgt. Tucker who told me to contact another sergeant from the drug enforcement unit whose name I don't remember.

9. When I spoke with this other sergeant, I threatened to retain an attorney if necessary to straighten out the matter. This sergeant seemed agitated by my comment and responded with

something to the effect of, "I don't know why people always run out and get attorneys." He then told me to come down to the department to pick up my guns.

10. When I did go down to get my guns, nobody there seemed to know what I was talking about, though eventually I was given my guns without any paperwork and I didn't sign anything when I picked them up.

11. There was never any explanation or justification given to me by anyone about why they had raided my parents' house.

I declare under the penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Dated: 05-15-2022

# NOTICE OF SEIZURE AND INTENT TO FORFEIT

Notice Served To: MuKhlis Shamoon

Address: 8929 WilcRAY  City: Shelby Twp  State: MI

Date: 9/13/12  Time: 1.40  Location Of Seizure: 8929 WilcRAY

## NOTIFICATION

On, day/ 13 month/ 9 year/ 12 the Detroit Police Department determined that the property described below is subject to forfeiture pursuant to Michigan Law MCLA 333.7521, et. seq., and that the Department intends to seek forfeiture of this property.

If you desire to challenge the forfeiture of this property, you MUST DO ALL of the following within twenty (20) days of receiving this notice:

1. FILE A CLAIM WITH THE DETROIT POLICE DEPARTMENT FORFEITURE UNIT 2121 W. Fort, DETROIT, MI 48201, (313) 596.2630, DESCRIBING YOUR INTEREST IN THE PROPERTY.
2. POST A BOND THAT IS 10% OF THE VALUE OF THE PROPERTY CLAIMED (said BOND will be no less than $250.00 and NO GREATER THAN $5000.00).

After filing a written claim and posting the required BOND, the case will be referred to the Wayne County Prosecutor's Office for filing in the Wayne County Circuit Court. If the Court orders the property forfeited to the Detroit Police Department, you May be required to pay ALL costs incurred during the forfeiture proceedings.

Failure to file a claim and post BOND within TWENTY (20) days will result in your DEFAULT and your property will be declared forfeited to the Detroit Police Department.

## THIS FORM MUST BE FAXED IMMEDIATELY TO FORFEITURE AT 596-2309

## DESCRIPTION OF PROPERTY

Amount of Currency: $ 315.-  ET#: E 4027350 4

| Vehicle/yr. Veh /Mileage: | Make: | Model: | | Style: | Color: |
|---|---|---|---|---|---|
| | | License Plate # | | Vin# | |

ET#
Other Property:  (loc veh stored)

## ACKNOWLEDGEMENTS

Notice Received By: MuKhlis Shamoon  Signature: X Mukhlis M. Shamoon

Notice Served By: BRIANA Johnson  Signature: Briana A Johnson

Rank: PO  Badge#: 5010  Assignment: NB

Date: 9/13/12  Time: 1.40  Location of Service: 8929 Wilcray

Witness: Joe Tucker  Signature: 

Rank: SGT  Badge#: S-95  Assignment: N/B

(Revised: 03.7.2005)

# **EXHIBIT H**

# DECLARATION OF DEBRA METRIS-SHAMOON

I, DEBRA METRIS-SHAMOON, state as follows:

1. I am competent to testify as to the contents of this declaration.

2. Along with my husband and parents, I was at my house located in Shelby Township, Michigan, on the date of September 13, 2012, when my house was raided by unknown agents.

3. I say "unknown" because none of the officers identified themselves, the officers were dressed in black, and none of them displayed badges. When I was able to look outside I did see that one of the cars was a Detroit Police vehicle.

4. At the time I thought my house was being robbed, though one of the officers later identified himself by the name "Tucker."

5. At no time during the raid did any of the officers show us a warrant.

6. The officers took my and my husband's medical marijuana plants, about $315 of cash, and also took several registered firearms belonging to my son Adam.

7. We had no idea what was happening as we thought there must have been some kind of mix up with another house.

8. Neither I nor any of my family members were ever charged with any crimes arising from this raid.

9. In the weeks after the raid, I twice contacted the Detroit Police Department asking why they had raided our house and demanded to see a warrant. Both times I spoke with a woman who told me she couldn't find anything in the system under either my name or our home address.

10. My son Adam contacted one of the officers whose name was written down on a paper and my son asked what was going on and why did they raid our home. My son never got any

answers about what had happened, though in November or December of 2012 he was told to come down to the station to pick up his firearms.

11. It wasn't until February or March of 2015 that I saw media reports about another raid carried out by officers from the City of Detroit that I had any idea that the officers may have violated our rights.

12. After seeing these media reports, I contacted my current attorneys' office and inquired if they could help us sort out what happened to us in September 2012.

13. A couple months later, in or around April 2015, I learned through other media reports that federal agents had indicted several Detroit police officers for conducting unlawful searches and seizures in and around Detroit. It wasn't until then I firmly believed that my family's rights had also been violated by the raid on our house in September 2012.

14. At no time did the City ever send me or my family any kind of notice or paperwork about the City filing for bankruptcy, and I didn't know about the City's bankruptcy until my attorneys talked to me about it well after I contacted them in the Spring of 2015.

I declare under the penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Dated: _5-15-22_            _Debra Metris-Shamoon_

# EXHIBIT I

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION


 3
       UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5     vs.                              Case No. 15-20217
                                        Hon. Stephen J. Murphy, III
 6     D-1 DAVID HANSBERRY
       D-2 BRYAN WATSON
 7     D-3 KEVLIN OMAR BROWN,

 8                          Defendants.
       _____/
 9
                         JURY TRIAL: VOLUME 14
10
             BEFORE THE HONORABLE STEPHEN J. MURPHY, III
11                  United States District Judge
             Theodore Levin United States Courthouse
12                  231 West Lafayette Boulevard
                       Detroit, Michigan  48226
13                    Tuesday, June 28, 2016

14     APPEARANCES:

15     For the Plaintiff          J. MICHAEL BUCKLEY
       United States of America:  SHELDON N. LIGHT
16                                U.S. Attorney's Office
                                  211 W. Fort Street
17                                Suite 2001
                                  Detroit, Michigan  48226
18                                313-226-9732

19     For the Defendant          MICHAEL J. HARRISON
       David Hansberry:           Harrison Law PLC
20                                240 Daines Street
                                  Birmingham, Michigan  48009
21                                248-430-6421

22     For the Defendant          STEVEN F. FISHMAN
       Bryan Watson:              615 Griswold
23                                Suite 1125
                                  Detroit, Michigan  48226
24                                313-962-4090

25
```

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5543   Page 2 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

2

```
 1    APPEARANCES:  Continued

 2    For the Defendant          KENNETH SASSE
      Kevlin Omar Brown:         27 E. Flint Street
 3                               2nd Floor
                                 Lake Orion, Michigan  48362
 4                               248-821-7325

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    To obtain a copy of this official transcript, contact:
            Linda M. Cavanagh, Official Court Reporter
25        (248) 884-0327 • linda_cavanagh@mied.uscourts.gov
```

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5544   Page 3 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

3

```
 1                    TABLE OF CONTENTS

 2    Government Witnesses Continued:                  Page

 3    ARTHUR LEAVELLS

 4        Direct Examination Continued by Mr. Light      5
          Cross-Examination by Mr. Harrison             15
 5        Cross-Examination by Mr. Fishman              71
          Redirect Examination by Mr. Light           147
 6        Recross-Examination by Mr. Harrison          149
          Recross-Examination by Mr. Fishman           150
 7

 8

 9

10

11

12

13

14

15
                          EXHIBITS
16
      Identification                    Offered    Received
17
      NONE
18

19

20

21

22

23

24

25
```

Case 2:15-cr-20217-SJM-APP ECF No. 229 filed 05/02/17 PageID.5545 Page 4 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

4

```
 1              Detroit, Michigan

 2              Tuesday, June 28, 2016

 3                              –  –  –

 4              (Proceedings commenced at 8:36 a.m., all parties

 5              present)

 6              (Whereupon the jury entered the courtroom at

 7              8:36 a.m.)

 8              THE LAW CLERK:  United States District Court for the

 9     Eastern District of Michigan is now in session, the Honorable

10     Stephen J. Murphy presiding.

11              The Court calls Case No. 15-20217, United States of

12     America versus David Hansberry and others.

13              THE COURT:  Okay.  Everybody's in place and let's all

14     be seated please.  Morning to everybody.

15              THE JURORS:  Good morning.

16              THE COURT:  We're going to get back to work here in

17     just a few seconds.  I -- at the end of the day yesterday, you

18     know, your mind is in a number of different places, but we're

19     going to go from now until 1:30, and what I'd like to do, if

20     possible, is, you know, stretch out the morning session.  If we

21     don't have to take a break, we won't, and we'll go from now til

22     about 10:45 or 11:00, take our usual 25 or 30-minute break,

23     come back and then go from 11:30 roughly til 1:30.  So that's

24     my idea.  If it doesn't work out that way, it's fine.  If any

25     of the parties or lawyers or the jury, of course, needs a break
```

Case 2:15-cr-20217-SJM-APP  ECF No. 229  filed 05/02/17  PageID.5546  Page 5 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

5

1    prior to 11:00, just get Mr. Lepola's attention or whatever the

2    case may be and we'll take -- we'll take a quick comfort break.

3            But my idea that I didn't put very artfully yesterday

4    was that if we compress our -- our time, even though we're

5    knocking off a little early today, we might be able to get in

6    just as much testimony.  Regardless of whether we do, we're

7    making very good progress, as I mentioned yesterday, and I

8    think we are -- we are right on schedule.

9            So continue to pay good attention.  Thank you for

10   being on time.  Keep your minds open.

11           And if you're ready to go, Mr. Light --

12           MR. LIGHT:  Thank you, Your Honor.

13           THE COURT:  -- we're ready to go as well.  Yes, sir.

14                   DIRECT EXAMINATION CONTINUED

15   BY MR. LIGHT:

16   Q.   Good morning, Mr. Leavells.

17   A.   Good morning.

18   Q.   When we finished yesterday, we had listened to a recording

19   that you made of your conversations with David Hansberry on

20   September 7, 2014, correct?

21   A.   Correct.

22   Q.   And in those conversations you talked about a number of

23   different topics, including your mutual interest in growing

24   marijuana?

25   A.   Correct.

```
 1   Q.   Including the plan that purportedly came from Gary Jackson
 2   to stage another rip-off like the ones that had occurred
 3   before?
 4   A.   Correct.
 5   Q.   Including Mr. Watson's idea --
 6            MR. HARRISON:  Your Honor, I'm going to object --
 7   Q.   -- about how to manipulate that?
 8            MR. HARRISON:  -- I'm going to object again, Your
 9   Honor, to the continued leading.
10            THE COURT:  I think we're setting the stage for
11   further testimony, so I'll hold the objection in abeyance and
12   ask you to, when we're back into the testimony, go ahead and --
13            MR. LIGHT:  I just have a couple more along those
14   lines.
15            THE COURT:  Yeah.  Sum -- sum up where we were and
16   then get out of the leading questions and we'll move forward.
17            Go right ahead.
18   BY MR. LIGHT:
19   Q.   Did your discussions also include what Mr. Watson and you
20   had talked about about how to implement what Gary Jackson had
21   been talking about?
22   A.   Yes.
23   Q.   And finally, did you talk some about contacts between Mr.
24   Hansberry and the person he called "my man" in Kentucky?
25   A.   Yes.
```

1  Q.  Now, four days later did you meet again with Officer Bryan

2  Watson on September 11, 2014?

3  A.  Yes.

4  Q.  And did you record that conversation as well?

5  A.  Yes.

6       MR. LIGHT:  I'm going to ask the Court if we may play

7  and publish to the jury Government Exhibit 808.

8       THE COURT:  Yes, sir.  Go right ahead.

9       (Audio clip being played at 8:41 a.m.)

10      MR. LIGHT:  Stop there.

11 BY MR. LIGHT:

12 Q.  Where's this conversation taking place?

13 A.  At his house.

14 Q.  Where?

15 A.  At his house.

16 Q.  And where is that located?

17 A.  In Novi.

18 Q.  And you're outside?

19 A.  Yes.

20 Q.  Looking at a hornets nest or something like that?

21 A.  Yes.

22      MR. LIGHT:  Go ahead.

23      (Audio clip being played at 8:41 a.m.)

24      MR. LIGHT:  Would you stop there?

25 BY MR. LIGHT:

```
 1    Hansberry, you tell him the truck's en route, they take the
 2    truck down, correct?
 3    A.   Correct.
 4    Q.   And lots of notification are made, correct?
 5    A.   Yes.
 6    Q.   Federal agents you told us were notified, right?
 7    A.   Correct.
 8    Q.   A Border Patrol agent with a dog was called, correct?
 9    A.   Correct.
10    Q.   Other federal agents arrive, correct?
11    A.   Correct.
12    Q.   Your supervisors arrived, correct?
13    A.   Yeah.
14    Q.   In all, would it be fair to say that there were at least
15    20 or 30 law enforcement officers at that scene?
16    A.   It was a lot.
17    Q.   And you tell us that when you arrived on the scene, that
18    the semi was stopped, correct?
19    A.   Correct.
20    Q.   And that there were officers inside the cab, correct?
21    A.   Correct.
22    Q.   And that there was money that appeared to already be out
23    on the -- on the ground in duffle bags, correct?
24    A.   It didn't appear to be but it was, laying right there on
25    the ground next to the car.
```

1   Q.   Okay.  And the officers -- what month was this?

2   A.   This was in July.

3   Q.   July 2010, right?

4        Officers are wearing their summer plainclothes

5   uniforms, correct?

6   A.   Summer plainclothes uniforms?

7   Q.   The officers on your crew are wearing polo shirts, right?

8   A.   Officers on my crew?  No.

9   Q.   No?

10  A.   Just two officers that had the raid gear on.  The rest of

11  us was in plainclothes.

12  Q.   And who were the officers in the raid gear?

13  A.   Tourville and Napier.

14  Q.   Tourville and Napier.

15       And explain to us what the raid gear is.

16  A.   At that time it was polo shirts with "Police" on it,

17  narcotic patches on the side and BDU pants.

18  Q.   So the raid gear would be polo shirts that say "Police"

19  and BDU -- like 511 BDU pants, right?

20  A.   Correct.

21  Q.   Okay.  And you say that when Officer Napier exited the

22  truck cab, you tried to hug him, right?

23  A.   Correct.

24  Q.   And he kept you away, correct?

25  A.   Pushed me away.

```
 1    Q.   Pushed you away.

 2         And now in retrospect, you're inferring to the jury

 3    that you believe that Officer Napier had stolen money and

 4    didn't want to hug you because then you would have noticed the

 5    money that he had on him, correct?

 6    A.   I say -- you could say that.

 7    Q.   That's your inference, right?

 8    A.   Mm-hmm.

 9    Q.   All right.  And Gary Jackson told you and you believed

10    that there was $3 million in that truck when it was stopped,

11    correct?

12    A.   He said it before and he said it after and stayed to it.

13    Q.   And what you all found was $2.1 million, correct?

14    A.   2.1197.

15    Q.   Okay.  And so approximately $900,000 was missing, right?

16    A.   Correct.

17         MR. HARRISON:  And can we take a look at 724-F?

18    BY MR. HARRISON:

19    Q.   What do we see there?

20    A.   What part?

21    Q.   How much of the money do we see there?

22    A.   That's the 2.1197.

23    Q.   That's all of it, right?

24    A.   Correct.

25         MR. HARRISON:  Can we see G?
```

Jury Trial: Volume 14 • Tuesday, June 28, 2016

1    BY MR. HARRISON:

2    Q.    Do these numbers mean anything to you, sir?

3    A.    Yes.

4    Q.    What do they mean?

5    A.    The numbers to the left is the itemized number and then to

6    the right is how much is in that pack.

7    Q.    Okay.  And so the 20 would mean $20,000, right?

8    A.    Correct.

9    Q.    So one of those packets that is labeled 20 would have --

10   would be $20,000, right?

11   A.    Correct.

12   Q.    Okay.  And, sir, would you agree with me that those

13   packets are approximately eight to ten inches long and

14   approximately six to eight inches across, does that sound about

15   accurate?

16   A.    I don't -- I don't know.

17   Q.    About the size of a legal pad, that'd be a fair estimate?

18   A.    I don't know.

19   Q.    You don't know.

20          And would you agree with me, sir, that they're about

21   four to five inches thick?

22   A.    I don't know the dimensions of it.

23   Q.    Okay.  So what we see there is $2.1 million, right?

24   A.    2.1197.

25   Q.    Right.  So you would agree with me that half of that would

1    be a little more than a million, right?

2    A.   Somewhere around there.

3    Q.   And you believe or you surmise that Officers Tourville and

4    Officers Napier were able to take half of that money and hide

5    it under their polo shirts and in their pants, and they were

6    able to do that before any of the other officers arrived,

7    that's what you're suggesting to us, correct?

8    A.   That's not what I'm suggesting.  I didn't say a million

9    dollars.

10   Q.   $900,000, right?

11   A.   2.1197, so that's more like seven to eight thousand,

12   800,000.

13   Q.   Okay.  Fair enough.  I want to move you on to some of the

14   specific incidents that you talked about, other ones.  You

15   talked -- you told us about an incident in South -- Southfield

16   involving a raid that you did with Sergeant Hansberry's crew

17   where a woman was in the bathroom asking you to shoot her,

18   right?

19   A.   Asking officers to shoot her, yes.

20   Q.   Asking officers to shoot her.

21          And you remember specifically her saying that, right,

22   "Please shoot me," something like that?

23   A.   Something around -- like that.

24   Q.   Okay.  And you remember that there were officers from

25   another department there as well, correct?

1    A.   Southfield.

2    Q.   And you told us that your recollection was that somewhere

3    around $40,000 was found, right?

4    A.   It was on the table.

5    Q.   It was on the table?

6    A.   Correct.

7    Q.   What was your role in that entry, that raid?

8    A.   I didn't really have a role in that one.  I was just in

9    the -- in the entry crew.

10   Q.   So you were part of the entry crew?

11   A.   Correct.

12   Q.   Part of the crew that went in after the door was -- was --

13   was taken down, right?

14   A.   Correct.

15   Q.   Part of the crew that went around and searched and

16   secured, right?

17   A.   Correct.

18   Q.   And you don't remember specifically what you did, what

19   your role was?

20   A.   No.  I was just on the stack that I can remember.

21   Q.   On the stack.

22        Can you explain to the jury what that means, to be on

23   the stack?

24   A.   Just stacked up in the -- in the line.

25   Q.   Okay.  And you recall that after the money was secured,

```
 1              THE COURT:  Five minutes?
 2              MR. BUCKLEY:  Judge, I would agree with Mr. Fishman
 3    as well.
 4              THE COURT:  All right.  Let's take five minutes,
 5    ladies and gentlemen.  It's 10:25 and let's get back at 10:30.
 6    Let's all rise for our jurors please.
 7              (Whereupon the jury was excused at 10:25 a.m.)
 8              THE COURT:  Okay.  Five-minute recess.  You can step
 9    down.
10              (Court in recess at 10:26 a.m.)
11              (Proceedings resumed at 10:36 a.m., all parties
12              present)
13              (Whereupon the jury entered the courtroom at
14              10:36 a.m.)
15              THE COURT:  Okay.
16              MR. FISHMAN:  We all feel a lot better now, Judge.
17              THE COURT:  I know.  Always ready to help.
18              MR. FISHMAN:  Especially those of us who are a little
19    up in years, you know.
20              THE COURT:  I was ready myself.
21              All right.  Let's all be seated.  Our jury's back.
22              Now, listen, Mr. Fishman, we -- maybe, you know,
23    when -- 35, 40 minutes, 11:00, 11:15, when you think it's a
24    good time for our break, you let us know --
25              MR. FISHMAN:  I will.
```

```
1            THE COURT:  -- and we'll take -- okay.  Go right
2    ahead.
3                       CROSS-EXAMINATION
4    BY MR. FISHMAN:
5    Q.   Okay.  So Mr. Levels [sic], you started -- or Leavells,
6    you started as a police officer in 1999, correct?
7    A.   Correct.
8    Q.   When you were asked at the grand jury why you wanted to
9    become a police officer, you said as follows, page 5:  Answer,
10   "Well, I thought I could make a difference, you know, and
11   wanted to support my family."  Do you remember that answer?
12   A.   Correct.
13   Q.   All right.  So that was part of your intention, when you
14   said "make a difference," you meant do something good out for
15   the community, correct?
16   A.   Correct.
17   Q.   And then you told Mr. Harrison about an incident that
18   happened where you were trying to help Benny Doughrity, it's
19   D-O-U-G-H-R-I-T-Y, because he was some type of kin to Mr.
20   Jackson, am I right?
21   A.   Correct.
22   Q.   And Gary Jackson approached you and he asked you if you
23   could do something to help his kin, whatever he was to him,
24   right?
25   A.   Correct.
```

1  Q.  And you said you'd see what you could do, something like

2  that, correct?

3  A.  Yes.

4  Q.  And what you decided to do, according to what you were

5  telling us before the break, was you typed up a search warrant

6  affidavit, am I right?

7  A.  Correct.

8  Q.  And I'm not going to read through the same things that Mr.

9  Harrison read through, but you'd agree with me that it

10  contained all kinds of lies, right?

11  A.  Some.

12  Q.  Well, I don't want to go through all of them, but the ones

13  you agreed with Mr. Harrison were lies, you still agree those

14  were lies, right?

15  A.  Correct.

16  Q.  And you knew from your experience that you can't just type

17  up a search warrant affidavit, you have to actually swear to it

18  and sign it, am I right?

19  A.  Correct.

20  Q.  And you knew then as a police officer that swearing to an

21  affidavit was exactly the same as what you did yesterday when

22  Judge Murphy asked you if you're telling the truth, correct?

23  A.  Correct.

24  Q.  It's an oath, isn't it?

25  A.  Correct.

1    Q.   And what you did was you swore to something that you knew

2    contained a number of lies, am I right?

3    A.   Correct.

4    Q.   Can you tell us, sir, how did you decide which lies to

5    stick in there, for instance, the surveillances that you

6    claimed you observed narcotics transactions, how -- how did you

7    decide what lie you should stick in there?

8    A.   It's just wording.

9    Q.   Well, it's word -- how did you pick a black male,

10   heavyset, wearing a tan jacket, did you just pick that out of

11   the sky?

12   A.   Yeah.  It's not hard to do.

13   Q.   It's not hard to do.

14            Had -- had you done that before?

15   A.   Yeah, I've done it before.

16   Q.   You've submitted false affidavits both to the Prosecutor's

17   Office and to judges before this?

18   A.   Correct, just like your client did.

19   Q.   Okay.  Mr. Levels [sic], we're going to -- Leavells --

20   we're going to have a real -- I'm going to ask you questions

21   and you answer my question.  If you want to make a speech, you

22   tell the Judge.  If he lets you do it, you can speech, okay?

23   You got it?  You got it?

24   A.   I understand what you're saying.

25   Q.   All right.  So my question is are you telling the jury

1   that in addition to this false affidavit, you've submitted

2   other false affidavits, true?

3   A.   I made others.

4   Q.   And on each occasion you did the same thing in terms of

5   typing it up, swearing to it, eventually talking to a

6   prosecutor and then seeing a judge about it, am I right?

7   A.   Correct.

8   Q.   And in this instance, the one that we have here, was March

9   the 14th of 2013, correct?

10  A.   Correct.

11  Q.   And based on your testimony, you said you went to the FBI

12  task force in October of 12, am I right?

13  A.   Yeah, late October, 12.

14  Q.   Halloween I think you said, true?

15  A.   During Halloween.

16  Q.   And then you stayed about six or seven months, correct?

17  A.   Up until May, June -- I mean April, May.

18  Q.   April, May of 2013, right?

19  A.   Correct.

20  Q.   Which means that on March the 14th of 2013 when you

21  submitted this false affidavit, you were working for the FBI?

22  A.   I was working for Detroit Police Department.

23  Q.   Okay.  Let me use a different preposition.  You were

24  working with the FBI at the time you did this?

25  A.   I was on the joint task force, yes.

```
 1    Q.  And did you tell any of your superiors, either Sergeant

 2    Weathers or maybe one of the FBI agents, say, "Guess what,

 3    fellas?  I've got to help this guy out so I'm going to go

 4    submit a false affidavit to a prosecutor and a judge."  Did you

 5    tell anybody that?

 6    A.  No.

 7    Q.  Because you knew if you told them, number one, you'd be

 8    booted off the task force in 15 minutes, right?

 9    A.  I don't know that.

10    Q.  You don't.

11         Well, you figure they would say, "Hey, we're going to

12    give you one of those commendations for doing this."  Is that

13    what you figured would happen?

14    A.  Never thought of it.

15    Q.  Okay.  You -- you certainly thought of the notion if you

16    told the FBI or other officers that you were about to submit a

17    false affidavit, you knew something bad would happen to you,

18    didn't you?  I'm sorry?

19    A.  Well, you didn't give me a chance to answer.

20    Q.  Go ahead.  Somebody coughed.  I thought you did.

21    A.  Oh.  I didn't -- can you repeat the question now?

22    Q.  Yeah.  My question is you knew, did you not, that if you

23    told the FBI or anybody on your task force, "I'm about to

24    submit a false affidavit to a judge and to a prosecutor," that

25    something bad would happen to you, right?
```

1    A.   I don't know what will happen.

2    Q.   How well did you know Assistant Prosecutor Sarah DeYoung

3    as of March 24th of 2013?

4    A.   I knew her.

5    Q.   And you knew she was a narcotics prosecutor over there,

6    correct?

7    A.   Correct.

8    Q.   And from what you saw, first she appeared to be a good

9    lawyer, true?

10   A.   True.

11   Q.   And she appeared to be a straightforward,

12   straight-shooting, honest person, true?

13   A.   True.

14   Q.   Did it bother you in the least when you were reading this

15   affidavit over the phone to her that you were telling her a

16   bunch of lies, did that bother you?

17   A.   I was reading what was on there.

18   Q.   I know that, but my question is, sir, did it bother your

19   conscience, did it bother your mind, did it bother you at all

20   to be reading a pack of lies to somebody like Sarah DeYoung

21   who's a narcotics prosecutor at the Wayne County Prosecutor's

22   Office?

23   A.   I didn't know my state of mind at that time so I can't

24   tell you something from not -- from back then.

25   Q.   What you do know though about your state of mind was you

1    were certainly trying to help Gary Jackson, that's for sure?

2    A.   Correct.

3    Q.   And if it required you to lie on the phone to the

4    prosecutor, whatever your state of mind was, it wasn't enough

5    to keep you from doing it, agreed?

6    A.   I did what I did.

7    Q.   All right.  And after you lied to Sarah DeYoung, you had

8    to go in front of some judge or magistrate with your affidavit

9    and have a brief conversation with that judge or magistrate,

10   true?

11   A.   True.

12   Q.   And you've done that countless occasions, true?

13   A.   Correct.

14   Q.   And the judge or magistrate, whether they happen to be

15   sitting on the bench at the time or they're in chambers or

16   they're somewhere, they do the same thing that Judge Murphy did

17   that we talked about earlier:  You put your hand in the air,

18   you tell that judge or that magistrate everything in here is

19   true, right?

20   A.   Correct.

21   Q.   So when you stuck your hand in the air on March

22   the 24th -- I'm sorry, March the 14th of 2013 and you were

23   asked is everything true, did it bother you to lie outright to

24   the judge or magistrate, did it bother you?

25   A.   I don't know my state of mind at that time so I don't

1    know.

2    Q.   Okay.  You told Mr. Harrison that you know nothing of

3    whether or not -- strike that.  Let me start over.

4            Whether it was in person, on the phone, on e-mail or

5    by carrier pigeon, did you ever say to Sarah DeYoung after this

6    raid where you got the phony stuff, did you inform Sarah

7    DeYoung that you wanted her to give a break to Benny Doughrity?

8    A.   After?

9    Q.   After you had the phony raid with the phony warrant and

10   whatever the phony stuff you found in there, did you

11   communicate in any way with Sarah DeYoung that you wanted her

12   to give a break to Benny Doughrity on his case?

13   A.   After?

14   Q.   At any time.

15   A.   I asked her what was needed to make that case go away.

16   Q.   And you asked her that before the phony affidavit?

17   A.   I asked her what was needed.

18   Q.   Right.  My question is did you ask her that before you

19   read that phony affidavit to her or after?

20   A.   I had to ask her before.

21   Q.   All right.  So you talked to her before and you asked her

22   what was needed, and her answer was?

23   A.   Some drugs and a gun.

24   Q.   So that gave you the brilliant idea to look -- to create a

25   search warrant affidavit looking for drugs and a gun, right?

```
 1    A.   Correct.

 2    Q.   And after you found whatever you found, did you then

 3    contact Sarah DeYoung and say, "Hey, we went in, he was my

 4    source and we found drugs and guns, what are you going to do

 5    for him?" or something like that?

 6    A.   No.  I just let her know what we got and that was it.

 7    Q.   You never then -- I'm asking you this for the last time.

 8    This is your last chance.  You never said to Sarah DeYoung,

 9    "Look, we found this stuff and I want you to do something, I'm

10    asking you to do something for Doughrity on his criminal case."

11    A.   Once again, I called her and let her know what we got.

12    Q.   Okay.  The whole purpose of the exercise, including the

13    phony affidavit, was to try to help Mr. Jackson's kin, Benny

14    Doughrity, correct?

15    A.   Correct.

16    Q.   Do you know, sir, where Mr. Doughrity is today?

17    A.   No.

18    Q.   Do you know, do you have any information whatsoever that

19    tells you that he's sitting in the penitentiary today on that

20    case?

21             MR. LIGHT:  Objection, Your Honor.  He's already said

22    he doesn't know.

23             THE COURT:  I'll overrule.  You can answer that.

24             Go ahead.

25    BY MR. FISHMAN:
```

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5621    Page 80 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

80

1    Q.   Do you know that he's in the penitentiary today on the

2    case you were supposedly trying to help him on?

3    A.   No, I don't know.

4    Q.   Okay.  Did Sarah DeYoung ever say to you at any time,

5    either before or after, did she ever say to you, "Hey, don't

6    worry about it, I'll take care of that case, nothing will

7    happen to him"?

8    A.   I don't recall.

9    Q.   Okay.  All right.  You started your police career at the

10   Third Precinct, correct?

11   A.   Correct.

12   Q.   You worked Special Operations, correct?

13   A.   Correct.

14   Q.   You went to Narcotics, correct?

15   A.   Correct.

16   Q.   And then you went to the FBI task force around 2012,

17   around Halloween as you've told us, right?

18   A.   Correct.

19   Q.   When you got to the FBI task force, did you tell anybody

20   there, "Hey, there's a lot of crookery going on in Detroit

21   Police Narcotics; in fact, I'm one of them."  Did you tell them

22   that?

23   A.   No.

24   Q.   But by then, according to you, there was all kinds of

25   crookery going on in the Detroit Police Narcotics Section,

1    right?

2    A.   It was things going on.

3    Q.   Right.  Including money seizure and some of the other

4    things you've told us about, correct?

5    A.   Correct.

6    Q.   But just so we're clear, you never said to anybody at the

7    FBI or anybody at the task force, you know, "You don't want me,

8    I've been a crook, and I know some other guys and I can tell on

9    them."  You didn't do that, did you?

10   A.   Nope.

11   Q.   So by January of 2014 you were in Narcotics again and you

12   were working on Sergeant Geelhood's crew, is that correct?

13   A.   In January, yes.

14   Q.   And did you have some suspicions about Sergeant Geelhood?

15   A.   What do you mean?

16   Q.   Well, I mean did you think Sergeant Geelhood was a crook?

17   A.   I don't know if he was a crook.

18   Q.   Did you have any suspicions about him at all?

19   A.   That's a wide open question.  I mean --

20   Q.   You're right.

21   A.   -- be specific.

22   Q.   No, that's my question.  The answer is easy, yes or no?

23   A.   I can't answer that question.

24   Q.   Okay.  Did Sergeant Geelhood before he was a sergeant work

25   on Sergeant Hansberry's crew with you, Hansberry, Watson and

1    the other people you've named?

2    A.    I wasn't on there when he was there.

3    Q.    Did you know him to have worked on Sergeant Hansberry's

4    crew?

5    A.    Yes.

6    Q.    And your answer is, when I asked you were you -- did you

7    have any suspicions, you don't know?  Is that your answer?

8    A.    You have to specify what you're talking about.  Other than

9    that, I can't answer the question.

10   Q.    Okay.  When you were on Sergeant Geelhood's crew in

11   January of 2014, were you still selling marijuana to Calvin

12   Turner?

13   A.    Yes.

14   Q.    And tell the jury again how -- how many times you figure

15   you gave weed to Calvin Turner.

16   A.    Several.

17   Q.    Well, does several mean four or five, 10 or 12, what does

18   that mean?

19   A.    I don't know, sir.

20   Q.    More than 10?

21   A.    Several.

22   Q.    Okay.  And what kind of quantities were you giving him?

23   A.    Pounds.

24   Q.    And how were you dividing up the money, splitting it?

25   A.    Yes.

1   Q.   And that was while you were -- continued while you were

2   working on Geelhood's crew, correct?

3   A.   Correct.

4   Q.   You were also running a grow house, right, or being

5   involved in a grow house, correct?

6   A.   Correct.

7   Q.   And was the marijuana that was being grown in the house

8   being sold?

9   A.   It still hadn't been sold.

10  Q.   I'm sorry?

11  A.   It wasn't sold.

12  Q.   It was just in the process of being grown?

13  A.   Yeah.

14  Q.   Did you tell Sergeant Geelhood, "Hey, I hope you don't

15  mind, but I've got a grow house and I'm giving weed to Calvin

16  Turner.  Is it okay if I stay on the crew?"  Did you have a

17  conversation like that with him?

18  A.   No.

19  Q.   Were you guys also ripping off marijuana when you'd go for

20  raids while you were working with Sergeant Geelhood's crew?

21  A.   Sometimes.

22  Q.   And was the sergeant in the middle of that, was he either

23  taking it himself or watching you guys?

24  A.   He pretty much knew.

25  Q.   He pretty much knew.  Okay.

1           And the crew was what, five, six, seven, eight

2    people?

3    A.   It all depends.

4    Q.   Were Beasley and Bray still on the crew?

5    A.   Yes.

6    Q.   And you've testified on numerous occasions Beasley and

7    Bray were not crooks, correct?

8    A.   Correct.

9    Q.   And you're saying they knew and looked the other way, or

10   are you saying they didn't know and they got nothing out of it?

11   A.   You have to ask them.

12   Q.   No, I'm asking you, sir, from what you observed and what

13   you heard.

14   A.   I mean I don't know if they knew anything.

15   Q.   Okay.  You'd -- you'd agree with me that -- that in most

16   raids, at some point in time, everybody is inside the location

17   at some point in time, true?

18   A.   Pretty much.

19   Q.   And you'd agree with me the evidence has to be catalogued

20   and listed, correct?

21   A.   Correct.

22   Q.   And you'd agree with me that oftentimes that evidence

23   includes controlled substances, it may also include personal

24   property like jewelry and it may also include cash, correct?

25   A.   Rarely jewelry, but...

1    Q.    Okay.  Let's say cash and drugs.  Yes?

2    A.    And guns, yeah.

3    Q.    And guns, right?  Okay.

4          The incident occurs where you have the raid and

5    there's some equipment that's taken, the one that you've been

6    talking about to both the government and Mr. Harrison, correct?

7    A.    Correct.

8    Q.    You didn't think ahead of time that maybe this crook who's

9    growing marijuana is slick enough that he might have some

10   surveillance inside, did you?

11   A.    I don't know.

12   Q.    Well, did it cross your mind, hey, maybe we shouldn't

13   steal this stuff because maybe the guy's got surveillance

14   equipment?

15   A.    A lot of places have surveillance.

16   Q.    That's not my question though.  I'm talking about this

17   incident, did it occur to you that it might not be a good idea

18   to participate in stealing because he might have surveillance

19   equipment?

20   A.    I don't know.

21   Q.    Did anybody say while the stealing was going on or before

22   the stealing or after the stealing, "Hey, fellas, we could get

23   caught, maybe the guy's got surveillance equipment."  Anybody

24   say that?

25   A.    Not that I remember.

1  Q.  But you -- you'd agree, as you've just said, these days a

2  lot of people do have surveillance equipment; houses,

3  buildings, parking lots, right?

4  A.  Courtrooms.

5  Q.  Courtrooms.

6  A.  Mm-hmm.

7  Q.  Okay.  So when you got suspended, tell us again what's the

8  month and year?

9  A.  It was 2014 in July.

10  Q.  July.

11      That meant when you were suspended, there's two ways

12  of being suspended in the police department, with pay and

13  without pay.  Which way were you suspended?

14  A.  With pay.

15  Q.  All right.  So you were still getting your pay, correct?

16  A.  Correct.

17  Q.  And your understanding was that the -- there'd be an

18  investigation generally by Internal Affairs, is that true?

19  A.  Correct.

20  Q.  And at some point in time there'd be some recommendation

21  and maybe you'd have a trial board or maybe not and you'd get

22  some kind of a punishment or not, correct?

23  A.  I don't know what would happen.

24  Q.  You were not concerned then, though, that you were going

25  to get fired as a result of the stealing from the weed house,

1  were you?

2  A.   I didn't get fired.

3  Q.   Sir, I'm asking you, were you concerned at the time when

4  you were suspended and you were still getting paid, were you

5  concerned that you were going to be fired or did you figure

6  you'll get 30 days off or something?

7  A.   I knew I wasn't going to get fired.

8  Q.   Okay.  So you were still getting a check from the police

9  department every two weeks, correct?

10  A.   Correct.

11  Q.   And in April of 2014 you started having a marijuana

12  connection with this fellow Timothy Davis, am I right?

13  A.   Correct.

14  Q.   Did I hear you correctly, did you tell Mr. Harrison you

15  didn't know Timothy Davis was working with the government until

16  he mentioned it to you today?

17  A.   No, that isn't what he said.

18  Q.   All right.  You -- you -- you've -- you've learned that he

19  was -- he was an informant for the government, right, you knew

20  that before you came in here today, didn't you?

21  A.   Right.

22  Q.   You knew that those deliveries you were making of weed and

23  hash and cannabis oil and whatever the other stuff was, you

24  knew that he was working for the government when you gave those

25  things to him, right?

```
1   A.   No.

2   Q.   You -- you -- you know that now though, don't you?

3   A.   Yeah, now, afterwards.

4   Q.   And you learned afterwards, you learned that the money

5   that you got came from the FBI?

6   A.   Correct.

7   Q.   Okay.  So now you didn't learn that until after you were

8   busted in the phony rip set up by Gary Jackson correct?

9   A.   Correct.

10  Q.   All right.  So nobody, the FBI or the government, for

11  whatever reasons, they didn't grab you when you took the money

12  from Timothy Davis, right?

13  A.   Correct.

14  Q.   They didn't grab you when you provided them with whatever

15  you provided them, right?

16  A.   Yes.

17  Q.   They left you out there, right?

18  A.   I guess.

19  Q.   Under suspension from the police department, true?

20  A.   No.

21  Q.   Working as a police officer?

22  A.   Which time?

23  Q.   Timothy Davis.  We're talking about April of 2014.

24  A.   I was off, sir.

25  Q.   All right.  And then the suspension came what -- when
```

Case 2:15-cr-20217-SJM-APP    ECF No. 229    filed 05/02/17    PageID.5630    Page 89 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

89

1    again?

2    A.   In July.

3    Q.   And was it early July?

4    A.   It was in July.

5    Q.   All right.  And again, you were still getting paid, right?

6    A.   Correct.

7    Q.   So when Gary Jackson came to you and proposed this robbery

8    where y'all could split $40,000, it wasn't like you weren't

9    getting a paycheck from the City of Detroit, right?

10   A.   I wasn't getting the same paycheck that I was getting

11   before.

12   Q.   And so the jury understands, you mean because you weren't

13   getting court time, right?

14   A.   Court time, overtime, things like that.

15   Q.   And as a narcotics officer, you spend a lot of time

16   testifying in court, right?

17   A.   Correct.

18   Q.   Which you've done a zillion times, right?

19   A.   Yes.

20   Q.   And you get paid extra if you work overtime and you get

21   paid what's called court time, particularly if you're not

22   working that day, right?

23   A.   Correct.

24   Q.   So your check, even though it was still coming from the

25   citizens, was smaller than it was before?

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5631   Page 90 of 156
Jury Trial: Volume 14 • Tuesday, June 28, 2016

90

1    A.   Whole lot smaller.

2    Q.   A whole lot smaller, right?

3    A.   Correct.

4    Q.   Are you telling the jury that's why you agreed to get

5    involved in trying to steal the 40,000 along with Gary Jackson,

6    was it 'cuz you weren't getting enough dough from the city?

7    A.   No, I made a bad judgment.

8    Q.   All right.  That didn't enter into it though.  It wasn't

9    the fact that you weren't getting enough money from the city

10   that caused you to say, you know, "I'm going to go in and

11   participate in a robbery," it wasn't that?

12   A.   Made a mistake.

13   Q.   Okay.  But -- but it was greed, wasn't it?  I mean, to be

14   blunt, wasn't it just greed?

15   A.   How was it greed?

16   Q.   I'm asking you.  Didn't it seem like it's -- "I can get

17   $20,000 or $19,000, I can do it easy" and you were greedy,

18   isn't that right?

19   A.   That's not greedy.

20   Q.   Okay.  It is stealing though, you would agree with that,

21   yes?

22   A.   It's taking money.

23   Q.   Okay.  And do -- would -- would you agree that when Mr.

24   Jackson called you and proposed this idea, that one of the

25   things you were thinking about was, "Boy, what's in it for

1    Q.  But you hope, do you not, that it will be as low as

2    possible, right?

3    A.  Correct.

4    Q.  Okay.  So --

5         MR. FISHMAN:  Thank you, Ms. Koch.

6    BY MR. FISHMAN:

7    Q.  It's your testimony that everybody that you worked with in

8    Narcotics, particularly on Sergeant Hansberry's crew except for

9    Beasley and Bray, were all dirty cops, am I right?

10   A.  I don't know about Amy Metalic.

11   Q.  Okay.  Barnett, he's dirty for sure, right?

12   A.  I don't know.

13   Q.  Well, didn't you -- didn't you tell us yesterday you saw

14   Officer Barnett take an ounce of cocaine and stick it in his

15   pocket and walk out with it?

16   A.  Yeah, I seen him do that.

17   Q.  Don't you think that kind of meets the definition of a

18   dirty cop, or is that something that's -- what -- what you're

19   supposed to do?

20   A.  I mean I just knew he wasn't right.

21   Q.  Okay.  Officer Napier?

22   A.  Right.

23   Q.  Officer Tourville?

24   A.  Right.

25   Q.  Officer Riley?

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5657   Page 116 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

116

1    A.    Right.

2    Q.    What about Officer Whitten, W-H-I-T-T-E-N, did she work on

3    your crew?

4    A.    Yeah, she did.

5    Q.    Is she a crook?

6    A.    Not that I know of.

7    Q.    Okay.  So she's no, Beasley's no, Bray's no, Metalic,

8    question mark?

9    A.    Yeah, I don't know.

10   Q.    And Geelhood?

11   A.    Yeah

12   Q.    Yes.  Okay.

13         And the people, whoever their names are that you

14   recognize as the code names that were given to you, do you say

15   they're crooked or no?  Sting, Seal, Lobo, Dragon.

16   A.    I have no idea.

17   Q.    Okay.

18   A.    Dragon, no.

19   Q.    When you saw Officer Barnett take the cocaine during a

20   raid, can you tell the jury approximately when that was?

21   A.    I don't know exactly.

22   Q.    Was it before or after the large money seizure that we're

23   going to talk about in a second?

24   A.    After.

25   Q.    Okay.  And you said that you -- you talked to Sergeant

1   Hansberry and Officer Watson about it, correct?

2   A.   Correct.

3   Q.   Did you -- did you have lieutenants still in those days?

4   A.   Did I have who?

5   Q.   Were there lieutenants in the Narcotics Section?

6   A.   Correct.

7   Q.   And over the lieutenant is what, the inspector, used to

8   be, now the captain?

9   A.   Right.

10  Q.   And then there are commanders, correct?

11  A.   Correct.

12  Q.   And then there's the Chief of Police.  Deputy chiefs and

13  then the Chief of Police, correct?

14  A.   Inspectors and... yeah.

15  Q.   All right.  So you -- you told us you talked to Hansberry

16  and Watson and they asked you what did you want to do about it,

17  right?

18  A.   Correct.

19  Q.   And you didn't want to do anything about it, did you?

20  A.   I told them whatever they wanted to do.

21  Q.   Because if you wanted to do something about it, whatever

22  these two said, you could have gone to the lieutenant, the

23  inspector, all the way up to the Chief of Police and say, "Hey,

24  I just saw crookery in a search warrant execution," right?

25  A.   I mean I went to my immediate supervisor.

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5659   Page 118 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

118

1   Q.   I know that.  But my question is, sir, if your immediate

2   supervisor didn't do anything, there was nothing keeping you

3   from going way higher than him in the police department and

4   reporting what you say you saw, right?

5   A.   Yeah, wasn't nothing stopping me.

6   Q.   You told the jury, in response to Mr. Light's question at

7   the end of your direct testimony, if you would have stayed in

8   southwest Detroit, you wouldn't be here right now, correct?

9   A.   Correct.

10   Q.   So are you blaming other people for the fact that you lied

11   on search warrant affidavits, gave weed to Calvin Turner and

12   all the other things that you've talked about, is that somebody

13   else's fault?

14   A.   Did I say that?

15   Q.   I'm asking you.

16   A.   I didn't say that.  I said that if I'd a stayed there, I'd

17   a been okay.

18   Q.   And my question is are you blaming that on other people or

19   are you taking responsibility for it yourself?

20   A.   I'm a man.  I take responsibility for myself.

21   Q.   You -- you'd agree, had you gone to some superior officer

22   higher than your sergeant about Officer Barnett, you could have

23   put a stop to whatever was going on right then, couldn't you?

24   A.   No.

25   Q.   Okay.  You told us you knew Calvin Turner from childhood,

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5687   Page 146 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

146

```
1    A.   They got people out the house.

2    Q.   Did you learn that somebody was arrested?

3    A.   Yes.

4    Q.   Did you learn that that person's name was Dante Mitchell?

5    A.   I don't recall the name, sir.

6    Q.   Did you learn that that person wound up being charged in

7    court, in Recorder's Court in Frank Murphy?

8    A.   I have no idea.

9    Q.   Did you talk to Gary Jackson about what kind of story that

10   guy should tell to the police or to the prosecutors?

11   A.   What story?

12   Q.   Did you talk to Gary Jackson about what kind of story the

13   person who was being held hostage -- and let's assume his name

14   is Fred Tucker -- did you talk to Gary Jackson about what that

15   guy ought to tell the police and prosecutors about the whole

16   incident?

17   A.   I don't know exactly.  I don't know.

18   Q.   Do you know today that during May of 2014 there was a

19   federal wiretap on Mr. Jackson that picked up his phone calls?

20   A.   How would I know that?

21   Q.   I don't know.  That's why I'm just -- you didn't know and

22   you don't know it now?

23   A.   You're telling me.

24        MR. FISHMAN:  Okay.  That's all.

25        THE COURT:  Thank you.  Anything from you, Mr. Sasse?
```

Jury Trial: Volume 14 • Tuesday, June 28, 2016

```
 1            MR. SASSE:  No.  Thank you, Your Honor.
 2            THE COURT:  Mr. Light, you want to ask some
 3   questions?
 4            MR. LIGHT:  I have just a few, Your Honor.
 5            Could I see that report from Glynn Court, sir --
 6            MR. FISHMAN:  Sure.
 7            MR. LIGHT:  -- that you asked about, sir?
 8            MR. FISHMAN:  Yes, sir.
 9                    REDIRECT EXAMINATION
10   BY MR. LIGHT:
11   Q.   Just -- just one area I want to try to clarify a little
12   bit with you, Mr. Leavells.  That seizure from the cab of the
13   truck, of the semi truck, was a lot of money, correct, sir?
14   A.   Correct.
15   Q.   The final count of what was brought downtown to DBT -- DPD
16   headquarters was about $2.197 million, is that right?
17   A.   Correct.
18   Q.   Now, Gary Jackson insisted that there was more money than
19   that in that -- in that cab, correct?
20   A.   Correct.
21   Q.   How much did he insist was there?
22   A.   It was a range, but he kept saying 3 million.
23   Q.   And Little, Gary Jackson's nephew, you talked with him
24   about that as well?
25   A.   Correct.
```

1  Q.   And he insisted what amount of money was present in that

2  cab, as he understood it?

3  A.   Three million, and kept showing me pictures.

4  Q.   Now, there's a difference of about $800,000 there,

5  correct?

6  A.   Correct.

7  Q.   If that $800,000 went walkabout away from that cab during

8  the execution of -- of -- of that street enforcement, do you

9  know how it walked away, how it got away?

10  A.   No.

11  Q.   You're not saying that somebody stuffed it all in the

12  cargo pockets of the cargo pants that Napier and Tourville had

13  on, you're not saying that, are you, sir?

14  A.   Nope.

15  Q.   You just don't know if or how that money was stolen,

16  correct?

17  A.   Correct.

18  Q.   Mr. Fishman asked you some questions about your grand jury

19  testimony.  Do you recall that?

20  A.   Yes.

21  Q.   And he asked you a question and your answers from pages 30

22  to 31 of your grand jury testimony, right?

23  A.   Right.

24  Q.   That wasn't all your grand jury testimony on this subject,

25  was it, sir?

Case 2:15-cr-20217-SJM-APP   ECF No. 229   filed 05/02/17   PageID.5690   Page 149 of
155
Jury Trial: Volume 14 • Tuesday, June 28, 2016

149

1   A.   No.

2   Q.   On page 36, starting at line 12, were these -- was this

3   question asked and did you give this answer:  Question, "After

4   the fact, were there discussions involving Gary Jackson about

5   how much money was in the cab?"  Answer, "Correct.  What the

6   final tally was that we came up with was 2.197.  The number

7   that Gary Jackson told us was 3 million.  We didn't give him

8   any money out of this.  We paid him through city funds which

9   was $250,000 cash."

10   A.   Correct.

11   Q.   Was that your testimony before the grand jury as well?

12   A.   Yes.

13          MR. LIGHT:  No further questions.

14          THE COURT:  Okay.  Well, now hold on just a sec.  Do

15   you want to respond to any of that, Mr. Harrison?

16          MR. HARRISON:  One question.

17                    RECROSS-EXAMINATION

18   BY MR. HARRISON:

19   Q.   I just want to make sure I heard what I heard just now

20   right.  With regard to the southwest Detroit big money seizure

21   that Mr. Light just asked -- asked you about, you agreed with

22   his question, you don't know if or how that money was stolen,

23   right?

24   A.   Correct.  It wasn't southwest either.

25          MR. FISHMAN:  Yeah, it's east -- east side.

```
1    communicate electronically about it, and keep your minds open.

2    We'll see you tomorrow morning and we'll get through this,

3    okay?

4              All right.  Let's all rise for our jurors please.

5              (Whereupon the jury was excused at 12:41 p.m.)

6              THE COURT:  Okay.  Everybody may be seated.  We're

7    going to be in recess.  Thank you all very much.

8              MR. LIGHT:  Thank you, Your Honor.

9              MR. BUCKLEY:  Thank you, Your Honor.

10             (Court in recess at 12:42 p.m.)

11             (Whereupon proceedings in the above-entitled matter

12             were adjourned to Wednesday, June 29, 2016)

13                             —  —  —

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T I O N

 2         I, Linda M. Cavanagh, Official Court Reporter of the

 3   United States District Court, Eastern District of Michigan,

 4   appointed pursuant to the provisions of Title 28, United States

 5   Code, Section 753, do hereby certify that the foregoing pages 1

 6   through 155 comprise a full, true and correct transcript of the

 7   proceedings held in the matter of United States of America vs.

 8   David Hansberry, Bryan Watson and Kevlin Omar Brown, Case No.

 9   15-20217, on Tuesday, June 28, 2016.

10

11

12              s/Linda M. Cavanagh
                Linda M. Cavanagh, CSR-131, RPR, RMR, CRR
13              Federal Official Court Reporter
                United States District Court
14              Eastern District of Michigan

15

16

17   Date: May 1, 2017
     Detroit, Michigan
18

19

20

21

22

23

24

25
```

# **EXHIBIT J**

```
1              UNITED STATES DISTRICT COURT
2             EASTERN DISTRICT OF MICHIGAN
3                  SOUTHERN DIVISION
4
5   DEBRA METRIS-SHAMOON,
6   MUKHLIS SHAMOON,
7   CARL VERES, PAUL METRIS,
8   JULIA METRIS,
9          Plaintiffs,
10       vs.                      Case #18-cv-13683
11  CITY OF DETROIT, and          HON. ARTHUR J. TARNOW
12  SGT. JOE TUCKER, SGT. CANDACE
13  MATSCHIKOWSKI, in their Individual
14  and Official Capacities; SGT. STEPHEN
15  GEELHOOD, JUAN DAVIS, and BRIAN JOHNSON,
16  In their Individual Capacities;
17  jointly and severally,
18          Defendants.
19  _____/
20  PAGE 1 TO 132
21       The Virtual deposition of CHIEF JAMES CRAIG,
22       Taken Via Hanson Remote
23       Commencing at 11:00 a.m.
24       Thursday, May 21, 2020
25       Before Kelley Whitaker, CSR 0977.
```

```
1
2   Court reporter, attorneys & witness appearing remotely.
3
4   APPEARANCES:
5
6   DENNIS A. DETTMER, P27043
7   MICHAEL DEZSI, P64530
8   Dettmer & Dezsi, PLLC
9   613 Griswold, #1400
10  Detroit, MI  48224
11  (313) 281-8090
12  ddettmeresq@yahoo.com
13  bbentley@dezsilaw.com
14      Appearing on behalf of the Plaintiffs.
15
16  JAMES M. SUROWIEC, P49560
17  LINDSEY R. JOHNSON, P67081
18  Allen Brothers, PLLC
19  401 N. Main Street
20  Royal Oak, MI  48-67-1812
21  (248) 951-9060
22  jsurowiec@allenbrotherspllc.com
23      Appearing on behalf of the Defendants
24
25  APPEARANCES CONTINUED:
```

```
1   APPEARANCES CONTINUED:
2
3   GRANT HA, P53403
4   City of Detroit Police Department
5   1301 3rd St., #75-751
6   Detroit, MI  48226-2503
7   (313) 596-2158
8       Appearing on behalf of Witness, Chief Craig
9
10  ALSO PRESENT:  DEBRA METRIS-SHAMOON
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1               TABLE OF CONTENTS
2   Witness                                Page
3             CHIEF JAMES CRAIG
4
5   EXAMINATION BY MR. DETTMER              9
6   EXAMINATION BY MR. SUROWIEC             122
7   RE-EXAMINATION BY MR. DETTMER           131
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        E X H I B I T S - Not Attached

2       (Exhibits retained by Mr. Dettmer)

3  EXHIBIT 1      10

4  Notice of Deposition

5  EXHIBIT 2      10

6  May 13, 2020, Email

7  EXHIBIT 4      14

8  Wikipedia History of Craig

9  EXHIBIT 5      15

10  Excerpt from Board

11  EXHIBIT 5A      16

12  Excerpt from Board

13  EXHIBIT 6      17

14  Organizational Charts

15  EXHIBIT 7      42

16  Detroit News Article

17  EXHIBIT 7A      49

18  Detroit News Report

19  EXHIBIT 8      61

20  Police Commissioner Meeting

21  EXHIBIT 9      66

22  Administrative Message

23  EXHIBIT 10      86

24  Comerica Bank Deposit

25  Tally Sheet

1  EXHIBIT 11A      83

2  Photo

3  EXHIBIT 11B      83

4  Photo

5  EXHIBIT 12      93

6  Detroit News Article

7  11/03/2014

8

9  EXHIBIT 12      93

10  Detroit News Article

11  11/03/2014

12  EXHIBIT 12C      96

13  Indictment, Hansberry/Watson

14  EXHIBIT 12D      97

15  Free Press Article

16  6/30/16

17  EXHIBIT 12E      98

18  Leavells Testimony

19  EXHIBIT 12F      98

20  Leavells Testimony

21  EXHIBIT 12G      99

22  Jackson Testimony

23  EXHIBIT 13      101

24  Money Counter Memo

25

1  EXHIBIT 12J      102

2  Hansberry Conviction

3  EXHIBIT 13      90

4  Investigation money counter

5  EXHIBIT 14      102

6  Use of Paid Informants

7  EXHIBIT 14A      103

8  Protective Order

9  EXHIBIT 14B      103

10  Confidentiality of SOI

11  EXHIBIT 14C      103

12  Confidentiality of SOI

13  EXHIBIT 15      107

14  Internal Affairs Investigation

15  EXHIBIT 16      108

16  Matelic File

17  EXHIBIT 17      108

18  Geelhood Case

19  EXHIBIT 18      109

20  Darell Chancellor Case

21  EXHIBIT 19      109

22  Darell Chancellor Case

23

24

25

1       Virtual Deposition

2       May 27, 2020

3       About 11:00 a.m.

4       - - -

5      COURT REPORTER: My name is Kelley

6  Whitaker, CSR-0977, a Michigan State Notary Public and

7  Certified Shorthand Reporter, and this deposition is

8  being held via videoconferencing equipment and

9  telecommunication.

10      The counsel, witness, and reporter are not in

11  the same room. The witness will be sworn in remotely,

12  pursuant to stipulation and agreement of all parties.

13      Will the parties please stipulate on the

14  record that they consent and waive any objections to

15  this manner of conducting the deposition and the

16  attorneys participating in this deposition acknowledge

17  that I am not physically present in the deposition room

18  and that I will be reporting this deposition remotely.

19     Please indicate your agreement by stating your name

20  and your agreement on the record.

21     MR. DETTMER: Dennis Dettmer, on behalf of the

22  plaintiffs. And I agree to this remote deposition

23  taking and have no objection whatsoever.

24     MR. SUROWIEC: James Surowiec, on behalf of

25  City of Detroit, defendants, and I agree to the



1  deposition being taken remotely in the manner that you
2  just described.
3                    -  -  -
4             CHIEF JAMES CRAIG,
5  having first been duly sworn, was examined and testified
6  on his oath as follows:
7        MR. DETTMER:  Chief Craig, I'm Dennis Dettmer,
8  and it's a pleasure to meet you.
9        THE WITNESS:  Nice meeting you, too.
10 EXAMINATION BY MR. DETTMER:
11 Q.  I'd like to ask you a series of questions.  And starting
12     off, we have given four Notices of Deposition to your
13     counsel and his firm.  And I am wondering if you've seen
14     any one of those, because they have attached a subpoena
15     duces tecum to the City of Detroit asking for certain
16     documents.
17          Have you seen that -- any one of those four
18     deposition notices?
19 A.  I don't recall seeing any of the notices.  I was made
20     aware that there was a disposition (sic) by an attorney
21     that works at my office, or how or could have been, but
22     personally I have not seen it.  But I was advised that
23     there was a deposition.
24
25

1        EXHIBIT 1
2        Notice of Deposition
3        WAS MARKED FOR IDENTIFICATION
4        EXHIBIT 2
5        May 13, 2020, Email
6        WAS MARKED FOR IDENTIFICATION
7  BY MR. DETTMER:
8  Q.  Okay.  The Notice of Deposition is Exhibit 1 to your
9      deposition today.  I have as a Notice, also, a second
10     exhibit, Number 2, which is an email dated May 13th,
11     2020, from counsel for the defendant -- Lindsey Johnson
12     for the defendants.
13          And she indicates -- I'll read it into the
14     record.  Thank you for your Notice of Deposition which
15     we will have our clients appear remotely.  However,
16     Defendant City will not respond to the duces tecum
17     portion of the deposition since discovery has already
18     closed in this matter May 7th.
19          Also, this Deposition Notice requests
20     documents that have already been provided to you by the
21     Defendant City in response to client's numerous prior
22     Discovery Requests.
23          I would suggest that that mission is totally
24     improper.  We initially sent our First Notice of
25     Deposition on October 30th, 2019.  We Re-Noticed it on

1  December 9th, 2019, February 25, 2020, May 13th, 2020,
2  and May 18th, 2020.  And I'll reference Court Order that
3  was entered on December 20th, 2019, by Judge Whalen that
4  ordered that we could take your deposition today.
5          And the point I'm making, the subpoena and the
6  Exhibit A attached to that subpoena directed to the
7  City, all were duplicative and all really started to
8  originate on October 30th, 2019.  And the assertion that
9  it's not timely, since Discovery is cut off, as
10 indicated by what I am saying, that is not a
11 well-founded objection at all.
12          We will proceed accordingly --
13        MR. SUROWIEC:  I would like to --
14        MR. DETTMER:  -- with the Court.  Now I would
15 like --
16        MR. SUROWIEC:  I would like to respond to that
17 just briefly.
18          We have provided all of the records requested
19 in the subpoena duces tecum, and the form of that, I
20 believe, is improper.  Chief Craig doesn't have those
21 records.  We provided them, all of them, to Plaintiffs
22 on numerous occasions.  We filed objections to that --
23 to that subpoena.  To the extent that -- to the extent
24 that the discovery is closed, that's not really the
25 issue.

1          The issue is, this information has been
2  provided.  Chief Craig is not going to show up at this
3  deposition with a bunch of papers, which you yourself
4  and Mr. Dezsi have already agreed this is very
5  cumbersome.  We are remote; he is remote.  What good is
6  it going to do?  So that's our objection.
7        MR. DETTMER:  That's not a proper reason not
8  to produce the records that I requested in that
9  subpoena.
10        MR. SUROWIEC:  We object.
11        MR. DETTMER:  The documents have been
12 subpoenaed and you have not produced the records that I
13 requested --
14        MR. SUROWIEC:  We are a party.
15        MR. DETTMER:  But let me go on.
16        (Multiple speakers)
17        MR. SUROWIEC:  Go ahead.
18        We are a party to the subpoena.
19        MR. DETTMER:  Chief Craig, have you seen any
20 of the exhibits?
21        THE WITNESS:  The only predeposition -- I have
22 seen some exhibits.  I couldn't tell you which ones or
23 what was contained.  As it was already referenced, I
24 don't have anything in my possession right now.
25

BY MR. DETTMER:

Q. All right. I am going to run through some of these
fairly quickly. I'll make a reference to them. Your
counsel has them. If you want to take a look at them,
we can bring them up on the screen. Okay?

So if you have any question about any single
exhibit as we are discussing it, please indicate that
and we'll put it on the screen so you can see it in
detail. Okay?

A. Okay.

MR. SUROWIEC: Dennis, can I ask a quick
question? Are you referring to the exhibits that were
sent by Beth yesterday?

MR. DETTMER: Yes.

MR. SUROWIEC: Okay. So she indicated
1 through 10 and then 12 through 22 or 23. We didn't
get 1 through 10. Are there about 23 exhibits we're
talking about?

MR. DETTMER: There are actually more than 23
because some had subparts. If you looked at them, you
would have seen that. I've looked at the same email
chain that you did -- that you got, and I had all my --
all of the exhibits. But I don't want to argue about
that. You made that point. I don't agree with it.

MR. SUROWIEC: Dennis --



MR. DETTMER: You should have gotten them,
should have looked at the end of that chain, the first
email, and they were there.

MR. SUROWIEC: Dennis, I am just telling you,
for the record, we didn't get 1 through 10, so we'll
look at what you have, but I'm just telling you, I've
made my record and I asked Lindsey, did you get them.
We have what we have, which you sent last night.

That's fine. Go ahead.

MR. DETTMER: The email chain will show what
you got. And if you somehow overlooked it, that's it.

MR. SUROWIEC: Okay.

EXHIBIT 4

Wikipedia History of Craig

WAS MARKED FOR IDENTIFICATION

MR. DETTMER: Our Exhibit 4 is a Wikipedia
page, and it's about you. And it gives a history of
your starting in the police department in Detroit after
you graduated high school here from Cass Tech.

And have you seen this document?

THE WITNESS: I don't know if I've seen this
specific document. I have seen my name on Wikipedia,
and I know those things get updated, so this particular
page, I'm not certain. I'm skimming through it as you
move up.



MR. DETTMER: It's a brief history. Rather
than going through it with you in any detail, Exhibit 4
kind of gives your biographical background.

THE WITNESS: Yes, this would be one that I
hadn't seen. I notice that there is some reference made
to US Representative Rashida Tlaib, so I haven't
personally seen this page.

MR. DETTMER: I would ask that, if you have
any questions about it, Mr. Surowiec will provide you
the -- Exhibit 4 and you can raise that -- an issue with
me and through him about --

MR. SUROWIEC: I don't have the exhibit.

MR. DETTMER: But it's a general statement
about your background.

THE WITNESS: I understand.

BY MR. DETTMER:

Q. Captain prepared you well and you're off and running.

A. Yes, he did.

Q. The next exhibit -- I have 5 and 5A. These are excerpts
from the Detroit Board of Police Commissioners.

EXHIBIT 5

Excerpt from Board

WAS MARKED FOR IDENTIFICATION

EXHIBIT 5A

Excerpt from Board

WAS MARKED FOR IDENTIFICATION

BY MR. DETTMER:

Q. This is related to your appointment. Okay?

What was the relationship between the Detroit
Board of Police Commissioners and the Detroit Police
Department?

A. They provide oversight to the police department;
however, when I was appointed as police chief in 2013,
it was not on the approval -- there was some
conversation, as I recall, between the Police Commission
and representation of the emergency manager who was in
place when I was appointed, and so as is reflected, and
I am relying on my memory, Executive Order Number 11,
that I was not under the supervisory oversight of the
police commission at that time.

Q. Once the bankruptcy was completed, did the relationship
you and the Detroit Board of Police Commissioners
change?

A. At some point. I don't know how soon after -- the
relationship basically was that they were the
supervising or oversight entity as it's reflected in the
City Charter of the Detroit Police Department.

Q. You were appointed by then emergency manager, Kevin Orr,

1  on -- effective on July 1, 2013?

2  **A.  July 1, 2013, yes.**

3  Q.  Then the Exhibit 5A is another emergency manager City of

4  Detroit Order Number 42, which really just deals with

5  powers of the Board of Police Commissioners being

6  reinstated effective immediately, and this is dated

7  September 25, 2014.

8       On that date, through the Order Number 42, how

9  did your relationship change with the board, if at all?

10 **A.  The way I describe it, I don't think there was much**

11 **change.  The order was explicit as to the commission**

12 **being reinstated in their role, but even prior to the**

13 **reinstatement, the department was responsive to the**

14 **police commission, even though by an earlier order**

15 **before the reinstatement, I didn't have to but we did it**

16 **because we just felt it was the right thing to do.**

17 **EXHIBIT 6**

18 **Organizational Charts**

19 **WAS MARKED FOR IDENTIFICATION**

20 BY MR. DETTMER:

21 Q.  Exhibit 6 is a collection of organizational charts of

22 the Detroit Police Department that were provided to us

23 through discovery.  I wanted to ask you some general

24 questions about the organization and basically to

25 recognize the chain of command.  Right?

1       There is a chain of command in any police

2  department, and there is one, obviously, in Detroit;

3  correct?

4  **A.  Yes, it is.**

5  Q.  And you are, in effect, the chief executive officer as

6  the chief of police, correct?

7  **A.  That's correct.**

8  Q.  You have a number of assistant chiefs?

9  **A.  I do.**

10 Q.  And you have -- I'm not sure how many, maybe more than

11 one deputy chiefs?

12 **A.  Yes.  Several deputy chiefs.**

13 Q.  And then the next level of the chain of command would

14 involve commanders or captains, correct?

15 **A.  That's correct.**

16 Q.  Captains and commanders are basically equivalent

17 positions?  It's a matter of terminology, right?

18 **A.  They're not equivalent.  They're referred to as command**

19 **officers.  Commander outranks the Captain; the Captain**

20 **replaces the former rank of inspector.**

21 Q.  Thank you for that.

22      Then in the chain of command -- if I can just

23 briefly say this -- lieutenants and sergeants and then

24 police officers, that is right, in that sequence?

25 **A.  No.  The sequence in terms of chain of command starts**

1  out with police officers now in the current

2  organizational structure, corporals, neighborhood police

3  officers, detective, sergeant, and lieutenant.  And

4  within the rank of sergeant, there's a master sergeant

5  that has more rank or more authority than that of a

6  sergeant.

7  Q.  Of what level in the chain of command in the City of

8  Detroit is our supervisory responsibilities played?

9  **A.  What level in the department?**

10 Q.  Yes.  For example, do -- under the current chain of

11 command, are corporals supervisors?

12 **A.  They are not.  But depending on their role, they could**

13 **perform the role of field training officer, and as a**

14 **field training officer, they are responsible for**

15 **providing training to probationary police officers;**

16 **however, they would not be considered supervisors in the**

17 **rank structure.  But they are --**

18 Q.  I'm sorry.

19 **A.  And detectives are not supervisors, either.**

20 Q.  So the first level of supervision within the Detroit

21 Police Department is a sergeant, correct?

22 **A.  That's correct.**

23 Q.  And is that true back to 2010, January 1st, 2010, from

24 your general knowledge of the operation of the police

25 department?

1  **A.  As you know, I didn't start here until July of 2013.**

2  **But I would suppose, based on, as you reference, general**

3  **knowledge, that the sergeant would be the first line of**

4  **supervision.**

5  Q.  Okay.  Generally, the chain of command -- a sergeant

6  reports up the line to a lieutenant, correct?  And at

7  that point the communication is basically in that chain,

8  starting with you, going down to the assistant chiefs to

9  the deputy chiefs and down through the line, and

10 reporting back up is pretty much the same.

11      So if somebody -- if a police officer, for

12 example, makes a mistake, the sergeant is the person

13 that supervises that and deals with that initially,

14 correct?

15 **A.  Generally speaking, yes.**

16 Q.  If there is a problem, ongoing problem, he reports that

17 up the line to the lieutenant and the discipline

18 process, and the chain of command and communication

19 follows that up.

20      You don't always hear about what's going on at

21 the top of this chain of command, what a

22 sergeant's doing, unless it's a matter that comes up

23 through the chain, correct?

24 **A.  I do not always know.  However, to your point, you made**

25 **some reference into the relationship between sergeant**

1   and lieutenant. I believe there are times that the

2   lieutenant may not always know when a sergeant is

3   administering corrective action.

4           It could be counseling. Generally, if it's a

5   written counseling session, I believe the lieutenant

6   would be involved in that at some point through the

7   chain of command. But it's not so rigid, and I can't

8   speak to what occurred in 2010. I can talk about what

9   happens now.

10          There are times where a Captain or a commander

11  of the station may have direct contact with a police

12  officer relative to conduct, and it could be something

13  as simple as advising that police officer to wear a seat

14  belt when operating a motor vehicle, as an example.

15  Q.  In the -- you're familiar, obviously, with the different

16      units within the Detroit Police Department, correct?

17  A.  Yes.

18  Q.  You became the Chief of Police in the day-to-day

19      operation. You've learned quite a bit, I assume, about

20      the day-to-day operations about a lot of these different

21      units.

22  A.  Basically, yes.

23  Q.  If there's a Narcotics raid, there's usually a sergeant

24      that heads that up, correct?

25  A.  I would expect.



1   Q.  He has a crew?

2   A.  At what period of time are you talking about?

3   Q.  Let's go back. I mean -- you're looking -- at least the

4       scope of the current review goes back to 2010, although

5       I understand you're not back to 2010 yet.

6           But going back to prior to your -- the

7       effective date of the reorganization of the Narcotics

8       units in July 2014, you understood that the workings, I

9       assume, of the Narcotics Unit. And you understood that

10      there were sergeants and there were -- and they

11      supervised the police officers that worked under them

12      and their crew, right?

13  A.  That's correct.

14  Q.  And as far as you know, that goes back to 2010. You

15      don't have any information to the contrary?

16  A.  I suppose. I can't say. I mean, you bring up an

17      example of saying an execution of a search warrant, and

18      I can't tell you definitively if, on every execution of

19      the search warrant in 2010, if the sergeant was present.

20      I wouldn't know that.

21          In fact, I can't tell you even after my

22      appointment if that was a consistent practice. An

23      expectation, yes. But to say that I know in every

24      single execution of a search warrant a sergeant was

25      present, I can't make that statement.



1   Q.  Are you suggesting that your Detroit Police Department,

2       in its organizational structure, didn't have a

3       supervisor in a narcotics raid? That is the sergeant

4       that headed up the crew and oversaw its activities?

5   A.  That is the expectation, but I can't tell you on every

6       single search warrant execution that a supervisor was

7       present. The expectation is that a sergeant at minimum

8       should be.

9           Now, since we've opened up, which I am sure

10      you'll get into, the task force that we're now working

11      on, certainly the expectation is that a supervisor, a

12      lieutenant shall be present when a raid is initiated by

13      a Narcotics Unit. But I've also teetered on even the

14      rank of captain being present.

15          Right now, as it stands today, the direction

16      is that a lieutenant shall be present on every execution

17      of a Narcotics search warrant.

18  Q.  Chief, when did that policy become established?

19  A.  That was during this iteration of the investigative work

20      that we are currently involved in. As we began and

21      started --

22  Q.  Going back to August 7th, 2019, correct, when you first

23      started.

24  A.  When we started our task force operation -- I don't have

25      the date in front of me -- current task force.

1           During that inquiry, there were some things we

2       learned about how the Narcotics Unit functions, and one

3       thing that we learned is that, generally speaking,

4       sergeants would be present. That would be the highest

5       rank present at Narcotics search warrant executions, as

6       you refer to as raids.

7           I've mandated that the rank of lieutenant, a

8       lieutenant shall be present at all executions of search

9       warrants by Narcotics.

10  Q.  The purpose, if I may ask you, of having the lieutenant

11      present would be to elevate the level of supervision

12      because of the terms about sergeants and how they

13      operate?

14  A.  Yes. In terms of accountability, some things that we

15      have learned during this most recent task force that we

16      have, that we now just named Operation Clean Sweep.

17      What we have learned is that in some instances sergeants

18      may have been involved, directly involved, in the

19      alleged misconduct that we were investigating.

20          And the extent of their involvement could be

21      nothing more than being complicit and not taking

22      appropriate supervisory action when necessary.

23  Q.  Well, from what you say, prior to direct policy that

24      you've initiated, the policy was really one of inaction,

25      which is correctly in these raids that were undertaken

1  (Inaudible) affidavit, correct?

2          COURT REPORTER:  Can you repeat -- can you

3  repeat the question?

4          THE WITNESS:  I'm sorry; the affidavits were

5  not what?

6  BY MR. DETTMER:

7  Q.  The search warrant and affidavits initiated the raids --

8  do you want me to call it search warrant executions?

9  You know, when, previously, prior to what you just

10  described, the sergeants were generally the supervisors

11  on the scene of an execution and search warrant, right?

12  A.  Generally, it is my belief that they were.  And I'm

13  talking about from 2013 going forward.  I can't speak to

14  what was going on prior to that.

15  Q.  And it was your decision that, to reduce any possibility

16  or reduce the problems within the Narcotics Unit, you

17  were looking at having a greater level of supervision,

18  if I understand you correctly.  Is that right?

19  A.  A greater level of supervisor for purposes of managerial

20  oversight.  Lieutenants -- the rank of lieutenant is

21  considered a mid-manager underneath the rank of captain.

22  So at this point where we are in our probe, I feel

23  comfortable that a middle manager or a manager and

24  captain or commander rank should be present at search

25  warrant executions, primarily what we now call the Major

1  Violators section.

2          Again, those -- when we started an earlier --

3  and you've heard me reference in newspapers that the FBI

4  started a probe into the Detroit Police Department's

5  Narcotic section in 2010.  That investigation culminated

6  in 2014.

7          What didn't work out at the conclusion of the

8  FBI's work -- it wasn't a seamless transition of that

9  investigated -- that investigation into the Detroit

10  Police Department.

11          So, in other words, so I'm making myself

12  clear, there were a lot of things that we didn't know

13  that we now know because it was a federal investigation

14  that involved federal crimes.  And so they were the lead

15  agency investigating those crimes, and there was no

16  review of any administrative violations.

17          Now, administrative investigations at times

18  does and do involve criminal allegations; however, they

19  also address any administrative concerns that could

20  result in discipline leading up to termination.

21          So I hope I'm making myself clear, that at the

22  conclusion of the FBI's investigation in 2014, I, along

23  with select members of our executive team were brought

24  into the findings and that it would be several

25  individuals indicted and/or charged.

1          What we didn't get is information

2  concerning -- any allegations concerning administrative

3  violations.  Again, administrative violations could

4  result in not only discipline but dismissal.

5  Q.  I'll get into a little more detail about that further

6  into the deposition, if I may.

7          But you would acknowledge, prior to your

8  taking your current position in July of 2013 -- 5/1/2013

9  (sic), there was criminal activity by members of the

10  Narcotics Unit?

11  A.  I only know that because the Federal Bureau of

12  Investigation, I'm told, launched a probe into the

13  Detroit Police Department's Narcotics section in 2010.

14  That investigation was a four-year investigation.  It

15  culminated in 2014, I guess, roughly a year and a half

16  into my tenure.  Narcotics was not on the radar.

17          There were other issues concerning the

18  department relative to accountability.  It had to do

19  with the Federal Consent Decree that we were under.  But

20  nowhere under the Consent Decree was there any reference

21  or review of the operations of the Narcotics section.

22          Again, the FBI's probe was confidential, and

23  because it was confidential, I believe in 2010 most

24  likely the executive levels of this department did not

25  know that there was an FBI probe.

1  Q.  Well, you would agree, at some point, and I believe

2  Lieutenant Hansberry was indicted by a filing in federal

3  court on April 8th, 2015.

4          At that point there was some knowledge that

5  there was criminal activity, at least it was alleged at

6  that point in the Narcotics -- then Narcotics -- well, I

7  shouldn't say that -- Major Violators Unit, previously

8  the Narcotics Unit, Hansberry, correct?  That indictment

9  ended it?

10  A.  I was aware, as I've already testified to, that I was

11  made aware that the FBI was planning to indict and in

12  one instance charge members of the department's

13  Narcotics Unit.  That's when I became aware that there

14  was allegations of criminality not reflective of the

15  entire Narcotics Unit.

16          As I've already testified, I believe, as my

17  memory serves me, that two were indicted, one was

18  charged.  There was an additional member that committed

19  suicide, I was told, but more than likely would have

20  been indicted.  So you are talking about a total of

21  maybe four out of the entire Narcotics Unit.

22          Now if your question is, do I believe that

23  there were others involved in misconduct, I can only say

24  it's based on a belief and based on what I know today

25  and what I didn't know at the conclusion of the FBI's

1    investigation that I do believe that there were other
2    criminal and administrative violations occurring; not
3    necessarily reflective of every member of the Narcotics
4    Unit.
5    Q.   We're talking about -- actually, there were a number of
6         indictments at the same time.  Hansberry, who was then,
7         I believe, a lieutenant, but he had come out of the
8         Narcotics Unit as a sergeant, and Police Officer Watson,
9         who was in that same Hansberry crew, and Arthur
10        Leavells, and Officer Napier.  And Napier,
11        unfortunately, committed suicide in his family's side
12        drive, as you will recall, in January of 2018.
13             But I think I saw some, and I'll discuss this
14        with you later.  We need to get rolling here.  There
15        were some feelings that the Hansberry crew, which fell
16        into Geelhood's crew, members of those two crews,
17        originating with Hansberry, were involved in criminal
18        activity.  Is that fair to say?
19   A.   There was certainly speculation.  None of these other
20        members were charged, as you know.  Again, I'll repeat,
21        that at the conclusion of the FBI's investigation, the
22        focus was on the folks that were indicted and the one
23        that was charged.
24             The remaining members who were more than
25        likely being investigated by the FBI, they were never

1    charged.  However, it doesn't mean that those additional
2    members were not involved in some other kind of
3    misconduct, maybe some of what they were involved in
4    would be construed as criminal.  However, this attorney
5    did not charge them.  The problem --
6    Q.   Let me ask you this.
7    A.   I'm trying to finish a point.
8    Q.   Yes.
9    A.   The problem with the conclusion is it wasn't a seamless
10        transition from criminality to administrative work, and I am not faulting the FBI for
11        administrative work, and I am not faulting the FBI for
12        that because that's not what they do.
13             The Detroit Police Department investigates
14        misconduct.  And if misconduct is made aware, you
15        investigate and, again, as I have already testified to,
16        sometimes that misconduct amounts to discipline, which
17        could mean suspension days leading up to and including
18        dismissal.
19   Q.   Let me -- I was going to get into this later, but since
20        you are raising it.
21             During the trial of Hansberry and Watson,
22        Leavells testified, and a Source of Information, Gary
23        Jackson, testified.  And I would represent to you that
24        testimony was more inclusive of criminal conduct by
25        other members of Hansberry's crew.

1             And what I'm really getting to, was someone
2    assigned from the Detroit Police Department, whether
3    Internal Affairs or some investigative level, how the
4    events of that trial and evaluate the testimony and
5    consider Internal Affairs investigations of, for
6    example, Napier and others -- I guess, Napier's dead by
7    that time -- but by other members of that crew?
8         MR. SUROWIEC:  Objection; form, foundation,
9    compound question.
10        Go ahead.
11        THE WITNESS:  I can answer the question?
12        MR. SUROWIEC:  Yes, Chief.
13        THE WITNESS:  Factually there were two members
14   of the Detroit Police Department that were part of the
15   Public Corruption Task Force.  These two members -- I
16   can't think of the second member's name.  But Tim Ewald,
17   which I suggested to counsel, had intimacy for years
18   relative to the narcotics investigation that was
19   conducted by the FBI.
20             When I talk about the seamless transition,
21   where I felt it was a failure on the part of the
22   department, is that there was no handoff.  That these
23   are the folks that got charged federally, these are the
24   people that we have concerns with administratively, and
25   we should launch an investigation.

1             These two members of the department primarily
2    didn't do the heavy lifting, as you will, of
3    investigative work.  They were trusted members of the
4    FBI's investigative team, although they were part of the
5    Detroit Police Department.
6    BY MR. DETTMER:
7    Q.   I'm sorry.  If -- I don't mean to interrupt you.  But
8         Ewald and who was the other one?
9    A.   I can't think of the second name right now.  He has
10        since returned.  He is working in the City in IT.  It
11        will come to me, but right now Tim Ewald had been part
12        of the FBI's task force on public corruption, so he was
13        very intimate relative to what was going on with the
14        investigation, and I would imagine he would opine that
15        there were others that were not criminally charged but
16        certainly were engaged in acts of misconduct.
17   Q.   Well, in Leavells' testimony during the trial of
18        Hansberry, it was very clear that other members of
19        Hansberry's were clearly involved in criminal activity
20        and, either inside the court, a hearing, trial, or
21        review of transcripts would have clearly shown that.
22             To your knowledge that didn't happen, correct?
23   A.   There were no --
24        MR. SUROWIEC:  Objection, form, foundation to
25   the question.

1        Chief, I apologize.  Go ahead and answer, if

2    you can.

3        THE WITNESS:  Yes, I -- you know, as I've

4    already testified to, and I made the statement several

5    times, there certainly was no seamless transition at the

6    conclusion of the criminality -- criminal case to moving

7    into the administrative.

8        Again, there were a lot of things that I and

9    my executive team were unaware of.  We knew that there

10   was some problems, and in terms of -- there were other

11   members of Narcotics that may have been involved in

12   criminal activity, however, they weren't charged

13   criminally.

14   BY MR. DETTMER:

15   Q.   Let me ask you -- let me ask you it this way.  Did Ewald

16        prepare any memoranda or writing, that you're aware of,

17        that described the testimony of Leavells at the trial?

18   A.   I am not aware of that memo.

19   Q.   Did any -- are you aware of whether the Detroit Police

20        Department acquired the transcripts of Leavells and Gary

21        Jackson, the SOI?

22   A.   I am not aware of it.

23   Q.   Are you aware of any memoranda or writing that Ewald

24        prepared describing the testimony and the indication of

25        other individuals involved in any criminal activity?



1    A.   I cannot recall any memorandum prepared by Tim Ewald.

2         My -- I have had conversations.  Tim Ewald was very

3         different from the Hansberry case that concluded in 2014

4         to where we are today, without going into details

5         because it's a confidential part of the investigative

6         work that we are doing.

7         We have very specific information that we got

8    from a source.  It was very descriptive of the type of

9    alleged conduct that was going on.  Based on that

10   information and the case that was later brought by the

11   one who was recently charged or indicted, Mosley, we now

12   had a clear picture of what was going on allegedly in

13   the Narcotics Unit.

14   And that is why, based on information that we

15   got from a source, through the FBI, and I can't go into

16   that because it's still very much part of the

17   investigation, we have created a task force operation.

18   And that task force operation has been very surgical,

19   very thorough in looking at everything.

20   As I had testified to earlier, that operation

21   is called Operation Clean Sweep, and so as we have gone

22   on, based on the information that we got from the

23   source, we are getting a lot of information now.  And so

24   information that we did not have at the conclusion of

25   Hansberry.



1        MR. SUROWIEC:  Can we have a time frame,

2    Chief, from when that happened?

3        THE WITNESS:  It would be --

4        MR. DETTMER:  Let me ask you this way.  Let me

5    ask you this way.

6    BY MR. DETTMER:

7    Q.   The raid on the three locations where there were

8         Narcotic Unit's records was on August 22, 2019.  How

9         long prior to that when what is now called Clean Sweep

10        originate and the investigation undertaken?

11   A.   When we raided our own Narcotics Unit, seized all of its

12        records, it was strategically done, based on we knew

13        that former Officer Mosley was going to face charges.

14        So I made a decision based on Mosley being

15        charged and fearful that, if we didn't act by seizing

16        all of our records, that the records could be destroyed.

17        That was one issue.

18        The second issue, I believe that, based on the

19        allegation against Officer Mosley, that that was not his

20        first time engaging in this kind of criminal misconduct.

21        So based on those two factors and the third

22        factor, ironically around the same time period there was

23        a source who provided information about what was going

24        on in Narcotics as to some of the alleged misconduct.

25        Those three things put me in a good position

1    to, one, go in, seize all of our records, and it was

2    from that point that we started a task force.  We didn't

3    have a name for it.  We started off relatively small.

4    At the present time we have 17 members.  We

5    also -- it's a DPD-led task force.  Of the 17 members,

6    5 are the FBI, 3 are part-time, and 2 FBI full-time.

7    Q.   Let me ask you about that, Director Graveline filing

8         a declaration filed with federal court on May 19 of this

9         year.

10        One of the things he's talking about is the

11        sequence of investigation starting most currently and

12        going back historically.  And he raised this question

13        about the concern about the Statute of Limitations.  I'm

14        wondering what you perceive, in any meetings or

15        discussions about this, that the longest Statute of

16        Limitations that may apply as potential criminal conduct

17        by members of the nar- -- the Major Violators or the

18        Narcotics Units.  What do you think?  Three years?  Six

19        years?

20        MR. SUROWIEC:  Objection to form.

21        Chief, one second.

22        Objection; form, foundation.  That's a

23   multiparted question.  I'm not sure what the question

24   is, it's somewhat loaded.

25        If you can answer it, Chief, go ahead.

1      THE WITNESS:  I think I can.  I'll try my
2  best.
3      So there are two things at work here.  One,
4  the criminal statute probably, as was articulated by
5  Chris Graveline, would probably be out.  However, since
6  my tenure I've also initiated what I call a Statute of
7  Limitations for administrative misconduct.
8      So how that works is that, once the department
9  becomes aware of misconduct from any source, it could be
10  from a civil lawsuit like this.  If we become aware of
11  allegations of misconduct, the clock starts.  We have
12  one year from the time we're made aware to complete and
13  adjudicate that allegation.  So that's the
14  administrative statute.
15      Now, you should note that this has not been
16  something that has been agreed to by both the department
17  and the unions.  It's, for the most part, a handshake.
18      At some point in the near future, we will
19  codify and we will develop a memorandum of understanding
20  to solidify the administrative Statute of Limitations.
21  And the reason why that came about, one of the things
22  that was problematic in the Detroit Police Department
23  for years, I was told, is that a lot of cases that were
24  being brought to the arbitrator, and those
25  administrative matters were being dismissed.  And the



1  reasons for the dismissals were because of the lack of
2  timeliness.
3      So based on the lack of timeliness, I felt it
4  was important for both the community and the concerned
5  accused officer that there would be a timely
6  adjudication to all allegations of misconduct.
7  BY MR. DETTMER:
8  Q.  I'm --
9  A.  I am --
10  Q.  Go ahead.
11  A.  So in terms of the criminal statutes relative to some of
12      the officers that were never investigated criminally or
13      were investigated criminally -- and I can't testify as
14      to why, let's say, the FBI did not opt to pursue
15      charges.  Maybe it was a US Attorney said we don't think
16      that there's enough to charge them with whatever the
17      criminal charge was.  I don't know.
18  Q.  The point --
19  A.  However --
20  Q.  The point I'm making, there must be some criminal
21      statutes that are under consideration by the task force,
22      and the question is, do you know what periods of time
23      we're talking?
24  A.  Since we are working with both Federal Bureau of
25      Investigation, US Attorney's Office, anything that we



1  find criminally, if it meets the US Attorney standard --
2      certainly, this task force is a dual task force.  It's
3      addressing allegations of criminality and it's also
4      addressing administration violations.  So it's a twofold
5      task force.
6      FBI certainly is interested in the work.  This
7      is why they had dedicated staff to Operation Clean
8      Sweep.  The belief is there may be some allegations that
9      can be brought forth criminally, even though some of
10      them are dated.  I don't know what the statute of
11      limitation, like, for example, color of law, or whatever
12      that -- there may be some of those.  I don't know if
13      statute of those goes much longer, as Attorney Graveline
14      may have articulated.  When we seized our records, we
15      are going back ten years.  And so right now where we are
16      in this probe, we have gone back to the year of 2017.
17      So we haven't quite gone back ten years.
18  Q.  Yes.  I am aware of that and in some of the articles
19      that we will introduce as we get going, you've made that
20      clear.
21      The point that I am making with you is if I
22      were sitting at the table with the task force as a
23      member, I would say we need to start looking at
24      documents that are relevant to the Statute of
25      Limitations period expiring.

1      For example, if we have a six-year statute, we
2      should be looking at 2014 and start our investigation in
3      2014 and come forward to the current time.  I don't
4      understand it starting in 2020 or '19 and going
5      backward, because the Statute of Limitations is a key
6      element here.  It sounds like a major mistake on the
7      part of whoever is heading this task force not to
8      analyze that as a key issue.
9  A.  I rely strongly on my legal advisers.  There was a
10      method.  You're not a part of the task force, and it's
11      okay to criticize me.  But what I feel good about is
12      finally for the first time -- it may be the books will
13      say -- and the first time we have an opportunity to
14      totally eradicate criminal misconduct from the Narcotics
15      department.
16  Q.  This is an administrative issue you are talking about?
17  A.  Administrative and criminal.  It's no doubt to me.  I
18      can speculate that there are probably many allegations
19      of criminality that have gone untouched for whatever
20      reason.
21      I've talked to members in this organization as
22      recent as a couple of days ago.  And during that meeting
23      with my command staff, I gave a brief update on the task
24      force's work.  In my brief remarks, I indicated that it
25      is our mission and goal to totally for the first time

1    eradicate misconduct from the Narcotics Unit.

2  Q.  I support that, Chief.  But --

3  A.  But, so, like I said, to many of you who have been on

4    the department for in excess of, let's say, 10, 15,

5    20 years, you've heard the stories -- I wasn't here

6    then -- that there was a strong belief that there were

7    members in the Narcotics Unit engaging in misconduct.

8  Q.  Well, would you agree with the point I made a few

9    minutes ago, that really the investigation should have

10   started more timely with the expiration of the Statute

11   of Limitations?  Would you agree to that?

12 A.  I'm not going to agree for this one reason.  I

13   understand where you're going.  Let me tell you why we

14   started where we started.

15          Initially, we didn't know what we were dealing

16   with.  As I pointed out, there were a couple of things

17   in play.  We had another dirty officer that got

18   charged -- Officer Mosley, who got charged and I had a

19   strong belief that Officer Mosley was involved in other

20   criminal misconduct.  I believed it.

21          So part of the reason for this surgical look,

22   it was to go back and look at Mosley, look at the

23   team -- he was a team leader.  And we wanted to know if

24   the involvement even was beyond him.  So we started

25   there because we knew that that was timely.

1          No doubt in my mind that there are going to be

2    cases that as we continue this task force that are not

3    going to meet the criminal statute.

4          However, we've been in consultation with the

5    US Attorney's Office, the FBI, certainly, if there's

6    color of law violations -- as another part that I didn't

7    get into, we have also been meeting regularly with Wayne

8    County Prosecutor's office, primarily the Innocence

9    Project, and we are also looking at -- I'm going

10   to pause for just a minute.  The mayor is calling me

11   so...

12          MR. DETTMER:  We are pausing at 12:05; is that

13   correct?

14          THE WITNESS:  Yes, if we could just pause and

15   I'll be short.

16          (Off the record at 12:02

17          Back on at 12:05 p.m.)

18          EXHIBIT 7

19          Detroit News Article

20          WAS MARKED FOR IDENTIFICATION

21 BY MR. DETTMER:

22 Q.  I'd like to go through articles, and starting with 7.

23   Exhibit 7, and it goes to 7D, and these are basically

24   the comments that you made to newspapers, and I just

25   want to confirm that what you said to the newspapers is

1    properly reported.

2          Secondly, your discussion so far indicates,

3    you know, substantially the same thing.  But first of

4    all, Exhibit 7...

5          MR. SUROWIEC:  Dennis, can I interrupt real

6    quick?  We, honestly, didn't get Exhibits 1 through 10.

7    We did forward the ones we got last night to the Chief,

8    but could Michael put this up on the screen?

9          MR. DETTMER:  Yes, he can put it up.

10   Michael?

11 BY MR. DETTMER:

12 Q.  This is an article from the -- August 22, 2019 --

13   the Detroit News, and we marked it as your Deposition

14   Exhibit 7.

15          And it starts off, a team of Detroit

16   investigators seized records of computer data from three

17   of the department's own facilities Thursday, as part of

18   an ongoing internal probe into the allegations of

19   corruption into the department's drug operations, Chief

20   James Craig said.

21          Is that a fair statement?  Is that accurate?

22 A.  It is.

23 Q.  And then it goes on:  The investigation, the latest in a

24   series of probes in the former Narcotics section, which

25   were closed in 2014 because of rampant corruption,

1    kicked off about four months ago after a large shipment

2    of drugs had been seized in Detroit was switched for

3    another substance by the time it got to Chicago for a

4    court hearing, Craig said.  Is that accurate?  The

5    statement, just generally?

6  A.  Yes, that was an investigation -- we got information

7    that -- from the DEA and FBI about an allegation which I

8    can tell you didn't come to fruition.

9  Q.  It did not?

10 A.  Did not.  However, without going into detail, because it

11   directly concerns what we are doing now, it was

12   beneficial in the investigative work we're doing now.

13   I'll just leave it there.

14 Q.  Let me ask you this.  In terms of the switch out of the

15   drugs on the -- from Detroit to Chicago, was the

16   Narcotics Unit involved in any way in --

17 A.  There was no indication that what came to us occurred.

18   It would have been -- it could have been our Narcotics

19   Unit.  It could have been -- I mean, allegedly it could

20   have been Narcotics.  It could have been the place where

21   the narcotics were being held.

22          Again, it was an allegation only, but in terms

23   of the work that we were proceeding with, and, again, I

24   cannot and will not go into details, but it helped us

25   with the work that we are doing even though that issue



1    was unfounded.

2  Q.  Chief, let me ask you this, then.

3        Was that acquisition of those drugs --

4  A.  Can you hold one second?  The gentleman -- I've got a

5      gentleman in my office that -- the other name -- he just

6      happens to be in the office.

7             (Chief having a discussion

8              off the record.)

9        THE WITNESS:  Saraino.  His name is Saraino.

10 BY MR. DETTMER:

11 Q.  Ewald's partner, in effect?

12 A.  Yes, that's correct.

13 Q.  Do you know how to spell that?

14        THE WITNESS:  How is Saraino's name spelled?

15      Saraino, S A R A I N O.  That's his last name.

16        First name?

17 BY MR. DETTMER:

18 Q.  S, as in "Sam," right?

19 A.  Yes, first name, Michael.

20 Q.  Thank you.

21        THE WITNESS:  You're not in trouble, Mike.

22      Okay.  Anyway.

23 BY MR. DETTMER:

24 Q.  Well, what I am asking you, did the Major Violator's

25      Unit exercise a search warrant and acquire those drugs?

1  A.  I don't recall the circumstances involved in the drugs,

2      but based on the DEA, FBI, it was unfounded and so -- in

3      fact, I know the DEA was doing an investigation relative

4      to the DEA's role, and I just don't know the outcome of

5      their role.

6  Q.  All right.  The next page of this article, I saw, Craig

7      said, he initiated the seizure of records and computer

8      files because of concerns about, and they quote, "a

9      residual effect of corruption", and he said has long

10     been part of Narcotics operation, which the chief

11     renamed the Major Violators section five years ago.

12        Is that a proper quote of a residual effect?

13 A.  I could say yes.  I think it was residual.  A lot of it

14     was speculative on my part.  But I made the statement

15     and, again, there were things I didn't -- as I have

16     already testified to in this session, there were things

17     I didn't know about the Hansberry matter, that as we

18     launched this probe, there is a direct nexus to it.

19 Q.  We will get into that in more detail, but...

20 A.  I'm not going to get into a lot of detail because, as I

21     indicated, I am in the middle of a corruption probe, and

22     some of what we are doing is very confidential.

23 Q.  Well, we are under a Protective Order in this

24     proceeding.  And I think the assertion of a privilege

25     we'll deal with, might require a motion and a court

1  appearance and maybe more testimony from you.  But right

2  now I want to go through this quickly.

3        Then you go on in the next paragraph, or the

4  article goes on, part of the corruption Craig referred

5  to involved former drug cops Hansberry, Watson, and

6  Leavells, who were convicted in federal court of

7  offenses that include ripping off drug dealers and

8  stealing and buying drugs that had been seized.

9        Basically, you acknowledge that in your

10 testimony so far today, correct?

11 A.  That's correct.

12 Q.  And then at the very bottom of the second page in 

13     Exhibit 7, it says, he, referring to you, said

14     allegations made against Hansberry, Watson, and other

15     cops, the federal lawsuit also played a part in the

16     ongoing investigation which is the latest in a string of

17     probes into the department's narcotics operation.

18        Is that a fair statement --

19 A.  Yes.

20 Q.  -- that represented that?

21 A.  Yes.

22 Q.  And -- well, I'll come back to that.  But I'm wondering

23     why Hansberry and Watson, you know, are the -- well,

24     seeming to leading into this.  Why did that -- the

25     allegations made against them play a role in the ongoing

1  investigation? 

2  A.  Because as we are doing the work that we're doing now,

3      we're finding certain patterns that have continued, that

4      preexisted the FBI's investigation.  We believe that

5      continued even after their indictment.

6  Q.  Going on to the next page of Exhibit 7, page 3.  It

7      states at the very top, Craig disbanded the drug unit in

8      July 2014 because what he said was systemic problems

9      uncovered during the Internal Affairs investigation that

10     includes how drugs and evidence were handled.

11        "Systemic problems," by that do you mean

12     there's an activity according to a fixed plan, a

13     methodical operation within the drug unit?

14 A.  I think it probably would have been better articulated

15     as trying to build in enhanced accountability.  Did I

16     believe that there were other problems inside of the

17     drug unit that we couldn't identify?

18        But one thing that was missing from the

19     conclusion of that investigation and where we are now,

20     we didn't have anyone inside giving us information as to

21     some of the alleged conduct.  However, basically

22     disbanding the Narcotics section and renaming it to

23     Major Violators was done to incorporate some best

24     practices that would tend to build in more

25     accountability.

1  One thing that I recall, and it didn't really
2  work as well as I thought, was to put a time limit of
3  how long officers assigned to Narcotics would work. So
4  what some did to do a workaround on the rule -- it was
5  like a five-year rule; that if you worked Narcotics for
6  five years, you had to leave. That's a best practice.
7  And what ultimately happened, investigators
8  would be moved out of Narcotics, not that anybody was
9  accused of any wrongdoing. It was just a best practice.
10  They were moved out, more cases than not, into
11  precinct-level Special Op Units to do the drug
12  investigations and some -- and I don't know the
13  number -- some ended up returning to the drug unit. So
14  there was an interruption in their time. So...
15  Q.  I will get to that issue. I have an exhibit, the
16  administrative message making -- effective July 14th,
17  2014, the formation of Major Violators, and I'll get to
18  that.
19  EXHIBIT 7A
20  Detroit News Report
21  WAS MARKED FOR IDENTIFICATION
22  BY MR. DETTMER:
23  Q.  But I'd like to go on, and there's a December 11th,
24  2019, Exhibit 7A of a Detroit News report and it's
25  titled Detroit Police Probe Yields Allegations of

1  Widespread Corruption on Drug Unit.
2  Would you agree with the lead-in to this
3  article?
4  MR. SUROWIEC:  Object to form, foundation.
5  Go ahead, Chief, and answer the question.
6  THE WITNESS:  Are you talking about the title
7  of the article?
8  BY MR. DETTMER:
9  Q.  Yes. Right. Do you see it there?
10  A.  Yes, I'd say there was widespread, given what we were
11  starting to uncover. But I want to pause for a moment
12  and make it abundantly clear that it didn't mean that
13  everybody working the drug unit was involved in
14  criminality.
15  Q.  In the first paragraph, the indication -- if I just read
16  it into the record. Four months after Detroit Police
17  and Internal Affairs officers raided their own
18  department Narcotics Unit, investigators have uncovered
19  alleged corruption that includes drug cops planting
20  evidence, lying to prosecutors in search warrants,
21  robbing dope dealers, and embezzling funds, Police
22  Commission said.
23  You don't disagree with that, I assume?
24  A.  I don't disagree that those were allegations that we
25  were looking at. I'm putting emphasis on

1  "allegations"."  We haven't really --
2  Q.  It goes on, since -- the next paragraph.
3  Since the August 22nd raid in which dozens of
4  files and computers were seized and analyzed, Chief
5  James Craig has reassigned everyone in the unit with
6  five or more years' experience, correct?
7  Is that a correct statement?
8  A.  That is.
9  Q.  Then you go on, I am extremely concerned there may be a
10  pattern of practice of criminal misconduct in the
11  Narcotics Unit. Sadly, as we continue our probe, we
12  think it's going to grow in terms of magnitude.
13  Is that a correct quote from you?
14  A.  That's correct.
15  Q.  And then down lower on the first page, after Director
16  Graveline's picture. It goes on: Craig said, he
17  enlisted FBI, Michigan State Police, US Attorney's
18  Office after materials seized in the raid, he enlisted
19  help -- I'm sorry -- revealed more problems than
20  anticipated. Is that correct? Or were they involved
21  prior to?
22  A.  No, I think the FBI came. We initiated the probe, and
23  the FBI made a commitment. They gave us two
24  permanent -- and as I indicated earlier, there were
25  three part-time and I think one of the FBI was also part

1  of the Public Corruption Task Force who is a Michigan
2  State Police. I'm not certain if he's still involved in
3  that, but he was at the time.
4  Q.  You go on after -- by adding people. Now we are on to
5  17. And you recorded this saying, this is a major
6  corruption investigation, but I want to caution that
7  these are just allegations at this point. That's what
8  you've said a number of times, correct?
9  A.  That's correct.
10  Q.  On the second page of Exhibit 7A, in the first full
11  paragraph, it says, one of the investigation's
12  findings -- and I want to skip down -- the second bullet
13  point, false affidavits alleging were presented to --
14  allegedly were presented to prosecutor to get search
15  warrants.
16  And you are then quoted, it's alleged that the
17  probable cause allegedly the warrants was fabricated.
18  Surveillance that was supposedly conducted to get the
19  warrants wasn't done. Is that correct? Is that proper?
20  A.  That's correct.
21  Q.  And you indicated there were identified eight instances
22  where this may have occurred, correct?
23  A.  At that time, yes.
24  Q.  And in the next -- the next bullet point, drug suspects
25  were designated as confidential informants without

1   permission.  Only a prosecutor either from the Wayne
2   County Prosecutor's Office or the US Attorney's Office
3   can authorize a member of the department to turn a
4   suspect in to an informant.  You said that, correct?
5   A.   I did.
6   Q.   And then it goes on, based on our investigation so far,
7        we found 11 instances where officers improperly made
8        suspects into informants.  Based on our investigation so
9        far we -- I'm sorry -- we found 11 of these.
10            Now, let me ask you, how is it recorded that a
11       confidential informant really should be a Source of
12       Information, right -- or Confidential Informant has been
13       authorized by either US Attorney's Office or the Wayne
14       County Prosecutor's Office to act as an informant.
15            How is that done?  What is the trail?
16  A.   I can't tell you what the paperwork is.  But simply put,
17       if an arrest is made, narcotics are seized, then the
18       police officer cannot unilaterally release that person.
19       You're going to work this case off, and you'll work it
20       off.  We're not going to take you into custody, but
21       you'll work it off giving us additional information.
22            Only a prosecutor -- the point is, only a
23       prosecutor can make that decision to say, okay, you've
24       got this person with large amounts of, let's say,
25       cocaine, and we think the information that he or she has



1   is invaluable in getting someone, say, higher up.
2        In the drug trade, that prosecutor could make
3   that decision, not a police officer.  I can't make that
4   decision as a police chief.  I certainly -- it can be
5   recommended -- a recommendation that we pursue as -- a
6   word that they use in Narcotics, it's called flipping a
7   source, who they got drugs on.  We found -- as it was
8   indicated, we found that that happened a number of
9   times, and that is improper.
10  Q.   Now, going on the second page in A, down a little bit,
11       you indicate, we're also looking very closely at the
12       supervisors and managers in the Major Violators section.
13       What did they know and what did they do about it?  The
14       investigation is looking very closely at the management
15       that oversaw Narcotics.
16            And so you were very concerned that the
17       Narcotic Units were not being properly supervised,
18       correct?
19  A.   That's correct.
20  Q.   And have you found anything where it's been established
21       that there was a deficiency in supervision?
22  A.   As we continued our probe, based on the alleged conduct
23       or misconduct that supervisors either knew or didn't
24       know but should have known -- I guess that's the best
25       way to describe it -- that is something that we're still



1   probing.
2   Q.   On the last page, Exhibit 7A.  You attribute -- I'll
3        read it.
4            You attribute the problem "basic greed", and I
5        assume your basic greed of officers and supervisors in
6        the Narcotics Unit, and including, obviously, the Major
7        Violators Unit, correct?
8   A.   That's correct.
9   Q.   7B, this is a newspaper article in Detroit News,
10       December 12th, 2019.  And you're quoted a number of
11       times and I --
12            MR. DETTMER:  Michael, can you bring that up?
13  BY MR. DETTMER:
14  Q.   Start off, selling drugs in any city is dangerous as
15       dealers risk being killed or robbed by rivals, but in
16       Detroit, pushers for years also have known they could be
17       ripped off by cops, Police Chief James Craig said.
18            Is that accurate?
19  A.   Yes, if I would have -- if I said it that way.  But I
20       guess that's the essence of it -- yes, I don't know if I
21       would have said it just like that.
22  Q.   That's the point you want to make?
23  A.   Yes, but I might have said it differently.
24  Q.   Then it goes on, the next paragraph, the culture here
25       has been such that drug traffickers figure that it was

1   just one of the costs of doing business.  They knew I
2   could get killed, robbed by my competition or robbed by
3   cops.  It's not like that in other cities that I have
4   worked.
5        Is that a proper quote from you?
6   A.   That's correct.
7   Q.   You go on on the next page, again, that -- the
8        investigation that's underway, has uncovered a pattern
9        and practice of alleged corruption.  Is that fair to
10       say, in the drug unit?
11  A.   That's correct.
12            And, again, I want to put emphasis on that
13       does not mean that every single member assigned to Major
14       Violators was engaged in this pattern and practice.
15  Q.   I understand.  You've made that point a number of times
16       in the articles being quoted.  And I understand that.
17       I'm not suggesting that every officer that is or was
18       ever in the Narcotics Unit or Major Violators are
19       criminals, but there are some.  That's clearly, I think,
20       the point, correct?
21  A.   That's correct.
22  Q.   You were quoted a number of other times.  Do you want to
23       take a quick look through this?  I don't know if you can
24       see it clearly.
25  A.   Is there anything specific that you want me to see?

1  Q.  For example, on the second page, those who are

2      trafficking in large amounts of drugs got passes based

3      on the decision of a police officer.  They are not going

4      to come back knocking on my door, saying, Chief, we want

5      to make a complaint.

6  A.  That's correct.

7  Q.  That was the problem, right?

8  A.  In essence.

9          I'm not saying with every arrest, but we have

10     seen that what -- you know, what drug dealer who's

11     getting a pass is going to come in and make a complaint.

12 Q.  I understand that.

13         7C is an article titled Detroit Police

14     Officials Revamp Internal Affairs Probe Procedures.

15     This is dated April 27th, 2019, and it's a Detroit News

16     article.

17         Now, the Internal Affairs has what

18     responsibility?

19 A.  To investigate both administrative and criminal

20     misconduct.

21 Q.  And it's a check, in a way.  It has some supervisory

22     responsibility, correct?

23         Well, let me ask you it a different way.  Does

24     it play some role in supervising the police officers?

25 A.  It can play a role in establishing policy, but the probe



---

1      is separate from IA.  It was birthed out of --

2  Q.  Well, earlier in your testimony today, you indicated

3      that one of the things you changed was the Internal

4      Affairs.  Can you put a time period on investigations

5      from inception to conclusion of one year?  And you

6      indicated some --

7  A.  That was involving -- that was involving allegations of

8      misconduct, and that change had nothing to do with this

9      probe.  That was overall --

10 Q.  Internal Affairs' probes can turn up criminal conduct,

11     correct?

12 A.  That's correct.

13 Q.  So if these things languished and then were not being,

14     if you will, aggressively addressed and putting a cap on

15     the time period made it more efficient, I assume, and

16     more analytical and more factual based, you know, you

17     can't -- four years after the fact, getting the facts

18     established is hard, agreed?  The purpose of --

19         MR. SUROWIEC:  Object to the form and

20     foundation of the question.

21 BY MR. DETTMER:

22 Q.  The purpose of this was to really elevate, in some ways,

23     the effectiveness of the supervision, correct?

24 A.  I don't like your question.

25         I mean, I don't mean to be smug, or...



---

1  Q.  No.  No, that's okay.

2  A.  It's just that it was done, as I had testified already,

3      to address the lack of timeliness of investigations,

4      and, twofold, to address an accused officer.  They

5      deserve to have a timely resolution to their

6      allegations.  And also to the community that expects

7      that when they initiate allegations of misconduct, that

8      matter is addressed not four or five years later.

9  Q.  Internal Affairs is a process in the discipline of

10     police officers, correct?  In all levels of police

11     officers?

12 A.  That is one -- Internal Affairs is one part.  They

13     execute, initiate -- strike initiate.

14         But they execute the investigative work of

15     serious allegations of misconduct which in some

16     instances includes criminal misconduct.

17 Q.  And it's significant in the process of keeping track of

18     what is occurring within the police department?  If it's

19     not running efficiently, you're not staying on top of

20     the supervision that's needed?

21 A.  Well, there are other -- I disagree with the question.

22         We have audit functions inside the police

23     department that monitor compliance with rules and

24     directives.  Internal Affairs investigates allegations

25     of misconduct.

---

1  Q.  The practice is that it be done timely.  That's a

2      supervision issue?

3  A.  That's specific to allegations that come forth and,

4      again, as I've already testified to, because there was

5      no timely resolution and many of the cases going before

6      arbitrators that were appealed were being dismissed

7      because of the lack of timeliness.

8          So I felt strongly that Internal Affairs in

9      the department could be more efficient in responding to

10     the completion of internal investigations.

11 Q.  I'd like to go on to 7E now.  And it's an article dated

12     February 11th, of this year, 2020.  And it's titled

13     Craig Defense Inhouse Probe of Police Narcotics Unit.

14         And in the second paragraph you are quoted, do

15     you see that?  It is not -- I don't know if our -- can

16     you read that?

17 A.  Frankly, we are best poised to do this investigation.

18 Q.  Yes.  You can read it to yourself.  Is that an

19     accurate --

20 A.  Yes.

21 Q.  -- recital of your statement?

22 A.  Yes.

23 Q.  And then down below the pictures, the second paragraph,

24     that starts, "Craig said", could you read that?

25 A.  Yes.  It cuts off at a point because of the --

1        MR. DETTMER:  Can you roll that up, Michael?

2        THE WITNESS:  A little bit.  Roll it up.  Not

3    that way, the other way.  Stop there.

4  BY MR. DETTMER:

5  Q.  Is that a correct recitation?

6  A.  That's correct.

7  Q.  The second page, the paragraph that starts the second

8    page, the probe, Craig said, see that?

9        MR. DETTMER:  Pick it up a little, Michael.  A

10    little more.

11        THE WITNESS:  I see it right there.

12  BY MR. DETTMER:

13  Q.  Is that accurate?

14  A.  That's correct.

15  Q.  And then the next paragraph, is that accurate?

16  A.  Meaning if there's a pattern of conduct?

17  Q.  Yes, that's the one.  Is that an accurate recitation?

18  A.  I've already testified to this very same thing not even

19    two minutes ago.

20  Q.  And then going on, you again indicate that the probe was

21    going back to 2010.  That was something that you said a

22    number of times.

23        EXHIBIT 8

24        Police Commissioner Meeting

25        WAS MARKED FOR IDENTIFICATION

1  BY MR. DETTMER:

2  Q.  Go on to Exhibit 8.

3        This is a July 17, 2014, meeting of the

4    Detroit Board of Police Commissioners which occurred on

5    Thursday, July 7th, 2014.

6        I have 2, 3, pages -- actually, a couple of

7    pages identifying who was there and the date again.  But

8    going to page 37, you are discussing, and there's a

9    report in detail by Hanson no less, of what's said at

10    the meeting, correct?

11        And this report starting at line 12 on page 37

12    addressing -- I'm sorry, on line 15, a discussion about

13    the revamping of the Narcotics Unit, the Major

14    Violators.

15        Do you recall that discussion?

16  A.  Not offhand.  That was 2014.  I've been to many --

17  Q.  Basically, though, you described the revamping of the

18    Narcotics Unit into the Major Violators?

19  A.  I'm sure I've had a number of conversations with the

20    Police Commission relative to the Narcotics Unit, and

21    I'm sure I would have briefed them on changes being

22    made.

23  Q.  There's a question about the length of time an officer

24    can be a member of the Narcotics Unit, if you will.  And

25    on page 39 you say:  "I appreciate you bringing that up"

1    and you're referring to Commissioner Crawford's question

2    about finding a rotation in Narcotics.

3        You go on:  I was adhering or adopting, but I

4    know that best practices and police departments that

5    have come under such judgments, they have put limited

6    duration on the tours of duty, high-risk assignments,

7    such as Narcotics, Vice, Gang Units.  And the reason for

8    that is because those assignments have had lengthy tours

9    of duties is a greater likelihood of corruption.

10        You knew that and made that point to the

11    commission, correct?

12  A.  I did.

13  Q.  And you go on, starting at line 19 on a page 39, in

14    Detroit, what we've done in adhering to the best

15    practices, is that the tour of duty in those

16    assignments, Vice, Gangs, Narcotics, would be three

17    years, and the termination of the three-year assignment,

18    the concerned employee could request a one-year

19    extension.

20        Did you enforce that policy consistently?

21  A.  I delegated enforcement down to assistant chief and

22    Deputy Chief Leavell and it candidly wasn't enforced in

23    the manner in which it was articulated.

24        I can say I felt there was some resistance,

25    even though not voiced, because it's always been the way

1    things were done in this department.

2        So if they move someone out, the person still

3    worked -- I have since learned -- worked in Narcotics

4    and sat at the precinct level.  And then at some point

5    they were brought back.  I'm not always aware who

6    left -- I mean, now it's different.  We certainly have a

7    more rigor attacks.

8        The argument that those who have been in the

9    organization was that they felt lengthy experience was

10    important.  Instead of this three-year and a one-year

11    extension, if necessary.  It wasn't really well

12    received, at least that was my sense.  Certainly now,

13    there's no pushback.

14  Q.  Well, are you applying a three-year plus one possible,

15    max of four years?

16  A.  If my memory --

17  Q.  Is that being enforced?

18  A.  If my -- well, since the start of our probe, we moved

19    anybody with five years or more out.  So, yes, it has

20    been.

21        So based on what I know now, there's nobody

22    that has excess of five years, at least to my knowledge.

23  Q.  But until the probe started, 2019, there were people

24    that maybe as much as five or more years in --

25  A.  Right, there were still some people --

1    Q.   -- Major Violators and Narcotics, right?

2    A.   That's correct.  So we have --

3    Q.   So the supervision wasn't adhering to the policy you

4         instituted --

5                   (Indiscernible, multiple

6                    speakers at the same time)?

7                   THE WITNESS:  I'm wondering, are you going to

8         let me answer the question or are you going to talk,

9         because I can't get a response out.  I would like to get

10        a response out, if that's okay.

11                  MR. DETTMER:  I want you to respond.

12                  THE WITNESS:  Okay.

13                  So the answer is yes, we found instances where

14        it wasn't adhered to.  As I testified to earlier, that

15        in some instances they were moved out and then brought

16        back.

17                  In other words, the clock stopped and it was

18        restarted.  So if you are out of Narcotics, say, for a

19        couple of months and you were brought back, the clock is

20        starting all over again.  That was a way to get around

21        an unpopular decision.

22   BY MR. DETTMER:

23   Q.   Well, you, as the chief of police, as CEO of the Detroit

24        Police Department, had the final say on policy, correct?

25        And you expect your officers, including all of your

1         command officers, to follow policy that you oversee and

2         instituted, correct?

3    A.   That's correct.

4    Q.   And the failure to do so is a failure of vision but at

5         different levels, correct?

6    A.   You can say that, yes.

7                   EXHIBIT 9

8                   Administrative Message

9                   WAS MARKED FOR IDENTIFICATION

10   BY MR. DETTMER:

11   Q.   I want to then go on to Exhibit 9.  This is the

12        administrative message dated June 27th, 2014, where

13        there are organizational changes within organized crime.

14   BY MR. DETTMER:

15   Q.   And organized crime is -- has under its umbrella a

16        number of different things.  It had -- I can't -- it had

17        Narcotics Unit, gang intelligence, task force and vice

18        enforcement.  And you changed the name of the Narcotics

19        Unit, and effective July 14, 2014, you named it Major

20        Violators and reduced the number and I think posted

21        other conditions, correct?

22   A.   That's correct.

23   Q.   Do you have something time wise that caused you to do

24        this in the summer of -- or in the period of

25        June 2014 -- or in 2014 that caused you to make this

1         decision?

2    A.   As I remember, it probably was the same time following

3         the conclusion of the Hansberry indictment.  So we were

4         looking for a way to change the culture, move the

5         major -- I mean Narcotics in another direction, that

6         based on what we've learned in our probe, there were

7         things that we didn't know that had we known at that

8         point, that would have been included in the restructure.

9         We just didn't know it.  There was a lot of things we

10        didn't know.

11   Q.   Hansberry was indicted on April 8th, 2015.  But there

12        was an ongoing investigation, correct, prior to that,

13        about Hansberry and his crew members?  Correct?

14   A.   Yes.  I have already testified that the FBI initiated

15        and started the investigation in 2010 --

16   Q.   Right.

17   A.   -- and culminated in 2014.

18   Q.   Now, in terms of the Detroit Police Department, were

19        files opened about this investigation that originated

20        with the investigation you described previously but were

21        giving some direction to the organizational features?

22        You didn't just wake up one day and dictate this five-

23        or six-page document, right?

24             Exhibit 9.  You had some information provided

25        to you before, correct?

1    A.   As I've indicated and I've testified before, the changes

2         were made based on the Hansberry case and his other

3         crime partners.  And it was our way of trying to move

4         the organization in another direction.

5                   However, as I've already testified, and I've

6         probably have said this three times, there are a lot of

7         things that we didn't know in terms of practices until

8         the Mosley matter.  And around the same time that Mosley

9         was charged, we had got information from a source who

10        was very familiar with the operations of narcotics and

11        the kind of things that some of the members were

12        allegedly involved in.

13   Q.   Was that person a member of the Narcotics Unit or Major

14        Violators Unit?

15   A.   As I indicated to you earlier in this conversation, we

16        are in the middle of a confidential -- and I'm not going

17        to disclose, unless compelled by a court the name of

18        that person.  That person is a federal -- I guess it's

19        safe to say he is a federal informant, not a Detroit

20        Police Department informant.

21   Q.   So then he's not -- I mean, that suggests to me he was

22        never part of the Detroit Police Department?

23   A.   I am not -- as you know -- well, let me just stop there.

24        I'm not going to get into confidentiality of that part

25        of the investigation.  I'm saying that we had a source




1    that was a federal source. The information was provided
2    to us, and I'll leave it at that.
3  Q.  Looking at it, you will, first of all, the former
4    Narcotics Unit was made up of enforcement, and
5    Conspiracy Unit; is that correct?
6  **A.  To the best of my knowledge.**
7  Q.  And do you recall what the difference in the two were --
8  **A.  Not offhand.**
9  Q.  -- as far as conspiracy?
10  **A.  Not offhand, I don't. I'm sorry.**
11  Q.  Did the -- at least what I understand, based on prior
12    testimony, that enforcement basically was street level
13    and conspiracy was higher-level drug dealer enforcement
14    addressing higher-level drug.
15       Does that ring a bell with you at all?
16  **A.  Yes, that sounds pretty close to correct.**
17  Q.  And what was the role of Major Violators? Did they fill
18    in on the conspiracy side, major drug dealers, or did
19    they deal with enforcement?
20  **A.  The idea was to focus on -- as you articulated, the**
21  **conspiracy side. Street enforcement we felt could be**
22  **better focused by precincts as complaints were being**
23  **made to various complaints -- I mean precincts about**
24  **street level drug dealing.**
25      **It would be the station that would handle it**



1    because the Major Violator section was smaller than the
2    former, and they were also a part of -- at least a
3    component was part of DEA task force. We felt that it
4    was better that they focus on Major Violators.
5  Q.  Chief, you, obviously, correct -- let me ask you. You
6    didn't fully lay out, do all of the investigation and
7    assignments that are made and reflected in Exhibit 9,
8    correct? You set a policy and you put it in motion
9    based on what you were aware of that was of concerning
10    turnkey, correct?
11  **A.  That's correct.**
12  Q.  Who participated in putting this document together,
13    assignments, differentiating different components with
14    the meetings. What's the process of doing something
15    like this, which is a significant chain?
16  **A.  It would have probably involved -- I see the name at the**
17  **conclusion, a Steve Dolunt, a former assistant chief,**
18  **was the ranking member over operations that came under**
19  **his chain. Certainly James White, who was an assistant**
20  **chief, was involved in that administrative part.**
21      **So those two assistant chiefs and select staff**
22  **would be involved in the crafting of policy or**
23  **documentation.**
24  Q.  Are there documents that White and Dolunt were involved
25    in and people would report to them generated so that it



1    resulted that, if you will, in Exhibit 9, the
2    administrative message dated June 27th, 2014?
3  **A.  I'm not aware of any additional documents -- or at least**
4  **I don't recall any additional documents.**
5  Q.  Did White and Dolunt have to look at things and have
6    meetings with people related to the implementation of
7    policy change that you directed?
8  **A.  I am certain that they had meetings, but I wasn't part**
9  **of those meetings.**
10  Q.  Well, you're aware of the process, right? You've come
11    up through the ranks and overseeing the processes and
12    methodology.
13      How is something like this implemented if it's
14    not -- if there isn't a paper trail function?
15  **A.  As far as I know, this is the only -- there was a**
16  **conversation and the two assistant chiefs got together**
17  **and executed launching this change.**
18      **As to what that involved, I don't have**
19  **specific information. As I've testified, I did not sit**
20  **through that.**
21  Q.  Well, you see the enforcement operations? That's like
22    the third page.
23  **A.  Again, I did not participate in the actual planning. I**
24  **had discussions with the executive team, and during my**
25  **conversation, I didn't provide them any written**

1    direction. I ended up telling them what I wanted and
2    delegated to them to create and, at the conclusion,
3    execute.
4  Q.  Are you saying this document was created as a result of
5    verbal discussions only?
6  **A.  The initial direction of changing to Major Violators was**
7  **a discussion, and there was a subsequent -- I'm**
8  **assuming. I don't know because I did not sit through**
9  **meetings with Dolunt and White other than maybe to get**
10  **an update on what has occurred.**
11  Q.  Well, Chief Dolunt in the Enforcement Operations, on the
12    third page of Exhibit 9, discusses the paid positions of
13    different people.
14      You've seen these kinds of documents before,
15    correct?
16  **A.  That's correct.**
17  Q.  People are reassigned on some regular basis. Generally,
18    it generates a document similar to what we are looking
19    at on page 3, 5, and Bates Number 1 through -- 1 through
20    7 (sic), correct? You have seen those? Correct?
21      I'm sorry, 144 through 147.
22  **A.  Yes.**
23  Q.  For example, you indicated that there would be one
24    lieutenant over the Major Violators. And on the Bates
25    Number 144, there is a number of lieutenants that are

1 listed, one of them being James Moore. And he was in
2 the 3rd Precinct, and he was put into Major Violators.
3 Who made that decision? Why was he selected?
4 A. I don't know how the selection was made. I don't know
5 how the selection was made. They make recommendations.
6 Given that that was 2014, at the time, most of
7 these individuals I didn't personally know, so I relied
8 heavily on recommendations made by my executive team,
9 which was the assistant chiefs. So they felt that's who
10 they wanted in these concerned assignments. There was
11 nothing to say they couldn't go there, at least not that
12 I am aware of. Nothing was brought to my attention.
13 Q. Well, approximately at that point in time, there were
14 48 officers, a lieutenant, 6 sergeants, 41 police
15 officers in what was then the Narcotics Unit. And that
16 48 went down to basically 24, right in half.
17 You had no role in any of the decisions of the
18 appointments to be either lieutenant, the sergeants, or
19 the police officers, correct?
20 A. I relied on my executive team to make recommendations
21 and absent anything that was concerning, I supported
22 their decisions. Again, I had been in the department a
23 year. And probably most of these folks -- as I am
24 looking at -- I mean, I know most of them now that I
25 didn't know. So I didn't have any personal knowledge.

1 I didn't handpick myself. I relied on my executives to
2 make their decisions.
3 Q. Well, let me point something out, if I can.
4 Hansberry's crew, that involved Sergeant
5 Geelhood, eventually, nine of those people were in the
6 list of the July 22, 2014, list of people who were
7 removed from the Narcotics Unit, Geelhood, Bray,
8 Leavells, Matelic, Beasley, Riley, Barnett, Tourville,
9 and Napier, who committed suicide sometime after this in
10 January 2015.
11 Do you know if any of those officers I just
12 enumerated and the eight that are still alive are under
13 investigation?
14 A. There are some that are under investigation and one just
15 retired in --
16 Q. Some are currently under investigation?
17 A. Some are, yes. Yes.
18 Q. Do you know which ones?
19 A. Sergeant Geelhood is currently under investigation --
20 Internal has a case of an allegation that emanated out
21 of the Wayne County Prosecutor's office -- and we've
22 opened an investigation relative to him.
23 Q. Is that Sergeant Geelhood?
24 A. That is correct.
25 Q. Anybody else?

1 A. Amy Matelic was under investigation by Internal Affairs
2 and she was --
3 Q. She entered into a consent agreement, correct, and
4 left -- just to refresh your memory -- left the Detroit
5 Police Department?
6 A. She was under investigation involving allegations
7 concerning something that emanated out of a civil
8 lawsuit, and she opted to leave the department. And we
9 allowed her to do so. But it wasn't anything --
10 Q. She was charged with falsifying an affidavit for a
11 search warrant, and she basically, as I recall -- I'm
12 just trying to refresh your memory -- that Stephen
13 Geelhood provided her the information and she did --
14 A. I'm familiar with that case. She --
15 MR. SUROWIEC: Dennis, could you please let
16 the witness answer your questions.
17 BY MR. DETTMER:
18 Q. Go ahead.
19 A. No, it's getting a little old. I start to talk and I
20 get talked over. I mean, can we just let me get my
21 comment out. If that's not satisfactory then -- because
22 I'm feeling like every time I start talking, you over
23 talk me.
24 Q. I don't mean to be and I don't -- really, I'm not trying
25 to be rude to you. We're under a 3 1/2 hour limitation,

1 and I want to move ahead. Some of this stuff, as you
2 said, you repeated.
3 A. A lot of it I just read it -- can I share my
4 frustration?
5 A lot of what I'm saying is repeated, and you
6 want to talk about efficiency of time, why am I saying
7 the exact same thing? I'm not going to lie. I'm going
8 to tell the truth.
9 Q. No, no, no -- I know you're a truthful fellow.
10 A. Yes, sometimes so far I guess, but I would rather be
11 upfront. So relative to this, I'm familiar with Amy
12 Matelic. There was a lawsuit and she was facing
13 termination for false statements.
14 As you know, you articulated, given at the
15 trial, she opted -- in lieu of being terminated, she
16 resigned or retired under charges. I think that is it.
17 So we put under charges. So she has since left the
18 department. So that option is sometimes afforded. I
19 mean, because if a person wants to opt to retire, you
20 know, all we can do is put the reason for the retirement
21 or resignation, and if there's an open case like this
22 was, we put retired under charges. That's generally --
23 not in every case, but that's generally what we do.
24 Relative to Geelhood, that something, as
25 I've already indicated, it came out of the -- I think

1  this was the Innocence Project case is what I was
2  briefed, so we have an open investigation relative to
3  him and we're not complete with that yet.
4          And I think there was a couple of other names
5  that you mentioned that I am not --
6  BY MR. DETTMER:
7  Q.  Do you recognize any of them?  I will go through them
8      again.
9  A.  Outside of Geelhood and Matelic -- what were the other
10     names you mentioned?
11 Q.  Bray.
12 A.  I've heard Bray's name, but I'm unaware of any open
13     investigations unless he's part of our probe.  There are
14     a lot of names that come up in our probe, that I can't
15     just off the top of my head tell you who they are.
16 Q.  Those nine people I have listed were either in or became
17     under Hansberry and subsequently Geelhood, was in
18     Hansberry's -- and there were nine of them.  And as you
19     know, Napier committed suicide, so there were eight
20     people, and I'll give you the names of other -- you
21     know, Leavells is out, obviously.  But -- and Matelic's
22     out.  But who are still in play are Geelhood, Bray,
23     Beasley, Riley, Barnett, and Tourville.
24          Any of those ring a bell?
25 A.  Tourville comes to mind; I just can't recall what.  It



1  seems as if -- we may have.  I don't know.  I think his
2  name -- again, some of these names are coming up in our
3  probe and we are moving forward.
4          In fact, there are several members, and I
5  don't know if it's Tourville, but we have several
6  members that have chief hearings pending that are
7  dismissal cases.
8  Q.  You've indicated a number of times that you're looking
9      at a lot of Hansberry's crew?
10 A.  Well, not just --
11 Q.  I know, not just, but you are looking at them?
12 A.  Yes, we are.  But, again, to what you -- you've
13     indicated earlier, you think we're going around -- we're
14     doing this backwards.  We should have started back in
15     fear of the statute.
16          And I will just be candid with you, if the US
17     Attorney wanted us to start at the back, like 2010, or
18     whatever date our files go back to, because of statute
19     issues.  I am certain they would have raised that issue,
20     because, you know, Mr. Graveline was a former US
21     Attorney, very familiar with the statutes.
22          But, again, we opted -- because our initial
23     concern was Mosley, and me believing that Mosley was
24     involved in other allegations, which we have found that
25     he was involved in other allegations of criminality.



1  Q.  I'd like to talk to you about the stop on July 6th,
2      2010, with Hansberry's crew.  And I know you don't have
3      personal knowledge of that.  But recognizing that
4      potentially this is an issue of review and should be --
5      for my valuation of it, I'd like to ask you some
6      questions.
7          Do you recall this is the stop where some
8      millions of dollars were on the way to a Mexican cartel
9      and on the east side near Gratiot and Outer Drive, I
10     believe there was a stop by Hansberry's crew.  And
11     there's a good amount of dispute about the amount of
12     money.  I've had maybe three different numbers, based on
13     various sources, testimony, and trial and things like
14     that.
15          But are you somewhat familiar with all of
16     that?
17 A.  I've heard it.  I'm not intimate with that case.  I
18     can't offer you anything.  You could probably brief me
19     out as to what you know, but I have heard -- and we
20     haven't gone back and did an exhaustive review of that.
21     I just heard just basically what you're saying now.
22 Q.  There is a connection between Arthur Leavells and Gary
23     Jackson, a mutual friend.  Right?  And Gary Jackson was
24     a -- probably a high-level drug dealer.  He owned a --
25     or leased a truck operation for cleaning trucks, in --

1  what really apparently was the issue there, trucks come
2  in and either drop drugs or pick up money, and the semis
3  head down to Mexico or whatever.  That's basically the
4  argument of the US Attorney in the Hansberry trial.
5          But what I'm interested in and wanted to
6  discuss with you is the fact that there are three
7  different numbers, dollar numbers, that were significant
8  in this case.  Gary Jackson testified there was -- he
9  delivered $3 million to the drug runner who was driving
10 the truck to Mexico.  And at the time he did that,
11 Leavells, Hansberry, and Watson and Hansberry's crew
12 were in on this deal.  They were going to stop it and
13 get the money.  It was all prearranged.
14          The second number was a tally sheet that was
15 with the money, and it -- it indicated that there was
16 $2,370,000 on -- in the various bags that had the money
17 in it in the semi.
18          Then there was a dispute that went to Internal
19 Affairs, basically, over the counters -- a dispute over
20 like $15,000.  But what Comerica Bank established and
21 what was deposited in the Detroit Police Department's
22 account with Comerica was $2,084,820.  That's the
23 established amount that was there.
24          Basically, the testimony was that Tourville
25 and Napier grabbed money per an agreement, and they were

1    charged with that.  The question is, was there

2    2,084,000, 2,370,000 or 3 million?

3              Now, clearly the evidence that was grabbed at

4    the time indicated in the tally sheet there was

5    2.3 million plus, and for some reason nobody used that

6    in any kind of investigation.  It didn't trigger

7    anything.  Because them talking about 2,084,000 being

8    deposited, there is a difference of somewhere in excess

9    of $180,000 (sic) that disappeared, if the tally sheet

10   is correct.

11             Jackson is correct in his testimony in federal

12   court, and I'm sure, you know, he faced serious

13   consequences if he perjured himself, that there was

14   3 million.

15             There was no accounting in any form by

16   supervision of the Detroit Police Department on those

17   issues.  I hope I'm making it clear to you the issue.

18        MR. SUROWIEC:  Thousands of dollars.

19   BY MR. DETTMER:

20   Q.   Hundreds of thousands of dollars disappeared and the

21        testimony of Leavells was that the crew grabbed that by

22        a prearranged agreement.

23             MR. SUROWIEC:  I would object to form,

24        foundation.  You are testifying.  The question is not

25        even a question.  It was literally about a three-minute

1    statement.

2              It's inaccurate to the extent that you would

3    say that Tourville and Napier were charged, and it calls

4    for speculation on the part of the chief, who wasn't

5    there.

6              But, Chief, if you can answer that, which I am

7    not sure what that was.

8         THE WITNESS:  I can't.  I wasn't here then.

9    In fact, I was a police chief in Portland, Maine, in

10   2010.  I've heard some discussions about that limited --

11   as I indicated before you started your three-minute

12   narrative on what took place, I say you probably know

13   more about this than I do.

14             As it turns out, you have read testimony in

15   the federal case, which I have not.  I don't know.  As

16   we continue to do our probe and go back, I am certain

17   that this issue will resurrect.  What will come out of

18   it, I don't know.

19   BY MR. DETTMER:

20   Q.   I guess the point I'm making with you, this is an

21        opportunity for supervision, and I would indicate to you

22        that --

23             MR. DETTMER:  If we can go to Chief Exhibit

24        11B, Michael.

25

1              EXHIBIT 11A

2              Photo

3              WAS MARKED FOR IDENTIFICATION

4              EXHIBIT 11B

5              Photo

6              WAS MARKED FOR IDENTIFICATION.

7    BY MR. DETTMER:

8    Q.   The highest level of the Detroit Police Department was

9         aware of this event and, in fact, after the money was

10        acquired -- that's Exhibit 11A -- that's the money on

11        the trunk of a car at the scene of the stop.

12             And 11B, unfortunately, is sideways, but --

13        there you go.  And you'll recognize all of those

14        individuals, I am sure, Chief Godbee being in the

15        center, correct?

16   A.   That's correct.

17   Q.   There's the money.

18   A.   Correct.

19   Q.   And the point I'm making with you, there was a

20        subsequent investigation of how a money counter being

21        inaccurate over $15,000.  Really, we are talking about

22        900,000 or 280,000 disappeared, and the trial was about

23        how Hansberry and his crew grabbed that money.

24             You're not aware of any of that?  We're not

25        making (inaudible) --

1    A.   No.

2    Q.   Here is something with the highest level management of

3         the Detroit Police Department at the time and it wasn't

4         properly handled.  Is that fair to say?

5    A.   I can't say.  Now, I guess --

6    Q.   Assuming what I said is correct?

7    A.   Well, here is a question I --

8         MR. SUROWIEC:  He is not going to say --

9         THE WITNESS:  I can't say how it was handled.

10   Now, at some point this allegation was made that money

11   was missing.  Am I correct to say that?

12        MR. DETTMER:  Yes, but it was -- it was

13   focused on a counter -- money counter issue, not on the

14   tally sheet.

15        THE WITNESS:  So if it was a counter issue --

16   I mean, either we believe that money was stolen -- as

17   you referenced, the highest levels of the organization

18   were aware that there was some sort of nefarious act or

19   money was alleged to have not been accounted for, then

20   the only thing one could do was then initiate an

21   investigation into it.  I don't know if the then Chief

22   Ralph Godbee became aware and initiated an internal

23   investigation.  I'm unaware of that.

24   BY MR. DETTMER:

25   Q.   Well, there is evidence to support, as you well know

1  probably --

2  A.  But specific to your -- specific to your question, if

3  the chief became aware of an allegation of theft, the

4  chief would then be responsible to initiate an internal

5  investigation.  I don't know because I wasn't here.

6      Maybe as part of the work that we'll be doing

7  in the coming months, however long it takes us to get to

8  that time period, maybe we'll have the answer.  Maybe I

9  can find that answer out right now.  I don't know.

10 Q.  Chief, what I'm really asking you, though, there was a

11 tally sheet that indicated there was $2,370,000 in that

12 truck.

13 A.  Okay.

14 Q.  That was evidence that the Detroit Police Department had

15 and it was totally ignored.  And the point I am making

16 with you, that evidence was an indication that the

17 department should have known there was some problem here

18 and investigated it.  They never investigated it.

19 A.  You know --

20     MR. SUROWIEC:  That's a mischaracterization of

21 the evidence, and you're painting it in an absolutely

22 false light.

23     But go ahead, Chief, if you can answer that.

24     THE WITNESS:  I can't answer that.  I mean,

25 the way the question's framed -- I know what I would do

1  in a given situation.  But to say a tally sheet

2  reflected one thing, I guess one could argue, if I'm

3  understanding your synopsis, that -- how do we know the

4  tally sheet was correct?  I don't know.  Who's making

5  the allegation that -- I just don't know.

6      And so what you are doing is -- you want me to

7  say that it wasn't handled properly.  I don't know what

8  the chief knew at that time.  If I had known that you

9  were going to ask me this question in 2020, I would have

10 called him on July the 27th, say, one day I'm going to

11 be chief in Detroit and this question's going to be

12 asked.  Did you do anything with this money thing.

13     I mean, I'm being facetious, of course.  But

14 I'm just saying, there's no way -- I don't know enough

15 about the facts, and the way you framed it, the tally

16 sheet tells me nothing.

17 BY MR. DETTMER:

18 Q.  Well, here, let me make the point for the record.  In

19 Exhibit 10, DPD Bates 1643 --

20     EXHIBIT 10

21     Comerica Bank Deposit

22     Tally Sheet

23     WAS MARKED FOR IDENTIFICATION

24 BY MR. DETTMER:

25 Q.  Well, here, let me make the point for the record.  In

1  Exhibit 10, DPD Bates 1643 -- is a bank deposit with the

2  Comerica Bank and it shows a deposit of $2,084,830.

3  A.  I understand.

4  Q.  In Bates Number -- DPD Bates Number 1648 in Exhibit 10

5  there's a tally sheet, and there are a number of pages

6  listing each of the deposits that were made -- or the

7  money bags that were in the -- in the vault, and that

8  tally sheet shows 2,370,000.  Whether it's accurate or

9  not, no way either you or I know this.

10     But the point is that it raised an issue, and

11 there's no investigation at all at any point about that

12 tally sheet and the discrepancy between the bank

13 deposit, and its significant.  All I'm saying is --

14 A.  To your point -- I'll just say, to your point,

15 absolutely it's significant.  And if you had asked me

16 the question, if you were the chief and you were made

17 aware of a discrepancy, what would you have done.

18 Q.  What would you have done?

19 A.  That's the question.

20 Q.  What would you have done?

21 A.  If I were the chief in 2010 in Detroit and I became

22 aware of a discrepancy, I would have initiated an

23 investigation to find out was it just an error that

24 somebody -- on the bank slip make a mistake?  What would

25 it have been?  I don't know.

1  I would have at least wanted to know because,

2  worst-case scenario, somebody stole the money.  And then

3  it would have been involving interviews of people

4  involved.  It would have been a number of things we

5  could have done.

6      With that kind of money, we would have gotten

7  search warrants to get into bank records of certain

8  department employees, to see if there was an unusual

9  amount of money deposited, which -- and in an

10 administrative case, even if, say, the US Attorney said,

11 well, it's not really enough.  Or the Wayne County

12 prosecutor said it's not enough to prove theft, maybe.

13 Based upon a preponderance of evidence, it's enough to

14 support an allegation that a theft occurred.  It just

15 doesn't meet a criminal standard.  I mean, so that's

16 what I would have done.  At least take a look.  It

17 doesn't mean that I would have proven that the money was

18 stolen.  I don't know.  I really don't know.

19 Q.  And the point I think is well taken.  There was the

20 opportunity to actually know what occurred, and there

21 was a total lack of indifference to this, from what I

22 can see.

23     And the point I'm making is, Hansberry's crew

24 are basically the defendants in our cases that we have

25 and had they properly proceeded, had the Detroit



1 department supervision properly proceeded, it's -- these
2 people wouldn't have been raided.
3 These are the people who are criminal cops,
4 and they raided our clients' homes, and that's the point
5 I'm making with you. They didn't -- as you are correct,
6 it should have happened and it didn't.
7 MR. SUROWIEC: I would object to the narration
8 -- the narrative there. And I would also object to the
9 fact that you're -- you're giving false evidence because
10 you know that there was an Internal Affairs
11 investigation that was launched after the discrepancy
12 was noted, and that would have been under Chief Godbee,
13 so why are you saying there wasn't, Dennis?
14 MR. DETTMER: Here. Here. That investigation
15 was over whether the money counters were properly
16 operating. That was the issue, over $15,000.
17 MR. SUROWIEC: They did Garrity. They did
18 Garrity. They interviewed about 20 to 30 officers.
19 They did --
20 MR. DETTMER: Here --
21 MR. SUROWIEC: It was done.
22 BY MR. DETTMER:
23 Q. They weren't interviewing them about the $2,370,000
24 tally sheet. They weren't -- that number never came up
25 at all anyplace.



1 A. Well, I've got to tell you something. I am a little
2 dismayed because specifically I asked was there an
3 investigation. And counsel is now articulating that
4 there was an investigation. Maybe you don't like how
5 the investigation was conducted.
6 But if people were Garrity'd -- I even took
7 four to five minutes explaining that I would have people
8 interviewed, and it sounds like this is the very same
9 thing that happened anyway.
10 Q. No. No.
11 A. Just the outcome is different.
12 Q. Exhibit 13, that I have is the investigation.
13 EXHIBIT 13
14 Investigation money counter
15 WAS MARKED FOR IDENTIFICATION
16 THE WITNESS: Okay.
17 BY MR. DETTMER:
18 Q. And it was about the counter, the money counter
19 discrepancy. That is what it was about. $15,370.00.
20 Exhibit 13 of the exhibits that we have. And that's it.
21 It's not about the tally sheet.
22 A. So I'm curious -- I'm curious, as I'm looking at this
23 memo, you got --
24 Q. You're looking at it. It's Exhibit 13, for the record.
25 A. Yes. Exhibit 13, Commander Brian Stair, who was the



1 commanding officer of IA at the time, Sergeant Dietrich
2 Lever, who is now a lieutenant still working for DPD,
3 don't you think either one or at least Lever who's still
4 a department member -- in fact, Lever, a lieutenant, is
5 a key member of our Operation Clean Sweep. I'm sure he
6 can give you and articulate the investigation involved
7 here. I can't.
8 Q. With all due respect, the only point I'm making was
9 there was evidence that there was $2,370,000 in those
10 bags.
11 A. Understood.
12 Q. And it's not mentioned at all anyplace. Anyplace. And
13 this is about 15 grand, I mean, come on. And had it
14 occurred, there's a good chance that Hansberry's crew
15 would have been operating that raided our clients'
16 homes.
17 A. But I'm looking --
18 Q. That's the point I'm trying to make with you.
19 A. I know. But as I'm looking at this memo, I know we're
20 putting a lot of time into this memo that I have no
21 idea. But it does reflect -- the counter reflected
22 2,084,820 and a difference of what you call 15 grand,
23 15,370. I would have to go through the whole thing, but
24 I think if this is a concern, why not have Dietrich
25 Lever deposed? Why not?

1 Q. I missed what you're saying.
2 A. Why not have Lieutenant Lever deposed to find out what
3 he would tell you about this? He's the investigator.
4 Q. My point is, it was there, it was -- and the evidence
5 was there. The tally sheet. There's no mention of it
6 anyplace. I mean --
7 A. Okay.
8 Q. -- if the head of Internal Affairs was aware of it, it
9 surely isn't reflected in any way --
10 A. Okay.
11 Q. -- in any document that I am aware of, of an Internal
12 Affairs investigation related to that.
13 Let's go on.
14 MR. SUROWIEC: I'm just going to pose an
15 objection. This is a 17-page document. Mr. Dezsi is
16 literally on page 1, has not moved off of page 1. The
17 witness is being cross-examined with zero (inaudible) to
18 this. It's not proper.
19 (Multiple speakers
20 speaking at the same time.)
21 MR. DETTMER: Are you suggesting someplace in
22 this document there's a tally sheet showing the
23 $2,370,000, in any way it's a part of this
24 investigation?
25 MR. SUROWIEC: I'm suggesting that you -- you

1    initially started your question off by actually
2    testifying that there was no IA investigation.  That's
3    what you said.  Leaving the chief to believe that --
4         MR. DETTMER:  There was no investigation about
5    the amount of money --
6         MR. SUROWIEC:  You need to join the police
7    force because --
8         (Multiple speakers
9         speaking at the same time)
10        MR. DETTMER:  -- the $2,370,000.  Are you
11   suggesting there was an investigation of the $2,370,000
12   tally sheet, Jim?  Come on.
13        MR. SUROWIEC:  Dennis, you need to be a police
14   officer because you don't like the way they do their
15   job.  But as the chief said, Lieutenant Lever's the guy
16   who knows.  You know, you're looking at half the
17   information.
18        MR. DETTMER:  Let's move on.
19        Exhibit 12.
20        EXHIBIT 12
21        Detroit News Article
22        11/03/2014
23        WAS MARKED FOR IDENTIFICATION
24   BY MR. DETTMER:
25   Q.  Exhibit 12 is a November 3, 2014, Detroit News article.



1    And it's about four Detroit police officers suspended
2    following a probe.
3         You are quoted in here a number of times.  But
4    this really involves two different crews of the four
5    cops.  There are two and two.  It's not all four of them
6    related to one incident.  But you go on.  I'm looking at
7    Paragraph 1, 2, 3 -- it's the third paragraph.  It's out
8    on the -- the first one out on the margin.  Detroit
9    Police Chief Craig disbanded the drug unit.
10        Do you see that?
11        Again, they use systemic problems with
12   something you had previously said.
13        And what I am looking at is this relates to
14   Hansberry and others in his crew, correct?
15   A.  Yes.  I think I've already testified that even though
16   there were those who were part of the crew weren't
17   charged, I believe they still had limited knowledge that
18   they were involved in criminal and/or administrative
19   misconduct.
20   Q.  You're quoted a number of times here, but I think that
21   the points that -- I need to go on.  I want to get done
22   with some of this stuff.  Let's skip 12A.
23        12B, this is recording (sic) the suicide of
24   James Napier, an article in the Detroit News,
25   January 22, 2015.  And the second paragraph.

1    I'm sorry.  Let me go back to the first
2    paragraph.  I'll read it.  Detroit police officer,
3    according to two police sources, was being investigated
4    by the FBI and Detroit Internal Affairs narcotics
5    corruption died of a self-inflicted gunshot wound on
6    Thursday morning, January 22, 2015.  It doesn't say that
7    that's the morning.
8         And the second paragraph -- I'll skip over the
9    first couple of lines.  But it again says two sources --
10   last two lines.  Two sources familiar with the
11   investigation into corruption of the former narcotics
12   section, that he was one of the officers being
13   investigated.
14        Do you know who was being investigated at that
15   time?
16        MR. SUROWIEC:  Objection; hearsay to what you
17   just read, form, foundation.
18        Chief, go ahead and answer, if you know.
19        THE WITNESS:  Well, I think you've named all
20   of them I think early on in my testimony.  I feel like I
21   keep going over the same role.  I talked about --
22   BY MR. DETTMER:
23   Q.  The people I previously mentioned you're talking about?
24   A.  Earlier on in this deposition, I referenced three people
25   that were charged -- no, two people charged -- I mean,

1    two people indicted, one charged, and one committed
2    suicide, and this would be that person.  That's it.
3    That's what I know.
4    Q.  Just for the record, I have as Exhibit 12C, this is the
5    indictment of Hansberry, Watson.
6         EXHIBIT 12C
7         Indictment, Hansberry/Watson
8         WAS MARKED FOR IDENTIFICATION
9    BY MR. DETTMER:
10   Q.  Also, Leavells was indicted but not part of --
11   A.  He was charged.  He was charged.
12   Q.  Well, he pled.
13   A.  Okay.  Okay.  That's fine.
14   Q.  He really testified about the criminality, and it was a
15   plea deal.
16   A.  Right.
17   Q.  But the point I was just making with you, and I
18   mentioned this before, the indictment was on April 8th,
19   2015.  That was the significance of that exhibit.
20        And I -- based on your testimony, I assume you
21   didn't really have much knowledge about the actual
22   trial, correct?
23   A.  I did not.
24   Q.  There's an article in this Exhibit 12D, the Free Press
25   on June 30th, 2016.

1    EXHIBIT 12D

2    Free Press Article

3    6/30/16

4    WAS MARKED FOR IDENTIFICATION

5    BY MR. DETTMER:

6    Q.  The trial's ongoing and the papers are reporting what's

7        occurring.

8        MR. DETTMER:  And point to the bottom,

9        Michael.

10   BY MR. DETTMER:

11   Q.  During the trial, which is in its fourth week,

12       prosecutors had portrayed Hansberry as a fast-talking

13       schemer and a big spender who was motivated by greed.

14       Thursday they cited his bank and tax records

15       that bolster that claim, showing jurors how Hansberry

16       spent his money while working for the Detroit Police

17       Department.  I have writing over it; I'm sorry.

18       It goes on and explains about how much money

19       he had and what he was doing.  He had an Aston Martin, a

20       Cadillac, a Cadillac ATS, Corvette, and a Mazda6.

21       And I've raised this about supervision.  He

22       was at the Dexter base of the Narcotics Unit, and when I

23       was taking testimony of his crew members, I asked about

24       the cars.  Yes, he brought those cars to the base.  You

25       know, and the point that's being made in this article,

1    on the next page --

2    A.  Is there a question?

3    Q.  -- the FBI made the point that his earnings were covered

4        by cash -- I'm sorry; his earnings and purchases and

5        spendings, the difference, a shortage, earnings of his

6        salary as a Detroit police officer, was made up by cash

7        deposits and substantial, you know, cash deposits.

8        And the question is, the supervisors at the

9        base, the narcotics base on Dexter, never raised with

10       you, sir, or do you have any knowledge that Hansberry

11       seems to be living pretty high considering his earnings?

12       Anybody ever raise that with you?

13   A.  They did not.

14       MR. SUROWIEC:  Objection; form, foundation.

15       Time frame.

16       This is talking about 2010, Dennis.

17       MR. DETTMER:  I have a number of the

18       transcripts from the trial of Hansberry, two of them

19       were Leavells testimony, and that's Exhibits 12E and F.

20       EXHIBIT 12E

21       Leavells Testimony

22       WAS MARKED FOR IDENTIFICATION

23       EXHIBIT 12F

24       Leavells Testimony

25       WAS MARKED FOR IDENTIFICATION

1    MR. DETTMER:  And 12G is Gary Jackson's

2        testimony.

3        EXHIBIT 12G

4        Jackson Testimony

5        WAS MARKED FOR IDENTIFICATION

6    BY MR. DETTMER:

7    Q.  Gary Jackson clearly indicates there was $3 million.

8        I'm sure his testimony was thoroughly vetted by the FBI,

9        and he ran a risk of being -- to have no deal based on

10       perjury.

11       I would also indicate to you that Godbee

12       testified at the trial for the defense.  He came on and

13       he claimed a meeting that's in dispute that Gary Jackson

14       never mentioned that there was $3 million being shipped

15       on July 26th, 2010, and -- well, that matter is in

16       dispute.

17       But the point is he, Gary Jackson, testified

18       that there was 3 million and he told Chief Godbee that

19       and he just testified that Godbee said, I knew it.

20       Suggesting that he knew there was some crime going on.

21       Have you talked to anybody about that aspect

22       of Gary Jackson's testimony?

23       Were you aware of it?

24       MR. SUROWIEC:  Objection; form, foundation,

25       hearsay, completely improper question.

1    But, Chief, go ahead, answer it, if you can.

2        Have you talked to anyone?

3        THE WITNESS:  I have heard some loose

4        conversation about it.  I'll reiterate for purposes of

5        the record.  I was not here when that meeting took

6        place.  I've had conversations with Chris Graveline as

7        part of our probe, and this is something that was talked

8        about.  I'm just not understanding what I can add to

9        that meeting.

10   BY MR. DETTMER:

11   Q.  Okay.  When you meet with somebody that brings you

12       serious information about wrongdoing, do you generate

13       any paper?  Do you do a memo?  On such and such a date,

14       I spoke with so and so, and he said A, B, C?

15   A.  I do not.  I called Chris Graveline, and if it's a

16       serious matter, I'll call in the commander, and I say, I

17       need you to open an investigation into X, Y, and Z.

18   Q.  It appears to be your testimony that Graveline, Director

19       Graveline, is familiar with the testimony at the trial,

20       correct?

21   A.  I don't know if he was familiar.  It was a discussion we

22       had as part of this probe, and certainly he talked about

23       a -- some testimony provided by former Chief Godbee

24       relative to that and the exact specific statements you

25       made about I thought so.



1        Like you, when I heard that, I had -- I asked

2    Graveline the same question.  I said, if he thought

3    that, did he do anything about it?  That's what I asked

4    Graveline.  I said, do we know in our investigation if

5    he did anything about it?  Because if you think

6    somebody's involved in criminal behavior, what, if

7    anything, did you do as the chief executive?

8        And so at this point, I don't have an answer

9    for you because we haven't gotten -- I was concerned

10   enough I said, well, maybe as part of our

11   investigative work, I know that he testified in the

12   civil matter.  Maybe we need to call him in as part of

13   our probe to find out, what, if anything, was done.

14       That was the conversation that Chris Graveline

15   and I had.

16 Q.  Thank you.  We've already discussed the Exhibit 13,

17   which is the interoffice memo about the money counter

18   here.

19       EXHIBIT 13

20       Money Counter Memo

21       WAS MARKED FOR IDENTIFICATION

22 BY MR. DETTMER:

23 Q.  12I is out of order.  (Inaudible) 12I is a

24   Warrendale/Detroit -- and I only raise this, and I'm

25   sure you haven't seen this.  But that there was public

1    knowledge, as of July 26th, 2010, that there was

2    suggested $2.3 million that was, in fact, seized, a

3    little less than the tally sheet of 2.370.

4       But this is the only specific time I've seen a

5    document that says -- that suggests the amount was more

6    than $2,080,000 -- 85,000.  But the point I'm making

7    with you, Chief, this issue was in the public media, and

8    I don't know where the source of this is, but it's out

9    there and it's probably the most accurate thing about

10   the tally sheet that I saw.

11      Going on, 12J is the conviction of Hansberry,

12   and it's dated February 22nd, 2017.  That's when he was

13   convicted by the jury.

14       EXHIBIT 12J

15       Hansberry Conviction

16       WAS MARKED FOR IDENTIFICATION

17       EXHIBIT 14

18       Use of Paid Informants

19       WAS MARKED FOR IDENTIFICATION

20 BY MR. DETTMER:

21 Q.  Exhibit 14 is reigning in the use of paid informants.

22   We talked about that a little bit.  I'd like to just

23   point out maybe one or two things.

24      You had a very serious concern about

25   informants, the reliability and the use of them.  And

1    this is your discussion about that with the media.

2    Okay?  Exhibit 14.

3       Then I'd like to go on.  There's a stipulated

4    Protective Order that we marked as Exhibit 14A.

5       EXHIBIT 14A

6       Protective Order

7       WAS MARKED FOR IDENTIFICATION

8       EXHIBIT 14B

9       Confidentiality of SOI

10      WAS MARKED FOR IDENTIFICATION

11      EXHIBIT 14C

12      Confidentiality of SOI

13      WAS MARKED FOR IDENTIFICATION

14 BY MR. DETTMER:

15 Q.  That relates to the confidentiality of the SOI documents

16   that I have that were produced to us, and it's

17   Exhibit 14B and C.  So subject to Protective Order, and

18   this actually was in the Reid versus City of Detroit.

19   But we all recognize that this is confidentiality.

20      One of them is an individual named Ken

21   Jackson, and he's SOI 2499, and the other one is Gary

22   Jackson, SOI 2449.

23      Gary Jackson is the one that had provided the

24   information about the transfer -- the money on July 27,

25   2010.  And if we can go to that.

1        Unfortunately these aren't Bates marked.  But

2    I'd like to indicate the stop was on July 26, 2010.

3    Arthur Leavells signs up Gary Jackson as SOI 2449 on

4    July 27, 2010, the day after the raid.

5       Is that proper procedure?  He's already used

6    him as the Source of Information.  Signs him up the next

7    day after the stop of 2 million plus is --

8 A.  I can't speak to what -- gee, I don't know.  I don't

9    know what...

10      MR. DETTMER:  Well, look at the next page,

11   Michael, I think it is, looking at the record of payment

12   to informant.

13 BY MR. DETTMER:

14 Q.  Now, the -- apparently, Leavells worked very hard at

15   getting Jackson a reward for the stop on the 26th, and

16   on August 14, 2010, a little more than two weeks after

17   the stop, Leavells, it appears with some advisory DPD

18   people and $250,000 in cash, and he signs --

19      MR. DETTMER:  Michael, can you move it a

20   little bit to the left?

21 BY MR. DETTMER:

22 Q.  Well, you can see the $250,000, and he got -- he, Gary

23   Jackson, received $250,000 from the Detroit Police

24   Department as a result of that stop on July.

25      Were you aware of that?


HANSON RENAISSANCE

1 A.  It's signed 8/14.  I mean, I've seen documents -- that
2     document, I believe I saw doing predep, but I wasn't
3     aware of it in 2010, no.
4 Q.  Were you aware of it prior to the last couple of weeks
5     of deposition, unrelated to dep preparation?
6 A.  I mean, I may have been.  I don't recall specifically.
7     If you have a direct question and I was signed off on
8     anything, I can verify that.  But I don't --
9 Q.  You don't have any information, that's what I'm asking
10    you, prior to that?
11 A.  I don't have any knowledge of -- of that.
12 Q.  Is this consistent with Detroit Police Department
13    policy, once you came on board in 2013?  The day after
14    the stop, the acquisition of the money, the SOI had
15    signed off --
16 A.  I can't tell what was happening seven years ago.  In
17    fact, to be candid, Narcotics was not on my radar until
18    the FBI advised me as to what they were planning on
19    doing.
20        We had a 12-year Consent Judgment, and the key
21    issues concerning the department accountability were
22    outlined in the Consent Judgment, but narcotics was not
23    one of them.
24 Q.  You notice on -- well, you can't see it.
25        MR. DETTMER:  But, Michael, can you run it up



1     or down?
2 BY MR. DETTMER:
3 Q.  This is Informant's Code 2499, which is not Gary Jackson
4     SOI number, he's 2449.  And Leavells has used these
5     numbers kind of interchangeable in cases we have.  And
6     you will see that -- there's another payment, and this
7     one is again to 2499 of $5,000 to -- Leavells to,
8     apparently, for Jackson, Gary Jackson, and it's listed
9     as a bonus payment.
10        Are you aware of the DPD paying bonus
11    payments?
12 A.  I don't have specific -- I reviewed that document within
13    a couple of months after I got here.  I was briefed.  I
14    don't have any independent recall.  I did make my
15    signature at some point, so it's mine.  I know that.  I
16    just don't have any independent recall.
17        And I don't know who was working, which AC
18    briefed me.  I don't recall, really, having to approve
19    informant payments.  I know we have done them, but,
20    again, a lot of what I've discussed today has to do with
21    this unilateral flipping and, as you indicated, the
22    transposing informant numbers.
23        I'm learning some of this as we go through the
24    probe.  And given the name of the officer who is listed
25    here, who's been implicated for criminal misconduct,

1     certainly that causes me concern.  But I don't have
2     any -- I think I signed off on that in September of
3     2013, two months after I was here.  I just don't recall
4     it.
5        EXHIBIT 15
6        Internal Affairs Investigation
7        WAS MARKED FOR IDENTIFICATION
8 BY MR. DETTMER:
9 Q.  Next, Exhibit 15.  This is an Internal Affairs
10    investigation following a raid by a spinoff of
11    Hansberry's crew.  You can see who it included.
12    Geelhood, Barnett, Riley, Matelic, Leavells, and
13    Tourville.
14 A.  Right.
15 Q.  These officers, including Sergeant Geelhood who was a
16    supervisor of his crew, were suspended for a year.
17        Are you aware of that?
18 A.  Suspended for a year?
19 Q.  Yes.  Suspended with pay for a year.
20 A.  I don't independently recall that.  It wouldn't surprise
21    me.  A lot of times we -- the police commission, and
22    this would have been pre them getting their authority
23    back, so I don't recall them being suspended for a year
24    with pay.
25 Q.  They always make it very clear to me when you ask them

1     about it, well, we were suspended but with pay.
2 A.  Well, that's a fact.  I mean, that's kind of been the
3     process.  I don't understand it.  But in order to take
4     pay away, pre the adjudication of this matter, it would
5     have to go before the police commission.
6        So that was a standing practice.  I have since
7     changed that on case-by-case.  So this happened -- like
8     I have two former narcotic officers off right now
9     suspended with pay.
10        And ordinarily if they were pending criminal
11    charges, I would give it to the police commission, but
12    I've opted to move forward with the disciplinary
13    hearing, and it is my anticipation that that's a
14    termination case.
15 Q.  Exhibit 16 -- I want to go on.  We're almost done.
16        EXHIBIT 16
17        Matelic File
18        WAS MARKED FOR IDENTIFICATION
19 BY MR. DETTMER:
20 Q.  16 is the file on Matelic that we previously talked
21    about just so you know.
22 A.  Okay.
23        EXHIBIT 17
24        Geelhood Case
25        WAS MARKED FOR IDENTIFICATION

BY MR. DETTMER:

1  Q. 17 deals with a case involving Steven Geelhood, and this
2  is the matter that the director has raised to Geelhood
3  and an issue about a guy named by Michael Hathaway in
4  the criminal division of the Third Circuit, and then a
5  civil lawsuit following that that was initially assigned
6  to -- was assigned to --
7

8  A. I think that's the case that we are investigating
9  Sergeant Geelhood now. I think -- I'm almost certain
10 that's the case.

11 Q. But this, again, goes back to an April 25, 2014, raid
12 where Geelhood is the affiant, okay? That's being
13 investigated.

14 And then finally 18 and 19.

15 EXHIBIT 18

16 Darell Chancellor Case

17 WAS MARKED FOR IDENTIFICATION

18 EXHIBIT 19

19 Darell Chancellor Case

20 WAS MARKED FOR IDENTIFICATION.

21 BY MR. DETTMER:

22 Q. Exhibits 18 and 19 involve a Darell Chancellor. I don't
23 know if you know about that. But the records provided
24 that he actually initiated an investigation related
25 to this lawsuit.

1  And this involves a search warrant that goes
2  back -- well, Chancellor was convicted and sent to
3  prison, and he was still in prison until the Conviction
4  Integrity Unit release suggested to the Prosecutor
5  Worthy that he be released, and he was and the case was
6  dismissed.

7  A. And this is the case about Geelhood, yes?

8  Q. Yes, this is another case.

9  A. Yes, there's got to be a case -- I don't know -- you're
10 telling me that Chris Graveline based on an integrity,
11 we opened a case against Geelhood based on an integrity.
12 I think I mentioned that earlier in my --

13 Q. Yes. Yes. Okay. That's this case. Okay.

14 A. Right.

15 MR. DETTMER: Let's take a moment.

16 (Off the record at 12:15 p.m.)

17 BY MR. DETTMER:

18 Q. Chief Craig, you would acknowledge that you're
19 attempting to change the culture of the Detroit Police
20 Department to the extent that there are some groups, for
21 example, the Hansberry and Geelhood crews that were
22 doing apparently dishonest acts, correct?

23 A. I made a full commitment. I think I spelled it out
24 early on in my deposition that we missed some things
25 with the Hansberry case. It wasn't a seamless

1  transition from criminal to administrative relative to
2  the other members of the Hansberry crew.

3  We know that now looking back, so I think key
4  for where we are today is that we have information on
5  practices, illegal practices occurring in -- alleged
6  illegal practices occurring in Narcotics that we are
7  aggressively tackling.

8  The reason for the seizure of all of the
9  records, the person that provided information, the one I
10 told you I couldn't talk about that was a federal -- it
11 came from the federal side of the house, gave us
12 information. From that person, it kind of spelled it
13 out to specific alleged criminal actions.

14 So given that and the timing of Mosley, I felt
15 very strongly that what we didn't know at the conclusion
16 of Hansberry we know now. So now we have a template
17 where we can totally eradicate any type of corruption
18 involving Narcotics. There was so much we didn't have,
19 that we now do have.

20 Q. Well, Chief, you indicated --

21 A. And so my goal is just -- I'm sorry.

22 Q. What position was --

23 COURT REPORTER: I missed that question. Can
24 you repeat the question?

25 THE WITNESS: You were broken up.

1  BY MR. DETTMER:

2  Q. What level of rank does Ted (sic) Ewald have?

3  A. He's an investigator. One of the original investigator
4  ranks. As I've testified to, Tim Ewald -- Tim Ewald has
5  been a long-time assigned investigator with the FBI's
6  public corruption unit. He is a DPD officer but
7  assigned to the FBI.

8  Q. Well --

9  A. And he was --

10 Q. Well, does he have a liaison relationship with the
11 Detroit Police Department where he reports to someone
12 about the investigations, ongoing investigations by the
13 FBI?

14 A. He does now. He does now. One of the problems that
15 I've discovered early on that it was technically a
16 liaison, but because he was -- I mean, this -- for
17 example, he is a DPD officer working with the FBI on the
18 Hansberry case, but, again, I didn't find out about the
19 Hansberry case until sometime in 2014.

20 So it is not like that the DPD liaison came
21 over and said, okay, here's a list of cases that the FBI
22 was investigating. It was a confidential investigation.
23 And many times the FBI will initiate and have ongoing
24 confidential investigations and will not tell the
25 department.



1  Q.  Yes, but after --

2  A.  Now, the DPD officer --

3          MR. DETTMER:  We are losing you.

4          MR. SUROWIEC:  Chief, hold on one second.

5  This is Jim Surowiec.

6              Whoever the IT person is, if they are on the

7  line or if anybody who can help, Chief is frozen.  Chief

8  Craig, I'm not seeing you move at all.  And, Dennis,

9  you're clipping in and out.

10          THE WITNESS:  You can't see this?

11          MR. SUROWIEC:  I'm wondering if there's

12  something we can do.

13          MR. DETTMER:  It says bandwidth is low.  It

14  says your bandwidth is low, Chief.  That's what I'm

15  getting a report of.

16          THE WITNESS:  Yes, I am in the office.  I'm in

17  my office, so this should be a good bandwidth, you know.

18          MR. DETTMER:  Yes, I would think so.

19          MR. SUROWIEC:  Should we reconnect?  Is there

20  an IT person?  Michael?

21          THE REPORTER:  The chief could go out and come

22  back in.

23              (Pause in proceedings

24              12:21 - 12:32 p.m.)

25          THE WITNESS:  In the interest of addressing

1  the transition between Han- -- can you hear me okay?

2          The transition of the Hansberry with the

3  Detroit staff that was embedded in the FBI was certainly

4  not something I was quite impressed with.  In fact, I

5  can candidly say that I went through a number of

6  commanding officers over at Internal Affairs prior to

7  getting to the one before Chris Graveline.  There was

8  someone named commander, who is now a Deputy Chief.

9          But the communication, seamless, didn't work

10  out in a manner that it should have, and at some point I

11  even moved Tim Ewald out of the FBI task force.  He has

12  since been restored to that position.  The communication

13  has changed dramatically.

14          My perception was that the DPD liaison role

15  was to work closely with the department executive team.

16  I recognize that there were some cases that the FBI were

17  investigating that they didn't necessarily want to brief

18  the department on.

19          However, because of the intimacy our DPD staff

20  had with the Hansberry case, I assumed or thought that

21  anything that wasn't addressed by the Feds could have

22  been easily been addressed by the department.  That did

23  not happen.

24          So as a result of that, it wasn't until -- and

25  I think I have said this several times throughout this

1  deposition -- it wasn't until that information we got

2  from the source of the type of alleged conduct that was

3  going on in Narcotics that we were able to effectively

4  launch our own probe, which we've done.

5          It's a DPD-led tasks force and, again, the FBI

6  is part of that task force.  There's a total of five

7  agents, three part-time, two permanent, and so now I

8  have a high level of confidence that the work that we're

9  doing now is the work that will finally make a

10  difference.

11          And finally eradicating, not describing

12  different points, a pattern of misconduct, and, again,

13  not by all, but just things that were allowed to happen

14  in Narcotics that weren't challenged.

15  BY MR. DETTMER:

16  Q.  You would agree the conviction of Hansberry and Watson

17  in February of 2017 should have opened up a lot of

18  information through Ewald to the Internal Affairs

19  people, correct?

20  A.  Absolutely.  He was technically assigned to Internal

21  Affairs, but it wasn't -- and, again, I liked --

22  personally liked him, Ewald.  I just think I

23  overestimated his capabilities, meaning that while he

24  had been attached to the FBI for a long time, clearly

25  working as an investigator in Internal Affairs is very

1  different than being a task force officer in the FBI.

2          You're not actually writing up investigations

3  and doing the kind of investigative work that IA is

4  doing.  The agents that worked there are on a much

5  different level.

6          I mean, for example, a lot of what the DPD

7  task force officers, Ewald would do, is they would

8  listen to wire conversations and make notes that would

9  then go off to the agents who were the ones who were

10  presenting the cases to the U.S. Attorney.

11          And so that was a piece of the transition that

12  didn't make a lot of sense.  And very frustrating, to be

13  honest, because I knew then -- I felt we had a missed

14  opportunity on some of the others that worked Narcotics,

15  that while they didn't meet the threshold for federal

16  prosecution, they certainly could have met the threshold

17  of administrative prosecution, if you will.

18          And so -- that was then.  But, again, the good

19  news was we were able to get very clear information on

20  the type of behaviors that were going on in Narcotics by

21  some.

22  Q.  Well, Chief, you would agree you're trying to change the

23      culture.  That's what you are talking about, correct?

24  A.  That has been something I've been trying to do for --

25      and have been successful.  I mean, we are in a 13-year

1    Consent Judgment.
2            The department was not compliant because there
3    was a culture of a lack of accountability by management.
4    That's a fact.  I've said it publicly then and I'll say
5    it publicly now.
6            So once we got out from under Consent Judgment
7    and we start to build a new management, an executive
8    team, that's when change started to take place.
9    Q.   We talked about -- I mentioned that Hansberry and
10   Watson, the conviction was in February of 2017.  And
11   between that period and August of 2019, 2 1/2 years, is
12   reflective of kind of a historical lack of supervision
13   that's gone on, at least going back to 2010, correct?
14   A.   I would say even before that.  I think the culture was
15   such that -- and this is my opinion.  It's not based on
16   fact.  It's -- my opinion is that when there were
17   investigations like the FBI would come in, do their
18   investigation, whoever got convicted got convicted, and
19   it was done.  It was over.
20           Mosley was different.  Mosley popped up.  He
21   got charged with the one incident.  I believe had
22   business or status quo had -- we had allowed it to be
23   that way, he would have been charged and business would
24   have continued.
25           But instead, I'm going to say it now for the



1    fifth time, a couple of things worked out in our favor.
2    One, we had some information.  Two, I had a hunch, if
3    you will, and the hunch was Mosley; this was not the
4    first time he engaged in this kind of criminal behavior.
5    There was no way for me to believe that.
6            So it was based on those two primary factors
7    that we launched the probe.  The fact that I had now a
8    former US Attorney who understood the workings on the
9    other side certainly was a recipe for success.
10           So -- and while this is a lengthy undertaking,
11   we're in the process, as of now, adding additional
12   staff, task force operation, because we are going back,
13   and, as I think I indicated early in my deposition,
14   we're really only back to 2017.
15           Again, I recognize that counsel believes that
16   we should have started in reverse.  It didn't work out
17   that way.  I'm still comfortable that we started where
18   we started and we're doing what we're doing now.
19   Q.   I'd like to raise two points.  We talked about the
20   July 2010 stop and 2 million whatever, officers, and
21   we've talked about Hansberry and Watson being convicted
22   in February '17.
23           Those two events on the Detroit Police
24   Department had constructive notice that there was a
25   problem with the police department, correct?  And they



1    investigated --
2            (Mulitple speakers
3            speaking at the same time.)
4    A.   I don't know if I -- I don't -- I can't agree with --
5    Q.   -- that they had Ewald?
6    A.   I am not going to agree with you.  So -- I'm not going
7    to agree with you, and I'm going to tell you on this
8    reason.
9            Number one, I wasn't here in 2010.  I don't
10   know about this tally sheet investigation.
11           You, on the record, said there was no
12   investigation.  The City's attorney said there was an
13   investigation.  And then you show that there was an
14   investigative report.  So I'm troubled by that.
15           So when you make a statement that the
16   department basically ignored -- let me just say this to
17   you.  I have never ignored anything in my tenure in this
18   police department.  I respond to what I am aware of, and
19   sometimes, as we are going down this journey of change,
20   there were things I wasn't made aware of.  So I can take
21   responsibility for that.
22           But if I had known what I know now, would I
23   have done things differently maybe at the conclusion of
24   Hansberry?  Absolutely.  I didn't know.  I didn't know.
25   I would have launched the task force then.

1    BY MR. DETTMER:
2    Q.   Chief, let me make the point about the tally sheet.  The
3    point really I was making with you, was, there was never
4    an investigation of the tally sheet.
5            The investigation was solely related to the
6    money counters and the inefficiency there.  And the real
7    issue was the tally sheet.  Why wasn't that
8    investigated?  We're talking about $280,000, not $15,000
9    because of a defective machine.
10           (Multiple speakers
11           speaking at the same time)?
12           THE WITNESS:  How about in my -- how about in
13   my expert opinion?  I don't think it's just about the
14   tally machine.  If you've got a concern, I think the
15   concern is more about there was an inadequate
16   investigation.
17           There was an investigation.  There wouldn't be
18   two separate investigations of the same issue.  That's
19   not even logical.  I've been doing this too long.  I'm
20   suggesting that you could have confronted me with --
21   said, well, do you think that, based on the fact that
22   the tally sheet was not mentioned in the counter
23   investigation, that the investigation was inadequate?
24   And I probably would have said to you, I'd agree.  If
25   the tally sheet was an issue, I would have wanted to

1    look at that if it wasn't mentioned.  But I haven't even

2    read that investigation to even know if the tally sheet

3    was mentioned.

4    BY MR. DETTMER:

5    Q.   I appreciate that.  But, Chief, I wasn't trying to

6         mislead you.  I actually had that, Internal Affairs

7         document as an exhibit.  If you can look at it and get

8         all of the exhibits from Mr. Surowiec, but I was not

9         trying to mislead you.

10                  The whole point is the issue of the tally

11        sheet was some indication of a serious problem, and as

12        events played out in the federal trial, it was the

13        essence of the criminality going back to 2010.

14   A.   And I can't argue with you.  I'm just saying that given

15        the way you described the investigation, because

16        initially you said there was no investigation.  And I

17        know what you were saying now.

18   Q.   No investigation of the tally sheet.

19   A.   Of the tally.  But why wouldn't the tally sheet and the

20        money counter have been all in one, because it's part of

21        the same issue.  It's the same issue.

22   Q.   And I agree with you.  Why wasn't that picked up when

23        Internal Affairs looked at a $15,000 discrepancy.  Why

24        didn't they pick that up?

25   A.   I don't know the answer to that.



1                  MR. SUROWIEC:  And I'm going to just object.

2         I object to --

3                  (Multiple speakers

4                  speaking at the same time)

5    BY MR. DETTMER:

6    Q.   And they should have had notice of that.  Or if they did

7         have notice, they just ignored it.

8                  MR. SUROWIEC:  Dennis, can I just raise a

9         point here?  I'd like to be able to ask him about five

10        minutes of cleanup questions.  I would like -- we're at

11        the 2:27 mark, and you're going over old stuff.

12                 MR. DETTMER:  Go ahead.

13                 Chief, nice talking to you.  Enjoy the rest of

14        your day.

15                 THE WITNESS:  Say what now?

16                 MR. SUROWIEC:  Chief, this is Jim Surowiec.  I

17        have about five minutes or less of cleanup questions I

18        just want to ask you.  Okay?

19   EXAMINATION BY MR. SUROWIEC:

20   Q.   You indicated you started here in 2013.  When you

21        started, you came from Cincinnati; is that correct?

22   A.   That's correct.

23   Q.   Okay.  When you found out about Hansberry, Watson, and

24        Leavells, you were informed by the FBI in 2014 that they

25        had been indicted and they were going to be charged?



1    A.   I would guess it was in 2014 only because soon after the

2         FBI brought me in to advise me, Hansberry and crew were

3         indicted not long after that.  So they had started --

4         they had an investigation that they started in 2010 that

5         was ongoing through 2013 up until the culmination time

6         of 2014.

7    Q.   Okay.  Were you ever informed at any point in time prior

8         to finding out in 2014 that the FBI was looking at

9         Hansberry and Watson and Leavells?

10   A.   I did not, no.  In fact --

11   Q.   Okay.

12   A.   What I wanted to say is in support of that.  So

13        Hansberry was a lieutenant working at the 12th Precinct,

14        and we were getting ready to make captains.  And so

15        right at the time that he came up as a potential

16        candidate, I learned about the investigation, so, of

17        course, it was confidential.

18                 I said nothing, but that was in 2014.  Up

19        until that point, he was -- at least by the team around

20        me, regarded him very favorably as a top candidate in

21        Detroit Police Department.

22   Q.   So there was nothing that anybody had notice of up until

23        the point the FBI said, knock knock.  He's getting

24        indicted, Watson is getting indicted, Leavells is going

25        down, that would have --

1    A.   Well, it wasn't that close.  They gave me a little bit.

2         By that time the investigation was rock solid.

3    Q.   Got you.

4    A.   And, again, when they're doing a confidential

5         investigation, they're not necessarily going to alert

6         the department because they don't know who to trust.

7    Q.   They could have been looking into you?

8    A.   I doubt that they were looking into me, but --

9    Q.   But they look at the highest levels.  I'm just saying

10        they look at everybody.

11   A.   I don't --

12   Q.   No?

13   A.   No.  I'm not saying that.  What I'm suggesting to you is

14        they do their investigation and they only bring in the

15        people who they feel they should, and the two task force

16        officers were already embedded.

17                 So to my knowledge, they were the only two

18        that knew about those Narcotic officers being

19        investigated.

20   Q.   In terms of 2010 when you weren't there, 2011, 2012,

21        2013, before you arrived, you don't have any evidence

22        because your director has not looked back that far, that

23        there was a pattern or culture of corruption, correct?  You haven't gotten back

24        that far?

1  A.   I have an opinion -- I have a strong opinion, yes.

2  Q.   Okay.  But it's not evidence based; is that fair?

3  A.   It's not evidence based.

4  Q.   It's based on your police -- you have police instincts

5       and gut and you're looking back and you're looking back

6       hard on and at everything?

7  A.   And I follow my gut sometimes, and I did on Mosley and I

8       was absolutely correct.  So, yes, I have a strong

9       opinion and instinct that's the result of almost

10      44 years of experience.

11 Q.   So when they're talking about -- when they are talking

12      about the newspaper articles where you are being quoted

13      as saying there is a culture of corruption or pattern

14      and practice, you're referencing, and correct me if I'm

15      wrong, you just found out about Hansberry, Watson,

16      Leavells.  There was also a civilian out of the

17      department by the name of Kenyal Brown, who was

18      indicted.

19           And then when you thought everything had been

20      shaken out and everybody had learned their lesson, in

21      2018 or '19, Mosley gets indicted.

22           Those are the individuals that we're talking

23      about in terms of being criminally charged, correct?

24 A.   Mosley gets -- the difference with Mosley, we had

25      additional information that we started to look at.  And



1       looking at that additional information helped me form an

2       opinion that there is a pattern.

3  Q.   Okay.

4  A.   Based on what I learned -- I'm telling you there's a

5       pattern of criminality that we started to see among

6       some.  Allegations.

7  Q.   Okay.

8  A.   And that we are investigating right now.

9       And I know that we have -- we have talked in the past

10      and we discussed the concept of Monell, which is a

11      Monell claim, a constitutional claim against the City

12      for having an unconstitutional custom and practice and

13      policy.

14           When you say a pattern and practice, are you

15      saying it in legal terms or are you saying it in your

16      terms as a layman saying I see a pattern?  I'm a police

17      officer --

18 A.   Not legal.  In lay terms as a police -- it's like when I

19      look at crime and I see that there's a cluster of

20      robberies in a certain location.  I call it a pattern.

21           If I see a cluster or similar type of alleged

22      misconduct, I'll call that a pattern, too.  Now, again,

23      we're talking about allegations.

24 Q.   Okay.  How many at high point did you say Narcotics had

25      in it before you cut the staff in half?



1  A.   I think it was already asked and answered.  I think

2       Dennis had an accurate account.  Roughly 40-something,

3       down to maybe 24, almost in half.  We focused on the

4       Major Violators, which was the old conspiracy, if you

5       will, and street enforcement, which is going to be left

6       with the precincts.

7  Q.   So of 40 officers at the high point, we have -- in terms

8       of police officers, Hansberry, Watson, Leavells, and

9       Mosley who were convicted.  No one else, correct?

10 A.   As far as I know.

11 Q.   Okay.  Who has -- at the department, under your watch,

12      who has the final decisionmaking authority as to what

13      policies are enacted?  Like the one that was enacted on

14      Major Violators and establishing the new way?

15 A.   I initiate the policy, and I don't know the date that

16      the police commission came back into their authority,

17      but they have to approve policy enacted by the Detroit

18      Police Department.

19 Q.   Okay.  Does a police officer have the authority to enact

20      policy?

21 A.   They do not.

22 Q.   Does a sergeant have the power to enact a policy?

23 A.   No.  Carry out policy.

24 Q.   Lieutenant, captain, commander, do any of those

25      individuals have the ability or authority to enact

1       policy?

2  A.   No.

3  Q.   Let me take a quick look here.

4  A.   I'm getting close.  Help me out.  Help me out.

5  Q.   The last question I'll ask you is, so when you're making

6       these statements, because Mr. Dezsi showed you a lot of

7       news articles about widespread corruption, that is in

8       direct response to Hansberry, Leavells, Watson, and

9       Mosley; is that fair?

10 A.   Mosley, but in the interest of fairness, because of the

11      probe -- the probe was just not for Mosley.  We didn't

12      launch this probe just for Mosley.

13 Q.   Right.

14 Q.   Okay?

15 A.   But I'm saying it wasn't in connection to 2010, '11,

16      '12, '13, '14 --

17 A.   No, I didn't have any information then.

18 Q.   Fair enough.

19 A.   I might have had suspicions, but the 2010 matter that

20      was culminating in 2014, I did not have the information

21      that I now have.

22 Q.   All right.

23 A.   So if I'm saying there's a pattern, a widespread, given

24      what I now know, the allegations, and I've got to put

25      emphasis on alleged, because there's been no additional

1 people charged. There has been one that has been
2 retired or resigned in lieu of termination, which was
3 part of the alleged misconduct. She just didn't get
4 terminated. She resigned in lieu of.
5 Q. Here is my windup. The cases that we are now dealing
6 with, because one has been dismissed, one of the five
7 cases has been dismissed. So we've got this case, which
8 is Metris-Shamoon versus City of Detroit and all of the
9 individuals. Frontczak versus City of Detroit. Reid
10 versus City of Detroit, and Gardella -- I'm sorry,
11 that's --
12 A. You know, you're naming all of these cases. I don't
13 have them in front of me to know which, so...
14 Q. That was my question. There was one more there.
15 Lockard versus City of Detroit.
16       Do you know anything about those cases?
17 A. Not definitively, no. I mean --
18 Q. Okay.
19 A. If you named officers involved in the cases, the names
20 may --
21 Q. But in terms of the allegations that are involved in
22 those cases -- I mean, they're asking you questions
23 about a Monell claim and about policy in the City.
24 We're really here to talk about these cases.
25       Do you have any intimate knowledge of the



1 lawsuits?
2 A. Some of the lawsuits we have opened up and initiated
3 misconduct investigations, as I indicated during our
4 predeposition, as I've indicated here. Matelic came out
5 of a civil lawsuit. Geelhood came out of Wayne County
6 Prosecutor's Integrity Unit, if my memory serves me
7 correct. So I know for a fact, those two -- one for
8 sure came out of a lawsuit.
9 Q. Okay.
10 A. That's very different today. That if people are filing
11 lawsuits, and in the lawsuit they are alleging
12 misconduct, we will open up and initiate an Internal
13 Affairs investigation.
14       It happened early on because it wasn't a
15 seamless transition. A lot of times the Law Department
16 didn't notify the department of allegations. This has
17 been, fortunately, a recent change.
18       This is something that I gave Grant Ha, who
19 works on my staff, that anytime a lawsuit comes in
20 alleging misconduct, we have to be notified so that we
21 can open up a misconduct. That didn't happen before.
22 Q. Okay. Thank you, sir.
23 A. All right. Thank you.
24       MR. DETTMER: One quick question. Very quick.
25

1 RE-EXAMINATION BY MR. DETTMER:
2 Q. You're still looking at crew members of Hansberry and
3 Geelhood's crews, and I would suggest to you those crews
4 are members of the various grades of our four current
5 cases. You don't know any of the detail of that; fair
6 to say?
7 A. No, haven't gone that far back. As I indicated in my
8 earlier testimony, we are working from Mosley back.
9 Possibly when we get to 2010, 2011, or if -- or through
10 the course of lawsuits that are coming in, we'll
11 initiate investigations.
12       So I am certain that we're going to be looking
13 at individuals who are probably no longer members of the
14 department, and who have retired. There's some cases
15 that the Wayne County Prosecutor's office is also
16 interested in exonerating. Hey, folks, I've got to
17 really -- I mean, I'm actually ten minutes out. So...
18       MR. SUROWIEC: I am done.
19       MR. DETTMER: Good to you see you, Chief.
20 Thank you.
21       THE WITNESS: Thank you.
22       (Deposition concluded about 3:00 p.m.)
23
24
25



1 CERTIFICATE OF NOTARY.
2 STATE OF MICHIGAN        )
3                          ) SS
4 COUNTY OF ST. CLAIR      )
5       I, Kelley Whitaker, Certified Shorthand Reporter, a
6 Notary Public in and for the above county and state, do
7 hereby certify that the above deposition was taken by
8 Virtual means; that the witness was by me first duly
9 sworn to testify to the truth, and nothing but the
10 truth, that the foregoing questions asked and answers
11 made by the witness were duly recorded by me
12 stenographically and reduced to computer transcription;
13 that this is a true, full and correct transcript of my
14 stenographic notes so taken; and that I am not related
15 to, nor of counsel to either party nor interested in the
16 event of this cause.
17
18
19           Kelley A. Whitaker Nader
20           Kelley A. Nader
21           RPR, CSR 0977 Notary Public,
22           St. Clair County, Michigan
23 My Commission expires: 1/27/2026
24
25

# **EXHIBIT K**

# Detroit police probe yields allegations of widespread corruption in drug unit

George Hunter, The Detroit News    Published 11:23 p.m. ET Dec. 11, 2019 | Updated 10:05 a.m. ET Dec. 12, 2019

*Detroit* — Four months after Detroit police internal affairs officers raised their own department's narcotics unit, (/story/news/local/detroit-city/2019/08/22/detroit-cops-seize-drug-records-amid-internal-probe/2084344001/) investigators have uncovered alleged corruption that includes drug cops planting evidence, lying to prosecutors in search warrant affidavits, robbing dope dealers and embezzling funds, police officials said.

Since the Aug. 22 raid, in which dozens of files and 50 computers were seized and analyzed, Chief James Craig has reassigned everyone in the unit with five or more years' experience.

"I'm extremely concerned there may be a pattern and practice of criminal misconduct in the narcotics unit," Craig said. "Sadly, as we continue our probe, we think it's going to grow in terms of magnitude."

The corruption is possibly so extensive that Chris Graveline, director of the department's Professional Standards Section and head of the ongoing investigation, set up a hotline this week, urging anyone with knowledge of misconduct by drug officers to call (313) 596-3190.



**Chris Graveline, director of the Detroit police Professional Standards Section, addresses the media.** *(Photo: George Hunter)*

Craig said he enlisted help from the FBI, Michigan State Police and U.S. Attorney's Office after the material seized in the raid revealed more problems than anticipated.

"This started with a small team of our own Professional Standards investigators, but as they starting seeing the scope of the issues we were dealing with, the team has since grown to 17, and we may ask for even more help," Craig said. "This is a major corruption investigation, but I want to caution that these are just allegations at this point.

"The files we seized in the raid go back as far as 10 years, so the focus of our probe is roughly 10 years," Craig said. "However, since the raid, we've only looked at the past year and a half. So there's a lot more material to go through.

"We're not just looking at documents and case files; so far, we've also interviewed more than 20 complainants who were involved in narcotics trafficking, who had search warrants executed on them but were never arrested," Craig said.

Among the investigation's findings:

- Six instances of narcotics officers stealing money from drug dealers, and two cases of officers planting drugs on suspects.
- False affidavits allegedly were presented to prosecutors to get search warrants. "It's alleged that the probable cause to get the warrants was fabricated," Craig said. "Surveillance that was supposedly conducted to get the warrants wasn't done; information (officers) said they got from confidential informants was erroneous; and information (officers) said they'd gleaned from (the Detroit police drug hotline) 224-DOPE was non-existent. So far, we've identified eight instances where that may have occurred."
- Drug suspects were designated as confidential informants without permission. "Only a prosecutor, either from the Wayne County Prosecutor's Office or U.S. Attorney's Office, can authorize a member of the department to turn a suspect into an informant," Craig said. "Based on our investigation, so far we've found 11 instances where officers improperly made suspects into informants."
- Funds meant to pay informants were embezzled. "We found 50 vouchers with thumb prints and signatures of informants, but no dollar amount listed," Graveline said. It's alleged officers told informants they'd be paid a certain amount for information; the officers allegedly submitted requests for more money and pocketed the difference. (Thumbprints are used on the vouchers to identify informants.)

The first leg of the investigation — the latest in a series of probes into the former Narcotics Section, which was closed in 2014 and reformed as the Major Violators Section because of rampant corruption — kicked off in April, after a large shipment of drugs that had been seized in Detroit was switched for another substance by the time it got to Chicago for a court hearing, Craig said.

Former Detroit narcotics officer Michael Mosley, who was indicted in federal court on charges related to allegations that he took a bribe from a drug dealer, is central to the investigation, Craig said.

Mosley, who was indicted the same day the drug unit was raided, is scheduled to stand trial March 3.

"I can tell you primarily we're looking at the crew (Mosley) was assigned to, which includes a supervisor and five officers," Craig said. All have been reassigned, the chief said.

"I strongly believe that Mosley's criminal activity didn't start with the one time he was caught by the FBI, which is one of the reasons I ordered this investigation," he said.

"We're also looking very closely at the supervisors and managers in the Major Violators Section; what did they know, and what did they do about it?" Craig said. "This investigation is looking very closely at management that oversaw narcotics."

Craig stressed that moving people with five years of experience doesn't necessarily mean they are under suspicion.

Mosley's attorney, Robert Morgan, declined to comment.

Craig said the probe also is focusing on the activities of officers who worked withex-Detroit narcotics cops David Hansberry, Bryan Watson and Arthur Leavells, who in 2017 were convicted in federal court (/story/news/local/detroit-city/2017/02/22/ex-detroit-cops-face-sentencing-extortion/98245018/)of offenses that included ripping off drug dealers and stealing money and drugs that had been seized in raids.

That investigation, which started in 2010, was focused solely on "the criminality of those who were indicted," Craig said. "(The current probe) is also taking a look at processes and other issues that could have contributed to the alleged problems we're uncovering."

Allegations of corruption in the Detroit police narcotics unit go back decades. In 1973, 22 Detroit cops from the 10th Precinct were indicted on charges of involvement in heroin trafficking; nine of the officers were convicted of various crimes.

In 1991, five current and former Detroit cops and a relative of then-Mayor Coleman Young were among a group that was charged with providing protection for FBI agents posing as drug traffickers. Five defendants pleaded guilty in federal court, while other officers were acquitted. **Buy Photo**



**From left, Detroit Police Chief James Craig and Lt. Charles Flanagan during a raid at 9432 Moross in Detroit on July 3, 2014.** *(Photo: David Coates, The Detroit News)*

Charles Flanagan, a Detroit cop for 30 years before he retired in 2015, ran the former Narcotics Section from 2013-15. He said when he took over the unit, he found "problems that existed long before I got there."

Flanagan reported to Craig that he'd uncovered numerous issues, including a sergeant who had failed to turn in 32 pieces of drug evidence confiscated from hospitalized suspects, and another sergeant who made up false evidence tags for items seized during drug raids, including three flat-screen TVs, a laptop computer and an Xbox 360 video game system.

"I tried to correct some of the obvious issues when I got there," Flanagan said. "Most of the problems I encountered were things that were years old.

"One of the biggest problems in Narcotics historically has been that commanding officers were handcuffed because a lot of people would end up in those specialized units because of cronyism and nepotism," Flanagan said. "They'd have so-called mentors at the higher ranks in the department, and no matter how bad they were, their bosses were afraid to get rid of them."

Craig, who investigated corruption while he was a Los Angeles cop, blamed "basic greed" for many of the problems plaguing the drug unit.

"We thought that the indictment of the Hansberry team would have caused people to walk straight, but greed is the foundation for engaging in corruption," Craig said. "It comes down to basic greed.

"I'm not happy about what we've found in this investigation, but I think it's important to advise the public about what's going on," he said. "Some people might want to say this department is out of control, but I would remind them that this is a DPD-initiated investigation. We're not hiding from this."

ghunter@detroitnews.com

(313) 222-2134

Twitter: @GeorgeHunter_DN

Read or Share this story: https://www.detroitnews.com/story/news/local/detroit-city/2019/12/11/detroit-police-probe-uncovers-widespread-alleged-corruption-drug-unit/4398321002/

# Detroit police chief: Longstanding culture of drug unit corruption

__George Hunter__, **The Detroit News**　　Published 4:19 p.m. ET Dec. 12, 2019 | **Updated 4:49 p.m. ET Dec. 12, 2019**

*Detroit* — Selling drugs in any city is dangerous, as dealers risk being killed or robbed by rivals — but in Detroit, pushers for years also have known they could be ripped off by cops, police chief James Craig said Thursday.

"The culture here has been such that drug traffickers figured that was just the cost of doing business," Craig said during a press conference at Public Safety Headquarters. "They knew 'I could get killed, robbed by my competition or robbed by cops.' It's not like that in other cities I've worked in."



**Detroit police chief James Craig and Chris Graveline, director of the Professional Standards Section, address the media on Thursday.** *(Photo: George Hunter)*

Craig's remarks followed a Detroit News report (/story/news/local/detroit-city/2019/12/11/detroit-police-probe-uncovers-widespread-alleged-corruption-drug-unit/4398321002/) about a four-month ongoing investigation that uncovered "a pattern and practice" of alleged corruption in the drug unit, called the Major Violators Section.

The allegations include drug cops planting evidence, lying to prosecutors in search warrant affidavits, robbing dope dealers and embezzling funds meant to pay informants.

The Detroit-initiated investigation started Aug. 22, when Detroit internal affairs officers raided their department's own drug unit, seizing and analyzing dozens of files and 50 computers.

Investigators also have interviewed more than 20 people whose drug houses were raided but were not arrested, and Craig said they told police it's no secret on the street that many Detroit drug cops were crooked.

In multiple instances, investigators found Detroit officers raided drug houses, seized money and drugs, and then told the dealers they could "work off the case" by giving police information about other drug houses.

After getting the information, Craig said the cops allegedly would "start the process all over again" when they raided the locations the dealers had told them about.

Officers would sometimes make confidential informants out of the people whose houses they'd raided without getting the required authorization from prosecutors, Craig said. Then, the officers allegedly embezzled the funds used to pay the informants, the chief said.

"Imagine you're a drug trafficker," Craig said. "A search warrant is executed at your home. Your next thought is, 'I'm going to be arrested.' Instead, you're getting paid, and that case is over.

"Those who are trafficking large amounts of drugs got a pass based on the decision of a police officer. They're not going to come knocking on my door saying, 'chief, we want to make a complaint.'"

Chris Graveline, a former assistant U.S. Attorney who heads the police department's Professional Standards Section, said the alleged corrupt cops could taint other cases in which they testified.

"The first thing you have to ask yourself is, what role did that witness play in my case?" Graveline said. "If it's a major role, then that's a big concern. Immediately, you're thinking 'I need to evaluate each of these cases, and how significant their testimony is in this case.

"This is going to require a lot of evaluation, not only by the Detroit Police Department but by prosecutors," Graveline said.

Wayne County Prosecutor Kym Worthy declined to comment, her spokeswoman, Maria Miller, said Thursday.

The alleged corruption is thought to be so rampant, police officials set up a 24-hour hotline at (313) 596-3190 to encourage people to call in tips about crooked drug cops.

"It's been up 24 hours, and we've already started to receive tips," Craig said. "One of the things we've learned from the complainants we've already interviewed was that they expect (corruption by narcotics officers)."

Craig stressed the alleged crooked officers make up only a small portion of the police department.

"How are you going to put on the badge ... and you're as much of a criminal as the people you're going after?" Craig said. "If you make the conscious decision to engage in criminal conduct, you're no longer a police officer. We're going to find you, and we're going to arrest you."

Read or Share this story: https://www.detroitnews.com/story/news/local/detroit-city/2019/12/12/detroit-police-chief-longstanding-culture-drug-unit-corruption/4410031002/

# EXHIBIT L

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
----------------------------------------------------------  x
                                                            :
In re                                                       :          Chapter 9
                                                            :
CITY OF DETROIT, MICHIGAN,                                  :          Case No. 13-53846
                                                            :
                      Debtor.                               :          Hon. Steven W. Rhodes
                                                            :
                                                            :
----------------------------------------------------------  x
```

---

**EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**
**(October 22, 2014)**

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

13-53846-swr  Doc 8045-39  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 230 of 282

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ................. 1

    A.      Defined Terms. ................................................................................................................ 1

    B.      Rules of Interpretation and Computation of Time. ....................................................... 30

          1.      Rules of Interpretation. .................................................................................. 30

          2.      Computation of Time. ..................................................................................... 30

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN; EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................................................................................................... 30

    A.      Unclassified Claims. .................................................................................................... 31

          1.      Payment of Administrative Claims. ............................................................... 31

          2.      Bar Dates for Administrative Claims. ............................................................ 31

    B.      Classified Claims. ....................................................................................................... 32

          1.      Designation of Classes. .................................................................................. 32

          2.      Subordination; Reservation of Rights to Reclassify Claims. .......................... 33

          3.      Treatment of Claims. ...................................................................................... 33

    C.      Confirmation Without Acceptance by All Impaired Classes. ....................................... 45

    D.      Treatment of Executory Contracts and Unexpired Leases. .......................................... 45

          1.      Assumption. .................................................................................................... 45

          2.      Assumption of Ancillary Agreements. ............................................................ 45

          3.      Approval of Assumptions and Assignments. .................................................. 45

          4.      Payments Related to the Assumption of Executory Contracts and Unexpired Leases. ........................................................................................................... 46

          5.      Contracts and Leases Entered Into After the Petition Date. ............................ 46

          6.      Rejection of Executory Contracts and Unexpired Leases. .............................. 46

          7.      Rejection Damages Bar Date. ......................................................................... 46

          8.      Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. ......................................................................................... 47

          9.      Insurance Policies. ......................................................................................... 47

ARTICLE III CONFIRMATION OF THE PLAN. ................................................................................ 47

    A.      Conditions Precedent to the Effective Date. ................................................................ 47

    B.      Waiver of Conditions to the Effective Date. ............................................................... 48

    C.      Effect of Nonoccurrence of Conditions to the Effective Date. ..................................... 49

    D.      Effect of Confirmation of the Plan. ............................................................................ 49

          1.      Dissolution of Retiree Committee. ................................................................. 49

          2.      Preservation of Rights of Action by the City. ................................................ 49

          3.      Comprehensive Settlement of Claims and Controversies. .............................. 49

          4.      Discharge of Claims. ...................................................................................... 50

| | | | |
|---|---|---|---|
| | 5. | Injunction. | 50 |
| | 6. | Exculpation. | 51 |
| | 7. | Releases | 52 |
| E. | | No Diminution of State Power | 53 |
| F. | | Effectiveness of the Plan. | 53 |
| G. | | Binding Effect of Plan. | 53 |
| ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN | | | 54 |
| A. | | DWSD. | 54 |
| | 1. | Rates and Revenues. | 54 |
| | 2. | DWSD CBAs. | 54 |
| | 3. | Potential DWSD Authority Transaction. | 54 |
| B. | | The New B Notes, New C Notes and New LTGO Bonds. | 55 |
| C. | | The UTGO Settlement. | 55 |
| D. | | The State Contribution Agreement. | 55 |
| | 1. | State Contribution. | 55 |
| | 2. | Income Stabilization Payments. | 55 |
| | 3. | Conditions to State's Participation. | 56 |
| | 4. | Release of Claims Against the State and State Related Entities. | 56 |
| E. | | The DIA Settlement. | 57 |
| | 1. | Funding Contributions. | 57 |
| | 2. | Transfer of DIA Assets. | 57 |
| | 3. | Conditions to the DIA Funding Parties' Participation. | 57 |
| F. | | Contingent Payment Rights | 58 |
| | 1. | Special Restoration | 58 |
| | 2. | General Restoration | 58 |
| G. | | The OPEB Settlement. | 58 |
| H. | | The LTGO Settlement. | 59 |
| I. | | The Syncora Settlement | 59 |
| J. | | The FGIC/COP Settlement | 59 |
| K. | | Issuance of the New Securities. | 59 |
| L. | | Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents. | 60 |
| M. | | Release of Liens. | 60 |
| N. | | Professional Fees | 61 |
| | 1. | Professional Fee Reserve | 61 |
| | 2. | Fee Review Order | 61 |
| | 3. | Dismissal of the Fee Examiner | 61 |
| | 4. | Potential Review of Fees Not Subject to Fee Review Order | 61 |

13-53846-tjt Doc 13975-9 Filed 09/17/22 Entered 09/17/22 34:833:338 Page 232 of
13-53846-swr Doc 8045-9 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 9 of 31
282

5. Court-Appointed Expert .................................................................................. 62

O. Assumption of Indemnification Obligations. .............................................................. 62

P. Incorporation of Retiree Health Care Settlement Agreement. ...................................... 62

Q. Payment of Workers' Compensation Claims................................................................. 62

R. 36th District Court Settlement. ..................................................................................... 62

S. Payment of Certain Claims Relating to the Operation of City Motor Vehicles. ........... 62

T. Payment of Tax Refund Claims. .................................................................................... 63

U. Utility Deposits. ............................................................................................................ 63

V. Pass-Through Obligations. ............................................................................................ 63

W. Exit Facility. .................................................................................................................. 63

X. Post-Effective Date Governance. .................................................................................. 63

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN ........................... 64

A. Appointment of Disbursing Agent. ............................................................................... 64

B. Distributions on Account of Allowed Claims. .............................................................. 64

C. Certain Claims to Be Expunged. ................................................................................... 64

D. Record Date for Distributions; Exception for Bond Claims. ........................................ 64

E. Means of Cash Payments. .............................................................................................. 64

F. Selection of Distribution Dates for Allowed Claims..................................................... 65

G. Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise
Insured. .......................................................................................................................... 65

H. City's Rights of Setoff Preserved. ................................................................................. 65

I. Delivery of Distributions and Undeliverable or Unclaimed Distributions. ................... 65

1. Delivery of Distributions Generally.................................................................. 65

2. Delivery of Distributions on Account of Bond Claims...................................... 65

3. De Minimis Distributions / No Fractional New Securities. ............................... 66

4. Undeliverable or Unclaimed Distributions. ...................................................... 66

5. Time Bar to Cash Payment Rights..................................................................... 66

J. Other Provisions Applicable to Distributions in All Classes. ....................................... 66

1. No Postpetition Interest. .................................................................................... 66

2. Compliance with Tax Requirements. ................................................................. 66

3. Allocation of Distributions. ............................................................................... 67

4. Surrender of Instruments. .................................................................................. 67

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............................................ 67

A. Treatment of Disputed Claims. ...................................................................................... 67

1. General................................................................................................................ 67

2. ADR Procedures. ................................................................................................ 68

3. Tort Claims. ........................................................................................................ 68

B.      Disputed Claims Reserve. ..................................................................................... 68

C.      Objections to Claims. ............................................................................................ 69

     1.      Authority to Prosecute, Settle and Compromise. .......................................... 69

     2.      Expungement or Adjustment of Claims Without Objection. ......................... 69

     3.      Extension of Claims Objection Bar Date. .................................................... 69

     4.      Authority to Amend List of Creditors. ......................................................... 69

ARTICLE VII RETENTION OF JURISDICTION .................................................................. 69

ARTICLE VIII MISCELLANEOUS PROVISIONS ................................................................. 71

A.      Plan Supplements. ................................................................................................. 71

B.      Modification of the Plan. ....................................................................................... 71

C.      Revocation of the Plan. .......................................................................................... 71

D.      Severability of Plan Provisions. ............................................................................. 71

E.      Effectuating Documents and Transactions. ............................................................ 71

F.      Successors and Assigns. ......................................................................................... 72

G.      Plan Controls. ........................................................................................................ 72

H.      Notice of the Effective Date. .................................................................................. 72

I.      Governing Law. ..................................................................................................... 72

J.      Request for Waiver of Automatic Stay of Confirmation Order. ............................... 72

K.      Term of Existing Injunctions and Stays. ................................................................ 72

L.      Service of Documents ............................................................................................ 72

     1.      The City ...................................................................................................... 73

     2.      The Retiree Committee ................................................................................ 73

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit I.A.9 | Principal Terms of 36th District Court Settlement |
| Exhibit I.A.66 | Schedule of Class 9 Eligible City Assets |
| Exhibit I.A.88 | Schedule of COP Swap Agreements |
| Exhibit I.A.108 | Form of Detroit General VEBA Trust Agreement |
| Exhibit I.A.112 | Form of Detroit Police and Fire VEBA Trust Agreement |
| Exhibit I.A.126 | Principal Terms of DIA Settlement |
| Exhibit I.A.127 | Form of DIA Settlement Documents |
| Exhibit I.A.132 | Dismissed FGIC/COP Litigation |
| Exhibit I.A.133 | Dismissed Syncora Litigation |
| Exhibit I.A.148 | Schedule of DWSD Bond Documents & Related DWSD Bonds |
| Exhibit I.A.156 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.159 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.183 | Principal Terms of Exit Facility |
| Exhibit I.A.197 | Form of FGIC/COP Settlement Documents |
| Exhibit I.A.198 | Form of FGIC Development Agreement |
| Exhibit I.A.216 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.230 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.237 | Form of LTGO Settlement Agreement |
| Exhibit I.A.246 | Principal Terms of New B Notes |
| Exhibit I.A.247 | Form of New B Notes Documents |
| Exhibit I.A.248 | Principal Terms of New C Notes |
| Exhibit I.A.249 | Form of New C Notes Documents |
| Exhibit I.A.250.a | Form of New GRS Active Pension Plan |
| Exhibit I.A.250.b | Principal Terms of New GRS Active Pension Plan |
| Exhibit I.A.254.a | Form of New PFRS Active Pension Plan |

Exhibit I.A.254.b        Principal Terms of New PFRS Active Pension Plan

Exhibit I.A.280          Prior GRS Pension Plan

Exhibit I.A.281          Prior PFRS Pension Plan

Exhibit I.A.292          Restoration Trust Agreement

Exhibit I.A.298          Retiree Health Care Settlement Agreement

Exhibit I.A.305          Schedule of Secured GO Bond Documents

Exhibit I.A.332          State Contribution Agreement

Exhibit I.A.340          Form of Syncora Development Agreement

Exhibit I.A.344          Form of Syncora Settlement Documents

Exhibit I.A.354          Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds

Exhibit I.A.360          Form of UTGO Settlement Agreement

Exhibit II.B.3.q.ii.A    Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits

Exhibit II.B.3.q.ii.C    Terms of PFRS Pension Restoration

Exhibit II.B.3.r.ii.A    Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits

Exhibit II.B.3.r.ii.C    Terms of GRS Pension Restoration

Exhibit II.D.5           Schedule of Postpetition Collective Bargaining Agreements

Exhibit II.D.6           Executory Contracts and Unexpired Leases to Be Rejected

Exhibit III.D.2          Retained Causes of Action

    **6.**   **taking any actions to interfere with the implementation or consummation of the Plan.**

    **b.**   **All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.**

    **6.**   **Exculpation.**

    From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; underline{provided} that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the Syncora Exculpated Parties solely in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in connection with the FGIC/COP Settlement Documents and any actions or litigation positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the RDPMA Exculpated Parties and (g) the COP Agent, solely in its capacity as such and solely in connection with any Distributions made pursuant to the terms of the Plan; underline{provided}, underline{further}, that the foregoing provisions in this Section III.D.6 shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan. This Section III.D.6 shall not affect any liability of (a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or FGIC or (b) the Syncora Exculpated Parties or FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties.

7. **Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

a. each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i. all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); provided further, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii. all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

-52-

13-53846-tjt Doc 13027-8 Filed 05/17/22 Entered 05/17/22 13:29:38 Page 200 of 282
13-53846-swr Doc 8045 Filed 10/22/14 Entered 10/22/14 03:48:38 Page 60 of 81

1. **The City**

   David G. Heiman, Esq.
   Heather Lennox, Esq.
   Thomas A. Wilson, Esq.
   JONES DAY
   North Point
   901 Lakeside Avenue
   Cleveland, Ohio 44114
   Telephone: (216) 586-3939
   Facsimile: (216) 579-0212

   Bruce Bennett, Esq.
   JONES DAY
   555 South Flower Street
   Fiftieth Floor
   Los Angeles, California 90071
   Telephone: (213) 243 2382
   Facsimile: (213) 243 2539

   Jonathan S. Green, Esq.
   Stephen S. LaPlante, Esq.
   MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
   150 West Jefferson
   Suite 2500
   Detroit, Michigan 48226
   Telephone: (313) 963-6420
   Facsimile: (313) 496-7500

   (Counsel to the City)

2. **The Retiree Committee**

   Claude Montgomery, Esq.
   Carole Neville, Esq.
   DENTONS US LLP
   1221 Avenue of the Americas
   New York, New York 10020
   Telephone: (212) 768-6700
   Facsimile: (212) 768-6800

   Sam J. Alberts, Esq.
   DENTONS US LLP
   1301 K Street NW, Suite 600, East Tower
   Washington, DC 20005-3364
   Telephone: (202) 408-6400
   Facsimile: (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

(Counsel to the Retiree Committee)


Dated: October 22, 2014                Respectfully submitted,

                                       The City of Detroit, Michigan


                                       By:    /s/ Kevyn D. Orr
                                       Name:  Kevyn D. Orr
                                       Title: Emergency Manager for the City of Detroit, Michigan

-74-

13-53846-tjt  Doc 13505-89  Filed 09/17/22  Entered 09/17/22 18:29:38  Page 240 of 282
13-53846-swr  Doc 8045-8  Filed 10/22/14  Entered 10/22/14 03:43:25  Page 81 of 82

# EXHIBIT M



KYM L. WORTHY
PROSECUTING ATTORNEY

COUNTY OF WAYNE
OFFICE OF THE PROSECUTING ATTORNEY

FRANK MURPHY HALL OF JUSTICE
1441 ST. ANTOINE STREET
DETROIT, MICHIGAN 48226-2302

Press Release
March 24 ,2020
Two Pages

*For Immediate Release*

Contact:  Maria Miller
Wayne County Prosecutor's Office
Assistant Prosecuting Attorney
(313) 224-5817
(313) 213-0457
mmiller@waynecounty.com

## WCPO to Dismiss Two Narcotics Cases

On March 24, 2020, the Wayne County Prosecutor's Office Conviction Integrity Unit (CIU) presented an order which was signed by Third Circuit Court Chief Judge Timothy Kenny dismissing the case against Darell Chancellor who was convicted on December 12, 2012, of Possession of 450 grams to 999 grams of Cocaine.  He was sentenced to 14 years, three months to 30 years as a Habitual Fourth Offender.

On the same day, the Wayne County Prosecutor's Office Public Integrity Unit presented an order which was signed by to Chief Judge Timothy Kenny dismissing the case against Darrell Richmond, who was convicted on August 9, 2019, of Delivery/Manufacture Narcotics Less than 50 grams and Felony Firearm Second Degree. He was sentenced to three to 20 years on the drug charge and a five-year consecutive sentence on the felony firearm charge.

Both cases were dismissed by order and no court appearances were held due to the Covid-19 pandemic.

**Statement of Prosecutor Kym Worthy**

 Prosecutor Worthy said, "The cases that we are announcing today are the result of the tireless work of investigators from the Detroit Police Department and the Federal Bureau of Investigations (Richmond), and the Wayne County Prosecutor's Office Conviction Integrity Unit (Chancellor). These are the first cases that deal directly with fraudulent search warrant affidavits and

other activities by highly unethical and compromised narcotics police officers. These cases take time to review, and we expect that there will be more. I will not hesitate to free other wrongfully convicted individuals if we find tainted or fraudulent evidence."

**-more-**

### Darell Chancellor CIU Recommendation*

The alleged evidence in the case about Mr. Chancellor cannot be corroborated and has been credibly refuted. It was based upon a fraudulent search warrant. Mr. Chancellor's claim that he was wrongfully convicted is credible and his case will be dismissed by the Conviction Integrity Unit.

### Darrell Richmond - Public Integrity Unit Recommendation *

The DPD and FBI investigation clearly shows that the information provided in the search warrant for Mr. Richmond's home was based upon false and not-credible information. The conviction of Mr. Richmond will be dismissed by the WCPO Public Integrity Unit.

*Note: At this time limited information is being released BY WCPO due to the ongoing investigation of the Detroit Police Narcotics Unit by DPD and the FBI.

#####

# **EXHIBIT N**



**detroit**
**police**
James E. Craig
Chief of Police          D.P.D. 568 (rev. 9.97)

**INTER-OFFICE MEMORANDUM**
**PROFESSIONAL STANDARDS BUREAU**

| Date |
| --- |
| July 18, 2014 |

To:        Chief of Police James E. Craig (Through Channels)

Subject:   **DUTY STATUS REPORT FOR THE FOLLOWING OFFICERS ASSIGNED TO NARCOTICS:**
           **SERGEANT STEPHEN GEELHOOD, BADGE S-501, PENSION #233448**
           **POLICE OFFICER LARRY BARNETT, BADGE 2841, PENSION #233194**
           **POLICE OFFICER STEVEN RILEY, BADGE 197, PENSION #235195**
           **POLICE OFFICER AMY MATELIC, BADGE 2379, PENSION #234518**
           **POLICE OFFICER ARTHUR LEAVELLS, BADGE 463, PENSION #235788**
           **POLICE OFFICER GREGORY TOURVILLE, BADGE 682, PENSION #235981**

From:      Commander Johnny Thomas, Professional Standards Bureau

### ISSUE:

On July 10, 2014, members of Internal Affairs suspended Sergeant Stephen Geelhood, badge S-501, and Police Officers Larry Barnett, badge 2841, Steven Riley, badge 197, Amy Matelic, badge 2379, Arthur Leavells, badge 463 and Gregory Tourville, badge 682, after it was discovered that during an investigation the officers were captured on video during a narcotic raid, putting at least five (5) small boxes, later identified as boxes of High Intensity Light bulbs, into a larger box as well as into bags. These items were not placed on evidence and are unaccounted for. The video also shows that at least four (4) officers are in this same room at one time while the light bulbs are being placed into the box and bag.

What should Sergeant Geelhood and Officers Barnett, Riley, Matelic, Leavells and Tourvilles duty status be?

### DISCUSSION:

On June 19, 2014, Sergeant Juan Ayala, badge S-266, assigned to Internal Affairs, received a phone call from a Mr. Brent Rayis, W/M/30, of 3271 Edmunton, Rochester Hills, in which Mr. Rayis alleged that on February 13, 2014, at approximately 1:30 P.M., he was at 20103 W. Eight Mile Rd when it was raided by the Narcotics crew headed by Sergeant Geelhood.

Mr. Rayis stated that during the raid his Chase Debit card was taken and subsequently he discovered an unauthorized $1000 charge was made against his card. Mr. Rayis stated that the Marijuana that was found was in 20105 W. Eight Mile Rd, which the crew did not have a warrant for. Mr. Rayis also stated that once the raid was over he was arrested and taken to another location where the crew conducted another raid before being conveyed to the Detroit Detention Center (DDC) for processing.

To:           Chief of Police James E. Craig (Through Channels)          July 18, 2014

Subject:    **DUTY STATUS REPORT, MEMBERS ASSIGNED TO NARCOTICS**    **Page 2**

From:      Commander Johnny Thomas, Professional Standards Bureau

On June 20, 2014, Mr. Rayis presented himself at 1301 Third, Suite 319N, the Internal Affairs Office, to make a statement. Mr. Rayis also brought a disc that he claimed was from a hidden camera in 20103 W. Eight Mile Rd. The video was reviewed and it shows the officers' actions inside the location.

The video reveals the officers coming into the location, ordered Mr. Rayis to the ground, handcuffing him and then clearing the location. Once the location is cleared Mr. Rayis gets taken into 20101 W. Eight Mile Rd. The officers are then observed opening a closed door on the west side wall and entering another room. The officers are later seen coming out of that door with what appear to be Marijuana plants. The officers put the plants in bags and boxes, but they also put at least five (5) smaller boxes (Mr. Rayis later identified the smaller boxes as boxes of High Intensity Light bulbs) into the bags and boxes with the plants.

It should be noted that in the video, Officers Leavells, Barnett, Riley and Tourville are in view of each other and observed or participated in the destruction or concealing of property in the bags and boxes used to package the Marijuana Plants, with Sergeant Geelhood standing in the background in the same room. The officers listed the Marijuana as evidence on their arrest report; however, the property taken, other than the marijuana plants, was not listed as evidence and therefore is unaccounted for.

The video reveals that Officer Matelic entered the view of the camera on three separate occasions; however she was not in the room when the items were placed in the box that contained the Marijuana plants

The video also reveals that at least four (4) officers are in this same room at one time while the light bulbs are being placed into bags and boxes with the plants. The video reveals other unknown items are taken from the shelves as well as Officer Matelic with an object in her hand and then reacting as if she was shocked and threw the item to the ground.

Mr. Rayis also provided limited video from 20101 W. Eight Mile Rd that revealed five (5) officers that enter the location, followed by Sergeant Geelhood. The video shows the raid crew making entry into the T-shirt shop and walking toward the back. In the video a white male, later identified as Ibrahim Gharib, W/M/31, of 6160 N Slivery Ln, Dearborn Heights, is seen meeting the officers in the front part of the store with his hand up. Mr. Gharib is patted down and was placed in front of a display case with his hands on the glass.

To:        Chief of Police James E. Craig (Through Channels)          July 18, 2014

Subject:   **DUTY STATUS REPORT, MEMBERS ASSIGNED TO NARCOTICS**          **Page 3**

From:      Commander Johnny Thomas, Professional Standards Bureau

The video reveals a black male, later identified as Grady Wicker III, B/M/29, of 29500 Franklin Rd, Southfield, also walked into the front of the store and also placed against the display case with his hands on the glass. The rest of the video reveals the officers' interaction with the detainees.

On the same date, Police Officer Michael Saraino, badge 247, assigned to Internal Affairs, and Sergeant Ayala conducted an audio recorded interview of Mr. Rayis. During the interview, Mr. Rayis' statement closely mirrored that of his phone call. Mr. Rayis also identified the things taken by the officers as high intensity light bulbs.

A review of CRISNET Report #1402130158.1, titled "08-48-2913-Execution of Search Warrant," completed by Police Officer Amy Matelic, and all of the attached Preliminary Complaint Reports, Investigator's Report and all other paperwork that pertained to the execution of the search warrant at 20103 W. Eight Mile Rd., revealed the only property listed taken was Marijuana Plants, loose Marijuana, currency, and Mr. Rayis' vehicle, a 2003 Acura. No other property was listed as taken.

On July 2, 2014, Investigator Timothy Ewald, badge I-1, assigned to Internal Affairs, and Officer Saraino, went to the Property Section and inspected the packages where the unaccounted merchandise was seen being placed into, and they were not found.

On July 10, 2014, Sergeant Ayala conducted an audio recorded interview with Mr. Wicker who stated he was in the backroom of his place of employment, 20101 W. Eight Mile Rd. Mr. Wicker stated that while at the location the police played with and broke gag shock pens that were at the location. Mr. Wicker also stated that the police took at least three (3) shock pens from the store and five (5) HPS light bulbs that belong to him, as they were leaving. After the police left Mr. Wicker checked his vehicle, since the police searched it, and found an I-Pod and a black pair of Rayban glasses were missing.

On July 10, 2014, Officer Saraino, and Sergeant Ayala, conducted an audio recorded interview of Mr. Gharib. Mr. Gharib stated that on February 13, 2014, at approximately 1:30 P.M., the police came into his work at 20101 W. Eight Mile, and searched the place. Mr. Gharib stated that he was detained in his shop and searched. During the search Mr. Gharib stated that the officers stole gag "shocking" items that he had for sale for $5.00 each. He also stated that the female officer was tricked and shocked by a male officer and that she threw the pen to the floor and broke it (this fact was confirmed by the video viewed). Mr. Gharib also stated that his 2008 Jeep Liberty was searched and after the police left his Bulova watch was missing.

To:        Chief of Police James E. Craig (Through Channels)          July 18, 2014

Subject:   **DUTY STATUS REPORT, MEMBERS ASSIGNED TO NARCOTICS**      **Page 4**

From:      Commander Johnny Thomas, Professional Standards Bureau

On July 10, 2014, at approximately 4:00 P.M., Lieutenant Kelly Fitzgerald, badge L-33, assigned to Internal Affairs, and Sergeant Ayala along with members assigned to Internal Affairs went to 14655 Dexter, Narcotics Base, and stood by as Captain Rodney Cox, Commanding Officer of Organized Crime, suspended the above listed officers and sergeant with pay.

It shall also be noted that a walk through was conducted of the location and none of the described items were located at this time.

**RECOMMENDATION:**

**JOHNNY THOMAS**
Commander
Professional Standards Bureau

# **EXHIBIT O**

# NOTICE OF SEIZURE AND INTENT TO FORFEIT

| | | | |
|---|---|---|---|
| Notice Served To: Mukhlis Shamoon | | | |
| Address: 8929 Wilaray | City: Shelby Twp | State: MI |
| Date: 9/13/12 | Time: 1:40 | Location Of Seizure: 8929 Wilaray | |

## NOTIFICATION

On, day/ 13 month/ 9 year/ 12 the Detroit Police Department determined that the property described below is subject to forfeiture pursuant to Michigan Law MCLA 333.7521, et. seq., and that the Department intends to seek forfeiture of this property.

If you desire to challenge the forfeiture of this property, you MUST DO ALL of the following within twenty (20) days of receiving this notice:

1. FILE A CLAIM WITH THE DETROIT POLICE DEPARTMENT FORFEITURE UNIT 2121 W. Fort, DETROIT, MI 48201, (313) 596.2630, DESCRIBING YOUR INTEREST IN THE PROPERTY.
2. POST A BOND THAT IS 10% OF THE VALUE OF THE PROPERTY CLAIMED (said BOND will be no less than $250.00 and NO GREATER THAN $5000.00).

After filing a written claim and posting the required BOND, the case will be referred to the Wayne County Prosecutor's Office for filing in the Wayne County Circuit Court. If the Court orders the property forfeited to the Detroit Police Department, you May be required to pay ALL costs incurred during the forfeiture proceedings.

Failure to file a claim and post BOND within TWENTY (20) days will result in your DEFAULT and your property will be declared forfeited to the Detroit Police Department.

## THIS FORM MUST BE FAXED IMMEDIATELY TO FORFEITURE AT 596-2309
## DESCRIPTION OF PROPERTY

| | | | |
|---|---|---|---|
| Amount of Currency: $ 315 - | | ET#: E 4Q273504 | |
| Vehicle/yr. | Make: | Model: | Style: | Color: |
| Veh /Mileage: | License Plate # | | Vin#: | |
| ET# | | (loc veh stored) | |
| Other Property: | | | |

## ACKNOWLEDGEMENTS

| | | |
|---|---|---|
| Notice Received By: Mukhlis Shamoon | Signature: X Mukhlis W. Shamoon |
| Notice Served By: Brian A Johnson | Signature: Brian A Johnson |
| Rank: PO | Badge#: 5010 | Assignment: NB |
| Date: 9/13/12 | Time: 1:40 | Location of Service: 8929 Wilaray |
| Witness: Joe Tucker | Signature: |
| Rank: SGT | Badge#: S-95 | Assignment: N/B |

(Revised: 03.7.2005)

000019

# EXHIBIT P

# Internal Affairs Database - Member History Report

**Member Name**  TUCKER JR, JOE

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case Number** 00i213 | **Date Assigned** 12/5/2000 | **Command** | | | | **Date Closed** 6/4/2001 | |
| **Allegation** PERJURY | | | | Rank: PO | | **Finding** NOT SUSTAINED | |
| **DPD Charges** Miscellaneous | | **2nd** | | | **3rd** | | |

**Notes**  On December 5, 2000, Internal Affairs received information regarding an allegation of Perjury involving Police Officer Joe Tucker Jr.
Improper conduct

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case Number** 04i280 | **Date Assigned** 9/10/2004 | **Command** 6TH PRECINCT | | | | **Date Closed** 5/9/2005 | |
| **Allegation** MISCONDUCT | | | | Rank: SGT | | **Finding** SUSTAINED | |
| **DPD Charges** Miscellaneous | | **2nd** Truthfulness | | | **3rd** | | |

**Notes**  SGT TUCKER SUBMITTED AN INJURED PO I&R WHICH STATED CIVILIANS WERE INTERVIEWED. THE CIVILIANS STATED THAT THEY WERE NEVER INTERVIEWED.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case Number** 11i167 | **Date Assigned** 12/1/2011 | **Command** ORGANIZED CRIME AN | | | | **Date Closed** 12/21/2011 | |
| **Allegation** FRAUD | | | | Rank: SGT | | **Finding** | |
| **DPD Charges** | | **2nd** | | | **3rd** | | |

**Notes**  On November 28, 2011, Internal Affairs received an Inter-Office Memo from Organized Crime alleging time fraud by some officers getting paid overtime that had not worked any.    THIS CASE WAS ADMINISTRATIVELY CLOSED PER CO. STAIR ON DECEMBER 21, 2011.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case Number** 14i149 | **Date Assigned** 12/9/2014 | **Command** | | | | **Date Closed** 7/17/2015 | |
| **Allegation** FRAUD | | | | Rank: SGT | | **Finding** EXONERATED | |
| **DPD Charges** Conduct Unprofessional | | **2nd** Authority Misuse | | | **3rd** Miscellaneous | | |

**Notes**  Internal Affairs rec'd information from DC Fitzgerald that after conducting an audit of court appearances, it appears that Lt. Tucker and Sgt Graves may have submitted fraudulent court appearance notices.

EXONERATED ON FRAUD CHARGES.
REFERRED TO DISCIPLINARY ON THE BELOW CHARGES FOR SGT TUCKER

## RE: REQUEST THE DISCIPLINARY HISTORY

DISCIPLINARY ADMIN <

Fri 5/29/2020 11:27 AM

**To:** DEANNA WILSON 361

Good Morning,

Please see below:

**CAPTAIN JOE TUCKER, JR.**

It is to be noted that Captain Joe Tucker, Jr., was appointed to the Department on September 20, 1993 and appointed to his current rank on December 12, 2016. Disciplinary records reflect that he has the following contacts:

File No. 960180 - On June 17, 1996, Captain Joe Tucker, Jr., (then Police Officer) appeared for a Commander's Hearing and was found guilty of Neglect of Duty , (i.e., on November 28, 1995, appeared in Recorder's Court while off duty to attend a sentencing hearing without being notified and later turning in a court appearance slip). Officer Tucker received a one (1) day suspension.

**SERGEANT STEPHEN GEELHOOD, BADGE S-501**

It is to be noted that Sergeant Stephen Geelhood was appointed to the Department on November 28, 1994 and promoted to his current rank on November 22, 2013. Disciplinary records reflect that he has no prior contact.

**Lieutenant Robert Torres**
Detroit Police Department
Disciplinary Administration
1301 Third, Suite 746A
Professional Standards Bureau
Detroit, Michigan 48226

"The Detroit Police Department is a model of sustained policing excellence that places our neighborhoods and people first."

**From:** DEANNA WILSON 361
**Sent:** Friday, May 29, 2020 10:50 AM
**To:** DISCIPLINARY ADMIN
**Subject:** REQUEST THE DISCIPLINARY HISTORY



# DISCIPLINARY HISTORY

**PENSION** 233043       **DATE UPDATED** 1/16/2017

**LAST NAME** TUCKER       **FIRST NAME** JOE

CAPTAIN JOE TUCKER, JR.

It is to be noted that Captain Joe Tucker, Jr., was appointed to the Department on September 20, 1993 and appointed to his current rank on December 12, 2016. Disciplinary records reflect that he has the following contacts:

File No. 960180 - On June 17, 1996, Captain Joe Tucker, Jr., (then Police Officer) appeared for a Commander's Hearing and was found guilty for Neglect of Duty , (i.e., on November 28, 1995, appeared in Recorder's Court while off duty to attend a sentencing hearing without being notified and later turning in a court appearance slip). Officer Tucker received a one (1) day suspension. (jpc)

**OLD RECORDS**

File No. 050276 - On September 21, 2005, Sergeant Tucker was charged with 1) Neglect of Duty (i.e. . On October 20, 2004, fail to provide a complete and accurate Summary Investigation and Report regarding an injured police officer and injured prisoner); 2) Willful Disobedience of Rules or Orders (i.e. , on March 1, 2005, admitted during a Garrity Interview that he knew all Department reports are to be complete and accurate; however, he failed to interview all parties relevant to the Summary Investigation and Report that he had completed). The recommendation of the trial board was issuance of an Official Reprimand. On February 4, 2008, the Chief of Police approved the recommendation. (mlt)

File No. 080193A - On June 11, 2008, this file was reviewed by Attorney Letitia C. Jones, of the City of Detroit Law Department with the recommendation of Administrative Closure (cjg)

File No. 080730 - On January 22, 2009, this file was reviewed by Attorney Letitia C. Jones, of the City of Detroit Law Department with the recommendation of Administrative Closure. (cjg)

File No. 150133 - On July 13, 2015, Lieutenant Tucker was found not guilty for 1) Willful Disobedience of Rules or Orders, (i.e. October and November of 2014, fill out court slips with a start time of 8:00 a.m.), 2) Using Authority or Position for Financial Gain or for Obtaining Privileges or Favors (i.e. use his authority to gain entry to a closed courtroom. Dismissal of all charges and specification in this matter.
(zv)       File No. 160022C -
On March 2, 2016, a Notice of Discipline was prepared charging Captain (then Lieutenant) Tucker, Jr. with 1) Neglect of Duty (i.e., On April 29, 2015, at approximately 4:30p.m., Lt. Tucker, Jr., took control of an accident scene at Strathmoor and Margareta, were citizens were transported to the hospital, but failed to ensure that victims were interviewed). On June 14, 2016, Lt. Tucker was issued an Official Written Reprimand. (kj) (jdd)

# **EXHIBIT Q**



To: Commanding Officer, Internal Controls Section (through channels)

Subject:

**INTERNAL AFFAIRS UNIT**

**IAU CASE #00 213**
**SERGEANT JOSEPH TUCKER JR., BADGE S-95**
**ASSIGNED:**     **SIXTH PRECINCT**
**APPOINTED:**     **SEPTEMBER 20, 1993**
**ALLEGATION:**     **PERJURY**

**IAU INVESTIGATOR:**
Sergeant Karen L. Fairley

**INVESTIGATION:**



On December 4, 2000, the Internal Affairs Unit received an investigative report prepared on April 12, 2000, by Investigator Sandra K. Mercer, assigned to the Office of the Chief Investigator. The report pertained to a complaint, Citizen Complaint Report (CCR) #29405, BPC #99-772, filed on October 5, 1999, at the Twelfth Precinct, by Ms. Paulette Crowder, B/F/47, of 20400 Wyoming. Information contained in the report revealed misconduct on the part of then Police Officer Joseph Tucker Jr., Badge 2373, then assigned to the Narcotics Division. Specifically, Officer Tucker swore to and signed a Search Warrant and Affidavit that contained false information.

The investigative report indicated that on October 4, 1999, Officer Tucker caused a Search Warrant and Affidavit (#004438) to be issued for the search of 20400 Wyoming, for narcotics. The Search Warrant and Affidavit also stated that the "seller," Mr. Clifford Crowder, B/M/30, was to be searched. However, Investigator Mercer's investigation supported Ms. Crowder's contention that her son, Mr. Clifford Crowder, was incarcerated on October 4, 1999, one of the dates Officer Tucker swore to have seen him at 20400 Wyoming selling drugs.

Investigator Mercer's investigation disclosed that on October 4, 1999, Sergeant Terence Randolph, Badge S-872, of the Narcotics Division, and his crew, including Officer Tucker, raided Ms. Crowder's residence looking for narcotics and her son, Clifford Crowder. However, information gathered by Investigator Mercer revealed that Mr. Crowder was picked up on September 29, 1999, by Wayne County Corrections officials on warrant #95-009989, for probation violation, and subsequently sentenced to twenty years in prison. He was held in the Wayne County Jail until his transfer to the Jackson Correctional Facility on October 4, 1999. (Document 7-1)

On May 16, 2000, Chief Investigator Lori Bobbitt Waddles prepared a memo addressed to the Chief of Police. The memo indicated that the Office of the Chief Investigator's investigation of the aforementioned CCR resulted in a finding of "Improper Conduct," and was being forwarded for appropriate action. (Document 7-2)

On September 16, 2000, a Charge Sheet was prepared by Lieutenant Steven Dolunt, Badge L-43, then assigned to the Disciplinary Administration Unit, recommending that Officer Tucker be charged with "Neglect of Duty." (Document 7-3)

On November 1, 2000, Lieutenant Dolunt addressed a memo to the Commanding Officer of the Narcotics Enforcement Section. The memo indicated that the Chief of Police waived jurisdiction in Officer Tucker's disciplinary matter and that it was to be handled at the command level. (Document 7-4)

On November 30, 2000, Inspector Patrick McCarthy, assigned to the Narcotics North-West Section, prepared a memo addressed to Inspector Donald Williams, of the Internal Controls Section. The memo stated he was forwarding a copy of Investigator Mercer's report for review and disposition. (Document 7-5)

On December 5, 2000, this matter was assigned to Sergeant Karen L. Fairley, Badge S-382, of the Internal Affairs Unit for investigation.

On January 22, 2001, Sergeant Tucker (promoted October 27, 2000) was interviewed by Sergeant Fairley after she advised him of his constitutional rights (Miranda). Sergeant Tucker acknowledged having a Search Warrant and Affidavit sworn in on October 4, 1999. He listed on the Search Warrant and Affidavit September 29, 1999, October 1, 1999, and October 4, 1999, as the dates on which he allegedly observed Mr. Crowder selling drugs from the side entrance of 20400 Wyoming. According to Sergeant Tucker, he set up surveillance per a complaint of narcotics activity at the Wyoming address. He was positioned approximately one and a half blocks from the home and using binoculars when he observed who he thought was Mr. Crowder conducting narcotics transactions from the side door.

Sergeant Tucker further stated that he later found out that the person he observed at the door was not Mr. Crowder, who was incarcerated. He went on to say that it is not common to swear out a warrant and be mistaken about the target, but he was certain that it was Mr. Crowder because he has dealt with him in the past. He also stated that the reason he named Mr. Crowder in the search warrant was because he wanted to be thorough.

Sergeant Tucker went on to say that on October 4, 1999, at approximately 9:30 A.M., he conducted a surveillance at 20400 Wyoming prior to swearing out the warrant in order to make sure nothing had changed since his last surveillance. At that time he was alone and observed who he thought was Mr. Crowder at the location. Sergeant Tucker described the person he observed as being a black male, approximately twenty-five years old, 5'6", with a dark complexion and "kinky" hair. That person's physical attributes were close to Mr. Crowder's physical attributes. This person was later identified as Mr. Aronde Ware, B/M/20, who was investigated and released at the scene when the search warrant was executed. On the other days in question narcotics buys

(controlled purchases) were made, and surveillance was conducted, and he was certain that the person selling was Mr. Crowder.

Sergeant Tucker added that he had seen Mr. Crowder prior to obtaining the warrant a few times. Once when he arrested him, and two or three times when he was being investigated. Lastly, Sergeant Tucker stated that it was approximately a six hour time lapse from the time he obtained the search warrant until the warrant was executed. (Tape)

On February 13, 2001, Sergeant Fairley presented an Investigator's Report to Wayne County Assistant Prosecuting Attorney Maria Miller for review.

On March 2, 2001, Ms. Miller denied the issuance of a warrant against Sergeant Tucker due to insufficient evidence. (Document 10-1)

On March 19, 2001, Sergeant Candace Kailimai, Badge S-501, and Investigator Lisa Collins, Badge-I-176, both assigned to the Internal Affairs Unit, interviewed Sergeant Tucker under the provisions of Garrity. He stated that the statement he made under Miranda was the same that he would make under Garrity, and that he had nothing more to add. (Tape)

**CONCLUSION:**

**KAREN L. FAIRLEY**
Sergeant, S-382
Internal Affairs Unit

APPROVED
JUN 0 1 2001

LIEUTENANT, INTERNAL AFFAIRS SECTION

**JAMES WEISS**
Sergeant, S-1014
Internal Affairs Unit

KLF/JW:klf

APPROVED
JUN 0 4 2001

COMMANDER
**INTERNAL CONTROLS DIVISION**

**MISCONDUCT SUMMARY/IAU CASE #00 213**
**SERGEANT JOSEPH TUCKER JR., BADGE S-95**
**ASSIGNED:**        **SIXTH PRECINCT**


Charge:                **NEGLECT OF DUTY**

**SPECIFICATION:**  That he, Sergeant Joseph Tucker Jr., Badge S-95, assigned to the Sixth Precinct, did, on October 4, 1999, while holding the rank of police officer and assigned to the West-North Section, while on duty and in civilian attire at the 36th District Court, neglect his duty by swearing to and signing a Search Warrant and Affidavit that contained false information, specifically that he had observed an individual, namely Mr. Clifford Crowder, selling narcotics from 20400 Wyoming on September 29, 1999, October 1, 1999, and October 4, 1999, when in fact Mr. Crowder had been incarcerated since September 29, 1999; this being in violation of General Order 72-17, Section K, subsection 1.

# EXHIBIT R

Sgt. Tucker
From:    KELLY FITZGERALD
To:      ROBINSON, KEVIN
BC:      WELLES, PAUL; FITZGERALD, KELLY
Date:    Friday - November 25, 2011 2:20 PM
Subject: Sgt. Tucker

Lieutenant, after we spoke this morning I still was uneasy about this situation. I've given this thing with Tucker a lot of thought and I have to get this off my chest and then I'll leave you to enjoy your Holiday weekend.

I've been at Narcotics for quite awhile. I was there in 1999 when they Arrested Delford Forte and Derrick Carpenae from Narcotics Conspiracy for stealing cash money out of dope houses. This was investigated and proven, they were caught in the act.

I was there in 2001 when Dogbite (Sgt. Raby) was charged and convicted with stealing money because he had a gambling problem. There were also many accusations against Lt. Art McNamara (Coyote) which were never founded but he retired anyway. I believe the rumors, whether true or not, somehow lessened all the good narcotics work he did as a cop because of the allegations.

Sgt. Kenny Jackson (Action) and crew were transferred for accusations of stealing that as far as I know where investigated but were unfounded. These officers also carry this around to this day.

I say all this to say that each one of these instances had different sets of circumstances. Some you could prove and did, some you know it was happening but never could prove and some that you had no idea if it did or did not and it was never proved and ruined some people's careers. Street cops have to deal with allegations all the time.

In this instance I believe (and this is just an opinion) the best case scenario is to transfer Sgt. Tucker out of Narcotics to remove him from the temptation and to re-assign each member of that crew to the other 5 crews under Narcotics. We can prove that he was supposed to be on surveillance and posted on a social network site to the contrary.

It may be hard to prove and circumstantial at best that he has lied on logs and OT sheets, but because one of his officers has come forward I believe removing Sgt. Tucker would not be unfair nor will it undermined the officers efforts from coming forward. Obviously he would be told that there were allegations of OT stealing and that a prelim investigation shows he did, and that's why he was removed.

I also believe that re-assigning the officers and removing Tucker would send a message to Narcotics as to just how serious we are about this. I will also go one step further and suggest that the crews all be re-aligned with the exception of the crew chiefs and maybe one or 2 officers to remove the sense of comfort or complacency amongst crews that could have led to this sort of thing in the first place.

Again, I am just throwing this out there. My intentions aren't to step on anyone's toes or go above ranks. If I were running Narcotics, this is the decision that I would make and feel it is the best conclusion given this specific incident.

13-53846-tjt    Doc 13653-5    Filed 05/27/22    Entered 05/27/22 15:26:08    Page 39 of 69
http://gw.ci.detroit.mi.us/gw/webacc?User.context=fc7f9785958435b3dda2c6fce450dcedb...  8/20/2013
DPD002734

Sgt. Tucker

Either way, we'll get past this.

This situation arose in November/December of 2011 when I, Lieutenant Kelly Fitzgerald, of the Detroit Police Department was assigned to the Narcotics Section as an Administrative Sergeant. My primary function was to process all paperwork for the Commanding Officer of Narcotics, Lieutenant Kevin Robinson and I was a direct report to Lieutenant Robinson (referred to as Robinson going forward).

During the week of November 21, 2011, Police Officer (now Sergeant) Stephen Geelhood, called me and inquired about why he was not paid for overtime he worked on November 10, 2011. Officer Geelhood (referred to as Geelhood going forward) worked on a Narcotic Raid crew and reported to Sergeant (Now Lieutenant) Joe L. Tucker Jr. (referred to as Tucker going forward). I explained to Geelhood that I would check into the situation and get back to him. I inquired with Police Officer Jennifer Biggers, the timekeeping officer, why Geelhood had not been paid for the overtime (OT) he worked on November 10, 2011 and she wrote me a note and placed copies of four (4) separate OT requests for the case submitted by Tucker which listed Geelhood and other members of the crew. The note stated "Hey Kelly I talked to K-Rob (referring to Robinson) about these yesterday, and he approved the O.T. for 11/4, 11/8, and 11/13. He said he would take a look at the Nov 10ᵗʰ O.T. when he gets back. Thanks!! Crash". The name Crash is Officer Biggers nickname. Robinson eventually denied the OT for 11/10/11 and dated the denial stamp signed November 10, 2011.

Later the same day during the week of November 21, 2011, Geelhood came to see me for an answer as to why the OT was denied by Robinson. I showed him the note given to me and copies of the OT requests authorized by Tucker along with copies of their daily Activity Logs for the OT worked and Geelhood became upset and told me he was tired of working all the OT and doing all the work and that Tucker did not actually work the OT but put his name on the OT, and that he (Geelhood) actually worked all the OT and now he is losing out on OT and Tucker is getting paid OT that he is not actually working. I was shocked by his admission and I asked if he had proof that Tucker did not work this OT. He said no and he doubts any of the other guys would tell the truth that Tucker did not work because they work as a "crew concept" and you do not "rat" on anyone like that. He said he had no physical proof that Tucker was not their during those dates (11/4, 11/10, 11/13, 11/18) but that Tucker is forever "tagging" himself on Facebook (FB) at places/locations around the city, suburbs and other states and he told me that he was sure there were specific dates that (Tucker) actually put in for OT for working at the exact same time he "tagged" himself outside the city or at an specific location which was not the location his activity log listed that he was at that allowed him to get paid the OT. In other words, Tucker was falsifying OT requests and activity logs saying he worked OT that he did not work. He gave me examples of Tucker "tagging" himself on FB with his sick child at a hospital while he was getting paid OT to work at Narcotics, "tagging" himself on FB at a restaurant outside the city, while getting paid OT to work at Narcotics and "tagging" himself on FB from a child's concert downtown while getting paid to work at Narcotics.

I told Geelhood I would look into his allegations and he left my office, but he was very upset/mad that he was still not getting paid for the OT worked on 11/10/11. During that same week of November 21, 2011, after my meeting with Geelhood, I pulled up Tuckers FB page (we were FB friends at the time) and scrolled through the numerous postings and "taggings" Tucker documented on his FB page and was stunned to find similar "taggings" that Geelhood had spoken to me about. I printed those "tags" from a computer on November 22, 2011. I was unsure if there were more dates that Tucker may have posted on FB and could have possibly put in for OT at the exact same time so I printed several days of postings to bring back to the office to verify whether or not Tucker had actually put in for OT during the same time

DPD002736

as alleged. This allegation from Geelhood was of criminal fraud and is a very serious charge and I had to be sure that I was absolutely positive Tucker was committing fraud before I took the evidence and the allegation to the next level. I went through several weeks/moths of Tuckers approved OT as well as his normal paid working time and discovered the following results:

- May 9, 2011 Tucker posted he was in Las Vegas at an airport at 8:32 PM but his time sheets says he was at work at Narcotics from 11AM-7PM
- On June 30, 2011, Tucker posted that he was at Providence Hospital with his sick son at 5:41 PM, yet Tucker was on a paid BV day and worked OT on "operation Party Stopper" at Narcotics from 5PM-12A
- On September 23, 2011, Tucker tagged himself and two others and a child in a picture at the Fox Theater at 3:33 PM with characters from a children's play, YoGabbaGabba Show, while he was paid to work his regular scheduled hours of 11A-7P for the day
- On October 22, 2011, Tucker tagged himself at J Alexanders restaurant (suburb) at 4:03 PM, yet he was paid OT to be on narcotics surveillance from 1P-8P

There were a few other "tags" that stood out that he appeared to be at a certain location conducting various activities (Car Wash, Running at the gym, watching the Lions football game, in Washington DC at the Police Memorial) while he was being paid either OT or regular straight time working at Narcotics. I gathered all the documents and information I had at proceeded to report my findings to Robinson. Robinson seemed disinterested, and gave me the impression that my findings were no big deal. I cannot recall my exact conversation with Robinson but I was upset enough about his lack of concern and what seemed to be him (Robinson) blowing me off that I called Deputy Chief Paul Welles (referred to as Welles going forward), the DC over the Bureau that ran Narcotics and explained to him what I uncovered. Welles was angry, surprised and upset and told me to reduce my concern to writing and email it to Robinson. Welles stated that if Robinson had not brought the allegations and evidence forward by "Monday", that he would step in and get involved.

On Friday, November 25, 2011 at 2:20 PM I authored the following email to Robinson and CC'd Welles:

*"Lieutenant, after we spoke this morning I still was uneasy about the situation. I've given this thing with Tucker a lot of thought and I have to get this off my chest and then I'll leave you to enjoy your Holiday weekend.*

*I've been at narcotics for quite awhile. I was there in 1999 when they Arrested Delford Forte and Derrick Carpenter from Narcotics Conspiracy for stealing cash money out of dope houses. This was investigated and proven, they were caught in the act.*

*I was there in 2001 when Dogbite (Sgt. Raby) was charged and convicted with stealing money because he had a gambling problem. There were also many accusations against Lt. Art McNamara (Coyote) which were never founded but he retired anyway. I believe the rumors, whether true or not, somehow lessened all the good narcotics work he did as a cop because of the allegations.*

*Sgt. Kenny Jackson (action) and crew were transferred for accusations of stealing that as far as I know where investigated but were unfounded. These officers carry this around to this day.*

*I say all this to say that each one of these instances had different sets of circumstances. Some you could prove and did, some you know was happening but never could prove and some that you had no idea if it*

DPD002737

did or did not and it was never proved and ruined some people's careers. Street cops have to deal with allegations all the time.

In this instance I believe (and this is just an opinion) the best case scenario is to transfer Sgt. Tucker out of Narcotics to remove him from the temptation and to re-assign each crew member of that crew to the other 5 crews under Narcotics. We can prove that he was supposed to be on surveillance and posted on a social network site to the contrary.

It may be hard to prove and circumstantial at best that he lied on logs and OT sheets, but because one of his officers has come forward I believe removing Sgt. Tucker would not be unfair nor will it undermine the officers efforts from coming forward. Obviously he would be told that there were allegations of OT stealing and that a prelim investigation shows he did, and that's why he was removed.

I also believe that re-assigning the officers and removing Tucker would send a message to Narcotics as to just how serious we are about this. I will also go one step further and suggest that crews all be re-aligned with the exception of the crew chiefs and maybe one or 2 officers to remove the sense of comfort or complacency amongst crews that could have led to this sort of thing in the first place.

Again, I am just throwing this out there. My intensions aren't to step on anyone's toes or go above ranks. If I were running Narcotics, this is the decision that I would make and feel it is the best conclusion given this specific incident.

Either way, we'll get past this."

Robinson never responded but the following Monday, November 28, 2011, Robinson called me into his office to show me a memo he authored addressed to Commander Shereece Fleming-Freeman, of Organized Crime, Robinson's direct boss. The memo read as follows:

"Request for Investigation of overtime worked by personnel assigned to Narcotics.

During the week of November 21, 2011, writer was advised by Sergeant Kelly Fitzgerald, badge S-308, assigned as the administrative Sergeant at Narcotics, that Police Officer Stephen Geelhood, badge 501, assigned to Narcotics Conspiracy Crew contacted her with information. Officer Geelhood stated that there was a discrepancy in overtime that was recently worked and approved during the November 4, 2011 through November 12, 2011 period. ==Officer Geelhood stated that crew members did not work all the approved overtime during this period and it was approved by crew Sergeant Joe Tucker, badge S-95.==

Sergeant Fitzgerald advised writer who in turn advised Commander Fleming Freeman. This allegation implies false or incorrect overtime being paid to members of the crew.

This documentation as the attached were being provided to your office for review and prerogative."

Robinson included the overtime requests dated November 4, 8, 10 and (13) 2011 and he (Robinson) endorsed (signed) the memo. He showed me the memo and told me to hand deliver it to Fleming-Freeman. I explained to him that the memo was not completely accurate and that I had more information/evidence that should be added and attached to the memo and Robinson told me he was sticking to what Geelhood originally complained about (the false OT by Tucker that he could not prove but stated Tucker did not work). I was very upset with Robinson and felt as is this was being down played as some sort of clerical error. I drove to Fleming-Freemans office and delivered the memo and attachment to her. I recall her telling me that I did the right thing and that this needed to be reported and she was forwarding the information to Internal Affairs (IA).

On December 7, 2011, members from IA, Sergeant Michelle Zberkot and Richard Firsdon came to Narcotics to speak to me about the incident. I gave them copies of all the information I had and told them of all the additional information I had gathered that was not reported in the memo from Robinson. It is my recollection that they left and came back the following day to retrieve additional timekeeping documents they needed for their investigation.

At some point on 12/7 or 12/8, 2011, they were in my office and Robinson called me and asked why I were in there with the door shut. When I explained to him that I was giving them additional documents, he became angry and told me that he was in charge and that they needed to talk to him. I went with them into his office while he explained to them that what Tucker was doing was not a crime and that it is done all the time at Narcotics. In front of Robinson I provided Firsdon and Zberkot with three (3) recent OT requests signed and submitted by Tucker. The requests were for OT worked by Tucker and his crew members on November 28-30, 2011. They were complete with signed activity logs from Tucker and crew as well. I then provided them with a FB posting/tag that Tucker posted on November 28, 2011 at 12:31 PM near Paradise NV (Nevada) that was a picture or what appears to be a hotel room and window in the background and he posted "Breakfast overlooking the Vegas Strip, I WANNA STAY!!" Again on November 28, 2011 at 7:38 PM Tucker tagged himself from McCarran International Airport in Las Vegas Nevada, stating "Time to come home". Then again on November 29, 2011, at 12:53 AM, Tucker tagged himself from Detroit Metro Airport and posted " LUCY, I'm boooome!!" (Appearing to reference an old I Love Lucy show.

I provided the unapproved OT and all the documents for the three (3) OT requests to Firsdon and Zberkot and they left. I could tell that Robinson was frustrated and he told me to give him the three OT request so he could look at them. The next morning Robinson handed me back the three requests for OT submitted by Tucker for the dates of November 28-30 and told me to fax IA the OT request for November 28th to show he "Denied" that OT. The date of the Denial stamp and signature from Robinson was December 7, 2011, the date that I gave the documents to Firsdon and Zberkot in his office. Robinson approved the other two dates (11/29-30) and it was my belief that he did that because I had no documents to show that Tucker was not at work and that he worked the OT on those dates. I followed his orders and faxed the info as requested, but I called Firsdon first to tell him what was happening.

Shortly after that date, Geelhood came back to my office and told me that Tucker found out that he came to me about the OT fraud and he was upset that I gave the information to IA. He expressed his fear of being transferred or retaliated against and told me who would not cooperate in the investigation and that he wanted me to call IA and tell them to forget about the whole thing. I expressed to him that I would not do that and I tried to assure him that this was being investigated and he would not be transferred or retaliated against. He was adamant that he was not going to cooperate and left my office. I went to Robinson and told him what happened and I asked if he had told anyone about this incident. He stated to me that he had told Police Officer Booker Tooles (buddah) and that was all. Time passed (a few weeks) and I never heard back from Firsdon and/or Zberkot. I was very frustrated because I felt that nothing changed in the office as far as Tucker and the crew. It was then that I decided to take all the notes I saved and all my correspondence and dates and reduced it to a timeline and documented dates and times and people involved so I would not forget if I was ever questioned formally. This never occurred and after a few months I expressed to DC Welles that I no longer wanted to work at Narcotics in that environment or for Robinson and that I wanted to transfer to another command because of what happened. I even sent emails to other Captains asking if they had openings in their commands so I could transfer out of Narcotics. In October of 2012 Welles transferred me out of Narcotics to the Criminal Investigations Bureau. I never heard another thing about this investigation from anyone including IA.

DPD002739

In November of 2013 I was promoted to the rank of Lieutenant (Tucker was also promoted to Lieutenant along with me) and I was assigned as the Commanding Officer of IA. I had occasion to ask Firsdon who was still at IA now working for me, what happened to the investigation and he told me he was told to turn over all the documents and that the case was "Administratively Closed" by his Lieutenant Whitney Walton and the Commander, Brian Stair. Working at IA for a year and a half I realized rather quickly that the investigation and the information I provided to IA was criminal in nature and should have been looked into by IA and a thorough and compete investigation was warranted. This did not happen.

At the very least, all members mentioned in the complaint should have been interviewed. The investigating OIC could have and should have requested phone records, FB records, financial records, payroll records, video records at Providence Hospital, Fox Theater, Metro Airport, McCann Airport, and any other records that may have provided evidence of fraud. To my knowledge, this did not happen.

At some point in early 2014, while I was in charge or IA, another fraud investigation was brought to the attention of Commander Sims, the Commanding Officer over myself and IA that involved Tucker (now a Lieutenant in charge of the Special Victims Unit, SVU). At the time Tucker was at SVU he reported through the chain of command to my husband, Deputy Chief Charles Fitzgerald, and it was DC Fitzgerald who requested in writing to Commander Sims that IA investigate not only Tucker but other members of SVU due to evidence of possible fraud that surfaced after an audit. Sims gave the information to me and directed me to open and assign an IA investigation on the documents provided, which I did and which was exactly what should have occurred in 2011 when the first complaint was lodged. During the investigation it was reported back to the Chief, during a briefing on the case with myself, the OIC Sergeant Juan Ayala, and Captain Brain Mounsey, the Commanding Officer of Internal Control, who is my direct supervisor, that there was evidence that Tucker at the very least violated several department policies, although the criminal investigation was still ongoing. Chief Craig transferred Tucker as well as his immediate supervisor, Commander Nichols Giaquinto, out of SVU. Tucker was transferred to the 12th Precinct Patrol.

Because of but not limited to, the above mentioned events, Tucker has brought a lawsuit against the City of Detroit naming me, among others as racially discriminating against him and it is sited that I am targeting Tucker because he is black. The suit also speaks of the incident from Narcotics in 2011, stating that I was targeting and investigating him on my own for no reason for fraud and that IA looked into the allegation that I brought forward and it was determined to be "Unfounded".

This was reported in the Detroit News on Friday, July 3, 2015 in an article authored by George Hunter. These accusations against me are completely false. When the allegation of fraud and the information to follow was brought to my attention from Geelhood in 2011, I did exactly what I was supposed to do and gather information and forwarded everything to my supervisors and IA. I took the information to my Lieutenant, my Commander, my Deputy Chief and eventually to IA, all of whom have swept the incident and the evidence I brought forward, under the rug, further leading to the terrible accusations that I am targeting Tucker.

I am respectfully requesting that your office (OIG) look into the following but not limited to:

- Why the initial complaint of criminal conduct that I sent to IA in November/December of 2011 was not investigated, and was closed "Administratively?
- Why I was never formally interviewed regarding the complaint I sent to IA in November/December of 2011?

DPD002740

- Whether or not DC Welles, Commander Fehrming-Freeman, Lieutenant Robinson, or Officer Geelhood were formally interviewed regarding the complaint I sent to IA in November/December of 2011?
- If not, why not?
- Due to the statute of limitations of criminal fraud being five (5) years and still within the scope of possible criminal charges against any member involved in criminal fraudulent activity, I am requesting that all documents that I have provided to IA and still retain copies of, be investigated for both criminal and departmental charges on anyone who violated such charges.

For fear of retaliation against myself and my husband, although I am willing to give my name and my personal information, provide a full statement as well as any and all evidence or supporting documents that I still retain, I am requesting to remain anonymous if and until such time that I must make a public statement.

Thank you for your consideration in this matter.

Kelly Fitzgerald,
Kellyfitz308@yahoo.com

DPD002741

# EXHIBIT S

**U.S. District Court**
**Eastern District of Michigan (Port Huron)**
**CIVIL DOCKET FOR CASE #: 3:18-cv-13683-RHC-EAS**

Metris-Shamoon et al v. City of Detroit et al
Assigned to: District Judge Robert H. Cleland
Referred to: Magistrate Judge Elizabeth A. Stafford
Cause: 28:1983 Civil Rights

Date Filed: 11/26/2018
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Debra Metris-Shamoon**                                        represented by **Dennis A Dettmer**
Dettmer & Dezsi, PLLC
1523 N. Main St.
Royal Oak, MI 48067
313-757-8112
Fax: 313-887-0420
Email: ddettmeresq@yahoo.com
*ATTORNEY TO BE NOTICED*

**Michael R. Dezsi**
Law Office of Michael R. Dezsi, PLLC
1523 N. Main St.
Royal Oak, MI 48067
313-757-8112
Fax: 313-887-0420
Email: mdezsi@dezsilaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mukhlis Shamoon**                                             represented by **Dennis A Dettmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael R. Dezsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carl Veres**                                                  represented by **Dennis A Dettmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael R. Dezsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Paul Metris**                                                 represented by **Dennis A Dettmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael R. Dezsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Julia Metris**                                                represented by **Dennis A Dettmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael R. Dezsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Detroit**                                             represented by **Crystal B Olmstead**
City of Detroit Law Department
2 Woodward Ave Ste. 500
Detroit, MI 48224
313-237-5035

Fax: 313-224-5505
Email: olmsteadc@detroitmi.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
Allen Brothers
400 Monroe Street
Suite 220
Detroit, MI 48226
313-962-7777
Email: jamesallen@allenbrotherspllc.com
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**James M. Surowiec**
Macomb County Corporation Counsel
1 S. Main St., 8th Fl
Mt. Clemens, MI 48043
586-469-6346
Fax: 586-307-8286
Email: james.surowiec@macombgov.org
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
Schenk & Bruetsch, PLC
211 W. Fort Street, Suite 1410
Detroit, MI 48226
313-774-1000
Email: Lindsey.Johnson@SBDetroit.com
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Patrick M. Cunningham**
City of Detroit Law Department
2 Woodward Avenue
Suite 500
Detroit, MI 48226
313-237-5032
Fax: 313-224-5505
Email: cunninghamp@detroitmi.gov
*ATTORNEY TO BE NOTICED*

**Defendant**
**John Doe**
*TERMINATED: 03/21/2019*

represented by **John Doe**
PRO SE

**Lindsey R. Johnson**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**
**Jane Doe**
*TERMINATED: 03/21/2019*

represented by **Jane Doe**
PRO SE

**Lindsey R. Johnson**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**
**Sgt Joe Tucker**
*TERMINATED: 06/25/2021*

represented by **Crystal B Olmstead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**James M. Surowiec**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

Lindsey R. Johnson
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sgt Candace Matschikowski**
*TERMINATED: 06/25/2021*

represented by **Crystal B Olmstead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**James M. Surowiec**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sgt Stephen Geelhood**

represented by **Crystal B Olmstead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**James M. Surowiec**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Juan Davis**
*TERMINATED: 06/25/2021*

represented by **Crystal B Olmstead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James P. Allen**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**James M. Surowiec**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brian A Johnson**
*TERMINATED: 06/25/2021*

represented by **Crystal B Olmstead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James P. Allen**

*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**James M. Surowiec**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

**Lindsey R. Johnson**
(See above for address)
*TERMINATED: 12/07/2021*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/26/2018 | 1 | COMPLAINT filed by All Plaintiffs against All Defendants with Jury Demand. Plaintiff requests summons issued. Receipt No: 0645-7002575 - Fee: $ 400. County of 1st Plaintiff: Macomb - County Where Action Arose: Macomb - County of 1st Defendant: Wayne. [Previously dismissed case: No] [Possible companion case(s): USDC EDMICH, 15-cv-10547, Judge Borman] (Dezsi, Michael) (Entered: 11/26/2018) |
| 11/27/2018 | 2 | SUMMONS Issued for *City of Detroit* (SKra) (Entered: 11/27/2018) |
| 11/27/2018 | | A United States Magistrate Judge of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form is available for download at http://www.mied.uscourts.gov (SKra) (Entered: 11/27/2018) |
| 11/29/2018 | 3 | NOTICE of Appearance by Dennis A Dettmer on behalf of All Plaintiffs. (Dettmer, Dennis) (Entered: 11/29/2018) |
| 12/12/2018 | 4 | CERTIFICATE of Service/Summons Returned Executed. City of Detroit served on 12/12/2018, answer due 1/2/2019. (Dezsi, Michael) (Entered: 12/12/2018) |
| 12/13/2018 | 5 | NOTICE of Appearance by James P. Allen on behalf of City of Detroit. (Allen, James) (Entered: 12/13/2018) |
| 12/13/2018 | 6 | NOTICE of Appearance by Lindsey R. Johnson on behalf of City of Detroit. (Johnson, Lindsey) (Entered: 12/13/2018) |
| 12/17/2018 | 7 | STIPULATED ORDER Extending Time for Response to 1 Complaint. **Response due by 1/31/2019**. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 12/17/2018) |
| 01/31/2019 | 8 | ANSWER to Complaint with Affirmative Defenses with Jury Demand *Defendant City of Detroit's Answer to Complaint, Affirmative Defenses and Other Defenses and Reliance Upon Jury Demand and Certificate of Service* by City of Detroit. (Allen, James) (Entered: 01/31/2019) |
| 02/15/2019 | 9 | NOTICE TO APPEAR: **Scheduling/Settlement Conference set for 3/7/2019 11:30 AM before District Judge Arthur J. Tarnow**. (MLan) (Entered: 02/15/2019) |
| 02/21/2019 | | TEXT-ONLY NOTICE: **Scheduling/Settlement Conference ADJOURNED TO 3/14/2019 11:00 AM before District Judge Arthur J. Tarnow**. (MLan) (Entered: 02/21/2019) |
| 03/13/2019 | 10 | ATTORNEY APPEARANCE: James M. Surowiec appearing on behalf of City of Detroit (Surowiec, James) (Entered: 03/13/2019) |
| 03/14/2019 | | Minute Entry for proceedings before District Judge Arthur J. Tarnow: Scheduling Conference held on 3/14/2019. (MLan) (Entered: 03/14/2019) |
| 03/14/2019 | 11 | SCHEDULING ORDER: **Witnesses to be exchanged by 5/1/2019, Discovery Motions to be filed by 8/23/2019, Discovery due by 9/20/2019, Dispositive Motion Cut-off set for 10/28/2019, Joint Final Pretrial Order due 2/3/2020, Final Pretrial Conference set for 2/10/2020 02:30 PM before District Judge Arthur J. Tarnow**. Signed by District Judge Arthur J. Tarnow. (Refer to image for additional dates) (MLan) (Entered: 03/14/2019) |
| 03/21/2019 | 12 | STIPULATED ORDER Allowing Plaintiffs to File First Amended Complaint. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 03/21/2019) |
| 03/21/2019 | 13 | AMENDED COMPLAINT with Jury Demand filed by All Plaintiffs against All Defendants. NEW PARTIES ADDED. (Dezsi, Michael) (Entered: 03/21/2019) |
| 03/21/2019 | | REQUEST for SUMMONS for Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Dezsi, Michael) (Entered: 03/21/2019) |
| 03/22/2019 | 14 | SUMMONS Issued for *Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker* (DPer) (Entered: 03/22/2019) |
| 04/03/2019 | 15 | STIPULATED ORDER Extending Time for Response to 13 Amended Complaint. **Response due by 4/29/2019**. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 04/03/2019) |
| 04/10/2019 | 16 | CERTIFICATE of Service/Summons Returned Executed. Stephen Geelhood served on 4/5/2019, answer due 4/26/2019. (Dezsi, Michael) (Entered: 04/10/2019) |
| 04/18/2019 | 17 | CERTIFICATE of Service/Summons Returned Executed. Brian A Johnson served on 4/17/2019, answer due 5/8/2019. (Dezsi, Michael) (Entered: 04/18/2019) |
| 04/18/2019 | 18 | CERTIFICATE of Service/Summons Returned Executed. Juan Davis served on 4/17/2019, answer due 5/8/2019. (Dezsi, Michael) (Entered: 04/18/2019) |
| 04/18/2019 | 19 | CERTIFICATE of Service/Summons Returned Executed. Joe Tucker served on 4/18/2019, answer due 5/9/2019. (Dezsi, Michael) (Entered: 04/18/2019) |

| 04/29/2019 | 20 | ATTORNEY APPEARANCE: James P. Allen appearing on behalf of Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Allen, James) (Entered: 04/29/2019) |
|---|---|---|
| 04/29/2019 | 21 | ATTORNEY APPEARANCE: James M. Surowiec appearing on behalf of Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Surowiec, James) (Entered: 04/29/2019) |
| 04/29/2019 | 22 | ATTORNEY APPEARANCE: Lindsey R. Johnson appearing on behalf of Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Johnson, Lindsey) (Entered: 04/29/2019) |
| 04/29/2019 | 23 | ANSWER to Amended Complaint with Affirmative Defenses *and Reliance Upon Jury Demand* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Johnson, Lindsey) (Entered: 04/29/2019) |
| 05/01/2019 | 24 | *Plaintiffs'* WITNESS LIST by All Plaintiffs (Dezsi, Michael) (Entered: 05/01/2019) |
| 05/01/2019 | 25 | *Defendants' Preliminary Lay and Expert* WITNESS LIST by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Johnson, Lindsey) (Entered: 05/01/2019) |
| 05/13/2019 | 26 | AMENDED ANSWER to Complaint 13 Amended Complaint with Affirmative Defenses *and Reliance Upon Jury Demand* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Johnson, Lindsey) (Entered: 05/13/2019) |
| 08/08/2019 | 27 | STIPULATED ORDER Allowing Defendants Leave to File Amended Affirmative Defenses. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 08/08/2019) |
| 08/09/2019 | 28 | AFFIRMATIVE DEFENSES by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Johnson, Lindsey) (Entered: 08/09/2019) |
| 08/13/2019 | 29 | ORDER REFERRING OTHER MATTERS to Magistrate Judge R. Steven Whalen: Discovery Conference. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 08/13/2019) |
| 08/20/2019 | 30 | NOTICE TO APPEAR: **Discovery Conference set for 9/10/2019 at 10:00 AM before Magistrate Judge R. Steven Whalen**. (THac) (Entered: 08/20/2019) |
| 08/22/2019 | 31 | MOTION Extend Scheduling Order by 120 days by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A) (Johnson, Lindsey) (Entered: 08/22/2019) |
| 08/22/2019 | 32 | ORDER REFERRING MOTION to Magistrate Judge R. Steven Whalen: 31 MOTION Extend Scheduling Order by 120 days filed by City of Detroit, Juan Davis, Candace Matschikowski, Brian A Johnson, Joe Tucker, Stephen Geelhood. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 08/22/2019) |
| 08/26/2019 | 33 | NOTICE OF HEARING on 31 Defendants' MOTION to Amend Scheduling Order Dates by 120 Days . **Motion Hearing set for 9/10/2019 at 10:00 AM before Magistrate Judge R. Steven Whalen**. (THac) (Entered: 08/26/2019) |
| 09/04/2019 | 34 | RESPONSE to 31 MOTION Extend Scheduling Order by 120 days filed by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Indictment, # 3 Exhibit B Jury Trial Transcript, # 4 Exhibit C Internal Affairs File, # 5 Exhibit D Affidavit and Search Warrant, # 6 Exhibit E Discovery Requests, # 7 Exhibit F Notices of Deposition) (Dezsi, Michael) (Entered: 09/04/2019) |
| 09/06/2019 | 35 | REPLY to Response re 31 MOTION Extend Scheduling Order by 120 days filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7) (Johnson, Lindsey) (Entered: 09/06/2019) |
| 09/10/2019 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Discovery Conference held 9/10/2019 - (CCie) Modified on 9/10/2019 (CCie). (Entered: 09/10/2019) |
| 09/10/2019 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Motion Hearing held on 9/10/2019 re 31 MOTION Extend Scheduling Order by 120 days filed by City of Detroit, Juan Davis, Candace Matschikowski, Brian A Johnson, Joe Tucker, Stephen Geelhood - Disposition: Motion granted. (Court Reporter: Digitally Recorded) (CCie) (Entered: 09/10/2019) |
| 09/10/2019 | 36 | ORDER GRANTING DEFENDANTS' 31 Motion to Amend Scheduling Order- Signed by Magistrate Judge R. Steven Whalen. ***PLEASE SEE DOCUMENT FOR IMPORTANT DATES*** (CCie) (Entered: 09/10/2019) |
| 09/14/2019 | 37 | MOTION for Reconsideration re 36 Order on Motion - Free by All Defendants. (Attachments: # 1 Exhibit May v. City of Detroit) (Surowiec, James) (Entered: 09/14/2019) |
| 09/17/2019 | 38 | ORDER STAYING 36 Order on Motion, Set Deadlines as to 37 MOTION for Reconsideration re 36 Order on Motion: (**Plaintiff's Response due by 9/24/2019**) - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 09/17/2019) |
| 09/18/2019 | 39 | RESPONSE to 37 MOTION for Reconsideration re 36 Order on Motion - Free filed by All Plaintiffs. (Dezsi, Michael) (Entered: 09/18/2019) |
| 09/23/2019 | 40 | ORDER DENYING DEFENDANTS 37 Motion for Reconsideration - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 09/23/2019) |
| 10/31/2019 | 41 | NOTICE TO APPEAR BY TELEPHONE: **Status Conference set for 11/13/2019 02:00 PM before District Judge Arthur J. Tarnow**. (MLan) (Entered: 10/31/2019) |
| 11/08/2019 | 42 | MOTION for Relief from the Magistrate Judge's Discovery Order [Dkt #36] re 36 Order on Motion - Free by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Declaration, # 3 Exhibit B Redacted Declaration, # 4 Exhibit C Deposition Transcript, # 5 Exhibit D Affidavit & Warrant, # 6 Exhibit E Sealed) (Dezsi, Michael) (Entered: 11/08/2019) |
| 11/08/2019 | 43 | SEALED EXHIBIT *E Deposition Transcript* re 42 MOTION for Relief from the Magistrate Judge's Discovery Order [Dkt #36] re 36 Order on Motion - Free by All Plaintiffs. (Dezsi, Michael) (Entered: 11/08/2019) |
| 11/12/2019 | 44 | MOTION to Compel *Deposition Testimony* by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit Article, # 3 Exhibit Notices of Depositions, # 4 Exhibit email, # 5 Exhibit Jackson trial testimony, # 6 Exhibit Leavells Plea Agreement, # 7 Exhibit Leavells trial testimony, # 8 Exhibit Indictment, # 9 Exhibit Memo Re Reorganization, # 10 Exhibit Objections to Discovery, # 11 Exhibit Sims Depo Trans excerpts) (Dezsi, Michael) (Entered: 11/12/2019) |

| | | |
|---|---|---|
| 11/13/2019 | | TEXT-ONLY NOTICE: Telephone Status Conference on 11/13/2019 is Cancelled. Issues resolved. (MLan) (Entered: 11/13/2019) |
| 11/13/2019 | 45 | ORDER REFERRING MOTIONS to Magistrate Judge R. Steven Whalen: 42 MOTION for Relief from the Magistrate Judge's Discovery Order re 36 MOTION filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres, 44 MOTION to Compel *Deposition Testimony* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 11/13/2019) |
| 11/19/2019 | 46 | NOTICE OF HEARING on 42 MOTION for Relief from the Magistrate Judge's Discovery Order [Dkt 36] and 44 MOTION to Compel *Deposition Testimony*. **Resolved/Unresolved Issues due by 12/17/2019. Motion Hearings set for 12/19/2019 at 10:00 AM before Magistrate Judge R. Steven Whalen.** (TTac) (Entered: 11/19/2019) |
| 11/22/2019 | 47 | RESPONSE to 42 MOTION for Relief from the Magistrate Judge's Discovery Order [Dkt #36] re 36 Order on Motion - Free *with Brief in Support* filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1- Plaintiffs' Concurrence Email, # 3 Exhibit 2- Plaintiffs' Emails agreeing to Protective Order, # 4 Exhibit 3- Plaintiffs' Statement of Unresolved Discovery Issues, # 5 Exhibit 4- Plaintiffs' Email Denying Concurrence, # 6 Exhibit 5- Email from Case Manager, # 7 Exhibit 6- Attorney's Eyes Only Discovery Production, # 8 Exhibit 7-Attorney's Eyes Only Geelhood Dep Transcript, # 9 Exhibit 8- Geelhood Transcript Pages Start-Finish Times) (Suroweic, James) (Entered: 11/22/2019) |
| 11/22/2019 | 48 | SEALED EXHIBIT re 47 Response to Motion,,, by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Exhibit 6-Attorney's Eyes Only Court Ordered Discovery Production, # 2 Exhibit 7-Attorney's Eyes Only Geelhood Deposition Transcript) (Suroweic, James) (Entered: 11/22/2019) |
| 11/25/2019 | 49 | REPLY to Response re 42 MOTION for Relief from the Magistrate Judge's Discovery Order [Dkt #36] re 36 Order on Motion - Free filed by All Plaintiffs. (Dezsi, Michael) (Entered: 11/25/2019) |
| 11/27/2019 | 50 | RESPONSE to 44 MOTION to Compel *Deposition Testimony with Brief in Support* filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1-Search Warrant, # 3 Exhibit 2-Articles) (Suroweic, James) (Entered: 11/27/2019) |
| 12/03/2019 | 51 | REPLY to Response re 44 MOTION to Compel *Deposition Testimony* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 12/03/2019) |
| 12/09/2019 | 52 | MOTION for Protective Order *with Brief in Support* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Suroweic, James) (Entered: 12/09/2019) |
| 12/10/2019 | 53 | INDEX of Exhibits re 52 MOTION for Protective Order *with Brief in Support* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Attachments: # 1 Exhibit 1- Proposed Protective Order, # 2 Exhibit 2- Search Warrant, # 3 Exhibit 3- Deposition Excerpts Metris-Shamoon, # 4 Exhibit 4- Chief Craig Declaration, # 5 Exhibit 5-Chief Godbee Declaration) (Suroweic, James) (Entered: 12/10/2019) |
| 12/10/2019 | 54 | INDEX of Exhibits re 52 MOTION for Protective Order *with Brief in Support* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker *(CORRECTED VERSION)* (Attachments: # 1 Exhibit 1- Proposed Protective Order, # 2 Exhibit 2- Search Warrant, # 3 Exhibit 3- Deposition Excerpts Metris-Shamoon, # 4 Exhibit 4- Chief Craig Declaration, # 5 Exhibit 5-Chief Godbee Declaration) (Suroweic, James) (Entered: 12/10/2019) |
| 12/13/2019 | 55 | EXHIBIT *Supplemental Exhibits* re 44 MOTION to Compel *Deposition Testimony* by All Plaintiffs (Attachments: # 1 Index of Exhibits, # 2 Exhibit news article, # 3 Exhibit news article,) (Dezsi, Michael) (Entered: 12/13/2019) |
| 12/16/2019 | 56 | *First Amended Lay and Expert* WITNESS LIST by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Johnson, Lindsey) (Entered: 12/16/2019) |
| 12/19/2019 | 57 | *Second Amended Lay and Expert* WITNESS LIST by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Johnson, Lindsey) (Entered: 12/19/2019) |
| 12/19/2019 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Motion Hearing held on 12/19/2019 re 44 MOTION to Compel *Deposition Testimony* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres, 42 MOTION for Relief from the Magistrate Judge's Discovery Order [Dkt #36] re 36 Order on Motion - Free filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres - Disposition: Motion 42 and 44 granted. (Court Reporter: Digitally Recorded - DUTY) (CCie) (Entered: 12/20/2019) |
| 12/20/2019 | 58 | ORDER GRANTING PLAINTIFF'S 42 Motion for Relief from Magistrate Judge's Discovery Order - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 12/20/2019) |
| 12/20/2019 | 59 | ORDER GRANTING PLAINTIFF'S 44 Motion to Compel- Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 12/20/2019) |
| 12/23/2019 | 60 | ORDER REFERRING MOTION to Magistrate Judge R. Steven Whalen: 52 MOTION for Protective Order filed by City of Detroit, Juan Davis, Candace Matschikowski, Brian A Johnson, Joe Tucker, Stephen Geelhood. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 12/23/2019) |
| 12/30/2019 | 61 | MOTION to Compel *Production of Documents* by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Detroit News Article, # 3 Exhibit B Plaintiffs' 2nd RTP, # 4 Exhibit C Defendants' Objections 2nd RTP, # 5 Exhibit D Detroit News Article, # 6 Exhibit E Detroit News Article, # 7 Exhibit F Jury Trial Transcript Gary Jackson, # 8 Exhibit G Jury Trial Transcript Arthur Leavells) (Dezsi, Michael) (Entered: 12/30/2019) |
| 12/30/2019 | 62 | ORDER REFERRING MOTION to Magistrate Judge R. Steven Whalen: 61 MOTION to Compel *Production of Documents* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 12/30/2019) |
| 12/30/2019 | 63 | MOTION to Compel *Plaintiffs' Responses to Document Requests* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A- Plaintiffs' Responses to Roggs, # 3 Exhibit B- Plaintiffs' Doc Production, # 4 Exhibit C-Plaintiffs' Responses to RPD, # 5 Exhibit D-December 16th Email, # 6 Exhibit E - Dec 29 to 30th Email Correspondence) (Johnson, Lindsey) (Entered: 12/30/2019) |
| 01/03/2020 | 64 | ORDER DENYING DEFENDANTS' 52 Motion for Protective Order - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 01/03/2020) |
| 01/03/2020 | 65 | REQUEST *for an Extension of Time to reply or Object to Magistrate Judge's Opinion* by City of Detroit, Juan Davis, Stephen Geelhood, |

| | | |
|---|---|---|
| | | Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1- Declaration of Surowiec and Email, # 3 Exhibit 2- Declaration of Holland, # 4 Exhibit 3- Email to Court Reporter) (Surowiec, James) (Entered: 01/03/2020) |
| 01/03/2020 | 66 | REQUEST *(Corrected) for Extension of Time to File Objections to the Opinion and Order of the Magistrate Judge* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1- Declaration of Surowiec and Email, # 3 Exhibit 2- Declaration of Holland, # 4 Exhibit 3- Email to Court Reporter) (Surowiec, James) (Entered: 01/03/2020) |
| 01/07/2020 | 67 | ORDER REFERRING MOTION to Magistrate Judge R. Steven Whalen: 63 MOTION to Compel *Plaintiffs' Responses to Document Requests* filed by City of Detroit, Juan Davis, Candace Matschikowski, Brian A Johnson, Joe Tucker, Stephen Geelhood. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 01/07/2020) |
| 01/07/2020 | 68 | NOTICE OF HEARING on 61 MOTION to Compel *Production of Documents* and 63 MOTION to Compel *Plaintiffs' Responses to Document Requests*. **Resolved/Unresolved Issues due by 2/4/2020. Motion Hearing set for 2/6/2020 at 10:00 AM before Magistrate Judge R. Steven Whalen.** (THac) (Entered: 01/07/2020) |
| 01/07/2020 | | TEXT-ONLY ORDER GRANTING DEFENDANT'S 66 Request for An Extension of Time, filed by City of Detroit, Juan Davis, Candace Matschikowski, Brian A Johnson, Joe Tucker, Stephen Geelhood - Entered by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 01/07/2020) |
| 01/09/2020 | 69 | NOTICE TO APPEAR BY TELEPHONE: **Status Conference set for 1/13/2020 03:00 PM before District Judge Arthur J. Tarnow.** Counsel are directed to forward their phone numbers by email to mike_lang@mied.uscourts.gov prior to the conference. (MLan) (Entered: 01/09/2020) |
| 01/13/2020 | | Minute Entry for proceedings before District Judge Arthur J. Tarnow: Telephonic Status Conference held on 1/13/2020. (MLan) (Entered: 01/13/2020) |
| 01/13/2020 | 70 | RESPONSE to 61 MOTION to Compel *Production of Documents and Brief in Support* filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1- Hearing Transcript, # 3 Exhibit 2 - Search Warrant, # 4 Exhibit 3- Defendants Discovery Responses) (Johnson, Lindsey) (Entered: 01/13/2020) |
| 01/14/2020 | 71 | RESPONSE to 63 MOTION to Compel *Plaintiffs' Responses to Document Requests* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 01/14/2020) |
| 01/17/2020 | 72 | NOTICE by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker re 64 Order on Motion for Protective Order, 59 Order on Motion to Compel *of Objections to the Orders of the Magistrate Judge* (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1- Hearing Transcript, Dec 19, 2019, # 3 Exhibit 2- Order Granting Plaintiffs' Motion to Compel Depositions, # 4 Exhibit 3- Order Denying Defendants' Motion for Protective Order) (Surowiec, James) (Entered: 01/17/2020) |
| 01/20/2020 | 73 | SUPPLEMENTAL BRIEF re 72 Notice (Other),, *Response to Defendants Objections to Magistrate Judge's Orders* filed by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit News Article 12/11/19, # 3 Exhibit News Article 12/12/19) (Dezsi, Michael) (Entered: 01/20/2020) |
| 01/21/2020 | 74 | REPLY to Response re 63 MOTION to Compel *Plaintiffs' Responses to Document Requests* filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit E, # 3 Exhibit F, # 4 Exhibit G, # 5 Exhibit H, # 6 Exhibit I) (Johnson, Lindsey) (Entered: 01/21/2020) |
| 01/21/2020 | 75 | REPLY to Response re 61 MOTION to Compel *Production of Documents* filed by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit H Transcript) (Dezsi, Michael) (Entered: 01/21/2020) |
| 01/23/2020 | 76 | SUPPLEMENTAL BRIEF re 74 Reply to Response to Motion, filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Johnson, Lindsey) (Entered: 01/23/2020) |
| 01/27/2020 | 77 | MOTION TO EXTEND Discovery *30 Days* by All Plaintiffs. (Dezsi, Michael) (Entered: 01/27/2020) |
| 01/29/2020 | 78 | ORDER Sustaining in part and Overruling in part 72 Objections by Defendants re 64 Order on Motion for Protective Order, 59 Order on Motion to Compel. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 01/29/2020) |
| 01/29/2020 | 79 | ORDER REFERRING MOTIONS to Magistrate Judge R. Steven Whalen: 77 MOTION TO EXTEND Discovery 30 Days filed by Plaintiffs, 44 MOTION to Compel *Deposition Testimony* filed by Plaintiffs, 52 MOTION for Protective Order filed by Defendants. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 01/29/2020) |
| 01/29/2020 | 80 | SUPPLEMENTAL BRIEF re 78 Order, Order to Vacate filed by All Plaintiffs. (Dezsi, Michael) (Entered: 01/29/2020) |
| 02/04/2020 | 81 | NOTICE OF HEARING on 77 MOTION TO EXTEND Discovery *30 Days*. **Motion Hearing set for 2/6/2020 at 10:00 AM before Magistrate Judge R. Steven Whalen -** (CCie) (Entered: 02/04/2020) |
| 02/04/2020 | 82 | RESPONSE to 77 MOTION TO EXTEND Discovery *30 Days Opposing Any Extension* filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1- Plaintiffs' 2nd Notice of Deposition for Chiefs, # 3 Exhibit 2- Email between Counsel, # 4 Exhibit 3- Hearing Transcript Excerpts (12/19/2019), # 5 Exhibit 4- Plaintiffs' 1st Notice of Deposition of Chiefs, # 6 Exhibit 5- US Atty Sentencing Memo, # 7 Exhibit 6- Police Report, # 8 Exhibit 7- Mukhlis Shamoon Deposition Excerpts, # 9 Exhibit 8- Preliminary Lab Tests, # 10 Exhibit 9- Chain of Custody Reports, # 11 Exhibit 10- Notice of Forfeiture, # 12 Exhibit 11- January Notices of Deps & Subpoenas, # 13 Exhibit 12- Plaintiffs' 5th RFP, # 14 Exhibit 13- Notice of Status Conference, # 15 Exhibit 14- Plaintiffs Email Insisting on Proceeding with Deps of Chiefs, # 16 Exhibit 15- Defs' email seeking compromise) (Surowiec, James) (Entered: 02/04/2020) |
| 02/04/2020 | | TEXT-ONLY NOTICE: Final Pretrial Conference on 2/10/2020 is Cancelled. New date to be set following determination of pending motions. (MLan) (Entered: 02/04/2020) |
| 02/06/2020 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Motion Hearing held on 2/6/2020 re 63 MOTION to Compel *Plaintiffs' Responses to Document Requests* filed by City of Detroit, Juan Davis, Candace Matschikowski, Brian A Johnson, Joe Tucker, Stephen Geelhood, 77 MOTION TO EXTEND Discovery *30 Days* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres, 61 MOTION to Compel *Production of Documents* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres - Disposition: 61 Motion granted in part and denied in part; 63 Motion granted in part and denied in part; 77 Motion granted. (Court Reporter: Digitally Recorded) (CCie) (Entered: 02/06/2020) |

| 02/07/2020 | 83 | ORDER GRANTING PLAINTIFFS' 61 Motion to Compel- Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 02/07/2020) |
|---|---|---|
| 02/07/2020 | 84 | ORDER GRANTING DEFENDANTS' 63 Motion to Compel- Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 02/07/2020) |
| 02/07/2020 | 85 | ORDER GRANTING PLAINTIFFS' 77 MOTION TO EXTEND Discovery - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 02/07/2020) |
| 02/07/2020 | | TEXT-ONLY ORDER AMENDING SCHEDULING ORDER: **Discovery due by 5/7/2020, Dispositive Motion Cut-off set for 6/8/2020, Joint Final Pretrial Order due 9/21/2020, Final Pretrial Conference set for 9/28/2020 02:30 PM before District Judge Arthur J. Tarnow.** Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 02/07/2020) |
| 02/10/2020 | 86 | SUPPLEMENTAL ORDER re 58 Order on Motion - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 02/10/2020) |
| 02/10/2020 | 87 | ORDER GRANTING PLAINTIFFS' 44 Motion to Compel AND DENYING DEFENDANTS' 52 Motion for Protective Order - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 02/10/2020) |
| 03/09/2020 | 88 | STIPULATED PROTECTIVE ORDER - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 03/09/2020) |
| 04/03/2020 | 89 | NOTICE to All Plaintiffs *of Motion to Consolidate Cases* (Dezsi, Michael) (Entered: 04/03/2020) |
| 04/06/2020 | 90 | MOTION for Order to Show Cause *and/or for Default Judgment for Defendants' Failure to Comply with this Court's Prior Discovery Order [Dkt #83]* by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Plaintiffs' Second Request to Produce, # 3 Exhibit B Detroit News Article 12/11/2019, # 4 Exhibit C Detroit News Article 12/12/2019, # 5 Exhibit D Defendants' Answers to Second Request to Produce, # 6 Exhibit E Article) (Dezsi, Michael) (Entered: 04/06/2020) |
| 04/06/2020 | 91 | MOTION for Voluntary Dismissal Without Prejudice Against Defendants Johnson, Matschikowski, and Tucker by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Jury Trial Transcript, # 3 Exhibit B Detroit News Article 12/11/2019, # 4 Exhibit C Detroit News Article 12/12/2019) (Dezsi, Michael) (Entered: 04/06/2020) |
| 04/14/2020 | 92 | ORDER REFERRING MOTION to Magistrate Judge R. Steven Whalen: 90 MOTION for Order to Show Cause *and/or for Default Judgment for Defendants' Failure to Comply with this Court's Prior Discovery Order [Dkt #83]* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 04/14/2020) |
| 04/20/2020 | 93 | RESPONSE to 91 MOTION for Voluntary Dismissal Without Prejudice Against Defendants Johnson, Matschikowski, and Tucker filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6) (Johnson, Lindsey) (Entered: 04/20/2020) |
| 04/21/2020 | 94 | RESPONSE to 90 MOTION for Order to Show Cause *and/or for Default Judgment for Defendants' Failure to Comply with this Court's Prior Discovery Order [Dkt #83] in opposition* filed by All Defendants. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A - Declaration of Graveline, # 3 Exhibit B - Defendants doc production, # 4 Exhibit C - Email exchange re LR 71) (Johnson, Lindsey) (Entered: 04/21/2020) |
| 04/21/2020 | 95 | NOTICE OF HEARING BY TELEPHONE on 90 MOTION for Order to Show Cause *and/or for Default Judgment for Defendants' Failure to Comply with this Court's Prior Discovery Order [Dkt #83].* **Resolved/Unresolved Issues due by 5/15/2020. Motion Hearing set for 5/19/2020 at 10:00 AM before Magistrate Judge R. Steven Whalen.** CALL IN INFORMATION WILL BE PROVIDED PRIOR TO HEARING. (THac) (Entered: 04/21/2020) |
| 04/24/2020 | 96 | REPLY to Response re 91 MOTION for Voluntary Dismissal Without Prejudice Against Defendants Johnson, Matschikowski, and Tucker filed by All Plaintiffs. (Dezsi, Michael) (Entered: 04/24/2020) |
| 04/27/2020 | 97 | REPLY to Response re 90 MOTION for Order to Show Cause *and/or for Default Judgment for Defendants' Failure to Comply with this Court's Prior Discovery Order [Dkt #83]* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 04/27/2020) |
| 05/04/2020 | 98 | *Amended* WITNESS LIST by All Plaintiffs (Dezsi, Michael) (Entered: 05/04/2020) |
| 05/19/2020 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Telephonic Motion Hearing held on 5/19/2020 re 90 MOTION for Order to Show Cause *and/or for Default Judgment for Defendants' Failure to Comply with this Court's Prior Discovery Order [Dkt #83]* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres. Disposition: Motion taken under advisement (Court Reporter: Rene Twedt) (MarW) (Entered: 05/19/2020) |
| 05/30/2020 | 99 | STIPULATED ORDER EXTENDING SCHEDULING ORDER: **Discovery due by 7/7/2020, Dispositive Motion Cut-off set for 8/8/2020, Final Pretrial Conference set for 11/23/2020 02:30 PM before District Judge Arthur J. Tarnow.** Signed by District Judge Arthur J. Tarnow. (Refer to image for additional dates) (MLan) (Entered: 05/30/2020) |
| 06/08/2020 | 100 | NOTICE TO APPEAR BY TELEPHONE - **Status Conference set for 6/9/2020 at 10:00 AM before Magistrate Judge R. Steven Whalen** - ***PLEASE SEE NOTICE FOR ADDITIONAL IMPORTANT INFORMATION*** (CCie) (Entered: 06/08/2020) |
| 06/09/2020 | 101 | OPINION and ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' 90 MOTION for Order to Show Cause *and/or for Default Judgment for Defendants' Failure to Comply with this Court's Prior Discovery Order [Dkt #83]* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 06/09/2020) |
| 06/09/2020 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Telephonic Status Conference held on 6/9/2020 - (CCie) (Entered: 06/09/2020) |
| 06/15/2020 | 102 | NOTICE of Appearance by Patrick M. Cunningham on behalf of City of Detroit. (Cunningham, Patrick) (Entered: 06/15/2020) |
| 06/15/2020 | 103 | MOTION to Stay re 101 Memorandum Opinion & Order,, Terminate Motions, by City of Detroit. (Cunningham, Patrick) (Entered: 06/15/2020) |
| 06/17/2020 | 104 | ORDER REFERRING MOTION to Magistrate Judge R. Steven Whalen: 103 MOTION to Stay re 101 Memorandum Opinion & Order filed by City of Detroit. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 06/17/2020) |
| 06/19/2020 | 105 | MOTION to Disqualify Counsel *City of Detroit Law Department* by All Plaintiffs. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Appearance of Counsel Garcia, # 3 Exhibit B Excerpt of Deposition Transcript of Arthur Leavells, # 4 Exhibit C Leavells Plea Agreement, |

| | | |
|---|---|---|
| | | # 5 Exhibit D Excerpt of Jury Trial Transcript: Arthur Leavells, # 6 Exhibit E Correspondence from Garcia) (Dezsi, Michael) (Entered: 06/19/2020) |
| 06/26/2020 | 106 | RESPONSE to 103 MOTION to Stay re 101 Memorandum Opinion & Order,, Terminate Motions, filed by All Plaintiffs. (Dezsi, Michael) (Entered: 06/26/2020) |
| 07/01/2020 | 107 | ORDER REFERRING MOTION to Magistrate Judge R. Steven Whalen: 105 MOTION to Disqualify Counsel *City of Detroit Law Department* filed by Plaintiffs. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 07/01/2020) |
| 07/01/2020 | 108 | NOTICE TO APPEAR BY TELEPHONE: **Status Conference set for 7/2/2020 at 9:30 AM before Magistrate Judge R. Steven Whalen** - ***PLAINTIFFS' COUNSEL, PLEASE EMAIL THE CASE MANAGER A CALL IN NUMBER FOR THE TELEPHONE CONFERENCE*** (CCie) (Entered: 07/01/2020) |
| 07/01/2020 | 109 | RESPONSE to 105 MOTION to Disqualify Counsel *City of Detroit Law Department* filed by City of Detroit. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8) (Johnson, Lindsey) (Entered: 07/01/2020) |
| 07/02/2020 | | Minute Entry for proceedings before Magistrate Judge R. Steven Whalen: Telephonic Status Conference held on 7/2/2020 - (CCie) |
| 07/02/2020 | 110 | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' 103 Motion to Stay - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 07/02/2020) |
| 07/07/2020 | 111 | REPLY to Response re 105 MOTION to Disqualify Counsel *City of Detroit Law Department* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 07/07/2020) |
| 07/16/2020 | 112 | APPEAL OF MAGISTRATE JUDGE DECISION by City of Detroit re 110 Order on Motion to Stay. (Cunningham, Patrick) (Entered: 07/16/2020) |
| 07/20/2020 | 113 | RESPONSE to 112 Appeal of Magistrate Judge Decision *Denying Its Motion for Clarification or for a Sixty Day Stay of Enforcement* by All Plaintiffs. (Dezsi, Michael) (Entered: 07/20/2020) |
| 07/23/2020 | 114 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Objection to R&R Hearing set for 8/5/2020 03:30 PM before District Judge Arthur J. Tarnow**. |Zoom Webinar Information: https://zoom.us/j/99317086263?pwd=ZzUrTUNCNHlvaEJFckdqaVQyYVBXQT09 Passcode: 235954 Or join by phone: Dial(for higher quality, dial a number based on your current location): US: +1 301 715 8592 or +1 312 626 6799 or +1 602 753 0140 or +1 213 338 8477 or +1 253 215 8782| (MLan) (Entered: 07/23/2020) |
| 07/27/2020 | 115 | RE-NOTICE TO APPEAR BY VIDEO CONFERENCE: **Objection to R&R Hearing set for 8/5/2020 03:30 PM before District Judge Arthur J. Tarnow**. THIS NOTICE CORRECTS THE ZOOM INVITATION INFORMATION. |Zoom Webinar Information: https://zoom.us/j/99317086263?pwd=ZzUrTUNCNHlvaEJFckdqaVQyYVBXQT09 Passcode: 235954 Or iPhone one-tap : US: +13017158592,,99317086263#,,,,,,0#,,235954# or +13126266799,,99317086263#,,,,,,0#,,235954#| (MLan) (Entered: 07/27/2020) |
| 08/05/2020 | | Minute Entry for proceedings before District Judge Arthur J. Tarnow: OBJECTION Hearing held on 8/5/2020. Disposition: Objection Resolved on the Record. (Court Reporter: Lawrence Przybysz) (MLan) (Entered: 08/06/2020) |
| 08/11/2020 | 116 | STIPULATED PROTECTIVE ORDER. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 08/11/2020) |
| 08/11/2020 | 117 | STIPULATED ORDER Extending Deadlines: **Discovery due by 9/10/2020, Dispositive Motion Cut-off set for 10/23/2020**. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 08/11/2020) |
| 08/18/2020 | 118 | NOTICE by All Plaintiffs of withdrawal of 91 MOTION for Voluntary Dismissal Without Prejudice Against Defendants Johnson, Matschikowski, and Tucker *; Partial Withdrawal as to Defendant Tucker Only*. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Internal Affairs documents, # 3 Exhibit B Excerpt IA Case 00 213, # 4 Exhibit C Defendants' Answers & Objections to Plaintiffs' Third Request for Production of Documents, # 5 Exhibit D Correspondence, # 6 Exhibit E Excerpt IA Case 14 149) (Dezsi, Michael) (Entered: 08/18/2020) |
| 08/26/2020 | 119 | DOCUMENT IS NOT A NOTICE DOCUMENT TITLED: DEFENDANTS RESPONSE TO PLAINTIFFS NOTICE OF PARTIAL WITHDRAWAL OF MOTION FOR VOLUNTARY DISMISSAL NOTICE by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker re 118 Notice to Withdraw Motion,, (Surowiec, James) Modified on 8/28/2020 (LGra). (Entered: 08/26/2020) |
| 08/27/2020 | 120 | NOTICE by All Plaintiffs re 116 Protective Order *Dated August 11, 2020* (Dezsi, Michael) (Entered: 08/27/2020) |
| 10/23/2020 | 121 | MOTION to Dismiss *Pursuant to Fed R Civ P 12(c) with Brief in Support* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1- Davis Complaint, # 3 Exhibit 2- Davis First Amended Complaint, # 4 Exhibit 3- Davis Motion to Certify, # 5 Exhibit 4- R&R Denying Class Cert, # 6 Exhibit 5-Order Denying Class Cert, # 7 Exhibit 6- Metris Shamoon Complaint, # 8 Exhibit 7- Metris Shamoon First Amended Complaint) (Surowiec, James) (Entered: 10/23/2020) |
| 10/23/2020 | 122 | MOTION for Summary Judgment *With Brief in Support* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Surowiec, James) (Entered: 10/23/2020) |
| 10/24/2020 | 123 | MOTION for Summary Judgment *CORRECTED with Brief in Support* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1- Geelhood Deposition, # 3 Exhibit 2- Search Warrant, # 4 Exhibit 3- Declaration of Tucker, # 5 Exhibit 4- Declaration of Johnson, # 6 Exhibit 5- Declaration of J Davis, # 7 Exhibit 6- Declaration of Matschikowski, # 8 Exhibit 7- DPD Report, # 9 Exhibit 8-Prelim Lab Test, # 10 Exhibit 9-Firearm Reports, # 11 Exhibit 10- Notice of Forfeiture, # 12 Exhibit 11- Dixon Declaration, # 13 Exhibit 12-IBRSYS Property Reports, # 14 Exhibit 13-Mrs. Shamoon Dep, # 15 Exhibit 14- Mr. Shamoon Dep, # 16 Exhibit 15- Photos of Grow Op, # 17 Exhibit 16- Paul Metris Dep, # 18 Exhibit 17- Julia Metris Dep, # 19 Exhibit 18- Mr. Veres Dep) (Surowiec, James) (Entered: 10/24/2020) |
| 11/10/2020 | 124 | STIPULATED ORDER Extending Time for Responses as to 121 MOTION to Dismiss Pursuant to Fed R Civ P 12(c) and 123 CORRECTED MOTION for Summary Judgment: **Responses due by 11/23/2020**. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 11/10/2020) |
| 11/18/2020 | | TEXT-ONLY NOTICE: Final Pretrial Conference on 11/23/2020 is Cancelled. New date to be set following determination of pending motions. (MLan) (Entered: 11/18/2020) |

| 11/20/2020 | 125 | RESPONSE to 123 MOTION for Summary Judgment *CORRECTED with Brief in Support* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 11/20/2020) |
|---|---|---|
| 11/20/2020 | 126 | APPENDIX re: 125 Response to Motion filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres. by All Plaintiffs *Combined Exhibits In Opposition to Defendants' Corrected Motion for Summary Judgment [Dkt#123] and Motion to Dismiss [Dkt #121]* (Attachments: # 1 Exhibit A Search Warrant & Affidavit, # 2 Exhibit B DPD Report (Shamoon), # 3 Exhibit C Deposition Transcript of Debra Metris-Shamoon, # 4 Exhibit D Order of Dismissal, # 5 Exhibit E Motion Hearing Transcript, # 6 Exhibit F Deposition Transcript of Matthew Bray, # 7 Exhibit G Motion Hearing Transcript, # 8 Exhibit H Defendants' Answers & Objections to Second Request to Admit, # 9 Exhibit I Defendants' Answers & Objections to Plaintiffs' 1st Interrogatories and Requests for Production, # 10 Exhibit I-2 Defendants' Answers & Objections to Plaintiffs' Fifth Request to Produce, # 11 Exhibit I-3 Defendant City's Responses & Objections to Schedule A, # 12 Exhibit J McGee Complaint, # 13 Exhibit K Defendants Response to Court Order Production, # 14 Exhibit K1 Audio Recording of Chuck Fitzgerald, # 15 Exhibit L Search Warrant & Affidavit (Matelic) McCallum, # 16 Exhibit M Final Conference Transcript; McCallum, # 17 Exhibit N WCPO Press Release, # 18 Exhibit O Order of Dismissal; People v Chancellor, # 19 Exhibit P Jury Trial Transcript Vol 14, # 20 Exhibit Q Defendants' Answers & Objections to Plaintiffs' 4th Interrogatories, # 21 Exhibit R DPD Communications, # 22 Exhibit S Detroit News Article 12-11-2014, # 23 Exhibit T Indictment of Watson & Hansberry, # 24 Exhibit U Hansberry Judgment, # 25 Exhibit V Watson Judgment, # 26 Exhibit W Jury Trial Transcript Vol 15, # 27 Exhibit X DPD Record, # 28 Exhibit Y Detroit News 12-11-2019, # 29 Exhibit Z Detroit News 12-12-2019, # 30 Exhibit AA DPD Report (Davis), # 31 Exhibit BB DPD Report (McShane), # 32 Exhibit CC DPD Report (Lockard), # 33 Exhibit DD DPD Report (Reid), # 34 Exhibit EE Deposition Transcript of Chief Craig, # 35 Exhibit FF Deposition Transcript of Stephen Geelhood 04-04-2016, # 36 Exhibit GG IA File (Rayis), # 37 Exhibit HH Chancellor Documents, # 38 Exhibit II Search Warrant & Affidavit (Geelhood); Chancellor, # 39 Exhibit JJ Order of Dismissal; People v. McCallum, # 40 Exhibit KK Search Warrant & Affidavit (Bray); Lockard, # 41 Exhibit LL Deposition Transcript of Matthew Bray 01-30-2020, # 42 Exhibit MM Defendants' Answers & Objections to Plaintiff's 4th Request to Produce; Frontczak, # 43 Exhibit NN 2012 Operating Procedures, # 44 Exhibit OO DPD Retention Policy, # 45 Exhibit PP Correspondence, # 46 Exhibit QQ Search Warrant & Affidavit (Bray) McShane, # 47 Exhibit RR Deposition Transcript of Stephen Geelhood 10-15-2019, # 48 Exhibit SS Declaration of Stephen Geelhood, # 49 Exhibit TT Declaration of Sgt. McCoy-O'Neill, # 50 Exhibit UU Deposition Transcript (2) of Stephen Geelhood 10-15-2019, # 51 Exhibit VV DPD Seizure, # 52 Exhibit WW Warrendale Blog, # 53 Exhibit XX Deposition Transcript of Chief Godbee, # 54 Exhibit YY IA Case documents, # 55 Exhibit ZZ Detroit News 01-22-2015, # 56 Exhibit AAA IA Correspondence, # 57 Exhibit BBB Notice of Discipline, # 58 Exhibit CCC Leavells Plea Agreement, # 59 Exhibit DDD Deposition Transcript of Mukhlis Shamoon, # 60 Exhibit EEE SOI Documents, # 61 Exhibit FFF Obituary, # 62 Exhibit GGG Declaration of Justin Reid, # 63 Exhibit HHH Search Warrant & Affidavit (Leavells) Reid, # 64 Exhibit III Search Warrant & Affidavit (Leavells) Davis, # 65 Exhibit JJJ Excerpt of Leavells Deposition Transcript, # 66 Exhibit KKK Photographs (Dezsi, Michael) (Entered: 11/20/2020) |
| 11/20/2020 | 127 | Ex Parte MOTION for Leave to File *Exhibits in the Traditional Manner* by All Plaintiffs. (Dezsi, Michael) (Entered: 11/20/2020) |
| 11/20/2020 | 128 | RESPONSE to 121 MOTION to Dismiss *Pursuant to Fed R Civ P 12(c) with Brief in Support* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 11/20/2020) |
| 11/30/2020 | 129 | STIPULATION AND ORDER granting Plaintiffs' leave to file excess pages in plaintiffs' brief in opposition to Defendants' Motion for Summary Judgment 123 . Signed by District Judge Arthur J. Tarnow. (McColley, N) (Entered: 11/30/2020) |
| 12/04/2020 | 130 | REPLY to Response re 121 MOTION to Dismiss *Pursuant to Fed R Civ P 12(c) with Brief in Support* filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 8- McCallum Opinion (Excerpt), # 3 Exhibit 9-WCP-CIU Memo_Redacted, # 4 Exhibit 10- Deposition of APA Newman (Excerpt), # 5 Exhibit 11- Cover Page CIU-Memo Under Seal) (Surowiec, James) (Entered: 12/04/2020) |
| 12/07/2020 | 131 | MOTION for Leave to File *Sealed Exhibit (Ex. 11) re: 130 Reply Brief* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Surowiec, James) (Entered: 12/07/2020) |
| 12/07/2020 | 132 | REPLY to Response re 123 MOTION for Summary Judgment *CORRECTED with Brief in Support* filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 19- Geelhood Dep Part II, # 3 Exhibit 20- Police Reports, # 4 Exhibit 21- CI Death Certificate, # 5 Exhibit 22- Detective Rutledge Declaration, # 6 Exhibit 23- CI Obituary, # 7 Exhibit 24- Geelhood Declaration, # 8 Exhibit 25- Verdict Form USA v. Hansberry, # 9 Exhibit 26- Deposition of Chief Godbee, # 10 Exhibit 27- Deposition of Chief Craig) (Surowiec, James) (Entered: 12/07/2020) |
| 12/08/2020 | | TEXT-ONLY ORDER granting 127 Ex Parte MOTION for Leave to File *Exhibits in the Traditional Manner* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 12/08/2020) |
| 12/10/2020 | 136 | EXHIBIT K1 in support of 126 Appendix filed by plaintiffs (filed in the traditional manner) (DPer) (Entered: 12/28/2020) |
| 12/11/2020 | 133 | RESPONSE to 131 MOTION for Leave to File *Sealed Exhibit (Ex. 11) re: 130 Reply Brief* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 12/11/2020) |
| 12/21/2020 | 134 | STIPULATED ORDER Extending Time and Granting Excess Pages. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 12/21/2020) |
| 12/22/2020 | 135 | MOTION for Leave to File *Corrected (Signed) Declarations in Support of Defendants Motions for Summary Judgment* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Index of Exhibits A- with corrected exhibits 3, 4, 5, 6, and 11 attached) (Surowiec, James) (Entered: 12/22/2020) |
| 12/29/2020 | 137 | RESPONSE to 135 MOTION for Leave to File *Corrected (Signed) Declarations in Support of Defendants Motions for Summary Judgment* filed by All Plaintiffs. (Dezsi, Michael) (Entered: 12/29/2020) |
| 01/04/2021 | 138 | REPLY to Response re 135 MOTION for Leave to File *Corrected (Signed) Declarations in Support of Defendants Motions for Summary Judgment* filed by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Attachments: # 1 Exhibit A- Email of Defendants stipulating to Plaintiffs' requested relief) (Surowiec, James) (Entered: 01/04/2021) |
| 01/22/2021 | 139 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Status Conference set for 2/18/2021 11:00 AM before District Judge Arthur J. Tarnow**. This conference is set to discuss recently filed motions (#131 and 135). Counsel will receive Zoom invitation by email. (MLan) (Entered: 01/22/2021) |
| 02/18/2021 | | Minute Entry for proceedings before District Judge Arthur J. Tarnow: Status Conference held on 2/18/2021. (MLan) (Entered: 02/18/2021) |

| | | |
|---|---|---|
| 02/23/2021 | 140 | ORDER granting 131 Motion for Leave to File Sealed Exhibit; granting 135 Motion for Leave to File Corrected (Signed) Declarations. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 02/23/2021) |
| 03/01/2021 | 141 | EXHIBIT *REPLACEMENT DECLARATIONS (SIGNED)* re 123 MOTION for Summary Judgment *CORRECTED with Brief in Support* by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker (Attachments: # 1 Index of Exhibits, # 2 Exhibit 3- Signed Declaration of Sgt. Tucker, # 3 Exhibit 4- Signed Declaration of PO B. Johnson, # 4 Exhibit 5- Signed Declaration of Juan Davis, # 5 Exhibit 6- Signed Declaration of Sgt. Matschikowski, # 6 Exhibit 11- Signed Declaration of Sgt. Dixon) (Surowiec, James) (Entered: 03/01/2021) |
| 03/02/2021 | 142 | SEALED EXHIBIT *11* re 130 Reply to Response to Motion, by City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski, Joe Tucker. (Surowiec, James) (Entered: 03/02/2021) |
| 03/11/2021 | 143 | NOTICE OF HEARING BY VIDEO CONFERENCE on 121 MOTION to Dismiss Pursuant to Fed R Civ P 12(c), 123 MOTION for Summary Judgment CORRECTED with Brief in Support. **Motion Hearing set for 4/28/2021 02:30 PM before District Judge Arthur J. Tarnow.** |Zoom Webinar Information: https://www.zoomgov.com/j/1618355148?pwd=MnRqMm1lZCtDd0hVNU9WWTZzVVJqdz09 Passcode: 436861 Or iPhone one-tap : US: +16692545252,,1618355148# or +16468287666,,1618355148#|. (MLan) (Entered: 03/11/2021) |
| 03/16/2021 | 144 | OPINION AND ORDER DENYING PLAINTIFFS' 105 MOTION to Disqualify Counsel *City of Detroit Law Department*, Motions terminated: 105 MOTION to Disqualify Counsel *City of Detroit Law Department* filed by Julia Metris, Paul Metris, Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres - Signed by Magistrate Judge R. Steven Whalen. (CCie) (Entered: 03/16/2021) |
| 04/28/2021 | | Minute Entry for proceedings before District Judge Arthur J. Tarnow: Motion Hearing held on 4/28/2021 re 123 MOTION for Summary Judgment *CORRECTED* filed by City of Detroit, Juan Davis, Candace Matschikowski, Brian A Johnson, Joe Tucker, Stephen Geelhood, 121 MOTION to Dismiss *Pursuant to Fed R Civ P 12(c)* filed by City of Detroit, Juan Davis, Candace Matschikowski, Brian A Johnson, Joe Tucker, Stephen Geelhood Disposition: Motions taken under advisement. (Court Reporter: Lawrence Przybysz) (MLan) (Entered: 04/29/2021) |
| 06/25/2021 | 145 | ORDER granting in part and denying in part 121 Motion to Dismiss; denying 123 Motion for Summary Judgment. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 06/25/2021) |
| 07/08/2021 | 146 | AMENDED COMPLAINT with Jury Demand filed by All Plaintiffs against City of Detroit, Stephen Geelhood. NO NEW PARTIES ADDED. (Dezsi, Michael) (Entered: 07/08/2021) |
| 07/08/2021 | 147 | NOTICE of Change of Address/Contact Information by Michael R. Dezsi on behalf of All Plaintiffs. (Dezsi, Michael) (Entered: 07/08/2021) |
| 07/20/2021 | 148 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Status Conference set for 8/2/2021 03:30 PM before District Judge Arthur J. Tarnow.** Counsel will receive Zoom invitation by email. (MLan) (Entered: 07/20/2021) |
| 07/22/2021 | 149 | ANSWER to Amended Complaint with Affirmative Defenses by City of Detroit. (Surowiec, James) (Entered: 07/22/2021) |
| 08/02/2021 | | Minute Entry for proceedings before District Judge Arthur J. Tarnow: Status Conference held on 8/2/2021 **Joint Final Pretrial Order to be submitted by 1/18/2022, Final Pretrial Conference set for 1/25/2022 03:00 PM before District Judge Arthur J. Tarnow, Jury Trial set for 1/31/2022 09:30 AM before District Judge Arthur J. Tarnow.** (MLan) (Entered: 08/02/2021) |
| 09/27/2021 | 150 | TRANSCRIPT of Motion Hearing held on April 28, 2021. (Court Reporter/Transcriber: Lawrence R. Przybysz) (Number of Pages: 40) (Appeal Purposes) The parties have 21 days to file with the court and Court Reporter/Transcriber a Redaction Request of this transcript. If no request is filed, the transcript may be made remotely electronically available to the public without redaction after 90 days. Redaction Request due 10/18/2021. Redacted Transcript Deadline set for 10/28/2021. Release of Transcript Restriction set for 12/27/2021. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, the transcript is publicly available. (Przybysz, L) (Entered: 09/27/2021) |
| 12/07/2021 | 151 | STIPULATED ORDER of Substitution of Counsel - Attorney Crystal B Olmstead for City of Detroit, Juan Davis, Stephen Geelhood, Brian A Johnson, Candace Matschikowski and Joe Tucker added. Attorney James M. Surowiec; James P. Allen and Lindsey R. Johnson terminated. Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 12/07/2021) |
| 12/07/2021 | | Text-Only Order of reassignment from Magistrate Judge R. Steven Whalen to Magistrate Judge Elizabeth A. Stafford pursuant to Administrative Order 21-AO-013. (SSch) (Entered: 12/07/2021) |
| 12/10/2021 | 152 | STIPULATED ORDER of Adjournment of Trial: **Joint Final Pretrial Order to be submitted by 5/9/2022, Final Pretrial Conference set for 5/16/2022 03:00 PM before District Judge Arthur J. Tarnow, Jury Trial set for 5/23/2022 09:30 AM before District Judge Arthur J. Tarnow.** Signed by District Judge Arthur J. Tarnow. (MLan) (Entered: 12/10/2021) |
| 02/16/2022 | | Text-Only Order of reassignment from District Judge Arthur J. Tarnow to District Judge Victoria A. Roberts pursuant to Administrative Order 22-AO-007. (SSch) (Entered: 02/16/2022) |
| 02/17/2022 | 153 | ORDER of RECUSAL and REASSIGNING CASE from District Judge Victoria A. Roberts in Detroit to District Judge Robert H. Cleland in Port Huron. (SSch) (Entered: 02/17/2022) |
| 03/03/2022 | 154 | ORDER Referring ALL Pretrial Matters to Magistrate Judge Elizabeth A. Stafford. Signed by District Judge Robert H. Cleland. (LWag) (Entered: 03/03/2022) |
| 03/16/2022 | 155 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Status Conference set for 4/7/2022 at 10:30 AM before Magistrate Judge Elizabeth A. Stafford.** ***Parties are to file a joint factual and procedural summary of the case by 3/30/22. Parties to receive Zoom invitation in a separate email prior to conference.*** (MarW) (Entered: 03/16/2022) |
| 03/30/2022 | 156 | STATEMENT of Joint Factual and Procedural Summary by Debra Metris-Shamoon (Dezsi, Michael) (Entered: 03/30/2022) |
| 04/07/2022 | | Minute Entry for virtual proceedings before Magistrate Judge Elizabeth A. Stafford: Status Conference held on 4/7/2022. (Court Reporter: None Present, Not on the Record) (MarW) (Entered: 04/07/2022) |
| 04/07/2022 | 157 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Status Conference set for 5/10/2022 at 09:30 AM before Magistrate Judge Elizabeth A. Stafford.** Parties are to be prepared to discuss the status of the bankruptcy motion, alternative dispute resolution, and the schedule for pretrial proceedings. Counsel to receive Zoom invitation in a separate email. (MarW) (Entered: 04/07/2022) |

| 04/18/2022 | 158 | AMENDED NOTICE TO APPEAR BY TELEPHONE: **Status Conference reset for 6/16/2022 at 11:30 AM before Magistrate Judge Elizabeth A. Stafford.** The Court shall initiate the conference call. (Status conference adjourned because of the pending motion before the bankruptcy court) (MarW) (Entered: 04/18/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/17/2022 10:20:01 | | |
| **PACER Login:** | md4293suite1600 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:18-cv-13683-RHC-EAS |
| **Billable Pages:** | 20 | **Cost:** | 2.00 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |