## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### REPLY BRIEF IN SUPPORT OF CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE ACCRUED LIABILITY IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN

Marc N. Swanson (P71149)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-8451
swansonm@millercanfield.com

Attorneys for the City of Detroit

October 31, 2022

Charles N. Raimi (P29746)
Deputy Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Coleman A. Young Municipal Ctr
Detroit, Michigan 48226
Telephone: (313)-237-5037
raimic@detroitmi.gov

# TABLE OF CONTENTS

Page

Index of Authorities ..................................................................... ii

I.      This Court's rulings requiring 30-year amortization were
        integral to the Court's determination of feasibility and
        confirmation of the POA ................................................... 2

        A. The Ernst & Young financial projections formed the
           foundation of the POA and expressly require 30-year
           amortization.......................................................... 2

        B. Kopacz opines the POA is feasible expressly based
           on 30-year amortization............................................. 5

        C. This Court has ruled that the POA required the
           legacy plans' UAAL as of June 30, 2023 to be
           amortized over thirty-years, which was integral both
           to the Court's finding of feasibility and confirmation
           of the POA ........................................................... 6

II.     This Court's multiple rulings requiring 30-year
        amortization bind PFRS; the retirees never once
        suggested otherwise..................................................... 9

III.    PFRS' arguments are devoid of merit ................................. 11

        A. The City does not rely on extrinsic evidence, it relies
           on this Court's rulings and the entire trial record.......... 11

        B. The State Contribution Agreement provides no
           support to PFRS..................................................... 14

        C. PFRS' reliance on out-of-context snippets of
           discovery deposition testimony is disingenuous and
           completely misplaced ............................................. 18

        D. PFRS' reliance on the City's pre-bankruptcy defaults
           is shameful.......................................................... 19

i

Conclusion and Relief..........................................................................22

13-53846-tjt    Doc 13663    Filed 10/31/22    Entered 10/31/22 16:55:43    Page 3 of 26

# INDEX OF AUTHORITIES

<u>Page(s)</u>

<u>Cases</u>

*Andrusz v. Andrusz,*
   320 Mich App 445 (2017) ........................................................................ 17

*In re A.P. Liquidating Co.,*
   421 Fed. Appx. 583 (6th Cir. 2011) ...................................................... 17

*In re Moye,*
   437 Fed.Appx. 338 (6th Cir. 2011) ......................................................... 9

*Mason v. Telefunken Semiconductors America*, LLC,
   797 F.3d 33 (1st Cir. 2015) .................................................................. 17

*Toder v. Progressive Mi. Ins. Co.,*
   2017 WL 3316939 (Mich. Ct. Apps. 2017) .......................................... 17
*Winget v. JP Morgan Chase Bank*, N.A.,
   537 F.3d 565 (6th Cir, 2008) ................................................................ 10

<u>Statutes</u>

11 U.S.C. § 943(b)(7) ................................................................................ 6, 9

<u>Rules</u>

Fed. R. Bankr. P. 7001(7) ............................................................................ 22

Attached for the Court's convenience are particularly relevant excerpts of the Confirmation Opinion and Order. Exhibits 15 and 16; (exhibits 1-14 were appended to the City's opening brief). They address all relevant issues and expressly hold the POA requires 30-year amortization of PFRS' UAAL as of June 30, 2023. E.g., "The City will then [beginning FY 23] amortize the remaining UAAL for both plans over the next thirty years at an interest rate of 6.75%. *Id.*" Ex. 15, p. 231.

PFRS completely ignores this Court's rulings. PFRS erroneously argues that because the POA allegedly is "silent" on the amortization term, PFRS has "unfettered discretion" over the term. PFRS brief, pp. 10, 31 (subheading A). The opening sentence of PFRS' brief dramatically proclaims that the POA's alleged silence on amortization is the "supreme irony" of the City's motion.

The POA is not "silent." This Court has ruled that the POA requires 30-year amortization. And the Confirmation Order states: "* * * the terms of the Plan **and this Order** shall be binding upon, and inure to the benefit of: (a) the City; (b) any and all holders of Claims [which includes, of course, PFRS] * * *." Ex. 16, p. 86, ¶E(28), emphasis added. That one sentence destroys PFRS' entire theory of this case.

PFRS' other theory is that language in the State Contribution Agreement gives PFRS "unfettered discretion" over the amortization term after FY 2023. So, while PFRS has purported to accelerate amortization from 30 to 20 years, under PFRS'

"unfettered discretion" argument both PFRS and GRS could demand that the UAAL be amortized in 10 years, 5 years, or even 1 year.

The State Contribution Agreement language upon which PFRS relies does not even mention the amortization term and does not remotely support PFRS' position. At no time during the bankruptcy proceedings or thereafter did PFRS ever make the claim of "unfettered discretion." That claim is rejected by the Court's 30-year amortization rulings and would have been laughed out of this bankruptcy court had it been asserted. PFRS' position would have given two of the many unsecured creditors – PFRS and GRS – the sole right to accelerate hundreds of millions of dollars of payments as they saw fit - and thereby unilaterally destroy the POA's feasibility and the City's finances. Such a "plan" would have been unconfirmable.

I.   **This Court's rulings requiring 30-year amortization were integral to the Court's determination of feasibility and confirmation of the POA.**

   A. **The Ernst & Young financial projections formed the foundation of the POA and expressly require 30-year amortization.**

The Court incorporated 40-year projections prepared by Ernst & Young (E&Y) as the foundation of the POA. The Confirmation Opinion's discussion of the POA and its feasibility cites to and incorporates City trial exhibit 793 (E&Y's final 40-year projection, ex. 17 here) more than 30 times. See ex. 15, pages 224-233.

In analyzing E&Y's projections the Court relied on and incorporated the reports and testimony of its independent feasibility expert (Martha Kopacz) and

E&Y's financial and restructuring expert Gaurav Malhotra. *Id.* Malhotra's most relevant testimony from his initial trial appearance is discussed below.[1]

Malhotra testified that City trial exhibit 723 (ex. 18) "shows the key items of the settlement with GRS and PFRS as a part of the plan of adjustment." PFRS ex. G, p. 133. The City's contributions to PFRS and GRS are to run until 2053, i.e., 30-year amortization, at which time the plans would be fully funded. Ex. 18.

E&Y ultimately prepared four versions of its 40-year projections which are appended here as exhibits 17, 19, 20 and 21 (City trial exhibits 793, 111, 734, 779). The second page of each 40-year projection sets forth the POA's key assumptions for each of the unsecured claims including the following for PFRS:

- Contributions (years 1-10) – Estimated to be $261m from foundations/State Settlement

- Contributions (years 11-40)- UAAL as of June 30, 2023 estimated to be ~681m **amortized over 30yr,** including contributions in second decade from DIA and foundations (Emphasis added)

GRS' UAAL likewise was to amortized over 30 years. Ex. 17, p. 2.

---

[1]Malhotra testified first on September 29, 2014. On October 21, 2014 he addressed supplemental projections that had been created after the important settlements with Syncora and FIGC.

PFRS' brief attached as its exhibit G Malhotra's trial testimony from September 29, 2014. To avoid adding several hundred additional pages to this filing, the City cites to PFRS exhibit G. The referenced page numbers are those in the top right-hand corner of the pages of that exhibit.

3

Malhotra explained the 40-year projections as follows: "[O]n a line-by-line basis [they] project over the forty years what the revenues and expenses would be using primarily the same sources I had talked about earlier, and the forty-year model was used to really illustrate how the City was going to pay for the overall settlements it has reached with various classes * * *." PFRS ex. G, p. 63.

The 40-year projections set forth (by decade) the City's anticipated operational expenses not considering unsecured POA claims. E.g., City trial ex. 734 (ex. 20), p. 4. The bottom line, "funds available for unsecured claims," is carried over to page 5. The top half of page 5 identifies additional sources of funds (e.g., Grand Bargain) to assist the City in paying its unsecured claims.

The bottom half of page 5 is critical. It identifies the City's many unsecured claims and when, **by decade**, the City will pay those claims. Ex. 20, p. 5. The City's pension contributions to PFRS alone were estimated to be (in millions) $261M for 2014-2023, $618M for 2023-2033, $464M for 2034-2043, and $311M for 2044-2053. Id. The City is also liable over those four decades for payment of hundreds of millions of dollars for other unsecured claims. Id. For example, after 2023, payments on B notes will be $470M for 2023-2033, $451M for 2034-2043, and $69M for 2044-2053. Id. The B notes include $450 million owed under the OPEB (retiree health care) settlement, which also inures exclusively to the benefit of PFRS and GRS members. Ex. 15, pp. 185-186.

4

Malhotra testified "the city should be able to satisfy its operating expenses" and "the city should have the ability to pay its obligations **as scheduled in these distributions.**" PFRS ex. G, pp. 152-162 and specifically pp. 160-161, referring to City exhibit 734, emphasis added. Malhotra returned to Court on October 21, 2014 and testified that the City would be able to meet its operating expenses and pay its obligations under the POA as scheduled in E&Y's final 40 year projection which incorporated the Syncora and FGIC settlements. City exhibit 793 (ex. 17 here).

**B. Kopacz opines the POA is feasible expressly based on 30-year amortization.**

Kopacz' expert report was admitted into evidence as Court exhibit 12000, and excerpts are appended as exhibit 22. Section J discusses pensions and observes: "Critical decisions made today will have a substantial impact on the City's liquidity in future years. The magnitude and importance of these decisions will be critical to Detroit's viability in the decades to come." Ex. 22, pp. 124-125.

The report specifically addresses how the estimated UAAL existing as of FY 2023 will be amortized under the POA and states: **"The POA proposes that the City will amortize the remaining UAAL for each Retirement System – as of June 30, 2023 – over the following thirty-year timeframe."** Id, p. 133. Emphasis added.

The report incorporates and relies upon E&Y's 40-year projections which provide for 30-year amortization. Id, pp. 135- 136. Kopacz ultimately opined that

5

"The assumptions that underlie the City's [E&Y's] plan of adjustment projections regarding its revenues, expenses and plan payments are reasonable;" and "The City's plan is feasible as required by 11 U.S.C. § 943(b)(7)." Ex. 22, p. 10. Kopacz thereafter filed supplemental reports which addressed updated versions of the POA. Those reports found the updated plans feasible but expressed grave concern about the additional debt being imposed on the City by the FGIC and Syncora settlements.[2]

### C. This Court has ruled that the POA required the legacy plans' UAAL as of June 30, 2023 to be amortized over thirty-years, which was integral both to the Court's finding of feasibility and confirmation of the POA.

Feasibility is a legal requirement for confirmation and "the Court has an independent duty to determine the issue and to make specific findings of fact." Ex. 15 at p. 220. The Court adopted the following feasibility test:

"Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default?" Ex. 15, p. 222.

---

[2]PFRS ignores Kopacz' reports and testimony with one exception, namely, Kopacz' testimony that she was "not retained to opine on the appropriateness of any smoothing method or amortization period used by the Detroit Retirement Systems." PFRS' brief, pp. 21-22, footnote 12. That testimony was elicited by PFRS' counsel during Kopacz' Daubert examination. The Court rejected PFRS' objections and held that Kopacz was qualified as an expert on feasibility and whether E&Y's projections of revenue and expense were reasonable. Order, Doc7511.

Kopacz is not an actuary and obviously was not retained to opine on actuarial issues. Kopacz was specifically asked to opine on the feasibility of the POA which expressly required 30-year amortization.

6

The Court found the POA was feasible. The Court repeatedly cites to the final E&Y 40-year projection (trial ex. 793, ex. 17) which requires 30-year amortization. Ex. 15, pp. 223-229. The Opinion finds reasonable the exhibit's decade-by-decade revenue and expenditure projections based on 30-year amortization. Ex. 15, pp. 225-226.

The Court adopted and incorporated into the Court's Opinion Kopacz's entire report which, as quoted above, confirms the 30-year amortization period. Ex. 15 at p. 221, ex 22 at p. 133. The Court likewise adopted Kopacz' conclusion that the final plan – which included significant additional debt due to the FGIC and Syncora settlements - remained feasible. Ex. 15, pp. 228-230. But the Court reiterated Kopacz' concern, namely, "It is not realistic or prudent to believe that the City could take on additional Plan obligations and remain within the continuum of reasonableness necessary to establish feasibility." Ex. 15, p. 228. The Court reviewed the City's projected 40-year revenues and expenditures on a decade-by-decade basis and noted the severe financial stress the City will be under beginning July 1, 2023:

> "For the period FY2024-FY2033, the City will be required to spend $541 million servicing the B Notes, C Notes, and Restructured UTGO Notes. The City projects that it will be required to spend $1.241 billion to service its obligations to the GRS and PFRS UAAL, [fn23] for a total of $1.7891 billion. The City projects that it will also have $1.7891 billion for plan-related expenses during that time period.

Therefore, the City projects that it will break even at the end of this time." Ex. 15, p. 230.

**Footnote 23** states:

> "As discussed in part III.F. above, the City's obligations to the GRS and the PFRS are fixed under the plan from FY2014–FY2023. During this time, as the City works to stabilize its finances and implement the RRIs, the majority of the City's contributions to the GRS and the PFRS will come from the DWSD, the State Contribution Agreement, and the Grand Bargain funding. See **Ex. 793** at 3. However, after 2023, the City projects the retirement systems will remain somewhat underfunded. See Ex. 12000 at 133. **The balance of the underfunding in 2023 will be amortized over a thirty year period of time.** Id." Ex. 15, footnote 23, emphasis added.

The footnote cites City trial exhibit 793 (ex.17), and Kopacz' report, trial exhibit 120000 (ex. 22), both of which confirm the 30-year amortization period.

The next section (8) of the Court's feasibility discussion addressed "the feasibility of the City's plan to address its pension obligations." Ex. 15, pp. 231-233. The Court held, with respect to the remaining UAAL for GRS and PFRS as of June 30, 2023, the POA provided as follows: "**The City will then amortize the remaining UAAL for both plans over the next thirty years at an interest rate of 6.75%.**" Id, p. 231, emphasis added.

The POA, which requires 30-year amortization, was held to be in the best interest of the creditors. Ex. 15, pp. 219-220. The Court found "the City has effectively done all that it can do for its creditors in its plan." Id, and:

> "There is no more money available for creditors in the City's already tight budget projections. Every dollar is accounted for in

providing necessary services, in implementing the necessary RRIs, and in meeting plan obligations. All of those cash uses are essential to the City's future. In this plan, the floor of the best interest test and the ceiling of the feasibility test have, for all practical purposes, converged.

"Accordingly, the Court finds that the plan will provide creditors all that they can reasonably expect under the circumstances and that it is therefore in their best interests, as required by § 943(b)(7)." Id.

The Confirmation Opinion was incorporated in its entirety into the Confirmation Order. Ex. 16, p. 6, ¶(F). The Order, like the Opinion, relies on Kopacz' reports and E&Y's 40-year projections in concluding the POA was feasible and, therefore, should be confirmed. Ex. 16, pp. 36-38. The Order observes: "It is more likely than not that the Plan is sustainable over the long term. **Based on the Projections,** the City will have sufficient liquidity to sustain normal municipal operations, issue and perform under the New Securities, satisfy the Settlements and otherwise meet its financial obligations after the Effective Date." Ex. 16, p. 41, ¶17.

## II. This Court's multiple rulings requiring 30-year amortization bind PFRS; the retirees never once suggested otherwise.

The Confirmation Order provides "* * * the terms of the Plan **and this Order** shall be binding upon, and inure to the benefit of: (a) the City; (b) any and all holders of Claims [which includes PFRS] * * *." Ex. 16, p. 86, ¶E(28), emphasis added. Even if the Confirmation Order/Opinion did not expressly so provide, the Court's 30-year amortization rulings would bind PFRS under the law of the case doctrine and res judicata. *In re Moye*, 437 Fed.Appx. 338, 341 (6th Cir. 2011), ("Under the

9

law-of-the case doctrine, a court follows its prior final decisions in the case as the law of the case, except for a few narrow exceptions [not applicable here]"); *Winget v. JP Morgan Chase Bank*, N.A., 537 F.3d 565, 578 (6th Cir, 2008), ("res judicata principles bar relitigation of any issues raised or that could have been raised in the confirmation proceeding").

The Court's thirty-year amortization rulings were final and binding. PFRS did not challenge them at any time during the confirmation hearing, on reconsideration or on appeal. And for good reason – the retirees did very well under the POA.

Ron Bloom was the retiree committee's highly sophisticated, Harvard Business School educated, financial advisor. Bloom testified the retiree committee's primary objective was to "maximize the value of the claims." Ex. 26, p. 19. That goal was achieved beyond anyone's wildest dreams. Despite this Court's holding that the pension claims had no special protection in bankruptcy court, PFRS members sustained only a 55% reduction in COLA. Bloom testified the committee supported the POA, despite the "long period of time" over which payments would be made by the City, because the committee recognized the City's sincere commitment to revitalization. Ex. 15, pp. 249-250. Bloom never once suggested that the legacy plans would have "unfettered discretion" to accelerate City funding as it saw fit after 2023. To the contrary, Bloom explained: "we cared about revitalization [because] we were relying on the City of Detroit to be there to honor

10

these promises on into the future." Ex. 26, p. 20. Indeed, the very first time PFRS even raised the arguments upon which it now relies was when it filed its response brief in this case.

**III. PFRS' arguments are devoid of merit.**

>  **A. The City does not rely on extrinsic evidence, it relies on this Court's rulings and the entire trial record.**

PFRS completely ignores this Court's rulings and offers no explanation why PFRS is not bound by them. PFRS instead argues the City "resorts to extrinsic evidence * * *." Brief, p.1. PFRS cites as "extrinsic evidence" exhibit 14 appended to the City's brief. The City provided that as one example of E&Y's 40-year projections that formed the basis of the POA and required 30-year amortization.[3]

The City relies on this Court's Confirmation Opinion and Order which are not "extrinsic evidence," and which incorporate E&Y's 40-year projections. PFRS only discussion of the 40-year projections appears at page one of its brief. There, PFRS ridicules the City's reliance on exhibit 14 on the following four grounds, each of which is dead wrong or, at best, seriously misleading:

>  **1. The exhibit "states on its face that it was merely a 'hypothetical scenario' for payment of the PFRS claim that was 'subject to change.'"**

---

[3] Ex. 14 was an excerpt of City trial ex. 111, the full document is appended here as ex. 19. E&Y's later 40-year projections are appended here as exhibits 17, 20 and 21.

11

E&Y's 40-year projections each has a disclaimer on its face. Ex. 19. The disclaimer points out that the exhibit is providing financial projections and "[T]here will usually be differences between forecasted information and actual results because events and circumstances frequently do not occur as expected and those differences may be material."

It is too obvious for words that future events cannot be predicted with certainty. But the provisions of the exhibit relevant to this dispute are not the precise numbers which everyone knew would change. Rather, they are (i) page 2, setting forth the key POA provisions for the legacy plans settlement including 30-year amortization, and (ii) pages 4-5 which project revenue and expenses by decade, and show how 30-year amortization is key to spreading out the City's POA liabilities. Malhotra explained the disclaimer:

> "A. Its our standard disclaimer.
> "Q. Okay. What are you disclaiming?
> "A. That the assumptions and the data are at the end of the day the product of the client.
> "Q. Are you disclaiming the accuracy of the model?
> "A. No." Malhotra testimony, PFRS ex. G, pp. 75-76.

E&Y's 40-year projections confirmed that the POA incorporated a settlement between Kevyn Orr and GRS/PFRS that required 30-year amortization. Ex. 723 and Malhotra testimony, PFRS ex. G at p. 133. PFRS' new claim – that it was given "unfettered discretion" to decide when the City would have to pay the UAAL after

June 30, 2023 - would have blown up the POA had PFRS or any retiree representative ever articulated such a claim – which they did not.

## 2. The exhibit "was one of 2,300 exhibits introduced at trial and was never incorporated into the Plan."

E&Y's 40-year forecasts were among a very few trial exhibits that were incorporated in the Confirmation Opinion and Order. Ex. 15, 224-233; ex. 16, pp. 36-38. Their requirement of 30-year amortization was the foundation of the POA.

## 3. The exhibit "was cited by the Court in its Confirmation Opinion only in passing."

The exhibit cited by PFRS (excerpt of ex. 17, City trial exhibit 111) addressed an early version of the POA. The Confirmation Opinion cited E&Y's final 40-year forecast (ex. 793) more than 30 times. Ex. 15, pp. 223-228.

## 4. The exhibit's "author admitted at trial that the parties would have to 'decide what the amortization methodology is of the UAAL at the year 10.'"

PFRS cites the following exchange between the Court and Malhotra to support the alleged "admission" cited above. (PFRS brief, pp. 1, 19-20, emphasis added):

"THE COURT: My question was a slightly different one. Does the plan commit the city, legally commit the city to make those payments?

"THE WITNESS: My understanding is the city is committed to fund the unfunded liability. I just don't know - - the city and the Retirement Systems have to decide what the amortization **methodology** is of the UAAL at the end - - at the end of year ten, and the city is committed to fund that underfunded liability. Depending on what amortization schedule gets picked, the payments can change slightly because of the

13

interest rate, but my understanding is the city is committed to make the payments beyond 2024 into those pension systems. * * *

"Q  Let me ask this.  How would the change in amortization after 2024 affect the contribution level?

"A  It depends on the amortization **methodology**.  What we have used in the projections is **a straight-line principle** in which the city is making higher payments in the first decade, and over the course of the **30 years** it makes lower payments going forward.  You can change the amortization **methodology** to make it like **a level payment over 30 years** in which the city will have lower payments in the first, say, ten years, but over the course of the **30 years** the city will end up paying more because it has to pay more interest, so it's more on the **methodology** aspect as to how that liability gets serviced."

Malhotra's testimony addressed only the amortization **methodology,** while confirming that the amortization **term** was **30-years.**  PFRS argues that Malhotra "outright admitted that the amortization **period** was not yet determined * * *." Brief, p. 10, emphasis added. The testimony and this Court's rulings prove the opposite.

## B. The State Contribution Agreement provides no support to PFRS.

PFRS' brief (pp. 9-16) quotes three times the following language emanating from the State Contribution Agreement which, according to PFRS, is the source of its "unfettered discretion" over the amortization term:

"For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include: * * *

"(d) <u>review and affirmation or rejection of the correctness of any an all calculations, actuarial assumptions and/or assessments used by the Actuary including</u>, but not limited to (i) those underlying the restoration of the pension benefits, <u>funding levels and amortization thereof</u>, all in accordance with the pension restoration program

14

attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of **annual funding levels and amortization thereof**, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law; * * *

"Interpretation of Retirement System governing documents, existing law, **the Plan of Adjustment or other financial determination that could affect funding or benefit levels[.]**"

PFRS' brief, double emphasis (bold and underline) added by PFRS.

PFRS offers no explanation of how any of that language purports to give PFRS unfettered discretion over the **amortization term** for the UAAL as of 2023 or any other time. The first part of section (d), which defines the provision's scope, simply gives the Investment Committee (IC) authority to review the "correctness" of "calculations, actuarial assumptions and/or assessments."

The provision goes on to give the IC authority to determine the "correctness" of "annual funding levels and amortization thereof." "Correctness" means checking the calculations. Nothing in the language even purports to give PFRS authority over the amortization term. Indeed, the phrase "amortization thereof" makes no sense because an "annual funding level" does not get "amortized." It is the amount that must be paid in the given year. PFRS' brief simply quotes the language – with dramatic double emphasis - but offers no analysis of its meaning.

The City can only presume that the quoted language was intended to address actuarial considerations that underlie the calculation of annual funding payments

15

during the thirty-year amortization. Those are, for example, whether the amount will be determined using straight-line principle calculations or level-payments over the 30-year amortization term. See Malhotra's testimony quoted earlier where he discusses these "methodology" issues while confirming that the amortization term was 30-years. Presumably, the IC was given authority to determine the "correctness" of those calculations.

If there were any possible doubt on this subject it is dispelled by another provision in the PFRS plan that addresses the same subject, annual funding levels, but uses entirely different language. The PFRS plan document addresses both the Component I (hybrid) plan and the Component II (frozen legacy plan). Ex. 23 (plan excerpts). Component II uses the language quoted above drawn from the State Contribution Agreement. Ex. 23, p. 62, sec 16.2(1)(d). In direct contrast, Component I (hybrid plan) states in relevant part as follows:

> "For plan years commencing July 1, 2023 and later, the accrued pension liabilities for Members shall be determined by the Actuary using reasonable and appropriate actuarial assumptions approved by the Board and the Investment Committee. **The City's annual contributions to finance the normal costs of benefits and any such unfunded accrued pension liabilities shall be determined by the Actuary amortizing such unfunded accrued pension liabilities over a period or period of future years as established by the Board and approved by the Investment Committee.**" Emphasis added.

The fact that PFRS was given authority over the amortization term for the hybrid plan, but not the legacy plan, makes perfect sense. The hybrid plan was

16

created by the POA. It had no UAAL. The required annual funding was expected to avoid accrual of anything more than nominal UAAL. Amortization of UAAL for the hybrid plan was and is a moot point.

"Where the same word or phrase might have been used...in different portions of a [contract] but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored." *Toder v. Progressive Mi. Ins. Co.*, 2017 WL 3316939 (Mich. Ct. Apps. 2017) at *7, quoting *Mason v. Telefunken Semiconductors America*, LLC, 797 F.3d 33, 42 (1st Cir. 2015). See also *Andrusz v. Andrusz*, 320 Mich App 445, 454 (2017), (construing consent judgment); *In re A.P. Liquidating Co.*, 421 Fed. Appx. 583, 589 (6th Cir. 2011), ("Having used different words he must have had different meanings.")

Here, when the authors wanted to empower PFRS with the authority to determine the amortization term for the **hybrid plan** they knew exactly how to do so. No such authority was granted for the Component II (legacy) plans because both the settlement with GRS/PFRS, and the POA, require thirty-year amortization. For further proof, the state of Michigan and its counsel have received notice of the City's motion to enforce 30-year amortization and have submitted no opposition.

Finally, PFRS, in misplaced reliance on the State Contribution Agreement, argues that as between the City and PFRS, PFRS "gets to decide" the amortization term. Brief, p. 2. In fact, this Court "gets to decide" and has already decided on 30-

year amortization. Because the POA requires 30-year amortization, PFRS has no authority under law or the PFRS plan document to "alter or depart from" that requirement. See the City's initial brief, p. 26, discussion of PFRS plan ¶16.6.

### C. PFRS' reliance on out-of-context snippets of discovery deposition testimony is disingenuous and completely misplaced.

PFRS argues that the City's "own experts did not support [30-year amortization]." Brief, subheading 3, p. 21. PFRS's argument is specious.

**Glen Bowen**. PFRS' brief (pp. 22-24) devotes three full pages to discovery deposition testimony of actuary Glen Bowen. But PFRS does not bother to tell the Court that the entire quoted exchange related to a letter written by Bowen to the City of Detroit on **January 28, 2013** – before the bankruptcy was even filed. Bowen dep., PFRS ex. B, pp. 295-296. The opening question in the exchange (PFRS brief p. 22) states "Scenario three, if you look at it, changes to a closed 30-year amortization. Do you see that?" "Scenario three" was one of a myriad of hypotheticals appearing in a series of letters sent by Bowen to the City in 2012 and early 2013. PFRS ex. B, pp. 263-290. In the quoted testimony Bowen was asked his opinion on the various hypotheticals – all of which had absolutely nothing to do with the POA.

Bowen's opinion, and those of other actuaries, were completely irrelevant because none of them had any authority to decide the amortization term. Their job was to provide actuarial calculations. The City and the legacy plans settlement

expressly incorporated 30-year amortization. The Court was the ultimate decision-maker and its rulings confirm 30-year amortization.

**Charles Moore.** PFRS (pp. 24-25) quotes Moore's discovery deposition testimony stating: "I have reviewed many municipal plans and that is a trend that I have seen [shorter than 30-year amortization]." The exchange related to the Plan's requirement that the City's water and sewer department (DWSD) pay its share of GRS' unfunded liability during the period 2014-2023, as part of the City's 10-year pension holiday. Moore dep, PFRS ex. H, pp. 331-334. The creditor attorney was attempting to show that 10-years was too short – on the theory that a longer period would allow DWSD to use its funds to increase the creditor's payout. That morphed into an esoteric and hypothetical discussion of other plan amortization periods generally, completely unrelated to the POA. Like Bowen's opinion, Moore's opinion about amortization period "trends" for other plans is completely irrelevant.

### D. PFRS' reliance on the City's pre-bankruptcy defaults is shameful.

Not only is PFRS' position legally unsound, but PFRS' actuary and the City's expert actuary agree that there is no need for acceleration to protect pension beneficiaries. City's initial brief, pp. 12-13, 23-24. Rather, PFRS argues it has "unfettered discretion" to do so and such action is justified by the City's pre-bankruptcy defaults.

PFRS' characterizes the City's opposition to 20-year amortization as follows: "Unfortunately, as was all too common pre-petition, the City wants to ignore its pension obligations and divert cash to meet other needs – which was a recipe for disaster pre-bankruptcy." Brief, pp. 4-5. That argument is repeated throughout PFRS' brief, e.g., PFRS is entitled to consider "the long history of payment defaults that nearly bankrupted the Retirement Systems;" and "the City once again wants to avoid its pension obligations and spend the money elsewhere * * *." Brief, pp. 27, 28-29.

PFRS believes it is entitled to inflict severe financial distress on the City – contrary to the POA and this Court's Orders- based on the City's prebankruptcy sins. That position is directly contrary to the entire purpose of the POA and Chapter 9 of the Bankruptcy Code:

> "The purpose of the Plan is to adjust the City's debts to enable the City to reverse its decades-long financial decline, eliminate its service delivery insolvency, restore adequate municipal services to its residents and meet its future financial obligations, consistent with the overarching remedial purpose of chapter 9 and the objectives and purposes of the Bankruptcy Code." Ex. 16, p. 20.

> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> "In every case [chapter 9 or other], a debtor needs help, made mistakes, took unwarranted risks, accepted bad advice, exercised bad judgment, was too long in denial, or had just plain bad luck.

> "But no matter, our society holds dear the values of a fresh start and of second chances. That value is manifested with brilliant clarity in our bankruptcy laws. \* \* \* The current leadership of the City is now

20

getting the City back from the emergency manager and from us in the bankruptcy world. The City will have the fresh start that it needs and deserves under our federal bankruptcy laws. It is now the responsibility of City leadership to implement this plan. The City's true and full fresh start depends on it." Ex. 15, p. 277.

Equally shameful is PFRS' discussion of feasibility. PFRS completely ignores the overwhelming trial evidence, Kopacz' report and this Court's rulings requiring 30-year amortization as a key component of the POA's feasibility. Instead, PFRS states (brief, p. 4):

> "Moreover, raising the specter of "feasibility" now gets the City nowhere. It is undisputed that the City *has* the money. To its credit, the City has set aside hundreds of millions of dollars in trust **to fund the 2023 Payment.** The issue is not whether the City can afford a shorter 20-year amortization – it admits it can – the issue is that the City would rather spend the money on other things." Emphasis added.

Of all PFRS' unsound and cynical arguments that is the worst. PFRS is fully aware that the $355 million in the Retiree Protection Trust Fund is **not,** as PFRS claims, "to fund the 2023 payment." The Trust Fund was created because, in reliance on Gabriel Roeder's use of outdated mortality tables, the actuaries in this case underestimated the legacy plans' UAAL by some $500 million. The Trust Fund was created specifically to address that mammoth error and "ensure proper funding of legacy pensions * * *." Duggan dec'l, City ex. 1, ¶¶16-19. Under the POA, "proper funding" is determined by 30-year amortization.

30-year amortization was ordered so the City's POA creditor claims would be spread out, to ensure the City could make those payments and deal with its many

difficult operational issues. The City's funding of the Retiree Protection Trust Fund has come at the expense of other priorities including public safety. A recent Detroit News article explained that the City had lost 223 police officers since January 2022. They were leaving for suburban jobs with higher pay, better benefits and safer working conditions. Ex. 24. In response, the City has negotiated a new agreement providing officers with very significant pay raises. Ex. 25. This is exactly why the POA requires 30-year amortization.[4]

**CONCLUSION AND RELIEF**

The City asks the Court to grant its motion and order PFRS to use 30-year amortization.

By: /s/ Marc N. Swanson
Marc N. Swanson (P71149)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
swansonm@millercanfield.com

Attorneys for the City of Detroit

October 31, 2022

By: /s/ Charles N. Raimi
Charles N. Raimi (P29746)
City of Detroit Law Department
2 Woodward Ave., Suite 500
Detroit, MI 48226
Telephone: (313)-237-5037
raimic@detroitmi.gov

---

[4] PFRS' final argument is that the City should have filed an adversary proceeding rather than a motion. However, there is no need to file an adversary proceeding when a chapter 9 plan provides for injunctive or other equitable relief. Fed. R. Bankr. P. 7001(7). The POA here provides for such relief, POA pp. 50, 70, and that is the relief the City seeks. This Court has routinely dealt with such issues under the POA by motion.