## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>City of Detroit, Michigan,<br><br>    Debtor. | Bankruptcy Case No. 13-53846<br><br>Judge Thomas J. Tucker<br><br>Chapter 9 |

## EXHIBITS TO REPLY BRIEF IN SUPPORT OF CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE ACCRUED LIABILITY IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN

### (EXHIBITS 1-14 FILED WITH THE CITY'S INITIAL BRIEF)

Ex. 15 – Excerpts of the Confirmation Opinion (524 B.R. 147)

Ex. 16 – Excerpts of the Confirmation Order (Court Doc 8272)

Ex. 17 – City trial exhibit 793

Ex. 18 – City trial exhibit 723

Ex. 19 – City trial exhibit 111

Ex. 20 – City trial exhibit 734

Ex. 21 – City trial exhibit 779

Ex. 22 – Expert report of Martha Kopacz re POA feasibility (excerpts)

Ex. 23 – Combined Plan for the Police & Fire Retirement System (excerpts)

Ex. 24 – Detroit News article, 8/31/22, Detroit losing a cop nearly every day

Ex. 25 – Detroit News article, 9/30/22, sharp pay raises for Detroit police

Ex. 26 – Testimony of Ron Bloom – financial advisor to retirees (excerpts)

# EXHIBIT 15



EXHIBIT

Ex. 15

524 B.R. 147
United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

In re CITY OF **DETROIT**, Michigan, Debtor.

No. 13–53846.
|
Signed Dec. 31, 2014.

**Synopsis**
**Background:** Chapter 9 debtor-city sought confirmation of eighth amended plan of adjustment, and approval of settlements with creditors.

**Holdings:** The Bankruptcy Court, Steven Rhodes, J., held that:

[1] proposed settlement was fair and equitable, warranting its approval;

[2] plan was in the best interests of creditors, as required for confirmation;

[3] plan was feasible, as required for confirmation;

[4] plan was proposed in good faith, as required for confirmation;

[5] plan did not discriminate unfairly in favor of pension classes, as required for confirmation;

[6] impairing and discharging § 1983 claims against city would not violate Fourteenth Amendment; and

[7] Takings Clause claims against city would be excepted from discharge.

Plan confirmed.

West Headnotes (65)

[1]     Bankruptcy  Judicial authority or approval

Bankruptcy  Adjustment of Debts of a Municipality

Proposed state contribution agreement, whereby state of Michigan agreed to contribute $194.8 million to general retirement system and police and fire retirement system for Chapter 9 debtor-city in settlement of city's pension underfunding claim, which city and state contended was equal to net present value of $350 million payable over 20–year period, was fair and equitable, warranting its approval, given that obligation not to impair municipal pensions established in Michigan constitution was absolute, if city's claim against state were successful, state would be responsible for potentially $3 billion, and many skilled and capable representatives of pension creditors concluded that agreement was fair. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.; M.C.L.A. Const. Art. 9, § 24.

[2]     Bankruptcy  Judicial authority or approval

Bankruptcy  Adjustment of Debts of a Municipality

Release of liabilities against state and its related entities in debtor-city's state contribution agreement, whereby state agreed to contribute $194.8 million to general retirement system and police and fire retirement system for city in settlement of city's pension underfunding claim, was necessary and appropriate to implementation of proposed Chapter 9 plan, warranting approval; agreement was part of a "grand bargain" settlement that was the cornerstone of city's plan, and without that settlement, several other settlements would also collapse, impacted classes had overwhelmingly voted to accept the plan, and both city and state needed finality regarding city's pension liabilities. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.; 11 U.S.C.A. § 524(e).

[3]     Bankruptcy  Judicial authority or approval

Bankruptcy  Adjustment of Debts of a Municipality

Bankruptcy court would approve, as being fair and equitable and in best interests of creditors, proposed settlement whereby Chapter 9 debtor-city, in exchange for payment commitments from municipally owned art museum and various funders, would transfer all of its right, title, and interest in pieces of art to the museum to be held in perpetual charitable trust for benefit of people of city and state, free and clear of all liens, encumbrances, claims, and interests of city or its creditors; museum asserted that the donors of many of the pieces of art imposed specific transfer restrictions on them and that museum and many of its individual donors would vigorously challenge any attempt by city to sell any of the art, any such litigation would take years to conclude and would be costly to pursue, nationally accepted standards for museums prohibited the de-acquisition of art to pay debt, and de-accessing many highly valuable pieces at the same time would flood the art market and could cause prices to fall significantly. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.; 11 U.S.C.A. § 943(b)(7).

[4]   **Bankruptcy** ⟜ Judicial authority or approval
      **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Bankruptcy court would approve, as being fair and equitable, proposed pension global settlement, whereby Chapter 9 debtor-city agreed to allowed claim amount of unfunded accrued actuarial liability (UAAL) of $1.25 billion for police and fire retirement system and $1.879 billion for general retirement system; pension reductions for retirees on account of the UAAL were significantly less than city had originally concluded would be necessary, and a substantial majority of pension classes voted in favor of city's plan and accepted the necessity of shared sacrifice for the common good of the city. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

[5]   **Bankruptcy** ⟜ Judicial authority or approval
      **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Bankruptcy court would approve, as being fair and equitable, proposed annuity savings fund (ASF) recoupment settlement, whereby Chapter 9 debtor-city would recoup excess interest from ASF participants, which had resulted from general retirement system (GRS) for city crediting interest in each participant's ASF account at the assumed rate of return even when the actual rate of return was less, to offset unfunded accrued actuarial liability (UAAL) and reduce pension cuts to GRS retirees; class of claims affected by the settlement accepted it by a vote of 73%, and caps and other limitations on the recoupment amount that the parties negotiated would reduce the hardship of it. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

[6]   **Bankruptcy** ⟜ Judicial authority or approval
      **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Bankruptcy court would approve, as being fair and equitable, proposed settlement whereby Chapter 9 debtor-city agreed to allowed claim amounts of $2.208 billion for police and fire retirement system retirees and $2.095 billion for general retirement system retirees for loss of certain post-employment benefits, including health, vision, dental, and life and death benefits, and city would establish voluntary employee benefit association boards to provide health benefits, including life insurance, to retirees and certain of their beneficiaries and dependents; the settlement avoided protracted and expensive litigation to resolve intense factual and legal disputes and settled one of city's largest liabilities, allowing city to bring its bankruptcy closer to conclusion. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

[7]   **Bankruptcy** ⟜ Judicial authority or approval
      **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Proposed settlement of claims filed by creditors of state district court located in city, which Chapter 9 debtor-city was required to fund the operations of, for an allowed claim of $6 million

13-53846-tjt   Doc 13663-1   Filed 10/31/22   Entered 10/31/22 16:55:43   Page 4 of 56

with an ultimate distribution of $2 million was reasonable, warranting its approval; claims against the court were obviously not frivolous, as they had been reduced to substantial awards in arbitration, and if city had chosen instead to continue to contest those claims, the number of claims would have made the expense of the litigation significant. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.; M.C.L.A. §§ 600.8103, 600.8104.

[8]    **Bankruptcy** ⟿ Judicial authority or approval
       **Bankruptcy** ⟿ Adjustment of Debts of a
       Municipality

Bankruptcy court would approve, as being fair and equitable, proposed settlement whereby Chapter 9 debtor-city and bond insurers agreed to allowed claim in the amount of $388 million relating to variable rate unlimited tax general obligation bonds (UTGO bonds), with just under $288 million of the bonds to be restructured and reallocated among the holders of the bonds; the restructured bonds represented a 74% recovery for holders of the bonds, and issues relating to the bonds had already been vigorously litigated before the settlement was reached and any further litigation would have been lengthy, complex, and time consuming. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

[9]    **Bankruptcy** ⟿ Judicial authority or approval
       **Bankruptcy** ⟿ Adjustment of Debts of a
       Municipality

Bankruptcy court would approve, as being fair and equitable, proposed settlement between Chapter 9 debtor-city, bond insurer, and investment management company relating to limited tax obligation bonds (LTGO bonds), whereby city agreed to make a $55 million cash payment and LTGO bond creditors would receive $17.3 million in excess "New B Notes"; total estimated recovery for holders of LTGO bond claims was 41% and the class accepted the plan by a vote of 63%. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

[10]   **Bankruptcy** ⟿ Judicial authority or approval
       **Bankruptcy** ⟿ Adjustment of Debts of a
       Municipality

Bankruptcy court would approve, as being fair and equitable, proposed settlement whereby Chapter 9 debtor-city agreed to make $5 million cash payment to creditor, a holder and insurer of pension related certificates of participation (COPs), and creditor would receive $23.5 million in "New B Notes," $21.3 million in "New C Notes," and $6.25 million in certain settlement credits, as well as a five-year option to acquire and develop certain properties owned by city; value of the monetary portion of the settlement was estimated to be 13% of creditor's claims, and even if city were successful in litigation with creditor, it would have spent years and millions of dollars defending the results, and confirmation and the effectiveness of the plan may have been held in limbo as the issues made their way through the appellate process. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

[11]   **Bankruptcy** ⟿ Judicial authority or approval
       **Bankruptcy** ⟿ Adjustment of Debts of a
       Municipality

Bankruptcy court would approve, as being fair and equitable, proposed settlement whereby Chapter 9 debtor-city and creditor, a holder and insurer of pension related certificates of participation (COPs), agreed to allowed claim for $6.11 million, and creditor would receive approximately $4.5 million in "New B Notes"; creditor held one of the largest claims against city and zealously litigated its objections, the COPs litigation involved highly complex and novel issues that would have taken significant time and expense to resolve, and creditor's estimated monetary recovery was 13% of its claims, which was comparable to what the general unsecured creditors were receiving. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

[12]   **Bankruptcy** ⟿ Adjustment of Debts of a
       Municipality

Chapter 9 debtor-city bears the burden of establishing each of the required elements for confirmation of its plan by a preponderance of the evidence. 11 U.S.C.A. §§ 943(b), 1129.

**[13]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

Bankruptcy court has an independent obligation to determine that a proposed Chapter 9 plan meets confirmation requirements, notwithstanding creditor approval. 11 U.S.C.A. § 943(b).

**[14]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

Bankruptcy statute governing confirmation of Chapter 9 plan requires that all of debtor's professional fees in connection with the case be reasonable. 11 U.S.C.A. § 943(b)(3).

**[15]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

Bankruptcy court could not accept, without further judicial review, fee examiner's findings that professional fees incurred by Chapter 9 debtor-city, whether paid or unpaid at the point of confirmation, were reasonable. 11 U.S.C.A. § 943(b)(3).

**[16]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

Bankruptcy statute governing confirmation of Chapter 9 plan only requires that the court determine that professional fees are reasonable and does not require the court to make this determination before it enters an order confirming the plan. 11 U.S.C.A. § 943(b)(3).

**[17]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

Pension claims were unsecured contract claims under the Michigan constitution and therefore subject to impairment in bankruptcy; provision of Bankruptcy Code requiring that "the debtor is not prohibited by law from taking any action necessary to carry out the plan" did not prohibit that. M.C.L.A. Const. Art. 9, § 24; 11 U.S.C.A. §§ 943(b)(4), 1123(b)(1).

**[18]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

Eighth amended plan of adjustment proposed by Chapter 9 debtor-city was in the best interests of creditors, as required for confirmation; if the case were dismissed, state law remedies would not provide creditors with a better result than the plan, whether in bankruptcy or outside of bankruptcy, no provision of law allowed creditors to access city assets to satisfy their claims, and there was no more money available for creditors in the city's already tight budget projections. 11 U.S.C.A. § 943(b)(7).

2 Cases that cite this headnote

**[19]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

"Best interests of creditors" requirement of Chapter 9 differs significantly from the best interests requirement in Chapter 11, which involves considering a liquidation analysis. 11 U.S.C.A. §§ 943(b)(7), 1129(a)(7).

2 Cases that cite this headnote

**[20]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

"Best interests of creditors" requirement of Chapter 9 requires that a proposed plan provide a better alternative for creditors than what they already have. 11 U.S.C.A. § 943(b)(7).

1 Cases that cite this headnote

**[21]    Bankruptcy** ⟷ Adjustment of Debts of a Municipality

Under "best interests of creditors" requirement of Chapter 9, the question is whether the plan

is in the best interests of creditors as a whole; confirmation may not be denied simply because some creditors may do better upon dismissal. 11 U.S.C.A. § 943(b)(7).

2 Cases that cite this headnote

[22]     **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Eighth amended plan of adjustment proposed by Chapter 9 debtor-city was feasible, as required for confirmation; city's revenue and expense projections extended 40 years into the future and were reasonable, the plan reduced city's debt by over $7 billion, and it was likely that city would be able to sustainably provide services to citizens of the city and meet obligations contemplated in the plan without significant probability of default. 11 U.S.C.A. § 943(b)(7).

1 Cases that cite this headnote

[23]     **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

As with cases in Chapter 11, a Chapter 9 feasibility finding should prevent confirmation of visionary schemes which promise creditors more under a proposed plan than the debtor can possibly attain after confirmation. 11 U.S.C.A. § 943(b)(7).

[24]     **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Under feasibility requirement of Chapter 9, a proposed plan should offer a reasonable prospect of success and be workable. 11 U.S.C.A. § 943(b)(7).

[25]     **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Feasibility requirement of Chapter 9 requires a practical analysis of whether the debtor can accomplish what the plan proposes and provide governmental services; although success need not be certain or guaranteed, more is required

than mere hopes, desires, and speculation. 11 U.S.C.A. § 943(b)(7).

[26]     **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

In determining feasibility of a Chapter 9 plan, probability of future success will depend upon reasonable income and expense projections. 11 U.S.C.A. § 943(b)(7).

[27]     **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

As with plans proposed under Chapter 11, if performance of a Chapter 9 plan is based upon deferred payments, projections of future income and expenses must be based upon reasonable assumptions and must not be speculative or conjectural. 11 U.S.C.A. § 943(b)(7).

[28]     **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

**Bankruptcy** ⟜ Classification of claims

To be "substantially similar," for purposes of Bankruptcy Code provision requiring that claims in given class be substantially similar to each other in Chapter 11 plan, which provision is also applicable in Chapter 9 cases, claims need not be identical and there is certainly no requirement that claims be classified according to their values. 11 U.S.C.A. § 1122(a).

[29]     **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

**Bankruptcy** ⟜ Classification of claims

Under Bankruptcy Code provision requiring that claims in given class be substantially similar to each other in Chapter 11 plan, which provision is also applicable in Chapter 9 cases, claims will be substantially similar if they are similar in legal nature or character. 11 U.S.C.A. § 1122(a).

[30]     **Bankruptcy**  ⟿  Adjustment of Debts of a
Municipality

**Bankruptcy**  ⟿  Classification of claims

Bankruptcy Code provision requiring that claims
in given class be substantially similar to each
other in Chapter 11 plan, which provision is also
applicable in Chapter 9 cases, does not require
that all similar claims be placed in one class. 11
U.S.C.A. § 1122(a).

[31]     **Bankruptcy**  ⟿  Adjustment of Debts of a
Municipality

**Bankruptcy**  ⟿  Classification of claims

Classification scheme satisfies Bankruptcy Code
provision requiring that claims in given class
be substantially similar to each other in Chapter
11 plan, which provision is also applicable in
Chapter 9 cases, when a reasonable basis exists
for the classification scheme, and the claims
or interests within each particular class are
substantially similar. 11 U.S.C.A. § 1122(a).

[32]     **Bankruptcy**  ⟿  Adjustment of Debts of a
Municipality

**Bankruptcy**  ⟿  Classification of claims

Under Bankruptcy Code provision requiring
that claims in given class be substantially
similar to each other in Chapter 11 plan,
which provision is also applicable in Chapter
9 cases, plan proponent must not separately
classify substantially similar claims solely to
gerrymander favorable votes. 11 U.S.C.A. §
1122(a).

[33]     **Bankruptcy**  ⟿  Adjustment of Debts of a
Municipality

Classification scheme of Chapter 9 debtor-city's
proposed plan did not improperly gerrymander
pension claims by including both impaired and
unimpaired claims in the class; under the plan,
all holders of pension claims were in the class
and all such holders had similar claims, and each
had a right to receive cost-of-living adjustment

(COLA) benefits and the plan reduced that
benefit by 55%. 11 U.S.C.A. § 1122(a).

1 Cases that cite this headnote

[34]     **Bankruptcy**  ⟿  Adjustment of Debts of a
Municipality

Eighth amended plan of adjustment was
proposed by Chapter 9 debtor-city in good faith,
as required for confirmation; city filed its plan
with honest, good intentions and reasonable
expectation that the plan was feasible, process
the city undertook to seek confirmation of plan
was fundamentally fair to city's creditors, and
plan was designed to achieve the objectives and
purposes of Chapter 9. 11 U.S.C.A. § 1129(a)
(3).

3 Cases that cite this headnote

[35]     **Bankruptcy**  ⟿  Good faith and legality

"Good faith," as required for confirmation of
Chapter 11 plan, is generally interpreted to mean
that there exists a reasonable likelihood that the
plan will achieve a result consistent with the
objectives and purposes of the Bankruptcy Code.
11 U.S.C.A. § 1129(a)(3).

2 Cases that cite this headnote

[36]     **Bankruptcy**  ⟿  Adjustment of Debts of a
Municipality

Purpose of reorganization under Chapter 9 is
to allow municipalities created by state law to
adjust their debts through a plan voted on by
creditors and approved by the bankruptcy court.

[37]     **Bankruptcy**  ⟿  Adjustment of Debts of a
Municipality

Primary purpose of debt restructure for a
municipality is not future profit, but rather
continued provision of public services; another is
to provide a municipality a breathing space and
an opportunity to address its long term solvency
through an organized process.

[38]    **Bankruptcy** ⟜ Good faith and legality

"Good faith" requirement for confirmation of Chapter 11 plan generally requires that the plan be proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected, and that the plan proponent deal with its creditors in a manner that is fundamentally fair. 🔲11 U.S.C.A. § 1129(a)(3).

2 Cases that cite this headnote

[39]    **Bankruptcy** ⟜ Good faith and legality

In deciding whether Chapter 11 plan has been proposed in "good faith," pre-petition behavior is largely irrelevant; however, when considering the plan, courts consider the totality of the circumstances, and the court's own common sense and judgment. 🔲11 U.S.C.A. § 1129(a)(3).

1 Cases that cite this headnote

[40]    **Bankruptcy** ⟜ Good faith and legality

Deciding whether Chapter 11 plan has been proposed in "good faith" is an intensely fact-specific inquiry. 🔲11 U.S.C.A. § 1129(a)(3).

1 Cases that cite this headnote

[41]    **Bankruptcy** ⟜ Disclosure and Solicitation

Purpose of section of Bankruptcy Code requiring that proponent of Chapter 11 plan comply with applicable provisions of the Code is to assure that plan proponent has complied with disclosure requirements in connection with the solicitation of acceptances of the plan. 🔲11 U.S.C.A. § 1129(a)(2).

[42]    **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Chapter 9 debtor-city adequately disclosed terms of annuity savings fund (ASF) recoupment settlement, even though city did not disclose that amortization of the ASF recoupment amount over each creditor's life expectancy would include interest at 6.75%; although city did not separately identify the interest rate or the dollar amount of the interest when it disclosed individualized calculation of the monthly ASF recoupment amount for each affected creditor in the class, city's disclosure nevertheless would enable an employee or retiree in the class to make an informed judgment about the plan, and diverse group of attorneys had reviewed city's proposed disclosures on the ASF recoupment before the court approved them and apparently none of those attorneys considered that disclosing the interest rate or amount was necessary. 11 U.S.C.A. § 1125.

[43]    **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Although Chapter 9 debtor-city modified plan several times after court approved disclosure statement and city served it on creditors, and after the deadlines to vote had passed, city was not required to re-solicit ballots after the initial solicitation; none of the modifications in any of the successive amended plans adversely changed the treatment of any claims, but, rather, city had modified its plan to incorporate creditor settlements that maintained or improved the treatment of claims or otherwise clarified various plan provisions. 11 U.S.C.A. § 942; Fed.Rules Bankr.Proc.Rule 3019(a), 11 U.S.C.A.

[44]    **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

Chapter 9 debtor-city's eighth amended plan of adjustment did not discriminate unfairly in favor of pension classes, as would prevent plan confirmation, given that state constitution singled out municipal pension claims for special protection, and city had a strong interest in preserving its relationships with its employees, in enhancing their motivation, and in attracting skilled new employees, consistent with its

financial resources. ⌐11 U.S.C.A. § 1129(b)(1); M.C.L.A. Const. Art. 9, § 24.

[45] **Bankruptcy** ⊷ Classification of claims
**Bankruptcy** ⊷ Fairness and Equity; "Cram Down."

Bankruptcy Code permits discrimination in the treatment of classes of claims; it only prohibits unfair discrimination. ⌐11 U.S.C.A. § 1129(b)(1).

[46] **Bankruptcy** ⊷ Fairness and Equity; "Cram Down."

Determining fairness, for purposes of Bankruptcy Code provision forbidding classifications that discriminate unfairly against creditors of debtor, is a matter of relying upon the judgment of conscience. ⌐11 U.S.C.A. § 1129(b).

1 Cases that cite this headnote

[47] **Bankruptcy** ⊷ Adjustment of Debts of a Municipality

Chapter 9 debtor-city's eighth amended plan of adjustment did not discriminate unfairly in favor of creditors of state district court located in city, given that city had a strong interest in maintaining efficiency of court operations and in maintaining the employees' morale, and city had a continuing legal and funding relationship with the court. ⌐11 U.S.C.A. § 1129(b)(1); M.C.L.A. §§ 600.8103, 600.8104.

[48] **Bankruptcy** ⊷ Adjustment of Debts of a Municipality

Chapter 9 debtor-city's eighth amended plan of adjustment did not discriminate unfairly against certain classes of unsecured creditors, even though some creditors in those classes might be involuntary creditors. ⌐11 U.S.C.A. § 1129(b)(1).

[49] **Bankruptcy** ⊷ Adjustment of Debts of a Municipality

Chapter 9 debtor-city's eighth amended plan of adjustment was fair and equitable with respect to two dissenting classes of creditors, as required for confirmation, given that there was no misconduct that would require the court's remedy as a condition of confirmation, and very few of the creditors in the two classes filed objections to the plans. ⌐11 U.S.C.A. § 1129(b)(1).

[50] **Bankruptcy** ⊷ Adjustment of Debts of a Municipality
**Constitutional Law** ⊷ Fourteenth Amendment in general

Impairing and discharging § 1983 claims against Chapter 9 debtor-city would not violate Fourteenth Amendment; the Fourteenth Amendment did not provide a substantive constitutional right to compensation for damages. U.S.C.A. Const.Amend. 14; ⌐42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[51] **Civil Rights** ⊷ Rights Protected

Congress enacted ⌐§ 1983 for the express purpose of enforcing provisions of the Fourteenth Amendment; it provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States. U.S.C.A. Const.Amend. 14; ⌐42 U.S.C.A. § 1983.

[52] **Bankruptcy** ⊷ Adjustment of Debts of a Municipality

Bankruptcy Code did not provide for discharge of ⌐§ 1983 claims against Chapter 9 debtor-city's officers in their individual capacity; a claim

against a city employee in his or her individual capacity was not a claim against the city for bankruptcy purposes. 42 U.S.C.A. § 1983.

**[53]** **Bankruptcy** ⟸ Adjustment of Debts of a Municipality

Chapter 9 debtor-city's plan's proposed third-party release of § 1983 claims against officers of the city in their individual capacity was not essential to the plan, and therefore bankruptcy court would sustain creditors' objections to provisions of city's plan that would have the effect of discharging and releasing those claims; city had a strong interest in efficient and effective functioning of its police department, and protecting its officers from personal liability for § 1983 claims was necessary to that mission, and that protection appeared to be fully accomplished by contractual indemnity obligations that city assumed in the plan, specifically indemnity obligations in city's collective bargaining agreements with its public safety unions. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[54]** **Bankruptcy** ⟸ Adjustment of Debts of a Municipality

**Eminent Domain** ⟸ Necessity of making compensation in general

Discharging Takings Clause claims against Chapter 9 debtor-city would violate the Fifth Amendment, warranting excepting the claims from discharge; if confirmed, the plan would deny creditors just compensation for private property that city took or allegedly took. U.S.C.A. Const.Amend. 5; 11 U.S.C.A. § 944(c) (1).

4 Cases that cite this headnote

**[55]** **Eminent Domain** ⟸ Necessity of making compensation in general

**Eminent Domain** ⟸ Recovery of compensation

Takings Clause violation is defined by two elements: (1) the public taking of private property, and (2) the subsequent denial of just compensation for that taking. U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**[56]** **Constitutional Law** ⟸ Avoidance of constitutional questions

**Constitutional Law** ⟸ Clearly, positively, or unmistakably unconstitutional

Courts should avoid interpreting a statute in a manner that would render it clearly unconstitutional if there is another reasonable interpretation available.

**[57]** **Bankruptcy** ⟸ Adjustment of Debts of a Municipality

**Municipal Corporations** ⟸ Pensions and benefits

**Public Employment** ⟸ Funds and Contributions

Chapter 9 debtor-city's eighth amended plan of adjustment did not violate funding clause of Michigan constitution, even though objectors asserted the plan impermissibly provided city with a 10–year holiday on making pension contributions; municipal pension obligations were contractual obligations subject to impairment in confirmed plan in Chapter 9 bankruptcy case, and because city's only pension funding obligation was fixed in the plan, the city would fully comply with the funding clause when it fulfilled those obligations. M.C.L.A. Const. Art. 9, § 24.

**[58]** **Public Employment** ⟸ Funds and Contributions

Purpose of the funding clause of Michigan constitution is to check legislative bodies, requiring them to fund pension obligations annually, and thereby preventing back door spending. M.C.L.A. Const. Art. 9, § 24.

[59]  **Bankruptcy** ⟐ Adjustment of Debts of a Municipality

**Municipal Corporations** ⟐ Pensions and benefits

**Public Employment** ⟐ Pensions and Benefits

Chapter 9 debtor-city's plan's impairment of pension claims did not constitute improper impairment of claims against city's retirement systems under Michigan constitution, as city was the sole entity liable to participants of the retirement systems on account of their pension claims, and therefore their claims were not claims against the retirement systems, but, rather, were claims against the city. M.C.L.A. Const. Art. 9, § 24.

[60]  **Bankruptcy** ⟐ Adjustment of Debts of a Municipality

Pension claims of employees of Chapter 9 debtor-city's public library were properly included in city's eighth amended plan of adjustment, even though library might have, pursuant to collective bargaining agreements, contractual obligations to employees and retirees that were independent of city's obligations; the plan did not purport to affect library's independent obligations, and library and its unions were free to address, enforce, resolve, or renegotiate any such contractual obligations.

[61]  **Bankruptcy** ⟐ Adjustment of Debts of a Municipality

**Municipal Corporations** ⟐ Nature and purposes of improvements in general

Chapter 9 debtor-city's eighth amended plan of adjustment did not violate Michigan's Blighted Area Rehabilitation Act, even although objecting parties asserted that the plan did not provide for the involvement of residents and interested parties in blight remediation and rehabilitation; as part of its restructuring, city intended to spend $440.3 million on blight remediation projects to stabilize and revitalize its neighborhoods. M.C.L.A. §§ 125.71–125.84.

[62]  **Bankruptcy** ⟐ Judicial authority or approval

**Bankruptcy** ⟐ Adjustment of Debts of a Municipality

Proposed settlement, whereby state of Michigan agreed to, inter alia, contribute $194.8 million to retirement systems for Chapter 9 debtor-city, was not improper, despite objector's argument that the settlement allocated funds from state's tobacco settlement that belonged "equitably and morally" to cities around the state; source of funds identified by state to fund its contribution to the proposed settlement was irrelevant to whether the plan met the requirements for confirmation under the Bankruptcy Code, and the objection cited no legal limitation on state's authority to distribute tobacco settlement money within its discretion or any legal basis for the argument that cities were "equitably and morally" entitled to the money.

[63]  **Bankruptcy** ⟐ Adjustment of Debts of a Municipality

**Municipal Corporations** ⟐ Pensions and benefits

**Public Employment** ⟐ Pensions and Benefits

Chapter 9 debtor-city's eighth amended plan of adjustment did not violate the Federal Transit Act as a result of impairment of pension claims of city department of transportation (DOT) retirees; with respect to active employees, city bargained with and ultimately entered into agreements with each of the six unions representing DOT employees, and city was not required to collectively bargain with retirees to satisfy the Federal Transit Act. 49 U.S.C.A. § 5333(b).

[64]  **Bankruptcy** ⟐ Adjustment of Debts of a Municipality

Bankruptcy court would approve exit financing of up to $325 million proposed in Chapter 9 debtor-city's eighth amended plan of adjustment;

the proposed exit financing and city's proposed uses of the proceeds of the exit financing were necessary and appropriate to implement the plan, the financing was not inconsistent with any other provisions of the Bankruptcy Code, fees associated with the financing were reasonable, and terms of the exit financing were fair and reasonable. 11 U.S.C.A. §§ 943(b)(3), 🏳1123(a)(5), 🏳(b)(6).

[65]   **Bankruptcy** ⟜ Adjustment of Debts of a Municipality

**Bankruptcy** ⟜ Construction, execution, and performance

Bankruptcy Code provision governing obtaining credit does not apply to post-confirmation exit financing. 11 U.S.C.A. § 364.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*156** Bruce Bennett, Los Angeles, CA, Judy B. Calton, Honigman Miller Schwartz & Cohn LLP, Eric D. Carlson, Tamar Dolcourt, Timothy A. Fuscon, Eric B. Gaabo, Jonathan S. Green, Jeffrey S. Kopp, Foley & Lardner LLP, Stephen S. LaPlante, John A. Simon, Marc N. Swanson, Miller Canfield Paddock and Stone, P.L.C., **Detroit**, Robert S. Hertzberg, Deborah Kovsky–Apap, Pepper Hamilton LLP, Kay Standridge Kress, Southfield, MI, David Gilbert Heiman, Cleveland, OH, Heather Lennox, New York, NY, for Debtor.

Sean M. Cowley, Richard A. Roble, United States Trustee, **Detroit**, MI, for Trustee.

Brett Howard Miller, New York, NY, Geoffrey T. Pavlic, Mark H. Shapiro, Southfield, MI, for Creditor Committee.

*Supplemental Opinion Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing*

STEVEN W. RHODES, Bankruptcy Judge.

## Table of Contents

I. INTRODUCTION................................................................................................ 159

II. THE PLAN CONFIRMATION PROCESS............................................................ 161

   A. The City's Plans of Adjustment................................................................. 161

   B. An Overview of the City's Eighth Amended Plan of Adjustment.................. 162

   C. Objections Filed by Represented Parties..................................................... 163

   D. The Participation by Unrepresented Parties................................................. 165

      1. The Unrepresented Parties' Oral Presentations........................................ 165

      2. The Unrepresented Parties' Participation in the Confirmation Hearing........... 166

   E. The City Tour............................................................................................ 166

III. THE SETTLEMENTS IN THE PLAN................................................................. 167

   A. Mediation.................................................................................................. 167

   B. The Applicable Law.................................................................................. 168

C. The *Bard* Considerations Applicable to All of the Settlements.................... ........ 169

D. The Grand Bargain............................................................................................. ........ 169

E. The State Contribution Agreement........................................................................ 170

    1.    The Potential Claim Against the State of Michigan............................................................ 170

    2.    The Terms of the State Contribution Agreement................................................... ............ 170

    3.    The State Contribution Agreement Is Fair and Equitable..................................... ........... 171

        a.    The State Contribution Agreement Is Reasonable in Amount.................................................. 171

        b.    The Releases in the State Contribution Agreement Are Reasonable.......................... ............ 172

F. The DIA Settlement............................................................................................. ........ 176

    1.    The Dispute over the DIA Art............................................................................................ 176

    2.    The Terms of the DIA Settlement..................................................................................... 176

    3.    The DIA Settlement Is Fair and Equitable......................................................................... 177

G. The Pension Global Settlement......................................................................... 179

    1.    The Terms of the Pension Global Settlement.................................................................... 179

        a.    The Treatment of Pension Claims........................................................................ ............ 179

        b.    Restoration of Pension Benefits.......................................................................................... 180

        c.    Governance and Oversight.................................................................................................. 180

    2.    The Pension Global Settlement Is Fair and Equitable............................................... ............ 180

H. The Annuity Savings Fund Recoupment Settlement......................................... 182

    1.    The Dispute Over the Excess ASF Credits......................................................................... 182

    2.    The Terms of the ASF Settlement...................................................................................... 182

    3.    Objections to the ASF Settlement...................................................................................... 182

    4.    The ASF Settlement Is Fair and Equitable, and Does Not Violate the Bankruptcy Code..... ............ 183

I. The OPEB Settlement.......................................................................................... ........ 184

    1.    The Disputes Over the OPEB Claims................................................................................ 184

    2.    The Terms of the OPEB Settlement................................................................................... 185

13-53846-tjt   Doc 13663-1   Filed 10/31/22   Entered 10/31/22 16:55:43   Page 14 of
56

3. The OPEB Settlement Is Fair and Equitable.................................................................. 186

J. The 36th District Court Settlement........................................................... 186

K. The UTGO Settlement........................................................................... 187

1. The Dispute Regarding the UTGO Bonds................................................................ 188

2. The Terms of the UTGO Settlement....................................................................... 188

3. The UTGO Settlement Is Fair and Equitable........................................................... 189

L. The LTGO Settlement........................................................................... 190

1. The Dispute Regarding the LTGO Bonds................................................................ 190

2. The Terms of the LTGO Settlement....................................................................... 191

3. The LTGO Settlement Is Fair and Equitable........................................................... 191

M. The Settlements Related to the Certificates of Participation....................... 192

1. The Dispute Relating to the COPs Transactions...................................................... 192

2. The Terms of the COPs Settlement....................................................................... 193

3. The Terms of the Syncora Global Settlement........................................................... 194

4. The Syncora Global Settlement Is Fair and Equitable.............................................. 195

5. The Terms of the FGIC Global Settlement.............................................................. 196

6. The FGIC Global Settlement Is Fair and Equitable................................................ 197

IV. SETTLEMENTS THAT THE COURT APPROVED DURING THE CASE........... 197

A. The Swaps Settlement......................................................................... 197

B. The DWSD Bondholders Settlement....................................................... 198

C. The MIDDD Settlement........................................................................ 198

V. THE CREATION OF THE GREAT LAKES WATER AUTHORITY..................... 198

VI. THE CLASSES OF CLAIMS IN THE CITY'S PLAN AND THE RESULTS OF THE BALLOTING......................................................................................... 199

VII. THE STATUTORY REQUIREMENTS FOR CHAPTER 9 PLAN CONFIRMATION................................................................................... 200

VIII. THE COURT'S FINDINGS REGARDING CONFIRMATION OF THE CITY'S
EIGHTH AMENDED PLAN OF ADJUSTMENT.................................................. 202

IX. THE OUTSTANDING OBJECTIONS TO THE CITY'S PLAN............................. 203

A. Objections Filed by Represented Parties......................................... 203

B. Objections Filed by Unrepresented Parties....................................... 203

X. ISSUES RELATING TO PLAN CONFIRMATION.......................................... 204

A. The City's Professional Fees Will Be Fully Disclosed and Reviewed for
Reasonableness As Soon As Practicable, As Required by § 943(b)(3).... ........ 204

    1.   The City's Professional Fees Will Be Fully Disclosed........................................ 204

    2.   Section 943(b)(3) Requires the Court to Determine Whether the City's Professional Fees
in the Case Are Reasonable........................................................... 205

        a.   The Scope of § 943(b)(3)....................................................... 206

        b.   Reasonableness in This Case Is Insufficient to Comply with § 943(b)(3) and *City of
Avon Park*............................................................................. 210

        c.   The Process for Reviewing Fees........................................... 211

B. The Debtor Is Not Prohibited by Law from Taking Any Action Necessary
to Carry Out the Plan, As Required by § 943(b)(4).......................................... 211

C. The Plan Is in the Best Interests of Creditors, As Required by § 943(b)
(7)........................................................................................................ 212

    1.   The Applicable Law................................................................ 212

    2.   If the Case Were Dismissed, State Law Remedies Would Not Provide Creditors with a
Better Result Than the Plan....................................................... 213

        a.   The Creditors' Legal Remedies in the Event of a Dismissal.................. 213

        b.   The Creditors' Recoveries in the Event of a Dismissal........................... 215

        c.   The Creditors' Loss of Other Plan Benefits.................................. 217

    3.   The Creditors Can Access No Other Assets in This Bankruptcy Case......................... 218

    4.   The Best Interests of Creditors and Feasibility............................................ 219

D. The Plan Is Feasible, As Required by § 943(b)(7) 108.............................. 219

    1.   Applicable Law.................................................................... 219

13-53846-tjt   Doc 13663-1   Filed 10/31/22   Entered 10/31/22 16:55:43   Page 16 of
56

2. An Overview of Feasibility..................................................................................................... 220

3. Evidentiary Issues Regarding the Report and Testimony of the Court's Feasibility Expert.. ............ 222

4. The Expert's Standard for Feasibility........................................................................ ............. 222

5. The City's Plan Is Feasible............................................................................................ ......... 223

6. The City's Revenue and Expense Projections....................................................................... 224

    a. The City's Ten–Year Revenue Projections...................................................... ............. 224

    b. The City's Ten–Year Expense Projections............................................................... 224

    c. The City's Forty–Year Revenue Projections................................................... ............. 225

    d. The City's Forty–Year Expense Projections............................................................... 225

    e. The Resulting Forty–Year Projections..................................................................... 225

    f. The Expert's Review of the Plan Projections............................................................ 226

    g. The Revenue in the Plan Projections........................................................... ............. 226

    h. The Expenditures, Revenue and Cost Savings Associated with the RRIs.................. 228

7. The City's Obligations to Creditors Under the Plan............................................... ............. 228

    a. The City's Post–Bankruptcy Debt............................................................................ 229

    b. The Cost of Servicing the Post–Bankruptcy Debt...................................................... 229

    c. The City Will Be Able to Service Its Post–Bankruptcy Debt..................................... 230

8. Obligations.......................................................................................................................... 231

    a. The City's Plan Regarding Its Pension Obligations.................................................. 231

    b. Evaluating the Risks in the City's Plan to Address Its Pension Obligations............... ............. 232

    c. Recommendations for Enhanced Disclosures to Reduce the Risk of Unmanageable Pension Obligations.................................................................... ............. 233

9. The City Will Be Able to Sustainably Provide Adequate Services........................................ 234

    a. The Blight Initiatives.................................................................................... ............. 235

    b. The Public Safety Initiatives..................................................................................... 236

    c. The Organizational Efficiency Initiatives................................................................. 238

    d. The Resident Services Initiatives.............................................................................. 240

    e. The Business Services Initiatives.............................................................................. 240

10. The City's Commitment to Implement the Plan........................................................... 241

11. Final Thoughts and Recommendations on Feasibility............................................ 244

E. Each of the Claims in Each Class Is Substantially Similar to the Other Claims in the Class, As Required by § 1122(a)......................................... 245

1. The Applicable Law............................................................................................ 245

2. Creditors' Objections to Classification Are Overruled....................................... 246

F. The City Proposed the Plan in Good Faith, As Required by § 1129(a)(3). ........ 247

1. The Applicable Law............................................................................................ 247

2. The City's Good Faith........................................................................................ 248

3. The City's Long–Term Solvency......................................................................... 249

4. Federalism Considerations in the Court's Good Faith Analysis......................... 250

G. Bankruptcy Code, As Required by § 1129(a)(2)................................................. 251

1. The ASF Interest Rate Disclosure Issue............................................................ 252

2. Successive Plan Modifications Did Not Require Re–Solicitation of Ballots......... 253

H. The Plan Does Not Discriminate Unfairly Against Dissenting Classes 14 and 15, As Required by § 1129(b)(1)........................................................ 253

1. The Plan Discriminates Against Dissenting Classes 14 and 15........................ 253

2. The Unfair Discrimination Standard.................................................................. 255

3. The Discrimination Against the Classes of General Unsecured Creditors and Convenience Creditors Is Not Unfair................................................................ 257

a. The Discrimination in Favor of the Pension Classes Is Not Unfair............... 257

b. The Discrimination in Favor of the UTGO, LTGO and 36th District Court Classes Is Not Unfair.............................................................................. 258

c. The Discrimination Against Classes 14 and 15 Is Not Unfair Even Though Some Creditors in Those Classes May Be Involuntary Creditors....................... 258

I. The Plan Is Fair and Equitable with Respect to the Dissenting Classes, As Required by § 1129(b)(1).......................................................... 259

1. The Test of "Fair and Equitable" in Chapter 9.................................................. 260

2. The Plan Is "Fair and Equitable"....................................................................... 261

J. The Objections of the Creditors with Constitutional Claims Are Sustained........ 262 in Part and Overruled in Part........................................................

1. The Relevant Plan Provisions................................................................................................. 262

2. The § 1983 Creditors' Objections.......................................................................................... 262

    a. Impairing and Discharging the § 1983 Claims Against the City Does Not Violate the
       Fourteenth Amendment......................................................................................................... 263

    b. The Bankruptcy Code Does Not Provide for the Discharge of § 1983 Claims
       Against the City's Officers in Their Individual Capacity................................................. 265

    c. The City Has Not Established That a Third–Party Release of § 1983 Claims
       Against Its Officers in Their Individual Capacity Is Essential to Its Plan.................... 266

3. The Takings Clause Creditors' Objection................................................................................ 267

    a. Discharging Takings Clause Claims Would Violate the Fifth Amendment.................... 268

    b. Discharge.............................................................................................................................. 270

K. The Plan Does Not Violate the Funding Clause of the Michigan
   Constitution.............................................................................................................. 270

L. Retirement Systems....................................................................................................... 271

M. Included in the Plan........................................................................................................ 272

N. The Plan Does Not Violate the Blighted Area Rehabilitation Act...................... 273

O. The Grand Bargain Is Not an Improper Use of Tobacco Settlement
   Money..................................................................................................................... 273

P. The Plan Does Not Violate the Federal Transit Act.................................... 273

XI. THE EXIT FINANCING PROPOSED IN THE PLAN IS APPROVED...................... 275

XII. CONCLUSION....................................................................................................... 276

**\*159 I. INTRODUCTION** [1]

In chapter 9 of the bankruptcy code, the federal government offers help to the **\*160** states in solving a problem that, under our constitutional structure, the states cannot solve by themselves. That problem is the adjustment of the debts of an insolvent municipality. In this case, this Court grants that help to the State of Michigan (the "State") and the City of Detroit (the "City").

On December 5, 2013, the Court entered an order for relief finding that the City was eligible to file a chapter 9 bankruptcy case under § 109(c). [2] (Dkt. # 1946) Both before and after that, nearly every creditor group filed litigation against the City seeking the full protection of its claims.

The City filed its first plan and disclosure statement on February 21, 2014. At that time, the City had no approved settlements with any of its creditors. After that, every creditor group filed objections to the City's plan.

Since then, however, through court-ordered mediation, the City has achieved settlements with every creditor group

that was represented by counsel, with one exception—creditors with claims that the City or its officers had violated their constitutional rights. Successive settlements resulted in successive plans. The settlements also resulted in the settling creditors' support of the plan and their withdrawal of their litigation against the City and their objections to the plan.

The City now seeks confirmation of its eighth amended plan of adjustment, filed on October 22, 2014. (Dkt. # 8045)

In the context of seeking confirmation of its plan, the City also seeks approval of its several settlements with creditors under bankruptcy rule 9019:

- The Grand Bargain settlement, which includes the State Contribution Agreement, the DIA settlement and the global pension settlement;

- The OPEB settlement;

- The 36th District Court settlement;

- The UTGO settlement;

- The LTGO settlement;

- The COPs settlement, including the Syncora settlement and the FGIC settlement.

As more fully described in parts III and IV below, the Court has reviewed each settlement included in the plan and determines that each is fair and equitable, and within the range of reasonableness. Accordingly, the Court approves those settlements.

Based upon its findings in part VIII below, the Court concludes that the City's eighth amended plan of adjustment meets the legal requirements for confirmation. Most significantly, the Court finds that:

- The plan was proposed in good faith.

- The plan is feasible. ✓

- The plan is in the best interests of creditors.

- The Court will determine the reasonableness and disclosure of the professional fees for which the City is responsible in connection with this case.

- The City's proposed exit financing meets the requirements of the bankruptcy code.

- The plan was accepted by all creditor classes but two—the classes of other unsecured claims and convenience claims.

- As to the two dissenting creditor classes, the plan is fair and equitable.

- **\*161** • As to the two dissenting creditor classes, the plan does not unfairly discriminate against them.

Accordingly, the Court confirms the plan.

It does so, however, with conditions. First, for the reasons stated in part X.J.2. below, creditors' claims against City employees in their individual capacity are neither discharged nor released. Second, for the reasons stated in part X.J.3. below, creditors' claims against the City that are based in the Takings Clause of the Fifth Amendment of the United States Constitution are excepted from the discharge.

The Court's confirmation of the City's plan also comes with recommendations in parts X.D.8.c. and X.D.11. below to take specific actions to assure that what happened in **Detroit** never happens again.

## II. THE PLAN CONFIRMATION PROCESS

### A. The City's Plans of Adjustment

The City filed ten plans of adjustment. Most of the amended plans were the result of successive creditor settlements and agreements.

The City filed its first plan and disclosure statement on February 21, 2014 (Dkt. 2708 and 2709), ahead of the March 1, 2014, deadline that this Court first set.

On March 31, 2014, the City filed an amended plan and disclosure statement. (Dkt. 3380 and 3382) This plan incorporated the Court-approved swap settlement agreement and the initial stages of the Grand Bargain, discussed in parts IV.A. and III.D., respectively.

On April 16, 2014, the City filed its second amended plan and disclosure statement. (Dkt. 4140 and 4141) It clarified and expanded on aspects of the Grand Bargain and added the settlements relating to the restoration of

benefits, the ASF recoupment and the income stabilization program, discussed in parts III.G.1.b., III.H and III.E.2, respectively. It also clarified and expanded on aspects of the OPEB settlement, discussed in part III.I. below, incorporated the UTGO settlement, discussed in part III.K. below, and introduced the concept of post-effective date oversight for the City.

On April 25, 2014, the City filed its third amended plan and disclosure statement. (Dkt. 4271 and 4272) This plan incorporated the parties' agreements that clarified and expanded upon the provisions for restoration of PFRS pension benefits and other aspects of the Grand Bargain and the OPEB settlement. It also clarified the treatment of claims relating to the operation of City vehicles, tax refund claims, utility deposits and pass-through claims.

On May 5, 2014, the City filed its fourth amended plan and disclosure statement. (Dkt. 4391 and 4392) The Court approved that disclosure statement. (Dkt. # 4401) The City served solicitation packages, including this plan and disclosure statement, and plan ballots. (Dkt. 4421 and 6179) It also published notice of the plan and the disclosure statement in the Detroit News, the Detroit Free Press, USA Today and the Wall Street Journal. (Dkt. 6209, 6211 and 6253) This amended plan incorporated the final aspects of the Grand Bargain, including final agreements relating to restoration of pension benefits and pension plan governance, as well as the OPEB settlement. [3]

*162 On July 25, 2014, the City filed a fifth amended plan. (Dkt. # 6257) This plan incorporated the LTGO settlement, discussed in part III.L. below, and the 36th District Court settlement, discussed in part III.J. below. It also added the cash payment option for the ASF recoupment settlement, and specified the composition of the two Voluntary Employee Benefit Association ("VEBA") boards created as part of the OPEB settlement. Clarifications and changes were also made to the Grand Bargain and the UTGO settlement.

On July 29, 2014, the City filed a corrected fifth amended plan. (Dkt. # 6379) This plan removed the provisions for post-confirmation reporting to the bankruptcy court that were apparently included in the fifth amended plan by mistake.

On August 20, 2014, the City filed its sixth amended plan. (Dkt. # 6908) This plan incorporated the DWSD bondholders settlement, discussed in part IV.B below.

On September 16, 2014, the City filed its seventh amended plan. (Dkt. # 7502) This plan incorporated the Syncora global settlement and set forth the treatment of COPs claims in class 9, discussed in part III.M. below. It also incorporated agreements with the retiree committee and the LTGO parties regarding the residual interests in the COP claims reserve. It also reflected the closing and completion of the DWSD bond tender offer and further specified how the two VEBA boards would be comprised. It also provided for the prepayment to creditors in classes 7, 12 and 14 of the October 2015 interest payment on the Excess New B Notes.

On October 22, 2014, the City filed its eighth and last amended plan. (Dkt. # 8045) This final plan reflects the City's settlement with FGIC, its last objecting financial creditor, discussed in part III.M. below. It also reflects the settlement with the UAW and AFSCME regarding the treatment of retirees of the Detroit Public Library and the Detroit Regional Convention Facility Authority.

For the reasons discussed in part X.G.2. below, the Court concluded that the plans that the City filed after the fourth amended plan did not require new balloting and therefore did not require a new disclosure statement.

### B. An Overview of the City's Eighth Amended Plan of Adjustment

The plan that the City ultimately requested this Court to confirm contemplates a complete restructuring of the City's debt. The City has settled with every major creditor group. Because of the plan, the City has eliminated approximately $7 billion in liabilities. Trial Tr. 70:4–7, Sept. 30, 2014. (Dkt. # 7821) Upon exiting bankruptcy, the City will issue "New B Notes" in the aggregate face amount of $632 million and "New C Notes" in the aggregate face amount of $88 million. These new notes will be used to *163 restructure the City's obligations for post-retirement health benefits, debt service on several types of bonds and other unsecured liabilities. Ex. 791. The City has also restructured its unlimited tax general obligation bonds at a significant savings and will use exit financing to retire many of its limited tax general obligation bonds. Ex. 791. In addition, the settlements with FGIC, the City's largest creditor, and Syncora include real estate development agreements that give these creditors vested stakes in the City's recovery.

The plan also contemplates post-bankruptcy financial oversight of the City to ensure that the fiscal exigencies that resulted in the City's chapter 9 bankruptcy never happen again. The state legislation that implemented the Grand Bargain created a financial review commission to review the City's finances and budgets to ensure that the City adheres to the plan and continues to implement needed financial and operational reforms.[FN] Mich. Comp. Laws § 141.1631 *et seq.* The GRS and PFRS are also required to create investment committees whose role will be to make recommendations to, and approve certain actions by, the respective system's board of trustees. Mich. Comp. Laws § 38.1133g; Eighth Am. Plan of Adjustment (hereafter cited as "Plan"), Ex. I.A.332 at 2. (Dkt. # 8045)

Finally, because of the financial reforms contained in the plan, the City is able to invest approximately $1.7 billion in several reinvestment and restructuring initiatives ("RRIs") over ten years to help improve the City government's infrastructure and its provision of services. Ex. 579. These RRIs are designed to "substantially improve and provide adequate levels of services, as well as enhance revenue and reduce costs." Trial Tr. 42:11–12, Sept. 5, 2014. (Dkt. # 7434) The City believes these RRIs will also result in approximately $841 million in revenue savings and that they are critical to the City's recovery after bankruptcy. Ex. 592; *see also* Fourth Am. Disclosure Statement (hereafter cited as "Disc. Stmt.") at 160. (Dkt. # 4391) The RRIs will, among other things:

> (a) Provide basic, essential services to City residents; (b) attract new residents and businesses to foster growth and redevelopment; (c) reduce crime; (d) demolish blighted and dangerous properties; (e) provide functional streetlights that are aligned with the current population footprint; (f) improve information technology systems, thereby increasing efficiency and decreasing costs; and (g) otherwise set the City on a path toward a better future.

Disc. Stmt. at 10. (Dkt. # 4391)

## C. Objections Filed by Represented Parties

The following represented parties objected to the plan and subsequently withdrew their objections due to settlements with the City:

- Oakland County (Dkt. 4627 and 6648);

- The United States (Dkt. # 4629);

- Macomb County (Dkt. 4636, 6666 and 7039);

- U.S. Bank National Association (Dkt. 4647 and 6679);

- BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management (the "DWSD Bondholders") (Dkt. 4650, 4671 and 6681);

- Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., *164 Deutsche Bank AG, London; Dexia Crédit Local, Dexia Holdings, Inc., and FMS Wertmanagement AöR (Dkt. 4653 and 5979);

- Wilmington Trust, N.A. (Dkt. 4656, 6678, 7050 and 7603);

- Berkshire Hathaway Assurance Corporation (Dkt. 4657 and 6680);

- Financial Guaranty Insurance Company ("FGIC") (Dkt. 4660, 6674 and 7611);

- Wayne County (Dkt. # 4663);

- National Public Finance Guarantee Corporation ("NPFG") (Dkt. 4665 and 6687);

- Merrill Lynch Capital Services, Inc. and UBS AG ("the Swap Counterparties") (Dkt. # 4668);

- Assured Guaranty Municipal Corp. (Dkt. 4674 and 6677);

- Ambac Assurance Corp. (Dkt. # 4677);

- Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") (Dkt. 4679, 6651, 7041 and 7213);

Any sale could result in the cancellation of the tri-county millage taxes that support almost 70% of the DIA's operating budget. Trial Tr. 113:6–19, Sept. 18, 2014. (Dkt. # 7634)

The DIA also presented credible historical documentary evidence in support of its position that the City holds the art in trust. Public Act 67 of 1919, which provided for the transfer of the DIA real property and its art from the **Detroit** Museum of Art (the predecessor to the DIA) to the City, required that the "property so conveyed shall in the hands of said city be faithfully used for the purposes for which the [**Detroit** Museum of Art] was organized." Ex. 286. In January 1920, after the 1919 transfer of the art, the trustees of the **Detroit** Museum of Art held a special meeting to determine its future. The minutes of that meeting reflect that the trustees believed the restrictions in PA 67 of 1919 "give assurance that the property cannot be used excepting for the same purposes as were provided for in the incorporation of the **Detroit** Museum of Art." Ex. 269 at 4. At that same meeting, the trustees resolved to continue in existence to "encourage and receive in trust and to administer future gifts and legacies." *Id.* at 5; *see also* Ex. 268 at 11 (minutes of meeting of City Arts Commission in 1961 **\*178** noting that the purpose of the Founders Society, the successor to the **Detroit** Museum of Art, was to "assist the City of **Detroit** in the operation of the DIA and ... to promote the people's interest in and knowledge of art matters").

Further, the recitals in the Operating Agreement between the City and the Founders Society dated May 15, 1984, first state that the City "has maintained and operated the DIA for over 60 years for the benefit of the citizens of the City and the State of Michigan." It later states that the City would use state-allocated funds solely for the DIA, which was consistent with "the goal of continuing to benefit the citizens of the City and the State by preserving for their enjoyment the treasures of the DIA[.]" Ex. 281 at 1, 3.

Finally, the DIA's current Collection Management Policy states that "the [DIA] must be ever aware of its role as trustee of the collection for the benefit of the public." Ex. 267 at 11. Even the façade of the DIA itself, built by the City in 1927, states that it is "Dedicated by the People of **Detroit** to the Knowledge and Enjoyment of Art." *See* Trial Tr. 101:4–13, Sept. 18, 2014. (Dkt. # 7634)

This is strong evidence that the DIA was founded for the benefit of the residents of the City and the State, that the City believed that this was the case when the City received title

to the art in 1919, and that the City has treated the DIA as a public trust for over one hundred years.

The evidence further establishes that nationally accepted standards for museums prohibit the de-acquisition of art to pay debt. Annmarie Erickson, the executive vice president and chief operating officer of the DIA, testified that the DIA is a member of the Association of Art Museum Directors (the "AAMD"), which represents over one hundred sixty art museums throughout the United States, Canada and Mexico. The AAMD standards provide that "proceeds from the sale of accessioned works of art by an art museum be used only to replenish the collection through the acquisition of other works of art." Ex. 273 at 2. A violation of this standard "will be considered a serious breach of professional responsibility and sanctions may be recommended by a vote of the members of [AAMD]. The imposition of sanctions or penalties may mean suspension of all professional interchange, including loans and shared exhibitions." *Id.* at 3. This standard refers to the prohibition of the sale of art to pay operating expenses of a museum. However, Ms. Erickson testified that the standard would also apply to the sale of art for the purpose of paying City debt. Trial Tr. 114:16–115:19, Sept. 18, 2014. (Dkt. # 7634) Accordingly, it is likely that if the City sold any of its art to pay its debts, the national and international art community would refuse to do business with the DIA. Trial Tr. 29:17–23, Oct. 7, 2014 (Dkt. # 7878); Trial Tr. 115:2–19, Sept. 18, 2014. (Dkt. # 7634)

Further, the City presented credible evidence that de-accessing many highly valuable pieces at the same time would flood the art market and could cause prices to fall significantly. Trial Tr. 112:5–9, Sept. 16, 2014 (Dkt. # 7618); Trial Tr. 14:19–15:18, Sept. 18, 2014. (Dkt. # 7634) Consequently, there is no guaranty that the City would achieve the high returns that many creditors asserted.

On the other hand, the creditors did submit substantial evidence and legal grounds to support the contrary view that the City can legally sell or monetize the DIA art. For example, the current DIA Operating Agreement states that "[t]he *City* shall retain title to and ownership of the (a) *City art collection* and (b) the *DIA properties.*" Ex. 254 at 15 (italics in original).

**\*179** On balance, the Court concludes that in any potential litigation concerning the City's right to sell the DIA art, or concerning the creditors' right to access the art to satisfy their claims, the position of the Attorney General and the DIA would almost certainly prevail.

However, the evidence also establishes that any such litigation would take years to conclude and would be costly to pursue. It also would be difficult for the City to endure that delay and expense while at the same time attempting to revitalize itself.

In addition, because of the DIA settlement and the Grand Bargain, the GRS and the PFRS will receive $816 million in outside funding that would not be available to them otherwise.

The Court therefore concludes that the DIA settlement was a most reasonable and favorable settlement for the City and its pension creditors. The Court overrules any remaining objections and approves the settlement under bankruptcy rule 9019.

### G. The Pension Global Settlement

The final component of the Grand Bargain is the global settlement of pension-related issues, including the treatment of claims relating to the UAAL of the GRS and the PFRS.

#### 1. The Terms of the Pension Global Settlement

The GRS, the PFRS and the retiree committee, on one hand, and the City, on the other hand, aggressively disputed the pension plans' UAAL. The GRS and PFRS reported that as of June 30, 2013, the GRS was 70% funded and the PFRS was 89.3% funded with a combined total UAAL for both retirement systems of only $1.5 billion. Disc. Stmt. at 105. (Dkt. # 4391) The City claimed that the UAAL is actually $2 billion for the GRS and $1.4 billion for the PFRS, for a total of $3 .4 billion. *Id.* at 107.

##### a. The Treatment of Pension Claims

As part of the settlement, the parties agreed to an allowed aggregate UAAL claim of $1.25 billion for the PFRS and $1.879 billion for the GRS.

Because of the Grand Bargain, the GRS and the PFRS will receive $816 million in outside funding that would not have been available to them otherwise. Consequently, the pension reductions for retirees on account of the UAAL are now significantly less than the City had originally concluded would be necessary.

For PFRS pension claims, the accrued pension amount will not be reduced. However, the annual cost of living adjustment ("COLA") will be reduced to 45% of the amount provided in pre-petition collective bargaining agreements.

For GRS pension claims, the accrued pension amount will be reduced by 4.5% and COLAs will be eliminated. Some GRS retirees will also be subject to the terms of an annuity savings fund ("ASF") recoupment. Some of those GRS retirees have objected to this ASF recoupment. The Court addresses this issue separately in part III.H. below.

Because of the outside money committed as part of the Grand Bargain, the City will have little responsibility for funding the GRS and the PFRS through June 2023. During that time period, the PFRS will be funded exclusively from contributions from the DIA, the DIA Funders, the Foundation Funders and the State under the Grand Bargain, as described previously.

Through 2023, GRS funding will come from: (a) the DWSD; (b) a portion of the contributions from the State, the DIA, the DIA Funders, and the Foundation Funders as part of the Grand Bargain, (c) the proceeds from the Stub UTGO Bonds as part of the UTGO settlement, described in part III.K. below, and (d) certain revenues **\*180** from City departments, (e) the **Detroit Public Library** and (f) the **Detroit Regional Convention Facility Authority.**

In addition, the parties agree that the pension plans in effect on the petition date will be frozen as of July 1, 2014. Active employees continuing to work for the City after July 1, 2014, will have benefits accrue under new hybrid pension plans. The pension formulas contained in the new hybrid plans are less generous than those in the prior plans.

##### b. Restoration of Pension Benefits

As part of the settlement, the parties agree upon certain provisions for the restoration of pension benefit payments if funding levels for the retirement systems exceed certain targets. Through 2023, the funding targets for purposes of benefit restoration are 75% for GRS and 78% for PFRS. *See* Disc. Stmt. at 19–23 (Dkt. # 4391); Plan, Exs. II.B.3.q.ii.C. and II.B.3.r.ii.C. (Dkt. # 8045) If at any time these targets are exceeded, the amount by which the targets are exceeded will be credited to a restoration reserve account. When the

assets credited to the restoration reserve account can fully fund certain percentages of the reduced benefits (for example, when the GRS reserve account can fund 0.5% of the 4.5% benefit reduction), restoration payments will begin. As more money becomes available in the restoration reserve accounts, more benefits will be restored. If funding levels for the retirement systems drop, money in the restoration reserve accounts may no longer be available and restoration payments will be suspended.

### c. Governance and Oversight

As described previously, the parties have agreed to establish investment committees for the PFRS and the GRS as required by the State Contribution Agreement. The retiree committee has also agreed to defer to the retirement systems, the City and the State regarding post-effective date governance of the prior pension plans and restoration mechanics.

The parties have further agreed that until June 30, 2023, the boards of trustees of each system will adopt and maintain an investment return assumption and discount rate of 6.75% for purposes of determining the assets and liabilities of the pension systems.

The plan also includes a provision that all parties are enjoined until June 30, 2023 from making any amendment to the terms, conditions and rules of operation of the GRS and the PFRS relating to the calculation of pension benefits, the selection of investment return assumptions, or the contributions to the pension systems.

The City has also set certain targets at which the UAAL for the GRS and the PFRS must be funded. For 2023, the funding targets are 70% for the GRS and 78% for the PFRS. For 2053, in 40 years, the targets are 100% for each. Ex. 723.

Finally, the retiree committee has agreed that it will support the plan and advise retirees to vote in favor of the plan. The committee further agreed to suspend its appeal of the Court's eligibility order and to dismiss the appeal upon the effective date of the plan.

The pension classes voted to accept the plan by 82% in class 10 (PFRS) and 73% in class 11(GRS).

### 2. The Pension Global Settlement Is Fair and Equitable

[4]    Despite these strong votes in favor of the plan, the treatment of pension claims in the City's plan has been a significant issue in this case. In the Court's eligibility opinion, it held that because of the Bankruptcy Clause of the U.S. Constitution, the federal bankruptcy power could be used to impair pension rights in this *181 case, even if the Michigan constitution protects them. *In re City of Detroit, Mich.,* 504 B.R. 97, 150–54 (Bankr.E.D.Mich.2013). The Court stands by that decision.

Here at the confirmation stage, the Court must determine whether the plan's treatment of pension claims meets the legal requirements for plan confirmation and settlement approval. The plan confirmation issues include good faith, best interests of creditors, feasibility and others. The Court addresses these questions separately in other parts of this opinion. The Court will now address whether the pension settlement is a reasonable settlement under bankruptcy rule 9019.

Despite the acceptance of the plan by the pension classes, a significant number of pension creditors still strongly oppose the impairment of their pension rights. They believe and assert in their many objections that under the Michigan constitution, their pension rights are not subject to impairment. They credibly state that they worked hard for the City, that they did nothing wrong, and that these pension impairments will cause them real hardship. Some also argue that the pension impairments in the plan are unnecessary because the pension plans are in fact fully funded. They further argue that if the pension plans are underfunded, as the City asserts, the City should sell the art at the DIA or other City assets. As discussed in part II.D. above, many of these objecting parties took the time to come to court to give a strong, sincere and personal voice to their objections.

The Court, however, finds that the pension settlement is a reasonable settlement and overrules those objections to the plan and to the pension settlement.

Several representatives of the pension classes appealed this Court's eligibility decision. The City, of course, takes the position that the eligibility decision was correct and should be affirmed. To determine the reasonableness of the settlement, it is incumbent upon this Court to estimate the parties' likelihood of success of the appeal. That is challenging here. The issue of whether pensions can be impaired in

13-53846-tjt  Doc 13663-1  Filed 10/31/22  Entered 10/31/22 16:55:43  Page 25 of
56

bankruptcy despite state constitutional protection is a novel one. However, this Court believes that its reasoning in the eligibility decision is sound. The Court therefore estimates that the pension creditors' chances of success on appeal would be in the range of 25%.

The next step is to determine each side's best-case scenario. For the City, that would plainly be to prevail on appeal and to continue in this chapter 9 case. For the pension creditors, however, the best-case scenario is much less clear. The City presented convincing evidence at the confirmation hearing that it would have no ability to pay the UAAL even if the pension creditors were to prevail on appeal. Gaurav Malhotra, an expert on restructuring and financial analysis at Ernst & Young, LLP, testified that without restructuring, the City would have a $4 billion deficit over the next ten years, or $390 to $400 million per year, due largely to the City's unsustainable legacy costs. Trial Tr. 71:10–13, Sept. 29, 2014 (Dkt. # 7819); Ex. 109 at 6.

It is therefore a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. Without the outside funding from the Grand Bargain, the City anticipated having to reduce pensions by as much as 27%. Disc. Stmt. at 17. (Dkt. # 4391) The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

**\*182** At the same time, the Court recognizes that even these relatively minor pension reductions will cause real and, in some cases, severe hardship. However, this bankruptcy, like most, requires shared sacrifice because the City is insolvent and desperately needs confirmation of this plan to fix its future.

As noted, a substantial majority of both classes 10 and 11 voted in favor of the City's plan and accepted the necessity of shared sacrifice for the common good of the City. That collective judgment is entitled to substantial consideration here.

Accordingly, the Court finds that the pension settlement is reasonable and approves it.

### H. The Annuity Savings Fund Recoupment Settlement

In the City's long-standing Annuity Savings Fund program, GRS employees could voluntarily contribute a percentage of their gross pay to a separate pension account. The GRS then invested these ASF contributions with the other ASF assets that the City contributed or that the GRS earned on its investments. Each participant's ASF account increased in value based on the participant's contributions and the interest that the GRS credited to that account.

#### 1. The Dispute Over the Excess ASF Credits

For many years, the GRS credited interest in each participant's ASF account at the assumed rate of return even when the actual rate of return was less.

The City claims that this diversion of assets increased the GRS UAAL. It therefore contends that recoupment of the excess interest from the ASF participants is necessary and appropriate to offset the increased UAAL. That recoupment in turn reduces the pension cuts to the GRS retirees. The City calculates that the total of this claim is approximately $387 million.

The ASF participants assert that there is no basis for recoupment.

#### 2. The Terms of the ASF Settlement

The parties have settled this issue as part of the global pension settlement. The City and the retiree committee have agreed that the ASF recoupment amount for each retiree will be limited to the total amount of excess interest that was credited between July 1, 2003, and June 20, 2013. The GRS will amortize each ASF participant's recoupment amount over the participant's life expectancy with interest at 6.75%, to be deducted from the participant's monthly pension check or ASF account. In no event will the total ASF recoupment from any participant exceed the amount necessary to amortize the ASF excess amount calculated for the participant at 6.75% interest. Each ASF participant will have the option to pay the ASF recoupment amount in a single lump sum cash payment.

The parties also agreed upon limitations on the ASF recoupment. The ASF recoupment will be capped at 20% of

the highest value of each participant's ASF account between July 1, 2003, and June 30, 2013. An additional cap limits the combined pension reduction and ASF recoupment for each participant to 20% of such participant's annual pension.

The City anticipates that this settlement will result in an additional $190 million for the GRS. City's Consol. Resp. to Certain *Pro Se* Objections, ¶ 8 at 9. (Dkt. # 7303) This is approximately 49% of the City's ASF claim.

### 3. Objections to the ASF Settlement

Several GRS participants object to the ASF recoupment in the plan. These include: Hassan Aleem (Dkt. # 5057); George Cannon (Dkt. # 5126); Roger N. **\*183** Cheek (Dkt. # 5947); Jamie S. Fields (Dkt. # 4404); Michael J. Karwoski (Dkt. 5089 and 5923); Mattie D. Pritchett (Dkt. # 5887); John P. Quinn (Dkt. # 5723); Dennis Taubitz (Dkt. # 5971); Gerald G. Thompson (Dkt. # 3352); Jean Vortkamp (Dkt. # 4578); Mary Jo Vortkamp (Dkt. # 4579); Steven Wojtowicz (Dkt. # 6870); and Demetria Wright (Dkt. # 5795). They argue:

1. The ASF recoupment violates the applicable statute of limitations.

2. Under state law, the City's recoupment claim has no merit.

3. They did nothing that justifies imposing this liability on them.

4. The GRS board of trustees did nothing wrong and was acting within its complete discretion under Sections 47–2–17 and 47–2–18 of the **Detroit** City Code by allocating the excess interest payments to ASF participants.

5. The City has no standing to assert the recoupment claim.

6. They do not consent to the lesser treatment of their pension claim in class 11 that results from the recoupment.

7. The treatment of the City's recoupment claim in the plan violates their right to be heard on the merits.

8. The City did not properly disclose the 6.75% interest rate.

9. The 6.75% interest rate is illegal, usurious and unfair.

10. The Court should carve the ASF settlement out of the plan and then approve the plan.

11. The ASF recoupment proposes a seizure of the assets of creditors holding class 11 claims without due process of law because the City has not brought any action under bankruptcy or non-bankruptcy law that would provide a legal basis for ASF recoupment.

12. The ASF recoupment settlement in the plan constitutes an improperly asserted preference or fraudulent transfer action.

13. The City is precluded from recouping the ASF excess interest amounts because the City had knowledge of, or participated in, the allocation of these amounts to the ASF participants.

14. As a result of the imposition of the 6.75% interest rate to annuitize the ASF excess amounts, amounts recovered from ASF distribution recipients will "greatly exceed" the ASF recoupment cap, which is 20% of the highest value of the ASF distribution recipient's annuity savings account during the ASF recoupment period.

### 4. The ASF Settlement Is Fair and Equitable, and Does Not Violate the Bankruptcy Code

**[5]** The ASF recoupment settlement is a part of the global pension settlement and therefore a part of the Grand Bargain. It is also a part of the City's plan. The bankruptcy code provides that a class of claims accepts a plan "if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan." 11 U.S.C. § 1126(c). Although there are dissenting creditors in class 11, "[i]n a Chapter 9 [case], dissenting creditors in an accepting class are bound by the accepting vote of the other members." *In re City of Colorado Springs Spring Creek Gen'l Improvement Dist.,* 187 B.R. 683, 690 (Bankr.D.Colo.1995).

**\*184** The Court, therefore, has only two issues to consider. The first is whether the settlement is fair and equitable. The second is whether the plan provisions that incorporate the ASF settlement violate the bankruptcy code.

It is not for the Court to rule on the merits of the City's ASF recoupment claim. Nor is it for the Court to rule on the merits of the participants' defenses to that claim. The Court only

reviews the parties' respective positions to determine whether the settlement is fair and equitable.

The Court finds that the City's recoupment claim would quite likely succeed. As noted, the practice was to credit interest in each participant's ASF account at the assumed rate of return even when the actual rate of return was less. The legal authority of the GRS board to do that is doubtful. The prudence of the practice is even more doubtful. The practice ignored the practical reality that over the long term, the GRS needs to retain its earnings that exceed the assumed rate of return to offset the earnings shortfalls that result when the actual rate of return is less than the assumed rate of return. The City's claims of breach of fiduciary duties and diversion of assets are therefore quite strong. Its claim that recoupment against ASF participants is the proper equitable remedy is also quite strong.

On the other hand, the Court considers that the asserted defenses have less merit.

On balance, it appears that the City's recoupment claim would have a reasonable likelihood of success, in the range of 60–70%.

However, the length, complexity and expense of litigation would be substantial. If the City prevails, issues of collectability against ASF participants could also be substantial, depending upon the structure of the final judgment.

The Court also considers that this settlement is part of the much larger settlement of all pension-related issues. The class of claims affected by the settlement, class 11, accepted the settlement by a vote of 73%. Finally, the Court notes that the caps and other limitations on the recoupment amount that the parties negotiated should reduce the hardship of it.

Fairly weighing these factors suggests that the ASF recoupment settlement is well within the range of possible reasonable settlements. The Court, therefore, overrules the objections and finds the ASF recoupment portion of the pension settlement is fair and equitable. The Court further concludes that nothing about the ASF settlement violates the bankruptcy code.

## I. The OPEB Settlement

In addition to their pension claims, retirees also have claims against the City for loss of other post-employment benefits ("OPEB claims") including post-employment health, vision, dental, life and death benefits. These OPEB claims constitute class 12 in the plan.

### 1. The Disputes Over the OPEB Claims

The amount of the City's outstanding obligation related to OPEB claims has been the subject of intense dispute, described more fully below. However, all estimates put the liability in the multi-billion dollar range. OPEB claims represent the single largest portion of the City's unsecured debt obligation. Trial Tr. 11:5–9, Oct. 2, 2014. (Dkt. # 7878)

In early 2014, the City notified its retirees that it would drastically change the healthcare plans that it offered to them, resulting in significantly lower benefit payments. In response, the retiree committee *185 filed an adversary proceeding against the City seeking an injunction to prohibit it from unilaterally changing the healthcare benefits that it provided to retirees. The committee asserted largely equitable grounds relating to the hardship that terminating these benefits would naturally cause retirees. There did not appear to be any substantial legal grounds for the requested relief. See, Complaint, *Official Comm. of Retirees v. City of Detroit (In re City of Detroit )*, No. 13–05244 (Bankr.E.D.Mich. Oct. 22, 2013). (Dkt. # 1)

The City and the retiree committee disputed the present value of the OPEB claims. The City estimated the amount of the claim to be roughly $3.77 billion. The retiree committee estimated it to be approximately $5 billion. City's Consol. Reply to Certain Objections to Confirmation of Fourth Am. Plan at 13. (Dkt. # 5034) The difference in the estimated values of the claim is the result of differing actuarial assumptions and discount rates that the parties used. *Id.*

The City and the retiree committee also disagreed on the characterization of payments that the City made on OPEB benefits after the City filed this case. The City's position was that these payments were a partial satisfaction of the OPEB claim and should reduce the amount of New B Notes that, under the plan, would be distributed on account of the allowed OPEB claim on a dollar-for-dollar basis. The retiree committee argued that the payments should be ignored for purposes of calculating the OPEB claim amount. *Id.* at 14.

## 2. The Terms of the OPEB Settlement

The City and the retiree committee reached a settlement of their disputes related to the OPEB claim as part of the pension global settlement.

Pursuant to the settlement, the total allowed amount of the OPEB claim is fixed at $4.303 billion—$2.208 billion for PFRS retirees and $2.095 billion for GRS retirees.

In addition, the City and retiree committee have settled on the treatment of the OPEB claim. The City will establish VEBAs for the PFRS and the GRS. On the effective date, the City will distribute $232 million in New B Notes to the PFRS VEBA and $218 million in New B Notes to the GRS VEBA. The retiree committee also negotiated an improved interest rate for the New B Notes—4.0% for the first twenty years and 6.0% for the last ten years. The New B Notes have a thirty-year maturity.

The City will also distribute $42.7 million in New B Notes to the VEBAs from the Excess New B Notes. As described in part III.M. below, the Excess New B Notes are a result of the settlement agreements with holders of class 9 claims.

The start-up costs for the VEBAs will be funded by: (1) $8 million from a reserve fund held in the currently existing benefits plans; (2) approximately $3.5 million from charitable contributions; (3) an advance of the interest payment on the Excess New B Notes due in October of 2015; and (4) $18 million in grants from various local foundations and the **Detroit** Benefits Board. Ex. 720; *see also* Letter Agreement with Retiree Committee at 2–3, Nov. 4, 2014. (Dkt. # 8183)

The VEBAs will provide health benefits, including life insurance, to retirees and certain of their beneficiaries and dependents. Each VEBAS will be governed by boards of trustees that will be responsible for the management of its assets, for its administration, and for determining the beneficiaries' benefits.

As a result of this settlement and the creation of the VEBAs, the City will have no further responsibility to provide retiree **\*186** healthcare or other benefits for retirees. Further, the City will have no responsibility to provide life insurance or death benefits to current or former employees. The current death benefit plan will be frozen and will be self-liquidating. Any existing retirees who participate in the death benefit plan

will be given a one-time opportunity to receive a lump sum distribution of the present value of the actuarially determined death benefit.

The plan treats the OPEB claim in class 12. The estimated recovery for the class 12 OPEB claim is 10%. Class 12 accepted the plan by over 88%.

## 3. The OPEB Settlement Is Fair and Equitable

[6]    The City contends that the OPEB settlement is fair and reasonable for several reasons. First, the City believes that the settlement avoids protracted and expensive litigation to resolve intense factual and legal disputes. Second, the City asserts that, given the range of estimated OPEB claim values between $3.771 billion and $5 billion, the settled allowed claim amount of $4.303 billion is reasonable. Lastly, the City argues that the settlement is in the best interests of the City and its creditors because it settles one of the City's largest liabilities and at the time, allowed the City to bring the bankruptcy closer to its conclusion.

The Court agrees that litigation to resolve the amount of the City's OPEB liability would be complex, lengthy and very expensive. Resolution of the litigation would turn largely on actuarial opinion testimony with extensive discovery regarding multiple competing experts. Disc. Stmt. at 15. (Dkt. # 4391) The evidence would be intensely fact-specific. Trial Tr. 18:1–5, Oct. 2, 2014. (Dkt. # 7878) As the City points out, any litigation could also involve resolution of other fact-intensive issues, such as retiree census data and the proper discount rate to be applied to liabilities. Disc. Stmt. at 152. (Dkt. # 4391)

The outcome of any potential litigation to resolve the claim would be uncertain. The City's view that the retiree committee would zealously oppose the City's position is justified. Trial Tr. 17:12–15, Oct. 2, 2014. (Dkt. # 7878) It is also significant that the City would be responsible for the committee's professional fees in any such litigation. A settled claim amount that falls almost exactly midway between the disputed values is therefore reasonable.

The Court also finds that creation of the VEBAs to address the OPEB claim is reasonable. The City presented evidence that, without restructuring, OPEB liabilities would account for as much as 26% of expenditures from the City's general fund by the year 2023. Trial Tr. 177:10–13, Oct. 1, 2014 (Dkt. # 7850);

Ex. 721. Such a large liability would destroy the City's ability to make the financial and operational changes necessary to provide adequate municipal services.

The City's evidence also shows that transferring the OPEB legacy costs to the VEBAs will reduce the City's obligation to a much more manageable 3% of general fund expenditures over the next 30 years. Trial Tr. 173:21–174:15, Oct. 1, 2014 (Dkt. # 7850); Ex. 721.

Accordingly, the Court finds that the OPEB settlement is reasonable and approves it.

### J. The 36th District Court Settlement

[7]   Although the 36th District Court is a separate legal entity from the City, under state law, the City is required to fund the operations of the court. Mich. Comp. Laws §§ 600.8103 and 600.8104. When the City filed this bankruptcy case, the 36th District Court was defending various employment-related claims. Because the City is required to fund the 36th District *187 Court, it would ultimately be liable for the payment of any judgments against the 36th District Court on those claims.

During the bankruptcy proceeding, the creditors with claims against the 36th District Court participated in arbitration and obtained awards in the aggregate amount of approximately $14 million. Trial Tr. 58:14–17, 59:24–25, Oct. 2, 2014. (Dkt. # 7878)

AFSCME is the bargaining agent for employees of the 36th District Court. AFSCME, the individual creditors and the 36th District Court itself filed proofs of claim related to the obligations arising from those arbitration awards.

The parties have settled. Under this settlement, the 36th District Court creditors are classified into class 17 and the aggregate liquidated allowed amount of their claims is fixed at $6 million. The parties have agreed to settle the claims for a recovery of $2 million (33%) and the 36th District Court will withdraw its proof of claim entirely with prejudice.

The 36th District Court creditors whose claims are less than $100,000 will receive 33% of their allowed claim in cash. Creditors whose claims are more than $100,000 will receive 33% of their allowed claims payable in five equal annual installments plus simple interest at a rate of 5% per year.

The parties have also agreed to release all of the claims that they may have against each other, except that AFSCME and some of the individual creditors do not release claims that they have against the 36th District Court related to certain identified pending proceedings. The City has also agreed to carve out an exception to the broad third-party releases in the plan to allow the 36th District Court creditors to pursue actions against the State and its related entities with respect to the liabilities that the 36th District Court creditors assert to the extent that the plan does not satisfy those liabilities.

AFSCME and the individual creditors are deemed to have voted their respective claims in favor of the plan in the amounts established by the Order Regarding the Voting of Claims Relating to the 36th District Court. (Dkt. # 5905)

The Court finds that this settlement is reasonable. The claims against the 36th District Court were obviously not frivolous, as they have been reduced to substantial awards in arbitration. Outside of bankruptcy, the City would be liable to pay those claims on behalf of the court. If the City had chosen instead to continue to contest those claims, the number of claims would have made the expense of the litigation significant. Trial Tr. 62:2–10, Oct. 2, 2014. (Dkt. # 7878)

Settling the dispute for an allowed claim of $6 million with an ultimate distribution of $2 million is reasonable. Consequently, the Court approves the 36th District Court settlement.

### K. The UTGO Settlement

Under Michigan law, the City is authorized to issue variable rate unlimited tax general obligation bonds ("UTGO Bonds") with approval from voters. Each year, the City is required to levy sufficient *ad valorem* property taxes to pay the debt service on those bonds without limitation as to rate or amount. Mich. Comp. Laws § 141.2701(1).

When the City filed this case, it had as much as $480 million in outstanding UTGO Bonds, including principal and accrued interest ("Prior UTGO Bonds"). The claims related to Prior UTGO Bonds are in class 8.

### *188 1. The Dispute Regarding the UTGO Bonds

confidence that the borrowings ... by the city will get repaid in the ordinary course.").

Most importantly, the City and its creditors would lose the benefits of the RRIs, *218 one of which is the creation of a sufficient operating budget surplus for the City to pay its obligations under the plan. *See* Trial Tr. 71–72, Sept. 29, 2014. (Dkt. # 7819) (Mr. Malhotra testifying that "it was probably unlikely that the city would have been able to" implement the RRIs without the plan); Trial Tr. 228–29, Sept. 5, 2014. (Dkt. # 7434) (Mr. Moore testifying that "clearly" the RRIs "would not have been able to get undertaken without some sort of restructuring based on the structural deficit that existed within the city in June of 2013").

The evidence establishes, therefore, that the plan is a much better alternative for creditors than dismissal.

### 3. The Creditors Can Access No Other Assets in This Bankruptcy Case

Whether in bankruptcy or outside of bankruptcy, no provision of law allows the creditors to access City assets, most importantly including the DIA art, to satisfy their claims. The market value of the City's assets, including its art is, therefore, irrelevant in this case. As observed above, a judgment creditor's sole remedy is a court-ordered property tax assessment process under Michigan's Revised Judicature Act. Michigan law prohibits execution on municipal property.

Some creditors argue that even if the assets would not be accessible to unsecured creditors outside of bankruptcy, the best interests test in chapter 9 requires this Court's full consideration of all of the City's assets, including the art.

The Court rejects this argument. The legal limitations on the collection of judgments that apply outside of bankruptcy also constrain the best interests of creditors test in bankruptcy. Neither the bankruptcy code nor the case law suggests otherwise.

As noted, the City determined not to sell or monetize the DIA art in the art market. Under § 904, that decision is off-limits to the Court.

However, even if the law did give the Court some authority here, the Court would not have interfered with the City's decision. The City made the only appropriate decision.

Maintaining the art at the DIA is critical to the feasibility of the City's plan and to the City's future. The Court toured parts of the DIA and saw the art there, as well as how its many visitors were experiencing the art. It also accepts the testimony of Ms. Erickson on the priceless value that the DIA and the art create for the City, the region and the state. Trial Tr. 157–64, Sept. 18, 2014. (Dkt. # 7634)

The evidence unequivocally establishes that the DIA stands at the center of the City as an invaluable beacon of culture, education for both children and adults, personal journey, creative outlet, family experience, worldwide visitor attraction, civic pride and energy, neighborhood and community cohesion, regional cooperation, social service, and economic development. Every great city in the world actively pursues these values. They are the values that **Detroit** must pursue to uplift, inspire and enrich its residents and its visitors. They are also the values that **Detroit** must pursue to compete in the national and global economy to attract new residents, visitors and businesses. To sell the DIA art would only deepen **Detroit's** fiscal, economic and social problems. To sell the DIA art would be to forfeit **Detroit's** future. The City made the right decision.

Some creditors proposed using the art as collateral for a loan to pay creditors' claims. The City also rejected that concept. That decision was sound for at least two good reasons. First, that proposal would just substitute debt for debt and *219 would not help the City. Second, if the City defaulted, it might lose the art. The City made the right decision here too.

Beyond that, the record reflects that the City has made reasonable efforts to monetize other assets, including the **Detroit** Windsor Tunnel, certain real estate properties, certain parking properties, the Joe Louis arena property and certain other property that it no longer needs. It also entered into the Great Lakes Water Authority memorandum of understanding with Wayne, Oakland and Macomb Counties, which benefits all creditors. The Court finds that the City has made reasonable efforts to monetize its assets to satisfy the best interests of creditors test.

### 4. The Best Interests of Creditors and Feasibility

Finally, the Court finds that the "best interests of creditors" in chapter 9 is necessarily constrained by the second confirmation requirement found in § 943(b)(7)—that the plan is feasible. *See* 11 U.S.C. § 943(b)(7). In *In re Mount Carbon,*

the court observed that the " 'best interests' test acts as a floor requiring a reasonable effort at payment of creditors by the municipal debtor and that the 'feasibility' requirement sets a corresponding ceiling which prevents the Chapter 9 debtor from promising more than it can deliver." 242 B.R. at 34. *See also In re Pierce Cnty. Hous. Auth.,* 414 B.R. at 718.

As a result, the City "may obtain confirmation of a plan, over objection, which does not utilize all of the assets of the estate to retire its obligations." *In re Sanitary & Improvement Dist., No. 7,* 98 B.R. at 974. This is a straightforward observation that if a city "gives away" too much under a plan, its future ability to fund its plan obligations and daily operations is lessened.

As the Court's expert witness on feasibility, Ms. Martha Kopacz, stated in her second supplemental report:

> I want to emphasize, however, that there is little space remaining on the continuum of [feasibility]. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they have imposed additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern.

Ex. 12002 at 6.

The Court addresses Ms. Kopacz's conclusions as they impact feasibility in part X.D. below. However, the Court finds that Ms. Kopacz's observation supports a finding that the City has effectively done all that it can do for its creditors in its plan.

There is no more money available for creditors in the City's already tight budget projections. Every dollar is accounted for in providing necessary services, in implementing the necessary RRIs, and in meeting plan obligations. All of those cash uses are essential to the City's future. In this plan, the floor of the best interest test and the ceiling of the feasibility test have, for all practical purposes, converged.

Accordingly, the Court finds that the plan will provide creditors all that they can reasonably expect under the circumstances and that it is therefore in their best interests, as required by § 943(b)(7).

### D. The Plan Is Feasible, As Required by § 943(b)(7)

#### 1. Applicable Law

[22] [23] [24] [25] [26] [27] Section 943(b)(7) provides, "The court shall confirm the plan if—... *220 (7) the plan is ... feasible." Few creditors substantively challenge the feasibility of the City's plan. Regardless, the Court has an independent duty to determine the issue and to make specific findings of fact. *See In re Mount Carbon,* 242 B.R. at 36 ("Not only is feasibility an express requirement set out in § 943(b)(7), but the long history of Chapter 9 requires an objective evaluation of the [chapter 9 debtor's] proposed reorganization.") (citing *Everglades Drainage Dist.,* 319 U.S. at 418–19, 63 S.Ct. 1141)

> As with cases in chapter 11, a chapter 9 feasibility finding should " 'prevent confirmation of visionary schemes which promise creditors ... more under a proposed plan than the debtor can possibly attain after confirmation.' " A plan should offer a reasonable prospect of success and be workable. In Chapter 9, this requires a practical analysis of whether the debtor can accomplish what the plan proposes and provide governmental services. Although success need not be certain or guaranteed, more is required than mere hopes, desires and speculation. The probability of future success will depend upon reasonable income and expense projections. As with plans proposed under Chapter 11, if performance of a Chapter 9 plan is based upon deferred payments, projections of future income and expenses must be based upon reasonable assumptions and must " 'not be speculative or conjectural.' " Plan terms which provide for negative amortization, or for deferred payments over an extensive period of time, may make the showing of feasibility difficult. *Indeed a feasibility showing premised upon long-term repayment or negative amortization may be particularly difficult for the Chapter 9 debtor, which must not only demonstrate a probability that it will be able to*

*pay on pre-petition debt in accordance with the plan, but most also demonstrate the probability that it can continue to provide public services while it repays debt.*

*In re Mount Carbon,* 242 B.R. at 35 (citations omitted) (emphasis added).

### 2. An Overview of Feasibility

In this case, examining the feasibility of the plan is difficult for a number of reasons. The City's debt is enormous and the City proposes to pay most of its creditors over a long period of time. As the Court discusses below, the City's revenue and expense projections extend forty years into the future.

Second, the feasibility of the plan depends upon the City's ability to fix and maintain its broken governmental operations. This is significant because the chapter 9 feasibility inquiry requires an analysis of whether the City can reasonably provide sustainable municipal services, as the court found in *In re Mount Carbon.* It is also significant because the City's ability to repay its creditors pursuant to the plan depends upon the City's ability to increase its revenues from taxes and fees by improving the efficiency of City operations and by identifying and accessing untapped sources of revenue.

The feasibility analysis is yet more complex because several key parts of the plan depend upon performance by parties who are completely beyond the City's control. For example, because the City's contributions to the retirement systems are fixed through FY2023, a risk remains that the pension plans will be significantly more underfunded than anticipated if one of the many organizations participating in the Grand Bargain fails to perform in the time or manner promised.

As the City itself succinctly states in its pretrial brief in support of plan confirmation, "[T]he City was—and remains today *221 —enmeshed in a financial crisis of unsurpassed proportions and complexity." City's Pretrial Br. ¶ 1 at 17–18. (Dkt. # 7143) Despite efforts from both the City and the State of Michigan, "the City is trapped in a vicious circle of cash crises, general fund deficits, crushing long-term liabilities and tumbling credit ratings exacerbated by the City's bureaucratic structure and frequent deviations from established budgets." *Id.* ¶ 2 at 18.

Finally, overlaying these concerns is that throughout these proceedings, the City's creditors have focused much more heavily on whether the plan provides them with a sufficient recovery, rather than on whether the City is "promising more than it can deliver." *See* *In re Mount Carbon,* 242 B.R. at 34. Thus their litigation focus was on whether the plan is in the best interests of creditors, unfairly discriminates, and is fair and equitable, rather than on whether it is feasible.

For these reasons, the Court found that the adversarial system would not function to clarify the issues and elucidate the facts relating to feasibility. Accordingly, it decided to seek out an independent expert witness on the feasibility of the City's plan. After interviewing several candidates from diverse backgrounds, on April 22, 2014, the Court appointed Martha Kopacz as its expert witness on feasibility. *See generally* Order Appt'ing Expert Witness. (Dkt. # 4215) Ms. Kopacz is an experienced restructuring professional from the Boston-based firm, Phoenix Management Services. The Court instructed Ms. Kopacz to "investigate and reach a conclusion on: (a) Whether the City's plan is feasible as required by 11 U.S.C. § 943(b)(7); and (b) Whether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable." *Id.* ¶ 2 at 1.

After an evidentiary *Daubert* hearing on September 15, 2014, the Court determined Ms. Kopacz was qualified under Federal Rule of Evidence 702 to give expert testimony concerning these two questions, and that her opinion was the product of the application of reliable methods to sufficient facts and data. *See* Order Re: Expert Test. at 2–3. (Dkt. # 7511)

Ms. Kopacz fulfilled her assignment, as set forth in three expert reports, Ex. 12000, 12001, 12002, and in her testimony on October 22, 2014. *See generally* Trial Tr. 1–89, Oct. 22, 2014. (Dkt. # 8082) She provided the Court with a critical analysis of the City's financial projections and its qualitative assumptions, as well as invaluable guidance for interpreting and understanding the mountain of data that the City's financial professionals produced. Thus, although the City admirably shouldered the burden of producing the necessary raw financial data and projections, the efforts of Ms. Kopacz and her team were essential for the Court to discharge its duty under § 943(b)(7).

The Court finds Ms. Kopacz testified credibly. Therefore, the Court adopts Ms. Kopacz's findings and conclusions as expressed in her testimony and in her three expert reports

almost in their entirety, and incorporates them into the Court's feasibility analysis. The only conclusion that the Court cannot quite accept relates to her concerns about the expedited pace of this proceeding. The Court addresses this question in part X.F.4. below.

Before turning to the substance of Ms. Kopacz's findings and conclusions and the supporting evidence that the City's financial professionals compiled and testified to, the Court must address two evidentiary issues concerning Ms. Kopacz's testimony and expert reports.

### *222 3. Evidentiary Issues Regarding the Report and Testimony of the Court's Feasibility Expert

Although the GRS and the PFRS do not object generally to Ms. Kopacz's expertise, they did file a joint motion to exclude certain portions of Ms. Kopacz's testimony relating to the systems' historical performance and management, and their future governance and reporting requirements. In their motion, the GRS and the PFRS assert that Ms. Kopacz lacks the necessary qualifications to give pension-related opinions and further that her investigation of these issues exceeded the scope of her assignment from the Court. Retirement Systems' Mot. to Exclude at 1–2. (Dkt. # 7061)

The GRS and the PFRS also moved to exclude these same portions of Ms. Kopacz's opinion and findings from admission into the evidentiary record as part of her expert reports. They argued that not only does Ms. Kopacz lack the expertise to give these opinions, but that any mention of them in her reports constitutes inadmissible hearsay. Retirement Systems' Br. in Opp'n to Admis. of Expert Report at 1–2. (Dkt. # 6847) Relying on Engebretsen v. Fairchild Aircraft Corp., 21 F.3d 721, 728–29 (6th Cir.1994), the GRS and the PFRS argue that expert reports in general may only be admitted into evidence to show the basis for the expert's opinion, "but not as general proof of the underlying matter." Br. in Opp'n at 9. (Dkt. # 6847)

The Court concludes that the motion to exclude the expert's testimony is moot because the expert's testimony is now concluded and the testimony did not address the challenged matter. Accordingly, the Court denies that motion.

The Court further concludes that the motion to exclude the challenged matter from the expert's report should be denied. All of the challenged matter is within Ms. Kopacz's

expertise to investigate and pertinent to her opinion on the feasibility of the plan. Her supplemental report of August 27, 2014, clarifies that she derived her statements regarding these matters from either the disclosure statement (Dkt. # 4391) or the July 18, 2013 declaration of Charles M. Moore. (Dkt. # 13) These are hearsay sources, but under Fed. R. Evid 703, an expert may rely on hearsay. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

While the challenged matter may be of marginal relevance to the greater issues before the Court, its prejudice to the GRS and the PFRS is equally marginal. The Court concludes that there is no cause to exclude it and denies this motion as well.

### 4. The Expert's Standard for Feasibility

Ms. Kopacz began her work by developing and articulating a standard for measuring the feasibility of the City's plan. The Court finds that Ms. Kopacz's articulation is appropriate and adopts it here:

> Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default?

Ex. 12000 at 13. It closely tracks the standard articulated by the Mount Carbon court, set forth above. See Mount Carbon Metro. Dist., 242 B.R. at 35.

Intertwined here are also the questions of whether the City is committed to implement the plan and whether it has sufficient resources to monitor its performance under the plan. The first question requires a review of the testimony of City leaders. *223 The second question requires an examination of the Financial Review Commission and the other controls under Public Acts 181 and 182 of 2014 (hereafter, "Grand Bargain Legislation"), Mich. Comp.

Laws §§ 141.1631–[x]141.1643,[x]117.4s–t, as well as the internal systems created by the Mayor and the City's chief financial officer.

### 5. The City's Plan Is Feasible

The Court finds that the plan is feasible. As detailed below, this finding is based on the testimony and documentary evidence presented by Ms. Kopacz, Trial Tr. Oct. 22, 2014 (Dkt. # 8082), Kevyn Orr, Trial Tr. Oct. 1–3, 2014 (Dkt. 7850, 7878, 7894), and by the following independent professionals that the City retained:

- Gaurav Malhotra of Ernst & Young, Trial Tr. Sept. 29 & Oct. 21, 2014 (Dkt. 7819 and 8098);

- Dr. Robert Cline, formerly of Ernst & Young, Trial Tr. Aug. 18, 2014 (Dkt. # 7015);

- Caroline Sallee of Ernst & Young, Trial Tr. Sept. 8–9, 2014 (Dkt. 7472 and 7473);

- Charles Moore of Conway MacKenzie, Inc., Trial Tr. Sept. 5 & 8, 2014 (Dkt. 7434 and 7462);

- Kenneth Buckfire of Miller Buckfire and Co., Trial Tr. Sept. 30, 2014 (Dkt. # 7821);

- James Doak of Miller Buckfire and Co., Trial Tr. Oct. 3, 2014 (Dkt. # 7894);

- Alan Perry of Milliman, Inc., Trial Tr. Sept. 15–16, 2014 (Dkt. 7617 and 7618);

- Glenn Bowen of Milliman, Inc., Trial Tr. Sept. 15, 2014 (Dkt. # 7617); and

- Gerald Salzman of Desman Associates, Trial Tr. Oct. 21, 2014 (Dkt. # 8098).

This finding is also based on the testimony and documentary evidence presented by the following elected and appointed leadership of the City and the State:

- Michael Duggan, Mayor of the City of Detroit, Trial Tr. Oct. 6, 2014 (Dkt. # 7917);

- Brenda Jones, Detroit City Council President, Trial Tr. Oct. 6, 2014 (Dkt. # 7917);

- John Hill, the City's Chief Financial Officer, Trial Tr. Sept. 4–5, 2014 (Dkt. 7411 and 7434);

- Beth Niblock, the City's Chief Information Officer, Trial Tr. Sept. 8, 2014 (Dkt. # 7462);

- James Craig, Detroit Police Chief, Trial Tr. Sept. 9, 2014 (Dkt. # 7473);

- Edsel Jenkins, Detroit Executive Fire Commissioner, Trial Tr. Sept. 9, 2014 (Dkt. # 7473);

- Sue McCormick, Director of the Detroit Water and Sewerage Department, Trial Tr. Sept. 17, 2014 (Dkt. # 7638); and

- Brom Stibbitz, Senior Policy Advisor for the Michigan Department of Treasury, Trial Tr. Oct. 1, 2014 (Dkt. # 7850).

It is also based on the testimony and documentary evidence presented by:

- Annmarie Erickson, Executive Vice President and Chief Operating Officer of the DIA, Trial Tr. Sept. 18, 2014 (Dkt. # 7634);

- Rip Rapson, President of the Kresge Foundation, Trial Tr. Oct. 2, 2014 (Dkt. # 7878);

- Dan Gilbert, Chairman of Rock Holdings, Trial Tr. Oct. 1, 2014 (Dkt. # 7850); and

- Roger Penske, Chairman of the Penske Corporation, Trial Tr. Oct. 3, 2014 (Dkt. # 7894).

### *224 6. The City's Revenue and Expense Projections

*It is my opinion that, except where otherwise noted in my Report, the projections are generally mathematically correct and materially reasonable and therefore fall within the Feasibility Standard I have defined.*

> *It is my opinion that, except where otherwise noted in my Report, the individual assumptions used to build the projections fall into a reasonable range and, that when taken as a group, these assumptions are also reasonable and fall within the Feasibility Standard.*

Martha Kopacz, Ex. 12000 at 200.

Exhibit 793, to which Mr. Malhotra testified on October 21, 2014, sets forth the City's income and expense projections over ten and forty-year periods of time. *See generally* Trial Tr. 45:16–86:8, Oct. 21, 2014. (Dkt. # 8098)

### a. The City's Ten–Year Revenue Projections

The City projects that it will receive approximately $11.6903 billion in revenue under the plan[19] from FY2014–FY2023. Ex. 793 at 7–8. This total amount includes $11.1815 billion in general fund revenue from the City's eight primary sources:

    1. Municipal income tax;

      2. State revenue sharing payments;

      3. Wagering taxes;

      4. Property taxes;

      5. Utility users' taxes;

      6. Sales and charges for services;

      7. Other revenue, such as permits and parking tickets; and

      8. Normal general fund reimbursements and receipts from enterprise funds.

It also includes $482.9 million in new revenue initiatives to be implemented under the plan and $241.1 million in proceeds from cash loans. *Id.* at 7. The City will also receive $508.8 million in plan-related reimbursements to the general fund from City enterprise funds, including $464.4 million in reimbursements from the DWSD and $44.4 million from other enterprise funds, including the library and parking systems. *Id.* at 7–8.

In addition, the City will receive approximately $404.5 million from the Grand Bargain and the State Contribution Agreement over this ten-year period (and $256.3 million over the next ten-year period from FY2024–FY2033) to be paid to the City's pension plans. *Id.* at 5.

### b. The City's Ten–Year Expense Projections

On the operating expenditures side, the City projects that it will spend a total of $10.3609 billion from FY2014–

FY2023. *Id.* at 7. This amount includes payroll and active employee healthcare and pension contributions (but not the pension underfunding claims), as well as repayment of the cash loans, an annual contingency,[20] several one-time costs of restructuring, and additional operating expenditures associated with the implementation of the **\*225** RRIs. This leaves approximately $1.3294 billion for the City's plan obligations to its creditors from FY2014–FY2023, plus approximately $404.5 million in Grand Bargain and State Contribution Agreement funds for the pension claims, for a total of $1.7339 billion. *Id.* at 7–8.

### c. The City's Forty–Year Revenue Projections

The forty-year revenue projections are grouped by decade and are largely an extension of the ten-year projections. *See, e.g.,* Trial Tr. 62–63, 83, 154, Sept. 29, 2014 (describing previous version of the forty-year projections). (Dkt. # 7819) For the most part, after FY2023 (the end of the first ten-year period) the City's experts applied a flat, positive growth rate for each component of the City's general fund revenue streams and the new general fund revenue initiatives. Ex. 793 at 4 ("Growth after FY23"). Other income components drop off. For example, most of the plan-related DWSD reimbursements to the general fund will end after the first decade. This is because most of the DWSD plan-related reimbursements will be used to satisfy DWSD's portion of the current pension underfunding, which the plan requires DWSD to pay over a ten-year period in annual payments of $45.4 million. Ex. 793 at 8. Also, the City will receive all of the proceeds from the cash loans in the first two decades following the effective date of the plan. *Id.* at 5.

### d. The City's Forty–Year Expense Projections

On the operating expenditures side, the City similarly assumes a flat growth rate in expenditures for employee salary, overtime, and other fringe benefits, as well as for active employee pensions and the additional operating costs arising from the Restructuring and Reinvestment Initiatives. *Id.* at 4: Other operating expenditures have growth assumptions built into the plan. For example, the City projects that it will be required to contribute $2.2 million to the Income Stabilization Fund from FY2024–FY2033. *Id.; see also* Plan, § IV.D.2 at 55–56. (Dkt. # 8045)

### e. The Resulting Forty–Year Projections

The resulting forty-year projections provide as follows:

1) From FY2024–FY2033, the City projects that it will collect $12.2321 billion in revenue and have $10.6993 billion in operating expenditures, leaving $1.5328 billion to satisfy its plan obligations to creditors, plus $256.3 million in Grand Bargain funds for satisfaction of the pension claims, for a total of $1.7891 billion.

2) From FY2034–FY2043, the City projects that it will collect $14.4455 billion and have $13.0563 billion in operating expenditures, leaving $1.3892 billion to satisfy its last remaining plan obligations to creditors.

3) From FY2044–FY2053, the City projects that it will receive $17.3359 billion and have $16.5230 billion in operating expenses, leaving $812.9 million to satisfy its plan obligations to creditors. Ex. 793 at 4–5.

The City began building these projections by constructing a baseline scenario that projects the City's finances in the absence of "the quantitative impacts of the restructuring initiatives, the cancellation of debt, the cash flow ramifications from the alterations in the City's pension plans and OPEB, and other impacts of the bankruptcy proceedings." Ex. 12000 at 32; Trial Tr. 72:13–17, Sept. 29, 2014. (Dkt. # 7819) Building from this baseline projection, the City constructed the projections in Exhibit 793 by taking into account all of these costs and benefits of the plan and the RRIs (hereafter, "Plan Projections"). Ex. *226 12000 at 25–26; Trial Tr. 78:7–15, Sept. 29, 2014. (Dkt. # 7819)

### f. The Expert's Review of the Plan Projections

Ms. Kopacz and her team reviewed the Plan Projections in great detail. They interviewed the City's elected and appointed officials, the emergency manager, many City employees, advisors, creditors, leaders and members of labor unions, as well as representatives of the GRS and the PFRS, the DIA, the Land Bank Authority, and many charitable organizations. *Id.* at 4. They also reviewed thousands of pages of documents that the City and third parties produced. They then "critiqued the methodology used to develop the financial projections, as well as the data and information used as the foundation for the assumptions." *Id.* at 5.

Ms. Kopacz concluded that the projections are "mathematically correct and materially reasonable." *Id.* at 200. She further concluded that "the individual assumptions used to build the projections fall into a reasonable range and, that when taken as a group, these assumptions are also reasonable and fall within the Feasibility Standard." *Id.*

### g. The Revenue in the Plan Projections

On the revenue side, Ms. Kopacz examined Dr. Cline's expert opinion with regard to the City's corporate and individual income taxes and wagering taxes, which are two of the City's largest sources of revenue. Trial Tr. 58–68, Aug. 18, 2014. (Dkt. # 7015) Dr. Cline explained that for income taxes, the Plan Projections are higher than the baseline projections due to "stronger growth in the underlying tax bases." *Id.* at 67. This is a function of more optimistic assumptions about wage and employment growth as the plan is implemented and the economic conditions of the City improve. *Id.* Ms. Kopacz reported that when compared to state and national estimates for wage and employment growth, the City's assumptions are "more conservative." Ex. 12000 at 47. She testified there is a reasonable chance that employment and wages will be higher than projected. Trial Tr. 37:8–11, Oct. 22, 2014. (Dkt. # 8082)

For wagering taxes, Dr. Cline testified that the key factor is the impact of new casinos in Toledo, Ohio, on the gross revenues of the City's casinos. Trial Tr. 75:2–77:25, Aug. 18, 2014. (Dkt. # 7015) As a result, he assumed a negative growth rate for the early years of the projections, but eventually returned to a 1% annual increase. *Id.* at 75:18–76:16; *see also* Ex. 112–C. Ms. Kopacz agreed with Dr. Cline's assessment of the risks, adding that it was completely outside the City's control and that the assumptions adequately took the Toledo casinos into account. Trial Tr. 40, Oct. 22, 2014. (Dkt. # 8082)

Ms. Sallee gave expert testimony with regard to the City's property taxes and state revenue sharing payments. In creating her projections for property tax revenues, Ms. Sallee testified that she assumed the revenue would decrease in the short term as a result of a citywide property reassessment, but that eventually revenues would increase due to improved collections and long-term rebounding property values. Trial Tr. 234, Sept. 8, 2014 (Dkt. # 7472) Ms. Sallee explained that increased collections will result from residents' improved "ability to pay," based on the lower amount of taxes and the

improvements in wage and employment growth that Dr. Cline projected. *Id.*

Ms. Kopacz agreed that it is reasonable to assume that "reduced assessments will result in improved property tax collection rates and, in the longer term, increased property values as **Detroit** becomes a more \*227 desirable location." Ex. 12000 at 59. Ms. Kopacz also testified that she found the City's property tax revenue projections and assumptions to be "conservative," particularly in the later years of the Plan Projections as the City begins to experience the full benefits of the implementation of the RRIs. Trial Tr. 44, Oct. 22, 2014. (Dkt. # 8082)

As for the state revenue sharing payments, Ms. Sallee testified that the City receives two types: 1) constitutional payments, which are calculated as a percentage of the statewide sales tax (15% of the first 4% of sales tax revenues), divided among Michigan municipalities based upon population, and 2) Economic Vitality Incentive Program ("EVIP") payments, which are set forth in the state's annual appropriation legislation and are thus at the discretion of the state legislature. Trial Tr. 241:10–21, 247:3–15, Sept. 8, 2014. (Dkt. # 7472) The legislature distributes the EVIP payments based on a municipality's financial "accountability and transparency," "consolidation of services," and whether it has established a plan to deal with any existing pension underfunding. Ex. 12000 at 51. Ms. Sallee testified that she assumed the constitutional payments would decrease after the next census, in line with Dr. Cline's population decline projections, and that the EVIP payments would remain constant throughout the forecast period. Trial Tr. 250:1–9, 252:14–255:10, Sept. 8, 2014. (Dkt. # 7472)

Ms. Kopacz agreed that these projections were reasonable. In particular, she testified that she finds it "hard to fathom" that the City would not receive the full EVIP payments going forward, "given the capability of the current Mayor and the CFO." Trial Tr. 39:16–18, Oct. 22, 2014. (Dkt. # 8082)

As explained above, although the DWSD operates as an enterprise fund, it is another major source of revenue for plan payments. Exhibit M to the City's Fourth Amended Disclosure Statement (Dkt. # 4391) and Exhibit 178 set forth the City's projections of the DWSD's revenues, operating and legacy expenditures, and capital improvement plan for FY2014–FY2023. Ms. Kopacz expressed skepticism in her original report regarding the feasibility of the DWSD payments under the plan. Ex. 12000 at 196 ("While DWSD's

debt is impacted by the POA, the DWSD operations are not included in the Plan. DWSD does play a significant role in funding the City's pension obligations during the forecast period.").

However, following the Court's approval of the DWSD Bondholders settlement on August 25, 2014 (Dkt. # 7028), Ms. Kopacz testified, "Based on the DWSD settlement [ ], the risk that I had identified with the DWSD contribution to the pension funding is now removed." Trial Tr. 75, Oct. 22, 2014. (Dkt. # 8082) Ms. McCormick also testified that the DWSD will have sufficient resources to make all the necessary capital improvements to infrastructure so that it can continue providing adequate water and sewer services to its customers. Trial Tr. 99:4–100:6, Sept. 17, 2014. (Dkt. # 7638)

The City's parking department is another important source for revenues needed in the plan. [21] James Doak and Gerald Salzman testified about the City's projected parking revenues. *See* Trial Tr. 123–126, Oct. 3, 2014 (Dkt. # 7894); Trial Tr. 9–45, Oct. 21, 2014. (Dkt. # 8098) Mr. Salzman works for Desman, a firm that \*228 designs parking garages and optimizes parking system revenue. City Exhibit 783 reflects Mr. Salzman's projections of the City's parking revenues under four different scenarios—a "status quo" scenario; an "optimized," but still City-run scenario; a "private" investment and development scenario; and a "private upside" scenario, which is identical to the private scenario except that parking rates increase every three years. Ex. 783 at 47, 52.

Mr. Doak testified that the Plan Projections include an assumption that the City's parking revenues will exceed $10 million per year, and that the status quo scenario would not be sufficient. Trial Tr. 130:2–9, Oct. 3, 2014. (Dkt. # 7894) However, he also testified that the City has "the prospective capacity to either run the parking operations more efficiently and more economically generating more cash flow, or seek a private partner" in order to achieve the projected parking revenues in the plan. *Id.* at 130.

Ms. Kopacz further confirmed that the assumptions underlying the plan's parking revenue projections are "by and large ... not significantly different than the historical trend," thus, while there is "some rate increase," and "some increased usage," she explained that "it's not a hockey stick" projection, and she concluded, "from the revenue side, I think they're reasonable." Trial Tr. 20–21, Oct. 22, 2014. (Dkt. # 8082)

### h. The Expenditures, Revenue and Cost Savings Associated with the RRIs

Mr. Moore provided expert testimony regarding the projected expenditures, revenue, and cost savings associated with the implementation of the RRIs. He testified that the projected expenses and gains associated with the RRIs are "reasonable and achievable." *See, e.g.,* Trial Tr. 75, 80–82, 152, Sept. 5, 2014. (Dkt. # 7434) To reduce risk, Mr. Moore and his team at Conway MacKenzie specifically targeted areas with historically high costs and within the City's immediate control. These include labor inefficiencies, high levels of employee downtime and overtime, inefficient processes, ineffective or non-existent management metrics and tools, and improper deployment and use of assets. Ex. 464 at 10–11. In determining which initiatives should be included in the RRIs, the Conway team omitted any initiative that had a high degree of risk in implementation or that was outside the reasonable influence of the City's leadership (for example, an initiative requiring state legislative action). Trial Tr. 74, Sept. 5, 2014. (Dkt. # 7434)

Mr. Orr also testified that the increased revenues and cost savings projections associated with the RRIs are reasonable "and achievable." Trial Tr. 124–25, Oct. 2, 2014. (Dkt. # 7878)

### 7. The City's Obligations to Creditors Under the Plan

> *While my opinion is the Plan of Adjustment remains feasible and there is not yet a 'significant probability of default' as described in the Standard, there is no denying the possibility of default has increased. It is not realistic or prudent to believe that the City could take on any additional Plan obligations and remain within the continuum of reasonableness necessary to establish feasibility.*

Martha Kopacz, Ex. 12002 at 6.

The plan reduces the City's debt burden by over $7 billion. *See, e.g.,* Trial Tr. 70:4–7, Sept. 30, 2014. (Dkt. # 7821) This is a truly remarkable achievement for the City, unprecedented in the history of municipal bankruptcy. However, the Court begins with the statement from Ms. Kopacz above to emphasize the magnitude of debt that **\*229** the City is undertaking and retaining under the plan, particularly in light of the ambitious revitalization plan that the City intends to implement over the next ten years.

### a. The City's Post–Bankruptcy Debt

As Mr. Malhotra testified, and as reflected in Exhibit 791, the City will issue $1.063 billion in new notes under the plan. This amount includes:

1. $55 million in New LTGO Bonds, to be paid on the effective date from a part of the proceeds of the exit financing;

2. $88 million in New C Notes, payable over twelve years at 5%;

3. $288 million in Restructured UTGO Notes, payable over fourteen years, at the various pre-bankruptcy interest rates of between 3.7% and 5.375%; and

4. $632 million in New B Notes, payable over thirty years at 4% for the first twenty years and 6% over the last ten years and interest-only for the first ten years.

*See* Ex. 791; Trial Tr. 63, Oct. 21, 2014. (Dkt. # 8098) In addition, the City is obligated under the plan to pay $2.2 million in cash to class 17, the 36th District Court creditors, and $20 million in cash to cover the VEBA start-up costs. Ex. 793 at 2. These obligations total $1.0852 billion. This is in addition to other debts that the City retains, including debts associated with the DWSD and secured GO bonds. *See* Plan, § II.B.3.a–k at 33–35. (Dkt. # 8145)

The plan also obligates the City to pay $3.795 billion to the GRS and the PFRS on account of the class 10 and 11 pension claims. *Id.* at 3. Of this amount, $661 million will be paid through contributions from the Grand Bargain and the State Contribution Agreement. *Id.*

Finally, the City is required by the Grand Bargain Legislation to maintain a minimum cash balance equal to 5% of annual projected expenditures. Mich. Comp. Laws § 117.4t(1)(c)(vi). Although this is not a debt-service obligation, the Court must nevertheless determine whether it is feasible that this amount will be available after all other plan obligations are satisfied. Because the City's forecasted annual expenditures hover around $1 billion, the minimum cash balance amount is approximately $50 million. City Ex. 793 at 7.

### b. The Cost of Servicing the Post–Bankruptcy Debt

The cost of servicing these obligations and maintaining the minimum cash balance over the same ten and forty-year periods for which the City projected its income and operating expenditures is also reflected in City Exhibit 793, and was testified to by Mr. Malhotra. *See generally* Ex. 793; Trial Tr. Oct. 21, 2014. (Dkt. # 8098)

For the time period FY2014–FY2023, the City will be required to spend $709.5 million to service the notes and satisfy its cash obligations. This amount includes $20 million in cash to the VEBAs, $2.2 million in cash to the 36th District Court creditors in class 17, and $687.3 million payable to service the B Notes. The City will also expend $979.2 million to service its obligations to the GRS and PFRS on account of the UAAL. This totals $1.6887 billion. Ex. 793 at 5.

As discussed above, the City projects that it will have $1.7339 billion available to pay plan-related expenses.

Therefore, after paying its operating expenditures and satisfying its obligations to creditors, the City projects a surplus of $45.2 million. *Id.* When added to the City's then-existing cash balance, the City projects that it will have a cash balance of *230 $81.2 million at the end of FY2023, which is sufficient to meet the requirements of the Grand Bargain Legislation.[22] *Id.* at 8.

For the period FY2024–FY2033, the City will be required to spend $541 million servicing the B Notes, C Notes, and Restructured UTGO Notes. The City projects that it will be required to spend $1.2481 billion to service its obligations to the GRS and PFRS UAAL,[23] for a total of $1.7891 billion. *Id.* at 5. The City projects that it will also have $1.7891 billion for plan-related expenses during that time period. Therefore, the City projects that it will break even at the end of this time period, after paying its operating expenses and satisfying its plan obligations. *Id.* at 4–5. The City also projects that it will be able to maintain the $81.2 million cash balance carried over from the first decade of projections through the end of FY2033. *Id.* at 5. The New C Notes, the New LTGO Bonds, the New UTGO Bonds, and the City's cash obligations to the 36th District Court creditors and the VEBAs are projected to all be satisfied by the end of FY2033. (Ex. 791; Ex. 793 at 5)

For the time period FY2034–FY2043, the City will be required to spend $450.6 million servicing the New B Notes. Ex. 793 at 5. The City projects that it will also be required to contribute $938.5 to the GRS and PFRS UAAL, for a total of $1.3892 billion. *Id.* As detailed above, the City projects that it

will have $1.3892 billion in funds left over after its operating expenses are paid, thus breaking even again for this ten-year period. *Id.* at 4–5. However, again, the City projects that it will be able to maintain the $81.2 million cash balance through the end of FY2043. *Id.* at 5.

Finally, for the time period FY2044–FY2053, the City will be required to spend only $68.9 million to fully satisfy the B Notes. *Id.* The City also projects that it will be required to contribute $628.9 million to complete payment on the pension underfunding, for a total of $697.8 million in plan obligations. *Id.* During this time period, the City projects that it will have $813.0 million in revenue funds after paying its operating expenses, leaving a surplus of $115.2 million. When this surplus is added to the City's projected then-existing cash balance, the City projects it will have an overall cash balance of $196.4 million by the end of FY2053. *Id.*

### c. The City Will Be Able to Service Its Post–Bankruptcy Debt

As Ms. Kopacz's opening cautionary note suggests, and the Court's review of *231 the projections demonstrates, the Plan Projections do not leave much room for error. In two of the four ten-year periods, the City projects that it will only "break even" after paying its operating expenses and its obligations to creditors. *Id.* at 4–5. For the first thirty years of the plan, the City maintains its mandated cash balance only by deferring certain RRIs and selling assets. *Id.* at 10–14.

Nevertheless, as the Court concludes above, the City's projections are reasonable. Ms. Kopacz reported that a number of the assumptions underlying the projections are even "conservative." Ex. 12000 at 200. In addition, as counsel for the City pointed out in closing arguments, a narrow margin of error is to be expected in a broadly consensual plan:

> [T]he fact that the deals that were reached with creditors had the result of leaving the City with just about enough to accomplish its principal objectives through reinvestment and service improvement but did not create an overwhelming margin is the result you should exactly expect from a largely consensual plan. That's how they come out. Every side tries for as

much as they can get and leaves for the other side only what is perceived they need. No one gets extra.

Trial Tr. 130–131, Oct. 27, 2014. (Dkt. # 8156)

Accordingly, the Court concludes that the City is reasonably likely to have a balanced annual operating budget and to satisfy its plan obligations to creditors, while maintaining a cash balance that is sufficient to meet the requirements of the Grand Bargain legislation for the life of the plan.

### 8. The Feasibility of the City's Plan to Address Its Pension Obligations

*The City must be continually mindful that a root cause of the financial troubles it now experiences is the failure to properly address future pension obligations.*
Martha Kopacz, Ex. 12000 at 147.

#### a. The City's Plan Regarding Its Pension Obligations

The plan provides the City with fixed payments toward the pension underfunding for FY2014–FY2023. For the PFRS, 100% of the payments are covered by the funds from the State Contribution Agreement and the Grand Bargain. Ex. 732. For the GRS, which has a larger underfunding claim, the State Contribution Agreement and the Grand Bargain funds cover only 20%. *Id.* The City is obligated to contribute $575 million in cash. However, approximately $428.5 million of that will come from DWSD revenues to cover DWSD's portion of the GRS underfunding liability, and another $31.7 million will come from the UTGO millage, as described in III.K. above. This leaves a balance of $114.6 million. *Id.* Mr. Malhotra testified that $80 million of this $114.6 million will come from the City's general fund and that it is included in the Plan Projections. Trial Tr. 84, Oct. 21, 2014. (Dkt. # 8098) The balance will come from the City's parking and library revenues. *Id.* at 81.

However, at the end of FY2023, the GRS and PFRS will remain significantly underfunded. Using the assumptions from the global pension settlement, including the 6.75% discount rate, the City projects that the PFRS will only achieve 78% funding, leaving a UAAL of $681 million. Ex. 793 at 2. For the GRS, the City projects a 70% funded status by the end of FY2023, leaving a UAAL of $695 million. *Id.*

The City will then amortize the remaining UAAL for both plans over the next thirty years at an interest rate of 6.75%. *Id.* Between FY2024 and FY2033, the City **\*232** will receive an additional $68 million in Grand Bargain proceeds to pay toward the UAAL amortization for PFRS, and $188 million for GRS. The balance of the amortized UAAL will come from the City. *Id.* at 5.

The plan greatly reduces the City's pension obligations, thanks to the State Contribution Agreement, the Grand Bargain funding, and the modification of the City's obligations to its current retirees. The Grand Bargain legislation reflects the State's ability and commitment to make its contribution. *See* Mich. Comp. Laws § 141.1602. Ms. Erickson credibly testified that the DIA has already raised $85 million of the $100 million that it committed, and that she is "completely confident" the DIA will be able to raise the balance. Trial Tr. 117, Sept. 18, 2014. (Dkt. # 7634) Mr. Rapson testified that the Kresge Foundation is fully committed to making its promised $100 million contribution to the Grand Bargain, and furthermore that it "should not eat into the normal investments we would normally make in the City of Detroit." Trial Tr. 202, Oct. 2, 2014. (Dkt. # 7878)

Mr. Orr testified that he has received letters also expressing commitment from representatives of the Ford Foundation, the Kellogg Foundation, the Davidson Foundation, the Erb Family Foundation, the Mott Foundation, the McGregor Fund, the Hudson–Webber Foundation, the Community Foundation for Southeast Michigan, and the Knight Foundation. *See* Ex. 352; Trial Tr. 54, Oct. 2, 2014. (Dkt. # 7878)

#### b. Evaluating the Risks in the City's Plan to Address Its Pension Obligations

However, the risk remains that at the end of FY2023, the UAAL could be much larger than currently projected. Ms. Kopacz testified that the fixed nature of the City's obligations for the next ten years supports the plan's feasibility. Trial Tr. 62, Oct. 22, 2014. (Dkt. # 8082) The primary risk that Ms. Kopacz cites is the City's decision to discount the pension underfunding (and thus reduce all pension contributions) by 6.75%, which is based on the City's assumption that its pension investments will grow at that rate if properly managed. Ex. 12000 at 144–51. Her report stated:

The City's assumption of a 6.75% rate of return implicitly requires the City to accept risk and volatility. Volatility is, of course, a positive and a negative force. At times, the City should be expected to achieve returns above 6.75% and, at times, the City should expect returns below this level. Over the past 10 years, the Retirement Systems have seen significant variations in their investment returns both above and below the average return. Because the City's defined benefit plans [as opposed to the new hybrid pension plans] are essentially in runoff, they will inevitably experience declining asset levels. In this environment of declining assets and volatility, returns over time are not equally weighted.

.... In an environment in which expected returns are low in the short term—as the current low-interest-rate, low-inflation environment may be—funds cannot simply balance low returns in the short term with high returns later; they will need much higher returns later because investible assets will be lower than they otherwise would have been.

*Id.* at 149–50 (footnote omitted).

She echoed this concern in her testimony:

> The concern that I have is that if the City does not monitor the [pension] obligation that is going to be there in 2023 and beyond, ... is that they could wake **\*233** up with a bad nightmare, not unlike what they've been through with the pension systems to get to this point.

Trial Tr. 60, Oct. 22, 2014. (Dkt. # 8082)

The GRS and the PFRS have historically used significantly higher assumed investment rates of return, and thus discount rates, of 7.9 and 8.0%. Ex. 12000 at 127. Nevertheless, Ms. Kopacz stated, "Highlighting that the City's assumptions are low relative to history, a history that got them to this place, ... is not much consolation." *Id.* at 147

The City presented testimony from actuaries to support the assumption that the City's investments will achieve the projected 6.75% growth rate. Glenn Bowen of Milliman testified that the 6.75% rate assumes a lower inflation rate than the vast majority of large public pension plans. Trial Tr. 121, Sept. 15, 2014. (Dkt. # 7617) The City also presented testimony from Alan Perry, another actuary from Milliman, who testified that the 6.75% rate is "at or near the bottom of the assumption that we would see for the largest public [pension] plans." *Id.* at 222:10–15. These two points support a conclusion that the City's assumptions regarding the investment return rate are conservative.

Mr. Bowen also testified that in November 2013, Milliman performed a series of calculations based on the City's asset allocations, and determined that the City could reasonably expect an investment return assumption of at least 7.2%. *Id.* at 91; Ex. 496.

Based on this evidence, the Court concludes that the City's projection of the UAAL for both retirement systems at the end of FY2023, including the 6.75% investment return assumption, is reasonable and supports a finding that the plan is feasible.

### c. Recommendations for Enhanced Disclosures to Reduce the Risk of Unmanageable Pension Obligations

To improve the feasibility of the plan, Ms. Kopacz makes several recommendations to enhance the disclosures in the annual reports of the status of the pension UAAL. In her report, Ms. Kopacz recommends that on an annual basis, the City disclose three funding benchmarks:

> The expected standard deviation of investment returns of the asset portfolio on the report date;
>
> The plan liability and normal cost calculated at the risk-free rate, which estimates the investment risk being taken in the investment earnings assumption; and
>
> A standardized plan contribution for assessing the aggregate risks to the adequacy of the recommended contribution.

Ex. 12000 at 155–56 (citing the Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding," February 2014).

Ms. Kopacz further recommended "that the City disclose the gross liability and the UAAL by year on an undiscounted basis." *Id.* at 156. She explained, "This will allow third parties

a better understanding of the changes in the liabilities from year to year." *Id.*

The Court strongly recommends that the City, the GRS and the PFRS give serious consideration to these additional disclosures. Based on the record, the Court agrees that "[t]imely, accurate financial reporting relating to the City's pension plans will be an essential tool as the retirement systems manage the plans' assets and liabilities and make critical decisions regarding future estimated rates of returns and annual funding requirements." *Id.* at 155.

### *234 9. The City Will Be Able to Sustainably Provide Adequate Services

*The RRIs are one of the positive outcomes of the bankruptcy process. The RRIs provide the backbone of improved services to the citizens of Detroit.*
Martha Kopacz, Ex. 12000 at 207.

The Court has determined the City's financial projections and the assumptions that underlie them are reasonable, including the projected expenditures and increased revenues associated with the RRIs. Therefore, the only remaining feasibility questions are 1) whether the RRIs, if implemented, are reasonably likely to enable the City to sustainably provide adequate services, and 2) whether the City is reasonably likely to be able to implement the RRIs.

Charles Moore is the chief architect of the RRIs. He was qualified as an expert in "advising municipal and corporate entities on organizational turnarounds and restructuring, including operational and financial revitalization." Trial Tr. 75–76, Sept. 5, 2014. (Dkt. # 7434) During his testimony, he explained that the RRIs can be broken down into seven categories:

1. Blight initiatives, which focus on the remediation of primarily residential blight;

2. Public safety initiatives, which focus on police and fire services to improve overall public safety;

3. Resident service initiatives, which focus on departments that primarily interact with residents (such as the Department of Transportation);

4. Business service initiatives, which focus on departments that interact with businesses (such as Buildings, Safety Engineering and Environmental Department);

5. Organizational initiatives, which focus on the departments that serve primarily to support City operations (such as the Finance Department and General Services);

6. Management initiatives, which relate to the mayor's office, city council and the city clerk; and

7. Non-departmental initiatives, which relate to the 36th District Court.

*Id.* at 40–41.

In developing the RRIs, Mr. Moore and his team at Conway MacKenzie reviewed each of the general fund departments and the enterprise funds that impact the general fund. This was done to understand the nature of each department, the services that each provides, and the way in which those services are provided. That information was reviewed against benchmark data to determine the level of deficiency in each department. From there, initiatives for improving the level of services were developed and compiled into the reinvestment plan. *Id.* at 66–67.

This process was conducted from the bottom up, meaning that Conway MacKenzie worked department by department with employees and department heads to develop individual projects and initiatives to address specific service deficiencies. *Id.* at 66. For example, with regard to labor requirements for a given department, it looked at how many employees would be required to complete all necessary tasks, the appropriate pay levels, and the amount of training required. It looked at departmental information technology requirements, the associated costs, and the necessity of outside contractors and consultants. *Id.* at 68–69. Where necessary, it relied on outside experts for additional input. For example, the Tridata Group was consulted as to the fire department, and both the Manhattan Institute and the Bratton Group were consulted as to the *235 police department. Trial Tr. at 69–72, 263–64, Sept. 5, 2014. (Dkt. # 7434)

Mr. Moore testified that in his expert opinion, each specific RRI is necessary and that if successfully implemented, the RRIs will improve City services to an adequate level. *Id.* at 8283. The specific facts supporting these conclusions for the most significant RRIs are summarized below.

### a. The Blight Initiatives

In assessing the scope of the blight problem, Mr. Moore relied, in part, on a report issued by the **Detroit** Blight Removal Task Force in May 2014. *Id.* at 88:7–10. The Task Force was created in September 2013 to focus on reducing or eliminating blight in the City. *See* Ex. 73. The Task Force surveyed over 99% of the City's 380,000 lots and compiled the results in a comprehensive database known as the Motor City Mapping Project. Trial Tr. at 90:5–91:7, Sept. 5, 2014. (Dkt. # 7434) The Task Force identified an estimated 80,000 properties in the City that were either blighted or showing signs of blight. Approximately 30% of residential structures and 30% of commercial structures were blighted. Ex. 464 at 13–14, tables 1a and 1b.

In addition to relying on the Task Force report, Mr. Moore visited multiple blight removal sights, spoke with residents living in areas where blight removal activities were undertaken, met with members of the blight removal task force, and spoke with City personnel involved in blight removal from the planning and development department and the building department. Trial Tr. at 89–90, Sept. 5, 2014. (Dkt. # 7434)

The proposed blight initiatives contemplate $440.3 million in total investment and $72.3 million in revenue initiatives, resulting in net reinvestment of $368 million. *Id.* at 92–93; Ex. 464 at 15, tables 1c and 1d.

This level of investment will not completely eradicate blight in the City. Eliminating all 80,000 properties that are "blighted or showing signs of blight" would cost approximately $850 million. Ex. 464 at 17, table 1e. The initiative is focused primarily on structural blight (buildings) as opposed to non-structural blight (brush and other debris).

There is no direct financial revenue projected from these initiatives. There is, however, indirect benefits from blight removal. These include:

- The improved appearance of the City;

- The stabilization of neighborhoods;

- Reduced migration from the City;

- Increased demand for property;

- Decreased crime;

- Reduction in the number of fires;

- Improved fire rating (which ties to insurance rates);

- Reduced maintenance burden on the City;

- Efficient land utilization;

- More efficient delivery of City services; and

- Enhanced development opportunities.

Ex. 464 at 14–15; Trial Tr. 95–96, Sept. 5, 2014. (Dkt. # 7434)

The City's disclosure statement further states, "In developing its blight removal initiative, the City has taken into account the proposals set forth in the **Detroit** Future City Strategic Framework ... and the City believes that its strategies for blight removal are consistent with the goals set forth in the Strategic Framework." Disc. Stmt. § IX.B.1, at 162. (Dkt. # 4391)

Mr. Rapson testified about the **Detroit** Future City Plan, which was developed primarily by the Kresge Foundation. Trial Tr. 182, Oct. 2, 2014. (Dkt. # 7878) He **\*236** explained that the Blight Task Force is "nested within" the **Detroit** Future City project. *Id.* at 183. More importantly, he testified that incorporating City's blight removal initiative into the highly-developed **Detroit** Future City plan the increases its feasibility. *Id.* at 182 ("[T]he **Detroit** Future City plan is really in many ways the way by which the City will operationalize its approach to blight.").

Finally, the Court finds Mr. Rapson credibly testified that the blight removal initiatives "will help the City return to providing adequate services." *Id.* at 203. He elaborated:

[T]hese investments in City services represent a return to the kind of investments that are going to be necessary for us to make progress on blight remediation and to improve the kind of public services and emergency services that any city depends on for its long-term health.

....

I think they will [ ] help stabilize the environment [so that the City can] build these other investments on top of an environment that is safe and that is not characterized by massive swaths of blighted land, but I think it will also

serve as an accelerant. My sense is that what the plan of adjustment ... does is to really accelerate the kind of progress that we need to make as a community if we're going to return to health....

*Id.* at 203–04.

### b. The Public Safety Initiatives

The public safety initiatives are intended to improve the overall performance of the police and fire departments and to increase safety in the City.

In assessing how well the police department is currently functioning, Mr. Moore relied on numerous reports that have been written about the City, as well as nationwide data sources regarding the effectiveness of police departments (for example, the FBI's uniformed crime reporting statistics). The benchmarking data measures crime rates, case closures and response times. Trial Tr. 97–99, Sept. 5, 2014. (Dkt. # 7434)

The initiatives for the police department contemplate an investment of $339.8 million, cost savings of $87.6 million and revenue initiatives of $32.6 million, for a net reinvestment of about $220 million. *Id.* at 96–98; Ex. 464 at 20, table 2a. The specific investments required for the police department were determined by working closely with Police Chief James Craig as well as the finance and IT departments. Trial Tr. 105–06, Sept. 5, 2014. (Dkt. # 7434)

The $339.8 million in proposed expenditures for the police department include:

1) $175 million in operating expenses. This is primarily to address staffing issues such as shifting 250 uniformed officers who currently perform duties that civilians could perform back to patrol duty and hiring civilians to fill the open positions. This represents about 12% of the police force.

2) $91.3 million in fleet expenditures. More than half of the department's vehicles are over ten years old; this investment will put the fleet replacement cycle at 3 ½ to 4 years, which is not ideal, but is a significant improvement.

3) $38.4 million in technology related expenses. This includes replacing handheld and vehicle radios as well as implementing an integrated police information system. That system allows for sharing information

between precincts, accessing background information on individuals, automating paperwork and improving data access for management.

**\*237** 4) $34.2 million in capital expenditures. This includes funds for improving existing facilities ($24 million for substantial repairs that have been delayed) as well as opening three new precincts ($7 million) and a new training facility ($3 million).

*Id.* at 100–06.

Chief Craig confirmed that these investments will enable the police department to adequately serve the residents of **Detroit**. He described a "plan of action," prepared under his supervision and direction, that is designed to transform the department into a "premier law enforcement agency." *See* Ex. 66; Trial Tr. 108–09, Sept. 9, 2014. (Dkt. # 7473) Chief Craig testified that the plan of action was his way of incorporating the public safety initiatives described in the disclosure statement into the actual day-to-day functioning of the police department. Trial Tr. 109–10, Sept. 9, 2014. (Dkt. # 7473) He testified that the police department's implementation of the plan of action is "roughly 65 percent complete," citing, *inter alia*, an overall crime reduction of 19 percent from 2013, a murder clearance rate of 67% (up from 11% previously), and the successful transition out of an eleven year Department of Justice consent decree. *Id.* at 109–12. He also testified that "in-service training" has increased, and the department has successfully implemented its own "neighborhood police officer initiative," designed to establish relationships between officers and the neighborhoods they protect. *Id.* at 115–16.

Chief Craig also testified that they had recently hired 133 new officers, but that they were only keeping up with attrition. *Id.* at 113. Part of the problem, he explained, is that officers in neighboring cities offer higher pay.

However, several weeks later Mayor Duggan testified that he has made efforts to address this problem. Trial Tr. 82, Oct. 6, 2014. (Dkt. # 7917) He testified that he was able to renegotiate contracts with the police unions in order to give all officers an 8% increase in base pay by reducing annual sick days and by moving 150 uniformed officers out of "non-core" roles, such as traffic enforcement, crime statistics, and prisoner transport, and into patrol positions. *Id.* He testified that the department plans to hire retired officers to fill the non-core positions at a lower hourly wage with no benefits, explaining, "It'll save us a huge amount of money, and when we bring the retired

officers back, we can move the 150 cops back to the street. And with the money we save, we can give [the] officers a base pay increase of eight percent." *Id.* Mayor Duggan testified that these changes will allow the police department "to effectuate the plan ... much more quickly," particularly by "putting officers on the street." *Id.* at 82–83.

In assessing the Fire Department, Mr. Moore looked to the National Fire Protection Association's published standards and concluded that the City is not meeting those standards. The NFPA standard response time for firefighting and EMS is six minutes. The City department's response times were 9 minutes for firefighting and 18 minutes, 20 seconds for EMS. This is due to a lack of resources, both people and equipment. Trial Tr. 107–08, Sept. 5, 2014. (Dkt. # 7434)

The initiatives for the Fire Department contemplate a total investment of $218.9 million, with cost savings of $60.6 million and revenue initiatives of $87 million, for a net reinvestment of $71.3 million. Ex. 464 at 20, table 2a. This includes:

1. $85.3 million in additional operating expenses. This is primarily for hiring additional firefighters. This will be offset by some attrition, as well *238 as increased efficiency as the department moves towards cross-training and cross-utilization of its fire and EMS resources.

2. $58.6 million in fleet expenditures. This anticipates the purchase of about 17 vehicles per year. About 30% of the fleet will be replaced in 2015 and about 12% each year thereafter.

3. $71.3 million in capital expenditures. This addresses repairing or replacing facilities. Many of the older facilities were not built to accommodate modern equipment and must be replaced or upgraded. $30 million is allocated for that. In order to meet NFPA standards regarding response times, some firehouses need to be relocated. $20 million is allocated for equipment replacement.

4. $300,000 to combine firefighting and EMS. Most of this money has already been spent implementing Tridata's recommendations

Trial Tr. 107–11, Sept. 4, 2014. (Dkt. # 7434) *See also* Ex. 464 at 20, 26–28.

Executive Fire Commissioner Edsel Jenkins confirmed Mr. Moore's testimony that the proposed initiatives dedicated to the fire department will enable the department to come into compliance with—or close to compliance with—the NFPA standards. Trial Tr. 53, Sept. 9, 2014. (Dkt. # 7473) He explained that certain kinds of complex, large fires will likely continue to impact the Department's compliance with the NFPA standards. He explained, "[I]f we have all [of] our resources tied up at one or two fires, that's going to leave us really hard-pressed to meet the response times for EMS and fire for regular runs." *Id.* at 88. However, he further explained that the RRIs provide a "great cash injection that the department needs," and that while he could not say the department would be "perfect," he testified, "we'll be very close." *Id.* at 89.

The Court finds that Chief Craig and Commissioner Jenkins are fully committed to and capable of implementing the RRIs in their departments. The Court further finds that if these RRIs are implemented, they will enable the City to provide an adequate level of public safety service that will be sustainable over the long term.

### c. The Organizational Efficiency Initiatives

These initiatives relate to departments that provide support for the City's operations, specifically: the finance department, the general services department, the human resources department, the law department, the office of the auditor general, the department of elections, and the human rights department. Implementation of the RRIs associated with these departments is essential to the City's improvement in its operations and ultimately the services it provides.

The RRIs for organizational efficiency contemplate a total investment of $479.9 million, offset by cost savings of $109 million, and revenue initiatives of $98.2 million, for a net reinvestment of $272.7 million. Ex. 464, at 57–58, tables 5a and 5b. The Court addresses the main components of the organizational efficiency initiatives below.

The income tax division of the finance department is marked for a $12.2 million investment, primarily for the implementation of a tax software program known as "City Tax," which is expected to create cost savings of $10.4 million. Trial Tr. 142, Sept. 5, 2014. (Dkt. # 7434) The City also hopes to increase its income tax revenue by working with the IRS to obtain information on individuals whose federal tax

returns suggest that they should be filing a tax return with the City but who *239 have not done so. *Id.* at 143. Mr. Stibbitz testified that the State is similarly hoping to assist the City in collecting income taxes. He stated, "[W]e've been working on an agreement and building a system, ... through which we could actually collect city income taxes on behalf of the City." Trial Tr. 91, Oct. 1, 2014. (Dkt. # 7850)

Mr. Orr testified that the investments in the income tax division will address another serious problem in the City— people who are trying to pay their municipal income taxes frequently have to wait in line for several hours to make their payments. Trial Tr. 122–23, Oct. 2, 2014. (Dkt. # 7878)

The grants division of the finance department is new and budgeted for a $19 million investment. Trial Tr. 143, Sept. 5, 2014. (Dkt. # 7434) It is responsible for establishing a grants management system. The City gets a fair amount of grant revenue each year, but the money is not properly tracked. HUD and other granting authorities have indicated that without changes, the City is at risk of losing future grants and also possibly having to reimburse grants already received. *Id.* at 143–44. The new initiatives are designed to prevent this from happening. Mr. Hill testified that the City will continue to use an interim grants management program until the City completes all of its planned information technology upgrades. Trial Tr. 87–88, Sept. 4, 2014. (Dkt. # 7411) The expectation is to use the grant management module in the new financial control system once it is fully implemented. *Id.* at 88.

One major area that needs improvement is the human resources department, in which the City plans to invest $40 million. Trial Tr. 152, Sept. 5, 2014. (Dkt. # 7434) Mr. Moore described reinvestment in this department as "another one of those critical elements that underlies all of the reinvestment initiatives." *Id.* The department is understaffed and under-resourced. As a result, it can take the City six months to fill open positions. The plan calls for the City to eventually add over 800 employees. To free that process from the current constraints imposed by the condition of the HR department, the City plans to spend $25 million in additional labor and training, including adding eleven employees dedicated to monitoring the City's compliance with union contracts. *Id.* at 152–56. In addition, the City has hired a new director of human resources, who will start in January 2015. Trial Tr. 71, Oct. 22, 2014. (Dkt. # 8082)

The City plans to direct the bulk of the remaining organizational efficiency investment in the finance

department. The plan calls for a $221.4 million reinvestment in the finance department, $101 million of which will be dedicated toward information technology upgrades, including the implementation of a new enterprise resource planning system ("ERP"), as well as support staff, hardware and software. Trial Tr. 140, Sept. 5, 2014. (Dkt. # 7434) The City also intends to spend $24.9 million on labor, including hiring new employees and budgeting for future training. The City plans to hire nine new people to track, monitor and maintain the implementation of the RRIs citywide. These employees' responsibilities will include "making sure that the City is able to close its books on a monthly basis, perform bank reconciliations, activities that you would expect any accounting and finance area to be able to accomplish." *Id.* at 140–41.

Because these RRIs are fundamental to the success of the plan, the City built flexibility into other RRIs to ensure that the organizational efficiency initiatives would not be deferred. *See* Trial Tr. 71–72, Oct. 21, 2014. (Dkt. # 8098)

*240 Ms. Niblock testified that the IT reinvestment initiatives are reasonable and, when implemented, will address the City's IT deficiencies. Trial Tr. 129, Sept. 8, 2014. (Dkt. # 7472) Mr. Hill will work with Ms. Niblock on the implementation of the finance department's IT upgrades. *Id.* at 130. He testified that they have been working toward implementing best practices over the past several months, so that the finance department will be fully prepared when the new ERP system is implemented. Trial Tr. 172, Sept. 4, 2014. (Dkt. # 7411) To further reduce implementation risk, Mr. Hill explained that the City decided to use one of two cloud-based ERP systems. He testified that the benefit of a cloud-based system is that the responsibility for storage of information is not with the City, so it does not need to allocate assets and resources to data storage and organization. This is done by the cloud servicing company. *Id.* at 171–73.

Mr. Hill testified that the finance department will use the IT upgrades to improve the state of its financial controls systems, its ability to issue periodic accounting statements, and its cash management functions. *Id.* at 84–86.

#### d. The Resident Services Initiatives

The resident services initiatives focus on non-public-safety departments "that have the front facing impact on residents," specifically transportation, ombudsperson, public works

(solid waste), recreation and vital records (health and wellness). Trial Tr. 114, Sept. 5, 2014. (Dkt. # 7434)

The RRIs for resident services contemplate total investment of $170.9 million, with cost savings of $64.7 million and revenue initiatives of $52 million, for a net reinvestment of $54.2 million. The largest expenditures are for transportation and recreation. Ex. 464 at 33, tables 3a and 3b.

First, the City contemplates spending $111 million for the department of transportation ("DDOT"). The number of miles serviced by DDOT has declined significantly over the past five years, from sixteen million miles annually in 2009 to twelve million miles today. Trial Tr. 115, Sept. 5, 2014. (Dkt. # 7434) Mayor Duggan intends to restore service back to 2009 levels by the end of fiscal year 2023. This means DDOT will need between 225 and 230 buses for peak afternoon times. Presently, DDOT only has about 190 functioning buses. *Id.* at 115–16.

To address these problems, the $111 million in proposed expenditures includes $101 million in additional operating expenses (fuel, maintenance, parts, supplies, additional drivers, cameras and security personnel) and $10.3 million in capital expenditures for facility improvements. *Id.* at 117–18.

Mayor Duggan's testimony supports the feasibility of the City's plan to improve its transportation services. He testified that the City is set to receive fifty new buses in early 2015. Trial Tr. 89, Oct. 6, 2014. (Dkt. # 7917)

The bulk of the remaining resident services investments relate to the reopening of the City's parks. Under the plan, the City will invest $37.8 million to reopen 180 of the City's closed parks. Trial Tr. 122, Sept. 5, 2014. (Dkt. # 7434) Mayor Duggan testified that churches and business people have come together to sponsor parks that were not covered by the reinvestments in the plan. As a result, the City plans to reopen all 275 of its parks. Trial Tr. 89, Oct. 6, 2014. (Dkt. # 7917)

### e. The Business Services Initiatives

The business services initiatives relate to the City departments that primarily interact with businesses, including the department of planning and development, and the buildings, safety engineering and *241 environmental department (BSEED). These initiatives also cover reinvestment in

the Coleman A. Young Municipal Airport, the parking department, the board of zoning appeals and the department of administrative hearings. These departments address overall planning for the City, licensing and permits for businesses, and monitoring how businesses operate within the City. Trial Tr. 124–25, Sept. 5, 2014. (Dkt. # 7434)

The RRIs for business services contemplate $51.4 million in investment offset by cost savings of $24.3 million and revenue initiatives of $61.9 million. Thus, these initiatives are a net gain for the City. Ex. 464 at 43, tables 4a and 4b.

First, to reduce redundancies, the City planning commission will be combined with the City's department of planning and development. The City plans to spend $22.5 million on this department, offset by $1.9 million in cost savings. The most important component of the City planning commission initiatives is $11 million directed toward the creation of a new master plan for development in the City, which will include provisions for tracking blight removal efforts and facility location planning for the fire and police departments. Trial Tr. 125–26, Sept. 5, 2014. (Dkt. # 7434)

The City also plans to invest $20 million in the airport so that it can remain in compliance with federal guidelines and maintain its operating certificate. A portion of this amount will go toward developing a long-term plan for the airport and the remaining $15.7 million will be dedicated to facility updates. *Id.* at 127–28.

For the municipal parking department, in addition to the Desman improvements addressed above, the City plans to spend $8.2 million to improve the condition of City-owned impound lots, parking meters, and the department's vehicles. *Id.* at 128.

The Court concludes that the overall effect of these RRIs, and others not discussed here but detailed in the disclosure statement, will enable the City to sustainably provide adequate public services.

### 10. The City's Commitment to Implement the Plan

*I can say, unequivocally, that without the positive and capable leadership of Mayor Duggan and the constructive relationship between the City Council and the Mayor, I would be unable to opine that the plan, as currently proposed, is feasible. The near term future will require*

*course adjustments as undoubtedly revenues and expenses will vary from projections and unforeseen events will demand changes in plan. The democratic system has put in plan individuals who, at least for the next three years, can choose to continue the positive course for the City. I believe they will do so.*

Martha Kopacz, Ex. 12000 at 29.

Having concluded that the RRIs are likely to restore services, the Court will now address whether the City is likely to implement the RRIs. Mr. Orr testified that as his tenure as Emergency Manager draws to a close, he is confident the City will be able to implement the RRIs and sustain them over the long term:

First, the mayor and the city council have shown me since the time I've been here in the last nine months that they are working hard. We started out a little rough, and there was some concern, but we've managed to work together and push some of these reforms through. And they're working together ... to move the City forward.

Secondly, there's going to be a level of oversight in place with the Financial Review Commission, which is modeled on other commissions, the MAC, the DC Control Board, others. That commission *242 is designed to be a robust commission to make sure after all this effort and work that the City keeps fidelity with the plan going forward.

Third, my sense is at city hall there's a very high degree of sensitivity and concern that the eyes of the county, if not ... the world, are on them; that they have an obligation to this Court; that they recognize we're in a federal process, and this is going to be ordered. I certainly have emphasized that to them. And ... my impression is they feel very sincerely that they have an obligation to make this work.

Trial Tr. 123–24, Oct. 2, 2014. (Dkt. # 7878)

Mayor Duggan testified credibly that the City is committed to implementing the RRIs, and that he has already developed effective methods of tracking progress on the improvement of city services. Trial Tr. 84–88, Oct. 6, 2014. (Dkt. # 7917) He testified that the City is "probably about ten percent of where we need to be" in terms of providing adequate city services, but that under the plan and the RRIs, "we're building in the right order," meaning the RRIs are properly prioritized to enable the City to maintain financial stability as it works to improve services. *Id.* at 96–97. He testified, "[I]t's going to be a multi-year process before the people of the city get the kind of services that people in a major city deserve, but it's getting

a little bit closer every month." *Id.* at 97. For example, he testified that the City has seen 20,000 new LED street lights installed since January. *Id.* at 88.

Mayor Duggan further testified that he believes the City will be able to attract and train a sufficient number of qualified employees to fill the positions needed for implementation of the RRIs. He described a job fair in March of 2014, at which the City recruited bus drivers, bus mechanics, police officers and firefighters. *Id.* at 135. He testified that the City received hundreds of applications for every open position. *Id.* at 135.

He also enthusiastically testified that the City plans to invest $15 million in training City employees to use "lean processes," or methods designed to achieve maximum efficiency. Mayor Duggan first began using this type of training while working as the Director of the Detroit Medical Center, and testified that it was "very successful." *Id.* at 69, 95–96. He testified that he identified eighteen of the "most screwed up processes in the City of Detroit," and used a combination of outside "lean process" experts and City employees to develop ways to improve them. *Id.* at 95–96. He continued:

I went to the meetings [related to lean process implementation] ... and it's great to hear our employees reporting out on what they've done.... And we're going to continue to do this over and over until we get 400, 500 employees lean certified so that any employee can participate in a process to make their department more efficient.

*Id.* at 96.

City Council President Brenda Jones reiterated that the City is committed to implementing the plan. Trial Tr. 58, Oct. 6, 2014. (Dkt. # 7917) She characterized the RRIs as "help[ing] the City restructure so that the citizens can receive adequate services," and testified that the level of service the City is currently providing its citizens is "improving." *Id.* at 17, 2122. To make sure the RRIs are fully carried out, she testified:

[The City Council] will work as a team with the mayor collaboratively and the

departments collaboratively to make sure that the services are improving and are adequate for the citizens in the City of **Detroit**. We will do our part with **\*243** contracts and with the budget to ensure that the dollars that are being reinvested into the City will be spend where they should be spent.

*Id.* at 26.

Ms. Kopacz testified that the Mayor's decision to hire Mr. Hill as the CFO also supports feasibility, as does his decision to hire Ms. Niblock as the new CIO. Trial Tr. 53–54, Oct. 22, 2012. (Dkt. # 8082) She also testified that the Mayor has hired a "top notch" head of HR, who will start in January, as well as a new deputy mayor for economic policy. *Id.* The new deputy mayor for economic policy will focus on ensuring the City is achieving the plan's revenue projections. *Id.* Regarding the City's middle management, Ms. Kopacz testified, "I think there is a genuine desire to right the ship, to help the City prosper." *Id.* at 70.

One of Ms. Kopacz's early concerns about the feasibility of the plan was that the City had not made sufficient efforts to harmonize the Plan Projections with the City's budgets and its finances more generally. Ex. 12000 at 25–29. Mayor Duggan testified that the City began addressing this concern on April 17, 2014, when he became aware that the Court required his input on whether the plan is feasible. Trial Tr. 99, Oct. 6, 2014. (Dkt. # 7917) He testified:

> After the Court indicated that it expected me to testify as to whether I thought [the plan] was feasible, the relationship between the emergency manager and me changed dramatically. The inclusion in analysis in the operations changed. But what I did immediately was this went from some theoretical document the emergency manager was preparing to the blueprint that we were going to have to operate on.... And I wanted to validate every number in here and every risk so that I could be comfortable in my own mind either saying to the Court I

believe it was feasible or I did not. And so I put out a directive to each department head to first give me a preliminary analysis of how feasible they thought [the RRIs] were, and then over a six-week period from late May to early July I spent hours with the different departments—most of them came back two and three times until I was satisfied.

*Id.* at 100–01.

Another one of Ms. Kopacz's early concerns was the City's ability to monitor plan compliance.

The record establishes that the City will have adequate resources to monitor compliance with the plan. In addition to the initiatives in the finance department, Mr. Orr testified that the investments in the human resources department will allow the City to continue to monitor its progress and compliance with the plan throughout all of the City's departments:

> So a particular component is that the City be able to [ ] assess, train, and gauge the efficacy of a particular job or function so that we can measure whether we're meeting the RRIs, and [the HR-related RRIs] are designed to put those types of systems in place throughout the City's roughly ... 28 departments.

Trial Tr. 122, Oct. 2, 2014. (Dkt. # 7878)

The City also plans to invest $15 million to implement a "311 system" to allow residents to report issues to the City and for the City to track resolution of those issues. *See* Trial Tr. 112, Sept. 8, 2014. (Dkt. # 7472)

Most importantly, Mr. Hill testified that the City now has "budget strings" to prevent City employees from spending money without a specific provision covering the expense in the budget. He testified, "[T]he City cannot spent money and pay **\*244** for things unless they have a budget string." Trial Tr. 103, Sept. 4, 2014. (Dkt. # 7411)

Finally, in addition to these systems of internal control, the Court finds that the Grand Bargain Legislation enhances the feasibility of the plan. As Ms. Kopacz testified, "The existence of the Financial Review Commission, the oversight commission, I think is a very positive qualitative factor in ensuring that the City conducts itself in a way that—that ensures or helps to ensure that the—commitments of the plan are going to be met." Trial Tr. 69, Oct. 22, 2014. (Dkt. # 8082)

The Grand Bargain Legislation establishes a nine-member Financial Review Commission, comprised of the state treasurer, the director of the department of technology, management, and budgeting, three members appointed by the governor, the mayor (or a designee of the mayor), two members chosen by the governor from nominations by the Speaker of the House and the Senate Majority Leader, and the president of the city council (or a designee). *See* ⌐Mich. Comp. Laws § 141.1635.

The statute provides for wide-ranging oversight of the City's finances and, more specifically, of the City's compliance with the plan. *See* ⌐Mich. Comp. Laws §§ 141.1636 and ⌐141.1637. One significant responsibility of the commission is to review the City's 4-year financial plans required by § 117.4t of the Home Rule City Act. The commission may require modifications to the plan where necessary. ⌐Mich. Comp. Laws § 141.1636(4). The commission is also empowered to review and approve the City's collective bargaining agreements and to "review, modify, and approve proposed and amended operational budgets." ⌐*Id.* at §§ 141.1636(9) and ⌐141.1637(c).

### 11. Final Thoughts and Recommendations on Feasibility

For the foregoing reasons, the Court concludes that the plan is feasible, as required by § 943(b)(7). Specifically, the Court finds it is likely that the City will be able to sustainably provide basic municipal services to the citizens of **Detroit** and to meet the obligations contemplated in the plan without the significant probability of default.

Nevertheless, significant risks remain. Most are beyond the City's control, but the Court recommends certain actions to the City and other stakeholders to improve the feasibility of the plan—from both a qualitative and quantitative perspective.

While remaining cautious due to the limitations on the Court's authority imposed by §§ 903 and 904, and the Tenth Amendment of the United States Constitution, the Court feels a duty to make these recommendations because of the unique position that the Court has held in this case over the past eighteen months.

The Court first appeals to the City's labor unions and retiree associations. In his closing argument, counsel for the City perceptively asserted that the goal of protecting municipal pensions in this City and in this country requires these parties to enhance their vigilance of municipal pension funding. Trial Tr. 32–33, 134, Oct. 27, 2014. (Dkt. # 8156) The Court agrees. The Court would only additionally ask these parties to consider whether this goal of protecting municipal pensions in the City and indeed the broader goal of revitalizing the City suggests that they should take a longer-term and broader view of the best interests of their members and retirees.

The second recommendation is to the State. The Revised Municipal Finance Act unequivocally states that the Michigan **\*245** department of treasury is "directed to protect the credit of this state and its municipalities." Mich. Comp. Laws § 141.2201. The argument is powerful that this provision of State law, together with the constitutional protections of pensions, requires the State to take full responsibility to vigorously supervise and regulate its municipalities to assure adequate pension funding. The municipal employees and retirees of this City and State need and deserve the State's robust commitment to that obligation.

The Court has found that the State Contribution of $194.8 million in exchange for a release of liability on the pensioners' constitutional claims is a reasonable settlement. *See* part III.E.3. History will judge the correctness of this finding. It will judge that this finding was correct only if what happened here in **Detroit** never happens again. The State can sustain that finding in history only by fulfilling its constitutional, legal, and moral obligations to assure that the municipalities in this state adequately fund their pension obligations. If the State fails, history will judge that this Court's approval of that settlement was a massive mistake.

However, the City's labor and retiree associations and the State can effectively carry out their responsibilities only if the City provides them with adequate accurate financial information. It is unrealistic and wasteful for these entities to replicate all of the City's accounting functions. Rather, the

City must provide the State, labor unions, and the public with the information they need.

Therefore, in addition to the requirements imposed by the Grand Bargain Legislation, the Court recommends that the City adopt the annual reporting requirements that Ms. Kopacz advocates in her expert report, discussed in part X.D.8.

### E. Each of the Claims in Each Class Is Substantially Similar to the Other Claims in the Class, As Required by § 1122(a)

#### 1. The Applicable Law

**[28]** **[29]** Section 1122 sets forth the basic rule governing the classification of claims and interests. With the exception of "convenience classes" of unsecured claims, the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class. 11 U.S.C. § 1122(a). To be "substantially similar" for purposes of § 1122, "claims need not be identical ... [a]nd there is certainly no requirement that claims be classified according to their values." *In re Dow Corning Corp.*, 244 B.R. 634, 655 (Bankr.E.D.Mich.1999) (citations omitted), *aff'd,* 255 B.R. 445 (E.D.Mich.2000), *aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648 (6th Cir.2002). Under that section, "claims will be substantially similar if they are similar in legal nature or character." 244 B.R. at 655.

**[30]** The bankruptcy code does not require the converse, that all similar claims be placed in one class. *In re Dow Corning Corp.,* 280 F.3d at 661 ("Section 1122(a) does not demand that all similar claims be in the same class.").

The Sixth Circuit has stated, "the bankruptcy court has substantial discretion to place similar claims in different classes.... Congress incorporated into section 1122 ... broad discretion to determine proper classification according to the factual circumstances of each individual case." *Id.* (citations and quotation marks omitted).

**[31]** "A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the *246 classification scheme, and the claims or interests within each particular class are substantially similar." *In re Eagle–Picher Indus., Inc.,* 203 B.R. 256, 270 (S.D.Ohio 1996).

**[32]** A plan proponent must not separately classify substantially similar claims solely to gerrymander favorable votes. As explained by the Sixth Circuit:

> [T]here must be some limit on a debtor's power to classify creditors in such a manner.... Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 586 (6th Cir.1986) (footnote omitted). *See also Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274, 1279 (5th Cir.1991) (Under § 1122 of the bankruptcy code, "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.").

Upon a review of the classes in the plan, the Court finds that all of the claims in each class are similar and that therefore the plan complies with § 1122(a).

#### 2. Creditors' Objections to Classification Are Overruled

**[33]** Certain individual objectors argue that the plan's classification scheme improperly gerrymanders class 10 (PFRS pension claims) by including both impaired and unimpaired claims in the class. They assert that certain retirees holding PFRS pension claims are essentially unimpaired under the plan because: (a) the impairment of class 10 claims arises solely from the elimination of future, not existing, claims to COLA adjustments, and (b) some retirees with claims in class 10 have no imminent likelihood of receiving COLA benefits regardless of whether the plan is confirmed. *See* Obj. of William Ochadleus, *et. al.* (Dkt. # 5788); Obj. of Jamie S. Fields (Dkt. # 4404).

demonstrates that the City has treated its creditors fairly in seeking confirmation of its plan. It is also strong evidence that the City's detailed financial projections support its reasonable expectation that the plan is feasible in the long term.

The City has proven through witness after witness that upon confirmation, it intends to implement its plan. The City has also proven its commitment and ability to begin the challenging process of revitalization.

The Court is compelled, however, to expand upon its conclusion that the plan is designed to achieve the objectives and purposes of chapter 9.

### 3. The City's Long–Term Solvency

Over the course of this case, many creditors, including retirees, have challenged the City's good faith in allocating as much as $1.7 billion toward its RRIs while not satisfying all of its financial obligations to its creditors.

The Court rejects this challenge. The vast majority of the $1.7 billion for the RRIs comes from improved efficiency of City operations, new revenue initiatives and the exit financing. More importantly, however, the plan is designed so that the City's creditors will share in any potential financial upside realized from the RRIs. This upside is in the form of reduced risk that the City will default on its financial obligations in the future. In turn, this should result in enhanced market values for the notes that the City is distributing in satisfaction of many of the creditors' claims.

Charles Moore, the chief architect of the RRIs, testified that the "ultimate goal" of the RRIs is "really stability within the City, stability of the population base and providing a platform so that both resident population as well as business growth can occur." Trial Tr. 42, Sept. 5, 2014. (Dkt. # 7434)

Particularly significant here is the testimony of Ron Bloom, the head of the financial advisory team for the retiree committee. Regarding the City's good faith, he testified:

> What I'm trying to convey is that we saw the City taking a fresh start to how it dealt with long-seated problems, to be honest about them, and some of that came back on us in a bad way

> because we had substantial reductions in benefits that we'd been promised, and we didn't like that.... *But I think one of the things the City persuaded us over the course of the case was [that] they were sincere ... we didn't like what they had to say often, but we felt that their commitment to revitalization was sincere. And when we saw evidence of that ... for instance how they were treating the active workers, that was to us a positive sign that our long-term interest was going to be served and the revised promises we got would eventually be honored.*

Trial Tr. 26, Sept. 17, 2014 (emphasis added). (Dkt. # 7638)

Mr. Bloom testified that the retiree committee realized early on that because a one-time "payout" for the retirement plans was simply not feasible, the City would have to pay the retirees' claims over a long period of time. Mr. Bloom added that without some major (and potentially very expensive) improvements in City operations to slow the long-term decline in the City, the committee's constituents would face a huge risk that the City would not be able to honor even its revised, reduced promises in the long term. *Id.* at 20–21.

The Court notes that the same observation holds true for virtually all of the City's creditors.

**\*250** The Court finds that the City's plan, particularly the RRIs and the settlements, demonstrates a good faith effort to achieve the purposes of chapter 9.

### 4. Federalism Considerations in the Court's Good Faith Analysis

The Court here addresses some findings that Ms. Kopacz made and clarifies the Court's own role in the City's bankruptcy case. Ms. Kopacz wrote in her first report, "This bankruptcy has been largely focused on deleveraging the City, often to the exclusion of fixing the City's broken operations." Ex. 12000 at 23. She further testified:

> The speed of this proceeding has been a two-edged sword. And the good side of that is that ... in a little bit over a year



the City will have gone through a massive restructuring process.

And [the City] will have significantly de-levered its balance sheet. So going from in excess of $10 [billion] down to ... less than $4 [billion] is a huge de-levering of the City and that's a really good thing.

But because the focus has been on that de-levering and the speed [of] getting that done, there has not been until recently as much energy put into restructuring the operations of the City.... So fundamentally the City operationally was broken. And that's evident.... I believe you said it's service delivery insolvent, right?

... I believe the Emergency Manager had to pick one of two options. And, the focus was on de-levering, not fixing the operations. So ... the speed cut against what are necessary long term things that will now have to be accomplished outside of the bankruptcy which could be more difficult to accomplish ... than in the bankruptcy under the power of the Emergency Manager.

Trial Tr. 25–26, Oct. 22, 2014. (Dkt. # 8082)

The Court agrees with Ms. Kopacz that the City's focus on debt has created challenges, as has the expedited pace that this Court imposed on this bankruptcy. However, the Court finds this path is entirely consistent with the limitations of federalism that the Tenth Amendment of the United States Constitution imposes and that §§ 903 and 904 manifest.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

Consistent with (or perhaps required by) that amendment, § 903 provides that chapter 9 "does not limit or impair the power of a State to control, by legislation or otherwise, a municipality ... in the exercise of the political or governmental powers of such municipality[.]" 11 U.S.C. § 903. Whether for clarity or emphasis, § 904 underscores that restriction on this Court's authority by providing, "Notwithstanding any power of the court, ... the court may not ... interfere with" a chapter 9 debtor's property, revenue, or use thereof, or with any of its "political or governmental powers." 11 U.S.C. § 904.

Unlike chapter 11, chapter 9 requires that the debtor municipality establish that it is "insolvent" before it can

receive the protection of the bankruptcy court. 🔲 11 U.S.C. § 109(c)(3). The court in *In re Mount Carbon* astutely observed the significance of this distinction in identifying the purpose of chapter 9:

> Consistent with the concept of limited federal jurisdiction over governmental entities created by state law, the insolvency requirement limits eligibility under Chapter 9. It also suggests that Chapter 9 is a means to remedy insolvency, *251 unlike Chapter 11 which can be used by a solvent entity to restructure its affairs for business purposes.

🔲 242 B.R. at 33.

The Court finds that the City's plan, the manner in which the City has prosecuted this bankruptcy case and assembled the plan, and the speed that the Court has imposed on the case have been entirely consistent with the constitutional and statutory limitations on this Court's authority and the policy underlying chapter 9. Properly, the focus has been on de-leveraging the City to the extent negotiated and allowed by law, and restructuring the City's remaining debt so that the City's remaining obligations are more predictable and manageable. The focus has also been on setting the City on a path to recovery. Under the Tenth Amendment, however, it is for the City, not this Court, to supervise the execution of that recovery. Accordingly, the City's plan represents a good faith acknowledgement of the demands of the United States Constitution and of the needs of democracy.

As Ms. Kopacz also testified, "[T]he debt that the City is taking on as part of the restructuring [has] enabled it to resolve its bad borrowing practices and bad financial decisions of the past.... It is a debt level that the City can manage." Trial Tr. 24, Oct. 22, 2014. (Dkt. # 8082) She also testified, "[T]he good news is that some of the [City's expenses] as a result of the restructuring have been fixed at reasonable levels going forward, i.e., pension [s]." *Id.* at 48

Ms. Kopacz's report and testimony are irrefutable proof that the City's plan was filed to achieve a result consistent with the objectives and purposes of chapter 9—to adjust the City's

debts so that it can reinvest in itself, address its operational problems, recover its ability to provide adequate municipal services, and maintain long-term solvency.

For these reasons, the Court finds that the City proposed its plan in good faith, as required by ⊡§ 1129(a)(3).

### G. The City Has Complied with the Applicable Provisions of the Bankruptcy Code, As Required by ⊡§ 1129(a)(2)

[41] ⊡Section 1129(a)(2) requires, "The proponent of the plan complies with the applicable provisions of this title." ⊡11 U.S.C. § 1129(a)(2). "The principal purpose of ⊡section 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the plan." *In re Trans World Airlines. Inc.*, 185 B.R. 302, 313 (Bankr.E.D.Mo.1995); *see also* ⊡*In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir.2000); ⊡*In re G–I Holdings Inc.*, 420 B.R. 216, 262 (D.N.J.2009); ⊡*In re Texaco Inc.*, 84 B.R. 893, 906–7 (Bankr.S.D.N.Y.1988); ⊡*In re Butler,* 42 B.R. 777, 782(Bankr.E.D.Ark.1984); ⊡*In re Toy & Sports Warehouse, Inc..* 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984).

The City has complied with the requirements of § 1125 in the solicitation of acceptances to the plan. That section requires:

> (b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information[.]

11 U.S.C. § 1125(b).

On May 5, 2014, the Court entered an order approving the City's fourth amended **\*252** disclosure statement. (Dkt. # 4401) Nothing in the record suggests, and no party argues, that the City solicited acceptances before that approval. That is all that § 1125(b) and ⊡1129(a)(2) require. *In re Connector 2000 Ass'n, Inc.,* 447 B.R. 752, 763 (Bankr.D.S.C.2011).

Two issues, however, do require further discussion. The first is whether the ASF interest rate was properly disclosed. The second is whether a new disclosure statement and new balloting was required for any of the amended plans that the City filed after the balloting was underway or completed.

### 1. The ASF Interest Rate Disclosure Issue

[42] Several objecting parties have argued that the City did not adequately disclose the terms of the ASF recoupment because it failed to disclose that the amortization of the ASF recoupment amount over each creditor's life expectancy would include interest at 6.75%.

Under § 1125(a)(1), the issue is whether the disclosure statement and the accompanying materials were "in sufficient detail" that would enable a creditor in class 11 "to make an informed judgment about the plan."

The detail that the City did disclose on this point was an individualized calculation of the monthly ASF recoupment amount for each affected creditor in class 11. This amount included the interest but the disclosure did not separately identify the interest rate or the dollar amount of the interest.

Nevertheless, the Court finds that the City's disclosure would enable an employee or retiree in class 11 to make an informed judgment about the plan. The disclosure statement would have been more complete if it had included the dollar amount of the interest and the rate of interest, but that is not the test. Every disclosure statement can always include more information. The only issue is whether the information that was disclosed was sufficient for creditors in class 11 to make an informed judgment about the plan.

In the Court's experience, two facts were most important to these creditors in making an informed judgment about whether to accept the amount of the ASF recoupment that

the plan proposes and therefore whether to accept the plan. The first fact is the actual dollar impact of ASF recoupment that the creditor would repay. The second fact is how long the ASF recoupment payments would last. As noted, the City did disclose to each class 11 creditor the full dollar amount of the ASF recoupment, including interest, and the time period of the recoupment.

Another factor fully persuades the Court that disclosure of the interest rate and amount was not necessary under § 1125(a)(1). A diverse group of attorneys reviewed the City's proposed disclosures on the ASF recoupment before the Court approved them. This group included attorneys for the City, the retiree committee, the two pension plans, and the several retiree associations. Apparently, none of those attorneys considered that disclosing the interest rate or amount was necessary to comply with § 1125. That is important here because those representatives, especially those on the creditor side, were the closest to the creditors in class 11 and therefore were in the best position to judge whether the City's disclosure statement was adequate under § 1125. Significantly, none of those representative groups or their representatives opposed confirmation on this ground.

Accordingly, the Court concludes that the City's disclosures of the ASF recoupment settlement did meet the disclosure requirements of § 1125. The Court overrules **\*253** this objection and finds that the City complied with § 1125, as required by ⊡§ 1129(a)(2).

### 2. Successive Plan Modifications Did Not Require Re–Solicitation of Ballots

[43]   The City modified the plan several times after the Court approved the disclosure statement and the City served it on creditors, and even after the deadlines to vote had passed. Section 942 permits this, stating, "The debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of this chapter. After the debtor files a modification, the plan as modified becomes the plan." 11 U.S.C. § 942.

Bankruptcy rule 3019(a) identifies the circumstances in which a plan modification requires a new solicitation of ballots:

In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

The Court finds that none of the modifications in any of the successive amended plans adversely changed the treatment of any claims. As noted in part II.A. above, the City modified its plan to incorporate creditor settlements that in each case, maintained or improved the treatment of claims or otherwise clarified various plan provisions. Accordingly, the Court concludes that the City was not required to re-solicit ballots after the initial solicitation.

### H. The Plan Does Not Discriminate Unfairly Against Dissenting Classes 14 and 15, As Required by ⊡§ 1129(b)(1)

[44]   As noted, two classes of claims voted to reject the plan. These are class 14, consisting of the other unsecured claims, and class 15, consisting of the convenience claims under $25,000. ⊡Section 1129(b) allows the Court to confirm the City's plan despite those dissenting class votes if, with respect to those dissenting classes, "the plan does not discriminate unfairly, and is fair and equitable."

The Court will first address the unfair discrimination test. In doing so, the Court will first identify the discrimination against the classes of other unsecured claims and convenience