Financing[19] and the projected structural surplus in the POA projections; that is: the projected revenues must exceed the projected expenses of the City for the foreseeable future. It is important that readers of the POA understand there is no cash in a bank account to fund the RRIs. The cash for the investments will come from the Mayor and the departmental leaders delivering services as economically and efficiently as the POA forecasts.


Outside Factors of Influence

I can say, unequivocally, that without the positive and capable leadership of Mayor Duggan and the constructive relationship between the City Council and the Mayor, I would be unable to opine that the plan, as currently proposed, is feasible. The near term future will require course adjustments as undoubtedly revenues and expenses will vary from projections and unforeseen events will demand changes in plans. The democratic system has put in place individuals who, at least for the next three years, can choose to continue the positive course for the City. I believe they will do so.

---

[19] The City's investment banker, Miller Buckfire & Co. has prepared solicitation materials as is the process of sourcing this financing.

29

Court's Ex 12000-029

Southeast Michiganders and Detroiters are extensively engaged in civic and charitable pursuits that benefit the revitalization of Detroit. While detractors cite crime rates and nonfunctioning public works, there are a similar group of enthusiastic, impassioned supporters of Detroit's bright future. Two tangible examples are the Detroit Future City plan and the Blight Task Force report. Each of these privately funded efforts resulted in professionally stellar frameworks that current and future elected officials should consider as components of Detroit's master plan. I find it encouraging that there are the underpinnings of business plans for the City which can be blended with financial plans to improve the prospects of success.

In addition, the level of private funds invested in Detroit annually is significant. During my interviews, one executive estimated that private foundations, collectively, spend between $150-$200 million annually on "public" works to support investments in the safety, health and welfare and economic development within the City of Detroit. This level of funding is significant to the overall revitalization efforts outlined in the POA.

Court's Ex 12000-030

## Section E - City of Detroit Financial Forecast Summary

Introduction

The City's Plan of Adjustment incorporates multiple, interrelated financial forecasts that must be individually and collectively evaluated in order to fully understand how the City intends to operate after a confirmation of the Plan of Adjustment. These forecasts, which vary in both duration and intended scope, emanated from the various City professional advisors and their original responsibilities. To fully appreciate the operating plan for the City, Phoenix has reviewed each of the financial forecasts and has worked with the City and its professionals to understand how each of these documents bridge to one another.

The Plan of Adjustment's financial forecasts are as follows:

1. Plan of Adjustment – Ten Year Financial Projections (the "10 Yr Plan"),

2. Plan of Adjustment – Forty Year Financial Projections (the "40 Yr Plan")

3. Plan of Adjustment – Restructuring and Reinvestment Initiatives (the "RRIs")

4. City of Detroit – Triennial Executive Budget ("City Budget")

31

## Plan of Adjustment – Ten Year Financial Projections

The 10 Yr Plan, built and modified by Ernst & Young ("E&Y"), is the City's financial forecast for the fiscal years 2014-2023. This plan was originally developed to show how Detroit would operate exclusive of the chapter 9 bankruptcy proceeding. That is, it is effectively the baseline plan. This forecast was built on a department level basis and does not include the quantitative impacts of the restructuring initiatives, the cancellation of debt, the cash flow ramifications from the alterations in the City's pension plans and OPEB[20], and other impacts of the bankruptcy proceedings.

The City and its advisors produced, as part of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit and the corresponding Fourth Amended Disclosure Statement (dated May 5, 2014), an updated version of the 10 Yr Plan which reflected the then most current forecast assumptions and terms of negotiated agreements. In light of the incremental negotiations, modified forecast assumptions and other changes, a newer 10 Yr Plan (in concert with an updated 40 Yr Plan and modified RRIs) has been produced by the City advisors and is dated July 2, 2014. For the purpose of this Report, Phoenix used the July 2, 2014 version

---

[20] Other Post Employment Benefits

Court's Ex 12000-032

## Section J - Pensions

<u>Introduction</u>

Detroit's legacy retirement obligations, combining both pensions and OPEB, are the City's largest liability when combining the funded and unfunded liabilities. Additionally, these liabilities are arguably the most visible to the City's retirees, current employees, and to its citizens, generally. Despite the relative importance, the magnitude of the City's retirement obligations and the methods for calculating them are largely unknown. Assessing the City's future pension and OPEB responsibilities involves, among other factors, forecasted health care costs, complex actuarial models[43], and assumptions for the anticipated rate of returns on the pensions' assets and the rate used to discount the plans' future liabilities. Critical decisions made today will have a substantial impact on the City's liquidity in future

---

[43] Traditional actuarial forecasts imbed assumptions related to pensioners' mortality, rates of retirement, salary increases, overtime, disability rates, interest earned on assets, and pension plan administrative expenses.

Court's Ex 12000-124

years. The magnitude and importance of these decisions will be critical to Detroit's viability in the decades to come.

Background

The City of Detroit has historically maintained two separate defined benefit plans, one for uniformed personnel and one for all other City employees. The City's existing pension plans are administered by the respective Retirement Systems, the Police & Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS"). The bankruptcy claims related to PFRS claims are classified as Class 10, while the GRS claims are designated as Class 11 in the POA. These plans provided for a calculated amount of retirement income based on earnings and longevity of each individual employee. As typical with defined benefit plans, the benefits are fixed and are not dependent on investment returns or other outside factors.

Detroit's Plan, in an effort to mitigate the City's expanding legacy pension issues, proposes to fundamentally restructure the City's pension obligations for both its current retirees and its active employees, effective June 30, 2014. The Plan provides that, on the Effective Date, the City will assume the obligations related to already accrued benefits under the GRS and the PFRS pension plans *as those benefits will have been modified in the POA*. The POA pension proposal modifies

each plan under revised structures that impose reduced monthly pension amounts and/or reduced or eliminated COLA adjustments. The POA also proposes to restructure the accrual of pension benefits of active employees beginning on July 1, 2014, the parameters of which are detailed below.

## City of Detroit Retirees Demographics

As of June 30, 2013, the Retirement Systems for the City of Detroit had approximately 32,247 members. The demographics of the each Retirement System are detailed below:

|  | PFRS | | GRS | | RS Total | |
|---|---|---|---|---|---|---|
| Active | 3,272 | 26% | 5,658 | 28% | 8,930 | 28% |
| Retirees | 9,054 | 73% | 12,118 | 61% | 21,172 | 65% |
| Other | 111 | 1% | 2,214 | 11% | 2,325 | 7% |
|  | 12,437 | | 19,990 | | 32,427 | |

Of the City's estimated 21,172 retirees, roughly 7,200 (or 34%) are over the age of 75, with another 35% between the ages of 65 and 75. The average PFRS pension in FY2013 was $30,607 as compared to the average FY2013 GRS pension of $19,213.

## Pension Funding Level

126

The accounting for defined benefit plans can be very complex. The calculations used to determine the appropriate funding levels required each year are dependent upon macro-economic factors, actuarial assumptions, and other variables that can be difficult to understand and can be manipulated to bias the required funding levels.[44]

Historically, a number of different practices have contributed to a significant funding shortfall in the two pension plans. The Retirement Systems utilized unrealistic rate of return assumptions and managed the pension plans in accordance with questionable investment strategies that resulted in considerable underfunding of the respective Plans. The Retirement Systems assumed aggressive annual rates of return on investment (PFRS: 8.0%; GRS: 7.9%), allocated asset gains and losses over a seven-year period which masked potential funding shortfalls, and utilized renewing 29- (PFRS) and 30- (GRS) year amortization periods for funding the unfunded pension obligations.

The calculation of this funding shortfall, or the Unfunded Actuarial Accrued Liability ("UAAL"), is dependent upon the use of assumptions as noted above.

---

[44] Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code; Docket No. 13; Page 5

Court's Ex 12000-127

Based on the assumption methodologies used by the retirement systems previously, the UAAL was projected, at the end of FY2012, to have been approximately $977 million.[45] At June 30, 2013, that UAAL estimate was $1.5 billion as PFRS reported it was 89% funded with a UAAL of $415 million. At that same time, GRS reported it was 70% funded with a UAAL of $1.1 billion. Using what the City now believes are more accurate assumptions, the City's actuary - Milliman, Inc. - has estimated that the combined systems' UAAL, at June 30, 2013, was approximately $3.5 billion.[46]

In addition to issues involving the aggressiveness of the rate of return assumption used to determine funding levels, also contributing to the increase of the UAAL were a number of questionable activities engaged in by the retirement systems, which included:

- Utilizing GRS fund assets to pay the promised returns on the Annuity Savings Program which, upon members of GRS allocating 3%, 5% or 7% of their after-tax salaries into a discreet defined contribution plan, effectively guaranteed a minimum 7.9% annual investment return

---

[45] Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code; Docket No. 13; Page 5

[46] Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code; Docket No. 13; Page 7

regardless of the actual investment performance of the pension plans' assets;

- o Using actual market returns for crediting purposes rather than the guarantee, the City believes that over $387 million of excess investment earnings were credited to Annuity Savings Funds from 2003-2013

- GRS trustees, when the plan's actual returns were higher than the assumed rate of return, paid a portion of the positive variance between the actual investment return and the assumed rate of return in an additional pension check to already retired pensioners in what is commonly referred to as the "13th check" program
- The City periodically deferred its required year-end PFRS contributions, and then borrowed to pay those deferrals with debt priced at a rate of 8%;
- Retirement System officials have been accused and/or indicted of material fiduciary misconduct, allegedly draining the pension of necessary liquidity and contributing to the underfunding of the Retirement Systems.[47]

Pension Treatment

The City's Plan of Adjustment proposes to "freeze" the accruing of pension benefits under the terms of the City's legacy pension plans and, effective June 30, 2014, institute restructured, distinct pension plans for the City's active employees. For the current employees, their future pensions will be a combination of that which was accrued under the legacy plan through June 30, 2014, and after that date, what will be accrued under the new revised plan as detailed below. For the City's retirees,

---

[47] Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code; Docket No. 13; Page 10

depending on whether they are members of PFRS or GRS, the POA proposes to modify their accrued benefits under the legacy pension plans via reductions in gross pensions, cost of living adjustments, or reductions in investment earnings in the Annuity Savings Program.

Active City Employees

The Plan of Adjustment proposes a "hybrid" pension plan for the City's active employees for their accrued employment time after June 30, 2014. The adjusted pension plan – for both PFRS and GRS – endeavors to combine the features of a fixed contribution plan with the estimated investment performance of a fixed benefit plan. The City and its actuaries constructed this hybrid plan to generate accrued pension payments to its active employees upon retirement commensurate with a 6.75% estimated annual investment return.

For active PFRS employees, the updated pension formula will be equivalent to their Final Average Compensation ("FAC") – defined as the average base compensation (excluding overtime, sick leave, longevity, etc. over the last ten consecutive years) times years of service times 2.0%. For example, a theoretical PFRS employee whose FAC was $40,000 with 25 years of experience would accrue an annual pension of $20,000 ($40,000 x 25 x 2.0%). This calculation represents

the defined benefit portion of the new hybrid plan. The defined contribution portion of the new plan incorporates an annual 12.25% contribution from the City of employees' base compensation and requires an employee contribution of 6%, if the employee was hired before July 1, 2014, or 8% if hired after that date. In addition, PFRS employees will be eligible for retirement at ages 50-52, depending on their rank, with twenty-five years of service.

The revised GRS pension plan for active employees is similar to the PFRS plan, albeit adjusted for Social Security (GRS pensioners are eligible for Social Security in contrast to PFRS pensioners). The updated pension formula will be equivalent to FAC over the last ten consecutive years times years of service times 1.5%. For example, a theoretical GRS employee whose FAC was $40,000 with 30 years of experience would accrue an annual pension of $18,000 ($40,000 x 30 x 1.5%). The City will contribute 5.75% of the employee's base compensation annually, while the employee will contribute 4%. In addition, GRS employees will be eligible for retirement at age 55 with thirty years of service.

## Proposed POA Restructured Terms

| | PFRS | GRS |
|---|---|---|
| Pension Formula | FAC x # of years x 2.0% | FAC x # of years x 1.5% |
| Investment Return | 6.75% | 6.75% |
| ER Contribution | 11-12% of base compensation | 5% of base compensation |
| EE Contribution | Hired before 7/1/14: 6%; after 7/1/14: 8% | 4% of base compensation |
| Retirement Age | Age 50-52 with 25 years experience | Age 55 with 30 years experience |
| COLA Eligibility | 0-1% compounded, variable | Variable after 4 years and 100% funded |
| Annuity Savings Fund | n/a | Interested credit at actual return (0-5%) |
| | | |
| Theoretical Annual Pension | | |
| ($40k FAC with 25/30 years experience) | $20,000 = $40,000 x 25 x 2.0% | $18,000 = $40,000 x 30 x 1.5% |

The fundamental amendments to the future pension plans lend themselves favorably to the POA's feasibility. Redefining base compensation as an average of the last ten years' pay as opposed to last three, eliminating non-base compensation such as overtime and sick leave from the calculation, reducing the estimated rate of return, and incorporating a defined employee contribution all contribute to the increased likelihood that the City can meet the requirements of the new pension plan. A concern remains, though, that embedded within the "hybrid" nature of this pension plan, is the concept that a fixed contribution will, *over time,* produce the required, fixed benefit. Pension plans with fixed contributions are generally just that -- defined contribution plans, not defined benefit plans. To the degree that the actual investment return underperforms the targeted levels or the employee population exhibits life expectancies in excess of the actuarial assumptions, the City has the potential to again be saddled with an underfunded pension plan.

132

<u>Current Retirees</u>

The combined UAAL for both Retirement Systems was approximately $3.5 billion as of June 30, 2013. The City's Plan of Adjustment, for the current retirees' pension plan, establishes targeted funding rates by the end of fiscal year 2023 for each Retirement System, specifically 75% for PFRS and 70% for GRS, based upon a heavily-negotiated 6.75% assumed investment rate of return. While I assume this investment rate of return as a "given" in all pension analyses to follow, further discussion with regards to the appropriateness of this assumed investment rate of return, and more particularly, its use as the assumed liability discount rate, is detailed below. These targeted funding levels, combined with the proposed benefit reductions for each pension plan, dictate the required cash contributions to the Retirement Systems during the period ending June 30, 2023. The POA proposes that the City will amortize the remaining UAAL for each Retirement System – as of June 30, 2023 – over the following thirty-year timeframe.

The following graph illustrates, per the City's actuary – Milliman, Inc. – the estimated funding levels for PFRS and GRS at ten-year intervals during the period FY2014-2053[48]. Based on the City's actuarial tables, the POA projections assume

---

[48] Both PFRS and GRS plans are forecasted to initially have decreasing funding levels; PFRS is forecasted to decrease from 87% in FY2015 to 78% in 2023; GRS is estimated to decrease from 74% in FY2015 to 65% in FY2043

that the pension plans' funding levels significantly improve in the last ten years of this forty year period in question[49].



The POA assumed investment rate of return of 6.75% was a heavily negotiated component of the POA amongst the City, its retirees, the Retirement Systems, the Retiree Committee, and the labor unions. The POA stipulates that the board of trustees of the PFRS and GRS "must" maintain a 6.75% investment return assumption through the period ending June 30, 2023; thereafter, that rate is at the discretion of the Retirement Systems. While the new, proposed rate is more conservative than the historically-used 7.9% and 8.0% rates, current debate abounds as to whether a municipal pension plan, that is not 100% funded, should use any rate for its liability discount rate other than the government risk-free rate.

---

[49] Milliman, Inc. letter, dated May 7, 2014

134

The following table illustrates where the City's proposed 6.75% investment rate compares to other comparable municipal pension plan assumptions[50]:

**Public Pensions - Assumed Investment Returns - Dec 2013**

| City of Detroit | 6.75% |
|---|---|
| Connecticut Teachers | 8.50% |
| Houston Firefighters | 8.50% |
| Ohio Police & Fire | 8.25% |
| Ohio PERS | 8.00% |
| Michigan Municipal/SERS/Public Schools | 8.00% |
| U.S. National Average | 7.72% |
| CALPERS | 7.50% |
| Indiana PERF/Teachers | 6.75% |
| DC Police & Fire/Teachers | 6.50% |

Pension Funding

In an effort to partially alleviate the City of Detroit's liquidity concerns and to fund some portion of the proposed RRIs in the first ten years, the Plan of Adjustment incorporates dedicated external funding for the Retirement Systems aimed at reducing the respective UAALs, portions of which the receipt is predicated upon Classes 10 (PFRS) and 11 (GRS) voting to accept the Plan. The following analyses illustrate the POA's proposed funding sources for the respective Retirement Systems over the 2014-2053 timeframe encompassed in the POA's 40 Yr Plan.

**Plan of Adjustment – Proposed PFRS Contributions – FY2014-2053**

---

[50] NASRA Issue Brief: "Public Pension Plan Investment Return Assumptions"; April 2014

135

| ($ Millions) | 2014 - 2023 | 2024 - 2033 | 2034 - 2043 | 2044 - 2053 |
|---|---|---|---|---|
| **City-specified Contributions** | | | | |
| State of Michigan | $ 96 | $ - | $ - | $ - |
| Foundations (DIA Settlement) | $ 165 | $ 201 | $ - | $ - |
| Other/City GF | $ - | $ 416 | $ 465 | $ 311 |
| **Total** | $ 261 | $ 618 | $ 465 | $ 311 |

## Plan of Adjustment – Proposed GRS Contributions – FY2014-2053

| ($ Millions) | 2014 - 2023 | 2024 - 2033 | 2034 - 2043 | 2044 - 2053 |
|---|---|---|---|---|
| **City-specified Contributions** | | | | |
| DWSD | $ 429 | $ - | $ - | $ - |
| UTGO | $ 32 | $ - | $ - | $ - |
| State of Michigan | $ 99 | $ - | $ - | $ - |
| DIA (DIA Settlement) | $ 45 | $ 55 | $ - | $ - |
| Other/City GF | $ 115 | $ 575 | $ 474 | $ 318 |
| **Total** | $ 719 | $ 630 | $ 474 | $ 318 |

In order of magnitude, the City-specified contributions in the 2nd, 3rd, and 4th decades reflect the estimated 30-year amortization payments on the respective plans' UAALs at June 2023. The DWSD is expected to contribute to GRS roughly $428 million from FY2015-2023, constituting DWSD's allocable share of the remaining GRS UAAL, after considering the pension modifications proposed in the POA. The State of Michigan has committed to contribute the present value of $350 million, approximately $194 million[51], for the benefit of pensioners. The State's contribution, signed into law by Governor Snyder on June 20, 2014, requires the approval of Classes 10 and 11, requires support from the Retirement Systems,

---

[51] The $350 million contribution is discounted at the 6.75% rate.

136

cessation of all bankruptcy-related litigation, and the full commitment of other external financing sources dedicated to the pension plans.

In addition to the identified pension funding sources highlighted above, the POA assumes implementation of the DIA Settlement, in which the City, DIA, and certain charitable foundations agree to irrevocably transfer the DIA art collection to the DIA Corporation. The art will be held in perpetual charitable trust within Detroit's city limits, in exchange for future payments of $366 million, pledged by the charitable foundations, and a commitment from the DIA Corporation to raise $100 million. Both DIA Settlement commitments are designated to be paid into the pension plans over the next twenty years.

The following tables illustrate the proposed funding contributions into PFRS and GRS for the fiscal years 2014-2023:

### Plan of Adjustment – Proposed PFRS Contributions – FY2014-2023

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City-specified Contributions** | | | | | | | | | | | |
| State | $ - | $ 96.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 96.0 |
| Foundations | $ - | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 154.7 |
| Other | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total | $ - | $ 114.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 260.7 |

### Plan of Adjustment – Proposed GRS Contributions – FY2014-2023

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City-specified Contributions** | | | | | | | | | | | |
| DWSD | $ - | $ 65.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 428.6 |
| UTGO | $ - | $ 4.4 | $ 4.0 | $ 4.0 | $ 3.9 | $ 3.7 | $ 3.7 | $ 3.6 | $ 2.3 | $ 2.0 | $ 31.6 |
| State | $ - | $ 98.8 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 98.8 |
| DIA | $ - | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 45.0 |
| Other/City GF | $ - | $ 14.6 | $ 22.5 | $ 22.5 | $ 22.5 | $ 22.5 | $ 2.5 | $ 2.5 | $ 2.5 | $ 2.5 | $ 114.6 |
| Total | $ - | $ 188.2 | $ 76.9 | $ 76.9 | $ 76.8 | $ 76.6 | $ 56.6 | $ 56.5 | $ 55.2 | $ 54.9 | $ 718.6 |

Court's Ex 12000-137

## Plan of Adjustment – PFRS (Class 10)

The POA proposes two alternative restructuring scenarios of the PFRS pension, with the respective depth of the assumed pension cuts being dependent on whether *both* Classes 10 and 11 approve the Plan of Adjustment.

## PFRS – Scenario A

In the event that both Classes 10 and 11 vote for the POA, with an assumed investment return of 6.75% and a targeted funding rate of 75% in 2023, the POA proposes that PFRS pensioners will receive 100% of their current/accrued pension, but will have their lifetime Cost of Living Adjustments ("COLAs") reduced by 55%. With COLAs estimated to represent approximately 18% of the total PFRS liabilities, the proposed 55% COLA elimination translates into a 9.9% reduction in estimated PFRS liabilities.

## PFRS – Scenario B

138

If either Classes 10 or 11 vote against the POA, and maintaining the assumed investment return of 6.75% and a targeted funding rate of 75% in 2023, PFRS pensioners will still receive 100% of their current/accrued pension, but their lifetime COLAs will be completely eliminated.

### Police and Fire Retirement Systems of the City of Detroit
### Projection of Liabilities and Assets
### Scenario A
### Assuming 55% COLA Reduction, 75% Targeted Funded Status, and 6.75% Investment Return[52]

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| City-specified Contributions | $ - | $ 114.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 260.7 |
| Market Value of Assets | $ 3,071 | $ 3,096 | $ 3,024 | $ 2,946 | $ 2,863 | $ 2,775 | $ 2,681 | $ 2,579 | $ 2,470 | $ 2,354 | |
| Actuarial Accrued Liability | $ 3,624 | $ 3,573 | $ 3,521 | $ 3,464 | $ 3,404 | $ 3,340 | $ 3,271 | $ 3,198 | $ 3,118 | $ 3,035 | |
| Unfunded Liability | $ (553) | $ (477) | $ (497) | $ (518) | $ (541) | $ (565) | $ (590) | $ (619) | $ (648) | $ (681) | |
| Funded Ratio - BOY | | 86.6% | 85.9% | 85.0% | 84.1% | 83.1% | 82.0% | 80.6% | 79.2% | 77.6% | |
| Expected FY Benefit Payments | | $ (285) | $ (283) | $ (284) | $ (284) | $ (283) | $ (283) | $ (284) | $ (285) | $ (283) | $ (2,554) |
| Expected FY Admin Expenses | | $ (7) | $ (7) | $ (7) | $ (7) | $ (7) | $ (7) | $ (8) | $ (8) | $ (8) | $ (66) |
| Expected FY Net Investment Return | | $ 201 | $ 200 | $ 195 | $ 190 | $ 184 | $ 178 | $ 172 | $ 165 | $ 157 | $ 1,642 |

[52] Milliman, Inc. letter, dated April 23, 2014

Court's Ex 12000-139

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Market Value of Assets - Roll Forward** | | | | | | | | | | | |
| Market Value of Assets - BOY | | 3,071 | 3,094 | 3,023 | 2,945 | 2,862 | 2,775 | 2,681 | 2,579 | 2,469 | 3,071 |
| City-specified Contributions | | 114 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 261 |
| Expected FY Net Investment Return | | 201 | 200 | 195 | 190 | 184 | 178 | 172 | 165 | 157 | 1,642 |
| Expected FY Benefit Payments | | (285) | (283) | (284) | (284) | (283) | (283) | (284) | (285) | (283) | (2,554) |
| Expected FY Admin Expenses | | (7) | (7) | (7) | (7) | (7) | (7) | (8) | (8) | (8) | (66) |
| Market Value of Assets - EOY | 3,071 | 3,094 | 3,023 | 2,945 | 2,862 | 2,775 | 2,681 | 2,579 | 2,469 | 2,354 | 2,354 |
| | | | | | | | | | | | |
| **Actuarial Accrued Liability - Roll Forward** | | | | | | | | | | | |
| Actuarial Accrued Liability - BOY | | 3,624 | 3,573 | 3,521 | 3,464 | 3,404 | 3,340 | 3,271 | 3,198 | 3,118 | 3,624 |
| Expected FY Benefit Payments | | (285) | (283) | (284) | (284) | (283) | (283) | (284) | (285) | (283) | (2,554) |
| Add'l Accrued Liability | | 234 | 231 | 227 | 224 | 219 | 214 | 211 | 205 | 200 | 1,965 |
| Actuarial Accrued Liability - EOY | 3,624 | 3,573 | 3,521 | 3,464 | 3,404 | 3,340 | 3,271 | 3,198 | 3,118 | 3,035 | 3,035 |

## Plan of Adjustment – GRS (Class 11)

Similar to Class 10, the POA proposes two alternative restructuring scenarios of the GRS pension, with the respective depth of the assumed pension cuts being dependent on whether *both* Classes 10 and 11 approve the Plan of Adjustment.

### GRS – Scenario A

In the event that both Classes 10 and 11 vote for the POA, with an assumed investment return of 6.75% and a targeted funding rate of 70% in 2023, GRS pensioners will receive 95.5% of their current/accrued pension, will have their lifetime COLAs eliminated, and pensions will be subjected to a maximum of a 15.5% recoupment of their Annuity Savings Fund excess return[53]. The combined impact of these proposed changes represents an approximate 27% reduction in

---

[53] Not all GRS retirees will be subject to ASF recoupment; only those retirees who ASF annual return, for FY2004-2013, was greater than the plan assets' actual return up to a maximum recoupment of 15.5% of the pensioner's peak ASF balance

140

Court's Ex 12000-140

GRS's estimated liabilities comprised of 4.5% from reduced pensions, roughly 9% from the Annuity Savings Fund recoupment, and 14% from the eliminated COLAs.

GRS – Scenario B

If either Classes 10 or 11 vote against the POA, and maintaining the assumed investment return of 6.75% and a targeted funding rate of 70% in 2023, GRS pensioners will receive 73% of their current/accrued pension, will have their lifetime COLAs eliminated, and the ASF recoupment will vary from 0.01% to 100% of a retiree's pension, based upon the excess amount of the pension. The combined impact of these proposed changes represents an approximate 50% in GRS's estimated liabilities comprised of 27% from reduced pensions, roughly 9% from the Annuity Savings Fund recoupment, and 14% from the eliminated COLAs.

**General Retirement Systems of the City of Detroit**
**Projection of Liabilities and Assets**
**Scenario A**
**Assuming 4.5% Benefit Reduction, 100% COLA Reduction, 70% Funded Status, Annuity Savings Fund Recoupment, and 6.75% Investment Return**[54]

---

[54] Milliman, Inc. letter, dated April 25, 2014

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| City-specified Contributions | $ - | $ 196.2 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 718.6 |
| Market Value of Assets | $ 2,027 | $ 2,106 | $ 2,057 | $ 2,005 | $ 1,951 | $ 1,893 | $ 1,831 | $ 1,764 | $ 1,695 | $ 1,622 | |
| Actuarial Accrued Liability | $ 2,921 | $ 2,866 | $ 2,809 | $ 2,751 | $ 2,688 | $ 2,622 | $ 2,552 | $ 2,477 | $ 2,399 | $ 2,317 | |
| Unfunded Liability | $ (894) | $ (760) | $ (752) | $ (746) | $ (737) | $ (729) | $ (721) | $ (713) | $ (704) | $ (695) | |
| Funded Ratio | | 73.5% | 73.2% | 72.9% | 72.6% | 72.2% | 71.7% | 71.2% | 70.7% | 70.0% | |
| Expected FY Benefit Payments | | $ (243) | $ (241) | $ (239) | $ (239) | $ (239) | $ (238) | $ (238) | $ (237) | $ (235) | $ (2,149) |
| Expected FY Admin Expenses | | $ (9) | $ (9) | $ (10) | $ (10) | $ (10) | $ (10) | $ (11) | $ (11) | $ (11) | $ (91) |
| Expected FY Net Investment Return | | $ 135 | $ 136 | $ 133 | $ 129 | $ 125 | $ 122 | $ 117 | $ 113 | $ 108 | $ 1,118 |

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Market Value of Assets - Roll Forward** | | | | | | | | | | | |
| Market Value of Assets - BOY | | $ 2,027 | $ 2,106 | $ 2,058 | $ 2,007 | $ 1,952 | $ 1,893 | $ 1,833 | $ 1,766 | $ 1,696 | $ 2,027 |
| City-specified Contributions | | $ 196 | $ 65 | $ 65 | $ 65 | $ 65 | $ 65 | $ 65 | $ 65 | $ 65 | $ 719 |
| Expected FY Net Investment Return | | $ 135 | $ 136 | $ 133 | $ 129 | $ 125 | $ 122 | $ 117 | $ 113 | $ 108 | $ 1,118 |
| Expected FY Benefit Payments | | $ (243) | $ (241) | $ (239) | $ (239) | $ (239) | $ (238) | $ (238) | $ (237) | $ (235) | $ (2,149) |
| Expected FY Admin Expenses | | $ (9) | $ (9) | $ (10) | $ (10) | $ (10) | $ (10) | $ (11) | $ (11) | $ (11) | $ (91) |
| Market Value of Assets - EOY | $ 2,027 | $ 2,106 | $ 2,058 | $ 2,007 | $ 1,952 | $ 1,893 | $ 1,833 | $ 1,766 | $ 1,696 | $ 1,624 | $ 1,624 |
| **Actuarial Accrued Liability - Roll Forward** | | | | | | | | | | | |
| Actuarial Accrued Liability - BOY | | $ 2,921 | $ 2,866 | $ 2,809 | $ 2,751 | $ 2,688 | $ 2,622 | $ 2,552 | $ 2,477 | $ 2,399 | $ 2,921 |
| Expected FY Benefit Payments | | $ (243) | $ (241) | $ (239) | $ (239) | $ (239) | $ (238) | $ (238) | $ (237) | $ (235) | $ (2,149) |
| Add'l Accrued Liability | | $ 188 | $ 184 | $ 181 | $ 176 | $ 173 | $ 168 | $ 163 | $ 159 | $ 153 | $ 1,545 |
| Actuarial Accrued Liability - EOY | $ 2,921 | $ 2,866 | $ 2,809 | $ 2,751 | $ 2,688 | $ 2,622 | $ 2,552 | $ 2,477 | $ 2,399 | $ 2,317 | $ 2,317 |

## Pension Restoration

The Plan of Adjustment incorporates, for both PFRS and GRS, the potential for previously-reduced pension benefits to be restored if the funding levels of the respective Retirement Systems improve to agreed-upon restoration levels at designated timeframes, the fiscal years ending 2023, 2033, and 2043. These pension restoration payments are designed to be variable, in that, they are only distributed to

142

Court's Ex 12000-142

the pensioners if the investment performance of the pension plans is at least three percentage points above the targeted funding levels.

The pension restoration thresholds, for both PFRS and GRS, are perpetually three percentage points above each pension plan's targeted funding level throughout the FY2014-2053 time period. If the funding levels exceeds the plan's restoration targeted funding level, i.e. are more than 3 percentage points above the targeted funding level, monies will be allocated to a "restoration reserve account". Once the restoration reserve account equals at least 10% of the lifetime value of the previously-reduced COLA payments, restoration payments will commence in the following year. According to the POA, restoration payments for PFRS will be conditional until 2023, and until 2028 for GRS. If, as a result of the funds' assets subsequently underperforming the targeted investment levels, which would mean that the returns fall below the 3 percentage point threshold for restoration payments, COLA restoration payments are immediately suspended. Beginning in FY2023 for PFRS and FY2028 for GRS, to the degree the plans' funding levels are in excess of the restoration targeted levels, those specific restoration payments become fixed, or "guaranteed", going forward.

It should be clearly understood, in FY2023 (FY2028 for GRS), FY2033 and FY2043, the *maximum* funded level of the GRS and PFRS is the amount shown in the table below. As a result of the negotiations with the parties, the provisions of the

POA relative to the pension settlements ensure that the pension plans at these benchmark dates will never be funded above the restoration funding rate for either the PFRS or GRS plans. If the funding level is above this targeted amount at the benchmark dates, the excess will be swept to a permanent restoration fund such that the funding level will be reduced to the amount shown. In the event that the funding levels at these benchmark dates are below these levels, the City is responsible for this unfunded amount and must fund it in the future. Therefore, as the City considers the average rate of return, it must keep in mind it is "giving away" some of the upside, yet retaining all of the downside.

The following table summarizes both PFRS and GRS's targeted and pension restoration funding levels for the 2014-2043 timeframe (pension restoration payments cease in 2043)[55].

| | PFRS | | GRS | |
| | Funding Target | Restoration Target | Funding Target | Restoration Target |
|---|---|---|---|---|
| 2014-2023 | 75% | 78% | 70% | 73% |
| 2024-2033 | 81% | 84% | 70% | 73% |
| 2034-2043 | 84% | 87% | 70% | 73% |

Impact on Feasibility

---

[55] Multiple Milliman, Inc. Pension reports; multiple Phoenix discussions with Jones Day attorneys re: Pension plans

144

There is considerable debate regarding the selection of the discount rate for calculating liabilities in government sponsored defined benefit (DB) plans. At one end of the debate is the thought that the discount rate of liabilities should equal the expected return on pension assets; at the other end is the thought the liabilities have a very strong contractual and legal requirement and therefore represent a certainty of payment and therefore should be discounted at, or near, the risk free rate. This seemingly academic question has real world consequences when viewing Detroit's POA and its perceived feasibility.

The Nelson A. Rockefeller Institute of Government's recent analysis on this issues - The Blinken Report - dated January 2014, notes[56]:

> *The problem begins with mismeasurement of liabilities and the cost of funding them securely, for financial reporting purposes. The proper way to value future cash flows such as pension benefit payments is with discount rates that reflect the risk of the payments. This is separate from the question of the rate pension funds will earn on their investments.*
>
> *This bears repeating: The proper rate for valuing pension liabilities on financial statements is separate from the question of what pension funds will earn on their investments. Different rates may be appropriate for valuing liabilities than for assumed investment returns — and we recommend, later, that different rates be used. The major*

---

[56] The Blinken Report- Strengthening the Security of Public Sector Defined Benefit Plans, dated January 2014. Donald J Boyd and Peter J Kiernan. *Expert's Note: In the preface of this Report special note is made of the contribution to the analysis and work by Dick Ravitch. Mr. Ravitch is Judge Rhodes' non-testifying consultant in this chapter 9.*

145

*significance of valuing liabilities incorrectly is that it leads to inadequate funding policies, and encourages the mistaken belief that benefits can be greater, services can be greater, or taxes lower while still funding benefits securely. (Blinken Report Emphasis)*

*Because pensions are promises that should be kept, and have strong legal protections, they should be valued using discount rates that reflect the riskiness of expected benefit payments. Unfortunately, the longstanding practice for public pension plans in the United States, developed before modern financial theory, is to use the expected return on pension fund assets to value liabilities, even though there is no logical connection between how much is owed to workers and what assets will earn. This practice is not used by public pension plans in other countries, or by private plans in the United States, or by economists or financial analysts valuing other cash flows. Our nation's public pension plans stand virtually alone, and recent accounting rule changes by the Governmental Accounting Standards Board (GASB) have not addressed this properly. Rates that reflect the expected risk of benefit payments ordinarily are much lower than the rates public pension funds use to value liabilities, and as a result, public pension liabilities are underestimated by at least $1-2 trillion, and the annual costs of funding them securely are underestimated by at least $100-200 billion.*

The City of Detroit, in its POA, has used a rate of 6.75% to discount the liabilities of the pension plans. This rate is lower than the historical rates that PFRS and GRS have previously used and lower than recent investment returns, although recent market returns are heavily impacted by the recovery from the Great Recession. It is also low relative to peers (see previous chart on comparison of Assumed Investment Returns of comparable public plans). In fact, there are few other major government sponsored plans that use a lower rate to discount the liabilities in their pension plans. On the surface, this appears to be a conservative

assumption. However, I am not convinced that the City appreciates the opportunity it has to provide stewardship in this area. Highlighting that the City's assumptions are low relative to history, a history that got them to this place, and low relative to their peers - peers who collectively may be underfunded by $2 trillion or more, is not much consolation.[57]

We believe that the selection of a discount rate has relevance as to the feasibility of the Detroit POA, in that, in the future without the benefit to change pension obligations, pension funding requirements become a de facto first priority on cash flows. This results in crowding out other cash flow priorities. The City must be continually be mindful that a root cause of the financial troubles it now experiences is the failure to properly address future pension obligations. Below we address two main concerns regarding the selection of the discount rate for valuing future liabilities in the Plan.

The investment return at 6.75% appears to be based on future investment returns. This rate clearly reflects a rate above the current risk free rate of return and therefore indicates a level of assumed volatility and risk. The argument for using a discount rate that is related to investment returns typically states that using a rate

---

[57] Blinken Executive Summary pg. vii.

147

that is higher than the risk free rate is acceptable due to the long "runway" of a municipal pension. The argument goes: a municipal entity differs from an individual in that, as an individual ages, they typically must moderate their investment behavior towards lower risk investments due to shortening time horizons and, therefore, often lock in losses in down markets. The argument continues: the long time horizon of a municipal pension plan allows it to avoid this phenomenon. Of course, pension plans are not able to defer plan payments during down markets, and therefore, in significant down markets, the loss of principal as a result of making payments to pensioners, without offsetting investment returns, can result in a plan that "locks in" losses. These "locked in" losses create underfunding.

Further, the current POA contemplates Pension Restoration provisions. These provisions essentially allow pension plan beneficiaries to have some opportunity for restoration of lost pension benefits. Post confirmation, until June 2023 for PFRS and June 2028 for GRS, if the pension plans exceed 78% for PFRS or 73% for GRS, despite still being underfunded nearly 22% and 27%, respectively, additional funds can be set aside into a pension restoration fund. The funding levels and the ability of beneficiaries to receive restoration benefits are limited to actuarial and investment return adjustments and not to additional city contributions. However, under this plan, the City can be underfunded in FY2043 and still be in the mode of restoring pension benefits to then existing retirees. Based on the settlement terms and the

148

assumptions made, there does not appear to be recognition that a pension plan, someday, will need to be 100% funded. The City appears to adopt an institutional philosophy of underfunding.

On top of the conceptual argument that funding targets should be set at no less than 100%, before additional commitments are made to increase benefits, a larger concern exists. The City's assumption of a 6.75% rate of return implicitly requires the City to accept risk and volatility. Volatility is, of course, a positive and a negative force. At times, the City should be expected to achieve returns above 6.75% and, at times, the City should expect returns below this level. Over the past 10 years, the Retirement Systems have seen significant variations in their investment returns both above and below the average return. Again, this is the argument for municipal pensions to use investment returns because over the long term, there should be smoothing. Because the City's defined benefit plans are essentially in runoff, they will inevitably experience declining asset levels. In this environment of declining assets and volatility, returns over time are not equally weighted.

Thus, order matters when returns are volatile. It is much better to receive high returns early and low returns later, even though both streams provide the same simple average growth rate. Examples of the impact of timing on returns in a given 10-year period are detailed in the Sensitivity section below. This is not a trivial

issue, even though it is quite technical. As pension funds mature and net outflows increase, asset values will be more volatile and more susceptible to the order in which returns occur. In an environment in which expected returns are low in the short term — as the current low-interest-rate, low-inflation environment may be — funds cannot simply balance low returns in the short term with high returns later; they will need much higher returns later because investible assets will be lower than they otherwise would have been.[58]

As example from the Blinken report: *Blinken Report Footnote #96*

*Consider a pension fund that has net outflows equal to 4.5 percent of assets, with benefits and contributions both growing 7 percent annually (roughly consistent with recent experience). If it earns 4 percent on investments for five years, followed by 12 percent for five years, its assets at the end of ten years will be nearly 13 percent lower than if the returns come in the opposite order, even though annual average return is 7.9 percent either way. [(1.04^10 x 1.12^10)-1 = (1.12^10 x 1.04^10)-1 = 7.93%.] If the fund earns 4 percent for ten years followed by ten years of 12 percent, its assets after twenty years would be 90 percent less than if returns had come in the opposite order. These calculations assume no change in contributions to amortize asset shortfalls in the early years. Amortization would narrow the difference between the two sequences of returns.*

---

[58] Blinken  pg 25.

Further exacerbating this issue, the City is agreeing to give up part, or maybe all, of its upside investment returns by virtue of the pension restoration benefits, but it is retaining all of the downside risk. If the funds' assets participate in a bull market in the first ten years of the POA, and the pension plans move to a funded level of 88%, the City would provide significant restoration benefits. If this bull market was then followed by a five year bear market, all of the restoration benefits paid during the bull market would serve to exacerbate the unfunded level of the pension plans and the City could be responsible for considerable funding risk.

It appears that the combination of a need to continue to invest in assets with risk and volatility in order to achieve investment returns and the restoration benefit to the pensioners, even at a level of low plan funding, acts as a one sided collar. That is, the City gives away much of the upside in investment earnings, while retaining all of the downside investment risk.

Legality of POA's Proposed Pension Cuts

Numerous parties in this bankruptcy, namely employees, retirees, Retirement Systems, and certain labor unions, have argued that the City is not legally able to

Court's Ex 12000-151

impair accrued pension benefits as they are protected under Article IX, Section 24 of the Michigan State Constitution of 1963. These same groups were granted permission to appeal the Bankruptcy Court's eligibility ruling to the U.S. Court of Appeals for the Sixth Circuit. To the degree that these parties are successful in their appeal of the Bankruptcy Court's eligibility ruling, the City's chapter 9 could be dismissed or may be unable to effectuate reductions in accrued vested pension benefits.

Sensitivity Analysis

The Society of Actuaries issued a *Report of the Blue Ribbon Panel on Public Pension Funding* in February 2014. The Blue Ribbon Panel recommended stress tests measuring the effect of investment returns over a 20-year period that are three percentage points above and below those used in calculating standardized plan contributions[59]. The panel believes that +/- 3% points represents "plausible stresses" based on its review of prior market returns[60].

------

[59] The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014

[60] The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014

In response to my request for a sensitivity analysis for the pension plans assuming various average rates of return for the FY2014-2023 period and the aforementioned scenarios of 1) a bear market 5-year period followed by a bull market 5-year period and 2) a bull market 5-year period followed by a bear market 5-year period, the City's actuary has analyzed the PFRS plan.

As illustrated below, if the PFRS plan averages a 6% rate of return (75 basis points lower than the assumed rate of return) over the nine years ending June 2023, the plan is forecasted to be only 70% funded in June 2023, resulting in an additional $236 million of unfunded liability versus the POA projections. That unfunded variance expands to $527 million if the PFRS plan averages a 5% rate of return during this time period. Finally, if PFRS is negatively impacted by a bear market/bull market cycle (as opposed to the inverse) with five years averaging 0% followed by five years averaging 10%, the pension plan would have $342 million more in unfunded liabilities during the 10-year period in question.

# PFRS Average Rate of Return Scenario Analysis[61]

| Average Rates of Return July 2014 - June 2023 | Estimated Funding Status June 2023 | Estimated Projected Unfunded Liability June 2023 | Estimated Projected Unfunded Liability Variance |
|---|---|---|---|
| 3.00% | 43% | $ 1,717 | $ 1,036 |
| 5.00% | 60% | $ 1,208 | $ 527 |
| 6.00% | 70% | $ 917 | $ 236 |
| 6.75% | 78% | $ 681 | $ - |
| 8.00% | 92% | $ 252 | $ (429) |
| 0% - 1st 5 years; 10% - 2nd five years | 53% | $ 1,439 | $ 758 |
| 10% - 1st 5 years; 0% - 2nd five years | 64% | $ 1,097 | $ 416 |

We have requested sensitivity analysis for GRS consistent with the PFRS sensitivity analysis highlighted above. At the time of this Report's release, we have not been provided the GRS sensitivity analysis.

## Recommendations on Reporting Requirements

The City of Detroit will be bound by numerous reporting requirements and financial oversight when it emerges from bankruptcy. Going forward, these intended protocols are designed to assist the City in managing its cash flow and liquidity relative to its POA commitments and its future budgets. In addition, it will be important for the City to report its financial condition to various constituencies on a regular basis.

---

[61] Milliman, Inc. letter; dated July 9, 2014

Timely, accurate financial reporting relating to the City's pension plans will be an essential tool as the retirement systems manage the plans' assets and liabilities and make critical decisions regarding future estimated rates of returns and annual funding requirements. At the end of June 2012, the Governmental Accounting Standards Board ("GASB") issued standards intended to reform how state and local governments report the financial status of their pension funds and how they finance them. GASB 67 defines how government pension funds must report finances related to pension activities. GASB 68 pertains to state and local government reporting of activities associated with pension finances.[62] Both GASB standards are effective in FY2015 and will enhance the City's financial disclosures relating to its pension plans.

As the asset features and credit quality of the pension plans' investments evolve over time, so, too, will the reporting corresponding to those investments. The City's pension plans should establish a baseline level of financial reporting that will be accurate and illustrative of the condition of the pension plans at any point in time. The Society of Actuaries' report recommended that actuarial funding reports should contain, for at least the previous ten years, information presenting the relationship of benefit payments, funding liabilities, and assets to payroll; the relationship

---

[62] Governmental Accounting Standards Board

between the recommended contribution to payroll and to the sponsor's budget or revenue source; and the ratio of contributions made to the total recommended contribution.[63]

Additionally, to understand current risk levels, three benchmarks should be disclosed:

1) The expected standard deviation of investment returns of the asset portfolio on the report date;

2) The plan liability and normal cost calculated at the risk-free rate, which estimates the investment risk being taken in the investment earnings assumption; and

3) A standardized plan contribution for assessing the aggregate risks to the adequacy of the recommended contribution.[64]

Further, we recommend that the City disclose the gross liability and the UAAL by year on an undiscounted basis. This will allow third parties a better understanding of the changes in the liabilities from year to year.

---

[63] The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014

[64] The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014

156

Court's Ex 12000-156

## Section K - Human Capital and Leadership

Detroit's fifty year decline was caused by changing demographics, economics and the failure of elected officials to respond effectively. The downward spiral finally resulted in the City filing for Bankruptcy. Beyond the financial crises, the City has suffered from a deterioration of the efficiency and effectiveness of its City's workforce, as measured by the cost of service delivery versus the benefit the citizens received from those services.[65] Inadequate investment in human capital and poor leadership during the decline served to exacerbate the situation.

At its core, this chapter 9 is a fundamental change project. The City, through the guidance of its bankruptcy advisors, has fundamentally changed the City's balance sheet and reduced its long term obligations. The Emergency Manager has begun the even harder task of reshaping the operations of the City for the benefit of the taxpayers. The Mayor, and other elected and appointed officials, will need to continue this part of the change project. Human capital and leadership are two of

---

[65] Docket # 14, page 29 of 106, Memorandum in Support of Statement of Qualifications Pursuant to Section 109 (c) of the Bankruptcy Code

157

# EXHIBIT 23

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**



EXHIBIT

Ex.23

# TABLE OF CONTENTS

Page

COMPONENT I ........................................................................................................ 1
ARTICLE 1.        GENERAL PROVISIONS........................................................... 1
        Sec 1.1.        Police and Fire Retirement System Established; Adoption of 2014
                       Plan Document .......................................................................... 1
        Sec 1.2.        Retirement System Intended to be Tax-Qualified; Governmental
                       Plan ........................................................................................... 1
        Sec 1.3.        Compliance With Plan of Adjustment.......................................... 1
        Sec 1.4.        Board of Trustees ...................................................................... 2
        Sec 1.5.        Board of Trustees – Membership; Appointment........................... 2
        Sec 1.6.        Board of Trustees; Scheduling of Elections for Active and Retiree
                       Trustees .................................................................................... 3
        Sec 1.7.        Procedures for election of Retiree Trustees ................................. 3
        Sec 1.8.        Board of Trustees; Oath; Term; Vacancies ................................. 4
        Sec 1.9.        Board of Trustees; Officers and Employees................................. 4
        Sec 1.10.       Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum........... 4
        Sec 1.11.       Board of Trustees; Compensation; Expenses ............................... 5
        Sec 1.12.       Rules for Administration of Funds................................................ 5
        Sec 1.13.       Board of Trustees; Certain Data to be Kept ................................. 5
        Sec 1.14.       Board of Trustees; Annual Audit Report ..................................... 5
        Sec 1.15.       Board of Trustees; Legal Advisors............................................... 5
        Sec 1.16.       Board of Trustees; Medical Director............................................ 6
        Sec 1.17.       Designation of Actuary; Authority to Engage Additional Actuaries ......... 6
        Sec 1.18.       Board of Trustees; Adoption of Mortality and Other Tables of
                       Experience and Rates of Interest; Limitations on Payments by the
                       Retirement System ..................................................................... 7
        Sec 1.19.       Board of Trustees; Annual Actuarial Valuation of Assets and
                       Liabilities.................................................................................. 7
        Sec 1.20.       Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary
                       Duties........................................................................................ 7
        Sec 1.21.       Investment Committee; Establishment; Purpose; Fiduciary Status;
                       Fiduciary Duties ....................................................................... 8
        Sec 1.22.       Investment Committee; Membership; Appointment................... 8

-i-

# TABLE OF CONTENTS
### (continued)

Sec 1.23. Investment Committee; Term; Resignation and Removal; Vacancies................................................................................9

Sec 1.24. Investment Committee; Operation; Meetings; Quorum; Voting..............10

Sec 1.25. Investment Committee; Compensation; Expenses; Employment of Advisors.......................................................................11

Sec 1.26. Investment Committee; Special Reporting Obligation ...........................11

ARTICLE 2.    DEFINITIONS ...............................................................14

Sec 2.1.    Definitions ........................................................................14

ARTICLE 3.    MEMBERSHIP ...............................................................22

Sec 3.1.    Eligible Employees..............................................................22

Sec 3.2.    Cessation of Membership; Re-Employment ...............................22

Sec 3.3.    Report From City................................................................23

ARTICLE 4.    SERVICE CREDIT ..........................................................24

Sec 4.1.    Credited Service .................................................................24

Sec 4.2.    Vesting Service...................................................................24

Sec 4.3.    Service Credit; Military Service.............................................24

Sec 4.4.    Service Credit; Qualified Military Service................................25

ARTICLE 5.    ELIGIBILITY FOR RETIREMENT ......................................26

Sec 5.1.    Eligibility for Unreduced Normal Retirement Benefit.............26

Sec 5.2.    Eligibility for Deferred Vested Retirement Benefit ...............26

Sec 5.3.    Eligibility for Disability Retirement Benefit – Duty Disability.............26

Sec 5.4.    Eligibility for Disability Retirement Benefit – Non-Duty Disability.......28

Sec 5.5.    Disability Retirees; Reexamination.........................................29

Sec 5.6.    Disability Benefits; Procedures for Determination of Disability ............30

Sec 5.7.    Return of Accumulated Mandatory Contributions to Non-Vested Member ........................................................................32

Sec 5.8.    Benefits Offset by Workers' Compensation and Benefits; Subrogation ......................................................................32

ARTICLE 6.    RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)................................33

Sec 6.1.    Retirement Allowance..........................................................33

Sec 6.2.    Variable Pension Improvement Factor (Escalator) ...................33

# TABLE OF CONTENTS
## (continued)

ARTICLE 7.     DEATH BENEFITS ...................................................................... 34

    Sec 7.1.     Accidental Death Benefit; Performance of Duty ....................... 34

    Sec 7.2.     Non-Duty Death Benefits ............................................................ 35

    Sec 7.3.     Refund of Accumulated Mandatory Contributions Upon Death of Member ........................................................................................ 35

ARTICLE 8.     FORMS OF PAYMENT ............................................................... 36

    Sec 8.1.     Retirement Allowance Options .................................................. 36

    Sec 8.2.     Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ................................................................................... 37

ARTICLE 9.     FUNDING AND RESERVES ...................................................... 38

    Sec 9.1.     Funding Objective of the Retirement System ........................... 38

    Sec 9.2.     Funds .......................................................................................... 38

    Sec 9.3.     Method of Financing Retirement System Benefits ................... 39

    Sec 9.4.     Member Contributions Picked-Up ............................................ 40

    Sec 9.5.     Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations ................................................................................. 40

ARTICLE 10.    VOLUNTARY EMPLOYEE CONTRIBUTIONS ....................... 43

    Sec 10.1.    Voluntary Employee Contributions; Amount; Vesting ............ 43

    Sec 10.2.    Changing an Election to Contribute .......................................... 43

    Sec 10.3.    Individual Member Accounting; Crediting of Earnings ............ 43

    Sec 10.4.    Distribution of Accumulated Voluntary Employee Contributions ........... 43

ARTICLE 11.    LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS ..................................................................... 45

    Sec 11.1.    The Loan Program ...................................................................... 45

    Sec 11.2.    Eligibility for Loan .................................................................... 45

    Sec 11.3.    Amount of Loan ......................................................................... 45

    Sec 11.4.    Terms and Conditions ................................................................ 45

    Sec 11.5.    Loan Balance .............................................................................. 46

    Sec 11.6.    Default ........................................................................................ 46

    Sec 11.7.    Distribution ................................................................................ 47

    Sec 11.8.    Annual Report ............................................................................ 47

# TABLE OF CONTENTS
(continued)

Page

ARTICLE 12.    DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM .......48
    Sec 12.1.    General Provisions ......................................................48
    Sec 12.2.    Conversion to Retirement Allowance .....................................48
    Sec 12.3.    Investment of DROP Assets...............................................48
    Sec 12.4.    Distribution of Amounts Credited to DROP Account.............................49
    Sec 12.5.    Death of Member While Participating in the DROP Program.................49
    Sec 12.6.    Disability of Member While Participating in the DROP Program...........50
    Sec 12.7.    Cost Neutrality .......................................................50
ARTICLE 13.    LIMITATION ON BENEFITS AND CONTRIBUTIONS ...........................51
    Sec 13.1.    Compliance With Code Section 415(b) And Regulations.....................51
    Sec 13.2.    Compliance with Code Section 415(c) and Regulations....................54
ARTICLE 14.    RETIREMENT SYSTEM ADMINISTRATION .................................55
    Sec 14.1.    Board of Trustees as Retirement System Administrator.....................55
    Sec 14.2.    Powers and Duties of Board..............................................55
    Sec 14.3.    Executive Director; Employees...........................................57
    Sec 14.4.    Discretionary Authority.................................................57
    Sec 14.5.    Administrator's Decision Binding........................................58
ARTICLE 15.    MANAGEMENT OF FUNDS ...............................................59
    Sec 15.1.    Board as Trustee of Retirement System Assets............................59
    Sec 15.2.    Maintenance of Segregated Funds ........................................59
    Sec 15.3.    Custodian of Funds......................................................59
    Sec 15.4.    Exclusive Purpose ......................................................59
    Sec 15.5.    Prohibited Conduct......................................................59
ARTICLE 16.    INVESTMENT OF RETIREMENT SYSTEM ASSETS.............................61
    Sec 16.1.    Investment Powers of the Board and the Investment Committee ...........61
    Sec 16.2.    Investment Management ..................................................62
    Sec 16.3.    Best Practices .........................................................63
    Sec 16.4.    Chief Investment Officer................................................63
    Sec 16.5.    Investment Consultants .................................................64
ARTICLE 17.    RETIREE MEDICAL ACCOUNT ...........................................66

Sec 17.1.    Establishment of Account ................................................................66

Sec 17.2.    Effective Date ................................................................................66

Sec 17.3.    Funding of Benefits ........................................................................66

Sec 17.4.    Limitation on Contributions ............................................................66

Sec 17.5.    Impossibility of Diversion ..............................................................67

Sec 17.6.    Administration ..............................................................................67

Sec 17.7.    Right to Amend or Terminate Medical Plans ....................................67

Sec 17.8.    Reversion ....................................................................................67

Sec 17.9.    Limitation of Rights ......................................................................67

ARTICLE 18.    MISCELLANEOUS ....................................................................68

Sec 18.1.    Nonduplication of Benefits ............................................................68

Sec 18.2.    Assignments Prohibited ................................................................68

Sec 18.3.    Protection Against Fraud ..............................................................68

Sec 18.4.    Errors ........................................................................................68

Sec 18.5.    Conviction of Felony; Forfeiture of Rights ......................................68

Sec 18.6.    Amendment; Termination; Exclusive Benefit ....................................69

Sec 18.7.    Expenses of Administration; Forfeitures Not to Increase Benefits ..........69

Sec 18.8.    Required Distributions - Compliance with Code Section 401(a)(9)
            and Regulations ............................................................................69

Sec 18.9.    Direct Rollovers ..........................................................................70

Sec 18.10.    Construction ..............................................................................71

Sec 18.11.    Severability ..............................................................................71

COMPONENT II ................................................................................................72

ARTICLE A.    COMMON PROVISIONS OF THE POLICE AND FIRE
            RETIREMENT SYSTEM ................................................................73

Sec. A-1.    Common Provisions ......................................................................73

ARTICLE B.    FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM AS OF
            JUNE 30, 2014 ............................................................................75

Sec. B-1.    Freeze of Police and Fire Retirement System as of June 30, 2014 ..........75

ARTICLE C.    DEFINITIONS ............................................................................78

Sec. C-1.    Definitions ................................................................................78

-v-

# TABLE OF CONTENTS
### (continued)

**ARTICLE D.**     **MEMBERSHIP** ...................................................................................... 85

    Sec. D-1.     Generally ............................................................................. 85

    Sec. D-2.     Membership election option prior to July 1, 2014 ..................... 86

    Sec. D-3.     Cessation of membership ....................................................... 87

**ARTICLE E.**     **SERVICE CREDITABLE** ..................................................................... 88

    Sec. E-1.     Members to file statement of service, etc. ................................ 88

    Sec. E-2.     Credit for service .................................................................. 88

    Sec. E-3.     Employees in military service commencing prior to July 1, 2014 ........... 88

    Sec. E-4.     Verification of service claimed ............................................... 91

    Sec. E-5.     Prior Service certificates ........................................................ 91

    Sec. E-6.     Creditable service at retirement .............................................. 91

**ARTICLE F.**     **BENEFITS PROVIDED TO MEMBERS** ............................................. 92

    Sec. F-1.     Petition for retirement, mandatory age .................................... 92

    Sec. F-2.     Old Plan/New Plan ............................................................... 94

    Sec. F-3.     Pension Multiplier ................................................................ 95

    Sec. F-4.     Disposition of surplus benefits upon death of retired member ........... 96

    Sec. F-5.     Retirement allowance for certain persons leaving City employment after eight years service (40 & 8) ............................................. 96

    Sec. F-6.     Reduced Early Pension Benefits (40 & 8 Vesting Retirees) ............ 97

    Sec. F-7.     Duty disability ..................................................................... 98

    Sec. F-8.     Duty disability benefits; Members in service on or after July 1, 1941 but prior to January 1, 1969 ........................................... 98

    Sec. F-9.     Duty disability benefits; Members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10 ...................................................................... 100

    Sec. F-10.     Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below ................................. 101

    Sec. F-11.     Non-duty disability .............................................................. 103

    Sec. F-12.     Disability retirement procedures ............................................ 105

    Sec. F-13.     Generally ............................................................................ 107

    Sec. F-14.     Increase of Benefits; Pension Improvement Factor (Escalator) ........... 107

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| Sec. F-15. | Payment | 108 |
| Sec. F-16. | Generally | 108 |
| Sec. F-17. | Payment of Accumulated Contributions | 110 |
| Sec. F-18. | Allowances to surviving spouses | 110 |
| Sec. F-19. | Payment of benefits to employees who became Members before January 1, 1969 | 112 |
| Sec. F-20. | Payment of benefits to employees who became Members on or after January 1, 1969 | 113 |
| Sec. F-21. | Deferred vested benefits | 113 |
| Sec. F-22. | Forfeiture of rights | 113 |
| Sec. F-23. | Generally | 114 |
| Sec. F-24. | Disposition of surplus benefits upon death of Member and Beneficiary | 116 |
| Sec. F-25. | Generally | 116 |
| Sec. F-26. | Generally | 116 |
| Sec. F-27. | Authority of Board | 116 |
| Sec. F-28. | Member With Twenty or Twenty-Five Years of Service | 117 |
| Sec. F-29. | Disabled Member | 118 |
| Sec. F-30. | Optional Annuity Withdrawal | 118 |
| ARTICLE G. | METHOD OF FINANCING | 121 |
| Sec. G-1. | General | 121 |
| Sec. G-2. | Annuity Savings Fund | 121 |
| Sec. G-3. | Annuity Reserve Fund | 122 |
| Sec. G-4. | Alternative Financing Method | 122 |
| Sec. G-5. | Contributions to and payments from Pension Accumulation Fund | 123 |
| Sec. G-6. | Retiree payments from Pension Reserve Fund; reinstatement of disability Retirees to active service | 124 |
| Sec. G-7. | Expense Fund | 124 |
| Sec. G-8. | Deferred Retirement Option Plan Fund | 124 |
| Sec. G-9. | Appropriations prior to July 1, 2014 and after June 30, 2023 | 124 |
| Sec. G-10. | Maintenance of reserves | 124 |

Sec. G-11. Survivors Benefit Fund ...................................................................... 125

Sec. G-12. Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries ...................................................... 126

Sec. G-13. Determination of City's annual contribution — Disability Pension liabilities ........................................................................................... 129

Sec. G-14. Determination of City's annual contribution — Death Pension liabilities ........................................................................................... 129

Sec. G-15. Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities ............................. 130

Sec. G-16. Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014 and after June 30, 2023 ....................................................................... 130

Sec. G-17. Board of trustees to compute City's annual contribution ...................... 130

Sec. G-18. Employer Contribution ...................................................................... 131

ARTICLE H. MISCELLANEOUS ........................................................................... 132

Sec. H-1. Recall of Retirees during emergencies ................................................ 132

ARTICLE I. DEFERRED RETIREMENT OPTION PLAN ........................................... 133

Sec. I-1. General provisions ........................................................................... 133

Sec. I-2. Conversion to Retirement Allowance .................................................. 133

Sec. I-3. Investment of DROP assets .............................................................. 133

Sec. I-4. Distribution of amounts credited to DROP Account ............................. 134

Sec. I-5. Death of Member while participating in the DROP program ................. 134

Sec. I-6. Disability of Member While Participating in the DROP Program ......... 135

Sec. I-7. Cost Neutrality ............................................................................... 135

ARTICLE J. PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM .......... 137

Sec. J-1. Participant Annuity Savings Fund Loan Program ................................. 137

ARTICLE K. SPECIAL PLAN OF ADJUSTMENT PROVISIONS ............................. 140

Sec. K-1. Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment ......................................................................... 140

Sec. K-2. Income Stabilization Benefits .......................................................... 140

Sec. K-3. Restoration of Pension Benefits ........................................................ 143

APPENDIX A .................................................................................................... 152

-viii-

ARTICLE IX, SECTION 24 OF STATE OF MICHIGAN CONSTITUTION..........................152

CITY OF DETROIT CHARTER............................................................................................153

DETROIT CITY CODE........................................................................................................154

COLLECTIVE BARGAINING AGREEMENTS ...................................................................155

thereon, provided that the DROP Accounts are held and invested within the Retirement System.

(6) The Medical Benefits Account Fund shall be the fund in which shall be accumulated the amounts contributed to the Retirement System for the purposes of funding Medical Benefits, together with earnings thereon.

(7) The Expense Fund shall be the fund to which shall be credited funds, if any, provided to the Retirement System by the City to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(8) The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the assets of Component I of the Retirement System and earnings thereon, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9. There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document. Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be used in the following manner in the following order: (i) to pay administrative expenses of Component I (to the extent there are insufficient funds for this purpose credited to the Expense Fund), and/or (ii) transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

## Sec 9.3. Method of Financing Retirement System Benefits

(1) The pension liabilities for Members under this Component I shall be determined by the Plan's Actuary using the Entry Age Actuarial Cost Method of actuarial valuation.

(2) The City's annual contribution to finance the prospective pension liabilities during the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be (a) eleven and two-tenths percent (11.2%) of the Compensation of active employees who are members of the DFFA (for pay periods ending on or before November 6, 2014) and members of DPOA (for pay periods ending on or before October 3, 2014) and (b) twelve and one-quarter percent (12.25%) of the Compensation of active employees who are members of the DPCOA, the DPLSA, the DPOA (for pay periods beginning on or after October 3, 2014) and the DFFA (for pay periods beginning on or after November 6, 2014). A portion of the City's annual contribution for each Plan Year shall be credited to the Pension Accumulation Fund and a portion shall be credited to the Rate Stabilization Fund, each amount as determined by the City in its sole discretion. For plan years commencing July 1, 2023 and later, the accrued pension liabilities for Members shall be determined by the Actuary using reasonable and appropriate actuarial assumptions approved by the Board and the Investment Committee. The City's annual contributions to finance the normal cost of benefits and any such unfunded accrued pension liabilities

- 39 -

shall be determined by the Actuary amortizing such unfunded accrued pension liabilities over a period or periods of future years as established by the Board and approved by the Investment Committee.

(3) Except as provided in Section 9.5, for each Plan Year, a Member who was an active employee as of June 30, 2014 ("current active") shall contribute to the Retirement System an amount equal to six percent (6%) of his or her Compensation for such Plan Year and a Member who is hired or rehired by the City on or after July 1, 2014 ("new employee") shall contribute to the Retirement System an amount equal to eight percent (8%) of his or her Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014. The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014 and (ii) the Member's date of hire, to the date he or she ceases to be an active Member. The contribution shall be deducted from a Member's Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

## Sec 9.4.  Member Contributions Picked-Up

(1) The City shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2) The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code. The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3) The City shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both. The City shall designate the Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

## Sec 9.5.  Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations

(1) To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a

- 40 -

granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

### Sec 16.2. Investment Management

(1)    For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

    (a)    development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

    (b)    within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

    (c)    evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

    (d)    review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

    (e)    in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of all or a portion of the lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

    (f)    communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

    (g)    determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

    (h)    the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

- 62 -

(i)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment or other financial determination that could affect funding or benefit levels;

(j)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(k)     determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l)     performance of an asset/liability valuation study for the Retirement System every three years, or more often as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314* and *Plan Investment Guidelines.*

## Sec 16.3.   Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

## Sec 16.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System. The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it. The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board. The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio. The chief investment officer shall

- 63 -

# EXHIBIT 24

# The Detroit News



EXHIBIT

Ex.24

**DETROIT**

# Detroit is losing a cop nearly every day: 'A lot of officers are saying: Screw it'



**George Hunter**
The Detroit News

Published 11:00 p.m. ET Aug. 31, 2022 | Updated 10:33 a.m. ET Sept. 1, 2022

*Detroit* — During a summer of multiple mass shootings, an explosion in carjackings and random gun violence, dozens of Detroit cops are leaving the police force for neighboring agencies, despite the city's efforts to stem the blue flight to the suburbs.

The Detroit Police Department has lost 223 sworn officers since January, an average of about 28 per month. With four months remaining in the year, the number of outgoing officers has already more than doubled the 103 cops who turned in their DPD badges in 2021.

About half the officers who have left this year joined suburban law enforcement agencies that are struggling to fill their own vacant positions amid a nationwide labor shortage, Detroit police officials said. Other officers went to police departments outside Metro Detroit, officials said.

The departure of Detroit cops to the suburbs for more money, better benefits and safer working conditions has been an issue for years, despite repeated attempts by the city and police department to halt the exodus. In the most recent effort, the Detroit City Council in March approved a proposal by Mayor Mike Duggan to pay each officer a $2,000 "retention incentive bonus."

When the bonuses were announced March 8, 19 officers had left the department in 2022. Since then, another 204 have departed as of Wednesday.

"One of the big issues we have is, we're losing officers to the suburbs at a good rate," Detroit Police Assistant Chief David LeValley said. "We get them, train them in the academy and then the suburban agencies are not shy about recruiting and taking our officers."

But one factor driving Detroit police to other departments is the "lack of respect" officers in the city often encounter, said Steve Dolunt, a former Detroit Police assistant chief who retired in 2017.

"You arrest someone, and they get right back out because judges are giving low or no bonds," Dolunt said. "You've got people spitting on you, antagonizing you, egging you on, while someone else

is filming you with their cell phone. People are getting in the officers' faces and saying, 'If you arrest me, I'll be back out tomorrow.'

"A lot of officers are saying, 'Screw it, I'll go to work in the suburbs, where I can make more money and I don't have to deal with all that crap,'" Dolunt said. "Can you really blame them?"

Detroit isn't the only city losing cops in recent years. A June 2021 nationwide survey by the Police Executive Research Forum of 194 police departments showed a nearly 20% increase in resignations in 2020-21 compared with the previous year.

But the emigration of Detroit officers has been especially significant, with the 326 cops who have left since 2021 representing 14% of the current police force. Longtime current and ex-DPD officials say they've never seen so many officers resigning in such a short period.

LeValley said ramped-up recruitment efforts have resulted in 138 new officers being hired this year, bringing the force up to 2,250 sworn officers, still 200 short of the 2,450 budgeted positions. Another 61 recruits are expected to graduate by the end of the year, LeValley said.

But replacing experienced officers with rookies comes at a cost, Dolunt said.

"It takes years to learn the city's culture," said Dolunt, who led various street units during his 31-year career, including the Violent Crimes Task Force. "A lot of these kids are from the suburbs, and they don't know how to deal with the different situations that come up on the job.

"There are things you can only learn by being out in the street; you can't learn them in the academy, and you need people with experience to patrol a city like Detroit. You've got kids out there with no experience, and the people training them only have a few years on the job themselves. That's not good."

## Spike in violence

There were 30 DPD resignations in August, a violent month in Detroit that included 33 homicides, 112 non-fatal shootings, 56 sexual assaults and 116 robberies and 26 carjackings, according to police statistics.

Aside from a 38% increase in carjackings, there has been a decrease in most violent crimes in Detroit this year. Homicides were up 2%, but nonfatal shootings are down 13%, sex assaults down 11% and overall violent crime down 12% year-to-date from the same Aug. 1-30 period in 2021.

But there has been a recent spike in violence, including 24 nonfatal shootings and nine homicides last weekend. There have been three mass shootings in the city since July 31.

And then there was the tragic death this summer of Officer Loren Courts, who was killed when he and his partner were ambushed while responding to a 911 call reporting shots fired on the city's west side.

"Our officers are dealing with all sorts of dangerous situations every day," said Mark Young, president of the Detroit Lieutenants and Sergeants Association. "Our manpower numbers are down, but look at the way the officers handled that shooter (19-year-old Dontae Smith, who was charged Wednesday with initiating a shooting spree that left three people dead).

"DPD is out there performing with valor, but if we don't start paying our officers a competitive wage, with competitive benefits, this hemorrhaging is going to continue," said Young, whose union is in contract negotiations with the city, along with the Detroit Police Officers Association and the Detroit Command Officers Association.

The three unions' contracts expired July 1, but the parties agreed to extend the pact to continue negotiating.

## 'Not nearly enough'

Starting annual salary for Detroit police officers is about $42,000, LeValley said. That compares with starting yearly salaries of $51,861 in Warren, $44,160-$54,355 in Southfield and $49,346 in Sterling Heights.

"The mayor and the chief are committed to getting a new contract, and there's no question we need to get our pay competitive with other agencies," LeValley said. "The starting pay was $28,000 in 2014, so there has been progress, although it's not nearly enough."

Detroit is one of the few municipalities in Michigan that pays for officer training. Other departments require candidates to foot the bill for Michigan Coalition on Law Enforcement Standards training, which state officials estimate can run from about $6,000 to $10,000.

Candidates often take the free training and then bolt for higher-paying jobs in the suburbs. For years, Detroit officials have complained about representatives from other police agencies showing up at the Detroit Police Academy to recruit officers as soon as they graduate.

"A lot of these officers are leaving for other departments as soon as they walk across the stage (during their Detroit Police graduation ceremonies)," Dolunt said. "Although there are a few suburban departments that won't take officers right out of the academy."

Ronald Haddad, who spent 34 years on the Detroit police force, said he hired several ex-Detroit cops while serving as Dearborn chief from 2008-20 — "but when they'd apply right out of the police academy, I wouldn't take them," he said.

"I wouldn't hire them until at least they'd gone through their (one-year) probationary period," Haddad said. "I think they should have to give back something in return for the training that Detroit paid for. Plus, there was the matter of them not having any experience. I just didn't think they were good hires."

Taylor Police Chief John Blair said he also rejects applicants fresh out of the Detroit Police Academy but said he's "hired a bunch" of officers from Detroit in recent years, including four who are scheduled to start in September.

"We don't hire officers out of the academy, but what we are doing is offering lateral transfers, and that's made a huge difference," said Blair, whose department pays a starting annual salary of "just over $50,000."

"We were struggling tremendously to fill open positions, but then the City Council and the mayor backed us offering lateral transfers, and where we had three to four people on the hiring list, now we have 18," Blair said.

"With lateral transfers, you're paid at a higher rate, depending on your level of experience, similar to what happens in the corporate world," Blair said. "A lot of departments are starting to go to lateral transfers to attract officers."

Blair said Taylor allows officers to transfer up to five years of their experience, and that five-year police veterans start at about $75,000 annually.

## More money, benefits

Detroit Police Capt. Aric Tosqui, vice president of the Detroit Police Command Officers Association union, said when he talks to outgoing police officers, "they tell me they're leaving for more money, better benefits and a better pension system."

"Those are things that are out of our hands as supervisors, so we try to do what we can, such as making for a good work environment, and stress things like health and wellness, making time for family, and explaining that there's a lot of room for advancement here," Tosqui said. "If you go to a department that has 20 people, it may be 10 years before you're promoted. Here, you can advance fast.

"But it's a different conversation when it's a young officer who's thinking about leaving, as opposed to someone who's older," Tosqui said. "We just had a sergeant in the 10th Precinct who had 33 years of DPD service, who retired and is now working for the (Oakland County Sheriff's Office). It's harder to talk those officers into staying."

LeValley said Duggan recently approved paying officers double-time instead of time-and-a-half for overtime shifts.

"Offering double-time was like the (retention) bonuses — it's a show of good faith that we believe the officers should be making more money, and while we're going through contract negotiations, it's a way for us to incentivize the worker," he said.

## Paid to leave

During the early discussions of the plan to give $2,000 bonuses to Detroit officers and $1,000 to part-time police assistants, Council President Mary Sheffield suggested spreading out the bonus payments over the course of a year, said her spokesman, Brian White.

"There were concerns about paying the entire amount up front because we were afraid officers would just take the money and leave, which is what happened," White said of the bonuses that were paid for by using $5 million in federal American Rescue Act funds, some of the city's General Fund and money that was allotted for overtime.

"But, it was a short conversation; the administration didn't want that," White said. "They didn't give a reason."

Duggan spokesman John Roach said the ongoing negotiations with the three police unions played a role in how the bonuses were paid.

"It was clear last year that the contract negotiations with the three police unions were going to be so complicated that they were going to run well past the June 30 expiration," Roach said in an email. "Chief White was very concerned about officer morale during this period and felt that the city needed to deliver a concrete show of good faith, letting the officers know the city was genuinely committed to raising their compensation for the long run.

"No one at DPD believed a one-time of $2,000 was enough of an incentive to change the mind of an officer leaving for higher compensation in another department. DPD leadership felt strongly that it would be ineffective if structured as a retention bonus with a specific time requirement, but would be much more effective as a show of good faith to help get through a difficult negotiation process."

White, Sheffield's spokesman, said despite the councilwoman's misgivings about paying officers in one lump sum, she voted to pass the measure anyway.

"Nobody wanted to be seen as not supporting police officers," he said.

*ghunter@detroitnews.com*

*(313) 222-2356*8846-tjt    Doc 13663-3    Filed 10/31/22    Entered 10/31/22 16:55:43    Page 59 of 74

# EXHIBIT 25



NEWS    LOCAL 4+    WEATHER    SPORTS    FEATURES    LIVE IN THE D    ANN

NEWS    LOCAL 4+    WEATHER    SPORTS    FEATURES    LIVE IN THE D    ANN ARBOR    NE



**LOCAL NEWS**

# Detroit police officers to get pay raises under new agreement

'I was extremely pleased when we got the notice in September that we had $35 million to $45 million more than we expected'

**Megan Woods**, Reporter

Published: **September 30, 2022 at 8:30 PM**

Tags: **Detroit, Detroit Police Department, Mayor Mike Duggan, Chief James White, Local, Detroit Police Officers Association, DPOA, Mark Young**

 NEWS        LOCAL 4+        WEATHER        SPORTS        FEATURES        LIVE IN THE D        ANN

*It's been a significant problem plaguing Detroit police for years, but now a new deal with the city's police unions is raising pay for officers and helping keep them on the force.*



**DETROIT** – The **Detroit Police Department** is trying to fill 300 vacancies while keeping the officers they do have, and they plan to do it by increasing pay. **Mayor Mike Duggan**, Detroit police **Chief James White**, and union leaders made the announcement Friday morning.

Rumors about pay bumps had leaked within the department before the announcement, and White says because of that, they are already getting feedback.

"Already, as of yesterday, I had five officers hand walk to my office a request to return to the police department," said White. "That's the impact; five officers from suburban agencies."

It says a lot given that the Detroit Police Department lost 72 officers in August and September alone, and two-thirds of those went to other police departments.

If union members ratify the contract, starting pay for Detroit police officers will go from $43,000 to $53,000. For



NEWS        LOCAL 4+       WEATHER       SPORTS       FEATURES       LIVE IN THE D       ANN

The agreement with the lieutenants and sergeants union would raise the pay of detectives by $11,000, sergeants by an average of $10,000, and lieutenants by an average of $11,000.

Duggan says the money is coming from the city's income tax revenue after having a revenue estimating conference in February and again in September.

"I was extremely pleased when we got the notice in September that we had $35 million to $45 million more than we expected as far as I was concerned the number one priority was public safety," Duggan said.

White said he knows the change in pay will make a difference.

"You can't have the number of officers that we're going to hire without having a robust training program, and there's money here to pay our trainers separate and apart from patrol, something we didn't have in the past," White said.

Mark Young, president of DPOA, said, "All we want is this to be a better place for people to live, work, play, and to socialize. I'm already receiving calls from people trying to come back to our department, which is a good sign."

To move forward, unions must approve the agreement within a week. Duggan says they will also need to submit a budget amendment for $25 million for the contract to go into effect.

**Click here** to watch the full announcement.

*Copyright 2022 by WDIV ClickOnDetroit - All rights reserved.*

# EXHIBIT 26

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .      Docket No. 13-53846
        MICHIGAN,               .
                               .      Detroit, Michigan
                               .      September 17, 2014
              Debtor.           .      8:32 a.m.
. . . . . . . . . . . . . . . .

        TRIAL RE. OBJECTIONS TO CONFIRMATION OF CHAPTER 9 PLAN
              BEFORE THE HONORABLE STEVEN W. RHODES
              UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  EVAN MILLER
                            THOMAS CULLEN, JR.
                            GEOFFREY S. IRWIN
                       51 Louisiana Avenue, N.W.
                       Washington, DC  20001
                       (202) 879-3939

                       Jones Day
                       By:  ROBERT W. HAMILTON
                       325 John H. McConnell Blvd., Suite 600
                       Columbus, OH  43215
                       (614) 281-3848

For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  EDWARD SOTO
Company:               1395 Bricknell Avenue, Suite 1200
                       Miami, FL  33131
                       (305) 577-3177

                       Weil, Gotshal & Manges, LLP
                       By:  ALFREDO PEREZ
                       700 Louisiana, Suite 1600
                       Houston, TX  77002
                       (713) 546-5040

For County of          Dechert, LLP
Macomb, Michigan:      By:  ALLAN BRILLIANT
                       1095 Avenue of the Americas
                       New York, NY  10036
                       (212) 698-3600

**EXHIBIT**
*Ex. 26*

APPEARANCES (continued):

| | |
|---|---|
| For Official Committee of Retirees: | Dentons, US, LLP<br>By: DAN BARNOWSKI<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005-3364<br>(202) 408-6417 |
| For Ad Hoc Water and Sewer Bondholders: | Kramer Levin Naftalis & Frankel, LLP<br>By: JONATHAN M. WAGNER<br>1177 Avenue of the Americas<br>New York, NY 10036<br>(212) 715-9393 |
| Court Recorder: | LaShonda Moss<br>United States Bankruptcy Court<br>211 West Fort Street, 21st Floor<br>Detroit, MI 48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI 49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1   promised people pension and it had promised people

2   healthcare.  Those were two promises that, in our view, were

3   important promises, and so we always viewed our job as trying

4   to represent and advocate on behalf of both of those

5   promises.

6   Q   Okay.  And how did that play out in terms of -- I don't

7   want you to talk about discussions with the city or

8   mediation, but in terms of the negotiations, was the

9   committee willing to give a little on one side in order to

10  get more on the other, or --

11  A   Early in the case -- early in the case, the committee

12  determined that pensions would be a priority, and I think

13  there were a number of different reasons for that, but, in

14  any event, the committee concluded that there were other

15  options, at least to a degree, on the healthcare.  And while

16  changes in retiree healthcare would be very painful for

17  people, the committee determined perhaps because we believed

18  we had a better legal argument on the pension, perhaps

19  because of people's emotional connection to their pension,

20  for a constellation of reasons, the committee strongly

21  believed that the priority should be on pensions.  And so as

22  we approached the situation, that's what we did on behalf of

23  the committee, and the committee, as it advocated for itself,

24  determined that its highest priority was protecting the

25  pension.  And, again, our initial position was the pension

1  should remain untouched in its entirety, but pretty early on

2  we signaled that we could see a compromise in the OPEB, in

3  the retiree insurance arena.

4       MR. WAGNER:  Your Honor, just note my objection.  To

5  the extent the testimony is being offered as the witness'

6  subjective views concerning OPEB and pension, I believe

7  that's not relevant with respect to the reasonableness of any

8  settlement, and also to the extent that OPEB and pension are

9  being combined we have an objection.

10       MR. SOTO:  A separate objection, your Honor, would

11  also be that to the extent the witness is talking about

12  anything that has to do with the mediation, I think the

13  mediation order is still in place, and it's hard for me to

14  figure that out yet.

15       THE COURT:  Well, I think it's a little bit broad to

16  prohibit the witness from talking about anything that has to

17  do with mediation.  What the Court's order prohibits is

18  disclosure of anything that took place during mediation, and

19  the Court will abide that order, of course.  Beyond that, the

20  objections are overruled.  You may proceed.

21  BY MR. BARNOWSKI:

22  Q    Did the committee have any other goals going into the

23  negotiations with the city?  And, again, don't talk about

24  what was talked about with the city or the actual

25  negotiations.

1   A   No.  I would talk about how we approached it.

2   Q   Right.

3   A   The committee's objective, at least as I perceived it and

4   as one of their advisors what I believe the direction they

5   were giving to me was to do as best as we could -- and I

6   described the relative weighting of the claims, but to do as

7   best as we could to maximize the value of the claims.  But we

8   viewed it in a -- within what I would call constraints or

9   context.  The committee early on established or believed that

10  the city's objective, which had been stated early on in the

11  June presentation and the city had been very public and vocal

12  about, was a key priority of the proceeding -- and this was

13  before the filing, but even after the filing -- was that

14  Detroit be able to revitalize itself.  Detroit had been --

15  and this was well-documented and discussed, you know, quite

16  broadly -- self-evident I think would be fair, at least from

17  my perspective, self-evident, that Detroit had been in

18  decline for a long time.  And, you know, I'd been observing

19  that from a distance.  And when you work with GM and

20  Chrysler, you can't help observe what's going on in Detroit,

21  so to me those -- that was self-evident that Detroit was in a

22  long-term decline and that part of the test of whether a

23  reorganization would be successful was whether or not Detroit

24  was given a reasonable chance to revitalize itself.  So for

25  us we determined for some different reasons which I can talk

1  about, but we determined that anything we put forward we had

2  to in good faith feel was consistent with revitalizing the

3  City of Detroit.  We felt that, number one, because we had no

4  expectation -- again, from the beginning, we had no

5  expectation that we were going to get a one-time lump sum

6  cash payout.  We had these big claims.  They are reducible to

7  present value.  In theory, they could be resolved simply by

8  the city, you know, writing a check as it were for the whole

9  amount, and we would go away.  We had no expectation that

10  that was feasible.  It didn't take, again, long looking at

11  the public documents that the city -- were available to

12  anybody that the city would not be capable of writing

13  enormous checks.  So for one -- so one reason we cared about

14  revitalization was at the end of the day we were relying on

15  the City of Detroit to be there to honor these promises out

16  on into the future.  And while we felt like we had strong

17  legal arguments that no matter what the city agreed to on

18  pension in this case it should be protected by the

19  Constitution, the reality is, as we observed, when you get

20  yourself in bankruptcy, bad things happen.  And so for us to

21  bet -- so we were, whether we liked it or not, betting on the

22  city because our promises, the promise -- the revised

23  promises that the city would make, whatever they would be,

24  would be promises that would pay out over time, and so we had

25  to have belief that revitalization could occur because if the

1  city continued in this long-term decline, the revised

2  promises it made would likely be challenged, not as a legal

3  matter but as a financial matter, so for that reason we were

4  concerned about revitalization. Second -- I'm sorry. Go

5  ahead.

6  Q   No.  I was going to say were there any other reasons why

7  you were interested in revitalization?

8          THE COURT:  Excuse me.  Before you answer that

9  question --

10          THE WITNESS:  Yes, sir.

11          THE COURT:  -- was the "we" that you referred to

12  many times in that answer you, Lazard, the committee, you and

13  Lazard, or some other answer?

14          THE WITNESS:  Okay.  Well, I was the leader of the

15  Lazard team, so I think I can speak for Lazard on this

16  matter.  And I think I am reflecting the views of the

17  committee, yes.  It is also Lazard's view, but I think in

18  this case it's coincident with the view of the committee --

19          THE COURT:  Okay.

20          THE WITNESS:  -- yes.

21          THE COURT:  It would help me if you could -- if you

22  could explicitly state who your answers refer to.

23          THE WITNESS:  Yes, sir.  Okay.

24  BY MR. BARNOWSKI:

25  Q   So the question was --

1  THE COURT: We're waiting for -- we're waiting for a

2  question. What was your question?

3  MR. BARNOWSKI: Right.

4  BY MR. BARNOWSKI:

5  Q  The question was were there any other reasons why the

6  committee was interested in the city's ability to revitalize

7  itself through this bankruptcy?

8  A  Yeah. I think the -- I think the committee also believed

9  that the political overlay -- this is a political

10  environment. The city is a political entity. There are many

11  stakeholders who are political entities who are involved in

12  this case whether it be the -- whether it be the other

13  counties or whether it be the State of Michigan itself, and

14  our perception -- the committee's perception was they had a

15  keen interest in revitalization as well, and so, again, we

16  felt like to put ourselves adverse to that view that

17  revitalization was key, we thought to put ourselves adverse

18  to that would make it very unlikely that we would be

19  successful in our advocacy to bring other stakeholders into

20  support of our overall view. So irrespective of whether we

21  were getting a long-term payout, which we were, but separate

22  and apart from that, we believed that the resolution of this

23  case would involve the -- would include the involvement of

24  other stakeholders, and, again, reading the newspapers,

25  watching -- and, again, everyone on the committee, you know,

1  lived in and around Detroit. They had views of what the

2  politics were, and so, again, the committee felt like being

3  on the wrong side of revitalization was just not a place that

4  would get us where we needed to go.

5  Q   Okay.  Now, you talked a little bit about the committee's

6  goals or purposes going into the negotiations.  I want to

7  fast forward a little bit and just ask you did the committee

8  achieve all it hoped to do through the negotiations?

9  A   No, I don't think we achieved all that we hoped to

10  achieve.  Certainly in the beginning, again, we had been very

11  public and vocal about the fact that we thought the pensions

12  should be left untouched.  I believe what the committee

13  thought and the reason they determined to support the plan

14  was we believe that we received enough, that it was enough to

15  get -- again, in the context of the situation, given the

16  constraints I've prior talked about, given the reality of the

17  various other stakeholders and the other contending matters

18  in the case, and given the alternative in the city's

19  solicitation, we felt like support of the plan was

20  appropriate and in the best interest of the people we were

21  representing.  But there was -- you know, there was enormous

22  disappointment by the members of the committee that they were

23  going to be recommending to their fellow retirees that they

24  vote in favor of having their pensions reduced.  That's a --

25  you know, in my experience, that's a challenging thing to ask

1  an elected or appointed representative to do.

2  Q   Did the committee believe that the settlement proposal

3  would further the city's ability to revitalize itself in the

4  ways that you've described?

5  A   I think the committee felt that the -- our settlement and

6  the POA generally would help to facilitate the revitalization

7  of the city.   There are no guarantees.   We did not view there

8  is guarantees, but we believed that it was a reasonable

9  amount that could be done in the context of a court

10  proceeding to set the stage for possible revitalization.

11  Q   Okay.  And putting aside the financial means of

12  revitalization, were there other purposes of the

13  revitalization or ways that the plan would further

14  revitalization in the committee's mind?

15  A   Well, one thing we observed, some of it in the plan and

16  some of it simply in the city's behavior as we watched them

17  negotiate with us and with other entities, was we saw the

18  city taking a different view toward its workforce, and,

19  again, our view was that a workforce that is motivated and

20  excited about the opportunity to participate in the

21  revitalization of Detroit is an important element of that

22  revitalization.  You know, we believed that the city needed

23  money, just, you know, money to remove blighted houses, to

24  buy new police cars, et cetera, and that was critical, and

25  that had to be provided for in the plan, but at the end of