## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S MOTION FOR AUTHORITY TO MODIFY THE CONFIRMED PLAN OF ADJUSTMENT TO ADDRESS CREDITED SERVICE SHORTFALL SUSTAINED BY CERTAIN MEMBERS OF THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT

The City of Detroit, Michigan ("City"), by its undersigned counsel, files the *City of Detroit's Motion for Authority to Modify the Confirmed Plan of Adjustment to Address Credited Service Shortfall Sustained By Certain Members of the General Retirement System of the City of Detroit* ("Motion"). In support of the Motion, the City respectfully states as follows:

## I.      **Introduction**

In response to the COVID-19 pandemic and stay at home orders issued by the state of Michigan, in April 2020, the City started a Work Share/Furlough program (the "Work Share Program"). Under the Work Share Program, rather than being laid off, eligible employees would instead work a reduced number of hours in the work week and would receive a portion of weekly unemployment benefits. By participating in the Work Share Program, the City was able to retain trained employees and avoid the expense of recruiting, hiring and training new employees.

Employees participating in the City's Work Share Program (i) continued to maintain Membership status in the Combined Plan for the General Retirement System of the City of Detroit, Michigan (working more than 600 hours in a calendar year (Section 3.1)); and, (ii) were required to continue making mandatory employee contributions to the Retirement System (Section 9.3.(3)). Although, the employees participating in the Work Share Program and the City continued to make mandatory employee and employer contributions to the pension plan (albeit, based on a reduced salary), the employees did not accrue Credited Service for any month in which they worked less than 140 hours. These employees were still required to make their mandatory employee contributions to the Retirement System for the month in which they received no Credited Service. Additionally, these employees will be required to make up this lost Credited Service with future service to the City in order to meet the age and service requirements for retirement.

The City had over 1,300 employees that were placed in the Work Share Program. As of June 2022, these employees averaged a loss of 5.68 months of Credited Service and collectively contributed approximately $2.8 million dollars in employee contributions for months in which no Credited Service was given. Unless corrected, this will produce an unfair windfall gain for the pension system and an unfair loss for those employees who were placed on the Work Share Program through no fault of their own.

2

The City and the General Retirement System ("GRS") Board of Trustees believe that the granting of pro rata Credited Service to those employees participating in the Work Share Program during the COVID pandemic based upon their actual service is fair and appropriate. Such Credited Service would be granted in accordance with the following modification to the Combined Plan for the General Retirement System of the City of Detroit, Michigan:

> For the time that a Member participated in the employer's Work Share Program during the period April 1, 2020, through December 31, 2022, the Member's Credited Service shall be adjusted under the following Formula: The Member shall receive full months of Credited Service for that period equal to the Employee's total Hours of Service for the period divided by 140. That number shall be rounded down to determine the total Credited Service in full twelfths (1/12) of a year. To the extent a Member received Credited Service for the time the Member was on Work Share, that Credited Service shall be null and void and shall be replaced in toto by the Credited Service set forth in the above Formula.

For months worked while in the Work Share Program, the proposed change would allow hours in one month to be combined with hours in another month for determining the 140-hour requirement. The System's actuaries have prepared a cost estimate of the impact of this amendment. Ex. 6(c). Such an estimate is difficult because of many unknown factors such as the number of members who will not vest due to not remaining employed for at least 10 years, and investment gains earned on Member contributions. If there is a cost, it is minimal when compared to the direct payroll savings achieved by the City in implementing its Work Share Program.

3

Finally, nothing in the City's bankruptcy plan prohibits the proposed modification. Indeed, this Court retained jurisdiction to enter orders modifying the plan if needed. As the proposed modification is justified, fair, and does not affect any distribution to, or treatment of, any claim or creditor in any Class under the Plan except those in Class 11,[1] the City respectfully requests that the Court enter an order authorizing and approving the modification.

## II. **Background**

### A. **Relevant background from the City's bankruptcy case.**

On July 18, 2013 ("Petition Date"), the City commenced this chapter 9 case ("Bankruptcy Case"). After a number of iterations, the City filed its *Eighth Amended Plan of the Adjustment of Debts of the City of Detroit (October 22, 2014)* ["Plan," Doc. No. 8045]. The Court confirmed the City's Plan ["Confirmation Order," Doc. No. 8272] and on December 10, 2014 ("Effective Date"), it became effective. [Doc. No. 8649.]

Class 11 of the Plan provides for treatment of pension claims of the GRS. Plan, Art. II.B.3.r, pp. 39-40. These pension claims were allowed in the aggregate amount of approximately $1,879,000,000. *Id.* The Plan provides that the pension plan for the GRS in effect on the Petition Date would be frozen as of July 1, 2014.

---

[1] Class 11 of the Plan provides for treatment of pension claims of the GRS. The GRS supports the modification.

39885196.3/022765.00213

[*Supplemental Opinion Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing*, p. 43 of 219, Doc. No. 8993.] This change and others are set forth in the Combined Plan for the General Retirement System of the City of Detroit, Michigan (Amendment and Restatement Effective July 1, 2014) ("GRSD Plan"). The GRSD Plan has two components. Component I of the GRSD Plan applies to benefits accrued by members of the GRS on or after July 1, 2014, and to the operation of the GRS on or after July 1, 2014 (i.e., to active employees). The Plan identifies Component I as the "New GRS Active Pension Plan." *See* Exhibit I.A.250.a to the Plan, Doc. No. 8045-1, p. 377 of 809; **Exhibit 6A** to this Motion. Component II of the GRSD Plan generally applies to benefits accrued by members of the GRS prior to July 1, 2014. The Plan identifies Component II as the "Prior GRS Pension Plan." *See* Exhibit I.A.280, Doc. No. 8045-1, p. 530 of 809; **Exhibit 6B** to this Motion.

More specifically, with respect to the accrual of future benefits for active employees, Class 11 provides that

> Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan

Plan, Art. II.B.3.r.F, p. 41.

39885196.3/022765.00213

**B.  Credited Service under Component I**

Section 3.1 of Component I provides in pertinent part that all "full-time employees" of the City employed on or after July 1, 2014, are included in the Membership of Component I of the GRSD Plan. "Full-time employees" are generally defined under the plan as employees who are "employed in a position normally requiring six hundred hours of work or more per calendar year".

All Members of the Component I plan are required to make mandatory employee contributions to the Retirement System.[2]  Section 9.3.(3) provides in pertinent part that:

> "[F]or each Plan Year, a Member shall contribute to the Retirement System an amount equal to four percent (4%) of his or her base Compensation for such Plan Year... The officer or officers responsible for processing the payroll shall cause a Member's <u>Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014, and (ii) the Member's date of hire to the date he ceases to be an Employee</u>. The contribution shall be deducted from a Member's Compensation, notwithstanding that the minimum compensation provided by law for the Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System." (Emphasis added).

---

[2] Capitalized terms not defined in this Motion shall have the meanings ascribed to them in the GRSD Plan.

Employees working more than more than 600 hours per calendar year are included in the Membership of the GRSD Plan. All Plan Members are required to make mandatory employee contributions to the GRSD Plan. However, Credited Service is not based solely upon Membership and/or employee contributions. Employees are only credited with one month of Credited Service for each calendar month in which they perform 140 hours or more of service for the individual's employer. Specifically, Section 4.1. titled "Credited Service", provides in pertinent part:

(1) The Board shall keep an accurate record of each Employee's accumulated Service credit from the date of commencement of employment with the Employer to the date of termination of employment with the Employer.

(2) A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the Employer as an Employee, beginning on the later of July 1, 2014 or his date of hire with the Employer and ending on the date his employment with the Employer is terminated. Service shall be credited in years and twelfths (1/12th) of a year. Not more than one-twelfth (1/12th) of a year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in a calendar month. Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in any period of 12 consecutive months.

*"Hour of Service"* is further defined in the plan as "(i) each hour for which a Member is paid or entitled to payment by the Employer for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the

7

Employer for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence)" Section 2.1(24).

### C.    City of Detroit Work Share/Furlough Program

On March 10, 2020, Governor Gretchen Whitmer issued Executive Order 2020-4, which declared a state of emergency in Michigan to address the COVID-19 pandemic. This order was further adjusted several times over the next 70 days. The Governor's Executive Orders in part restricted access to places of public accommodation and school buildings, limited gatherings and travel, and required workers who were not necessary to sustain or protect life to remain at home. As part of the Governor's efforts to mitigate the economic harms of the pandemic, the state expanded eligibility for unemployment benefits.

In response to the pandemic and the Executive Orders, the City was faced with a need to change its daily business activities and its workforce. In April of 2020, the City started the Work Share Program.  A Work Share Program permits employers to maintain operational productivity during declines in regular business activity instead of laying off workers. With the Work Share Program, rather than being laid off, eligible employees would instead work a reduced number of hours in the work week and would receive a portion of weekly unemployment benefits. By participating in Work Share, the City was able to retain trained employees and avoid the expense of recruiting, hiring and training new employees.

8

With the Work Share Program, unemployment benefits are based on a percentage of the reduced hours of work and pay. The reduction in work hours must result in an equivalent reduction in wages. An example of the calculation of the Work Share Program benefit is as follows:

> While weekly benefits rates vary from person to person, if a worker was fully unemployed, their weekly benefit amount would be, for example, $360. Under Work Share, a worker whose hours were reduced by 20 percent would receive a Work Share benefit payment of $72 ($360 x 20%) = $72.

Unemployment benefits cannot exceed 20 times the weekly benefit payable to participating employees. Participating employees must have earned a sufficient amount of wages in order to establish an unemployment claim and receive Work Share benefits. The program requires employers to maintain the fringe benefits of participating employees and obtain approval, if necessary, from collective bargaining representatives. The City was required to meet and maintain a number of State requirements to participate in the Work Share Program.

Employees participating in the City's Work Share Program (i) continued to maintain Membership status in the GRSD Plan (working more than 600 hours in a calendar year (Section 3.1)); and, (ii) were required to continue making mandatory employee contributions to the Retirement System (Section 9.3.(3)). Although the employees participating in the program and the City continued to make mandatory employee and employer contributions to the pension plan (albeit, based on a reduced

9

salary), the employees did not accrue Credited Service for any month in which they worked less than 140 hours. In certain months, depending on payroll dates, these employees did not meet the 140 hours of service requirements and accordingly received no Credited Service for the hours they did work. These employees were still required to make their mandatory employee contributions to the Retirement System for the month in which they received no Credited Service. Additionally, these employees will be required to make up this lost Credited Service with future service to the City in order to meet the age and service requirements for retirement.

The City had over 1,300 employees that were placed in the Work Share Program. As of June 2022, these employees averaged a loss of 5.68 months of Credited and collectively contributed approximately $2.8 million dollars in employee contributions for months in which no Credited Service was given.

The Retirement Board has recommended that the City consider Bankruptcy Court approval to grant pro rata Credited Service to those employees participating in the Work Share Program during the COVID pandemic based upon their actual service to the city as follows:

> For the time that a Member participated in the employer's Work Share Program during the period April 1, 2020, through December 31, 2022, the Member's Credited Service shall be adjusted under the following Formula: The Member shall receive full months of Credited Service for that period equal to the Employee's total Hours of Service for the period divided by 140. That number shall be rounded down to determine the total Credited Service in full twelfths (1/12) of a year. To the extent a Member received Credited Service for the time the Member was on

10

Work Share, that Credited Service shall be null and void and shall be replaced in toto by the Credited Service set forth in the above Formula.

**Summary of Hybrid (Component I) Workshare/Furlough Data**

|  | General | DOT | DWSD | Library | Total |
|---|---|---|---|---|---|
| Number of members | 1,093 | 139 | 110 | 0 | 1,342 |
| Average Age on June 30, 2021 | 49.4 | 51.5 | 50.8 | n/a | 49.7 |
| Average Service on June 30, 2021 | 12.1 | 16.8 | 13.1 | n/a | 12.7 |
| Average Salary on June 30, 2021 | 67,077 | 44,805 | 70,721 | n/a | 65,069 |
| Average full months of Credited Service that would be gained as a result of this proposal.* | 5.95 | 5.65 | 3.04 | n/a | 5.68 |
| Total contributions made during months worked in which service was not granted under current rules. | $2,459,395 | $197,593 | $126,894 | n/a | $2,783,883 |

*Full months of Credited Service that would be gained as a result of this proposal was determined by:

(1) Taking credited service earned under the proposed rules while in the Workshare/Furlough program, as reported by the System;
(2) Truncating the amount in (1) to an integer month based on our understanding of administrative procedures;
(3) Then subtracting credited service earned under the current rules while in the Workshare/Furlough program, as reported by the System; and
(4) Result is the full months of credited service that would be gained as a result of this proposal.

The Retirement Board requested that its actuary, GRS Consulting, provide a supplemental actuarial report that considers the proposal to allow the accrual of some additional Credited Service for Workshare participants that worked less than 140 hours in a month by combining monthly service (less than 140 hours) over the Work Share period. The report is attached as **Exhibit 6C**.

For months worked while in the Work Share Program, the proposed change would allow hours in one month to be combined with hours in another month for determining the 140-hour requirement. The report was based on the data and assumptions from the June 30, 2021, Annual Actuarial Valuations, new data specific to the Work Share participants, and clarified administrative procedures for Credited Service.

39885196.3/022765.00213

Based on the data provided, for members valued in the report, the total employer and employee contributions made on behalf of Work Share participants during months worked in which service was not granted under was $2.78 million. If no service below 140 hours is credited, the contributions made during these months effectively become a gain to the Plan (since contributions were being made while service was not being accrued). If hours in one month may be combined with hours in another month for determining the 140-hour requirement as part of the total effect of the Work Share Program, the actuary has estimated that the net cost for the Component I Plan would be approximately $1.17 million ($3.95 million - proposal impact less the $2.78 million Work Share contribution gain). This cost amount does not, however, recognize the significant investment gain made on the employee contributions to the Retirement System over this period.

**D.    The proposed modification to the New GRS Active Pension Plan.**

The City and the GRSD Board of Trustees believe that the granting of Credit Service to those employees required to participate the City's Work Share Program as a result of the Covid Pandemic is just and appropriate under these unique circumstances. The cost impact to the Retirement System is minimal when compared to the direct payroll savings achieved by the City in implementing its Work Share Program. Accordingly, the City and the GRSD respectfully request that this Court enter and order modifying the GRSD Plan by adding the following paragraph:

12

For the time that a Member participated in the employer's Work Share Program during the period April 1, 2020, through December 31, 2022, the Member's Credited Service shall be adjusted under the following Formula: The Member shall receive full months of Credited Service for that period equal to the Employee's total Hours of Service for the period divided by 140. That number shall be rounded down to determine the total Credited Service in full twelfths (1/12) of a year. To the extent a Member received Credited Service for the time the Member was on Work Share, that Credited Service shall be null and void and shall be replaced in toto by the Credited Service set forth in the above Formula.

## III.   <u>Argument</u>

### A.   **The Plan and Confirmation Order permit the modification.**

The Plan anticipates the possibility that modifications might become necessary at some point after confirmation.

> Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

Plan, Art. VIII.B., p. 71.

> The City is hereby authorized to make non-material modifications or amendments to the Plan at any time prior to the substantial consummation of the Plan, without further order of the Court. In addition, without the need for a further order or authorization of this Court, but subject to the express provisions of this Order, the City shall be, and hereby is, authorized and empowered to make non-material modifications to the documents filed with the Court, including Exhibits or documents forming part of the

13

evidentiary record at the Confirmation Hearing, in its reasonable business judgment as may be necessary or appropriate.

Confirmation Order, ¶ 73, p. 117; *see also id.*, ¶ 74 (noting that modifications to the Plan may not impair Class 9 treatment or adversely affect FGIC without FGIC's written consent). Thus, prior to substantial consummation of the Plan, the City could modify its Plan without Court approval. After substantial consummation, however, a Court order is required. The Court retains jurisdiction to enter such an order.

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to [. . .]

Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan [. . . .]

Plan, Art. VII.H, p. 70; *see also* Confirmation Order, ¶ 92, pp. 125-26

("Notwithstanding the entry of this Order, from and after the Effective Date, the

14

Court shall retain such jurisdiction over the Chapter 9 Case to the fullest extent permitted by law, including, among other things, jurisdiction over those matters and issues described in Article VII of the Plan . . . ."); 11 U.S.C. § 945(a) ("The court may retain jurisdiction over the case for such period of time as is necessary for the successful implementation of the plan.").

### B. A confirmed and substantially consummated chapter 9 plan may be modified when no creditor will be treated less favorably by the modification.

The Plan has been confirmed and substantially consummated. *In re City of Detroit, Mich.*, 838 F.3d 792, 799 (6th Cir. 2016), *cert. denied sub nom. Ochadleus v. City of Detroit, Mich.*, 137 S. Ct. 1584, 197 L. Ed. 2d 707 (2017), and *cert. denied sub nom. Quinn v. City of Detroit, Mich.*, 137 S. Ct. 2270, 198 L. Ed. 2d 714 (2017). However, it may still be modified to authorize the revision of the GRSD Plan proposed in this Motion.

"The Bankruptcy Code does not explicitly provide for modification of a plan after confirmation. Neither did the Bankruptcy Act. However, two cases have held that such modification is permissible." 6 COLLIER ON BANKRUPTCY ¶ 942.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citing *Am. United Life Ins. Co. v. Haines City, Fla.*, 117 F.2d 574 (5th Cir. 1941) and *Wells Fargo Bank & Union Trust Co. v. Imperial Irrigation Dist.*, 136 F.2d 539 (9th Cir. 1943)).

39885196.3/022765.00213

The *American United Life Insurance Company* case considered whether Congress's failure to include any provision in the Bankruptcy Act for post-confirmation modification of a Chapter IX plan meant that such modifications were impermissible. 117 F.2d at 576. The Fifth Circuit considered an argument "against the possible modification of a confirmed plan [] based on the words of the statute [. . .] 'Before a plan is confirmed, changes and modifications may be made therein, with the approval of the judge after hearing,' etc. The implication is urged that afterwards changes cannot be made." *Id.* The court rejected that argument, stating that it was "unwilling to put a plan into such a strait jacket" and that "[t]here ought to be some leeway for such adjustments." *Id.* The main requirement is that the modification sought must be justified and fair. *Id.*

The *Wells Fargo Bank & Union Trust Company* court faced a slightly different question. In that case, the debtor sought to confirm a plan that contained provisions allowing for post-confirmation modification without court approval, so long as certain conditions were met. 136 F.2d at 548-50. The Ninth Circuit found these provisions permissible. *Id.* at 550. The fact that the Bankruptcy Act did not expressly provide for them did not make them unlawful. *Id.*

More recent cases agree. For example, in *Ault v. Emblem Corporation (In re Wolf Creek Valley Metropolitan District Number IV)*, one creditor wanted to buy property from another, but the second creditor would not sell to the first. 138 B.R.

610, 613 (D. Colo. 1992). In retaliation, the first creditor pressured the municipal debtor to amend its plan on the day of confirmation to the detriment of the second creditor and apparently without notice to him. *Id.* The amended plan was confirmed and the confirmation order became final before the second creditor was able to object. *Id.* The second creditor moved the bankruptcy court to amend the plan to "cure defects" in it, but the bankruptcy court denied the motion, in part because the court felt that it could not authorize any amendments to the plan because the plan had been consummated. *Id.* at 613-14, 619.

The district court reversed, focusing on the fact that the sought-after plan modification affected only the two creditors. *Id.* at 620. Because of this, it was possible to amend the plan without disrupting the legitimate expectations of others. *Id.* The court felt this made modification of the confirmed plan possible. *Id.*

Just a few years ago, another court reviewed the case law and concluded that post-confirmation modifications of chapter 9 plans are permissible. *In re Barnwell Cnty. Hosp.*, 491 B.R. 408, 414-16 (Bankr. D.S.C. 2013). That court found only one case that held to the contrary, *In re East Shoshone Hospital District*, No. 98-20934-9, 2000 WL 33712301 (Bankr. D. Idaho Apr. 27, 2000). *Id*. at 415, 416.

The *Barnwell* court distinguished *East Shoshone* on the basis that the proposed modification in *East Shoshone* "would dramatically alter the treatment of

17

a creditor who objected to the modification,"[3] whereas the change under consideration in *Barnwell* would not. *Id.* at 416. The *Barnwell County Hospital* court also afforded more weight to the two published appellate court decisions, *Wolf Creek Valley Metropolitan District Number IV* and *American United Life Insurance Company*, than it did to *East Shoshone*, an unpublished bankruptcy court opinion. *Id.* Finally, the *Barnwell* court noted that the plan at issue in its case expressly provided for modifications. *Id.* For these reasons, the court concluded it had the ability to approve a proposed modification to the confirmed chapter 9 plan. *Id.*

For these reasons, Colliers concludes that

> Given the Bankruptcy Code's silence on postconfirmation modifications, there is no basis to impose a *per se* rule prohibiting such modifications. Whether based on the reasoning that: (i) a chapter 9 plan should not be confined to a "straightjacket" as a matter of equity; (ii) a plan of reorganization is a contract subject to modification for surprise or mistake; (iii) a plan itself can provide for postconfirmation modifications; (iv) a plan has not been consummated; or (v) the bankruptcy court has continuing jurisdiction over a chapter 9 plan under the terms of the plan and section 945(a), a bankruptcy court has sufficient authority to consider, after such notice and a hearing as is appropriate under the circumstances, postconfirmation modifications and authorize such modifications that are

---

[3] "Here the proposed modification changes dramatically the treatment of the Trust under the plan. It does not simply correct some overlooked matter nor does it address something which has arisen to the mutual surprise of the parties after confirmation." *E. Shoshone Hosp. Dist.*, 2000 WL 33712301 at *4.

39885196.3/022765.00213

necessary for the successful adjustment of the chapter 9
debtor's debts.

6 COLLIER ON BANKRUPTCY ¶ 942.03 (footnotes and citations omitted).

Here, the Plan and Confirmation Order provide the City with the ability to make changes to the Plan prior to substantial confirmation *without a Court order*. Plan, Art. VIII.B, p. 71; Confirmation Order, ¶ 73, p. 117. They do not speak to changes after substantial consummation, the implication being that such changes at that time may require a Court order. In fact, the Court retained jurisdiction to enter orders modifying the Plan if needed for that purpose. Plan, Art. VII.H, p.70; Confirmation Order, ¶ 92, pp. 125-26.[4]

---

[4] The Proposed Modification is not prohibited by subsection H of Class 11 of the Plan because it does not amend or change the calculation of pension benefits. Class 11, subsection H provides: "Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law." Plan, Art. II.B.3.r.H, p. 42. (boldfacing removed).

19

The modification sought affects only the City and members of the GRS—no other creditor is helped or harmed in any way—so the modification sought is permissible under the Plan and case law. *Wolf Creek Valley Metro. Dist. No. IV*, 138 B.R. at 620; *see also Am. United Life Ins.*, 117 F.2d at 576.

Although the proposed modification has no negative effect on the claims of City creditors, the change is expected to have a significant positive affect on Class 11 and the GRS, which supports the modification. As the proposed modification is justified, fair, and does not affect any distribution to, or treatment of, any claim or creditor in any Class under the Plan except those in Class 11, the City respectfully requests that the Court enter an order authorizing and approving the modification.

## IV.  <u>Conclusion</u>

WHEREFORE, the City respectfully requests that this Court enter an order, substantially in the form attached as Exhibit 1, granting the relief requested in this Motion and granting the City such other and further relief as the Court may deem just and proper.

39885196.3/022765.00213

December 2, 2022

Respectfully submitted,

By: /s/ Marc N. Swanson
     Marc N. Swanson (P71149)
     MILLER, CANFIELD, PADDOCK AND
     STONE, P.L.C.
     150 West Jefferson, Suite 2500
     Detroit, Michigan 48226
     Telephone: (313) 496-7591
     Facsimile: (313) 496-8451
     swansonm@millercanfield.com

        -and-

     Charles N. Raimi (P29746)
     Deputy Corporation Counsel
     City of Detroit Law Department
     2 Woodward Avenue, Suite 500
     Coleman A. Young Municipal Center
     Detroit, Michigan 48226
     Telephone: (313) 237-5037
     Facsimile: (313) 224-5505
     raimic@detroitmi.gov

ATTORNEYS FOR THE CITY OF DETROIT

## EXHIBIT LIST

Exhibit 1    Proposed Order

Exhibit 2    Notice

Exhibit 3    None

Exhibit 4    Certificate of Service

Exhibit 5    None

Exhibit 6A  New GRS Active Pension Plan

Exhibit 6B  Prior GRS Pension Plan

Exhibit 6C  Supplemental Actuarial Report

# EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## [PROPOSED] ORDER GRANTING CITY OF DETROIT'S MOTION FOR AUTHORITY TO MODIFY THE CONFIRMED PLAN OF ADJUSTMENT TO ADDRESS CREDITED SERVICE SHORTFALL SUSTAINED BY CERTAIN MEMBERS OF THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT

This matter, having come before the court on the *City of Detroit's Motion for Authority to Modify the Confirmed Plan of Adjustment to Address Credited Service Shortfall Sustained By Certain Members of the General Retirement System of the City of Detroit* ("Motion"); and the Court having jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Article VII of the Plan; and due and proper notice of the Motion having been given as provided in the Motion; and it appearing that no other or further notice of the Motion need be given; and a hearing on the Motion having been held before the Court; and any objections or other responses to the Motion having been overruled or withdrawn; and the Court finding that the legal and factual bases set forth in the Motion and at the hearing establish

just cause for the relief granted; and the Court being fully advised in the premises; and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.     The Motion is granted as set forth herein.

2.     The City may amend Component I of the GRSD Plan with language that is substantially similar to the following:

> A Member participating in the employer's Work Share Program at any time during the period April 1, 2020, through December 31, 2022, shall be credited with one month of Credited Service for each period during which he or she performs one hundred forty (140) or more Hours of Service for the Employer as an Employee. Service shall be credited in years and twelfths (1/12th) of a year. Not more than one-twelfth (1/12th) of a year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in a calendar month. Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in any period of 12 consecutive months.

3.     Nothing in this Order is intended to constitute, will constitute, or may be deemed as constituting the City's consent under section 904 of the Bankruptcy Code to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

4.     The Court retains jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

2

## EXHIBIT 2 – NOTICE

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**NOTICE OF OPPORTUNITY TO RESPOND TO CITY OF DETROIT'S MOTION FOR AUTHORITY TO MODIFY THE CONFIRMED PLAN OF ADJUSTMENT TO ADDRESS CREDITED SERVICE SHORTFALL SUSTAINED BY CERTAIN MEMBERS OF THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT**

The City has filed its *City of Detroit's Motion for Authority to Modify the Confirmed Plan of Adjustment to Address Credited Service Shortfall Sustained By Certain Members of the General Retirement System of the City of Detroit* (the "Motion"). **Your rights may be affected. You should read these papers carefully and discuss them with your attorney.** If you do not want the Court to enter an Order granting the Motion, within 14 days, you or your attorney must:

1. File with the court a written response or an answer explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

3

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above. You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2. If a response or answer is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
      Marc N. Swanson (P71149)
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      Telephone: (313) 496-7591
      Facsimile: (313) 496-8451
      swansonm@millercanfield.com

Dated: December 2, 2022

4

# EXHIBIT 3 – NONE

39885196.3/022765.00213

# EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 2, 2022 he electronically filed the *City of Detroit's Motion for Authority to Modify the Confirmed Plan of Adjustment to Address Credited Service Shortfall Sustained By Certain Members of the General Retirement System of the City of Detroit* (the "Motion") with the Clerk of the Court which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case. The City has engaged a Noticing Agent, which will serve the Motion on all parties identified on the Special Service List and the General Service List maintained by the Noticing Agent and will file a subsequent Proof of Service after it has performed the service.

DATED:  December 2, 2022

By: /s/ Marc N. Swanson
    Marc N. Swanson
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

2

# **EXHIBIT 5**

## **NONE**

**Exhibit 6A – New GRS Active Pension Plan**

**EXHIBIT I.A.250.a**

FORM OF NEW GRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT I ....................................................................................................... 1

ARTICLE 1.   GENERAL PROVISIONS ............................................................. 2

Sec. 1.1.      General Retirement System Established; Adoption of 2014 Combined Plan Document; Amendment and Restatement of 2014 Combined Plan Document ........................................... 2

Sec. 1.2.      Retirement System Intended to be Tax-Qualified ................... 2

Sec. 1.3.      Compliance With Plan of Adjustment ..................................... 2

Sec. 1.4.      Board of Trustees .................................................................... 3

Sec. 1.5.      Board of Trustees – Membership; Appointment ..................... 3

Sec. 1.6.      Board of Trustees; Retiree Member Election .......................... 3

Sec. 1.7.      Board of Trustees; Oath; Term; Vacancies.............................. 4

Sec. 1.8.      Board of Trustees; Officers and Employees ............................ 4

Sec. 1.9.      Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 5

Sec. 1.10.     Board of Trustees; Compensation; Expenses ........................... 5

Sec. 1.11.     Rules for Administration of Funds ........................................... 5

Sec. 1.12.     Board of Trustees; Certain Data to be Kept............................. 5

Sec. 1.13.     Board of Trustees; Annual Audit Report.................................. 6

Sec. 1.14.     Board of Trustees; Legal Advisors .......................................... 6

Sec. 1.15.     Designation of Actuary; Authority to Engage Additional Actuaries......... 6

Sec. 1.16.     Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System ................................. 7

Sec. 1.17.     Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities ..................... 7

Sec. 1.18.     Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties .............. 7

Sec. 1.19.     Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties ....... 8

Sec. 1.20.     Investment Committee; Membership; Appointment ................. 8

Sec. 1.21.     Investment Committee; Term; Resignation and Removal; Vacancies .................. 9

Sec. 1.22.     Investment Committee; Operation; Meetings; Quorum; Voting ............. 10

-i-

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:37:16   Page 34 of 168
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:46:29   Page 37 of 68
809

Sec. 1.23.  Investment Committee; Compensation; Expenses; Employment of Advisors .................................................................................................. 11

Sec. 1.24.  Investment Committee; Special Reporting Obligations ........................ 11

ARTICLE 2.  DEFINITIONS ................................................................................................ 13

Sec. 2.1.  Definitions ............................................................................................ 13

ARTICLE 3.  MEMBERSHIP ............................................................................................... 21

Sec. 3.1.  Eligible Employees ............................................................................... 21

Sec. 3.2.  Cessation of Membership; Re-Employment by the Employer ............... 21

Sec. 3.3.  Report of the Employer ......................................................................... 22

ARTICLE 4.  SERVICE CREDIT ......................................................................................... 23

Sec. 4.1.  Credited Service .................................................................................... 23

Sec. 4.2.  Vesting Service ...................................................................................... 23

Sec. 4.3.  Service Credit; Military Service ........................................................... 23

Sec. 4.4.  Service Credit; Qualified Military Service ........................................... 24

ARTICLE 5.  ELIGIBILITY FOR RETIREMENT BENEFITS ............................................. 25

Sec. 5.1.  Eligibility for Unreduced Normal Retirement Benefit .......................... 25

Sec. 5.2.  Eligibility for Reduced Early Retirement Benefit ................................. 25

Sec. 5.3.  Eligibility for Deferred Vested Retirement Benefit ............................... 25

Sec. 5.4.  Eligibility for Retirement Benefit – Disabled Members ........................ 25

Sec. 5.5.  Return of Accumulated Mandatory Contributions to Non-Vested Member .................................................................................................. 25

ARTICLE 6.  RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) .................................................. 27

Sec. 6.1.  Retirement Allowance ........................................................................... 27

Sec. 6.2.  Variable Pension Improvement Factor (Escalator) ............................... 27

ARTICLE 7.  DEATH BENEFITS ........................................................................................ 28

Sec. 7.1.  Accidental Death Benefit; Performance of Duty ................................... 28

Sec. 7.2.  Death Benefits for Surviving Spouses Generally .................................. 28

Sec. 7.3.  Refund of Accumulated Mandatory Contributions Upon Death of Member .................................................................................................. 28

Sec. 7.4.  Benefits Offset by Compensation Benefits; Subrogation ...................... 28

-ii-

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:27:16  Page 35 of 168
13-53846-swr  Doc 3045-1  Filed 12/03/14  Entered 12/03/14 03:49:29  Page 36 of 68
809

# TABLE OF CONTENTS
(continued)

Page

ARTICLE 8.  FORMS OF PAYMENT ...................................................................... 30

    Sec. 8.1.    Retirement Allowance Options .............................................. 30

    Sec. 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ........................................................................... 31

ARTICLE 9.  FUNDING AND RESERVES .............................................................. 32

    Sec. 9.1.    Funding Objective of the Retirement System ......................... 32

    Sec. 9.2.    Funds ..................................................................................... 32

    Sec. 9.3.    Method of Financing Retirement System Benefits ................. 33

    Sec. 9.4.    Member Contributions Picked-Up .......................................... 34

    Sec. 9.5.    Fiscal Responsibility: Increased Funding Obligations and Benefit Reductions .................................................................. 34

ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS ............................. 36

    Sec. 10.1.    Voluntary Employee Contributions; Amount; Vesting .......... 36

    Sec. 10.2.    Changing an Election to Contribute ........................................ 36

    Sec. 10.3.    Individual Member Accounting; Crediting of Earnings .......... 36

    Sec. 10.4.    Distribution of Accumulated Voluntary Employee Contributions .......... 36

ARTICLE 11. LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS ...................................................................... 38

    Sec. 11.1.    The Loan Program .................................................................. 38

    Sec. 11.2.    Eligibility for Loan ................................................................ 38

    Sec. 11.3.    Amount of Loan ..................................................................... 38

    Sec. 11.4.    Terms and Conditions ............................................................ 38

    Sec. 11.5.    Loan Balance ......................................................................... 39

    Sec. 11.6.    Default ................................................................................... 39

    Sec. 11.7.    Distribution ............................................................................ 40

    Sec. 11.8.    Annual Report ........................................................................ 40

ARTICLE 12. LIMITATION ON BENEFITS AND CONTRIBUTIONS ................. 41

    Sec. 12.1.    Compliance With Code Section 415(b) And Regulations ....... 41

    Sec. 12.2.    Compliance with Code Section 415(c) and Regulations ......... 43

ARTICLE 13. RETIREMENT SYSTEM ADMINISTRATION ............................... 45

    Sec. 13.1.    Board of Trustees as Retirement System Administrator .......... 45

-iii-

13-53846-tjt  Doc 13645-1  Filed 12/03/14  Entered 12/03/22 12:27:16  Page 36 of 168
13-53846-swr  Doc 3045-1  Filed 03/22/14  Entered 03/22/14 03:46:29  Page 36 of 168
809

| | | |
|---|---|---|
| Sec. 13.2. | Powers and Duties of Board | 45 |
| Sec. 13.3. | Executive Director; Employees | 47 |
| Sec. 13.4. | Discretionary Authority | 47 |
| Sec. 13.5. | Administrator's Decision Binding | 48 |
| ARTICLE 14. MANAGEMENT OF FUNDS | | 49 |
| Sec. 14.1. | Board as Trustee of Retirement System Assets | 49 |
| Sec. 14.2. | Maintenance of Segregated Funds | 49 |
| Sec. 14.3. | Custodian of Funds | 49 |
| Sec. 14.4. | Exclusive Purpose | 49 |
| Sec. 14.5. | Prohibited Conduct | 49 |
| ARTICLE 15. INVESTMENT OF RETIREMENT SYSTEM ASSETS | | 51 |
| Sec. 15.1. | Investment Powers of the Board and the Investment Committee | 51 |
| Sec. 15.2. | Investment Management | 52 |
| Sec. 15.3. | Best Practices | 53 |
| Sec. 15.4. | Chief Investment Officer | 53 |
| Sec. 15.5. | Investment Consultants | 54 |
| ARTICLE 16. RETIREE MEDICAL ACCOUNT | | 56 |
| Sec. 16.1. | Establishment of Account | 56 |
| Sec. 16.2. | Effective Date of Retiree Medical Account | 56 |
| Sec. 16.3. | Funding of Benefits | 56 |
| Sec. 16.4. | Limitation on Contributions | 56 |
| Sec. 16.5. | Impossibility of Diversion | 57 |
| Sec. 16.6. | Administration | 57 |
| Sec. 16.7. | Right to Amend or Terminate Medical Plans | 57 |
| Sec. 16.8. | Reversion | 57 |
| Sec. 16.9. | Limitation of Rights | 57 |
| ARTICLE 17. MISCELLANEOUS | | 58 |
| Sec. 17.1. | Nonduplication of Benefits | 58 |
| Sec. 17.2. | Assignments Prohibited | 58 |
| Sec. 17.3. | Protection Against Fraud | 58 |

-iv-

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:27:16  Page 37 of 168
13-53846-swr  Doc 3045-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 38 of 68
809

**TABLE OF CONTENTS**

(continued)

Sec. 17.4.    Errors ........................................................................................................ 58

Sec. 17.5.    Amendment; Termination; Exclusive Benefit ......................................... 58

Sec. 17.6.    Forfeitures Not to Increase Benefits ....................................................... 59

Sec. 17.7.    Required Distributions - Compliance with Code Section 401(a)(9)
and Regulations ........................................................................................ 59

Sec. 17.8.    Direct Rollovers ...................................................................................... 59

Sec. 17.9.    Construction ............................................................................................ 61

Sec. 17.10.   Severability ............................................................................................. 61

-v-

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:27:16   Page 38 of 168
13-53846-swr   Doc 5045-1   Filed 10/22/14   Entered 10/22/14 03:46:29   Page 383 of 809

# COMPONENT I

# ARTICLE 1. GENERAL PROVISIONS

**Sec. 1.1.** **General Retirement System Established; Adoption of 2014 Combined Plan Document; Amendment and Restatement of 2014 Combined Plan Document**

Effective July 1, 1938, a General Retirement System for the employees of the City of Detroit was established for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries. The provisions of the Detroit General Retirement System, as in effect July 1, 2014, were set forth in a Combined Plan Document. As provided in Ordinance 19-14 and Ordinance 20-14 and Section 47-1-1 of the Detroit City Code, this Combined Plan Document replaced in its entirety Chapter 47 of the Detroit City Code as in effect on June 30, 2014 and any conflicting provisions in any collective bargaining agreements covering Members (including, without limitation, the City Employment Terms that applied to Members effective July 18, 2012). All resolutions and policies of the Retirement Board previously adopted which were inconsistent with the provisions of the Combined Plan Document were also repealed to the extent of such inconsistency.

The Combined Plan Document is hereby amended and restated effective July 1, 2014, in the form of this instrument. Component I of the Combined Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Detroit General Retirement System on and after July 1, 2014. Component II of the Combined Plan Document applies to benefits accrued by Members prior to July 1, 2014. Except as specifically provided in Component II, benefits provided under Component II of the Combined Plan Document are frozen effective June 30, 2014.

**Sec. 1.2.** **Retirement System Intended to be Tax-Qualified**

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code. The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

**Sec. 1.3.** **Compliance With Plan of Adjustment**

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment"). Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment. To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

### Sec. 1.4.    Board of Trustees

Effective July 1, 1938, a Board of Trustees of the Detroit General Retirement System was created.  The Board is vested with responsibility for the general administration, management and operation of the Detroit General Retirement System and with the trust and investment powers conferred in this Combined Plan Document.

### Sec. 1.5.    Board of Trustees – Membership; Appointment

The Board of Trustees of the Detroit General Retirement System shall consist of ten Trustees, as follows:

(1)    The Mayor, *ex officio*, or the Mayor's designee;

(2)    One City Council member, *ex officio*, who is selected by the City Council;

(3)    The City Treasurer, *ex officio*;

(4)    Five active employee Members of the Retirement System to be elected by the Members in accordance with such rules and regulations as may be adopted by the Board.  No more than one Trustee shall be elected from any one City Department;

(5)    One individual, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

(6)    One retiree who is receiving benefits under the Retirement System and who is elected by Retirees in accordance with procedures described in Section 1.6.

### Sec. 1.6.    Board of Trustees; Retiree Member Election

The procedures for the election of the Retiree member of the Board of Trustees shall be as follows:

(1)    *Notice*.  Notice of a primary election shall be sent to each Retiree by United States Mail.

(2)    *Nominating petitions*.  No candidate's name shall be placed on the primary election ballot unless a nominating petition containing the signatures of at least one hundred and twenty-five Retirees is filed with the executive director of the Retirement System.  The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board.  Notwithstanding the foregoing, an incumbent Retiree Trustee shall not be required to submit a nominating petition but instead shall submit a written communication indicating his or her intention to seek an additional term.

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:27:16  Page 41 of 168
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 386 of
809

(3)     *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position held by the Retiree at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election.  No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4)     *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.6 shall be handled in accordance with such rules and regulations as the Board may adopt.

## Sec. 1.7.     Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the Detroit City Clerk.

The regular term of office for the elected Member Trustees and the Trustee appointed by the Mayor under Section 1.5(5) shall be for a period of six years, one such Trustee to be elected or appointed, as the case may be, each year.  The term of office for the Retiree Trustee shall be two years.

If an active employee Trustee leaves the employ of the City, or if an elected or appointed Trustee fails to attend four consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  By resolution, the Board shall declare the office vacated as of the date of adoption of such resolution.  If a vacancy occurs in the office of Trustee, the vacancy shall be filled at the next regular election held by the Board, or at any special election ordered by resolution adopted by the Board.

## Sec. 1.8.     Board of Trustees; Officers and Employees

The Board shall elect a chair and vice-chair from its members.  The executive director of the Retirement System or its designee shall serve as secretary of the Board.  The Board may employ such actuarial, medical and other contractors and employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

13-53846-tjt   Doc 13645-1   Filed 12/03/14   Entered 12/03/22 12:23:16   Page 42 of 68
13-53846-swr   Doc 3045-1   Filed 03/22/14   Entered 03/22/14 03:46:29   Page 38 of 68
809

### Sec. 1.9. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1) The Board shall hold regular meetings, at least one in each month, and shall hold special meetings as necessary. The Board shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings. All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Board meetings shall be held within the City of Detroit.

(2) Each Trustee shall be entitled to one vote on each question before the Board. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3) Five Trustees shall constitute a quorum.

### Sec. 1.10. Board of Trustees; Compensation; Expenses

Members of the Board of Trustees shall serve without additional compensation from the Employer, but they shall be compensated by the Retirement System as follows:

(1) *Stipend.* Trustees are eligible for a meeting stipend, provided the Trustee attends one or more regular or special Board meetings during a month. The stipend amount shall be a minimum of sixty-seven dollars ($67.00) per week multiplied by the Trustee's years of service. Eligibility rules and the amount of the stipend shall be set by Board resolution. However, the amount of the weekly meeting stipend shall not exceed two hundred dollars ($200.00).

(2) *Ex Officio Trustees.* Ex Officio Trustees are not eligible for a stipend payment.

(3) *Attendance.* For purposes of this Section 1.10, attendance at a Board meeting shall include actual attendance at a meeting or being otherwise available to attend a Board meeting canceled for lack of a quorum.

Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec. 1.11. Rules for Administration of Funds

Subject to the limitations contained in this Combined Plan Document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Plan document and for the transaction of its business.

### Sec. 1.12. Board of Trustees; Certain Data to be Kept

The Board shall keep or cause to be kept, in convenient form, such data as shall be necessary for an actuarial valuation of the Retirement System and for checking and compiling

the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec. 1.13.    Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.14.    Board of Trustees; Legal Advisors

(1)    The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)    Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)    Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec. 1.15.    Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board. In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary. The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing their actuarial duties and shall comply with all requests for information or modeling requested by the Board or the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Board and Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the term sheet regarding Investment Committee Governance for General Retirement System, attached to that certain agreement by and between the Michigan Settlement Administration Authority, a Michigan body public corporation (the "Authority"), the Retirement System, the Police and Fire Retirement System for the City of Detroit, Michigan ("PFRS") and the City (the "State Contribution Agreement") as Exhibit A (the "Governance Term Sheet") and the Plan of Adjustment. Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

13-53846-tjt   Doc 13645-1   Filed 12/03/14   Entered 12/03/14 03:46:29   Page 44 of 168
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 23:27:16   Page 383 of
809

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

### Sec. 1.16. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this section shall not permit or be used to provide for an interest rate which would violate the prohibitions of subsection (2) or (3) of this section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

### Sec. 1.17. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.16, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.18. Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee.  To the extent the Board exercises discretion with respect to investment of Retirement System assets, each member of the Board of Trustees shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*., and shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose.  Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:37:16  Page 45 of 68
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 391 of

809

### Sec. 1.19. Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties

As of the effective date of the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment Committee is controlled by the Governance Term Sheet. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*. The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

### Sec. 1.20. Investment Committee; Membership; Appointment

The Investment Committee shall consist of seven (7) members, determined as follows:

(1)     Five independent members, two of whom must be residents of the State of Michigan, and none of whom may be a party-in-interest with respect to the Retirement System, as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as is necessary to bring the number of independent Investment Committee members to five (5);

13-53846-tjt Doc 13645-1 Filed 12/03/22 Entered 12/03/22 12:27:16 Page 46 of 168
13-53846-swr Doc 5045-1 Filed 12/03/22 Entered 12/03/22 03:45:29 Page 39 of 60
809

(2)     One Retiree who is a Retiree member of the Board of Trustees who shall be appointed by the Board; and

(3)     One employee who is an active employee member of the Board of Trustees who shall be appointed by the Board.

### Sec. 1.21.   Investment Committee; Term; Resignation and Removal; Vacancies

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
| --- | --- |
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees.  Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier.  Notwithstanding any provision of this Combined Plan Document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee.  An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in according with the voting procedure set forth in Section 1.22; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government.  A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings.  In the event of any such removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:27:16  Page 47 of 168
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 391 of
809

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("State Treasurer"), in consultation with the Foundation, pursuant to such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the State Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

### Sec. 1.22.   Investment Committee; Operation; Meetings; Quorum; Voting

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of its proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Investment Committee meeting shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Except as otherwise provided in the Governance Term Sheet, each Investment Committee member shall be entitled to one vote on each question before the Committee and at least four concurring votes shall be necessary for a decision by the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a

State or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

### Sec. 1.23.   Investment Committee; Compensation; Expenses; Employment of Advisors

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System. The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Retirement System. Such engagements shall not be subject to approval of the Board.

### Sec. 1.24.   Investment Committee; Special Reporting Obligations

(1)     Beginning in 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the State Treasurer on a semi-annual basis and at such other times as the State Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)     In the event the Retirement System receives a written notice from the State Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the State Treasurer a written certification that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)     Beginning in 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)     Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

   (a)     a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:27:16   Page 49 of 168
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:46:29   Page 39 of 68
809

(b)     a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to the Foundation that, as of the date of the annual report required to be provided by the City to the Foundation under the Omnibus Transaction Agreement by and among the City, The Detroit Institute of Arts and Foundation For Detroit's Future ("Annual Report"):

    (i)      the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

    (ii)     the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan Document; and

    (iii)    the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)     a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the State Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the State Treasurer; and (iv) in the event that the State Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee.  Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d)     any additional information that may be reasonably requested by the Foundation from time to time.

(5)   Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

# ARTICLE 2. DEFINITIONS

## Sec. 2.1.    Definitions

Unless a different meaning is plainly required by context, the following words and phrases have the meanings respectively ascribed to them by this section:

(1)    *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)    *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System representing after-tax amounts deducted from the compensation of the Member, together with earning on such contributions.

(3)    *Actuarial Equivalent* or *Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.  The rates of interest, tables and factors adopted by the Board from time to time to determine Actuarial Equivalence shall not violate the terms of the Plan of Adjustment.

(4)    *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5)    *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)    *Age*, *Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)    *Average Final Compensation* means the average Compensation received by a Member during the ten consecutive years of Credited Service under the Retirement System (for this purpose, both before and after July 1, 2014) which immediately precede the date of the Member's last termination of employment with the Employer.  If a Member has less than ten years of Credited Service, the Member's Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.  If a Member is absent from service with the City for a period of not less than two consecutive months during his last two years of employment because of an unpaid leave under the Family and Medical Leave Act, such Member's Average Final Compensation will mean the average Compensation received by the Member during the ten consecutive year period out of the last twelve years of Credited Service which produces the highest average.

(8)    *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance

or pension payable from funds of the Retirement System due to the participation of a Member.

(9)     *Board of Trustees* or *Board* or *Retirement Board* means the Board of Trustees of the Retirement System.

(10)    *City* means the City of Detroit, Michigan, a municipal corporation.

(11)    *City Council* or *Council* means the legislative body of the City.

(12)    *Combined Plan* means the Combined Plan for the General Retirement System of the City of Detroit, Michigan, effective July 1, 2014 and as amended thereafter.

(13)    *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the taxable income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which are contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the Employer on and after July 1, 2014.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the

numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14) *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

    (a)    the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (b)    the 2014 Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15) *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

    (1)    The 1973 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (2)    the 1973 Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16) *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document and, solely for purposes of Section 2.1(7), service credited to a Member prior to July 1, 2014 pursuant to Component II of this Combined Plan.

(17) *Disability* or *Disabled* means that a Member has been determined to be eligible to receive long term disability benefits under a policy or plan of insurance or self-insurance maintained by the Employer.

(18) *Employee* means any regular and/or permanent officer, agent, or person in the employ of the Employer, but does not include:

    (a)    individuals whose services for the Employer are compensated on a contractual or fee basis;

    (b)    persons who are not employed as Full-time Employees;

    (c)    any person during any period when such person is classified by the Employer as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the Employer;

    (d)    the medical director of the Retirement System; or

13-53846-tjt Doc 13645-1 Filed 12/03/22 Entered 12/03/22 12:27:16 Page 53 of 168
13-53846-swr Doc 3045-1 Filed 10/22/14 Entered 10/22/14 03:46:29 Page 393 of
809

(e)     any Police or Fire employee covered by the Police and Fire Retirement System of the City of Detroit, Michigan by virtue of such employment.

If a person described in (c) above is reclassified by the Employer as a common-law employee of the Employer and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(19)   *Employer* means the City, or any board, commission, or court serving the City, to the extent that both the City, through the action of City Council, and the governing authority of such board, commission or court, shall mutually agree to include the employees of such board, commission, or court, as Employees under the provisions of this Retirement System at such time as they are eligible.  To the extent that any employees of a board, commission, or court are considered Employees for this purpose, all employees of such board, commission, or court, shall be so included.  However, only City board members and commissioners who are also Employees are eligible to participate in the Retirement System, unless otherwise specifically provided for in the Combined Plan Document.  In all cases of doubt, the Board of Trustees shall decide who is an Employee.

(20)   *Family and Medical Leave Act* means the federal Family and Medical Leave Act of 1993, as amended, and regulations issued thereunder.

(21)   *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(22)   *Full-time Employee* means an Employee who is employed in a position normally requiring six hundred hours of work or more per calendar year; provided, however, that an employee who is hired by an Employer as a part-time transit operator to work less than twenty-five hours per week shall not be a full-time employee under the Retirement System.  Notwithstanding the general rule, a special service employee of the City shall be considered a full-time employee under the Retirement System upon completion of fourteen hundred and forty (1440) hours or more in a Fiscal Year.  For purposes of Component I, once a special service employee has worked 1440 hours in a Fiscal Year, the employee will be deemed to be a full-time employee under the Retirement System for all subsequent Fiscal Years.

(23)   *General Retirement System* or *Retirement System* means the General Retirement System of the City of Detroit created and established by Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997  and 2012  Detroit City Charters, Article 47 of the Detroit City Code and this Combined Plan Document, as amended from time to time, which consists of:

(a)     The 2014 Defined Benefit Plan, the terms of which are described in Component I hereof;

(b)     The 2014 Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, the terms of which are described in Component I hereof;

13-53846-swr  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:23:46  Page 54 of 168
13-53846-tjt  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 393 of
809

(c) The Frozen 1973 Defined Benefit Plan, the terms of which are described in Component II hereof; and

(d) The Frozen 1973 Defined Contribution Plan, the terms of which are described in Component II hereof.

References to the words Retirement System in Component I of the Combined Plan Document shall mean the provisions of the 2014 Defined Benefit Plan and/or the 2014 Defined Contribution Plan described in Component I, unless a different meaning is plainly required by the context.

(24) *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the Employer for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the Employer for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(25) *Internal Revenue Code* or *Code* means the United States Internal Revenue Code of 1986, as amended.

(26) *Investment Committee* means the committee established pursuant to Section 1.19 which shall have the powers and duties described herein.

(27) *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(28) *Medical Beneficiary* means a Member who has retired from employment with the Employers and the spouses and dependants of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(29) *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(30) *Medical Benefits Account* means the bookkeeping account established under Section 16.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(31) *Member* means any Employee who is included in the membership of the Retirement System and who has not retired or died.

(32) *Normal Retirement Age* means age sixty-two (62). Notwithstanding the foregoing, the Normal Retirement Age of a Member who is an active Employee as of June 30, 2014 and who has 10 or more years of Vesting Service as of such date shall be as follows solely for purposes of this Component I:

| Age as of July 1, 2014 | Normal Retirement Age |
|---|---|
| 61 years | 60 years and 0 months |
| 60 years | 60 years and 0 months |
| 59 years | 60 years and 3 months |
| 58 years | 60 years and 6 months |
| 57 years | 60 years and 9 months |
| 56 years | 61 years and 0 months |
| 55 years | 61 years and 3 months |
| 54 years | 61 years and 6 months |
| 53 years | 61 years and 9 months |

(33) *Normal Retirement Date* means for any Member the later of the date the Member (i) attains 10 years of Vesting Service, or (ii) attains Normal Retirement Age.

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon attainment of his or her Normal Retirement Date while employed by an Employer.

(34) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(35) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance payable under Component I of the Combined Plan. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(36) *Plan Actuary* or *Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.15 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Board or the Investment Committee may direct.

(37) *Plan Document* or *Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(38) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846*.

(39) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(40) *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of Component II of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(41) *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:27:16  Page 56 of 168
13-53846-swr  Doc 3045-1  Filed 12/18/14  Entered 12/18/14 03:48:29  Page 40 of 63
809

(42) *Retirement* means a Member's withdrawal from the employ of the Employer with a Retirement Allowance paid by the Retirement System.

(43) *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(44) *Service* means personal services rendered to the Employer by a person as an Employee, provided such person is compensated by the Employer for such personal services.

(45) *Spouse* means the person to whom a Member is legally married under applicable law at the time the determination is made.

(46) *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(47) *Vesting Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(48) *Voluntary Employee Contributions* mean the after-tax contributions made by a Member to the Retirement System pursuant to Section 10.1.

(49) *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for a Member who elects to make Voluntary Employee Contributions.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 12.2(1) |
| Annual Report | Section 1.24(4)(b) |
| Authority | Section 1.19 |
| compensation | Section 12.1(11) |
| Compliance Report | Section 1.24(1) |
| Cure Certification | Section 1.24(2) |
| Default Notice | Section 1.24(2) |
| Direct Rollover | Section 17.8(2)(a) |
| Distributee | Section 17.8(2)(b) |
| Dollar Limit | Section 12.1(3)(b) |
| Eligible retirement plan | Section 17.8(2)(c) |
| Eligible rollover distribution | Section 17.8(2)(d) |
| Expense Fund | Section 9.2(6) |
| Foundation | Section 1.20(1) |
| funding level | Section 9.5 |
| Governance Term Sheet | Section 1.15 |
| Income Fund | Section 9.2(7) |
| Investment management decision/investment management matter | Section 15.2 |

| | |
|---|---|
| limitation year | Section 12.1(2) |
| Medical Benefit Fund | Section 9.2(5) |
| Medical Plans | Section 16.1 |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One. Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(3) |
| Pension Certificate | Section 1.24(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| PFRS | Section 1.19 |
| Plan of Adjustment | Section 1.3 |
| Pop-up Form | Section 8.1(2)(b) |
| Rate Stabilization Fund | Section 9.2(4) |
| Standard Form | Section 8.1(2)(a) |
| State Contribution Agreement | Section 1.15 |
| State Treasurer | Section 1.21 |
| Straight Life Retirement Allowance | Section 8.1(1) |

# ARTICLE 3. MEMBERSHIP

## Sec. 3.1.    Eligible Employees

The membership of the Retirement System shall consist of all persons who are Full-time Employees, except:

    (a)    persons who are members of the Police and Fire Retirement System of the City of Detroit, Michigan established under Title IX, Chapter VII of the 1918 Detroit City Charter, continued in the 1974, 1997 and 2012 Detroit City Charters, and continued in the form of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan; and

    (b)    Any person who is a member of any other public employee pension or retirement plan or retirement system adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

## Sec. 3.2.    Cessation of Membership; Re-Employment by the Employer

(1)    The following provisions shall apply to a non-vested Member who terminates employment with the Employer and is re-employed:

    (a)    Except as otherwise provided in this Article 3, if any non-vested Member leaves the employment of the Employer for any reason other than Retirement or death, such person shall continue to be a Member until such time as the Member receives a total distribution of his Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.  Upon receipt of his Accumulated Mandatory Employee Contributions, the Member's Credited Service and Vesting Service at that time shall be forfeited.

    (b)    If the Member is re-employed by an Employer (other than as a part-time transit operator) within a period of six years from and after the date employment with the Employer last terminated, any forfeited Credited Service and Vesting Service rendered on and after July 1, 2014 shall be restored for purposes of determining the Member's Retirement Allowance after re-employment, provided that within the two year period beginning on the Member's re-employment date, the Member re-contributes to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5.

    (c)    If a non-vested Member is re-employed (other than as a part-time transit operator) more than six years from and after the date employment with the Employer last terminated, the Member shall not be permitted to re-contribute to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5 and any forfeited Credited Service and Vesting Service shall not be restored at the time of the Member's re-employment.

(2)     A former Employee who is vested but has not yet begun to receive a Retirement Allowance and who is rehired (other than as a part-time transit operator) prior to being separated for six years shall have his benefit pertaining to his total Credited Service earned on and after July 1, 2014 calculated in accordance with the terms of Component I of the Retirement System in effect at the time of his last separation from service.

(3)     A former Employee who is vested but has not yet begun to receive a Retirement Allowance and who is rehired (other than as a part-time transit operator) after being separated for more than six years shall be entitled to two separate and distinct pension benefits under Component I, each to be calculated in accordance with the provisions of Component I of the Retirement System in effect at the time of each separation from service.

(4)     Retirement benefits for a Retiree who returns to active full time employment with an Employer shall be subject to the following provisions:

(a)     A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment.  The variable pension improvement factor (escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)     A Retiree's Average Final Compensation for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation earned by the Retiree after he returns to work.

(d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance.  However, the individual may select a separate payment option with respect to his second Retirement Allowance.

(e)     The Coordination of Benefits (Equaled Social Security) option will not be available with respect to payment of the second Retirement Allowance.

## Sec. 3.3.     Report of the Employer

It shall be the duty of the Employer to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 23:46:29   Page 60 of 168
13-53846-swr   Doc 3045-1   Filed 03/22/14   Entered 03/22/14 03:49:29   Page 405 of
809

# ARTICLE 4. SERVICE CREDIT

## Sec. 4.1.    Credited Service

(1)    The Board shall keep an accurate record of each Employee's accumulated Service credit from the date of commencement of employment with the Employer to the date of termination of employment with the Employer.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the Employer as an Employee, beginning on the later of July 1, 2014 or his date of hire with the Employer and ending on the date his employment with the Employer is terminated. Service shall be credited in years and twelfths ($1/12^{th}$) of a year.  Not more than one-twelfth ($1/12^{th}$) of a year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in any period of 12 consecutive months.

(3)    A Member who does not perform Service for the Employer by reason of a Disability which begins on or after July 1, 2014 shall be credited with Credited Service for the period of his Disability during which he is entitled to receive long-term disability benefits under the Employer's plan or policy.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Section 5.2, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).

## Sec. 4.2.    Vesting Service

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the Employer.

(2)    A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec. 4.3.    Service Credit; Military Service

An Employee who enters the military service of the United States while employed by an Employer shall have the period of such military service credited as Service in the same manner as if the Employee had served the Employer without interruption, provided that (1) the Employee's entry into such military service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the Employer; (2) he or she is re-employed by the Employer upon completion of such military service; and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service.  The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder.  During the period of military service and until return to employment with the

Employer, the Employee's Mandatory Employee Contributions to the Retirement System shall be suspended.

**Sec. 4.4.    Service Credit; Qualified Military Service**

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u).   Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:27:16  Page 62 of 168
13-53846-swr  Doc 3645-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 40 of 68
809

# ARTICLE 5. ELIGIBILITY FOR RETIREMENT BENEFITS

## Sec. 5.1.    Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Date while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

## Sec. 5.2.    Eligibility for Reduced Early Retirement Benefit

Any Member who has attained Age fifty-five, who is credited with thirty or more years of Credited Service, and who has not attained his Normal Retirement Date, shall have the option of retiring upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The Retirement Allowance payable to a Member who retires early shall be the Actuarial Equivalent of the Retirement Allowance that would be payable to the Member at his Normal Retirement Date pursuant to Section 6.1, as determined by the Plan Actuary.  A Member's early retirement benefit shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec. 5.3.    Eligibility for Deferred Vested Retirement Benefit

Any Member who ceases to be an employee before satisfying the requirements for receipt of a retirement benefit under Section 5.1 or Section 5.2 and who is credited with ten or more years of Vesting Service upon his or her termination of employment (regardless of age), shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his attainment of Age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec. 5.4.    Eligibility for Retirement Benefit – Disabled Members

Any Member who becomes Disabled prior to his Normal Retirement Date shall be entitled to receive an unreduced Retirement Allowance commencing at any time following the Member's attainment of Age sixty-two.  Disability retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec. 5.5.    Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases to be an Employee before becoming eligible for a deferred vested Retirement Allowance under Section 5.3, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:37:46  Page 63 of 168
13-53846-swr  Doc 5045-1  Filed 12/03/22  Entered 12/03/14 03:46:29  Page 403 of 63
809

installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

## ARTICLE 6. RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec. 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Date or his actual retirement from employment with the Employer in the form of a Straight Life Retirement Allowance shall be equal to one and one-half percent (1.5%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth (1/12th) year) of Credited Service earned after June 30, 2014.

### Sec. 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2018 and effective the first day of each Plan Year thereafter, the Board may determine that a Retiree's annual Retirement Allowance shall be increased by a factor of two percent (2.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement; provided, that the recipient of said Retirement Allowance shall have attained Age sixty-two and shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.   The Pension Improvement Factor (Escalator) shall not be compounded.

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 23:46:29   Page 65 of 168
13-53846-swr   Doc 3045-1   Filed 03/22/14   Entered 03/22/14 03:46:29   Page 41 of 63
809

# ARTICLE 7. DEATH BENEFITS

### Sec. 7.1.     Accidental Death Benefit; Performance of Duty

(1)     If a Member is killed in the performance of duty in the service of the Employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the Employer, and such death, illness or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the Employer, the Member's surviving Spouse shall be entitled to a monthly annuity benefit equal to the Member's Retirement Allowance at the time of his death, unreduced for early payment. Such benefit shall be payable until the surviving Spouse's death.

(2)     The minimum annual Retirement Allowance payable to a surviving Spouse under this Section 7.1 shall be equal to ten percent (10%) of the Member's Average Final Compensation determined as of the date of the Member's death.

### Sec. 7.2.     Death Benefits for Surviving Spouses Generally

If any Member dies while in the employ of the Employer (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, the Member's surviving Spouse shall receive a Retirement Allowance. The Retirement Allowance payable to the Spouse shall be computed in the same manner in all respects as if said Member had (i) retired effective the day preceding the Member's death, notwithstanding that the Member had not attained his or her Normal Retirement Date, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving Spouse as Beneficiary.

### Sec. 7.3.     Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member dies while employed by the City or following termination of employment and the Member is not eligible for a benefit under Section 7.1 or 7.2, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

### Sec. 7.4.     Benefits Offset by Compensation Benefits; Subrogation

(1)     Any amounts which may be paid or payable to a Beneficiary on account of a Member's death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' benefits, shall be an offset against any amounts payable from funds of the Retirement System on account of the Member's death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:37:46   Page 66 of 168
13-53846-swr   Doc 5045-1   Filed 06/24/14   Entered 06/24/14 03:45:29   Page 41 of 63
809

payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System, and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)     In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

# ARTICLE 8. FORMS OF PAYMENT

## Sec. 8.1.    Retirement Allowance Options

(1)    Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a  Beneficiary to receive benefit payments following the Member's death, in accordance with the options set forth below:

    (a)    *Option One.  Cash Refund Annuity.*  If a Retiree who elected a Cash Refund Annuity dies before payment of the Accumulated Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

    (b)    *Option Two.  Joint and One Hundred Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced Retirement Allowance shall be paid to and continued throughout the life of the  Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (c)    *Option "A".  Joint and Seventy-Five Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (d)    *Option Three.  Joint and Fifty Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the  Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

    (e)    *Option "B".  Joint and Twenty-Five Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced Retirement Allowance shall be paid throughout the life of the  Beneficiary nominated by written designation duly executed and

filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2) *Joint and Survivor Optional Forms of Payment.* The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

    (a) *Standard Form.* Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

    (b) *Pop-up Form.* Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

(3) *Coordination of Benefits.* According to such rules and regulations as the Board shall adopt, until the first payment of a Retirement Allowance becomes due, but not thereafter, a Member under Age sixty-five may elect to have the Member's Straight Life Retirement Allowance provided for under Component I equated on an Actuarial Equivalent basis to provide an increased Retirement Allowance payable to Age sixty-two or Age sixty-five, and to provide a decreased Retirement Allowance thereafter. The increased Retirement Allowance payable to such Age shall approximate the total of the decreased Retirement Allowance payable thereafter and the estimated social security benefit. If a Member elects to receive increased and then decreased Retirement Allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (1) of this Section 8.1. This coordination of benefits option shall not create any additional actuarial costs to the City.

## Sec. 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1(1), both a Retiree and his Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board. If there are no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the second to die of the Retiree or Beneficiary.

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:37:16  Page 69 of 168
13-53846-swr  Doc 3645-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 414 of

809

# ARTICLE 9. FUNDING AND RESERVES

### Sec. 9.1.     Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive Employer and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of Component I of the Retirement System).

### Sec. 9.2.     Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Employee Contribution Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Medical Benefit Fund, the Expense Fund, and the Income Fund, as follows:

(1)     The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances. Upon the Retirement, termination, or death of a Member with a vested Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's Retirement Allowance.

(2)     The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members together with earnings thereon.

(3)     The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the Employer's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section E-16(c) of Component II, and from which shall be paid Retirement Allowances and other benefits on account of Members.

(4)     The Rate Stabilization Fund shall be the Fund to which shall be credited Employer annual contributions in excess of the amount of the Employer's contribution which is credited to the Pension Accumulation Fund and amounts transferred to Component I as provided in Section E-16(c) of Component II.

(5)     The Medical Benefit Fund shall be the Fund to which shall be credited contributions made for the purpose of funding Medical Benefits.

(6)     The Expense Fund shall be the fund to which shall be credited any money provided by the Employers to pay the administrative expenses of the Retirement System, and from

13-53846-tjt Doc 13645-1 Filed 12/03/21 Entered 12/03/22 12:37:16 Page 70 of 168
13-53846-swr Doc 3645-1 Filed 10/22/14 Entered 10/22/14 03:46:29 Page 415 of
809

which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(7) The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of Component I of the Retirement System and any earnings thereon, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9.  There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.  Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

### Sec. 9.3. Method of Financing Retirement System Benefits

(1) The pension liabilities for Members shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2) The Employer's annual contribution to finance the prospective pension liabilities for the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be five percent (5%) of the base Compensation of active Members for the applicable Plan Year. A portion of the Employer's annual contribution for each Plan Year as determined by the City shall be credited to the Rate Stabilization Fund.  The remainder of the City's annual contribution shall be allocated to the Pension Accumulation Fund.

(3) Except as provided in Section 9.5, for each Plan Year, a Member shall contribute to the Retirement System an amount equal to four percent (4%) of his or her base Compensation for such Plan Year.  A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014.  The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014, and (ii) the Member's date of hire to the date he ceases to be an Employee. The contribution shall be deducted from a Member's Compensation, notwithstanding that the minimum compensation provided by law for the Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment.  Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:27:16  Page 71 of 168
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 414 of
809

### Sec. 9.4.    Member Contributions Picked-Up

(1)    The Employer shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)    The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code.  The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)    The Employer shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both.  The Employer shall designate Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions.  No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

### Sec. 9.5.    Fiscal Responsibility: Increased Funding Obligations and Benefit Reductions

(1)    To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below one hundred percent (100%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than one hundred percent (100%):

   (a)    the Trustee may not award the variable pension improvement factor (escalator) described in Section 6.2 to any Retiree;

   (b)    all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under Component I of the Retirement System; and

   (c)    Member Mandatory Employee Contributions shall be increased from four percent (4%) of Compensation to five percent (5%) of Compensation for up to the next following five Plan Years.

(2)    In the event the funding level of Component I of the Retirement System determined as provided in Section 9.5(1) is projected to fall below eighty percent (80%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than eighty percent (80%):

   (a)    the remedial action required in Section 9.5(1) shall be implemented or continued;

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:37:16   Page 72 of 168
13-53846-swr   Doc 3645-1   Filed 04/22/14   Entered 04/22/14 03:46:29   Page 41 of 68
809

(b)    the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for a Plan Year;

(c)    Member Mandatory Employee Contributions shall be increased from five percent (5%) of Compensation to six percent (6%) of Compensation for up to the next following five Plan Years;

(d)    the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (b) above; and

(e)    the Retirement Allowance accrued by Members for up to the next five Plan-Year-period shall be determined as provided in Section 6.1, except that one percent (1%) shall be substituted for one and one-half percent (1.5%) wherever it appears in said Section 6.1.

In determining whether the eighty percent (80%) funding level under this Section 9.5(2) has been achieved, the Plan's Actuary shall calculate the funding percentage of the Retirement System after taking into account the elimination of the variable pension improvement factor (escalator) pursuant to Section 9.5(1)(a) but prior to taking into account the remedial steps provided in Sections 9.5(1)(b) and (c).

(3)    For purposes of this Section 9.5, the "funding level" of Component I of the Retirement System shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System. The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee. The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

13-53846-tjt Doc 13645-1 Filed 12/03/22 Entered 12/03/22 12:23:46 Page 73 of 168
13-53846-swr Doc 3045-1 Filed 10/22/14 Entered 10/22/14 03:46:29 Page 413 of
809

# ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec. 10.1.   Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member may elect to reduce his Compensation for any Plan Year by a whole percentage equal to three percent (3%), five percent (5%) or seven percent (7%) and have such amount contributed by the Employer to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

## Sec. 10.2.   Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

## Sec. 10.3.   Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second Plan Year immediately preceding the Plan Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

## Sec. 10.4.   Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases to be an Employee other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the actuarial equivalent value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)     If a Member dies while employed by the Employer or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Voluntary Employee

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:37:16   Page 74 of 168
13-53846-swr   Doc 3645-1   Filed 10/22/14   Entered 10/22/14 03:46:29   Page 413 of
809

Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving the Member, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

## ARTICLE 11. LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec. 11.1.   The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account under Component I of the Retirement System.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

### Sec. 11.2.   Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve months or more.  Former Members, Spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.   No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time.   A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

### Sec. 11.3.   Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Ten Thousand Dollars ($10,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

### Sec. 11.4.   Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)      Each loan application shall be made in writing.

(b)      All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:37:16   Page 76 of 168
13-53846-swr   Doc 5045-1   Filed 06/22/14   Entered 06/22/14 03:46:29   Page 421 of
809

(c)     Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the Employers' costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec. 11.5.   Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the Employers' costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec. 11.6.   Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:37:16   Page 77 of 168
13-53846-swr   Doc 3645-1   Filed 10/22/14   Entered 10/22/14 03:46:29   Page 421 of
809

payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

## Sec. 11.7.   Distribution

No distribution shall be made to a Member, former Member, Spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the individual from the Retirement System.

## Sec. 11.8.   Annual Report

The Retirement System shall include, in its annual report to all Members, an accounting of the Loan Program established by this Article 11, which contains the number and amount of loans made, the costs of administering the Loan Program maintained under this Component I, the amount of payments made including interest received by Component I of the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that Fiscal Year covered the costs of administering the Loan Program under Component I.

# ARTICLE 12. LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec. 12.1. Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

   (a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 12.1(2) has been satisfied shall be made, in accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 12.1(8) or (9);

   (b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 12.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System, commencing at Age sixty-two; and

   (c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an annual benefit payable in the form of a straight life annuity, commencing when

13-53846-tjt   Doc 13645-1   Filed 12/03/14   Entered 12/03/22 12:37:16   Page 79 of 168
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:46:29   Page 424 of
809

the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     Notwithstanding the foregoing provisions of this Section 12.1, except as provided in Section 12.1(5), the maximum annual benefit specified in Section 12.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by an Employer, does not exceed $10,000 for the Plan Year or any prior Plan Year and (b) the Member was not at any time a participant in a defined contribution plan maintained by an Employer.

(5)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 12.1(2) shall be such limitation (without regard to this Section 12.1(5)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten. In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 12.1(2) and in Section 12.1(4) shall be such limitations (determined without regard to this Section 12.1(5)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.

(6)     Notwithstanding anything in this Section 12.1 to the contrary, if the annual benefit of a Member who has terminated employment with the Employer is limited pursuant to the limitations set forth in Section 12.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(7)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 12.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(8)     The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 12.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:23:16  Page 80 of 168
13-53846-swr  Doc 3504-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 423 of
809

the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 12.1(7).

(9) The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 12.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(10) For purposes of applying the limitations set forth in this Section 12.1, all qualified defined benefit plans (whether or not terminated) ever maintained by an Employer shall be treated as one defined benefit plan.

(11) For purposes of this Section 12.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year. The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with an Employer or (b) the end of the limitation year that includes the date of the Member's severance from employment with an Employer, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the Employer and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(12) This Section 12.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to, any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

## Sec. 12.2.   Compliance with Code Section 415(c) and Regulations

(1) The "Annual Addition" with respect to a Member for a limitation year (which shall be the Plan Year) shall in no event exceed the lesser of:

(a)     $40,000 (adjusted as provided in Code Section 415(d)); or

(b)     One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)     The Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions for such limitation year to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified defined contribution plan (whether or not terminated) maintained by an Employer, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)     In the event the Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 12.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

## ARTICLE 13. RETIREMENT SYSTEM ADMINISTRATION

### Sec. 13.1.  Board of Trustees as Retirement System Administrator

(1)     The Retirement Board shall have the power and authority to manage and administer the Retirement System in accordance with the provisions of the Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 13.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document. This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

### Sec. 13.2.  Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

(a)     exclusive authority regarding the administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Retirement System required of the Employer and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

13-53846-tjt  Doc 13645-1  Filed 12/03/22  Entered 12/03/22 12:27:16  Page 83 of 168
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 422 of
809

(g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h)     to prepare an annual report for the Retirement System for each Fiscal Year in compliance with generally accepted accounting principles.  The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the Fiscal Year.  The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and to the Investment Committee.  The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)     to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and Accumulated Contributions of each Member who has made contributions to the Retirement System;

(j)     to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the Employer or a Member, or overpayment or underpayment of benefits to a Member, former Member, or  Beneficiary by the Retirement System.  In the event of overpayment to a Member, former Member or  Beneficiary, the Board may, as far as practicable, adjust future payments to such individual, in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System.  The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

13-53846-tjt  Doc 13645-1  Filed 12/03/14  Entered 12/03/22 12:27:16  Page 84 of 168
13-53846-swr  Doc 3645-1  Filed 10/22/14  Entered 10/22/14 03:46:29  Page 423 of
809

(l)     except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec. 13.3.   Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)     manage and administer the Retirement System under the supervision and direction of the Board;

(b)     annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following Fiscal Year; and

(c)     perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board; and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may, but need not, be an employee of the City.

## Sec. 13.4.   Discretionary Authority

The Board shall have discretion to:

(a)     interpret the provisions of the Retirement System;

(b)     make factual findings with respect to any and all issues arising under the Retirement System;

(c)     determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)     decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)     make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

13-53846-swr   Doc 13645-1   Filed 12/03/14   Entered 12/03/22 12:27:16   Page 85 of 168
13-53846-tjt   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:46:29   Page 480 of
809

### Sec. 13.5.    Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

# ARTICLE 14. MANAGEMENT OF FUNDS

## Sec. 14.1.   Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City and, subject to the terms of Article 15, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq.* of the *Michigan Compiled Laws, as amended*.

## Sec. 14.2.   Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan Document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan Document.  Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan Document may be commingled for investment purposes, and transferred as provided in Section E-16(c) of Component II.

## Sec. 14.3.   Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.  The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

## Sec. 14.4.   Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose other than payment of the reasonable expenses of maintaining the Retirement System.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

## Sec. 14.5.   Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)     Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)      Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)      Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)      Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

# ARTICLE 15. INVESTMENT OF RETIREMENT SYSTEM ASSETS

## Sec. 15.1.   Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 15, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq*. of the *Michigan Compiled Laws, as amended*.  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 15.

All investment management decisions made by the Board, as more fully described in Section 15.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has responsibility and authority, including the investment management matters described in Section 15.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee  and the Chief Investment Officer are authorized to implement the decision.

If the Board disapproves an investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not less than five business days, of the request by the Investment Committee to discuss the disapproval by the Board described in the written response.  Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended Investment Management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision.  Any action taken by the Board or the Investment Committee in violation of the terms of this Article 15 shall constitute an *ultra vires* act and the Investment Committee or the Board is

granted the express right to seek to preliminarily enjoin such violation without the need to show irreparable harm.

### Sec. 15.2. Investment Management

(1)      For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

       (a)      development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

       (b)      within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

       (c)      evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

       (d)      review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article G of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

       (e)      in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of all or a portion of the reduced base monthly pension amounts and the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

       (f)      communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

       (g)      determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

       (h)      the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

13-53846-tjt Doc 13645-1 Filed 12/03/22 Entered 12/03/22 12:37:16 Page 90 of 168
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 435 of
809

(i)   interpretation of Retirement System governing documents, existing law, the Plan of Adjustment and other financial information that could affect funding or benefit levels;

(j)   review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors, as necessary, prior to approval of the annual audit or other financial reports;

(k)   determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l)   performance of an asset/liability valuation study for the Retirement System every three years or, more often, as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Act No. 314 of the Public Acts of 1965, being Sections 38.1132 et seq*. of the *Michigan Compiled Laws*, as amended, and the Retirement System's investment guidelines.

## Sec. 15.3.   Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)   the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)   the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)   the liquidity needs of the Retirement System.

## Sec. 15.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.   The chief investment officer shall report directly to the Investment Committee and the executive director of the Board.   The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall

13-53846-swr   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:23:16   Page 91 of 168
13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 03:49:29   Page 404 of
809

provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

## Sec. 15.5.   Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Board and the Investment Committee with oversight of the Retirement System's investment portfolio.   Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.   Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.   The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.   The duties of an investment consultant may include, but shall not be limited to:

(a)  providing an asset/liability valuation study for the Retirement System;

(b)  reviewing the Retirement System's asset allocation based on current market assumptions;

(c)  identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)  implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)  monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)  recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations, in the event of a deviation from expectations;

(g)  communicating the investment policies of the Retirement System to the investment managers;

(h)  reviewing the investment policies with the appropriate employees of the Retirement System;

(i)  aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

13-53846-swr   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:27:16   Page 92 of 168
13-53846-tjt   Doc 3045-1   Filed 03/22/14   Entered 03/22/14 03:46:29   Page 48 of 68
809

(j)     attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)     meeting with the Investment Committee and the Board to provide detailed quarterly performance reports and executive summaries of performance;

(l)     meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)     meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manager selections.

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:27:16   Page 93 of 168
13-53846-swr   Doc 3045-1   Filed 10/22/14   Entered 10/22/14 03:45:29   Page 403 of
809

# ARTICLE 16. RETIREE MEDICAL ACCOUNT

## Sec. 16.1.    Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board shall pay the cost, which would otherwise be borne by the Employers, for certain medical and related benefits provided under the plans or programs maintained by the Employers to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 16 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec. 16.2.    Effective Date of Retiree Medical Account

Medical Benefits may be paid from the Medical Benefits Account beginning October ___, 2014, or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec. 16.3.    Funding of Benefits

Subject to the Plan of Adjustment and the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Plan under Section 17.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis, or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year by the Employers pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time any Employer makes a contribution to the Trustee, the Employer shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec. 16.4.    Limitation on Contributions

At all times the aggregate of the contributions made by the Employers to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the Employers to the Plan under Sections 9.3, 9.4 and 9.5 other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 16.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:37:16   Page 94 of 168
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:46:29   Page 483 of
809

### Sec. 16.5.   Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits, shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the Employers.

### Sec. 16.6.   Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  The interpretation and administration of the terms of this Article 16 shall be subject to the provisions of the Combined Plan Document.

### Sec. 16.7.   Right to Amend or Terminate Medical Plans

The Employers expressly reserve the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by any such Employer that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible Spouses and dependents to pay all or any portion of the cost of such medical benefits.

### Sec. 16.8.   Reversion

At no time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, shall any part of the Medical Benefits Account be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the Employers to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the Employers.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the Employers' contributions to the Medical Benefits Account.

### Sec. 16.9.   Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

13-53846-swr   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:23:16   Page 95 of 168
13-53846-tjt   Doc 3645-1   Filed 03/22/14   Entered 03/22/14 03:49:29   Page 44 of 68
809

# ARTICLE 17. MISCELLANEOUS

## Sec. 17.1.   Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by an Employer (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec. 17.2.   Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of payment, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec. 17.3.   Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec. 17.4.   Errors

If any change or error in the records results in any person receiving from the Retirement System more or less than the person would have been entitled to receive from the Retirement System had the records been correct, the Board shall correct such error and, as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such person was correctly entitled shall be paid.

## Sec. 17.5.   Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan Document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments permitted under the terms of the Plan of Adjustment (including amendments contemplated in Section G-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Retirement System, or any successor plan or trust, that govern the calculation of pension benefits during the period ending June 30, 2023, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit

13-53846-tjt   Doc 13645-1   Filed 12/03/22   Entered 12/03/22 12:36:29   Page 96 of 168
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 44 of 68
809

under the Retirement System, except as provided in the Plan of Adjustment. Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan Document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code. The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Retirement System by the City must be approved by the Council or person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

## Sec. 17.6.   Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

## Sec. 17.7.   Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan Document to the contrary. Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year in which he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires. Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section 17.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

## Sec. 17.8.   Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(2)     For purposes of this Section 17.8, the following terms shall have the following meanings:

(a)     "Direct rollover" means a payment by the retirement system to an eligible retirement plan specified by a distributee.

(b)     "Distributee" means a Member or former Member. It also includes the Member's or former Member's surviving Spouse, a Spouse or former spouse who is the

alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E). However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

(c) "Eligible retirement plan" means any of the following that accepts a distributee's eligible rollover distribution:

(i) a qualified trust described in Code Section 401(a);

(ii) an annuity plan described in Code Section 403(a);

(iii) an annuity contract described in Code Section 403(b);

(iv) an individual retirement account described in Code Section 408(a);

(v) an individual retirement annuity described in Code Section 408(b);

(vi) a Roth IRA described in Code Section 408A; or

(vii) a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the Retirement System.

(d) "Eligible rollover distribution" means any distribution of all or any portion of the balance to the credit of a distribute under the Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year. Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the Retirement System. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan

13-53846-tjt Doc 13645-1 Filed 12/03/14 Entered 12/03/22 12:37:16 Page 98 of 168
13-53846-swr Doc 3645-1 Filed 10/22/14 Entered 10/22/14 03:46:29 Page 443 of
809

described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec. 17.9.   Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate.  The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I and/or Component II of this Combined Plan Document or to the Combined Plan Document in its entirety, as the context may require, and not to any particular provision or section thereof.  The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan Document or the Retirement System created hereunder.

## Sec. 17.10.   Severability

If any section or part of a section of this Combined Plan Document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan Document or Retirement System or of the Combined Plan Document or Retirement System in its entirety.

# **Exhibit 6B – Prior GRS Pension Plan**

39885196.3/022765.00213

**EXHIBIT I.A.280**

PRIOR GRS PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

**TABLE OF CONTENTS**

**Page**

COMPONENT II ........................................................................................................... 1

ARTICLE A.  COMMON PROVISIONS OF THE GENERAL RETIREMENT
SYSTEM............................................................................................ 2

Sec. A-1.  Common Provisions............................................................... 2

ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30,
2014.................................................................................................... 4

Sec. B-1.  Freeze of Eligibility and Benefits Under General Retirement
System.............................................................................. 4

ARTICLE C.  DEFINITIONS .................................................................................. 6

Sec. C-1.  Definitions................................................................................ 6

ARTICLE D.  SERVICE CREDIT .......................................................................... 11

Sec. D-1.  Service Credit.......................................................................... 11

Sec. D-2.  Service Credit; Former Employees of the Founder's Society—
Detroit Institute of Arts.................................................... 11

Sec. D-3.  Service Credit; Transfer to Other Governmental Service........ 11

Sec. D-4.  Service Credit; Military Service ............................................. 11

Sec. D-5.  Service Credit; Qualified Military Service (Pre-Employment
Service) ............................................................................ 11

ARTICLE E.  DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN
OF THE GENERAL RETIREMENT SYSTEM................................ 13

Sec. E-1.  Membership ............................................................................ 13

Sec. E-2.  Cessation of Membership; Re-Employment by the Employer ... 13

Sec. E-3.  Service Retirement................................................................... 16

Sec. E-4.  Service Retirement Allowance ............................................... 19

Sec. E-5.  Disability Retirement ............................................................. 20

Sec. E-6.  Accidental Death Benefit; Performance of Duty .................... 23

Sec. E-7.  Accumulated Contributions; Return of 1973 Defined Contribution
Plan Amount .................................................................... 24

Sec. E-8.  Retirement Allowance Options................................................ 25

Sec. E-9.  Benefits for Surviving Spouses; Generally............................. 27

Sec. E-10.  Benefits for Surviving Spouses; Disability Retirees................ 27

Sec. E-11.  Disposition of Surplus Benefits upon Death of Retiree and
Beneficiary ...................................................................... 28

Sec. E-12. Pensions Offset by Compensation Benefits; Subrogation ....................... 28

Sec. E-13. Disability Retirees; Reexamination; Authority of the Board.................. 28

Sec. E-14. Transfer of Department or Department Functions; Generally................ 29

Sec. E-15. Pension Improvement Factor (Escalator).................................. 30

Sec. E-16. Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate ........................................................................ 31

Sec. E-17. Funds............................................................................ 32

Sec. E-18. Method of Financing.......................................................... 32

Sec. E-19. Determination of City's Annual Contribution ......................................... 35

ARTICLE F.  PARTICIPANT LOAN PROGRAM................................................. 36

Sec. F-1. Established ...................................................................... 36

Sec. F-2. The Loan Program .............................................................. 36

Sec. F-3. Eligibility ...................................................................... 36

Sec. F-4. Amount of Loan................................................................ 37

Sec. F-5. Terms and Conditions ......................................................... 37

Sec. F-6. Renewal of Loan ............................................................... 38

Sec. F-7. Loan Balance ................................................................... 38

Sec. F-8. Distributions................................................................... 38

Sec. F-9. Annual Report .................................................................. 38

ARTICLE G.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS ....................................... 39

Sec. G-1. Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment....................................................................... 39

Sec. G-2. Annuity Savings Fund Recoupment ....................................... 40

Sec. G-3. Income Stabilization Benefits ................................................ 43

Sec. G-4. Restoration of Pension Benefits.............................................. 46

ARTICLE H.  MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM................................................................................ 56

Sec. H-1. Enforcement; Civil Action ................................................... 56

Sec. H-2. Limitation of Other Statutes.................................................. 56

# COMPONENT II

13-53846-tvr Doc 8066 Filed 12/02/14 Entered 12/02/14 03:48:69 Page 105 of
309
13-53846-swr Doc 8045-1 Filed 10/22/14 Entered 10/22/14 03:27:16 Page 95 of
309

# ARTICLE A.  COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM

## Sec. A-1.  Common Provisions

Certain provisions of the Combined Plan for the General Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Sections of Component I:

(a)     Article I (General Provisions);

(b)     Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

Employer

Fiscal Year

General Retirement System or Retirement System

Internal Revenue Code or Code

Investment Committee

Member

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

13-53846-tjt   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:09   Page 106 of
13-53846-swr   Doc 13664   Filed 12/02/21   Entered 12/02/21 03:27:09   Page 965 of
309

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse; and

Straight Life Retirement Allowance;

(c)     Article 12 (Limitation on Benefits and Contributions);

(d)     Article 13 (Retirement System Administration);

(e)     Article 14 (Management of Funds);

(f)     Article 15 (Investment of Retirement System Assets); and

(g)     Article 17 (Miscellaneous).

## ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30, 2014

### Sec. B-1.  Freeze of Eligibility and Benefits Under General Retirement System

Notwithstanding anything in Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code or this Combined Plan for the General Retirement System of the City of Detroit, Michigan to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

(a)     No new employee hired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the General Retirement System in effect as of the Freeze Date;

(b)     No employee who is rehired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue either a benefit or service credit for any purpose under the terms of the General Retirement System in effect as of the Freeze Date; provided, however, that a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (c) of this Section B-1 and who is rehired by an Employer on or after July 1, 2014 but prior to the date the Member incurs a six-year break in service shall be eligible to accrue service credit following rehire solely for the purpose of determining the Member's vesting in and eligibility for payment of his Frozen Accrued Benefit;

(c)     Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service, Average Final Compensation, and the pension multiplier formulae in effect as of such Freeze Date under the terms of the General Retirement System ("Frozen Accrued Benefit");

(d)     Except as otherwise provided in subsection (e) of this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit.  No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the General Retirement System;

(e)     Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of his unused accrued sick leave to increase his Average Final Compensation ("Sick Leave Rollover") if the Member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election ("Special Election") to add the value of twenty-five percent (25%) of the Member's unused sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance to the earnings used in computing Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit; provided, however, that at least twenty-five percent (25%) of the Member's sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance remains in the Member's sick leave bank at the time the completed Special Election form is received by the Retirement System and, provided further that the completed Special Election form is received by the Retirement System no later than August 22, 2014 or, if later, the date set forth in a collective bargaining

agreement between the City and a union whose members are eligible to make a Special Election. A Member's Special Election shall be made in the manner set forth by the Board of Trustees and the Retirement System. A Member may revoke a Special Election, as long as such revocation occurs on or before the latest date upon which such Member is permitted to make a Special Election. Notwithstanding anything in this subsection (e) to the contrary, a Member's Special Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's unused sick leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement if he retired as of June 30, 2014, and (ii) the electing Member's employment with an Employer is terminated before the electing Member becomes eligible for an immediate service retirement under the Retirement System;

(f)     Service earned after the Freeze Date shall be credited to a Member solely for purposes of determining the Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the General Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the General Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(g)     No Member shall make contributions to the Annuity Savings Fund under the General Retirement System in effect as of June 30, 2014 with respect to wages earned on or after the earliest date following June 30, 2014 that the City's payroll department can implement the freeze. All after tax contributions made on or after the date referenced in the preceding sentence shall be made to and in accordance with the terms of Component I of the Combined Plan.

The foregoing terms shall be referred to as the "Freeze" of the provisions of the General Retirement System as in effect on the Freeze Date and the provisions of Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code and this Component II of the Combined Plan shall be interpreted and construed by the Board of Trustees and the Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1, the provisions in Chapter 47, or any collective bargaining agreement or other document governing the terms of employment of any employee, the Board of Trustees and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

# ARTICLE C.  DEFINITIONS

## Sec. C-1.  Definitions

Unless a different meaning is plainly required by context, for purposes of this Component II the following words and phrases have the meanings respectively ascribed to them by this Section C-1:

(1)     *Accrued Service* means a Member's credited service for employment rendered before July 1, 2014.

(2)     *Accumulated Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Member's individual account in the Annuity Savings Fund, together with regular interest thereon.

(3)     *Annuity* means the portion of the retirement allowance which is paid for by a Member's accumulated contributions.

(4)     *Annuity Reserve* means the present value of all payments to be made on account of any annuity or benefit in lieu of any annuity.  Such annuity reserve shall be computed upon the basis of such mortality tables and regular interest as shall be adopted by the Board.

(5)     *Average Final Compensation* means:

a.      On or before June 30, 1992.  For those Members who retired or separated from active service with vested pension rights on or before June 30, 1992, the highest average compensation received by a Member during any period of five consecutive years of credited service selected by the Member from the ten years of credited service which immediately preceded the date of the Member's last termination of City employment. If a Member has less than five years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

b.      On or after July 1, 1992 but before July 1, 1998.  For those Members who retired or separated from active service with vested pension rights on or after July 1, 1992 but before July 1, 1998, the highest average compensation received by a Member during any period of four consecutive years of credited service during the ten years of credited service which immediately preceded the date of the Member's last termination of City employment.  If a Member has less than four years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

c.      On or after July 1, 1998.  For those Members who retire or separate from active service with vested pension rights on or after July 1, 1998, the

highest average compensation received by a Member during any period of three consecutive years of credited service during ten years of credited service which immediately precede the date of the Member's last termination of City employment. If a Member has less than three years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

d.    Sick Leave Election. For those nonunion Members with a regular or early service retirement who retire on or after July 1, 1999, in computing the highest average compensation received by a Member, the Member shall have the option of adding the value of twenty-five percent (25%) of the Member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation. Bargaining unit members who retire on or after July 1, 1999 and prior to July 1, 2014 shall have the Unused Sick Leave On Retirement benefit provided for in the applicable bargaining agreement. For any Member choosing to exercise this option, the lump sum payment the Member will receive will be the remaining value of the unused accrued sick leave bank as provided in the bargaining agreement.

(6)    *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a retirement allowance or pension payable from funds of the General Retirement System due to the participation of a Member.

(7)    *Compensation* means:

a.    On or before June 30, 1992. For those Members retired or separated from active service with vested pension rights, on or before June 30, 1992, all remuneration, excluding longevity payments, paid to a Member because of personal services rendered by the Member to the Employer. Compensation in excess of the limitations set forth in Section 401(a)(17) of the Internal Revenue Code shall be disregarded.

b.    On or after July 1, 1992. For those Members who retire on or after July 1, 1992, all remuneration, including longevity payments, paid to a Member because of personal services rendered by the Member to the Employer. Compensation in excess of the limitations set forth in Section 401(a)(17) of the Internal Revenue Code shall be disregarded.

(8)    *Conversion* means that date on which a Member's benefits change from disability retirement benefits to normal retirement benefits.

(9)    *Credited Service* means membership service credited to a Member to the extent provided in this Component II.

(10)     *Final Compensation* means a Member's annual rate of compensation at the time employment with all Employers is last terminated.

(11)     *Pension* means, for purposes of this Component II, the portion of a retirement allowance which is paid for by appropriations made by the Employers into the appropriate funds.

(12)     *Pension Reserve* means the present value of all payments to be made on account of any pension, or benefit in lieu of any pension. Such pension reserve shall be computed upon the basis of such mortality and other tables of experience, and regular interest, as shall be adopted by the Board.

(13)     *Regular Interest* means such rate or rates per annum, compounded annually, as the Board of Trustees shall determine in accordance with the limitations contained in Section E-16 of this Component II.

(14)     *Retiree* means a former Member who is receiving a retirement allowance from Component II of the Retirement System.

(15)     *Retirement* means a Member's withdrawal from the employ of the Employers with a retirement allowance or pension paid by Component II of the Retirement System.

(16)     *Retirement Allowance* means the sum of the annuity and the pension.

(17)     *Service* means personal services rendered to the Employer by a person as an employee of the Employer, provided such person is compensated by the Employer for such personal services.

(18)     *Service credit for purposes of the 1973 Defined Benefit/Defined Contribution (Annuity) Plan* means that, in accordance with such rules and regulations as the Board shall adopt, each Member shall be credited with service as follows: (1) One month of service credit is earned when the Member is paid for eighty hours of work during the month; (2) A full year of credit is earned for nine months of credit in any calendar year, except the Member's last year of work, which service credit shall be determined as of the Member's last day on the Employer's payroll. Less than nine months of service rendered in a calendar year shall neither be credited as a full year of service, nor shall more than one year of service be credited to any Member for service rendered in any one calendar year. Service credit is used to determine eligibility for service retirement, vesting, non-duty disability and survivor benefits. Service credit is also earned by a Member while retired on a duty disability or while receiving Workers' Compensation benefits.

The following terms shall have the meanings given to them in the Sections of this Component II set forth opposite such term:

| | |
|---|---|
| 2023 UAAL Amortization | Section G-4(3)a |
| Accrued Liability Fund | Section E-18(d) |

| | |
|---|---|
| Actual Return | Section G-2(5) |
| Adjusted Accrued Benefit | Section G-1(1)a |
| Adjusted Deferred Accrued Benefit | Section G-1(1)b |
| Annuity Reserve Fund | Section E-18(b) |
| Annuity Savings Fund Excess Amount | Section G-2(1) |
| Annuity Savings Fund of the 1973 Defined Contribution Plan | Section E-18(a) |
| ASF | Section G-2 |
| ASF account | Section G-2(1) |
| ASF Recalculation Period | Section G-2 |
| ASF Excess Return | Section E-16(c) |
| ASF Recoupment | Section G-1(1)(c) |
| Cash Option Cap | Section G-2(4) |
| Cash Repayment Option | Section G-2(4) |
| Certificate of Default | Section G-3(7) |
| COLA | Section G-4 |
| Determination Date | Section E-18 |
| Eligible Pensioner | Section G-3(5) |
| Estimated Adjusted Annual Household Income | Section G-3(3)b |
| Excess Assets | Section G-3(7) |
| Expense Fund | Section E-18(f) |
| Extra Contribution Account | Section G-4(3)b |
| Federal Poverty Level | Section G-3(6) |
| Final Payment Notice | Section G-2(4) |
| Freeze | Section B-1 |
| Freeze Date | Section B-1 |
| Frozen Accrued Benefit | Section B-1(c) |
| Funded Level | Section G-4(2) |
| Funding Conditions | Section G-1(1)a |
| Funding Proceeds | Section E-18(d) |
| Funding Target | Sections G-4(2)a, G-4(3)a, G-4(4)a |
| Governor | Section G-4(5) |
| IME | Section E-5(a) |
| Income Fund | Section E-18(g) |
| Income Stabilization Benefit | Section G-3(2) |
| Income Stabilization Benefit Plus | Section G-3(3) |
| Income Stabilization Fund | Section G-3(4) |
| Monthly Annuity Savings Fund Excess Amount | Section G-2(2) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section E-8(a) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section E-8(a) |
| Option One.  Cash Refund Annuity | Section E-8(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section E-8(a) |
| Option Two. Joint and One Hundred Percent Survivor | |

| | |
|---|---|
| Allowance | Section E-8(a) |
| Participant Loan Program | Section F-1 |
| Pension Accumulation Fund | Section E-18(c) |
| Pension Funding Transaction | Section E-18(d) |
| Pension Improvement Factor (Escalator) | Sections E-15, G-1(2) |
| Pension Reserve Fund | Section E-18(e) |
| Pension Restoration Agreement | Section G-4 |
| Permanent Restoration Target | Section G-4(2)g, G-4(3)a, G-4(4)a |
| Pop-up Form | Section E-8(b)(2) |
| Restoration Reserve Account | Section G-4(2)a |
| Restoration Reserve Suspension Trigger | Sections G-4(2)g, G-4(3)a, G-4(4)a |
| Restoration Target | Sections G-4(2)a, G-4(3)a, G-4(4)a |
| Sick Leave Rollover | Section B-1(e) |
| Special Election | Section B-1(e) |
| Standard Form | Section E-8(b)(1) |
| Straight Life Retirement Allowance | Section E-8(a) |
| Transition Cost | Section E-16(c) |
| UAAL | Sections E-18(d), G-4 |
| Waterfall Classes | Section G-4(1) |

# ARTICLE D.  SERVICE CREDIT

## Sec. D-1.  Service Credit

The Board shall keep an accurate record of each employee's accumulated service credit from the date of commencement of employment with the Employers.

## Sec. D-2.  Service Credit; Former Employees of the Founder's Society—Detroit Institute of Arts

Pursuant to Section 6-519 of the 1974 Detroit City Charter, and for the sole purpose of computing service credit to determine eligibility for a retirement allowance from the General Retirement System, a person who was inducted into the classified service of the City during the calendar year 1984 as a result of the transfer of certain functions at the Detroit Institute of Arts from The Founder's Society/Detroit Institute of Arts to the City, shall be credited with service credit equivalent to continuous time worked as a full time employee of the Founder's/Detroit Institute of Arts retroactive to January 1, 1984.  Such Founder's Society/Detroit Institute of Arts service credit shall have no effect upon the amount of retirement benefits paid by the General Retirement System.  Such Founder's Society/Detroit Institute of Arts service credit shall be added to the service credit earned as a City employee only for purposes of meeting service credit eligibility requirements under the General Retirement System.  The Board of Trustees of the General Retirement System shall make all determinations of crediting of such Founder's Society/Detroit Institute of Arts service credit in accordance with the provisions of this Component II of the Combined Plan.

## Sec. D-3.  Service Credit; Transfer to Other Governmental Service

A Member transferred from the City payroll by his or her department head to the payroll of any City, county, state, or federal government to serve the interests of the City during peace time shall continue to be a Member of the Retirement System for purposes of service credit in accordance with the ordinance or resolution passed to implement such transfer.

## Sec. D-4.  Service Credit; Military Service

An Employee of the Employer who enters the military service of the United States while so employed shall have such service credited as City service for purposes of this Component II in the same manner as if the employee had served the employer without interruption, provided that (1) the employee's entry into such service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, and (2) he or she is re-employed by the Employer upon completion of such service.  During the period of service and until return to City employment, his or her contributions to the fund shall be suspended and the fund balance shall be accumulated at regular interest.

## Sec. D-5.  Service Credit; Qualified Military Service (Pre-Employment Service)

(a) Notwithstanding any provision of this Component II to the contrary, contributions, benefits, and service credit with respect to qualified military service, shall be provided in accordance with Section 414(u) of the Internal Revenue Code.  Up to three years of pre-

employment service credit may be purchased prior to June 30, 2014 for the following periods: service for a period of not less than ninety days between (1) the date of declaration of war by Congress and the recognized date of cessation of military hostilities; (2) the onset of World War II on December 8, 1941 to its conclusion on July 1, 1946; (3) the onset of the Korean Conflict on June 27, 1950 to its conclusion on December 31, 1953; (4) the onset of the Vietnam Conflict on February 28, 1961 to its conclusion on May 7, 1975, or (5) beginning on the date of the recognition of an emergency condition by the issuance of a presidential proclamation or a presidential executive order, during which emergency condition the Member received the Armed Forces Expeditionary or other Campaign Service Medal authorized by the Federal Government for the Expedition or Campaign.

(b)     This time may be applied toward a Member's credited service and may be used in meeting the minimum time needed for an automatic Option Two or automatic Option Three pension.

(c)     This time shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability pension, or for a service pension.

# ARTICLE E.  DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM

## Sec. E-1.  Membership

The membership of the General Retirement System 1973 Defined Benefit/Defined Contribution (Annuity) Plan – Component II of the Combined Plan - shall consist of all persons who are full time employees of the Employer except:

(a)     persons who are members of the Police and Fire Retirement System of the City of Detroit, Michigan, established under Title IX, Chapter VII of the 1918 Detroit City Charter and continued in the 1974, 1997 and 2012 Detroit City Charters and as continued in the form of the Combined Plan for the Police and Fire Retirement System for the City of Detroit, Michigan, effective July 1, 2014 and as thereafter amended;

(b)     persons who are hired or rehired by an Employer on or after July 1, 2014; and

(c)     Any person who is a member of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

Special Service employees who worked more than fourteen hundred forty (1440) hours per Fiscal Year ending on or before June 30, 2014 will be eligible to participate in Component II of the Retirement System.

## Sec. E-2.  Cessation of Membership; Re-Employment by the Employer

(a)     Any Member who retires under Section E-3(a), (b), or (c), or dies, shall have a non-forfeitable right to a benefit.

(b)     With respect to persons not on the active payroll prior to October 1, 2005, the following provisions of this subsection shall apply:

    (1)     Except as otherwise provided for in this Component II, if any non-vested Member leaves City employment for any reason other than retirement or death, such person shall thereupon cease to be a Member and his or her credited service at that time shall be forfeited.  In the event of re-employment by the City prior to July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component II of the Combined Plan.  In the event of reemployment by the employer on or after July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component I of the Combined Plan.  If re-employment occurs prior to July 1, 2014 and within a period of six (6) years from and after the date City employment last terminated, credited service last forfeited shall be restored to the employee's credit for purposes of accruing a benefit after re-employment.

(2) With respect to persons on the active payroll on or after October 1, 2005, re-employment prior to July 1, 2014 shall restore any previously forfeited service credit notwithstanding the time of re-employment.

(c) Vested former employees rehired prior to receiving pension benefits and prior to July 1, 2014.

(1) Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to July 1, 2014 and prior to being separated for six (6) years shall have their pensions calculated in accordance with the rules in effect at the earlier of (i) the time of their last termination of active service or retirement and (ii) June 30, 2014.

(2) Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 1992 but prior to July 1, 2014 and after being separated for more than six (6) years who accumulate enough service credit to be eligible for a second pension shall be entitled to two (2) separate and distinct pensions, each to be calculated in accordance with the rules in effect at the earlier of (i) the time of each separation from service and (ii) June 30, 2014.

(3) An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor earned through June 30, 2014 added to the vested amount of the original pension for payment when the employee eventually retires. The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(d) Vested former employees rehired prior to receiving pension benefits and on or after July 1, 2014.

(1) Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to being separated for six (6) years and on or after July 1, 2014 shall have their Component II pension calculated in accordance with the rules in effect on June 30, 2014 and their Component I pension calculated in accordance with the rules in effect at the time of their last termination of active service or retirement.

(2) Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 2014 after being separated for more than six (6) years who accumulate enough service credit to be eligible for a Component I pension shall be entitled to two (2) separate and distinct pensions under Component I and Component II, each to be calculated in accordance with the rules in effect at the time of each separation from service.

(3) An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor added to the vested

amount of the original pension for payment when the employee eventually retires. The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(e)     Retirement benefits for retirees who return to active full time employment prior to July 1, 2014.

(1)     Retirees who return to work will have their pension benefit amount suspended upon re-employment. However, retirees who have not withdrawn the amounts credited to their defined contribution account shall be entitled to continue to receive the monthly annuity from the 1973 Defined Contribution Plan. The pension improvement factor shall continue to be added to the vested amount of the original pension but shall not be paid on the defined benefit amount until the employee again separates from service.

(2)     Retirees who return to work prior to July 1, 2014 will be entitled to receive a second pension benefit in accordance with the rules in effect at the earlier of (1) their final separation, or (ii) June 30, 2014, with respect to service credit earned after the retiree returns to active employment. Previous service credit will be used to determine the retirement factors that will be credited to service time earned after return to active employment and used to calculate the new pension amount.

(3)     Average Final Compensation will be based upon the amounts earned after the retiree returns to work through the earlier of (1) their final separation and (ii) June 30, 2014.

(4)     Employees who retire under this Section E-2(e) for a second time will not be allowed to change the original option selection with respect to the original pension benefit. However, employees may make a separate option selection on their second pension benefit amount.

(5)     The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will be included only on the employee's original pension.

(6)     The coordination of benefits (equated Social Security) option will not be available on a second pension amount.

(7)     If a retiree who returns to work and dies while working, had an accumulated combined total service time of at least twenty years, the employee's Spouse will be eligible for automatic Option Two benefits, notwithstanding the option form of retirement originally elected.

(8)     If a retiree who returns to work and dies while working had an accumulated combined total service time of at least fifteen years but less than twenty years, the employee's Spouse will be eligible for automatic Option Three benefits, notwithstanding the option form of retirement originally elected.

(9)     If the employee returns to work and dies prior to accumulating a combined total of fifteen years of service credit, the original pension and benefit option chosen shall resume unless the employee had chosen the Straight Life Option which would result in no survivor pension benefits.

(10)    The Board of Trustees will determine all entitlements for re-employed individuals on a case by case basis consistent with this section and will resolve all issues based upon special circumstances or unique situations.

## Sec. E-3.  Service Retirement

(a)     *Retirement after thirty years of service.*  Any Member hired prior to January 1, 1996 who has accumulated at least thirty or more years of credited service regardless of age, or, for any Member who was hired on or after January 1, 1996 and who has accumulated at least thirty or more years of credited service and has attained age fifty-five, may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement, the Member shall receive a retirement allowance as provided in Section E-4 of this Component II of the Combined Plan.

(b)     *Retirement after twenty-five years of service.*  Any Employee who is covered by the provisions of this Component II and who is a member of the International Union of Operating Engineers IUOE Local 324 (Principal Clerks), the International Brotherhood of Teamsters Teamster Local 214, the Police Officers Association of Michigan, or the Emergency Medical Service Officers Association, who on July 1, 1995, or later has twenty-five (25) or more years of credited service may retire upon his or her written application filed with the Board of Trustees setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement the Member shall receive a Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan.

(c)     *Retirement at age sixty-five with eight years of service; at age sixty with ten years of service.*

(1)     Sixty-five and eight.  Any Member who has attained sixty-five years of age and has at least eight years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

(2)     Sixty and ten.  Any Member who has attained sixty years of age and has at least ten years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement, the former Member shall receive the retirement allowance provided for in Section E-4 of this Component II of the Combined Plan.

(d)  *Conversion of Duty-Disability benefit to Retirement Allowance.*

(1)  Retirees who are members of the Emergency Medical Service Officers Association or the Police Officers Association of Michigan and who began receiving a Duty Disability Pension after July 1, 1995 may choose to convert to a service retirement at the time they would have had twenty-five (25) years of service with the City.

(e)  *Retirement after twenty-five years of service without attaining age sixty years; reduced pension.*

(1)  Early retirement.  Any Member of the Retirement System who is on the payroll on or after July 1, 1992, and who has twenty-five years of credited service and has not attained sixty years of age, shall have the option of early retirement by accepting an actuarially reduced retirement allowance as determined by the Board after consultation with the Plan Actuary, notwithstanding the age of the Member who elects early retirement; provided however that any Member hired by an Employer on or after January 1, 1996 must have twenty-five years of credited service and have attained age fifty-five to have such early retirement option.  Said election shall be made within ninety days of separation from City service. Actuarial tables provided by the Plan Actuary shall always provide this actuarially reduced retirement allowance at no cost to the employee.

Notwithstanding the foregoing, any Member hired by an Employer on or after January 1, 1996 who has twenty-five years of credited service and has attained age fifty-five shall have the option of early retirement by accepting

(2)  Fringe benefits.  Employees utilizing the early retirement provision in Section E-3(e)(1) will not be entitled to the fringe benefits, if any, accruing to employees who qualify for a normal service retirement until such time as they would have qualified for a normal service retirement under Section E-3(a) or (b) of this Component II of the Combined Plan.

(f)  *Vested retirement allowance; age forty and eight years of service; ten years of service regardless of age.*

(1)  Eligibility.

a.  Any Member hired before July 1, 1980 who has reached forty years of age and has acquired eight or more years of credited service shall be eligible to receive benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan.

b.  Any Member hired on or after July 1, 1980 who has acquired ten years of credited service shall be eligible to receive the benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan, regardless of age.

c.    Any non-union Member hired on or after July 1, 1980 but before March 31, 1992 who has acquired ten years of credited service regardless of age or has reached age forty with eight or more years of credited service, whichever is earlier, shall be eligible to receive benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan.

(2)    *Benefits*.

a.    Any Member described in Section E-3(f)(1) of this Component II who left City employment on or before June 30, 1992 but prior to the date the Member would have first become eligible to retire as provided in Section E-3(a), (b) or (c) of this Component II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law, retirement or death, shall be entitled to a retirement allowance based upon one point five percent (1.5%) of Average Final Compensation for the first ten years of service and one point six three percent (1.63%) for service in excess of ten years.  There shall be no change to the base pension upon which future increases are based.

b.    Any Member described in Section E-3(f)(1) of this Component II of the Combined Plan who leaves City employment on or after July 1, 1992, but prior to the date the Member would have first become eligible to retire as provided in Section E-3(a), (b) or (c) of this Component II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law, retirement or death, shall be entitled to a retirement allowance computed according to Section E-4 of this Component II of the Combined Plan.

(3)    *Commencement of retirement allowance*.  The retirement allowance shall begin on the first day of the calendar month following the month in which a retirement application is filed with the Board, on or after that date on which the Member would have been eligible to retire with an unreduced service retirement under Section E-3(a) or (b) of this Component II of the Combined Plan, had City employment continued or on the date when age sixty is reached, whichever is earlier.  Unless otherwise provided in this Article, no service credit shall be earned for the period of absence from City employment and such person's beneficiary shall not be entitled to any other benefit afforded in this Article except those benefits afforded either in Section E-3 or in Section E-4 of this Component II of the Combined Plan notwithstanding termination of membership.

(4)    *Withdrawal of accumulated contributions*.  Upon separation from City employment, Members who qualify for benefits pursuant to Section E-3(f)(1) of this Component II of the Combined Plan  may withdraw their 1973 Defined Contribution Plan accumulated contributions and all other funds standing to their credit in the Annuity Savings Fund at that time without affecting their benefits under Section E-3(f)(2) or E-4 of this Component II of the Combined Plan.

In the event that any law, State or Federal, is passed during the term of the collective bargaining agreement or City Employment Terms agreement which permits Employees to vest their pension prior to meeting the vesting requirements set forth in this Component II, any Employee who vests his or her pension in such a manner shall not be eligible for any pension benefits until his or her sixty-second (62nd) birthday. This provision will not affect the current practice governing disabled Employees.

### Sec. E-4. Service Retirement Allowance

Upon retirement, a Member who meets the qualifications set forth in section E-3(a), (b) or (c) of this Component II of the Combined Plan, shall receive a Straight Life Retirement Allowance, and shall have the right to elect to receive in lieu of the Straight Life Retirement Allowance, a reduced retirement allowance under an option provided for in E-8 of this Component II of the Combined Plan.

The Straight Life Retirement Allowance shall consist of:

(a)    An Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the 1973 Defined Contribution Annuity Savings Fund at the time of retirement; and

(b)    A Basic Pension of twelve dollars ($12.00) per annum multiplied by the number of years, and fractions of years of credited service, not to exceed ten (10) years; and

(c)    A Membership Service Pension.

(1)    For Members who retire on or before June 30, 1992, a membership service pension of one point five percent (1.5%) of Average Final Compensation for the first ten (10) years of service and one point six three percent (1.63%) for service in excess of ten (10) years.

(2)    For Members who retire on or after July 1, 1992 but prior to July 1, 1998, a membership service pension of one point five percent (1.5%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point seven percent (1.7%) of Average Final Compensation for each year of service in excess of ten (10) years up to twenty (20) years of service, plus one point nine percent (1.9%) of Average Final Compensation for each year of service in excess of twenty years. In no event shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(3)    For Members who retire on or after July 1, 1998, a membership service pension for service rendered prior to July 1, 2012 of one point six percent (1.6%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point eight percent (1.8%) of Average Final Compensation for each year of service in excess of ten (10) years, up to twenty (20) years of service, plus two percent (2%) of Average Final Compensation for each year of service in excess of twenty (20) years up to twenty-five (25) years, plus two point two percent (2.2%) of Average Final Compensation for each year of service in excess of twenty-five

(25) years; plus, for service rendered after July 1 2012 and prior to July 1, 2014, one and one-half percent (1.5%) of Average Final Compensation for each year of service; plus twelve dollars ($12) for each year of City service not to exceed one hundred twenty dollars ($120). Notwithstanding the foregoing, for members of the Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920 and the Detroit Senior Water Systems Chemists Association bargaining units, the effective date of the one and one-half percent multiplier was April 1, 2013 for all years of service rendered after that date. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(d)     With respect to regular service retirees under Section E-3(a) and (b) of this Component II of the Combined Plan only and excluding persons who receive vested benefits under Section E-3(c) and (d) of this Component II of the Combined Plan, in no case shall the total of the annual Straight Life Pension be less than three hundred sixty dollars ($360.00) times each of the first ten (10) years of service at retirement, plus one hundred twenty dollars ($120.00) for each year of service in excess of ten (10) years. Effective July 1, 2007, each year of service in excess of ten (10) years earned prior to July 1, 2014 shall be calculated using two hundred twenty-five dollars ($225.00).

(e)     The recalculation of the pension benefit shall include previous pension improvement factors but shall not include special increases granted by prior separate ordinances.

(f)     If a retiree dies before receipt of Straight Life Retirement allowance payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between these accumulated contributions and the aggregate amount of Straight Life Retirement allowance payments received, shall be paid to such person or persons nominated by written designation duly executed by the retiree and filed with the Board. If there is no such designated person or persons surviving the retiree, such difference shall be paid to his or her estate. In no case shall any benefits be paid under this section because of the death of a retiree if the retiree had elected any of the Options provided for in Section E-8 of this Component II of the Combined Plan.

## Sec. E-5. Disability Retirement

(a)     *Duty Disability; Eligibility.* Upon the application of a Member or the Member's department head, a Member who becomes totally and permanently incapacitated for duty in the employ of the Employer shall be retired by the Board; provided, such incapacity is found by the Board to be the natural and proximate result of the actual performance of duty, without willful negligence on the part of the Member; provided further, that any employee who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner ("IME"). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City, the employee shall not be eligible for the duty disability retirement.

(b)     *Duty disability; Benefits*.  Upon retirement for disability as provided in Section E-5(a) of this Component II of the Combined Plan, a retiree shall receive the following benefits:

(1)     Any Member who is eligible for a Service Retirement under Section E-3(a) or (b) of this Component II of the Combined Plan shall receive a Service Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan and shall have the right to elect an option provided for in Section E-8 of this Component II of the Combined Plan.

(2)     Any Member prior to eligibility for a Service Retirement under Section E-3(a) or (b) of this Component II of the Combined Plan shall receive a Disability Retirement Allowance to begin as of the date of disability.  In no case shall the Disability Retirement Allowance be retroactive to more than six months before the date the application for Disability Retirement is filed with the Board, or prior to the date the Member's name last appeared on a City payroll with pay, whichever is later.  The Disability Retirement Allowance shall continue until the Member reaches eligibility for Service Retirement or recovers prior to that event.  Upon reaching eligibility for Service Retirement, he or she shall receive a pension as provided in Sections E-4(b)-(e) of this Component II of the Combined Plan, together with an annuity which shall be the equivalent of the annuity which would have been received had contributions to the Annuity Savings Fund continued.  Said contributions are to be based on the final compensation at the date of duty disability and the annuity percentage in effect for the employee on the July first prior to the effective date on which the employee is added to the disability retirement payroll, provided said July first is at least six months prior to the effective date that the employee is added to the regular retirement payroll.  In computing the pension, membership service credit shall be given for the period a Duty Disability Retirement Allowance is received.  The Disability Retirement Allowance shall consist of:

(i)     Cash Refund Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the Annuity Savings Fund at the time of retirement.  If a retiree dies before receipt of annuity payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions, the difference between the accumulated contributions and the aggregate amount of annuity payments received shall be paid in a single lump sum to such person or persons nominated by written designation duly executed and filed with the Board.  If there is no such designated person surviving the retiree, such difference shall be paid to the retiree's estate.

(ii)    In addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the Member's Average Final Compensation at the time of duty disability, subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.  This Disability Pension shall in no event exceed fifty-seven hundred dollars ($5,700.00) per annum.

(iii) For Members who retired on disability on or after January 1, 1999 or on or after July 1, 2012 for members of the Emergency Medical Service Officers Association and Police Officers Association of Michigan bargaining units, in addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the Member's average compensation at the time of duty disability, subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan. This Disability Pension shall in no event exceed nine thousand dollars ($9,000.00) per annum.

(c) *Non-Duty Disability; Eligibility.* Upon the application of a Member or the Member's department head, a Member who has at least ten years of credited service who becomes totally and permanently incapacitated for duty as a result of causes which do not occur in the actual performance of duty to the employer, may be retired by the Board if the IME certifies to the Board after examination that such Member is mentally or physically totally incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such Member should be retired.

(d) *Non-Duty Disability; Benefits.* Upon retirement for non-duty disability as provided in Section E-5(c) of this Component II of the Combined Plan, a Member shall receive the following benefits:

(1) After attaining sixty years of age, a Member shall receive a Service Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan and shall have the right to elect an Option as provided in Section E-8 of this Component II.

(2) Prior to age sixty, a Member shall receive benefits as provided in Section E-5(d)(2)(i)-(iv) of this Component II of the Combined Plan:

i. A Cash Refund Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the Annuity Savings Fund at the time of retirement. In the event a retiree dies before the total of the Cash Refund Annuity payments received equals or exceeds the amount of his or her accumulated contributions at the time of retirement, the remainder shall be paid in a single lump sum to such person or persons nominated by written designation duly executed by the Member and filed with the Board. If there is no such designated person or persons surviving, any such remainder shall be paid to the retiree's estate.

ii. In addition to the Annuity, a Disability Pension which shall be based on the Service Retirement factors in effect on the effective date of disability. The service retirement factors shall be multiplied by the Average Final Annual Compensation multiplied by the number of years and fractions of years of service credited to the retiree. In addition, a basic pension of twelve dollars ($12.00) per annum for a maximum of ten years of credited service shall be added for a total not to exceed one hundred twenty dollars ($120.00) and adjustments thereto, as calculated pursuant to applicable

provisions of this Component II of the Combined Plan. Said Disability Pension shall begin as of the date of the disability. However, in no case shall the Disability Pension begin more than six months before the date the application for disability retirement was filed with the Board, or prior to the date his or her name last appeared on a City payroll with pay, whichever is later. Payment of the Disability Pension shall continue to age sixty. Said Disability Pension shall not exceed thirty-nine hundred dollars ($3,900.00) per annum, and shall be subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.

iii.    A Member who retired on disability on or after January 1, 1999 shall receive a Disability Pension as provided for in Section E-5(d)(2)(ii) of this Component II of the Combined Plan. Said Disability Pension shall not exceed six thousand dollars ($6,000.00) per annum, and shall be subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.

iv.    Effective July 1, 1967, notwithstanding the limitations contained in Section E-5(d)(2)(ii) of this Component II of the Combined Plan, disability retirees under Section E-5(c) of this Component II of the Combined Plan, who retired (1) prior to August 13, 1953, shall receive a supplementary Disability Pension of forty dollars ($40.00) per month; or (2) after August 13, 1956 and prior to July 1, 1966, shall receive a supplementary Disability Pension of twenty dollars ($20.00) per month.

v.    Upon Attaining Age Sixty, the retiree shall receive a Pension computed according to the provisions of Section E-4(b)-(e) of this Component II of the Combined Plan; provided, that no service credit shall be given for the time a Disability Pension provided for in Section E-5(d)(2)(ii) of this Component II of the Combined Plan was received. Upon attaining age sixty, the retiree shall have the right to make an election under Section E-8 of this Component II of the Combined Plan.

**Sec. E-6. Accidental Death Benefit; Performance of Duty**

If a Member is killed in the performance of duty in the service of the employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the employer, and such death, illness, or injuries resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the employer, the following benefits shall be paid, subject to Section E-12 of this Component II of the Combined Plan:

(a)    *Annuity Savings Fund.* Accumulated savings in the Member's Annuity Savings Fund at the time of death shall be paid in a single lump sum to such person or persons as the Member nominated in a writing duly executed and filed with the Board. In the event there is no designated person or persons surviving the Member, the accumulated contributions shall be paid to the Member's estate.

(b)     *A Pension* of one-third of the final compensation of said Member shall be paid to the surviving Spouse to continue until remarriage. If an unmarried child, or children under age eighteen also survive the deceased Member, each surviving child shall receive a pension of one-fourth of said final compensation, to be divided equally. Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, such child's pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen. In no event shall any child receive a pension of more than one-fourth of said final compensation.

(c)     *No Surviving Spouse; Children*. If there is no surviving Spouse, or if such surviving Spouse dies or remarries before the youngest surviving child of a deceased Member shall have attained the age of eighteen, any unmarried child or children under age eighteen, if any, shall receive a Pension equal to one-fourth of the deceased Member's final compensation; provided, that if there are more than two such surviving children, each shall receive a pension of an equal share of one-half of said final compensation. Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, the child's Pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen. In no case shall any such child's Pension be more than one-fourth of the deceased Member's final compensation.

(d)     *Annual Limit*. The total amount payable under Section E-6(b) and (c) of this Component II of the Combined Plan on account of the death of a Member, shall not exceed nine thousand dollars ($9,000.00) per annum.

(e)     *Dependent Father and/or Mother*. If the deceased Member has no surviving Spouse or children eligible for a Pension under this section, a Pension equal to one-sixth of the deceased Member's final compensation shall be paid to the Member's surviving dependent father and/or mother; provided that in no case shall either parent's Pension exceed fifty dollars ($50.00) per month. Payment to a dependent parent or parents shall be contingent upon a finding by the Board of Trustees after investigation that such parent or parents were actually dependent upon said deceased Member through a lack of earning power resulting from physical or mental disability.

(f)     *Section E-12 of Component II of the Combined Plan Applicable*. The benefits provided in Section E-6 of this Component II shall be subject to Section E-12 of this Component II.

## Sec. E-7. Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount

(a)     *Cessation of Employment*.

(1)     If a Member ceases to be an employee of the employer before becoming eligible for a Pension paid out of City contributions to the Retirement System, such Member shall be paid all or part of the Member's Annuity Savings Fund, being the 1973 Defined Contribution Plan amount, as the Member shall demand by written application filed with the Board.

(2)     Except as otherwise provided in this Article, upon the death of a Member, the Member's Annuity Savings Fund shall be paid to such person or persons nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated person or persons surviving, the Member's said accumulated contributions shall be paid to the Member's estate.

(3)     If a Member who dies without a legal will is not survived by a Spouse and has not nominated a beneficiary as provided in Section E-7(a)(2) of this Component II, the Member's accumulated Annuity Savings Fund contributions at the time of death may be used to pay burial expenses, if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

(4)     Accumulated contributions to be returned as provided in this section may be paid in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time. After a Member ceases to be a Member, any balance in the Annuity Savings Fund which is unclaimed by the said Member or the Member's heirs, shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

(b)     *One-Time Withdrawal; Twenty-Five Years*. Prior to the receipt of the first retirement benefit check, an employee with twenty-five or more years of service shall be allowed to withdraw either a partial or full amount of his or her accumulated contributions, one time only.

(c)     *One-Time Withdrawal; Duty and Non-Duty Disability Retirees*. Duty and non-duty disability retirees shall be allowed to withdraw either a partial or full amount of their accumulated contributions, one time only.

(d)     *One-Time Withdrawal*. Withdrawal by a Member under either (b) or (c) of this Section E-7 constitutes the one time withdrawal allowed.

### Sec. E-8. Retirement Allowance Options

(a)     *Election by Member*. Until the earlier of the first time a retirement allowance payment check is cashed, or six months after the first payment check is issued, but not thereafter, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the actuarial equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced retirement allowance payable throughout life, with the exception that there will be no reduction in the benefits received pursuant to Section E-4(e) of this Component II of the Combined Plan, and nominate a beneficiary to receive benefits following the Member's death, in accordance with the options set forth below:

*Option One. Cash Refund Annuity*. If a retiree who elected a Cash Refund Annuity dies before payment of the annuity portion of the reduced retirement allowance has been

received in an aggregate amount equal to, but not exceeding the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between said accumulated contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to such person or person nominated by written designation duly executed by the Member and filed with the Board. If no such designated person or persons survive the retiree, any such difference shall be paid to the retiree's estate.

*Option Two. Joint and One Hundred Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced retirement allowance shall be paid to and continued throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "A". Joint and Seventy-Five Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option Three. Joint and Fifty Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "B". Joint and Twenty-Five Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced retirement allowance shall be paid throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

(b)     *Joint and Survivor Optional Forms of Payment.* The Joint and Survivor Optional Forms of Payment provided under Section E-8(a) of this Component II of the Combined Plan shall be made available in either the standard form or the pop-up form, as follows:

(1)     *Standard Form.* Under the Standard Form, the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

(2)     *Pop-up Form.* Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the Straight Life Retirement Allowance form of payment.

(c)    *Coordination of Benefits.* According to such rules and regulations as the Board shall adopt, until the first payment of a retirement allowance becomes due, but not thereafter, a Member under age sixty-five may elect to have the Member's Straight Life Retirement Allowance provided for in Section E-4 of this Component II of the Combined Plan equated on an actuarial equivalent basis to provide an increased retirement allowance payable to age sixty-two or age sixty-five, and to provide a decreased retirement allowance thereafter. The increased retirement allowance payable to such age shall approximate the total of the decreased retirement allowance payable thereafter and the estimated social security benefit. If a Member elects to receive increased and then decreased retirement allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (a) of this section. This coordination of benefits option shall not create any additional actuarial costs.

## Sec. E-9. Benefits for Surviving Spouses; Generally

(a)    The surviving Spouse of any Member who dies while in the employ of the City or in the employ of a second governmental unit as provided in Section E-14 of this Component II after the date such Member either (1) has earned twenty years of credited service regardless of age, or (2) has earned eight years of credited service and has attained age sixty-five, or (3) has earned ten or more years of credited service and has attained age sixty, shall receive a retirement allowance. The Spouse's retirement allowance shall be computed according to Section E-4 of this Component II of the Combined Plan in the same manner in all respects as if the said Member had retired effective the day preceding the Member's death, notwithstanding that the Member had not attained age sixty, elected a Joint and One Hundred Percent Survivor Allowance as provided for in Section E-8 of this Component II, and nominated the surviving Spouse as beneficiary. No payments shall be made under this Section E-9 on account of the death of a Member if any benefits are paid under Section E-6 of this Component II. If an Employee dies with twenty (20) years of service and without a surviving Spouse, dependent children shall be paid a total of nine thousand dollars ($9,000.00) per year which shall be divided equally among all eligible dependent children until the youngest child reaches age nineteen, or for life, if a child is permanently physically or mentally impaired and such impairment occurred prior to the child's attainment of age nineteen. There shall be no retirement escalator for this payment.

(b)    In addition to in-service death benefits which existed prior to July 1, 1998 for Members with twenty or more years of service, if a Member dies on or after July 1, 1998 or such later date as provided in a collective bargaining agreement, after having attained fifteen or more but less than twenty years of creditable service at any age below sixty, the surviving Spouse will be paid a Fifty Percent Joint and Survivor benefit. If there is no eligible surviving Spouse, dependent children shall be paid a total of six thousand dollars ($6,000.00) which shall be divided equally among all eligible dependent children until the youngest child reaches age nineteen, or for life if a child is permanently physically or mentally impaired.

## Sec. E-10. Benefits for Surviving Spouses; Disability Retirees

The surviving Spouse of a disability retiree who retired under the provisions of Section E-5 of this Component II of the Combined Plan and who died before the age of sixty shall receive a retirement allowance computed in the same manner as if the disability retiree had been a Member who became eligible for death benefits under Section E-9 of Component II of the Combined Plan, provided the disability retiree had earned fifteen or more years of credited service. In the case of a non-duty disability retiree, credited service shall be determined on the effective date of the non-duty disability retirement. In the case of a duty disability retiree, credited service shall be determined on the date of death of the disability retiree assuming City employment had continued until the date of death.

## Sec. E-11. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint Twenty-Five Percent Survivor allowance as provided for under Section E-8 of this Component II of the Combined Plan, both a retiree and beneficiary die before they have received in retirement allowance payments, an aggregate amount equal to the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, less withdrawals, the difference between the said accumulated contributions and the said aggregate amount of retirement allowances paid the retiree and beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the retiree duly executed and filed with the Board. If there are no person or persons surviving retiree and beneficiary, any such difference shall be paid to the retiree's estate.

## Sec. E-12. Pensions Offset by Compensation Benefits; Subrogation

(a)    <u>Generally</u>.  Any amounts which may be paid or payable to a Member, retiree, or to the dependents of a Member or retiree on account of any disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be offset against any pensions payable from funds of the Retirement System on account of the same disability or death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for said pension payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the Pension Reserve, and such pensions as may be provided by the Pension Reserve so reduced shall be payable as provided in this Article E.

(b)    <u>The City's right of subrogation</u>.  In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the City shall be subrogated to the rights of said person against such third party to the extent of the benefit which the City or the Retirement System pays or becomes liable to pay.

## Sec. E-13. Disability Retirees; Reexamination; Authority of the Board

(a)    *Medical examination*.  At least once each year during the first five years following the retirement of a Member with a Disability Retirement Allowance or Disability Pension, and at least once in every three year period thereafter, the Board may, and upon the retiree's application shall, require that any disability retiree who has not attained age sixty undergo a medical examination, to be made by, or under the direction of, the Medical Director.  Should any such disability retiree who has not attained age sixty refuse to submit to at least one such medical examination in any such period, the retiree's retirement allowance or pension may be discontinued by the Board until withdrawal of such refusal.  Should such refusal continue for one year, all of the disability retiree's rights in and to the Pension portion of the Retirement Allowance may be revoked by the Board.  If upon such examination of a disability retiree, the Medical Director reports that the retiree is physically able and capable of resuming employment, and such report is concurred in by the Board, the retiree shall be restored to active service with the City and the Disability Retirement Allowance shall terminate.

(b)    *Other employment*.  If such disability retiree is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the retiree's Disability Retirement Allowance and final compensation, the Pension portion of the Disability Retirement Allowance shall be reduced by the amount of such difference. If the amount of the earnings changes, the Pension may be adjusted accordingly.

(c)    *Reinstatement to active service*.  A disability retiree who has been, or shall be, reinstated to active service in the employ of the City as provided in this Section, shall again become a Member of the Retirement System.  All credited service at the time of the retirement shall be restored to full force and effect and a duty disability retiree shall be given membership service credit for the period said retiree was out of service due to such duty disability.

## Sec. E-14.  Transfer of Department or Department Functions; Generally

In the event a function or functions of a City Department or the Department itself is transferred to the federal or state government, or to a political subdivision of the State of Michigan (second governmental unit), a Member of the Retirement System whose employment is transferred from the City to the second governmental unit shall be entitled to a retirement allowance payable by the Retirement System subject to the following conditions:

(a)    *Employment within sixty days of transfer*.  The employee enters the employment of the second governmental unit within sixty days from and after the effective date of the transfer of the function or functions of a City Department or the Department itself to the second governmental unit.

(b)    *Credited service combined; ten year minimum*.  The employee's credited service as a Member of the Retirement System plus any credited service acquired in the employ of the second governmental unit totals at least ten years.

(c)    *Retirement; second governmental unit*.  If the employee retires from employment with the second governmental unit on account of age and service, the employee's Retirement

13-53846-swr   Doc 8045   Filed 12/02/22   Entered 12/02/22 03:48:69   Page 133 of
309

Allowance shall be computed in accordance with Section E-3(b) or Section E-4 of this Component II of the Combined Plan, whichever is applicable. If the employee retires from employment in the second governmental unit because of total and permanent disability arising from non-service connected causes, the Retirement Allowance shall be computed in accordance with Section E-5(d) of this Component II of the Combined Plan. In computing the Retirement Allowance, the basic pension shall not exceed twelve dollars ($12.00) per year for a maximum of ten years for a total amount to not exceed one hundred twenty dollars ($120.00), and the membership service pension shall be based only upon City-credited service existing at the time of transfer. In determining the Average Final Compensation defined in Section C-1 of this Component II of the Combined Plan, the compensation received as an employee of the second governmental unit shall be regarded as compensation paid by the City. If the employee leaves the employ of the second governmental unit with a deferred retirement allowance, no City retirement allowance shall be paid unless the employee has met the requirements of Section E-3(d)(1) of this Component II of the Combined Plan. Notwithstanding the foregoing, effective as of the Freeze Date, for purposes of calculating a Retirement Allowance for a Member whose employment was transferred prior to July 1, 2014 from the City to a second governmental unit, Average Final Compensation for the transferred Member shall be compensation received by such transferred Member prior to July 1, 2014 as an employee of the second governmental unit.

(d)  *Allowance starting date*. The retirement allowance shall begin upon retirement from the employment of the second governmental unit, but in no event prior to the date the employee would have become eligible for retirement had the employee continued in City employment. If retirement is because of total and permanent disability arising from non-service-connected causes, the retirement allowance shall begin upon the approval of retirement by the Board.

## Sec. E-15. Pension Improvement Factor (Escalator)

(a)  *Increase of pension*. On or after July 1, 1992 and prior to the effective date of the Plan of Adjustment, effective as of the first day of July of each year, the pension portion of any Retirement Allowance or Duty Death Benefit which is paid or payable under this Article shall be increased by a factor of two and one quarter percent (2.25%), computed on the basis of the amount of the original pension received at the time of retirement, including, if applicable, any supplemental pensions provided under this Article; provided, that the recipient of said pension shall have been on the retirement rolls at least one year prior to said July first date. If the recipient has been on the retirement payroll less than one year prior to said July first date, the amount of the increase shall be prorated accordingly.

(b)  *Payment*. Except as provided in paragraph (c) below, the pension improvement factor of two and one quarter percent (2.25%) provided for in Section E-15(a) of this Component II, shall be payable notwithstanding any Retirement Allowance or pension amount limitation provisions in this Article to the contrary.

(c)  After the effective date of the City Employment Terms between the City of Detroit and Police Officers Association of Michigan presented to the union on July 18, 2012,

employees represented by the union will no longer receive the two and one-quarter percent (2.25%) per annum escalation.

(d)      Effective April 1, 2013, the post-retirement escalator factor for all service after that date shall be eliminated for any employee who is a member of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920.

### Sec. E-16.  Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate

(a)      The Retirement System and the Board of Trustees shall not make any payment to active or retired Members other than payments that are required by the Retirement System as established by this Combined Plan to govern the Retirement System or the Plan of Adjustment.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(b)      The Retirement System and the Board of Trustees shall not provide any savings plan, annuity plan, or other Member investment or savings vehicle that provides an annual return to investing Members which in any year is greater than the actual investment return net of expenses of the Retirement System's invested reserves for the year in which the return is earned and accrued, provided that such return shall neither be greater than the assumed annual return as expressed in the Retirement System's valuation for that year nor less than zero.  This prohibition shall apply to all annual returns credited to accounts of investing Members in the Annuity Savings Fund of the 1973 Defined Contribution Plan from the effective date of Ordinance 37-11 to June 30, 2013.  Notwithstanding anything in this Section E-16 to the contrary, effective for Plan Years beginning on and after July 1, 2013, the annual rate of return credited to a Member's account in the Annuity Savings Fund of the 1973 Defined Contribution Plan shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Plan Year immediately preceding the Plan Year in which the annual return is credited.

(c)      In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (b) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I. The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary.  In the event there is an ASF Return Excess for a Plan Year following the Plan

Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I. "Transition Cost" shall be determined by the Plan Actuary.

### Sec. E-17.  Funds

The 1973 Defined Benefit/Defined Contribution (Annuity) Plan shall consist of the Annuity Savings Fund, the Annuity Reserve Fund, the Pension Accumulation Fund, the Pension Reserve Fund, and the Income Fund.

### Sec. E-18.  Method of Financing

(a)  *Annuity Savings Fund of the 1973 Defined Contribution Plan*.

    (1)  The Annuity Savings Fund of the 1973 Defined Contribution Plan shall be the fund in which shall be accumulated at regular interest, in accordance with the limitations that are contained in Section E-16 of this Component II of the Combined Plan, the contributions of Members made prior to the first payroll date occurring in August 2014 to provide their annuities.  At the election of the Member, the amount of the basic contribution of a Member to the Retirement System prior to the first payroll date occurring in August 2014 were zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of annual compensation.  If a Member elected three percent (3%), his or her contribution shall be that amount which is subject to taxation under the provisions of the *Federal Insurance Contribution Act, 26 USC 3101 et seq. (Act)*, plus five percent (5%) of the portion of annual compensation, if any, which exceeds the amount subject to taxation under that *Act*.

    (2)  The contribution rate elected by the Member under Section E-18(a)(1) of this Component II of the Combined Plan were deducted from the Member's compensation notwithstanding that the minimum compensation provided by law for any Member were reduced thereby.  Payment of compensation, less said deductions, constituted a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment, except as to benefits provided under this Article E.

    (3)  Upon retirement of a Member with a Retirement Allowance, the Member's accumulated contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund, refunded to the Member, or a combination thereof.

(b)  *Annuity Reserve Fund*.  The Annuity Reserve Fund shall be the fund, from which all annuities and benefits in lieu of annuities payable as provided in this Article E, shall be paid.  If a disability retiree is reinstated to active City service, the retiree's Annuity Reserve at that time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or her individual account therein.

(c)    *Pension Accumulation Fund*. The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from the contributions made by the City, including various departments thereof, the Detroit Public Library, and certain third parties pursuant to the Plan of Adjustment and from which shall be paid pensions and other benefits on account of Members with prior service credit, and transfers as provided in this Section E-18. Contributions to the Pension Accumulation Fund from the effective date of the Plan of Adjustment through Fiscal Year 2023, shall be made only in the amounts and from the sources identified in the Plan of Adjustment.

For Fiscal Years beginning after June 30, 2023, contributions to fund pension benefits (adjusted as provided in the Plan of Adjustment) shall be made as follows:

(1)    Certain amounts shall be contributed by certain third parties as provided in the Plan of Adjustment.

(2)    The City's annual contribution shall be calculated by the Actuary as provided in Section E-19.

(3)    Upon the retirement of a Member without prior service credit, or upon a Member's death in the performance of duty, the Pension Reserve Fund for the pension or pensions to be paid on the Member's account shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund.

(4)    Upon the basis of such mortality and other tables of experience and interest as the Board shall adopt from time to time consistent with Section 1.16(d) of Component I, the Actuary shall compute annually the pension reserve liabilities for pension benefits being paid to retirees and beneficiaries.

(5)    On an annual basis, the Board shall ascertain and report to the Mayor and the Council the amount of City contributions due to the Retirement System. The Council shall appropriate and the City shall pay such contributions during the appropriate Fiscal Year. When paid, such contributions shall be credited to the Pension Accumulation Fund.

(6)    If the amount appropriated by the City and paid to the Retirement System for any Fiscal Year is insufficient to make the transfers and pay the pensions, as adjusted in the Plan of Adjustment, from the Pension Accumulation Fund as provided in this Section E-18, the amount of such insufficiency shall be provided by the appropriating authorities of the City.

(d)    *Accrued Liability Fund*. Pursuant to *Ordinance No. 5-05*, which authorized the creation of the Detroit General Retirement Service Corporation, the City previously entered into a transaction (the "Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described above in Subsection (c). The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transactions, as described below) that were deposited into the System are termed the "Funding Proceeds." The Funding Proceeds were deposited into a new fund in the System to be called the Accrued Liability Fund. The purpose of the Funding

Proceeds was to fund all or part of the heretofore unfunded actuarial accrued liability ("UAAL") of the Retirement System, as determined as of a date certain, that is, the "Determination Date," pursuant to the Retirement System's actuarial valuation as of that date. The Funding Proceeds are assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay pension benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of this Pension Funding Transaction, and any earnings thereon. Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund to the Pension Accumulation Fund as provided in *Chapter 47 of the 1984 Detroit City Code* and *Ordinance No. 5-05*.

As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

(e)     *Pension Reserve Fund*. The Pension Reserve Fund shall be the fund from which pensions shall be paid to retirees and beneficiaries. Should a disability retiree be reinstated to active service, the retiree's Pension Reserve at that time, shall be transferred from the Pension Reserve Fund to the Pension Accumulation Fund.

(f)     *Expense Fund*. The Expense Fund shall be the fund to which shall be credited all money provided by the City to pay the administrative expenses of the Retirement System, and from which shall be paid all the expenses necessary in connection with the administration and operation of the Retirement System.

(g)     *Income Fund*. The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the Retirement System (other than those derived from the investments credited to any Accrued Liability Fund), all gifts and bequests received by the Retirement System, and all other moneys the disposition of which is not specifically provided for in this Article E. There shall be paid or transferred from the Income Fund, all amounts required to credit regular interest to the various Funds of the Retirement System, except for the Accrued Liability Fund which is to be credited with interest, dividends and other earnings pursuant to Section E-18(d)(2) of this Component II of the Combined Plan in accordance with the limitations that are contained in Section E-18 of this Component II of the Combined Plan.

(h)     *Maintenance of Reserves*.

(1)     The maintenance of proper reserves in the various Funds of the Retirement System except the Expense Fund are hereby made obligations of the Pension Accumulation Fund.

(2)     City contributions to the Retirement System to the extent necessary to provide pensions on account of Members who are employees of a revenue-supported division of the City shall be made from the revenues of the said division. Any City contribution to the Retirement System from any Fund by law with a certain

13-53846-tjt   Doc 8045   Filed 12/02/14   Entered 12/02/14 03:48:09   Page 138 of
309
13-53846-swr   Doc 13041   Filed 12/02/24   Entered 12/02/24 03:48:09   Page 138 of

and definite purpose shall, at the direction of the Finance Director, be accounted for separately.

**Sec. E-19.   Determination of City's Annual Contribution**

(a)   For the period ending June 30, 2023, the City shall make only those contributions to the Retirement System as are set forth in the Plan of Adjustment.

(b)   For Fiscal Years beginning on and after July 1, 2023, the annuity and pension reserve liabilities for Members, retirees, and beneficiaries, shall be actuarially evaluated as set forth in this Article for each division as is accounted for separately pursuant to Section E-18(h)(2) of this Component II of the Combined Plan.

   (1)   *Pension Liabilities*.

      a.   The pension liabilities for Members shall be determined by the Actuary using reasonable and appropriate actuarial assumptions approved by the Board and the Investment Committee.

      b.   The City's annual contribution to finance any unfunded accrued pension liabilities, expressed as a percentage of active employees' compensation, shall be determined by amortizing such unfunded accrued pension liabilities as a level percentage of such compensation over a period or periods of future years as established by the Board and approved by the Investment Committee.

   (2)   *Pension Accumulation Fund*.   Based upon the provisions of this Article E including any amendments, the Board shall compute the City's annual contributions to the Retirement System, expressed as a percentage of active Member compensation each Fiscal Year, using actuarial valuation data as of the June thirtieth date which date is a year and a day before the first day of such Fiscal Year.  The Board shall report to the Mayor and Council the contribution percentages so computed.  Such contribution percentages shall be used in determining the contribution dollars to be appropriated by Council and paid to the Retirement System.  Such contribution dollars shall be determined by multiplying the applicable contribution percentage for such Fiscal Year by the Member compensation paid for such Fiscal Year.  Such contribution dollars for each Fiscal Year shall be paid to the Retirement System in such Fiscal Year in a manner to be agreed upon from time to time by the Board and the City, provided, for any Fiscal Year for which an agreement has not been reached before the first day of such Fiscal Year, such contribution dollars shall be paid in equal monthly installments at the end of each calendar month in such Fiscal Year.

# ARTICLE F.  PARTICIPANT LOAN PROGRAM

## Sec. F-1.  Established.

Any loans granted or renewed shall be made pursuant to a Participant Loan Program which shall conform with the requirements of Section 72(p) of the Internal Revenue Code.  Such loan program shall be established in writing by the Board of Trustees, and must include, but need not be limited to the following:

(1)  The identity of the administrator of the Participant Loan Program;

(2)  A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

(3)  The procedures under the program for determining a reasonable rate of interest; and

(4)  The events constituting default and the steps that will be taken to preserve plan assets.

## Sec. F-2.  The Loan Program.

(1)  This Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the Retirement System for prospective participants in the Loan Program.  The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program.  Copies of the rules shall also be made available to prospective Members in the offices of the Retirement System; and

(2)  All collective bargaining agreements which accept the terms of this section are specifically agreeing to be subject to the Board's authority to modify or amend the Participant Loan Program from time to time, including during the effective terms of the applicable labor agreement and no such modification or amendment shall be deemed a violation of said labor agreement and no grievance or other form of action shall be effective to overturn or alter the Board's decision.

## Sec. F-3.  Eligibility.

Subject to rules and procedures established by the Board, loans will initially be made only to non-union Members of the Retirement System.  Union employees will be eligible when their respective bargaining unit has accepted the Loan Program.  Former Members, spouses of Members, and beneficiaries are not eligible to receive any loans from the Retirement System.  Subject to rules and procedures established by the Board, a Member who has been in the Combined Plan for twelve (12) months or more is eligible to apply for a loan under this Component II.  No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

13-53846-tjt   Doc 8045   Filed 10/22/14   Entered 10/22/14 03:48:09   Page 140 of
169
13-53846-swr   Doc 13661   Filed 12/02/21   Entered 12/02/21 03:27:59   Page 509 of
509

## Sec. F-4.  Amount of Loan.

A Member who has satisfied applicable rules and procedures may borrow from his or her account an amount, which does not exceed fifty percent (50%) of the Member's vested accumulated balance, or ten thousand dollars ($10,000.00) reduced by the excess, if any, of: 1) the highest outstanding balance of loans from the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or 2) the outstanding balance of loans from the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be one thousand dollars ($1,000.00).

## Sec. F-5.  Terms and Conditions.

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(1)  Loan applications shall be in writing;

(2)  Loans shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period;

(3)  Each loan shall be made against the assignment of the Member's entire right, title, and interest in and to the Retirement System, supported by the Member's collateral promissory note for the amount of the loan, including interest payable to the order of the Board of Trustees;

(4)  Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the Combined Plan.  The loan interest rate shall be calculated in a manner that will not negatively affect the Employers' costs with respect to the Retirement System or the investment return allocated to Members;

(5)  Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code.  A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

**Sec. F-6.  Renewal of Loan.**

Any loans granted or renewed shall be made pursuant to the Participant Loan Program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

**Sec. F-7.  Loan Balance.**

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's account balance, and shall not be part of net investment income or part of the Member's account balance for the purpose of allocation of net investment income under the Retirement System.

**Sec. F-8.  Distributions.**

No distributions shall be made to a Member, former Member, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

**Sec. F-9.  Annual Report.**

The Retirement System shall include, in its annual report to all Members, an accounting of the Loan Program established by this Article F, which contains the number and amount of loans made under this Component II, the costs of administering the Loan Program under Component II, the amount of payments made including interest received by Component II of the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that Fiscal Year covered the costs of administering the Loan Program maintained under this Component II.

# ARTICLE G.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS

## Sec. G-1.  Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment

Notwithstanding anything in Articles A, C, D or E of Component II to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following provisions to comply with the terms of the Plan of Adjustment shall be implemented:

(1)    *Reduction in monthly pension payments.*

a.    For a retiree or a surviving beneficiary who is receiving a monthly pension benefit as of the effective date of the Plan of Adjustment, as soon as practicable following such effective date such retiree's or surviving beneficiary's monthly pension benefit will be reduced to an amount that is equal to 95.5% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment ("Adjusted Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then such retiree's or surviving beneficiary's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment.

b.    The Frozen Accrued Benefit that will be paid as a monthly Retirement Allowance upon the retirement or death of an active employee Member or a vested former employee Member on or after the Effective Date, will be reduced to an amount that is equal to 95.5% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1 ("Adjusted Deferred Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on an annual basis that the "Funding Conditions" as defined herein have been satisfied, and in the event such Funding Conditions have not been satisfied then such active employee Member's or vested former employee Member's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1.

c.  *Cap on Benefit Reductions for Certain Retirees.*  With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, such retiree's or surviving beneficiary's Adjusted Accrued Benefit, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

For purposes of this Sec. G-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2)  *Elimination of Pension Improvement Factor.*  For all pension benefits payable after the Effective Date, the Pension Improvement Factor (Escalator) that will be applied to the monthly Adjusted Accrued Benefit or Adjusted Deferred Accrued Benefit of a Member, retiree, surviving beneficiary or vested former employee will be equal to 0%.

(3)  *Recoupment of Excess Returns on Annuity Savings Fund Account.*  The terms of Section G-2 Annuity Savings Fund Recoupment shall apply to the Annuity Savings Fund account of Members, retirees and vested former employees as provided in Section G-2.

(4)  *Future Disability Pensions Eliminated.*  The Duty Disability Retirement Allowance and Non-Duty Disability Retirement Allowance are eliminated with respect to Members who become disabled on or after July 1, 2014.

(5)  *Effect of Payment Default.*  In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall automatically reduce the monthly pension benefits payable to Members, retirees, surviving beneficiaries, and former employees to the extent of such default.

## Sec. G-2.  Annuity Savings Fund Recoupment

Notwithstanding anything in Articles A, B, C, D or E to the contrary, upon the effective date of the Plan of Adjustment, Members, retirees or vested former employees who were identified by the City as a Class 11 Holder under the Plan of Adjustment and who participated in the Annuity Savings Fund ("ASF") at any time during the period that began on July 1, 2003 and ended on June 30, 2013 ("ASF Recalculation Period") are subject to the following provisions:

(1)  *Recoupment from Members, retirees and vested former employees who maintain an Annuity Savings Fund account ("ASF account") as of the Effective Date.*  For each Member, retiree or vested former employee who maintains an ASF account

in the Retirement System as of the effective date of the Plan of Adjustment, such individual's ASF account balance will be reduced by such individual's Annuity Savings Fund Excess Amount, as determined by the City in accordance with this Section G-2 (1).

    a.    For a Member, retiree or former vested employee who did not receive any distribution or loan from such individual's ASF account during the ASF Recalculation Period, the Annuity Savings Fund Excess Amount means the difference between the value of such individual's ASF account as recalculated using the Actual Return (as defined in paragraph (3) below) and the actual value of such individual's ASF account as of June 30, 2013; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance relating to the ASF account) during the ASF Recalculation Period.

    b.    For a Member, retiree or vested former employee who during the ASF Recalculation Period has received a distribution (other than a total distribution) or loan from the ASF, the Annuity Savings Fund Excess Amount means the difference between (i) the sum of (A) the value of such individual's ASF account as of June 30, 2013 and (B) all distributions (including any unpaid loans) received by such individual from his or her ASF account during the ASF Recalculation Period, and (ii) the value of such individual's ASF account as of June 30, 2013 as recalculated using the Actual Return; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loans made to the individual) during the ASF Recalculation Period.

(2)    *Recoupment from Members, retirees and former employees who previously took total Annuity Savings Fund account distributions.*    Except as provided in paragraph (4) below, for each Member, retiree or vested former employee who has received a total distribution of the individual's ASF account during the ASF Recalculation Period, the individual's monthly pension benefit (and the survivor monthly pension benefit payable to the Member's survivor, if any) will be reduced by the individual's "Monthly Annuity Savings Fund Excess Amount" as determined by the City in accordance with this Section G-2(2).

A Monthly Annuity Savings Fund Excess Amount means the difference between (i) the value of the ASF account of a Member, retiree or vested former employee as of the date of distribution to such individual from the ASF, provided such date falls within the ASF Recalculation Period, and (ii) the value of the individual's ASF account as of such date, as recalculated using the Actual Return; provided, however, such difference shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance) during the ASF Recalculation Period; provided, further, such amount will be converted into

a monthly annuity amount based on the individual's life expectancy, gender and, if the Member has not already retired, the expected date of retirement.

(3)     *Recoupment from Members, retirees and former employees who received partial Annuity Savings Fund account distributions.*  A Member, retiree or vested former employee who previously received a distribution of a portion but not the entirety of the Member's Annuity Savings Account shall be subject to paragraph (1) to the extent of any funds then credited to the Member's Annuity Savings Fund account and shall be subject to paragraph (2) to the extent of any Excess Amount that cannot be recovered pursuant to paragraph (1).

(4)     *Cash repayment option.*  Notwithstanding paragraphs (2) and (3) above and subject to the Cash Option Cap described below, a Member, retiree, employee or former employee whose monthly pension benefit will be reduced pursuant to paragraph (2) or (3) may elect to make a single lump sum cash payment to the Retirement System of the Annuity Savings Fund Excess Amount by cashier's check or wire transfer ("Cash Repayment Option").  Each individual eligible for the Cash Repayment Option shall be provided by first-class U.S. mail an election notice and an election form no later than seven days following the Effective Date. The individual shall have thirty-five days from the date on which the election form is mailed to return the election form as directed on the form.  An election of the Cash Repayment Option shall be effective only if it is received by the deadline set forth on the election form.

No later than fourteen days following the election deadline, the Board shall notify each individual who timely elects the Cash Repayment Option of the amount to be repaid to the Retirement System ("Final Payment Notice").  Such amount must be paid to the Retirement System on or before the later of (i) ninety days after the Effective Date, or (ii) fifty days following the date on which the Final Payment Notice is mailed to the individual.

If payment is not timely received, the monthly pension benefit of an individual who elects the Cash Repayment Option shall be reduced as provided in paragraph (2) or (3).

The Cash Repayment Option shall be limited to an aggregate amount of $30 million (the "Cash Option Cap").  In the event the Retirement System receives timely and properly completed election forms representing an aggregate recovery amount in excess of the Cash Option Cap, then each individual who made a timely election of the Cash Repayment Option shall be permitted to repay an amount equal to his pro rata share of the Cash Option Cap.  Any Annuity Savings Fund Excess Amount that is not repaid under the Cash Repayment Option shall be repaid as provided in paragraph (2) or (3).

(5)     *Definition of Actual Return.*  "Actual Return" means the actual net return percentage on the Retirement System's invested assets for each Fiscal Year

during the ASF Recalculation Period; provided, however, that for any such Fiscal Year the net return shall not be greater than 7.9% nor less than 0%.

(6)     *Limitation on recoupment.*  Notwithstanding anything in this Section G-2 to the contrary:

    a.     a Member's ASF account value after recoupment of the Member's Annuity Savings Fund Excess Amount will never be less than the contributions made to the ASF by such Member and will reflect all interest credited by the Board to the Member's ASF account for the Fiscal Years ending prior to July 1, 2002; and

    b.     in no event shall the amount recovered from a Member described in Section G-2(2) (or G-2(3), with respect to amounts that may not be recovered pursuant to Section G-2(1)) exceed the Member's Annuity Savings Fund Excess Amount plus interest on such amount at a rate of 6.75%.  Upon the Member's repayment of such amount in full, the Member's monthly pension benefit in effect immediately prior to adjustment as provided in Section G-2(2) (adjustment as provided in Section G-1), increased as provided in Section G-4, if applicable, shall be fully restored.

(7)     *Cap on benefit reductions for certain retirees.*  With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, the Adjusted Accrued Benefit of such retiree or surviving beneficiary, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

Annuity Savings Fund Excess Amounts of Members described in paragraphs (1) and (3) shall be transferred from the Annuity Savings Fund to the Pension Accumulation Fund and shall be used to pay pensions and other benefits to Members as provided in Component II of the Combined Plan.

## Sec. G-3.  Income Stabilization Benefits

(1)     The provisions of this Section G-3 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer.

(2)     Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section G-3, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i)  the amount needed to restore an Eligible Pensioner's reduced

annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013. The Income Stabilization Benefit as determined under this Section G-3(2) will not increase after the date on which the Income Stabilization Benefit is determined. The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3)  To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section G-3) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section G-3 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

a.  The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

b.  An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the pension benefit paid to the Eligible Pensioner from the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Accrued Benefit that is payable to the Eligible Pensioner for that year as determined under Section G-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section G-4; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4)  A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of

Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section G-3 (7).

(5)     For purposes of this Section G-3, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section G-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

    a.      An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

    b.      The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board. The Board, with the assistance of the Investment Committee, shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

    c.      After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

    d.      An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death, or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6)     For purposes of this Section G-3, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7)     In the event that in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income

Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System. The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)     In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System.

## Sec. G-4. Restoration of Pension Benefits

The following rules shall govern how accrued pensions, including Pension Improvement Factor ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re. City of Detroit, Michigan*, Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)     *Waterfall Classes.*

There will be three Waterfall Classes:

a.      Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries.

b.      Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

c.      Waterfall Class 3 – All other Members who as of June 30, 2014 are not in retirement benefit pay status.

(2)     *Restoration of Benefits Through June 30, 2023*.

a.      Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial

accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (investment and administrative), future Employer contributions as set forth in the Plan of Adjustment (subject to the conditions in the Plan of Adjustment) and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 70% funded ratio, the Restoration Target will be a 75% funded ratio, and the Restoration Reserve Suspension Trigger will be a 71% funded ratio, all projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Actuary projects that the projected Funded Level as of June 30, 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 75%), a credit of assets for bookkeeping purposes will be made into a new notional "Restoration Reserve Account". The notional credit will be in an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Reserve Account assets will be credited with interest in an amount equal to the net return on Retirement System investments, but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the Pension Reserve Fund.

b.      To the extent that the City's (including DWSD or a successor authority) actual contributions in any of the Fiscal Years 2015 through 2023 are less than the contributions provided for in the Plan of Adjustment, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.      Actual restoration payments and credits will work as follows: each year in conjunction with preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore a portion of the 4.5% across the board pension cuts in one or more minimum incremental amounts equal to ½% of the monthly benefit for each member of Waterfall Class 1 (i.e. reducing the initial across the board cut to 4.0%). This restoration only occurs if the funding level in the Restoration Reserve Account can fund 100% of each incremental increase over the remaining actuarially projected lives of the eligible recipients in Waterfall Class 1. If the Restoration Reserve Account satisfies the required funding level, then in the next Fiscal Year, actual restoration payments will be made to Waterfall Class 1 members in amounts equal to the benefit associated with each increment that have been fully funded in the Restoration Reserve Account. Once Waterfall Class 1 has sufficient

assets in the Restoration Reserve Account to fully fund and restore the 4.5% cut in their monthly benefits, and to the extent that additional assets in the Restoration Reserve Account remain and will fully fund at least ½% of the monthly benefit for each member of Waterfall Class 2 over their remaining actuarially projected lives, then Waterfall Class 2 members will receive pension restoration in minimum ½% benefit increments until an amount equal to the 4.5% cuts in their monthly benefits has been fully funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account remain and will fund at least a minimum ½% of the monthly benefit of each member in Waterfall Class 3 over their remaining actuarially projected lives, then each such member of Waterfall Class 3 shall receive a credit granting them a right upon retirement to receive pension restoration equal to the benefit increments that are fully funded. Restoration payments will be calculated and paid on a prospective basis only.

d.      After the full 4.5% across the board pension cuts are restored for all three Waterfall Classes, and to the extent there are additional assets in the Restoration Reserve Account to fully fund COLA benefits over the actuarially-projected lives of the eligible recipient Waterfall Class, such assets will be used to fully fund and restore a portion of the COLA values that were eliminated as part of the Plan of Adjustment. COLA will be restored in minimum 10% COLA value increments up to 50% of the future COLA values for each member of Waterfall Class 1 (i.e., a 50% future COLA value will constitute a 1.25% simple COLA), then up to 50% of the future COLA values for each member of Waterfall Class 2, and then up to 50% of the future COLA values for each member of Waterfall Class 3 until all members of the three Waterfall Classes have had 50% of the value of their COLAs fully funded and restored. After 50% of the future values of COLA have been fully funded and restored, and to the extent there are additional assets in the Restoration Reserve Account for each of the three Waterfall Classes, then a second 50% COLA restoration will be made, first to members of Waterfall Class 1, then Waterfall Class 2, and then Waterfall Class 3. Classes will be restored in minimum 10% COLA value increments. Restoration payments will be calculated and paid on a prospective basis only.

e.      If the amounts in the Restoration Reserve Account are sufficient to fully-fund the 4.5% across the board pension cuts for all three Waterfall Classes and 100% COLA restoration for all three Waterfall Classes, then any additional assets in the Restoration Reserve Account shall be used to increase the frozen accrued benefits of active and other Members whose Annuity Savings Fund accounts were diminished as part of the Annuity Savings Fund Recoupment (described in Section G-2), such that they receive treatment equal to the 20%/20% ceiling applied to retirees in pay status under the Plan of Adjustment. If after such pension restoration there are additional assets in the Restoration Reserve Account to fully

fund benefit increments over their remaining actuarially projected lives, Waterfall Class 1 members will receive pension restoration in ½% benefit increments of the reductions to their monthly pension due to Annuity Savings Fund Recoupment, and once such pension benefits are restored, Waterfall Class 2 members will receive pension restoration in ½% benefit increments in connection with the reductions to their monthly pensions due to Annuity Savings Fund Recoupment.  Restoration payments will be calculated and paid on a prospective basis only

f.      Once restoration payments to applicable retirees and restoration credits to active employees begin, as long as the Restoration Reserve Account continues to have assets sufficient to fund 100% of an incremental pension restoration amount for such Waterfall Class members for their actuarially projected lives, such restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments (over their actuarially projected lives), falls below 100% for the second or greater increment, the annual amounts to pay such second or other additional increment can continue until the Restoration Reserve Account lacks any assets to fund it.  For example, assume a ½% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019, (i.e., a 1% pension increase).  Assume further that in the following Fiscal Year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment of ½% would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid).  For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

g.      In the event the Funded Level (not including the assets in the Restoration Reserve Account) falls below 71% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 71% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net investment returns for the Retirement System for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 70%) then restoration payments and credits in the following year will be modified in the following manner: (1) funds previously credited  to the Restoration Reserve Account will be notionally transferred and credited to the Pension  Reserve Account in sufficient amounts to restore the projected Funded Level in 2023 to 70%; (2) following such transfer, the remaining assets in the Restoration Reserve

Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph f.

h.  Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level as of 2023 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 71%.

(3)  *Restoration of Benefits from July 1, 2023 to June 30, 2033*.

a.  During this period, the Funding Target, the Restoration Target, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2033 Permanent Restoration Target
75%, or if greater, 1% more  than 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Reserve Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows.

13-53846-tjt  Doc 13661  Filed 12/02/21  Entered 12/02/21 03:48:19  Page 154 of
13-53846-swr  Doc 8045  Filed 10/22/14  Entered 10/22/14 03:48:19  Page 543 of
309

For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 at the then current investment return assumption which is assumed to be net of expenses (administrative and investment) and the applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL at market value over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the Funding Target set forth above as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded.

b.   To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Targets. To the extent that the City's (including for this purpose DWSD or a successor authority) actual contributions in any of the Fiscal Years 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.   Each year, in addition to the credit of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest equal to the net return on Retirement System investments, but capped at the then investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

d.   In connection with preparation of the actuarial report for Fiscal Year 2028, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, which shall be 75%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to

satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2028 has satisfied  the Permanent Restoration Target (75%), then the amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.  Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in paragraph a and otherwise in accordance with this Section G-4, notwithstanding whether the Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

e.   In connection with preparation of the annual actuarial valuation report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target for 2033, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension  Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.   Following receipt of the actuarial reports for 2028, and in the event that the projected Funded Level of the Retirement System as of 2033 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual normal course administrative expenses until 2033 equal to the average annual administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus

interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 71%.

(4)  *Restoration of Benefits from July 1, 2033 to June 30, 2043.*

a.  During this period, the Funding Target, the Restoration Target , the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2043 Permanent Restoration Target
75% ,or if greater, 1% more  than 2043 Restoration Target

2043 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Level). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining  whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

b.  In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the amounts in the

Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable payments for the applicable Waterfall Class shall be permanently restored and shall no longer be variable.

(5)     *Modification of the Pension Restoration Program.*

If any time after July 1, 2026, the Investment Committee (by vote of 5 of its 7 members), or the Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement, such that the continued operation of the Pension Restoration Agreement without amendment will: (a) materially harm the long-term economic interests of the City, or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the restoration program, if as of that juncture (and for purposes of applying this subsection 5) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section G-4 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund the Retirement System's frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Pension Restoration Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor of the State of Michigan ("Governor") in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall

furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, inter alia, whether or in what manner to amend the Pension Restoration Agreement and this Section G-4.

## ARTICLE H.  MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM

### Sec. H-1.  Enforcement; Civil Action.

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, 1984 Detroit City Code or the terms of this Plan, may be brought by:

    (1)     A Plan participant who is or may become eligible to receive benefit;

    (2)     A beneficiary who is or may become eligible to receive a benefit;

    (3)     A Plan fiduciary, including a Trustee;

    (4)     The Finance Director, on behalf of the City as Plan sponsor.

### Sec. H-2.  Limitation of Other Statutes.

No other provision of law, charter, or ordinance, which provides pensions or retirement benefits wholly or partly at the City expense, exclusive of federal Social Security old-age and survivors' insurance benefits for City employees, their surviving spouses and other dependents, shall apply to Members, retirees or beneficiaries of the Retirement System, their surviving spouses or other dependents.

**<u>Exhibit 6C – Supplemental Actuarial Report</u>**

39885196.3/022765.00213

# General Retirement System of the City of Detroit
# Supplemental Actuarial Report as of June 30, 2021

| | |
|---|---|
| **Requested By**: | General Retirement System of the City of Detroit (DGRS) |
| **Date:** | May 13, 2022 |
| **Submitted By**: | Jamal Adora, ASA, EA, MAAA |
| | Judith A. Kermans, EA, FCA, MAAA |
| | David T. Kausch, FSA, EA, FCA, MAAA, PhD |
| | Gabriel, Roeder, Smith & Company |

This report contains an actuarial valuation of a proposed change in benefits for members of the City of Detroit General Retirement System (DGRS). For months worked while in the Workshare/Furlough program, the proposed change would allow hours in one month to be combined with hours another month for determining the 140-hour requirement.

Jamal Adora, Judith A. Kermans, and David T. Kausch are Members of the American Academy of Actuaries (MAAA) and meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

This report may be shared with other parties, but only in its entirety and only with the permission of the DGRS. Gabriel, Roeder, Smith & Company is not responsible for unauthorized use of this report. This report should not be used for any purpose other than the purpose stated above. The actuaries issuing this report are independent of the plan and the plan sponsor.

**The date of the valuation was June 30, 2021**. This means that the results of the supplemental valuation use the June 30, 2021 valuation as the base for the census data and measurement of liabilities. Additional Workshare and Furlough data was provided through September 2021. Supplemental valuations do not predict the result of future actuarial valuations. Rather, supplemental valuations give an indication of the probable long-term cost of the **benefit change only** without comment on the complete end result of the future valuations.

Actuarial assumptions and methods were consistent with those used in the regular actuarial valuation of the Retirement System on the valuation date (June 30, 2021), unless otherwise noted. For additional information, please see the June 30, 2021 actuarial valuation of Component I issued March 17, 2022 and Component II issued March 11, 2022. Actuarial assumptions are adopted by the Board and the Investment Committee (IC). In particular:

- The assumed rate of interest was 6.75%;
- The assumed VPIF (COLA) rate for Component I (Hybrid) was 0.5%;
- Wage inflation of 3.00%; and
- Employer contributions through 2023 are fixed by the Plan and/or the Plan of Adjustment (POA) approved by the Bankruptcy Court. The Board has not established a funding policy for post-2023 contributions. Changes in the Unfunded Actuarial Accrued Liabilities (UAAL) were amortized over alternate periods of 8 and 15 years for purposes of illustrating the magnitude of the proposed change relative to an annual contribution.

# General Retirement System of the City of Detroit
# Supplemental Actuarial Report as of June 30, 2021

## Background

A member is credited with one month of Credited Service for each calendar month in which the individual performs 140 hours or more of service for the individual's employer. In April of 2020, the City started a Workshare/Furlough program. Although, the employees participating in the program and the City continued to contribute to the pension plan (based on a reduced salary) on behalf of the members, the employees did not accrue Credited Service for any month in which they worked less than 140 hours. For months worked while in the Workshare/Furlough program, the City has asked us to evaluate the effect of allowing hours in one month to be transferred to/combined with another month for determining the 140-hour requirement. **This supplemental actuarial valuation only estimates the impact of service during the Workshare/Furlough program. It does not consider the impact of a change in the service crediting rules for other members of the Plan.**

## Data

The System has provided us with data on individuals that were in the Workshare or Furlough program. The data consisted of a member list of:

- Number of months worked in the Workshare/Furlough program;
- Credited service earned under the current rules while in the Workshare/Furlough program;
- Credited service earned under the proposed rules while in the Workshare/Furlough program; and
- Member and city contributions made during each month worked in the Workshare/Furlough program.

We matched this data to the data provided by the Retirement System for the DGRS Hybrid (Component I) **June 30, 2021 valuation**. From the data, we also summed the contributions made for each month in which service was not granted under the current rules. A reconciliation between the Workshare/Furlough data received and the data used in this supplemental valuation is shown below:

| | |
|---|---|
| Active members in the Workshare/Furlough data | 1,624 |
| Members excluded due to not being an active member in the 6/30/2021 valuation | -282 |
| Hybrid (Component I) member's in the program valued in this supplemental | 1,342 |

13-53846-tjt    Doc 13664    Filed 12/02/22    Entered 12/02/22 12:27:16    Page 163 of 168

## Summary of Hybrid (Component I) Workshare/Furlough Data

|  | General | DOT | DWSD | Library | Total |
|---|---|---|---|---|---|
| Number of members | 1,093 | 139 | 110 | 0 | 1,342 |
| Average Age on June 30, 2021 | 49.4 | 51.5 | 50.8 | n/a | 49.7 |
| Average Service on June 30, 2021 | 12.1 | 16.8 | 13.1 | n/a | 12.7 |
| Average Salary on June 30, 2021 | 67,077 | 44,805 | 70,721 | n/a | 65,069 |
| Average full months of Credited Service that would be gained as a result of this proposal.* | 5.95 | 5.65 | 3.04 | n/a | 5.68 |
| Total contributions made during months worked in which service was not granted under current rules. | $2,459,395 | $197,593 | $126,894 | n/a | $2,783,883 |

*Full months of Credited Service that would be gained as a result of this proposal was determined by:*

(1) *Taking credited service earned under the proposed rules while in the Workshare/Furlough program, as reported by the System;*
(2) *Truncating the amount in (1) to an integer month based on our understanding of administrative procedures;*
(3) *Then subtracting credited service earned under the current rules while in the Workshare/Furlough program, as reported by the System; and*
(4) *Result is the full months of credited service that would be gained as a result of this proposal.*

## Benefits Valued

**Current Provisions**
***Credited Service:*** A member is credited with one month of Credited Service for each calendar month in which the individual performs 140 hours or more of service for the employer as an employee. Credited Service is recorded from the later of July 1, 2014, or the date of hire.

**Proposed Provisions**
***Credited Service:*** A member is credited with one month of Credited Service for each calendar month in which the individual performs 140 hours or more of service for the employer as an employee. Credited Service is recorded from the later of July 1, 2014, or the date of hire. **While participating in the Workshare/Furlough, hours in one month may be transferred to/combined with hours in another month for determining the 140-hour requirement.**

## Valuation Method

There are several ways the impact of this proposal could be estimated depending on the data available. In order to estimate the financial effect of the proposal with the limited data that we received, we had to make assumptions and approximations. We estimated the liability of increasing the Credited Service of the members in the data set provided for the study by the amount expected to be gained (truncated total months reported less the months that already met the 140 hours criteria) as a result of the proposal. Those liabilities were then compared to the liabilities (for the same group) in the June 30, 2021 valuation. The actual cost of this proposal, if implemented, would depend on actual service granted to the affected members and the timing of the grant and may produce different results.

## Results

The estimated impact on the Hybrid (Component I) Plan is shown below:

| Hybrid (Component I) | | | | | |
|---|---|---|---|---|---|
| | General | DOT | DWSD | Library | Total |
| Increase in Actuarial Accrued Liability (AAL) | $ 3,420,000 | $ 300,000 | $ 230,000 | $    - | $3,950,000 |
| Increase in AAL Amortized as a Level % of Pay* | | | | | |
| Over 8 years | 0.26% | 0.15% | 0.12% | 0.00% | 0.22% |
| Over 15 years | 0.16% | 0.09% | 0.07% | 0.00% | 0.13% |

*\* Total Component I (Hybrid) payroll of $267.0 million as of June 30, 2021.*

The increase in the present value of future benefits as a result of this proposal is $4.3 million. The impact on the Actuarial Accrued Liability (AAL) represents the increase in past service cost granted as a result of the proposal. The impact on the PVB includes the impact on the AAL and also includes the increase in present value of future normal cost as a result of the proposal.

The 15-year amortization period is consistent with illustrations shown in the Executive Summary of the Component I June 30, 2021 valuation report. The 8-year amortization period is shown because the Average Expected Remaining Service Life (AERSL) for the affected individuals is 8 years. Although we are currently working on the development of a funding policy with the Board, for this specific event we recommend the amortization period go no longer than 8 years and for it to be amortized as a separate layer (base).

## Comments

**Comment 1** – Based on the data provided, for members valued in this report, the total employer and employee contributions made on behalf of Workshare/Furlough members during months worked in which service was not granted under current rules was $2.78 million. If no service below 140 hours is credited and refunds of the employee contributions are not issued, the contributions made effectively become a gain to the Plan (since contributions were being made while service was not being accrued). **When we consider the proposal evaluated in this report (hours in one month may be transferred to/combined with hours in another month for determining the 140-hour requirement) as part of the total effect of the Workshare/Furlough program, we estimate that the net cost for Hybrid (Component I) would be approximately $1.17 million** ($3.95 million - proposal impact less $2.78 million Workshare/Furlough contribution gain) rather than the $3.95 million amount shown when the contributions are not separately isolated.

We did not consider interest earned during the year on the $2.78 million contribution. The DGRS Plan earned investment income in excess of the assumed 6.75% expected amount during the 2021 Fiscal Year.

The Workshare/Furlough program may have also resulted in other gains which we have not isolated. These gains may include reduced average compensation or delayed retirement.

**Comment 1A** – Using a 2.0% assumed VPIF rate, the proposal impact would be $4.47 million. This is $0.52 million more than the $3.95 million proposal impact under the 0.5% assumed VPIF rate.

**Comment 1B** – Using a 0.5% assumed VPIF rate, we estimate that granting 70% of service under the proposed provisions would result in a net cost of approximately $0.

Using a 2.0% assumed VPIF rate, we estimate that granting 65% of service under the proposed provisions would result in a net cost of approximately $0.

**Comment 2** — Since the Legacy (Component II) plan benefits are frozen as of June 30, 2014, the proposed change would only affect the vesting/eligibility service in the Legacy (Component II) plan. This may allow some of the members valued to retire a few months earlier. The estimated impact on the Legacy (Component II) plan is shown below:

### Summary of Legacy (Component II) Workshare/Furlough Data

|  | General | DOT | DWSD | Library | Total |
|---|---|---|---|---|---|
| Members in Workshare/Furlough | 506 | 98 | 55 | 0 | 659 |
| Average months of Credited Service that would be gained as a result of proposal | 5.52 | 4.94 | 3.11 | n/a | 5.23 |

### Legacy (Component II) Results

|  | General | DOT | DWSD | Library | Total |
|---|---|---|---|---|---|
| Increase in Actuarial Accrued Liability (AAL) | $ 100,000 | $ 7,000 | $ 8,000 | $ - | $ 114,000 |
| Increase in AAL Amortized as a Level Dollar Amount |  |  |  |  |  |
| Over 8 years | $ 18,000 | $ 1,000 | $ 1,000 | $ - | $ 20,000 |
| Over 15 years | $ 12,000 | $ 1,000 | $ 1,000 | $ - | $ 13,000 |

## Comments (Continued)

**Comment 2A** — When we consider the Workshare/Furlough program in the absence of this proposal to allow hours in one month to be transferred to/combined with hours in another month for determining the 140-hour requirement, the program effectively resulted in a gain to the plan, since accruals for retirement eligibility were reduced. **When we consider the proposal as part of the total effect of the Workshare/Furlough program, we believe that the total cost of the Workshare/Furlough program would still produce a small savings in the Legacy (Component II) plan. We have not calculated the estimated savings.**

**Comment 3** – This analysis only considered the group of Workshare/Furlough members as currently reported. If additional members are found to be eligible for additional service, estimated costs and/or savings would be different than shown in this report.

**Comment 4** — This report reflects new actuarial assumptions based on the five-year experience study from 2015 to 2020 as adopted by the Board and approved by the Investment Committee for purposes of the regular June 30, 2021 actuarial valuations. The assumed rate of return remains 6.75%, as prescribed by the Plan of Adjustment. As noted in our experience study report issued February 4, 2022, there is a downward trend on capital market assumptions, which suggest that the assumed rate of return may need to be lowered in the near future. Results in this report would be different if different assumptions were used.

**Comment 5** — This report does not reflect the potential impact on restoration of benefits of Legacy (Component II) or fiscal responsibility provisions of Hybrid (Component I). The increase in the AAL resulting from this proposal may impact the projected funded status of the Hybrid (Component I) plan and may affect the remedial actions in Section 9.5 of the Plan of Adjustment. These changes will be reflected in valuations as they occur.

**Comment 6** — This report was prepared using our proprietary valuation model and related software which, in our professional judgment, has the capability to provide results that are consistent with the purposes of the tool. We performed tests to ensure that the model reasonably represents that which is intended to be modeled.

**Comment 7** — The calculations are based upon assumptions regarding future events, which may or may not materialize. They are also based upon present and proposed plan provisions that are outlined in the report. If you have reason to believe that the assumptions that were used are unreasonable, that the plan provisions are incorrectly described, that important plan provisions relevant to this proposal are not described, or that conditions have changed since the calculations were made, you should contact the authors of this report prior to relying on information in the report.

**Comment 8** — If you have reason to believe that the information provided in this report is inaccurate, or is in any way incomplete, or if you need further information in order to make an informed decision on the subject matter of this report, please contact the authors of the report prior to making such decision.

## Comments (Concluded)

**Comment 9** — No statement in this report is intended to be interpreted as a recommendation in favor of the changes, or in opposition to them.

**Comment 10** — In the event that more than one plan change is being considered, it is very important to remember that the results of separate actuarial valuations cannot generally be added together to produce a correct estimate of the combined effect of all of the changes. The total can be considerably greater than the sum of the parts due to the interaction of various plan provisions with each other, and with the assumptions that must be used.

**Comment 11** — This report is intended to describe the financial effect of the proposed plan changes on the Retirement System. Except as otherwise noted, potential effects on other benefit plans were not considered.

**Comment 12** — The reader of this report should keep in mind that actuarial calculations are mathematical estimates based on current data and assumptions about future events (which may or may not materialize). Please note that actuarial calculations can and do vary from one valuation year to the next, sometimes significantly if the group valued is very small (less than 30 lives). As a result, the cost impact of a benefit change may fluctuate over time, as the demographics of the group changes.

**Comment 13** — A determination of the Plan sponsor's ability to make contributions when due (before and/or after the proposed changes) was outside our scope of expertise and was not performed.