# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In re:<br>City of Detroit, Michigan,<br>      Debtor. | Bankruptcy Case No. 13-53846<br>Judge Thomas J. Tucker<br>Chapter 9 |

## CITY OF DETROIT'S STATUS REPORT ON BANKRUPTCY CASE

On June 6, 2022, the Court entered its *Order Requiring the City to File a Further Status Report by December 2, 2022* ("Order," Doc. No. 13580). The Order provided that the City of Detroit ("City") must file a further status report, updating the June 3, 2022, status report ("Previous Status Report," Doc. No. 13578), and "discussing whether the Chapter 9 bankruptcy case should then be closed, and if not, why not, and if not, when the City contends that the case will be ready to be closed." Order, p. 1. The City files this Report in accordance with that directive, respectfully stating as follows:

## I. INTRODUCTION

The bankruptcy case may be closed when case administration is complete, subject to the retained jurisdiction of the Court over the case for as long as necessary for the successful implementation of the Plan. 11 U.S.C. § 945. Although the City continues to make progress in this case, critical matters remain pending before case administration can be considered complete, including one issue that directly

threatens the successful implementation of the Plan. This Report summarizes those known and reasonably foreseeable matters.

***First***, the City must distribute New B Notes[1] to the Holders of Allowed Class 14 Other Unsecured Claims. On May 20, 2022, the Court entered an order approving the first and final distribution to Holders of Allowed Class 14 Other Unsecured Claims ("Distribution Order") [Doc. No. 13570]. The City is prepared to make this distribution but is first waiting on the denial of a motion by Richard Wershe Jr. that seeks to file a $100 million unsecured claim more than eight years after the bar date, and the granting of the City's motion to enforce the Plan of Adjustment and claims bar date order against Mr. Wershe.

***Second***, in November 2021, the City's police and fire retirement system ("PFRS") officially adopted a drastic acceleration of the amortization of the unfunded actuarial accrued liability of the PFRS Component II (legacy) plan. This action violates the Plan of Adjustment and threatens the City's ability to fully and successfully implement the Plan of Adjustment. The City has filed a motion with this Court to enforce the Plan of Adjustment against the PFRS [Doc. No. 13602]. A

---

[1] Terms that are capitalized but not defined in this Report have the meanings ascribed to them in the City's *Eighth Amended Plan for the Adjustment of Debts of the City of Detroit* ("Plan of Adjustment"), as filed as Docket Number 8045 and confirmed with minor modifications by this Court's order filed at Docket Number 8272.

39938172.3/022765.00213

response and a reply have been filed. [Doc. Nos. 13634, 13663.] The matter has not yet been argued or decided, however.

**_Third,_** earlier today, the City filed its *Motion for Authority to Modify the Confirmed Plan of Adjustment to Address Credited Service Shortfall Sustained By Certain Members of the General Retirement System of the City of Detroit.* [Doc. No. 13664]. ("GRS Motion"). As detailed in the GRS Motion, in response to the COVID-19 pandemic and stay at home orders issued by the state of Michigan, in April 2020, the City started a Work Share/Furlough program (the "Work Share Program"). Under the Work Share Program, rather than being laid off, eligible employees would instead work a reduced number of hours in the work week and would receive a portion of weekly unemployment benefits. Although the employees participating in the Work Share Program and the City continued to make mandatory employee and employer contributions to the pension plan (albeit, based on a reduced salary), the employees did not accrue credited service under the plan for any month in which they worked less than 140 hours. Unless corrected, this will produce an unfair windfall gain for the pension system and an unfair loss for those employees who were placed on the Work Share Program through no fault of their own.

The City and the General Retirement System ("GRS") Board of Trustees believe that the granting of pro rata credited service to those employees participating in the Work Share Program during the COVID pandemic based upon their actual

service is fair and appropriate. As a result, the City filed the GRS Motion which requests that the Court enter an order permitting a modification to the Combined Plan for the General Retirement System of the City of Detroit, Michigan to address this issue.

Thus, the City requests that this Court not close this bankruptcy case now or at any time in the near future. Instead, the City requests that the Court require the City to file another status report in six months so that the City and the Court can reevaluate the status of the case at that time.

The City provides the below update on the status of the bankruptcy case to assist the Court. The City is available and willing to address any questions the Court may have regarding this Report or the continuing administration of this case.

## II. BACKGROUND

### A. The Distribution Process

1. On September 17, 2019, the City filed the *City of Detroit's Motion to Implement Distributions of B Notes to Holders of Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment* [Doc. No. 13126] ("Brokerage Motion") in order to establish procedures for the *pro rata* distribution of New B Notes to Holders of Allowed Class 14 Claims.

2. The Court approved the Brokerage Motion, entering its *Order Granting the City of Detroit's Motion to Implement Distributions of B Notes to Holders of*

*Allowed Class 14 Claims Under the City's Confirmed Plan of Adjustment* [Doc. No. 13173] ("Brokerage Order").

3. The Brokerage Order approved both the form of the notice of the obligations imposed by the Brokerage Order ("Notice") and the forms of the Brokerage Account Form and Tax Form (collectively, the "Distribution Forms") to be served on and used by Holders of Class 14 Claims as described in and attached to the Brokerage Motion. Brokerage Order, ¶ 2.

4. Under the Brokerage Order, if a Class 14 Claimant fails to return properly filled out Distribution Forms within 180 days of being initially served with the Distribution Forms, the Class 14 Claimant releases any right to distributions that otherwise would be due to the Class 14 Claimant and the claimant's claim will be disallowed and expunged from the claims register. Brokerage Order, ¶ 6.

5. On November 24, 2021, the City filed its *Motion to Establish Procedures for Distribution of New B Notes to Holders of Allowed Class 14 Claims Under the City's Plan of Adjustment* [Doc. No. 13476] ("Procedures Motion"). The Procedures Motion was filed to establish procedures if a distribution to a Claimholder failed. On December 22, 2021, this Court entered an order granting the Procedures Motion. (Doc. No. 13488.)

6. On March 16, 2022, the City filed its *Motion for an Order (A) Approving First and Final Distribution of New B Notes to Holders of Allowed Class*

*14 Claims Under the City's Plan of Adjustment and (B) Granting Other Related Relief* [Doc. No. 13521] ("Distribution Motion"). The Distribution Motion provided "interested parties the opportunity to review the planned Distribution and to timely raise any concerns they may have or be permanently and forever barred, estopped, and enjoined from raising any objection to the proposed first and final Distribution or asserting any Class 14 Claim against the City or any of its property." Distribution Motion, p. 3.

7. The Distribution Motion included, as Exhibit 6-B, a list of all Holders of Allowed Class 14 Claims whom the City believed were entitled to receive a Distribution under the Plan.[2]

8. The City received informal objections to the Distribution Motion, which resulted in a few Claims being added to Exhibit 6-B. A revised Exhibit 6-B, reflecting these changes, was attached to the City's certification to the Court that no timely formal objections were received to the Distribution Motion and that all informal objections had been resolved. (Doc. No. 13568.)

9. The Court approved the Distribution Motion by entering the Distribution Order. In the Distribution Order, the Court found that the revised Exhibit 6-B contains a complete and exhaustive list of Allowed Class 14 Claims and

---

[2] For informational purposes, the Distribution Motion also included Exhibit 6-C, a list of all Holders of Allowed Class 14 Claims who had not provided the City with tax and brokerage account information and thus had waived their Claims.

that only claims on the revised Exhibit 6-B will receive Distributions under Class 14 of the Plan. Distribution Order, ¶ 2. The Distribution Order further states that "no other alleged Holder of a Class 14 Claim will be entitled to a Distribution under the Plan, and each such other alleged Holder of a Class 14 Claim will be permanently estopped, barred, and enjoined from seeking a Distribution or any other relief from the City or any of its property." *Id.*, ¶ 8.

10. Since this time, the City has entered into additional stipulations, each approved by order of this Court, each effecting minor adjustments to the planned distribution. (Doc. Nos. 13621, 13622, 13650, 13654.)

11. The City is prepared to make its first and final distribution to Holders of Allowed Class 14 Claims upon resolution of the Wershe Motion to Enforce and Motion to File Late Claim (each as defined below).

### B. Outstanding Motions and Issues

#### 1. Motion to Enforce Against Richard Wershe and Richard Wershe's Motion to File a Late Claim

12. On July 20, 2021, more than seven years after the Bar Date, Richard Wershe Jr. filed a lawsuit against the City in the District Court for the Eastern District of Michigan ("District Court") seeking monetary damages on account of alleged events that occurred a decade or more before the City filed for bankruptcy.

13. As a result, on January 4, 2022, the City filed its *Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Richard Wershe Jr.* [Doc. No. 13491] ("Wershe Motion to Enforce").

14. The Court conducted a hearing on the Wershe Motion to Enforce on April 20, 2022. The Wershe Motion to Enforce is pending before this Court.

15. On May 9, 2022, Wershe filed *Richard Wershe, Jr's Motion for Entry of Notice of Claim After Bar Date* [Doc. No. 13560] ("Motion to File Late Claim," and with the Wershe Motion to Enforce, the "Wershe Filings"), seeking leave to file a $100 million unsecured claim against the City more than eight years after the Bar Date.

16. The City filed an objection to the Motion to File Late Claim on May 23, 2022. [Doc. No. 13572.] As the City explained in its objection, out of an abundance of caution, the City currently does not intend to make a Distribution to Holders of Allowed Class 14 Claims until the Wershe Filings are resolved. The City reserves the right to make a final Distribution under the authority provided to it in the Distribution Order prior to resolution of the Wershe Filings, however.

17. The Court set a deadline for Mr. Wershe to file a reply brief. [Doc. No. 13643.] Mr. Wershe filed a brief by the deadline. [Doc. No. 13655.] The Motion to File Late Claim is pending before this Court.

### 2. DFFA Motion to Enforce

18. On August 30, 2021, the DFFA filed its *Motion of Detroit Fire Fighters Association (DFFA) for the Entry of an Order Enforcing the Plan of Adjustment Against: Christopher McGhee, Norman Brown, Craig Brown, James Washington, Shannon Ferguson, Junius Perry, and Orlando Potts* [Doc. No. 13430] ("DFFA Firefighters Motion"). The City concurred in the DFFA Firefighters Motion. (Doc. No. 13438.)

19. The Court conducted oral argument on the DFFA Firefighters Motion on January 12, 2021, and scheduled a bench opinion. *See* Docket Nos. 13477, 13493, and 13508.

20. On February 22, 2022, this Court entered an Order cancelling the bench opinion because the Court decided to enter a written opinion. (Doc. No. 13515.) The Court has not yet issued its written opinion.

### 3. Motion to Enforce Against the PFRS

21. In November 2021, the PFRS officially adopted a drastic acceleration of the amortization of the unfunded actuarial accrued liability ("UAAL") of the PFRS Component II (legacy) plan. This action violates the Plan of Adjustment and threatens the City's ability to implement the Plan of Adjustment fully and successfully.

22. The City filed a motion with this Court to enforce the Plan of Adjustment against the PFRS [Doc. No. 13602]. A response and a reply have been filed. [Doc. Nos. 13634, 13663.] The matter has not yet been argued or decided, however.

### 4. Motion to Enforce Against GRS

23. On December 2, 2022, the City filed the GRS Motion. As detailed in the GRS Motion, in response to the COVID-19 pandemic and stay at home orders issued by the state of Michigan, in April 2020, the City started a Work Share/Furlough program (the "Work Share Program"). Under the Work Share Program, rather than being laid off, eligible employees would instead work a reduced number of hours in the work week and would receive a portion of weekly unemployment benefits. Although, the employees participating in the Work Share Program and the City continued to make mandatory employee and employer contributions to the pension plan (albeit, based on a reduced salary), the employees did not accrue credited service under the plan for any month in which they worked less than 140 hours. Unless corrected, this will produce an unfair windfall gain for the pension system and an unfair loss for those employees who were placed on the Work Share Program through no fault of their own.

24. The City and the General Retirement System ("GRS") Board of Trustees believe that the granting of pro rata credited service to those employees

participating in the Work Share Program during the COVID pandemic based upon their actual service is fair and appropriate. As a result, the City filed the GRS Motion which requests that the Court enter an order permitting a modification to the Combined Plan for the General Retirement System of the City of Detroit, Michigan to address this issue.

### C. Matters Resolved Since Last Report

#### 1. DFFA Motions

25. On May 27, 2022, the City filed its *City of Detroit's Motion for the Entry of an Order Enforcing the Confirmation Order Against the DFFA* ("DFFA Grievance Motion," Doc. No. 13575.). The DFFA Grievance Motion explained that the DFFA filed a grievance which violated the Plan of Adjustment.

26. On July 22, 2022, the DFFA filed its *DFFA'S Motion to Dismiss for Lack of Jurisdiction the City Motion for the Entry of an Order Enforcing the Confirmation Order Against the DFFA (R13575), and Its Supplement and Amendment (R13582)* ("DFFA Dismissal Motion," Doc. No. 13593). The DFFA Dismissal Order sought dismissal of the DFFA Grievance Motion on subject matter grounds.

27. The City and the DFFA stipulated to dismissal of both the DFFA Grievance Motion and the DFFA Dismissal Motion without prejudice. On

September 2, 2022, the Court entered an order approving this stipulation. (Doc. No. 13620.)

### 2. Motion to Reconsider

28. On August 23, 2022, Raymond Thompson Jr. filed his *Creditors Motion for Reconsideration and/or for Relief from Judgment of the Order Granting Debtor City of Detroit's Motion to Exclude Creditor Raymond Thompson Jr. from Disbursement Despite Timely Submission or Alternative Release from Order* ("Reconsideration Motion," Doc. No. 13612). The Reconsideration Motion asserted that Mr. Thompson had timely submitted brokerage account information and asked that Mr. Thompson be allowed to participate in the distribution of B Notes to Class 14 Claims holders.

29. The City investigated the allegations in the Reconsideration Motion and found that there likely was cause to grant the relief requested. The City thus entered a stipulation with Mr. Thompson, setting forth the results of its investigation and stipulating to the requested relief. (Doc. No. 13621.) On September 7, 2022, the Court entered an order approving this stipulated relief. (Doc. No. 13622.)

### 3. Motion to Enforce Against Metris

30. On April 6, 2022, the City filed its *City of Detroit's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Debra Metris-Shamoon, Mukhlis Shamoon, Carl Veres, Paul Metris and Julia Metris*

("Metris Motion to Enforce," Doc. No. 13532). The City asserted that the lawsuit filed by the Metris parties violated the discharge injunction entered in this bankruptcy case.

31. The Metris parties filed a response and the City filed a reply. (Doc. Nos. 13565 and 13588.) The Court held a hearing on the Metris Motion to Enforce on August 24, 2022. On August 26, 2022, the Court issued an Opinion and an Order granting the Metris Motion to Enforce. (Doc. Nos. 13617, 13618.)

32. The Metris parties have filed an appeal which remains pending at this time. (*See* Doc. No. 13624.)

   **D.     The Remaining Class 15 Claim**

33. As of the filing of the Previous Status Report, only one claim remained to be liquidated, claim number 799 of Daryl Cain ("Cain Claim").

34. The Cain Claim is being liquidated in the District Court, Case Number 13-10525 ("Cain Case") under this Court's *Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims* (Doc. No. 2302) and this Court's order at docket number 13269. (Doc. No. 13269, ¶ 2.).

35. Even though the Cain Claim is not fully resolved, the City confirmed that it is a Class 15 Claim. (Doc. Nos. 13246, 13249, 13258, 13269, 13278, 13281, 13285, 13286.)

36. The District Court originally granted the City summary judgment in the Cain Case in September of 2016. Cain Case, Doc. Nos. 44, 45.

37. In October of 2017, after appeal, the Sixth Circuit reversed the District Court's grant of summary judgment to the City, directing the District Court to hold further proceedings in the matter. *Id.*, Doc. Nos. 52, 53.

38. Since then, the District Court has granted Cain's motion for trial by jury and reopened discovery. *Id.*, Doc. No. 70.

39. At one point, Cain was assigned counsel. *Id.*, Doc. No. 55. Counsel later moved to withdraw, and the District Court granted the request.[3] *Id.*, Doc. Nos. 62, 64. Cain moved again for counsel to be appointed, but his request was denied. *Id.*, Doc. Nos. 71, 73, 74.

40. On or about November 22, 2021, Magistrate Judge Patricia T. Morris conducted a status and settlement conference, but a settlement was not reached. Cain had made an offer to settle, then withdrew it, and demands a jury trial.

41. There are no scheduling orders currently on the Cain Case docket.

42. Cain was served with the Distribution Motion but did not object. Doc. Nos. 13522 (pp. 13 and 21 of 22), 13534.

---

[3] Cain apparently approved of counsel's withdrawal. The District Court referred to a letter from Cain where he accused counsel of violating his constitutional rights and made other complaints. "Clearly, there has been a breakdown in the attorney-client relationship." Cain Case, Doc. No. 64.

43. The Cain Claim is not included on the list of claims to receive a distribution of New B Notes as a Class 14 Claim. (Doc. No. 13568, Ex. 6-B.)

44. Paragraph 8 of the Distribution Order bars Cain from asserting again that the Cain Claim should be treated as a Class 14 Claim.

45. As a claim subject to treatment under Class 15 of the Plan of Adjustment, any distribution on the Cain Claim will be paid by the City directly in cash (albeit with the cash payout capped at $6,250). This amount can be reserved for and later resolved without keeping the City's bankruptcy case open.

46. Consequently, the City does not believe it is required to wait for final liquidation of the Cain Claim before making a distribution of New B Notes or closing this bankruptcy case.

## III. THIS CASE HAS NOT BEEN "FULLY ADMINISTERED"

47. In the City's confirmed Plan of Adjustment, the Court retained jurisdiction to "[e]nter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code[.]" Plan, Art. VII.P (Doc. No. 8045, p. 78 of 82; Doc. No 8272, p. 211 of 225).

48. Section 945(b) states that "Except as provided in subsection (a) of this section, the court shall close the case when administration of the case has been completed." 11 U.S.C. § 945(b). Subsection (a) states that a bankruptcy court may

39938172.3/022765.00213

retain jurisdiction for whatever time is necessary for successful plan implementation. 11 U.S.C. § 945(a).

49. The Bankruptcy Code does not explain when administration of a chapter 9 case is complete and, to the City's knowledge, only one reported decision has addressed the question. *In re Lake Lotawana Cmty. Improvement Dist.*, Case No. 10-44629-can9; 2017 WL 1968282 (Bankr. W.D. Mo. May 11, 2017).

50. The *Lake Lotawana Community Improvement District* court noted that neither the Bankruptcy Code nor the Bankruptcy Rules offer guidance as to when a chapter 9 case has been administered. *Id.* at *2. The court then observed

> Returning to § 945(b) then, cannons of statutory construction require that when Congress does not define a term, courts must give it its ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Black's Law Dictionary defines "administration" as the "judicial action in which a court undertakes the management and distribution of property." Black's Law Dictionary 49 (9th ed. 2009).

*Id.* at *3.

51. Thus, the court determined that a case is administered when there is no longer anything for the court to manage in the case. *Id.*

52. In this case, there are several matters that must be addressed prior to the closing the case. First and foremost, the Wershe Filings need to be resolved. Once that is done, New B Notes must be distributed to Class 14 Claim Holders in accordance with the Distribution Order. The motion regarding the PFRS must also

- 16 -
39938172.3/022765.00213

13-53846-tjt    Doc 13665    Filed 12/02/22    Entered 12/02/22 12:37:32    Page 16 of 19

be resolved to ensure that the City's bankruptcy case remains a success. Finally, the GRS Motion also needs to be resolved. These significant issues prevent the City's bankruptcy case from being closed at this time.

## IV. CONCLUSION

53. For the reasons described above, the City respectfully requests that the Court not close this bankruptcy case now or in the near future. Instead, the City requests that the Court require the City to file another status report in six months so that the City and this Court can reevaluate the status of the case then. The City is available and willing to address any questions the Court may have regarding this Report or the continuing administration of this case.

Dated: December 2, 2022

CITY OF DETROIT LAW DEPARTMENT

By: */s/ Charles N. Raimi*
Charles N. Raimi (P29746)
Attorneys for the City of Detroit
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
Phone - (313) 237-5037/(313)
Email - raimic@detroitmi.gov

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ *Marc N. Swanson*
Marc N. Swanson (P71149)
Ronald A. Spinner (P73198)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

Counsel for the City of Detroit, Michigan

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| In re: | Bankruptcy Case No. 13-53846 |
|---|---|
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2022, I electronically filed the *City of Detroit's Status Report on Bankruptcy Case* with the Clerk of the Court via the Court's ECF electronic filing system which will serve notice to all ECF participants.

By: /s/ *Marc N. Swanson*
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

Counsel for the City of Detroit, Michigan

Dated: December 2, 2022