# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S SUPPLEMENT FILED IN CONNECTION WITH THE CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE UAAL IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN

The City of Detroit ("City"), by its undersigned counsel, Miller, Canfield, Paddock and Stone, P.L.C., files this supplement in connection with its *City of Detroit's Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan* [Doc. No. 13602].

## RELEVANT DOCUMENT EXCERPTS

**Exhibit 1 – Forty-Year Financial Projections and Explanation of Projected Financial Information from the Disclosure Statement**

The *Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* (Doc. No. 4391) was filed and circulated in May 2014. This was the first and only Disclosure Statement served on voters in connection with the solicitation of the plan of adjustment.

Attached as Exhibit 1 to this Supplement is the Forty-Year Financial Projections from the Disclosure Statement[1] and Section XI of the Disclosure Statement which is titled "Projected Financial Information." Section XI was included to "provide details regarding the City's projected operations under the Plan, subject to the assumptions set forth below." Disclosure Statement, p. 170 (Doc. No. 4391, p. 185 of 197). Those assumptions were described in a set of exhibits including "Exhibit K." *Id.*

Page 173 of 212 of Exhibit K states that the amortization period for the pensions' unfunded actuarial accrued liability (UAAL) was to be 30 years using a 6.75% discount rate. As discussed in the City's previous filings, the Opinion and Order approving the final Plan expressly requires 30-year amortization and cites and incorporates the referenced financial projections.

**Exhibits 2 and 3 – The version of the State Contribution Agreement attached to the Disclosure Statement and the revised version of the State Contribution Agreement attached to the Plan**

Attached as Exhibit 2 to this Supplement is the State Contribution Agreement that was attached to the Disclosure Statement and served on all voting parties for their consideration in deciding whether to vote for or against the City's proposed plan of adjustment as proposed at that time. Exhibit B to the State Contribution Agreement is a document entitled "PFRS Governance Terms."

---

[1] The Forty-Year Financial Projections were Exhibit K to the Disclosure Statement.

40195049.4/022765.00213

Attached as Exhibit 3 to this Supplement is the version of the State Contribution Agreement that was included with the final filed version of the Plan.[2] Exhibit B to that version of the State Contribution Agreement is a document entitled "PFRS Governance Terms."

The PFRS Governance Terms circulated to voters did not mention amortization at all. *See* Exhibit 2. The revised version of the PFRS Governance Terms does include two instances of the word. *See* Exhibit 3. They appear in the revised definition of "Investment Management,"[3] which includes a "reviewer" role for the Investment Committee concerning calculations made by the Plan Actuary. *See* Investment Management definition, point 4, Exhibit 3, p. 5.

As discussed in the City's reply brief, nothing in the Governance Agreement purported to give the Investment Committee any authority, let alone "unfettered discretion," to change the Plan's express requirement of 30-year amortization. If it had, such a change would have been extraordinarily material. It would have allowed PFRS and GRS to accelerate several **billion** dollars of payments from the Plan specified amortization term of 30 years to whatever shorter term they wanted - based on, in PFRS' words, their "unfettered discretion." Such a change would have

---

[2] *Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (October 22, 2014)* (Doc. No. 8045).

[3] *See* page 737 of 809.

40195049.4/022765.00213

required an explanation to all creditors, as well as notice to the feasibility expert (Ms. Kopacz) and other interested parties, and a new round of balloting. In truth, had PFRS' current position ever been articulated it would have blown up the Plan.

The attached documents, which are part of the record in this case, fully support the City's position that the State Contribution Agreement cannot be read, and was never intended, to give the PFRS and GRS Investment Committees authority to change the Plan's express requirement of 30-year amortization.

Dated: February 6, 2023      Respectfully submitted,

By: /s/ Marc N. Swanson
     Marc N. Swanson (P71149)
     MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
     150 West Jefferson, Suite 2500
     Detroit, Michigan 48226
     Telephone: (313) 963-6420
     Facsimile: (313) 496-8451
     swansonm@millercanfield.com

          and

By: /s/ Charles N. Raimi
     Charles N. Raimi (P29746)
     Deputy Corporation Counsel
     City of Detroit Law Department
     2 Woodward Avenue, Suite 500
     Coleman A. Young Municipal Center
     Detroit, Michigan 48226
     Telephone: (313)-237-5037
     raimic@detroitmi.gov

ATTORNEYS FOR THE CITY OF DETROIT

40195049.4/022765.00213

# SUMMARY OF ATTACHMENTS

The following documents are attached.

Exhibit 1    Forty-Year Financial Projections and Explanation of Projected Financial Information

Exhibit 2    Version of State Contribution Agreement Attached to Disclosure Statement

Exhibit 3    Revised Version of State Contribution Agreement Attached to Plan

Exhibit 4    Certificate of Service

**EXHIBIT 1**

**Forty-Year Financial Projections and**
**Explanation of Projected Financial Information**

# XI.

## PROJECTED FINANCIAL INFORMATION

### A.    Projections

Attached to this Disclosure Statement as Exhibit I, Exhibit J and Exhibit K are certain financial documents (together, the "Projections"), which provide details regarding the City's projected operations under the Plan, subject to the assumptions set forth below.  In particular, the Projections consist of:

- A ten-year summary of restructuring initiatives, attached hereto as Exhibit I

- A ten-year statement of projected cash flows, attached hereto as Exhibit J

- A forty-year statement of projected cash flows, attached hereto as Exhibit K

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE FINANCIAL ACCOUNTING STANDARDS BOARD, THE GOVERNMENTAL ACCOUNTING STANDARDS BOARD OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.  THE CITY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROJECTIONS AND, ACCORDINGLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUMES NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIMS ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE CITY DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION.  THE CITY DOES NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT THE CITY BELIEVES ARE REASONABLE (WHICH ASSUMPTIONS ARE DESCRIBED IN FURTHER DETAIL IMMEDIATELY BELOW).  THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CITY'S CONTROL.  NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN THE PROJECTIONS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

### 1.    Assumptions

The Projections were prepared by the City with the assistance of its professionals to present the anticipated impact of the Plan.  The Projections all assume that the Plan will be confirmed before and implemented on the Effective Date in accordance with its stated terms.  In addition, the Projections and the Plan are premised upon other assumptions, including the anticipated future performance of the City, general economic and business conditions, no material changes in the laws and regulations applicable to the operation of municipalities such as the City, and other matters largely or completely outside of the City's control.  Each of the Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth in the Disclosure Statement, the Plan, the Plan Supplement, the Projections themselves, the historical financial information for the County contained or referenced herein, and other information submitted to the Bankruptcy Court during the course of the City's chapter 9 case.

**(a)      Revenue Assumptions**

●  <u>Municipal Income Tax</u>.  Municipal income tax revenues increase over the period of the Projections due to (i) a general improved employment outlook and (ii) anticipated wage inflation.  Projected revenues for Fiscal Year 2013 reflect the impact of certain one-time items, including a tax amnesty program and a one-time benefit from an increase in the capital gains tax rate.

●  <u>State Revenue Sharing</u>.  Projected revenues for state revenue sharing were developed in consultation with the Treasury.  These revenues increase due to anticipated higher tax revenue collections and distribution by the State.

●  <u>Wagering Tax</u>.  The Projections assume that wagering tax revenues will decrease through Fiscal Year 2015 due to competition from other casinos, primarily those in Ohio, before recovering as a result of an improved general economic outlook.

●  <u>Sales and Charges for Services</u>.  Revenues from sales and charges for services are projected to decline primarily as a result of the transfer of:  (i) vital records operations from the City's Department of Health and Wellness Promotion (the "<u>Health & Wellness Department</u>") to Wayne County effective December 2013; and (ii) electricity distribution services from the Public Lighting Department to third party provider.

●  <u>Property Tax</u>.  The City projects that property tax revenues will continue to decline through Fiscal Year 2020 as a result of ongoing reductions in assessed property values with modest increases beginning in Fiscal Year 2021.

●  <u>Utility Users Tax</u>.  The Projections assume that utility users tax revenues will decrease from Fiscal Year 2013 as a result of the transfer of lighting operation, service and repair to the PLA and the related allocation of $12.5 million of utility users tax revenues to the PLA.  Inflationary revenue increases have been assumed beginning in Fiscal Year 2017.

●  <u>Other Taxes</u>.  Inflationary revenue increases have been assumed for all other taxes, beginning in Fiscal Year 2017.

●  <u>Parking/Court Fines and Other Revenue</u>.  The amounts provided in the Projections for parking and court fines and other revenue are derived from recent trends.

●  <u>Grant Revenue</u>.  The City projects that grant revenues will decrease as a result of the (i) transition of the Health & Wellness Department to the Institute for Population Health ("<u>IPH</u>") and (ii) expiration of certain public safety grants.

●  <u>Licenses, Permits and Inspection Charges</u>.  The amount provided in the Projections for licenses, permits and inspection charges is derived primarily from recent trends.  The City's projection for Fiscal Year 2013 includes one-time permit and inspection revenues from utility providers.

●  <u>Revenue from Use of Assets</u>.   The City's projected revenue for Fiscal Year 2014 includes proceeds from sale of Veteran's Memorial Building.

●  <u>Street Fund Reimbursement</u>.  Street Fund reimbursement from solid waste revenues are projected to decline beginning in Fiscal Year 2015.  The solid waste portion of the Street Fund, therefore, would no longer reimburse the General Services Department (a department accounted for in the General Fund) for maintenance costs.

●  <u>DDOT Risk Management Reimbursement</u>.  The projected revenues for DDOT risk management reimbursement are based on recent trends.  No reimbursement is reflected in Fiscal Year 2013 because, as set forth in subsection (b) below, in Fiscal Year 2013, the General Fund made risk management payments from refunding proceeds.

-171-

13-53846-swr   Doc 4367   Filed 05/06/23   Entered 05/06/23 14:05:23   Page 186 of 797
13-53846-swr   Doc 4378   Filed 05/05/14   Entered 05/05/14 11:50:12   Page 186 of 797

- Parking and Vehicle Fund Reimbursement. Based on recent trends and scheduled debt service for the Vehicle Fund through Fiscal Year 2016 with revenues and associated expenses being offset.

- UTGO Property Tax Millage. The Projections assume treatment consistent with the Plan.

- DWSD Sewer Service Rates. The Projections assume that rates for sewer service provided by DWSD will increase by 4% annually.

**(b)     Operating Expenditure Assumptions**

- Salaries and Wages. The Projections assume a 10% wage reduction for uniformed employees beginning in Fiscal Year 2014 for contracts expiring during Fiscal Year 2013. Headcount is assumed to increase beginning in Fiscal Year 2015 to allow for improved levels of services to City residents. For all employees, 5% wage inflation assumed in Fiscal Year 2015, 0% in Fiscal Year 2016 and 2.5% annually beginning in Fiscal Year 2017, decreasing to 2% annually beginning in Fiscal Year 2020.

- Overtime. The projected future costs of overtime are based upon recent trends.

- Health Benefits (Active Employees). The projected cost of health benefits for active employees is based upon the health care plan designs being offered for 2014 enrollment and assumes an average rate of health care inflation of 5.6%.

- Other Employment Benefits. The City has calculated the Projections for other employment benefits separately by specific benefit based upon recent trends.

- Professional and Contractual Services. The Projections assume a decrease in costs incurred for professional and contractual services beginning Fiscal Year 2014 primarily due to the transition of the Health & Wellness Department to IPH. Cost inflation in the amount of 1.0% has been assumed beginning in Fiscal Year 2015.

- Materials and Supplies. The Projections provide for decreases in expenditures beginning in Fiscal Year 2015 due to the transition of the PLD distribution business to third party provider. Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- Utilities. The City's projected utility cost is based on recent trends and assumes cost inflation of 1.0% beginning in Fiscal Year 2015. Average cost inflation of 3.5% has been assumed for water and sewer rates beginning in Fiscal Year 2015.

- Purchased Services. The Projections assume increased costs beginning in Fiscal Year 2014 due to prisoner pre-arraignment function costs and beginning in Fiscal Year 2015 as a result of increased costs of payroll processing management. In addition, cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- Risk Management and Insurance. Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- Maintenance Capital (Current Run Rate). Fiscal Year 2013 includes one-time capital outlays. Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015.

- Other Expenses. Cost inflation of 1.0% has been assumed beginning in Fiscal Year 2015 with respect to certain costs.

- Contributions to Non-Enterprise Funds. Assumed contributions are projected to increase in Fiscal Years 2015 and 2016 primarily due to scheduled vehicle fund debt service. In addition, contributions for the operations of PLA begin in Fiscal Year 2015.

- DDOT Subsidy. The General Fund's subsidy to DDOT is projected to increase primarily due to personnel and operating cost inflation. A one-time contribution to the General Fund of $16 million has been

included for Fiscal Year 2012. The costs for Fiscal Year 2013 exclude a risk management payment, made from refunding proceeds.

- <u>Grant Related Expenses</u>. Projected grant expenses have been captured within the specific expense line items.

**(c)**      **Legacy Expenditure Assumptions**

- <u>Debt Service</u>. The Projections assume treatment consistent with the Plan.

- <u>COP and Swap Service</u>. The Projections assume treatment consistent with the Plan.

- <u>Pension Contributions</u>. The Projections assume treatment consistent with the Plan.

- <u>Health Benefits (Retirees)</u>. The Projections assume treatment consistent with the Plan.

-173-

13-53846-tjt Doc 13078 Filed 03/06/23 Entered 03/06/23 14:35:53 Page 10 of 77
13-53846-swr Doc 4391 Filed 05/05/14 Entered 05/05/14 11:50:15 Page 180 of 197

**EXHIBIT K**

FORTY-YEAR FINANCIAL PROJECTIONS

13-53846-tjt Doc 2878 Filed 02/06/23 Entered 02/06/23 14:35:53 Page 11 of 77
13-53846-swr Doc 4391-2 Filed 09/05/14 Entered 09/05/14 13:55:12 Page 11 of 17
212

# City of Detroit
## Plan of Adjustment - 40 year projections

The attached Plan of Adjustment preliminary forecast (the "POA Financial Projections"), its assumptions and underlying data are the product of the Client and its management ("Management") and consist of information obtained solely from the Client. With respect to prospective financial information relative to the Client, Ernst & Young LLP ("EY") did not examine, compile or apply agreed upon procedures to such information in accordance with attestation standards established by the AICPA and EY expresses no assurance of any kind on the information presented. It is the Client's responsibility to make its own decision based on the information available to it. Management has the knowledge, experience and ability to form its own conclusions related to the Client's POA Financial Projections. There will usually be differences between forecasted and actual results because events and circumstances frequently do not occur as expected and those differences may be material. EY takes no responsibility for the achievement of forecasted results. Accordingly, reliance on this report is prohibited by any third party as the projected financial information contained herein is subject to material change and may not reflect actual results.

13-53846-tjt Doc 2678 Filed 02/06/14 Entered 02/06/23 14:35:53 Page 12 of 77
13-53846-swr Doc 4391-2 Filed 09/05/14 Entered 09/05/14 11:55:12 Page 1 of 77
212

Plan of Adjustment - 40 year projections
Assumptions
*($ in millions)*

| Plan of Adjustment - 40 year projections | | |
|---|---|---|
| General Fund Cash Flows | GF 40yr cash flows | $4.2b funds available for unsecured claims |
| | DIP financing | Quality of Life ($120m @ 6.5% assumed to be refinanced as part of exit facility) |
| | Exit financing | $300m note @ 6.0% maturing in FY23 |
| | Swap treatment | $85m settlement |
| | Contingency | Reflects 1.0% of total revenues |
| Revenue stream from DWSD | Pension | $429m for pension in the first 10 years |
| | OPEB | 12.1% of OPEB - current retirees payments |
| | POC | 11.5% of total POC payments |
| Reimbursement from other funds | Reimbursements from Parking (non-GF) and Library | |
| Hypothetical art proceeds (a) | Foundations | $366m over 20 years |
| | DIA | $100m over 20 years |
| Hypothetical State settlement (a) | Contributions to pension | $195m in FY15 |
| Hypothetical claims treatment | | |
| PFRS | | |
| Pension | Contributions (years 1-10) | Estimated to be $261m from foundations / State settlement |
| | Contributions (years 11-40) | UAAL as of June 30, 2023 estimated to be ~$681m (b) ==amortized over 30yr,== including contributions in second decade from DIA and foundations |
| | Discount rate | 6.75% |
| | Targeted funded status as of 2023 | 78% |
| GRS | | |
| Pension | Contributions (years 1-10) | Estimated to be $99m from State settlement; $429m from DWSD; $45m from DIA; $146m from GF & other funds |
| | Contributions (years 11-40) | UAAL as of June 30, 2023 estimated to be ~$695m (b) ==amortized over 30yr,== including contributions in second decade from DIA and foundations |
| | Discount rate | 6.75% |
| | Targeted funded status as of 2023 | 70% |
| UTGO | Hypothetical Note A | $287.5m note funded with pass-through UTGO millage |
| Other unsecured | Hypothetical Notes B | $650m note paid over 30 years - $450m OPEB, $18m LTGO, $162m POC, $4m notes/loans and $16m other |

Footnotes:

(a)  Hypothetical art and State settlement proceeds are subject to a consensual agreement with respect to the treatment of pension-related claims.

(b)  Estimated pension contributions to retirement systems and unfunded pension liabilities as of June 30, 2023 are subject to change.

Plan of Adjustment - 40 year projections
Recovery summary
($ in millions)

## 10 Years

| Creditor | Claim | State settlement | Art proceeds | Cash | Notes A (UTGO) | Notes B | 10 year $ |
|---|---|---|---|---|---|---|---|
| PFRS pension | $1,250 | $96 | $165 | | | | $261 |
| GRS pension | $1,879 | $99 | $45 | $575 | | | $719 |
| PFRS OPEB | $2,208 | | | $9 | | $79 | $88 |
| GRS OPEB | $2,095 | | | $11 | | $74 | $85 |
| UTGO | $388 | | | | $328 | | $328 |
| LTGO | $164 | | | | | $6 | $6 |
| POC | $1,473 | | | | | $55 | $55 |
| Notes/loans payable | $34 | | | | | $1 | $1 |
| Other unsecured items | $150 | | | | | $6 | $6 |
| | $9,640 | $195 | $210 | $595 | $328 | $221 | $1,548 |

Hypothetical distributions

## 40 Years

| Creditor | Claim | State settlement | Art proceeds | Cash | Notes A (UTGO) | Notes B | Illustrative Recoveries $ | $ PV (a) | % | | Adjusted % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PFRS pension | $1,250 | $96 | $233 | $1,325 | | | $1,654 | $735 | 59% | Excludes State, Foundation, and DIA proceeds | 39% |
| GRS pension | $1,879 | $99 | $233 | $1,809 | | | $2,141 | $1,118 | 60% | | 48% |
| PFRS OPEB | $2,208 | | | $9 | | $436 | $445 | $212 | 10% | | |
| GRS OPEB | $2,095 | | | $11 | | $409 | $420 | $201 | 10% | | |
| UTGO | $388 | | | | $368 | | $368 | $288 | 74% | | |
| LTGO | $164 | | | | | $34 | $34 | $16 | 10% | | |
| POC | $1,473 | | | | | $304 | $304 | $141 | 10% | | |
| Notes/loans payable | $34 | | | | | $7 | $7 | $3 | 10% | | |
| Other unsecured items | $150 | | | | | $31 | $31 | $14 | 10% | | |
| | $9,640 | $195 | $466 | $3,154 | $368 | $1,221 | $5,404 | $2,730 | 28% | | |

Hypothetical distributions

### Description of Hypothetical notes

| Note | Face value | Interest rate | Recipients | Term | Comments |
|---|---|---|---|---|---|
| Note A | $287.5 | n/a | UTGO | 14 years | Represents ~87% of UTGO scheduled debt service |
| Note B | $650.0 | 4%, 4%, 6% | OPEB, LTGO, POC, Notes & Other unsec. | 30 years | 10 yrs interest only, and straight-line amortization thereafter |

*Footnotes:*
(a) Present value amounts calculated assuming 5% discount rate

Plan of Adjustment - 40 year projections
Preliminary forecast and distributions
($ in millions)

| | Growth after FY23 | 2014-2023 | 2024-2033 | 2034-2043 | 2044-2053 | 40-year total |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Municipal income tax | 2.4% - 2.8% | $ 2,770.2 | $ 3,510.0 | $ 4,590.6 | $ 6,059.3 | $ 16,930.1 |
| State revenue sharing | 0.1% - 1.7% | 1,963.9 | 2,076.3 | 2,262.5 | 2,488.6 | 8,791.3 |
| Wagering taxes | 1.0% | 1,745.7 | 1,924.6 | 2,126.0 | 2,348.4 | 8,144.7 |
| Property taxes | 1.5% - 2.2% | 1,089.7 | 1,368.5 | 1,638.6 | 1,901.7 | 5,998.4 |
| Utility users' taxes | 1.5% - 1.7% | 257.2 | 304.3 | 353.2 | 409.9 | 1,324.6 |
| Sales and charges for services | 2.0% | 1,118.9 | 1,162.6 | 1,417.2 | 1,727.5 | 5,426.2 |
| Other revenue | 2.0% | 712.8 | 753.5 | 918.5 | 1,119.7 | 3,504.5 |
| General Fund reimbursements | 2.0% | 264.1 | 238.8 | 291.1 | 354.9 | 1,149.0 |
| Transfers in for UTGO | n/a | 532.8 | 147.6 | 22.1 | - | 702.4 |
| Restructuring: | | | | | | |
| Department revenue initiatives | 2.0% | 477.2 | 578.3 | 704.9 | 859.3 | 2,619.6 |
| QOL / exit financing proceeds (net) | n/a | 292.7 | - | - | - | 292.7 |
| Total revenues | | 11,225.1 | 12,064.6 | 14,324.6 | 17,269.2 | 54,883.5 |
| **Expenditures** | | | | | | |
| Salaries/overtime/fringe - Public Safety | 2.0% - 2.25% | (2,858.7) | (3,524.5) | (4,356.5) | (5,442.1) | (16,181.8) |
| Salaries/overtime/fringe - Non-Public Safety | 2.0% - 2.25% | (901.6) | (1,087.2) | (1,343.9) | (1,678.8) | (5,011.5) |
| Health benefits (a) | ~4% inflation cap beg. FY20 | (752.3) | (928.2) | (1,373.9) | (2,033.7) | (5,088.1) |
| OPEB payments - future retirees | ~1% of wages uniform / 2% of wages non-uniform | (43.9) | (53.5) | (65.6) | (81.1) | (244.1) |
| Active pension plan | 11.2%/12.25% uniform / 5.75% non-uniform | (326.7) | (417.5) | (515.6) | (643.2) | (1,903.0) |
| Other operating expenses | 2.0% | (3,013.7) | (3,436.4) | (4,189.0) | (5,106.4) | (15,745.5) |
| Restructuring: | | | | | | |
| Additional operating expenditures | 2.0% | (368.9) | (379.2) | (462.3) | (563.5) | (1,774.0) |
| Working capital | n/a | (24.8) | - | - | - | (24.8) |
| Secured debt service | n/a | (390.5) | (391.0) | (67.2) | - | (848.6) |
| Contributions to income stabilization fund | n/a | (17.8) | (2.2) | - | - | (20.0) |
| Swap interest set-aside | n/a | (103.7) | - | - | - | (103.7) |
| QOL / exit financing principal/interest payments | n/a | (420.9) | - | - | - | (420.9) |
| Reorganization (Capital investments) | 2.0% | (609.4) | (415.4) | (501.4) | (605.3) | (2,131.5) |
| Restructuring professional fees | n/a | (130.0) | - | - | - | (130.0) |
| Blight (excludes heavy commercial) | n/a | (420.0) | - | - | - | (420.0) |
| PLD decommission | n/a | (75.0) | - | - | - | (75.0) |
| Contingency | n/a | (101.1) | (120.6) | (143.2) | (172.7) | (537.7) |
| Reinvestment deferrals | n/a | 45.2 | 146.6 | 52.3 | (244.2) | - |
| Total expenditures | | (10,513.8) | (10,609.2) | (12,966.2) | (16,570.9) | (50,660.1) |
| Funds available for unsecured claims | | $ 711.3 | $ 1,455.3 | $ 1,358.4 | $ 698.3 | $ 4,223.4 |

Footnotes:

(a) Health benefits include $142.8m of OPEB payments for current retirees in FY 2014 ($123.8m) and FY 2015 ($19m).

Plan of Adjustment - 40 year projections
Preliminary forecast and distributions
(*$ in millions*)

| | 2014-2023 | 2024-2033 | 2034-2043 | 2044-2053 | 40-year total |
|---|---|---|---|---|---|
| **Sources** | | | | | |
| Funds available for unsecured claims | $ 711.3 $ | 1,455.3 $ | 1,358.4 $ | 698.3 | $ 4,223.4 |
| Revenue stream from DWSD - no transaction | | | | | |
| Pension | 428.5 | - | - | - | 428.5 |
| OPEB (based on 12.1% of OPEB - current retirees payments) | 19.9 | 41.4 | 39.1 | 3.0 | 103.5 |
| POC (based on 11.5% of total POC payments) | 6.4 | 14.2 | 13.5 | 1.0 | 35.1 |
| Sub-total: Revenue stream from DWSD | 454.8 | 55.7 | 52.6 | 4.1 | 567.1 |
| Reimbursement from other funds | 27.6 | 32.9 | 25.3 | 15.3 | 101.1 |
| Hypothetical art proceeds | | | | | |
| Foundation fundraising | 164.7 | 201.3 | - | - | 366.0 |
| DIA contributions | 45.0 | 55.0 | - | - | 100.0 |
| State settlement | 194.8 | - | - | - | 194.8 |
| Total hypothetical sources | $ 1,598.2 $ | 1,800.2 $ | 1,436.3 $ | 717.7 | $ 5,552.4 |
| | | | | | |
| **Uses** | | | | | |
| Hypothetical retiree payments | | | | | |
| PFRS pension payments | (260.7) | (617.7) | (464.5) | (311.3) | (1,654.2) |
| GRS pension payments | (718.6) | (630.4) | (474.0) | (317.7) | (2,140.7) |
| PFRS OPEB payments - current retirees | (9.1) | - | - | - | (9.1) |
| GRS OPEB payments - current retirees | (10.9) | - | - | - | (10.9) |
| Subtotal: hypothetical retiree distributions | (999.3) | (1,248.1) | (938.5) | (628.9) | (3,814.9) |
| Hypothetical notes | | | | | |
| Note A (UTGO) | (327.5) | (40.8) | - | - | (368.4) |
| Note B ($650m - 10yr Interest only) | (221.0) | (495.4) | (468.0) | (36.3) | (1,220.6) |
| Subtotal: hypothetical notes | (548.5) | (536.2) | (468.0) | (36.3) | (1,589.0) |
| Total hypothetical distributions / total uses | $ (1,547.8) $ | (1,784.3) $ | (1,406.5) $ | (665.2) | $ (5,403.9) |
| | | | | | |
| Surplus / (deficit) | $ 50.4 $ | 15.8 $ | 29.7 $ | 52.5 | $ 148.5 |
| Ending cash balance | $ 86.4 $ | 102.2 $ | 131.9 $ | 184.5 | $ 184.5 |

13-53846-tjt  Doc 1673-2  Filed 02/06/23  Entered 02/06/23 14:35:12  Page 16 of 77
13-53846-swr  Doc 4391  Filed 05/05/14  Entered 05/05/14 11:55:12  Page 17 of
212

Plan of Adjustment - 40 year projections
Preliminary forecast and distributions
(\$ in millions)

| | | 2014-2023 | 2024-2033 | 2034-2043 | 2044-2053 | 40-year total |
|---|---|---|---|---|---|---|
| **Total distributions to creditors** | | | | | | |
| PFRS pension (c) | \$ | (260.7) | \$ (617.7) | \$ (464.5) | \$ (311.3) | \$ (1,654.2) |
| GRS pension (c) | | (718.6) | (630.4) | (474.0) | (317.7) | (2,140.7) |
| PFRS OPEB | | (9.1) | - | - | - | (9.1) |
| GRS OPEB | | (10.9) | - | - | - | (10.9) |
| UTGO (Note A) | | (327.5) | (40.8) | - | - | (368.4) |
| Note B | | | | | | |
|   PFRS OPEB | | (78.9) | (176.9) | (167.2) | (13.0) | (436.0) |
|   GRS OPEB | | (74.1) | (166.0) | (156.8) | (12.2) | (409.0) |
|   LTGO | | (6.1) | (13.7) | (12.9) | (1.0) | (33.7) |
|   POC | | (55.0) | (123.4) | (116.5) | (9.0) | (304.0) |
|   Notes/loans payable | | (1.3) | (2.8) | (2.7) | (0.2) | (6.9) |
|   Other unsecured items | | (5.6) | (12.6) | (11.9) | (0.9) | (31.0) |
| Total hypothetical distributions to unsecured creditors | | (1,547.8) | (1,784.3) | (1,406.5) | (665.2) | (5,403.9) |
| Total secured debt service (including QOL/Exit financing) | | (811.4) | (391.0) | (67.2) | - | (1,269.5) |
| Total distributions to creditors | \$ | (2,359.2) | \$ (2,175.3) | \$ (1,473.7) | \$ (665.2) | \$ (6,673.5) |
| Percentage of total revenues (including other sources) | | 19.5% | 17.5% | 10.2% | 3.8% | 11.9% |

| | Claims (a) | | 40 years | | | |
|---|---|---|---|---|---|---|
| | \$ in millions | % | Nominal (b) | % | PV @ 5.0% (b) | % |
| PFRS pension (c) | 1,250.0 | 13% | 1,325.2 | 106% | 481.8 | 39% |
| GRS pension (c) | 1,879.0 | 19% | 1,808.9 | 96% | 895.5 | 48% |
| PFRS OPEB | 2,207.8 | 23% | 445.1 | 20% | 211.9 | 10% |
| GRS OPEB | 2,095.2 | 22% | 419.9 | 20% | 201.1 | 10% |
|   Sub-total: Pension and OPEB | 7,432.1 | 77% | 3,999.2 | 54% | 1,790.3 | 24% |
| UTGO (Note A) | 387.9 | 4% | 368.4 | 95% | 288.4 | 74% |
| Notes B (excl. OPEB) | | | | | | |
|   LTGO | 163.5 | 2% | 33.7 | 21% | 15.7 | 10% |
|   POC | 1,472.9 | 15% | 304.0 | 21% | 141.4 | 10% |
|   Notes/loans payable | 33.6 | 0% | 6.9 | 21% | 3.2 | 10% |
|   Other unsecured items | 150.0 | 2% | 31.0 | 21% | 14.4 | 10% |
|   Sub-total: Note B (excl. OPEB) | 1,820.1 | 19% | 375.6 | 21% | 174.7 | 10% |
| Total | \$ 9,640.0 | 100% | \$ 4,743.1 | 49% | \$ 2,253.4 | 23% |

Footnotes:
(a) Subject to ongoing legal review/negotiation. Final allowed claim amounts under these categories may be materially different.
(b) Nominal pension system payments have each been adjusted by \$661m for PFRS and GRS combined (State settlement & art proceeds) for the calculation of recoveries.
(c) Retirement system pension claims based on actuarial valuation as of June 30, 2013.

Plan of Adjustment - 40 year projections
Preliminary forecast and distributions
(*$ in millions*)

| | | | | | Preliminary forecast | | | | | | 2014-2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $ 247.9 | $ 256.2 | $ 262.3 | $ 268.3 | $ 274.0 | $ 279.9 | $ 286.0 | $ 292.2 | $ 298.5 | $ 304.9 | $ 2,770.2 |
| State revenue sharing | 191.5 | 192.9 | 194.5 | 196.1 | 197.8 | 199.6 | 201.4 | 194.9 | 196.6 | 198.3 | 1,963.9 |
| Wagering taxes | 169.9 | 168.2 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.5 | 180.3 | 182.1 | 1,745.7 |
| Property taxes | 114.9 | 104.5 | 106.8 | 105.2 | 105.3 | 106.6 | 106.8 | 109.6 | 113.2 | 116.9 | 1,089.7 |
| Utility users' taxes | 20.1 | 24.5 | 24.9 | 25.5 | 26.0 | 26.4 | 26.8 | 27.2 | 27.6 | 28.0 | 257.2 |
| Sales and charges for services | 131.5 | 118.0 | 115.8 | 113.7 | 111.5 | 109.3 | 107.1 | 104.5 | 103.4 | 104.1 | 1,118.9 |
| Other revenue | 86.3 | 80.1 | 78.7 | 67.3 | 66.0 | 66.3 | 66.6 | 66.9 | 67.2 | 67.5 | 712.8 |
| General Fund reimbursements | 29.8 | 42.9 | 41.7 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 264.1 |
| Transfers in for UTGO | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | 532.8 |
| Restructuring: | | | | | | | | | | | |
|   Department revenue initiatives | 7.2 | 72.0 | 48.3 | 53.0 | 56.2 | 45.8 | 46.2 | 46.1 | 50.6 | 51.8 | 477.2 |
|   QOL / exit financing proceeds (net) | 52.5 | 240.2 | - | - | - | - | - | - | - | - | 292.7 |
|     Total revenues | 1,118.2 | 1,362.1 | 1,100.7 | 1,079.6 | 1,088.1 | 1,084.5 | 1,092.4 | 1,094.0 | 1,096.5 | 1,109.0 | 11,225.1 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe - Public Safety | (245.2) | (264.1) | (270.3) | (277.5) | (284.4) | (291.5) | (297.4) | (303.3) | (309.4) | (315.6) | (2,858.7) |
| Salaries/overtime/fringe - Non-Public Safety | (85.7) | (86.9) | (86.0) | (86.1) | (88.0) | (90.2) | (92.0) | (93.8) | (95.4) | (97.3) | (901.6) |
| Health benefits (a) | (173.0) | (67.1) | (52.1) | (55.9) | (60.0) | (63.6) | (66.1) | (68.7) | (71.5) | (74.3) | (752.3) |
| OPEB payments - future retirees | (3.9) | (4.1) | (4.2) | (4.3) | (4.4) | (4.5) | (4.5) | (4.6) | (4.7) | (4.8) | (43.9) |
| Active pension plan | (17.0) | (31.4) | (32.0) | (32.9) | (33.7) | (34.5) | (35.2) | (35.9) | (36.6) | (37.4) | (326.7) |
| Other operating expenses | (290.9) | (313.6) | (312.8) | (293.3) | (296.7) | (295.7) | (297.6) | (299.4) | (306.1) | (307.7) | (3,013.7) |
| Restructuring: | | | | | | | | | | | |
|   Additional operating expenditures | (12.6) | (68.9) | (51.3) | (42.6) | (32.9) | (29.7) | (32.2) | (31.7) | (33.1) | (34.0) | (368.9) |
|   Working capital | (39.8) | 15.0 | - | - | - | - | - | - | - | - | (24.8) |
|   Secured debt service | (35.4) | (39.4) | (39.4) | (39.4) | (39.4) | (39.4) | (39.5) | (39.5) | (39.5) | (39.6) | (390.5) |
|   Contributions to income stabilization fund | - | (2.5) | (2.3) | (2.3) | (2.2) | (2.1) | (2.1) | (2.0) | (1.3) | (1.1) | (17.8) |
|   Swap interest set-aside | (45.9) | (57.8) | - | - | - | - | - | - | - | - | (103.7) |
|   QOL / exit financing principal/interest payments | (1.3) | (14.6) | (18.0) | (18.0) | (18.0) | (68.0) | (90.0) | (85.5) | (81.0) | (26.5) | (420.9) |
|   Reorganization (Capital investments) | (31.2) | (152.1) | (91.0) | (61.7) | (52.4) | (49.3) | (45.5) | (44.4) | (41.8) | (40.0) | (609.4) |
|   Restructuring professional fees | (82.2) | (47.8) | - | - | - | - | - | - | - | - | (130.0) |
|   Blight (excludes heavy commercial) | (2.0) | (98.0) | (80.0) | (80.0) | (80.0) | (80.0) | - | - | - | - | (420.0) |
|   PLD decommission | - | (25.0) | (25.0) | (25.0) | - | - | - | - | - | - | (75.0) |
| Contingency | - | (13.6) | (11.0) | (10.8) | (10.9) | (10.8) | (10.9) | (10.9) | (11.0) | (11.1) | (101.1) |
| Reinvestment deferrals | - | - | 62.5 | 38.0 | 1.7 | 59.4 | (15.4) | (10.9) | (16.0) | (74.2) | 45.2 |
|     Total expenditures | (1,066.2) | (1,271.9) | (1,012.7) | (991.7) | (1,001.2) | (1,000.0) | (1,028.4) | (1,030.7) | (1,047.5) | (1,063.6) | (10,513.8) |
| **Funds available for unsecured claims** | $ 51.9 | $ 90.3 | $ 88.0 | $ 87.9 | $ 86.9 | $ 84.5 | $ 64.0 | $ 63.3 | $ 49.1 | $ 45.4 | $ 711.3 |

*Footnotes:*
(a) Health benefits include $142.8m of OPEB payments for current retirees in FY 2014 ($123.8m) and FY 2015 ($19m).

Plan of Adjustment - 40 year projections
Preliminary forecast and distributions
*($ in millions)*

| | | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2014- 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sources** | | | | | | | | | | | | |
| Funds available for unsecured claims | $ | 51.9 $ | 90.3 $ | 88.0 $ | 87.9 $ | 86.9 $ | 84.5 $ | 64.0 $ | 63.3 $ | 49.1 $ | 45.4 $ | 711.3 |
| Revenue stream from DWSD - no transaction | | | | | | | | | | | | |
| Pension | | - | 65.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 428.5 |
| OPEB (based on 12.1% of OPEB - current retirees payments) | | - | 2.5 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 19.9 |
| POC (based on 11.5% of total POC payments) | | - | 0.4 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 6.4 |
| Sub-total: Revenue stream from DWSD | | - | 68.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 454.8 |
| Reimbursement from other funds | | - | 3.1 | 3.1 | 3.1 | 3.1 | 3.1 | 3.0 | 3.0 | 3.0 | 3.0 | 27.6 |
| Hypothetical art proceeds | | | | | | | | | | | | |
| Foundation fundraising | | - | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 18.3 | 164.7 |
| DIA contributions | | - | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 45.0 |
| State settlement | | - | 194.8 | - | - | - | - | - | - | - | - | 194.8 |
| Total hypothetical sources | $ | 51.9 $ | 379.8 $ | 162.7 $ | 162.7 $ | 161.6 $ | 159.3 $ | 138.6 $ | 137.9 $ | 123.7 $ | 120.0 $ | 1,598.2 |
| | | | | | | | | | | | | |
| **Uses** | | | | | | | | | | | | |
| Hypothetical retiree payments | | | | | | | | | | | | |
| PFRS pension payments | | - | (114.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (260.7) |
| GRS pension payments | | - | (188.2) | (76.9) | (76.9) | (76.8) | (76.6) | (56.5) | (56.5) | (55.2) | (54.9) | (718.6) |
| PFRS OPEB payments - current retirees | | (9.1) | - | - | - | - | - | - | - | - | - | (9.1) |
| GRS OPEB payments - current retirees | | (10.9) | - | - | - | - | - | - | - | - | - | (10.9) |
| Subtotal: hypothetical retiree distributions | | (20.0) | (302.5) | (95.2) | (95.2) | (95.1) | (94.9) | (74.8) | (74.8) | (73.5) | (73.2) | (999.3) |
| Hypothetical notes | | | | | | | | | | | | |
| Note A (UTGO) | | - | (45.8) | (41.5) | (41.5) | (40.5) | (38.4) | (37.8) | (37.1) | (24.1) | (20.8) | (327.5) |
| Note B ($650m - 10yr Interest only) | | - | (13.0) | (26.0) | (26.0) | (26.0) | (26.0) | (26.0) | (26.0) | (26.0) | (26.0) | (221.0) |
| Subtotal: hypothetical notes | | - | (58.8) | (67.5) | (67.5) | (66.5) | (64.4) | (63.8) | (63.1) | (50.1) | (46.8) | (548.5) |
| Total hypothetical distributions / total uses | $ | (20.0) $ | (361.4) $ | (162.7) $ | (162.7) $ | (161.6) $ | (159.3) $ | (138.6) $ | (137.9) $ | (123.7) $ | (120.0) $ | (1,547.8) |
| | | | | | | | | | | | | |
| Surplus / (deficit) | $ | 32.0 $ | 18.4 $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | 50.4 |
| Ending cash balance | $ | 68.0 $ | 86.4 $ | 86.4 $ | 86.4 $ | 86.4 $ | 86.4 $ | 86.4 $ | 86.4 $ | 86.4 $ | 86.4 $ | 86.4 |

**EXHIBIT 2**

**Version of State Contribution Agreement**
**Attached to Disclosure Statement**

**EXHIBIT I.A.268**

FORM OF STATE CONTRIBUTION AGREEMENT

# CONTRIBUTION AGREEMENT

This Contribution Agreement ("Agreement"), dated as of _____, 2014, is made by and among the Michigan Settlement Administration Authority, a Michigan body public corporate (the "Authority"), the General Retirement System for the City of Detroit, the Police and Fire Retirement System for the City of Detroit and the City of Detroit (the "City").

## RECITALS

A.    The City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 (the "Chapter 9 Case") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

B.    During the course of the Chapter 9 Case, the City has asserted that the City's Police and Fire Retirement System (the "PFRS" or a "System") and the General Retirement System (the "GRS" or a "System") are underfunded.

C.    During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan (the "State") may be obligated to pay a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes.

D.    As part of the mediation process in the Chapter 9 Case, the mediators asked the State and other parties to consider contributing funds to assist in reducing the amount of underfunding in the PFRS and GRS pension funds by providing additional settlement funds for the benefit of pensioners that would not be otherwise available.

E.    As part of its determination that the City was eligible to file the Chapter 9 Case, the Court determined that pension obligations of the City can be impaired or diminished in the Chapter 9 Case and are not protected from such impairment or diminution by the State Constitution.

F.    In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 2, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of specific conditions, to make a contribution to the GRS and PFRS in return for releases from, among other things, any claims against the State and the State Related Entities described in this Agreement.

G.    On _____ ___, 2014, the Authority was established as the disbursement agent for the State with respect to the State Contribution (as defined below).

H.    Capitalized terms used in this Agreement but not defined have the same meaning as set forth in the Plan.

NOW THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1.    State Contribution.    On the later of (a) the date on which the Conditions Precedent have been satisfied, and (b) 60 days after the Effective Date of the Plan, the Authority shall disburse $[_____] to GRS and $[_____] to PFRS (collectively, the "State Contribution")

13-53846-tjt   Doc 2638   Filed 02/06/14   Entered 02/06/14 13:55:53   Page 22 of 77
13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 13:50:12   Page 29 of
302

for the purpose of increasing the assets of the PFRS and GRS. The total aggregate State Contribution is equal to the net present value of $350,000,000 payable over 20 years determined using a discount rate of 6.75%, which results in a total contribution by the State of $194,800,000. The State Contribution shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims, each as defined in the Plan.

2. <u>Governance Requirements of the GRS and PFRS</u>. At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "<u>Investment Committee</u>") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on **Exhibit A** and **Exhibit B**, respectively, each attached to and incorporated by reference into this Agreement.

3. <u>Income Stabilization Funds and Income Stabilization Payments</u>. The City, GRS and PFRS shall establish an income stabilization program and amend the governing documents for GRS and the governing documents for PFRS to include the following:

    a.    A supplemental pension income stabilization payment (the "<u>Income Stabilization Payment</u>") payable on an annual basis beginning not later than 120 days after the Effective Date, to each Eligible Pensioner equal to the lesser of (a) the amount needed to restore the Eligible Pensioner's reduced pension benefit to the amount of the pension benefit that the Eligible Pensioner received from GRS or PFRS in 2013, or (b) the amount needed to bring the total annual household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

    b.    In addition, to the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income in any calendar year is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit ("<u>Income Stabilization Benefit Plus</u>"). The Income Stabilization Benefit Plus shall be equal to the lesser of either (a) the amount needed to restore 100% of the Eligible Pensioner's pension benefits, including escalators and cost of living adjustments; or (b) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

    c.    An Eligible Pensioner's "<u>Estimated Adjusted Annual Household Income</u>" shall be calculated as follows: (i) the annual pension benefit amount paid in 2013 shall be subtracted from the Eligible Pensioner's 2013 total household income (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation), as adjusted for inflation or Social Security COLA increases, to create a base additional income amount, plus (ii) the following three items as applicable, (x) the reduced pension benefit that GRS or PFRS will pay the

Eligible Pensioner for that year, (y) any GRS or PFRS pension restoration due to an improved GRS or PFRS funding level, and (z) the Eligible Pensioner's Income Stabilization Benefit. Notwithstanding the foregoing, Income Stabilization Payments, including the Income Stabilization Benefit Plus, under both GRS and PFRS shall not exceed $20 million in aggregate.

d.    A separate recordkeeping sub-account called the "Income Stabilization Fund" will be set up under each of GRS and PFRS for the sole purpose of paying the Income Stabilization Payments, including Income Stabilization Benefit Plus payments, to Eligible Pensioners. The assets credited to the sub-accounts will be invested on a commingled basis with the applicable System's assets and will be credited with a pro-rata portion of the System's earnings and losses.

e.    Amounts credited to the Income Stabilization Fund, including the Assigned UTGO Bond Tax Proceeds, may not be used for any purpose other than the payment of Income Stabilization Payments, including Income Stabilization Benefit Plus payments, to Eligible Pensioners, except as expressly provided in subparagraph (f) below.

f.    In 2022, provided that the State has not issued a certificate of default with respect to a System at any time prior to 2022, the Investment Committee for that System shall conduct a valuation to determine the Income Stabilization Payments, including Income Stabilization Benefit Plus payments, anticipated to be made from the System in the future, in order for the System to fulfill the obligation to make such payments (the "Estimated Future Liability"). In the event that 75% of the independent members of the Investment Committee determine that the GRS or PFRS Income Stabilization Fund is credited with assets in excess of its Estimated Future Liability (the "Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board of Trustees that the Excess Assets, but not more than $35 million, be used to fund that System's Adjusted Pension Benefits. The Investment Committee shall have the right to engage professionals to assist in this task as necessary, and such expenses shall be paid by the Systems. If any funds remain in the GRS or PFRS Income Stabilization Fund on the date upon which no Eligible Pensioners under their respective System are living, the remainder of that System's Income Stabilization Fund shall be used to fund that System's Adjusted Pension Benefits.

g.    "Eligible Pensioners" are those retirees or surviving spouses who are at least 60 years of age or those minor children receiving survivor benefits from GRS or PFRS, each as of the Effective Date, whose pension benefit from GRS or PFRS will be reduced by the confirmed Plan, and who have a total household income equal to or less than 140% of the Federal Poverty Line in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation).

CLI-2209145v1                                    3

13-53846-tjt   Doc 2678-1   Filed 02/06/03   Entered 02/06/23 14:13:53   Page 24 of 77
13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 11:50:12   Page 24 of 47
302

No new persons will be eligible to receive an Income Stabilization Payment at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

h.   The initial determination of Eligible Pensioners, and the amounts of Income Stabilization Payments payable to Eligible Pensioners shall be made by the State in its sole discretion.  The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board of Trustees of GRS and PFRS, as applicable. The Board of Trustees, with the assistance of the Investment Committee of GRS and PFRS, shall be responsible for properly administering the respective Income Stabilization Fund and annually certifying to the Treasurer that it has properly administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners.

4.   <u>Conditions Precedent</u>.  The Authority's obligations under this Agreement are not effective or enforceable until each of the following conditions (the "<u>Conditions Precedent</u>") have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer:

a.   The Authority receives the State Contribution from the State.

b.   An endorsement of the Plan by the Official Retiree Committee which will include a letter from the Official Retiree Committee as part of the Plan solicitation package recommending to Classes 10 and 11 a vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in the respective classes.

c.   Cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, as it related to the City (a) challenging PA 436 or any actions taken pursuant to PA 436, including but not limited to, a dismissal with prejudice of the cases set forth on **Exhibit D**, or (b) seeking to enforce Article IX, Section 24 of the Michigan Constitution.

d.   Active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way (including funding) the litigation described in subparagraph 4(c) by the parties listed on **Exhibit C**, or equivalent assurance of litigation finality

e.   Classes 10 and 11 accept the Plan.

f.   By September 30, 2014, the Court enters a final, non-appealable order confirming the Plan that includes, at a minimum, the following:

i.   A release of the State and State Related Entities by each holder of a Pension Claim of all Liabilities arising from or related to the

13-53846-tjt   Doc 2638   Filed 02/06/23   Entered 02/06/23 14:35:53   Page 25 of 57
13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 13:50:12   Page 25 of 77
302

City, the Chapter 9 case (including the authorization to file the Chapter 9 Case), the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution.

ii.     A requirement that the governing documents of GRS and the governing documents of PFRS be amended to include:

    a)     the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of this Agreement; and

    b)     the Income Stabilization Payments, the Income Stabilization Benefit Plus payments, and Income Stabilization Fund described in Paragraph 3 of this Agreement.

iii.    Approval of, and authority for the City to enter into, the UTGO Settlement.

iv.    A requirement that the City irrevocably assigns the right to receive not less than an aggregate amount of $20,000,000 of the payments on the Reinstated Stub UTGO Bonds to the Income Stabilization Funds of the GRS and PFRS. Such payments will be made to the Income Stabilization Funds in the form of annual installment payments over a 14 year period, **[pursuant to a payment schedule approved by the State.]**

v.     Approval of, and authority for the City to enter into, the DIA Settlement.

vi.    Agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant to MCL 141.1563, or compliance with any new legislation that is enacted regarding post-bankruptcy governance.

g.     Evidence satisfactory to the State of an irrevocable commitment by:

i.      The Foundations to fund $366,000,000 (or the net present value thereof) as part of the DIA Settlement; and

ii.     The DIA Corp. to fund $100,000,000 (or the net present value thereof) as part of the DIA Settlement.

h.     The Plan Effective Date occurs on or before December 31, 2014.

5.     <u>Non-occurrence of Conditions Precedent.</u>    If the Conditions Precedent are not met to the satisfaction of the Authority and the Treasurer on or before December 31, 2014, upon

CLI-2209145v1                                   5

13-53846-tjt   Doc 2678   Filed 02/06/14   Entered 02/06/14 13:55:12   Page 26 of 77
13-53846-swr   Doc 4351-1   Filed 04/09/14   Entered 04/09/14 13:50:12   Page 29 of 77
302

written request of the Treasurer, the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement.

6. Default by GRS and PFRS and Remedies.

a. A System will be in default if the System has not complied with any of the conditions set forth in the Plan, its respective governing documents, or this Agreement, including but not limited to failing to make the required Income Stabilization Payments or Income Stabilization Benefit Plus payments, or using funds in the Income Stabilization Fund for unauthorized purposes.

b. In the event of default by a System, and failure of the System to promptly cure such default to the satisfaction of the Treasurer within the time period reasonably established by the Treasurer, no portion of the total State Contribution to the defaulting System, as adjusted for earnings and losses, may be taken into consideration by the System during the remainder of the 20 year period following the date of such default for purposes of determining whether benefits reduced by the Plan may be restored. Notwithstanding the foregoing, in the event that a default is cured in a subsequent year, the Treasurer may determine in his or her sole discretion (taking into consideration such factors as the financial impact of the default on the System) that the defaulting System may once again include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

c. Each Board of Trustees shall provide reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request in order for the Treasurer to determine that the conditions set forth herein have been satisfied. The Treasurer shall provide either a certificate of compliance, or in the event of a default that has not been cured to the Treasurer's satisfaction, a notice of default, upon request of the System or any of the independent members of the Board of Trustees.

d. Notwithstanding the foregoing, in the event of a default, the Treasurer and the Authority shall have the right to pursue all available legal and equitable remedies against the Board of Trustees for the defaulting System, the Investment Committee, or any other person.

7. Execution in Counterparts. This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

8. Governing Law/Jurisdiction. This Agreement shall be construed in accordance with the laws of the State of Michigan, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with

13-53846-tjt   Doc 2638-1   Filed 02/06/03   Entered 02/06/03 14:35:53   Page 27 of 77
13-53846-swr   Doc 4391-1   Filed 05/06/14   Entered 05/06/14 13:55:12   Page 29 of
302

such laws. The Bankruptcy Court of the Eastern District of Michigan shall have exclusive jurisdiction over any action or proceeding solely with respect to this Agreement, and each party, to the extent permitted by law, agrees to submit to such jurisdiction and to waive any defense based on venue or jurisdiction of such court.

9.    Amendment.    This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

10.    Limitation of Liability.    The obligation to make the State Contribution is not a general obligation or indebtedness of the State or the Authority and is subject to satisfaction of the conditions described herein. Furthermore, neither the State nor the Authority has any liability or obligation arising from or related to the contributions and funding of the Income Stabilization Fund of each System. Notwithstanding anything contained herein to the contrary, no State Related Entity or board member of the Authority shall have any liability for the representations, warranties, covenants, agreements or other obligations of the State or the Authority hereunder or in any of the certificates, notices or agreements delivered pursuant hereto.

11.    Severability.    If any one or more of the covenants, agreements or provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the invalidity of any such covenants, agreements and provisions shall in no way affect the validity or effectiveness of the remainder of this Agreement, and it shall continue in force to the fullest extent permitted by law.

12.    Headings.    Any headings preceding the text of the several articles and sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience or reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

[Remainder of Page Intentionally Left Blank – Signatures on Following Page]

CLI-2209145v1                                              7

13-53846-tjt   Doc 2678-1   Filed 02/06/23   Entered 02/06/23 14:35:53   Page 28 of 77
13-53846-swr   Doc 4391-1   Filed 08/05/14   Entered 08/05/14 13:50:12   Page 29 of
302

**MICHIGAN SETTLEMENT ADMINISTRATION AUTHORITY**

By: _____
Title: Authorized Officer


**GENERAL RETIREMENT SYSTEM FOR THE CITY OF DETROIT**

By: _____
Title: Authorized Officer


**POLICE AND FIRE RETIREMENT SYSTEM FOR THE CITY OF DETROIT**

By: _____
Title: Authorized Officer


**CITY OF DETROIT**

By: _____
Title: Emergency Manager

**EXHIBIT A – GRS Governance Terms**

*In re City of Detroit, Michigan*

INVESTMENT COMMITTEE GOVERNANCE
FOR GENERAL RETIREMENT SYSTEM

| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement applicable to the General Retirement System of the City of Detroit (GRS). |
|---|---|
| SCOPE OF GOVERNANCE | The GRS is currently administered by a ten (10) member Board of Trustees that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System. The GRS Board currently makes all administrative, actuarial and investment related decisions for the GRS. Upon the Effective Date under the POA, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the GRS Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The GRS Investment Committee ("GRS IC") shall consist of seven (7) voting members consisting of:<br>  i. Five (5) Independent Members;<br>  ii. One (1) Employee Member; and<br>  iii. One (1) Retiree Member.<br>Collectively, or individually, "Members" or "Member".<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan. None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4).<br><br>Each Independent Member of the GRS IC shall have expert knowledge or extensive experience with respect to either: (a) economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the GRS IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the GRS IC Independent Members shall satisfy the requirements of (b) above.<br>The five (5) initial GRS IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the City and the GRS Board, in consultation with the Foundations, and named in the POA Successor Independent Members shall be appointed by a majority of the remaining Independent Members after three (3) weeks' notice to the GRS Board and the State Treasurer of the individuals chosen, in accordance with such rules and regulations |

CLI-2209295v2

13-53846-tjt-swr   Doc 1378   Doc 4391-1   Filed 02/06/23   Filed 09/05/14   Entered 02/06/23 14:35:53   Entered 09/05/14 13:55:12   Page 31 of 77   Page 20 of 77
302

as may be adopted by the GRS IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

If the five (5) initial GRS IC Independent Members are not selected by mutual agreement by the time of confirmation of the City's Plan of Adjustment, then the five (5) initial GRS IC Independent Members shall be selected by the Bankruptcy Court.

In the event the Bankruptcy Court selects the Independent Members as described immediately above, Successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the GRS Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the GRS IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Member shall be an employee-elected Member from the GRS Board appointed by the GRS Board. The initial Employee Member will be _____.

The Retiree Member shall be a retiree-elected Member from the GRS Board appointed by the GRS Board. The initial Retiree Member will be _____.

The terms of office of the initial GRS IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the GRS IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the GRS IC and neglects to perform those duties, (b) the Member has committed a material breach of GRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the GRS IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC

CLI-2209295v2 2

13-53846-tjt   Doc 4391-1   Filed 02/06/23   Entered 02/06/23 14:35:53   Page 32 of 77
13-53846-swr   Doc 1678   Filed 08/05/14   Entered 08/05/14 13:55:12   Page 202 of 302

| | |
|---|---|
| | Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by avote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the GRS IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled. <br><br> All members of the GRS IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the GRS shall be payable out of the investment returns of the GRS. <br><br> The GRS IC shall be an investment fiduciary to the GRS. An IC Member or other fiduciary under the GRS shall discharge his or her duties with respect to the GRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the GRS IC shall comply with all GRS Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| GRS IC MEETINGS | The GRS IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members. <br><br> Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.). <br><br> The GRS IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the GRS IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall |

CLI-2209295v2 3

13-53846-tjr Doc 2638-1 Filed 02/06/23 Entered 02/06/23 14:35:53 Page 33 of 77
13-53846-swr Doc 4351-1 Filed 05/05/14 Entered 05/05/14 11:55:12 Page 203 of 302

| | |
|---|---|
| | be necessary for a decision of the committee. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The GRS IC shall serve in a fiduciary capacity with respect to the Investment Management of all GRS Plan Assets, the investment return assumption, and GRS Board compliance with benefit plan provisions, as set forth more fully below.  The GRS IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5).<br><br>All Investment Management decisions approved by the GRS Board shall require a recommendation by an affirmative vote of the GRS IC, in accordance with the provisions of this agreement. All actions and recommendations of the GRS IC shall be forwarded to the GRS Board for consideration and are subject to GRS Board approval.  The GRS Board shall take no action with respect to any matter for which the GRS IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the GRS IC.   If the GRS Board fails to act with respect to an Investment Management decision that has been recommended by an affirmative vote of the GRS IC, and such failure continues for 45 days after the date that the recommendation was made to the GRS Board, then the GRS Board shall be deemed to have agreed to the recommended Investment Management decision and the Chief Investment Officer is authorized to implement the decision.  If the GRS Board disapproves action recommended by an affirmative vote of the GRS IC and does not provide a detailed written response outlining the reasons for such disapproval, then the GRS Board shall be deemed to have agreed to the recommended Investment Management decision and the Chief Investment Officer is authorized to implement the decision.  If the GRS Board disapproves such action and provides  a detailed written response outlining the reasons for such disapproval, the IC shall have 45 days after the receipt of the response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days of such request by the GRS IC, unless a later date is agreed to in writing by the GRS Board and the GRS IC, to discuss the disapproval by the Board described in the written response.  Within ten (10) days of the conclusion of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the IC, the GRS Board shall be deemed to have agreed to the recommended Investment Management decision and the Chief Investment Officer is authorized to implement the decision.<br><br>"Investment Management" with respect to GRS Plan Assets shall mean:<br>    1. Developing sound and consistent investment goals, objectives and performance measurement standards |

CLI-2209295v2 4

13-53846-tjt  Doc 2638-1 Filed 02/06/23 Entered 02/06/23 14:35:53 Page 34 of 77
13-53846-swr  Doc 4391 Filed 05/05/14 Entered 05/05/14 13:50:12 Page 204 of 302

which are consistent with the needs of the Plan.

2. Within 120 days after the Effective Date of the POA, all of the GRS assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.

3. Evaluating and selecting Qualified Manager(s) to invest and manage the Plan's assets.

4. Evaluating and selecting the Plan Actuary to prepare annual actuarial valuation reports and any other projections or reports used to determine restoration of pension benefits.

5. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

6. Determining how Plan assets should be allocated among various asset classes.

7. Determining, in conjunction with the Plan Actuary, any and all calculations and/or assessments underlying the restoration of pension benefits.

8. Reviewing and evaluating the results of the investment managers in context with established standards of performance, including restoration of pension benefits.

9. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

10. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

11. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

12. Reviewing and approving, prior to issuance, the annual audit and all financial reports prepared on behalf of the GRS.

13. Causing an asset/liability valuation study to be performed for GRS every two (2) years, or as requested by the GRS IC or GRS Board.

The GRS IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of asset allocation policy, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.

2. In establishing the GRS investment allocation and

| | investment policy target return, the desire to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Variable Restoration Program, to the extent that is prudent.<br>3. The liquidity needs of the GRS Plan.<br><br>The fact that the IC makes a recommendation to the Board which is not recommended by the CRS CIO or the Investment Consultant shall not be a basis or factor in determining a breach of fiduciary duty. |
|---|---|
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall have the exclusive power to retain and discharge the GRS CIO, set and approve any and all compensation for, and terms of employment of, the GRS CIO. With respect to GRS plan assets, the GRS CIO shall report directly to the GRS IC and the GRS Board. The CIO shall be responsible for assisting the GRS IC and the GRS Board in overseeing the GRS's investment portfolio. |
| PLAN ACTUARY | [To Be Negotiated and Agreed Upon] |
| QUALIFIED MANAGER(S) | [To Be Negotiated and Agreed Upon] |

DETROIT 56620-1 1313895v8

13-53846-tjt  Doc 2638-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 36 of 77
13-53846-swr  Doc 4351-1  Filed 08/05/14  Entered 08/05/14 13:55:12  Page 26 of 73
302

**EXHIBIT B – PFRS Governance Terms**

CLI-2209145v1

13-53846-tjt   Doc 1373-1   Filed 02/06/23   Entered 02/06/23 14:35:53   Page 37 of 77
13-53846-swr   Doc 4391-1   Filed 09/05/14   Entered 09/05/14 13:55:12   Page 207 of
302

# INVESTMENT COMMITTEE GOVERNANCE
## FOR POLICE AND FIRE RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirement under the State Contribution Agreement applicable to the Police and Fire Retirement System of the City of Detroit (PFRS). |
| SCOPE OF GOVERNANCE | The PFRS is currently administered by a ten (10) member Board of Trustees that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System.  The PFRS Board currently makes all administrative, actuarial and investment related decisions for the PFRS.  Upon the Effective Date under the POA, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA.  All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the PFRS Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The PFRS Investment Committee ("PFRS IC") shall consist of nine (9) voting members consisting of: <br> i. Five (5) Independent Members; <br> ii. Two (2) Employee Members; and <br> iii. Two (2) Retiree Members. <br><br> There shall be one Employee Member elected by the active police officers eligible for a pension from the PFRS and one from the active firefighters eligible for a pension from the PFRS. <br><br> There shall be one Retiree Member elected by the retired police officers receiving a pension from the PFRS and one retired firefighter receiving a pension from the PFRS.  Each of the four (4) uniformed Members shall have one-half (1/2) vote. <br><br> At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan.  None of the Independent Members shall be a party in interest as defined in MCL 38.1132d(4). <br><br> Each Independent Member of the PFRS IC shall have expert knowledge or extensive experience with respect to either: (a) |

CLI-2209303v2

13-53846-tjt  Doc 2978-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 38 of 77
13-53846-swr  Doc 4391-1  Filed 05/05/14  Entered 05/05/14 13:50:12  Page 208 of
302

economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the PFRS IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the PFRS IC Independent Members shall satisfy the requirements of (b) above.

The five (5) initial GRS IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the City and the GRS Board, in consultation with the Foundations, and named in the POA. Successor Independent Members shall be appointed by a majority of the remaining Independent Members after three (3) weeks' notice to the GRS Board and the State Treasurer of the individuals chosen, in accordance with such rules and regulations as may be adopted by the GRS IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

If the five (5) initial GRS IC Independent Members are not selected by mutual agreement by the time of confirmation of the City's Plan of adjustment, then the five (5) initial GRS IC Independent Members shall be selected by the Bankruptcy Court.

In the event the Bankruptcy Court selects the Independent Members as described immediately above, Successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the GRS Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the GRS IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Members shall be employee-elected Members from the PFRS Board appointed by the PFRS Board. The initial Employee Members will be _____.

The Retiree Members shall be retiree-elected Members from the PFRS Board appointed by the PFRS Board. The initial Retiree Members will be _____.

The terms of office of the initial PFRS IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent

2

13-53846-tjt  Doc 2678  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 39 of 77
13-53846-swr  Doc 4391-1  Filed 05/05/14  Entered 05/05/14 13:50:12  Page 39 of 77
302

Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the PFRS IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the PFRS IC and neglects to perform those duties, (b) the Member has committed a material breach of PFRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the PFRS IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the PFRS IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the PFRS IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the PFRS shall be payable out of the investment returns of the PFRS.

The PFRS IC shall be an investment fiduciary to the PFRS. An

3

CLI-2209303v2

13-53846-tjt  Doc 2708-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 40 of 77
13-53846-swr  Doc 4391-1  Filed 05/05/14  Entered 05/05/14 13:50:12  Page 27 of 77
302

| | |
|---|---|
| | IC Member or other fiduciary under the PFRS shall discharge his or her duties with respect to the PFRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the PFRS IC shall comply with all PFRS Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| PFRS IC MEETINGS | The PFRS IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members. |
| | Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.). |
| | The PFRS IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the PFRS IC, so long as at least three (3) Independent Members are present. Each Independent Member shall be entitled to one vote on each question before the IC and each Employee Member and Retiree Member shall be entitled to one-half (1/2) vote on each question before the IC. In each case, at least four (4) concurring votes shall be necessary for a decision of the committee. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The PFRS IC shall serve in a fiduciary capacity with respect to the Investment Management of all PFRS Plan Assets, the investment return assumption, and PFRS Board compliance with benefit plan provisions, as set forth more fully below. The PFRS IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5). |
| | All Investment Management decisions approved by the PFRS Board shall require a recommendation by an affirmative vote of the PFRS IC, in accordance with the provisions of this agreement. All actions and recommendations of the PFRS IC shall be forwarded to the PFRS Board for consideration and are |

4

CLI-2209303v2

13-53846-tjt   Doc 4391-1   Filed 02/08/23   Entered 02/08/23 14:35:12   Page 41 of 77
13-53846-swr   Doc 2673-1   Filed 02/06/14   Entered 02/06/14 13:55:12   Page 12 of 17
302

subject to PFRS Board approval.  The PFRS Board shall take no action with respect to any matter for which the PFRS IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the PFRS IC.  If the PFRS Board fails to act with respect to an Investment Management decision that has been recommended by an affirmative vote of the PFRS IC, and such failure continues for 45 days after the date that the recommendation was made to the PFRS Board, then the PFRS Board shall be deemed to have agreed to the recommended Investment Management decision and the Chief Investment Officer is authorized to implement the decision.  If the PFRS Board disapproves action recommended by an affirmative vote of the PFRS IC and does not provide a detailed written response outlining the reasons for such disapproval, then the PFRS Board shall be deemed to have agreed to the recommended Investment Management decision and the Chief Investment Officer is authorized to implement the decision.  If the PFRS Board disapproves such action and provides  a detailed written response outlining the reasons for such disapproval, the PFRS IC shall have 45 days after the receipt of the response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days of such request by the PFRS IC, unless a later date is agreed to in writing by the PFRS Board and the PFRS IC, to discuss the disapproval by the Board described in the written response. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either  withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the IC, the PFRS Board shall be deemed to have agreed to the recommended Investment Management decision and the Chief Investment Officer is authorized to implement the decision.

"Investment Management" with respect to PFRS Plan Assets shall mean:

1.  Developing sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.
2.  Within 120 days after the Effective Date of the POA, all of the PFRS assets not already under qualified management, if any, must be  managed by qualified managers selected by the IC.

5

3. Evaluating and selecting Qualified Manager(s) to invest and manage the Plan's assets.
4. Evaluating and selecting the Plan Actuary to prepare annual actuarial valuation reports and any other projections or reports used to determine restoration of pension benefits.
5. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.
6. Determining how Plan assets should be allocated among various asset classes.
7. Determining, in conjunction with the Plan Actuary, any and all calculations and/or assessments underlying the restoration of pension benefits.
8. Reviewing and evaluating the results of the investment managers in context with established standards of performance, including restoration of pension benefits.
9. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.
10. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.
11. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.
12. Reviewing and approving, prior to issuance, the annual audit and all financial reports prepared on behalf of the PFRS.
13. Causing an asset/liability valuation study to be performed for PFRS every two (2) years, or as requested by the PFRS IC or PFRS Board.

The PFRS IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of asset allocation policy, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.
2. In establishing the PFRS investment allocation and investment policy target return, the desire to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Variable Restoration Program, to the extent that is prudent.

6

CLI-2209303v2

13-53846-tjt   Doc 1368-1   Filed 02/06/23   Entered 02/06/23 14:35:53   Page 43 of 77
13-53846-swr   Doc 4351-1   Filed 05/05/14   Entered 05/05/14 13:55:12   Page 272 of 302

| | |
|---|---|
| | 3.  The liquidity needs of the PFRS Plan.<br><br>The fact that the IC makes a recommendation to the Board which is not recommended by the CRS CIO or the Investment Consultant shall not be a basis or factor in determining a breach of fiduciary duty. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall have the exclusive power to retain and discharge the PFRS CIO, set and approve any and all compensation for, and terms of employment of, the PFRS CIO.  With respect to PFRS plan assets, the PFRS CIO shall report directly to the PFRS IC and the PFRS Board.  The CIO shall be responsible for assisting the PFRS IC and the PFRS Board in overseeing the PFRS's investment portfolio. |
| PLAN ACTUARY | [To Be Negotiated and Agreed Upon] |
| QUALIFIED MANAGER(S) | [To Be Negotiated and Agreed Upon] |

DETROIT 56620-1 1314911v2

7

CLI-2209303v2
13-53846-swr  Doc 1638-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 44 of 77
13-53846-tjt  Doc 4391-1  Filed 05/05/14  Entered 05/05/14 13:55:12  Page 274 of 302

**EXHIBIT C**

1. General Retirement System

2. Police and Fire Retirement System

3. AFSCME

4. UAW

5. Detroit Police Officers Association

6. Detroit Police Command Officers Association

7. Detroit Police Lieutenants and Sergeants Association

8. Detroit Fire Fighters Association

9. Retired Detroit Police and Fire Fighters Association

10. Retired Detroit Police Members Association

11. Detroit Retired City Employees Association

12. Official Retirees Committee

13. City of Detroit

CLI-2209145v1

13-53846-tjt   Doc 13578-1   Filed 02/06/23   Entered 02/06/23 14:35:53   Page 45 of 77
13-53846-swr   Doc 4391-1   Filed 05/05/14   Entered 05/05/14 13:50:12   Page 27 of 302

**EXHIBIT D**

LANSING 40432-1 490647v9

CLI-2209145v1

13-53846-tjt Doc 13673-1 Filed 02/06/23 Entered 02/06/23 14:35:53 Page 46 of 77
13-53846-swr Doc 4301-1 Filed 09/05/14 Entered 09/05/14 13:50:12 Page 276 of 302

Cases to be dismissed:

1. GRS et al. v. Emergency Manager of Detroit (Ingham County Circuit Court)
2. United Retired Government Employees (URGE) et al. v. Governor, et al. (E.D. Mich.)
3. Webster et al. v. State of Michigan, Governor, and State Treasurer (Ingham County Circuit Court)
4. Detroit Library Commission v. Governor, State Treasurer, and Detroit Public Schools Emergency Manager (Ingham County)
5. Flowers et al. v. Governor, State Treasurer, and State of Michigan (Ingham County Circuit Court)
6. DPOA v. City of Detroit (Michigan Court of Appeals)

The settling parties will not attempt to amend to include the City of Detroit or its Emergency Manager as a defendant, or collaterally or retroactively attack the Detroit bankruptcy or actions of Detroit or its EM, or otherwise participate, support, fund, or appeal in the following cases:

1. Phillips et al v. Governor and State Treasurer (E.D. Mich.)
2. Michigan AFSCME Council 25 v. Governor, State Treasurer, et al. (E.D. Mich.)
3. NAACP v. Governor, State Treasurer, and Secretary of State (E.D. Mich.)
4. Robert Davis/Citizens United Against Corrupt Government v. Governor, State of Michigan, Dept. of Treasury, Dept. of State Police, et al. (Ingham County Circuit Court)
5. Robert Davis/Citizens United Against Corrupt Government v. Michigan Department of Treasury and Carla Robert (Wayne County Circuit Court)
6. Robert Davis v. Local Emergency Financial Assistance Loan Board (Ingham Court)
7. Robert Davis v. Weatherspoon, Governor, Attorney General, and State Treasurer (E.D. Mich.)
8. Allen Park Retirees v. EM Parker, City of Allen Park (Wayne Circuit)
9. Allen Park Retirees v. State (Court of Claims)
10. Deborah Moore-El v. Snyder (E.D. Mich.)
11. Faith, et al. v. Snyder (E.D. Mich.)
12. Sarella Johnson, et al. v. Snyder (E.D. Mich.)

# EXHIBIT 3

## Revised Version of State Contribution Agreement Attached to Plan

**EXHIBIT I.A.332**

STATE CONTRIBUTION AGREEMENT

# CONTRIBUTION AGREEMENT

This Contribution Agreement ("Agreement"), dated as of _____, 2014, is made by and among the Michigan Settlement Administration Authority, a Michigan body public corporate (the "Authority"), the General Retirement System of the City of Detroit, the Police and Fire Retirement System of the City of Detroit and the City of Detroit (the "City").

## RECITALS

A.     The City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 (the "Chapter 9 Case") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

B.     During the course of the Chapter 9 Case, the City has asserted that the City's Police and Fire Retirement System (the "PFRS" or a "System") and the General Retirement System (the "GRS" or a "System" and collectively with the PFRS, the "Systems") are underfunded.

C.     During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan (the "State") may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes.

D.     As part of the mediation process in the Chapter 9 Case, the mediators asked the State and other parties to assist in reducing the amount of underfunding in the PFRS and GRS pension funds by providing settlement funds for the benefit of pensioners that would not be otherwise available.

E.     As part of its determination that the City was eligible to file the Chapter 9 Case, the Court determined that pension obligations of the City can be impaired or diminished in the Chapter 9 Case and are not protected from such impairment or diminution by the State Constitution.

F.     In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 5, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS in return for releases from, among others, the GRS and PFRS as set forth in the Support and Release Agreement entered into by the State and each of the Systems in connection with this matter.

G.     On June 20, 2014, the Authority was established as the disbursement agent for the State with respect to the State Contribution (as defined below).

H.     Capitalized terms used in this Agreement but not defined have the same meanings as set forth in the Plan.

1

13-53846-tjt   Doc 13076   Filed 02/06/23   Entered 02/06/23 14:05:53   Page 50 of 77
13-53846-swr   Doc 8048-1   Filed 10/22/14   Entered 10/22/14 03:45:29   Page 715 of
809

NOW THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1. <u>State Contribution</u>. On the later of (a) the date on which the Conditions Precedent have been satisfied, and (b) 60 days after the Effective Date of the Plan, the Authority shall disburse $98,800,000 to GRS and $96,000,000 to PFRS (collectively, the "<u>State Contribution</u>") for the purpose of increasing the assets of the PFRS and GRS. The total aggregate State Contribution is equal to the net present value of $350,000,000 payable over 20 years determined using a discount rate of 6.75%, which results in a total contribution by the State of $194,800,000. The State Contribution shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims, each as defined in the Plan.

2. <u>Governance Requirements of the GRS and PFRS</u>. At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "<u>Investment Committee</u>") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on **Exhibit A** and **Exhibit B**, respectively, each attached to and incorporated by reference into this Agreement. Further, the Emergency Manager for the City and any subsequently appointed emergency manager for the City, appointed under PA 436 or under any successor or replacement statutes to PA 436, shall not seek to exercise any powers granted under section 12(1)(m) of PA 436 (or equivalent provision under any successor or replacement statute) against the Board of GRS or the Board of PFRS until the earlier of (a) one year following entry of an order confirming the Plan, and (b) December 31, 2015.

3. <u>Income Stabilization Funds and Income Stabilization Payments</u>. The City, GRS and PFRS shall establish an income stabilization program and amend the governing documents for GRS and the governing documents for PFRS to include the following:

    a.     A supplemental pension income stabilization payment (the "<u>Income Stabilization Payments</u>") payable on an annual basis beginning not later than 120 days after the Effective Date, to each Eligible Pensioner equal to the lesser of (a) the amount needed to restore the Eligible Pensioner's reduced pension benefit to the amount of pension benefit that the Eligible Pensioner received from GRS or PFRS in 2013, or (b) the amount needed to bring the total annual household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

    b.     In addition, to the extent an Eligible Pension's Estimated Adjusted Annual Household Income in any calendar year is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit ("<u>Income Stabilization Benefit Plus</u>"). The Income Stabilization Benefit Plus shall be equal to the lesser of either (a) 100% restoration of pension benefits, including escalators and cost of living adjustments; or (b) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

2

c.     An Eligible Pensioner's "Estimated Adjusted Annual Household Income" shall be calculated as follows: (i) the annual pension benefit amount paid in 2013 shall be subtracted from the Eligible Pensioner's 2013 total household income (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation) as adjusted for inflation or Social Security COLA increases to create a base additional income amount, plus (ii) the following three items as applicable, (x) the reduced pension benefit that GRS will pay the Eligible Pensioner for that year, (y) any GRS pension restoration due to an improved GRS funding level, and (z) the Eligible Pensioner's Income Stabilization Benefit. Notwithstanding the foregoing, Income Stabilization Payments, including the Income Stabilization Benefit Plus, under both GRS and PFRS shall not exceed $20 million in aggregate.

d.     A separate recordkeeping sub-account called the "Income Stabilization Fund" will be set up under each of GRS and PFRS for the sole purpose of paying the Income Stabilization Payments to Eligible Pensioners. The assets credited to the sub-accounts will be invested on a commingled basis with the applicable System's assets and will be credited with a pro-rata portion of the System's earnings and losses.

e.     Amounts credited to the Income Stabilization Fund, including the Assigned UTGO Bond Tax Proceeds, may not be used for any purpose other than the payment of Income Stabilization Payments to Eligible Pensioners, except as expressly provided in subparagraph (f) below.

f.     In 2022, provided that the State has not issued a certificate of default with respect to a System at any time prior to 2022, the Investment Committee for that System shall conduct a valuation to determine the Income Stabilization Payments anticipated to be made from the System in the future, in order for the System to fulfill the obligation to make Income Stabilization Payments (the "Estimated Future Liability"). In the event that 75% of the independent members of the Investment Committee determine that the GRS or PFRS Income Stabilization Fund is credited with assets in excess of its Estimated Future Liability (the "Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board of Trustees that the Excess Assets, but not more than $35 million, be used to fund each System's payment of Adjusted Pension Amounts. The Investment Committee shall have the right to engage professionals to assist in this task as necessary, and such expenses shall be paid by the Systems. If any funds remain in the GRS or PFRS Income Stabilization Fund on the date upon which no Eligible Pensioners under their respective System are living, the remainder of each System's Income Stabilization Fund shall be used to fund each System's payment of Adjusted Pension Amounts.

3

g.      "Eligible Pensioners" are those retirees or surviving spouses who are at least 60 years of age or those minor children receiving survivor benefits from GRS or PFRS, each as of the Effective Date, whose pension benefit from GRS or PFRS will be reduced by the confirmed Plan, and who have a total household income equal to or less than 140% of the Federal Poverty Line in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation). No new persons will be eligible to receive an Income Stabilization Payment at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

h.      The initial determination of Eligible Pensioners, and the amounts of Income Stabilization Payments payable to Eligible Pensioners shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board of Trustees of GRS and PFRS, as applicable. The Board of Trustees, with the assistance of the Investment Committee of GRS and PFRS, shall be responsible for properly administering the respective Income Stabilization Fund and annually certifying to the Treasurer that it has properly administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners.

4.      Conditions Precedent. The Authority's obligations under this Agreement are not effective or enforceable until each of the following conditions (the "Conditions Precedent") have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer:

a.      The Authority receives the State Contribution from the State.

b.      An endorsement of the Plan by the Official Retiree Committee which will include a letter from the Official Retiree Committee as part of the Plan solicitation package recommending to Classes 10 and 11 a vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in the respective classes.

c.      Cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City (a) challenging PA 436 or any actions taken pursuant to PA 436, including but not limited to, a dismissal with prejudice of the cases set forth on **Exhibit D**, or (b) seeking to enforce Article IX, Section 24 of the Michigan Constitution; provided, however, (i) until the State Contribution is received by the Systems, the Systems agree to stay any pending litigation described in this subparagraph, and (ii) that as a condition precedent to the GRS and the PFRS dismissing any pending litigation described in this subparagraph that they are prosecuting, the GRS and the PFRS have the right to receive written confirmation from the Authority

4

that the Authority is prepared and authorized to disburse the State Contribution in accordance with this Agreement and the Plan, subject only to the dismissal by the GRS and PFRS of any pending litigation described in this subparagraph that they are prosecuting.

d.    Active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way (including funding) the litigation described in subparagraph 4(c) by the parties listed on **Exhibit C**, or equivalent assurance of litigation finality (which, as to the Systems, shall be deemed satisfied by the execution of the Support and Release Agreement to be entered into by the State and each of the Systems in connection with this matter).

e.    Classes 10 and 11 accept the Plan.

f.    By December 31, 2014, the Court enters a final, non-appealable order confirming the Plan that includes, at a minimum, the following:

i.    A release of the State and State Related Entities by each holder of a Pension Claim of all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

ii.    A requirement that the governing documents of GRS and the governing documents of PFRS be amended to include:

a)    the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of this Agreement; and

b)    the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of this Agreement.

iii.    Approval of, and authority for the City to enter into, the UTGO Settlement.

iv.    A requirement that the City irrevocably assigns the right to receive not less than an aggregate amount of $20,000,000 of the payments on the Reinstated Stub UTGO Bonds to the Income Stabilization Funds of the GRS and PFRS. Such payments will be made to the Income Stabilization Funds in the form of annual installment payments over a 14 year period, pursuant to a payment schedule approved by the State.

5

v. Approval of, and authority for the City to enter into, the DIA Settlement.

vi. Agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant to MCL 141.1563, or compliance with any new legislation that is enacted regarding post-bankruptcy governance.

g. Evidence satisfactory to the State of an irrevocable commitment by:

i. The Foundations to fund $366,000,000 (or the net present value thereof) as part of the DIA Settlement; and

ii. The DIA Corp. to fund $100,000,000 (or the net present value thereof) as part of the DIA Settlement.

h. The Plan Effective Date occurs on or before April 1, 2015.

5. <u>Non-occurrence of Conditions Precedent</u>. If the Conditions Precedent are not met to the satisfaction of the Authority and the Treasurer on or before April 1, 2015, upon written request of the Treasurer, the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement.

6. <u>Default by GRS and PFRS; Cure Period; Remedies</u>.

a. A System will be in default if the System has not materially complied with any of the terms and conditions set forth in (i) the Plan, (ii) the Governing Documents, or (iii) this Agreement, including, but not limited to, failing to make the required Income Stabilization Payments or using funds in the Income Stabilization Fund for unauthorized purposes. For the purposes of this Agreement, "<u>Governing Documents</u>" shall mean, (x) for the GRS, the Combined Plan for the General Retirement System of the City of Detroit, Michigan, and (y) for the PFRS, the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan. Notwithstanding subparagraph 'e' below, there shall not be an event of default for purposes of this paragraph 6 unless and until the Treasurer delivers to the alleged defaulting System a written notice declaring and specifically identifying the facts of an alleged default (the "<u>Default Notice</u>"). Nothing herein shall prohibit the subject System from contesting the alleged default; provided, however, until the contest over the alleged default is resolved, the subject System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

b. In the event of a default by a System, the System shall have 100 days after receiving the Default Notice in accordance with subparagraph 'a' above (the "<u>Cure Period</u>") to cure such default by remedying the damages sustained as a result of the default, as well as making any delinquent

6

13-53846-tjt  Doc 3078  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 55 of 77
13-53846-swr  Doc 8048-1  Filed 02/06/23  Entered 02/06/23 14:35:29  Page 57 of
809

Income Stabilization Payments, and restoring any funds improperly removed from any other fund maintained by the System, including the Income Stabilization Fund, as applicable. Prior to the expiration of the Cure Period, at least six of the seven total aggregate votes of the Investment Committee for the defaulting System must certify to the Treasurer that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "<u>Cure Certification</u>"). During the Cure Period, the defaulting System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

c.    If the Investment Committee for the defaulting System provides the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then the default will be deemed cured and the defaulting System may once again include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

d.    If the Investment Committee for the defaulting System fails to provide the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then no portion of the total State Contribution to the defaulting system, as adjusted for earnings and losses, may be taken into consideration by the System during the remainder of the 20 year period following the date of such default for purposes of determining whether benefits reduced by the Plan may be restored. Notwithstanding the foregoing, if at any time during or after the Cure Period the Investment Committee certifies by a simple majority vote, that (i) the default has been cured; and (ii) that no material damages have been caused by the default that have not otherwise been remedied, then the Treasurer may consent to the defaulting System once again including its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored, which consent shall not be unreasonably withheld.

e.    Each Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "<u>Compliance Report</u>") that certifies that the Investment Committee is not aware of any defaults, or, if the Investment Committee is aware of a default, specifically identifying the facts of such default. After review of a Compliance Report, the Treasurer shall provide to the System either a certificate of compliance or a Default Notice.

f.    Notwithstanding the foregoing, in the event of a default, the Treasurer and the Authority shall have the right to pursue all available legal and

7

13-53846-swr  Doc 8048-1  Filed 10/22/14  Entered 10/22/14 03:45:29  Page 56 of 77
13-53846-tjt  Doc 3078-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 72 of
809

equitable remedies against the Board of Trustees for the defaulting System, the Investment Committee, or any other person.

7. <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

8. <u>Governing Law/Jurisdiction</u>. This Agreement shall be construed in accordance with the laws of the State of Michigan, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws. The Bankruptcy Court of the Eastern District of Michigan shall have exclusive jurisdiction over any action or proceeding solely with respect to this Agreement, and each party, to the extent permitted by law, agrees to submit to such jurisdiction and to waive any defense based on venue or jurisdiction of such court.

9. <u>Amendment</u>. This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

10. <u>Limitation of Liability</u>. The obligation to make the State Contribution is not a general obligation or indebtedness of the State or the Authority and is subject to satisfaction of the conditions described herein. Furthermore, neither the State nor the Authority has any liability or obligation arising from or related to the contributions and funding of the Income Stabilization Fund of each System. Notwithstanding anything contained herein to the contrary, no State Related Entity or board member of the Authority shall have any liability for the representations, warranties, covenants, agreements or other obligations of the State or the Authority hereunder or in any of the certificates, notices or agreements delivered pursuant hereto.

11. <u>Severability</u>. If any one or more of the covenants, agreements or provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the invalidity of any such covenants, agreements and provisions shall in no way affect the validity or effectiveness of the remainder of this Agreement, and it shall continue in force to the fullest extent permitted by law.

12. <u>Headings</u>. Any headings preceding the text of the several articles and sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience or reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

[Remainder of Page Intentionally Left Blank – Signatures on Following Page]

8

**MICHIGAN SETTLEMENT ADMINISTRATION AUTHORITY**

By: _____
Title: Authorized Officer

**GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT**

By: _____
Title: Authorized Officer

By: _____
Title: Authorized Officer

**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**

By: _____
Title: Authorized Officer

By: _____
Title: Authorized Officer

**CITY OF DETROIT**

By: _____
Title: Emergency Manager

9

13-53846-tjt   Doc 13078-1   Filed 02/06/23   Entered 02/06/23 14:03:53   Page 58 of 77
13-53846-swr   Doc 8045-1   Filed 10/22/14   Entered 10/22/14 03:45:29   Page 72 of
809

**EXHIBIT A – GRS Governance Terms**

13-53846-tjt  Doc 13078-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 59 of 77
13-53846-swr  Doc 8048-1  Filed 10/22/14  Entered 10/22/14 03:45:29  Page 724 of
809

*In re City of Detroit, Michigan*

# INVESTMENT COMMITTEE GOVERNANCE
# FOR GENERAL RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the General Retirement System of the City of Detroit (GRS). |
| SCOPE OF SETTLEMENT | The GRS is currently administered by a ten (10) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System. The Board currently makes all administrative, actuarial and investment related decisions for the GRS. Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at GRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of seven (7) voting members consisting of:<br>  i. Five (5) Independent Members;<br>  ii. One (1) Employee Member; and<br>  iii. One (1) Retiree Member.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan. None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the GRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either: (a) economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the City and the Board, in consultation with the Foundation for Detroit's |

13-53846-tjt  Doc 13078-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 60 of 77
13-53846-swr  Doc 8046-1  Filed 10/22/14  Entered 10/22/14 03:45:29  Page 72 of
809

Future. The initial Independent Members and their terms of office will be as follows: Ken Whipple (2 years), David Sowerby (3 years), Robert Rietz (4 years), Doris Ewing (5 years) and Kerrie VandenBosch (6 years). Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Member shall be an employee-elected Member from the Board appointed by the Board. The initial Employee Member will be June Nickleberry.

The Retiree Member shall be a retiree-elected Member from the Board appointed by the Board. The initial Retiree Member will be Thomas Sheehan.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial

2

term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of GRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the GRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the GRS. An IC Member or other fiduciary under the GRS shall discharge his or her duties with respect to the GRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and

3

13-53846-tjt  Doc 13078-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 62 of 77
13-53846-swr  Doc 8048-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 62 of 77
809

| | |
|---|---|
| | Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members. |
| | Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.). |
| | The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all GRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6). |
| | All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written |

4

response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response.  Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone.  Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision.  Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board, whichever is applicable, is granted the express right to seek to preliminarily enjoin such violation of the breaching party without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.

2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.

3. Evaluating, retaining, terminating, and selecting qualified managers to invest and manage the plan assets.

4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024 the recommended annual contributions to GRS in accordance with applicable law.

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and

5

13-53846-tjt  Doc 13078-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 64 of 77
13-53846-swr  Doc 8048-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 72 of 809

any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of a portion of the 4.5% reduction in base monthly pension amounts and the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the GRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for GRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.

2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the extent that is prudent and consistent with the overall funding, liquidity needs and actuarial

6

| | |
|---|---|
| | assumptions governing the Plan. |
| | 3. The liquidity needs of the GRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the GRS's investment portfolio. The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC. Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the GRS and other duties to GRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

DETROIT 56620-1 1315511v11

7

13-53846-tjt Doc 13078-1 Filed 02/06/23 Entered 02/06/23 14:35:53 Page 66 of 77
13-53846-swr Doc 8048-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 73 of 77
809

**EXHIBIT B – PFRS Governance Terms**

13-53846-tjt Doc 3078-1 Filed 02/06/23 14 Entered 02/06/23 14:35:53 Page 67 of 77
13-53846-swr Doc 8048-1 Filed 10/22/23 14 Entered 10/22/23 03:45:29 Page 7 of 77
809

*In re City of Detroit, Michigan*

# INVESTMENT COMMITTEE GOVERNANCE
# FOR POLICE AND FIRE RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the Police and Fire Retirement System of the City of Detroit (PFRS). |
| SCOPE OF SETTLEMENT | The PFRS is currently administered by a seventeen (17) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System. The Board currently makes all administrative, actuarial and investment related decisions for the PFRS. Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at PFRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of nine (9) voting members consisting of:<br>  i. Five (5) Independent Members;<br>  ii. Two (2) Employee Members; and<br>  iii. Two (2) Retiree Members.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan. None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the PFRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either: (a)economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the |

1

13-53846-tjt Doc 13078 Filed 02/06/23 Entered 02/06/23 14:35:53 Page 68 of 77
13-53846-swr Doc 8048-1 Filed 10/22/14 Entered 10/22/14 03:48:29 Page 73 of 77
809

City and the Board, in consultation with the Foundation for Detroit's Future. The initial Independent Members and their terms of office will be as follows: Rebecca Sorenson (2 years), Joseph Bogdahn (3 years), Robert C. Smith (4 years), McCullough Williams III (5 years) and Woodrow S. Tyler (6 years). Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Members shall consist of one active police member and one active fire member from the Board, appointed by the Board. The initial Employee Members will be Mark Diaz and Sean Neary.

The Retiree Members shall consist of one retiree-elected police member and one retiree-elected fire member from the Board, each receiving a pension from PFRS and appointed by the Board. The initial elected Retiree Members will be Michael Simon and Louis Sinagra.

Each of the four (4) uniformed Members shall have one-half (1/2) vote.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in

2

13-53846-tjt  Doc 13078-1  Filed 02/10/23  Entered 02/10/23 14:03:53  Page 69 of 77
13-53846-swr  Doc 8045-1  Filed 10/22/14  Entered 10/22/14 03:45:29  Page 67 of 74
809

accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of PFRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the PFRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the PFRS. An IC Member or other fiduciary under the PFRS shall discharge his or her duties with respect to the PFRS in compliance with the provisions of Public Act

3

13-53846-tjt  Doc 13078-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 70 of 77
13-53846-swr  Doc 8048-1  Filed 10/22/14  Entered 10/22/14 03:48:29  Page 73 of 77
809

| | |
|---|---|
| | 314 of 1965, as amended.  An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose.  Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
| IC MEETINGS | The IC shall meet at least once every other month.  The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held.  The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.

Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).

The IC shall adopt its own rules of procedure and shall keep a record of its proceedings.  Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present.  Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee, except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all PFRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below.  The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).

All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval.  The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC.  If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within |

4

13-53846-tjt   Doc 3678-1   Filed 02/06/23   Entered 02/06/23 14:35:53   Page 71 of 77
13-53846-swr   Doc 8048-1   Filed 10/22/14   Entered 10/22/14 03:45:29   Page 73 of
809

such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision. After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision. Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board is granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.
2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.
3. Evaluating, retaining, terminating and selecting qualified managers to invest and manage the plan assets.
4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024, the recommended annual contributions to PFRS in accordance with applicable law.

5

13-53846-tjt   Doc 13078-1   Filed 02/06/23   Entered 02/06/23 14:35:29   Page 72 of 77
13-53846-swr   Doc 8048-1   Filed 10/22/14   Entered 10/22/14 03:43:29   Page 73 of 77
809

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the PFRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for PFRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.

2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the

6

13-53846-swr  Doc 8048-1  Filed 02/10/23  Entered 02/10/23 14:35:29  Page 73 of 77
13-53846-tjt  Doc 3076-1  Filed 02/06/14  Entered 02/06/14 03:45:29  Page 73 of 77
809

| | |
|---|---|
| | extent that is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Plan.<br>3. The liquidity needs of the PFRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the PFRS's investment portfolio.<br><br>The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC.<br><br>Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the PFRS and other duties to PFRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

DETROIT 56620-1 1315534v8

## EXHIBIT C

1.  General Retirement System

2.  Police and Fire Retirement System

3.  AFSCME

4.  UAW

5.  Detroit Police Officers Association

6.  Detroit Police Command Officers Association

7.  Detroit Police Lieutenants and Sergeants Association

8.  Detroit Fire Fighters Association

9.  Retired Detroit Police and Fire Fighters Association

10. Retired Detroit Police Members Association

11. Detroit Retired City Employees Association

12. Official Retirees Committee

13. City of Detroit

13-53846-tjt  Doc 13078-1  Filed 02/06/23  Entered 02/06/23 14:35:53  Page 75 of 77
13-53846-swr  Doc 8048-1  Filed 10/22/14  Entered 10/22/14 03:45:29  Page 74 of
809

**EXHIBIT D**

Cases to be dismissed:

1.      GRS et al. v. Emergency Manager of Detroit (Ingham County Circuit Court)
2.      Webster et al. v. State of Michigan, Governor, and State Treasurer (Ingham County Circuit Court)
3.      Detroit Library Commission v. Governor, State Treasurer, and Detroit Public Schools Emergency Manager (Ingham County)
4.      Flowers et al. v. Governor, State Treasurer, and State of Michigan (Ingham County Circuit Court)
5.      DPOA v. City of Detroit (Michigan Court of Appeals)

The settling parties will not attempt to amend to include the City of Detroit or its Emergency Manager as a defendant, or collaterally or retroactively attack the Detroit bankruptcy or actions of Detroit or its EM, or otherwise participate, support, fund or appeal in the following cases:

1.      Phillips et al v. Governor and State Treasurer (E.D. Mich.)
2.      Michigan AFSCME Council 25 v. Governor, State Treasurer, et al. (E.D. Mich.)
3.      NAACP v. Governor, State Treasurer, and Secretary of State (E.D. Mich.)
4.      Robert Davis/Citizens United Against Corrupt Government v. Governor, State of Michigan, Dept. of Treasury, Dept. of State Police, et al. (Ingham County Circuit Court)
5.      Robert Davis/Citizens United Against Corrupt Government v. Michigan Department of Treasury and Carla Robert (Wayne County Circuit Court)
6.      Robert Davis v. Local Emergency Financial Assistance Loan Board (Ingham Court)
7.      Robert Davis v. Weatherspoon, Governor, Attorney General, and State Treasurer (E.D. Mich.)
8.      Allen Park Retirees v. EM Parker, City of Allen Park (Wayne Circuit)
9.      Allen Park Retirees v. State (Court of Claims)
10.     Deborah Moore-El v. Snyder (E.D. Mich.)
11.     Faith, et al. v. Snyder (E.D. Mich.)
12.     Sarella Johnson, et al. v. Snyder (E.D. Mich.)
13.     United Retired Government Employees (URGE) et al. v. Governor, et al. (E.D. Mich.)

DETROIT 56620-1 1314985v13

13-53846-swr   Doc 8048-1   Filed 10/22/14   Entered 10/22/14 03:48:29   Page 76 of 77
13-53846-tjt   Doc 13678-1   Filed 02/06/23   Entered 02/06/23 14:35:53   Page 76 of 77
809

## EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 6, 2023, he filed a copy of the foregoing *City of Detroit's Supplement Filed in Connection with the City of Detroit's Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan* with the Clerk of the Court via the Court's ECF electronic filing system which will provide notice of the filing to all registered participants in this matter.

Dated: February 6, 2023

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

*Attorneys for the City of Detroit*