UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## SUR-REPLY IN SUPPORT OF RESPONSE TO CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AND REQUIRE 30-YEAR AMORTIZATION OF THE UAAL IN THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN

Respectfully submitted,

By: */s/ Jennifer K. Green*
    Jennifer K. Green
    Ronald A. King
    Clark Hill PLC
    151 S. Old Woodward, Ste 200
    Birmingham, MI 48009
    (248) 988-2315
    jgreen@clarkhill.com
    rking@clarkhill.com
    *Attorney for Creditor – PFRS*

Date: February 13, 2023

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ........................................................................ ii

I.  INTRODUCTION ........................................................................1

II. LEGAL ANALYSIS ....................................................................3

  A.  Under The Terms Of The Plan, The PFRS Does Not Need To Allow The City To Amortize Any Of The Post-2023 Pension Payments—Let Alone For 30 Years............................................................3

    (1) The PFRS Pension Plan Documents Contemplate Payment By The City After 2023 With No Amortization Period......................................4

    (2) If The City Had Wanted To Include An Amortization Period For The PFRS, It Knew How To. ...........................................................12

  B.  The Financial Projections, Malhotra's Summary Chart, And Malhotra's Testimony Are Not "The Plan" And Cannot Be Enforced As The Plan .........................................................................13

  C.  Financial Projections Designed To Demonstrate Feasibility Of A Plan Are Not "The Plan" ...........................................................17

  D.  Even With The Uncertainty As To Both The Pension Payment Amount And The Amortization Period, The Plan Was Found Feasible ........................................................................18

  E.  The Plan Controls Over The Confirmation Opinion And Order ........24

  F.  Neither Law of the Case Nor Res Judicata Apply Here ....................26

  G.  An Adversary Proceeding Is Necessary ............................................28

i

# INDEX OF AUTHORITIES

## <u>Cases</u>

*Brady–Morris v. Schilling (In re Knight Trust),* 303 F.3d 671 (6th Cir. 2002) ......28

*EEOC v. United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus. of the United States and Canada, Local No. 120,* 235 F.3d 244 (6th Cir.2000)..................................................................................27

*Gomez v. Great Lakes Steel Div.*, 803 F.2d 250 (6th Cir. 1986)..................................15

*In re Adelphia Bus. Solutions, Inc.,* 341 B.R. 415 (Bankr.S.D.N.Y.2003) .............21

*In re City of Detroit*, 538 B.R. 314 (E.D. Mich. Bkr. 2015).......................................17

*In re City of Detroit*, 614 B.R. 255 (E.D. Mich. Bkr. Crt. 2020) ..............................4

*In Re Davis Offshore, L.P. v. Nancy Sue Davis Trust*, 644 F.3d 259 (5th Cir. 2011) ................................................................................................ 24, 25

*In re Doty*, 129 B.R. 571 (Bkrtcy.N.D.Ind.,1991) ....................................................26

*In re Young Broadcasting Inc*., 430 B.R. 99 (Bkrtcy.S.D.N.Y. 2010)....................20

*Rodriguez v. Village of Port Chester*, 535 F.Supp.3d 202 (S.D.N.Y., 2021)..........15

*United States v. Milkiewicz*, 470 F.3d 390 (1st Cir. 2006) .........................................15

*Winget v. JP Morgan Chase Bank, N.A*., 537 F.3d 565 (6th Cir. 2008)..................27

## <u>Rules</u>

Fed. R. Bank. P. 7001(7) ................................................................................. 28, 29

Fed. R. Evid. 1006 ...............................................................................................15

13-53846-tjt    Doc 13679    Filed 02/13/23    Entered 02/13/23 19:58:45    Page 3 of 32

# I. INTRODUCTION

Once again proving the PFRS's entire point, the City has attached twenty-six separate documents to its papers in an effort to convince this Court what *another* document says. The City points to these twenty-six other exhibits—over 300 pages in total—in an attempt to show what *the Plan* allegedly says. Remarkably absent from the City's Reply, though, are citations to salient pages or excerpts from *the Plan.* The Plan is not the testimony of the City's witnesses. The Plan is not the Financial Projections. The Plan is not the Confirmation Opinion.

Under the Plan itself, as set forth in the PFRS's Response, funding policy decisions (which is what an amortization period is) fall squarely within the ambit of the PFRS Board and Investment Committee. Further, the amended PFRS Pension Plan (the "PFRS Pension Plan") sets forth the payment procedures for Component II (the legacy/frozen plan) and it clearly states that "after July 1, 2023… the City shall pay such contributions to the Retirement System *during the ensuing Fiscal Year*." It does *not* say "after July 1, 2023… the City may pay such contributions over thirty years." And unlike the Financial Projections that the City hangs its hat on, this Court has already held that the amended PFRS Pension Plan is part of the Plan of Adjustment and supersedes any settlement terms that were not expressly included in the Plan. As a result, this quoted language from the PFRS Pension Plan clearly trumps a mere "assumption" used by the City in formulating its Financial Projections—projections which were used to demonstrate the *feasibility* of the Plan but which were not, in and of themselves, "the Plan."

But because the Plan is not favorable to the City, it instead seeks to build a record of circumstantial evidence to argue that the Plan *must* include a 30-year amortization period; otherwise, the Plan would not have been feasible. While the "record" from plan confirmation is largely irrelevant, as the Plan itself is controlling, the record is clear that ten years ago, at the time of confirmation—even with (i) the amount of the pension underfunding that would exist in 2023 being a complete unknown, and (ii) no amortization period set in stone—the City's financial expert, the Court's independent feasibility expert, and this Court all agreed the Plan was still feasible. Plus, feasibility is a red herring because the City *has* the money to pay using the shorter 20-year amortization period selected by the PFRS (it just does not want to).

In the end, after canvassing the entirety of the confirmation trial record in an effort to drum up evidence that a 30-year amortization is required under the Plan, the *only* place the City could find an explicit reference to an amortization period was in the Financial Projections, which were only briefly summarized by the Court—and in a footnote, no less—in the Confirmation Opinion. In the face of express language in the State Contribution Agreement giving the PFRS discretion to set its own funding policies and express language in the PFRS Pension Plan granting the PFRS Board with the authority to "compute the City's annual contributions" and requiring payment by the City "during the ensuing Fiscal Year[,]" however, the City's reliance on the Financial Projections falls flat and its Motion should be denied.

## II.   LEGAL ANALYSIS

**A.   Under The Terms Of The Plan, The PFRS Does Not Need To Allow The City To Amortize *Any* Of The Post-2023 Pension Payments—Let Alone For 30 Years**

Treatment of the PFRS Claim is laid out in the Plan as follows—and notably, the only express term in the Plan itself is that the City will pay the amounts owed after 2023, but there is nothing about an amortization period for these payments:

> During the Fiscal Years from the Effective date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.1.ii.A. The exclusive source for such contributions shall be certain DIA proceeds and a portion of the State Contribution. **After June 30, 2023 . . . the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto[.]"**

(Plan of Adj., Dkt. No. 8045-1, pg. 315 of 809) (emphasis added).  The Plan says nothing of the 40-year Financial Projections when it describes the treatment of the PFRS claim—it does not cite them, reference them, quote them, or incorporate them as an exhibit.[1]  It does, however, expressly incorporate the State Contribution Agreement, which as set forth in the PFRS's Response, bestows the PFRS Board and Investment Committee with the authority to set the appropriate funding policy for the

---

[1]  The City's argument in its Supplemental brief [Dkt. No. 13678] that the Financial Projections were referenced in the Disclosure Statement is irrelevant, as the Plan controls. (Plan of Adj., Dkt. No. 8045-1, pg. 72) ("Plan Controls. In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.")

PFRS. In addition, as will be set forth below, the Board's authority to set an appropriate funding policy for Component II (*i.e.*, the legacy/frozen plan) is laid out in the PFRS Pension Plan, which (unlike the Financial Projections) *is* part of the Plan of Adjustment, as it was expressly incorporated into the Plan. See *In re City of Detroit*, 614 B.R. 255, 266-67 (E.D. Mich. Bkr. Crt. 2020).

**(1)    The PFRS Pension Plan Documents Contemplate Payment By The City After 2023 With No Amortization Period.**

The PFRS would technically be within its rights to insist on payment for the contributions owed by the City with *no* amortization period given the discretion it was given in the State Contribution Agreement and the PFRS Pension Plan. Article G to Component II (the Legacy/Frozen Plan)—entitled "Method of Financing"—governs the City's payments for funding Component II after the ten-year pension hiatus and this section expressly states that payment is due from the City "during the Fiscal Year" the contribution obligation arises:

> Sec. G-5.    Contributions to and payments from the Pension Accumulation Fund.
>
> **Contributions to and payments from the Pension Accumulation Fund shall be made as follows:**
> <div align="center">***</div>
>
> (b)    Subject to the Plan of Adjustment, for Fiscal Years commencing prior to July 1, 2014, **and on or after July 1, 2023**, the Board of Trustees annually ascertained and reported to the Mayor and the Council **the amount of contributions due the Retirement System by the City,** and the Council shall appropriate and **the City shall pay such contributions to the Retirement System *during the ensuing Fiscal Year*.** When paid, such contributions shall be credited to the Pension Accumulation Fund.

(c) For Fiscal Years commencing after June 30, 2014 and prior to July 1, 2023, the City shall make contributions to the Pension Accumulation Fund only as provided in the Plan of Adjustment.

(Ex. D to PFRS Response, Article G-5) (emphasis added). Thus, the payment due "after July 1, 2023" has no amortization period associated with it. Instead, the amended PFRS Pension Plan—which was revised specifically to address the changes under the Plan of Adjustment—explicitly states that the City "shall pay such contributions to the Retirement System *during the ensuing Fiscal Year*." It does not say that after July 1, 2023, the City "may amortize such payment over thirty years."

The ten-year hiatus followed by a resumption of normal, unfettered payment obligations is echoed in the next section, too, which addresses appropriations by the City:

Sec. G-9. Appropriations prior to July 1, 2014 **and after June 30, 2023.**

(a) The Board of Trustees shall certify to the City Council **the amount of the appropriation necessary to pay to the various funds of the Component II** of the Retirement System the amounts payable by the City as enumerated in this Component II, according to legal budget procedure.

(b) **To cover the requirements of Component II** prior to July 1, 2014 **and after June 30, 2023**, such amounts **as shall be necessary to cover the needs of Component II shall be paid into the Pension Accumulation Fund[2] and the Expense Fund by special appropriations or transfers to the Retirement System**; provided,

_____

[2] The "Pension Accumulation Fund" or "PAF" is one of several funds that comprise Component II. (Ex. D to PFRS Response, Article G-1) ("The funds of Component II… shall be the Annuity Savings Fund, Annuity Reserve Fund, Pension Accumulation Fund, Pension Reserve Fund, Deferred Retirement Option Plan Fund, Expense Fund and the Survivors Benefit Fund.") All payments from the City are paid to the PAF first before being allocated to the other funds.

5

however that no transfers can be made from the Accrued Liability Fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to Section G-4 (as in effect prior to July 1, 2014).[3]

(Ex. D to PFRS Response, Article G-9) (emphasis added).  The PFRS Pension Plan documents state only that the "amount of the appropriation necessary to pay the various funds of the Component II" will be made and that after June 30, 2023, "such amounts as shall be necessary to cover the needs of Component II shall be paid into the Pension Accumulation Fund"—but again, nowhere do these documents state that these payments "shall be paid over thirty years."  Such language simply does not exist.

Next, Article G-17 expressly states that *the Board*—not the City—sets the City's contribution payment amount, which necessarily includes the authority to choose any amortization schedule that may impact that contribution amount:

> [T]he **Board of Trustees shall compute the City's annual contributions** for Fiscal Years commencing prior to July 1, 2014 **and after June 30, 2023**… using actuarial valuation data… The Board shall report to the Mayor and to the City Council the contribution percents so computed, and such contribution percents **shall be used in determining the contribution dollars to be appropriated by the City Council and paid to the Retirement System.**

_____

[3] The reference to the Accrued Liability Fund and Section G-4 relates to a special account that was set up in 2005 to receive the proceeds from the Certificates of Participation ("COPs") transaction and that account was dissolved after the City's bankruptcy.  (Article G-5(b), stating "[a]s soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.").  Thus, any reference to a "scheduled amortizing amount" in Article G-9(b) relates to the COPs transaction and an account that no longer exists, so this section does not aid the City's argument that amortization is permitted.

6

(Ex. D to PFRS Response, Article G-17) (emphasis added). As the PFRS has repeatedly stated, it has no obligation to allow the City to amortize the contribution payment *at all* (let alone for 30 years). The PFRS has every right to enforce the Plan as written and demand a more aggressive payment schedule for the amounts owed for Component II. However, the PFRS *is* mindful of the City's desire to fund its reinvestment initiatives. Accordingly, after consultation with its actuaries, the PFRS has set a funding policy that allows the City to pay its contribution amount using a 20-year amortization period—a result which fairly balances the City's desire to fund its reinvestment initiatives, while still ensuring that the PFRS has faithfully discharged its fiduciary duties to its members.

Lastly, the Plan itself only limits the discretion of the PFRS Board during the ten-year period colloquially referred to as the "pension hiatus" or the "pension holiday." After that, computation of the City's employer contribution reverts back to pre-bankruptcy procedures. The Plan of Adjustment states:

> **G. No Changes in Terms for Ten Years.** Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits … or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, ***the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023,*** notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective

7

bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

(Plan of Adj., Section II.B.3.q.ii.G). Thus, the PFRS was forbidden from changing the amount of "the contribution to the PFRS" during the pension holiday, but after June 30, 2023, the amount of the "contribution to the PFRS" shifts back to being computed by the Board in consultation with its actuaries. The Plan does *not* say "after July 2053, the authority to determine the amount of the employer contribution will be returned to the PFRS Board." Instead, every single citation related to the computation of the City's pension contribution (in both the Plan of Adjustment as well as in the PFRS Pension Plan) carves out this ten-year period but reverts back to the ordinary employer contribution calculation procedures after 2023. When this provision of the Plan and Article G of the PFRS Pension Plan are read together, the answer to the amortization question is simple—after 2023, it is the Board's decision (solely) and the only time period when the Board did not have authority to set an amortization period was during the ten-year pension hiatus. After that period ends, the Board resumes its normal fiduciary responsibilities and is once again free to set the applicable funding policy.

The order the City has requested from this Court, however, violates the Plan, the PFRS Pension Plan, the State Contribution Agreement and Michigan law by stripping the PFRS Board of its right to make this critical funding policy decision.[4]

---

[4] Under the Plan of Adjustment, unless a rule of law or procedure is supplied by federal law, then "the laws of the State of Michigan. . . shall govern the rights, obligations,

Under well-established Michigan law, the PFRS Board has the sole discretion to calculate the employer contribution payment and set an appropriate amortization period (if any)—not the City. See *Policemen and Firemen Retirement System v. City of Detroit,* 270 Mich.App. 74, 75–77 (Mich. App. 2006), *leave denied*, 477 Mich. 892 (2006). In that case, just like here, the City wanted a longer amortization period to reduce its annual payment amount and argued that it controlled the amortization decision, not the PFRS. The court began its analysis by summarizing the PFRS Board's authority as follows:

> The Board is responsible for the general administration, management, and operation of the Policemen and Firemen Retirement System. . . Part of the Board's responsibilities is to ensure that the retirement system is properly funded. Accordingly, the Board, after consultation with an actuary, determines the amount of Detroit's annual pension contribution. . . The 2004 plan was underfunded and, therefore, one component of the pension contribution is the amount of time necessary for Detroit to meet the system's unfunded accrued liabilities. Logically, the amount of time permitted to satisfy the accrued liabilities, also known as the amortization period, affects the amount Detroit is obligated to contribute to the plan each year. In March 2004, the Board, by a six-to-five vote, adopted a 14–year amortization period to calculate Detroit's annual contribution to finance the unfunded accrued pension liabilities. However, Detroit maintained that a 20–year amortization period should apply under a local ordinance, notwithstanding that Detroit never followed the ordinance in the past and the Board had set the amortization period for many years.

---

construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulations, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan." (Plan of Adj., pg. 72(I)). Further, under M.C.L. 38.1133g, the Investment Committee and the Board are obligated to carry out their fiduciary duties in accordance with "applicable law."

*Id.* at 75-76.  In response to the City's insistence that it controlled the amortization period decision, the PFRS Board sought a declaratory judgment "that it has the right to determine the time period for the financing of unfunded accrued pension liabilities.'" *Id.* at 76.  The Board filed a motion for summary disposition and argued that under Michigan law, only it has "the authority to determine the amortization period and that Detroit must abide by its recommendation and pay the amount of pension contribution calculated by the Board."  The trial court disagreed with the PFRS, but the Michigan Court of Appeals reversed and ruled that the power to set amortization was strictly within the PFRS Board's power, reasoning:

> The Board has the authority to adopt the amortization period to finance unfunded accrued pension liabilities . . . Detroit argues that MCL 38.1140m merely places caps on the amortization periods starting in 2006, but that "[i]t does not give the Board the right to decide on the amortization period." We disagree.  The statute provides that the Board, acting on the recommendation of an actuary, makes "the determination of the required employer contribution." MCL 38.1140m. Further, the statute explicitly provides that the Board "shall confirm" that the plan "provides for the payment of the required employer contribution" and "shall confirm" that the system receives "the required employer contribution...." *Id.*  "The word 'shall' is unambiguous and is used to denote mandatory, rather than discretionary, action." . . .  Thus, the statutory language is unequivocal that the Board determines the amount the employer (Detroit) contributes annually to the retirement system and that the employer, in turn, is "required" to make the contribution. The Board's determination also necessarily includes the amount of time in which Detroit must pay the unfunded accrued pension liabilities because the period directly affects the amount Detroit must contribute to the plan each year.

*Id.* at 81-82 (citation omitted).  The court further reasoned:

As noted, MCL 38.1140m [of Act 314] states that the Board is to determine the annual contribution. . . Thus, the statute contemplates that the Board, through an actuary, shall determine the annual payment, which includes a determination of the "amortized portion of the unfunded principal liability." *Id.* Moreover, the next portion of the statute provides . . . the required employer contribution shall not be determined using an amortization period greater than 30 years. . . A plain reading of this section, in conjunction with the rest of MCL 38.1140m, compels the conclusion that, while the amortization period is capped at no greater than 30 years at the end of 2005, the actuary and the Board have discretion, within that limit, to determine the appropriate amortization period. Indeed, the above language evidences the Legislature's intent to grant the Board the authority to determine the amortization period because it included limits (caps) in its grant of authority to the Board to determine the employer's annual contribution. Further, it is self-evident that, because the Board has the responsibility to determine the employer's annual contribution to the system and to ensure that the system is adequately funded, an integral element of that calculation is how much the city must annually contribute to pay down its unfunded liabilities. Again, how long those liabilities are amortized, according to the calculations of the actuary, directly affects the adequacy of the system funding and the amount Detroit must pay each year.

*Id.* at 81-82. Thus, the court concluded: "The Legislature granted the Board the authority to determine the annual plan contributions, which necessarily includes the annual amortization period . . . We reverse the trial court's decision and grant the Board a declaratory judgment that it has the authority under applicable law to set the amortization period." *Id.*

The same is true here. The PFRS Board is vested with the authority (and the *autonomy*—independent from the pension plan's funder) to set an appropriate policy to ensure the system is adequately funded. The Plan of Adjustment (at least, post-2023) did not change this. In fact, the PFRS Pension Plan drafted and enacted by the

City in connection with the Plan of Adjustment retains the same process that governed before the bankruptcy—*i.e.*, that the "***board of trustees*** shall annually ascertain and report to the mayor and the council the amount of contributions due the retirement system by the city . . . and the city shall pay such contributions to the retirement system during the ensuing fiscal year" and the "***Board of Trustees*** shall compute the City's annual contributions[.]"[5] (emphasis added).  Accordingly, the Plan, the PFRS Pension Plan, the State Contribution Agreement (codified in Act 314) and Michigan law all dictate the same result: the PFRS has the sole discretion to select the amortization period.

    (2) **If The City Had Wanted To Include An Amortization Period For The PFRS, It Knew How To.**

The lack of any express term for amortization for the PFRS payment is particularly glaring because in other contexts within the Plan, where amortization periods were expressly negotiated and agreed upon as a material financial term, those amortization periods are explicitly set forth in the Plan itself.  For example, for the new LTGO Bonds, the City expressly spelled out the specific amortization terms:

---

[5]    See *Policemen and Firemen Retirement System,* 270 Mich.App. at 80-82, n. 3-4 (quoting Detroit City Code, § 54-43-4(b) and § 54-2-7); see also PFRS Pension Plan Article G-5, G-17.

**Schedule 1**

**Financial Terms of New LTGO Bonds**

| | |
|---|---|
| Principal: | $55 million |
| Interest Rate: | 5.65% per annum (first 10 years, 5.00% payable in cash and 0.65% capital appreciation added to principal) |
| Final Maturity: | 23 years |
| Amortization: | Interest payable semi-annually |
| | On each anniversary from the sixth through tenth anniversary—$2 million principal due per year |
| | On each anniversary from the eleventh through twenty-third anniversary—principal payment equal to one-thirteenth (1/13) of the principal outstanding immediately prior to the eleventh anniversary (approximately $3,735,115 per year) |

(Plan of Adj., pg. 282). Similarly, with respect to the New B Notes, the amortization

terms were expressly written out in the Plan itself:

**NEW B NOTES**
**SUMMARY OF PRINCIPAL TERMS[1]**

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

| | |
|---|---|
| Obligation | The City's obligations with respect to the New B Notes shall be a general and unsecured obligation of the City. |
| Initial Principal Amount | $632.0 million. |
| Interest Rate | 4.0% for the first 20 years; 6.0% for years 21 through 30. |
| Maturity | 30 years. |
| Amortization | Interest only for 10 years; amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance. |
| Disclosure | The City will provide a continuing disclosure undertaking under 17 C.F.R. § 240.15c2-12 in connection with the delivery of the New B Notes. |

*Id.* at pg. 315. No similar language was used for the PFRS claim.

**B.  The Financial Projections, Malhotra's Summary Chart, And Malhotra's Testimony Are Not "The Plan" And Cannot Be Enforced As The Plan**

The City claims in its Reply: "E&Y's 40-year projections confirmed that the

POA incorporated a settlement between Kevyn Orr and GRS/PFRS that required 30-

year amortizations." (Reply at pg. 12) In support of this statement that the POA

"incorporated" a settlement with a 30-year amortization, the City cites two items: (i) Malhotra's testimony, and (ii) Exhibit 723 from the confirmation trial. However, neither of these is "the Plan." Witness testimony is not "the Plan." Exhibits admitted at the confirmation trial are not "the Plan." The "Plan" is a defined term:

> 273.    "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

(Plan of Adj., pg. 23). Unless the exhibit is attached to or referenced in the Plan itself (like the State Contribution Agreement and the PFRS Pension Plan), it is not the Plan.

Moreover, Exhibit 723 from the confirmation trial (attached to the City's Reply as Exhibit 18) is merely a summary chart that according to Malhotra, showed the "key items of the settlement with GRS and PFRS." Even this summary chart, though, does not include the word "amortization." Further, this document was not an excerpt from the Plan. As such, Exhibit 723 was admitted as merely a "demonstrative aide" and was never intended to be substantive evidence of the Plan:

> MR. STEWART [from Jones Day]: And just for the record, let's put up Exhibit 723. . . Do you see Exhibit 723, Mr. Malhotra?
> A. I do.
> Q. What is this?
> A. It shows the key items of the settlement with GRS and PFRS as a part of the plan of adjustment.
> Q. Okay. . . could you tell us what are GRS and PFRS?
> A. The General Retirement System and the Police and Fire Retirement System.
> Q. Do you know off the top of your head what class each is in?
> A. Class 10 and 11.
> Q. Now, tell us … Your honor, if I could, I would move the admission of Exhibit 723 *as a demonstrative exhibit.*
> MR. SOTO: No objection, your Honor.

MR. WAGNER: Yeah. No objection as a demonstrative.

THE COURT: It is admitted.

(Ex. G to PFRS Response Brief, Malhotra Tran. at pg. 132-33) (emphasis added). A "demonstrative exhibit" is not substantive evidence and should not be relied upon by a finder of fact. "[D]emonstrative exhibits 'ha[ve] no probative value in [themselves],'" but "they may be admissible for the purpose of 'illustrat[ing] oral testimony.'" *Rodriguez v. Village of Port Chester*, 535 F.Supp.3d 202, 218 (S.D.N.Y., 2021) (citation omitted). Courts caution against demonstrative exhibits for precisely the reason presented here—the risk that a demonstrative will improperly relied upon for its "truth." *Id.* at 219 (noting that when "determining the admissibility of demonstrative exhibits… courts must carefully weigh whether the exhibits are unduly prejudicial" because the factfinder could "interpret them as real-life recreations of substantive evidence that they must accept as true.") Unless a summary is being admitted as a summary of a voluminous writing under Fed. R. Evid. 1006 (which Exhibit 723 was not), a summary introduced as a demonstrative aide is "more akin to argument than evidence[.]" *Gomez v. Great Lakes Steel Div.*, 803 F.2d 250, 257 (6th Cir. 1986); *United States v. Milkiewicz*, 470 F.3d 390, 396-98 (1st Cir. 2006) (citations omitted) (noting demonstratives are by definition "less neutral in [their] presentation" and thus not properly considered evidence). Hence, Exhibit 723 should be ignored altogether in favor of the actual Plan language.

Similarly, witness testimony is undisputedly *not* part of the Plan. And even if

it was, Malhotra's testimony actually supports the PFRS's position:

> THE COURT:  Excuse me. Before we leave this one [Exhibit 723] . . . Does the plan commit the city to make the payments in your section of the change here called "Future Contributions"?
>
> THE WITNESS:  Those contributions are assumed in the plan, your Honor, and the city—
>
> THE COURT:  They are what?
>
> THE WITNESS:  They are assumed to be made in the plan, your Honor, so the city is in the projections making those payments beyond 2024 into the pension systems in the plan.
>
> THE COURT:  My question was a slightly different one. Does the plan commit the city, legally commit the city to make those payments?
>
> THE WITNESS: My understanding is the city is committed to the fund the unfunded liability. I just don't know—the city and the Retirement Systems have to decide what the amortization methodology is of the UAAL at the end—at the end of year ten, and the city is committed to fund that underfunded liability. Depending on what amortization schedule gets picked, the payments can change slightly because of the interest rate, but my understanding is the city is committed to make the payments beyond 2024 into those pension systems.

(Ex. G to PFRS Response, Malhotra, 9/29/2014 Hrg. Tran., pg. 139-140).  Malhotra's testimony is actually 100% aligned with the PFRS's position: the City is legally obligated to make the payment under the Plan (period) and the amortization (if any) gets decided after year ten.

Lastly, the City's argument that Kevyn Orr and the PFRS reached "a settlement" containing a 30-year amortization period is entirely unavailing.  The City blasted this exact argument when the RDPFFA made a similar attempt to claim that it had "reached a settlement" during mediation but the particulars of that settlement did not make their way into the Plan and instead were only on the term sheet from

mediation. In the face of that argument, this Court has already held—as it should—that unwritten settlement terms not expressly incorporated in the Plan of Adjustment are not enforceable. *In re City of Detroit*, 538 B.R. 314, 320 (E.D. Mich. Bkr. 2015) (holding that the RDPFFA term sheet was not "incorporated into or made part of the Plan" and thus the term sheet "did not survive confirmation of the Plan"). Although at least in the RDPFFA case, the disputed term was part of a written term sheet signed by the parties, which is not true with respect to the amortization issue. Here, there is even less basis to find the Financial Projections part of the Plan, as they were created unilaterally by the City (without input or approval by the PFRS or any of the other 27 constituents involved in the pension settlement), they were ever-evolving (indeed, they were changed at least ten times by the City's own admission), and the 30-year amortization period was merely an "assumption" baked into the projections by the City's financial expert (presumably because that is what period the City used before the bankruptcy). But perhaps most importantly, financial projections used to show that a plan of adjustment is "feasible" are not *the Plan.* They are merely a piece of evidence used at confirmation trials to demonstrate feasibility but they do not set forth "the Plan."

## C.    Financial Projections Designed To Demonstrate Feasibility Of A Plan Are Not "The Plan"

The City attempts to convince the Court that its Financial Projections are "part of the Plan" and not extrinsic evidence because they "were among a very few trial exhibits that were incorporated in the Confirmation Opinion and Order." (Reply, pg.

13). But the "Plan" is a defined term and exhibits referenced in the Court's Confirmation Opinion are not part of the Plan:

> 273. "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

(Plan of Adj., pg. 23). *Of course* the City's Financial Projections were discussed at length in the Confirmation Opinion. They had to be, since demonstrating that the Plan was financially feasible was an element of the City's case. But that is a far cry from one line item in the Financial Projections—which were a guess 40 *years* into the future—being transformed into a "contract" or a promise to perform. The purpose of these Financial Projections were merely to show the Court, hypothetically, how the City's finances could progress in the future. The City is now treating them as gospel. If the opposite was true (and in some cases it is)—that the City fared worse under its projected financial condition—the City would not be here arguing that it should be held to the projections. If the City's revenues faltered one year and it could not perform as it thought it could a decade ago, the Plan would not retroactively fail the feasibility test and be unwound.

**D.    Even With The Uncertainty As To Both The Pension Payment Amount And The Amortization Period, The Plan Was Found Feasible**

Perhaps the best evidence that the Plan was feasible even without an amortization period set in stone in the Plan is the fact that the City undisputedly *has* the money to pay the unfunded liability for Component II. Under the Plan, the City had ten full years to plan for this part of its financial reorganization, and to its credit,

the City planned accordingly and set aside the money. Thus, the Plan as it is actually spelled out in the documents (with no certainty as to the amount of the pension payment after 2023 and with no amortization schedule agreed upon beforehand) *was* feasible as presented to this Court at plan confirmation—in part, because the Plan gave the City *an entire decade* to plan and budget accordingly.

But because the Plan language is not favorable to the City, it instead seeks to build a record of extrinsic evidence to argue that the Plan *must* include a 30-year amortization period; otherwise, the Plan would not have been feasible. The City attempts to backfill this argument by speculating that any other "plan" would not have been approved by the Court. The record is clear, though. Ten years ago, at the time of confirmation—even with (i) the amount of the pension underfunding after the ten years an unknown, and (ii) no concrete amortization schedule set in stone—the experts and the Court agreed the Plan was still feasible. Kopacz cited the potential wild swing of *over $1 billion dollars* that could be owed at the end of the ten-year hiatus depending on how the markets faired yet she still concluded it was feasible:

### PFRS Average Rate of Return Scenario Analysis[7]

| Average Rates of Return July 2014 - June 2023 | Estimated Funding Status June 2023 | Estimated Projected Unfunded Liability June 2023 | Estimated Projected Unfunded Liability Variance |
|---|---|---|---|
| 3.00% | 43% | $ 1,717 | $ 1,036 |
| 5.00% | 60% | $ 1,208 | $ 527 |
| 6.00% | 70% | $ 917 | $ 236 |
| 6.75% | 78% | $ 681 | $ - |
| 8.00% | 92% | $ 252 | $ (429) |
| 0% - 1st 5 years; 10% - 2nd five years | 53% | $ 1,439 | $ 758 |
| 10% - 1st 5 years; 0% - 2nd five years | 64% | $ 1,097 | $ 416 |

13-53846-tjt    Doc 13679    Filed 02/13/23    Entered 02/13/23 19:58:45    Page 22 of 32

Kopacz also acknowledged in her Supplemental Report that "the City may have continuing unfunded pension obligations far into the future" and "*these obligations may increase beyond the assumptions presented in the July 2, 2014 financial projections*." (Ex. F to PFRS Response, Kopacz Supp. Report) (emphasis added).

The City's financial expert, Malhotra, echoed this exact concern and cited the uncertainty as to the amount of the pension payments due after 2023 as the biggest risk to feasibility. He explained to the Court that unlike the other creditor settlements—which were locked in, both in terms of amount and other economic terms—the pension liability at the end of the ten-year hiatus was not:

> THE COURT: Okay. I want to ask you, what are the two or three most critical assumptions in the City's 10-year forecast or projections that concern you the most?
>
> A. The first one, Your Honor, would be the unfunded pension liability of the City at the end of the 10 years because in a lot of this in terms of the settlement to the creditors, we have boxed in what the City's liability will be. On the side of the pensions, we are still using calculations to estimate what that 10-year unfunded liability will be. So that will be my first one as a concern because it's an unknown, it's an estimate, but it's still not boxed in in terms of how we have boxed in our best ability of the other claims.

(Ex. G, Malhotra Hrg. Tr. 9/29/2014, pg. 272). The City pretends as though the uncertainty as to how much would be owed to cover the pension shortfall after the ten-year pension holiday would have prevented the City from being able to prove the Plan was feasible. Not so. "Just as speculative prospects of success cannot sustain feasibility, the mere prospect of financial uncertainty cannot defeat feasibility." *In re Young Broadcasting Inc.*, 430 B.R. 99, 129 (Bkrtcy.S.D.N.Y.,2010) (citing *In re U.S.*

*Truck Co.*, 47 B.R. 932, 944 (E.D.Mich.1985). "Success need not be guaranteed, so long as the plan has a 'reasonable likelihood of success.'" *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421–22 (Bankr.S.D.N.Y.2003).

The pension-related uncertainties were risks but every plan has some level of risk. The Court even acknowledged this risk but still ultimately found the Plan feasible. *In re City of Detroit*, 524 F.R. 147 at 232 (noting "the risk remains that at the end of FY2023, the UAAL could be much larger than currently projected").

The City lastly claims the Court's Confirmation Opinion "adopted and incorporated" the entirety of Kopacz's report—a report that the City claims "confirms the 30-year amortization period." (Reply, pg. 7). This is entirely circular, as Kopacz was just summarizing the same portion of the Malhotra Financial Projection. Neither expert's report—not the Malhotra Financial Projections and not the Kopacz feasibility report—are part of the Plan of Adjustment. The City pretends that the Financial Projections and the Kopacz feasibility report somehow magically transform into "the Plan." Feasibility, though, was established by more than just a set of Financial Projections and the Kopacz report—it was established (as the Court expressly listed in its Conformation Opinion) by the testimony of twenty-two witnesses, ranging from Kevyn Orr, Malhotra, Charles Moore, Glenn Bowen of Milliman, Michael Duggan, Brenda Jones (City Council President), Dan Gilbert, and Roger Penske. And exactly none of those witnesses testified that the Plan would only be feasible if the PFRS pension

payment in 2023 was paid over a thirty-year period. In fact, to the contrary: both Kopacz and Moore went on record outright *criticizing* the City and the Retirement Systems' prior use of lengthy amortization periods and cited it as one of a handful of "practices" that led to chronic underfunding and "contributed to a significant shortfall in the two pension plans" (Ex. F to PFRS Response, Kopacz Supp. Report, Dkt. No. 13634-7, pg. 127) (criticizing the use of "renewing 29- (PFRS) and 30-(GRS) year amortization periods for funding the unfunded pension obligations") (citing Dkt. No. 13).

The City attempts to undermine the PFRS's assertion in its Response that the City's own experts did not support a 30-year amortization period by claiming that (i) the Glenn Bowen deposition testimony cited by the PFRS related to his work early in the bankruptcy case, not at the confirmation phase of the case; and (ii) Chuck Moore's deposition testimony was an "esoteric and hypothetical discussion of other plan amortization periods[.]" (Reply, pg. 18-19). But the absence of any testimony during plan confirmation from either Bowen or Moore—the two key pension task force experts—in favor of a 30-year amortization period is telling. The reason the record is bereft of any such testimony is because those experts were decidedly *against* long amortization periods and those experts would have been promptly impeached with the testimony cited by the PFRS in its Response if they had shown up at plan confirmation and abandoned their prior unequivocal testimony that lengthy amortization periods were inappropriate for the City. In fact, in addition to his later deposition testimony, Moore's

first-day declaration has an entire section dedicated solely to his criticism of the 29-year and 30-year amortization periods previously used by the City. In a section entitled "***GRS' Amortization Method Is Unreasonable***," Moore chastised the use of a 30-year open amortization because "[t]his causes the UAAL to grow rapidly (due to compounding), and essentially 'kicks the can' of responsible pension funding 'down the road.'" (Dkt. No. 13, Moore Declaration at page 8-9) (emphasis in original). He further noted that while "many governmental plans use long amortization periods to fund liabilities—in part to justify lower current contributions to their pension systems—use of a 30-year amortization period on an open-ended basis simply defers indefinitely the cost to the City of the Systems' liabilities" which he explained "is especially problematic in mature pension funds like GRS and PFRS[.]" Moore also explained in his declaration that the City asked Milliman to "determine the City's future contribution obligations using more reasonable amortization periods" and Moore specifically identified more "reasonable" amortization periods as "shorter, closed amortization periods—15 years for PFRS (to account for the fact that the PFRS is already closed for new hires) and 18 years for the GRS." *Id.* This is *precisely* the position urged by the PFRS's actuaries as set forth in the PFRS Response. Gabriel Roeder advised the PFRS to reject the City's request for a 30-year amortization because "[i]n mature legacy plans, the risk of plan insolvency is increased when amortization periods are longer than 10 or 15 years"[6]—

_____

[6] See Ex. J to PFRS Response, Gabriel Roeder Report.

advice that is in line with the City's *own* pension experts' dim view of lengthy amortization periods. In its current Motion, the City would have this Court believe that it engaged not just one pension expert—but an entire *task force* of pension experts—yet somehow came up with a Plan of Adjustment that adopted the same exact 30-year amortization that those experts lambasted on day one of the bankruptcy filing as well as during their discovery depositions prior to the confirmation trial.

In short, after fly-specking the entire confirmation record, the City's whole case hangs on a self-admitted "assumption" used by a financial expert. That "assumption" was then blindly regurgitated by Kopacz in her report without questioning whether it was actually part of the Plan—yet incredibly, the City stretches this to claim that Kopacz "confirmed" in her report that a 30-year amortization was part of the Plan. The PFRS does not dispute that the City may have used a 30-year amortization period a placeholder in its Financial Projections—what it does dispute is that this term was ever formally incorporated into the Plan itself. It was not.

**E. The Plan Controls Over The Confirmation Opinion And Order**

Contrary to the City's argument, the Plan controls over the conflicting Confirmation Opinion and Order. See e.g., *In Re Davis Offshore, L.P. v. Nancy Sue Davis Trust*, 644 F.3d 259 (5th Cir. 2011). In *Davis Offshore*, an adversary proceeding was filed six months after the plan was finalized and the confirmation order was entered, at which time it was discovered that the release and exculpation provisions contained in the plan were different than the ones set forth in the confirmation order.

The scope of the release and exculpation provisions were critical to determining whether the adversary proceeding could move forward because under the plan, claims against the buyer of the debtor's assets in the bankruptcy proceeding were discharged. Under the release in the confirmation order, however, they were not. The bankruptcy court, in analyzing the conflicting interpretations of the plan versus the confirmation order, ruled that as a matter of law, the confirmation order took precedence over the plan. *Id.* at 268. The Fifth Circuit reversed, reasoning:

> [A]llowing an order of confirmation always to trump the plan, if the two documents are in conflict, encourages error and abuse. In the flurry of activity that normally precedes plan confirmation, the parties have more likely negotiated and studied the terms of the plan itself than the often boilerplate language embodied in the court's order of confirmation. . . An error in the confirmation order should not overcome the parties' negotiated deal.

*Id.* at 268. Moreover, the court continued, "allowing the order of confirmation to stand alone, separate and apart from the plan, in the interpretive process would tempt parties to insert other provisions in the confirmation order that might not coincide with a plan…[.]" *Id.*

The same is true here. As pointed out in the PFRS's Response Brief, no less than *twenty-seven* separate parties here heavily negotiated the pension portion of the Plan. The various inter-related documents that form the Grand Bargain (*i.e.*, the State Contribution Agreement and the PFRS Pension Plan) were negotiated by and between numerous parties—the City, State, the Foundations, the two Retirement Systems, and

the Retiree Committee. The Plan was voted on by tens of thousands of retirees. A confirmation opinion—and a mere footnote in that opinion, no less—should not "overcome the parties' negotiated deal."

The absurdity of the City's stance is perhaps best illustrated by the fact that the City has now put forth not one, not two, but *ten* iterations of its financial projections, and under the City's reasoning, each one of these ever-evolving financial projections was binding and could be unilaterally updated and amended by the City until the close of confirmation trial—even if that financial projection altered the specifically negotiated terms by the parties. "At its simplest, a plan is an offer of promises made by a debtor and accepted by the creditors following serious and frequently protracted negotiations. In many of its most vital aspects, a plan is a kind of contract involving, as it does, matters of offer, acceptance, performance and the like[.]" *In re Doty*, 129 B.R. 571, 590–91 (Bkrtcy.N.D.Ind.,1991) (citations omitted). A plan is *not* a unilaterally crafted financial projection.

## F.    **Neither Law of the Case Nor Res Judicata Apply Here**

The City attempts to raise two preclusion doctrines to argue that the PFRS is bound by this Court's Confirmation Opinion and Order but neither apply.[7] Res judicata bars relitigation of a legal "claim" or "cause of action" but it does not apply

---

[7] As an aside, this Court's ruling that the PFRS Pension Plan is part of the Plan of Adjustment *is* entitled to both res judicata and law of the case deference. See *In re City of Detroit*, 538 B.R. 314, 320 (E.D. Mich. Bkr. 2015).

to a factual issue or a party's legal position on a discrete issue. "[A] claim is barred by the res judicata effect of prior litigation if all of the following elements are present: "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies'; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 577–78 (6th Cir. 2008). The parties' current dispute was not litigated at the confirmation trial, as the City's recent objection to the PFRS's decision to utilize a 20-year amortization period was the first time it became apparent that the parties even *had* a disagreement relating to the amortization issue. Moreover, as even Malhotra admitted, the amortization issue was always contemplated to be an issue decided in 2023—at the end of the ten-year pension hiatus—so by definition, it could not have been raised and litigated back in 2013.

Similarly, the law of the case doctrine does not aide the City. "Issues decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition, constitute the law of the case." *EEOC v. United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus. of the United States and Canada, Local No. 120,* 235 F.3d 244, 249 (6th Cir.2000) (quotation omitted). As set forth above, this issue has not been litigated previously in this case. Moreover, while the "'law of the case' … expresses the practice of courts generally to refuse to reopen

what has been decided[,]" courts will diverge from a prior ruling if there is a "cogent reason to show the prior ruling is no longer applicable, such as if our prior opinion was a clearly erroneous decision which would work a manifest injustice." *Brady–Morris v. Schilling (In re Knight Trust),* 303 F.3d 671, 677-78 (6th Cir. 2002) (quotations omitted). Here, to the extent the Court previously relied on a document that was not the Plan and was inconsistent with the express terms of the Plan, a "cogent reason" certainly exists to depart from (or at least clarify) the footnote in the Confirmation Opinion which summarized the Financial Projection as though it represented the Plan of Adjustment itself.

### G.     An Adversary Proceeding Is Necessary

The City takes the position that an adversary proceeding is unnecessary. Fed. R. Bank. P. 7001(7) states "[a]n adversary proceeding is governed by the rules of this Part VII.  The following are adversary proceedings: . . . (7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12 or chapter 13 plan provides for the relief."  (emphasis added).  The City's position is that a mere motion is permissible because the Court has authority under the Plan to issue injunctions to "restrain interference by any Entity with consummation, implementation, or enforcement of the Plan or Confirmation Order."  The City's stance is that the 30-year amortization is part of the consummation/implementation of the Plan, and therefore, the Court has the authority to issue an injunction to enforce it.  Thus, the key issue is whether the 30-year amortization period is, in fact, provided for in the Plan

and/or Confirmation Order. If the Court finds that the Plan is silent on the amortization period and finds it necessary to inspect the external record (including the exhibits and testimony from trial) or if the Court finds that the City otherwise needs the funds to implement its "revitalization efforts," then under FRBP 7001(7), the City must invoke an adversary proceeding in order to properly adjudicate this issue.

<div style="margin-left: 50%;">
Respectfully submitted,
</div>

Date: February 13, 2023

By: */s/ Jennifer K. Green*
Jennifer K. Green
Ronald A. King
Clark Hill PLC
151 S. Old Woodward, Ste 200
Birmingham, MI 48009
(248) 988-2315
jgreen@clarkhill.com
rking@clarkhill.com
*Attorney for Creditor – PFRS*