**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DARELL CHANCELLOR

The City of Detroit, Michigan ("City") by its undersigned counsel, Miller, Canfield, Paddock and Stone, PLC, files this *Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Darell Chancellor* ("Motion"). In support of this Motion, the City respectfully states as follows:

## I. Introduction

1. On June 19, 2020, Darell Chancellor ("Chancellor") filed two lawsuits, one in federal and one in state court, against the City and a police officer of the City (in his representative and individual capacities) seeking monetary damages on account of the same alleged incidents that occurred in 2011 and 2012. The state court lawsuit was removed by the City and the lawsuits were then consolidated by order of the Federal District Court. Chancellor's claims in these lawsuits arose prior to the City's bankruptcy filing in July, 2013. Consequently, the filing of the lawsuits violates the discharge and injunction provisions in the City's confirmed Plan and the Bar Date Order (each as defined below).

36336370.7/022765.00213

2.     The City informed Chancellor of these violations and asked him to voluntarily dismiss the City from his lawsuits, but to no avail.  As a result, the City is left with no choice but to seek an order barring and permanently enjoining Chancellor from asserting and prosecuting the claims described in the federal court action and the state court action against Officer Stephen Geelhood (in his representative capacity), the City, or property of the City and requiring Chancellor to dismiss each court action with prejudice to the extent it seeks any such relief.

## II.     Factual Background

### A.     The City's Bankruptcy Case

3.     On July 18, 2013 ("Petition Date"), the City filed this chapter 9 case.

4.     On October 10, 2013, the City filed its Motion Pursuant to Section 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof ("Bar Date Motion") [Doc. No. 1146], which was approved by order of this Court on November 21, 2013 ("Bar Date Order").  [Doc. No. 1782].

5.     The Bar Date Order established February 21, 2014, as the deadline for filing claims against the City.  Paragraph 6 of the Bar Date Order states that the

> following entities must file a proof of claim on or before the Bar Date…any entity: (i) whose prepetition claim against the City is not listed in the List of Claims or is listed as disputed, contingent or unliquidated; and (ii) that desires to share in any distribution in this

bankruptcy case and/or otherwise participate in the proceedings in this
bankruptcy case associated with the confirmation of any chapter 9
plan of adjustment proposed by the City…

Bar Date Order ¶ 6.

6.      Paragraph 22 of the Bar Date Order also provides that:

Pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy
Rule 3003(c)(2), any entity that is required to file a proof of claim in
this case pursuant to the Bankruptcy Code, the Bankruptcy Rules or this
Order with respect to a particular claim against the City, but that fails
properly to do so by the applicable Bar Date, shall be forever barred,
estopped and enjoined from: (a) asserting any claim against the City or
property of the City that (i) is in an amount that exceeds the amount, if
any, that is identified in the List of Claims on behalf of such entity as
undisputed, noncontingent and liquidated or (ii) is of a different nature
or a different classification or priority than any Scheduled Claim
identified in the List of Claims on behalf of such entity (any such claim
under subparagraph (a) of this paragraph being referred to herein as an
"Unscheduled Claim"); (b) voting upon, or receiving distributions
under any Chapter 9 Plan in this case in respect of an Unscheduled
Claim; or (c) with respect to any 503(b)(9) Claim or administrative
priority claim component of any Rejection Damages Claim, asserting
any such priority claim against the City or property of the City.

7.      Chancellor did not file a proof of claim.

8.      On October 22, 2014, the City filed its *Eighth Amended Plan of the*

*Adjustment of Debts of the City of Detroit* ("Plan"), which this Court confirmed on

November 12, 2014.  [Doc. Nos. 8045 & 8272].

9.      The discharge provision in the Plan provides:

Except as provided in the Plan or in the Confirmation Order, the rights
afforded under the Plan and the treatment of Claims under the Plan
will be in exchange for and in complete satisfaction, discharge and

- 3 -

release of all Claims arising on or before the Effective Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (ii) the Holder of a Claim based on such debt has accepted the Plan.

Plan, Art. III.D.4, at p.50.

10.     Further, the Plan injunction set forth in Article III.D.5 provides in pertinent part:

**Injunction**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

**a.     all Entities that have been, are or may be holders of Claims against the City…shall be permanently enjoined from taking any of the following actions against or affecting the City or its property…**

**1.     commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affect the City of its property…**

**5.     proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

**6.     taking any actions to interfere with the implementation or consummation of the Plan.**

36336370.7/022765.00213

Plan, Article III.D.5, at pp.50-51 (emphasis added).

11.     The Court also retained jurisdiction to enforce the Plan injunction and to resolve any suits that may arise in connection with the consummation, interpretation or enforcement of the Plan.  Plan, Art. VII. F, G, I, at p.72.

**B.     Chancellor's Lawsuits Against the City and Officer Stephen Geelhood**

12.     On June 19, 2020, Chancellor filed a complaint against the City and Officer Stephen Geelhood (in his individual and representative capacity), in the United States District Court for the Eastern District of Michigan, commencing case number 20-11616 ("Federal Court Lawsuit"). On September 23, 2020, Chancellor filed his Second Amended Complaint ("Second Amended Complaint").  A copy of the Second Amended Complaint is attached as **Exhibit 6A** and the docket in the Federal Court Lawsuit is attached as **Exhibit 6B.**

13.     On June 19, 2020, Chancellor filed a complaint ("Removed Complaint") against the City and Officer Stephen Geelhood (in his individual and representative capacity), in the Third Judicial Circuit of Michigan, commencing case number 20-007758-NO ("Removed Lawsuit" and together with the Federal Court Lawsuit, the "Lawsuits").  A copy of the State Court Complaint is attached as **Exhibit 6C.**

14.     The State Court Lawsuit was removed to the United States District Court for the Eastern District of Michigan by notice dated July 27, 2020,

commencing case number 20-11992. On September 23, 2020, Chancellor filed an amended complaint. On that same day, the District Court entered the Order of Consolidation, which consolidated case 20-11616 with case 20-11992 for all purposes, including trial. **Exhibit 6D.** The Order of Consolidation also closed case 20-11992 for administrative purposes. The docket in the Removed Lawsuit is attached as **Exhibit 6E.**

15. The complaints are substantially similar.

16. Prior to the conviction at issue here, Chancellor had been convicted of five other crimes as an adult. **Exhibit 6F,** Darell Chancellor Deposition Transcript, pp. 20-23.[1]

17. Three of these convictions were for possession of heroin. Darell Chancellor Deposition Transcript, pp. 20-21. The other convictions were for receiving and concealing a stolen car and armed robbery. Darell Chancellor Deposition Transcript, pp. 21-23. Chancellor spent seven to eight years in prison for the armed robbery conviction and was released in 2010. Darell Chancellor Deposition Transcript, p. 25 §§ 8-14.

18. After Chancellor was released from prison in 2010, he was paroled. Darell Chancellor Deposition Transcript, p. 25, §§14-17.

---

[1] Chancellor was deposed on April 23, 2021.

36336370.7/022765.00213

19.     In his deposition, Chancellor stated after he was released, he moved into his mother's house at 5023 32nd Street, as he reported to his parole officer. Darell Chancellor Deposition Transcript, p. 35 §§ 22-25.  However, Chancellor alleged that he moved out of his mother's house the following month, in January 2011, and moved in with his girlfriend at 9029 Robinson in violation of his parole. Chancellor alleges that he lied to his parole officer and did not tell him about the alleged move. *Id.*

20.     The location where Chancellor resided is significant because Chancellor alleges that on November 2, 2011, an affidavit in support of a search warrant was falsified and sworn to by Defendant Officer Geelhood ("Geelhood") before a 36th District Court magistrate in the City of Detroit.  Second Amended Complaint ¶ 8.

21.     Chancellor further alleges that because of the false affidavit, a search warrant was issued by the magistrate for the search of the home of Chancellor's mother. Second Amended Complaint ¶ 9.

22.     According to Chancellor, in 2011, Geelhood falsely alleged that he received information from a confidential informant on October 31, 2011, that a large quantity of heroin was being stored and sold from the home of Chancellor's mother. Second Amended Complaint ¶ 10.

36336370.7/022765.00213

23.     In the affidavit, Geelhood stated that he set up surveillance at Chancellor's mother's home at 5023 32nd street on November 1, 2011, and "personally observed a black male in his '30s [, 5'8''‚] 180 lbs.' engaging in a 'suspected narcotics transaction' with buyers." Second Amended Complaint ¶ 11.

24.     On November 2, 2011, the search warrant based on Geelhood's allegedly false affidavit was executed at Chancellor's mother's home. During the execution of the warrant, a quantity of cocaine was found on the premises. No heroin was found. Second Amended Complaint ¶ 13.

25.     Chancellor alleges that he was not at his mother's house when the search warrant was executed. Second Amended Complaint ¶ 14. Darell Chancellor Deposition Transcript p. 41. Chancellor was later arrested in May of 2012 and charged with (a) the delivery/manufacture of a controlled substance (450 to 999 grams); (b) possession of a controlled substance (450 to 999 grams); (c) felon in possession of a firearm; and (d) felony firearm. Second Amended Complaint ¶ 14. When Chancellor was arrested, Chancellor stated that he knew that he was innocent. Darell Chancellor Deposition Transcript, p. 49 §§ 16-18.

26.     Chancellor alleged that the false claims made and sworn to by Geelhood in the search warrant affidavit led directly to the issuance of the search warrant, the raid at Chancellor's mother's home, the seizure of the cocaine, and to Chancellor's subsequent prosecution. Second Amended Complaint ¶ 15.

- 8 -

27.     Further, according to Chancellor, as a direct result of Geelhood's false affidavit in 2011, Chancellor was arrested and held in Wayne County Jail until his trial on November 8, 2012. Second Amended Complaint ¶¶ 16-17.

28.     In 2012, Geelhood was "the prosecution's star witness at trial." He testified to both the seizure of the cocaine during the raid and the events that he claimed had occurred the two previous days. Second Amended Complaint ¶ 18.

29.     During Chancellor's trial in 2012, Chancellor alleges that Geelhood testified falsely when he swore to the affidavit before the 36th District Court magistrate.  Second Amended Complaint ¶ 19.

30.     Chancellor alleges that Geelhood testified falsely at the trial in 2012 about receiving a tip from the confidential informant, conducting surveillance, and falsely identified Chancellor as the person that he observed selling heroin during his surveillance of Chancellor's mother's home. Second Amended Complaint ¶ 20.

31.     Chancellor also alleges:

21. The falseness of Geelhood's testimony regarding the alleged three separate hand-to-hand narcotic transactions during his surveillance is magnified by the fact that he never stopped any of the individuals allegedly involved in the drug buys to verify that one had actually taken place.

22. The falseness of Geelhood's identification of Darell as the person who he allegedly observed selling drugs on November 1, 2011 was further demonstrated by the difference between the description of the alleged seller as 5'8", 180 pounds, no glasses, and the actual size and description of Darell who is 5'11", 250 pounds and has worn prescription glasses his entire adult life.

36336370.7/022765.00213

Second Amended Complaint ¶¶ 21-22.

32.     Indeed, Chancellor challenged the veracity of Geelhood's testimony at his trial in 2012.  Second Amended Complaint ¶ 24.

33.     In that regard, during his deposition, Chancellor's attorney asked Chancellor:

> Q.     Without belaboring the point, Darell, what did it feel
>         like to go to trial and be accused of a crime that you
>         didn't commit?
> A.     I mean, it felt terrible. It feels more terrible when
>         you get found guilty of something you ain't commit
>         because it's like the justice system that failed you.
>         You been taught to believe in the justice system, but
>         to get to found guilty for something you ain't do is
>         where the justice going to come from, yeah.

Darell Chancellor Deposition Transcript, p. 78 §§ 10-18.

34.     During his trial, Chancellor testified and proclaimed his innocence.

**Exhibit 6G, Trial Transcript, pp. 78-84.**

35.     On November 8, 2012, Chancellor sent Judge Hathaway – the judge presiding over his trial – a letter which provided in pertinent part that Chancellor had been "locked up for 6 months for something I know nothing about" and "the police got the wrong person."  **Exhibit 6H, Chancellor Letter to Judge Hathaway.**

36.     On November 12, 2012, Chancellor was found guilty of possession of cocaine. According to Chancellor, Judge Hathaway explicitly relied on Geelhood's

36336370.7/022765.00213

false statements that identified Chancellor as the person who was seen selling drugs from the target address. Second Amended Complaint ¶ 24.

37.    Chancellor was sentenced on December 12, 2012, to serve a term of 14 years and 3 months to 30 years of imprisonment. Second Amended Complaint ¶ 25.

38.    Chancellor began his sentence on December 12, 2012.  **Exhibit 6I, Chancellor Commitment to Department of Corrections.**

39.    Chancellor's attorney asked Chancellor what it felt like to be "wrongfully convicted":

> Q.    Every single day you're in that prison cell, jail cell, precinct cell being accused and ultimately wrongfully convicted of doing something you didn't do, Darell, every day, all day what did it feel like?
> A.    It feel terrible when you know you ain't do something, but you convicted for it. It was --
> Q.    I listened -- did I interrupt you? I'm sorry. If you weren't done, go ahead.
> A.    I mean, like I was saying, it's like, like I said, you sitting in there looking like where the justice going to come from. That's a hard feeling when you know you ain't done nothing, but a judge convicted you of something and now you stuck in prison trying to figure out how you going to get back home for something you ain't do. First, you ain't supposed to be here because you ain't did nothing. But now that you here, how you going to get back home for something you ain't do.
> Q.    So when Counsel went over your previous convictions, I didn't hear anything about you ever going to trial except for this thing.
> A.    Because I did that. I would never -- if I did something, I'm going to let you -- I'll say I did it.

- 11 -

> So if I do it --
> Q.    You didn't go to trial on those other charges --
> A.    No.
> Q.   because ultimately you either pled nolo contendere
>       or not guilty; right?
> A.    Right; right.
> Q.    Excuse me. Or guilty.· Sorry.
> A.    Right. I pled guilty; right.
> Q.    This one you fought and went to trial; right?
> A.    Right.

Darell Chancellor Deposition Transcript, pp. 83-84, §§ 2-8.

### C.    Chancellor Appeals His Conviction

40.    On or about January 18, 2013, Chancellor appealed his conviction and

the trial court entered the Claim of Appeal and Order Appointing Counsel. **Exhibit**

**6J, Claim of Appeal and Order Appointing Counsel.**  The docket sheet for

Chancellor's appeal is attached as **Exhibit 6K, Court of Appeals Docket Sheet.**

41.    The Michigan Court of Appeals affirmed the trial court despite

Defendant's argument that he was the victim of mistaken identity. **Exhibit 6L,**

**Decision of the Michigan Court of Appeals.**

42.    On March 24, 2020, Chancellor's conviction was vacated.  Second

Amended Complaint ¶ 34.

## III.   Argument

43.    Chancellor violated the Plan's injunction and discharge provisions

when he filed the Lawsuits to assert pre-petition claims and otherwise seek relief

against the City and Geelhood (in his representative capacity). And, he continues to violate them by persisting in prosecuting the Lawsuits.

44.     Under the "fair contemplation" test, Chancellor's claims against the City and Geelhood arose pre-petition – *i.e.,* before July 18, 2013 – because before that date, Chancellor "could have ascertained through the exercise of reasonable due diligence that [he] had a claim" against the City, based on the events which occurred in 2011 and 2012, as detailed in the Second Amended Complaint and the other exhibits to this Motion. *See In re City of Detroit, Michigan*, 548 B.R. 748, 763 (Bankr. E.D. Mich. 2016) (citation omitted); *see also* Doc. No. 11296, 13617; *Burton v. Sanders*, No. 20-11948, 2021 WL 168543, at *9 (E.D. Mich. Jan. 1, 2021), at *4; *Monson v. City of Detroit*, No. 18-10638, 2019 WL 1057306, at *9 (E.D. Mich. March 6, 2019); *Sanford v. City of Detroit*, No. 17-13062, 2018 WL 6331342, at *5-6 (E.D. Mich. Dec. 4, 2018).

45.     Despite holding a pre-petition claim, Chancellor did not file a proof of claim in the City's bankruptcy case. The Plan's discharge provision states that the "rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date." Plan Art. III.D.4, at p.50.

46.     Consequently, Chancellor does not have a right to a distribution or payment under the Plan on account of the claims asserted in the Lawsuits. Plan,

36336370.7/022765.00213

Art. III.D.5, at p.50 ("[A]ll entities that have been, are or may be holders of Claims against the City . . . shall be permanently enjoined from . . . proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan."). *See also* Plan, Art. I.A.19, at p.3; Art. I.A.134, at p.11; Art. VI.A.1, at p.67 ("Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim."). Any claims that Chancellor may have had were discharged, and the Plan enjoins Chancellor from pursuing them. The Bar Date Order also forever barred, estopped, and enjoined Chancellor from pursuing the claims asserted in the Lawsuits.

47. Even if Chancellor could somehow seek relief on his claims against Geelhood (in his representative capacity), the City, or its property (which he cannot), the proper and only forum for doing so would be in this Bankruptcy Court. There is therefore no set of circumstances under which Chancellor is, or would have been, permitted to commence and prosecute the Lawsuits against Geelhood (in his representative capacity), the City or its property.

## IV.    Conclusion

48. The City thus respectfully requests that this Court enter an order, in substantially the same form as the one attached as **Exhibit 1**: (a) directing Chancellor to dismiss, or cause to be dismissed, the City and Geelhood in his

representative capacity with prejudice from the Lawsuits; (b) permanently barring, estopping and enjoining Chancellor from asserting the claims alleged in, or claims related to, the Lawsuits against Geelhood (in his representative capacity), the City or property of the City; and (c) prohibiting Chancellor from sharing in any distribution in this bankruptcy case. The City sought, but did not obtain, concurrence to the relief requested in the Motion.

Dated: April 28, 2023

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com
Attorneys for the City of Detroit

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## EXHIBIT LIST

| | |
|---|---|
| Exhibit 1 | Proposed Order |
| Exhibit 2 | Notice of Opportunity to Object |
| Exhibit 3 | None |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None |
| Exhibit 6A | Second Amended Complaint |
| Exhibit 6B | Federal Court Lawsuit Docket |
| Exhibit 6C | State Court Complaint |
| Exhibit 6D | Order of Consolidation |
| Exhibit 6E | Removed Lawsuit Docket |
| Exhibit 6F | Darell Chancellor Deposition Transcript |
| Exhibit 6G | Trial Transcript |
| Exhibit 6H | Chancellor Letter to Judge Hathaway |
| Exhibit 6I | Chancellor Commitment to Department of Corrections |
| Exhibit 6J | Claim of Appeal and Order Appointing Counsel |

- 16 -

Exhibit 6K          Court of Appeals Docket Sheet

Exhibit 6L          Decision of the Michigan Court of Appeals

36336370.7/022765.00213

## EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## ORDER GRANTING CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DARELL CHANCELLOR

This matter, having come before the Court on the Motion to Enforce Order, Pursuant to Sections 105, 501, and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing of Proofs of Claim and Approving Form and Manner of Notice Thereof Against Darell Chancellor ("Motion"),[1] upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.    The Motion is granted.

2.    Within five days of the entry of this Order, Darell Chancellor shall dismiss, or cause to be dismissed, the City of Detroit and Officer Stephen

---

[1] Capitalized terms used but not otherwise defined in this Order shall have the meanings given to them in the Motion.

Geelhood in his representative capacity with prejudice from the cases captioned as: (a) *Darell Deon Chancellor, Chancellor, v Officer Stephen Geelhood in his Individual and Representative Capacity, and the City of Detroit, a municipal entity*, *Defendants*, filed in the United States District Court for the Eastern District of Michigan and assigned Case No. 20-cv-11616 ("Federal Lawsuit"); and (b) *Darell Chancellor, Chancellor, v Officer Stephen Geelhood in his Individual and Representative Capacity, and the City of Detroit, a municipal entity*, *Defendants*, as removed to the United States District Court for the Eastern District of Michigan and assigned Case No. 20-cv-11992 ("Removed Lawsuit", and together with Federal Lawsuit, the "Lawsuits").

3. Darell Chancellor is permanently barred, estopped and enjoined from asserting claims asserted in the Lawsuits or claims arising from or related to the Lawsuits against Officer Geelhood (in his representative capacity), the City of Detroit, or property of the City of Detroit.

4. Darell Chancellor is prohibited from sharing in any distribution in this bankruptcy case.

5. The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

## EXHIBIT 2 – NOTICE

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| In re: | Bankruptcy Case No. 13-53846 |
|---|---|
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**NOTICE OF OPPORTUNITY TO OBJECT TO CITY OF
DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING
THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST
DARELL CHANCELLOR**

The City of Detroit has filed papers with the Court requesting the entry of an

order enforcing the bar date order and confirmation order against Darell Chancellor.

**Your rights may be affected. You should read these papers carefully and**

**discuss them with your attorney.**

If you do not want the Court to enter an Order granting the *City Of Detroit's*

*Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation*

*Order Against Darell Chancellor,* within 14 days, you or your attorney must:

1.    File with the court a written response or an answer, explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above.  You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2.   If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
      Marc N. Swanson (P71149)
      Megan R. Baxter (P81945)
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      Telephone: (313) 496-7591
      Facsimile: (313) 496-8451
      swansonm@millercanfield.com
      baxter@millercanfield.com


Dated: April 28, 2023

**EXHIBIT 3 – NONE**

## EXHIBIT 4 – CERTIFICATE OF SERVICE

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 28, 2023, he served a copy of the foregoing **CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DARELL CHANCELLOR** upon counsel for Darell Chancellor, in the manner described below:

Via first class mail and email:

**Madeline M. Sinkovich**
Mike Morse Law Firm
24901 Northwestern Hwy
Ste 700
Southfield, MI 48075
Email: madeline.sinkovich@855mikewins.com


**Ayanna D. Hatchett**
Johnson Law PLC
535 Griswold St.
Suite 2632
Detroit, MI 48226-3687
Email: ahatchett@venjohnsonlaw.com

DATED:  April 28, 2023

By: /s/ Marc N. Swanson
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

**EXHIBIT 5 – NONE**

**EXHIBIT 6A**
**Second Amended Complaint**

36336370.7/022765.00213

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

DARELL CHANCELLOR,

      Plaintiff,                             Case No. 20-cv-11616

v.                                    Hon. George Caram Steeh

OFFICER STEPHEN GEELHOOD in his
Individual and Representative Capacity,
and the CITY OF DETROIT,
a Municipal entity,

      Defendants.

---

| VEN R. JOHNSON (P39219) | PATRICK CUNNINGHAM |
|---|---|
| AYANNA D. HATCHETT (P70055) | (P67643) |
| Counsel for Plaintiff | City of Detroit Law Department |
| The Buhl Building | Attorneys for Defendant City of D |
| 535 Griswold, Ste. 2632 | 2 Woodward Ave., Suite 500 |
| Detroit, MI 48226 | Detroit, MI 48226 |
| (313) 324.8300 | (313) 237.5032 |
| vjohnson@venjohnsonlaw.com | cunninghamp@detroitmi.gov |
| ahatchett@venjohnsonlaw.com | |

---

## PLAINTIFF'S SECOND AMENDED COMPLAINT

      NOW COMES Plaintiff, DARELL CHANCELLOR, through his counsel, JOHNSON LAW, PLC and for this Amended Complaint, against the defendants, states as follows:

1. At all times relevant to this lawsuit, Plaintiff, Darell Chancellor ("Darell") was a resident of Detroit, in Wayne County, Michigan.

2. At all times relevant to this lawsuit, Defendant Officer Stephen Geelhood ("Geelhood") was employed as a police officer with the Detroit Police Department.

3. At all times relevant to this lawsuit, Geelhood acted under color of state law and is being sued in his individual and representative capacities.

4. At all times relevant to this lawsuit, Defendant City of Detroit ("The City") was a municipal corporation, duly organized in carrying on governmental functions in the City of Detroit, in Wayne County, Michigan.

5. The amount in controversy exceeds $25, 000.00 exclusive of costs, interest and attorney fees; and jurisdiction is otherwise conferred on this Court pursuant to the United States Constitution as well as 42 U.S.C. §1983.

6. Plaintiff relies on the jury demand that was originally filed in this Court.

## <u>COMMON ALLEGATIONS</u>

7. At all times relevant to this lawsuit, Geelhood was a member of the now-defunct narcotics unit in the police department for the City of Detroit.

8. On November 2, 2011, an affidavit in support of a search warrant was falsified and sworn to by Officer Geelhood before a 36th District Court magistrate in the City of Detroit.

2

9. As a result of Geelhood's swearing to the false affidavit, a search warrant was issued by the magistrate for the search of *5023 32nd Street* in Detroit, the home of Darell's mother.

10. In the false affidavit, Geelhood alleged that he had received information from a confidential informant (CI) on October 31, 2011 that a large quantity of heroin was being stored at and sold from the 32nd Street home. That allegation was false.

11. In the false affidavit, Geelhood further alleged that he had set up surveillance at 5023 32nd Street on November 1, 2011, and personally observed a black male, described as being in his "30s [, 5'8",] 180 lbs." engaging in a "suspected narcotics transaction" with buyers. That allegation was also false.

12. The affidavit went on to state that based on his 17 years of experience as a police officer and 9 years in the Narcotics Unit, Geelhood believed that there was probable cause that heroin and the individual suspected of making the narcotics transaction would be found on the premises.

13. On November 2, 2011, the search warrant based on Geelhood's false affidavit was executed at 5023 32nd Street in Detroit. During the execution of the warrant, a quantity of cocaine was found on the premises. No heroin was found.

14. Darell was not at his mother's house when the search warrant was executed. But he was later arrested in May of 2012 and charge with (a) the delivery/manufacture of a controlled substance (450 to 999 grams); (b) possession of a controlled substance (450 to 999 grams); (c) felon in possession of a firearm; and (d) felony firearm.

15. The false claims made and sworn to b Geelhood in the search warrant affidavit led directly to the issuance of the search warrant, the raid at 5023 32nd Street, the seizure of the cocaine and to Darell's subsequent prosecution.

16. As a direct result of Geelhood's false affidavit, Darell was arrested in May of 2012 and held in Wayne County Jail until his trial date.

17. A bench trial was conducted before the Honorable Daniel Hathaway on November 8, 2012.

18. Geelhood was the prosecution's star witness at trial. He testified to both the seizure of the cocaine during the raid and the events that he falsely claimed had occurred the two previous days.

19. Geelhood testified falsely at trial that he was telling the truth to the magistrate when he swore to the affidavit before the 36th District Court magistrate.

20. Geelhood also testified falsely at trial about receiving a tip from the CI, conducting surveillance, and he further falsely identified Darell as the person

4

that he supposedly observed selling heroin during his alleged surveillance of Darell's mother's home.

21. The falseness of Geelhood's testimony regarding the alleged three separate hand-to-hand narcotic transactions during his surveillance is magnified by the fact that he never stopped any of the individuals allegedly involved in the drug buys to verify that one had actually taken place.

22. The falseness of Geelhood's identification of Darell as the person who he allegedly observed selling drugs on November 1, 2011 was further demonstrated by the difference between the description of the alleged seller as 5'8", 180 pounds, no glasses, and the actual size and description of Darell who is 5'11", 250 pounds and has worn prescription glasses his entire adult life.

23. On November 12, 2012, when Darell was found guilty of possession of cocaine, Judge Hathaway explicitly relied on Geelhood's false statements that identified Darell as the person who was seen selling drugs from the target address.

24. The reliance on Geelhood's false statements was highlighted when Judge Hathaway issued his verdict convicting Darell of possession of cocaine and stated the following:

> "*So it really comes down to the reliability of Officer Geelhood's identification. As I said when [Geelhood] was*

> questioned and the discrepancies were pointed out he was
> adamant and maintained that the individual he saw that day
> through the binoculars was, in fact, the defendant Mr.
> Chancellor; that he recognized him from that surveillance
> that he did and that he was in fact the person and of course to
> me, this comes down to, well, part of it comes down to that
> identification." (Trial transcript, Vol. 3, pp 31-32)

25. Darell was sentenced on December 12, 2012 to serve a term of 14 years and 3 months to 30 years of imprisonment.

26. The Conviction Integrity Unit (CIU), a division of the Wayne County Prosecutor's Office, became involved in Darell's case as a result of an internal investigation by the Detroit Police Department (DPD) as well as a federal investigation into the department's Narcotics Unit concerning allegations that multiple Detroit police narcotics officers, including Geelhood, had participated in falsifying warrant affidavits, falsely accusing citizens of drug crimes and stealing case, guns and narcotics found during search warrant executions.

27. On information and belief, at the time of Darell's trial in 2012, the City was aware of the existence of the federal investigation and that the DPD had begun its own investigation of the Narcotics Unit.

28. As a result of the DPD's investigation, the Narcotic Unit, which included Geelhood, was disbanded by Detroit Police Chief James Craig in the summer of 2014.

6

29. In 2019, because of the numerous allegations of misconduct against multiple officers in the Narcotics Unit, Darell's conviction was reviewed by the CIU.

30. The CIU's investigation found that the records of the DPD and/or the Narcotics Unit contained no complaints of criminal activity at the 32nd Street address.

31. The CIU also found that there were no records of the tip allegedly provided by the CI to Geelhood as alleged in his false search warrant affidavit.

32. At the conclusion of their investigation, the CIU determined that the allegations contained in the search warrant affidavit and Geelhood's trial testimony could not be corroborated.

33. Likewise, the CIU concluded that the allegations in Geelhood's affidavit that supported the issuance of the search warrant for the home on 32nd Street were false.

34. An order to vacate Darell's conviction was subsequently entered on March 24, 2020.

35. From the time of Darell's false arrest that arose from Geelhood's falsified search warrant and affidavit, up through the time that his conviction was vacated, Darell was incarcerated for eight years.

36. Because of Geelhood and/or the City's negligent, grossly negligent and/or intentional misconduct, Darell was unlawfully arrested, imprisoned,

7

maliciously prosecuted and deprived of due process, for a crime that Geelhood and/or the City knew Darell did not commit.

## COUNT I:  STATE CLAIM—FALSE ARREST--GEELHOOD

37. Plaintiff reasserts and incorporates each of the allegations stated above.

38. Darell was arrested.

39. Darell was aware of the arrest and it was against his will.

40. Geelhood knew that the search warrant that Darell's arrest was premised upon was not based on true and accurate information and thus didn't provide probable cause for Darell's arrest.

41. Geelhood knew that he had falsified statements in the affidavit to support the search warrant which led to an unlawful search and seizure of the property found at Darell's mother's home on 32nd Street, which ultimately led to Darell's arrest.

42. As the direct and proximate result of Geelhood's misconduct, Darell suffered, and will continue to suffer, damages in the future, including, but not limited to:

   a.   Physical pain and suffering;
   b.   Mental anguish;
   c.   Fright and shock;
   d.   Denial of social pleasure and enjoyments;
   e.   Embarrassment, humiliation or mortification;
   f.   Lost wages and/or earning capacity;
   g.   The legal expense incurred by Darell to defend against the frivolous criminal   charges prosecuted against him; and

8

h.     All other damages learned through the course of discovery and up to the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

## COUNT II: STATE CLAIM—MALICIOUS PROSECUTION—GEELHOOD

43. Plaintiff reasserts and incorporates each of the allegations stated above.

44. Geelhood instituted and initiated the allegations of criminal activity against Darell without probable cause and with malice or a with primary purpose other than bringing about justice through the proper adjudication of the claim upon which the proceedings are based.

45. Darell's criminal conviction was vacated in his favor.

46. As the direct and proximate result of Geelhood's misconduct, Darell has suffered damages and will continue to suffer damages in the future, including but not limited to:

a.  Mental anguish;
b.  Embarrassment, humiliation or mortification;
c.  Denial of social pleasure and enjoyment; and
d.  All other damages learned through the course of discovery and up through time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

## COUNT III:  STATE CLAIM—FALSE IMPRISONMENT--GEELHOOD

47. Plaintiff reasserts and incorporates each of the allegations stated above.

48. Darell was imprisoned by Geelhood when he was arrested without probable cause and thus deprived of his personal liberty and freedom of movement.

49. Such imprisonment was against Darell's will.

50. Geelhood accomplished the imprisonment by actual physical force.

51. Geelhood intended to deprive Darell of his personal liberty or freedom of movement.

52. Such imprisonment was unlawful because the arrest was made without probable cause.

53. The prosecution against Darell was caused by Geelhood.

54. A post-conviction proceeding vacated Darell's underlying conviction for possession which in turn released Darell from serving further time in prison.

55. There was no probable cause for initiating or continuing the proceeding.

56. The initiation or continuation of the proceeding was done with malice or a primary purpose other than that of bringing the offender to justice.

57. As the direct and proximate result of misconduct by Geelhood, Darell suffered, and will continue to suffer, damages in the future, including, but not limited to:

   a.    Physical pain and suffering;
   b.    Mental anguish;

10

     c.      Fright and shock;

     d.      Denial of social pleasure and enjoyments;

     e.      Embarrassment, humiliation or mortification;

     f.      Lost wages and/or earning capacity;

     g.      The legal expense that Darell incurred to defend against the wrongfully prosecuted criminal charges; and

     h.      All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

## <u>COUNT IV: STATE CLAIM—GROSS NEGLIGENCE—GEELHOOD</u>

58. Plaintiff reasserts and incorporates each of the allegations stated above.

59. Geelhood had a duty to the general public and in particular to Darell, to refrain from grossly negligent conduct.

60. Geelhood breached that duty and was grossly negligent, or was so reckless as to demonstrate a substantial lack of concern for whether an injury would result when he knowingly falsified the contents of the affidavit that supported the search warrant and knowing executed the search warrant that he knew lacked probable cause.

61. By knowingly falsifying the contents of affidavit and knowingly executing a search that he knew lacked probable cause, Geelhood withheld evidence that exculpated Darell.

11

62. Geelhood's gross negligence was the one most immediate, efficient, and direct cause of the injury or damage, e.g., the proximate cause, of Darell's damages and injuries, including but not limited to:

    a.    False arrest for a crime he did not commit;
    b.    False imprisonment for a crime he did not commit;
    d.    Physical pain and suffering;
    e.    Mental anguish;
    f.    Fright and shock;
    g.    Denial of social pleasure and enjoyment;
    h.    Embarrassment, humiliation or mortification;
    i.    Lost wages and/or earning capacity; and
    j.    All other damages learned through the course of discovery.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

## COUNT V: FEDERAL CLAIM-- MUNICIPAL LIABILITY— CITY OF DETROIT

63. Plaintiff reasserts and incorporates each of the allegations stated above.

64. At all times relevant to this lawsuit, Darell had a right under the due process clause of the state and federal constitutions not to be deprived of his life, liberty, or property.

65. Geelhood's acts of falsifying the affidavit in support of the operative search warrant and executing the search warrant that he accordingly knew lacked the requisite probable cause amounts to withholding exculpatory evidence and

violated Darell's fundamental constitutional rights under the 4th, 8th and 14th Amendments.

66. At all times relevant to this lawsuit, the City did have a custom or practice of corruption and misconduct within the narcotics' unit that gave rise to routinely falsifying affidavits to support search warrants, falsely accusing citizens of possessing and/or selling drugs, as well as unlawfully stealing and/or seizing property obtained from searches.

67. Those customs and practices of the City's narcotics unit were so pervasive that the narcotics unit was ultimately disbanded by the Detroit Police Department's own police chief.

68. At all times relevant to this lawsuit, the City did have a custom or practice within its narcotics' unit of failing to adequately train and/or supervise its officers.

69. These failures to adequately train and/or supervise were evident by the years and years of officer corruption and misconduct that went unnoticed and undisciplined.

70. The City, by facilitating a custom and/or practice of corruption and misconduct as well as failing to adequately train and/or supervise acted as the "moving force" behind the deprivation of Darell's constitutional rights.

13

71. There is a direct causal link between the customs and/or practices and the injuries that Darell has suffered.

72. As a direct and proximate result of the City's customs and/or practices and Geelhood's misconduct specifically, Darell has suffered damages and will continue to suffer damages in the future, including but not limited to the following:

    a.    Physical pain and suffering;
    b.    Mental anguish;
    c.    Fright and shock;
    d.    Denial of social pleasure and enjoyments;
    e.    Embarrassment, humiliation or mortification;
    f.    Lost wages and/or earning capacity;
    g.    The legal expense that Darell incurred to defend against wrongfully prosecuted criminal charges; and
    h.    All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

<u>**COUNT VI: FEDERAL CLAIMS-FALSE ARREST &**</u>
<u>**FALSE IMPRISONMENT--GEELHOOD**</u>

73. Plaintiff reasserts and incorporates each of the allegations stated above.

74. Pursuant to 42 U.S.C. § 1983, as well as the 4th, 8th and/or 14th Amendments to the United States Constitution, individuals are protected from detention without legal process.

14

75. Darell was falsely arrested and falsely imprisoned by Geelhood.

76. Geelhood intentionally and deliberately, or with a reckless disregard for the truth, made false statements, material misrepresentations and/or omissions in the search warrant and affidavit to establish probable cause for Darell's arrest and imprisonment.

77. The magistrate would not have found probable cause for the search warrant without Geelhood's false statements, material misrepresentations and/or omissions.

78. The protection from detention without legal process is a clearly established constitutional right of which a reasonable person and/or officer would have known,.

79. Hence, Geelhood's actions are objectively unreasonable considering this clearly established constitutional right.

80. As a direct and proximate result of Geelhood's misconduct, Darell has suffered damages, and will continue to suffer damages in the future, including, but not limited to:

a.    Physical pain and suffering;
b.    Mental anguish;
c.    Fright and shock;
d.    Denial of social pleasure and enjoyments;
e.    Embarrassment, humiliation or mortification;
f.    Lost wages and/or earning capacity;
g.    The legal expense incurred by Darell to defend against the frivolous criminal charges prosecuted against him; and

15

      h.      All other damages learned through the course of discovery and up to the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT VII: FEDERAL CLAIM—MALICIOUS PROSECUTION—GEELHOOD

81. Plaintiff reasserts and incorporates each of the allegations stated above.

82. Pursuant to 42 U.S.C. § 1983, as well as the 4th, 8th and/or 14th Amendments to the United States Constitution, individuals are protected from criminal prosecution without probable cause.

83. A criminal prosecution was initiated by Geelhood against Darell.

84. Geelhood influenced and/or participated in the prosecution against Darell when he intentionally and deliberately, or with a reckless disregard for the truth, made false statements, material misrepresentations and/or omissions in the search warrant and affidavit.

85. Geelhood's false statements were material in establishing probable cause to prosecute Darell.

86. Darell suffered a deprivation of liberty as a consequence of the legal proceeding because he was imprisoned for over 8 years.

87. The criminal proceedings against Darell were ultimately resolved in his favor when his conviction was vacated.

16

88. The protection from criminal prosecution without probable cause is a clearly established constitutional right of which a reasonable person would have known.

89. Geelhood's actions were objectively unreasonable considering this clearly established constitutional right.

90. As a direct and proximate result of Geelhood's misconduct, Darell has suffered, and will continue to suffer damages in the future, including, but not limited to:

    a.    Physical pain and suffering;
    b.    Mental anguish;
    c.    Fright and shock;
    d.    Denial of social pleasure and enjoyments;
    e.    Embarrassment, humiliation or mortification;
    f.    Lost wages and/or earning capacity;
    g.    The legal expense that Darell incurred to defend against wrongfully prosecuted criminal charges; and
    h.    All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

17

## <u>COUNT VIII:  FEDERAL CLAIMS—DENIAL OF DUE PROCESS—GEELHOOD</u>

91.   Plaintiff reasserts and incorporates each of the allegations stated above.

92.   Darell had a right under the due process clause in the federal constitution, as well as the due process clause in Michigan's constitution, not to be deprived of his life, liberty, or property.

93.   At all times relevant to this lawsuit, Geelhood was a state actor and his conduct was subject to 42 U.S.C. §§ 1983, 1985, and 1988.

94.   The search warrant and affidavit that Geelhood falsified and/or his failure to disclose that he falsified the search warrant and affidavit violated Darell's right to due process.

95.   Geelhood willfully or inadvertently falsified the search warrant and affidavit and/or failed to disclose that he falsified the search warrant and affidavit.

96.   Probable cause could not have been established without Geelhood's falsified statements in the search warrant and affidavit and/or without his failure to disclose that he falsified statements in the search warrant and affidavit.

97.   As a result of Geelhood's falsified statements in the search warrant and affidavit and/or Geelhood's failure to disclose that he falsified statements in the search warrant and affidavit Darell was prejudiced.

98.   Geelhood's knowledge that the statements he provided to establish probable cause for the search warrant and affidavit were false was exculpatory.

99. Despite having this exculpatory evidence, Geelhood never produced this evidence to the prosecution or defense counsel in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

100. The right to due process is a clearly established constitutional right of which a reasonable person would have known.

101. Geelhood's actions were objectively unreasonable considering this clearly established constitutional right.

102. As a direct and proximate result of Geelhood's misconduct, Darell has suffered damages and will continue to suffer damages in the future, including, but not limited to:

   a.  Physical pain and suffering;
   b.  Mental anguish;
   c.  Fright and shock;
   d.  Denial of social pleasure and enjoyments;
   e.  Embarrassment, humiliation or mortification;
   f.  Lost wages and/or earning capacity;
   g.  The legal expense that Darell incurred to defend against wrongfully prosecuted criminal charges; and
   h.  All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

Respectfully submitted,

**JOHNSON LAW, PLC.**


By:  */s/    Ayanna D. Hatchett*
AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39
Counsel for Plaintiff
The Buhl Building
535 Griswold, Ste.  2632
Detroit, MI  48226
(313) 324.8300

Dated:  September 23, 2020

20

**EXHIBIT 6B**

**Federal Court Lawsuit Docket**

Query    Reports    Utilities    Help    Log Out

reassigned

# U.S. District Court
## Eastern District of Michigan (Detroit)
### CIVIL DOCKET FOR CASE #: 2:20-cv-11616-GCS-EAS

Chancellor v. Geelhood et al                          Date Filed: 06/19/2020
Assigned to: District Judge George Caram Steeh        Jury Demand: Plaintiff
Referred to: Magistrate Judge Elizabeth A. Stafford   Nature of Suit: 950 Constitutional - State
Demand: $75,000                                       Statute
Cause: 28:2201 Constitutionality of State Statute(s)  Jurisdiction: Federal Question

**Plaintiff**

**Darell Deon Chancellor**                represented by **Madeline M. Sinkovich**
                                                         Mike Morse Law Firm
                                                         24901 Northwestern Hwy
                                                         Ste 700
                                                         Southfield, MI 48075
                                                         248-621-2245
                                                         Email:
                                                         madeline.sinkovich@855mikewins.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ayanna D. Hatchett**
                                                         Johnson Law PLC
                                                         535 Griswold St.
                                                         Suite 2632
                                                         Detroit, MI 48226-3687
                                                         313-324-8300
                                                         Email: ahatchett@venjohnsonlaw.com
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Officer Stephen Geelhood**               represented by **Patrick M. Cunningham**
                                                         City of Detroit Law Department
                                                         2 Woodward Avenue
                                                         Suite 500
                                                         Detroit, MI 48226
                                                         313-237-5032
                                                         Fax: 313-224-5505
                                                         Email: cunninghamp@detroitmi.gov
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**City of Detroit, a Municipal entity**    represented by **Patrick M. Cunningham**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

13-53846-tjt    Doc 13691    Filed 04/28/23    Entered 04/28/23 09:24:05    Page 49 of 191

| Date Filed | # | Docket Text |
|---|---|---|
| 06/19/2020 | 1 | COMPLAINT *and Jury Demand* filed by Darell Deon Chancellor against All Defendants with Jury Demand. Plaintiff requests summons issued. Receipt No: AMIEDC-7875697 - Fee: $ 400. County of 1st Plaintiff: wayne - County Where Action Arose: Wayne - County of 1st Defendant: wayne. [Previously dismissed case: No] [Possible companion case(s): None] (Hatchett, Ayanna) (Entered: 06/19/2020) |
| 06/19/2020 | 2 | SUMMONS Issued for *City of Detroit, a Municipal entity* (SKra) (Entered: 06/19/2020) |
| 06/19/2020 | 3 | SUMMONS Issued for *Officer Stephen Geelhood* (SKra) (Entered: 06/19/2020) |
| 06/19/2020 | | A United States Magistrate Judge of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form is available for download at http://www.mied.uscourts.gov (SKra) (Entered: 06/19/2020) |
| 07/17/2020 | 4 | ANSWER to Complaint with Affirmative Defenses by City of Detroit, a Municipal entity. (Cunningham, Patrick) (Entered: 07/17/2020) |
| 08/04/2020 | 5 | ANSWER to Complaint with Affirmative Defenses by Officer Stephen Geelhood. (Cunningham, Patrick) (Entered: 08/04/2020) |
| 08/04/2020 | 6 | NOTICE TO APPEAR BY TELEPHONE: **Scheduling Conference set for 9/14/2020 at 2:00 PM before District Judge George Caram Steeh.** *Plaintiff's counsel shall initiate the conference call to 313-234-5175* ***JOINT DISCOVERY PLAN DUE BY 9/08/2020*** (BSau) (Entered: 08/04/2020) |
| 09/08/2020 | 7 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Scheduling Conference set for 9/14/2020 at 2:00 PM before District Judge George Caram Steeh.** (BSau) (Entered: 09/08/2020) |
| 09/11/2020 | 8 | DISCOVERY plan jointly filed pursuant to Federal Rules of Civil Procedure 26(f) (Hatchett, Ayanna) (Entered: 09/11/2020) |
| 09/14/2020 | | Minute Entry for proceedings before District Judge George Caram Steeh: Scheduling Conference held on 9/14/2020. (Court Reporter: None Present, Not on the Record) (BSau) (Entered: 09/14/2020) |
| 09/14/2020 | 9 | SCHEDULING ORDER: **Discovery due by 3/19/2021, Dispositive Motion Cut-off set for 4/23/2021, Final Pretrial Conference for 8/17/2021 at 10:00 AM before District Judge George Caram Steeh, Jury Trial set for 8/31/2021 at 9:00 AM before District Judge George Caram Steeh.** Signed by District Judge George Caram Steeh. (Refer to image for additional dates) (BSau) (Entered: 09/14/2020) |
| 09/23/2020 | 10 | AMENDED COMPLAINT with Jury Demand filed by Darell Deon Chancellor against All Defendants. NO NEW PARTIES ADDED. (Hatchett, Ayanna) (Entered: 09/23/2020) |
| 09/23/2020 | 11 | ORDER of consolidation. Signed by District Judge George Caram Steeh. (DPer) (Entered: 09/23/2020) |
| 09/23/2020 | 12 | Notice to Parties Regarding Consolidated Case: Order of consolidation entered on *09/23/20*. Designated lead case number is *20-11616*. (DPer) (Entered: 09/23/2020) |
| 09/23/2020 | 13 | AMENDED COMPLAINT with Jury Demand *Plaintiff's Second Amended Complaint* filed by Darell Deon Chancellor against All Defendants. NO NEW PARTIES ADDED. (Hatchett, Ayanna) (Entered: 09/23/2020) |

| 10/07/2020 | 14 | ANSWER to Amended Complaint with Affirmative Defenses by City of Detroit, a Municipal entity, Officer Stephen Geelhood. (Cunningham, Patrick) (Entered: 10/07/2020) |
| --- | --- | --- |
| 01/22/2021 | 15 | *Defendants'* WITNESS LIST by City of Detroit, a Municipal entity, Officer Stephen Geelhood (Cunningham, Patrick) (Entered: 01/22/2021) |
| 01/25/2021 | 16 | *PLAINTIFF'S* WITNESS LIST by Darell Deon Chancellor (Hatchett, Ayanna) (Entered: 01/25/2021) |
| 02/25/2021 | 17 | FIRST STIPULATED ORDER to Extend Scheduling Order. **Discovery due by 6/18/2021, Dispositive Motion Cut-off set for 7/23/2021, Final Pretrial Conference reset for 11/16/2021 at 10:00 AM before District Judge George Caram Steeh, Jury Trial reset for 11/30/2021 at 9:00 AM before District Judge George Caram Steeh**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 02/25/2021) |
| 04/22/2021 | 18 | *Second* WITNESS LIST by City of Detroit, a Municipal entity, Officer Stephen Geelhood (Cunningham, Patrick) (Entered: 04/22/2021) |
| 05/21/2021 | 19 | SECOND STIPULATED ORDER TO EXTEND SCHEDULING ORDER. **Discovery due by 9/16/2021; Dispositive Motion Cut-off reset for 10/21/2021; Final Pretrial Conference reset for 2/15/2022 at 10:00 AM before District Judge George Caram Steeh; and Jury Trial reset for 3/1/2022 at 09:00 AM before District Judge George Caram Steeh**. Signed by District Judge George Caram Steeh. (LHos) (Entered: 05/21/2021) |
| 07/21/2021 | 20 | *Third* WITNESS LIST by All Defendants (Cunningham, Patrick) (Entered: 07/21/2021) |
| 08/30/2021 | 21 | THIRD STIPULATION AND ORDER to Extend Scheduling Order. **Discovery due by 12/14/2021, Dispositive Motion Cut-off set for 1/18/2022, Final Pretrial Conference reset for 5/17/2022 at 10:00 AM before District Judge George Caram Steeh, Jury Trial reset for 5/31/2022 at 9:00 AM before District Judge George Caram Steeh**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 08/30/2021) |
| 10/18/2021 | 22 | *CERTIFICATE OF SERVICE & THIRD AMENDED* WITNESS LIST by All Plaintiffs (Hatchett, Ayanna) (Entered: 10/18/2021) |
| 10/18/2021 | 23 | *FOURTH* WITNESS LIST by All Defendants (Cunningham, Patrick) (Entered: 10/18/2021) |
| 12/10/2021 | 24 | FOURTH STIPULATED ORDER Extending Scheduling Order. **Discovery due by 2/14/2022, Dispositive Motion Cut-off set for 3/18/2022**. Final pretrial and trial dates will be determined after ruling on any dispositive motions. Signed by District Judge George Caram Steeh. (BSau) (Entered: 12/10/2021) |
| 02/03/2022 | 25 | STIPULATED PROTECTIVE ORDER. Signed by District Judge George Caram Steeh. (BSau) (Entered: 02/03/2022) |
| 02/11/2022 | 26 | MOTION for Protective Order by City of Detroit, a Municipal entity, Officer Stephen Geelhood. (Attachments: # 1 Exhibit Craig Affidavit) (Cunningham, Patrick) (Entered: 02/11/2022) |
| 02/11/2022 | 27 | MOTION Extend Discovery and Dispositive Motion Cutoff by City of Detroit, a Municipal entity, Officer Stephen Geelhood. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Cunningham, Patrick) (Entered: 02/11/2022) |
| 02/14/2022 | 28 | ORDER Granting Defendants' 27 MOTION Extend Discovery and Dispositive Motion Cutoff. **Discovery due by 4/15/2022, Dispositive Motion Cut-off set for 5/16/2022**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 02/14/2022) |

| 02/14/2022 | | Text-Only Order of reassignment from Magistrate Judge R. Steven Whalen to Magistrate Judge Elizabeth A. Stafford pursuant to Administrative Order 21-AO- 013. (JOwe) (Entered: 02/14/2022) |
|---|---|---|
| 02/14/2022 | 29 | ORDER Referring Pretrial Matters Excluding Dispositive Motions to Magistrate Judge Elizabeth A. Stafford Including 26 Motion for Protective Order. Signed by District Judge George Caram Steeh. (BSau) (Entered: 02/14/2022) |
| 02/22/2022 | 30 | NOTICE OF IN PERSON HEARING on 26 MOTION for Protective Order . **Motion Hearing set for 3/22/2022 at 02:00 PM before Magistrate Judge Elizabeth A. Stafford.** (MarW) (Entered: 02/22/2022) |
| 02/25/2022 | 31 | RESPONSE to 26 MOTION for Protective Order , *Brief In Support & Certificate of Service* filed by All Plaintiffs. (Attachments: # 1 Exhibit 1-Correspondences & Deposition Notices, # 2 Exhibit 2-Emails (11-24-2021), # 3 Exhibit 3-Correspondences, NOD & Subpoenas, # 4 Exhibit 4-Order Re Motion Summary Judgment) (Hatchett, Ayanna) (Entered: 02/25/2022) |
| 03/04/2022 | 32 | REPLY to Response re 26 MOTION for Protective Order filed by All Defendants. (Cunningham, Patrick) (Entered: 03/04/2022) |
| 03/21/2022 | 33 | ORDER Canceling Hearing And Denying Defendant's Motion for Protective Order (ECF No. 26 ). Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 03/21/2022) |
| 04/22/2022 | 34 | STIPULATED ORDER Extending Scheduling Order Dates. **Discovery due by 6/13/2022, Dispositive Motion Cut-off set for 7/14/2022**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 04/22/2022) |
| 06/13/2022 | 35 | STIPULATED ORDER Extending Scheduling Order Dates. **Discovery due by 8/12/2022, Dispositive Motion Cut-off set for 9/9/2022**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 06/13/2022) |
| 08/12/2022 | 36 | MOTION to Compel by Darell Deon Chancellor. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit) (Sinkovich, Madeline) (Entered: 08/12/2022) |
| 08/18/2022 | 37 | NOTICE TO APPEAR BY TELEPHONE: **Status Conference regarding Motion to Compel set for 8/23/2022 at 11:00 AM before Magistrate Judge Elizabeth A. Stafford**. See notice for AT&T conference details. (MarW) (Entered: 08/18/2022) |
| 08/22/2022 | | Set Deadlines/Hearings: **TELEPHONIC Status Conference reset for 8/24/2022 at 11:00 AM before Magistrate Judge Elizabeth A. Stafford.** Counsel shall call (888) 5578511 and enter access code: 1137044 to participate in the telephonic conference. *** Please note that a security code will be emailed separately*** (MarW) (Entered: 08/22/2022) |
| 08/22/2022 | 38 | STIPULATED ORDER Extending Scheduling Order. **Discovery due by 11/10/2022, Dispositive Motion Cut-off set for 12/8/2022**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 08/22/2022) |
| 08/24/2022 | | Minute Entry for telephonic proceedings before Magistrate Judge Elizabeth A. Stafford: Telephonic Status Conference held on 8/24/2022 (Court Reporter: None Present, Not on the Record) (MarW) (Entered: 08/24/2022) |
| 08/24/2022 | 39 | ORDER About Plaintiff's Motion to Compel (ECF No. 36 ). (**Response due by 8/26/2022; Notice to Court regarding motion to compel due 9/7/2022**). See Order for more details. Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 08/24/2022) |
| 08/26/2022 | 40 | RESPONSE to 36 MOTION to Compel filed by All Defendants. (Cunningham, Patrick) (Entered: 08/26/2022) |

| 09/22/2022 | | TEXT-ONLY ORDER: The Court ordered the plaintiff to, by September 7, 2022, file a notice of whether its motion to compel, ECF No. 36, has become moot. ECF No. 39. If the motion had not become moot, the city was to submit unredacted and redacted copies of the internal affairs report for in camera review by September 12, 2022. *Id.* Plaintiff filed no notice about whether the motion is moot. It must do so no later than September 26, 2022. If the plaintiff still files no notice, the Court will deny the motion to compel as moot. SO ORDERED. Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 09/22/2022) |
| 09/23/2022 | [41] | NOTICE by All Plaintiffs re [36] MOTION to Compel (Hatchett, Ayanna) (Entered: 09/23/2022) |
| 09/23/2022 | [42] | ORDER Extending Deadline for Defendant to Produce Documents for In Camera Review. (**Documents for In Camera Review due by 9/30/2022**) Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 09/23/2022) |
| 10/17/2022 | [43] | ORDER Granting in Part and Denying in Part Plaintiff's Motion to Compel (ECF No. [36] ). Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 10/17/2022) |
| 10/24/2022 | [44] | CERTIFICATION OF COMPLETION OF PRETRIAL PROCEEDINGS by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 10/24/2022) |
| 11/10/2022 | [45] | STIPULATED ORDER for Limited Extension of Scheduling Order. **Discovery due by 2/7/2023**, **Dispositive Motion Cut-off set for 3/7/2023**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 11/10/2022) |
| 02/07/2023 | [46] | *Plaintiff's Fourth Amended* WITNESS LIST by All Plaintiffs (Hatchett, Ayanna) (Entered: 02/07/2023) |
| 03/03/2023 | [47] | STIPULATED ORDER FOR LIMITED EXTENSION OF SCHEDULING ORDER: **Discovery due by 4/24/2023 Dispositive Motion Cut-off set for 5/24/2023**. Signed by District Judge George Caram Steeh. (MLan) (Entered: 03/03/2023) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/27/2023 14:36:50 | | | |
| **PACER Login:** | mcps3037 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-11616-GCS-EAS |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**EXHIBIT 6C**

**State Court Complaint**

36336370.7/022765.00213

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARELL CHANCELLOR,

    Plaintiff,               CASE NO.
                               HON.

-vs-

OFFICER STEPHEN GEELHOOD,
In his individual and representative capacity,
And the CITY OF DETROIT,
A municipal entity,

    Defendants.

| VEN R. JOHNSON (P39219) | PATRICK M. CUNNINGHAM |
|---|---|
| AYANNA D. HATCHETT (P70055) | (P67643) |
| Attorneys for Plaintiff | City of Detroit Law Department |
| 535 Griswold, Ste. 2632 | Attorneys for Defendant City of Detroit |
| Detroit, MI 48226 | 2 Woodward Avenue, Suite 500 |
| (313) 324-8300 | Detroit, MI 48226 |
| vjohnson@venjohnsonlaw.com | (313) 237-5032 |
| ahatchett@venjohnsonlaw.com | cunninghamp@detroitmi.gov |

**A case between these parties arising out of the same incident is currently before this court at Case No. 20-11616.**

**Notice of Removal of Civil Action**

Under 28 U.S.C. § 1441, Defendant City of Detroit (hereinafter, "City")

removes this civil action predicated upon the following:

1.    On June 19, 2020, plaintiff commenced this action in the Third Judicial

       Circuit of Michigan. This action is now pending before that court.

2.    Defendant was served with the summons and complaint on June 29, 2020. (Exhibit A).

3.    Paragraph 5 of Plaintiff's complaint alleges claims under the United States Constitution as well as money damages under 42 USC § 1983. (Id).

4.    This Court has original jurisdiction of the above-entitled action under 28 U.S.C. § 1331 and removal of the action to this Court is proper under 28 U.S.C. § 1441.

5.    Under 28 U.S.C. § 1441(c) this action is removed in its entirety to this Court.

6.    Copies of all process, pleadings, and orders served upon the defendants in this matter are attached.

7.    This notice is timely, having been filed within thirty days after service of the Amended Complaint upon the defendants, which raises claims under the United States Constitution as well as 42 USC § 1983.

8.    Upon information and belief, no other defendants have been served, and all potential defendants are expected to consent.

2

9.      The undersigned has prepared a written notice of the removal of this action.

Such notice has been provided to counsel for plaintiff and to the clerk of the

court from which this matter is removed. Promptly after filing this Notice of

Removal of Civil Action, the undersigned will file a copy with the clerk of

the court from which this action is removed, and provide a copy to counsel

of record by first class mail and email.  Based upon the authorities and facts

recited above, defendants remove the above-entitled action to this Court.

                                   CITY OF DETROIT

                                   PATRICK M. CUNNINGAM (P67643)
                                   By:/s/ Patrick M. Cunningham
                                   City of Detroit Law Department
                                   Attorney for City of Detroit
                                   2 Woodward Avenue, Suite 500
                                   Detroit, Michigan 48226
                                   (313) 237-5032
                                   cunninghamp@detroitmi.gov

July 27, 2020

3

**Certificate of Service**

The undersigned certifies that on July 27, 2020, he served the foregoing papers upon the above named counsel of record by U.S. Mail and by email.

/s/ Patrick M. Cunningham

4

# EXHIBIT A

| Approved, SCAO | Original - Court<br>1st Copy- Defendant | 2nd Copy - Plaintiff<br>3rd Copy -Return |
|---|---|---|

| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | SUMMONS | CASE NO.<br>20-007758-NO<br>Hon.Edward Ewell, Jr. |
|---|---|---|

Court address : 2 Woodward Ave., Detroit MI 48226

Court telephone no.: 313-224-5195

| Plaintiff's name(s), address(es), and telephone no(s)<br>CHANCELLOR, DARELL | v | Defendant's name(s), address(es), and telephone no(s).<br>CITY OF DETROIT, a Muncipal entity |
|---|---|---|

Plaintiff's attorney, bar no., address, and telephone no

Ayanna D. Hatchett 70055
535 Griswold St Ste 2632
Detroit, MI 48226-3687

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court,

where it was given case number _____ and assigned to Judge _____.

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.

| SUMMONS |
|---|

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>6/19/2020 | Expiration date*<br>9/18/2020 | Court clerk<br>Carlita McMiller |
|---|---|---|

Cathy M. Garrett- Wayne County Clerk.

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (9/19)  SUMMONS    MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105



| | SUMMONS |
|---|---|
| | Case No. : **20-007758-NO** |

## PROOF OF SERVICE

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐  **OFFICER CERTIFICATE**  OR | ☐  **AFFIDAVIT OF PROCESS SERVER** |
|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:   (notarization not required) | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that:   (notarization required) |

☐ I served personally a copy of the summons and complaint.

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint, together with _____

List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled $ | Fee $ | | Signature _____ |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled $ | Fee $ | Total fee $ | Name (type or print) _____ |
| | | | | Title _____ |

Subscribed and sworn to before me on _____ , _____ County, Michigan.

Date

My commission expires: _____  Signature: _____

Date                                                    Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____

Attachments

_____ on _____

Day, date, time

_____ on behalf of _____.

Signature

20-007758-NO FILED IN MY OFFICE    Cathy M. Garrett    WAYNE COUNTY CLERK    6/19/2020 12:49 PM    Carlita McMiller

**STATE OF MICHIGAN**

**IN THE THIRD CIRCUIT OF WAYNE COUNTY**

DARELL CHANCELLOR,

      Plaintiff,

                            Case No. 20-      -NO

v.                                    Hon.

OFFICER STEPHEN GEELHOOD in his
Individual and Representative Capacity,
and the CITY OF DETROIT,
a Municipal entity,

      Defendants.

_____

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
Counsel for Plaintiff
The Buhl Building
535 Griswold, Ste. 2632
Detroit, MI 48226
(313) 324.8300
vjohnson@venjohnsonlaw.com
ahatchett@venjohnsonlaw.com

RECEIVED
JUN 29 2020
CITY OF DETROIT
LAW DEPARTMENT

_____

**COMPLAINT & JURY DEMAND**

There are no other pending civil actions arising out
of the transactions or occurrences alleged in this Complaint.

/s/        *Ayanna D. Hatchett*
AYANNA D. HATCHETT (P70055)

NOW COMES Plaintiff, DARELL CHANCELLOR, through his counsel, JOHNSON

LAW, PLC and for his Complaint against the defendants states as follows:

1. At all times relevant to this lawsuit, Plaintiff, Darell Chancellor ("Darell") was a resident

   of Detroit, in Wayne County, Michigan.

1

2. At all times relevant to this lawsuit, Defendant Officer Stephen Geelhood ("Geelhood") was employed as a police officer with the Detroit Police Department.

3. At all times relevant to this lawsuit, Geelhood acted under color of state law and is being sued in his individual and representative capacities.

4. At all times relevant to this lawsuit, Defendant City of Detroit ("The City") was a municipal corporation, duly organized in carrying on governmental functions in the City of Detroit, in Wayne County, Michigan.

5. The amount in controversy exceeds $25, 000.00 exclusive of costs, interest and attorney fees; and jurisdiction is otherwise conferred on this Court pursuant to the United States Constitution as well as 42 U.S.C. §1983.

## COMMON ALLEGATIONS

6. At all times relevant to this lawsuit, Geelhood was a member of the now-defunct narcotics unit in the police department for the City of Detroit.

7. On November 2, 2011, an affidavit in support of a search warrant was falsified and sworn to by Officer Geelhood before a 36th District Court magistrate in the City of Detroit.

8. As a result of Geelhood's swearing to the false affidavit, a search warrant was issued by the magistrate for the search of *5023 32nd Street* in Detroit, the home of Darell's mother.

9. In the false affidavit, Geelhood alleged that he had received information from a confidential informant (CI) on October 31, 2011 that a large quantity of heroin was being stored at and sold from the 32nd Street home.  That allegation was false.

10. In the false affidavit, Geelhood further alleged that he had set up surveillance at 5023 32nd Street on November 1, 2011, and personally observed a black male, described as being in

2

his "30s [, 5'8",] 180 lbs." engaging in a "suspected narcotics transaction" with buyers. That allegation was also false.

11. The affidavit went on to state that based on his 17 years of experience as a police officer and 9 years in the Narcotics Unit, Geelhood believed that there was probable cause that heroin and the individual suspected of making the narcotics transaction would be found on the premises.

12. On November 2, 2011, the search warrant based on Geelhood's false affidavit was executed at 5023 32nd Street in Detroit. During the execution of the warrant, a quantity of cocaine was found on the premises. No heroin was found.

13. Darell was not at his mother's house when the search warrant was executed. But he was later arrested in May of 2012 and charge with (a) the delivery/manufacture of a controlled substance (450 to 999 grams); (b) possession of a controlled substance (450 to 999 grams); (c) felon in possession of a firearm; and (d) felony firearm.

14. The false claims made and sworn to b Geelhood in the search warrant affidavit led directly to the issuance of the search warrant, the raid at 5023 32nd Street, the seizure of the cocaine and to Darell's subsequent prosecution.

15. As a direct result of Geelhood's false affidavit, Darell was arrested in May of 2012 and held in Wayne County Jail until his trial date.

16. A bench trial was conducted before the Honorable Daniel Hathaway on November 8, 2012.

17. Geelhood was the prosecution's star witness at trial. He testified to both the seizure of the cocaine during the raid and the events that he falsely claimed had occurred the two previous days.

3

18. Geelhood testified falsely at trial that he was telling the truth to the magistrate when he swore to the affidavit before the 36th District Court magistrate.

19. Geelhood also testified falsely at trial about receiving a tip from the CI, conducting surveillance, and he further falsely identified Darell as the person that he supposedly observed selling heroin during his alleged surveillance of Darell's mother's home.

20. The falseness of Geelhood's testimony regarding the alleged three separate hand-to-hand narcotic transactions during his surveillance is magnified by the fact that he never stopped any of the individuals allegedly involved in the drug buys to verify that one had actually taken place.

21. The falseness of Geelhood's identification of Darell as the person who he allegedly observed selling drugs on November 1, 2011 was further demonstrated by the difference between the description of the alleged seller as 5'8", 180 pounds, no glasses, and the actual size and description of Darell who is 5'11", 250 pounds and has worn prescription glasses his entire adult life.

22. On November 12, 2012, when Darell was found guilty of possession of cocaine, Judge Hathaway explicitly relied on Geelhood's false statements that identified Darell as the person who was seen selling drugs from the target address.

23. The reliance on Geelhood's false statements was highlighted when Judge Hathaway issued his verdict convicting Darell of possession of cocaine and stated the following:

> "So it really comes down to the reliability of Officer Geelhood's identification. As I said when [Geelhood] was questioned and the discrepancies were pointed out he was adamant and maintained that the individual he saw that day through the binoculars was, in fact, the defendant Mr. Chancellor; that he recognized him from that surveillance that he did and that he was in fact the person and of course

4

> *to me, this comes down to, well, part of it comes down to that identification.*" (Trial transcript, Vol. 3, pp 31-32)

24. Darell was sentenced on December 12, 2012 to serve a term of 14 years and 3 months to 30 years of imprisonment.

25. The Conviction Integrity Unit (CIU), a division of the Wayne County Prosecutor's Office, became involved in Darell's case as a result of an internal investigation by the Detroit Police Department (DPD) as well as a federal investigation into the department's Narcotics Unit concerning allegations that multiple Detroit police narcotics officers, including Geelhood, had participated in falsifying warrant affidavits, falsely accusing citizens of drug crimes and stealing case, guns and narcotics found during search warrant executions.

26. On information and belief, at the time of Darell's trial in 2012, the City was aware of the existence of the federal investigation and that the DPD had begun its own investigation of the Narcotics Unit.

27. As a result of the DPD's investigation, the Narcotic Unit, which included Geelhood, was disbanded by Detroit Police Chief James Craig in the summer of 2014.

28. In 2019, because of the numerous allegations of misconduct against multiple officers in the Narcotics Unit, Darell's conviction was reviewed by the CIU.

29. The CIU's investigation found that the records of the DPD and/or the Narcotics Unit contained no complaints of criminal activity at the 32nd Street address.

30. The CIU also found that there were no records of the tip allegedly provided by the CI to Geelhood as alleged in his false search warrant affidavit.

31. At the conclusion of their investigation, the CIU determined that the allegations contained in the search warrant affidavit and Geelhood's trial testimony could not be corroborated.

32. Likewise, the CIU concluded that the allegations in Geelhood's affidavit that supported the issuance of the search warrant for the home on 32nd Street were false.

33. An order to vacate Darell's conviction was subsequently entered on March 24, 2020.

34. From the time of Darell's false arrest that arose from Geelhood's falsified search warrant and affidavit, up through the time that his conviction was vacated, Darell was incarcerated for eight years.

35. Because of Geelhood and/or the City's negligent, grossly negligent and/or intentional misconduct, Darell was unlawfully arrested, imprisoned, maliciously prosecuted and deprived of due process, for a crime that Geelhood and/or the City knew Darell did not commit.

## COUNT I:  STATE CLAIM—FALSE ARREST--GEELHOOD

36. Plaintiff reasserts and incorporates each of the allegations stated above.

37. Darell was arrested.

38. Darell was aware of the arrest and it was against his will.

39. Geelhood knew that the search warrant and affidavit that Darell's arrest was premised upon was not based on true and accurate information and thus did not provide probable cause for Darell's arrest.

40. Geelhood knew that he had falsified statements in the affidavit to support the search warrant which led to an unlawful search and seizure of the property found at Darell's mother's home on 32nd Street, which ultimately led to Darell's arrest.

41. As the direct and proximate result of Geelhood's misconduct, Darell suffered, and will continue to suffer, damages in the future, including, but not limited to:

6

a.      Physical pain and suffering;

b.      Mental anguish;

c.      Fright and shock;

d.      Denial of social pleasure and enjoyments;

e.      Embarrassment, humiliation or mortification;

f.      Lost wages and/or earning capacity;

g.      The legal expense incurred by Darell to defend against the frivolous criminal charges prosecuted against him; and

h.      All other damages learned through the course of discovery and up to the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

## COUNT II: STATE CLAIM—MALICIOUS PROSECUTION—GEELHOOD

42. Plaintiff reasserts and incorporates each of the allegations stated above.

43. Geelhood instituted and initiated the allegations of criminal activity against Darell without probable cause and with malice or a with primary purpose other than bringing about justice through the proper adjudication of the claim upon which the proceedings are based.

44. Darell's criminal conviction was vacated in his favor.

45. As the direct and proximate result of Geelhood's misconduct, Darell has suffered damages and will continue to suffer damages in the future, including but not limited to:

7

a. Mental anguish;

b. Embarrassment, humiliation or mortification;

c. Denial of social pleasure and enjoyment; and

d. All other damages learned through the course of discovery and up through time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT III:  STATE CLAIM—FALSE IMPRISONMENT--GEELHOOD

46. Plaintiff reasserts and incorporates each of the allegations stated above.

47. Darell was imprisoned by Geelhood when he was arrested without probable cause and thus deprived of his personal liberty and freedom of movement.

48. Such imprisonment was against Darell's will.

49. Geelhood accomplished the imprisonment by actual physical force.

50. Geelhood intended to deprive Darell of his personal liberty or freedom of movement.

51. Such imprisonment was unlawful because the arrest was made without probable cause.

52. The prosecution against Darell was caused by Geelhood.

53. A post-conviction proceeding vacated Darell's underlying conviction for possession which in turn released Darell from serving further time in prison.

54. There was no probable cause for initiating or continuing the proceeding.

55. The initiation or continuation of the proceeding was done with malice or a primary purpose other than that of bringing the offender to justice.

8

56. As the direct and proximate result of misconduct by Geelhood, Darell suffered, and will continue to suffer, damages in the future, including, but not limited to:

a.      Physical pain and suffering;

b.      Mental anguish;

c.      Fright and shock;

d.      Denial of social pleasure and enjoyments;

e.      Embarrassment, humiliation or mortification;

f.      Lost wages and/or earning capacity;

g.      The legal expense that Darell incurred to defend against the wrongfully prosecuted criminal charges; and

h.      All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT IV: STATE CLAIM—GROSS NEGLIGENCE—GEELHOOD

57. Plaintiff reasserts and incorporates each of the allegations stated above.

58. Geelhood had a duty to the general public and in particular to Darell, to refrain from grossly negligent conduct.

59. Geelhood breached that duty and was grossly negligent, or was so reckless as to demonstrate a substantial lack of concern for whether an injury would result when he

9

knowingly falsified the contents of the affidavit that supported the search warrant and knowing executed the search warrant that he knew lacked probable cause.

60. By knowingly falsifying the contents of affidavit and knowingly executing a search that he knew lacked probable cause, Geelhood withheld evidence that exculpated Darell.

61. Geelhood's gross negligence was the one most immediate, efficient, and direct cause of the injury or damage, e.g., the proximate cause, of Darell's damages and injuries, including but not limited to:

    a.      False arrest for a crime he did not commit;

    b.      False imprisonment for a crime he did not commit;

    d.      Physical pain and suffering;

    e.      Mental anguish;

    f.      Fright and shock;

    g.      Denial of social pleasure and enjoyment;

    h.      Embarrassment, humiliation or mortification;

    i.      Lost wages and/or earning capacity; and

    j.      All other damages learned through the course of discovery.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

Respectfully submitted,

**JOHNSON LAW, PLC.**

10

By: */s/ Ayanna D. Hatchett*
     AYANNA D. HATCHETT (P70055)
     VEN R. JOHNSON (P39
     Counsel for Plaintiff
     The Buhl Building
     535 Griswold, Ste. 2632
     Detroit, MI 48226
     (313) 324.8300

Dated: June 19, 2020

11

Carlita McMiller        6/19/2020 12:49 PM        WAYNE COUNTY CLERK        Cathy M. Garrett        20-007758-NO FILED IN MY OFFICE

# STATE OF MICHIGAN
## IN THE THIRD CIRCUIT OF WAYNE COUNTY

DARELL CHANCELLOR,

      Plaintiff,

v.

OFFICER STEPHEN GEELHOOD in his
Individual and Representative Capacity,
and the CITY OF DETROIT,
a Municipal entity,

      Defendants.

Case No. 20-     -NO
Hon.

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
Counsel for Plaintiff
The Buhl Building
535 Griswold, Ste. 2632
Detroit, MI 48226
(313) 324.8300
vjohnson@venjohnsonlaw.com
ahatchett@venjohnsonlaw.com

## JURY DEMAND

    NOW COMES Plaintiff, DARELL CHANCELLOR, through his counsel, JOHNSON

LAW, PLC to respectfully demand a trial by jury.

                    Respectfully submitted,

                    **JOHNSON LAW, PLC**

          By: */s/ Ayanna D. Hatchett*
                    AYANNA D. HATCHETT (P70055)
                    VEN R. JOHNSON (P39
                    Counsel for Plaintiff
                    The Buhl Building
                    535 Griswold, Ste. 2632
                    Detroit, MI 48226
                    (313) 324.8300

Dated: June 19, 2020

.



7015 1520 0001 1540 8903

Metroplex MI 480 ZIP
THU 25 JUN 2020 PM

First Class Mail

**JOHNSON LAW, PLC**
ATTORNEYS AND COUNSELORS
Buhl Building . 535 Griswold Street . Suite 2632
Detroit, Michigan 48226

Lawrence Garcia
Mayor's Office
2 Woodward Ave., Suite 1126
Detroit, MI 48226
209359

RECEIVED
JUN 2 9 2020
CITY OF DETROIT
LAW DEPARTMENT



First Class Mail

**EXHIBIT 6D**

**Order of Consolidation**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARELL DEON CHANCELLOR,

                                     Case No.  20-11616, 20-11992
      Plaintiff,                     Honorable George Caram Steeh

v.

OFFICER STEPHEN GEELHOOD, et al.,

      Defendants.
_____/

## ORDER OF CONSOLIDATION

To promote convenience and judicial economy, to avoid unnecessary costs and delay, and pursuant to the stipulation of the parties, the Court orders the consolidation of separate cases pursuant to Federal Rule of Civil Procedure 42(a), which provides:

> If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay.

**IT IS THEREFORE ORDERED** that the following case 20-11616 is consolidated with civil number 20-11992 for all purposes, including trial.

**IT IS FURTHER ORDERED** that **all subsequent papers filed after the date of this order shall be entered on civil number 20-11616**.

**IT IS FURTHER ORDERED** that civil number 20-11992 is hereby closed for

administrative purposes.

                                           s/George Caram Steeh
                                           United States District Judge

Dated:  September 23, 2020

# EXHIBIT 6E

## Docket of Removed Lawsuit

36336370.7/022765.00213

**Query    Reports    Utilities    Help    Log Out**

<span style="color:red">CLOSED</span>,reassigned

# U.S. District Court
## Eastern District of Michigan (Detroit)
## CIVIL DOCKET FOR CASE #: 2:20-cv-11992-GCS-RSW

Chancellor v. Detroit, City of et al **\*\*CASE CLOSED - ALL ENTRIES MUST BE MADE IN 20-11616.\*\***
Assigned to: District Judge George Caram Steeh
Referred to: Magistrate Judge R. Steven Whalen
Case in other court: Wayne County Circuit Court, 20-007758-NO
Cause: 28:1983 Civil Rights

Date Filed: 07/27/2020
Date Terminated: 09/23/2020
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Darell Deon Chancellor**                          represented by   **Ayanna D. Hatchett**
Johnson Law PLC
535 Griswold St.
Suite 2632
Detroit, MI 48226-3687
313-324-8300
Email: ahatchett@venjohnsonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Detroit, City of**                          represented by   **Patrick M. Cunningham**
City of Detroit Law Department
2 Woodward Avenue
Suite 500
Detroit, MI 48226
313-237-5032
Fax: 313-224-5505
Email: cunninghamp@detroitmi.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Stephen Geelhood**                          represented by   **Patrick M. Cunningham**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/27/2020 | 1 | NOTICE OF REMOVAL by Detroit, City of from Wayne County Circuit Court, case number 20-007758-NO. Receipt No: AMIEDC-7948809 - Fee: $ 400 [Previously dismissed case: No] [Possible companion case(s): United States District Court for the |

13-53846-tjt    Doc 13691    Filed 04/28/23    Entered 04/28/23 09:24:05    Page 80 of 191

| | | |
|---|---|---|
| | | Eastern District of Michigan, 20-11616, Judge Hon. George Caram Steeh] (Cunningham, Patrick) (Entered: 07/27/2020) |
| 07/28/2020 | 2 | ORDER REASSIGNING CASE from District Judge Stephen J. Murphy, III and Magistrate Judge David R. Grand to District Judge George Caram Steeh and Magistrate Judge R. Steven Whalen. (NAhm) (Entered: 07/28/2020) |
| 08/03/2020 | 3 | ANSWER to Complaint with Affirmative Defenses by Detroit, City of. (Cunningham, Patrick) (Entered: 08/03/2020) |
| 08/04/2020 | 4 | ANSWER to Complaint with Affirmative Defenses by Stephen Geelhood. (Cunningham, Patrick) (Entered: 08/04/2020) |
| 08/04/2020 | 5 | NOTICE TO APPEAR BY TELEPHONE: **Scheduling Conference set for 9/14/2020 at 2:00 PM before District Judge George Caram Steeh.** *Plaintiff's counsel shall initiate the conference call to 313-234-5175* ***JOINT DISCOVERY PLAN DUE BY 9/08/2020*** (BSau) (Entered: 08/04/2020) |
| 09/08/2020 | 6 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Scheduling Conference set for 9/14/2020 at 2:00 PM before District Judge George Caram Steeh.** (BSau) (Entered: 09/08/2020) |
| 09/08/2020 | 7 | DISCOVERY plan jointly filed pursuant to Federal Rules of Civil Procedure 26(f) (Hatchett, Ayanna) (Entered: 09/08/2020) |
| 09/14/2020 | | Minute Entry for proceedings before District Judge George Caram Steeh: Scheduling Conference held on 9/14/2020. (Court Reporter: None Present, Not on the Record) (BSau) (Entered: 09/14/2020) |
| 09/14/2020 | 8 | SCHEDULING ORDER: **Discovery due by 3/19/2021, Dispositive Motion Cut-off set for 4/23/2021, Final Pretrial Conference set for 8/17/2021 at 10:00 AM before District Judge George Caram Steeh, Jury Trial set for 8/31/2021 at 9:00 AM before District Judge George Caram Steeh.** Signed by District Judge George Caram Steeh. (Refer to image for additional dates) (BSau) (Entered: 09/14/2020) |
| 09/23/2020 | 9 | AMENDED COMPLAINT with Jury Demand filed by Darell Deon Chancellor against All Defendants. NO NEW PARTIES ADDED. (Hatchett, Ayanna) (Entered: 09/23/2020) |
| 09/23/2020 | 10 | ORDER of consolidation. Signed by District Judge George Caram Steeh. (DPer) (Entered: 09/23/2020) |
| 09/23/2020 | 11 | Notice to Parties Regarding Consolidated Case: Order of consolidation entered on *09/23/20*. Designated lead case number is *20-11616*. (DPer) (Entered: 09/23/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/27/2023 14:54:12 | | |
| **PACER Login:** | mcps3037 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-11992-GCS-RSW |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

**EXHIBIT 6F**

**Darell Chancellor Deposition Transcript**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


DARELL CHANCELLOR,

     Plaintiff,


v                          Case No. 20-11616

                          HON. GEORGE CARAM STEEH

OFFICER STEPHEN GEELHOOD,

in his individual and representative

capacity, and the CITY OF DETROIT,

a municipal entity,

     Defendants.


                        /


     The Deposition of DARELL CHANCELLOR,

     Taken at Wayne County, Michigan,

     Commencing at 11:38 a.m.,

     Friday, April 23, 2021,

     Before Diane H. Draugelis, CER-2530.

1  REMOTE APPEARANCES:

2

3  VEN R. JOHNSON

4  AYANNA D. HATCHETT

5  Johnson Law, PLC

6  535 Griswold Street

7  Suite 2632

8  Detroit, Michigan 48226

9  313.324.8300

10  vjohnson@venjohnsonlaw.com

11  ahatchett@venjohnsonlaw.com

12      Appearing on behalf of the Plaintiff.

13

14  PATRICK M. CUNNINGHAM

15  City of Detroit Law Department

16  2 Woodward Avenue

17  Suite 500

18  Detroit, Michigan 48226

19  313.237.5032

20  cunninghamp@detroitmi.gov

21      Appearing on behalf of the Defendants.

22

23

24

25

1                         TABLE OF CONTENTS

2

3    WITNESS                                        PAGE

4    DARELL CHANCELLOR

5

6    EXAMINATION

7    BY MR. CUNNINGHAM:                               5

8    BY MR. JOHNSON:                                 70

9    RE-EXAMINATION

10   BY MR. CUNNINGHAM:                              90

11

12

13                        EXHIBITS

14

15   EXHIBIT                                        PAGE

16   (Exhibits retained by Mr. Cunningham.)

17

18   DEPOSITION EXHIBIT 1                            40

19   DEPOSITION EXHIBIT 2                            50

20   DEPOSITION EXHIBIT 3                            50

21

22

23

24

25

1  Wayne County, Michigan

2  Friday, April 23, 2021

3  11:38 a.m.

4

5            (Witness presented identification.)

6            THE REPORTER:  The attorneys participating in

7      this proceeding acknowledge that I am not physically

8      present in the conference room and that I will be

9      reporting this proceeding remotely.  They further

10     acknowledge that in lieu of an oath administered in

11     person, the witness will verbally declare his testimony

12     in this matter is under penalty of perjury.  The

13     parties and counsel consent to this arrangement and

14     waive any objections to this manner of reporting.

15     Please indicate your agreement on the record.

16            MR. CUNNINGHAM:  Patrick Cunningham on behalf

17     of the defendants and I agree.

18            MS. HATCHETT:  Ayanna Hatchett on behalf of

19     plaintiff and we have no objection to the statement as

20  read.

21            MR. JOHNSON:  Ven Johnson on behalf of

22     plaintiff as well.  Thanks.

23                DARELL CHANCELLOR,

24     was thereupon called as a witness herein, and after

25     having first been duly sworn to testify to the truth,

1    the whole truth, and nothing but the truth, was

2    examined and testified as follows:

3                          EXAMINATION

4    BY MR. CUNNINGHAM:

5    Q.   Good morning, Mr. Chancellor, my name is Patrick

6         Cunningham and I represent Steven Geelhood and the City

7         of Detroit in your lawsuit against those two groups.

8         Have you ever given deposition testimony before?

9    A.   Yes.

10   Q.   I'm sorry.  The answer is yes?

11   A.   Yes.

12   Q.   How long has it been since you last gave deposition

13        testimony?

14   A.   I think since 2005.

15   Q.   Did you end up coming into the office or are you at

16        home?

17   A.   I'm at home.

18   Q.   Okay.  If you could do your best, I can't really -- I

19        can really only see the top of your forehead there.

20        That's much better.  Thanks.

21             Is there anybody at home with you there?

22   A.   Not in the room, no.

23   Q.   Okay.  So, I'm sorry, when was the last time you gave

24        deposition testimony?

25   A.   2005.

1    Q.    2005?  Okay.  This is the same thing, but it's a little
2          bit different, obviously, since we're doing all of this
3          remotely and everybody is appearing by Zoom.  But the
4          rules are still the same.  You have sworn to tell the
5          truth, and Diane is going to be taking down a written
6          record of the things that you and I say.  And in order
7          to make it easier on Diane, there are a view things
8          that I'm going to ask you to do.  The first is to give
9          verbal answers in words.  In a normal conversation I
10         might ask you a yes or no question and you might nod
11         your head and shake your head and I would know what you
12         meant, but it's difficult for Diane to take down.  So
13         please do your best to answer verbally in words.  Is
14         that fair?
15   A.    Yes.
16   Q.    Okay.  Another thing that's particularly difficult to
17         avoid is uh-huhs and unh-unhs which are difficult to
18         transcribe, so please do your best to answer with
19         yesses and nos.  Is that fair?
20   A.    Yes.
21   Q.    Okay.  The last thing is, and this is particularly true
22         on Zoom, it's difficult to transcribe when more than
23         one person is talking at a time, so please do your best
24         to wait until I've finished asking a question before
25         you start answering a question.  Is that fair?

1    A.   No problem.

2    Q.   Okay.  And the last thing is if I ask a question and

3         you give an answer, I will assume that you heard and

4         understood the question.  Is that fair?

5    A.   Yes.

6    Q.   Could you please give me your full name?

7    A.   Darell Deon Chancellor.

8    Q.   And what is your current address?

9    A.   5023 32nd.

10   Q.   And where at that location do you stay?  In a room?

11   A.   Yes.

12   Q.   Where is your room?

13   A.   In the living room.

14   Q.   Do you have a bed that you sleep on?

15   A.   I sleep on my mother couch.

16   Q.   How many bedrooms are in the house at 5023 32nd Street?

17   A.   Three.

18   Q.   Who lives at 5023 32nd Street with you right now?

19   A.   My mother, and my sister and her boyfriend.

20   Q.   And what is your mother's name?

21   A.   Janet Chancellor.

22   Q.   And what is your sister's name?

23   A.   Crystal Chancellor.

24   Q.   And how do you spell Crystal?

25   A.   What is it?  C-y-t -- I mean C-y-s-t-a-l.

1   Q.   Okay. And what is your mother's boyfriend's name?

2   A.   Alvin Thomas.

3   Q.   And nobody lives at the house besides you, your mom,

4       your sister and her boyfriend?

5   A.   Yes.

6   Q.   Okay. What is your Social Security number?

7   A.   ***-**-3013.

8   Q.   Do you have a Michigan driver's license?

9   A.   No.

10   Q.   Do you have a Michigan State ID?

11   A.   Yes.

12   Q.   Do you have it with you?

13   A.   Yes.

14   Q.   Could you read me the number off of it?

15   A.   Which number?

16   Q.   The long one that starts with a letter and ends with a

17       bunch of numbers.

18   A.   C-524-135-139-932.

19   Q.   Could you hold it up to the camera so that I can see

20       it? I think that's good. Let me just Zoom in on that.

21       Can you just pull it back a little bit? Right there is

22       perfect. What's the weight on that identification

23       card?

24   A.   280.

25   Q.   What's the height?

1  A.  5'11".

2  Q.  And when was that issued?

3  A.  Issued -- what's this?

4  Q.  Should be in the top right corner?

5  A.  December 14, 2020.

6  Q.  And below that should be the expiration date.  What's

7      the expiration date?

8  A.  December 7, 2024.

9  Q.  What's your date of birth?

10 A.  12-7-81.

11 Q.  So are you still 5'11"?

12 A.  Yes.

13 Q.  How much do you weigh right now?

14 A.  Like, say about 2-, say about 300 now.

15 Q.  Are you right handed?

16 A.  Yes.

17 Q.  Always been right handed?

18 A.  Yes.

19 Q.  Do you have any names that you have used in the past

20      besides Darell Chancellor?

21 A.  Yes.

22 Q.  What other names have you used?

23 A.  Jason Chancellor, Jason Thomas.

24 Q.  What did you use the name Jason Chancellor for?

25 A.  I don't recall.  I think I had a -- I don't recall.  I

1      think I had a dope case and I used the name.

2  Q.  Did you tell the police that your name was Jason

3      Chancellor?

4  A.  Yes.

5  Q.  What about Jason Thomas?  What did you use that name

6      for?

7  A.  Probably the same thing.

8  Q.  Was that a name you gave to the police?

9  A.  Yes.

10 Q.  Are there any other names that you've used in the past

11     besides Darell Chancellor, Jason Chancellor or Jason

12     Thomas?

13 A.  No, not that I know of.

14 Q.  Are you married?

15 A.  No.

16 Q.  Have you ever been married?

17 A.  Yes.

18 Q.  How many times have you been married?

19 A.  Once.

20 Q.  And are you divorced?

21 A.  Yes.

22 Q.  What's the name of your ex-wife?

23 A.  Katrice Butler.

24 Q.  When you were married did she go by Katrice Chancellor?

25 A.  Yes.

1    Q.    Did she ever have another last name besides Butler or

2          Chancellor?

3    A.    I don't know.

4    Q.    Not to your knowledge?

5    A.    Not to my knowledge.

6    Q.    Okay.  When you married her, before you married did she

7          go by Katrice Butler?

8    A.    Yes.

9    Q.    Has she remarried since you guys got divorced?

10   A.    Yes.

11   Q.    Do you know if she uses a different last name, a

12         married last name now?

13   A.    I don't know.

14   Q.    Give me one second.  I'm just going to try --

15   A.    No problem.

16   Q.    -- and find a name here.  Katrice Alford, is that

17         Katrice's last now?

18   A.    I don't -- I believe so.

19   Q.    Okay.  Where does Katrice live?

20   A.    I don't know, sir.  I don't know the name of the block.

21         I forget the name of the block.

22   Q.    When you say the name of the block, do you mean the

23         name of the street that she lives on?

24   A.    Yes.

25   Q.    And do you have Katrice's phone number?

1   A.   Yes.

2   Q.   What's her phone number?

3   A.   313-828-4115.

4   Q.   Thank you.  Do you and Katrice have any children?

5   A.   Yes.

6   Q.   How many children do you have?

7   A.   One.

8   Q.   Do you have a son or a daughter?

9   A.   A son.

10  Q.   What's your son's name?

11  A.   Darell Chancellor, Jr.

12  Q.   Darell Chancellor, Jr.?  And how old is Darell

13       Chancellor, Jr.?

14  A.   Nine.

15  Q.   Do you have any other children besides Darell

16       Chancellor, Jr.?

17  A.   No.

18  Q.   Do you pay child support for Darell Chancellor, Jr.?

19  A.   No.

20  Q.   Where does Darell Chancellor, Jr. live?

21  A.   His mother.

22  Q.   Does your son ever stay with you?

23  A.   He comes over sometime.

24  Q.   How often?

25  A.   When he want to, whenever he call me and say he want to

1      spend the weekend with me.

2   Q.   How frequently does that happen?

3   A.   About -- since I've been home, about four or five

4        times.

5   Q.   Does your mom work?

6   A.   No.

7   Q.   Does Crystal work?

8   A.   Yes.

9   Q.   Where does Crystal work?

10  A.   Don't know.

11  Q.   Does Alvin Thomas work?

12  A.   Not to my knowing.

13  Q.   Is there anyone that depends on you for financial

14       support?

15  A.   Like who?  I might help my son.

16  Q.   Do you help him?

17  A.   I can't right now, do not have a job.

18  Q.   Okay.  So you're not currently employed?

19  A.   No.

20  Q.   Where is the last place you were employed?

21  A.   G&G Market.

22  Q.   Where is G&G Market?

23  A.   It was on Lovett and Warren.

24  Q.   Is it no longer on Lovett and Warren?

25  A.   No.

1    Q.   There's still a gas station there, isn't there?

2    A.   Yes.

3    Q.   Was it the same kind of operation, G&G Market is the

4         gas station that's there now?

5    A.   Yes.

6    Q.   What did you do at G&G Market?

7    A.   Stock, basically.  Yeah, basically stock and whatever

8         else was asked of me.

9    Q.   What else was asked of you besides stocking shelves?

10   A.   I mean make sure it stay clean, try to keep riffraff up

11        out of there.

12   Q.   Who was your boss at G&G Market?

13   A.   Kevin.

14   Q.   What's Kevin's last name?

15   A.   I can't remember.  It was one of them funny last names.

16        He used to own the gas station.

17   Q.   What kind of funny last name?

18   A.   One of them -- not funny, but hard to pronounce.  One

19        of them Arabic --

20   Q.   I understood what you said.  I'm not trying to make it

21        offensive, but I'm just trying to know specifically how

22        was it unusual?

23   A.   One of the Arab last names, so it's hard to pronounce.

24   Q.   Who did you work with at G&G Market?

25   A.   I worked by myself.

1    Q.   When you were working at G&G Market would you be the

2         only person there?

3    A.   I mean, Kevin would be there, but like besides that

4         it's just mainly me.

5    Q.   You didn't have any coworkers?

6    A.   No.

7    Q.   And when was the last time you worked at G&G Market?

8    A.   2012; like 2012.

9    Q.   Do you have a phone number for Kevin?

10   A.   No, I haven't talked to Kevin.

11   Q.   And so Kevin worked there, but he was also the owner of

12        the store?

13   A.   Yes.

14   Q.   What's the last place that you worked before G&G?

15   A.   Before G&G I worked for some temp services.  I don't

16        recall the names, but it was a few temp services.

17   Q.   Did you ever work for Manpower?

18   A.   I don't recall that.  It's probably a temp service or

19        something, but I don't recall the name.

20   Q.   Yeah, I was just asking because Manpower is a popular

21        temp service.

22   A.   Oh, okay.

23   Q.   See if that jogs your memory at all.  What did you

24        do -- what kind of jobs did the temp service have you

25        doing?

1    A.   I mean, it's different jobs.  You go to different sites

2         every day.  It's a different job.

3    Q.   Right.  So what were some of the jobs that you were

4         doing?

5    A.   I don't recall, that's why I say, it was before G&G

6         Market, so I don't really recall.

7    Q.   And so you don't recall any jobs that you did for the

8         temp service?

9    A.   No; vaguely.

10   Q.   I know it was before G&G Market, but when was the last

11        time you worked for a temp service?

12   A.   Don't recall, sir.

13   Q.   Have you ever filed a lawsuit before this one?

14   A.   Yes.  Well, I had attorney file.  I never filed one

15        myself.

16   Q.   Sure.  How many lawsuits have you had an attorney file

17        for you?

18   A.   One, before this one, one.

19   Q.   One before this?

20   A.   Yes.

21   Q.   And did you testify at a deposition in connection with

22        that lawsuit?

23   A.   Yes, that's the deposition I told you, yes.

24   Q.   Okay.  Sir, I can only see the top of your head right

25        now, Mr. Chancellor.  There you go, that's much better.

1    Thank you.

2              And who did you sue in that lawsuit, that

3    prior lawsuit?

4  A.  The City of Detroit, an Officer Melendez.

5  Q.  And what was that lawsuit about?

6  A.  Basically the same things going on now.  Officer

7    Melendez lied on me.

8  Q.  What did he say?

9  A.  He said I had a firearm, which I didn't.

10 Q.  Did Officer Melendez have any involvement in this

11   lawsuit, the one we're talking about right now?

12 A.  No, not to my knowing.  I don't know.

13 Q.  You're not aware of any involvement that he had?

14 A.  No.

15 Q.  And what was the result of that prior lawsuit?

16 A.  It was settled out.

17 Q.  And did you receive a payment?

18 A.  Yes.

19 Q.  How much did you receive?

20            MS. HATCHETT:  I'm just going to object

21   preliminarily as based on relevance, but go ahead,

22   Darell.

23            THE WITNESS:  It was 250,000.

24 BY MR. CUNNINGHAM:

25 Q.  What did you do with that $250,000?

1    A.   I didn't get a chance to spend it.  I was locked up, so

2         the state took it.

3    Q.   Did the state take it to pay for the cost of your

4         imprisonment?

5    A.   Yes.

6              MS. HATCHETT:  Objection; relevance.

7    BY MR. CUNNINGHAM:

8    Q.   In this case you were convicted of possession of

9         cocaine; right?

10   A.   In this case I was exonerated.

11   Q.   Well, initially you were convicted by the judge; right?

12   A.   Yes.

13   Q.   Before that conviction, how many prior convictions did

14        you have before the one underlying this case?

15             MS. HATCHETT:  I'll just object based off of

16        relevance to this whole line of questioning, if I can

17        have a continuing objection; Patrick, on this one.

18             MR. CUNNINGHAM:  I'll give you a continuing

19        objection on the basis of relevance.

20             MS. HATCHETT:  Thank you.

21             MR. CUNNINGHAM:  Sure.

22             THE WITNESS:  Now you say what?

23   BY MR. CUNNINGHAM:

24   Q.   How many prior convictions did you have before the one

25        underlying this case?  You know, let me start over.

1   That's a confusing way to go about it.  I can see that

2   you're confused.

3      What's the first time you were ever convicted

4   of a crime?

5 A. I think -- as a adult?

6 Q. Were you convicted before you were an adult?

7 A. I had, yes, I had a conviction as a juvenile, yes.

8 Q. How old were you when you had a juvenile conviction?

9 A. I think I was about 15, 16 at the time.

10 Q. And what was that conviction for?

11 A. I think it was like -- I don't know how to put it.  It

12   was like truant, just basic like truancy at school and

13   acting up at home, so my mother decided to award me to

14   the state, if that's like a case.

15 Q. Did you end up living -- when you say award you to the

16   state, does that mean you stopped living with your mom?

17 A. Yes, my mother award me to the state, yes.

18 Q. And where did you go to live?

19 A. With the state.

20 Q. What was the name of the place where you lived?

21 A. It was like St. Thomas or Burton Center.  It was one of

22   those centers, stuff like that.

23 Q. And how long did you live at one of those centers?

24 A. Till my grandma came and got me.  My grandma took

25   custody of me, so not that long.  A few months at the

1       most.

2   Q.  And so I guess I'm not clear.  As a juvenile were you

3       convicted of a crime?

4   A.  If that's not a crime, I guess not.

5   Q.  Okay.  Were there any other convictions you had as a

6       juvenile?

7   A.  I think I had a possession of marijuana or something

8       like that.

9   Q.  How old we're you when you were convicted of possession

10      of marijuana?

11  A.  Around the same, about 15, 16.

12  Q.  When is the first time you were convicted of a crime as

13      an adult?

14  A.  I think like 2000; 2000, 2001, something in there.

15  Q.  You would have been about 20 years old, 21 years old,

16      something like that?

17  A.  Yes.

18  Q.  And what were you convicted of around 2000 or 2001?

19  A.  Under 50, attempted to deliver under 50.

20  Q.  Under 50 grams of what?

21  A.  Heroin.

22  Q.  Did you have a trial for that conviction?

23  A.  No.

24  Q.  Did you plead guilty to that conviction?

25  A.  Yes.

1  Q.  Okay.  After 2000 or 2001 when you were convicted of
2      attempted delivery of under 50 grams of heroin, what's
3      the next time you were convicted of a crime?
4  A.  Right after that it was 2001, another under 50.
5  Q.  Under 50 grams of what?
6  A.  Heroin.
7  Q.  Did you have a trial for that charge?
8  A.  No.
9  Q.  Did you plead guilty to that charge?
10 A.  Yes.
11 Q.  After your second conviction of under 50 grams of
12     heroin, what's the next time you got convicted of a
13     crime?
14 A.  It was all around in the same time, so it was like from
15     2000 to 2001 or 2002, it was another under 25 or under
16     50.
17 Q.  Under 25 or 50 grams of what?
18 A.  Heroin.
19 Q.  And did you have a trial in that case?
20 A.  No.
21 Q.  Did you plead guilty in that case?
22 A.  Yes.
23 Q.  After your third conviction of possession of heroin,
24     what's the next time you were convicted of a crime?
25 A.  What was it?  I think I got -- I think it was a

1        receiving and concealing, receiving and concealing over
2        $1,000.
3    Q.  And did you have a trial in that case?
4    A.  No.
5    Q.  Did you plead guilty in that case?
6    A.  Yes.
7    Q.  What did you plead guilty to receiving and concealing?
8    A.  It was a car.
9    Q.  A stolen car?
10   A.  Yes.
11   Q.  After your conviction of receiving and concealing the
12       car, what's the next time you were convicted of a
13       crime?
14   A.  Armed robbery.  I think it was an armed robbery, 2003
15       armed robbery, felony firearm.
16   Q.  And did you have a trial in that case?
17   A.  No.
18   Q.  Did you plead guilty in that case?
19   A.  Plead no contact (phonetic).
20   Q.  Pled no contest?
21   A.  Yeah.
22   Q.  And what did you do that you pled no contest to armed
23       robbery?
24   A.  What you mean?  I don't understand the question.
25   Q.  Did you rob someplace?

1   A.   A person.

2   Q.   Who did you rob?

3   A.   A drug dealer.

4   Q.   What did you rob this person of?

5   A.   Some glasses.

6   Q.   What kind of glasses?

7   A.   Cartier glasses.

8   Q.   And were you armed when you robbed this person of

9        Cartier glasses?

10  A.   Yes.

11  Q.   What were you armed with?

12  A.   A gun.

13  Q.   What kind of gun?

14  A.   A .357.

15  Q.   Was that a .357 Magnum?

16  A.   I don't remember the make and the model -- I mean the

17       model.

18  Q.   Where did you get a .357 from?

19            MS. HATCHETT:  Object to relevance.  Go

20       ahead.

21            THE WITNESS:  I don't recall.

22  BY MR. CUNNINGHAM:

23  Q.   After armed robbery and felony firearm, what's the next

24       thing you were convicted of?

25  A.   There's no convictions after that.  I was convicted of

1          this what I have been exonerated from, that was it.

2     Q.   In 2001 when you were convicted of under 50 grams of

3          heroin, were you imprisoned after that conviction?

4     A.   What you mean, imprisoned?

5     Q.   Did they put you in jail?

6     A.   No.

7     Q.   Did you get probation?

8     A.   Yes.

9     Q.   Okay.  After the second conviction in 2001 under 50

10         grams of heroin, did they put you in jail after that?

11    A.   No.

12    Q.   Did you get probation?

13    A.   Yes, I didn't go to prison for none of them

14         convictions.

15    Q.   Okay.  I appreciate you trying to save me some time,

16         but just for completeness sake I'm going to go through

17         them.

18              For the third conviction in 2002, under 25

19         grams of heroin, did you get probation for that?

20    A.   Yes.

21    Q.   And were you in jail for that at all?

22    A.   No.

23    Q.   Okay.  The conviction of receiving and concealing over

24         $1,000, did you get probation for that?

25    A.   Yes.

1    Q.   And did you go to jail at all for that?

2    A.   No.

3    Q.   And for the armed robbery, felony firearm conviction,

4         were you sentenced to probation for that?

5    A.   No.

6    Q.   Were you sentenced to prison for that?

7    A.   Yes.

8    Q.   All right.  And was your sentence for the armed

9         robbery, felony firearm?

10   A.   7 to 15, 5 for the armed robbery, 2 for the gun, so

11        altogether it was 7 to 15.

12   Q.   And how long did you actually serve in prison?

13   A.   Like 7-1/2 years, 8 years.

14   Q.   So that was from 2003 to about 2010; is that right?

15   A.   Yes.

16   Q.   And when you were released in 2010, you were paroled?

17   A.   Yes.

18   Q.   Since you have been let out of prison in this case have

19        you been charged with any other crimes?

20   A.   No.

21   Q.   Did you ever receive medical care when you were in

22        prison?

23   A.   Like what?

24   Q.   Like seeing a doctor or seeing a nurse or anything like

25        that?

1    A.    I mean, yes, if I was sick I went to the doctor, yes.

2    Q.    Okay.  And do they have a doctor at the prison or do

3          you leave the prison to go see a doctor somewhere else?

4    A.    I mean, they got a doctor at the prison.

5    Q.    And I see that you're wearing glasses; right?

6    A.    Yes.

7    Q.    And I always find this question difficult to ask.  Why

8          do you wear glasses?  Because I need them to see.

9          That's always the answer and it makes sense, but what

10         kind of vision problems do you have without your

11         glasses that your glasses correct for you?

12   A.    Without my glasses, I can't see.  It's blurry.  I --

13   Q.    Go ahead.  I'm sorry.

14   A.    I can't function without my glasses.

15   Q.    Are things close to you blurry or are things far away

16         from you blurry or are both of them blurry?

17   A.    It's all blurry.

18   Q.    Do you have an eye doctor that you go see?

19   A.    Not out here.

20   Q.    Did you see an eye doctor in prison?

21   A.    Yes.

22   Q.    Do you wear contact lenses?

23   A.    No.

24   Q.    Have you ever owned contact lenses?

25   A.    No.

1  Q.  Have you ever had a doctor prescribe contact lenses?

2  A.  No.

3  Q.  Do you have any kind of hearing impairment?

4  A.  No.

5  Q.  Do you have a recollection of the day of November 1st,

6      2011?

7  A.  Could you repeat the date?

8  Q.  Sure, November 1st, 2011.

9  A.  Yes.

10  Q.  What do you remember about November 1st, 2011?

11  A.  I mean, what do you mean what do I remember?

12  Q.  Well, you woke up that morning; is that true?

13  A.  Yes.

14  Q.  Where were you when you woke up?

15  A.  I was at home.

16  Q.  Where was home?

17  A.  9209 Robison.

18  Q.  And was anyone there with you?

19  A.  Yes, my wife, Katrice.

20  Q.  Anyone else?

21  A.  My son was just newborn at the time.

22  Q.  Was there anyone there with you besides Katrice and

23      your son?

24  A.  No.

25  Q.  Okay.  So November 1st, 2011, you wake up.  What time

1       did you wake up?

2   A.  Early.  I had to go to work.

3   Q.  How early is early, approximately?

4   A.  About 8:00.  I woke up about 7:30.

5   Q.  And what time did you go to work?

6   A.  I made it to work about 9:00, something like that,

7       8:45; about 8:45, 9:00 o'clock.

8   Q.  And how did you get to work?

9   A.  I drove my car.

10  Q.  What kind of car did you have?

11  A.  It was a purple, like a purple Cavalier.

12  Q.  Chevy Cavalier?

13  A.  Yes.

14  Q.  And how long were you at work?

15  A.  I was at work all day.

16  Q.  What time did your shift end?

17  A.  My shift end about -- say about -- it really is when

18      he's done with me.  I can be there all day, but it

19      depends on when he's done, you know, if we done working

20      for the day.

21  Q.  Well, when were you done working that day?

22  A.  About that day at about 5:00; about 5:00, 6:00,

23      something like that.

24  Q.  And then what did you do at 5:00 o'clock when you were

25      done working?

1   A.   I went home.

2   Q.   And where was home?

3   A.   Robison, 9209 Robison.

4   Q.   And when you got home was anyone else there?

5   A.   Besides my wife and my kid, no.

6   Q.   And what did you do when you got home?

7   A.   I didn't do nothing.  I watched T.V.  The day was over

8        with.

9   Q.   Did you leave the house again after you got home from

10       work?

11  A.   No.

12  Q.   Okay.  Do you have a recollection of the day November

13       2nd, 2011?

14  A.   What do you mean?

15  Q.   Do you remember that day?  Can you remember that day?

16  A.   Yes.

17  Q.   Okay.  And what do you remember about that day?

18  A.   I don't understand the question.

19  Q.   Okay.  Just like we did with the day before, you woke

20       up that morning; right?

21  A.   Right.

22  Q.   And where were you?

23  A.   At home.

24  Q.   And where was home?

25  A.   9209 Robison.

1    Q.   And who was there?

2    A.   The same person that was there the day before.

3    Q.   That's your wife and your son?

4    A.   Yes.

5    Q.   And no one else there?

6    A.   No.

7    Q.   And did you work on November 2nd, 2011?

8    A.   Yes.

9    Q.   And what time did you start work?

10   A.   About the same, about 8:00; about 8:45, 9:00.

11   Q.   And how did you get to work?

12   A.   My car.

13   Q.   And that's the purple Chevy Cavalier?

14   A.   Yes.

15   Q.   And what time did you get off work?

16   A.   Around the same.  It was around the same, about 5:00 or

17        6:00.

18   Q.   So you started work around 9:00 and you got off around

19        5:00; is that right?

20   A.   About 5:00, 6:00.

21   Q.   So were you at work from 9:00 a.m. to 5:00 p.m.?

22   A.   Yes.

23   Q.   And then around 5:00 or 6:00 you are done working and

24        what did you do?

25   A.   I went home to Robison.

1    Q.    And who was there?

2    A.    My wife and my son.

3    Q.    Anyone else?

4    A.    No.

5    Q.    So November 1st was coming up on 10 years ago; right?

6    A.    Uh-huh.

7    Q.    Why do you remember that day?

8    A.    Why do I remember that day?

9    Q.    Yeah.

10   A.    Because I -- I mean why wouldn't I remember that day?

11         I just spent 8 years in prison over that day.  If

12         something traumatic happened to you, you remember that

13         day, too.

14   Q.    Okay.  And did anything out of the ordinary happen on

15         November 1st, 2011 to you?

16   A.    What you mean, that date?

17   Q.    Yes, November 1st, 2011.  Anything out of the ordinary

18         happen to you that day?

19   A.    No, not that day.

20   Q.    Okay.  What about on November 2nd, 2011, did anything

21         out of the ordinary happen to you that day?

22   A.    No.

23   Q.    Did you talk to your mother that day?

24   A.    I talked to my mother, yes, that night.

25   Q.    And what did you talk about?

1    A.    She told me that the police had raided her house.

2    Q.    Did you have a cell phone on November 2nd, 2011?

3    A.    Yes.

4    Q.    Do you still have that cell phone?

5    A.    No.

6    Q.    What happened to it?

7    A.    I don't recall.

8    Q.    Who was your cell phone carrier on November 2nd, 2011?

9    A.    I don't recall.  I don't recall.

10   Q.    Where were you when your mother called you on November

11         2nd, 2011?

12   A.    I was at home.

13   Q.    And what did you do after you talked to your mom?

14   A.    What you mean, what did I do about what?

15   Q.    About anything.  But what did you do?  You hung up the

16         phone and then what happened after that?

17   A.    Nothing happened after that.  I hung up the phone and

18         that was that.

19   Q.    Did you leave the house that night after you got off

20         the phone with your mom?

21   A.    No.

22   Q.    So your mom's house is 5023 32nd Street; right?

23   A.    Yes

24   Q.    And that's the house you're at right now; right?

25   A.    No, I'm not right there right now, no.

1    Q.   Where are you now?

2    A.   I'm over a friend house right now.

3    Q.   Oh, I assumed that you were.

4    A.   Do I have to be at home to do this call?

5    Q.   No, I asked you earlier where you were and you told me

6         that you were at 5023 32nd Street.

7               MS. HATCHETT:  Actually, I think you may have

8         asked him specifically where he was living.

9               MR. CUNNINGHAM:  Correct.  Well, I asked him

10        that, too.

11              THE WITNESS:  Yeah.

12   BY MR. CUNNINGHAM:

13   Q.   Okay.  I asked you -- maybe I misunderstood.  Where are

14        you right now?

15   A.   Do I got to answer that?

16   Q.   Yeah.  I wouldn't -- you're testifying remotely from a

17        location.  I would like to know the location where

18        you're testifying from remotely.

19              MR. JOHNSON:  Please answer, Darell.  Thank

20        you.

21              THE WITNESS:  Okay.  I'm over at my

22        girlfriend house.

23   BY MR. CUNNINGHAM:

24   Q.   All right.  And what's the address there?

25   A.   It's 15040 Robison.

1   Q.   1504?

2   A.   Yeah, zero, Robison.

3   Q.   I'm sorry.  15040 Robison?  Did I get it right?

4   A.   Say it again for me.

5   Q.   Sure.  15040?

6   A.   Yes; Robison.  I mean not Robison, Ferguson.

7   Q.   Ferguson?

8   A.   Yeah; Ferguson.

9   Q.   And what's your girlfriend's name?

10  A.   Davanek Rogers.

11  Q.   Can you spell her first name for me?

12  A.   D-a-v-a-n-e-k.  Davanek.

13  Q.   And is Rogers R-o-g-e-r-s?

14  A.   Yes.

15  Q.   So 5023 32nd Street, that's your mom's house?

16  A.   Yes.

17  Q.   Is that still your mom's house?

18  A.   Yes.

19  Q.   Okay.  Have you lived there in the past?

20  A.   What you mean, in the past?

21  Q.   Did you ever live at that house?

22  A.   Yes.

23  Q.   When is the last time you lived there?

24  A.   I stay there now.

25  Q.   And when did you start living there this time, if that

1    makes sense?

2  A.  When I got out of prison.

3  Q.  And when was that?

4  A.  March 26, 2020.

5  Q.  Okay.  On March 26. 2020 you got out of prison and you

6      started living at 5023 32nd Street?

7  A.  Yes.

8  Q.  And have you lived anywhere else in between March 26,

9      2020 and now?

10 A.  No.

11 Q.  All right.  Before March 26 of 2020 had lived at 5023

12     32nd Street before that?

13 A.  You said before March 2020?  I was locked up.

14 Q.  Correct.  Ever in the past, did you ever live at that

15     address before?

16 A.  Yes; yes.

17 Q.  And when is the last time you lived at that address

18     before, before you moved back in in March 26, 2020?

19 A.  I was at that location when I got out of prison the

20     first time, in December.  December 14 -- I mean

21     December 15, 2010 I stayed there.

22 Q.  Okay.  So December 15, 2010 you got out of prison and

23     you moved --

24 A.  Yes.

25 Q.  -- into your mom's house?

1   A.   Yes.

2   Q.   And when did you move out of your mom's house?

3   A.   The next month when my utilities, when my lights was on

4        on my house on Robison, I moved into Robison.

5   Q.   And that would have been January 2011?

6   A.   Yes.

7   Q.   When you were living at -- on 32nd Street, when I say

8        the 32nd street house, I'm going to mean your mom's

9        house; is that fair?

10  A.   Okay.  Yes; yes; yes.

11  Q.   All right.  When you were living at the 32nd Street

12       house in December of 2010, who lived there with you?

13  A.   The same people and my brother.

14  Q.   So your mom?

15  A.   My mother, her boyfriend, that's my sister.

16  Q.   Alvin?

17  A.   Alvin, and Antonio.

18  Q.   And Antonio, was your brother?

19  A.   Yes.

20  Q.   Also last name Chancellor?

21  A.   Yes.

22  Q.   So in December of 2010, did anybody live there besides

23       you, your mom, Crystal, Alvin and Antonio?

24  A.   No, that was it.

25  Q.   Okay.  After you moved out in January of 2011, did

1        anybody else move into the 32nd Street house?

2    A.   I don't think -- I don't know.  I don't recall.

3    Q.   Did you have any cousins that lived there?

4    A.   I don't recall.

5    Q.   Did Ronald Durrell live there?

6    A.   I don't recall.

7    Q.   All right.  In January of 2011 -- let's see.  Well, I

8        guess it's between December and January, December of

9        2010 and January of 2011, when you were living at the

10        32nd Street house, where did you sleep?

11   A.   On the couch.

12   Q.   Is it the same couch you're sleeping on now?

13   A.   No.

14   Q.   Is the couch the same location?

15   A.   Yes.

16   Q.   Is it on the first floor or the second floor?

17   A.   The first floor.

18   Q.   After you moved out, did you ever stay over or stay the

19        night at the 32nd Street house?

20   A.   No.

21   Q.   Did you keep any of your belongings at the 32nd Street

22        house after you moved out?

23   A.   No.

24   Q.   And there are only three bedrooms in the 32nd Street

25        house?

1   A.   Yes.

2   Q.   How many beds?

3   A.   Should be three.  Yes, I say three.

4   Q.   Okay.  At the trial in this case, remember the trial in

5        this case, the criminal trial?

6   A.   Yes.

7   Q.   Okay.  There was a document introduced into evidence

8        from the Michigan Department of Treasury, do you

9        remember that?

10  A.   Yes.

11  Q.   What was that document?

12  A.   It was -- it was something from my parole officer, a

13       payment or something.  If I ain't mistaken, it was some

14       type of payment thing from my parole officer.

15  Q.   You told your parole officer that you lived at 5023

16       32nd Street right?

17  A.   Yes.

18  Q.   And your parole officer came to visit you at that

19       location; right?

20  A.   Yes

21  Q.   And did she visit you there after January of 2011?

22  A.   No, not to my -- I don't recall.  I don't recall seeing

23       her after that.

24  Q.   Did you ever tell your parole officer that you moved to

25       Robison?

1  A.  No.

2  Q.  So when you told your parole officer that you lived at

3      32nd Street, you really lived at Robison; is that

4      right?

5  A.  Yes, sir.

6  Q.  So you were lying to her when you told her that; right?

7  A.  Yes.

8  Q.  Did you tell your parole officer that you lived

9      upstairs at 32nd Street?

10 A.  No.

11 Q.  So if she testified that you told her that you lived

12     upstairs, she would be lying?

13 A.  Yes.

14          MR. CUNNINGHAM:  Hey, Ayanna, I have a few

15     exhibits I'm going to show him.  I'm going to e-mail

16     them to you right now.

17          MS. HATCHETT:  Okay.  Thank you.

18          MR. CUNNINGHAM:  Just give me one minute, Mr.

19     Chancellor.

20          MR. JOHNSON:  If you can, e-mail them to me,

21     too, sir.

22          MR. CUNNINGHAM:  I will.

23          MR. JOHNSON:  I appreciate it.  Thanks.

24          MR. CUNNINGHAM:  Bear with me.  My computer

25     is not cooperating with me.

1    BY MR. CUNNINGHAM:

2    Q.   All right.  Mr. Chancellor, I'm going to share a

3         document on your screen.  You should be able to see it

4         on your phone, I hope.  So we'll see how this goes.

5         Okay.  Can you see that, Mr. Chancellor?

6    A.   Yes, a little bit.

7    Q.   I'll try and make it a little bit bigger.

8    A.   Okay.

9    Q.   Can you see what it says at the top there?

10   A.   Parole conditions.

11   Q.   If I highlight it, can you see the highlighting?

12   A.   Yeah.

13   Q.   Okay.  Parole conditions.  All right.

14   A.   Yeah.

15   Q.   And number 2 here, can you see that?

16   A.   Yes.

17   Q.   And could you read that for me?

18   A.   Hold on one second.  You must not change residence

19        without prior permission of your agent, your field

20        agent.

21   Q.   And I'm just going to zoom out a little bit so you can

22        it's one whole document.  Is that your signature at the

23        bottom?

24   A.   Yes.

25   Q.   Okay.  I'm going to mark that as Exhibit 1.  And then

1      I'm going to ask you to look at this also, Mr.

2      Chancellor.  Is that your writing?

3   A.   Yes.

4   Q.   And is that your signature at the bottom?

5   A.   Yes.

6   Q.   That's it for the moment.

7             All right.  Are you aware that on November

8      2nd, 2011 cocaine was found at your mom's house at 5023

9      32nd Street?

10  A.   Could you repeat the question?

11  Q.   Sure.  Are you aware that on November 2nd, 2011 cocaine

12     was found at your mother's house at 5023 32nd Street?

13  A.   Yeah, I'm aware they say something found there.

14  Q.   I'm sorry.  You aware what?

15  A.   I'm aware that something was found there they say.

16  Q.   At your trial do you remember your attorney stipulating

17     that what they found was cocaine?

18  A.   Yes.

19  Q.   So would you disagree with me when I say that what they

20     found there was cocaine?

21  A.   I don't know what they found there.  I wasn't there,

22     sir.

23  Q.   Was that your cocaine?

24  A.   No.

25  Q.   Do you know how that cocaine got there?

1   A.   No.

2   Q.   Well, it wasn't your mother's cocaine; right?

3   A.   Not to my knowing.

4   Q.   So do you know whether it was your mother's cocaine?

5            MS. HATCHETT:  Objection; relevance.

6   BY MR. CUNNINGHAM:

7   Q.   I'm sorry.  I couldn't hear your response.

8   A.   No, I don't know who cocaine it was.

9   Q.   Was it Ronald Durrell's cocaine?

10  A.   Don't know, sir.

11  Q.   Was it Alvin Thomas' cocaine?

12  A.   Don't know, sir.

13           MS. HATCHETT:  Objection; asked and answered,

14       lack of foundation.

15  BY MR. CUNNINGHAM:

16  Q.   Was it Crystal's cocaine?

17           MS. HATCHETT:  Same objection.

18  BY MR. CUNNINGHAM:

19  Q.   Did it belong to one of your cousins?

20  A.   Don't know, sir.  Ain't belong to me.

21  Q.   Okay.  And so you don't know how it got there?

22  A.   No, sir.

23  Q.   All right.  Your house on Robison, it's 9209?  That's

24       right, isn't it, 9209?

25  A.   9209, yes.

1   Q.   Okay.  Why did you purchase that house?

2   A.   I don't understand the question.

3   Q.   Were you in prison when you purchased that house?

4   A.   Yes.

5   Q.   So what did you need a house for?

6   A.   Just because I was coming home and I wanted a house to

7        live in.

8   Q.   When did you purchase that house?

9   A.   I don't recall.  I don't recall.  I think it was -- I

10       don't recall, sir.

11  Q.   Okay.  Who did you purchase it from?

12  A.   What do you mean, who I purchase it from?

13  Q.   Did you pay money to somebody to get the house?

14  A.   I had a, yes, my friend Roxsanna Collins.

15  Q.   So you bought the house from Roxsanna?

16  A.   No, she bought it for me.  I was incarcerated, so I

17       couldn't, you know, sign deeds and all that, so she

18       bought the house for me, and when I was coming home I

19       was getting the house from her.

20  Q.   Who did she buy the house from?

21  A.   I don't know, sir.

22  Q.   And so I think what you're telling me is she bought it

23       from somebody else, you're not sure who, and then you

24       bought it from her?  Really you were just kind of using

25       her as a go-between between whoever owned it before she

1    owned it and yourself?

2  A.  Yes.

3  Q.  So Roxsanna never lived there?

4  A.  No.

5  Q.  And how do you know Roxsanna?  What's your relationship

6      with her?

7  A.  I took her to her prom like years ago, way, way years

8      ago.  Used to be my girlfriend.

9  Q.  Where does Roxsanna live?

10 A.  Don't know.

11 Q.  And, I'm sorry, Roxsanna's last name is Collins; is

12     that right?

13 A.  Yes.

14 Q.  And Roxsanna by the way is R-o-x-s-a-n-n-a?

15 A.  Yes.

16 Q.  And what's Roxsanna's phone number?

17 A.  I got to go through my phone to get it.

18 Q.  Okay.  If you could do that, please.

19 A.  I'm kind of scared.

20 Q.  It's touch and go with that, isn't it?  Right.  Let's

21     hold off on that for the time being.

22 A.  Right.

23 Q.  We might not want to risk that.

24 A.  Right.

25 Q.  All right.  I'm going to try to remember at the end and

1    then I'll ask you again, and then if we lose our

2    connection, so be it.

3  A.   All right.

4  Q.   Okay.  How much did you pay for 9209 Robison?

5  A.   I don't recall.  I don't remember.  I don't remember.

6  Q.   Where did you get the money to buy it?

7             MS. HATCHETT:  Objection to relevance.  You

8    can go ahead, Mr. Chancellor, if you can recall.

9             THE WITNESS:  I don't.  I don't recall.  It

10   was -- I don't recall.

11  BY MR. CUNNINGHAM:

12  Q.   On Robison did anybody ever live there with you and

13   your wife and your son besides the --

14  A.   No.

15  Q.   -- three of you?

16  A.   No.  Well, her kids.

17  Q.   When did her kids live there?

18  A.   When they came -- I guess when they came over.

19  Q.   So they didn't live there, but they would stay with you

20   sometimes?

21  A.   Yes, from her and her mother, yes.

22  Q.   And what's Katrice's mother's name?

23  A.   Linda, I think.

24  Q.   And what's Linda's last name?

25  A.   Butler.

1    Q.    And where does Linda live?

2    A.    Don't know, sir.

3    Q.    What's Linda's phone number?

4    A.    Don't know, sir.

5    Q.    Is Linda's number in your phone?

6    A.    No.

7    Q.    Before you moved into the house on Robison, who lived

8          there?

9    A.    Don't know, sir.

10   Q.    Now, I've seen a utility bill from DTE for that

11         address.  You know what I'm talking about?

12   A.    I can't -- I don't know what you're talking about.  I

13         can't see it.

14   Q.    Okay.  Let me see if I can find it.  I can't put my

15         fingers on it right now.  Did you have electric service

16         at the house at Robison when you lived there?

17   A.    Yes.

18   Q.    Did you have other utilities besides electricity?

19   A.    Like heat?

20   Q.    Yes.

21   A.    Yes.

22   Q.    And was that also through DTE?

23   A.    Yes.

24   Q.    Did you have water?

25   A.    Yes.

1    Q.    And was that through Detroit Water & Sewerage

2          Department?

3    A.    Yes, I think so.

4    Q.    Did you have cable T.V.?

5    A.    Yes.

6    Q.    Who did you get your cable T.V. from?

7    A.    I don't know.  I didn't pay no cable bills.

8    Q.    Did you have Comcast cable?

9    A.    Don't know, sir.

10   Q.    Did you have AT&T cable?

11   A.    Don't know, sir.

12   Q.    I'm going to show you another document.  Can you see

13         that document, Mr. Chancellor?

14   A.    Yeah.

15   Q.    And is this your signature at the bottom?

16   A.    Yeah.

17   Q.    All right.  And this document says dated this February

18         8, 2008; you see where it says that?

19   A.    Yes.

20   Q.    Was that the date you signed this document?

21   A.    I don't recall.

22   Q.    And did Roxsanna sign her name or did you sign her

23         name?

24   A.    She had to sign on her own name.

25   Q.    Okay.  And do you see this identification card here at

1      the bottom?

2   A.   Yes.

3   Q.   Is that your identification card?

4   A.   Yes.

5   Q.   It's also got your signature at the bottom?

6   A.   Yes.

7   Q.   And that's a picture of you?

8   A.   Yes.

9   Q.   Where were you on February 8th, 2008?

10  A.   I was locked up.

11  Q.   Did Roxsanna ever come to the prison to see you?

12  A.   Unh-unh.

13  Q.   Is that a no?

14  A.   I don't recall, sir, no.

15  Q.   Did you ever have a notary come to the prison where you

16       were to sign this deed?

17  A.   I don't recall.

18  Q.   Who recorded this deed?

19  A.   I don't recall, sir.

20  Q.   When were you arrested for this case?

21  A.   May 2nd, 2012.

22  Q.   And where were you when you were arrested?

23  A.   I was driving.  I was pulled over.

24  Q.   And was that in the city of Detroit?

25  A.   Yes.

1    Q.   And where did they take you when they arrested you?

2    A.   The jail.

3    Q.   Was that the Detroit Detention Center or was that

4         before the Detroit Detention Center?

5    A.   That was before the Detroit Detention Center.

6    Q.   So which jail was it?

7    A.   If I can recall, it was the precinct, the 2nd Precinct.

8    Q.   And how long were you at the 2nd Precinct?

9    A.   For a couple days.

10   Q.   And then what happened after a couple days?

11   A.   I went to Wayne County.

12   Q.   And how long we're you at Wayne County Jail?

13   A.   To trial, till I lost the trial.

14   Q.   Never bonded out?

15   A.   No.

16   Q.   When you were arrested did you believe that you were

17        innocent?

18   A.   I know I was innocent.

19   Q.   I'm going to show you another document.  Can you see

20        that document, Mr. Chancellor?

21   A.   Yes.

22   Q.   Do you recognize that document?

23   A.   Yes.

24   Q.   That document was -- I think it was the Defense Exhibit

25        A in your trial; right?

1    A.    I don't recall what exhibit it was.

2    Q.    Okay.  But you were aware of that at the time of trial,

3          this document?

4    A.    I'm aware of this, yes.

5    Q.    I know you were aware of it now, but back then you were

6          aware of it, too; right?

7    A.    Yes.

8    Q.    And at the time of your trial did you believe that the

9          statements in this affidavit were false?

10   A.    Could you repeat the question?

11   Q.    Sure.  Let's take a look at the -- part of the search

12         warrant.  I'm sorry.  I'd like to mark this as Exhibit

13         3, and I'd like to mark the deed we looked at before as

14         Exhibit 2, which I failed to mention.

15               Okay.  Can you see the part where it says --

16         I'm going to try and highlight it here -- on November

17         1st, 2011 affiant set up a fixed surveillance?

18   A.    Yes.

19   Q.    Okay.  And during the course of 30 minutes, affiant

20         observed at least three persons separately go to the

21         above address, knock on the door of 5023 32nd, engage

22         in a short conversation with the person matching the

23         above seller description.  Then the suspected buyer

24         would stay outside and the above-described seller

25         returned and made a suspected narcotic transaction with

1        the buyer in which money was exchanged for suspected

2        heroin.  Affiant has seen this type of activity several

3        times in the past and finds this type of activity to be

4        consistent with ongoing narcotic activity.

5                Do you believe that's a true statement?

6    A.   I believe --

7                MR. JOHNSON:  First of all, hold on.  It's

8        affiant, first of all, but go ahead.

9                THE WITNESS:  I believe I ain't got nothing

10       to do nothing in this statement, so I don't true or

11       guess who, I don't know who you're talking about.

12   BY MR. CUNNINGHAM:

13   Q.   Okay.  I guess then my question is do you know whether

14       that statement is true or not?

15   A.   No, I don't know nothing about nothing in this

16       statement.

17   Q.   Okay.  Now, all right, Mr. Chancellor, I'm going to ask

18       you to look at another paragraph.  It says on October

19       31st, 2011, affiant received information from a

20       credible and reliable informant.  The CI stated to

21       affiant that he/she knows there is a large amount of

22       heroin at the above location which is being stored and

23       sold at this location.  The affiant has sued the CI in

24       over three occasions resulting in three arrests for

25       VSCA with cases pending in 36th District and Third

1          Circuit resulting in the confiscation of quantities of

2          marijuana, cocaine and firearms proving the CI is

3          familiar with narcotics and it's packaging.  Do you

4          know if that statement is true?

5     A.   I don't know nothing about none of that.

6     Q.   Okay.  Do you own a motor vehicle?

7     A.   No.

8     Q.   Have you owned a motor vehicle since the purple Chevy

9          Cavalier that you used to own?

10    A.   Yes.

11    Q.   What other motor vehicle have you owned?

12    A.   I had a -- what was it? -- a Crown Victoria and a

13         Trailblazer.

14    Q.   When did you own a Crown Victoria?

15    A.   Like, I want to say the end of 2011, beginning of 2012.

16    Q.   What color was the Crown Victoria?

17    A.   Gold, brownish gold.

18    Q.   Okay.  Did you own that gold Crown Victoria on November

19         1st, 2011?

20    A.   What was the date?

21    Q.   November 1st, 2011.

22    A.   No, not that I can recall.

23    Q.   Have you ever spoken to Stephen Geelhood before?

24    A.   No.

25    Q.   Have you ever spoken to him on the telephone?

1   A.   No.

2   Q.   Had you ever met Stephen Geelhood before November 1st

3        of 2011?

4   A.   No.

5   Q.   Do you know of any reason why he would make up a fake

6        affidavit and come to search your mom's house on

7        November 1st, 2011?

8   A.   No, don't have the slightest idea.

9   Q.   Do you currently receive any government benefits?

10  A.   No.  What do you mean?

11  Q.   Sure.  Medicaid?  Do you get Medicaid?

12  A.   I got a Medicaid card.  I haven't used it or nothing.

13  Q.   And you're not Medicare eligible, are you?

14  A.   What you mean?

15  Q.   Medicare is usually for people 65 and older, but also

16       for some people with chronic health conditions.

17  A.   No.

18  Q.   It's that red, white and blue card that says Medicare

19       on it if you're eligible.

20  A.   No.

21  Q.   Do you receive any kind of Social Security benefits?

22  A.   No.

23  Q.   Do you get food stamps or a Bridge card or anything

24       like that?

25  A.   Get a Bridge card.

```
 1    Q.   Other than Medicaid, do you have any other kind of
 2         health insurance?
 3    A.   No, not to my knowing.
 4    Q.   Do you have any kind of automobile insurance?
 5    A.   No.
 6    Q.   Any other kind of insurance?
 7    A.   No.
 8    Q.   All right.  I have one more document to look at.  Okay.
 9         Can you see that document, Mr. Chancellor?
10    A.   Yeah.
11    Q.   Do you recognize that document?
12    A.   Not right offhand.
13    Q.   Well, I'm going to suggest to you that this is a
14         document -- actually, I don't even know if this is
15         true, so let me ask you a question about this document.
16         It looks to me like a document that the CIU sent to you
17         and had you provide them information and you sent it
18         back to them.  Does that sound right to you?
19    A.   No, I don't recall.
20    Q.   Okay.  I'm going to ask you to look at this.  Is that
21         your handwriting?
22    A.   Yes.
23    Q.   And what about this part, this is my new evidence?  Is
24         that your handwriting?
25    A.   Yeah.
```

1    Q.   And is this what you believe was new evidence in your

2         criminal case?

3    A.   I believe it was just evidence that wasn't looked at.

4    Q.   Okay.  I'm going to ask you to look at this handwritten

5         number 10 here.  It says, please tell us of the new

6         evidence which supports your claim that you are

7         innocent of the crimes of conviction.  You see that?

8    A.   Yes.

9    Q.   Now, here you have a whole section of evidence, and

10        then here you have another section that says, my new

11        evidence.  And is this evidence that you thought was

12        new evidence that shows your innocence?

13   A.   I thought this was evidence that wasn't submitted at

14        trial.

15   Q.   Okay.  Okay.  Fair enough.  And so new evidence you

16        have listed here, my original state ID card that shows

17        my height and weight, which is your height is 5'11" and

18        your weight is 220 pounds, do you see that?

19   A.   Right.

20   Q.   And you thought that was something that should have

21        been considered at trial but was not?

22   A.   Right.

23   Q.   Correct?

24   A.   Yes.

25   Q.   Yeah.  Okay.  And then the second one was my quit claim

```
1        deed to the house I stayed at.  Is that also evidence
2        that you -- was not considered at your criminal trial
3        that you thought should have been considered?
4    A.  Yes.
5    Q.  And that's the quit claim deed that we just looked at;
6        right?
7    A.  Yes.
8    Q.  The third thing here is my detainee input sheet to show
9        my weight before I got to jail.  That's also something
10       that you thought should have been considered at your
11       trial but wasn't?
12   A.  Yes.
13   Q.  Okay.  The next thing is my DTE energy bill.  That's
14       evidence that you thought should have been considered
15       at your trial but wasn't?
16   A.  Yes.
17   Q.  And that's -- the DTE bill I was referring to earlier,
18       but I can't seem to put my fingers on now.
19               Chapter 5.  Affidavit for Janet Chancellor to
20       testify.  That's Janet Chancellor is your mom; right?
21   A.  Yes.
22   Q.  And so you thought she was going to give some testimony
23       that she didn't offer at trial; right?
24   A.  That she -- yes.
25   Q.  Okay.  Besides this new evidence that you listed here,
```

1      is there any other new evidence that you think should

2      have been considered at your criminal trial that wasn't

3      considered?

4              MR. JOHNSON:  Calls for a legal conclusion.

5      Go ahead.

6              THE WITNESS:  Like, could you repeat that

7      question?

8              MR. CUNNINGHAM:  Yes.

9   BY MR. CUNNINGHAM:

10  Q.   So you made a list of things and you said I think these

11       things should have been considered at my criminal

12       trial, but they weren't.  I want to make sure that if

13       there's anything else that you think should have been

14       on this list, what else is it?

15              MR. JOHNSON:  Calls for a legal conclusion.

16      Go ahead.

17              THE WITNESS:  No, I think everything is on

18      there.

19  BY MR. CUNNINGHAM:

20  Q.   So you can't think of another document that you have

21       that you wish the court to consider --

22              MR. JOHNSON:  Same --

23              MR. CUNNINGHAM:  -- in your --

24              MR. JOHNSON:  Sorry.  I apologize, Patrick.

25      Same objection.  I apologize.

1              MR. CUNNINGHAM:  No problem.

2              THE WITNESS:  No.

3    BY MR. CUNNINGHAM:

4    Q.   Here.  I'm going to as the question real slow.  Give

5         Mr. -- give your lawyer an opportunity to object, and

6         then if you could answer.  All right, Mr. Chancellor?

7    A.   Go ahead.

8    Q.   Okay.  Besides the stuff you listed that we just went

9         over, is there any other document that you know of that

10        you wish had been admitted into evidence at your

11        criminal trial?

12             MR. JOHNSON:  Calls for legal conclusion.  Go

13        ahead, please, Darell.

14             THE WITNESS:  Not right now.

15   BY MR. CUNNINGHAM:

16   Q.   Okay.  And, again, let's do the same thing.  I'll ask

17        real slow.  Give your attorney an opportunity to object

18        and then please answer.

19             Are there any other witnesses -- like you

20        said my mom, Janet Chancellor would testify.  Are there

21        any other witnesses besides your mom, Janet Chancellor,

22        who you thought should have testified at your criminal

23        trial, but didn't?

24             MR. JOHNSON:  Same objection.  Go ahead,

25        Darell.

1                   THE WITNESS:  No.

2    BY MR. CUNNINGHAM:

3    Q.    Okay.  Have you seen a doctor since you were released

4          from prison?

5    A.    Yes.  What type of doctor?

6    Q.    Any type of doctor.

7    A.    Yes.

8    Q.    What doctors have you seen since you were released from

9          prison?

10   A.    I've seen a doctor, I just left a doctor.  I was

11         getting checked for COVID.

12   Q.    Okay.  And besides getting checked for COVID, have you

13         seen a doctor for any other reason since you were

14         released from prison?

15   A.    Yes.

16   Q.    What other reasons have you seen a doctor for?

17   A.    I seen a doctor, I forget his name.  I forget the name.

18   A.    What did you see him for?

19   A.    Because I been going through a lot of stuff since I've

20         been released from prison.

21   Q.    Have you seen a psychiatrist since you got released

22         from prison?

23   A.    Yes.

24   Q.    What psychiatrist have you seen?

25   A.    I forget his name.  I forget his name.

1   Q.   How many times have you seen him?

2   A.   Once.

3            MR. JOHNSON:  Darell, are you talking about

4        Dr. Shiner?  S-h-i-n-e-r.

5            THE WITNESS:  That's him.

6   BY MR. CUNNINGHAM:

7   Q.   Have you seen any other psychiatrist besides Dr.

8        Shiner?

9   A.   No.

10  Q.   And you only saw him one time?

11  A.   Yes.

12  Q.   Have you seen a psychologist since you were released

13       from prison?

14  A.   No.

15  Q.   Do you have any kind of physical ailment that you link

16       to your time in prison?

17  A.   I mean, what do you mean?

18  Q.   Like, so you see a psychiatrist I guess for mental

19       issues.  Do you have any physical issues that you see a

20       doctor for?

21  A.   No, no physical issue.

22  Q.   And how long were you in prison?

23  A.   Eight years.

24  Q.   Is that the longest stretch of prison time you've done?

25  A.   Yes.

1   Q.   How long is the next longest time?

2   A.   For the armed robbery.

3   Q.   And what did you talk about with Dr. Shiner?

4   A.   I told him what was going on with me.  I don't like --

5        I'm really -- how I feel.  I don't feel safe really

6        going outside or being, really, I don't feel safe in

7        the law enforcements no more.  You know, I stay -- I

8        tell him I stay in the house nowadays because I don't

9        want another episode to happen.  I don't know what will

10       happen next.  That's what we talked about.  I tell him

11       I don't want to go outside, really.

12  Q.   Are you taking any kind of medication?

13  A.   No.

14  Q.   Are you doing any kind of talk therapy where you go

15       talk to a doctor, or a social worker or a psychologist?

16  A.   No.

17  Q.   What do you want to tell me about your time in prison?

18  A.   It was long, hard and terrible.  I mean you see things

19       you not supposed to see in prison.

20  Q.   Things like what?

21  A.   Like I had a bunkie used to get butt naked in middle of

22       the night and jack off while I'm laying there.  Like I

23       had 300-pound bunkie wanted to fight and --

24  Q.   I'm sorry.  You cut out on me a little bit.  You had a

25       300-pound bunkie that what?

1   A.   Wanted to fight every night.

2   Q.   He wanted to fight you?

3   A.   He wanted to fight.  He didn't care who it was.  I was

4      just locked in the room with him.

5   Q.   Did you ever have any fights while you were in prison?

6   A.   I had a lot of fights when I was in prison.

7   Q.   How many fights?

8   A.   More than I can count.

9   Q.   More than 10 fights?

10   A.   I don't recall the number of fights.

11   Q.   Well, can you put like a ballpark estimate on it?

12   A.   I just said I had a bunkie that woke up, wanted to

13      fight.  I don't recall the nights or how many nights in

14      a row that he woke up, wanted to do this, but it was a

15      lot of nights.

16   Q.   What was his name?

17   A.   I don't recall.  I really didn't want to know his name.

18   Q.   How long was he your bunkie?

19   A.   For months, for about six months.

20   Q.   Did you get a GED while you were in prison?

21   A.   Yes.

22   Q.   Was that the first stretch or the second stretch?

23   A.   The first stretch.

24   Q.   Did you do any education in prison during the second

25      stretch?

1   A.   No.

2   Q.   Did you have a job at the prison during the second

3        stretch?

4   A.   Yes.

5   Q.   What was your job?

6   A.   I was a porter.

7   Q.   What does a porter do?

8   A.   Clean up doo-doo.  Clean up after everybody.  Like the

9        people use the bathroom, you got to go in there and

10       clean it when they done.  If there was doo-doo on the

11       floor or pee on the floor, you got to clean that up.

12  Q.   You just told me you got your GED.  Did you ever attend

13       a high school?

14  A.   Yes.

15  Q.   What high school did you attend?

16  A.   Chadsey.

17  Q.   Where is that?

18  A.   It's on Martin and McGraw.  Well, yeah, between Martin

19       and McGraw.

20  Q.   And that's a Detroit Public School high school?

21  A.   Yes.

22  Q.   What's the last grade you attended?

23  A.   The 11th.

24  Q.   Did you complete the 11th grade?

25  A.   No.

1    Q.   So you completed 10th grade and part of 11th grade?

2    A.   Yes.

3    Q.   We talked about your bunkies in prison.  Is there

4         anything else you want to tell me about prison?

5    A.   Don't go.

6    Q.   Sound advice.

7              Are there any other experiences you had

8         during this stretch of prison that stick out in your

9         memory?

10   A.   No.  Like I said, worst is seeing another man jack off

11        in front of you.  That's a terrible feeling.

12   Q.   I can understand that.  Have you filed a lawsuit under

13        the Wrongful Imprisonment Compensation Act?

14   A.   I don't know, what's the name of it?

15   Q.   I think it's actually incarceration.  The state --

16              MR. JOHNSON:  WICA; WICA.  W-I-C-A.

17   BY MR. CUNNINGHAM:

18   Q.   Are you familiar with that, Mr. Chancellor, at all?

19   A.   No, I ain't.  No, I haven't.

20   Q.   Okay.

21              MR. JOHNSON:  We have not filed as of now.

22   BY MR. CUNNINGHAM:

23   Q.   What injuries have you suffered as a result of your

24        imprisonment?

25   A.   What you mean, physically?  I don't know what you mean.

1   Q.   Any kind, physical or emotional.

2   A.   Like I'm very paranoid now.  Like I told you, I don't

3        want to go outside.  I don't.  I can't even spend like

4        time with my son like I want to outside because I'm

5        scared.  I don't know what can happen next.  Like I

6        say, it ain't -- I don't know, I don't trust the

7        police.  I can't just go outside like that.  I mean

8        there's more than Geelhood.  I don't trust none of

9        them.  I can't -- I don't want to go outside.  Like I

10       say, I don't go outside.  I don't sleep well.  It's

11       just it's a total -- it's totally different.

12  Q.   Do you have any financial expense that you've incurred

13       as a result of your imprisonment?  Did it cost you any

14       money?

15  A.   That what cost me any money?

16  Q.   Being in prison.

17            MR. JOHNSON:  Foundation.  Go ahead.

18            THE WITNESS:  Yes.  I mean, I spent money on

19       lawyers, I lost my house due to me being in prison and

20       I was -- I was, what was it? -- had to pay restitution

21       while I was in prison.

22  BY MR. CUNNINGHAM:

23  Q.   What lawyers did you pay?

24  A.   I had Ronnie Cromer and Ray Paige.

25  Q.   Ray Paige was your trial attorney at the criminal

1       trial; right?

2    A.    Yes.

3    Q.    What did Ronnie Cromer do for you?

4    A.    Ronnie, he was my first lawyer before.  He's the one I

5          had before trial.  Ray just stepped in at trial.

6    Q.    Did you have to pay any lawyers besides Ronnie Cromer

7          and Ray Paige?

8    A.    Pay them for what?

9    Q.    Fair question.  Did you have to pay any lawyers as a

10         result of your imprisonment other than Ronnie Cromer or

11         Ray Paige?

12   A.    No.

13   Q.    You said you lost your house.  Why did you lose your

14         house?

15   A.    The mortgage.  It wasn't going to pay itself.  If I'm

16         locked up, I'm the one paying the bills there.

17   Q.    Did you have a mortgage on your house?

18   A.    I mean not -- no, I did not have a mortgage.  Excuse

19         me.

20   Q.    Okay.

21   A.    But the taxes.  Excuse me.

22   Q.    Taxes?  Okay.  Was the house foreclosed on?

23   A.    Yes.

24   Q.    And how much restitution did you pay?

25   A.    I think they made me pay like $1,000 for victim fees or

```
1        something.  I don't --

2   Q.   Aside from what we just talked about, are there any

3        other expenses that incurred, money that you had to pay

4        out as a result of your imprisonment?

5   A.   No.

6   Q.   Have you ever met Valerie Newman?

7   A.   Yes.

8   Q.   When did you meet Valerie Newman?

9   A.   I met Valerie Newman like when I got released.  I think

10       it was a month or so after I got released.

11  Q.   Did she ever come to talk to you while you were in

12       prison?

13  A.   No.

14  Q.   Do you know Pat Little?

15  A.   Pat Little?  No.

16  Q.   Do you know Carol Stanyar?

17  A.   No.

18  Q.   Do you know Tim Ewald?

19  A.   I know Tim Ewald, yes.

20  Q.   How do you know Tim Ewald?

21  A.   Tim, I had -- Tim came, talked to me.

22  Q.   When is the first time you met Tim?

23  A.   Well, I knew Tim since Officer Melendez case.

24  Q.   That was like the year 2000, is that about right or is

25       that not the right time frame?
```

1  A.  No, like 2000 and -- yeah.  No, about 2003, something

2     like that, 2002.

3  Q.  Around 2002, 2003?  And how did you know Tim Ewald in

4     around 2002 or 2003?

5  A.  Officer Melendez.

6  Q.  What was Tim's role in that situation?

7  A.  I guess he was on Officer Melendez case.

8  Q.  And what kind of involvement did you have with Tim?

9  A.  Like during my case he just had me really point out

10    Officer Melendez in the lineup and all that.

11 Q.  Was he a police officer investigating Melendez?

12 A.  I don't recall.  I don't know.

13 Q.  Okay.  Did you keep in touch with Tim after the

14    Melendez --

15 A.  No, I haven't seen him since.

16 Q.  Did you ever speak to him on the phone?

17 A.  No.

18 Q.  After you moved out of your mom's house on 32nd Street,

19    how often would you go over there?

20 A.  What days?   What time you talking?

21 Q.  I'm talking about after you moved out in January of

22    2011.

23 A.  Oh, I mean I go over there like -- like I go over there

24    about probably -- I used to go probably three, four

25    times out the week, check on my mother.

1    Q.   Were you over there on November 1st, 2011?

2    A.   No.  November 1st?  No.

3    Q.   You didn't go over to check on your mother that day?

4    A.   No.

5    Q.   Are there any other injuries that you suffered or

6         damages that you incurred that you want to tell me

7         about that we didn't already talk about?

8    A.   No.

9              MR. JOHNSON:  Foundation.  Go ahead.  Sorry.

10   BY MR. CUNNINGHAM:

11   Q.   Is there any other kind of treatment you've sought

12        since you got released from prison other than with Dr.

13        Shiner?

14   A.   No.

15   Q.   Is there a Katie Chancellor in your family?

16   A.   A who?

17   Q.   Katie Chancellor?

18   A.   No, I never heard the name.

19             MR. CUNNINGHAM:  Okay.  All right.  I think

20        that's all I have.

21             MS. HATCHETT:  Okay.  We don't have any other

22        questions.  We don't have any follow-up questions,

23        Patrick.

24             MR. JOHNSON:  Wait a minute, Hatchett.  Wait

25        a minute.

```
 1              MS. HATCHETT:  Oh, sorry.

 2              MR. JOHNSON:  What's this "we: stuff?

 3                     EXAMINATION

 4   BY MR. JOHNSON:

 5   Q.   I'm going to ask you a couple questions about the

 6        search warrant that Counsel asked you about, Exhibit 3,

 7        if my notes are at all legible and correct.

 8              At the time of November 2, 2011, were you

 9        5'8" and 1800 pounds?

10   A.   No.

11   Q.   Okay.  Now, we've seen some documents and so forth

12        around that time that said how tall you were.  If you

13        weren't 5'8", how tall were you?

14   A.   5'11".

15   Q.   So three inches taller than 5'8"?

16   A.   Right.

17   Q.   And 180 pounds.  How much were you -- did you weigh on

18        November 2, 2011?

19   A.   220.

20   Q.   So 40 pounds more?

21   A.   Right.

22   Q.   Okay.  Do you even know when is the last time you

23        weighed only 180 pounds?

24   A.   No.

25   Q.   Has it been, shall I say, a lot of years?
```

1   A.   Yeah, it's been a lot of years.

2   Q.   No offenses, brother, me, too, but I'm just asking.

3   A.   Right.

4   Q.   So if in the search warrant Officer Geelhood was

5        describing a black male, 30s -- let me ask you that.

6        How old were you back on November 2 of 2011, roughly?

7   A.   I think I want 29.

8   Q.   All right.  So at least if that's true, he says 30s,

9        you'd be within a year or so of that; right?

10  A.   Right.

11  Q.   All right.  So if he's talking about a black male who

12       is in his 30s, 5'8", 180, that is not you, a black male

13       5'11", 220?

14  A.   Correct, that is not me.

15  Q.   So do you have any knowledge if he says he, Geelhood in

16       his affidavit, that on October 31, 2011 someone that

17       looked like that was inside the home at 5023 32nd

18       Street, Detroit, Michigan, that was allegedly seen by a

19       confidential informant --

20  A.   You talking?

21  Q.   Yeah, I know.  Sorry.  The hamster is on the wheel

22       though still, brother, so give me a minute.

23  A.   Okay.  Go ahead.

24  Q.   Where he knew that there was a large -- the

25       confidential informant, that he knew there was a large

1    amount of heroin stored and sold at that location, do

2    you have any information about that?

3  A.  No.

4  Q.  Did you have any large amount of heroin stored and sold

5    at that location on October 31, 2011?

6  A.  No.

7  Q.  Did the confidential informant in any way testify at

8    your trial?

9  A.  No.

10 Q.  Was the confidential informant ever revealed to you or

11   your counsel that you're aware of as to who that person

12   is?

13 A.  No.

14 Q.  If, according to Geelhood -- excuse me -- Officer

15   Geelhood on November 1, 2011, the day before you were

16   arrested, he claims that 5023 32nd Street, over the

17   course of 30 minutes he observed three people

18   separately go into the address, knock on the door and

19   engage in short conversation with a person matching the

20   above-seller description, first of all, is 5'8", 180,

21   is that matching your description, yes or no?

22 A.  No.

23 Q.  So if Geelhood claims to have seen that on November 1,

24   was it you?

25 A.  No.

1   Q.   You said you weren't even at the house on November 1;

2       correct?

3   A.   Correct.

4   Q.   The suspected buyer would stay outside and

5       above-described seller returned and made suspected

6       narcotic transition.  Any idea who that is or what

7       they're doing?

8   A.   No.

9   Q.   And then there was alleged money exchanged for

10      suspected heroin.  Okay?  Was that you?

11   A.   No.

12   Q.   What were you charged with on November 2, the next day?

13   A.   I wasn't charged the next day.  It was -- I wasn't -- I

14      didn't get arrested on this thing.  I got charged --

15      what was it? -- May 2nd, 2012, and they charged --

16   Q.   What were you charged with?

17   A.   I was charged with attempt to deliver.

18   Q.   Of what?

19   A.   450 grams.

20   Q.   Of what?

21   A.   Of cocaine.

22   Q.   Okay.  Well, this affidavit said heroin.

23   A.   Right.

24   Q.   Do you have any information --

25   A.   No.

1    Q.    -- as to why Geelhood would say that there was activity

2          on November 1 relative to suspected heroin if

3          ultimately you were charged with cocaine?

4    A.    No, I do not.

5    Q.    Are you aware at all of Officer Geelhood's record with

6          the Detroit Police Department in terms of how many

7          times he's been investigated or written up for

8          suspected criminal activity related to him being a

9          narcotics officer?

10   A.    No, I don't know nothing about it.

11   Q.    You mentioned Melendez many times today.  You sued that

12         officer; correct?

13   A.    Correct.

14   Q.    Apparently you were successful at least in terms of

15         getting a settlement; true?

16   A.    Correct.

17   Q.    I think I heard you say 250 grand; right?

18   A.    Yes; yes.

19   Q.    And so you told us that that money was in the bank and

20         that's in part what the state took after you were

21         improperly and illegally arrested and charged with

22         this; right?

23   A.    Right.

24   Q.    And did they take all that money?

25   A.    Yes, basically.  They took half.

1   Q.   I need to know how much money did they take out of the

2        money that you had while you were in prison on this

3        charge in this case.

4   A.   No, not on this case.  They took it when I was locked

5        up for armed robbery.

6   Q.   I apologize.  My bad.  Got it.

7             On November 2 were you at your mom's house?

8   A.   No.

9   Q.   On October 31, 2011 were you at your mom's house?

10  A.   No.

11  Q.   Going back to my question about Melendez.  What

12       happened, when did that lawsuit settle, to the best of

13       your memory, Darell?

14  A.   I think it was 2006.

15  Q.   Do you know what, if anything, happened to Melendez?

16  A.   Unh-unh.

17  Q.   Did he remain a police officer?  Did he get in trouble?

18       Do you have any idea?  If you don't know, tell me.

19  A.   I just -- well, recently when I was coming home on this

20       case, I mean I just got exonerated on this case, I

21       think he just got locked up for something else.  I'm

22       not for sure though.

23  Q.   Okay.  And do you know when he last worked with DPD?

24  A.   Unh-unh; no.

25  Q.   Are you aware of any issue at all between Geelhood and

1        your mom?

2    A.   No.

3    Q.   So in terms of the activities that are identified in

4         this November 2, 2011 search warrant by Geelhood,

5         number one, had nothing to do with you?

6    A.   Nothing to do with me.

7    Q.   Not you?

8    A.   No.

9    Q.   Correct?

10   A.   Correct; not me.

11   Q.   How long was your trial, Darell?

12   A.   I think my trial was two days.

13   Q.   Okay.  So you told us you got arrested on this May 2,

14        2012; correct?

15   A.   Correct.

16   Q.   So about six months after the affidavit we're talking

17        about; right?

18   A.   Right.

19   Q.   Did you have any knowledge that you were about to be

20        arrested?

21   A.   No, I got pulled over on a routine traffic stop.

22   Q.   And then did they ultimately tell you that they charged

23        you based on this affidavit of search warrant and what

24        they found in your mom's house from six months earlier?

25   A.   They just told me I had a warrant.

1    Q.   And that's when you found out it was for this?

2    A.   I found out that -- I didn't find out what it was for

3         until I went to my -- to court to have a hearing.

4    Q.   Your mom told you that they raided the house; right?

5    A.   Right.

6    Q.   When did she tell you that?

7    A.   The same day, the day they raided.

8    Q.   November 2, 2011?

9    A.   Right.

10   Q.   Did she tell you that they found anything?

11   A.   No, she just told me that they -- the police searched

12        her house.

13   Q.   Did she tell you that they confiscated any drugs?

14   A.   No.

15   Q.   Did she tell you that they are asking about you and

16        whether you lived there or anything like that?

17   A.   No, she only thing she said they asked who stayed at

18        the house.

19   Q.   And you may not know this, do you know what your mom

20        told them?

21   A.   No.

22   Q.   So from May 2, 2012, you getting arrested, you said a

23        couple days in the precinct in that jail, then went to

24        Wayne County Jail; right?

25   A.   Right.

1  Q.  Remained there through trial?

2  A.  Right.

3  Q.  Trial was when?

4  A.  Trial was November 12, 2012.

5  Q.  November 12, 2012?

6  A.  2012, yeah.

7  Q.  About a year after this search warrant we've been

8      talking about; right?

9  A.  Right.

10  Q.  Without belaboring the point, Darell, what did it feel

11      like to go to trial and be accused of a crime that you

12      didn't commit?

13  A.  I mean, it felt terrible.  It feels more terrible when

14      you get found guilty of something you ain't commit

15      because it's like the justice system that failed you.

16      You been taught to believe in the justice system, but

17      to get to found guilty for something you ain't do is

18      where the justice going to come from, yeah.

19  Q.  Did you have a jury or was it just Judge Hathaway?

20  A.  Just Judge Hathaway.

21  Q.  Did you ever any experience with Judge Dan Hathaway

22      before?

23  A.  Never, never, never in life.

24  Q.  When you heard him say the word guilty --

25  A.  Huh.

1  Q.  And you just made a sound, didn't you?

2  A.  Yeah.

3  Q.  Darell, you can still feel it?

4  A.  Yeah, I'm guilty, yeah, when you hear guilty, I mean

5      it's like there's nothing else come after that.  That's

6      the last say-so, guilty.  So --

7  Q.  And from --

8  A.  Yes, sir.

9  Q.  -- that day all the way through March 26th, of 2020 you

10      remained jailed and then ultimately in prison?

11  A.  I remained in prison, yes.

12  Q.  Obviously, the entire time that you're in jail, whether

13      it's the precinct, Wayne County or prison, you ain't

14      working at G&G?

15  A.  No.

16  Q.  Or anywhere else?

17  A.  I'm a porter.  Like I just told, I'm cleaning people

18      feces that just got to use the bathroom.

19  Q.  At the jail prison; right?

20  A.  At the jail prison.

21  Q.  My question though is when you're in jail or prison,

22      you're not able to work an outside job?

23  A.  No.

24  Q.  And earn any wages?

25  A.  Correct.

```
 1   Q.   That otherwise you'd be able to earn?

 2   A.   Correct.

 3   Q.   You tell us that you last worked for G&G in 2012.  I

 4        thought that's what I heard.  Am I wrong about that?

 5   A.   Correct; you're correct.

 6   Q.   So, in other words, you were working at G&G when you

 7        got arrested on May 2, 2012?

 8   A.   Yes.

 9   Q.   Roughly, if you know, Darell, how much money were you

10        making at G&G?

11   A.   It wasn't -- it was like $10 an hour, something like

12        that.

13   Q.   But it was a job?

14   A.   But it was a job.

15   Q.   When you were working, Counsel asked you about some of

16        your temporary agency jobs.  Really what he's trying to

17        ask you, Darell, is can you tell us not necessarily the

18        names of places and stuff, but the type of work you

19        were doing.  In other words, were you being a stock guy

20        and putting stuff at a grocery store, were you stamping

21        parts with a press at a, you know, at a stamping

22        facility?

23   A.   Right.

24   Q.   Can you think back at all and let us better understand

25        while you were working for any type of temp agency what
```

1     types of work you were doing?

2  A.  Like -- well, like I told you with the temp service,

3     one day you can be stocking, one day you could be

4     stamping.

5  Q.  And that's what we want to hear about.  Tell us what

6     you can think of.  Again, we'll talk about where it was

7     later, and if you remember, you do, you don't, but we

8     want to know what type of jobs, please.

9  A.  It was like with the temp service, it's mainly -- like

10    you say, it's mainly packing and -- it's mainly packing

11    with temp services.

12 Q.  Packing like what?

13 A.  Like produce, or whatever, whatever they bring in that

14    got to be packed.  It can be produce.  You can pack

15    sugar.  You can pack whatever they got to be packed,

16    got to be packed.

17 Q.  By the way, when they arrested you on May 2, 2012, you

18    didn't have the unregistered gun on you, did you?

19 A.  No; no.

20 Q.  All right.  You told us you were making roughly 10

21    bucks an hour at G&G.  When you were working your jobs

22    through the temp agencies, what was your hourly rate,

23    approximately?

24 A.  $8, $9, you know, the job varies.

25 Q.  Yeah.

1    A.   So wherever the temp service, whatever they pay, that

2         what you working for that day.

3    Q.   Were you and Katrice still married then when you got

4         arrested?

5    A.   Yeah.

6    Q.   When did you all get a divorce?

7    A.   I mean, when we -- too much time, I'll just say that.

8         I had too much time to do.

9    Q.   So she divorced you?

10   A.   Yeah.

11   Q.   While you were in prison for this thing that you didn't

12        do?

13   A.   Yes.

14   Q.   Approximately when?

15   A.   Let me see.  It was -- I think it was 2016.

16   Q.   So about four years or so after you were wrongfully

17        convicted?

18   A.   Yeah.  She looked at like four years after, 10 more to

19        go.

20   Q.   Yeah.  And I should have asked you that.  So when you

21        were convicted the sentence the judge gave, Judge

22        Hathaway --

23   A.   Yeah.

24   Q.   -- was what?

25   A.   14; 14 to 30.  14 years, 3 -- it was 14 years, 3 months

1    to 30 years.

2  Q.  Every single day you're in that prison cell, jail cell,

3       precinct cell being accused and ultimately wrongfully

4       convicted of doing something you didn't do, Darell,

5       every day, all day what did it feel like?

6  A.  It feel terrible when you know you ain't do something,

7       but you convicted for it.  It was --

8  Q.  I listened -- did I interrupt you?  I'm sorry.  If you

9       weren't done, go ahead.

10 A.  I mean, like I was saying, it's like, like I said, you

11      sitting in there looking like where the justice going

12      to come from.  That's a hard feeling when you know you

13      ain't done nothing, but a judge convicted you of

14      something and now you stuck in prison trying to figure

15      out how you going to get back home for something you

16      ain't do.  First, you ain't supposed to be here because

17      you ain't did nothing.  But now that you here, how you

18      going to get back home for something you ain't do.

19 Q.  So when Counsel went over your previous convictions, I

20      didn't hear anything about you ever going to trial

21      except for this thing.

22 A.  Because I did that.  I would never -- if I did

23      something, I'm going to let you -- I'll say I did it.

24      So if I do it --

25 Q.  You didn't go to trial on those other charges --

1    A.    No.

2    Q.    -- because ultimately you either pled nolo contendere

3          or not guilty; right?

4    A.    Right; right.

5    Q.    Excuse me.  Or guilty.  Sorry.

6    A.    Right.  I pled guilty; right.

7    Q.    This one you fought and went to trial; right?

8    A.    Right.

9    Q.    Unfortunately, lost.

10   A.    Exactly.

11   Q.    So you lost your wife -- right, Darell -- from this?

12   A.    Yes; yes.

13   Q.    You didn't just lose her though, you lost somebody else

14         really important in your life, too?

15   A.    I lost a lot -- to death, yes, I lost a lot of people

16         to death due to me being locked up.  I lost my auntie.

17   Q.    I'm talking about your son.

18   A.    I lost eight, nine years, the first nine years of his

19         life, eight years of his life.

20   Q.    That's where I'm going, brother.

21   A.    So, yeah, I mean, yeah, I lost that.

22   Q.    What's his date of birth?

23   A.    8-25th, that's the day, birthday.

24   Q.    August 25?

25   A.    Yes.  Excuse me.  Yes, it's August 25th.

```
1    Q.   Why are you putting the phone down?

2    A.   Because, like you say, I mean, it's emotional.

3    Q.   You're crying?

4    A.   Basically.  It's emotional.  I -- it's emotional.

5    Q.   And what ultimately you're crying about is when I asked

6         you questions about the time you missed with your son?

7    A.   Right.  I mean, it's hard to -- you can't get that

8         back.

9    Q.   Was he born on August 25, 2011?

10   A.   Yes.

11   Q.   So about three months before this false affidavit?

12   A.   Right.  You can't get that back.

13   Q.   So when he was born, where did Katrice have your son?

14   A.   Huh?

15   Q.   Where did she have him?  What hospital?

16   A.   At Children's.

17   Q.   And were you with her when she delivered?

18   A.   Yes.

19   Q.   When you brought the baby home, where did you all live?

20   A.   On Robison.

21   Q.   You, Katrice and your son, brand new son?

22   A.   Yes.

23   Q.   Every day for the rest of that year throughout 2011

24        you, Katrice and the son lived there on Robison?

25   A.   Yes.
```

1    Q.   Your son did not live with anybody at 5023 32nd Street

2         ever, did he?

3    A.   No.

4    Q.   I think I heard you tell Counsel the last time you

5         lived at that house was in early I think January 2011?

6    A.   Yes.

7    Q.   And you lived there then why?

8    A.   Because my electricity wasn't on at my house.

9    Q.   At Robison?

10   A.   Right.

11   Q.   And the only way you could live in Robison, obviously,

12        if the utilities are working?

13   A.   Exactly.

14   Q.   And you got those working approximately when?

15   A.   The next month I was released from prison.

16   Q.   Which is when?

17   A.   Was January.

18   Q.   2011?

19   A.   2011, yes.

20   Q.   Why did you list 5023 32nd Street on any of the

21        documents about parole and all that other stuff?

22   A.   The G&G Market and the parole office is literally six

23        to seven blocks apart.  So if I got to report, I could

24        still -- it won't bother my work.  I can leave work and

25        literally go report and be back at work in less than 20

1      minutes.  That's why.

2  Q.  How often did you have to report?

3  A.  Every two weeks.

4  Q.  And did you report?

5  A.  Every two weeks.

6  Q.  And did you have any problem at all with your parole

7      officer?

8  A.  I didn't have a problem at all.

9  Q.  But why tell them that the 5023 address if you were

10     really living on Robison?

11 A.  Because if I was to tell them to change the address

12     they would change my parole officer to a parole

13     building that's so -- it's totally out of the way.  The

14     other parole office was on 8 Mile and something at the

15     time.

16 Q.  Okay.  You were simply trying to keep your job at G&G?

17 A.  Basically.

18 Q.  Did your parole officer, to the best of your

19     knowledge -- if you remember, great, if you don't, tell

20     us -- write you up for anything that you're aware of

21     from when you got out of prison in January 2011 up

22     until the time that you were arrested in May of 2012?

23 A.  No, she didn't write me up for nothing.  I went back to

24     prison.  She didn't wrote me up anything.

25 Q.  That's why I asked.

```
 1              So I asked you for the rest of 2011 about
 2         where you lived with your baby and your wife.  But now
 3         January 1, 2012 up until the time you were arrested on
 4         May 2, 2012, for those five months -- actually, four
 5         full months and two days -- where did you live?
 6    A.   On Robison.
 7    Q.   With your wife and your son?
 8    A.   With my wife and my son.
 9    Q.   Is that the last time where you actually lived with
10         either one of them?
11    A.   Yes.
12    Q.   So from May 2, 2012, the time you were jailed, did your
13         wife, Katrice, ever bring your son up to the prison or
14         the jail?
15    A.   I seen him like twice.
16    Q.   Did you ask her to bring him more often?
17    A.   Yes.  She, I mean, yeah, but you can't make nobody do
18         nothing.
19    Q.   I hear you, man, but did you ask?
20    A.   Yes, I asked.  You know, I asked.  I wanted to see him,
21         but, you know, she had other plans.
22    Q.   Let me ask you.  Roles reversed, can you blame her not
23         wanting to bring a baby, a brand new baby up to a
24         prison to visit somebody he doesn't even know?
25    A.   I'm not mad at her.  To this day I'm not mad at her.
```

```
1   Q.   But if anybody truly wants to know about you and what
2        you've gone through, a huge part of you is that young
3        man?
4   A.   Yes.
5   Q.   That's been taken from you, Darell?
6   A.   Yeah.
7   Q.   How do you get that time back?
8   A.   You can't.  That's time gone.
9   Q.   All right.  In any regard, you told us about Tim Ewald.
10       E-w-a-l-d.  Is that the gentleman who is an
11       investigator for the feds?
12  A.   Yes.
13  Q.   Did you ever talk to anybody from Wayne County at all
14       other than Val Newman after your exoneration and
15       release from prison?
16  A.   No.
17  Q.   I said Wayne County.  City of Detroit, too?  Same
18       question, City of Detroit.
19  A.   No.
20  Q.   Other than what information you got from -- well, Val
21       Newman is on behalf of the County, so my question is
22       has anybody from the city ever written you, talked to
23       you, apologized to you for any of this?
24  A.   No; no.  No one.
25            MR. JOHNSON:  Appreciate your time.  Thank
```

1       you, sir.  I've got no more questions.

2                   MR. CUNNINGHAM:  I just have two follow-ups.

3                   RE-EXAMINATION

4   BY MR. CUNNINGHAM:

5   Q.   Have you filed state or federal tax returns in the

6        past, Mr. Chancellor?

7   A.   No.

8   Q.   Never?

9   A.   Not -- no, not that I know of.

10  Q.   Okay.  So nothing you can recall?

11  A.   Not that I can recall.

12  Q.   And when you were arrested, that wasn't Officer

13       Geelhood who placed you under arrest; right?

14  A.   Correct.

15                  MR. CUNNINGHAM:  That's all I have.

16                  MR. JOHNSON:  No more questions.  Thank you

17       very much.

18                  (Deposition concluded at 2:19 p.m.

19                  Signature of the witness was not requested by

20                  counsel for the respective parties hereto.)

21

22

23

24

25

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                          ) SS

4    COUNTY OF WAYNE    )

5

6              I, DIANE H. DRAUGELIS, certify that this

7         deposition was taken before me on the date

8         hereinbefore set forth; that the foregoing

9         questions and answers were recorded electronically

10        and transcribed by me; that this is a true, full,

11        and correct transcript of my recording so taken;

12        and that I am not related to, nor of counsel to,

13        either party nor interested in the event of this

14        cause.

15

16

17

18

19

20        _Diane H. Draugelis_

21             DIANE H. DRAUGELIS, CER-2530

22             Notary Public,

23             Wayne County, Michigan.

24   My Commission expires:  December 12, 2022

25

## $

**$1,000**
22:2 24:24
66:25
**$10**
80:11
**$250,000**
17:25
**$8**
81:24
**$9**
81:24

## -

**-**-**-3013**
8:7

## 1

**1**
40:25 72:15,
23 73:1 74:2
88:3
**10**
31:5 55:5
62:9 81:20
82:18
**10th**
64:1
**11:38**
4:3
**11th**
63:23,24
64:1
**12**
78:4,5
**12-7-81**
9:10
**14**
9:5 35:20
82:25
**15**
19:9 20:11

25:10,11
35:21,22
**1504**
34:1
**15040**
33:25 34:3,5
**16**
19:9 20:11
**180**
70:17,23
71:12 72:20
**1800**
70:9
**1st**
27:5,8,10,25
31:5,15,17
50:17 52:19,
21 53:2,7
69:1,2

## 2

**2**
25:10 40:15
50:14 70:8,
18 71:6
73:12 75:7
76:4,13
77:8,22 80:7
81:17 88:4,
12
**2-**
9:14
**20**
20:15 86:25
**2000**
20:14,18
21:1,15
67:24 68:1
**2001**
20:14,18
21:1,4,15
24:2,9
**2002**
21:15 24:18
68:2,3,4

**2003**
22:14 25:14
68:1,3,4
**2005**
5:14,25 6:1
**2006**
75:14
**2008**
47:18 48:9
**2010**
25:14,16
35:21,22
36:12,22
37:9
**2011**
27:6,8,10,25
29:13 30:7
31:15,17,20
32:2,8,11
36:5,25
37:7,9 38:21
41:8,11
50:17 51:19
52:15,19,21
53:3,7 68:22
69:1 70:8,18
71:6,16
72:5,15 75:9
76:4 77:8
85:9,23
86:5,18,19
87:21 88:1
**2012**
15:8 48:21
52:15 73:15
76:14 77:22
78:4,5,6
80:3,7 81:17
87:22 88:3,
4,12
**2016**
82:15
**2020**
9:5 35:4,5,
9,11,13,18
79:9
**2021**
4:2

**2024**
9:8
**21**
20:15
**220**
55:18 70:19
71:13
**23**
4:2
**25**
21:15,17
24:18 84:24
85:9
**250**
74:17
**250,000**
17:23
**25th**
84:25
**26**
35:4,5,8,11,
18
**26th**
79:9
**280**
8:24
**29**
71:7
**2:19**
90:18
**2nd**
29:13 30:7
31:20 32:2,
8,11 41:8,11
48:21 49:7,8
73:15

## 3

**3**
50:13 70:6
82:25
**30**
50:19 72:17
82:25 83:1
**300**
9:14

1

**300-pound**
  61:23,25
**30s**
  71:5,8,12
**31**
  71:16 72:5
  75:9
**313-828-4115**
  12:3
**31st**
  51:19
**32nd**
  7:9,16,18
  32:22 33:6
  34:15 35:6,
  12 36:7,8,11
  37:1,10,19,
  21,24 38:16
  39:3,9 41:9,
  12 50:21
  68:18 71:17
  72:16 86:1,
  20
**357**
  23:14,15,18
**36th**
  51:25

**4**

**40**
  70:20
**450**
  73:19

**5**

**5**
  25:10 56:19
**5'11"**
  9:1,11 55:17
  70:14 71:13
**5'8"**
  70:9,13,15
  71:12 72:20
**50**
  20:19,20

**21:**2,4,5,11,
  16,17 24:2,9
**5023**
  7:9,16,18
  32:22 33:6
  34:15 35:6,
  11 38:15
  41:8,12
  50:21 71:17
  72:16 86:1,
  20 87:9
**5:00**
  28:22,24
  30:16,19,20,
  21,23

**6**

**65**
  53:15
**6:00**
  28:22 30:17,
  20,23

**7**

**7**
  9:8 25:10,11
**7-1/2**
  25:13
**7:30**
  28:4

**8**

**8**
  25:13 31:11
  47:18 87:14
**8-25th**
  84:23
**8:00**
  28:4 30:10
**8:45**
  28:7 30:10
**8th**
  48:9

**9**

**9209**
  27:17 29:3,
  25 42:23,24,
  25 45:4
**9:00**
  28:6,7
  30:10,18,21

**A**

**a.m.**
  4:3 30:21
**above-described**
  50:24 73:5
**above-seller**
  72:20
**accused**
  78:11 83:3
**acknowledge**
  4:7,10
**Act**
  64:13
**acting**
  19:13
**activities**
  76:3
**activity**
  51:2,3,4
  74:1,8
**address**
  7:8 33:24
  35:15,17
  46:11 50:21
  72:18 87:9,
  11
**administered**
  4:10
**admitted**
  58:10
**adult**
  19:5,6 20:13
**advice**

**64:**6
**affiant**
  50:17,19
  51:2,8,19,
  21,23
**affidavit**
  50:9 53:6
  56:19 71:16
  73:22 76:16,
  23 85:11
**agencies**
  81:22
**agency**
  80:16,25
**agent**
  40:19,20
**agree**
  4:17
**agreement**
  4:15
**ahead**
  17:21 23:20
  26:13 45:8
  51:8 57:5,16
  58:7,13,24
  65:17 69:9
  71:23 83:9
**ailment**
  60:15
**Alford**
  11:16
**alleged**
  73:9
**allegedly**
  71:18
**altogether**
  25:11
**Alvin**
  8:2 13:11
  36:16,17,23
  42:11
**amount**
  51:21 72:1,4
**answering**
  6:25
**answers**
  6:9

Antonio
  36:17,18,23
apologize
  57:24,25
  75:6
apologized
  89:23
Apparently
  74:14
appearing
  6:3
approximately
  28:3 81:23
  82:14 86:14
April
  4:2
Arab
  14:23
Arabic
  14:19
armed
  22:14,15,22
  23:8,11,23
  25:3,8,10
  61:2 75:5
arrangement
  4:13
arrest
  90:13
arrested
  48:20,22
  49:1,16
  72:16 73:14
  74:21 76:13,
  20 77:22
  80:7 81:17
  82:4 87:22
  88:3 90:12
arrests
  51:24
assume
  7:3
assumed
  33:3
AT&T
  47:10

attempt
  73:17
attempted
  20:19 21:2
attend
  63:12,15
attended
  63:22
attorney
  16:14,16
  41:16 58:17
  65:25
attorneys
  4:6
August
  84:24,25
  85:9
auntie
  84:16
automobile
  54:4
avoid
  6:17
award
  19:13,15,17
aware
  17:13 41:7,
  11,13,14,15
  50:2,4,5,6
  72:11 74:5
  75:25 87:20
Ayanna
  4:18 39:14

———————

B

———————

baby
  85:19 88:2,
  23
back
  8:21 35:18
  50:5 54:18
  71:6 75:11
  80:24 83:15,
  18 85:8,12
  86:25 87:23
  89:7

bad
  75:6
ballpark
  62:11
bank
  74:19
based
  17:21 18:15
  76:23
basic
  19:12
basically
  14:7 17:6
  74:25 85:4
  87:17
basis
  18:19
bathroom
  63:9 79:18
Bear
  39:24
bed
  7:14
bedrooms
  7:16 37:24
beds
  38:2
beginning
  52:15
behalf
  4:16,18,21
  89:21
belaboring
  78:10
belong
  42:19,20
belongings
  37:21
benefits
  53:9,21
bigger
  40:7
bill
  46:10 56:13,
  17
bills
  47:7 66:16

birth
  9:9 84:22
birthday
  84:23
bit
  6:2 8:21
  40:6,7,21
  61:24
black
  71:5,11,12
blame
  88:22
block
  11:20,21,22
blocks
  86:23
blue
  53:18
blurry
  26:12,15,16,
  17
bonded
  49:14
born
  85:9,13
boss
  14:12
bother
  86:24
bottom
  40:23 41:4
  47:15 48:1,5
bought
  43:15,16,18,
  22,24
boyfriend
  7:19 8:4
  36:15
boyfriend's
  8:1
brand
  85:21 88:23
Bridge
  53:23,25
bring
  81:13 88:13,
  16,23

brother
 36:13,18
 71:2,22
 84:20
brought
 85:19
brownish
 52:17
bucks
 81:21
building
 87:13
bunch
 8:17
bunkie
 61:21,23,25
 62:12,18
bunkies
 64:3
Burton
 19:21
Butler
 10:23 11:1,7
 45:25
butt
 61:21
buy
 43:20 45:6
buyer
 50:23 51:1
 73:4

———————

C

C-524-135-
139-932
 8:18
C-Y-S-T-A-L
 7:25
C-Y-T
 7:25
cable
 47:4,6,7,8,
 10
call
 12:25 33:4

called
 4:24 32:10
Calls
 57:4,15
 58:12
camera
 8:19
car
 22:8,9,12
 28:9,10
 30:12
card
 8:23 47:25
 48:3 53:12,
 18,23,25
 55:16
care
 25:21 62:3
Carol
 67:16
carrier
 32:8
Cartier
 23:7,9
case
 10:1 18:8,
 10,14,25
 19:14 21:19,
 21 22:3,5,
 16,18 25:18
 38:4,5 48:20
 55:2 67:23
 68:7,9 75:3,
 4,20
cases
 51:25
Cavalier
 28:11,12
 30:13 52:9
cell
 32:2,4,8
 83:2,3
Center
 19:21 49:3,
 4,5
centers
 19:22,23

Chadsey
 63:16
chance
 18:1
Chancellor
 4:23 5:5
 7:7,21,23
 9:20,23,24
 10:3,11,24
 11:2 12:11,
 12,13,16,18,
 20 16:25
 36:20 39:19
 40:2,5 41:2
 45:8 47:13
 49:20 51:17
 54:9 56:19,
 20 58:6,20,
 21 64:18
 69:15,17
 90:6
change
 40:18 87:11,
 12
Chapter
 56:19
charge
 21:7,9 75:3
charged
 25:19 73:12,
 13,14,15,16,
 17 74:3,21
 76:22
charges
 83:25
check
 68:25 69:3
checked
 59:11,12
Chevy
 28:12 30:13
 52:8
child
 12:18
children
 12:4,6,15

Children's
 85:16
chronic
 53:16
CI
 51:20,23
 52:2
Circuit
 52:1
city
 5:6 17:4
 48:24 89:17,
 18,22
CIU
 54:16
claim
 55:6,25 56:5
claims
 72:16,23
clean
 14:10 63:8,
 10,11
cleaning
 79:17
clear
 20:2
close
 26:15
cocaine
 18:9 41:8,
 11,17,20,23,
 25 42:2,4,8,
 9,11,16 52:2
 73:21 74:3
Collins
 43:14 44:11
color
 52:16
Comcast
 47:8
commit
 78:12,14
Compensation
 64:13
complete
 63:24

completed
  64:1
completeness
  24:16
computer
  39:24
concealing
  22:1,7,11
  24:23
concluded
  90:18
conclusion
  57:4,15
  58:12
conditions
  40:10,13
  53:16
conference
  4:8
confidential
  71:19,25
  72:7,10
confiscated
  77:13
confiscation
  52:1
confused
  19:2
confusing
  19:1
connection
  16:21 45:2
consent
  4:13
considered
  55:21 56:2,
  3,10,14
  57:2,3,11
consistent
  51:4
contact
  22:19 26:22,
  24 27:1
contendere
  84:2
contest
  22:20,22

continuing
  18:17,18
conversation
  6:9 50:22
  72:19
convicted
  18:8,11
  19:3,6 20:3,
  9,12,18
  21:1,3,12,24
  22:12 23:24,
  25 24:2
  82:17,21
  83:4,7,13
conviction
  18:13 19:7,
  8,10 20:22,
  24 21:11,23
  22:11 24:3,
  9,18,23 25:3
  55:7
convictions
  18:13,24
  20:5 23:25
  24:14 83:19
cooperating
  39:25
corner
  9:4
correct
  26:11 33:9
  35:14 55:23
  70:7 71:14
  73:2,3
  74:12,13,16
  76:9,10,14,
  15 79:25
  80:2,5 90:14
cost
  18:3 65:13,
  15
couch
  7:15 37:11,
  12,14
counsel
  4:13 70:6
  72:11 80:15
  83:19 86:4

90:20
count
  62:8
County
  4:1 49:11,12
  77:24 79:13
  89:13,17,21
couple
  49:9,10 70:5
  77:23
court
  57:21 77:3
cousins
  37:3 42:19
COVID
  59:11,12
coworkers
  15:5
credible
  51:20
crime
  19:4 20:3,4,
  12 21:3,13,
  24 22:13
  78:11
crimes
  25:19 55:7
criminal
  38:5 55:2
  56:2 57:2,11
  58:11,22
  65:25 74:8
Cromer
  65:24 66:3,
  6,10
Crown
  52:12,14,16,
  18
crying
  85:3,5
Crystal
  7:23,24
  13:7,9 36:23
Crystal's
  42:16
Cunningham
  4:16 5:4,6

17:24 18:7,
  18,21,23
  23:22 33:9,
  12,23 39:14,
  18,22,24
  40:1 42:6,
  15,18 45:11
  51:12 57:8,
  9,19,23
  58:1,3,15
  59:2 60:6
  64:17,22
  65:22 69:10,
  19 90:2,4,15
current
  7:8
custody
  19:25
cut
  61:24

D

D-A-V-A-N-E-K
  34:12
damages
  69:6
Dan
  78:21
Darell
  4:23 7:7
  9:20 10:11
  12:11,12,15,
  18,20 17:22
  33:19 58:13,
  25 60:3
  75:13 76:11
  78:10 79:3
  80:9,17 83:4
  84:11 89:5
date
  9:6,7,9 27:7
  31:16 47:20
  52:20 84:22
dated
  47:17

daughter
  12:8
Davanek
  34:10,12
day
  16:2 27:5
  28:15,18,20,
  21,22 29:7,
  12,15,17,19
  30:2 31:7,8,
  10,11,13,18,
  19,21,23
  69:3 72:15
  73:12,13
  77:7 79:9
  81:3 82:2
  83:2,5 84:23
  85:23 88:25
days
  49:9,10
  68:20 76:12
  77:23 88:5
dealer
  23:3
death
  84:15,16
December
  9:5,8 35:20,
  21,22 36:12,
  22 37:8
decided
  19:13
declare
  4:11
deed
  48:16,18
  50:13 56:1,5
deeds
  43:17
defendants
  4:17
Defense
  49:24
deliver
  20:19 73:17
delivered
  85:17

delivery
  21:2
Deon
  7:7
Department
  38:8 47:2
  74:6
depends
  13:13 28:19
deposition
  5:8,12,24
  16:21,23
  90:18
describing
  71:5
description
  50:23 72:20,
  21
detainee
  56:8
Detention
  49:3,4,5
Detroit
  5:7 17:4
  47:1 48:24
  49:3,4,5
  63:20 71:18
  74:6 89:17,
  18
Diane
  6:5,7,12
difficult
  6:12,16,17,
  22 26:7
disagree
  41:19
District
  51:25
divorce
  82:6
divorced
  10:20 11:9
  82:9
doctor
  25:24 26:1,
  2,3,4,18,20
  27:1 59:3,5,

6,10,13,16,
  17 60:20
  61:15
doctors
  59:8
document
  38:7,11
  40:3,22
  47:12,13,17,
  20 49:19,20,
  22,24 50:3
  54:8,9,11,
  14,15,16
  57:20 58:9
documents
  70:11 86:21
doo-doo
  63:8,10
door
  50:21 72:18
dope
  10:1
DPD
  75:23
driver's
  8:8
driving
  48:23
drove
  28:9
drug
  23:3
drugs
  77:13
DTE
  46:10,22
  56:13,17
due
  65:19 84:16
duly
  4:25
Durrell
  37:5
Durrell's
  42:9

**E**

e-mail
  39:15,20
E-W-A-L-D
  89:10
earlier
  33:5 56:17
  76:24
early
  28:2,3 86:5
earn
  79:24 80:1
easier
  6:7
education
  62:24
electric
  46:15
electricity
  46:18 86:8
eligible
  53:13,19
emotional
  65:1 85:2,4
employed
  13:18,20
end
  5:15 19:15
  28:16,17
  44:25 52:15
ends
  8:16
energy
  56:13
enforcements
  61:7
engage
  50:21 72:19
entire
  79:12
episode
  61:9
estimate
  62:11

**evidence**
  38:7 54:23
  55:1,3,6,9,
  11,12,13,15
  56:1,14,25
  57:1 58:10
**Ewald**
  67:18,19,20
  68:3 89:9
**ex-wife**
  10:22
**EXAMINATION**
  5:3 70:3
**examined**
  5:2
**exchanged**
  51:1 73:9
**excuse**
  66:18,21
  72:14 84:5,
  25
**exhibit**
  40:25 49:24
  50:1,12,14
  70:6
**exhibits**
  39:15
**exonerated**
  18:10 24:1
  75:20
**exoneration**
  89:14
**expense**
  65:12
**expenses**
  67:3
**experience**
  78:21
**experiences**
  64:7
**expiration**
  9:6,7
**eye**
  26:18,20

___

**F**

**facility**
  80:22
**failed**
  50:14 78:15
**fair**
  6:14,19,25
  7:4 36:9
  55:15 66:9
**fake**
  53:5
**false**
  50:9 85:11
**familiar**
  52:3 64:18
**family**
  69:15
**February**
  47:17 48:9
**feces**
  79:18
**federal**
  90:5
**feds**
  89:11
**feel**
  61:5,6 78:10
  79:3 83:5,6
**feeling**
  64:11 83:12
**feels**
  78:13
**fees**
  66:25
**felony**
  22:15 23:23
  25:3,9
**felt**
  78:13
**Ferguson**
  34:6,7,8
**field**
  40:19

**fight**
  61:23 62:1,
  2,3,13
**fights**
  62:5,6,7,9,
  10
**figure**
  83:14
**file**
  16:14,16
**filed**
  16:13,14
  64:12,21
  90:5
**financial**
  13:13 65:12
**find**
  11:16 26:7
  46:14 77:2
**finds**
  51:3
**fingers**
  46:15 56:18
**finished**
  6:24
**firearm**
  17:9 22:15
  23:23 25:3,9
**firearms**
  52:2
**fixed**
  50:17
**floor**
  37:16,17
  63:11
**follow-up**
  69:22
**follow-ups**
  90:2
**food**
  53:23
**foreclosed**
  66:22
**forehead**
  5:19
**forget**
  11:21 59:17,

  25
**fought**
  84:7
**found**
  41:8,12,13,
  15,17,20,21
  76:24 77:1,
  2,10 78:14,
  17
**foundation**
  42:14 65:17
  69:9
**frame**
  67:25
**frequently**
  13:2
**Friday**
  4:2
**friend**
  33:2 43:14
**front**
  64:11
**full**
  7:6 88:5
**function**
  26:14
**funny**
  14:15,17,18

___

**G**

**G&g**
  13:21,22
  14:3,6,12,24
  15:1,7,14,15
  16:5,10
  79:14 80:3,
  6,10 81:21
  86:22 87:16
**gas**
  14:1,4,16
**gave**
  5:12,23 10:8
  82:21
**GED**
  62:20 63:12

**Geelhood**
5:6 52:23
53:2 65:8
71:4,15
72:14,15,23
74:1 75:25
76:4 90:13
**Geelhood's**
74:5
**gentleman**
89:10
**girlfriend**
33:22 44:8
**girlfriend's**
34:9
**give**
6:8 7:3,6
11:14 18:18
39:18 56:22
58:4,5,17
71:22
**glasses**
23:5,6,7,9
26:5,8,11,
12,14
**go-between**
43:25
**gold**
52:17,18
**good**
5:5 8:20
**government**
53:9
**grade**
63:22,24
64:1
**grams**
20:20 21:2,
5,11,17
24:2,10,19
73:19
**grand**
74:17
**grandma**
19:24
**great**
87:19

**grocery**
80:20
**groups**
5:7
**guess**
20:2,4 37:8
45:18 51:11,
13 60:18
68:7
**guilty**
20:24 21:9,
21 22:5,7,18
78:14,17,24
79:4,6 84:3,
5,6
**gun**
23:12,13
25:10 81:18
**guy**
80:19
**guys**
11:9

**H**

**half**
74:25
**hamster**
71:21
**handed**
9:15,17
**handwriting**
54:21,24
**handwritten**
55:4
**happen**
13:2 31:14,
18,21 61:9,
10 65:5
**happened**
31:12 32:6,
16,17 49:10
75:12,15
**hard**
14:18,23
61:18 83:12
85:7

**Hatchett**
4:18 17:20
18:6,15,20
23:19 33:7
39:17 42:5,
13,17 45:7
69:21,24
70:1
**Hathaway**
78:19,20,21
82:22
**he/she**
51:21
**head**
6:11 16:24
**health**
53:16 54:2
**hear**
42:7 79:4
81:5 83:20
88:19
**heard**
7:3 69:18
74:17 78:24
80:4 86:4
**hearing**
27:3 77:3
**heat**
46:19
**height**
8:25 55:17
**hereto**
90:20
**heroin**
20:21 21:2,
6,12,18,23
24:3,10,19
51:2,22
72:1,4
73:10,22
74:2
**Hey**
39:14
**high**
63:13,15,20
**highlight**
40:11 50:16

**highlighting**
40:11
**hold**
8:19 40:18
44:21 51:7
**home**
5:16,17,21
13:3 19:13
27:15,16
29:1,2,4,6,
9,23,24
30:25 32:12
33:4 43:6,18
71:17 75:19
83:15,18
85:19
**hope**
40:4
**hospital**
85:15
**hour**
80:11 81:21
**hourly**
81:22
**house**
7:16 8:3
29:9 32:1,
19,22,24
33:2,22
34:15,17,21
35:25 36:2,
4,8,9,12
37:1,10,19,
22,25 41:8,
12 42:23
43:1,3,5,6,
8,13,15,18,
19,20 46:7,
16 53:6 56:1
61:8 65:19
66:13,14,17,
22 68:18
73:1 75:7,9
76:24 77:4,
12,18 86:5,8
**huge**
89:2

**hung**
32:15,17

## I

**ID**
8:10 55:16
**idea**
53:8 73:6 75:18
**identification**
4:5 8:22 47:25 48:3
**identified**
76:3
**illegally**
74:21
**impairment**
27:3
**important**
84:14
**imprisoned**
24:3,4
**imprisonment**
18:4 64:13, 24 65:13 66:10 67:4
**improperly**
74:21
**incarcerated**
43:16
**incarceration**
64:15
**inches**
70:15
**incurred**
65:12 67:3 69:6
**informant**
51:20 71:19, 25 72:7,10
**information**
51:19 54:17 72:2 73:24 89:20
**initially**
18:11
**injuries**
64:23 69:5
**innocence**
55:12
**innocent**
49:17,18 55:7
**input**
56:8
**inside**
71:17
**insurance**
54:2,4,6
**interrupt**
83:8
**introduced**
38:7
**investigated**
74:7
**investigating**
68:11
**investigator**
89:11
**involvement**
17:10,13 68:8
**issue**
60:21 75:25
**issued**
9:2,3
**issues**
60:19

## J

**jack**
61:22 64:10
**jail**
24:5,10,21 25:1 49:2,6, 12 56:9 77:23,24 79:12,19,20, 21 83:2 88:14
**jailed**
79:10 88:12
**Janet**
7:21 56:19, 20 58:20,21
**January**
36:5,25 37:7,8,9 38:21 68:21 86:5,17 87:21 88:3
**Jason**
9:23,24 10:2,5,11
**job**
13:17 16:2 63:2,5 79:22 80:13,14 81:24 87:16
**jobs**
15:24 16:1, 3,7 80:16 81:8,21
**jogs**
15:23
**Johnson**
4:21 33:19 39:20,23 51:7 57:4, 15,22,24 58:12,24 60:3 64:16, 21 65:17 69:9,24 70:2,4 89:25 90:16
**Jr**
12:11,12,13, 16,18,20
**judge**
18:11 78:19, 20,21 82:21 83:13
**jury**
78:19
**justice**
78:15,16,18 83:11
**juvenile**
19:7,8 20:2, 6

## K

**Katie**
69:15,17
**Katrice**
10:23,24 11:7,16,19 12:4 27:19, 22 82:3 85:13,21,24 88:13
**Katrice's**
11:17,25 45:22
**Kevin**
14:13 15:3, 9,10,11
**Kevin's**
14:14
**kid**
29:5
**kids**
45:16,17
**kind**
14:3,17 15:24 23:6, 13 26:10 27:3 28:10 43:24 44:19 53:21 54:1, 4,6 60:15 61:12,14 65:1 68:8 69:11
**knew**
67:23 71:24, 25
**knock**
50:21 72:18
**knowing**
13:12 17:12 42:3 54:3

knowledge
  11:4,5 71:15
  76:19 87:19

---

L

lack
  42:14
large
  51:21 71:24,
  25 72:4
law
  61:7
lawsuit
  5:7 16:13,22
  17:2,3,5,11,
  15 64:12
  75:12
lawsuits
  16:16
lawyer
  58:5 66:4
lawyers
  65:19,23
  66:6,9
laying
  61:22
leave
  26:3 29:9
  32:19 86:24
left
  59:10
legal
  57:4,15
  58:12
legible
  70:7
lenses
  26:22,24
  27:1
letter
  8:16
license
  8:8
lied
  17:7

lieu
  4:10
life
  78:23 84:14,
  19
lights
  36:3
Linda
  45:23 46:1
Linda's
  45:24 46:3,5
lineup
  68:10
link
  60:15
list
  57:10,14
  86:20
listed
  55:16 56:25
  58:8
listened
  83:8
literally
  86:22,25
live
  11:19 12:20
  19:18,23
  34:21 35:14
  36:22 37:5
  43:7 44:9
  45:12,17,19
  46:1 85:19
  86:1,11 88:5
lived
  19:20 34:19,
  23 35:8,11,
  17 36:12
  37:3 38:15
  39:2,3,8,11
  44:3 46:7,16
  77:16 85:24
  86:5,7 88:2,
  9
lives
  7:18 8:3
  11:23

living
  7:13 19:15,
  16 33:8
  34:25 35:6
  36:7,11 37:9
  87:10
location
  7:10 33:17
  35:19 37:14
  38:19 51:22,
  23 72:1,5
locked
  18:1 35:13
  48:10 62:4
  66:16 75:4,
  21 84:16
long
  5:12 8:16
  19:23,25
  25:12 28:14
  49:8,12
  60:22 61:1,
  18 62:18
  76:11
longer
  13:24
longest
  60:24 61:1
looked
  50:13 55:3
  56:5 71:17
  82:18
lose
  45:1 66:13
  84:13
lost
  49:13 65:19
  66:13 84:9,
  11,13,15,16,
  18,21
lot
  59:19 62:6,
  15 70:25
  71:1 84:15
Lovett
  13:23,24
lying

39:6,12

---

M

mad
  88:25
made
  28:6 50:25
  57:10 66:25
  73:5 79:1
Magnum
  23:15
make
  6:7 14:10,20
  23:16 40:7
  53:5 57:12
  88:17
makes
  26:9 35:1
making
  80:10 81:20
male
  71:5,11,12
man
  64:10 88:19
  89:3
manner
  4:14
Manpower
  15:17,20
March
  35:4,5,8,11,
  13,18 79:9
marijuana
  20:7,10 52:2
mark
  40:25 50:12,
  13
Market
  13:21,22
  14:3,6,12,24
  15:1,7 16:6,
  10 86:22
married
  10:14,16,18,
  24 11:6,12
  82:3

**Martin**
63:18

**matching**
50:22 72:19,
21

**matter**
4:12

**Mcgraw**
63:18,19

**meant**
6:12

**Medicaid**
53:11,12
54:1

**medical**
25:21

**Medicare**
53:13,15,18

**medication**
61:12

**meet**
67:8

**Melendez**
17:4,7,10
67:23 68:5,
7,10,11,14
74:11 75:11,
15

**memory**
15:23 64:9
75:13

**mental**
60:18

**mention**
50:14

**mentioned**
74:11

**met**
53:2 67:6,9,
22

**Michigan**
4:1 8:8,10
38:8 71:18

**middle**
61:21

**Mile**
87:14

**minute**
39:18 69:24,
25 71:22

**minutes**
50:19 72:17
87:1

**missed**
85:6

**mistaken**
38:13

**misunderstood**
33:13

**model**
23:16,17

**mom**
8:3 13:5
19:16 32:13,
20 36:14,23
56:20 58:20,
21 76:1
77:4,19

**mom's**
32:22 34:15,
17 35:25
36:2,8 41:8
53:6 68:18
75:7,9 76:24

**moment**
41:6

**money**
43:13 45:6
51:1 65:14,
15,18 67:3
73:9 74:19,
24 75:1,2
80:9

**month**
36:3 67:10
86:15

**months**
19:25 62:19
76:16,24
82:25 85:11
88:4,5

**morning**
5:5 27:12
29:20

**mortgage**
66:15,17,18

**mother**
7:15,19
12:21 19:13,
17 31:23,24
32:10 36:15
45:21 68:25
69:3

**mother's**
7:20 8:1
41:12 42:2,4
45:22

**motor**
52:6,8,11

**move**
36:2 37:1

**moved**
35:18,23
36:4,25
37:18,22
38:24 46:7
68:18,21

---

**N**

**naked**
61:21

**names**
9:19,22
10:10 14:15,
23 15:16
80:18

**narcotic**
50:25 51:4
73:6

**narcotics**
52:3 74:9

**necessarily**
80:17

**newborn**
27:21

**Newman**
67:6,8,9
89:14,21

**night**
31:24 32:19

**37:19 61:22**
62:1

**nights**
62:13,15

**nod**
6:10

**nolo**
84:2

**normal**
6:9

**nos**
6:19

**notary**
48:15

**notes**
70:7

**November**
27:5,8,10,25
29:12 30:7
31:5,15,17,
20 32:2,8,10
41:7,11
50:16 52:18,
21 53:2,7
69:1,2 70:8,
18 71:6
72:15,23
73:1,12 74:2
75:7 76:4
77:8 78:4,5

**nowadays**
61:8

**number**
8:6,14,15
11:25 12:2
15:9 40:15
44:16 46:3,5
55:5 62:10
76:5

**numbers**
8:17

**nurse**
25:24

## O

**oath**
 4:10
**object**
 17:20 18:15
 23:19 58:5,
 17
**objection**
 4:19 18:6,
 17,19 42:5,
 13,17 45:7
 57:25 58:24
**objections**
 4:14
**observed**
 50:20 72:17
**occasions**
 51:24
**October**
 51:18 71:16
 72:5 75:9
**offenses**
 71:2
**offensive**
 14:21
**offer**
 56:23
**offhand**
 54:12
**office**
 5:15 86:22
 87:14
**officer**
 17:4,6,10
 38:12,14,15,
 18,24 39:2,8
 67:23 68:5,
 7,10,11 71:4
 72:14 74:5,
 9,12 75:17
 87:7,12,18
 90:12
**older**
 53:15

**ongoing**
 51:4
**operation**
 14:3
**opportunity**
 58:5,17
**order**
 6:6
**ordinary**
 31:14,17,21
**original**
 55:16
**owned**
 26:24 43:25
 44:1 52:8,11
**owner**
 15:11

## P

**p.m.**
 30:21 90:18
**pack**
 81:14,15
**packaging**
 52:3
**packed**
 81:14,15,16
**packing**
 81:10,12
**Paige**
 65:24,25
 66:7,11
**paragraph**
 51:18
**paranoid**
 65:2
**parole**
 38:12,14,15,
 18,24 39:2,8
 40:10,13
 86:21,22
 87:6,12,14,
 18
**paroled**
 25:16

**part**
 50:11,15
 54:23 64:1
 74:20 89:2
**participating**
 4:6
**parties**
 4:13 90:20
**parts**
 80:21
**past**
 9:19 10:10
 34:19,20
 35:14 51:3
 90:6
**Pat**
 67:14,15
**Patrick**
 4:16 5:5
 18:17 57:24
 69:23
**pay**
 12:18 18:3
 43:13 45:4
 47:7 65:20,
 23 66:6,8,9,
 15,24,25
 67:3 82:1
**paying**
 66:16
**payment**
 17:17 38:13,
 14
**pee**
 63:11
**penalty**
 4:12
**pending**
 51:25
**people**
 36:13 53:15,
 16 63:9
 72:17 79:17
 84:15
**perfect**
 8:22

**perjury**
 4:12
**permission**
 40:19
**person**
 4:11 6:23
 15:2 23:1,4,
 8 30:2 50:22
 72:11,19
**persons**
 50:20
**phone**
 11:25 12:2
 15:9 32:2,4,
 8,16,17,20
 40:4 44:16,
 17 46:3,5
 68:16 85:1
**phonetic**
 22:19
**physical**
 60:15,19,21
 65:1
**physically**
 4:7 64:25
**picture**
 48:7
**place**
 13:20 15:14
 19:20
**places**
 80:18
**plaintiff**
 4:19,22
**plans**
 88:21
**plead**
 20:24 21:9,
 21 22:5,7,
 18,19
**pled**
 22:20,22
 84:2,6
**point**
 68:9 78:10
**police**
 10:2,8 32:1

65:7 68:11
74:6 75:17
77:11

**popular**
15:20

**porter**
63:6,7 79:17

**possession**
18:8 20:7,9
21:23

**pounds**
55:18 70:9,
17,20,23

**precinct**
49:7,8 77:23
79:13 83:3

**preliminarily**
17:21

**prescribe**
27:1

**present**
4:8

**presented**
4:5

**press**
80:21

**previous**
83:19

**prior**
17:3,15
18:13,24
40:19

**prison**
24:13 25:6,
12,18,22
26:2,3,4,20
31:11 35:2,
5,19,22 43:3
48:11,15
59:4,9,14,
20,22 60:13,
16,22,24
61:17,19
62:5,6,20,24
63:2 64:3,4,
8 65:16,19,
21 67:12

69:12 75:2
79:10,11,13,
19,20,21
82:11 83:2,
14 86:15
87:21,24
88:13,24
89:15

**probation**
24:7,12,19,
24 25:4

**problem**
7:1 11:15
58:1 87:6,8

**problems**
26:10

**proceeding**
4:7,9

**produce**
81:13,14

**prom**
44:7

**pronounce**
14:18,23

**provide**
54:17

**proving**
52:2

**psychiatrist**
59:21,24
60:7,18

**psychologist**
60:12 61:15

**Public**
63:20

**pull**
8:21

**pulled**
48:23 76:21

**purchase**
43:1,8,11,12

**purchased**
43:3

**purple**
28:11 30:13
52:8

**put**
19:11 24:5,
10 46:14
56:18 62:11

**putting**
80:20 85:1

---

## Q

**quantities**
52:1

**question**
6:10,24,25
7:2,4 22:24
26:7 29:18
41:10 43:2
50:10 51:13
54:15 57:7
58:4 66:9
75:11 79:21
89:18,21

**questioning**
18:16

**questions**
69:22 70:5
85:6 90:1,16

**quit**
55:25 56:5

---

## R

**R-O-G-E-R-S**
34:13

**R-O-X-S-A-N-
N-A**
44:14

**raided**
32:1 77:4,7

**rate**
81:22

**Ray**
65:24,25
66:5,7,11

**RE-
EXAMINATION**
90:3

**read**
4:20 8:14
40:17

**real**
58:4,17

**reason**
53:5 59:13

**reasons**
59:16

**recall**
9:25 15:16,
18,19 16:5,
6,7,12 23:21
32:7,9 37:2,
4,6 38:22
43:9,10
45:5,8,9,10
47:21 48:14,
17,19 49:7
50:1 52:22
54:19 62:10,
13,17 68:12
90:10,11

**receive**
17:17,19
25:21 53:9,
21

**received**
51:19

**receiving**
22:1,7,11
24:23

**recently**
75:19

**recognize**
49:22 54:11

**recollection**
27:5 29:12

**record**
4:15 6:6
74:5

**recorded**
48:18

**red**
53:18

**referring**
56:17

regard
  89:9
related
  74:8
relationship
  44:5
relative
  74:2
release
  89:15
released
  25:16 59:3,
  8,14,20,21
  60:12 67:9,
  10 69:12
  86:15
relevance
  17:21 18:6,
  16,19 23:19
  42:5 45:7
reliable
  51:20
remain
  75:17
remained
  78:1 79:10,
  11
remarried
  11:9
remember
  14:15 23:16
  27:10,11
  29:15,17
  31:7,8,10,12
  38:4,9 41:16
  44:25 45:5
  81:7 87:19
remotely
  4:9 6:3
  33:16,18
repeat
  27:7 41:10
  50:10 57:6
report
  86:23,25
  87:2,4

REPORTER
  4:6
reporting
  4:9,14
represent
  5:6
requested
  90:19
residence
  40:18
respective
  90:20
response
  42:7
rest
  85:23 88:1
restitution
  65:20 66:24
result
  17:15 64:23
  65:13 66:10
  67:4
resulting
  51:24 52:1
returned
  50:25 73:5
returns
  90:5
revealed
  72:10
reversed
  88:22
riffraff
  14:10
risk
  44:23
rob
  22:25 23:2,4
robbed
  23:8
robbery
  22:14,15,23
  23:23 25:3,
  9,10 61:2
  75:5
Robison
  27:17 29:3,

25 30:25
33:25 34:2,
3,6 36:4
38:25 39:3
42:23 45:4,
12 46:7,16
85:20,24
86:9,11
87:10 88:6
Rogers
  34:10,13
role
  68:6
Roles
  88:22
Ronald
  37:5 42:9
Ronnie
  65:24 66:3,
  4,6,10
room
  4:8 5:22
  7:10,12,13
  62:4
roughly
  71:6 80:9
  81:20
routine
  76:21
row
  62:14
Roxsanna
  43:14,15
  44:3,5,9,14
  47:22 48:11
Roxsanna's
  44:11,16
rules
  6:4

S

S-H-I-N-E-R
  60:4
safe
  61:5,6

sake
  24:16
save
  24:15
say-so
  79:6
scared
  44:19 65:5
school
  19:12 63:13,
  15,20
screen
  40:3
search
  50:11 53:6
  70:6 71:4
  76:4,23 78:7
searched
  77:11
section
  55:9,10
Security
  8:6 53:21
seller
  50:23,24
  73:5
sense
  26:9 35:1
sentence
  25:8 82:21
sentenced
  25:4,6
separately
  50:20 72:18
serve
  25:12
service
  15:18,21,24
  16:8,11
  46:15 81:2,9
  82:1
services
  15:15,16
  81:11
set
  50:17

settle
  75:12
settled
  17:16
settlement
  74:15
Sewerage
  47:1
shake
  6:11
share
  40:2
sheet
  56:8
shelves
  14:9
shift
  28:16,17
Shiner
  60:4,8 61:3
  69:13
short
  50:22 72:19
show
  39:15 47:12
  49:19 56:8
shows
  55:12,16
sick
  26:1
sign
  43:17 47:22,
  24 48:16
signature
  40:22 41:4
  47:15 48:5
  90:19
signed
  47:20
simply
  87:16
single
  83:2
sir
  11:20 16:12,
  24 39:5,21
  41:22 42:10,

12,20,22
43:10,21
46:2,4,9
47:9,11
48:14,19
79:8 90:1
sister
  7:19 8:4
  36:15
sister's
  7:22
sites
  16:1
sitting
  83:11
situation
  68:6
sleep
  7:14,15
  37:10 65:10
sleeping
  37:12
slightest
  53:8
slow
  58:4,17
social
  8:6 53:21
  61:15
sold
  51:23 72:1,4
someplace
  22:25
son
  12:8,9,22
  13:15 27:21,
  23 30:3 31:2
  45:13 65:4
  84:17 85:6,
  13,21,24
  86:1 88:7,8,
  13
son's
  12:10
sought
  69:11

sound
  54:18 64:6
  79:1
speak
  68:16
specifically
  14:21 33:8
spell
  7:24 34:11
spend
  13:1 18:1
  65:3
spent
  31:11 65:18
spoken
  52:23,25
St
  19:21
stamping
  80:20,21
  81:4
stamps
  53:23
Stanyar
  67:16
start
  6:25 18:25
  30:9 34:25
started
  30:18 35:6
starts
  8:16
state
  8:10 18:2,3
  19:14,16,17,
  19 55:16
  64:15 74:20
  90:5
stated
  51:20
statement
  4:19 51:5,
  10,14,16
  52:4
statements
  50:9

station
  14:1,4,16
stay
  7:10 12:22
  14:10 34:24
  37:18 45:19
  50:24 61:7,8
  73:4
stayed
  35:21 56:1
  77:17
Stephen
  52:23 53:2
stepped
  66:5
Steven
  5:6
stick
  64:8
stipulating
  41:16
stock
  14:7 80:19
stocking
  14:9 81:3
stolen
  22:9
stop
  76:21
stopped
  19:16
store
  15:12 80:20
stored
  51:22 72:1,4
street
  7:16,18
  11:23 32:22
  33:6 34:15
  35:6,12
  36:7,8,11
  37:1,10,19,
  21,24 38:16
  39:3,9 41:9,
  12 68:18
  71:18 72:16
  86:1,20

**stretch**
  60:24 62:22,
  23,25 63:3
  64:8
**stuck**
  83:14
**stuff**
  19:22 58:8
  59:19 70:2
  80:18,20
  86:21
**submitted**
  55:13
**successful**
  74:14
**sue**
  17:2
**sued**
  51:23 74:11
**suffered**
  64:23 69:5
**sugar**
  81:15
**suggest**
  54:13
**support**
  12:18 13:14
**supports**
  55:6
**supposed**
  61:19 83:16
**surveillance**
  50:17
**suspected**
  50:23,25
  51:1 73:4,5,
  10 74:2,8
**sworn**
  4:25 6:4
**system**
  78:15,16

---

**T**

---

**T.V.**
  29:7 47:4,6

**taking**
  6:5 61:12
**talk**
  31:23,25
  61:3,14,15
  67:11 69:7
  81:6 89:13
**talked**
  15:10 31:24
  32:13 61:10
  64:3 67:2,21
  89:22
**talking**
  6:23 17:11
  46:11,12
  51:11 60:3
  68:20,21
  71:11,20
  76:16 78:8
  84:17
**tall**
  70:12,13
**taller**
  70:15
**taught**
  78:16
**tax**
  90:5
**taxes**
  66:21,22
**telephone**
  52:25
**telling**
  43:22
**temp**
  15:15,16,18,
  21,24 16:8,
  11 80:25
  81:2,9,11,22
  82:1
**temporary**
  80:16
**terms**
  74:6,14 76:3
**terrible**
  61:18 64:11
  78:13 83:6

**testified**
  5:2 39:11
  58:22
**testify**
  4:25 16:21
  56:20 58:20
  72:7
**testifying**
  33:16,18
**testimony**
  4:11 5:8,13,
  24 56:22
**therapy**
  61:14
**thing**
  6:1,16,21
  7:2 10:7
  23:24 38:14
  56:8,13
  58:16 73:14
  77:17 82:11
  83:21
**things**
  6:6,7 17:6
  26:15 57:10,
  11 61:18,20
**Thomas**
  8:2 9:23
  10:5,12
  13:11 19:21
**Thomas'**
  42:11
**thought**
  55:11,13,20
  56:3,10,14,
  22 58:22
  80:4
**till**
  19:24 49:13
**Tim**
  67:18,19,20,
  21,22,23
  68:3,8,13
  89:9
**Tim's**
  68:6

**time**
  5:23 6:23
  15:7 16:11
  19:3,9 20:12
  21:3,12,14,
  24 22:12
  24:15 27:21,
  25 28:5,16
  30:9,15
  34:23,25
  35:17,20
  44:21 50:2,8
  60:10,16,24
  61:1,17 65:4
  67:22,25
  68:20 70:8,
  12,22 79:12
  82:7,8 85:6
  86:4 87:15,
  22 88:3,9,12
  89:7,8,25
**times**
  10:18 13:4
  51:3 60:1
  68:25 74:7,
  11
**today**
  74:11
**told**
  16:23 32:1
  33:5 38:15
  39:2,6,11
  61:4 63:12
  65:2 74:19
  76:13,25
  77:4,11,20
  79:17 81:2,
  20 89:9
**top**
  5:19 9:4
  16:24 40:9
**total**
  65:11
**totally**
  65:11 87:13
**touch**
  44:20 68:13

U.S. Legal Support · www.uslegalsupport.com

16

traffic
  76:21
Trailblazer
  52:13
transaction
  50:25
transcribe
  6:18,22
transition
  73:6
traumatic
  31:12
Treasury
  38:8
treatment
  69:11
trial
  20:22 21:7,
  19 22:3,16
  38:4,5 41:16
  49:13,25
  50:2,8
  55:14,21
  56:2,11,15,
  23 57:2,12
  58:11,23
  65:25 66:1,5
  72:8 76:11,
  12 78:1,3,4,
  11 83:20,25
  84:7
trouble
  75:17
truancy
  19:12
truant
  19:12
true
  6:21 27:12
  51:5,10,14
  52:4 54:15
  71:8 74:15
trust
  65:6,8
truth
  4:25 5:1 6:5

type
  38:14 51:2,3
  59:5,6
  80:18,25
  81:8
types
  81:1

U

Uh-huh
  31:6
uh-huhs
  6:17
ultimately
  74:3 76:22
  79:10 83:3
  84:2 85:5
underlying
  18:14,25
understand
  22:24 29:18
  43:2 64:12
  80:24
understood
  7:4 14:20
Unh-unh
  48:12 75:16,
  24
unh-unhs
  6:17
unregistered
  81:18
unusual
  14:22
upstairs
  39:9,12
utilities
  36:3 46:18
  86:12
utility
  46:10

V

vaguely

  16:9
Val
  89:14,20
Valerie
  67:6,8,9
varies
  81:24
vehicle
  52:6,8,11
Ven
  4:21
verbal
  6:9
verbally
  4:11 6:13
victim
  66:25
Victoria
  52:12,14,16,
  18
view
  6:7
vision
  26:10
visit
  38:18,21
  88:24
VSCA
  51:25

W

W-I-C-A
  64:16
wages
  79:24
wait
  6:24 69:24
waive
  4:14
wake
  27:25 28:1
wanted
  43:6 61:23
  62:1,2,3,12,
  14 88:20

wanting
  88:23
warrant
  50:12 70:6
  71:4 76:4,
  23,25 78:7
Warren
  13:23,24
watched
  29:7
water
  46:24 47:1
Wayne
  4:1 49:11,12
  77:24 79:13
  89:13,17
wear
  26:8,22
wearing
  26:5
week
  68:25
weekend
  13:1
weeks
  87:3,5
weigh
  9:13 70:17
weighed
  70:23
weight
  8:22 55:17,
  18 56:9
wheel
  71:21
white
  53:18
WICA
  64:16
wife
  27:19 29:5
  30:3 31:2
  45:13 84:11
  88:2,7,8,13
witnesses
  58:19,21

**woke**
 27:12,14
 28:4 29:19
 62:12,14
**word**
 78:24
**words**
 6:9,13 80:6,
 19
**work**
 13:5,7,9,11
 14:24 15:17
 28:2,5,6,8,
 14,15 29:10
 30:7,9,11,
 15,18,21
 79:22 80:18
 81:1 86:24,
 25
**worked**
 14:25 15:7,
 11,14,15
 16:11 75:23
 80:3
**worker**
 61:15
**working**
 15:1 28:19,
 21,25 30:23
 79:14 80:6,
 15,25 81:21
 82:2 86:12,
 14
**worst**
 64:10
**write**
 87:20,23
**writing**
 41:2
**written**
 6:5 74:7
 89:22
**wrong**
 80:4
**Wrongful**
 64:13

**wrongfully**
 82:16 83:3
**wrote**
 87:24

---

### Y

**year**
 67:24 71:9
 78:7 85:23
**years**
 20:15 25:13
 31:5,11 44:7
 60:23 70:25
 71:1 82:16,
 18,25 83:1
 84:18,19
**yesses**
 6:19
**young**
 89:2

---

### Z

**zoom**
 6:3,22 8:20
 40:21