**EXHIBIT 6G**

**Trial Transcript**

36336370.7/022765.00213

STATE OF MICHIGAN
IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE                          Case No. 12-4974-01
STATE OF MICHIGAN

vs.

DARELL DEON CHANCELLOR,
        Defendant.
-------------------------/

**COPY**

WAIVER TRIAL
Proceedings had in the above-entitled cause before

the Honorable DANIEL A. HATHAWAY, Judge of the Circuit Court for

the County of Wayne at 1441 St. Antoine Street, Detroit,

Michigan, on Thursday, November 8, 2012.

APPEARANCES:

For the People              STEPHANIE L. ZEIGER, ESQ.  P66019
                            Assistant Prosecuting Attorney
                            Wayne County Prosecutor's Office
                            1441 St. Antoine Street
                            Detroit, Michigan  48226
                            Telephone (313) 224-5761

For the Defendant           RAY A. PAIGE, ESQ.  P41848
                            615 Griswold Suite 1308
                            Detroit, Michigan  48226
                            Telephone (313) 510-3335

                            - - -      - - -      - - -

Reported by                 ZELDA HARRIS RELEFORD, CSR 4897
                            Official Court Reporter

## TABLE OF CONTENTS

WITNESSES:  For the People                                PAGE

BRIAN ANTHONY JOHNSON
        Direct Examination by Ms. Zeiger              5
        Cross-Examination by Mr. Paige               14
        Redirect Examination by Ms. Zeiger           21
        Re-cross Examination by Mr. Paige            22
STEVEN GEELHOOD
        Direct Examination by Ms. Zeiger             26
        Cross-Examination by Mr. Paige               37
        Redirect Examination by Ms. Zeiger           44
        Re-cross Examination by Mr. Paige            46
        Redirect Examination by Ms. Zeiger           55
        Re-cross Examination by Mr. Paige            60
CYNDI IZUMI
        Direct Examination by Ms. Zeiger             63
        Cross-Examination by Mr. Paige               66
TOMMY BELL
        Direct Examination by Ms. Zeiger             69
        Cross-Examination by Mr. Paige               75


WITNESSES:  For the Defendant

DARELL DEON CHANCELLOR
        Direct Examination by Mr. Paige              78
        Cross-Examination by Ms. Zeiger              84


Matter adjourned                                     93

E X H I B I T S

|            | Identified | Admitted | Stipulated |
|------------|------------|----------|------------|
| People's 1 | 13         | 14       | --         |
| People's 2 | --         | --       | 62         |
| People's 4 | 74         | 74       | --         |
| People's 5 | 73         | 73       | --         |
| People's 6 | 44         | 45       | --         |
| Defendant's A | --      | 20       |            |

```
1        Detroit, Michigan

2        Thursday, November 8, 2012

3        Afternoon Session

4        ---        ---        ---

5              COURT CLERK:  Calling Case No. 12-4974, People

6    vs. Darell Chancellor.  Here for a continuation of a trial.

7              MS. ZEIGER:  Good afternoon, your Honor.

8              Stephanie Zeiger, on behalf of the People.

9              THE COURT:  Good afternoon.

10             MR. PAIGE:  May it please the Honorable Court,

11   Ray Paige, on behalf of the Defendant, your Honor.

12             Today is the date set for a waiver trial,

13   your Honor.

14             THE COURT:  Okay.

15             MR. PAIGE:  I've had the occasion to be given a

16   letter that's --

17             THE COURT:  Yeah, it just came in from the

18   Defendant addressed to me.  So I wanted to make sure that

19   you knew what had been sent to me.  That you've got a copy,

20   and that the People got a copy.

21             MR. PAIGE:  Yeah.  And I'm just now reading it,

22   Your Honor.  I was not aware of this.

23             THE COURT:  Honestly, I wasn't either until

24   literally thirty seconds before I walked out.  So there we

25   have it.
```

3

```
 1              MS. ZEIGER:  Your Honor, the People will be
 2   moving for a sequestration motion with the exception to my
 3   officer-in-charge, Sergeant Joe Tucker, Jr., who will not
 4   be testifying.  The individual sitting behind me is my
 5   intern, your Honor, David Klein (ph.).  He's not a witness
 6   at all.
 7              THE COURT:  Okay.  I'm issuing a mutual order of
 8   sequestration.  If there's anyone in the courtroom who
 9   intends to testify in this matter, you're instructed to
10   remove yourself from the courtroom until such time as you
11   are called as a witness.  Then when you're called as a
12   witness, you're free to stay in the courtroom.  I'm making
13   an exception for the officer-in-charge.
14              MS. ZEIGER:  Thank you.
15              MR. PAIGE:  One moment, your Honor.
16              THE COURT:  Okay.
17              All right.  Do you wish to make an opening
18   statement, at this time, Ms. Zeiger?
19              MS. ZEIGER:  No, your Honor.  The People will
20   continue with our waiver of opening statement, if there's
21   no objection.
22              THE COURT:  All right.  Any objection?
23              MR. PAIGE:  No, objection, your Honor.
24              THE COURT:  All right.
25              MR. PAIGE:  We reserve the right to make one,
```

4

```
 1    your Honor.

 2              THE COURT:   All right.  You reserve.  All right.

 3    Thank you.

 4              Then, Ms. Zeiger, do you want to call your first

 5    witness?

 6              MS. ZEIGER:  Yes, your Honor.  The People will

 7    call Officer Brian Johnson.

 8              COURT CLERK:   Would you come and spell your name

 9    for her, please.

10              OFFICER JOHNSON:  Yes.

11              Brian Anthony Johnson, B-R-I-A-N   A-N-T-H-O-N-Y

12    J-O-H-N-S-O-N.

13              COURT CLERK:  Do you solemnly swear or affirm the

14    testimony you're about to give to the Court will be the

15    truth so help you God?

16              OFFICER JOHNSON:  I do.

17              THE COURT:   Have a seat, please.

18              MS. ZEIGER:  May I proceed, your Honor?

19              THE COURT:   Please.

20              MS. ZEIGER:  Thank you.

21              B R I A N   A N T H O N Y   J O H N S O N,

22    having been duly sworn was examined and testified as

23    follows:

24                          DIRECT EXAMINATION

25    BY MS. ZEIGER:
```

5

1    Q    Good afternoon, sir.

2    A    Good afternoon, ma'am.

3    Q    Could you please state your name for the record.

4    A    Brian Anthony Johnson.  I'm a Detroit Police Officer,

5        currently assigned to the narcotics division for the last

6        eleven years.

7    Q    How long have you been a police officer total, Officer

8        Johnson?

9    A    Fifteen years.

10    Q    I'm going to direct your attention back to November 2nd,

11        2011 at about 5:30 in the afternoon.  Were you working on

12        that day and at that time?

13    A    Yes, ma'am.

14    Q    And did you have occasion to go to an address of 5023

15        32nd Street in the City of Detroit, County of Wayne?

16    A    Yes, ma'am.

17    Q    What was your reason for going to that address?

18    A    To execute a narcotic search warrant.

19    Q    What is at that address?

20    A    A home.

21    Q    Did you go there with other members of the narcotics unit?

22    A    Yes, ma'am.

23    Q    And when you got to that home, did you, in fact, execute

24        that search warrant on that home?

25    A    Yes, ma'am.

6

```
 1   Q    What role did you play in executing that search warrant?

 2   A    The shotgun man.

 3   Q    What is the shotgun man?

 4   A    The shotgun man is the first one to enter the location.  My

 5        duties is to encounter and neutralize any possible threat

 6        to myself or the crew.

 7   Q    And do you remember -- was presence and purpose announced

 8        that day?

 9   A    Yes, ma'am.

10   Q    And was entry forced into that home or were you let in, if

11        you remember?

12   A    May I refer to my PCR?

13   Q    Will that refresh your recollection?

14   A    Yes, ma'am.

15             We went in through an open front door.

16   BY MS. ZEIGER:

17   Q    So the front door was open.  That means you don't have to

18        breach any doors?

19   A    Correct.

20             THE COURT:   But did someone let you in, or it

21        was just open?

22             THE WITNESS:   It was unlocked, sir.  The door

23        was closed, but it was unlocked.

24             THE COURT:   All right.   Thank you.

25   BY MS. ZEIGER:
```

7

| | | |
|---|---|---|
| 1 | Q | When you execute a search warrant, do you always check |
| 2 | | first to see if a door is unlocked or locked? |
| 3 | A | I always check and make sure to see if the door is open. |
| 4 | Q | Did you go into the home? |
| 5 | A | Yes, ma'am. |
| 6 | Q | Did you encounter anyone in that home? |
| 7 | A | Well, we encountered someone on the front porch. |
| 8 | Q | On the front porch? |
| 9 | A | Detained that person, and entered the location and |
| 10 | | encountered a female inside. |
| 11 | Q | The person on the front porch male or female? |
| 12 | A | Male. |
| 13 | Q | So when you first got to that location, was that person |
| 14 | | already on the porch? |
| 15 | A | Yes, ma'am. |
| 16 | Q | Did one of your crew members deal with him or did you deal |
| 17 | | with him? |
| 18 | A | I gave him some verbal orders.  I said, get down.  He got |
| 19 | | down.  And I proceeded inside of the location.  So one of |
| 20 | | my crew members detained him. |
| 21 | Q | You said there was a black female in the home; is that |
| 22 | | correct? |
| 23 | A | Yes, ma'am. |
| 24 | Q | Where was that black female at? |
| 25 | A | She was in the dining room. |

8

1  Q  Do you see that black female any where here in court today?

2  A  Yes, ma'am.

3  Q  Where is she at?

4  A  Sitting in the last row of the courtroom.

5  Q  Was there anybody else in the home at that time besides the

6     black female?

7  A  No, ma'am.

8         THE COURT:  Can we know who it is he's talking

9     about?  Who is he talking about?

10        MS. ZEIGER:  Sorry, your Honor.

11        THE COURT:  Okay.

12        (Lady in audience acknowledged her presence)

13        THE COURT:  Thank you, ma'am.  I appreciate it.

14        MS. ZEIGER:  Sorry, your Honor.  I didn't realize

15     there was more than one black female in the back.  Thank

16     you.

17        THE COURT:  Thanks.

18 BY MS. ZEIGER:

19  Q  Can you describe for us the inside of this home.  How it's

20     broken down.

21  A  You enter like a living room area.  Then a dining room.

22     Going straight back is a kitchen.  And then a stairwell

23     leading upstairs.  Going in it would be -- the bedrooms

24     would be to the right -- to the left, I'm sorry.

25  Q  Upstairs -- was there a kitchen upstairs?

9

```
 1   A    Yes, ma'am.

 2   Q    And there was a kitchen downstairs?

 3   A    Yes, ma'am.

 4   Q    Two kitchens in this house?

 5   A    Yes, ma'am.

 6   Q    Was this a two -- was it a two-family flat?

 7   A    No, ma'am.

 8   Q    It was a one -- it was a one family home?

 9   A    It had one address, yes, ma'am.

10   Q    Were there bedrooms upstairs and downstairs?

11   A    Yes, ma'am.

12   Q    How many entrance doors did this home have?

13   A    A front door and, I believe, there was a back door.

14   Q    So in the front there was only one door?

15   A    Yes, ma'am.

16   Q    It wasn't set up like a flat where there would have been

17        two entrances?

18   A    No, ma'am.

19   Q    Would there have been a way for you to get to the upstairs

20        from the front foyer area of the home.

21   A    No, ma'am.

22   Q    Would the only way to get upstairs was through the main

23        floor living area on the first floor?

24   A    Yes, ma'am.

25   Q    Did you go upstairs and search?
```

10.

```
 1  A    After the location was cleared, yes, ma'am.

 2  Q    Did you find anybody upstairs?

 3  A    No, ma'am.

 4  Q    Did you search the entire home, top and bottom?

 5  A    I didn't, no, ma'am.

 6  Q    Do you know if crew members searched the entire home, top

 7       and bottom?

 8  A    Yes, ma'am.

 9  Q    Did you assist in searching?

10  A    Yes, ma'am.

11  Q    Where did you search?

12  A    I searched upstairs.

13  Q    Did you seize anything when you searched?

14  A    Yes.  After the location was cleared, I seized some POR,

15       off the kitchen table.

16  Q    What's P --

17            COURT REPORTER:  I'm sorry.  Repeat that.  You

18       retrieved something off the table.

19            THE WITNESS:   Some POR, proof of residence.

20            COURT REPORTER:  Thank you.

21  BY MS. ZEIGER:

22  Q    Proof of residence.  What exactly did you seize?

23  A    It was State of Treasury mail in the name of Darell

24       Chancellor.

25  Q    Did it have an address associated with it?
```

11

```
 1   A    Yes, ma'am.

 2   Q    What address was that?

 3   A    The address of that location, ma'am.

 4   Q    502 --

 5   A    5023, yes, ma'am.

 6   Q    32nd Street?

 7   A    Yes, ma'am.

 8   Q    Officer Johnson, was that letter opened or closed when you

 9        found it?

10   A    It was open.

11             THE COURT:   Where exactly did you say you found

12        it?

13             THE WITNESS:   On the kitchen table.

14             THE COURT:   The kitchen upstairs --

15             THE WITNESS:   Upstairs.

16             THE COURT:   -- or downstairs?

17             THE WITNESS:   The upstairs kitchen table.

18             THE COURT:   Upstairs kitchen table.

19        Thank you.

20             MS. ZEIGER:   Your Honor, may I approach the

21        witness?

22             THE COURT:   Yes.

23             (People's proposed Exhibit No. 1 marked for

24               identification)

25   BY MS. ZEIGER:
```

                                                                    12

1   Q    Officer Johnson, I'm going to show you what's been marked

2        as People's proposed Exhibit No. 1.  And actually let me

3        just ask you a question before that.  The item, the proof

4        of residency, that you've testified that you seized did you

5        place that under evidence tag number?

6   A    Yes, ma'am.

7   Q    Do you remember that evidence tag number off of your

8        memory?

9   A    No, ma'am.

10   Q    Do you need your report to refresh your recollection as to

11        that number?

12   A    Yes, ma'am.

13               MR. PAIGE:   Stipulate.  I'll stipulate to it.

14  BY MS. ZEIGER:

15   Q    I'm going to hand you what's been marked as People's

16        proposed Exhibit No. 1.  Is that the -- can you tell us

17        what is inside of that item?

18   A    From the outside of the envelope it states:

19               "Michigan Department of Treasury."

20               It's addressed to a Darell Deon Chancellor.

21      The date on the outside of the envelope is 11/1/11.

22               Inside it says:

23               "Department of Treasury."

24               And it's dated -- again, addressed to a

25      Mr. Darell Chancellor, with a date on it of 11/5/11.

13

1          MS. ZEIGER:  Your Honor, we ask for the admission

2     of People's proposed Exhibit No 1.

3          THE COURT:    Any objection?

4          MR. PAIGE:    No, objection, your Honor.

5          THE COURT:    All right.  People's 1 is admitted.

6          (People's Exhibit 1 admitted into evidence.)

7          MS. ZEIGER:  Thank you, your Honor.

8  BY MS. ZEIGER:

9  Q    Officer Johnson, did you seize anything else from the

10      residence that day, either upstairs or downstairs?

11 A    No, ma'am.

12          MS. ZEIGER:  Nothing further, your Honor.

13          THE COURT:    Okay.  Cross-examine.

14          MR. PAIGE:    Just a few questions with the

15     Court's permission?

16          THE COURT:    Sure.

17                  CROSS-EXAMINATION

18  BY MR. PAIGE:

19 Q    Officer Johnson, I just want to be clear about a couple

20      things because I plan to argue this at the end of the day.

21      One is that this gentleman was not on the premises when you

22      got there, right?

23 A    That's correct, sir.

24          THE COURT:    And when he says -- for the record,

25     when he says, "this gentleman," he's talking about the

                                                              14

```
 1        Defendant.
 2   BY MR. PAIGE:
 3   Q    The Defendant, right?
 4   A    That's correct, sir.
 5   Q    And, so that I'm clear, this dwelling appeared to be
 6        occupied, meaning that there were lights on?
 7   A    Yes, sir.
 8   Q    There was furniture in the house?
 9   A    Yes, sir.
10   Q    Bedrooms?
11   A    Yes, sir.
12   Q    Upstairs and downstairs?
13   A    Yes, sir.
14   Q    Refrigerator?
15   A    There were appliances.
16   Q    Appliances.
17             A person detained on the porch?
18   A    Yes, sir.
19   Q    Black female?
20   A    Inside the location, yes, sir.
21             THE COURT:   She was inside.   There was a
22        different person on the porch.
23   BY MR. PAIGE:
24   Q    Black female, who is present in the courtroom today, right?
25   A    That was inside the location, yes, sir.
```

15

1  Q   Right.  All right.  And there was a black male that was on

2      the porch?

3  A   Yes, sir.

4  Q   What was his name?

5  A   I don't have that in my report, sir.

6  Q   You don't?

7  A   No, sir.

8  Q   Can you give me a description of that person?

9  A   Black male, probably '5 9", '5 10".  I think I have that --

10     it's on my sergeant's PCR.

11             THE COURT:   Do you remember if you were able to

12     determine whether that particular person that was on the

13     porch was a resident of that location or not?

14             THE WITNESS:  He was not a resident, sir.  He

15     stated he was there doing some work for the lady that owned

16     the residence.

17             THE COURT:   Okay.

18 BY MR. PAIGE:

19 Q   And you took that to be -- you believed that, right?

20 A   Yes, sir.

21 Q   Did you investigate that?  Did you talk to the lady of the

22     -- whoever the lady purportedly was supposed to be of the

23     residence as to whether that person was doing some work for

24     her or not?

25 A   Yes, sir.

16

1  Q     All right.   And did you submit that to a writing?

2  A     No, sir.

3  Q     Okay.   And this is your report here.

4              Before you got to the premises, you had a search

5        warrant, right?

6              This is your report?

7  A     No, that's Sergeant Tucker's report.

8              MS. ZEIGER:   I thought you wanted Sergeant

9        Tucker's report.   I'm sorry.

10             THE WITNESS:   I was saying that the name of the

11       gentleman on the porch --

12             THE COURT:   Yeah, that report has the name of

13       the --

14             THE WITNESS:   -- was on Sergeant Tucker's

15       report.

16             THE COURT:   -- or the description of the person

17       that's on the porch.

18  BY MR. PAIGE:

19  Q     Okay.   The description is on his report, right?   This is

20        the report you were referring to, right?

21  A     Yes, sir.

22  Q     Okay.   That will refresh your memory as far as the height

23        and weight, right?

24  A     We have the name, and the birthdate, and the address of the

25        gentleman that was detained on the porch.

17

1   Q   Does it have the height on it?

2   A   No, sir.

3   Q   Does it have the weight on it?

4   A   No, sir.

5   Q   Do you have a recollection of -- you've already told us the

6       person was approximately '5 8", '5 9", right?

7   A   Probably about '5 9", '5 10", slim build.

8   Q   Slim build.

9           Okay.  When you -- before you got to the

10      premises -- and I'm going to move on -- you were armed with

11      a search warrant, right?

12  A   Yes. sir.

13  Q   And in the search warrant, there was a description of a

14      person to be searched, right?

15  A   Yes, sir.

16  Q   And the description of the person to be searched was

17      approximately '5 9", and a hundred and sixty something

18      pounds, right?

19  A   Officer Geelhood gave that, and --

20  Q   I'm just asking does that comport with your recollection?

21  A   I can't recall, sir.

22  Q   Okay.  Do you have a recollection of -- were you -- you

23      were interested in searching a person when you got to the

24      premises, right?

25  A   Yes, sir.

18

```
 1    Q    And is there anything that can refresh your memory relative

 2         to who was the person to be searched or the description of

 3         the person?

 4    A    We're briefed off the search warrant.

 5    Q    I understand that.

 6    A    So the search warrant would refresh my memory.

 7              MR. PAIGE:   This is the original, ma'am?

 8              MS. ZEIGER:  It's the original copied.  I made a

 9         copy of the original.

10              THE COURT:   It's the closest she has.

11              MS. ZEIGER:  It's all I've got.

12    BY MR. PAIGE:

13    Q    After looking at the search warrant, does this refresh your

14         memory of the description of the person to be searched?

15    A    Yes, sir.

16    Q    And what was that?

17    A    The person of interest was a black male, 30s, '5 8", 180

18         pounds.

19    Q    Okay.  No mention of glasses, right?

20    A    No, sir.

21              MR. PAIGE:   Stand up, Mr. Chancellor.

22    BY MR. PAIGE:

23    Q    How much would you say he weighs?

24    A    I'd probably say on the plus side of 200.

25    Q    200 and if I told you about 220 -- I'm just -- I'm just
```

19

1     saying.

2  A    Yeah.

3  Q    About 220. All right. And if I were to tell you he's

4     about '5 11".

5  A    I would probably have to stand next to him, sir.

6  Q    You can stand next to him. You want to?

7  A    Yeah.

8  Q    Because we -- this is a search for the truth. You know,

9     this is not a -- we just trying to get it where it's at.

10  A    Probably.

11  Q    Okay. You want to be as close to '6 0" tall as you can be,

12     huh?

13  A    Yes, sir.

14          MR. PAIGE: May I mark this into evidence, if

15    there's no objection?

16          THE COURT: Any objection to the search warrant

17    being placed into evidence?

18          MS. ZEIGER: No, your Honor, that's fine.

19          THE COURT: All right. So that's going to be

20    Defense A. Defense A, the copy of the search warrant, is

21    admitted.

22          (Defense Exhibit A admitted into evidence.)

23          MR. PAIGE: Nothing further.

24    Thank you, sir.

25          THE COURT: Redirect?

20

```
 1                        MS. ZEIGER:  Yes, your Honor.

 2                        Thank you:

 3                        May I approach the witness?

 4                        THE COURT:   Yes.

 5                        MS. ZEIGER:  Thank you.

 6                              REDIRECT EXAMINATION

 7    BY MS. ZEIGER:

 8    Q    Officer Johnson, you were just shown Sergeant Tucker's

 9         report.  Can you tell us the name of the individual that

10         was on the porch?

11    A    Mr. Ronald Durhall (ph.), black male, birthdate 12/1/58,

12         of 4981 32nd Street.

13    Q    So that would have been down the street then from the

14         location that you were at?

15    A    Yes, ma'am.

16    Q    And he was born in 1958?

17    A    1958.

18    Q    Thank you.

19                        Also, you were asked whether the house was

20         furnished.  Was the upstairs furnished?

21    A    Yes, ma'am.

22    Q    Did it appear to be currently being lived in, in your

23         opinion?

24    A    Yes, ma'am.

25                        MS. ZEIGER:  Nothing further, your Honor.
```

```
 1                THE COURT:    Anything based upon that, Mr. Paige?

 2                     RECROSS-EXAMINATION

 3  BY MR. PAIGE:

 4  Q    Were you aware that -- do you see the Durhall (ph.) that

 5       -- do you see him in the courtroom?    The person that you

 6       detained?

 7  A    No, sir.

 8                MR. PAIGE:    Mr. Durhall, would you stand up.

 9       Just stand up.

10  BY MR. PAIGE:

11  Q    Is this the person that you detained?

12  A    It could be.   Without seeing his name, or his ID, I

13       couldn't tell you, sir.

14                THE COURT:    You can't tell from looking at him

15       now?

16                THE WITNESS:    No, sir.

17                MR. PAIGE:    If you can -- come closer, sir.

18  BY MR. PAIGE:

19  Q    Is this the person --

20                Just stay right there.   Don't be too excited.

21  BY MR. PAIGE:

22  Q    Is the person that you detained, was he approximately his

23       height?

24  A    He was similar to his height.

25  Q    And was he approximately his weight?
```

22

1   A    I couldn't tell you that, sir.

2   Q    I mean, is it --

3   A    He was slim build.  I don't know how much that gentleman

4        weighs.

5   Q    Well, would you consider --

6             Take your jacket off.

7   BY MR. PAIGE:

8   Q    Would you consider him slim build?

9   A    Yes, sir.

10  Q    All right.

11            Have a seat.

12  BY MR. PAIGE:

13  Q    And this -- okay, if I were to tell you that this person,

14       Mr. Durhall (ph.), was not a handy man, but he lived there,

15       and was the boyfriend of Mr. Chancellor's mother, could you

16       refute that?

17  A    Only thing I can tell you is that that gentleman and the

18       lady inside the location lied to me that day then.

19  Q    Okay.  And people do -- it's not unusual to lie to the

20       police, is it?

21  A    Not at all.

22  Q    All right.

23            Did you search every bedroom in the house?

24  A    No, sir.

25  Q    Did you go through the drawers in the bedrooms to look for

1    proof of residencies for whatever reason?

2  A   I didn't, sir, no.

3  Q   Have you to this date did a record search to make a

4    determination of who owned the house?

5  A   I didn't, no, sir.

6  Q   To this date, your role as it relates to an officer --

7    you're a sergeant, right?

8  A   No, sir.

9  Q   You should be.

10            Yeah, but you've been a law enforcement officer

11    for a while, right?

12  A   Yes, sir.

13  Q   Did you trace any proceeds from what purports -- this is a

14    drug raid, right?

15  A   Yes, sir.

16  Q   Did you seize any cars or monies from Defendant Chancellor?

17  A   No, sir.

18  Q   Airplanes, boats?

19  A   No, sir.

20            MR. PAIGE:   Nothing further -- no, no.

21  BY MR. PAIGE:

22  Q   Were you aware that Defendant Chancellor has a brother that

23    lived in that house?

24  A   No, sir.

25  Q   That is about '5 10" and slim build, were you aware of

24

```
 1        that?

 2   A    No, sir.

 3   Q    Were you aware that there was a cousin who lived in that

 4        house by the name of Willie Chancellor that was similarly

 5        build as Antonio Chancellor, the Defendant's brother?

 6        Just yes or no.

 7   A    No, sir.

 8   Q    And so that it's clear -- and I know the Judge knows this

 9        and you know it, but I just want to put it on the record

10        you don't know if Defendant Chancellor ever opened that

11        mail, do you?

12   A    No, sir.

13   Q    And notwithstanding whether he did or not -- I'll leave

14        that alone.

15                  MR. PAIGE:   Nothing further.

16                  MS. ZEIGER:  Nothing further, your Honor.

17                  THE COURT:   All right.

18             Thank you, officer.

19                  THE WITNESS:   Thank you, sir.

20             (Witness excused.)

21                  MS. ZEIGER:  Your Honor, the People would call

22        Officer Steven Geelhood next.

23                  THE COURT:   All right.

24                  COURT CLERK:  Can you spell your name for her.

25                  OFFICER GEELHOOD:  Steven with a V, last name
```

25-

1    G-E-E-L-H-O-O-D.

2                    COURT REPORTER:  Thank you.

3                    COURT CLERK:  Do you solemnly swear or affirm the

4        testimony you're about to give to the Court will be the

5        truth so help you God?

6                    OFFICER GEELHOOD:  Yes.

7                    THE COURT:   Have a seat, please.

8                    MS. ZEIGER:  May I proceed, your Honor?

9                    THE COURT:   Please.

10                   MS. ZEIGER:  Thank you.

11                      S T E V E N    G E E L H O O D,

12       having been duly sworn was examined and testified as

13       follows:

14                        DIRECT EXAMINATION

15   BY MS. ZEIGER:

16   Q    Good afternoon, sir.

17   A    Good afternoon.

18   Q    Can you please state your name for the record.

19   A    Steven Geelhood.

20   Q    And, sir, how are you employed?

21   A    City of Detroit for 18 years.

22   Q    Are you currently assigned to a unit within the Detroit

23       Police Department?

24   A    Yes.

25   Q    What is that?

26

1   A   Narcotics.

2   Q   How long have you been with narcotics?

3   A   Over ten years.

4   Q   I'm going to direct your attention to November 2nd, 2011

5       were you at 5023 32nd Street in the City of Detroit, County

6       of Wayne around 5:30 in the afternoon?

7   A   Yes.

8   Q   What was your reason for going to that location?

9   A   Execute a search warrant.

10  Q   What is at that address?

11  A   Single family dwelling.

12  Q   And did you go to that location with other members of the

13      narcotics unit?

14  A   I did.

15  Q   When you got to that home, did you make entry into that

16      home?

17  A   Yes.

18  Q   Do you remember what role you played during execution of

19      that search warrant?

20  A   I would have been on the entry team.

21  Q   And, as you were entering into that home, did you see

22      anybody outside on the front porch?

23  A   I did.

24  Q   Who -- do you know who that person was?

25  A   He said -- he stated he worked on the house or something.

27

1   Q    You said, "he".  Was it a male?

2   A    It was a male.

3   Q    And can you tell us what ethnicity he is?

4   A    He was black.

5   Q    Did you have any dealings with him?

6   A    He was talked to, yes.

7   Q    By yourself or by somebody else in your crew?

8   A    Crew members.  I don't think I had interest.

9   Q    When you -- did you go inside the home?

10  A    Yes.

11  Q    Was anybody inside the home?

12  A    There was.

13  Q    Who was that?

14  A    It was a woman in the home.

15  Q    Do you know what her name was?

16  A    I don't have recollection.  It was the mother of the

17       Defendant.

18  Q    And when you say, "the Defendant" are you referring to

19       Darell Chancellor?

20  A    I am.

21  Q    Where did you encounter this woman at?

22  A    The front room.

23  Q    Was anybody else in the home?

24  A    No.

25  Q    Can you tell us how this home was set up?

28

1   A   When you go into the house, there was a living room, and

2       then like a dining room, and then the kitchen.  The

3       bedrooms would be to your left.  Then the upstairs would be

4       through the back.  Kitchen area, up the stairs, and the

5       same way reversed.  Kitchen, dining room, living room.

6   Q   So there was, it seems as though, a separate home or

7       separate living quarters upstairs?

8   A   Yes.

9   Q   Did it appear to you as though somebody was currently

10      living in that area?

11  A   Yes, there was clothes there.

12  Q   Could you tell what type of clothes?  Were they men's or

13      women's, children?

14  A   Men's clothes.

15          THE COURT:   I'm sorry.  Did you say there was

16      one bedroom upstairs?

17          THE WITNESS:   I recall one for sure that there

18      was a bed in, and there might have been two rooms that were

19      -- could have been bedrooms.

20          THE COURT:   You don't recall for sure.  I'm just

21      wondering where did you say you saw the men's clothing?

22          THE WITNESS:   It would have been in the kitchen.

23          THE COURT:   Oh, in the kitchen?

24          THE WITNESS:   Yes.

25          THE COURT:   Okay.

29

1   BY MS. ZEIGER:

2   Q    Let's talk about that.   Where did you find men's clothing

3        in the kitchen?

4   A    In the hamper in the kitchen under the kitchen table.

5             THE COURT:    Officer, there's a clothes hamper in

6        the kitchen?

7             THE WITNESS:    Yes.

8   BY MS. ZEIGER:

9   Q    Was there anything else in that clothes hamper besides male

10       clothing?

11  A    Yes, I made a confiscation of narcotics from that hamper.

12  Q    And, specifically, what type of narcotics?

13  A    It would have been cocaine.

14  Q    Did you place that cocaine on a lock sealed folder number?

15  A    I did.

16  Q    What was that?

17  A    Referring to my PCR, --

18  Q    Will that refresh your recollection?

19  A    It would.

20  Q    Please do so.

21  A    Nancy 03346711.

22            MS. ZEIGER:    May I approach, your Honor?

23            THE COURT:    Yes.

24            MS. ZEIGER:    Thank you.

25  BY MS. ZEIGER:

30

```
 1   Q     Officer, I'm going to show you what's marked as People's

 2         proposed Exhibit No. 2.

 3                   MR. PAIGE:    I'll stipulate that that's it.

 4                   MS. ZEIGER:    Okay.  But I'm going to ask him some

 5         follow up questions.

 6   BY MS. ZEIGER:

 7   Q     Is that the lock sealed folder number that you just read

 8         off to us as being the lock sealed folder number that you

 9         placed the cocaine on that day?

10   A     It is.

11   Q     And how many -- did you find more than one bag of cocaine?

12   A     There was one bag with four bags inside.

13   Q     The way that the cocaine is today, is that the way that it

14         was when you found it back on November 2nd, 2011?

15   A     No.

16   Q     Can you describe it the way it looked back on November 2nd?

17   A     It would have been all white chunks of cocaine.

18   Q     And would you agree with me that that's liquified --

19   A     It has.

20   Q     -- inside?   Okay.  Was that the way that you seized it

21         that day?

22   A     No.

23   Q     Okay.  Does it have a stench to it?

24   A     Very much so.

25                   THE COURT:   Is that normal?  Is that what
```

                                                                    31

1    happens to it when it sits in a bag?

2              THE WITNESS:   If it sits too long in the heat.

3              MS. ZEIGER:   Your Honor, we have someone from the

4    Michigan State Police who can explain why this is like

5    this.

6              THE COURT:   Okay.   I've never seen that before.

7              MS. ZEIGER:   Yes.

8              THE COURT:   I was just more curious than

9    anything.

10   BY MS. ZEIGER:

11   Q   And, Officer Geelhood, was that a small amount of cocaine?

12   A   Very large amount.

13   Q   And in your training and experience this amount of cocaine

14       is that indicative of anything to you?

15   A   Yes, dealing of cocaine.   Major dealing of cocaine.

16   Q   Did you have a further conversation with the -- you

17       described her as the Defendant's mother?

18   A   Yes.

19   Q   Did you order her or ask her to do anything for you?

20   A   I asked her to contact the Defendant.

21   Q   Did she comply?

22   A   She did.

23   Q   How did she make contact with him?

24   A   With a -- with her cell phone.

25   Q   Did you observe her talk to anybody?

32

1    A    I did.

2    Q    Did you talk to anybody?

3    A    I did.

4    Q    Can you tell us the person you talked to was that male or

5         female?

6    A    It was a male.

7    Q    Can you tell us what your side of the conversation was?

8    A    It would have been that we would like to make contact and

9         talk about what happened during the raid.

10   Q    Did you ask that person to come to the home at all?

11   A    I did.

12   Q    Did that person ever come to that home?

13   A    No.

14   Q    Had you been to that house before November 2nd, 2011 or in

15        the area of that home of 5023 32nd Street?

16   A    I had.

17   Q    When was that?

18   A    During my pre-raid surveillance.

19   Q    And do you remember specifically what date that was?

20   A    I would have to refer to my search warrant.

21              MS. ZEIGER:   Your Honor, --

22              THE COURT:   No, I don't have it.

23              THE WITNESS:   There is a copy right here.  I can

24        see it.

25              THE COURT:   Ms. Zeiger, do you want to give it

33

1   to the witness?

2      MS. ZEIGER: Yes.

3 BY MS. ZEIGER:

4 Q And this has been marked, I believe, as Defense --

5      MR. PAIGE: 1.

6      THE COURT: Defense A.

7      MR. PAIGE: Oh, it's A?

8      MS. ZEIGER: Defense A.

9      THE COURT: Yeah. People 1, Defense A.

10      MS. ZEIGER: Yes.

11 BY MS. ZEIGER:

12 Q So we have marked this already, and it has been admitted as

13   Defense A.

14 A I was there the day before the raid.

15 Q So that would have been November 1st, 2011?

16 A Correct.

17 Q And what was your reason for being around that location on

18   November 1st?

19 A I had received information on the 31st of October that

20   there was drugs being sold by -- at this location.

21 Q Do you remember what time of day it was that you were in

22   that area on November 1st?

23 A It would have been later in the evening.

24 Q Did you observe anything?

25 A I did.

34

1 Q    What did you observe?

2 A    Referring to my search warrant --

3 Q    Would that refresh your recollection?

4 A    It would.

5            Within thirty minutes, I observed three people

6      independently go into the front door of that house having

7      conversation with the described Defendant seated here, and

8      making purchases of suspected heroin.

9 Q    You just pointed to somebody.  Who did you point to?

10 A   The gentleman sitting in front of the defense table with

11     the blue shirt, black pants.

12 Q   Thank you.

13           MS. ZEIGER:  May the record reflect that the

14     witness has identified the Defendant Mr. Darell Chancellor?

15           THE COURT:   Yes, it will.

16           MS. ZEIGER:   Thank you.

17 BY MS. ZEIGER:

18 Q   Where did you exactly see the Defendant?

19 A   At the front of the -- at the door of that house of the

20     house that we raided.

21 Q   You described it it seems as though this home is broken up

22     into two living spaces.  Did this home have more than one

23     front door?

24 A   No.

25 Q   Were there any lights on in the front of this house?

35

```
 1   A      When we hit it?

 2   Q      No, on November 1st.  Excuse me.

 3   A      I could visually see, yes, that it was this person sitting

 4          at this table right here.  I could see him.  It was lit

 5          enough for me to see him.

 6                  THE COURT:   Was it daylight or night?

 7                  THE WITNESS:   It would have been towards the

 8          evening hours, but I could see.  It probably would have

 9          been around 5:00 or 6:00, but it was October so it was

10          late.

11                  THE COURT:   Okay.

12                  THE WITNESS:   Dark.

13   BY MS. ZEIGER:

14   Q      I see that you're wearing glasses today.

15   A      Yes.

16   Q      Are those reading glasses or are those prescription

17          glasses?

18   A      Readers.

19   Q      On November 1st, 2011 when you were outside doing

20          surveillance were you using anything to assist you in your

21          ability to see?

22   A      I had binoculars in the vehicle.  I was using those, yes.

23   Q      You were using your binoculars, okay.

24                  And, approximately, how far away from the

25          home were you set up conducting your surveillance with your
```

36

1     binoculars?

2 A   I'd say, approximately, three to four hundred feet.

3 Q   Are these binoculars that you use on a daily basis doing

4     surveillance?

5 A   All the time when I'm on surveillance, yes.

6         MS. ZEIGER: Nothing further at this time, your

7     Honor.

8         THE COURT: Okay. Cross-exam.

9            CROSS-EXAMINATION

10 BY MR. PAIGE:

11 Q   How do you pronounce your last name?

12 A   Geelhood.

13 Q   Geelhood?

14 A   Geelhood.

15 Q   Geelhood. Listen, I think you're the key to this case. So

16     I'm going to spend a little bit of time with you, but not

17     that much, all right?

18 A   Yes, sir.

19 Q   All right. You was the affiant on the search warrant,

20     right?

21 A   Yes.

22 Q   All right. And when you gave information to a magistrate,

23     were you telling the truth then about the description --

24 A   Yes, sir.

25 Q   -- of the person?

37

1    A    Yes.

2    Q    And in that description, you indicated that the person was

3         approximately '5 --

4    A    If I can refer to my paperwork?

5    Q    Yes, please do.

6    A    I put he was '5 8", a 180 pounds.

7    Q    '5 8" and a 180 pounds.

8              You never said anything about glasses, did you?

9    A    No, sir.

10             MR. PAIGE:   Stand up, Mr. Chancellor.

11   BY MR. PAIGE:

12   Q    How much do you say he weighs right here?

13   A    Probably 210.

14   Q    210, 220?

15   A    I guess, yes.

16   Q    Yeah.  So are you normally 40 pounds --

17             Have a seat.

18   BY MR. PAIGE:

19   Q    Are you normally -- would you agree with me the difference

20        between 220 and 180 would put a person from a description

21        of mainly a slim build to a -- would you consider him a

22        medium build?

23   A    Would I consider him a medium build?

24   Q    A medium build, right.

25   A    No, he's on the heavier side.

38

```
 1   Q   So you would say on a heavier side?

 2   A   Correct.

 3   Q   You would call him heavy build then?  I'm just trying to

 4       get the vernacular right.

 5   A   Yes, sir.

 6   Q   In your description of the person in the search warrant,

 7       in your every day vernacular, would you say that a person

 8       '5 8", '5 9", and a 180 pounds is heavy build?

 9   A   No.

10   Q   Have you ever been wrong before?

11   A   Yes, sir.

12   Q   And would you not agree that identification evidence is

13       probably the most unreliable evidence?

14               MS. ZEIGER:  Objection, argumentative.

15               MR. PAIGE:   Well, I'll just say this.

16   BY MR. PAIGE:

17   Q   Have you ever made a mistake about identifying someone

18       before thinking that you know someone, and then all of a

19       sudden you say, oh, that's not the person that I thought it

20       was?  Has that ever happened to you?

21   A   Not like this, sir, no.

22   Q   Well, no.  I'm not saying like this.

23               I'm just saying have you ever made a mistake

24       in identification?

25   A   No, sir.  I'm quite positive this was the gentleman at the
```

39

```
 1      house.

 2  Q   No, you -- no, no, no, no.  See you -- you're trying to

 3      protect yourself, and I'm not beating you up.

 4              I'm saying have you ever made a mistake about

 5      identification about -- for any reason?

 6              MS. ZEIGER:  Your Honor, this has been asked and

 7      answered.

 8              MR. PAIGE:   I'll move on.

 9              THE COURT:   Yeah.

10  BY MR. PAIGE:

11  Q   Did you see --

12              Stand up, sir.

13  BY MR. PAIGE:

14  Q   Did you see this person on the premises on the date that

15      you executed the search warrant?

16  A   It could have been him, yes.

17  Q   It could have been him.

18              Come closer, again.

19      How would you describe him?

20  A   What his build is?

21  Q   Yes.

22  A   From a distance, probably '5 10", 170.

23  Q   Bingo.

24              Have a seat.

25  BY MR. PAIGE:
```

40

```
 1  Q    So you can get it right.

 2            So were you aware that the Defendant had a

 3       brother on the premises that was named Antonio?  Were you

 4       aware of that, that lived there?

 5  A    I wasn't aware of that, no.

 6  Q    And that he was -- he is described as about '5 10", '5 11",

 7       a 170, 180 pounds.  Are you aware of that?

 8  A    No, sir.

 9  Q    Are you aware that there was another black male, his

10       cousin, living on those premises?

11  A    No, sir.

12  Q    November of last year, right?

13  A    A year ago, yes.

14  Q    What was the date, November what?

15  A    It was the 2nd.

16  Q    November 2nd around election time, right?

17  A    Correct.

18  Q    Okay.  And it was about what time in the evening?

19  A    Like I said earlier, about 5:00 or 6:00, maybe.

20  Q    5:00 or 6:00, all right.

21            THE COURT:   You're talking about the

22       surveillance or the execution of the warrant?

23            MR. PAIGE:   The surveillance.

24            THE COURT:   Okay.  That was the 1st, not the

25       2nd, right?
```

41

1                    THE WITNESS:    That was the 1st, yes.

2   BY MR. PAIGE:

3   Q    Okay.   About what time was the surveillance?

4   A    About 5:00 or 6:00.

5   Q    About 5:00 or 6:00.

6                    Now, listen, when I asked this man to stand up,

7        he's approximately how far away from you right now?

8                    You don't have to stand up again.

9   BY MR. PAIGE:

10  Q    How far away would you say he's from you?

11  A    Sixty feet.

12  Q    Sixty feet.

13                   And you had to ask me to have him come closer to

14       you, did you not?

15                   No, I'm not laughing.

16  A    Did I have him come closer?

17  Q    I -- I had him come closer to you.

18  A    I did not ask for him to come closer, no.   You did.

19  Q    No, I did for you -- so you could --

20  A    Thank you for that, yeah.

21  Q    But I brought him closer to you --

22  A    You did bring him closer, yes.

23  Q    -- because you couldn't really make a determination from

24       where he was at, at that point, right?

25  A    Yes.

42

```
 1   Q    So it's nighttime.  It's nighttime November 1st

 2        at about 6:00.  It's nighttime, right?

 3   A    Yes.  Evening time, yes.

 4   Q    Evening, nighttime.

 5             Was the person -- strike that.  And I've already

 6        gotten it out.

 7             Did you describe the person in the search warrant

 8        wearing glasses?

 9   A    No, I didn't.

10   Q    And if I were to tell you that this man has a heavy

11        prescription because he has problems, like me, and maybe

12        not like you because you got reading glasses, right?

13   A    Yes, sir.

14   Q    If I were to tell you that he has a heavy prescription, you

15        couldn't refute that, could you?

16   A    If what now?  If he had a prescription?

17   Q    I mean --

18   A    I wouldn't have any idea whether he has a prescription.

19   Q    All right.  Well, it wasn't -- a guy didn't have a cane

20        and a dog, a blind man, you know.  That's not necessary.

21                  MR. PAIGE:   Nothing further.

22                  THE COURT:   Redirect.

23                  MS. ZEIGER:  Thank you, your Honor.

24                  May I approach, your Honor?

25                  THE COURT:   Yes.
```

43

```
 1                    MS. ZEIGER:   Thank you.

 2                    REDIRECT EXAMINATION

 3   BY MS. ZEIGER:

 4   Q    Officer, I'm going to show you what's been marked as

 5        People's proposed Exhibit No. 6.  Can you tell me what that

 6        is.

 7   A    It's the Defendant.

 8   Q    And is that a picture of the Defendant?

 9   A    It is.

10   Q    And do you know when that was taken?

11   A    Let's see 11/2 of '11 -- no, that's when it was run.

12   Q    Yes.

13                    Is that a Secretary of State document?

14   A    Oh, expires on 12/7/14.  It was effective on 1/10/11.

15   Q    And is the Defendant wearing glasses in that picture?

16   A    He is not.

17   Q    And is that the picture that Mr. Chancellor would have been

18        -- had taken for his driver's license?

19   A    It is.

20   Q    And what address is associated with that?

21   A    5023 32nd.

22   Q    Thank you.

23                    MS. ZEIGER:   Your Honor, we ask for the admission

24        of People's proposed Exhibit No. 6.

25                    MR. PAIGE:   No objection.
```

44

```
 1                    THE COURT:   People's 6 is admitted.

 2                    MS. ZEIGER:   Thank you.

 3                    (People's Exhibit No. 6 admitted into evidence.)

 4   BY MS. ZEIGER:

 5   Q    The person that you saw outside on November 1st, 2011 --

 6   A    Yes.

 7   Q    -- this is the person that you described as doing

 8        hand-to-hand transactions?

 9   A    Yes.

10   Q    Was that person wearing glasses?

11   A    No.

12   Q    When you were using your binoculars, did you have any

13        troubles viewing that individual?

14   A    None.

15   Q    And was that the Defendant?

16   A    Absolutely.

17   Q    Does the Defendant look the same way today as he did a year

18        ago?

19   A    He's heavier.

20   Q    And I'm going to show you People's Exhibit No. 6.   Is he

21        heavier now than what he was in this photograph?   Looking

22        at the picture as comparison.

23   A    Yes.   It appears to me that he's thinner here than he is

24        here.

25   Q    Okay.   He's thinner where?
```

45

```
 1   A      In this picture.

 2   Q      Okay.  Than he is seating --

 3   A      Correct.

 4   Q      -- sitting here today?

 5   A      Yes.

 6   Q      Okay.

 7                    THE COURT:   And did we determine the picture was

 8          taken in January of 2011?  Is that what it says?

 9                    THE WITNESS:   Yes, sir.

10                    THE COURT:   Okay.  Thank you.

11   BY MS. ZEIGER:

12   Q      Are you aware of any other family member living at that

13          home besides the Defendant and the Defendant's mother?

14   A      No.

15   Q      The person that was brought up to you and you were asked to

16          look at, do you know if that was the person who was on the

17          porch that day?  And when I say "that day," I mean the day

18          of the raid?

19   A      It appears that he is, yes.

20   Q      Was that the person that you saw the day before when you

21          were doing your surveillance on December -- November 1st,

22          2011?

23   A      No.

24                    MS. ZEIGER:   Nothing further, your Honor.

25                    RECROSS-EXAMINATION
```

46

1    BY MR. PAIGE:

2    Q    You told your Honor that this picture was taken from the

3         Secretary of State --

4    A    Yes.

5    Q    -- to get a driver's license?

6    A    Yes.

7    Q    How do you know that?

8    A    It says it on the top.

9    Q    Just point to it because I can't see where.

10   A    That's what this means.

11   Q    You said, "that's what this means?"

12   A    Yes.

13   Q    It doesn't say driver's license on that, does it?

14   A    To me it does.

15                THE COURT:    What does it say?    Tell me what it

16        says.

17   BY MR. PAIGE:

18   Q    It's a code, right?

19   A    That's what it means, sir.

20   Q    Well, let me tell you what I think it means.    I think it

21        means that he was getting a state ID.    So, I think that's

22        a difference.    Because I want to -- this is a search for

23        the truth.    Are you telling me that on this particular date

24        that this man was getting a driver's license and not

25        complying with the requirement to get a state ID?

47

1   A    That's him going to the Secretary of State and getting an

2        ID of some sort from the Secretary of State.

3   Q    Now, it's some sort.

4                 MS. ZEIGER:  I didn't understand what you yelled

5        out.

6   BY MR. PAIGE:

7   Q    Now, it's some sort of ID, right?

8   A    It has to be done through the Secretary of State of

9        Michigan.  That's what that document states.

10  Q    That's not the question I asked you under oath.

11               I asked you did you tell this Court that

12       this man was getting a driver's license, specifically?

13       Did you tell your Honor, Judge Hathaway, that this man was

14       getting a driver's license picture?  Did you say that?

15  A    Yes.

16  Q    And now I'm going to ask you another question.  When you

17       got that search warrant, what day was that on?

18  A    It was on the 2nd.

19  Q    The 2nd.

20               Did you -- and I don't mean to insult you.

21  A    Please don't.

22  Q    Did you pull a picture of Darell Chancellor prior to

23       getting that search warrant?  Yes or no.

24  A    Prior to, no.

25  Q    Did you -- when did this become in your possession?

48

```
 1   A    After the search warrant.  It probably was --

 2   Q    What -- when?

 3   A    Probably when we were doing the paperwork.

 4   Q    No, I don't want to know probably.  Because if you had this

 5        -- did you -- did you pull his picture and then go and make

 6        a false affidavit about this man?  Did you do that?

 7   A    No, sir.

 8   Q    Because his lower torso is not published in this purported

 9        picture, right?

10   A    It doesn't appear to be, sir.

11   Q    And so it gives opportunity for error for the description

12        as far as his body weight, does it not?

13   A    What are you asking me?

14   Q    I'm telling you that you can't tell how much this man

15        weighs based on this picture.

16   A    She asked me my opinion of his weight.  That's what I

17        answered.

18   Q    No.  It ain't she talking to you now.

19             I said, you cannot determine this man's weight by

20        this picture, can you?  Can you?

21   A    I believe that I can.  That he looks smaller there than he

22        does when he's sitting here.

23   Q    Would you make a guesstimate about his weight without

24        knowing his weight in using this -- as far as talking to a

25        judge and --
```

49

```
 1   A   I could not give a total weight from that picture, no, sir.

 2   Q   And what if I were to tell you that as a requirement of a

 3       state ID, he was told to take his glasses off.

 4   A   I was not there, sir.

 5   Q   Of course you were not.

 6                Big dope transaction, right?  Big dope

 7       transaction.  That's a lot of dope.  You've already told us

 8       that, right?  That's a question, It's a lot of dope,

 9       right?

10   A   What question are you asking me the transaction or the

11       amount of the dope?

12   Q   The amount of the dope.

13   A   It's a lot of dope, yes, sir.

14   Q   Yes.  And what would be the value of that dope?

15   A   I believe that it's about $400.00 a gram, and it was over

16       600 grams.

17   Q   So give me a guesstimate.  You're good with numbers.

18   A   Approximately $240,000.00.

19   Q   How much?

20   A   Approximately $240,000.00.

21   Q   $240,000.00?

22   A   Yes.

23   Q   Okay.  Did you do any trace -- traces to make a

24       determination of what kind of assets this man owned on/or

25       about November 1st or 2nd of 2011?  Did you do any trace
```

50

```
 1        evidence on that?  You.

 2   A    I had another address from the mother that she'd given me

 3        at the house.

 4   Q    I'm asking you a question, sir.  Did you do --

 5   A    And I'm trying to answer it, sir.

 6   Q    So what did you determine?

 7   A    Whether he lived at the other house that she gave me.

 8   Q    I'm not asking you that question.  I'm asking you did you

 9        make a determination of what his net worth was on November

10        1st or 2nd of 2011?

11             MS. ZEIGER:   And, your Honor, I'm going to

12        object at this point.  If I may be allowed to redirect

13        again based upon this questioning?  Because I think this

14        goes outside the scope of my redirect.  If I can --

15             THE COURT:   It does go outside the scope, but

16        I'll allow it with the understanding that you can reopen --

17             MS. ZEIGER:   Thank you.

18             THE COURT:   -- your redirect.

19             MS. ZEIGER:   Thank you, your Honor.

20   BY MR. PAIGE:

21   Q    Did you do any trace evidence on this guy to make a

22        determination what his assets -- what his net worth was?

23   A    No, sir.

24   Q    The dope that you found was not in plain view?

25   A    Correct.
```

51

```
 1   Q    And, in fact, the dope was covered up by clothing, right?

 2   A    Yes.

 3   Q    That's what you put in your report, did you not?

 4   A    I said, yes.

 5   Q    And it was pushed under a table?

 6   A    I didn't know who pushed it there or why it was pushed

 7        there.   It was under a table.   That's why I confiscated

 8        it.

 9   Q    I didn't ask you --

10              THE COURT:    The hamper was under a table?

11              THE WITNESS:   Yes, sir.

12              THE COURT:   Okay.

13   BY MR. PAIGE:

14   Q    There is no fingerprints on the dope that is traced back to

15        him, right?

16   A    I didn't believe we got any back, no.

17   Q    No latent prints, right?

18   A    I didn't get any back.

19   Q    You never saw him touch that dope, did you?

20   A    Not that particular bag that we confiscated, no.

21   Q    Did you ever confiscate a bag of dope that he purportedly

22        sold?   Did you ever confiscate a bag that he sold?

23   A    No.

24   Q    Did you detain the people who you thought were making drug

25        transactions?
```

52

1   A   No, sir.

2   Q   Did you go into all the bedrooms?

3   A   Yes.

4   Q   You went in everyone of the bedrooms in that house?

5   A   I went over the whole house, yes.

6   Q   So how many bedrooms did you go into?

7   A   Approximately four.

8   Q   Sir, if I tell you it's three bedrooms downstairs and three

9       upstairs, you might have missed two?

10  A   I told you I went into approximately four. I went into

11      every room in that house.

12  Q   So you don't really know how many you went into. That

13      would be a better answer. It could be --

14  A   I'm trying to answer you, sir. Some of the rooms didn't

15      have beds in them.

16  Q   So if -- some of the rooms didn't have beds in them?

17  A   Right.

18  Q   So you didn't call them bedrooms then. There were rooms

19      that appeared to be bedrooms, but they didn't have beds

20      in them, and so you didn't -- you won't call them

21      bedrooms?

22  A   I'll answer by saying I went in every room in the house.

23  Q   All right. Were the lights on?

24  A   Where?

25  Q   Were the lights on in the house?

53

```
 1   A    Some of the rooms, not all of the rooms.

 2   Q    Did you get an electricity bill?  That's all I'm trying to

 3        get.  Did you get an electricity bill?

 4   A    Did I get an electricity bill?

 5   Q    Yes, out of the house?

 6   A    Did I, no.

 7   Q    Did you get a cable bill?

 8   A    You're asking me if I got one?

 9   Q    Yes.

10   A    No.

11   Q    Did anybody in your crew get one, if you know?

12   A    There's other confiscations.  I did not make them.

13   Q    Okay.  Did you get any other proof of residency in the

14        house?

15   A    I did not get any other proof of residency.

16   Q    You saw a female in the house, right?

17   A    Yes.

18   Q    Is she in the courtroom today?

19   A    Yes.

20   Q    Did you get any proof of residency from her?

21   A    I --

22   Q    Did you check her for ID?

23   A    I made a confiscation of the dope.  That's all I made.

24             MR. PAIGE:   Stand up.

25   BY MR. PAIGE:
```

54

```
1   Q    Did you check her for ID?

2   A    I did not.

3   Q    You weren't looking for proof of residency from her?

4   A    I did not.

5   Q    The person that was detained on the porch, that you don't

6        know if this was the man or not, did you get proof of

7        residency or check his -- that person's driver's license?

8   A    You're asking me if I did, I did not.

9   Q    And do you know if anybody in your crew did?

10  A    They would have.

11  Q    They would have?

12  A    Yes.

13  Q    Well, we've already had one person to testify and said that

14       he -- claimed that he did not.

15            MS. ZEIGER:  Your Honor, I'm going to object.

16       He cannot tell what one person's testimony is.  That's the

17       whole purpose of the sequestration.

18            THE COURT:   I'll sustain the objection.

19            MR. PAIGE:  Correct.  I got it.

20            THE COURT:   Go ahead, Ms. Zeiger.

21            MS. ZEIGER:  Thank you.

22                       REDIRECT EXAMINATION

23  BY MS. ZEIGER:

24  Q    Officer Geelhood, did you have this picture of People's

25       Exhibit No. 6 with you before you executed a search
```

55

1    warrant?

2    A    No.

3    Q    Did you know the Defendant's name before you executed the

4         search warrant?

5    A    No.

6    Q    Did you put a name into your search warrant?

7    A    No.

8    Q    Had you had a name, would you have put that into the search

9         warrant?

10   A    Yes.

11   Q    Where did you learn the name of Darell Chancellor from?

12             MR. PAIGE:    Objection to hearsay.

13             MS. ZEIGER:    Your Honor, he went on and on about

14   how my officer knew who this person was ahead of time, and

15   lied in the search warrant, lied to the magistrate, and did

16   it based upon this document.

17             MR. PAIGE:    I never said he lied.    I asked him

18   the question did he lie.    And it's still hearsay.

19             THE COURT:    All right.    What was the question

20   again?

21             MS. ZEIGER:    Your Honor, I asked him where it was

22   that he got the name of Darell Chancellor from.

23             THE COURT:    Well, I -- I don't think that that's

24   hearsay unless it's -- the answer to it is that someone

25   told him.    If the answer is that someone told him, then it

56

```
 1    would be hearsay.

 2              MR. PAIGE:    That's what --

 3              THE COURT:    But if he gets some form of

 4    identification from someone or something, then I don't

 5    think that's hearsay.  That's something that he obtained as

 6    part of his police work.

 7              MS. ZEIGER:   And I would agree that he got

 8    identification from someone.

 9              THE COURT:    Okay.  Then I'm going to allow it.

10    BY MS. ZEIGER:

11  Q    Who did you get the name of Darell Chancellor from that

12       day?

13  A    We got it from POR that was upstairs, and we also got it

14       from the mother.

15  Q    And the mother this is the woman standing -- sitting in the

16       back?

17  A    Yes.

18              MR. PAIGE:    Your Honor, I ask that the mother's

19    information be stricken because it's hearsay.

20              THE COURT:    Well, --

21              MR. PAIGE:    It's not a big deal, but it is

22    hearsay.

23              THE COURT:    Yeah, I will -- I'll allow it to be

24    stricken as hearsay.  But I just thought that there was

25    from Officer Johnson that that came out without objection.
```

57

```
 1        I don't know.  Maybe I'm not remembering his testimony
 2        properly.  But I'll allow that that be stricken, and go on
 3        the basis of the fact that he got it from the proof of
 4        residence.
 5               Go ahead, please.
 6   BY MS. ZEIGER:
 7   Q    But you didn't have that name before you got to the house
 8        that day?
 9   A    Correct.
10   Q    Okay.  You were asked about the assets of the Defendant.
11        After you were at this house executing the search warrant,
12        did you end up going to another location?
13   A    I did.
14   Q    What location is that?
15   A    It would have been on the west side.  I'm trying to recall
16        the address.  I'm -- the mother gave it to me at the scene.
17   Q    What was your reason for going to that location?
18   A    She gave me that location that he also --
19               MR. PAIGE:   Objection to the hearsay.
20               THE COURT:   All right.  I'll sustain that.
21   BY MS. ZEIGER:
22   Q    Were you checking out another home?
23   A    Yes.
24   Q    And when you got to that home, did you see any vehicles
25        outside?
```

58

1   A    I did.

2   Q    What vehicles did you see outside?

3   A    The same one I saw during the surveillance that the

4       Defendant was driving, a later model either an Aurora or a

5       Riviera.

6   Q    So you saw this Aurora or Riviera on November 1st, 2011 at

7       5023 32nd Street when you were conducting your

8       surveillance?

9   A    Yes.

10  Q    And then you also saw this Riviera or Aurora at another

11      location on the west side?

12  A    Correct.

13           THE COURT:   Where did you see it when you were

14      doing the surveillance on the 1st?

15           THE WITNESS:   It was in front of the house.

16           THE COURT:   Okay.

17           THE WITNESS:   The 50 --

18           THE COURT:   Parked on the street in front of the

19      house?

20           THE WITNESS:   Yes.

21  BY MS. ZEIGER:

22  Q    Where did you see it in relationship to this other address

23      on the 2nd?

24  A    In the driveway.

25  Q    The height on People's Exhibit No. 6 what is that listed

59

1    at?

2  A    '5 11".

3  Q    And what height did you have in your search warrant?

4  A    Referring to my document it's '5 8".

5  Q    And, again, you did not have this picture before the search

6    warrant?

7  A    No.

8  Q    Was the description that you put in the search warrant

9    based upon your observations on November 1st?

10  A    Yes.

11             MS. ZEIGER:  Nothing further, your Honor.

12             THE COURT:   All right.  Thank you.

13             Re-cross limited to the area that she covered.

14             MR. PAIGE:   Let's try to get through this

15    because I know we're trying to get this in.

16                  RECROSS-EXAMINATION

17  BY MR. PAIGE:

18  Q    The Riviera did you run a license plate check on it?  Did

19    you?

20  A    I would have.  I don't recall what came back.

21  Q    If you would have, then that would be evidence, right?

22    I mean, that would be -- you would have memorialized that,

23    right?

24  A    Yes.

25  Q    Is there any where in your records you can refresh your

60

1        memory?

2    A    I would have ran the plate that was in front of the house.

3        Whether it came back to that gentleman or not, I can't

4        recall.

5    Q    Well, wouldn't you put that in your notes that you ran the

6        plate and it came back to John or Jane Doe?

7    A    I would have run the plate to ensure it was run.  I do not

8        know who it came back to.  It is not in front of me.

9                  MR. PAIGE:   All right.  Nothing further.

10                  THE COURT:   Okay.

11                  Thank you.

12                  MS. ZEIGER:  Nothing further, your Honor.

13                  THE COURT:   All right.  You're all set.  Thank

14        you, officer.

15                  (Witness excused.)

16                  MS. ZEIGER:  We're going to put a stipulation on

17        the record.

18                  THE COURT:   Okay.

19                  MS. ZEIGER:  As it relates to People's Exhibit

20        No. 2, the cocaine that was found by Officer Geelhood and

21        in lock sealed folder N, as in Nancy 03346711.  Officer

22        Geelhood testified that the cocaine was not in the manner

23        that it is today.  Today it is now melted, for lack of a

24        better word, I'm using a non-scientific word.  But he

25        testified that it was not like this.  That is was a hard

61

1    substance on November 2nd, 2011.

2         And we also have a laboratory analysis that was

3    offered by Holli Proulx, her last name is spelled

4    P-R-O-U-L-X.  Her first name is Holli, H-O-L-L-I.  She is a

5    Forensic Scientist in the Control Substances Unit in the

6    Michigan State Police.  She received one sealed plastic bag

7    N, as in Nancy 03346711 containing one plastic bag

8    containing four knotted plastic bags containing off white

9    material.  She analyzed two of the bags.  She came up with

10   a weight of 516.65 grams.  It was a Schedule II cocaine

11   base was the substance identified within the bag.

12         So stipulated?

13         MR. PAIGE:    So stipulated.

14         THE COURT:    Okay.

15         MS. ZEIGER:   And, your Honor, --

16         THE COURT:    That stipulation is made a part of

17   the record then.

18         MS. ZEIGER:   And, your Honor, at this time I do

19   have Ms. Proulx in court, and I'm going to be releasing her

20   as a result of this stipulation.

21         THE COURT:    Okay.

22         MS. ZEIGER:   Thank you.

23         THE COURT:    That's fine.

24         Thanks for being here.

25         MS. ZEIGER:   And I'll grab my next witness.

62

1          THE COURT:   Give the court reporter the spelling

2     of your name, please.

3          MS. IZUMI:   Cyndi C-Y-N-D-I.   Last name Izumi,

4     I-Z-U-M-I.

5          COURT REPORTER:   Thank you.

6          THE COURT:   All right, ma'am.

7          Would you raise your right hand, please.

8          Do you swear or affirm that the testimony

9     you're about to give in this matter shall be the truth so

10    help you God?

11         MS. IZUMI:   Yes.

12         THE COURT:   Have a seat, please.

13         MS. ZEIGER:   May I proceed, your Honor?

14         THE COURT:   Yes.

15         MS. ZEIGER:   Thank you.

16              C Y N D I   I Z U M I ,

17    having been duly sworn was examined and testified as

18    follows:

19              DIRECT EXAMINATION

20    BY MS. ZEIGER:

21    Q    Could you please state your name for the record.

22    A    Cyndi Izumi.

23    Q    And, Ms. Izumi, are you a police officer?

24    A    No.

25    Q    Are you familiar with someone by the name of Darell

63

1          Chancellor?

2     A    Yes.

3     Q    Do you see Mr. Chancellor here in court today?

4     A    Yes.

5     Q    Can you point to him and tell me what he's wearing.

6     A    He's wearing black pants and a gray shirt.

7     Q    Thank you.

8               MS. ZEIGER:  May the record reflect that the

9     witness has identified the Defendant Mr. Darell Chancellor.

10              THE COURT:   It will reflect that.

11              MS. ZEIGER:  Thank you.

12    BY MS. ZEIGER:

13    Q    Ms. Izumi, have you ever been to a location or home at

14         5023 32nd Street in the City of Detroit, County of Wayne?

15    A    Yes.

16    Q    And approximately how many times have you been there?

17    A    Three times.

18    Q    Have you ever been there when the Defendant has been

19         present?

20    A    Yes.

21    Q    How many times?

22    A    I believe two of the three times.

23    Q    Do you remember when the first time was that you were at

24         the home and the Defendant was there?

25              Are you referring to some notes?

64

```
1   A    Yes, I am.

2   Q    And would that refresh you recollection?

3   A    Yes.

4   Q    Thank you.

5   A    It was 7/19/11.

6   Q    And when he was there, did he represent that home as his

7        home?

8   A    Yes.

9   Q    Did he indicate whether he lived there with anybody else?

10  A    His mother and, I believe, his sister.

11  Q    Do you see -- do you know his mom?

12  A    Yes.

13  Q    Do you see her in court at all here today?

14  A    Yes.

15  Q    Where is she at?

16  A    She's on the back row with the glasses.

17  Q    Dressed in black?

18  A    Yes.

19  Q    Thank you.

20            THE COURT:   Just for the record, it's the same

21       woman that was earlier identified as Defendant's mother.

22            MS. ZEIGER:   Thank you, your Honor.

23  BY MS. ZEIGER:

24  Q    That was on July 19th, 2011?

25  A    Yes.
```

65

1   Q   When was the next time that you were at the home?

2   A   It was March 21st, 2012.

3   Q   Was the Defendant present then?

4   A   Yes.

5   Q   And was he representing that as his home at that time, as

6       well?

7   A   Yes.

8   Q   Was the mother present there?

9   A   She was in the backyard, but she was still at the home.

10  Q   Was anybody else present?

11  A   Not that I was aware of.

12  Q   Okay.

13              MS. ZEIGER:  Nothing further, your Honor.

14              THE COURT:  Okay.

15                  CROSS-EXAMINATION

16  BY MR. PAIGE:

17  Q   Did he tell you, for instance, where did he sleep in the

18      house?   Did he tell you he slept on the couch?

19  A   No, we never discussed  --

20  Q   You never talked about that?

21  A   I believe it was the upper level, but he never specified

22      whether he slept on a couch or on a bed or whatnot.

23  Q   But you never -- you never went into an area of where he

24      purportedly lived to his bedroom or anything?

25  A   Me, myself, no, sir.

66

1  Q    Isn't it true that as a -- one of the requirements is that

2       you have to have two good addresses?

3  A    What requirement?

4              THE COURT:    Requirement to what?

5  BY MR. PAIGE:

6  Q    Well, you were visiting for a state agency, right?

7  A    Yes, sir.

8  Q    And as a condition, did you have two addresses on him?

9       Yes or no.

10 A    No.

11 Q    You just had that one address?

12 A    Yes.

13 Q    Okay.  Are you aware of a person by the name of Mr. Durhall

14      (ph.) that lived at that address?

15 A    No.

16 Q    Are you aware of how many siblings the Defendant had at the

17      time that you visited him at that address?  Whether he had

18      brothers or sisters or cousins that were living there?

19 A    I was just aware of the sister living there.

20 Q    Did you know about his brothers?

21 A    No.

22 Q    Did you do any -- have you ever done an asset run on him to

23      make a determination of what his net worth was?

24 A    No.

25 Q    Do you know if he was receiving any state aid?

67

```
1   A     As far as I know, he told me he was receiving a Bridge

2         Card.

3   Q     He was receiving a Bridge Card?

4   A     Yes.

5               MR. PAIGE:   All right.  Nothing further.

6               MS. ZEIGER:   Nothing further, your Honor.

7               THE COURT:   Okay.  I just want to make sure I

8   understood one thing.  Did you say he told you he lived in

9   the upstairs?  Is that what I heard you testify?

10              THE WITNESS:   His sleeping area.

11              THE COURT:   I'm not understanding.  He told you

12  his sleeping area was upstairs; is that what you're telling

13  me?

14              THE WITNESS:   I don't know offhand either him or

15  his mother when I did the initial investigation --

16              THE COURT:   Someone told you?

17              THE WITNESS:   Yes.

18              THE COURT:   Okay.  You don't remember

19  specifically who?

20              THE WITNESS:   I do not.

21              THE COURT:   Okay.  Anything based upon my

22  additional question?

23              MR. PAIGE:   No.

24              MS. ZEIGER:   No, your Honor.

25              THE COURT:   All right.  Thanks.
```

68

```
 1                    Thanks, ma'am.

 2          THE WITNESS:   Thank you.

 3          (Witness excused)

 4          MS. ZEIGER:   Your Honor, I have one more witness

 5     to call.

 6          THE COURT:   Okay.

 7          Sir, give the court reporter the spelling of your

 8     name, please.

 9          OFFICER BELL:  Tommy T-O-M-M-Y  Bell, B-E-L-L.

10          COURT REPORTER:  Thank you.

11          OFFICER BELL:  You're welcome.

12          THE COURT:   Mr. Bell, could you raise your right

13     hand.

14          Do you swear or affirm the testimony you're about

15     to give in this matter shall be the truth so help you God?

16          OFFICER BELL:  Yes, sir, I do.

17          THE COURT:   All right.

18          Have a seat, please.

19          MS. ZEIGER:  May I proceed, your Honor?

20          THE COURT:   Please.

21          MS. ZEIGER:  Thank you,

22              T O M M Y    B E L L ,

23     having been duly sworn was examined and testified as

24     follows:

25                    DIRECT EXAMINATION
```

69

1   BY MS. ZEIGER:

2   Q    Good afternoon, sir.

3   A    Good afternoon.

4   Q    Could you please state your name for the record.

5   A    Tommy Bell.

6   Q    And, sir, how are you employed?

7   A    Police Officer for the City of Detroit.

8   Q    Are you assigned to a specific unit within the City of

9        Detroit?

10  A    Assigned to the narcotics division.

11  Q    How long have you been a police officer?

12  A    Police officer for over 25 years; narcotics division for

13       over 13 years.

14  Q    Directing your attention back to November 2nd, 2011 at 5:30

15       in the afternoon were you at 5023 32nd Street in the City

16       of Detroit, County of Wayne?

17  A    Yes.

18  Q    Why were you at that location?

19  A    To execute a search warrant.

20  Q    And what is at that address?

21  A    A single family dwelling.

22  Q    What was your role in executing the search warrant?

23  A    Initial at the house I was outside security.

24  Q    And did you encounter somebody on the porch that day when

25       you were executing the search warrant?

70

1   A   It was somebody, yes.

2   Q   And when you say "it was somebody," were they male or

3        female?

4   A   It was a male.

5   Q   Do you see that person any where here in court today, if

6        you remember?

7   A   I don't recall what he was -- looked like.

8   Q   Okay.  Did you ever end up going inside of the location?

9   A   Yes.

10   Q   And was that after entry was made by the entry team?

11   A   That's correct.

12   Q   Did you assist in the clearing of the home, or did you go

13        in after the house was cleared?

14   A   I went into the home after the house was cleared.

15   Q   Did you assist in searching at all?

16   A   Yes.

17   Q   And can you tell us how this house is set up?

18   A   It's a regular house.  Bedrooms, kitchen, living room

19        downstairs.  You go to the rear of the house going from

20        front to the back of the house facing the door you go to

21        the back it's an upstairs area also has a kitchen, dining

22        room, living room, bedrooms upstairs.

23   Q   Would it be fair to say that it was set up as a two family

24        flat, but yet it only had one address and one front door?

25   A   Correct.

71

1 Q   Did you search either the top or the bottom of that home?

2 A   The upstairs.

3 Q   And did you seize anything upstairs?

4 A   Yes.

5 Q   Specifically, where did seize something from?

6 A   A clothes hamper?

7 Q   And where was that clothes hamper at?

8 A   It was in the upstairs area I would define as in the

9     kitchen.

10 Q   And did you observe Officer Geelhood seize anything from

11     the same hamper?

12 A   Yes.

13 Q   What was that?

14 A   Suspected narcotics.

15 Q   What did you seize from this hamper?

16 A   Two handguns.

17 Q   Can you tell me about the first one that you seized?

18 A   If I may refer to my report?

19 Q   Will that refresh your recollection?

20 A   Yeah.

21 Q   Please do so.

22 A   It was a .40 caliber glock, blue steel automatic, loaded

23     with nine live rounds.

24 Q   Did you put that one on an evidence tag number?

25 A   That's correct.

72

1    Q    Okay.   What evidence tag number was that?

2    A    Referring to my report that would be evidence tag 371904

3         -- E371904.

4                    MS. ZEIGER:   Your Honor, may I approach the

5         witness?

6                    THE COURT:   Yes.

7                    MS. ZEIGER:   Thank you.

8    BY MS. ZEIGER:

9    Q    I'm going to show you what's been marked as People's

10        proposed Exhibit No. 5.

11                   MS. ZEIGER:   And, your Honor, for the record,

12        this gun has been checked by your deputy.

13                   THE COURT:   Thank you.

14   BY MS. ZEIGER:

15   Q    Is that the evidence tag that correlates with that item?

16   A    That's correct.

17   Q    And what is inside that?

18   A    It's a glock handgun.

19   Q    Okay.   Thank you.

20                   MS. ZEIGER:   We would ask the admission of

21        People's proposed Exhibit No. 5.

22                   MR. PAIGE:   No objection.

23                   THE COURT:   People's 5 is admitted.

24                   (People's Exhibit No. 5 admitted into evidence.)

25   BY MS. ZEIGER:

73

1   Q   Did you seize anything else?

2   A   A .9mm Ruger handgun.

3   Q   Was that glock that I just showed you and admitted into

4       evidence, was that loaded?

5   A   Yes, it was.

6   Q   How many times?

7   A   Nine live rounds.

8   Q   Okay.  That Ruger was that loaded, as well?

9   A   Fifteen live rounds.

10  Q   I'm going to show you what's been marked as People's

11      proposed Exhibit No. 4.  Can you look at that item.  And

12      what is that?

13  A   It's a blue steel automatic .9mm Ruger with magazine,

14      nine rounds.

15  Q   Is that the item that you seized from the hamper --

16  A   That's correct.

17  Q   -- along with the .40 caliber glock?

18  A   Yes, ma'am.

19  Q   Thank you.

20          MS. ZEIGER:  We ask the admission of People's

21      proposed Exhibit No. 4.

22          THE COURT:   Any objection?

23          MR. PAIGE:   No objection.

24          THE COURT:   People's 4 is admitted.

25          (People's Exhibit No. 4 admitted into evidence.)

74

1  BY MS. ZEIGER:

2  Q    Officer Bell, the clothing that was in that hamper, can you

3       describe that for us.

4  A    As far as my recollection, it was just jeans.  I would say

5       men's jeans, shirts, underwear, socks.

6  Q    It was all male clothing?

7  A    Yes.

8  Q    Did you seize anything else that day?

9  A    No, I did not.

10              MS. ZEIGER:   Nothing further, your Honor.

11              THE COURT:    Okay.   Cross-examine.

12              MR. PAIGE:    Real quick.

13                   CROSS-EXAMINATION

14  BY MR. PAIGE:

15  Q    One gun was in the hamper, right?

16  A    Both guns, sir.

17  Q    Oh, both guns were in the hamper?

18  A    Yes, sir.

19              MR. PAIGE:    Nothing further.

20              THE COURT:    Okay.

21              You're all set.  Thank you, sir.

22              THE WITNESS:   Thank you, sir.

23              (Witness excused.)

24              MS. ZEIGER:   Your Honor, at this time there's a

25       stipulation between defense counsel and the People that

75

1    back on November 2nd, 2011 the Defendant had previously

2    been convicted of a felony and was ineligible to possess a

3    firearm.  So stipulated, Mr. Paige?

4              MR. PAIGE:   Yes, it is.

5              MS. ZEIGER:  Thank you.

6              THE COURT:   All right.  That stipulation is made

7    a part of the record in this case.

8              MS. ZEIGER:  Thank you, your Honor.

9              The People would rest at this time.

10             THE COURT:   Okay.  Defense witnesses?

11             MR. PAIGE:   Your Honor, I'm going to reserve the

12   right to make a directed verdict motion.

13             THE COURT:   Okay.

14             MR. PAIGE:   And do it all at one time.

15             THE COURT:   All right.

16             MR. PAIGE:   But I'm not giving up that right --

17             THE COURT:   Sure.  Yeah, absolutely.

18             MR. PAIGE:   -- to make a motion for directed

19   verdict.

20             May I counsel with my client just for one second?

21             THE COURT:   Sure.

22             MR. PAIGE:   Two minutes in the box so I can --

23             THE COURT:   Yeah, we'll take a brief recess.

24   We'll come back in three minutes.

25             MR. PAIGE:   Yes, thank you.

76

```
 1                    MS. ZEIGER:  Thank you, your Honor.
 2               (Matter in recess)
 3               (Matter reconvened)
 4                    THE COURT:   Okay.  How do you wish to proceed at
 5     this time, Mr. Paige?
 6                    MR. PAIGE:   Your Honor, the defense -- the
 7     Defendant wants to testify.
 8                    THE COURT:   Okay.
 9                    MR. PAIGE:   Can I voir dire him real quick --
10                    THE COURT:   Absolutely, yeah.
11                    MR. PAIGE:   -- on this?
12                    THE COURT:   Yes.
13               Stand up, please.
14                    MR. PAIGE:   You know you have the absolute right
15     not to testify?
16                    THE DEFENDANT:   Yes.
17                    MR. PAIGE:   And if you do not testify, your
18     Honor would instruct himself like he would instruct a jury
19     that he can't use that against you?  You understand that?
20                    THE DEFENDANT:   Yes.
21                    MR. PAIGE:   And I've had the occasion to talk to
22     you about this?
23                    THE DEFENDANT:   Yes.
24                    MR. PAIGE:   And I've given you the admonishment
25     that it's been my experience a lot of times when defendants
```

77

```
1     take the stand they hang themselves?

2                    THE DEFENDANT:   Yes.

3                    MR. PAIGE:   And so we understand what's at risk?

4                    THE DEFENDANT:   Yes.

5                    MR. PAIGE:   You swear to tell the truth?

6                    THE DEFENDANT:   Yes.

7                    MR. PAIGE:   I can't do all the Judge's work.

8                    THE COURT:   Yeah.   I'll do the swearing in.

9                    Okay.   Can you raise your right hand.

10                   Do you swear or affirm the testimony you're

11    about to give in this matter shall be the truth so help you

12    God?

13                   THE DEFENDANT:   Yes.

14                   THE COURT:   All right.   Have a seat, please,

15    Mr. Chancellor.

16             D A R E L L   D E O N   C H A N C E L L O R,

17    sworn by the Court, was examined and testified as follows:

18                        DIRECT EXAMINATION

19    BY MR. PAIGE:

20    Q   Mr. Chancellor, just, again, for the record your name.

21    A   Darell Deon Chancellor.

22    Q   Could you speak up.

23    A   Darell Deon Chancellor.

24    Q   And how old are you?

25    A   I'm 30.
```

78

```
1    Q    You're 30 years old?

2    A    Yes.

3    Q    And how tall are you?

4    A    I'm '5 11".

5    Q    And how much do you weigh?

6    A    250.

7    Q    250?

8    A    Yes.

9                    THE COURT:    Two five 0?

10                   THE WITNESS:    Yes, sir.

11   BY MR. PAIGE:

12   Q    You're not just putting those numbers up so you can get

13        away from the 180, are you?

14   A    No, sir.  We can get a scale.

15   Q    How about on November 2nd -- November 1st of last year how

16        much did you weigh?

17   A    I was 245.

18   Q    245?

19   A    Yes.

20   Q    First of all, where did you live on November 2nd, of 2011?

21   A    I lived on 9209 Robson.

22   Q    Okay.  What's your mother's address?

23   A    5023 32nd.

24   Q    Okay.  You heard a person on the stand indicate that she

25        visited you three times at the second address, right?
```

79

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Was that true? |
| 3 | A | She visit me, yes, once in the inside and once on the |
| 4 | | outside. |
| 5 | Q | And did you give the state that address? |
| 6 | A | Yes. |
| 7 | Q | And when you gave them that information, was that |
| 8 | | information true? |
| 9 | A | At the time it was.  Because when I first came home, she |
| 10 | | asked me where -- was that my location?  I told her, yes. |
| 11 | | But my lights was cut off on Robson.  So I had to parole to |
| 12 | | that house. |
| 13 | Q | Okay.  Now the house on Robson give us that address again. |
| 14 | A | 9209 Robson. |
| 15 | Q | Okay.  The majority of your clothing, if all, was where at |
| 16 | | on November 2nd, 2011? |
| 17 | A | All my clothes was on Robson. |
| 18 | Q | Who did you live with on Robson, if anyone? |
| 19 | A | My wife and my son, my newborn. |
| 20 | Q | Your wife's name is what? |
| 21 | A | Katrice Chancellor. |
| 22 | Q | On November 2nd, 2011 were you working? |
| 23 | A | Yes. |
| 24 | Q | And where did you work? |
| 25 | A | G and G Market. |

80

1   Q   And what is G and G Market?

2   A   It's, like, a gas station/market where -- it was, like, a

3       grocery store/gas station.

4   Q   And what hours did you work?

5   A   From like 8:00 to 4:00, 8:00 to 5:00 or whenever he called.

6       Whenever he needed me.

7   Q   Okay.  And on November 2nd, of 2011, did you own your own

8       home?

9   A   Yes.

10  Q   Where was that?

11  A   On Robson.

12  Q   Okay.  And what was the value of that house?

13  A   I think $3,500.00.

14  Q   $3,500.00?

15  A   Yes.

16  Q   Okay.  You didn't live out in Farmington Hills in a

17      $400,000.00 house?

18  A   No, sir.

19  Q   How many new Eldorado Cadillacs did you own on November

20      2nd?

21  A   None.

22  Q   How many fur coats?

23  A   None.

24  Q   Those glasses is that a prop for court today?

25  A   No, sir.

81

```
 1   Q    Are those prescription glasses?

 2   A    Yes, sir.

 3   Q    Without those glasses you would be a version of Stevie

 4        Wonder?

 5   A    Without these glasses, I probably can't walk out of the

 6        courtroom.

 7   Q    And how long have you worn glasses?

 8   A    All my life.

 9   Q    The house on 32nd who lived there on November 2nd, if you

10        know, of 2011?

11   A    My mother, my sister, my cousin.

12   Q    What's your cousin's name?

13   A    Willie Chancellor.

14   Q    Who else lived there, if you know?

15   A    Antonio Chancellor.

16   Q    Who is that?

17   A    My brother.

18   Q    Can you describe him.

19   A    He's about '5 9", 165, 170.

20   Q    Okay.  Your cousin -- strike that.

21             Did Mr. Durhall (ph.) live there -- stay there

22        sometimes?

23   A    Yes.

24   Q    Okay.  Do you see him in the courtroom?

25   A    Yes.
```

82

1   Q   Okay.  And could you just point him out for the record.

2       He's already been put into the record, but could you point

3       him out.

4   A   He's in the back row.  He's the only guy in the back row.

5   Q   Yeah, I can even see that.

6                   And what's his relationship to your family?

7   A   He's my mother's boyfriend.

8   Q   Okay.  I guess that makes him a handy man.  He does some

9       work around the house sometimes?

10  A   He better, if he want to still stay there.

11  Q   All right.  Did you have any clothing upstairs?

12  A   No.

13  Q   What size shoe do you wear?  You look like you've got big

14      feet.

15  A   11.

16  Q   They not that big.  11?

17  A   Okay.

18  Q   And your pant size?

19  A   44.

20  Q   44?

21  A   Yes.

22  Q   And your shirt size?

23  A   5X.

24  Q   5X.  If I looked in that collar right now, I'll see a 5X?

25  A   Yes, sir.

83

```
 1   Q   5X large.  You're not even helping yourself out.  It says
 2       5X large; is that right?
 3   A   Yes, sir.
 4   Q   So you've been locked up for a while, right?
 5   A   Yes.
 6   Q   We got a judge.  We don't have a jury.  You've been locked
 7       up for a while.  You didn't get fat on the prison food did
 8       you -- or jail food, did you?
 9   A   No, sir, they didn't feed us enough.
10   Q   Whose dope is it?
11   A   I don't know.
12   Q   Is it your dope?
13   A   No, sir.
14   Q   Is it your guns?
15   A   No, sir.
16   Q   What were you doing with your life on November 2nd, 2011?
17       What were you doing with your life?  If Judge Hathaway had
18       to get a synopsis of what you were doing with your life,
19       what were you doing with your life?
20   A   I was working.  I was taking care of my family.
21                  MR. PAIGE:   Nothing further.
22                  THE COURT:   All right.  Thank you.
23                  Cross-examine.
24                  MS. ZEIGER:   Thank you.
25                        CROSS-EXAMINATION
```

84

1   BY MS. ZEIGER:

2   Q   Good afternoon, Mr. Chancellor.

3   A   Good afternoon.

4   Q   When did you start working at G and G Market?

5   A   I'd say around the summertime of 2011.

6   Q   And did you have to get that job as a condition of your

7       parole?

8   A   Yes.  I had to maintain a job, yes.

9   Q   Okay.  And you had to prove to Agent Izumi that you have a

10      job, correct?

11  A   Yes.

12  Q   A legitimate job?

13  A   Yes.

14  Q   How much money did you make an hour?

15  A   Like $7.50.

16  Q   How many hours did you work a week?

17  A   It varies.

18  Q   Give me a range.

19  A   Like a week probably thirty five; forty hours.

20  Q   You get taxes taken out or is it under the table?

21  A   It's under the table.

22  Q   Does your wife work, Katrice?

23  A   Yes.

24  Q   What does she do?

25  A   She worked at -- what's the clothing store name?   Forman

85

1       Mills.  But right now she work at Family Dollar.

2  Q    When did she work at Forman Mills?

3  A    This was, like, when I first came home.

4  Q    When was that?

5  A    2010, December 2010.

6  Q    How long did she -- when did she stop working at Forman

7       Mills?

8  A    She stopped working there about I'd say February.  She got

9       pregnant so she stopped working.

10  Q    February of 2011?

11  A    Yes.

12  Q    When was your son born?

13  A    My son was born in August, August 25th.

14  Q    Of 2011?

15  A    Yes.

16  Q    Okay.  When did she go to work at the Family Dollar?

17  A    Last year sometime.

18  Q    So since you've been in?

19  A    No, it was right before I got locked up.

20  Q    Are those Cartiers that you're wearing?

21  A    Yes.

22  Q    How expensive are those glasses?

23  A    About $300.00, $400.00.

24  Q    Okay.  Your address 9209 Robson is Robson R-O-B-S-O-N?

25  A    Yes.

86

1    Q    How long have you owned that house?

2    A    I was incarcerated when I bought that house.

3    Q    You were incarcerated when you bought that house?

4    A    Yes.

5    Q    Okay.  Did they bring the documents to you in jail to have

6         you sign?

7    A    No. I went through another person.  She bought the house,

8         and it was mine.

9    Q    Is the house legally deeded in your name?

10   A    Yes.

11   Q    Okay.  When did that happen?

12   A    Like November of 2010 right before I got out.  Right before

13        I was to get out.

14   Q    Okay.  So right when you got out, you had a home to live

15        in?

16   A    I didn't have no lights.

17   Q    Okay.  When did you get lights?

18   A    January of 2011.

19   Q    All right.  Fair to say that Agent Izumi came out July 19th

20        2011 and you represented your mom's house as your house;

21        isn't that correct?

22   A    Yes.

23   Q    Okay.  Did you have lights at the Robson address then?

24   A    Yes.

25   Q    Okay.  When you didn't have lights, where were you living

87

| | | |
|---|---|---|
| 1 | | at? |
| 2 | A | I was staying with my mother. |
| 3 | Q | How long did you not have lights for? |
| 4 | A | I came home in December.  The next month I had lights. |
| 5 | Q | Was Katrice staying with you then, also? |
| 6 | A | On Robson? |
| 7 | Q | No, at your mom's house when you first came out? |
| 8 | A | No. |
| 9 | Q | How long have you and Katrice been married? |
| 10 | A | Since 2008.  I got married when I was incarcerated. |
| 11 | Q | Okay.  And Agent Izumi she was back out there in March |
| 12 | | of 2012, as well, too, correct? |
| 13 | A | Yes. |
| 14 | Q | And you were there? |
| 15 | A | Yes. |
| 16 | Q | And you represented that home to her, again, as your home? |
| 17 | A | Yes. |
| 18 | Q | Were you embarrassed of your Robson house? |
| 19 | A | No. |
| 20 | Q | Were you hiding that house from her? |
| 21 | A | No. |
| 22 | Q | Why were you lying to her? |
| 23 | A | Because I worked -- my job is closer to my mother's house. |
| 24 | | If I would have told her I had a different address, she |
| 25 | | would have switched offices and it would have made me go way |

88

```
 1        on Eight Mile to report when it's out the way of my job.

 2   Q    So the whole reason why you were lying was that you could

 3        stay at the office where Agent Izumi is?

 4   A    Yes.  Because the parole office is right down the street

 5        from my job.

 6   Q    Where is the G and G Market?

 7   A    On Eleven and Warren.

 8   Q    And it's fair to say that lying to your parole agent is a

 9        violation of your parole about where you're living?

10   A    Yes.

11   Q    Okay.  Now you said that on 11 -- on November 2nd, 2011 you

12        were working between 8:00 and 4:00, 8:00 and 5:00, correct?

13   A    Yes.

14   Q    Okay.  But you were not present at your mom's house when

15        the search warrant was executed?

16   A    No, sir -- no, ma'am.

17   Q    It's okay.  You received a phone call from a police officer

18        that day, didn't you?

19   A    No.

20   Q    No.  You never talked to officer Geelhood?

21   A    No.

22   Q    What were you doing on November 1st, 2011?  Do you

23        remember?

24   A    No, ma'am.

25   Q    Mr. Durhall (ph.) does he also live down the street?
```

89

1       Does he have an address down the street of 4981 32nd

2       Street?

3  A   No, not to my knowledge.

4  Q   No, okay.  How long have he and your mom been boyfriend and

5       girlfriend?

6  A   For a long time.

7  Q   Your brother Antonio Chancellor how old is he?

8  A   He's 36 -- 37.

9  Q   Your cousin Willie how old is he?

10  A   He's 34.

11  Q   And you're testifying that they all stay with your mom?

12  A   Yes.

13  Q   What's your sister's name?

14  A   Crystal Chancellor.

15  Q   Now, can you stand up for me so that I can see your

16       clothing.  It's fair to say that you're clothing is a

17       little bit baggie, correct?

18  A   Yes.

19  Q   What was that?

20  A   Yes.

21  Q   Yes, it is baggie.

22  A   Yes.

23  Q   Okay.  And you can sit down.  Thank you.

24           And you have access to snacks and things of that

25       nature in the jail, correct?

90

1   A    What at Dickerson?

2   Q    Dickerson.

3   A    Yes.

4   Q    Okay.

5                    MS. ZEIGER:   Nothing further, your Honor.

6                    THE COURT:   All right.

7                    MR. PAIGE:   No further questions.

8                    THE COURT:   Thank you, Mr. Chancellor.   You're

9   all set.   Step down, sir.

10                    All right.   Any additional witnesses or evidence

11   on behalf of defense?

12                    MS. ZEIGER:   Not on behalf of the People, your

13   Honor.

14                    MR. PAIGE:   Neither on behalf of the defense.

15                    THE COURT:   Okay.   So at this point, the defense

16   rest?

17                    MR. PAIGE:   Yes, your Honor.

18                    THE COURT:   All right.   Defense rest.   So do you

19   want to make a closing argument at this time?   The reason

20   I'm bringing that up is I'm not going to be prepared to

21   make a decision on this case today.   Because I want to give

22   some thought to the evidence that's been presented.   I

23   don't want to rush it.   I want to give some thought to

24   this.   So I'm saying that because I'm happy to have closing

25   arguments now, and then have you come back in the morning,

91

1    and I'll deliberate and make a decision.   Or, if you

2    prefer, you can come first thing in the morning and do

3    closing, and then I'll deliberate at that time, as well.

4              MS. ZEIGER:   Is there any way that we can come at

5    like 8:30?  I have to be at the airport at 11:00, and I

6    have a motion in front of Judge Bill with Danny Blanc that

7    I'm going to try and get done between --

8              MR. PAIGE:   Will you be here Monday?

9              MS. ZEIGER:   Yes, I will be here Monday.

10             THE COURT:   Do you want to just do it Monday

11   morning?

12             MR. PAIGE:   Yes.

13             MS. ZEIGER:   You want to do it Monday morning?

14             MR. PAIGE:   Yes, your Honor, yes.

15             THE COURT:   Because 8:30 does present a problem

16   for us.

17             MS. ZEIGER:   I understand.

18             THE COURT:   We're trying to get our Friday

19   docket put together --

20             MS. ZEIGER:   Gotcha.

21             THE COURT:   -- and when we do that, it makes it

22   more difficult on everybody.

23             MS. ZEIGER:   Just knowing that I'm with Mr. Blanc

24   I know that it's going to be a lengthy motion.

25             THE COURT:   Yeah.  So let's plan on 9:00 a.m. --

92

```
 1              MS. ZEIGER:  Okay.
 2              THE COURT:   -- Monday morning.  We'll get
 3    finished up.  We'll have closing argument, and then I'll
 4    deliberate at that time.
 5              MS. ZEIGER:  Thank you, your Honor.
 6              MR. PAIGE:   Thank you, your Honor.
 7              MS. ZEIGER:  Your Honor, would you want me to
 8    bring any of the guns and the drugs?
 9              THE COURT:   Leave the guns and the cocaine.
10              MS. ZEIGER:  Okay.  I'll keep the paper documents
11    with me.
12              THE COURT:   Right.
13              MS. ZEIGER:  Okay.  Sounds good.
14              THE COURT:   Just make sure you bring them back
15    --
16              MS. ZEIGER:  Will do.
17              THE COURT:   -- so that I'll have them when I
18    deliberate.
19              MS. ZEIGER:  Will do.  I'll make sure I do that.
20              (Matter adjourned)
21              ---      ---      ---
22
23
24
25
```

93

CERTIFICATE OF COURT REPORTER

I certify that this transcript, consisting of
94 pages, is a complete, true, and correct transcript of the
proceedings and testimony taken in this case on Thursday,
November 8, 2012.


ZELDA HARRIS RELEFORD, CSR 4897
Official Court Reporter

94

# EXHIBIT 6H

## Chancellor Letter to Judge Hathaway

Dear Honorable Judge D Hathaway

My name is _____ _____. I had trial November 8 in front of you case #2012701846. I didn't want a jury trial because I'm fighting for my life, and _____ _____ in the court room know the laws and can read the facts better then you. I been locked up 6 months for something I know nothing about. Me and my wife had my first baby I missed his first birthday and its killing me. I know what I'm about to say you hear it all the time, but the police got the wrong person you will see that by the discription they got do not match me at all. I know I'm facing alot of time if I got found guilty so please believe me if I did or knew anything I wouldn't be taking this chance of trial. The evidence and the facts will show that I haven't did anything.

P.S
Thank You Kindly For Your Time

# EXHIBIT 6I

## Chancellor Commitment to Department of Corrections

Approved, SCAO    Original – Court

1st copy – Corrections
2nd copy – Corrections (for return
3rd copy – Michigan State Police CJIC

4th copy – Defendant
5th copy – Prosecutor
6th copy – Cashier

| STATE OF MICHIGAN THIRD JUDICIAL CIRCUIT WAYNE COUNTY | JUDGMENT OF SENTENCE COMMITMENT TO DEPARTMENT OF CORRECTIONS ☐ Amended | CASE NO. 12-004974-01-FH |
|---|---|---|

**ORI MI –** 821095J **Court Address** 1441 St. Antoine, Detroit, MI 48226   **Courtroom** 604*   **Court Telephone No.** 313-224-2441
Police Report No.

THE PEOPLE OF THE STATE OF MICHIGAN

v

Defendant name, address, and telephone no.
Darell Chancellor    12 - 10620
Alias(es) -                    DIV-III  35/588    B/M

| CTN/TCN 12701246-01 | SID 2082932H | DOB 12/07/1981 |
|---|---|---|

| Prosecuting attorney name Stephanie L. Zeiger | Bar no. 66019 | Defendant attorney name Ray A. Paige | Bar no. 41848 |
|---|---|---|---|

**THE COURT FINDS:**

1. The defendant was found guilty on 11/12/2012    of the crime(s) stated below:

| Count | CONVICTED BY | | | DISMISSED BY* | CRIME | CHARGE CODE (S) MCL citation/PACC Code |
|---|---|---|---|---|---|---|
| | Plea* | Court | Jury | | | |
| 1 | | 0 | | | POSS NARC 450-999 G ENH SENT 4 OFF | 333.74032A2 769.12 |

*For plea: insert "G" for guilty plea, "NC" for nolo contendere, or "MI" for guilty but mentally ill, For dismissal; insert "D" for dismissed by court or "NP" for dismissed by prosecutor/plaintiff.

☐ 2. The conviction is reportable to the Secretary of State under MCL 257.625(21)(b).
☐ 3. HIV testing and sex offender registration is completed.        Defendant's driver license number
☐ 4. The defendant has been fingerprinted according to MCL 28.243.

**IT IS ORDERED:**

☐ 5. Probation is revoked.
6. Participating in a special alternative incarceration unit is        ☐ prohibited.    ☐ permitted.
7. Defendant is sentenced to custody of Michigan Department of Corrections. This sentence shall be executed immediately.

| Count | SENTENCE DATE | MINIMUM | | MAXIMUM | | DATE SENTENCE BEGINS | JAIL CREDIT | | OTHER INFORMATION |
|---|---|---|---|---|---|---|---|---|---|
| | | Years | Mos. | Days | Years | Mos. | | Mos. | Days |
| 1 | 12/12/2012 | 14 | 3 | 0 | 30 | 0 | 12/12/2012 | 0 | 0 | |

☒ 8. Sentence(s) to be served consecutively to: (if this item is not checked, the sentence is concurrent)
☐ each other.    ☒ case numbers    PAROLE.

9. Defendant shall pay as follows:

| State Minimum | Crime Victim | Restitution | Court Costs | Attorney Fees | Fine | Other Costs | Total |
|---|---|---|---|---|---|---|---|
| $ 68.00 x 1=68 | $ 130 | $ 0 | $ 600 | $ 0 | $ 0 | $ 0 | $ 798 |

The due date for payment is    at sentencing    . Fine, costs, and fees not paid within 56 days of the due date are subject to a 20% late penalty on the amount owed.

10. The concealed weapon board shall    suspend for _____ days    permanently revoke    the concealed
weapon license, permit number _____    issued by _____    County.
☐ 11. The defendant is subject to lifetime monitoring pursuant to MCL 750.520n.
12. Court recommendation:

12/12/2012                                                                                                        P48434
**Date**                        Judge        Hon Daniel A. Hathaway                            **Bar no.**

I certify that this is a correct and complete abstract from the original court records. The sheriff shall, without needless delay, deliver defendant to the Michigan Department of Corrections at a place designated by the department.

(SEAL)                                                    _____
                                            Deputy court clerk

MCL 765.15(2), MCL 769.1k, MCL 769.16a, MCL 775.22,

CC 219b-3CC – (4/2009) JUDGMENT OF SENTENCE, COMMITMENT TO DEPARTMENT OF CORRECTIONS        MCL 780.766 MCR 6.427

# EXHIBIT 6J

## Claim of Appeal and Order Appointing Counsel

36336370.7/022765.00213

| STATE OF MICHIGAN<br>3rd JUDICIAL CIRCUIT<br>WAYNE COUNTY | CLAIM OF APPEAL AND<br>ORDER APPOINTING COUNSEL | CASE NO. AND SUFFIX<br>12-4974                    01 |
|---|---|---|

Court Address
1441 ST. ANTOINE, ROOM 917  DETROIT, MI  48226

Court Telephone No.
(313) 224-6222

**People of THE STATE OF MICHIGAN**

V

| Defendant Name, Last | First | Middle |
|---|---|---|
| CHANCELLOR | DARELL | DEON |

Date of Birth, address, Inmate Number (if known)
CHARLES EGELER RECEPTION & GUIDANCE CENTER          12/07/1981
3855 COOPER STREET                                                      351588

JACKSON, MI  49201-7518

| | | Terms of Incarceration | | | | | | | | | | Intermediate Sanctions | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Offense Information | | | | | | | Minimum | | | Maximum | | | | Probation | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Description | PACC Code | H | C | A | S | Y | M | D | Y | M | D | K | P | J | Y | M | D | R | F | O |
| | CON SUB/POSS. NARC/COCAI | 333.74032A2 | 4 | | | | 14 | 3 | | 30 | | | X | X | | | | | | | |

H=Habitual C=Conspiracy A=Attempt S=Solicitation Y=Year M=Month D=Day K=Consecutive P=Prison J=Jail R=Restitution F=Fine O=Other

The defendant claims an appeal from a final judgment or order entered on 12/12/2012 in the 3rd Circuit Court, WAYNE COUNTY, Michigan by Judge DANIEL A. HATHAWAY 48434.  Copies of the final judgment or order being appealed and docket entries are attached for the Court of Appeals, appointed counsel, and Michigan Appellate Assigned Counsel System.

On 01/02/2013 the defendant filed a request for appointment of counsel and a declaration of indigency.
IT IS ORDERED:

STATE APPELLATE DEFENDER OFFICE                          645 GRISWOLD, PENOBSCOT BLDG. SUITE 3300
Name of Appellate Counsel                                            Address
DETROIT, MI  48226                              313-256-9833                                   1
City, State, Zip                                       Telephone No.                          Bar No.

Is appointed counsel for the defendant in post-conviction proceedings.  If appointed counsel can not or will not accept this appointment, he/she shall notify the court immediately.

The court reporter(s)/recorder(s) shall file with the trial court clerk the transcripts checked below and any other transcripts requested by counsel in this case not previously transcribed.  Transcripts shall be filed within 28 days for pleas or 91 days for trials from the date ordered or requested [MCR7.210(B)].  Reporter(s)/recorder(s) shall be paid as provided by law.

| Transcripts Ordered | | | Previously Ordered | Filed | Number | Date(s) of Proceeding |
|---|---|---|---|---|---|---|
| SENTENCE | GARY COURY | | | | | 12/12/2012 |
| BENCH OR WAIVER TRIAL | GARY COURY | | | | | 11/12/2012 |
| BENCH OR WAIVER TRIAL | ZELDA HARRIS-RELEFORD | | | | | 11/08/2012 |
| BENCH OR WAIVER TRIAL | GARY COURY | | | | | 10/30/2012 |

The clerk shall immediately send to counsel a copy of the transcripts ordered above or requested by counsel as they become available.
The clerk shall forward documents upon request by counsel [MCR 6.433].

Date                    VIRGIL SMITH                                                      20714
                          Judge                                                                Bar No.

**CERTIFICATE OF MAILING**

I certify that on this date I mailed a copy of this claim of appeal to appointed counsel, defendant, court reporter(s)/recorder(s), prosecutor, Court of Appeals, and Michigan Appellate Assigned Counsel System (MAACS).  I also mailed a copy of the final judgment or order being appealed and the docket entries to appointed counsel, the Court of Appeals, and MAACS.  I also mailed a copy of the defendant's request for appointment of counsel to appointed counsel, the prosecutor, and MAACS.

1/18/2013
Date                    Signature

CC403 (12/96)                                    Page 1 of 1

**EXHIBIT 6K**

**Court of Appeals Docket Sheet**

36336370.7/022765.00213

COA 314437
MSC 150944

PEOPLE OF MI V DARELL CHANCELLOR

Lower Court/Tribunal
WAYNE CIRCUIT COURT
Judge(s)
HATHAWAY DANIEL A

 Docket    Case Documents

# Case Information                                        ✕

## Case Header

Case Status

Case Number

| COA #314437 | MSC #150944 |

**Case Status**

**MSC**    Closed

**COA**    Case Concluded; File Archived

# Parties & Attorneys to the Case – Court of Appeals

### 1

## PEOPLE OF MI
Plaintiff - Appellee

Attorney(s)

**STEER VALERIE M**
#38489, Prosecutor

---

### 2

## CHANCELLOR DARELL
Defendant - Appellant

Attorney(s)

**PAGAC CHRISTINE A**
#67095, State Appellate Defender

# Parties & Attorneys to the Case – Supreme Court

### 1

## PEOPLE OF MI
Plaintiff

Attorney(s)

Valerie M Steer
#38489

---

### 2

## CHANCELLOR DARELL

Defendant

Attorney(s)
Christine A. Pagac
#67095

[ **COLLAPSE ALL** ]  EXPAND ALL

---

01/23/2013    1  Claim of Appeal - Criminal    ✕

Attorney
STATE APPELLATE DEFENDER
#1284

Service Date
01/18/2013

Fee Code
Prisoner Indigent

---

12/12/2012    2  Order Appealed From    ✕

Trial Court
WAYNE CIRCUIT COURT

Case Number
12-004974-FH

Trial Court Judge
HATHAWAY DANIEL A
#48434

Nature Of Case
Control Subs - PWID
Habitual Offender 3rd or Higher

Comments
Cir Ct #12-004974-01-FH

01/23/2013    3   Transcript Ordered By Trial Court     ✕

Document Date
01/18/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
12/12/2012
11/12/2012
10/30/2012

Comments
Please see evt 1 for scanned document

01/26/2013    4   Steno Certificate - Tr Request Received     ✕

Document Date
01/18/2013

Reporter
RELEFORD ZELDA H #4897

Timely
Yes

Hearing Dates
11/08/2012

02/05/2013    5   Invol Dismissal Warning - No Steno Cert     ✕

Attorney
STATE APPELLATE DEFENDER
#1284

Related Reporters

COURY GARY #3827

Related Events
3. Transcript Ordered By Trial Court

Due Date
02/26/2013

Comments
No Steno Cert for Transcripts in Event 3

| 02/06/2013 | 6 Steno Certificate - Tr Request Received | ✕ |
| --- | --- | --- |

Document Date
01/18/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
11/08/2012
11/12/2012
12/12/2012

| 02/06/2013 | 7 Transcript Not Taken By Steno | ✕ |
| --- | --- | --- |

Document Date
02/04/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
10/30/2012

02/11/2013    8  Transcript Ordered By Trial Court    ✕

Document Date
02/06/2013

Reporter
ABDULLAH WYLENE N #3400

Timely
Yes

Hearing Dates
10/30/2012

Comments
Amended - correct court reporter

02/11/2013    9  Correspondence Received    ✕

Party
2. CHANCELLOR DARELL

Attorney
SACKS JONATHAN R
#67389

Service Date
02/08/2013

Comments
Aty reqst trs 5/29/12; 8/17/12; 8/20/12 & 10/9/12

02/11/2013    10  Correspondence Received    ✕

Party
2. CHANCELLOR DARELL

Attorney
SACKS JONATHAN R
#67389

**Service Date**
02/08/2013

**Comments**
Reqst steno cert from reporter Abdullah

---

02/12/2013    1 1   Steno Certificate - Tr Request Received      ✕

---

**Document Date**
02/06/2013

**Reporter**
ABDULLAH WYLENE N #3400

**Timely**
Yes

**Hearing Dates**
10/30/2012

---

02/19/2013    1 2   Transcript Ordered By Trial Court      ✕

---

**Document Date**
02/14/2013

**Reporter**
COURY GARY #3827

**Timely**
Yes

**Hearing Dates**
10/09/2012
08/20/2012
08/17/2012
05/29/2012

---

02/20/2013    1 3   Notice Of Filing Transcript      ✕

---

Document Date

02/19/2013

Reporter
ABDULLAH WYLENE N #3400

Timely
Yes

Hearing Dates
10/30/2012

03/14/2013    14  Notice Of Filing Transcript                                    ✕

Document Date
03/13/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
12/12/2012
11/12/2012

04/22/2013    15  Notice Of Filing Transcript                                    ✕

Document Date
04/19/2013

Reporter
RELEFORD ZELDA H #4897

Timely
Yes

Hearing Dates
11/08/2012

04/23/2013    1 6  Transcript Overdue - Notice to Reporter    ✕

Reporter
COURY GARY #3827

Comments
Hearing Date 11/8/12 (Docket Event 6)

04/26/2013    1 7  Steno Certificate - Tr Request Received    ✕

Document Date
02/14/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
10/09/2012
08/20/2012
08/17/2012
05/29/2012

05/07/2013    1 8  Telephone Contact    ✕

Reporter
COURY GARY #3827

Comments
Per Rptr Coury; He Erroneously Listed 11/8/12 Hrng on his Steno Cert - Will Fax an Amd Steno Cert

05/07/2013    1 9  Transcript Not Taken By Steno    ✕

Document Date
05/07/2013

Reporter
COURY GARY #3827

Hearing Dates
11/08/2012

Comments
See T/C in Event 18

05/28/2013    20 Notice Of Filing Transcript                                    ✕

Document Date
05/22/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
10/09/2012

05/28/2013    21 Notice Of Filing Transcript                                    ✕

Document Date
05/22/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
05/29/2012
08/17/2012
08/20/2012

07/16/2013    22 Motion: Extend Time - Appellant                               ✕

**Party**

2. CHANCELLOR DARELL

**Attorney**

PAGAC CHRISTINE A
#67095

**Service Date**

07/16/2013

**Answer Due**

07/23/2013

**Fee Code**

Prisoner Indigent

**Requested Extension**

09/10/2013

---

| 07/23/2013 | 2 3 | Submitted on Administrative Motion Docket | ✕ |

**Submitted Events**

22. Motion: Extend Time - Appellant

---

| 07/25/2013 | 2 4 | Order: Extend Time - Appellant Brief - Grant | ✕ |

**Related Events**

22. Motion: Extend Time - Appellant

**Panel**

Gleicher Elizabeth L.

**Attorney**

PAGAC CHRISTINE A
#67095

**Amount**

$0.00

Extend To
09/10/2013

VIEW ORDER →

| 09/10/2013 | 25 Motion: Extend Time - Appellant | ✕ |

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
09/10/2013

Answer Due
09/17/2013

Fee Code
Prisoner Indigent

Requested Extension
10/08/2013

Comments
Extraordinary extension

| 09/17/2013 | 26 Submitted on Administrative Motion Docket | ✕ |

Submitted Events
25. Motion: Extend Time - Appellant

| 09/18/2013 | 27 Order: Extend Time - Appellant Brief - Grant with Invol Warning | ✕ |

Related Events
25. Motion: Extend Time - Appellant

Panel

Gleicher Elizabeth L.

Attorney
PAGAC CHRISTINE A
#67095

Amount
$0.00

Extend To
10/08/2013

Comments
Clerk shall place matter on invl dsmsl dkt w/o furtr notice to ptys if AT brf not fl'd by 10/8/13

**VIEW ORDER →**

| 10/08/2013 | 2 8 Brief: Appellant | ✕ |

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
10/08/2013

Oral Argument Requested
Yes

Joint Parties

Timely
Yes

| 11/13/2013 | 2 9 Noticed | ✕ |

Date Sent
11/18/2013

| 12/05/2013 | 3 0 Stipulation: Extend Time - AE Brief | ✕ |

Party
1. PEOPLE OF MI

Attorney
STEER VALERIE M
#38489

Extend To
12/10/2013

| 12/11/2013 | 3 1 Record Request | ✕ |

Date Sent
12/11/2013

Agency
WAYNE CIRCUIT COURT

| 12/12/2013 | 3 2 Record Filed | ✕ |

Comments
file;trs(8)

| 02/13/2014 | 3 4 Prosecutor Advisory - No Brief | ✕ |

Attorney
WAYNE COUNTY PROSECUTOR
#1182

| 02/20/2014 | 37 | Brief: Appellee | ✕ |

**Party**
1. PEOPLE OF MI

**Attorney**
STEER VALERIE M
#38489

**Service Date**
02/20/2014

**Joint Parties**

**Timely**
No

| 04/16/2014 | 46 | Motion: Extend Time - Standard 4 - Appointed Attorney | ✕ |

**Party**
2. CHANCELLOR DARELL

**Attorney**
PAGAC CHRISTINE A
#67095

**Service Date**
04/16/2014

**Answer Due**
04/23/2014

**Fee Code**
Prisoner Indigent

**Comments**
Brief filed w/motion

| 04/16/2014 | 47 | Submitted on Motion Docket Affecting Call | ✕ |

Submitted Events

46. Motion: Extend Time - Standard 4 - Appointed Attorney

| 04/16/2014 | 5 1 Brief: Standard 4 | ✕ |

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
04/16/2014

Joint Parties

Comments
Allowed per 4/17/14; Brf attached to motion

| 04/17/2014 | 4 9 Order: Extend Time - Standard 4 - Grant | ✕ |

Related Events
46. Motion: Extend Time - Standard 4 - Appointed Attorney

Panel
Murray Christopher M.
Jansen Kathleen
Shapiro Douglas B.

Attorney
PAGAC CHRISTINE A
#67095

Amount
$0.00

Comments
Responsive brf may be filed by 5/1/14

VIEW ORDER →

| 04/17/2014 | 5 0 Verbal Order to Parties-Phone | ✕ |

Comments
Read content of order to aty Steer and secretary to aty Pagac

| 05/07/2014 | 4 4 Submitted on Case Call | ✕ |

| 05/07/2014 | 5 2 Oral Argument Audio | ✕ |

| 08/15/2014 | 5 3 Telephone Contact | ✕ |

Comments
W:joycelynn sharpe@wcc req peo's exh 6

| 08/19/2014 | 5 4 Material Received by Record Room | ✕ |

Comments
exh(6)

| 09/30/2014 | 6 3 Opinion - Per Curiam - Unpublished | ✕ |

Result
L/Ct Judgment/Order Affirmed

Panel
Murray Christopher M.
Jansen Kathleen
Shapiro Douglas B.

Pages

3

<div style="border:1px solid #b33; display:inline-block; padding:8px 16px;">READ OPINION →</div>

| 09/30/2014 | 6 4 Opinion - Dissent | ✕ |

Author

Shapiro Douglas B.

Pages

5

<div style="border:1px solid #b33; display:inline-block; padding:8px 16px;">READ OPINION →</div>

| 10/21/2014 | 6 5 Motion: Reconsideration of Opinion | ✕ |

Party

2. CHANCELLOR DARELL

Attorney

PAGAC CHRISTINE A
#67095

Service Date

10/21/2014

Answer Due

11/04/2014

Fee Code

Prisoner Indigent

| 11/18/2014 | 6 6 Submitted on Reconsideration Docket | ✕ |

Submitted Events

65. Motion: Reconsideration of Opinion

| 12/04/2014 | 6 7 | Order: Reconsideration – Grant – Vacate Opinion | ✕ |

**Related Events**
65. Motion: Reconsideration of Opinion

**Panel**
Murray Christopher M.
Jansen Kathleen
Shapiro Douglas B.

**Attorney**
PAGAC CHRISTINE A
#67095

**Amount**
$0.00

**Comments**
A new opinion is attached to order

**VIEW ORDER →**

| 12/04/2014 | 6 8 | Opinion – On Reconsideration – Per Curiam – Unpublished | ✕ |

**Result**
L/Ct Judgment/Order Affirmed

**Panel**
Murray Christopher M.
Jansen Kathleen
Shapiro Douglas B.

**Pages**
3

**READ OPINION →**

| 12/04/2014 | 6 9 | Opinion – Dissent | ✕ |

**Author**

Shapiro Douglas B.

Pages
5

<div style="border:1px solid">READ OPINION →</div>

---

01/29/2015    7 0   Application for Leave to SCt    ✕

Supreme Court Number
150944

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

---

01/29/2015    7 1   Supreme Court Motion: Miscellaneous    ✕

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Comments
to file pro per supplement; supplement attached

---

02/19/2015    7 2   Supreme Court - File & Record Sent To    ✕

Comments
sc#150944 lcf;8 tr;env(exh)

---

02/20/2015    7 3   COA and TCt Received    ✕

8 tr; 1 exh; 1 files;

03/13/2015     7 4   Supreme Court: Answer - SCt Application/Complaint     ✕

Party
1

Attorney
STEER VALERIE M
#38489

05/28/2015     7 5   Supreme Court Order: Deny Application/Complaint     ✕

Comments
Grant motion to file pro per supplement.

VIEW ORDER →

06/04/2015     7 6   File Closed-Out     ✕

**EXHIBIT 6L**

**Decision of the Michigan Court of Appeals**

36336370.7/022765.00213

# Court of Appeals, State of Michigan

## ORDER

People of MI v Darell Chancellor

Docket No.    314437

LC No.    12-004974-FH

Christopher M. Murray
Presiding Judge

Kathleen Jansen

Douglas B. Shapiro
Judges

The Court orders that the motion for reconsideration is GRANTED, and this Court's opinion issued September 30, 2014 is hereby VACATED. A new opinion is attached to this order.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

DEC 0 4 2014

Date

Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DARELL CHANCELLOR,

      Defendant-Appellant.

UNPUBLISHED
December 4, 2014

No. 314437
Wayne Circuit Court
LC No. 12-004974-FH

---

## ON RECONSIDERATION

Before: MURRAY, P.J., and JANSEN and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his conviction after a bench trial of possession of 450 to 999 grams of cocaine, MCL 333.7403(2)(a)(ii). The trial court sentenced defendant, as a fourth habitual offender, MCL 769.12, to a term of 14 years and 3 months to 30 years' imprisonment.[1] We affirm.

This case arises out of a search of a house and seizure of 516.65 grams of cocaine. On November 1, 2011, Detroit police surveilled a house at 5023 32nd Street during which Officer Steven Geelhood observed a black male engage in three independent hand-to-hand transactions of suspected drugs at the front door of the house. The next day, police executed a search warrant. Upon searching a second-floor kitchen area, police found a bag containing four smaller bags of cocaine and two loaded handguns. The items were inside a clothes hamper that was tucked under a kitchen table. On top of the kitchen table, police found an open letter sent from the Michigan Department of Treasury and addressed to defendant at 5023 32nd Street. Police detained defendant's mother and a man during the search. Defendant was not then present at the house, but was later arrested.

---

[1] Defendant was also charged with possession with intent to deliver 450 to 999 grams of cocaine, MCL 333.7401(2)(a)(ii), felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, but was acquitted of those other charges.

13-53846-tjt   Doc 13691-1   Filed 04/28/23   Entered 04/28/23 09:24:05   Page 126 of 133

Defendant raises a single issue on appeal, arguing that there was insufficient evidence presented at trial to support his conviction of possessing cocaine under a constructive possession theory. When reviewing a claim of insufficient evidence, this Court reviews the record de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We review the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

Possession of a controlled substance requires a showing of "dominion or right of control over the drug with knowledge of its presence and character." *People v Meshell*, 265 Mich App 616, 621; 696 NW2d 754 (2005), quoting *People v Nunez*, 242 Mich App 610, 615; 619 NW2d 550 (2000), in turn quoting *People v Maliskey*, 77 Mich App 444, 453; 258 NW2d 512 (1977). Possession can be actual or constructive. *People v Wolfe*, 440 Mich 508, 520; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Constructive possession exists when the totality of the circumstances indicates a sufficient nexus between the defendant and the controlled substance. *Id*. at 521; see also, *People v Konrad*, 449 Mich 263, 271; 536 NW2d 517 (1995), citing *People v Germaine*, 234 Mich 623, 627; 208 NW 705 (1926) (analyzing whether the defendant had sufficient dominion or control to support a conviction based on constructive possession). By itself, a defendant's presence at a location where drugs are found is insufficient to establish possession. *Wolfe*, 440 Mich at 520.

Defendant contends that he was not the person police observed during the surveillance and that he did not live at 5023 32nd Street at the time of the search. But viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that defendant constructively possessed the seized cocaine. Officer Geelhood testified at trial that he was "[a]bsolutely" certain defendant was the person he saw involved in the suspected drug transactions at the front door of the house. Although defendant argues that he is the victim of mistaken identity – citing his heavier weight at the time of trial and reliance on prescription glasses – Officer Geelhood testified that he had a clear view of defendant during the surveillance. The prosecution also introduced as a trial exhibit a Secretary of State document depicting defendant as thinner and not wearing glasses. The trial court found Officer Geelhood's testimony concerning his identification of defendant to be reliable, and those questions of credibility are left to the trier of fact to resolve. *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009).

Also, police found the cocaine in the second-floor living quarters, and sufficient evidence suggested defendant occupied or had control over that area. The cocaine was in a clothes hamper that held male clothing, and police seized the letter addressed to defendant from the table under which the cocaine was found. Additionally, defendant's parole agent, Cyndi Izumi, testified that she visited defendant at 5023 32nd Street and that defendant told her he lived there. Indeed, defendant admitted that he told Izumi that he lived at the house and that he had, in fact, lived there for a time. The Secretary of State document listed defendant's address as 5023 32nd Street, and Officer Geelhood testified that during the search, defendant's mother directed him to a second residence where he could find defendant. Officer Geelhood went there and observed a vehicle that had been parked in front of 5023 32nd Street during the surveillance.

On this record, there was sufficient evidence to link defendant to both the house (through identification of him as the person involved in the front-door transactions and his admission that he at times lived there)[2] and that he had control over the area where police found the cocaine (through the evidence of the mail and clothing). Though there was no direct evidence that defendant actually possessed the drugs found inside the house (though there certainly was direct evidence of him possessing drugs at the front door), circumstantial evidence and the reasonable inferences that arise from the evidence can constitute satisfactory proof of the elements of a crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). And, all conflicts in the evidence must be resolved in favor of the prosecution. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). The prosecution was not required to show that defendant was the only person with access to or control over the cocaine. Possession may be joint, with more than one person actually or constructively possessing a controlled substance. *Konrad*, 449 Mich at 271, citing *Wolfe*, 440 Mich at 520. Under these circumstances, there was sufficient evidence of the required nexus between defendant and the cocaine to reasonably find constructive possession beyond a reasonable doubt.[3]

Our dissenting colleague argues that the trial court's factual findings were not sufficient to support defendant's conviction. Defendant, however, does not argue or raise this issue in his counsel's brief nor in his own Standard 4 brief. Therefore, it is not an issue properly before us. In any event, "[a]lthough the circuit court's findings were brief, they established that it was aware of the relevant issues in the case and correctly applied the law . . . ." *People v Smith*, 211 Mich App 233, 235; 535 NW2d 248 (1995). See, also, MCR 6.403 and MCR 2.517(A)(2). The main issue was whether defendant could be connected to the cocaine—and the trial court made findings that (1) defendant resided at the house and (2) defendant's residence was "upstairs" (where the cocaine was located) such that he constructively possessed the cocaine. Given the evidence as outlined above, the trial court's findings—albeit brief—were sufficient enough for us to conclude that the trial court was aware of the relevant issues and made findings on those issues that were supported by the evidence.

Affirmed.

/s/ Christopher M. Murray
/s/ Kathleen Jansen

---

[2] In his Standard 4 brief, defendant argues that he received the ineffective assistance of counsel when his trial counsel did not present defendant's wife and mother as witnesses who could testify that defendant did not live at this house, and when failing to object to "liquid formed narcotics" at trial. Even assuming those acts were ineffective, defendant is not entitled to relief because in light of the facts presented to the court, he has not established prejudice. *People v Corbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001).

[3] Defendant suggests that that trial court rendered inconsistent rulings with respect to the cocaine and firearm possession charges. The requirement that a firearm be readily accessible distinguishes the firearm possession charges from the drug possession charge. See, *People v Williams (After Remand)*, 198 Mich App 537, 541; 499 NW2d 404 (1993).

-3-

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DARELL CHANCELLOR,

        Defendant-Appellant.

UNPUBLISHED
December 4, 2014

No. 314437
Wayne Circuit Court
LC No. 12-004974-FH

Before: MURRAY, P.J., and JANSEN and SHAPIRO, JJ.

SHAPIRO, J. (*dissenting*).

I respectfully dissent. This case concerns a bench trial with highly controverted proofs. The majority reviews the most inculpatory proofs, and based upon them, concludes that there was sufficient evidence to convict. I would agree with the majority's conclusion if the trial court had made factual findings adopting those proofs or even if it provided a clear indication that it based defendant's conviction upon them even without formal fact-finding. However, the trial court did not do so and so it cannot be determined whether defendant's conviction was based on the facts referenced by the majority or by a conclusion on the part of the trial court that defendant could be convicted of possession of cocaine solely on the basis of a finding that he resided in the relevant house, a finding which by itself would not be sufficient. Accordingly, I would reverse defendant's conviction and remand for a new trial.

## I. FACTS

Defendant was charged with both possession and possession with intent to deliver 450 to 999 grams of cocaine, MCL 333.7401(2)(a)(*ii*) (possession with intent to deliver); MCL 333.7403(2)(a)(*ii*) (possession), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. After a bench trial, the court acquitted defendant of possession with intent to deliver and felony-firearm. However, the court convicted defendant of possession. Defendant was sentenced as a fourth habitual offender, MCL 769.12, to the statutory 30-year maximum term and to a minimum term of 170 months, the lowest term within the relevant sentencing guidelines range.

The charges arose out of a search of a home on 32nd Street in Detroit at approximately 5:30 p.m. on November 2, 2011. Three police officers and defendant's parole officer testified in the prosecution's case-in-chief. Defendant testified on his own behalf.

Officer Geelhood testified that on October 31, 2011, he received information that heroin was being sold from the 32nd Street house. The following evening, he watched the house and within 30 minutes saw three people independently go to the front door, have a conversation with a black man (who he later identified as the "seller" in his search warrant affidavit), and make purchases of what he believed to be heroin. He testified that he observed these activities from about 400 feet away, using binoculars, and although it was dark, there was a light on at the front of the house. Geelhood testified, consistent with the description he set forth in the search warrant affidavit, that the seller he saw during this period of observation was a black male, 5'7" to 5'8" tall, 170-180 pounds, and of slim build. He also testified that the man was not wearing glasses.

Geelhood testified that he was "absolutely certain" that the man he observed was defendant. However, he conceded that defendant was 5'11" tall and of "heavy build," weighing, in his estimation, between 210 and 220 pounds. Given the clear divergence between his description of the seller and defendant's actual appearance, Geelhood was asked if his description of the seller in the affidavit could have been mistaken. He denied any error and reaffirmed his description of the seller as a man as much as 4 inches shorter and up to 50 pounds lighter than defendant appeared to him at trial.

All three officers testified that defendant was not present at the 32nd Street house when the warrant was executed. Present at the home were defendant's mother and a black male in his 50s, about 5'9" tall and of slim build, weighing approximately 170 pounds. This individual told the officers that he was working on the house, but that he did not live there. He was apparently not pursued as a suspect.

The officers testified that the 32nd Street house had at least four bedrooms – two on the first floor and two on the second. There were kitchens on both the first and second floors, though the second floor could only be accessed by stairs from the first floor, i.e., there was no separate entrance or private stairs to the second floor. There was a table in the upstairs kitchen. Beneath the table was a clothes hamper in which the officers found men's clothing, the large quantity of cocaine at issue, and two guns. None of the clothes were offered as evidence and the officers did not further describe the type or size of the clothing.

One of the officers testified that he found an envelope on the table in the upstairs kitchen that had been opened and contained a letter from the State of Michigan addressed to defendant at the 32nd Street address. The officer testified that prior to the discovery of this letter they did not have a name associated with the suspected seller. An officer asked defendant's mother where they could find defendant and she provided the officers with a different address. An officer testified that he went to that address and observed a car in the driveway that had been seen at the 32nd Street house the night before during surveillance. He ran the license plate and learned that the vehicle belonged to defendant. When defendant was later arrested, he was not in possession of any drugs.

Defendant's parole officer also testified. She stated that she had met with defendant on two occasions at the 32nd Street address and that he told her that he lived there.

Defendant testified on his own behalf and stated that neither the cocaine nor the guns found at the 32nd Street house belonged to him. He testified that at the time of trial he was 30 years old, 5'11" tall, and weighed 250 pounds. He testified that on the date of the search, he weighed 245 pounds. He testified that he always wore the glasses he was wearing in the courtroom and could not function without them. He testified that he wore size 44 waist pants and it was shown that the shirt he was wearing was 5XL, though he conceded that the clothes were baggy.

The prosecution speculated in argument that defendant probably gained weight (apparently 40-60 lbs) due to eating jail food while awaiting trial.[1] In addition, the prosecution introduced a Secretary of State photo of defendant's head and shoulders taken in January 2011 in which he was not wearing glasses. Geelhood testified that, in his opinion, defendant appeared thinner in the photo than he did at trial.

Defendant testified that he lived on Robson Street with his wife and son at the time of the search and kept all of his clothes there. He testified that he had lived at his mother's home on 32nd Street when he was initially released from prison in November 2010, i.e., when he gave that address to the parole officer. He stated that after moving to the Robson address, he continued to represent to his parole officer that he lived at the 32nd Street house. He testified that he misrepresented his address to the parole officer because his workplace was near his mother's home and if he reported the change in address, he would have been reassigned to a parole office located a greater distance away. He testified that on the date of the search, the persons living at the 32nd Street house were his mother, his brother, his sister, and a male cousin. He described his brother as 37 years old, 5'9" tall, and weighing approximately 165-170 pounds. He described his cousin as 34 years old. He stated that another person, the man present at the house at the time of the search, was his mother's boyfriend, who lived in the house.

After hearing proofs and argument, the trial court delivered its findings and verdict. It found defendant guilty of constructively possessing the cocaine, but not acquitted him of possession with intent to deliver and felony-firearm.

## II. ANALYSIS

Where a criminal case is bench tried, it is not sufficient for the court to simply state a verdict. Under MCR 6.403, "[t]he court must find the facts specially . . . . The court must state its findings and conclusions on the record or in a written opinion made part of the record." "[I]n criminal cases . . . a judge who sits without a jury is obligated to articulate the reasons for his decision in findings of fact. Findings of fact in a nonjury case serve a function paralleling the judge's charge in a jury case, that of revealing the law applied by the fact finder." *People v Jackson*, 390 Mich 621, 627; 212 NW2d 918 (1973). In other words, the requirement that the trial court make factual findings is not to require that the court resolve each and every factual

---

[1] Contrary to this argument, when defendant was admitted to the jail, a "detainee input sheet" was prepared that listed defendant's weight at 240 lbs. Admittedly, this document, while in the lower court record, was not admitted into evidence.

dispute, but to assure that the court correctly applied the law. See *People v Armstrong*, 175 Mich App 181, 184; 437 NW2d 343 (1989). Further, a trial judge sitting as fact-finder in a bench trial is not permitted to reach "compromise" verdicts. *Wayne Co Prosecutor v Detroit Recorder's Court Judge*, 177 Mich App 762, 765; 442 NW2d 771 (1989), citing *People v Burgess*, 419 Mich 305, 310-311; 353 NW2d 444 (1984).

In this case, the trial court's findings were inadequate to determine the factual basis for defendant's conviction and to determine whether the trial court properly applied the law in reaching its verdict.

The trial court's factual findings and conclusions of law as to the relevant charge read in their entirety as follows:

> [O]n Count II, I do find that there was sufficient basis to show proof beyond a reasonable doubt that the defendant did in fact possess the cocaine that was found in the laundry hamper and that it did exceed 450 grams or more; that the proof of residence was established beyond a reasonable doubt for [defendant]; that the fact that the mail was found in the upstairs location indicates to me that the residence was upstairs and that in fact there is a sufficient basis for me to find constructive possession by [defendant] of that cocaine, and I find him guilty of Count II, controlled substance possession, cocaine.

It is reasonable to infer from the trial court's findings that the conviction may have been based solely on the court's conclusion that defendant resided at the 32nd Street house. However, "[i]t is well established that a person's presence, by itself, at a location where drugs are found is insufficient to establish constructive possession." *People v Wolfe*, 440 Mich 508, 520; 441 Mich 1201 (1992). While residence at the subject house is certainly relevant to the question of constructive possession, the legal standard is not satisfied by residence alone, but rather whether that the defendant exercised "*dominion or right of control* over the drug with knowledge of its presence and character." *People v McKinney*, 258 Mich App 157, 165; 670 NW2d 254 (2003) (quotation marks and citations omitted).

Beyond mere presence or possible residence, demonstrating dominion and control requires additional circumstances, albeit ones that may vary from case to case. *Wolfe*, 440 Mich at 520 ("some additional connection between the defendant and the contraband must be shown."); see also *id*. at 522-524 (the defendant attempted to destroy drugs when police arrived, was found in possession of $5 used to purchase cocaine by an undercover officer, and possessed the only key to the apartment where the drugs were discovered); *McKinney*, 258 Mich App at 166 (the defendant claimed ownership of $3,000 discovered by police and shared the bedroom where the drugs were discovered); *People v Nunez*, 242 Mich App 610, 615-616; 619 NW2d 550 (2000) (possession established where police found utility bills addressed to the defendant, the defendant had a key to the apartment, and a witness testified that the defendant resided in the apartment).

In the instant case, the prosecution did not assert that defendant lived alone in the 32nd Street home and the defense presented evidence that at least two other men resided there. Finding the proofs sufficient is even more difficult, given that the contraband was found in a

common area, i.e., a room in the house accessible to all residents and as to which defendant, if he did live there, had no special or exclusive dominion. Thus, even if only one member of the household had dominion and control over the contraband and the others never exercised any control over it, by definition, each member of the household shared a "nexus" with the contraband, by virtue of their residence in the home where it was found. However, this does not answer the question of which of the residents had dominion and control over the drugs. It is not a crime to merely live in a house in which someone else possesses drugs. And again, "[i]t is well established that a person's presence, by itself, at a location where drugs are found is insufficient to prove constructive possession." *Wolfe*, 440 Mich at 520.

The court did note that the letter addressed to defendant was found on a table and the drugs were found in a clothing hamper under that table. I agree that the location of the letter is of some relevance, but it was not found in the hamper along with the drugs and no drugs were on the table. I do not agree that the mere presence of the letter in the same common room as the hidden drugs is sufficient to establish defendant's dominion and control over the drugs. See *Nunez*, 242 Mich App at 615-616 (in addition to utility bills addressed to the defendant, police found defendant in possession of a key, and a witness testified explicitly that defendant resided there). Indeed, the letter was the sole object in the house identified as belonging to defendant. No other items were linked to the defendant. There were four bedrooms, none of which were identified as belonging to defendant or containing any of his possessions. There was no evidence that any items found in any bedrooms or closets belonged to defendant and the clothes in the hamper were not linked to him other than by the fact that they were men's clothes. I would agree that the fact that they were men's clothes would have been sufficient had the trial court concluded that no other men lived in the house, but it did not.

In my view, a conviction based solely on the letter would rest on insufficient evidence. Thus, the critical question is whether the man Geelhood observed the night before the search, making suspect transactions, was defendant. However, the trial court made no findings in this regard and its absence of such a finding is critical. Had the court found that the man seen the night before was defendant, I would defer to that finding and affirm the conviction as the events of the night before would link him to the drugs.[2] However, if the trial court found that the man seen the night before was not defendant, then he could not be properly found to have exercised dominion and control over the drugs found in the house.

In sum, the trial court did not render sufficient factual findings for a reviewing court to determine whether it properly applied the law. *Jackson*, 390 Mich at 627. The proper remedy in such a case is to reverse the conviction and remand for a new trial. Accordingly, I would reverse defendant's conviction and remand for a new trial.

/s/ Douglas B. Shapiro

---

[2] Of course, if the trial court found that defendant was the man the police observed, it would lead to the conclusion that defendant was guilty of possession with intent to distribute.