UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                  Case No. 13-53846

CITY OF DETROIT, MICHIGAN,                              Chapter 9

                    Debtor.                             Judge Thomas J. Tucker

_____/

**OPINION REGARDING THE CITY OF DETROIT'S MOTION
TO ENFORCE PLAN OF ADJUSTMENT AGAINST THE POLICE AND FIRE
RETIREMENT SYSTEM PENSION PLAN (DOCKET # 13602)**

## I. Introduction

The Motion now before the Court in this Chapter 9 case requires the Court to resolve a dispute between the City of Detroit (the "City") and one of its pension plans, the Police and Fire Retirement System of the City of Detroit, Michigan (the "PFRS"). The City's motion is entitled "City of Detroit's Motion to Enforce Plan of Adjustment and Require 30-Year Amortization of the UAAL in the Police and Fire Retirement System Pension Plan" (Docket # 13602, the "Motion"). The PFRS objects to the City's Motion. After two rounds of extensive briefing by the parties, and the filing of numerous exhibits, the Court held a telephonic hearing on the Motion on March 15, 2023, and then took the Motion under advisement.

In 2014, the City obtained confirmation of its plan of adjustment (the "POA").[1] One of the City's many obligations under the POA is to pay a certain unfunded liability to the PFRS for retirement benefits, known as the unfunded actuarial accrued liability ("UAAL"), existing as of June 30, 2023. More specifically, beginning with the year starting on July 1, 2023, the City must

---

[1] This bankruptcy case was assigned to Judge Steven W. Rhodes until his retirement in February 2015. The case was reassigned to the undersigned judge on February 17, 2015. *See* "Designation of Bankruptcy Judge," filed February 17, 2015 (Docket # 9288).

begin making annual payments to the PFRS in order to reduce, and ultimately eliminate, the UAAL.

The City contends that one of the terms under the POA is that these payments are to be made over a period of 30 years, based on a 30-year amortization of the UAAL existing as of June 30, 2023. The PFRS disputes that such a 30-year amortization is part of the POA. Rather, the PFRS contends that *no* particular amortization is part of the POA.

The PFRS argues that it has the authority to decide the amortization term used to compute the City's annual contribution to the UAAL existing as of June 30, 2023. The PFRS argues that "under the terms of the Plan, the PFRS does not need to allow the City to amortize *any* of the post-2023 pension payments - let alone for 30 years[.]"[2]

The PFRS has recently decided that the City must make the payments over a period of only 20 years, based on a 20-year amortization. The PFRS's 20-year amortization would significantly accelerate the City's payments, compared to a 30-year amortization. The parties agree that if the City is required to pay based on a 20-year amortization, the City's payments will be roughly $12 million more per year in each of years 1-20 than the payments would be in those years if the City pays based on a 30-year amortization.

The City's Motion seeks declaratory and injunctive relief against the PFRS, precluding the PFRS from shortening the 30-year amortization period.

---

[2] PFRS Sur-Reply (Docket # 13681) at pdf p. 6, caption II.A (initial capitalization and bold omitted) (italics on original).

2

For the reasons stated in this Opinion, the Court concludes that the City is correct, that a 30-year amortization is indeed part of the confirmed POA, and that the PFRS cannot change it. The Court will grant the City's Motion.

## II. Background and facts

### A. The City's confirmed plan of adjustment

The plan of adjustment in this Chapter 9 bankruptcy case was confirmed on November 12, 2014. The confirmed plan includes the document entitled "Eighth Amended Plan for the Adjustment of Debts for the City of Detroit," filed October 22, 2014 (the "Plan") and all of its many exhibits,[3] and it also includes the Order entitled "Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit," filed November 12, 2014 (the "Confirmation Order").[4] (The Plan and the Confirmation Order are collectively referred to as the "POA.") The POA became effective on December 10, 2014.[5]

Significantly, and as discussed below, the Confirmation Order expressly incorporated the Court's written opinion regarding confirmation, which is entitled "Supplemental Opinion Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing," filed December 31, 2014 (the "Confirmation Opinion").[6]

### B. The PFRS UAAL

---

[3] Docket # 8045.

[4] Docket # 8272.

[5] *See* Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit and (II) Occurrence of Effective Date, filed December 10, 2014 (Docket # 8649).

[6] Docket # 8993. The Confirmation Opinion was published. *See In re City of Detroit, Michigan*, 524 B.R. 147 (Bankr. E.D. Mich. 2014).

## 1. Background

The following background facts about the PFRS pension plan, recounted in the City's

Motion, are undisputed:

> The City historically had two defined benefit pension plans for employees and retirees. The Police and Fire Retirement System ("PFRS") managed the plan for public safety employees and retirees. The General Retirement System ("GRS") managed the plan for all other City employees and retirees. Both plans were frozen in bankruptcy and, under the POA, covered only City retirees and employees who performed services for the City prior to July 1, 2014.

> Both plans were replaced going forward with hybrid plans that combined elements of both defined benefit and defined contribution plans. In the POA, the new hybrid plans are known as Component I plans, and the frozen plans are known as Component II plans.

> At issue in this case is the PFRS Component II plan that was frozen in bankruptcy and now covers only public safety employees and retirees who provided services prior to July 1, 2014. References in this brief to the PRFS plan are to the PFRS Component II plan that was frozen in bankruptcy. Because the plan was frozen and no new beneficiaries are being added, it is a "closed plan" and will terminate after all beneficiaries have died. . . . .

> At the time of the bankruptcy, both the public safety (PFRS) and general retirement (GRS) legacy (Component II) plans were underfunded. Under financial projections prepared for the POA, the plans were likewise projected to be underfunded at the end of the 10-year [period after confirmation]. Actuaries identify the amount of such underfunding as the plan's "unfunded actuarial accrued liability," or "UAAL."[7]

## 2. The Fourth Amended Plan and the Fourth Amended Disclosure Statement

---

[7] City's Br. in Supp. of Mot. (Docket # 13602) at pdf pp. 17, 19-20 (record citations omitted).

4

The relevant history of the POA's treatment of the claims of the PFRS, including the UAAL, can be traced back to the plan and disclosure statement filed by the City on May 5, 2014, when the City filed its Fourth Amended Plan and its Fourth Amended Disclosure Statement.[8]

The Fourth Amended Plan treated the pension claims of the PFRS in Class 10 (the "PFRS Pension Claims"),[9] and the pension claims of the General Retirement System for the City of Detroit (the "GRS") in Class 11 (the "GRS Pension Claims").[10] Under the Fourth Amended Plan, the Class 10 PFRS Pension Claims were to be "allowed in an aggregate amount equal to the sum of approximately $1,250,000,000,"[11] and the Class 11 GRS Pension Claims were to be "allowed in an aggregate amount equal to the sum of approximately $1,879,000,000."[12]

The Fourth Amended Plan provided that from the Plan's Effective Date "through Fiscal Year 2023," the City would not be obligated to make any contributions to fund accrued benefits "under the Prior PFRS Pension Plan."[13] During that time, such annual contributions were to come only from other sources, known as "certain DIA Proceeds and a portion of the State

---

[8] "Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)" (Docket # 4392, the "Fourth Amended Plan"); "Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit" (Docket # 4391, the "Fourth Amended Disclosure Statement").

[9] *See* Fourth Amended Plan (Docket # 4392) at pdf pp. 38-40.

[10] *See id.* at pdf pp. 40-42; 19 (Definition 153, defining "GRS").

[11] *See id.* at pdf p. 38.

[12] *See id.* at pdf p. 40.

[13] *See id*. at pdf p. 39 (Contributions to PFRS).

5

Contribution."[14]  After June 30, 2023, the PFRS would receive "certain additional DIA Proceeds," and the City would be required to contribute certain defined funding to the PFRS, discussed below.[15]

The Court approved the Fourth Amended Disclosure Statement in an Order filed on May 5, 2014.[16]  In that Order, the Court found that the disclosure statement "contains 'adequate information'" about the Fourth Amended Plan, "as defined by" 11 U.S.C. § 1125(a)(1).[17]

Part of that "adequate information" about the plan was in the financial projections in the disclosure statement.  Section XI of the Fourth Amended Disclosure Statement was captioned "**PROJECTED FINANCIAL INFORMATION**."[18]  Section XI.A, captioned "**Projections,**" stated, in relevant part:

> Attached to this Disclosure Statement as Exhibit I, Exhibit J and Exhibit K are certain financial documents (together, the "Projections"), which provide details regarding the City's projected

---

[14]  *See id.*  Under the Fourth Amended Plan, the "DIA Proceeds" are the "irrevocable funding commitments" of at least $466 million described in Section  IV.F.1 of that plan.  *See id.* at pdf pp. 15 ¶ 88,  53-54 ¶ IV.F.1.  In the Eighth Amended Plan "DIA Proceeds" means the "irrevocable funding commitments" of at least $466 million as described in Section  IV.E.1 of that plan.  *See* Eighth Amended Plan (Docket # 8045) at pdf pp. 17 ¶ 123, 64 ¶ IV.E.1.

Under the Fourth Amended Plan "'State Contribution' means payments to be made to GRS and PFRS by the State [of Michigan ("State")] or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement." Fourth Amended Plan (Docket # 4392) at pdf p. 29 ¶ 267.  This definition of "State Contribution" also appears in the Eighth Amended Plan (Docket # 8045) at pdf p. 34 ¶ 331.

[15]  *See* Fourth Amended Plan (Docket # 4392) at pdf pp. 39-40.

[16]  "Order Approving the Proposed Disclosure Statement" (Docket # 4401).

[17]  *Id.* at 2 ¶ 3.

[18]  Docket # 4391 at pdf p. 185 (bold and capitalization in original).

6

operations under the Plan, subject to the assumptions set forth below. In particular, the Projections consist of:

- A ten-year summary of restructuring initiatives, attached hereto as Exhibit I

- A ten-year statement of projected cash flows, attached hereto as Exhibit J

- **A forty-year statement of projected cash flows, attached hereto as Exhibit K**[19]

Exhibit K of the Fourth Amended Disclosure Statement, in turn, was entitled "**City of Detroit** Plan of Adjustment - 40 year projections."[20]  Exhibit K projections included the assumptions under the Fourth Amended Plan that the City would make no payments on the pension claims of the PFRS and the GRS in the first 10 years of the Plan, and that during that time, payments to the PFRS and the GRS would be made by other parties.  Then beginning in year 11, the City would make annual payments to the PFRS and GRS on the UAAL existing as of June 30, 2023.  *Those annual payments would be determined by taking the UAAL existing as of June 30, 2023, and amortizing that amount over 30 years at a discount rate of 6.75%.*  The projections for the payments to the PFRS included the following:

| PFRS Pension | Contributions (years 1-10) | Estimated to be $261m from foundations /State settlement |
|---|---|---|
| | Contributions (**years 11-40**) | UAAL as of June 30, 2023 estimated to be ~$681m **amortized over 30yr,** including contributions in second decade from DIA and foundations |

---

[19]  *Id.* (bolding of "Projections" and underlining in original) (other bolding added).

[20]  Docket # 4391-2 at pdf pp. 171-79 (bold in original).

7

| | |
|---|---|
| Discount rate | **6.75%** |
| Targeted funded status as of 2023 | 78%[21] |

Other pages in the 40-year projections detailed the sources of income for the City, the City's expenses, the amounts that would be paid on the pension claims of the PFRS and the GRS and other creditors' claims over forty years, and the sources of the payments to the PFRS and the GRS and other creditors.[22]  These pages *also* projected a 30-year amortization of the payments of the UAAL to the PFRS and the GRS.  They listed substantial amounts for "PFRS pension payments" and for "GRS pension payments" over the years "2024-2033," "2034-2043," and "2044-2053."[23]

Footnotes to the projections stated that certain payments on the pension claims were the result of settlements with the DIA and the State of Michigan, and that the amount of the UAAL as of June 30, 2023 was subject to change, and that therefore the amount of the City's annual contributions to the PFRS and GRS was subject to change.[24]  Some of the numbers "subject to change" in the projections were changed, due to later settlements and the updated information received on account of those settlements.  But as discussed below, one thing that never changed

---

[21]  *Id.* at pdf p. 173 (footnote omitted) (bold added).

[22]  *See id.* at pdf pp. 174-179.

[23]  *See id.* at pdf pp. 176-77.

[24]  *See id.* at pdf p. 173 nn.(a)-(b).

8

was that the UAAL, existing as of June 30, 2023, would be amortized over 30 years at a discount rate of 6.75%.[25]

The projections regarding the claims of the PFRS and the GRS were developed by incorporating the key elements of the settlements that were reached with "a number of parties with an interest in the City's two pension plans [(the PFRS and the GRS pension plans)] and in protecting the City's art at the DIA[,]" which settlements were incorporated into the Fourth Amended Plan. *In re City of Detroit*, 524 B.R. 147, 169 (Bankr. E.D. Mich. 2014). This collection of settlements incorporated into the Fourth Amended Plan, and incorporated into the later amended plans that were filed, was known as "the Grand Bargain." The Grand Bargain was the "cornerstone" of the Fourth Amended Plan and all later filed amended plans. *Id.*

The City served the Fourth Amended Plan and the Fourth Amended Disclosure Statement, including the 40-year projections, on all required parties. The Court's Confirmation Opinion described this process and events that led up to the filing of the Eighth Amended Plan.

> The City served solicitation packages, including this [fourth amended] plan and disclosure statement, and plan ballots. (Dkt. ## 4421 and 6179). It also published notice of the [fourth amended] plan and the disclosure statement in the Detroit News, the Detroit Free Press, USA Today and the Wall Street Journal. (Dkt. ## 6209, 6211 and 6253). This [fourth] amended plan incorporated the final aspects of the Grand Bargain, including final

---

[25] *See* discussion in Part II.C of this Opinion, below; *see, e.g.*, Trial Tr. (Sept. 29, 2014) (Docket # 7819) (testimony of Gaurav Malhotra, an expert on restructuring and financial analysis at Ernst & Young, LLP) at 77-78 ("[Exhibit] 109 is the July 2nd [2014] update of the [P]rojections, and so we would have updated it since May 5th [2014] for the items that we knew had changed because it was during this time frame that there were a couple of settlements that were reached, but on the baseline scenario, other than some changes that we would have made for new information that we would have received, [the] majority of this would have essentially remained the same or close to it.")).

9

> agreements relating to restoration of pension benefits and pension
> plan governance, as well as the OPEB settlement.[26]

*City of Detroit*, 524 B.R. at 161 (footnote 3 omitted) (footnote added).

The pension creditors in Class 10 (PFRS) voted overwhelming to accept the Plan, by a margin of 82% of the votes cast. *City of Detroit*, 524 B.R. at 175, 180.

The Fourth Amended Plan was later amended several times, as a "result of successive creditor settlements and agreements. . . . On October 22, 2014, the City filed its eighth and last amended plan. . . . [T]he Court concluded that the plans that the City filed after the fourth amended plan did not require new balloting and therefore did not require a new disclosure statement." *City of Detroit*, 524 B.R. at 147, 161-62. This was so because "[t]he Court [found] that none of the modifications in any of the successive amended plans adversely changed the treatment of any claims." *Id.* at 253 (citing Fed. R. Bank. P. 3019(a)). The Court found that because "the City modified its plan to incorporate creditor settlements that in each case, maintained or improved the treatment of claims or otherwise clarified various plan provisions[,] . . . the City was not required to re-solicit ballots after the initial solicitation." *Id.*

### 3. The Eighth Amended Plan

---

[26] The OPEB Claims are claims against the City for "post-retirement health, vision, dental, life, and death benefits," for certain retirees "who retired on or before December 31, 2014 and are otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree[,]"which are treated in Class 12 of the fourth amended plan and the Plan. *See* Plan (Docket # 8045) at pdf p. 28 ¶¶ I.A.259-60, 49 ¶¶ B.1., B.3.s.

As with the Fourth Amended Plan, the Eighth Amended Plan treated the pension claims of the PFRS in Class 10, and those claims still were to be "allowed in an aggregate amount equal to the sum of approximately $1,250,000,000."[27]

As with the Fourth Amended Plan, the Eighth Amended Plan provided that from the Plan's Effective Date "through Fiscal Year 2023," the City would not be obligated to make any contributions to fund accrued benefits "under the Prior PFRS Pension Plan."[28]  During that time, such annual contributions were to come only from other sources, known as "certain DIA Proceeds and a portion of the State Contribution."[29]  After June 30, 2023, the PFRS would receive "certain additional DIA Proceeds," and the City would be required to:

> contribute sufficient funds required to pay each Holder of a PFRS
> Pension Claim his or her PFRS Adjusted Pension Amount in
> accordance with and as modified by the terms and conditions
> contained in the Plan and the Prior PFRS Pension Plan, in
> accordance with the State Contribution Agreement and exhibits
> thereto.[30]

### 4. Confirmation

The Court held a lengthy trial regarding confirmation of the Plan and approval of the settlements incorporated into the Plan, in September and October 2014.  As discussed below, the feasibility of the Plan was one of the key issues, and the evidence at trial was premised on the City's projections, including the 30-year amortization of the UAAL as of June 30, 2023.

---

[27] *See* Docket # 8045 at pdf p. 45.

[28] *Id.*

[29] *Id.*

[30] *Id.*

On November 7, 2014, the Court issued an oral opinion from the bench (the "Bench Opinion"), announcing that the Court would confirm the Plan and would approve all the settlements.[31]  The Court also stated in its Bench Opinion that "[t]he Court will soon issue a supplemental written opinion that will more fully address all of the issues."[32]

On November 12, 2014, the Court entered its Confirmation Order.[33]  As noted above, the City's POA includes the document entitled "Eighth Amended Plan for the Adjustment of Debtors for the City of Detroit," filed October 22, 2014 (the Plan), and all of its many exhibits,[34] and it also includes the Confirmation Order.[35]  (As noted above, the Plan and the Confirmation Order are collectively referred to as the POA.)

The Confirmation Order confirmed the Plan, and stated that the Plan and the Confirmation Order are "binding upon" the City and "any and all holders of Claims," among many others.[36]

The Confirmation Order incorporated by reference the Confirmation Opinion that was filed later.  The Confirmation Order stated that "[t]he Court's supplemental opinion regarding

---

[31]  A transcript of the bench opinion is filed at Docket # 8257.

[32]  *Id.* at 4; *see also id.* at 49, 53.

[33]  Docket # 8272 ("Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit").

[34]  Docket # 8045.  The Eighth Amended Plan states that all of the exhibits are part of the Plan. *See* Eighth Amended Plan (Docket # 8045) at pdf p. 30 ¶ 273 (defining "Plan"), pdf p. 22 ¶ 182 (defining "Exhibits"), pdf pp. 6-7 ("Table of Exhibits").  The Plan exhibits were filed at Docket ## 8045-1 through 8045-10.

[35]  Docket # 8272.

[36]  *See* Confirmation Order (Docket # 8272) at pdf p. 72 ¶ A.1; pdf p. 90 ¶ E.28; *see generally* 11 U.S.C. § 944(a).

confirmation of the Plan (the "<u>Confirmation Opinion</u>"), to be issued, is incorporated fully herein."[37]  Thus, the Confirmation Opinion is part of the Confirmation Order.  As such, the Confirmation Opinion is part of the POA.

The Confirmation Order also incorporated by reference all of the findings and conclusions in the Confirmation Opinion.  The Confirmation Order stated:

> **All findings of fact and conclusions of law announced by the Court** on the record in connection with confirmation of the Plan or otherwise at the Confirmation Hearing or **in the Confirmation Opinion are incorporated herein by reference.** The findings of fact and conclusions of law set forth herein, **in the Confirmation Opinion** and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.[38]

The Confirmation Order states:

> In the event of a direct conflict between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.[39]

By virtue of this language, the Confirmation Order made clear that its provisions, including the provisions of the Confirmation Opinion, which the Confirmation Order expressly incorporated, govern if they conflict with any provision in the Plan or any of its exhibits.

## C.  The incorporation of the 30-year amortization term into the POA

---

[37]  Confirmation Order at pdf p. 10 ¶ G (underlining in original).

[38]  *Id.* at pdf pp. 73-74 ¶ B.4 (footnote omitted) (emphasis added).

[39]  *Id.* at pdf p. 126 ¶ 83.

The 30-year amortization of the PFRS UAAL, existing as of June 30, 2023, is part of the confirmed POA and is binding on the PFRS, by virtue of the Confirmation Order's express incorporation of the Confirmation Opinion. The Confirmation Opinion clearly shows the 30-year amortization. It states:

> [T]he City's obligations to the GRS and the PFRS are fixed under the plan from FY2014–FY2023. During this time, as the City works to stabilize its finances and implement the [restructuring and reinvestment initiatives, known as the "RRIs"],[40] the majority of the City's contributions to the GRS and the PFRS will come from the DWSD [(Detroit Water and Sewerage Department)], the State Contribution Agreement,[41] and the Grand Bargain funding. *See* Ex.

---

[40] Citing the trial testimony of Charles Moore, the expert who "is the chief architect of the RRIs," the Court noted "that the RRIs can be broken down into seven categories:"

1. Blight initiatives, which focus on the remediation of primarily residential blight;

2. Public safety initiatives, which focus on police and fire services to improve overall public safety;

3. Resident service initiatives, which focus on departments that primarily interact with residents (such as the Department of Transportation);

4. Business service initiatives, which focus on departments that interact with businesses (such as Buildings, Safety Engineering and Environmental Department);

5. Organizational initiatives, which focus on the departments that serve primarily to support City operations (such as the Finance Department and General Services);

6. Management initiatives, which relate to the mayor's office, city council and the city clerk; and

7. Non-departmental initiatives, which relate to the 36th District Court.

Confirmation Opinion, 524 B.R. at 234.

[41] The State Contribution Agreement refers to the settlement agreement between the City, the State of Michigan (the "State"), the GRS, and the PFRS to settle the State's potential liability for the

793 at 3. However, after 2023, the City projects the retirement systems will remain somewhat underfunded. *See* Ex. 12000 at 133. **The balance of the underfunding in 2023 will be amortized over a thirty year period of time.** *Id.*
. . . .

### a. The City's Plan Regarding Its Pension Obligations

The [P]lan provides the City with fixed payments toward the pension underfunding for FY2014–FY2023. For the PFRS, 100% of the payments are covered by the funds from the State Contribution Agreement and the Grand Bargain. Ex. 732. For the GRS, which has a larger underfunding claim, the State Contribution Agreement and the Grand Bargain funds cover only 20%. *Id*. The City is obligated to contribute $575 million in cash. However, approximately $428.5 million of that will come from DWSD revenues to cover DWSD's portion of the GRS underfunding liability, and another $31.7 million will come from the UTGO [(Unlimited Tax General Obligation)] millage, . . . This leaves a balance of $114.6 million. *Id.* Mr. Malhotra testified that $80 million of this $114.6 million will come from the City's general fund and that it is included in the Plan Projections. Trial Tr. 84, Oct. 21, 2014. (Dkt. # 8098) The balance will come from the City's parking and library revenues. *Id.* at 81.

However, at the end of FY2023, the GRS and PFRS will remain significantly underfunded. Using the assumptions from the global pension settlement, including the 6.75% discount rate, the City projects that the PFRS will only achieve 78% funding, leaving a UAAL of $681 million. Ex. 793 at 2. For the GRS, the City projects a 70% funded status by the end of FY2023, leaving a UAAL of $695 million. *Id.* **The City will then amortize the remaining UAAL for both plans over the next thirty years at an interest rate of 6.75%.** *Id.* Between FY2024 and FY2033, the City will receive an additional $68 million in Grand Bargain proceeds to pay toward the UAAL amortization for PFRS, and

---

UAAL of the GRS and the PFRS under Article IX, § 23 of the Michigan constitution. *See City of Detroit*, 524 B.R. at 170. ("It has been suggested that because pensions are protected by the Michigan constitution, the State may be obligated to pay all or a portion of the UAAL.").

$188 million for GRS. The balance of the amortized UAAL will come from the City. *Id.* at 5.[42]

Elsewhere in the Confirmation Opinion, the Court described what it called the "final component of the Grand Bargain," namely, the "global settlement of pension-related issues, including the treatment of the claims relating to the UAAL of the GRS and the PFRS."[43]  In that description, the Court described how the UAAL was to be gradually paid down to zero (*i.e.*, reach 100% funding), ***over the 30-year period of 2023 to 2053***:

> The City has also set certain targets at which the UAAL for the GRS and the PFRS must be funded. For 2023, the funding targets are 70% for the GRS and 78% for the PFRS. **For 2053, in 40 years, the targets are 100% for each.** Ex. 723.[44]

Four trial exhibits were cited by the Court in the Confirmation Opinion excerpts quoted above.  One of those exhibits (Exhibit 732) concerned only the pension contributions during the first ten years of the Plan.[45]  Each of the other three exhibits clearly shows the 30-year amortization.  One of those other exhibits (Exhibit 793), which is quoted below, included 40-year projections that clearly showed the 30-year amortization of the PFRS UAAL.[46]  Another of the exhibits (Exhibit 723) reflected the 30-year amortization, in projecting a PFRS pension funding

---

[42]  Confirmation Opinion, 524 B.R. at 230 n.23, 231-32 (emphasis added) (footnotes added).

[43]  *Id.*, 524 B.R. at 179.

[44]  *Id.*, 524 B.R. at 180 (emphasis added).

[45]  It appears that unlike the other exhibits, Exhibit 732 might not be on file in this case, so the Court is filing a copy of that Exhibit today, as a supplement to this Opinion.

[46]  A copy of Exhibit 793 is attached to the City's reply brief (Docket # 13663) as Exhibit 17, and appears at Docket # 13663-2, beginning at pdf p. 25.

16

level of 78% in 2023 moving up to a funding level of 100% *30 years later*, in 2053.[47] The fourth exhibit (Exhibit 12000) was the expert report of Martha E.M. Kopacz, regarding the feasibility of the Plan. The Court cited page 133 of that report, where Ms. Kopacz stated that "the City will amortize the remaining UAAL for each Retirement System – as of June 30, 2023 – over the following thirty-year timeframe."[48] *None* of the trial exhibits cited in the Court's Confirmation Opinion showed an amortization period shorter than, or other than, 30 years.

In Part II.B.2 of this Opinion, above, the Court discussed the 40-year projections that were filed with the City's Fourth Amended Disclosure Statement on May 5, 2014. As quoted above, those clearly showed the 30-year amortization of the PFRS UAAL existing as of June 30, 2023. As the Court noted in Part II.B.2, those projections were later updated, to reflect later settlements. But in the later, updated projections, the 30-year amortization never changed.

The Court considered four updated 40-year projections during and after the confirmation trial, and cited each of them in the Confirmation Order. As listed by the Court, these were "Exhibits 111 (July 2014), 734 (September 2014), 779 (October 2014) and 793 (October 2014)."[49] The Court cited these projections in the Confirmation Order as part of the Court's

---

[47] A copy of Exhibit 723 is attached to the City's reply brief (Docket # 13663) as Exhibit 18, and appears at Docket # 13663-2, pdf p. 41.

[48] *See* Confirmation Opinion, 524 B.R. at 230 n.23. A copy of excerpts from the Kopacz expert report (Exhibit 12000) is attached to the City's reply brief (Docket # 13663) as Exhibit 22, and appears at Docket # 13663-2, beginning at pdf p. 75. Page 133 of that report appears at Docket # 13363-3, pdf p. 14.

[49] Confirmation Order at pdf p. 41 ¶ 11. Copies of these trial exhibits are attached to the City's reply brief (Docket # 13663) as Exhibits 19-21 and 17 (Docket # 13663-2).

finding that the Plan was feasible, and the Court found that these 40-year projections were "reasonable" and "accurate."[50]

Each of these 40-year projections clearly shows the 30-year amortization, in the same way. For example, Exhibit 793 (October 2014), which the Court also cited in the Confirmation Opinion, showed the 30-year amortization in the same way the May 5, 2014 projections did:

PFRS Pension (Class 10) . . .

| | |
|---|---|
| Contributions (years 1-10) | Estimated to be $261m from foundations /State settlement |
| Contributions (**years 11-40**) | UAAL as of June 30, 2023 estimated to be ~$681m **amortized over 30yr,** including contributions in second decade from DIA and foundations |
| Discount rate | **6.75%** |
| Targeted funded status as of 2023 | 78%[51] |

And, like all the other 40-year projections, this exhibit further showed the 30-year amortization of the payments of the UAAL to the PFRS, where it listed substantial amounts for "PFRS pension payments" over the years "2024-2033," "2034-2043," and "2044-2053."[52]

---

[50] Confirmation Order at pdf p. 41 ¶ 11.

[51] Ex. 793 at 793-002 (copy attached as Exhibit 17 to the City's reply brief at Docket # 13663-2 at pdf p. 26) (bold added).

[52] Ex. 793 at 793-005 and 793-006 (Exhibit 17 to the City's reply brief at Docket # 13663-2 at pdf pp. 29- 30).

The City says that in the Confirmation Opinion the Court cited this Exhibit 793 "more than 30 times."[53]  Actually, by this Court's count, it was 17 times.[54]  And the Court specifically cited the second page of this exhibit, quoted above, when it stated that under the Plan, after "the end of FY 2023," "[t]he City will then amortize the remaining UAAL for both [the PFRS plan and the GRS plan] over the next thirty years at an interest rate of 6.75%."[55]

In both the Confirmation Order and the Confirmation Opinion, the Court relied heavily on the 40-year projections, including the 30-year amortization, among other things, in finding that the City's Plan was feasible.[56]

## D.  The recent attempt by the PFRS to shorten the amortization period from 30 to 20 years

The PFRS recently has attempted to reduce the 30-year amortization period for the City's payment of the UAAL existing as of June 30, 2023, to 20 years.  On March 4, 2021, the PFRS Board of Trustees adopted a resolution which provides that the UAAL existing at the end of June 30, 2023 be amortized over 20 years.[57]  On October 18, 2021 the PFRS Investment Committee approved a resolution setting a 20-year amortization period for the UAAL existing as of June 30,

---

[53]  City's Reply Br. (Docket # 13663) at pdf p. 17.

[54]  *See* Confirmation Opinion, 524 B.R. at 224-31.

[55]  *Id.*, 524 B.R. at 231.

[56]  *See, e.g.*, Confirmation Order at pdf p. 45 ¶ 17 (relying on the "Projections" to find feasibility); pdf p. 41 ¶ 11 (defining the "Projections" to include the 10-year and the 40-year projections); Confirmation Opinion, 524 B.R. at 224-33.

[57]  *See* Ex. 3 to Mot. (Docket # 13602-1) (Minutes of March 4, 2021 Meeting No. 3279 of the Board of Trustees of the PFRS) at pdf pp. 29-30.

19

2023.[58]  That resolution by the Investment Committee was affirmed by the PFRS Board at a

meeting held on November 18, 2021.[59]

These actions were taken despite the City's repeated efforts to persuade the PFRS

Investment Committee and the PFRS Board of Trustees not to take these actions.[60]

## E.  The City's Motion

On August 3, 2022, the City filed the present Motion, seeking an order: (1) declaring that

"[t]he resolutions passed and the votes taken by [the PFRS] and the Investment Committee which

shortened the amortization period to 20 years are void and of no force or effect;" (2) enjoining

and barring the PFRS and the Investment Committee "from shortening the 30-year amortization

period;" and (3) requiring the PFRS to amortize the PFRS's UAAL "that will exist as of June 30,

2023, over an additional 30 years commencing on June 30, 2023."[61]

## III.  Jurisdiction

This Court has subject matter jurisdiction over this Chapter 9 bankruptcy case and this

contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and E.D. Mich. LR 83.50(a).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(O), because it is a  proceeding "affecting

---

[58] *See* Ex. 7 to Mot. (Docket # 13602-1) (Minutes of the October 18, 2021 Meeting No. 062 of the PFRS Investment Committee) at pdf p. 65.

[59] *See* Ex. 9 to Mot. (Docket # 13602-2) (Minutes of the November 18, 2021 Meeting No. 3296 of the PFRS Board) at pdf p. 9.

[60] *See, e.g., id.* at pdf p. 8 (proposed resolution not adopted by the PFRS Board, describing a July 21, 2021 memo from the City's office of Chief Financial Officer "sent to legal counsel for the PFRS [Investment Committee] . . . explaining the fundamental reasons why it would be improper for the PFRS [Investment Committee] to approve a shorter funding plan than the POA's 30-year plan and ask[ing] that the PFRS [Investment Committee] hear from both Mayor Duggan and the City's actuarial expert before the PFRS [Investment Committee] and the PFRS Board made any decisions on the funding policy").

[61] *See* proposed order attached to Mot. (Docket # 13602) at pdf pp. 5-6 ¶¶ 2-3.

. . . the adjustment of the debtor-creditor . . . relationship." This is also a core proceeding

because it is a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C.

§ 1334(b). Matters falling within this category are deemed to be core proceedings. *See Allard v.*

*Coenen* (*In re Trans-Indus., Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009) (citing *Mich. Emp.*

*Sec. Comm'n v. Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1144 (6th Cir. 1991)).

Because the City's Motion asks the Court to interpret and enforce its own Confirmation

Order, this is a proceeding "arising in" a case under title 11. *See Palltronics, Inc. v. PALIoT*

*Sols., Inc.* (*In re Lightning Tech., Inc.*), 647 B.R. 76, 91-93 (Bankr. E.D. Mich. 2022) (detailed

discussion of bankruptcy court's jurisdiction to interpret and enforce its own orders); *see also In*

*re Chesapeake Energy Corp.*, __ F.4th __, No. 21-20323, 2023 WL 3882721, at *6 (5th Cir. June

8, 2023) (citation omitted) ("Within its core jurisdiction, the [bankruptcy] court may also be

called upon to interpret the terms of a confirmed reorganization plan."). This is a proceeding

"arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise

only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

This dispute is a type over which this Court retained jurisdiction under the confirmed

POA. Article VII, Sections G and I of the POA state:

> Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy
> Code and notwithstanding entry of the Confirmation Order and the
> occurrence of the Effective Date, the Bankruptcy Court will retain
> exclusive jurisdiction over all matters arising out of, and related to,
> the Chapter 9 Case and the Plan to the fullest extent permitted by
> law, including, among other things jurisdiction to:
> . . . .
>
> G.  Resolve any cases, controversies, suits or disputes that may
>     arise in connection with the consummation, interpretation or
>     enforcement of the Plan or any contract, instrument, release or

21

other agreement or document that is entered into or delivered
pursuant to the Plan or any Entity's rights arising from or
obligations incurred in connection with the Plan or such
documents;

. . . .

I.  Issue injunctions, enforce the injunctions contained in the Plan
and the Confirmation Order, enter and implement other orders
or take such other actions as may be necessary or appropriate to
restrain interference by any Entity with consummation,
implementation or enforcement of the Plan or the Confirmation
Order[.][62]

## IV. Discussion

### A. Based on the Confirmation Order, the 30-year amortization is part of the POA.

As demonstrated in Parts II.B and II.C of this Opinion, above, the 30-year amortization of
the City's payment of the UAAL existing as of June 30, 2023 was incorporated into the POA, by
the Confirmation Order.  This unambiguously means that the 30-year amortization is part of the
confirmed POA.  That confirmed POA must be enforced as written.

The PFRS is correct in pointing out that the new PFRS Plan and the State Contribution
Agreement were incorporated into the Plan, by the Plan itself, and therefore are part of the POA.
For the reasons discussed in Part IV.B of this Opinion below, however, those documents do not
conflict with the 30-year amortization in the POA.

The PFRS argues that the Confirmation Order cannot be deemed to incorporate the 30-
year amortization, because that would create a conflict with the Plan document and its exhibits,
namely, the new PFRS Plan and the State Contribution Agreement.  And, according to the PFRS,
when there is a conflict between a debtor's plan document(s) on the one hand, and the order

---

[62]  Plan (copy appended at Docket # 8272) at pdf pp. 209-10; *see also* Confirmation Order
(Docket # 8272) at pdf pp. 129-30.

confirming the plan, on the other hand, the plan document(s) must prevail over the confirmation

order.  In support of this argument, the PFRS cites a case from the Fifth Circuit Court of Appeals,

*Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Trust* (*In re Davis Offshore, L.P.*), 644

F.3d 259 (5th Cir. 2011).

The PFRS is wrong in arguing that there is any conflict in the Plan-related documents.

But also the PFRS is wrong in arguing that the Plan document and exhibits control if they

conflict with the Confirmation Order.  The opposite is true.  The PFRS's reliance on the *Davis*

*Offshore* case is misplaced.  The *Davis Offshore* case is directly contrary to the law in the Sixth

Circuit, and it is clearly distinguishable from this case in any event.

In *Davis Offshore*, one of the Chapter 11 debtor's equity holders filed an adversary

proceeding against the debtor and several other defendants, seeking to revoke the confirmation of

the debtor's plan, on the ground that it was procured by fraud.  One of the issues on appeal was

whether one of the defendants, Gregg Davis, had been released from fraud claims by the

confirmed plan.  The bankruptcy court and the court of appeals both held that Davis was not

released by the exculpation clause in the plan of reorganization.  But the bankruptcy court had

held that Davis was released by the broader release provision in the order confirming the plan.

*See* 644 F.3d at 265, 267.  The bankruptcy court ruled that the "'broader' terms of the

confirmation order would control over the Plan."  *Id.* at 265.

On appeal, the Fifth Circuit characterized the bankruptcy court's ruling to be that "if a

Plan and confirmation order conflict, the terms of the court's order are dispositive."  *Id.* at 267

(footnote omitted); *see also id.* at 268-69.  The appeals court described the bankruptcy court's

ruling as, in effect, a *per se* rule, that "as a matter of law, . . . the confirmation order must always

prevail over the terms of a conflicting plan." *Id.* at 268. The court of appeals held that such a *per se* rule is wrong, and noted that such a rule is supported by only "slender" and "minimal" legal authority that was "non-controlling" in the Fifth Circuit. *See id.* at 267-68. Importantly for this Court, however, the contrary legal authority cited by the *Davis Offshore* court includes a Sixth Circuit case. *See id.* at 267 n.8 (citing *Guardian Sav. & Loan Ass'n v. Arbors of Houston Assocs. Ltd. P'ship* (*In re Arbors of Houston Assocs. Ltd. P'ship*), No. 97-2099, 172 F.3d 47, 1999 WL 17649, at *4 (6th Cir. Jan. 4, 1999)).

But after rejecting the bankruptcy court's *per se* rule, the court of appeals in *Davis Offshore* went on to resolve the inconsistency between the plan and the confirmation order in the case before it, by ruling that the broader release provision in the confirmation order prevailed. *See id.* at 269.

In this case, *if* the Court were to find that there is a conflict between the Plan and the Confirmation Order (which the Court does not), then the Court would have to rule that the provisions of the Confirmation Order, including the incorporated 30-year amortization term, prevail. This is so for at least two reasons.

First, the law in the Sixth Circuit is contrary to the Fifth Circuit's holding in the *Davis Offshore* case. In this circuit, the rule is that "[w]hen [the plan document and the confirmation order are] in conflict, the confirmation order prevails." *Guardian Sav. & Loan Ass'n*, 1999 WL 17649, at *4 (citations omitted).[63] *See also Forklift LP Corp. v. iS3C, Inc.* (*In re Forklift LP*

---

[63] After so holding, the Sixth Circuit in *Guardian Savings* found that in the case before it, the plan and the confirmation order did not actually conflict.

*Corp.*), 363 B.R. 388, 396 (Bankr. D. Del. 2007) (citations omitted) (same) (noting that "[a] plan of reorganization has no effect without a court's confirmation").

Second, in this case, the Confirmation Order explicitly states that in the event of a conflict between the Plan and the Confirmation Order, the Confirmation Order governs. As noted in Part II.B.4 of this Opinion, the Confirmation Order states:

> In the event of a direct conflict between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.[64]

In this way, this case is different from the *Davis Offshore* case. There is no indication in the court of appeals opinion in *Davis Offshore* that either the confirmation order or the plan had any provision saying what happens in the event of a conflict between the two documents.

**B.  None of the documents cited by the PFRS conflict with the POA's 30-year amortization.**

In any event, there is no conflict between the Confirmation Order, which incorporates the Confirmation Opinion and therefore incorporates the 30-year amortization term, and any Plan provision. For example, there is nothing in the description of the Plan's treatment of Class 10 claims that is inconsistent with the 30-year amortization term.

Contrary to the PFRS's argument, there is no inconsistency between the 30-year amortization term, on the one hand, and any of the following, on the other hand: (1) the governance terms in Exhibit B to the State Contribution Agreement; (2) the new PFRS Plan; and (3) Michigan's Public Act 314, as amended (Mich. Comp. Laws § 38.1133(g)). The Court will discuss each of these things.

---

[64]  Confirmation Order (Docket # 8272) at pdf p. 126 ¶ 83.

25

### 1. The State Contribution Agreement

The State Contribution Agreement is an exhibit to the Plan,[65] and therefore is part of the Plan, and it is discussed in the Confirmation Opinion. *See* discussion in Part II.C of this Opinion. As quoted in Part II.B.3 above, the Plan requires the City to make PFRS contributions after June 30, 2023 "in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto."[66] Under the Plan, and in accordance with the State Contribution Agreement, an Investment Committee for the PFRS was established. The Plan provides that "[t]he Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date."[67]

Under the State Contribution Agreement, and its Exhibit B (the "Governance Term Sheet"), the PFRS Investment Committee was given certain "investment management" authority with respect to the PFRS Plan. The PFRS relies on the part of the Investment Committee's authority to make recommendations to the PFRS Board about the following things (bold, italics, and underlining supplied by the PFRS):

> 4. ***Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary*** including, but not limited to: (i) those underlying the restoration of pension benefits, ***funding levels and amortization thereof***, all in accordance with the Pension Restoration Program [attached to the City's Plan of Adjustment,]

---

[65] The State Contribution Agreement was Plan Exhibit I.A.332 (Docket # 8045-1 at pdf p. 714). A copy of it also is filed at Docket # 13678, at pdf p. 48.

[66] *See* Docket # 8045 at pdf p. 45 ¶ II.B.3.q.ii.A.

[67] *See id.* at pdf p. 46 ¶ II.B.3.q.ii.F.

(ii) ***those underlying the determination of annual funding levels and amortization thereof***[, and (iii) on or after fiscal year 2024, the recommended annual contributions to PFRS in accordance with applicable law.]
. . .

8. Any interpretation of Plan documents, existing law, ***the POA or other financial determination that could affect funding or benefit levels***.[68]

The PFRS contends that these provisions give it the authority to determine the term of any amortization of the UAAL existing as of June 30, 2023. The PFRS is wrong, for at least two reasons. First, the provisions quoted above say no such thing. The Court agrees with the City's argument on this point:

> PFRS offers no explanation of how any of that language purports to give PFRS unfettered discretion over the **amortization term** for the UAAL as of 2023 or any other time. The first part of [the quotation], which defines the provision's scope, simply gives the Investment Committee (IC) authority to review the "correctness" of "calculations, actuarial assumptions and/or assessments."
>
> The provision goes on to give the IC authority to determine the "correctness" of "annual funding levels and amortization thereof." "Correctness" means checking the calculations. Nothing in the language even purports to give PFRS authority over the amortization term. Indeed, the phrase "amortization thereof" makes no sense because an "annual funding level" does not get "amortized." It is the amount that must be paid in the given year.
> . . . .
>
> The City can only presume[ that the quoted language was intended to address actuarial considerations that underlie the calculation of annual funding payments during the thirty-year amortization. Those are, for example, whether the amount will be determined using straight-line principle calculations or level-payments over the 30-year amortization term. See Malhotra's testimony quoted earlier

---

[68] PFRS Br. (Docket # 13634) at pdf p. 16 (quoting Ex. B to State Contribution Agreement (emphasis supplied by PFRS); Ex. B to State Contribution Agreement (Docket # 13678) at pdf pp. 72-73.

27

where he discusses these "methodology" issues **while confirming that the amortization term was 30-years**.[69]  Presumably, the IC was given authority to determine the "correctness" of those calculations.[70]

There is a second reason why the governance terms in the State Contribution Agreement do not conflict with the 30-year amortization in the POA: the Governance Term Sheet itself precludes the Investment Committee and the PFRS Board from taking any action that is inconsistent with the POA.  It does this in two ways.  First, it contains an overriding provision at the end of the Governance Term Sheet that says this:

---

[69]  This reference by the City to Malhotra's testimony is to Guarav Malhotra's trial testimony, about how the "amortization methodology" used can affect the City's required pension contribution level *over the 30-year amortization* starting in 2024.  The PFRS cited Malhotra's testimony.  In doing so, the PFRS noted that Malhotra was the author of the 40-year financial projections, discussed in Part II.C of this Opinion.  The PFRS quoted Malhotra's testimony, in part, as follows:

> Q. . . . How would the change in amortization after 2024 affect the contribution level?
>
> A.  *It depends on the amortization methodology*.  What we have used in the projections is a straight line principal in which the City is making higher payments in the first decade and **over the course of the 30 years** makes lower payments going forward.  You can change the amortization methodology to make it like a level payment **over 30 years** in which the City will have lower payments in the first say 10 years, but **over the course of the 30 years** the City will end up paying more because it has to pay more interest.  ***So it's more on the methodology aspect as to how that liability gets serviced***.

PFRS Br. (Docket # 13634) at pdf pp. 25-26 (quoting 9/29/2014 testimony of G. Malhotra) (first and last emphasis in original; other emphasis added).

[70]  City's Reply Br. (Docket # 13663) at pdf pp. 15-16 (emphasis added) (footnote added).

| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the [Investment Committee] or the [PFRS] Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment.[71] |
|---|---|

Here, the phrase "the confirmed Plan of Adjustment" clearly means the Plan and its exhibits and the Confirmation Order, which incorporates the 30-year amortization. (There is no "confirmed" Plan of Adjustment without the Confirmation Order.)

Second, the Governance Term Sheet expressly requires each member of the PFRS Investment Committee to "discharge his or her duties with respect to the PFRS in compliance with the provisions of Public Act 314 of 1965, as amended."[72] As discussed below, that Michigan statute *also* precludes taking any action that is contrary to the POA.

These overriding provisions in the Governance Term Sheet clearly mean that the PFRS Investment Committee and the PFRS Board cannot exercise their authority to change the 30-year amortization term. That is true even if the "investment management" language cited by the PFRS, quoted above, otherwise could include authority to decide the length of the amortization of the City's payment of the UAAL existing as of June 30, 2023.

### 2. The new PFRS Plan

The PFRS argues that the new PFRS Plan supports its position. A pre-confirmation form of the new PFRS Plan was an exhibit to the Plan[73] and it was finalized and adopted on December

---

[71]  Ex. B to State Contribution Agreement at 7 (Docket # 13678 at pdf p. 74).

[72]  *Id.* at 3-4 (Docket # 13678 at pdf pp. 70-71).

[73]  Plan Ex. I.A.254.a (Docket # 8045-1 at pdf p. 448) (New Hybrid PFRS Pension Plan) (Component I); Plan Ex. I.A.281 (Docket # 8045-1 at pdf p. 590) (Prior PFRS Pension Plan) (Component II).

8, 2014 based on the confirmed POA.[74]  The PFRS argues that this document shows that ***no amortization period is required*** for payment of the UAAL existing as of June 30, 2023, let alone a 30-year amortization.  But that document does not support the PFRS argument.

The PFRS relies on provisions in Article G of Component II of the new PFRS Plan,[75] which it also refers to as the "Legacy/Frozen Plan."  First, the PFRS quotes Section G-5(b).  In emphasizing certain parts of this Section, however, the PFRS fails to highlight the critical very first words of Section G-5(b) — "Subject to the Plan of Adjustment, . . . ."  Here is how the PFRS quotes this section (underlining, bold, and italics supplied by the PFRS):

> Sec. G-5. Contributions to and payments from the Pension Accumulation Fund.
>
> **<u>Contributions to and payments from the Pension Accumulation Fund shall be made as follows:</u>**
>
>        * * *
>
> (b)  Subject to the Plan of Adjustment, for Fiscal Years commencing prior to July 1, 2014, **<u>and on or after July 1, 2023</u>**, the Board of Trustees annually ascertained and reported to the Mayor and the Council **<u>the amount of contributions due the Retirement System by the City,</u>** and the Council shall appropriate and **<u>the City shall pay such contributions to the Retirement System *during the ensuing Fiscal Year*</u>**. When paid, such

---

[74]  As this Court explained in detail in a prior opinion, the new PFRS Plan was adopted by Order No. 44 of the Emergency Manager, Kevin D. Orr, issued on December 8, 2014, two days before the effective date of the confirmed POA.  *See In re City of Detroit, Michigan*, 614 B.R. 255, 260-61 (Bankr. E.D. Mich. 2020).  A copy of the new PFRS Plan, which combines Components I and II, is in the record in this case in the following location, among other possible locations: as part of Exhibit 6I to an earlier motion filed by the City on August 9, 2019, at Docket # 13090.  That Exhibit 6I is a copy of Emergency Manager Order No. 44, and a copy of the adopted new PFRS Plan is attached to that Emergency Manager Order as its Exhibit E.  The exact location in the record of the adopted new PFRS Plan is Docket # 13090-1, beginning at pdf p. 13.

[75]  The provisions quoted by the PFRS, which this Opinion quotes below, are in the record at Docket # 13090-1, at pdf pp. 147-48, 154.

contributions shall be credited to the Pension Accumulation Fund.[76]

Next, the PFRS quotes Section G-9, which states the following (underlining and bold supplied by the PFRS):

> Sec. G-9. Appropriations prior to July 1, 2014 **and after June 30, 2023.**
>
> (a) The Board of Trustees shall certify to the City Council **the amount of the appropriation necessary to pay to the various funds of the Component II** of the Retirement System the amounts payable by the City as enumerated in this Component II, according to legal budget procedure.
>
> (b) **To cover the requirements of Component II** prior to July 1, 2014 **and after June 30, 2023**, such amounts **as shall be necessary to cover the needs of Component II shall be paid into the Pension Accumulation Fund and the Expense Fund by special appropriations or transfers to the Retirement System**; provided, however that no transfers can be made from the Accrued Liability Fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to Section G-4 (as in effect prior to July 1, 2014).[77]

Finally, the PFRS quotes Section G-17, which states the following (underlining and bold supplied by the PFRS):

> [T]he **Board of Trustees shall compute the City's annual contributions** for Fiscal Years commencing prior to July 1, 2014 **and after June 30, 2023**… using actuarial valuation data… The Board shall report to the Mayor and to the City Council the contribution percents so computed, and such contribution percents **shall be used in determining the contribution dollars to be**

---

[76] PFRS's Sur-Reply Br. (Docket # 13681) at pdf p. 7 (bold, underlining, and italics supplied by the PFRS).

[77] *Id.* at pdf pp. 8-9 (footnotes omitted) (bold and underlining supplied by the PFRS).

31

13-53846-tjt   Doc 13704   Filed 06/26/23   Entered 06/26/23 14:30:44   Page 31 of 37

**appropriated by the City Council and paid to the Retirement System.**[78]

These provisions in the new PFRS Plan do not support the PFRS's position. First,

Section G-5(b) explicitly says that it is "[s]ubject to the Plan of Adjustment." And the new PFRS

Plan defines "Plan of Adjustment" to mean the confirmed POA:

> *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan*, Case No. 13-53846.[79]

Thus, in calculating the City's required annual contributions after June 30, 2023, the

PFRS is subject to and bound by the POA's 30-year amortization. Therefore, under Section G-

5(b), for each of the 30 years "on and after July 1, 2023," the PFRS is to calculate the City's

required contribution for the ensuing Fiscal Year" based on the 30-year amortization, and the

City is to pay the required contribution for that ensuing Fiscal Year. When Section G-5(b) is

viewed in this light, Sections G-9 and G-17 add nothing that supports the PFRS's position.

In addition, the new PFRS Plan contains an overriding provision that requires the PFRS

Board and Investment Committee to comply with the confirmed POA. Section 1.3 states:

> The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment"). Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect

---

[78] *Id.* at pdf p. 9 (bold and underlining supplied by the PFRS).

[79] New PFRS Plan, Section 2.1(45) (Docket # 13090-1) at pdf p. 42 (italics in original). This definition of "Plan of Adjustment" applies to both Components I and II of the new PFRS Plan. *See id.* at Section A-1(b) (Docket # 13090-1) at pdf p. 97-98.

32

to the Plan of Adjustment. To the extent that a conflict arises
between the Combined Plan Document and the Plan of
Adjustment, the City, the Board of Trustees, the Investment
Committee and the Retirement System are directed to interpret any
inconsistency or ambiguity to give full effect to the Plan of
Adjustment.[80]

For these reasons, the new PFRS Plan does not support the PFRS's position.

### 3. Michigan's Public Act 314, as amended (Mich. Comp. Laws § 38.1133(g))

The PFRS's cites Mich. Comp. Laws § 38.1133(g), but like the State Contribution

Agreement and the new PFRS Plan, that statute's relevant provisions all are "subject to" the

confirmed POA. The statute provides, in pertinent part:

(1) **Subject to a plan for adjustment**, each large sponsored
system shall establish an investment committee.

(2) The investment committee shall recommend to the governing
board of the large sponsored system investment management
decisions, including, but not limited to, all of the following:
. . . .

(d) **Subject to a plan for adjustment**, all calculations, actuarial
assumptions, or assessments used by an actuary, including, but not
limited to, those underlying the restoration of pension benefits,
funding levels, and amortization of the restoration of pension
benefits, and those underlying the determination of annual funding
levels and amortization of annual funding levels, and
recommended contributions to the large sponsored system in
accordance with applicable law.
. . . .

(g) Interpretation of the large sponsored system's governing
documents, applicable laws, plans of adjustment approved by
United States bankruptcy courts, and other financial determinations
affecting the large sponsored system's funding or benefit levels.

---

[80] *Id.* at Section 1.3 (Docket # 13090-1) at pdf p. 25. This section applies to both Components I
and II of the new PFRS Plan. *See id.* at Section A-1(a) (Docket # 13090-1) at pdf p. 97.

> (h) Based on annual actuarial valuation reports and any other projections or reports, as applicable from an actuary or other professional advisors, the determination of the extent of restoration of pension benefits **all in conformance with a plan for adjustment**.
>
> . . . .
>
> (6) As used in this section:
>
> . . . .
>
> (d) **"Plan for adjustment" means a plan for the adjustment of debts entered and approved by a federal bankruptcy court** for a city that has established a large sponsored system.

Mich. Comp. Laws § 38.1133g (emphasis added).

This further confirms that the 30-year amortization in the confirmed POA is binding on the PFRS. It was incorporated into the POA by the Confirmation Order, and as that Order says, the Confirmation Order is "binding upon" the City and "any and all holders of Claims," including the PFRS.[81]

### 4. Further comment

The 30-year amortization term in the POA did not and should not come as a surprise to anyone, and certainly not the PFRS. As described in detail in Parts II.B and II.C of this Opinion, the 30-year amortization was clear in the 40-year projections from at least as early as the filing of the City's Fourth Amended Disclosure Statement on May 5, 2014, and in every such set of projections thereafter, and this was clear to everyone during the lengthy confirmation trial. These projections were used as a fundamental basis on which the feasibility of the City's Plan was demonstrated at trial, and on which the Court found that the Plan was feasible. It should not surprise anyone that this 30-year amortization is part of the POA, based on the Court's

---

[81] Confirmation Order (Docket # 8272) at pdf p. 90 ¶ E.28.

34

Confirmation Order and the Confirmation Opinion that the Court expressly incorporated into the

Confirmation Order.  And as the Confirmation Order itself states, the Confirmation Order is

binding on the PFRS.

**C.  The City is entitled to the injunctive relief sought in the Motion, and because that relief is provided for in the POA, an adversary proceeding is not required under Fed. R. Bankr. P. 7001(7).**

The PFRS argues that the City cannot obtain the injunctive relief it seeks by motion.

Rather, the PFRS argues that the City must file an adversary proceeding.  The PFRS cites Fed. R.

Bankr. P. 7001(7), for the proposition that "a proceeding to obtain an injunction or other

equitable relief" requires an adversary proceeding.  But that rule does not require an adversary

proceeding "when a chapter 9 . . . plan provides for [such] relief."  The rule states:

> An adversary proceeding is governed by the rules of this Part VII.
> The following are adversary proceedings:
> . . . .
>
> (7) a proceeding to obtain an injunction or other equitable relief,
> except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan
> provides for the relief[.]

Fed. R. Bankr. P. 7001(7).

The POA in this case provides for the very type of injunction that the City seeks here.  As

the Court has now ruled, the PFRS's efforts to impose a 20-year amortization is contrary to the

POA.  As a result, the PFRS's conduct violates the following injunction contained in the

Confirmation Order:

> On the Effective Date, except as otherwise provided in the Plan or
> in this Order, **all Entities that have been, are or may be holders
> of Claims against the City, . . ., along with their Related
> Entities**, shall be, and hereby **are, permanently enjoined from
> taking any of the following actions against or affecting the City**

or its property . . . (e) **proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of this Order**, the Plan or the Settlements (to the extent such Settlements have been approved by the Court herein); and (f) **taking any actions to interfere with the implementation or consummation of the Plan.**[82]

Similarly, the PFRS's conduct violates the injunction in Article III of the Plan, which is applicable to "all Entities that have been, are or may be holders of Claims against the City,"[83] and which therefore enjoins the PFRS from:

> proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and . . . taking any actions to interfere with the implementation or consummation of the Plan.[84]

Under the Plan, the Court retains jurisdiction to enter injunctions to enforce the confirmed POA. In Article VII, Section I of the Plan, quoted in Part III of this Opinion, the Court retains jurisdiction to:

> **Issue injunctions,** enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate **to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order[.]**[85]

Given these provisions in the POA, the Court has authority to further enjoin the PFRS's

---

[82] Confirmation Order (Docket # 8272) at pdf pp. 93-94 ¶ H.32 (emphasis added).

[83] Plan (copy appended at Docket # 8272) at pdf p. 190.

[84] Id. at pdf p. 190-91, Sections III.D.5.a.5 and III.D.5.a.6.

[85] *Id.* at pdf p. 210 (emphasis added).

36

conduct, in the way the City requests, without the need for an adversary proceeding.

**V. Conclusion**

For the reasons stated in this Opinion, the Court will grant the City's Motion, and will enter an order requiring the PFRS to amortize the UAAL existing as of June 30, 2023 over 30 years; and enjoining the PFRS from any further attempts to shorten that amortization period to 20 years or to any length of time less than 30 years from June 30, 2023 forward.

**Signed on June 26, 2023**              /s/ Thomas J. Tucker

                                                       **Thomas J. Tucker**
                                                       **United States Bankruptcy Judge**