# EXHIBIT 6D

## Summary Judgment Response

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| RICHARD CADOURA, | ) | |
| | ) | Case No. 20-cv-12986 |
| PLAINTIFF, | ) | Hon. Gershwin A. Drain |
| | ) | Magistrate Judge Anthony P. Patti |
| VS. | ) | |
| | ) | |
| THE CITY OF DETROIT, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COMES, Plaintiff, RICHARD CADOURA, by and through his attorneys, Carla D. Aikens, P.L.C., and for his Response to Defendant's Motion for Summary Judgment, states as follows:

1.  Plaintiff admits that his Complaint brings claims of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as well as a retaliation claim under the Elliot Larsen Civil Rights Act (ELCRA).(ECF No. 1)

2.  Admitted. Plaintiff's Complaint speaks for itself. (ECF No. 1).

3.  Denied. Plaintiff can establish a prima facie case of retaliation in violation of both Title VII and ELCRA.

4.  Neither admitted nor denied but leave Defendant to its proofs.

1

WHEREFORE Plaintiff, Richard Cadoura, respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgment in its entirety and grant such other relief as deemed necessary and appropriate in the Court's discretion.

Dated: February 17, 2023

Respectfully Submitted,

/s/ Austen J. Shearouse
Carla D. Aikens (P69530)
Austen J. Shearouse (P84852)
CARLA D. AIKENS, P.C.
*Attorneys for Plaintiff*
615 Griswold Street, Ste. 709
Detroit, MI 48226
austen@aikenslawfirm.com

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RICHARD CADOURA, | ) | |
| | ) | Case No. 20-cv-12986 |
| PLAINTIFF, | ) | Hon. Gershwin A. Drain |
| | ) | Magistrate Judge Anthony P. Patti |
| VS. | ) | |
| | ) | |
| THE CITY OF DETROIT, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## BREIF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................i

TABLE OF AUTHORITIES...................................................................................ii

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 1

STANDARD OF REVIEW .................................................................................... 5

ARGUMENT .......................................................................................................... 5

CONCLUSION .....................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 US 242 (1986) ............................................... 4

*Barrow v. City of Cleveland*, 773 F. App'x 254 (6th Cir. 2019)............................ 5

*Celotex Corp v. Catrett*, 477 US 317 (1986) ......................................................... 4

*Muhammad v. Close*, 379 F.3d 413 (6th Cir. 2004)................................................ 5

*Rogers v. Henry Ford Health Sys.*, 897 F.3d 763 (6th Cir. 2018).......................... 5

**Rules**

Fed. R. C1v. P. 56(c) ............................................................................................. 4

Fed. R. Civ. P. 56................................................................................................... 1

## INTRODUCTION

Plaintiff, Richard Cadoura brought this Complaint on November 5, 2020, against Defendant City of Detroit (hereinafter referred to as "Detroit" or "Defendant") for claims of retaliation in violation of both Title VII and ELCRA when he was offered a position, accepted it, and then had his job offer revoked before he could start working. Defendant has filed two motions for judgment on the pleadings (ECF No. 5 and ECF No. 16), which this Honorable Court has denied. Discovery has closed on this matter and Defendant then brought this instant motion seeking dismissal of Plaintiff's claims pursuant to Fed. R. Civ. P. 56.

## STATEMENT OF FACTS

Plaintiff began serving as an EMT and paramedic for the Detroit Fire Department in 1999, a job he held for fifteen years because of his love for what he did. (Exhibit A: Dep. of Richard Cadoura at 48-49) (Exhibit B: Dep. of Joseph Barney III at 36).[1]  Mr. Cadoura was known to be a good EMT/paramedic as confirmed by Joseph Barney III, a 29-year servant for the City of Detroit.[2] *Id.* at 43.  As Mr. Barney stated:

---

[1] "This is a man that was fighting hard to improve the lot for everybody at EMS…" Exhibit B at 36.

[2] Mr. Barney has held positions as an EMT, paramedic, assistant superintendent, Captain of the Training Academy for EMS, and a Shift Captain. See Exhibit B at 9-10.

1

> So at the end of the day, I thought, you know, this guy never hurt anybody that I know of. Most of his discipline was based against management that was adversarial and I don't recall any patient care complaints and he treated citizens well. So I didn't see a problem with bringing him back and that's what I told Chief Burch.

*Id*. at 37.

During his time with the Detroit Fire Department, Mr. Cadoura was involved in a news story regarding ambulance run times as well as a lawsuit against the City. (Exhibit A at 13, 51, 65).The lawsuit dealt with issues of racial discrimination and hostile work environment, issues that were compounded by the over-issuance of discipline in 2012 and 2013. (Exhibit B at 44-45). According to Mr. Barney, the Detroit Fire Department "didn't care" about their employees nor their disciplinary records. *Id*. During the end of Mr. Cadoura's career with the City of Detroit, Mr. Barney stated that it "[was]n't following [its] own rules under General Rule 61C-3," which resulted in the due process rights of employees being violated. (*Id.* at 45-46). Mr. Barney further stated that the time when Mr. Cadoura left the Detroit Fire Department was "a very ugly period." *Id*. at 36.

Mr. Cadoura resigned on June 13, 2013.  (*See* Defendant's Exhibit 4, ECF No. 33-5, PageID 268-70). On the resignation notice, it states that Mr. Cadoura was not eligible for reinstatement due to pending discipline at the time of his resignation. This is allegedly the result of a City of Detroit policy mandating the same, but even more senior members of the Detroit Fire Department had not seen

said policy. (Exhibit C: Dep. of Donella James at 35-36); (Exhibit D: Dep. of John Sablowski at 36). However, Defendant was failing to offer trial boards[3] and otherwise adjudicate the disciplines being issued towards the end of Mr. Cadoura's employment and let these charges "sit for two years and there would be no adjudication of it and, you know, that impacts people negatively." (Exhibit B at 29). In fact, Defendant "had people that would charge somebody because they didn't want them to be in a supervisory capacity and, you know, with that out being adjudicated, they wouldn't be eligible to be –you know, to test out as a supervisor." *Id*. at 30.[4]

Mr. Cadoura reached out for reemployment with the City in November of 2017, a time in which the Detroit Fire Department was "reaching out to all Fire Detroit EMS employees." (Exhibit E: Deposition of Jerald James at 48) (*see also* Exhibit D at 35). Defendant even reached out to and rehired Brian Moore, a Detroit Fire Department paramedic, who "killed a patient." (Exhibit E at 42) (Exhibit C at 25).[5]

---

[3] "Trial boards" are an administrative board that helped adjudicate appeals of discipline that did not go through the arbitration process.

[4] Defendant never gave Mr. Cadoura an exit interview. (Exhibit A at 23).

[5] "I know there was an issue with Paramedic Moore and another employee that was a friend that had to do with workplace violence. And I believe that Brian Moore had an issue with patient care...." (Exhibit C at 24-25).

3

(Exhibit C at 25:19-23).    Plaintiff went through the application process and
fulfilled the testing required of him by Defendant. (Exhibit A at 18-21); (Exhibit F:
Candidate Rating Sheet for Mr. Cadoura in December of 2017).[6] He was even
assured that his years of service to the community would be taken into
consideration for his reapplication to the Detroit Fire Department. *Id*. at 22.

Belinda Brown, from Defendant's HR department, eventually sent him a text
message telling him he was hired and to resign from his then-current job.  (Exhibit
A at 20:21-21:1) (Exhibit G: Brown Dep. at 34:20-35:18)[7].  However, shortly after
Chief Burch passed and Plaintiff had attended his funeral, Plaintiff received a
phone call stating that his employment filed had been reviewed and that he had
been placed on the "do not rehire" list. (*Id*. at 21:14-22:1).  He was then formally
denied via a letter from Ms. Brown. (*See* Defendant's Exhibit 11, ECF No. 33-12,
PageID 293).

---

[6] All areas were listed as passing by both Belinda Brown and Captain Daniel
Walisesky.

[7] Brown stated that she did not recall sending the text but did not deny that she sent
it.

4

## STANDARD OF REVIEW

As a threshold matter, summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material facts far trial and the party is entitled to judgement as a matter of law. Fed. R. C1v. P. 56(c); *Celotex Corp v. Catrett*, 477 US 317, 322-323; 106 S.CT. 2548; 91 L.Ed.2d 265 (1986) When considering a motion for summary judgment, the District Court "must view the evidence in a light most favorable to the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 251-52; 106 S.CT. 2505; 91 L.Ed.2d 202 (1986). Finally, the Court must accept as true to the text of the note any direct evidence offered by the nonmoving party, in opposition to the Summary Judgement motion. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004). Ultimately, the standard of review for summary judgment is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided, that one party must prevail as a matter of law." *Anderson*,(supra) 477 US at 251-52. Plaintiff submits that, utilizing this standard, the Court should reject Defendant's position and deny summary judgment.

## **ARGUMENT**

### I.   **Plaintiff Has Properly Stated a Claim Under both Title VII and ELCRA.**

Plaintiff can establish a prima facie case of retaliation under both Title VII and ELCRA by showing: (1) he engaged in a protected activity; (2) his exercise of

5

the protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the adverse action. *Barrow v. City of Cleveland*, 773 F. App'x 254, 261 (6th Cir. 2019) (citing *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018)).

Defendant points to differences between the EEOC charge and the Complaint as evidence of "contradiction," with the implication that this undermines his claims. However, Defendant has not cited to, nor is Plaintiff aware of, any case, rule, or statute requiring the EEOC charge to directly mirror the Complaint. Claims brought by plaintiffs are routinely given more detail and change slightly as discovery is done and/or more information becomes available. Plaintiff was placed on the "do not rehire list" due to an alleged policy Defendant has that requires such a designation when someone retires/resigns with pending discipline as well as poor work behavior. (*See* Defendant's Exhibit 16, ECF No. 33-17, PageID. 338). Neither of these reasons stand when examined fully as set forth fully in Section (c). Defendant maintains that Mr. Cadoura's allegation of retaliation due to his prior lawsuit is "not supported by any evidence," stating further that "he has not established that the decisionmakers knew about his alleged protected activity…" (*See* Defendant's Motion for Summary Judgment, ECF No. 33, PageID. 255).

6

However, Jerald James, a former Chief for Defendant, stated:



(Exhibit E at 37-38). Thus, it is clear that decision makers were aware of this lawsuit when they disciplined Mr. Cadoura, placed him on the "do not rehire list," and denied his reinstatement. Importantly, around the time of Mr. Cadoura's resignation, there was a surge of disciplinary issues, as Mr. Barney stated. (Exhibit B at 30). His statement, from a non-interested party, shows that the Administration used discipline as a means to suppress employees from promotion. Thus, a leap in logic is not required for a jury to find such actions were also undertaken when Mr. Cadoura was placed on the "do not rehire list" and denied reinstatement.

Given the widespread knowledge of the issues about which Mr. Cadoura complained, it is clear that Defendant created the situation for the denial of Mr. Cadoura's reinstatement with the improper issuance of discipline even before he

7

left the department, the denial of his procedural rights including an exit interview, and his denied reinstatement which prompted this lawsuit.

### a. *Plaintiff can establish that his protected activity was known to the decisionmakers.*

The above section, which includes the statement from Jerald James, shows widespread knowledge of Mr. Cadoura's lawsuit when he was receiving the improper disciplines mentioned in Joseph Barney III's testimony. (Exhibit E at 37-38); (Exhibit B at 36, 44-45, 45-46). Further, Defendant did not cite to any evidence or testimony stating Belinda Brown and Kemia Crosson were the only "decisionmakers" involved in the denial of Mr. Cadoura's reinstatement. Defendant's own records actually support the fact that other high-ranking individuals were involved in the denial and pulled Mr. Cadoura's file, which is not normal for the process. (Exhibit G: Deposition of Belinda Brown at 29-30) (Exhibit H: February 24, 2017 Email from Chief Sean Larkins).[8]

| From: | Sean Larkins |
|---|---|
| To: | Kemia Crosson |
| Cc: | Zack, Sydney |
| Subject: | Employee Rehire |
| Date: | Friday, February 24, 2017 3:41:05 PM |

Kemia,

You will be receiving an application for rehire from a Richard Cadoura. Please pull his file and speak to the Department prior to making any decisions.

Thank you.

---

[8] Upon information and belief, Sean Larkins, current Superintendent of EMS, is a twenty-seven-year veteran of Defendant.

8

(Exhibit H and Exhibit G at 30 respectively). Chief Sean Larkins clearly had a reason to deviate from the normal procedure of hiring, as testified to by Belinda Brown. Chief Larkins was working during the time of Mr. Cadoura's lawsuit against Defendant and inserted himself into the rehiring process. There is no explanation offered by Defendant as to why Chief Larkins would deviate from the normal hiring process, particularly where Belinda Brown had already told him he would be hired. A reasonable jury could rule Mr. Cadoura's prior lawsuit, his protected activity, was known by at least Chief Larkins who clearly inserted himself as part of the decision-making process.

> ### b. Mr. Cadoura has established a causal connection between his protected activity and Defendant's decision not to rehire him.

.     The prior section shows a jury could reasonably find that the decision makers involved in denying Mr. Cadoura's rehire application knew of the prior lawsuit, his protected activity. Defendant points to the disciplinary records as evidence to support their legitimate, non-retaliatory reason for Mr. Cadoura being denied reinstatement in 2017.[9] However, Joseph Barney III and Donella James

---

[9] That reason is fully address in Section (c).

9

both stated Mr. Cadoura was a competent EMT/paramedic, who did not have issues with patient care. (Exhibit B at 37) (Exhibit C at 17). Section (c) sets out a full explanation as to the pretextual nature of Defendant's proffered legitimate reason for Mr. Cadoura's denial. Defendant does not have a plausible explanation for any of the oddities in this case:

- Belinda Brown from Defendant's HR stated to Plaintiff that he would be hired and should resign from his then-current employment.

- Chief Larkins asked for Cadoura's file to be pulled, which Belinda Brown stated was not normal. (Exhibit G at 30) (Exhibit H).

- Brian Moore was rehired despite resigning/quitting with pending discipline relating to killing a patient, issues with workplace violence, and a recommendation from Jerald James to be placed on the do not rehire list. (Exhibit E at 42, 51) (Exhibit C at 24).
- Multiple superiors in the Detroit Fire Department being completely unaware of the alleged Detroit policy requiring a do not rehire designation for someone resigning with pending discipline. (Exhibit C: Dep. of Donella James at 35-36)(Exhibit D: Dep. of John Sablowski at 36).

All of these facts support Mr. Cadoura's claims of retaliation as they show repeated differences in treatment and/or process. Defendant did not address Brian Moore, a comparator to Plaintiff, in its motion in any manner. His situation, as fully set forth below, provides a strong piece of evidence that Mr. Cadoura was treated differently based upon something other than his do not rehire designation based on pending discipline. When viewed in a light most favorable to Plaintiff, he

10

has established a genuine issue of material fact as to the matter of a causal connection.

      c.  *Defendant's proffered legitimate reason was merely pretextual and was not the reason for the denial of Mr. Cadoura's application.*

Mr. Cadoura can show pretext in this matter, as Defendant's proffered legitimate reason does not hold up when examined in the full light of the facts and evidence. Throughout Defendant's instant motion, references to the disciplinary record of Mr. Cadoura as well as poor work performance make up the basis of their alleged legitimate reason. However, Mr. Cadoura can offer evidence to counter this reason showing that this was merely pretextual.

First, there is Brian Moore. Mr. Moore was recommended for the do no rehire list due to an incident where "[h]e killed a patient." (Exhibit E at 42). Jerald James knew Defendant "rehired a whole bunch of people that had resigned and been terminated and etc." *Id.* at 43. Similar to Mr. Cadoura, Mr. Moore resigned prior to receiving any disciplinary action related to the incident where a patient died. *See Id.* at 51. Thus, not only did Mr. Moore have a "severe" patient care issue, but he resigned prior to receiving the disciplinary action related to that issue.[10] However, unlike Mr. Cadoura, he was rehired by Defendant despite Jerald James' recommendation that he be placed on the do not rehire list for killing a

---

[10] Defendant's argument for their legitimate reason rests on pending disciplinary action placing Mr. Cadoura on the do not rehire list.

11

patient. *Id*. at 42-43, 48 (See also Exhibit C at 24). Mr. Moore even had issues with workplace violence against another employee. (Exhibit C at 24). Mr. Cadoura did not have those issues and Mr. Barney, a veteran on the force, did not see a problem with bringing him back and advised the Chief Burch of the same. (Exhibit B at 37).

Further, and importantly, Brown stated that even though she was in Humar Resources, she did not know he was ineligible for rehire until Chief Larkins told her the same.  (Exhibit G at 22:19-24).  Brown told Cadoura that they would have told him at his exit interview when he left the City that he was ineligible for rehire, but Cadoura informed her that he never had an exit interview at all. (Exhibit A at 23). Brown further told him that, at the time he first left (which she told him was a "discharge" rather than a resignation), he should have had a disciplinary hearing if he was actually subject to discipline; but then after informing him of this, she hung up the phone saying she had "said too much." (*Id*.)

Mr. Cadoura wanted to improve the Detroit Fire Department, yet he was not allowed to do so due to pending discipline, the same issue Brian Moore had but was allowed to return. (Exhibit B at 43); (Exhibit E at 42, 43, 51). John Sablowski, a former coworker, and supervisor for Mr. Cadoura, had no problems working with him when they were both paramedics. (Exhibit D at 27). Yet, despite his record of service and individuals like Mr. Barney recommending his reinstatement, Mr. Cadoura was denied rehire and Mr. Moore was not. This leads to two possible

conclusions: 1) Brian Moore was exempted from an allegedly mandatory placement on the do not rehire list according to an alleged policy; and/or 2) Mr. Moore was placed on the do not rehire list according to the same policy as Mr. Cadoura, but was treated differently despite having a far more severe basis for his disciplinary action.

Both conclusions are devasting to Defendant's arguments. The first would mean that Defendant did not apply this alleged policy to all of its employees equally. This would reasonably point someone to the conclusion that Defendant "picked and chose" to whom to apply this mandatory policy and selected Mr. Cadoura for some other reason than pending discipline. That reason was Mr. Cadoura's prior lawsuit, which the entire department knew about, according to Jerald James' testimony. The second explanation would mean that despite applying the policy to both individuals, one was given adversarial treatment for another reason.[11] Either of this conclusions could be reasonably supported by the evidence and a reasonable jury could rule the Defendant's proffered reason was merely pretextual as it relates to Mr. Cadoura based upon the information provided.

---

[11] Defendant cannot say Mr. Cadoura was not qualified as the attached Exhibit F shows Mr. Cadoura received passing grades in all areas for his candidate rating sheet in 2017.

13

## CONCLUSION

WHEREFORE Plaintiff, Richard Cadoura, respectfully requests this Honorable Court deny Defendant's Motion in its entirety and grant such other relief as deemed necessary and appropriate in this Court's discretion.

Dated:  February 17, 2023

Respectfully Submitted,

/s/ Austen J. Shearouse
Carla D. Aikens (P69530)
Austen J. Shearouse (P84852)
CARLA D. AIKENS, P.C.
*Attorneys for Plaintiff*
615 Griswold Street, Ste. 709
Detroit, MI 48226
austen@aikenslawfirm.com

## CERTIFICATION PURSUANT TO L.R. 7.1

LOCAL RULE CERTIFICATION: I, Austen J. Shearouse, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for nonproportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1 (d)(3).

*/s/ Austen J. Shearouse*
Austen J. Shearouse

## CERTIFICATE OF SERVICE

14

I hereby certify that on February 17, 2023, I caused to have electronically filed Plaintiff's Response to Defendant's Motion for Summary Judgment, Brief in Support of Motion, and Certificate of Service with the Clerk of the Court using the E-file & Serve system, which will serve a copy of such filing via email to all attorneys of record.

/s/     Carla D. Aikens

15

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| RICHARD CADOURA, | ) |
| | )  Case No. 20-cv-12986 |
| PLAINTIFF, | ) Hon. Gershwin A. Drain |
| | ) Magistrate Judge Anthony P. Patti |
| VS. | ) |
| | ) |
| THE CITY OF DETROIT, | ) |
| | ) |
| DEFENDANT. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## PLAINTIFF'S LIST OF EXHIBITS

Plaintiff submits the following exhibits to his Response to Defendants'

Motion for Summary Judgment:

Exhibit A          Deposition of Richard Cadoura

Exhibit B          Deposition of Joseph Barney III

Exhibit C          Deposition of Donella James

Exhibit D          Deposition of John Sablowski

Exhibit E          Deposition of Jerald James

Exhibit F          Candidate Rating Sheet for Mr. Cadoura in December of 2017

Exhibit G          Deposition of Belinda Brown

Exhibit H          February 24, 2017 Email from Chief Sean Larkins

Dated:  February 17, 2023                    Respectfully Submitted,

                                             /s/ Austen J. Shearouse
                                             Carla D. Aikens (P69530)
                                             Austen J. Shearouse (P84852)
                                             CARLA D. AIKENS, P.L.C.
                                             *Attorneys for Plaintiff*
                                             615 Griswold Street, Ste. 709
                                             Detroit, MI 48226
                                             austen@aikenslawfirm.com


## **CERTIFICATE OF SERVICE**

 I hereby certify that on February 18, 2023, I caused to have electronically filed Plaintiff's Exhibit List and Certificate of Service with the Clerk of the Court using the E-file & Serve system, which will serve a copy of such filing via email to all attorneys of record.

                         /s/     Carla D. Aikens

EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the Matter of:

RICHARD CADOURA,

    Plaintiff,                 Case No. 20-cv-12986
                               Hon. Gershwin A. Drain
vs.                  Magistrate Judge: Anthony P. Patti

CITY OF DETROIT,

    Defendant.
_____/

ZOOM VIDEO CONFERENCE DEPOSITION OF RICHARD CADOURA

          Transcript of the deposition taken in the
above-entitled matter by Zoom video conferencing, on

Thursday, January 5, 2023, commencing at or about 10:00 a.m.

APPEARANCES:


For the Plaintiff:   CARLA D. AIKENS (P69530)
                   AUSTEN SHEAROUSE (P84852)
                   Carla D. Aikens P.L.C.
                   615 Griswold Street, Suite 709
                   Detroit, Michigan 48226
                   844.835.2993
                   carla@aikenslawfirm.com

For the Defendant:   JASON T. McFARLANE (P73105)
                   ANDRAE D. SMITH (P69153)
                   City of Detroit Law Department
                   2 Woodward Avenue, Suite 500
                   Detroit, Michigan 48226
                   313.237.3088/313.237.0548
                   mcfaj@detroitmi.gov
                   smithand@detroitmi.gov

REPORTED BY:        TAMARA A. O'CONNOR
                   CSMR-2656, CER-2656

TAMARA A. O'CONNOR
248.882.1331     toconnorrptg@aol.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 25 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 2

TABLE OF CONTENTS

WITNESS                                                PAGE

Richard Cadoura

      Examination by Mr. McFarlane            3

      Examination by Mr. Shearouse           64

EXHIBITS                                             MARKED

Defendant's Exhibit 1                                  11

  (12-12-11 Cadoura Statement)

Defendant's Exhibit 2                                  24

  (Conditional Offer of Employment)

Defendant's Exhibit 3                                  24

  (12-4-17 Letter Re: PAT)

Defendant's Exhibit 4                                  25

  (1-13-18 Letter Re:  Regret letter)

Defendant's Exhibit 5                                  47

  (Resignation Form)

TAMARA A. O'CONNOR
248.882.1331     toconnorrptg@aol.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 26 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 3

1    Thursday, January 5, 2023 – 10:00 a.m.
2    (Deposition taken by Zoom video
3    conferencing.  The term "inaudible" is
4    used where audio fades out or audio
5    interference causes testimony to be
6    unintelligible.)
7    REPORTER:  Please raise your right hand.
8    Do you solemnly swear to tell the truth, the whole truth
9    and nothing but the truth?
10   MR. CADOURA:  Yes, ma'am.
11   REPORTER:  Thank you.
12   MR. MCFARLANE:  This is the date and time
13   set for the deposition of Mr. Cadoura in the lawsuit that
14   he filed against the City of Detroit and to be used for
15   all purposes under the Michigan Federal Rules of Civil
16   Procedure.
17        RICHARD CADOURA
18   having been called as a witness, was sworn to testify to
19   the truth, the whole truth and nothing but the truth, was
20   examined and testified as follows:
21        EXAMINATION
22   BY MR. MCFARLANE:
23   Q    Sir, as this is taken via Zoom, I would ask, are you
24        alone?
25   A    Yes, sir.

Page 4

1    Q    Okay.  Nobody else present?
2    A    No, sir.
3    Q    Okay.
4    A    Am I okay or do you want me to center myself a little
5         better --
6    Q    You're absolutely fine.  I'm not going to fuss over
7         whether you're centered or not.  It's all right by me.
8         Just so you know, when I'm talking, don't talk over me.
9         It makes it very hard for the Court Reporter.  When I'm
10        talking, let me finish.  I'll try and let you finish.
11        I'm sure we'll screw it up somewhere along the way, but
12        the less we do it, the better.
13            If you don't understand any questions I
14        ask, just let me know because if you answer, it will seem
15        like you understood the question.
16            If you need a break, let us know and we'll
17        take a break.  Any questions before we start?
18   A    No, sir.
19   Q    What is your full name?
20   A    Richard Najib; N-a-j-i-b.  Last name is Cadoura; C-a-d-o-
21        u-r-a.
22   Q    Have you ever used any other names?
23   A    No.
24   Q    What is your date of birth?
25   A    September 3, 1971.

Page 5

1    Q    And what is your current address?
2    A    Current address is 12559 Stoneridge Lane, South Rockford,
3         Michigan, Apartment 102.  I'm sorry.  12559 Stoneridge
4         Lane, Apartment 102, South Rockford, Michigan 48179.  I
5         haven't changed it on my Driver's License yet, but I am
6         in the process of moving.
7    Q    And I take it based on what you just said, you're
8         currently in the process of moving?
9    A    That's right.
10   Q    Do you live with anybody else?
11   A    No.
12   Q    I would like to start with your employment history.
13        Prior to working for the City of Detroit, where did you
14        work?
15   A    Community Ambulance.
16   Q    And when did you start working for Community Ambulance?
17   A    I believe it was probably the summer of '97.
18   Q    And how long did you stay with Community Ambulance?
19   A    I would say probably anywhere between six months and a
20        year.  I was actually working for a few of their
21        companies.  One was a hospital-based company and the other
22        was a private ambulance company.  The other one was
23        Health Link EMS.  It was under the same parent company.
24        I worked part-time for both and then when I received my
25        letter to work for the City of Detroit, I obtained

Page 6

1         residency in the City which was a requirement of
2         employment and then I resigned after the, well, two weeks
3         before the academy started.  So we were supposed to start
4         June 8, 1998.
5             I resigned from both jobs two weeks prior.
6    Q    And then you came to the City of Detroit.  Is that
7         correct?
8    A    That's correct.
9    Q    And what title did you hold at the City of Detroit?
10   A    They called it back then, it still could be true today,
11        it was EMMT which was an Emergency Mobile Medical
12        Technician.
13   Q    Did you hold any other titles with the City?
14   A    No.
15   Q    Okay.  And when did you leave the City?
16   A    It was June 7th, 2013.
17   Q    And why did you leave?
18   A    I was working, you know, my regular shift with the
19        regular partner that I had and before I made the decision
20        to leave, I was brought before one of the HR personnel
21        with then Chief Gerald James and we had a meeting.
22            Apparently, they had some issue with, they
23        said that I couldn't be clean shaven every day and I told
24        them, you know, that was never an issue before.  Why is
25        it becoming an issue now and it became apparent that I

3 (Pages 3 to 6)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 27 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 7

1 didn't want to be discharged because they told me in that
2 meeting that if things didn't change, then I would be
3 subject to a discharge and I didn't want to be discharged
4 from there.
5 Q  And so you resigned?
6 A  That's correct.
7 Q  Prior to your resignation did you have any pending
8    discipline?
9 A  That's correct.
10 Q  And do you recall what that pending discipline was?
11 A  There was a lot.  I couldn't really specify one over the
12    other.  You are talking about the most recent ones that
13    led up to me resigning?
14 Q  If you have some in mind, I'd like to hear them, yeah.
15 A  They took issue with the fact that a camera crew was
16    following us around.  The Commissioner at the time, James
17    Mack, stated that our times were consistent with the
18    national average which was 12 minutes and it wasn't true,
19    so a camera crew was following us around and they
20    documented the fact that it wasn't correct and put the
21    City in the public eye and everybody was focused on that
22    and then I started receiving a lot of discipline.
23 Q  When was this camera crew following you around?
24 A  Sometime in the summer of 2008.
25 Q  Okay.  And do you recall any specific discipline that you

## Page 8

1    had that was still pending when you resigned?
2 A  All of it.
3 Q  All of it?
4 A  That's correct.
5 Q  None of your discipline went to Trial Board?
6 A  No.
7 Q  Did you appeal all of your discipline?
8 A  We were in the process of switching unions at the time
9    from Operating Engineers to the POAM which is the Police
10    Officers Association of Michigan and they stated that the
11    discipline that I had currently would transfer over and
12    POAM would assume responsibility for it and I never
13    received a Trial Board for any of it.
14 Q  Do you recall a discipline for telling your supervisor to
15    go to your truck and fuck off?
16 A  I remember that.
17 Q  Okay.  And did you write a statement in that discipline,
18    your own handwritten statement?
19 A  I don't recall.
20 Q  Did you tell your supervisor to fuck off?
21 A  Yes, I did.
22 Q  And why did you do that?
23 A  If you could bear with me, we were responding to a call
24    on the freeway where a person was ejected out of the
25    vehicle.  There was a massive backup in traffic on the

## Page 9

1    expressway, so we had to take a different route.
2       When we arrived on scene, we found the
3    person who was barely breathing and he was coughing up
4    blood and his sister was sitting off to the side and she
5    was crying hysterically and the firemen that were there
6    were upset because it took us so long to get there.  They
7    actually responded first and we loaded him up into the
8    ambulance and some doctor happened to be there on the
9    side of the freeway and wanted to assist and he asked if
10    he could ride in the ambulance.
11       My Lieutenant at the time stated that he
12    could, so we transported him to Detroit Receiving and
13    then when we delivered care over to the staff, one of the
14    staff members pointed out that I had blood or some tissue
15    from the patient on my shirt and I went to go take it off
16    so I could put it in a biohazard bag and as I was coming
17    outside, Lieutenant John Sablowski was talking to my
18    partner who was Jeff Sebree at the time.
19       I asked him if there was something wrong
20    and he said he was conducting an inquiry about a patient
21    abandonment and when I asked him what he was implying, he
22    said that you left the girl there and didn't make sure
23    that she was attended to.
24       Well, there was an EMS lieutenant on scene
25    and I was in the back attending to the patient and Jeff

## Page 10

1    Sebree who was my partner, he's also an EMT, stated that
2    the other ambulance was there because we called for more
3    resources.  He told him through the window that the girl
4    was sitting off to the side of the road and that we would
5    be leaving.  There was an EMS Lieutenant there.  He
6    understood exactly what was happened and we transported.
7       When we got to the hospital, he was
8    conducting an inquiry for some allegedly abandonment and
9    he tried to talk to my partner and I told him if you're
10    trying to imply any discipline or any investigation that
11    could lead to discipline, I'm invoking my Weingarten
12    rights as well as for Mr. Sebree because I don't know
13    where you're going with this.
14       I don't even know where the charge was
15    actually initiated from.  I believe it was from then
16    Captain (inaudible) James, which was Chief Gerald James'
17    wife.  She was also an administrative officer and the
18    Lieutenant got mad because I wouldn't answer any of his
19    questions which was not being insubordinate.
20       I invoked my Weingarten rights.  I didn't
21    want to speak until I talked to a Union representative
22    based on what the issue was.  Then as I was walking away,
23    the Lieutenant focused his attention on the fact that I
24    wasn't wearing my duty shirt and I told him that it had
25    blood on it and he told me, "I don't care.  You put it

4 (Pages 7 to 10)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 28 of 125

755c4784-c363-4279-9438-88070af26d85

44444444444444444444444444444444444444444444444444444444444444444444444444444444

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 11

1  back on. I'm ordering you to put it back on."
2  I said, "It's contaminated and I'm not
3  doing it," and he started to come towards me. This is a
4  Lieutenant that I worked with when he was a paramedic on
5  the ambulance. I worked with him on multiple occasions
6  and we had a good working relationship.
7  I couldn't understand what was going on at
8  this particular time, but there was some urgency for him
9  to start something and the situation got heated and I did
10  say it. I was disappointed in the fact that he was one
11  of my commanding officers and somebody that I had respect
12  for and for him to imply that I would put on a bloody
13  soaked shirt to me was just with, all due respect, bad
14  judgment on his part.
15  Q  Understood. I'm going to show you a document that I'll
16  have marked as Exhibit 1.
17  (At 10:12 a.m., Defendant's
18  Exhibit 1 marked)
19  Q  (By Mr. McFarlane) Can you see that document, sir?
20  A  Yeah.
21  Q  Does this look familiar?
22  A  Yeah.
23  Q  Okay. Are you aware if you wrote this?
24  A  That's correct. That's my signature.
25  Q  Okay. So would this be your statement regarding that

## Page 12

1  altercation?
2  A  That's correct.
3  Q  Okay. Thank you. Is there any other specific discipline
4  that you remember that was pending when you resigned?
5  A  As a result of the media story, I did have my shirt
6  untucked for a brief moment when I was on camera. I was
7  called in by Assistant Superintendent Joe Wilson and I
8  believe I received a 48-hour suspension for that.
9  Q  Did you serve that suspension?
10  A  I don't recall. I probably did.
11  Q  When you resigned from the City of Detroit, were you
12  eligible to collect a pension?
13  A  At the time I wasn't sure because the City was on the
14  verge of bankruptcy prior to me leaving, so I wasn't sure
15  what that would entail after.
16  Q  Did you ever receive any pension payments from the City
17  of Detroit?
18  A  If I did, I would be eligible this year. This would be
19  my 25th year of service.
20  Q  Speaking of the bankruptcy, are you aware if – okay, so
21  let's go back. So prior to your resignation you had a
22  lawsuit against the City of Detroit. Is that correct?
23  A  Say that one more time.
24  Q  Prior to your resignation did you have a lawsuit against
25  the City of Detroit?

## Page 13

1  A  That's correct.
2  Q  And when was that lawsuit filed?
3  A  About probably by Norm Yatooma probably sometime probably
4  2008 maybe when all the issues started happening.
5  Q  And what were you alleging in that lawsuit?
6  A  I don't recall. There were some documents, you know,
7  that they presented. It was part of a class action.
8  There were several other participants that were involved.
9  Then Lieutenant Mike Kearns was involved. Lieutenant
10  Mike Christy was involved and then there were probably
11  several other people.
12  Q  And what happened with that lawsuit?
13  A  At the time that the City was filing for bankruptcy, the
14  attorney, Elias Muwad, called me and said that the City
15  was filing for bankruptcy, so whatever settlement I would
16  get, it would be pennies on the dollar and that he could
17  no longer represent me, so I called the City of Detroit
18  Law Department and spoke with Letitia Jones and she asked
19  me – I told her that I'm no longer represented by Counsel
20  and she hung up on me.
21  Q  Did you or your attorney at the time file a claim with
22  the bankruptcy court?
23  A  No. To my knowledge, no.
24  Q  Not that you know of. Okay. Do you know what happened
25  within the bankruptcy court regarding your lawsuit?

## Page 14

1  A  No.
2  Q  Did your attorney ever inform you about any filings
3  within the bankruptcy court regarding your lawsuit?
4  A  No. Not to my knowledge.
5  Q  So after you resigned from the City of Detroit, where did
6  you go next?
7  A  At the time, I was currently working with the Riverview
8  Fire Department. It was part-time employment.
9  Q  And when did you begin working for Riverview?
10  A  When I became a paramedic.
11  Q  And do you know what year that was?
12  A  It was I believe in the beginning of 2008.
13  Q  So from 2008 to 2013 you were working part-time with
14  Riverview?
15  A  That's correct.
16  Q  And you said how many hours were you doing at that point?
17  A  The required minimum of part-time. I think at that time
18  it was required to work either 48 or 54 hours a month.
19  Q  And how many hours were you working at the City of
20  Detroit?
21  A  The standard which was 84 hours bi-weekly.
22  Q  So bi-weekly.
23  A  With option of overtime. I mean, they had a lot of
24  vacancies to fill.
25  Q  When you resigned from the City did you maintain part-

5 (Pages 11 to 14)

TAMARA A. O'CONNOR
248.882.1331  toconnorrptg@aol.com
13-53846-tjt  Doc 13713-4  Filed 08/04/23  Entered 08/04/23 10:44:20  Page 29 of 125
755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 15

1      time at Riverview or did you go full-time?
2   A   They were part-time.  Also, I was working at Harper
3      Hospital as a contingent EMT.
4   Q   Harper Hospital, and when did you start working there?
5   A   I want to say probably 2004 to 2008, so right around the
6      time, I believe, when I got my paramedics license.  Right
7      around that time.
8   Q   How many hours did you put in at Harper Hospital?
9   A   It was contingent employment, so I was only required to
10     work eight hours a month.  I sometimes would work no more
11     than 24 hours a week.
12  Q   When did you or have you separated from employment with
13     Riverview?
14  A   Yes, I have.
15  Q   Okay.  And when was that?
16  A   2015.
17  Q   And why did you leave Riverview?
18  A   I was discharged.
19  Q   And what were you discharged for?
20  A   I actually don't know.  There were a list of charges that
21     were applied.  They didn't specify any specific one.
22  Q   What was the list of charges that you can recall?
23  A   I guess I had a disagreement. I'll answer your question
24     first.  I believe it was insubordination was one and they
25     said that I was recording some meetings without prior

## Page 16

1      authorization, that I was - a couple other things.  I
2      don't have a list.  There's probably about 25 or so
3      things.
4          The Police Chief at the time, he was the
5      Public Safety Director and he didn't really oversee the
6      Fire Department.  He was mainly overseeing the Police
7      Department and he had an Assistant Chief at the time.
8      His name was Michael Pool.
9          He was just there to take care of
10     administrative issues.  When it came to discipline, it
11     would come from the Public Safety Director.
12  Q   And is that who disciplined you?
13  A   That's correct.
14  Q   And were you in a union at Riverview?
15  A   That's correct.
16  Q   And what was the name of that union?
17  A   I believe it was AFSCME, I believe.
18  Q   Was it a Local or just the overarching AFSCME Union?
19  A   No, it was a Local.  I don't recall the Local number
20     itself.
21  Q   Did you appeal your discharge?
22  A   I did, because I was the elected Vice-President of our
23     Local.
24  Q   And what was the result of that grievance?
25  A   I was returned back to duty.

## Page 17

1   Q   And did you stay with Riverview at that point?
2   A   For about a year.
3   Q   And then you said you left in 2015?
4   A   No.
5   Q   When did you leave?
6   A   I believe it was probably 2018.
7   Q   2018.  Why did you leave in 2018?
8   A   I was discharged a second time.
9   Q   Okay.  And what was that discharge?
10  A   Again, it was from the same person, Cliff Rosbohn. Well,
11     no.  I take that back.  They had appointed a Fire Chief.
12  Q   And who was that?
13  A   I'm trying to think of his name.  I can't recall.
14  Q   And what were the charges?
15  A   A few that were pending.  I don't recall.
16  Q   And did you grieve it?
17  A   No.
18  Q   Why not?
19  A   I settled with the Department.
20  Q   And when you say "settled," had you filed a lawsuit?
21  A   That's correct.
22  Q   And when did you file that lawsuit?
23  A   I don't recall.  Around the time possibly when I was
24     discharged the first time.
25  Q   Do you recall when your last day of employment with

## Page 18

1      Riverview was?
2   A   That I couldn't tell you.  It was probably the last full
3      day that I worked was the day that I was suspended and
4      then I received the termination letter in the mail.
5   Q   Was that before or after you applied to the City of
6      Detroit for the second time?
7   A   Actually, I applied before that.  I applied for
8      reinstatement prior to going through the application
9      process.  I believe it was back in 2017.
10  Q   And what was the result of your reinstatement request?
11  A   I never heard anything back.  I actually went to Fire
12     Department Headquarters which was located, I believe, on
13     Michigan and Third.  It was the old MGM Grand Casino
14     building and I had spoken with the superintendent, Shawn
15     Larkins.
16  Q   Okay.
17  A   I had worked with him for several years on the ambulance
18     at different stations.  I had a good relationship with
19     him.  Somebody told me that I could call him and then
20     when he stated that I could come down there and talk to
21     him, I made an appointment and then I was able to pass
22     through security and then he met me downstairs and walked
23     me back upstairs and we had a little talk.
24         He asked me how things were going since I
25     left and I said, "Well, you know, a lot of things

6 (Pages 15 to 18)

TAMARA A. O'CONNOR
248.882.1331      toconnorrptg@aol.com
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 30 of 125

755c4784-c363-4279-9438-88070af26d85

## RICHARD CADOURA v CITY OF DETROIT
### Deposition of Richard Cadoura

### Page 19

1    happened as a result of the Detroit story and the
2    controversy and everything that was going on that some of
3    my current employers weren't too happy about that."
4    I said, "You know, I probably never should have left."
5    So he had somebody come down from Fire Department HR and
6    I want to say I believe her name was Kemia.  Kemia Brown,
7    possibly.
8    Q    If I said Kemia Crosson, would that --
9    A    Kemia Crosson.  There we go, and then he handed me a
10   reinstatement letter.  I filled it out and Ms. Crosson
11   you said is her name?
12   Q    I don't know if that's who you spoke to, but there is a
13   Kemia Crosson that I'm aware of that works in Fire from
14   HR, so I'm just asking if that's her.  If you don't
15   recall, that's okay.
16   A    She came downstairs and I handed her the letter, the
17   reinstatement letter, which usually when you fill out
18   documentation, they're required to make copies and then
19   issue one of them back to you and then they keep two.
20   It's always been Fire Department standard that they give
21   you some kind of documentation from, you know, whatever
22   meeting you had or whatever documents you submitted.
23        I never received anything and I never
24   heard anything back.
25   Q    And then at some point did you apply for a position at

### Page 20

1    the City of Detroit after that?
2    A    That's correct.
3    Q    Okay.  And what position did you apply for?
4    A    At the time, they said that I could apply for a paramedic
5    position at the City of Detroit.
6    Q    And do you know when you applied?
7    A    I'm sorry?
8    Q    Do you know when you applied?
9    A    No, shortly after that.  Probably sometime in late maybe
10   the middle 2017, late 2017.
11   Q    And after you applied did you hear back?
12   A    That's correct.  The point of contact that I had was back
13   then was Assistant Chief, Raymond Birch.  I had spoken
14   to him on the phone and he said that the City was eager
15   to bring back technicians that had a lot of experience
16   that could mentor a lot of the younger group that were
17   hiring in.
18        I told him that I was interested and then
19   I applied, so he was my point of contact from that point.
20   Q    And did you get a job offer from the City?
21   A    After the process was completed, I was contacted by text
22   message from the HR Director, Ms. Brown.  She sent me a
23   text message saying -- it was either email or text message
24   that said that I was offered the position and upon
25   accepting it, I could resign from my current employment

### Page 21

1    because I would be returning back to the City of Detroit.
2    Q    Okay.  And you said Ms. Brown was the HR Director?
3    A    I didn't know exactly her position if she was part of
4    Fire Department HR or if she was general City HR.  At the
5    time I didn't know.
6    Q    So you're not sure if she's an HR Director or not?
7    A    She was.
8    Q    Okay.
9    A    To my understanding.
10   Q    Did you have any other communications with Ms. Brown at
11   that time other than the text message?
12   A    We spoke on the phone.
13   Q    And when did you speak to her on the phone?
14   A    Well, in the text message that I received.  It was after
15   Assistant Chief Raymond Birch passed away.  The day after
16   I was interviewed, he passed away and then I attended his
17   funeral and then about a week later possibly, I received
18   a text message asking if I could call her.  This is Ms.
19   Brown.
20        I called her and she stated that they
21   would have to withdraw their offer of position as
22   paramedic with the City of Detroit Fire Department.
23   Q    And did she state anything else?
24   A    She stated that apparently they reviewed my employee file
25   and that it stated that I was discharged and placed on a

### Page 22

1    Do Not Rehire List.
2        With all due respect, Counsel, is it okay
3    if I sip on something so that I can keep my throat clear?
4    Q    Absolutely.  Go for it.
5    A    All right.  Thank you.  Did you want me to finish that?
6    Q    Yeah, go ahead.
7    A    So around the time when they were doing the physical
8    agility test which is the physical portion of the
9    requirement to enter into employment with the City of
10   Detroit Fire Department EMS Division, at the time I was
11   talking with Ms. Brown there and she stated to me, "Mr.
12   Cadoura, you have a look of concern on your face."
13        I said, "Honestly," I said, "it's kind of
14   a surprise that I'm actually, you know, being considered
15   to come back for reemployment with the City."  I said, "I
16   received a lot of discipline in the past and I thought
17   that that would be an issue."
18        She said that my 15 years of service or
19   just one day shy of 15 years, she said, "Your service
20   record will weigh heavily on your return.  You spent a
21   lot of years with the City of Detroit Fire Department and
22   that would weigh heavily."
23        They gave me some sense of reassurance.  The
24   vibe that I got from then Assistant Chief Joe Barney, he
25   just seemed like he was distant, didn't really say much,

7 (Pages 19 to 22)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 31 of 125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 23

1    couldn't understand.  I worked with him, you know, for
2    many years.  There were no issues that I could remember
3    and then after that when I spoke to her, I said, that
4    night that she called me to tell me that I wasn't going
5    to be able to come back, and she told me that I was
6    discharged and I said, "I wrote a resignation letter and
7    it was acknowledged and then they paid me out for my time
8    several months later."
9          I was not aware of any discharge from
10    employment and she said that on my exit interview, they
11    stated that I was recommended to not be rehired.  I told
12    her that I never received an exit interview.  She stated
13    that it was mandatory that I receive an exit interview
14    because at that point is when they tell you if you're
15    eligible for rehire in the future or if you're not.
16          She said at the time, I said, "So if I was
17    discharged from the Fire Department, then I would have to
18    have a show cause hearing as to why I was being
19    discharged.  There had to have been some discipline that
20    preceded that."
21          She told me that she thought that she said
22    too much and hung up.
23  Q   And that was the last conversation you had with Ms.
24    Brown?
25  A   That's correct.

## Page 24

1   Q   And did you receive – I want to go over some documents.
2     Did you ever receive a letter from the City regarding an
3     offer of employment?
4   A   I believe I did.
5   Q   Let me show you what I'll have marked as Exhibit 2.
6          (At 10:34 a.m., Defendant's
7           Exhibit 2 marked)
8   Q   (By Mr. McFarlane)  Does this document look familiar?
9   A   That's correct.
10  Q   And do you recall receiving this?
11  A   I don't recall.
12  Q   Do you recall responding to the City and providing your
13    name, date of birth, and Driver's License and the other
14    information requested?
15  A   That's correct.
16  Q   So you did provide that information to the City?
17  A   To my recollection, yes.
18  Q   Do you recall receiving a letter to go to the physical
19    agility test?
20  A   That's correct.
21  Q   I'm going to show you what I'll have marked as Exhibit 3.
22          (At 10:35 a.m., Defendant's
23           Exhibit 3 marked)
24  Q   (By Mr. McFarlane)  And do you recall receiving this
25    letter?

## Page 25

1   A   I don't recall.  Are you saying email?
2   Q   Do got an email you said?
3   A   No.  With all due respect, I'm asking is this an email or
4     was this a hard copy letter that they mailed?
5   A   I have a copy of and the blacked out portion on the top
6     is your address.  We've redacted that in discovery, but
7     as far as I can tell, this is a letter addressed to you
8     that was in your personnel file.  I'm just trying to
9     verify if you recall receiving it?
10  A   Possibly, but I don't recall.
11  Q   Okay.  And do you know when you attended the physical
12    ability test?
13  A   I believe I read in there that it said that it was
14    December 7th.
15  Q   Does that seem accurate?
16  A   I would say yes.  I mean, I don't recall exactly, but if
17    that was the date, I did attend.
18  Q   And do you recall receiving a letter from the City
19    informing you that you were no longer being considered
20    for employment?
21  A   I don't recall receiving that.
22  Q   I'll share with you what will be marked, I think I'm on
23    Exhibit 4.
24          (At 10:37 a.m., Defendant's
25           Exhibit 4 marked)

## Page 26

1   Q   (By Mr. McFarlane)  Do you recall this document?
2   A   No, I don't recall.
3   Q   Do you know when you spoke to Ms. Brown when she informed
4     you that you were no longer being considered for
5     employment?
6   A   I received a text message stating when the academy was
7     going to start which was January 2nd of 2018.  It was
8     prior to, I believe, the first of the year.
9   Q   Prior to the first of the year.
10  A   It may have been.  I believe it was just about two weeks
11    outside of when the academy was supposed to start.
12  Q   And at that time were you still employed by Riverview?
13  A   No.
14  Q   So at the end of 2017 you were no longer employed by
15    Riverview?
16  A   That's correct.
17  Q   I thought earlier you told me you were still at Riverview
18    in 2018?
19  A   At the time that I applied I was just in the process of
20    being reinstated, so I wasn't at the time employed.  I
21    started sometime probably in the beginning of 2018, so
22    right around that time, but at the time the decision was
23    made for me to go to the City of Detroit, I was in the
24    process of – there was a delay from sometime, I believe,
25    in October until like the first of the year for me to be

8 (Pages 23 to 26)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 32 of 125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 27

1      reinstated, so there was a time when I did receive
2      information from the Arbitrator and there was some kind
3      of delay about returning me back.
4    Q   Do you know the return to work date?
5    A   I believe it was -- no, I don't.
6    Q   Okay.  Was it early, mid-January, late January?
7    A   I think it was the beginning of January.
8    Q   When you were reinstated, did you receive any back pay
9      award?
10   A   No.
11   Q   You were reinstated, no back pay?
12   A   In the Arbitrator's ruling, he believed that I was off
13     for 16 months.  He believed that a two-month suspension
14     would have been appropriate instead of discharge and the
15     Union declined to pursue the back pay.
16   Q   Did you have any other employment other than the ones
17     we've spoken about?
18   A   Yes, I did.
19   Q   Okay.  What other employers did you work for?
20   A   The City of Woodhaven.
21   Q   And when did you work for the City of Woodhaven?
22   A   I believe it was August 27, 2015.
23   Q   Okay.  Until when?
24   A   I would say probably two months ago.
25   Q   So that would be November-ish of 2022?

## Page 28

1    A   October or November.
2    Q   October or November of 2022.  Okay.
3    A   That's correct.
4    Q   And why did you leave Woodhaven?
5    A   Discharged.
6    Q   And what were you discharged for from the City of
7      Woodhaven?
8    A   I contested their promotional process.  I stated to them
9      that -- there was a new Chief appointed.  He was a
10     Captain, Brad Miles.  He was promoted to Chief and in
11     their contract, the previous one, stated that they would
12     use seniority as a means of promotion.  I was the senior
13     paramedic fireman.
14         They switched unions and either that
15     language was removed.  The City Manager who I had issues
16     with in the past wanted the seniority element to be
17     removed.  They initiated some testing, written testing.  I
18     took the test.  I complied with all the requirements.
19     They were upset that I was concerned about the process
20     that they were using and then I did the interview.
21         They said that I scored the highest on the
22     interview.  I don't recall seeing my test scores.
23     Everybody else knew what my test scores were but me, and
24     I was discharged.
25   Q   And were there any specific charges drafted against you

## Page 29

1      or were you just discharged?
2    A   They said that there was a comment that I made to a
3      female firefighter that was on probation.
4    Q   And what comment did they allege that you made to a
5      female probationary employee?
6    A   I don't recall because I didn't see any specific
7      statement that she wrote.  They paraphrased some things
8      and then pursuant to her interview, they interviewed
9      several other female firefighters.  Some of them were my
10     superiors and whatever issues they brought up, it was
11     unbeknownst to me that there was any kind of problem
12     because it was never brought up to me.
13   Q   When they discharged you did they provide you either an
14     investigation or a fact sheet or anything tell you why
15     you were being discharged?
16   A   It was an unsworn meeting.  It was a Garrity hearing the
17     first one which I had Union representation there and I
18     was told before, the day before that I was suspended by
19     Mr. Kyle Fowle who was also an employee with the City of
20     Detroit Fire Department at the time --
21         REPORTER:  The last name, please?
22         THE WITNESS:  Fowle; F-o-w-l-e.
23         REPORTER:  Thank you.
24   Q   (By Mr. McFarlane)  You said he was a City employee as
25     well?

## Page 30

1    A   That's correct.  He at the time separated from Detroit to
2      pursue employment with the City of Livonia.
3    Q   So he was a former City employee that was going to
4      Livonia?
5    A   Permanent.  That's correct.  He was the one that was
6      instrumental in putting myself and Assistant Chief
7      Raymond Birch at the time in contact.
8    Q   Okay.  Do you know when he left the City of Detroit?
9    A   I don't recall.
10   Q   Okay.  So you had a Garrity Interview.  What happened
11     after the Garrity Interview?
12   A   They informed me that I was going to have a Loudermill
13     Hearing.
14   Q   Did that hearing go forward?
15   A   I'm sorry?
16   Q   Did that hearing go forward?
17   A   That's correct.
18   Q   And when did that hearing go forward?
19   A   I don't recall when the date was.  It was probably a
20     couple weeks after the Garrity.
21   Q   And then what happened at the Loudermill Hearing?
22   A   They just told me the person who was conducting the
23     meeting which was not the City Manager, I really don't
24     know who he was.  He just told me that they didn't
25     believe anything I had to say and that concluded the

9 (Pages 27 to 30)

TAMARA A. O'CONNOR
248.882.1331      toconnorrptg@aol.com
13-53846-tjt     Doc 13713-4     Filed 08/04/23     Entered 08/04/23 10:44:20     Page 33 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 31

1    meeting.
2  Q   Did you ever receive written charges?
3  A   No.
4  Q   No. Did you appeal the discipline?
5  A   The Union sent me an email. At first, they had a
6      representative from the Union. I can't remember his
7      name. He was a retired policeman with the City of
8      Woodhaven that somehow he managed to become our
9      bargaining agent for same city that he retired from and
10     he left the Union, so I had no representation and then at
11     the time I was told by the full-time Union representative
12     that Gerald James would be overseeing my case with the
13     City of Woodhaven.
14 Q   Did Gerald James work for the City of Woodhaven?
15 A   No. He was a representative with the Michigan
16     Association of Fire Fighters.
17 Q   And what did they have to do with your Union procedure,
18     if you know?
19 A   Because it was a discharge and I don't recall seeing what
20     the process was, my understanding is that I was
21     represented by the business agent for the Union and
22     because he left, they were going to have Gerald James
23     look at it and he was going to look into the matter and
24     then they abruptly turned it over to somebody else which
25     I don't remember what his name is.

## Page 32

1  Q   So it went from Gerald James to somebody else?
2  A   That's correct.
3  Q   What Union were you in at Woodhaven?
4  A   The Michigan Association of Fire Fighters.
5  Q   Do you know how the Hearing Officer – I don't know if
6      that's the right term. Are they called Hearing Officers?
7      Do you know what they're called that oversee the
8      discipline cases?
9  A   To my understanding, they're referred to as a business
10     agent.
11 Q   So Gerald James would have been the business agent?
12 A   I don't know what his title is there, but he was assuming
13     the role.
14 Q   Okay. And do you know how the business agent position
15     is, like, are there more than one business agent?
16 A   I have no idea what their organizational structure is.
17 Q   And for your Union was there a Local or was it just
18     Michigan Association of Fire Fighters?
19 A   It was a Local.
20 Q   And do you know your Local?
21 A   I don't recall what the number was.
22 Q   Okay. And so then it went from Gerald James to somebody
23     else and you said you don't recall that individual's
24     name. Correct?
25 A   That's correct. I met him one time. It was another

## Page 33

1      hearing that they had. I don't remember what they called
2      it. It was another meeting.
3  Q   And what happened at that meeting?
4  A   The gentleman that was my representative said that we're
5      going to tell them that their allegations are baseless,
6      that there's nothing to support whatever their
7      allegations are and that we're going to proceed through
8      the process.
9  Q   Is that process still ongoing or is it concluded?
10 A   No. I received a letter from the Union stating that they
11     were not going to pursue the grievance.
12 Q   And when did you receive that letter?
13 A   It was an email.
14 Q   Do you know when you received that?
15 A   Probably about three weeks ago.
16 Q   And is there any appeal process or is that the end of the
17     grievance procedure?
18 A   I thought about contacting the Michigan Employment
19     Relations Commission to challenge the Union's decision
20     and the Employer's decision to terminate initially.
21 Q   And did you contact MERC?
22 A   Not yet.
23 Q   So is that something you're still considering?
24 A   I've have issues with this Union before when I was
25     working with the City of Flat Rock which was in between

## Page 34

1      Riverview and Woodhaven.
2  Q   Let's talk about you said City of Flat Rock?
3  A   That's correct.
4  Q   And when did you work for the City of Flat Rock?
5  A   Around the time that I was discharged from Riverview. I
6      would say probably 2016.
7  Q   And when did you leave the City of Flat Rock?
8  A   I was there for pretty much the duration of the time that
9      I was terminated from Riverview, so around the time when
10     I think it was the summer or the fall of 2017.
11 Q   So did you leave Flat Rock when you went back to
12     Riverview?
13 A   No. I was actually maintaining employment with three
14     departments.
15 Q   So you maintained employment with Flat Rock while still
16     at Riverview?
17 A   When I was coming back to Riverview.
18 Q   Are you still working with Flat Rock?
19 A   No.
20 Q   Do you know when that employment relationship ended?
21 A   I want to say I know they weren't happy with the fact
22     that I told them that I was returning to Detroit, that I
23     was pursuing returning back to the City of Detroit. I
24     want to say, you know, honestly, I don't recall the exact
25     date.

10 (Pages 31 to 34)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 35

1  Q   Can you give me a year; 2017, 2018?
2  A   Probably 2018.
3  Q   And why did you leave the City of Flat Rock?
4  A   I was supposed to come off probation the preceding year
5      which was 2017 on or about December 6th or 7th.  I made
6      an agreement to have a 12-month probation.  At that time,
7      I would come off probation and be on the roster as a
8      part-time fireman/paramedic.
9          My probation was extended, but it was
10     never articulated to me why and the Union declined to
11     file a grievance to force the city to decide if I was
12     going to be coming off probation or not.  After returning
13     from a call where a seven year old was unresponsive in a
14     mobile home park, there was some issue with the response
15     time and the next day I was interviewed by the Assistant
16     Chief who was assuming the role of the Chief because the
17     current Chief Vack, V-a-c-k, William Vack, was on medical
18     and the then Chief who is now the Mayor was assuming the
19     role of the Fire Chief and terminated my employment as a
20     result of their investigation about the call.
21 Q   And go ahead.  You said it was alleged.  What was the
22     allegation?
23 A   That I was encouraging the woman to file a complaint
24     against the city for the poor response time which I
25     didn't do.

## Page 36

1  Q   And did you receive written discipline in that case?
2  A   I heard that there was some complaint that a Sergeant
3      made about insubordination.  I never seen anything, but
4      it implied that we didn't do our station duties prior to
5      the shift change which he was assuming command of the
6      shift and the person who was in charge was a lower
7      licensed level than me, but because of his seniority,
8      that put him in charge and told we needed to do the
9      duties and he found something better to do.
10         Then when there was an issue about why
11     those duties weren't done, I told him that he could just
12     talk to the duty officer and he declined.  He wanted to
13     hear it from me and I told him I was working on my EMS
14     report and that's what my delay was and he didn't like
15     the answer I gave him.
16 Q   Did you have a partner on that run?
17 A   That's correct.
18 Q   And was your partner disciplined?
19 A   No.
20 Q   Were you in a Union at Flat Rock?
21 A   That's correct.
22 Q   And what was that Union?
23 A   Michigan Association of Fire Fighters.
24 Q   And did you appeal that discharge?
25 A   At the time, Joe O'Connor was the business agent for the

## Page 37

1      Flat Rock Fire Department and when I asked fire fighter
2      Tim Webb who was the Union President for our Local, he
3      said that I would have to talk to Mr. O'Connor about it
4      and when I spoke to him, Mr. O'Connor, I said, "You know,
5      I went through a lot with this department with harassment
6      and changing the guidelines to complete probation and all
7      the other things that happened during my employment
8      there, including comments that were made and things that
9      were said that were outrageous."
10         He stated to me, "Why would you want to
11     work for a department like that anyway," which to me it
12     didn't seem like, my perception is that they weren't
13     going to pursue any grievance for the discharge.
14 Q   So for their grievance process would you have to file a
15     grievance or is it the Union's choice?
16 A   To my understanding, it's the Union's choice if they're
17     going to pursue filing a grievance.
18 Q   And did they pursue filing a grievance in that case?
19 A   No.
20 Q   So you were discharged from Flat Rock.  Did anything
21     occur after that?
22 A   Could you repeat that?
23 Q   After you were discharged from Flat Rock, did you have
24     any other interaction with Flat Rock?
25 A   I had a lawsuit pending after my discharge.

## Page 38

1  Q   Okay.  And what were the claims in that lawsuit?
2  A   Well, the Fire Department was operating with expired
3      equipment which I repeatedly reported and the day after
4      my discharge, two people were murdered in the community
5      and the response was from an ambulance that had under-
6      licensed personnel in an ambulance that was set up for
7      advanced life support and their concern was that I was
8      going to report it to the State if they didn't make those
9      changes.  I had done - I'm sorry.  Your question?
10 Q   No, go ahead.  You can continue.  I didn't mean to cut
11     you off.
12 A   I just took issues with the department as an operator
13     from the standpoint that I was reporting expired
14     equipment as well as working with under-licensed staff
15     doing procedures that were not in their scope of practice
16     and I was uncomfortable with the fact that they were
17     doing these procedures and then they would transfer care
18     to me which I would essentially take the person to the
19     hospital and have to explain, you know, what they did
20     prior to me getting there and so on and so forth and I
21     just kept raising the issue that at some point I wasn't
22     trying to make decisions there for them, but I think that
23     some other Commander made some poor decisions as far as
24     transferring care to lower licensed personnel which
25     they're not supposed to do and just different things like

11 (Pages 35 to 38)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 35 of
125

755c4784-c363-4279-9438-88070af26d85

## RICHARD CADOURA v CITY OF DETROIT
### Deposition of Richard Cadoura

### Page 39

1  that and then they just wanted me to explain it and I
2  just didn't feel comfortable doing it.
3  Q   And what was the result of that lawsuit?
4  A   It was settled.
5  Q   And when was that lawsuit settled?
6  A   Officially, I don't know.
7  Q   Was it recently or a few years ago?
8  A   Recently.
9  Q   So would it be the last year or the year before?
10 A   This year.
11 Q   This year.  So 2022 or 2023?
12 A   I stand corrected.  It was 2022.
13 Q   I just want to make sure.  One of those odd situations
14     where that's actually relevant today, five days ago.
15 A   I just want to state if I can to the attorney that my
16     employment with Flat Rock, the City of Flat Rock, was
17     quite contentious because the first day that I started
18     there, one of the Sergeants, Ray Rich, approached me and
19     said, he stated, "I don't like what you did in the City
20     of Detroit and I don't like what you did in Riverview and
21     I'm not going to tolerate any of that here.  If I feel
22     that you're going to do any of those things, you're going
23     to be out of here."
24 Q   Go ahead.  I'm just going to ask, who's Ray did you say
25     Rick or Rich?

### Page 40

1  A   Rich; R-i-c-h.
2  Q   And who is that?
3  A   He was a Sergeant with the Flat Rock Fire Department.  I
4      never had any interactions with him outside of that.
5  Q   Was he your Sergeant?
6  A   He was one of the command officers that was there, not
7      directly over me that particular day.  I believe I was
8      there to secure some equipment, you know, like PPE they
9      call it, Personal Protective Equipment, to start
10     responding to calls and uniforms and so on.
11 Q   And you said you had no interaction with him after that
12     date?
13 A   That particular day, but as I would come in from home
14     responding to calls, I would have direct interaction with
15     him until they put me on shift which happened about six
16     months.  With all due respect, there seemed to be some
17     theme where even with my employment with the City of
18     Detroit that there was an issue with response times and
19     personnel and other issues as far as, you know, the
20     ambulances running, are they equipped to run, were there
21     enough, were they available, and the issue with Riverview
22     was the fact that they were concerned about if I was
23     going to be able to dedicate a time because they were
24     down an ambulance every day which was part of the reason
25     why I was originally discharged.

### Page 41

1  I brought awareness to the community
2  through Facebook that there were issues with staffing and
3  that if they needed an ambulance, that they needed to
4  raise their concerns with City Hall.  I was a Union
5  representative at the time.  My activities were
6  protected.
7  I felt that it was a danger to the public
8  and they had a right to know and in Flat Rock it was the
9  issue about the fact that this lady called for an
10 ambulance and one didn't show up because the police
11 department failed to initiate the ambulance response and
12 the call was held up and they took issue with the fact
13 that if I raised concerns about the response times and
14 lack of response times in the City of Detroit, that I
15 could potentially do that in the City of Flat Rock.
16     MR. SHEAROUSE:  Jason, real quick, can we
17 take a quick five minute break so that I can get some
18 more water?
19     MR. MCFARLANE:  Sure, no problem.  We'll
20 come back at 11:10.
21     MR. SHEAROUSE:  Thank you.
22     (At 11:04 a.m., recess taken)
23     (At 11:13 a.m., back on the record)
24 Q   (By Mr. McFarlane)  Let's continue where we left off, Mr.
25     Cadoura.  Where did you work after the City of Riverview?

### Page 42

1  A   I was still employed with the Woodhaven Fire Department
2      and Flat Rock.
3  Q   And was that in 2018?
4  A   In the beginning.
5  Q   And are you employed by Woodhaven and Flat Rock still?
6  A   No.
7  Q   Are you currently employed?
8  A   That's correct.
9  Q   And where are you currently employed?
10 A   At Octapharma Plasma.
11 Q   And can you spell that?
12 A   O-c-t-a-p-h-a-r-m-a.
13 Q   And what did you do there?
14 A   I'm what's referred to as a physician substitute.
15 Q   And what are your job duties?
16 A   To perform physicals on prospective plasma donation
17     candidates.
18 Q   And when did you start working there?
19 A   I believe it was August 2021.
20 Q   Was there ever a time where you were unemployed from any
21     position?  Was there ever a time where you went without
22     an employer?
23 A   No.
24 Q   Okay.  So between where you are – any other positions
25     that you are currently employed other than Octapharma

12 (Pages 39 to 42)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 36 of 125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 43

1　　　Plasma?
2　A　No.
3　Q　Okay.  So how many hours do you work there?
4　A　Anywhere between, well, we're required to work full-time
5　　　hours which is anywhere between 32 and 40.
6　Q　And how many hours do you actually work?
7　A　It was a busy time this last year.  They were low on the
8　　　position that I carry and I was promoted to a travel
9　　　position substitute, so I would travel to different
10　　　centers.
11　　　　　They're required to have medical staff on
12　　　site in order to stay open and without medical personnel
13　　　on staff, they can't operate.
14　Q　So how many hours were you putting in a week?
15　A　Anywhere between 40 and 70.
16　Q　And are you paid hourly or salary?
17　A　Hourly.
18　Q　And what's your hourly rate?
19　A　Probably anywhere between I think the last that I knew
20　　　was $30.57 an hour.
21　Q　I'm sorry.  I missed that.  Could you repeat that?
22　A　$30.57 per hour.
23　Q　And do you have any benefits?
24　A　Full-time health benefits.
25　Q　Any dental?

## Page 44

1　A　Yes.
2　Q　Any vision?
3　A　Yes.
4　Q　Any pension or 401(k)?
5　A　401(k).
6　Q　And were there any other employers that we haven't
7　　　discussed between Riverview and Octapharma Plasma?
8　A　I worked for a company called DM Care Express.
9　Q　Okay.  And when did you work for them?
10　A　I'd probably say anywhere between 2015 and 2017.
11　Q　And what did you do there?
12　A　I was part of the event staff.  I was a paramedic.
13　Q　And why did you leave DM Care?
14　A　A scheduling conflict between Woodhaven and Flat Rock.
15　Q　Are there any other employers that we haven't discussed?
16　A　U.S. Steel.
17　Q　And when did you work at U.S. Steel?
18　A　I would say in the spring of 2017.
19　Q　And how long did you work at U.S. Steel?
20　A　About two weeks, a little over two weeks.
21　Q　And why did that employment end?
22　A　I resigned because I would not climb a 30-story blast
23　　　furnace without a safety harness.  I thought the safety
24　　　standards there were lacking.  I didn't think that – not
25　　　to mention, Zug Island is one of their facilities which I

## Page 45

1　　　would be required to be stationed and they had some of
2　　　the highest recording Benzene levels in the world which
3　　　are toxic and I just didn't want to be exposed to.
4　Q　After, other than that, have you done any other
5　　　employers?
6　A　I worked for Hillsdale County EMS.
7　Q　And when did you work for Hillsdale?
8　A　It was a couple months.
9　Q　And why did you leave Hillsdale?
10　A　The pay.
11　Q　And where did you go when you left Hillsdale?
12　A　Well, I was still working with Woodhaven.
13　Q　When did you leave Woodhaven?
14　A　I believe it was October or November of last year, 2022.
15　Q　And why did you leave Woodhaven?
16　A　I was discharged.
17　Q　Have we talked about that one already?
18　A　That's correct.
19　Q　I'm just trying to make sure.  I got it.  Okay.  Any
20　　　other employers between Riverview and present?
21　A　That I can recall off the top of my head, no.
22　Q　Okay.
23　A　I was working with Riverview when I became a paramedic in
24　　　2008, so my employment with them ran concurrent with
25　　　Detroit up until I thought was my

## Page 46

1　　　resignation/termination.  I really don't know what you
2　　　call it.
3　Q　Did you fill out any documents when you left the City of
4　　　Detroit?
5　A　At the time they switched over to a computer system where
6　　　we would clock in and clock out and we used to sign in on
7　　　a sheet, a payroll sheet, and then we would log into the
8　　　journal which would open and close a shift and then we
9　　　would record any overtime and so on and then they
10　　　switched to a computer system where we would clock in and
11　　　clock out and then anything that the administration would
12　　　need, we would do – it was a fairly new computer system,
13　　　so I was still trying to figure it out.
14　　　　　We still would write letters and so on as
15　　　requested because they would have to initiate multiple
16　　　copies and then they would have to sign one.  They would
17　　　have to sign them all and then return one to us and then
18　　　keep the other two.
19　Q　When you resigned from the City of Detroit did you fill
20　　　out a resignation form?
21　A　I wrote a letter.  I either wrote it or I sent it in an
22　　　email.  I don't recall which one because I never received
23　　　a copy, to my knowledge.
24　Q　I'm going to show you we'll mark – I think we're on
25　　　Exhibit 5 if I'm correct?

13 (Pages 43 to 46)

TAMARA A. O'CONNOR
248.882.1331　　toconnorrptg@aol.com
13-53846-tjt　　Doc 13713-4　　Filed 08/04/23　　Entered 08/04/23 10:44:20　　Page 37 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 47

1    REPORTER: Yes, Exhibit 5.
2    (At 11:23 a.m., Defendant's
3    Exhibit 5 marked)
4    Q    (By Mr. McFarlane)  Let me share this.  Have you seen
5    this document before, sir?
6    A    I don't remember it, but it does look like my writing.
7    Q    Does this appear to be your signature here?
8    A    That's correct.
9    Q    Okay.  Have you ever seen this document filled out below
10   your signature before?
11   A    No.
12   Q    Have you ever requested your personnel file from the City
13   of Detroit?
14   A    I did.
15   Q    And when did you do that?
16   A    After I was told that I couldn't return to the department
17   when I received a call from Ms. Brown.
18   Q    And did you ever receive a copy of that personnel file?
19   A    I did from the City of Detroit Law Department, not from
20   the Fire Department.  I received a call from an attorney
21   from the Law Department and when I called her back – I
22   don't recall what her name was, but she said I'm looking
23   at a FOIA request for your employee file and I said,
24   "That's correct."  She said, "I'm curious why they just
25   didn't give it to you, why they forwarded it here."  I

Page 48

1    said, "I don't have a clue either."  Then she said, "Give
2    us about two weeks to review the file to make sure that
3    nobody else's names or anything appears in there and that
4    it doesn't violate HIPPA," or, I'm sorry, not HIPPA, the
5    guidelines, the federal guidelines for the collection of
6    information on our EMS run reports as well as just
7    protecting the names of other technicians and so on.
8         Then I was told that the file was ready to
9    be picked up.  I went down to, I believe, the City-County
10   Building.  I was told that I had to pay ten cents per
11   page, I believe.  They told me it was $33.00 I believe
12   and .10 cents because it was 300 or so pages.
13   Q    Okay.  I want to talk about the damages that you're
14   alleging in this case.  Are there any economic damages
15   that you're alleging you suffered in this lawsuit?
16   A    I want to be clear that serving with the Detroit Fire
17   Department was probably by far the best job that I ever
18   had.  It was an honor and a privilege serving the
19   community, being recognized as an Emergency Medical
20   Technician with the Fire Department and as a result of
21   things that went on over there with, you know, the
22   exposure of the response times and the personnel issues
23   and everything else that went on there, the job schedule
24   was, I mean, to nobody else.
25        We had the best schedule ever that

Page 49

1    accommodated for time off and the money was good for the
2    position that I was carrying and to be honest with you, I
3    carried a lot of responsibility.  I haven't found a job
4    like that since.  I enjoy what I do at the plasma center,
5    but that job was the best.
6         The money, I was very well paid by the
7    City.  What I wanted to do was to become a paramedic to
8    make more, carry on more responsibility.  I wanted to
9    transfer to the Fire Fighting Division, which I wasn't
10   allowed to do, but there was no growth and there was no
11   opportunity to promote to Lieutenant or maybe even a
12   Captain and I wanted to retire from that place and I
13   would have been doing it this year.
14        Damages are far more than economic.  I
15   loved that place.
16   Q    Let's take it in turn.  So economic damages, what
17   specific damages regarding economics?  Are there any that
18   you can tell me that you're claiming here?
19   A    I believe so.  I believe that if I was able to follow the
20   natural progression from being a paramedic which their
21   pay last I was made aware was around $28, and that I was
22   told with the ability – they asked me upon returning if I
23   was going to consider going to the Fire Academy, which I
24   expressed interest that I was going to try to become a
25   fireman there and they now have a cross-position pay

Page 50

1    which was an increase.
2         I was talking to somebody the other day.  I
3    can't remember who it was.  In passing they said that a
4    lot of people were leaving the job because they were
5    promised crossover pay which is crossover meaning that
6    you're a fire fighter and you're an EMT or you're a
7    firefighter and you're a paramedic and that they hire
8    people at a higher rate than what the current EMT
9    position carries or what the current paramedic position
10   carries and, I mean, I could have been a fireman there
11   working eight days a month and could have pursued outside
12   employment if I wanted to or worked overtime when it
13   became available.
14        I really don't know what the possibilities
15   could have been financially or personally.  I mean, to
16   try to obtain one of the highest positions in the Fire
17   Department, I worked with Mr. Larkins who is the current
18   sitting EMS Administrator and he was my paramedic
19   partner.
20        I worked with him for years.  I thought it
21   was the greatest thing that he got promoted to be the EMS
22   Chief there.  Did I have aspirations of joining his
23   administration some day and possibly passing down what I
24   learned on the job to younger people to make it a safer
25   environment for them, I really don't know what would

14 (Pages 47 to 50)

TAMARA A. O'CONNOR
248.882.1331     toconnorrptg@aol.com
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 38 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 51

1 happen.
2 Q Okay. You talk about emotional or psychological damages.
3 Are you claiming any of those here?
4 A I don't know if that's included, but I can tell you
5 respectfully, that is a highly trained Fire Department.
6 The things that we do there are not done anywhere. When
7 I applied with other departments to go work, they had a
8 real problem with the fact that I did some things that
9 they'll never do in their entire career and it was just
10 over one weekend, so there was a lot of backlash with the
11 experience that I had from Detroit.
12 There were a lot of people that talked
13 about wanting to work there, but they didn't have the
14 courage to go through the training or to even apply let
15 alone to go through the training and pass it to become one
16 of the best EMTs or firemen or paramedics in the world.
17 I would put them against people in New
18 York, LA, Miami, anywhere, and because of the things that
19 happened in Detroit as far as being on TV, being on the
20 news, and reporting the issues that were going on there,
21 maybe my employers took notice of that and that I could
22 possibly potentially do that at their place of employment
23 which they did have issues like the City of Detroit did.
24 No other departments are immune from the
25 type of problems that the City of Detroit had with

## Page 52

1 personnel issues, staffing, the vehicles, maintenance,
2 and response times. I mean, it's a problem nationally.
3 Q Have you sought – I'm sorry. I thought you were done.
4 A No. I think – I don't think I ever really left there. I
5 think that my heart and my mind was always there. I was
6 still concerned about the personnel during COVID and
7 whatever issues were happening and I felt helpless.
8 Like, I couldn't do anything for them. I felt that I
9 should have been there working with them.
10 Q Have you sought any treatment for any emotional or
11 psychological injuries?
12 A I was diagnosed with PTSD.
13 Q And when was that?
14 A I don't recall. Probably sometime after I left.
15 Q Was that prior to the events of this lawsuit?
16 A That's correct.
17 Q Have you sought any treatment after the events of this
18 lawsuit?
19 A Just, you know, I received a lot of calls from people
20 that either were still currently working there or had
21 worked there. They stated that they heard I was coming
22 back. There seemed some element of excitement. I
23 messaged Joe Barney on Facebook messenger.
24 I told him that I appreciated any possible
25 way that he could help, you know, in returning me back.

## Page 53

1 He seemed enthusiastic at the time. There was a – I
2 don't remember his first name, but his last name was
3 Kazinski (phonetic), I believe.
4 Kazinski. I'm not sure how to spell that.
5 It starts with a K, and we messaged back and forth on the
6 Facebook messenger and he told me that they needed me to
7 come back to mentor some of the younger kids that didn't
8 know what we experienced and what we went through.
9 Between those years after I exposed the
10 issues with a fellow co-worker about the issues with
11 response times and so on that was going on, so I believe
12 that there was a positive element to me returning.
13 I'm not, you know, the second coming,
14 respectfully. I'm not the - I'm just one person, but I
15 believe that when I worked there, I had a lot of
16 credibility, had a lot of respect from the people that I
17 worked with and I was going to do my part to help move
18 the department forward and knowing that I wasn't
19 going to be able to come back for whatever reason, I was
20 devastated.
21 I believe that I started my EMS career
22 there even though I had a couple of years experience
23 with, you know, Community Ambulance and Health Link, but
24 I believe that the day that I started that job with
25 Detroit was really the beginning of my career and I

## Page 54

1 wanted it to end there.
2 Q So after you were told that you couldn't return to the
3 City of Detroit, did you seek any treatment for any
4 emotional or psychological injuries?
5 A I talked to a therapist about, you know, that issue. I
6 also tried talking to the EAP representative, I believe,
7 assistance. It was through the Chaplin Core with the
8 Detroit Fire Department at the time. He's now deceased.
9 At the time it was Reverend McNeely. M-c-N-e-e-l-y, I
10 believe. I went and spoke to him personally, told him
11 that I couldn't understand the issues that I was going
12 through with the Fire Department as far as the repeated
13 discipline, the suspensions, just the overall treatment
14 from some of my Lieutenants and Captains and there was a
15 fair percentage of them that were providing the
16 information to leak to the media about some of the
17 current situations that were going on in the department.
18 Why they didn't go and report those issues
19 themselves, I don't know.
20 Q When did you speak to Reverend McNeely?
21 A I believe when I was on light duty as a result of not
22 being able to shave every day. They wanted me to wear a
23 hood in the event that we were exposed to somebody who
24 was having symptoms of hepatitis or tuberculosis, that we
25 would have to don our respiratory protection and to my

15 (Pages 51 to 54)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 39 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 55

1    understanding that those filters were one time use.
2    Those things were very expensive for the City to buy and
3    they claimed that they would only buy one for me and
4    wouldn't pay for the replacement filters or cartridges
5    and there were other people that had them and never used
6    them, but I spoke to Reverend McNeely about the issues
7    that were going on.
8          He said that he would talk to some of the
9    administrators to find out what the issues were.  I spoke
10   with the Commissioner.  Well, actually, I never met the
11   Commissioner although every time I faced a suspension or
12   I was placed off duty for talking to somebody in the
13   media or it was alleged that I was talking to somebody
14   from the media, I would immediately be placed on
15   administrative leave pending a Commissioner's hearing.
16         I never actually – the only Commissioner
17   that I ever met was Don Austin.  He was a Fire
18   Commissioner for a short time.  I met him on duty as well
19   as off duty to address my concerns about the issues that
20   were going on relevant to my discipline, my multiple
21   suspensions.
22         It just seemed like there was no
23   resolution to anything that was going on there.  If I
24   would be called in because I was being disciplined, the
25   first thing they would tell me is that it's not

## Page 56

1    adversarial.  They would tell me what the charge is, what
2    the penalty is, and then I would go on immediate
3    suspension without being able to explain the situation to
4    determine if there was a misunderstanding or something
5    that could have resolved the issue and I could have been
6    replaced back to duty.
7          It did happen one time which I was shocked
8    that I was returned back to the field and not suspended.
9    Q  And is it fair to say that you met with Reverend McNeely
10      before you resigned from the City?
11   A  That's correct.  I was assigned to Fire Department
12      Headquarters which was at 250 West Larned.  It's
13      currently not in existence anymore, but at the time I was
14      assigned there and had to carry out various
15      administrative duties and he was on the same floor we
16      were on.
17         So I remember going to his office.  I would
18      say good morning to him every morning.
19   Q  You mentioned that you saw a therapist.  When did you see
20      a therapist?
21   A  I can't recall.  Probably sometime after that.
22   Q  Was it prior to 2017?
23   A  That's correct.
24   Q  Have you seen a therapist since 2017?
25   A  I was seeing one and then I met a different one.  I

## Page 57

1    didn't have insurance after I left the City, which again
2    was a hardship.  They have very good health insurance.  I
3    didn't pay anything for like ten years, and they started
4    charging us or having, you know, I don't know what they
5    call it, not co-pays, but we would have to pay a certain
6    amount for our insurance which wasn't a big deal.
7          You know, we were very well paid, so I
8    didn't have an issue with that, but when I went on
9    Medicaid, I had to go to a guidance center that accepted
10   people without insurance.
11   Q  And when was that?
12   A  Probably – I don't recall, honestly.
13   Q  You got a year?
14   A  It might have been about 2018 right around the time when
15      I knew that I wasn't coming back to the City.
16   Q  And who did you see in 2018?
17   A  I don't recall her name.
18   Q  And what was the place you went to?
19   A  The Guidance Center.
20   Q  And where is that located?
21   A  In Southgate.
22   Q  And you saw, you said it was a female doctor?
23   A  It was a therapist.  Well, there was a psychiatrist
24      there.  I spoke with her briefly and there was a
25      therapist that they assigned me.

## Page 58

1    Q  And you don't recall her name?
2    A  No.
3    Q  And how many times did you see her?
4    A  Probably once a week.
5    Q  For how long?
6    A  Until we got insurance through HAP and then I was no
7       longer on Medicaid, so I couldn't, we couldn't
8       participate in that program anymore because of the fact
9       that we have good health insurance.
10   Q  And when you say you got insurance, who did you get that
11      insurance through?
12   A  HAP; Health Alliance Plan.
13   Q  Did you get that through an employer or on your own?
14   A  No, through my wife.  She was employed with Henry Ford
15      Hospital.
16   Q  And did you see anybody after that?
17   A  No.
18   Q  And do you recall approximately when your wife got that
19      insurance?
20   A  I don't recall when she was employed there.
21   Q  Do you recall how many times you saw the therapist?
22   A  It was a handful of times.  Maybe ten times, maybe less,
23      maybe more.  She took a position with the hospital, I
24      believe, and the psychiatrist was leaving, too, and
25      around that time they couldn't find – I think I spoke to

16 (Pages 55 to 58)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 40 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 59

1  another lady.
2      I can't remember her name.  I think I
3  spoke to her once.
4  Q  And were you ever diagnosed with anything from that
5      therapist?
6  A  I believe they told me it was PTSD related from the job.
7  Q  Did they say specifically which job?
8  A  I don't recall.  I focused a lot about the beginning of
9      my career with the City of Detroit.  It was the longest
10     employer that I've had in the field that I practice in.
11 Q  Any other issues that you discussed other than the
12     beginning of your employment?
13 A  We never really got that far in the ten or so visits.  We
14     were just, you know, just – she was trying to find out a
15     little bit about me.  I think the sessions were probably
16     like 45 minutes, if that.
17 Q  Did you ever receive any written diagnosis or reports
18     from that therapist?
19 A  Nothing from them.  I mean, it was in my file there, but
20     I never requested it.
21 Q  Any other therapists other than the one at the Guidance
22     Center that you've spoken to?
23 A  There was just one before that like in the very
24     beginning.
25 Q  And when was that?

## Page 60

1  A  While I was working in Detroit.
2  Q  So that would be somewhere prior to 2013?
3  A  That's correct.
4  Q  Okay.  You mentioned that you have social media.  What
5      social media do you have a subscription to or are you
6      registered with?
7  A  Facebook, Instagram.  I don't post.  I just have family
8      on there as friends and then I subscribe to some pages
9      that deal with other Fire Departments, you know, to see
10     how they operate, what the conditions are there, the
11     types of things that they experience, you know, on the
12     job.
13     Just different ones.  I don't really know
14     how they do it, but it's like when they see you looking
15     at something, they just start sending you more of it,
16     more content, and just about, you know, diet and
17     exercise, some law enforcement pages.  I did have – I
18     don't even know if you would classify it as an employer,
19     but I was a reserve deputy with the Wayne County Sheriffs
20     for about ten years, but I was never paid.
21     It was voluntary.  It was a community
22     service position.  The Chief at the time, I believe his
23     name was Chief Stewart Rich who passed away last year
24     towards the end of 2022.  I don't remember exactly what
25     month, but I did do community service with them on and

## Page 61

1  off for about ten years.
2  Q  Have you had any discussions regarding the complaints in
3      your lawsuit with anybody other than your attorney?
4  A  To my knowledge, no.
5  Q  Do you have any written documents, notes, that were taken
6      prior to the filing of this lawsuit?
7  A  I'm sorry.  Repeat that one more time.
8  Q  Do you have any written notes or documents that you kept
9      either typed or handwritten relating to this lawsuit that
10     were created prior to the lawsuit?
11 A  No.  The only person that I spoke to was Bill Harp.  He
12     was one of the representatives of the DFFA at the time.
13     When I was reapplying with the City, I spoke to him to
14     ask, you know, how I would go about reapplying with the
15     City and he told me at this point there was nothing he
16     could do to help me because I wasn't employed with the
17     department and then that was it.
18     I spoke with Kyle Fowle who I worked with
19     at Woodhaven because at the time he was still working in
20     Detroit.
21 Q  And what's Kyle Fowle's position?
22 A  Right now?
23 Q  When you spoke to him or right now.  Either way?
24 A  He was a part-time fire fighter/paramedic like myself,
25     but he was also --  I'm sorry.  Say that again?

## Page 62

1  Q  What was his position with the City of Detroit?
2  A  Paramedic.
3  Q  Paramedic, and was he a full-time paramedic when you
4      spoke to him?
5  A  That's correct.
6  Q  And is he still, if you know, employed with the City of
7      Detroit?
8  A  No.
9  Q  And do you know why he's not employed by the City of
10     Detroit?
11 A  To my understanding, he resigned to pursue outside
12     employment with another full-time agency.  Ironically, as
13     close as him and I, I thought we were, you know, working
14     at Riverview, not Riverview, Woodhaven, he wrote a letter
15     that resulted in my suspension which led to my
16     termination.
17 Q  And that's at Woodhaven?
18 A  That's correct.  He told me about it the night before.  I
19     was placed on suspension the Monday of whatever month
20     that was.  Maybe September, October.  He told me the day
21     before that I was suspended that they were conducting an
22     investigation about me and that he was forced to initiate
23     a writeup, but at the time when him and I were working at
24     Woodhaven and he was still employed with the City of
25     Detroit, he says, "You need to get back on the job so we

17 (Pages 59 to 62)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 41 of
125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 63

1  can work together and then work there until we can
2  retire."
3  Q  Anybody else that you spoke to about the allegations in
4     this lawsuit?
5  A  I just had a conversation with he's a Lieutenant who was
6     talking about retiring and told him that when he retired
7     officially from the department that there would be a job
8     at Octapharma if he wanted to come there.
9  Q  And what Lieutenant was that?
10 A  Steve Strong.  We didn't discuss anything about anything
11    to do with Detroit other than just he told me that he was
12    going to stay past his retirement time.
13 Q  Did you guys discuss this lawsuit?
14 A  No, sir.
15 Q  Anybody else that you discussed this lawsuit, again,
16    other than your attorneys?
17 A  You said before?  Before the filing of the lawsuit?
18 Q  Yes.  No, that's when I was asking about the written
19    documents.  I'm saying have you discussed this lawsuit
20    with anybody other than your attorneys?
21 A  I spoke to a Lieutenant there.  He's Arabic.  I can't
22    remember his name.  We just talked briefly.  I just asked
23    him about how, you know, things were there, that I was in
24    the process of trying to come back and then that was it.
25 Q  And when did you speak to him?

## Page 64

1  A  It's been years.
2  Q  Any other discussions about this lawsuit with anybody
3     other than your attorneys?
4  A  No.  Not to my knowledge, no.
5        MR. MCFARLANE:  I'm going to take a break.
6     I may be done.  I'm going to take about a 15 minute or so
7     minute break, so 12:10.  Everybody is good?
8        MR. SHEAROUSE:  That works for me.
9        MR. MCFARLANE:  All right.
10       (At 11:54 a.m., recess taken)
11       (At 12:11 p.m., back on the record)
12       MR. MCFARLANE:  Back on the record, Tammy?
13       REPORTER:  Yes.
14       MR. MCFARLANE:  I have no further
15    questions.
16       MR. SHEAROUSE:  I just have a few follow-
17    up questions.
18          EXAMINATION
19 BY MR. SHEAROUSE:
20 Q  Mr. Cadoura, thank you for your time here today.  I know
21    we discussed a lot about your employment history as well
22    as some of the issues that you've had at the various
23    places of employment.  Could you just briefly describe to
24    me, I know we had mentioned earlier that you complained
25    or I shouldn't say complained – strike that, that you brought

## Page 65

1  up issues with certain policies that weren't being
2  followed at Detroit.  Is that correct, the Detroit Fire
3  Department?
4  A  That's correct.  It was brought to the public's attention
5     because a news reporter who was looking into issues that
6     were going on in the department, he wanted to challenge
7     some of the things that he had heard as far as the
8     Commissioners had claimed that they were following the
9     national standard and they wanted to get video proof that
10    it wasn't.
11 Q  And this national standard had to do with response times.
12    Is that correct?
13 A  That's correct.
14 Q  Were there any other policies that Detroit was not
15    following at that time, to your knowledge?
16 A  For a time they had radios in the ambulances where we
17    were supposed to use to contact the hospital that were
18    outside of the city and those were removed from the
19    ambulances when they were putting newer ambulances into
20    service.  At the time, that was Chief Gary Kelly that
21    instituted that and then they were later put back on
22    because the issue was brought to a government
23    organization called HEMS, which is H-E-M-S, and they sent
24    the letter to the City stating that they heard that the
25    radios were taken out and that they needed to be placed

## Page 66

1  back in immediately.
2  Q  And at Detroit did you notice any issues with under-
3     licensing of EMTs or paramedics?
4  A  They were putting us in Crown Victorias which were
5     refurbished police cars that they turned into
6     administrative cars for the Lieutenants and Captains and
7     the Fire Chiefs and they wanted us to respond to calls
8     with limited equipment.  They weren't even – the
9     ambulance is licensed based on the State.
10
11       If you don't have an ambulance where you
12    can put somebody in to transport them to the hospital,
13    they refer to that as a Romeo unit.  The standard
14    spelling R-o-m-e-o, and that is two licensed EMTs
15    that can only respond as first responders, but could not put
16    them in the vehicle and transport them to the hospital.
17       I worked on those vehicles many times.
18    Sometimes we were the subject of criticism by the public
19    because they're essentially waiting for an ambulance and
20    all we were doing was trying to render care while we're
21    waiting for an ambulance and that was the phrase that we
22    heard a lot which was, "no units available City-wide or
23    just no units available," and so on.
24       MR. SHEAROUSE:  I don't think I have
25    anything further.

18 (Pages 63 to 66)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 42 of 125

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 67

1    MR. MCFARLANE:  I have no further
2  questions.
3    (At 12:15 p.m., deposition concluded)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 68

C E R T I F I C A T I O N

(STATE OF MICHIGAN)

(COUNTY OF OAKLAND)


    I certify that this transcript, consisting of

68 pages, is a complete, true and correct record of the

deposition testimony of RICHARD CADOURA taken in this case by

Zoom video conferencing on Thursday, January 5, 2023.

The term "inaudible" is used where audio fades out or audio

interference causes testimony to be unintelligible.

    I further certify that prior to taking this

deposition, RICHARD CADOURA was duly sworn to tell the

truth, the whole truth and nothing but the truth.


1-5-23   *Tamara A. O'Connor*
_____  _____

Date     TAMARA A. O'CONNOR, CSMR-2656, CER-2656
         Notary Public
         My Commission Expires: 6-25-27
to*

19 (Pages 67 to 68)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com

755c4784-c363-4279-9438-88070af26d85

# Detroit Fire Department
## E.M.S. Division

Medic Co. No. M-19

Detroit, ___Dec 12,2011___

To: Asst. Superintendant Wilson

From: Tech. Richard Cadoura

Re: Charge of Conduct

On 11-08-2011, While detailed to Medic 6, I called AC. Donella James and was informed that Lt. Sablowski was coming to the Hospital to " Conduct and Investigation into an Allegation of Patient Abandonment". I walked to the ER Dock and observed Lt. Sablowski talking with my partner Jeff Sebree. As I approached , I was informed by Lt. Sablowski that he was"conducting and investigation". I respectfully declined until a Union Rep could be present, invoking my Weingarten and Garrity Rights. Lt. Sablowski DENIED my request stating " this is not an investigation but an inquiry". I stated under GR 6.1 Section C. a Supervisor will provide a Union Rep prior to any questioning that may lead to charges now or in the future. My request was DENIED!!! As I attempted to walk back into the hospital Lt. Sablowski continued to follow me Shouting "you will answer my questions". Lt Sablowski allowed the situation to escalate by his FAILURE TO MAINTAIN ORDER AND DISCIPLINE. I do regret the fact that I allowed Lt.Sablowski's Disrespectful, Abusive, Demeaning Behavior to Provoke me into telling him ' TO GO FUCK HIMSELF" 3 times, but it did end the Confrontation. In my almost 14 year career with Dems I have NEVER been put in that situation by any other Officer in the Detroit Fire Dept. I filed a Violence in the Workplace compliant against Lt. Sablowski several years ago which was later dropped by the Law Department without being fully investigated. Since that time I have had False Complaints, Written Statements and Improper Charges written against me by Lt. Sablowski resulting in being placed off LWOPCA several times. Without the Department Investigating his Conduct.

Respectfully Richard Cadoura #608

Fwd by:

RECEIVED

DEC 14 2011

ASSISTANT SUPERINTENDENT'S OFFICE
EMERGENCY MEDICAL SERVICE

DEFENDANT'S
EXHIBIT
Cadoura
1-5-23   TMC

20-cv-12986 000357



**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313•224•9421
Fax 313•628•1164
www.detroitmi.gov

December 19, 2017

Richard Cadoura


Dear Richard:

The City of Detroit is pleased to extend to you a conditional offer of employment for the position of Emergency Medical Technician (Paramedic) in the Fire Department - EMS Division with a starting rate/salary of $23.52.

You may accept or decline this offer by responding to this email at brownbel@detroitmi.gov by the expiration date of Friday, December 22, 2017.

This offer is contingent upon your successful completion of a criminal background investigation, driver's license, drug screen and pre-employment medical evaluation.

In order to complete the criminal clearance, we need the following confidential information:

Phone Number:
Date of Birth:
Gender:
Race:
Alias/Maiden Name:
Driver License Number:
Copy of diploma, degree, or transcripts verifying completion

Failure to provide this information will rescind this offer of employment.

Once we receive your acceptance and the results of your pre-employment medical evaluation, you will receive an email from Employee Services Consultant, Kemia Crosson with your final certification date.

The City of Detroit is an Equal Opportunity Employer. No applicant shall be discriminated against on the basis of race, religion, color, age, gender, national origin, disability, or other criteria prohibited by City, State or Federal law.

If you have any questions, please feel free to contact me at 313.720.5632 and I will be more than happy to discuss the details of this offer.

Sincerely,

Belinda Brown, Recruiter II
Human Resources Department



20-cv-12986 000482



**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313·224·9421
Fax 313·628·1164
www.detroitmi.gov

December 4, 2017

Richard Cadoura



Dear Mr./Ms. Cadoura:

RE: Application for – Exam - 2017222403126xx

You have been scheduled to take the Physical Agility Test (PAT) for the Emergency Medical Technician (Basic / Paramedic) position. In order to participate in the PAT you must have a signed, current Medical Clearance from a physician.

This Medical Clearance Form is included with this letter. NO CANDIDATE will be allowed to participate in the PAT without a current Medical Clearance Form signed and dated by a physician.

You are scheduled to participate in the PAT on Thursday, December 7, 2017 at 8:30 am.

Please report to the Fire Department Training Academy, located at 10200 Erwin Street (between Lynch & Grinnell - off Van Dyke) in Detroit, 48208. Parking is available in the front of the Fire Department Training Academy.

YOU MUST BRING WITH YOU TO THE PHYSICAL AGILITY TEST:

- This letter - Admittance Notice
- Your signed medical clearance
- A COPY and the ORIGINAL of your current Driver's License with Chauffeurs' Endorsement (if you don't have one, you must have one by the first day of the Academy – 1/22/2018)
- A COPY and the ORIGINAL of your current State of MI - EMT (Basic / Paramedic) License
- A COPY and the ORIGINAL of your current State of MI - Detroit East Medical Control Authority Certification (DEMCA), (if applicable for Paramedic)
- Bring an Updated Resume
- Bring a COPY of the following - Work Experience Documentation:
  o two (2) recent check stubs
  o 2016 W-2
  o two (2) Reference Letters

Please wear loose fitting and comfortable full-length pants and shirt, along with gym shoes or other comfortable footwear.

Please reply back stating you will be in attendance by contacting me at 313.720.5632 by Wednesday, December 6, 2017.

IF YOU CAN NOT MAKE IT TO THIS EVENT AND WISH TO RE-SCHEDULE, please contact my Administrative Assistant, Lisa Nelson at 313.224.3477.

Sincerely,
Belinda Brown, HR Recruiter II
Human Resources Department



DEFENDANT'S
EXHIBIT 3

20-cv-12986 000483



**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313•224•9421
Fax 313•628•1164
www.detroitmi.gov

January 13, 2018

Richard Cadoura


RE: Application for Paramedic

Dear Mr. Cadoura:

Thank you for your interest in the above referenced position. Your skills and commitment to the City of Detroit were recognized and greatly appreciated.

We regret to inform you that you are no longer considered for selection for the Detroit Fire Department - EMS Division.

If you have any questions, please feel free to contact me at 313.224.3730.

Sincerely,

Belinda Brown
Human Resources Department



# DATABASE

**City of Detroit**

## NOTICE OF RESIGNATION
## EVALUATION AND RECOMMENDATION FOR REINSTATEMENT

### 1. EMPLOYEE

DEPARTMENT ___FIRE___           DIVISION ___EMS___

I, ___RICHARD CADOURA___, S.S. # [redacted] Hereby tender

my resignation as ___EMT___ for the following reason(s): ___RETIREMENT___
title

My last day of work will be __7__ __6a__ , Additional comments: _____
day   date

Forwarding Address (either home or work): [redacted]

_____ (signature)        __6-3-13__ (date)

### 2. HUMAN RESOURCES DEPARTMENT, EMPLOYEE SERVICES DIVISION

DISCIPLINARY ACTION – LAST 18 MONTHS

Number of Written Reprimands: 1          Number of Suspensions: 1
Reason(s) for Reprimand: __conduct__
Reason(s) for Suspension: __Conduct__

ATTENDANCE AND TARDINESS RECORD – LAST 18 MONTHS

| Paid Sick Leave | 10 Occurrences | Beginning of Shift |
| --- | --- | --- |
| Absent /No Pay | Occurrences | Return from Lunch |
| Dept. Leave | Occurrences | |
| A.W.O.L. | Occurrences | |
| Workers Compensation | Occurrences | |
| Funeral Leave. | Occurrences | |
| FMLA | Occurrences | |
| Other | Occurrences | |
| 15 Total Days Absent | 10 Total Absence Occurrences | ___ Total Times Tardy |

DEFENDANT'S
EXHIBIT 5
Cadoura
1-5-23  TNO

GODIVA

Thank you again for choosing GODIVA as your partner in making a more wonderful place!

Copyright © City of Detroit, 2003. All rights reserved.

Notice of Resignation
Effective 04/09/03                    Page 3                    FORM9067
                                                               Rev 6

## ATTENDANCE AND TARDINESS RECORD

☐ Satisfactory     ☑ Needs Improvement     ☐ Unsatisfactory

Comments: _____

## WORK PERFORMANCE

| | EE | ME | NI | UN | |
|---|---|---|---|---|---|
| Overall ability to perform: | ☐ | ☑ | ☐ | ☐ | EE-Exceeds Expectations |
| Quality of work: | ☐ | ☐ | ☑ | ☐ | NI-Needs Improvement |
| Quantity of work: | ☐ | ☑ | ☐ | ☐ | ME-Meets Expectations |
| Knowledge & Skills: | | | | | UN-Unsatisfactory |
|     Technical Knowledge: | ☐ | ☑ | ☐ | ☐ | |
|     Practical Skills: | ☐ | ☑ | ☐ | ☐ | |
|     Ability to learn: | ☐ | ☑ | ☐ | ☐ | |
| Work Behavior: | ☐ | ☐ | ☑ | ☐ | |
| Supervisory Abilities: | ☐ | ☐ | ☐ | ☐ | ☑ (N/A) |

## DEPARTMENTAL RECOMMENDATION

REINSTATEMENT: ☐ Yes ☑ No     Date:_____

Completed by: _Anthony M Wade_     Title: _Relation Lt_
    Supervisor's Name

Approved by: _Gerald Jones_     Title: _EMS D. Supt_
    Manager's Name

Approved Date: _6/10/13_ Comments (If reinstatement is NOT recommended, state reason):_____

_Pending discipline for work behavior._

EXIT INTERVIEW(S) CONDUCTED BY:

Date of Interview: _6/10/13_ Name: _Anthony M Wade_ Title: _Relation Lt_

COMMENTS: _____

Date of Interview: _____ Name: _____ Title: _____

COMMENTS: _____

**Reinstatement is governed by Human Resources Rule 15. To be eligible for Reinstatement, the applicant must have at least one year of prior service and resigned in good standing. Applications for reinstatement will be accepted for a period between three (3) months and twenty-four (24) months following the last day on the active payroll.**

Copyright © City of Detroit, 2003. All rights reserved.

MM 9/4/13

## 4. HUMAN RESOURCES DEPARTMENT, EMPLOYEE SERVICES DIVISION

Last Day Worked: 06/03/13  Last Day Paid: 06/03/13  City Seniority Date: 06/08/98

Effective Date of Resignation: 06/04/13  (in accordance with Human Resources Rule 15)

The Human Resources Department ☒ concurs ☐ does NOT concur with the Reinstatement

Recommendation of the employing department:

Brandi Richmon                          Date: 9/16/13
HRC Printed Name

Signature

Copyright © City of Detroit, 2003. All rights reserved.

Notice of Resignation
Effective 04/09/03

Page 5

FORM9067
Rev 6
20-cv-12986 000464

13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 50 of 125

EXHIBIT B

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
 2               EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4    RICHARD CADOURA,
 5        Plaintiff,            CASE NO. 20-cv-12986
 6    -vs-                      HON. GERSHWIN A. DRAIN
 7    THE CITY OF DETROIT,      MAGISTRATE ANTHONY P.
 8        Defendant.            PATTI
 9    _____/
10        The Deposition of JOSEPH BARNEY, III, taken via
11    Zoom, by me, Carol L. Martin, CSR-3532, a Notary
12    Public, in and for the County of Oakland, State of
13    Michigan, on Friday, January 6, 2023, commencing at
14    or about 10:16 a.m..
15    APPEARANCES:
16    For the Plaintiff:
17        CARLA D. AIKENS, P.L.C.
18        By: Mr. Austen Shearouse
19        615 Griswold Street, Suite 709
20        Detroit, Michigan 48226
21        (844) 835-2993
22
23
24
25
```

Page 1

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 52 of
125

January 6, 2023

| | |
|---|---|
| 1 APPEARANCES CONTINUED: | 1   Friday, January 6, 2023 |
| 2 For the Defendant: | 2   10:16 a.m. |
| 3   CITY OF DETROIT LAW DEPARTMENT | 3   *   *   * |
| 4   By: Mr. Jason McFarlane | 4   J O S E P H   B A R N E Y, I I I |
| 5   2 Woodward Avenue, Suite 500 | 5   after having been first duly sworn to tell the |
| 6   Detroit, Michigan 48226 | 6   truth, the whole truth, and nothing but the |
| 7   (313) 237-0548 | 7   truth, was examined and testified as follows: |
| 8 | 8   EXAMINATION |
| 9 | 9 BY MR. SHEAROUSE: |
| 10 | 10 Q. Good morning.  My name is Austen Shearouse and I |
| 11 | 11   represent Plaintiff Cadoura in this matter.  This |
| 12 | 12   deposition is being taken pursuant to the |
| 13 | 13   agreement of all parties to be used for all |
| 14 | 14   purposes under the Michigan Court Rules. |
| 15 | 15     First off, have you ever had your |
| 16 | 16   deposition taken before? |
| 17 | 17 A.  Yes. |
| 18 | 18 Q.  Yep?  Okay.  So just a couple of ground rules |
| 19 | 19   just as a reminder.  Especially with Zoom, make |
| 20 | 20   sure that I finish the entire question to give |
| 21 | 21   the court reporter adequate time with the lag to |
| 22 | 22   take everything down and I'm going to try and do |
| 23 | 23   the same with your answers.  I know inevitably we |
| 24 | 24   will talk over each other a little bit, but try |
| 25 | 25   to keep it down as much. |
| Page 2 | Page 4 |

| | |
|---|---|
| 1     I N D E X | 1     Make sure all your answers are verbal. |
| 2 WITNESS:                 PAGE: | 2   So "yeses" and "nos," "maybes", and "I don't |
| 3 JOSEPH BARNEY, III | 3   knows."  I know sometimes we have a habit to nod |
| 4 Examination by Mr. Shearouse        4 | 4   along one way or the other, but for the ease of |
| 5 Examination by Mr. McFarlane       46 | 5   the court reporter, make sure everything is |
| 6 | 6   verbal. |
| 7 | 7     If you need to take a break, please let |
| 8 NO EXHIBITS MARKED | 8   me know.  I'm happy to do that.  All I ask is |
| 9 | 9   that if there's a question that's been posed, |
| 10 | 10   answer that question and I'll be happy to take |
| 11 | 11   that break. |
| 12 | 12     So in reviewing -- or first off, can you |
| 13 | 13   state your full name for the record? |
| 14 | 14 A.  My name is Joseph Charles Barney, III.  I'm not |
| 15 | 15   going to look directly into the camera here |
| 16 | 16   because your voice is completely -- you're off |
| 17 | 17   and I just -- |
| 18 | 18 Q.  That's fine.  That's fine.  I understand it to be |
| 19 | 19   a little disassociating, so no worries.  What's |
| 20 | 20   your date of birth? |
| 21 | 21 A.  3-18-65. |
| 22 | 22 Q.  And what's your current address? |
| 23 | 23 A.  3363 20th Street, Wyandotte, Michigan 48192. |
| 24 | 24 Q.  And how long have you lived at that address? |
| 25 | 25 A.  Since 2002. |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

Joseph Barney, III
January 6, 2023

Page 6

1 Q. Does anyone else live there with you?
2 A. Well, my son just moved back about a week ago and
3   my wife. She's in Florida.
4 Q. So your wife is in Florida right now? Is your
5   son currently in the room with you?
6 A. No. I'm by myself.
7 Q. In reviewing for today's deposition, did you
8   review any documentation?
9 A. Yes.
10 Q. What documentation did you review?
11 A. I was sent some old Charge Forms that had
12   "Expungement" written on them and a few other
13   Charge Forms that I can't recall off the top of
14   my head. What I mean by Charge Forms, I mean
15   Department Charge Forms.
16 Q. And those Department Charge Forms were related to
17   Mr. Cadoura specifically?
18 A. Yes.
19 Q. Did you discuss this deposition with anyone other
20   than Mr. Jason before this deposition?
21 A. No, other than letting the Department know that I
22   had a deposition and, you know, that I wouldn't
23   be in this morning because I was in a deposition.
24 Q. And who did you let know at the Department?
25 A. Captain -- I should say Chief Olkowski. My shift

Page 7

1   that I am Captain of. Let them know I wouldn't
2   be in.
3 Q. And how do you spell the chief's name?
4 A. O-l-k-o-w-s-k-i.
5 Q. And have you ever gone by any other name other
6   than Joseph Charles Barney, III?
7 A. No, sir.
8 Q. Are you currently employed?
9 A. Yes, sir.
10 Q. By who?
11 A. The City of Detroit.
12 Q. And how long have you been working for the City
13   of Detroit?
14 A. Twenty-nine years and one month.
15 Q. And when you started with the City of Detroit,
16   what was your position?
17 A. I was an Emergency Medical Mobile Technician.
18 Q. Can you tell me a little bit about the duties of
19   an Emergency Medical Mobile Technician?
20 A. Well, you respond to emergency runs that were
21   sent to you either by a dispatch or through a
22   computer. NBC. You render care, you, you know,
23   transport to the hospital, you prepare the truck
24   for the daily service, you maintain it during the
25   day, and then you turn it over to a crew that

Page 8

1   relieves you.
2 Q. When you first started working as an Emergency
3   Medical Mobile Technician, what were the hours
4   that were required? The working hours?
5 A. Well, they haven't changed. Usually from
6   7:00 a.m. to 7:00 p.m., 7:00 p.m. to 7:00 a.m..
7   We used to have an impact shift when I came on.
8   So that would be from 4:00 to -- 4:00 to midnight
9   or 12:24 actually, and then we had peak shifts,
10   which we have now, that go from 1:00 to 1:00.
11   During the mid-2000s I believe they went from
12   2:00 to 2:00.
13 Q. And this is Department wide?
14 A. For the EMS Division. The Department has ten
15   divisions.
16 Q. Can you explain a little bit about the process of
17   getting hired as a Mobile Medical Technician?
18 A. Well, I think, you know, the process has changed
19   a lot, but in the '90s/2000s, you just would
20   apply for a job. You'd go through a -- I went
21   through three different physicals. I had a
22   physical at Fire Medical, which used to be at
23   250 West Larned, I had a physical at the City
24   County Building, and then I had a third physical
25   done off of West Grand Boulevard. We had a

Page 9

1   written test, we had an oral interview, and a
2   physical agility test, and then we were placed on
3   the list -- the eligibility list for hiring.
4 Q. And you said the process has changed since then,
5   correct?
6 A. Yeah, a little bit I believe. You know, what you
7   need now to have is an EMT License and a Driver's
8   License. You still have the agility test and a
9   written test and an oral interview, but it's all
10   kind of expedited now, where this would take --
11   the process before would take like months because
12   it was spread out.
13     Now, you know, you get your interview
14   the same day you do your agility test and really,
15   at this point, EMS doesn't even -- that was up to
16   Academy 77. EMS doesn't even have an agility
17   test or anything right now because the Fire
18   Department no longer hires standalone EMS
19   employees. So right now that process is
20   completely dead.
21 Q. You said standalone EMTs?
22 A. Yeah. The Fire Department is going through a
23   process with integration where they start to
24   integrate the EMS guys that are in the EMS
25   Division into Fire and so they stopped hiring

3 (Pages 6 - 9)

Joseph Barney II
January 6, 2023

1 standalone EMS or EMS divisional employees. Now
2 all employees hired are through the Fire
3 Department and their firefighting division
4 employees and they have to have firefighting and
5 they go through that process.
6 Q. So just so I understand the required -- kind of
7 the requirement now is to also be a firefighter
8 along with an EMT?
9 A. Yeah, but there's a two-way path. There's also
10 a process for Detroit residents as well where
11 they can be hired without any education and they
12 will be sent to Wayne Community College where
13 they'll be given EMT and also firefighter.
14 There's kind of two pathways.
15 Q. So going back to your experience, are you still
16 working as an Emergency Medical Mobile
17 Technician?
18 A. No.
19 Q. What other positions have you held?
20 A. Paramedic. I was promoted to Paramedic in '95.
21 In 2017 I was the Captain of the Training
22 Academy for the EMS section and in 2018, I was
23 the Assistant Superintendent and then in 2021, I
24 -- wait a second. I got to think about this. In
25 2022 in February, I was un-appointed and moved to
Page 10

1 learn the general policies as well for the City
2 of Detroit?
3 A. That's correct. They would have a portion of
4 their class for that. Correct.
5 Q. And then in 2018, you said you were promoted to
6 Assistant Superintendent. What was the
7 responsibilities in that role?
8 A. Operationally, day-to-day EMS operations.
9 Q. Was that more of an overview position or like a
10 logistics position?
11 A. I think a little bit of everything. I mean
12 logistically, you had to handle the logistics of
13 the division in medical response, but, for
14 instance, COVID, I was in the field every day and
15 protests I was in the field every day taking runs
16 with the crews because I didn't have enough crew
17 members.
18 Q. And then you said in the fall of 2022 you were
19 promoted to Shift Captain; is that correct?
20 A. No, that would have been February of 2022 and I
21 was not promoted, I was demoted.
22 Q. Oh, demoted. My apologies.
23 A. That's fine.
24 Q. Was there any particular reason for that
25 demotion?
Page 12

1 Shift Captain at the Field Operations.
2 Q. Can you explain to me a little bit of the duties
3 of how a paramedic differs from your original
4 employment position?
5 A. Well, you have more patient care
6 responsibilities. As a paramedic, you're higher
7 level, so, therefore, you're kind of in charge of
8 the truck relative to outpatient care and you're
9 kind of in charge of the whole truck. You got to
10 make sure all the proper equipment is there and
11 what have you, and then, you know, when you're
12 assessing patients and you're writing legal
13 documents, you have to sign those legal
14 documents and ultimately, you're responsible for
15 that patient, if you're working with a partner of
16 a lesser licensure.
17 Q. And then in your position as a Captain of EMS'
18 Training Academy, what did that role entail?
19 A. Well, it entailed running the Academy classes for
20 new hires. CPR for the whole Department.
21 Compliance, TB, respiratory fit, immunizations
22 for the Department, continuing education, special
23 events. We handled a lot of special operations
24 and things.
25 Q. So is that Academy where new EMS hires would
Page 11

1 A. Well, I was instructed that I was not liked by
2 staff and that I had a PIP from the previous year
3 and so they said they were going in a new
4 direction since it's an appointed position and
5 they gave me an option to retire or continue on
6 and I elected to continue on as Captain.
7 Q. And you said PIP. What is that?
8 A. Professional Improvement Plan.
9 Q. Can you describe a little bit about what that is?
10 A. Well, in 2020 -- in 2021 December, I had sent
11 some e-mails and I had alluded the Law Department
12 about some things that I was concerned about
13 within my division with commissioners, and the
14 next thing I knew, I was in a meeting with all
15 the commissioners and chief and they were -- they
16 had some complaints that they had been holding.
17 So they said that they had too many complaints
18 from the union and as a result, they wanted me to
19 have a PIP.
20     They sent me to some training, made me
21 take additional training, and pretty much the
22 conditions of the PIP was that I was not to have
23 anymore complaints from the union. So at the
24 time -- I went a year, I didn't have any
25 complaints from the union, but obviously things
Page 13

4 (Pages 10 - 13)

Joseph Thomas, DO
January 6, 2023

1  changed.
2  Q. And you said you were alerting to some issues --
3     the commissioners and the chief to certain
4     issues; is that correct?
5  A. Yes.
6  Q. What issues were those?
7  A. Well, we had some issues with COVID.  None of the
8     commissioners or chiefs were coming to work and I
9     was the only one coming in and at the time had
10    found that the chain of command had been
11    circumvented by the senior chiefs and I also had
12    found that, you know, I had a bunch of equipment
13    laying everywhere in certain stations and that,
14    you know, there had to be more oversight, and so
15    I alerted the Department to some of the issues
16    that I was seeing and recommended that people
17    start returning back to work and let's just say
18    that probably didn't go over very well.
19 Q. And this meeting that you had with the
20    commissioners and chief -- when was that?
21 A. That would have been in December of '21.
22 Q. So just so my timeline is correct, December of
23    '21 you had this meeting and then February of '22
24    was when --
25 A. Wait.  Wait.  I'm sorry.  I'm sorry.  I have to

Page 14

1  the middle of the winter and the gentleman inside
2  became pretty angry when I asked a few questions.
3  So I went into the station and I signed in with
4  the log that I was there because I knew that it
5  was going to be a problem.  So when I walked back
6  out, the guy was angry.  He swore at me.  I just
7  got in my vehicle and I called the deputy
8  commissioner.  A second deputy commissioner
9  Distelrath.
10    I alerted him that I had an ambulance
11 outside, I went into the station.  There was an
12 issue there and I was just leaving the station
13 because I didn't want to escalate things further,
14 and later that day, I had a complaint come in
15 that I was out in the back lot of the fire
16 station flipping people off, swearing, and
17 driving erratic and crazy in my black Taurus and,
18 in fact, they had filed two police reports.  I
19 drove a red Taurus, I didn't drive a black
20 Taurus.
21    The Department made me write a response,
22 send it off, you know, to the complaint.  Never
23 heard anything else from that, and then had
24 additional complaints from the head of the union,
25 for instance, in -- they only had one supervisor

Page 16

1  think this through.  I'm mixing my -- December of
2  2020 I had the meeting and then in January I had
3  the PIP and then in February of '22 is when I was
4  demoted.
5  Q. And you said that the basis for this PIP and the
6     eventual demotion was the complaints from the
7     union, correct?
8  A. Yeah.  I had several complaints and, you know,
9     they were unfounded obviously, but the union did
10    not like me very much and I had a lot of
11    complaints from them.  Probably about six or
12    seven, and again, like I said, most of them were
13    unfounded and, you know, they just said, "Don't
14    get anymore complaints" and sent me to some
15    training classes with the city and they also made
16    me take some LinkedIn learning classes.
17 Q. Do you know what any of these complaints were
18    for?
19 A. Well, the one complaint was for a -- a -- I
20    stopped by a station when I was on my way to work
21    and I saw an ambulance parked outside and being
22    operationally the Chief in charge, they shouldn't
23    have an ambulance parked outside.
24       So I stopped at the fire station to
25    check on it and see why it was sitting outside in

Page 15

1  working and we normally have four to five.  So
2  nobody would come into work, so I came into work
3  and I met with the one supervisor working.  I
4  asked him what he needed from me.  He told me
5  that he would like me to go out in the field and
6  he would do the paperwork because he's accustomed
7  to doing it every day where I was not and he just
8  wanted me to run the field.
9       So I went ahead and ran the field,
10 responding to any complaints or any issues that
11 EMS crews needed to help them out and the union
12 filed a complaint on me and this is after, you
13 know, they said that we don't respond or help
14 them enough.  So they filed a complaint on me.
15 It was pretty lengthy and that went to the
16 commissioner.  So those were the type of
17 complaints that I was getting and I was told not
18 to get them anymore.
19 Q. Those were the only two complaints that you can
20 recall?
21 A. Off the top of my head, yes, but there was more.
22 Oh, I did have another complaint.  I gave a guy
23 Christmas Eve off or Christmas Day.  A 32-year
24 employee.  One of the captains didn't like it.
25 He filed a complaint.  Said I showed favoritism,

Page 17

5 (Pages 14 - 17)

1  but the guy followed the process and, you know,
2  ultimately the assistant superintendent has say.
3  It didn't affect manpower at all.  So I gave the
4  guy Christmas Day off and my captain wrote a
5  complaint on that because he felt I had showed
6  that guy favoritism after he told him no, he
7  couldn't have it.
8      So that's the kind of stuff that went
9  down to the Law Department or to Human Rights.
10 Q. So in either of your positions as the Assistant
11 Superintendent or the Shift Captain or I guess
12 even the Captain of the Training -- EMS Training
13 Academy, did you ever have to discipline one of
14 your subordinates?
15 A. Yes.
16 Q. What's the process for disciplining one of your
17 subordinates?
18 A. Well, there's progressive steps to discipline.
19 You know, you start off with an oral
20 consultation.  You know, alert them that there
21 might be a problem with what they did.  You
22 explain the rule to them, so they understand the
23 rule and what happened and then you move on and
24 then there's a -- the next step would be, let's
25 say, a written reprimand and that's where you

1  know, what remediation I might have offered.
2  Q. And then the written reprimand -- is it -- is the
3  process always oral consultation, written
4  reprimands, or will sometimes it be --
5  A. No.  Sometimes depending on the -- depending on
6  the violation or, you know, what exactly
7  happened, it could go -- you could bypass a
8  written and go right to a punitive.  There's a
9  list of guidelines for that too under like
10 General Rule 11.  You know -- you know, an oral
11 consultation, a written, and that's so that the
12 Department had it documented under General Rule
13 11 on how you were to proceed.
14 Q. And what are some examples of actions where the
15 skipping the process of the first two steps in
16 this disciplinary scheme?
17 A. Well, let's say you had some very improper
18 patient care.  You know, something that was such
19 an egregious violation that we're bound to notify
20 the Medical Control Authority.  Something like
21 that.  If that patient care was egregious, there
22 is an investigation behind it and you could see a
23 suspension immediately.  Insubordination, AWOL.
24 Not being at work.  Things of that nature.
25 Q. Now, you mentioned earlier that you have had to

1  actually place the incident in writing to paper
2  and they get a written reprimand.
3      Again, you make sure that they
4  understand the rule or understand the process
5  that was broken.  If they need some remediation,
6  you give them remediation because obviously, you
7  can't help them out, if they don't understand
8  that, and then the next step in the progressive
9  steps of discipline would have been a charge of
10 -- and with a possible suspension and then, you
11 know -- or discharge, for that matter.  Could
12 have been any of those.
13 Q. And you said the first step was this oral
14 consultation.  Is there any recordkeeping on if
15 an oral consultation occurs with a particular
16 employee?
17 A. I don't think we're very good at it.  I know that
18 sometimes, if I have given an oral -- which
19 usually that would happen more in the field with
20 lieutenants than it would, let's say, an
21 assistant superintendent or even a captain, for
22 that matter, but I would send an e-mail, you
23 know, or have something in writing that I went
24 out and talked to so and so on this date to
25 discuss this and they need efficiencies and, you

1  discipline subordinates during your time with the
2  City of Detroit?
3  A. Yes.
4  Q. Have you ever had to skip the first couple of
5  steps and go straight to a charge or discharge
6  with one of your subordinates?
7  A. When I was the Assistant Chief, I heard all
8  discipline, except for discharges.  So the vast
9  majority of the discipline cases that would come
10 to me were already to the punitive or the
11 suspension stage or reprimands and things of that
12 nature had already been handed out.
13     When I was a Captain at the Training
14 Academy, I had a few instances and I would have
15 had to -- I had given some oral consultations, I
16 had given a written, I had actually given -- I
17 had recommended some charges/discipline.  From
18 time to time, I would have a probationary
19 employee separation, which there wasn't -- you
20 know, well documented and that.  They were kind
21 of at will employees and if they were very
22 deficient, then they would be separated.
23 Q. And the process for -- what's the process for
24 discharging an employee?
25 A. Well, it's pretty much the same.  You get a

Joseph Barney IV
January 6, 2023

| | |
|---|---|
| 1   notification that there's a discipline. Some | 1 Q. Can you explain a little bit about what a |
| 2   action. You have a charge hearing. It's usually | 2   designated representative is? |
| 3   set with the chief or commissioner's designee, | 3 A. I was the guy that handled the day-to-day |
| 4   which is at this time Chief Larkins. Chief | 4   operation of the union. Well, not necessarily |
| 5   Larkins would hear the charges, make a | 5   the union. So we didn't have a local at the |
| 6   recommendation, and then from there, it would be | 6   time. Our local was dissolved. So we didn't |
| 7   either appealed up to the commissioners or by the | 7   have anybody handling the day-to-day operation |
| 8   employee. | 8   and reporting to the union itself. |
| 9 Q. And then if the recommendation is termination, | 9        So at some point I was asked to perform |
| 10   what's the process to go about informing the | 10   that function and did and that would have been |
| 11   employee of this termination? | 11   about 2010, and so I handled the day-to-day |
| 12 A. You know, there's a new contract now, but I | 12   operation of union activity and then, you know, |
| 13   believe -- I think it's ten days. I mean you get | 13   I'd report back to the union and if we process |
| 14   your charges and they have a -- you get a Notice | 14   grievances or what have you, I would start the |
| 15   of Intent to charge. It has a date of the | 15   process and then when they'd get to the fourth |
| 16   hearing on it. Usually the charge hearing is | 16   step, which was before arbitration, the union |
| 17   within ten days and then you recommend, you | 17   obviously made a decision then. I kind of owned |
| 18   know, that you have the union representative | 18   everything until the fourth step -- or the |
| 19   there. They get a copy and that's how they're | 19   Association owned everything until the fourth |
| 20   usually notified. An employee has to sign for | 20   step and then when it made it to the arbitration |
| 21   it. | 21   piece, the POAM took over running everything. |
| 22 Q. And you said earlier that you reviewed Charge | 22 Q. And did you step down from that position -- that |
| 23   Forms for today's deposition; is that correct? | 23   designated rep position? |
| 24 A. Yeah. They were old Charge Forms. | 24 A. No. The certified bargaining agent changed from |
| 25 Q. Do you know of what years those are from? | 25   POAM to the DFFA in 2016. |
| Page 22 | Page 24 |

| | |
|---|---|
| 1 A. I believe they were from 2008 to like 2010. | 1 Q. Looking specifically to Mr. Cadoura, did you ever |
| 2 Q. And were all of those charges involving | 2   work with Mr. Cadoura on the same shift? |
| 3   Mr. Cadoura? | 3 A. I would say I only worked once or twice with |
| 4 A. I believe so. | 4   Mr. Cadoura, but I was aware of Mr. Cadoura, yes. |
| 5 Q. And what were the contents of those charges? | 5 Q. When you say you were aware of Mr. Cadoura, what |
| 6 A. You know, I didn't really look at them that | 6   do you mean? |
| 7   closely. I just looked at the back and saw they | 7 A. Well, the appraisement of Demsa (ph) was -- was |
| 8   were all expunged. I didn't really have much to | 8   very active and we'll say union activities or |
| 9   do with the union, so a lot of that stuff that | 9   association activities specifically against the |
| 10   happened with Mr. Cadoura I wasn't aware of on | 10   City Fire Department because EMS had been kind of |
| 11   that level. | 11   run into the ground and it was very aggressive |
| 12 Q. And what union is it for the City of Detroit Fire | 12   with him and I know Mr. Cadoura was a very avid |
| 13   Department and EMS? | 13   supporter. |
| 14 A. Well, right now it's the Detroit Firefighters | 14 Q. When you say he was a very avid supporter, what |
| 15   Association. | 15   do you mean? |
| 16 Q. And was that the same one during Mr. Cadoura's | 16 A. That they were close friends and he always, you |
| 17   employment? | 17   know, supported him and he always was a vocal -- |
| 18 A. No. During Mr. Cadoura's employment, it would | 18   he was vocal of the deficiencies of the Fire |
| 19   have been the International Operating Engineers. | 19   Department specific to EMS. |
| 20   I think it was Local 539 and that would have been | 20 Q. Do you recall what deficiencies he was vocal |
| 21   the Police Officers Association of Michigan. | 21   about? |
| 22 Q. Have you ever held a position in any of these | 22 A. Well, he had a lot of issues with response times. |
| 23   unions? | 23   He had a lot of issues with, you know, 15/20 |
| 24 A. Not as an elected official, but as a designated | 24   minutes to respond to a run, staffing, poor |
| 25   representative, yes. | 25   management, abuse of management. |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

Atkinson-Baker, A Veritext Company
(800) 55‑TEXAT                                www.veritext.com

1 Q. As to the response times specifically, are you
2   aware of a news story done about the response
3   times?
4 A. There were lots of news stories done about
5   response times.
6 Q. Specifically that Mr. Cadoura participated in?
7 A. You know, off the top of my head, I cannot
8   recall. I knew there was a story with him. I
9   remember one, but there were a lot of stories.
10  Only one I can recall, but I can't layout the
11  specifics.
12 Q. So when an employee brings up complaints like
13  this, what's the typical process for addressing
14  these concerns?
15 A. There really is no process.
16 Q. So other than knowing Mr. Cadoura for his
17  openness about deficiencies, is there any other
18  reason that you knew about Mr. Cadoura?
19 A. No.
20 Q. At some point Mr. Cadoura resigned from the City
21  of Detroit EMS; is that correct?
22 A. I believe so.
23 Q. Do you know why he resigned?
24 A. No.
25 Q. At the time that he resigned, Mr. Cadoura had

Page 26

1   been working for the City of Detroit for
2   approximately 15 years. Is it normal for that
3   tenured of a person to resign?
4 A. Yeah. At this point I guess -- you know, I guess
5   it's cyclic. You know, during good periods of
6   time with EMS, you have few resignations. I mean
7   2012 we were going as the preamble into the
8   bankruptcy. EMS was being attritioned out. I
9   mean at one point we got down to five ambulances
10  to service the city. We lost a lot of talent and
11  we had guys that had 20 years leaving the job.
12  You know, post-bankruptcy 2015, EMS started to
13  build up. We had equipment, 25 units. We were
14  doing good.
15      We weren't having resignations, but now
16  we're kind of into that cycle again when we have
17  a lot of ambulances closed and we're losing a lot
18  of tenured employees right now. So it's been
19  cyclic as the service goes.
20 Q. And around the time of Mr. Cadoura's resignation,
21  were you involved in any way in disciplining
22  Mr. Cadoura?
23 A. No, I was not.
24 Q. Did you ever have any conversations with anyone
25  mentioning Mr. Cadoura's potential discipline

Page 27

1   around that time?
2 A. In 2012?
3 Q. Yeah, 2012/2013 time.
4 A. Well, he did have some discipline. Some charges,
5   if I recall, and I had written some grievances,
6   but other than that, no, and it was a -- he was
7   part of a wider settlement that I had sought in
8   2012 for mutual agreement to dismissing some
9   discipline and some of the charges and he was
10  part of that discussion, but some of those
11  disciplinary actions didn't get dismissed.
12 Q. Can you recall what those disciplinary actions
13  were?
14 A. I can't recall off the top of my head.
15 Q. And after his resignation, did you ever see
16  Mr. Cadoura's employment file?
17 A. No.
18 Q. Have you ever seen Mr. Cadoura's employment file?
19 A. No.
20 Q. And you said that Mr. Cadoura was a part of a
21  wider settlement; is that correct?
22 A. Yes. Well, there was a group of -- there was
23  probably about 200 pieces of discipline that we
24  were looking to get some common ground with the
25  Department on and maybe getting some of the

Page 28

1   charges dismissed. Some of the issues were
2   because the Department wasn't living up to having
3   Trial Boards and, you know, so a lot of the
4   discipline would sit for two years and there
5   would be no adjudication of it and, you know,
6   that impacts people negatively.
7       So we sat down with them and tried to
8   hammer out some of that. Get an agreement, and
9   we did. I don't have a copy of it on me that's
10  signed or anything, but, you know, that's what we
11  worked towards.
12 Q. And you said the backup of charges was due to
13  issues with the Trial Boards?
14 A. Yes. Well, the Department -- if you got
15  disciplined in, let's say, pre-bankruptcy, you
16  could -- you'd be disciplined and then you'd have
17  an option to have a Trial Board or obviously if
18  the union filed for arbitration, but a lot of
19  times that would take a long time getting to
20  arbitration, but the Trial Boards had to be held
21  within a certain specific set of time.
22      You'd have three panel members and the
23  employee would have been able to pick a panel
24  member, the Department would pick a panel member,
25  and there would have been just one at will panel

Page 29

8 (Pages 26 - 29)

Atkinson-Baker, A Veritext Company
(800) 551-7300          www.veritext.com
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 59 of
125

1 member.
2      So what happened is the Department had
3 very few, if any, Trial Boards and they were
4 disciplining a lot of people and so what was
5 happening is this whole process got really backed
6 up and there was no adjudication within the
7 Department for these charges and that impacted
8 not just -- you know, obviously it affected
9 people being able to get promoted and, you know,
10 at the time we had acting supervisors that had
11 been through the process to become a supervisor,
12 and so even as a promotional process, it could
13 impact that because we had people that would
14 charge somebody because they didn't want them to
15 be in a supervisory capacity and, you know, with
16 that out being adjudicated, they wouldn't be
17 eligible to be -- you know, to test out as a
18 supervisor.
19      So it was very problematic and, in fact,
20 you know, when Jones Day came in during the
21 bankruptcy, we were able to show that it was cost
22 and time prohibitive and completely changed the
23 whole process for the post-bankruptcy.
24 Q. You say there was some issue with -- my
25 apologies. You said there was some issue with

Page 30

1 charges being levied against the employees to
2 block promotions?
3 A. Well, let's say you have 200 employees and let's
4 say you have 10 employees that are acting as a
5 supervisor and there's a test coming up for a
6 supervisor. Now, let's say in this pool of
7 employees that there is five years -- let's say,
8 you have five years -- you have to have five
9 years on a job to apply. So now that pool is
10 down to 150, let's say.
11      So then on top of that, you start -- on
12 my shift, I start charging these people because
13 I'm going to thin the pool of people that are
14 eligible to take the promotional exam, because
15 they can't take it, if they have -- let's say
16 they're on the second step of attendance control
17 or they had a 12-hour suspension. So if they
18 have a suspension on their record, they're not
19 eligible to take the promotional exam.
20      So what we found is that there was a lot
21 of issues with that and, you know, the Department
22 just wasn't hearing the charges and this
23 discipline would hang out over these people's
24 heads for two years.
25 Q. Is there a policy in place now to prevent this

Page 31

1 thinning of the pool of applicants?
2 A. Well, at this point, the process -- you know,
3 again, EMS is being slowly eliminated with, you
4 know, the Department -- Fire Department taking
5 over. So I mean I think that standard now is
6 actually down to two years to apply as a
7 supervisor and, you know, as far as discipline,
8 discipline is being heard timely and it -- you
9 know, there's specific things built within the
10 contract like expedited arbitration and that now
11 you see that that process was cleaned up.
12 Q. And so if this discipline is hanging out over
13 somebody's career and they resign, what happens
14 to that discipline?
15 A. I suppose it's in their file. I mean obviously
16 there's no -- nothing being heard -- charges or
17 anything because they're no longer an employee.
18 So, you know, I guess it would just -- it would
19 be there and it was just never a -- you know,
20 there was never a hearing on it.
21 Q. Would discipline like that with no hearing ever
22 being had cause someone to be on a do not rehire
23 list?
24 A. Possibly.
25 Q. What are some other reasons that somebody might

Page 32

1 be placed on the do not rehire list?
2 A. Attendance control, too many absences at work,
3 too many tardies, lots of disciplinary actions.
4 Q. In your experience, what qualifies as a lot of
5 disciplinary action?
6 A. I would presume probably a discharge and a number
7 of suspensions that are duty related to having
8 little regard for your position.
9 Q. So suspensions and discharge typically make up
10 the bulk of the reasons someone might be on a do
11 not rehire list?
12 A. Correct.
13 Q. So if somebody was never discharged, you would
14 solely look at suspensions then as the primary
15 reason for --
16 A. Well, I guess it would be a global look. I mean
17 you'd look at the -- you would look at the
18 discipline, citizen complaints. I guess I should
19 add citizen complaints. Those are really big
20 too. If you have a guy that has 18 citizen
21 complaints in two years, then there's some smoke
22 where there's fire usually. That could be a
23 problem and the discipline. So you look at I
24 guess the whole picture of that period of time
25 that the employee was at the job.

Page 33

9 (Pages 30 - 33)

1 Q. Do you know if Mr. Cadoura had any citizen
2    complaints against him?
3 A. I do not, no.
4 Q. And at some point after his resignation,
5    Mr. Cadoura came back to try to be rehired with
6    the City of Detroit. Did you know about that?
7 A. Yes.
8 Q. How did you find out about that?
9 A. I was at the Training Academy and they were
10    having physical agility tests and oral interviews
11    and he was there.
12 Q. You said you saw him at the Training Academy and
13    oral interview?
14 A. Well, physical agility and oral interviews were
15    being held at the Academy and, yes, I saw him
16    there.
17 Q. Did you have any conversations with him?
18 A. Yeah. I said hi and good to see him. Asked what
19    was going on. I knew he had a child and stuff
20    and I wished him well.
21 Q. At that time did you know about any of
22    Mr. Cadoura's lingering discipline?
23 A. I didn't think about it. I mean, you know, 2012
24    I knew that there was outstanding things, but I
25    didn't -- didn't think about it.

Page 34

1    was a very ugly period and EMS was being
2    systematically destroyed and, you know, we were
3    all different, you know, ten years ago.
4    Everybody. I mean if you look at yourself ten
5    years ago, you were probably a different person,
6    and so this is a man that was fighting hard to
7    improve the lot for everybody at EMS and, you
8    know, post-bankruptcy, we came up a lot better
9    and at the time when he was applying, EMS was
10    growing and doing well with good equipment,
11    hiring lots of people and, you know, he had a
12    family and, you know, when you become a family
13    man, you kind of change and you're not just
14    responsible for yourself, you're responsible for
15    your family.
16        So you become a little more conservative
17    and you think about your actions. You know,
18    maybe you're not going to be as aggressive
19    because, let's say, you've got a roof to put over
20    somebody's head other than yourself. You're more
21    conservative in some of the things that you maybe
22    say and do. So I think, you know, we all have
23    grown some. I've grown some as a person. I
24    wasn't, you know, the guy I was at, you know,
25    2012.

Page 36

1 Q. Were you surprised to see him back at the
2    Training Academy?
3 A. No. I mean Ron Meyers showed up as well and he's
4    a guy that had retired years earlier. So from
5    time to time we can have some guys show up at the
6    Training Academy. It was good to see him.
7 Q. And do you know what became of Mr. Cadoura's
8    attempt to be rehired by the City of Detroit?
9 A. I don't believe he was rehired.
10 Q. Do you know why he wasn't rehired?
11 A. I only had one discussion about this and that was
12    with Chief -- Assistant Chief Raymond Burch and I
13    guess he was on a do not rehire list and he had
14    asked me what my thoughts were and I told him
15    that I thought we should, you know, take a look
16    at rehiring him.
17 Q. Was that your recommendation then?
18 A. Pardon me?
19 Q. Your recommendation was -- you said that you
20    spoke with Raymond Burch that he was on the do
21    not rehire list and that Chief Burch asked you
22    your thoughts and that you -- then you said that
23    "you should look into rehiring him." Was there
24    anything that you base that statement on?
25 A. Well, you know, the period up to the bankruptcy

Page 35

1        So at the end of the day, I thought, you
2    know, this guy never hurt anybody that I know of.
3    Most of his discipline was based against
4    management that was adversarial and I don't
5    recall any patient care complaints and he treated
6    citizens well. So I didn't see a problem with
7    bringing him back and that's what I told Chief
8    Burch.
9 Q. And you said that most of the issues were
10    adversarial against management; is that correct?
11 A. Yes, that I can recall.
12 Q. What you said earlier about becoming a family man
13    causes people to become less aggressive about --
14    in pursuing thoughts and actions, is that what
15    you were referring to?
16 A. Well, that was just my opinion I guess I should
17    say. You know, this is an observation that I had
18    that when people become family men and have
19    children, they change a little bit.
20 Q. So would you have described Mr. Cadoura during
21    his first stint in Detroit as very passionate
22    about improving the Detroit Fire Department?
23 A. I do. I would say that describes him.
24 Q. And how did you find out that Mr. Cadoura was not
25    rehired?

Page 37

10 (Pages 34 - 37)

A. Well, I believe through Chief Burch.
Q. Did you have any reaction to that knowledge that he wasn't going to be rehired?
A. No.
Q. During your time working with the City of Detroit and being on the same payroll as Mr. Cadoura, did you ever hear any issues regarding Mr. Cadoura's lawsuits?
A. No.
Q. So as we sit here today, other than this current lawsuit, do you know about any of Mr. Cadoura's other lawsuits he might be involved in?
A. No.
Q. And the one in 2012 that you mentioned -- that was a -- was that a settlement with the -- between the union and the Fire Department or was that a lawsuit settled?
A. No, that was a settlement agreement between the Fire Department and the POAM.
Q. Do you know if Mr. Cadoura was ever given an exit interview?
A. I have no idea.
Q. Isn't it typical for someone to get an exit interview?
A. They're supposed to, yes.



Q. And what typically is the content or discussion that is in an exit interview, if you know?
A. I have never had one. As Assistant Chief, most of the time those would have been handled by Captain Olkowski. Usually administrative captains would handle that.
Q. Why don't we go ahead and take a five, ten-minute break. I'm going to refill my water and everything and then we'll come back here around 11:30. Does that sound good?
A. That's fine.
(Break taken)
MR. SHEAROUSE: Back on the record.
BY MR. SHEAROUSE:
Q. We were talking last about exit interviews and you said that you have never had to attend one; is that correct?
A. That's correct.
Q. And you said that's typically handled by the admin captain, correct?
A. Correct.
Q. Who would that have been in the time of Mr. Cadoura's resignation in 2012/2013?
A. It may have been Captain Wade, but I'm not 100 percent sure, but during that period of time, it



might have been Captain Wade.
Q. And when discipline -- going back to our discussion earlier on discipline. When discipline is issued by a supervisor, what's the process for the documentation about that discipline?
A. What will happen is the supervisor will write an investigative packet. Generally he'll collect -- he or she may collect statements from, let's say, a citizen complaint from the citizen, collect statements from the crew or any witnesses involved, and they'll compile all that and then summarize their findings with their recommendation to charge.
That will go to the shift captain and the shift captain will either say, "Yeah, we recommend" -- you know, "I agree with you on this" and charges will be prepared or the captain will say, "No, this doesn't rise to that level. Give him a written reprimand or give him an oral consultation." "Give he or she an oral consultation." So that's usually where it goes.
Once there is some charges, it's processed over to the admin side of the building, where an admin will go ahead and type up the



paperwork with the notification to the union and to the employee and that paperwork goes back to the Field Operations where the paperwork is taken out, where the employee will sign for it, and then they have the charged hearing on the specified date.
Q. And those are sent along you said to the captain after the reporting supervisor makes -- does his investigation?
A. Correct. The shift captain where that shift the employee is on.
Q. And are there types of discipline that can apply to a whole unit of a certain ambulance on a shift?
A. I guess I don't understand your question.
Q. Is there -- let me try to rephrase. Would there be an action or inaction by one EMS person on the EMS crew that could have the entire crew disciplined?
A. Absolutely.
Q. What kind of things would those be?
A. Well, the things would be improper patient care. You know, there's two people on the truck and, you know, not everything rises -- even if you're a basic EMT on the truck with a paramedic,

January 6, 2023

| | |
|---|---|
| 1 ultimately the paramedic is in charge, but if | 1 Q. So when someone receives a discipline that's |
| 2 somebody is doing something that's so negligent, | 2 worthy of a suspension, is there a particular |
| 3 you still have the duty to, you know, do the | 3 guideline that instructs the captain or the shift |
| 4 right thing. So something in that situation. | 4 chief or whoever is issuing the suspension as to |
| 5 Lost equipment. Unless one party were to say | 5 how much time to suspend someone for? |
| 6 necessarily take the responsibility and like, | 6 A. Well, there is a General Rule 11 that has |
| 7 "Hey, I lost the blood pressure cuff," or what | 7 guidelines laid out, but I'll tell you, times |
| 8 have you, and then say, you know, the crew is | 8 change. I mean, you know, when you're fully |
| 9 disciplined collectively for missing equipment. | 9 complemented with staff, you're not suspending |
| 10 Q. And when an incident is reported for potential | 10 to -- or you have the latitude to give a guy a |
| 11 discipline, are written statements of the other | 11 day off here or there. You know, EMS in its |
| 12 technicians or employees taken as well? | 12 current state, we don't suspend anybody hardly |
| 13 A. Yeah, generally. | 13 unless it's super egregious because we need the |
| 14 Q. And if you know, how much weight is given to | 14 bodies at work. So we hold a lot of stuff in |
| 15 those witness statements? | 15 abeyance now. So a lot of that goes with how |
| 16 A. You know, that's -- that's a tough question to | 16 much manpower you have available. |
| 17 answer because it's -- you know, it's just like | 17 Q. And was that a similar situation in 2012/2013 |
| 18 anything, no two situations are the same, no two | 18 with the looming bankruptcy? |
| 19 witnesses are the same. I mean you just have to | 19 A. If you're asking my opinion, in 2012/2013 they |
| 20 look at the packet globally. Everything that | 20 didn't care. |
| 21 happened. You know, the facts. Look at the CAD | 21 Q. Who didn't care? |
| 22 sheets, look at, you know, as many facts that you | 22 A. Administrators. They didn't care. |
| 23 can find. You know, objective things, not | 23 Q. So when you say they didn't care, they didn't |
| 24 subjective things. So I can't put a number on | 24 care about issuing suspensions or they didn't |
| 25 that because every case is different. | 25 care about the employees themselves, just to |
| Page 42 | Page 44 |

| | |
|---|---|
| 1 Q. And if an EMT or paramedic was to receive | 1 clarify? |
| 2 discipline for something that someone else on | 2 A. I think both. I don't think they were worried |
| 3 their shift had done, would that discipline also | 3 about the employees and I don't think they were |
| 4 go through the same process of the Trial Board | 4 too concerned about giving a suspension to |
| 5 and all of that? | 5 somebody and it negatively impacting the amount |
| 6 A. Well, at the time, you know, whatever the -- | 6 of trucks out on the street. I mean because |
| 7 whatever -- whatever process is in place, whether | 7 honestly, we had only five some days, ten trucks. |
| 8 it's 2012 or 2022, '23, all discipline should | 8 So if they gave a guy a suspension, it didn't |
| 9 proceed through the same process, period. | 9 impact your operation at all. |
| 10 Q. Going back to the time when Mr. Cadoura was | 10 Q. So would you say back in 2012/2013 they were a |
| 11 attempting to be rehired, were there any | 11 little more -- they were giving suspensions a |
| 12 conversations you were aware of where individuals | 12 little more freely? |
| 13 discouraged Mr. Cadoura from reapplying? | 13 A. Yes. |
| 14 A. I can't recall. | 14 Q. In your opinion, was that always the correct |
| 15 Q. Do you know of anyone who wouldn't want | 15 decision? |
| 16 Mr. Cadoura back? | 16 A. No. |
| 17 A. I don't. | 17 Q. And why not? |
| 18 Q. Do you know if Mr. Cadoura was well liked by his | 18 A. Well, people are entitled to, A, due process and |
| 19 co-workers? | 19 the Department was not practicing due process. |
| 20 A. I can't really -- I can't really say. I mean, | 20 They weren't following their own rules under |
| 21 you know, a lot of co-workers have come and gone | 21 General Rule 61C-3, was members rights, you know, |
| 22 through the years and, you know, I can only | 22 and if you find somebody guilty, everybody is not |
| 23 speak on myself, I can't speak for other people. | 23 guilty until they've went through the whole |
| 24 Q. In your opinion, was Mr. Cadoura a good EMT? | 24 process, as far as I'm concerned. You know, if |
| 25 A. Yep. Yes. | 25 somebody doesn't get a chance to have their say |
| Page 43 | Page 45 |

12 (Pages 42 - 45)

1 and have it adjudicated through the process that
2 the Department has in place in writing in a
3 contract in your own rules, then, no, that's not
4 right and it's not fair.
5     MR. SHEARHOUSE: I don't think I have
6 anything further.
7     THE WITNESS: Okay.
8     MR. MCFARLANE: I have a couple of
9 follow-up questions.
10         EXAMINATION
11 BY MR. MCFARLANE:
12 Q. And based on what you were just talking about --
13    we'll start there. So you said suspensions were
14    given more freely and that they weren't always
15    getting through the process; is that correct?
16 A. That is correct.
17 Q. Okay. And at that time were you still part of
18    the union?
19 A. Yes, sir.
20 Q. And what union was that?
21 A. That was the POAM. Police Officers Association
22    of Michigan.
23 Q. And did their contracts have a grievance process
24    in it?
25 A. Let me think about this for a second. There was

Page 46

1    then let's say there was a charge hearing, there
2    was some discipline, and then we would go ahead
3    and file a grievance, if we felt that the
4    suspension was unjust, and in the case of even
5    like Weingarten violations, we even took and
6    filed Unfair Labor Practices.
7 Q. And those would be filed where?
8 A. Well, the grievances would have been processed
9    through most likely the superintendent and
10    assistant superintendent, who his designee was.
11    Some went directly to HR depending on whether it
12    was payroll bound, or what have you. Others
13    would go to the commissioner level depending on
14    how broad the suspension was and then the Unfair
15    Labor Practices would have been filed through
16    MERC.
17 Q. All right. And with respect to filing
18    complaints, earlier you said there was no process
19    for processing employee complaints. Is the union
20    able to file a grievance on behalf of an
21    employee?
22 A. We are and we would. We filed complaints. You
23    know what, there was complaints on ambulance
24    safety. We filed a whole bunch of complaints.
25    The problem is the city just never responded.

Page 48

1 a process in the contract that was the old
2 operating engineers contract that was in
3 operation up until 2012. In 2012 there was a
4 CET, which is applied after Public Act 4. It was
5 instituted by the state, which the whole process
6 was run by the city.
7     Coming out of bankruptcy in 2013, I
8 believe it was November, is when the POAM picked
9 up that contract. So both the 2013 -- actually,
10 all three. The 2013, the CET, and the old
11 operating engineers contract all had different
12 processes.
13 Q. Did the union ever grieve what it felt was unfair
14    disciplines?
15 A. Yes.
16 Q. And that was something that they -- could the
17    union file the grievance or could the member file
18    a grievance or both?
19 A. Well, the member could file a grievance or both.
20    In most cases, if there was some discipline, I
21    think -- for instance, I think we filed nearly
22    200 grievances over I think a ten-month period of
23    time from 2010 and in that time, we filed class
24    action grievances to address some of the issues
25    with -- that was broadly affecting everyone, and

Page 47

1 Q. And was the union able to file like ULPs at MERC?
2 A. Yes, we did.
3 Q. Did the union file any OSHA complaints?
4 A. Lots of them.
5 Q. And are you familiar with what is now coined
6    CRIA, but I believe used to be the Human Rights
7    Department?
8 A. Yes.
9 Q. Are employees able to make complaints at the
10    Human Rights Department or now known as CRIA?
11 A. They are now, yes.
12 Q. Are there any other entities that you're familiar
13    with in the City of Detroit that handles employee
14    complaints?
15 A. I imagine if you went through the ombudsman, you
16    could probably file a complaint as well.
17 Q. Earlier you testified about the promotional
18    processes and discipline that was issued
19    regarding the promotional process that kept
20    people from being eligible?
21 A. Yes.
22 Q. Did the union grieve that?
23 A. Yes.
24 Q. And what was the result of that grievance?
25 A. We ended up going and getting a CEEP applied and

Page 49

13 (Pages 46 - 49)

Page 50

```
1    then the bankruptcy ensued. During the process
2    and meeting with Jones Day, David Birnbaum
3    specifically was the attorney from Jones Day.
4    What we did is we took all our grievances and we
5    laid them out. We laid out the expunged charges
6    that we were able to get expunged through
7    Commissioner Wheeler for greater than two years
8    and what we did is we took the Department of
9    General Rules and we showed the attorneys how the
10   whole process had -- the Department's process
11   with the Trial Boards had broken, you know, the
12   process for promotions and we explained it to
13   them. We laid out the paperwork.
14        We were able to show that we had acting
15   lieutenants at the time and these lieutenants,
16   you know, could eliminate some of the potential
17   people that could apply by just applying for the
18   discipline. They're found guilty at the
19   divisional hearing, and the next thing you know,
20   it's on your record for two years and if there's
21   a promotional process during that two years,
22   you're not eligible, and the Jones Day attorney
23   did agree with us, and actually, if you read I
24   think Article -- well, of the 2013 contract,
25   Article 9 and 10 -- and actually we wrote that at
```

Page 51

```
1    the union and they gave us the latitude to do
2    that because they recognized that we knew going
3    in that we were really broken as a Department or
4    as -- you know, and then the city there relative
5    to discipline.
6         So they allowed us to change that and
7    that's where we eliminated the Trial Boards
8    altogether and they agreed they were cost and
9    time prohibitive because they were paying the
10   battalion chief overtime coming on these things
11   as well. So that's how that all became
12   eliminated and, you know, the promotional process
13   was affected by it.
14 Q. And how many interactions prior to 2013 did you
15   have with Mr. Cadoura?
16 A. You know, I had a few. I mean when you're out in
17   the streets and you run into crews at the
18   hospital, you talk to them. I'd see him here and
19   there. Were we friends? No. Did we hang out?
20   No, but, you know, when you're on the job for any
21   period of time, you get to know people. You
22   know, at one point I guess we were Facebook
23   Friends. Now we aren't Facebook Friends and I
24   can't even tell you when that was. That was a
25   long time ago, but, you know, the one common
```

Page 52

```
1    thread that we had was we both were passionate
2    about EMS and the citizens being served properly
3    and him and I kind of went different pathways and
4    I necessarily didn't follow us Sahm (ph), where
5    I went a different pathway, and in the end, I
6    mean we took different paths and we kind of
7    separated, but I know who he was and, you know,
8    he had my respect as a person for what he was
9    trying to do.
10        Maybe I didn't agree with some -- you
11   know, wasn't an in-the-face kind of guy, but, you
12   know, at the end of the day, I understood when
13   somebody gets in your face, you get right back at
14   them.
15 Q. Did you have involvement in the hiring process in
16   2017/2018?
17 A. I did limited. So we were trying to attract
18   employees. We had -- I think we went -- we put
19   in about 150 that year, because we were short
20   staffed. So what we did -- we had the Training
21   Academy up, we put up tents. People came through
22   the door and would say, "Wow, this is pretty cool
23   stuff" and, you know, a lot of our special
24   operations equipment.
25        So we had an obstacle course there for
```

Page 53

```
1    this. HR would come in. We'd come in.
2    Typically I'd leave my office and go down and
3    talk to everybody. Welcome them to the Training
4    Academy, introduce them to Chief Green, who is
5    ultimately in charge of the Training Academy,
6    and, you know, talk a little bit about EMS and
7    that was generally my involvement. From time to
8    time, I was asked to sit in maybe on the oral
9    interview portions, but that wasn't all the time.
10   That was just once in a while, if they didn't
11   have enough people.
12 Q. I know Chief Burch was mentioned earlier. I want
13   to be careful how I word this. Do you know the
14   status of Chief Burch?
15 A. Chief Burch is deceased.
16 Q. And when did that occur?
17 A. I got to think this out here. It's been five
18   years. It would have been 2018.
19        MR. MCFARLANE: No further questions.
20        MR. SHEAROUSE: I don't have anything
21   further.
22        MR. MCFARLANE: Thank you, sir. You're
23   all set.
24        (Deposition concluded at 11:54 a.m.)
25             *    *    *
```

14 (Pages 50 - 53)

Atkinson-Baker, A Veritext Company
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 65 of
(800) 288-3376    125    www.veritext.com

January 6, 2023

```
 1  STATE OF MICHIGAN )
 2                    )
 3  COUNTY OF OAKLAND )
 4           Certificate of Notary Public
 5       I do hereby certify the witness, whose
 6  attached testimony was taken in the above matter, was
 7  first duly sworn to tell the truth; the testimony
 8  contained herein was reduced to writing in the
 9  presence of the witness by means of Stenography;
10  afterwards transcribed; and is a true and
11  complete transcript of the testimony given.  I
12  further state that I am not connected by blood or
13  marriage with any of the parties, their attorneys
14  or agents, and that I am not interested,
15  directly, indirectly or financially in the matter
16  of controversy.
17       In witness hereof, I have hereunto set my hand
18  this day in Novi, Michigan, County of Oakland,
19  State of Michigan. January 13, 2023
20
21       Carol L. Martin
22       Carol L. Martin, CSR-3532
23       Certified Shorthand Reporter
24       Notary Public, Oakland County, Michigan
25       My Commission Expires: 10/25/2025
                                          Page 54
```

15 (Page 54)

EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

 2                     EASTERN DISTRICT OF MICHIGAN

 3                           SOUTHERN DIVISION

 4     _____

 5     RICHARD CADOURA,

 6              Plaintiff,

 7         v.                              Case No.

 8     THE CITY OF DETROIT,                20-cv-12986

 9              Defendant.

10     _____

11              VIDEOCONFERENCE DEPOSITION OF

12                       DONELLA JAMES

13     DATE:          Monday, January 9, 2023

14     TIME:          9:03 a.m.

15     LOCATION:      Remote Proceeding

16                    Troy, MI 48083

17     REPORTED BY:   Qiuana Glover, Notary Public

18     JOB NO.:       5655075

19

20

21

22

23

24

25

                                              Page 1
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                          www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 68 of
125

| | APPEARANCES | | PROCEEDINGS |
|---|---|---|---|
| 1 | A P P E A R A N C E S | 1 | P R O C E E D I N G S |
| 2 | ON BEHALF OF PLAINTIFF RICHARD CADOURA: | 2 | THE REPORTER:  Good morning.  My name |
| 3 | CARLA D. AIKENS, ESQUIRE (by videoconference) | 3 | is Q. Glover; I am the reporter assigned by Veritext |
| 4 | AUSTEN SHEAROUSE, ESQUIRE (by videoconference) | 4 | to take the record of this proceeding.  We are now on |
| 5 | Aikens Law Firm | 5 | the record at 9:03 a.m. |
| 6 | 615 Griswold, Suite 709 | 6 | This is the deposition of Donella James |
| 7 | Detroit, MI 48226 | 7 | taken in the matter of Richard Cadoura vs. The City of |
| 8 | carla@aikenslawfirm.com | 8 | Detroit on today, Monday, January 9, 2023 via Zoom. |
| 9 | austen@aikenslawfirm.com | 9 | I am a notary authorized to take |
| 10 | (844) 835-2993 | 10 | acknowledgments and administer oaths in Michigan. |
| 11 | | 11 | Parties agree that I will swear in the witness |
| 12 | ON BEHALF OF DEFENDANT THE CITY OF DETROIT: | 12 | remotely. |
| 13 | JASON T. MCFARLANE, ESQUIRE (by videoconference) | 13 | Additionally, absent an objection on |
| 14 | Detroit City Attorney's Office | 14 | the record before the witness is sworn, all parties |
| 15 | Two Woodward Avenue, Suite 500 | 15 | and the witness understand and agree that any |
| 16 | Detroit, MI 48226 | 16 | certified transcript produced from the recording of |
| 17 | mcfaj@detroitmi.gov | 17 | this proceeding: |
| 18 | | 18 | - is intended for all uses permitted |
| 19 | | 19 | under applicable procedural and |
| 20 | | 20 | evidentiary rules and laws in the same |
| 21 | | 21 | manner as a deposition recorded by |
| 22 | | 22 | stenographic means; and |
| 23 | | 23 | - shall constitute written stipulation |
| 24 | | 24 | of such. |
| 25 | | 25 | At this time will everyone in |
| | Page 2 | | Page 4 |

| | INDEX | | |
|---|---|---|---|
| 1 | I N D E X | 1 | attendance please identify yourself for the record. |
| 2 | EXAMINATION:                    PAGE | 2 | MR. SHEAROUSE:  Austen Shearouse on |
| 3 | By Mr. Shearouse                5 | 3 | behalf of Plaintiff Cadoura. |
| 4 | | 4 | MR. MCFARLANE:  Jason McFarlane on |
| 5 | E X H I B I T S | 5 | behalf of City of Detroit and Donella James. |
| 6 | NO.        DESCRIPTION            PAGE | 6 | MS. JAMES:  Donella James, the witness |
| 7 | (None marked.) | 7 | for the City of Detroit. |
| 8 | | 8 | THE REPORTER:  Thank you.  After |
| 9 | | 9 | hearing no objection, I will now swear in the witness. |
| 10 | | 10 | Ms. James, can you please raise your right hand. |
| 11 | | 11 | WHEREUPON, |
| 12 | | 12 | DONELLA JAMES, |
| 13 | | 13 | called as a witness, and having been first duly sworn |
| 14 | | 14 | to tell the truth, the whole truth, and nothing but |
| 15 | | 15 | the truth, was examined and testified as follows: |
| 16 | | 16 | THE REPORTER:  Thank you.  Counsel, you |
| 17 | | 17 | may begin. |
| 18 | | 18 | EXAMINATION |
| 19 | | 19 | BY MR. SHEAROUSE: |
| 20 | | 20 | Q   Good morning.  My name is Austen Shearouse |
| 21 | | 21 | and I represent Plaintiff Cadoura in this matter.  I |
| 22 | | 22 | just have a couple of quick questions and some ground |
| 23 | | 23 | rules so that we can get rolling on this as quickly as |
| 24 | | 24 | possible.  First off, have you ever had your |
| 25 | | 25 | deposition taken before? |
| | Page 3 | | Page 5 |

2 (Pages 2 - 5)

1    A   I have had a deposition done before, but
2  nothing related to this issue.
3    Q   Okay.  So just as a reminder, I know the
4  court reporter made a mention of it earlier, but
5  especially with it being Zoom, make sure to give a
6  couple of seconds after the question finishes so that
7  she can ensure a correct record of it and I'm going to
8  try to do the same for your answer.  I know at some
9  point, we will inevitably talk over each other or
10 anticipate where the other one is going.  It's just
11 kind of the nature of things.  But if we could both do
12 our best to try to avoid that situation.
13       If at any point in time you need a break,
14 I'm happy to do that.  All I ask is that if myself or
15 Mr. McFarlane has posed a question, I ask that that
16 question be answered before we take a break.
17       Other than that, make sure all your answers
18 are verbal.  No head nods or shakes or uh-uhs.  That
19 obviously makes it very tough for the court reporter
20 to record them.
21       Can you state your full name for the record,
22 please.
23    A   Yes; Donella Denise James.
24    Q   And what is your date of birth?
25    A   May 12, 1969.

Page 6

1    Q   Are you currently employed?
2    A   Yes.
3    Q   Where are you employed at?
4    A   Ascension St. John Hospital in Detroit.
5    Q   And what is your role there?
6    A   Registered nurse.
7    Q   And when did you start in that position?
8    A   I've actually been employed at Ascension St.
9  John Hospital since August of 1994.  But upon retiring
10 from the City of Detroit in 2016, became a part-time
11 employee in the emergency department.
12    Q   So you said that you have been working with
13 Ascension St. John since 1994, correct?
14    A   Correct.
15    Q   So was that employment running congruent to
16 when you were working with the City of Detroit?
17    A   That is correct.
18    Q   Okay.  And what were you doing for Ascension
19 St. John while you were working for the City of
20 Detroit?
21    A   Was my initial employ, I was working in the
22 emergency department as an emergency room technician.
23 And then, in, I want to say, 2002, I got my nursing
24 license and my role transitioned at that time to a
25 registered nurse.

Page 7

1    Q   And then, you've been a registered nurse
2  with them since 2002?
3    A   Correct.
4    Q   Were there any breaks in your employment
5  with that or is that continuous employment?
6    A   It's considered continuous.  Although, I had
7  approximately a nine month break during schooling.
8  But because the time was so short, they made the
9  employment just continuous.
10    Q   Okay.  And then, you said that you retired
11 from the City of Detroit Fire Department in 2016; is
12 that correct?
13    A   Correct, September the 6th, I believe, is
14 the accurate date, 2016.
15    Q   And when did you start working with the City
16 of Detroit?
17    A   September 3, 1991.
18    Q   And what role did you start out in at the
19 City of Detroit in 1991?
20    A   With my initial employment, I was hired as
21 an emergency medical technician, which later then
22 transitioned to a paramedic, which then later became a
23 lieutenant, which, I believe, the classification now
24 is assistant EMS supervisor.  And upon my retirement,
25 I was actually the EMS supervisor, which was a

Page 8

1  captain.
2    Q   And do you know about what time you were
3  promoted from EMT to paramedic?
4    A   I don't.  I would have to look up my
5  licensing dates.  I really, honestly, I do not know
6  those dates.
7    Q   And would you happen to know the dates for
8  your promotion from paramedic to lieutenant?
9    A   Unfortunately, no.
10    Q   And what about lieutenant to captain?
11    A   No, sir.  To be specific, a specific date,
12 no, I don't have that.
13    Q   Do you have years for those?
14    A   I would totally be speculating so I'm going
15 to say no.
16    Q   No worries.  Okay.  So EMT to paramedic.
17 And the rank of captain/EMS supervisor, was that the
18 rank that you retired from?
19    A   That is correct.
20    Q   Were you ever demoted from that rank at any
21 point in time?
22    A   That is negative.
23    Q   Were you ever demoted from any rank?
24    A   That is also negative.
25    Q   in your role as a lieutenant, did you ever

Page 9

3 (Pages 6 - 9)

1  issue discipline?
2     A   Yes.
3     Q   Can you explain the process of issuing
4  discipline to me?
5     A   Well, it depends on what the actual
6  allegations are.  But under normal circumstances,
7  there's an investigation that occurs where the
8  individual that's being, well not disciplined, but the
9  individual in which the charges are being preferred
10 usually provides a statement, either written or oral.
11 You usually compile all that information together.
12 You submit it in a written document.
13       Your captain, who is on your shift, reviews
14 those documents.  And then, that information gets
15 forwarded to administration.
16       When administration gets those documents,
17 they review it and then they determine whether or not
18 it is valid for discipline and then they prefer the
19 discipline.
20    Q   And so, are there forms that you fill out
21 when you issue somebody discipline?
22    A   Correct.  There's actually a charge form and
23 there is a format that most people follow for the
24 charge form.  But you usually include an investigative
25 summary with statements from the individual that's

Page 10

1  they are then advised of what their discipline is.  If
2  I'm not mistaken, the general rules did have
3  guidelines of where discipline could begin based on
4  the offense.
5     Q   And if there is a suspension issued, is
6  there a form that's filled out?
7     A   Correct; yes.  There's a form that's done
8  when the actual charge hearing is done by either the
9  assistant or the chief of the department.  At that
10 time, they're told what their discipline is.  If I'm
11 not mistaken, it was written on the back of the charge
12 form as to what the penalty was.
13       MR. SHEAROUSE:  I'm going to go ahead
14 and share my screen real quick.  Let me know if you
15 can see that document clearly.
16       THE WITNESS:  I think I lost you in
17 it's entirety.  Are you there still?
18       MR. SHEAROUSE:  Yeah.  We're still
19 there.
20       THE WITNESS:  Yes.  I can see the
21 actual charge.
22       MR. SHEAROUSE:  Okay.
23 BY MR. SHEAROUSE:
24    Q   And so, what is this document, if you know?
25    A   Okay.  The document that I'm viewing that's

Page 12

1  being charged and based on your findings which support
2  the charges.
3     Q   And are there different levels of discipline
4  within the City of Detroit Fire Department?
5     A   I'm not exactly sure what you're asking.
6  Can you just provide a clarification?
7     Q   Sure.  Are there different punishments
8  within the City of Detroit Fire Department for
9  discipline?
10    A   Yes -- yes.  There are levels of discipline.
11 But as far as an EMS supervisor, we have no control
12 over that.  There are guidelines based on the degree
13 of the discipline being a first, second, third, or
14 subsequent offenses.
15    Q   Are there certain actions that receive more
16 severe discipline?
17    A   I don't know if the severity of the
18 discipline is a good term for it, but there are
19 guidelines which start based on allegations or the
20 particular rule that's violated.
21    Q   And are those guidelines shared with the
22 City of Detroit personnel?
23    A   I don't know if they are readily available
24 or accessible to them.  But at the time where the
25 charges are being heard by the administrative staff,

Page 11

1  in my screen is the actual suspension notice.  That's
2  not the charge that's preferred by the officer that's
3  supervising the technician at the time.  That's a form
4  that's actually generated by the administrative
5  office.
6     Q   And so, this is the administrative office
7  form?
8     A   Correct.
9     Q   Okay.  And then, is it typically signed by
10 one of the administration and the supervisor who
11 issued the discipline?
12    A   I think maybe there may be some confusion.
13 The actual supervisor that generates the charge signs
14 that charge.  The form that you have in front of me,
15 which is the notice of the suspension, is more of a
16 summation of what the charge is and then it outlines
17 or details the suspension itself.  That's not the
18 actual charge form that gets generated by the
19 supervisors.
20    Q   Okay.  So that suspension notice is filled
21 out after all of the proceedings have concluded then?
22    A   That is correct.
23    Q   And with that form particularly, that makes
24 a recommendation for discharge, correct?
25    A   For discharge?  I mean, it can include up to

Page 13

4 (Pages 10 - 13)

1 discharge. But that particular document that you
2 showed me detailed a suspension, the duration of the
3 suspension and what the actual suspension was for.
4    Q   What are some reasons that that document
5 might be filled out to recommend termination?
6    A   I don't have that information for you.
7    Q   Have you ever recommended somebody for
8 termination?
9    A   That is a negative. That is nothing -- that
10 -- the recommendation for termination does not come
11 from the field supervision office.
12    Q   So when you issue discipline for someone
13 subordinate to you, you don't make a recommendation
14 for termination or what?
15    A   That is accurate. We have no involvement of
16 what the suspension could be, up to and including
17 termination.
18    Q   Have you ever been involved in the hiring
19 process for the City of Detroit?
20    A   That is a negative; not that I can recall.
21    Q   Are you familiar with the City of Detroit
22 having a "do not rehire" list?
23    A   Not that I have been involved -- I'm
24 sorry -- not that I have ever been involved in the do
25 not hire process so I'm not absolutely sure of what

Page 14

1 all of the requirements or what the stipulations are
2 for an individual being deemed as do not rehire.
3    Q   So you've never recommended anybody not to
4 be hired?
5    A   That is correct; never.
6    Q   Have you ever heard about someone not being
7 recommended to be rehired?
8    A   Yes. But as far as knowing the reason why
9 they weren't rehired, no.
10    Q   Can you explain the promotional process
11 within the City of Detroit Fire Department, starting
12 from the EMT position?
13    A   Well, from the EMT position to be promoted
14 for to a paramedic, you have to complete an approved
15 paramedic program and then you have to be successful
16 with the licensing process through the City of
17 Detroit. I mean, not the City of Detroit, through the
18 State of Michigan.
19        At that time, you then submit a letter of
20 interest for paramedic and then there's requirements
21 within the department that you have to do so many
22 hours of rotation as a third person on the vehicle, on
23 the paramedic truck. You're usually evaluated by one
24 of the supervisors, as far as being competent to
25 perform in your duties. And then, you work -- if I'm

Page 15

1 not mistaken, because it's been a while -- that you
2 ride as a third or it used to be that you would ride
3 as a third person on the truck as a paramedic during
4 the probationary period. And then, once you were
5 deemed competent then you were given the ability to
6 function fully as a paramedic on the truck.
7        As far as being promoted from paramedic to
8 lieutenant or assistant EMS supervisor, there was a
9 written test that you had to do as far as an oral
10 interview. And then you were placed on an eligibility
11 list, which was, if I'm not mistaken, valid for two
12 years. And as positions became available, as far as
13 individuals retiring or leaving the department, then
14 you would get promoted to lieutenant, which was the
15 same process as being a captain. There was a written
16 as well as an oral interview.
17    Q   Okay. So once someone files a letter of
18 interest for paramedic and they secure their licensure
19 and perform their hours, what stair next step?
20    A   There is a probationary period. Like I
21 said, they work on a vehicle as a third under the
22 supervision, it used to be, of a more senior paramedic
23 where they could get feedback and instruction,
24 teaching, experience. And then, after that time, they
25 were also being evaluated by supervisors who would

Page 16

1 also periodically respond to runs to see how they were
2 performing. And if there was no issues with that,
3 then after the probationary period, they would be
4 certified as a paramedic.
5    Q   During your time at the City of Detroit, did
6 you ever work with Richard Cadoura?
7    A   Not that I can -- I'm sorry -- not that I'm
8 able to recall have we ever worked on an ambulance
9 together. I am able to say that at some point in time
10 during my career, I was a supervisor for him.
11    Q   And what was your impression of him?
12    A   As far as -- just for clarification -- as
13 far as being a supervisor for him?
14    Q   What was your impression of his ability as
15 an EMT to treat patients?
16    A   If I'm able to recall, I don't believe there
17 was ever any issues of him improperly caring for a
18 patient that I'm aware of. I don't think any of the
19 issues with Mr. Cadoura were related to patient care,
20 as far as when I was a supervisor for him.
21    Q   But you said there were issues with him?
22    A   No. Just for clarification, I'm saying as
23 far as I'm aware, I can't recall any issues that I had
24 with him related to patient care.
25    Q   Right. But there were issues, you're

Page 17

5 (Pages 14 - 17)

Atkinson-Baker, A Veritext Company
(800) 551-7300                          www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 72 of 125

**Page 18**

1 saying, non-related to patient care?
2 A  That is correct.  Yes.
3 Q  And what were those issues?
4 A  Mr. Cadura had issues with supervision.  He
5 did not take direction well if it was something that
6 he did not agree with.  There were instances where it
7 was detailed of him being insubordinate as far as and
8 also as far as disobedience, refusing to wear the
9 uniform in the prescribed manner, refusing to shave,
10 issues such as that.
11 Q  And onto the uniform point, is there a
12 reason that someone might not wear the uniform
13 properly?
14 A  There can be instances where a technician's
15 uniform gets soiled with blood or body fluids on the
16 scene of a run.  That can be an issue.  Or just
17 failing to not be compliant with what the uniform
18 regulations are.
19     All of the employees, the department had a
20 rule where you were required to bring a spare uniform
21 to work in the case of if a uniform gets soiled you
22 would have a clean uniform to change into.
23 Q  Are you supposed to keep that spare uniform
24 on the truck?
25 A  Yes, sir, you are.  Yes.  You are.

**Page 19**

1 Q  So you said that there were instances of
2 insubordination.  Can you give me a specific?
3 A  Mr. Cadoura didn't like to shave.  In
4 compliance with MIOSHA, in order for a HEPA mask to
5 fit secularly on one's face, in the absence of having
6 a shaven profile, the technicians were required to be
7 clean-shaven.  Mr. Cadoura did not like to shave.  So
8 I can attest to an incident in which I had where he
9 refused to shave and he became insubordinate when I
10 addressed him on shaving.
11 Q  Do you know if there was any reason, in
12 particular, that he wasn't shaving?
13 A  There was no documented reason that I'm
14 aware of of him refusing to shave, other than just an
15 unwillingness to shave.
16 Q  During his time at the City of Detroit Fire
17 Department, did you ever hear about Mr. Cadoura being
18 the target of any racial harassment?
19 A  No, not that I'm aware of.
20 Q  Were you ever aware of anybody at the City
21 of Detroit during your tenure being the subject of
22 racial harassment?
23 A  No -- no, not that I'm able to recall.
24 Q  Do you ever recall Mr. Cadoura making
25 complaints about his situation within the department?

**Page 20**

1 A  Can you provide clarification on that?
2 Q  Sure.  Do you ever recall Mr. Cadoura making
3 a complaint that somebody was harassing him?
4 A  No, not that I can recall.
5 Q  Do you ever recall Mr. Cadoura making any
6 complaint or notifying anyone in the department about
7 policies not being followed?
8 A  No, not that I can recall.  Other than, I
9 mean, if you want to say something as vague about if
10 he got disciplined and then complained about the
11 discipline that was being preferred against him.  But
12 that would kind of be normally what most technicians
13 would do.  They weren't in agreement with what they
14 were being accused of.  So anything specific, not that
15 I'm able to recall.
16 Q  So other than this lawsuit, are you aware of
17 any other of Mr. Cadoura's lawsuits?
18 A  The only lawsuit that I have some
19 information but it's vague was a reverse
20 discrimination lawsuit which was years ago where him
21 and several other individuals were suing the
22 department alleging reverse discrimination.
23 Q  Do you know what happened with that suit?
24 A  As far as the specifics of it?  No.  Other
25 than the fact that I was told that it was dismissed.

**Page 21**

1 Q  Did you hear any other information about
2 that lawsuit?
3 A  No, sir.  That's a negative.  No.
4 Q  Were you aware of Mr. Cadoura being involved
5 with a news story regarding ambulance response times?
6 A  The only thing I can say as far as to be as
7 accurate as possible is that that was so long ago that
8 I know I was not involved in it directly.  So anything
9 or any information that I provide to you would be
10 speculative.
11 Q  So switching gears a bit.  When someone
12 resigns from the City of Detroit Fire Department,
13 what's the process for them going about doing that?
14 A  Under normal circumstances, they usually
15 submit a letter advising of their intent to leave.
16 There was a process at one time that once HR was
17 notified that they would do an exit interview and then
18 they would depart.  I'm not exactly sure of the entire
19 process only because I'm not involved in anyone
20 leaving or being hired.
21 Q  But to your knowledge, an exit interview at
22 some point in time was supposed to occur?
23 A  Correct.  That is correct.  But my
24 understanding is that the exit interviews are normally
25 voluntarily so the technician that's leaving does not

6 (Pages 18 - 21)

Atkinson-Baker, A Veritext Company
(800) 288-3376                    www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 73 of
125

January 9, 2023

| | |
|---|---|
| 1 have to comply with it. | 1    Q    Were there any issues with Mr. Moore during |
| 2    Q    Do you know how the technician is notified | 2 your supervision of him? |
| 3 about that exit interview? | 3    A    As far as his performance as an EMT and a |
| 4    A    No, I do not. | 4 paramedic, I can't recall that I ever preferred any |
| 5    Q    And then, if somebody resigned and then | 5 discipline against him for violations of rules.  But, |
| 6 wanted to come back to the City of Detroit, what would | 6 like I said, I mean, I'm sorry and I don't mean to, |
| 7 that process look like? | 7 like, be vague.  I mean, I've been gone for six years |
| 8    A    I would have to say that it would be normal, | 8 so there's a lot of things I can't remember what I did |
| 9 just like any other individual applying for the City | 9 yesterday.  So in the absence of having something in |
| 10 of Detroit.  You would have to go through the | 10 front of me that has my name on it that I'm able to |
| 11 application process and whatever requirements were | 11 actually review then, I mean, I have to say that I'm |
| 12 deemed necessary.  But an individual who's coming back | 12 not sure.  Anything else, I would just be guessing. |
| 13 to the department, as long as they're not deemed a do | 13    Q    And I don't want you to guess.  So please, |
| 14 not rehire, would go through the same process. | 14 by all means, if you don't know, continue to tell me I |
| 15    Q    But if they are deemed a do not rehire, is | 15 don't know.  That's completely fine.  No harm, no |
| 16 there a different process? | 16 foul.  So you weren't aware of any disciplinary action |
| 17    A    I would -- it would be my assumption that, | 17 that Mr. Moore may or may not have received? |
| 18 yes, that if they were a do not rehire then human | 18    A    As far as secondhand knowledge?  Then I can |
| 19 resources would not even allow them to come back -- | 19 say, I mean, you know, supervisors would talk or you |
| 20    Q    And in regard -- oh, sorry. | 20 would hear of other supervisors speaking in the office |
| 21    A    I'm sorry. | 21 of technicians being disciplined.  I know there was an |
| 22    Q    Oh, no, please continue.  Sorry. | 22 issue with Paramedic Moore and another employee that |
| 23    Q    But the entire hiring process or return | 23 was a friend that had to do with workplace violence. |
| 24 process is all handled through human resources. | 24 And I believe that Brian Moore had an issue with |
| 25    Q    Okay.  And earlier, you stated that you | 25 patient care, but all of the specifics of it I'm not |
| Page 22 | Page 24 |
| 1 didn't know the reasons that someone might be placed | 1 sure of.  If I had probably preferred a discipline and |
| 2 on the do not rehire list? | 2 it was really egregious, then I would be able to |
| 3    A    That is correct.  I'm sorry.  I was just | 3 recall it.  But other than that, it's very vague. |
| 4 checking my watch.  I think that's my employer.  I'm | 4    Q    And you said you vaguely remember hearing |
| 5 sorry. | 5 about a patient care issue but you wouldn't know the |
| 6    Q    No, you're okay. | 6 specifics of that? |
| 7    A    As far as I'm aware, I'm not exactly | 7    A    Correct. |
| 8 positive to be able to say what all the caveats are | 8    Q    Okay.  Did you ever hear about him being |
| 9 that makes an individual a no rehire, a do not rehire. | 9 placed on the do not rehire list? |
| 10 But, I mean, as far as hearsay, I know an individual | 10    A    No, I'm not.  I've got to remember.  I'm |
| 11 is expected to give a certain amount of notice.  But | 11 sorry.  Everything's delayed.  That's a negative.  No, |
| 12 other than that, I'm not sure what else entails that | 12 I did not know that Brian Moore was a do not rehire. |
| 13 makes the individual a do not rehire.  But that would | 13 But I know he was back on the job.  I don't know if |
| 14 be with any employer.  The expectation is that if | 14 he's still currently employed because I would see him |
| 15 you're leaving your employment you would give at | 15 occasionally come to the emergency department.  So I |
| 16 minimum a two week notice. | 16 don't know if he still works for the city. |
| 17    Q    Have you ever supervised, worked with, or | 17    Q    Okay.  But you do know that at some point in |
| 18 heard of an individual that worked at the City of | 18 time he came back to the job? |
| 19 Detroit Fire Department named Brian Moore? | 19    A    Correct.  That is correct.  Yes. |
| 20    A    Yes.  I am familiar with Brian Moore. | 20    Q    Okay.  Did you ever supervise or work with a |
| 21    Q    In what capacity are you familiar with him? | 21 -- let me find it.  My handwriting on this name is so |
| 22    A    As far as just totally professional as far | 22 poor.  Let me pull it up.  Did you ever work with or |
| 23 as him working on the job as an EMT, working as a | 23 supervise a Nicholas Collingsworth? |
| 24 paramedic, and on several occasions being his | 24    A    That is correct.  Yes, I did work with |
| 25 supervisor. | 25 Nicholas Collingsworth.  I think I worked with him a |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

Atkinson-Baker, A Veritext Company
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 74 of
125
(800) 551-7300                                    www.veritext.com

| | |
|---|---|

**Page 26**

1 couple times on the ambulance. But I can tell you for
2 sure that I was his supervisor.
3   Q   Did you ever recommend him for any
4 discipline?
5   A   Absolutely.
6   Q   And what were some of the issues that Mr.
7 Collingsworth had?
8   A   I preferred charges on Nicholas
9 Collingsworth for, I believe, it was for
10 insubordination and also for obedience.
11   Q   Can you explain the difference between
12 insubordination and obedience discipline?
13   A   Insubordination was failing to comply with
14 an order, being insubordinate. Just pretty much not
15 going to do what you were directed to do. And
16 obedience was more behavior dialogue.
17   Q   Okay.
18   A   I may have -- I would have to see documents
19 in his personnel file -- I may have even charged
20 Nicholas Collingsworth with patient care related
21 issues too, but I'm not exactly sure.
22   Q   Do you know if he was recommended for the do
23 not rehire list?
24   A   I want to say yes, but the specifics, I'm
25 not sure of why.

**Page 27**

1   Q   So you weren't sure of the reasoning for
2 that placement?
3   A   Correct.
4   Q   Do you know if he was ever taken off?
5   A   Can you provide clarification when you say
6 "taken off"?
7   Q   Yes. Of course. Do you know if Mr.
8 Collingsworth was ever taken off the do not rehire
9 list?
10   A   That, I'm not aware of. That, I do not
11 know.
12   Q   So generally, during your time at the City
13 of Detroit, have you ever heard of anybody being taken
14 off the do not rehire list?
15   A   No, not that I'm aware of.
16   Q   As a supervisor, did you have any insight as
17 to reasons why someone might be taken off of the list?
18   A   No, I was not.
19   Q   And you said earlier that you were not aware
20 of any complaints Mr. Cadoura made regarding racial
21 harassment during his time with the City of Detroit,
22 correct?
23   A   Not -- not that I'm able to recall.
24   Q   Okay. I'm going to share my screen again
25 here.

**Page 28**

1   A   Okay.
2   Q   So let me know once it's visible to you.
3   A   Are you able to enlarge it so that I can see
4 it?
5   Q   Let me see. Is this at all helping if I
6 zoom in a little bit?
7   A   When you zoomed in, it cut off half the
8 screen.
9   Q   All right. Yeah. Let me see if I --
10   A   Yeah. Because it wouldn't let me open it
11 further.
12   Q   Yeah. I'm going to re-zoom.
13   A   Okay.
14   Q   Let's see if this is any better? Is this a
15 little bit more clear?
16   A   Okay. That's better. That's much better.
17   Q   Wonderful. So what you see before you, this
18 looks to me like a letter from Captain Joe Wilson to
19 -- or from, sorry, Gary Kelley to Captain Joe Wilson
20 mentioning Lieutenant John Sablowski not to be
21 assigned in any role or sector that would cause him to
22 be the immediate supervisor of Richard Cadoura. Do
23 you see that?
24   A   Yes, I do see the document.
25   Q   Okay. Do you know why this document was

**Page 29**

1 issued?
2   A   That is a negative. I don't have any
3 information as to why the document was generated. I
4 can only provide an assumption that it's possible that
5 there was an investigation for some allegations
6 against Lieutenant Sablowski by Cadoura and until the
7 investigation was completed then that would warrant
8 him not being his immediate supervisor until that's
9 done.
10   Q   And what sorts of complaints would lead to
11 an investigation against someone like Lieutenant John
12 Sablowski?
13   A   I don't know what the specific complaint
14 that generated this particular letter, but it was not
15 uncommon for technicians to complain about
16 supervisors, especially if they felt like they were
17 being supervised or if their assumption was they were
18 not being unfairly treated. But with all allegations,
19 it warrants an investigation. And until the
20 investigation is concluded and the allegations are
21 either unfounded or found to be some validity then
22 they would not allow that supervisor to be the
23 immediate supervisor of the individual that has filed
24 the complaint.
25   Q   And about how long, typically, would an

8 (Pages 26 - 29)

Page 30

1 investigation into something like this take?
2    A  I don't think there's any specific or there
3 was any specific duration. It just entailed the --
4 what the specifics were of the allegations as far as
5 what resources would be needed. If it was an
6 allegation of any type of forms of harassment, then
7 normally that investigation would be held through the
8 law department, if I'm not mistaken.
9    Q  So even though there was no set time, was it
10 common in the City of Detroit to have these
11 investigations done within six months of the
12 complaint?
13    A  If that's the information that you have as
14 far as the deadline, then I guess that would be
15 accurate. But I can't say with any surety that it
16 would be six months. It could be less than that,
17 depending on how much investigation is needed, what
18 the details are as far as interviews with the person
19 that is bringing about the allegations, as far as the
20 individual that's being alleged to have done some
21 wrongdoing.
22    Q  And I want to clarify. I'm not referencing
23 any specific policy or anything. I'm just trying to
24 find out what the average time for the investigation
25 duration would be.

Page 31

1    A  As far as working for the city, there's
2 nothing that's cut and dry. But I'm sure that things
3 needed to be investigated within a timely manner. But
4 that, like I said, is dependent on the amount of
5 investigation that's needed.
6    Q  Okay.
7    A  And as you can see, the document says "until
8 further notice," which would make me believe that
9 there was an active investigation being done. So
10 until it was resolved, and to prohibit any further
11 issues with Mr. Cadoura and Lieutenant Sablowski,
12 that's why they felt that in the best interest of the
13 department, as well as in the best interest of the
14 technician, that he would be not directly supervised
15 by him.
16    Q  Then below this, you'll see that this was
17 issued July 14, 2008 and then February 12, 2009 there
18 is another letter from Gary Kelley saying, "Effective
19 immediately, all restrictions involving work
20 experience related to -- a blanked out name -- and EMT
21 Richard Cadoura are hereby lifted."
22      Do you know any other supervisors that
23 Cadoura might have made complaints against that would
24 prohibit him working with them?
25    A  No, not that I'm aware of. I mean, you

Page 32

1 figure this was back in 2009. That's, like, 13 years
2 ago, so that, I'm not sure. And I'm not exactly sure
3 what Mr. Cadoura's date was when he finally left the
4 department so I'm not sure what else he probably filed
5 against various supervisors within the department.
6    Q  Mr. Cadoura issued his resignation in 2012-
7 2013, towards the end of 2012.
8    A  Okay.
9    Q  Just so we've got a timeline going here.
10 And then, you said that the law department handles the
11 investigation for issues involving harassment; is that
12 correct?
13    A  That is correct. I believe it was the law
14 department and then, I want to say, human relations,
15 maybe?
16    Q  So those types of investigations were held
17 outside of the department. But were investigations
18 related to performance as an EMT generally taken care
19 of by the department itself?
20    A  That is correct.
21    Q  Okay. So earlier, we were talking about Mr.
22 Cadoura's ability as an EMT and we also discussed his
23 insubordination; do you remember that?
24    A  Yes.
25    Q  Okay. In your opinion, was Mr. Cadoura an

Page 33

1 asset to the City of Detroit?
2    A  In my opinion, as far as an EMT working on
3 the job, I could say that he probably was an asset as
4 far as being able to take care of patients. But
5 there's more to an employee -- in my opinion, there's
6 more to an employee than just their ability to
7 perform. It's the employee as a whole. And Mr.
8 Cadoura had an issue with being supervised. He did
9 not want to be directly supervised.
10      As long as he was given the ability to
11 perform in his capacity which he felt, then you didn't
12 have an issue with him. But any time that you
13 addressed him on a deficiency than he became defiant.
14 Now, that's my opinion. I'm entitled to my opinion.
15    Q  Yeah, of course.
16    A  I mean, and as you can see just from the
17 documents that you probably have in front of you, when
18 you look at Mr. Cadoura's disciplinary record, unless
19 there's a lot of patient care related issues, I think
20 the majority of Mr. Cadoura's issues was based on
21 attitude and behavior.
22    Q  I meant to ask this earlier, but my
23 apologies. Ms. James, have you ever been married?
24    A  Yes, I am currently married. I have been
25 married for 24 years.

9 (Pages 30 - 33)

January 9, 2023

| | |
|---|---|
| 1   Q   Oh, congratulations. | 1   stating the same? |
| 2   A   Thank you. | 2   A   That, I'm not aware of.  As I said before, |
| 3   Q   What is the name of your spouse? | 3   those types of issues related to an individual being a |
| 4   A   I'm sure you're aware; my husband is Gerald | 4   do not rehire was solely on the basis of the |
| 5   James.  He was once the chief of the department.  We | 5   administrative office.  The field supervision office |
| 6   both started in September of '91 together and we both | 6   had no control over that or no input in that. |
| 7   retired in 2016 together. | 7   Q   Were you ever aware of your husband making a |
| 8   Q   Love that.  Yeah.  I just needed that for my | 8   recommendation for Mr. Cadoura being placed on the do |
| 9   clarification. | 9   not rehire list? |
| 10   A   Okay. | 10   A   That, I'm not aware of.  Contrary to what |
| 11   Q   Let's see?  During your time with the City | 11   most people would believe, we didn't really discuss a |
| 12   of Detroit, do you ever recall a period where a higher | 12   lot of stuff as far as what his role was. |
| 13   than average amount of discipline was being issued? | 13   Q   So just so I'm clear, the field supervision, |
| 14   A   Let me see how I want to word this?  I'm not | 14   do they make any recommendation to terminate, place on |
| 15   going to say it was a higher amount of discipline | 15   do not rehire, anything like that? |
| 16   being issue.  It depends on who you're talking to | 16   A   My answer to that is, no.  Field supervision |
| 17   who's referring to that being a higher amount of | 17   has no input in that. |
| 18   discipline.  I think the amount of discipline was | 18   Q   So in any of your positions that you held, |
| 19   appropriate for what was being done at that time. | 19   would you have had any input into those issues? |
| 20       There's always been discipline being | 20   A   That is negative.  No. |
| 21   preferred throughout my -- my entire tenure within the | 21   Q   Okay.  Is there a position that your husband |
| 22   department.  I just believe that at some point the -- | 22   would have held that would have required him to make |
| 23   what was being committed at the time just became more | 23   such a recommendation? |
| 24   egregious and was more notable that needed discipline. | 24   A   Yes.  He was the superintendent of EMS.  So |
| 25   Where, in the past, some disciplinary issues were kind | 25   yes, that would have been one of his roles. |
| Page 34 | Page 36 |
| 1   of looked over, sidestepped, or just not considered to | 1   Q   Okay.  When someone is disciplined, is there |
| 2   be that important.  Where, at the point that probably | 2   an appeals process? |
| 3   people are preferring or referring or alleging that | 3   A   Yes, there is.  There's the trial board. |
| 4   there was higher amounts of discipline. | 4   The technician, I want to say, had approximately 14 |
| 5   Q   So there was a time where there was | 5   days to appeal for a trial board and that would be the |
| 6   disciplinable actions that were being overlooked? | 6   -- that's their route for their appeal process for |
| 7   A   Yes. | 7   having discipline dismissed. |
| 8   Q   And do you know if having discipline on | 8   Q   How was Mr. Cadoura's personality on the |
| 9   someone's record prevents them from being promoted? | 9   job?  Was he fairly easy-going? |
| 10   A   I believe it's based on the type of | 10   A   I want to say, yes, with his coworkers, but |
| 11   discipline that would prevent you from being promoted. | 11   not very easy-going with supervision, especially in |
| 12   Depends on where it is as far as the timeliness of it. | 12   the instance of where an issue needed to be addressed. |
| 13   I don't believe that an EMT can be promoted to a | 13       MR. SHEAROUSE:  I'm going to go ahead |
| 14   paramedic with patient care related issues within a | 14   and take a quick, let's say, ten minute break.  I'm |
| 15   certain period of time, but the specifics, I'm not | 15   going to look over my notes and I might have no |
| 16   sure of. | 16   further questions, but I'm going to take a little |
| 17   Q   And you said patient care related issues for | 17   break. |
| 18   an EMT? | 18       THE WITNESS:  Okay. |
| 19   A   I believe so -- I believe so.  Yes. | 19       MR. SHEAROUSE:  All right?  Be back |
| 20   Q   If someone resigns with pending discipline, | 20   here, let's say, around 10:12. |
| 21   are they automatically placed on a do not rehire list, | 21       MR. MCFARLANE:  Ms. James, you can go |
| 22   to your knowledge? | 22   ahead and mute yourself, stop your video, and then |
| 23   A   I don't have the knowledge of that.  That, | 23   come back in ten minutes. |
| 24   I'm not sure of. | 24       THE WITNESS:  Okay; got you. |
| 25   Q   Would you be aware of any Detroit policy | 25       THE REPORTER:  All right.  We are off |
| Page 35 | Page 37 |

10 (Pages 34 - 37)

Atkinson-Baker, A Veritext Company

(800) 551-7308     www.veritext.com

1  the record here at 10:01 a.m.
2         (Off the record.)
3         THE REPORTER:  Okay.  We are back on
4  the record at 10:13 a.m.  Counsel?
5         MR. SHEAROUSE:  Ms. James, just a few
6  more questions.  I appreciate your time here today.
7  BY MR. SHEAROUSE:
8    Q    Going back, I know earlier we discussed that
9  there was an issue with Mr. Cadoura shaving; is that
10  correct?
11   A    That is correct.
12   Q    And what was the reason that he needed to be
13  clean-shaven, again?
14   A    If I'm able to recall accurately, the
15  equipment that was provided to the technicians for
16  respiratory protection mandated that in order for the
17  equipment to be effective for the tech to avoid the
18  technician being exposed to airborne pathogens that
19  they had to be clean-shaven in order to be able to
20  obtain an adequate seal.  That's why the department
21  mandated that when you reported to work, you had to be
22  clean-shaven.  For those individuals, due to
23  healthcare concerns, that didn't have the ability to
24  shave on a daily basis, to be clean-shaven, they were
25  given the option of being fitted for what's called a

Page 38

1  further.
2         MR. MCFARLANE:  I don't have any
3  questions.
4         MR. SHEAROUSE:  All right.  Thank you
5  for your time, Ms. James.
6         THE WITNESS:  Oh, you're welcome.  Have
7  a good day.
8         MR. SHEAROUSE:  You as well.
9         MR. MCFARLANE:  Thank you, ma'am.
10         THE WITNESS:  No problem.  Mr.
11  McFarlane, if you need anything, please give me a
12  call.
13         MR. MCFARLANE:  Will do.  Thank you.
14         THE REPORTER:  All right.  We are off
15  the record here at 10:16 a.m.
16         (Whereupon, at 10:16 a.m., the
17         proceeding was concluded.)
18
19
20
21
22
23
24
25

Page 40

1  HEPA hood.  But in order to be fitted for the HEPA
2  hood, they had to be placed on what was called light
3  duty until that HEPA hood was delivered to the
4  department.
5    Q    And you said those were issued for health
6  concerns?
7    A    That would be health and safety.  In order
8  for the equipment to protect the technician, they had
9  to be clean-shaven.
10   Q    And those, do you remember what kind of
11  masks those were that required the technician to be
12  clean-shaven?
13   A    I want to -- I want to say it was the N95
14  mask.  And they were also, the technicians were
15  evaluated yearly by an annual fit test to ensure that
16  the masks that they were provided were sized
17  appropriately and they had an adequate seal.
18   Q    During your time at City of Detroit, did the
19  department ever switch the EMS masks from the N95?
20   A    That's a negative.  During while I was there
21  a up until my retirement, they were provided N95
22  masks.  They came in various sizes.  And that was the
23  purpose of an annual fit test, which was conducted
24  through the training department.
25         MR. SHEAROUSE:  I don't have anything

Page 39

1         CERTIFICATE OF DEPOSITION OFFICER
2         I, QIUANA GLOVER, the officer before whom
3  the foregoing proceedings were taken, do hereby
4  certify that any witness(es) in the foregoing
5  proceedings, prior to testifying, were duly sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a qualified
8  transcriptionist; that said digital audio recording of
9  said proceedings are a true and accurate record to the
10  best of my knowledge, skills, and ability; that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to the action in which this was taken;
13  and, further, that I am not a relative or employee of
14  any counsel or attorney_____
15  hereto, nor financially_____ the
16  outcome of this action.

17         QIUANA GLOVER
18         Notary Public in and for the
19         State of Michigan
20
21
22
23
24
25

Page 41

11 (Pages 38 - 41)

```
 1          CERTIFICATE OF TRANSCRIBER
 2      I, DIANE OTTO, do hereby certify that this
 3   transcript was prepared from the digital audio
 4   recording of the foregoing proceeding, that said
 5   transcript is a true and accurate record of the
 6   proceedings to the best of my knowledge, skills, and
 7   ability; that I am neither counsel for, related to,
 8   nor employed by any of the parties to the action in
 9   which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13
14

15               DIANE OTTO, CER, CET 1353
16
17
18
19
20
21
22
23
24
25
                                          Page 42
```

EXHIBIT D

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

 2                    EASTERN DISTRICT OF MICHIGAN

 3                          SOUTHERN DIVISION

 4      _____

 5      RICHARD CADOURA,

 6              Plaintiff,

 7         v.                              Case No.

 8      THE CITY OF DETROIT,               20-cv-12986

 9              Defendant.

10      _____

11               VIDEOCONFERENCE DEPOSITION OF

12                      JOHN SABLOWSKI

13      DATE:          Monday, January 9, 2023

14      TIME:          1:11 p.m.

15      LOCATION:      Remote Proceeding

16                     Troy, MI 48083

17      REPORTED BY:   Qiuana Glover, Notary Public

18      JOB NO.:       5655075

19

20

21

22

23

24

25

                                              Page 1
```

John Sablowski
January 9, 2023

APPEARANCES

1
2  ON BEHALF OF PLAINTIFF RICHARD CADOURA:
3      AUSTEN SHEAROUSE, ESQUIRE (by videoconference)
4      Aikens Law Firm
5      615 Griswold, Suite 709
6      Detroit, MI 48226
7      austen@aikenslawfirm.com
8      (844) 835-2993
9
10 ON BEHALF OF DEFENDANT THE CITY OF DETROIT:
11     JASON T. MCFARLANE, ESQUIRE (by videoconference)
12     Detroit City Attorney's Office
13     Two Woodward Avenue, Suite 500
14     Detroit, MI 48226
15     mcfaj@detroitmi.gov
16
17
18
19
20
21
22
23
24
25
                                                        Page 2

INDEX

1
2  EXAMINATION:                                    PAGE
3      By Mr. Shearouse                            5
4
5          EXHIBITS
6  NO.        DESCRIPTION                          PAGE
7          (None marked.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                        Page 3

PROCEEDINGS

1
2          THE REPORTER:  Good morning.  My name
3  is Q. Glover; I am the reporter assigned by Veritext
4  to take the record of this proceeding.  We are now on
5  the record at 1:11 p.m.
6          This is the deposition of John
7  Sablowski taken in the matter of Richard Cadoura vs.
8  The City of Detroit on today, Monday, January 9, 2023
9  via Zoom.
10         I am a notary authorized to take
11 acknowledgments and administer oaths in Michigan.
12 Parties agree that I will swear in the witness
13 remotely.
14         Additionally, absent an objection on
15 the record before the witness is sworn, all parties
16 and the witness understand and agree that any
17 certified transcript produced from the recording of
18 this proceeding:
19         - is intended for all uses permitted
20           under applicable procedural and
21           evidentiary rules and laws in the same
22           manner as a deposition recorded by
23           stenographic means; and
24         - shall constitute written stipulation
25           of such.
                                                        Page 4

1          At this time will everyone in
2  attendance please identify yourself for the record.
3          MR. SHEAROUSE:  Austen Shearouse on
4  behalf of Plaintiff Cadoura.
5          MR. MCFARLANE:  Jason McFarlane on
6  behalf of City of Detroit.
7          MR. SABLOWSKI:  John Sablowski.
8          THE REPORTER:  All right.  Thank you.
9  After hearing no objection, I will now swear in the
10 witness.  Mr. Sablowski, can you please raise your
11 right hand.  Thank you.
12 WHEREUPON,
13             JOHN SABLOWSKI,
14 called as a witness, and having been first duly sworn
15 to tell the truth, the whole truth, and nothing but
16 the truth, was examined and testified as follows:
17         THE REPORTER:  Thank you.  Counsel, you
18 may begin.
19             EXAMINATION
20 BY MR. SHEAROUSE:
21     Q   Good afternoon, Mr. Sablowski.  I appreciate
22 you taking the time to be with us today.  Have you
23 ever had your deposition taken before?
24     A   Yes, I have.
25     Q   Just a couple quick reminders, especially
                                                        Page 5

2 (Pages 2 - 5)

Page 6

1 since we're over Zoom.  There can be a little bit of a
2 delay with me getting my questions out, so all I ask
3 is make sure to give an extra second or two at the end
4 of it and I'll try to do the same with your answers,
5 that way we're not talking over each other and making
6 it more difficult for the court reporter.
7        If at any point in time you need a break,
8 I'm happy to do that.  All I ask is that if me or Mr.
9 McFarlane has posed a question to you, please answer
10 that question and then we can take that break.
11        Before we get started here, have you
12 reviewed any documents in preparation for this
13 deposition today?
14     A   Yes, I have.
15     Q   What have you reviewed?
16     A   I received a packet from the City of Detroit
17 via e-mail.  I think there was, like, 30-some pages in
18 it.  I tried to print them all up, but my computer
19 kept glitching.  I've got an old computer, so I've got
20 what I've got.  And I also reviewed those papers.
21     Q   And what's the primary content of those
22 papers?
23     A   Based on what I'm seeing is a packet of
24 disciplinary charge summaries from various
25 supervisors.

Page 8

1     A   I went for treatment for cancer.  I have two
2 forms of cancer.
3     Q   I'm so sorry to hear that.  And you're
4 currently going through treatment right now?
5     A   I just finished -- well, I shouldn't say I
6 just finished.  Probably about three weeks ago, I
7 finished my radiation treatment and I'm still under
8 doctor care as far as follow-ups and further testing
9 for extension of the cancer.
10     Q   Well, congratulations on finishing that
11 first round and I will be praying that it is full in
12 remission.
13     A   Me too.
14     Q   Okay.  And when you took that FMLA, were you
15 working at the City of Detroit?
16     A   No, it was not.
17     Q   Where are you working at?
18     A   I was working for Beaumont Hospital.  I was
19 working a freestanding emergency room in security.
20     Q   You said you were working at a freestanding
21 emergency room as security?
22     A   Yes, at that time.  I have since resigned.
23     Q   Okay.  And how long had you held that
24 position?
25     A   A little over a year.  I want to say a

Page 7

1     Q   And the last thing before we get into it is,
2 make sure that all your answers are verbal.  So if at
3 any point in time you start nodding or mm-hmm, uh-huh,
4 the court reporter might ask you to make sure it's a
5 verbal answer.  Because it, obviously, is very
6 difficult for her to take down a physical response on
7 text.
8        So can you state your full name for the
9 record, please.
10     A   John Fitzgerald Sablowski.
11     Q   And what's your date of birth?
12     A   19 June, 1965.
13     Q   And are you currently employed?
14     A   No, I'm not.
15     Q   When was your last date of employment?
16     A   The last day I worked had to have been
17 somewhere right around the end of August.  I went out
18 for treatment, for medical treatment.  I went off
19 FMLA.
20     Q   August of 2022?
21     A   Yeah, sometime at that point in time.
22     Q   Okay.
23     A   I'm not exactly sure of the date that I went
24 off on FMLA.  I know when my procedure was, but.
25     Q   And why did you have to go on FMLA?

Page 9

1 little over a year.
2     Q   So started sometime in July-August of '21?
3     A   Correct.
4     Q   And prior to that, where were you working?
5     A   Prior to that, I was working for Ascension
6 St. John Hospital.  I had obtained my PA 330, police
7 authority certification, and worked for them for
8 roughly 3 1/2 years, something like that.
9     Q   So did you start there sometime in the
10 latter half of 2017?
11     A   No.  I retired -- actually, I retired from
12 the City of Detroit August -- I'm not sure the exact
13 date of 2018.  I finished out my shift and that next
14 morning when I finished out my shift, I started at
15 Ascension in orientation, 2018.
16     Q   And you worked at Ascension St. John in a
17 security capacity?
18     A   Yes, I did.
19     Q   And did you work that job continuously until
20 you switched over to Beaumont?
21     A   Correct.  I moved up to St. Clair County and
22 the Beaumont facility had just opened up.  It was
23 brand-new and it was closer to my home location.
24     Q   And so then, prior to Ascension, you were
25 working for the City of Detroit; is that correct?

3 (Pages 6 - 9)

Page 10

1    A    Correct.
2    Q    And when did you start with the City of
3  Detroit?
4    A    Started with the City of Detroit in 1993,
5  the exact date, I don't recall.  I believe it was
6  sometime in August.
7    Q    And you retired from there in August of
8  2018?
9    A    Correct; as soon as I hit my 25th year.
10   Q    And when you started in 1993, what was your
11  position?
12   A    Emergency mobile medical technician.
13   Q    And were you promoted from that position?
14   A    Yes.
15   Q    When were you promoted?
16   A    I want to say about four or five years
17  later, I obtained my paramedic and I was promoted to
18  advanced EMT.
19   Q    And you had to obtain your paramedic's
20  certification for that?
21   A    Yes, I did.
22   Q    Is that certification still current?
23   A    Yes, it is.
24   Q    Has it ever lapsed?
25   A    No, it has not.

Page 11

1    Q    And then, after that promotion in 1997,
2  roughly, were you promoted again?
3    A    Yes, I was.
4    Q    What was the next promotion?
5    A    I was brought up as an acting lieutenant,
6  which I held that position for two years.  I had to
7  retest again and I was promoted to lieutenant, full-
8  fledged lieutenant.
9    Q    And when were you acting lieutenant?
10   A    Right around 2004, 2005, I believe.  I don't
11  have the exact date.  You would have to pull my -- my
12  record from the City of Detroit.
13   Q    And then, after that two-year period, you
14  retested and then were fully instated as a full-time
15  lieutenant?
16   A    Yes.
17   Q    And was that the position you held the
18  remainder of your time?
19   A    Yes, it is.  I acted as an acting captain
20  for seven or eight months after Captain James had
21  retired.  And I believe she retired in 2016, so I held
22  acting captain for that period of time.
23   Q    And once that acting captain position ended,
24  you went back to your lieutenant role?
25   A    Yes.  Once they brought up the full-fledged

Page 12

1  captain, which was Captain Smaller, I stepped down
2  back to the lieutenant position and worked under
3  Captain Smaller until I retired.
4    Q    During your time as a lieutenant, what were
5  your job responsibilities?
6    A    As a lieutenant, my job was to support the
7  crew in the field when they needed supplies, whatever
8  their daily needs were.  I had to make myself
9  available whenever I reported for duty until the time
10  I went home to take care of them needs within their
11  job scope.
12        I also was responsible for doing
13  investigations based on citizen complaints, internal
14  complaints.  Upon completing those investigations,
15  formatted a summary and forwarded it to my shift
16  captain with recommendations and findings.
17        Ultimately, the shift captain had the final
18  determination and any outcome of any investigation.
19  Sometimes those investigations, depending on how
20  severe they were, were sent up to the chief prior to
21  any formal disciplinary or actions being taken.
22   Q    So correct me if I'm wrong.  So it sounds
23  like your role as a lieutenant in the investigations
24  was kind of the information collection; is that
25  correct?

Page 13

1    A    Correct.
2    Q    Did you ever make any recommendations?
3    A    Yes, I have.
4    Q    And how does that process work?
5    A    Based on the type of incident, complaint,
6  allegations, incidents, whatever, I would review all
7  parties' information.  It's pretty much like sitting
8  before a, like what you're doing right now, you're
9  fact-finding.  Okay?  I pull in everybody that's been
10  involved in the incident and question them.  Get
11  written letters, summate it and forward it.  And
12  depending on, again, the degree of it, could it be a
13  counseling statement all the way up to a
14  recommendation of a charge, department charge.
15   Q    And a counseling statement, what is that,
16  exactly?
17   A    A counseling statement is, it's basically a
18  form that I take out that after I found that there was
19  enough evidence that there was wrongdoing.  I would
20  take a copy of the policy, go out, sit with the
21  technician, and explain what I found.  And our way of
22  working it out so it doesn't happen again was we were
23  going to have a conversation about it.  And on
24  completion of that conversation, the technician agrees
25  to do better and not do what they did wrong and we

4 (Pages 10 - 13)

John Szymanski
January 9, 2023

1 move on.
2        That counseling statement stays in a file at
3 the chief's office for two years and it's thrown out
4 after two years.  If they continue in that role of
5 behavior, then they set a pattern.  On that pattern,
6 then we move up to the next step of the disciplinary
7 process, which could be department charges.
8     Q    But you said you have made the
9 recommendation for charges before, correct?
10    A    Yes.
11    Q    Does that process differ from the counseling
12 statement?
13    A    There are certain things that you can
14 counsel on and there are certain things that you
15 can't.
16    Q    What --
17    A    I'm sorry?
18    Q    My apologies.  Please continue.
19    A    There are certain things you can counsel on
20 and some certain things that you can't.  Again, the
21 recommendation goes to the captain.  We discuss it.
22 Depending on the egregiousness of the action, it would
23 even go up to the chief and then come back.  Now, I've
24 worked under a number of different chiefs from Gary
25 Kelley -- actually, Gary Kelley was in and then James

Page 14

1 Kesteloot, Gerald James, assistant chief Joe Wilson --
2 everybody had their own way of handling things.  So we
3 would just discuss it and they would make the final
4 recommendation.
5    Q    And what sorts of things did you recommend
6 discipline for?
7    A    It could be -- it varied -- it varied in
8 many different degrees.  Continuous violation of
9 department policy, placing the unit in service, being
10 in proper uniform, grooming standards, cruising the
11 city streets, not notifying your supervisor that
12 you're going to be out of quarters, all the way up to
13 patient care and handling to conduct.  I mean, it
14 varied.
15        There were, I want to believe, I don't have
16 them anymore, but the policies and directives, there
17 were close to 100 policy and directives that could be
18 violated within the Detroit Fire Department EMS
19 Division.  And on top of that, you had your general
20 rules under the fire department.
21        THE REPORTER:  I think we're having
22 technical issues.  Can he hear us?
23        MR. MCFARLANE:  Yeah, he can hear us.
24 The video is just scrambled.  He's been responding
25 throughout.

Page 15

1        MR. SHEAROUSE:  Let's see, where was I?
2 BY MR. SHEAROUSE:
3    Q    So you mentioned a couple different areas
4 or, I guess, types of potential discipline that you
5 issued.  Was there one that was more common than the
6 others?
7    A    Well, it varies.  Like I said, every day,
8 you know, it could be something different.
9    Q    And so, once you do your investigation and
10 submit your report, along with that report, are you
11 making that recommendation for discipline?
12    A    Yes.  Some -- some cases, I make the
13 recommendation for discipline.  Patient care and
14 handling was number one.  Our job is to help people
15 and take care of them and I feel that if there was an
16 egregious act that brought suffering to that patient
17 that it warranted disciplinary under the Detroit Fire
18 Department policies and procedures.
19    Q    So were there certain investigations that
20 you didn't recommend discipline on or that you
21 couldn't -- sorry, strike that.
22        Were there certain areas of discipline that
23 you could not recommend disciplinary action on?
24    A    No, I can recommend disciplinary actions on
25 everything that I came across that was infracted.

Page 16

1 However, the purpose of disciplinary isn't to be
2 punitive or harm somebody, it's to correct bad
3 behavior.  So if I can correct the bad behavior by
4 counseling statements on the minor stuff, like I said,
5 not being at quarters, cruising, not placing
6 themselves in service, you know, the minor stuff, then
7 I was able to work that out without having to do the
8 hardship of the paperwork and go through the whole
9 disciplinary process unnecessarily.
10    Q    Did you ever recommend someone to be
11 terminated?
12    A    Under General Rule 11, the only one that can
13 put that through is the chief.  I do not believe that
14 I have ever recommended anybody be terminated.  I
15 can't recall ever submitting paperwork to have
16 somebody terminated.
17    Q    Were you ever asked for your opinion on a
18 termination?
19    A    No.
20    Q    So as far as terminations go, did you have
21 any input at all?
22    A    I do not, again, recollect ever being a part
23 of any process in which my opinion was asked due to a
24 termination of an employee.
25    Q    Have you ever been disciplined before?

Page 17

5 (Pages 14 - 17)

**Page 18**

1    A   Yes, I have.
2    Q   Do you remember when the last discipline you
3 received was?
4    A   Yes.
5    Q   When was that?
6    A   I want to say 2017.
7    Q   Do you remember what that was for?
8    A   Yes, I do.
9    Q   What was that for?
10   A   It was conduct, workplace violence.  An
11 allegation was made against me and the City of Detroit
12 placed me off duty and I was off for seven months.
13 Actually, I was terminated during that process.
14   Q   You were terminated during that process?
15   A   Yes, I was.
16   Q   Did you end up coming back?
17   A   I went to arbitration.  My arbitration
18 attorney presented all facts, evidence, and the
19 arbitrator ruled in my favor.  I was awarded my time
20 served, backpay, and made whole.
21   Q   Are you aware of something in the City of
22 Detroit Fire Department known as a "do not rehire"
23 list?
24   A   Yes, I am.
25   Q   What is your understanding of that list?

**Page 19**

1    A   There are certain -- there are certain
2 things that you can be terminated for that you're not
3 rehired.  You're put down by the chief as a do not
4 rehire.  I know attendance is one of them.  The other
5 one is quitting without giving -- serving notice, just
6 up and quit.  I don't want to be here anymore.  You
7 don't show up for work, you don't follow through with
8 your schedule.  Depending on the type of disciplinary,
9 it could be even under General Rule 11, which could be
10 a major infraction of department policy.
11       THE WITNESS:  Is my video the only one
12 that's acting up?
13       MR. MCFARLANE:  It appears to be.
14       MR. SHEAROUSE:  Yes -- yes.
15       THE WITNESS:  Okay.  It's probably this
16 old computer.  I'm running Windows 8 so, sorry.  I
17 tried to upload the current version.  I'm not techno
18 savvy.
19       MR. SHEAROUSE:  It happens.  It
20 definitely happens.  I had somebody once doing it on
21 in early 2000's phone dial in, so I've seen it all.
22 BY MR. SHEAROUSE:
23   Q   So you said that some of the things that
24 might put somebody on the do not rehire list would be
25 attendance, not serving notice and quitting, major

**Page 20**

1 infraction of department policy.  Is there anything
2 else that might get someone on the do not rehire list?
3    A   Again, it has to be a violation of the
4 department policies, general rules under the fire
5 department.  There has to be a reason.  And again,
6 that's only submitted by the chief, from my
7 understanding.
8    Q   If someone resigns with pending discipline,
9 does that put them on the do not rehire?
10   A   I'm not sure.  I wasn't at that level to
11 make that determination or be a part of that
12 involvement.
13   Q   So you're not aware of any policy that would
14 make that so?
15   A   If they quit under discipline?
16   Q   If they quit with pending discipline, does
17 that happen?
18   A   I've heard -- I've heard of it.  But, again,
19 I'm not aware of it.  I don't have the policy in front
20 of me.
21   Q   Okay.  So you don't recall ever seeing a
22 policy like that?
23   A   That's above my -- my chain.
24   Q   So you don't recall ever seeing a policy
25 like that?

**Page 21**

1    A   No, but I've heard of it.  Just like I've
2 heard of the other ones as well.  The only one that I
3 have actually seen was General Rule 11.
4    Q   Have you ever heard of somebody getting
5 taken off the do not rehire list?
6    A   Not to my knowledge.
7    Q   Are you familiar with a Brian Moore?
8    A   Brian Moore?  I know Brian Moore.
9    Q   Do you know if Brian Moore was placed on the
10 do not rehire list?
11   A   I don't know anything about Brian Moore,
12 anything, outside of me supervising him.
13   Q   When did you supervise him from?
14   A   Oh, God.  Years ago.  I remember working a
15 run with him where we responded to a run where a guy
16 was shot in the street.  By the time that they got the
17 patient loaded in the back of the truck, I intubated
18 the patient and started the IV and helped him out.
19 That was the last time.  I couldn't tell you an exact
20 date.
21   Q   Are you aware if Mr. Moore attempted to
22 reapply to the City of Detroit Fire Department?
23   A   Again, I don't know anything about Mr. Moore
24 as far as his employment with the city, outside of
25 working with him one-on-one.

6 (Pages 18 - 21)

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 86 of 125

**Page 22**

1 Q   And what about a Nicholas Collingsworth?
2 A   Okay.  I supervised Nicholas Collingsworth
3 back in the day.  I didn't supervise him directly as
4 his immediate.  Mr. Collingsworth worked the
5 west side and I would be detailed over to the west
6 side periodically and had contact with him at that
7 point in time.
8 Q   And are you aware of any details of his
9 employment?
10 A   Am I aware of any?
11 Q   Yes.
12 A   As far as what?
13 Q   As far as, was he placed on a do not rehire
14 list?
15 A   Again, I don't know.
16 Q   You mentioned earlier that improper uniform
17 was something that could be disciplined for, correct?
18 A   Yes.
19 Q   Are there situations where a technician
20 would be allowed to be out of uniform?
21 A   Yes, there is.
22 Q   What kind of situations would those be?
23 A   They failed to place a spare uniform on the
24 truck and their uniform became contaminated.  They
25 have damaged their uniform to where it needed

**Page 23**

1 alteration or repair, at which point in time they are
2 required to have a second uniform, either -- well, at
3 the time, which the policy changed later on -- they
4 are required to have a spare uniform on the truck at
5 all times.
6 Q   So if they failed to have a spare uniform on
7 the truck and their uniform became soiled for some
8 reason or another, would that be a violation?
9 A   It would be -- it would not be a violation
10 if they informed the immediate supervisor or the shift
11 captain that they had a soiled uniform and needed to
12 make quarters to change out if they had a spare
13 uniform at quarters.  I've had times when I've had
14 crews who, later on, when the policy was changed,
15 didn't have a uniform in the truck.  We went into the
16 hospital, got them a gown, got them cleaned up, and
17 they put on a hospital gown and we make sure the front
18 of their cab was clean of any contaminants and they
19 were sent back to quarters to change out their
20 uniform.  If they didn't have one at quarters, then
21 they would be sent home.  Which, there again, goes
22 another violation of department policy.  Because now
23 I've got to shut a uniform -- unit down to send you
24 home to get a replacement uniform.
25 Q   When an EMT makes a complaint against a

**Page 24**

1 supervisor, what happens?
2 A   Well, you use the chain of command.  You go
3 through the shift captain.  If you make no resolution
4 at the shift captain, you go to the assistant chief.
5 No resolution at the assistant chief, you go to the
6 chief.
7     Depending on how -- what type of complaint
8 it is, it can start there or it can go to the law
9 department as a formal complaint through human
10 resources -- I'm sorry -- through human resources,
11 which then draws in the law department, depending on
12 what the complaint is.
13 Q   Is there an investigation that's conducted?
14 A   Yes.
15 Q   Who conducts that investigation?
16 A   Depends where the complaint starts.
17 Q   Have you ever been the subject of an
18 investigation?
19 A   Yes, I have.
20 Q   When was that?
21 A   I don't know the exact years.
22 Q   Was it sometime around 2007?
23 A   I want to say somewhere right around there.
24 I can't be 100 percent sure.
25 Q   Do you remember what the content of that

**Page 25**

1 investigation was?
2 A   It was an EO2.  I'm not 100 percent sure
3 exactly what the allegations were, outside of that I
4 made -- was alleged to have made discriminatory
5 statements to an employee that I don't even talk to
6 that went to another employee that said I made these
7 statements that led to an investigation through human
8 resources and the law department.
9 Q   And you said the allegations were based from
10 an employee that you did not talk to at the time; is
11 that correct?
12 A   Correct.
13 Q   Do you remember that employee's name?
14 A   Yes; Doug Bayer.
15 Q   Bear, B-E-A-R?
16 A   Something like that.  B-A -- I don't know.
17 I know it's not, it's, like, Bayer aspirin, I
18 guess, B-A-Y-E-R or something like that.  It's been a
19 long time.
20 Q   Was that the only investigation that you've
21 been the subject of?
22 A   No.
23 Q   Do you remember the other?
24 A   Yes.  There was one that a lawsuit was filed
25 against the City of Detroit naming multiple people by

7 (Pages 22 - 25)

**Page 26**

1 Kim Asaro.
2  Q   And who was that filed by?
3  A   Kim Asaro.
4  Q   Do you know how to spell that last name?
5  A   Last time I messed it up, I got yelled at.
6 I'm not even going to try.
7  Q   And was there a resolution in that case?
8  A   I don't know.  It was at the law department.
9  Q   And what were the allegations against you in
10 that case?
11  A   Again, I wasn't for sure on that one.  I
12 know that she -- she listed that I yelled at her from
13 across the -- the bay.  We were at the apparatus shop
14 and she was socializing with one of the mechanics and,
15 due to the noise in the shop, I was trying to get her
16 attention and I hollered across the shop for her to
17 expedite and get back in service because we were short
18 units and I was sent over there to get everybody
19 moving out of the shop.  So I know that was one of
20 them.  Outside of that, again, I don't recall
21 everything that was -- that was listed.  I don't have
22 the packet.  Never received a packet.
23  Q   So in that first investigation that we
24 talked about involving Doug Bayer, how does the
25 investigation process work?

**Page 27**

1  A   Well, that -- that process happened where
2 Mr. Bayer made some allegations to Mr. Zeineh who went
3 through, again, HR and the law department and I
4 underwent a, I want to say, close to two-year
5 investigation where they questioned pretty much every
6 member that worked for the Detroit EMS division.  They
7 questioned them in a survey as to my abilities as a
8 supervisor and if I was a racist.  So it basically
9 gave everybody an open forum to give their opinion of
10 what they thought of me.
11  Q   During that investigation, did you have to
12 contact witnesses yourself?
13  A   No.
14  Q   At some point in time, you were the
15 supervisor for Richard Cadoura; is that correct?
16  A   Correct.
17  Q   Do you remember what years that was?
18  A   No, I do not.
19  Q   Was EMT Cadoura a good EMT as it relates to
20 patient care?
21  A   Well, I worked with Cadoura when I was a
22 paramedic and I had no problems working with him as a
23 paramedic.
24  Q   So as an EMT himself you would say he was a
25 good EMT?

**Page 28**

1  A   When I worked with him as a technician.  I
2 can't vouch for his everyday work ethics after that,
3 after I became promoted.
4  Q   So it sounds like what you're saying is
5 after you were promoted, there were issues?
6  A   Yes, there was.  I mean, you're aware of
7 that.
8  Q   What kind of issues did you run into?
9  A   You have the charge packets in front of you.
10 There were a couple times during his "tenure" under
11 my supervision.  I've also had to counsel him for a
12 variety of things under my "tenure" as his
13 supervisor.
14  Q   At some point in time during your
15 supervision of Mr. Cadoura, were you and Mr. Cadoura
16 placed on a do not work together limitation?
17  A   Yes, we were.
18  Q   What was the reasoning for that?
19  A   An investigation.  Apparently, Mr. Cadoura
20 had filed a complaint through the department or HR and
21 I received a letter from the chief indicating that we
22 were not to work directly together while the
23 investigation was going on, which is understandable.
24      It didn't hamper my overtime.  If I had to
25 work, then another supervisor would assume that unit

**Page 29**

1 or that side of town and vice versa.  If he worked
2 overtime, he would be placed in a different sector
3 than me or given to a different supervisor to
4 supervise.
5  Q   Was there any action that resulted from that
6 investigation?
7  A   The only thing that I received was a letter
8 exonerating me from -- from the allegations, whatever
9 they were.  I don't know what they were.
10  Q   And after that, did you and Mr. Cadoura
11 continue to work together?
12  A   I continued to supervise Mr. Cadoura; I
13 believe so.
14  Q   Do you recall any incidents involving both
15 Mr. Cadoura and a Mr. Zeineh, Z-E-I-N-E-H?
16  A   You'd have to be specific as to what
17 incident.
18  Q   An incident at the hospital involving a run
19 sheet.
20  A   I have -- I remember that I was sent to do
21 an investigation -- well, to gather facts as to a unit
22 that was reporting in service and a minute later they
23 weren't anywhere near the hospital.  And I was
24 requested to take a look at the run sheet as to the
25 documentation of the time that the unit actually put

8 (Pages 26 - 29)

Atkinson-Baker, A Veritext Company
(800) 551-7300                     www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 88 of
125

1 themselves in service to see if there was discrepancy
2 between the run sheet and the time that they reported
3 to dispatch.
4    Q   And what happened during your investigation?
5    A   To the best of my recollection, I went out
6 to the medic quarters. I asked for a copy -- to see
7 their run sheet and Mr. Zeineh refused to give it to
8 me.
9    Q   Do you remember him invoking his Weingarten
10 rights?
11    A   Yes, I do.
12    Q   And did he ever give you the run sheet?
13    A   No, he didn't. I went in the truck and got
14 it out of the glove box.
15    Q   Did Mr. Cadoura inform you where the run
16 sheet was?
17    A   I don't recall that.
18    Q   Do you know if Mr. Zeineh was disciplined
19 for that?
20    A   Yes, he was.
21    Q   What kind of discipline did he receive?
22       THE WITNESS: Mr. McFarlane, am I able
23 to discuss Mr. Zeineh's work record?
24       MR. MCFARLANE: Unless you hear an
25 objection, you can go ahead and answer.

Page 30

1       THE WITNESS: Okay. Mr. Zeineh was --
2 the only set of charges that were received from that
3 was insubordination for Mr. Zeineh. Your Weingarten
4 rights doesn't protect you from giving me a run sheet.
5 That protects you from making a statement that could
6 lead to disciplinary action. Me questioning you, it's
7 like you going in and receiving your -- being
8 mirandized, okay? Because being mirandized, anything
9 you say afterwards can be held against you. However,
10 the evidence that I collect at that scene does not
11 prevent you from being prosecuted, the process of
12 disciplinary.
13    Q   Do you know what ethnicity Mr. Zeineh is?
14    A   I'm not sure exactly what ethnicity he is.
15 I don't know -- I know he's Middle Eastern, based on
16 what I found out during his allegations under his EO2
17 against me back in '07-'08, something like that. He
18 was Middle Eastern. I don't know exactly.
19       MR. SHEAROUSE: I'm going to go ahead
20 and share my screen here real quick. Oh, sorry.
21 Madam Court Reporter, could I get permission to share
22 the screen? I think I may have had it and then when I
23 left I think it revoked it.
24       THE REPORTER: You're all set.
25       MR. SHEAROUSE: Wonderful; thank you.

Page 31

1       THE REPORTER: You're welcome.
2       MR. SHEAROUSE: Very good. Are you
3 able to see the document on my screen?
4       THE WITNESS: Yes, I am. I'm able to
5 see it. It's small, but I can see it.
6       MR. SHEAROUSE: Let me see if I can
7 zoom in for you.
8       THE WITNESS: Okay, that's good.
9       MR. SHEAROUSE: That's a little bit
10 better? I'll give you a second to read this over and
11 you let me know if you remember this incident.
12       THE WITNESS: Okay.
13 BY MR. SHEAROUSE:
14    Q   Okay. Do you recall that incident?
15    A   Yeah. I briefly, you know, I remember bits
16 and pieces of it. It happened a long time ago.
17    Q   Did you conduct an investigation into this?
18    A   There wasn't really anything to conduct an
19 investigation into. I submitted documentation as to
20 the shift captain as to my encounter. To do an
21 investigation, I'd have to pull video and a whole
22 bunch of other things, you know, get to the hospital
23 and see if they have video, and I don't recall pulling
24 any video. I believe the captain may have done the
25 investigation. I'm not sure.

Page 32

1    Q   Did you ever see the statements from the
2 other two EMTs that were there?
3    A   Yeah. I think I got something here that was
4 in that packet on this one. Let me see if I can find
5 it. Mark Astalos and Pat Payne submitted some
6 documentation.
7    Q   And you said you had those statements in
8 front of you?
9    A   Yes, I do. Yeah. They were asked to submit
10 letters. I'm sorry.
11    Q   And are those in their own handwriting?
12    A   I guess they're in their handwriting. I'm
13 not sure. I don't -- I'm not an expert at handwriting
14 and I don't have a copy of their -- but this is what's
15 submitted within the packet.
16    Q   And reading over that statement, do you see
17 towards the bottom of Mr. -- I can't pronounce that
18 name.
19    A   Astalos?
20    Q   Yeah, Astalos. I butchered that last
21 name -- Mark's, I'll call him Mark -- at the bottom of
22 Mark's statement, where he says "Mr. Cadoura said in a
23 nonthreatening voice."?
24    A   Okay.
25    Q   Is there a reason that Mr. Mark would say

Page 33

9 (Pages 30 - 33)

1 that it was in a nonthreatening voice and differ from
2 your account?
3     A   Technicians don't like to go against
4 technicians.  Just like police don't go against police
5 and firefighters don't go against firefighters.
6 Technicians don't like to go against technicians.
7     Q   So you're saying Mr. Mark's account is
8 incorrect?
9     A   Yes.
10    Q   And would that be the same for Mr. Payne's
11 account as well?
12    A   Correct.
13    Q   And other than your statement given to the
14 chief on this incident, are there any other documents
15 that support your position?
16    A   I don't believe so.  I'm not sure.
17    Q   You said you left the City of Detroit in
18 2018, correct?
19    A   Correct.
20    Q   Do you ever recall Mr. Cadoura reapplying to
21 the City of Detroit EMS?
22    A   No.  I'm not -- I'm not 100 percent sure.  I
23 know somebody who had left was trying to get their job
24 back but I'm not sure who it was, if it was Cadoura.
25 You mentioned Hollingsworth.  I'm not sure who it

Page 34

1 was placed on a do not rehire, so that would be
2 premature for me to say.
3     Q   If Mr. Cadoura was placed on do not rehire
4 due to pending discipline, would that be something
5 that you're familiar with?
6     A   I am not familiar, again, with why he left,
7 under what circumstances that Mr. Cadoura left, or
8 even him applying for the City of Detroit again.  I'm
9 not aware of it.
10    Q   But more generally, are you aware of any
11 policy that states that pending discipline is
12 automatic placement on the do not rehire list?
13    A   I'm not aware.  Again, that's above my pay
14 grade.
15        MR. SHEAROUSE:  I'm going to go ahead
16 and share my screen here real quick.  I zoom in for
17 you.  Do you see this document in front of you?
18        THE WITNESS:  If you can zoom it up?
19 Yes, I see the document.
20        MR. SHEAROUSE:  I can zoom in a little
21 bit more, if that helps?
22 BY MR. SHEAROUSE:
23    Q   This was in reference to that run sheet that
24 we mentioned earlier.
25    A   Yes.

Page 36

1 might have been, or Brian Moore?  I don't know.
2     Q   Around 2018, was there a large need for more
3 EMTs in the City of Detroit EMS?
4     A   There's always a need for EMTs in the City
5 of Detroit.
6     Q   Hopefully, experienced ones?
7     A   Everybody.  Even private sectors are looking
8 for experienced EMTs.  I can walk out the door right
9 now and have a job within a couple of hours.
10    Q   And do you have any input in the rehiring
11 process?
12    A   No, I do not.
13    Q   Did anyone ever ask you for your opinion on
14 the applicants?
15    A   I do not recall being asked for anybody who
16 wanted their job back how I felt about it.
17    Q   So you were never asked about Mr. Cadoura?
18    A   No, I was not.
19    Q   Were you aware that he was placed on the do
20 not rehire list?
21    A   No, I was not.
22    Q   Do you believe he should have been on a do
23 not rehire list?
24    A   I don't have his disciplinary record and nor
25 do I have his HR record, which would indicate why he

Page 35

1     Q   Do you see towards the bottom, the third
2 paragraph, where it says "Technician Richard Cadoura,
3 Badge Number 608, directed me to the location of the
4 requested run sheet."
5     A   Okay.
6     Q   Does that help refresh your memory on if Mr.
7 Cadoura directed you to the run sheet?
8     A   Yes -- yes, it does.
9     Q   Okay.  Do you have any reason to correct
10 that statement in this document right here?
11    A   No.  There's no reason for me to recorrect
12 it.  If Mr. Zeineh refused to give it to me and go to
13 the truck and get it, and Mr. Cadoura obviously, in my
14 statement, typed out that he directed me where the run
15 sheet was at.
16    Q   So when a unit is out, is in service, and is
17 looking to refuel, do they need to notify dispatch?
18    A   Yes, they do.  If they don't have a fuel
19 yard immediately in their location and they're heading
20 away from their immediate area, they're going to
21 notify dispatch they're heading for fuel.  And when
22 they arrive at the fueling yard, they're required to
23 let dispatch know they're at the fueling yard.  And
24 when they leave the fueling yard, dispatch is
25 notified.  This way, they're not given a run while

Page 37

10 (Pages 34 - 37)

13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 90 of
125

**Page 38**

1 they're fueling their truck, unless it's a top
2 priority and they have no units available.
3   Q  And is that a City of Detroit policy?
4   A  It's an EMS policy.
5   Q  EMS policy?
6   A  Yup.
7   Q  And would that policy be in the handbook?
8   A  It should be.  Again, I don't have that
9 stuff with me anymore.  It's either a policy or a
10 directive.
11   Q  What's the difference between a policy and a
12 directive?
13   A  A directive is, basically, the chief --
14 again, I can't give directive, a formal directive to
15 the entire division.  The chief will make a directive.
16 Instead of invoking a policy, this is a directive.
17 This is what I'm telling you you have to do in lieu of
18 this policy, all orders of your superior must be met.
19 Okay?  They'll put out directives.  And directives and
20 the policies go into a book at quarters.  Every day
21 that we make rounds to them quarters, if we have a new
22 one, we not only put it in the book but we also
23 document that it's there for the crew to review.  And
24 if we see the crew, sometimes we'll even share it with
25 the crew.  You know, go up if we've got time and

**Page 39**

1 explain the new directive.
2   Q  And to your knowledge, the run sheets that
3 we were talking about earlier, where are those stored?
4   A  I know there was a directive that they were
5 not to be kept in the -- again, I don't -- I'd have to
6 look.  Hold on.  Let me see if I can find that one.
7 Okay.  That's what it was.  The run sheets -- they
8 didn't want the run sheets being kept in the clipboard
9 because what happened was we used to just plop all of
10 the run sheets in there.  And based on HIPAA, if you
11 lost your clipboard now there's ten run sheets out
12 there.  So when you got back to your truck when you
13 completed your run sheet you were supposed to put it
14 in the glove box.
15   Q  Do you know when that directive was issued?
16   A  Policy and procedure dated 4/4 of '07.
17   Q  And so, a new directive like that, is there
18 a grace period for the people in the field to adhere
19 to that or is it immediate adherence?
20   A  Well, what happens with something like this,
21 because it's such HIPAA sensitive, when we have our
22 shift briefing before we go afield -- because when we
23 report, we report -- we reported to fire headquarters.
24 We didn't have a fire station we went to.  We'd go
25 through our mail and any new policies, procedures,

**Page 40**

1 directives, mail that needed to go out to the field to
2 the crews would be given to each sector boss and we'd
3 take it out.
4   Something like this, we would have to meet
5 up with every unit.  And within 24 -- I mean, by the
6 end of that shift or after speaking to them, I should
7 say, that's when that policy should be instituted by
8 that crew.  They have to put it in the glove box.
9 They can't put it in the clipboard anymore.  And there
10 were other technicians later on that were found to be
11 in violation.  Old habits are hard to break.
12   Q  Other than this current lawsuit, are you
13 aware of any of Mr. Cadoura's other lawsuits?
14   A  No, I'm not aware of any other lawsuits from
15 Mr. Cadoura.
16   Q  Are you aware of a news story involving
17 ambulance response times that Mr. Cadoura was a part
18 of?
19   A  No, I'm not.  I think there was a piece of
20 paper in here for Vince Fourment where he had spoke to
21 Mr. Cadoura that I read, but I'm not aware of the
22 actual incident.  I wasn't part of it.
23   Q  You said that was from who?
24   A  Jim -- Vince Fourment had found that -- it
25 was one of the forms in the packet.  Mr. Fourment had

**Page 41**

1 spoke with Cadoura about speaking with the media.
2   Q  Do you remember what the contents of that
3 were?
4   A  He walked up and I guess he was talking to
5 the media.  And we're not allowed to, even as
6 supervisors, talk with the media and if we do we can
7 be subjected to disciplinary.
8   Q  Is there any position that someone might
9 hold in the union that might allow them to speak to
10 the media?
11   A  The union can, when it came to the union
12 president.  The union president spoke to the media
13 quite often whenever there was issues related to
14 Detroit EMS.  And he's speaking on behalf of the
15 union.  He's not, at that point in time, speaking on
16 behalf of the technicians in uniform, I should say.
17 He's not the liaison for the city of Detroit to speak
18 to the media.
19   Q  So what happens if someone speaks to the
20 media?
21   A  A report is generated, sent up, and the
22 chief will make a determination in violation of the
23 department policy.
24   Q  And is there a disciplinary action that's
25 typically done for speaking to the media?

11 (Pages 38 - 41)

1    A    That's up to the chief.
2    Q    Were you aware of anybody ever being
3 disciplined for speaking to the media?
4    A    Not that I know of.  I know they've been
5 spoken to, but I don't know -- I'm not, again, I'm not
6 familiar with everybody's actions and the goings on of
7 everything in EMS.
8    Q    Do you know if Mr. Cadoura was ever spoken
9 to about speaking to the media?
10   A    Yeah.  He was spoken to based on Vince
11 Fourment's letter that I reviewed that was sent with
12 this packet.  He was spoken to.
13   Q    Do you know if he was ever disciplined for
14 that?
15   A    I don't know.  I wasn't part of anything.  I
16 wasn't his supervisor.  I wasn't involved in it.
17   Q    During your time with the City of Detroit,
18 did you notice any discrimination or harassment on the
19 basis of race?
20   A    No.  Every year we are -- every year we
21 receive a packet from the city, an EO2, on
22 discrimination against -- for somebody's race, their
23 sex, their gender, their sexuality, makeup, whatever
24 they wanted to be, and it was enforced.  And we took
25 it out and spoke with crews about it as well.

Page 42

1 Everybody was held to the department standards.  And I
2 never witnessed anybody directly target anybody or
3 make any comments against somebody's race directly.
4    Q    In your opinion, was Mr. Cadoura an asset to
5 the City of Detroit EMS?
6    A    I don't have an opinion of Mr. Cadoura or
7 any other employee that works for the city.  Outside
8 of them doing their job, and if you asked me how they
9 were doing at that one moment.  I wasn't always Mr.
10 Cadoura's or a number of technicians' immediate
11 supervisor.  Sometimes I was just a fill in.
12        MR. SHEAROUSE:  Okay.  Let's go ahead
13 and take a ten minute break.  I'm going to review my
14 notes here for a little bit.  We'll come back here,
15 let's just call it 2:30, we'll restart.
16        THE WITNESS:  Okay.
17        MR. MCFARLANE:  Go ahead and stop your
18 video and mute yourself and then we'll be back.
19        THE REPORTER:  Okay.  We are off the
20 record here at 2:17.
21        (Off the record.)
22        THE REPORTER:  Okay.  We are back on
23 the record here at 2:31 p.m.
24        MR. SHEAROUSE:  Mr. Sablowski, I
25 appreciate your time.  I just have a few more

Page 43

1 questions.
2 BY MR. SHEAROUSE:
3    Q    Did you ever supervise a technician named
4 Kevin Williams?
5    A    Yes, I did.
6    Q    Do you know if he was placed on the do not
7 rehire list?
8    A    I'm not sure if he was placed on the do not
9 rehire.
10   Q    Do you ever recall disciplining Mr.
11 Williams?
12   A    Again, unless I have all my records, files,
13 I can't attest to that.
14        MR. SHEAROUSE:  I don't think I have
15 anything further.
16        MR. MCFARLANE:  I have no questions.
17        MR. SHEAROUSE:  All right.  That will
18 conclude us for the day.  Thank you so much for your
19 time, Mr. Sablowski.
20        THE WITNESS:  No problem.
21        THE REPORTER:  All right.  We are off
22 the record here at 2:32 p.m.
23        (Whereupon, at 2:32 p.m., the
24        proceeding was concluded.)
25

Page 44

1        CERTIFICATE OF DEPOSITION OFFICER
2        I, QIUANA GLOVER, the officer before whom
3 the foregoing proceedings were taken, do hereby
4 certify that any witness(es) in the foregoing
5 proceedings, prior to testifying, were duly sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a qualified
8 transcriptionist; that said digital audio recording of
9 said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially interested in the
16 outcome of this action.

17        QIUANA GLOVER
18        Notary Public in and for the
19        State of Michigan
20
21
22
23
24
25

Page 45

12 (Pages 42 - 45)

```
1          CERTIFICATE OF TRANSCRIBER
2      I, DIANE OTTO, do hereby certify that this
3   transcript was prepared from the digital audio
4   recording of the foregoing proceeding, that said
5   transcript is a true and accurate record of the
6   proceedings to the best of my knowledge, skills, and
7   ability; that I am neither counsel for, related to,
8   nor employed by any of the parties to the action in
9   which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto nor financially or
12  otherwise interested in the outcome of the action.
13
14

15          DIANE OTTO, CER, CET 1353
16
17
18
19
20
21
22
23
24
25
                                    Page 46
```

13 (Page 46)

Atkinson-Baker, A Veritext Company
(818) 551-7300                           www.depo.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 93 of
125

EXHIBIT E

```
1           IN THE UNITED STATES DISTRICT COURT FOR THE

2                  EASTERN DISTRICT OF MICHIGAN

3                       SOUTHERN DIVISION

4    RICHARD CADOURA,

5        Plaintiff,              CASE NO. 20-cv-12986

6    -vs-                        HON. GERSHWIN A. DRAIN

7    THE CITY OF DETROIT,        MAGISTRATE ANTHONY P.

8        Defendant.              PATTI

9    _____/

10       The Deposition of JERALD JAMES, taken via Zoom,

11   before me, Carol L. Martin, CSR-3532, a Notary

12   Public, in and for the County of Oakland, State of

13   Michigan, on Friday, January 6, 2023, commencing at

14   or about 1:00 p.m..

15   APPEARANCES:

16   For the Plaintiff:

17       CARLA D. AIKENS, P.L.C.

18       By: Mr. Austen Shearouse

19       615 Griswold Street, Suite 709

20       Detroit, Michigan 48226

21       (844) 835-2993

22

23

24

25

                                           Page 1
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 95 of
125

Jerald James
January 6, 2023

| | |
|---|---|
| 1 APPEARANCES CONTINUED: | 1      Friday, January 6, 2023 |
| 2 For the Defendant: | 2      1:00 p.m. |
| 3   CITY OF DETROIT LAW DEPARTMENT | 3      *   *   * |
| 4   By: Mr. Jason McFarlane | 4      J E R A L D   J A M E S |
| 5   2 Woodward Avenue, Suite 500 | 5   after having been first duly sworn to tell the |
| 6   Detroit, Michigan 48226 | 6   truth, the whole truth, and nothing but the |
| 7   (313) 237-0548 | 7   truth, was examined and testified as follows: |
| 8 | 8      EXAMINATION |
| 9 | 9 BY MR. SHEAROUSE: |
| 10 | 10 Q. Good afternoon.  My name is Austen Shearouse and |
| 11 | 11   I represent the Plaintiff Cadoura in this matter. |
| 12 | 12   Real quick, just a couple of ground rule |
| 13 | 13   questions.  Have you ever had your deposition |
| 14 | 14   taken before? |
| 15 | 15 A. Yes. |
| 16 | 16 Q. Yes?  Okay.  So just sort of as a reminder, |
| 17 | 17   especially with us being on Zoom, make sure that |
| 18 | 18   I've finished the question before answering.  I |
| 19 | 19   know sometimes you can kind of tell where I'm |
| 20 | 20   going with the question, but it makes it easier |
| 21 | 21   for the court reporter, if we just get that extra |
| 22 | 22   couple of seconds to make sure that we don't talk |
| 23 | 23   over each other, and I'll try to do the same with |
| 24 | 24   your answer.  I know it will still happen.  It |
| 25 | 25   always inevitably happens that one of us ends up |
| Page 2 | Page 4 |

| | |
|---|---|
| 1      I N D E X | 1   talking over each other at some point, but I'm |
| 2 WITNESS:               PAGE: | 2   going to do my best to make sure that I let you |
| 3 JERALD JAMES | 3   fully answer my questions and all I ask is that |
| 4 Examination by Mr. Shearouse      4 | 4   you allow me the same for my questions to be out. |
| 5 Examination by Mr. McFarlane      49 | 5      If at any point in time you need a |
| 6 Re-Examination by Mr. Shearouse      50 | 6   break, just let me know.  I'm happy to allow |
| 7 | 7   that.  All I ask is that if I've posed a question |
| 8 NO EXHIBITS MARKED | 8   or opposing counsel has posed the question, you |
| 9 | 9   answer the question and then we can go ahead and |
| 10 | 10   take that break. |
| 11 | 11      We'll go ahead and get started.  Can I |
| 12 | 12   have your full name for the record, please? |
| 13 | 13 A. Jerald James. |
| 14 | 14 Q. That's J-e-r-a-l-d? |
| 15 | 15 A. Correct. |
| 16 | 16 Q. And what is your date of birth? |
| 17 | 17 A. 5-6-70. |
| 18 | 18 Q. And what is your current address? |
| 19 | 19 A. 29122 Rachid, R-a-c-h-i-d, Lane, and that's |
| 20 | 20   Chesterfield, Michigan 48047. |
| 21 | 21 Q. And how long have you resided at that address? |
| 22 | 22 A. Since 2007. |
| 23 | 23 Q. Is there anyone else that lives at that address |
| 24 | 24   with you? |
| 25 | 25 A. Yes, my family. |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

Atkinson-Baker, A Veritext Company
(800) 557-7300                            www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 96 of
125

Terell James
January 6, 2023

1 Q. And who is that specifically?
2 A. That's my wife, Donnella James. And do I have to
3    reveal my child's name to you?
4 Q. Just the name. I'm not going to ask for ages or
5    anything like that.
6 A. Well, that's the question I had is why does my
7    15-year-old child have to be revealed in a
8    deposition?
9 Q. I'm just getting who all is present and could be
10    potentially there at the house that can
11    potentially hear these conversations or --
12 A. I'm not at home right now. I'm at work.
13 Q. Okay. So you're at your office right now?
14 A. That's correct.
15 Q. Is there anybody else in the office with you?
16 A. In my -- my particular office? No. There are
17    other employees here, but, no, not at my office.
18    The door is closed.
19 Q. Okay. And you're currently employed with the
20    City of Detroit?
21 A. No, I am not.
22 Q. What is your current employment?
23 A. I am an Executive Administrator for the Michigan
24    Association of Police.
25 Q. And when did you start that position?

Page 6

1    years and then I voluntarily stepped down back to
2    Captain from '14 until I retired in '16.
3 Q. Was there any particular motivation for that
4    voluntary stepdown?
5 A. I didn't like the current commissioner nor the
6    deputy commissioner. I felt they were woefully
7    inaccurate for their position.
8 Q. Do you know their names?
9 A. Yep. Sydney Zack was the Deputy Commissioner.
10    Jonathan Jackson was the Fire Commissioner.
11 Q. And how long had they been in those roles?
12 A. Mr. Jackson had recently got promoted with the
13    election of Mayor Duggan. I don't know his exact
14    appointment date, and Sydney Zack kind of rotated
15    between the Fire Department, Police Department,
16    back to the Fire Department, so I can't tell you
17    exactly how many connected or continuous years
18    she had with the Fire Department.
19 Q. Do you know if they were in those positions in
20    2012/2013?
21 A. Jonathan Jackson no. Sydney Zack may have been
22    in '13. I can't recall exactly when she got
23    promoted, but it was after I was already Chief.
24    She came from the Law Department.
25 Q. She came from the Law Department?

Page 8

1 A. 2015.
2 Q. And what are your current job responsibilities in
3    that role?
4 A. I am a labor relations advocate. Enforcement
5    of contracts, grievance filing, contract
6    negotiations. I represent close to 150 different
7    bargaining units.
8 Q. And prior to this position, what was your
9    employment?
10 A. I did work for the City of Detroit EMS Division
11    until September of 2016. 1991 through September
12    of 2016.
13 Q. And when you were hired in 1991, what was your
14    position?
15 A. I was an Emergency Medical Technician for the EMS
16    Division.
17 Q. And was that the same position that you held in
18    2016?
19 A. No.
20 Q. What position did you hold in 2016?
21 A. I was a Paramedic Shift Supervisor at the rank of
22    Captain.
23 Q. And when did you assume that role?
24 A. Initially in 2008. I held that position for two
25    years. I was then promoted to Chief for four

Page 7

1 A. Correct.
2 Q. So other than the promotion to Paramedic Shift
3    Supervisor at the rank of Captain and the
4    promotion to Chief, were there any other
5    promotions that you were given during your time
6    with the City of Detroit?
7 A. Yes. I went from EMT to Paramedic in 1998, I
8    went from Paramedic to Lieutenant in 2003, and I
9    went from Lieutenant to Captain in 2008 and
10    Captain and Chief in 2010.
11 Q. And then you said you voluntarily stepped back
12    down in 2014, correct?
13 A. That is correct.
14 Q. Thank you. So when you started out as an
15    Emergency Medical Tech for the EMS Division, what
16    were your responsibilities?
17 A. Responding to calls for service through 911 on
18    an ambulance and providing treatment/transport to
19    residents, patients, visitors of the City of
20    Detroit.
21 Q. And how does that differ from the paramedic
22    position?
23 A. The paramedic has a more advanced skill set.
24    They're able to push medication, add more
25    advanced airway procedures, use defibrillators,

Page 9

3 (Pages 6 - 9)

| | |
|---|---|
| 1   etc.. So it's more of a transitional upgrade | 1   or higher of attendance control -- their |
| 2   from an EMT to a paramedic, but the outcome is | 2   attendance control program and you could not have |
| 3   the same. You still treat/transport sick and | 3   any active discipline for you to be considered |
| 4   injured. | 4   for a promotion. |
| 5 Q. And is there a requirement for extra licensing to | 5 Q. And you said active discipline. How does one go |
| 6   be a paramedic? | 6   about resolving an active discipline? |
| 7 A. That is correct. You have to attend a paramedic | 7 A. Either through the grievance process through your |
| 8   class that's approved by the Michigan Department | 8   collective bargaining agreement or at the time |
| 9   of Health and Human Services. You get certified | 9   there was an internal appeal process, which was |
| 10   after that class and then you have to take a | 10   called a Trial Board, which was governed by the |
| 11   test -- a state exam, and then upon passing that | 11   Fire Department. |
| 12   test, you're licensed to perform as a paramedic. | 12 Q. So until you went through one of those processes, |
| 13 Q. So other than needing that license and | 13   was the discipline considered active? |
| 14   certificate, is there any other additional | 14 A. Only for two years. |
| 15   requirements to become a paramedic? | 15 Q. So I just want to make sure I'm understanding |
| 16 A. To become a paramedic for the City of Detroit, | 16   this. If after two years the Trial Board had |
| 17   yes, you have to have an ACLS Card. Advanced | 17   not been -- a person had not gone for a Trial |
| 18   Cardiac Life Support, and you have to be approved | 18   Board or aggrieved this discipline, it would be |
| 19   through the Detroit East Medical Control | 19   removed? |
| 20   Authority to function in their control zone as a | 20 A. It wouldn't be removed, but it could not be used |
| 21   paramedic. | 21   against you for the purposes of progressive |
| 22 Q. What was that organization you said that you | 22   discipline and/or restriction for a promotion. |
| 23   needed to be approved by? | 23 Q. Okay. And in your role as Shift Supervisor and |
| 24 A. The Detroit East Medical Control Authority. | 24   Chief, did you ever have to discipline a |
| 25 Q. So once you have that approval, your ACLS Card, | 25   subordinate? |
| Page 10 | Page 12 |

| | |
|---|---|
| 1   and this advanced license, you would then be | 1 A. As Chief, I disciplined. As Shift Supervisor, I |
| 2   available to become a paramedic. | 2   recommended discipline. |
| 3 A. To function as a paramedic with the City of | 3 Q. And what was the process for recommending |
| 4   Detroit, correct. | 4   discipline as a Shift Supervisor? |
| 5 Q. Okay. Are there any other requirements to become | 5 A. Well, you had to -- obviously within the |
| 6   a paramedic than those? | 6   construct of the contract, we had to do an |
| 7 A. Not for the City of Detroit, no. | 7   investigation, which was a result of interviews |
| 8 Q. Okay. If someone is looking to become promoted | 8   with the employee, the complainant, if it was a |
| 9   to paramedic, do you know what sorts of -- what | 9   complaint issue. If it was a lieutenant, they |
| 10   sort of process they would go about? | 10   would provide the investigation to me, I would |
| 11 A. When I was being promoted, yes. Currently -- | 11   review it, and then I would have to either agree |
| 12   I've been gone for six years. I don't know what | 12   or disagree with their recommendation and then |
| 13   they're doing currently. I mean if you want me | 13   sign off on that document and forward it to the |
| 14   to detail what I had to do, I can. | 14   chief for their final resolution. |
| 15 Q. Yes. Can you tell me what you went through when | 15 Q. In that investigation, did you typically conduct |
| 16   you originally were promoted? | 16   those investigations at the station house? |
| 17 A. We had to submit a letter to the chief of EMS | 17 A. Typically, yes, they were either at a firehouse |
| 18   requesting to be promoted to paramedic. They | 18   where the employee is normally assigned to their |
| 19   would then review that request. You had to do | 19   medic unit or they would be brought to the EMS |
| 20   what was essentially a skills evaluation. You | 20   headquarters per se in an investigative affair. |
| 21   had to go to the training section, perform a | 21 Q. Was there ever a situation where an investigation |
| 22   skills assessment on starting IVs, intubation, | 22   would be conducted out in the field? |
| 23   CPR. You had to do a written exam, which more or | 23 A. It happened rarely, if you met a crew at a |
| 24   less validated your knowledge of the local | 24   hospital, if there was a scenario dealing with |
| 25   medical protocols. You could not be on step two | 25   uniform issues, accidents. So, yeah, depending |
| Page 11 | Page 13 |

4 (Pages 10 - 13)

January 6, 2023

**Page 14**

1 on the circumstances, there were some field
2 investigations, but for the most part, they were
3 conducted in-house.
4 Q. So you mentioned that the few times that it would
5 happen in the field, those were uniform issues or
6 accidents, correct?
7 A. It could be. I mean it would be something minor
8 for you to question an employee at their truck,
9 but an accident scene, you would meet, if the
10 crew was okay. There would be -- sometimes you
11 met them on the scene, at the hospital. Maybe a
12 complaint on the scene. Violent person, etc.,
13 stolen equipment. So there are some times.
14 It just depends on the circumstance where the
15 investigation would be done in the field, but
16 primarily they were done inside of a firehouse or
17 at what was deemed to be the headquarters for
18 EMS.
19 Q. Okay. And what sort of uniform issues would lead
20 to an investigation?
21 A. Well, any violation of the Department's uniform
22 expectation would prompt or could prompt an
23 investigation, i.e., not shaving, not wearing a
24 uniform properly, not wearing the required
25 components of the uniform. So any violation of a

**Page 15**

1 set uniform standard could promote or prompt an
2 investigation.
3 Q. And, to your knowledge, are there circumstances
4 that would allow an individual not to adhere to
5 the uniform policy.
6 A. Only if that individual's safety or health was at
7 risk.
8 Q. So if a paramedic or EMT had gotten blood on
9 their uniform at a scene, would that be cause for
10 them not to have that part of the uniform on?
11 A. Yes. Bloodborne packaging, hazardous material.
12 That would be -- that would be something that
13 would promote them to not properly wear a
14 particular uniform. Correct.
15 Q. And then as chief, you said you did discipline in
16 your time; is that correct?
17 A. Correct. As the Chief, I had the final say from
18 the division, if discipline was going to be
19 carried out and barring significant discipline,
20 i.e., termination or suspensions of 30 days or
21 longer, I had the authority to approve those
22 without the fire commissioner's signoff. Any
23 discipline above 30 days or termination, I could
24 not do. It had to come from the Fire
25 Commissioner's Office. I could recommend it to

**Page 16**

1 the fire commissioner, but they ultimately had to
2 approve any terminations or suspensions over 30
3 days.
4 Q. And with these open discipline actions, it would
5 limit somebody from seeking a promotion, correct?
6 A. It could, only if it was a suspension. If it was
7 a written reprimand, from that perspective, it
8 could restrict the promotion, but, yeah, it would
9 have to be a suspension or higher.
10 Q. Okay. And was there any particular requirement
11 on how long the suspension had to be or just any
12 suspension was a bar?
13 A. Yeah, any active suspension. Anything less than
14 24 months.
15 Q. If an employee wanted to appeal a suspension or
16 appeal a -- strike that.
17 If an employee wanted to appeal a
18 discipline, how would they go about doing that?
19 A. There's two routes. One would be they could
20 either file a grievance and have a union appeal
21 it up to and including arbitration or there was a
22 form -- a Trial Board request that the employee
23 or the union completed. They would then submit
24 that Trial Board request to the Office of the
25 Fire Commissioner and the Fire Commissioner's

**Page 17**

1 Office would then schedule the Trial Board based
2 on that appeal request.
3 Q. And about how soon after was the Trial Board
4 hearing supposed to occur?
5 A. There was no set time. It was all based on the
6 Commissioner's Office and the rank of the
7 individuals that were available. You had to be
8 at the level of battalion chief or higher for you
9 to sit on a Trial Board. So the pool of
10 eligible candidates was restricted, but there was
11 no set time. It could be anywhere from 30 days.
12 Some of them never got scheduled for years.
13 Q. So there was an issue with scheduling these Trial
14 Boards for disciplines?
15 A. Yes. It was horrible. Correct.
16 Q. Was it due to a lack of staffing or was it due to
17 the amount of disciplines that were being issued?
18 A. It was a combination of both, because there was
19 a limited amount of people who are eligible to
20 sit on the panel and they were doing them not
21 only for the EMS Division. It was for the Fire
22 Department as a whole. So that select group of
23 individuals had to review, appeal, judge on any
24 discipline within all eight or nine divisions of
25 the Fire Department.

5 (Pages 14 - 17)

Atkinson-Baker, A Veritext Company
13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 99 of
(800) 551-7300                                                              www.veritext.com
125

January 6, 2023

1  Q.  And once you became a Shift Supervisor in 2008,
2      did you notice more disciplines being issued than
3      when you were a Paramedic?
4  A.  No, I wouldn't have any insight as to how many
5      disciplines any other shift had submitted.  The
6      only person that had that access would be the
7      commissioner -- I mean the fire -- I mean the EMS
8      chief.
9  Q.  And then when you were promoted to Chief in 2010,
10     did you happen to notice any large amount of
11     disciplines?
12 A.  No, not anymore than I did when I was a union
13     rep.  As a union rep -- actually, from the time I
14     got promoted forward, there were considerably
15     less disciplines that I was aware of as a union
16     rep versus when I got promoted.
17 Q.  So you knew about less disciplines when you were
18     the union rep or when you were --
19 A.  More disciplines.  More disciplines when I was a
20     union rep.  There were multiple terminations,
21     multiple leaves without pay.  We were doing
22     grievances and Trial Boards almost weekly.
23 Q.  And what dates were you a union rep?
24 A.  I was a Union Steward from '95 until '98.  I
25     become a Chief Steward in '98 and the Union

Page 18

1      to discipline action, such as oral -- an oral
2      consultation, a written reprimand, a charge, and
3      a discharge; is that correct?
4  A.  Similar to that, correct.  There is an oral
5      reprimand, a written reprimand, a suspension, and
6      then demotion, if you are in a higher level, and
7      then termination.  Correct.
8  Q.  So the demotion would only be available to higher
9      level individuals?
10 A.  Well, paramedics.  You can be demoted from
11     paramedic back down to EMT.
12 Q.  And when an oral reprimand is given, is there a
13     written record of that oral reprimand anywhere?
14 A.  Yes.
15 Q.  Who makes that record?
16 A.  It's normally within the office of the EMS -- the
17     EMS superintendent.  Every employee has a
18     disciplinary -- or used to anyway.  Has a
19     disciplinary track sheet and on that form, you
20     would document if it was an oral, written,
21     suspension.  If it was a six-month suspension,
22     one year, two year.  So that became a permanent
23     part of the employee's disciplinary file.  So as
24     the disciplines fell off, you would highlight
25     that the discipline was no longer applicable, but

Page 20

1      President in 2000.
2  Q.  And how long did you serve as Union President?
3  A.  Three years until I got promoted to Lieutenant.
4  Q.  Did you ever work with Mr. Cadoura?
5  A.  Yes.
6  Q.  How often would you say you worked with
7      Mr. Cadoura?
8  A.  It was infrequently.  Maybe on a detail or over
9      time.  I could probably count on my hands how
10     many times I worked with him.
11 Q.  What was your general impression of Mr. Cadoura?
12 A.  At the time I was working with him on the truck?
13     He was a relatively nice, easygoing guy.
14     Appeared to like his job and, you know, upbeat.
15 Q.  At the times that you and him worked together, do
16     you recall him mentioning any issues with
17     policies not being followed?
18 A.  No.
19 Q.  Did you ever bring any complaints about policies
20     not being followed?
21 A.  Always.  I was a Union Steward.  I was filing
22     grievances and complaints and letters to the
23     Mayor's Office.  So, yeah, he may have overheard
24     me discussing it, but to him directly, no.
25 Q.  And it's my understanding that there are levels

Page 19

1      it still remained on the form.
2  Q.  While you were working at Detroit Fire, did you
3      ever hear of anyone making any derogatory
4      comments to Mr. Cadoura?
5  A.  To him directly?  Not that I could recall.
6  Q.  Did you ever hear anybody make comments about him
7      just generally, not to him?
8  A.  Yes.
9  Q.  What kind of comments did you overhear?
10 A.  That he was an asshole, he was a jerk, wouldn't
11     do his job.  That just too -- that's just a
12     minor amount.  I mean from his peers -- they
13     despised him.  The ones that were complaining to
14     me.
15 Q.  And who were the ones that complained to you?
16 A.  I can't recall.  There were -- there were
17     multiple technicians/supervisors that had
18     significant issues over a period of time with
19     Mr. Cadoura.
20 Q.  Do you recall what any of those issues were?
21 A.  Well, sure.  I mean he had become argumentative,
22     abrasive.  He had picked up a second job with
23     another ambulance company.  My employees were
24     calling me telling me he was jumping and run, he
25     was cursing at them, they didn't want to work

Page 21

6 (Pages 18 - 21)

**Page 22**

1 with him, his behavior on the scene, his behavior
2 at the hospital, his comments towards nurses. I
3 mean the laundry list just went on and on.
4 Q. Do you know if Mr. Cadoura ever received a
5 citizen complaint?
6 A. Yes.
7 Q. Do you recall what that was about?
8 A. No, I don't. As far as the complaints went, once
9 they came into the office, they were sent out to
10 the field for investigation and the supervisors
11 would then investigate them from there, and what
12 the outcome of these were, I can't -- I don't
13 recall offhand, no.
14 Q. So all these complaints were made to you by your
15 subordinates?
16 A. Correct.
17 Q. Did any of them ever file any formal complaints
18 against Mr. Cadoura?
19 A. No.
20 Q. Was there any investigation done into any of
21 these complaints?
22 A. No, because they would not file a formal
23 complaint. I advised them when they called, "I
24 hear your complaint. If you have an issue,
25 you've got two options. Contact your union and

**Page 23**

1 have your union have a conversation with them or
2 make a formal complaint to your shift supervisor
3 and we will address the issue," but, yes, so
4 calling me and trying to leverage an
5 investigation or going directly to the chief to
6 complain, I would hear it, but, no, I was not
7 going to take an action on something that an
8 employee was not willing to follow the proper
9 process.
10 Q. And while you were working for the City of
11 Detroit, was there a settlement between the union
12 and the Fire Department?
13 A. There were probably multiple settlements between
14 the union and the Fire Department.
15 Q. Was there one roughly in 2012/2013 involving a
16 large amount of discipline that had been issued?
17 A. Yeah. Yeah. The Trial Boards that Sydney Zack
18 and Smith? Yeah.
19 Q. Did you have any involvement with that?
20 A. Yes, to a degree.
21 Q. What was your involvement?
22 A. I disagreed with it. She came to me and asked me
23 my opinion. I told her, "Of course, anything
24 over two years should automatically be expunged."
25 Some of those were very egregious actions that

**Page 24**

1 involved improper patient care, assaults on
2 co-workers, etc.. She expunged them all. So,
3 yes, I did have some involvement, but she
4 overrode my recommendation, and I also complained
5 to HR about what she was going to do, but she
6 ultimately did what she did.
7 Q. So did you not want all of those disciplines
8 expunged after two years?
9 A. The ones after two years, yes.
10 Q. Did you review any documentation before today's
11 deposition?
12 A. Yes. Yes.
13 Q. What documentation did you review?
14 A. There was some reports that I had that date back
15 to looks like 2008 from Chief Kestalu (ph). So
16 there appears to be some disciplinary documents
17 in here. His resignation notice and paperwork
18 from HR. There's about it looks like 38 pages.
19 Q. And that's Mr. Cadoura's resignation notice?
20 A. I think that is in this document, if I'm not
21 mistaken. There's letters in here, there's
22 suspension notices, Charge Forms. There's a
23 multitude of documents in here.
24 Q. So is it your understanding that Mr. Cadoura
25 resigned from the City of Detroit --

**Page 25**

1 A. Yes.
2 Q. -- EMS?
3 A. That is correct. That's my understanding.
4 Q. Do you know if he was placed on a do not rehire
5 list?
6 A. Yes.
7 Q. Do you know why?
8 A. Because he resigned with discipline pending.
9 Q. Is that a policy of Detroit EMS?
10 A. That is a policy of the City of Detroit. The
11 information I received when I got promoted to
12 Chief was there were only two reasons that I
13 could put a person down as a do not rehire, which
14 were a requirement of the City of Detroit. One
15 was if they did not provide a two-week notice and
16 the other was if they resigned in lieu of a
17 discipline. Those two individuals would have to
18 be listed as a do not rehire.
19 Q. So you said the second one was in lieu of
20 discipline?
21 A. Correct. Yes. If they were resigning with
22 discipline pending or under investigation for a
23 disciplinary action and they resigned, they were
24 to be listed as a do not rehire.
25 Q. Just for my clarification, is it only if they

7 (Pages 22 - 25)

Trial Page 9
January 6, 2023

| | |
|---|---|
| 1    were resigning to avoid discipline or if they<br>2    just resigned and there just happened to be<br>3    discipline pending?  Either one would get them --<br>4 A. Correct.  If there was a disciplinary<br>5    connotation.  If the employee resigned under<br>6    investigation or if the investigation had been<br>7    completed and the next step was to then inform<br>8    them of that discipline and they resigned, then<br>9    they would be listed as a do not rehire.<br>10 Q. And the discipline -- the discipline only<br>11    finishes through the Trial Board, correct?<br>12 A. When you say finishes through the Trial Board?<br>13 Q. We're talking about open disciplinary action and<br>14    if somebody were to be waiting on Trial Board<br>15    action, that would still leave it as an open<br>16    discipline action, correct?<br>17 A. It would.  Yes, it would leave it as an open<br>18    disciplinary action.  Correct.<br>19 Q. And you said that sometimes those Trial Boards<br>20    could take years?<br>21 A. Yes.  If you're asking would someone who appealed<br>22    a discipline be listed as a do not rehire, the<br>23    answer to that question is no.  They've already<br>24    been disciplined.  They're appealing that<br>25    discipline.  The outcome of that discipline would<br><br>Page 26 | 1 Q. So if someone was placed on the do not rehire<br>2    list, would they make it to that eligibility<br>3    list?<br>4 A. They shouldn't.<br>5 Q. And you left the City of Detroit in 2016,<br>6    correct?<br>7 A. That is correct.<br>8 Q. So did you ever hear anything about Mr. Cadoura<br>9    attempting to reapply to the City of Detroit?<br>10 A. Yes, I did.<br>11 Q. Who did you hear that from?<br>12 A. Robert Olkowski.<br>13 Q. And who is Robert Olkowski?<br>14 A. He is an employee of the EMS Division for the<br>15    City of Detroit.<br>16 Q. Do you know what his rank is?<br>17 A. I think he's the assistant chief now, if I'm not<br>18    mistaken.<br>19 Q. At the time he informed you about Mr. Cadoura<br>20    reapplying, was that his position?<br>21 A. No.<br>22 Q. What was his position at that time?<br>23 A. I'm not sure.  When I left, he was a lieutenant.<br>24    I don't recall when -- he was in administration<br>25    at some -- he was somewhere in administration.<br><br>Page 28 |
| 1    be leveraged by either a Trial Board or an<br>2    arbitrator or a settlement between the union and<br>3    the employer.  It was only germane because those<br>4    individuals who quit in lieu of being disciplined<br>5    or were aware they were being investigated for a<br>6    potential discipline and then quit to usurp that<br>7    process.<br>8 Q. So if somebody was waiting on Trial Boards for<br>9    their disciplinary action, they would not be<br>10    automatically placed on a do not rehire list?<br>11 A. Yeah.  My office -- at least when I was the<br>12    Chief, I could not place them as a do not rehire<br>13    because they were appealing a disciplinary<br>14    action.<br>15 Q. Did you ever do any hiring or were you involved<br>16    in the hiring process when you were at the City<br>17    of Detroit?<br>18 A. No.  That was strictly HR.<br>19 Q. So you don't have any knowledge on that process<br>20    at all?<br>21 A. No.  We just get -- when I was a Chief, you'd get<br>22    a list of names that HR said was eligible for the<br>23    next Academy and what date they were going to<br>24    start and we then scheduled the Academy and those<br>25    individuals reported.<br><br>Page 27 | 1    He was lieutenant, captain.  Somewhere in the<br>2    offices of administration.<br>3 Q. And what did he tell you in that conversation?<br>4 A. He just called me and said, "Did you put Cadoura<br>5    down as a do not rehire?"  I said, "Yeah, I did."<br>6    He said, "Okay" and that was it.<br>7 Q. And the reasoning for that do not rehire was<br>8    pending discipline?<br>9 A. That is correct.<br>10 Q. Were you ever aware of Mr. Cadoura being involved<br>11    in a news story regarding response times for the<br>12    City of Detroit EMS?<br>13 A. Yes.<br>14 Q. How did you find out about that?<br>15 A. Probably on the news.<br>16 Q. Were there any discussions about his<br>17    participation in that story?<br>18 A. With me?  No.<br>19 Q. Did you have any conversations with anybody else<br>20    about that?<br>21 A. There were multiple conversations.  Well, let me<br>22    clarify.  Are you talking about when I was<br>23    employed or not employed after I retired?<br>24 Q. Either.  If there were conversations.<br>25 A. Well, when I was employed, sure, there were<br><br>Page 29 |

8 (Pages 26 - 29)

13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 102 of
125

| | |
|---|---|
| 1 multiple conversations with the Law Department, | 1 A. Human Resources. My understanding is that |
| 2 main controls, State of Michigan, the | 2 information was revealed to the employee from |
| 3 Commissioner's Office, the City Council. Every | 3 Human Resources and I never notified anybody that |
| 4 time a news story hit about response times, I got | 4 they were on the do not rehire list. |
| 5 a phone call and there were meetings, etc.. When | 5 Q. And from Human Resources, would they notify them |
| 6 I retired, no, I didn't talk to anybody about | 6 as soon as that decision had been made or -- |
| 7 Detroit EMS any longer. | 7 A. No. Go ahead. I'm sorry. |
| 8 Q. So it was just whenever a general news story was | 8 Q. Let me have you answer that part first. As soon |
| 9 published about response times there was a lot of | 9 as that decision had been made, was the employee |
| 10 administrative interest on it? | 10 or former employee notified? |
| 11 A. Yes. I had a lot of explaining to do and charts | 11 A. No, and the reason why I say that is because it |
| 12 and time reports, and etc.. So, yeah, there was | 12 was an investigation. I had to -- once I |
| 13 constant conversations with multiple agencies and | 13 submitted the form to HR and said, "Do not |
| 14 city officials, etc.. | 14 rehire," HR would then contact me. There would |
| 15 Q. Do you know what was causing those delays in | 15 be I guess an interrogation as to why I |
| 16 response times? | 16 classified the employee as a do not rehire. Even |
| 17 A. Well, there was a multitude of things. | 17 though I documented it that way, my understanding |
| 18 Everything from mismanagement of 911 calls and | 18 is HR has the ultimate authority to approve that |
| 19 triage, not enough vehicles, not enough | 19 departmental recommendation. |
| 20 employees. Just the construct of an urban | 20 Now, if they approved it or not, I was |
| 21 response system that just did not have enough | 21 never notified. I just submitted it. I talked |
| 22 resources to support the, you know, daily deluge | 22 to the people from HR and they handled it from |
| 23 of 911 calls. | 23 there. |
| 24 Q. So when someone resigns from the Department, is | 24 Q. So other than you and HR, was there anybody else |
| 25 there an exit interview conducted? | 25 involved in the decision to ultimately put or not |
| Page 30 | Page 32 |

| | |
|---|---|
| 1 A. It is a voluntary exit interview. Correct. | 1 put somebody on the do not rehire list? |
| 2 Q. Who schedules that exit interview? | 2 A. To my knowledge, no. |
| 3 A. Well, my office would schedule it, if the | 3 Q. In your opinion, was Mr. Cadoura a good EMT? |
| 4 employee was willing to do it. We were -- as a | 4 A. No. |
| 5 Lieutenant and Captain, when we got a | 5 Q. And why do you say that? |
| 6 resignation, we would notify an employee of an | 6 A. Well, let me classify that. Good EMT? I can't |
| 7 option to do an exit interview. When I was a | 7 say he did not provide good patient care. I |
| 8 Chief, whenever those letters came in, I would | 8 never got a complaint about his patient care, so |
| 9 ask the lieutenants, captains, make sure they | 9 I can't say as far as the treatment and transport |
| 10 know they have a right to do an exit interview, | 10 of citizens that he is not a good EMT. If you |
| 11 and if the employee wished to do so, then my door | 11 want to quantify that as a good employee, I would |
| 12 was open and we could do an exit interview. | 12 say no. |
| 13 Q. Do you know if Mr. Cadoura did an exit interview? | 13 Q. And why would you say he's not a good employee? |
| 14 A. No, he did not. | 14 A. Well, just even based off of the reports that I |
| 15 Q. Do you know if he was offered an exit interview? | 15 reviewed and the ones that aren't here, he was |
| 16 A. I don't know. The direction from my office was | 16 very abrasive, profane, argumentative, insolent, |
| 17 always to tell them, but, no, we never did a | 17 insubordinate. There wasn't a rule he was not |
| 18 follow-up. There was no form to sign that they | 18 willing to break. It was his job to do what he |
| 19 were notified of an exit interview opportunity. | 19 wanted to do with and he showed us that is what |
| 20 No. | 20 he was going to do. |
| 21 Q. And at that exit interview, would you have | 21 Q. Were you ever aware of Mr. Cadoura making |
| 22 notified Mr. Cadoura that he was on the do not | 22 complaints on policies not being followed? |
| 23 rehire list? | 23 A. Probably so. I mean I would assume I was aware |
| 24 A. No. | 24 of if there was a grievance filed or a letter |
| 25 Q. How would he have gone about finding that out? | 25 submitted, but I say that with an asterisk, |
| Page 31 | Page 33 |

9 (Pages 30 - 33)

Page 34

1 because a lot of them went directly to Sydney
2 Zack. So I'm not sure what was reported to her.
3 Q. Did any of your subordinates ever mention him
4 filing any complaints about policies not being
5 followed?
6 A. To my knowledge, not that I can recall.
7 Q. And the reports that are in front of you -- who
8 is authoring those reports?
9 A. I guess it would depend on which one you
10 specifically are stating. There is like 38 pages
11 here. Can you kind of identify which one
12 specifically?
13 Q. Do you have a date on whatever one is first on
14 your page, so I can identify it?
15 A. The very first one is June 8, 2008 and it's
16 addressed to Chief James Kestalu.
17     MR. MCFARLANE: Do you have the Bates
18 Stamped exhibits?
19     MR. SHEAROUSE: Yeah, I do somewhere.
20 Yeah.
21     MR. MCFARLANE: I can tell you the
22 Bates Stamp of what he's looking at.
23     MR. SHEAROUSE: Okay. Yeah. What's the
24 Bates Stamp?
25     MR. MCFARLANE: One Twenty-Seven.

Page 36

1 document to assert their agreement with it.
2 Q. And if there was a factual disparity between the
3 witness statements and the person reporting the
4 grievance, was there a process on how to resolve
5 that?
6 A. If you mean as far as any investigation or --
7 Q. Yes.
8 A. -- post-discipline?
9 Q. Let's start with the investigation first.
10 A. If there is a factual -- more or less a factual
11 misalignment of the truth, then the supervisor
12 has the obligation to capture their review and
13 provide their recommendation. Either they
14 believe the complaint is without merit, that the
15 complainant and/or witness statements are not
16 accurate, or that the employee's account of the
17 incident is more plausible, more believable based
18 on data, be it from a CAD system or from other
19 witnesses, and then they will from that point
20 make a recommendation to the chief to either drop
21 the complaint or not proceed or that discipline
22 is warranted.
23 Q. And the next document on your list is -- is that
24 a May 1 letter to Chief James Kestalu?
25 A. That's correct.

Page 35

1 BY MR. SHEAROUSE:
2 Q. I see that now. To James Kestalu. And that was
3 from Captain Joe Wilson?
4 A. That is correct.
5 Q. And this was an incident involving Lieutenant
6 John Sablowski?
7 A. That's what it appears. Correct.
8 Q. Do you recall any specifics about that situation?
9 A. No. I was a Shift Captain. That was to Chief
10 Kestalu. It appeared that Gary Kelly was still
11 the chief. So I would have had no knowledge of
12 this incident.
13 Q. And when an investigation is done to a
14 discipline, are witness statements taken?
15 A. Yes. If there were witnesses, there should be
16 witness statements included. Correct.
17 Q. And those are written down?
18 A. Correct.
19 Q. And the witness signs them?
20 A. Depending on the complainant, i.e., if we get a
21 complaint over the phone, sometimes the
22 supervisors would do that interrogation over the
23 phone and document the statements from the
24 witness or the complainant, but, no, we would not
25 go out to their home and then have them sign the

Page 37

1 Q. And the subject line says, "Incident Report EMT?"
2 A. No. It says, "Incident With Technician Cadoura."
3 May 1, 2008?
4 Q. Yes. Okay. So at the bottom it has John
5 Sablowski's signature on it?
6 A. Correct.
7 Q. Were you ever aware that Mr. Cadoura had made
8 several complaints against Mr. Sablowski?
9 A. I was aware of one complaint he made against
10 Sablowski that I can recall.
11 Q. What complaint was that?
12 A. That -- and this is just me recalling it best I
13 can. Is that John was picking on him or
14 harassing him or something similar to that.
15 Q. Do you know if anything became of that complaint?
16 A. Not that I was aware of, no.
17 Q. Were you involved in that investigation at all?
18 A. No.
19 Q. At any point in time during your stint with the
20 City of Detroit, did you hear about Mr. Cadoura
21 ever filing a lawsuit?
22 A. Yes.
23 Q. How did you hear about that?
24 A. On the news.
25 Q. Did anyone at the stations make mention of it?

10 (Pages 34 - 37)

13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 104 of
125

1  A.  Not before it hit the news.
2  Q.  After the news, was there conversations about it?
3  A.  Well, there was a buzz everywhere about it after
4      it hit the news.
5  Q.  What was the general sentiment about it?
6  A.  It was a reversed discrimination lawsuit with him
7      and three or four other individuals.
8  Q.  Now, was that the only lawsuit you heard about?
9  A.  That I was aware of that I can recall, yes.
10 Q.  During the process of discipline, is the employee
11     being potentially subject to discipline -- are
12     they considered innocent until a final
13     determination is made?
14 A.  No.  When they come to my office -- well, as the
15     Chief.  Let me state that perspective.  As the
16     Chief, if that's what you're asking me, when I
17     schedule them for discipline, all the documents
18     have been reviewed, all the data has been
19     reviewed, and based on a preponderance of the
20     evidence before me, inclusive of the written
21     responses or investigation and interrogation of
22     the employee, they are deemed to be guilty and
23     their meeting with me is to determine or provide
24     them with what their discipline is going to be.
25 Q.  So they are not presumed -- they are presumed

Page 38

1      guilty even before the whole process has been
2      complete?
3  A.  No.  When they get to the chief's office, the
4      process is done.  If you're asking me as a
5      frontline supervisor or lieutenant or captain,
6      that's a different perspective.  So I mean I
7      guess if you could clarify for me what
8      perspective you're looking from, then those are
9      two different dynamics.
10 Q.  All right.  So at the point in which somebody
11     would seek a Trial Board, are they considered not
12     guilty or guilty?
13 A.  No, they're considered guilty.  They are
14     appealing that guilt.
15 Q.  And if someone receives a written warning or a
16     written reprimand, are they considered guilty or
17     not guilty?
18 A.  That is correct.  They're still guilty.
19 Q.  So as soon as a written reprimand is issued, that
20     person is considered guilty?
21 A.  Yes.  They could not -- they could not receive a
22     written reprimand unless there had been a
23     determination made by the Office of the
24     Superintendent of EMS that they had violated a
25     policy based on an investigation from a

Page 39

1      supervisor.
2  Q.  And just so I'm clear, as soon as any written
3      reprimand, suspension, anything like that -- as
4      soon as any sort of disciplinary action was
5      taken, it was presumed guilty for the employee
6      being disciplined?
7  A.  Correct.  You would not be disciplined, if you
8      were found to not be in violation.  So the
9      discipline more or less supports that the
10     Department's investigation yielded the fact that
11     you had violated a policy, procedure, expectation
12     and the review of the documents that were turned
13     in surrounding that incident gave us reason to
14     believe that you were, in fact, guilty and this
15     was a result of that guilt.
16         If you were not guilty, those actions
17     are dismissed.  The employees are normally
18     notified the investigation is over.  We found
19     that you didn't do anything wrong and that's the
20     end of it.
21 Q.  While you were employed with the City of Detroit,
22     do you recall anybody making any derogatory
23     statements on the basis of somebody's race?
24 A.  Derogatory?  I mean I guess I will ask you to
25     quantify that.  I mean are you talking about

Page 40

1      police?  Citizens?  Visitors?  Are you talking
2      about employees?  Talking about administration?
3  Q.  Well, we'll just stay with employees within the
4      City of Detroit Fire Department and its
5      divisions.
6  A.  Yes.  There's been multiple employees that have
7      been disciplined and/or terminated for making
8      inappropriate derogatory comments about race.
9  Q.  Do you know if any of those comments were
10     directed towards Mr. Cadoura?
11 A.  Not that I'm aware of, no.
12 Q.  Do you know if he complained about any of these
13     comments being made to him?
14 A.  Not that I was made aware of, no.
15 Q.  So with the placing of Mr. Cadoura on a do not
16     rehire list, was there any recourse for him to be
17     taken off of that list?
18 A.  I would have to defer you to HR.  They are the
19     governing agency that deals with the hiring
20     process of it and what that impact is.  I don't
21     know if there is an appeal route.  Like I say,
22     once I talked to HR, gave them my explanation for
23     it, I was never even notified if they agreed or
24     disagreed with my recommendation not to rehire.
25     It was an HR issue from that point forward.

Page 41

11 (Pages 38 - 41)

Todd Adams
January 6, 2023

1  Q.  So you've never heard of anybody getting taken
2      off the do not rehire list?
3  A.  I've heard of people being rehired that were
4      listed as do not rehire.  I don't know if they
5      were taken off the list or not.  As we note in
6      his incident, he wasn't and he was rehired.  So I
7      don't -- I have no idea what that process would
8      be.
9  Q.  Do you know the names of those people that were
10     rehired?
11 A.  No, I don't because once I left, I was gone.
12     That was it.  I don't know who prior to me listed
13     people as do not rehire or after me.  So I
14     wouldn't be able to accurately answer that
15     question.  I do -- let me change that.  I do know
16     of one I put down on a do not rehire, Brian
17     Moore, that was brought back.  That's the only
18     one that I can recall.
19 Q.  And you listed him as a do not rehire?
20 A.  Yes, I did.
21 Q.  Do you remember why you listed him as a do not
22     rehire?
23 A.  He killed a patient.
24 Q.  Do you know when he was rehired?
25 A.  No, I don't, but it was after -- it was -- it was

Page 42

1      either after I left -- it might have been after I
2      left.  They rehired a whole bunch of people that
3      had resigned and been terminated and etc.  So I
4      can't recall exactly when he went back.
5  Q.  Do you know what race Mr. Moore is?
6  A.  I would assume Caucasian.
7          MR. SHEAROUSE:  Why don't we go ahead
8      and take a ten-minute break.  See if I've got
9      anymore questions and then if not, then I will
10     pass him over to you, Jason.
11         MR. MCFARLANE:  All right.  Sounds good.
12         (Break taken)
13 BY MR. SHEAROUSE:
14 Q.  I've just got a couple more questions for you,
15     Mr. James.  I appreciate your time here today.
16     During your employment with the City of Detroit,
17     was your wife also working with the City of
18     Detroit?
19 A.  Yes.
20 Q.  What was her position?
21 A.  At what time?  She was an EMT, paramedic,
22     lieutenant, and captain.
23 Q.  I guess we'll start with EMT.  When did she start
24     as an EMT?
25 A.  In September of '91.

Page 43

1  Q.  And she was promoted to paramedic?
2  A.  Yes.
3  Q.  Do you know when that was?
4  A.  No.  She was promoted to paramedic before me, so
5      I would assume maybe '96ish.  Ninety-five maybe.
6  Q.  And then you said she was promoted after that to
7      lieutenant?
8  A.  Correct.
9  Q.  Do you know that date?
10 A.  No, I don't.  She was promoted before she -- I
11     was still a Union President when she became
12     lieutenant.  She was acting first and then she
13     got officially promoted, so I don't have that
14     date.
15 Q.  And then after that, she was promoted to captain?
16 A.  That is correct.
17 Q.  Do you know that date?
18 A.  No.  It was after my promotion.  I got promoted
19     to Captain in 2008.  So she must have been
20     promoted in '09 or '10 maybe.  I'm not sure.
21 Q.  Did your wife ever discipline Mr. Cadoura?
22 A.  Probably so.  I do believe so.  Correct.
23 Q.  Do you have any recollection of specific
24     disciplines that she might have issued?
25 A.  Not other than what's in this packet that I

Page 44

1      reviewed.
2  Q.  All right.  Is there something from your wife's
3      in that packet?
4  A.  Yes.
5  Q.  What is that situation?
6  A.  Hold on.  Let me pull it up.  No, that's not
7      hers.  I thought there was one in here from her.
8      Maybe it's not.  Wait, is this -- yep.  The very
9      last one I have in my pocket is from her.
10 Q.  Is there a little number on the bottom right-hand
11     corner of that piece of paper?
12 A.  Yeah.  It looks like 249.  It's dated 2-13-2013.
13     It's a Charge Form to the Commissioner's Office.
14 Q.  And did she ever discuss this situation with you?
15 A.  Discuss?  Probably not.  Just submitted the
16     packet and the document.  It looks as if it was
17     just a late call off.
18 Q.  And what is a late call off?
19 A.  Somebody calling off after the start of shift.
20 Q.  And what's the typical discipline for that?
21 A.  It's typically a -- you know, let me go back.  It
22     really does depend on what discipline they have.
23     If this occurred in the past.  So if it's a
24     progressive issue germane to the attendance
25     control policy or if it's connected with other

Page 45

12 (Pages 42 - 45)

13-53846-tjt    Doc 13713-4    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 106 of
125

Page 46

1    disciplines.  So I don't know necessarily if I
2    can say it's a typical scenario.  It really does
3    depend on the case.
4  Q.  And we talked about earlier -- I know I'm kind of
5    bouncing around a little bit.  We talked about
6    earlier the news stories were kind of a regular
7    occurrence about response times; is that correct?
8  A.  That's correct.
9  Q.  Help me to understand, are response times kept
10   per station or are they kept for just the
11   Department as a whole?
12 A.  They're kept for the Department, the station, the
13   shift, and the unit.
14 Q.  So if a particular -- like a particular shift is
15   having continuously low response times, that
16   reflects on both the station and those
17   individuals working that shift?
18 A.  Well, when you say shift -- because there is four
19   shifts.  So we'll look at nights too.  Was it
20   busier Friday night, Saturday night?  Typically
21   their response times are going to lag, but when
22   you compare them to east side unit versus west
23   side versus central.  Then you have to get into
24   the individual dynamics of the actual responding
25   unit.  Travel distance, weather.  There is a lot

Page 47

1    that goes into it when you're doing a response
2    time kind of matrix or review.
3  Q.  Is there any pressure on the station chiefs to --
4    or shift captains to get response times down?
5  A.  Not to get response times down, but to get
6    in-service times down.  Response times are
7    distance specific, but, yes, there was some
8    pressure to ensure that units were available to
9    respond to calls as appropriate.
10 Q.  And you said in-service times.  Can you explain
11   what that is?
12 A.  Well, typically, when you're on the scene of a
13   non-transport, there's a time parameter that you
14   look at for you to have the unit back in service.
15   If you're at the hospital, if it's a priority
16   one, priority two, priority three.  So each one
17   of those caveats kind of lay out the groundwork
18   for what -- there was a benchmark of what the
19   expectation was to have a unit placed back in
20   service.
21      If they were not in service, then there
22   was a reason -- an expectation that you would
23   request a delay.  "I'm delayed for cleaning.  I'm
24   delay for equipment.  Gas."  Whatever the issue
25   is.  As long as the unit requested a delay, if

Page 48

1    the supervisors then granted or awarded that
2    delay, then they were -- it was good.
3  Q.  After Mr. Cadoura left in -- or resigned, were
4    you ever aware of him going to any other fire
5    department?
6  A.  When I was still there?  No.
7  Q.  No?
8  A.  Was I aware of it?  Yes.
9  Q.  Where are you aware that he's worked?
10 A.  Flat Rock, Riverview, Melvindale, the proving
11   grounds for some plant that he worked at for a
12   minute, but, yeah, I'm aware that he's worked in
13   multiple different departments.
14 Q.  Were you aware of him working in Woodhaven?
15 A.  Yes.
16 Q.  How did you find out about all these other
17   employments?
18 A.  I represent three -- not represent, but three of
19   those departments are part of the organization
20   that I am the Assistant Executive Director of and
21   I became aware of it because he's been terminated
22   from those three and as terminations get grieved,
23   there is a process within our office to appeal
24   those grievances and how those issues are
25   navigated.

Page 49

1      MR. SHEAROUSE:  I don't have anything
2    further.
3      MR. MCFARLANE:  I have a couple of quick
4    questions.
5         EXAMINATION
6  BY MR. MCFARLANE:
7  Q.  You mentioned that you had recommended Brian
8    Moore for a do not rehire; is that correct?
9  A.  That is correct.
10 Q.  And do you know if HR approved that do not
11   rehire?
12 A.  I'm not sure.  As I indicated, once I submitted
13   it, I will get a phone call.  Somebody from HR
14   would request, you know, validation or
15   clarification.  I explain to them what the reason
16   was for it and they would handle it.  So I don't
17   necessarily know if there was approval or
18   disapproval.  I never got any further contact
19   from HR on any of the do not rehires that I
20   recommended.
21 Q.  And are you aware of any of the circumstances of
22   Brian Moore returning to the city?
23 A.  Well, the only thing I'm aware of is there was a
24   push to hire and they were reaching out to all
25   Fire Detroit EMS employees and that he was a part

13 (Pages 46 - 49)

Atkinson-Baker, A Veritext Company
(800) 288-3376                    www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 107 of 125

1  of that push.
2 Q. Do you know if that is being handled by HR for
3  the Fire Department?
4 A. I think that in concert, the Fire Department may
5  have pushed for it. I would assume HR would have
6  had some involvement, however, that's just an
7  assumption because my understanding also is that
8  the Department has the ability to overturn in
9  certain circumstances those recommendations and
10  it becomes an internal administrative battle from
11  there is my understanding.
12      MR. MCFARLANE: I have no further
13  questions.
14      MR. SHEAROUSE: I might have one
15  follow-up.
16      EXAMINATION
17 BY MR. SHEAROUSE:
18 Q. You said that they reached out to all prior
19  Detroit employees for a potential rehire. Do you
20  know if they reached out to Mr. Cadoura?
21 A. I don't know who they reached out to. It was a
22  rumor to me that this is what they were doing. I
23  was not a part of that process. I just heard
24  about it.
25 Q. Okay. And last question. Do you know how long

Page 50

1 Mr. Moore worked with the city before he sought
2 rehire?
3 A. How long he worked before? No, I can't recall
4 how long he was there before he was terminated or
5 before he was recommended to termination.
6 Q. Okay. Was he actually terminated?
7 A. No, he quit.
8      MR. SHEAROUSE: I have no further
9 questions.
10      MR. MCFARLANE: No further questions.
11      MR. SHEAROUSE: Thank you for your time,
12 Mr. James.
13      THE WITNESS: You're welcome.
14      (Deposition concluded at 2:21 p.m.)
15      *   *   *

Page 51

1 STATE OF MICHIGAN )
2      )
3 COUNTY OF OAKLAND )
4     Certificate of Notary Public
5    I do hereby certify the witness, whose
6 attached testimony was taken in the above matter, was
7 first duly sworn to tell the truth; the testimony
8 contained herein was reduced to writing in the
9 presence of the witness by means of Stenography;
10 afterwards transcribed; and is a true and
11 complete transcript of the testimony given. I
12 further state that I am not connected by blood or
13 marriage with any of the parties, their attorneys
14 or agents, and that I am not interested,
15 directly, indirectly or financially in the matter
16 of controversy.
17    In witness hereof, I have hereunto set my hand
18 this day in Novi, Michigan, County of Oakland,
19 State of Michigan. January 13, 2023
20
21    Carol L. Martin
22    Carol L. Martin, CSR-3532
23    Certified Shorthand Reporter
24    Notary Public, Oakland County, Michigan
25    My Commission Expires: 10/25/2025

Page 52

14 (Pages 50 - 52)

EXHIBIT F

## Candidate Rating Sheet – Emergency Medical Technician (Basic/Paramedic)

Candidate Name: RICHARD CARDURA                          Date: 12-7-17

Have you ever worked for the City of Detroit? (Yes) or No  -  If so, what year(s): 1998 - 2013

Have you ever been discharged from employment? Yes or (No)              Are you a veteran? Yes or (No)

How is your driving record? Good

Are you able to perform the essential functions of the position with or without accommodation? (Yes) or No

| Competency – FAILED QUESTIONS MUST CONTAIN A REASON FOR FAILURE | Pass/Fail |
|---|---|
| 1. **Personal Qualifications** (*Professionalism and Dependability*) | (P) F |
| Notes/Reason for Failure: GOOD — NO ATTENDANCE ISSUES | |
| 2. **Personal Qualifications** (*Professionalism and Dependability*) | (P) F |
| Notes/Reason for Failure: PARTNERS ON DEPARTMENT OVER HIS CAREER. | |
| 3. **Technical** (*Willingness to Work in Hazardous Conditions*) | (P) F |
| Notes/Reason for Failure: HAVING THE ABILITY TO INTERACT WITH PEOPLE THAT ARE UNDER DURESS IN SITUATIONS | |
| 4. **Interacting with Others** (*Supporting Diversity/Teamwork*) | (P) F |
| Notes/Reason for Failure: NO PROBLEM WORKING WITH PEOPLE WITH ETHNIC / OR DIVERSE POPULATION OR PARTNER. | |
| 5. **Ease of Supervision** (*Taking Direction/Orders*) | (P) F |
| Notes/Reason for Failure: INDISPUTABLE, NO PROBLEM WITH FOLLOWING ORDERS FROM SUPERVISION. | |
| 6. **Communication & Customer Service** (*Serving and Helping Others*) | (P) F |
| Notes/Reason for Failure: DELICATE BALANCE BETWEEN PROVIDING CARE AND RESPECTING RELIGIOUS BELIEFS OF INDIVIDUALS | |
| 7. **Integrity** | (P) F |
| Notes/Reason for Failure: TELL THE PARTNER TO PUT IT BACK OR YOU WILL BE FORCED TO TURN THE MATTER OVER TO THE DEPARTMENT. | |

HR Signature  BBrown                    EMS Signature  Daniel Walinsky Capt

## Candidate Rating Sheet – Emergency Medical Technician (Basic/Paramedic)

Candidate Name: _Richard Cadoura_  Date: _12-7-17_

Have you ever worked for the City of Detroit? (Yes) or No - If so, what year(s): _'98-'13 EMS Division_

Have you ever been discharged from employment? Yes or (No)        Are you a veteran? Yes or (No)

How is your driving record? _good_

Are you able to perform the essential functions of the position with or without accommodation? (Yes) or No

| Competency – FAILED QUESTIONS MUST CONTAIN A REASON FOR FAILURE | Pass/Fail |
|---|---|
| 1.  Personal Qualifications *(Professionalism and Dependability)* | (P)/ F |
| Notes/Reason for Failure:  - attendance good  .probation good | Pass |
| 2.  Personal Qualifications *(Professionalism and Dependability)* | (P)/ F |
| Notes/Reason for Failure:  great  .partners over the years  .biggest impression on the job. | Pass |
| 3.  Technical *(Willingness to Work in Hazardous Conditions)* | (P)/ F |
| Notes/Reason for Failure:  *15 years, it wasn't an issue/problem over *Understand they are under duress and we will give them care. | Pass |
| 4.  Interacting with Others *(Supporting Diversity/Teamwork)* | (P)/ F |
| Notes/Reason for Failure:  *no problems over the yrs. .benefit for the public .warned ppl personality -surburan vs city | Pass |
| 5.  Ease of Supervision *(Taking Direction/Orders)* | (P)/ F |
| Notes/Reason for Failure:  *no problem with chain of command. * no conflict | Pass |
| 6.  Communication & Customer Service *(Serving and Helping Others)* | (P)/ F |
| Notes/Reason for Failure:  *family dealing with the death of a love one - put family at ease .and another family was rushed to the hospital because of an incident.* | Pass |
| 7.  Integrity | P /(F) |
| Notes/Reason for Failure:  * tell the person  * zero tolerance, turn the person in .and tell her to put it back. | Pass |

HR Signature _B Brown_        EMS Signature _Darrell Walinsky_

EXHIBIT G

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

 2                    EASTERN DISTRICT OF MICHIGAN

 3                         SOUTHERN DIVISION

 4

 5    RICHARD CADOURA,

 6

 7            Plaintiff,

 8

 9                                  Case No: 20-cv-12986

10                                  Hon. Gershwin A. Drain

11                                  Magistrate Anthony P. Patti

12

13    -vs-

14

15  THE CITY OF DETROIT,

16

17            Defendant.

18  _____/

19

20            DEPOSITION (via Zoom) of BELINDA BROWN

21

22            Taken by the Plaintiff on the 4th day of

23            August, 2022 via Zoom Deposition commencing at

24            11:04 a.m.

25

                                               Page 1
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com
13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 113 of 125

August 4, 2022

| | |
|---|---|
| 1 APPEARANCES: | 1   Zoom Deposition |
| 2 | 2   Thursday, August 4, 2022 |
| 3 For the Plaintiff:     REJANAE BROOKS (P85701) | 3   11:04 a.m. |
| 4         Carla D. Aikens, P.L.C. | 4 |
| 5         615 Griswold | 5         BELINDA BROWN |
| 6         Suite 709 | 6 |
| 7         Detroit, Michigan 48226 | 7   was thereupon called as a witness herein, and after |
| 8         844-835-2993 | 8   having first been duly sworn to tell the truth, the |
| 9 | 9   whole truth and nothing but the truth, was examined |
| 10 For the Defendant:     JASON T. McFARLANE (P73105) | 10   and testified as follows: |
| 11         ANDRAE SMITH (P69153) | 11 |
| 12         City of Detroit - Law Department | 12         EXAMINATION |
| 13         2 Woodward Avenue | 13 |
| 14         Suite 500 | 14 BY MS. BROOKS: |
| 15         Detroit, Michigan 48226 | 15 |
| 16         313-237-3088 | 16 Q   Ms. Brown, my name is Rejanae Brooks.  I'm |
| 17 | 17     appearing today on behalf of the plaintiff. |
| 18 Reported By:        Amy Bertin, CER-3871 | 18 |
| 19         Certified Electronic Reporter | 19       If I ask you something you don't understand |
| 20         586-468-2411 | 20     what I said or, you know, also I'm in Michigan as |
| 21 | 21     well and my internet is just not good so if you |
| 22 | 22     can't hear me, please let me know, I'll repeat the |
| 23 | 23     question.  Okay? |
| 24 | 24 A   No problem.  Yes. |
| 25 | 25 Q   Could you please state your name for the record, |
| Page 2 | Page 4 |

| | |
|---|---|
| 1         TABLE OF CONTENTS | 1   please? |
| 2 | 2 A   Belinda Brown. |
| 3 WITNESS                    PAGE | 3 Q   And are you currently employed? |
| 4 | 4 A   Yes. |
| 5 BELINDA BROWN | 5 Q   Where are you currently employed? |
| 6 | 6 A   The City of Detroit. |
| 7     Examination by Ms. Brooks          4 | 7 Q   What is your role? |
| 8 | 8 A   I am a recruiter. |
| 9 | 9 Q   How long have you been a recruiter? |
| 10 | 10 A   Since October 10, 2016. |
| 11 | 11 Q   And what do you do in that position? |
| 12 | 12 A   I have a number of departments that I recruit for. |
| 13 EXHIBITS:  Exhibits Attached to Transcript) IDENTIFIED | 13     So if the department states that they are looking |
| 14 | 14     to fill any of their vacancies, I will post them on |
| 15 Exhibit 1   Offer Letter          27 | 15     our City's website. |
| 16 Exhibit 2   February 24th, '17 email   30 | 16 Q   You said on the City website? |
| 17 Exhibit 3   Regret Letter          32 | 17 A   Yes.  On the City of Detroit website. |
| 18 Exhibit 4   Text Message 1         34 | 18 Q   Do you do anything other than post the vacancies on |
| 19 Exhibit 5   Text Message 2         36 | 19     the website? |
| 20 Exhibit 6   Personnel file.        40 | 20 A   I go out and look for talent based on what the |
| 21 | 21     department is seeking, what position they're |
| 22 | 22     looking for to fill. |
| 23 | 23 Q   Where would you go out to look for talent? |
| 24 | 24 A   At the community college.  Depending on what title |
| 25 | 25     it is, I'll go to the schools, the high schools, |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

August 4, 2022

1    community out reach that's out there.  I'll go on
2    Indeed, LinkedIn, any type of organizations.
3 Q   So you said you started at the City of Detroit in
4    October of 2016?
5 A   Correct.
6 Q   Did you have any job before then?
7 A   Yes.
8 Q   Where were you employed?
9 A   I was employed at Whelan Security as an HR manager.
10 Q   And how long were you there?
11 A   For one year.
12 Q   What is Whelan Security?
13 A   It's a contract security company.
14 Q   And you said you were HR there; correct?
15 A   HR manager.
16 Q   So what was some of your duties as HR manager?
17 A   As a human resources generalist, I did everything
18    from the hiring to the recruitment piece, to the
19    onboarding, benefits, employee relations, the whole
20    realm of HR.
21 Q   What's your highest level of education?
22 A   A bachelor's degree.
23 Q   In what?
24 A   Business administration, major human resources.
25 Q   When did you obtain that?

Page 6

1 A   2006.
2 Q   And where did you get that degree?
3 A   Sienna Heights University.
4 Q   I'm sorry.  Sienna or did you say Sienna?
5 A   Sienna Heights University in Adrian, Michigan.
6 Q   Perfect.
7
8       In your current position as a recruiter for
9    the City of Detroit, do you have to take any
10    trainings or get any certificates?
11 A   Repeat the question, please.
12 Q   In your current position for the City of Detroit as
13    the recruiter, do you have to get any, do you do
14    any trainings or receive any certificates?
15 A   I have received training and certificates.
16 Q   What kind of trainings?
17 A   Any type of human resources training.  But since
18    I've been employed with the City of Detroit I
19    received a certificate of, certification in human
20    resources generalist with our talent development
21    division.
22 Q   So no yearly, like you don't have to do anything
23    yearly to keep your position?
24 A   No.
25 Q   As the recruiter, I know you keep saying HR

Page 7

1    generalist, is that interchangeable, like the
2    recruiter and HR generalist?
3 A   With the City of Detroit I am a recruiter.  But
4    when I worked at Whelan, I was HR manager it's like
5    the realm of it is like a generalist.  So I did the
6    A through Z of human resources compared to with the
7    City of Detroit I'm just a recruiter.
8 Q   So what I'm hearing and you can correct me if I'm
9    wrong is for the City of Detroit you just strictly
10    do recruiting.  So that's going out and trying to
11    fill vacancies?
12 A   Correct.  Yes.
13 Q   So do you have any say in the hiring and firing of
14    employees for the City of Detroit?
15 A   The hiring along with the department is what I do.
16    Could you explain -- yeah.  Let me just, what
17    exactly are you involved in in the hiring?
18 A   I meet with the department, they let me know what
19    their vacancy is and I will post that vacancy
20    title.  Whatever that position is, I will post it.
21    Once the position comes down, the posting comes
22    down, it closes, then me and the department will
23    set up an interview or if a test is required
24    they'll take a test.  Those pass the test will, me
25    and the department will set up interviews.  Once

Page 8

1    the person meets all the qualifications for the
2    interview they are placed on the eligibility list
3    and then we hire.
4 Q   And is that decision to hire up to you or someone
5    else?
6 A   Based on the scoring of the eligibility list, it's
7    based on who's next in line to be hired.
8 Q   And so did you have -- what did you do to prepare
9    for today's deposition?
10 A   I met with my attorney.
11 Q   Did you review any documents?
12 A   Yes.
13 Q   Did you help produce any documents for this matter?
14 A   I want to say, yes.  Yes.
15 Q   Is that typical that you would help produce the
16    documents?
17 A   This is my first time in doing a deposition or
18    being --
19 Q   This is your first time doing, taking a deposition?
20 A   With the City of Detroit in this matter with the
21    gentleman that we're speaking of.
22 Q   So this is also your first time helping produce
23    documents in this particular matter?
24 A   Correct.
25 Q   I want to talk a little bit about some of the

Page 9

3 (Pages 6 - 9)

13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 115 of
125

August 4, 2022

| | |
|---|---|
| 1 things at the City of Detroit, in particular the | 1 and eight people pass that interview, the eight |
| 2 procedures. | 2 that passed are now placed on the eligibility list. |
| 3 | 3 And everything at this point -- |
| 4 So are you aware of like any retention | 4 Q I'm sorry. I didn't mean to cut you off. And you |
| 5 policies for personnel files? | 5 said, and everything is what? |
| 6 A No. | 6 A Ranked. |
| 7 Q So is it common to put out a vacancy for -- well, | 7 Q Ranked based on what? |
| 8 scratch that. | 8 A Their scores. |
| 9 | 9 Q So is it safe to say that whoever got the highest |
| 10 Is it typical that the City of Detroit would | 10 score is like the first in line? |
| 11 try to go and rehire individuals? | 11 A Yes. |
| 12 A It's typical for the City of Detroit to rehire if | 12 Q So is there anything special that takes place when |
| 13 the individual apply online and they meet all the | 13 an application has -- I'm sorry, when somebody who |
| 14 qualifications, we move forward with the hiring. | 14 has already worked for the City of Detroit applies? |
| 15 Q Has there ever been an instance where the City of | 15 It's all, is it just like standard, straight across |
| 16 Detroit was seeking to rehire with, that was the | 16 the board? |
| 17 targeted individual, people who had previously | 17 A Yes. But there are a number of tiers. There are |
| 18 worked for the City of Detroit? | 18 some positions that requires a computerized based |
| 19 A No. | 19 test and there are some positions that doesn't. So |
| 20 Q Could you explain the process of what it looks like | 20 if it requires a computerized test or a physical |
| 21 when someone is applying for rehire. What does | 21 agility test, the computerized test, we go this |
| 22 that look like? | 22 way, the process is this way. If it's a physical |
| 23 A So someone that is applying for a position -- this | 23 agility test, the process is this way. Or if it's |
| 24 is the question you're asking. Someone that is | 24 just a straight interview, the process is this way. |
| 25 applying for the position and they just happen to | 25 Q So would you look at a personnel file of someone |
| Page 10 | Page 12 |
| 1 be a rehire or are you speaking we're targeting | 1 who previously worked for the City of Detroit in |
| 2 someone and we want that person to come be rehired | 2 consideration of the application? |
| 3 back? | 3 A Please repeat the question. |
| 4 Q Have you ever targeted someone to come back? | 4 Q Would you look at the personnel file of a person |
| 5 A No. | 5 who had previously worked for the City of Detroit |
| 6 Q So my question is just a little bit more general. | 6 in consideration for the application? |
| 7 Someone submits an application, they are, I guess, | 7 A If they are marked as non rehireable we wouldn't be |
| 8 applying for -- I don't even know how to phrase | 8 able to move forward with hiring that individual. |
| 9 this. They used to be employed by the City of | 9 Q How would you know they were marked non rehireable? |
| 10 Detroit, they are now reapplying, what happens on | 10 A Based on our -- based on the personnel file and |
| 11 your end? | 11 based on our payroll system. |
| 12 A They would apply online, the application, fill out | 12 Q So when would you look at the personnel file? |
| 13 the application. If the position requires a test, | 13 A Once they have completed the whole process. |
| 14 they will take the test. If they pass the test, | 14 Q So they have passed the -- well, if there is |
| 15 the next step would be the interview. And if they | 15 required for a test, they have already passed all |
| 16 pass the interview then they will be placed on an | 16 the tests and the physical test, now you're looking |
| 17 eligibility list. And then based on their ranking, | 17 at the personnel file? |
| 18 if they are next in line then they will be hired. | 18 A Correct. |
| 19 If not, they stay on the eligibility list for | 19 Q And could you explain to me some circumstances on |
| 20 ninety days. | 20 when someone would be non rehireable? |
| 21 Q What do you mean by next in line? | 21 A If a department sees that an individual used to |
| 22 A Is a ranking. | 22 work for the City, then I will be notified. And |
| 23 Q A ranking amongst all of the people who apply? | 23 then at that point a research will be done where |
| 24 A All of the people that passed. So those that pass | 24 I'll pull the personnel file to see what the status |
| 25 the interview, let's say we interview ten people | 25 is. |
| Page 11 | Page 13 |

4 (Pages 10 - 13)

August 4, 2022

1  Q   I'm not sure you understood my question.
2
3        I'm asking for some examples of what makes
4   someone non rehireable.
5  A   Because that's on our employee services side,
6   because now the individual is now working and being
7   employed with the City, employee services is
8   another division, they would know all of that.  I
9   would not know that.  All I would see is what is in
10  the system or what was marked.  So I wouldn't be
11  able to answer that.
12 Q   That's fair.
13
14        Do you know someone currently in the employee
15  services division?
16 A   They have probably fifteen employees.  They have a
17  number.
18 Q   Is there like a head person in that department?
19 A   It is.
20 Q   Who is that?
21 A   Raquiba Dismuke.
22 Q   Could you spell that?
23 A   Yes.  R-A-Q-U-I-B-A.  And her last name is D-I-S-M-
24  U-K-E.
25 Q   I'm sorry, you cut out.  Could you spell the last
                                                    Page 14

1   name one more time, please?
2  A   D-I-S-M-U-K-E.
3  Q   Perfect.  Thank you.
4
5        And so she would be the person to talk to if I
6   wanted to know about what makes someone non
7   hireable?
8  A   Correct.
9  Q   I know that you already said that you are not
10  familiar with the retention policy of documents for
11  the City of Detroit; correct?
12 A   Correct.
13 Q   As far as personnel files go?
14 A   Correct.
15 Q   Do you know who would know about that?
16 A   Our chief of policy and planning.
17 Q   Chief of policy and planning.
18 A   Her name is Kimberly Hall Wagner.
19 Q   And you said chief of policy and planning?
20 A   Correct.
21 Q   Well, I don't like to waste a lot of time so I want
22  to get straight to it.
23
24        Can you recall the first time speaking to Mr.
25  Richard Cadoura?
                                                    Page 15

1  A   During our physical agility test with EMS division.
2  Q   And that was your first time speaking to him during
3   the physical agility test?
4  A   Correct.
5  Q   So when he submitted an application, were you
6   notified of the application?
7  A   Yes.
8  Q   After receiving his application, what happened?
9  A   So a posting is posted, individuals apply online.
10  Him and along with other applicants, I send them a
11  notification to attend the next physical agility
12  test with the EMS division on this particular day,
13  at this particular time.  Those that show up, we
14  start the physical agility test.  They get
15  introduced to what's going to happen next, they go
16  out to the bay to see what the physical agility
17  test entails and then they take the test.
18 Q   So the notification to attend the physical agility
19  test, is that considered an offer of employment,
20  was that a conditional offer or is that just, what
21  is that?
22 A   So for the EMS division, they were seeking to hire
23  EMTs, emergency medical technician and paramedics.
24  So in order for them to, in order for the division
25  to hire, to get ready to start the process we have
                                                    Page 16

1   to make sure that they are able to do the physical
2   piece of being an EMT or a paramedic.
3
4        So that is just them come in to do the
5   physical portion of it.  So, in other words, in the
6   beginning when I mentioned we have individuals come
7   in and take the computerized based test and that's
8   the process that way or they come in and do an
9   interview and that's a process this way.  With EMS
10  their process begins with the physical agility
11  test.
12 Q   So once an individual passes the physical agility
13  test then what's next after that?
14 A   An oral interview.
15 Q   And who is the oral interview with?
16 A   It's a human resources recruiter along with a
17  member of the EMS division, one of their captains
18  or one of their lieutenants.
19 Q   And this is when we get in the ranking system?
20  After this, if they pass that interview then
21  they're ranked?
22 A   On the eligibility list, yes.
23 Q   So did Mr. Cadoura pass the physical agility test?
24 A   Yes.
25 Q   And was he invited to an oral interview?
                                                    Page 17

5 (Pages 14 - 17)

Brian Brown
August 4, 2022

1  A   Yes.
2  Q   Do you recall who his oral interview was with?
3  A   Yes.  Me and Captain Walinsky.
4  Q   Walinsky.  Can you spell that?
5  A   W-A-L-I-N-S-K-Y.
6  Q   And did he pass this oral interview?
7  A   Yes.
8  Q   And so he was placed on the eligibility list?
9  A   Yes.
10 Q   And ranked?
11 A   Yes.
12 Q   So was he ever offered employment after he was
13     ranked?
14 A   Yes.
15 Q   So once he was offered employment, then what
16     happened?
17 A   I send, along with him and some other individuals
18     that passed, I send the department, the division,
19     the EMS division a list of names on who will be
20     moving forward in the hiring process so they can do
21     their steps.  I don't know what their steps is but
22     just giving them the names of, these are the next
23     group of EMTs or paramedics that will be hired and
24     I just give it to the division.
25 Q   Do you recall the other applicants who were moving

*Page 18*

1  Q   So taking you back to when you sent the list of Mr.
2      Cadoura and the other applicants to the EMS
3      department, do you recall anyone saying anything to
4      you about the list?
5  A   Yes.
6  Q   What do you recall?
7  A   One of the -- the chief mentioned that he was non
8      rehireable.
9  Q   Is this Mr. Walinsky?
10 A   No.  He is the captain.
11 Q   Who was the chief at the time?
12 A   Sean Larkins.  S-E-A-N, Larkins, L-A-R-K-I-N-S.
13 Q   And he was chief of EMS?
14 A   He is chief of EMS.
15 A   Oh.  He is.  And Mr. Walinsky is the captain of
16     the --
17 A   Within EMS.
18 Q   And I might have cut you off to figure out who this
19     person was.  What did Mr. Larkins say to you after
20     you sent the list?
21 A   He stated that he was non rehireable.
22 Q   Did he tell you why?
23 A   No.
24 Q   Did you ask why?
25 A   No.

*Page 20*

1      forward with Mr. Cadoura?
2  A   No, I cannot.
3  Q   And you said that you give the list of the people
4      who are moving forward to the EMS department?
5  A   Correct.
6  Q   Who was in charge of that, who received that list?
7  A   I cannot recall who the individuals are but it
8      would be -- I cannot recall.
9  Q   Is it always the same position like the chief of
10     EMS or who typically receives that list?
11 A   I cannot recall.
12 Q   Let me ask you this.  Is it a similar setup today
13     as, you know, people go through, they do the oral
14     interview, they are placed on an eligibility list
15     and ranked?  Do you still send the list of names to
16     the department that they're being hired into?
17 A   No.  Because we have changed the process now as a
18     whole, within the whole entire fire department.
19 Q   So what happens now?
20 A   We are hiring fire fighters and they are doing dual
21     roles.  So they come in as a fire fighter and
22     they'll do a twenty week academy.  And at the end
23     of the academy they are now EMTs.  So when they get
24     out and do their roles after completing the academy
25     they are now fire fighter/EMTs.

*Page 19*

1  Q   So once you learned that he was non rehireable then
2      what happened?
3  A   I pulled his personnel file.
4  Q   For what purpose?
5  A   To see why he is non rehireable.
6  Q   Did you figure it out?
7  A   It is listed in the personnel file.
8  Q   Do you recall what it said?
9  A   No.  Not as of today.
10 Q   Did you discuss the fact that Mr. Cadoura was non
11     rehireable with anyone after you learned that?
12 A   I brought it back up to Chief Larkins by letting
13     him know I see.
14 Q   And was that the end of the discussion?
15 A   No.  I had to put a letter together to let Mr.
16     Cadoura know that he was not able to move forward
17     in the hiring process.
18 Q   And did you tell him why?
19 A   No.
20 Q   Did he ask you?
21 A   I never had a verbal conversation with him.  It was
22     communicated via email.
23 Q   You never had a verbal conversation with him
24     throughout the process or after you learned he was
25     non rehireable?

*Page 21*

6 (Pages 18 - 21)

| | | | |
|---|---|---|---|
| 1 | A | Throughout the whole entire process. | |
| 2 | Q | What do you consider a verbal communication? | |
| 3 | A | Me actually talking to an individual. | |
| 4 | Q | In person or on the phone? | |
| 5 | A | In person or on the phone. | |
| 6 | Q | How did you communicate with Mr. Cadoura? | |
| 7 | A | Via email. | |
| 8 | Q | Solely email? | |
| 9 | A | Solely email. | |
| 10 | Q | So did Mr. Cadoura respond to your email after you | |
| 11 | | informed him that he was no longer considered? | |
| 12 | A | I don't recall. | |
| 13 | Q | Are you aware of any of Mr. Cadoura's past -- | |
| 14 | | scratch that. | |
| 15 | | | |
| 16 | | After you learned that he was -- actually, | |
| 17 | | scratch that. | |
| 18 | | | |
| 19 | | When he applied, could you see that he was a | |
| 20 | | rehire? | |
| 21 | A | No. | |
| 22 | Q | So you had no knowledge of that until Mr. Larkins | |
| 23 | | informed you? | |
| 24 | A | Correct. | |
| 25 | Q | And in the personnel file was, was there anything | |

Page 22

1   speaking to his previous employment?
2  A  So in his personnel file, during the time that he
3     worked for the City to the last day of work and the
4     reason why he was non rehireable is listed.
5  Q  Did you see anything regarding disciplinary issues
6     in his personnel file?
7  A  It is on that one sheet that states the reason that
8     he is non rehireable.
9  Q  So the reason is the only thing that spoke to
10    discipline? I guess my question is like, did you
11    see write-ups or anything like that in the file?
12 A  No.
13 Q  I should have done this earlier. Are you alone in
14    the room?
15 A  I am.
16 Q  And is there anything in front of you?
17 A  The TV.
18 Q  So you said that the only thing that spoke to
19    discipline was the reason why he was non
20    rehireable?
21 A  So just asking, do you have the sheet that states
22    his last day? Because all that is on there, the
23    date, the last day that he worked and the reason
24    why he is not recommended to return back to work.
25 Q  I do. I do have it. I just wanted to see what you

Page 23

1   knew before I bring anything up. But mainly the
2   question was, were there writeups in there as well.
3   I just wanted to know your knowledge because you
4   said you were hired in 2016; right?
5  A  That's correct.
6  Q  He was there, his previously employment was before
7     you started. I wanted to know what you knew about
8     his previous employment.
9  A  Even though I was hired in October 2016, I didn't
10    go over to the fire department until July 2017.
11 Q  So do you know anything about any other lawsuits
12    that Mr. Cadoura is involved in?
13 A  No.
14 Q  To this day you do not?
15 A  I received an email maybe the beginning of this
16    year in regards to this whole process that we're
17    going through right now. And that's when I
18    received knowledge.
19 Q  So what were you told about those?
20
21    MR. MCFARLANE: I'm going to object as
22    privileged.
23
24    MS. BROOKS: I'm almost certain that -- so
25    that's just for the record. I'm pretty sure she

Page 24

1   can still answer if she knows; right?
2
3    MR. MCFARLANE: No. She's not answering that.
4   It's a communication with an attorney, she's
5   absolutely not answering.
6
7    MS. BROOKS: So let me rephrase it.
8
9  BY MS. BROOKS:
10
11 Q  What did you learn about the other lawsuits?
12 A  I have no knowledge of any lawsuits.
13 Q  I'm talking about when you said that you were
14    informed about them at the beginning of the year.
15
16    MR. MCFARLANE: That mischaracterizes her
17    testimony.
18
19    MS. BROOKS: Ms. Bertin, is that how you
20    pronounce it? Could you please reread, I want to
21    say when I asked what she knew about it?
22
23    (Whereupon the question and answer were played
24    back by the court reporter.)
25

Page 25

7 (Pages 22 - 25)

August 4, 2022

1  BY MS. BROOKS:
2
3  Q   So my question is, what did you learn about it?
4      You said you received knowledge at the beginning of
5      the year.  What did you learn?
6  A   That I was involved in what we're doing right now.
7  Q   And did you know what your involvement was?
8  A   No.
9  Q   Do you know now?
10 A   That I hired him and was in the process of hiring
11     him and he wasn't hired because of a previous
12     lawsuit.
13 Q   I want to pull up some documents, please forgive me
14     it might be slow.  I usually have multiple screens.
15
16         Can you see my screen, Ms. Brown?
17 A   Yes.
18 Q   Are you able to read it or do I need to zoom?
19 A   No.  I can read it.
20 Q   Do you know what this is?
21 A   This is an offer letter.
22 Q   And does it look like the offer letter that Mr.
23     Cadoura received?
24 A   Yes.
25 Q   And it says, you know, sincerely Belinda Brown.

Page 26

1  Did you personally send this to him?
2  A   Yes.
3  Q   And it says that this offer is contingent upon your
4      successful completion of a criminal background
5      investigation, driver's license, drug screening,
6      and pre employment medical evaluation.  Is it safe
7      for me to say that this occurred after the physical
8      agility test and the oral interview"?
9  A   Yes.
10 Q   Do you recall if Mr. Cadoura –- I know it says you
11     may accept or decline this offer by responding to
12     this email by the expiration date of Friday,
13     December 22nd, 2017.  Do you recall if he accepted
14     or declined?
15 A   He did accept.
16
17         MS. BROOKS:  I'm going to mark that exhibit as
18     Plaintiff's Exhibit 1, offer letter.
19
20         (Document marked for identification as
21     Plaintiff's Deposition Exhibit Number 1.)
22
23 BY MS. BROOKS:
24
25 Q   Share my screen again.  Ms. Brown, can you see my

Page 27

1      screen?
2  A   Yes.
3  Q   Are you able to read it or do I need to zoom?
4  A   No.  I am able to read it.
5  Q   So this is an email from Sean Larkins who you have
6      informed me is the chief of EMS.
7  A   Correct.
8  Q   And this is to -- who is this to?
9  A   Kemia Crosson.  She is the employee services
10     consultant.
11 Q   And who is Zack Sydney or Sydney Zack?
12 A   So Sydney Zack used to be the deputy commissioner,
13     the second deputy commissioner.
14 Q   Okay.
15 A   Within the fire department.
16 Q   So Mr. Larkins tells Kemia that she will be
17     receiving an application for rehire from a Richard
18     Cadoura.  Please pull his file and speak to the
19     department prior to making any decisions.  Are you
20     aware of this email?
21 A   No, I am not.
22 Q   Is it common for Mr. Larkins to know that he's
23     going to receive –-
24
25         MR. MCFARLANE:  I'm going to object.  It calls

Page 28

1      for speculation.
2
3         MS. BROOKS:  Okay.
4
5  MS. BROOKS:
6
7  Q   You can answer.
8  A   I don't know.
9  Q   How would he know he was receiving an application
10     from –-
11
12         MR. MCFARLANE:  Objection.  Calls for
13     speculation.
14
15 BY MS. BROOKS:
16
17 Q   If you know, you can answer.
18 A   I don't know.
19 Q   But he's not involved in the -- he's not involved in
20     the application intake process, is he?
21 A   No.  Not the application intake process.
22 Q   And is it common to pull someone's file prior to
23     making any decisions?
24 A   Repeat your question.
25

Page 29

8 (Pages 26 - 29)

**Page 30**

1     MR. MCFARLANE:  Objection.  Vague.
2
3  BY MS. BROOKS:
4
5  Q   Is it common to pull an applicant's file prior to
6      making any decisions of hiring?
7  A   No.
8
9      MS. BROOKS:  I'm going to mark this as
10     Plaintiff's Exhibit 2, a February 24th, email.
11
12     (Document marked for identification as
13     Plaintiff's Exhibit Number 2.)
14
15     THE WITNESS:  Can you repeat that last question
16  again?  I apologize.
17
18     MS. BROOKS:  I don't want to misstate it.  I
19  don't remember how I worded it, so Ms. Bertin could
20  you read that back, please?
21
22     (Whereupon the question was read back by the
23     court reporter.)
24
25     THE WITNESS:  So prior to hiring?

**Page 31**

1
2  BY MS. BROOKS:
3
4  Q   Correct.
5  A   Once we determine that a person was a previous
6      employee, it is not common to pull a person's
7      personnel file, a previous employee personnel file.
8  Q   Okay.
9  A   To see if they are rehireable.
10 Q   Can you see my screen, Ms. Brown?
11 A   Yes.
12 Q   And I know this one looks a little bit different.
13     Are you able to read it or do I need to zoom?
14 A   I'm able to read it.
15 Q   Okay.  And this is -- do you know what this it?
16 A   Yes.
17 Q   What is it?
18 A   It's letting him know that we regret to inform that
19     he's no longer considered for employment with the
20     City of Detroit EMS division.
21 Q   And did you send him this?
22 A   Yes.
23 Q   Were you directed to send this email?  I think it
24     was an email.  Was it an email or a letter?
25 A   It's an email.

**Page 32**

1  Q   Were you directed to send this email?
2  A   After -- yes.
3  Q   Who directed you to send this email?
4  A   I don't recall.
5
6      MS. BROOKS:  I'm going to mark this as
7  Plaintiff's Exhibit 3, regret letter.
8
9      (Document marked for identification as
10     Plaintiff's Deposition Exhibit Number 3.)
11
12 BY MS. BROOKS:
13
14 Q   Can you see my screen?
15 A   Yes.
16 Q   Do you recognize this?
17 A   It looks like a text message.
18 Q   So this first text message is from December 22nd of
19     2017.  And it says, "Good evening, Ms. Brown.  Sorry
20     for the inconvenience but I just wanted to check to
21     make sure you received my email earlier today.  By
22     the way, this is Richard Cadoura."
23
24     Do you recall receiving this text?
25 A   As of today, no.  But I see it was a text submitted.

**Page 33**

1  Q   And it does say -- can you see my mouse?
2  A   I do.
3  Q   So right here it says, Ms. Brown, Detroit HR.
4  A   Yes.
5  Q   Is it safe to say that this is you?
6
7      MR. MCFARLANE:  Objection.  Calls for
8  speculation.
9
10     MS. BROOKS:  You can answer, if you know.
11
12     MR. MCFARLANE:  This isn't her phone.  How
13  would she know who that is?
14
15 BY MS. BROOKS:
16
17 Q   Right.  If you know.
18 A   I don't know.
19 Q   Well, it says here, "I did.  Thanks.  Merry
20     Christmas to you and your family."
21
22     Do you recall sending that text?
23 A   No.  I do not recall.
24 Q   Well, down here where it says January 8th, 2018.
25     "Good afternoon, Ms. Brown.  This is Richard Cadoura

9 (Pages 30 - 33)

## Page 34

1    and my physical and drug screen are complete."

2

3        Do you recall receiving that?

4 A  I don't.

5 Q  Was Mr. Cadoura in contact with you about his

6    physical and drug screen?

7 A  I don't recall.

8 Q  Do you remember if he was in contact with anyone

9    else during his process of onboarding?

10 A  I cannot -- I don't recall.

11 Q  Do you know if you were the main point of contact?

12 A  I had an assistant who is no longer here.

13 Q  Who was your assistant at the time?

14 A  Cheremy (ph) Matthews.  But I cannot say if she was

15    here at that time.  I mean, it was so long ago.  I

16    can't say if she was actually, you know, what --

17 Q  You're not aware of what dates she was employed?

18 A  No.

19

20        MS. BROOKS:  I'm going to mark the last exhibit

21    as Plaintiff's Exhibit 4, text message 1.

22

23        (Document marked for identification as

24        Plaintiff's Deposition Exhibit Number 4.)

25

## Page 35

1 BY MS. BROOKS:

2

3 Q  I'm going to share my screen.  Can you see my

4    screen?

5 A  Yes, I can.

6 Q  So this appears to be to the same person; correct?

7    Right here.  As the last text message.

8 A  Yes.

9 Q  So this text message, January 9th, 2018 says, "Good

10    afternoon.  You are all set.  You can put in your

11    two weeks notice.  The academy starts on Monday,

12    January 22 nd.  Someone will contact you and tell you

13    the next step."

14

15        Do you see that?

16 A  I do.

17 Q  Do you recall sending that?

18 A  I do not.

19 Q  It says, "This is a great day.  Thank you so much

20    for everything."

21

22        And on January 12th, 2018 the text message

23    says, "This is Belinda Brown, HR recruiter for the

24    City of Detroit.  Please give me a call when you are

25    available."

## Page 36

1        Do you recall sending that?

2 A  I do not.

3

4        MS. BROOKS:  I'm going to mark this as

5    plaintiff's Exhibit 5, text message 2.

6

7        (Document marked for identification as

8        Plaintiff's Deposition Exhibit Number 5.)

9

10 BY MS. BROOKS:

11

12 Q  Ms. Brown?

13 A  Yes.

14 Q  Prior to receiving Mr. Cadoura's application, were

15    you aware of who he was?

16 A  No.

17

18        MS. BROOKS:  Can we take like five minutes?

19    You okay with that?

20

21        MR. MCFARLANE:  Yes.

22

23        (Brief pause.)

24

25 BY MS. BROOKS:

## Page 37

1

2 Q  Ms. Brown, you said that you pulled Mr. Cadoura's

3    personnel file; correct?

4 A  Correct.

5 Q  Are you able to see my screen?

6 A  Yes.

7 Q  Does this look like what you saw when you pulled his

8    personnel file?

9 A  Yes.

10 Q  And this says it's a notice of resignation

11    evaluation, recommendation for reinstatement.  Is

12    this the only thing that was in the personnel file?

13 A  That's the only thing I received from the personnel

14    file.

15 Q  And I want to scroll down here where it says, "If

16    reinstatement is not recommended, state the reason."

17    And it says, "Pending discipline, poor work

18    behavior."

19

20        Is that what you read as well?

21 A  Yes.

22 Q  Do you know what the pending discipline was?

23 A  No.

24 Q  Did you ever ask to find out?

25 A  No.

10 (Pages 34 - 37)

August 4, 2022

| | |
|---|---|
| 1 Q   Do you know who knows what the pending discipline | 1        (Document marked for identification as |
| 2        is? | 2    Plaintiff's Deposition Exhibit Number 6.) |
| 3 A   I don't know. | 3 |
| 4 Q   Do you know what the poor work behavior was? | 4        MS. BROOKS:  And I believe that that is it for |
| 5 A   I do not. | 5    me. |
| 6 Q   Do you know who knows? | 6 |
| 7 A   I do not. | 7        Do you have any?  I'm not sure if you want to |
| 8 Q   So right here it says, "Reinstatement is governed by | 8    go. |
| 9    Human Resources Rule 15."  I'm going to stop right | 9 |
| 10    there.  Is there like a pamphlet of the Human | 10        MR. MCFARLANE:  I have no questions. |
| 11    Resources Rules? | 11 |
| 12 A   Yes. | 12        MS. BROOKS:  All right, Ms. Brown.  Well, I |
| 13 Q   It says, "To be eligible for reinstatement the | 13    really appreciate your time. |
| 14    applicant must have at least one year of prior | 14 |
| 15    service and resigned in good standing.  Applications | 15        (Deposition concluded at 12:15 p.m.) |
| 16    for reinstatement will be accepted for a period of | 16 |
| 17    between three months and twenty-four months | 17              - - - |
| 18    following the last day on the active payroll." | 18 |
| 19 | 19 |
| 20        Okay.  It says, good standing.  What's the | 20 |
| 21    definition of good standing because I'm not -- yeah. | 21 |
| 22    What's the definition of good standing? | 22 |
| 23 A   Because I am a recruiter and not employee services, | 23 |
| 24    I could not tell you what their definition would be | 24 |
| 25    in regards to good standing. | 25 |
| Page 38 | Page 40 |

| | |
|---|---|
| 1 Q   Would Raquiba be able to speak to that? | 1              CERTIFICATE OF NOTARY |
| 2 A   Yes.  And Kemia Crosson because she is the employee | 2 |
| 3    services consultant for the fire department. | 3    STATE OF MICHIGAN   ) |
| 4 Q   I want to make sure I have this distinction.  So | 4                  ) |
| 5    Raquiba is the, she's just the head of employee | 5    COUNTY OF OAKLAND   ) |
| 6    services? | 6 |
| 7 A   Well, she's the manager. | 7        I certify that this transcript, consisting |
| 8 Q   For multiple units? | 8    of 41 pages, is a complete, true, and correct record of |
| 9 A   Within employee services. | 9    the testimony of BELINDA BROWN, held in this case on |
| 10 Q   And so Kemia is specifically over the fire | 10    Thursday, August 4th, 2022. |
| 11    department? | 11        I also certify that prior to taking this |
| 12 A   Correct. | 12    deposition, BELINDA BROWN, was duly sworn to tell the |
| 13 Q   So are you aware what the Human Resources Rule 15 | 13    truth. |
| 14    is? | 14        I also certify that I am not a relative or |
| 15 A   Not offhand.  I don't know it.  I can't memorize it. | 15    employee of or an attorney for a party; or financially |
| 16    I don't know. | 16    interested in the action. |
| 17 Q   As far as eligibility for reinstatement, do you know | 17    August 10, 20 |
| 18    what exactly is needed? | 18 |
| 19 A   No.  Because that's employee services. | 19        Amy Bertin, CER-3871 |
| 20 Q   So I would need to talk to Kemia? | 20        Notary Public |
| 21 A   Correct. | 21        Oakland County, Michigan |
| 22 | 22        My Commission Expires: 08-12-24 |
| 23        MS. BROOKS:  I'm going to mark this as, I | 23 |
| 24    believe, Plaintiff's Exhibit 6, personnel file. | 24    signature not requested |
| 25 | 25 |
| Page 39 | Page 41 |

11 (Pages 38 - 41)

13-53846-tjt   Doc 13713-4   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 123 of
125

# EXHIBIT H

| | |
|---|---|
| **From:** | Sean Larkins |
| **To:** | Kemia Crosson |
| **Cc:** | Zack, Sydney |
| **Subject:** | Employee Rehire |
| **Date:** | Friday, February 24, 2017 3:41:05 PM |

Kemia,

You will be receiving an application for rehire from a Richard Cadoura.  Please pull his file and speak to the Department prior to making any decisions.

Thank you.


Chief Sean W. Larkins, Superintendent of EMS
City of Detroit Fire Department
1301 Third Street, Suite 603
Detroit, Michigan 48226
Office:  (313) 596-5182
Cell:  (313) 300-1355

Confidentiality Notice: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. If you are not the intended recipient(s), you are hereby notified that any dissemination, unauthorized review, use, disclosure or distribution of this email and any materials contained in any attachments is prohibited. If you receive this message in error, or are not the intended recipient(s), please immediately notify the sender by email and destroy all copies of the original message, including attachments.