**EXHIBIT 6F**

**Summary Judgment Motion**

40916945.7/022765.00213

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RICHARD CADOURA,

        Plaintiff,                           Case No. 20-cv-12986
                                                Hon. Gershwin A. Drain
v.                                           Magistrate Judge Anthony P. Patti

THE CITY OF DETROIT,

        Defendant.

---

| | |
|---|---|
| **CONNER GALLAGHER (P82104)** | **JASON MCFARLANE (P73105)** |
| CARLA D. AIKENS, P.C | **ANDRAE D. SMITH (P69153)** |
| Attorneys for Plaintiff | CITY OF DETROIT LAW DEPT |
| 615 Griswold St. Suite 709 | Attorney for Defendant |
| Detroit, Michigan 48226 | 2 Woodward Avenue, Suite 500 |
| (844) 835-2993 | Detroit, MI 48226 |
| conner@aikenslawfirm.com | (313) 237-0548 / (313) 237-3088 |
| | mcfaj@detroitmi.gov |
| | smithand@detroitmi.gov |

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

    Defendant City of Detroit moves, pursuant to Fed. R. Civ. P. 56 for dismissal of all counts of Plaintiff Richard Cadoura's Complaint.

1.      Richard Cadoura ("Plaintiff") claims that Defendants discriminated and retaliated against him in violation of the Title VII of the Civil Rights Act of 1964, and the Elliot Larsen Civil Rights Act in retaliation for alleged protected activity.

2.      Plaintiff's Complaint (Dkt. #1) presents two counts: Count I Retaliation in Violation of Title VII of the Civil Rights Act of 1964, Count II alleges Retaliation in Violation of the Elliot Larsen Civil Rights Act.

3.      Plaintiff is unable to establish a prima facie case of retaliation in violation of Title VII or ELCRA.

4.       The accompanying brief in support sets forth in greater detail the factual and legal bases for this motion.

The undersigned certifies compliance with the pre-filing conference requirement of Local Rule 7.1(a) by seeking concurrence in the relief requested on this motion from Plaintiff. Plaintiff did not concur.

WHEREFORE, Defendant City of Detroit respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's Complaint in its entirety.

Respectfully submitted,

CITY OF DETROIT LAW DEPARTMENT

By:     */s/Jason T. McFarlane* (P73105)
        Attorney for Defendant
        2 Woodward Avenue, Suite 500
        Detroit, MI 48226
        (313) 237-0548
Dated: January 13, 2023            mcfaj@detroitmi.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RICHARD CADOURA,

        Plaintiff,                               Case No. 20-cv-12986

                                             Hon. Gershwin A. Drain

v.                                          Magistrate Judge Anthony P. Patti

THE CITY OF DETROIT,

        Defendant.

---

**CONNER GALLAGHER (P82104)**
CARLA D. AIKENS, P.C
Attorneys for Plaintiff
615 Griswold St. Suite 709
Detroit, Michigan 48226
(844) 835-2993
conner@aikenslawfirm.com

**JASON MCFARLANE (P73105)**
**ANDRAE D. SMITH (P69153)**
CITY OF DETROIT LAW DEPT
Attorney for Defendant
2 Woodward Avenue, Suite 500
Detroit, MI 48226
(313) 237-0548 / (313) 237-3088
mcfaj@detroitmi.gov
smithand@detroitmi.gov

---

**BRIEF IN SUPPORT**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................... i

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ............................................................................................... 1

FACTS................................................................................................................ 1

STANDARD OF REVIEW................................................................................... 5

ARGUMENT ..................................................................................................... 6

       I.     Plaintiff Has Failed to State a Claim Under TITLE VII or ELCRA. .................. 6

          a.  *Plaintiff cannot established that his protected activity was known to the decisionmakers nor that*............................................................................. 8

          b.  *Plaintiff has not established a causal connection between the alleged protected activity and the decision not to rehire Plaintiff.*............................ 9

          c.  *Defendants have proffered a Legitimate non-retaliatory reason for its actions.* ............................................................................................... 10

          d.  *Plaintiff is unable to demonstrate pretext.* ............................................... 11

CONCLUSION.................................................................................................. 12

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ...................................................... 5

*Arendale v. City of Memphis*,
   519 F.3d 587 (6th Cir.2008) ............................................................................................. 5

*Jones v. Johanns*,
   264 F. App'x 463 (6th Cir. 2007) ..................................................................................... 6

*Laster v City of Kalamazoo*,
   746 F.3d 714 ............................................................................................................. 6, 10

*Lewis v. Philip Morris Inc.*,
   355 F.3d 515 (6th Cir.2004) ............................................................................................. 5

*Michael v. Caterpillar Financial Services Corp.*,
   496 F.3d 584 (6th Cir.2007) ........................................................................................... 11

*Nguyen v. City of Cleveland*,
   229 F.3d 559 (6th Cir. 2000) ...................................................................................... 9, 10

*U.S. SEC v. Sierra Brokerage Services, Inc.*,
   712 F.3d 321 (6th Cir.2013) ............................................................................................. 5

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338, 133 S.Ct. 2517,186 L.Ed.2d 503 (2013) .................................................... 9

## Rules

Fed. R. Civ. P. 56 ................................................................................................................ i

## INTRODUCTION

On November 5, 2020, Plaintiff filed the instant lawsuit alleging that Defendant retaliated against him in violation of Title VII and the ELCRA.

On February 1, 2021, Defendant filed a Motion for Judgment on the Pleadings. Plaintiff filed a response on March 22, 2021. Defendant filed its Reply on April 1, 2021. The hearing on the Motion was held on August 4, 2021.

The Court denied the Defendant's Motion for Judgment on the Pleadings without prejudice. Specifically, this Court held that the parties were to submit additional briefing on the issue of exhaustion pending a short period of discovery on the issue. **(Dkt. #13).**

Defendant filed its Renewed Motion for Judgment on the Pleadings as Plaintiff failed to exhaust his administrative remedies where he did not timely file an EEOC Charge. Further, the EEOC file that Defendant received via a FOIA request indicates that the intake questionnaire was never received nor acted upon by the EEOC and therefore, does not equate to the filing of an EEOC charge. **(Dkt. #16).**

On April 8, 2022, this Court denied Defendant's Renewed Motion. **(Dkt. #20).**

## FACTS

In 1999, Plaintiff was hired by the Defendant City as an EMT and paramedic. During his employment with the City of Detroit, Plaintiff had a significant disciplinary history. Between October 2000 and December 11, 2011, Plaintiff had 13 disciplinary contacts. **Exhibit 1, Discipline Summary.** On March 1, 2012, then Chief Jerald James sent a letter to then 2nd

1

Deputy Commissioner Sydney Zack, concerning Plaintiff's work behavior. **Exhibit 2.** Plaintiff had additional disciplinary contacts in February 2013. **Exhibit 3.**

In May of 2009, Plaintiff joined three other employees of the Defendant City Fire Department in a lawsuit against Defendant City for violations of Michigan's ELCRA. Plaintiff's allegations in the 2009 lawsuit asserted that he had not been given any meaningful opportunity to receive a promotion and was passed over for promotions based on his race and ethnicity. (**McCraken, Thomas et al. v City of Detroit et al. 09-010633-CZ**)

On June 3, 2013, Plaintiff resigned from the City of Detroit. **Exhibit 4, Resignation.** Plaintiff indicated that the reason for resignation was retirement. The resignation form contains additional sections to be filled out by HR and Plaintiff's Supervisor. On June 10, 2013, Anthony Wade and Jerald James completed the supervisor section and further indicated that they did not recommend Plaintiff for reinstatement due to pending discipline and poor work performance. On September 16, 2013, Brandi Richmon, Human Resources, concurred with the supervisor's recommendation.

On July 18, 2013, the City of Detroit filed bankruptcy. On February 4, 2014, Plaintiff filed bankruptcy claim #682 with the United States Bankruptcy Court, Eastern District of Michigan. **Exhibit 5.** In late 2014, the City filed its *Eighth Amended Plan of* Adjustment which was confirmed and subsequently became effective on December 10, 2014 ("Effective Date"). Any claims that arose on or before the Effective Date were discharged by the plan. Further,

on June 8, 2017, the City of Detroit filed a Motion to disallow or expunge Plaintiff's claim. On June 27, 2017, Plaintiff's claim was disallowed and expunged. **Exhibit 6.**

Around November 2017, Plaintiff applied for employment with the City of Detroit as an Emergency Medical Technician (Paramedic). Plaintiff submitted an application and resumé. **Exhibit 7 and 8.**

On December 4, 2017, Plaintiff was sent a letter indicating that he was scheduled to take a Physical Agility Test (PAT). **Exhibit 9.** On December 19, 2017, Plaintiff was sent a conditional offer letter. **Exhibit 10.** On January 13, 2018, Plaintiff was sent a letter indicating that he was no longer considered for the position. **Exhibit 11.**

*Plaintiff's Conversations with Belinda Brown*

During his deposition, Plaintiff testified to the following interactions with Belinda Brown. **Exhibit 12, Plaintiff's Deposition pp 20-23.** He further testified that the below discussions were the only discussions that he had with Ms. Brown. **Exhibit 12, Plaintiff's Deposition p 23, lines 23-25.**

- After the process was completed, he received a text message or email from Ms. Brown that he was offered the position and upon accepting it, he could resign from his current employment. **Exhibit 12, Plaintiff's Deposition p 20, lines 20-25.**

- After he was informed that the City was withdrawing its offer, he spoke with Ms. Brown over the phone and she stated that they would have to withdraw the position because they reviewed his employee file and that it stated that he was discharged and placed

3

on a do not rehire list. **Exhibit 12, Plaintiff's Deposition p 21, lines 20-25 and p 22, line 1.**

- That during the PAT test, she informed him that his service record would weigh heavily on his return.

Plaintiff prepared an intake questionnaire with the EEOC on October 24, 2018. On August 22, 2019, Plaintiff filed an EEOC Charge alleging that when he called to ask about why the offer was rescinded, he was told that he was on a do not hire list. **Exhibit 13.** Plaintiff received a right to sue letter on August 6, 2020. Plaintiff's EEOC charge alleged:

> "I was previously employed by the above-named employer from 1998 through 2013.
>
> While I was employed, I made internal complaints regarding discrimination. Most recently, in November of 2017 I applied to an open position of Paramedic. On December 19, 2017, I was offered the Paramedic position and began training. However, on approximately January 13, 2018 the employer rescinded the offer. When I called to ask for the reason, I was told that I'm allegedly on a non-rehire list.
>
> I believe that I was denied re-hire in retaliation for complaining and based on my race and National Origin (Middle Eastern), in violation of Title VII of the Civil Rights Act of 1964, as amended."

Plaintiff's Complaint presents two counts: Count I Retaliation in Violation of Title VII of the Civil Rights Act of 1964, Count II alleges Retaliation in Violation of the Elliot Larsen Civil Rights Act. **(Dkt. #1).**

4

## STANDARD OF REVIEW

Summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir.2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Moreover, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.' " *Arendale v. City of Memphis,* 519 F.3d 587, 605 (6th Cir.2008) (citing and quoting *Lewis v. Philip Morris Inc.,* 355 F.3d 515, 533 (6th Cir.2004)).

5

## ARGUMENT

### I.    Plaintiff Has Failed to State a Claim Under TITLE VII or ELCRA.

Plaintiff must demonstrate four elements to establish a prima facie case of retaliation under both Title VII and Michigan's Elliot-Larsen Civil Rights Act (ELCRA): "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster*, 746 F.3d at 730 (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)).

Assuming arguendo that Plaintiff is able to establish that he engaged in activity and that he was subject to a materially adverse action, i.e. was not rehired, he still has not established that the decisionmakers knew about his alleged protected activity nor has Plaintiff established a causal connection between the protected activity and the decision not to rehire Plaintiff.

Plaintiff alleged in his Complaint that he was told by Belinda Brown that he was not eligible to work for Defendant because of his participation in his previous anti-discrimination lawsuit against Defendant and its fire Department. (**Dkt #1, p 4, paragraph 18.**) This allegation is not supported by any evidence.

6

In fact, Plaintiff's EEOC charge and his testimony at his deposition directly contradict this allegation.

Plaintiff's EEOC charge stated: "When I called to ask for the reason, I was told that I'm allegedly on a non-rehire list." Plaintiff made no allegation that he was told that it was because of a previous anti-discrimination lawsuit.

As detailed above, when asked about his conversations with Belinda Brown, Plaintiff testified that:

- "I called her and she stated that they would have to withdraw their offer of position of paramedic with the City of Detroit Fire Department." **Exhibit 12, Plaintiff's Deposition p 21, lines 20-22 line 20-22.**

- **"**She stated that apparently they reviewed my employee file and that it stated that I was discharged and placed on a Do Not Rehire List." **Exhibit 12, Plaintiff's Deposition p 21, lines 24-25 and p 22 line 1.**

He further testified that other than the discussions on pages 19-23 of his deposition, Plaintiff had no other discussions with Ms. Brown. **Exhibit 12, Plaintiff's Deposition p 23, lines 23-25.**

With the exception of the mention of a discharge, this is consistent with the documentary evidence in this case. Plaintiff's Resignation and Recommendation for Reinstatement form indicates that he was a do not hire because of pending discipline and poor work behavior. **Exhibit 4.**

7

Further, email exchanges between Sean Larkins, Superintendent of EMS, Kemia Crosson and Belinda Brown support that Plaintiff were not recommended for reinstatement.

On January 12, 2018 the following exchange occurred:

- Larkins sent an email to Crosson asking: "This former employee is not a rehire, correct? **Exhibit 14.**

- Brown responded: There are two former employees: Richard Cadoura and Nicholas Collingsworth. I just received their personnel file and they are both not recommended for reinstatement. **Exhibit 14.**

On March 25, 2020, in an email to Tara Brin, Kemia Crosson explained the following:

"The employee file on Richard Cadoura indicates he is a Do Not Rehire. There are not any additional files at EMS that states otherwise or claims of discrimination from HR. Anyone can apply for a positon. However, once the file is pulled and indicates the person does not have a recommendation for reinstatement, the department who completed the form are not obligated to accept/hire the person back into the department. Richard Cadoura can work for any other department except Fire. If you have any other questions, or need further clarification do not hesitate to contact me at 313-410-0668." **Exhibit 15.**

When asked for further clarification on the reason for the do not hire, Crosson stated:

"In his resignation paperwork, it stated that he would not be reinstated because of pending discipline and poor work behavior." **Exhibit 16.**

### a. **Plaintiff cannot established that his protected activity was known to the decisionmakers nor that**

Plaintiff has not offered any evidence that the above individuals knew about his prior lawsuit let alone the contents of the lawsuit. In fact, Belinda Brown did not begin working at the City of Detroit until October 2016, more than 7 years after the lawsuit and more than 3

8

years after Plaintiff resigned.  Similarly, Kemia Crosson did not begin employment with the City of Detroit until October 2013, after Plaintiff's resignation.

Ms. Brown further testified that she did not have knowledge Plaintiff's prior lawsuits.

**Exhibit 17, Brown Deposition, pp 24, 25.**

Therefore, Plaintiff has failed to establish a prima facie case of retaliation under either Title VII or ELCRA and his claims should be dismissed.

### b. Plaintiff has not established a causal connection between the alleged protected activity and the decision not to rehire Plaintiff.

To prove causation in a Title VII retaliation case, a plaintiff must show that the employee's protected activity was a "but for" cause of the employer's adverse action against her, meaning the adverse action would not have occurred absent the employer's desire to retaliate. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360, 133 S.Ct. 2517,186 L.Ed.2d 503 (2013). In other words, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action" or otherwise engaged in protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Plaintiff has not shown that he would have been rehired if it wasn't for the City's desire to retaliate. As shown above, the reason for the decision not to rehire Plaintiff is clear. Plaintiff resigned and was not recommended for rehire because of pending discipline and poor work behavior, which is supported by his disciplinary records.

Further, Plaintiff's testimony and the above communications show that the reasons for not hiring Plaintiff was the do not hire recommendation. There is no evidence that the decision makers knew of the alleged protected activity nor that it was considered in the decision not to rehire.

Therefore, Plaintiff has failed to establish a prima facie case of retaliation under either Title VII or ELCRA and his claims should be dismissed.

### c. Defendants have proffered a Legitimate non-retaliatory reason for its actions.

Assuming arguendo that Plaintiff can establish a prima facie case of retaliation, Defendants have proffered a legitimate non-retaliatory reason for its actions.

If Plaintiff succeeds in establishing her prima facie case, a presumption of unlawful retaliation arises, and the burden shifts to Defendant to produce a legitimate, non-retaliatory reason for its action. *Id.* If Defendant is able to produce such a reason, the burden shifts back to Plaintiff to show that Defendant's reason was not the true reason for the adverse action and was merely pretextual. *Id.* Despite the shifting burdens of the *McDonnell Douglas* framework, Plaintiff always bears the ultimate burden of persuasion. *Laster,* 746 F.3d at 731.

Defendants have proffered a legitimate non-retaliatory reason for the decision not to rehire Plaintiff as it is clear from Plaintiff's file that he was not recommended for rehire due to pending discipline and poor work performance. Therefore, the burden shifts back to Plaintiff to show pretext.

### d. Plaintiff is unable to demonstrate pretext.

There are three ways Plaintiff can demonstrate pretext. She can show that Defendant's stated reasons: (1) have no basis in fact; (2) were not the actual reason for the termination; or (3) are insufficient to warrant the challenged conduct. *Michael v. Caterpillar Financial Services Corp.,* 496 F.3d 584, 597 (6th Cir.2007).

Plaintiff is unable to establish that the Defendant's proffered reason for the decision to not rehire Plaintiff is pretext. There is nothing in the record that contests that Plaintiff resigned in 2013 and based on the recommendation of Jerald James and the concurrence by Human Resources, Plaintiff was not recommended for reinstatement.

Plaintiff is unable to establish that Defendants proffered reason is not based in fact, that it was not the actual reason for the decision to not rehire, nor can he show that the reason is insufficient not to rehire Plaintiff. Plaintiff has not shown that he was not rehired because of the prior recommendation against reinstatement.

Plaintiff has not provided evidence from which a reasonable jury could find that Defendant's proffered legitimate reason for the decision not to rehire Plaintiff are actually a pretext for retaliation.

Therefore, Plaintiff has failed to establish that Defendant's legitimate non-retaliatory reason for the decision not to rehire Plaintiff was pretext and his claims should be dismissed.

**CONCLUSION**

Plaintiff's Complaint should be dismissed in its entirety and with prejudice.

Respectfully submitted,

CITY OF DETROIT LAW DEPARTMENT

By:    */s/Jason T. McFarlane*
JASON T. MCFARLANE (P73105)
Attorney for Defendant
2 Woodward Avenue, Suite 500
Detroit, MI 48226
(313) 237-0548
Dated: January 13, 2023    mcfaj@detroitmi.gov

12

## <u>CERTIFICATION PURSUANT TO L.R. 7.1</u>

LOCAL RULE CERTIFICATION: I, Jason McFarlane, certify that this document complies with Local Rule 5.1 (a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1 (d)(3).

*/s/ Jason McFarlane*
<u>Jason McFarlane</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2023, I caused to have electronically filed **Defendant's Motion for Summary Judgment, Brief in Support of Motion, Exhibits 1-17 and Certificate of Service** with the Clerk of the Court using the E-file & Serve system, which will serve a copy of such filing via email to all attorneys of record.

*/s/Myria Ross*

13

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RICHARD CADOURA,

               Plaintiff,                            Case No. 20-cv-12986

v.                                          Hon. Gershwin A. Drain

                                              Magistrate Judge Anthony P. Patti

THE CITY OF DETROIT,

               Defendant.

---

**CONNER GALLAGHER (P82104)**
CARLA D. AIKENS, P.C
Attorneys for Plaintiff
615 Griswold St. Suite 709
Detroit, Michigan 48226
(844) 835-2993
conner@aikenslawfirm.com

**JASON MCFARLANE (P73105)**
**ANDRAE D. SMITH (P69153)**
CITY OF DETROIT LAW DEPT
Attorney for Defendant
2 Woodward Avenue, Suite 500
Detroit, MI 48226
(313) 237-0548 / (313) 237-3088
mcfaj@detroitmi.gov
smithand@detroitmi.gov

---

**DEFENDANT'S LIST OF EXHIBITS**

Exhibit 1     -     Plaintiff Discipline Summary

Exhibit 2     -     Chief Jerald James letter to 2nd Deputy Commissioner Sydney Zack

Exhibit 3     -     Plaintiff February 2013 Disciplinary Contacts

Exhibit 4     -     Plaintiff Resignation

Exhibit 5     -     Plaintiff Bankruptcy Claim #682

Exhibit 6     -     Order Disallowing and Expunging Plaintiff Bankruptcy Claim #682

Exhibit 7      -      Plaintiff November 2017 Emergency Medical Technician Application

Exhibit 8      -      Plaintiff Resumé

Exhibit 9      -      December 4, 2017 Physical Agility Test Letter

Exhibit 10     -      December 19, 2017 Conditional Offer Letter

Exhibit 11     -      January 13, 2018 City of Detroit Letter to Plaintiff

Exhibit 12     -      Plaintiff's Deposition

Exhibit 13     -      Plaintiff August 22, 2019 EEOC Charge

Exhibit 14     -      Larkins email to Crosson

Exhibit 15     -      Kemia Crosson email to Tara Brin

Exhibit 16     -      Kemia Crosson email to Lesa Kent

Exhibit 17     -      Brown Deposition

# Detroit Fire Department

## Emergency Medical Service Division

### Summary of Conduct

page 1

| Last | First | Badge | Pension Number | AppDate |
|------|-------|-------|----------------|---------|
| CAdouRa | Richard | 602 | | 6-8-98 |

EMMT _____ AEMMT _____

### COMMENDATIONS

| Date | Description | Type of commendation |
|------|-------------|---------------------|
| | | |
| | | |
| | | |
| | | |

### DISCIPLINARY ACTION

| Date | Description | G.R. or P.D. | Action Taken |
|------|-------------|--------------|--------------|
| 7-28-00 | Operating Apparatus 12/11/01 OVER TORNED TIB | P.D 15.4.46 | 6 hrs Suspension TB Reversed |
| 10-8-00 | Policies Took Keys Home | P.D 15.48 | Charge Dismissed |
| 1-6-01 | Lost Equipment (Cprep) | PD 15.4.31 | 12 hrs. Suspension |
| | Obedience TB | GR 5.4 | 3 Day Suspension |
| 3-13-09 | Lost Safety Equip CAtidea | PD 15.4.31 | Written Reprimand |
| 2-24-10 | Safe Operation of Vehicle | G.R 15.4.50 | Written Reprimand |
| 9-8-10 | INSUBORDINATION | GR 5.35 | 12 th SUSPENSION (vac) |
| 9-8-10 | INSUBORDINATION | GR 5.35 | 12 HOUR SUSPENSION expunged |
| 10-22-10 | INSUBORDINATION | GR 5.35 | 12 HOUR SUSPENSION expung |
| 10-22-10 | IMPROPER HANDLING SICK/INJURED | PD 15.4.10 | 34 HOUR SUSPENSION |
| 3-15-11 | DISOBEDIENCE OF RULES/DIRECTIVES | GR 5.Ab | 12 HOUR SUSPENSION |
| 12-12-11 | CONDUCT | GR 5.1 | 12 HOURS SUSPENSION |
| 12-14-11 | INSUBORDINATION | GR 5.35 | 48 Hour SUSPENSION |
| | | | |
| | | | |
| | | | |
| | | | |

printed   3/27/00

To:        Sydney Zack
           2nd Deputy Commissioner

From:      Jerald James, Chief
           Superintendent EMSD

Date:      March 1, 2012

Re:        **EMPLOYEE WORK BEHAVIOR**

I am requesting assistance relative to the proper handling of current EMT Richard Cadoura. This employee has continuously displayed his refusal to comply with standing policies as well as not be receptive to direction from supervisory staff.

Upon reviewing this employees, since 2010, disciplinary file it reveals the following;

| Charge | Disciplinary Action | Outcome |
|---|---|---|
| Insubordination 9/8/10 (refused to comply with directive from supervisor relative to proper wearing of the uniform) | 12 hour suspension | Expunged trialboard not scheduled |
| Insubordination 10/28/10 (failing to comply with uniform policy) | 12 hour suspension | Expunged trialboard not scheduled |
| 10/22/10 Improper Patient Care (failed to properly treat a patient) | 36 hour suspension | Expunged trialboard not scheduled |
| Disobedience of Rules 3/15/12 (failed to inspect rig, resulted in responding to run without proper equipment) | 12 hour suspension | Awaiting trialboard |
| Conduct 12/12/11(told a supervisor to fuck off) | 12 hour suspension | Awaiting trialboard |
| Insubordination 12/12/11 (failed to adhere to order | 48 hour suspension | Awaiting trailboard |

*"One Team"*

*Dave Bing, Mayor*

| relative to uniform) | | |
|---|---|---|

I have been contacted multiple times by several supervisors, over the past several months, requesting assistance relative to dealing with this employee. He is openly defiant to any direction from supervision. As of this writing there are several sets of charges that have been submitted or recommended for this employee as well.

:JKJ

Enclosure

*"One Team"*

*Dave Bing, Mayor*

# OFFICIAL DETROIT FIRE DEPARTMENT-CHARGE

**TO: EXECUTIVE FIRE COMMISSIONER**  **DATE:**  2/13/2013

| NAME | RANK | BADGE NO. | DIVISION / BATTALION / COMPANY |
|---|---|---|---|
| Richard Cadoura | EMT | 608 | EMS / Nights One / Medic 19 |

**CHARGE:** General Rule 5.29b: Disobedience of Rules and/or Directives

That he, EMT Richard Cadoura, assigned to Medic 19 on 02/13/2013 did fail to notify Central Office of his absence due to illness two hours prior to the start of his assigned shift beginning at 07:00 hrs. Specifically, EMT Cadoura did not contact Central Office until **17:51 hrs** for notification of absence due to illness.

**This being a direct violation of General Rule 5.29b: Disobedience of Rules or Directives**

WITNESSES:

_Central Office Off-Duty Report_

_A/Capt. Donnella James_

Preferred by       Name / Rank

_EMS / Field Operations / Nights One_
Division / Battalion / Company

L.W.O.P.P.C.A.

Reason: _____

From: _____ Hrs.   To: _____ Hrs.   Date: _____   To Date: _____

Total Hours Deducted From Pay

Verified by: _____
Name / Rank

Division / Battalion / Company
EMS ADMINISTRATION

Pending Action For The Above Charges

| To: | Richard Cadoura | EMT | EMS / Nights One / Medic 19 | 02-26-2013 |
|---|---|---|---|---|
| | Name | Rank | Division / Battalion / Company | Notification Date |

Is To Appear Before:   **Hearing Officer**   At: 2000   Hrs.

On: 2/27/13   At: **EMS Headquarters**   To Answer The Above Charges
Date      Location

Received by: _Refusal to Sign_   Notifying Superior _A/Cpt_
Signature of Charge      Signature

DISTRIBUTION:  DIVISION HEAD / BATTALION CHIEF
COMPANY
ADMINISTRATION
PAYROLL
CIVIL SERVICE
UNION
MEMBER

400-CH
( Revised 10-21-99 )

# DATABASE

**City of Detroit**
## NOTICE OF RESIGNATION
## EVALUATION AND RECOMMENDATION FOR REINSTATEMENT

## 1. EMPLOYEE

DEPARTMENT ___FIRE___   DIVISION ___EMS___

I, ___RICHARD CADOURA___, S.S. # ████████ hereby tender

my resignation as ___EMT___ for the following reason(s): ___RETIREMENT___
title

My last day of work will be __7__ __6__ Additional comments: _____
day  date

Forwarding Address (either home or work): ████████████████████

signature   6-3-13
(signature)   (date)

## 2. HUMAN RESOURCES DEPARTMENT, EMPLOYEE SERVICES DIVISION

### DISCIPLINARY ACTION – LAST 18 MONTHS

Number of Written Reprimands: 1        Number of Suspensions: 1

Reason(s) for Reprimand: Conduct

Reason(s) for Suspension: Conduct

### ATTENDANCE AND TARDINESS RECORD – LAST 18 MONTHS

| | | |
|---|---|---|
| 15 Paid Sick Leave | 10 Occurrences | ___ Beginning of Shift |
| ___ Absent /No Pay | Occurrences | ___ Return from Lunch |
| ___ Dept. Leave | Occurrences | |
| ___ A.W.O.L. | Occurrences | |
| ___ Workers Compensation | Occurrences | |
| ___ Funeral Leave. | Occurrences | |
| ___ FMLA | Occurrences | |
| ___ Other | Occurrences | |
| 15 Total Days Absent | 10 Total Absence Occurrences | ___ Total Times Tardy |

Copyright © City of Detroit, 2003. All rights reserved.

Notice of Resignation
Effective 04/09/03

Page 3

FORM9087
Rev 6

## 3. SUPERVISOR

### ATTENDANCE AND TARDINESS RECORD

☐ Satisfactory        ☑ Needs Improvement        ☐ Unsatisfactory

Comments: _____

### WORK PERFORMANCE

|                        | EE | ME | NI | UN |
|------------------------|----|----|----|----|
| Overall ability to perform: | ☐ | ☑ | ☐ | ☐ |
| Quality of work:       | ☐ | ☑ | ☐ | ☐ |
| Quantity of work:      | ☐ | ☑ | ☐ | ☐ |
| Knowledge & Skills:    |    |    |    |    |
|    Technical Knowledge: | ☐ | ☑ | ☐ | ☐ |
|    Practical Skills: | ☐ | ☑ | ☐ | ☐ |
|    Ability to learn: | ☐ | ☑ | ☐ | ☐ |
| Work Behavior:         | ☐ | ☐ | ☑ | ☐ |
| Supervisory Abilities: | ☐ | ☐ | ☐ | ☑ (N/A) |

EE-Exceeds Expectations
NI-Needs Improvement
ME-Meets Expectations
UN-Unsatisfactory

## DEPARTMENTAL RECOMMENDATION

REINSTATEMENT: ☐ Yes ☑ No          Date:_____

Completed by: _Anthony M Wade_          Title: _Admin Lt_
    Supervisor's Name

Approved by: _Ferald Johnson_          Title: _EMS. Supt_
    Manager's Name

Approved Date: _6/10/13_  Comments (If reinstatement is NOT recommended, state reason):_____

_Pending discipline. Poor work behavior._

EXIT INTERVIEW(S) CONDUCTED BY:

Date of Interview: _6/10/13_ Name: _Anthony M Wade_ Title: _Admin Lt_

COMMENTS:_____

Date of Interview: _____ Name: _____ Title:_____

COMMENTS:_____

---

**Reinstatement is governed by Human Resources Rule 15. To be eligible for Reinstatement, the applicant must have at least one year of prior service and resigned in good standing. Applications for reinstatement will be accepted for a period between three (3) months and twenty-four (24) months following the last day on the active payroll.**

Copyright © City of Detroit, 2003. All rights reserved.

**4. HUMAN RESOURCES DEPARTMENT, EMPLOYEE SERVICES DIVISION**   JMcM 6/4/13

Last Day Worked: 06/03/13   Last Day Paid: 06/03/13   City Seniority Date: 06/08/98

Effective Date of Resignation: 06/04/13   (in accordance with Human Resources Rule 15)

The Human Resources Department ☒ concurs ☐ does NOT concur with the Reinstatement

Recommendation of the employing department:

Brandi Richmon _____   Date: 9/16/13

HRC Printed Name

_____
Signature

Copyright © City of Detroit, 2003. All rights reserved.

Notice of Resignation
Effective 04/09/03

Page 5

FORM9057
Rev 6

13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   20-Page 28 of 2
119

Claim #682 Date Filed: 1/31/2014

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT *Eastern District of Michigan* | | PROOF OF CLAIM |
|---|---|---|

Name of Debtor:

*City of Detroit, MI*

Case Number:

*Chapter 9*

*13-53846*

RECEIVED

FEB 0 4 2014

KURTZMAN CARSON CONSULTANT

COURT USE ONLY

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

*Richard Cadeura*

Name and address where notices should be sent:
*Elias Muawad, Esq.*
*Law offices of Elias Muawad, PC*
*36700 Woodward Ave, Ste 209*
*Bloomfield Hills, MI 48304*

Telephone number: *248-594-4700*    email: *elias@muawadpc.com*

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:
(If known)

Filed on:

Name and address where payment should be sent (if different from above):

Telephone number:        email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ *100,000*

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** *See attached Complaint*
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** *0633* | **3a. Debtor may have scheduled account as:** _____ (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ (See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**

**Value of Property:** $_____

**Annual Interest Rate_____% ☐ Fixed or ☐ Variable**
**(when case was filed)**

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:**
$_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

**Amount entitled to priority:**
$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

1353846140131000000000021

B10 (Official Form 10) (04/13)                                                                                                                    2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A).  If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached.  If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**RECEIVED**

**FEB 0 4 2014**

**KURTZMAN CARSON CONSULTANTS**

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.   ☑ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: *Elias Muawad*
Title: *Attorney*
Company: *Law Offices of Elias Muawad, PC*
Address and telephone number (if different from notice address above):
*Same as above*

(Signature)    (Date) *1-30-14*

Telephone number:                    email:

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

*The instructions and definitions below are general explanations of the law.  In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case.  A separate space is provided for the payment address if it differs from the notice address.  The creditor has a continuing obligation to keep the court informed of its current address.  See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5.  Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred.  Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.  If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.  You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here.  A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured.  Skip this section if the

claim is entirely unsecured.  (See Definitions.)  If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority.  (See Definitions.)  A claim may be partly priority and partly non-priority.  For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt.  You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence.  You may also attach a summary in addition to the documents themselves.  FRBP 3001(c) and (d).  If the claim is based on delivering health care goods or services, limit disclosing confidential health care information.  Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it.  FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature.  If you sign this form, you declare under penalty of perjury that the information provided in this claim is true and correct to the best of your knowledge, information, and reasonable belief.  Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration.  Print the name and title, if any, of the creditor or other person authorized to file this claim.  State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices.  If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

THOMAS McCRACKEN, RICHARD CADOURA,
MICHAEL KEARNS and MICHAEL CHRISTY,

          Plaintiffs,

v.

CITY OF DETROIT, a Michigan municipal
corporation; TYRONE C. SCOTT, Executive Fire
Commissioner of the Detroit Fire Department;
SETH R. DOYLE, III, Deputy Fire Commissioner
of the Detroit Fire Department; CHERYL A.
CAMPBELL, 2nd Deputy Fire Commissioner
of the Detroit Fire Department; GARY N. KELLY,
Chief Superintendent of EMS, Detroit Fire Department;
jointly and severally,

          Defendants.

MCCRACKEN, THOMAS , et al. v DETR
Hon. Prentis Edwards          05/04/2009

**09-010633-CZ**

---

| | |
|---|---|
| **Norman Yatooma & Associates, P.C.** | **City of Detroit Law Department** |
| By: Robert S. Zawideh (P43787) | By: Andrew Jarvis (P59191) |
| Attorneys for Plaintiff | Attorneys for Defendants |
| 219 Elm Street | 660 Woodward Avenue, Suite 1650 |
| Birmingham, Michigan 48009 | Detroit, Michigan 48226 |
| (248) 642-3600 | (313) 237-5038 |

---

*There is no other pending or resolved civil action arising out of
the transaction or occurrence alleged in the complaint.*

**<u>FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY</u>**

      NOW COME the Plaintiffs, THOMAS McCRACKEN, RICHARD CADOURA,

MICHAEL KEARNS, and MICHAEL CHRISTY ("Plaintiffs"), by and through their

attorneys, NORMAN YATOOMA & ASSOCIATES, P.C., and in support of their

Complaint against the CITY OF DETROIT ("DETROIT"), TYRONE C. SCOTT

("SCOTT"), SETH R. DOYLE, III ("DOYLE"), CHERYL A. CAMPBELL

("CAMPBELL"), and GARY N. KELLY ("KELLY"), states the following:

1

1.     This is an action for reverse discrimination pursuant to the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq., and the common law of the State of Michigan.

2.     Plaintiff THOMAS McCRACKEN is a resident of the City of Detroit, in the County of Wayne and State of Michigan.

3.     Plaintiff RICHARD CADOURA is a resident of Garden City, in the County of Wayne and State of Michigan.

4.     Plaintiff MICHAEL KEARNS is a resident of Clinton Township, in the County of Macomb and State of Michigan.

5.     Plaintiff MICHAEL CHRISTY is a resident of the Township of China, in the County of St. Clair and State of Michigan.

6.     Defendant DETROIT is a Michigan municipal corporation whose headquarters and principal place of business are located in the City of Detroit, in Wayne County, Michigan.

7.     By information and belief, Defendant SCOTT is the Executive Fire Commissioner of Defendant DETROIT's Fire Department and is a resident of Wayne County, Michigan.

8.     By information and belief, Defendant DOYLE is the Deputy Fire Commissioner of Defendant DETROIT's Fire Department and is a resident of Wayne County, Michigan.

9.     By information and belief, Defendant CAMPBELL is the 2nd Deputy Fire Commissioner of Defendant DETROIT's Fire Department and is a resident of Wayne County, Michigan.

NORMAN YATOOMA & ASSOCIATES, P.C.

2

10.     By information and belief, Defendant KELLY is the Chief Superintendent of EMS, of Defendant DETROIT's Fire Department and is a resident of Wayne County, Michigan.

11.     The events giving rise to this cause of action occurred in Wayne County, Michigan.

12.     This court has subject matter jurisdiction over this action and venue is otherwise proper in this Court because the amount in controversy exceeds $25,000, exclusive of interest, costs, and attorney fees, and actions alleging a violation of ELCRA may be brought in the circuit court for the county where the alleged violation occurred, or for the county where the person against whom the civil complaint is filed resides or has his principal place of business.  MCL 37.2801(2).

### Background Facts

13.     All of the Plaintiffs are long standing white employees of the Emergency Medical Services (EMS) division of the City of Detroit Fire Department.

14.     Plaintiff THOMAS McCRACKEN ("McCRACKEN") has been employed first as an Emergency Medical Technician and then as a Paramedic with Detroit EMS for almost nineteen (19) years.  In April of 2007, he was promoted to Lieutenant, but was subsequently demoted back to the field without either explanation or evaluation of his performance.

15.     Plaintiff RICHARD CADOURA ("CADOURA") has been an Emergency Medical Technician with Detroit EMS since 1999.  Despite being qualified for the position, Defendants have refused to allow CADOURA to meaningfully test for a promotion to Paramedic, despite repeated requests by CADOURA.

3

16.     Plaintiff MICHAEL KEARNS ("KEARNS") has been a Lieutenant / Assistant Field Supervisor, Grade 2, for the Detroit Fire Department, EMS Division, for the past seventeen (17) years.  Prior to this position, he was an EMT Specialist for 5 years, the last two of which he was an EMS instructor.

17.     Plaintiff MICHAEL CHRISTY ("CHRISTY") has been a Lieutenant / Assistant Field Supervisor, Grade 2, for the Detroit Fire Department, EMS Division, since 2005.  Prior to this position, he was an EMT Specialist for 16 years.  From 1995 to 1999, CHRISTY also served as a Director of Operations for SEMEMSA.

## KEARNS AND CHRISTY-UNLAWFUL FAILURE TO PROMOTE

18.     Within the past three years, both KEARNS and CHRISTY applied for the position of EMS Supervisor, within the City of Detroit Fire Department.

19.     Both KEARNS and CHRISTY timely and appropriately completed all of the steps needed to be considered for the position.

20.     Neither KEARNS nor CHRISTY obtained the position.

21.     The position was awarded to an African-American with less seniority, experience and qualifications than KEARNS and CHRISTY.

22.     Defendants have failed and refused to produce test results or other information on which they based their decision to pass over KEARNS and CHRISTY for promotion.

## CADOURA-UNLAWFUL FAILURE TO PROMOTE

23.     In fall of 2008, CADOURA applied for a promotion to the position of Paramedic within the City of Detroit Fire Department.

24.     CADOURA timely and appropriately completed all of the steps needed to be considered for the position.

4

NORMAN YATOOMA & ASSOCIATES, P.C.

25.     CADOURA did not obtain the position.

26.     African-American employees with less seniority, experience and qualifications than CADOURA have been promoted to the position of Paramedic within Detroit EMS.

### McCRACKEN-UNLAWFUL DEMOTION

27.     In April of 2007, McCRACKEN was promoted to Lieutenant, but was subsequently demoted back to the rank of Paramedic without either explanation or evaluation of his performance.

28.     McCRACKEN's former position of Lieutenant has since been filled by an African-American employee with less seniority, experience and qualifications than McCRACKEN.

### HOSTILE ENVIRONMENT ON ACCOUNT OF RACE – ALL PLAINTIFFS

29.     Throughout the course of their respective employment Plaintiffs were regularly harassed on account of their race by Defendants, as well as their employees and agents.

30.     The harassment included frequent unwelcomed comments and conduct of an offensive and racial nature directed at each of the Plaintiffs.

31.     Plaintiffs made complaints to several of their superiors on a number of occasions, but no action was taken and the harassment continued.

32.     Plaintiffs' superiors are well aware of the offensive and racial nature directed of the conduct and comments directed not only at each of the Plaintiffs, but at all white or non-African American employees employed by the City of Detroit Fire Department.  Not only do they take no action to put a halt to that unlawful conduct or communication, they themselves participate in it.

5

33.   At all material times, Plaintiffs performed their job duties in a manner that was satisfactory or above.

## COUNT I – FAILURE TO PROMOTE

34.   Plaintiffs incorporate by reference paragraphs 1 through 33 as though fully stated to avoid repetition.

35.   At all material times, Plaintiffs were employees, and Defendants were their employers, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

36.   Plaintiffs' race was at least one factor that made a difference in Defendants' decision not to promote or to demote Plaintiffs from the various positions described above.

37.   Had Plaintiffs been African-Americans, they would not have suffered the adverse employment actions described herein.

38.   Defendants, through their agents, representatives, and employees, were predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

39.   Defendants, through its agents, representatives, and employees, treated Plaintiffs differently from similarly situated African-American employees in the terms and conditions of employment, based on unlawful consideration of race.

40.   Defendants' actions were intentional in disregard for Plaintiffs' rights and sensibilities.

41.   As a direct and proximate result of Defendants' unlawful actions, each individual Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and

6

embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

## COUNT II – HOSTILE ENVIRONEMENT ON ACCOUNT OF RACE

42.     Plaintiffs incorporate by reference paragraphs 1 through 41 as though fully stated to avoid repetition.

43.     At all material times, Plaintiffs were employees, and Defendants were their employers, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

44.     Plaintiffs were harassed by Defendants, as well as their agents and employees throughout the course of their employment an account of their race.

45.     This racial harassment has included, but is not limited to, unwelcomed comments and conduct of an offensive and racial nature directed at Plaintiffs and the creation of a hostile work environment.

46.     This racial harassment has included, but is not limited to, singling out some or all of the Plaintiffs for discriminatory treatment on account of their race.

47.     The actions of Defendants and their agents, representatives, and employees was intentional.

48.     The conduct of Defendant's agents and employees in racially harassing Plaintiffs constitutes race discrimination in violation of MCL 37.2101 et seq.

49.     As a direct and proximate result of Defendants' unlawful actions against Plaintiffs as described, Plaintiffs have suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity; loss of career opportunities; loss of reputation and esteem in the community; mental and emotional distress; and loss of the ordinary pleasures of life.

7

WHEREFORE, EACH INDIVIDUAL PLAINTIFF REQUESTS that this court enter judgment against Defendants as follows:

A.      compensatory damages for each Plaintiff in whatever amount above $25,000 he is found to be entitled;

B.      exemplary damages for each Plaintiff in whatever amount above $25,000 he is found to be entitled;

C.      an award of lost wages and the value of fringe benefits, past and future for each Plaintiff;

D.      an award of interest, costs, and reasonable attorney fees for each Plaintiff;

E.      an order enjoining Defendants, their agents, representatives, and employees from further acts of discrimination or retaliation;

F.      an order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Respectfully Submitted,

Dated: June 15, 2009

Norman Yatooma & Associates, P.C.
By: Robert S. Zawideh (P43787)
Attorney for Plaintiffs
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

NORMAN YATOOMA & ASSOCIATES, P.C.

8

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

THOMAS McCRACKEN, RICHARD CADOURA,
MICHAEL KEARNS and MICHAEL CHRISTY,

        Plaintiffs,

v.

CITY OF DETROIT, a Michigan municipal
corporation; TYRONE C. SCOTT, Executive Fire
Commissioner of the Detroit Fire Department;
SETH R. DOYLE, III, Deputy Fire Commissioner
of the Detroit Fire Department; CHERYL A.
CAMPBELL, 2nd Deputy Fire Commissioner
of the Detroit Fire Department; GARY N. KELLY,
Chief Superintendent of EMS, Detroit Fire Department;
jointly and severally,

        Defendants.

Case No.:  09-010633-CZ
Hon. Prentis Edwards

---

**Norman Yatooma & Associates, P.C.**
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

**City of Detroit Law Department**
By: Andrew Jarvis (P59191)
Attorneys for Defendants
660 Woodward Avenue, Suite 1650
Detroit, Michigan 48226
(313) 237-5038

---

## RELIANCE ON DEMAND FOR TRIAL BY JURY

    Plaintiffs hereby rely on the previously filed demand for trial by jury on all issues
that may be submitted to a jury.

Respectfully Submitted,

Dated: June 15, 2009

**Norman Yatooma & Associates, P.C.**
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiffs
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

9

## PROOF OF SERVICE

Chelsea Gornbein hereby certifies that on Monday, June 15, 2009, she served an

Amended Complaint and this Proof of Service via First Class Mail to the following:

**City of Detroit Law Department**
By: Andrew Jarvis (P59191)
Attorneys for Defendants
660 Woodward Avenue, Suite 1650
Detroit, Michigan 48226
(313) 237-5038

The above statement and information is true to the best of my knowledge,

information, and belief.

Dated:  June 15, 2009

/Chelsea Gornbein, Legal Assistant

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**ORDER GRANTING CITY OF DETROIT'S MOTION UNDER THE ORDER, PURSUANT TO SECTIONS 105 AND 502 OF THE BANKRUPTCY CODE, APPROVING ALTERNATIVE DISPUTE RESOLUTION PROCEDURES TO PROMOTE THE LIQUIDATION OF CERTAIN PREPETITION CLAIMS AGAINST THOMAS MCCRACKEN, MICHAEL KEARNS, AND RICHARD CADOURA**

This case is before the Court on the motion entitled "*City of Detroit's Motion Under the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims Against Thomas McCracken, Michael Kearns, and Richard Cadoura*" (Docket # 11901, the "Motion"). No timely response was filed to the Motion. The Court finds good cause to enter this Order.

**IT IS ORDERED THAT:**

1.      The Motion is granted.

2.      Claim numbers 682, 683, and 685 are disallowed and expunged.

3.      The City's claims agent is authorized to update the claims register accordingly.

4.  No later than June 28, 2017, counsel for the City must serve a copy of this Order upon Thomas McCracken, Michael Kearns, and Richard Cadoura, and file proof of such service.

.

**Signed on June 27, 2017**

_/s/_ **Thomas  J. Tucker**

**Thomas  J. Tucker**
**United States Bankruptcy Judge**

13-53846-tjt   Doc 13793-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 42 of
18-53846-tjt   Doc 13930   Filed 08/27/17   Entered 08/27/17 11:04:10   Page 2 of 2
119

**2017222403126xx - Paramedic (Detroit Fire Department)**

### Contact Information -- Person ID: 34342645

| | | |
|---|---|---|
| Name: | Richard N. Cadoura | Address: |
| Home Phone: | | Alternate Phone: |
| Email: | | |

### Personal Information

| | |
|---|---|
| Driver's License: | Yes, Class C |
| Can you, after employment, submit proof of your legal right to work in the United States? | Yes |
| What is your highest level of education? | Some College |

### Preferences

| | |
|---|---|
| Minimum Compensation: | $20.00 per hour; |
| Are you willing to relocate? | Maybe |
| | |
| Types of positions you will accept: | Regular |
| Types of work you will accept: | Full Time |
| Types of shifts you will accept: | Day , Evening , Night , Rotating , Weekends |

**Objective**

### Education

**Professional**
*Michigan Academy Emergency Services*
-
New Boston, Michigan

Did you graduate: Yes
Major/Minor:
Degree Received: Certification

**Professional**
*Wayne County Community College*
-
Taylor, Michigan

Did you graduate: No
Major/Minor:
Degree Received: Professional

**College/University**
*Schoolcraft College*
-
Livonia, Michigan

Did you graduate: No
Major/Minor: Para medicine
Degree Received: Associate's

### Work Experience

**Firefighter Paramedic**
8/2015 - Present

Hours worked per week: 40
May we contact this employer?

WOODHAVEN FIRE DEPARTMENT
Woodhaven, Michigan

**Duties**
Respond to Emergency Medical Calls and initiate Basic Life Support or Advance Life Support to patients
Medical treatment for patient 12 lead EKG's, IV's, Medications
Respond to Fire Calls under direction of Incident Commander initiate suppression, ventilation, overhaul of fire.
Hazmat operations

Monthly Fire and EMS training
Chief Michael Clark 734-675-4918

---

**Firefighter Paramedic**
4/2008 - Present

RIVERVIEW FIRE DEPARTMENT
Riverview, Michigan

Hours worked per week: 40
May we contact this employer?

**Duties**
Respond to Emergency Medical Calls and initiate Basic Life Support or Advance Life Support to patients
Medical treatment for patient 12 lead EKG's, IV's, Medications
Respond to Fire Calls under direction of Incident Commander initiate suppression, ventilation, overhaul of fire.
Hazmat Operations, Pump Operator
Deputy Chief Pool 734-281-4264

---

**Paramedic FireFighter**
12/2016 - Present

Flat Rock Fire Department
25500 Gibraltar rd
Flat Rock, Michigan 48134
734-782-2500

Hours worked per week: 36
Name of Supervisor: Chief Vack - 734-782-2500
May we contact this employer? Yes

**Duties**
Respond to Emergency Medical Calls and initiate Basic Life Support or Advance Life Support to patients Medical treatment for patient 12 lead EKG's, IV's, Medications Respond to Fire Calls under direction of Incident Commander initiate suppression, ventilation, overhaul of fire. Weekly fire training

---

**Paramedic**
4/2017 - Present

DMCare express
6420 E Lafayette
Detrooit, Michigan 48201

Hours worked per week: 33
Name of Supervisor: Jennifer - Operations supervisor
May we contact this employer? Yes

**Duties**
Work Dugout at Tigers games respond to emergencies on Field and or in Dugout
LCA arena practice area first aid paramedic , respond to on ice emergencies and work first aid at events and arena

---

**Confined Space Rescue Technician**
9/2015 - 10/2016

ELITE TECHNICAL RESCUE
LIVONIA, Michigan

Hours worked per week: 40
May we contact this employer? Yes

**Duties**
Automotive Industry Site Safety

Under direction of supervisor from Elite Technical Rescue provide confined space rescue and safety
Jim Keaton ( owner and operator) 734-323-5224

**Reason for Leaving**
reduced hours due to contract work available

---

**Police Officers, Firefighters and Command staff**
6/1998 - 6/2013

Hours worked per week: 40
May we contact this employer? Yes

Detroit Fire Department
Detroit, Michigan 48201

**Duties**
Detroit, MI
June 1998-2013
Respond to trauma and medical calls
Transportation of patients to appropriate medical facility
Communication with Dispatchers, Police Officers, Firefighters and Command staff
Chief Sean Larkins 313-596-5180

**Reason for Leaving**
retired and vested with 15 years

| Certificates and Licenses |
|---|

Type: Paramedic

Number: 3201011907

Issued by: SOM

Date Issued: 8 /2008    Date Expires: 8 /2019

Type: ACLS

Number:

Issued by:

Date Issued: 12 /2015    Date Expires: 12 /2020

Type: Confined Space Entry Certificate

Number:

Issued by:

Date Issued: 3 /2015    Date Expires:

| Skills |
|---|

Office Skills

Typing:

Data Entry:

| Additional Information |
|---|

| References |
|---|

Professional
**Williamson, Craig**
Captain
734-934-6745

| Resume |
|---|

**Text Resume**

| Attachments |
|---|

| Attachment | File Name | File Type | Created By |
|---|---|---|---|
| Richard N Cadoura2 2017 Resume.rtf | Richard N Cadoura2 2017 Resume.rtf | **Resume** | Job Seeker |

**Agency-Wide Questions**

**1.** Q: How did you hear about this job?

A: Other

**2.** Q: Have you ever worked for the City of Detroit?

A:

**3.** Q: Were you a resident of the City of Detroit 12 months prior to filing this application:

A:

**Supplemental Questions**

**1.** Q: Do you possess a High School Diploma or GED?

A: Yes

**2.** Q: Do you possess a current unrestricted State of Michigan Emergency Medical Technician (Paramedic) License?

A: Yes

**3.** Q: Do you possess a current Detroit East Medical Control Authority (DEMCA) License?

A: No

**4.** Q: Do you possess a valid State of Michigan Chauffeur License?

A: Yes

# Richard N. Cadoura

8533 Mathias #30
Grosse Ile, Michigan 48138
(313)-971-8500
Rcdfd971@gmail.com

*Administrative Assistant with 6+ years of experience flawless preparation of presentations, preparing facility reports and maintaining the utmost confidentiality. Possesses a B.A. in History and expertise in Microsoft Excel. Looking to leverage my knowledge and experience into a role as Project Manager.*

## PROFESSIONAL EXPERIENCE

**ELITE TECHNICAL RESCUE**                                   **LIVONIA, MI**
Confined Space Rescue Technician                       September 2015- Present
Automotive Industry Site Safety

- Under direction of supervisor from Elite Technical Rescue  provide confined space rescue and safety
- Jim Keaton ( owner and operator) 734-323-5224

**WOODHAVEN FIRE DEPARTMENT**                        **Woodhaven, MI**
*Firefighter Paramedic*                                          *August 2015 – Present*

- Respond to Emergency Medical Calls and initiate Basic Life Support or Advance Life Support to patients
- Medical treatment for patient 12 lead EKG's , IV's, Medications
- Respond to Fire Calls under direction of Incident Commander initiate suppression, ventilation, overhaul of fire.
- Hazmat operations
- Monthly Fire and EMS training
- Chief Michael Clark 734-675-4918

**RIVERVIEW FIRE DEPARTMENT**                          **Riverview, MI**
*Firefighter Paramedic*                                          *April 2008 – Present*

- Respond to Emergency Medical Calls and initiate Basic Life Support or Advance Life Support to patients
- Medical treatment for patient 12 lead EKG's , IV's, Medications
- Respond to Fire Calls under direction of Incident Commander initiate suppression, ventilation, overhaul of fire.
- Hazmat Operations, Pump Operator
- Deputy Chief Pool 734-281-4264

## Detroit Fire Department                                   **Detroit, MI**
                                                                 June 1998-2013

- Respond to trauma and medical calls
- Transportation of patients to appropriate medical facility
- Communication with Dispatchers, Police Officers, Firefighters and Command staff
- Chief Sean Larkins 313-596-5180

123 Your Address   City, , State, , Zip Code   (xxx)-xxx-xxxx   your@email.com

## EDUCATION

**Michigan Academy Emergency Services**                                    **New Boston, MI**
Paramedic, August 2006
- 12 Lead EKG's, Anatomy and Physiology, Pharmacology, Medical and Trauma Emergencies
- ACLS Certification

Firefighter 1 &, January 2007
- Fire Fighter 1 & 2
- Hazmat Training

**Wayne County Community College**                                          **Taylor, MI**
- AAS Liberal Arts started with a transfer to Schoolcraft College 2007-2008

**Schoolcraft College**                                                     **Livonia, MI**
- Transfer AAS Para medicine ( 2016-Current)
- Environmental Health and Safety

## ADDITIONAL SKILLS

- **OSHA** 30hour General Industry Construction  December 2015
- **OSHA** 10 hour Industrial
- Confined Spaced  Rescue Tech
- Confined Space Entry Certificate
- Hazmat Awareness
- Pump Operator

123 Your Address   City, , State, , Zip Code   (xxx)-xxx-xxxx   your@email.com





**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313•224•9421
Fax 313•628•1164
www.detroitmi.gov

December 4, 2017

Richard Cadoura

███████████

Dear Mr./Ms. Cadoura:

RE:   Application for – Exam - 2017222403126xx

You have been scheduled to take the Physical Agility Test (PAT) for the Emergency Medical Technician (Basic / Paramedic) position.  In order to participate in the PAT you must have a signed, current Medical Clearance from a physician.

This Medical Clearance Form is included with this letter.  NO CANDIDATE will be allowed to participate in the PAT without a current Medical Clearance Form signed and dated by a physician.

You are scheduled to participate in the PAT on Thursday, December 7, 2017 at 8:30 am.

Please report to the Fire Department Training Academy, located at 10200 Erwin Street (between Lynch & Grinnell - off Van Dyke) in Detroit, 48208.  Parking is available in the front of the Fire Department Training Academy.

YOU MUST BRING WITH YOU TO THE PHYSICAL AGILITY TEST:

•        This letter - Admittance Notice
•        Your signed medical clearance
•        A COPY and the ORIGINAL of your current Driver's License with Chauffeurs' Endorsement (if you don't have one, you must have one by the first day of the Academy – 1/22/2018)
•        A COPY and the ORIGINAL of your current State of MI - EMT (Basic / Paramedic) License
•        A COPY and the ORIGINAL of your current State of MI - Detroit East Medical Control Authority Certification (DEMCA), (if applicable for Paramedic)
•        Bring an Updated Resume
•        Bring a COPY of the following - Work Experience Documentation:
o        two (2) recent check stubs
o        2016 W-2
o        two (2) Reference Letters

Please wear loose fitting and comfortable full-length pants and shirt, along with gym shoes or other comfortable footwear.

Please reply back stating you will be in attendance by contacting me at 313.720.5632 by Wednesday, December 6, 2017.

IF YOU CAN NOT MAKE IT TO THIS EVENT AND WISH TO RE-SCHEDULE, please contact my Administrative Assistant, Lisa Nelson at 313.224.3477.

Sincerely,
Belinda Brown,  HR Recruiter II
Human Resources Department



**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313•224•9421
Fax 313•628•1164
www.detroitmi.gov

December 19, 2017

Richard Cadoura


Dear Richard:

The City of Detroit is pleased to extend to you a conditional offer of employment for the position of Emergency Medical Technician (Paramedic) in the Fire Department - EMS Division with a starting rate/salary of $23.52.

You may accept or decline this offer by responding to this email at brownbel@detroitmi.gov by the expiration date of Friday, December 22, 2017.

This offer is contingent upon your successful completion of a criminal background investigation, driver's license, drug screen and pre-employment medical evaluation.

In order to complete the criminal clearance, we need the following confidential information:

Phone Number:
Date of Birth:
Gender:
Race:
Alias/Maiden Name:
Driver License Number:
Copy of diploma, degree, or transcripts verifying completion

Failure to provide this information will rescind this offer of employment.

Once we receive your acceptance and the results of your pre-employment medical evaluation, you will receive an email from Employee Services Consultant, Kemia Crosson with your final certification date.

The City of Detroit is an Equal Opportunity Employer. No applicant shall be discriminated against on the basis of race, religion, color, age, gender, national origin, disability, or other criteria prohibited by City, State or Federal law.

If you have any questions, please feel free to contact me at 313.720.5632 and I will be more than happy to discuss the details of this offer.

Sincerely,

Belinda Brown, Recruiter II
Human Resources Department



**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313•224•9421
Fax 313•628•1164
www.detroitmi.gov

January 13, 2018


Richard Cadoura



RE:   Application for Paramedic

Dear Mr. Cadoura:

Thank you for your interest in the above referenced position.  Your skills and commitment to the City of Detroit were recognized and greatly appreciated.

We regret to inform you that you are no longer considered for selection for the Detroit Fire Department - EMS Division.

If you have any questions, please feel free to contact me at 313.224.3730.

Sincerely,

Belinda Brown
Human Resources Department

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the Matter of:

RICHARD CADOURA,

    Plaintiff,               Case No. 20-cv-12986
                             Hon. Gershwin A. Drain
vs.                Magistrate Judge: Anthony P. Patti

CITY OF DETROIT,

    Defendant.
_____/

ZOOM VIDEO CONFERENCE DEPOSITION OF RICHARD CADOURA

             Transcript of the deposition taken in the
above-entitled matter by Zoom video conferencing, on

Thursday, January 5, 2023, commencing at or about 10:00 a.m.

APPEARANCES:


For the Plaintiff:    CARLA D. AIKENS (P69530)
                    AUSTEN SHEAROUSE (P84852)
                    Carla D. Aikens P.L.C.
                    615 Griswold Street, Suite 709
                    Detroit, Michigan 48226
                    844.835.2993
                    carla@aikenslawfirm.com

For the Defendant:    JASON T. McFARLANE (P73105)
                    ANDRAE D. SMITH (P69153)
                    City of Detroit Law Department
                    2 Woodward Avenue, Suite 500
                    Detroit, Michigan 48226
                    313.237.3088/313.237.0548
                    mcfaj@detroitmi.gov
                    smithand@detroitmi.gov

REPORTED BY:          TAMARA A. O'CONNOR
                    CSMR-2656, CER-2656

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 52 of
119

Page 2

TABLE OF CONTENTS

WITNESS                                              PAGE

Richard Cadoura

        Examination by Mr. McFarlane              3

        Examination by Mr. Shearouse             64

EXHIBITS                                           MARKED

Defendant's Exhibit 1                               11

  (12-12-11 Cadoura Statement)

Defendant's Exhibit 2                               24

  (Conditional Offer of Employment)

Defendant's Exhibit 3                               24

  (12-4-17 Letter Re: PAT)

Defendant's Exhibit 4                               25

  (1-13-18 Letter Re:  Regret letter)

Defendant's Exhibit 5                               47

  (Resignation Form)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 53 of
119

755c4784-c363-4279-9438-88070af26d85

## RICHARD CADOURA v CITY OF DETROIT
### Deposition of Richard Cadoura

### Page 3

1  Thursday, January 5, 2023 – 10:00 a.m.
2  (Deposition taken by Zoom video
3  conferencing.  The term "inaudible" is
4  used where audio fades out or audio
5  interference causes testimony to be
6  unintelligible.)
7  REPORTER:  Please raise your right hand.
8  Do you solemnly swear to tell the truth, the whole truth
9  and nothing but the truth?
10  MR. CADOURA:  Yes, ma'am.
11  REPORTER:  Thank you.
12  MR. MCFARLANE:  This is the date and time
13  set for the deposition of Mr. Cadoura in the lawsuit that
14  he filed against the City of Detroit and to be used for
15  all purposes under the Michigan Federal Rules of Civil
16  Procedure.
17  RICHARD CADOURA
18  having been called as a witness, was sworn to testify to
19  the truth, the whole truth and nothing but the truth, was
20  examined and testified as follows:
21  EXAMINATION
22  BY MR. MCFARLANE:
23  Q  Sir, as this is taken via Zoom, I would ask, are you
24  alone?
25  A  Yes, sir.

### Page 4

1  Q  Okay.  Nobody else present?
2  A  No, sir.
3  Q  Okay.
4  A  Am I okay or do you want me to center myself a little
5  better --
6  Q  You're absolutely fine.  I'm not going to fuss over
7  whether you're centered or not.  It's all right by me.
8  Just so you know, when I'm talking, don't talk over me.
9  It makes it very hard for the Court Reporter.  When I'm
10  talking, let me finish.  I'll try and let you finish.
11  I'm sure we'll screw it up somewhere along the way, but
12  the less we do it, the better.
13  If you don't understand any questions I
14  ask, just let me know because if you answer, it will seem
15  like you understood the question.
16  If you need a break, let us know and we'll
17  take a break.  Any questions before we start?
18  A  No, sir.
19  Q  What is your full name?
20  A  Richard Najib; N-a-j-i-b.  Last name is Cadoura; C-a-d-o-
21  u-r-a.
22  Q  Have you ever used any other names?
23  A  No.
24  Q  What is your date of birth?
25  A  September 3, 1971.

### Page 5

1  Q  And what is your current address?
2  A  Current address is 12559 Stoneridge Lane, South Rockford,
3  Michigan, Apartment 102.  I'm sorry.  12559 Stoneridge
4  Lane, Apartment 102, South Rockford, Michigan 48179.  I
5  haven't changed it on my Driver's License yet, but I am
6  in the process of moving.
7  Q  And I take it based on what you just said, you're
8  currently in the process of moving?
9  A  That's right.
10  Q  Do you live with anybody else?
11  A  No.
12  Q  I would like to start with your employment history.
13  Prior to working for the City of Detroit, where did you
14  work?
15  A  Community Ambulance.
16  Q  And when did you start working for Community Ambulance?
17  A  I believe it was probably the summer of '97.
18  Q  And how long did you stay with Community Ambulance?
19  A  I would say probably anywhere between six months and a
20  year.  I was actually working for a few of their
21  companies.  One was a hospital-based company and the other
22  was a private ambulance company.  The other one was
23  Health Link EMS.  It was under the same parent company.
24  I worked part-time for both and then when I received my
25  letter to work for the City of Detroit, I obtained

### Page 6

1  residency in the City which was a requirement of
2  employment and then I resigned after the, well, two weeks
3  before the academy started.  So we were supposed to start
4  June 8, 1998.
5  I resigned from both jobs two weeks prior.
6  Q  And then you came to the City of Detroit.  Is that
7  correct?
8  A  That's correct.
9  Q  And what title did you hold at the City of Detroit?
10  A  They called it back then, it still could be true today,
11  it was EMMT which was an Emergency Mobile Medical
12  Technician.
13  Q  Did you hold any other titles with the City?
14  A  No.
15  Q  Okay.  And when did you leave the City?
16  A  It was June 7th, 2013.
17  Q  And why did you leave?
18  A  I was working, you know, my regular shift with the
19  regular partner that I had and before I made the decision
20  to leave, I was brought before one of the HR personnel
21  with then Chief Gerald James and we had a meeting.
22  Apparently, they had some issue with, they
23  said that I couldn't be clean shaven every day and I told
24  them, you know, that was never an issue before.  Why is
25  it becoming an issue now and it became apparent that I

3 (Pages 3 to 6)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 54 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

### Page 7

1   didn't want to be discharged because they told me in that
2   meeting that if things didn't change, then I would be
3   subject to a discharge and I didn't want to be discharged
4   from there.
5   Q   And so you resigned?
6   A   That's correct.
7   Q   Prior to your resignation did you have any pending
8       discipline?
9   A   That's correct.
10  Q   And do you recall what that pending discipline was?
11  A   There was a lot.  I couldn't really specify one over the
12      other.  You are talking about the most recent ones that
13      led up to me resigning?
14  Q   If you have some in mind, I'd like to hear them, yeah.
15  A   They took issue with the fact that a camera crew was
16      following us around.  The Commissioner at the time, James
17      Mack, stated that our times were consistent with the
18      national average which was 12 minutes and it wasn't true,
19      so a camera crew was following us around and they
20      documented the fact that it wasn't correct and put the
21      City in the public eye and everybody was focused on that
22      and then I started receiving a lot of discipline.
23  Q   When was this camera crew following you around?
24  A   Sometime in the summer of 2008.
25  Q   Okay.  And do you recall any specific discipline that you

### Page 8

1       had that was still pending when you resigned?
2   A   All of it.
3   Q   All of it?
4   A   That's correct.
5   Q   None of your discipline went to Trial Board?
6   A   No.
7   Q   Did you appeal all of your discipline?
8   A   We were in the process of switching unions at the time
9       from Operating Engineers to the POAM which is the Police
10      Officers Association of Michigan and they stated that the
11      discipline that I had currently would transfer over and
12      POAM would assume responsibility for it and I never
13      received a Trial Board for any of it.
14  Q   Do you recall a discipline for telling your supervisor to
15      go to your truck and fuck off?
16  A   I remember that.
17  Q   Okay.  And did you write a statement in that discipline,
18      your own handwritten statement?
19  A   I don't recall.
20  Q   Did you tell your supervisor to fuck off?
21  A   Yes, I did.
22  Q   And why did you do that?
23  A   If you could bear with me, we were responding to a call
24      on the freeway where a person was ejected out of the
25      vehicle.  There was a massive backup in traffic on the

### Page 9

1       expressway, so we had to take a different route.
2           When we arrived on scene, we found the
3       person who was barely breathing and he was coughing up
4       blood and his sister was sitting off to the side and she
5       was crying hysterically and the firemen that were there
6       were upset because it took us so long to get there.  They
7       actually responded first and we loaded him up into the
8       ambulance and some doctor happened to be there on the
9       side of the freeway and wanted to assist and he asked if
10      he could ride in the ambulance.
11          My Lieutenant at the time stated that he
12      could, so we transported him to Detroit Receiving and
13      then when we delivered care over to the staff, one of the
14      staff members pointed out that I had blood or some tissue
15      from the patient on my shirt and I went to go take it off
16      so I could put it in a biohazard bag and as I was coming
17      outside, Lieutenant John Sablowski was talking to my
18      partner who was Jeff Sebree at the time.
19          I asked him if there was something wrong
20      and he said he was conducting an inquiry about a patient
21      abandonment and when I asked him what he was implying, he
22      said that you left the girl there and didn't make sure
23      that she was attended to.
24          Well, there was an EMS lieutenant on scene
25      and I was in the back attending to the patient and Jeff

### Page 10

1       Sebree who was my partner, he's also an EMT, stated that
2       the other ambulance was there because we called for more
3       resources.  He told him through the window that the girl
4       was sitting off to the side of the road and that we would
5       be leaving.  There was an EMS Lieutenant there.  He
6       understood exactly what was happened and we transported.
7           When we got to the hospital, he was
8       conducting an inquiry for some allegedly abandonment and
9       he tried to talk to my partner and I told him if you're
10      trying to imply any discipline or any investigation that
11      could lead to discipline, I'm invoking my Weingarten
12      rights as well as for Mr. Sebree because I don't know
13      where you're going with this.
14          I don't even know where the charge was
15      actually initiated from.  I believe it was from then
16      Captain (inaudible) James, which was Chief Gerald James'
17      wife.  She was also an administrative officer and the
18      Lieutenant got mad because I wouldn't answer any of his
19      questions which was not being insubordinate.
20          I invoked my Weingarten rights.  I didn't
21      want to speak until I talked to a Union representative
22      based on what the issue was.  Then as I was walking away,
23      the Lieutenant focused his attention on the fact that I
24      wasn't wearing my duty shirt and I told him that it had
25      blood on it and he told me, "I don't care.  You put it

4 (Pages 7 to 10)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 55 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 11

1  back on.  I'm ordering you to put it back on."
2         I said, "It's contaminated and I'm not
3  doing it," and he started to come towards me.  This is a
4  Lieutenant that I worked with when he was a paramedic on
5  the ambulance.  I worked with him on multiple occasions
6  and we had a good working relationship.
7         I couldn't understand what was going on at
8  this particular time, but there was some urgency for him
9  to start something and the situation got heated and I did
10  say it.  I was disappointed in the fact that he was one
11  of my commanding officers and somebody that I had respect
12  for and for him to imply that I would put on a bloody
13  soaked shirt to me was just with, all due respect, bad
14  judgment on his part.
15  Q   Understood.  I'm going to show you a document that I'll
16  have marked as Exhibit 1.
17              (At 10:12 a.m., Defendant's
18              Exhibit 1 marked)
19  Q   (By Mr. McFarlane)  Can you see that document, sir?
20  A   Yeah.
21  Q   Does this look familiar?
22  A   Yeah.
23  Q   Okay.  Are you aware if you wrote this?
24  A   That's correct.  That's my signature.
25  Q   Okay.  So would this be your statement regarding that

## Page 12

1  altercation?
2  A   That's correct.
3  Q   Okay.  Thank you.  Is there any other specific discipline
4  that you remember that was pending when you resigned?
5  A   As a result of the media story, I did have my shirt
6  untucked for a brief moment when I was on camera.  I was
7  called in by Assistant Superintendent Joe Wilson and I
8  believe I received a 48-hour suspension for that.
9  Q   Did you serve that suspension?
10  A   I don't recall.  I probably did.
11  Q   When you resigned from the City of Detroit, were you
12  eligible to collect a pension?
13  A   At the time I wasn't sure because the City was on the
14  verge of bankruptcy prior to me leaving, so I wasn't sure
15  what that would entail after.
16  Q   Did you ever receive any pension payments from the City
17  of Detroit?
18  A   If I did, I would be eligible this year.  This would be
19  my 25th year of service.
20  Q   Speaking of the bankruptcy, are you aware if – okay, so
21  let's go back.  So prior to your resignation you had a
22  lawsuit against the City of Detroit.  Is that correct?
23  A   Say that one more time.
24  Q   Prior to your resignation did you have a lawsuit against
25  the City of Detroit?

## Page 13

1  A   That's correct.
2  Q   And when was that lawsuit filed?
3  A   About probably by Norm Yatooma probably sometime probably
4  2008 maybe when all the issues started happening.
5  Q   And what were you alleging in that lawsuit?
6  A   I don't recall.  There were some documents, you know,
7  that they presented.  It was part of a class action.
8  There were several other participants that were involved.
9  Then Lieutenant Mike Kearns was involved.  Lieutenant
10  Mike Christy was involved and then there were probably
11  several other people.
12  Q   And what happened with that lawsuit?
13  A   At the time that the City was filing for bankruptcy, the
14  attorney, Elias Muwad, called me and said that the City
15  was filing for bankruptcy, so whatever settlement I would
16  get, it would be pennies on the dollar and that he could
17  no longer represent me, so I called the City of Detroit
18  Law Department and spoke with Letitia Jones and she asked
19  me – I told her that I'm no longer represented by Counsel
20  and she hung up on me.
21  Q   Did you or your attorney at the time file a claim with
22  the bankruptcy court?
23  A   No.  To my knowledge, no.
24  Q   Not that you know of.  Okay.  Do you know what happened
25  within the bankruptcy court regarding your lawsuit?

## Page 14

1  A   No.
2  Q   Did your attorney ever inform you about any filings
3  within the bankruptcy court regarding your lawsuit?
4  A   No.  Not to my knowledge.
5  Q   So after you resigned from the City of Detroit, where did
6  you go next?
7  A   At the time, I was currently working with the Riverview
8  Fire Department.  It was part-time employment.
9  Q   And when did you begin working for Riverview?
10  A   When I became a paramedic.
11  Q   And do you know what year that was?
12  A   It was I believe in the beginning of 2008.
13  Q   So from 2008 to 2013 you were working part-time with
14  Riverview?
15  A   That's correct.
16  Q   And you said how many hours were you doing at that point?
17  A   The required minimum of part-time.  I think at that time
18  it was required to work either 48 or 54 hours a month.
19  Q   And how many hours were you working at the City of
20  Detroit?
21  A   The standard which was 84 hours bi-weekly.
22  Q   So bi-weekly.
23  A   With option of overtime.  I mean, they had a lot of
24  vacancies to fill.
25  Q   When you resigned from the City did you maintain part-

5 (Pages 11 to 14)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 56 of 119

755c4784-c363-4279-9438-88070af26d85

## RICHARD CADOURA v CITY OF DETROIT
### Deposition of Richard Cadoura

### Page 15

1    time at Riverview or did you go full-time?
2  A   They were part-time.  Also, I was working at Harper
3    Hospital as a contingent EMT.
4  Q   Harper Hospital, and when did you start working there?
5  A   I want to say probably 2004 to 2008, so right around the
6    time, I believe, when I got my paramedics license.  Right
7    around that time.
8  Q   How many hours did you put in at Harper Hospital?
9  A   It was contingent employment, so I was only required to
10    work eight hours a month.  I sometimes would work no more
11    than 24 hours a week.
12  Q   When did you or have you separated from employment with
13    Riverview?
14  A   Yes, I have.
15  Q   Okay.  And when was that?
16  A   2015.
17  Q   And why did you leave Riverview?
18  A   I was discharged.
19  Q   And what were you discharged for?
20  A   I actually don't know.  There were a list of charges that
21    were applied.  They didn't specify any specific one.
22  Q   What was the list of charges that you can recall?
23  A   I guess I had a disagreement. I'll answer your question
24    first.  I believe it was insubordination was one and they
25    said that I was recording some meetings without prior

### Page 16

1    authorization, that I was - a couple other things.  I
2    don't have a list.  There's probably about 25 or so
3    things.
4         The Police Chief at the time, he was the
5    Public Safety Director and he didn't really oversee the
6    Fire Department.  He was mainly overseeing the Police
7    Department and he had an Assistant Chief at the time.
8    His name was Michael Pool.
9         He was just there to take care of
10    administrative issues.  When it came to discipline, it
11    would come from the Public Safety Director.
12  Q   And is that who disciplined you?
13  A   That's correct.
14  Q   And were you in a union at Riverview?
15  A   That's correct.
16  Q   And what was the name of that union?
17  A   I believe it was AFSCME, I believe.
18  Q   Was it a Local or just the overarching AFSCME Union?
19  A   No, it was a Local.  I don't recall the Local number
20    itself.
21  Q   Did you appeal your discharge?
22  A   I did, because I was the elected Vice-President of our
23    Local.
24  Q   And what was the result of that grievance?
25  A   I was returned back to duty.

### Page 17

1  Q   And did you stay with Riverview at that point?
2  A   For about a year.
3  Q   And then you said you left in 2015?
4  A   No.
5  Q   When did you leave?
6  A   I believe it was probably 2018.
7  Q   2018.  Why did you leave in 2018?
8  A   I was discharged a second time.
9  Q   Okay.  And what was that discharge?
10  A   Again, it was from the same person, Cliff Rosbohn. Well,
11    no.  I take that back.  They had appointed a Fire Chief.
12  Q   And who was that?
13  A   I'm trying to think of his name.  I can't recall.
14  Q   And what were the charges?
15  A   A few that were pending.  I don't recall.
16  Q   And did you grieve it?
17  A   No.
18  Q   Why not?
19  A   I settled with the Department.
20  Q   And when you say "settled," had you filed a lawsuit?
21  A   That's correct.
22  Q   And when did you file that lawsuit?
23  A   I don't recall.  Around the time possibly when I was
24    discharged the first time.
25  Q   Do you recall when your last day of employment with

### Page 18

1    Riverview was?
2  A   That I couldn't tell you.  It was probably the last full
3    day that I worked was the day that I was suspended and
4    then I received the termination letter in the mail.
5  Q   Was that before or after you applied to the City of
6    Detroit for the second time?
7  A   Actually, I applied before that.  I applied for
8    reinstatement prior to going through the application
9    process.  I believe it was back in 2017.
10  Q   And what was the result of your reinstatement request?
11  A   I never heard anything back.  I actually went to Fire
12    Department Headquarters which was located, I believe, on
13    Michigan and Third.  It was the old MGM Grand Casino
14    building and I had spoken with the superintendent, Shawn
15    Larkins.
16  Q   Okay.
17  A   I had worked with him for several years on the ambulance
18    at different stations.  I had a good relationship with
19    him.  Somebody told me that I could call him and then
20    when he stated that I could come down there and talk to
21    him, I made an appointment and then I was able to pass
22    through security and then he met me downstairs and walked
23    me back upstairs and we had a little talk.
24         He asked me how things were going since I
25    left and I said, "Well, you know, a lot of things

6 (Pages 15 to 18)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 57 of 119

755c4784-c363-4279-9438-88070af26d85

## RICHARD CADOURA v CITY OF DETROIT
### Deposition of Richard Cadoura

### Page 19

1    happened as a result of the Detroit story and the
2    controversy and everything that was going on that some of
3    my current employers weren't too happy about that."
4    I said, "You know, I probably never should have left."
5    So he had somebody come down from Fire Department HR and
6    I want to say I believe her name was Kemia.  Kemia Brown,
7    possibly.
8    Q    If I said Kemia Crosson, would that --
9    A    Kemia Crosson.  There we go, and then he handed me a
10   reinstatement letter.  I filled it out and Ms. Crosson
11   you said is her name?
12   Q    I don't know if that's who you spoke to, but there is a
13   Kemia Crosson that I'm aware of that works in Fire from
14   HR, so I'm just asking if that's her.  If you don't
15   recall, that's okay.
16   A    She came downstairs and I handed her the letter, the
17   reinstatement letter, which usually when you fill out
18   documentation, they're required to make copies and then
19   issue one of them back to you and then they keep two.
20   It's always been Fire Department standard that they give
21   you some kind of documentation from, you know, whatever
22   meeting you had or whatever documents you submitted.
23       I never received anything and I never
24   heard anything back.
25   Q    And then at some point did you apply for a position at

### Page 20

1    the City of Detroit after that?
2    A    That's correct.
3    Q    Okay.  And what position did you apply for?
4    A    At the time, they said that I could apply for a paramedic
5    position at the City of Detroit.
6    Q    And do you know when you applied?
7    A    I'm sorry?
8    Q    Do you know when you applied?
9    A    No, shortly after that.  Probably sometime in late maybe
10   the middle 2017, late 2017.
11   Q    And after you applied did you hear back?
12   A    That's correct.  The point of contact that I had was back
13   then was Assistant Chief, Raymond Birch.  I had spoken
14   to him on the phone and he said the City was eager
15   to bring back technicians that had a lot of experience
16   that could mentor a lot of the younger group that were
17   hiring in.
18       I told him that I was interested and then
19   I applied, so he was my point of contact from that point.
20   Q    And did you get a job offer from the City?
21   A    After the process was completed, I was contacted by text
22   message from the HR Director, Ms. Brown.  She sent me a
23   text message saying -- it was either email or text message
24   that said that I was offered the position and upon
25   accepting it, I could resign from my current employment

### Page 21

1    because I would be returning back to the City of Detroit.
2    Q    Okay.  And you said Ms. Brown was the HR Director?
3    A    I didn't know exactly her position if she was part of
4    Fire Department HR or if she was general City HR.  At the
5    time I didn't know.
6    Q    So you're not sure if she's an HR Director or not?
7    A    She was.
8    Q    Okay.
9    A    To my understanding.
10   Q    Did you have any other communications with Ms. Brown at
11   that time other than the text message?
12   A    We spoke on the phone.
13   Q    And when did you speak to her on the phone?
14   A    Well, in the text message that I received.  It was after
15   Assistant Chief Raymond Birch passed away.  The day after
16   I was interviewed, he passed away and then I attended his
17   funeral and then about a week later possibly, I received
18   a text message asking if I could call her.  This is Ms.
19   Brown.
20       I called her and she stated that they
21   would have to withdraw their offer of position as
22   paramedic with the City of Detroit Fire Department.
23   Q    And did she state anything else?
24   A    She stated that apparently they reviewed my employee file
25   and that it stated that I was discharged and placed on a

### Page 22

1    Do Not Rehire List.
2        With all due respect, Counsel, is it okay
3    if I sip on something so that I can keep my throat clear?
4    Q    Absolutely.  Go for it.
5    A    All right.  Thank you.  Did you want me to finish that?
6    Q    Yeah, go ahead.
7    A    So around the time when they were doing the physical
8    agility test which is the physical portion of the
9    requirement to enter into employment with the City of
10   Detroit Fire Department EMS Division, at the time I was
11   talking with Ms. Brown there and she stated to me, "Mr.
12   Cadoura, you have a look of concern on your face."
13       I said, "Honestly," I said, "it's kind of
14   a surprise that I'm actually, you know, being considered
15   to come back for reemployment with the City."  I said, "I
16   received a lot of discipline in the past and I thought
17   that that would be an issue."
18       She said that my 15 years of service or
19   just one day shy of 15 years, she said, "Your service
20   record will weigh heavily on your return.  You spent a
21   lot of years with the City of Detroit Fire Department and
22   that would weigh heavily."
23       They gave me some sense of reassurance.  The
24   vibe that I got from then Assistant Chief Joe Barney, he
25   just seemed like he was distant, didn't really say much,

7 (Pages 19 to 22)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 58 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 23

1   couldn't understand.  I worked with him, you know, for
2   many years.  There were no issues that I could remember
3   and then after that when I spoke to her, I said, that
4   night that she called me to tell me that I wasn't going
5   to be able to come back, and she told me that I was
6   discharged and I said, "I wrote a resignation letter and
7   it was acknowledged and then they paid me out for my time
8   several months later."
9            I was not aware of any discharge from
10  employment and she said that on my exit interview, they
11  stated that I was recommended to not be rehired.  I told
12  her that I never received an exit interview.  She stated
13  that it was mandatory that I receive an exit interview
14  because at that point is when they tell you if you're
15  eligible for rehire in the future or if you're not.
16           She said at the time, I said, "So if I was
17  discharged from the Fire Department, then I would have to
18  have a show cause hearing as to why I was being
19  discharged.  There had to have been some discipline that
20  preceded that."
21           She told me that she thought that she said
22  too much and hung up.
23  Q   And that was the last conversation you had with Ms.
24  Brown?
25  A   That's correct.

Page 24

1   Q   And did you receive – I want to go over some documents.
2       Did you ever receive a letter from the City regarding an
3       offer of employment?
4   A   I believe I did.
5   Q   Let me show you what I'll have marked as Exhibit 2.
6           (At 10:34 a.m., Defendant's
7            Exhibit 2 marked)
8   Q   (By Mr. McFarlane)  Does this document look familiar?
9   A   That's correct.
10  Q   And do you recall receiving this?
11  A   I don't recall.
12  Q   Do you recall responding to the City and providing your
13      name, date of birth, and Driver's License and the other
14      information requested?
15  A   That's correct.
16  Q   So you did provide that information to the City?
17  A   To my recollection, yes.
18  Q   Do you recall receiving a letter to go to the physical
19      agility test?
20  A   That's correct.
21  Q   I'm going to show you what I'll have marked as Exhibit 3.
22          (At 10:35 a.m., Defendant's
23           Exhibit 3 marked)
24  Q   (By Mr. McFarlane)  And do you recall receiving this
25      letter?

Page 25

1   A   I don't recall.  Are you saying email?
2   Q   Do got an email you said?
3   A   No.  With all due respect, I'm asking is this an email or
4       was this a hard copy letter that they mailed?
5   A   I have a copy of and the blacked out portion on the top
6       is your address.  We've redacted that in discovery, but
7       as far as I can tell, this is a letter addressed to you
8       that was in your personnel file.  I'm just trying to
9       verify if you recall receiving it?
10  A   Possibly, but I don't recall.
11  Q   Okay.  And do you know when you attended the physical
12      ability test?
13  A   I believe I read in there that it said that it was
14      December 7th.
15  Q   Does that seem accurate?
16  A   I would say yes.  I mean, I don't recall exactly, but if
17      that was the date, I did attend.
18  Q   And do you recall receiving a letter from the City
19      informing you that you were no longer being considered
20      for employment?
21  A   I don't recall receiving that.
22  Q   I'll share with you what will be marked, I think I'm on
23      Exhibit 4.
24          (At 10:37 a.m., Defendant's
25           Exhibit 4 marked)

Page 26

1   Q   (By Mr. McFarlane)  Do you recall this document?
2   A   No, I don't recall.
3   Q   Do you know when you spoke to Ms. Brown when she informed
4       you that you were no longer being considered for
5       employment?
6   A   I received a text message stating when the academy was
7       going to start which was January 2nd of 2018.  It was
8       prior to, I believe, the first of the year.
9   Q   Prior to the first of the year.
10  A   It may have been.  I believe it was just about two weeks
11      outside of when the academy was supposed to start.
12  Q   And at that time were you still employed by Riverview?
13  A   No.
14  Q   So at the end of 2017 you were no longer employed by
15      Riverview?
16  A   That's correct.
17  Q   I thought earlier you told me you were still at Riverview
18      in 2018?
19  A   At the time that I applied I was just in the process of
20      being reinstated, so I wasn't at the time employed.  I
21      started sometime probably in the beginning of 2018, so
22      right around that time, but at the time the decision was
23      made for me to go to the City of Detroit, I was in the
24      process of – there was a delay from sometime, I believe,
25      in October until like the first of the year for me to be

8 (Pages 23 to 26)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 59 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 27

1     reinstated, so there was a time when I did receive
2     information from the Arbitrator and there was some kind
3     of delay about returning me back.
4   Q   Do you know the return to work date?
5   A   I believe it was -- no, I don't.
6   Q   Okay.  Was it early, mid-January, late January?
7   A   I think it was the beginning of January.
8   Q   When you were reinstated, did you receive any back pay
9     award?
10  A   No.
11  Q   You were reinstated, no back pay?
12  A   In the Arbitrator's ruling, he believed that I was off
13    for 16 months.  He believed that a two-month suspension
14    would have been appropriate instead of discharge and the
15    Union declined to pursue the back pay.
16  Q   Did you have any other employment other than the ones
17    we've spoken about?
18  A   Yes, I did.
19  Q   Okay.  What other employers did you work for?
20  A   The City of Woodhaven.
21  Q   And when did you work for the City of Woodhaven?
22  A   I believe it was August 27, 2015.
23  Q   Okay.  Until when?
24  A   I would say probably two months ago.
25  Q   So that would be November-ish of 2022?

## Page 28

1   A   October or November.
2   Q   October or November of 2022.  Okay.
3   A   That's correct.
4   Q   And why did you leave Woodhaven?
5   A   Discharged.
6   Q   And what were you discharged for from the City of
7     Woodhaven?
8   A   I contested their promotional process.  I stated to them
9     that -- there was a new Chief appointed.  He was a
10    Captain, Brad Miles.  He was promoted to Chief and in
11    their contract, the previous one, stated that they would
12    use seniority as a means of promotion.  I was the senior
13    paramedic fireman.
14        They switched unions and either that
15    language was removed.  The City Manager who I had issues
16    with in the past wanted the seniority element to be
17    removed.  They initiated some testing, written testing.  I
18    took the test.  I complied with all the requirements.
19    They were upset that I was concerned about the process
20    that they were using and then I did the interview.
21        They said that I scored the highest on the
22    interview.  I don't recall seeing my test scores.
23    Everybody else knew what my test scores were but me, and
24    I was discharged.
25  Q   And were there any specific charges drafted against you

## Page 29

1     or were you just discharged?
2   A   They said that there was a comment that I made to a
3     female firefighter that was on probation.
4   Q   And what comment did they allege that you made to a
5     female probationary employee?
6   A   I don't recall because I didn't see any specific
7     statement that she wrote.  They paraphrased some things
8     and then pursuant to her interview, they interviewed
9     several other female firefighters.  Some of them were my
10    superiors and whatever issues they brought up, it was
11    unbeknownst to me that there was any kind of problem
12    because it was never brought up to me.
13  Q   When they discharged you did they provide you either an
14    investigation or a fact sheet or anything tell you why
15    you were being discharged?
16  A   It was an unsworn meeting.  It was a Garrity hearing the
17    first one which I had Union representation there and I
18    was told before, the day before that I was suspended by
19    Mr. Kyle Fowle who was also an employee with the City of
20    Detroit Fire Department at the time --
21        REPORTER:  The last name, please?
22        THE WITNESS:  Fowle; F-o-w-l-e.
23        REPORTER:  Thank you.
24  Q   (By Mr. McFarlane)  You said he was a City employee as
25    well?

## Page 30

1   A   That's correct.  He at the time separated from Detroit to
2     pursue employment with the City of Livonia.
3   Q   So he was a former City employee that was going to
4     Livonia?
5   A   Permanent.  That's correct.  He was the one that was
6     instrumental in putting myself and Assistant Chief
7     Raymond Birch at the time in contact.
8   Q   Okay.  Do you know when he left the City of Detroit?
9   A   I don't recall.
10  Q   Okay.  So you had a Garrity Interview.  What happened
11    after the Garrity Interview?
12  A   They informed me that I was going to have a Loudermill
13    Hearing.
14  Q   Did that hearing go forward?
15  A   I'm sorry?
16  Q   Did that hearing go forward?
17  A   That's correct.
18  Q   And when did that hearing go forward?
19  A   I don't recall when the date was.  It was probably a
20    couple weeks after the Garrity.
21  Q   And then what happened at the Loudermill Hearing?
22  A   They just told me the person who was conducting the
23    meeting which was not the City Manager, I really don't
24    know who he was.  He just told me that they didn't
25    believe anything I had to say and that concluded the

9 (Pages 27 to 30)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 60 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 31

1    meeting.
2  Q  Did you ever receive written charges?
3  A  No.
4  Q  No.  Did you appeal the discipline?
5  A  The Union sent me an email.  At first, they had a
6     representative from the Union.  I can't remember his
7     name.  He was a retired policeman with the City of
8     Woodhaven that somehow he managed to become our
9     bargaining agent for same city that he retired from and
10    he left the Union, so I had no representation and then at
11    the time I was told by the full-time Union representative
12    that Gerald James would be overseeing my case with the
13    City of Woodhaven.
14 Q  Did Gerald James work for the City of Woodhaven?
15 A  No.  He was a representative with the Michigan
16    Association of Fire Fighters.
17 Q  And what did they have to do with your Union procedure,
18    if you know?
19 A  Because it was a discharge and I don't recall seeing what
20    the process was, my understanding is that I was
21    represented by the business agent for the Union and
22    because he left, they were going to have Gerald James
23    look at it and he was going to look into the matter and
24    then they abruptly turned it over to somebody else which
25    I don't remember what his name is.

## Page 32

1  Q  So it went from Gerald James to somebody else?
2  A  That's correct.
3  Q  What Union were you in at Woodhaven?
4  A  The Michigan Association of Fire Fighters.
5  Q  Do you know how the Hearing Officer – I don't know if
6     that's the right term.  Are they called Hearing Officers?
7     Do you know what they're called that oversee the
8     discipline cases?
9  A  To my understanding, they're referred to as a business
10    agent.
11 Q  So Gerald James would have been the business agent?
12 A  I don't know what his title is there, but he was assuming
13    the role.
14 Q  Okay.  And do you know how the business agent position
15    is, like, are there more than one business agent?
16 A  I have no idea what their organizational structure is.
17 Q  And for your Union was there a Local or was it just
18    Michigan Association of Fire Fighters?
19 A  It was a Local.
20 Q  And do you know your Local?
21 A  I don't recall what the number was.
22 Q  Okay.  And so then it went from Gerald James to somebody
23    else and you said you don't recall that individual's
24    name.  Correct?
25 A  That's correct.  I met him one time.  It was another

## Page 33

1     hearing that they had.  I don't remember what they called
2     it.  It was another meeting.
3  Q  And what happened at that meeting?
4  A  The gentleman that was my representative said that we're
5     going to tell them that their allegations are baseless,
6     that there's nothing to support whatever their
7     allegations are and that we're going to proceed through
8     the process.
9  Q  Is that process still ongoing or is it concluded?
10 A  No.  I received a letter from the Union stating that they
11    were not going to pursue the grievance.
12 Q  And when did you receive that letter?
13 A  It was an email.
14 Q  Do you know when you received that?
15 A  Probably about three weeks ago.
16 Q  And is there any appeal process or is that the end of the
17    grievance procedure?
18 A  I thought about contacting the Michigan Employment
19    Relations Commission to challenge the Union's decision
20    and the Employer's decision to terminate initially.
21 Q  And did you contact MERC?
22 A  Not yet.
23 Q  So is that something you're still considering?
24 A  I've have issues with this Union before when I was
25    working with the City of Flat Rock which was in between

## Page 34

1     Riverview and Woodhaven.
2  Q  Let's talk about you said City of Flat Rock?
3  A  That's correct.
4  Q  And when did you work for the City of Flat Rock?
5  A  Around the time that I was discharged from Riverview.  I
6     would say probably 2016.
7  Q  And when did you leave the City of Flat Rock?
8  A  I was there for pretty much the duration of the time that
9     I was terminated from Riverview, so around the time when
10    I think it was the summer or the fall of 2017.
11 Q  So did you leave Flat Rock when you went back to
12    Riverview?
13 A  No.  I was actually maintaining employment with three
14    departments.
15 Q  So you maintained employment with Flat Rock while still
16    at Riverview?
17 A  When I was coming back to Riverview.
18 Q  Are you still working with Flat Rock?
19 A  No.
20 Q  Do you know when that employment relationship ended?
21 A  I want to say I know they weren't happy with the fact
22    that I told them that I was returning to Detroit, that I
23    was pursuing returning back to the City of Detroit.  I
24    want to say, you know, honestly, I don't recall the exact
25    date.

10 (Pages 31 to 34)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 35

1  Q   Can you give me a year; 2017, 2018?
2  A   Probably 2018.
3  Q   And why did you leave the City of Flat Rock?
4  A   I was supposed to come off probation the preceding year
5      which was 2017 on or about December 6th or 7th.  I made
6      an agreement to have a 12-month probation.  At that time,
7      I would come off probation and be on the roster as a
8      part-time fireman/paramedic.
9          My probation was extended, but it was
10     never articulated to me why and the Union declined to
11     file a grievance to force the city to decide if I was
12     going to be coming off probation or not.  After returning
13     from a call where a seven year old was unresponsive in a
14     mobile home park, there was some issue with the response
15     time and the next day I was interviewed by the Assistant
16     Chief who was assuming the role of the Chief because the
17     current Chief Vack, V-a-c-k, William Vack, was on medical
18     and the then Chief who is now the Mayor was assuming the
19     role of the Fire Chief and terminated my employment as a
20     result of their investigation about the call.
21  Q   And go ahead.  You said it was alleged.  What was the
22     allegation?
23  A   That I was encouraging the woman to file a complaint
24     against the city for the poor response time which I
25     didn't do.

## Page 36

1  Q   And did you receive written discipline in that case?
2  A   I heard that there was some complaint that a Sergeant
3      made about insubordination.  I never seen anything, but
4      it implied that we didn't do our station duties prior to
5      the shift change which he was assuming command of the
6      shift and the person who was in charge was a lower
7      licensed level than me, but because of his seniority,
8      that put him in charge and told we needed to do the
9      duties and he found something better to do.
10         Then when there was an issue about why
11     those duties weren't done, I told him that he could just
12     talk to the duty officer and he declined.  He wanted to
13     hear it from me and I told him I was working on my EMS
14     report and that's what my delay was and he didn't like
15     the answer I gave him.
16  Q   Did you have a partner on that run?
17  A   That's correct.
18  Q   And was your partner disciplined?
19  A   No.
20  Q   Were you in a Union at Flat Rock?
21  A   That's correct.
22  Q   And what was that Union?
23  A   Michigan Association of Fire Fighters.
24  Q   And did you appeal that discharge?
25  A   At the time, Joe O'Connor was the business agent for the

## Page 37

1      Flat Rock Fire Department and when I asked fire fighter
2      Tim Webb who was the Union President for our Local, he
3      said that I would have to talk to Mr. O'Connor about it
4      and when I spoke to him, Mr. O'Connor, I said, "You know,
5      I went through a lot with this department with harassment
6      and changing the guidelines to complete probation and all
7      the other things that happened during my employment
8      there, including comments that were made and things that
9      were said that were outrageous."
10         He stated to me, "Why would you want to
11     work for a department like that anyway," which to me it
12     didn't seem like, my perception is that they weren't
13     going to pursue any grievance for the discharge.
14  Q   So for their grievance process would you have to file a
15     grievance or is it the Union's choice?
16  A   To my understanding, it's the Union's choice if they're
17     going to pursue filing a grievance.
18  Q   And did they pursue filing a grievance in that case?
19  A   No.
20  Q   So you were discharged from Flat Rock.  Did anything
21     occur after that?
22  A   Could you repeat that?
23  Q   After you were discharged from Flat Rock, did you have
24     any other interaction with Flat Rock?
25  A   I had a lawsuit pending after my discharge.

## Page 38

1  Q   Okay.  And what were the claims in that lawsuit?
2  A   Well, the Fire Department was operating with expired
3      equipment which I repeatedly reported and the day after
4      my discharge, two people were murdered in the community
5      and the response was from an ambulance that had under-
6      licensed personnel in an ambulance that was set up for
7      advanced life support and their concern was that I was
8      going to report it to the State if they didn't make those
9      changes.  I had done - I'm sorry.  Your question?
10  Q   No, go ahead.  You can continue.  I didn't mean to cut
11     you off.
12  A   I just took issues with the department as an operator
13     from the standpoint that I was reporting expired
14     equipment as well as working with under-licensed staff
15     doing procedures that were not in their scope of practice
16     and I was uncomfortable with the fact that they were
17     doing these procedures and then they would transfer care
18     to me which I would essentially take the person to the
19     hospital and have to explain, you know, what they did
20     prior to me getting there and so on and so forth and I
21     just kept raising the issue that at some point I wasn't
22     trying to make decisions there for them, but I think that
23     some other Commander made some poor decisions as far as
24     transferring care to lower licensed personnel which
25     they're not supposed to do and just different things like

11 (Pages 35 to 38)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 62 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 39

1    that and then they just wanted me to explain it and I
2    just didn't feel comfortable doing it.
3    Q   And what was the result of that lawsuit?
4    A   It was settled.
5    Q   And when was that lawsuit settled?
6    A   Officially, I don't know.
7    Q   Was it recently or a few years ago?
8    A   Recently.
9    Q   So would it be the last year or the year before?
10   A   This year.
11   Q   This year.  So 2022 or 2023?
12   A   I stand corrected.  It was 2022.
13   Q   I just want to make sure.  One of those odd situations
14       where that's actually relevant today, five days ago.
15   A   I just want to state if I can to the attorney that my
16       employment with Flat Rock, the City of Flat Rock, was
17       quite contentious because the first day that I started
18       there, one of the Sergeants, Ray Rich, approached me and
19       said, he stated, "I don't like what you did in the City
20       of Detroit and I don't like what you did in Riverview and
21       I'm not going to tolerate any of that here.  If I feel
22       that you're going to do any of those things, you're going
23       to be out of here."
24   Q   Go ahead.  I'm just going to ask, who's Ray did you say
25       Rick or Rich?

Page 40

1    A   Rich; R-i-c-h.
2    Q   And who is that?
3    A   He was a Sergeant with the Flat Rock Fire Department.  I
4        never had any interactions with him outside of that.
5    Q   Was he your Sergeant?
6    A   He was one of the command officers that was there, not
7        directly over me that particular day.  I believe I was
8        there to secure some equipment, you know, like PPE they
9        call it, Personal Protective Equipment, to start
10       responding to calls and uniforms and so on.
11   Q   And you said you had no interaction with him after that
12       date?
13   A   That particular day, but as I would come in from home
14       responding to calls, I would have direct interaction with
15       him until they put me on shift which happened about six
16       months.  With all due respect, there seemed to be some
17       theme where even with my employment with the City of
18       Detroit that there was an issue with response times and
19       personnel and other issues as far as, you know, the
20       ambulances running, are they equipped to run, were there
21       enough, were they available, and the issue with Riverview
22       was the fact that they were concerned about if I was
23       going to be able to dedicate a time because they were
24       down an ambulance every day which was part of the reason
25       why I was originally discharged.

Page 41

1    I brought awareness to the community
2    through Facebook that there were issues with staffing and
3    that if they needed an ambulance, that they needed to
4    raise their concerns with City Hall.  I was a Union
5    representative at the time.  My activities were
6    protected.
7    I felt that it was a danger to the public
8    and they had a right to know and in Flat Rock it was the
9    issue about the fact that this lady called for an
10   ambulance and one didn't show up because the police
11   department failed to initiate the ambulance response and
12   the call was held up and they took issue with the fact
13   that if I raised concerns about the response times and
14   lack of response times in the City of Detroit, that I
15   could potentially do that in the City of Flat Rock.
16       MR. SHEAROUSE:  Jason, real quick, can we
17   take a quick five minute break so that I can get some
18   more water?
19       MR. MCFARLANE:  Sure, no problem.  We'll
20   come back at 11:10.
21       MR. SHEAROUSE:  Thank you.
22       (At 11:04 a.m., recess taken)
23       (At 11:13 a.m., back on the record)
24   Q   (By Mr. McFarlane)  Let's continue where we left off, Mr.
25       Cadoura.  Where did you work after the City of Riverview?

Page 42

1    A   I was still employed with the Woodhaven Fire Department
2        and Flat Rock.
3    Q   And was that in 2018?
4    A   In the beginning.
5    Q   And are you employed by Woodhaven and Flat Rock still?
6    A   No.
7    Q   Are you currently employed?
8    A   That's correct.
9    Q   And where are you currently employed?
10   A   At Octapharma Plasma.
11   Q   And can you spell that?
12   A   O-c-t-a-p-h-a-r-m-a.
13   Q   And what did you do there?
14   A   I'm what's referred to as a physician substitute.
15   Q   And what are your job duties?
16   A   To perform physicals on prospective plasma donation
17       candidates.
18   Q   And when did you start working there?
19   A   I believe it was August 2021.
20   Q   Was there ever a time where you were unemployed from any
21       position?  Was there ever a time where you went without
22       an employer?
23   A   No.
24   Q   Okay.  So between where you are – any other positions
25       that you are currently employed other than Octapharma

12 (Pages 39 to 42)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 63 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 43

1    Plasma?
2  A  No.
3  Q  Okay.  So how many hours do you work there?
4  A  Anywhere between, well, we're required to work full-time
5     hours which is anywhere between 32 and 40.
6  Q  And how many hours do you actually work?
7  A  It was a busy time this last year.  They were low on the
8     position that I carry and I was promoted to a travel
9     position substitute, so I would travel to different
10    centers.
11        They're required to have medical staff on
12    site in order to stay open and without medical personnel
13    on staff, they can't operate.
14  Q  So how many hours were you putting in a week?
15  A  Anywhere between 40 and 70.
16  Q  And are you paid hourly or salary?
17  A  Hourly.
18  Q  And what's your hourly rate?
19  A  Probably anywhere between I think the last that I knew
20    was $30.57 an hour.
21  Q  I'm sorry.  I missed that.  Could you repeat that?
22  A  $30.57 per hour.
23  Q  And do you have any benefits?
24  A  Full-time health benefits.
25  Q  Any dental?

## Page 44

1  A  Yes.
2  Q  Any vision?
3  A  Yes.
4  Q  Any pension or 401(k)?
5  A  401(k).
6  Q  And were there any other employers that we haven't
7     discussed between Riverview and Octapharma Plasma?
8  A  I worked for a company called DM Care Express.
9  Q  Okay.  And when did you work for them?
10  A  I'd probably say anywhere between 2015 and 2017.
11  Q  And what did you do there?
12  A  I was part of the event staff.  I was a paramedic.
13  Q  And why did you leave DM Care?
14  A  A scheduling conflict between Woodhaven and Flat Rock.
15  Q  Are there any other employers that we haven't discussed?
16  A  U.S. Steel.
17  Q  And when did you work at U.S. Steel?
18  A  I would say in the spring of 2017.
19  Q  And how long did you work at U.S. Steel?
20  A  About two weeks, a little over two weeks.
21  Q  And why did that employment end?
22  A  I resigned because I would not climb a 30-story blast
23    furnace without a safety harness.  I thought the safety
24    standards there were lacking.  I didn't think that – not
25    to mention, Zug Island is one of their facilities which I

## Page 45

1     would be required to be stationed and they had some of
2     the highest recording Benzene levels in the world which
3     are toxic and I just didn't want to be exposed to.
4  Q  After, other than that, have you done any other
5     employers?
6  A  I worked for Hillsdale County EMS.
7  Q  And when did you work for Hillsdale?
8  A  It was a couple months.
9  Q  And why did you leave Hillsdale?
10  A  The pay.
11  Q  And where did you go when you left Hillsdale?
12  A  Well, I was still working with Woodhaven.
13  Q  When did you leave Woodhaven?
14  A  I believe it was October or November of last year, 2022.
15  Q  And why did you leave Woodhaven?
16  A  I was discharged.
17  Q  Have we talked about that one already?
18  A  That's correct.
19  Q  I'm just trying to make sure.  I got it.  Okay.  Any
20    other employers between Riverview and present?
21  A  That I can recall off the top of my head, no.
22  Q  Okay.
23  A  I was working with Riverview when I became a paramedic in
24    2008, so my employment with them ran concurrent with
25    Detroit up until I thought was my

## Page 46

1     resignation/termination.  I really don't know what you
2     call it.
3  Q  Did you fill out any documents when you left the City of
4     Detroit?
5  A  At the time they switched over to a computer system where
6     we would clock in and clock out and we used to sign in on
7     a sheet, a payroll sheet, and then we would log into the
8     journal which would open and close a shift and then we
9     would record any overtime and so on and then they
10    switched to a computer system where we would clock in and
11    clock out and then anything that the administration would
12    need, we would do – it was a fairly new computer system,
13    so I was still trying to figure it out.
14        We still would write letters and so on as
15    requested because they would have to initiate multiple
16    copies and then they would have to sign one.  They would
17    have to sign them all and then return one to us and then
18    keep the other two.
19  Q  When you resigned from the City of Detroit did you fill
20    out a resignation form?
21  A  I wrote a letter.  I either wrote it or I sent it in an
22    email.  I don't recall which one because I never received
23    a copy, to my knowledge.
24  Q  I'm going to show you we'll mark – I think we're on
25    Exhibit 5 if I'm correct?

13 (Pages 43 to 46)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 64 of 119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 47

1            REPORTER: Yes, Exhibit 5.
2            (At 11:23 a.m., Defendant's
3            Exhibit 5 marked)
4   Q   (By Mr. McFarlane) Let me share this. Have you seen
5      this document before, sir?
6   A   I don't remember it, but it does look like my writing.
7   Q   Does this appear to be your signature here?
8   A   That's correct.
9   Q   Okay. Have you ever seen this document filled out below
10      your signature before?
11   A   No.
12   Q   Have you ever requested your personnel file from the City
13      of Detroit?
14   A   I did.
15   Q   And when did you do that?
16   A   After I was told that I couldn't return to the department
17      when I received a call from Ms. Brown.
18   Q   And did you ever receive a copy of that personnel file?
19   A   I did from the City of Detroit Law Department, not from
20      the Fire Department. I received a call from an attorney
21      from the Law Department and when I called her back – I
22      don't recall what her name was, but she said I'm looking
23      at a FOIA request for your employee file and I said,
24      "That's correct." She said, "I'm curious why they just
25      didn't give it to you, why they forwarded it here." I

## Page 48

1      said, "I don't have a clue either." Then she said, "Give
2      us about two weeks to review the file to make sure that
3      nobody else's names or anything appears in there and that
4      it doesn't violate HIPPA," or, I'm sorry, not HIPPA, the
5      guidelines, the federal guidelines for the collection of
6      information on our EMS run reports as well as just
7      protecting the names of other technicians and so on.
8      Then I was told that the file was ready to
9      be picked up. I went down to, I believe, the City-County
10      Building. I was told that I had to pay ten cents per
11      page, I believe. They told me it was $33.00 I believe
12      and .10 cents because it was 300 or so pages.
13   Q   Okay. I want to talk about the damages that you're
14      alleging in this case. Are there any economic damages
15      that you're alleging you suffered in this lawsuit?
16   A   I want to be clear that serving with the Detroit Fire
17      Department was probably by far the best job that I ever
18      had. It was an honor and a privilege serving the
19      community, being recognized as an Emergency Medical
20      Technician with the Fire Department and as a result of
21      things that went on over there with, you know, the
22      exposure of the response times and the personnel issues
23      and everything else that went on there, the job schedule
24      was, I mean, nobody else.
25      We had the best schedule ever that

## Page 49

1      accommodated for time off and the money was good for the
2      position that I was carrying and to be honest with you, I
3      carried a lot of responsibility. I haven't found a job
4      like that since. I enjoy what I do at the plasma center,
5      but that job was the best.
6      The money, I was very well paid by the
7      City. What I wanted to do was to become a paramedic to
8      make more, carry on more responsibility. I wanted to
9      transfer to the Fire Fighting Division, which I wasn't
10      allowed to do, but there was no growth and there was no
11      opportunity to promote to Lieutenant or maybe even a
12      Captain and I wanted to retire from that place and I
13      would have been doing it this year.
14      Damages are far more than economic. I
15      loved that place.
16   Q   Let's take it in turn. So economic damages, what
17      specific damages regarding economics? Are there any that
18      you can tell me that you're claiming here?
19   A   I believe so. I believe that if I was able to follow the
20      natural progression from being a paramedic which their
21      pay last I was made aware was around $28, and that I was
22      told with the ability – they asked me upon returning if I
23      was going to consider going to the Fire Academy, which I
24      expressed interest that I was going to try to become a
25      fireman there and they now have a cross-position pay

## Page 50

1      which was an increase.
2      I was talking to somebody the other day. I
3      can't remember who it was. In passing they said that a
4      lot of people were leaving the job because they were
5      promised crossover pay which is crossover meaning that
6      you're a fire fighter and you're an EMT or you're a
7      firefighter and you're a paramedic and that they hire
8      people at a higher rate than what the current EMT
9      position carries or what the current paramedic position
10      carries and, I mean, I could have been a fireman there
11      working eight days a month and could have pursued outside
12      employment if I wanted to or worked overtime when it
13      became available.
14      I really don't know what the possibilities
15      could have been financially or personally. I mean, to
16      try to obtain one of the highest positions in the Fire
17      Department, I worked with Mr. Larkins who is the current
18      sitting EMS Administrator and he was my paramedic
19      partner.
20      I worked with him for years. I thought it
21      was the greatest thing that he got promoted to be the EMS
22      Chief there. Did I have aspirations of joining his
23      administration some day and possibly passing down what I
24      learned on the job to younger people to make it a safer
25      environment for them, I really don't know what would

14 (Pages 47 to 50)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 65 of 119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 51

1    happen.
2  Q   Okay.  You talk about emotional or psychological damages.
3      Are you claiming any of those here?
4  A   I don't know if that's included, but I can tell you
5      respectfully, that is a highly trained Fire Department.
6      The things that we do there are not done anywhere.  When
7      I applied with other departments to go work, they had a
8      real problem with the fact that I did some things that
9      they'll never do in their entire career and it was just
10     over one weekend, so there was a lot of backlash with the
11     experience that I had from Detroit.
12           There were a lot of people that talked
13     about wanting to work there, but they didn't have the
14     courage to go through the training or to even apply let
15     alone to go through the training and pass it to become one
16     of the best EMTs or firemen or paramedics in the world.
17           I would put them against people in New
18     York, LA, Miami, anywhere, and because of the things that
19     happened in Detroit as far as being on TV, being on the
20     news, and reporting the issues that were going on there,
21     maybe my employers took notice of that and that I could
22     possibly potentially do that at their place of employment
23     which they did have issues like the City of Detroit did.
24           No other departments are immune from the
25     type of problems that the City of Detroit had with

## Page 52

1      personnel issues, staffing, the vehicles, maintenance,
2      and response times.  I mean, it's a problem nationally.
3  Q   Have you sought – I'm sorry.  I thought you were done.
4  A   No.  I think – I don't think I ever really left there.  I
5      think that my heart and my mind was always there.  I was
6      still concerned about the personnel during COVID and
7      whatever issues were happening and I felt helpless.
8      Like, I couldn't do anything for them.  I felt that I
9      should have been there working with them.
10 Q   Have you sought any treatment for any emotional or
11     psychological injuries?
12 A   I was diagnosed with PTSD.
13 Q   And when was that?
14 A   I don't recall.  Probably sometime after I left.
15 Q   Was that prior to the events of this lawsuit?
16 A   That's correct.
17 Q   Have you sought any treatment after the events of this
18     lawsuit?
19 A   Just, you know, I received a lot of calls from people
20     that either were still currently working there or had
21     worked there.  They stated that they heard I was coming
22     back.  There seemed some element of excitement.  I
23     messaged Joe Barney on Facebook messenger.
24           I told him that I appreciated any possible
25     way that he could help, you know, in returning me back.

## Page 53

1      He seemed enthusiastic at the time.  There was a – I
2      don't remember his first name, but his last name was
3      Kazinski (phonetic), I believe.
4           Kazinski.  I'm not sure how to spell that.
5      It starts with a K, and we messaged back and forth on the
6      Facebook messenger and he told me that they needed me to
7      come back to mentor some of the younger kids that didn't
8      know what we experienced and what we went through.
9           Between those years after I exposed the
10     issues with a fellow co-worker about the issues with
11     response times and so on that was going on, so I believe
12     that there was a potential element to me returning.
13           I'm not, you know, the second coming,
14     respectfully.  I'm not the - I'm just one person, but I
15     believe that when I worked there, I had a lot of
16     credibility, had a lot of respect from the people that I
17     worked with and I was going to do my part to help move
18     the department forward and knowing that I wasn't
19     going to be able to come back for whatever reason, I was
20     devastated.
21           I believe that I started my EMS career
22     there even though I had a couple of years experience
23     with, you know, Community Ambulance and Health Link, but
24     I believe that the day that I started that job with
25     Detroit was really the beginning of my career and I

## Page 54

1      wanted it to end there.
2  Q   So after you were told that you couldn't return to the
3      City of Detroit, did you seek any treatment for any
4      emotional or psychological injuries?
5  A   I talked to a therapist about, you know, that issue.  I
6      also tried talking to the EAP representative, I believe,
7      assistance.  It was through the Chaplin Core with the
8      Detroit Fire Department at the time.  He's now deceased.
9      At the time it was Reverend McNeely.  M-c-N-e-e-l-y, I
10     believe.  I went and spoke to him personally, told him
11     that I couldn't understand the issues that I was going
12     through with the Fire Department as far as the repeated
13     discipline, the suspensions, just the overall treatment
14     from some of my Lieutenants and Captains and there was a
15     fair percentage of them that were providing the
16     information to leak to the media about some of the
17     current situations that were going on in the department.
18           Why they didn't go and report those issues
19     themselves, I don't know.
20 Q   When did you speak to Reverend McNeely?
21 A   I believe when I was on light duty as a result of not
22     being able to shave every day.  They wanted me to wear a
23     hood in the event that we were exposed to somebody who
24     was having symptoms of hepatitis or tuberculosis, that we
25     would have to don our respiratory protection and to my

15 (Pages 51 to 54)

TAMARA A. O'CONNOR
248.882.1331   toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 66 of 119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 55

1 understanding that those filters were one time use.
2 Those things were very expensive for the City to buy and
3 they claimed that they would only buy one for me and
4 wouldn't pay for the replacement filters or cartridges
5 and there were other people that had them and never used
6 them, but I spoke to Reverend McNeely about the issues
7 that were going on.
8 He said that he would talk to some of the
9 administrators to find out what the issues were. I spoke
10 with the Commissioner. Well, actually, I never met the
11 Commissioner although every time I faced a suspension or
12 I was placed off duty for talking to somebody in the
13 media or it was alleged that I was talking to somebody
14 from the media, I would immediately be placed on
15 administrative leave pending a Commissioner's hearing.
16 I never actually – the only Commissioner
17 that I ever met was Don Austin. He was a Fire
18 Commissioner for a short time. I met him on duty as well
19 as off duty to address my concerns about the issues that
20 were going on relevant to my discipline, my multiple
21 suspensions.
22 It just seemed like there was no
23 resolution to anything that was going on there. If I
24 would be called in because I was being disciplined, the
25 first thing they would tell me is that it's not

## Page 56

1 adversarial. They would tell me what the charge is, what
2 the penalty is, and then I would go on immediate
3 suspension without being able to explain the situation to
4 determine if there was a misunderstanding or something
5 that could have resolved the issue and I could have been
6 replaced back to duty.
7 It did happen one time which I was shocked
8 that I was returned back to the field and not suspended.
9 Q And is it fair to say that you met with Reverend McNeely
10 before you resigned from the City?
11 A That's correct. I was assigned to Fire Department
12 Headquarters which was at 250 West Larned. It's
13 currently not in existence anymore, but at the time I was
14 assigned there and had to carry out various
15 administrative duties and he was on the same floor we
16 were on.
17 So I remember going to his office. I would
18 say good morning to him every morning.
19 Q You mentioned that you saw a therapist. When did you see
20 a therapist?
21 A I can't recall. Probably sometime after that.
22 Q Was it prior to 2017?
23 A That's correct.
24 Q Have you seen a therapist since 2017?
25 A I was seeing one and then I met a different one. I

## Page 57

1 didn't have insurance after I left the City, which again
2 was a hardship. They have very good health insurance. I
3 didn't pay anything for like ten years, and they started
4 charging us or having, you know, I don't know what they
5 call it, not co-pays, but we would have to pay a certain
6 amount for our insurance which wasn't a big deal.
7 You know, we were very well paid, so I
8 didn't have an issue with that, but when I went on
9 Medicaid, I had to go to a guidance center that accepted
10 people without insurance.
11 Q And when was that?
12 A Probably – I don't recall, honestly.
13 Q You got a year?
14 A It might have been about 2018 right around the time when
15 I knew that I wasn't coming back to the City.
16 Q And who did you see in 2018?
17 A I don't recall her name.
18 Q And what was the place you went to?
19 A The Guidance Center.
20 Q And where is that located?
21 A In Southgate.
22 Q And you saw, you said it was a female doctor?
23 A It was a therapist. Well, there was a psychiatrist
24 there. I spoke with her briefly and there was a
25 therapist that they assigned me.

## Page 58

1 Q And you don't recall her name?
2 A No.
3 Q And how many times did you see her?
4 A Probably once a week.
5 Q For how long?
6 A Until we got insurance through HAP and then I was no
7 longer on Medicaid, so I couldn't, we couldn't
8 participate in that program anymore because of the fact
9 that we have good health insurance.
10 Q And when you say you got insurance, who did you get that
11 insurance through?
12 A HAP; Health Alliance Plan.
13 Q Did you get that through an employer or on your own?
14 A No, through my wife. She was employed with Henry Ford
15 Hospital.
16 Q And did you see anybody after that?
17 A No.
18 Q And do you recall approximately when your wife got that
19 insurance?
20 A I don't recall when she was employed there.
21 Q Do you recall how many times you saw the therapist?
22 A It was a handful of times. Maybe ten times, maybe less,
23 maybe more. She took a position with the hospital, I
24 believe, and the psychiatrist was leaving, too, and
25 around that time they couldn't find – I think I spoke to

16 (Pages 55 to 58)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 67 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

## Page 59

1 another lady.
2 I can't remember her name. I think I
3 spoke to her once.
4 Q And were you ever diagnosed with anything from that
5 therapist?
6 A I believe they told me it was PTSD related from the job.
7 Q Did they say specifically which job?
8 A I don't recall. I focused a lot about the beginning of
9 my career with the City of Detroit. It was the longest
10 employer that I've had in the field that I practice in.
11 Q Any other issues that you discussed other than the
12 beginning of your employment?
13 A We never really got that far in the ten or so visits. We
14 were just, you know, just -- she was trying to find out a
15 little bit about me. I think the sessions were probably
16 like 45 minutes, if that.
17 Q Did you ever receive any written diagnosis or reports
18 from that therapist?
19 A Nothing from them. I mean, it was in my file there, but
20 I never requested it.
21 Q Any other therapists other than the one at the Guidance
22 Center that you've spoken to?
23 A There was just one before that like in the very
24 beginning.
25 Q And when was that?

## Page 60

1 A While I was working in Detroit.
2 Q So that would be somewhere prior to 2013?
3 A That's correct.
4 Q Okay. You mentioned that you have social media. What
5 social media do you have a subscription to or are you
6 registered with?
7 A Facebook, Instagram. I don't post. I just have family
8 on there as friends and then I subscribe to some pages
9 that deal with other Fire Departments, you know, to see
10 how they operate, what the conditions are there, the
11 types of things that they experience, you know, on the
12 job.
13 Just different ones. I don't really know
14 how they do it, but it's like when they see you looking
15 at something, they just start sending you more of it,
16 more content, and just about, you know, diet and
17 exercise, some law enforcement pages. I did have -- I
18 don't even know if you would classify it as an employer,
19 but I was a reserve deputy with the Wayne County Sheriffs
20 for about ten years, but I was never paid.
21 It was voluntary. It was a community
22 service position. The Chief at the time, I believe his
23 name was Chief Stewart Rich who passed away last year
24 towards the end of 2022. I don't remember exactly what
25 month, but I did do community service with them on and

## Page 61

1 off for about ten years.
2 Q Have you had any discussions regarding the complaints in
3 your lawsuit with anybody other than your attorney?
4 A To my knowledge, no.
5 Q Do you have any written documents, notes, that were taken
6 prior to the filing of this lawsuit?
7 A I'm sorry. Repeat that one more time.
8 Q Do you have any written notes or documents that you kept
9 either typed or handwritten relating to this lawsuit that
10 were created prior to the lawsuit?
11 A No. The only person that I spoke to was Bill Harp. He
12 was one of the representatives of the DFFA at the time.
13 When I was reapplying with the City, I spoke to him to
14 ask, you know, how I would go about reapplying with the
15 City and he told me at this point there was nothing he
16 could do to help me because I wasn't employed with the
17 department and then that was it.
18 I spoke with Kyle Fowle who I worked with
19 at Woodhaven because at the time he was still working in
20 Detroit.
21 Q And what's Kyle Fowle's position?
22 A Right now?
23 Q When you spoke to him or right now. Either way?
24 A He was a part-time fire fighter/paramedic like myself,
25 but he was also -- I'm sorry. Say that again?

## Page 62

1 Q What was his position with the City of Detroit?
2 A Paramedic.
3 Q Paramedic, and was he a full-time paramedic when you
4 spoke to him?
5 A That's correct.
6 Q And is he still, if you know, employed with the City of
7 Detroit?
8 A No.
9 Q And do you know why he's not employed by the City of
10 Detroit?
11 A To my understanding, he resigned to pursue outside
12 employment with another full-time agency. Ironically, as
13 close as him and I, I thought we were, you know, working
14 at Riverview, not Riverview, Woodhaven, he wrote a letter
15 that resulted in my suspension which led to my
16 termination.
17 Q And that's at Woodhaven?
18 A That's correct. He told me about it the night before. I
19 was placed on suspension the Monday of whatever month
20 that was. Maybe September, October. He told me the day
21 before that I was suspended that they were conducting an
22 investigation about me and that he was forced to initiate
23 a writeup, but at the time when him and I were working at
24 Woodhaven and we was still employed with the City of
25 Detroit, he says, "You need to get back on the job so we

17 (Pages 59 to 62)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 68 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 63

1     can work together and then work there until we can
2     retire."
3  Q  Anybody else that you spoke to about the allegations in
4     this lawsuit?
5  A  I just had a conversation with he's a Lieutenant who was
6     talking about retiring and told him that when he retired
7     officially from the department that there would be a job
8     at Octapharma if he wanted to come there.
9  Q  And what Lieutenant was that?
10 A  Steve Strong.  We didn't discuss anything about anything
11    to do with Detroit other than just he told me that he was
12    going to stay past his retirement time.
13 Q  Did you guys discuss this lawsuit?
14 A  No, sir.
15 Q  Anybody else that you discussed this lawsuit, again,
16    other than your attorneys?
17 A  You said before?  Before the filing of the lawsuit?
18 Q  Yes.  No, that's when I was asking about the written
19    documents.  I'm saying have you discussed this lawsuit
20    with anybody other than your attorneys?
21 A  I spoke to a Lieutenant there.  He's Arabic.  I can't
22    remember his name.  We just talked briefly.  I just asked
23    him about how, you know, things were there, that I was in
24    the process of trying to come back and then that was it.
25 Q  And when did you speak to him?

Page 64

1  A  It's been years.
2  Q  Any other discussions about this lawsuit with anybody
3     other than your attorneys?
4  A  No.  Not to my knowledge, no.
5         MR. MCFARLANE:  I'm going to take a break.
6     I may be done.  I'm going to take about a 15 minute or so
7     minute break, so 12:10.  Everybody is good?
8         MR. SHEAROUSE:  That works for me.
9         MR. MCFARLANE:  All right.
10        (At 11:54 a.m., recess taken)
11        (At 12:11 p.m., back on the record)
12        MR. MCFARLANE:  Back on the record, Tammy?
13        REPORTER:  Yes.
14        MR. MCFARLANE:  I have no further
15    questions.
16        MR. SHEAROUSE:  I just have a few follow-
17    up questions.
18            EXAMINATION
19 BY MR. SHEAROUSE:
20 Q  Mr. Cadoura, thank you for your time here today.  I know
21    we discussed a lot about your employment history as well
22    as some of the issues that you've had at the various
23    places of employment.  Could you just briefly describe to
24    me, I know we had mentioned earlier that you complained
25    or I shouldn't say complained – strike that, you brought

Page 65

1     up issues with certain policies that weren't being
2     followed at Detroit.  Is that correct, the Detroit Fire
3     Department?
4  A  That's correct.  It was brought to the public's attention
5     because a news reporter who was looking into issues that
6     were going on in the department, he wanted to challenge
7     some of the things that he had heard as far as the
8     Commissioners had claimed that they were following the
9     national standard and they wanted to get video proof that
10    it wasn't.
11 Q  And this national standard had to do with response times.
12    Is that correct?
13 A  That's correct.
14 Q  Were there any other policies that Detroit was not
15    following at that time, to your knowledge?
16 A  For a time they had radios in the ambulances where we
17    were supposed to use to contact the hospital that were
18    outside of the city and those were removed from the
19    ambulances when they were putting newer ambulances into
20    service.  At the time, that was Chief Gary Kelly that
21    instituted that and then they were later put back on
22    because the issue was brought to a government
23    organization called HEMS, which is H-E-M-S, and they sent
24    the letter to the City stating that they heard that the
25    radios were taken out and that they needed to be placed

Page 66

1     back in immediately.
2  Q  And at Detroit did you notice any issues with under-
3     licensing of EMTs or paramedics?
4  A  They were putting us in Crown Victorias which were
5     refurbished police cars that they turned into
6     administrative cars for the Lieutenants and Captains and
7     the Fire Chiefs and they wanted us to respond to calls
8     with limited equipment.  They weren't even – the
9     ambulance is licensed based on the State.
10
11        If you don't have an ambulance where you
12    can put somebody in to transport them to the hospital,
13    they refer to that as a Romeo unit.  The standard
14    spelling R-o-m-e-o, and that is two licensed EMTs that
15    can only respond as first responders, but could not put
16    them in the vehicle and transport them to the hospital.
17        I worked on those vehicles many times.
18    Sometimes we were the subject of criticism by the public
19    because they're essentially waiting for an ambulance and
20    all we were doing was trying to render care while we're
21    waiting for an ambulance which was the phrase that we
22    heard a lot which was, "no units available City-wide or
23    just no units available," and so on.
24        MR. SHEAROUSE:  I don't think I have
25    anything further.

18 (Pages 63 to 66)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 69 of
119

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 67

```
1            MR. MCFARLANE:  I have no further
2   questions.
3            (At 12:15 p.m., deposition concluded)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 68

C E R T I F I C A T I O N

(STATE OF MICHIGAN)

(COUNTY OF OAKLAND)


        I certify that this transcript, consisting of

68 pages, is a complete, true and correct record of the

deposition testimony of RICHARD CADOURA taken in this case by

Zoom video conferencing on Thursday, January 5, 2023.

The term "inaudible" is used where audio fades out or audio

interference causes testimony to be unintelligible.

        I further certify that prior to taking this

deposition, RICHARD CADOURA was duly sworn to tell the

truth, the whole truth and nothing but the truth.


1-5-23   *Tamara A. O'Connor*
_____   _____

Date       TAMARA A. O'CONNOR, CSMR-2656, CER-2656

           Notary Public

           My Commission Expires: 6-25-27

to*

19 (Pages 67 to 68)

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com

755c4784-c363-4279-9438-88070af26d85

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 69

**A**

**a.m** 1:12 3:1 11:17 24:6,22 25:24 41:22,23 47:2 64:10
**abandonment** 9:21 10:8
**ability** 25:12 49:22
**able** 18:21 23:5 40:23 49:19 53:19 54:22 56:3
**above-entitled** 1:11
**abruptly** 31:24
**absolutely** 4:6 22:4
**academy** 6:3 26:6,11 49:23
**accepted** 57:9
**accepting** 20:25
**accommodated** 49:1
**accurate** 25:15
**acknowledged** 23:7
**action** 13:7
**activities** 41:5
**address** 5:1,2 25:6 55:19
**addressed** 25:7
**administration** 46:11 50:23
**administrative** 10:17 16:10 55:15 56:15 66:6
**Administrator** 50:18
**administrators** 55:9
**advanced** 38:7
**adversarial** 56:1

**AFSCME** 16:17 16:18
**agency** 62:12
**agent** 31:9,21 32:10,11,14,15 36:25
**agility** 22:8 24:19
**ago** 27:24 33:15 39:7,14
**agreement** 35:6
**ahead** 22:6 35:21 38:10 39:24
**Aikens** 1:14,15
**allegation** 35:22
**allegations** 33:5 33:7 63:3
**allege** 29:4
**alleged** 35:21 55:13
**allegedly** 10:8
**alleging** 13:5 48:14,15
**Alliance** 58:12
**allowed** 49:10
**altercation** 12:1
**ambulance** 5:15 5:16,18,22 9:8 9:10 10:2 11:5 18:17 38:5,6 40:24 41:3,10 41:11 53:23 66:9,11,19,21
**ambulances** 40:20 65:16,19 65:19
**amount** 57:6
**ANDRAE** 1:19
**answer** 4:14 10:18 15:23 36:15
**Anthony** 1:6
**anybody** 5:10 58:16 61:3

63:3,15,20 64:2
**anymore** 56:13 58:8
**anyway** 37:11
**Apartment** 5:3 5:4
**apparent** 6:25
**apparently** 6:22 21:24
**appeal** 8:7 16:21 31:4 33:16 36:24
**appear** 47:7
**APPEARAN...** 1:13
**appears** 48:3
**application** 18:8
**applied** 15:21 18:5,7,7 20:6,8 20:11,19 26:19 51:7
**apply** 19:25 20:3 20:4 51:14
**appointed** 17:11 28:9
**appointment** 18:21
**appreciated** 52:24
**approached** 39:18
**appropriate** 27:14
**approximately** 58:18
**Arabic** 63:21
**Arbitrator** 27:2
**Arbitrator's** 27:12
**arrived** 9:2
**articulated** 35:10
**asked** 9:9,19,21 13:18 18:24

37:1 49:22 63:22
**asking** 19:14 21:18 25:3 63:18
**aspirations** 50:22
**assigned** 56:11 56:14 57:25
**assist** 9:9
**assistance** 54:7
**Assistant** 12:7 16:7 20:13 21:15 22:24 30:6 35:15
**Association** 8:10 31:16 32:4,18 36:23
**assume** 8:12
**assuming** 32:12 35:16,18 36:5
**attend** 25:17
**attended** 9:23 21:16 25:11
**attending** 9:25
**attention** 10:23 65:4
**attorney** 13:14 13:21 14:2 39:15 47:20 61:3
**attorneys** 63:16 63:20 64:3
**audio** 3:4,4 68:9 68:9
**August** 27:22 42:19
**AUSTEN** 1:15
**Austin** 55:17
**authorization** 16:1
**available** 40:21 50:13 66:22,23
**Avenue** 1:20
**average** 7:18

**award** 27:9
**aware** 11:23 12:20 19:13 23:9 49:21
**awareness** 41:1

**B**

**back** 6:10 9:25 11:1,1 12:21 16:25 17:11 18:9,11,23 19:19,24 20:11 20:12,15 21:1 22:15 23:5 27:3,8,11,15 34:11,17,23 41:20,23 47:21 52:22,25 53:5 53:7,19 56:6,8 57:15 62:25 63:24 64:11,12 65:21 66:1
**backlash** 51:10
**backup** 8:25
**bad** 11:13
**bag** 9:16
**bankruptcy** 12:14,20 13:13 13:15,22,25 14:3
**barely** 9:3
**bargaining** 31:9
**Barney** 22:24 52:23
**based** 5:7 10:22 66:9
**baseless** 33:5
**bear** 8:23
**becoming** 6:25
**beginning** 14:12 26:21 27:7 42:4 53:25 59:8,12,24
**believe** 5:17 10:15 12:8

TAMARA A. O'CONNOR
248.882.1331       toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 71 of
119

14:12 15:6,24
16:17,17 17:6
18:9,12 19:6
24:4 25:13
26:8,10,24
27:5,22 30:25
40:7 42:19
45:14 48:9,11
48:11 49:19,19
53:3,11,15,21
53:24 54:6,10
54:21 58:24
59:6 60:22
**believed** 27:12
27:13
**benefits** 43:23
43:24
**Benzene** 45:2
**best** 48:17,25
49:5 51:16
**better** 4:5,12
36:9
**bi-weekly** 14:21
14:22
**big** 57:6
**Bill** 61:11
**biohazard** 9:16
**Birch** 20:13
21:15 30:7
**birth** 4:24 24:13
**bit** 59:15
**blacked** 25:5
**blast** 44:22
**blood** 9:4,14
10:25
**bloody** 11:12
**Board** 8:5,13
**Brad** 28:10
**break** 4:16,17
41:17 64:5,7
**breathing** 9:3
**brief** 12:6
**briefly** 57:24
63:22 64:23
**bring** 20:15

**brought** 6:20
29:10,12 41:1
64:25 65:4,22
**Brown** 19:6
20:22 21:2,10
21:19 22:11
23:24 26:3
47:17
**building** 18:14
48:10
**business** 31:21
32:9,11,14,15
36:25
**busy** 43:7
**buy** 55:2,3

**C**

**C** 68:1,1
**C-a-d-o-** 4:20
**Cadoura** 1:4,9
2:3,8 3:10,13
3:17 4:20
22:12 41:25
64:20 68:7,12
**call** 8:23 18:19
21:18 35:13,20
40:9 41:12
46:2 47:17,20
57:5
**called** 3:18 6:10
10:2 12:7
13:14,17 21:20
23:4 32:6,7
33:1 41:9 44:8
47:21 55:24
65:23
**calls** 40:10,14
52:19 66:7
**camera** 7:15,19
7:23 12:6
**can't** 17:13 31:6
43:13 50:3
56:21 59:2
63:21
**candidates**

42:17
**Captain** 10:16
28:10 49:12
**Captains** 54:14
66:6
**care** 9:13 10:25
16:9 38:17,24
44:8,13 66:20
**career** 51:9
53:21,25 59:9
**Carla** 1:14,15
carla@aikensl...
1:17
**carried** 49:3
**carries** 50:9,10
**carry** 43:8 49:8
56:14
**carrying** 49:2
**cars** 6:5,6
**cartridges** 55:4
**case** 1:5 31:12
36:1 37:18
48:14 68:7
**cases** 32:8
**Casino** 18:13
**cause** 23:18
**causes** 3:5 68:10
**center** 4:4 49:4
57:9,19 59:22
**centered** 4:7
**centers** 43:10
**cents** 48:10,12
**CER-2656** 1:23
68:17
**certain** 57:5
65:1
**certify** 68:5,11
**challenge** 33:19
65:6
**change** 7:2 36:5
**changed** 5:5
**changes** 38:9
**changing** 37:6
**Chaplin** 54:7
**charge** 10:14

36:6,8 56:1
**charges** 15:20
15:22 17:14
28:25 31:2
**charging** 57:4
**Chief** 6:21 10:16
16:4,7 17:11
20:13 21:15
22:24 28:9,10
30:6 35:16,16
35:17,18,19
50:22 60:22,23
65:20
**Chiefs** 66:7
**choice** 37:15,16
**Christy** 13:10
**city** 1:7,19 3:14
5:13,25 6:1,6,9
6:13,15 7:21
12:11,13,16,22
12:25 13:13,14
13:17 14:5,19
14:25 18:5
20:1,5,14,20
21:1,4,22 22:9
22:15,21 24:2
24:12,16,25 25:18
26:23 27:20,21
28:6,15 29:19
29:24 30:2,3,8
30:23 31:7,9
31:13,14 33:25
34:2,4,7,23
35:3,11,24
39:16,19 40:17
41:4,14,15,25
46:3,19 47:12
47:19 49:7
51:23,25 54:3
55:2 56:10
57:1,15 59:9
61:13,15 62:1
62:6,9,24
65:18,24
**City-County**

48:9
**City-wide** 66:22
**Civil** 3:15
**claim** 13:21
**claimed** 55:3
65:8
**claiming** 49:18
51:3
**claims** 38:1
**class** 13:7
**classify** 60:18
**clean** 6:23
**clear** 22:3 48:16
**Cliff** 17:10
**climb** 44:22
**clock** 46:6,6,10
46:11
**close** 46:8 62:13
**clue** 48:1
**co-pays** 57:5
**co-worker** 53:10
**collect** 12:12
**collection** 48:5
**come** 11:3 16:11
18:20 19:5
22:15 23:5
35:4,7 40:13
41:20 53:7,19
63:8,24
**comfortable**
39:2
**coming** 9:16
34:17 35:12
52:21 53:13
57:15
**command** 36:5
40:6
**Commander**
38:23
**commanding**
11:11
**commencing**
1:12
**comment** 29:2,4
**comments** 37:8

TAMARA A. O'CONNOR
248.882.1331      toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 72 of
119

**Commission**
33:19 68:19
**Commissioner**
7:16 55:10,11
55:16,18
**Commissioner's**
55:15
**Commissioners**
65:8
**communicatio...**
21:10
**community** 5:15
5:16,18 38:4
41:1 48:19
53:23 60:21,25
**companies** 5:21
**company** 5:21
5:22,23 44:8
**complained**
64:24,25
**complaint** 35:23
36:2
**complaints** 61:2
**complete** 37:6
68:6
**completed** 20:21
**complied** 28:18
**computer** 46:5
46:10,12
**concern** 22:12
38:7
**concerned** 28:19
40:22 52:6
**concerns** 41:4
41:13 55:19
**concluded** 30:25
33:9 67:3
**concurrent**
45:24
**Conditional**
2:10
**conditions** 60:10
**conducting** 9:20
10:8 30:22
62:21

**CONFEREN...**
1:9
**conferencing**
1:11 3:3 68:8
**conflict** 44:14
**consider** 49:23
**considered**
22:14 25:19
26:4
**considering**
33:23
**consistent** 7:17
**consisting** 68:5
**contact** 20:12,19
30:7 33:21
65:17
**contacted** 20:21
**contacting**
33:18
**contaminated**
11:2
**content** 60:16
**contentious**
39:17
**CONTENTS**
2:1
**contested** 28:8
**contingent** 15:3
15:9
**continue** 38:10
41:24
**contract** 28:11
**controversy**
19:2
**conversation**
23:23 63:5
**copies** 19:18
46:16
**copy** 25:4,5
46:23 47:18
**Core** 54:7
**correct** 6:7,8 7:6
7:9,20 8:4
11:24 12:2,22
13:1 14:15

16:13,15 17:21
20:2,12 23:25
24:9,15,20
26:16 28:3
30:1,5,17 32:2
32:24,25 34:3
36:17,21 42:8
45:18 46:25
47:8,24 52:16
56:11,23 60:3
62:5,18 65:2,4
65:12,13 68:6
**corrected** 39:12
**coughing** 9:3
**couldn't** 6:23
7:11 11:7 18:2
23:1 47:16
52:8 54:2,11
58:7,7,25
**Counsel** 13:19
22:2
**County** 45:6
60:19 68:3
**couple** 16:1
30:20 45:8
53:22
**courage** 51:14
**court** 1:1 4:9
13:22,25 14:3
**COVID** 52:6
**created** 61:10
**credibility** 53:16
**crew** 7:15,19,23
**criticism** 66:18
**cross-position**
49:25
**Crosson** 19:8,9
19:10,13
**crossover** 50:5,5
**Crown** 66:4
**crying** 9:5
**CSMR-2656**
1:23 68:17
**curious** 47:24
**current** 5:1,2

19:3 20:25
35:17 50:8,9
50:17 54:17
**currently** 5:8
8:11 14:7 42:7
42:9,25 52:20
56:13
**cut** 38:10

─────────

**D**

**D** 1:14,15,19
**damages** 48:13
48:14 49:14,16
49:17 51:2
**danger** 41:7
**date** 3:12 4:24
24:13 25:17
27:4 30:19
34:25 40:12
68:17
**day** 6:23 17:25
18:3,3 21:15
22:19 29:18
35:15 38:3
39:17 40:7,13
40:24 50:2,23
53:24 54:22
62:20
**days** 39:14
50:11
**deal** 57:6 60:9
**deceased** 54:8
**December** 25:14
35:5
**decide** 35:11
**decision** 6:19
26:22 33:19,20
**decisions** 38:22
38:23
**declined** 27:15
35:10 36:12
**dedicate** 40:23
**Defendant** 1:8
1:18
**Defendant's** 2:7

2:9,11,13,15
11:17 24:6,22
25:24 47:2
**delay** 26:24 27:3
36:14
**delivered** 9:13
**dental** 43:25
**department**
1:19 13:18
14:8 16:6,7
17:19 18:12
19:5,20 21:4
21:22 22:10,21
23:17 29:20
37:1,5,11 38:2
38:12 40:3
41:11 42:1
47:16,19,20,21
48:17,20 50:17
51:5 53:18
54:8,12,17
56:11 61:17
63:7 65:3,6
**departments**
34:14 51:7,24
60:9
**deposition** 1:9
1:10 3:2,13
67:3 68:7,12
**deputy** 60:19
**describe** 64:23
**determine** 56:4
**Detroit** 1:7,16
1:19,20 3:14
5:13,25 6:6,9
9:12 12:11,17
12:22,25 13:17
14:5,20 18:6
19:1 20:1,5
21:1,22 22:10
22:21 26:23
29:20 30:1,8
34:22,23 39:20
40:18 41:14
45:25 46:4,19

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 73 of
119

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

47:13,19 48:16
51:11,19,23,25
53:25 54:3,8
59:9 60:1
61:20 62:1,7
62:10,25 63:11
65:2,2,14 66:2
**devastated**
53:20
**DFFA** 61:12
**diagnosed** 52:12
59:4
**diagnosis** 59:17
**didn't** 7:1,2,3
9:22 10:10
15:21 16:5
21:3,5 22:25
29:6 30:24
35:25 36:4,14
37:12 38:8,10
39:2 41:10
44:24 45:3
47:25 51:13
53:7 54:18
57:1,3,8 63:10
**diet** 60:16
**different** 9:1
18:18 38:25
43:9 56:25
60:13
**direct** 40:14
**directly** 40:7
**Director** 16:5,11
20:22 21:2,6
**disagreement**
15:23
**disappointed**
11:10
**discharge** 7:3
16:21 17:9
23:9 27:14
31:19 36:24
37:13,25 38:4
**discharged** 7:1,3
15:18,19 17:8

17:24 21:25
23:6,17,19
28:5,6,24 29:1
29:13,15 34:5
37:20,23 40:25
45:16
**discipline** 7:8,10
7:22,25 8:5,7
8:11,14,17
10:10,11 12:3
16:10 22:16
23:19 31:4
32:8 36:1
54:13 55:20
**disciplined**
16:12 36:18
55:24
**discovery** 25:6
**discuss** 63:10,13
**discussed** 44:7
44:15 59:11
63:15,19 64:21
**discussions** 61:2
64:2
**distant** 22:25
**DISTRICT** 1:1
1:1
**Division** 1:2
22:10 49:9
**DM** 44:8,13
**doctor** 9:8 57:22
**document** 11:15
11:19 24:8
26:1 47:5,9
**documentation**
19:18,21
**documented**
7:20
**documents** 13:6
19:22 24:1
46:3 61:5,8
63:19
**doesn't** 48:4
**doing** 11:3 14:16
22:7 38:15,17

39:2 49:13
66:20
**dollar** 13:16
**don** 54:25 55:17
**don't** 4:8,13
8:19 10:12,14
10:25 12:10
13:6 15:20
16:2,19 17:15
17:23 19:12,14
24:11 25:1,10
25:16,21 26:2
27:5 28:22
29:6 30:9,19
30:23 31:19,25
32:5,12,21,23
33:1 34:24
39:6,19,20
46:1,22 47:6
47:22 48:1
50:14,25 51:4
52:4,14 53:2
54:19 57:4,12
57:17 58:1,20
59:8 60:7,13
60:18,24 66:11
66:24
**donation** 42:16
**downstairs**
18:22 19:16
**drafted** 28:25
**Drain** 1:5
**Driver's** 5:5
24:13
**due** 11:13 22:2
25:3 40:16
**duly** 68:12
**duration** 34:8
**duties** 36:4,9,11
42:15 56:15
**duty** 10:24
16:25 36:12
54:21 55:12,18
55:19 56:6

| E |
| --- |

**E** 68:1
**eager** 20:14
**EAP** 54:6
**earlier** 26:17
64:24
**early** 27:6
**EASTERN** 1:1
**economic** 48:14
49:14,16
**economics** 49:17
**eight** 15:10
50:11
**either** 14:18
20:23 28:14
29:13 46:21
48:1 52:20
61:9,23
**ejected** 8:24
**elected** 16:22
**element** 28:16
52:22 53:12
**Elias** 13:14
**eligible** 12:12,18
23:15
**else's** 48:3
**email** 20:23 25:1
25:2,3 31:5
33:13 46:22
**Emergency** 6:11
48:19
**EMMT** 6:11
**emotional** 51:2
52:10 54:4
**employed** 26:12
26:14,20 42:1
42:5,7,9,25
58:14,20 61:16
62:6,9,24
**employee** 21:24
29:5,19,24
30:3 47:23
**employer** 42:22
58:13 59:10

60:18
**Employer's**
33:20
**employers** 19:3
27:19 44:6,15
45:5,20 51:21
**employment**
2:10 5:12 6:2
14:8 15:9,12
17:25 20:25
22:9 23:10
24:3 25:20
26:5 27:16
30:2 33:18
34:13,15,20
35:19 37:7
39:16 40:17
44:21 45:24
50:12 51:22
59:12 62:12
64:21,23
**EMS** 5:23 9:24
10:5 22:10
36:13 45:6
48:6 50:18,21
53:21
**EMT** 10:1 15:3
50:6,8
**EMTs** 51:16
66:3,14
**encouraging**
35:23
**ended** 34:20
**enforcement**
60:17
**Engineers** 8:9
**enjoy** 49:4
**entail** 12:15
**enter** 22:9
**enthusiastic**
53:1
**entire** 51:9
**environment**
50:25
**equipment** 38:3

TAMARA A. O'CONNOR
248.882.1331          toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 74 of
119

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 73

38:14 40:8,9
66:8
**equipped** 40:20
**essentially** 38:18
66:19
**event** 44:12
54:23
**events** 52:15,17
**everybody** 7:21
28:23 64:7
**exact** 34:24
**exactly** 10:6
21:3 25:16
60:24
**Examination**
2:4,5 3:21
64:18
**examined** 3:20
**excitement**
52:22
**exercise** 60:17
**Exhibit** 2:7,9,11
2:13,15 11:16
11:18 24:5,7
24:21,23 25:23
25:25 46:25
47:1,3
**EXHIBITS** 2:6
**existence** 56:13
**exit** 23:10,12,13
**expensive** 55:2
**experience**
20:15 51:11
53:22 60:11
**experienced**
53:8
**expired** 38:2,13
**Expires** 68:19
**explain** 38:19
39:1 56:3
**exposed** 45:3
53:9 54:23
**exposure** 48:22
**Express** 44:8
**expressed** 49:24

**expressway** 9:1
**extended** 35:9
**eye** 7:21

**F**

**F** 68:1
**F-o-w-l-e** 29:22
**face** 22:12
**Facebook** 41:2
52:23 53:6
60:7
**faced** 55:11
**facilities** 44:25
**fact** 7:15,20
10:23 11:10
29:14 34:21
38:16 40:22
41:9,12 51:8
58:8
**fades** 3:4 68:9
**failed** 41:11
**fair** 54:15 56:9
**fairly** 46:12
**fall** 34:10
**familiar** 11:21
24:8
**family** 60:7
**far** 25:7 38:23
40:19 48:17
49:14 51:19
54:12 59:13
65:7
**federal** 3:15
48:5
**feel** 39:2,21
**fellow** 53:10
**felt** 41:7 52:7,8
**female** 29:3,5,9
57:22
**field** 56:8 59:10
**fighter** 37:1 50:6
**fighter/param...**
61:24
**Fighters** 31:16
32:4,18 36:23

**Fighting** 49:9
**figure** 46:13
**file** 13:21 17:22
21:24 25:8
35:11,23 37:14
47:12,18,23
48:2,8 59:19
**filed** 3:14 13:2
17:20
**filing** 13:13,15
37:17,18 61:6
63:17
**filings** 14:2
**fill** 14:24 19:17
46:3,19
**filled** 19:10 47:9
**filters** 55:1,4
**financially**
50:15
**find** 55:9 58:25
59:14
**fine** 4:6
**finish** 4:10,10
22:5
**fire** 14:8 16:6
17:11 18:11
19:5,13,20
21:4,22 22:10
22:21 23:17
29:20 31:16
32:4,18 35:11
36:23 37:1,1
38:2 40:3 42:1
47:20 48:16,20
49:9,23 50:6
50:16 51:5
54:8,12 55:17
56:11 60:9
61:24 65:2
66:7
**firefighter** 29:3
50:7
**firefighters** 29:9
**fireman** 28:13
49:25 50:10

**fireman/para...**
35:8
**firemen** 9:5
51:16
**first** 9:7 15:24
17:24 26:8,9
26:25 29:17
31:5 39:17
53:2 55:25
66:15
**five** 39:14 41:17
**Flat** 33:25 34:2
34:4,7,11,15
34:18 35:3
36:20 37:1,20
37:23,24 39:16
39:16 40:3
41:8,15 42:2,5
44:14
**floor** 56:15
**focused** 7:21
10:23 59:8
**FOIA** 47:23
**follow** 49:19
**follow-** 64:16
**followed** 65:2
**following** 7:16
7:19,23 65:8
65:15
**follows** 3:20
**force** 35:11
**forced** 62:22
**Ford** 58:14
**form** 2:16 46:20
**former** 30:3
**forth** 38:20 53:5
**forward** 30:14
30:16,18 53:18
**forwarded**
47:25
**found** 9:2 36:9
49:3
**Fowle** 29:19,22
61:18
**Fowle's** 61:21

**freeway** 8:24 9:9
**friends** 60:8
**fuck** 8:15,20
**full** 4:19 18:2
**full-time** 15:1
31:11 43:4,24
62:3,12
**funeral** 21:17
**furnace** 44:23
**further** 64:14
66:25 67:1
68:11
**fuss** 4:6
**future** 23:15

**G**

**Garrity** 29:16
30:10,11,20
**Gary** 65:20
**general** 21:4
**gentleman** 33:4
**Gerald** 6:21
10:16 31:12,14
31:22 32:1,11
32:22
**Gershwin** 1:5
**getting** 38:20
**girl** 9:22 10:3
**give** 19:20 35:1
47:25 48:1
**go** 8:15 9:15
12:21 14:6
15:1 19:9 22:4
22:6 24:1,18
26:23 30:14,16
30:18 35:21
38:10 39:24
45:11 51:7,14
51:15 54:18
56:2 57:9
61:14
**going** 4:6 10:13
11:7,15 18:8
18:24 19:2
23:4 24:21

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 75 of
119

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

26:7 30:3,12
31:22,23 33:5
33:7,11 35:12
37:13,17 38:8
39:21,22,22,24
40:23 46:24
49:23,23,24
51:20 53:11,17
53:19 54:11,17
55:7,20,23
56:17 63:12
64:5,6 65:6
**good** 11:6 18:18
49:1 56:18
57:2 58:9 64:7
**government**
65:22
**Grand** 18:13
**greatest** 50:21
**grievance** 16:24
33:11,17 35:11
37:13,14,15,17
37:18
**grieve** 17:16
**Griswold** 1:16
**group** 20:16
**growth** 49:10
**guess** 15:23
**guidance** 57:9
57:19 59:21
**guidelines** 37:6
48:5,5
**guys** 63:13

**H**

**H-E-M-S** 65:23
**Hall** 41:4
**hand** 3:7
**handed** 19:9,16
**handful** 58:22
**handwritten**
8:18 61:9
**HAP** 58:6,12
**happen** 51:1
56:7

**happened** 9:8
10:6 13:12,24
19:1 30:10,21
33:3 37:7
40:15 51:19
**happening** 13:4
52:7
**happy** 19:3
34:21
**harassment**
37:5
**hard** 4:9 25:4
**hardship** 57:2
**harness** 44:23
**Harp** 61:11
**Harper** 15:2,4,8
**haven't** 5:5 44:6
44:15 49:3
**he's** 10:1 54:8
62:9 63:5,21
**head** 45:21
**Headquarters**
18:12 56:12
**health** 5:23
43:24 53:23
57:2 58:9,12
**hear** 7:14 20:11
36:13
**heard** 18:11
19:24 36:2
52:21 65:7,24
66:22
**hearing** 23:18
29:16 30:13,14
30:16,18,21
32:5,6 33:1
55:15
**heart** 52:5
**heated** 11:9
**heavily** 22:20,22
**held** 41:12
**help** 52:25 53:17
61:16
**helpless** 52:7
**HEMS** 65:23

**Henry** 58:14
**hepatitis** 54:24
**higher** 50:8
**highest** 28:21
45:2 50:16
**highly** 51:5
**Hillsdale** 45:6,7
45:9,11
**HIPPA** 48:4,4
**hire** 50:7
**hiring** 20:17
**history** 5:12
64:21
**hold** 6:9,13
**home** 35:14
40:13
**Hon** 1:5
**honest** 49:2
**honestly** 22:13
34:24 57:12
**honor** 48:18
**hood** 54:23
**hospital** 10:7
15:3,4,8 38:19
58:15,23 65:17
66:12,16
**hospital-based**
5:21
**hour** 43:20,22
**hourly** 43:16,17
43:18
**hours** 14:16,18
14:19,21 15:8
15:10,11 43:3
43:5,6,14
**HR** 6:20 19:5,14
20:22 21:2,4,4
21:6
**hung** 13:20
23:22
**hysterically** 9:5

**I**

**I'd** 7:14 44:10
**I'll** 4:10 11:15

15:23 24:5,21
25:22
**I'm** 4:6,8,9,11
5:3 10:11 11:1
11:2,15 13:19
17:13 19:13,14
20:7 22:14
24:21 25:3,8
25:22 30:15
38:9 39:21,24
42:14 43:21
45:19 46:24,25
47:22,24 48:4
52:3 53:4,13
53:14,14 61:7
61:25 63:19
64:5,6
**I've** 33:24 59:10
**idea** 32:16
**immediate** 56:2
**immediately**
55:14 66:1
**immune** 51:24
**implied** 36:4
**imply** 10:10
11:12
**implying** 9:21
**inaudible** 3:3
10:16 68:9
**included** 51:4
**including** 37:8
**increase** 50:1
**individual's**
32:23
**inform** 14:2
**information**
24:14,16 27:2
48:6 54:16
**informed** 26:3
30:12
**informing** 25:19
**initially** 33:20
**initiate** 41:11
46:15 62:22
**initiated** 10:15

28:17
**injuries** 52:11
54:4
**inquiry** 9:20
10:8
**Instagram** 60:7
**instituted** 65:21
**instrumental**
30:6
**insubordinate**
10:19
**insubordination**
15:24 36:3
**insurance** 57:1,2
57:6,10 58:6,9
58:10,11,19
**interaction**
37:24 40:11,14
**interactions**
40:4
**interest** 49:24
**interested** 20:18
**interference** 3:5
68:10
**interview** 23:10
23:12,13 28:20
28:22 29:8
30:10,11
**interviewed**
21:16 29:8
35:15
**investigation**
10:10 29:14
35:20 62:22
**invoked** 10:20
**invoking** 10:11
**involved** 13:8,9
13:10
**Ironically** 62:12
**Island** 44:25
**issue** 6:22,24,25
7:15 10:22
19:19 22:17
35:14 36:10
38:21 40:18,21

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 76 of
119

41:9,12 54:5
56:5 57:8
65:22
**issues** 13:4
16:10 23:2
28:15 29:10
33:24 38:12
40:19 41:2
48:22 51:20,23
52:1,7 53:10
53:10 54:11,18
55:6,9,19
59:11 64:22
65:1,5 66:2
**it's** 4:7 11:2
19:20 22:13
37:16 52:2
55:25 56:12
60:14 64:1

**J**

**James** 6:21 7:16
10:16,16 31:12
31:14,22 32:1
32:11,22
**January** 1:12
3:1 26:7 27:6,7
68:8
**Jason** 1:18
41:16
**Jeff** 9:18,25
**job** 20:20 42:15
48:17,23 49:3
49:5 50:4,24
53:24 59:6,7
60:12 62:25
63:7
**jobs** 6:5
**Joe** 12:7 22:24
36:25 52:23
**John** 9:17
**joining** 50:22
**Jones** 13:18
**journal** 46:8
**Judge** 1:6

**judgment** 11:14
**June** 6:4,16

**K**

**K** 53:5
**Kazinski** 53:3,4
**Kearns** 13:9
**keep** 19:19 22:3
46:18
**Kelly** 65:20
**Kemia** 19:6,6,8
19:9,13
**kept** 38:21 61:8
**kids** 53:7
**kind** 19:21
22:13 27:2
29:11
**knew** 28:23
43:19 57:15
**know** 4:8,14,16
6:18,24 10:12
10:14 13:6,24
13:24 14:11
15:20 18:25
19:4,12,21
20:6,8 21:3,5
22:14 23:1
25:11 26:3
27:4 30:8,24
31:18 32:5,5,7
32:12,14,20
33:14 34:20,21
34:24 37:4
38:19 39:6
40:8,19 41:8
46:1 48:21
50:14,25 51:4
52:19,25 53:8
53:13,23 54:5
54:19 57:4,4,7
59:14 60:9,11
60:13,16,18
61:14 62:6,9
62:13 63:23
64:20,24

**knowing** 53:18
**knowledge**
13:23 14:4
46:23 61:4
64:4 65:15
**Kyle** 29:19
61:18,21

**L**

**LA** 51:18
**lack** 41:14
**lacking** 44:24
**lady** 41:9 59:1
**Lane** 5:2,4
**language** 28:15
**Larkins** 18:15
50:17
**Larned** 56:12
**late** 20:9,10 27:6
**law** 1:19 13:18
47:19,21 60:17
**lawsuit** 3:13
12:22,24 13:2
13:5,12,25
14:3 17:20,22
37:25 38:1
39:3,5 48:15
52:15,18 61:3
61:6,9,10 63:4
63:13,15,17,19
64:2
**lead** 10:11
**leak** 54:16
**learned** 50:24
**leave** 6:15,17,20
15:17 17:5,7
28:4 34:7,11
35:3 44:13
45:9,13,15
55:15
**leaving** 10:5
12:14 50:4
58:24
**led** 7:13 62:15
**left** 9:22 17:3

18:25 19:4
30:8 31:10,22
41:24 45:11
46:3 52:4,14
57:1
**let's** 12:21 34:2
41:24 49:16
**Letitia** 13:18
**letter** 2:12,14,14
5:25 18:4
19:10,16,17
23:6 24:2,18
24:25 25:4,7
25:18 33:10,12
46:21 62:14
65:24
**letters** 46:14
**level** 36:7
**levels** 45:2
**license** 5:5 15:6
24:13
**licensed** 36:7
38:6,24 66:9
66:14
**licensing** 66:3
**lieutenant** 9:11
9:17,24 10:5
10:18,23 11:4
13:9,9 49:11
63:5,9,21
**Lieutenants**
54:14 66:6
**life** 38:7
**light** 54:21
**limited** 66:8
**Link** 5:23 53:23
**list** 15:20,22
16:2 22:1
**little** 4:4 18:23
44:20 59:15
**live** 5:10
**Livonia** 30:2,4
**loaded** 9:7
**Local** 16:18,19
16:19,23 32:17

32:19,20 37:2
**located** 18:12
57:20
**log** 46:7
**long** 5:18 9:6
44:19 58:5
**longer** 13:17,19
25:19 26:4,14
58:7
**longest** 59:9
**look** 11:21 22:12
24:8 31:23,23
47:6
**looking** 47:22
60:14 65:5
**lot** 7:11,22 14:23
18:25 20:15,16
22:16,21 37:5
49:3 50:4
51:10,12 52:19
53:15,16 59:8
64:21 66:22
**Loudermill**
30:12,21
**loved** 49:15
**low** 43:7
**lower** 36:6 38:24

**M**

**M-c-N-e-e-l-y**
54:9
**ma'am** 3:10
**Mack** 7:17
**mad** 10:18
**Magistrate** 1:6
**mail** 18:4
**mailed** 25:4
**maintain** 14:25
**maintained**
34:15
**maintaining**
34:13
**maintenance**
52:1
**managed** 31:8

TAMARA A. O'CONNOR
248.882.1331     toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 77 of 119

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 76

Manager 28:15
30:23
mandatory
23:13
mark 46:24
marked 2:6
11:16,18 24:5
24:7,21,23
25:22,25 47:3
massive 8:25
matter 1:3,11
31:23
Mayor 35:18
mcfaj@detroi...
1:21
McFARLANE
1:18 2:4 3:12
3:22 11:19
24:8,24 26:1
29:24 41:19,24
47:4 64:5,9,12
64:14 67:1
McNeely 54:9
54:20 55:6
56:9
mean 14:23
25:16 38:10
48:24 50:10,15
52:2 59:19
meaning 50:5
means 28:12
media 12:5
54:16 55:13,14
60:4,5
Medicaid 57:9
58:7
medical 6:11
35:17 43:11,12
48:19
meeting 6:21 7:2
19:22 29:16
30:23 31:1
33:2,3
meetings 15:25
members 9:14

mention 44:25
mentioned
56:19 60:4
64:24
mentor 20:16
53:7
MERC 33:21
message 20:22
20:23,23 21:11
21:14,18 26:6
messaged 52:23
53:5
messenger
52:23 53:6
met 18:22 32:25
55:10,17,18
56:9,25
MGM 18:13
Miami 51:18
Michael 16:8
Michigan 1:1,16
1:20 3:15 5:3,4
8:10 18:13
31:15 32:4,18
33:18 36:23
68:2
mid-January
27:6
middle 20:10
Mike 13:9,10
Miles 28:10
mind 7:14 52:5
minimum 14:17
minute 41:17
64:6,7
minutes 7:18
59:16
missed 43:21
misunderstan...
56:4
mobile 6:11
35:14
moment 12:6
Monday 62:19
money 49:1,6

month 14:18
15:10 50:11
60:25 62:19
months 5:19
23:8 27:13,24
40:16 45:8
morning 56:18
56:18
move 53:17
moving 5:6,8
multiple 11:5
46:15 55:20
murdered 38:4
Muwad 13:14

N

N 68:1
N-a-j-i-b 4:20
Najib 4:20
name 4:19,20
16:8,16 17:13
19:6,11 24:13
29:21 31:7,25
32:24 47:22
53:2,2 57:17
58:1 59:2
60:23 63:22
names 4:22 48:3
48:7
national 7:18
65:9,11
nationally 52:2
natural 49:20
need 4:16 46:12
62:25
needed 36:8
41:3,3 53:6
65:25
never 6:24 8:12
18:11 19:4,23
19:23 23:12
29:12 35:10
36:3 40:4
46:22 51:9
55:5,10,16

59:13,20 60:20
new 28:9 46:12
51:17
newer 65:19
news 51:20 65:5
night 23:4 62:18
Norm 13:3
Notary 68:18
notes 61:5,8
notice 51:21
66:2
November 28:1
28:2 45:14
November-ish
27:25
number 16:19
32:21

O

O 68:1
O'CONNOR
68:17
O-c-t-a-p-h-a-...
42:12
O'Connor 1:23
36:25 37:3,4
OAKLAND
68:3
obtain 50:16
obtained 5:25
occasions 11:5
occur 37:21
Octapharma
42:10,25 44:7
63:8
October 26:25
28:1,2 45:14
62:20
odd 39:13
offer 2:10 20:20
21:21 24:3
offered 20:24
office 56:17
officer 10:17
32:5 36:12

officers 8:10
11:11 32:6
40:6
officially 39:6
63:7
okay 4:1,3,4
6:15 7:25 8:17
11:23,25 12:3
12:20 13:24
15:15 17:9
18:16 19:15
20:3 21:2,8
22:2 25:11
27:6,19,23
28:2 30:8,16
32:14,22 38:1
42:24 43:3
44:9 45:19,22
47:9 48:13
51:2 60:4
old 18:13 35:13
once 58:4 59:3
ones 7:12 27:16
60:13
ongoing 33:9
open 43:12 46:8
operate 43:13
60:10
operating 8:9
38:2
operator 38:12
opportunity
49:11
option 14:23
order 43:12
ordering 11:1
organization
65:23
organizational
32:16
originally 40:25
outrageous 37:9
outside 9:17
26:11 40:4
50:11 62:11

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 78 of
119

65:18
overall 54:13
overarching
   16:18
oversee 16:5
   32:7
overseeing 16:6
   31:12
overtime 14:23
   46:9 50:12

**P**

P 1:6
P.L.C 1:15
p.m 64:11 67:3
P69153 1:19
P69530 1:14
P73105 1:18
P84852 1:15
page 2:2 48:11
pages 48:12 60:8
   60:17 68:6
paid 23:7 43:16
   49:6 57:7
   60:20
paramedic 11:4
   14:10 20:4
   21:22 28:13
   44:12 45:23
   49:7,20 50:7,9
   50:18 62:2,3,3
paramedics
   15:6 51:16
   66:3
paraphrased
   29:7
parent 5:23
park 35:14
part 11:14 13:7
   21:3 40:24
   44:12 53:17
part- 14:25
part-time 5:24
   14:8,13,17
   15:2 35:8

61:24
participants
   13:8
participate 58:8
particular 11:8
   40:7,13
partner 6:19
   9:18 10:1,9
   36:16,18 50:19
pass 18:21 51:15
passed 21:15,16
   60:23
passing 50:3,23
PAT 2:12
patient 9:15,20
   9:25
Patti 1:6
pay 27:8,11,15
   45:10 48:10
   49:21,25 50:5
   55:4 57:3,5
payments 12:16
payroll 46:7
penalty 56:2
pending 7:7,10
   8:1 12:4 17:15
   37:25 55:15
pennies 13:16
pension 12:12
   12:16 44:4
people 13:11
   38:4 50:4,8,24
   51:12,17 52:19
   53:16 55:5
   57:10
percentage
   54:15
perception
   37:12
perform 42:16
Permanent 30:5
person 8:24 9:3
   17:10 30:22
   36:6 38:18
   53:14 61:11

Personal 40:9
personally
   50:15 54:10
personnel 6:20
   25:8 38:6,24
   40:19 43:12
   47:12,18 48:22
   52:1,6
phone 20:14
   21:12,13
phonetic 53:3
phrase 66:21
physical 22:7,8
   24:18 25:11
physicals 42:16
physician 42:14
picked 48:9
place 49:12,15
   51:22 57:18
placed 21:25
   55:12,14 62:19
   65:25
places 64:23
Plaintiff 1:5,14
Plan 58:12
plasma 42:10,16
   43:1 44:7 49:4
please 3:7 29:21
POAM 8:9,12
point 14:16 17:1
   19:25 20:12,19
   20:19 23:14
   38:21 61:15
pointed 9:14
police 8:9 16:4,6
   41:10 66:5
policeman 31:7
policies 65:1,14
Pool 16:8
poor 35:24
   38:23
portion 22:8
   25:5
position 19:25
   20:3,5,24 21:3

21:21 32:14
42:21 43:8,9
49:2 50:9,9
58:23 60:22
61:21 62:1
positions 42:24
   50:16
positive 53:12
possibilities
   50:14
possible 52:24
possibly 17:23
   19:7 21:17
   25:10 50:23
   51:22
post 60:7
potentially
   41:15 51:22
PPE 40:8
practice 38:15
   59:10
preceded 23:20
preceding 35:4
present 4:1
   45:20
presented 13:7
President 37:2
pretty 34:8
previous 28:11
prior 5:13 6:5
   7:7 12:14,21
   12:24 15:25
   18:8 26:8,9
   36:4 38:20
   52:15 56:22
   60:2 61:6,10
   68:11
private 5:22
privilege 48:18
probably 5:17
   5:19 12:10
   13:3,3,3,10
   15:5 16:2 17:6
   18:2 19:4 20:9
   26:21 27:24

30:19 33:15
34:6 35:2
43:19 44:10
48:17 52:14
56:21 57:12
58:4 59:15
probation 29:3
   35:4,6,7,9,12
   37:6
probationary
   29:5
problem 29:11
   41:19 51:8
   52:2
problems 51:25
procedure 3:16
   31:17 33:17
procedures
   38:15,17
proceed 33:7
process 5:6,8
   8:8 18:9 20:21
   26:19,24 28:8
   28:19 31:20
   33:8,9,16
   37:14 63:24
program 58:8
progression
   49:20
promised 50:5
promote 49:11
promoted 28:10
   43:8 50:21
promotion
   28:12
promotional
   28:8
proof 65:9
prospective
   42:16
protected 41:6
protecting 48:7
protection 54:25
Protective 40:9
provide 24:16

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 79 of
119

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

29:13
providing 24:12
    54:15
psychiatrist
    57:23 58:24
psychological
    51:2 52:11
    54:4
PTSD 52:12
    59:6
public 7:21 16:5
    16:11 41:7
    66:18 68:18
public's 65:4
purposes 3:15
pursuant 29:8
pursue 27:15
    30:2 33:11
    37:13,17,18
    62:11
pursued 50:11
pursuing 34:23
put 7:20 9:16
    10:25 11:1,12
    15:8 36:8
    40:15 51:17
    65:21 66:12,15
putting 30:6
    43:14 65:19
    66:4

_____
        Q
_____
question 4:15
    15:23 38:9
questions 4:13
    4:17 10:19
    64:15,17 67:2
quick 41:16,17
quite 39:17

_____
        R
_____
R 68:1
R-i-c-h 40:1
R-o-m-e-o 66:14
radios 65:16,25

raise 3:7 41:4
raised 41:13
raising 38:21
ran 45:24
rate 43:18 50:8
Ray 39:18,24
Raymond 20:13
    21:15 30:7
read 25:13
ready 48:8
real 41:16 51:8
really 7:11 16:5
    22:25 30:23
    46:1 50:14,25
    52:4 53:25
    59:13 60:13
reapplying
    61:13,14
reason 40:24
    53:19
reassurance
    22:23
recall 7:10,25
    8:14,19 12:10
    13:6 15:22
    16:19 17:13,15
    17:23,25 19:15
    24:10,11,12,18
    24:24 25:1,9
    25:10,16,18,21
    26:1,2 28:22
    29:6 30:9,19
    31:19 32:21,23
    34:24 45:21
    46:22 47:22
    52:14 56:21
    57:12,17 58:1
    58:18,20,21
    59:8
receive 12:16
    23:13 24:1,2
    27:1,8 31:2
    33:12 36:1
    47:18 59:17
received 5:24

8:13 12:8 18:4
    19:23 21:14,17
    22:16 23:12
    26:6 33:10,14
    46:22 47:17,20
    52:19
receiving 7:22
    9:12 24:10,18
    24:24 25:9,18
    25:21
recess 41:22
    64:10
recognized
    48:19
recollection
    24:17
recommended
    23:11
record 22:20
    41:23 46:9
    64:11,12 68:6
recording 15:25
    45:2
redacted 25:6
reemployment
    22:15
refer 66:13
referred 32:9
    42:14
refurbished
    66:5
regarding 11:25
    13:25 14:3
    24:2 49:17
    61:2
registered 60:6
Regret 2:14
regular 6:18,19
rehire 22:1
    23:15
rehired 23:11
reinstated 26:20
    27:1,8,11
reinstatement
    18:8,10 19:10

19:17
related 59:6
relating 61:9
Relations 33:19
relationship
    11:6 18:18
    34:20
relevant 39:14
    55:20
remember 8:16
    12:4 23:2 31:6
    31:25 33:1
    47:6 50:3 53:2
    56:17 59:2
    60:24 63:22
removed 28:15
    28:17 65:18
render 66:20
repeat 37:22
    43:21 61:7
repeated 54:12
repeatedly 38:3
replaced 56:6
replacement
    55:4
report 36:14
    38:8 54:18
reported 1:23
    38:3
reporter 3:7,11
    4:9 29:21,23
    47:1 64:13
    65:5
reporting 38:13
    51:20
reports 48:6
    59:17
represent 13:17
representation
    29:17 31:10
representative
    10:21 31:6,11
    31:15 33:4
    41:5 54:6
representatives

61:12
represented
    13:19 31:21
request 18:10
    47:23
requested 24:14
    46:15 47:12
    59:20
required 14:17
    14:18 15:9
    19:18 43:4,11
    45:1
requirement 6:1
    22:9
requirements
    28:18
reserve 60:19
residency 6:1
resign 20:25
resignation 2:16
    7:7 12:21,24
    23:6 46:20
resignation/te...
    46:1
resigned 6:2,5
    7:5 8:1 12:4,11
    14:5,25 44:22
    46:19 56:10
    62:11
resigning 7:13
resolution 55:23
resolved 56:5
resources 10:3
respect 11:11,13
    22:2 25:3
    40:16 53:16
respectfully
    51:5 53:14
respiratory
    54:25
respond 66:7,15
responded 9:7
responders
    66:15
responding 8:23

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 80 of
119

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 79

| | | | | |
|---|---|---|---|---|
| 24:12 40:10,14 | 41:8 57:14 | **says** 62:25 | **set** 3:13 38:6 | **six** 5:19 40:15 |
| **response** 35:14 | 61:22,23 64:9 | **scene** 9:2,24 | **settled** 17:19,20 | **SMITH** 1:19 |
| 35:24 38:5 | **rights** 10:12,20 | **schedule** 48:23 | 39:4,5 | smithand@de... |
| 40:18 41:11,13 | **Riverview** 14:7 | 48:25 | **settlement** 13:15 | 1:22 |
| 41:14 48:22 | 14:9,14 15:1 | **scheduling** | **seven** 35:13 | **soaked** 11:13 |
| 52:2 53:11 | 15:13,17 16:14 | 44:14 | **share** 25:22 47:4 | **social** 60:4,5 |
| 65:11 | 17:1 18:1 | **scope** 38:15 | **shave** 54:22 | **solemnly** 3:8 |
| **responsibility** | 26:12,15,17 | **scored** 28:21 | **shaven** 6:23 | **somebody** 11:11 |
| 8:12 49:3,8 | 34:1,5,9,12,16 | **scores** 28:22,23 | **Shawn** 18:14 | 18:19 19:5 |
| **result** 12:5 | 34:17 39:20 | **screw** 4:11 | **she's** 21:6 | 31:24 32:1,22 |
| 16:24 18:10 | 40:21 41:25 | **Sebree** 9:18 10:1 | **Shearouse** 1:15 | 50:2 54:23 |
| 19:1 35:20 | 44:7 45:20,23 | 10:12 | 2:5 41:16,21 | 55:12,13 66:12 |
| 39:3 48:20 | 62:14,14 | **second** 17:8 18:6 | 64:8,16,19 | **sorry** 5:3 20:7 |
| 54:21 | **road** 10:4 | 53:13 | 66:24 | 30:15 38:9 |
| **resulted** 62:15 | **Rock** 33:25 34:2 | **secure** 40:8 | **sheet** 29:14 46:7 | 43:21 48:4 |
| **retire** 49:12 63:2 | 34:4,7,11,15 | **security** 18:22 | 46:7 | 52:3 61:7,25 |
| **retired** 31:7,9 | 34:18 35:3 | **see** 11:19 29:6 | **Sheriffs** 60:19 | **sought** 52:3,10 |
| 63:6 | 36:20 37:1,20 | 56:19 57:16 | **shift** 6:18 36:5,6 | 52:17 |
| **retirement** | 37:23,24 39:16 | 58:3,16 60:9 | 40:15 46:8 | **South** 5:2,4 |
| 63:12 | 39:16 40:3 | 60:14 | **shirt** 9:15 10:24 | **SOUTHERN** |
| **retiring** 63:6 | 41:8,15 42:2,5 | **seeing** 28:22 | 11:13 12:5 | 1:2 |
| **return** 22:20 | 44:14 | 31:19 56:25 | **shocked** 56:7 | **Southgate** 57:21 |
| 27:4 46:17 | **Rockford** 5:2,4 | **seek** 54:3 | **short** 55:18 | **speak** 10:21 |
| 47:16 54:2 | **role** 32:13 35:16 | **seen** 36:3 47:4,9 | **shortly** 20:9 | 21:13 54:20 |
| **returned** 16:25 | 35:19 | 56:24 | **shouldn't** 64:25 | 63:25 |
| 56:8 | **Romeo** 66:13 | **sending** 60:15 | **show** 11:15 | **Speaking** 12:20 |
| **returning** 21:1 | **Rosbohn** 17:10 | **senior** 28:12 | 23:18 24:5,21 | **specific** 7:25 |
| 27:3 34:22,23 | **roster** 35:7 | **seniority** 28:12 | 41:10 46:24 | 12:3 15:21 |
| 35:12 49:22 | **route** 9:1 | 28:16 36:7 | **shy** 22:19 | 28:25 29:6 |
| 52:25 53:12 | **Rules** 3:15 | **sense** 22:23 | **side** 9:4,9 10:4 | 49:17 |
| **Reverend** 54:9 | **ruling** 27:12 | **sent** 20:22 31:5 | **sign** 46:6,16,17 | **specifically** 59:7 |
| 54:20 55:6 | **run** 36:16 40:20 | 46:21 65:23 | **signature** 11:24 | **specify** 7:11 |
| 56:9 | 48:6 | **separated** 15:12 | 47:7,10 | 15:21 |
| **review** 48:2 | **running** 40:20 | 30:1 | **sip** 22:3 | **spell** 42:11 53:4 |
| **reviewed** 21:24 | | **September** 4:25 | **sir** 3:23,25 4:2 | **spelling** 66:14 |
| **Rich** 39:18,25 | **——————** | 62:20 | 4:18 11:19 | **spent** 22:20 |
| 40:1 60:23 | **S** | **Sergeant** 36:2 | 47:5 63:14 | **spoke** 13:18 |
| **Richard** 1:4,9 | **Sablowski** 9:17 | 40:3,5 | **sister** 9:4 | 19:12 21:12 |
| 2:3 3:17 4:20 | **safer** 50:24 | **Sergeants** 39:18 | **site** 43:12 | 23:3 26:3 37:4 |
| 68:7,12 | **safety** 16:5,11 | **serve** 12:9 | **sitting** 9:4 10:4 | 54:10 55:6,9 |
| **Rick** 39:25 | 44:23,23 | **service** 12:19 | 50:18 | 57:24 58:25 |
| **ride** 9:10 | **salary** 43:16 | 22:18,19 60:22 | **situation** 11:9 | 59:3 61:11,13 |
| **right** 3:7 4:7 5:9 | **saw** 56:19 57:22 | 60:25 65:20 | 56:3 | 61:18,23 62:4 |
| 15:5,6 22:5 | 58:21 | **serving** 48:16,18 | **situations** 39:13 | 63:3,21 |
| 26:22 32:6 | **saying** 20:23 | **sessions** 59:15 | 54:17 | **spoken** 18:14 |
| | 25:1 63:19 | | | |

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 81 of
119

RICHARD CADOURA v CITY OF DETROIT
Deposition of Richard Cadoura

Page 80

20:13 27:17
59:22
**spring** 44:18
**staff** 9:13,14
38:14 43:11,13
44:12
**staffing** 41:2
52:1
**stand** 39:12
**standard** 14:21
19:20 65:9,11
66:13
**standards** 44:24
**standpoint**
38:13
**start** 4:17 5:12
5:16 6:3 11:9
15:4 26:7,11
40:9 42:18
60:15
**started** 6:3 7:22
11:3 13:4
26:21 39:17
53:21,24 57:3
**starts** 53:5
**state** 21:23 38:8
39:15 66:9
68:2
**stated** 7:17 8:10
9:11 10:1
18:20 21:20,24
21:25 22:11
23:11,12 28:8
28:11 37:10
39:19 52:21
**statement** 2:8
8:17,18 11:25
29:7
**STATES** 1:1
**stating** 26:6
33:10 65:24
**station** 36:4
**stationed** 45:1
**stations** 18:18
**stay** 5:18 17:1

43:12 63:12
**Steel** 44:16,17
44:19
**Steve** 63:10
**Stewart** 60:23
**Stoneridge** 5:2,3
**story** 12:5 19:1
**Street** 1:16
**strike** 64:25
**Strong** 63:10
**structure** 32:16
**subject** 7:3
66:18
**submitted** 19:22
**subscribe** 60:8
**subscription**
60:5
**substitute** 42:14
43:9
**suffered** 48:15
**Suite** 1:16,20
**summer** 5:17
7:24 34:10
**superintendent**
12:7 18:14
**superiors** 29:10
**supervisor** 8:14
8:20
**support** 33:6
38:7
**supposed** 6:3
26:11 35:4
38:25 65:17
**sure** 4:11 9:22
12:13,14 21:6
39:13 41:19
45:19 48:2
53:4
**surprise** 22:14
**suspended** 18:3
29:18 56:8
62:21
**suspension** 12:8
12:9 27:13
55:11 56:3

62:15,19
**suspensions**
54:13 55:21
**swear** 3:8
**switched** 28:14
46:5,10
**switching** 8:8
**sworn** 3:18
68:12
**symptoms** 54:24
**system** 46:5,10
46:12

## T

**T** 1:18 68:1,1
**TABLE** 2:1
**take** 4:17 5:7 9:1
9:15 16:9
17:11 38:18
41:17 49:16
64:5,6
**taken** 1:10 3:2
3:23 41:22
61:5 64:10
65:25 68:7
**talk** 4:8 10:9
18:20,23 34:2
36:12 37:3
48:13 51:2
55:8
**talked** 10:21
45:17 51:12
54:5 63:22
**talking** 4:8,10
7:12 9:17
22:11 50:2
54:6 55:12,13
63:6
**TAMARA** 1:23
68:17
**Tammy** 64:12
**Technician** 6:12
48:20
**technicians**
20:15 48:7

**tell** 3:8 8:20 18:2
23:4,14 25:7
29:14 33:5
49:18 51:4
55:25 56:1
68:12
**telling** 8:14
**ten** 48:10 57:3
58:22 59:13
60:20 61:1
**term** 3:3 32:6
68:9
**terminate** 33:20
**terminated** 34:9
35:19
**termination**
18:4 62:16
**test** 22:8 24:19
25:12 28:18,22
28:23
**testified** 3:20
**testify** 3:18
**testimony** 3:5
68:7,10
**testing** 28:17,17
**text** 20:21,23,23
21:11,14,18
26:6
**thank** 3:11 12:3
22:5 29:23
41:21 64:20
**that's** 5:9 6:8
7:6,9 8:4 11:24
11:24 12:2
13:1 14:15
16:13,15 17:21
19:12,14,15
20:2,12 23:25
24:9,15,20
26:16 28:3
30:1,5,17 32:2
32:6,25 34:3
36:14,17,21
39:14 42:8
45:18 47:8,24

51:4 52:16
56:11,23 60:3
62:5,17,18
63:18 65:4,13
**theme** 40:17
**therapist** 54:5
56:19,20,24
57:23,25 58:21
59:5,18
**therapists** 59:21
**there's** 16:2
33:6
**they'll** 51:9
**they're** 19:18
32:7,9 37:16
38:25 43:11
66:19
**thing** 50:21
55:25
**things** 7:2 16:1,3
18:24,25 29:7
37:7,8 38:25
39:22 48:21
51:6,8,18 55:2
60:11 63:23
65:7
**think** 14:17
17:13 25:22
27:7 34:10
38:22 43:19
44:24 46:24
52:4,4,5 58:25
59:2,15 66:24
**Third** 18:13
**thought** 22:16
23:21 26:17
33:18 44:23
45:25 50:20
52:3 62:13
**three** 33:15
34:13
**throat** 22:3
**Thursday** 1:12
3:1 68:8
**Tim** 37:2

TAMARA A. O'CONNOR
248.882.1331    toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 82 of
119

| | | | | |
|---|---|---|---|---|
| **time** 3:12 7:16 | 48:11 49:22 | **TV** 51:19 | 37:15,16 | 10:21 15:5 |
| 8:8 9:11,18 | 52:24 53:6 | **two** 6:2,5 19:19 | **unions** 8:8 28:14 | 19:6 22:5 24:1 |
| 11:8 12:13,23 | 54:2,10 59:6 | 26:10 27:24 | **unit** 66:13 | 34:21,24 37:10 |
| 13:13,21 14:7 | 61:15 62:18,20 | 38:4 44:20,20 | **UNITED** 1:1 | 39:13,15 45:3 |
| 14:17 15:1,6,7 | 63:6,11 | 46:18 48:2 | **units** 66:22,23 | 48:13,16 |
| 16:4,7 17:8,23 | **tolerate** 39:21 | 66:14 | **unresponsive** | **wanted** 9:9 |
| 17:24 18:6 | **top** 25:5 45:21 | **two-month** | 35:13 | 28:16 36:12 |
| 20:4 21:5,11 | **toxic** 45:3 | 27:13 | **unsworn** 29:16 | 39:1 49:7,8,12 |
| 22:7,10 23:7 | **traffic** 8:25 | **type** 51:25 | **untucked** 12:6 | 50:12 54:1,22 |
| 23:16 26:12,19 | **trained** 51:5 | **typed** 61:9 | **upset** 9:6 28:19 | 63:8 65:6,9 |
| 26:20,22,22 | **training** 51:14 | **types** 60:11 | **upstairs** 18:23 | 66:7 |
| 27:1 29:20 | 51:15 | | **urgency** 11:8 | **wanting** 51:13 |
| 30:1,7 31:11 | **transcript** 1:10 | _____ | **use** 28:12 55:1 | **wasn't** 7:18,20 |
| 32:25 34:5,8,9 | 68:5 | **U** | 65:17 | 10:24 12:13,14 |
| 35:6,15,24 | **transfer** 8:11 | **u-r-a** 4:21 | **usually** 19:17 | 23:4 26:20 |
| 36:25 40:23 | 38:17 49:9 | **U.S** 44:16,17,19 | | 38:21 49:9 |
| 41:5 42:20,21 | **transferring** | **unbeknownst** | _____ | 53:18 57:6,15 |
| 43:7 46:5 49:1 | 38:24 | 29:11 | **V** | 61:16 65:10 |
| 53:1 54:8,9 | **transport** 66:12 | **uncomfortable** | **V-a-c-k** 35:17 | **water** 41:18 |
| 55:1,11,18 | 66:16 | 38:16 | **vacancies** 14:24 | **way** 4:11 52:25 |
| 56:7,13 57:14 | **transported** | **under-** 38:5 66:2 | **Vack** 35:17,17 | 61:23 |
| 58:25 60:22 | 9:12 10:6 | **under-licensed** | **various** 56:14 | **Wayne** 60:19 |
| 61:7,12,19 | **travel** 43:8,9 | 38:14 | 64:22 | **we'll** 4:11,16 |
| 62:23 63:12 | **treatment** 52:10 | **understand** 4:13 | **vehicle** 8:25 | 41:19 46:24 |
| 64:20 65:15,16 | 52:17 54:3,13 | 11:7 23:1 | 66:16 | **we're** 33:4,7 |
| 65:20 | **Trial** 8:5,13 | 54:11 | **vehicles** 52:1 | 43:4 46:24 |
| **times** 7:17 40:18 | **tried** 10:9 54:6 | **understanding** | 66:17 | 66:20 |
| 41:13,14 48:22 | **truck** 8:15 | 21:9 31:20 | **verge** 12:14 | **we've** 25:6 |
| 52:2 53:11 | **true** 6:10 7:18 | 32:9 37:16 | **verify** 25:9 | 27:17 |
| 58:3,21,22,22 | 68:6 | 55:1 62:11 | **vibe** 22:24 | **wear** 54:22 |
| 65:11 66:17 | **truth** 3:8,8,9,19 | **understood** 4:15 | **Vice-President** | **wearing** 10:24 |
| **tissue** 9:14 | 3:19,19 68:13 | 10:6 11:15 | 16:22 | **Webb** 37:2 |
| **title** 6:9 32:12 | 68:13,13 | **unemployed** | **Victorias** 66:4 | **week** 15:11 |
| **titles** 6:13 | **try** 4:10 49:24 | 42:20 | **video** 1:9,11 3:2 | 21:17 43:14 |
| **today** 6:10 39:14 | 50:16 | **uniforms** 40:10 | 65:9 68:8 | 58:4 |
| 64:20 | **trying** 10:10 | **unintelligible** | **violate** 48:4 | **weekend** 51:10 |
| **told** 6:23 7:1 | 17:13 25:8 | 3:6 68:10 | **vision** 44:2 | **weeks** 6:2,5 |
| 10:3,9,24,25 | 38:22 45:19 | **union** 10:21 | **visits** 59:13 | 26:10 30:20 |
| 13:19 18:19 | 46:13 59:14 | 16:14,16,18 | **voluntary** 60:21 | 33:15 44:20,20 |
| 20:18 23:5,11 | 63:24 66:20 | 27:15 29:17 | **vs** 1:6 | 48:2 |
| 23:21 26:17 | **tuberculosis** | 31:5,6,10,11 | | **weigh** 22:20,22 |
| 29:18 30:22,24 | 54:24 | 31:17,21 32:3 | _____ | **Weingarten** |
| 31:11 34:22 | **turn** 49:16 | 32:17 33:10,24 | **W** | 10:11,20 |
| 36:8,11,13 | **turned** 31:24 | 35:10 36:20,22 | **waiting** 66:19,21 | **went** 8:5 9:15 |
| 47:16 48:8,10 | 66:5 | 37:2 41:4 | **walked** 18:22 | 18:11 32:1,22 |
| | | **Union's** 33:19 | **walking** 10:22 | |
| | | | **want** 4:4 7:1,3 | |

TAMARA A. O'CONNOR
248.882.1331        toconnorrptg@aol.com
13-53846-tjt    Doc 13713-6    Filed 08/04/23    Entered 08/04/23 10:44:20    Page 83 of
119

34:11 37:5
42:21 48:9,21
48:23 53:8
54:10 57:8,18
**weren't** 19:3
34:21 36:11
37:12 65:1
66:8
**West** 56:12
**what's** 42:14
43:18 61:21
**who's** 39:24
**wife** 10:17 58:14
58:18
**William** 35:17
**Wilson** 12:7
**window** 10:3
**withdraw** 21:21
**witness** 2:2 3:18
29:22
**woman** 35:23
**Woodhaven**
27:20,21 28:4
28:7 31:8,13
31:14 32:3
34:1 42:1,5
44:14 45:12,13
45:15 61:19
62:14,17,24
**Woodward** 1:20
**work** 5:14,25
14:18 15:10,10
27:4,19,21
31:14 34:4
37:11 41:25
43:3,4,6 44:9
44:17,19 45:7
51:7,13 63:1,1
**worked** 5:24
11:4,5 18:3,17
23:1 44:8 45:6
50:12,17,20
52:21 53:15,17
61:18 66:17
**working** 5:13,16

5:20 6:18 11:6
14:7,9,13,19
15:2,4 33:25
34:18 36:13
38:14 42:18
45:12,23 50:11
52:9,20 60:1
61:19 62:13,23
**works** 19:13
64:8
**world** 45:2
51:16
**wouldn't** 10:18
55:4
**write** 8:17 46:14
**writeup** 62:23
**writing** 47:6
**written** 28:17
31:2 36:1
59:17 61:5,8
63:18
**wrong** 9:19
**wrote** 11:23
23:6 29:7
46:21,21 62:14

---

**X**

---

**Y**

---

**Yatooma** 13:3
**yeah** 7:14 11:20
11:22 22:6
**year** 5:20 12:18
12:19 14:11
17:2 26:8,9,25
35:1,4,13 39:9
39:9,10,11
43:7 45:14
49:13 57:13
60:23
**years** 18:17
22:18,19,21
23:2 39:7
50:20 53:9,22
57:3 60:20

61:1 64:1
**York** 51:18
**you're** 4:6,7 5:7
10:9,13 21:6
23:14,15 33:23
39:22,22 48:13
48:15 49:18
50:6,6,6,7
**you've** 59:22
64:22
**younger** 20:16
50:24 53:7

---

**Z**

---

**Zoom** 1:9,11 3:2
3:23 68:8
**Zug** 44:25

---

**0**

---

**1**

---

**1** 2:7 11:16,18
**1-13-18** 2:14
**1-5-23** 68:15
**10** 48:12
**10:00** 1:12 3:1
**10:12** 11:17
**10:34** 24:6
**10:35** 24:22
**10:37** 25:24
**102** 5:3,4
**11** 2:7
**11:04** 41:22
**11:10** 41:20
**11:13** 41:23
**11:23** 47:2
**11:54** 64:10
**12** 7:18
**12-12-11** 2:8
**12-4-17** 2:12
**12-month** 35:6
**12:10** 64:7
**12:11** 64:11
**12:15** 67:3
**12559** 5:2,3

**15** 22:18,19 64:6
**16** 27:13
**1971** 4:25
**1998** 6:4

---

**2**

---

**2** 1:20 2:9 24:5,7
**20-cv-12986** 1:5
**2004** 15:5
**2008** 7:24 13:4
14:12,13 15:5
45:24
**2013** 6:16 14:13
60:2
**2015** 15:16 17:3
27:22 44:10
**2016** 34:6
**2017** 18:9 20:10
20:10 26:14
34:10 35:1,5
44:10,18 56:22
56:24
**2018** 17:6,7,7
26:7,18,21
35:1,2 42:3
57:14,16
**2021** 42:19
**2022** 27:25 28:2
39:11,12 45:14
60:24
**2023** 1:12 3:1
39:11 68:8
**24** 2:9,11 15:11
**25** 2:13 16:2
**250** 56:12
**25th** 12:19
**27** 27:22
**28** 49:21
**2nd** 26:7

---

**3**

---

**3** 2:4,11 4:25
24:21,23
**30-story** 44:22
**30.57** 43:20,22

**300** 48:12
**313.237.3088/...**
1:21
**32** 43:5
**33.00** 48:11

---

**4**

---

**4** 2:13 25:23,25
**40** 43:5,15
**401(k)** 44:4,5
**45** 59:16
**47** 2:15
**48** 14:18
**48-hour** 12:8
**48179** 5:4
**48226** 1:16,20

---

**5**

---

**5** 1:12 2:15 3:1
46:25 47:1,3
68:8
**500** 1:20
**54** 14:18

---

**6**

---

**6-25-27** 68:19
**615** 1:16
**64** 2:5
**68** 68:6
**6th** 35:5

---

**7**

---

**70** 43:15
**709** 1:16
**7th** 6:16 25:14
35:5

---

**8**

---

**8** 6:4
**84** 14:21
**844.835.2993**
1:17

---

**9**

---

**97** 5:17

TAMARA A. O'CONNOR
248.882.1331      toconnorrptg@aol.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 84 of
119

# Detroit Fire Department
## E.M.S. Division

Medic Co. No. M-19

Detroit, __Dec 12,2011__

To: Asst. Superintendant Wilson

From: Tech. Richard Cadoura

Re: Charge of Conduct

On 11-08-2011, While detailed to Medic 6, I called AC. Donella James and was informed that Lt. Sablowski was coming to the Hospital to " Conduct and Investigation into an Allegation of Patient Abandonment". I walked to the ER Dock and observed Lt. Sablowski talking with my partner Jeff Sebree. As I approached , I was informed by Lt. Sablowski that he was"conducting and investigation". I respectfully declined until a Union Rep could be present, invoking my Weingarten and Garrity Rights. Lt. Sablowski DENIED my request stating " this is not an investigation but an inquiry". I stated under GR 6.1 Section C. a Supervisor will provide a Union Rep prior to any questioning that may lead to charges now or in the future. My request was DENIED!!! As I attempted to walk back into the hospital Lt. Sablowski continued to follow me Shouting "you will answer my questions". Lt Sablowski allowed the situation to escalate by his FAILURE TO MAINTAIN ORDER AND DISCIPLINE. I do regret the fact that I allowed Lt.Sablowski's Disrespectful, Abusive, Demeaning Behavior to Provoke me into telling him ' TO GO FUCK HIMSELF" 3 times, but it did end the Confrontation. In my almost 14 year career with Dems I have NEVER been put in that situation by any other Officer in the Detroit Fire Dept. I filed a Violence in the Workplace compliant against Lt. Sablowski several years ago which was later dropped by the Law Department without being fully investigated. Since that time I have had False Complaints, Written Statements and Improper Charges written against me by Lt. Sablowski resulting in being placed off LWOPCA several times. Without the Department Investigating his Conduct.

Respectfully Richard Cadoura #608

_[signature]_ #608

Fwd by:

_[signature]_
12/13/11

RECEIVED
DEC 14 2011
ASSISTANT SUPERINTENDENT'S OFFICE
EMERGENCY MEDICAL SERVICE

DEFENDANT'S EXHIBIT
Cadoura
1-5-23    TTR

20-cv-12986 000357



**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313•224•9421
Fax 313•628•1164
www.detroitmi.gov

December 19, 2017

Richard Cadoura


Dear Richard:

The City of Detroit is pleased to extend to you a conditional offer of employment for the position of Emergency Medical Technician (Paramedic) in the Fire Department - EMS Division with a starting rate/salary of $23.52.

You may accept or decline this offer by responding to this email at brownbel@detroitmi.gov by the expiration date of Friday, December 22, 2017.

This offer is contingent upon your successful completion of a criminal background investigation, driver's license, drug screen and pre-employment medical evaluation.

In order to complete the criminal clearance, we need the following confidential information:

Phone Number:
Date of Birth:
Gender:
Race:
Alias/Maiden Name:
Driver License Number:
Copy of diploma, degree, or transcripts verifying completion

Failure to provide this information will rescind this offer of employment.

Once we receive your acceptance and the results of your pre-employment medical evaluation, you will receive an email from Employee Services Consultant, Kemia Crosson with your final certification date.

The City of Detroit is an Equal Opportunity Employer. No applicant shall be discriminated against on the basis of race, religion, color, age, gender, national origin, disability, or other criteria prohibited by City, State or Federal law.

If you have any questions, please feel free to contact me at 313.720.5632 and I will be more than happy to discuss the details of this offer.

Sincerely,

Belinda Brown, Recruiter II
Human Resources Department



DEFENDANT'S
EXHIBIT
2
Cadoura
1-5-23  Tha

20-cv-12986 000482



**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313•224•9421
Fax 313•628•1164
www.detroitmi.gov

December 4, 2017

Richard Cadoura



Dear Mr./Ms. Cadoura:

RE:   Application for – Exam - 2017222403126xx

You have been scheduled to take the Physical Agility Test (PAT) for the Emergency Medical Technician (Basic / Paramedic) position.  In order to participate in the PAT you must have a signed, current Medical Clearance from a physician.

This Medical Clearance Form is included with this letter.  NO CANDIDATE will be allowed to participate in the PAT without a current Medical Clearance Form signed and dated by a physician.

You are scheduled to participate in the PAT on Thursday, December 7, 2017 at 8:30 am.

Please report to the Fire Department Training Academy, located at 10200 Erwin Street (between Lynch & Grinnell - off Van Dyke) in Detroit, 48208.  Parking is available in the front of the Fire Department Training Academy.

YOU MUST BRING WITH YOU TO THE PHYSICAL AGILITY TEST:

- This letter - Admittance Notice
- Your signed medical clearance
- A COPY and the ORIGINAL of your current Driver's License with Chauffeurs' Endorsement (if you don't have one, you must have one by the first day of the Academy – 1/22/2018)
- A COPY and the ORIGINAL of your current State of MI - EMT (Basic / Paramedic) License
- A COPY and the ORIGINAL of your current State of MI - Detroit East Medical Control Authority Certification (DEMCA), (if applicable for Paramedic)
- Bring an Updated Resume
- Bring a COPY of the following - Work Experience Documentation:
  o   two (2) recent check stubs
  o   2016 W-2
  o   two (2) Reference Letters

Please wear loose fitting and comfortable full-length pants and shirt, along with gym shoes or other comfortable footwear.

Please reply back stating you will be in attendance by contacting me at 313.720.5632 by Wednesday, December 6, 2017.

IF YOU CAN NOT MAKE IT TO THIS EVENT AND WISH TO RE-SCHEDULE, please contact my Administrative Assistant, Lisa Nelson at 313.224.3477.

Sincerely,
Belinda Brown,  HR Recruiter II
Human Resources Department

**DEFENDANT'S EXHIBIT 3**
Cadoura
1-5-23



**Human Resources**
RECRUITMENT

Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 314
Detroit, Michigan 48226

Phone 313·224·9421
Fax 313·628·1164
www.detroitmi.gov

January 13, 2018

Richard Cadoura

RE:   Application for Paramedic

Dear Mr. Cadoura:

Thank you for your interest in the above referenced position.  Your skills and commitment to the City of Detroit were recognized and greatly appreciated.

We regret to inform you that you are no longer considered for selection for the Detroit Fire Department - EMS Division.

If you have any questions, please feel free to contact me at 313.224.3730.

Sincerely,

Belinda Brown
Human Resources Department



DEFENDANT'S EXHIBIT 4
Cadoura
1-5-23   TH8

20-cv-12986 000484

# DATABASE

City of Detroit
## NOTICE OF RESIGNATION
## EVALUATION AND RECOMMENDATION FOR REINSTATEMENT

## 1. EMPLOYEE

DEPARTMENT ___FIRE___ DIVISION ___EMS___

I, ___RICHARD CADOURA___, S.S.# ▮▮▮▮ Hereby tender

my resignation as ___EMT___ for the following reason(s): ___RETIREMENT___
   title

My last day of work will be __7__ __16__ Additional comments: _____
   day  date

Forwarding Address (either home or work): ▮▮▮▮▮▮▮▮▮

_(signature)_        6-3-13
                     _(date)_

## 2. HUMAN RESOURCES DEPARTMENT, EMPLOYEE SERVICES DIVISION

### DISCIPLINARY ACTION – LAST 18 MONTHS

Number of Written Reprimands: 1        Number of Suspensions: 1
Reason(s) for Reprimand: Conduct
Reason(s) for Suspension: Conduct

### ATTENDANCE AND TARDINESS RECORD – LAST 18 MONTHS

| | | |
|---|---|---|
| ✓ Paid Sick Leave | 10 Occurrences | ___ Beginning of Shift |
| ___ Absent /No Pay | Occurrences | ___ Return from Lunch |
| ___ Dept. Leave | Occurrences | |
| ___ A.W.O.L. | Occurrences | |
| ___ Workers Compensation | Occurrences | |
| ___ Funeral Leave. | Occurrences | |
| ___ FMLA | Occurrences | |
| ___ Other | Occurrences | |
| 15 Total Days Absent | 10 Total Absence Occurrences | ___ Total Times Tardy |

DEFENDANT'S EXHIBIT 5
Cadoura
1-5-23 TMD

GODIVA

Thank you again for choosing GODIVA as your partner in making the world a more wonderful place!

Copyright © City of Detroit, 2003. All rights reserved.

Notice of Resignation
Effective 04/09/03        Page 3        FORM9067 Rev 6

## ATTENDANCE AND TARDINESS RECORD

☐ Satisfactory    ☑ Needs Improvement    ☐ Unsatisfactory

Comments: _____

_____

## WORK PERFORMANCE

| | EE | ME | NI | UN | |
|---|---|---|---|---|---|
| Overall ability to perform: | ☐ | ☑ | ☐ | ☐ | EE-Exceeds Expectations |
| Quality of work: | ☐ | ☐ | ☑ | ☐ | NI-Needs Improvement |
| Quantity of work: | ☐ | ☑ | ☐ | ☐ | ME-Meets Expectations |
| Knowledge & Skills: | | | | | UN-Unsatisfactory |
|    Technical Knowledge: | ☐ | ☑ | ☐ | ☐ | |
|    Practical Skills: | ☐ | ☑ | ☐ | ☐ | |
|    Ability to learn: | ☐ | ☑ | ☐ | ☐ | |
| Work Behavior: | ☐ | ☐ | ☑ | ☐ | |
| Supervisory Abilities: | ☐ | ☐ | ☐ | ☐ | ☑ (N/A) |

## DEPARTMENTAL RECOMMENDATION

REINSTATEMENT: ☐ Yes  ☑ No    Date:_____

Completed by: _Anthony M Wade_   Title: _Relmin L7_
    Supervisor's Name

Approved by: _Jerald Jame_   Title: _EMS Supv_
    Manager's Name

Approved Date: _6/10/13_ Comments (If reinstatement is NOT recommended, state reason):____

_Pending discipline, poor work behavior._

EXIT INTERVIEW(S) CONDUCTED BY: ____

Date of Interview: _6/10/13_ Name: _Anthony M Wade_ Title: _Relmin L7_

COMMENTS:_____

Date of Interview: _____ Name: _____ Title:_____

COMMENTS:_____

**Reinstatement is governed by Human Resources Rule 15. To be eligible for Reinstatement, the applicant must have at least one year of prior service and resigned in good standing. Applications for reinstatement will be accepted for a period between three (3) months and twenty-four (24) months following the last day on the active payroll.**

Copyright © City of Detroit, 2003. All rights reserved.

YMG 9/4/13

## 4. HUMAN RESOURCES DEPARTMENT, EMPLOYEE SERVICES DIVISION

Last Day Worked: 06/03/13 Last Day Paid: 06/03/13 City Seniority Date: 06/08/98

Effective Date of Resignation: 06/04/13 (in accordance with Human Resources Rule 15)

The Human Resources Department ☒ concurs ☐ does NOT concur with the Reinstatement

Recommendation of the employing department:

Brandi Richmon _____ Date: 9/16/13
HRC Printed Name

_____
Signature

Copyright © City of Detroit, 2003. All rights reserved.

Notice of Resignation
Effective 04/09/03

Page 5

FORM9067
Rev 6
20-cv-12986 000464

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 471-2019-03981 |

| Michigan Department Of Civil Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Richard N. Cadoura** | **(313) 971-8500** | **1971** |

| Street Address | City, State and ZIP Code |
|---|---|
| **12559 Stoneridge Lane, #102, South Rockwood, MI 48179** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CITY OF DETROIT FIRE DEPARTMENT** | **201 - 500** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **1301 3rd Street, Detroit, MI 48226** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☒ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **11-06-2017** Latest **01-13-2018**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was previously employed by the above-named employer from 1998 through 2013.

While I was employed, I made internal complaints regarding discrimination. Most recently, in November of 2017 I applied to an open position of Paramedic. On December 19, 2017 I was offered the Paramedic position and began training. However, on approximately January 13, 2018 the employer rescinded the offer. When I called to ask for the reason, I was told that I'm allegedly on a non-rehire list.

I believe that I was denied re-hire in retaliation for complaining and based on my race and National Origin (Middle Eastern), in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY — When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 8-22-2019 Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) Aug 22nd 2019 |

PAGE 01/01                    THE UPS STORE                    7346921887                    08/22/2019 16:45

| | |
|---|---|
| **From:** | Sean Larkins |
| **To:** | Belinda Brown |
| **Cc:** | Kemia Crosson |
| **Subject:** | Re: Richard Cadoura & Nicholas Collingsworth |
| **Date:** | Friday, January 12, 2018 3:58:24 PM |
| **Attachments:** | IMAGE.BMP |
| | IMAGE.BMP |

Thank you.


Chief Sean W. Larkins, Superintendent of EMS
City of Detroit Fire Department
1301 Third Street, Suite 603
Detroit, Michigan 48226
Office: (313) 596-5182
Cell: (313) 300-1355




Mike Duggan, Mayor

Confidentiality Notice: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. If you are not the intended recipient(s), you are hereby notified that any dissemination, unauthorized review, use, disclosure or distribution of this email and any materials contained in any attachments is prohibited. If you receive this message in error, or are not the intended recipient(s), please immediately notify the sender by email and destroy all copies of the original message, including attachments.


>>> Belinda Brown 1/12/2018 3:57 PM >>>
There are two former employees:  Richard Cadoura and Nicholas Collingsworth.  I just received their personnel file and they are both not recommended for reinstatement.


>>> Sean Larkins 1/12/2018 3:55 PM >>>
Kemia,

This former employee is not a rehire, correct?


Chief Sean W. Larkins, Superintendent of EMS
City of Detroit Fire Department
1301 Third Street, Suite 603
Detroit, Michigan 48226
Office: (313) 596-5182
Cell: (313) 300-1355




Mike Duggan, Mayor

Confidentiality Notice: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. If you are not the intended recipient(s),

you are hereby notified that any dissemination, unauthorized review, use, disclosure or distribution of this email and any materials contained in any attachments is prohibited. If you receive this message in error, or are not the intended recipient(s), please immediately notify the sender by email and destroy all copies of the original message, including attachments.

have received this communication in error, please immediately notify us by reply email or telephone at the above number and return the original message to the sender. Thank you.

---

**From:** Kemia Crosson
**Sent:** Wednesday, March 25, 2020 4:07 PM
**To:** Tara Brin <brint@detroitmi.gov>
**Cc:** Lesa Kent <kentl@detroitmi.gov>; Raquiba Dismuke <DISMUKR@detroitmi.gov>
**Subject:** RE: EEOC Charge 471-2019-03981

Hello Tara,

The employee file on Richard Cadoura indicates he is a Do Not Rehire.  There are not any additional files at EMS that states otherwise or claims of discrimination from HR.  Anyone can apply for a positon. However, once the file is pulled and indicates the person does not have a recommendation for reinstatement, the department who completed the form are not obligated to accept/hire the person back into the department.  Richard Cadoura can work for any other department except Fire. If you have any other questions, or need further clarification do not hesitate to contact me at 313-410-0668.

Thanks!


*Kemia Crosson*

Employee Services Consultant
City of Detroit-Human Resources Department
Detroit Public Safety Headquarters
1301 Third Street – Ste 728
Detroit, Michigan 48226
Office: (313) 596-1441
Fax: (313) 237-2584

---

**From:** Raquiba Dismuke
**Sent:** Wednesday, March 25, 2020 2:07 PM
**To:** Tara Brin <brint@detroitmi.gov>; Kemia Crosson <crossonk@detroitmi.gov>
**Cc:** Lesa Kent <kentl@detroitmi.gov>
**Subject:** RE: EEOC Charge 471-2019-03981

Kemia
See below

---

| From: | Kemia Crosson |
|---|---|
| To: | Lesa Kent; Tara Brin |
| Cc: | Raquiba Dismuke |
| Subject: | RE: EEOC Charge 471-2019-03981 |
| Date: | Wednesday, March 25, 2020 8:18:00 PM |

Hello Lesa,

In his resignation paperwork, it stated that he would not be reinstated because of pending discipline and poor work behavior.

Thanks!


*Kemia Crosson*

Employee Services Consultant
City of Detroit-Human Resources Department
Detroit Public Safety Headquarters
1301 Third Street – Ste 728
Detroit, Michigan 48226
Office: (313) 596-1441
Fax: (313) 237-2584



**From:** Lesa Kent
**Sent:** Wednesday, March 25, 2020 8:15 PM
**To:** Tara Brin <brint@detroitmi.gov>; Kemia Crosson <crossonk@detroitmi.gov>
**Cc:** Raquiba Dismuke <DISMUKR@detroitmi.gov>
**Subject:** Re: EEOC Charge 471-2019-03981

Hey Kemia I'm sorry I might have missed it is there any explanation why he is a do-not-hire.

Lesa Kent
313.224.2942
Civil Rights, Inclusion and Opportunity


**From:** Kemia Crosson <crossonk@detroitmi.gov>
**Sent:** Wednesday, March 25, 2020 5:25:01 PM
**To:** Tara Brin <brint@detroitmi.gov>
**Cc:** Lesa Kent <kentl@detroitmi.gov>; Raquiba Dismuke <DISMUKR@detroitmi.gov>
**Subject:** RE: EEOC Charge 471-2019-03981

You're welcome!

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

 2                   EASTERN DISTRICT OF MICHIGAN

 3                        SOUTHERN DIVISION

 4

 5    RICHARD CADOURA,

 6

 7              Plaintiff,

 8

 9                                  Case No: 20-cv-12986

10                                  Hon. Gershwin A. Drain

11                                  Magistrate Anthony P. Patti

12

13    -vs-

14

15   THE CITY OF DETROIT,

16

17              Defendant.

18   _____/

19

20              DEPOSITION (via Zoom) of BELINDA BROWN

21

22              Taken by the Plaintiff on the 4th day of

23              August, 2022 via Zoom Deposition commencing at

24              11:04 a.m.

25

                                                 Page 1
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com
13-53846-tjt   Doc 13713-6   Filed 08/04/23   Entered 08/04/23 10:44:20   Page 97 of 119

August 4, 2022

| | |
|---|---|
| 1 APPEARANCES: | 1    Zoom Deposition |
| 2 | 2    Thursday, August 4, 2022 |
| 3 For the Plaintiff:     REJANAE BROOKS (P85701) | 3    11:04 a.m. |
| 4          Carla D. Aikens, P.L.C. | 4 |
| 5          615 Griswold | 5          BELINDA BROWN |
| 6          Suite 709 | 6 |
| 7          Detroit, Michigan 48226 | 7    was thereupon called as a witness herein, and after |
| 8          844-835-2993 | 8    having first been duly sworn to tell the truth, the |
| 9 | 9    whole truth and nothing but the truth, was examined |
| 10 For the Defendant:     JASON T. McFARLANE (P73105) | 10   and testified as follows: |
| 11          ANDRAE SMITH (P69153) | 11 |
| 12          City of Detroit - Law Department | 12          EXAMINATION |
| 13          2 Woodward Avenue | 13 |
| 14          Suite 500 | 14 BY MS. BROOKS: |
| 15          Detroit, Michigan 48226 | 15 |
| 16          313-237-3088 | 16 Q   Ms. Brown, my name is Rejanae Brooks.  I'm |
| 17 | 17   appearing today on behalf of the plaintiff. |
| 18 Reported By:       Amy Bertin, CER-3871 | 18 |
| 19          Certified Electronic Reporter | 19      If I ask you something you don't understand |
| 20          586-468-2411 | 20   what I said or, you know, also I'm in Michigan as |
| 21 | 21   well and my internet is just not good so if you |
| 22 | 22   can't hear me, please let me know, I'll repeat the |
| 23 | 23   question.  Okay? |
| 24 | 24 A  No problem.  Yes. |
| 25 | 25 Q  Could you please state your name for the record, |
| Page 2 | Page 4 |

| | |
|---|---|
| 1          TABLE OF CONTENTS | 1    please? |
| 2 | 2 A  Belinda Brown. |
| 3 WITNESS                           PAGE | 3 Q  And are you currently employed? |
| 4 | 4 A  Yes. |
| 5 BELINDA BROWN | 5 Q  Where are you currently employed? |
| 6 | 6 A  The City of Detroit. |
| 7    Examination by Ms. Brooks            4 | 7 Q  What is your role? |
| 8 | 8 A  I am a recruiter. |
| 9 | 9 Q  How long have you been a recruiter? |
| 10 | 10 A  Since October 10, 2016. |
| 11 | 11 Q  And what do you do in that position? |
| 12 | 12 A  I have a number of departments that I recruit for. |
| 13 EXHIBITS: Exhibits Attached to Transcript) IDENTIFIED | 13   So if the department states that they are looking |
| 14 | 14   to fill any of their vacancies, I will post them on |
| 15 Exhibit 1   Offer Letter            27 | 15   our City's website. |
| 16 Exhibit 2   February 24th, '17 email    30 | 16 Q  You said on the City website? |
| 17 Exhibit 3   Regret Letter            32 | 17 A  Yes.  On the City of Detroit website. |
| 18 Exhibit 4   Text Message 1            34 | 18 Q  Do you do anything other than post the vacancies on |
| 19 Exhibit 5   Text Message 2            36 | 19   the website? |
| 20 Exhibit 6   Personnel file.            40 | 20 A  I go out and look for talent based on what the |
| 21 | 21   department is seeking, what position they're |
| 22 | 22   looking for to fill. |
| 23 | 23 Q  Where would you go out to look for talent? |
| 24 | 24 A  At the community college.  Depending on what title |
| 25 | 25   it is, I'll go to the schools, the high schools, |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

| | |
|---|---|
| 1    community out reach that's out there. I'll go on | 1    generalist, is that interchangeable, like the |
| 2    Indeed, LinkedIn, any type of organizations. | 2    recruiter and HR generalist? |
| 3 Q   So you said you started at the City of Detroit in | 3 A   With the City of Detroit I am a recruiter. But |
| 4    October of 2016? | 4    when I worked at Whelan, I was HR manager it's like |
| 5 A   Correct. | 5    the realm of it is like a generalist. So I did the |
| 6 Q   Did you have any job before then? | 6    A through Z of human resources compared to with the |
| 7 A   Yes. | 7    City of Detroit I'm just a recruiter. |
| 8 Q   Where were you employed? | 8 Q   So what I'm hearing and you can correct me if I'm |
| 9 A   I was employed at Whelan Security as an HR manager. | 9    wrong is for the City of Detroit you just strictly |
| 10 Q   And how long were you there? | 10    do recruiting. So that's going out and trying to |
| 11 A   For one year. | 11    fill vacancies? |
| 12 Q   What is Whelan Security? | 12 A   Correct. Yes. |
| 13 A   It's a contract security company. | 13 Q   So do you have any say in the hiring and firing of |
| 14 Q   And you said you were HR there; correct? | 14    employees for the City of Detroit? |
| 15 A   HR manager. | 15 A   The hiring along with the department is what I do. |
| 16 Q   So what was some of your duties as HR manager? | 16    Could you explain -- yeah. Let me just, what |
| 17 A   As a human resources generalist, I did everything | 17    exactly are you involved in in the hiring? |
| 18    from the hiring to the recruitment piece, to the | 18 A   I meet with the department, they let me know what |
| 19    onboarding, benefits, employee relations, the whole | 19    their vacancy is and I will post that vacancy |
| 20    realm of HR. | 20    title. Whatever that position is, I will post it. |
| 21 Q   What's your highest level of education? | 21    Once the position comes down, the posting comes |
| 22 A   A bachelor's degree. | 22    down, it closes, then me and the department will |
| 23 Q   In what? | 23    set up an interview or if a test is required |
| 24 A   Business administration, major human resources. | 24    they'll take a test. Those pass the test will, me |
| 25 Q   When did you obtain that? | 25    and the department will set up interviews. Once |
| Page 6 | Page 8 |

| | |
|---|---|
| 1 A   2006. | 1    the person meets all the qualifications for the |
| 2 Q   And where did you get that degree? | 2    interview they are placed on the eligibility list |
| 3 A   Sienna Heights University. | 3    and then we hire. |
| 4 Q   I'm sorry. Sienna or did you say Sienna? | 4 Q   And is that decision to hire up to you or someone |
| 5 A   Sienna Heights University in Adrian, Michigan. | 5    else? |
| 6 Q   Perfect. | 6 A   Based on the scoring of the eligibility list, it's |
| 7 | 7    based on who's next in line to be hired. |
| 8      In your current position as a recruiter for | 8 Q   And so did you have -- what did you do to prepare |
| 9    the City of Detroit, do you have to take any | 9    for today's deposition? |
| 10    trainings or get any certificates? | 10 A   I met with my attorney. |
| 11 A   Repeat the question, please. | 11 Q   Did you review any documents? |
| 12 Q   In your current position for the City of Detroit as | 12 A   Yes. |
| 13    the recruiter, do you have to get any, do you do | 13 Q   Did you help produce any documents for this matter? |
| 14    any trainings or receive any certificates? | 14 A   I want to say, yes. Yes. |
| 15 A   I have received training and certificates. | 15 Q   Is that typical that you would help produce the |
| 16 Q   What kind of trainings? | 16    documents? |
| 17 A   Any type of human resources training. But since | 17 A   This is my first time in doing a deposition or |
| 18    I've been employed with the City of Detroit I | 18    being -- |
| 19    received a certificate of, certification in human | 19 Q   This is your first time doing, taking a deposition? |
| 20    resources generalist with our talent development | 20 A   With the City of Detroit in this matter with the |
| 21    division. | 21    gentleman that we're speaking of. |
| 22 Q   So no yearly, like you don't have to do anything | 22 Q   So this is also your first time helping produce |
| 23    yearly to keep your position? | 23    documents in this particular matter? |
| 24 A   No. | 24 A   Correct. |
| 25 Q   As the recruiter, I know you keep saying HR | 25 Q   I want to talk a little bit about some of the |
| Page 7 | Page 9 |

3 (Pages 6 - 9)

August 4, 2022

1   things at the City of Detroit, in particular the
2   procedures.
3
4        So are you aware of like any retention
5   policies for personnel files?
6 A   No.
7 Q   So is it common to put out a vacancy for -- well,
8   scratch that.
9
10       Is it typical that the City of Detroit would
11   try to go and rehire individuals?
12 A   It's typical for the City of Detroit to rehire if
13   the individual apply online and they meet all the
14   qualifications, we move forward with the hiring.
15 Q   Has there ever been an instance where the City of
16   Detroit was seeking to rehire with, that was the
17   targeted individual, people who had previously
18   worked for the City of Detroit?
19 A   No.
20 Q   Could you explain the process of what it looks like
21   when someone is applying for rehire.  What does
22   that look like?
23 A   So someone that is applying for a position -- this
24   is the question you're asking.  Someone that is
25   applying for the position and they just happen to

Page 10

1   and eight people pass that interview, the eight
2   that passed are now placed on the eligibility list.
3   And everything at this point --
4 Q   I'm sorry.  I didn't mean to cut you off.  And you
5   said, and everything is what?
6 A   Ranked.
7 Q   Ranked based on what?
8 A   Their scores.
9 Q   So is it safe to say that whoever got the highest
10   score is like the first in line?
11 A   Yes.
12 Q   So is there anything special that takes place when
13   an application has -- I'm sorry, when somebody who
14   has already worked for the City of Detroit applies?
15   It's all, is it just like standard, straight across
16   the board?
17 A   Yes.  But there are a number of tiers.  There are
18   some positions that requires a computerized
19   test and there are some positions that doesn't.  So
20   if it requires a computerized test or a physical
21   agility test, the computerized test, we go this
22   way, the process is this way.  If it's a physical
23   agility test, the process is this way.  Or if it's
24   just a straight interview, the process is this way.
25 Q   So would you look at a personnel file of someone

Page 12

1   be a rehire or are you speaking we're targeting
2   someone and we want that person to come be rehired
3   back?
4 Q   Have you ever targeted someone to come back?
5 A   No.
6 Q   So my question is just a little bit more general.
7   Someone submits an application, they are, I guess,
8   applying for -- I don't even know how to phrase
9   this.  They used to be employed by the City of
10   Detroit, they are now reapplying, what happens on
11   your end?
12 A   They would apply online, the application, fill out
13   the application.  If the position requires a test,
14   they will take the test.  If they pass the test,
15   the next step would be the interview.  And if they
16   pass the interview then they will be placed on an
17   eligibility list.  And then based on their ranking,
18   if they are next in line then they will be hired.
19   If not, they stay on the eligibility list for
20   ninety days.
21 Q   What do you mean by next in line?
22 A   Is a ranking.
23 Q   A ranking amongst all of the people who apply?
24 A   All of the people that passed.  So those that pass
25   the interview, let's say we interview ten people

Page 11

1   who previously worked for the City of Detroit in
2   consideration of the application?
3 A   Please repeat the question.
4 Q   Would you look at the personnel file of a person
5   who had previously worked for the City of Detroit
6   in consideration for the application?
7 A   If they are marked as non rehirable we wouldn't be
8   able to move forward with hiring that individual.
9 Q   How would you know they were marked non rehireable?
10 A   Based on our -- based on the personnel file and
11   based on our payroll system.
12 Q   So when would you look at the personnel file?
13 A   Once they have completed the whole process.
14 Q   So they have passed the -- well, if there is
15   required for a test, they have already passed all
16   the tests and the physical test, now you're looking
17   at the personnel file?
18 A   Correct.
19 Q   And could you explain to me some circumstances on
20   when someone would be non rehireable?
21 A   If a department sees that an individual used to
22   work for the City, then I will be notified.  And
23   then at that point a research will be done where
24   I'll pull the personnel file to see what the status
25   is.

Page 13

4 (Pages 10 - 13)

August 4, 2022

1  Q   I'm not sure you understood my question.
2
3        I'm asking for some examples of what makes
4    someone non rehireable.
5  A   Because that's on our employee services side,
6    because now the individual is now working and being
7    employed with the City, employee services is
8    another division, they would know all of that.  I
9    would not know that.  All I would see is what is in
10   the system or what was marked.  So I wouldn't be
11   able to answer that.
12 Q   That's fair.
13
14       Do you know someone currently in the employee
15   services division?
16 A   They have probably fifteen employees.  They have a
17   number.
18 Q   Is there like a head person in that department?
19 A   It is.
20 Q   Who is that?
21 A   Raquiba Dismuke.
22 Q   Could you spell that?
23 A   Yes.  R-A-Q-U-I-B-A.  And her last name is D-I-S-M-
24   U-K-E.
25 Q   I'm sorry, you cut out.  Could you spell the last

Page 14

1    name one more time, please?
2  A   D-I-S-M-U-K-E.
3  Q   Perfect.  Thank you.
4
5        And so she would be the person to talk to if I
6    wanted to know about what makes someone non
7    hireable?
8  A   Correct.
9  Q   I know that you already said that you are not
10   familiar with the retention policy of documents for
11   the City of Detroit; correct?
12 A   Correct.
13 Q   As far as personnel files go?
14 A   Correct.
15 Q   Do you know who would know about that?
16 A   Our chief of policy and planning.
17 Q   Chief of policy and planning.
18 A   Her name is Kimberly Hall Wagner.
19 Q   And you said chief of policy and planning?
20 A   Correct.
21 Q   Well, I don't like to waste a lot of time so I want
22   to get straight to it.
23
24       Can you recall the first time speaking to Mr.
25   Richard Cadoura?

Page 15

1  A   During our physical agility test with EMS division.
2  Q   And that was your first time speaking to him during
3    the physical agility test?
4  A   Correct.
5  Q   So when he submitted an application, were you
6    notified of the application?
7  A   Yes.
8  Q   After receiving his application, what happened?
9  A   So a posting is posted, individuals apply online.
10   Him and along with other applicants, I send them a
11   notification to attend the next physical agility
12   test with the EMS division on this particular day,
13   at this particular time.  Those that show up, we
14   start the physical agility test.  They get
15   introduced to what's going to happen next, they go
16   out to the bay to see what the physical agility
17   test entails and then they take the test.
18 Q   So the notification to attend the physical agility
19   test, is that considered an offer of employment,
20   was that a conditional offer or is that just, what
21   is that?
22 A   So for the EMS division, they were seeking to hire
23   EMTs, emergency medical technician and paramedics.
24   So in order for them to, in order for the division
25   to hire, to get ready to start the process we have

Page 16

1    to make sure that they are able to do the physical
2    piece of being an EMT or a paramedic.
3
4        So that is just them come in to do the
5    physical portion of it.  So, in other words, in the
6    beginning when I mentioned we have individuals come
7    in and take the computerized based test and that's
8    the process that way or they come in and do an
9    interview and that's a process this way.  With EMS
10   their process begins with the physical agility
11   test.
12 Q   So once an individual passes the physical agility
13   test then what's next after that?
14 A   An oral interview.
15 Q   And who is the oral interview with?
16 A   It's a human resources recruiter along with a
17   member of the EMS division, one of their captains
18   or one of their lieutenants.
19 Q   And this is when we get in the ranking system?
20   After this, if they pass that interview then
21   they're ranked?
22 A   On the eligibility list, yes.
23 Q   So did Mr. Cadoura pass the physical agility test?
24 A   Yes.
25 Q   And was he invited to an oral interview?

Page 17

5 (Pages 14 - 17)

1  A   Yes.
2  Q   Do you recall who his oral interview was with?
3  A   Yes.  Me and Captain Walinsky.
4  Q   Walinsky.  Can you spell that?
5  A   W-A-L-I-N-S-K-Y.
6  Q   And did he pass this oral interview?
7  A   Yes.
8  Q   And so he was placed on the eligibility list?
9  A   Yes.
10 Q   And ranked?
11 A   Yes.
12 Q   So was he ever offered employment after he was
13     ranked?
14 A   Yes.
15 Q   So once he was offered employment, then what
16     happened?
17 A   I send, along with him and some other individuals
18     that passed, I send the department, the division,
19     the EMS division a list of names on who will be
20     moving forward in the hiring process so they can do
21     their steps.  I don't know what their steps is but
22     just giving them the names of, these are the next
23     group of EMTs or paramedics that will be hired and
24     I just give it to the division.
25 Q   Do you recall the other applicants who were moving

Page 18

1          forward with Mr. Cadoura?
2  A   No, I cannot.
3  Q   And you said that you give the list of the people
4      who are moving forward to the EMS department?
5  A   Correct.
6  Q   Who was in charge of that, who received that list?
7  A   I cannot recall who the individuals are but it
8      would be -- I cannot recall.
9  Q   Is it always the same position like the chief of
10     EMS or who typically receives that list?
11 A   I cannot recall.
12 Q   Let me ask you this.  Is it a similar setup today
13     as, you know, people go through, they do the oral
14     interview, they are placed on an eligibility list
15     and ranked?  Do you still send the list of names to
16     the department that they're being hired into?
17 A   No.  Because we have changed the process now as a
18     whole, within the whole entire fire department.
19 Q   So what happens now?
20 A   We are hiring fire fighters and they are doing dual
21     roles.  So they come in as a fire fighter and
22     they'll do a twenty week academy.  And at the end
23     of the academy they are now EMTs.  So when they get
24     out and do their roles after completing the academy
25     they are now fire fighter/EMTs.

Page 19

1  Q   So taking you back to when you sent the list of Mr.
2      Cadoura and the other applicants to the EMS
3      department, do you recall anyone saying anything to
4      you about the list?
5  A   Yes.
6  Q   What do you recall?
7  A   One of the -- the chief mentioned that he was non
8      rehireable.
9  Q   Is this Mr. Walinsky?
10 A   No.  He is the captain.
11 Q   Who was the chief at the time?
12 A   Sean Larkins.  S-E-A-N, Larkins, L-A-R-K-I-N-S.
13 Q   And he was chief of EMS?
14 A   He is chief of EMS.
15 Q   Oh.  He is.  And Mr. Walinsky is the captain of
16     the --
17 A   Within EMS.
18 Q   And I might have cut you off to figure out who this
19     person was.  What did Mr. Larkins say to you after
20     you sent the list?
21 A   He stated that he was non rehireable.
22 Q   Did he tell you why?
23 A   No.
24 Q   Did you ask why?
25 A   No.

Page 20

1  Q   So once you learned that he was non rehireable then
2      what happened?
3  A   I pulled his personnel file.
4  Q   For what purpose?
5  A   To see why he is non rehireable.
6  Q   Did you figure it out?
7  A   It is listed in the personnel file.
8  Q   Do you recall what it said?
9  A   No.  Not as of today.
10 Q   Did you discuss the fact that Mr. Cadoura was non
11     rehireable with anyone after you learned that?
12 A   I brought it back up to Chief Larkins by letting
13     him know I see.
14 Q   And was that the end of the discussion?
15 A   No.  I had to put a letter together to let Mr.
16     Cadoura know that he was not able to move forward
17     in the hiring process.
18 Q   And did you tell him why?
19 A   No.
20 Q   Did he ask you?
21 A   I never had a verbal conversation with him.  It was
22     communicated via email.
23 Q   You never had a verbal conversation with him
24     throughout the process or after you learned he was
25     non rehireable?

Page 21

6 (Pages 18 - 21)

August 4, 2022

| | |
|---|---|
| 1 A   Throughout the whole entire process. | 1   knew before I bring anything up.  But mainly the |
| 2 Q   What do you consider a verbal communication? | 2   question was, were there writeups in there as well. |
| 3 A   Me actually talking to an individual. | 3   I just wanted to know your knowledge because you |
| 4 Q   In person or on the phone? | 4   said you were hired in 2016; right? |
| 5 A   In person or on the phone. | 5 A   That's correct. |
| 6 Q   How did you communicate with Mr. Cadoura? | 6 Q   He was there, his previously employment was before |
| 7 A   Via email. | 7   you started.  I wanted to know what you knew about |
| 8 Q   Solely email? | 8   his previous employment. |
| 9 A   Solely email. | 9 A   Even though I was hired in October 2016, I didn't |
| 10 Q   So did Mr. Cadoura respond to your email after you | 10   go over to the fire department until July 2017. |
| 11   informed him that he was no longer considered? | 11 Q   So do you know anything about any other lawsuits |
| 12 A   I don't recall. | 12   that Mr. Cadoura is involved in? |
| 13 Q   Are you aware of any of Mr. Cadoura's past -- | 13 A   No. |
| 14   scratch that. | 14 Q   To this day you do not? |
| 15 | 15 A   I received an email maybe the beginning of this |
| 16       After you learned that he was -- actually, | 16   year in regards to this whole process that we're |
| 17   scratch that. | 17   going through right now.  And that's when I |
| 18 | 18   received knowledge. |
| 19       When he applied, could you see that he was a | 19 Q   So what were you told about those? |
| 20   rehire? | 20 |
| 21 A   No. | 21       MR. MCFARLANE:  I'm going to object as |
| 22 Q   So you had no knowledge of that until Mr. Larkins | 22   privileged. |
| 23   informed you? | 23 |
| 24 A   Correct. | 24       MS. BROOKS:  I'm almost certain that -- so |
| 25 Q   And in the personnel file was, was there anything | 25   that's just for the record.  I'm pretty sure she |
| Page 22 | Page 24 |

| | |
|---|---|
| 1   speaking to his previous employment? | 1   can still answer if she knows; right? |
| 2 A   So in his personnel file, during the time that he | 2 |
| 3   worked for the City to the last day of work and the | 3       MR. MCFARLANE:  No.  She's not answering that. |
| 4   reason why he was non rehireable is listed. | 4   It's a communication with an attorney, she's |
| 5 Q   Did you see anything regarding disciplinary issues | 5   absolutely not answering. |
| 6   in his personnel file? | 6 |
| 7 A   It is on that one sheet that states the reason that | 7       MS. BROOKS:  So let me rephrase it. |
| 8   he is non rehireable. | 8 |
| 9 Q   So the reason is the only thing that spoke to | 9 BY MS. BROOKS: |
| 10   discipline?  I guess my question is like, did you | 10 |
| 11   see write-ups or anything like that in the file? | 11 Q   What did you learn about the other lawsuits? |
| 12 A   No. | 12 A   I have no knowledge of any lawsuits. |
| 13 Q   I should have done this earlier.  Are you alone in | 13 Q   I'm talking about when you said that you were |
| 14   the room? | 14   informed about them at the beginning of the year. |
| 15 A   I am. | 15 |
| 16 Q   And is there anything in front of you? | 16       MR. MCFARLANE:  That mischaracterizes her |
| 17 A   The TV. | 17   testimony. |
| 18 Q   So you said that the only thing that spoke to | 18 |
| 19   discipline was the reason why he was non | 19       MS. BROOKS:  Ms. Bertin, is that how you |
| 20   rehireable? | 20   pronounce it?  Could you please reread, I want to |
| 21 A   So just asking, do you have the sheet that states | 21   say when I asked what she knew about it? |
| 22   his last day?  Because all that is on there, the | 22 |
| 23   date, the last day that he worked and the reason | 23       (Whereupon the question and answer were played |
| 24   why he is not recommended to return back to work. | 24       back by the court reporter.) |
| 25 Q   I do.  I do have it.  I just wanted to see what you | 25 |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

August 4, 2022

| | |
|---|---|
| 1 BY MS. BROOKS: | 1    screen? |
| 2 | 2 A   Yes. |
| 3 Q   So my question is, what did you learn about it? | 3 Q   Are you able to read it or do I need to zoom? |
| 4    You said you received knowledge at the beginning of | 4 A   No.  I am able to read it. |
| 5    the year.  What did you learn? | 5 Q   So this is an email from Sean Larkins who you have |
| 6 A   That I was involved in what we're doing right now. | 6    informed me is the chief of EMS. |
| 7 Q   And did you know what your involvement was? | 7 A   Correct. |
| 8 A   No. | 8 Q   And this is to -- who is this to? |
| 9 Q   Do you know now? | 9 A   Kemia Crosson.  She is the employee services |
| 10 A   That I hired him and was in the process of hiring | 10    consultant. |
| 11    him and he wasn't hired because of a previous | 11 Q   And who is Zack Sydney or Sydney Zack? |
| 12    lawsuit. | 12 A   So Sydney Zack used to be the deputy commissioner, |
| 13 Q   I want to pull up some documents, please forgive me | 13    the second deputy commissioner. |
| 14    it might be slow.  I usually have multiple screens. | 14 Q   Okay. |
| 15 | 15 A   Within the fire department. |
| 16      Can you see my screen, Ms. Brown? | 16 Q   So Mr. Larkins tells Kemia that she will be |
| 17 A   Yes. | 17    receiving an application for rehire from a Richard |
| 18 Q   Are you able to read it or do I need to zoom? | 18    Cadoura.  Please pull his file and speak to the |
| 19 A   No.  I can read it. | 19    department prior to making any decisions.  Are you |
| 20 Q   Do you know what this is? | 20    aware of this email? |
| 21 A   This is an offer letter. | 21 A   No, I am not. |
| 22 Q   And does it look like the offer letter that Mr. | 22 Q   Is it common for Mr. Larkins to know that he's |
| 23    Cadoura received? | 23    going to receive -- |
| 24 A   Yes. | 24 |
| 25 Q   And it says, you know, sincerely Belinda Brown. | 25      MR. MCFARLANE: I'm going to object.  It calls |
| Page 26 | Page 28 |

| | |
|---|---|
| 1    Did you personally send this to him? | 1    for speculation. |
| 2 A   Yes. | 2 |
| 3 Q   And it says that this offer is contingent upon your | 3      MS. BROOKS:  Okay. |
| 4    successful completion of a criminal background | 4 |
| 5    investigation, driver's license, drug screening, | 5 MS. BROOKS: |
| 6    and pre employment medical evaluation.  Is it safe | 6 |
| 7    for me to say that this occurred after the physical | 7 Q   You can answer. |
| 8    agility test and the oral interview"? | 8 A   I don't know. |
| 9 A   Yes. | 9 Q   How would he know he was receiving an application |
| 10 Q   Do you recall if Mr. Cadoura -- I know it says you | 10    from -- |
| 11    may accept or decline this offer by responding to | 11 |
| 12    this email by the expiration date of Friday, | 12      MR. MCFARLANE:  Objection.  Calls for |
| 13    December 22nd, 2017.  Do you recall if he accepted | 13    speculation. |
| 14    or declined? | 14 |
| 15 A   He did accept. | 15 BY MS. BROOKS: |
| 16 | 16 |
| 17      MS. BROOKS:  I'm going to mark that exhibit as | 17 Q   If you know, you can answer. |
| 18    Plaintiff's Exhibit 1, offer letter. | 18 A   I don't know. |
| 19 | 19 Q   But he's not involved in the -- he's not involved in |
| 20      (Document marked for identification as | 20    the application intake process, is he? |
| 21      Plaintiff's Deposition Exhibit Number 1.) | 21 A   No.  Not the application intake process. |
| 22 | 22 Q   And is it common to pull someone's file prior to |
| 23 BY MS. BROOKS: | 23    making any decisions? |
| 24 | 24 A   Repeat your question. |
| 25 Q   Share my screen again.  Ms. Brown, can you see my | 25 |
| Page 27 | Page 29 |

8 (Pages 26 - 29)

August 4, 2022

| | |
|---|---|
| 1     MR. MCFARLANE: Objection. Vague. | 1 Q  Were you directed to send this email? |
| 2 | 2 A  After -- yes. |
| 3 BY MS. BROOKS: | 3 Q  Who directed you to send this email? |
| 4 | 4 A  I don't recall. |
| 5 Q  Is it common to pull an applicant's file prior to | 5 |
| 6    making any decisions of hiring? | 6    MS. BROOKS: I'm going to mark this as |
| 7 A  No. | 7  Plaintiff's Exhibit 3, regret letter. |
| 8 | 8 |
| 9    MS. BROOKS: I'm going to mark this as | 9    (Document marked for identification as |
| 10  Plaintiff's Exhibit 2, a February 24th, email. | 10  Plaintiff's Deposition Exhibit Number 3.) |
| 11 | 11 |
| 12    (Document marked for identification as | 12 BY MS. BROOKS: |
| 13  Plaintiff's Exhibit Number 2.) | 13 |
| 14 | 14 Q  Can you see my screen? |
| 15    THE WITNESS: Can you repeat that last question | 15 A  Yes. |
| 16  again? I apologize. | 16 Q  Do you recognize this? |
| 17 | 17 A  It looks like a text message. |
| 18    MS. BROOKS: I don't want to misstate it. I | 18 Q  So this first text message is from December 22nd of |
| 19  don't remember how I worded it, so Ms. Bertin could | 19  2017. And it says, "Good evening, Ms. Brown. Sorry |
| 20  you read that back, please? | 20  for the inconvenience but I just wanted to check to |
| 21 | 21  make sure you received my email earlier today. By |
| 22    (Whereupon the question was read back by the | 22  the way, this is Richard Cadoura." |
| 23  court reporter.) | 23 |
| 24 | 24    Do you recall receiving this text? |
| 25    THE WITNESS: So prior to hiring? | 25 A  As of today, no. But I see it was a text submitted. |
| Page 30 | Page 32 |

| | |
|---|---|
| 1 | 1 Q  And it does say -- can you see my mouse? |
| 2 BY MS. BROOKS: | 2 A  I do. |
| 3 | 3 Q  So right here it says, Ms. Brown, Detroit HR. |
| 4 Q  Correct. | 4 A  Yes. |
| 5 A  Once we determine that a person was a previous | 5 Q  Is it safe to say that this is you? |
| 6  employee, it is not common to pull a person's | 6 |
| 7  personnel file, a previous employee personnel file. | 7    MR. MCFARLANE: Objection. Calls for |
| 8 Q  Okay. | 8  speculation. |
| 9 A  To see if they are rehireable. | 9 |
| 10 Q  Can you see my screen, Ms. Brown? | 10    MS. BROOKS: You can answer, if you know. |
| 11 A  Yes. | 11 |
| 12 Q  And I know this one looks a little bit different. | 12    MR. MCFARLANE: This isn't her phone. How |
| 13  Are you able to read it or do I need to zoom? | 13  would she know who that is? |
| 14 A  I'm able to read it. | 14 |
| 15 Q  Okay. And this is -- do you know what this it? | 15 BY MS. BROOKS: |
| 16 A  Yes. | 16 |
| 17 Q  What is it? | 17 Q  Right. If you know. |
| 18 A  It's letting him know that we regret to inform that | 18 A  I don't know. |
| 19  he's no longer considered for employment with the | 19 Q  Well, it says here, "I did. Thanks. Merry |
| 20  City of Detroit EMS division. | 20  Christmas to you and your family." |
| 21 Q  And did you send him this? | 21 |
| 22 A  Yes. | 22    Do you recall sending that text? |
| 23 Q  Were you directed to send this email? I think it | 23 A  No. I do not recall. |
| 24  was an email. Was it an email or a letter? | 24 Q  Well, down here where it says January 8th, 2018. |
| 25 A  It's an email. | 25  "Good afternoon, Ms. Brown. This is Richard Cadoura |
| Page 31 | Page 33 |

9 (Pages 30 - 33)

Belinda Brown
August 4, 2022

**Page 34**

1    and my physical and drug screen are complete."
2
3        Do you recall receiving that?
4 A   I don't.
5 Q   Was Mr. Cadoura in contact with you about his
6    physical and drug screen?
7 A   I don't recall.
8 Q   Do you remember if he was in contact with anyone
9    else during his process of onboarding?
10 A   I cannot -- I don't recall.
11 Q   Do you know if you were the main point of contact?
12 A   I had an assistant who is no longer here.
13 Q   Who was your assistant at the time?
14 A   Cheremy (ph) Matthews.  But I cannot say if she was
15    here at that time.  I mean, it was so long ago.  I
16    can't say if she was actually, you know, what --
17 Q   You're not aware of what dates she was employed?
18 A   No.
19
20        MS. BROOKS:  I'm going to mark the last exhibit
21    as Plaintiff's Exhibit 4, text message 1.
22
23        (Document marked for identification as
24        Plaintiff's Deposition Exhibit Number 4.)
25

**Page 36**

1        Do you recall sending that?
2 A   I do not.
3
4        MS. BROOKS:  I'm going to mark this as
5    plaintiff's Exhibit 5, text message 2.
6
7        (Document marked for identification as
8        Plaintiff's Deposition Exhibit Number 5.)
9
10 BY MS. BROOKS:
11
12 Q   Ms. Brown?
13 A   Yes.
14 Q   Prior to receiving Mr. Cadoura's application, were
15    you aware of who he was?
16 A   No.
17
18        MS. BROOKS:  Can we take like five minutes?
19    You okay with that?
20
21        MR. MCFARLANE:  Yes.
22
23        (Brief pause.)
24
25 BY MS. BROOKS:

**Page 35**

1 BY MS. BROOKS:
2
3 Q   I'm going to share my screen.  Can you see my
4    screen?
5 A   Yes, I can.
6 Q   So this appears to be to the same person; correct?
7    Right here.  As the last text message.
8 A   Yes.
9 Q   So this text message, January 9th, 2018 says, "Good
10    afternoon.  You are all set.  You can put in your
11    two weeks notice.  The academy starts on Monday,
12    January 22nd.  Someone will contact you and tell you
13    the next step."
14
15        Do you see that?
16 A   I do.
17 Q   Do you recall sending that?
18 A   I do not.
19 Q   It says, "This is a great day.  Thank you so much
20    for everything."
21
22        And on January 12th, 2018 the text message
23    says, "This is Belinda Brown, HR recruiter for the
24    City of Detroit.  Please give me a call when you are
25    available."

**Page 37**

1
2 Q   Ms. Brown, you said that you pulled Mr. Cadoura's
3    personnel file; correct?
4 A   Correct.
5 Q   Are you able to see my screen?
6 A   Yes.
7 Q   Does this look like what you saw when you pulled his
8    personnel file?
9 A   Yes.
10 Q   And this says it's a notice of resignation
11    evaluation, recommendation for reinstatement.  Is
12    this the only thing that was in the personnel file?
13 A   That's the only thing I received from the personnel
14    file.
15 Q   And I want to scroll down here where it says, "If
16    reinstatement is not recommended, state the reason."
17    And it says, "Pending discipline, poor work
18    behavior."
19
20        Is that what you read as well?
21 A   Yes.
22 Q   Do you know what the pending discipline was?
23 A   No.
24 Q   Did you ever ask to find out?
25 A   No.

10 (Pages 34 - 37)

| | |
|---|---|
| 1 Q Do you know who knows what the pending discipline | 1 (Document marked for identification as |
| 2 is? | 2 Plaintiff's Deposition Exhibit Number 6.) |
| 3 A I don't know. | 3 |
| 4 Q Do you know what the poor work behavior was? | 4 MS. BROOKS: And I believe that that is it for |
| 5 A I do not. | 5 me. |
| 6 Q Do you know who knows? | 6 |
| 7 A I do not. | 7 Do you have any? I'm not sure if you want to |
| 8 Q So right here it says, "Reinstatement is governed by | 8 go. |
| 9 Human Resources Rule 15." I'm going to stop right | 9 |
| 10 there. Is there like a pamphlet of the Human | 10 MR. MCFARLANE: I have no questions. |
| 11 Resources Rules? | 11 |
| 12 A Yes. | 12 MS. BROOKS: All right, Ms. Brown. Well, I |
| 13 Q It says, "To be eligible for reinstatement the | 13 really appreciate your time. |
| 14 applicant must have at least one year of prior | 14 |
| 15 service and resigned in good standing. Applications | 15 (Deposition concluded at 12:15 p.m.) |
| 16 for reinstatement will be accepted for a period of | 16 |
| 17 between three months and twenty-four months | 17 - - - |
| 18 following the last day on the active payroll." | 18 |
| 19 | 19 |
| 20 Okay. It says, good standing. What's the | 20 |
| 21 definition of good standing because I'm not -- yeah. | 21 |
| 22 What's the definition of good standing? | 22 |
| 23 A Because I am a recruiter and not employee services, | 23 |
| 24 I could not tell you what their definition would be | 24 |
| 25 in regards to good standing. | 25 |
| Page 38 | Page 40 |

| | |
|---|---|
| 1 Q Would Raquiba be able to speak to that? | 1 CERTIFICATE OF NOTARY |
| 2 A Yes. And Kemia Crosson because she is the employee | 2 |
| 3 services consultant for the fire department. | 3 STATE OF MICHIGAN ) |
| 4 Q I want to make sure I have this distinction. So | 4 ) |
| 5 Raquiba is the, she's just the head of employee | 5 COUNTY OF OAKLAND ) |
| 6 services? | 6 |
| 7 A Well, she's the manager. | 7 I certify that this transcript, consisting |
| 8 Q For multiple units? | 8 of 41 pages, is a complete, true, and correct record of |
| 9 A Within employee services. | 9 the testimony of BELINDA BROWN, held in this case on |
| 10 Q And so Kemia is specifically over the fire | 10 Thursday, August 4th, 2022. |
| 11 department? | 11 I also certify that prior to taking this |
| 12 A Correct. | 12 deposition, BELINDA BROWN, was duly sworn to tell the |
| 13 Q So are you aware what the Human Resources Rule 15 | 13 truth. |
| 14 is? | 14 I also certify that I am not a relative or |
| 15 A Not offhand. I don't know it. I can't memorize it. | 15 employee of or an attorney for a party; or financially |
| 16 I don't know. | 16 interested in the action. |
| 17 Q As far as eligibility for reinstatement, do you know | 17 August 10, 20 |
| 18 what exactly is needed? | 18 |
| 19 A No. Because that's employee services. | 19 Amy Bertin, CER-3871 |
| 20 Q So I would need to talk to Kemia? | 20 Notary Public |
| 21 A Correct. | 21 Oakland County, Michigan |
| 22 | 22 My Commission Expires: 08-12-24 |
| 23 MS. BROOKS: I'm going to mark this as, I | 23 |
| 24 believe, Plaintiff's Exhibit 6, personnel file. | 24 signature not requested |
| 25 | 25 |
| Page 39 | Page 41 |

11 (Pages 38 - 41)

3-18-1 Page 1

August 4, 2022

**[08-12-24 - assistant]**

| **0** | **21**   35:21 | **615**   2:5 | **ago**   34:15 |
|---|---|---|---|
| **08-12-24**   41:22 | **22**   35:12,22 | **7** | **aikens**   2:4 |
| **1** | **22nd**   27:13 | **7**   35:7 | **amy**   2:18 41:19 |
| **1**   3:15,18 27:18 | 32:18 | **709**   2:6 | **andrae**   2:11 |
| 27:21 34:21 | **23**   35:23 | **8** | **answer**   14:11 |
| 35:1 | **24**   35:24 | **8**   35:8 | 25:1,23 29:7,17 |

**1**   3:15,18 27:18 27:21 34:21 35:1
**10**   5:10 35:10 41:17
**11**   35:11
**11:04**   1:24 4:3
**12**   35:12
**12986**   1:9
**12:15**   40:15
**12th**   35:22
**13**   35:13
**14**   35:14
**15**   35:15 38:9 39:13
**16**   35:16
**17**   3:16 35:17
**18**   35:18
**19**   35:19

**2**

**2**   2:13 3:16,19 30:10,13 35:2 36:5
**20**   1:9 35:20
**2006**   7:1
**2016**   5:10 6:4 24:4,9
**2017**   24:10 27:13 32:19
**2018**   33:24 35:9 35:22
**2022**   1:23 4:2 41:10,17

**21**   35:21
**22**   35:12,22
**22nd**   27:13 32:18
**23**   35:23
**24**   35:24
**24th**   3:16 30:10
**25**   35:25
**26738**   41:18
**27**   3:15

**3**

**3**   3:17 32:7,10 35:3
**30**   3:16
**313-237-3088**   2:16
**32**   3:17
**34**   3:18
**36**   3:19
**3871**   2:18 41:19

**4**

**4**   3:7,18 4:2 34:21,24 35:4
**40**   3:20
**41**   41:8
**48226**   2:7,15
**4th**   1:22 41:10

**5**

**5**   3:19 35:5 36:5 36:8
**500**   2:14
**586-468-2411**   2:20

**6**

**6**   3:20 35:6 39:24 40:2

**615**   2:5

**7**

**7**   35:7
**709**   2:6

**8**

**8**   35:8
**844-835-2993**   2:8
**8th**   33:24

**9**

**9**   35:9
**9th**   35:9

**a**

**a.m.**   1:24 4:3
**able**   13:8 14:11 17:1 21:16 26:18 28:3,4 31:13,14 37:5 39:1
**absolutely**   25:5
**academy**   19:22 19:23,24 35:11
**accept**   27:11,15
**accepted**   27:13 38:16
**action**   41:16
**active**   38:18
**administration**   6:24
**adrian**   7:5
**afternoon**   33:25 35:10
**agility**   12:21,23 16:1,3,11,14,16 16:18 17:10,12 17:23 27:8

**ago**   34:15
**aikens**   2:4
**amy**   2:18 41:19
**andrae**   2:11
**answer**   14:11 25:1,23 29:7,17 33:10
**answering**   25:3 25:5
**anthony**   1:11
**apologize**   30:16
**appearances**   2:1
**appearing**   4:17
**appears**   35:6
**applicant**   38:14
**applicant's**   30:5
**applicants**   16:10 18:25 20:2
**application**   11:7 11:12,13 12:13 13:2,6 16:5,6,8 28:17 29:9,20,21 36:14
**applications**   38:15
**applied**   22:19
**applies**   12:14
**apply**   10:13 11:12,23 16:9
**applying**   10:21 10:23,25 11:8
**appreciate**   40:13
**asked**   25:21
**asking**   10:24 14:3 23:21
**assistant**   34:12 34:13

Page 1

Atkinson-Baker, A Veritext Company
(818) 551-7300

www.veritext.com

Belinda Brown
August 4, 2022

**[attached - computerized]**

| | | | |
|---|---|---|---|
| **attached** 3:13 | **benefits** 6:19 | **cadoura's** 22:13 | 11:9 12:14 13:1 |
| **attend** 16:11,18 | **bertin** 2:18 | 36:14 37:2 | 13:5,22 14:7 |
| **attorney** 9:10 | 25:19 30:19 | **call** 35:24 | 15:11 23:3 |
| 25:4 41:15 | 41:19 | **called** 4:7 | 31:20 35:24 |
| **august** 1:23 4:2 | **bit** 9:25 11:6 | **calls** 28:25 29:12 | **city's** 5:15 |
| 41:10,17 | 31:12 | 33:7 | **closes** 8:22 |
| **available** 35:25 | **board** 12:16 | **captain** 18:3 | **college** 5:24 |
| **avenue** 2:13 | **brief** 36:23 | 20:10,15 | **come** 11:2,4 17:4 |
| **aware** 10:4 | **bring** 24:1 | **captains** 17:17 | 17:6,8 19:21 |
| 22:13 28:20 | **brooks** 2:3 3:7 | **carla** 2:4 | **comes** 8:21,21 |
| 34:17 36:15 | 4:14,16 24:24 | **case** 1:9 41:9 | **commencing** |
| 39:13 | 25:7,9,19 26:1 | **cer** 2:18 41:19 | 1:23 |
| | 27:17,23 29:3,5 | **certain** 24:24 | **commission** |
| **b** | 29:15 30:3,9,18 | **certificate** 7:19 | 41:22 |
| | 31:2 32:6,12 | 41:1 | **commissioner** |
| **b** 14:23 | 33:10,15 34:20 | **certificates** 7:10 | 28:12,13 |
| **bachelor's** 6:22 | 35:1 36:4,10,18 | 7:14,15 | **common** 10:7 |
| **back** 11:3,4 20:1 | 36:25 39:23 | **certification** | 28:22 29:22 |
| 21:12 23:24 | 40:4,12 | 7:19 | 30:5 31:6 |
| 25:24 30:20,22 | **brought** 21:12 | **certified** 2:19 | **communicate** |
| **background** | **brown** 1:20 3:5 | **certify** 41:7,11 | 22:6 |
| 27:4 | 4:5,16 5:2 26:16 | 41:14 | **communicated** |
| **based** 5:20 9:6,7 | 26:25 27:25 | **changed** 19:17 | 21:22 |
| 11:17 12:7,18 | 31:10 32:19 | **charge** 19:6 | **communication** |
| 13:10,10,11 17:7 | 33:3,25 35:23 | **check** 32:20 | 22:2 25:4 |
| **bay** 16:16 | 36:12 37:2 | **cheremy** 34:14 | **community** 5:24 |
| **beginning** 17:6 | 40:12 41:9,12 | **chief** 15:16,17,19 | 6:1 |
| 24:15 25:14 | **business** 6:24 | 19:9 20:7,11,13 | **company** 6:13 |
| 26:4 | | 20:14 21:12 | **compared** 8:6 |
| **begins** 17:10 | **c** | 28:6 | **complete** 34:1 |
| **behalf** 4:17 | | **christmas** 33:20 | 41:8 |
| **behavior** 37:18 | **cadoura** 1:5 | **circumstances** | **completed** 13:13 |
| 38:4 | 15:25 17:23 | 13:19 | **completing** |
| **believe** 39:24 | 19:1 20:2 21:10 | **city** 1:15 2:12 | 19:24 |
| 40:4 | 21:16 22:6,10 | 5:6,16,17 6:3 | **completion** 27:4 |
| **belinda** 1:20 3:5 | 24:12 26:23 | 7:9,12,18 8:3,7,9 | **computerized** |
| 4:5 5:2 26:25 | 27:10 28:18 | 8:14 9:20 10:1 | 12:18,20,21 17:7 |
| 35:23 41:9,12 | 32:22 33:25 | 10:10,12,15,18 | |
| | 34:5 | | |

Page 2

[concluded - employee]

| | | | |
|---|---|---|---|
| concluded 40:15 | cv 1:9 | deputy 28:12,13 | doing 9:17,19 |
| conditional 16:20 | **d** | determine 31:5 | 19:20 26:6 |
| consider 22:2 | d 2:4 14:23 15:2 | detroit 1:15 2:7 | drain 1:10 |
| consideration 13:2,6 | date 23:23 27:12 | 2:12,15 5:6,17 | driver's 27:5 |
| considered 16:19 22:11 31:19 | dates 34:17 | 6:3 7:9,12,18 | drug 27:5 34:1,6 |
| consisting 41:7 | day 1:22 16:12 | 8:3,7,9,14 9:20 | dual 19:20 |
| consultant 28:10 39:3 | 23:3,22,23 24:14 | 10:1,10,12,16,18 | duly 4:8 41:12 |
| contact 34:5,8 34:11 35:12 | 35:19 38:18 | 11:10 12:14 | duties 6:16 |
| contents 3:1 | days 11:20 | 13:1,5 15:11 | **e** |
| contingent 27:3 | december 27:13 32:18 | 31:20 33:3 | e 14:24 15:2 20:12 |
| contract 6:13 | decision 9:4 | 35:24 | earlier 23:13 32:21 |
| conversation 21:21,23 | decisions 28:19 29:23 30:6 | development 7:20 | eastern 1:2 |
| correct 6:5,14 8:8,12 9:24 | decline 27:11 | different 31:12 | education 6:21 |
| 13:18 15:8,11,12 15:14,20 16:4 | declined 27:14 | directed 31:23 32:1,3 | eight 12:1,1 |
| 19:5 22:24 24:5 28:7 31:4 35:6 | defendant 1:17 2:10 | disciplinary 23:5 | electronic 2:19 |
| 37:3,4 39:12,21 41:8 | definition 38:21 38:22,24 | discipline 23:10 23:19 37:17,22 38:1 | eligibility 9:2,6 11:17,19 12:2 17:22 18:8 19:14 39:17 |
| county 41:5,21 | degree 6:22 7:2 | discuss 21:10 | eligible 38:13 |
| court 1:1 25:24 30:23 | department 2:12 5:13,21 8:15,18 | discussion 21:14 | email 3:16 21:22 22:7,8,9,10 24:15 27:12 28:5,20 30:10 31:23,24,24,25 32:1,3,21 |
| criminal 27:4 | 8:22,25 13:21 14:18 18:18 | dismuke 14:21 | |
| crosson 28:9 39:2 | 19:4,16,18 20:3 24:10 28:15,19 | distinction 39:4 | |
| current 7:8,12 | 39:3,11 | district 1:1,2 | |
| currently 5:3,5 14:14 | departments 5:12 | division 1:3 7:21 14:8,15 16:1,12 16:22,24 17:17 18:18,19,24 31:20 | emergency 16:23 |
| cut 12:4 14:25 20:18 | depending 5:24 | document 27:20 30:12 32:9 34:23 36:7 40:1 | employed 5:3,5 6:8,9 7:18 11:9 14:7 34:17 |
| | deposition 1:20 1:23 4:1 9:9,17 9:19 27:21 32:10 34:24 36:8 40:2,15 41:12 | documents 9:11 9:13,16,23 15:10 26:13 | employee 6:19 14:5,7,14 28:9 31:6,7 38:23 39:2,5,9,19 |

Page 3

[employee - human]

| | f | forward   10:14 | h |
|---|---|---|---|
| 41:15 | **fact**   21:10 | 13:8 18:20 19:1 | **hall**   15:18 |
| **employees**   8:14 | **fair**   14:12 | 19:4 21:16 | **happen**   10:25 |
| 14:16 | **familiar**   15:10 | **four**   38:17 | 16:15 |
| **employment** | **family**   33:20 | **friday**   27:12 | **happened**   16:8 |
| 16:19 18:12,15 | **far**   15:13 39:17 | **front**   23:16 | 18:16 21:2 |
| 23:1 24:6,8 27:6 | **february**   3:16 | | **happens**   11:10 |
| 31:19 | 30:10 | g | 19:19 |
| **ems**   16:1,12,22 | **fifteen**   14:16 | **general**   11:6 | **head**   14:18 39:5 |
| 17:9,17 18:19 | **fighter**   19:21,25 | **generalist**   6:17 | **hear**   4:22 |
| 19:4,10 20:2,13 | **fighters**   19:20 | 7:20 8:1,2,5 | **hearing**   8:8 |
| 20:14,17 28:6 | **figure**   20:18 | **gentleman**   9:21 | **heights**   7:3,5 |
| 31:20 | 21:6 | **gershwin**   1:10 | **held**   41:9 |
| **emt**   17:2 | **file**   3:20 12:25 | **give**   18:24 19:3 | **help**   9:13,15 |
| **emts**   16:23 18:23 | 13:4,10,12,17,24 | 35:24 | **helping**   9:22 |
| 19:23,25 | 21:3,7 22:25 | **giving**   18:22 | **high**   5:25 |
| **entails**   16:17 | 23:2,6,11 28:18 | **go**   5:20,23,25 6:1 | **highest**   6:21 |
| **entire**   19:18 22:1 | 29:22 30:5 31:7 | 10:11 12:21 | 12:9 |
| **evaluation**   27:6 | 31:7 37:3,8,12 | 15:13 16:15 | **hire**   9:3,4 16:22 |
| 37:11 | 37:14 39:24 | 19:13 24:10 | 16:25 |
| **evening**   32:19 | **files**   10:5 15:13 | 40:8 | **hireable**   15:7 |
| **exactly**   8:17 | **fill**   5:14,22 8:11 | **going**   8:10 16:15 | **hired**   9:7 11:18 |
| 39:18 | 11:12 | 24:17,21 27:17 | 18:23 19:16 |
| **examination**   3:7 | **financially**   41:15 | 28:23,25 30:9 | 24:4,9 26:10,11 |
| 4:12 | **find**   37:24 | 32:6 34:20 35:3 | **hiring**   6:18 8:13 |
| **examined**   4:9 | **fire**   19:18,20,21 | 36:4 38:9 39:23 | 8:15,17 10:14 |
| **examples**   14:3 | 19:25 24:10 | **good**   4:21 32:19 | 13:8 18:20 |
| **exhibit**   3:15,16 | 28:15 39:3,10 | 33:25 35:9 | 19:20 21:17 |
| 3:17,18,19,20 | **firing**   8:13 | 38:15,20,21,22 | 26:10 30:6,25 |
| 27:17,18,21 | **first**   4:8 9:17,19 | 38:25 | **hon**   1:10 |
| 30:10,13 32:7,10 | 9:22 12:10 | **governed**   38:8 | **hr**   6:9,14,15,16 |
| 34:20,21,24 36:5 | 15:24 16:2 | **great**   35:19 | 6:20 7:25 8:2,4 |
| 36:8 39:24 40:2 | 32:18 | **griswold**   2:5 | 33:3 35:23 |
| **exhibits**   3:13,13 | **five**   36:18 | **group**   18:23 | **human**   6:17,24 |
| **expiration**   27:12 | **following**   38:18 | **guess**   11:7 23:10 | 7:17,19 8:6 |
| **expires**   41:22 | **follows**   4:10 | | 17:16 38:9,10 |
| **explain**   8:16 | **forgive**   26:13 | | 39:13 |
| 10:20 13:19 | | | |

Page 4

**[identification - mcfarlane]**

| i | | | |
|---|---|---|---|
| **identification** 27:20 30:12 32:9 34:23 36:7 40:1 | 29:19,19 **involvement** 26:7 **issues** 23:5 **i'm** 4:20 | **knowledge** 22:22 24:3,18 25:12 26:4 **knows** 25:1 38:1 38:6 | **listed** 21:7 23:4 **little** 9:25 11:6 31:12 **long** 5:9 6:10 34:15 |
| **identified** 3:13 **inconvenience** 32:20 **individual** 10:13 10:17 13:8,21 14:6 17:12 22:3 | **j** | **l** | **longer** 22:11 31:19 34:12 **look** 5:20,23 10:22 12:25 13:4,12 26:22 37:7 |
| | **january** 33:24 35:9,12,22 **jason** 2:10 **job** 6:6 **july** 24:10 | **l** 18:5 20:12 **larkins** 20:12,12 20:19 21:12 22:22 28:5,16,22 **law** 2:12 | |
| **individuals** 10:11 16:9 17:6 18:17 19:7 **inform** 31:18 **informed** 22:11 22:23 25:14 28:6 | **k** | **lawsuit** 26:12 **lawsuits** 24:11 25:11,12 **learn** 25:11 26:3 26:5 | **looking** 5:13,22 13:16 **looks** 10:20 31:12 32:17 **lot** 15:21 |
| | **k** 14:24 15:2 18:5 20:12 **keep** 7:23,25 **kemia** 28:9,16 39:2,10,20 **kimberly** 15:18 **kind** 7:16 **knew** 24:1,7 25:21 | **learned** 21:1,11 21:24 22:16 **letter** 3:15,17 21:15 26:21,22 27:18 31:24 32:7 | **m** |
| **instance** 10:15 **intake** 29:20,21 **interchangeable** 8:1 **interested** 41:16 **internet** 4:21 **interview** 8:23 9:2 11:15,16,25 11:25 12:1,24 17:9,14,15,20,25 18:2,6 19:14 27:8 | **know** 4:20,22 7:25 8:18 11:8 13:9 14:8,9,14 15:6,9,15,15 18:21 19:13 21:13,16 24:3,7 24:11 26:7,9,20 26:25 27:10 28:22 29:8,9,17 29:18 31:12,15 31:18 33:10,13 33:17,18 34:11 34:16 37:22 38:1,3,4,6 39:15 39:16,17 | **letting** 21:12 31:18 **level** 6:21 **license** 27:5 **lieutenants** 17:18 **line** 9:7 11:18,21 12:10 **linkedin** 6:2 **list** 9:2,6 11:17 11:19 12:2 17:22 18:8,19 19:3,6,10,14,15 20:1,4,20 | **m** 14:23 15:2 **magistrate** 1:11 **main** 34:11 **major** 6:24 **making** 28:19 29:23 30:6 **manager** 6:9,15 6:16 8:4 39:7 **mark** 27:17 30:9 32:6 34:20 36:4 39:23 **marked** 13:7,9 14:10 27:20 30:12 32:9 34:23 36:7 40:1 **matter** 9:13,20 9:23 **matthews** 34:14 **mcfarlane** 2:10 24:21 25:3,16 |
| **interviews** 8:25 **introduced** 16:15 **investigation** 27:5 **invited** 17:25 **involved** 8:17 24:12 26:6 | | | |

Page 5

Atkinson-Baker, A Veritext Company
(818) 551-7300

www.veritext.com

Belinda Brown
August 4, 2022

**[mcfarlane - physical]**

28:25 29:12
30:1 33:7,12
36:21 40:10
**mean**  11:21 12:4
34:15
**medical**  16:23
27:6
**meet**  8:18 10:13
**meets**  9:1
**member**  17:17
**memorize**  39:15
**mentioned**  17:6
20:7
**merry**  33:19
**message**  3:18,19
32:17,18 34:21
35:7,9,22 36:5
**met**  9:10
**michigan**  1:2 2:7
2:15 4:20 7:5
41:3,21
**minutes**  36:18
**mischaracterizes**
25:16
**misstate**  30:18
**monday**  35:11
**months**  38:17,17
**mouse**  33:1
**move**  10:14 13:8
21:16
**moving**  18:20,25
19:4
**multiple**  26:14
39:8

**n**

**n**  18:5 20:12,12

**name**  4:16,25
14:23 15:1,18
**names**  18:19,22
19:15
**nd**  35:12
**need**  26:18 28:3
31:13 39:20
**needed**  39:18
**never**  21:21,23
**ninety**  11:20
**non**  13:7,9,20
14:4 15:6 20:7
20:21 21:1,5,10
21:25 23:4,8,19
**notary**  41:1,20
**notice**  35:11
37:10
**notification**
16:11,18
**notified**  13:22
16:6
**number**  5:12
12:17 14:17
27:21 30:13
32:10 34:24
36:8 40:2

**o**

**oakland**  41:5,21
**object**  24:21
28:25
**objection**  29:12
30:1 33:7
**obtain**  6:25
**occurred**  27:7
**october**  5:10 6:4
24:9

**offer**  3:15 16:19
16:20 26:21,22
27:3,11,18
**offered**  18:12,15
**offhand**  39:15
**oh**  20:15
**okay**  4:23 28:14
29:3 31:8,15
36:19 38:20
**onboarding**  6:19
34:9
**once**  8:21,25
13:13 17:12
18:15 21:1 31:5
**online**  10:13
11:12 16:9
**oral**  17:14,15,25
18:2,6 19:13
27:8
**order**  16:24,24
**organizations**
6:2

**p**

**p**  1:11
**p.l.c.**  2:4
**p.m.**  40:15
**p69153**  2:11
**p73105**  2:10
**p85701**  2:3
**page**  3:3
**pages**  41:8
**pamphlet**  38:10
**paramedic**  17:2
**paramedics**
16:23 18:23
**particular**  9:23
10:1 16:12,13

**party**  41:15
**pass**  8:24 11:14
11:16,24 12:1
17:20,23 18:6
**passed**  11:24
12:2 13:14,15
18:18
**passes**  17:12
**patti**  1:11
**pause**  36:23
**payroll**  13:11
38:18
**pending**  37:17
37:22 38:1
**people**  10:17
11:23,24,25 12:1
19:3,13
**perfect**  7:6 15:3
**period**  38:16
**person**  9:1 11:2
13:4 14:18 15:5
20:19 22:4,5
31:5 35:6
**person's**  31:6
**personally**  27:1
**personnel**  3:20
10:5 12:25 13:4
13:10,12,17,24
15:13 21:3,7
22:25 23:2,6
31:7,7 37:3,8,12
37:13 39:24
**ph**  34:14
**phone**  22:4,5
33:12
**phrase**  11:8
**physical**  12:20
12:22 13:16

Page 6

Page 113 of 119

**[physical - rihireable]**

16:1,3,11,14,16
16:18 17:1,5,10
17:12,23 27:7
34:1,6
**piece**  6:18 17:2
**place**  12:12
**placed**  9:2 11:16
12:2 18:8 19:14
**plaintiff**  1:7,22
2:3 4:17
**plaintiff's**  27:18
27:21 30:10,13
32:7,10 34:21,24
36:5,8 39:24
40:2
**planning**  15:16
15:17,19
**played**  25:23
**please**  4:22,25
5:1 7:11 13:3
15:1 25:20
26:13 28:18
30:20 35:24
**point**  12:3 13:23
34:11
**policies**  10:5
**policy**  15:10,16
15:17,19
**poor**  37:17 38:4
**portion**  17:5
**position**  5:11,21
7:8,12,23 8:20
8:21 10:23,25
11:13 19:9
**positions**  12:18
12:19
**post**  5:14,18
8:19,20

**posted**  16:9
**posting**  8:21
16:9
**pre**  27:6
**prepare**  9:8
**pretty**  24:25
**previous**  23:1
24:8 26:11 31:5
31:7
**previously**  10:17
13:1,5 24:6
**prior**  28:19
29:22 30:5,25
36:14 38:14
41:11
**privileged**  24:22
**probably**  14:16
**problem**  4:24
**procedures**  10:2
**process**  10:20
12:22,23,24
13:13 16:25
17:8,9,10 18:20
19:17 21:17,24
22:1 24:16
26:10 29:20,21
34:9
**produce**  9:13,15
9:22
**pronounce**  25:20
**public**  41:20
**pull**  13:24 26:13
28:18 29:22
30:5 31:6
**pulled**  21:3 37:2
37:7
**purpose**  21:4

**put**  10:7 21:15
35:10

**q**

**qualifications**
9:1 10:14
**question**  4:23
7:11 10:24 11:6
13:3 14:1 23:10
24:2 25:23 26:3
29:24 30:15,22
**questions**  40:10

**r**

**r**  14:23 20:12
**ranked**  12:6,7
17:21 18:10,13
19:15
**ranking**  11:17
11:22,23 17:19
**raquiba**  14:21
39:1,5
**reach**  6:1
**read**  26:18,19
28:3,4 30:20,22
31:13,14 37:20
**ready**  16:25
**really**  40:13
**realm**  6:20 8:5
**reapplying**
11:10
**reason**  23:4,7,9
23:19,23 37:16
**recall**  15:24 18:2
18:25 19:7,8,11
20:3,6 21:8
22:12 27:10,13
32:4,24 33:22,23
34:3,7,10 35:17

36:1
**receive**  7:14
28:23
**received**  7:15,19
19:6 24:15,18
26:4,23 32:21
37:13
**receives**  19:10
**receiving**  16:8
28:17 29:9
32:24 34:3
36:14
**recognize**  32:16
**recommendation**
37:11
**recommended**
23:24 37:16
**record**  4:25
24:25 41:8
**recruit**  5:12
**recruiter**  5:8,9
7:8,13,25 8:2,3,7
17:16 35:23
38:23
**recruiting**  8:10
**recruitment**
6:18
**regarding**  23:5
**regards**  24:16
38:25
**regret**  3:17
31:18 32:7
**rehire**  10:11,12
10:16,21 11:1
22:20 28:17
**rehireable**  13:7
13:9,20 14:4
20:8,21 21:1,5

Page 7

[rehireable - status]

21:11,25 23:4,8
23:20 31:9
**rehired** 11:2
**reinstatement**
37:11,16 38:8,13
38:16 39:17
**rejanae** 2:3 4:16
**relations** 6:19
**relative** 41:14
**remember** 30:19
34:8
**repeat** 4:22 7:11
13:3 29:24
30:15
**rephrase** 25:7
**reported** 2:18
**reporter** 2:19
25:24 30:23
**requested** 41:24
**required** 8:23
13:15
**requires** 11:13
12:18,20
**reread** 25:20
**research** 13:23
**resignation**
37:10
**resigned** 38:15
**resources** 6:17
6:24 7:17,20 8:6
17:16 38:9,11
39:13
**respond** 22:10
**responding**
27:11
**retention** 10:4
15:10

**return** 23:24
**review** 9:11
**richard** 1:5
15:25 28:17
32:22 33:25
**right** 24:4,17
25:1 26:6 33:3
33:17 35:7 38:8
38:9 40:12
**role** 5:7
**roles** 19:21,24
**room** 23:14
**rule** 38:9 39:13
**rules** 38:11

**s**

**s** 14:23 15:2 18:5
20:12,12
**safe** 12:9 27:6
33:5
**saw** 37:7
**saying** 7:25 20:3
**says** 26:25 27:3
27:10 32:19
33:3,19,24 35:9
35:19,23 37:10
37:15,17 38:8,13
38:20
**schools** 5:25,25
**score** 12:10
**scores** 12:8
**scoring** 9:6
**scratch** 10:8
22:14,17
**screen** 26:16
27:25 28:1
31:10 32:14
34:1,6 35:3,4

37:5
**screening** 27:5
**screens** 26:14
**scroll** 37:15
**sean** 20:12 28:5
**second** 28:13
**security** 6:9,12
6:13
**see** 13:24 14:9
16:16 21:5,13
22:19 23:5,11,25
26:16 27:25
31:9,10 32:14,25
33:1 35:3,15
37:5
**seeking** 5:21
10:16 16:22
**sees** 13:21
**send** 16:10 18:17
18:18 19:15
27:1 31:21,23
32:1,3
**sending** 33:22
35:17 36:1
**sent** 20:1,20
**service** 38:15
**services** 14:5,7
14:15 28:9
38:23 39:3,6,9
39:19
**set** 8:23,25 35:10
**setup** 19:12
**share** 27:25 35:3
**sheet** 23:7,21
**show** 16:13
**side** 14:5
**sienna** 7:3,4,4,5

**signature** 41:18
41:24
**similar** 19:12
**sincerely** 26:25
**slow** 26:14
**smith** 2:11
**solely** 22:8,9
**somebody** 12:13
**someone's** 29:22
**sorry** 7:4 12:4
12:13 14:25
32:19
**southern** 1:3
**speak** 28:18 39:1
**speaking** 9:21
11:1 15:24 16:2
23:1
**special** 12:12
**specifically**
39:10
**speculation** 29:1
29:13 33:8
**spell** 14:22,25
18:4
**spoke** 23:9,18
**standard** 12:15
**standing** 38:15
38:20,21,22,25
**start** 16:14,25
**started** 6:3 24:7
**starts** 35:11
**state** 4:25 37:16
41:3
**stated** 20:21
**states** 1:1 5:13
23:7,21
**status** 13:24

Page 8

Belinda Bee, M.D.
August 4, 2022

[stay - worked]

**stay**   11:19
**step**   11:15 35:13
**steps**   18:21,21
**stop**   38:9
**straight**   12:15
   12:24 15:22
**strictly**   8:9
**submits**   11:7
**submitted**   16:5
   32:25
**successful**   27:4
**suite**   2:6,14
**sure**   14:1 17:1
   24:25 32:21
   39:4 40:7
**sworn**   4:8 41:12
**sydney**   28:11,11
   28:12
**system**   13:11
   14:10 17:19

**t**

**t**   2:10
**table**   3:1
**take**   7:9 8:24
   11:14 16:17
   17:7 36:18
**taken**   1:22
**takes**   12:12
**talent**   5:20,23
   7:20
**talk**   9:25 15:5
   39:20
**talking**   22:3
   25:13
**targeted**   10:17
   11:4

**targeting**   11:1
**technician**   16:23
**tell**   4:8 20:22
   21:18 35:12
   38:24 41:12
**tells**   28:16
**ten**   11:25
**test**   8:23,24,24
   11:13,14,14
   12:19,20,21,21
   12:23 13:15,16
   16:1,3,12,14,17
   16:17,19 17:7,11
   17:13,23 27:8
**testified**   4:10
**testimony**   25:17
   41:9
**tests**   13:16
**text**   3:18,19
   32:17,18,24,25
   33:22 34:21
   35:7,9,22 36:5
**thank**   15:3 35:19
**thanks**   33:19
**thing**   23:9,18
   37:12,13
**things**   10:1
**think**   31:23
**three**   38:17
**thursday**   4:2
   41:10
**tiers**   12:17
**time**   9:17,19,22
   15:1,21,24 16:2
   16:13 20:11
   23:2 34:13,15
   40:13

**title**   5:24 8:20
**today**   4:17 19:12
   21:9 32:21,25
**today's**   9:9
**told**   24:19
**training**   7:15,17
**trainings**   7:10
   7:14,16
**transcript**   3:13
   41:7
**true**   41:8
**truth**   4:8,9,9
   41:13
**try**   10:11
**trying**   8:10
**tv**   23:17
**twenty**   19:22
   38:17
**two**   35:11
**type**   6:2 7:17
**typical**   9:15
   10:10,12
**typically**   19:10

**u**

**u**   14:23,24 15:2
**understand**   4:19
**understood**   14:1
**united**   1:1
**units**   39:8
**university**   7:3,5
**ups**   23:11
**usually**   26:14

**v**

**vacancies**   5:14
   5:18 8:11
**vacancy**   8:19,19
   10:7

**vague**   30:1
**verbal**   21:21,23
   22:2
**vs**   1:13

**w**

**w**   18:5
**wagner**   15:18
**walinsky**   18:3,4
   20:9,15
**want**   9:14,25
   11:2 15:21
   25:20 26:13
   30:18 37:15
   39:4 40:7
**wanted**   15:6
   23:25 24:3,7
   32:20
**waste**   15:21
**way**   12:22,22,23
   12:24 17:8,9
   32:22
**website**   5:15,16
   5:17,19
**week**   19:22
**weeks**   35:11
**whelan**   6:9,12
   8:4
**witness**   3:3 4:7
   30:15,25
**woodward**   2:13
**worded**   30:19
**words**   17:5
**work**   13:22 23:3
   23:24 37:17
   38:4
**worked**   8:4
   10:18 12:14

Page 9

Atkinson-Baker, A Veritext Company
(818) 551-7300
www.veritext.com

[worked - zoom]

|  |  |
| --- | --- |
| 13:1,5 23:3,23 | |
| **working** | 14:6 |
| **write** | 23:11 |
| **writeups** | 24:2 |
| **wrong** | 8:9 |

**y**

| | |
| --- | --- |
| **y** | 18:5 |
| **yeah** | 8:16 38:21 |
| **year** | 6:11 24:16 |
| 25:14 26:5 | |
| 38:14 | |
| **yearly** | 7:22,23 |
| **you're** | 34:17 |

**z**

| | |
| --- | --- |
| **z** | 8:6 |
| **zack** | 28:11,11,12 |
| **zoom** | 1:20,23 4:1 |
| 26:18 28:3 | |
| 31:13 | |

Page 10

Atkinson-Baker, A Veritext Company
(818) 551-7300
www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.