**EXHIBIT 6C**

**Petition for Habeas Corpus**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

Case No. 2:10-cv-... Filed 11/23/10 Page 1 of 65

## I. (a) PLAINTIFFS
KENNETH FITZGERALD NIXON

## DEFENDANTS
GREGG McQUIGGIN

**(b)** County of Residence of First Listed Plaintiff    CChippewa
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    ChippewaG
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
SHELDON HALPERN    26339 Woodward Avenue
Huntington Woods, MI 48070
(248) 554-0400

Attorneys (If Known)
Michigan Attorney General, Habeas Corpus Division

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☒ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 2254
Brief description of cause:
Continued unconstitutional confinement of a state prisoner, contrary to the 4th, 6th and 14th Amendments

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE Bruce Morrow, Wayne Circuit Court    DOCKET NUMBER 05-005711-01

DATE
November 22, 2010

SIGNATURE OF ATTORNEY OF RECORD
*Sheldon Halpern*

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

## PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?      ☐ Yes
                                                                                   ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.          Other than stated above, are there any pending or previously
          discontinued or dismissed companion cases in this or any other    ☒ Yes
          court, including state court? (Companion cases are matters in which    ☐ No
          it appears substantially similar evidence will be offered or the same
          or related parties are present and the cases arise out of the same
          transaction or occurrence.)

If yes, give the following information:

Court:   Michigan court of Appeals, Michigan Supreme Court

Case No.:   266033 133678  293476  140403

Judge:   C. Stevens, M Talbot, C. Murray; O'Connell, Talbot, Saad,  Supreme Court Bench

Notes :

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

KENNETH FITZGERALD NIXON,

        Petitioner,

-v-                                  Case No.

                                        Hon.

GREG MCQUIGGIN, Warden,

        Respondent.

_____/

## PETITION FOR HABEAS CORPUS

Petitioner Kenneth Fitzgerald Nixon, by and through his attorney, Sheldon Halpern, moves this Honorable Court pursuant to 28 U.S.C. § 2254 to grant Habeas Corpus relief, and says:

1.    Petitioner, Kenneth Fitzgerald Nixon, was convicted after jury trial in Wayne County Circuit Court Case No. 05-005711-01, and sentenced by the Hon. Bruce U. Morrow on October 12, 2005 to terms of life in prison for felony murder first degree murder and 20 to 40 years for attempted murder and 10-20 years for arson of a dwelling.

2.    Petitioner, through counsel, sought direct appeal with the Michigan Court of Appeals, with counsel filing a brief and a supplemental brief, and Petitioner filing a pro per Standard 11 brief, and the Michigan Court of Appeals considered all the issues, affirming the convictions at issue on March 1, 2007, in docket no. 266033.   The

1

Michigan Supreme Court denied leave to appeal on September 10, 2007, and denied reconsideration on November 29, 2007 in docket no. 133678.

3.     Petitioner filed a Motion for Relief from Judgment in the trial court on December 8, 2008.  The trial court considered the merits of all the issues and denied relief by Opinion and Order entered July 17, 2009.

4.     Application for leave to appeal was filed with and denied by the Michigan Court of Appeals on November 23, 2009 in docket no. 293476.   Application for leave to appeal was denied by the Michigan Supreme Court in docket no. 140403, on September 9, 2010.

5.     The Wayne County Circuit Court is a state court of Michigan, located within the Eastern District of Michigan.  Respondent Greg McQuiggin is the Warden of the Chippewa Correctional Facility, a state prison located within the Western District of Michigan, where Petitioner Kenneth Fitzgerald Nixon is being held as prisoner 499063.

6.     **Issue I.  Newly discovered evidence of actual innocence permits consideration of Petitioner's constitutional violations.**     Petitioner, Kevin Fitzgerald Nixon, submits that because of his colorable claim of innocence, any claims of procedural default that may be advanced by respondent in this case should be disregarded and his issues heard on the merits. *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005); *Schlup v. Delo*, 513 U.S. 298; 115 S. Ct. 851; 130 L.Ed.2d 808 (1995).

The evidence presented at trial was ambiguous as best.  The physical and forensic evidence was inconclusive.  The only witness to implicate Petitioner provided circumstances and details that defy physics, logic and internal consistency.  Perhaps

2

sensing these shortcomings, the prosecutor introduced the testimony of a jail house

informant in an effort to suggest the Petitioner had confessed to another jail inmate.

The prosecutor went as far as to tell the jury:

> "The point is no matter how you shake it, no matter how you look at
> Mr. January, he's telling you what was told to him, and that is evidence
> that you can use by itself to convict beyond a reasonable doubt." (T
> IV, 170-171).

7.    Petitioner has obtained evidence that Stanley January had fabricated his

testimony for the express purpose of obtaining early release so he could be home for

his daughter's graduation. Petitioner presents new evidence that his conviction was

based on perjured testimony by the same witness the prosecutor told the jury they

solely rely upon to find Petitioner guilty.  Petitioner has made a prima facie case that

any confidence in the outcome of his trial has been substantially undermined.

8.    **Issue II.   Petitioner was denied a fair trial by ineffective**

**assistance of counsel in violation of the Sixth Amendment.**    Petitioner submits

that his trial counsel was ineffective in several areas, each providing an independent

ground for relief, including:

a)    failure to investigate and prepare for trial.   Before trial, while the

police were investigating the case, Petitioner, claiming his innocence agreed to take a

polygraph examination.   After the exam, the polygrapher who administered the test

indicated he had passed the test. (See affidavit of Kenneth Nixon, in Appendix).   The

investigating officer told defense counsel Petitioner had failed the exam.   Rather than

pursue this information and contact the test administrator, defense counsel did nothing

3

despite being asked to pursue this important lead.  As it is, Petitioner did pass a polygraph exam.  The results of that examination are found in the Appendix.   This approach became a recurring theme for the defense, being provided with information but not following up or conducting interviews.

During trial, defense counsel when talking about possible defense witnesses commented: "Those witnesses – I haven't had a chance to get out to see, but I called them all.  They're supposed to be here today."  (T IV, 13).

An important witness, a prosecution witness, was a cousin to codefendant. Despite such obvious access to talk to this witness, Mario Mahdi, defense counsel's preparation was limited to a brief interview in hallway of court just before court was to resume.

Another example of the failure to prepare is seen where trial counsel called an alibi witness to testify but failed to ask about how she had seen Petitioner at home even while the fire trucks were just responding.  The importance is noted when the prosecutor claimed that while people could have seen Petitioner at home, he could of snuck out of the house, firebombed the house and made it back to the house.  The testimony not heard by the jury because of counsel's failure to prepare for trial was that Petitioner was still at the house while the fire trucks were coming and therefore there was no time for Petitioner to have snuck out of the house and returned.

Similarly, defense witnesses included a neighbor on his front porch during the all relevant times who said he never saw Petitioner leave out the front of the house. The prosecutor claimed that Petitioner could have snuck out the back of the house.

4

Defense counsel had failed to ask the witnesses about the condition of the back door of the house on Havana Street.  The back door was secured shut, having been broken and for security purposes could not be opened at all and the only way Petitioner could have left the house was through front door and testimony at trial demonstrated he never went out the front door during the relevant times.  Petitioner was denied effective assistance of counsel. *Sims v Livesay,* 970 F2d 1575 (CA 6, 1992).

        b)   providing erroneous advice.   Petitioner was a young man facing murder charges and was trusting and relying upon the advice of counsel.  Before trial began, trial counsel was under the impression that by conducting a trial jointly with codefendant LaToya Caulfield, Petitioner would benefit from hearing some of the same evidence despite the fact that LaToya Caulfield was Petitioner's primary alibi witness. By failing to seek separate trials, Petitioner's best alibi witness was not available to testify on Petitioner's behalf.  Trial counsel also failed to advise Petitioner on the right to testify.   *Lyons v Jackson*, 299 F.3d 588 (6th Cir. 2002).

        c)   failure to present evidence;   The prosecutor's theory was that Petitioner and Ronrico Simmons were fighting with each other over LaToya Caulfield at the time of the fire and that was the motivation for Petitioner to firebomb Simmons' house.   Before trial even began, Petitioner's mother told defense counsel that Simmons and Nixon had grown up together and were like brothers and like brothers fought from time to time, but had reconciled their differences and were on friendly terms at the time of the fire.  (See Affidavit of Tracy Nixon in Appendix).  Defense counsel refused to even consider using her as a witness and never bothered to develop this important

5

information.   The failure to interview and to prepare and obtain these statements constitutes ineffective assistance of counsel.  *Stewart v Wolfenbarger*, 468 F3d 338, 356-357 (6th Cir, 2005):

        d)   failure to object   Trial counsel permitted without objection for the prosecutor to transmute Stanley January's testimony into a confession made by Petitioner.   As discussed in the separate issue concerning prosecutorial misconduct, Stanley January did not testify to such a confession.   His testimony fell considerably short of even providing an inferable basis of a confession.   The prosecutor was allowed to tell the jury that they could rely upon January's testimony exclusively to find Petitioner guilty.   Trial counsel also failed to object to the prosecutor's questioning of a witness wherein the prosecutor gave the impression she was aware of witness tampering by Petitioner while improperly questioning Trevor Hill.

      It is objectively unreasonable to conclude strategy is involved where trial counsel does not even bother to investigate or interview witnesses and is unable to even determine if evidence is favorable to the Petitioner.   *Washington v Hofbauer*, 228 F3d 689 (CA 6, 2000).

      9.   We cannot have confidence in the verdict where unreasonable actions taken by counsel deprived the jury of relevant and critical evidence that supported the defense denying Petitioner of his constitutional rights. *McQueen v Scroggy*, 99 F3d 1302, 1311 (CA 6, 1996); *Kyles v Whitley*, 514 US 419, (1995).   The state courts unreasonably refused to grant an evidentiary hearing on ineffective assistance of counsel, therefore, the federal court should conduct one.

6

10. **_Issue III. Petitioner's_** **_conviction_** **_based_** **_upon_** **_perjured_**
**_testimony._**   The prosecutor decided to add to the case against Petitioner by calling
Stanley January, an inmate, who was at the same jail that Petitioner housed at prior to
trial.   The jailhouse informant relayed to the jury how Petitioner had confided in him
and claimed Petitioner had confessed to the crime.

The prosecutor even bolstered jailhouse informant January's testimony with
selective clips of recorded telephone conversations of inmates made from the jail.
Defense counsel was not provided with any access to other telephone conversations
involving inmate January, and was not permitted to review the calls and to listen for the
first time, when played for the jury, and could not cross-examine or impeach with other
telephone conversations.

Petitioner has obtained newly discovered evidence that jailhouse information
fabricated his testimony, and had planned on fabricating his testimony to avoid
consequences for his criminal actions and obtain early enough release to attend his
daughter's graduation.

Had a jury been provided with this evidence, that Stanley January lied about
hearing any kind of a confession made by Petitioner, there is a reasonable probability of
different result.   In this case the prosecutor told the jury they could rely exclusively
upon Stanley January's testimony to find Petitioner guilty. (T IV, 170-171).  Where that
testimony is exposed a perjury, no reasonable juror could find Petitioner guilty.

Petitioner submits these documents provide prima facie proof that the
testimony to the jury from jailhouse witness January was perjured.

7

Petitioner further submits that the prosecutor was aware that jailhouse informant January's testimony was materially false and not only did not correct the misleading impression left with the jury, but bolstered the informant's testimony with selected recorded telephone conversations involving Mr. January. The prosecutor, in general, is aware of the strong possibility of false testimony as provided by a jail house informant. A prosecutor misleads a jury and suborns perjury when vouching for and telling a jury they should exclusively rely upon jailhouse informant testimony to convict under these circumstances.

11. Significant ethical and legal implications arise for prosecutors when the government offers leniency to individuals who take part, or claim to take part, in crimes. An offer of leniency "gives the witness a powerful incentive to fabricate his testimony in order to curry favor with the government," and also to find "a fast and easy way out of trouble with the law." *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1123 (9th Cir. 2001).

Petitioner contends that there were specific facts present from which it is reasonably inferred that either the investigating officers and/or the prosecutor knew Stanley January was lying to the jury.

Under these circumstances, Petitioner submits the prosecuting authorities were aware of Stanley January's perjury and failed to correct the same entitling Petitioner to relief in the form of a new trial. *Rosencrantz v Lafler*, 568 F.3d 577 (6th Cir. 2009), ("A conviction obtained by the knowing use of perjured testimony must be set aside if 'the false testimony could . . . in any reasonable likelihood have affected the

8

judgment of the jury. . . .' *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (internal quotation marks omitted); see also *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)."

12. **Issue IV. Petitioner denied a fair trial by prosecutorial misconduct.** The prosecutor at trial during cross-examination of a defense witness, decided to introduce facts of witness intimidation of prosecution witnesses, including that prosecution witnesses were assaulted in the parking lot after court. Of course there was no evidence of any such conduct, nor was any evidence ever introduced from the witness stand regarding any intimidiation of prosecution witensses. The problem was that there was no good faith basis to even support these questions; not even "[a] well reasoned suspicion that a circumstance is true." *United States v. Sampol*, 636 F.2d 621, 658 (D.C. Cir. 1980).

Further misconduct occurred where during closing argument the prosecutor misstated the testimony of Stanley January and transmuted that testimony into a confession that the jury was told was sufficient in and of itself to convict Petitioner. The witness could not say he actually heard a confession, but the prosecutor told the jury he had.

13. Where a prosecutor's comments violate an explicitly granted right under the Constitution, the comments constitute a constitutional violation. *Hodge v Hurley*, 426 F.3d 368, (6th Cir, 2005); *Donnelly v DeChristoforo*, 416 US 637; 94 S Ct 1868; 40 L Ed 2d 431 (1974). Where a prosecutor argues facts not in evidence, the prosecutor becomes a witness, not subject to cross-examination. In so doing, he violates due

9

process and the constitutional right of confrontation. *Berger v United States,* 295 US 78; 55 S Ct 629; 79 L Ed 1314 (1935).

It was highly prejudicial to place before the jury untrue facts of a confession by Petitioner, which could cause the jury to abandon the presumption of innocence, *Taylor v. Kentucky,* 436 U.S. 478; 98 S.Ct. 1930; 56 L.Ed.2d 468 (1978).

14. ***Issue V.   Appellate counsel was constitutionally ineffective.***

We submit there was ineffective assistance of appellate counsel regarding the failure of the appeal attorney to raise the issues raised herein, as well as to review the record and present meritorious issues on appeal.   This constitutes "cause" for any procedural default arising from the failure to raise claims of ineffective assistance of counsel in the first appeal. *Alston v Garrison,* 720 F2d 812 (CA 4, 1983); *Osborn v Shillinger,* 861 F2d 612 (CA 10, 1988); *Dawan v Lockhart,* 980 F2d 470 (CA 8, 1992); *Combs v Coyle,* 205 F3d 269 (CA 6, 2000); *Satterlee v. Wolfenbarger,* 374 F. Supp. 2d 562 (E.D. Mich. 2005), aff'd 453 F.3d 362 (6th Cir. 2006).

It is reasonably probable that Petitioner Nixon would have gotten a reversal on his appeal of right, but for the inaction of appellate counsel.   See *Mapes v Coyle,* 171 F3d 408 (CA 6, 1999), finding ineffective assistance of appellate counsel where counsel omitted issues that were "significant and obvious."  Under *Mapes v Coyle* and many other cases, a court may find ineffective assistance of appellate counsel from the failure to raise particular issues on appeal if the issues were obvious or should have been discovered, and if the failure to raise them was prejudicial.   It is impossible to imagine how failure to raise these issues could have helped Mr. Nixon's appeal in any

10

way. If the issues had been raised, the result of the appeal would unquestionably have been different. In this case, the issues not raised in the earlier appeal are highly meritorious and will change the result, if they can get consideration on their merits.

15. **Other matters.** The convictions and sentences under which Petitioner is imprisoned are unlawful, unconstitutional and void because of violation of Petitioner's constitutional rights. The violations are not mere irregularities, but are major constitutional violations which deprived him of fundamental fairness, and reflect unreasonable state court rulings which fail to follow correct standards established by the United States Supreme Court and are unreasonable in light of the facts on the record.

16. This Court has jurisdiction over this Petition and the issues raised pursuant to 28 U.S.C. §2241 and 28 U.S.C. §2254, because Petitioner is being held in violation of the Constitution and laws of the United States pursuant to a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

17. Petitioner incorporates by reference the Brief in Support of Petition for Habeas Corpus and the exhibits in the Appendix.

11

WHEREFORE, Petitioner Kenneth Fitzgerald Nixon moves this Honorable Court to take the following action:

a) Accept jurisdiction over this case;

b) Require the Respondent to answer the allegations in this Petition and the Brief in Support;

c) Hold such evidentiary hearings as this Court may deem necessary or appropriate;

d) Issue an Order that this Court will grant a Writ of Habeas Corpus unless the State vacates the conviction and holds a new trial within a specified time;

e) Issue a Writ of Habeas Corpus freeing Petitioner from his unconstitutional confinement.

Respectfully submitted,

SHELDON HALPERN P14560
Attorney for Petitioner Nixon
26339 Woodward Avenue
Huntington Woods, MI 48067
(248) 554-0400

Dated: _November 22, 2010_

12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KENNETH FITZGERALD NIXON,

       Petitioner,

-v-                                   Case No.
                                       Hon.

GREG MCQUIGGIN, Warden,

       Respondent.
_____/

## BRIEF IN SUPPORT OF PETITION FOR HABEAS CORPUS

SHELDON HALPERN P14560
Attorney for Petitioner Nixon
26339 Woodward Avenue
Huntington Woods, MI  48067
(248) 554-0400

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................i
INDEX OF AUTHORITIES............................................................................. ii
STATEMENT OF QUESTIONS PRESENTED .................................................. v
STATEMENT OF THE CASE ........................................................................1
I.     PETITIONER SHOULD BE EXCUSED FROM PROCEDURAL DEFAULTS, IF ANY, BECAUSE OF A SUBSTANTIAL SHOWING OF INNOCENCE. .........................7
II.    PETITIONER WAS DENIED A FAIR TRIAL BY INEFFECTIVE ASSISTANCE OF . COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT.............................. 20
III.   PROSECUTOR'S USE OF PERJURED TESTIMONY DENIED PETITIONER DUE .. PROCESS.................................................................................…....... 30
IV.   THE PROSECUTOR PREJUDICED PETITIONER WITH IMPROPER AND ........... MISLEADING ARGUMENT. ...................................................................... 37
V.    FAILURE TO PROVIDE CONSTITUTIONALLY EFFECTIVE REPRESENTATION .. ON APPEAL........................................................................................... 41
CONCLUSION ....................................................................................... 45

i

## INDEX OF AUTHORITIES

### Cases

*Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005)..........................................................40

*Beasley v United States*, 491 F2d 687 (CA 6, 1974)..............................................21, 27

*Berger v United States*, 295 US 78; 55 S Ct 629; 79 L.Ed 1314 (1935).......................40

*Blackburn v. Foltz,* 828 F.2d 1177, (6th Cir.1987) .....................................................26

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), ......................7

*Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983)......................................................41

*Burris v. Parke*, 116 F.3d 256 (7th Cir.1997)...............................................................18

*Corsa v. Anderson*, 443 F. Supp. 176 (ED Mich. 1977)...............................................27

*Donnelly v DeChristoforo*, 416 US 637; 94 S Ct 1868; 40 L Ed 2d 431 (1974)............40

*Edwards v Carpenter*, 529 US 446; 120 S Ct 1587; 146 L Ed 2d 518 (2000) ...............44

*Fagan v Washington*, 942 F2d 1155 (CA 7,1991) ......................................................44

*Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993) ..........................................................22

*Gaines v Hopper*, 575 F2d 1147 (CA 5, 1978)....................................................21, 27

*Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).........37

*Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996)...............................................................27

*Gray v Greer*, 800 F2d 644 (CA 7, 1986) .................................................................43

*Groseclose v Bell*, 130 F3d 1161 (CA 6, 1997) ...........................................................28

*Harris v Reed (On Remand)*, 894 F2d 871 (CA 7, 1990) .............................................28

*Hart v Gomez*, 174 F3d 1067 (CA 9, 1999) .................................................................28

*Herrera v Collins*, 506 US 390, 417 (1993)..................................................................17

*Hodge v Hurley*, 426 F.3d 368 (6th Cir., 2005) ..........................................................40

*Hollenback v United States*, 987 F2d 1272 (CA 7, 1993)............................................45

*Horton v. Zant,* 941 F.2d 1449 (11th Cir.1991) ..........................................................29

*In Re Byrd,* 269 F.3d 585 (6th Cir. 2001) [en banc....................................................18

*In Re Lott,* 366 F.3d 431 (6th Cir. 2004),....................................................................18

*Jemison v Foltz*, 672 F Supp 1002 (E.D. Mich 1987)....................................................28

*Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) .......................43

*Kansas v Ventris*, 07-1356 (U.S. 4-29-2009).................................................................36

*Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir.) ........................................................22

*Kimmelman v Morrison*, 477 US 365; 106 S Ct 2574; 91 L Ed 2d 305 (1986)..............21

*Kowalak v. United States*, 645 F.2d 534, 537-538 (6th Cir. 1981) ...............................27

*Kyles v Whitley*, 514 US 419; 115 S Ct 1555; 131 L Ed 2d 490 (1995)........................29

*Landers v Rees*, 782 F2d 1042 (CA 6, 1985)...............................................................21

*Lewis v Erickson*, 946 F.2d 1361 (8th Cir. 1991). .......................................................18

*Lord v Wood*, 184 F3d 1097 (CA 9, 1999)...................................................................29

*Lyons v Jackson*, 299 F.3d 588 (6th Cir. 2002), .........................................................25

*Malley v. Manson*, 547 F.2d 25 (2nd Cir. 1976).........................................................41

*Mapes v Coyle*, 171 F3d 408 (CA 6, 1999).................................................................43

*Mapes v Tate*, (*Mapes II*), 388 F.3d 187 (6th Cir. 2004)............................................42

ii

*Mason v Hanks,* 97 F3d 887 (CA 7, 1996)................................................43

*Matire v Wainwright,* 811 F2d 1430 (CA 11,1987) ....................................45

*Mayo v Henderson,* 13 F3d 528 (CA 2, 1994)..................................... 44, 45

*McCoy v. Norris,* 958 F.Supp. 420 (E.D. Ark. 1996) ....................................9

*McFarland v. Yukins,* 356 F.3d 688, 699 (6th Cir.2004) .............................42

*McQueen v Scroggy,* 99 F3d 1302 (CA 6, 1996)........................................29

*Murray v Carrier,* 477 US 478; 106 S Ct 2639; 91 L Ed 2d 397 (1986).......................44

*Northern Mariana Islands v. Bowie,* 243 F.3d 1109, 1123 (9th Cir. 2001). ................35

*On Lee v. United States,* 343 U. S. 747, 757 (1952). ...............................35

*Page v. United States,* 884 F.2d 300, 302 (7th Cir.1989) ..........................43

*Paradis v. Arave,* 130 F.3d 557, 564 (9th Cir. 2000).................................9

*People v Barbara,* 400 Mich 352, 411–414; 255 NW2d 171 (1977);...........................16

*People v Erb,* 48 Mich App 622, 632, (1973)..........................................39

*People v Phillips,* 469 Mich 390 (2003). ...........................................16

*People v Pickens,* 446 Mich 298 (1994) ..............................................20

*People v. Rosales,* 160 Mich. App. 304 (1987) .......................................41

*Quezada v Smith,* 10-2738-op (2nd Cir. 10-21-2010), ................................17

*Reasonover v. Washington,* 60 F.Supp.2d 937 (E.D. Mo. 1999)....................9

*Richter v. Bartee,* 973 F. Supp. 1118 (D. Neb. 1997)....................................9

*Roe v. Flores-Ortega,* 528 U.S. 470; 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).............28

*Rosencrantz v Lafler,* 568 F.3d 577 (6th Cir. 2009) ................................37

*Sanders v. Sullivan,* 863 F.2d 218 (2d Cir. 1988)...................................17

*Schlup v. Delo,* 513 U.S. 298; 115 S. Ct. 851; 130 L.Ed.2d 808 (1995)......................7

*Seehan v. State of Iowa,* 37 F.3d 389 (8th Cir. 1994)..............................28

*Sims v Livesay,* 970 F2d 1575 (CA 6, 1992)................................. 21, 24, 26

*Smith v Roberts,* 115 F.3d 818 (10th Cir. 1997);....................................18

*Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)............42

*Souter v. Jones,* 395 F.3d 577 (6th Cir. 2005)........................................7

*Stewart v Wolfenbarger,* 468 F3d 338, (6th Cir, 2005) ............................26

*Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984) ..... passim

*Sullivan v Fairman,* 819 F2d 1382 (CA 7, 1987) ............................... 21, 27

*Taylor v. Kentucky,* 436 U.S. 478; 98 S.Ct. 1930; 56 L.Ed.2d 468 (1978) .................41

*Towns v. Smith,* 395 F.3d 251 (6th Cir, 2005)........................................28

*Tucker v Prelesnik,* 181 F3d 747 (CA 6, 1999) .......................................28

*United States  v. Harris,* 523 F.2d 172 (6th Cir. 1973) .............................41

*United States ex rel. Cosey v. Wolff,* 727 F.2d 656, (7th Cir.1984) ............26

*United States v Porterfield,* 624 F2d 122 (CA 10, 1980)....................... 21, 27

*United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)........37

*United States v. Harris,* 558 F.2d 366, 371 (7th Cir.1977)..........................44

*United States v. McLain,* 823 F.2d 1457 (11th Cir. 1987) ..........................41

*United States v. Rusmisel,* 716 F.2d 301 (5th Cir. 1983)..........................27

*United States v. Sampol,* 636 F.2d 621, 658 (D.C. Cir. 1980) ....................38

*United States v. Young,* 470 U.S. 1, 17-19 (1985)...................................40

*Washington v Hofbauer,* 228 F3d 689 (CA 6, 2000).............................. 21, 28

*Weygandt v. Ducharme*, 774 F.2d 1491 (9th Cir. 1985)............................................28
*Wilson v Cowan*, 578 F2d 166 (CA 6, 1978).......................................................21, 27
*Workman v. Tate,* 957 F.2d 1339, (6th Cir.1992) .......................................................26

iv

STATEMENT OF QUESTIONS PRESENTED

I.    WHETHER PETITIONER SHOULD BE EXCUSED FROM PROCEDURAL
      DEFAULTS, IF ANY, BECAUSE OF A SUBSTANTIAL SHOWING OF
      INNOCENCE?

          Petitioner says "yes."

II.   WHETHER PETITIONER WAS DENIED A FAIR TRIAL BY INEFFECTIVE
      ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT?

          Petitioner says "yes."

III.  WHETHER PROSECUTOR'S USE OF PERJURED TESTIMONY DENIED
      PETITIONER DUE PROCESS?

          Petitioner says "yes."

IV.   WHETHER THE PROSECUTOR PREJUDICED PETITIONER WITH IMPROPER
      AND MISLEADING ARGUMENT?

          Petitioner says "yes."

V.    WHETHER PETITIONER WAS PREJUDICED BY FAILURE TO PROVIDE
      CONSTITUTIONALLY EFFECTIVE REPRESENTATION ON APPEAL?

          Petitioner says "yes."

v

## STATEMENT OF THE CASE

### *Statement of Proceedings:*

Petitioner, Kenneth Fitzgerald Nixon, was convicted after jury trial in Wayne County Circuit Court Case No. 05-005711-01, and sentenced by the Hon. Bruce U. Morrow on October 12, 2005 to terms of life in prison for felony murder first degree murder and 20 to 40 years for attempted murder and 10-20 years for arson of a dwelling.

Petitioner, through counsel, sought direct appeal with the Michigan Court of Appeals, with counsel filing a brief and a supplemental brief, and Petitioner filing a pro per Standard 11 brief, and the Michigan Court of Appeals considered all the issues, affirming the convictions at issue on March 1, 2007, in docket no. 266033. The Michigan Supreme Court denied leave to appeal on September 10, 2007, and denied reconsideration on November 29, 2007 in docket no. 133678.

Petitioner filed a Motion for Relief from Judgment in the trial court on December 8, 2008. The trial court considered the merits of all the issues and denied relief by Opinion and Order entered July 17, 2009. Application for leave to appeal was filed with and denied by the Michigan Court of Appeals on November 23, 2009 in docket no. 293476. Application for leave to appeal was denied by the Michigan Supreme Court in docket no. 140403, on September 9, 2010.

Petitioner seeks habeas corpus review of his unconstitutional confinement.

### *Statement of Facts:*

1

On May 19, 2005 just before midnight, Naomi Vaughn was home at 19428 Charleston, Detroit, MI, asleep in her upstairs bedroom when she was awakened by her 13 year old son Brandon who was screaming.  (T II, 64-65).   When she awoke, there was no smoke in her room, no indication at all that anything was wrong.  (T II, 66). When she stepped in the hallway, she noticed in that her son Raylon's bedroom next to hers was on fire.  (T II, 66-67).

Brandon Vaughn was in his bedroom, also upstairs, when before midnight he heard a boom when something hit the house and then he saw his brother Raylon's bedroom on fire.  (T III, 184).   The fire investigator noted that a bottle had been thrown with gasoline in it that struck just outside and below Raylon's bedroom window, and that the bedroom would have been "superheated" and in flames within 15-20 seconds after the bottle hit the house.  (T III, 142, 145, 151).

Naomi Vaughn and Brandon Vaughn went downstairs and she watched Brandon unlock the two locks of the front door and the two locks of the porch door to their residence and after an attempt to retrieve her other children, they went outside the house and she lost sight of Brandon for a moment.  (T II, 90-92, 111-112).

Naomi Vaughn and her children were living in a house of her boyfriend, Ronrico Simmons who was not at home when the fire started, but was walking towards the house on Annin Street when he heard Naomi Vaughn screaming and the upstairs of his house on fire and ran to help. (T II, 96; T III, 74-75).   Annin Street runs east-west and ends at Charleston Street.  (T II, 73-74).  There was a streetlight at the intersection of Annin and Charleston that was operating that night.  (T II, 73-74; T III, 77).   Ms.

2

Vaughn's house was the first house south of Annin on the east side of Charleston and explained how Mr. Simmons could see the house was on fire as he was walking on Annin from Havana Street, 3 blocks to the west of Charleston and had seen the fire when he was less than 1 block away from Charleston and then just ran to Ms. Vaughn's assistance. (T II, 73-74, 96).

Police and fire responded to the scene, two children had died in the fire and by 3:00 a.m. that morning, Naomi Vaughn and Ronrico Simmons were being interviewed for their statements. (T III, 97; T III, 113). Both Simmons and Vaughn said they did not know who had burnt their house but both told the police about an encounter earlier that day where Raylon and the other children got into a fight, just down the block from the house, with Dajah and her friends. (T II, 78-79, 114, 122-123; T III, 95, 98).

A few hours after this fight, a man, saying he was Dajah's father, appeared at the house and spoke with Naomi Vaughn. (T II, 79, 114; T III, 105-106).    While he was there, another car drove up and a woman got out and charged up to the house and had to be restrained by Dajah's dad from going after Naomi Vaughn. (T II, 116-117). During this encounter, Dajah's dad repeatedly noted his disappointment in the attack on his daughter and repeatedly stressed to Naomi: "this is how people's houses get shot up" (T II, 119-120; T III, 105-106).

The next day, both Vaughn and Simmons changed their stories to the police and both now said that Brandon Vaughn had told them that night that he saw who did the firebombing and it was "Beans"  (Petitioner Nixon) and "Toya", (jointly tried

3

codefendant LaToya Caulfield who was acquitted). (T II, 130;T III, 126-127). Despite claiming Brandon told him this information the night of the fire while the police and fire officials were present Simmons could not explain why he never told Brandon to tell any of these officials, nor why Simmons did not tell any of these officers about this important information. (T III, 114). Similarly, when Naomi Vaughn was asked that if Brandon told her that night that "Beans and Toya did this" why did she not tell anyone, she could only say: "At that time, I didn't – I don't know why I didn't." (T II, 130).

Later that morning, the police raided a house 3 blocks over 19380 Havana Street where LaToya Caulfield lived with Petitioner. (T III, 14, 18). The police seized Petitioner's work pants and work shoes and examined the tow truck and took rags and other items. (T III, 153-154). Petitioner works for a towing service and had worked all that prior day and had closed up the auto shop around 10:00 p.m. on May 19, 2005 and drove the tow truck home and parked it on Havana Street. (T IV, 110, 112). The canine handler noted the dog detected gasoline and petroleum products associated with Petitioner's clothes and work boots. (T III, 182). The canine handler had to admit that the dog does not differentiate between petroleum products and the canine will indicate a hit when finding motor oil. (T III, 185, 188, 195).

One prosecution witness testified that Petitioner and LaToya Caulfield were home on Havana Street at the time the house on Charleston was firebombed. (T III, 21-22, 26). Defense witnesses included the neighbor who was on porch during the night including when the firebombing took place and Petitioner and Caulfield never left

4

the Havana house;  (T IV, 131-132), and a relative of Ms. Caulfield who said LaToya and Petitioner were at home during that night and did not leave.  (T IV, 148-149).

The last prosecution witness called was an acknowledged  "jailhouse informant", Stanley January. (T IV, 168).   January was facing armed robbery charges when he cut a deal to testify against a different inmate at jail.  (T IV, 7-8).  January told the jury he was testifying out of the kindness of his heart and was not expecting any consideration for his testimony.  (T IV, 43-44).  January was scheduled to be sentenced within days after offering his testimony against Petitioner.  (T IV, 7-8).  January was also facing parole violations for the armed robbery, having been parole on the time of the robbery, and still had to contend with that proceeding. (T IV, 51).

Back in May, 2005, January was in jail in the same area as Petitioner and had asked Petitioner to let him make a three-way call, so he could talk to his daughter.  (T IV 20).   January then related how Petitioner told him he was in jail being accused of the firebombing and was in a conversation with others, including another inmate who knew the fathers of the two children that perished in the firebombing and asked Petitioner if he did it.  (T IV, 20, 25).

When asked about the circumstances during which Petitioner confessed January testified:

> "But any way, you know, he just was – he looked real nervous, you know.  I told him that 'You know, you have that right to be nervous,' you know, dealing with the nature of the crime that he's supposed to be in here for, you know." (T IV, 22).

5

January claimed to have written down the notes of his encounter in May, 2005 but did not tell anyone until 3 months later, or just before his upcoming sentencing. (T IV, 35,, 38).  Those notes also had scribbles of details he was trying to string together concerning two other inmates that were in the jail and for which he had intentions of offering his cooperation to authorities. (T IV, 65-66).   Although there was never any evidence offered that even suggested there Petitioner had ever been inside the house on Charleston, let alone had been involved in a fight, inmate January told the jury how Petitioner had gotten into a fight at the house at Charleston Street before the firebombing.   (T IV, 69).

LaToya Caulfield was acquitted and Petitioner was convicted.

6

ARGUMENT

I.   PETITIONER SHOULD BE EXCUSED FROM PROCEDURAL
     DEFAULTS, IF ANY, BECAUSE OF A SUBSTANTIAL SHOWING
     OF INNOCENCE.

Petitioner, Kevin Fitzgerald Nixon, submits that because of his colorable claim

of innocence, any claims of procedural default that may be advanced by respondent in

this case should be disregarded and his issues heard on the merits. *Souter v. Jones*,

395 F.3d 577 (6th Cir. 2005); *Schlup v. Delo,* 513 U.S. 298; 115 S. Ct. 851; 130 L.Ed.2d

808 (1995).

### A.   *Standard for Schlup Gateway Claims.*

In *Schlup v. Delo*, 513 U.S. 298; 115 S. Ct. 851; 130 L.Ed.2d 808 (1995), the

United States Supreme Court held that the colorable claim of innocence by Schlup

permitted him to avoid any procedural bars, despite his inability to show "cause and

prejudice" for not raising the issue previously.

> "Schlup's claim of innocence, on the other hand, is
> procedural, rather than substantive.  His constitutional claims
> are based not on his innocence, but rather on his contention
> that the ineffectiveness of his counsel, see *Strickland v.
> Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
> (1984), and the withholding of evidence by the prosecution, see
> *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
> (1963), denied him the full panoply of protections afforded to
> criminal defendants by the Constitution.
> ...
> Schlup's claim of innocence is thus "not itself a
> constitutional claim, but instead a gateway through which a
> habeas petitioner must pass to have his otherwise barred
> constitutional claim considered on the merits."
> ...

7

However, if a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."

The Supreme Court in *Schlup v. Delo* also explained that when innocence is not the constitutional issue, but merely used as a gateway for other constitutional claims, the standard of proof of the innocence is substantially reduced:

"If there were no question about the fairness of the criminal trial, a Herrera-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish Schlup's innocence. On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error, Schlup's threshold showing of innocence would justify a review of the merits of the constitutional claims."

The standard, then, is not whether the facts "unquestionably establish" Petitioner's innocence. The standard is whether the facts "undermine confidence in the result of the trial."

Furthermore, the Supreme Court ruled that a showing that the evidence was sufficient to convict does not bar the reliance on a colorable claim of innocence:

"[P]etitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict."

8

Even if the evidence is sufficient to convict, Petitioner has plainly shown evidence of innocence sufficient to "undermine confidence in the result of the trial," and therefore sufficient to permit his federal constitutional claims to be heard.  See also *Richter v. Bartee*, 973 F. Supp. 1118 (D. Neb. 1997); *McCoy v. Norris*, 958 F.Supp. 420 (E.D. Ark. 1996);   *Reasonover v. Washington*, 60 F.Supp.2d 937 (E.D. Mo. 1999); *Paradis v. Arave,* 130 F.3d 557, 564 (9th Cir. 2000).

### B.    *Evidence presented at trial*

The physical evidence presented at trial was less than persuasive and could not permit any juror to reasonably infer guilt or innocence from the test results.  There were remnants of a glass bottle that contained gasoline that hit below Raylon's upstairs bedroom window and that bedroom was in flames within 15-20 seconds. (T III, 142, 145, 151).   A Molotov cocktail had been thrown at the house, a canine unit had been deployed and gasoline detected at the Charleston house. (T III, 145).   Later when Petitioner was arrested in his home on Havana Street, his work clothes and boots were taken into custody and subjected to a canine unit test and was found to have traces of petroleum products. ( T II, 180, 182).

The canine handler explained that a hit meant that the dog detected petroleum products; however the dog can not differentiate between any of the petroleum products and if there were traces of motor oil on the pants or boots, the dog would indicate a hit for petroleum products.  (T II, 185, 188, 193).

While this may have been incriminating evidence in another case, Petitioner had worked that day and closed up the shop around 10:00 pm and drove his tow truck

9

home to Havana Street. (T IV, 111-112).   Petitioner works with motor vehicles all day and is a tow truck driver. (T IV, 110).   That his work pants and shoes have petroleum products is both expected and not any indication of a connection to the firebombing.

The prosecutor's theory was that Ronrico Simmons and Petitioner were enemies because Simmons had dated LaToya Caulfield, and Petitioner, therefore, must have firebombed Simmons' house in revenge, assisted by LaToya Caulfield who drove Petitioner in her car over to Charleston.   To support this theory, the prosecutor introduced evidence of a past dispute between Simmons and Petitioner months prior to the firebombing and statements from two witnesses, Brandon Vaughn and Stanley January.

The only statements provided by Brandon Vaughn, 13 years old at the time, that were not contradicted by his earlier testimony and the testimony of the other prosecution witnesses were that:  Brandon was in his upstairs in his bedroom before the fire, (T III, 184); and, Brandon disappeared for a moment and then came back acting very agitated after the fire, when the victims were gathering themselves outside but before the police and fire personnel responded. (T II, 92, 96;T III, 79).

As to what happened in between was unclear as Brandon Vaughn gave one version at trial that differed from his version provided at the preliminary examination, and for which to be true, then his mother, Naomi Vaughn, lied and her boyfriend, Ronrico Simmons must be blind.

10

At trial, Brandon was in his bedroom, upstairs, on the north side of the house, he was not asleep, when he heard a boom like noise just before midnight on May 19, 2005. (T III, 184). Brandon claimed he was not aware there was any fire when he ran downstairs. (T III, 186). Brandon went downstairs, unlocked the doors and went out the porch and saw Nixon getting into the passenger side of a car. (T III, 185).

Brandon claimed to have seen LaToya driving the car and to having chased the car to see who it was and then went back upstairs, woke up his mother and brought her outside and at that time he saw Rico running. (T III, 187).

Brandon said that LaToya was in her car heading south on Charleston when Petitioner Nixon got into the car, and the car backed up and turned around on Annin Street and then headed North on Charleston for a couple blocks and turned on Lantz. (T III, 190-192).

Brandon's testimony at trial had some significant differences from his preliminary examination testimony including that while at trial he said he did not know there was a fire before running outside, at the preliminary examination he said he said he saw flames in his brother's room before running downstairs. (PE I, 22). Another example is that at the preliminary examination, Brandon Vaughnn not only saw Petitioner get in the car, he stated he had watched Petitioner throw the bottle at his brother's window while standing on the porch in the first place. (PE I, 34).

Brandon Vaughn's testimony was also contradicted by the other prosecution witnesses. For example, Brandon says he heard something hit the house so he ran downstairs, he unlocks the front door and the porch door, he claims to have seen

11

Petitioner at this time and running after the car to identify LaToya, watches the car back up Charleston, turn around on Annin and then head north on Charleston and then Brandon runs back to the house, and wakes up his mother, Naomi Vaughn. (T III, 185-192).

The arson investigator stated that once the bottle hits the house, the bedroom would be in flames being "superheated" within 15-20 seconds. (T III, 151). It is highly doubtful that Brandon Vaughn did not know the bedroom upstairs was not on fire. Indeed, in previous statements, Brandon did admit he saw the flames before going downstairs the first time. (PE I, 22).

Naomi Vaughn said Brandon woke her up and at that time, there was nothing apparently wrong in her room until she got to the hallway and could see the fire, and she watched Brandon Vaughn unlock the two locks of the front door and unlock the two locks of the porch door and go outside. (T II, 90-92, 111-112).

If Naomi is telling the truth then the fire expert is wrong about how long this fire with an accelerant took to engulf the bedroom with flames, and Brandon for some reason, after running outside the house and seeing Petitioner, then runs back inside the house, and locks the 2 porch door locks and the 2 front door locks, runs upstairs and then wakes up his mother, and they go back downstairs and she watches Brandon then unlock the 2 front door locks and 2 porch door locks.

Additionally, if Brandon's testimony is accurate and Petitioner and LaToya, in their car backed up onto Annin and then turned north on Charleston while the house was burning, then Ronrico Simmons either lied about his testimony or else is blind

12

because Mr. Simmons was walking on Annin towards Charleston at the very same time Petitioner and LaToya were turning around in front him, underneath the lit streetlight. (T III, 76, 108-109).

Although several witnesses told the jury versions of what Brandon Vaughn allegedly said to them while the fire was being fought, none of these witnesses never bothered to tell any investigating official when giving their initial statements, (T III, 97; T III, 113); instead, the mention of what Brandon had said was not made until a day and half later. (T II, 130;T III, 126-127). Such testimony by Brandon Vaughn is highly improbable and could not reasonably be relied upon as being accurate.

Perhaps sensing the inherent weakness in Brandon Vaughn's testimony, the prosecutor's last witness was jail house informant, Stanley January.

Mr. January was facing armed robbery charges when he cut a deal to testify against a different inmate at jail. (T IV, 7-8). January told the jury he was testifying out of the kindness of his heart and was not expecting any consideration for his testimony. (T IV, 43-44). January was scheduled to be sentenced within days after offering his testimony against Petitioner. (T IV, 7-8). January was also facing parole violations for the armed robbery, having been parole on the time of the robbery, and still had to contend with that proceeding. (T IV, 51).

Back in May, 2005, January was in jail in the same area as Petitioner and had asked Petitioner to let him make a three-way call, so he could talk to his daughter. (T IV 20). January then related how Petitioner told him he was in jail being accused of the firebombing and was in a conversation with others, including another inmate who

13

knew the fathers of the two children that perished in the firebombing and asked Petitioner if he did it. (T IV, 20, 25).

January claimed to have written down the notes of his encounter in May, 2005 but did not tell anyone until 3 months later, or just before his upcoming sentencing. (T IV, 35, 38). Those notes also had scribbles of details he was trying to string together concerning two other inmates that were in the jail and for which he had intentions of offering his cooperation to authorities. (T IV, 65-66). Although there was never any evidence offered that even suggested there Petitioner had ever been inside the house on Charleston, let alone had been involved in a fight, inmate January told the jury how Petitioner had gotten into a fight at the house at Charleston Street before the firebombing. (T IV, 69).

### C) *Newly discovered evidence*

After the trial in this matter, Christopher Crump, an inmate at a correctional facility, sent a letter to Petitioner's mother, Tracy Nixon explaining that he had been in the Wayne County Jail at the time with Nixon and Stanley January. Mr. Crump informed Tracy Nixon that Stanley January fabricated his testimony against Petitioner so that he could make a deal with the prosecutor's office and arrange to be out of jail in time for his daughter's high school graduation.

The undersigned counsel was presented this information by Tracy Nixon and made arrangements for a professional visit with Mr. Crump at Chippewa Correctional Facility and discussed the matters stated in the letter sent to Tracy Nixon and was

14

provided a typed statement prepared by Mr. Crump setting forth what he would testify

to at hearing.

That statement provided:

- Crump was in the same holding cell with Stanley January are several
  occasions;

- Crump had seen January before at the Motor City Casino and they
  formed a friendship.

- January told Crump he was in jail for robbery, but was trying to get out
  of jail so that he could still attend his daughter's graduation;

- January explained to Crump that he believed he found a way to get out
  of jail early when he met another inmate in jail and had a chance to go
  through his discovery packet and found out some details by his murder
  case and with that information he was going to fabricate a story and make
  some deals with the government;

- Crump had no intention of being labeled a snitch while in Wayne County
  Jail, but did happen to see Stanley January while at Quarantine at Jackson
  State Prison, where all newly sentenced are housed;

- January told Crump he received 1 year for the robbery in exchange for
  his testimony against Nixon.  This was the first time January identified the
  inmate he had fabricated testimony against;

- A couple of weeks later, January was very nervous and explained to
  Crump that the other inmate, Kenneth Nixon, would be coming soon and
  January needed to get out of Quarantine;

- Just prior to January being transferred Crump asked for his inmate
  number and was provided the phone number and address for his daughter
  instead.

Had a jury been provided with this evidence, that Stanley January lied about

hearing any kind of a confession made by Petitioner, there is a reasonable probability of

different result.   In this case the prosecutor told the jury they could rely exclusively

15

upon Stanley January's testimony to find Petitioner guilty. (T IV, 170-171). Where that testimony is exposed a perjury, no reasonable juror could find Petitioner guilty.

### D) *Additional evidence of innocence*

In further support of Petitioner's claim of innocence are the results of a polygraph examination wherein the examiner found Petitioner's answers that he did not firebomb the house on Charleston and was home with LaToya Caulfield in her house on Havana Street to be truthful and reliable. Similarly are the polygraph results of LaToya Caulfield and another alibi witness, Tracy Nixon. Both witnesses were found to be truthful and reliable. Those results are found in the Appendix. Polygraph results may be admitted and relied upon in post conviction proceedings and are part of the state court record. See, *People v Barbara,* 400 Mich 352, 411–414; 255 NW2d 171 (1977); accord, *People v Phillips,* 469 Mich 390 (2003).

The affidavits of Petitioner Nixon and Tracy Nixon are found in the Appendix. Finally, Petitioner offers the testimony of LaToya Caulfield, who was a codefendant jointly tried with Petitioner, the jury deciding Petitioner's fate never considered this evidence. Her affidavit is found in the Appendix.

### E) *Conclusion*

When considering the impact of this new evidence, it is instructive to recall that the prosecutor told the jury that they could convict Petitioner based solely upon the testimony of jailhouse informant Stanley:

> "The point is no matter how you shake it, no matter how you look at Mr. January, he's telling you what was told to him, and that is evidence that you can use by itself to convict beyond a reasonable doubt." (T IV, 170-171).

16

Petitioner presents new evidence that his conviction was based on perjured testimony by the same witness the prosecutor told the jury they solely rely upon to find Petitioner guilty. Petitioner has made a prima facie case that any confidence in the outcome of his trial has been substantially undermined.

While the Supreme Court does not recognize a free standing claim of actual innocence as a cognizable habeas claim, *Herrera v Collins*, 506 US 390, 417 (1993) does provide that newly discovered evidence that supports actual innocence and a constitutional violation will merit habeas relief. Here, Petitioner has presented newly discovered evidence this is conviction was based upon perjured testimony. A habeas claim is made out where a state prisoner demonstrates his conviction is based upon perjured testimony, regardless of whether the government knew it was perjury at the time the evidence was presented. The Second Circuit recently granted permission to file a successive habeas in *Quezada v Smith*, 10-2738-op (2nd Cir. 10-21-2010), holding:

> Once newly discovered evidence has been presented, the gate-keeping issues are whether Quezada has identified a constitutional error and, if so, whether he has shown by clear and convincing evidence that but for that error no reasonable jury would have found him guilty. As noted, at this stage Quezada is required only to make a prima facie showing that these two requirements have been met. To show constitutional error he relies on *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988). We ruled in *Sanders* that due process is violated if a state leaves in place a criminal conviction after a credible recantation of material testimony and the recantation would "most likely" have changed the outcome. 863 F.2d at 222.

17

See also *Smith v Roberts*, 115 F.3d 818 (10th Cir. 1997); *Lewis v Erickson,* 946 F.2d 1361 (8th Cir. 1991).

At a minimum, this Court should conduct a hearing on the claim of innocence and other claims advanced in the Petition.   *In Re Byrd,* 269 F.3d 585 (6th Cir. 2001) [en banc].

In *Byrd,* the petitioner submitted an affidavit by John Brewer that contradicted his trial testimony, admitted Brewer's own role in the incident, and exonerated Byrd.  The panel followed the unreasonable rule of presuming that evidence supporting innocence is a lie, finding without any hearing that the Brewer affidavit "lacks any credibility whatsoever" and that it contradicted his sworn testimony at trial. *In Re Byrd,* 269 F.3d 544 (2001).  The en banc court found that there was reason to hold a hearing, *In Re Byrd,* 269 F.3d at 591, concurring opinion of Judge Jones, with 3 other judges:

> "The en banc court agrees with the view in *Burris v. Parke*, 116 F.3d 256 (7th Cir.1997) that in these circumstances, a federal court does well when it refuses to rubber-stamp such inadequate proceedings in the state court on a habeas claim. Otherwise, 'a state could insulate its decisions from collateral attack in federal court by refusing to grant evidentiary hearings in its own courts.'"

In *In Re Lott,* 366 F.3d 431 (6th Cir. 2004), the Court found that to get a hearing the Petitioner need merely make a "prima facie showing" that his claim is meritorious, which means "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court."

18

Petitioner has consistently requested an evidentiary hearing from the state courts to present witnesses and provide support for his claims and the state courts have refused to hold such hearings. (Hrng 7/17/2009, 7, 11).

In *Souter v. Jones,* the Court noted that the only evidence of that petitioner's guilt was the bottle, and the evidence discovered after trial, consisting of recantations by prosecution witnesses, cast considerable doubt on whether the bottle caused the injuries. Here the new evidence shows Stanley January's testimony to have been perjured and also shows that Petitioner was not involved in the firebombing. As the Court held in *Souter*:

> "[T]he new affidavits do not merely add to the defense, but also deduct from the prosecution. As a result, the affidavits can be considered 'new reliable evidence' upon which an actual innocence claim may be based."

The same is true here, in that the new evidence adds to the defense and deducts from the prosecution. This Court should order that there has been a substantial showing of innocence permitting Petitioner Nixon's issues to be heard on their merits. In the alternative, the Court should conduct an evidentiary hearing on the showing of innocence before issuing a final ruling. *In Re Byrd,* supra.

19

II.   PETITIONER WAS DENIED A FAIR TRIAL BY INEFFECTIVE
ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH
AMENDMENT.

This was a "fast track" case in that this homicide trial was held within 3

months from the date of the preliminary examination and the trial court noted its

displeasure with the unpreparedness:

> "[W]hat continues to surprise me is how discovery is conducted
> during trial....everybody isn't on board, and it seems like the
> investigation on – isn't working as diligently to try to provide the
> Prosecution with what they need in order to go forward; and,
> certainly, if you don't have it, it handicaps the Defense." (T III,
> 7-8).

Further problems with the discovery and failure to have the case ready for

trial caused the trial court to observe:

> "I don't know why we're dealing with pretrial matters in the
> middle of trial on the fourth day....But you're asking me to rule
> on something and again I'm thinking that it's pretrial and we're
> on the fourth day." (T III, 118).

Petitioner submits he was denied a fair trial by ineffective assistance of trial

counsel.    A criminal defendant is entitled to the effective assistance of counsel.

*Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *Beasley v*

*United States*, 491 F2d 687 (CA 6, 1974); *People v Pickens*, 446 Mich 298 (1994); US

Const, Amend VI; Const 1963, Art 1, §20.

The standard employed under *Strickland* asks two questions.  First, were the

attorney's advice and actions "within the range of competence demanded of attorneys

in criminal cases," or, stated differently, were the actions and advice "reasonable under

prevailing professional norms."   *Strickland*, at 687, 688.   The second question is

20

whether the representation failing to meet these standards prejudiced the defendant.

In *Beasley v United States*, 491 F2d 687 (CA 6, 1974), the Court stated that, to be constitutionally adequate:

> "Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a timely manner."

Defense counsel in a criminal case has a "Duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v Washington*, supra.

Effective assistance of counsel requires that counsel make reasonable investigations into the prosecutor's case and adequately prepare for trial. *Kimmelman v Morrison*, 477 US 365; 106 S Ct 2574; 91 L Ed 2d 305 (1986).   As the Court held in *Washington v Hofbauer*, 228 F3d 689 (CA 6, 2000), "the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel."

Failure of defense counsel to adequately investigate or present a defense constitutes ineffective assistance of counsel. *Sims v Livesay*, 970 F2d 1575 (CA 6, 1992); *Landers v Rees*, 782 F2d 1042 (CA 6, 1985); *Wilson v Cowan*, 578 F2d 166 (CA 6, 1978); *Beasley v United States*, supra; *United States v Porterfield*, 624 F2d 122 (CA 10, 1980); *Gaines v Hopper*, 575 F2d 1147 (CA 5, 1978); *Sullivan v Fairman*, 819 F2d 1382, 1391-1392 (CA 7, 1987).

Ineffective assistance of counsel can take the form of a failure to call witnesses or present other evidence if the failure deprives the defendant of a substantial defense. In *Landers v Rees*, 782 F2d 1042 (CA 6, 1985), the Court stated

21

"Counsel's failure to pursue a substantial defense, however, violates the defendant's constitutional right when the failure is a result of ineffectiveness or incompetence."   An attorney fails to act reasonably where he fails to investigate defenses.   *Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993):

> "Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories. An attorney must make a reasonable investigation in preparing a case or make a reasonable decision not to conduct a particular investigation. *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir.), cert. denied, 112 S. Ct. 431 (1991).

> As the Court held in *Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999):

> "A lawyer who fails adequately to investigate, and to introduce into evidence, records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."

In *Strickland v Washington*, supra, the Supreme Court held that prejudice is shown from ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   466 US at 664.   Under *Strickland*, the defendant need not make the higher showing that "counsel's deficient performance more likely than not altered the outcome of the case." 466 US at 693.   However, in this case both the lower standard of *Strickland* and the higher standard rejected by *Strickland* are met as to each individual and separate claim presented.

### A)   *Failure to investigate.*

22

Before trial, while the police were investigating the case, Petitioner, claiming his innocence agreed to take a polygraph examination. After the exam, the polygrapher who administered the test indicated he had passed the test. (See affidavit of Kenneth Nixon, in Appendix). The investigating officer told defense counsel Petitioner had failed the exam. Rather than pursue this information and contact the test administrator, defense counsel did nothing despite being asked to pursue this important lead. As it is, Petitioner did pass a polygraph exam. The results of that examination are found in the Appendix. This approach became a recurring theme for the defense, being provided with information but not following up or conducting interviews.

During trial, defense counsel when talking about possible defense witnesses commented: "Those witnesses – I haven't had a chance to get out to see, but I called them all. They're supposed to be here today." (T IV, 13).

An important witness, a prosecution witness, was a cousin to codefendant. Despite such obvious access to talk to this witness, Mario Mahdi, defense counsel's preparation was limited to a brief interview in hallway of court just before court was to resume.

Another example of the failure to prepare is seen where trial counsel called an alibi witness to testify but failed to ask about how she had seen Petitioner at home even while the fire trucks were just responding. The importance is noted when the prosecutor claimed that while people could have seen Petitioner at home, he could of snuck out of the house, firebombed the house and made it back to the house. The testimony not heard by the jury because of counsel's failure to prepare for trial was that

23

Petitioner was still at the house while the fire trucks were coming and therefore there was no time for Petitioner to have snuck out of the house and returned.

Similarly, defense witnesses included a neighbor on his front porch during the all relevant times who said he never saw Petitioner leave out the front of the house. The prosecutor claimed that Petitioner could have snuck out the back of the house. Defense counsel had failed to ask the witnesses about the condition of the back door of the house on Havana Street. The back door was secured shut, having been broken and for security purposes could not be opened at all and the only way Petitioner could have left the house was through front door and testimony at trial demonstrated he never went out the front door during the relevant times.

Petitioner was denied effective assistance of counsel. *Sims v Livesay*, 970 F2d 1575 (CA 6, 1992).

### B. Failure to provide constitutionally effective advice

Petitioner was a young man facing murder charges and was trusting and relying upon the advice of counsel. Before trial began, trial counsel was under the impression that by conducting a trial jointly with codefendant LaToya Caulfield, Petitioner would benefit from hearing some of the same evidence despite the fact that LaToya Caulfield was Petitioner's primary alibi witness. By failing to seek separate trials, Petitioner's best alibi witness was not available to testify on Petitioner's behalf.

Trial counsel also failed to advise Petitioner on the right to testify. In *Lyons v Jackson*, 299 F.3d 588 (6th Cir. 2002), the constitutional nature of the role and purpose of advice was discussed:

24

The duty of defense counsel to consult is paramount when a client has to decide whether or not to waive a constitutional right, such as the right to trial. Because the decision whether or not to plead guilty ultimately rests with the client, see *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal"); *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring) ("[o]nly such basic decisions as whether to plead guilty, waive a jury, or testify in one's own behalf are ultimately for the accused to make"), counsel must ensure that the client's decision is as informed as possible. Failing even to consider, let alone notify the client of, a factor that could negate the entire benefit of the guilty plea is not within the range of professional norms."

Petitioner submits the failure to be properly informed of his rights by trial counsel constituted ineffective assistance of counsel.

### C)   *Failure to present evidence*

The prosecutor's theory was that Petitioner and Ronrico Simmons were fighting with each other over LaToya Caulfield at the time of the fire and that was the motivation for Petitioner to firebomb Simmons' house.   Before trial even began, Petitioner's mother told defense counsel that Simmons and Nixon had grown up together and were like brothers and like brothers fought from time to time, but had reconciled their differences and were on friendly terms at the time of the fire.  (See Affidavit of Tracy Nixon in Appendix).  Defense counsel refused to even consider using her as a witness and never bothered to develop this important information.

There was other information available to show no animosity existed between Simmons and Petitioner at the time of the fire, but defense counsel did not develop that

25

evidence either.   Ronrico Simmons when first interviewed by the police after the fire never mentioned Petitioner as being an enemy or being someone likely to have started the fire.   Indeed, the police asked if he knew Petitioner, and Simmons said he did not have a problem with Petitioner and if the police wanted to get in touch with Nixon, Simmons could call him on his two-way radio. (T III, 98).

The failure to interview and to prepare and obtain these statements constitutes ineffective assistance of counsel.   See *Stewart v Wolfenbarger*, 468 F3d 338, 356-357 (6th Cir, 2005):

> "Where counsel fails to investigate and interview promising witnesses, and therefore 'ha[s] no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir.1992) (quoting *United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 658 n. 3 (7th Cir.1984)). *See also Blackburn v. Foltz,* 828 F.2d 1177, 1183 (6th Cir.1987) ("Counsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary.").

This is the type of evidence that would provide a reasonable juror with a basis to find Petitioner not guilty and therefore would make a different result probable. This failure of defense counsel to present evidence in support of the defense constitutes ineffective assistance of counsel.   *Sims v Livesay*, 970 F2d 1575 (CA 6, 1992); *Landers v Rees*, 782 F2d 1042 (CA 6, 1985); *Wilson v Cowan*, 578 F2d 166 (CA 6, 1978); *Beasley v United States*, supra; *United States v Porterfield*, 624 F2d 122 (CA 10, 1980); *Gaines v Hopper*, 575 F2d 1147 (CA 5, 1978);  *Sullivan v Fairman*, 819 F2d 1382, 1391-1392 (CA 7, 1987).

### D)   *Failure to Object*

26

Trial counsel permitted without objection for the prosecutor to transmute Stanley January's testimony into a confession made by Petitioner.  As discussed in the separate issue concerning prosecutorial misconduct, Stanley January did not testify to such a confession.  His testimony fell considerably short of even providing an inferable basis of a confession.   The prosecutor was allowed to tell the jury that they could rely upon January's testimony exclusively to find Petitioner guilty.

Trial counsel also failed to object to the prosecutor's questioning of a witness wherein the prosecutor gave the impression she was aware of witness tampering by Petitioner while improperly questioning Trevor Hill.

Further, trial counsel failed to object to the repeated hearsay statements made by Brandon Vaughn as retold to the jury through other witnesses.

The critical failure of an attorney to object can be ineffective assistance of counsel if it deprives the defendant of an opportunity for dismissal of the case or for success on appeal.  *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996); *Kowalak v. United States*, 645 F.2d 534, 537-538 (6th Cir. 1981); *Corsa v. Anderson*, 443 F. Supp. 176 (ED Mich. 1977).  Trial counsel's performance can be deemed deficient based upon the failure to object to highly prejudicial remarks made by the prosecutor during trial. *United States v. Rusmisel*, 716 F.2d 301 (5th Cir. 1983); *Seehan v. State of Iowa*, 37 F.3d 389 (8th Cir. 1994); *Weygandt v. Ducharme*, 774 F.2d 1491 (9th Cir. 1985).

As discussed in each issue, it prejudiced Petitioner when the prosecutor made improper and unfair arguments during trial and closing.  It is hard to consider any matters more prejudicial then allowing the jury to hear such damaging and untrue

27

information before deciding his client's fate. It is more than probable that these omissions affected the outcome of the proceedings entitling Petitioner to a new trial that honors a defendant's constitutional rights.

### E)   Conclusion:

There are cases finding ineffective assistance of counsel from the approach to the defense taken by defense counsel. See, for example, *Groseclose v Bell*, 130 F3d 1161 (CA 6, 1997); *Tucker v Prelesnik*, 181 F3d 747 (CA 6, 1999); *Jemison v Foltz*, 672 F Supp 1002 (E.D. Mich 1987); *Harris v Reed (On Remand)*, 894 F2d 871 (CA 7, 1990); *Hart v Gomez*, 174 F3d 1067 (CA 9, 1999).

It is objectively unreasonable to conclude strategy is involved where trial counsel does not even bother to investigate whether information could provide evidence favorable to the Petitioner.   *Washington v Hofbauer*, 228 F3d 689 (CA 6, 2000).

Nor can trial counsel's efforts be considered strategic. A decision can be deemed strategic, only if based on conclusions reached after reasonable investigation. Consider *Towns v. Smith,* 395 F.3d 251 (6th Cir, 2005):

> "'The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000); *accord Clinkscale,* 375 F.3d at 443. A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs,* 205 F.3d at 288)."

Here, as in *Lord v Wood*, 184 F3d 1097 (CA 9, 1999), "trial counsel had at their fingertips information that could have undermined the prosecution's case, yet

28

chose not to develop this evidence...Their performance therefore fell outside the wide range of professionally competent assistance that *Strickland* requires." See also *Jemison v Foltz*, supra [failure to cross-examine witnesses as to points that might prove helpful to the defense was ineffective assistance of counsel.]

Prejudice is determined by whether the errors involved undermined the integrity of the proceedings. It is not necessary to show that the evidence not pursued by counsel would have changed the result. A reviewing court should focus on whether counsel's alleged errors "have undermined the reliability of and confidence in the result." *McQueen v Scroggy*, 99 F3d 1302, 1311 (CA 6, 1996):

> "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 1311-12 (quoting *Strickland*, 466 US at 686, 104 S Ct 2052).

As the Court held in *Kyles v Whitley*, 514 US 419, (1995):

> "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial understood as a trial resulting in a verdict worthy of confidence."

We cannot have confidence in the verdict where unreasonable actions taken by counsel deprived the jury of relevant and critical evidence that supported the defense and would have provided a basis for a reasonable juror to find him not guilty and denied Petitioner of his constitutional rights.

This Court should grant habeas relief in the form of an evidentiary hearing, and upon making findings and rulings, order a new trial for Petitioner.

29

### III. PROSECUTOR'S USE OF PERJURED TESTIMONY DENIED PETITIONER DUE PROCESS.

The firebombing of a house resulting in the death of young children in a predominantly Chaldean and African American neighborhood presented evidentiary problems for the prosecutor on many levels.

While the police did detect the presence of gasoline related particles on Petitioner's work clothing, the connection to a firebomb was unpersuasive where Petitioner had spend over hours that day at working on and services vehicles, as he did every working day at his job.

Petitioner maintained his innocence and had an alibi, being at home at the time the house on Charleston was firebombed.

The prosecutor decided to add to the case against Petitioner by calling Stanley January, an inmate, who was at the same jail that Petitioner housed at prior to trial. The jailhouse informant relayed to the jury how Petitioner had confided in him and confessed to the crime.

The prosecutor even bolstered jailhouse informant January's testimony with selective clips of recorded telephone conversations of inmates made from the jail.

Defense counsel was not provided with any access to other telephone conversations involving inmate January, and was not permitted to review the calls and to listen for the first time, when played for the jury, and could not cross-examine or impeach with other telephone conversations.

30

Petitioner has obtained newly discovered evidence that jailhouse information fabricated his testimony, and had planned on fabricating his testimony to avoid consequences for his criminal actions and obtain early enough release to attend his daughter's graduation.

Petitioner submitted the following evidence in support this claim to the state courts in the form of statements prepared and made by Christopher Crump that included:

- Crump was in the same holding cell with Stanley January are several occasions;

- Crump had seen January before at the Motor City Casino and they formed a friendship.

- January told Crump he was in jail for robbery, but was trying to get out of jail so that he could still attend his daughter's graduation;

- January explained to Crump that he believed he found a way to get out of jail early when he met another inmate in jail and had a chance to go through his discovery packet and found out some details by his murder case and with that information he was going to fabricate a story and make some deals with the government;

- Crump had no intention of being labeled a snitch while in Wayne County Jail, but did happen to see Stanley January while at Quarantine at Jackson State Prison, where all newly sentenced are housed;

- January told Crump he received 1 year for the robbery in exchange for his testimony against Nixon.  This was the first time January identified the inmate he had fabricated testimony against;

- A couple of weeks later, January was very nervous and explained to Crump that the other inmate, Kenneth Nixon, would be coming soon and January needed to get out of Quarantine;

- Just prior to January being transferred Crump asked for his inmate number and was provided the phone number and address for his daughter instead.

31

Had a jury been provided with this evidence, that Stanley January lied about hearing any kind of a confession made by Petitioner, there is a reasonable probability of different result.   In this case the prosecutor told the jury they could rely exclusively upon Stanley January's testimony to find Petitioner guilty. (T IV, 170-171).  Where that testimony is exposed a perjury, no reasonable juror could find Petitioner guilty.

Petitioner submits these documents provide prima facie proof that the testimony to the jury from jailhouse witness January was perjured.

Petitioner further submits that the prosecutor was aware that jailhouse informant January's testimony was materially false and not only did not correct the misleading impression left with the jury, but bolstered the informant's testimony with selected recorded telephone conversations involving Mr. January.

Petitioner submits there are alternate theories to support a constitutional violation.  Initially, Petitioner submits that it violates due process to sustain a conviction that was obtained by perjured testimony, regardless if the prosecutor was aware of the perjury at the time of the trial.

A habeas claim is made out where a state prisoner demonstrates his conviction is based upon perjured testimony, regardless of whether the government knew it was perjury at the time the evidence was presented.   The Second Circuit recently granted permission to file a successive habeas in *Quezada v Smith*, 10-2738-op (2nd Cir. 10-21-2010), holding:

32

> Once newly discovered evidence has been presented, the
> gate-keeping issues are whether Quezada has identified a
> constitutional error and, if so, whether he has shown by clear
> and convincing evidence that but for that error no reasonable
> jury would have found him guilty. As noted, at this stage
> Quezada is required only to make a prima facie showing that
> these two requirements have been met. To show constitutional
> error he relies on Sanders v. Sullivan, 863 F.2d 218 (2d Cir.
> 1988). We ruled in Sanders that due process is violated if a
> state leaves in place a criminal conviction after a credible
> recantation of material testimony and the recantation would
> "most likely" have changed the outcome. 863 F.2d at 222.

See also *Smith v Roberts*, 115 F.3d 818 (10th Cir. 1997); *Lewis v Erickson*, 946 F.2d 1361 (8th Cir. 1991).

Secondly, the prosecutor is charged with knowledge that Stanley January's testimony was false and constituted perjury.    Not only did the prosecutor present a jailhouse informant, the prosecutor actually vouched for Stanley January during closing arguments:

> "But what you can tell about Stanley January is that he took
> detailed notes of what he did and who he talked to, and his
> conversations corroborate." (T IV, 161).

> "The point is no matter how you shake it, no matter how you
> look at Mr. January, he's telling you what was told to him, and
> that is evidence that you can use by itself to convict beyond a
> reasonable doubt." (T IV, 170-171).

The prosecutor, in general, is aware of the strong possibility of false testimony as provided by a jail house informant.  A prosecutor misleads a jury and suborns perjury when vouching for and telling a jury they should exclusively rely upon jailhouse informant testimony to convict under these circumstances.  Significant ethical

33

and legal implications arise for prosecutors when the government offers leniency to individuals who take part, or claim to take part, in crimes. An offer of leniency "gives the witness a powerful incentive to fabricate his testimony in order to curry favor with the government," and also to find "a fast and easy way out of trouble with the law." *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1123 (9th Cir. 2001).

Judge Stephen S. Trott, a judge on the U.S. Court of Appeals for the Ninth Circuit cautioned in *Bowie*, supra:

> [B]ecause of the perverse and mercurial nature of the devils with whom the criminal justice system has chosen to deal, each contract for testimony is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to "get" a target of sufficient interest to induce concessions from the government. Defendants or suspects with nothing to sell sometimes embark on a methodical journey to manufacture evidence and to create something of value, setting up and betraying friends, relatives, and cellmates alike. Frequently, and because they are aware of the low value of their credibility, criminals will even go so far as to create corroboration for their lies by recruiting others into the plot".
> ***
>
> What emerges from this record is an intent to secure a conviction of murder even at the cost of condoning perjury. This record emits clear overtones of the Machiavellian maxim: 'the end justifies the means,' an idea that is plainly incompatible with our constitutional concept of ordered liberty.'" (citation omitted)).

The known and admitted inherent unreliability of jailhouse informant's testimony has been long known with the United States Supreme Court having recognized the "serious questions of credibility" informers pose. *On Lee v. United States*, 343 U. S. 747, 757 (1952).

34

Recently, the United States Supreme Court was asked to establish rules for even considering whether to admit jailhouse informant testimony at trial. See. *Kansas v Ventris,* 07-1356 (U.S. 4-29-2009) ("Respondent's amicus insists that jailhouse snitches are so inherently unreliable that this Court should craft a broader exclusionary rule for uncorroborated statements obtained by that means."   The dissent in *Ventris* commented that "The likelihood that evidence gathered by self-interested jailhouse informants may be false cannot be ignored."

Specifically, Petitioner contends that there were specific facts present from which it is reasonably inferred that either the investigating officers and/or the prosecutor knew Stanley January was lying to the jury.

Consider how the prosecutor was aware that Stanley January was taking notes down on different inmates, trying to piece together the facts about their cases, with an admitted intent of offering damaging testimony against those inmates in exchange for obtaining favorable treatment.  (T IV, 63, 65-66).

The prosecutor also knew that January had already testified against another inmate using information he could piece together.  The prosecutor was also aware that January was still facing a parole violation hearing and sentencing for a robbery charge, both to take place after testifying against Petitioner.  (T IV, 7-8, 51).

The prosecutor was aware that January waited 3 months before telling anyone about his information.  (T IV, 35).  The prosecutor witnessed January having troubles remembering what his testimony was supposed to be and having to look at his notes. (T IV, 35, 38).  Under these circumstances, Petitioner submits the prosecuting

35

authorities were aware of Stanley January's perjury and failed to correct the same entitling Petitioner to relief in the form of a new trial.  *Rosencrantz v Lafler,* 568 F.3d 577 (6th Cir. 2009), ("A conviction obtained by the knowing use of perjured testimony must be set aside if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . .' *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (internal quotation marks omitted); see also *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)."

This Court should find that Petitioner's conviction was obtained by the use of perjured testimony and should grant relief in the form of a new trial.

36

IV.  THE PROSECUTOR PREJUDICED PETITIONER WITH
     IMPROPER AND MISLEADING ARGUMENT.

Petitioner was convicted for firebombing a house that resulted in the death of

two children.   In an effort to make Petitioner appear like a bad person to the jury, the

prosecutor cross examined Petitioner's employer, Mr. Hill with questions suggesting the

prosecutor was aware of witness intimidation without any evidence to support the

fabricated prior bad act:

"Q.  Okay. Sir, have you threatened any of the People's witnesses in
     this case?

A.   No. I don't even know who the witnesses are.

Q.   You don't even know who the witnesses are?

A.   No, sir.

Q.   Sir, were you present in the parking lot outside of the
     courthouses last week?

A.   No, sir.

Q.   After court?

A.   No, sir.

Q.   You didn't have anything to do with the assaulting, punching one
     of the witnesses in this case?"  (TIV, 116).

The problem was that there was no good faith basis to even support these

questions; not even "[a] well reasoned suspicion that a circumstance is true." *United*

*States v. Sampol*, 636 F.2d 621, 658 (D.C. Cir. 1980).

37

The prosecutor also introduced the testimony of Stanley January a jail house informant.   When Mr. January was asked directly if Petitioner confessed to him, January explained he did not actually hear Nixon confess.  (T IV, 21).  When pressed to describe the circumstances of the confession, January told the jury:

> "But any way, you know, he just was – he looked real nervous, you know.  I told him that 'You know, you have that right to be nervous,' you know, dealing with the nature of the crime that he's supposed to be in here for, you know."  (T IV, 22).

January even explained that Nixon was nervous when another inmate that knew the fathers of the deceased children had asked Nixon if he killed those children.  (T IV, 25).   Nevertheless, during closing argument, the prosecutor stated:

> "The point is no matter how you shake it, no matter how you look at Mr. January, he's telling you what was told to him, and that is evidence that you can use by itself to convict beyond a reasonable doubt." (T IV, 170-171).

Here the prosecutor tells the jury that Stanley January heard the Petitioner confessed to him yet when asked to explain the manner of this confession, the witness never could describe how Petitioner confessed.

The record at best demonstrated that when a friend of the father of the deceased children asked Petitioner if he did it, Petitioner appeared nervous, but never admitted to firebombing the house.

Statements by the prosecutor of this kind prejudice defendants.  See *People v Erb*, 48 Mich App 622, 632, (1973):

> "Also to be considered is the prominence of the office which the prosecutor holds and the subsequent weight of statements made by the prosecuting attorney.  Statements made by a

38

prosecutor which attest to or vouch for the credibility of certain witnesses are very cautiously reviewed. To hold otherwise would be to ignore the impact of such statements upon a jury, which is heavily influenced by prosecutorial comments; when such comments relate to the credibility of a witness, which is the exclusive province of the jury, prejudice to the defendant readily follows."

Where a prosecutor's comments violate an explicitly granted right under the Constitution, the comments constitute a constitutional violation. *Hodge v Hurley,* 426 F.3d 368, (6th Cir, 2005); *Donnelly v DeChristoforo*, 416 US 637; 94 S Ct 1868; 40 L Ed 2d 431 (1974). Where a prosecutor argues facts not in evidence, the prosecutor becomes a witness, not subject to cross-examination. In so doing, he violates due process and the constitutional right of confrontation. *Berger v United States*, 295 US 78; 55 S Ct 629; 79 L Ed 1314 (1935).

The conduct of the prosecutor was in clear violation of established constitutional rights, reaffirmed by the Sixth Circuit in *Hodge v Hurley,* 426 F.3d 368, (6th Cir., 2005):

> It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying. *United States v. Young*, 470 U.S. 1, 17-19 (1985); *Berger*, 295 U.S. at 86-88 (citing prosecutor's statements suggesting that he had personal knowledge that a witness was not being truthful as one example of egregious prosecutorial misconduct); *see also Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005) ("To be certain, prosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence. But, they can not put forth their opinions as to credibility of a witness, guilt of a defendant, or appropriateness of capital punishment.")

39

A conviction should be reversed where prejudicial and improper argument by the prosecutor has the effect of denying the defendant a fair trial. *United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987); *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983). If the argument is sufficiently improper, it may be cause for reversal even without an objection. *United States v. Harris*, 523 F.2d 172 (6th Cir. 1973); *Malley v. Manson*, 547 F.2d 25 (2nd Cir. 1976); *People v. Rosales*, 160 Mich. App. 304 (1987).

It was highly prejudicial to place before the jury untrue facts of a confession by Petitioner, which could cause the jury to abandon the presumption of innocence, *Taylor v. Kentucky*, 436 U.S. 478; 98 S.Ct. 1930; 56 L.Ed.2d 468 (1978).

This Court should find that the Michigan courts acted contrary to and have involved an unreasonable application of clearly established federal law embodied in decisions of the Supreme Court, and find further that this state adjudication involved an unreasonable determination of the facts and grant Petitioner a writ of Habeas Corpus to be issued unless the State grants a new trial at which the jury should judge Petitioner's guilt or innocence based on the actual testimony and not improper prosecutor argument.

## V. FAILURE TO PROVIDE CONSTITUTIONALLY EFFECTIVE REPRESENTATION ON APPEAL.

We submit there was ineffective assistance of appellate counsel regarding the failure of the appeal attorney to raise the issues raised in the Motion for Relief for Judgment filed in the state courts, as well as to review the record and present meritorious issues on appeal. The 6th Circuit in *Mapes v Tate*, (*Mapes II*), 388 F.3d 187 (6th Cir. 2004) ruled with respect to ineffective assistance of appellate counsel:

> In order to establish a Sixth Amendment violation, it must be shown both that counsel's representation fell below an objective standard of reasonableness, and that his deficiencies prejudiced the defendant. See *Strickland*, 466 U.S. at 687-88, 104 S.Ct. 2052. With respect to prejudice in the context of ineffective assistance of appellate counsel, a defendant must show a reasonable probability that, but for his counsel's defective performance, he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Although this analysis necessarily involves an evaluation of the underlying claims, it does not require a decision on or a determination of these issues. All that is required is a determination that, based on the nature of the underlying claims, there is "a reasonable probability that, but for his counsel's [failings] . . ., [the defendant] would have prevailed on his appeal." Id.; see also *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir.2004).

The issues in this case were so highly meritorious that, if raised and considered on the merits, they could not fail to win.

Appellate counsel raised issues which were inferior to those raised in a Motion for Relief from Judgment. Those issues included a claim based upon non-testifying codefendant's statements and was rejected being neither newly discovered nor likely to have any effect on the outcome; a claim of hearsay statements of identification made

41

by a witness who was present and subject to cross-examination rejected under state law; a claim based on the playing of taped jailhouse phone calls, and claims of ineffective assistance of counsel for not objecting to the hearsay and prosecutorial misconduct.

It is reasonably probable that Petitioner Nixon would have gotten a reversal on his appeal of right, but for the inaction of appellate counsel. See *Mapes v Coyle*, 171 F3d 408 (CA 6, 1999), finding ineffective assistance of appellate counsel where counsel omitted issues that were "significant and obvious." Under *Mapes v Coyle* and many other cases, a court may find ineffective assistance of appellate counsel from the failure to raise particular issues on appeal if the issues were obvious or should have been discovered, and if the failure to raise them was prejudicial. It is impossible to imagine how failure to raise these issues could have helped Mr. Nixon's appeal in any way.

The issue of ineffective assistance of appellate counsel was discussed at length in *Mason v Hanks*, 97 F3d 887 (CA 7, 1996). The Court held:

> "Effective advocacy does not require the appellate attorney to raise every non-frivolous issue under the sun, of course. *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). After all, "[o]ne of the principal functions of appellate counsel is winnowing the potential claims so that the court may focus on those with the best prospects." *Page v. United States*, 884 F.2d 300, 302 (7th Cir.1989). This is not to say that counsel's selection of the issues to pursue on appeal is beyond scrutiny. **"Were it legitimate to dismiss a claim of ineffective assistance of counsel on appeal solely because we found it improper to review appellate counsel's choice of issues, the right to effective assistance of counsel on appeal**

42

**would be worthless."**  *Gray*, 800 F.2d at 646.[1]  Instead, we engage in a pragmatic assessment of appellate counsel's work.  Genuinely strategic decisions that were "arguably appropriate at the time, but, with the benefit of 'hindsight', appear[ ] less than brilliant" will not be second-guessed.  *Gray*, 800 F.2d at 646 (citing *United States v. Harris*, 558 F.2d 366, 371 (7th Cir.1977)).

But when appellate counsel omits (without legitimate strategic purpose) "a significant and obvious issue," we will deem his performance deficient (*Gray*, 800 F.2d at 646;  *Hollenback*, 987 F.2d at 1275)[2], and **when that omitted issue "may have resulted in a reversal of the conviction, or an order for a new trial," we will deem the lack of effective assistance prejudicial** (*Gray*, 800 F.2d at 646). ...

The ultimate question we ask is "whether, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding [here, Mason's direct appeal] would have been different."

Ineffective assistance of appellate counsel is "good cause" for failing to raise an issue in the appeal of right.  *Edwards v Carpenter*, 529 US 446; 120 S Ct 1587; 146 L Ed 2d 518 (2000) *Murray v Carrier*, 477 US 478, 488; 106 S Ct 2639; 91 L Ed 2d 397 (1986); MCR 6.508(D).

If the issues had been raised, the result of the appeal would unquestionably have been different.  In this case, the issues not raised in the earlier appeal are highly meritorious and will change the result, if they can get consideration on their merits.

As the Court held in *Mayo v Henderson*, 13 F3d 528 (CA 2, 1994):

"a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."

---

[1] *Gray v Greer*, 800 F2d 644 (CA 7, 1986)
[2] *Hollenback v United States*, 987 F2d 1272 (CA 7, 1993)

43

"See, also, *Fagan v Washington*, 942 F2d 1155, 1157 (CA 7,1991) ("His lawyer failed to raise either claim, instead raising weaker claims... No tactical reason-- no reason other than oversight or incompetence--has been or can be assigned for the lawyer's failure to raise the only substantial claims that [defendant] had."); *Matire v Wainwright*, 811 F2d 1430, 1438 (CA 11,1987) (ineffective assistance of counsel when appellate counsel ignored "a substantial, meritorious Fifth Amendment issue" raising instead a "weak issue")." *Mayo v Henderson*, supra.

In *Strickland v Washington*, supra, the Supreme Court held that prejudice is shown from ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 US at 664.

While it is true that an attorney need not raise all arguable claims, it does not thereby follow that the attorney never need to raise any arguable claim. Instead, "The question is whether a reasonable appellate attorney could conclude that [the claimed issue was] not worthy of mention on appeal."

This Court should order an evidentiary hearing regarding ineffective assistance of appellate counsel and upon full consideration of the issues find that ineffective assistance of appellate counsel excuses any procedural default, and grant relief in the form of a new trial, or at minimum, a new appeal of right.

44

## CONCLUSION

WHEREFORE, Petitioner Kenneth Fitzgerald Nixon moves this Honorable Court to take the following action:

a)   Accept jurisdiction over this case;

b)   Require the Respondent to answer the allegations in this Petition and the Brief in Support;

c)   Hold such evidentiary hearings as this Court may deem necessary or appropriate;

d)   Issue an Order that this Court will grant a Writ of Habeas Corpus unless the State vacates the conviction and holds a new trial within a specified time;

e)   Issue a Writ of Habeas Corpus freeing Petitioner from his unconstitutional confinement.

Respectfully submitted,

SHELDON HALPERN P14560
Attorney for Petitioner Nixon
26339 Woodward Avenue
Huntington Woods, MI  48067
(248) 554-0400

Dated: _November 22, 2010_

45

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


KENNETH FITZGERALD NIXON,

        Petitioner,

-v-                             Case No.
                                  Hon.

GREG MCQUIGGIN, Warden,

        Respondent.

_____/

## **APPENDIX INDEX FOR PETITION FOR HABEAS CORPUS**


| Item | Content |
|------|---------|
| 1. | Michigan Court of Appeals Opinion affirming conviction. |
| 2. | Michigan Supreme Court Order denying leave. |
| 3. | Michigan Supreme Court Order denying reconsideration. |
| 4. | Trial Court Order denying Motion for Relief from Judgment. |
| 5. | Michigan Court of Appeals Order denying leave. |
| 6. | Michigan Supreme Court Order denying leave. |
| 7. | Affidavit of Kenneth Nixon. |
| 8. | Polygraph results. |
| 9. | Affidavit of LaToya Caulfield. |
| 10. | Polygraph results. |
| 11. | Affidavit of Tracy Nixon. |
| 12. | Polygraph results. |
| 13 | Statement prepared by Cris Crump. |


SHELDON HALPERN P14560
Attorney for Petitioner Nixon
26339 Woodward Avenue
Huntington Woods, MI  48067
(248) 554-0400

<u>INDEX OF EXHIBITS</u>

| Item | Content |
| --- | --- |
| 1. | Michigan Court of Appeals Opinion affirming conviction. |
| 2. | Michigan Supreme Court Order denying leave. |
| 3. | Michigan Supreme Court Order denying reconsideration. |
| 4. | Trial Court Order denying Motion for Relief from Judgment. |
| 5. | Michigan Court of Appeals Order denying leave. |
| 6. | Michigan Supreme Court Order denying leave. |
| 7. | Affidavit of Kenneth Nixon. |
| 8. | Polygraph results. |
| 9. | Affidavit of LaToya Caulfield. |
| 10. | Polygraph results. |
| 11. | Affidavit of Tracy Nixon. |
| 12. | Polygraph results. |
| 13 | Statement prepared by Cris Crump. |

<u>INDEX OF EXHIBITS</u>

<u>Item</u>              <u>Content</u>
1.       Michigan Court of Appeals Opinion affirming conviction.
2.       Michigan Supreme Court Order denying leave.
3.       Michigan Supreme Court Order denying reconsideration.
4.       Trial Court Order denying Motion for Relief from Judgment.
5.       Michigan Court of Appeals Order denying leave.
6.       Michigan Supreme Court Order denying leave.
7.       Affidavit of Kenneth Nixon.
8.       Polygraph results.
9.       Affidavit of LaToya Caulfield.
10.      Polygraph results.
11.      Affidavit of Tracy Nixon.
12.      Polygraph results.
13       Statement prepared by Cris Crump.

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KENNETH FITZGERALD NIXON,

        Defendant-Appellant.

UNPUBLISHED
March 1, 2007

No. 266033
Wayne Circuit Court
LC No. 05-005711-01

Before: O'Connell, P.J., and Saad and Talbot, JJ.

PER CURIAM.

Defendant firebombed a home in which Naomi Vaughn lived with her five children and her boyfriend, Ronrico Simmons, and two of the children died. A jury convicted defendant of two counts of felony murder, MCL 750.316(1)(b), four counts of attempted murder, MCL 750.91, and arson of a house, MCL 750.72. Defendant appeals his convictions, and we affirm.

## I. Newly Discovered Evidence

Defendant contends that he is entitled to a new trial on the grounds of newly discovered evidence. Specifically, defendant claims that his codefendant and girlfriend, Latoya Caulford, who was acquitted of all charges in a separate jury trial, came forward after defendant's trial and stated that defendant did not commit the crimes because, when they occurred, he was with her in her room at a different home.[1]

---

[1] Defendant failed to preserve this issue by moving for a new trial or by moving for relief from judgment. *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005). Defendant filed a motion with this Court to remand for an evidentiary hearing and a motion for a new trial on this basis, but this Court denied the motion. *People v Nixon*, unpublished order of the Court of Appeals, entered June 16, 2006 (Docket No. 266033). Therefore, review is limited to the existing record. *People v Powell*, 235 Mich App 557, 561 n 4; 599 NW2d 499 (1999).

We review unpreserved claims for plain error. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To avoid forfeiture: (1) an error must have occurred, (2) the error must be clear or obvious, (3) and the error must have affected substantial rights, meaning it affected the outcome of the trial. *Carines, supra* at 763, citing *United States v Olano*, 507 US

(continued...)

-1-

To obtain a new trial on the basis of newly discovered evidence, a defendant must prove that "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *Cox, supra* at 450 (citation omitted). Evidence is newly discovered if defendant or his counsel did not know about it at the time of trial. *People v Burton*, 74 Mich App 215, 222-223; 253 NW2d 710 (1977).

There is no new information in this case. First and foremost, both defendants obviously were aware of this evidence at the time of defendant's trial. Also, in his closing argument, defense counsel asserted that defendant was in Caulford's room with her at the time of the crime, and several witnesses corroborated that assertion.[2] Accordingly, Caulford's "new evidence" testimony would add very little to the testimony that defendant already presented. The jury heard three witnesses testify that defendant was in Caulford's room with her and did not find them credible. It is highly unlikely that the jury would have believed the same assertion if it was also given by Caulford, who was defendant's girlfriend and was tried for the same offenses. Such evidence would be merely cumulative, and there is no likelihood that it would result in a different outcome. Defendant has failed to establish plain error affecting his substantial rights, and he is not entitled to a new trial.

## II. Audio Tapes

Defendant says that the trial court abused its discretion when it allowed the prosecutor to play portions of defendant's telephone calls from jail. We review a trial court's decision whether to admit evidence for an abuse of discretion. *People v Lukity,* 460 Mich 484, 488; 596 NW2d 607 (1999). This Court defers to the trial court's judgment when the trial court chooses an outcome that falls within the range of reasonable and principled outcomes. *People v Babcock,* 469 Mich 247, 269; 666 NW2d 231 (2003).[3]

---

(...continued)

725, 731-734; 113 S Ct 1770; 123 L Ed 2d 508 (1993). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Carines, supra* at 763-764, citing *Olano, supra* at 736-737.

[2] Mario Mahdi, Caulford's cousin who also lived in the house, testified that he saw defendant playing a video game, probably around midnight. Later in his testimony, Mahdi stated that he believed defendant and Caulford were in Caulford's bedroom at the time of the fire, around midnight, but he did not see defendant. Basim Alyais, Caulford's neighbor, testified that he was on his porch drinking beer from 7:00 p.m. to 12:30 a.m. on the night of the incident, and defendant did not leave the house after 10:00 p.m. Lisa Anne Caulford-Zaatari, Caulford's aunt, also testified that she was at Caulford's home from 4:00 p.m. to 12:10 a.m., and defendant and Caulford went in the bedroom at 9:30 p.m. According to Caulford-Zaatari, defendant did not leave while she was there.

[3] In general, evidence is admissible if it is relevant. *People v Starr,* 457 Mich 490, 497; 577 NW2d 673 (1998); MRE 402. Michigan Rule of Evidence 401 provides, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to
(continued...)

-2-

Stanley J. January, Jr. was in the Wayne County jail at the same time as defendant. January testified that, on May 23, 2005, defendant told him he was the one who perpetrated the firebombing but he thought only Naomi was home and he felt sorry that the children were killed. The same day, defendant made a phone call from the jail to January's daughter so that January could talk to her. The prosecution played this phone call for the jury to corroborate January's testimony, and January identified defendant's voice as he handed the phone to January, his own voice, and his daughter's voice. According to January, he also heard defendant tell someone over the phone that he hoped to get out of jail on bond so that he could disappear. Moreover, January claimed that he did not talk to defendant after May 23, 2005, because defendant was moved to a different cell that evening, and this was corroborated by the second phone call that was played for the jury, made by defendant on May 24, 2005. These two calls were relevant because they were used to show that January's testimony was credible. *Mills, supra* at 72.

In another call played for the jury, defendant told someone that a police dog searched his clothes and his house. This evidence was relevant to establish that the clothes the police collected from a bedroom in Caulford's house were those defendant wore on the date of the crime. The call also established that the police dog correctly alerted officers to the clothing, which tested positive for the presence of gasoline.

In a fourth recording, defendant discussed "Mario [Mahdi]" "his girlfriend," "Lisa," and "Mario's daddy." Defendant told the person on the other end of the line not to offer "Mario's daddy" anything because he would tell. This phone call was relevant to demonstrate a possible reason for the inconsistencies between Mario Mahdi's statement to the police and his testimony at trial. On the day of the crime, Mahdi told police that, in either March or April 2005, Mahdi and defendant were driving past Simmons's home and defendant said, "He's going to get his." However, at trial, Mahdi claimed that defendant did not make that statement and Mahdi explained that he told the police otherwise because he was scared. Mahdi also testified at trial to facts that he did not tell police, but that supported defendant's alibi defense. In general, a defendant's threat against a witness is admissible to show consciousness of guilt. *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996). It is reasonable to conclude from Mahdi's inconsistencies and defendant's statements on the audiotape that defendant may have had friends

_____

(...continued)

the determination of the action more probable or less probable than it would be without the evidence." *People v Hall*, 433 Mich 573, 580; 447 NW2d 580 (1989). The evidence must be "material," or significant to the determination of the action, and it must be "probative," meaning it "makes a fact of consequence more or less probable than it would be without the evidence." *People v Mills*, 450 Mich 61, 66-67; 537 NW2d 909 (1995).

Even if relevant, the court may exclude evidence "'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.'" *People v Sabin (After Remand)*, 463 Mich 43, 58; 614 NW2d 888 (2000); MRE 403. Unfair prejudice exists where a jury is likely to give marginally probative evidence undue or preemptive weight, and it would be inequitable to allow its admission. *Mills, supra* at 75-76.

or family members try to influence witness testimony. This evidence is both relevant and material.[4]

### III. Hearsay

Further, defendant claims that the trial court erred when it admitted Brandon Vaughn's statements that identified defendant as the person who started the fire. Defendant did not object to the testimony and, thus, this issue is unpreserved and we review it for plain error. *Knox, supra* at 508; *Carines, supra* at 763-764.

Pursuant to MRE 801(d)(1)(C), if a prior statement is one of identification and the witness is available for cross-examination, it is considered substantively admissible as nonhearsay. *People v Malone*, 445 Mich 369, 376-378; 518 NW2d 418 (1994). The rule "does not require laying a foundation other than that the witness is present and found to be available for cross-examination." *Id.*, p 377.

Brandon Vaughn is one of the children who survived the fire and he consistently identified defendant as the person who started the fire to his mother, Simmons, Lieutenant Frank Maiorana, the arson investigator, and at trial. Brandon also knew defendant for two years before the crime. Brandon testified that he was awake in his room when he heard something hit the house. Brandon ran downstairs to see what happened, he unlocked the door, saw defendant get into the passenger seat of Caulford's green Neon, saw Caulford driving, and chased the car. Brandon then ran back into the house, woke his mother, told her who he saw commit the crimes, and got his younger sister out of the house. Brandon told Simmons what happened after Brandon was outside. Simmons testified that Brandon was frantic and crying, and he kept walking off and coming back. Brandon told Simmons he saw Caulford and defendant drive up in a green Neon, defendant threw something at the house, jumped back in the car, and Caulford drove off.

At the scene, Brandon told Lieutenant Maiorana that he heard a loud boom in his brother, Raylond's, bedroom and saw defendant run from the front of the house, get into a green Neon that Caulford was driving, and take off down the street. Maiorana made small talk with Brandon before talking about the fire to make sure Brandon was calm and answered accurately. Maiorana found the cocktail in Raylond's bedroom after talking to Brandon. The police drove Brandon by

---

[4] Defendant also maintains that probative value of the phone calls is substantially outweighed by the danger of unfair prejudice resulting from informing the jury that the calls were made from jail. However, before the tapes were even played, January testified that he met defendant and spoke with him in the county jail on May 23, 2005. Therefore, the jury already knew defendant was in jail, and based on the date given, defendant's incarceration was for the present case. Defendant relies on cases that find prejudice where there is a reference to a defendant's prior incarcerations or prior convictions, which is not the case here. See *People v Greenway*, 365 Mich 547, 549-550; 114 NW2d 188 (1962); *People v Fleish*, 321 Mich 443, 461; 32 NW2d 700 (1948); *People v Spencer*, 130 Mich App 527, 537; 343 NW2d 607 (1983). Defendant was not unfairly prejudiced by the introduction of the phone calls to the jury.

Caulford's home around 1:30 a.m., and Brandon identified the home and the green Neon as Caulford's and indicated that defendant was involved in the incident.

Defense counsel had the opportunity to cross-examine Brandon regarding his identification of defendant and, during cross-examination, Brandon specifically said he told Simmons that defendant started the fire. Defense counsel did not address Brandon's conversation with Maiorana. Therefore, Simmons' and Maiorana's testimony regarding Brandon's identification of defendant was admissible as nonhearsay under MRE 801(d)(1)(C).

Moreover, were we to consider the testimony hearsay, the statements would be admissible as excited utterances.[5] MRE 803(2). Surviving a devastating fire that killed two of his siblings clearly is a startling event. Brandon made his statements to Simmons during the fire, and Brandon was in a frantic state. Maiorana arrived at the scene while the house was still on fire and talked to Brandon only 15 to 30 minutes after that. Although Maiorana may have calmed Brandon down to get his statement, it is unlikely that a 13-year-old who had just escaped a house fire and had actually seen his brother on fire, would have the capacity to fabricate a story about who committed such a crime against his family. Brandon's statements qualify as excited utterances under the hearsay exception, and the court did not err in admitting this testimony.

### IV. Ineffective Assistance of Counsel

Defendant says that he was denied the effective assistance of counsel. Defendant did not move for a new trial or an evidentiary hearing before the trial court on this issue, and therefore, we review this issue on the basis of the existing record. *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002).[6]

---

[5] An excited utterance is " '[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.' " *People v Smith*, 456 Mich 543, 551; 581 NW2d 654 (1998); MRE 803(2). Such a statement is considered more reliable because the declarant does not have the opportunity for reflection necessary for fabrication. *People v Straight*, 430 Mich 418, 423-424; 424 NW2d 257 (1988). There is no express time limit for an excited utterance. *Smith, supra* at 551. Rather, the focus of the exception is the "lack of capacity to fabricate, not the lack of time to fabricate." *Straight, supra* at 425.

[6] The determination whether defendant received ineffective assistance of counsel is a question of both fact and constitutional law. The trial court's findings of fact are reviewed for clear error, while questions of law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

The right to effective assistance of counsel is guaranteed by the United States and Michigan Constitutions, in order to protect a criminal defendant's right to a fair trial. US Const, Am VI; Const 1963, art I, § 20; *Strickland v Washington*, 466 US 668, 684; 104 S Ct 2052; 80 L Ed 2d 674 (1984). There is a strong presumption that defendant received effective assistance of counsel, and the burden is on defendant to prove counsel's actions were not sound trial strategy. *LeBlanc, supra* at 578. To prevail on a claim of ineffectiveness of counsel, defendant must show: (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) "that counsel's errors were so
(continued...)

Defendant maintains that defense counsel should have objected when the prosecutor asked Trevor Hill, defendant's business partner, if he had threatened or assaulted any of the witnesses in this case, or if defendant paid Hill for his testimony.  According to defendant, the prosecutor presented no evidence linking him to any alleged threats, assaults or pay-offs of any witnesses.  However, as discussed, the prosecutor presented evidence in the fourth phone call played for the jury, in which defendant discussed "Mario," "his girlfriend," "Lisa," and "Mario's daddy" and told the recipient of the phone call not to offer Mario's daddy anything because he would tell.  This phone call was relevant and admissible to demonstrate a possible reason for the inconsistencies between Mahdi's statement to the police and his testimony at trial, and that defendant may have had friends or family members try to influence witness testimony.  Trial counsel's decision not to object to every statement that surfaced throughout the course of the trial was a matter of strategy that is presumed reasonable.  *Strickland, supra* at 689.

Defendant also asserts that trial counsel was ineffective for not objecting to the admission of Brandon's identification statements during other witnesses' testimony.  We have concluded that such statements were admissible.  "Trial counsel is not required to advocate a meritless position."  *People v Snider,* 239 Mich App 393, 425; 608 NW2d 502 (2000).  In addition, trial counsel used the inconsistencies in the details of all Brandon's statements to argue that his testimony was not believable and may have come from Simmons, creating reasonable doubt that defendant was the perpetrator.  This demonstrates that counsel's decision was the result of calculated reasoning, and this Court will not substitute its judgment for that of counsel in matters of trial strategy.  *People v Matuszak,* 263 Mich App 42, 58; 687 NW2d 342 (2004).  Defendant clearly was not deprived of a fair trial.

Affirmed.

/s/ Peter D. O'Connell
/s/ Henry William Saad
/s/ Michael J. Talbot

---

(...continued)

serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland, supra* at 687; *People v Pickens,* 446 Mich 298, 318; 521 NW2d 797 (1994).  A defendant must show that, but for trial counsel's errors, there would have been a different outcome.  *Pickens, supra* at 314.

# Order

**Michigan Supreme Court**
Lansing, Michigan

September 10, 2007

133678

Clifford W. Taylor,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
Plaintiff-Appellee,

v

SC: 133678
COA: 266033
Wayne CC: 05-005711-01

KENNETH FITZGERALD NIXON,
Defendant-Appellant.

_____/

On order of the Court, the application for leave to appeal the March 1, 2007 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.



Clerk

p0830

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 29, 2007

Clifford W. Taylor,
Chief Justice

133678(72)

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
    Plaintiff-Appellee,

v

KENNETH FITZGERALD NIXON,
    Defendant-Appellant.

SC: 133678
COA: 266033
Wayne CC: 05-005711-01

_____/

On order of the Court, the motion for reconsideration of this Court's September 10, 2007 order is considered, and it is DENIED, because it does not appear that the order was entered erroneously.



d1119

I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 29, 2007

_Corbin R. Davis_
Clerk

| STATE OF MICHIGAN<br>THIRD JUDICIAL<br>CIRCUIT COURT | ORDER<br>DENYING/GRANTING<br>MOTION | CASE NO.<br><br>*05-5711-01* |
| --- | --- | --- |

THE PEOPLE OF THE STATE OF MICHIGAN

vs.

*KENNETH FITZGERALD NIXON*
Defendant

At a Session of Said Court held in The Frank Murphy Hall of Justice

at Detroit in Wayne County on _____ **JUL 1 7 2009** _____

PRESENT: Honorable _____ **HON. BRUCE U. MORROW** _____
Judge

A Motion for *RELIEF FROM JUDGEMENT*

_____ having been filed; and

the People having filed an answer in opposition; and the Court having reviewed the briefs and

records in the case and being fully advised in the premises;

**IT IS ORDERED THAT** the Motion for *RELIEF FROM JUDGEMENT*

_____ be and

is hereby ☒ denied   ☐ granted.

Judge

ORDER DENYING/GRANTING MOTION

FORM #7

i

**APPENDIX ITEM #4**

| STATE OF MICHIGAN THIRD JUDICIAL CIRCUIT COURT | ORDER DENYING/GRANTING MOTION | CASE NO. *05-5711-01* |
|---|---|---|

THE PEOPLE OF THE STATE OF MICHIGAN

vs.

*KENNETH NIXON*

_____
Defendant

At a Session of Said Court held in The Frank Murphy Hall of Justice

at Detroit in Wayne County on _____ **JUL 1 7 2009** _____

**PRESENT:** Honorable _____ **HON. BRUCE U. MORROW** _____

Judge

A Motion for *AN EVIDENTIARY HEARING*

_____ having been filed; and

the People having filed an answer in opposition; and the Court having reviewed the briefs and

records in the case and being fully advised in the premises;

**IT IS ORDERED THAT** the Motion for *AN EVIDENTIARY*

*HEARING* _____ be and

is hereby ☒ denied   ☐ granted.

*Bruce U Morrow*
_____
Judge

**ORDER DENYING/GRANTING MOTION**

FORM #7

NOV 2 4 2009

# Court of Appeals, State of Michigan

## ORDER

People of MI v Kenneth Fitzgerald Nixon

Docket No. 293476

LC No. 05-005711

Cynthia Diane Stephens
Presiding Judge

Michael J. Talbot

Christopher M. Murray
Judges

The Court orders that the application for leave to appeal is DENIED because defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D).

_____
Presiding Judge



A true copy entered and certified by Sandra Schultz Mengel, Chief Clerk, on

NOV 23 2009

Sandra Schultz Mengel

**APPENDIX ITEM #5**

# Order

**Michigan Supreme Court**
Lansing, Michigan

September 9, 2010

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway
Alton Thomas Davis,
Justices

140403

PEOPLE OF THE STATE OF MICHIGAN,
Plaintiff-Appellee,

v

SC: 140403
COA: 293476
Wayne CC: 05-005711

KENNETH FITZGERALD NIXON,
Defendant-Appellant.

_____/

On order of the Court, the application for leave to appeal the November 23, 2009 order of the Court of Appeals is considered, and it is DENIED, because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D).



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

September 9, 2010

Clerk

d0830

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

**PEOPLE OF THE STATE OF MICHIGAN,**
          **Plaintiff,**

**Case No. 05-005711-01**
**HON. BRUCE U. MORROW**

**v**

**KENNETH FITZGERALD NIXON,**
          **Defendant.**

| | |
|---|---|
| **KYM L. WORTHY (P38875)**<br>Wayne County Prosecutor<br>1441 Saint Antoine Street<br>Detroit, MI 48226<br>(313) 224-5777 | **SHELDON HALPERN (P14560)**<br>Attorney for Defendant<br>26339 Woodward Avenue<br>Huntington Woods, MI  48070<br>(248) 554-0400 |

## KENNETH NIXON'S AFFIDAVIT  IN SUPPORT OF NEW TRIAL PURSUANT TO HIS DECEMBER 8, 2008, MOTION FOR RELIEF FROM JUDGMENT

Kenneth Nixon a legally competent adult makes this affidavit pursuant to MCR 2.119(B)(1)(a)-(c).  Affiant will testify to all the facts stated below which are based on his personal knowledge, unless otherwise stated to be on information and belief.

### A. INTRODUCTION

1.  I am the defendant in this case.  I am serving life without parole for 2 convictions of first-degree murder.  I was also convicted and sentenced on 4 counts of attempted murder and 1 count arson.

2.  I was tried before Wayne County Circuit Judge Bruce Morrow along with my co-defendant LaToya Caulford.  We had a joint trial with separate juries.  Neither I nor Ms. Caulford testified.

**APPENDIX ITEM #7**

3. Ms. Caulford was acquitted on all charges.

4. The Michigan Court of Appeals affirmed my conviction.   The Michigan Supreme Court denied my application for appeal.  My case is now before this Honorable Court on my Motion For Relief From Judgment postappeal proceeding.

## B. MY ACTUAL INNOCENCE AND MY ALIBI DEFENSE WERE NOT PRESENTED TO THE JURY.

5. I have known LaToya Caulford since we were in elementary school.  At the time of my arrest on May 20, 2005, we had been together in an intimate relationship for 3-4 years.  We have a son, Keyone who was 13 months-old at the time of my arrest.

6. On the night of the fire at Naomi Vaughn's home May 19, 2005, I was with LaToya and our infant son at LaToya's residence on Havana Street, Detroit, Michigan. I arrived there after work about 10:00 PM.  I remained there and did not leave until Detroit Police Homicide Detectives arrested me the next morning about 5:00 – 6:00 AM May 20, 2005.

7. Several hours after my arrest the police gave me a polygraph test because I repeatedly told them I did not set the fire, I was not present at the fire and I did not know who set the fire.

8. The detectives who were questioning me drove me to a police station located in a school building near downtown.  I was placed in a room with a female polygraph examiner.  She asked me a number of questions about the fire.  I truthfully answered her questions.  She did not tell me if I had passed or failed the test.  She did say (paraphrased): "I'm beginning to see the truth."  She then left the room.

2

9.  I do not know for a fact and do not have personal knowledge, but I believe she then met with and talked to the detectives.

10.  When the examiner re-entered the testing room, she told me I failed the test because I had not truthfully answered each and every question.  I understood her to be telling me I had passed some of the questions and had not passed some of them.

11.  I was then escorted out of the room by the examiner who returned me to the detectives in an open hallway.

12.  I was behind the two detectives as we walked down the hallway toward the stairs.  The examiner walked along with me, to my side.  When I looked directly at her, she mouthed the words: "You passed."

13.  I told my trial lawyer the facts stated in paragraphs 7-12 above.  On several occasions before my trial I asked my lawyer if the prosecutor had given him a report, or any written materials regarding the polygraph test.  My lawyer told me the prosecutor told him there were no reports and seemed to indicate to my lawyer that the test itself had never taken place.

14.  I never saw any written reports or discovery materials regarding the police polygraph procedure.  On the morning my trial began, my lawyer told me he had received a report from the prosecutor that morning.  He neither gave me a copy of the report, nor showed me a copy of it.

15.  I asked my lawyer what were the test results.  He told me I had failed.  I asked him if he could (or if he planned to) call the police polygraph examiner as a

witness. He said he did not plan to/would not call her because (paraphrased): "Every examiner he knew would say I failed in order to keep their job."

16. My lawyer never discussed or advised me about taking a private test so that the police polygraph procedure/results could be challenged.

17. At no time before or during my trial did my lawyer ever discuss with me whether or not I would testify in my own defense. He never explained anything about that topic: i.e., my rights to testify or to remain silent; what it would mean to me, my case and the jury if I testified, or if I did not testify. He did not tell how I would be questioned in court by him, and then cross examined by the prosecutor; etc., etc., etc.

18. My appeal lawyer never discussed with me the topic of not testifying at trial.

19. My present lawyer was the first to discuss and explain everything about my rights to either testify or to not testify. He made sure I understood his explanation.

### C. MY PENDING MOTIONS FOR RELIEF FROM JUDGMENT, FOR FAVORABLE INITIAL JUDICIAL CONSIDERATION; FAVORABLE CONSIDERATION OF POLYGRAPH EVIDENCE; AND FOR AN EVIDENTIARY HEARING ON MY INEFFECTIVE ASSISTANCE OF COUNSEL AND NEWLY DISCOVERED EVIDENCE CLAIMS.

20. My present lawyer personally consulted with me at Saginaw Correctional Facility before I was transferred to Macomb Correctional Facility. He discussed and explained every aspect of my case followed by his advisements regarding strategies and tactics of this MCR 6.500 proceeding.

21. In addition to personal consultation, I have had several discussions, consultations and advisements by telephone with my lawyer and a member of his office staff.

22.  While my lawyer was investigating my actual innocence defense including witness interviews, he made a professional visit to Chippewa Correctional Facility where he interviewed a prisoner named Christopher Crump.  Mr. Crump gave my lawyer critical information based on Crump's personal knowledge that prosecution witness Stanley January had lied at my trial.  After completing his investigation, my lawyer then asked me if I was willing to take polygraph tests.  I indicated my full support of and agreement with that plan.

23. I was polygraphed at Macomb Correctional Facility, New Haven, Michigan on November 6, 2008.  I was given three separate tests:  two involved the firebombing incident; the other test involved my trial lawyer's failure to consult or advise me regarding my right to testify, and whether I would or would not testify during my trial.

24.  I was told by the polygraph examiner Mr. Ellerbrake, and my lawyer that I passed all three tests because I was truthful in all the facts of my case as I told those facts to my lawyer and Mr. Ellerbrake.  Mr. Ellerbrake's questions were based on the factual recitations I had previously given to my lawyer and to Mr. Ellerbrake the day he gave me the tests.  I was also given copies of the test results and reports.

25.  I also discussed with my lawyer and he advised me regarding polygraph testing for LaToya Caulford and my mother Tracy Nixon regarding certain specific facts of my case.

26.  I do not have personal knowledge of the questions asked.  I do have personal knowledge of the facts, conversations and events provided by LaToya and my mother that made up the factual bases of their tests.

27.  I have since learned from my lawyer and my mother that she and LaToya passed their polygraph tests.  I know that they passed because they have truthfully told my lawyer everything they know about my case.

28.  I want to testify before Judge Morrow regarding my innocence, my alibi defense and all the facts I have stated in this affidavit.  I want Judge Morrow to hear each and every detail of my case, most importantly that I did not commit this horrible crime.

_____
Kenneth Fitzgerald Nixon

Dated:  January ___9___, 2009

Subscribed and sworn to before me
this ___9___ day of January, 2009.

_____
Notary Public

___Macomb___ County, Michigan

My Commission Expires:  2/25/13

Document drafted by:  Sheldon Halpern P.C.

GHENT ELLERBRAKE & ASSOCIATES, LLC
POLYGRAPH ▦ INVESTIGATIVE SERVICES

75 East Henry
Saline, MI 48176
734-944-1600
fax 734-429-4050
ghenteller@aol.com

Sheldon Halpern
Attorney at Law
26339 Woodward Ave.
Huntington Woods, Mi 48070

November 6, 2008

**CONFIDENTIAL**

SUBJECT:   Kenneth Fitzgerald Nixon, Examinee, b/m, dob 3/29/86

At your request, Kenneth Nixon was examined at the Macomb Correctional Facility. This
examination was directed at evaluating his truthfulness regarding a fire bombing in the City Of
Detroit on May 19, 2005.

**RELEVANT QUESTIONS:**

The examinee was asked the following relevant questions, which he answered as indicated:

1. Do you know, for sure, who caused that fire at 19428 Charleston on May 19, 2005?  NO

2. Did you cause that fire at 19428 Charleston on May 19, 2005?  NO

3. Were you on Charleston St. at the time of the fire?  NO

4. Are you the one Brandon saw on Charleston St. immediately before the fire?  NO

**APPENDIX ITEM #8**

Page 2

## DIAGNOSTIC EVALUATION:

After careful analysis of the Examinee's polygrams based on the case facts available, it is the opinion of the undersigned that Kenneth Nixon is being truthful..

*William F. Ellerbrake*

William F. Ellerbrake
Polygraph Examiner
License #60010002(7

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

                                  Court of Appeals No. ~~256496~~

                                  266033

v

                                    Lower Court No. 04-1911

KENNETH FITZGERALD NIXON,

       Defendant-Appellant.

_____

State of Michigan    )
                     )ss
County of Wayne   )

## <u>LaTOYA CAULFORD</u>

I, LaTOYA CAULFORD, being first duly sworn, say that the following is true to the best of my knowledge and belief:

1.    I was originally charged as a co-defendant in the above-captioned case.

2.    I was not present during the firebombing which occurred on May 19, 2005 at 19428 Charleston, and I have personal knowledge that Defendant Kenneth Nixon was also not present at the location Charleston during the hours of 10:00 p.m. through 5:00 a.m. of the following morning, as he was with me in my bedroom at my house during that entire time.

3.    At 10:00 p.m., Mr. Nixon arrived at my house in my green Neon, and at approximately 10:15 p.m., we watched T.V. in my bedroom until approximately 11:45 p.m. when I fell asleep.

**APPENDIX ITEM #9**

4.     At approximately 12:00 a.m., I was awakened by my aunt who was knocking at the front door in the screen-in porch, who wanted to get her cigarettes from inside the house.

5.     When I awoke at that time, Mr. Nixon was still sleeping in my bed, along with our 1-year old child.

6.     After giving my aunt her cigarettes from inside the house, I returned to bed at approximately 12:15 a.m., and stayed there with Mr. Nixon until 5:00 a.m., when the police came and arrested Mr. Nixon.

7.     I did not give this information to Mr. Nixon's lawyer before trial because I was tried separately in this case and was represented by another attorney.

Deponent further sayeth not.

LaTOYA CAULFORD

Subscribed and sworn to before me
this _6TL_ day of May, 2006.

Notary Public

DELPHIA J. TINSON
NOTARY PUBLIC MACOMB CO., MI
MY COMMISSION EXPIRES 01/15/2007
ACTING IN WAYNE COUNTY, MI

2

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

**PEOPLE OF THE STATE OF MICHIGAN,**
                **Plaintiff,**

**Case No. 05-005711-01**
**HON. BRUCE U. MORROW**

**v**

**KENNETH FITZGERALD NIXON,**
                **Defendant.**
                                                                                /

| | |
|---|---|
| **KYM L. WORTHY (P38875)**<br>Wayne County Prosecutor<br>1441 Saint Antoine Street<br>Detroit, MI 48226<br>(313) 224-5777 | **SHELDON HALPERN (P14560)**<br>Attorney for Defendant<br>26339 Woodward Avenue<br>Huntington Woods, MI 48070<br>(248) 554-0400 |

                                                                                /

## AFFIDAVIT OF LATOYA CAULFORD IN SUPPORT OF KENNETH NIXON'S DECEMBER 8, 2008, MOTION FOR RELIEF FROM JUDGMENT

LaToya Caulford a legally competent adult makes this affidavit pursuant to MCR 2.119(B)(1)(a)-(c). Affiant will testify to all the facts stated below which are based on her personal knowledge.

1.  I have read and reviewed my July 6, 2006 Affidavit that was prepared by Attorney David R. Cripps for use in the appeal case of my Co-Defendant, Kenneth Nixon.

2.  All of my statements regarding the facts, circumstances, dates and times of Kenneth Nixon's whereabouts during the late night hours of May 19, 2005 (10:00 PM to 12:00 PM) and early morning hours (12:01 AM to approximately 6:00 AM) of May 20,

2005 were accurately and truthfully stated in my Affidavit dated and notarized July 6, 2006.

3. All of my statements regarding the facts, circumstances, dates and times of my whereabouts during the late night hours of May 19, 2005 (10:00 PM to 12:00 PM) and early morning hours (12:01 AM to approximately 6:00 AM) of May 20, 2005 were accurately and truthfully stated in my Affidavit dated and notarized July 6, 2006.

4. Accordingly, I hereby adopt and re-affirm the truthfulness of my July 6, 2006 Affidavit statements.

5. If called as a witness in any court proceeding, at any time, at any place, I will testify to the statement made in my July 6, 2006 Affidavit; as well as the above statements of re-affirmance.

LaToya Caulford

Dated: December 17, 2008

Subscribed and sworn to before me
This 17th day of December, 2008.

MELVENNA NICOLE FANT, Notary Public
Wayne County, Michigan
Acting in Oakland County, Michigan
My Commission Expires: 09/15/2013

MELVENNA NICOLE FANT
Notary Public, State of Michigan
County of Wayne
My Commission Expires Sep. 15, 2013
Acting in the County of _____

Document drafted by: Sheldon Halpern P.C. (P14560)



# GHENT ELLERBRAKE & ASSOCIATES, LLC
POLYGRAPH ▪▪ INVESTIGATIVE SERVICES

75 East Henry
Saline, MI 48176
734 944-1600
fax 734-429-4050
ghenteller@aol.com

Sheldon Halpern
Attorney at Law
26339 Woodward Ave
Huntington Woods, Mi 48070

December 18, 2008

## CONFIDENTIAL

SUBJECT:    LaToya Caulford, Examinee, b/f, dob 7/15/86

At your request, LaToya Caulford was examined in my office on December 18, 2008. This examination was directed at evaluating her truthfulness regarding an affidavit dated July 6, 2006

## RELEVANT QUESTIONS:

The examinee was asked the following relevant questions, which she answered as indicated:

1. Were you present at the fire bombing that occurred at 19428 Charleston, May 19/20, 2005? NO

2. Are you lying about Kenneth Nixon not leaving your house on Havana between 10pm May 19, 2005 and 5am May 20, 2005? NO

3. Did you tell any deliberate lies in your affidavit dated July 6, 2005? NO

**APPENDIX ITEM #10**

Page 2

## DIAGNOSTIC EVALUATION:

After careful analysis of the Examinee's polygrams based on the case facts available, it is the opinion of the undersigned that LaToya Caulford is being truthful..

William F. Ellerbrake
Polygraph Examiner
License #6001000267

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

**PEOPLE OF THE STATE OF MICHIGAN,**
**Plaintiff,**

**Case No. 05-005711-01**
**HON. BRUCE U. MORROW**

**v**

**KENNETH FITZGERALD NIXON,**
**Defendant.**

| | |
|---|---|
| **KYM L. WORTHY (P38875)** | **SHELDON HALPERN (P14560)** |
| Wayne County Prosecutor | Attorney for Defendant |
| 1441 Saint Antoine Street | 26339 Woodward Avenue |
| Detroit, MI 48226 | Huntington Woods, MI 48070 |
| (313) 224-5777 | (248) 554-0400 |

### TRACY NIXON'S AFFIDAVIT IN SUPPORT OF KENNETH NIXON'S DECEMBER 8, 2008, MOTION FOR RELIEF FROM JUDGMENT

## A. INTRODUCTION

1. I am Kenneth Nixon's mother.

2. The subject matter of this Affidavit is the May 19, 2005, fire at the home of Naomi Vaughn, 19428 Charleston, Detroit, Michigan, that happened very late in the evening of the 19th. Two of Ms. Vaughn's young children died in the fire. This Affidavit also details Ronrico Simmons' long-standing friendship with Kenneth and my entire family as that friendship relates to the fire.

3. Kenneth was arrested by Detroit Police Homicide Section Detectives in the early morning hours (approximately 6:00 AM) of the very next day, May 20, 2005.

**APPENDIX ITEM #11**

4. My son was charged with murder, arson and attempted murder. His girlfriend and mother of their infant son, LaToya Caulford, was also charged as Kenneth's co-defendant.

5. Kenneth and LaToya were tried together before separate juries. LaToya was acquitted of all charges. Kenneth was convicted and sentenced to life in prison.

6. The Detroit Police and Wayne County Prosecutor's theory of the case was that Kenneth firebombed the Vaughn home, where Ronrico Simmons lived, as retaliation against Ronrico over a personal matter involving Kenneth, Ronrico and LaToya.

7. In January 2005 Kenneth told me he suspected Ronrico and LaToya were carrying on a secret affair. I told Kenneth if that was in fact the situation, he should sever his relationships with both LaToya and Ronrico, and take care of and focus only on his relationship with his son.

8. Shortly thereafter, Kenneth learned that Ronrico and LaToya were in fact having an affair. Kenneth was devastated because of LaToya's infidelity and Rico's breach of friendship and trust. As a result, Kenneth and Ronrico became bitter enemies. Each threatened physical harm to the other.

9. On a very regular basis (every 2 or 3 days) I would hear from family, friends and neighborhood acquaintances about the latest episode in Kenneth and Ronrico's "beef".

## B. KENNETH NIXON AND RONRICO SIMMONS BIOGRAPHICAL HISTORY

10. Ronrico Simmons came into our family's life many years ago when he was 13 years old. He is 6 years older than Kenneth who was 7 at that time. His relationship with

Kenneth developed over the years into a close friendship with Ronrico much like a big brother to Kenneth.

11. Ronrico became fully involved with my family on a day-to-day basis to such a degree of closeness that Ronrico would call me "Mom". We called him Rico.

12. As a mother to Kenneth and surrogate mother to Rico, I was deeply saddened, hurt and concerned over Kenneth and Rico's estrangement. I made it my business to do all I could to make (force) the boys to reconcile.

13. In either March or April of 2005, six to eight weeks before the fire, I put my foot down with Kenneth. I insisted he "reach out" to Rico and end their feud before something bad happened.

14. One day during that time period Kenneth was at my home. In my presence he called Rico on the telephone. I only heard Kenneth's side of the conversation. I heard him say to Rico (paraphrased): "We are going to stop this beefing right now. You stay away from me, I'll stay away from you. I've got my girl and my son. You stay away from me, I'll stay away from you."

15. After that day, I did not hear any more reports of the prior day-to-day melodrama between Kenneth and Rico.

## C. MY INTERACTIONS AND CONVERSATIONS WITH KENNETH'S TRIAL LAWYER

16. After Kenneth's arrest I had many conversations and contacts with his lawyer, Attorney Robert F. Kinney. I passed on a great deal of information I was receiving and gathering about the fire and the surrounding circumstances. I routinely passed this information to Mr. Kinney.

17.  When I learned that the police and prosecutor were using Kenneth and Rico's "beef" regarding LaToya as the "motive" for Kenneth to have set the fire, I told Mr. Kinney all of the above facts regarding the history of Kenneth and Rico's friendship; especially the facts of their estrangement because of Rico's affair with LaToya; and their (Kenneth and Rico) reconciliation several weeks before the fire.  I indicated I want to testify to inform the jury of the true status of their friendship.  I wanted the jury to be told that the prosecutor's theory of Kenneth's motive was all wrong.

18.  Mr. Kinney told me my information was hearsay; and even if I did testify, I would not be believed because I was Kenneth's mother.

19.  I will testify anytime, any place to the above stated facts.

_____
Tracy Nixon

Dated:  December 17, 2008

Subscribed and sworn to before me
This 17th day of December, 2008.

_____
MELVENNA NICOLE FANT, Notary Public
Wayne County, Michigan
Acting in Oakland County, Michigan
My Commission Expires:  09/15/2013

> MELVENNA NICOLE FANT
> Notary Public, State of Michigan
> County of Wayne
> My Commission Expires Sep. 15, 2013
> Acting in the County of _Oakland_

Document drafted by:  Sheldon Halpern P.C.



# GHENT ELLERBRAKE & ASSOCIATES, LLC
### POLYGRAPH & INVESTIGATIVE SERVICES

75 East Henry
Saline, MI 48176
734-944-1600
fax 734-429-4050
ghenteller@aol.com

Sheldon Halpern
Attorney at Law
26339 Woodward Ave
Huntington Woods, M  48070

December 18, 2008

**CONFIDENTIAL**

SUBJECT:     Tracy Nixon, Examinee, b/f, dob 4/22/66

At your request, Tracy Nixon was examined in my office on December 18, 2008.  This examination was directed at evaluating her truthfulness regarding an affidavit dated December 17, 2008.

**RELEVANT QUESTIONS:**

The examinee was asked the following relevant questions, which she answered us indicated:

1. Did you tell any deliberate lies in your affidavit dated December 17, 2008?  NO

2. Are all the facts in your affidavit dated December 17, 2008 true? YES

Page 2


## DIAGNOSTIC EVALUATION:

After careful analysis of the Examinee's polygrams based on the case facts available, it is the opinion of the undersgned that Tracy Nixon is being truthful..


*William F. Ellerbrake*

William F. Ellerbrake
Polygraph Examiner
License #6001000267

## AFFIDAVIT OF CHRIS CRUMP

This affidavit is affirmed by Affiant Chris Crump, and Affiant is conveying a true statement to the Best of my Knowledge, Information and Belief and this affidavit is made of my own free will and accord, further in the interest of justice and on behalf of an innocent man.

1). Affiant Chris Crump was incarcerated on May 9th, 2005, affiant's case docket numbers #'s are 36th District Court No: 04-56615-C.C. 05-5305, 05-59782-C.C. 05-5221; Circuit Court Case Number: 05-055858.01. Some of affiant's court dates include 5-17-05; 5-24-05; 6-1-05 and 9-14-05.

2). Affiant further states that on several occasions affiant happened to be in the same holding cell awaiting to be transferred to Court with a man that affiant came to know as Stanley January.

3). On Affiant's first encounter with Stanley January approached me and stated that Affiant looked familiar and Stanley January then asked Affiant where affiant lived? Affiant replied that he was from the westside of Detroit and asked where Stanley January where he lived. He replied he lived on the eastside of Detroit. From that point affiant and January continued to talk about places that we frequented and through these conversations we both came to the conclusion that we frequented the "Motor City Casino" and January stated that is where he had saw affiant before.

4). Affiant and January continued to talk about why each other is locked up and he told affiant that he was locked up for Bank Robbery or Armed Robbery and that he had to get out of jail. He stated that his daughter was graduating from High School and going to college and that his ex-wife and daughter would be disappointed and furious at him if he missed this hallmark occasion. That is what January confided to affiant at that first time meeting.

5). The next time that affiant saw Stanley January down in the holding cells, he greeted affiant affectionately as "nephew", gave affiant a handshake and pulled affiant to the side and stated: "Let me holler at you." Again Affiant and January began to talk and catch up when January all of sudden stated that he thought he found a way to get out from under his case. January told affiant that a guy that was housed in the same unit with him had went to recreation, and while he was out of his cell he went through his discovery package and read his police incident report and found out the details of why the guy was accused of a murder. He said that he (Stanley January) was going to make up a lie that involved the circumstances of what he was charged with to try and make a deal with the prosecutor to get his case dropped or try and get the minimum amount of time for his in exchange for testifying against this guy. January then asked what affiant thought of his plan, is it good and did affiant think it would work? January then asked affiant not to ever say anything about what he had told affiant.

6). Affiant thought to himself, this is wrong, but affiant kept his thoughts to himself because he was not looking for any conflict, and keep his confidence!

7). Affiant knows and expresses in the African-American Community it is socially unacceptable to testify or become an informant against someone for the State's Prosecution of another person's freedom.

8). Affiant may or may not have seen Stanley January once or twice more after the

**APPENDIX ITEM # 13**

previous two encounters.

9). Affiant's next time he seen Stanley January was in Jackson Prison Quarantine. As as matter of fact, affiant and January both were housed in 7 Block in Jackson Prison on the Westside of the building on the first gallery, affiant locked in 7-1-083, just a few cells or more from Janaury, so when we were released for breakfast, lunch and dinner chow, we often walked to the chow hall together and when they broke our cell doors for the hour yard session, we often went to yard together.

10). When affiant got the first opportunity to ask Stanley January about the amount of time he was sentenced to do, he started smiling and again pulled affiant to the side in confidence and told affiant that his plea had worked and how the prosecutor was stupid enough to let him hood wink them.

11). Stanley January told affiant he received 1 year for his crime in exchange for his fabricated testimony against Nixon. That was the first time that January said the name of the person that he testified against.

12). A couple weeks after January confessed about the fabricated testimony and the deal he made, affiant noticed that January was anxious and really nervous about something and so affiant asked Stanley January on the yard, why he was so stressed out and January stated: "I got to leave quarantine before the guy Kenneth Nixon got here."

13). One day before Stanley January was about to transfer out, Affiant asked Janaury for his inmate number so that he could keep in touch. January replied: "You don't need my inmate number because I am going to be free within 6 months to 7 months and here is contact information." He gave affiant a home address that he said was his daughter's house at 4642 St. Antoine in Detroit and a telephone number: #313-833-7334 and told affiant to contact him there at these contact numbers and address. Stanley said this in a gloating manner!

14). Affiant further states that some months later affiant was transferred to Macomb Correctional Facility and was contacted by my brother's girldfriend, who asked did affiant know a Kenneth Nixon since affiant's incarceration? Affiant told her no, but asked why did she want to know? She then told affiant that he was her hairstylist son and affiant told her that he was sending her some information concerning her son case. Affaiant never heard from Nixon's Mother.

15). This Monday, August 24th, 2008, an attorney by the name of Stanley Halperin contacted me to find out what exactly did I know.

Affiant declares that the foregoing is true to the best of my knowledge, information and belief and affiant is willing to testify to the same in a Court of Law and of his own free will and accord. Further Affiant sayeth not!

Respectfully,

/S/ _____          Date: August ___, 2008
    Mr. Chris Crump

cc:file
hjb/CC
Attorney Halperin
Ms. Nixon