| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## *EX PARTE* MOTION FOR LEAVE TO FILE REPLY TO THE CITY OF DETROIT'S RESPONSE TO MOTION FOR RECONSIDERATION

The Police and Fire Retirement System of the City of Detroit ("PFRS"), by its undersigned counsel, Clark Hill PLC, files this *ex parte* motion for leave to file a Reply to the City of Detroit's Response [Dkt. No. 13715] to its *Motion to Amend or alter pursuant to Federal Rule of Bankruptcy Procedure 9023, and pursuant to Local Rule 9024-1 for Reconsideration of, the Court's Order Granting the City of Detroit's Motion to Enforce Plan of Adjustment Against the Police and Fire Retirement System Pension Plan (Docket #13602)* [Dkt. No. 13707].

1.      On June 26, 2023, the Court issued a 37-page *Opinion Regarding the city of Detroit's Motion to Enforce Plan of Adjustment Against the Police and Fire Retirement System Pension Plan (Docket # 13602).* [Dkt. No. 13704]

2.      On July 10, 2023, the PFRS filed its *Motion to Amend or alter pursuant to Federal Rule of Bankruptcy Procedure 9023, and pursuant to Local Rule 9024-1 for Reconsideration of, the Court's Order Granting the City of Detroit's Motion to*

1

ClarkHill\14893\165083\272977501.v1-8/24/23
13-53846-tjt    Doc 13723    Filed 08/24/23    Entered 08/24/23 22:23:08    Page 1 of 34

*Enforce Plan of Adjustment Against the Police and Fire Retirement System Pension Plan (Docket #13602)*. [Dkt. No. 13707]

3. On July 13, 2023, the Court ordered the City to file a response brief. [Dkt. No. 13709]

4. On August 10, 2023, the City filed its response brief. [Dkt. No. 13715]

5. Among the issues raised in the PFRS's Motion for Reconsideration, it asks the Court to reconsider or amend its holding that PFRS cannot change the 6.75% interest rate for the next 30 years.

6. In the City's Response, it admits that it "has always understood that the 6.75% discount rate could be changed after June 30, 2023." [Dkt. No. 13715, pg. 6]

7. As such, the City concedes that at least part of the Court's ruling was in error. However, the City offers no explanation as to why the error should not be corrected, or how reconsideration of the reasoning behind the erroneous holding and correction of the resulting error would not alter the Court's other rulings. The PFRS respectfully submit that the issues merit more attention than the City suggests and in light of the City's admission, requests the opportunity to file a Reply to the City of Detroit's Response.

8. In addition, the City recently made a public statement regarding certain changes to the pension benefits that will be made after the ten-year injunction in the Plan of Adjustment expires. These statements are directly relevant to arguments

raised in the Motion for Reconsideration but were not available to the PFRS when it filed its original Motion for Reconsideration. Accordingly, the PFRS seeks to apprise the Court of this new evidence.

9.      The PFRS has prepared a reply (Exhibit 7) consisting of 22 pages. Although the length exceeds the typical page limit requirements, given the complexity and importance of the issues, the PFRS requests the length of the response brief be extended to this length pages.[1]

10.     The PFRS sought concurrence from the City on August 24, 2023, and the City had not responded as of the filing of this Motion.

WHEREFORE, the PFRS respectfully requests that the Court enter an order, substantially in the form attached as **Exhibit 7,** granting the PFRS leave to file a reply in support of its Motion for Reconsideration.

Respectfully submitted,

Date:  August 24, 2023

By: */s/ Jennifer K. Green*
Jennifer K. Green
Ronald A. King
Clark Hill PLC
151 S. Old Woodward, Ste 200
Birmingham, MI 48009
(248) 988-2315
jgreen@clarkhill.com
rking@clarkhill.com
*Attorney for Creditor – PFRS*

---

[1] The PFRS is submitting its proposed reply brief without exhibits for purposes of seeking leave but will add the Exhibit A cited in the reply if leave is granted.

3

## SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with E.D. Mich. LBR 9014-1(c).

Exhibit 1:    Proposed Form of Order

Exhibit 2:    None [Motion Seeks Ex Parte Relief]

Exhibit 3:    None [Brief Not Required]

Exhibit 4:    Certificate of Service

Exhibit 5:    None

Exhibit 6:    None

Exhibit 7:    Reply in Support of Motion to Amend or alter pursuant to Federal Rule of Bankruptcy Procedure 9023, and pursuant to Local Rule 9024-1 for Reconsideration of, the Court's Order Granting the City of Detroit's Motion to Enforce Plan of Adjustment Against the Police and Fire Retirement System Pension Plan (Docket #13602)

# EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| In re: | Bankruptcy Case No. 13-53846 |
|---|---|
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## PROPOSERD ORDER GRANTING *EX PARTE* MOTION FOR LEAVE TO FILE REPLY TO THE CITY OF DETROIT'S RESPONSE TO MOTION FOR RECONSIDERATION

This matter coming before the Court on the *ex parte* motion of the City of Detroit Police and Fire Retirement System ("PFRS") for entry of an order granting leave to file a reply in support of its *Motion to Amend or alter pursuant to Federal Rule of Bankruptcy Procedure 9023, and pursuant to Local Rule 9024-1 for Reconsideration of, the Court's Order Granting the City of Detroit's Motion to Enforce Plan of Adjustment Against the Police and Fire Retirement System Pension Plan (Docket #13602)*, and the Court finding good cause for the entry of this Order; and the Court being fully advised in the premises;

**THE COURT ORDERS THAT** the motion for leave is granted and PFRS may file a reply in excess of page limits in support of its *Motion to Amend or alter pursuant to Federal Rule of Bankruptcy Procedure 9023, and pursuant to Local Rule 9024-1 for Reconsideration of, the Court's Order Granting the City of Detroit's*

*Motion to Enforce Plan of Adjustment Against the Police and Fire Retirement*

*System Pension Plan (Docket #13602).*

# EXHIBIT 2 – NONE

# EXHIBIT 3 – NONE

## EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>City of Detroit, Michigan,<br><br>Debtor. | Bankruptcy Case No. 13-<br>53846 Judge Thomas J. Tucker<br>Chapter 9 |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 24, 2023, she served a copy of the foregoing *Ex Parte Motion for Leave to File Reply* with the Clerk of the Court via the Court's ECF electronic filing system which will provide notice of the filing to all registered participants in this matter.

Respectfully submitted,

Date:  August 24, 2023

By: */s/ Jennifer K. Green*
    Jennifer K. Green
    Clark Hill PLC
    151 S. Old Woodward, Ste 200
    Birmingham, MI 48009
    (248) 988-2315
    jgreen@clarkhill.com
    *Attorney for Creditor – PFRS*

# EXHIBIT 5 – NONE

# EXHIBIT 6 – NONE

**EXHIBIT 7 – [PROPOSED] REPLY IN SUPPORT OF MOTION TO AMEND OR ALTER PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9023, AND PURSUANT TO LOCAL RULE 9024-1 FOR RECONSIDERATION OF, THE COURT'S ORDER GRANTING THE CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AGAINST THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN (DOCKET #13602)**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**EXHIBIT 7 – [PROPOSED] REPLY IN SUPPORT OF MOTION TO AMEND OR ALTER PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9023, AND PURSUANT TO LOCAL RULE 9024-1 FOR RECONSIDERATION OF, THE COURT'S ORDER GRANTING THE CITY OF DETROIT'S MOTION TO ENFORCE PLAN OF ADJUSTMENT AGAINST THE POLICE AND FIRE RETIREMENT SYSTEM PENSION PLAN (DOCKET #13602)**

## I.      INTRODUCTION

By admitting that the inclusion of the 6.75% interest rate over thirty years in the Confirmation Opinion was an error and *not* what the actual Plan calls for, the City has confirmed this Motion is meritorious and the Amortization Opinion requires reconsideration. It proves the point that these issues were inartfully referenced in the Confirmation Opinion, which is understandable given that it was a complex multi-week trial, with dozens of witnesses and 2,300 exhibits. But the City's attempt to divide the salient sentence in half and claim that one of the actuarial assumptions can be changed (the interest rate) whereas the other cannot (amortization) is nonsensical. This newly admitted "error" alone is grounds to warrant reconsideration.

Additional grounds also exist because the Court ignored controlling Michigan case law—the very law that the parties themselves agreed would govern the Plan of

1

Adjustment and its attendant documents—which has already interpreted the same pension plan language that the parties reincorporated into the new pension plan documents for post-2023 governance purposes. It also erred by ignoring Article G of the Plan of Adjustment which states that actuarial terms (and other terms) can be changed after the ten years—a provision which, as will be set forth below, the City has recently admitted in the media allows changes to be made, even to items that were explicitly *forbidden* under the Plan. This admission also supports the PFRS's Motion, as newly-acquired evidence is a proper basis for such a request.

Most importantly, though, the Confirmation Opinion itself, which now both approves of the ten-year injunction as part of the Plan and simultaneously *dis*approves of that provision by ostensibly carving actuarial assumptions out of that clause altogether, has been rendered hopelessly inconsistent—even the City was forced to admit as much, as the 6.75% interest rate does not extend for thirty years and this was an error by the Court. But this "error" goes further than that. There is no rhyme or reason why certain actuarial assumptions could be changed but not others if—as the City claims—the "controlling" document in all of this is a set of Financial Projections that seemingly mandated a 6.75% interest rate over thirty years. The City itself was forced to admit in its Response that the Financial Projections it has hung its hat on this entire time are themselves *wrong,* as the 6.75% does *not* continue for 30 years as the City modeled in its Financial Projections.

Instead, the 6.75% over 30 years was merely an *assumption* the City plugged in for the time being in order to run calculations, but it was never intended to be binding for 30 years as "the Plan." The City's admission that the interest rate could be changed proves precisely what the PFRS has been arguing all along: the interest rate and amortization period used in the Financial Projections were only "assumptions"—mere placeholders—that would be updated in 2023 when the ten-year Plan injunction expired. Now, based on the City's admission that the 6.75% over thirty years was an error, the need for reconsideration is irrefutable, as both the Confirmation Opinion *and* the underlying Financial Projections that were the crux of the City's case are *both mistaken.* The Financial Projections used two crucial and inter-related actuarial assumptions over a thirty-year period but as even the City must now admit, at least one of those assumptions was not written in stone.

When one views the Financial Projections for what they really are as it relates to the PFRS—mere "funding targets" as the Court called them in the Confirmation Opinion—the City's entire case falls apart. The Financial Projections are admittedly erroneous. A document that is admittedly wrong should not be morphed into a binding document with the weight of the "Plan." The City's Response does not even attempt to (i) make a substantive argument to address the internal conflict issue, (ii) distinguish the controlling Michigan case law, or (iii) refute the argument that Article G in the Plan of Adjustment permits changes after ten years to actuarial

assumptions and the amount of the City's annual contributions—and in fact, the City has now publicly stated in a newspaper interview that the Plan *does* permit such changes after 2023 (and notably, the Court also never reconciled this provision with its amortization ruling). If the Court corrects any one of these errors, or considers either of the two new binding admissions by the City, the Motion should be granted, as a motion for reconsideration is properly brought if it calls "attention to an argument or controlling authority that was overlooked or disregarded in the original ruling, presents evidence or argument that could not previously have been submitted, or successfully points out a manifest error of fact or law." *Davie v. Mitchell,* 291 F. Supp. 2d 573, 634 (N.D. Ohio 2003), aff'd, 547 F.3d 297 (6th Cir. 2008).

## A. The City Has Yet to Craft Any Substantive Argument to Address the 10-Year Injunction in Article G of the Plan of Adjustment

Despite the PFRS raising Article G of the Plan—which clearly permits changes after ten years—in its prior briefing, as well as at oral argument and in its Motion for Reconsideration,[1] the City has still never once set forth a detailed

---

[1] These issues were not waived. (Dkt. No. 13681, pg. 10 of 33; Hrg. Tr. 3/15/2023 at pg. 56). Article G from the PFRS Claim Treatment Section of the Plan of Adjustment provides that no changes could be made for ten years, but after that, actuarial assumptions impacting the amount of the City's "contribution," including the "investment return assumption" could be changed:

> **G. No Changes in Terms for Ten Years.** … the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and **against the subsequent amendment of the terms, conditions and rules of operation of the PFRS**, … **or against any action that governs the** *selection of the investment return assumption* **described in Section II.B.3.q.ii.B**, *the contribution to the PFRS* or the calculation or amount of PFRS pension benefits *for the period ending June 30, 2023*… [.]

4

substantive explanation as how that provision is not dispositive to the issue at hand. The Court also did not address this provision, which is dispositive and outcome determinative. If this error is corrected, the PFRS would prevail. On this ground alone, this Motion should be granted.

## B.    The City Admits Half of the Sentence It Claims Is Controlling Is Wrong

The Amortization Opinion adopts the following sentence as the "Plan"—half of which the City now readily concedes is erroneous: "The City will then amortize the remaining UAAL for both plans over the next thirty years at an interest rate of 6.75%." The City's position is now—for the first time—that the first half of the sentence that relates to amortization is gospel, but the second half of the sentence that relates to the interest rate is rank error. The City cannot have it both ways.

The City half-heartedly attempts to claim that the Confirmation Opinion's reference to the 6.75% discount rate "may have been an error." (Response, pg. 5). To say it "may have been an error" is nonsensical, as the City in the next breathe also claims it "has always understood that the 6.75% interest rate could be changed after June 30, 2023[.]"[2] (Response, pg. 3). The City later reiterated that it "does not disagree" that the interest rate can be changed after June 30, 2023. *Id.* at pg. 9. Thus, the inescapable conclusion is that it ***was*** an error, not ***may*** have been an error.

---

Plan, Art. II.B.3.q.ii.G.

[2]      It is inaccurate for the City to claim it has "always" acknowledged that the 6.75% could be changed after ten years, seeing as the PFRS outright asked the City's counsel at the hearing and the City refused to answer the question, instead stating that it was irrelevant and not at issue.

5

Given that this acknowledged "error" in the Confirmation Opinion has now been repeated and carried through to the Amortization Opinion, the issue of who determines these actuarial assumptions deserves reconsideration. There are now at least three different reads of the Confirmation and the Amortization Opinions:

(i)     the UAAL has to be paid back over a 30-year period, but the assumed rate of return for that 30-year period can be changed by the PFRS after June 30, 2023 (based upon Footnote 23 of the Conf. Op. and the City's new concession that the alleged 6.75% "finding of fact" by the Court was an error);

(ii)    the UAAL has to be paid back over a 30-year period and with an assumed rate of 6.75% for that entire 30 years (based upon pg. 231 of the Conf. Op. and the Amortization Opinion); or

(iii)   the actuarial assumptions used to calculate the City's "contribution" amount can be decided by the PFRS after June 30, 2023—both the interest rate and the amortization period (based upon pg. 180 of the Conf. Op., Article G of the Plan, the State Contribution Agreement, and Articles G-5, G-9 and G-17 of the amended Pension Plan).

Only the third interpretation is viable now that the City has admitted that the interest rate can be changed; thus, the Court should revisit its ruling.

Moreover, the City misunderstands the PFRS's "internal conflict" argument—it is not enough for the City to merely concede that the 6.75% does not continue for 30 years to resolve the internal conflict in the Confirmation Opinion. The point of raising what the City now agrees was an obvious error in the Confirmation Opinion was to demonstrate: (i) the Court was simply *not* referencing the "Plan" in the first place nor did it intend for that portion of its Opinion to have the force and effect of "the Plan," and (ii) by deeming this erroneous sentence as part

6

of "the Plan," it leads to even more inconsistencies supporting three different possible interpretations of the PFRS's post-2023 governance authority.

Perhaps most importantly, it also undermines the very Financial Projections that the City claims to be controlling. The Financial Projections spread the UAAL repayment over thirty years, and they applied a 6.75% interest rate over that entire thirty-year time period. As the City now admits, that 6.75% was just a placeholder until such time as the interest rate was changed post-2023. ***This renders the entire premise of the City's argument in this case—that the Financial Projections terms were set in stone, could not be changed, and served as the future "Plan"—utterly baseless.*** As the PFRS has repeatedly said, and the City now seemingly agrees, the City had to select *some* actuarial assumptions in order to lay out a hypothetical repayment plan, but everyone understood those assumptions were not set in stone post-2023. This is the one (and only) interpretation that actually reconciles why the Confirmation Opinion seemingly says one thing on page 180 but says something different on page 231, and this conflict should be resolved in a revised ruling.

## C. The Confirmation Opinion Does Not Require a 30-Year Amortization

Contrary to the City's Response, the "conflict" issue goes beyond just the 6.75% interest issue. (Dkt. No. 13715, pg. 3). The conflict is that the Court approved—in one part of the Confirmation Opinion—an express term of the Plan that gave the PFRS the right to make certain changes after ten years, but later—in a

7

different part of the Confirmation Opinion—seemingly takes away that right. Moreover, the Court calls the Financial Projections mere "funding targets" in one part of the Confirmation Opinion but later they somehow get transformed into binding Plan terms, under the Amortization Opinion. Yet the City repeatedly claims "the Confirmation Opinion expressly *requires* 30-year amortization," which is simply not true. (Response, pg. 6; see also pg. 7-8) (noting Confirmation Opinion's "requirement of 30-year amortization" and claiming "Exhibit 793 fully supports this Court's conclusion that the Confirmation Opinion and POA *require* 30-year amortization") (emphasis added). In the Confirmation Opinion, the Court was careful to distinguish which creditor payments were "required" and definite under the Plan versus which ones were mere "projections"—and the 30-year amortization period was never characterized as "required." As set forth in the PFRS's previous papers, after the ten-year injunction against changes expired, actuarial terms could be changed but there was no crystal ball to know what those terms would actually be a decade later, so the City had no choice but to "project" what *might* reasonably happen. When delving into the Financial Projections decade by decade, the Court was careful to make this distinction between "required" payments versus "projected" payments and "targets":

> For the time period **FY2034–FY2043, the City will be *required* to spend $450.6 million servicing the New B Notes.** Ex. 793 at 5. **The City *projects* that it will also be required to contribute $938.5 to the GRS and PFRS UAAL, for a total of $1.3892 billion.** *Id.*

8

***

Finally, for the time period **FY2044–FY2053, the City will be _required_ to spend only $68.9 million to fully satisfy the B Notes.** *Id.* **The City also *projects* that it will be required to contribute $628.9 million to complete payment on the pension underfunding, for a total of $697.8 million in plan obligations.** *Id.*

*In re City of Detroit*, 524 B.R. at 230 (emphasis added). This is in line with the

Court's characterization of the future funding "targets" as the Court called them in

its Confirmation Opinion—*i.e.*, the City was "targeting" full repayment in 30 years.

Again, this was a mere "target"—not a "requirement." As the Court explained:

### c. Governance and Oversight

As described previously, the parties have agreed to establish investment committees for the PFRS and the GRS as required by the State Contribution Agreement… The parties have further agreed that until June 30, 2023, the boards of trustees of each system will adopt and maintain an investment return assumption and discount rate of 6.75% for purposes of determining the assets and liabilities of the pension systems.

The plan also includes a provision that all parties are enjoined until June 30, 2023 from making any amendment to the terms, conditions and rules of operation of the GRS and the PFRS relating to the calculation of pension benefits, the selection of investment return assumptions, or the contributions to the pension systems.

***The City has also set certain _targets_ at which the UAAL for the GRS and the PFRS must be funded***. For 2023, ***the _funding targets_*** are 70% for the GRS and 78% for the PFRS. For ***2053, in 40 years, the _targets_ are 100% for each***. Ex. 723.

*In re City of Detroit,* 524 B.R. at 180 (emphasis added). The cited exhibit (Ex. 723)

was a version of the 40-year Financial Projections. But when referencing these

projections, the Court characterized the 30-year repayment period as mere "targets."

9

It was not a "requirement" of the Plan. The Court did not deem these as "imperatives" in order to approve the Plan. In fact, quite the opposite—the Court was careful to distinguish between the express Plan terms, as approved on page 180 of the Confirmation Opinion, versus a recitation of the Financial Projections, which were mere "targets."

## D. Footnote 23 Relies On Projections the City Now Admits Were Erroneous

The only other mention of a 30-year amortization is in footnote 23, which does not reference the 6.75% interest rate. However, now that the Financial Projections are admittedly erroneous as it relates to repayment of the UAAL, the second sentence that the City relies upon also ceases to have any import because these terms are admittedly mere "assumptions" subject to change in 2023. Footnote 23 states:

> As discussed in part III.F. above, the City obligations to the GRS and the PFRS are fixed under the plan from FY2014-FY2023. During this time, as the City works to stabilize its finances and implement its RRIs, the majority of the City's contributions to the GRS and the PFRS will come from the DWSD, the State Contribution Agreement, and the Grand Bargain Funding. See Ex. 793 at 3. However, after 2023, the City projects the retirement systems will remain somewhat underfunded. *See* 12000 at 133. The balance of the underfunding will be amortized over a thirty year period of time. *Id.*

Exhibit 12000 cited here is the Kopacz Report, not "the Plan." The Kopacz Report merely quoted the Financial Projections, **which even the City has now admitted were utilizing certain actuarial assumptions that could be changed in the future.** Kopacz did not independently opine that feasibility hinged on a 30-year amortization

period (in fact, quite the opposite—she actually reiterated her concern, as pointed out the PFRS's earlier filings, that a 30-year amortization was too lengthy).[3] Instead, Kopacz merely recited the City's Financial Projection—blindly, without confirming it against actual Plan terms—but either way, Kopacz did not say this amortization period was "required" for the Plan to be feasible. All she stated in her Report was that the City "proposes" to pay it back over thirty years. *Id.* "Proposing" to pay something back over thirty years is a far cry from *requiring* a 30-year amortization. Yet, this sentence in Footnote 23 has somehow transformed into "the City *must* pay over 30 years" based on faulty Financial Projections that the City now admits it fully understands were subject to change in material respects come 2023. Thus, this sentence does not aid the City.

E.    **The Internal Conflict Argument Was Not Waived**

The City claims this "internal conflict" argument was waived, but during the hearing on this matter, the PFRS argued that the sentence ten-year injunction that permits plan changes was "directly in conflict with page 231," which states that the actuarial assumptions "are locked in for 30 years, both the interest rate and contribution rate." (Hrg. Tr., pg. 39). Regardless, the more nuanced internal conflict issue could not have been waived, as it was not fully ripe until this Court elevated

---

[3] Ex. F. to PFRS Response, Kopacz Supp. Report, Dkt. No. 1364-7, pg. 127 (criticizing the "29-(PFRS) and 30-(GRS) year amortization periods for funding the unfunded pension obligations").

the sentence on page 231 of the Confirmation Opinion over conflicting statements by the Court on page 180 (in which the Court approved the term permitting the parties to change actuarial assumptions after ten years—not thirty—and in which the Court called the repayment plan set forth in the Financial Projections mere "funding targets"—not a requirement under the Plan).

Moreover, the internal conflict problem arose in part based upon the manner in which the Court analyzed this issue in the Amortization Opinion. As set forth above, the hypothetical repayment plan set forth in the Financial Projections—as described by the Court itself when laying out the terms of the Plan on page 180— were mere "targets." Yet in the Amortization Opinion, the Court focused on the fact that there were targets laid out over 30 years rather than focusing on the fact that the Court was merely calling them "funding targets" instead of "required amortization periods." In the Amortization Opinion, the Court stated:

> Elsewhere in the Confirmation Opinion, the Court described what it called the "final component of the Grand Bargain," namely, the "global settlement of pension-related issues, including the treatment of the claims relating to the UAAL of the GRS and the PFRS."[43] In that description, the Court described how the UAAL was to be gradually paid down to zero (*i.e.*, reach 100% funding), *over the 30-year period of 2023 to 2053*:
>
> > The City has also set certain targets at which the UAAL for the GRS and the PFRS must be funded. For 2023, the funding targets are 70% for the GRS and 78% for the PFRS. **For 2053, in 40 years, the targets are 100% for each.** Ex. 723.[44]

(Amortization Opinion, pg. 16) (footnote 43 and 44 are references to pg. 179 and 180, respectively, of the Conf. Op.). The Court's quotation of this paragraph, only—in a vacuum—while ignoring the directly preceding paragraph in the Confirmation, highlights the internal inconsistency in the Confirmation Opinion. The paragraph directly preceding the one quoted above acknowledged and approved the injunction against changes to repayment terms for the City's contributions for the first ten years, after which changes could be implemented post-2023:

> The plan also includes a provision that all parties are enjoined until June 30, 2023 from making any amendment to the terms, conditions and rules or operation of the GRS and the PFRS relating to the calculation of pension benefits, the selection of investment return assumptions, or the contributions to the pension systems.

*Id.* at 180. When the two paragraphs are together, the internal conflict is even more obvious, because if the "funding targets" were actually supposed to be pre-ordained and *required* 30-year amortization periods as the City urges, then these two paragraphs are in direct conflict.

When read in conjunction with the paragraph outlining Article G's ten-year pause from making any changes, the paragraph cited by the Court in the Amortization Opinion—which merely cites to the Financial Projections regarding the City's "hope" and "intent" to have the PFRS fully funded by a "target" date of 2053 makes sense. In the paragraph directly above, the Court was citing the "Plan" terms and in the next paragraph (the one cited by this Court in its Amortization

13

Opinion), the Court was merely reiterating the City's "funding targets" based upon its Financial Projections. The original Confirmation Opinion was careful to note the distinction between the two—the first paragraph on page 180 was a recitation of the actual "Plan" and the next paragraph on page 180 was a recitation of a "funding target" from a Financial Projection. There was no indication in this portion of the Confirmation Opinion that the Court intended for these "funding targets" or Financial Projections to overtake the express terms of the Plan itself.

## F.     The Disclosure Statement Is Also Internally Inconsistent

The City claims the Disclosure Statement incorporating the Financial Projections, which were in a constant state of flux and expressly cautioned as "subject to change"—should somehow be relied upon as "crystal clear" evidence (Response, pg. 4) that the UAAL would be amortized over 30 years. This is rich, seeing as that exact same Disclosure Statement openly criticized the use of a 29- and 30-year amortization periods and deemed them an "unrealistic assumption" previously used by Retirement Systems that led to "misleading" UAAL figures because the lengthy amortization periods of 29- and 30-years were inappropriate actuarial assumptions that "served to understate substantially the Retirement Systems' UAAL" and "allow[ed] unfunded liabilities to continue to grow rapidly as a result of compounding." (Fourth Am. Disc. Stmt., Dkt. No. 4391, Page 120 of 197). The City can hardly claim with a straight face that this Disclosure Statement

made it "crystal clear" that the City intended to use an amortization period that the City *itself* deemed in that same exact document to be an "unrealistic" actuarial assumption that led to "misleading" UAAL figures in the first place.

## G. The City Has Now Publicly Admitted the Ten-Year Injunction Has Expired and Changes Can Be Made—Even to Express Terms in the Plan

In its original Response Brief and Sur-Reply, the PFRS argued that the Plan allowed for changes to be made after the first ten years. (Response, pg. 16-17, Sur-Reply, pg. 7-11). The PFRS reiterated this argument at oral argument.[4] Yet to date, the City has never formulated a substantive response as to why Article G of the Plan does not control the amortization issue (nor has the Court addressed this argument)—but it now appears it is because the City knows full well that the PFRS can make changes starting on June 30, 2023, when the Plan-imposed injunction expires. In fact, the City itself has even recently gone on record that it, too, intends to make changes now that the "shackles" of the ten-year injunction are behind it.

---

[44] See Hrg. Tr. 3/15/23 at pg. 46-49 ("for 10 years, there was a period of time where the board did not make that decision [amortization]… under (2)(b)(3)(q)(2)(g)… that expired at the end of the 10 years. And at that point in time, then the PFRS was once again permitted to change the 6.75% interest rate, as well as any employer contribution. And that particular section… even states that the PFRS can change the terms, conditions, and rules of operation of the PFRS. So the only intervening period of time where the PFRS was ever unable to determine the amortization period was during the pension holiday… the plan of adjustment… does all tie out because the plan of adjustment states that for the first ten years the funding for the pension comes from the grand bargain. At the expiration of that 10 years, the board has authority to go outside of the plan of adjustment. The plan of adjustment no longer controls all of these issues . . . look at Article G of the plan of adjustment itself, that at the end of the 10 years this decision would be decided by the board… The 6.75% percent, which is the interest rate, that's another item that at the end of the 10 years reverts back to the board as a decision. And that is explicit in Article G of the plan of adjustment, the one that ties all of the board's authority to the ten-year pension holiday").

Just days after the PFRS filed its Motion for Reconsideration, the City publicly announced that it was considering reinstating the so-called "13th check" program, a pension benefit that had been outright banned under the Plan. During the bankruptcy, the so-called "13th Check Program"—which was where the Retirement Systems paid an additional check at the end of the year—was highly criticized by the City and its experts. The City blamed the "13th Check Program" as one of the leading causes of pension underfunding and outlawed the practice as part of the bankruptcy. (Fourth Am. Disc. Stmt., Dkt. No. 4391, pg. 121 of 197) ("Past Pension Practices. The Retirement Systems' trustees and certain City officials also have engaged in a variety of practices that exacerbated and, in certain cases, masked the extent of the Retirement Systems' UAAL… in years in which the actual investment return exceeded the assumed rate of return, the GRS Trustees paid out a portion of the excess to already retired pensioners. Referred to as the "13th check" program… these payments were made in excess of the pensioner's earned pension and to the detriment of the Retirement Systems… the total cost to the City of the GRS practices of distributing pension-fund earnings over assumed rates of return to retirees and active employees – whether by direct payment via a "13th check" or through excess contributions to employees' Annuity Savings Plan accounts – as of June 30, 2008, was $1.92 billion").

As a result, the Plan of Adjustment expressly forbid any 13th checks from being paid: "The Retirement System … shall not make any payment … other than payments that are required by the governing documents of the Retirement System. This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name." (Eighth Am. Plan of Adj., New Pension Plan Section 1.16(2); see also Art. 13.1(3) (same) and Art. 14.1(3) (same).

Yet the City has now gone to the media touting its plan of reinstate both the 13th check program and the cost-of-living increases that were stripped as a result of the bankruptcy.   As the City now openly admits, even the 13th Check Program—a program expressly prohibited by the Plan itself—can be changed because the "shackles" of the ten-year period are off.  This admission lines up with the Mayor's prior public pronouncements on the amortization issue quoted in the PFRS's original Response—that he is frustrated that the *City* does not have the power to decide the amortization issue—and is also consistent with the PFRS's interpretation of Article G of the Plan.  The Mayor recently gave the following interview:

> When the city's bankruptcy shackles come off next year, Mayor Mike Duggan would like to sweeten pension benefits for Detroit retirees and current employees. Duggan told The Detroit News this week he wants to restore a 13th pension check for retirees of Detroit's General Retirement System and increase the cost-of-living allowances for retired police officers and firefighters—benefits that were slashed in the city's bankruptcy a decade ago.  The extra monthly pension check was

17

historically sent to pensioners in December each year. The mayor said the next budget proposal, due out in February, will attempt to restore some of what retired city workers lost in Detroit's historic bankruptcy… "There are two things we're looking at: the pension benefits for our active employees are not competitive enough in the market I'd like to see us make some improvements in those[.]" . . . He's also interested in adding a 13th pension check at the end of 2024 when the city's 2014 exit plan allows Detroit to negotiate changes to retirement benefits with its two pension funds . . . "How those things might be structured and how it might work, I don't know yet but we'll figure it out . . . I think some type of enhancement in terms of a 13th check is fair . . . I'm hopeful that the budget we propose in February will have a 13th check in it."

(Ex. A, Detroit Free Press Article, dated July 14, 2023). This is a party admission under Fed. R. Evid. 801(d) and is therefore admissible evidence.[5]

To be clear, the PFRS is not critical of the Mayor's plans to the extent these changes will assist its members and facilitate restoration of benefits that were lost as a result of the bankruptcy (assuming, of course, these changes do not exacerbate underfunding concerns). The point of raising these plans by the City is because these admissions (which were not available until July 14—four days after the PFRS filed its Motion for Reconsideration) once again support what the PFRS has maintained

---

[5]   This admission by the Mayor is admissible evidence. *Greene v. Scott*, 637 F. App'x 749, 752 (4th Cir. 2016) (finding Mayor's statements in newspaper article were non hearsay statement by a party-opponent under Fed. R. Evid. 801(d)(2)); *McCowan v. City of Philadelphia*, 603 F.Supp.3d 171, 182 (E.D.Pa., 2022) ("Because the press release was published directly by the Office of the Mayor and is being offered against the City, it falls under Rule 801(d)(2)'s exclusion for statements 'made by the [opposing] party's agent or employee on a matter within the scope of that relationship.'"); *Wilburn v. Robinson*, 480 F.3d 1140, 1148 (D.C. Cir. 2007) (finding deputy mayor's statement was an admission by a party opponent—the District—and therefore, admissible under Rule 801(d)(2)(D)).

all along: everyone knew that under Article G of the Plan of Adjustment, certain go-forward terms were going to have to be reset at the end of the ten years—and as the Mayor now apparently admits, even those terms that were expressly ***forbidden*** under the Plan, such as the 13th Check Program and COLA increases, could be reinstated.[6] It appears the motive behind the City seeking to extend the amortization period to 30-years is control, pure and simple, because the inability to pay a higher amount under a 20-year amortization period is clearly not the issue seeing as the City is now proposing adding budget items to cover new, *enhanced* benefit payments.

Thus, the City *agrees* with the PFRS's position—that even terms that were written in stone for the first ten years are now open to change—the assumed rate of return, contribution amounts, amortization periods, and pension benefit payments such as the 13th check and COLA. This new evidence—particularly when coupled with the City's recent admission that the 6.75% interest rate can be changed at the ten-year mark—supports the PFRS's request that the Court reconsider its prior ruling, as submission of new evidence is grounds for such a motion.

## H.  The Michigan Case Law Argument Was Not Waived; It Was Raised But Not Ruled Upon.

This case was cited by the PFRS, *PFRS v. City of Detroit*, 270 Mich. App. 74,

---

[6]  These changes—reinstatement of the 13th check and returning COLA increases—are directly contrary to the express provisions of the Plan and the Confirmation Opinion. See *In re City of Detroit*, 524 B.R. at 179 (noting for PFRS pension claims, the "annual cost of living adjustment ('COLA') will be reduced to 45% of the amount provided in pre-petition [CBAs]" and for GRS, "COLAs will be eliminated"); see also Pension Plan Section 1.16, Art. 13.1 and Art. 14.1.

81 n. 3-4 (2006), *leave denied*, 477 Mich. 892 (2006), was not waived. (See Sur-Reply, pg. 8-11, see also pg. 8, n. 4; Hrg. Tr., pg. 38). The Court, however, did not address this argument in its Amortization Opinion, so the PFRS's reconsideration request is proper. *Davie*, 291 F. Supp. 2d at 634 (noting motion for reconsideration is properly brought if it calls "attention to an argument or controlling authority that was overlooked or disregarded in the original ruling"). The City's only other real attack on the *PFRS* case is that the PFRS did not "identify, attach, or quote this purported language" that it claims was interpreted favorably by the Michigan Court of Appeals. This is not true. In its Motion, the PFRS quoted the salient provisions of the newly amended Pension Plan and explained that the two provisions interpreted in the *PFRS* case were Articles G-17 and G-5, both of which the PFRS quoted at length (Article G-5 on pg. 6-7 and Article G-17 on pg. 9). The PFRS also provided the pinpoint cite for the two former pension plan provisions, which were quoted by Michigan court in the *PFRS* case. (See Motion, pg. 22) (quoting *PFRS*, 270 Mich. App. at 81 n. 3-4). While the City claims the language between the pre- and post-bankruptcy pension plan provisions could not possibly be the same, this is not the precise argument the PFRS set forth. The PFRS made a slightly more nuanced argument, which was that the parties chose to "reincorporate the same exact language" with the "only difference in those sections" being the "carve-out of the ten-year period where the PFRS was enjoined from deciding amortization for that

time period." *Id.* Regardless, for the sake of convenience, the PFRS will quote the

two provisions side by side to demonstrate that but for the carve-out for the ten-year

injunction period under the Plan of Adjustment when the PFRS could not change the

actuarial terms or change the City's contribution amount because it was being paid

by third parties, the two provisions that the Michigan Court of Appeals interpreted

to mean the PFRS was in control of the amortization period decision are the same:

| Former Pension Plan Terms | Amended Pension Plan Post-Bankruptcy |
|---|---|
| "The board of trustees shall annually ascertain and report to the mayor and the council the amount of contributions due the retirement system by the city, and the city council shall appropriate and the city shall pay such contributions to the retirement system during the ensuing fiscal year[.]"<br><br>Source: *PFRS*, 270 Mich. App. at 81 n. 3 (quoting Detroit City Code, § 54–43–4(b)) | **"Subject to the Plan of Adjustment, for Fiscal Years commencing prior to July 1, 2014, and on or after July 1, 2023,** the Board of Trustees annually ascertained and reported to the Mayor and the Council the amount of contributions due the Retirement System by the City, and the Council shall appropriate and the City shall pay such contributions to the Retirement System during the ensuing Fiscal Year."<br><br>Source: Pension Plan Art. G-5 (emphasis added to reflect addition of ten-year carve-out for pension holiday and Plan injunction) |
| Based upon the provisions of this ordinance, including any amendments, the Board of Trustees shall compute the City's annual contributions, expressed as a percent of active member compensation, to the retirement system for the fiscal year beginning July 1, 1975, using actuarial evaluation data as of June 30, 1974, and for each subsequent fiscal year using actuarial evaluation data as of the June 30 date which is a year and a day before the first day of such fiscal year. The Board shall report to the Mayor and to the city council the contribution percents so computed and such contribution percent shall be used in determining the | Based upon the provisions of this Article, including any amendments, the Board of Trustees shall compute the City's annual contributions **for Fiscal Years commencing prior to July 1, 2014 and after June 30, 2023**, expressed as a percent of active Member compensation, to the Retirement System for the Fiscal Year beginning July 1, 1975, using actuarial valuation data as of June 30, 1974, and for each subsequent Fiscal Year **prior to July 1, 2014 and after June 30, 2023**, using actuarial valuation data as of the June 30th date which date is a year and a day before the first day of such Fiscal Year. The Board shall report to the Mayor and to the City Council the contribution percents so computed, and such contribution presents shall be used in determining the contribution dollars to be |

| | |
|---|---|
| contribution dollars to be appropriated by the city council and paid to the retirement system[.]"<br><br>*Id.* at n. 4 (quoting Detroit City Code, § 54–2–7) | appropriated by the City Council and paid to the Retirement System[.]"<br><br>Pension Plan, Art. G-17 (emphasis added) |

Once this case is considered by the Court, the inescapable conclusion is that it was the PFRS's sole discretion to decide amortization prior to the bankruptcy and far from this being "changed" in the bankruptcy, the parties actually re-incorporated the same language into the revised Pension Plan—the only difference being that this PFRS was prohibited from making this decision until after the ten-year period under the Plan of Adjustment expired on June 30, 2023.

## II.    CONCLUSION

For the reasons stated above, the PFRS respectfully requests the Court reconsider its prior ruling.

> Respectfully submitted,
>
> By: */s/ Jennifer K. Green*
> Jennifer K. Green
> Clark Hill PLC
> 151 S. Old Woodward, Ste 200
> Birmingham, MI 48009
> (248) 988-2315
> jgreen@clarkhill.com
> *Attorney for Creditor – PFRS*

Date:  August __, 2023