UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                   Case No. 13-53846

CITY OF DETROIT, MICHIGAN,                               Chapter 9

                Debtor.                                  Judge Thomas J. Tucker
_____ /

**OPINION REGARDING THE MOTION BY DETROIT FIRE FIGHTERS
ASSOCIATION FOR AN ORDER ENFORCING THE PLAN OF ADJUSTMENT**

## I. Introduction

This case is before the Court on a civil contempt matter. Now before the Court is the

motion filed by the Detroit Fire Fighters Association, Local 344 (the "DFFA"), entitled "Motion

of Detroit Fire Fighters Association (DFFA) For the Entry Of An Order Enforcing The Plan Of

Adjustment Against: Christopher McGhee, Norman Brown, Craig Brown, James Washington,

Shannon Ferguson, Junius Perry, and Orlando Potts" (Docket # 13430, the "Motion").

The seven respondents named in the Motion (the "Respondents")[1] are current or former

fire fighters employed by the City of Detroit (the "City"). The Respondents are the plaintiffs in a

lawsuit pending in the Wayne County, Michigan Circuit Court, entitled *Christoher McGhee, et

al. v. City of Detroit, et al.*, Case No. 20-006272-CD (the "State Court Lawsuit"). The

Respondents filed the State Court Lawsuit on May 12, 2020, and filed their currently-operative

complaint (their "First Amended Complaint") in that case on July 8, 2020.[2] The defendants in

the State Court Lawsuit are the City, five City employees, the DFFA, and five current or former

---

[1] As suggested by the title of the Motion , the seven Respondents are Christopher McGhee,
Norman Brown, Craig Brown, James Washington, Shannon Ferguson, Junius Perry, and Orlando Potts.

[2] A copy of the First Amended Complaint is attached to the Motion as Exhibit 6A (Docket
# 13430-1) at pdf pp. 2-37.

officers of the DFFA.

The DFFA's Motion alleges that in filing their First Amended Complaint and in prosecuting the State Court Lawsuit, the Respondents have been seeking relief that is inconsistent with certain terms in a collective bargaining agreement ("CBA") dated November 6, 2014 between the DFFA and the City (the "2014 CBA"). The DFFA further alleges that the 2014 CBA was incorporated into the City's confirmed plan of adjustment. Based on that, the DFFA alleges that the Respondents' State Court Lawsuit violates the confirmed plan, including certain injunctions in the plan and the order confirming the plan. The DFFA seeks an order holding the Respondents in civil contempt of court, and granting injunctive and monetary relief.

Two parties in interest — namely, the City and the Police and Fire Retirement System of the City of Detroit (the "PFRS") — filed responses purporting to join the DFFA's Motion, and concurring in the relief sought by the Motion.[3] The seven Respondents jointly filed a response, objecting to the Motion.[4] The DFFA and the City then filed replies in support of the Motion.[5]

The Court held a telephonic hearing on the Motion. Confirming action taken during the hearing, the Court entered an order requiring the DFFA to file a supplement in support of the Motion, containing several specified things.[6] The DFFA timely filed the required supplement.[7]

The Court has reviewed all of the written and oral arguments of the parties, and all of the

---

[3] Docket ## 13438, 13445.

[4] Docket # 13455.

[5] Docket ## 13471, 13467.

[6] Order (Docket # 13493).

[7] Docket # 13495.

2

papers filed by the parties, including all exhibits and including the DFFA's post-hearing supplement. Based on the following findings and conclusions, and for the following reasons, the Court will grant the Motion in part and deny it in part.

## II. Facts

The following facts are undisputed.

### A. The City's confirmed plan of adjustment

The plan of adjustment in this Chapter 9 bankruptcy case was confirmed on November 12, 2014. It consists of the plan, entitled "Eighth Amended Plan for the Adjustment of Debts for the City of Detroit," filed October 22, 2014 (the "Plan"), and all of its many exhibits,[8] and the confirmation order, entitled "Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit," filed November 12, 2014 (the "Confirmation Order").[9] (The Plan, its exhibits, and the Confirmation Order are collectively referred to as the "POA."). The POA became effective on December 10, 2014.[10]

### B. The 2014 CBA

Shortly before confirmation of the Plan, and in contemplation of that confirmation, the City and the DFFA negotiated and agreed to a new collective bargaining agreement, the 2014 CBA. That agreement, executed and dated November 6, 2014, was for a term from November 6,

---

[8] Docket # 8045.

[9] Docket # 8272.

[10] *See* Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts for the City of Detroit and (II) Occurrence of Effective Date, filed December 10, 2014 (Docket # 8649).

2014 through June 30, 2019.[11]  It was later extended.[12]

## C. The relevant provisions in the 2014 CBA

The provisions of the 2014 CBA that are relevant to this dispute concern the seniority status of fire fighters who take what is known as a duty disability retirement.  Such fire fighters are those who become totally disabled for duty by reason of injury, illness, or disease resulting from the performance of duty.  While disabled, such fire fighters receive a retirement benefit, but they can later return to active duty if they become able to do so.  For such returning fire fighters, the question becomes what is their seniority level when they return to active duty?  Do they return with zero seniority?  Or do they return with the seniority level they had when they left on the duty disability retirement?  Or, even better for the returning fire fighters, do they return with the seniority they had when they left, plus seniority for the time they spent on duty disability retirement?  The question is important to the returning fire fighters, and also to other active duty fire fighters, because of the effect seniority can have on rank, promotions, salary, and ultimately pension benefits.

The seniority provisions of the 2014 CBA are less generous to the fire fighters who return to active duty from duty disability retirement, compared to the seniority provisions in prior collective bargaining agreements.  The meaning of the 2014 CBA's seniority provisions was the subject of an arbitration decision.  In a grievance arbitration decided on May 12, 2021 (the "2021

---

[11]  *See* Mot. Ex. 6E (Docket # 13430-3) at 71, § 30.

[12]  *See, e.g.*, "Arbitrator's Opinion and Award" (Mot. Ex. 6D (Docket # 13430-2) at pdf p. 19) ("There was an extension of the 2014-2019 CBA in 2016 extending the contract to 2020.").

4

Arbitration"),[13] the City took the position that under the 2014 CBA, a fire fighter on duty disability retirement who later returned to active duty lost all prior seniority, and returned with no seniority, regardless of how long they were on duty disability retirement.[14] The DFFA took the position that if a fire fighter on duty disability retirement returned to active duty within two years, they would return with all of their "previous accumulated seniority including the time they were off on duty disability retirement."[15]

In taking these competing positions, the City relied on Article 12.D.2 of the 2014 CBA, and the DFFA relied on Article 12.D.7. These provisions state:

> D.   Loss of Seniority. An Employee shall lose his/her seniority for the following reasons only:
> . . .
>
> 2.   Retirement.
> . . .
>
> 7.   Absence from work for any reason (including lay-off) in excess of two (2) years . . . .[16]

The arbitrator ruled that Article 12.D.2 did not apply, and that Article 12.D.7 did apply.[17] The arbitrator therefore agreed with the DFFA's position, and ruled that:

> [A]n employee who went on a duty disability pension who then

---

[13]   A copy of the arbitrator's May 12, 2021 decision, entitled "Arbitrator's Opinion and Award," is attached to the Motion as Exhibit 6D (Docket # 13430-2 at pdf pp. 5-25, the "Arbitration Decision").

[14]   *See* Arbitration Decision at 2, 6 (Docket # 13430-2 at pdf pp. 6, 10).

[15]   *See id.* at 9 (Docket # 13430-2 at pdf p. 13).

[16]   A complete copy of the 2014 CBA is attached to the DFFA's supplement as Exhibit D (Docket ## 13495-5, 13495-9). The Article 12.D provisions quoted appear at Docket # 13495-5, pdf pp. 20-21 (underlining in original).

[17]   *See* Arbitration Decision at 10-11 (Docket # 13430-2 at pdf pp. 14-15).

5

returns to full duty within two years of going on duty disability retirement is entitled to full seniority to be reinstated without loss of any seniority, including the time the employee was on duty disability retirement . . . .[18]

And the arbitrator ruled that a fire fighter on a duty disability pension who does not return to active duty within two years loses all seniority, and starts with zero seniority when they return to active duty.[19]

Previous collective bargaining agreements were more generous to the returning fire fighters than the 2014 CBA. The 2021 Arbitration Decision described some of the early prior history:

> . . . [B]eginning in 1981 the parties' CBA, based upon a one-page document signed between the then President of the Association and the Mayor of the City of Detroit, anyone that went off on duty disability who returned to work even after 19 and 20 years would return to work based upon seniority accumulated while they were off work. This agreement was continued in the July 1, 1998 - June 30, 2001 Agreement between the parties.
>
> It was explained that this benefit could mean that an employee who had worked for three years, gone on duty disability for 20 years, and then returned, based upon 23 years of seniority, as a Fire Officer as if the employee had never left, resulting in the benefits of higher rank, higher pay and increased pension upon retirement.[20]

Beginning in 2001, the collective bargaining agreement became less generous to the returning fire fighters. As the arbitrator described it, under the 2001-2008 agreement, "an

---

[18] *Id.* at 16 (Docket # 13430-2 at pdf p. 20).

[19] *See id.* at 16-19 (Docket # 13430-2 at pdf pp. 20-23) (lengthy discussion about whether Christopher Smith returned to active duty within the two year limit, and ruling that he did).

[20] *Id.* at 4 (Docket # 13430-2 at pdf p. 8) (record citations omitted).

6

employee on duty disability could continue to accrue seniority for three years at which point the employee's seniority is frozen until return to active duty."[21]  As quoted by the arbitrator, Article 9 of the 2001-2008 CBA provided:

### 9.  SENIORITY

* * *

C.    **Forfeitures**: An employee shall forfeit his seniority only for the following reasons:

* * *

6.  he/she retires on a regular service retirement or a reduced disability retirement, or if on a duty disability, reaches what would have been his twenty-fifth (25th) anniversary.

* * *

8.  (a)   Seniority credit for promotions to any position in the Department shall be frozen and cease to accumulate for any member on a disability retirement for three (3) years or more. In the event such person is returned to active service, he/she shall be reinstated with his/her frozen seniority.[22]

According to the Respondents, the 2001-2008 CBA "was mutually extended through 2013."[23]

## D.  All of the Respondents were adversely affected by the new seniority provisions in the 2014 CBA.

All seven of the Respondents are fire fighters who went on a duty disability retirement before the City filed its bankruptcy case, and before the adoption of the 2014 CBA.  And all of them were on a duty disability retirement for more than three years, and in some cases for much

---

[21]  *Id.* at 4-5 (Docket # 13430-2 at pdf pp. 8-9).

[22]  *Id.* at 5 (Docket # 13430-2 at pdf p. 9) (bold in original).  A copy of the 2001-2008 CBA is attached to the DFFA's supplement as Exhibit E (Docket # 13495-11).  The Article 9 provisions quoted above appear at Docket ## 13495-11, pdf pp. 13-14.

[23]  Resp'ts' Resp. to Mot. (Docket # 13455) at pdf p. 7 n.1.

7

more than three years.  Upon a return to active duty after adoption of the 2014 CBA, each of the Respondents could only return with zero seniority.

By comparison, and as described above, under the last CBA in effect before the adoption of the 2014 CBA, each Respondent would have been able to return to active duty with the following seniority: (a) the amount of seniority he had when he went on duty disability retirement; plus (b) three years of additional seniority.

The following chart lists facts about the Respondents that are alleged in their response to the Motion, and in the First Amended Complaint they filed in the State Court Lawsuit.[24]

| Name | Start date | Disability retirement date | Return to active duty date |
|---|---|---|---|
| Christopher McGhee | March 1992 | December 1999 | June 2016 |
| Norman Brown | unknown | 2003 | January 2018 |
| Craig Brown | January 1999 | May 2013 | May 2017 |
| James Washington | August 1992 | March 2013 | September 2016 |
| Shannon Ferguson | August 1994 | 2003 | [September 2018/March 2020] |
| Junius Perry | January 1999 | 2010 | March 2020 |
| Orlando Potts | March 1991 | June 2005 | [June 2018/March 2020] |

---

[24]  *See* Resp'ts' Resp. to Mot. (Docket # 13455) at pdf pp. 12-22; Pls.' First Am. Compl. (filed in the State Court Lawsuit), Mot. Ex. 6A (Docket # 13430-1) at pdf pp. 10-19.  In this chart, the "Start date" means the month and year in which the Respondent first began working as a fire fighter for the City. Norman Brown's start date is listed as unknown, because it is not stated in the Respondents' Response or in their First Amended Complaint.  The "Disability retirement date" is the month and year the Respondent began a duty disability retirement.  Except as to Shannon Ferguson and Orlando Potts, the "Return to active duty date" is the month and year in which the Respondent returned to active duty as a fire fighter.  Respondents allege that Shannon Ferguson was cleared to return to active duty in September 2018, but did not return to active duty, and was informed in March 2020 that he was not eligible to return to work.  Respondents allege that Orlando Potts was approved to return to active duty in June 2018, but did not return to work, and sometime during or after March 2020 converted his disability retirement to a general retirement.

8

As can be seen from this chart, the Respondents were on a duty disability retirement for periods of time ranging from a low of 3 years and six months (James Washington) to a high of 16 years and 7 months (Christopher McGhee). Under the 2014 CBA, at the time each of the Respondents returned to active duty, or in the cases of Mr. Ferguson and Mr. Potts, when they were cleared to return to active duty, they could only return with zero seniority.

**E. The Respondents' State Court Lawsuit**

In their First Amended Complaint in the State Court Lawsuit, the Respondents seek monetary and injunctive relief against the DFFA, the City, and the other defendants, alleging claims in thirteen counts.[25]

In their First Amended Complaint, the Respondents admit that under the terms of the 2014 CBA, fire fighters who retire on duty disability like themselves "lose their seniority," and can only return to work with no seniority. The First Amended Complaint alleges:

> 32. On November 6, 2014, the City and the DFFA entered into a new CBA 2014-2019.
>
> 33. **Article 12 Seniority - D (2) of the 2014-2019 CBA**, states that employees who retire from service as a result of a duty disability, shall lose their seniority.
>
> 34. Pursuant to the new CBA provision, they shall no longer be allowed to return to the employ of the City and maintain their accumulate[d] seniority, or advance to the rank of their original class.[26]

This, Respondents allege, contrasts with the situation before the adoption of the 2014 CBA:

---

[25] First Am. Compl. (Mot. Ex. 6A (Docket # 13430-1)).

[26] *Id.* at ¶¶ 32-34 (bold in original) (record citation omitted).

27. Prior to 2014, the Collective Bargaining Agreement (CBA) . . . between the City and DFFA allowed a fire fighter that had retired as a result of a duty disability to maintain his/her accumulated seniority if they returned to the employ of the City of Detroit as a fire fighter.

. . . .

29. Specifically, the 2001-2008 CBA . . . between DFFA and the City stated in part: [quotation omitted from Section 9 of the 2001-2008 CBA, which is quoted, in part, in Part III.C of this Opinion, above].

30. Prior to 2014, in reliance upon the longstanding disability retirement policy, a litany of fire fighters, . . . retired with a duty disability injury, and sometime thereafter returned to the employ of the City of Detroit as a fire fighter.

31. Those individuals were allowed to return as fire fighters, maintain their seniority, and advance to the rank of their entry class.[27]

Although they admit that under the terms of the 2014 CBA they could only return to work with zero seniority, the Respondents allege that at least some of them were initially allowed to return to active duty with their previous seniority. But that seniority, Respondents allege, was later taken from them. And Respondents allege that after adoption of the 2014 CBA, the City, the DFFA, and the other defendants "conspired to selectively enforce the new provision of the [2014 CBA]."[28] Respondents allege that

36. . . . [A]fter negotiation of the 2014-2019 CBA, the City continued to return many fire fighters to duty with their previous seniority [intact], without objection from the Union; and officers were allowed to assume the rank that their original class had achieved.

---

[27] *Id.* at ¶¶ 27, 29-31 (record citation omitted).

[28] *Id.* at ¶ 37.

10

37.  The Defendants had conspired to selectively enforce the new provision of the [2014 CBA].

38.  In fact, after 2014 the City and the Union agreed to allow some fire fighters to return from duty disability retirement, maintain their previous seniority, be promoted in accordance with their class ranking, and retire after receiving the promotion with a pension based upon the ranking that they had achieved with their original class.[29]

Later, Respondents allege, the City and the DFFA agreed to enforce the 2014 CBA seniority provisions across the board: "The Defendants put in place an alleged blanket demotion of all disability retirement returnees that had returned to work for the City after 2014[,]" and "[a]s a result, the [Respondents] were stripped of the seniority they had accumulated prior to their retirement, and in many instances demoted."[30]  Respondents further allege that they "filed grievances and wrote letters to both the Union and the City in an effort to address the disparate treatment; however, their efforts fell on deaf ears."[31]  Respondents allege that they suffered injury and damages as a result.[32]

Respondents' First Amended Complaint alleges claims based on many legal theories in its thirteen counts, and prays for substantial injunctive and monetary relief.  The legal theories include the following:

---

[29]  *Id.* at ¶¶ 36-38.  The First Amended Complaint does not specifically identify any such other fire fighters.  Nor have the Respondents identified any such fire fighters in responding to the Motion in this case.

[30]  *Id.* at ¶¶ 44-45.

[31]  *Id.* at ¶ 49.

[32]  In addition, the First Amended Complaint alleges certain other claims that are specific to two of the Respondents, which the Court will discuss below, in Parts IV.A.5 and IV.C of this Opinion.

11

• Against the DFFA and certain of its officers: claims of breach of a duty of fair representation and of a fiduciary duty, and a claim under Michigan law of "tortious interference with a business relationship or expectancy;"[33] and

• Against the DFFA, the City, and all the other defendants: claims of breach of contract, promissory estoppel, disability discrimination under Michigan law; age discrimination under Michigan law, claims under 42 U.S.C. § 1983 based on alleged discrimination and retaliation, and an alleged violation of due process, all in violation of the 14th amendment to the United States Constitution, and a claim of "civil conspiracy."[34]

The First Amended Complaint prays for substantial monetary relief, including "a judgment against Defendants in an amount exceeding $10,000,000.00," and unspecified compensatory damages, punitive damages, interest, costs, and attorney fees.[35]

The First Amended Complaint also prays for the following "[e]quitable" relief:

a. An injunction prohibiting any further acts of discrimination or retaliation;

b. An order directed to the Union for it to cease and desist its breach of the duty of fair representation;

c. An order compelling the Union to proceed on grievances which it had wrongfully refused to handle;

d. An order reestablishing the seniority level that the Plaintiffs are rightly entitled to;

e. An order placing each of the Plaintiffs in their rightful and

---

[33] *See* First Am. Compl. (Mot. Ex. 6A (Docket # 13430-1)) at ¶¶ 165-75, 219-24 (Counts II, IX).

[34] *See id.* at ¶¶ 156-64, 176-218, 225-54 (Counts I, III through VIII, and X through XIII).

[35] *Id.* at pp. 35-36.

lawful position at their appropriate rank;

[f].   Back pay and or lost earnings to which the Plaintiffs are entitled;

[g].   An order compelling the Union to post a notice on its breach of the duty of fair representation in conspicuous places;

[h].   An award of interest, costs, and reasonable attorney fees;

[i].   Whatever other equitable relief appears appropriate at the time of trial.[36]

## III. Jurisdiction

This Court has subject matter jurisdiction over this Chapter 9 bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(O), because it is a proceeding "affecting . . . the adjustment of the debtor-creditor . . . relationship[.]"  This is also a core proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within this category are deemed to be core proceedings.  *See Allard v. Coenen* (*In re Trans-Indus., Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009) (citing *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1144 (6th Cir. 1991)).

Because the Motion asks the Court to interpret and enforce its own Confirmation Order, this is a proceeding "arising in" a case under title 11.  *See In re City of Detroit, Michigan*, 652 B.R. 81, 94 (Bankr. E.D. Mich. 2023); *Palltronics, Inc. v. PALIoT Sols., Inc.* (*In re Lightning Tech., Inc.*), 647 B.R. 76, 91-93 (Bankr. E.D. Mich. 2022) (detailed discussion of bankruptcy court's jurisdiction to interpret and enforce its own orders); *see also In re Chesapeake Energy*

---

[36] *Id.*

13

*Corp.*, 70 F.4th 273, 281 (5th Cir. 2023) (citation omitted) ("Within its core jurisdiction, the

[bankruptcy] court may also be called upon to interpret the terms of a confirmed reorganization

plan.").  This is a proceeding "arising in" a case under title 11, because it is a proceeding that "by

[its] very nature, could arise only in bankruptcy cases."  *See Allard v. Coenen*, 419 B.R. at 27.

 This dispute is a type over which this Court retained jurisdiction under the confirmed

Plan.  Article VII, Sections G and I of the confirmed Plan state:

> Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things jurisdiction to:
> . . . .
>
> G. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;
> . . . .
>
> I. Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order[.][37]

## IV.  Discussion

### A.  Respondents' filing and prosecution of the State Court Lawsuit violated the POA, including the injunctions contained in the Plan and in the Confirmation Order.

---

[37] Plan (Docket # 8045) at 69-70; *see also* Confirmation Order (Docket # 8272) at 125-26.

**1. The 2014 CBA was incorporated into the City's confirmed plan of adjustment.**

The 2014 CBA was designed, at least in part, to reduce the City's labor costs with respect to its fire fighters. It was part of the City's larger strategy to reduce costs in its POA. The 2014 CBA stated that it would be "incorporated into and become a part of the both the [City's] plan of adjustment and [the] order confirming the plan of adjustment."[38] And as this Court has noted previously, there are "many ways in which the POA altered the previously-existing pension-related rights and other rights of many of the City's active and retired employees." *In re City of Detroit, Michigan*, 614 B.R. 255, 268 (Bankr. E.D. Mich. 2020).

As contemplated in the 2014 CBA, that agreement was incorporated into and made part of the POA. The Respondents do not dispute this.

This incorporation occurred in at least two ways. First, the Confirmation Order stated that:

> 47. **Contracts, leases and other agreements entered into after the Petition Date by the City**, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, **will be performed by the City in the ordinary course of its business. Accordingly, such contracts** and leases (including any assumed Executory Contracts or Unexpired Leases) **will survive and remain unaffected by entry of this Order.**[39]

As counsel for the DFFA conceded during the hearing, the 2014 CBA is not one of the "collective bargaining agreements identified on Exhibit II.D.5 to the Plan," within the meaning of

---

[38] Mot. Ex. 6E (Docket # 13430-3) at 71, § 30.

[39] Confirmation Order (Docket # 8272) at 101-02, ¶ 47 (emphasis added).

the foregoing language in ¶ 47 of the Confirmation Order.[40]  But nonetheless it is included in

¶ 47, as one of the "[c]ontracts, leases and other agreements entered into after the Petition Date

by the City."  Therefore, the 2014 CBA, which was entered into before the entry of the

Confirmation Order, is an agreement that must be "performed by the City in the ordinary course

of its business."  In this sense, under this language in the Confirmation Order, the 2014 CBA is

part of the POA.

Second, the POA includes the 2014 CBA and its more restrictive seniority provisions in a

more indirect way.  As this Court has explained in prior opinions, included as part of the POA

was a new pension plan applicable to Detroit fire fighters, entitled "Combined Plan for the Police

and Fire Retirement System of the City of Detroit, Michigan," (the "New PFRS Plan").  *See In re

City of Detroit, Michigan*, 614 B.R. 255, 260-61, 266-67 (Bankr. E.D. Mich. 2020)*; see also In

re City of Detroit, Michigan*, 652 B.R. 81, 99 n.74 (Bankr. E.D. Mich. 2023).[41]  The new PFRS

_____

[40]  There are 37 such CBAs listed in Exhibit II.D.5 to the Plan.  (*See* Docket # 8045-10 at pdf pp.
28-30).  The 2014 CBA is not one of them.  This may be because the 2014 CBA was dated and executed
on November 6, 2014 (*see* Docket # 13495-9 at pdf p. 11), whereas the Plan and its Exhibit II.D.5 were
filed earlier, on October 22, 2014.  The DFFA's counsel argued during the hearing that this omission was
a "scrivener's error."  But the Court does not need to decide whether that is true or not, because the 2014
CBA is covered by ¶ 47 of the Confirmation Order regardless.

[41]  In the cited opinions, the Court detailed how the new PFRS Plan was expressly incorporated into
the POA, and then formally adopted after confirmation, two days before the effective date of the
POA.  And the Court explained where the New PFRS Plan is located in the record:

> [T]he new PFRS Plan was adopted by Order No. 44 of the Emergency
> Manager, Kevin D. Orr, issued on December 8, 2014, two days before
> the effective date of the confirmed POA.  *See In re City of Detroit,
> Michigan*, 614 B.R. 255, 260-61 (Bankr. E.D. Mich. 2020).  A copy of
> the new PFRS Plan . . . is in the record in this case in the following
> location, among other possible locations: as part of Exhibit 6I to an
> earlier motion filed by the City on August 9, 2019, at Docket # 13090.
> That Exhibit 6I is a copy of Emergency Manager Order No. 44, and a
> copy of the adopted new PFRS Plan is attached to that Emergency

16

Plan, in turn, expressly required the PFRS Board of Trustees "to administer the Retirement System consistent with the pension provisions of the [2014 CBA]."[42]

This is important because, as the Respondents admit, the 2014 CBA's seniority provisions at issue — *i.e.*, those that apply to fire fighters who return to active duty from a duty disability retirement — affect the returning fire fighters' pay, rank, promotions, and ultimately, the amount of their pension benefits. In their First Amended Complaint filed in the State Court Lawsuit, for example, the Respondents alleged that one form of damages caused by the defendants' enforcement of the 2014 CBA's seniority provisions was that it "deprived the [Respondents] of the opportunity to collect a larger pension."[43] Similarly, the Respondents alleged that the City's selective enforcement of the 2014 CBA for a time allowed some fire fighters to "return from duty disability retirement, [and] maintain their previous seniority."[44] This, Respondents alleged, had the effect of allowing those fire fighters to "be promoted in accordance with their class ranking, and retire after receiving the promotion with a pension based upon their ranking that they had achieved with their original class."[45]

It would be contrary to the New PFRS Plan, which is part of the POA, for the Respondents to be allowed to return to active duty with any seniority, because that would allow

---

Manager Order as its Exhibit E. The exact location in the record of the adopted new PFRS Plan is Docket # 13090-1, beginning at pdf p. 13.

*In re City of Detroit, Michigan*, 652 B.R. 81, 99 n.74 (Bankr. E.D. Mich. 2023).

[42] *See* New PFRS Plan, App. A (Docket # 13090-1) at pdf p. 179.

[43] *See* First Am. Compl. (Mot. Ex. 6A (Docket # 13430-1)) at ¶ 51.

[44] *Id.* at ¶ 38.

[45] *Id.*

them ultimately to retire with higher pensions. That result would be contrary to the New PFRS

Plan, which is part of the POA, because the New PFRS Plan must be administered "consistent

with" the 2014 CBA. That result would be contrary to the POA.

## 2. The applicable injunctions in the Plan and in the Confirmation Order

The broad injunctions in Article III.D.5.a of the Plan and in ¶ 32 of the Confirmation

Order prohibit the Respondents from taking any action to interfere in any way with the City's

performance of its obligations under the 2014 CBA. This includes filing or prosecuting any

lawsuit that seeks relief that is contrary to the terms of the 2014 CBA.

First, Article III.D.5 of the Plan, all of which is in bold letters, states, in relevant part:

> **5. Injunction.**
>
> **On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**
>
> **a. <u>all Entities that have been, are or may be holders of Claims against the City</u>, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, <u>shall be permanently enjoined from taking any of the following actions against or affecting the City or its property</u>, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, <u>with respect to such claims</u> (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**
>
> **1. <u>commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property</u> (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims); . . . .**

18

**5. proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan** or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

**6. taking any actions to interfere with the implementation or consummation of the Plan.**[46]

Second, and similarly, Paragraph 32 of the Confirmation Order states, in relevant part:

32. On the Effective Date, except as otherwise provided in the Plan or in this Order, **all Entities that have been, are or may be holders of Claims against the City**, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity, along with their Related Entities, **shall be, and hereby are, permanently enjoined from taking any of the following actions against or affecting the City or its property**, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, **with respect to such Claims** (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from this Order)**: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property** . . .; **(e) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of this Order, the Plan** or the Settlements (to the extent such Settlements have been approved by the Court herein); and **(f) taking any actions to interfere with the implementation or consummation of the Plan**.[47]

**3. The Respondents violated the injunctions contained in the Plan and in the Confirmation Order.**

In filing their First Amended Complaint in the State Court Lawsuit, and in prosecuting

---

[46] Plan (Docket # 8045), Article III.D.5, at 50-51 (pdf pp. 57-58) (bold in original) (underlining added).

[47] Confirmation Order (Docket # 8272) at 89-90, ¶ 32 (emphasis added).

19

that lawsuit, the Respondents all violated the injunctions contained in the Plan and in ¶ 32 of the Confirmation Order, quoted above.

**First**, both injunctions apply to "all Entities that have been, are or may be holders of Claims against the City." The injunctions apply to each of the Respondents. Each of them is an "Entit[y] that ha[s] been, are or may be [a] holder[] of Claims against the City." "Claim," as that word is used in both the Plan and in the Confirmation Order, means a "claim" as defined in § 101(5) of the Bankruptcy Code, 11 U.S.C. § 101(5).[48] As relevant here, when the City filed this bankruptcy case, each Respondent had a claim against the City, in the form of rights to a duty disability retirement benefit and associated seniority rights under the pre-2014 CBA. Those rights continued to exist, as modified by the 2014 CBA and the Confirmation Order, when the Confirmation Order was entered. Such rights gave each of the Respondents a "claim" against the City.

Under the Bankruptcy Code definition, a "claim" is defined broadly, to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5)(A). As this Court noted in a previous opinion,

> "Congress intended by this language to adopt the broadest available definition of 'claim,'" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) (citations omitted), which includes "'all legal obligations of the debtor, no matter how remote or contingent.'" *In re Huffy Corp.*, 424 B.R. 295, 301 (Bankr. S.D. Ohio 2010) (quoting *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 200 (4th

---

[48] "Claim" is a capitalized term used in, but not otherwise defined in, the Confirmation Order, so it has the meaning given to it in the Plan. *See* Confirmation Order (Docket # 8272) at pdf p. 5 n.1. The Plan, in turn, defines "Claim" to mean "a claim, as defined in section 101(5) of the Bankruptcy Code, against the City." Plan (Docket # 8045) at pdf p. 13, Article I, ¶ 60.

Cir. 1988)).

*In re City of Detroit, Michigan*, 548 B.R. 748, 781 (Bankr. E.D. Mich. 2016).

**Second**, as quoted above, the injunctions in Article III.D.5 of the Plan and in ¶ 32 of the Confirmation Order "permanently enjoined" Entities holding Claims against the City "from taking any of the following actions against or affecting the City or its property, . . . with respect to such Claims." The "following actions" that are enjoined include "commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property . . .; [and] proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of [the Plan or the Confirmation Order] . . . ; and taking any actions to interfere with the implementation or consummation of the Plan.[49]

The Respondents' actions in filing the First Amended Complaint and prosecuting their State Court Lawsuit were actions that are covered by each phrase in the "following actions" list just quoted, and therefore were actions that were enjoined. Respondents made claims, and sought relief, that were directly and unambiguously contrary to the 2014 CBA's provisions governing the duty disability retirement and associated seniority rights. Respondents do not dispute this. Rather, the Respondents admitted this in ¶ 34 of their First Amended Complaint. There they admitted that under the terms of the 2014 CBA they could only return to active duty with the City with zero seniority. *See* discussion in Part II.E of this Opinion. And the

---

[49] Plan (Docket # 8045), Article III.D.5.a, at 50-51 (pdf pp. 57-58); *see also* Confirmation Order (Docket # 8272) at 89-90, ¶ 32.

21

Respondents admitted the same thing in their written response to the Motion.[50]

Because the 2014 CBA provisions at issue were part of the POA, the Respondents' actions violated the injunctions in the Plan and in ¶ 32 of the Confirmation Order.

This is not a case in which the Respondents have made a colorable claim to *enforce* the terms of the 2014 CBA. Nor is it a case in which the Respondents can plausibly argue that the relevant provisions of the 2014 CBA are ambiguous. They are not. Rather, the Respondents' State Court Lawsuit alleges claims clearly designed to *avoid the enforcement* of the 2014 CBA; that is, to disregard and violate the clear and unambiguous terms of the 2014 CBA, and, therefore, the POA.

Thus, in their actions against the City and certain City employees in the State Court Lawsuit, the Respondents violated the injunctions in the Plan and in the Confirmation Order. The injunctions bar actions "against or affecting the City or its property, . . . and the Related Entities of each of the foregoing." In addition, the Respondents' actions against the other defendants in the State Court Lawsuit also violated the injunctions. As for the defendants who are former or present City employees, those persons are "Related Entities."[51] As for the other defendants, the Respondents' actions against each of the defendants in the State Court Lawsuit "affect" both the City and the City's property.

### 4. Respondents' arguments

Respondents oppose the Motion, on two main grounds.

---

[50] *See* Resp'ts' Resp. to Mot. (Docket # 13455) at pdf p. 8 ¶¶ 10-11.

[51] The defendants who are present or former employees of the City are "Related Entities" as that defined term is used in the POA injunctions. *See* Plan (Docket # 8045), Article I.A.289 (definition of "Related Entity").

First, the Respondents seem to argue that their State Court Lawsuit does not seek to avoid the 2014 CBA's seniority provisions. Rather, they argue, they merely seek relief for damages they suffered from the *selective enforcement* of those provisions.

This selective enforcement theory is described in more detail in Part II.E of this Opinion. Respondents allege that the 2014 CBA's seniority provisions were not enforced against certain other fire fighters who returned to work from a duty disability retirement. For at least a time after the adoption of the 2014 CBA, Respondents allege, other such fire fighters were allowed to return to work with recognition of their previous seniority. (The Respondents have not specifically identified any such other fire fighters.) And for a time, such previous seniority was recognized for at least some of the Respondents when they returned to work from a duty disability retirement. But that seniority was taken away from those Respondents when the City later began to enforce the 2014 CBA across the board.[52]

---

[52] During the hearing, for example, Respondents' attorney summarized the situation of four of the Respondents in this way:

> McGhee, rehired in 2016, two years after the bankruptcy and the CBA, promoted in 2019 in accordance with the pre-2014 CBA past practice, and then demoted and stripped of all seniority in January 2020.

> Norm Brown, rehired in January 2018, promoted via testing in July 2018, and then demoted and stripped of all seniority in January 2020.

> C. Brown, rehired in May 2017; demoted and stripped of all seniority in January 2020.

> Washington, rehired in 2016, promoted to sergeant in accordance with the pre-2014 CBA past practice; demoted and stripped of all seniority in January 2020.

Tr. (Docket # 13550) at 64-65. The allegations specific to these four Respondents are stated in more detail in the First Amended Complaint at ¶¶ 56-105.

In their written response to the Motion, the Respondents state that the merely "seek damages from the named Defendants for the inconsistent application of the 2014 CBA after November 12, 2014, and the resulting injuries suffered by the Plaintiffs."[53]  During the hearing, the Respondents' attorney argued that the Respondents "should be compensated as a result of the Defendants' choosing to selectively enforce the [2014] CBA, and that the damages that the [Respondents] sustained as a result of that selective enforcement they should be compensated for."[54]

The Respondents' selective enforcement theory seems to be that they should get the benefit of seniority under the pre-2014 CBA rules, even though that would be contrary to the unambiguous terms of the 2014 CBA, because (1) some other, as-yet unnamed fire fighters erroneously got that benefit, at least for a time; and (2) four of the seven Respondents erroneously got that benefit for a time, until it was taken away in 2020.

Under the Respondents' selective enforcement theory, however, the injuries and damages that the Respondents allege all flow from the City's enforcement of the seniority provisions in the 2014 CBA.  But for that, the Respondents would have no alleged injuries or damages.  The selective enforcement theory is therefore wholly inconsistent with the seniority provisions of the 2014 CBA.

 A second line of argument that Respondents make is that all of the actions they complain of took place after the Confirmation Order was entered in 2014, and because of that, their claims were not discharged by the POA.  They argue that the claims they now assert did not exist before

---

[53]  Resp'ts' Resp. to Mot. (Docket # 13455) at pdf p. 5.

[54]  Tr. (Docket # 13550) at 64.

confirmation of the POA, and that before the confirmation, the Respondents could not have reasonably foreseen that they would have such claims.[55]  As a result, the Respondents argue, their claims were not discharged.[56]

This line of argument is not responsive to the Motion, and misses the point.  The theory of the Motion is not that the Respondents' claims now being asserted were discharged by the POA.  Rather, as the Court discusses in Part IV.A.3 of this Opinion, the Respondents had claims that included certain seniority rights, which were *modified* by the 2014 CBA and the POA. Before the City filed this bankruptcy case, and before the adoption of the 2014 CBA and confirmation of the POA in November 2014, the Respondents had claims against the City, which included rights to a duty disability retirement benefit and associated seniority rights.  Those seniority rights were *modified* by the 2014 CBA and the Confirmation Order, to the extent that each of the Respondents lost any previous rights they had to return to active duty with their previous seniority; instead they could return to work only with zero seniority.  That modification of the Respondents' seniority rights is binding on the Respondents under the 2014 CBA and the POA, and under 11 U.S.C. § 944(a).  And as discussed above, the POA enjoined the Respondents from taking action contrary to that modification.  *See* Part IV.A.3 of this Opinion.

### 5.  **With two possible exceptions, all of the Respondents' claims are barred by the POA.**

For the reasons discussed above, all of the claims alleged in the Respondents' First

---

[55]  *See* Resp'ts' Resp. to Mot. (Docket # 13455) at pdf pp. 32-35.

[56]  Previously, this Court has applied what is known as the "fair contemplation" test to determine whether a claim arose before the bankruptcy petition was filed, and therefore is subject to discharge.  *See, e.g., In re City of Detroit, Michigan*, 584 B.R. 748, 763 (Bankr. E.D. Mich. 2016); *In re City of Detroit, Michigan*, 642 B.R. 807, 810 (Bankr. E.D. Mich. 2022).

Amended Complaint are barred and enjoined by the POA, with two possible exceptions.[57]  The

exceptions are certain claims alleged with respect to Norman Brown and Shannon Ferguson.  As

to those claims, the present record and the arguments of the parties do not show that the claims

are barred by the POA.  The Court will describe those exceptions briefly.

The first exception concerns Respondent Norman Brown.  Mr. Brown appears to include

a claim that he was wrongly demoted for reasons unrelated to his seniority, and unrelated to the

seniority provisions in the 2014 CBA.  Mr. Brown  alleges that after he returned to active duty

from a duty disability retirement in January 2018, he was "promoted through testing (as opposed

to the seniority system) to the rank of Lieutenant on July 30, 2018. . . "[58]  He alleges that on

January 27, 2020 he was "demoted . . . to the position of Fire Fighter," at a lower pay rate.[59]  He

appears to allege that the demotion was improper because he was entitled to his Lieutenant rank

regardless of his seniority under the 2014 CBA.  He appears to allege that he should not have

been demoted, even if his seniority was correctly reduced.[60]

To the extent Norman Brown's claim is as just described, the Court cannot find that it is

---

[57]  As noted in Part II.E of this Opinion, the many legal theories asserted in Respondents' First
Amended Complaint, seeking to avoid the effects of the 2014 CBA seniority provisions,  include a claim
under 42 U.S.C. § 1983 against all defendants.  There is an exception to the injunction in ¶ 32 of the
Confirmation Order, not argued by the Respondents, stating that "claims against officers or employees of
the City in their individual capacity under 42 U.S.C. § 1983 shall not be enjoined."  Confirmation Order
(Docket # 8272) at 91, ¶ 32.  (Similarly, such claims were excepted from discharge, in ¶ 30 of the
Confirmation Order.  *See id.* at 88, ¶ 30.)  But the Respondents have not argued that this exception to the
injunction applies to any extent to their purported § 1983 claims.  As a result, the Respondents have
forfeited any such argument.  *See, e.g., In re Shefa*, 649 B.R. 881, 883-84 (Bankr. E.D. Mich. 2023)
(citations omitted).

[58]  *See* First Am. Compl. at ¶¶ 67-68.

[59]  *Id.* at ¶ 74.

[60]  *See id.* at ¶¶ 68-69, 72, 82.

barred or enjoined by the POA.  The Court otherwise expresses no view on the merits of such claim.

The second exception concerns Respondent Shannon Ferguson.  Mr. Ferguson appears to include a claim that he was wrongly denied the right to return to work from his duty disability retirement, for reasons unrelated to his seniority, and unrelated to the seniority provisions in the 2014 CBA.  Mr. Ferguson alleges that he began a duty disability retirement in 2003.  He alleges that he requested to return to work in February 2018, and received a letter from the City in September 2018, "clearing him to return to duty."[61]  He appears to allege, however, that because of various errors and omissions by agents of the City, he was deprived of his right to return to work.[62]

To the extent Shannon Ferguson's claim is as just described, the Court cannot find that it is  barred or enjoined by the POA.  The Court otherwise expresses no view on the merits of such claim.

**B.  Respondents are in civil contempt for their violations of the POA injunctions.**

**1.  The elements necessary for holding the Respondents in civil contempt**

> Bankruptcy courts have civil contempt powers.  Those powers "flow from Bankruptcy Code § 105(a) and the inherent power of a court to enforce compliance with its lawful orders."  *In re Walker*, 257 B.R. 493, 496 (Bankr. N.D. Ohio 2001) (citations omitted).

*In re City of Detroit, Michigan*, 614 B.R. 255, 264 (Bankr. E.D. Mich. 2020).

In *City of Detroit, Michigan*, 614 B.R. at 263-66, this Court discussed the law of civil

---

[61]  *Id.* at ¶¶ 108-110.

[62]  *See id.* at ¶¶ 111-123.

contempt at length. The Court incorporates that discussion by reference, and adopts it in this Opinion. The Court stated the elements of contempt:

> [T]he elements that must be proven for a court to find a party in civil contempt are that (1) the party violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts; (2) the party did so with knowledge of the court's order; and (3) there is no fair ground of doubt as to whether the order barred the party's conduct — *i.e.*, no objectively reasonable basis for concluding that the party's conduct might be lawful. And at least as to the first two of these elements, the moving party must prove them by clear and convincing evidence.
>
> If these elements are proven, the accused party may still avoid a contempt finding, by proving that his/her compliance with the order in question was impossible.

*Id.* at 265-66.

### 2. The contempt elements are satisfied here.

All three of the elements of civil contempt are satisfied. The first and third elements, stated above, are met, for the reasons stated in Part IV.A of this Opinion. As for the second element, it is clear that the Respondents filed and prosecuted their First Amended Complaint with knowledge of the seniority provisions in the 2014 CBA, and with knowledge of the injunctions in the Plan and in the Confirmation Order. The Respondents do not dispute this. And it is shown in several ways.

***First***, it is clear that before they filed their First Amended Complaint, the Respondents and their attorney knew of the 2014 CBA, and specifically knew of the seniority provisions in that CBA. The First Amended Complaint itself described those provisions in the 2014 CBA.[63]

---

[63] *See, e.g.*, First Am. Compl. at ¶¶ 32-34.

28

**Second**, in a previous opinion involving certain other fire fighters and a different issue, the Court described in detail three notices that were mailed to creditors in 2014, including City fire fighters, giving notice of the Plan and of the entry of the Confirmation Order. The Court incorporates that discussion by reference here. *See In re City of Detroit, Michigan*, 614 B.R. 255, 269-72 (Bankr. E.D. Mich. 2020). As pointed out by counsel for the DFFA during the hearing, those notices were mailed to each of the Respondents in this case,[64] and the Respondents have not denied receiving the notices.

The third of these three notices was the December 10, 2014 notice of the entry of the Confirmation Order,[65] and it was mailed to creditors, including each of the Respondents, on December 22, 2014.[66] That notice stated that the Plan had been confirmed on November 12, 2014 by the Confirmation Order, and that the Effective Date of the confirmed plan was December 10, 2014.[67] That notice also included, in bold letters, the language of the injunctions that the Respondents later violated, which appear in the Plan and in the Confirmation Order, and which are quoted in Part IV.A.2 of this Opinion.[68] In addition to the fact that the Plan and the Confirmation Order are on file in this case and therefore were always available to the Respondents and their attorneys, the December 10, 2014 notice also stated that:

---

[64] *See* Tr. (Docket # 13550) at 9.

[65] Docket # 8649.

[66] *See* Docket # 9000 at pdf p. 1, Ex. B-1 at pdf pp. 137, 143, 369; Ex. B-2 at pdf pp. 205, 347, 370; Ex. B-4 at pdf p. 475.

[67] Docket # 8649 at 1, ¶ 1.

[68] *Id.* at 3-4, ¶ 4.a.

29

> Copies of the Plan, Confirmation Order and all other documents
> [f]iled in the Chapter 9 Case may be obtained, free of charge, from
> the City's restructuring website at https://www.kccllc.net/detroit or
> from Kurtzman Carson Consultants LLC by calling (877)
> 298-6236 (toll-free).[69]

***Third***, after the Respondents filed their First Amended Complaint on July 8, 2020, counsel for the DFFA repeatedly informed the Respondents' counsel that the Respondents' claims were contrary to the POA, and were barred as an impermissible attack on the POA.  This was done (1) in a telephone call on April 21, 2021;[70] (2) in a letter e-mailed to Respondents' counsel on April 23, 2021;[71] (3) in a case evaluation summary served on Respondents' counsel on May 17, 2021;[72] and (4) in a letter e-mailed to Respondents' counsel on June 17, 2021.[73]

Despite knowing of the Plan, the Confirmation Order, and the 2014 CBA seniority provisions, the Respondents filed and continued to prosecute their First Amended Complaint, in violation of the POA injunctions described above.

### 3.  The Respondents are in civil contempt.

For the foregoing reasons, the Court finds that each of the elements of civil contempt has been established, by clear and convincing evidence, as to each of the Respondents.  And Respondents have not alleged, or presented any support for, the affirmative defense that their compliance with the POA injunctions was impossible.

---

[69]  *Id.* at 8, ¶ 9.

[70]  *See* Docket # 13430-2 at pdf p. 3 (describing the April 21, 2021 call).

[71]  *See id.* at pdf pp. 2-3.

[72]  *See* Docket # 13495-2 at pdf pp. 2, 9, 13, 22-23.

[73]  *See* Docket # 13495-1 at pdf pp. 3-4, 6.

For these reasons, the Court finds each of the Respondents in civil contempt, for having violated the POA injunctions.

## C. The relief that will be ordered to remedy the Respondents' civil contempt

In their Motion, the DFFA seeks the following relief: (1) injunctive relief permanently enjoining the Respondents from asserting and prosecuting the claims in the State Court Lawsuit; (2) an order requiring the Respondents to immediately dismiss their State Court Lawsuit with prejudice; and (3) an award of damages (presumably, attorney fees and litigation expenses) against the Respondents and their counsel, for the Respondents' pursuit of the State Court Lawsuit.

This Court has authority to grant injunctive relief of the type described in items (1) and (2) above, to the extent the Court has found that the State Court Lawsuit violates the injunctions in the POA. Under the Plan, the Court retains jurisdiction to enter injunctions to enforce the confirmed POA. In Article VII, Section I of the Plan, quoted in Part III of this Opinion, the Court retains jurisdiction to:

> Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order[.]

Given this provision in the POA, and given the Court's authority generally to enforce its own orders, *see, e.g.*, 11 U.S.C. § 105(a), the Court has authority to enjoin specifically the Respondents' further prosecution of their State Court Lawsuit, and to order the Respondents to dismiss that lawsuit with prejudice. The Court will do this, but subject to two exceptions — the Court will not enjoin, or require the dismissal of, the claims of Norman Brown and Shannon

31

Ferguson that are described in Part IV.A.5 of this Opinion. The Court has not found that the prosecution of those claims violates the POA injunctions.

In the exercise of its discretion, however, the Court will not grant any attorney fees or other monetary relief in favor of the DFFA and against the Respondents or their counsel.

As this Court has held in prior opinions, if the Court finds a party in civil contempt, the Court has discretion to award compensatory monetary relief, but the Court also has discretion ***not*** to award such relief. The Court held this in *In re City of Detroit, Michigan*, 614 B.R. 255, 273 (Bankr. E.D. Mich. 2020):

> As this Court pointed out in its opinion in [*Schubiner v. Zolman* (*In re Schubiner*), 590 B.R. 362 (Bankr. E.D. Mich. 2018)], if the Court finds a party in civil contempt, the Court has discretion to award compensatory monetary relief, but the Court also has discretion ***not*** to award such relief. The Court made this point in *Schubiner* when discussing the specific form of contempt consisting of a violation of the discharge injunction under 11 U.S.C. § 524(a)(2). But the point applies to civil contempt generally, and to relief for violation of injunctions generally. The Court now reiterates the point. As stated in *Schubiner*:
>
>> This Court has discretion in deciding whether to award relief, including monetary relief, for a violation of the discharge injunction. *See, e.g., Badovick v. Greenspan* (*In re Greenspan*), 464 B.R. 61, No. 10-8019, 2011 WL 310703, at *5 (B.A.P. 6th Cir. 2011) (internal quotation marks and citation omitted) (the court has "broad discretion . . . in selecting an appropriate sanction" for a violation of the discharge injunction); *In re Perviz*, 302 B.R. 357, 370, 370 n. 4 (Bankr. N.D. Ohio 2003) (sanctions and monetary relief for violations of the discharge injunction are discretionary); *Mitchell v. Anderson* (*In re Mitchell*), 545 B.R. 209, 227-28 (Bankr. N.D. Ohio 2016) (damages for violation of the discharge injunction are "within the Court's discretion;" and holding that even if the defendant violated the discharge injunction, the

32

> court would not award any damages to the debtor under
> the circumstances of that case).
>
> *Schubiner*, 590 B.R. at 399. In the *Schubiner* case itself, for
> example, this Court exercised its discretion to decline to award any
> monetary relief for the defendant's alleged violation of the
> discharge injunction. *See* 590 B.R. at 399-400.

614 B.R. at 273.

In this case, the Court will decline to order any monetary relief against the Respondents

or their attorney. The Court makes this discretionary decision based on the following

considerations.

The Court has found that the Respondents' actions, in filing and prosecuting the claims in

their First Amended Complaint in the State Court Lawsuit, violated the POA injunctions. In the

Court's view, this is clear. But it becomes clear only after one reviews a number of specific

terms of the POA, including the Plan exhibits, in several steps, as the Court has done in Parts

IV.B.1 through IV.B.3 of this Opinion. Getting to the ultimate conclusion is a rather subtle and

complicated exercise.

As described in Part IV.B.2 of this Opinion, it is true that the DFFA's counsel repeatedly

warned Respondents' counsel, before filing the Motion, that the State Court Lawsuit violated the

POA. But those communications to Respondents' counsel did not walk through the specific

analysis to support the ultimate conclusion, in the way this Court has done in this Opinion.

Because it lacked such specific analysis, the argument made by the DFFA's counsel to

Respondents' counsel before filing the Motion was not particularly persuasive. And apparently

the Respondents' counsel did not have much or any prior involvement in, or familiarity with, this

bankruptcy case, and appears to have lacked any familiarity with the detailed POA.

33

A further complication, and a naturally confusing one for the Respondents and their counsel, is that for some time until 2020, the City did not correctly apply the seniority provisions of the 2014 CBA to at least four of the seven Respondents, and possibly to other fire fighters. *See* discussion in Parts II.E and IV.A.4 of this Opinion.

None of these considerations can justify Respondents' taking action that violated the POA's injunctions.  But these are significant mitigating factors in this case, when the Court considers whether to impose monetary relief against the Respondents, who are individuals who are present or former fire fighters for the City.

For these reasons, the Court will grant no monetary relief to the DFFA on its contempt motion.

## V.  Conclusion

For the reasons stated in this Opinion, the Court will enter an order finding each of the Respondents in civil contempt, and ordering the relief described in Part IV.C of this Opinion.

Signed on September 18, 2023



/s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**