# Exhibit 6A - Complaint

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARK CRAIGHEAD,<br><br>     Plaintiff,<br><br>v.<br><br>CITY OF DETROIT, FORMER INVESTIGATOR BARBARA SIMON, FORMER INVESTIGATOR JAMES FISHER, FORMER LIEUTENANT BOB JACKSON, POLYGRAPH OPERATOR ANDREW SIMS, AND OTHER AS-OF-YET-UNKNOWN EMPLOYEES OF THE CITY OF DETROIT,<br><br>     Defendants. | No. |

**COMPLAINT & DEMAND FOR JURY TRIAL**

NOW COMES Plaintiff, MARK CRAIGHEAD, by and through his attorneys, LOEVY & LOEVY, complaining of Defendants CITY OF DETROIT, FORMER INVESTIGATOR BARBARA SIMON, FORMER INVESTIGATOR JAMES FISHER, FORMER LIEUTENANT BOB JACKSON, FORMER POLYGRAPH OPERATOR ANDREW SIMS, and OTHER AS-OF-YET UNKNOWN EMPLOYEES OF THE CITY OF DETROIT, and alleges as follows:

1

## INTRODUCTION

1.      Plaintiff Mark Craighead was convicted of a murder that he did not commit. As a result, Mr. Craighead was forced to spend over seven years wrongfully incarcerated.

2.      Mr. Craighead was 41 years old, gainfully employed, married, and the father to four children when he was falsely arrested for murder. He had no prior criminal history and had never been arrested in his life.

3.      The only evidence used to convict Mr. Craighead came from a false confession coerced by Defendants, including the now notoriously corrupt detective Barbara Simon.

4.      Defendant Simon has now had four murder convictions overturned based on findings that she coerced suspects into making false confessions.

5.      Eventually, Mr. Craighead persevered and was able to obtain a Certificate of Innocence based on employment and telephone records establishing his alibi that he was at work at the time of the murder.

6.      Finally a free man, Mr. Craighead now seeks redress for his years of wrongful incarceration and the shame and damage to his reputation wrought by being falsely branded a murder.

7.      In addition to compensating Mr. Craighead for the years that he spent wrongfully convicted of a murder he did not commit and his attendant loss of

2

freedom, and his continued suffering, this action seeks to remedy Defendant City

of Detroit's unlawful policies, practices, and/or customs of routinely conducting

unlawful interrogations, and of failing to adequately train, supervise, and/or

discipline its officers that led Defendant Officers to violate Mark Craighead's

constitutional and state-law rights.

## JURISDICTION AND VENUE

8.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the

Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and

the laws and Constitution of the State of Michigan.

9.     This Court has jurisdiction over Plaintiff's constitutional claims

pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over any and all state

constitutional and state law claims pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because this is the

judicial district in which the events giving rise to this claim occurred.

## THE PARTIES

11.     Plaintiff Mark Craighead is 64 years old. At the time of his false arrest

in June 2000, Mr. Craighead was employed by Daimler Chrysler and coached

youth football. He was 41 years old, married, and had a 19 year-old daughter, 11

year-old daughter, 5 year-old daughter, and a 2 year-old son. Before his arrest on

3

murder charges, Mr. Craighead had never been arrested and had no criminal history of any kind whatsoever.

12.     At all times relevant hereto, Defendants Simon, Fisher, Jackson, Sims, and other unidentified employees of the Detroit Police Department ("Defendant Officers") were police officers or otherwise employed by the Detroit Police Department. All are sued in their individual capacities and at all times relevant hereto acted under color of regulations, usage, custom, state law and within the scope of their authority and employment, and pursuant to the policies and practices of Defendant CITY OF DETROIT during the investigation and prosecution of the crime at issue.

13.     Defendant CITY OF DETROIT is a Michigan municipal corporation authorized as such by the laws of the State of Michigan, that operates a police department as a part of its responsibilities and services. At all times relevant herein, Defendant CITY OF DETROIT, through and by its policymaking officials, acted under color of regulation, usage, custom, and law and pursuant to its policies and practices, as did all the individual Defendants herein. The City is or was the employer of each of the Defendant Officers at all relevant times.

4

## STATEMENT OF FACTS

### The Crime and Initial Investigation

14.    On June 27, 1997, victim Chole Pruett's body was discovered in an apartment. He had been shot four times in the torso.

15.    On that same day, at 2:35 a.m., a witness reported that a truck was on fire in Redford Township. The truck belonged to Pruett.

16.    As part of the initial investigation in 1997, police questioned over 25 people, including Mr. Craighead.

17.    Mr. Craighead was a friend of Pruett's, and willingly answered questions about Pruett's death.

18.    Mr. Craighead had nothing to hide. At the time of the murder, he was working an overnight shift at a Sam's Club Warehouse. The warehouse was locked during the entirety of his shift; any attempt to open one of the doors would have set off an alarm.

19.    Detroit police investigator Ronald Tate interviewed Mr. Craighead at his home on August 29, 1997, and cleared him from having any responsibility for the crime.

20.    During that interview, Investigator Tate had Mr. Craighead sign a statement.

5

21.     The case went unsolved. On March 18, 1999, Investigator Tate reinterviewed Mr. Craighead and again questioned him at his home. As he did in 1997, Investigator Tate cleared Plaintiff from being a suspect a second time.

22.     In June 2000, however, a new team of investigators took on the case.

23.     On June 20, 2000, Mr. Craighead was home after work, doing some tasks around the house. Then he and his brother Randle went to his wife's beauty salon and then to a football field where Plaintiff would coach youth football.

24.     Upon arriving home around 6 p.m. on June 20, 2000, Mr. Craighead saw two men, later identified as Defendant Lieutenant Jackson and Defendant Investigator Fisher, on his porch.

25.     The men identified themselves as police investigators and said they were looking for Mark Craighead.

26.     When Mr. Craighead identified himself, the investigators said they needed him to come to the police station to answer questions about Pruitt's death.

27.     In response, Mr. Craighead told the investigators that he could not come down to the station that day because he was tired and hungry after working a 10-hour shift.

28.     Mr. Craighead was indeed tired. The night before his encounter with Defendants Jackson and Fisher, Plaintiff slept approximately 3 hours before rising at 3 a.m. to prepare for the day, and then working his 5 a.m. to 3 p.m. shift.

6

29.     After finishing his shift, Mr. Craighead had gone house hunting with his wife until about 9:30 or 10 p.m.

30.     Mr. Craighead asked Defendants Fisher and Jackson if he could come down to the police station the next day after he got off work at 3 p.m.

31.     Defendants Jackson and Fisher told Plaintiff no, that he had no choice but to go to the station with them.

32.     At the time, Defendants had no probable cause whatsoever to suspect Mr. Craighead of involvement in Pruett's murder or any other crime.

33.     Mr. Craighead repeated to Defendants that he was tired after working all day, and that he had not slept much the night before because he and his wife had been house hunting until late.

34.     Mr. Craighead also told the Defendants that he was hungry because he had not eaten since that morning, and that he was dirty from working all day.

35.     Mr. Craighead again offered to the Defendants that he would come down to the station the following day.

36.     Defendant Fisher then told Mr. Craighead that he had no choice but to come to the station for questioning.

37.     Mr. Craighead asked the Defendants if he could go inside to change clothes and make a phone call.

7

38.    The Defendants told Mr. Craighead no, that he could not go inside his house, and positioned themselves to block him from accessing his home from the porch.

39.    Mr. Craighead continued to request that his interview be delayed until the following day because he was tired, hungry, and dirty.

40.    Again, Defendant Fisher instructed Mr. Craighead that he had to come to the station.

41.    Mr. Craighead stated that he wanted to go inside to call his lawyer. The Defendants refused that request.

42.    Mr. Craighead then asked if the questioning could be conducted at his house rather than the police station downtown. He told the Defendants that Investigator Tate had questioned him at his house on both prior occasions.

43.    Defendant Fisher told Mr. Craighead that's the way the old homicide did it, but they are the new homicide and they do things differently, or words to that effect.

44.    Defendant Jackson then told Mr. Craighead he could either ride down with them, or ride down in a patrol car, and radioed for a patrol car to come to Mr. Craighead's house.

45.    Feeling that he had no choice but to accompany the Defendants, Mr. Craighead asked if his brother could come with him.

8

46.    Defendant Fisher stated that Mr. Craighead's brother could ride separately to the station in his own car.

47.    Mr. Craighead then got into the Defendants' car. He was directed to sit in the backseat with Defendant Fisher, while Defendant Jackson drove them to the police station at 1300 Beaubien.

48.    During the ride to the police station, Defendants Fisher and Jackson questioned Mr. Craighead about the Pruett homicide.

49.    These Defendants did not read Mr. Craighead his *Miranda* warnings before questioning him in the car ride about the murder.

50.    When they arrived at the station, Defendants Jackson and Fisher walked Mr. Craighead into the first floor of the police station and allowed Mr. Craighead's brother to follow them inside.

51.    Defendants Jackson and Fisher took Mr. Craighead onto an elevator. When Mr. Craighead's brother tried to accompany them, the Defendants told him that he could not proceed past the first floor, but that Mr. Craighead would not be upstairs for long.

52.    The Defendants took Mr. Craighead to Squad Seven upstairs.

53.    Defendant Fisher directed Plaintiff to sit in a chair next to a desk and began filling out paperwork. During the course of filling out that paperwork,

9

Defendant Fisher asked Mr. Craighead questions about his personal information and his background.

54.    Then Defendant Jackson began questioning Mr. Craighead about the Pruett murder.

55.    Defendant Jackson told Plaintiff that this was a three year-old homicide that they needed to close.

56.    Mr. Craighead asked if he could go home if he wasn't under arrest, or words to that effect.

57.    The Defendants did not allow Mr. Craighead to leave.

58.    Mr. Craighead asked again, asking both to go home as well as to call his attorney and his wife.

59.    The Defendants again did not allow Mr. Craighead to call his attorney or his wife or to leave.

60.    Mr. Craighead then sat at the desk for approximately 30 minutes. While sitting there, Mr. Craighead asked Defendant Jackson if he could leave now.

61.    Defendant Jackson responded that it was Defendant Fisher's case, Defendant Fisher was on the phone, and he would finish with Mr. Craighead when he was off the phone.

62.    Mr. Craighead was moved to an empty desk where he waited until Defendant Simon came to talk to him.

10

63.     Defendant Simon sat down at the unoccupied desk next to
Mr. Craighead and started questioning him.

64.     Up to this point in time, no one (including Defendant Simon) had
provided Plaintiff with his *Miranda* rights.

65.     Mr. Craighead did not respond to Defendant Simon's questions.
Instead, he asked to call his attorney, and to go home, telling her that he had been
told he was not under arrest.

66.     Defendant Simon ignored Mr. Craighead's request for an attorney and
to leave, and continued asking him questions.

67.     When Mr. Craighead invoked his right to silence and did not answer
her questions, Defendant Simon locked Plaintiff in a room in Squad Seven, leaving
him there for approximately two to three hours.

68.     When Mr. Craighead pounded on the door to be released, Defendant
Simon told him that he would not be able to go home or go to work, and that he
would not be allowed a phone call until he started cooperating. Defendant Simon
told him to sit down and shut up.

69.     When Defendant Simon finally released Mr. Craighead from that
room, he informed her that he had a migraine headache, he was tired and hungry,
and his back was hurting. Mr. Craighead asked again to go home.

11

70. Defendant Simon responded by telling him that would not go anywhere until he took a polygraph test. Defendant Simon told Mr. Craighead that she could hold him for three or four days and he would lose his job at Chrysler as a result.

71. At the time, Mr. Craighead had not completed his 90-day probationary period at Chrysler (a program Chrysler implemented for all new employees in Mr. Craighead's role), and feared that she was correct and he would lose his job if he did not appear for work.

72. Defendant Simon told Mr. Craighead that, on the other hand, if he agreed to take the polygraph test, she would release him immediately upon completion of the test.

73. Mr. Craighead said he was not in condition to take a polygraph test, but if he was allowed to sleep he would return the following day and take it.

74. Defendant Simon reiterated that the only way he would be allowed to go home and go to work is if he took the polygraph test that night.

75. As a result of the coercion he had experienced thus far, Mr. Craighead agreed to take the polygraph test so that he could go home.

76. Defendant Simon proceeded to return Mr. Craighead to the same locked room, leaving him there for approximately an hour and a half.

12

77. At approximately 1 a.m. on June 21, Defendant Simon removed Plaintiff from the locked room, handcuffed him, and transported him to a different police facility on Brush Street to take a polygraph test.

78. Once at the polygraph testing facility, Plaintiff was once again left alone in a room while Defendants Simon and Defendant Andrew Sims met alone.

79. Defendant Sims then entered the room where Plaintiff was waiting and questioned Mr. Craighead for about an hour.

80. Defendant Sims then administered the polygraph exam to Mr. Craighead.

81. When the exam ended, Defendant Sims left the room, and then returned to tell Mr. Craighead that polygraph exams are extremely accurate, that juries will believe Defendant Sims's testimony about the polygraph results because he is a licensed polygraph technician, and that polygraph results are admissible in court.

82. Defendant Sims then falsely reported to Mr. Craighead that he had failed the polygraph exam.

83. Defendant Sims then informed Mr. Craighead that the polygraph results would be admissible as evidence against him in the Pruett murder case, and that he needed to talk in order to avoid going to jail for the rest of his life without parole, or words to that effect.

13

84. Mr. Craighead still refused to falsely implicate himself in the crime.

85. Defendant Sims then left, and Defendant Simon returned.

86. Defendant Simon told Mr. Craighead that his wife would find herself a new husband, and that his children would be calling someone else daddy unless he confessed what he had done, or words to that effect.

87. Defendant Simon threatened Mr. Craighead that if he did not confess, he would go to jail for the rest of his life without parole, or words to that effect.

88. In response, Mr. Craighead asked Defendant Simon if she would release him, as she'd promised to do if he took the polygraph test.

89. Defendant Simon laughed, told Mr. Craighead no, and instead handcuffed him and brought him back to 1300 Beaubien.

90. Back downtown, Defendant Simon brought Mr. Craighead to the ninth floor, where he was fingerprinted and placed in a cell.

91. Mr. Craighead remained in that cell, unable to sleep, until approximately 11 a.m. the next day, when Defendant Fisher removed him from his cell.

92. When Defendant Fisher arrived, Plaintiff informed him that he had a bad headache and required medication for it. Mr. Craighead also asked him for his attorney.

14

93. Rather than respond, Defendant Fisher told Mr. Craighead that he heard Plaintiff had failed his polygraph test, and that he should help himself confessing what he had done, or words to that effect.

94. Defendant Fisher brought Mr. Craighead down to Squad Seven and turned him over to Defendant Simon.

95. The actions by Defendants Fisher, Jackson, Simon and Sims to falsely arrest Mr. Craighead, deny him his right to counsel, wrongly incarcerate him, threaten him with life imprisonment, withhold medical treatment, among other tactics, were designed to overbear Plaintiff's will.

96. When Mr. Craighead encountered Defendant Simon a little after 11 a.m. on June 21, he had not received any food during his approximately 17 hours in custody, and he had not slept since the few hours of sleep he had the night of June 19.

97. Defendant Simon brought Mr. Craighead to the same room in Squad Seven that he had been locked inside the day before.

98. When they arrived in that room, Mr. Craighead asked for medicine for his headache, and asked to be able to call his attorney.

99. Defendant Simon refused his requests.

15

100. Defendant Simon told Mr. Craighead that they could prove he killed Pruett, that he would be convicted, and that he would be sent to jail for the rest of his life.

101. Defendant Simon suggested to Mr. Craighead that he had accidentally killed Pruett during an argument that turned into a struggle for a gun and the gun went off. Defendant Simon told Mr. Craighead that if he told her that happened, that it could be considered self-defense, and she could help him by getting the charges reduced to avoid facing a life sentence. She also told him that if he did so, he could bond out and fight the charges outside of jail.

102. Defendant Simon also told him that if Mr. Craighead did not cooperate, she would convict him of murder and he would spend the rest of his life incarcerated.

103. Having had almost no sleep for two days, hungry, and having had his pleas for a lawyer and to leave ignored, Mr. Craighead succumbed to the Defendants' efforts to coerce him to give a false confession. He repeated the scenario suggested to him by Defendant Simon and signed it, hoping that he would be released and he could resolve the situation out of custody.

104. Instead, Plaintiff was charged with murder. He would remain incarcerated for the next seven years.

105. Defendants caused Plaintiff to be charged with murder despite knowing there was no evidence to support the charge.

106. Plaintiff's coerced confession was demonstrably false; the forensic evidence from the scene of Pruett's homicide showed that Pruett was shot multiple times in an execution-style shooting, rather than a single accidental gunshot. Two of the bullets were lodged in the floor beneath the victim, demonstrating that the victim was laying prone on the ground when some of the shots were fired.

107. Moreover, Plaintiff's false confession stated that he struggled with the victim over a gun when the gun accidentally discharged one time, striking the victim. In reality, the victim was shot four times, and none of the shots were fired within two feet of the victim, as would be expected during an accidental firing during a struggle.

108. Plaintiff's confession was devoid of detail and provided no corroboration for the notion that he killed Pruett; nevertheless, it was used to wrongfully convict him.

### Plaintiff's Alibi

109. Plaintiff could not have committed the murder because he was at work at the time Pruett was killed.

110. On the night of June 26, 1997, Plaintiff was working his regular overnight shift at a Sam's Club warehouse.

17

111. Plaintiff worked from either 9 or 10 o'clock at night until 5 or 6 o'clock in the morning.

112. Per Sam's Club's policy, all overnight employees were locked inside the warehouse for the entire shift.

113. Had Mr. Craighead left the warehouse during his shift, an alarm would have sounded at both Wal-Mart headquarters and the Farmington Hills police department.

114. No alarm went off during the night of June 26, 1997 to the morning of June 27, 1997 while Mr. Craighead was there.

115. Phone records also help establish Plaintiff's alibi. During his time at work, he made phone calls from a landline inside the Sam's Club warehouse at 11:01 p.m. and 11:02 p.m. on June 26, 1997, and 12:19 a.m. and 2:27 a.m. on June 27, 1997.

116. The last call from inside the warehouse – at 2:27 a.m. – was placed 8 minutes before Pruett's truck was reported ablaze 30 miles away.

### Defendant Simon's Repeated Misconduct

117. Finally, Defendant City failed to supervise and discipline the Officer Defendants in this matter, including Defendant Simon. Some examples of Defendant Simon's misconduct include:

18

118. Defendant Simon caused Justly Johnson and Kendrick Scott to be wrongfully convicted of the shooting of Lisa Kindred.

119. In 1999, Defendant Simon knew that Johnson and Scott were innocent, but nonetheless threatened two witnesses into implicating them in the murder, ultimately securing their wrongful convictions. First, Simon coerced 16 year-old Antonio Burnette into falsely stating that Johnson and Scott had confessed to the murder. She screamed at Burnette and told him that if he did not provide them with false information about the shooter, they would put the murder on him. Along with another officer, Defendant Simon choked Burnette and threw him around. Burnette, who could not read, eventually agreed to sign a written statement falsely implicating Johnson and Scott. Burnette later recanted, saying he was threatened into providing false inculpatory testimony.

120. Also in 1999, Defendant Simon similarly coerced another witness, Raymond Jackson, a teenager who experienced mental health struggles, into providing false testimony against Johnson and Scott.

121. All told, Defendant Simon caused Johnson and Scott to spend more than 19 years in custody before they were exonerated.

122. Damon Nathaniel spent eight months in jail after Defendant Simon interrogated him for eight hours and then falsely claimed he had confessed to a murder. DNA evidence later proved Nathaniel was innocent of the murder.

19

123. In 1999, Defendant Simon coerced Steven Brown into implicating himself in a shooting, even though he was innocent. Specifically, Brown accused Simon of leaving him in an interrogation room for hours and then writing a false statement on Brown's behalf.

124. In 1996, Defendant Simon was also responsible for Lamarr Monson's wrongful conviction. Defendant Simon interrogated Monson for hours, and eventually wrote out a false statement in which Monson admitted inculpatory information about the murder of Christina Brown, and which omitted Monson's alibi. Monson requested to call his parents to arrange for a lawyer, and Defendant Simon told him he could call them after he signed the statement. Defendant Simon then falsely testified about the circumstances under which Monson provided this statement. Monson spent 20 years wrongfully in prison before being exonerated by forensic evidence.

125. Supervising officers were aware of these unconstitutional practices and showed deliberate indifference to, acquiescence in, and/or approval of them. Specifically, despite committing gross misconduct, Defendant Simon was not disciplined in any way, and thus was encouraged to commit the misconduct that led to Mr. Craighead being coerced into falsely confessing.

## Plaintiff's Conviction and Exoneration

126. Despite his innocence, Mr. Craighead was nonetheless convicted based on fabricated evidence.

127. His false confession was introduced against him.

128. Plaintiff testified in his own defense at trial, but was convicted based on the false evidence.

129. Mr. Craighead spent over seven years incarcerated for manslaughter.

130. He never gave up hope that he would someday be exonerated.

131. Through the work of the Michigan Innocence Clinic, Mr. Craighead was able to present evidence of Defendant Simon's torrid history of misconduct and convinced the criminal court to overturn his conviction.

132. On June 1, 2023, Mr. Craighead was awarded a Certificate of Innocence.

## DAMAGES

133. Defendants' actions deprived Mr. Craighead of his civil rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and his state law rights.

134. Mr. Craighead's liberty was curtailed upon his arrest on June 20, 2000, and continued for the duration of his incarceration until his release from prison.

21

135. Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad faith acts and omissions caused Mr. Craighead to be falsely arrested, tried, wrongfully convicted and incarcerated for over seven years for a crime he did not commit.

136. Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad faith acts and omissions caused Mr. Craighead severe injuries and damages, which continue to date and will continue into the future, for all of which he is entitled monetary relief, including but not limited to:

    a.     Seizure and loss of liberty;

    b.     Personal and physical injuries, including assaults, illness and inadequate medical care;

    c.     Pain and suffering;

    d.     Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e.     Permanent loss of natural psychological development, past and future;

    f.     Loss of family relationships;

    g.     Damage to business and property;

    h.     Legal expenses; and

    i.     Loss of earnings and earning potential.

137. The conduct of Defendants was reckless and outrageous, entitling Plaintiff to an award of punitive damages from any and all the individual

Defendants, herein, as well as costs and reasonable attorney fees, pursuant to 42
U.S.C. §1988.

**COUNT I**
**42 U.S.C. § 1983 – Coerced Confession in Violation**
**of the Fifth Amendment**

138. Plaintiff incorporates each paragraph of this pleading as if fully restated
here.

139.   In the manner described more fully above, the Defendant Officers,
individually, jointly, and in conspiracy with each other, as well as under color of
law and within the scope of their employment, forced Plaintiff to incriminate
himself falsely and against his will, in violation of his rights secured by the Fifth
Amendment.

140.   As described more fully above, the Defendant Officers participated in,
encouraged, advised, and ordered an unconstitutional and unlawful interrogation of
Plaintiff that caused him to make involuntary and false statements implicating
himself in the murder of Chole Pruett.

141.   The coerced, involuntary, false statement the Defendant Officers
fabricated and attributed to Plaintiff was used against him to his detriment in his
criminal case.

142.   The misconduct described in this Count was objectively unreasonable
and was undertaken intentionally, with malice and reckless indifference to the

23

rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

143.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

144.   Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Detroit.

145.   In addition, at all times relevant to the events described in this pleading and for a period of time before those events, Defendant City of Detroit had notice of a widespread practice by officers and agents of the Detroit Police Department under which individuals like Plaintiff who were suspected of criminal activity were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the Detroit Police Department to be subjected to extreme duress and abuse, to falsely confess to committing crimes to which they had no connection and for which there was no probable cause to suggest they were involved.

146.   Specifically, at all relevant times and for a period of time before the events giving rise to this case, there existed a widespread practice among officers, employees, and agents of the Detroit Police Department under which criminal

24

suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (a) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (b) individuals were subjected to actual and threatened physical and psychological violence; (c) individuals were interrogated at length without proper protection of their constitutional right to have an attorney present or to remain silent; (d) individuals were forced to sign false statements fabricated by the police; (e) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (f) supervisors like Defendant Jackson, with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

147. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the Detroit Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques and by failing to adequately

25

punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Plaintiff.

148. The above widespread practices were so well-settled as to constitute *de facto* policy of the Detroit Police Department, and were able to exist and thrive because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

149. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Detroit in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Detroit Police Department.

150. The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confession at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

151. Plaintiff's injuries were caused by officers, agents, and employees of the City of Detroit, including but not limited to the individually named Defendants who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

26

## COUNT II
## 42 U.S.C. § 1983 – Coerced Confession in Violation of the Fourteenth Amendment

152.   Plaintiff incorporates each paragraph of this pleading as if fully restated here.

153.   In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

154.   As described in detail above, the misconduct described in this Count was carried out using extreme techniques of psychological coercion. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

155.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

156.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

27

157.   Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Detroit in the manner more fully described in Count VIII.

## COUNT III—42 U.S.C. § 1983
### Fourteenth Amendment Due Process

158.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here word for word.

159.   As described more fully above, the Defendant Officers, while acting individually, jointly, severally and in conspiracy with one another, as well as under color of law and within the scope of their employment, deliberately, recklessly and/or intentionally deprived Plaintiff of his constitutional clearly established Fourteenth Amendment due process right to fair criminal proceedings by, among other things, fabricating inculpatory evidence and withholding exculpatory and/or impeachment evidence.

160.   Absent the Defendant Officers' violations of Plaintiff's constitutional right to a fair criminal proceeding, the prosecution of Plaintiff could not and would not have been pursued.

161.   The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Detroit, in the manner more fully described below, in Count VIII.

162.   As a direct and proximate result of Defendant Officers' fabrication of false inculpatory evidence, acting pursuant to the customs, policies and/or practices

28

of Defendant City of Detroit, Defendant Officers violated Plaintiff's clearly

established Fourteenth Amendment due process rights, including the right to a fair

trial, Plaintiff was wrongfully convicted and suffered the injuries and damages

described above.

163. Acting with recklessness, deliberate indifference and/or intent, by

withholding material exculpatory and impeachment evidence prior to, during, and

after trial, Defendant Officers, acting pursuant to the customs, policies and/or

practices of Defendant City of Detroit, violated Plaintiff's clearly established

Fourteenth Amendment right to due process of law as announced by the United

States Supreme Court in *Brady v. Maryland* and its progeny, undermining

confidence in the outcome of the trial, and directly and proximately causing

Plaintiff to be wrongfully arrested, prosecuted, convicted and imprisoned, and to

suffer the constitutional violations, injuries and damages described above.

164. As a direct and proximate result of the foregoing actions, Plaintiff has

suffered the following injuries, among others:

a. Unreasonable seizure and loss of liberty;

b. Personal and physical injuries, including assaults, illness and
inadequate medical care;

c. Pain and suffering;

d. Severe mental anguish, emotional and psychological distress,
humiliation, indignities, embarrassment and degradation;

e.   Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f.   Loss of family relationships;

g.   Damage to business and property;

h.   Legal expenses;

i.   Loss of earnings and earning potential; and

j.   Continuing injuries and damages as fully set forth above.

## COUNT IV—42 U.S.C. § 1983
### Fourth and Fourteenth Amendment – Unreasonable Seizure and Illegal Detention and Prosecution

165.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here word for word.

166.   As described more fully above, Defendant Officers, individually, jointly, severally and in conspiracy with one another, as well as under color of law and within the scope of their employment and authority, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate a criminal prosecution against Plaintiff that was lacking in probable cause, unreasonably instituted, by suppressing exculpatory evidence, fabricating false evidence, and failing to adequately investigate the crime, in spite of the fact that they knew Plaintiff was innocent, all in violation of his constitutional rights.

167.   In so doing, the Defendants caused Plaintiff to be deprived of his liberty without probable cause, detained without probable cause, and subjected

30

improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

168.   The prosecution of Plaintiff ultimately terminated in his favor when his conviction was vacated, all charges dismissed, and he was granted a certificate of innocence.

169.   The actions of these Defendants violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

170.   The misconduct described above was undertaken pursuant to the policies and practices of Defendant City of Detroit, in the manner more fully described below in Count VIII.

171.   As a direct and proximate result of the foregoing actions, Plaintiff has suffered the following injuries, among others:

a.   Seizure and loss of liberty, resulting in:

b.   Personal and physical injuries, including assaults, illness and inadequate medical care;

c.   Pain and suffering;

d.   Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e.   Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

31

f.   Loss of family relationships;

g.   Damage to business and property;

h.   Legal expenses;

i.   Loss of earnings and earning potential; and

j.   Continuing injuries and damages as fully set forth above.

## COUNT V—42 U.S.C. § 1983
### Failure to Intervene

172.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

173.   In the manner described more fully above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity and duty to do so.

174.   The Defendant Officers' actions and omissions in the face of a constitutional duty to intervene were the direct and proximate cause of Plaintiff's constitutional violations and injuries, including but not limited to loss of liberty, physical harm and emotional distress.

175.   The actions of these Defendants violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and

32

thereby caused his wrongful conviction and the injuries and damages set forth above.

176. The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Detroit, in the manner more fully described below in Count VIII.

177. As a direct and proximate result of the foregoing actions, Plaintiff has suffered the following injuries, among others:

a. Seizure and loss of liberty, resulting in:

b. Restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, movement, educational opportunities, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression;

c. Personal and physical injuries, including assaults, illness and inadequate medical care;

d. Pain and suffering;

e. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

f. Permanent loss of natural psychological development, past and future;

g. Loss of family relationships;

h. Damage to business and property;

i. Legal expenses;

j. Loss of earnings and earning potential; and

k. Continuing injuries and damages as fully set forth above.

33

## COUNT VI—42 U.S.C. § 1983
### Supervisor Liability

178.   Supervisory Defendant Jackson was the officer in charge of the investigation and prosecution of Plaintiff. Defendant Jackson was the supervisor of the homicide unit overseeing this case.

179.   Supervisory Defendant Jackson gave direct orders causing the violation of Plaintiff's constitutional rights and/or encouraged or knowingly approved of the actions of other officers under his authority in his actions that violated the constitutional rights of Plaintiff, to wit:

   a.   He directed and/or approved of Plaintiff's arrest without probable cause;

   b.   He directed and/or approved of Plaintiff's continued detention without probable cause in order to coerce Plaintiff to falsely confess;

   c.   He directed and/or approved of Defendant Sim's fabricated polygraph result; and

   d.   He directed and/or approved of the false promises and threats used by Defendants to coerce Plaintiff to falsely confess to murder.

180.   The actions of Defendant Jackson violated Plaintiff's clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable seizure, to have a fair trial, and to not be compelled to testify against himself, and thereby caused his wrongful conviction and the injuries and damages set forth above.

34

181. As a direct and proximate result of the foregoing actions, Plaintiff has suffered the following injuries, among others:

a. Unreasonable seizure and loss of liberty;

b. Personal and physical injuries, including assaults, illness and inadequate medical care;

c. Pain and suffering;

d. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e. Permanent loss of natural psychological development, past and future;

f. Loss of family relationships;

g. Damage to business and property;

h. Legal expenses;

i. Loss of earnings and earning potential; and

J. Continuing injuries and damages as fully set forth above.

### COUNT VII—42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

182. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

183. After Pruett's murder, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process, all as described in the various paragraphs of this Complaint.

35

184. In this manner, the Defendant Officers, acting in concert with other unknown coconspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

185. In furtherance of the conspiracy, each of the coconspirators engaged in and facilitated overt acts, including but not limited to those set forth above—such as fabricating and withholding evidence—and was an otherwise willful participant in joint activity.

186. As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

187. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

188. The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Detroit, in the manner more fully described below in Count VIII.

## COUNT VIII—42 U.S.C. §1983
## Municipal Liability Under *Monell*

189. Plaintiff incorporates each paragraph of this Complaint as if fully restated here word for word.

190.   Defendant City of Detroit, acting through its top officials,

policymakers and the Detroit Police Department (DPD), authorized, sponsored,

approved, and ratified actions by Detroit Police Department officers, supervisors

and investigators during the course of their law enforcement actions conducted

within the scope of their respective authority and under color of law.

191.   At all relevant times hereto, Defendant City, acting through its top

officials, policymakers and the Detroit Police Department (DPD), did enable,

ratify, condone, tolerate, approve, and ratify actions that constituted improper,

flawed, erroneous and inappropriate police investigative methods, which were a

moving force in the violation of the constitutional rights of citizens, including

Plaintiff.

192.   Those improper, flawed, erroneous and inappropriate police

investigative methods constituted customs, policies and practices, which included

but were not limited to the following:

a.   An unwritten yet widespread practice of arresting and coercing suspects
through undisclosed threats and false promises to coerce false confessions;

b.   An unwritten yet widespread practice of arresting and intimidating
material witnesses to obtain fabricated inculpatory evidence or falsely undermine
exculpatory evidence;

c.   An unwritten yet widespread practice of withholding exculpatory
materials or information from criminal defendants;

d.   Failure to supervise, train and/or discipline law enforcement officers,
including but not limited to the individually named Defendant officers herein,
regarding the proper use of jailhouse informants, including failure to provide

37

practices for ensuring truthful and accurate testimony; at all times relevant hereto City policymakers knew that this lack of supervision and discipline would likely promote and/or condone the use of fabricated evidence from jailhouse informants and while said officers, and DPD officers knew that regardless of their improper use of jailhouse informants, there would be no reprisal by way of discipline, termination, criticism, or otherwise, thereby guaranteeing the continuation of such unconstitutional actions by Detroit police officers, including Defendants herein; and

e.   Failure to supervise, train and/or discipline law enforcement officers, including but not limited to the individually named Defendant officers herein, with regard to withholding exculpatory materials or information from criminal defendants, while at all times knowing that this lack of supervision and/or discipline would likely promote and/or condone the withholding of exculpatory materials or information where said officers, and other DPD officers, knew that regardless of their withholding of exculpatory materials or information, there would be no accountability by way of supervision, discipline, retraining, counselling, termination, criticism, or otherwise, thereby guaranteeing the continuation of such unconstitutional actions with impunity by Detroit police officers, including Defendants herein; and

f.   Condoning, approving, ratifying, and acquiescing in known unconstitutional conduct, and known patterns of unconstitutional conduct, undertaken by its officers, including the Defendant Officers herein, and its supervisors, thereby adopting said conduct as policy of Defendant City through the DPD.

193.   In particular, Defendant City, acting through its Police Department, supervisors and/or policymakers, was on actual notice that the Defendant Officers had histories of fabricating inculpatory evidence and withholding exculpatory evidence and deliberately and as a matter of policy failed to investigate, discipline, supervise and/or retrain said Defendants, thereby condoning and/or acquiescing in their unconstitutional actions and causing the false arrest, unlawful prosecution, wrongful conviction and wrongful imprisonment of Plaintiff.

38

194. Each of the aforementioned policies and/or practices were known to Defendant City as being highly likely and probable to cause violations of the constitutional rights of criminal defendants, including but not limited to Plaintiff.

195. The conduct of the individually named Defendants herein was committed pursuant to the policies and/or practices of Defendant City.

196. Each such policy and/or practice, referenced above, was a moving force in the violations of Plaintiff's constitutional rights, as set forth herein.

197. As a direct and proximate result of the foregoing actions, Plaintiff has suffered the following injuries, among others:

   a. Seizure and loss of liberty;

   b. Personal and physical injuries, including assaults, illness and inadequate medical care;

   c. Pain and suffering;

   d. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

   e. Permanent loss of natural psychological development, past and future;

   f. Loss of family relationships;

   g. Damage to business and property;

   h. Legal expenses;

   i. Loss of earnings and earning potential; and

   j. Continuing injuries and damages as fully set forth above.

39

## COUNT IX—State Law Claim
## Malicious Prosecution

198. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

199. In the manner described more fully above, the Defendant Officers individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, caused a criminal proceeding against Plaintiff to be commenced or continued.

200. The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings without any probable cause for doing so.

201. The Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

202. Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that those statements were false and perjured. The Defendant Officers were aware that, as alleged more fully above, no true or reliable evidence implicated Plaintiff in the Pruett murder, and all inculpatory evidence was coerced or fabricated. Furthermore, the Defendant Officers intentionally withheld from and misrepresented to prosecutors facts that

40

further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence that would have led to the actual perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

203.  The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

204.  The charges against Plaintiff were terminated in his favor.

205.  As a direct and proximate result of the foregoing actions, Plaintiff has suffered the following injuries, among others:

    a.    Seizure and loss of liberty;

    b.    Personal and physical injuries, including assaults, illness and inadequate medical care;

    c.    Pain and suffering;

    d.    Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e.    Permanent loss of natural psychological development, past and future;

    f.    Loss of family relationships;

    g.    Damage to business and property;

    h.    Legal expenses;

    i.    Loss of earnings and earning potential; and

    j.    Continuing injuries and damages as fully set forth above.

## COUNT X—State Law Claim
## Civil Conspiracy

206. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

207. As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown coconspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

208. In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff.

209. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

210. As a direct and proximate result of the foregoing actions, Plaintiff has suffered the following injuries, among others:

a. Seizure and loss of liberty;

b. Personal and physical injuries, including assaults, illness and inadequate medical care;

c. Pain and suffering;

d. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e. Permanent loss of natural psychological development, past and future;

42

f.     Loss of family relationships;

g.    Damage to business and property;

h.    Legal expenses;

i.     Loss of earnings and earning potential; and

j.     Continuing injuries and damages as fully set forth above.

WHEREFORE, Plaintiff MARK CRAIGHEAD, respectfully requests that this Court enter a judgment in his favor and against Defendants FORMER INVESTIGATOR BARBARA SIMON, FORMER INVESTIGATOR JAMES FISHER, FORMER LIEUTENANT BOB JACKSON, FORMER POLYGRAPH OPERATOR ANDREW SIMS, as-yet UNKNOWN OFFICERS OF THE DETROIT POLICE DEPARTMENT, and the CITY OF DETROIT awarding: (a) compensatory damages, attorneys' fees and costs against each Defendant, jointly and severally; (b) punitive damages against each of the Defendant Officers because they acted willfully, wantonly, and/or maliciously; and (d) any other relief this Court deems just and appropriate.

43

## JURY DEMAND

Plaintiff, MARK CRAIGHEAD, hereby demands a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: August 31, 2023

Respectfully submitted,

MARK CRAIGHEAD

By: /s/Megan Pierce
*One of Plaintiff's Attorneys*

Jon Loevy
Arthur Loevy
Megan Pierce
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
megan@loevy.com

44